UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,
Plaintiff/Defendant-in-Counterclaim

v.

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.,
Defendant.

and

CSFB 1999 – C1 ROYALL STREET, LLC
Defendant/Plaintiff-in-Counterclaim

and

WILLIAM LANGELIER and GERALD FINEBERG,
Defendants-in-Counterclaim

Civil Action No. 05-CV-10506 (WGY)

**ASSENTED TO MOTION OF BLUE HILLS OFFICE PARK LLC TO DISMISS DEFENDANT CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. WITHOUT PREJUDICE AND FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT TO SUBSTITUTE J.P. MORGAN CHASE BANK, AS TRUSTEE, AS DEFENDANT**

Plaintiff Blue Hills Office Park LLC ("Blue Hills") requests this Court to dismiss Defendant Credit Suisse First Boston Mortgage Securities Corp. ("CS Bank") without prejudice and moves, pursuant to Fed. R. Civ. P. 15(a), for leave to file the Second Amended Complaint. The proposed Second Amended Complaint is attached hereto as Exhibit "A." The Second Amended Complaint substitutes J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 ("J.P. Morgan") as defendant. In support of this Motion, Blue Hills avers and asserts as follows:

1.     On or about September 14, 1999, Blue Hills, as borrower, and Credit Suisse First Boston Mortgage Capital LLC, as lender, entered into a loan for $33.5 million (the "Loan") to be secured by a mortgage on Blue Hills' property located at 150 Royall Street, Canton, Massachusetts and known as the Blue Hills Office Park (the "Property").

2.     J.P. Morgan, formerly The Chase Manhattan Bank, was assigned all of Credit Suisse First Boston Mortgage Capital, LLC's ("Credit Suisse First Boston") rights, title, interest and obligations in the Mortgage Agreement, Cash Management Agreement and Mortgage Note and other related loan and security documents (collectively, the "Mortgage Loan Documents") in or about March 2000, by assignment recorded in the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, Page 387.

3.     Blue Hills initially named CS Bank as a defendant and alleged that CS Bank was the holder of the Mortgagee's interest until in or about November 2004.  In the course of discovery, Blue Hills has become aware that 1) CS Bank's role was as the Depositor in the creation of the mortgage-backed securities pool of which the Loan is a part; and 2) JP Morgan was the record holder of the Mortgagee's interest from April 20, 2000 until November 10, 2004. As Blue Hills' claims relate to events after April 2000, the proper defendant should be J.P. Morgan, as Trustee, rather than CS Bank as the Depositor.

4.     A party may amend its pleading after an opponent has responded to the original pleading either by leave of court or by written consent of the adverse party.  Fed. R. Civ. P. 15(a).  In fact, "leave shall be freely given when justice so requires."  *Id.*  In this case, Blue Hills has made numerous allegations against CS Bank, which is not the proper party in interest with respect to those claims.  The substitution of J.P. Morgan will allow Blue Hills' claims to go forward against the proper party.

5. Defendants have assented to the motion and to the filing of the Second Amended Complaint. Blue Hills understands that counsel for the present defendants will also be counsel for the party to be added, J.P. Morgan. Blue Hills requests that Local Rule 15.1(B) be deemed satisfied by previous communications between counsel regarding this substitution, which have on-going for longer than 10 days, and defendants have assented to this request.

WHEREFORE, Blue Hills requests that the Court enter an order:

1. Dismissing Defendant Credit Suisse First Boston Mortgage Corp. *without prejudice*;

2. Granting Blue Hills leave to file the Second Amended Complaint; and

3. Providing such other and further relief as is just and proper.

BLUE HILLS OFFICE PARK LLC
By its attorneys,

/s/ Meredith A. Swisher
Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

ASSENTED TO BY:

Attorneys for Defendants,

/s/ Bruce S. Barnett
E. Randolph Tucker (BBO# 503845)
Bruce E. Falby (BBO# 544143)
Bruce S. Barnett (BBO# 647666)
DLA Piper Rudnick Gray Cary US LLP
One International Place, 21st Floor
Boston, MA 02110-2613
Telephone: 617-406-6000

Dated: November 11, 2005
#326495 v2/14500/9985

CERTIFICATE REGARD LOCAL RULE 15.1(B)

For the reasons stated in Paragraph 5 of the motion, the undersigned requests that Local Rule 15.1(B) be deemed satisfied with respect to the motion to amend the pleading to add a new party.

/s/ Meredith A. Swisher
Meredith A. Swisher, Esq.

#326495 v2/14500/9985

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,
Plaintiff/Defendant-in-Counterclaim

v.

J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1,
Defendant

and CSFB 1999 – C1 ROYALL STREET, LLC,
Defendant/Plaintiff-in-Counterclaim

and

WILLIAM LANGELIER and GERALD FINEBERG,
Defendants-in-Counterclaim

Civil Action No. 05-CV-10506 (WGY)

# SECOND AMENDED COMPLAINT

## I. INTRODUCTION

By this action, plaintiff Blue Hills Office Park LLC ("Blue Hills") seeks, *inter alia,* (i) damages for the defendants' several breaches of a, *inter alia*, Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage Agreement"), a Cash Management Agreement and a Mortgage Note all dated September 14, 1999; (ii) damages for the defendants' several breaches of the covenant of good faith and fair dealing; and (iii) compensatory and punitive damages under the provisions of G.L. c. 93A, §§1, 2 and 11.

## II. PARTIES

### Plaintiff

1. Plaintiff Blue Hills is a Delaware limited liability company with a principal place of business at One Washington Street, Suite 400, Wellesley, Massachusetts 02481.

### Defendants

#### J.P. Morgan

2. Defendant J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 ("J.P. Morgan"), is, upon information and belief, a New York banking corporation with a principal place of business at New York, New York and a mailing address of c/o Lennar Partners, Inc., 1601 Washington Avenue, Suite 700, Miami Beach, FL 33139. Upon further information and belief, J.P. Morgan, formerly The Chase Manhattan Bank, was assigned all of Credit Suisse First Boston Mortgage Capital, LLC's ("Credit Suisse First Boston") rights, title, interest and obligations in the Mortgage Agreement, Cash Management Agreement and Mortgage Note and other related loan and security documents (collectively, the "Mortgage Loan Documents") in or about March 2000, by assignment recorded in the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, Page 387.

#### CSFB

3. Defendant CSFB 1999-C1 Royall Street, LLC ("CSFB") is, upon information and belief, a Delaware limited liability company with a principal place of business at 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139. Upon further information and belief, on or about November 8, 2004, all of J.P. Morgan's rights, title interest and obligations in

the Mortgage Loan Documents were assigned to CSFB by assignment recorded in Norfolk Registry of Deeds on November 10, 2004 in Book 21755, Page 477.

## III. JURISDICTION AND VENUE

4. Jurisdiction is predicated upon the provisions of 28 U.S.C. §1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

## IV. FACTUAL BACKGROUND

**Blue Hills Applies to Credit Suisse First Boston for Mortgage Financing**

5. On or about August, 1999, Blue Hills as the borrower and Credit Suisse First Boston agreed upon the general terms and conditions under which Credit Suisse First Boston, as the lender would, subject to Credit Suisse First Boston investment committee's final approval, loan $33.5 million in mortgage financing to Blue Hills to be secured by a mortgage on Blue Hills' property located at 150 Royall Street, Canton, Massachusetts and known as the Blue Hills Office Park (the "Property").

6. The Property consists of a two-story brick building containing approximately 275,000 square feet of space.

7. The general terms and conditions of the contemplated mortgage financing were summarized in two separate documents as follows:

- Mortgage Financing Application dated July 20, 1999 between Blue Hills and Credit Suisse First Boston, together with a term sheet which was incorporated into and made a part of the Mortgage Financing Application, copies of which are attached hereto as Exhibit "A"; and,
- Letter dated August 31, 1999 from David L. Doyle to Joseph Rubino at Credit Suisse First Boston, a copy of which is attached hereto as Exhibit "B."

(The Mortgage Financing Application and the attached term sheet and the August 31, 1999 letter are collectively referred to as the "Term Sheet.")

8.     As of August, 1999, the Property's sole tenant was an affiliate of the Bank of Boston known as Boston Equiserve Limited Partnership ("Equiserve") which had a lease with Blue Hills set to expire on July 31, 2004 (the "Equiserve Lease").

9.     As of August, 1999, if the Equiserve Lease were not renewed, the Property would require the infusion of substantial funds to reconfigure the Property for multiple tenant use and for tenant improvements, upgrades, lease commissions and cash reserves to address the possibility that the Equiserve Lease would not be renewed.

10.     Accordingly, Credit Suisse First Boston required and Blue Hills agreed to a so-called "hard lock box" arrangement pursuant to which rents were to be deposited directly into an account controlled by Credit Suisse First Boston, the net proceeds of which, if any, after deducting debt service payments, escrow and agreed upon reserve deposits and current Property expenses, would be remitted without restriction to Blue Hills.

11.     In addition, Credit Suisse First Boston and Blue Hills agreed that the various required reserve deposits could be accessed by Blue Hills in the event that the Equiserve Lease was not renewed.

12.     Blue Hills entered the above-described arrangement in reliance upon the foregoing provisions regarding the application and distribution of funds deposited into the "hard lock box" adverted to above.

13.     Credit Suisse First Boston also required, as a condition of its mortgage financing to Blue Hills, that Blue Hills would be precluded from having any additional secured or unsecured indebtedness, other than unsecured trade payables in the ordinary course.

14.     Accordingly, it was essential that Blue Hills have access to the reserve deposits described above in order to meet its monthly debt service under the Note and to pay for, *inter*

*alia*, tenant improvements and leasing commissions in the event the Equiserve Lease was not renewed.

**Blue Hills and Credit Suisse First Boston Execute the Mortgage Agreement, Cash Management Agreement and Note**

15. On or about September 14, 1999, Blue Hills executed the Mortgage Agreement, a copy of which is attached hereto as Exhibit "C," and a Mortgage Note (the "Note"), a copy of which is attached hereto as Exhibit "D."

16. The terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note.

17. In addition, on or about September 14, 1999, Blue Hills, Credit Suisse First Boston and Fineberg Management, Inc., as the Property's manager, entered into a Cash Management Agreement (the "Cash Management Agreement"), a copy of which is attached hereto as Exhibit "E."

18. Under the Cash Management Agreement and the Note, Blue Hills was obligated to deposit into a "Clearing Account" as specified in the Cash Management Agreement (the "Clearing Account") all of the rents that it received in connection with the Equiserve Lease.

19. The Cash Management Agreement also stipulated that the funds deposited into the Clearing Account were then transferred to a Credit Suisse First Boston controlled Cash Collateral Account at a bank referred to in the Cash Management Agreement as the "Deposit Bank" and thereafter divided into nine separate sub-accounts ("Sub-accounts") maintained on a ledger entry basis.

20. In general, paragraph 8 of the Note, Section 2 of the Cash Management Agreement and paragraph 6 of the Mortgage Agreement prescribed the manner, timing and the

amounts which Credit Suisse First Boston, J.P. Morgan and CSFB were required to allocate to and pay amounts from the various Sub-accounts.

21. The amounts deposited in the Cash Collateral Account were required to be allocated among the Sub-accounts by Credit Suisse First Boston, J.P. Morgan and CSFB in the order of priority set forth in paragraph 8(a) of the Note.

22. The Cash Management Agreement deemed Blue Hills' payment obligations to Credit Suisse First Boston, J.P. Morgan and CSFB satisfied to the extent of funds received by the Deposit Bank.

23. Paragraph 6 of the Mortgage Agreement also prescribed Credit Suisse First Boston's, J.P. Morgan's and CSFB's Sub-account disbursement obligations to, *inter alia*, the taxing authorities, insurance providers and to Blue Hills.

24. Section 2 of the Cash Management Agreement obligated Credit Suisse First Boston, J.P. Morgan and CSFB to make disbursements out of Sub-accounts in accordance with its terms and the terms of the Mortgage Agreement.

**<u>Wells Fargo Becomes Servicer of the Mortgage Loan Documents</u>**

25. Upon information and belief, in or about November 1999, Wells Fargo National Association ("Wells Fargo") became the Servicer of the Mortgage Loan Documents.

26. As Servicer of the Mortgage Loan Documents, Wells Fargo became obligated to service and administer them in accordance with applicable law, the terms of the Mortgage Loan Documents and, *inter alia*, in accordance with the higher of the care, skill, prudence and diligence which Wells Fargo would exercise in administering similar loans for third parties or, for similar loans owned by Wells Fargo.

27. As Servicer of the Mortgage Loan Documents, Wells Fargo was the defendants' agent and became obligated to perform all obligations of the holder of the Mortgage Loan Documents and to exercise all rights and remedies thereunder in accordance with the standards and provisions described in the preceding paragraph.

28. Upon information and belief, at all times relevant and material hereto, Wells Fargo was an agent of J.P. Morgan and/or CFSB.

**The Defendants' and Blue Hills' Rights and Obligations With Respect to the Cash Collateral Accounts**

29. Paragraph 6(a) of the Mortgage Agreement obligated Blue Hills to pay Credit Suisse First Boston, J.P. Morgan and CSFB specified amounts for real estate taxes and insurance premiums which would be then allocated by Credit Suisse First Boston into the "Tax and Insurance Impound Fund" (the "Tax Fund Sub-account").

30. Paragraph 6(a) provides in relevant part as follows:

> Mortgagor shall pay to Mortgagee on the eleventh day of each calendar month (a) one-twelfth of the Taxes that Mortgagee estimates will be payable during the next ensuing twelve (12) months (provided, however, that, for so long as the Bank of Boston Lease shall be in full force and effect and shall permit The Bank of Boston to reimburse Mortgagor for such Taxes on a quarterly basis, Mortgagor may pay to Mortgagee, on a quarterly basis, one-quarter of such Taxes commencing on the eleventh day of November, 1999 and on the eleventh day of each third calendar month thereafter) in order to accumulate with Mortgagee sufficient funds to pay all such Taxes at least ten (10) days prior to their respective due dates, and . . .
>
> If at any time Mortgagee determines that the [Tax Fund Sub-account] is not or will not be sufficient to pay the items set forth in (a) and (b) above, Mortgagee shall notify Mortgagor of such determination and Mortgagor shall increase its monthly payments to Mortgagee by the amount that Mortgagee estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or expiration of the Policies, as the case may be.

31.     Additionally, under the Note, the Tax Fund Sub-account was the Sub-account holding first priority among all nine Sub-accounts.

32.     Accordingly, Credit Suisse First Boston, J.P. Morgan and CSFB were obligated under paragraph 8(a) of the Note to allocate monies to the Tax Fund, on a first priority basis, from money deposited in the Cash Collateral Account:

> until the amount on deposit therein is equal to the amount required to be deposited in the [Tax Fund Sub-account] on the related Payment Date in accordance with the terms and conditions of the Mortgage [Agreement];

33.     Out of the Tax Fund Sub-Account, Credit Suisse First Boston, J.P. Morgan and CSFB were obligated to make payments of taxes and insurance premiums to the appropriate parties for the Property's real estate taxes and insurance.

34.     Beginning after November, 1999 and continuing into 2004, Blue Hills deposited into the Clearing Account the requisite real estate tax amounts.

35.     Paragraph 6(c)(ix) of the Mortgage Agreement obligated Credit Suisse First Boston, J.P. Morgan and CSFB to disburse to Blue Hills from time to time upon Blue Hills' request amounts from specific Sub-accounts (which are identified in the Mortgage Agreement as the "Leasing Escrow Funds" (the "Leasing Funds Sub-accounts") certain funds in excess of $2,750,000 to be used "solely toward payment or principal and interest then due and payable on the Note," provided that, *inter alia*, no event of default had occurred at the time the disbursement request was made and that net operating income for the Property was insufficient to pay principal and interest due and payable on the promissory note."

36. Paragraph 6(c)(ix) of the Mortgage Agreement provides, in pertinent part, as follows:

> From time to time (but not more frequently than once in any thirty (30) day period), from and after the first time when the aggregate amount on deposit in the [Leasing Funds Sub-accounts] equals or exceeds $2,750,000, Mortgagee shall disburse to Mortgagor from the [Leasing Funds Sub-accounts] amounts aggregating up to the Interim Reduction Amount (as hereinafter defined), for application solely toward payment of principal an interest then due and payable on the Note, upon satisfaction of the following conditions precedent:
>
> (a) Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement (each an "Interim Reduction Date"), a written request for such disbursement;
>
> (b) no Event of Default hereunder shall have occurred and be continuing as of the date of the request for such disbursement and on the Interim Reduction Date;
>
> (c) the Benchmark Reduction Date shall not have occurred as of the Interim Reduction Date;
>
> (d) Net Operating Income (excluding interest on credit accounts) for the then-current debt service period is insufficient to pay principal and interest due and payable on the Note after application toward all contributions to the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Leasing Escrow Funds and any other reserves required to be funded and other payments required to be made under the Loan Documents;

37. As of August 2, 2004, Blue Hills had, upon information and belief, approximately $4 million in the various Sub-accounts.

**Blue Hills Notifies Wells Fargo That Equiserve Is Not Renewing**
**the Equiserve Lease and Requests the Opportunity to Meet**

38. By late summer 2003, Equiserve notified Blue Hills that it would not be exercising its option to renew the Equiserve Lease. This information was then communicated to either or both of the defendants, through their agent, Wells Fargo.

39. In order to determine a reasonable approach to re-leasing the Property, Blue Hills engaged Cushman and Wakefield in late 2003 as Blue Hills' exclusive leasing agent to actively market the Property.

40. After Cushman and Wakefield's initial leasing efforts, which included initial showings to tenant prospects, it became apparent to Blue Hills that, because of the down turn in the real estate market coupled with a reduced number of tenants seeking larger blocks of rental space, Blue Hills would require substantial sums of money to upgrade the Property's infrastructure and to make tenant improvements; the very contingency anticipated when the Term Sheet was executed.

41. During the same time period, Blue Hills communicated with Wells Fargo, the defendants' agent, to advise Wells Fargo of its efforts and its difficulties as aforementioned.

42. In early 2004, Blue Hills again contacted Wells Fargo to confirm that Equiserve would not be renewing the Equiserve Lease; thus requiring Blue Hills to arrange access to funds in the Sub-accounts to enable Blue Hills to attract viable tenant prospects.

**Wells Fargo Provides Repeated Assurances That It Will**
**Respond Positively to Blue Hills**

43. Representatives of Wells Fargo assured Blue Hills during the foregoing time periods that they would be responsive to Blue Hills' requests, including scheduling a meeting

with Blue Hills to address Property marketing costs and to discuss the process to be followed by Blue Hills to access the funds in Sub-accounts.

**Wells Fargo's Dilatory Efforts and Its Failure to Meet with Blue Hills**

44. Despite such assurances, Wells Fargo failed to schedule any meetings or even to discuss Blue Hills' access to the funds in the Sub-accounts.

45. Wells Fargo representatives' responses to Blue Hills' repeated inquiries were that they were still trying to locate the proper people to respond to Blue Hills' requests.

46. In or about June, 2004 – two months before the Equiserve Lease was set to expire and nearly six months after Blue Hills first requested Wells Fargo's assistance – Wells Fargo informed Blue Hills that it was considering if the Special Servicer for the Mortgage Loan Documents, Lennar Partners, Inc. ("Lennar"), and not Wells Fargo, would be the proper party to meet with Blue Hills and properly respond to Blue Hills' requests.

47. For over six months, Wells Fargo promised, but failed to locate, a representative with authority to address Blue Hills' requests regarding, *inter alia*, re-leasing of the Property and the procedures for accessing the funds in the Sub-accounts.

48. While discussions were on-going between Blue Hills and Wells Fargo as described in the preceding paragraphs, by letter dated July 16, 2004, a copy of which is attached hereto as Exhibit "F," Wells Fargo advised Blue Hills that the Tax Fund had insufficient funds to pay the first installment of taxes to the Town of Canton for 2004 and requested Blue Hills to pay to Wells Fargo the sum of $158,181.19.

49. Wells Fargo's July 16, 2004 letter demanded that the aforementioned funds must be received by Wells Fargo 11 days later.

50.    Wells Fargo's July 16, 2004 letter did not provide Blue Hills with adequate notice such that it would have 30 days prior to any tax delinquency to make the real estate tax payments or deposit.

51.    Additionally, Wells Fargo demanded that payment be made directly to it as opposed to the "Clearing Bank" as designated in the Cash Management Agreement.

**The Equiserve Lease Expires and Blue Hills Requests Wells Fargo
To Make Disbursements from the Sub-accounts**

52.    Equiserve vacated the Property on July 31, 2004 and as no replacement tenant had been found, Equiserve's departure left the Property vacant.

53.    With the expiration of the Equiserve Lease, Blue Hills had no rental income to pay the debt service and other Property obligations under the Mortgage Loan Documents; the very condition of which Credit Suisse First Boston and Blue Hills considered and addressed in the Term Sheet, the Mortgage Agreement, Note and the Cash Management Agreement.

54.    By letter dated August 2, 2004 to Wells Fargo, Blue Hills requested a disbursement from the Sub-accounts to pay principal and interest due on the Note for the month of August, 2004, as well as money to pay real estate taxes. A copy of Blue Hills' letter is attached hereto as Exhibit "G."

55.    Thereafter, by letter dated August 5, 2004, Blue Hills again contacted Wells Fargo and notified it that, in fact, Equiserve had vacated the Property and that no replacement tenant had been found. Blue Hills also requested a meeting with Wells Fargo to discuss the status of and the future performance of the loan. In addition, Blue Hills requested that Lennar attend the meeting as well. A copy of the August 5, 2004 letter is attached hereto as Exhibit "H."

56. Wells Fargo failed and refused to make any distributions to Blue Hills pursuant to Blue Hills' letter to Wells Fargo dated August 2, 2004 despite having an obligation to do so under the Mortgage Loan Documents.

57. On September 2, 2004, Blue Hills again wrote to Wells Fargo and requested a distribution out of the Sub-accounts of $254,652.24 to pay principal and interest on the Note for the month of September, 2004. A copy of this letter is attached hereto as Exhibit "I."

58. Wells Fargo failed and refused to make any distributions to Blue Hills pursuant to Blue Hills' letter to Wells Fargo dated September 2, 2004 despite having an obligation under the Mortgage Agreement to disburse principal and interest payments then due under the Note.

**Wells Fargo Fails To Respond and Blue Hills Is Forced to Contact Lennar**

59. As a result of Wells Fargo's failure to timely locate a representative to address Blue Hills' urgent requests, Blue Hills conducted its own investigation as to who could be responsive to Blue Hills' requests.

60. As a result, Blue Hills contacted a representative of Lennar who suggested the content of a letter which, if sent by Blue Hills to Wells Fargo, could redirect Blue Hills' files to Lennar who would thereafter respond to Blue Hills.

61. Upon information and belief, Lennar was the "Special Servicer" of certain loans originated by Credit Suisse First Boston including, without limitation, the mortgage loan to Blue Hills evidenced by the Mortgage Loan Documents.

62. Upon information and belief, at all times relevant and material hereto, as "Special Servicer," Lennar was an agent of J.P. Morgan and CSFB.

63. Upon information and belief, as "Special Servicer," Lennar was obligated to service and administer the Mortgage Loan Documents in accordance with their provisions, all

applicable laws and in the same manner in which, and with the same care, skill, prudence and diligence as to which Wells Fargo, as Servicer, was required to adhere.

64. Blue Hills' files were apparently not transferred by Wells Fargo to Lennar until on or about August 19, 2004 as evidenced by Lennar's letter to Blue Hills dated August 19, 2004, a copy of which is attached hereto as Exhibit "J."

**Lennar, Like Wells Fargo, Promises a Positive Response to Blue Hills**

65. On August 19, 2004, Lennar wrote to Blue Hills to notify it that servicing responsibilities of the Mortgage Agreement had been transferred to Lennar as the Special Servicer and that Lennar looked forward to a "successful working relationship" with Blue Hills.

66. That same day, Lennar sent Blue Hills another letter dated August 19, 2004 informing Blue Hills that Lennar had the authority to meet with Blue Hills to review the status of the Note and "any issues arising under [the loan documents]." A copy of the second August 19, 2004 letter is attached hereto as Exhibit "K."

67. In Lennar's August 19, 2004 letter, Lennar advised Blue Hills that in order to "properly evaluate" Blue Hills' request, Blue Hills was requested to forward to Lennar all of the information set out in Exhibit "A" attached to Lennar's August 19, 2004 letter.

68. Blue Hills promptly complied with the document requests contained in Lennar's August 19, 2004 letter.

69. Based upon Blue Hills' communications with Lennar, Blue Hills had a reasonable expectation that a meeting would be scheduled and that Lennar would work with Blue Hills in formulating a plan with Blue Hills to re-lease the Property and would release funds from the Sub-accounts.

**Lennar, Like Wells Fargo, Fails to Meet with Blue Hills**

70.    Despite Blue Hills' prompt response to Lennar's document request, Lennar still failed to schedule a meeting to discuss Blue Hills' ever-pressing financial needs including the fact that neither Wells Fargo nor Lennar had released any funds so that Blue Hills could pay principal and interest due on the Note for August and September, 2004.

71.    Despite having all of the documents supplied by Blue Hills, Lennar claimed that it needed to have an appraisal report prepared for the Property and to conduct an environmental inspection of the Property and that Blue Hills' permission for access to the Property was needed.

72.    Blue Hills promptly gave its permission to Lennar to have access to the Property and, upon information and belief, the defendants' appraisal and the environmental inspections were conducted in September, 2004.

73.    After previously advising Blue Hills that it looked forward to a "successful working relationship" with Blue Hills, Lennar advised Blue Hills by letter dated September 17, 2004, a copy of which is attached hereto as Exhibit "L," that Blue Hills' requests for disbursement of sums sufficient to pay principal and interest due on the Note for the months of August and September were denied as Blue Hills was purportedly in default under the Mortgage Agreement  and Note as of August 2, 2004.

74.    In that same September 17, 2004 letter, Lennar closed by stating that because Blue Hills was in default, the Note had been accelerated and was immediately due and payable.

75.    All preconditions to Blue Hill's entitlement to disbursement of funds sufficient to pay principal and interest for August and September, 2004 had been satisfied.

76.    The default to which Lennar relied upon in its September 17, 2004 letter was that Blue Hills had purportedly failed to make a timely "quarterly deposit of real estate taxes due on

August 1, 2004" or "to pay the quarterly installment of real estate taxes due on August 2, 2004 . . . ."

77. Lennar and Wells Fargo knew, or should have known, that Blue Hills' failure to make principal and interest payments when due under the Note constituted an event of default under the Note and Mortgage Agreement.

78. Lennar and Wells Fargo also knew that there were ample funds in the Sub-accounts which could have been used to make the August and September 2004 principal and interest payments on the Note.

79. As of August 1, 2004, the defendants and/or their servicing agents, Lennar and Wells Fargo, had the obligation under the Mortgage Agreement, Note and the Cash Management Agreement to pay real estate taxes due to the Town of Canton, Massachusetts out of the Tax Fund Sub-account or to provide Blue Hills with at least 30 days notice that there were insufficient funds in the account so as to enable Blue Hills to replenish the reserve account. Credit Suisse First Boston, J.P. Morgan, Lennar and Wells Fargo did neither of these things.

80. The defendants and/or their agents, Lennar and Wells Fargo, also had the obligation under paragraph 8 of the Note to allocate amounts to the Tax Fund Sub-account so that funds were available to satisfy the Property's real estate tax obligations.

81. As of August 2, 2004 – the date on which Lennar asserted that Blue Hills was in default of the Mortgage Agreement for failing to pay real estate taxes –was nine days prior to that date on which Blue Hills was obligated under the Mortgage Agreement to make its next real estate tax deposit.

82. In addition, at the time that Lennar sent out its letter on September 17, 2004 to Blue Hills, defaulting, retroactively, Blue Hills as of August 2, 2004, it knew that Blue Hills had

made repeated requests to have a meeting to develop the joint plan to renovate and re-lease the Property, and also had in its possession two requests from Blue Hills to disburse funds out of the Lease Funds Sub-accounts, including a request to disburse funds to pay real estate taxes, pending Blue Hills' receipt of the final real estate tax payment from Equiserve.

83. By letter dated October 21, 2004, CSFB gave notice to Blue Hills of its intention to foreclose on the Property and that foreclosure sale occurred on or about November 12, 2004. A copy of this letter is attached hereto as Exhibit "M."

84. The defendants, through their agents, Lennar and/or Wells Fargo, wrongfully defaulted Blue Hills.

85. The defendants, through their agents, Lennar and/or Wells Fargo, wrongfully withheld from Blue Hills those amounts which Blue Hills was rightfully entitled to receive out of the Cash Collateral Account.

86. The defendants, through their agents, Lennar and/or Wells Fargo, wrongfully refused to allow Blue Hills to utilize funds on deposit in the Cash Collateral Account to pay principal and interest under the Mortgage Agreement.

87. The defendants, through their agents, Lennar and Wells Fargo, wrongfully foreclosed on the Property.

## V. BLUE HILLS' CLAIMS

### Count I
(Breach of Contract)

88. Blue Hills realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 87.

89. The Mortgage Agreement, Cash Management Agreement and Note constitute valid and binding contracts between Blue Hills and Credit Suisse First Boston and assigned to J.P. Morgan and CSFB.

90. The defendants, through their agents, Lennar and Wells Fargo, have breached their contractual obligations under the Mortgage Agreement, Note and the Cash Management Agreement by failing and refusing to release funds on deposit in the Cash Collateral Account to Blue Hills in accordance with the Mortgage Agreement, Note and the Cash Management Agreement, by failing and refusing to properly allocate sufficient funds in the Tax Fund Sub-account to pay real estate taxes, and by failing and refusing to pay real estate taxes.

91. The defendants, through their agents, Lennar and Wells Fargo, wrongfully defaulted Blue Hills and foreclosed on the Property.

92. The defendants, through their agents, Lennar and Wells Fargo, are liable to Blue Hills for all damages which Blue Hills has sustained as a result of their breaches of the Mortgage Agreement, Cash Management Agreement and Note, together with costs, interest and attorneys' fees.

93. The defendants are also liable for their agents', Lennar and Wells Fargo, failure to properly perform their duties as Servicer and Special Servicer respectively, with respect to the Mortgage Loan Documents.

**Count II**
(Breach of Covenant of Good Faith and Fair Dealing)

94. Blue Hills realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 93.

95. The Mortgage Agreement, Cash Management Agreement and Note constitute contracts which required that the defendants and their agents, Lennar and Wells Fargo, act in good faith and deal fairly with Blue Hills.

96. The defendants, directly and/or through their agents, Lennar and Wells Fargo, have breached the covenant of good faith and fair dealing under the Mortgage Agreement, Cash Management Agreement and Note by breaching the foregoing agreements, wrongfully defaulting Blue Hills and by wrongfully foreclosing on the Property.

97. The defendants, directly and/or through their agents, Lennar and Wells Fargo, have also breached the covenant of good faith and fair dealing with respect to the Mortgage Agreement, Cash Management Agreement and the Note by repeatedly providing assurances to Blue Hills that they were working on a solution for Blue Hills and were looking forward to "working successfully" with Blue Hills with respect to the Property when, in fact, they had neither the intention nor desire to do so.

98. By virtue of the defendants' breaches of the covenant of good faith and fair dealing, Blue Hills has sustained damages.

99. The defendants are liable to Blue Hills for all damages sustained by Blue Hills, together with costs, interest and attorneys' fees.

**Count III**
(Violations of M.G.L. c. 93A)

100. Blue Hills realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 99.

101. The defendants, directly and/or through their agents, Lennar and Wells Fargo have engaged in unfair and deceptive acts and practices in violation of M.G.L. c. 93A, §§1, 2 and 11. These violations include, without limitation, the following:

a.      Committing breaches of the Mortgage Agreement, Cash Management Agreement and Note by failing to disburse, upon Blue Hills' request, funds necessary to make principal and interest payments under the Note;

b.      Providing the repeated assurances over a period of over six months until the Equiserve Lease term ended, that Blue Hills would have access to its funds in the Sub-accounts for marketing and re-letting the Property, but refusing to schedule a meeting to discuss or agree to a process to give Blue Hills access to its own funds thus effectively precluding Blue Hills from any realistic opportunity to re-lease the Property;

c.      Wrongfully foreclosing on the Property;

d.      Wrongfully declaring Blue Hills to be in default of the Mortgage Agreement and Note;

e.      Breaching the covenant of good faith and fair dealing with respect to the Mortgage Agreement, Cash Management Agreement and Note and with respect to their dealings with Blue Hills generally;

f.      Failing to property allocate sufficient funds into the Tax Fund Sub-account; and,

g.      Failing to pay real estate taxes.

102.    At all times material and relative hereto, the events, transactions and occurrences described herein occurred substantially and primarily within the Commonwealth of Massachusetts.

103.    The violations of M.G.L. c. 93A, §§2 and 11 described above were knowingly, willfully and intentionally committed by the defendants directly and/or by their agents, Lennar and Wells Fargo.

WHEREFORE, Blue Hills demands:

1. That judgment be entered in its favor and against the defendants as to Counts I and II, for all damages Blue Hills has sustained, together with costs, interest and attorneys' fees;

2. That, as to Count III, this Court determine Blue Hills' damages caused by the defendants and that those damages be trebled, and that Blue Hills be awarded its costs, interest and attorneys' fees; and,

3. That Blue Hills be awarded such other and further relief as is proper and just.

BLUE HILLS OFFICE PARK LLC DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

BLUE HILLS OFFICE PARK LLC

By its attorneys,

Dated: November __, 2005

/s/ Meredith A. Swisher
Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

#326445 v1/14500/9985

# EXHIBIT A

# MORTGAGE FINANCING APPLICATION

DRAFT

July 20, 1999

Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
5th Floor
New York, New York 10010

Re: $33.5 Million Financing on Blue Hills Office Park (the "Property")

Gentlemen:

The purpose of this letter is to set forth the terms and conditions to be submitted to the investment committees of Credit Suisse First Boston Mortgage Capital LLC ("CSFB"; CSFB, its affiliates and their respective successors and assigns are hereinafter collectively referred to as the "Lender") in connection with the proposed first priority mortgage financing (the "Mortgage Financing") which the undersigned (the "Borrower") has requested to be provided by Lender. The terms and conditions of the Mortgage Financing to be considered shall be those set forth herein, as supplemented by the terms and conditions set forth in the attached term sheet, which term sheet is incorporated into, and made a part of, this letter.

Borrower acknowledges that it has paid to CSFB, simultaneously with the transmittal of this letter, a good faith deposit of $50,000 (the "Good Faith Deposit"). Borrower hereby agrees that the Good Faith Deposit will be held by CSFB and applied as hereinafter provided. Borrower further agrees to pay all out-of-pocket expenses actually incurred by CSFB in any way relating to the Mortgage Financing (including, without limitation, CSFB's due diligence in connection therewith) and to indemnify, defend and hold Lender harmless against all costs, expenses and damages incurred by such party as a result of or arising out of the Mortgage Financing. Borrower hereby agrees that CSFB's out-of-pocket expenses will include the fees and disbursements of CSFB's external legal counsel and auditors, CSFB's expenses and the fees of all third parties relating to the due diligence review and the costs of an appraisal, an environmental report and a structural engineering report for the Property. Borrower hereby agrees that the Good Faith Deposit will be used to reimburse CSFB or otherwise pay for these expenses. If the Mortgage Financing is not made as a result of Lender's willful or negligent failure to perform as herein provided or, alternatively, upon the consummation of the Mortgage Financing, the unapplied portion of the Good Faith Deposit will be promptly returned to Borrower. The obligations in this paragraph will survive in the event the Mortgage Financing is terminated for any reason.

It is anticipated that upon your receipt of the full amount of the Good Faith Deposit and your acceptance of this letter (which acceptance shall be evidenced by your countersigning a copy of this letter and returning the same to the undersigned), you will promptly begin your due diligence investigation of Borrower and the Property. The undersigned agrees to use its good faith efforts to cooperate with CSFB, and its counsel, agents and representatives, and provide CSFB, and its counsel, agents and representatives, with all reasonably requested information in order that CSFB may conduct its due diligence investigation and consummate the Mortgage Financing.

Borrower hereby acknowledges and represents that it is working solely with Lender to procure the Mortgage Financing for the Property and agrees not to, and will cause its principals and affiliates to not, obtain or attempt to arrange a financing for the Property (whether in the form of a permanent mortgage, bridge financing or otherwise) with any party other than Lender. Should Borrower or any principal or affiliate breach or violate the preceding sentence, CSFB will be entitled to retain the unapplied balance of the Good Faith Deposit and receive immediate payment, upon demand, of a break-up fee equal to 0.5% of the Mortgage Financing amount, which break up fee shall constitute liquidated damages, it being expressly acknowledged and agreed that Lender's actual damages in such instance will be impossible to calculate.

If, following CSFB's acceptance of this letter as hereinabove provided, the Mortgage Financing does not close on or prior to September 1, 1999, CSFB will have the option of terminating this letter and not proceeding with the Mortgage Financing, in which event Lender shall be entitled to retain the unapplied portion of the Good Faith Deposit.

