UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as<br>Trustee for the Registered Holders of<br>Credit Suisse First Boston Mortgage<br>Securities Corp., Commercial Mortgage<br>Pass-Through Certificates, Series 1999-C1,<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET,<br>LLC,<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**OPPOSITION OF BLUE HILLS OFFICE PARK LLC, GERALD
FINEBERG AND WILLIAM LANGELIER TO MOTION OF DEFENDANTS AND
COUNTERCLAIM-PLAINTIFFS FOR LEAVE TO AMEND COUNTERCLAIM**

### I. Introduction

Blue Hills Office Park LLC ("Blue Hills"), Gerald Fineberg ("Fineberg") and William Langelier ("Langelier") hereby oppose the Motion of Defendants and Counterclaim-Plaintiffs for Leave to Amend Counterclaim ("Motion to Amend"). The Motion to Amend should be denied because, *inter alia*, it was filed after the deadlines for fact discovery expired (and within days of the deadline for expert disclosures), the proposed amendments are futile, and Blue Hills, Fineberg and Langelier would be unfairly and unduly prejudiced if leave to amend is granted.

In further support of this Opposition, Blue Hills, Fineberg and Langelier aver and assert as follows:

## II. Factual and Procedural Background

1.  On or about August 31, 1999, Blue Hills and Credit Suisse First Boston Mortgage Capital LLC jointly executed a letter containing the terms and conditions under which Credit Suisse First Boston Mortgage Capital LLC[1] agreed to loan $33.1 million to Blue Hills (the "Loan") secured by a mortgage on Blue Hills' property located at 150 Royall Street, Canton, Massachusetts (the "Property"). The Loan closed on September 14, 1999 and additional Loan documents, including a Note, Mortgage Agreement and Cash Management Agreement, were dated as of September 14, 1999. By the above-captioned action, Blue Hills seeks, *inter alia*, damages for the Defendants' and their disclosed agents' multiple breaches of the Loan documents.

2.  On or about February 11, 2005, Blue Hills filed its Complaint against Credit Suisse First Boston Mortgage Capital LLC, the original Loan maker, and assignees of the Loan CSFB 1999-C1 Royall Street LLC and Credit Suisse First Boston Mortgage Security Corp. Blue Hills asserted claims for breach of contract, breach of the implied covenant of good faith and fair

---

[1] Credit Suisse First Boston was the original Loan maker. Thereafter, Credit Suisse First Boston assigned all of its interests in and obligations under the Loan to defendants J.P. Morgan Chase Bank as Trustee for the Registered Holders of Credit Suisse Bank First Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1991-C1 and then to CSFB 1999-C1 Royall Street LLC.

dealing, and violations of M.G.L. c. 93A.[2] The Complaint alleged, *inter alia*, that Defendants refused to release certain Loan reserves to Blue Hills in accordance with the Loan documents, wrongfully defaulted Blue Hills, and wrongfully foreclosed on the Property. Defendants each filed an Answer and Counterclaim on or about June 6, 2005, asserting counterclaims against Blue Hills, Fineberg and Langelier. The Counterclaims alleged Loan-related breaches arising out of Blue Hills' appeal of a zoning decision in 2003 ("Appeal") in connection with the abutting property located at 250 Royall Street, Canton, Massachusetts, the settlement of that Appeal and the acceptance of settlement proceeds in exchange for the dismissal of the Appeal. Defendants alleged that such violations were an improper "transfer" of "mortgaged property" that triggered the personal liability of Fineberg and Langelier under a limited Guaranty executed in favor of Defendants dated September 14, 1999. Defendants asserted claims for breach of the Mortgage and Cash Management Agreement, breach of the implied covenant of good faith and fair dealing, violations of M.G.L. c. 93A, intentional misrepresentation and breach of the Guaranty.

