UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

       Plaintiff, Defendant-in-Counterclaim,

       v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

       Defendants, Plaintiffs-in-Counterclaim,

       v.

WILLIAM LANGELIER and GERALD
FINEBERG,

       Defendants-in-Counterclaim.

Civil Action No. 05-CV-10506 (WGY)

**AFFIDAVIT OF BRUCE S. BARNETT IN SUPPORT OF DEFENDANTS' AND
PLAINTIFFS-IN-COUNTERCLAIM'S MOTIONS FOR SUMMARY JUDGMENT**

I, Bruce S. Barnett, depose and say as follows:

1.      I am counsel to defendants/plaintiffs-in-counterclaim in this action. I have personal knowledge of the matters set forth herein.

2.      On or about April 26, 2006, Meredith Swisher, counsel for the plaintiff and defendants-in-counterclaim, provided me over the telephone the following list of telephone numbers. She stated they were numbers on which Blue Hills Office Park LLC ("Blue Hills") and Fineberg Management personnel could receive phone calls:

| | | |
|---|---|---|
| 781-237-1683 | 781-239-1486 | 781-431-0422 |
| 781-239-1191 | 781-239-1487 | 781-431-1108 |
| 781-239-1480 | 781-239-1488 | 781-431-1242 |
| 781-239-1481 | 781-239-1489 | 781-431-1350 |
| 781-239-1482 | 781-239-1491 | 781-431-1620 |
| 781-239-1483 | 781-239-1492 | 781-431-1825 |
| 781-239-1484 | 781-239-1493 | 781-431-1907 |
| 781-239-1485 | 781-431-0406 | |

3.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of a document entitled First Amendment to Certificate of Formation of Blue Hills Office Park LLC, which was produced by Blue Hills in this action.

4.      Attached hereto as <u>Exhibit B</u> are true and correct copies of excerpts from the answers of Blue Hills, Langelier, and Fineberg to the Defendants' First Set of Interrogatories.

5.      Attached hereto as <u>Exhibit C</u> is the Note from Blue Hills to Credit Suisse First Boston Mortgage Capital LLC in the principal amount of $33,149,000.  It is Exhibit D to the Second Amended Complaint.

6.      Attached hereto as <u>Exhibit D</u> is a copy of the Guaranty executed by Fineberg and Langelier.  Blue Hills, Langelier, and Fineberg acknowledged that it is a true and correct copy of the Guaranty in their response to the Defendants' First Requests for Admission, No. 12.

7.      Attached hereto as <u>Exhibit E</u> are true and correct copies of excerpts from of Blue Hills, Langelier, and Fineberg's Responses to the Defendants' First Request for Admissions.

8.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of excerpts from the response of Blue Hills, Langelier, and Fineberg to the Defendants' Second Requests for Admissions.

9.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of the Canton Zoning Board of Appeals' written decision granting the special permit petition to build a garage at Blueview Corporate Center, 250 Royall Street, Canton, Massachusetts.

10.      Attached hereto as <u>Exhibit H</u> is a true and correct copy of Blue Hills' release of Blueview Corporate Center LLC, executed in connection with the Zoning Appeals settlement. It was acknowledged as accurate by the Blue Hills, Langelier and Fineberg in their response to the Defendants' Second Requests for Admission, No. 16.

11.      Attached here to as <u>Exhibit I</u> is a true and correct copy of a chain of email messages among employees of LNR Partners, Inc. ("LNR") and Wells Fargo Bank, N.A., ("Wells Fargo") in September 2003. This chain of emails was produced by LNR in this action; a portion of this document was marked as Deposition Exhibit 141.

12.      Attached hereto as <u>Exhibit J</u> are true and correct copies of excerpts from the answers of Blue Hills, Langelier, and Fineberg to Defendants' Second Set of Interrogatories.

13.      Attached hereto as <u>Exhibit K</u> is a true and correct copy of documents recorded with the Norfolk County Registry of Deeds subsequent to the foreclosure sale of the Property.

14.      Attached hereto as <u>Exhibit L</u> are true and correct copies of commercial advertisements run by Dean Associates, Inc., the auctioneer for the foreclosure of the Property, in the <u>Boston Herald</u> and the <u>Boston Globe</u> on Sunday, November 7, 2004. The second page of Exhibit L is a blow up of the lower right corner of the first page.

15.      Attached hereto as <u>Exhibit M</u> is a true and correct copy of excerpts from CSFB 1999-C1 Royall Street, LLC's answers to Fineberg and Langelier's First Interrogatories.

16.      Attached hereto as <u>Exhibit N</u> are true and correct copies of letters exchanged between counsel for the parties in this action in April 2006. At no point during the course of this

litigation has Blue Hills, Langelier or Fineberg produced any personal income tax statements for any of the partners/beneficiaries of the Royall Associates Realty Trust.

17.    On November 12, 2004, I went to the Property at the time scheduled for the foreclosure sale and observed the auctioneer postpone the sale by public proclamation until November 19, 2004.

Signed under the pains and penalties of perjury this 17th day of May, 2006.

Bruce S. Barnett

# BARNETT AFFIDAVIT EXHIBIT A

## FIRST AMENDMENT TO CERTIFICATE OF FORMATION
## OF
## BLUE HILLS OFFICE PARK LLC

This First Amendment to Certificate of Formation of Blue Hills Office Park LLC (the "Company") dated as of September **14**, 1999, has been fully executed and is being filed by the undersigned, as an authorized person, in accordance with the provisions of 6 Del. C. §18-202, to amend the original Certificate of Formation of the Company, which was filed on September **14**, 1999 with the Secretary of State of the State of Delaware (the "Certificate") under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq.).

The Certificate is hereby amended as follows:

The following new section is added to the Certificate, which new section shall remain in full force and effect for so long as any mortgage lien in connection with a loan (the "Loan") held by Credit Suisse First Boston Mortgage Capital LLC ("Lender") exists on the real property commonly known as and numbered 150 Royall Street, Canton, Massachusetts and owned of record by the Company and until such time as a Certificate of Amendment is filed with the Office of the Delaware Secretary of State removing the amendments contained in this First Amendment to Certificate of Formation, and during such period, the Certificate shall provide as follows:

"SIXTH:

A.    Purpose.  Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern:  The nature of the business and of the purposes to be conducted and promoted by the Company is to engage solely in the following activities:

(1)    To acquire that certain parcel of real property, together with all improvements located thereon, commonly known as and numbered 150 Royall Street, Canton, Massachusetts (the "Property").

(2)    To own, hold, sell, assign, transfer, operate, lease, mortgage, pledge and otherwise deal with the Property.  The Company shall not own any asset other than the Property, the income and proceeds therefrom and/or the personal property necessary for the ownership or operation of the Property.

(3)    To exercise all powers enumerated in the Delaware Limited Liability Company Act necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

B.    Certain Prohibited Activities.  Notwithstanding any provision hereof or any other document governing the formation, management or operation of the Company to the contrary, the following shall govern for so long as any mortgage lien held by the Lender exists on the

Blue Hill
1964

Property:  The Company shall only incur indebtedness in amounts as provided and permitted by the loan documents evidencing the Loan.  The Company shall not incur, assume or guaranty any other indebtedness.  The Company shall not consolidate or merge with or into any other entity or convey or transfer its properties and assets substantially as an entirety to any entity unless:  (1) the entity (if other than the Company) formed or surviving such consolidation or merger or that acquired by conveyance or transfer the properties and assets of the Company substantially as an entirety shall:  (a) be organized and existing under the laws of the United States of America or any State or the District of Columbia; (b) include in its organizational documents the same limitations set forth in this Section "Sixth"; and (c) expressly assume the due and punctual performance of the Company's obligations; and (2) immediately after giving effect to such transaction, no default or event of default under any agreement to which it is a party shall have been committed by and be continuing.  For so long as a mortgage lien held by the Lender exists on the Property, the Company will not voluntarily commence a case with respect to itself, as debtor, under the Federal Bankruptcy Code or any similar federal or state statute without the unanimous consent of all of the members and manager of the Company.  For so long as a mortgage lien held by the Lender exists on the Property, no material amendment to the Certificate of Formation may be made without first obtaining the approval of the Lender.

C.    Indemnification.  Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern:  Any indemnification shall be fully subordinated to any obligations respecting the Property and shall not constitute a claim against the Company in the event that cash flow is insufficient to pay such obligations.

D.    Separateness Covenants.  Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern:  For so long as any mortgage lien held by the Lender exists on the Property, in order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this First Amendment to Certificate of Formation the Company shall conduct its affairs in accordance with the following provisions:

(1)    It shall maintain separate records and books of account from those of any Affiliate.

(2)    It shall not commingle assets with those of any Affiliate.

(3)    It shall conduct its own business in its own name.

(4)    It shall maintain financial statements separate from any Affiliate.

(5)    It shall pay any liabilities out of its own funds, including salaries of any employees, not funds of any Affiliate.

(6)    It shall maintain an arm's length relationship with any Affiliate.

-2-

Blue Hill
1965

(7)     It shall not guaranty or become obligated for the debts of any other entity, including any Affiliate, or hold out its credit as being available to satisfy the obligations of others.

(8)     It shall use stationery, invoices and checks bearing its own name or the name of its management company.

(9)     It shall not pledge its assets for the benefit of any other entity, including any Affiliate.

(10)     It shall hold itself out as an entity separate from any Affiliate.

(11)     It shall at all times have a special purpose corporation with an Independent Director serving as a manager, general partner or trustee, as applicable, for any one of its Members that is a limited liability company, limited partnership or trust.

For purposes of the immediately preceding Subsection, the following terms shall have the following meanings:

"Affiliate" means any person controlling or controlled by or under common control with the Company including, without limitation: (A) any person who has a familial relationship, by blood, marriage or otherwise with any partner or employee of the Company, or any affiliate thereof; and (B) any person which receives compensation for administrative, legal or accounting services from the Company or any affiliate. For purposes of this definition, "control" when used with respect to any specified person, means the power to direct the management and policies of such person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Independent Director" means any individual who: (A) is not and has not been (and is not affiliated with a company or firm that is or has been) within the five (5) years immediately prior to such individual's appointment as an Independent Director either (i) employed as a director, officer or employee by, (ii) a significant advisor or consultant to, (iii) affiliated with a significant customer or supplier of, (iv) engaged under significant personal service contract(s) with, or (v) affiliated with a tax exempt entity that receives significant contributions from, the Company or any of its subsidiaries or affiliates; (B) at the time of such individual's appointment as an Independent Director, or at any time thereafter while serving as Independent Director, is not a legal or beneficial owner of any direct or indirect equity interest in the Company or any of its subsidiaries or affiliates; and (C) is not a spouse, parent, sibling or child or any person described by paragraphs (A) and (B) above.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

**Blue Hill**
**1966**

E. <u>Dissolution</u>. Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: To the extent permissible under applicable federal and state tax law, the vote of all the remaining members is sufficient to continue the life of the Company. If such vote is not obtained, for so long as a mortgage lien exists on the Property, the Company shall not liquidate the Property without first obtaining approval of the mortgagee holding a first mortgage lien on the Property. Such holders may continue to exercise all of their rights under the existing security agreements or mortgages until the debt underlying the mortgage liens has been paid in full otherwise completely discharged. Without limiting the other provisions of this paragraph, upon the dissolution or withdrawal of the manager of the Company, or the bankruptcy or liquidation of the manager of the Company, the Company will dissolve unless all members agree to continue the business of the Company and admit a successor manager, which new manager will have all the purposes and limitations on its activities and obligations identical to the present manager of the Company; provided, however, the members agree to immediately appoint a successor manager consistent with the herein provisions.

F. <u>Voting</u>. Notwithstanding any provision hereof or of any other document governing the formation, management or operation of the Company to the contrary, the following shall govern: When acting on matters subject to the vote of the Members, notwithstanding the that the Company is not then insolvent, all of the Members shall take into account the interest of the Company's creditors, as well as those of the Members."

Except as amended hereby, the Certificate shall remain in full force and effect unchanged.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

-4-

Blue Hill
1967

IN WITNESS WHEREOF, the undersigned have executed this First Amendment to Certificate of Formation as of this ___ day of September, 1999, and hereby certify under penalties of perjury, that the facts stated herein are true.

BLUE HILLS MANAGEMENT CORP., Manager
of Blue Hills Office Park LLC

By: _____
Gerald S. Fineberg, its President
and Treasurer, duly authorized

184141-14500/9547

-5-

Blue Hill
1968

# BARNETT AFFIDAVIT EXHIBIT B

## EXCERPTED MATERIALS

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>　　　Plaintiff/Defendant-in-<br>　　　Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>　　　Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>　　　Defendant/Plaintiff-in-<br>　　　Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>　　　Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## BLUE HILLS OFFICE PARK LLC'S ANSWERS TO DEFENDANTS'
## FIRST SET OF INTERROGATORIES

Blue Hills Office Park LLC ("Blue Hills") hereby answers the First Set of Interrogatories

by the Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston

Mortgage Security Corp. ("CS Bank") as follows:

## GENERAL OBJECTIONS

Blue Hills objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure. Blue Hills also objects to each interrogatory to

b)     identify the person(s) who made each communication;
c)     identify the person(s) who received each communication; and
d)     identify each and every document which reflects, constitutes, or concerns each communication.

## ANSWER NO. 2

Blue Hills objects to this interrogatory to the extent that it is overly broad, unduly burdensome, vague and ambiguous and seeks information that is subject to attorney-client privilege. Blue Hills further objects to this interrogatory to the extent its multiple subparts exceed the limit on interrogatories under the court order governing phased discovery. Without waiving these objections, Blue Hills states that it and its agents had several conversations with the Defendants from in or about the fall of 2003 through the date of foreclosure as well as conversations with third parties. With respect to written communications, pursuant to Fed. R. Civ. P. 33(c), Blue Hills will make available at a mutually convenient time all non-privileged and relevant written communications in his possession, custody or control.

## INTERROGATORY NO. 3

State the basis for the allegation, in paragraph 11 of Blue Hills First Amended Complaint, that "[Originator] and Blue Hills agreed that the various required reserve deposits could be accessed by Blue Hills in the event that the Equiserve Lease was not renewed."

## ANSWER NO. 3

Paragraph 6(c)(ix) of the Mortgage Agreement requires the Lender to disburse to Blue Hills funds from Reserve Accounts established with Blue Hills' own funds to pay principal and interest due on the Note. The disbursement arrangements specifically contemplated release of funds in the event the Equiserve lease was not renewed or extended. In or about August 1999, when Blue Hills and the original Lender agreed upon the terms and conditions of the $33.5 million loan to Blue Hills (the "Loan"), the parties were fully aware that the property located at 150 Royall Street, Canton, Massachusetts ("Property") was leased to a single tenant, Equiserve

3

Limited Partnership ("Equiserve"), which lease revenue was the sole recurring source of funds available to service the Loan. The parties were also aware that the Equiserve lease term expired on July 31, 2004, which expiration date is prior to the maturity date of the Loan. As a result, the Lender required Blue Hills to direct a substantial portion of its cash flow from the ownership of the Property into reserve accounts to address the fact that attracting new tenants would likely require significant expenditures to re-tenant the building for a single, a few or multiple tenants. At the time the Equiserve Lease term expired, a total of approximately $4 million was on deposit with the Lender in those Reserve Accounts. It was therefore clearly intended that Blue Hills would have access to deposits in the Reserve Accounts to address the circumstance of the Equiserve Lease not being renewed. The original Term Sheet for the Loan summarizing the intent of the Parties states that "funds will be available to the Borrower for the tenant improvements and leasing commissions necessary to re-let the building." In addition, as the Term Sheet specifically references the renewal of Equiserve's lease (at that time, Bank of Boston), there can be no question that the parties agreed that Blue Hills could access the Reserve Accounts in the event the Equiserve Lease was not renewed. This understanding was confirmed by letter dated August 31, 1999, attached to the First Amended Complaint as Exhibit "B", which states that "the monies held [in reserve] shall additionally be available for monthly debt service payments to the extent the monies from any existing leases in any month are insufficient . . . " The terms of the Mortgage Agreement, including *inter alia* paragraphs 6(b), 6(c)(i), 6(c)(ii), 6(c)(iv), 6(c)(ix), also confirm these understandings.

## INTERROGATORY NO. 4

State the basis for the allegation, in paragraph 16 of Blue Hills' First Amended Complaint, that "[t]he terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note."

4

**ANSWER NO. 4**

The letter from Blue Hills to Credit Suisse First Boston Mortgage Capital LLC dated

August 31, 1999 confirmed the terms of the financing and was countersigned by Credit Suisse

First Boston Mortgage Capital LLC. The term "loan documents" as defined in the Note

specifically includes all documents "executed and delivered in connection with this Note and the

Loan." The Term Sheet unquestionably falls within this definition.

**INTERROGATORY NO. 5**

If you contend that Blue Hills' mortgage should have permitted Blue Hills access to Loan
reserve or escrow funds to upgrade the Property, make tenant improvements, market the
Property, or for any other purpose, on terms other than those stated within the four corners of the
Mortgage Agreement, state the basis for that contention and, in your answer, identify those other
terms and any documents in which they are stated.

**ANSWER NO. 5**

Blue Hills objects to this interrogatory to the extent that it is vague and ambiguous with

respect to "other than those stated within the four corners of the Mortgage Agreement." Without

waiving that objection, Blue Hills incorporates its answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 6**

State the basis for the allegation in paragraph 34 of Blue Hills' First Amended Complaint
that "[b]eginning in November, 1999 and continuing into 2004, Blue Hills deposited into the
Clearing Account the requisite real estate tax amounts."

**ANSWER NO. 6**

Pursuant to Fed. R. Civ. P. 33(c), Blue Hills will make available at a mutually convenient

time their business records regarding the deposits of real estate tax amounts.

**INTERROGATORY NO. 7**

State the basis for the allegation, in paragraph 38 of Blue Hills' First Amended
Complaint, that "[t]his information [that Equiserve notified Blue Hills that it would not be
exercising its option to renew the Equiserve lease] was communicated to either or both of the
defendants, through their agents, Wells Fargo."

**ANSWER NO. 7**

Equiserve notified Blue Hills of its intent not to exercise its option to extend its lease in

or about May 2003. Shortly thereafter, Blue Hills communicated to Wells Fargo via telephone.

**INTERROGATORY NO. 8**

State the basis for the allegation, in paragraph 40 of Blue Hills' First Amended
Complaint, that Blue Hills' need for "substantial sums of money to upgrade the Property's
infrastructure and to make tenant improvements" was "the very contingency anticipated when
the Term Sheet was executed."

**ANSWER NO. 8**

Blue Hills incorporates its answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 9**

State the basis for the allegation, in paragraph 84 of Blue Hills' First Amended
Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully
defaulted Blue Hills."

**ANSWER NO. 9**

By denying Blue Hills access to the more than $4 million Blue Hills deposited with the

Lender for the purpose of funding debt service and re-tenanting costs upon Equiserve vacating

the Property, the Lender effectively precluded Blue Hills from re-tenanting the Property or

maintaining the Loan. Therefore, by placing Blue Hills' own funds beyond its reach and by its

refusal to even meet with Blue Hills to discuss the procedure for Blue Hills to access those funds,

the Lender procured the very default Lender then asserted entitled it to retain those funds.

Further, by not applying to the physical condition of the Property the multi-million dollar reserve

Blue Hills set aside for capital upgrades, the Lender adversely impacted the value of the Property

as well as the amount the Lender realized from its sale of the Property.

Blue Hills, by letters dated August 2, 2004 and September 2, 2004, requisitioned the

Lender for advances from the Reserve Accounts for payment of loan carrying costs, consistent

with the terms of the loan documents and the intent of the parties. The Reserves from which

Blue Hills requisitioned funds were Reserves established to address the very issue that had arisen

– the termination of the Equiserve Lease, the sole source of Borrower's revenue. The Lender's

failure to release those funds left Blue Hills with no other source of capital since the Lender's

loan documents required Blue Hills to be a single asset entity and expressly prohibited Blue Hills

from entering into any other borrowings. Thus, the Lender's refusal to release the funds *caused*

the very Event of Default that the Lender asserted was the basis for not releasing the funds from

its Reserves.

In addition to the foregoing, the Lender wrongfully defaulted Blue Hills by virtue of the

fact that in the September 17, 2004 letter to Blue Hills, the Lender asserted that Blue Hills failed

to make certain deposits required by the Loan Documents. However, those deposits were not yet

due from Blue Hills. At the time Blue Hills requisitioned for a withdrawal from the Reserves,

Blue Hills was not in default under the Loan Documents.

## INTERROGATORY NO. 10

Describe each communication concerning Blueview, the Special Permit, the ZBA
Decision, the Zoning Appeal, the Settlement, the Payment, the purchase of Blueview by DST
Realty of Massachusetts, Inc. and/or Equiserve's decision to move from the Property to
Blueview, including without limitation communications between you and Joseph P. Plunkett,
Stephen Cesso, Thomas R. McGee, Thomas R. Tye, or any other person, and among any
principals, members, managers, employees, agents, or affiliates of Blue Hills, and in your
answer:

a)  state the nature, date, time and place of each communication;
b)  identify the person(s) who made each communication;
c)  identify the person(s) who received each communication; and
d)  identify each and every document which reflects, constitutes, or concerns
    each communication.

7

Signed under the pains and penalties of perjury this 28 day of _October_, 2005.

Blue Hills Office Park LLC

By: _Gerald Fineberg_

Gerald Fineberg, President of
Blue Hills Management Corp.,
Manager of Blue Hills Office Park
LLC,   duly authorized

AS TO OBJECTIONS:

BLUE HILLS OFFICE PARK LLC,
By its attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: Nov 11, 2005

#322802 v1/14500/9985

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon (each party appearing pro se and) the attorney of record for
each other party by mail (by hand) Nov 11, 2005

12

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>     Plaintiff/Defendant-in-<br>     Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>     Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>     Defendant/Plaintiff-in-<br>     Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>     Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

### GERALD FINEBERG'S ANSWERS TO
### DEFENDANTS' FIRST SET OF INTERROGATORIES

Gerald Fineberg ("Fineberg") hereby answers the First Set of Interrogatories by the

Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston

Mortgage Security Corp. ("CS Bank") as follows:

### GENERAL OBJECTIONS

Fineberg objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure.  Fineberg also objects to each interrogatory to the

b)     identify the person(s) who made each communication;

c)     identify the person(s) who received each communication; and

d)     identify each and every document which reflects, constitutes, or concerns each communication.