Borrower understands and acknowledges that CSFB has not obtained internal investment committee approval for the Mortgage Financing and that its agreement to make the Mortgage Financing is subject to investment committee approval and the following conditions:

(a) CSFB's satisfactory completion of due diligence and underwriting on the Property;

(b) the absence of any development occurring with respect to the Property prior to the date on which the Mortgage Financing closing occurs which could, in CSFB's opinion, materially and adversely affect the net operating income or value of the Property or the ability of Borrower to service the Mortgage Financing;

(c) the execution and delivery of definitive agreements and other documentation relating to the Mortgage Financing satisfactory to CSFB and its counsel;

(d) the receipt of estoppels and subordination agreements from all tenants and from any ground lessor;

(e) the receipt of financial statements from Borrower and each of the key principals identified on the attached term sheet for both the last concluded financial year and last concluded financial quarter

preceding the date hereof, which financial statements shall be audited by an accounting firm acceptable to CSFB;

(f) the receipt of valid certificates of occupancy and zoning confirmation letters with respect to all of the improvements constructed upon the Property;

(g) no material adverse change in market conditions including, but not limited to, the liquidity of the fixed income market and/or the market for commercial mortgage backed securities, as determined by CSFB in its sole discretion, from the date hereof to the Closing Date; and

(h) the satisfaction of loan closing conditions customary for loans of this type, including, without limitation, receipt of an updated certified survey and a "clean" policy of mortgagee title insurance.

Borrower acknowledges and agrees that this letter and the attached term sheet do not set forth all of the terms and conditions of the Mortgage Financing, but are intended as an outline of the major points of understanding between the parties that will be set forth in the final loan documentation, which must be acceptable to CSFB in all respects.

This letter shall be governed by and construed and interpreted in accordance with the internal laws of the State of New York.

Please acknowledge your acceptance of the terms and conditions relating to the Mortgage Financing described herein by executing a copy of this letter. This letter must be executed and submitted by the Borrower by July 23, 1999 or this letter is considered void.

Sincerely,

By: ______________________

Name:
Title:

Acknowledged and Agreed to
as of this day of 1999:

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC

By: ______________________

Name:
Title:

DRAFT

# TERM SHEET

This Term Sheet is attached to, and forms a part of, that certain letter dated July 20, 1999 from ______________ to CSFB (the "Cover Letter"). All capitalized terms used and not otherwise defined in this Term Sheet have the meanings given to such terms in the Cover Letter.

**Property:**

Property Type: Office

Property Name: Blue Hills Office Park

Property Address: 150 Royall Street
Canton, Massachusetts

Interest of Borrower: Fee Simple

If any part of the Property is a ground leasehold interest, the terms of the related ground lease must be in accordance with the underwriting standards of CSFB and Standard & Poor's Ratings Services ("S&P").

**Borrower:** A single-purpose, bankruptcy-remote corporation, limited liability company or limited partnership meeting the requirements of S&P and acceptable to Lender.

**Key Principals:** Mr. William J. Langelier, general partner of Borrower, and Mr. Gerald S. Fineberg, general partner of Borrower.

**Manager:** The Property will be managed by a Manager acceptable to CSFB (the "Manager"), who will be entitled to receive a fee of no more than 5.0% of effective gross revenue. The Manager must subordinate its rights under the related management agreement to Lender's lien.

The Property management agreement and the loan documents will provide that Lender may request that Borrower terminate and replace the Manager with an independent third party manager acceptable to Lender if (i) an event of default on the Mortgage Financing occurs, or (ii) if an event of default under the management agreement occurs.

**Terms of the Mortgage Financing:**

**Financing Amount:** The amount of the Mortgage Financing will be no greater than $33,500,000. The exact amount of the Mortgage

Applicant's Initials ______________

Financing will be based upon (1) a maximum loan-to-value ratio (based on an MAI appraisal of existing property only, excluding expansion parcels) of no greater than 80% and (2) a minimum debt service coverage ratio ("DSCR") of 1.20x calculated as the ratio of (a) underwritten net operating income ("NOI") for the Property (calculated as provided below) for a twelve-month period to (b) annual debt service on the Mortgage Financing using (A) the Interest Rate (as defined below) and (B) a 30-year amortization schedule and (3) a minimum DSCR of 1.0x calculated as the ratio of (a) NOI to (b) an amount equal to the principal amount of the Mortgage Financing multiplied by a debt service constant of not less than 10.09%.

**Closing Date:** The funding of the Mortgage Financing (the "Closing") will occur only after, among other things, Lender and its counsel are fully satisfied with the terms of the loan documents, the results of CSFB's due diligence investigation and the investment committee of CSFB has approved the making of the Mortgage Financing.

**Maturity Date:** The maturity date for the Mortgage Financing will be the date that is the 30th anniversary of the first Payment Date after the Closing.

**Anticipated Repayment Date:** The date that is the 10th anniversary of the first Payment Date after the Closing.

**Interest Rate:** The Mortgage Financing will bear interest at a fixed rate (the "Interest Rate") per annum equal to the greater of (A) the yield on the U.S. Treasury Note with a 5.50 % coupon maturing in May, 2009 (which yield shall be determined upon the earlier to occur of a rate lock and the Closing, as each such term is hereinafter defined) plus 245 basis points and (B) 7.75%. Interest on the Mortgage Financing will be payable monthly in arrears and calculated on an actual/360 basis.

**Default Interest:** Upon the occurrence of an event of default, the Mortgage Financing will accrue interest at a rate per annum equal to the then-applicable interest rate (the Interest Rate or the Revised Interest Rate, as defined herein) plus 500 basis points.

Applicant's Initials ________

**Amortization:**

The Mortgage Financing will amortize over its term based on a 30 year amortization schedule. However, if the Mortgage Financing is not repaid on the Anticipated Repayment Date, the amortization of the Mortgage Financing will be accelerated as described below under "Hyper-Amortization".

**Payment Date:**

Monthly payments on the Mortgage Financing will be due on the eleventh day of each calendar month (each, a "Payment Date"), commencing on the eleventh day of the second calendar month next succeeding the Closing. At the Closing, Borrower shall pay to Lender, or Lender may deduct from the proceeds of the Mortgage Financing, an amount equal to the interest payable with respect to the period commencing on the date of the Closing through and including the tenth day of the calendar month next succeeding the calendar month in which the Closing occurs.

**Cash Management:**

Borrower will be required to establish an account (the "Clearing Account") at a bank (the "Lock Box Bank") into which all proceeds from the Property will be deposited. The Lock Box Bank will be selected by Borrower but must be acceptable to Lender. Lender may, or the Borrower or the Manager shall be required to notify each tenant, account debtor and credit card clearing bank to remit all amounts due with respect to the Property directly to a lock box maintained by the Lock Box Bank or to wire such amounts directly into the Clearing Account.

**Reserves:**

Borrower will establish and maintain reserves for existing deferred maintenance, ongoing taxes and insurance premiums, ongoing capital expenditures and such other purposes as CSFB shall determine to be necessary as a result of its due diligence review. Borrower will also be required to fund on-going tenant improvement and leasing commission reserves. The deferred maintenance reserve will be funded at closing and will be 125% of the amount specified in the property condition report obtained by CSFB during its due diligence review and the capital expenditure reserve will not be required to be funded at closing but will be funded from monthly cash flow of the Property at $0.20 per square foot per annum (or such larger amounts determined by CSFB as a result of its due diligence review).

Applicant's Initials ____________

  **Hyper-Amortization:**

**Revised Interest Rate:** If the Mortgage Financing is not prepaid on the Anticipated Repayment Date, the Mortgage Financing will accrue interest from such date at a rate (the "Revised Interest Rate") per annum equal to (i) the greater of (a) the Interest Rate plus 500 basis points and (b) the yield as of the Anticipated Repayment Date, calculated by linear interpolation of the yields of U.S. Treasury constant maturities with terms (one longer and one shorter) most nearly approximating that of non-callable U.S. Treasury obligations having maturities as close as possible to the Maturity Date, plus 500 basis points or (ii) so long as the note is an asset of a trust or other entity formed in connection with a rated securitization, a rate per annum equal to the Interest Rate plus 200 basis points. Interest that accrues on the Mortgage Financing at the Revised Interest Rate in excess of that accruing at the Interest Rate ("Excess Interest") shall be due and payable on the Maturity Date unless paid earlier out of Excess Cash Flow as described below. Unpaid Excess Interest will accrue interest at the Revised Interest Rate and shall be payable by Borrower on the Maturity Date.

**Accelerated Amortization:** In the event that the Mortgage Financing is not repaid on the Anticipated Repayment Date, all monthly cash flow remaining after funding the tax and insurance reserve, ground lease reserve (if any), scheduled debt service and capital expenditure reserve and any other reserves required by the Lender and paying budgeted operating expenses shall be applied to the unpaid principal balance of the Mortgage Financing until it is reduced to zero.

**Prepayment and Defeasance:**

**Prepayment:** Borrower may not voluntarily prepay the Mortgage Financing from the Closing through the date (the "Optional Prepayment Date") that is 3 months prior to the Anticipated Repayment Date. From and after the Optional Prepayment Date, Borrower may prepay the Mortgage Financing on any regularly scheduled Payment Date in whole only without penalty or premium. After the Anticipated Repayment Date, the Mortgage Financing may be prepaid in whole or in part on any regularly scheduled Payment Date without penalty or premium. Permitted partial prepayments shall be made in $100,000 increments only.



Applicant's Initials ________

**Defeasance:**

As described below, Borrower may obtain a release from its obligations under the Mortgage Financing by economically defeasing the entire Mortgage Financing on any Payment Date during the Defeasance Period (as defined below). In addition, if Borrower defeases the entire outstanding principal balance of the Mortgage Financing, Lender will release its lien on the Property. The "Defeasance Period" will be the period of time (a) commencing on the date that is the earlier of (i) four years following the full funding of the Mortgage Financing and (ii) two years after the securitization of the Mortgage Financing and (b) ending on the Anticipated Repayment Date.

To defease the Mortgage Financing, Borrower must pay Lender an amount equal to the principal balance of the Mortgage Financing for which a release is sought plus an additional amount (the "Yield Maintenance Charge") such that, in the aggregate, such amounts are sufficient to enable Lender to purchase non-callable U.S. Treasury obligations whose payments (x) equal all successive payments on the Mortgage Financing (including servicing and assuming that the Mortgage Financing is paid in full on the Anticipated Repayment Date) and (y) occur on, or as close as possible to, each successive Payment Date. In order to deafease the Mortgage Financing, the Borrower must also provide a comfort letter from an accountant acceptable to the Lender, obtain a rating confirmation from the Rating Agencies, deliver various customary documents and opinions and pay all of the costs and expenses associated with such defeasance.

**Rated Transaction:**

Lender intends to transfer the Mortgage Financing to a trust or other similar securitization vehicle in a public or private offering. Borrower agrees to cooperate with Lender to effect this securitization.

**No Other Debt:**

Borrower will not be permitted to have any indebtedness (secured or unsecured) other than the Mortgage Financing, short term unsecured indebtedness incurred in the ordinary course of business and such other debt as may be specifically approved by Lender in its sole discretion. If Borrower is not a corporation, the general partner or managing member of Borrower will not be permitted to have any indebtedness or make any loans. The Borrower may have a secured partnership loan which is subject to a subordination/standstill agreement, is non-foreclosable, and

Applicant's Initials ________

and pays interest only from excess cash flow remaining after all principal, interest and reserve account payments (including, but not limited to on-going capital expense and tenant improvement and leasing commission reserves and all cash flow sweep requirements) have been made. The holder of the partnership debt must be an "insider" for purposes of the bankruptcy code. The maximum amount of the partnership debt shall be_____ and the other terms must be acceptable to Lender.

**Reporting:**

Borrower will provide Lender with unaudited monthly and quarterly and audited annual income statements. The annual income statements shall be audited by an accounting firm acceptable to Lender. The monthly and quarterly statements will be prepared on a cash basis and will be required to be delivered to Lender within 30 and 45 days, respectively, of the end of the applicable period, and the annual audited statement will be required to be delivered within 120 days of the end of each fiscal year. All financial statements shall be certified by the Chief Financial Officer and/or Key Principal(s) of Borrower.

**Recourse Liability:**

The Mortgage Financing will be non-recourse, except as provided below and for which recourse may be had to Borrower and any or all of the Key Principals. The recourse exceptions will be:

(a) environmental matters;

(b) fraud and misrepresentation;

(c) misapplication of rents, security deposits, insurance and condemnation awards or other proceeds;

(d) misappropriation of any personal property which constitutes a portion of the collateral for the Mortgage Financing;

(e) breach of transfer restrictions, title related covenants, single purpose covenants and financing restrictions;

(f) physical waste;

(g) failure to pay property taxes or charges for labor or materials that create liens on the Property;

Applicant's Initials ________

(h) failure to make the first full monthly payment on the Mortgage Financing; and

(i) bankruptcy, insolvency or interference with Lender's pursuit of its rights or remedies.

**Documentation:** The Mortgage Financing will be evidenced by financing documentation customary for similar transactions (including, without limitation, a hazardous substances indemnity agreement and a guaranty of recourse obligations executed by the Key Principals) and in any event in form and substance satisfactory to CSFB. All documentation evidencing the Mortgage Financing will be governed by the law in which the real property is located.

**Assignment:** The Mortgage Financing may not be transferred or assigned by Borrower unless Borrower meets criteria set forth in the Mortgage Financing documentation and pays to Lender an assumption fee equal to 1% of the outstanding principal balance of the Mortgage Financing and any out-of-pocket costs in connection with such assumption.

**NOI Calculation:** The NOI for the Property shall be the NOI which will be determined by CSFB prior to the Closing in accordance with CSFB's underwriting standards for financings of this type and in conformity to the extent possible with the standards of the Rating Agencies.

**Insurance:** The Property will be covered by fire and casualty, machine and boiler, business interruption and liability insurance, all in form and substance satisfactory to CSFB. Additional insurance, such as flood, windstorm and earthquake, may be required. In general, the amount of the coverage relating to damage to the Property shall be in an amount not less than the greater of the full replacement cost of the Property and the principal balance of the Mortgage Financing, shall contain deductibles not in excess of the lesser of $25,000 and 5% of annual NOI. All insurance (except for earthquake or flood insurance) shall be written by carriers with an S&P rating of at least A. Business interruption insurance shall cover a period of not less than 18 months.

**Brokers:** Borrower shall (i) represent to Lender the identity of all brokers engaged in connection with the Mortgage Financing, (ii) pay any and all commissions and other similar fees owing in connection with the Mortgage Financing, and (iii) indemnify and defend Lender from and

Applicant's Initials ________

against all costs and expenses incurred by Lender as a result of a breach of the foregoing or otherwise in connection with any claim for a brokerage commission or fee made against Lender with respect to the Mortgage Financing.

**Confidentiality:** This term sheet and the letter to which it is attached is being delivered with the understanding that neither it nor its substance will be disclosed to any third person, except those who are in confidential relationships to Borrower (i.e., Borrower's principals, counsel, accountants and other retained business advisors) or as may be required by law.

**Special Conditions:**

**Cash Flow Sweep:** Borrower will be required to sweep a pre-determined amount of the monthly "Excess Cash Flow" ( defined as monthly gross rent minus monthly payments of interest and principal on the first mortgage and other reserve requirements set forth on page 6) as an additional reserve for Tenant Improvements and Leasing Commissions such that the annual contribution to the reserve account for Tenant Improvements and Leasing Commissions shall equal $750,000 per annum until such time as $4,250,000 is in the account (the "Cap"). Interest on the account shall remain in the account and shall be included in arriving at the "Cap". [ Example: if annual collection pursuant to the ongoing Tenant Improvement and Leasing Commission reserve set forth on page 6 is $275,000 per annum an additional $475,000 per annum will be required pursuant to the Cash Flow Sweep.] The funds will be available to Borrower for the tenant improvements and leasing commissions necessary to re-lease the building. As the funds are depleted below the "Cap" the Cash Flow Sweep shall be re-instated until an amount equal to the "Cap" is in the reserve account. No further cash flow sweep shall be required if Bank of Boston renews its lease, or another investment grade tenant executes a new lease, for a period extending at least three (3) years beyond the term of the loan.

Applicant's Initials ____________

# EXHIBIT B

**BERNKOPF, GOODMAN & BASEMAN LLP**
COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

August 31, 1999

David L. Doyle
DIRECT DIAL: (617) 790-3365
e-mail: ddoyle@bgblaw.com

Mr. Joseph Rubino
Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue - 5th Floor
New York, New York 10010

**RE: $33,500,000 FINANCING ON BLUE HILLS OFFICE PARK (THE "PROPERTY")**

Dear Mr. Rubino:

Our client is prepared to proceed with a mortgage financing on terms generally as noted in your draft Mortgage Financing Application dated July 20, 1999, with the language concerning Cash Flow Sweep as revised August 19, 1999, subject to the following understandings:

1. Non-Recourse. The exceptions to the non-recourse Mortgage Financing shall be the exceptions noted on the attached Exhibit A.

2. Leases. Lender approves the further renewal/extension of the existing Equiserve lease on terms not less favorable than the renewal/extension terms provided in that lease. Borrower must obtain Lender's approval for any other lease for more than ten (10%) percent of the rentable square footage, which approval shall not be unreasonably withheld or delayed so long as (a) such proposed lease is on a form approved by Lender or on a form customary for that type of lease and otherwise in compliance with the criteria described herein, (b) the rent is at no less than market rent, (c) the primary use is office, (d) the lease is with a creditworthy tenant, as reasonably determined consistent with the size of the space, the length of the term and the extent of tenant improvements and other concessions granted by Borrower, and (e) if the lease is for a term greater than five (5) years, the lease has appropriate expense stops or adjustments at not less than five (5) year intervals. For each proposed lease for which approval is required, Borrower shall provide Lender with information obtained in the ordinary course from the tenant concerning its creditworthiness and with a summary of the material economic terms of the proposed lease, a self addressed envelope and a reminder notice in capital letters that Lender shall notify Borrower of any objections within 10 business days of the Borrower's request or the consent request shall be deemed granted. Any objections to Borrower's request shall be in writing and include sufficient detail to enable Borrower to either appropriately renegotiate the lease terms or refute and/or resolve Lender's issues.

3. Casualty/Condemnation. Lender agrees to release the proceeds from any casualty/condemnation loss for the purpose of restoring the Property, provided (a) there is then no Event of Default, (b) the loss does not occur during the last year of the loan term and (c) if Lender reasonably determines that funds in addition to the net loss proceeds are needed to pay the entire cost of the restoration, the Borrower deposits the necessary additional amount with Lender in escrow pending disbursement as the first restoration dollars. If the Lender elects not to release the proceeds because the loss occurred during the last year of the term, the Borrower may prepay the loan at par, and upon prepayment, the Lender will release all collateral.

4. SNDA and Estoppel. The terms of the SNDA and Estoppel required from the exiting tenant Equiserve shall be acceptable to the tenant and reasonably acceptable to the Lender. Lender acknowledges the tenant's rights to require application of insurance and condemnation proceeds as provided in the lease.

5. Interest Rate/Amount. If the Loan closes on or prior to September 10, 1999, the Mortgage Financing will bear interest at that fixed rate having a 245 basis point spread over ten (10) year Treasuries (determined at the earlier of rate lock or closing). The loan amount will be a maximum of $33,500,000; provided that the borrower may refuse a lower amount without cost other than for cost incurred by third parties consistent with the items and costs listed in 6, below, and any excess funds paid shall be immediately refunded. If the Loan closes after September 10, 1999 and before October 25, 19999, the spread will be 255 basis points.

6. Due Diligence/Costs. The amount payable by Borrower for the following services will not exceed the amount listed across from that service:

| | |
|---|---|
| Legal: | $25,000 absent extraordinary negotiations. |
| Environmental and Engineering: | $5,000 in the aggregate. |
| Lender's Due Diligence, including insurance review: | $10,000 |
| Appraisal: | $7,000 |

Our client has separately forwarded a check in the amount of $20,000 as a deposit to be used toward paying these costs, understanding you have engaged third parties to perform the necessary tasks. The remaining portion of the good faith deposit shall be paid upon acceptance of this letter.

7. Cash Flow Sweep. Absent a continuing Event of Default, at such time (the "Redetermination Date") as there are leases in place from either investment grade tenants or other tenants, if any, whom Lender determines have satisfactory creditworthiness, which leases are sufficient to provide a DSCR of 1.20x and have terms extending not less than three (3) years after the Anticipated Repayment Date (a) Lender will release to Borrower all funds then in the additional reserve for Tenant Improvements and Leasing Commissions, except for the Necessary Escrow (defined below) and (b) the amount of the monthly contribution to that reserve will thereafter be the sum of the amounts determined for each such lease by dividing (1) the product of (i) $15 and (ii) such lease's square footage by (2) the number of months in the lease's term. As used herein, the term "Necessary Escrow" means (1) the sum of the amounts determined for each such lease by multiplying (x) that lease's portion of the monthly contribution determined pursuant to clause (b), above, by (y) the number of months from and after that lease's commencement date until the Redetermination Date, less (2) a reasonable allowance for the interest and appreciation reasonably expected to accrue on the Necessary Escrow and other funds to be held in reserve until the relevant dates of lease expiration. Prior to the Redetermination Date, provided there is no Event of Default and Equiserve has not extended the term of its lease for a period extending at least three years after the Anticipated Repayment Date, the monies held in such reserve shall additionally be available for monthly debt service payments to the extent the monies generated from any existing leases in any month are insufficient to make such payments after payment of that month's property operating expenses and the other sums due under the Loan documents for that month, up to the lesser of (i) an aggregate $1,000,000 or (ii) the amount in the reserve from time to time in excess of $2,750,000 less the amount of funds previously disbursed for tenant improvements and leasing commissions

8. Defeasance/Optional Prepayment Date. The Defeasance Period shall end on the Optional Prepayment Date. The Option Prepayment Date shall be the date six(6) months prior to the Anticipated Repayment Date.

9. Entity: The Borrower will be a newly created limited liability company or other single purpose, bankruptcy remote entity created for this transaction. Another newly created entity (which need not be single purpose or bankruptcy remote entity) will be created to be the Borrower's sole member/partner/owner, except to the extent some minor interest may need to be held by another entity or person by statute. The current property owner ("Current Owner") will be the sole member of the Borrowers' sole member/partner/owner, except to the extent some minor interest may need to be held by another entity or person by statute. The terms of the Current Owner's now-existing junior mortgage debt (the "Current Indebtedness") will be modified to release the mortgage security and provide that (a) there can be no acceleration for so long as the Mortgage Financing remains outstanding, (b) no payments will be made on the Current Indebtedness except to the extent there is Excess Cash Flow remaining after the Cash Flow Sweep and (c) the Current Indebtedness will not be secured by any pledges of membership interests or other security.

10. Management. The Property will be managed by either (a) Fineberg Management, Inc., or a successor professional management company reasonably acceptable to Lender and having substantial experience in management of similar properties, or (b) if the majority of the rentable square footage is leased to a single tenant, that tenant's management company.

11. Transfer/Assignment. Any transfer restrictions will explicitly permit (a) transfers between Key Principals, their family members and/or entities for the benefit of such Key Principals and/or family members; provided that the present Key Principals, their family members and/or entities for the benefit of such Key Principals and/or family members retain at least a fifty-one (51%) percent combined interest in the ownership and control the management of the Borrower, and (b) transfers on account of death.

12. Reserves. All monies to be deposited to reserves (excepting reserves for taxes or insurance or existing deferred maintenance) shall be invested in such "Permitted Investments" from among such of the Permitted Investments as may be suggested by Borrower and as can be accommodated reasonably by Lender. As used herein the term "Permitted Investments" shall mean investments of the types illustrated by the various obligations or securities listed in the attached letter dated October 24, 1997 and/or defined as Permitted Investments in its attachments.

Would you kindly countersign and return a copy of this letter to confirm these understandings.

Very truly yours,

David L. Doyle

CONFIRMED:
Credit Suisse First Boston Mortgage Capital LLC

By:______________________________

*See attached Exhibit A containing carve-outs to non-recourse provisions of the Mortgage Financing.*

DLD:mvt
cc: Mr. Gerald S. Fineberg
Mr. Daniel P. Frank
Mr. Joseph Donovan
Mr. William J. Langelier
Kenneth M. Goldberg, Esquire

#183554 v1/14500/9547

Would you kindly countersign and return a copy of this letter to confirm these understandings.

Very truly yours,

David L. Doyle

CONFIRMED:
Credit Suisse First Boston Mortgage Capital LLC

By:_______________________

*See attached Exhibit A containing carve-outs to non-recourse provisions of the Mortgage Financing.*

DLD:mvt
cc: Mr. Gerald S. Fineberg
Mr. Daniel P. Frank
Mr. Joseph Donovan
Mr. William J. Langelier
Kenneth M. Goldberg, Esquire

#183554 v1/14500/9547

**EXHIBIT A**
**EXCEPTIONS TO NON-RECOURSE**

*(Blacklined against Lender's proposed loan document text, other than conforming changes for defined terms such as Borrower/Maker or Lender/Payee)*

Lender's direct damages caused by: (i) fraud or intentional misrepresentation by Borrower or any guarantor in connection with the Loan; (ii) intentional physical waste of the Property; (iii) the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substance Indemnification Agreement of even date herewith given by Borrower to Lender or in the Mortgage concerning environmental, laws, hazardous substances of asbestos; (iv) the removal or disposal of any portion of the Property after an Event of Default; (v) the misapplication or conversion by Borrower of (a) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (b) any awards or other amounts received in connection with the condemnation of all or a portion of the Property, (c) any rents following an Event of Default, or (d) any Rents paid more than one month in advance; (vi) Borrower's failure to pay charges for labor or materials it requested or to pay or escrow taxes or other municipal charges that can create liens on any portion of the Property; and (vii) any security deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or other action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Mortgage) prior to the occurrence of the Event of Default that gave rise to such sale or foreclosure of action in lieu thereof.

Notwithstanding anything to the contrary in the Note or any of the Loan Documents, (a) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (b) the Debt shall be fully recourse to Borrower in the event that: (i) the first full monthly payment of principal and interest under the Note is not paid when due; (ii) Borrower intentionally fails to maintain its status as a single purpose entity, as required by, and in accordance with the terms and provisions of, the Mortgage; (iii) Borrower fails to obtain Lender's prior written consent before granting any subordinate financing or other voluptuary lien encumbering the Property; (iv) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage or (v) any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Borrower or if any proceeding for the dissolution or liquidation of Borrower shall be instituted by Borrower or any guarantor.

#183554 v1/14500/9547

# EXHIBIT C

BK 13733PG428

90

BLUE HILLS OFFICE PARK LLC

and

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC
(Mortgagee)

135860

**MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT**

99 SEP 15 PM 1:32

Dated: As of September 14, 1999

PROPERTY LOCATION:

Blue Hills Office Park
150 Royall Street
Canton, Massachusetts

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

Schulte Roth & Zabel LLP
900 Third Avenue
New York, New York 10022
Attention: Susan Nemery

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY
BARRY T. HANNON, REGISTER

# TABLE OF CONTENTS

Granting Clause One ........ 1
Granting Clause Two ........ 2
Granting Clause Three ........ 2
Granting Clause Four ........ 2
Granting Clause Five ........ 3
Granting Clause Six ........ 3
Granting Clause Seven ........ 3
Granting Clause Eight ........ 3

PART I GENERAL PROVISIONS

1. Payment of Debt and Incorporation of Covenants, Conditions and Agreements ........ 4
2. Warranty of Title ........ 4
3. Insurance ........ 4
4. Casualty ........ 7
5. Payment of Taxes, Etc. ........ 10
6. Tax and Insurance Impound Fund; Replacement Escrow Fund; Leasing Escrow Fund ........ 11
7. Condemnation ........ 16
8. Leases and Rents ........ 20
9. Maintenance and Use of Mortgaged Property ........ 24
10. Transfer or Encumbrance of the Mortgaged Property ........ 24
11. Representations and Covenants Concerning the Mortgagor and Mortgaged Property ........ 27
12. Single Purpose Entity/Separateness ........ 34
13. Estoppel Certificates and No Default Affidavits ........ 37
14. Controlling Agreement ........ 37
15. Changes in Laws Regarding Taxation ........ 38
16. No Credits on Account of the Debt ........ 38
17. Documentary Stamps ........ 38
18. Books and Records ........ 38
19. Performance of Other Agreements ........ 40
20. Further Acts, Etc. ........ 40
21. Recording of Mortgage, Etc. ........ 41
22. Reporting Requirements ........ 41
23. Events of Default ........ 42
24. Late Payment Charge ........ 44
25. Right To Cure Defaults ........ 44
26. Additional Remedies ........ 44
27. Right of Entry ........ 47
28. Security Agreement ........ 48
29. Actions and Proceedings ........ 49
30. Waiver of Setoff and Counterclaim ........ 49
31. Contest of Certain Claims ........ 49

32. Recovery of Sums Required to be Paid ....... 50
33. Marshalling and Other Matters ....... 50
34. Hazardous Substances ....... 50
35. Asbestos ....... 51
36. Environmental Monitoring ....... 52
37. Handicapped Access ....... 53
38. Indemnification ....... 54
39. Notices ....... 55
40. Authority ....... 56
41. Waiver of Notice ....... 56
42. Remedies of Mortgagor ....... 56
43. Sole Discretion of Mortgagee ....... 56
44. Non-Waiver ....... 56
45. No Oral Change ....... 57
46. Liability ....... 57
47. Inapplicable Provisions ....... 57
48. Headings, Etc. ....... 57
49. Duplicate Originals ....... 57
50. Definitions ....... 57
51. Homestead ....... 58
52. Assignments ....... 58
53. Waiver of Jury Trial ....... 58
54. Recourse Provisions ....... 58
55. Defeasance ....... 60
56. Cash Management Agreement ....... 63
57. Miscellaneous ....... 63
58. Management of the Mortgaged Property ....... 65
59. Sale of Notes and Securitization ....... 65
60. Securitization Indemnification ....... 67
61. Servicer ....... 69

PART II STATE SPECIFIC PROVISIONS

EXHIBIT A LEGAL DESCRIPTION

THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT (the "**Mortgage**"), made as of September 14, 1999, by BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company, having its principal place of business c/o Fineberg Management, Inc., One Washington Street, Suite 400, Wellsley, Massachusetts 02481 ("**Mortgagor**"), and to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, a Delaware limited liability company ("**Mortgagee**"), having its principal office at 11 Madison Avenue, New York, New York 10010.

WITNESSETH:

To secure the payment of an indebtedness in the original principal sum of THIRTY THREE MILLION ONE HUNDRED FORTY NINE THOUSAND AND 00/100 DOLLARS ($33,149,000.00), lawful money of the United States of America, to be paid with interest according to a certain mortgage note of even date herewith made by Mortgagor to Mortgagee (the mortgage note together with all extensions, renewals or modifications thereof being hereinafter collectively called the "**Note**", and the loan evidenced by the Note hereinafter being referred to as the "**Loan**") and all other sums due hereunder, under the other Loan Documents (hereinafter defined) and under the Note (said indebtedness and interest due under the Note and all other sums due hereunder under the Note and the other Loan Documents being hereinafter collectively referred to as the "**Debt**"), Mortgagor has mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, warranted, pledged, assigned, and hypothecated and by these presents does hereby deed, mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, assign and hypothecate unto Mortgagee, the real property described in Exhibit A attached hereto (the "**Premises**") and the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (the "**Improvements**");

TOGETHER WITH: all right, title, interest and estate of Mortgagor now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and such property, rights, interests and estates hereinafter described are collectively referred to herein as the "**Mortgaged Property**"), in accordance with all of the terms and provisions of this Mortgage and of the other Loan Documents:

GRANTING CLAUSE ONE

All easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, all rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtsey and rights of curtsey, property, possession, claim and demand

whatsoever, both at law and in equity, of Mortgagor of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

GRANTING CLAUSE TWO

All machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature, whether tangible or intangible, whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation, enjoyment and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "**Equipment**"), including any leases of any of the foregoing, any deposits existing at any time in connection with any of the foregoing, and the proceeds of any sale or transfer of the foregoing, and the right, title and interest of Mortgagor in and to any of the Equipment that may be subject to any "security interests" as defined in the Uniform Commercial Code, as adopted and enacted by the State or States where any of the Mortgaged Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Mortgage;

GRANTING CLAUSE THREE

Awards or payments, including interest thereon, that may heretofore and hereafter be made with respect to the Premises and the Improvements, whether from the exercise of the right of eminent domain or condemnation (including, without limitation, any transfer made in lieu of or in anticipation of the exercise of said rights), or for a change of grade, or for any other injury to or decrease in the value of the Premises and Improvements;

GRANTING CLAUSE FOUR

All leases, including, without limitation, that certain Lease by and between Mortgagor, successor-in-interest to Royall Associates Realty Trust, as lessor, and Boston EquiServe Limited Partnership ("**The Bank of Boston**"), successor-in-interest to The First National Bank of Boston, as lessee, dated April 19, 1989 (collectively, with all amendments thereto, the "**Bank of Boston Lease**"), and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises and the Improvements, including any extensions, renewals, modifications or amendments thereof (collectively, the "**Leases**") and all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or

employees from any and all sources arising from or attributable to the Premises and the Improvements (the "**Rents**"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

GRANTING CLAUSE FIVE

All proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation (subject, however, to the terms and conditions of this Mortgage) the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property;

GRANTING CLAUSE SIX

Upon any Event of Default, or if Mortgagor fails to act under circumstances when it is unreasonable not to so act, and as otherwise expressly provided in this Mortgage or in the other Loan Documents, the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of Mortgagee in the Mortgaged Property;

GRANTING CLAUSE SEVEN

All accounts, escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the Uniform Commercial Code, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, permits, consents, licenses, management agreements, contract rights (including, without limitation, any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair, or other work upon the Mortgaged Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Mortgaged Property), and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "**Intangibles**"); and

GRANTING CLAUSE EIGHT

All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

TO HAVE AND TO HOLD the above granted and described Mortgaged Property unto and to the use and benefit of Mortgagee, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly pay to Mortgagee the Debt at the time and in the manner provided

in the Note and this Mortgage and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the other Loan Documents (hereinafter defined) in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

AND Mortgagor represents and warrants to and covenants and agrees with Mortgagee as follows:

## PART I

## GENERAL PROVISIONS

1. **Payment of Debt and Incorporation of Covenants, Conditions and Agreements.** Mortgagor shall pay the Debt at the time and in the manner provided in the Note and in this Mortgage. All the covenants, conditions and agreements contained in (a) the Note and (b) all and any of the documents including the Note and this Mortgage now or hereafter executed by Mortgagor and/or others and by or in favor of Mortgagee, which evidences, secures or guarantees all or any portion of the payments due under the Note or otherwise is executed and/or delivered in connection with the Note and this Mortgage (the **"Loan Documents"**) are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.

2. **Warranty of Title.** Mortgagor warrants that Mortgagor has good, marketable and insurable title to the Mortgaged Property and has the full power, authority and right to execute, deliver and perform its obligations under this Mortgage and to deed, encumber, mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign and hypothecate the same and that Mortgagor possesses an unencumbered fee estate in the Premises and the Improvements and that it owns the Mortgaged Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Mortgage (the **"Permitted Exceptions"**) and that this Mortgage is and will remain a valid and enforceable first lien on and security interest in the Mortgaged Property, subject only to said exceptions. Mortgagor shall forever warrant, defend and preserve such title and the validity and priority of the lien of this Mortgage and shall forever warrant and defend the same to Mortgagee against the claims of all persons whomsoever.

3. **Insurance.**

(a) Mortgagor, at its sole cost and expense, for the mutual benefit of Mortgagor and Mortgagee, shall obtain and maintain during the entire term of this Mortgage (the **"Term"**) policies of insurance against loss or damage by fire, lightning and such other perils as are included in a standard "all-risk" endorsement, and against loss or damage by all other risks and hazards covered by a standard extended coverage insurance policy including, without limitation, riot and civil commotion, vandalism, malicious mischief, burglary and theft. Such insurance shall be in an amount equal to the greatest of (i) the then full replacement cost of the Improvements and Equipment, without deduction for physical depreciation, (ii) the outstanding principal balance of the Loan, and (iii) such amount that the insurer would not deem Mortgagor

SRZNY\611479v8

a co-insurer under said policies. The policies of insurance carried in accordance with this paragraph shall be paid annually in advance and shall contain "Replacement Cost" and "Agreed Amount" Endorsements with waivers of depreciation, and shall have a deductible no greater than (x) $10,000, or (y) five percent (5%) of Net Operating Income (as hereinafter defined), whichever is greater, unless otherwise agreed by Mortgagee.

(b) Mortgagor, at its sole cost and expense, for the mutual benefit of Mortgagor and Mortgagee, shall also obtain and maintain during the Term the following policies of insurance:

(i) Flood insurance if any part of the Mortgaged Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Program in an amount equal to the lesser of the outstanding principal amount of the Loan or the full replacement cost of the Improvements and Equipment, without deduction for physical depreciation (or such lesser amount as Mortgagee's insurance consultant shall require), plus such additional amount as Mortgagee's insurance consultant shall reasonably require.

(ii) Comprehensive public liability insurance, including broad form property damage, blanket contractual and personal injuries (including death resulting therefrom) coverages and containing minimum limits per occurrence of $1,000,000 and $2,000,000 in the aggregate for any policy year. In addition, at least $5,000,000 excess and/or umbrella liability insurance shall be obtained and maintained for any and all claims, including all legal liability imposed upon Mortgagor and all court costs and attorneys' fees incurred in connection with the ownership, operation and maintenance of the Mortgaged Property.

(iii) Rental loss and/or business interruption insurance in an amount equal to the greater of (A) estimated gross revenues for twenty-four (24) months from the operations of the Mortgaged Property or (B) the projected operating expenses (including debt service) for twenty-four (24) months for the maintenance and operation of the Mortgaged Property. The amount of such insurance shall be increased from time to time during the Term as and when new Leases and renewal Leases are entered into and the Rents increase or the estimate of (or the actual) gross revenue, as may be applicable, increases.