3.   Over ten (10) months later, Defendants seek leave to amend their Counterclaims to add factual allegations and counts for fraudulent transfer and conversion. By their proposed Amended Counterclaim, Defendants allege, *inter alia*, that the acceptance of settlement proceeds in connection with the Appeal also constitutes a fraudulent transfer pursuant to M.G.L. c. 109A and conversion. In addition, Defendants now allege - for the first time - that Blue Hills failed to

---

[2] Blue Hills filed its Complaint in Norfolk Superior Court on or about February 11, 2005. The action was removed by Defendants to the U.S. District Court, District of Massachusetts on or about March 21, 2005. Before any responsive pleading was filed, Blue Hills filed its First Amended Complaint on or about April 29, 2005. The First Amended Complaint did not name Credit Suisse First Boston Mortgage Capital, LLC, the original Loan maker, as a party. By stipulations approved by the Court, Defendants each filed an Answer and Counterclaim on or about June 6, 2005. By agreement of the parties, Blue Hills filed its Second Amended Complaint on or about November 17, 2005 to substitute J.P. Morgan Chase Bank, Trustee as the proper defendant in place of Credit Suisse First Boston Mortgage Security Corp. Neither the allegations nor the causes of action were amended by the Second Amended Complaint. Similarly, when Defendants each filed an Answer and Counterclaim to the Second Amended Complaint, no factual allegations nor causes of action were amended. The only change was the substitution of the parties.

deposit hold-over rent into the lock box account ("Lock Box") in breach of the Cash Management Agreement. Defendants also allege – for the first time – and that the sale of certain property abandoned by the Property's sole tenant, Boston Equiserve Limited Partnership ("Equiserve"), was improper, also triggering exceptions to the non-recourse provisions of the loan documents and the personal liability of Fineberg and Langelier.

4. As discussed in greater detail, *infra,* Blue Hills, Fineberg and Langelier deny that the filing of the Appeal, the acceptance of settlement proceeds, and the sale of Equiserve's abandoned workstations in any way breached Blue Hills' obligations under the Loan documents, constituted a fraudulent transfer, or resulted in conversion of the Defendants' collateral. Further, Defendants' allegations concerning allegedly misappropriated hold-over rent from Equiserve are meritless. Blue Hills' actions did not trigger any of the narrow exceptions to the non-recourse provisions of the Loan documents so as to give rise to any personal liability of Fineberg or Langelier.

### III. The Course of Discovery

**The Putative Amended Counterclaims are Not Based on Newly Discovered Information**

5. On September 15, 2005, Defendants served their first requests for production of documents and first set of interrogatories on Blue Hills, Fineberg and Langelier. Blue Hills, Fineberg and Langelier responded on November 11, 2005, the date set by agreement of the parties. Defendants also responded to Blue Hills' discovery requests on that same date.

6. Defendants now allege – for the first time – that Blue Hills, Fineberg and Langelier failed to deposit hold-over rent of approximately $10,000 in accordance with the Cash Management Agreement. Defendants, however, have been in possession – since November 2005 – of bank statements showing that such hold-over rent was not only paid in advance by

4

Equiserve but was <u>actually deposited</u> on or about June 30, 2004, together with the regular rental payment for July 2004. See documents bate-stamped "Blue Hill 1469" and "Blue Hill 1470," which are attached hereto as Exhibit "A."[3] On March 17, 2006, Lawrence Needle, the former property manager of the Property, testified that Equiserve held the computer room over for a few weeks, for which Equiserve paid additional rent. Conveniently omitted from Defendants' allegations, however, is Needle's testimony that he believed this rent was paid by Equiserve in advance and that it was deposited in the Lock Box. See Pages 88-90 of Deposition Transcript for Lawrence Needle, attached hereto as Exhibit "B." Despite the demonstrable falsity of the allegations, Defendants seek to proceed with claims for breach of the Cash Management Agreement as if Mr. Needle's deposition testimony did not occur and as if the aforementioned documents never existed.

7.  Blue Hills supplemented its responses to document requests on November 29, 2005. The documents produced included the Lease Termination Agreement, which sets forth the items that would be abandoned by Equiserve, including the workstations that form the basis of Defendants new allegations. Despite having had every opportunity to question witnesses in connection the abandoned items, Defendants did not do so.