## ANSWER NO. 2

Fineberg objects to this interrogatory to the extent that it is overly broad, unduly burdensome, vague and ambiguous and seeks information that is subject to attorney-client privilege. Fineberg further objects to this interrogatory to the extent its multiple subparts exceed the limit on interrogatories under the court order governing phased discovery. Without waiving these objections, Fineberg states that Blue Hills and its agents had several conversations with the Defendants from in or about the fall of 2003 through the date of foreclosure as well as conversations with third parties. With respect to written communications, pursuant to Fed. R. Civ. P. 33(c), Fineberg will make available at a mutually convenient time all non-privileged and relevant written communications in his possession, custody or control.

## INTERROGATORY NO. 3

State the basis for the allegation, in paragraph 11 of Blue Hills First Amended Complaint, that "[Originator] and Blue Hills agreed that the various required reserve deposits could be accessed by Blue Hills in the event that the Equiserve Lease was not renewed."

## ANSWER NO. 3

Paragraph 6(c)(ix) of the Mortgage Agreement requires the Lender to disburse to Blue Hills funds from Reserve Accounts established with Blue Hills' own funds to pay principal and interest due on the Note. The disbursement arrangements specifically contemplated release of funds in the event the Equiserve lease was not renewed or extended. In or about August 1999, when Blue Hills and the original Lender agreed upon the terms and conditions of the $33.5 million loan to Blue Hills (the "Loan"), the parties were fully aware that the property located at 150 Royall Street, Canton, Massachusetts ("Property") was leased to a single tenant, Equiserve

3

Limited Partnership ("Equiserve"), which lease revenue was the sole recurring source of funds available to service the Loan. The parties were also aware that the Equiserve lease term expired on July 31, 2004, which expiration date is prior to the maturity date of the Loan. As a result, the Lender required Blue Hills to direct a substantial portion of its cash flow from the ownership of the Property into reserve accounts to address the fact that attracting new tenants would likely require significant expenditures to re-tenant the building for a single, a few or multiple tenants. At the time the Equiserve Lease term expired, a total of approximately $4 million was on deposit with the Lender in those Reserve Accounts. It was therefore clearly intended that Blue Hills would have access to deposits in the Reserve Accounts to address the circumstance of the Equiserve Lease not being renewed. The original Term Sheet for the Loan summarizing the intent of the Parties states that "funds will be available to the Borrower for the tenant improvements and leasing commissions necessary to re-let the building." In addition, as the Term Sheet specifically references the renewal of Equiserve's lease (at that time, Bank of Boston), there can be no question that the parties agreed that Blue Hills could access the Reserve Accounts in the event the Equiserve Lease was not renewed. This understanding was confirmed by letter dated August 31, 1999, attached to the First Amended Complaint as Exhibit "B", which states that "the monies held [in reserve] shall additionally be available for monthly debt service payments to the extent the monies from any existing leases in any month are insufficient . . . " The terms of the Mortgage Agreement, including *inter alia* paragraphs 6(b), 6(c)(i), 6(c)(ii), 6(c)(iv), 6(c)(ix), also confirm these understandings.

## INTERROGATORY NO. 4

State the basis for the allegation, in paragraph 16 of Blue Hills' First Amended Complaint, that "[t]he terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note."

4

**ANSWER NO. 4**

The letter from Blue Hills to Credit Suisse First Boston Mortgage Capital LLC dated

August 31, 1999 confirmed the terms of the financing and was countersigned by Credit Suisse

First Boston Mortgage Capital LLC. The term "loan documents" as defined in the Note

specifically includes all documents "executed and delivered in connection with this Note and the

Loan." The Term Sheet unquestionably falls within this definition.

**INTERROGATORY NO. 5**

If you contend that Blue Hills' mortgage should have permitted Blue Hills access to Loan
reserve or escrow funds to upgrade the Property, make tenant improvements, market the
Property, or for any other purpose, on terms other than those stated within the four corners of the
Mortgage Agreement, state the basis for that contention and, in your answer, identify those other
terms and any documents in which they are stated.

**ANSWER NO. 5**

Fineberg objects to this interrogatory to the extent that it is vague and ambiguous with

respect to "other than those stated within the four corners of the Mortgage Agreement." Without

waiving that objection, Fineberg incorporates his answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 6**

State the basis for the allegation in paragraph 34 of Blue Hills' First Amended Complaint
that "[b]eginning in November, 1999 and continuing into 2004, Blue Hills deposited into the
Clearing Account the requisite real estate tax amounts."

**ANSWER NO. 6**

Pursuant to Fed. R. Civ. P. 33(c), Fineberg will make available at a mutually convenient

time the business records of Blue Hills regarding the deposits of real estate tax amounts.

**INTERROGATORY NO. 7**

State the basis for the allegation, in paragraph 38 of Blue Hills' First Amended
Complaint, that "[t]his information [that Equiserve notified Blue Hills that it would not be
exercising its option to renew the Equiserve lease] was communicated to either or both of the
defendants, through their agents, Wells Fargo."

5

**ANSWER NO. 7**

Equiserve notified Blue Hills of its intent not to exercise its option to extend its lease in

or about May 2003.  Shortly thereafter, Blue Hills communicated to Wells Fargo via telephone.

**INTERROGATORY NO. 8**

State the basis for the allegation, in paragraph 40 of Blue Hills' First Amended
Complaint, that Blue Hills' need for "substantial sums of money to upgrade the Property's
infrastructure and to make tenant improvements" was "the very contingency anticipated when
the Term Sheet was executed."

**ANSWER NO. 8**

Fineberg incorporates his answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 9**

State the basis for the allegation, in paragraph 84 of Blue Hills' First Amended
Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully
defaulted Blue Hills."

**ANSWER NO. 9**

By denying Blue Hills access to the more than $4 million Blue Hills deposited with the

Lender for the purpose of funding debt service and re-tenanting costs upon Equiserve vacating

the Property, the Lender effectively precluded Blue Hills from re-tenanting the Property or

maintaining the Loan.  Therefore, by placing Blue Hills' own funds beyond its reach and by its

refusal to even meet with Blue Hills to discuss the procedure for Blue Hills to access those funds,

the Lender procured the very default Lender then asserted entitled it to retain those funds.

Further, by not applying to the physical condition of the Property the multi-million dollar reserve

Blue Hills set aside for capital upgrades, the Lender adversely impacted the value of the Property

as well as the amount the Lender realized from its sale of the Property.

6

Blue Hills, by letters dated August 2, 2004 and September 2, 2004, requisitioned the Lender for advances from the Reserve Accounts for payment of loan carrying costs, consistent with the terms of the loan documents and the intent of the parties. The Reserves from which Blue Hills requisitioned funds were Reserves established to address the very issue that had arisen – the termination of the Equiserve Lease, the sole source of Borrower's revenue. The Lender's failure to release those funds left Blue Hills with no other source of capital since the Lender's loan documents required Blue Hills to be a single asset entity and expressly prohibited Blue Hills from entering into any other borrowings. Thus, the Lender's refusal to release the funds *caused* the very Event of Default that the Lender asserted was the basis for not releasing the funds from its Reserves.

In addition to the foregoing, the Lender wrongfully defaulted Blue Hills by virtue of the fact that in the September 17, 2004 letter to Blue Hills, the Lender asserted that Blue Hills failed to make certain deposits required by the Loan Documents. However, those deposits were not yet due from Blue Hills. At the time Blue Hills requisitioned for a withdrawal from the Reserves, Blue Hills was not in default under the Loan Documents.

## INTERROGATORY NO. 10

Describe each communication concerning Blueview, the Special Permit, the ZBA Decision, the Zoning Appeal, the Settlement, the Payment, the purchase of Blueview by DST Realty of Massachusetts, Inc. and/or Equiserve's decision to move from the Property to Blueview, including without limitation communications between you and Joseph P. Plunkett, Stephen Cesso, Thomas R. McGee, Thomas R. Tye, or any other person, and among any principals, members, managers, employees, agents, or affiliates of Blue Hills, and in your answer:

a)    state the nature, date, time and place of each communication;
b)    identify the person(s) who made each communication;
c)    identify the person(s) who received each communication; and
d)    identify each and every document which reflects, constitutes, or concerns each communication.

Signed under the pains and penalties of perjury this 28 day of October, 2005.

Gerald Fineberg

AS TO OBJECTIONS:

GERALD FINEBERG
By his attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: October 11, 2005
#323118 v1/14500/9985

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon (each party appearing pro se and) the attorney of record for
each other party by mail (by hand) Nav 14, 2005

12

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>     Plaintiff/Defendant-in-<br>     Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>     Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>     Defendant/Plaintiff-in-<br>     Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>     Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## WILLIAM LANGELIER'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

William Langelier ("Langelier") hereby answers the First Set of Interrogatories by the

Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston

Mortgage Security Corp. ("CS Bank") as follows:

## GENERAL OBJECTIONS

Langelier objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure. Langelier also objects to each interrogatory to the

b)    identify the person(s) who made each communication;
c)    identify the person(s) who received each communication; and
d)    identify each and every document which reflects, constitutes, or concerns
each communication.

## ANSWER NO. 2

Langelier objects to this interrogatory to the extent that it is overly broad, unduly

burdensome, vague and ambiguous and seeks information that is subject to attorney-client

privilege. Langelier further objects to this interrogatory to the extent its multiple subparts exceed

the limit on interrogatories under the court order governing phased discovery. Without waiving

these objections, Langelier states that Blue Hills and its agents had several conversations with

the Defendants from in or about the fall of 2003 through the date of foreclosure as well as

conversations with third parties. With respect to written communications, pursuant to Fed. R.

Civ. P. 33(c), Langelier will make available at a mutually convenient time all non-privileged and

relevant written communications in his possession, custody or control.

## INTERROGATORY NO. 3

State the basis for the allegation, in paragraph 11 of Blue Hills First Amended Complaint,
that "[Originator] and Blue Hills agreed that the various required reserve deposits could be
accessed by Blue Hills in the event that the Equiserve Lease was not renewed."

## ANSWER NO. 3

Paragraph 6(c)(ix) of the Mortgage Agreement requires the Lender to disburse to Blue

Hills funds from Reserve Accounts established with Blue Hills' own funds to pay principal and

interest due on the Note. The disbursement arrangements specifically contemplated release of

funds in the event the Equiserve lease was not renewed or extended. In or about August 1999,

when Blue Hills and the original Lender agreed upon the terms and conditions of the $33.5

million loan to Blue Hills (the "Loan"), the parties were fully aware that the property located at

150 Royall Street, Canton, Massachusetts ("Property") was leased to a single tenant, Equiserve

3

Limited Partnership ("Equiserve"), which lease revenue was the sole recurring source of funds available to service the Loan. The parties were also aware that the Equiserve lease term expired on July 31, 2004, which expiration date is prior to the maturity date of the Loan. As a result, the Lender required Blue Hills to direct a substantial portion of its cash flow from the ownership of the Property into reserve accounts to address the fact that attracting new tenants would likely require significant expenditures to re-tenant the building for a single, a few or multiple tenants. At the time the Equiserve Lease term expired, a total of approximately $4 million was on deposit with the Lender in those Reserve Accounts. It was therefore clearly intended that Blue Hills would have access to deposits in the Reserve Accounts to address the circumstance of the Equiserve Lease not being renewed. The original Term Sheet for the Loan summarizing the intent of the Parties states that "funds will be available to the Borrower for the tenant improvements and leasing commissions necessary to re-let the building." In addition, as the Term Sheet specifically references the renewal of Equiserve's lease (at that time, Bank of Boston), there can be no question that the parties agreed that Blue Hills could access the Reserve Accounts in the event the Equiserve Lease was not renewed. This understanding was confirmed by letter dated August 31, 1999, attached to the First Amended Complaint as Exhibit "B", which states that "the monies held [in reserve] shall additionally be available for monthly debt service payments to the extent the monies from any existing leases in any month are insufficient . . . " The terms of the Mortgage Agreement, including *inter alia* paragraphs 6(b), 6(c)(i), 6(c)(ii), 6(c)(iv), 6(c)(ix), also confirm these understandings.

## INTERROGATORY NO. 4

State the basis for the allegation, in paragraph 16 of Blue Hills' First Amended Complaint, that "[t]he terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note."

**ANSWER NO. 4**

The letter from Blue Hills to Credit Suisse First Boston Mortgage Capital LLC dated

August 31, 1999 confirmed the terms of the financing and was countersigned by Credit Suisse

First Boston Mortgage Capital LLC.  The term "loan documents" as defined in the Note

specifically includes all documents "executed and delivered in connection with this Note and the

Loan."  The Term Sheet unquestionably falls within this definition.

**INTERROGATORY NO. 5**

If you contend that Blue Hills' mortgage should have permitted Blue Hills access to Loan
reserve or escrow funds to upgrade the Property, make tenant improvements, market the
Property, or for any other purpose, on terms other than those stated within the four corners of the
Mortgage Agreement, state the basis for that contention and, in your answer, identify those other
terms and any documents in which they are stated.

**ANSWER NO. 5**

Langelier objects to this interrogatory to the extent that it is vague and ambiguous with

respect to "other than those stated within the four corners of the Mortgage Agreement." Without

waiving that objection, Langelier incorporates his answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 6**

State the basis for the allegation in paragraph 34 of Blue Hills' First Amended Complaint
that "[b]eginning in November, 1999 and continuing into 2004, Blue Hills deposited into the
Clearing Account the requisite real estate tax amounts."

**ANSWER NO. 6**

Pursuant to Fed. R. Civ. P. 33(c), Langelier will make available at a mutually convenient

time the business records of Blue Hills regarding the deposits of real estate tax amounts.

**INTERROGATORY NO. 7**

State the basis for the allegation, in paragraph 38 of Blue Hills' First Amended
Complaint, that "[t]his information [that Equiserve notified Blue Hills that it would not be
exercising its option to renew the Equiserve lease] was communicated to either or both of the
defendants, through their agents, Wells Fargo."

## ANSWER NO. 7

Equiserve notified Blue Hills of its intent not to exercise its option to extend its lease in or about May 2003. Shortly thereafter, Blue Hills communicated to Wells Fargo via telephone.

## INTERROGATORY NO. 8

State the basis for the allegation, in paragraph 40 of Blue Hills' First Amended Complaint, that Blue Hills' need for "substantial sums of money to upgrade the Property's infrastructure and to make tenant improvements" was "the very contingency anticipated when the Term Sheet was executed."

## ANSWER NO. 8

Langelier incorporates his answers to Interrogatory Nos. 3 and 4.

## INTERROGATORY NO. 9

State the basis for the allegation, in paragraph 84 of Blue Hills' First Amended Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully defaulted Blue Hills."

## ANSWER NO. 9

By denying Blue Hills access to the more than $4 million Blue Hills deposited with the Lender for the purpose of funding debt service and re-tenanting costs upon Equiserve vacating the Property, the Lender effectively precluded Blue Hills from re-tenanting the Property or maintaining the Loan. Therefore, by placing Blue Hills' own funds beyond its reach and by its refusal to even meet with Blue Hills to discuss the procedure for Blue Hills to access those funds, the Lender procured the very default Lender then asserted entitled it to retain those funds. Further, by not applying to the physical condition of the Property the multi-million dollar reserve Blue Hills set aside for capital upgrades, the Lender adversely impacted the value of the Property as well as the amount the Lender realized from its sale of the Property.

Blue Hills, by letters dated August 2, 2004 and September 2, 2004, requisitioned the Lender for advances from the Reserve Accounts for payment of loan carrying costs, consistent with the terms of the loan documents and the intent of the parties. The Reserves from which Blue Hills requisitioned funds were Reserves established to address the very issue that had arisen – the termination of the Equiserve Lease, the sole source of Borrower's revenue. The Lender's failure to release those funds left Blue Hills with no other source of capital since the Lender's loan documents required Blue Hills to be a single asset entity and expressly prohibited Blue Hills from entering into any other borrowings. Thus, the Lender's refusal to release the funds *caused* the very Event of Default that the Lender asserted was the basis for not releasing the funds from its Reserves.

In addition to the foregoing, the Lender wrongfully defaulted Blue Hills by virtue of the fact that in the September 17, 2004 letter to Blue Hills, the Lender asserted that Blue Hills failed to make certain deposits required by the Loan Documents. However, those deposits were not yet due from Blue Hills. At the time Blue Hills requisitioned for a withdrawal from the Reserves, Blue Hills was not in default under the Loan Documents.

## INTERROGATORY NO. 10

Describe each communication concerning Blueview, the Special Permit, the ZBA Decision, the Zoning Appeal, the Settlement, the Payment, the purchase of Blueview by DST Realty of Massachusetts, Inc. and/or Equiserve's decision to move from the Property to Blueview, including without limitation communications between you and Joseph P. Plunkett, Stephen Cesso, Thomas R. McGee, Thomas R. Tye, or any other person, and among any principals, members, managers, employees, agents, or affiliates of Blue Hills, and in your answer:

a)     state the nature, date, time and place of each communication;
b)     identify the person(s) who made each communication;
c)     identify the person(s) who received each communication; and
d)     identify each and every document which reflects, constitutes, or concerns each communication.

Signed under the pains and penalties of perjury this _28th_ day of _October_, 2005.

_William Langelier_

AS TO OBJECTIONS:

WILLIAM LANGELIER
By his attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: _Nov 11, 2005_

#322802 v1/14500/9985

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon each party appearing pro se and the attorney of record for
each other party by mail (by hand) _Nov 11, 2005_

12

# BARNETT AFFIDAVIT EXHIBIT C

## MORTGAGE NOTE
### (with defeasance and hyper-am)

$33,149,000.00

September 14, 1999

For value received, BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company, having its principal place of business c/o Fineberg Management, Inc., One Washington Street, Suite 400, Wellsley, Massachusetts 02481 (hereinafter referred to as "Maker"), promises to pay to the order of **CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC**, a Delaware limited liability company ("Lender" and also sometimes "Payee"), having its principal office at 11 Madison Avenue, New York, New York 10010, or at such place as the holder hereof may from time to time designate in writing, the principal sum of THIRTY-THREE MILLION ONE HUNDRED FORTY NINE THOUSAND AND 00/100 DOLLARS ($33,149,000.00), in lawful money of the United States of America, with interest thereon to be computed on the unpaid principal balance from time to time outstanding at the Applicable Interest Rate (as hereinafter defined), and to be paid in installments, as follows:

A.    payment of interest only on the date hereof with respect to the interest accrual period from the date hereof to and including October 10, 1999;

B.    constant payment of $254,652.24 (such amount hereinafter the "Monthly Payment Amount"), on the eleventh day of November, 1999 and on the eleventh day of each calendar month thereafter up to and including the eleventh day of September, 2029 (each a "Payment Date"); each of such payments to be applied (a) to the payment of interest computed at the Initial Term Interest Rate (as hereinafter defined); and (b) the balance applied toward the reduction of the principal sum;

and the balance of said principal sum together with all accrued and unpaid interest thereon shall be due and payable on the eleventh day of October, 2029 (the "Maturity Date"). Interest on the principal sum of this Note shall be calculated on the basis of the actual number of days elapsed and a three-hundred-sixty (360) day year. The constant payment required hereunder is based on an amortization schedule of three hundred sixty (360) months. For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods if the eleventh (11th) day of a given month is not a Business Day (as hereinafter defined), then amounts due on the Payment Date for such month shall be due on the next succeeding Business Day. All amounts due under this Note shall be payable without setoff, counterclaim or any other deduction whatsoever.

1.    As used in this Note:

(a)    The term "Annual Budget" shall mean an annual budget submitted by Maker to Payee in accordance with the terms of Paragraph 8(b) herein.

(b)    The term "Anticipated Repayment Date" shall mean October 11, 2009.



(c)     The term "Applicable Interest Rate" shall mean (a) from the date of this Note through but not including the Anticipated Repayment Date, the Initial Term Interest Rate, and (b) from and after the Anticipated Repayment Date through and including the date this Note is paid in full, the Extended Term Rate.

(d)     The term "Approved Annual Budget" shall mean each Annual Budget approved by Payee in accordance with the terms of Paragraph 8(b) hereof.

(e)     The term "Assignment of Leases" shall mean that certain Assignment of Leases and Rents of even date herewith executed by Maker in favor of Payee.

(f)     The term "Business Day" shall mean a day other than (i) a Saturday or Sunday, or (ii) any day on which commercial banks in New York City are not open for general banking business.

(g)     The term "Capital Expenditures" shall mean for any period, the amount expended for items capitalized under generally accepted accounting principles including expenditures for building improvements or major repairs, leasing commissions and tenant improvements.

(h)     The term "Cash Expenses" shall mean, for any period, the operating expenses for the Mortgaged Property (as defined in the Mortgage) as set forth in an Approved Annual Budget, to the extent that such expenses are actually incurred by Maker, minus payments into the Tax and Insurance Impound Fund (as defined in the Mortgage), the Base Leasing Escrow Fund (as defined in the Mortgage), the Replacement Escrow Fund (as defined in the Mortgage) and the Cash Flow Leasing Escrow Fund (as defined in the Mortgage).

(i)     The term "Cash Management Agreement" shall have the meaning assigned to such term in the Mortgage.

(j)     The term "Debt" shall mean, collectively, the whole of the outstanding principal sum of this Note, together with all interest accrued and unpaid thereon and all other sums due under the Loan Documents.

(k)     The term "Default Rate" shall mean a rate per annum which is equal to the lesser of (a) the maximum rate permitted by applicable law, or (b) five percent (5%) above the Applicable Interest Rate.

(l)     The term "Defeasance Option" shall mean the right and option of maker to release the Mortgaged Property (as defined in the Mortgage) from the lien of the Mortgage in accordance with the provision set forth in Paragraph 55 of the Mortgage.

(m)     The term "Extended Term Rate" shall mean a rate per annum equal to a rate per annum equal to the greater of (i) the Initial Term Interest Rate plus five (5) percentage points or (ii) the Treasury Rate plus five (5) percentage points; provided, however, that for so long as this Note is an asset of the trust, partnership, corporation or other entity formed in connection with a Securitization (as defined in the Mortgage) pursuant to which securities rated

2



by any Rating Agency (as defined in the Mortgage) have been issued, such term shall mean a rate per annum equal to the Initial Term Interest Rate plus two (2) percentage points.