(iv) Insurance against loss or damage from (A) leakage of sprinkler systems and (B) explosion of steam boilers, air conditioning equipment, high pressure piping, machinery and equipment, pressure vessels or similar apparatus now or hereafter installed in the Improvements (without exclusion for explosions), to the extent that such items now or hereafter exist upon the Mortgaged Property, in an amount at least equal to the outstanding principal amount of the Note or $2,000,000, whichever is less.

(v) If the Mortgaged Property includes commercial property, worker's compensation insurance with respect to any employees of Mortgagor, as required by any governmental authority or legal requirement.

(vi) During any period of repair or restoration, builder's "all risk" insurance in an amount equal to not less than the full insurable value of the Mortgaged Property insuring against such risks (including, without limitation, fire and extended coverage and collapse of the Improvements to agreed limits) as Mortgagee may request, in form and substance acceptable to Mortgagee.

(vii) If the Mortgaged Property is or becomes a legal "non-conforming" use, Ordinance or law coverage and insurance coverage to compensate for the cost of demolition and the increased cost of construction in amounts as requested by Mortgagee.

(viii) Such other insurance as may from time to time be reasonably required by Mortgagee in order to protect its interests.

(c) All policies of insurance (the **"Policies"**) required pursuant to this paragraph: (i) shall be issued by companies approved by Mortgagee and licensed to do business in the state where the Mortgaged Property is located, with a claims paying ability rating of "AA" or better by Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc.; (ii) shall name Mortgagee and its successors and/or assigns as their interest may appear as the beneficiary/mortgagee; (iii) shall contain a non-contributory standard mortgagee clause and a Mortgagee's loss payable endorsement or their equivalents, naming Mortgagee as the person to which all payments made by such insurance company shall be paid; (iv) shall contain a waiver of subrogation against Mortgagee; (v) shall be maintained throughout the Term without cost to Mortgagee; (vi) shall be assigned and the originals delivered to Mortgagee; (vii) shall contain such provisions as Mortgagee deems reasonably necessary or desirable to protect its interest including, without limitation, endorsements providing that neither Mortgagor, Mortgagee nor any other party shall be a co-insurer under said Policies and that Mortgagee shall receive at least thirty (30) days prior written notice of any modification, reduction or cancellation; and (viii) shall be satisfactory in form and substance to Mortgagee and shall be approved by Mortgagee as to amounts, form, risk coverage, deductibles, loss payees and insureds. Mortgagor shall pay the premiums for such Policies (the **"Insurance Premiums"**) as the same become due and payable and shall furnish to Mortgagee evidence of the renewal of each of the Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Mortgagee (provided, however, that Mortgagor is not required to furnish such evidence of payment to Mortgagee in the event that such Insurance Premiums have been paid by Mortgagee pursuant to Paragraph 6 hereof). If Mortgagor does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Mortgagee may procure, but shall not be obligated to procure, such insurance and pay the Insurance Premiums therefor, and Mortgagor agrees to reimburse Mortgagee for the cost of such Insurance Premiums promptly on demand. Within thirty (30) days after request by Mortgagee, Mortgagor shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Mortgagee, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices.

(d) Mortgagee agrees that the Policies provided by Mortgagor on the date hereof satisfy the current requirements hereunder.

(e) Notwithstanding anything to the contrary in this Mortgage or the other Loan Documents, business loss and rent insurance proceeds shall be considered Rents for all purposes.

4. Casualty.

(a) If the Mortgaged Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (an "**Insured Casualty**"), Mortgagor shall give prompt notice thereof to Mortgagee. Following the occurrence of an Insured Casualty, Mortgagor, regardless of whether insurance proceeds are available, shall, unless Mortgagee shall have elected to apply the insurance proceeds in reduction of the Debt, then only if Mortgagor shall have failed to repay the Debt in full within one hundred and eighty (180) days after such application, promptly proceed to restore, repair, replace or rebuild the same to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in accordance with applicable law. The expenses incurred by Mortgagee in the adjustment and collection of insurance proceeds shall become part of the Debt and be secured hereby and shall be reimbursed by Mortgagor to Mortgagee upon demand.

(b) Except to the extent provided in Paragraph 4(c) below, in case of loss or damages covered by any of the Policies, the following provisions shall apply:

(i) In the event of an Insured Casualty that does not exceed $250,000.00, Mortgagor may settle and adjust any claim and agree with the insurance company or companies on the amount to be paid upon the loss, provided that such adjustment is carried out in a competent and timely manner. In such case, Mortgagor is hereby authorized to collect and receipt for any such insurance proceeds, which shall be held in escrow by Mortgagor and applied by Mortgagor toward the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to the Insured Casualty, in the manner set forth below. Mortgagor hereby covenants and agrees to commence and diligently to prosecute such restoring, repairing, replacing or rebuilding; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such restoring, repairing, replacing or rebuilding in excess of the net proceeds of insurance made available pursuant to the terms hereof.

(ii) In the event of an Insured Casualty that is in excess of $250,000.00 but not in excess of thirty-five percent (35%) of the then outstanding principal balance of the Note, Mortgagor may settle and adjust any claim and agree with the insurance company or companies on the amount to be paid upon the loss, with Mortgagee's prior written consent, which shall not be unreasonably withheld; provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 4(b)(iv) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such insurance proceeds. Notwithstanding the foregoing, in the event that Mortgagor shall not have finally settled and adjusted any such claim within one hundred eighty (180) days following the Insured Casualty, then and in that event, Mortgagee shall thereupon control the settlement and adjustment, and Mortgagee shall consult with Mortgagor in respect thereof; provided, however, that, should

SRZNY\611479v8

Mortgagor and Mortgagee disagree as to such settlement or adjustment, then Mortgagee alone may settle and adjust the claim without the consent or agreement of Mortgagor and agree with the insurance company or companies on the amount to be paid on the loss. In any event, the proceeds of any such policy shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

(iii) In the event an Insured Casualty shall exceed thirty-five percent (35%) of the then outstanding principal balance of the Note, Mortgagor may settle and adjust any claim and agree with the insurance company or companies on the amount to be paid upon the loss, with Mortgagee's prior written consent, which shall not be unreasonably withheld; provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 4(b)(iv) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such insurance proceeds. Notwithstanding the foregoing, the event that Mortgagor shall not have finally settled such claim within sixty (60) days following the Insured Casualty, then and in that event, Mortgagee shall thereupon control the settlement and adjustment, and Mortgagee shall consult with Mortgagor in respect thereof; provided, however, that, should Mortgagor and Mortgagee disagree as to such settlement or adjustment, then Mortgagee alone may settle and adjust the claim without the consent or agreement of Mortgagor and agree with the insurance company or companies on the amount to be paid on the loss. In any event, the proceeds of any such policy shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

(iv) Mortgagee shall not unreasonably delay the granting or withholding of any consent requested of Mortgagee pursuant to the provisions of Paragraph 4(b)(ii) or 4(b)(iii), and if Mortgagee's disapproval of any proposed settlement or adjustment is not received by Mortgagor within forty-five (45) days following the receipt by Mortgagee of Mortgagor's request, Mortgagee shall be deemed to have granted its approval or consent, provided, however, that Mortgagor shall provide Mortgagee with written notice of, and request for approval or consent to, any proposed settlement or adjustment and provided, further, that such notice shall contain the following introductory sentence in conspicuous 14 point boldface type: "THIS IS A REQUEST FOR AN APPROVAL FROM MORTGAGEE BY MORTGAGOR, A RESPONSE TO WHICH MUST BE RECEIVED BY MORTGAGOR WITHIN FORTY-FIVE (45) DAYS OF MORTGAGEE'S RECEIPT HEREOF, OR SUCH APPROVAL SHALL BE DEEMED GRANTED."

(v) In the event of an Insured Casualty where the loss is in an aggregate amount in excess of $250,000.00 but less than thirty-five percent (35%) of the original principal balance of the Note, and if, in the reasonable judgment of Mortgagee, the Mortgaged Property can be restored within twelve (12) months and prior to the Anticipated Repayment Date (as defined in the Note) to an economic unit not materially less valuable (including an assessment of the impact of the termination of any Leases due to such Insured Casualty) and not materially less useful than the same was immediately prior to the Insured Casualty, then, if no Event of Default (as hereinafter defined) shall have occurred and be then continuing, the proceeds of insurance (after reimbursement of any expenses incurred by Mortgagee) shall be applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the

Mortgaged Property or part thereof subject to the Insured Casualty, in the manner set forth below. Mortgagor hereby covenants and agrees to commence and diligently to prosecute such restoring, repairing, replacing or rebuilding; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such restoring, repairing, replacing or rebuilding in excess of the net proceeds of insurance made available pursuant to the terms hereof.

(vi) Except as provided above, the proceeds of insurance collected upon any Insured Casualty shall, at the option of Mortgagee in its sole discretion, be applied to the payment of the Debt or applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to the Insured Casualty, in the manner set forth below. Any such application to the Debt shall be without any prepayment consideration except that if an Event of Default has occurred, then the Mortgagor shall pay to Mortgagee an additional amount equal to the Yield Maintenance Premium (hereinafter defined), if any, that would be required under Paragraph 55 hereof if Defeasance Collateral (hereinafter defined) was to be purchased by Mortgagor. Any such application to the Debt shall be applied to those payments of principal and interest last due under the Note but shall not postpone or reduce any payments otherwise required pursuant to the Note other than such last due payments. Upon any such application to the Debt, Mortgagor may within one hundred eighty (180) days after such application prepay the balance of the Debt without penalty or premium on not less than ten (10) days notice to Mortgagee and upon payment in full Mortgagee will release all collateral.

(vii) In the event Mortgagor is entitled to reimbursement out of insurance proceeds held by Mortgagee, such proceeds shall be disbursed from time to time upon Mortgagee being furnished with (1) evidence satisfactory to it of the estimated cost of completion of the restoration, repair, replacement and rebuilding, (2) funds or, at Mortgagee's option, assurances satisfactory to Mortgagee that such funds are available, sufficient in addition to the proceeds of insurance to complete the proposed restoration, repair, replacement and rebuilding, and (3) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other reasonable evidences of cost, payment and performance as Mortgagee may reasonably require and approve. Mortgagee may, in any event, require that all plans and specifications for such restoration, repair, replacement and rebuilding be submitted to and approved by Mortgagee prior to commencement of work. No payment made prior to the final completion of the restoration, repair, replacement and rebuilding shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than proceeds of insurance shall be disbursed prior to disbursement of such proceeds; and at all times, the undisbursed balance of such proceeds remaining in the hands of Mortgagee, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Mortgagee by or on behalf of Mortgagor for that purpose, shall be at least sufficient in the reasonable judgment of Mortgagee to pay for the cost of completion of the restoration, repair, replacement or rebuilding, free and clear of all liens or claims for lien. Any surplus which may remain out of insurance proceeds held by Mortgagee after payment of such costs of restoration, repair, replacement or rebuilding shall be paid to Mortgagor.

(c) (i) Notwithstanding the foregoing provisions of Paragraph 4(b), for so long as the Boston SNDA (as defined in Paragraph 8(d) below is in full force and effect, all proceeds of insurance collected upon any Insured Casualty shall be payable to and held and maintained by Mortgagee or deposited by Mortgagee with a third party trustee selected by Mortgagee, and all such proceeds shall be applied by Mortgagee as provided in the Boston SNDA (if and to the extent that the provisions of the Boston SNDA are in conflict with the provisions of Paragraph 4(b), provided, however, that, in the event that any Insured Casualty shall occur within twelve (12) months prior to, or at any time after, the Anticipated Repayment Date, Mortgagee shall, at its option, apply the proceeds from the Insured Casualty to the payment of the Debt. If Mortgagee elects to so apply such proceeds to the payment of the Debt, Mortgagor may within one hundred eighty (180) days after such application prepay the balance of the Debt without penalty or premium on not less than ten (10) days notice to Mortgagee and upon payment in full Mortgagee will release all collateral.

(ii) In the event that proceeds from any Insured Casualty are applied by Mortgagee as provided in the of Boston SNDA, Mortgagor shall restore and repair, or cause to be restored and repaired, the Mortgaged Property in the manner and upon such terms and conditions as required by the Bank of Boston Lease and (to the extent not in conflict with the Bank of Boston Lease) as would be required by a prudent interim construction lender, including, but not limited to (A) the deposit by Mortgagor with Mortgagee, within thirty (30) days after demand therefor, of any deficiency necessary in order to assure the availability of sufficient funds to pay for such restoration or repair, including Mortgagee's costs and expenses to be incurred in connection therewith; provided, however, that such funds shall be held in escrow by Mortgagee and disbursed as the first funds for restoration or repair, (B) the prior approval by Mortgagee of all plans and specifications, contractors and forms of construction contracts, and (C) the furnishing to Mortgagee of permits, bonds, lien waivers, invoices, receipts and affidavits from all contractors and subcontractors in form and substance reasonably satisfactory to Mortgagee in its discretion; provided, however, that, in the event that Mortgagor does not cause to be restored or repaired the Mortgaged Property in accordance with the foregoing provisions, and the same continues for thirty (30) days after notice from Mortgagee, the same shall be an Event of Default hereunder and Mortgagee may, in Mortgagee's absolute discretion and without regard to the adequacy of Mortgagee's security, elect to accelerate the maturity date of the Note, declare any and all of the Debt to be immediately due and payable and apply any sums then held by the Mortgagee or an insurance trustee pursuant to this Paragraph 4 to the payment of the Debt in whatever order Mortgagee elects.

5. **Payment of Taxes, Etc.** Subject to the provisions of Paragraph 6 hereof and of the Cash Management Agreement, Mortgagor shall pay all taxes, assessments, water rates and sewer rents, now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof (the "**Taxes**") and all ground rents, maintenance charges, other impositions, and other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Premises, now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof (the "**Other Charges**") as the same become due and payable. Mortgagor will deliver to Mortgagee receipts for payment or other evidence satisfactory to Mortgagee that the Taxes and Other Charges have been so paid or are

not then delinquent no later than thirty (30) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Mortgagor shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Mortgaged Property, and shall promptly pay for all utility services provided to the Mortgaged Property. Mortgagor shall furnish to Mortgagee receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Mortgagor is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid for by Mortgagee pursuant to Paragraph 6 hereof).

6. **Tax and Insurance Impound Fund; Replacement Escrow Fund; Leasing Escrow Fund.**

(a) Mortgagor shall pay to Mortgagee on the eleventh day of each calendar month (a) one-twelfth of the Taxes that Mortgagee estimates will be payable during the next ensuing twelve (12) months (provided, however, that, for so long as the Bank of Boston Lease shall be in full force and effect and shall permit The Bank of Boston to reimburse Mortgagor for such Taxes on a quarterly basis, Mortgagor may pay to Mortgagee, on a quarterly basis, one-quarter of such Taxes commencing with the eleventh day of November, 1999 and on the eleventh day of each third calendar month thereafter) in order to accumulate with Mortgagee sufficient funds to pay all such Taxes at least ten (10) days prior to their respective due dates, and (b) one-twelfth of the Insurance Premiums that Mortgagee estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Mortgagee sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (said amounts in (a) and (b) above hereinafter called the "**Tax and Insurance Impound Fund**"). Mortgagee will apply the Tax and Insurance Impound Fund to payments of Taxes and Insurance Premiums required to be made by Mortgagor pursuant to Paragraphs 3 and 5 hereof. In making any payment relating to the Tax and Insurance Impound Fund, Mortgagee may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Impound Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Paragraphs 3 and 5 hereof, Mortgagee shall, in its sole discretion, return any excess to Mortgagor or credit such excess against future payments to be made to the Tax and Insurance Impound Fund. In allocating such excess, Mortgagee may deal with the person shown on the records of Mortgagee to be the owner of the Mortgaged Property. If at any time Mortgagee determines that the Tax and Insurance Impound Fund is not or will not be sufficient to pay the items set forth in (a) and (b) above, Mortgagee shall notify Mortgagor of such determination and Mortgagor shall increase its monthly payments to Mortgagee by the amount that Mortgagee estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or expiration of the Policies, as the case may be. Until expended or applied as above provided, any amounts in the Tax and Insurance Impound Fund shall constitute additional security for the Debt. The Tax and Insurance Impound Fund shall not constitute a trust fund and may be commingled with other monies held

by Mortgagee. No earnings or interest on the Tax and Insurance Impound Fund shall be payable to Mortgagor. If Mortgagee so elects at any time, Mortgagor shall provide, at Mortgagor's expense, a tax service contract for the Term issued by a tax reporting agency acceptable to Mortgagee. If Mortgagee does not so elect, Mortgagor shall reimburse Mortgagee for the cost of making annual tax searches throughout the Term.

(b) Mortgagor shall pay to Mortgagee on the eleventh day of each calendar month the sum of Four Thousand Five Hundred Sixty Four and 42/100 Dollars ($4,564.42) which shall be deposited with and held by Mortgagee for replacement and repairs required to be made to the Mortgaged Property during the calendar year and for any other work approved by Mortgagee (**"Replacement Escrow Fund"**). Mortgagee shall make disbursements from the Replacement Escrow Fund as requested by Mortgagor, and approved by Mortgagee in its reasonable discretion, no more frequently than once in any thirty (30) day period of no less than $5,000.00 upon delivery by Mortgagor of Mortgagee's standard form of draw request accompanied by copies of paid invoices for the amounts requested and, if required by Mortgagee for requests in excess of $10,000.00 for a single item, lien waivers and releases from all parties furnishing materials and/or services in connection with the requested payment. Mortgagee may require an inspection of the Mortgaged Property at Mortgagor's expense prior to making a monthly disbursement in order to verify completion of replacements and repairs of items in excess of $10,000.00 for which reimbursement is sought. The Replacement Escrow Fund shall be held in an interest bearing account in Mortgagee's name as provided in the Cash Management Agreement. All earnings or interest on the Replacement Escrow Fund shall be and become part of such Replacement Escrow Fund and shall be disbursed as provided in this Paragraph 6(b). Until expended or applied as above provided, the Replacement Escrow Fund shall constitute additional security for the Debt. The Replacement Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Mortgagee.

(c) (i) Mortgagor (A) shall pay to Mortgagee on the date hereof the sum of $19,855.83, and (B) on the eleventh day of each calendar month during the Term shall pay to Mortgagee one-twelfth of $119,135, which shall be deposited with and held by Mortgagee for tenant improvement and leasing commission obligations incurred following the date hereof (the **"Base Leasing Escrow Fund"**). In addition, Mortgagor shall pay to Mortgagee for deposit in the Base Leasing Escrow Fund all funds received by Mortgagor from tenants in connection with the cancellation of any Leases, including, but not limited to, any cancellation fees, penalties, returns or refunds of tenant improvement allowances or leasing commissions, sums due in lieu of any lessee's obligation to remove tenant improvements or otherwise restore the leased premises or other charges.

(ii) Mortgagor (A) shall pay to Mortgagee on the date hereof the sum of $105,144.17, and (B) on the eleventh day of each calendar month during the Term shall pay to Mortgagee the Monthly Cash Flow Leasing Escrow Fund Amount (as defined in Paragraph 6(c)(iii)), which shall be deposited with and held by Mortgagee for tenant improvement and leasing commission obligations incurred by Mortgagor following the date hereof (the **"Cash Flow Leasing Escrow Fund"** and, collectively with the Base Leasing Escrow Fund, the **"Leasing Escrow Funds"**).

(iii) For purposes of this Mortgage, the term "Monthly Cash Flow Leasing Escrow Fund Amount" shall mean an amount equal to the lesser of (I) the amount remaining on deposit in the Cash Collateral Account immediately after application pursuant to subparagraphs 8(a)(i) through 8(a)(viii) of the Note, and (II) (A) prior to the Benchmark Reduction Date $52,572.08, and (B) from and after the Benchmark Reduction Date, the excess of (i) the aggregate of amounts separately calculated with respect to each Benchmark Lease by taking (y) the product of (A) $15 and (B) the number of rentable square feet of space leased pursuant to such Benchmark Lease, divided by (z) the number of months in the Benchmark Lease's then-current term rounded to the nearest integer, over (ii) $9,928. Notwithstanding the foregoing, for so long as the aggregate amount of Leasing Escrow Funds is $4,250,000, the term "Monthly Leasing Escrow Fund Amount" shall mean zero.

(iv) Mortgagee shall make disbursements from the Leasing Escrow Funds, no more frequently than once in any ninety (90) day period, for expenses reasonably incurred by Mortgagor for new Leases entered into by Mortgagor in accordance with the provisions of Paragraph 8 below. All such expenses shall be approved by Mortgagee in its sole discretion (reasonably exercised). Mortgagee shall make disbursements as requested by Mortgagor on a quarterly basis in increments of no less than $5,000.00 upon delivery by Mortgagor of Mortgagee's standard form of draw request accompanied by copies of paid invoices for the amounts requested for tenant improvements and leasing commissions, the newly executed Lease, extension, renewal, or modification, with terms commensurate with the expired Lease (if not previously delivered), and, if required by Mortgagee, lien waivers and releases from all parties furnishing materials and/or services in connection with the requested payment. Mortgagee may require an inspection of the Mortgaged Property at Mortgagor's expense prior to making a quarterly disbursement in order to verify completion of improvements for which reimbursement is sought.

(v) The Leasing Escrow Funds shall be held in an interest bearing account in Mortgagee's name as provided in the Cash Management Agreement. All earnings or interest on the Leasing Escrow Funds shall be and become part of such Leasing Escrow Funds and shall be disbursed as provided in this Paragraph 6(c). Until expended or applied as above provided, the Leasing Escrow Funds shall constitute additional security for the Debt. The Leasing Escrow Funds shall not constitute a trust fund and may be commingled with other monies held by Mortgagee.

(vi) Mortgagee shall disburse to Mortgagor from the Leasing Escrow Funds, on a one-time basis, an amount equal to the Benchmark Reduction Amount (as hereinafter defined), upon the satisfaction of the following conditions precedent:

(a) Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement (the "Benchmark Reduction Date"), a written request for such disbursement;

(b)    no Event of Default hereunder shall have occurred and be continuing as of the date of the request for such disbursement and on the Benchmark Reduction Date;

(c)    delivery to Mortgagee of copies of a fully-executed Lease or Leases (each, a "Benchmark Lease"), each of which (I) is for a term that expires no earlier than three (3) years beyond the Anticipated Repayment Date (as defined in the Note); and (II) is with a tenant which is either (y) rated (i) "BBB" or higher by S&P, or (ii) "Baa 2" or higher by Moody's, or (z) has creditworthiness satisfactory to Mortgagee in its sole discretion;

(d)    delivery to Mortgagee of current estoppel certificates from the tenant under each Benchmark Lease, certifying that the tenant has accepted the premises and is in occupancy and paying full unabated rent pursuant to its Benchmark Lease, and that, to the tenant's best knowledge, its Benchmark Lease is in full force and effect with no defaults beyond any applicable notice and cure periods; and

(e)    Mortgagor provides evidence satisfactory to Mortgagee that the proforma Debt Service Coverage Ratio is equal to or greater than 1.20:1.0, calculated (I) as if the Benchmark Leases were the sole source of revenues for the Mortgaged Property and (II) with Operating Expenses being determined including the following assumptions: (v) assuming that the rent payable under each Benchmark Lease in the first lease year is less than or equal to the rent in each succeeding lease year; (w) an assumed 5% vacancy; (x) the greater of the actual management fee or an assumed management fee equal to 4% of Gross Income from Operations using an assumed 5% vacancy; (y) an assumed stabilized monthly contributions to the Replacement Escrow Fund Amount equal to $54,773 per year; and (z) an assumed stabilized monthly contribution to the Base Leasing Escrow Fund equal to $119,135 per year.

(vii)   For purposes of this Mortgage, the term "Benchmark Reduction Amount" shall mean the amount on deposit in the Leasing Escrow Fund on any Benchmark Reduction Date but only to the extent same exceeds the Retained Amount (as hereinafter defined).

(viii)  For purposes of this Mortgage, the term "Retained Amount" shall be an amount equal to the aggregate of the positive amounts, if any, separately calculated with respect to each Benchmark Lease as follows:

(a)    the product of (I) $15 and (II) the number of square feet of space leased pursuant to such Benchmark Lease, divided by the number of months in the Benchmark Lease's full current term (not just the

remaining balance of the term) rounded to the nearest integer, multiplied by

(b) the number of months from the commencement date of the current term of the Benchmark Lease (not just the remaining balance of the term) until the Benchmark Reduction Date, rounded to the nearest integer, with the resulting amount reduced by

(c) an amount in Mortgagee's sole judgment (reasonably exercised) equal to any interest which Mortgagee anticipates will accrue on the Retained Amount and (ii) all payments required to be deposited into the Leasing Escrow Funds from the Benchmark Reduction Date until the expiration of the Benchmark Lease.

(ix) From time to time (but no more frequently than once in any thirty (30) day period), from and after the first time when the aggregate amount on deposit in the Leasing Escrow Funds equals or exceeds $2,750,000 Mortgagee shall disburse to Mortgagor from the Leasing Escrow Funds amounts aggregating up to the Interim Reduction Amount (as hereinafter defined), for application solely toward payment of principal and interest then due and payable on the Note, upon the satisfaction of the following conditions precedent:

(a) Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement (each, an "Interim Reduction Date"), a written request for such disbursement;

(b) no Event of Default hereunder shall have occurred and be continuing as of the date of the request for such disbursement and on the Interim Reduction Date;

(c) the Benchmark Reduction Date shall not have occurred as of the Interim Reduction Date;

(d) Net Operating Income (excluding interest on credit accounts) for the then-current debt service period is insufficient to pay principal and interest due and payable on the Note after application toward all contributions to the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Leasing Escrow Funds and any other reserves required to be funded and other payments required to be made under the Loan Documents; and

(e) the expiration date of the then-current term of the Bank of Boston Lease is not later than three (3) years beyond the Anticipated Repayment Date, and The Bank of Boston has not, prior to the Interim Reduction Date, exercised any renewal or extension right which

will (effective after the Interim Reduction Date) have the effect of so extending the expiration date of the Bank of Boston Lease.

(x) For purposes of this Mortgage, the "Interim Reduction Amount" shall mean an amount equal to the lesser of (a) $1,000,000 or (b) the amount on deposit in the Leasing Escrow Fund in excess of an amount equal to $2,750,000, less any amounts previously disbursed for tenant improvements and leasing commissions pursuant to Paragraph 6(c)(iv); provided, however, that no Interim Reduction Amount shall be disbursed so that the aggregate amount of all Interim Reduction Amount disbursements made by Mortgagee exceeds $1,000,000.

(xi) Notwithstanding the foregoing provisions of this Paragraph 6(c), on the Anticipated Repayment Date the entire amount then held in the Leasing Escrow Funds shall be applied to the payment of the Debt in such order as Mortgagee shall determine in its sole discretion.

(d) Mortgagor hereby pledges to Mortgagee and grants to Mortgagee a security interest in any and all monies now or hereafter deposited in the Tax and Insurance Impound Fund, the Replacement Escrow Fund and the Leasing Escrow Fund as additional security for the payment of the Debt. Upon the occurrence of an Event of Default, Mortgagee shall have no obligation to disburse any amounts held in the Tax and Insurance Impound Fund, the Replacement Escrow Fund and the Leasing Escrow Fund to the Mortgagor and may apply any sums then present in such funds to the payment of the Debt in any order in its sole discretion.

7. **Condemnation**. (a) Mortgagor shall promptly give Mortgagee written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding (a "**Condemnation**") and shall deliver to Mortgagee copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Mortgagor, regardless of whether an Award (hereinafter defined) is available, shall, unless Mortgagee shall have elected to apply the Award in reduction of the Debt, then only if Mortgagor shall have failed to repay the Debt in full within one hundred eighty (180) days after such application, promptly proceed to restore, repair, replace or rebuild the same to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with applicable law.

(b) Mortgagee is hereby irrevocably appointed as Mortgagor's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment ("**Award**") for any taking accomplished through a Condemnation (a "**Taking**") and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Mortgage. Notwithstanding the foregoing:

(i) In the event of an Award that does not exceed $250,000.00, Mortgagor may make any such settlement or compromise and adjust any claim provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 7(c) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such Award, which shall be held in escrow by Mortgagor and applied by

SRZNY\611479v8

Mortgagor toward the cost of restoring the Mortgaged Property or part thereof subject to the Taking, in the manner set forth below. Mortgagor hereby covenants and agrees to commence and diligently to prosecute such Restoration; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such Restoration in excess of the net proceeds of insurance made available pursuant to the terms hereof.

(ii) In the event of an Award that is in excess of $250,000.00 but not in excess of thirty-five percent (35%) of the then outstanding principal balance of the Note, Mortgagor may make any such settlement or compromise and adjust any claim, with Mortgagee's prior written consent, which shall not be unreasonably withheld; provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 7(c) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such Award. Notwithstanding the foregoing, in the event that Mortgagor shall not have finally settled and adjusted any such claim within one hundred eighty (180) days following the Taking, then and in that event, Mortgagee shall thereupon control the negotiations and proceedings, and Mortgagee shall consult with Mortgagor in respect thereof; provided, however, that, should Mortgagor and Mortgagee disagree as to such settlement or adjustment, then Mortgagee alone may settle and adjust the claim without the consent or agreement of Mortgagor. In any event, the proceeds of any such Award shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

(iii) In the event an Award in excess of thirty-five percent (35%) of the then outstanding principal balance of the Note, Mortgagor may make any such settlement or compromise and adjust any claim with Mortgagee's prior written consent, which shall not be unreasonably withheld; provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 7(c) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such Award. Notwithstanding the foregoing, the event that Mortgagor shall not have finally settled such claim within sixty (60) days following the Taking, then and in that event, Mortgagee shall thereupon control the negotiations and proceedings, and Mortgagee shall consult with Mortgagor in respect thereof; provided, however, that, should Mortgagor and Mortgagee disagree as to such settlement or adjustment, then Mortgagee alone may settle and adjust the claim without the consent or agreement of Mortgagor. In any event, the Award shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

(c) Mortgagee shall not unreasonably delay the granting or withholding of any consent requested of Mortgagee pursuant to the provisions of Paragraph 7(b), and if Mortgagee's disapproval of any proposed settlement or compromise or is not received by Mortgagor within forty-five (45) days following the receipt by Mortgagee of Mortgagor's request, Mortgagee shall be deemed to have granted its approval or consent, provided, however, that Mortgagor shall provide Mortgagee with written notice of, and request for approval or consent to, any proposed settlement or adjustment and provided, further, that such notice shall contain the following introductory sentence in conspicuous 14 point boldface type: "THIS IS A REQUEST FOR AN APPROVAL FROM MORTGAGEE BY MORTGAGOR, A RESPONSE

TO WHICH MUST BE RECEIVED BY MORTGAGOR WITHIN FORTY-FIVE (45) DAYS OF MORTGAGEE'S RECEIPT HEREOF, OR SUCH APPROVAL SHALL BE DEEMED GRANTED."

(d) Notwithstanding any Taking by any public or quasi-public authority (including, without limitation, any transfer made in lieu of or in anticipation of such a Taking), Mortgagor shall continue to pay the Debt at the time and in the manner provided for in the Note, this Mortgage and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Mortgagee to expenses of collecting the Award and to discharge of the Debt. Mortgagee shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. Mortgagor shall cause any Award that is payable to Mortgagor to be paid directly to Mortgagee.

(e) In the event of any Condemnation where the Award is in an aggregate amount in excess of $250,000 but less than thirty-five percent (35%) of the then outstanding original principal balance of the Note, and if, in the reasonable judgment of Mortgagee, the Mortgaged Property can be restored within twelve (12) months and prior to the Anticipated Repayment Date to an economic unit not less valuable (including an assessment of the impact of the termination of any Leases due to such Condemnation) and not materially less useful than the same was immediately prior to the Condemnation then, if no Event of Default shall have occurred and be then continuing, the proceeds of the Award (after reimbursement of any expenses incurred by Mortgagee) shall be applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to Condemnation, in the manner set forth below. Mortgagor hereby covenants and agrees to commence and diligently to prosecute such restoring, repairing, replacing or rebuilding; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such restoring, repairing, replacing or rebuilding in excess of the Award made available pursuant to the terms hereof.

(f) Except as provided above, the Award collected upon any Condemnation shall, at the option of Mortgagee in its sole discretion, be applied to the payment of the Debt or applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to the Condemnation, in the manner set forth below. Any such application to the Debt shall be without any prepayment consideration except that if an Event of Default has occurred then the Mortgagor shall pay to Mortgagee an additional amount equal to the Yield Maintenance Premium, if any, that would be required under Paragraph 55 hereof if Defeasance Collateral was to be purchased by Mortgagor. Any such application to the Debt shall be applied to those payments of principal and interest last due under the Note but shall not postpone or reduce any payments otherwise required pursuant to the Note other than such last due payments. Upon any such application to the Debt, Mortgagor may within one hundred eighty (180) days after such application prepay the balance of the Debt without penalty or premium on not less than ten (10) days notice to Mortgagee and upon payment in full, Mortgagee will release all collateral. If the Mortgaged Property is sold, through foreclosure or otherwise, prior to the receipt by Mortgagee of such Award, Mortgagee shall have

the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of said Award sufficient to pay the Debt.

(g) In the event Mortgagor is entitled to reimbursement out of the Award received by Mortgagee, such proceeds shall be disbursed from time to time upon Mortgagee being furnished with (1) evidence satisfactory to it of the estimated cost of completion of the restoration, repair, replacement and rebuilding resulting from such condemnation, (2) funds or, at Mortgagee's option, assurances satisfactory to Mortgagee that such funds are available, sufficient in addition to the proceeds of the Award to complete the proposed restoration, repair, replacement and rebuilding, and (3) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of costs, payment and performance as Mortgagee may reasonably require and approve; and Mortgagee may, in any event, require that all plans and specifications for such restoration, repair, replacement and rebuilding be submitted to and approved by Mortgagee prior to commencement of work. No payment made prior to the final completion of the restoration, repair, replacement and rebuilding shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than proceeds of the Award shall be disbursed prior to disbursement of such proceeds; and at all times, the undisbursed balance of such proceeds remaining in hands of Mortgagee, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Mortgagee by or on behalf of Mortgagor for that purpose, shall be at least sufficient in the reasonable judgment of Mortgagee to pay for the costs of completion of the restoration, repair, replacement or rebuilding, free and clear of all liens or claims for lien. Any surplus which may remain out of the Award received by Mortgagee after payment of such costs of restoration, repair, replacement or rebuilding shall, in the sole and absolute discretion of Mortgagee, be retained by Mortgagee and applied to payment of the Debt.

(h) (i) Notwithstanding the foregoing provisions of this Paragraph 7, for so long as the Boston SNDA (as defined in Paragraph 8(d) below) is in full force and effect any Award shall be payable to and held and maintained by Mortgagee or deposited by Mortgagee with a third party trustee selected by Mortgagee and all such Awards shall be applied by Mortgagee as provided in the Boston SNDA (if and to the extent that the provisions of the Boston SNDA are in conflict with the foregoing provisions of this Paragraph 7), provided, however, that, in the event that any Condemnation shall occur within twelve (12) months prior to, or at any time after, the Anticipated Repayment Date, Mortgagee shall at its option apply the Award to the payment of the Debt. If Mortgagee elects to so apply the Award to the payment of the Debt, Mortgagee may within one hundred eighty (180) days after the Condemnation prepay the balance of the Debt without penalty or premium on not less than ten (10) days notice to Mortgagee, and upon payment in full, Mortgagee will release all collateral.

(ii) In the event that the Award is applied by Mortgagee as provided in the Boston SNDA, Mortgagor shall restore, or cause to be restored, the Mortgaged Property in the manner and upon such terms and conditions as required by the Bank of Boston Lease and (to the extent not in conflict with the Bank of Boston Lease) as would be required by a

prudent interim construction lender, including, but not limited to (A) the deposit by Mortgagor with Mortgagee, within thirty (30) days after demand therefor, of any deficiency necessary in order to assure the availability of sufficient funds to pay for such restoration or repair, including Mortgagee's costs and expenses to be incurred in connection therewith, provided, however, that such funds shall be held in escrow by Mortgagee and disbursed as the first funds for restoration, (B) the prior approval by Mortgagee of all plans and specifications, contractors and forms of construction contracts, and (C) the furnishing to Mortgagee of permits, bonds, lien waivers, invoices, receipts and affidavits from all contractors and subcontractors in form and substance reasonably satisfactory to Mortgagee in its discretion; provided, however, that, in the event that Mortgagor does not cause to be restored the Mortgaged Property in accordance with the foregoing provisions, the same shall be an Event of Default hereunder and Mortgagee may, in Mortgagee's absolute discretion and without regard to the adequacy of Mortgagee's security, elect to accelerate the maturity date of the Note, declare any and all of the Debt to be immediately due and payable and apply any sums then held by the Mortgagee or an insurance trustee pursuant to this Paragraph 7 to the payment of the Debt in whatever order Mortgagee elects.

8. **Leases and Rents.**

(a) Mortgagor does hereby absolutely and unconditionally assign to Mortgagee, all Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment to Mortgagee shall not be construed to bind Mortgagee to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise impose any obligation upon Mortgagee. Mortgagor agrees to execute and deliver to Mortgagee such additional instruments, in form and substance satisfactory to Mortgagee, as may hereafter be requested by Mortgagee to further evidence and confirm such assignment. Nevertheless, subject to the terms of this paragraph, Mortgagee grants to Mortgagor a revocable license to operate and manage the Mortgaged Property and to direct lessees to pay Rents in accordance with the Loan Documents. Upon an Event of Default, without the need for notice or demand, the license granted to Mortgagor herein shall automatically be revoked, and Mortgagee shall immediately be entitled to possession of all Rents, whether or not Mortgagee enters upon or takes control of the Mortgaged Property. Mortgagee is hereby granted and assigned by Mortgagor the right, at its option, upon revocation of the license granted herein, to enter upon the Mortgaged Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license may be applied toward payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper.