8.  Defendants justify their belated attempt to amend the Counterclaims by claiming that they have newly discovered evidence in connection with the Appeal and Blue Hills' receipt of settlement proceeds. Although Blue Hills, Fineberg and Langelier initially objected to providing Defendants with information on the bank accounts where such settlement proceeds were being held, such information is irrelevant to Defendants' ability to bring additional claims. The Defendants possessed the settlement agreement entered into in connection with the Appeal

---

[3] The hold-over rent is reflected in the Lock Box deposit of $525,410.15, which is approximately $11,000.00 more than the usual monthly deposit. Defendants have all bank statements detailing the Lock Box deposits.

5

("Settlement Agreement") and other documents detailing the amount of the settlement proceeds as early as December 8, 2005 and did not request additional information concerning the bank accounts until February 3, 2006.

9.  On March 3, 2006, Blue Hills, Fineberg and Langelier disclosed to the Defendants that the settlement proceeds have *never* been transferred from clients funds accounts. When the Appeal was settled, the settlement proceeds were wired to Bernkopf Goodman LLP on or about August 8, 2003 and were held in a clients fund account. In 2005, pursuant to an agreement between Fineberg and Langelier, one-half of the settlement proceeds were wired to a clients fund account at Wilmer Cutler Pickering Hale and Dorr LLP. This information is immaterial to the claims that Defendants seek to add to their Counterclaims.

10. In accordance with the Court's Scheduling Order, fact discovery ended on March 17, 2006. To accommodate witnesses' schedules, two depositions were held after that date. By April 7, 2006, all non-expert depositions were completed. The deadline for expert disclosures was March 31, 2006.

### IV.   Argument

#### A.   The Motion to Amend is Untimely

Defendants' Motion to Amend is untimely. Not only was it filed *after* the close of fact discovery, but it was filed within days of the deadline for expert reports. Defendants have filed the Motion to Amend despite having had every opportunity to timely assert their claims for fraudulent transfer and conversion. In fact, despite having had numerous opportunities to seek leave to amend well before the close of discovery, they inexplicably failed to do so. The Motion to Amend is not based on any information which Defendants either did not possess when they

filed their Counterclaims on or about June 6, 2005 or which could not have been gleaned from the documents exchanged by the parties several months ago.

When Defendants asserted their Counterclaims, they knew, *inter alia*, that Blue Hills had filed and settled the Appeal, that Blue Hills had accepted settlement proceeds, and that Blue Hills had not sought the Defendants' prior written consent. The delineated facts were not only initially alleged by Defendants, but were also admitted in the Answers to Defendants' Counterclaim by Blue Hills, Fineberg and Langelier. In their Counterclaims, Defendants also alleged that Blue Hills had transferred the settlement proceeds, which they knew to be in excess of $1 million, in violation of the terms of the Loan documents.

The Counterclaims assert claims for breach of contract (including the Mortgage, Cash Management Agreement, and Guaranty), intentional misrepresentation and violations of G.L. c. 93A. The factual allegations forming the basis of those claims are also asserted by Defendants in support of their proposed claims for fraudulent transfer and conversion. Such claims could have been asserted by Defendants when they initially filed their Counterclaims.

Defendants' assertion that they did not obtain relevant information regarding the settlement proceeds until March 3, 2006 is not credible. Defendants had the Settlement Agreement since December 2005. Moreover, the information provided to Defendants on March 3, 2006 revealed that the settlement proceeds had never been transferred and had, in fact, been held in client funds accounts since August 2003. Rather than support a claim for fraudulent transfer or conversion, this alleged "new" evidence undercuts such claims.