(n)    The term "Excess Cash Flow" shall mean, for any period, the sum (determined in accordance with generally accepted accounting principles, consistently applied) of (i) net operating income (calculated as all income derived from the operation of the Mortgaged Property after payment of taxes and expenses), plus (ii) depreciation and amortization (to the extent deducted in determining net operating income) for such period, plus (iii) disbursements from the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Base Leasing Escrow Fund (as defined in the Mortgage), the Cash Flow Leasing Escrow Fund or any other escrows or reserves approved by Payee or provided for under the Loan Documents, but, in each case, only to the extent disbursed to Maker and not applied to the payment of, or reimbursement for, taxes, insurance and other amounts for which such reserves were set aside, minus (x) actual payments of the regularly scheduled principal and interest payments (calculated at the Applicable Interest Rate, or at the Default Rate, if applicable) due and payable in accordance with this Note during an applicable period and other amounts paid under the Loan Documents to or for the benefit of Payee, minus (y) actual Capital Expenditures in excess of payments from the Replacement Escrow Fund, the Base Leasing Escrow Fund, the Cash Flow Leasing Escrow Fund and funding of reserves for working capital and Extraordinary Expenses as approved by Lender in its sole discretion, and minus (z) payments into the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Base Leasing Escrow Fund, the Cash Flow Leasing Escrow Fund and other reserves required under the Loan Documents.

(o)    The term "Extraordinary Expense" shall mean any extraordinary operating expense or capital expense not set forth in an Approved Annual Budget or allotted for in the Replacement Escrow Fund.

(p)    The term "Initial Term Interest Rate" shall mean a rate of Eight and Forty-Nine One-Hundredths percent (8.49%) per annum.

(q)    The term "Loan" shall mean that certain loan made by Payee to Maker contemporaneously herewith.

(r)    The term "Loan Documents" shall mean collectively this Note, the Mortgage, the Assignment of Leases and any and all other documents securing, evidencing, or guaranteeing all or any portion of the Loan or otherwise executed and/or delivered in connection with this Note and the Loan.

(s)    The term "Mortgage" shall mean that certain Mortgage, Assignment of Leases and Rents and Security Agreement of even date herewith in the amount of this Note given by Maker for the use and benefit of Payee covering the fee estate of Maker in certain premises as more particularly described therein.

(t)    The term "Net Capital Expenditures" shall mean, for any period the amount by which Capital Expenditures during such period exceeds reimbursements for such items during such period from any fund established pursuant to the Loan Documents.

3

(u)    The term "Treasury Rate" shall mean, as of the Anticipated Repayment Date, the yield, calculated by linear interpolation (rounded to the nearest one-thousandth of one percent (*i.e.*, 0.001%)) of the yields of noncallable United States Treasury obligations with terms (one longer and one shorter) most nearly approximating the period from the Anticipated Repayment Date to the Maturity Date, as determined by Payee (absent manifest error) on the basis of Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading U.S. Governmental Security/Treasury Constant Maturities, or if such publication or any successor publication shall cease to be published, such other recognized source of financial market information as shall be reasonably selected by Payee.

2.    This Note is evidence of the Loan and of the obligation of the Maker to repay the Loan in accordance with the terms hereof. This Note is secured, *inter alia*, by (a) the Mortgage, (b) an Assignment of Leases, and (c) the other Loan Documents.

3.    If any sum payable under this Note is not paid on or before the date which is three (3) days after the date on which it is due, Maker shall pay to Payee upon demand an amount equal to the lesser of three percent (3%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray a portion of the expenses incurred by Payee in handling and processing such delinquent payment and to compensate Payee for the loss of the use of such delinquent payment. If the day when any payment required under this Note is due is not a Business Day, then payment shall be due on the first Business Day thereafter.

4.    The Debt or any portion thereof, shall without notice become immediately due and payable at the option of Payee upon the happening of any Event of Default (as defined in the Mortgage). In the event that it should become necessary to employ counsel to collect or enforce the Debt or to protect or foreclose the security therefor upon the happening of any Event of Default, Maker also shall pay on demand all costs of collection incurred by Payee, including attorneys' fees and costs reasonably incurred for the services of counsel whether or not suit be brought.

5.    Maker does hereby agree that upon the occurrence of an Event of Default (including upon the failure of Maker to pay the Debt in full on the Maturity Date), Payee shall be entitled to receive and Maker shall pay interest on the entire unpaid principal sum and any other amounts due at the Default Rate.

6.    Maker hereby agrees that upon the occurrence of an Event of Default Maker shall pay to Payee on the eleventh day of each month while such Event of Default continues, an aggregate amount equal to the Excess Cash Flow for the prior month, such Excess Cash Flow to be applied by Payee to the payment of the Debt in such order as Payee shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal. Interest at the Default Rate and Excess Cash Flow shall both be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt. Interest at the Default Rate shall be added to the Debt and shall be secured by the Mortgage. This paragraph, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Payee by reason of the occurrence of any Event of Default; the acceptance of any payment of



Excess Cash Flow shall not be deemed to cure or constitute a waiver of any Event of Default; and Payee retains its rights under this Note to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default despite any payment of Excess Cash Flow.

7.     This Note may not be prepaid prior to the Anticipated Repayment Date; provided, however, Maker shall have the right and option to release the Mortgaged Property from the lien of the Mortgage in accordance with the terms and provisions of the Defeasance Option. Notwithstanding the foregoing sentence, Maker shall have the privilege to prepay the entire principal balance of this Note and any other amounts outstanding on any Payment Date and upon not less than fifteen (15) days prior to written notice from Maker to Payee during the six (6) months preceding the Anticipated Repayment Date without payment of the Yield Maintenance Premium (as defined in the Mortgage) or any other premium or penalty or defeasance. Any prepayment prior to the Anticipated Repayment Date on a date other than a Payment Date shall, in any event, include interest through the following Payment Date. In addition, on the Anticipated Repayment Date or on any Payment Date thereafter, the Maker may, at its option and upon thirty (30) days prior written notice from Maker to Payee, prepay in whole or in part, in $100,000 increments only, the outstanding principal balance of this Note and any other amounts outstanding without payment of the Yield Maintenance Premium or any other premium or penalty. If prior to the Anticipated Repayment Date and following the occurrence of any Event of Default, Maker shall tender payment of an amount sufficient to satisfy the Debt at any time prior to a sale of the Mortgaged Property, either through foreclosure or the exercise of the other remedies available to Payee under the Mortgage, such tender by Maker shall be deemed to be voluntary and Maker shall pay, in addition to the Debt, the Yield Maintenance Premium, if any, that would be required under the Defeasance Option.

8.     (a)     From and after the date hereof, Maker shall cause all Rents (as defined in the Mortgage) to be deposited in the Clearing Account (as defined in the Cash Management Agreement). Commencing on the first day of each Collection Period (as defined in the Cash Management Agreement), all Rents deposited in the Cash Collateral Account (as defined in the Cash Management Agreement) shall be allocated in the following order of priority:

(i)     First, to fund the Tax and Insurance Impound Fund Account (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Tax and Insurance Impound Fund on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(ii)     Second, to fund the Monthly Debt Service Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Monthly Payment Amount;

(iii)     Third, to fund the Monthly Debt Service Subaccount with any other amounts due to the Payee under the Loan Documents not otherwise addressed by this Paragraph 8;

(iv)    Fourth, to fund the Replacement Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Replacement Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(v)    Fifth, to fund the Base Leasing Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Base Leasing Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(vi)    Sixth, to fund the Operating Expense Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Cash Expenses, other than management fees payable to affiliates of Maker for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(vii)    Seventh, to fund the Operating Expense Subaccount with any Net Capital Expenditures for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(viii)    Eighth, to fund the Operating Expense Subaccount with any Extra-ordinary Expenses approved by Payee for the month in which such Collection Period ends, if any;

(ix)    Ninth, to fund the Cash Flow Leasing Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is an amount equal to the Monthly Cash Flow Leasing Escrow Fund Amount (as such term in defined in paragraph (6)(c)(iii) of the Mortgage); and

(x)    Last, to fund the Borrower Remainder Sub-Account (as established pursuant to the Cash Management Agreement), any Rents remaining after making the foregoing payments.

Nothing in this Paragraph 8(a) shall limit, reduce or otherwise affect Maker's obligations to pay the Monthly Payment Amount, make payments to the Tax and Insurance Impound Fund, Base Leasing Escrow Fund, Replacement Escrow Fund or Cash Flow Leasing Escrow Fund due hereunder and pay other amounts due under the other Loan Documents, whether or not Rents are available to make such payments, provided, however, that Payee agrees to distribute amounts deposited in the Cash Collateral Account in the manner required pursuant to the terms of this Note, the Mortgage and the other Loan Documents. Maker represents and covenants that it will not make any distributions with respect to income for a given calendar month to its members or any of their affiliates during any month until the payments or deposits



specified in <u>subparagraph (i)</u> through <u>(ix)</u>, and any Cash Expenses for the Mortgaged Property (as defined in the Mortgage) then due have been made in full with respect to such month on a timely basis.

   (b)  For each fiscal year commencing after the date hereof, Maker shall submit to Payee for Payee's written approval an Annual Budget not later than sixty (60) days prior to the commencement of such fiscal year, in form satisfactory to Payee setting forth in reasonable detail budgeted monthly operating income and monthly operating capital and other expenses for the Mortgaged Property. From and after the earlier to occur of (i) an Event of Default or (ii) the Anticipated Repayment Date, each Annual Budget shall contain, among other things, limitations on management fees, third party service fees, and other expenses as the Maker may reasonably determine. Payee shall have the right to approve such Annual Budget, which approval shall not be unreasonably withheld (<u>provided, however</u>, that, prior to the earlier of (i) an Event of Default or (ii) the Anticipated Repayment Date, such approval shall be deemed given unless the monthly operating income remaining after application as set forth in <u>subparagraphs 8(a)(i)</u> through <u>8(a)(viii)</u> pursuant to such Annual Budget will not be sufficient at all times during the relevant fiscal year to fully fund the Monthly Cash Flow Leasing Escrow Fund Amount); and in the event that Payee objects to the proposed Annual Budget submitted by Maker, Payee shall advise Maker of such objections within fifteen (15) days after receipt thereof (and deliver to Maker a reasonably detailed description of such objections) and Maker shall within three (3) days after receipt of notice of any such objections revise such Annual Budget and resubmit the same to Payee. Payee shall advise Maker of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Maker a reasonably detailed description of such objections) and Maker shall revise the same in accordance with the process described in this subparagraph until the Payee approves an Annual Budget, provided, however, that if Payee shall not advise Maker of its objections to any proposed Annual Budget within the applicable time period set forth in this <u>Paragraph 8(b)</u>, then such proposed Annual Budget shall be deemed approved by Payee. Until such time that Payee approves or is deemed to approve a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in real estate taxes, insurance premiums and utilities expenses.

   9.  In the event that Maker does not pay the Debt in full prior to the Anticipated Repayment Date, the provisions of <u>Paragraph 8</u> as set forth above shall remain in full force and effect, and the following subparagraphs also shall apply:

   (a)  From and after the Anticipated Repayment Date, interest shall accrue on the unpaid principal balance from time to time outstanding on this Note at the Extended Term Rate. Interest accrued at the Extended Term Rate and not paid pursuant to this <u>Paragraph 9</u> shall be deferred and added to the Debt and shall earn interest at the Extended Term Rate to the extent permitted by applicable law (such accrued interest is hereinafter defined as "<u>Accrued Interest</u>"). All of the Debt, including any Accrued Interest, shall be due and payable on the Maturity Date.

   (b)  All Rents deposited in the Cash Collateral Account during each Collection Period shall be allocated in the following order of priority, in each case to the extent sufficient funds remain therefor:

7



(i)    First, to fund the Tax and Insurance Impound Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Tax and Insurance Impound Fund on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(ii)    Second, to fund the Monthly Debt Service Subaccount until the amount on deposit therein is equal to the Monthly Payment Amount (to be applied first to the payment of interest computed at the Initial Term Interest Rate with the remainder applied to the reduction of the outstanding principal balance of this Note);

(iii)    Third, to fund the Monthly Debt Service Subaccount with any other amounts due to the Payee under the Loan Documents and not otherwise addressed by this Paragraph 9;

(iv)    Fourth, to fund the Replacement Escrow Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Replacement Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(v)    Fifth, to fund the Base Leasing Escrow Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Base Leasing Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(vi)    Sixth, to fund the Operating Expense Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Cash Expenses, other than management fees payable to affiliates of Maker, for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(vii)    Seventh, to fund the Operating Expense Subaccount with any Net Capital Expenditures for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(viii)    Eighth, to fund the Operating Expense Subaccount with any Extraordinary Expenses approved by Payee for the month in which such Collection Period ends, if any;

(ix)    Ninth, to fund the Monthly Debt Service Subaccount with any amount equal to the remaining principal balance of this Note, to be applied against the outstanding principal due under this Note until such principal amount is paid in full;



(x)     Tenth, to fund the Monthly Debt Service Subaccount with any amount equal to any Accrued Interest, to be applied against the outstanding amount thereof until all such Accrued Interest has been repaid; and

(xi)     Last, to pay to Maker any excess amounts.

(c)     In the event that Maker must incur an Extraordinary Expense, then Maker shall promptly deliver to Payee a reasonably detailed explanation of such proposed Extraordinary Expense for the Payee's approval, which approval may be granted or denied in Payee's sole discretion.

(d)     Nothing in this Paragraph 9 shall limit, reduce or otherwise affect Maker's obligations to make payments of the Monthly Payment Amount, payments to the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Base Leasing Escrow Fund and the Cash Flow Leasing Escrow Fund due hereunder and under the other Loan Documents, whether or not Rents are available to make such payments; provided, however, that Payee agrees to distribute amounts deposited in the Cash Collateral Account in the manner required pursuant to the terms of this Note, the Mortgage and the other Loan Documents. Maker represents and covenants that it will not make any distributions with respect to income for a given calendar month to its members or any of their affiliates during any month until the payments or deposits specified in subparagraph (i) through (x), and any operating expenses then due for the Mortgaged Property (as defined in the Mortgage) have been made in full with respect to such month on a timely basis.

10.     It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Payee to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this paragraph (and the similar paragraph contained in the Mortgage) shall control every other covenant and agreement in this Note and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Debt, or if Payee's exercise of the option to accelerate the Maturity Date, or if any prepayment or the exercise of any Defeasance Option by Maker results in Maker having paid any interest in excess of that permitted by applicable law, then it is Payee's express intent that all excess amounts theretofore collected by Payee shall be credited on the principal balance of this Note and all other Debt and the provisions of this Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. In connection with the foregoing, all sums paid or agreed to be paid to Payee for the use, forbearance, or retention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Debt until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the

9



intention of Payee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

11.    This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought. Whenever used, the singular number shall include the plural, the plural the singular, and the words "Payee" and "Maker" shall include their respective successors, assigns, heirs, executors and administrators. If Maker consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

12.    Maker and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration (except as may be expressly provided for herein or in the other Loan Documents). No release of any security for the Debt or any person liable for payment of the Debt, no extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of the Loan Documents made by agreement between Payee and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Maker, and any other person or party who may become liable under the Loan Documents for the payment of all or any part of the Debt.

13.    Subject to the qualifications below, Payee shall not enforce the liability and obligation of Maker or its constituent members, partners, shareholders, directors, employees or agents to perform and observe the obligations contained in this Note, the Mortgage or the other Loan Documents by any legal, equitable or other action or proceeding wherein a judgment shall be sought against Maker or its constituent members, partners, shareholders, directors, employees or agents, except that Payee may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Payee to enforce and realize upon its interest under this Note, the Mortgage and the other Loan Documents, or in the Mortgaged Property, the Rents, or any other collateral given to Payee pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Maker only to the extent of Maker's interest in the Mortgaged Property, in the Rents and in any other collateral given to Payee, and Payee, by accepting this Note, the Mortgage and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Maker in any such action or proceeding under or by reason of or under or in connection with this Note, the Mortgage or the other Loan Documents. The provisions of this paragraph shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Payee to name Maker as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of the Payee thereunder; (d) impair the right of Payee to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; or (f) constitute a waiver of the right of Payee to enforce the liability and obligation of Maker, by money judgment or otherwise, to the extent of

10



any loss, damage, cost, expense, liability, claim or other obligation incurred by Payee including attorneys' fees and costs reasonably incurred, but in all events excluding, however, all consequential damages, arising out of or in connection with the following:

(i)     fraud or intentional misrepresentation by Maker or any guarantor in connection with the Loan;

(ii)    intentional physical waste of the Mortgaged Property;

(iii)   the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substance Indemnification Agreement of even date herewith given by Maker to Payee or in the Mortgage concerning environmental laws, hazardous substances or asbestos;

(iv)   the removal or disposal of any portion of the Mortgaged Property after an Event of Default;

(v)    the misapplication or conversion by Maker of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Mortgaged Property, (B) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, (C) any Rents following an Event of Default, or (D) any Rents paid more than one month in advance;

(vi)   failure to pay charges for labor or materials requested by Maker or to pay or escrow taxes (in accordance with Paragraph 6 of the Mortgage) or to pay other charges that can create liens on any portion of the Mortgaged Property; and

(vii)  any security deposits collected with respect to the Mortgaged Property which are not delivered to Payee upon a foreclosure of the Mortgaged Property or other action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Mortgage) prior to the occurrence of the Event of Default that gave rise to such sale or foreclosure or action in lieu thereof.

Notwithstanding anything to the contrary in this Note or any of the Loan Documents, (A) Payee shall not be deemed to have waived any right which Payee may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Payee in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Maker in the event that: (i) the first full monthly payment of principal and interest under this Note is not paid when due; (ii) Maker intentionally fails to maintain its status as a single purpose entity, as required by, and in accordance with the terms and provisions

11



of, the Mortgage; (iii) Maker fails to obtain Payee's prior written consent before granting any subordinate financing or other voluntary lien encumbering the Mortgaged Property; (iv) Maker fails to obtain Payee's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by <u>Section 10</u> of the Mortgage or (v), or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Maker or if any proceeding for the dissolution or liquidation of Maker shall be instituted by Maker or any guarantor.

14.    Maker (and the undersigned representative of Maker, if any) represents that Maker has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Note, the Mortgage and the other Loan Documents and that this Note, the Mortgage and the other Loan Documents constitute valid and binding obligations of Maker.

15.    All notices or other communications required or permitted to be given pursuant hereto shall be given in the manner specified in the Mortgage directed to the parties at their respective addresses as provided therein.

16.    EACH OF MAKER AND PAYEE HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF MAKER AND PAYEE, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF MAKER AND PAYEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF SUCH WAIVER.

17.    This Note shall be governed by and construed in accordance with the laws of the State in which the Mortgaged Property is located and the applicable laws of the United States of America.

SRZNY\611471v7



Maker has duly executed this Note the day and year first above written.

MAKER:

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By:  Blue Hills Management Corp.,
     a Massachusetts corporation
     its manager


By:  _Gerald S. Fineberg_
     Gerald S. Fineberg
     President


Pay to the order of _____,
without recourse.

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC,
   a Delaware limited liability company


By: _____
      Name:
      Title:

SRZNY\611471v3

# BARNETT AFFIDAVIT EXHIBIT D

742235

# GUARANTY

This GUARANTY ("**Guaranty**") is executed as of September 14, 1999, by GERALD S. FINEBERG, individually and WILLIAM J. LANGELIER, individually (whether one or more collectively referred to as "**Guarantor**"), for the benefit of Credit Suisse First Boston Mortgage Capital LLC, a Delaware limited liability company ("**Lender**").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Mortgage Note, dated of even date herewith, executed by BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company ("**Borrower**"), and payable to the order of Lender in the original principal amount of $33,149,000.00 (together with all renewals, modifications, increases and extensions thereof, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") which is secured by the lien and security interest of a Mortgage, Assignment of Leases and Rents and Security Agreement, of even date herewith (the "**Mortgage**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (together with the Note and Mortgage, the "**Loan Documents**"); and

WHEREAS, Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower, and to extend such additional credit as Lender may from time to time agree to extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

1.1     **Guaranty of Obligation.**  Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

1.2     **Definition of Guaranteed Obligations.**  As used herein, the term "**Guaranteed Obligations**" means the obligations or liabilities of Borrower to Lender for any

loss, damage, cost, expense, liability, claim or other obligation incurred by Lender, including attorneys' fees and costs reasonably incurred, but in all events excluding, however, all consequential damages, which arise (i) prior to the release of the Mortgaged Property (as defined in the Mortgage) from the lien of the Mortgage and the other Loan Documents in accordance with <u>Section 55</u> of the Mortgage, or (ii) prior to a sale or transfer of the Mortgaged Property consented to by Lender arising out of or in connection with the following:

(a)     fraud or intentional misrepresentation by Borrower or Guarantor in connection with the Loan;

(b)     intentional physical waste of the Mortgaged Property (as defined in the Mortgage);

(c)     the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substances Indemnification Agreement of even date herewith given by Borrower to Lender or in the Mortgage concerning environmental laws, hazardous substances or asbestos;

(d)     the removal or disposal of any portion of the Mortgaged Property after an Event of Default (as defined in the Mortgage);

(e)     the misapplication or conversion by Borrower of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Mortgaged Property, (ii) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, (iii) any Rents (as defined in the Mortgage) following an Event of Default, and (iv) any Rents paid more than one month in advance;

(f)     failure to pay charges for labor or materials requested by Borrower or Guarantor or to pay or escrow taxes (in accordance with <u>Paragraph 6</u> of the Mortgage) or to pay other charges that can create liens on any portion of the Mortgaged Property; and

(g)     any security deposits collected with respect to the Mortgaged Property which are not delivered to Lender upon a foreclosure of the Mortgaged Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Mortgage) prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof.

Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (ii) Guarantor shall be liable for the full amount of the Debt in the event that (A) the first full monthly payment of principal and interest on the Note is not paid when due; (B) Borrower fails to maintain its status as a single purpose entity, as required by, and in accordance with, the Mortgage; (C) Borrower fails to obtain Lender's prior written consent to any subordinate

2

financing or other voluntary lien encumbering the Mortgaged Property; (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by <u>Section 10</u> of the Mortgage; or (E) if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Borrower or Guarantor or if any proceeding for the dissolution or liquidation of Borrower or Guarantor shall be instituted by Borrower or Guarantor.

1.3    **Nature of Guaranty.**  This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection.  This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs).  The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations.  This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

1.4    **Guaranteed Obligations Not Reduced by Offset.**  The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

1.5    **Payment By Guarantor.**  If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein.  Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations.  Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

1.6    **No Duty To Pursue Others.**  It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which

3

shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

1.7     **Waivers.**  Guarantor agrees to the provisions of the Loan Documents, and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Mortgage or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Mortgaged Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

1.8     **Payment of Expenses.**  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.  The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

1.9     **Effect of Bankruptcy.**  In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect, and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

1.10     **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates, for so long as any sums due under the Loan Documents remain unpaid, any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

**1.11    Borrower.** The term "**Borrower**" as used herein shall include any new or successor corporation, association, partnership (general or limited), joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

# ARTICLE II

# EVENTS AND CIRCUMSTANCES NOT REDUCING
# OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

**2.1    Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the other Loan Documents, or any other document, instrument, contract or understanding between Borrower and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

**2.2    Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**2.3    Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor, or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor, or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4    Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations, or any part thereof, exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Mortgage or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations, or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Mortgage

5

or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

2.5    **Release of Obligors.**  Any full or partial release of the liability of Borrower on the Guaranteed Obligations, or any part thereof, or of any co-guarantors, or any other person or entity now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

2.6    **Other Collateral.**  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

2.7    **Release of Collateral.**  Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

2.8    **Care and Diligence.**  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

2.9    **Unenforceability.**  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

2.10    **Offset.**  The Note, the Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether

such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

    **2.11**   **Merger.** The reorganization, merger or consolidation of Borrower into or with any other corporation or entity.