(b) All Leases executed on or after the date hereof shall provide that they are subordinate to this Mortgage and that the tenant agrees to attorn to Mortgagee. None of the Leases shall contain any option to purchase, any right of first refusal to lease or purchase or any right to terminate the lease term (except (i) in the event of the destruction of all or substantially all of the Mortgaged Property or (ii) as expressly provided in the Bank of Boston Lease; provided, however, that for so long as the Mortgaged Property remains subject to this Mortgage, in the event that The Bank of Boston acquires title to the Mortgaged Property, as the

result of any right to purchase all or any part of the Mortgaged Property, whether pursuant to Section 20.01 of the Bank of Boston Lease or otherwise, such event shall be an Event of Default hereunder unless done in accordance with the provisions of that certain Subordination, Non-Disturbance and Attornment Agreement by and between Mortgagee and the Bank of Boston, dated the date hereof (the "Boston SNDA"). Mortgagor hereby covenants not to take any action which would trigger The Bank of Boston's rights under Section 20.01 of the Bank of Boston Lease. Leases executed after the date hereof shall not contain any provisions which adversely affect the Mortgaged Property or which might adversely affect the rights of any holder of the Loan without the prior written consent of Mortgagee. Each tenant shall conduct business only in that portion of the Mortgaged Property covered by its lease. Upon request, Mortgagor shall furnish Mortgagee with executed copies of all Leases.

(c) Mortgagor shall not, without the prior consent of Mortgagee (i) enter into any Lease of all or any part of the Mortgaged Property in excess of ten percent (10%) of the gross leasable area of the Improvements (a "Major Lease"), provided, however, that Mortgagee's consent shall not be unreasonably withheld or delayed if (A) the proposed Major Lease is on a form approved by Mortgagee or on a form customarily used for first class office buildings in the vicinity of the Mortgaged Property and otherwise in compliance with the criteria set forth in this Paragraph 8(c)(i)(B)-(E), (B) the rent under the proposed Major Lease is at no less than market rent, (C) the primary use of the leased premises is office use, (D) the lessee under the proposed Major Lease is creditworthy, as determined by Mortgagee in its reasonable discretion considering the amount of space leased, the length of the term and the extent of tenant improvements and other concessions granted to the lessee by Mortgagor, and (E) if the term of the proposed Major Lease is greater than five (5) years, the Major Lease contains provisions for appropriate rent adjustments at least every (5) years, (ii) cancel, terminate, abridge or otherwise modify the terms of any Major Lease, or accept a surrender thereof, (iii) consent to any assignment of or subletting under any Major Lease not in accordance with its terms, (iv) cancel, terminate, abridge or otherwise modify any guaranty of any Major Lease or the terms thereof, (v) accept prepayments of installments of Rents for a period of more than one (1) month in advance or (vi) further assign the whole or any part of the Leases or the Rents. If Mortgagee fails to respond to a request for consent hereunder within ten (10) business days of receipt thereof, such consent shall be deemed granted, provided that (x) with respect to (i) above, Mortgagor has provided Mortgagee with all information obtained by Mortgagor in the ordinary course of its dealings with the proposed lessee relating to the proposed lessee's creditworthiness, a summary of the material economic terms of the proposed Major Lease, a self-addressed envelope and a reminder notice in capital letters that Mortgagee shall notify Mortgagor of any objection within ten (10) business days of the Mortgagor's request, setting forth reasonably sufficient detail in order to reasonably enable Mortgagor to either appropriately renegotiate the Lease terms or refute or resolve Mortgagee's objection, or the consent shall be deemed granted and (y) with respect to (ii)-(iv) above, such request shall have been accompanied by all information requested by Mortgagee or reasonably necessary for Mortgagee to evaluate such request and shall have clearly stated, in 14 point type or greater, that if Mortgagee fails to respond to such request within ten (10) business days, Mortgagee's consent shall be deemed to have been granted. In the event that Mortgagee rejects a proposed Major Lease, Mortgagee shall provide such rejection to Mortgagor in writing setting forth the reasons for such rejection. In

addition, Mortgagor shall not (A) lease all or any part of the Mortgaged Property, (B) cancel, terminate, abridge or otherwise modify the terms of any Lease, or accept a surrender thereof, (C) consent to any assignment of or subletting under any Lease not in accordance with its terms or (D) cancel, terminate, abridge or otherwise modify any guaranty of any Lease or the terms thereof, unless such actions are exercised for a commercially reasonable purpose in arms-length transactions on market terms. Notwithstanding the foregoing, Mortgagee approves the further renewal or extension of the existing Bank of Boston Lease in accordance with the provisions thereof, on terms no less favorable than in effect on the date hereof.

(d) Mortgagor (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Mortgagee of all notices of default which Mortgagor shall send or receive thereunder; (iii) shall enforce all the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof, in a commercially reasonable manner; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall not execute any other assignment of the lessor's interest in the Leases or the Rents; (vi) shall deliver to Mortgagee, upon request, tenant estoppel certificates from each commercial tenant at the Mortgaged Property in form and substance reasonably satisfactory to Mortgagee, provided that Mortgagor shall not be required to deliver such certificates more frequently than two (2) times in any calendar year; and (vii) shall execute and deliver at the request of Mortgagee all such further assurances, confirmations and assignments in connection with the Mortgaged Property as Mortgagee shall from time to time require.

(e) All future security deposits of tenants, whether held in cash or any other form, shall not be commingled with any other funds of Mortgagor and, if cash, shall be deposited by Mortgagor at such commercial or savings bank or banks, or otherwise held in compliance with applicable law, as may be reasonably satisfactory to Mortgagee. Any bond or other instrument which Mortgagor is permitted to hold in lieu of cash security deposits under any applicable legal requirements shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as hereinabove described, shall be issued by an institution reasonably satisfactory to Mortgagee, shall, if permitted pursuant to any legal requirements, name Mortgagee as payee or mortgagee thereunder (or at Mortgagee's option, be fully assignable to Mortgagee) and shall, in all respects, comply with any applicable legal requirements and otherwise be reasonably satisfactory to Mortgagee. Mortgagor shall, upon request, provide Mortgagee with evidence reasonably satisfactory to Mortgagee of Mortgagor's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Mortgagor shall, upon Mortgagee's request, if permitted by any applicable legal requirements, turn over to Mortgagee the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Mortgaged Property, to be held by Mortgagee subject to the terms of the Leases.

(f) Representations regarding the Bank of Boston Lease. Mortgagor hereby represents and warrants to Mortgagee as follows:

(i) Mortgagor has delivered to Mortgagee a true, correct and complete copy of the Bank of Boston Lease (including all amendments thereto and modifications thereof) and there are no other Leases affecting the Mortgaged Property as of the date hereof other than the Leases described in the rent roll delivered to Mortgagee in connection with this Mortgage;

(ii) To the best of Mortgagor's knowledge, the Bank of Boston Lease constitutes the legal, valid and binding obligation of Mortgagor and is enforceable against The Bank of Boston and no default exists, or with the passing of time or the giving of notice or both would exist, under the Bank of Boston Lease;

(iii) The Bank of Boston has not, as of the date hereof, paid rent more than one (1) month in advance, and the rents under the Bank of Boston Lease have not been waived, released, or otherwise discharged or compromised;

(iv) All work to be performed by Mortgagor under the Bank of Boston Lease has been timely performed in accordance with the Bank of Boston Lease, all contributions (if any) to be made by Mortgagor to the Bank of Boston have been timely made in accordance with the Bank of Boston Lease and all other conditions precedent to the Bank of Boston's obligations thereunder have been fully satisfied as of the date hereof;

(v) To the best of Mortgagor's knowledge and belief, The Bank of Boston is free from bankruptcy, reorganization or arrangement proceedings or a general assignment for the benefit of creditors; and

(vi) To the best of Mortgagor's knowledge, the Bank of Boston Lease does not provide any party with the right to obtain a lien or encumbrance upon the Mortgaged Property superior to the lien of this Mortgage.

9. <u>Maintenance and Use of Mortgaged Property</u>. Mortgagor shall cause the Mortgaged Property to be maintained in a good and safe condition and repair. The Improvements and the Equipment shall not be removed, demolished or materially altered (except for normal replacement of the Equipment and tenant improvement work performed in the ordinary course of Mortgagor's business) without the consent of Mortgagee. Mortgagor shall promptly comply with all laws, orders and ordinances affecting the Mortgaged Property or the use thereof, subject to Mortgagor's right to contest as set forth in <u>Paragraph 31</u> hereof.

Mortgagor shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Mortgaged Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Mortgaged Property is or shall become a nonconforming use, Mortgagor will not cause or permit such nonconforming use to be discontinued or abandoned without the express written consent of Mortgagee. Mortgagor shall not (i) change the use of the Mortgaged Property, (ii) permit or suffer to occur any waste on or to the Mortgaged Property or to any portion thereof or (iii) take any steps whatsoever to convert the Mortgaged Property, or any portion thereof, to a condominium or cooperative form of management. Mortgagor will not install or permit to be installed on the Premises any underground storage tank.

**10. Transfer or Encumbrance of the Mortgaged Property.**

(a) Mortgagor acknowledges that Mortgagee has examined and relied on the creditworthiness and experience of Mortgagor in owning and operating properties such as the Mortgaged Property in agreeing to make the Loan, and that Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for repayment of the Debt. Mortgagor acknowledges that Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should Mortgagor default in the repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property. Mortgagor shall not, without the prior written consent of Mortgagee or as otherwise expressly provided herein or in the other Loan Documents, sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof, or permit the Mortgaged Property or any part thereof to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred.

(b) A sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer within the meaning of this Paragraph 10 shall be deemed to include (i) an installment sales agreement wherein Mortgagor agrees to sell the Mortgaged Property or any part thereof for a price to be paid in installments; (ii) an agreement by Mortgagor leasing all or a substantial part of the Mortgaged Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgagor's right, title and interest in and to any Leases or any Rents; (iii) if Mortgagor, Guarantor or any general partner or managing member of Mortgagor or Guarantor is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in all instances in one or a series of transactions by which an aggregate of more than 25% of such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the control of such corporation; (iv) if Mortgagor, any Guarantor or any member of Mortgagor or any Guarantor is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, member, non-member manager joint venturer or the transfer, assignment or pledge of any ownership interest of any general partner, member, non-member manager or joint venturer in Mortgagor or the transfer, assignment or pledge of any ownership interest in any general partner,

member, non-member manager or joint venturer; (v) if Mortgagor or any member of Mortgagor or any Guarantor is a limited partnership or limited liability company, the voluntary or involuntary sale, conveyance, transfer or pledge of any limited partnership interests or membership interests or the creation or issuance of new limited partnership interests or membership interests in either Mortgagor, Guarantor or any member of Mortgagor, by which an aggregate of more than 25% of such limited partnership interests or membership interests are held by, or pledged to, parties who are not currently limited partners or members; or (vi) the replacement of either of the "Guarantors" named as of the date hereof in that certain Guaranty, of even date herewith, made to Mortgagee in connection with the Loan (the "Key Principals") as the sole trustees of Royall Associates Realty Trust, provided, however, that, notwithstanding the foregoing subparagraphs (iii) or (v), so long as the Key Principals, their spouses or ex-spouses (provided, but only if such spouses or ex-spouses have control of the decision making with respect to the Mortgaged Property, such spouses or ex-spouses are in Mortgagor's reasonable judgment persons of good character and reputation), their direct descendants and their spouses, or any of them (including trusts for the benefit of the foregoing ("Key Principals Family Members")), or entities owned and controlled by any of them (i.e., ownership directly or indirectly of not less than 51% thereof with the ability to control or direct decision making ("Key Principals Entities")) shall in the aggregate be the owner of at least a 51% interest in the Mortgagor or the member of the Mortgagor and the Key Principals or, in the event of the death or incapacity of either Key Principal, one or more of the Key Principal Family Members, have effective control of the decision making with respect to the Mortgaged Property such entity or entities, the foregoing restrictions on transfer and/or any other such restrictions contained in this Mortgage shall not be or be deemed to have been violated so long as (I) Mortgagor shall give Mortgagee written notice of any such pending transfer, together with such information as shall allow Mortgagee to determine if such transfer complies with the requirements set forth in this proviso and (II) if not less than 51% of such interests are transferred, in one or more transactions, to Key Principals Family Members or Key Principals Entities, then, at Mortgagee's request, Mortgagee shall be provided with a non-consolidation opinion in connection therewith.

(c) Mortgagee shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Mortgagor's sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property without Mortgagee's consent. This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property regardless of whether voluntary or not, or whether or not Mortgagee has consented to any previous sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property.

(d) Mortgagee's consent to one sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property shall not be deemed to be a waiver of Mortgagee's right to require such consent to any future occurrence of same. Any sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property made in contravention of this paragraph shall be null and void and of no force and effect.

(e) Mortgagor agrees to bear and shall pay or reimburse Mortgagee on demand for all reasonable expenses (including, without limitation, reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Mortgagee in connection with the review, approval and documentation of any such sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer.

(f) Mortgagee's consent to the sale or transfer of the Mortgaged Property will not be unreasonably withheld or conditioned after consideration of all relevant factors, provided that:

(i) no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default shall have occurred and remain uncured;

(ii) the proposed transferee (**"Transferee"**) shall be a reputable entity or person of good character, creditworthy, with sufficient financial worth considering the obligations assumed and undertaken, as evidenced by financial statements and other information reasonably requested by Mortgagee with an organizational structure and documentation reasonably acceptable to Mortgagee;

(iii) the Transferee and its property manager shall have sufficient experience in the ownership and management of properties similar to the Mortgaged Property, and Mortgagee shall be provided with reasonable evidence thereof (and Mortgagee reserves the right to approve the Transferee without approving the substitution of the property manager);

(iv) Mortgagee, at its option, shall have recommendations in writing from the Rating Agencies (which Mortgagee and Mortgagor shall cooperate to obtain without unreasonable delay) to the effect that such transfer will not result in a requalification, reduction or withdrawal of any current securities rating assigned in a Securitization. The term **"Rating Agencies"** as used herein shall mean each of Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc., Duff and Phelps Credit Rating Co. and Fitch Investors Service, L.P., or any other nationally-recognized statistical rating agency which has been approved by Mortgagee;

(v) the Transferee shall have executed and delivered to Mortgagee an assumption agreement in form and substance acceptable to Mortgagee, evidencing such Transferee's

agreement to abide and be bound by the terms of the Note, this Mortgage and the other Loan Documents, together with such legal opinions and title insurance endorsements as may be reasonably requested by Mortgagee; and

(vi) Mortgagee shall have received an assumption fee equal to one percent (1%) of the Debt on the date of such assumption and the payment of, or reimbursement for, all costs and expenses incurred by Mortgagee in connection with such assumption (including reasonable attorneys' fees and costs).

**11. Representations and Covenants Concerning the Mortgagor and Mortgaged Property.** Mortgagor represents, warrants and covenants as follows:

(a) Organization and Existence. Mortgagor is duly organized and validly existing as a limited liability company in good standing under the laws of Delaware and in all other jurisdictions in which Mortgagor is transacting business. Mortgagor has the power and authority to execute, deliver and perform the obligations imposed on it under the Loan Documents and to consummate the transactions contemplated by the Loan Documents.

(b) Authorization. Mortgagor has taken all necessary actions for the authorization of the borrowing on account of the Loan and for the execution and delivery of the Loan Documents, including, without limitation, that those members of Mortgagor whose approval is required by the terms of Mortgagor's organizational documents have duly approved the transactions contemplated by the Loan Documents and have authorized execution and delivery thereof by the respective signatories. To the best of Mortgagor's knowledge, no other consent by any local, state or federal agency is required in connection with the execution and delivery of the Loan Documents.

(c) Valid Execution and Delivery. All of the Loan Documents requiring execution by Mortgagor have been duly and validly executed and delivered by Mortgagor.

(d) Enforceability. All of the Loan Documents constitute valid, legal and binding obligations of Mortgagor and are fully enforceable against Mortgagor in accordance with their terms by Mortgagee and its successors, transferees and assigns, subject only to bankruptcy laws and general principles of equity.

(e) No Defenses. The Note, this Mortgage and the other Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense, nor would the operation of any of the terms of the Note, this Mortgage or any

of the other Loan Documents, or the exercise of any right thereunder, render this Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury.

(f) Defense of Usury. Mortgagor knows of no facts that would support a claim of usury to defeat or avoid its obligation to repay the principal of, interest on, and other sums or amounts due and payable under, the Loan Documents.

(g) No Conflict/Violation of Law. The execution, delivery and performance of the Loan Documents by the Mortgagor will not cause or constitute a default under or conflict with the organizational documents of Mortgagor, any Guarantor or any general partner or managing member of Mortgagor or any Guarantor. The execution, delivery and performance of the obligations imposed on Mortgagor under the Loan Documents will not cause Mortgagor to be in default, including after due notice or lapse of time or both, under the provisions of any agreement, judgment or order to which Mortgagor is a party or by which Mortgagor is bound.

(h) Compliance with Applicable Laws and Regulations. All of the Improvements and the use of the Mortgaged Property comply with, and (subject to the provisions of Paragraphs 23(j) and 31 hereof) shall remain in compliance with, all applicable statutes, rules, regulations and private covenants now or hereafter relating to the ownership, construction, use or operation of the Mortgaged Property, including all applicable statutes, rules and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning and land use. The Improvements comply with, and shall remain in compliance with, applicable health, fire and building codes. There is no evidence of any illegal activities relating to controlled substances on the Mortgaged Property. All certifications, permits, licenses and approvals, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Mortgaged Property as a an office building complex have been obtained and are in full force and effect. All of the Improvements comply with all material requirements of any applicable zoning and subdivision laws and ordinances.

(i) Consents Obtained. All consents, approvals, authorizations, orders or filings with any court or governmental agency or body, if any, required for the execution, delivery and performance of the Loan Documents by Mortgagor have been obtained or made.

(j) No Litigation. There are no pending actions, suits or proceedings, arbitrations or governmental investigations against the Mortgaged Property, an adverse outcome of which would materially affect the Mortgagor's performance under the Note, this Mortgage or the other Loan Documents.

(k) Title. The Mortgagor has good and marketable fee simple title to the Mortgaged Property, and good title to the Equipment, subject to no liens, charges or encumbrances other than the Permitted Exceptions. The possession of the Mortgaged Property has been peaceful and undisturbed and title thereto has not been disputed or questioned to the best of Mortgagor's knowledge

(l) Permitted Exceptions. The Permitted Exceptions do not and will not materially and adversely affect (1) the ability of the Mortgagor to pay in full the principal and interest on the Note in a timely manner or (2) the use of the Mortgaged Property for the use currently being made thereof, the operation of the Mortgaged Property as currently being operated or the value of the Mortgaged Property.

(m) First Lien. Upon the execution by the Mortgagor and the recording of this Mortgage, and upon the execution and filing of UCC-1 financing statements or amendments thereto, the Mortgagee will have a valid first lien on the Mortgaged Property and a valid security interest in the Equipment subject to no liens, charges or encumbrances other than the Permitted Exceptions.

(n) ERISA. The Mortgagor has made and shall continue to make all required contributions to all employee benefit plans, if any, and the Mortgagor has no knowledge of any material liability which has been incurred by the Mortgagor which remains unsatisfied for any taxes or penalties with respect to any employee benefit plan or any multi-employer plan, and each such plan has been administered in compliance with its terms and the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended (**"ERISA"**) and any other federal or state law.

(o) Contingent Liabilities. The Mortgagor has no known material contingent liabilities.

(p) No Other Obligations. The Mortgagor has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Mortgagor is a party or by which the Mortgagor or the Mortgaged Property is otherwise bound, other than obligations incurred in the ordinary course of the operation of the Mortgaged Property and other than obligations under this Mortgage and the other Loan Documents.

(q) Fraudulent Conveyance. The Mortgagor (1) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (2) received reasonably equivalent value in exchange for its obligations under the Loan Documents. Giving effect to the Loans contemplated by the Loan Documents, the fair saleable value of the Mortgagor's assets exceed and will, immediately following the execution and delivery of the Loan Documents, exceed the Mortgagor's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities. The fair saleable value of the Mortgagor's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than the Mortgagor's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. The Mortgagor's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. The Mortgagor does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of the Mortgagor).

(r) Investment Company Act. The Mortgagor is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (2) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (3) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(s) Access/Utilities. The Mortgaged Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities. All public utilities necessary to the continued use and enjoyment of the Mortgaged Property as presently used and enjoyed are either (i) located in the public right-of-way abutting the Mortgaged Property, such that all such utilities are connected so as to serve the Mortgaged Property without passing over other property, or (ii) are connected to the Mortgaged Property by means of a valid permanent easement, which easement parcel is contiguous to the Mortgaged Property and to public right-of-way in which the public utility is located. All roads necessary for the full utilization of the Mortgaged Property for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities or are the subject of access easements for the benefit of the Mortgaged Property.

(t) Taxes Paid. Mortgagor has filed all federal, state, county and municipal tax returns required to have been filed by Mortgagor, and has paid all taxes which have become due pursuant to such returns or to any notice of assessment received by Mortgagor, and Mortgagor has no knowledge of any basis for additional assessment with respect to such taxes.

(u) Single Tax Lot. The Premises consists of a single lot or multiple tax lots; no portion of said tax lot(s) covers property other than the Premises or a portion of the Premises and no portion of the Premises lies in any other tax lot.

(v) Special Assessments. Except as disclosed in the title insurance policy, there are no pending or, to the knowledge of the Mortgagor, proposed special or other assessments for public improvements or otherwise affecting the Mortgaged Property, nor, to the knowledge of the Mortgagor, are there any contemplated improvements to the Mortgaged Property that may result in such special or other assessments.

(w) Flood Zone. The Mortgaged Property is not located in a flood hazard area as defined by the Federal Insurance Administration.

(x) Seismic Exposure. To the best of Mortgagor's knowledge, the Premises are not located in Zone 3 or Zone 4 of the "Seismic Zone Map of the U.S."

(y) Misstatements of Fact. No statement of fact made in the Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact presently known to the Mortgagor which has not been disclosed which adversely affects, nor as far as the Mortgagor can foresee, might adversely affect the business, operations or condition (financial or otherwise) of the representing party.

(z) Condition of Improvements. The Mortgaged Property has not been damaged by fire, water, wind or other cause of loss or any previous damage to the Mortgaged Property has been fully restored.

(aa) No Insolvency or Judgment. Neither Mortgagor or any member of Mortgagor, nor any guarantor of the Loan is currently (a) the subject of or a party to any completed or pending bankruptcy, reorganization or insolvency proceeding; or (b) the subject of any judgment unsatisfied of record or docketed in any court of the state in which the Mortgaged Property is located or in any other court located in the United States. The Loan will not render the Mortgagor or any member of Mortgagor insolvent. As used herein, the term "insolvent" means that the sum total of all of an entity's liabilities (whether secured or unsecured, contingent or fixed, or liquidated or unliquidated) is in excess of the value of all such

entity's non-exempt assets, i.e., all of the assets of the entity that are available to satisfy claims of creditors.

(bb) No Condemnation. No part of any property subject to this Mortgage has been taken in condemnation or other like proceeding to an extent which would impair the value of the Mortgaged Property, this Mortgage or the Loan or the usefulness of such property for the purposes contemplated by the loan application relating to the Loan (the **"Loan Application"**), nor is any proceeding pending, threatened or known to be contemplated for the partial or total condemnation or taking of the Mortgaged Property.

(cc) No Labor or Materialmen Claims. All parties furnishing labor and materials have been paid in full and, except for such liens or claims insured against by the policy of title insurance to be issued in connection with the Loan, there are no mechanics', laborers' or materialmens' liens or claims outstanding for work, labor or materials affecting the Mortgaged Property, whether prior to, equal with or subordinate to the lien of this Mortgage.

(dd) No Purchase Options. No tenant, person, party, firm, corporation or other entity has an option to purchase the Mortgaged Property, any portion thereof or any interest therein.

(ee) Leases. The Mortgaged Property is not subject to any Leases other than the Leases described in the rent roll delivered to Mortgagee in connection with this Mortgage. No person has any possessory interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of the Leases. As of the date hereof, (i) the Mortgagor is the owner and holder of the landlord's interest under each Lease; (ii) there are no prior assignments of any Lease or any portion of Rents which are presently outstanding and have priority over the Assignment of Leases and Rents (the **"Assignment of Leases and Rents"**), dated the date hereof, given by Mortgagor to Mortgagee and intended to be duly recorded; (iii) the Leases have not been modified or amended, except as disclosed to Mortgagee in writing on the date hereof; (iv) each Lease is in full force and effect; (v) neither Mortgagor nor any tenant under any Lease is in default under any of the terms, covenants or provisions of the Lease, and Mortgagor knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under any Lease; (vi) there are no offsets or defenses to the payment of any portion of the Rents; and (vii) all Rents due and payable under each Lease have been paid in full and no said Rents have been paid more than one (1) month in advance of the due dates thereof.

# EXHIBIT C

CONTINUED

(ff) Appraisal. All requirements and conditions of the appraisal of the Property submitted to Mortgagee as part of the Loan Application, upon which the value of the Mortgaged Property was conditioned, have been fully satisfied.

(gg) Boundary Lines. All of the Improvements which were included in determining the appraised value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property, and no easements or other encumbrances upon the Premises encroach upon any of the Improvements, so as to affect the value or marketability of the Mortgaged Property except those which are insured against by title insurance.

(hh) Survey. The survey of the Mortgaged Property delivered to Mortgagee in connection with this Mortgage, has been performed by a duly licensed surveyor or registered professional engineer in the jurisdiction in which the Mortgaged Property is situated, is certified to the Mortgagee, its successors and assigns, and the title insurance company, and is in accordance with the most current minimum standards for title surveys as determined by the American Land Title Association, with the signature and seal of a licensed engineer or surveyor affixed thereto, and does not fail to reflect any material matter affecting the Mortgaged Property or the title thereto.

(ii) Forfeiture. There has not been and shall never be committed by Mortgagor or any other person in occupancy of or involved with the operation or use of the Mortgaged Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Mortgaged Property or any part thereof or any monies paid in performance of Mortgagor's obligations under any of the Loan Documents.

(jj) Management Agreement. The Management Agreement, dated as of September 10, 1999 (the "**Management Agreement**") between Mortgagor and Fineberg Management, Inc. ("**Manager**") pursuant to which Manager operates the Mortgaged Property is in full force and effect and there is no default or violation by any party thereunder. The fee due under the Management Agreement, and the terms and provisions of the Management Agreement, are subordinate to this Mortgage and Manager shall attorn to Mortgagee. Mortgagor shall not terminate, cancel, modify, renew or extend the Management Agreement, or enter into any agreement relating to the management or operation of the Mortgaged Property with Manager or any other party without the express written consent of Mortgagee, which consent shall not be unreasonably withheld. If at any time

Mortgagee consents to the appointment of a new Manager, such new Manager and Mortgagor shall, as a condition of Mortgagee's consent, execute a Consent and Agreement of Manager in the form then used by Mortgagee.

(kk) No Broker. No financial advisors, brokers, underwriters, placement agents, agents or finders have been dealt with by the Mortgagor in connection with the Loan.

12. **Single Purpose Entity/Separateness.** Mortgagor represents, warrants and covenants as follows:

(a) Mortgagor does not own and will not own any asset or property other than (i) the Mortgaged Property, and (ii) incidental personal property necessary for the ownership or operation of the Mortgaged Property.

(b) Mortgagor will not engage in any business other than the ownership, management and operation of the Mortgaged Property and Mortgagor will conduct and operate its business as presently conducted and operated.

(c) Mortgagor will not enter into any contract or agreement with any affiliate of the Mortgagor, any constituent party of Mortgagor, any guarantor (a "**Guarantor**") of the Debt or any part thereof or any affiliate of any constituent party or Guarantor, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(d) Mortgagor has not incurred and will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than (i) the Debt, (ii) unsecured trade and operational debt incurred in the ordinary course of business not outstanding for more than sixty (60) days with trade creditors and in amounts as are normal and reasonable under the circumstances, but, in no event, to exceed three percent (3%) of the outstanding principal balance of the Loan from time to time in the aggregate, (iii) debt incurred in the financing of equipment and other personal property used on the Premises, and (iv) indebtedness incurred in connection with restoring the Mortgaged Property in accordance with the provisions of Paragraph 4 or Paragraph 7 hereof. No indebtedness other than the Debt may be secured (subordinate or pari passu) by the Mortgaged Property.

(e) Mortgagor has not made and will not make any loans or advances to any third party (including any affiliate or constituent party, any Guarantor or any affiliate of any constituent party or Guarantor), and shall not acquire obligations or securities of its affiliates.

(f) Mortgagor is and will remain solvent and Mortgagor will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(g) Mortgagor has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Mortgagor will not, nor will Mortgagor permit any constituent party or Guarantor to amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, certificate of organization, trust or other organizational documents of Mortgagor or such constituent party or Guarantor without the prior written consent of Mortgagee.

(h) Mortgagor will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party and Mortgagor will file its own tax returns unless required otherwise by applicable law. Mortgagor shall maintain its books, records, resolutions and agreements as official records.

(i) Mortgagor will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Mortgagor, any constituent party of Mortgagor, any Guarantor or any affiliate of any constituent party or Guarantor), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its affiliates as a division or part of the other and shall maintain and utilize a separate telephone number and separate stationery, invoices and checks.

(j) Mortgagor is adequately capitalized and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k) Mortgagor will not seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of the Mortgagor.

(l) Mortgagor will not commingle the funds and other assets of Mortgagor with those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party of Guarantor, or any other person.

(m) Mortgagor has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other person.

(n) Mortgagor does not and will not guarantee, become obligated for, or hold itself out to be responsible for the debts or obligations of any other person or entity or the decisions or actions respecting the daily business or affairs of any other person or entity.

(o) Mortgagor will not permit any affiliate or constituent party independent access to its bank accounts.

(p) Mortgagor shall pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations.

(q) (i) If Mortgagor is a limited partnership the general partner (an "**SPC Entity**") shall be a corporation whose sole asset is its interest in Mortgagor and the SPC Entity will at all times comply, and will cause Mortgagor to comply, with each of the representations, warranties, and covenants contained in this Paragraph 12 as if such representation, warranty or covenant was made directly by such general partner;

(ii) if Mortgagor is a limited liability company, Mortgagor's manager (an "SPC Entity") shall at all time be a corporation owning no interest in any entity other than Mortgagor and the SPC Entity will at all times comply, and will cause Mortgagor to comply, with each of the representations, warranty and covenants contained in this Paragraph 12 as if such representation warranty or covenant was made directly, to the extent applicable, by such manager; or

(iii) If Mortgagor is a single member limited liability company the sole member (A) shall at all times fully comply with and cause Mortgagor to fully comply with each of the representation, warranties and covenants in this Paragraph 12 as if such representation, warranty and covenant was made directly by such member, to the extent applicable, and (B) shall at all times have as a party in control for the purposes of the representations, warranties and covenants in this Paragraph 12 (an "SPC Entity") a corporation owning no interest in any entity other than said sole member and the corporation will at all times comply with each of the representations, warranties and covenants in this Paragraph 12 as if such representation, warranty and covenant was made directly by such corporation.

(r) Mortgagor shall at all times cause there to be at least one duly appointed member of the board of directors (an "**Independent Director**") of the SPC Entity reasonably satisfactory to Mortgagee who shall not have been at the time of such individual's appointment, and may not have been at any time during the preceding five years (i) a shareholder of, or an officer, director, attorney, counsel, partner or employee of, Mortgagor or any of its shareholders, subsidiaries or affiliates, (ii) a customer of, or supplier to, Mortgagor or any of its shareholders, subsidiaries or affiliates, (iii) a person or other entity controlling or under common control with any such shareholder, partner, supplier or customer, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, employee, supplier or customer of any other director of Mortgagor. As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

(s) Mortgagor shall not cause or permit the board of directors of the SPC Entity to take any action which, under the terms of any certificate of incorporation, by-laws or any voting trust agreement with respect to any common stock, requires a vote of the board of directors of the SPC Entity unless at the time of such action there shall be at least one member who is an Independent Director.

(t) Mortgagor shall conduct its business and shall cause each Covered Party (as hereinafter defined) to conduct business so that the assumptions made with respect to

each party (each, a "**Covered Party**") addressed in that certain opinion letter dated the date hereof (the "**Insolvency Opinion**") delivered by Bernkopf, Goodman & Baseman LLP in connection with the Loan shall be true and correct in all respects.

13. **Estoppel Certificates and No Default Affidavits.**

After request by Mortgagee, Mortgagor shall within ten (10) days furnish Mortgagee with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, if any, (vi) that the Note, this Mortgage and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification; and (vii) reaffirming all representations and warranties of Mortgagor set forth herein and in the other Loan Documents as of the date requested by Mortgagee or, to the extent of any changes to any such representations and warranties, so stating such changes.

14. **Controlling Agreement.** It is expressly stipulated and agreed to be the intent of Mortgagor, and Mortgagee at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Mortgagee to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this Paragraph 14 (and the similar paragraph contained in the Note) shall control every other covenant and agreement in this Mortgage and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Debt, or if Mortgagee's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Mortgagor results in Mortgagor having paid any interest in excess of that permitted by applicable law, then it is Mortgagor's and Mortgagee's express intent that all excess amounts theretofore collected by Mortgagee shall be credited on the principal balance of the Note and all other Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Mortgagor), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. All sums paid or agreed to be paid to Mortgagee for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Debt until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Mortgagee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

15.    **Changes in Laws Regarding Taxation.**  If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Debt from the value of the Mortgaged Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Mortgagee's interest in the Mortgaged Property (other than a tax measured solely based upon the gross receipts of Mortgagee), Mortgagor will pay such tax, with interest and penalties thereon, if any.  In the event Mortgagee is advised by counsel chosen by it that the payment of such tax or interest and penalties by Mortgagor would be unlawful or taxable to Mortgagee or unenforceable or provide the basis for a defense of usury, then in any such event, Mortgagee shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable without any prepayment consideration except that if an Event of Default has occurred, then the Mortgagor shall pay to Mortgagee an additional amount equal to the Yield Maintenance Premium, if any, that would be required under Paragraph 55 hereof if Defeasance Collateral was to be purchased by Mortgagor.

16.    **No Credits on Account of the Debt.**  Mortgagor will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Mortgaged Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Mortgaged Property, or any part thereof, for real estate tax purposes by reason of this Mortgage or the Debt.  In the event such claim, credit or deduction shall be required by law, Mortgagee shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable without any prepayment consideration except that if an Event of Default has occurred, then the Mortgagor shall pay to Mortgagee an additional amount equal to the Yield Maintenance Premium, if any, that would be required under Paragraph 55 hereof if Defeasance Collateral was to be purchased by Mortgagor.

17.    **Documentary Stamps.**  If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or this Mortgage, or impose any other tax or charge on the same, Mortgagor will pay for the same, with interest and penalties thereon, if any.

18.    **Books and Records.**

(a)    The financial statements heretofore furnished to Mortgagee are, as of the dates specified therein, complete and correct and fairly present the financial condition of the Mortgagor and any other persons or entities that are the subject of such financial statements, and are prepared in accordance with generally accepted accounting principles. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operation or business of Mortgagor from that set forth in said financial statements.

(b)    Mortgagor will maintain full and accurate books of accounts and other records reflecting the results of the operations of the Mortgaged Property and will furnish to Mortgagee on or before forty-five (45) days after the end of each calendar quarter the following items, each certified by Mortgagor as being true and correct:  (i) a written statement (rent roll) dated as of the last day of each such calendar quarter identifying each of the Leases by

the term, space occupied, rental required to be paid, security deposit paid, any rental concessions, and identifying any defaults or payment delinquencies thereunder; (ii) monthly and year to date operating statements prepared for each calendar month during each such calendar quarter, noting Net Operating Income (as hereinafter defined), Gross Income from Operations (as hereinafter defined), and Operating Expenses (as hereinafter defined), and including an itemization of actual (not pro forma) capital and other information necessary and sufficient under generally accepted accounting practices to fairly represent the financial position and results of operation of the Mortgaged Property during such calendar month, all in form satisfactory to Mortgagee; (iii) a property balance sheet for each such calendar quarter; (iv) a comparison of the budgeted income and expenses and the actual income and expenses for each calendar quarter and year to date together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such quarterly periods and year to date; and (v) a calculation reflecting the Debt Service Coverage Ratio (as hereinafter defined) as of the last day of each such calendar quarter. Until a Securitization has occurred, the Mortgagor shall, upon Mortgagee's request made not more than twice, furnish monthly each of the items listed in the immediately preceding sentence within twenty (20) days after the end of such month. Within one hundred twenty (120) days following the end of each calendar year, Mortgagor shall furnish statements of its financial affairs and condition including a balance sheet and a statement of profit and loss for the Mortgagor in such detail as Mortgagee may request, and setting forth the financial condition and the income and expenses for the Mortgaged Property for the immediately preceding calendar year, which statements shall be prepared by Mortgagor. Mortgagor's annual financial statements shall include (i) a list of the tenants, if any, occupying more than twenty (20%) percent of the total floor area of the Improvements, and (ii) a breakdown showing the year in which each Lease then in effect expires and the percentage of total floor area of the Improvements and the percentage of base rent with respect to which Leases shall expire in each such year, each such percentage to be expressed on both a per year and a cumulative basis. Mortgagor's annual financial statements shall be accompanied by a certificate executed by the chief financial officer of Mortgagor or the general partner of Mortgagor, as applicable, stating that each such annual financial statement presents fairly the financial condition of the Mortgaged Property being reported upon and shall be prepared by a "Big Six" accounting firm or other independent certified public accountant acceptable to Mortgagee (including Tobias and Fleischman). Each such annual financial statement shall be prepared in accordance with generally accepted accounting principles consistently applied. At any time and from time to time Mortgagor shall deliver to Mortgagee or its agents such other financial data as Mortgagee or its agents shall reasonably request with respect to the ownership, maintenance, use and operation of the Mortgaged Property.