With respect to the alleged transfer of proceeds from the sale of workstations, Defendants received the Lease Termination Agreement in November, 2005. As asserted in the proposed Amended Counterclaim, the Lease Termination Agreement outlined which items would be left

by Equiserve at the Property to be disposed of by Blue Hills. While the Defendants had such information *before* any depositions were conducted, Defendants made no inquiries of Blue Hills or its witnesses with respect to the materials left at the Property until the deposition of Lawrence Needle on March 17, 2006. Further, Blue Hills produced additional documents on February 21, 2006 regarding the sale of the workstations. While those documents were produced approximately *one month* before the end of discovery, Defendants filed their Motion to Amend *after* the close of discovery.

Finally, Defendants have absolutely no basis to assert claims for misappropriated hold-over rent. All rent - including the hold-over rent - was deposited in accordance with the Cash Management Agreement. Defendants were provided with Blue Hills' bank statements in November 2005, which show the deposit of additional rent in June 2004. Defendants made no inquiries of Mr. Needle or any of the other Blue Hills' witnesses regarding these bank statements.

### B.     The Motion to Amend is Prejudicial to Blue Hills, Fineberg and Langelier

If Defendants are allowed to assert new claims at this late date, Blue Hills, Fineberg and Langelier will have no opportunity to conduct additional discovery regarding the new claims and allegations. At minimum, Blue Hills, Fineberg and Langelier would need to be able to serve contention interrogatories, receive all documents upon which Defendants rely in asserting their new claims and allegations, and to conduct additional depositions relative to the new claims in order to prepare a defense. Pursuant to the Scheduling Order, as amended,[4] the deadline for expert disclosures was March 31, 2006, with opportunity for rebuttals by April 14, 2006. Expert discovery concludes by April 28, 2006 and dispositive motions must be filed by May 17, 2006.

---

[4] By Stipulation filed on March 29, 2006, the deadline for rebuttals to expert report has been set for April 14, 2006 and expert discovery concludes on April 28, 2006.

Granting Defendants leave to amend their Counterclaims would adversely affect Blue Hills' ability to file dispositive motions and to adequately prepare for their defense. Moreover, the experts retained by Blue Hills, Fineberg and Langelier will not be able to timely evaluate and respond to the newly asserted claims.

### C.   Defendants' Proposed Amended Counterclaims Are Futile

Leave to amend may be denied when a proposed amendment would be futile in that it fails to state a claim for which relief would be granted, or would fail to survive a motion for summary judgment. *See Liberty Leather Corp. v. Calllum,* 653 F.2d 694 (1st Cir. 1981). The proposed new Count II for "Breach of Contract - Cash Management Agreement," based solely upon Blue Hills' alleged failure to "deposit the Holdover Rent with the Clearing Bank," is without merit. See Paragraphs 67-69 of the proposed Amended Counterclaim. The lease to Equiserve expired as of July 31, 2004. After July 31, 2004, Equiserve occupied only a small portion of the Property. The *pro rata* rent for that period for the amount of space leased was $11,172.00. Equiserve paid that amount in advance, together with the rent due on July 1, 2004. This "Holdover" rent was deposited in the Clearing Bank, as was regular rent payment as of June 30, 2004. This is reflected on the bank statements from Banknorth for the periods June 1 - June 30, 2004 and for the period July 1 - July 31, 2004. These statements, bate-stamped Blue Hill 1469-1470, were provided to Defendants *on November 15, 2005*. See Exhibit "A." Defendants' have no basis in which to allege that this amount was not deposited with the Clearing Bank.

In making these proposed allegations, Defendants rely solely upon selected out-of-context excerpts of the deposition testimony of Lawrence Needle, the former property manager of Blue Hills Office Park. Mr. Needle testified at his deposition that Equiserve held over a small

9

portion of the computer room in the Property for a couple of weeks. He also testified that he believed the hold-over rent to have been deposited in the Lock Box. See Exhibit "B," attached hereto. The bank statements which were produced to Defendants by Blue Hills in November 2005 confirm the accuracy of Mr. Needle's testimony. Thus, there is no factual or legal basis supporting the allegations of misappropriation of rental income.