    **2.12**   **Preference.** Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

    **2.13**   **Other Actions Taken or Omitted.** Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

    To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

    **3.1**   **Benefit.** Guarantor is an affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

    **3.2**   **Familiarity and Reliance.** Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

    **3.3**   **No Representation By Lender.** Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce the Guarantor to execute this Guaranty.

    **3.4**   **Guarantor's Financial Condition.** As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

**3.5    Legality.**  The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, Mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor.  This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

**3.6    Survival.**  All representations and warranties made by Guarantor herein shall survive the execution hereof.

## ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

**4.1    Subordination of All Guarantor Claims.**  As used herein, the term "**Guarantor Claims**" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  Upon the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

**4.2    Claims in Bankruptcy.**  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application upon the Guaranteed Obligations, any such dividend or payment which is otherwise payable to Guarantor, and which, as between Borrower and Guarantor, shall constitute a credit upon the Guarantor Claims, then upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which

8

would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3    Payments Held in Trust.** In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4    Liens Subordinate.** Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, Mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

## ARTICLE V

## MISCELLANEOUS

**5.1    Waiver.** No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2    Notices.** All notices given hereunder shall be in writing and shall be either hand delivered or mailed, by registered U.S. mail, Return Receipt Requested, first class postage prepaid, to the parties at their respective addresses below or at such other address for any party as such party may designate by notice to the other parties hereto:

9

To Borrower:
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, MA 02481
Attn: Gerald Fineberg

To Lender:

Credit Suisse First Boston Mortgage Capital LLC
Principal Transactions Group
11 Madison Avenue
New York, New York 10010
Attention: Asset Management
Re: Blue Hills Office
    Park/Joseph Rubino
Telecopier: (212) 325-8164

with copies to:

Credit Suisse First Boston Mortgage Capital LLC
Legal and Compliance Department
11 Madison Avenue
New York, New York 10010
Attention: Colleen Graham, Esq.
Re: Blue Hills Office
    Park/Joseph Rubino
Telecopier: (212) 325-8220

ORIX Real Estate Capital Markets, LLC
1717 Main Street
Dallas, TX 75201
Attn: John Lloyd
Telecopier: (214) 237-2038

or any other servicer of the Loan

To Guarantor:

GERALD S. FINEBERG
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, MA 02481

10

and

WILLIAM J. LANGELIER
c/o The Langelier Company
2045 Jackson Street
Suite 501
San Francisco, CA  94109

with copies to:

Bernkopf, Goodman & Baseman LLP
125 Summer Street
Boston, Massachusetts  02110-1621
Attention:  David Doyle, Esq.
Telecopier:  (617) 790-3300

and to:

Hale and Dorr
60 State Street
Boston, Massachusetts  02109
Attn:  Andrew H. Cohen, Esq.
Telecopier:  (617) 526-5000

      **5.3**    <u>Governing Law</u>.  This Guaranty shall be governed by and construed in accordance with the laws of the State in which the real property encumbered by the Mortgage is located and the applicable laws of the United States of America.

      **5.4**    <u>Invalid Provisions</u>.  If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

      **5.5**    <u>Amendments</u>.  This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

      **5.6**    <u>Parties Bound; Assignment; Joint and Several</u>.  This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder.  If Guarantor

SRZNY\611506v7

consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

  **5.7**   **Headings.** Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

  **5.8**   **Recitals.** The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

  **5.9**   **Counterparts.** To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

  **5.10**   **Rights and Remedies.** If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

  **5.11**   **Other Defined Terms.** Any capitalized term utilized herein shall have the meaning as specified in the Mortgage, unless such term is otherwise specifically defined herein.

  **5.12**   **Entirety.** THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.

**5.13    Waiver of Right To Trial By Jury.  GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.**

    **5.14    Cooperation.**  Guarantor acknowledges that Lender and its successors and assigns may (i) sell this Guaranty, the Note and other Loan Documents to one or more investors as a whole loan, (ii) participate the Loan secured by this Guaranty to one or more investors, (iii) deposit this Guaranty, the Note and other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets, or (iv) otherwise sell the Loan or interest therein to investors (the transactions referred to in clauses (i) through (iv) are hereinafter each referred to as "**Secondary Market Transaction**").  Guarantor shall reasonably cooperate with Lender in effecting any such Secondary Market Transaction and shall reasonably cooperate to implement all requirements imposed by any Rating Agency (as defined in the Mortgage) involved in any Secondary Market Transaction, provided, however, that Guarantor's cooperation shall not increase the Guaranteed Obligations or cause the Guarantor to incur any material costs.

    In addition, Guarantor shall make available to Lender all information concerning its business and operations that Lender may reasonably request.  Lender shall be permitted to share all such information with the investment banking firms, Rating Agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan and the Loan Documents or the applicable Secondary Market Transaction.  It is understood that the information provided by Guarantor to Lender may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various investors may also see some or all of the information.  Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Guarantor in the form as provided by Guarantor.  Lender may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

    **5.15    Reinstatement in Certain Circumstances.**  If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

[No Further Text on this Page; Signature Page Follows]

SRZNY\611506v7

EXECUTED as of the day and year first above written.

GUARANTOR:

GERALD S. FINEBERG, individually

WILLIAM J. LANGELIER, individually

EXECUTED as of the day and year first above written.

GUARANTOR:

_____

GERALD S. FINEBERG, individually

_____

WILLIAM J. LANGELIER, individually

# BARNETT AFFIDAVIT EXHIBIT E

# EXCERPTED MATERIALS

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>　　　Plaintiff/Defendant-in-<br>　　　Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>　　　Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>　　　Defendant/Plaintiff-in-<br>　　　Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>　　　Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**BLUE HILLS OFFICE PARK LLC'S RESPONSES TO DEFENDANTS'
FIRST SET OF REQUESTS FOR ADMISSIONS**

Blue Hills Office Park LLC hereby responds to the First Request for Admissions of the

Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston

Mortgage Security Corp. ("CS Bank") as follows:

## REQUEST NO. 1

The claims asserted by Blue Hills in the Zoning Appeal are "claims . . . [or] causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon" and thus are Mortgaged Property under the Mortgage Agreement.

## RESPONSE NO. 1

Blue Hills denies the allegations contained in Request No. 1.

## REQUEST NO. 2

Blue Hills' settlement of the Zoning Appeal was an assignment, transfer, sale or encumbrance of Mortgage Property.

## RESPONSE NO. 2

Blue Hills denies the allegations contained in Request No. 2.

## REQUEST NO. 3

Blue Hills settled the Zoning Appeal without prior notification to or consent of its mortgagee.

## RESPONSE NO. 3

Blue Hills admits the allegations contained in Request No. 3. Blue Hills further answers

that it had no obligation to notify or obtain the consent of its mortgagee.

## REQUEST NO. 4

Prior to the filing of Lender's Counterclaim in this action, Blue Hills never informed its mortgagee or Wells Fargo or LNR Partners about the Zoning Appeal, the Settlement, or the Payment.

## RESPONSE NO. 4

Blue Hills admits the allegations contained in Request No. 4. Blue Hills further answers

that it had no obligation to inform its mortgagee, Wells Fargo or LNR Partners.

## REQUEST NO. 5

Blue Hills' settlement of the Zoning Appeal was an Event of Default under ¶ 23(d) of the Mortgage Agreement.

## RESPONSE NO. 5

Blue Hills denies the allegations contained in Request No. 5.

## REQUEST NO. 6

Because of the Event of Default referred to in Request for Admission No. 5, Blue Hills was not entitled to any disbursement from the Leasing Escrow Funds in August or September 2004.

## RESPONSE NO. 6

Blue Hills denies the allegations contained in Request No. 6.

## REQUEST NO. 7

Under ¶ 6(c)(ix) of the Mortgage Agreement, Leasing Escrow Funds may not be disbursed and applied to the payment of monthly principal and interest (a) when an Event of Default has occurred and its continuing as of the date of the request for such disbursement, or (b) when an Event of Default has occurred and is continuing as of the Interim Reduction Date.

## RESPONSE NO. 7

Blue Hills objects to Request No. 7 to the extent it is an improper summary or

interpretation of ¶ 6(c)(ix) of the Mortgage Agreement.  Without waiving that objection, Blue

Hills admits that ¶ 6(c)(ix) of the Mortgage Agreement speaks for itself.

## REQUEST NO. 8

The "cash flow sub-account" referred to in Exhibits G and I to the First Amended

3

Complaint is the "Leasing Escrow Funds" referred to in ¶ 6(c)(ix) of the Mortgage Agreement.

## RESPONSE NO. 8

Blue Hills objects to Request No. 8 to the extent it is vague and ambiguous with respect to the accounts referenced and improperly characterizes and takes out of context language contained in the documents attached as Exhibits G and I to the First Amended Complaint. Blue Hills further answers that it impossible to admit or deny the allegations contained in Request No. 8 because, *inter alia*, the various loan documents and cash management agreement at issue in this litigation as well as the communications between the Lender and/or its agents and Blue Hills refer to various accounts and define those accounts by various terms.

## REQUEST NO. 9

Prior to its letter dated August 2, 2004, Blue Hills never sent a written request to its mortgagee or Wells Fargo or LNR Partners for a disbursement from the Leasing Escrow Funds, as defined in the Mortgage Agreement, to pay principal or interest on the Loan.

## RESPONSE NO. 9

Blue Hills admits the allegations contained in Request No. 9.

## REQUEST NO. 10

Blue Hills never made the "Replacement Escrow Fund" payment contemplated by ¶ 6(b) of the Mortgage Agreement that was due on August 11, 2004.

## RESPONSE NO. 10

Blue Hills denies the allegations contained in Request No. 10. Blue Hills further answers that, to the extent due, it could not make any payment on August 11, 2004 because the Lender and/or its agents improperly defaulted Blue Hills and refused to release funds from the cash reserves to make the contemplated payment.

4

**REQUEST NO. 11**

Blue Hills never made the "Base Leasing Escrow Fund" payment contemplated by ¶ 6(c) of the Mortgage Agreement that was due on August 11, 2004.

**RESPONSE NO. 11**

Blue Hills denies the allegations contained in Request No. 11. Blue Hills further answers that, to the extent due, it could not make the payment on August 11, 2004 because the Lender and/or its agents improperly defaulted Blue Hills and refused to release funds from the cash reserves to make the contemplated payment.

**REQUEST NO. 12**

Attached hereto as Exhibit A is a true and correct copy of the Guaranty dated September 14, 1999 and signed by Gerald Fineberg and William Langelier, which is a valid and enforceable instrument.

**RESPONSE NO. 12**

Blue Hills admits that the Guaranty attached as Exhibit A is a true and correct copy except for the notation on the upper right corner of the first page. Blue Hills objects to the remaining allegations contained in Request No. 12 as they call for a legal conclusion as to the validity and enforceability of the Guaranty.

**REQUEST NO. 13**

Blue Hills requested that its mortgagee not escrow funds for property tax payments for the Property.

**RESPONSE NO. 13**

Blue Hills objects to Request No. 13 as it is vague and ambiguous with respect to "escrow funds." In light of various communications and references by the Lender and/or its agents to tax escrow accounts and/or tax escrow balances, Defendants' request is not clear. Blue

Signed under the pains and penalties of perjury this 28 day of _October_, 2005.

Blue Hills Office Park LLC

By: _Gerald Fineberg_

Gerald Fineberg, President of
Blue Hills Management Corp.,
Manager of Blue Hills Office Park
LLC,   duly authorized

AS TO OBJECTIONS:

BLUE HILLS OFFICE PARK LLC,
By its attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: Nov 11, 2005
#322801 v1/14500/9985

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was
served upon (each party appearing pro se and) the attorney of record for
each other party by mail (by hand) Nov 11, 2005

7

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-<br>    Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>    Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-<br>    Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>    Defendants-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. 05-CV-10506 (WGY) |

## GERALD FINEBERG'S RESPONSES TO DEFENDANTS' FIRST SET OF
## <u>REQUESTS FOR ADMISSIONS</u>

Gerald Fineberg ("Fineberg") hereby responds to the First Request for Admissions of the

Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston

Mortgage Security Corp. ("CS Bank") as follows:

## REQUEST NO. 1

The claims asserted by Blue Hills in the Zoning Appeal are "claims . . . [or] causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon" and thus are Mortgaged Property under the Mortgage Agreement.

## RESPONSE NO. 1

Fineberg denies the allegations contained in Request No. 1.

## REQUEST NO. 2

Blue Hills' settlement of the Zoning Appeal was an assignment, transfer, sale or encumbrance of Mortgage Property.

## RESPONSE NO. 2

Fineberg denies the allegations contained in Request No. 2.

## REQUEST NO. 3

Blue Hills settled the Zoning Appeal without prior notification to or consent of its mortgagee.

## RESPONSE NO. 3

Fineberg admits the allegations contained in Request No. 3. Fineberg further answers

that Blue Hills had no obligation to notify or obtain the consent of its mortgagee.

## REQUEST NO. 4

Prior to the filing of Lender's Counterclaim in this action, Blue Hills never informed its mortgagee or Wells Fargo or LNR Partners about the Zoning Appeal, the Settlement, or the Payment.

## RESPONSE NO. 4

Fineberg admits the allegations contained in Request No. 4. Fineberg further answers

2

that Blue Hills had no obligation to inform its mortgagee, Wells Fargo or LNR Partners.

## REQUEST NO. 5

Blue Hills' settlement of the Zoning Appeal was an Event of Default under ¶ 23(d) of the Mortgage Agreement.

## RESPONSE NO. 5

Fineberg denies the allegations contained in Request No. 5.

## REQUEST NO. 6

Because of the Event of Default referred to in Request for Admission No. 5, Blue Hills was not entitled to any disbursement from the Leasing Escrow Funds in August or September 2004.

## RESPONSE NO. 6

Fineberg denies the allegations contained in Request No. 6.

## REQUEST NO. 7

Under ¶ 6(c)(ix) of the Mortgage Agreement, Leasing Escrow Funds may not be disbursed and applied to the payment of monthly principal and interest (a) when an Event of Default has occurred and its continuing as of the date of the request for such disbursement, or (b) when an Event of Default has occurred and is continuing as of the Interim Reduction Date.

## RESPONSE NO. 7

Fineberg objects to Request No. 7 to the extent it is an improper summary or

interpretation of ¶ 6(c)(ix) of the Mortgage Agreement.  Without waiving that objection,

Fineberg admits that ¶ 6(c)(ix) of the Mortgage Agreement speaks for itself.

## REQUEST NO. 8

The "cash flow sub-account" referred to in Exhibits G and I to the First Amended

Complaint is the "Leasing Escrow Funds" referred to in ¶ 6(c)(ix) of the Mortgage Agreement.

## RESPONSE NO. 8

Fineberg objects to Request No. 8 to the extent it is vague and ambiguous with respect to the accounts referenced and improperly characterizes and takes out of context language contained in the documents attached as Exhibits G and I to the First Amended Complaint. Fineberg further answers that it impossible to admit or deny the allegations contained in Request No. 8 because, *inter alia*, the various loan documents and cash management agreement at issue in this litigation as well as the communications between the Lender and/or its agents and Blue Hills refer to various accounts and define those accounts by various terms.

## REQUEST NO. 9

Prior to its letter dated August 2, 2004, Blue Hills never sent a written request to its mortgagee or Wells Fargo or LNR Partners for a disbursement from the Leasing Escrow Funds, as defined in the Mortgage Agreement, to pay principal or interest on the Loan.

## RESPONSE NO. 9

Fineberg admits the allegations contained in Request No. 9.

## REQUEST NO. 10

Blue Hills never made the "Replacement Escrow Fund" payment contemplated by ¶ 6(b) of the Mortgage Agreement that was due on August 11, 2004.

## RESPONSE NO. 10

Fineberg denies the allegations contained in Request No. 10.  Fineberg further answers that, to the extent due, Blue Hills could not make any payment on August 11, 2004 because the Lender and/or its agents improperly defaulted Blue Hills and refused to release funds from the cash reserves to make the contemplated payment.

4

## REQUEST NO. 11

Blue Hills never made the "Base Leasing Escrow Fund" payment contemplated by ¶ 6(c) of the Mortgage Agreement that was due on August 11, 2004.

## RESPONSE NO. 11

Fineberg denies the allegations contained in Request No. 11. Fineberg further answers that, to the extent due, Blue Hills could not make the payment on August 11, 2004 because the Lender and/or its agents improperly defaulted Blue Hills and refused to release funds from the cash reserves to make the contemplated payment.

## REQUEST NO. 12

Attached hereto as Exhibit A is a true and correct copy of the Guaranty dated September 14, 1999 and signed by Gerald Fineberg and William Langelier, which is a valid and enforceable instrument.

## RESPONSE NO. 12

Fineberg admits that the Guaranty attached as Exhibit A is a true and correct copy except for the notation on the upper right corner of the first page. Fineberg objects to the remaining allegations contained in Request No. 12 as they call for a legal conclusion as to the validity and enforceability of the Guaranty.

## REQUEST NO. 13

Blue Hills requested that its mortgagee not escrow funds for property tax payments for the Property.

## RESPONSE NO. 13

Fineberg objects to Request No. 13 as it is vague and ambiguous with respect to "escrow funds." In light of various communications and references by the Lender and/or its agents to tax escrow accounts and/or tax escrow balances, Defendants' request is not clear. Finberg further

5

Signed under the pains and penalties of perjury this 28 day of October , 2005.

Gerald Fineberg

AS TO OBJECTIONS:

Defendants-in-Counterclaim,
BLUE HILLS OFFICE PARK LLC,
WILLIAM LANGELIER and GERALD
FINEBERG
By their attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated:
#323115 v1/14500/9985

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon (each party appearing pro se and) the attorney of record for
each other party by mail (by hand) Nov 11, 2005

7

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>      Plaintiff/Defendant-in-<br>      Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>      Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>      Defendant/Plaintiff-in-<br>      Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>      Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## WILLIAM LANGELIER'S RESPONSES TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS

William Langelier ("Langelier") hereby responds to the First Request for Admissions of the Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston Mortgage Security Corp. ("CS Bank") as follows:

**REQUEST NO. 1**

The claims asserted by Blue Hills in the Zoning Appeal are "claims . . . [or] causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon" and thus are Mortgaged Property under the Mortgage Agreement.

**RESPONSE NO. 1**

Langelier denies the allegations contained in Request No. 1.

**REQUEST NO. 2**

Blue Hills' settlement of the Zoning Appeal was an assignment, transfer, sale or encumbrance of Mortgage Property.

**RESPONSE NO. 2**

Langelier denies the allegations contained in Request No. 2.

**REQUEST NO. 3**

Blue Hills settled the Zoning Appeal without prior notification to or consent of its mortgagee.

**RESPONSE NO. 3**

Langelier admits the allegations contained in Request No. 3. Langelier further answers

that Blue Hills had no obligation to notify or obtain the consent of its mortgagee.

**REQUEST NO. 4**

Prior to the filing of Lender's Counterclaim in this action, Blue Hills never informed its mortgagee or Wells Fargo or LNR Partners about the Zoning Appeal, the Settlement, or the Payment.

**RESPONSE NO. 4**

Langelier admits the allegations contained in Request No. 4. Langelier further answers

2

that Blue Hills had no obligation to inform its mortgagee, Wells Fargo or LNR Partners.

## REQUEST NO. 5

Blue Hills' settlement of the Zoning Appeal was an Event of Default under ¶ 23(d) of the Mortgage Agreement.

## RESPONSE NO. 5

Langelier denies the allegations contained in Request No. 5.

## REQUEST NO. 6

Because of the Event of Default referred to in Request for Admission No. 5, Blue Hills was not entitled to any disbursement from the Leasing Escrow Funds in August or September 2004.

## RESPONSE NO. 6

Langelier denies the allegations contained in Request No. 6.

## REQUEST NO. 7

Under ¶ 6(c)(ix) of the Mortgage Agreement, Leasing Escrow Funds may not be disbursed and applied to the payment of monthly principal and interest (a) when an Event of Default has occurred and its continuing as of the date of the request for such disbursement, or (b) when an Event of Default has occurred and is continuing as of the Interim Reduction Date.

## RESPONSE NO. 7

Langelier objects to Request No. 7 to the extent it is an improper summary or

interpretation of ¶ 6(c)(ix) of the Mortgage Agreement.  Without waiving that objection,

Langelier admits that ¶ 6(c)(ix) of the Mortgage Agreement speaks for itself.

## REQUEST NO. 8

The "cash flow sub-account" referred to in Exhibits G and I to the First Amended

3

Complaint is the "Leasing Escrow Funds" referred to in ¶ 6(c)(ix) of the Mortgage Agreement.

## RESPONSE NO. 8

Langelier objects to Request No. 8 to the extent it is vague and ambiguous with respect to the accounts referenced and improperly characterizes and takes out of context language contained in the documents attached as Exhibits G and I to the First Amended Complaint. Langelier further answers that it impossible to admit or deny the allegations contained in Request No. 8 because, *inter alia*, the various loan documents and cash management agreement at issue in this litigation as well as the communications between the Lender and/or its agents and Blue Hills refer to various accounts and define those accounts by various terms.

## REQUEST NO. 9

Prior to its letter dated August 2, 2004, Blue Hills never sent a written request to its mortgagee or Wells Fargo or LNR Partners for a disbursement from the Leasing Escrow Funds, as defined in the Mortgage Agreement, to pay principal or interest on the Loan.

## RESPONSE NO. 9

Langelier admits the allegations contained in Request No. 9.

## REQUEST NO. 10

Blue Hills never made the "Replacement Escrow Fund" payment contemplated by ¶ 6(b) of the Mortgage Agreement that was due on August 11, 2004.

## RESPONSE NO. 10

Langelier denies the allegations contained in Request No. 10. Langelier further answers that, to the extent due, Blue Hills could not make any payment on August 11, 2004 because the Lender and/or its agents improperly defaulted Blue Hills and refused to release funds from the cash reserves to make the contemplated payment.