(c) For the purposes of this Mortgage, the following terms shall have the following meanings:

(i) The term "<u>Net Operating Income</u>" shall mean the amount obtained by subtracting Operating Expenses from Gross Income from Operations.

(ii) The term "<u>Operating Expenses</u>" shall mean the total of all expenditures, computed in accordance with generally accepted accounting principles, of

whatever kind relating to the operation, maintenance and management of the Mortgaged Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Mortgagee, and other similar costs, but excluding depreciation, debt service, capital expenditures, and contributions to the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Leasing Escrow Fund and any other reserves required under the Loan Documents.

(iii) The term "**Gross Income from Operations**" shall mean all income, computed in accordance with generally accepted accounting principles, derived from the ownership and operation of the Mortgaged Property from whatever source, including, but not limited to, Rents, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, and other pass-through or reimbursements paid by tenants under the Leases of any nature but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Mortgagor to any government or governmental agency, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, proceeds of casualty insurance and condemnation awards (other than business interruption or other loss of income insurance), and any disbursements to the Mortgagor from the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Leasing Escrow Fund, or any other escrow fund established by the Loan Documents.

(iv) The term "Debt Service Coverage Ratio" shall mean a ratio for the applicable period in which: (A) the numerator is the Net Operating Income (excluding interest on credit accounts) for such period as set forth in the statements required hereunder; and (B) the denominator is the aggregate amount of principal and interest due and payable on the Note.

**19. Performance of Other Agreements.** Mortgagor shall observe and perform each and every term to be observed or performed by Mortgagor pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Mortgaged Property.

**20. Further Acts, Etc.** Mortgagor will, at the cost of Mortgagor, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, Uniform Commercial Code financing statements or continuation statements, transfers and assurances as Mortgagee shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Mortgagee the property and rights hereby deeded, mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage or for facilitating the sale of the Loan and the Loan Documents as described in Paragraph 59 below. Mortgagor, on demand, will execute and deliver and hereby authorizes Mortgagee to execute in the name of Mortgagor or without the signature of Mortgagor to the extent Mortgagee may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to

evidence more effectively the security interest of Mortgagee in the Mortgaged Property. Upon foreclosure, the appointment of a receiver or any other relevant action, Mortgagor will, at the cost of Mortgagor and without expense to Mortgagee, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of or the Mortgaged Property. Mortgagor grants to Mortgagee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including, without limitation, such rights and remedies available to Mortgagee pursuant to this paragraph.

21. Recording of Mortgage, Etc. Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Mortgagee in, the Mortgaged Property. Mortgagor will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property and any instrument of further assurance, and all federal, state, county and municipal, taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance, except where prohibited by law so to do. Mortgagor shall hold harmless and indemnify Mortgagee, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of this Mortgage.

22. Reporting Requirements. Mortgagor agrees to give prompt notice to Mortgagee of the insolvency or bankruptcy filing of Mortgagor or the death, insolvency or bankruptcy filing of any Guarantor.

23. Events of Default. The Debt shall become immediately due and payable at the option of Mortgagee upon the happening of any one or more of the following events of default (each an **"Event of Default"**):

(a) if any portion of the Debt is not paid on or before the related Payment Date (as defined in the Note) or, for any payment other than a Monthly Payment Amount (as defined in the Note), the date on which such payment is due;

(b) subject to Mortgagor's right to contest as provided herein, if any of the Taxes or Other Charges are not paid when the same are due and payable (unless sums equaling the amount of Taxes and Other Charges then due and payable have been delivered to Mortgagee in accordance with Paragraph 6 hereof);

(c) if the Policies are not kept in full force and effect, or if the Policies are not delivered to Mortgagee promptly after request;

(d) if Mortgagor transfers or encumbers any portion of the Mortgaged Property without Mortgagee's prior written consent, other than in accordance with Paragraph 10 hereof;

(e) if any representation or warranty of Mortgagor, or of any Guarantor, made herein or in any other Loan Document or in any certificate, report, financial statement or other instrument or document furnished to Mortgagee shall have been false or misleading in any material respect when made;

(f) if Mortgagor or any Guarantor shall make an assignment for the benefit of creditors or if Mortgagor shall generally not be paying its debts as they become due;

(g) if a receiver, liquidator or trustee of Mortgagor or of any Guarantor shall be appointed or if Mortgagor or any Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Mortgagor or any Guarantor or if any proceeding for the dissolution or liquidation of Mortgagor or of any Guarantor shall be instituted; however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Mortgagor or such Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(h) if Mortgagor shall be in default under any other mortgage or security agreement covering any part of the Mortgaged Property whether it be superior or junior in lien to this Mortgage, after applicable notice and cure periods, if any;

(i) subject to Mortgagor's right to contest as provided herein, if the Mortgaged Property becomes subject to any mechanic's, materialman's or other lien and such lien is not removed of record or bonded within thirty (30) days of the filing or recording of such lien (except a lien for local real estate taxes and assessments not then due and payable);

(j) if Mortgagor fails to cure any violations of laws or ordinances affecting or which may be interpreted to affect the Mortgaged Property within thirty (30) days after Mortgagor first receives notice of any such violations (or such longer period as shall be permitted without interest or penalty by law, ordinance or regulation, subject to and in accordance with all applicable provisions of Paragraph 31 hereof);

(k) except as permitted in this Mortgage, the alteration, improvement, demolition or removal of any of the Improvements without the prior consent of Mortgagee;

(l) if Mortgagor shall continue to be in default under any term, covenant, or provision of the Note or any of the other Loan Documents, beyond applicable cure periods contained in those documents, if any, or, if none, for thirty (30) days after Mortgagor first receives notice of such default;

(m) if Mortgagor fails to cure a default under any other term, covenant or provision of this Mortgage within thirty (30) days after Mortgagor first receives notice of any



such default; provided, however, if such default is reasonably susceptible of cure, but not within such thirty (30) day period, then Mortgagor may be permitted up to an additional sixty (60) days to cure such default provided that Mortgagor diligently and continuously pursues such cure;

(n) if without Mortgagee's prior written consent, (i) the Management Agreement is terminated, (ii) the ownership, management or control of Manager is transferred, (iii) there is a material change in the Management Agreement, or (iv) if there shall be a material default by Mortgagor under the Management Agreement; or

(o) if Mortgagor ceases to continuously operate the Mortgaged Property or any material portion thereof as an office building for any reason whatsoever (other than temporary cessation in connection with any repair or renovation thereof undertaken with the consent of Mortgagee).

(p) If Mortgagor is in default under the Bank of Boston Lease beyond applicable notice and cure periods, if any, such that The Bank of Boston has the right to terminate the Bank of Boston Lease, in whole or in part, or to offset or abate any rentals or other sums due thereunder or if at any time while the Debt is outstanding the Bank of Boston Lease shall cease to be in full force and effect, except as the result of the expiration of the term thereunder or in accordance with the provisions of this Mortgage; provided, however, that an offset or abatement of rent shall not constitute an Event of Default hereunder if such offset or abatement relates to an item which is the subject of additional rent, is an item or expense which is not susceptible to further offset or abatement beyond the then current offset or abatement, the aggregate of all currently outstanding unpaid and unresolved offsets and abatements, when taking into account the currently claimed offset or abatement, does not exceed $200,000 and within seven (7) days after payment of the rent which included such offset or abatement Mortgagor deposits with Mortgagee an amount equal to such offset or abatement to be held by Mortgagee as additional collateral for the Debt until the cause of the offset or abatement has been resolved and the correct abated or offset rent has been paid, as applicable.

24. **Late Payment Charge.** If any portion of the Debt is not paid on or before the date which is three (3) days after the date on which such payment is due, Mortgagor shall pay to Mortgagee upon demand an amount equal to the lesser of three percent (3%) of such unpaid portion of the Debt or the maximum amount permitted by applicable law in order to defray a portion of the expenses incurred by Mortgagee in handling and processing such delinquent payment and to compensate Mortgagee for the loss of the use of such delinquent payment, and such amount shall be secured by this Mortgage.

25. **Right To Cure Defaults.** Upon the occurrence of any Event of Default, Mortgagee may, but without any obligation to do so and without notice to or demand on Mortgagor and without releasing Mortgagor from any obligation hereunder, make or do the same in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof. Mortgagee is authorized to enter upon the Mortgaged Property for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Mortgaged Property or to foreclose this Mortgage or collect the Debt, and the cost and expense thereof

SRZNY\611479v8

(including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest at the Default Rate (as defined in the Note) for the period after notice from Mortgagee that such cost or expense was incurred to the date of payment to Mortgagee, shall constitute a portion of the Debt, shall be secured by this Mortgage and the other Loan Documents and shall be due and payable to Mortgagee upon demand.

26. **Additional Remedies.**

(a) Upon the occurrence of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Mortgaged Property by Mortgagee itself or otherwise, including, without limitation, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee:

(i) declare the entire Debt to be immediately due and payable;

(ii) institute a proceeding or proceedings, judicial or nonjudicial, by advertisement or otherwise, for the complete foreclosure of this Mortgage in which case the Mortgaged Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(iii) with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Mortgage for the portion of the Debt then due and payable, subject to the continuing lien of this Mortgage for the balance of the Debt not then due;

(iv) sell for cash or upon credit the Mortgaged Property or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to the power of sale contained herein or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(v) institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, or in any of the other Loan Documents;

(vi) recover judgment on the Note either before, during or after any proceedings for the enforcement of this Mortgage;

(vii) apply for the appointment of a trustee, receiver, liquidator or conservator of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Mortgagor, any Guarantor or of any person, firm or other entity liable for the payment of the Debt;

(viii) enforce Mortgagee's interest in the Leases and Rents and enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, and thereupon Mortgagee may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Mortgaged Property and conduct the business thereat; (B) complete any construction on the Mortgaged Property in such manner and form as Mortgagee deems advisable; (C) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (D) exercise all rights and powers of Mortgagor with respect to the Mortgaged Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents; and (E) apply the receipts from the Mortgaged Property to the payment of Debt, after deducting therefrom all expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the taxes, assessments insurance and other charges in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Mortgagee, its counsel, agents and employees;

(ix) require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Mortgaged Property occupied by Mortgagor and require Mortgagor to vacate and surrender possession to Mortgagee of the Mortgaged Property or to such receiver and, in default thereof, evict Mortgagor by summary proceedings or otherwise; or

(x) pursue such other rights and remedies as may be available at law or in equity or under the Uniform Commercial Code including without limitation the right to receive and/or establish a lock box for all Rents proceeds from the Intangibles and any other receivables or rights to payments of Mortgagor relating to the Mortgaged Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Mortgaged Property, this Mortgage shall continue as a lien on the remaining portion of the Mortgaged Property.

(b) The proceeds of any sale made under or by virtue of this paragraph, together with any other sums which then may be held by Mortgagee under this Mortgage, whether under the provisions of this paragraph or otherwise, shall be applied by Mortgagee to the payment of the Debt in such priority and proportion as Mortgagee in its sole discretion shall deem proper.

(c) Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d) Upon the completion of any sale or sales pursuant hereto, Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the

accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Mortgagee is hereby irrevocably appointed the true and lawful attorney of Mortgagor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose Mortgagee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Mortgagor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any sale or sales made under or by virtue of this paragraph, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Mortgagor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under Mortgagor.

(e) Upon any sale made under or by virtue of this paragraph, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Mortgagee may bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Mortgagee is authorized to deduct under this Mortgage.

(f) No recovery of any judgment by Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Mortgagor shall affect in any manner or to any extent the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any liens, rights, powers or remedies of Mortgagee hereunder, but such liens, rights, powers and remedies of Mortgagee shall continue unimpaired as before.

(g) Mortgagee may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this paragraph at any time before the conclusion thereof, as determined in Mortgagee's sole discretion and without prejudice to Mortgagee.

(h) Mortgagee may resort to any remedies and the security given by the Note, this Mortgage or the Loan Documents in whole or in part, and in such portions and in such order as determined by Mortgagee's sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Note, this Mortgage or any of the other Loan Documents. The failure of Mortgagee to exercise any right, remedy or option provided in the Note, this Mortgage or any of the other Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Note, this Mortgage or the other Loan Documents. No acceptance by Mortgagee of any payment after the occurrence of any Event of Default and no payment by Mortgagee of any obligation for which Mortgagor is liable hereunder shall be deemed to waive or cure any Event

of Default with respect to Mortgagor, or Mortgagor's liability to pay such obligation. No sale of all or any portion of the Mortgaged Property, no forbearance on the part of Mortgagee, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Mortgagee to Mortgagor, shall operate to release or in any manner affect the interest of Mortgagee in the remaining Mortgaged Property or the liability of Mortgagor to pay the Debt. No waiver by Mortgagee shall be effective unless it is in writing and then only to the extent specifically stated. All costs and expenses of Mortgagee in exercising the rights and remedies under this Paragraph 26 (including reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Mortgagor immediately upon notice from Mortgagee, with interest at the Default Rate for the period after notice from Mortgagee and such costs and expenses shall constitute a portion of the Debt and shall be secured by this Mortgage.

(i) The interests and rights of Mortgagee under the Note, this Mortgage or in any of the other Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Mortgagee may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Mortgagee may grant with respect to the Mortgaged Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, Guarantor or surety of any of the Debt.

**27. Right of Entry.** In addition to any other rights or remedies granted under this Mortgage, Mortgagee, and its agents, during the Term, shall have the right to enter and inspect the Mortgaged Property during normal business hours. The cost of such inspections or audits shall be borne by Mortgagor should Mortgagee determine that an Event of Default exists, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Mortgagee. The cost of such inspections, if not paid for by Mortgagor following demand, may be added to the principal balance of the sums due under the Note and this Mortgage and shall bear interest thereafter until paid at the Default Rate.

**28. Security Agreement.**

(a) This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property. Mortgagor by executing and delivering this Mortgage has granted and hereby grants to Mortgagee, as security for the Debt, a security interest in the Mortgaged Property to the full extent that the Mortgaged Property may be subject to the Uniform Commercial Code (said portion of the Mortgaged Property so subject to the Uniform Commercial Code being called in this paragraph the "**Collateral**"). This Mortgage shall also constitute a "fixture filing" for the purposes of the Uniform Commercial Code. As such, this Mortgage covers all items of the Collateral that are or are to become fixtures. Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first paragraph of this Mortgage.

(b) If an Event of Default shall occur, Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Mortgagee, Mortgagor shall at its expense assemble the Collateral and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Mortgagor shall pay to Mortgagee on demand any and all expenses, including attorneys' fees and disbursements, incurred or paid by Mortgagee in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Collateral sent to Mortgagor in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper. In the event of any change in name, identity or structure of any Mortgagor, such Mortgagor shall notify Mortgagee thereof and promptly after request shall execute, file and record such Uniform Commercial Code forms as are necessary to maintain the priority of Mortgagee's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Mortgagee shall require the filing or recording of additional Uniform Commercial Code forms or continuation statements, Mortgagor shall, promptly after request, execute, file and record such Uniform Commercial Code forms or continuation statements as Mortgagee shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Mortgagor's obligations under the Note, this Mortgage and any of the other Loan Documents. Mortgagor hereby irrevocably appoints Mortgagee as its attorney-in-fact, coupled with an interest, to file with the appropriate public office on its behalf any financing or other statements signed only by Mortgagee, as secured party, in connection with the Collateral covered by this Mortgage.

29. __**Actions and Proceedings**__. Upon any Event of Default, or if Mortgagor fails to act under circumstances under which it is unreasonable not to so act, after written notice from Mortgagee, Mortgagee shall have the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its sole discretion, decides should be brought to protect their interest in the Mortgaged Property. Mortgagee shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

30. __**Waiver of Setoff and Counterclaim**__. All amounts due under this Mortgage, the Note and the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever. Mortgagor hereby waives the right to assert a setoff, counterclaim (other than a mandatory or compulsory counterclaim) or deduction in any action or proceeding in

which Mortgagee is a participant, or arising out of or in any way connected with this Mortgage, the Note, any of the other Loan Documents, or the Debt.

31. <u>Contest of Certain Claims</u>. Notwithstanding any provisions of the Loan Documents to the contrary, Mortgagor shall not be in default for failure to pay or discharge Taxes, Other Charges or any Legal Requirement (as herein below defined) or mechanic's or materialman's lien asserted against the Mortgaged Property if, and so long as, (a) Mortgagor shall have notified Mortgagee of same within five (5) days of obtaining knowledge thereof; (b) Mortgagor shall diligently and in good faith contest the same by appropriate legal proceedings which shall operate to prevent the enforcement or collection of the same and the sale of the Mortgaged Property or any part thereof, to satisfy the same; (c) Mortgagor shall have furnished to Mortgagee a cash deposit, or an indemnity bond satisfactory to Mortgagee with a surety reasonably satisfactory to Mortgagee, in an amount equal to (i) 125% of the amount of the Taxes, Other Charges or mechanic's or materialman's lien claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, to assure payment of the matters under contest and to prevent any sale or forfeiture of the Mortgaged Property or any part thereof or (ii) such other amount as a court shall designate, provided such amount shall have in fact been deposited with such court and to the extent that Mortgagee shall have reasonably determined that such deposit with such court shall prevent any such sale or forfeiture of the Mortgaged Property or any part thereof (in which event no additional deposit with Mortgagee shall be required); (d) Mortgagor shall promptly upon final determination thereof pay the amount of any such Taxes, Other Charges or claim so determined, together with all costs, interest and penalties which may be payable in connection therewith or shall comply with such Legal Requirement, as the case may be; (e) the failure to pay the Taxes, Other Charges or mechanic's or materialman's lien claim or to comply with such Legal Requirement does not constitute a default continuing beyond applicable notice and cure periods, if any, under any other deed of trust, mortgage or security interest covering or affecting any part of the Mortgaged Property; (f) notwithstanding the foregoing, Mortgagor shall immediately upon request of Mortgagee pay (and if Mortgagor shall fail so to do, Mortgagee may, but shall not be required to, pay or cause to be discharged or bonded against) any such Taxes, Other Charges or claim or comply with such Legal Requirement notwithstanding such contest, if in the opinion of Mortgagee, the Mortgaged Property or any part thereof or interest therein may be in danger of being sold, forfeited, foreclosed, terminated, canceled or lost and (g) in the case of a Legal Requirement, Mortgagee would not be in any danger of any criminal liability or any civil liability, for failure to comply therewith. As used herein, the term "Legal Requirements" shall mean all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all government departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, which now or at any time hereafter may be applicable to the Mortgaged Property or any part thereof (whether to the use, operations, ownership or otherwise), or any of the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways, or any use or condition of the Mortgaged Property. Mortgagee may pay over any such cash deposit or part thereof to the claimant entitled thereto at any time when, in the reasonable judgment of Mortgagee, the entitlement of such claimant is established.

32. **Recovery of Sums Required to be Paid.** Upon any Event of Default, or if Mortgagor fails to act under circumstances under which it is unreasonable not to so act, after written notice from Mortgagee, Mortgagee shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Mortgagee thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Mortgagor existing at the time such earlier action was commenced.

33. **Marshalling and Other Matters.** Mortgagor hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein. Further, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Mortgage on behalf of Mortgagor, and on behalf of each and every person acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Mortgage and on behalf of all persons to the extent permitted by applicable law.

34. **Hazardous Substances.** Mortgagor hereby represents and warrants to Mortgagee that, to the best of Mortgagor's knowledge, after due inquiry and investigation except as disclosed in the report dated September 3, 1999, prepared by Certified Environmental Incorporated (the **"Phase I Report"**) and delivered to Mortgagee in connection with the Loan: (a) the Mortgaged Property is not in direct or indirect violation of any local, state, federal or other governmental authority, statute, ordinance, code, order, decree, law, rule or regulation pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended **("CERCLA")**, the Resource Conservation and Recovery Act, as amended **("RCRA")**, the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Hazardous Substances Transportation Act, as amended, the Solid Waste Disposal Act, as amended, the Clean Water Act, as amended, the Clean Air Act, as amended, the Toxic Substance Control Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, any state super-lien and environmental clean-up statutes, the Massachusetts Hazardous Waste Management Act (M.G.L. Chapter 21C) and the Massachusetts Oil and Hazardous Materials Release Prevention and Response Act (M.G.L. Chapter 21E), and all rules and regulations adopted in respect to the foregoing laws whether presently in force or coming into being and/or effectiveness hereafter (collectively, **"Environmental Laws"**); (b) the Mortgaged Property is not subject to any private or governmental lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous and/or toxic, dangerous and/or regulated, substances, wastes, materials, raw materials which include hazardous constituents, pollutants or contaminants including without limitation, petroleum, tremolite, anthlophylie, actinolite or polychlorinated biphenyls and any other substances or materials which are included under or regulated by Environmental Laws or which are considered by scientific opinion to be otherwise dangerous in terms of the health, safety and welfare of humans (collectively, **"Hazardous Substances"**); (c) no Hazardous Substances are or have been (including the period prior to Mortgagor's acquisition of the Mortgaged Property) discharged, generated, treated, disposed of or stored on, incorporated

in, or removed or transported from the Mortgaged Property other than in compliance with all Environmental Laws; (d) no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Mortgaged Property; and (e) no underground storage tanks exist on any of the Mortgaged Property. So long as Mortgagor owns or is in possession of the Mortgaged Property, Mortgagor (i) shall keep or cause the Mortgaged Property to be kept free from Hazardous Substances, except such as are in compliance with all Environmental Laws, (ii) shall promptly notify Mortgagee if Mortgagor shall become aware of any Hazardous Substances on or near the Mortgaged Property in violation of any Environmental and/or if Mortgagor shall become aware that the Mortgaged Property is in direct or indirect violation of any Environmental Laws and/or if Mortgagor shall become aware of any condition on or near the Mortgaged Property which shall pose a threat to the health, safety or welfare of humans, and (iii) Mortgagor shall remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by law, promptly after Mortgagor becomes aware of same, at Mortgagor's sole expense. Notwithstanding anything to the contrary in this paragraph, the Mortgagor and/or tenants on the Mortgaged Property may use and store amounts of Hazardous Substances at the Mortgaged Property if such use or storage is in connection with and in amounts consistent with normal office use and the ordinary cleaning and maintenance of the Mortgaged Property so long as such use and storage (A) does not violate any applicable Environmental Laws and (B) is not the subject of any specific recommendations in the Phase I Report. Nothing herein shall prevent Mortgagor from recovering such expenses from any other party that may be liable for such removal or cure. The obligations and liabilities of Mortgagor under this Paragraph 34 shall survive any termination, satisfaction, or assignment of this Mortgage and the exercise by Mortgagee of any of its rights or remedies hereunder, including, without limitation, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure.

35. **Asbestos.** Mortgagor represents and warrants that, to the best of Mortgagor's knowledge, after due inquiry and investigation, no asbestos or any substance or material containing asbestos (**"Asbestos"**) is located on the Mortgaged Property except as may have been disclosed in the Phase I Report delivered to Mortgagee in connection with the Loan. Mortgagor shall not install in the Mortgaged Property, nor permit to be installed in the Mortgaged Property, Asbestos and shall remove any Asbestos promptly upon discovery to the satisfaction of Mortgagee, at Mortgagor's sole expense. Mortgagor shall in all instances comply with, and ensure compliance by all occupants of the Mortgaged Property with, all applicable federal, state and local laws, ordinances, rules and regulations with respect to Asbestos, and shall keep the Mortgaged Property free and clear of any liens imposed pursuant to such laws, ordinances, rules or regulations. In the event that Mortgagor receives any notice or advice from any governmental agency or any source whatsoever with respect to Asbestos on, affecting or installed on the Mortgaged Property, Mortgagor shall immediately notify Mortgagee. The obligations and liabilities of Mortgagor under this Paragraph 35 shall survive any termination, satisfaction, or assignment of this Mortgage and the exercise by Mortgagee of any of its rights or remedies hereunder, including but not limited to, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure.

36. **Environmental Monitoring**. Mortgagor shall give prompt written notices to Mortgagee of: (a) any proceeding or written inquiry by any governmental agency with respect to the presence of any Hazardous Substance or Asbestos on, under, from or about the Mortgaged Property, (b) all claims made or threatened in each case in writing, by any third party against Mortgagor or the Mortgaged Property relating to any loss or injury resulting from any Hazardous Substance or Asbestos, and (c) Mortgagor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Mortgaged Property that could cause the Mortgaged Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Mortgagor shall permit Mortgagee to join and participate in, as a party, at its own expense, if it so elects, any legal proceedings or actions initiated with respect to the Mortgaged Property in connection with any Environmental Law or Hazardous Substance, unless Mortgagor shall fail to act, under circumstances under which it is unreasonable not to act, in which event Mortgagor shall pay all reasonable attorneys' fees and disbursements incurred by Mortgagee in connection therewith. Upon Mortgagee's request from time to time, if Mortgagee has determined (in the exercise of its reasonable judgment) that an adverse change in the condition of the Mortgaged Property has occurred which constitutes reasonable cause for the performance of an environmental inspection or audit of the Mortgaged Property, Mortgagor shall provide at Mortgagor's sole expense, (i) an inspection or audit of the Mortgaged Property prepared by a licensed hydrogeologist or licensed environmental engineer approved by Mortgagee indicating the presence or absence of Hazardous Substances on, in or near the Mortgaged Property, and (ii) an inspection or audit of the Mortgaged Property prepared by a duly qualified engineering or consulting firm approved by Mortgagee, indicating the presence or absence of Asbestos on the Mortgaged Property; provided, however, any such inspection or audit requested by Mortgagee, during the Term, in excess of one (1) inspection during each five (5) year period commencing upon the date hereof, shall be performed at Mortgagee's expense unless an Event of Default exists or Mortgagee has determined (in the exercise of its reasonable judgment) that reasonable cause exists for the performance of an environmental inspection or audit. If Mortgagor fails to provide such inspection or audit within thirty (30) days after such request Mortgagee may order same, and Mortgagor hereby grants to Mortgagee and its employees and agents access to the Mortgaged Property and a license to undertake such inspection or audit. The cost of such inspection or audit may be added to the Debt and shall bear interest thereafter until paid at the Default Rate. In the event that any environmental site assessment report prepared in connection with such inspection or audit recommends (i) that an operations and maintenance plan be implemented for Asbestos or any Hazardous Substance, Mortgagor shall cause such operations and maintenance plan to be prepared and implemented at Mortgagor's expense upon request of Mortgagee, or (ii) site monitoring, containment cleanup, removal, restoration, or other work of any kind is reasonably necessary or desirable under an applicable Environmental Law (the **"Remedial Work"**), Mortgagor shall commence and thereafter diligently prosecute to completion all such Remedial Work within thirty (30) days after written demand by Mortgagee for performance thereof (or any such shorter period of time as may be required under applicable law.) All Remedial Work shall be performed by contractors approved in advance by Mortgagee, and under the supervision of a consulting engineer approved by Mortgagee. All costs and expenses of such Remedial Work shall be paid by Mortgagor including, without limitation, Mortgagee's reasonable attorneys' fees and disbursements incurred in connection with monitoring or review of such Remedial Work. In the event Mortgagor shall fail to timely commence, or

cause to be commenced, or fail to diligently prosecute to completion, such Remedial Work, Mortgagee may, but shall not be required to, cause such Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith, may be added to the Debt and shall bear interest thereafter until paid at the Default Rate.

37. **Handicapped Access.**

(a) Mortgagor agrees that the Mortgaged Property shall at all times strictly comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988 (if applicable), all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "**Access Laws**").

(b) Notwithstanding any provisions set forth herein or in any other document regarding Mortgagee's approval of alterations of the Mortgaged Property, Mortgagor shall not alter the Mortgaged Property in any manner which would increase Mortgagor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Mortgagee. The foregoing shall apply to tenant improvements constructed by Mortgagor or by any of its tenants. Mortgagee may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Mortgagee.

(c) Mortgagor agrees to give prompt notice to Mortgagee of the receipt by Mortgagor of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

38. **Indemnification.** In addition to any other indemnifications provided herein or in the other Loan Documents, Mortgagor shall protect, defend, indemnify and save harmless Mortgagee from and against all liabilities, obligations, claims, demands, damages, penalties, causes of action, losses, fines, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements), imposed upon or incurred by or asserted against Mortgagee by reason of (a) ownership of this Mortgage, the Mortgaged Property or any interest therein or receipt of any Rents; (b) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Mortgaged Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) any use, nonuse or condition in, on or about the Mortgaged Property or any part thereof or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (d) any failure on the part of Mortgagor to perform or comply with any of the terms of this Mortgage; (e) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any part thereof; (f) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance or Asbestos on, from, or affecting the Mortgaged Property; (g) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous

Substance or Asbestos; (h) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance or Asbestos; (i) any violation of the Environmental Laws, which are based upon or in any way related to such Hazardous Substance or Asbestos including, without limitation, the costs and expenses of any Remedial Work, attorney and consultant fees and disbursements, investigation and laboratory fees, court costs, and litigation expenses; (j) any failure of the Mortgaged Property to comply with any Access Laws; (k) any representation or warranty made in the Note, this Mortgage or any of the other Loan Documents being false or misleading in any material respect as of the date such representation or warranty was made; (l) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with the Loan, any Lease or other transaction involving the Mortgaged Property or any part thereof under any legal requirement or any liability asserted against Mortgagee with respect thereto; and (m) the claims of any lessee of any or any portion of the Mortgaged Property or any person acting through or under any lessee or otherwise arising under or as a consequence of any Lease. Any amounts payable to Mortgagee by reason of the application of this paragraph shall be secured by this Mortgage and shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Mortgagee until paid. The obligations and liabilities of Mortgagor under this Paragraph 38 shall survive and termination, satisfaction, or assignment of this Mortgage and the exercise by Mortgagee of any of its rights or remedies hereunder, including, but not limited to, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure, provided, however that Mortgagor shall have no obligations or liabilities under this Paragraph 38 to the extent the same arises out of Mortgagee's (or its agents' or employees') gross negligence or willful misconduct or willful breach of this Mortgage or any of the other Loan Documents or in connection with any event or condition that first arises from and after the date on which Mortgagee or any other party acquires title to the Mortgaged Property at a foreclosure sale or other transfer in lieu of foreclosure.

39. Notices. Any notice, report, demand or other instrument authorized or required to be given or furnished ("Notices") shall be in writing and shall be given as follows: (a) by hand delivery; (b) by deposit in the United States mail as first class certified mail, return receipt requested, postage paid; (c) by overnight nationwide commercial courier service; or (d) by telecopy transmission (other than for notices of default) with a confirmation copy to be delivered by duplicate notice in accordance with any of clauses (a)-(c) above, in each case, addressed to the party intended to receive the same at the following address(es):

Mortgagee: Credit Suisse First Boston Mortgage Capital LLC
Principal Transactions Group
11 Madison Avenue
New York, New York 10010
Attention: Asset Management
Re: Blue Hills Office Park/Joseph Rubino
Telecopier: (212) 325-8164

with copies to: Credit Suisse First Boston Mortgage Capital LLC
Legal & Compliance Department

11 Madison Avenue
New York, New York 10010
Attention: Colleen Graham, Esq.
Re: Blue Hills Office Park/Joseph Rubino - PTG
Telecopier: (212) 325-8220

and: ORIX Real Estate Capital Markets, LLC
1717 Main Street
Dallas, Texas 75201
Attn: John Lloyd
Telecopier: (214) 237-2038
or any successor servicer of the Loan.

Mortgagor: Blue Hills Office Park LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481

with a copy to: Bernkopf, Goodman & Barenan LLP
125 Summer Street
Boston, Massachusetts 02110-1621
Attention: David Doyle, Esq.
Telecopier: (617) 790-3300

Any party may change the address to which any such Notice is to be delivered, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this Paragraph 39. Notices shall be deemed to have been given on the date they are actually received; provided, that the inability to deliver Notices because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Notice for either party may be given by its respective counsel. Additionally, notice from Mortgagee may also be given by the Servicer.

**40. Authority.**

(a) Mortgagor (and the undersigned representative of Mortgagor, if any) represent and warrant that it (or they, as the case may be) has full power, authority and right to execute, deliver and perform its obligations pursuant to this Mortgage, and to deed, mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, hypothecate and assign the Mortgaged Property pursuant to the terms hereof and to keep and observe all of the terms of this Mortgage on Mortgagor's part to be performed.

(b) Mortgagor represents and warrants that Mortgagor is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

41.    **Waiver of Notice.** Mortgagor shall not be entitled to any notices of any nature whatsoever from Mortgagee except with respect to matters for which this Mortgage specifically and expressly provides for the giving of notice by Mortgagee to Mortgagor and except with respect to matters for which Mortgagee is required by applicable law to give notice, and Mortgagor hereby expressly waives the right to receive any notice from Mortgagee with respect to any matter for which this Mortgage does not specifically and expressly provide for the giving of notice by Mortgagee to Mortgagor.

42.    **Remedies of Mortgagor.**  In the event that a claim or adjudication is made that Mortgagee has acted unreasonably or unreasonably delayed acting in any case where by law or under the Note, this Mortgage or any of the other Loan Documents, it has an obligation to act reasonably or promptly, Mortgagee shall not be liable for any monetary damages (other than those directly resulting from gross negligence or willful misconduct of Mortgagee, but in no event shall Mortgagee be liable for any consequential damages) and Mortgagor's remedies shall be limited to injunctive relief or declaratory judgment or specific performance.

43.    **Sole Discretion of Mortgagee.**  Wherever pursuant to this Mortgage, Mortgagee exercises any right given to it to consent or not consent or approve or disapprove, or any arrangement or term is to be satisfactory to Mortgagee, the decision of Mortgagee to consent or not consent, to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Mortgagee and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

44.    **Non-Waiver.** The failure of Mortgagee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Mortgage. Mortgagor shall not be relieved of Mortgagor's obligations hereunder by reason of (a) the failure of Mortgagee to comply with any request of Mortgagor or Guarantor to take any action to foreclose this Mortgage or otherwise enforce any of the provisions hereof or of the Note, or the other Loan Documents, (b) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or of any person liable for the Debt or any portion thereof, or (c) any agreement or stipulation by Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Mortgage or any of the other Loan Documents. Mortgagee may resort for the payment of the Debt to any other security held by Mortgagee in such order and manner as Mortgagee, in its sole discretion, may elect. Mortgagee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Mortgagee thereafter to foreclosure this Mortgage. The rights and remedies of Mortgagee under this Mortgage shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Mortgagee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

45.    **No Oral Change.** This Mortgage, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Mortgagor or Mortgagee, but only by an agreement in writing signed

by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

46. Liability. If Mortgagor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. Subject to the provisions hereof requiring Mortgagee's consent to any transfer of the Mortgaged Property, this Mortgage shall be binding upon and inure to the benefit of Mortgagor and Mortgagee and their respective successors and assigns forever.

47. Inapplicable Provisions. If any term, covenant or condition of the Note or this Mortgage is held to be invalid, illegal or unenforceable in any respect, the Note and this Mortgage shall be construed without such provision.

48. Headings, Etc. The headings and captions of various paragraphs of this Mortgage are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

49. Duplicate Originals. This Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

50. Definitions. Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage may be used interchangeably in singular or plural form and the word **"Mortgagor"** shall mean "each Mortgagor and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein," the word **"Mortgagee"** shall mean "Mortgagee and any subsequent holder of the Note," the word **"Note"** shall mean "the Note and any other evidence of indebtedness secured by this Mortgage," the word **"person"** shall include an individual, corporation, limited liability company, partnership, trust, unincorporated association, government, governmental authority, and any other entity, and the words **"Mortgaged Property"** shall include any portion of the Mortgaged Property and any interest therein and the words **"attorneys' fees"** shall include any and all attorneys' fees, paralegal and law clerk fees, including, without limitation, fees at the pre-trial, trial and appellate levels incurred or paid by Mortgagee in protecting its interest in the Mortgaged Property and Collateral and enforcing its rights hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

51. Homestead. Mortgagor hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Mortgaged Property as against the collection of the Debt, or any part hereof.

52. Assignments. Mortgagee shall have the right to assign or transfer its rights under this Mortgage without limitation. Any assignee or transferee shall be entitled to all the benefits afforded Mortgagee under this Mortgage.

**53. Waiver of Jury Trial. EACH OF MORTGAGOR AND MORTGAGEE HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THIS MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF MORTGAGOR AND MORTGAGEE, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF MORTGAGOR AND MORTGAGEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MORTGAGOR.**

**54. Recourse Provisions.** Subject to the qualifications below, Mortgagee shall not enforce the liability and obligation of Mortgagor, to perform and observe the obligations contained in this Mortgage, the Note or any of the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Mortgagor, except that Mortgagee may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Mortgagee to enforce and realize upon its interests under the Note, this Mortgage or the other Loan Documents or in the Mortgaged Property, the Rents or any other collateral given to Mortgagee pursuant to this Mortgage and the other Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Mortgagor only to the extent of Mortgagor's interest in the Mortgaged Property, the Rents and in any other collateral given to Mortgagee, and Mortgagee, by accepting this Mortgage, the Note and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Mortgagor in any such action or proceeding under or by reason of or in connection with this Mortgage, the Note or any of the other Loan Documents. The provisions of this paragraph shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Mortgage, the Note or any of the other Loan Documents; (ii) impair the right of Mortgagee to name Mortgagor, as a party defendant in any action or suit for foreclosure and sale under this Mortgage; (iii) affect the validity or enforceability of any guaranty made in connection with the Loan or any rights and remedies of Mortgagee thereunder; (iv) impair the right of Mortgagee to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; or (vi) constitute a waiver of the right of Mortgagee to enforce the liability and obligation of Mortgagor, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Mortgagee (including attorneys' fees and costs reasonably incurred), but in all events excluding, however, all consequential damages, arising out of or in connection with the following:

(a) fraud or intentional misrepresentation by Mortgagor or any Guarantor in connection with the Loan;

(b) intentional physical waste of the Mortgaged Property;

(c) the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substance Indemnification Agreement of even date herewith given by Mortgagor to Mortgagee or in this Mortgage concerning Environmental Laws, Hazardous Substances and Asbestos;

(d) the removal or disposal of any portion of the Mortgaged Property after an Event of Default;

(e) the misapplication or conversion by Mortgagor of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Mortgaged Property, (ii) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, (iii) any Rents following an Event of Default or (iv) any Rents paid more than one month in advance;

(f) failure to pay charges for labor or materials requested by Mortgagor or Mortgagor's failure to pay or escrow (in accordance with Paragraph 6 thereof) taxes or other charges that can create liens on any portion of the Mortgaged Property; and

(g) any security deposits collected with respect to the Mortgaged Property which are not delivered to Mortgagee upon a foreclosure of the Mortgaged Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof.