Defendants' proposed new Counts VI and VII for fraudulent transfer and conversion are also futile. The Defendants are barred from asserting such claims under the non-recourse language set forth in the Loan documents. See Paragraph 13 of the Note and Paragraph 54 of the Mortgage Agreement, attached as Exhibits "C" and "D" to the Second Amended Complaint. Unless the alleged conduct falls within narrow exceptions to the non-recourse provisions, Defendants may not seek any damages except through foreclosure proceedings. Defendants foreclosed on the Property or about November 19, 2004. According to the subject Loan documents, Defendants are prohibited from seeking a judgment against Blue Hills (or the individual guarantors) unless Blue Hills' actions fall within certain narrow "carve-outs" to the non-recourse provisions set forth in the Loan documents. Thus, any proposed claims of fraudulent transfer and conversion are duplicative of the Defendants' counterclaims for breach of the Mortgage, Cash Management and Guaranty, all of which seek recovery based upon the non-recourse exceptions.

In asserting that they are entitled to damages, Defendants rely upon the following language set forth in paragraph 13 of the Note, Paragraph 54 of the Mortgage Agreement and Paragraph 1.2 of the Guaranty: "Debt shall be fully recourse to [Blue Hills] in the event that . . . (iv) [Blue Hills] fails to obtain [Lender's] prior written consent to any assignment, transfer or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the

Mortgage. . . . Such reliance is misplaced. Section 10 of the Mortgage Agreement - the *only* clause upon which Defendants rely to impose full recourse liability - prohibits transfers, sales and pledges of Mortgaged Property *to third parties*. Further, Section 10 of the Mortgage Agreement addresses not only the specific types of transfers which require the Defendants' consent, but the conditions under which consent will be given. These include, *inter alia*, the creditworthiness of the transferee and the transferee's experience in property management. *See, e.g.,* Mortgage Agreement, Section 10(f). The Appeal settlement resulted only in the *dismissal* of the Appeal; *no transfer of title* to any portion of the Mortgaged Property was made.

That the settlement proceeds from the Appeal have never been transferred or conveyed was disclosed to Defendants by Blue Hills, Fineberg and Langelier on March 3, 2006 All funds received have been held in client fund accounts at Bernkopf Goodman LLP and Wilmer Cutler Pickering Hale and Dorr LLP. Moreover, in August 2003, Blue Hills was current in its payment obligations to the Defendants. Since all payment obligations were being timely met by Blue Hills, the Defendants are hard pressed to credibly allege the existence of either insolvency or an intent to defraud. Further, pursuant to M.G.L.c. 109A §2, the term "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." Thus, there can be no legitimate claim of transfer when the proceeds have never been disbursed from client funds accounts.

### V. Conclusion

The Motion to Amend was filed after the close of fact discovery and within days of the deadline for expert disclosures; relies upon information that Defendants possessed at the time they filed their initial Counterclaims or could have ascertained from the documents produced by

11

December 2005; and proposes claims that are futile. Allowance of this Motion to Amend will severely prejudice Blue Hills, Fineberg and Langelier. Accordingly, the Motion to Amend should be denied. If, however, the Motion to Amend is allowed, Blue Hills, Fineberg and Langelier should be granted an extension of the discovery period to serve contention interrogatories, to receive all documents that support the new claims and allegations, and to conduct additional depositions relative to the new claims and allegations.

WHEREFORE, Blue Hills, Fineberg and Langelier request that the Court enter an order:

(a)  Denying the Motion to Amend;

(b)  Extending the discovery period to permit additional written discovery and deposition testimony on the new claims and allegations proposed in the Amended Counterclaim if such Motion to Amend is allowed; and

(c)  Granting all other relief the Court deems appropriate.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(D), Blue Hills, Fineberg and Langelier request a hearing on the Motion to Amend. Blue Hills, Fineberg and Langelier do not believe that more than a 10 to 15 minute hearing would be required.