4

**REQUEST NO. 11**

Blue Hills never made the "Base Leasing Escrow Fund" payment contemplated by ¶ 6(c) of the Mortgage Agreement that was due on August 11, 2004.

**RESPONSE NO. 11**

Langelier denies the allegations contained in Request No. 11.  Langelier further answers that, to the extent due, Blue Hills could not make the payment on August 11, 2004 because the Lender and/or its agents improperly defaulted Blue Hills and refused to release funds from the cash reserves to make the contemplated payment.

**REQUEST NO. 12**

Attached hereto as Exhibit A is a true and correct copy of the Guaranty dated September 14, 1999 and signed by Gerald Fineberg and William Langelier, which is a valid and enforceable instrument.

**RESPONSE NO. 12**

Langelier admits that the Guaranty attached as Exhibit A is a true and correct copy except for the notation on the upper right corner of the first page.  Langelier objects to the remaining allegations contained in Request No. 12 as they call for a legal conclusion as to the validity and enforceability of the Guaranty.

**REQUEST NO. 13**

Blue Hills requested that its mortgagee not escrow funds for property tax payments for the Property.

**RESPONSE NO. 13**

Langelier objects to Request No. 13 as it is vague and ambiguous with respect to "escrow funds."  In light of various communications and references by the Lender and/or its agents to tax escrow accounts and/or tax escrow balances, Defendants' request is not clear.  Langelier further

Signed under the pains and penalties of perjury this ___ day of October, 2005.

William Langelier

**AS TO OBJECTIONS:**

WILLIAM LANGELIER
By his attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: Nov 1/2005
#323111 v1/14500/9985

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail/by hand.

7

# BARNETT AFFIDAVIT EXHIBIT F

# EXCERPTED MATERIALS

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>     Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as<br>Trustee for the Registered Holders of<br>Credit Suisse First Boston Mortgage<br>Securities Corp., Commercial Mortgage<br>Pass-Through Certificates, Series 1999-C1,<br>     Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET,<br>LLC,<br>     Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>     Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## RESPONSE OF BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG TO DEFENDANTS' SECOND SET OF REQUESTS FOR ADMISSIONS

Blue Hills Office Park LLC ("Blue Hills"), William Langelier ("Langelier") and Gerald

Fineberg ("Fineberg") hereby responds to the Second Requests for Admissions of the Defendants

J.P. Morgan Chase Bank as Trustee for the Registered Holders of Credit Suisse First Boston

Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1

("J.P. Morgan") and CSFB 1999 - C1 Royall Street, LLC as follows:

## RESPONSES

### REQUEST NO. 1

At some point after the Payment was received by Blue Hills Office Park LLC, it was transferred, either in whole or in part, to individuals and/or entities other than Blue Hills Office Park LLC.

### RESPONSE NO. 1

Blue Hills, Fineberg and Langelier deny the allegations contained in Request No. 1.

### REQUEST NO. 2

An attorney representing Blue Hills attended the ZBA hearing held on May 1, 2003, concerning the application of Equiserve and National Development for a special permit to build a parking garage on the Blueview property.

### RESPONSE NO. 2

Blue Hills, Fineberg and Langelier admit the allegations contained in Request No. 2.

### REQUEST NO. 3

As of on or before May 1, 2003, Blue Hills knew that Equiserve had applied for a special permit to build a parking garage on the Blueview property.

### RESPONSE NO. 3

Blue Hills, Fineberg and Langelier admit that as of May 1, 2003 Blue Hills knew that

Equiserve had applied for a special permit to build a parking garage on the Blueview property.

### REQUEST NO. 4

The document attached hereto as Exhibit A is a true and correct copy of the Lease Termination Agreement entered into on August 5, 2003, between Equiserve and Blue Hills.

2

**RESPONSE NO. 12**

Blue Hills, Fineberg and Langelier admit that the document attached hereto as <u>Exhibit I</u> is a true copy of a letter dated April 28, 2004 that Blue Hills received from Wells Fargo. Blue Hills is unable to admit or deny the exact date that Blue Hills received <u>Exhibit I</u>.

**REQUEST NO. 13**

The document attached hereto as <u>Exhibit J</u> is a true and correct copy of a letter from Gilbert Stone, on behalf of Blue Hills, sent to Wells Fargo on or around April 28, 2004.

**RESPONSE NO. 13**

Blue Hills, Fineberg and Langelier admit the allegations contained in Request No. 13.

**REQUEST NO. 14**

The document attached hereto as <u>Exhibit K</u> is a true and correct copy of an e-mail (with attachment) from Donald Vaughan to Kenneth Goldberg, received by Mr. Goldberg (on behalf of Blue Hills) on or around July 18, 2003.

**RESPONSE NO. 14**

Blue Hills, Fineberg and Langelier deny that <u>Exhibit K</u> is an accurate copy of any e-mail received by Kenneth Goldberg, as it appears to contain handwritten notes. Further, Blue Hills, Fineberg and Langelier cannot admit or deny receipt of this e-mail as they do not have a copy of this e-mail in their possession, custody or control.

**REQUEST NO. 15**

The document attached hereto as <u>Exhibit L</u> is a true and correct copy of the ZBA Decision.

**RESPONSE NO. 15**

Blue Hills, Fineberg and Langelier admit that <u>Exhibit L</u> is a true and accurate copy of the ZBA Decision that Blue Hills obtained from the Town of Canton.

**REQUEST NO. 16**

The document attached hereto as <u>Exhibit M</u> is a true and correct copy of the settlement agreement (with all exhibits thereto) referenced at paragraph 29 of Lender's Counterclaim.

**RESPONSE NO. 16**

Blue Hills, Fineberg and Langelier admit that <u>Exhibit M</u> is a true and accurate copy of the Settlement Agreement entered into as of August 5, 2003 among Blue Hills, DST Realty, Inc. and Blueview Corporate Center LLC.  Blue Hills, Finberg and Langelier are unable to admit or deny Lender's intentions with respect to Paragraph 29 of its Counterclaim.

**REQUEST NO. 17**

The document attached hereto as <u>Exhibit N</u> is a true and correct copy of Blue Hills' release of Blueview LLC executed by Blue Hills  in connection with the Settlement.

**RESPONSE NO. 17**

Blue Hills, Fineberg and Langelier admit the allegations contained in Request No. 17.

**REQUEST NO. 18**

The document attached hereto as <u>Exhibit O</u> is a true and correct copy of a letter from Theodore Tye (on behalf of National Development) to Gary Lilienthal (on behalf of Blue Hills).

**RESPONSE NO. 18**

Blue Hills, Fineberg and Langelier admit the allegations contained in Request No. 18.

**REQUEST NO. 19**

The document attached hereto as <u>Exhibit P</u> is a true and correct copy of a letter, sent by e-mail, from Gary Lilienthal (on behalf of Blue Hills) to Robert Fishman.

**RESPONSE NO. 19**

Blue Hills, Fineberg and Langelier admit the allegations contained in Request No. 19.

Signed under the pains and penalties of perjury this 27th day of February, 2006.

_____
William Langelier

_____
Gerald Fineberg

Blue Hills Office Park LLC

By: _____
     Gerald Fineberg, President of
     Blue Hills Management Corp.,
     Manager of Blue Hills Office Park
     LLC,   duly authorized

AS TO OBJECTIONS:

_____
Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

#332361 v1/14500/9985

9

Signed under the pains and penalties of perjury this 27th day of ___February___, 2006.

_____
William Langelier

_Gerald Fineberg_
Gerald Fineberg


Blue Hills Office Park LLC

By: _Gerald Fineberg_
Gerald Fineberg, President of
Blue Hills Management Corp,
Manager of Blue Hills Office Park
LLC,   duly authorized


AS TO OBJECTIONS:

_Meredith A. Swisher_
Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: March 1, 2006
#332361 v1/14500/9985

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon (each party appearing pro se and) the attorney of record for
each other party by mail (by hand) e-mail March 1, 2006

_Meredith A. Swisher_

9

# BARNETT AFFIDAVIT EXHIBIT G

58

COMMONWEALTH OF MASSACHUSETTS

TOWN OF CANTON

ZONING BOARD OF APPEALS

PETITION OF BLUEVIEW CORPORATE CENTER LLC

CASE NO. 26-03-Mod/SPA-SP

DECISION

## I.    PETITION

BlueView Corporate Center LLC is seeking to construct a parking garage that will add a net total of 263 parking spaces at 250 Royall Street in Canton, Massachusetts. The site consists of approximately 10.76 acres of land. The vast majority of the property (9.76 acres) is located within the Limited Industrial Zoning District, with the balance of the site (approximately one acre) being located within the Single Residence AA Zoning District. All of the improvements to be constructed as part of this approval will occur within the Limited Industrial District.

On or about December 14, 2000, the Board of Appeals issued a special permit(s) and granted site plan approval relating to the construction of an approximately 188,950 square foot, first class office facility on the property. Since that time, all of the improvements shown on the approved site plan have been completed. The purpose of the zoning relief and approvals granted by this decision is to allow for the construction of the aforementioned parking garage which is to be built on a portion of the property.

BLUE HILL 1535

1

The Petitioner is seeking the following zoning approvals in connection with the project:

1.  An amendment to the previously approved Site Plan pursuant to Section 3.0 of the Zoning Bylaw; and

2.  A Special Permit pursuant to Section 2.15.2.C of the Zoning Bylaw to allow for the construction of the proposed garage within the Limited Industrial Zoning District.

## II. PUBLIC HEARING

A public hearing was held on this matter on Thursday, May 1, 2003 at 7:30 p.m. in the Hearing Room at Town Hall, 801 Washington Street, Canton, Massachusetts pursuant to a notice duly published in the Canton Citizen; posted in the Town Hall; and mailed to all "parties in interest" pursuant to M.G.L. c. 40A and the applicable Canton Bylaws. The public hearing was continued to May 22, 2003, at which meeting the Board voted to approve the requested relief.

Members of the Zoning Board of Appeals hearing the petition were Messrs. Paul B. Carroll, James F. Fitzgerald, Jr. and Gregory Pando.

Appearing on behalf of the Petitioners were Theodore R. Tye and Peter Carbone, Esquire of National Development; Steve Cesso, Esquire of EquiServe, Matt Goldstein of VHB, Inc. (civil engineer), Vinod Kalikiri of VHB, Inc. (traffic engineer), and Attorney Richard R. Staiti.

BLUE HILL 1536

## III.    DOCUMENTS PRESENTED

In addition to the application, the following written materials were submitted to the Board:

1.    Site Plans in seven (7) sheets entitled: "Site Plans, Special Permit & Site Plan Amendment, BlueView Corporate Center, Proposed Parking Structure, 250 Royall Street, Canton, Massachusetts," prepared by Vanasse, Hangen, Brustlin, Inc. dated April 9, 2000, latest revision dated May 18, 2003 (the "Amended Site Plan");

2.    Letter from the Canton Planning Board dated May 19, 2003 issuing a favorable recommendation, together with the supporting materials cited therein;

3.    Correspondence dated May 1, 2003 from the Canton Fire Chief, Timothy Ronayne;

4.    Correspondence from the Canton Assistant DPW Superintendent, Ronald Pasquarosa; and

5.    Correspondence dated May 7, 2003 from the Canton Police Chief, Chief Bright.

6.    Correspondence from "Friends of Little Blue", dated May 20, 2003.

7.    Memorandum in Support dated May 19, 2003 from National Development addressing the specific requirements of Sections 2.15.2.C and 3.04 of the Zoning Bylaw.

8.    Traffic Memorandum dated May 6, 2003 prepared by Vanasse Hangen Brustlin, Inc.

BLUE HILL 1537

## IV.    PRESENTATION AT PUBLIC HEARING

The Petitioner's attorney, Richard R. Staiti, made a written submission to the Board of Appeals with its application dated April 3, 2003 outlining the requested relief and indicating the manner in which the project satisfied the requirements for each form of relief.  The written submission, which also was orally summarized for the Board of Appeals at the Public Hearing, is entitled "Memorandum in Support of a Board of Appeals Application of National Development and EquiServe, Modification of Site Plan Approval, Special Permit (Use) and Variance (if necessary)."  Additionally, a Memorandum In Support was submitted to the Planning Board and Board of Appeals by National Development and EquiServe to further address concerns raised during the review process.   Said written materials are incorporated herein by reference and shall be referred to in the Board's Findings set forth in Section VI below.

## V. PLANNING BOARD REVIEW

Section 3.03 of the Zoning Bylaw states that "the Board of Appeals shall not take final action on a "Site Plan" until it has received a report thereon from the Planning Board, or until said Planning Board has allowed thirty-five (35) days to elapse after receipt of such Plan without submission of a report thereon."  At its meeting on May 19, 2003, the Planning Board voted unanimously to send a favorable recommendation to the Board of Appeals regarding the technical aspects of the Site Plan.  The Board's decision included several recommended conditions.

BLUE HILL 1538

## VI.  FINDINGS OF THE BOARD

After a review of all the data presented to the Board and its own review of the Zoning Bylaw, the Amended Site Plan, and the site itself, the Board makes the following findings:

1.      The site is located in a Limited Industrial District except for the residentially-zoned portion which will not be used for the construction of the proposed garage or for any commercial use.

2.      The proposed parking garage is permitted within the Limited Industrial District subject to the issuance of a special permit by the Board of Appeals.  Furthermore, the proposed garage complies with all of the requirements of Section 2.15.2.C of the Zoning Bylaw.

3.      The proposed structure meets all the dimensional requirements of the Zoning Bylaw.

4.      The proposed garage requires site plan approval pursuant to Section 3.0 of the Zoning Bylaw. All five (5) of the general conditions for Site Plan Approval have been met pursuant to Section 3.04 of the Zoning Bylaw.

5.      The plans have been thoroughly reviewed by the Planning Board and by its consultant, Edwards & Kelcey.  The Planning Board unanimously recommended approval of the plan with conditions.

BLUE HILL 1539

It is the decision of the Board that the relief requested herein satisfies the requirements of Sections 2.15.2.C and 3.04 of the Zoning Bylaw for the reasons and findings set forth below:

A.    Section 2.15.2.C (Special Permit)

1.    *The applicant has available space on the premises to comply with the otherwise applicable parking requirements of the Bylaw.*

Pursuant to Section 4 of the Zoning Bylaw, a minimum of 497 parking spaces are required on the Premises. Currently, there exist 677 parking spaces on the Premises, and the Applicant is proposing to construct an additional 263 parking spaces. As shown on the Amended Site Plan, there will be 560 parking spaces located on the Premises, not including the parking spaces to be located within the proposed parking structure. Therefore, as required by this Section, there is available space on the Premises to comply with the otherwise applicable parking requirements of the Bylaw (560 parking spaces to be constructed versus the 497 minimum required parking spaces).

2.    *The use of above and/or below grade structured parking would: (i) allow the applicant to preserve additional open space above that otherwise required by this Bylaw; (ii) decrease runoff from impervious surfaces, and (iii) would be effectively screened by trees of a minimum height of seven feet.*

(i)    Construction and use of the proposed parking structure will allow the Applicant to preserve additional open space. As shown on the

BLUE HILL 1540

Amended Site Plan, there are various landscaped and open areas located on the Premises that could be utilized for the creation of additional parking spaces, including portions of the landscaped area near the intersection of Green Street and Royall Street. By placing the additional parking spaces within the proposed structure, the existing landscaped areas will be preserved. Furthermore, as shown on the Amended Site Plan, additional open and landscaped areas will be created by the removal of a significant amount of impervious surface adjacent to the proposed garage. As a result of the removal of these existing impervious surfaces, there will be a net decrease in the total impervious surface on the Premises as a result of the proposed parking structure and a corresponding increase in open space.

(ii)     Due to the creation of additional landscaping and open space adjacent to the proposed garage, there will be a net decrease in the total amount of impervious surface on the Premises. As a result, there will be a corresponding decrease in runoff from impervious surfaces.

(iii)    As shown on the Landscape Plan included with the Amended Site Plan, a significant number of trees and plants will be added to the site to effectively screen the proposed structure. As required by the Zoning Bylaw, all proposed trees will be a minimum of seven (7') feet in height.

BLUE HILL 1541

7

3.    *The side yard width is not less than sixty feet.*

As shown on Sheet C-3 of the Amended Site Plan, the proposed structure meets

all setback requirements of the Zoning Bylaw.  Specifically, no portion of the

garage will be located closer than sixty (60) feet to any side yard.

4.    *(i) The lot on which such structured parking would be located is not less*

*than eight (8) acres. (ii) The location(s) where conforming parking would*

*otherwise be placed in the absence of such structured parking shall be shown on*

*the Site Plan submitted for approval to the Zoning Board of Appeals.  Such*

*location(s) shall not be occupied by buildings in the future until the owner has*

*demonstrated compliance with this section's requirements with respect to the*

*existing as well as any additional proposed parking. (iii) Such structured parking*

*shall not in any event exceed a height of thirty feet as measured from average*

*finished grade to the top of the uppermost deck (except for non-habitable*

*structures, including walls and stairwells, as provided in Section 4.42) or extend*

*more than twenty-four feet below average finished grade level.*

(i)    As shown on the Amended Site Plan, the Premises consists of 10.76

acres of land, 9.76 acres of which are located within the Limited

Industrial Zoning District.

(ii)    As stated above, the Premises require a minimum of 497 parking

spaces pursuant to Section 4 of the Zoning Bylaw.  Currently, there

exist in excess of 497 parking spaces on the Premises.  As shown on

BLUE HILL 1542

the Amended Site Plan, 497 parking spaces will be located on the

Premises exclusive of the spaces proposed to be located within the

parking structure.

(iii)    As indicated on an elevation of the proposed structure submitted to the

Zoning Board of Appeals and Planning Board, the maximum height of

the proposed structure is twenty-three (23) feet, as measured from the

average finished grade to the top of the uppermost deck.  Furthermore,

no portion of the proposed structure will extend more than twenty-four

(24) feet below grade.  As shown on the aforementioned exhibit, the

lowest portion of the proposed garage extends to a depth of

approximately seventeen (17) feet.

For the reasons set forth above, the Board finds that the proposed parking structure

meets all of the requirements of Section 2.15.2.C of the Zoning Bylaw.

B.    Section 3.04 (Amended Site Plan)

The Amended Site Plan meets the requirements of Section 3.04 for the following reasons:

1.    *Protection of adjoining premises against detrimental or offensive uses on*

*the site.*

As discussed above and as shown on the Amended Site Plan, the

Applicant has incorporated several measures into the design of the

proposed garage to protect the adjoining premises from any detrimental or

potentially offensive effects of the structure.  As noted above, a significant

BLUE HILL 1543

9

portion of the garage will be constructed below grade, minimizing to a great extent any visual impacts on adjoining properties. In addition to reducing visual impacts, the lowering of the garage will further eliminate or greatly reduce other potential, negative impacts such as noise and the glare of lights. To further reduce any negative impacts that may be caused by the glare of lights, the Applicant has agreed to use "cut off" type fixtures and restrict the height of the lights on the top of the garage to ten (10) feet.

2.    *Convenience and safety of vehicular and pedestrian movement within the site, and in relation to adjacent streets, property or improvements.*
The Amended Site Plan includes numerous measures to ensure the convenience and safety for both pedestrians and vehicles. For example, aisle widths either meet or, in various locations, exceed the minimum width required under the Zoning Bylaw. Also, an additional crosswalk has been added between the proposed garage and the South Building to ensure pedestrian safety. Furthermore, signage along Royall Street has been revised to improve vehicular movements on adjacent streets and properties.

3.    *Adequacy of the methods of disposal for sewerage, refuse and other wastes resulting from the uses permitted or permissible on the site, and the methods of drainage for surface water.*

BLUE HILL 1544

As required under Massachusetts law, runoff from the lower, covered levels of the proposed garage will be connected to the on-site and municipal sewer system. Prior to release into the sewer system, runoff will be treated within catch basins and other drainage structures. Furthermore, all surface runoff, including runoff from the uppermost level of the garage, will be captured and treated on site via the use of a particle separator as well as other stormwater management structures. As shown on the Amended Site Plan, as well as the site plan previously approved for the existing building, the building contains a compactor that will be utilized for the proper disposal of any refuse emanating from the site.

4.   *Adequacy of space for the off-street loading and unloading of vehicles, goods, products, materials and equipment incidental to the normal operation of the establishment.*

As shown on the Amended Site Plan, as well as the site plan previously approved for the existing building, there is adequate space on the property for the loading and unloading of vehicles, goods, products, materials and equipment. The building contains a loading dock for the loading and unloading of goods, products, materials and equipment used in connection with the operation of the building.

BLUE HILL 1545

11

5.      *Lateral connections of utilities including, but not limited to electric, telephone, and fire alarm to buildings and other structures shall be underground in all cases where the property to be served abuts any street where these utilities are installed underground.*

As shown on the Amended Site Plan, all lateral connections of utilities for both the existing building and the proposed garage are below grade.

For the reasons set forth above, the Board finds that the Amended Site Plan satisfies the requirements of Section 3.04.1 through 3.04.5 of the Zoning Bylaw.

## VII. DECISION OF THE BOARD

Based upon the foregoing findings, the Board voted unanimously to approve the Amended Site Plan and to grant the special permit as requested, subject to the following terms and conditions:

1.      The Petitioner shall fully comply with the Amended Site Plan.  Any amendments subsequent to the latest revision date of May 18, 2003 must be approved by the Zoning Board of Appeals.

2.      The Applicant shall be required to implement the following Transportation Demand Management measures:

      a.   Designation of an on-site Transportation Coordinator;

      b.   Establish staggered and flexible working hours;

      c.   Establish a shuttle service to MBTA-area stations;

      d.   Provide Ride-Matching services;

BLUE HILL 1546

e.  Provide preferential parking for employees utilizing carpools and vanpools;

f.  Provide on-site sales of MBTA passes; and

g.  Provide amenities to promote the use of bicycles for employees.

3.     Provided approval is granted from the applicable board or agency within the Town of Canton, and that sufficient right of way is available, the Applicant shall be required to construct a bituminous concrete sidewalk from the intersection of Green Street and Royall Street to the current driveway entrance for the property located at 150 Royall Street.

4.     The Applicant shall install trees a minimum of ten (10) feet in height around the perimeter of the proposed parking garage.

5.     The Applicant shall remove any trash and debris within and immediately adjacent to the cul-de-sac located at the end of Royall Street.  The Applicant shall also loam and seed the areas immediately adjacent to the cul-de-sac.

6.     The light poles to be installed on the top level of the parking garage shall be limited to a maximum height of ten (10) feet.

7.     Upon completion of the improvements shown on the Amended Site Plan, the Applicant shall submit an As-Built Plan in accordance with Section 3.06 of the Zoning Bylaw.