Notwithstanding anything to the contrary in any of the Loan Documents (i) Mortgagee shall not be deemed to have waived any right which Mortgagee may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by this Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Mortgagee in accordance with the Loan Documents, and (ii) the Debt shall become fully recourse to Mortgagor in the event that: (A) the first full monthly payment of principal and interest under the Note is not paid when due; (B) Mortgagor intentionally fails to maintain its status as a single purpose entity in accordance with the provisions of this Mortgage; (C) Mortgagor fails to obtain Mortgagee's prior written consent before granting any subordinate financing or other voluntary lien encumbering the Mortgaged Property; (D) Mortgagor fails to obtain Mortgagee's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of this Mortgage; or (E) if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by Mortgagor or if any proceeding for the dissolution or liquidation of Mortgagor shall be instituted by Mortgagor or Guarantor.

55. **Defeasance.**

(a) Provided no Event of Default has occurred and is continuing, at any time after the date which (i) is two years after the "startup day," within the meaning of Section 860G(a)(9) of the Internal Revenue Code of 1986, as amended from time to time or any successor statute (the "**Code**"), of a "real estate mortgage investment conduit," within the meaning of Section 860D of the Code, that holds the Note or (ii) is four years after the date hereof, whichever shall first occur, and before the Anticipated Repayment Date, Mortgagor may cause the release of the Mortgaged Property from the lien of this Mortgage and the other Loan Documents upon the satisfaction of the following conditions:

(i) not less than thirty (30) days prior written notice shall be given to Mortgagee specifying a date (the "**Release Date**") on which the Defeasance Collateral (as hereinafter defined) is to be delivered, such Release Date only to occur on a Payment Date (as defined in the Note);

(ii) all accrued and unpaid interest and all other sums due under the Note and under the other Loan Documents up to the Release Date, including, without limitation, all reasonable costs and expenses incurred by Mortgagee or its agents in connection with such release (including, without limitation, the fees and expenses incurred by attorneys and accountants in connection with the review of the proposed Defeasance Collateral and the preparation of the Defeasance Security Agreement (as hereinafter defined) and related documentation), shall be paid in full on or prior to the Release Date; and

(iii) Mortgagor shall deliver to Mortgagee on or prior to the Release Date:

(A) an amount equal to that which is sufficient to purchase direct, non-callable obligations of the United States of America that provide for payments prior, but as close as possible, to all successive monthly Payment Dates occurring after the Release Date and assuming the Loan is paid in full on the Anticipated Repayment Date (as defined in the Note), with each such payment being equal to or greater than the amount of the corresponding installment of principal, interest and, if applicable, the fee of the Servicer required to be paid hereunder and/or under the Note (the "**Defeasance Collateral**"), each of which shall be duly endorsed by the holder thereof as directed by Mortgagee or accompanied by a written instrument of transfer in form and substance wholly satisfactory to Mortgagee (including, without limitation, such instruments as may be required by the depository institution holding such securities to effectuate book-entry transfers and pledges through the book-entry facilities of such institution) in order to create a first priority security interest therein in favor of

the Mortgagee in conformity with all applicable state and federal laws governing granting of such security interests;

(B) a pledge and security agreement, in form and substance satisfactory to Mortgagee in its sole discretion, creating a first priority security interest in favor of Mortgagee in the Defeasance Collateral (the "**Defeasance Security Agreement**"), which shall provide, among other things, that any excess received by Mortgagee from the Defeasance Collateral over the amounts payable by Mortgagor hereunder shall be refunded to Mortgagor promptly after each Payment Date;

(C) a certificate of Mortgagor certifying that all of the requirements set forth in this Paragraph 55 have been satisfied;

(D) an opinion of counsel for Mortgagor in form and substance and delivered by counsel satisfactory to Mortgagee in its sole discretion stating, among other things, that (1) Mortgagee has a perfected first priority security interest in the Defeasance Collateral and that the Defeasance Security Agreement is enforceable against Mortgagor in accordance with its terms; and (2) that any REMIC Trust formed pursuant to a securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such defeasance;

(E) Mortgagor shall deliver evidence in writing from the applicable Rating Agencies (which Mortgagee and Mortgagor shall cooperate to obtain without unreasonable delay) to the effect that the collateral substitution will not result in a downgrading, withdrawal or qualification of the respective ratings in effect immediately prior to such defeasance event for any securities issued in connection with the securitization which are then outstanding;

(F) a certificate from a firm of independent public accountants acceptable to Mortgagee certifying that the Defeasance Collateral is sufficient to satisfy the provisions of paragraph A above; and

(G) such other incidental certificates, documents or instruments as Mortgagee may reasonably require.

(b) Upon compliance with the requirements of this paragraph, the Mortgaged Property shall be released from the lien of this Mortgage and the other Loan Documents, and the Defeasance Collateral shall constitute the only collateral which shall secure the Note and all other obligations under the Loan Documents. Mortgagee will, at Mortgagor's expense, execute and deliver any agreements reasonably requested by Mortgagor to release the lien of this Mortgage from the Mortgaged Property. Mortgagor, pursuant to the Defeasance

Security Agreement, shall authorize and direct that the payments received from Defeasance Collateral be made directly to Mortgagee and applied to satisfy the obligations of the Mortgagor under the Note.

(c) Upon the release of the Mortgaged Property in accordance with this paragraph, Mortgagor may, or at option of Mortgagee shall, assign all its obligations under the Note, together with the pledged Defeasance Collateral, to a successor entity designated by Mortgagor and approved by Mortgagee in its reasonable discretion. Such successor entity shall execute an assumption agreement in form and substance satisfactory to Mortgagee in its sole discretion pursuant to which it shall assume Mortgagor's obligations under the Note and the Defeasance Security Agreement. As conditions to such assignment and assumption, Mortgagor shall (i) deliver to Mortgagee an opinion of counsel in form and substance and delivered by counsel satisfactory to Mortgagee in its sole discretion stating, among other things, that such assumption agreement is enforceable against Mortgagor and such successor entity in accordance with its terms and that the Note, the Defeasance Security Agreement and the other Loan Documents, as so assumed, are enforceable against such successor entity in accordance with their respective terms, and (ii) pay all costs and expenses incurred by Mortgagee or its agents in connection with such assignment and assumption (including, without limitation, the review of the proposed transferee and the preparation of the assumption agreement and related documentation). Upon such assumption, Mortgagor shall be relieved of its obligations hereunder, under the other Loan Documents and under the Defeasance Security Agreement other than those obligations which are specifically intended to survive the termination, satisfaction or assignment of this Mortgage or the exercise of Mortgagee's rights and remedies hereunder.

(d) Upon the release of the Mortgaged Property in accordance with this paragraph, Mortgagor shall have no further right to prepay the Note pursuant to the other provisions of this paragraph or otherwise. In connection with the conditions set forth in subparagraph (a)(iii)(A) above, Mortgagor hereby appoints Mortgagee as its agent and attorney-in-fact for the purpose of purchasing the Defeasance Collateral with funds provided by the Mortgagor. Mortgagor shall pay any and all expenses incurred in the purchase of the Defeasance Collateral and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this paragraph.

(e) For purposes of this Mortgage the Note and the other Loan Documents, the term **"Yield Maintenance Premium"** shall mean the amount, if any, which, when added to the remaining principal amount of the Note, would be sufficient to purchase the Defeasance Collateral.

56. Cash Management Agreement. On or before the date hereof Mortgagor covenants and agrees to enter into one or more servicing account agreements, lockbox servicing agreements and/or cash management agreements acceptable to Mortgagee between Mortgagor, Manager, Mortgagee and, as applicable, one or more certain financial institutions (together with any modification, amendment, substitution or replacement thereof, hereinafter collectively referred to as the **"Cash Management Agreement"**). During any Sweep Period (as defined in

the Cash Management Agreement), all Rents shall be applied as set forth in the Cash Management Agreement and the escrows and reserves required hereunder shall be funded as provided therein. The Mortgagor shall pay all costs and expenses of the Servicer and any bank as required under the Cash Management Agreement. Upon the occurrence of an Event of Default, Mortgagee may apply any sums then held pursuant to the Cash Management Agreement to the payment of the Debt in any order in its sole discretion. Until expended or applied, amounts held pursuant to the Cash Management Agreement shall constitute additional security for the Debt.

57. **Miscellaneous.**

(a) Any consent or approval by Mortgagee in any single instance shall not be deemed or construed to be Mortgagee's consent or approval in any like matter arising at a subsequent date, and the failure of Mortgagee to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Mortgagee be estopped from exercising such right, power, remedy, consent or approval at a later date. Any consent or approval requested of and granted by Mortgagee pursuant hereto shall be narrowly construed to be applicable only to Mortgagor and the matter identified in such consent or approval and no third party shall claim any benefit by reason thereof, and any such consent or approval shall not be deemed to constitute Mortgagee a venturer or partner with Mortgagor nor shall privity of contract be presumed to have been established with any such third party. If Mortgagee deems it to be in its best interest to retain assistance of persons, firms or corporations (including, without limitation, attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Mortgagor shall reimburse Mortgagee for all costs reasonably incurred in connection with the employment of such persons, firms or corporations.

(b) Mortgagor covenants and agrees that during the Term, unless Mortgagee shall have previously consented in writing, (a) Mortgagor will take no action that would cause it to become an "**employee benefit plan**" as defined in 29 C.F.R. Section 2510.3-101, or "**assets of a governmental plan**" subject to regulation under the state statutes, and (b) Mortgagor will not sell, assign or transfer the Mortgaged Property, or any portion thereof or interest therein, to any transferee that does not execute and deliver to Mortgagee its written assumption of the obligations of this covenant. Mortgagor further covenants and agrees to protect, defend, indemnify and hold Mortgagee harmless from and against all loss, cost, damage and expense (including without limitation, all attorneys' fees and excise taxes, costs of correcting any prohibited transaction or obtaining an appropriate exemption) that Mortgagee may incur as a result of Mortgagor's breach of this covenant. This covenant and indemnity shall survive the extinguishment of the lien of this Mortgage by foreclosure or action in lieu thereof; furthermore, the foregoing indemnity shall supersede any limitations on Mortgagor's liability under any of the Loan Documents.

(c) The Loan Documents contain the entire agreement between Mortgagor and Mortgagee relating to or connected with the Loan. Any other agreements relating to or

SRZNY\611479v8

connected with the Loan not expressly set forth in the Loan Documents are null and void and superseded in their entirety by the provisions of the Loan Documents.

(d) Mortgagor hereby covenants and agrees not to commit, permit or suffer to exist any act, omission or circumstance affording such right of forfeiture. In furtherance thereof, Mortgagor hereby indemnifies Mortgagee and agrees to defend and hold Mortgagee harmless from and against any loss, damage or injury by reason of the breach of the covenants and agreements or the representations and warranties set forth in this paragraph. Without limiting the generality of the foregoing, the filing of formal charges or the commencement of proceedings against Mortgagor or all or any part of the Mortgaged Property under any federal or state law for which forfeiture of the Mortgaged Property or any part thereof or of any monies paid in performance of Mortgagor's obligations under the Loan Documents is a potential result, shall, if not stayed or dismissed within sixty (60) days, at the election of Mortgagee, constitute an Event of Default hereunder without notice or opportunity to cure.

(e) Mortgagor acknowledges that, with respect to the Loan, Mortgagor is relying solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Mortgagee or any parent, subsidiary or affiliate of Mortgagee. Mortgagor acknowledges that Mortgagee engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of the Mortgagor or its affiliates. Mortgagor acknowledges that it is represented by competent counsel and has consulted counsel before executing the Loan Documents.

(f) Mortgagor covenants and agrees to pay Mortgagee upon receipt of written notice from Mortgagee, all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Mortgagee in connection with (i) the preparation, negotiation, execution and delivery of this Mortgage and the other Loan Documents; (ii) Mortgagor's performance of and compliance with Mortgagor's respective agreements and covenants contained in this Mortgage and the other Loan Documents on its part to be performed or complied with after the date hereof; (iii) Mortgagee's performance and compliance with all agreements and conditions contained in this Mortgage and the other Loan Documents on its part to be performed or complied with after the date hereof; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Mortgage and the other Loan Documents; and (v) the filing and recording fees and expenses, title insurance fees and expenses, and other similar expenses incurred in creating and perfecting the lien in favor of Mortgagee pursuant to this Mortgage and the other Loan Documents.

(g) This Mortgage shall be governed by and construed in accordance with the laws of the State in which the Premises are located and the applicable laws of the United States of America.

**58. <u>Management of the Mortgaged Property.</u>**

Mortgagor shall maintain the Management Agreement for the operation of the Mortgaged Property in full force and effect and timely perform all of Mortgagor's obligations

thereunder and enforce performance of all obligations of the Manager thereunder, and not permit the termination or amendment of such Management Agreement unless the prior written consent of Mortgagee is first obtained. Mortgagor will enter into and cause the Manager to enter into an assignment and subordination of such Management Agreement in form satisfactory to Mortgagee, assigning and subordinating the Manager's interest in the Mortgaged Property and all fees and other rights of the manager pursuant to such Management Agreement to the rights of Mortgagee. Upon an Event of Default, Mortgagor at Mortgagee's request made at any time while such Event of Default continues, shall terminate the Management Agreement and replace the Manager with a Manager approved by Mortgagee.

59. **Sale of Notes and Securitization.**

At the request of the holder of the Note and, to the extent not already required to be provided by Mortgagor under this Agreement, Mortgagor shall use reasonable efforts to satisfy the reasonable market standards to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with the sale of the Note or participation therein or the first successful securitization (such sale and/or securitization, the "**Secondary Market Transaction**" or "**Securitization**") of rated single or multi-class securities (the "**Securities**") secured by or evidencing ownership interests in the Note and this Mortgage, including, without limitation, to:

(a) (i) provide such reasonable financial and other information with respect to the Mortgaged Property, the Mortgagor and the Manager as shall be in Mortgagor's or the Manager's possession or control, (ii) provide budgets relating to the Mortgaged Property (which may be accompanied by appropriate qualifications and reservations), and (iii) perform or permit or cause to be performed or permitted such site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if and to the extent such Phase Is indicate are necessary, Phase II's), engineering reports and other due diligence investigations of the Mortgaged Property, as may be reasonably requested by the holder of the Note or the Rating Agencies or as may be necessary or appropriate in connection with the Secondary Market Transaction (collectively, the "**Provided Information**"), together, if customary, with appropriate verification and/or consents of the Provided Information through letters of auditors or opinions of counsel of independent attorneys acceptable to the Mortgagee and the Rating Agencies;

(b) cause counsel to render opinions, which may be relied upon by the holder of the Note, the Rating Agencies and their respective counsel, agents and representatives, as to non-consolidation, fraudulent conveyance (to the extent relevant), and true sale or any other opinion customary in securitization transactions with respect to the Mortgaged Property and Mortgagor and its affiliates, which counsel and opinions shall be reasonably satisfactory to the holder of the Note and the Rating Agencies;

SRZNY\611479v8

(c) subject to the provisions entitled "Recourse Provisions" hereof, make such representations and warranties as of the closing date of the Securitization with respect to the Property, Mortgagor, and the Loan Documents as are customarily provided in securitization transactions and as may be reasonably requested by the holder of the Note or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents; and

(d) execute such reasonable amendments to the Loan Documents and Mortgagor's organizational documents, enter into a lockbox or similar arrangement with respect to the Rents as may reasonably be requested by the holder of the Note or the Rating Agencies or otherwise to effect the Securitization; provided, however, that the Mortgagor shall not be required to modify or amend any Loan Document if such modification or amendment would (i) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, or (ii) modify or amend any other material economic term of the Loan.

All reasonable third party costs and expenses incurred by Mortgagor and/or Mortgagee in connection with Mortgagor's complying with requests made under this Section 59 shall be paid by the Mortgagor; provided, that Mortgagor's out-of-pocket, third party costs of such compliance shall not exceed $5,000 and Mortgagor need not expend any sums in excess of such amount in connection with its compliance or continue to comply once it has incurred unreimbursed costs in excess of $5,000.

In the event that the provisions of this Mortgage or any Loan Documents require the receipt of written confirmation from each Rating Agency with respect to the ratings on the Securities, or, in accordance with the terms of the transaction documents relating to a Secondary Market Transaction, such a rating confirmation is required in order for the consent of the Mortgagee to be given, the Mortgagor shall pay all of the costs and expenses of the Mortgagee, Servicer and each Rating Agency in connection therewith, and, if applicable, shall pay any fees imposed by any Rating Agency as a condition to the delivery of such confirmation.

**60. Securitization Indemnification.**

(a) Mortgagor understands that certain of the Provided Information and the financial reports delivered to Mortgagee hereunder (collectively, the "**Required Records**") may be included in disclosure documents in connection with the Secondary Market Transaction, including, without limitation, a prospectus, prospectus supplement or private placement memorandum (each, a "**Disclosure Document**") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Secondary Market Transaction. In the

event that the Disclosure Document is required to be revised prior to the sale of all Securities, the Mortgagor will cooperate with the holder of the Note in updating the Disclosure Document by providing all current information necessary to keep the Provided Information and the Required Records disclosed in the Disclosure Document accurate and complete in all material respects.

(b) Mortgagor agrees to (i) indemnify Mortgagee (and for purposes of this Paragraph 60, Mortgagee hereunder shall include its officers and directors), the affiliate of Credit Suisse First Boston ("**First Boston**") that has filed the registration statement relating to the securitization (the "**Registration Statement**"), each of its directors, each of its officers who have signed the Registration Statement and each person or entity who controls the affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**First Boston Group**"), and First Boston, each of its directors and each person who controls First Boston within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "**Underwriter Group**") for any losses, claims, damages or liabilities (the "**Liabilities**") to which Mortgagee, the First Boston Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Provided Information or Required Records upon the omission or alleged omission to state in the Provided Information or Required Records a material fact required to be stated in the Provided Information or Required Records in order to make the statements in the Provided Information or Required Records, in light of the circumstances under which they were made not misleading, except to the extent that the Liabilities arise from (A) the gross negligence or willful misconduct of such indemnified party or (B) Provided Information to the extent contained in reports wholly prepared by third party consultants engaged by Mortgagee and (ii) reimburse Mortgagee, the First Boston Group or the Underwriter Group for any legal or other expenses reasonably incurred by Mortgagee, the First Boston Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(c) Promptly after receipt by an indemnified party under this Paragraph 60 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Paragraph 60, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party. In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party. After giving such notice and actually assuming such defense in accordance with the provisions of this Paragraph 60, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the

SRZNY\611479v8

indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(d) In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Paragraph 60(b) or (c) is for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Paragraph 60(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) First Boston's and Mortgagor's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Mortgagee and Mortgagor hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(e) The liabilities and obligations of both Mortgagor and Mortgagee under this Paragraph 60 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

61. **Servicer.** At the option of Mortgagee, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Mortgagee and Mortgagee may delegate all or any portion of its responsibilities under this Mortgage and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "**Servicing Agreement**") between Mortgagee and Servicer.

## PART II

## STATE SPECIFIC PROVISIONS

No Entry. Mortgagee may exercise any and all of its rights, remedies and options under this Mortgage and the other Loan Documents without the necessity of making an entry upon the Mortgaged Property and without the necessity of taking possession of the Mortgaged Property (whether by itself or though an agent).

Statutory Power of Sale. This Mortgage is upon the STATUTORY CONDITION and upon the further condition that all agreements of Mortgagor contained in this Mortgage and

the other Loan Documents be fully performed, for breach of which (which for purposes hereof shall mean upon an Event of Default) Mortgagee shall have the STATUTORY POWER OF SALE. In the event of the exercise of the STATUTORY POWER OF SALE, Mortgagee may foreclose on and sell all or any part of the Mortgaged Property, and thereafter Mortgagee shall continue to have the STATUTORY POWER OF SALE so long as any portion of the Mortgaged Property remains subject to this Mortgage.

[No Further Text on this Page; Signature Page Follows]

IN WITNESS WHEREOF, Mortgagor has executed this instrument the day and year first above written.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By: Blue Hills Management Corp.,
a Massachusetts corporation
its manager

By: [signature]
Gerald S. Fineberg
President and Treasurer

BK 13733 PG 501

A

THE COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss. September 9, 1999

Then personally appeared the above-named Gerald S. Fineberg, President and Treasurer of Blue Hills Management Corp., a Massachusetts corporation, as aforesaid, in its capacity as the manager of Blue Hills Office Park LLC, a Delaware limited liability company, and acknowledged the foregoing instrument to be the free act and deed of said corporation; and the free act and deed of said limited liability company, before me

Michelle Leveille
NOTARY PUBLIC

**MICHELLE LEVEILLE**
**NOTARY PUBLIC**
My Commission Expires Nov. 25, 2005

My commission expires: __________

SRZNY\611479v4

## Exhibit A

The land situated in Canton, Norfolk County, Massachusetts shown as Lot "C" on a plan entitled "Plan of Land, Canton, Massachusetts" dated December 9, 1971 by Universal Engineering Corporation, recorded with Norfolk Registry of Deeds as Plan 48 of 1972 in Plan Book 230 (hereinafter the "Plan"), and being more particularly bounded and described as follows:

| | |
|---|---|
| NORTHERLY AND NORTHWESTERLY: | by Royall Street, three hundred thirty-six and 65/100 (336.65) feet; |
| NORTHEASTERLY: | by Parcel A as shown on said Plan, by two (2) lines measuring, respectively, six hundred thirty-five and 82/100 (635.82) feet and two hundred (200.00) feet; |
| NORTHWESTERLY: | by Parcel A as shown on said Plan, one hundred forty (140.00) feet; |
| NORTHEASTERLY: | by Parcel B as shown on said Plan, seven hundred nine and 37/100 (709.37) feet; |
| SOUTHWESTERLY: | by Circumferential Highway (Route 128), eight hundred sixteen and 18/100 (816.18) feet; |
| SOUTHWESTERLY: | by Green Street, seven hundred sixty-six and 13/100 (766.13) feet; |
| NORTHWESTERLY: | by land now or formerly of Nocka, two hundred thirty-nine and 57/100 (239.57) feet; |
| WESTERLY: | by land of said Nocka, two hundred three and 57/100 (203.57) feet; and |
| NORTHWESTERLY: | by land of said Nocka, by two (2) lines measuring, respectively, eighty (80.00) feet and one hundred thirteen and 95/100 (113.95) feet. |

For title reference purposes see Deed recorded in the Norfolk Registry of Deeds on September 14, 1999 as Instrument No. 135114.

Book 13730 pg. 171

#184661 v1/14500/9547

# EXHIBIT D

# MORTGAGE NOTE
## (with defeasance and hyper-am)

$33,149,000.00

September 14, 1999

For value received, BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company, having its principal place of business c/o Fineberg Management, Inc., One Washington Street, Suite 400, Wellsley, Massachusetts 02481 (hereinafter referred to as "Maker"), promises to pay to the order of **CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC**, a Delaware limited liability company ("Lender" and also sometimes "Payee"), having its principal office at 11 Madison Avenue, New York, New York 10010, or at such place as the holder hereof may from time to time designate in writing, the principal sum of THIRTY-THREE MILLION ONE HUNDRED FORTY NINE THOUSAND AND 00/100 DOLLARS ($33,149,000.00), in lawful money of the United States of America, with interest thereon to be computed on the unpaid principal balance from time to time outstanding at the Applicable Interest Rate (as hereinafter defined), and to be paid in installments, as follows:

A. payment of interest only on the date hereof with respect to the interest accrual period from the date hereof to and including October 10, 1999;

B. constant payment of $254,652.24 (such amount hereinafter the "Monthly Payment Amount"), on the eleventh day of November, 1999 and on the eleventh day of each calendar month thereafter up to and including the eleventh day of September, 2029 (each a "Payment Date"); each of such payments to be applied (a) to the payment of interest computed at the Initial Term Interest Rate (as hereinafter defined); and (b) the balance applied toward the reduction of the principal sum;

and the balance of said principal sum together with all accrued and unpaid interest thereon shall be due and payable on the eleventh day of October, 2029 (the "Maturity Date"). Interest on the principal sum of this Note shall be calculated on the basis of the actual number of days elapsed and a three-hundred-sixty (360) day year. The constant payment required hereunder is based on an amortization schedule of three hundred sixty (360) months. For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods if the eleventh (11th) day of a given month is not a Business Day (as hereinafter defined), then amounts due on the Payment Date for such month shall be due on the next succeeding Business Day. All amounts due under this Note shall be payable without setoff, counterclaim or any other deduction whatsoever.

1. As used in this Note:

(a) The term "Annual Budget" shall mean an annual budget submitted by Maker to Payee in accordance with the terms of Paragraph 8(b) herein.

(b) The term "Anticipated Repayment Date" shall mean October 11, 2009.

(c) The term "Applicable Interest Rate" shall mean (a) from the date of this Note through but not including the Anticipated Repayment Date, the Initial Term Interest Rate, and (b) from and after the Anticipated Repayment Date through and including the date this Note is paid in full, the Extended Term Rate.

(d) The term "Approved Annual Budget" shall mean each Annual Budget approved by Payee in accordance with the terms of Paragraph 8(b) hereof.

(e) The term "Assignment of Leases" shall mean that certain Assignment of Leases and Rents of even date herewith executed by Maker in favor of Payee.

(f) The term "Business Day" shall mean a day other than (i) a Saturday or Sunday, or (ii) any day on which commercial banks in New York City are not open for general banking business.

(g) The term "Capital Expenditures" shall mean for any period, the amount expended for items capitalized under generally accepted accounting principles including expenditures for building improvements or major repairs, leasing commissions and tenant improvements.

(h) The term "Cash Expenses" shall mean, for any period, the operating expenses for the Mortgaged Property (as defined in the Mortgage) as set forth in an Approved Annual Budget, to the extent that such expenses are actually incurred by Maker, minus payments into the Tax and Insurance Impound Fund (as defined in the Mortgage), the Base Leasing Escrow Fund (as defined in the Mortgage), the Replacement Escrow Fund (as defined in the Mortgage) and the Cash Flow Leasing Escrow Fund (as defined in the Mortgage).

(i) The term "Cash Management Agreement" shall have the meaning assigned to such term in the Mortgage.

(j) The term "Debt" shall mean, collectively, the whole of the outstanding principal sum of this Note, together with all interest accrued and unpaid thereon and all other sums due under the Loan Documents.

(k) The term "Default Rate" shall mean a rate per annum which is equal to the lesser of (a) the maximum rate permitted by applicable law, or (b) five percent (5%) above the Applicable Interest Rate.

(l) The term "Defeasance Option" shall mean the right and option of maker to release the Mortgaged Property (as defined in the Mortgage) from the lien of the Mortgage in accordance with the provision set forth in Paragraph 55 of the Mortgage.

(m) The term "Extended Term Rate" shall mean a rate per annum equal to a rate per annum equal to the greater of (i) the Initial Term Interest Rate plus five (5) percentage points or (ii) the Treasury Rate plus five (5) percentage points; provided, however, that for so long as this Note is an asset of the trust, partnership, corporation or other entity formed in connection with a Securitization (as defined in the Mortgage) pursuant to which securities rated

by any Rating Agency (as defined in the Mortgage) have been issued, such term shall mean a rate per annum equal to the Initial Term Interest Rate plus two (2) percentage points.

(n) The term "Excess Cash Flow" shall mean, for any period, the sum (determined in accordance with generally accepted accounting principles, consistently applied) of (i) net operating income (calculated as all income derived from the operation of the Mortgaged Property after payment of taxes and expenses), plus (ii) depreciation and amortization (to the extent deducted in determining net operating income) for such period, plus (iii) disbursements from the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Base Leasing Escrow Fund (as defined in the Mortgage), the Cash Flow Leasing Escrow Fund or any other escrows or reserves approved by Payee or provided for under the Loan Documents, but, in each case, only to the extent disbursed to Maker and not applied to the payment of, or reimbursement for, taxes, insurance and other amounts for which such reserves were set aside, minus (x) actual payments of the regularly scheduled principal and interest payments (calculated at the Applicable Interest Rate, or at the Default Rate, if applicable) due and payable in accordance with this Note during an applicable period and other amounts paid under the Loan Documents to or for the benefit of Payee, minus (y) actual Capital Expenditures in excess of payments from the Replacement Escrow Fund, the Base Leasing Escrow Fund, the Cash Flow Leasing Escrow Fund and funding of reserves for working capital and Extraordinary Expenses as approved by Lender in its sole discretion, and minus (z) payments into the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Base Leasing Escrow Fund, the Cash Flow Leasing Escrow Fund and other reserves required under the Loan Documents.

(o) The term "Extraordinary Expense" shall mean any extraordinary operating expense or capital expense not set forth in an Approved Annual Budget or allotted for in the Replacement Escrow Fund.

(p) The term "Initial Term Interest Rate" shall mean a rate of Eight and Forty-Nine One-Hundredths percent (8.49%) per annum.

(q) The term "Loan" shall mean that certain loan made by Payee to Maker contemporaneously herewith.

(r) The term "Loan Documents" shall mean collectively this Note, the Mortgage, the Assignment of Leases and any and all other documents securing, evidencing, or guaranteeing all or any portion of the Loan or otherwise executed and/or delivered in connection with this Note and the Loan.

(s) The term "Mortgage" shall mean that certain Mortgage, Assignment of Leases and Rents and Security Agreement of even date herewith in the amount of this Note given by Maker for the use and benefit of Payee covering the fee estate of Maker in certain premises as more particularly described therein.

(t) The term "Net Capital Expenditures" shall mean for any period the amount by which Capital Expenditures during such period exceeds reimbursements for such items during such period from any fund established pursuant to the Loan Documents.

(u) The term "Treasury Rate" shall mean, as of the Anticipated Repayment Date, the yield, calculated by linear interpolation (rounded to the nearest one-thousandth of one percent (*i.e.*, 0.001%)) of the yields of noncallable United States Treasury obligations with terms (one longer and one shorter) most nearly approximating the period from the Anticipated Repayment Date to the Maturity Date, as determined by Payee (absent manifest error) on the basis of Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading U.S. Governmental Security/Treasury Constant Maturities, or if such publication or any successor publication shall cease to be published, such other recognized source of financial market information as shall be reasonably selected by Payee.

2. This Note is evidence of the Loan and of the obligation of the Maker to repay the Loan in accordance with the terms hereof. This Note is secured, *inter alia*, by (a) the Mortgage, (b) an Assignment of Leases, and (c) the other Loan Documents.

3. If any sum payable under this Note is not paid on or before the date which is three (3) days after the date on which it is due, Maker shall pay to Payee upon demand an amount equal to the lesser of three percent (3%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray a portion of the expenses incurred by Payee in handling and processing such delinquent payment and to compensate Payee for the loss of the use of such delinquent payment. If the day when any payment required under this Note is due is not a Business Day, then payment shall be due on the first Business Day thereafter.

4. The Debt or any portion thereof, shall without notice become immediately due and payable at the option of Payee upon the happening of any Event of Default (as defined in the Mortgage). In the event that it should become necessary to employ counsel to collect or enforce the Debt or to protect or foreclose the security therefor upon the happening of any Event of Default, Maker also shall pay on demand all costs of collection incurred by Payee, including attorneys' fees and costs reasonably incurred for the services of counsel whether or not suit be brought.

5. Maker does hereby agree that upon the occurrence of an Event of Default (including upon the failure of Maker to pay the Debt in full on the Maturity Date), Payee shall be entitled to receive and Maker shall pay interest on the entire unpaid principal sum and any other amounts due at the Default Rate.

6. Maker hereby agrees that upon the occurrence of an Event of Default Maker shall pay to Payee on the eleventh day of each month while such Event of Default continues, an aggregate amount equal to the Excess Cash Flow for the prior month, such Excess Cash Flow to be applied by Payee to the payment of the Debt in such order as Payee shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal. Interest at the Default Rate and Excess Cash Flow shall both be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt. Interest at the Default Rate shall be added to the Debt and shall be secured by the Mortgage. This paragraph, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Payee by reason of the occurrence of any Event of Default; the acceptance of any payment of

Excess Cash Flow shall not be deemed to cure or constitute a waiver of any Event of Default; and Payee retains its rights under this Note to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default despite any payment of Excess Cash Flow.

7. This Note may not be prepaid prior to the Anticipated Repayment Date; provided, however, Maker shall have the right and option to release the Mortgaged Property from the lien of the Mortgage in accordance with the terms and provisions of the Defeasance Option. Notwithstanding the foregoing sentence, Maker shall have the privilege to prepay the entire principal balance of this Note and any other amounts outstanding on any Payment Date and upon not less than fifteen (15) days prior to written notice from Maker to Payee during the six (6) months preceding the Anticipated Repayment Date without payment of the Yield Maintenance Premium (as defined in the Mortgage) or any other premium or penalty or defeasance. Any prepayment prior to the Anticipated Repayment Date on a date other than a Payment Date, shall, in any event, include interest through the following Payment Date. In addition, on the Anticipated Repayment Date or on any Payment Date thereafter, the Maker may, at its option and upon thirty (30) days prior written notice from Maker to Payee, prepay in whole or in part, in $100,000 increments only, the outstanding principal balance of this Note and any other amounts outstanding without payment of the Yield Maintenance Premium or any other premium or penalty. If prior to the Anticipated Repayment Date and following the occurrence of any Event of Default, Maker shall tender payment of an amount sufficient to satisfy the Debt at any time prior to a sale of the Mortgaged Property, either through foreclosure or the exercise of the other remedies available to Payee under the Mortgage, such tender by Maker shall be deemed to be voluntary and Maker shall pay, in addition to the Debt, the Yield Maintenance Premium, if any, that would be required under the Defeasance Option.

8. (a) From and after the date hereof, Maker shall cause all Rents (as defined in the Mortgage) to be deposited in the Clearing Account (as defined in the Cash Management Agreement). Commencing on the first day of each Collection Period (as defined in the Cash Management Agreement), all Rents deposited in the Cash Collateral Account (as defined in the Cash Management Agreement) shall be allocated in the following order of priority:

(i) First, to fund the Tax and Insurance Impound Fund Account (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Tax and Insurance Impound Fund on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(ii) Second, to fund the Monthly Debt Service Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Monthly Payment Amount;

(iii) Third, to fund the Monthly Debt Service Subaccount with any other amounts due to the Payee under the Loan Documents not otherwise addressed by this Paragraph 8;

(iv) Fourth, to fund the Replacement Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Replacement Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(v) Fifth, to fund the Base Leasing Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Base Leasing Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(vi) Sixth, to fund the Operating Expense Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Cash Expenses, other than management fees payable to affiliates of Maker for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(vii) Seventh, to fund the Operating Expense Subaccount with any Net Capital Expenditures for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(viii) Eighth, to fund the Operating Expense Subaccount with any Extraordinary Expenses approved by Payee for the month in which such Collection Period ends, if any;

(ix) Ninth, to fund the Cash Flow Leasing Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is an amount equal to the Monthly Cash Flow Leasing Escrow Fund Amount (as such term in defined in paragraph (6)(c)(iii) of the Mortgage); and

(x) Last, to fund the Borrower Remainder Sub-Account (as established pursuant to the Cash Management Agreement), any Rents remaining after making the foregoing payments.

Nothing in this Paragraph 8(a) shall limit, reduce or otherwise affect Maker's obligations to pay the Monthly Payment Amount, make payments to the Tax and Insurance Impound Fund, Base Leasing Escrow Fund, Replacement Escrow Fund or Cash Flow Leasing Escrow Fund due hereunder and pay other amounts due under the other Loan Documents, whether or not Rents are available to make such payments; provided, however, that Payee agrees to distribute amounts deposited in the Cash Collateral Account in the manner required pursuant to the terms of this Note, the Mortgage and the other Loan Documents. Maker represents and covenants that it will not make any distributions with respect to income for a given calendar month to its members or any of their affiliates during any month until the payments or deposits

specified in subparagraph (i) through (ix), and any Cash Expenses for the Mortgaged Property (as defined in the Mortgage) then due have been made in full with respect to such month on a timely basis.