                                      BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
By their attorneys,


/s/ Meredith A. Swisher
Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: April 12, 2006
#335356 v2/14500/9985

12

# EXHIBIT A

**Banknorth, N.A.**
Massachusetts

STATEMENT OF ACCOUNT

BLUE HILLS OFFICE PARK LLC
CO THE FINEBERG COMPANIES
LOCKBOX
PO BOX 9139
WELLESLEY MA 02481

Page: 1 of 2
Statement Period: Jun 01 2004-Jun 30 2004
Cust Ref #: 870045796-702-T-***
Primary Account #: 87-0045796

**Commercial Checking**

BLUE HILLS OFFICE PARK LLC
CO THE FINEBERG COMPANIES

Account # 87-0045796

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 0.00 | Average Collected Balance | 127.65 |
| Deposits | 1,042,880.88 | | |
| Other Withdrawals | 517,470.73 | | |
| Ending Balance | 525,410.15 | | |

### DAILY ACCOUNT ACTIVITY

**Deposits**

| POSTING DATE | DESCRIPTION | SERIAL NO. | AMOUNT |
|---|---|---|---|
| 6/2 | LOCKBOX DEPOSIT | | 514,202.52 |
| 6/15 | DEPOSIT | | 3,268.21 |
| 6/30 | LOCKBOX DEPOSIT | | 525,410.15 |
| | | Subtotal: | 1,042,880.88 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | SERIAL NO. | AMOUNT |
|---|---|---|---|
| 6/4 | WIRE TRANSFER OUTGOING BLUE HILLS OFFICE PARK LLC | | 514,202.52 |
| 6/18 | WIRE TRANSFER OUTGOING BLUE HILLS OFFICE PARK LLC | | 3,268.21 |
| | | Subtotal: | 517,470.73 |

### DAILY BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|
| 5/31 | 0.00 | 6/15 | 3,268.21 |
| 6/2 | 514,202.52 | 6/18 | 0.00 |
| 6/4 | 0.00 | 6/30 | 525,410.15 |

Blue Hill 1469

Call 1-800-747-7000 for 24-hour Direct Banking service

BANK DEPOSITS FDIC INSURED    WWW.BANKNORTHMA.COM

**Banknorth, N.A.**
Massachusetts

STATEMENT OF ACCOUNT

BLUE HILLS OFFICE PARK LLC
CO THE FINEBERG COMPANIES
LOCKBOX
PO BOX 9139
WELLESLEY MA 02481

Page: 1 of 2
Statement Period: Jul 01 2004-Jul 31 2004
Cust Ref #:     870045796-702-T-***
Primary Account #: 87-0045796

**Commercial Checking**
BLUE HILLS OFFICE PARK LLC
CO THE FINEBERG COMPANIES

Account # 87-0045796

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 525,410.15 | Average Collected Balance | 39.95 |
| Deposits | 370.83 | | |
| Other Withdrawals | 525,780.98 | | |
| Ending Balance | 0.00 | | |

### DAILY ACCOUNT ACTIVITY

**Deposits**

| POSTING DATE | DESCRIPTION | SERIAL NO. | AMOUNT |
|---|---|---|---|
| 7/27 | LOCKBOX DEPOSIT | | 370.83 |
| | | Subtotal: | 370.83 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | SERIAL NO. | AMOUNT |
|---|---|---|---|
| 7/2 | WIRE TRANSFER OUTGOING BLUE HILLS OFFICE PARK LLC | | 525,410.15 |
| 7/30 | WIRE TRANSFER OUTGOING BLUE HILLS OFFICE PARK LLC | | 370.83 |
| | | Subtotal: | 525,780.98 |

### DAILY BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|
| 6/30 | 525,410.15 | 7/27 | 370.83 |
| 7/2 | 0.00 | 7/30 | 0.00 |

Blue Hill 1470

Call 1-800-747-7000 for 24-hour Direct Banking service

BANK DEPOSITS FDIC INSURED        ©        WWW.BANKNORTHMA.COM

# EXHIBIT B

Case 1:05-cv-10506-WGY    Document 67-3    Filed 04/12/2006    Page 1 of 3

Lawrence G. Needle                                                                                  03/17/2006