BLUE HILL 1547

8.    The project also shall comply with an Order of Conditions to be issued by the Canton Conservation Commission prior to the commencement of construction. Any material changes to the Site Plan required by the Conservation Commission shall be reviewed and approved by the Board of Appeals.

9.    The maximum number of parking spaces within the parking garage shall be three hundred eighty (380).

10.    The height of the parking garage shall be reasonably consistent with the elevation of the garage as shown on a certain rendering submitted by the Applicant to the Board entitled, "Building Section Exhibit, BlueView Corporate Center, Proposed Parking Structure, Canton, Massachusetts," dated May 19, 2003 and prepared by Vanasse Hangen Brustlin, Inc.

11.    Prior to construction, the Applicant shall obtain and comply with any and all applicable permits and/or approvals required to be issued by any other board or agency with the Town of Canton.

12.    This decision shall be recorded with the Norfolk County Registry of Deeds after the twenty (20) day appeal period has expired pursuant to M.G.L. c. 40A.

A copy of this decision is on file in the Town Clerk's Office, Canton, Massachusetts.

BLUE HILL 1548

Dated this 22 day of _May_, 2003.

_____
Paul B. Carroll

_____
James F. Fitzgerald, Jr.

_____
Greg Pando

Copies to:

Town Clerk
Selectmen
Building Commissioner
Planning Board
Petitioner
File

**RECEIVED**

MAY 2 3 2003

TOWN CLERK
CANTON, MA

Town Clerk
Memorial Hall
Canton, Massachusetts 02021

A true copy
Attest:

_____
ASST  **Town Clerk of Canton**

BLUE HILL 1549

# BARNETT AFFIDAVIT EXHIBIT H

08/06/03  11:08 FAX              BERNKOPF GOODMAN              No.6741  P. 2
                                                                      @002

CONFIDENTIAL

## RELEASE

### (Blue Hills Office Park LLC)

### Dated: As of August 5, 2003

For the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt

and sufficiency of which are hereby acknowledged, Blue Hills Office Park LLC and its respective

agents, representatives, attorneys, heirs, devisees, servants, successors, employees, subsidiaries,

affiliates, related entities, and assigns (hereinafter collectively referred to as the "Releasing Parties")

hereby remise, release, and forever discharge Blueview Corporate Center LLC, and its officers,

directors, members, agents, representatives, attorneys, servants, employees, subsidiaries, affiliates,

related entities, successors, and assigns (hereinafter collectively referred to as the "Released

Parties") of and from all debts, demands, actions, causes of actions, suits, accounts, contracts,

agreements, and damages in any and all claims, counterclaims, demands, and liabilities whatsoever

of every kind, nature, and description whatsoever, both in law and equity, known or unknown,

which the Releasing Parties now have, or ever did have, against the Released Parties from the

beginning of the world through the date hereof with respect to: (i) any and all claims asserted or

which could have been asserted in that certain action pending before the Norfolk Superior Court,

Trial Division of The Commonwealth of Massachusetts, Civil Action, No. 03-01051 (the

"Appeal"), and (ii) all other claims which relate or refer to the construction of a parking structure

(the "Parking Structure") as authorized by the decision of the Town of Canton Zoning Board of

Appeals, Case No. 70-03-MBD/SPA-SP and all other permits and approvals issued concerning the

Parking Structure. This Release is not intended to release or modify any of the agreements,

undertakings, obligations or other provisions of the parties hereto set forth in that certain Settlement

Blue Hill
1880

**CONFIDENTIAL**

Agreement dated of even date by and among Blue Hills Office Park LLC, Blueview Corporate Center, LLC, and others, to which the form of this release is attached as Exhibit B-4.

For such consideration, the Releasing Parties agree not to institute any action or suit, and will not implead, join, or seek contribution or indemnification or otherwise involving the Released Parties in any action or suit which relates to the matters released hereby or which has been, was or could been brought by any of the Releasing Parties against any of the Released Parties concerning the Parking Structure.

The within Release shall be governed and construed in accordance with the laws of The Commonwealth of Massachusetts, and is intended to take effect as a sealed instrument. The Releasing Parties specifically represent that (i) they have executed this instrument of their own free will and intend to be bound by its terms; (ii) that they have read and understand the provisions of this Release; (iii) that they voluntarily sign same for the purpose of making a full and final settlement of all claims and causes of action against the Released Parties concerning the Parking Structure; (iv) that it is the intention of the Releasing Parties that the within Release be a complete and total release of any and all claims concerning the Parking Structure other than those claims reserved herein; and (v) that they have reviewed same with counsel of their choosing, and that they are not relying upon any representation of law or fact set forth by the Released Parties or the Released Parties' counsel.

BLUE HILLS OFFICE PARK LLC

By: Blue Hills Management Corp., its Manager

By _Gerald S. Fineberg_
    Gerald S. Fineberg,
    President and Treasurer
    Duly Authorized

#274065 v1/14500/9547

Blue Hill
1881

# BARNETT AFFIDAVIT EXHIBIT I

## Barnett, Bruce

| | |
|---|---|
| **From:** | Larry Golinsky [LGolinsky@lnrproperty.com] |
| **Sent:** | Wednesday, September 17, 2003 2:09 PM |
| **To:** | Vickie Taylor; Emily Cooper |
| **Cc:** | Jim Perillo |
| **Subject:** | RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA |

not much more to say

-----Original Message-----
From: Vickie Taylor
Sent: Wednesday, September 17, 2003 1:50 PM
To: Larry Golinsky; Emily Cooper
Cc: Jim Perillo
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA

Please see the Master Servicer's response below. According to the PSA, the loan isn't imminent unless the borrower sends in writing his request to restructure the loan or we are within 60 days of the tenant vacating. There is nothing at this point that triggers a transfer event.

-----Original Message-----
From: nhanvi@wellsfargo.com [mailto:nhanvi@wellsfargo.com]
Sent: Tuesday, September 16, 2003 3:37 PM
To: VTaylor@LNRPROPERTY.COM
Cc: mallegni@wellsfargo.com
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA

Vickie,

I just got off the phone with the borrower's representative and was informed that per his knowledge, the tenant will be vacating the property when their lease expires in July 2004. The borrower has initiated marketing of the potential vacant space but has no information concerning any prospective tenants. At this point in time the borrower is using a local leasing agent, but may expand their marketing when the lease expiration date approaches. If you have any other questions, please feel free to contact me.

Thanks,

Vi Nhan
Assistant Vice President/Credit Analyst
Wells Fargo Bank
Commercial Mortgage Servicing
Phone 415.396.8446
Fax  415.975.6477

**LNR04068**

-----Original Message-----
From: Mallegni, Curtis
Sent: Friday, September 12, 2003 1:39 PM
To: Nhan, Vi
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA


Vi,

Let me know if you have anything on this. Thanks.


Curtis

-----Original Message-----
From: Vickie Taylor [mailto:VTaylor@LNRPROPERTY.COM]
Sent: Friday, September 12, 2003 1:07 PM
To: Curtis J. Mallegni (E-mail)
Subject: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA


Can you give me the status on this property. We heard the tenant was going
to be vacating and not renewing their lease. We are concerned since this is
a $32 million loan that might potential be empty in the very near future.
Please let me know what you find out.

Vickie M. Taylor
Lennar Partners, Inc.
Effective December 2, 2002
1601 Washington Avenue
Suite 700
Miami Beach, FL 33139
Phone No. 305-695-5076
Fax No. 305-695-5601

This transmission is intended to be delivered only to the named addressee(s)
and may contain information that is confidential, proprietary, attorney
work-product or attorney-client privileged. If this information is received
by anyone other than the named addressee(s), the recipient should
immediately notify the sender by E-MAIL and by telephone (305/695-5600) and
obtain instructions as to the disposal of the transmitted material. In no
event shall this material be read, used, copied, reproduced stored or
retained by anyone other than the named addressee(s), except with the
express consent of the sender or the named addressee(s).

**LNR04069**

2/23/2006

# BARNETT
# AFFIDAVIT
# EXHIBIT J

# EXCERPTED MATERIALS

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as<br>Trustee for the Registered Holders of<br>Credit Suisse First Boston Mortgage<br>Securities Corp., Commercial Mortgage<br>Pass-Through Certificates, Series 1999-C1,<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET,<br>LLC,<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## ANSWERS OF BLUE HILLS OFFICE PARK LLC
## TO DEFENDANTS' SECOND SET OF INTERROGATORIES

Blue Hills Office Park LLC ("Blue Hills") answers the Second Set of Interrogatories by

the Defendants J.P. Morgan Chase Bank as Trustee for the Registered Holders of Credit Suisse

First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series

1999-C1 ("J.P. Morgan") and CSFB 1999 - C1 Royall Street, LLC as follows:

## GENERAL OBJECTIONS

Blue Hills objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure. Blue Hills also objects to these interrogatories to the extent they are vague, overly broad, unduly burdensome, seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, seeks information that is not in Blue Hills' possession, custody or control, seeks information that is already in Defendants' possession, custody or control, seeks information that is subject to the attorney-client privilege and/or the attorney work-product doctrine, and seeks information that is otherwise beyond the scope of permissible discovery.

Blue Hills incorporates by reference each and every one of its general objections into each and every Answer as if fully set forth therein.

Blue Hills reserves its rights to supplement their Answers pursuant to Rule 26(e) in the event that information that may be responsive to these interrogatories becomes available.

## ANSWERS

## INTERROGATORY NO. 1

Identify each and every person who prepared the responses to these interrogatories and/or assisted in the preparation of the responses to these interrogatories, and identify the specific interrogatories with respect to which each such person provided assistance.

## ANSWER NO. 1

Other than counsel, Joseph Donovan, Lawrence Needle, and Daniel Frank assisted in the preparation of these answers to interrogatories.

## INTERROGATORY NO. 2

If you contend that the letter attached as Exhibit "G" to Blue Hills' Second Amended Complaint was delivered to Wells Fargo on or before August 2, 2004, state the basis for that contention.

**ANSWER NO. 2**

Blue Hills states that the letter dated August 2, 2004 attached to Exhibit G to Blue Hills'

Second Amended Complaint was sent by regular mail on August 2, 2004 and was faxed to Wells

Fargo on August 4, 2004. The faxed copy of the August 2, 2004 letter with bate-stamp Blue

Hill 4679 contains an August 4, 2004 fax date at the top of the page. In addition, the Wells

Fargo LOANCATOR log bate-stamped WF1892 shows that Wells Fargo received the August 2,

2002 letter on August 4, 2004.

**INTERROGATORY NO. 3**

If you contend that Blue Hills believed, at any time between August 2, 2004 and
September 17, 2004, that Wells Fargo had granted the requests set forth in the letters attached as
Exhibits "G" and "I," state the basis for that contention.

**ANSWER NO. 3**

Blue Hills believed that the Lender was willing to work with Blue Hills and to meet with

Blue Hills based upon Lennar Partners, Inc.'s ("LNR") letters dated August 19, 2004 to Blue

Hills and Joe Donovan's correspondence with Wells Fargo dated August 5 and 13, 2004. In

addition, when the Lender paid the taxes directly to the Town of Canton after Blue Hills' August

2, 2004 letter to Wells Fargo, Blue Hills believed and assumed that the taxes had been paid out

of the escrow reserve funds in response to the request contained in Mr. Donovan's August 2,

2004 letter. After Blue Hills sent the August 2, 5 and 13, 2004 letters to Wells Fargo, Blue Hills

received the letters dated August 19, 2004 from LNR's Job Warshaw to the effect that LNR had

agreed to meet with and work with Blue Hills regarding the subject Loan, that those letters did

not advise Blue Hills that the Loan was in default and there is no written notification up until

September 17, 2004 that the real estate taxes had not been paid out of the escrow reserve as

requested by Mr. Donovan in his August 2nd and 13th letters/faxes to Wells Fargo. Based upon

3

Signed under the pains and penalties of perjury this 2nd day of March , 2006.

Blue Hills Office Park LLC

By: _Gerald Fineberg_

Gerald Fineberg, President of
Blue Hills Management Corp.,
Manager of Blue Hills Office Park
LLC,   duly authorized

AS TO OBJECTIONS:

BLUE HILLS OFFICE PARK LLC,
By its attorneys,

_Meredith Swisher_

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: March 3, 2006

#332362 v4 14500/9985

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was
served upon (each party appearing pro se and) the attorney of record for
each other party by mail (by hand)    March 3, 2006

_Meredith Swisher_

21

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC, )<br>    Plaintiff/Defendant-in-Counterclaim )<br> )<br>v.                                                            )<br> )<br>J.P. MORGAN CHASE BANK, as )<br>Trustee for the Registered Holders of )<br>Credit Suisse First Boston Mortgage )<br>Securities Corp., Commercial Mortgage )<br>Pass-Through Certificates, Series 1999-C1, )<br>    Defendant )<br> )<br>and CSFB 1999 – C1 ROYALL STREET, )<br>LLC, )<br>    Defendant/Plaintiff-in-Counterclaim )<br> )<br>and )<br> )<br>WILLIAM LANGELIER and GERALD )<br>FINEBERG, )<br>    Defendants-in-Counterclaim )<br>_____ ) | Civil Action No. 05-CV-10506 (WGY) |

## ANSWERS OF GERALD FINEBERG TO DEFENDANTS' SECOND SET OF INTERROGATORIES

Gerald Fineberg ("Fineberg") answers the Second Set of Interrogatories by the

Defendants J.P. Morgan Chase Bank as Trustee for the Registered Holders of Credit Suisse First

Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series

1999-C1 ("J.P. Morgan") and CSFB 1999 - C1 Royall Street, LLC as follows:

## GENERAL OBJECTIONS

Fineberg objects to each of Defendants' interrogatories to the extent that each interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the scope of the Federal Rules of Civil Procedure. Fineberg also objects to these interrogatories to the extent they are vague, overly broad, unduly burdensome, seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, seeks information that is not in Fineberg's possession, custody or control, seeks information that is already in Defendants' possession, custody or control, seeks information that is subject to the attorney-client privilege and/or the attorney work-product doctrine, and seeks information that is otherwise beyond the scope of permissible discovery.

Fineberg incorporates by reference each and every one of his general objections into each and every Answer as if fully set forth therein.

Fineberg reserves his rights to supplement their Answers pursuant to Rule 26(e) in the event that information that may be responsive to these interrogatories becomes available.

## ANSWERS

### INTERROGATORY NO. 1

Identify each and every person who prepared the responses to these interrogatories and/or assisted in the preparation of the responses to these interrogatories, and identify the specific interrogatories with respect to which each such person provided assistance.

### ANSWER NO. 1

Other than counsel, Joseph Donovan, Lawrence Needle, and Daniel Frank assisted in the preparation of these answers to interrogatories.

2

## INTERROGATORY NO. 2

If you contend that the letter attached as Exhibit "G" to Blue Hills' Second Amended Complaint was delivered to Wells Fargo on or before August 2, 2004, state the basis for that contention.

## ANSWER NO. 2

Fineberg states that the letter dated August 2, 2004 attached to Exhibit G to Blue Hills' Second Amended Complaint was sent by regular mail on August 2, 2004 and was faxed to Wells Fargo on August 4, 2004. The faxed copy of the August 2, 2004 letter with bate-stamp Blue Hill 4679 contains an August 4, 2004 fax date at the top of the page. In addition, the Wells Fargo LOANCATOR log bate-stamped WF1892 shows that Wells Fargo received the August 2, 2002 letter on August 4, 2004.

## INTERROGATORY NO. 3

If you contend that Blue Hills believed, at any time between August 2, 2004 and September 17, 2004, that Wells Fargo had granted the requests set forth in the letters attached as Exhibits "G" and "I," state the basis for that contention.

## ANSWER NO. 3

Blue Hills believed that the Lender was willing to work with Blue Hills and to meet with Blue Hills based upon Lennar Partners, Inc.'s ("LNR") letters dated August 19, 2004 to Blue Hills and Joe Donovan's correspondence with Wells Fargo dated August 5 and 13, 2004. In addition, when the Lender paid the taxes directly to the Town of Canton after Blue Hills' August 2, 2004 letter to Wells Fargo, Blue Hills believed and assumed that the taxes had been paid out of the escrow reserve funds in response to the request contained in Mr. Donovan's August 2, 2004 letter. After Blue Hills sent the August 2, 5 and 13, 2004 letters to Wells Fargo, Blue Hills received the letters dated August 19, 2004 from LNR's Job Warshaw to the effect that LNR had agreed to meet with and work with Blue Hills regarding the subject Loan, that those letters did

3

Signed under the pains and penalties of perjury this <u>2nd</u> day of <u>March</u>, 2006.

Gerald Fineberg

AS TO OBJECTIONS:

BLUE HILLS OFFICE PARK LLC,
By its attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated:  March 3, 2006

#333283 v1 14500/9985

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each other party by mail (by hand) March 3, 2006

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim )<br>)<br>v.    )<br>)<br>J.P. MORGAN CHASE BANK, as )<br>Trustee for the Registered Holders of )<br>Credit Suisse First Boston Mortgage )<br>Securities Corp., Commercial Mortgage )<br>Pass-Through Certificates, Series 1999-C1, )<br>    Defendant   )<br>)<br>and CSFB 1999 – C1 ROYALL STREET, )<br>LLC,    )<br>    Defendant/Plaintiff-in-Counterclaim )<br>)<br>and    )<br>)<br>WILLIAM LANGELIER and GERALD )<br>FINEBERG,    )<br>    Defendants-in-Counterclaim )<br>) | Civil Action No. 05-CV-10506 (WGY) |

## ANSWERS OF WILLIAM LANGELIER
## TO DEFENDANTS' SECOND SET OF INTERROGATORIES

William Langelier ("Langelier") answers the Second Set of Interrogatories by the

Defendants J.P. Morgan Chase Bank as Trustee for the Registered Holders of Credit Suisse First

Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series

1999-C1 ("J.P. Morgan") and CSFB 1999 - C1 Royall Street, LLC as follows:

## GENERAL OBJECTIONS

Langelier objects to each of Defendants' interrogatories to the extent that each interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the scope of the Federal Rules of Civil Procedure. Langelier also objects to these interrogatories to the extent they are vague, overly broad, unduly burdensome, seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, seeks information that is not in Langelier's possession, custody or control, seeks information that is already in Defendants' possession, custody or control, seeks information that is subject to the attorney-client privilege and/or the attorney work-product doctrine, and seeks information that is otherwise beyond the scope of permissible discovery.

Langelier incorporates by reference each and every one of his general objections into each and every Answer as if fully set forth therein.

Langelier reserves his rights to supplement their Answers pursuant to Rule 26(e) in the event that information that may be responsive to these interrogatories becomes available.

## ANSWERS

## INTERROGATORY NO. 1

Identify each and every person who prepared the responses to these interrogatories and/or assisted in the preparation of the responses to these interrogatories, and identify the specific interrogatories with respect to which each such person provided assistance.

## ANSWER NO. 1

Other than counsel, Joseph Donovan, Lawrence Needle, and Daniel Frank assisted in the preparation of these answers to interrogatories.

2

**INTERROGATORY NO. 2**

If you contend that the letter attached as Exhibit "G" to Blue Hills' Second Amended Complaint was delivered to Wells Fargo on or before August 2, 2004, state the basis for that contention.

**ANSWER NO. 2**

Langelier states that the letter dated August 2, 2004 attached to Exhibit G to Blue Hills' Second Amended Complaint was sent by regular mail on August 2, 2004 and was faxed to Wells Fargo on August 4, 2004. The faxed copy of the August 2, 2004 letter with bate-stamp Blue Hill 4679 contains an August 4, 2004 fax date at the top of the page. In addition, the Wells Fargo LOANCATOR log bate-stamped WF1892 shows that Wells Fargo received the August 2, 2002 letter on August 4, 2004.

**INTERROGATORY NO. 3**

If you contend that Blue Hills believed, at any time between August 2, 2004 and September 17, 2004, that Wells Fargo had granted the requests set forth in the letters attached as Exhibits "G" and "I," state the basis for that contention.

**ANSWER NO. 3**

Blue Hills believed that the Lender was willing to work with Blue Hills and to meet with Blue Hills based upon Lennar Partners, Inc.'s ("LNR") letters dated August 19, 2004 to Blue Hills and Joe Donovan's correspondence with Wells Fargo dated August 5 and 13, 2004. In addition, when the Lender paid the taxes directly to the Town of Canton after Blue Hills' August 2, 2004 letter to Wells Fargo, Blue Hills believed and assumed that the taxes had been paid out of the escrow reserve funds in response to the request contained in Mr. Donovan's August 2, 2004 letter. After Blue Hills sent the August 2, 5 and 13, 2004 letters to Wells Fargo, Blue Hills received the letters dated August 19, 2004 from LNR's Job Warshaw to the effect that LNR had

3

Signed under the pains and penalties of perjury this 27ᵗʰ day of February , 2006.

William Langelier


AS TO OBJECTIONS:


BLUE HILLS OFFICE PARK LLC,
By its attorneys,


Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: March 3, 2006

#333282 v1/14500/9985

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was
served upon (each party appearing pro se and) the attorney of record for
each other party by mail (by hand) March 3, 2006

# BARNETT
# AFFIDAVIT
# EXHIBIT K

Bk 21988 Pg508    #5279
01-14-2005 @ 10:21a

## CERTIFICATE OF ENTRY

We hereby certify that on November 19, 2004 we were present and saw Bruce S. Barnett, attorney for CSFB 1999-C1 ROYALL STREET, LLC, as assignee and present holder of a mortgage given by BLUE HILLS OFFICE PARK LLC to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, dated as of September 14, 1999 and recorded with Norfolk County Registry of Deeds in Book 13733, Page 428, make an open, peaceable and unopposed entry on the premises described in said mortgage, for the purpose of foreclosing said mortgage for breach of condition thereof.

E. RANDOLPH TUCKER

Robert T. Hayes

## COMMONWEALTH OF MASSACHUSETTS

Norfolk County, ss.

On this 19th day of November, 2004, before me, the undersigned notary public, personally appeared  E Randolph Tucker  and Robert T Hayes  proved to me through satisfactory evidence of identification, which was (a current driver's license) (a current U.S. passport) (my personal knowledge of the identity of the principal), to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of (his) (her) knowledge and belief.