(b) For each fiscal year commencing after the date hereof, Maker shall submit to Payee for Payee's written approval an Annual Budget not later than sixty (60) days prior to the commencement of such fiscal year, in form satisfactory to Payee setting forth in reasonable detail budgeted monthly operating income and monthly operating capital and other expenses for the Mortgaged Property. From and after the earlier to occur of (i) an Event of Default or (ii) the Anticipated Repayment Date, each Annual Budget shall contain, among other things, limitations on management fees, third party service fees, and other expenses as the Maker may reasonably determine. Payee shall have the right to approve such Annual Budget, which approval shall not be unreasonably withheld (provided, however, that, prior to the earlier of (i) an Event of Default or (ii) the Anticipated Repayment Date, such approval shall be deemed given unless the monthly operating income remaining after application as set forth in subparagraphs 8(a)(i) through 8(a)(viii) pursuant to such Annual Budget will not be sufficient at all times during the relevant fiscal year to fully fund the Monthly Cash Flow Leasing Escrow Fund Amount); and in the event that Payee objects to the proposed Annual Budget submitted by Maker, Payee shall advise Maker of such objections within fifteen (15) days after receipt thereof (and deliver to Maker a reasonably detailed description of such objections) and Maker shall within three (3) days after receipt of notice of any such objections revise such Annual Budget and resubmit the same to Payee. Payee shall advise Maker of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Maker a reasonably detailed description of such objections) and Maker shall revise the same in accordance with the process described in this subparagraph until the Payee approves an Annual Budget, provided, however, that if Payee shall not advise Maker of its objections to any proposed Annual Budget within the applicable time period set forth in this Paragraph 8(b), then such proposed Annual Budget shall be deemed approved by Payee. Until such time that Payee approves or is deemed to approve a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in real estate taxes, insurance premiums and utilities expenses.

9. In the event that Maker does not pay the Debt in full prior to the Anticipated Repayment Date, the provisions of Paragraph 8 as set forth above shall remain in full force and effect, and the following subparagraphs also shall apply:

(a) From and after the Anticipated Repayment Date, interest shall accrue on the unpaid principal balance from time to time outstanding on this Note at the Extended Term Rate. Interest accrued at the Extended Term Rate and not paid pursuant to this Paragraph 9 shall be deferred and added to the Debt and shall earn interest at the Extended Term Rate to the extent permitted by applicable law (such accrued interest is hereinafter defined as "Accrued Interest"). All of the Debt, including any Accrued Interest, shall be due and payable on the Maturity Date.

(b) All Rents deposited in the Cash Collateral Account during each Collection Period shall be allocated in the following order of priority, in each case to the extent sufficient funds remain therefor:

(i)     First, to fund the Tax and Insurance Impound Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Tax and Insurance Impound Fund on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(ii)    Second, to fund the Monthly Debt Service Subaccount until the amount on deposit therein is equal to the Monthly Payment Amount (to be applied first to the payment of interest computed at the Initial Term Interest Rate with the remainder applied to the reduction of the outstanding principal balance of this Note);

(iii)   Third, to fund the Monthly Debt Service Subaccount with any other amounts due to the Payee under the Loan Documents and not otherwise addressed by this Paragraph 9;

(iv)    Fourth, to fund the Replacement Escrow Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Replacement Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(v)     Fifth, to fund the Base Leasing Escrow Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Base Leasing Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(vi)    Sixth, to fund the Operating Expense Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Cash Expenses, other than management fees payable to affiliates of Maker, for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(vii)   Seventh, to fund the Operating Expense Subaccount with any Net Capital Expenditures for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(viii)  Eighth, to fund the Operating Expense Subaccount with any Extraordinary Expenses approved by Payee for the month in which such Collection Period ends, if any;

(ix)    Ninth, to fund the Monthly Debt Service Subaccount with any amount equal to the remaining principal balance of this Note, to be applied against the outstanding principal due under this Note until such principal amount is paid in full;

(x) Tenth, to fund the Monthly Debt Service Subaccount with any amount equal to any Accrued Interest, to be applied against the outstanding amount thereof until all such Accrued Interest has been repaid; and

(xi) Last, to pay to Maker any excess amounts.

(c) In the event that Maker must incur an Extraordinary Expense, then Maker shall promptly deliver to Payee a reasonably detailed explanation of such proposed Extraordinary Expense for the Payee's approval, which approval may be granted or denied in Payee's sole discretion.

(d) Nothing in this Paragraph 9 shall limit, reduce or otherwise affect Maker's obligations to make payments of the Monthly Payment Amount, payments to the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Base Leasing Escrow Fund and the Cash Flow Leasing Escrow Fund due hereunder and under the other Loan Documents, whether or not Rents are available to make such payments; provided, however, that Payee agrees to distribute amounts deposited in the Cash Collateral Account in the manner required pursuant to the terms of this Note, the Mortgage and the other Loan Documents. Maker represents and covenants that it will not make any distributions with respect to income for a given calendar month to its members or any of their affiliates during any month until the payments or deposits specified in subparagraph (i) through (x), and any operating expenses then due for the Mortgaged Property (as defined in the Mortgage) have been made in full with respect to such month on a timely basis.

10. It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Payee to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this paragraph (and the similar paragraph contained in the Mortgage) shall control every other covenant and agreement in this Note and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Debt, or if Payee's exercise of the option to accelerate the Maturity Date, or if any prepayment or the exercise of any Defeasance Option by Maker results in Maker having paid any interest in excess of that permitted by applicable law, then it is Payee's express intent that all excess amounts theretofore collected by Payee shall be credited on the principal balance of this Note and all other Debt and the provisions of this Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. In connection with the foregoing, all sums paid or agreed to be paid to Payee for the use, forbearance, or retention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Debt until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the

intention of Payee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

11.    This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought. Whenever used, the singular number shall include the plural, the plural the singular, and the words "Payee" and "Maker" shall include their respective successors, assigns, heirs, executors and administrators.  If Maker consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

12.    Maker and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration (except as may be expressly provided for herein or in the other Loan Documents).  No release of any security for the Debt or any person liable for payment of the Debt, no extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of the Loan Documents made by agreement between Payee and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Maker, and any other person or party who may become liable under the Loan Documents for the payment of all or any part of the Debt.

13.    Subject to the qualifications below, Payee shall not enforce the liability and obligation of Maker or its constituent members, partners, shareholders, directors, employees or agents to perform and observe the obligations contained in this Note, the Mortgage or the other Loan Documents by any legal, equitable or other action or proceeding wherein a judgment shall be sought against Maker or its constituent members, partners, shareholders, directors, employees or agents, except that Payee may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Payee to enforce and realize upon its interest under this Note, the Mortgage and the other Loan Documents, or in the Mortgaged Property, the Rents, or any other collateral given to Payee pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Maker only to the extent of Maker's interest in the Mortgaged Property, in the Rents and in any other collateral given to Payee, and Payee, by accepting this Note, the Mortgage and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Maker in any such action or proceeding under or by reason of or under or in connection with this Note, the Mortgage or the other Loan Documents.  The provisions of this paragraph shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Payee to name Maker as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of the Payee thereunder; (d) impair the right of Payee to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; or (f) constitute a waiver of the right of Payee to enforce the liability and obligation of Maker, by money judgment or otherwise, to the extent of

any loss, damage, cost, expense, liability, claim or other obligation incurred by Payee including attorneys' fees and costs reasonably incurred, but in all events excluding, however, all consequential damages, arising out of or in connection with the following:

(i) fraud or intentional misrepresentation by Maker or any guarantor in connection with the Loan;

(ii) intentional physical waste of the Mortgaged Property;

(iii) the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substance Indemnification Agreement of even date herewith given by Maker to Payee or in the Mortgage concerning environmental laws, hazardous substances or asbestos;

(iv) the removal or disposal of any portion of the Mortgaged Property after an Event of Default;

(v) the misapplication or conversion by Maker of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Mortgaged Property, (B) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, (C) any Rents following an Event of Default, or (D) any Rents paid more than one month in advance;

(vi) failure to pay charges for labor or materials requested by Maker or to pay or escrow taxes (in accordance with Paragraph 6 of the Mortgage) or to pay other charges that can create liens on any portion of the Mortgaged Property; and

(vii) any security deposits collected with respect to the Mortgaged Property which are not delivered to Payee upon a foreclosure of the Mortgaged Property or other action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Mortgage) prior to the occurrence of the Event of Default that gave rise to such sale or foreclosure or action in lieu thereof.

Notwithstanding anything to the contrary in this Note or any of the Loan Documents, (A) Payee shall not be deemed to have waived any right which Payee may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Payee in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Maker in the event that: (i) the first full monthly payment of principal and interest under this Note is not paid when due; (ii) Maker intentionally fails to maintain its status as a single purpose entity, as required by, and in accordance with the terms and provisions

of, the Mortgage; (iii) Maker fails to obtain Payee's prior written consent before granting any subordinate financing or other voluntary lien encumbering the Mortgaged Property; (iv) Maker fails to obtain Payee's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage or (v), or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Maker or if any proceeding for the dissolution or liquidation of Maker shall be instituted by Maker or any guarantor.

14. Maker (and the undersigned representative of Maker, if any) represents that Maker has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Note, the Mortgage and the other Loan Documents and that this Note, the Mortgage and the other Loan Documents constitute valid and binding obligations of Maker.

15. All notices or other communications required or permitted to be given pursuant hereto shall be given in the manner specified in the Mortgage directed to the parties at their respective addresses as provided therein.

16. EACH OF MAKER AND PAYEE HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF MAKER AND PAYEE, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF MAKER AND PAYEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF SUCH WAIVER.

17. This Note shall be governed by and construed in accordance with the laws of the State in which the Mortgaged Property is located and the applicable laws of the United States of America.

Maker has duly executed this Note the day and year first above written.

**MAKER:**

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By: Blue Hills Management Corp.,
a Massachusetts corporation
its manager

By: ________________________
Gerald S. Fineberg
President

Pay to the order of ________________________,
without recourse.

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC,
a Delaware limited liability company

By: ________________________________
Name:
Title:

# EXHIBIT E

CASH MANAGEMENT AGREEMENT
(this "Agreement")
dated as of September 14, 1999

among

BLUE HILLS OFFICE PARK LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481
(the "Borrower"),

FINEBERG MANAGEMENT, INC.
One Washington Street, Suite 400
Wellsley, MA 02481
(the "Manager"),

and

CREDIT SUISSE FIRST BOSTON
MORTGAGE CAPITAL LLC
11 Madison Avenue
New York, New York 10010
(together with its successors and assigns, the "Lender")

WHEREAS, pursuant to the Mortgage, Assignment of Leases and Rents and Security Agreement, of even date herewith (the "Mortgage"), by and between the Lender and the Borrower, the Lender has provided financing (the "Loan") to the Borrower secured by the property or properties owned by the Borrower and described in the Mortgage (the "Property");

WHEREAS, the Lender has delivered to the Borrower's bank identified in Exhibit A hereto (the "Clearing Bank"), which is an Eligible Bank, maintaining the operating account or accounts of the Borrower (the "Property Account"), a Clearing Bank Instruction Letter attached as Exhibit A hereto (together with any modifications, amendments or replacements thereof, the "Instruction Letter"), which provides that all Rents (as defined in the Mortgage) be deposited in the account named therein (upon delivery of the Instruction Letter, a "Clearing Account") and swept periodically into the accounts established hereunder;

NOW THEREFORE, in consideration of the premises and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Section 1. Defined Terms.

(a) As used herein the following capitalized terms shall have the respective meanings set forth below:

"Account Proceeds" shall mean any and all Rents and other revenue in connection with any Property that is deposited by any Clearing Bank, the Borrower, the Manager or otherwise into the Cash Collateral Account from time to time.

"Anticipated Repayment Date" means the "Anticipated Repayment Date" as defined in Section 1(b) of the Note.

"Borrower Remainder Account" shall mean the account of Borrower to which monies in the Borrower Remainder Sub-account are allocated in accordance with the terms of Section 3(b)(vii) hereof.

"Business Day" shall mean any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York or the city in which the Deposit Bank is located are required or permitted by law to be closed.

"Capital Expenditures" shall have the meaning ascribed to such term in the Note.

"Cash Collateral Account" shall have the meaning ascribed to such term in Section 2 hereof.

"Certificates" means the securities issued in connection with a Secondary Market Transaction.

"Clearing Account" shall have the meaning given such term in the Recitals.

"Clearing Bank" shall have the meaning given such term in the Recitals.

"Collateral" shall mean the Cash Collateral Account, the Tax and Insurance Impound Fund Account, all Permitted Investments and any and all proceeds and products thereof.

"Collection Period" with respect to any Payment Date, shall mean the period of days from the eleventh day of the month immediately preceding the Payment Date to the tenth day of the month in which such Payment Date occurs. With respect to the first Payment Date, the Collection Period shall commence on and include the date hereof and end on and include the tenth day of the calendar month of such first Payment Date.

"Deposit Bank" shall mean the Eligible Bank or Banks selected by the Lender to maintain the Cash Collateral Account.

"Eligible Account" shall mean either (i) an account or accounts maintained with an Eligible Bank or (ii) a Trust Account. Eligible Accounts may bear interest.

"Eligible Bank" shall mean a bank that (i) satisfies the Rating Criteria and (ii) insures deposits held by such bank through the Federal Deposit Insurance Corporation.

"Instruction Letter" shall have the meaning ascribed to such term in the Recitals.

"Loan" shall have the meaning ascribed to such term in the Recitals.

"Loan Documents" shall have the meaning set forth for such term in the Mortgage.

"Monthly Leasing Escrow Fund Amount" (as used in Paragraph 6(c)(iii) of the Mortgage) shall mean the aggregate of the monthly payments required pursuant to Paragraphs 6(c)(i) and 6(c)(ii) of the Mortgage.

"Monthly Payment Amount" shall have the meaning given to such term in the Note.

"Mortgage" shall have the meaning given such term in the Recitals.

"Mortgage Satisfaction Event" shall mean the satisfaction in full of the Obligations.

"Mortgage Sub-accounts" shall have the meaning ascribed to such term in Section 2(c).

"Note" shall mean that certain Mortgage Note, of even date herewith, made by the Borrower in favor of the Lender and evidencing the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Obligations" shall mean any and all debt, liabilities and obligations of the Borrower to the Lender pursuant to or in connection with the Loan, whether now or hereafter existing, including without limiting the generality of the foregoing, the indebtedness evidenced by the Note, all interest accruing thereon, and any and all debt, liabilities and obligations of the Borrower under the Loan Documents.

"Operating Expenses" shall mean, collectively, Cash Expenses (as defined in the Note) and Extraordinary Expenses (as defined in the Note).

"Payment Date" shall have the meaning given to such term in the Note.

"Permitted Investments" shall mean any investment suitable for the investment of escrows and reserves established under mortgage loans included in a Secondary Market Transaction in which some or all of the Certificates issued are rated "AAA" (or the equivalent rating) by the Rating Agencies, as the standards therefor are established from time to time, or such investments which are otherwise acceptable to the Lender. Schedule 1 annexed hereto sets forth certain obligations and securities which are merely illustrative of Permitted Investments as of the date hereof.

"Person" shall mean any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether territorial, national,

federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Property" shall have the meaning ascribed to such term in the Recitals.

"Rating Agencies" shall mean (i) any nationally-recognized statistical rating organizations that provide a rating on any Certificates on the date of issuance of the Certificates or (ii) prior to the issuance of the Certificates, S&P and any other nationally-recognized statistical rating organizations that have been designated by the Lender in its sole discretion.

"Rating Criteria" with respect to any Person, shall mean that (i) the short-term unsecured debt obligations of such Person are rated at least "A-1" by S&P and, if rated by another Rating Agency, are rated in an equivalent category by such other Rating Agency, if deposits are held by such person for a period of less than 30 days, or (ii) the long-term unsecured debt obligations of such Person are rated at least "AA-" by S&P and, if rated by another Rating Agency, are rated in an equivalent category by such other Rating Agency, if deposits are held by such person for a period of 30 days or more.

"Rents" shall have the meaning ascribed to such term in the Mortgage.

"S&P" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Secondary Market Transaction" shall have the meaning given to such term in the Mortgage.

"Servicer" shall mean a servicer or account administrator of the Lender designated by and acting for the benefit of the Lender.

"Tax and Insurance Impound Fund Account" shall have the meaning ascribed to such term in Section 2(e) hereof.

"Trust Account" shall mean a segregated trust account maintained by a corporate trust department of a federal depository institution or a state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(B) which has corporate trust powers and is acting in its fiduciary capacity.

(b) The meanings given to capitalized terms defined herein shall be equally applicable in both singular and plural forms of such terms.

(c) Capitalized terms used and not defined herein shall have the respective meanings given to such terms in the Mortgage.

Section 2. Establishment of the Cash Collateral Account and Tax and Insurance Impound Fund Account.

(a) The Lender has established and will maintain while the Loan is outstanding a cash collateral account (which may be a book-entry sub-account of an Eligible Account) at the Deposit Bank (the "Cash Collateral Account") which shall be entitled "Credit Suisse First Boston Mortgage Capital LLC as Mortgagee of Blue Hills Office Park LLC Cash Collateral Account". In connection with a Secondary Market Transaction, the Lender shall have the right to cause Deposit Bank to entitle the Cash Collateral Account with such other designation as the Lender may select in its reasonable discretion to reflect such assignment or transfer. The Lender shall, or shall cause the Servicer to, cause the Deposit Bank to deposit into the Cash Collateral Account, all Rents and other amounts transferred to the Deposit Bank from the Clearing Bank. Notwithstanding anything to the contrary herein or in the other Loan Documents (but subject to the provisions of Section 2(d)(ii) hereof), all payments due from the Borrower, and Sub-account allocations to be made, pursuant to the Loan Documents shall be deemed paid, or allocated, as applicable, upon the receipt of such amounts in immediately available funds by the Deposit Bank, unless not transmitted in accordance with the Clearing Bank Instruction Letter, in which case upon the receipt of such amounts in immediately available funds in the Cash Collateral Account.

(b) The Cash Collateral Account shall be an interest bearing account subject to and in accordance with the provisions of Sections 2(f) and 2(g) hereof. All interest income remaining in the Cash Collateral Account (other than the Tax and Insurance Impound Fund Account, if such account is established as a sub-account thereof) shall be for the benefit of the Borrower and credited to the Cash Collateral Account. The Cash Collateral Account (other than the Tax and Insurance Impound Fund Account, if such account is established as a sub-account thereof) shall be assigned the federal tax identification number of the Borrower, which number has been applied for. Borrower shall provide Lender or the Deposit Bank, at any time upon request of Lender, with a Form W-8 or W-9 to evidence Borrower is not subject to any back-up withholding under the United States Internal Revenue Code. Prior to application in accordance with the terms hereof, all amounts in the Cash Collateral Account shall remain an asset of Borrower, subject to the lien and security interest granted Lender hereunder, and subject to all of the terms and conditions of this Agreement and the other Loan Documents.

(c) The following sub-accounts (collectively, the "Mortgage Sub-accounts") of the Cash Collateral Account shall be maintained on a ledger-entry basis:

(i) "Tax and Insurance Impound Fund Sub-account";

(ii) "Monthly Debt Service Sub-account";

(iii) "Replacement Escrow Fund Sub-account";

(iv) "Base Leasing Escrow Fund Sub-account";

(v) "Cash Flow Leasing Escrow Fund Sub-account";

(vi) "Operating Expense Sub-account";

(vii) "Casualty and Condemnation Proceeds Sub-account";

(viii) "Extraordinary Receipts Sub-account"; and

(ix) "Borrower Remainder Sub-account".

Amounts allocated to the Mortgage Sub-accounts shall be disbursed in accordance with the terms of this Agreement and the Mortgage.

(d) (i) Concurrently herewith, the Lender has delivered an executed Instruction Letter to the Clearing Bank. Borrower shall not change the bank, bank location or account number of the Clearing Account without Lender's prior written consent. If the Clearing Account is so changed with Lender's consent, Lender's consent shall be conditioned upon the receipt by Lender, at least five (5) Business Days prior to the effectiveness of such change, of (A) a new letter substantially similar to the Instruction Letter with respect to such new bank, bank location or account number duly-executed by Borrower, and (B) such Clearing Bank's executed acknowledgment that its procedures with respect to the Clearing Account are governed by the Instruction Letter.

(ii) At the election of the Lender, at any time from time to time within ten (10) Business Days after notice from the Lender, the Borrower will establish a new Eligible Account (which shall become the Clearing Account) at a bank reasonably selected by the Lender (which bank shall also be required to be reasonably satisfactory to the Borrower if the Lender makes such an election at a time that no Event of Default has occurred and is then continuing) and shall cause all funds in the existing Clearing Account to be transferred to the new Clearing Account and any future Rents from the Property to be deposited in such new Clearing Account. In such event, or if Lender shall amend the provisions of the Instruction Letter such that the timing of any disbursements to be made by the Clearing Bank from the Clearing Account into the Cash Collateral Account is delayed, then all payments due from the Borrower, and Sub-Account Allocations to be made, pursuant to the Loan Documents shall be deemed paid, or allocated, as applicable, upon the receipt of such amounts in immediately available funds in the Clearing Account.

(e) The Lender may establish and maintain while the Loan is outstanding at the Deposit Bank one or more accounts (which may be a sub-account of the Cash Collateral Account) (the "Tax and Insurance Impound Fund Account") which shall be entitled "Credit Suisse First Boston Mortgage Capital LLC as Mortgagee of Blue Hills Office Park LLC Tax and Insurance Impound Fund Account". Amounts on deposit in the Tax and Insurance Impound Fund Account shall be disbursed at the direction of the Lender in accordance with the Mortgage. The Tax and Insurance Impound Fund Account shall be assigned the federal tax identification number of the Lender.

(f) The Lender or the Servicer shall direct the Deposit Bank to invest amounts allocated to the Cash Collateral Account in Permitted Investments selected by the Lender

(provided, however, that the Lender shall reasonably accommodate the Borrower's suggestions in selecting from among such Permitted Investments), and may (but shall not be obligated to) direct the Deposit Bank to invest amounts allocated to the Tax and Insurance Impound Fund Account in Permitted Investments selected by the Lender in its sole discretion. All earnings on such Permitted Investments on funds allocated to in such Accounts (other than the Tax and Insurance Impound Fund Subaccount) shall be for the benefit of the Borrower. The Lender or Servicer, as applicable, shall have liability for any loss in investments of funds that are invested in Permitted Investments but no such loss or liability shall affect Borrower's obligations to make all payments and deposits required to be made by Borrower under the Loan Documents.

(g) It is the intention of the parties hereto that the entire amounts deposited in the Cash Collateral Account (or as much thereof as the Lender may reasonably arrange to invest) shall at all times be invested in Permitted Investments, and that such Accounts shall be so-called "zero balance" accounts. All funds in such Accounts that are invested in a Permitted Investment are deemed to be held in such Accounts for all purposes of the Mortgage and the other Loan Documents.

(h) In order to further secure the performance by the Borrower of the Obligations and as a material inducement for the Lender to make the Loan in accordance with the terms of the Loan Documents, the Borrower hereby (i) requests that the Cash Collateral Account and the Tax and Insurance Impound Fund Account be established on its behalf at the Deposit Bank in the names set forth above and (ii) acknowledges that, subject to the terms, covenants and conditions of this Agreement, the Mortgage and the other Loan Documents, (A) the Cash Collateral Account and the Tax and Insurance Impound Fund Account will be subject to the sole dominion, control and discretion of the Lender (which may be exercised through the Servicer), (B) the Lender shall have the sole right to make withdrawals or transfers of funds from the Cash Collateral Account and the Tax and Insurance Impound Fund Account and (C) neither the Borrower nor any other Person claiming on behalf of or through the Borrower shall have any right or authority, whether express or implied, to make use of, or withdraw any funds, investments or other properties from, the Cash Collateral Account or the Tax and Insurance Impound Fund Account, or to give any instructions to the Deposit Bank with respect to the Cash Collateral Account or the Tax and Insurance Impound Fund Account.

Section 3. Allocation and Disbursement of Funds in the Cash Collateral Account.

(a) Commencing on the first Business Day of each Collection Period occurring prior to the Anticipated Repayment Date, the Lender or the Servicer shall allocate amounts deposited in the Cash Collateral Account from time to time during such Collection Period in the order and priority set forth in Section 8(a) of the Note. Commencing on or prior to the first Business Day of each Collection Period beginning on or after the Anticipated Repayment Date, the Lender or the Servicer shall allocate amounts deposited in the Cash Collateral Account from time to time during such Collection Period in the order and priority set forth in Section 9(b) of the Note.

SRZNY\611528v5

(b) The Lender or the Servicer shall disburse:

(i) Amounts allocated to the Tax and Insurance Impound Fund Sub-account to the Tax and Insurance Impound Fund Account on each Payment Date for further disbursement therefrom as set forth in the Mortgage;

(ii) Amounts allocated to the Monthly Debt Service Sub-account to the Lender on the related Payment Date;

(iii) Amounts allocated to the Replacement Escrow Fund Sub-account as set forth in the Mortgage;

(iv) Amounts allocated to the Base Leasing Escrow Fund Sub-account as set forth in the Mortgage;

(v) Amounts allocated to the Cash Flow Leasing Escrow Fund Sub-account as set forth in the Mortgage;

(vi) Amounts allocated to the Operating Expense Sub-account on the last Business Day of each week to the following account:

Bank:[Name of Bank holding Operating Account]
ABA#:
Attention:
Fax:
Account: Fineberg Management, Inc. - Operating Account
Account #: ___________

(vii) Amounts allocated to the Borrower Remainder Sub-account (which shall no longer be considered Rents) on the last Business Day of each week to the following account:

Bank:[Name of Bank]
ABA#:
Attention:
Fax:
Account: Blue Hills Office Park LLC
Account #: ___________]

Section 4. Fees.

(a) The Borrower agrees to pay the fees of the Servicer and the Deposit Bank in accordance with the customary fees charged by the Deposit Bank and the Servicer for the services described herein, as such fees are established from time to time.

(b) Upon the request of the Borrower, the Lender shall cause the Deposit Bank and the Servicer to include their fees in an account analysis statement.

Section 5. Termination.

(a) The Lender may replace the Deposit Bank with a new Deposit Bank upon five (5) days' notice to the Borrower and the Clearing Bank. The Borrower and Lender each hereby agrees to take all reasonable actions necessary to facilitate the transfer of the respective obligations, duties and rights of the Deposit Bank to the successor thereof selected by the Lender in its sole discretion.

(b) The Lender shall terminate this Agreement upon the occurrence of a Mortgage Satisfaction Event and return to Borrower all monies then held in the Cash Collateral Agreement and the Tax and Insurance Impound Fund Account after liquidating all Permitted Investments, or, if requested by the Borrower, the Lender shall, at no cost to the Lender, cooperate in causing a transfer to the Borrower of a Permitted Investment held by the Lender at the time of the Mortgage Satisfaction Event, if the same is susceptible of transfer and not then easily liquidated.

Section 6. Matters Concerning the Borrower.

(a) Simultaneously with the execution hereof, and as a condition to the funding of the Loan, and hereafter during the term of the Loan, the Borrower shall cause each of the following to occur:

(i) The Borrower or the Manager shall immediately instruct all Persons that presently or hereafter maintain open accounts with Borrower or the Manager or with whom the Manager or the Borrower presently or hereafter does business on an "accounts receivable" basis with respect to the Property to deliver all payments due under such accounts to the Clearing Bank at a lock box address at the Clearing Bank (the "Lock Box Address") in the form of cashier's checks or equivalent instruments for the payment of money. Neither the Borrower nor the Manager shall direct any such Person to make payments due under such accounts in any other manner.

(ii) Pursuant to an instruction letter in the form of Exhibit B hereto (a "Lessee Payment Direction Letter"), the Borrower or the Manager shall immediately notify and advise each tenant of the Property (collectively, the "Tenants") under each lease with respect to the Property (whether such lease is presently effective or executed after the date hereof), to send directly to the Lockbox Address promptly when due all payments, whether in the form of checks, cash, drafts, money orders or any other type of payment whatsoever of rent or any other item payable to the Borrower as landlord under such Leases. The foregoing requirements need not be satisfied with respect to any Lease executed after the date hereof to the extent the terms and conditions of the Lessee Payment Direction Letter are incorporated in the applicable Lease.

(iii) If notwithstanding the provisions of this Section 6(a), Borrower or Manager (or any affiliate thereof) receives any Rents, then (x) Borrower or Manager (or such affiliate) shall be deemed to hold such Rents in trust for Lender and (y) the Borrower and the Manager shall deposit with the Clearing Bank within one Business Day of receipt all such Rents received by the Borrower or the Manager (or such affiliate).

(b) Upon request of Lender, Borrower shall deliver to Lender such evidence as Lender may reasonably request to evidence that Borrower is complying with the provisions of this Section 6(a). Without the prior written consent of the Lender, neither the Borrower nor the Manager shall (i) terminate, amend, revoke or modify any Lessee Payment Direction Letter in any manner or (ii) direct or cause any Tenant to pay any amount in any manner other than as provided specifically in the related Lessee Payment Direction Letter.

(c) The Borrower hereby pledges, transfers and assigns to the Lender, and grants to the Lender, as additional security for the payment and performance of the Obligations, a continuing perfected first priority security interest in and to, and a first lien upon, (i) the Cash Collateral Account, the Clearing Account, the Tax and Insurance Impound Fund Account and all of the Borrower's right, title and interest in and to all cash, property or rights transferred to or deposited therein from time to time, (ii) all earnings, investments and securities held in the Cash Collateral Account and the Tax and Insurance Impound Fund Account in accordance with this Agreement and (iii) any and all proceeds of the foregoing. This Agreement and the pledge, assignment and grant of security interest made hereby shall secure payment of all amounts payable by the Borrower to the Lender under the Note and the other Obligations. The Borrower acknowledges that the Servicer, Clearing Bank and Deposit Bank are acting as the agent of, and at the direction of, the Lender in connection with the subject matter of this Agreement. The Borrower further agrees to execute, acknowledge, deliver, file or do at its sole cost and expense, all other acts, assignments, notices, agreements or other instruments as the Lender may reasonably require in order to effectuate, assure, convey, secure, assign, transfer and convey unto the Lender any of the rights granted by this Agreement and to more fully perfect and protect any lien or security interest granted hereby.

(d) In its sole discretion, the Borrower may from time to time deposit amounts into the Cash Collateral Account in respect of any Mortgage Sub-account from sources of the Borrower other than those received by the Clearing Bank with respect to the then-current Collection Period; provided, that if the Borrower deposits such amounts, the amounts deposited shall be subject to all of the terms hereof as if not separately deposited by the Borrower, and may not be withdrawn except as otherwise provided for in this Agreement. Nothing contained herein shall impair or otherwise limit Borrower's obligations to timely make the payments (including, without limitation, interest and principal) required by the Note, the Mortgage and the other Loan Documents, it being understood that such payments shall be so timely made in accordance with the Loan Documents regardless of the amounts on deposit in the Clearing Account, Cash Collateral Account and/or Tax and Insurance Impound Fund Account; provided, however, that Lender agrees to distribute funds deposited in the Cash Collateral Account, to the extent and in the time and manner required pursuant to the terms of this Agreement, the Mortgage and the other Loan Documents.

(e) The Borrower hereby covenants and agrees that, from and after the earlier to occur of (i) an Event of Default or (ii) the Anticipated Repayment Date, amounts allocated to the Operating Expense Sub-account with respect to the payment of Operating Expenses or Capital Expenditures shall be used only for payment of checks made by the Borrower for the payment of expenses incurred in the ordinary course of business of the ownership and operation

of the Property or for the payment of expenditures approved by the Lender or otherwise permitted hereunder or under the other Loan Documents.

(f)    If the actual Operating Expenses and Capital Expenditures paid during any Collection Period are (i) prior to the earlier to occur of (x) an Event of Default or (y) the Anticipated Repayment Date, in an amount such that the monthly operating income remaining after application of the amounts required to be applied pursuant to subparagraphs (8)(a)(i) through (8)(a)(viii) of the Note is insufficient to fully fund the Monthly Cash Flow Leasing Escrow Fund Amount, and (ii) thereafter, less than the amount transferred to the Operating Account, in either case during such Collection Period, the amount of such shortfall shall promptly be deposited by Borrower back into the Cash Collateral Account, in any event no later than twenty (20) days after the end of the applicable Collection Period, such amount to be applied in accordance with the Annual Budget (as defined in the Note) then applicable when such sum is redeposited into the Cash Account.  Within twenty (20) days after the end of each Collection Period occurring commencing upon the earlier to occur of (x) an Event of Default or (y) the Anticipated Repayment Date, Borrower shall prepare and deliver to Lender a statement in form and substance reasonably satisfactory to Lender in all material respects setting forth all amounts expended for Operating Expenses and Capital Expenditures during such Collection Period, including showing variances from budget and setting forth a short explanation of any variance in excess of ten percent (10%) of the budget line item in question and identifying any payment made to an Affiliate and the reasons therefor. Each such statement shall be certified by an officer of Borrower as being true, correct and complete in all material respects and shall include a certification that all amounts transferred to the Operating Account pursuant to this Agreement were expended for Operating Expenses and Capital Expenditures in accordance with this Agreement or have been or are being returned to the Cash Collateral Account as provided above.    Borrower shall promptly deliver to Lender such further written documentation (including, without limitation, invoices, canceled checks or copies of contracts) and information as Lender may reasonably request regarding any payments described in Borrower's statements. If Borrower shall fail to deposit any excess funds in the Cash Collateral Account or provide its required statements or, after written request of Lender, evidence of expenditures, in each case, within the time periods provided in the preceding sentences and such failure continues for ten (10) or more days after notice of such failure, then in addition to any other remedies which Lender may have with respect thereto, Lender may elect not to fund the Operating Expense Sub-account from monies in the Cash Collateral Account or Lender may continue to hold the funds in the Operating Expense Sub-account until such failure is cured.

Section 7.    Certain Matters Regarding the Lender.

(a)    The parties agree that the Deposit Bank shall pay over to the Lender all amounts deposited in any account maintained hereunder on demand, without notice to the Borrower, provided, that in making such demand, the Lender gives notice, in writing, signed by the Lender or an authorized agent thereof, that an Event of Default under the Mortgage has occurred and is continuing. Notwithstanding the foregoing, the Borrower shall not be deemed to have waived any rights the Borrower may have against the Lender if it is determined that the Lender acted improperly.

(b) Lender may exercise in respect of the Collateral all rights and remedies available to Lender hereunder or under the other Loan Documents or otherwise available at law or in equity. Without limiting the generality of the foregoing or the provisions of paragraph (a) above, upon the occurrence and during the continuance of an Event of Default, Borrower acknowledges and agrees that it will have no further right to request or otherwise require Lender to disburse funds from the Clearing Account, the Cash Collateral Account or the Tax and Insurance Escrow Account in accordance with the terms of this Agreement, it being agreed that Lender may, at its option, (i) direct the Deposit Bank to continue to hold the funds in the Cash Collateral Account and the Tax and Insurance Escrow Account and/or (ii) continue from time to time to apply all or any portion of the funds held in the Cash Collateral Account or Tax and Insurance Escrow Account to any payment(s) which such funds could have been applied to prior to such Event of Default (or to pay Cash Expenses, Net Capital Expenses and Extraordinary Expenses directly), to the extent and in such order and manner as Lender in its sole discretion may determine, and/or (iii) direct that the Deposit Bank or Clearing Bank from time to time disburse all or any portion of the funds held in the Cash Collateral Account or the Tax and Insurance Escrow Account or other Collateral then or thereafter held by the Deposit Bank or Clearing Bank, as applicable, to Lender, in which event Lender may apply the funds held in the Cash Collateral Account, the Tax and Insurance Escrow Account or other Collateral to the Obligations in any order and in such manner as Lender may determine in its sole discretion.

(c) Upon the occurrence and during the continuance of any Event of Default, Lender may, at any time or from time to time, collect, appropriate, redeem, realize upon or otherwise enforce its rights with respect to the Collateral, without notice to Borrower and without the need to institute any legal action, make demand, exhaust any other remedies or otherwise proceed to enforce its rights.

(d) No failure on the part of Lender to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right under this Agreement or the other Loan Documents. The remedies provided in this Agreement, the Note, the Mortgage and the other Loan Documents are cumulative and not exclusive of any remedies provided at law or in equity.

Section 8. Casualty and Condemnation Proceeds Sub-account; Extraordinary Receipts Sub-account.

Notwithstanding anything to the contrary contained herein, but subject to the provisions of the Mortgage, the following items of Rents, as and when received, shall be deposited and held in the Mortgage Sub-accounts described below and shall be applied in the order of priority set forth in this Section 8, and Borrower shall advise Lender at the time of receipt thereof of the nature of such receipt so that Lender shall have sufficient time to instruct the Deposit Bank to deposit and hold such amounts in the appropriate Mortgage Sub-account:

(a) Proceeds of any insurance (exclusive of rent or business interruption insurance, which shall be deemed Rents), which amounts shall be deposited in the Casualty and

SRZNY\611528v5



Condemnation Proceeds Sub-account and shall be applied (by instructions of Lender or Servicer to the Deposit Bank) in accordance with the provisions of the Mortgage applicable thereto.

(b) Condemnation awards, which amounts shall be deposited in the Casualty and Condemnation Proceeds Sub-account and shall be applied (by instructions of Lender or Servicer to the Deposit Bank) in accordance with the provisions of the Mortgage applicable thereto.

(c) Real estate tax refunds (net of any reasonable and customary fees and disbursements of tax certiorari counsel deducted from such refund to pay such counsel's fee), which amount shall be deposited in the Extraordinary Receipts Sub-account and shall thereafter be transferred (by instructions of Lender to the Deposit Bank) to the Property Account to the extent required to pay refunds due to any tenants of the Property (based on a certificate of Borrower as to the tenants entitled to receive such refunds and the amounts thereof), except Lender reserves the right to pay (or have the Servicer pay) any such tenant directly using monies so deposited in the Extraordinary Receipts Sub-account, in lieu of transferring such monies to the Operating Account for such payment. Lender or Servicer shall apply any excess, after the aforesaid payment, as if ordinary Rents deposited in the Cash Collateral Account.