CONFIDENTIAL

Page 86

1    A. No.
2    Q. Other than providing information according to
3  paragraph one of the lease termination agreement, did
4  you participate in drafting or creating or negotiating
5  it in any way?
6    A. No.
7    Q. Do you know who it was that made the decision
8  to enter into the lease termination agreement?
9    A. No.
10   Q. Did you yourself notify Wells Fargo or any
11 representative of the lender at any time about the
12 existence of this agreement?
13   A. No.
14   Q. Do you know if anyone else notified Wells
15 Fargo or the lender about the existence of this
16 agreement?
17   A. No.
18   Q. Did you talk to anyone about whether or not to
19 inform Wells Fargo or any representative of the lender
20 about the lease termination agreement?
21   A. No.
22   Q. I may have asked you this question before
23 lunch. If I did, I apologize.
24      Did you talk to anyone at Fineberg

Page 87

1  Management about whether or not to notify Wells Fargo or
2  any representative of the lender about the appeal of the
3  parking garage permit granted?
4    A. No.
5    Q. Did you talk to anyone at Fineberg Management
6  about whether or not to notify Wells Fargo or any
7  representative of the lender about the settlement of the
8  parking garage permit parking appeal?
9    A. No.
10   Q. Other than providing information to someone
11 with respect to paragraph one of the lease termination
12 agreement, did you have any communications with anyone
13 else or other communications with that person about the
14 lease termination agreement?
15   A. No.
16   Q. When is the first time you remember seeing the
17 lease termination agreement?
18   A. I don't recall.
19   Q. You mentioned earlier that you either saw it
20 or were aware of it prior to the tenant leaving in July
21 of 2004?
22   A. Correct.
23   Q. Did you have occasion to refer to it at that
24 time?

Page 88

1    A. Just as it pertains to No. 1 through 7.
2    Q. And you referred to it at some point in or
3  around July 2004?
4    A. Correct.
5    Q. Why did you do that?
6    A. To make sure that all those items were there
7  and we had an understanding between Dan Belz and myself
8  and to what was going to stay in the building and what
9  was going to be taken out of the building.
10   Q. So you talked to Mr. Belz about paragraph one
11 in July of 2004 or thereabouts?
12   A. Yes, I believe he had a copy also.
13   Q. Other than talking to Mr. Belz about what was
14 going to stay and what was going to go in the building,
15 did you talk to anyone else about the lease termination
16 agreement?
17   A. No.
18   Q. Other than conversations with someone who may
19 have been Dan Frank --
20   A. Correct.
21   Q. -- at the time it was created?
22      Did EquiServe hold over in the building
23 after July 31st, 2004?
24   A. In a small portion of the computer room for a

Page 89

1  couple of weeks.
2    Q. Did they pay hold-over rent as contemplated by
3  the termination agreement?
4    A. They paid for the approximately 5,000 square
5  feet they held over on.
6    Q. Did they pay whatever rates are specified in
7  the lease termination agreement?
8    A. No, I believe Dan Belz and I agreed on a rate
9  and I do not recall what that rate was.
10   Q. Was it a rate per square foot?
11   A. Yeah, he came out with some sort of rate. I
12 think it was based on whatever they were paying at that
13 time.
14   Q. Do you know what happened to the rent that you
15 received from EquiServe for the hold-over period?
16   A. I believe it went to the lock box.
17   Q. Did you receive a check from them directly,
18 yourself?
19   A. No.
20   Q. Do you know if anyone else at Fineberg
21 Management received a check for the hold-over rent from
22 EquiServe?
23   A. No.
24   Q. Do you know if EquiServe deposited the rent

23 (Pages 86 to 89)

Lawrence G. Needle                                                    03/17/2006
CONFIDENTIAL