Notary Public Stephen E Dean
My commission expires: 5 - 3

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY
WILLIAM P. O'DONNELL, REGISTER

-BOST1:312331.v1

150 Royall St., Canton

Blue Hill
1689

02/04/05  FRI 10:48 FAX                                                    ☑003



RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY

WILLIAM P. O'DONNELL, REGISTER

Bk 21988 Pg509  #5280
01-14-2005 @ 10:21a

## FORECLOSURE DEED

CSFB 1999-C1 ROYALL STREET, LLC, a Delaware limited liability company having a mailing address of c/o Lennar Partners, Inc., 1601 Washington Avenue, Suite 700, Miami Beach Florida 33139, as assignee and present holder of that certain Mortgage, Assignment of Leases and Rents and Security Agreement from BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, a Delaware limited liability company, recorded on September 15, 1999 with Norfolk County Registry of Deeds in Book 13733, Page 428, by power conferred in said mortgage and every other power for consideration of Eighteen Million Five Hundred Thousand Dollars ($18,500,000.00) paid, grants to CSFB 1999-C1 ROYALL STREET, LLC, the premises conveyed by said Mortgage located at 150 Royall Street, Canton, Massachusetts more particularly described as follows:

The land with the buildings thereon situated in Canton, Norfolk County, Massachusetts shown as Lot "C" on a plan entitled "Plan of Land, Canton, Massachusetts" dated December 9, 1971 by Universal Engineering Corporation, recorded with Norfolk Registry of Deeds as Plan 48 of 1972 in Plan Book 230 (hereinafter the "Plan"), and being more particularly bounded and described as follows:

NORTHERLY AND
NORTHWESTERLY:        by Royall Street, three hundred thirty-six and 65/100 (336.65) feet;

NORTHEASTERLY:        by Parcel A as shown on said Plan, by two (2) lines measuring, respectively, six hundred thirty-five and 82/100 (635.82) feet and two hundred (200.00) feet;

NORTHWESTERLY:        by Parcel A as shown on said Plan, one hundred forty (140.00) feet;

NORTHEASTERLY:        by Parcel B as shown on said Plan, seven hundred nine and 37/100 (709.37) feet;

SOUTHWESTERLY:        by Circumferential Highway (Route 128), eight hundred sixteen and 18/100 (816.18) feet;

SOUTHWESTERLY:        by Green Street, seven hundred sixty-six and 13/100 (766.13) feet;

NORTHWESTERLY:        by land now or formerly of Nocka, two hundred thirty-nine and 57/100 (239.57) feet;

WESTERLY:             by land of said Nocka, two hundred three and 57/100 (203.57) feet; and

*150 Royall St., Canton* (handwritten, left margin)

2

Blue Hill
1690

NORTHWESTERLY:    by land of said Nocka, by two (2) lines measuring, respectively, eighty (80.00) feet and one hundred thirteen and 95/100 (113.95) feet.

Insofar as now in force and applicable, the premises are conveyed subject to and with the benefit of all liens, encumbrances, easements, restrictions and other matters appearing of record.

Executed under seal as of this 29ᵗʰ day of November, 2004.

CSFB 1999-C1 ROYALL STREET, LLC, a Delaware limited liability company, present holder of said mortgage

By: Lennar Massachusetts Partners, Inc., a Massachusetts corporation, its Manager

By: _____
Randolph J. Wolpert
Vice President

By: _____
Michael J. Sherman
Assistant Treasurer

01/14/05 10:29AM    01
000000 #3302

FEE    $84360.00

CASH $84360.00

State of _Florida_
_Miami-Dade_ County, ss.

On this _09_ day of _November_, 2004, before me, the undersigned notary public, personally appeared Randolph J. Wolpert, Vice-President of Lennar Massachusetts Partners, Inc. and Michael J. Sherman, Assistant Treasurer of Lennar Massachusetts Partners, Inc., proved to me through satisfactory evidence of identification, which was (a current driver's license) (a current U.S. passport) (my personal knowledge of the identity of the principal), to be the persons whose names are signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of their knowledge and belief.

_____
Notary Public
My commission expires:



MARIA E. RUIZ
MY COMMISSION # DD 083329
EXPIRES: May 21, 2009
Bonded Thru Notary Public Underwriters

~BOST1:312338.v1

Blue Hill
1691

Bk 21988 Pg511  #5281
01-14-2005 @ 10:21a

## AFFIDAVIT OF SALE

We, RANDOLPH J. WOLPERT, Vice President, and MICHAEL J. SHERMAN,
Treasurer of Lennar Massachusetts Partners, Inc., Manager of CSFB 1999-C1 ROYALL
STREET, LLC, named in the foregoing Foreclosure Deed, make oath and say that the principal
and interest obligations mentioned in the mortgage referred to in said Foreclosure Deed were not
paid or tendered or performed when due or prior to the sale; and that we published on the 14th,
21st and the 28th days of October, 2004 and the 4th day of November, 2004 in the Canton Citizen,
a newspaper published in Canton, Massachusetts, and having a circulation in Canton,
Massachusetts, a Notice of Mortgagee's Sale of Real Estate, a true copy of which is attached
hereto as Exhibit A.

We also complied with Massachusetts General Laws, Chapter 244, Section 14, as
amended, by causing to be mailed the required notices by certified mail, return receipt requested.

Pursuant to said notice at the time and place therein appointed, CSFB 1999-C1 ROYALL
STREET, LLC sold the mortgaged premises at public auction by Stephen E. Dean, a licensed
auctioneer, to CSFB 1999-C1 ROYALL STREET, LLC , for consideration of
Eighteen Million Five Hundred Thousand Dollars ($18,500,000.00) bid by said CSFB 1999-C1
ROYALL STREET, LLC being the highest bid made therefore at said auction.

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY

*William P O'Donnell*
WILLIAM P. O'DONNELL, REGISTER

Blue Hill
1692

~BOST1:312351.v1

3

Bk 21988   Pg 512 #5281

Executed under seal as of this 29th day of November, 2004

CSFB 1999-C1 ROYALL STREET, LLC, a
Delaware limited liability company,

By: Lennar Massachusetts Partners, Inc., a
Massachusetts corporation, its Manager

By: _____
Randolph J. Wolpert
Vice President

By: _____
Michael J. Sherman
Assistant Treasurer

State of _Florida_
_Miami - Dade_ County, ss.

On this _29_ day of _November_, 2004, before me, the undersigned notary public, personally appeared Randolph J. Wolpert, Vice President of Lennar Massachusetts Partners, Inc. and Michael J. Sherman, Assistant Treasurer of Lennar Massachusetts Partners, Inc. proved to me through satisfactory evidence of identification, which was (a current driver's license) (a current U.S. passport) (my personal knowledge of the identity of the principal), to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of their knowledge and belief.

_____
Notary Public
My commission expires:



~BOST1:312351.v1

Blue Hill
1693

Exhibit A

Bk 21988  Pg 513 #5281

## LEGAL NOTICE
## MORTGAGEE'S SALE OF REAL ESTATE

By virtue and in execution of the POWER OF SALE contained in a certain mortgage from BLUE HILLS OFFICE PARK LLC, to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL, LLC, dated as of September 14, 1999 and recorded with Norfolk County Registry of Deeds (the "Records") in Book 13733, Page 428, of which mortgage the undersigned is the present holder, for breach of conditions contained in said mortgage and for the purpose of foreclosing the same will be sold at Public Auction at 10:00 A.M. on the 12th day of November, 2004, at the mortgaged premises located at 150 Royall Street, Canton, Massachusetts, all and singular the premises described in said mortgage, to wit:

The land situated in Canton, Norfolk County, Massachusetts shown as Lot "C" on a plan entitled "Plan of Land, Canton, Massachusetts" dated December 9, 1971, by Universal Engineering Corporation, recorded with Norfolk Registry of Deeds as Plan 48 of 1972 in Plan Book 230 (hereinafter the "Plan"), and being more particularly bounded and described as follows:

NORTHERLY AND NORTHWESTERLY: by Royall Street, three hundred thirty-six and 65/100 (336.65) feet;

NORTHEASTERLY: by Parcel A as shown on said Plan; by two (2) lines measuring, respectively, six hundred thirty-five and 82/100 (635.82) feet and two hundred (200.00) feet;

NORTHWESTERLY: by Parcel A as shown on said Plan, one hundred forty (140.00) feet;

NORTHEASTERLY: by Parcel B as shown on said Plan, seven hundred nine and 37/100 (709.37) feet;

SOUTHWESTERLY: by Circumferential Highway (Route 128), eight hundred sixteen and 18/100 (816.18) feet;

SOUTHWESTERLY: by Green Street, seven hundred sixty-six and 13/100 (766.13) feet;

NORTHWESTERLY: by land now or formerly of Nocks, two hundred thirty-nine and 57/100 (239.57) feet;

WESTERLY: by land of Nocks, two hundred three and 57/100 (203.57) feet; and

NORTHWESTERLY: by land of said Nocks, by Two (2) lines measuring, respectively, eighty (80.00) feet and one hundred thirteen and 95/100 (113.95) feet.

Insofar as now in force and applicable, the premises are conveyed subject to and with the benefit of all additional liens, encumbrances, easements, restrictions and other matters appearing of record and having priority over the mortgage described herein, if any.

The premises to be sold shall also be subject to all leases and tenancies, if any other may be, having priority over said mortgage, to tenancies or occupation by persons on the premises now or at the time of said auction which tenancies or occupation are subject to said mortgage, to rights or claims in personal property installed by tenants or occupants of the premises and to all laws and ordinances including, but not limited to, all building, zoning and environmental laws and ordinances.

TERMS OF SALE: Fifty Thousand and 00/100 Dollars ($50,000.00) shall be paid in cash or by certified or bank cashier's check by the purchaser at the time and place of sale.

The balance of the purchase price on a sale shall be paid in cash or by certified bank or cashier's check in or within thirty (30) days thereafter at the offices of Piper Rudnick LLP, One International Place, Boston, Massachusetts. The successful bidder and/or bidders shall be required to sign a Memorandum of Terms of Sale containing the above terms at the Auction Sale.

The Mortgagee reserves the right to postpone the sale to a later date by public proclamation at the time and date appointed for the sale and to further postpone at any adjourned sale date by public proclamation at the time and date appointed for the adjourned sale date.

In the event that the successful bidder at the foreclosure sale shall default in purchasing the within described property according to the terms of this Notice of Sale and/or terms of the Memorandum of Sale executed at the time of foreclosure, the Mortgagee reserves the right to sell the property by foreclosure deed to the second highest bidder provided that said second highest bidder shall deposit with Mortgagee's attorneys, Piper Rudnick LLP, the amount of the required deposit as set forth herein within three (3) business days after written notice of the default of the previous high bidder and title shall be conveyed to the said second highest bidder within thirty (30) days of said written notice.

Other terms to be announced at the sale or prior to default.

CSFB 1999-C1 ROYALL STREET, LLC, a Delaware limited liability company, present holder of said mortgage

By: Lennar Massachusetts Partners, Inc., a Massachusetts corporation, its Manager

By: Piper Rudnick LLP, its attorney

By:

Bruce S. Barnett
Piper Rudnick LLP
One International Place
Boston, Massachusetts 02110
(617) 406-6000

Blue Hill
1694

# BARNETT AFFIDAVIT EXHIBIT L

# AUCTIONS



To advertise in The Boston Globe please call 617-929-1500 or visit us at www.bostonglobe.com/classifieds.

A new job is waiting
for you here.

BostonWorks

Combining the power of

The Boston Globe
boston.com

SD001

## PUBLIC AUCTION

**22-UNIT COTTAGE COLONY**
**NEAR LAKE WINNIPESAUKEE**
k/a THE GREAT ESCAPE MOTEL
**TUESDAY, NOV. 23 AT 10:00 AM**
**34 DANIEL WEBSTER HIGHWAY**
**MEREDITH, NH**

ID #4-590 • The Great Escape, a 22-unit cottage colony with conditional approvals for condominium conversion • 9.08± acre site along Route 3 just minutes from Weirs Beach and Meredith Bay • Swimming pool and nice mountain views • 10 motel style units, 9 cottage units, and 3 units in main house/office • Investment opportunity close to New Hampshire's premier lake • Terms: $25,000 deposit by cash or certified check to bid; closing within 45 days. Other terms may be announced at time of sale. *For complete details, please call or visit our website.*

### James R. St. Jean
AUCTIONEERS

MA Lic. #838     1-800-639-1810     NH Lic. #2279
www.jsjauctions.com

---

## MORTGAGEE'S
REAL ESTATE AUCTION TO BE SOLD ON THE PREMISES
**BROOKLINE, MA REAL ESTATE**
### 60 HEATH HILL
**FRIDAY, NOVEMBER 12, 2004 at 4:00PM**

A PARCEL OF LAND CONTAINING 19,375+/- SQ. FT. IMPROVED WITH A SINGLE FAMILY CAPE-COD STYLE RESIDENCE CONTAINING APPROX. A TOTAL OF TWELVE (12) ROOMS WITH EIGHT (8) BEDROOMS, FOUR AND ONE-HALF (4½ 1/2) BATHROOMS. AMENITIES INCLUDE CENTRAL A/C, ATTACHED GARAGE, OPEN PORCH AND WOOD DECK. THIS PROPERTY IS LOCATED IN ONE OF BROOKLINE'S FINEST NEIGHBORHOODS. (SEE NORFOLK COUNTY REGISTRY OF DEEDS BOOK 15273, PAGE 407).
TERMS OF SALE: A deposit of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) to be paid by certified or bank of the purchaser at the time and place of the sale. Balance due within 30 days of the sale. Other terms, if any to be announced at the sale.
Call our automated line at (617) 964-1282 for continuously updated scheduling information.
Although we take great care in providing you this information which has been obtained from reliable sources, Commonwealth Auction Associates, Inc., does not warrant or guarantee the accuracy of this information.

(617) 964-1282 MA LIC. 2235
www.CommonwealthAuction.com

---

### The Boston Globe
CLASSIFIED
To advertise, call
617-929-1500
Fax 617-929-1511
www.bostonglobe.com/classifieds

---

### MELROSE, MA MORTGAGEE
REAL ESTATE AUCTION
Single family, 35 Cass St. Fri. Nov. 19, 11AM. 1484+/- SF living area, 7 rooms, 4 bdrms, 1 bath, 0.105+/- AC lot. TERMS: $5,000 deposit cash, certified or bank check at sale. Balance due 30 days. HARV LEVIN, INC., Lic #1541 800-522-8488

COMMONWEALTH AUCTION ASSOCIATES, INC.
(617) 964-0005   MA LIC. 2235
www.auctionsnewengland.com

(617) 964-1282
www.CommonwealthAuction.com

---

## PUBLIC AUCTION

REAL ESTATE AUCTIONS TO BE SOLD ON THE PREMISES

### THURSDAY
**NOVEMBER 11, 2004**
4:30PM-HOPKINTON, MA
7 MESERVE STREET a/k/a
9 MESERVE STREET-DEPOSIT $5,000

### FRIDAY
**NOVEMBER 12, 2004**
10:00AM-BRIGHTON (BOSTON), MA
1629 COMMONWEALTH AVENUE,
BRIGHTON PLACE CONDOMINIUM, UNIT
4-DEPOSIT $5,000
10:30AM-BRIGHTON (BOSTON), MA
1629 COMMONWEALTH AVENUE,
BRIGHTON PLACE CONDOMINIUM, UNIT
17-DEPOSIT $5,000
12:00PM-PEABODY, MA
17 HARRISON AVENUE-DEPOSIT $5,000
1:30PM-MARBLEHEAD, MA
21 MOXFORD STREET-DEPOSIT $5,000
2:30PM-REVERE, MA
104 STROME STREET, ROAD-DEPOSIT $5,000
3:00PM-CHELSEA, MA
41 HARVARD STREET-DEPOSIT $10,000
3:30PM-WALTHAM, MA
117 PROSPECT HILL ROAD-DEPOSIT $5,000

### MONDAY
**NOVEMBER 15, 2004**
11:00AM - HYDE PARK (BOSTON), MA
71 Hurd Street - Deposit $5,000
2:00PM-BONITA ATTLEBORO, MA
328 ELM STREET-DEPOSIT $5,000
3:00PM-HYDE PARK (BOSTON), MA
718 BEAUMONT STREET-DEPOSIT
$10,000

### TUESDAY
**NOVEMBER 16, 2004**
3:00PM-LEXINGTON, MA
34 PEACOCK FARM RD.-DEPOSIT $5,000

TERMS OF SALES: DEPOSITS IN THE AMOUNTS SPECIFIED ABOVE ARE TO BE PAID BY THE PURCHASER(S) AT THE TIME AND PLACE OF EACH SALE BY CERTIFIED OR BANK CHECK. ALL BALANCES DUE ARE TO BE PAID WITHIN 30 DAYS OF EACH INDIVIDUAL SALE. OTHER TERMS, IF ANY, TO BE ANNOUNCED AT THE SALES.
CALL OUR AUTOMATED AUCTION LINE AT (617) 964-1282 FOR CONTINUOUSLY UPDATED SCHEDULING INFORMATION

---

Mortgagee's Sale of Real Estate at Public Auction
To be Held on the Premises:

## New Bedford Real Estate
### Multi Family
86 Church Street, New Bedford, MA
**Wednesday, November 10, 2004 at 10:00 A.M.**

Offering for sale at public auction a parcel of land improved with a six unit building. Mortgage is recorded with the Bristol County (Southern District) Registry of Deeds at Book 6810, Page 170.
Terms of Sale: A deposit in the amount of $10,000 - TEN THOUSAND DOLLARS, by cash, certified or bank check will be required at the time and place of the sale, and the balance due within 30 days from the date of the sale. All other terms announced at the sale. Steven A. Ross Esq., Clmentin, Magrone, Cantell & Ross LLP, 376 Boylston St., Boston, MA Atty. for mortgagee.

### DEAN ASSOCIATES, INC.
AUCTIONEERS & CERTIFIED APPRAISERS
825 Beacon Street, #7 Newton, MA 02459
Tel #617-630-0662 Mass Lic #124 - NH Lic #2480 -
FL Lic AU2829 - RI Lic #2723
Visit our Website at www.deanassociatesinc.com

---

Mortgagee's Sale of Real Estate at Public Auction
To be Held on the Premises:

## CANTON COMMERCIAL REAL ESTATE
### OFFICE BUILDING
150 Royall St., Canton, MA
**Friday, November 12, 2004 at 10:00 A.M.**

Offering for sale at public auction an office building said to contain approximately 270,000 s.f. of rentable space. Parcel size approx 20.2 acres. Mortgage is recorded with Norfolk County Registry of Deeds in Book 13733, Page 428.Terms of Sale: A deposit in the amount of FIFTY THOUSAND DOLLARS-($50,000), by cash, certified or bank check will be required at the time and place of the sale, and the balance due within 30 days from the date of the sale. All other terms announced at the sale. Bruce S. Barnett Esq., Piper Rudnick, LLP, One International Place, Boston, MA 02110 Atty. for mortgagee.

### DEAN ASSOCIATES, INC.
AUCTIONEERS & CERTIFIED APPRAISERS
825 Beacon Street, #7 Newton, MA 02459
Tel #617-630-0662
Mass Lic #124 - NH Lic #2480 - FL Lic AU2829-RI Lic 2723
Visit our Website at www.deanassociatesinc.com

---

## PUBLIC AUCTION
BAR TO BE SOLD TO BARE WALLS
"WITCH'S KETTLE", 43 BOSTON ST., SALEM, MA
**WEDNESDAY, NOVEMBER 10, 2004 @ 10AM**

Salem Liquor License Auctioned
S/S 2 DR HOBART REFG., TRUE REFL, S/S ICE CHEST, TRUE CHILLER, TRUE REACH-IN, S/S LaCROSSE ICE BAY, S/S HOBART DW, S/S HOBART SINKS: 1,2,3 BAY, ANSUL SYSTEM W/ S/S HOOD, GAS GRILL, GLOBE SLICER, S/S LINCOLN ROTARY PIZZA OVEN, SANSAAS REGISTER, BAR ACC. & FIXTS, NEON SIGNS, BAR STOOLS & OTHER MISC, AUTOGRAPHED SPORTS MEMORABILIA
TERMS: 10% BP CASH OR CERTIFIED CHECK AND IN FULL DAY OF SALE. ALL ITEMS MUST BE REMOVED ASAP. OTHER TERMS MAY BE ANNOUNCED DAY OF AUCTION.

AUCTIONEER: GARRETT D. HEALEY
LIC#'S MA 197 NH#2357 ME#965 VT 701
GARRETT, INC. 76 HIGH ST. DANVERS, MA 01923
978-774-6008
www.garrettauctioneers.com

---



500 or visit us at www.bostonglobe.com/classifieds.

---

# BostonWorks

Combining the power of

### The Boston Globe
boston.com

SD001

| 604 Auctions | 604 Auctions |
|---|---|

**MORTGAGEE'S SALE OF REAL ESTATE AT PUBLIC AUCTION**

Monday, November 8, 2004 at 12:00 pm

**Orleans**
POSTPONED

Monday, November 8, 2004 at 2:00 pm

**Barnstable** POSTPONED

Tuesday, November 9, 2004 at 10:00 am

**West Yarmouth** CANCELLED

Friday, November 12, 2004 at 10:00 am

**Marlboro - Condominium**

TERMS: $5,000.00 cash or certified check at the time and place of EACH sale. The balance to be paid within thirty (30) days at the law offices of Attorney for the Mortgagee.
AUCTIONEER MAKES NO REPRESENTATIONS AS TO THE ACCURACY OF THE INFORMATION CONTAINED HEREIN.

**THE JUMPP COMPANY, AUCTIONEER**
CHELMSFORD (800) 850-0205  Mass. License #711
www.jumppcompany.com

---

**MORTGAGEE'S SALE OF REAL ESTATE AT PUBLIC AUCTION**

**LOWELL, MA**

Friday, November 19, 2004 at 11:00 a.m

**43 WALNUT STREET, LOWELL, MA**
- Single Family -

- 6 Rooms 3 Bedrooms
- 2,829+/- SF Lot
- Off Street Parking
- Fenced in Yard
- Excellent Opportunity

TERMS: $5,000.00 deposit, cash or certified funds, at the time of sale. Balance due within thirty (30) days at the Law Office of George Theodoros, 170 Merrimack Street, Lowell, MA. Other terms to be announced at the sale.
DIRECTIONS: Lowell connector to end, left onto Gorham Street, 2nd right onto Walnut Street. Watch for red auction arrows.
Visit www.harkinsrealestate.com for more information.