(d) Any other extraordinary event pursuant to which Borrower receives payments or income (in whatever form) derived from or generated by the use, ownership or operation of the Premises, not otherwise covered above (other than payments from any lessee under any Lease) shall be deposited in the Clearing Account and applied as ordinary Rents as if such amounts were ordinary Rents to be applied in accordance with the terms of this Agreement for the month in question.

(e) If the fees and disbursements of tax certiorari counsel described in paragraph (c) above shall not have been deducted from the real estate tax refunds by such counsel prior to payment of such refunds to Borrower, then such fees and disbursements may be paid as part of Operating Expenses, provided such fees and disbursements are commercially reasonable. References to application of any amounts received by Borrower by reason of any action taken by Borrower under or with respect to a Lease, or otherwise, is not intended in any manner to allow Borrower to take such action in conflict with any other provision of the Loan Documents.

Section 9. Successors and Assigns; Assignments; Agents.

(a) This Agreement shall bind and inure to the benefit of and be enforceable by the Borrower, the Lender and the Manager and their respective successors and assigns.

(b) The Lender shall have the right to assign or transfer rights and obligations under this Agreement without limitation. Any assignee or transferee shall be entitled to all the benefits afforded the Lender under this Agreement and the other Loan Documents; provided, that such assignee or transferee shall upon written request deliver to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement and the other Loan Documents and is also the assignee or transferee of the Note and the other Loan Documents.

(c) The Borrower shall have the right to assign and transfer its rights and obligations hereunder only with the prior written consent of the Lender.

(d) Any duties or actions of the Lender hereunder may be performed by the Lender or its agent(s), including without limitation, any Servicer or trustee in a Secondary Market Transaction, which includes the Loan.

Section 10. Amendment.

This Agreement may be amended from time to time in writing by all parties hereto. All amendments to this Agreement shall be in writing.

Section 11. Notices.

Notices to the parties hereto shall be addressed and delivered in the manner set forth in the Mortgage. Unless otherwise expressly provided herein, all such notices, to be effective, shall be in writing (including by facsimile), and shall be deemed to have been duly given or made (a) when delivered by hand or by nationally recognized overnight carrier, (b) upon receipt after being deposited in the mail, certified mail and postage prepaid or (c) in the case of facsimile notice, when sent and electronically confirmed, addressed as set forth above.

Section 12. Limitation on Liability.

Lender shall not be liable for any acts, omissions, errors in judgment or mistakes of fact or law, including, without limitation, acts, omissions, errors or mistakes with respect to the Collateral, except for those arising as a result of Lender's acts of gross negligence or willful misconduct or as otherwise expressly provided in the Loan Documents. Without limiting the generality of the foregoing, except as otherwise expressly provided for herein or as required by applicable law, Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other right pertaining to any Collateral. Lender is hereby authorized by Borrower to act on any written instruction believed by Lender in good faith to have been given or sent by Borrower.

Section 13. Mortgagee-in-Possession.

Borrower hereby confirms and agrees that notwithstanding the provisions of this Agreement, Borrower retains sole control of the operation and maintenance of the Property, subject to the obligations of Borrower under the Mortgage, the Assignment of Leases and Rents and the other Loan Documents, and Lender is not and shall not be deemed to be a mortgagee in possession.

Section 14. Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS.

[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this CASH MANAGEMENT AGREEMENT in several counterparts (each of which shall be deemed an original) as of the date first above written.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By: Blue Hills Management Corp.,
a Massachusetts corporation
its manager

By: [signature]
Gerald S. Fineberg
President

CREDIT SUISSE FIRST BOSTON
MORTGAGE CAPITAL LLC,
as the Lender

By: ______________________
Name:
Title:

FINEBERG MANAGEMENT, INC.
a Massachusetts corporation

By: [signature]
Name: **Gerald S. Fineberg**
Title: **President**

IN WITNESS WHEREOF, the parties hereto have executed this CASH MANAGEMENT AGREEMENT in several counterparts (each of which shall be deemed an original) as of the date first above written.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By: Blue Hills Management Corp.,
a Massachusetts corporation
its manager

By: ______________________
Gerald S. Fineberg
President

CREDIT SUISSE FIRST BOSTON
MORTGAGE CAPITAL LLC,
as the Lender

By: ______________________
Name: MARK FINEMAN
Title: VICE-PRESIDENT

FINEBERG MANAGEMENT, INC.
a Massachusetts corporation

By: ______________________
Name:
Title:

**EXHIBIT A**

**CLEARING BANK INSTRUCTION LETTER**

September ___, 1999

MetroWest Bank
15 Park Street
P.O. Box 9111
Framingham, Massachusetts 01701

Re: BLUE HILLS OFFICE PARK

Ladies and Gentlemen:

Blue Hills Office Park LLC (the "Borrower") has entered into a Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of September ___, 1999 (the "Loan Agreement"), with Credit Suisse First Boston Mortgage Capital LLC (together with its successors and assigns, the "Lender"), pursuant to which the Lender has provided financing to the Borrower secured by certain mortgages and/or deeds of trust on certain properties owned by the Borrower, including the property described in the caption of this letter (the "Property"). The Property is currently being managed by Fineberg Management, Inc. (the "Manager").

Currently, the [Borrower] [Manager] maintains the following account (the "Property Account") with you:

Name: [________________]
Account No.[______________]

The Borrower hereby notifies you that the Lender has required that it implement certain automatic clearing and processing functions and hereby instructs you, commencing on the date hereof, (the "Sweep Commencement Date"), to disburse all revenues from the Property ("Revenues") deposited in the Property Account from time to time in accordance with the following terms and provisions:

1. Promptly upon receipt of this letter you shall establish a post office box address in which the Borrower shall cause all Revenues in the form of checks, money orders and similar instruments to be deposited. Within one business day of receipt, you, as the "Clearing Bank," shall receive and process all Revenues and shall deposit the same into the Property Account referred to above, which Property Account, or an appropriate substitution or replacement thereof, shall thereafter be referred to as the "Clearing Account." Checks made payable to the Borrower, the Manager, the Property or the Clearing Account shall be deemed suitable for deposit in the Clearing Account. Items deposited with the Clearing Bank that are returned for insufficient or uncollected funds will be redeposited the first time. Items returned



unpaid a second time shall be processed in accordance with the standard procedures of the Clearing Bank.

2. The Clearing Account shall be an account of the Borrower but shall be under the sole dominion and control of the Lender and any servicer (a "Servicer") or other designee of the Lender named below or in a subsequent written notice from the Lender. The Clearing Account shall be assigned the federal tax identification number of the Borrower, which number has been applied for. You shall hold amounts on deposit in the Clearing Account as agent for the Lender and shall not commingle such amounts with any other amounts held by you on behalf of the Lender, the Borrower or any other person or entity. If, in accordance with your standard operating procedures, the Clearing Account may be established as a trust account for the benefit of the Lender, Borrower directs that the Clearing Account be maintained as such an account.

3. The Borrower hereby notifies the Clearing Bank that, in accordance with the Mortgage, the Clearing Account and all amounts held therein from time to time, and all renewals, replacements and substitutions therefor, have been irrevocably pledged to the Lender as additional security for the loan evidenced by the Mortgage. In connection with such pledge, the Borrower hereby waives all right of withdrawal from the Clearing Account.

4. The Borrower hereby irrevocably instructs and authorizes you, beginning on the date hereof, to disburse on the last business day of each week and on the eleventh day of each calendar month, (or, if the eleventh day of the month is a Saturday or Sunday or other day on which commercial banks in New York City re not open for general banking business (a "Business Day"), then on the next Business Day) via the ACH System, if available, or otherwise by wire transfer, all amounts constituting available funds on deposit in the Clearing Account to the following account:

Bank: Bank One Texas, N.A.
ABA#: 111000614
Acct. Name: Cash Collateral Account
Acct. No.: 1578611756
Ref.: Blue Hills Office Park LLC

5. If transferring such amounts by the ACH System and if required by Clearing Bank, each such transfer shall be initiated by the Lender or by the Servicer. If the Clearing Bank provides electronic data transfer services, the Clearing Bank shall provide the Lender and the Servicer access to the Clearing Bank's electronic data transfer system for purposes of effecting such transfers. At any time that funds may not be transferred as described above in this paragraph, the Clearing Bank shall transfer amounts by wire transfer of immediately available funds.

6. The instructions set forth herein are irrevocable and are not subject to modification in any manner, except that the Lender or the Servicer may, by written notice to you, amend the instructions contained herein.

7. In the event that the Clearing Bank fails to acknowledge that its procedures with respect to the Property Account are governed by this letter due to an objection to the terms hereof or otherwise, the Borrower hereby appoints the Lender as its attorney-in-fact with full authority to make changes to this letter and to execute on behalf of the Borrower any new or modified letter acceptable to the proposed Clearing Bank in the event that the Borrower fails to execute any such new or modified letter after written request to do so from the Lender.

8. Matters not covered by this letter shall be determined in accordance with the customary procedures of the Clearing Bank and in the event of a conflict between the terms of this letter and the customary procedures of the Clearing Bank, the terms of this letter shall govern.

9. The undersigned also notifies you that the name and address of the current Servicer with respect to the Cash Management Agreement is:

ORIX Real Estate Capital Markets, LLC
1717 Main Street, 12th Floor
Dallas, Texas 75201
Attn: John Lloyd

If you have any questions concerning this letter or the Cash Management Agreement, please contact Joseph Rubino of the Lender at (212) 325-6061 or John Lloyd of the Servicer at (214) 237-2079.

The address of the current Manager is:

Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481

Please acknowledge receipt of this letter and your agreement to the terms described herein by executing and returning to the Borrower an acknowledgment in the form of Schedule 1 hereto.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company
By: Blue Hills Management Corp.,
a Massachusetts corporation
its manager

By: [signature]
Name: **Gerald S. Fineberg**
Title: **President**

Acknowledged and Agreed:

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC

By:____________________________
Name:
Title:

Please acknowledge receipt of this letter and your agreement to the terms described herein by executing and returning to the Borrower an acknowledgment in the form of Schedule 1 hereto.

BLUE HILLS OFFICE PARK LLC

By:______________________________
Name:
Title:

Acknowledged and Agreed:

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC

By:______________________________
Name:
Title:

**SCHEDULE 1**

FORM OF ACKNOWLEDGMENT

September ___, 1999

Blue Hills Office Park LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481

Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
New York, New York 10010

Reference is made to that certain Clearing Bank Instruction Letter dated September ___, 1999 (the "Instruction Letter") from Blue Hills Office Park LLC (the "Borrower"). I, ____________, on behalf of MetroWest Bank (the "Bank"), hereby acknowledge receipt of the instructions set forth in the Instruction Letter and notice of the pledges and security interest described therein. The Bank hereby agrees to perform the instructions set forth in the Instruction Letter upon the delivery by Credit Suisse First Boston Mortgage Capital LLC (the "Lender") of the Instruction Letter.

If you have any questions, please call Nancy L. Conley at (508) 620-0300.

METROWEST BANK

By:______________________________
Name:
Title:

LOCK BOX ADDRESS:

______________________________
______________________________
______________________________

**EXHIBIT B**

**Form of Lessee Payment Direction Letter**

FINEBERG MANAGEMENT, INC.
One Washington Street, Suite 400
Wellesley, MA 02481

September __, 1999

EquiServe Limited Partnership
______________________________
______________________________

Re: Payment Direction Letter for Blue Hills Office Park
150 Royall Street, Canton, Massachusetts

Dear Sirs:

Blue Hills Office Park LLC, the owner of the Blue Hills Office Park (the "Property"), has mortgaged the Property to Credit Suisse First Boston Mortgage Capital LLC (together with its successors and assigns, the "Lender") and has agreed that all rents due for the Property will be paid directly to a bank selected by the Lender. Therefore, from and after the date hereof, all rent to be paid by you under the lease between you and Blue Hills Office Park LLC (the "Lease") should be sent directly to the following address:

METROWEST BANK
[Lockbox Address]

All checks should be made out to the "Blue Hills Office Park".

These payment instructions cannot be withdrawn or modified without the prior written consent of the Lender or its agent (the "Servicer"), or pursuant to a joint written instruction from the Borrower and the Lender or the Servicer. Until you receive written instructions from the Lender or the Servicer, continue to send all rent payments due under the Lease to MetroWest Bank. All rent payments must be delivered to MetroWest Bank no later than the day on which such amounts are due under the Lease.

If you have any questions concerning this letter, please contact the persons identified for notice purposes in the lease. We appreciate your cooperation in this matter.

FINEBERG MANAGEMENT, INC.

By:______________________________
Name:
Title:

SCHEDULE 1

[Schedule commences on the following page]

B-3

SRZNY\611528v5

**SCHEDULE 1**

# FORM OF ACKNOWLEDGMENT

September 13, 1999

Blue Hills Office Park LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
New York, New York 10010

Reference is made to that certain Clearing Bank Instruction Letter dated September ___, 1999 (the "Instruction Letter") from Blue Hills Office Park LLC (the "Borrower"). I, ___________, on behalf of MetroWest Bank (the "Bank"), hereby acknowledge receipt of the instructions set forth in the Instruction Letter and notice of the pledges and security interest described therein. The Bank hereby agrees to perform the instructions set forth in the Instruction Letter upon the delivery by Credit Suisse First Boston Mortgage Capital LLC (the "Lender") of the Instruction Letter. **

*The Bank shall be authorized on a monthly basis to withdraw from the so-called *

If you have any questions, please call Nancy L. Conley at (508) 620-0300.

*Lock Box Account/Clearing Account up to $120.00 per month for monies due the Bank for administrative fees in connection with the herein described arrangement.

METROWEST BANK

By: [signature]
Name: Roger G. Leblond
Title: Senior Vice President, Banking Operations

** In the event that the deposited item(s) are returned to MetroWest Bank as uncollectible, after being deposited a second time, then Credit Suisse First Boston Mortgage Capital LLC shall return the wired funds to MetroWest Bank eliminating any overdraft at MetroWest Bank.

RGL 9/13/99

**LOCK BOX ADDRESS:**

Blue Hills Office Park LLC
P.O. Box 9279
Boston, MA 02205-9279

SRZNY\611528v4

P.6

SEP 13 '99 09:59AM BERNKOPF GOODMAN

# EXHIBIT F



WELLS
FARGO

**Commercial Mortgage Servicing**
P.O. Box 4036, Concord, CA 94524
1320 Willow Pass Rd., Ste. 205
Concord, CA 94520
800 986-9711

July 16, 2004
Fax # 781 - 239 - 1493

BLUE HILLS OFFICE PARK LLC
ONE WASHINGTON STREET, SUITE 400
WELLSLEY, MA 02481-0000

Re: Loan # 76-0990083
Property Tax Shortage

Dear Mortgagor(s):

This letter is to inform you that your escrow account has insufficient funds to pay the 1st installment, which is due and payable to the Town of Canton. Tax shortages are typically caused by an increase in tax amounts billed by the Tax Collector over the prior year. The property taxes, which are payable now, will be delinquent after 8/2/04. The taxes due are in the amount of $158181.19. Currently, your tax escrow balance is $0.00, which indicates a shortage in the amount of $158181.19.

Please remit $158181.19 payable to Wells Fargo Bank, to my attention at the address below or via wire instructions as follows:

*Express Mail address*
*Wells Fargo, Commercial Mortgage Servicing*
*Attn:* Tim Parish, *Property Tax Dept.*
*1320 Willow Pass Road, Suite 205*
*Concord, CA 94520*

*US Mail Address*
*Wells Fargo Commercial Mortgage Servicing*
*Attn:* Tim Parish, *Property Tax Dept.*
*P.O. Box 4036*
*Concord, CA 94524*

*Wire Instructions:* *Wells Fargo Bank, ABA #121-000-248*
*200 B Street, Santa Rosa, CA*
*Credit to: Wells Fargo Commercial Mortgage Servicing*
*Account # 4535-078117*
*Reference:* *For further credit to WFCMS loan #76-0990083*
*Property tax escrow shortage*
*Attn:* Tim Parish

These funds must be received in our office no later than 7/27/03 in order for us to issue payment to the Town of Canton by 8/2/04. **Please include the loan number on your check to ensure proper identification.** Failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to your loan.

Should you have any questions or concerns regarding this matter, please contact me at the toll free number 1-800-986-9711 Ext 5303.

Sincerely,

Tim Parish
Operation Department

INV # 524

# EXHIBIT G

# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

RE:   Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

A request is hereby made for a withdrawal of $412,833.43 from the cash flow sub-account on this loan to be used to pay principal and interest as well as the advance the money due to pay real estate taxes. We have yet to receive real estate taxes from the tenant for the period of time that they were still in the building. Once received, we will deposit those sums into the operating account for you to sweep. Listed below is a breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| Real Estate Taxes | 158,181.19 |
| | $412,833.43 |

cc:   K. Goldberg, Esq.

# EXHIBIT H

# fineberg management, inc.

August 5, 2004

SENT VIA: Facsimile  1-925-691-5249

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

This letter is being sent to officially notify you that the tenant has fully vacated the building and at this time no replacement tenant has been found.  Therefore, we request a meeting with the lender to discuss the loan status and the future performance of the loan.

Based on our past experience, any decisions regarding the loan would need the approval of the Special Servicer; therefore, we request that the Special Servicer attend the meeting as well.  Please let us know who the Special Servicer is and if we need to notify them or if you will handle that yourself.

Sincerely,

Joseph A. Donovan
CFO

cc:   K. Goldberg, Esq.

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

# EXHIBIT I

fineberg management, inc.

September 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE: Blue Hills Office Park LLC
Loan #76-0990083

Dear Mr. Parish,

A request is hereby made for a withdrawal of $254,652.24 for the month of September from the cash flow sub-account on this loan to be used to pay principal and interest. Attached is last month's letter. As stated in the letter we did receive approximately one month's real estate tax from the tenant for $51,799.44 which was deposited and promptly swept by Wells Fargo; therefore, I assume that you have made the real estate tax payment to the town of Canton, MA.

Listed below is a breakdown of the principal and interest payment as we calculated it.

If you need any further information, please feel free to contact me.

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| | $254,652.24 |

Sincerely,

Joseph A. Donovan
CFO

Cc: Kenneth Goldberg
Job Warshaw, Lennar Partners

one washington street, suite 400, wellesley, ma 02481 tel (781) 239-1480 fax (781) 239-1493

# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

     A request is hereby made for a withdrawal of $412,833.43 from the cash flow
sub-account on this loan to be used to pay principal and interest as well as the advance
the money due to pay real estate taxes.  We have yet to receive real estate taxes from the
tenant for the period of time that they were still in the building.  Once received, we will
deposit those sums into the operating account for you to sweep.  Listed below is a
breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| Real Estate Taxes | 158,181.19 |
| | $412,833.43 |

cc:   K. Goldberg, Esq.

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

# EXHIBIT J

**LENNAR PARTNERS**
An LNR Company

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

Re: Portfolio: CS First Boston Mortgage, Series 1999-C1
Loan to: Blue Hills Office Park LLC
Property Address: 150 Royall Street, Canton, MA 02021
Loan No.: 76-0990083

Dear Borrower:

As a result of certain event(s) transpiring regarding your loan, certain servicing responsibilities have been transferred to Lennar Partners, Inc. as special servicer for JP Morgan Chase Bank, as Trustee for Credit Suisse First Boston Mortgage Securities Corp., Series 1999-C1.

I will be contacting you soon, as the Lennar Partners' asset manager assigned to your loan. In the meantime, if you have any questions or need any assistance with respect to your loan, you may contact me at (305) 695-5600, or write to me at the address provided below.

In addition, until further notice, inquires, requests and other correspondence relating to your loan should be made and addressed to my attention at the address below. All payments will continue to be made in the same manner as previously done before the transfer of your loan to Lennar, unless you are otherwise notified differently.

Thank you for your cooperation and we look forward to a successful working relationship.

Sincerely,

Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

cc: Debra Rudder – Wells Fargo Commercial Mortgage Servicing
Patricia Prince – Lennar Partners/Servicing Dept.

# EXHIBIT K

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

**RE:** Loan in the original principal amount of $33,149,000.00 (the "Loan") to Blue Hills Office Park LLC (the "Borrower") held by JP Morgan Chase Bank, as trustee (the "Trustee")
**Portfolio:** **CS First Boston Mortgage, Series 1999-C1**
**Loan No.:** **76-0990083**

Dear Borrower:

Lennar Partners, Inc. (the "**Special Servicer**") is the Special Servicer with respect to the Loan and has the authority, on behalf of the Trustee, to discuss and to meet with representatives of the Borrower to review the status of the Loan and any issues arising under any of the documents relating to the Loan (the "**Loan Documents**").

We have agreed to discuss with your representatives the status of the Loan and the Loan Documents provided that the following agreements and understandings govern. In order to ensure that our discussions will be as open and productive as possible, we wanted to write to you to confirm our mutual understanding that all discussions and/or negotiations will be governed by the terms and conditions in this letter. If you are in agreement with such terms and conditions, we would appreciate you acknowledging such by signing this letter in the space provided and returning it to us.

1. <u>Negotiations.</u> The Borrower and the Special Servicer agree that any discussions, negotiations, correspondence or other communications relating to the Loan and the Loan Documents that the Borrower may have in the future or may have had with representatives of Wells Fargo Commercial Mortgage Servicing, the Master Servicer (the "**Master Servicer**"), or the Special Servicer, (any such discussions, negotiations or correspondence or other communications being hereinafter referred to as "**Loan Communications**") are not binding upon any of the Borrower, the Trustee, or Special Servicer (collectively the "**Parties**"). The Borrower also acknowledges and agrees that none of the Trustee, the Master Servicer or the Special Servicer is under any obligation to consent or otherwise agree to any Borrower request with respect to the Loan, or to modify the Loan or the Loan Documents. Each of the Parties understands and agrees that no Party shall have any defense to any action by one or more of the other Parties, nor assert any waiver by one or more of the other Parties, based on any Loan Communications.

2. <u>Releases.</u> The Parties hereby completely, irrevocably and unconditionally release and forever discharge each of the Parties from any and all claims and demands whatsoever, in law or equity, whether such claims are presently known or unknown, direct or indirect, fixed or contingent, which the Parties may have or may claim to have against the other caused by, or arising out of any Loan Communications.

1601 Washington Avenue • Suite 700 • Miami Beach, Florida 33139
Telephone: (305) 695-5600 • Fax: (305) 695-5601

3. **No Waivers.** Each of the Parties acknowledge and agree that participation in the Loan Communications does not constitute by any Party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, of such Party under the Loan Documents, (b) a waiver or the release of any defaults under the Loan or the Loan Documents, or (c) a waiver, consent, release or modification of any right or remedy under any provision of the Loan Documents. None of the Parties intends to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties further understand and agree that no failure or delay in exercising any right or remedy with respect to the Loan or under the Loan Documents shall constitute a waiver of, or affect adversely in any manner, any of such rights and remedies nor shall any such failure or delay form the basis for any claim or cause of action.

4. **Only Written Agreements.** The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

5. **Authority.** The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. The Special Servicer represents and warrants that it is empowered to act on behalf of the Trustee under the Loan Documents in the capacity of attorney-in-fact, and the person signing this Agreement on behalf of Special Servicer hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Trustee. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.

6. **Expenses.** The Borrower agrees that it shall pay all costs of the Special Servicer in connection with Loan Communications, including but not limited to expenses for inspection of the property, legal fees and the fees of other professionals.

7. **Advice from Independent Counsel.** The Borrower acknowledges that independent counsel represents the Borrower, or if not so represented, that Borrower has been advised to obtain representation by independent counsel, and has fully reviewed the terms of this Agreement. Borrower acknowledges that Borrower executes this Agreement, based on its own independent judgment, on the advice of counsel, if represented, and is under no threat, coercion or duress from any Party.

8. **Settlement Negotiations.** Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor to be admissible as evidence in any administrative or judicial proceeding (i) between the Trustee, Borrower

and/or Special Servicer, or (ii) involving any of the Loan Documents or any of the property securing the Loan. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be used in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the Parties.

9. **Information Request.** In order to enable the Special Servicer to properly evaluate the Borrower's request, the Borrower agrees to forward to the Special Servicer all the information checked on **Exhibit A**, which is attached hereto.

Additional information may be requested in the future. Thank you for your attention to this matter.

Lennar Partners, Inc., as Special Servicer

By: [signature]
Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

**ACKNOWLEDGED AND AGREED BY:**

Borrower: Blue Hills Office Park LLC
By its manager: Blue Hills Management Corp.

By: [signature]
Name: Gerald S. Fineberg
Title: President

NOTICE TO CONSUMER BORROWERS AS REQUIRED BY FEDERAL FAIR DEBT COLLECTION PRACTICES ACT: We are attempting to collect debt and any information obtained will be used for that purpose.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID, SETTLED OR IS OTHERWISE NOT OBLIGATED: Please be advised that this letter constitutes neither a demand of payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, has paid, settled or is otherwise obligated by law.

cc: Debra Rudder – Wells Fargo Commercial Mortgage Servicing
Pat Prince – Lennar Partners/Loan Servicing

**Exhibit A**

**Review Documentation**

1. Borrower Information

☑ A financial statement (balance sheet and income statements) of Borrower (including those of the individual members of the current Borrower) and guarantors, if any, prepared within 30 days of the date hereof, and as of year-end.

☑ Federal tax returns (signed copies) for the last two years (if applicable) for both Borrower and Guarantor (s) (if applicable).

2. Property Information

☑ Operating statements for the Property for the last 2 years and year-to-date (broken down by each month); Healthcare related properties should include detailed census data for each period.

☑ Current business plan for the Property, including the budget for this year, detailing revenue and expense projections, etc.

☑ Current rent roll with summary of lease expiration dates.

☑ Current census data describing the unit types, payment type, additional rents, detailed by tenant / unit.

☑ Operator / Management Agreement and resume of manager (current and any proposed revisions, if applicable).

☑ Any recent environmental assessments, structural or property inspection reports for the Property.

☑ Copies of all current leases, including related amendments and renewals.

☐ Sample copy of resident leases.

☑ Site Plan.

☑ Most recent tax bill on the Property

☑ A copy of the Certificate of Insurance for all insurance coverage(s) as required under the Loan Documents, along with a copy of the policy.

3. Other

☐ Copies of most recent regulatory surveys by state and/or local agencies showing that the facility is in compliance. Any noted defect(s) should be explained and proof provided of remediation of the defect(s).

☐ Copies of all licenses and/or permits required by the state or local authorities to operate the facility.

# EXHIBIT L



September 17, 2004

BY FEDERAL EXPRESS

Mr. Joseph A. Donovan
Chief Financial Officer
Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

Re: Blue Hills Office Park LLC Loan No. 76-0990083

Dear Mr. Donovan:

The above-referenced loan has been transferred to Lennar Partners as special servicer and in that connection, we have received copies of your letters of August 2, 2004 and September 2, 2004 to Mr. Tim Parish of the Property Tax Department at Wells Fargo Commercial Mortgage Servicing. Following are our responses to your letters.

First, you requested in your August 2 letter that the sum of $158,181.19 be advanced from the "cash flow sub-account" on deposit with the mortgagee in order to pay the real estate taxes due on August 2, 2004. We interpret your letter as a request under Section 6(c)(ix) of the Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 14, 1999 (the "Mortgage"). Pursuant to that section, however, releases from the Leasing Escrow Funds may only be made for "payment of principal and interest then due and payable on the Note". The withdrawal of funds from the Leasing Escrow Fund for payment of real estate taxes is not permitted under the Mortgage.

Furthermore, under Section 5 of the Mortgage, the mortgagor is required timely to pay real estate taxes. Section 6(a) of the Mortgage provides for monthly deposits of real estate taxes in the Tax and Insurance Impound Fund, provided that so long as the "Bank of Boston Lease" remained in full force and effect, the Mortgagor was permitted to pay real estate taxes on a quarterly basis. The quarterly deposit of real estate taxes due on August 1, 2004 was not timely made and, furthermore, it is our understanding that the "Bank of Boston Lease" is no longer in full force and effect. In any event, the failure by the mortgagor either to make the quarterly escrow deposit on August 1, 2004 or to pay the quarterly installment of real estate taxes due on August 2, 2004 constituted an Event of Default under the Mortgage. The quarterly installment of taxes was made by the mortgagee out of its own funds in order to protect the mortgagee's collateral.

Your letter of August 2 also requested a withdrawal of $254,652.24 from the Leasing Escrow Funds for payment of monthly principal and interest. Section 6(c)(ix) of the Mortgage

~BOST1:308070.v2

300 Crown Colony Drive • Quincy, Massachusetts 02169
Telephone: (617) 472-4540 • FAX(617) 472-4580

permits such application of Leasing Escrow Funds up to the so-called "Interim Reduction Amount", but only on certain conditions. One such condition is that no Event of Default shall have occurred and be continuing as of the date of the request for such disbursement. As described above, the loan was already in default at the time of your request due to the failure to make the quarterly tax payment then due. Furthermore, as described above, the Leasing Escrow Funds are only permitted to be used for payment of principal and interest then due and, accordingly, the loan was also in default upon mortgagor's failure to make payments of $11,921.89 on account of the insurance escrow and $67,054.42 on account of reserves and Mortgagor's failure to make a monthly tax escrow payment since the "Bank of Boston Lease" was no longer in full force and effect as of the August 11 payment date.

Your September 2, 2004 letter made a similar request for a withdrawal of $254,652.24 from the Leasing Escrow Funds to pay principal and interest due on September 11. Again, that request cannot be honored due to the above-described Events of Default. Furthermore, as stated above, the application of such funds to principal and interest leaves an outstanding payment obligation due on September 11 to cover taxes, insurance and reserves.

Please be advised that as a result of the above-described Events of Default, the above-referenced loan has been accelerated and that the Debt, including all sums due under the Note and the other Loan Documents, is immediately due and payable.

Sincerely,

Joseph A. Polcari
Asset Manager

# EXHIBIT M

Piper Rudnick

One International Place, 21st Floor
Boston, Massachusetts 02110-2600
*main* 617.406.6000 *fax* 617.406.6100

BRUCE S. BARNETT
bruce.barnett@piperrudnick.com
*direct* 617.406.6002

October 21, 2004

RETURN RECEIPT REQUESTED
and FIRST CLASS MAIL

Blue Hills Office Park LLC
Mr. Gerald S. Fineberg (Cert. Mail No. 7001 1940 0004 9583 6096)
Mr. Joseph A. Donovan (Cert. Mail No. 7001 1940 0004 9583 6102)
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

Mr. William J. Langelier (Cert. Mail No. 7001 1940 0004 9583 6119)
c/o The Langelier Company
2045 Jackson Street
Suite 501
San Francisco, California 94109

Re: Notice of Intention to Foreclose and Deficiency after Foreclosure of Mortgage

Gentlemen:

You are hereby notified in accordance with Massachusetts General Laws, Chapter 244, § 14 and Chapter 244, §17B, of the intention of CSFB 1999-C1 Royall Street, LLC (the "Bank"), assignee of JP Morgan Chase Bank (formerly known as The Chase Manhattan Bank) as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, to foreclose under Power of Sale for breach of condition, the mortgage now held by the Bank on property located at 150 Royall Street, Canton, Massachusetts (the "Property"), given by Blue Hills Office Park LLC to Credit Suisse First Boston Mortgage Capital LLC, dated as of September 14, 1999 and recorded at the Norfolk County Registry of Deeds on September 15, 1999 in Book 13733, Page 428, to secure a certain Mortgage Note made by Blue Hills Office Park LLC, for the whole, or part, of which you may be liable to the Bank in case of a deficiency in the proceeds of the foreclosure sale.

Piper Rudnick

Mr. Gerald S. Fineberg
Mr. Joseph A. Donovan
Mr. William J. Langelier
October 21, 2004
Page 2

You are hereby notified of the foreclosure sale of the Property at 10:00 AM on Friday, November 12, 2004, all in accordance with the enclosed legal notice of mortgagee's sale of real estate.

Very truly yours,

CSFB 1999-C1 ROYALL STREET, LLC, a Delaware limited liability company

By: Lennar Massachusetts Partners, Inc., its Manager

By: Piper Rudnick LLP, its attorney,

By: ______________________
Bruce S. Barnett

cc: Stephen E. Nolan, Esq.
E. Randolph Tucker, Esq.
Staci Rutman
Joseph Polcari
Jeffrey Watkin, Esq.

~BOST1:311073.v1

**LEGAL NOTICE**
**MORTGAGEE'S SALE OF REAL ESTATE**

By virtue and in execution of the POWER OF SALE contained in a certain mortgage from BLUE HILLS OFFICE PARK LLC, to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, dated as of September 14, 1999 and recorded with Norfolk County Registry of Deeds (the "Records") in Book 13733, Page 428, of which mortgage the undersigned is the present holder, for breach of conditions contained in said mortgage and for the purpose of foreclosing, the same will be sold at Public Auction at 10:00 A.M. on the 12th day of November, 2004, at the mortgaged premises located at 150 Royall Street, Canton, Massachusetts, all and singular the premises described in said mortgage, to wit:

The land situated in Canton, Norfolk County, Massachusetts shown as Lot "C" on a plan entitled "Plan of Land, Canton, Massachusetts" dated December 9, 1971 by Universal Engineering Corporation, recorded with Norfolk Registry of Deeds as Plan 48 of 1972 in Plan Book 230 (hereinafter the "Plan"), and being more particularly bounded and described as follows:

NORTHERLY AND NORTHWESTERLY by Royall Street, three hundred thirty-six and 65/100 (336.65) feet;

NORTHEASTERLY by Parcel A as shown on said Plan, by two (2) lines measuring, respectively, six hundred thirty-five and 82/100 (635.82) feet and two hundred (200.00) feet;

NORTHWESTERLY by Parcel A as shown on said Plan, one hundred forty (140.00) feet;

NORTHEASTERLY by Parcel B as shown on said Plan, seven hundred nine and 37/100 (709.37) feet;

SOUTHWESTERLY by Circumferential Highway (Route 128), eight hundred sixteen and 18/100 (816.18) feet;

SOUTHWESTERLY by Green Street, seven hundred sixty-six and 13/100 (766.13) feet;

NORTHWESTERLY by land now or formerly of Nocka, two hundred thirty-nine and 57/100 (239.57) feet;

WESTERLY by land of said Nocka, two hundred three and 57/100 (203.57) feet; and

NORTHWESTERLY by land of said Nocka, by two (2) lines measuring, respectively, eighty (80.00) feet and one hundred thirteen and 95/100 (113.95) feet.

Insofar as now in force and applicable the premises are conveyed subject to and with the benefit of all additional liens, encumbrances, easements, restrictions and other matters appearing of record and having priority over the mortgage described herein, if any.

The premises to be sold shall also be subject to all leases and tenancies, if any there may be, having priority over said mortgage, to tenancies or occupation by persons on the premises now or at the time of said auction which tenancies or occupation are subject to said mortgage, to rights or claims in personal property installed by tenants or former tenants now located on the premises and also to all laws and ordinances including, but not limited to, all building, zoning and environmental laws and ordinances.

TERMS OF SALE: Fifty Thousand and no/100 Dollars ($50,000.00) shall be paid in cash or by certified or bank cashier's check by the purchaser at the time and place of sale.

The balance of the purchase price on a sale shall be paid in cash or by certified bank or cashier's check in or within thirty (30) days thereafter at the offices of Piper Rudnick LLP, One International Place, Boston, Massachusetts. The successful bidder and/or bidders shall be required to sign a Memorandum of Terms of Sale containing the above terms at the Auction Sale.

The Mortgagee reserves the right to postpone the sale to a later date by public proclamation at the time and date appointed for the sale and to further postpone at any adjourned sale date by public proclamation at the time and date appointed for the adjourned sale date.

In the event that the successful bidder at the foreclosure sale shall default in purchasing the within described property according to the terms of this Notice of Sale and/or terms of the Memorandum of Sale executed at the time of foreclosure, the Mortgagee reserves the right to sell the property by foreclosure deed to the second highest bidder provided that said second highest bidder shall deposit with Mortgagee's attorneys, Piper Rudnick LLP, the amount of the required deposit as set forth herein within three (3) business days after written notice of the default of the previous high bidder and title shall be conveyed to the said second highest bidder within thirty (30) days of said written notice.

Other terms to be announced at the time and place of the sale.

CSFB 1999-C1 ROYALL STREET, LLC, a Delaware limited liability company, present holder of said mortgage

By: Lennar Massachusetts Partners, Inc., a Massachusetts corporation, its Manager

By: Piper Rudnick LLP, its attorney

By: ______________________

Bruce S. Barnett
Piper Rudnick LLP
One International Place
Boston, Massachusetts 02110
(617) 406-6000

**Grave Intentions wil**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,
Plaintiff/Defendant-in-Counterclaim

v.

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITY CORP.,
Defendant.

and

CSFB 1999 – C1 ROYALL STREET, LLC
Defendant/Plaintiff-in-Counterclaim

and

WILLIAM LANGELIER and GERALD FINEBERG,
Defendants-in-Counterclaim

Civil Action No. 05-CV-10506 (WGY)

**CERTIFICATE OF SERVICE**

I, Meredith A. Swisher, hereby certify that I caused to be served, this 11th day of November 2005, the Assented to Motion of Blue Hills Office Park LLC to Dismiss Defendant Credit Suisse First Boston Mortgage Securities Corp. Without Prejudice and for Leave to File Second Amended Complaint to Substitute J.P. Morgan Chase Bank, as Trustee, as Defendant via electronic service, postage pre-paid, upon the following:

**Bruce S. Barnett**
**Traci S. Feit**
DLA Piper Rudnick Gray Cary US LLP
One International Place
Boston, MA 02110

**E. Randolph Tucker**
DLA Piper Rudnick Gray Cary US LLP
One International Place
Boston, MA 02110

/s/ Meredith A. Swisher
Meredith A. Swisher