Page 90

1  directly into the lock box?
2  　A.　As far as I know, all their payments were made
3  to the lock box.
4  　Q.　Can you estimate what the amount of the
5  hold-over rent payment was?
6  　A.　Under $10,000.
7  　Q.　Do you know when it was paid?
8  　A.　No.
9  　Q.　Was it after the end of the hold-over period?
10 　A.　They usually paid their rent in advance.
11 　Q.　Do you remember specifically when they made
12 this payment?
13 　A.　Not the specific date, no.
14 　Q.　And the hold-over period was a couple of
15 weeks?
16 　A.　Yes, they may have paid for the whole month,
17 though.
18 　Q.　So by the middle of August, 2004, EquiServe
19 had completely vacated the building?
20 　A.　Correct.
21 　Q.　After that occurred, did Blue Hills Office
22 Park receive any revenues or funds from any source --
23 　　MS. SWISHER:　Objection.
24 　Q.　-- after EquiServe left the building?

Page 91

1  　A.　We received a check for the removal of the
2  Haworth systems which were the cubicles left behind from
3  EquiServe.
4  　Q.　And was that a transaction you entered into
5  with D. Erwin & Associates' representatives --
6  　A.　Yes.
7  　Q.　-- who was represented at least in part by a
8  woman named Dot Erwin.
9  　　You received more than one check from
10 Ms. Erwin; isn't that right?
11 　A.　I believe so.
12 　　(Exhibit 305 Marked for Identification)
13 BY MR. BARNETT:
14 　Q.　This entire package of documents that's been
15 marked as Exhibit 305 begins with Bates Blue Hill 5063
16 and runs through Blue Hill 5121.
17 　　The first page of this, Mr. Needle, looks
18 like a photocopy of a file folder cover perhaps.　Would
19 you agree with me about that?
20 　A.　Yeah -- yes.
21 　Q.　Is this your file?
22 　A.　No.
23 　Q.　Somebody else's?
24 　A.　Appears so.

Page 92

1  　Q.　Could you turn to page Bates marked Blue Hill
2  5098, please?　This is a purchase agreement between D.
3  Erwin & Associates and Fineberg Management; is that
4  right?
5  　A.　Yes.
6  　Q.　Have you seen this before?
7  　A.　Yes.
8  　Q.　And this is the transaction by which you sold
9  1,000 Haworth Unigroup workstations for $100,000; is
10 that right?
11 　A.　Yes.
12 　Q.　And this is the sale of workstations you
13 referred to a few minutes ago?
14 　A.　Yes.
15 　Q.　If you flip backwards to Blue Hill 5095 and
16 Blue Hill 5096, on these two pages there are three
17 checks from D. Erwin & Associates to Fineberg
18 Management; is that right?
19 　A.　Yes.
20 　Q.　Are these the payments for the Haworth
21 workstations that total $100,000?
22 　A.　Yes.
23 　Q.　Did you receive these checks yourself?
24 　A.　Either I or Dan Frank received them by FedEx.

Page 93

1  　Q.　And on the top of page 5095, there's a
2  Banknorth deposit slip; is that right?
3  　A.　Correct.
4  　Q.　And that's a deposit slip for the Blue Hills
5  Office Park operating account?
6  　A.　I don't know if that's the operating account.
7  It says Blue Hills Office Park on it.
8  　Q.　Okay.　And you see the account number at the
9  bottom?
10 　A.　Correct.
11 　Q.　And you're not sure if that's the operating
12 account or not?
13 　A.　Right.
14 　Q.　Blue Hill 5072, this is another copy of one of
15 the checks that we were just looking at; would you agree
16 with me about that?
17 　A.　Yes.
18 　Q.　And there's another Banknorth deposit slip
19 down at the bottom at the same checking -- strike that.
20 　　It has the same account number that is
21 shown on the deposit slip on page 5095; do you see that?
22 　A.　Yes.
23 　Q.　And in the middle of this page it says, Royall
24 operating account?

LegaLink Boston, a Merrill Company
(617) 542-0039