**HARKINS AUCTIONEERS**
Michael R. Harkins, Auctioneer
Andover & Lowell, MA
(978) 475-1121
www.harkinsrealestate.com
MA License #557

---

**ABSOLUTE AUCTION**
**14.87± Acres of Development Land**
789' frontage on Route 9
Commercial/Business Zone
Route 9 (Boston Turnpike)
**Shrewsbury, MA**
**Wed, Nov 10 @ 12pm**
Auction to be held at Beechwood Hotel,
363 Plantation St., Worcester, MA
Sale per order of MA
Div. of Capital Asset Management
Call **800.521.0111**
www.JJManning.com/658

---

**The showroom is open 24/7.**



**Carfind.com**
The fastest place to buy or sell a car.

| 604 Auctions | 604 Auctions |
|---|---|

**MORTGAGEE'S REAL ESTATE AUCTION**
**TO BE SOLD ON THE PREMISES**
**BROOKLINE, MA REAL ESTATE**
**60 HEATH HILL**

Friday, November 12, 2004 @ 4:00 PM

A PARCEL OF LAND CONTAINING 13,575 +/- SQ. FT. IMPROVED WITH A SINGLE FAMILY CAPE-COD STYLE RESIDENCE CONTAINING (APPROX.) A TOTAL OF TWELVE (12) ROOMS WITH EIGHT (8) BEDROOMS, FOUR AND ONE-HALF (4 1/2) BATHROOMS, AMENITIES INCLUDE CENTRAL A/C, ATTACHED GARAGE, OPEN PORCH AND WOOD DECK. THIS PROPERTY IS LOCATED IN ONE OF BROOKLINE'S FINEST NEIGHBORHOODS. SEE NORFOLK COUNTY REGISTRY OF DEEDS BOOK 15273, PAGE 407.

TERMS OF SALE: A deposit of TWENTY FIVE THOUSAND & NO/100 DOLLARS ($25,000.00) to be paid by certified or bank check by the purchaser at the time and placed of sale. Balance due within 30 days from the sale. Other terms, if any, to be announced at the sale.

Call our automated auction line at (617) 964-1282 for continuously updated advertising information.

Although we take great care in providing you this information which has been obtained from reliable sources, the mortgagee, mortgagee's attorney and auctioneer does not warrant or guarantee its accuracy. All interested parties are advised to do their own research.

**COMMONWEALTH AUCTION ASSOCIATES, INC.**
(617) 964-0005          MA LIC 2205
www.CommonwealthAuction.com

---

**MORTGAGEE'S AUCTION**
**CAPE COD STYLE DWELLING**
**212 COLLEGE STREET SPRINGFIELD, MA**
WEDNESDAY, NOVEMBER 10, 2004 AT 2:00 PM

**DESCRIPTION**
PARCEL ID #03020037 * APPROXIMATE GROSS LIVING AREA - 824 SQ. FT. * ONE UNIT, 5 ROOM PROPERTY, INCLUDING (2) BEDROOMS & (1) BATHROOM * DETACHED GARAGE * OPEN PORCH * APPROXIMATE SITE AREA - 4,250 SQ. FT. *

BY ORDER OF
**STEPHEN J. SHECHTMAN, ESQ.**
SHECHTMAN HALPERIN SAVAGE, LLP
86 WEYBOSSET STREET, PROVIDENCE, RI 02903
ATTORNEY FOR THE PRESENT HOLDER OF THE MORTGAGE
TERMS: $5,000.00 (FIVE THOUSAND DOLLARS) DOWN PAYMENT IN CASH, CERTIFIED OR BANK CHECK (NO PERSONAL CHECKS) AT TIME OF SALE. OTHER TERMS TO BE ANNOUNCED AT THE SALE.

**Max Pollack & Co.**
401-331-6959  FAX 401-831-1270

---

**MORTGAGEE'S AUCTION**
**SPLIT/BI-LEVEL DWELLING**
**667 BRIDGE STREET EAST BRIDGEWATER, MA**
TUESDAY, NOVEMBER 9, 2004 AT 2:00 PM

**DESCRIPTION**
PARCEL ID MAP 28 * PARCEL 47 * APPROXIMATE GROSS LIVING AREA - 1,224 SF * ONE UNIT, BI-LEVEL, 6 ROOM PROPERTY, INCLUDING (3) BEDROOMS & (2) BATHROOMS * FULL BASEMENT, PARTIALLY FINISHED * DECK * FENCE * APPROXIMATE SITE AREA - 36 ACRES *

BY ORDER OF
**STEPHEN J. SHECHTMAN, ESQ.**
SHECHTMAN HALPERIN SAVAGE, LLP
86 WEYBOSSET STREET, PROVIDENCE, RI 02903
ATTORNEY FOR THE PRESENT HOLDER OF THE MORTGAGE
TERMS: $5,000.00 (FIVE THOUSAND DOLLARS) DOWN PAYMENT IN CASH, CERTIFIED OR BANK CHECK (NO PERSONAL CHECKS) AT TIME OF SALE. OTHER TERMS TO BE ANNOUNCED AT THE SALE.

**Max Pollack & Co.**

**MORTGAGEE'S SALE OF REAL ESTATE**
on the premises

**Georgetown**
Cape Style Home
**19 Pingree Farm Road**
Tuesday, November 9, 2004, 11:00 AM - REF #604-04

**Littleton**
**127 Harvard Road**
Wednesday, November 10, 2004, 3:00 PM - REF #826-04

**Natick**
Single Family Home
**11 Spooner Avenue**
Friday, November 12, 2004, 10:00 AM - REF #399-04

**Daniel J. Flynn & Co, Inc.**
1495 Hancock St, 4th fl, Quincy, MA
800-649-0018   MA LIC #858   617-479-9000

---

**AVAILABLE FOR IMMEDIATE SALE**
BY ORDER OF THE UNITED STATES BANKRUPTCY COURT PANEL TRUSTEE
TURNKEY OPERATION:

**THE LIGHTHOUSE INN GALILEE, RHODE ISLAND**

100 ROOM HOTEL WITH RESTAURANT, BANQUET FACILITIES AND IN SEASON PARKING OPERATION FOR GALILEE VISITORS AND BLOCK ISLAND BOAT CUSTOMERS

LOCATED IN CENTER OF THE PORT OF GALILEE • INDOOR POOL • JACUZZI • SAUNA • FITNESS ROOM • GAME ROOM • RESTAURANT • FULL SERVICE RESTAURANT • LOUNGE/BAR • OUTDOOR DINING

REAL ESTATE: APPROXIMATELY 5.14 ACRES OF LAND • 69,434 +/- SQ. FT. BUILDING AREA • 600 PARKING SPACES IN ADDITION TO HOTEL GUEST PARKING • (100) FULLY FURNISHED GUEST ROOMS INCLUDING HARBORSIDE AND POOLSIDE ROOMS • BANQUET ROOM FOR PRIVATE FUNCTIONS • DIRECTLY ACROSS FROM BLOCK ISLAND FERRY DOCK • SHORT WALK TO BEACHES • FULLY EQUIPPED KITCHEN WITH FULL LIQUOR LICENSE

Bids must be received by close: 11/29/04
TO OBTAIN BID PACKAGE CONTACT:
**LISA A. GEREMIA, ESQ. TRUSTEE**
**GEREMIA & DeMARCO, LTD.**
1350 DIVISION ROAD, WEST WARWICK, RI 02893
TEL: (401) 885-1444 EXT 4 OR EMAIL:
lag@geremialaw.com

TO ARRANGE FOR INSPECTION CONTACT:
**MAX POLLACK & CO., AUCTIONEERS, LTD.**
475 HARRIS AVENUE, PROVIDENCE, RI 02909
TEL: (401) 331-6959 FAX: (401) 831-1170
E-MAIL: maxpollack@aol.com
WEB SITE: www.maxpollack.com

---



**AUCTION**
**"The Columns"**
**14.92 Acres - Prime Property**
Partially Renovated - Fabulous Potential
**Saturday, November 20 at 11am**
**401 Main St. (Rt 28) W Dennis, Cape Cod**
Preview: Sun, Nov. 7 & 14, 11am-1pm
Terms: 10% Deposit, $25k Cash or Bank Check. Balance 45 days. 10% Buyers Premium.

For More Info, Pictures Visit
www.JJManning.com/666
**800.521.0111**

| 604 Auctions | 604 Auctions |
|---|---|

**Mortgagee's Sale of Real Estate at Public Auction**
To Be Held On The Premises

**Southbridge Real Estate**
176 Dresser St., Southbridge, MA
Friday, November 19, 2004 at 10:00 A.M.

**DEAN ASSOCIATES, INC.**
AUCTIONEERS & CERTIFIED APPRAISERS
825 Beacon St., Suite #7, Newton, MA 02459
Tel: 617-630-6802 Mass Lic #306 • MA Lic #958 • FLA Lic #AB3029 • RI Lic #2752
Visit our Website at www.deanassociatesinc.com

---

**New Bedford Real Estate**
Multi Family
59 Church Street, New Bedford, MA
Friday, November 12, 2004 at 10:00 A.M.

**DEAN ASSOCIATES, INC.**
AUCTIONEERS & CERTIFIED APPRAISERS
825 Beacon St., Suite #7, Newton, MA 02459

---

**Mortgagee's Sale of Real Estate at Public Auction**
To Be Held On The Premises

**Canton Commercial Real Estate-Office Building**
160 Royall St., Canton, MA
Friday, November 19, 2004 at 10:00 A.M.

**DEAN ASSOCIATES, INC.**
AUCTIONEERS & CERTIFIED APPRAISERS
825 Beacon St., Suite #7, Newton, MA 02459
Visit our Website at www.deanassociatesinc.com



**JOBFIND WORKS.**
get working. get workers.

**IN PRINT AND ONLINE AT jobfind.com**

| 604 Auctions |
|---|

Mortgagee's Sale of Real Estate at Public Auction
November 8, 2004 @ 9:00 AM
Terms of Sale: A deposit in the amount of $5,000 - FIVE THOUSAND DOLLARS...

Herald sports columnist Gerry Callahan holds nothing back in his weekly columns, Tunnel Vision.

From Spring to Fall, fishing fans are treated to Ted Ancher's Bass Bets.

SPEAK YOUR MIND! Herald sports fans are able to voice their opinions each Sunday in the Fanfare Poll.

COVERING ALL BASES. This two-page Sunday spread — by Boston Herald columnist Tony Massarotti is a favorite for Sox fans.

Look for the Patriots Report Card in the Herald each Tuesday during the football season.

BOXING FANS, turn to George Kimball's Boxing Notes each Monday in the Boston Herald.

---

**Mortgagee's Sale of Real Estate at Public Auction**
November 8, 2004 @ 12:00 Noon

To place your auction ad, call with time or address 1-800-624-9250 or email whsale@bostonherald.com

SD002

# BARNETT
# AFFIDAVIT
# EXHIBIT M

# EXCERPTED MATERIALS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

    Plaintiff, Defendant-in-Counterclaim.

    v.

CREDIT SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORP.,

    Defendant,

    and

CSFB 1999 – C1 ROYALL STREET, LLC;

    Defendant, Plaintiff-in-Counterclaim,

    v.

WILLIAM LANGELIER and GERALD
FINEBERG,

    Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

**CSFB 1999 – C1 ROYALL STREET, LLC'S ANSWERS TO
GERALD FINEBERG AND WILLIAM LANGELIER'S FIRST SET OF
INTERROGATORIES**

Defendant CSFB 1999 – C1 Royall Street, LLC  ("Lender") hereby answers Gerald

Fineberg and William Langelier's First Set of Interrogatories to CSFB 1999-C1 Royall Street,

LLC (the "Interrogatories"), as follows:

Under § 1.5 of the Guaranty, Fineberg and Langelier are required to pay any amount due on the Guaranteed Obligations (as defined therein) immediately upon demand. Lender demanded payment by letter dated April 20, 2005, from Mr. Tucker, on behalf of CSFB 1999 – C1 Royall Street, LLC, to Langelier and Fineberg, who have not made any payments under the Guaranty.

Lender reserves the right to supplement this Answer as discovery proceeds.

## INTERROGATORY NO. 11

**Please state the basis of and identify in detail all facts and documents that support your contentions that Fineberg and Langelier violated M.G.L. c. 93A as alleged in Count VI of the Counterclaim filed by CSFB.**

## RESPONSE NO. 11

Subject to and without waiving the General Objections, Lender answers as follows:

Blue Hills and Fineberg failed to notify the mortgagee of the Zoning Appeal, its compromise of that appeal, or its receipt of the settlement payment. Blue Hills intentionally failed to obtain its mortgagee's prior written consent to the compromise of the Zoning Appeal. Blue Hills intentionally failed to deposit the Payment into the Clearing Account.

Lender reserves the right to supplement this Answer as discovery proceeds.

## INTERROGATORY NO. 12

**Please state the basis of and identify in detail all facts and documents that support your claim for damages in the amount of $10,770,847.00 plus $1,134,250.90 in interest as set forth in your Initial Disclosures.**

## RESPONSE NO. 12

Subject to and without waiving the General Objections, Lender answers as follows:

- - 15 - -

As of November 11, 2004, the total debt owed by Blue Hills to Lender was

$33,343,438.59, with a principal balance of $31,979,793.66. Interest on that principal balance

from November 11, 2004, through the foreclosure on November 19 at the Mortgage Note default

rate of 13.49 per cent is $95,868.31. The amount of the foreclosure bid ($18,500,000) and the

reserves held by the Lender as of the foreclosure ($4,168,460.18) are credited against the total

debt as of the time of the foreclosure. Interest at the default rate on the remaining debt

($10,770,846.72) from the foreclosure through August 31, 2005 (the date of the Initial

Disclosures) is $1,150,281.55. (Lender states that the computation of damages included in the

Initial Disclosure is erroneous because the amount of post-foreclosure interest stated in that

document (and in the Interrogatory) was calculated on the basis of 365-day year instead of a 360-

day year, as called for by the Mortgage Note.)

In accordance with Rule 33(d), Lender states that further information responsive to this

Interrogatory may be ascertained from documents and business records Lender has produced or

will produce in this action, including in particular a loan payoff statement calculated as of

November 11, 2004. (Bates No. LNR03485.)

**INTERROGATORY NO. 13**

   **Please identify all acts undertaken by CS Bank, CSFB, Wells Fargo or Lennar to
sell, lease or market the Property to prospective buyers or tenants, both before and after
the foreclosure sale. In your answer, please identify all documents supporting such efforts,
including but not limited to, brokerage agreements, marketing brochures, inspections,
appraisals, offers to purchase, purchase and sale agreements, and all other documents
related to CSFB's marketing of, sale or lease of the Property.**

**RESPONSE NO. 13**

Lender objects to this Interrogatory to the extent it calls for identification of acts

undertaken by those outside of its control or for documents outside of Lender's custody,

possession or control. Lender further objects to this Interrogatory because it is overly broad and

The foregoing answers are based in part on personal knowledge of the undersigned and in part on other information available to Lender, which the undersigned believes to be true.

Signed under the pains and penalties of perjury this 11th day of November, 2005.

CSFB 1999 – C1 ROYALL STREET, LLC.,

By LNR Massachusetts Partners, Inc., its manager,

By its designated agent,

_____

Joseph A. Polcari, Asset Manager

Signed as to all objections pursuant to Rule 33, Fed.R.Civ.P., this 11th day of November, 2005.

E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO# 544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place
Boston, MA 02110
(617) 406-6000

- - 18 - -

~BOST1:393840.v2

The foregoing answers are based in part on personal knowledge of the undersigned and in part on other information available to Lender, which the undersigned believes to be true.

Signed under the pains and penalties of perjury this 11th day of November, 2005.

CSFB 1999 – C1 ROYALL STREET, LLC.,

By LNR Massachusetts Partners, Inc., its manager,

By its designated agent,

_____

Joseph A. Polcari, Asset Manager

Signed as to all objections pursuant to Rule 33, Fed.R.Civ.P., this 11th day of November, 2005.

_____

E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO# 544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place
Boston, MA  02110
(617) 406-6000

- - 18 - -

# BARNETT AFFIDAVIT EXHIBIT N



**PIPER RUDNICK
GRAY CARY**

DLA Piper Rudnick Gray Cary US LLP
33 Arch Street, 26th Floor
Boston, Massachusetts 02110-1447
T 617.406.6000
F 617.406.6100
W www.dlapiper.com


BRUCE E. FALBY
bruce.falby@dlapiper.com
T 617.406.6020   F 617.406.6120


April 20, 2006

**BY FAX AND MAIL**

Meredith A. Swisher, Esq.
Bernkopf Goodman LLP
125 Summer Street, 13th Floor
Boston, MA  02110

    Re:   *Blue Hills Office Park LLC v. Credit Suisse*
         *First Boston Mortgage Securities Corp., et al.*
         <u>Civil Action No. 05-CV-10506 (WGY)</u>

Dear Meredith:

       This letter responds to your letter of April 19, 2006.

       The requests in our September 15, 2005 document request for all documents covering the settlement payment and Blue Hills' damages could not have been clearer.  Documents that Blue Hills' expert relies on to give opinions about the settlement payment and damages are obviously responsive yet were never produced.

       In our second document request, we asked for all tax returns and other documents concerning claimed tax losses (requests 23 and 24).  Blue Hills still has not produced the individual tax returns of the individuals Mr. Andelman claims suffered tax losses.  I reiterate the requests made in letters dated April 5, 11, and 17 for those tax returns.

       You have also requested that we produce all draft reports and communications of our expert Mr. Stotz, yet you have not produced any such documents for Mr. Andelman.  We request immediate production of those documents.

Serving clients globally



Meredith A. Swisher, Esq.
April 20, 2006
Page 2

Please also produce the draft reports, communications, and documents relied upon by your other experts, and other documents in their files on this matter.

Sincerely,

Bruce E. Falby

BEF/lnf

cc:   Bruce S. Barnett, Esq.
      Traci S. Feit, Esq.

~BOST1:415496.v1



**DLA Piper Rudnick Gray Cary US LLP**
33 Arch Street, 26th Floor
Boston, Massachusetts 02110-1447
T 617.406.6000
F 617.406.6100
W www.dlapiper.com


BRUCE E. FALBY
bruce.falby@dlapiper.com
T 617.406.6020  F 617.406.6120

April 17, 2006

**BY FAX AND U.S. MAIL**

Peter B. McGlynn, Esq.
Bernkopf Goodman LLP
125 Summer Street, 13th Floor
Boston, MA  02110

> Re:  *Blue Hills Office Park LLC v. Credit Suisse*
> *First Boston Mortgage Securities Corp., et al.*
> <u>Civil Action No. 05-CV-10506 (WGY)</u>

Dear Peter:

The Rebuttal Expert Report of David P. Andelman, Esquire dated April 14, 2006 gives an opinion concerning the settlement payment.  Mr. Andelman relies on certain Blue Hills' financial statements.  Our first document request dated September 15, 2005 requested all documents concerning the settlement payment (request no. 4).  Blue Hills never produced the documents on which Mr. Andelman relies, and represented, to the contrary, that it had produced all documents concerning the settlement payment in its custody, possession, or control.  Please produce these newly identified documents immediately.  Judge Young has already ruled that Blue Hills is precluded from introducing such evidence.

I renew the requests we have already made for Blue Hills to produce the documents described in Traci Feit's letters to you dated April 5, 2006 and April 11, 2006.

Sincerely,

Bruce E. Falby

BEF/ss

cc:  Traci S. Feit, Esq.
     Meredith A. Swisher, Esq. *(by fax and mail)*

**Serving clients globally**



**PIPER RUDNICK GRAY CARY**

DLA Piper Rudnick Gray Cary US LLP
33 Arch Street, 26th Floor
Boston, Massachusetts 02110-1447
T 617.406.6000
F 617.406.6100
W www.dlapiper.com

TRACI S. FEIT
traci.feit@dlapiper.com
T 617.406.6010  F 617.406.6110

April 11, 2006

**BY FAX AND U.S. MAIL**

Peter B. McGlynn, Esq.
Bernkopf Goodman LLP
125 Summer Street, 13th Floor
Boston, MA  02110

Re:  *Blue Hills Office Park LLC v. Credit Suisse*
     *First Boston Mortgage Securities Corp., et al.*
     Civil Action No. 05-CV-10506 (WGY)

Dear Peter:

This is in response to your letter dated April 10, 2006, which you faxed to me yesterday. Thank you for agreeing to produce all documents referred to and/or relied upon by David Andelman in his expert report, including tax returns and accountant work papers concerning damages allegedly incurred by Blue Hills Office Park LLC ("Blue Hills").

As you know, however, in my April 5, 2006 letter to you I also requested that you produce individual tax returns (from 2001 to present) for each beneficiary of the Royall Associates Realty Trust, which you have put in issue by claiming taxes incurred by those individuals. Without these returns it is impossible to determine the amount of taxes each beneficiary would actually incur if there was a gain on foreclosure. They might not incur any income taxes, if they had loss carryovers available to offset the foreclosure gain, or if they had losses from other activities in the year of the foreclosure which exceeded the foreclosure gain. These documents should have already been produced as they are directly responsive to our requests for production. Therefore, I must insist that you produce these documents immediately.

**Serving clients globally**



Peter B. McGlynn, Esq.
April 11, 2006
Page 2

Thank you for your time and attention to this matter.

Sincerely,

Traci S. Feit

TSF/lnf

cc:    Meredith A. Swisher, Esq.

~BOST1:414238.v1



**PIPER RUDNICK
GRAY CARY**

DLA Piper Rudnick Gray Cary US LLP
33 Arch Street, 26th Floor
Boston, Massachusetts 02110-1447
T 617.406.6000
F 617.406.6100
W www.dlapiper.com


TRACI S. FEIT
traci.feit@dlapiper.com
T 617.406.6010  F 617.406.6110


April 5, 2006

## BY HAND DELIVERY AND U.S. MAIL

Peter B. McGlynn, Esq.
Bernkopf Goodman LLP
125 Summer Street, 13th Floor
Boston, MA  02110

> Re:  *Blue Hills Office Park LLC v. Credit Suisse*
> *First Boston Mortgage Securities Corp., et al.*
> <u>Civil Action No. 05-CV-10506 (WGY)</u>

Dear Peter:

I write to demand that you immediately produce all documents referred to and/or relied upon by David Andelman in his expert report, including tax returns and accountant work papers concerning damages allegedly incurred by Blue Hills Office Park LLC ("Blue Hills"). We requested all documents concerning Blue Hills' damages in our first request for production, and specifically requested all documents concerning Blue Hills' alleged tax losses in our second request for production. As such, these documents should have already been produced, and we now need the documents immediately for expert rebuttal disclosures.

Additionally, please immediately produce individual tax returns (from 2001 to present) for each beneficiary of the Royall Associates Realty Trust, which you have put in issue by claiming taxes incurred by those individuals and without which it is impossible to determine the amount of imputed taxable gain to each beneficiary. Again, these documents should have already been produced as they are directly responsive to our requests for production.

If you will not produce the above-referenced documents by Friday, April 7, 2006, please notify me immediately.

Sincerely,

*Traci Feit*

Traci S. Feit


TSF/lnf


~BOST1:413636.v1
**Serving clients globally**