UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

       Plaintiff, Defendant-in-Counterclaim,

       v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

       Defendants, Plaintiffs-in-Counterclaim,

       v.

WILLIAM LANGELIER and GERALD
FINEBERG,

       Defendants-in-Counterclaim.

Civil Action No. 05-CV-10506 (WGY)

**DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S
APPENDIX OF DEPOSITION EXHIBITS**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,
      Plaintiff, Defendant-in-Counterclaim,
              v.
J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage       Civil Action No.  05-CV-10506 (WGY)
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,
      Defendants, Plaintiffs-in-Counterclaim,
              v.
WILLIAM LANGELIER and GERALD
FINEBERG,
      Defendants-in-Counterclaim.

## AFFIDAVIT OF TRACI S. FEIT

I, Traci S. Feit, depose and say as follows:

1.      I am counsel to defendants/counterclaimants in this action.  I have personal

knowledge of the matters set forth herein.

2.      I am filing herewith a true and correct copy of certain Exhibits marked at

depositions in this matter.  The Exhibits are identified and tabbed according to the numbers given

to them in the depositions.  As a result, there are gaps in the sequence of the attachments.

SIGNED, under the penalties and perjury, this 17th day of May, 2006.

Traci S. Feit

~BOST1:419151.v1 |

# DEPOSITION EXHIBIT #1

# THE FINEBERG COMPANIES

ONE WASHINGTON STREET, STE #400
P.O. BOX 9139
WELLESLEY HILLS, MA. 02481
PHONE: (781) 239- 1480
FAX:    (781) 239-1493



EXHIBIT
Stone 1
2.9.06 0A

TO:- ELHAM

COMPANY: WELLS FARGO

FROM: PAUL WALLGRAN

DATE: OCT 27, 99

TOTAL NUMBER OF PAGES(INCLUDING COVER SHEET) 3

COMMENTS:

1- LETTER A AGREEMENT

2- R/E TAX INVOICE

3- THIS BILL IS DUE ON

NOV 1, 1999

THANKS

OCT.27.1999  11:15AM   FINEBERG MANAGEMENT

**BLUE HILLS OFFICE PARK, LLC**
**P.O. BOX 9139**
**WELLESLEY HILLS, MA. 02481**

September 29, 1999

Jim Lingle
Orix Real Estate Capital Markets, LLC
1717 Main St., 12th Floor, TX1-2495
Dallas, TX 75201

Re: ORECM Loan #197000600
      Blue Hills Office Park, LLC

Dear Mr. Lingle:

Please let this letter serve as a recap of our agreement with our tenant at the above referenced location regarding the quarterly real estate tax payments to the Town of Canton.

We currently have an understanding with Equiserve that they will pay us in advance of the due date for the real estate taxes as long as we send them a receipted copy directly upon payment. In order to do so, we bring payment each quarter to the Town of Canton and immediately fax the receipted copy to the tenant and the mortgagee.

Because of the aforementioned agreement and the fact that the Town of Canton sends us the quarterly billing semi-annually, we have found that it is much more effective for us to pay the bills in person and to be funded in advance by the mortgagee

Should you have any questions please call me at (781) 239 – 1480

Sincerely,

Lawrence G. Needle
Blue Hills Office Park, LLC

FROM COM OCT.27.1999 M.11:15AMETTS FINEBERG MANAGEMENTINARY REAL ESTATE TAX BILL    BILL NO. 615    P. 3/3
TOWN OF CANTON                                                                    JUNE 30, 1999    1170-04

Based on assessments as of January 1, 1999, Your Real Estate Tax
for fiscal year beginning July 1, 1999 and ending June 30, 2000 on
the parcel of real estate described below as follows                SEE REVERSE SIDE FOR IMPORTANT INFORMATION

...Assessor / Treasurer  James R Mogan
This form approved by the Department of Revenue

... MTF PAYMENTS TO: TOWN OF CANTON
                    P.O. BOX 378
                    CANTON, MA  E2821

... OWNER OF RECORD

| PROPERTY DESCRIPTION | |
| --- | --- |
| PARCEL    051-009 | |
| LOCATION    00150 ROYALL ST | |
| CLASS    340 | |

ROYALL ASSOCIATES REALTY TRUST
FINEBERG G S & LANGELIER W TRS
1 Washington St
Wellesley            MA    02481-1706

| PRELIMINARY REAL ESTATE TAX | $297,765.94 |
| --- | --- |
| 1ST QTR INSTALLMENT | $148,882.97 |
| 2ND QTR INSTALLMENT | $148,882.97 |

2ND QTR TAX DUE 11/1/1999    $148,882.97

PAYMENT COUPON 2

05700180000422 00001170042 0148882970

paid 148,882.97

# DEPOSITION EXHIBIT NO. 4



Commercial Mortgage Servicing
P.O. Box 4036, Concord, CA 94524
1320 Willow Pass Rd., Sta. 205
Concord, CA 94520
800 986-9711

July 16, 2004
Fax # 781 - 239 - 1493

BLUE HILLS OFFICE PARK LLC
ONE WASHINGTON STREET, SUITE 400
WELLSLEY, MA      02481-0000

**EXHIBIT**
Stone 4
2·9·06 QA

Re:     Loan # 76-0990083
        Property Tax Shortage

Dear Mortgagor(s):

This letter is to inform you that your escrow account has insufficient funds to pay the 1st installment, which is due and payable to the Town of Canton. Tax shortages are typically caused by an increase in tax amounts billed by the Tax Collector over the prior year. The property taxes, which are payable now, will be delinquent after 8/2/04. The taxes due are in the amount of $158181.19. Currently, your tax escrow balance is $0.00, which indicates a shortage in the amount of $158181.19.

Please remit $158181.19 payable to Wells Fargo Bank, to my attention at the address below or via wire instructions as follows:

*Express Mail address*                          *US Mail Address*
*Wells Fargo, Commercial Mortgage Servicing*    *Wells Fargo Commercial Mortgage Servicing*
*Attn:  Tim Parish, Property Tax Dept.*         *Attn: Tim Parish, Property Tax Dept.*
*1320 Willow Pass Road, Suite 205*              *P.O. Box 4036*
*Concord, CA 94520*                             *Concord, CA 94524*

*Wire Instructions:*     *Wells Fargo Bank, ABA #121-000-248*
                         *200 B Street, Santa Rosa, CA*
                         *Credit to:  Wells Fargo Commercial Mortgage Servicing*
                         *Account # 4535-078117*
                         *Reference:     For further credit to WFCMS loan #76-0990083*
                                         *Property tax escrow shortage*
                                         *Attn:  Tim Parish*

These funds must be received in our office no later than 7/27/03 in order for us to issue payment to the Town of Canton by 8/2/04. Please include the loan number on your check to ensure proper identification. Failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to your loan.

Should you have any questions or concerns regarding this matter, please contact me at the toll free number 1-800-986-9711 Ext 5303.

Sincerely,

Tim Parish
Operation Department

INV # 524

Blue Hill 0469

# DEPOSITION EXHIBIT NO. 5

```
XG073-02        UPDATE                Notes Maintenance              Apr  1,2005 Friday
                                                                         3:01 P.M.
-------------------------------------------------------------------------------
  Account number   760990083   BLUE HILLS OF   Note date    7/29/2004
 *Note type. . . . . . . . .              TX    TAX
  Reference number . . . . . .  NO TAX DSBRSMNT

                                Note Text

        I have contacted Gil Stern phone #1-781-239-1480 and notifie
        d him that per his loan agreement the only way we could move
        money from his reserve account to his tax account is if he
        provides a Certification Letter, Copy of Lease, or leases,
        and Copy of Invoice/Lien Waiver. Gil Advised that he did
        not have a Lien Waiver. I have contacted Jill Martin and she
        referenced that without the Lien Waiver, Gil will not be
        able to move money from reserves to the tax escrow bucket.
        Escalating this matter to Deborah Lambson.


-------------------------------------------------------------------------------

 F1=Rtn/Nc                        F12=Edit    Enter=Process    Roll keys
```

EXHIBIT

Stone E
2.9.06 DA

WF01745

```
              UPDATE                                    Apr  1,2005 Friday
XG073-02                    Notes Maintenance                3:01 P.M.
-------------------------------------------------------------------------
  Account number  760990083  BLUE HILLS OF  Note date   7/29/2004
  *Note type. . . . . . . . .            TX    TAX
  Reference number . . . . . . NON COMPLIANCE
                              Note Text

        I have called and talked with Gil Stern with regards to the
     tax shortage that was billed 7/16/04 and due 7/27/04. Taxes
     are due to the Town of Canton by 8/2/04. Gil stated that
     their tenant moved out and there are no available funds to
     pay taxes. We contacted Reserve Dept per borrower request
     to find out if Reserve money could be moved to tax escrow;
     Borrower unable to comply with requirements for transferring
     reserve money to tax escrow.   Advancing funds today per
     Ops Manager approval. Escalating to Asset Manager.


-------------------------------------------------------------------------

  F1=Rtn/Nc                        F12=Edit    Enter=Process    Roll keys
```

EXHIBIT
Stone 6
2·9·06 DA

WF01746

**Lloyd, Brent T.**

| | |
|---|---|
| **From:** | Lloyd, Brent T. |
| **Sent:** | Thursday, July 29, 2004 2:19 PM |
| | Engstrom, Deanna M. |
| **)ject:** | FW: Re: Loan # 76-0990083 Blue Hills Office Park LLC - Borrower cannot pay property taxes due 8/2/04 - |
| **Importance:** | High |
| **Follow Up Flag:** | LN # 76-0990083 Taxes need to be paid by 7/30/04 |
| **Due By:** | Thursday, July 29, 2004 2:00 PM |
| **Flag Status:** | Flagged |



Deanna,

Deborah wants to pay the taxes today for this account. Please get the check to me for signing ASAP, and overnight the check.

Thanks.

Brent

-----Original Message-----

| | |
|---|---|
| **rom:** | Lloyd, Brent T. |
| **ent:** | Thursday, July 29, 2004 1:24 PM |
| **o:** | Lambson, Deborah E. |
| **c:** | Engstrom, Deanna M. |
| **ubject:** | Re: Loan # 76-0990083 Blue Hills Office Park LLC - Borrower cannot pay property taxes due 8/2/04 - |
| **nportance:** | High |

Deborah,

wanted to advise that for the above referenced loan the borrower is not going to be able to make the payment for their xes due on 8/2/04. I have spoken with Gil Stern (Borrower) phone # 1-781-239-1480, and he advised that his tenant is ne, and therefore he will not have the funds required to make the tax payment due in the amount of $158,181.19. I have ached notepads that both Deanna, and myself have placed on this account. I have verified that this agency is not postal otected, which means the taxes must be paid out tomorrow in order for the payment to reach the tax collector by 8/2/04. n you please advise if you would like us to advance funds, and if so I will be sure to get the disbursement out first thing.



n # 76-0990083
annot Pay T...

anks.
nt Lloyd
an Servicing Supervisor
lls Fargo Commercial Mortgage Servicing
!0 Willow Pass Road
te 205
ncord, CA 94520
ne # 800-986-9711 Ext 5378
# 925-691-5249

information contained in this e-mail message may be privileged, confidential and protected from disclosure. nu are not the intended recipient, please contact the sender by phone or reply email and destroy all copies of inal message.

Zone 9
2-9-06 M

Return Form, Fee & Plans for Board of Appeals to:
BUILDING DEPARTMENT, Lower Level, Memorial Hall, Canton, MA 02021         PLEASE PRINT

RECEIVED
APR 3 2003
TOWN CLERK
CANTON MA

## Town of Canton
## BOARD OF APPEALS

Hearings 2nd and 4th THURS. evenings each month          DATE  April 4, 2003

Petitioner's Name  National Development And Equiserve

Owner's Name  BlueView Corporate Center LLC

Address  2310 Washington St.                    Tel No.  (617) 527-9800

Newton, MA          02462

Petitioner's Attorney for case (if any)  Richard R. Staiti, Esq.

LOCATION OF PROPERTY: 250 Royall Street        AREA ZONED FOR:  LI

IS PROPERTY LOCATED IN GROUNDWATER PROTECTION DISTRICT: ( )YES    (x)NO

APPLICABLE SECTION ZONING BY-LAWS:        SIZE OF PARCEL        SIZE OF BLDG.
2.15.2(C) p.30   3.0 p.38               Acres, Sq. Ft.        Sq. Ft.
                                        10.76 ±               133,000 sf ±
Sect.   Page    Sect.   Page

To enable the Board of Appeals and the Planning Board to give proper consideration to the plan submitted, such plan must incorporate the requirements listed in the Zoning By-law.

(x) SITE PLAN APPROVAL (Modification)         Indicate sq. ft. of building and other items as
Fill out this application in duplicate.       required in Art. III, 3.0 of Zoning By-law.
(1) copy to Planning Board with (3) copies of Plans.   Furnish seven (7) copies of site plan, 3 copies delivered
                                              to Planning Board two (2) weeks prior to Board of
                                              Appeals Hearing expedites decision. Four (4) copies
                                              should accompany this request.

( ) SPECIAL PERMIT (Sign)                     Copies of design of signs must be in triplicate. Indicate
                                              measurements, colors and location.
( ) SPECIAL PERMIT (Flood Plain)
(x) SPECIAL PERMIT (Use)
( ) SPECIAL PERMIT (Reduced Parking)
( ) SPECIAL PERMIT (Ground Water Protection)
( ) SPECIAL PERMIT (Telecommunication Tower)

(x) VARIANCE (if necessary)                   Explain reason for request in detail below and enclose
                                              pertinent plans.

( ) EXTENSION OF NON-CONFORMING               Explain reason for request in detail below and enclose
    USE OR BUILDING                           pertinent plans.

ADDITIONAL REMARKS (USE OF BUILDING OR PROPERTY)

Petitioner seeks a Special Permit and approval of modification and amendment to
existing site plan for the property in order to construct a parking garage on
the property.

BLUE HILL 1566

LIST OF ABUTTERS AND THEIR ABUTTERS: Obtain from Assessors Office, 1st FL. Town Hall. ATTACH LIST.

RECEIVED
APR 3 2003

BLUEVIEW CORPORATE CENTER, LLC
SIGNATURE OF APPLICANT  Lester K. ...
SIGNATURE OF OWNER  By: Theodore R. ...

RECEIVE
APR 14 2003
CANTON PLANNING BOARD

PETITIONER OR HIS REPRESENTATIVE MUST BE PRESENT AT THE HEARING

for Z.B.A



## LEASE TERMINATION AGREEMENT

This **LEASE TERMINATION AGREEMENT** entered into as of this 5th day of August, 2003 between EquiServe, Inc., successor to Equiserve Limited Partnership, as "Tenant", and Blue Hills Office Park, LLC, as "Landlord", relating to the Lease dated April 19, 1989, as subsequently amended and assigned (the "Lease"), covering a portion of the premises commonly known and addressed as 150 Royall Street, Canton, Massachusetts (the "Demised Premises").

WHEREAS, the term of the Lease ends on July 31, 2004 and, for all purposes, Tenant has waived, relinquished and terminated its right to extend that term or in any manner to otherwise occupy the Demised Premises beyond July 31, 2004 (the "Termination Date"), except as herein specifically set forth; and

WHEREAS, Tenant, in making arrangements for its relocation from the Demised Premises, has worked with Landlord to reach agreements herein set forth as to the contents and condition of the Demised Premises upon it being vacated by Tenant;

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) paid by each party hereto to the other, and in consideration of the mutual agreements herein, the receipt and sufficiency of which consideration the undersigned acknowledge, Landlord and Tenant agree as follows:

1. <u>Personalty, Fixtures & Equipment.</u> At the Termination Date or the conclusion of the Holdover Period (defined in Section 4, below), as the case may be, or such earlier date upon which the Lease is properly terminated on account of Tenant's default, Tenant agrees to leave the following personalty or equipment at the Demised Premises:

> (i) Voice and data cabling and electric wiring and equipment other than non-telephone computers and computer equipment, handsets and telephone switching equipment;
>
> (ii) Security system including its wiring, cameras and monitors;
>
> (iii) All health club and cafeteria furniture, fixtures, equipment and inventory owned by Tenant or any affiliates of Tenant;
>
> (iv) Generator and its appurtenances;
>
> (v) Electric scissor lift utilized by Tenant at the Demised Premises;
>
> (vi) A minimum of sixty percent (60%) of the workstation partitions, tracks and wiring and related office furniture (collectively, "Workstations") presently located in the Demised Premises, provided that the Workstations removed from the Demised Premises shall be generally of the same quality, type and mix as those that remain in the Demised Premises, that those removed are removed to 250 Royall Street in Canton, Massachusetts, being the property to which Tenant intends to move, or are used as "trade-ins" for procuring furnishings for the same, and that the Workstations which remain in the Demised Premises shall remain in one or more contiguous areas; and

(vii)    All HVAC, plumbing and electrical systems (including fixtures and equipment making up the same) presently located in the Demised Premises and placed therein by Tenant and not otherwise specifically dealt with in (i) through (vi) above.

The personalty or equipment to be left in the Demised Premises by Tenant by the terms of this Paragraph 1 described in the foregoing subsections (i) through (vi), inclusive, is referred to collectively as the "Yield Up Property." Tenant may, but is not obligated, to remove all its other personalty, fixtures and equipment (collectively, "Tenant Property") from the Demised Premises, and shall not remove or restore its alterations and modifications located therein. Title to the Yield Up Property and any other Tenant Property that remains at the Demised Premises on the Termination Date or at the conclusion of the Holdover Period, as the case may be, shall vest in Landlord on such date. Upon request of Landlord at or after such date, Tenant shall execute and deliver to Landlord a bill of sale in the form attached hereto as Exhibit A confirming transfer of title to the Yield Up Property. Any Tenant Property not removed at the Termination Date as that date is applicable to the Demised Premises not subject to holdover hereunder, and as applicable to the Holdover Premises, as applicable, shall be considered abandoned by Tenant and may be used or disposed of by Landlord as it determines, without Landlord or Tenant having any obligation to the other or any third party relating thereto, including, without limitation, any obligation of Landlord for an accounting thereof to Tenant or any third party.

2.    Condition of Yield Up Property and Other Equipment & Fixtures. All Yield Up Property shall be maintained by Tenant through the Termination Date applicable to the Demised Premises in which they are located, in good operating condition. In addition, Tenant shall continue to maintain in good operating condition through the Termination Date the currently existing building systems (such as the plumbing, electrical and HVAC systems) and the components, fixtures and equipment comprising the same and shall leave the same in the Demised Premises as and when required to be vacated hereunder.

3.    Removal Damage. Tenant shall use reasonable care in its move out and removal of Tenant Property. Damage caused by Tenant's move-out or removal of Tenant Property other than incidental blemishes in paint and finishes shall be repaired by Tenant to reasonably good condition. If Tenant breaches its obligations under this Section 3 and Landlord reasonably expends in excess of Ten Thousand Dollars ($10,000) to bring the Demised Premises into a condition consistent with this Section 3, Tenant shall be obligated to reimburse Landlord for such reasonable expenses in excess of Ten Thousand Dollars ($10,000) within seven (7) days of receipt of an invoice therefor.

4.    Holdover. Tenant shall have the right to hold over in a portion of the Demised Premises (but not in the area shown as Bay 000 on the floor plan attached hereto as Exhibit B and incorporated herein by reference), provided that:

A.    Tenant gives Landlord written notice on or before January 15, 2004, of its intention to hold over, which notice shall identify the contiguous area on the first and/or second floor of the Demised Premises in which Tenant intends to hold over (the "Holdover Premises"), such notice also must

2

state the duration of the hold over through the end of a calendar month, but not beyond October 31, 2004 (the hold over termination date as so specified by Tenant, the "Holdover Termination Date"). The holdover notice must also identify the Yield Up Property which will be yielded up to Landlord on the Termination Date and generally describe the personal property Tenant intends to remove or leave at the Demised Premises on the original Termination Date and on the Holdover Termination Date. Tenant's right to holdover is further subject to the following conditions: (i) Tenant shall have then maintained its obligations under the Lease current, without default not cured within any applicable grace period; (ii) Tenant otherwise vacates the remaining Demised Premises (i.e., the non Holdover Premises) in the Building on or before July 31, 2004, and (iii) Tenant pays rent and additional rent for its holdover of the Holdover Premises, calculated at that rate per square foot equal to 110% times per the square foot rent under the Lease, which payment is to be made on or before July 1, 2004, together with other sums which accrue for Tenant's occupancy for the month of July, 2004;

B.      Landlord will have the right, in addition to any other remedies at law or under the Lease, to have Tenant vacate and to recover the Demised Premises as of the Termination Date and the Holdover Premises (if any) as of the Extended Termination Date (by summary process or specific performance, as Landlord determines), free and clear of any right or interest of Tenant therein. Landlord's cost in proceedings to recover possession, including but not limited to reasonable legal fees and related costs, shall be payable by Tenant within 7 days after being invoiced therefor. If Tenant holds over in any portion of the Demised Premises for which Tenant has no right to holdover in accordance with this Paragraph 4, Tenant shall be responsible for holdover rent for a full calendar month on account of Tenant occupying for all or any portion of a month, at a rate equal to the rent, additional rent and other sums which accrue with respect to its occupancy of the Demised Premises for the month of July, 2004, times 150%; and

C.      In the event of a holdover by Tenant pursuant to Paragraph 4.A above, the term "Termination Date" shall apply (i) to the Extended Termination Date for the Holdover Premises, but not later than October 31, 2004 as to the Holdover Premises, and (ii) to July 31, 2004 for the remaining portion of the Demised Premises.

5.      <u>Representations & Warranties</u>. Landlord and Tenant represent and warrant to the other as follows:

A.      It has all requisite corporate power and authority to execute, deliver and perform this Agreement without further authorization or condition precedent; and

B.      Its execution, delivery and performance of this Agreement constitutes a legal, valid and binding obligation enforceable in accordance with its terms effective and enforceable as of this date.

3

6.    Miscellaneous.

    A.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

    B.    This Agreement shall be governed by and enforced and construed in accordance with the laws of the Commonwealth of Massachusetts. Any action at law or in equity arising out of or relating to this Agreement shall be filed only in the Superior Court of either Norfolk County or Suffolk County, Massachusetts, and the parties hereby consent and submit to the personal jurisdiction of such courts for the purpose of litigating any such action.

    C.    The parties hereto waive all right to trial by jury, and expressly agree to bear their own costs of such litigation including, but not limited to, attorneys' fees; provided, however, to the extent a party is held to have breached its agreements herein, that liable party shall also be responsible to pay and reimburse the other party for its reasonable legal fees and costs incurred in that proceeding.

    D.    This Agreement may not be altered, amended, or otherwise modified except by writing duly executed by an authorized representative of the party against which enforcement is sought.

    E.    This Agreement constitutes the entire understanding of the parties hereto with respect to the condition of the Demised Premises and the Termination Date of the Lease.

    F.    The recitals herein are incorporated within and made part of this Agreement.

**[Remainder of Page Intentionally Blank]**

4

BLUE HILL   1606

IN WITNESS WHEREOF, the undersigned have signed this Lease Termination Agreement under seal as of the day and year first above-written.

EquiServe, Inc., successor to
Equiserve Limited Partnership

TENANT:

By: *Morton B Comee*

Name: MORTON B. COMEE

Title: CHIEF OPERATING OFFICER

Blue Hills Office Park LLC

LANDLORD:

By: _____

Name:

Title:

00774994.7

5

IN WITNESS WHEREOF, the undersigned have signed this Lease Termination Agreement under seal as of the day and year first above-written.

<div style="text-align: right;">

EquiServe, Inc., successor to
Equiserve Limited Partnership

</div>

TENANT:    By: _____

                Name:

                Title:

Blue Hills Office Park LLC
By: Blue Hills Management Corp.,
  its Manager

LANDLORD:    By: *Gerald S. [signature]*

               Name: Gerald S. Fineberg

               Title: President and
                  Treasurer

00774994.10
#274037 v1/14500/9547

<div style="text-align: center;">5</div>

BLUE HILL    1608

EXHIBIT B

FLOOR PLAN

BLUE HILL    1609



KEY:
A · Technology Services        H Billing Project/Finance      O Shareholder Services
B Fairway/AWD                  I Transfer Operations          P Employee Plans
C Proxy                        J Options                      Q Stock Options
D Telecommunications           K Human Resources              R Shared (P&Q)
E Data Security                L CLD (Training)                S Facilities
F Audit                        M Quality                      T Process Improvement
G Image Center                 N Corporate Actions/BAM        U Database

OTH & SEELEN INC.      Subject: NOVEMBER 2000 SPACE ALLOCATION 1" = 60'-0"
ARCHITECTURE INTERIOR DESIGN PLANNING
                       Project: 1ST FLOOR - EQUISERVE
                            150 ROYALL STREET, CANTON, MA.      SC-1

BLUE HILL 1610

# DEPOSITION EXHIBIT #12



**BLUE HILLS OFFICE PARK, LLC**
150 ROYALL STREET
CANTON, MASSACHUSETTS 02021
(781) 828-6669

September 10, 2003

Ms. Linda O'Brien
Boston Equiserve, L.P.
150 Royall Street
Canton, MA 02021

Re: 2004 Fiscal Real Estate Tax, Second Quarter, 150 Royall Street, Canton, MA

Dear Linda:

Enclosed are the second quarter Real Estate Taxes for fiscal year ending 6/30/2004:

| | |
|---|---|
| Your share per Lease Terms 263,245 square feet + 5,800 square feet (Health Club) | 98.2407% |
| Actual Real Estate Tax | $ 154,752.47 |
| Your share, per lease | x   98.2407% |
| Fourth Quarter | $ 152,029.91 |

Please make your check in the amount of $152,029.91 payable to Blue Hills Office Park, LLC and remit to:

Blue Hills Office Park, LLC (Metrowest Bank)
PO Box 9029
Framingham, MA 01701-9029

PLEASE NOTE THAT THIS BILL IS DUE BY OCTOBER 16, 2003.

If you have any question regarding this invoice, please give me a call at my Canton office (781) 828-6699. Thank you.

Sincerely,

Lawrence G. Needle
Property Manager

S:\NEEDLE\RE Tax - Equiserve.doc

**Blue Hill 0463**



Commercial Mortgage Servicing
P.O. Box 4036, Concord, CA 94524
1320 Willow Pass Rd., Ste. 205
Concord, CA 94520
800 986-9711

October 9th, 2003
FAX # 1 - 781 - 239 - 1493

BLUE HILLS OFFICE PARK LLC
ONE WASHINGTON STREET, SUITE 400
WELLSLEY, MA    02481
Re:    Loan # 76-0990083
       Property Tax Shortage

Dear Mortgagor(s),

This letter is to inform you that your escrow account has insufficient funds to pay the 2nd Quarter installment of Canton Town. The taxes due are $154,752.47. Currently, your tax escrow balance is $0, which indicates a shortage amount of $154,752.47.

Please remit $154,752.47 to my attention at the address below or via wire instructions as follows:

*Express Mail address:*                          *US Mail Address*
*Wells Fargo Bank, Commercial Mortgage Servicing*   *Wells Fargo Bank, Commercial Mortgage Servicing*
*Attn: Brent Lloyd, Property Tax Dept.*          *Attn: Brent Lloyd, Property Tax Dept.*
*1320 Willow Pass Road, Suite 205*               *P. O. Box 4036*
*Concord, CA 94520*                              *Concord, CA 94524*

*Wire Instructions:*    *Wells Fargo Bank, ABA #121-000-248*
                        *200 B Street, Santa Rosa, CA*
                        *Credit to: Wells Fargo Commercial Mortgage Servicing*
                        *Account # 4535-078117*
                        *Reference:    For further credit to WFCMS loan # 76-0990083*
                        *Property tax escrow shortage*
                        *Attn: Brent Lloyd*

These funds must be received in our office no later than 10/16/03 in order for us to issue payment to the Canton Town Tax Collector by 10/31/03. Failing to remit the shortage amount within the specified time frame may result in penalties and/or interest, assessed by the Tax Collector, to be charged to your loan.

Should you have any questions or concerns regarding this matter, please contact me at 1-800-986-9711 Ext .5378

Sincerely,

Brent Lloyd
Operations Department

C:\Documents and Settings\lloyd54\My Documents\taxshortage1.dot

Blue Hill 0464

# View Activity Search

**Account Number:** 0870045796
**Account Name:** Blue Hills Office Park - LB

**Date:** October 15, 2003

**Activity** To sort by the column header, click on Date, Type, Description, Check Number, Credits or Debits.

| Date | Type | Description | Check Number | Credits | Debits |
|------|------|-------------|--------------|---------|--------|
| 10/15/2003 | OTHER DEPOSIT | LOCKBOX DEPOSIT | | $152,029.91 | |
| Total | | | | $152,029.91 | $0.00 |

**File Type**
-- Please Select --

**Delimeter**
-- Please Select --

Back | Download | Print

Blue Hill 0500

https://ecashmanager.banknorth.com/ma/AcctActivity.asp

10/16/2003





## EQUISERVE, INC.

| VOUCHER | INVOICE NUMBER AND DESCRIPTION | DATE | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
|---------|-------------------------------|------|--------------|----------|------------|
|         | 9/10/03-1                     | 09/10/03 | 152,029.91 |        | 152,029.91 |

Blue Hill 0501

## View Activity Search

**Account Number:**          0870045796
**Account Name:**            Blue Hills Office Park - LB

Date:    October 16, 2003

**Activity** To sort by the column header, click on Date, Type, Description, Check Number, Credits or Debits.

| Date | Type | Description | Check Number | Credits | Debits |
|------|------|-------------|--------------|---------|--------|
| 10/16/2003 | BOOK TRANSFER CREDIT ECASH MGR CREDIT | | 0 | $2,711.86 | |
| Total | | | | $2,711.86 | $0.00 |

**File Type**                **Delimeter**
-- Please Select --          : -- Please Select --

Back |   Download |   Print |

Blue Hill 0502

# fineberg management, inc.

October 16, 2003

Ms Betsy Raymond
BankNorth MA
15 Park Street
P.O. Box 9111
Framingham, MA 01701-9111

Dear Betsy:

Please accept this as your authorization to transfer $154752.47 from

the Blue Hills Office Park - Lockbox  Account # 0870045796 to the

following bank with instructions:

Wells Fargo Bank, ABA #121-000-248
200 B Street, Santa Rosa, CA

Credit to: Wells Fargo Commercial Mortgage Servicing
Account # 4535-078117

Reference:    For further credit to WFCMS loan # 76-0990083
Property tax escrow shortage
Attn: Brent Lloyd

If you have any questions don't hesitate to call.  Thanking you in advance.

Sincerely,

Gilbert W. Stone
Director of Accounting

Blue Hill 0503

one washington street, suite 400, wellesley ma 02481  tel. (781) 239-1480  fax (781) 239-1493

# DEPOSITION EXHIBIT NO. 13

EXHIBIT
Donovan
13
JKc  2/14/06

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1.,
      Defendant,

      and

CSFB 1999–C1 ROYALL STREET, LLC;
      Defendant, Plaintiff-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WJY)

## NOTICE OF DEPOSITION

To:    Peter B. McGlynn, Esq.
       Meredith Swisher, Esq.
       Bernkopf Goodman LLP
       125 Summer Street
       13th Floor
       Boston, MA  02110

      PLEASE TAKE NOTICE that pursuant to F. R. Civ. P. 30, defendants J.P. Morgan

Chase Bank, Trustee, and CSFB 1999-C1 Royall Street, LLC, by their attorneys, will take the

deposition upon oral examination of Blue Hills Office Park, LLC, at 10:00 a.m. on Friday,

February 17, 2006, at the law offices of DLA Piper Rudnick Gray Cary US LLP, One

International Place (21st Floor), Boston, MA 02110, before a Notary Public or before other

officer authorized by law to administer oaths. The deposition will be recorded by stenographic means and will continue from day to day until complete or adjourned. You are invited to attend and cross-examine.

This notice names as the deponent a collective, non-individual entity. The notice describes in Schedule A the matters on which examination is requested. Under the provisions of Rule 30(b)(6), Blue Hills Office Park, LLC, is required to identify and produce for deposition one or more officers, directors, managing agents, or other agents or employees to testify, and may set forth, for each person designated, the matters on which he will testify. The persons so designated shall testify as to matters known or reasonably available to Blue Hills Office Park LLC.

Respectfully submitted,

J.P. MORGAN CHASE BANK, TRUSTEE
CSFB 1999-C1 ROYALL STREET, LLC,
By their attorneys,

---

E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place
Boston, MA 02110
(617) 406-6000

January 30, 2006

Certificate of Service
I hereby certify that a true copy of the above document was served upon the attorneys of record for each other party by hand delivery on February 10, 2006.

---

## SCHEDULE A

Definitions

A.  "Blue Hills" refers to plaintiff Blue Hills Office Park, LLC, and each of its principals, members, managers, employees, agents, attorneys, assigns and affiliates, including but not limited to Fineberg Management, Inc., William J. Langelier, Gerald S. Fineberg, Joseph Donovan, Daniel Frank, and Larry Needle.

B.  "Equiserve" refers to Equiserve Limited Partnership, the sole tenant of the Property as of September 14, 1999, and each of its principals, partners, managers, employees, agents, attorneys, assigns, and affiliates.

C.  "Loan" refers to the loan evidenced by the Mortgage Note and Mortgage Agreement and related loan documents.

D.  "LNR Partners" refers to LNR Partners, Inc., formerly known as Lennar Partners, Inc., and each of its principals, directors, officers, managers, employees, agents, attorneys, assigns, and affiliates.

E.  "Mortgage Agreement" refers to the mortgage agreement dated September 14, 1999, between Blue Hills and Originator, and attached as Exhibit "C" to Blue Hills' Second Amended Complaint.

F.  "Mortgage Note" refers to the mortgage note dated September 14, 1999, between Blue Hills and Originator, and attached as Exhibit "D" to Blue Hills' Second Amended Complaint.

G.  "Originator" refers to Credit Suisse First Boston Mortgage Capital, LLC and each of its members, managers, employees, agents, assigns, and affiliates.

H.  "Property" refers to the property located at 150 Royall Street, Canton, Massachusetts, known as the Blue Hills Office Park.

I.  "Wells Fargo" refers to Wells Fargo Bank, National Association and each of its principals, directors, officers, employees, agents, attorneys, assigns, and affiliates.

J.  "Zoning Appeal" refers to the litigation initiated by the complaint filed by Blue Hills in Norfolk Superior Court on June 9, 2003 appealing the ZBA Decision.

K.  "ZBA Decision" refers to the decision of the Town of Canton Zoning Board of Appeals granting a special permit to Blueview LLC.

<u>Deposition Topics</u>

1.    The allegations of the Complaint.

2.    The allegations of the Counterclaim.

3.    The origination of the loan to Blue Hills, including without limitation the negotiation of the terms of the Mortgage Agreement.

4.    Property tax payments and property tax escrows for the Property and communications with the Defendants, Wells Fargo, or LNR Partners about the same, including without limitation the letter attached at Exhibit A and any follow-up communications thereto.

5.    The termination of Equiserve's tenancy at the Property, including without limitation all communications with the Defendants, LNR Partners, or Wells Fargo about the same.

6.    Plaintiffs' requests for meetings with the Defendants, LNR Partners, or Wells Fargo, including without limitation all communications with the Defendants, LNR Partners, or Wells Fargo about the same.

7.    Plaintiffs' requests for access to loan reserves, including without limitation all communications with the Defendants, LNR Partners, or Wells Fargo about the same.

8.    All communications with the Defendants, Wells Fargo, or LNR Partners, including those alleged in the Complaint.

9.    The Zoning Appeal and the settlement thereof, including without limitation the connection between the Zoning Appeal, its settlement, and the termination of Equiserve's tenancy.

10.    The disposition of the Zoning Appeal settlement proceeds.

11.    Any monies received by Blue Hills on account of the Property during the period September 14, 1999 to November 19, 2004.

12.    Blue Hills' responses to Defendants' discovery requests, including, without limitation, the basis for the denial of any request for admission served upon Blue Hills.

# Exhibit A

OCT.27.1999  11:15AM   FINEBERG MANAGEMENT                    NO.613   P.1/2

# THE FINEBERG COMPANIES

ONE WASHINGTON STREET, STE #400
P.O. BOX 9139
WELLESLEY HILLS, MA. 02481
PHONE: (781) 239-1480
FAX:    (781) 239-1493

TO: _ELHAM_

COMPANY: _WELLS FARGO_

FROM: _PAUL WOLLMAN_

DATE: _Oct 27, 99_

TOTAL NUMBER OF PAGES(INCLUDING COVER SHEET) _3_

COMMENTS: _____

1- LETTER & AGREEMENT

2- R/E TAX INVOICE

3- THIS BILL IS DUE ON

NOV 1, 1999

THANKS

OCT.27.1999  11:15AM    FINEBERG MANAGEMENT

BLUE HILLS OFFICE PARK, LLC
P.O. BOX 9139
WELLESLEY HILLS, MA. 02481

September 29, 1999

Jim Lingle
Orix Real Estate Capital Markets, LLC
1717 Main St., 12th Floor, TX1-2495
Dallas, TX 75201

Re: ORECM Loan #197000600
    Blue Hills Office Park, LLC

Dear Mr. Lingle:

Please let this letter serve as a recap of our agreement with our tenant at the above referenced location regarding the quarterly real estate tax payments to the Town of Canton.

We currently have an understanding with Equiserve that they will pay us in advance of the due date for the real estate taxes as long as we send them a receipted copy directly upon payment. In order to do so, we bring payment each quarter to the Town of Canton and immediately fax the receipted copy to the tenant and the mortgagee.

Because of the aforementioned agreement and the fact that the Town of Canton sends us the quarterly billing semi-annually, we have found that it is much more effective for us to pay the bills in person and to be funded in advance by the mortgagee.

Should you have any questions please call me at (781) 239 – 1480

Sincerely,

Lawrence G. Needle
Blue Hills Office Park, LLC

CITY/TOWN REAL ESTATE TAX BILL

BILL NO. 615    JUNE 28, 1999    1170-04

PAYMENT COUPON 2

| PROPERTY DESCRIPTION | |
|---|---|
| PARCEL | 051-659 |
| LOCATION | 00100 ROYALL ST |
| CLASS | 340 |

| PRELIMINARY | |
|---|---|
| REAL ESTATE TAX | $297,765.94 |
| 1ST QTR INSTALLMENT | $148,882.97 |
| 2ND QTR INSTALLMENT | $148,882.97 |

2ND QTR TAX DUE 11/1/1999    $148,882.97

ROYALL ASSOCIATES REALTY TRUST
FINBERG G S & LANDSHER, W TRS
1 Washington St
Wellesley            MA    02481-1704

0570013000042Z 000031700042 0148882970

paid 148,882.97

# DEPOSITION EXHIBIT NO. 15

11-17-05

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

RECEIVED

8

E. R. T.

BLUE HILLS OFFICE PARK LLC,                )
    Plaintiff/Defendant-in-Counterclaim )
                                     )
v.                                                                      )
                                       )
J.P. MORGAN CHASE BANK, as          )
Trustee for the Registered Holders of    )
Credit Suisse First Boston Mortgage      )
Securities Corp., Commercial Mortgage )
Pass-Through Certificates, Series 1999-C1, )
    Defendant                                              )
                                       )
and CSFB 1999–C1 ROYALL STREET,   )
LLC,                                                              ) -
    Defendant/Plaintiff-in-Counterclaim )
                                       )
and                                                               )
                                       )
WILLIAM LANGELIER and GERALD    )
FINEBERG,                                                )
    Defendants-in-Counterclaim            )

Civil Action No. 05-CV-10506 (WGY)



EXHIBIT
Donovan
15
ec 2/14/06

## SECOND AMENDED COMPLAINT

### I.    INTRODUCTION

By this action, plaintiff Blue Hills Office Park LLC ('Blue Hills') seeks, *inter alia,* (i) damages for the defendants' several breaches of a, *inter alia*, Mortgage, Assignment of Leases and Rents and Security Agreement (the 'Mortgage Agreement'), a Cash Management Agreement and a Mortgage Note all dated September 14, 1999; (ii) damages for the defendants' several breaches of the covenant of good faith and fair dealing; and (iii) compensatory and punitive damages under the provisions of G.L. c. 93A, §§1, 2 and 11.

## II.    PARTIES

### Plaintiff

1.    Plaintiff Blue Hills is a Delaware limited liability company with a principal place of business at One Washington Street, Suite 400, Wellesley, Massachusetts 02481.

### Defendants

### J.P. Morgan

2.    Defendant J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 ("J.P. Morgan"), is, upon information and belief, a New York banking corporation with a principal place of business at New York, New York and a mailing address of c/o Lennar Partners, Inc., 1601 Washington Avenue, Suite 700, Miami Beach, FL 33139. Upon further information and belief, J.P. Morgan, formerly The Chase Manhattan Bank, was assigned all of Credit Suisse First Boston Mortgage Capital, LLC's ("Credit Suisse First Boston") rights, title, interest and obligations in the Mortgage Agreement, Cash Management Agreement and Mortgage Note and other related loan and security documents (collectively, the "Mortgage Loan Documents") in or about March 2000, by assignment recorded in the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, Page 387.

### CSFB

3.    Defendant CSFB 1999-C1 Royall Street, LLC ("CSFB") is, upon information and belief, a Delaware limited liability company with a principal place of business at 1601 Washington Avenue, Suite 700, Miami Beach, Florida 33139. Upon further information and belief, on or about November 8, 2004, all of J.P. Morgan's rights, title interest and obligations in

the Mortgage Loan Documents were assigned to CSFB by assignment recorded in Norfolk

Registry of Deeds on November 10, 2004 in Book 21755, Page 477.

## III.    JURISDICTION AND VENUE

4.        Jurisdiction is predicated upon the provisions of 28 U.S.C. §1332, as the parties

are citizens of different states and the amount in controversy exceeds $75,000.00.

## IV.    FACTUAL BACKGROUND

### Blue Hills Applies to Credit Suisse First Boston for Mortgage Financing

5.        On or about August, 1999, Blue Hills as the borrower and Credit Suisse First

Boston agreed upon the general terms and conditions under which Credit Suisse First Boston, as

the lender would, subject to Credit Suisse First Boston investment committee's final approval,

loan $33.5 million in mortgage financing to Blue Hills to be secured by a mortgage on Blue Hills'

property located at 150 Royall Street, Canton, Massachusetts and known as the Blue Hills Office

Park (the "Property").

6.        The Property consists of a two-story brick building containing approximately

275,000 square feet of space.

7.        The general terms and conditions of the contemplated mortgage financing were

summarized in two separate documents as follows:

- Mortgage Financing Application dated July 20, 1999 between Blue Hills and
  Credit Suisse First Boston, together with a term sheet which was incorporated
  into and made a part of the Mortgage Financing Application, copies of which
  are attached hereto as Exhibit "A"; and,

- Letter dated August 31, 1999 from David L. Doyle to Joseph Rubino at Credit
  Suisse First Boston, a copy of which is attached hereto as Exhibit "B."

(The Mortgage Financing Application and the attached term sheet and the August 31, 1999 letter
are collectively referred to as the "Term Sheet.")

- 3 -

8.    As of August, 1999, the Property's sole tenant was an affiliate of the Bank of Boston known as Boston Equiserve Limited Partnership ('Equiserve') which had a lease with Blue Hills set to expire on July 31, 2004 (the 'Equiserve Lease').

9.    As of August, 1999, if the Equiserve Lease were not renewed, the Property would require the infusion of substantial funds to reconfigure the Property for multiple tenant use and for tenant improvements, upgrades, lease commissions and cash reserves to address the possibility that the Equiserve Lease would not be renewed.

10.    Accordingly, Credit Suisse First Boston required and Blue Hills agreed to a so-called 'hard lock box' arrangement pursuant to which rents were to be deposited directly into an account controlled by Credit Suisse First Boston, the net proceeds of which, if any, after deducting debt service payments, escrow and agreed upon reserve deposits and current Property expenses, would be remitted without restriction to Blue Hills.

11.    In addition, Credit Suisse First Boston and Blue Hills agreed that the various required reserve deposits could be accessed by Blue Hills in the event that the Equiserve Lease was not renewed.

12.    Blue Hills entered the above-described arrangement in reliance upon the foregoing provisions regarding the application and distribution of funds deposited into the 'hard lock box' adverted to above.

13.    Credit Suisse First Boston also required, as a condition of its mortgage financing to Blue Hills, that Blue Hills would be precluded from having any additional secured or unsecured indebtedness, other than unsecured trade payables in the ordinary course.

14.    Accordingly, it was essential that Blue Hills have access to the reserve deposits described above in order to meet its monthly debt service under the Note and to pay for, *inter*

*alia*, tenant improvements and leasing commissions in the event the Equiserve Lease was not renewed.

### Blue Hills and Credit Suisse First Boston Execute the Mortgage Agreement, Cash Management Agreement and Note

15.    On or about September 14, 1999, Blue Hills executed the Mortgage Agreement, a copy of which is attached hereto as Exhibit "C," and a Mortgage Note (the "Note"), a copy of which is attached hereto as Exhibit "D."

16.    The terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note.

17.    In addition, on or about September 14, 1999, Blue Hills, Credit Suisse First Boston and Fineberg Management, Inc., as the Property's manager, entered into a Cash Management Agreement (the "Cash Management Agreement"), a copy of which is attached hereto as Exhibit "E."

18.    Under the Cash Management Agreement and the Note, Blue Hills was obligated to deposit into a "Clearing Account" as specified in the Cash Management Agreement (the "Clearing Account") all of the rents that it received in connection with the Equiserve Lease.

19.    The Cash Management Agreement also stipulated that the funds deposited into the Clearing Account were then transferred to a Credit Suisse First Boston controlled Cash Collateral Account at a bank referred to in the Cash Management Agreement as the "Deposit Bank" and thereafter divided into nine separate sub-accounts ("Sub-accounts") maintained on a ledger entry basis.

20.    In general, paragraph 8 of the Note, Section 2 of the Cash Management Agreement and paragraph 6 of the Mortgage Agreement prescribed the manner, timing and the

amounts which Credit Suisse First Boston, J.P. Morgan and CSFB were required to allocate to and pay amounts from the various Sub-accounts.

21.     The amounts deposited in the Cash Collateral Account were required to be allocated among the Sub-accounts by Credit Suisse First Boston, J.P. Morgan and CSFB in the order of priority set forth in paragraph 8(a) of the Note.

22.     The Cash Management Agreement deemed Blue Hills' payment obligations to Credit Suisse First Boston, J.P. Morgan and CSFB satisfied to the extent of funds received by the Deposit Bank.

23.     Paragraph 6 of the Mortgage Agreement also prescribed Credit Suisse First Boston's, J.P. Morgan's and CSFB's Sub-account disbursement obligations to, *inter alia*, the taxing authorities, insurance providers and to Blue Hills.

24.     Section 2 of the Cash Management Agreement obligated Credit Suisse First Boston, J.P. Morgan and CSFB to make disbursements out of Sub-accounts in accordance with its terms and the terms of the Mortgage Agreement.

### Wells Fargo Becomes Servicer of the Mortgage Loan Documents

25.     Upon information and belief, in or about November 1999, Wells Fargo National Association ("Wells Fargo") became the Servicer of the Mortgage Loan Documents.

26.     As Servicer of the Mortgage Loan Documents, Wells Fargo became obligated to service and administer them in accordance with applicable law, the terms of the Mortgage Loan Documents and, *inter alia*, in accordance with the higher of the care, skill, prudence and diligence which Wells Fargo would exercise in administering similar loans for third parties or, for similar loans owned by Wells Fargo.

- 6 -

27.    As Servicer of the Mortgage Loan Documents, Wells Fargo was the defendants'

agent and became obligated to perform all obligations of the holder of the Mortgage Loan

Documents and to exercise all rights and remedies thereunder in accordance with the standards

and provisions described in the preceding paragraph.

28.    Upon information and belief, at all times relevant and material hereto, Wells

Fargo was an agent of J.P. Morgan and/or CFSB.

### The Defendants' and Blue Hills' Rights and Obligations
### With Respect to the Cash Collateral Accounts

29.    Paragraph 6(a) of the Mortgage Agreement obligated Blue Hills to pay Credit

Suisse First Boston, J.P. Morgan and CSFB specified amounts for real estate taxes and insurance

premiums which would be then allocated by Credit Suisse First Boston into the "Tax and

Insurance Impound Fund" (the "Tax Fund Sub-account").

30.    Paragraph 6(a) provides in relevant part as follows:

> Mortgagor shall pay to Mortgagee on the eleventh day of each
> calendar month (a) one-twelfth of the Taxes that Mortgagee
> estimates will be payable during the next ensuing twelve (12)
> months (provided, however, that, for so long as the Bank of Boston
> Lease shall be in full force and effect and shall permit The Bank of
> Boston to reimburse Mortgagor for such Taxes on a quarterly
> basis, Mortgagor may pay to Mortgagee, on a quarterly basis, one-
> quarter of such Taxes commencing on the eleventh day of
> November, 1999 and on the eleventh day of each third calendar
> month thereafter) in order to accumulate with Mortgagee sufficient
> funds to pay all such Taxes at least ten (10) days prior to their
> respective due dates, and . . .

> If at any time Mortgagee determines that the [Tax Fund Sub-
> account] is not or will not be sufficient to pay the items set forth in
> (a) and (b) above, Mortgagee shall notify Mortgagor of such
> determination and Mortgagor shall increase its monthly payments
> to Mortgagee by the amount that Mortgagee estimates is sufficient
> to make up the deficiency at least thirty (30) days prior to
> delinquency of the Taxes and/or expiration of the Policies, as the
> case may be.

31.    Additionally, under the Note, the Tax Fund Sub-account was the Sub-account holding first priority among all nine Sub-accounts.

32.    Accordingly, Credit Suisse First Boston, J.P. Morgan and CSFB were obligated under paragraph 8(a) of the Note to allocate monies to the Tax Fund, on a first priority basis, from money deposited in the Cash Collateral Account:

> until the amount on deposit therein is equal to the amount required to be deposited in the [Tax Fund Sub-account] on the related Payment Date in accordance with the terms and conditions of the Mortgage [Agreement];

33.    Out of the Tax Fund Sub-Account, Credit Suisse First Boston, J.P. Morgan and CSFB were obligated to make payments of taxes and insurance premiums to the appropriate parties for the Property's real estate taxes and insurance.

34.    Beginning after November, 1999 and continuing into 2004, Blue Hills deposited into the Clearing Account the requisite real estate tax amounts.

35.    Paragraph 6(c)(ix) of the Mortgage Agreement obligated Credit Suisse First Boston, J.P. Morgan and CSFB to disburse to Blue Hills from time to time upon Blue Hills' request amounts from specific Sub-accounts (which are identified in the Mortgage Agreement as the "Leasing Escrow Funds" (the "Leasing Funds Sub-accounts") certain funds in excess of $2,750,000 to be used "solely toward payment or principal and interest then due and payable on the Note," provided that, *inter alia*, no event of default had occurred at the time the disbursement request was made and that net operating income for the Property was insufficient to pay principal and interest due and payable on the promissory note."

36.    Paragraph 6(c)(ix) of the Mortgage Agreement provides, in pertinent part, as follows:

> From time to time (but not more frequently than once in any thirty (30) day period), from and after the first time when the aggregate amount on deposit in the [Leasing Funds Sub-accounts] equals or exceeds $2,750,000, Mortgagee shall disburse to Mortgagor from the [Leasing Funds Sub-accounts] amounts aggregating up to the Interim Reduction Amount (as hereinafter defined), for application solely toward payment of principal an interest then due and payable on the Note, upon satisfaction of the following conditions precedent:
>
> (a)    Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement (each an "Interim Reduction Date"), a written request for such disbursement;
>
> (b)    no Event of Default hereunder shall have occurred and be continuing as of the date of the request for such disbursement and on the Interim Reduction Date;
>
> (c)    the Benchmark Reduction Date shall not have occurred as of the Interim Reduction Date;
>
> (d)    Net Operating Income (excluding interest on credit accounts) for the then-current debt service period is insufficient to pay principal and interest due and payable on the Note after application toward all contributions to the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Leasing Escrow Funds and any other reserves required to be funded and other payments required to be made under the Loan Documents;

37.    As of August 2, 2004, Blue Hills had, upon information and belief, approximately $4 million in the various Sub-accounts.

### Blue Hills Notifies Wells Fargo That Equiserve Is Not Renewing
### the Equiserve Lease and Requests the Opportunity to Meet

38.    By late summer 2003, Equiserve notified Blue Hills that it would not be exercising its option to renew the Equiserve Lease. This information was then communicated to either or both of the defendants, through their agent, Wells Fargo.

39.    In order to determine a reasonable approach to re-leasing the Property, Blue Hills engaged Cushman and Wakefield in late 2003 as Blue Hills' exclusive leasing agent to actively market the Property.

40.    After Cushman and Wakefield's initial leasing efforts, which included initial showings to tenant prospects, it became apparent to Blue Hills that, because of the down turn in the real estate market coupled with a reduced number of tenants seeking larger blocks of rental space, Blue Hills would require substantial sums of money to upgrade the Property's infrastructure and to make tenant improvements; the very contingency anticipated when the Term Sheet was executed.

41.    During the same time period, Blue Hills communicated with Wells Fargo, the defendants' agent, to advise Wells Fargo of its efforts and its difficulties as aforementioned.

42.    In early 2004, Blue Hills again contacted Wells Fargo to confirm that Equiserve would not be renewing the Equiserve Lease; thus requiring Blue Hills to arrange access to funds in the Sub-accounts to enable Blue Hills to attract viable tenant prospects.

### Wells Fargo Provides Repeated Assurances That It Will
### Respond Positively to Blue Hills

43.    Representatives of Wells Fargo assured Blue Hills during the foregoing time periods that they would be responsive to Blue Hills' requests, including scheduling a meeting

with Blue Hills to address Property marketing costs and to discuss the process to be followed by

Blue Hills to access the funds in Sub-accounts.

### Wells Fargo's Dilatory Efforts and Its Failure to Meet with Blue Hills

44.     Despite such assurances, Wells Fargo failed to schedule any meetings or even to

discuss Blue Hills' access to the funds in the Sub-accounts.

45.     Wells Fargo representatives' responses to Blue Hills' repeated inquiries were that

they were still trying to locate the proper people to respond to Blue Hills' requests.

46.     In or about June, 2004—two months before the Equiserve Lease was set to expire

and nearly six months after Blue Hills first requested Wells Fargo's assistance—Wells Fargo

informed Blue Hills that it was considering if the Special Servicer for the Mortgage Loan

Documents, Lennar Partners, Inc. ('Lennar'), and not Wells Fargo, would be the proper party to

meet with Blue Hills and properly respond to Blue Hills' requests.

47.     For over six months, Wells Fargo promised, but failed to locate, a representative

with authority to address Blue Hills' requests regarding, *inter alia*, re-leasing of the Property and

the procedures for accessing the funds in the Sub-accounts.

48.     While discussions were on-going between Blue Hills and Wells Fargo as

described in the preceding paragraphs, by letter dated July 16, 2004, a copy of which is attached

hereto as Exhibit 'F,' Wells Fargo advised Blue Hills that the Tax Fund had insufficient funds to

pay the first installment of taxes to the Town of Canton for 2004 and requested Blue Hills to pay

to Wells Fargo the sum of $158,181.19.

49.     Wells Fargo's July 16, 2004 letter demanded that the aforementioned funds must

be received by Wells Fargo 11 days later.

- 11 -

50.    Wells Fargo's July 16, 2004 letter did not provide Blue Hills with adequate notice such that it would have 30 days prior to any tax delinquency to make the real estate tax payments, or deposit.

51.    Additionally, Wells Fargo demanded that payment be made directly to it as opposed to the "Clearing Bank" as designated in the Cash Management Agreement.

### The Equiserve Lease Expires and Blue Hills Requests Wells Fargo To Make Disbursements from the Sub-accounts

52.    Equiserve vacated the Property on July 31, 2004 and as no replacement tenant had been found, Equiserve's departure left the Property vacant.

53.    With the expiration of the Equiserve Lease, Blue Hills had no rental income to pay the debt service and other Property obligations under the Mortgage Loan Documents; the very condition of which Credit Suisse First Boston and Blue Hills considered and addressed in the Term Sheet, the Mortgage Agreement, Note and the Cash Management Agreement.

54.    By letter dated August 2, 2004 to Wells Fargo, Blue Hills requested a disbursement from the Sub-accounts to pay principal and interest due on the Note for the month of August, 2004, as well as money to pay real estate taxes. A copy of Blue Hills' letter is attached hereto as Exhibit "G."

55.    Thereafter, by letter dated August 5, 2004, Blue Hills again contacted Wells Fargo and notified it that, in fact, Equiserve had vacated the Property and that no replacement tenant had been found. Blue Hills also requested a meeting with Wells Fargo to discuss the status of and the future performance of the loan. In addition, Blue Hills requested that Lennar attend the meeting as well. A copy of the August 5, 2004 letter is attached hereto as Exhibit "H."

56.    Wells Fargo failed and refused to make any distributions to Blue Hills pursuant to Blue Hills' letter to Wells Fargo dated August 2, 2004 despite having an obligation to do so under the Mortgage Loan Documents.

57.    On September 2, 2004, Blue Hills again wrote to Wells Fargo and requested a distribution out of the Sub-accounts of $254,652.24 to pay principal and interest on the Note for the month of September, 2004.  A copy of this letter is attached hereto as Exhibit 'T.'

58.    Wells Fargo failed and refused to make any distributions to Blue Hills pursuant to Blue Hills' letter to Wells Fargo dated September 2, 2004 despite having an obligation under the Mortgage Agreement to disburse principal and interest payments then due under the Note.

### Wells Fargo Fails To Respond and Blue Hills Is Forced to Contact Lennar

59.    As a result of Wells Fargo's failure to timely locate a representative to address Blue Hills' urgent requests, Blue Hills conducted its own investigation as to who could be responsive to Blue Hills' requests.

60.    As a result, Blue Hills contacted a representative of Lennar who suggested the content of a letter which, if sent by Blue Hills to Wells Fargo, could redirect Blue Hills' files to Lennar who would thereafter respond to Blue Hills.

61.    Upon information and belief, Lennar was the "Special Servicer" of certain loans originated by Credit Suisse First Boston including, without limitation, the mortgage loan to Blue Hills evidenced by the Mortgage Loan Documents.

62.    Upon information and belief, at all times relevant and material hereto, as "Special Servicer," Lennar was an agent of J.P. Morgan and CSFB.

63.    Upon information and belief, as "Special Servicer," Lennar was obligated to service and administer the Mortgage Loan Documents in accordance with their provisions, all applicable

laws and in the same manner in which, and with the same care, skill, prudence and diligence as to which Wells Fargo, as Servicer, was required to adhere.

64.    Blue Hills' files were apparently not transferred by Wells Fargo to Lennar until on or about August 19, 2004 as evidenced by Lennar's letter to Blue Hills dated August 19, 2004, a copy of which is attached hereto as Exhibit "J."

### Lennar, Like Wells Fargo, Promises a Positive Response to Blue Hills

65.    On August 19, 2004, Lennar wrote to Blue Hills to notify it that servicing responsibilities of the Mortgage Agreement had been transferred to Lennar as the Special Servicer and that Lennar looked forward to a "successful working relationship" with Blue Hills.

66.    That same day, Lennar sent Blue Hills another letter dated August 19, 2004 informing Blue Hills that Lennar had the authority to meet with Blue Hills to review the status of the Note and "any issues arising under [the loan documents]." A copy of the second August 19, 2004 letter is attached hereto as Exhibit "K."

67.    In Lennar's August 19, 2004 letter, Lennar advised Blue Hills that in order to "properly evaluate" Blue Hills' request, Blue Hills was requested to forward to Lennar all of the information set out in Exhibit "A" attached to Lennar's August 19, 2004 letter.

68.    Blue Hills promptly complied with the document requests contained in Lennar's August 19, 2004 letter.

69.    Based upon Blue Hills' communications with Lennar, Blue Hills had a reasonable expectation that a meeting would be scheduled and that Lennar would work with Blue Hills in formulating a plan with Blue Hills to re-lease the Property and would release funds from the Sub-accounts.

## Lennar, Like Wells Fargo, Fails to Meet with Blue Hills

70.    Despite Blue Hills' prompt response to Lennar's document request, Lennar still failed to schedule a meeting to discuss Blue Hills' ever-pressing financial needs including the fact that neither Wells Fargo nor Lennar had released any funds so that Blue Hills could pay principal and interest due on the Note for August and September, 2004.

71.    Despite having all of the documents supplied by Blue Hills, Lennar claimed that it needed to have an appraisal report prepared for the Property and to conduct an environmental inspection of the Property and that Blue Hills' permission for access to the Property was needed.

72.    Blue Hills promptly gave its permission to Lennar to have access to the Property and, upon information and belief, the defendants' appraisal and the environmental inspections were conducted in September, 2004.

73.    After previously advising Blue Hills that it looked forward to a "successful working relationship" with Blue Hills, Lennar advised Blue Hills by letter dated September 17, 2004, a copy of which is attached hereto as Exhibit "L," that Blue Hills' requests for disbursement of sums sufficient to pay principal and interest due on the Note for the months of August and September were denied as Blue Hills was purportedly in default under the Mortgage Agreement and Note as of August 2, 2004.

74.    In that same September 17, 2004 letter, Lennar closed by stating that because Blue Hills was in default, the Note had been accelerated and was immediately due and payable.

75.    All preconditions to Blue Hill's entitlement to disbursement of funds sufficient to pay principal and interest for August and September, 2004 had been satisfied.

76.    The default to which Lennar relied upon in its September 17, 2004 letter was that Blue Hills had purportedly failed to make a timely "quarterly deposit of real estate taxes due on August 1, 2004" or "to pay the quarterly installment of real estate taxes due on August 2, 2004 . . . ."

77.    Lennar and Wells Fargo knew, or should have known, that Blue Hills' failure to make principal and interest payments when due under the Note constituted an event of default under the Note and Mortgage Agreement.

78.    Lennar and Wells Fargo also knew that there were ample funds in the Sub-accounts which could have been used to make the August and September 2004 principal and interest payments on the Note.

79.    As of August 1, 2004, the defendants and/or their servicing agents, Lennar and Wells Fargo, had the obligation under the Mortgage Agreement, Note and the Cash Management Agreement to pay real estate taxes due to the Town of Canton, Massachusetts out of the Tax Fund Sub-account or to provide Blue Hills with at least 30 days notice that there were insufficient funds in the account so as to enable Blue Hills to replenish the reserve account. Credit Suisse First Boston, J.P. Morgan, Lennar and Wells Fargo did neither of these things.

80.    The defendants and/or their agents, Lennar and Wells Fargo, also had the obligation under paragraph 8 of the Note to allocate amounts to the Tax Fund Sub-account so that funds were available to satisfy the Property's real estate tax obligations.

81.    As of August 2, 2004—the date on which Lennar asserted that Blue Hills was in default of the Mortgage Agreement for failing to pay real estate taxes—was nine days prior to that date on which Blue Hills was obligated under the Mortgage Agreement to make its next real estate tax deposit.

82.    In addition, at the time that Lennar sent out its letter on September 17, 2004 to Blue Hills, defaulting, retroactively, Blue Hills as of August 2, 2004, it knew that Blue Hills had made repeated requests to have a meeting to develop the joint plan to renovate and re-lease the Property, and also had in its possession two requests from Blue Hills to disburse funds out of the Lease Funds Sub-accounts, including a request to disburse funds to pay real estate taxes, pending Blue Hills' receipt of the final real estate tax payment from Equiserve.

83.    By letter dated October 21, 2004, CSFB gave notice to Blue Hills of its intention to foreclose on the Property and that foreclosure sale occurred on or about November 12, 2004. A copy of this letter is attached hereto as Exhibit 'M.'

84.    The defendants, through their agents, Lennar and/or Wells Fargo, wrongfully defaulted Blue Hills.

85.    The defendants, through their agents, Lennar and/or Wells Fargo, wrongfully withheld from Blue Hills those amounts which Blue Hills was rightfully entitled to receive out of the Cash Collateral Account.

86.    The defendants, through their agents, Lennar and/or Wells Fargo, wrongfully refused to allow Blue Hills to utilize funds on deposit in the Cash Collateral Account to pay principal and interest under the Mortgage Agreement.

87.    The defendants, through their agents, Lennar and Wells Fargo, wrongfully foreclosed on the Property.

## V.    BLUE HILLS' CLAIMS

### Count I
### (Breach of Contract)

88.    Blue Hills realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 87.

- 17 -

89.     The Mortgage Agreement, Cash Management Agreement and Note constitute valid and binding contracts between Blue Hills and Credit Suisse First Boston and assigned to J.P. Morgan and CSFB.

90.     The defendants, through their agents, Lennar and Wells Fargo, have breached their contractual obligations under the Mortgage Agreement, Note and the Cash Management Agreement by failing and refusing to release funds on deposit in the Cash Collateral Account to Blue Hills in accordance with the Mortgage Agreement, Note and the Cash Management Agreement, by failing and refusing to properly allocate sufficient funds in the Tax Fund Sub-account to pay real estate taxes, and by failing and refusing to pay real estate taxes.

91.     The defendants, through their agents, Lennar and Wells Fargo, wrongfully defaulted Blue Hills and foreclosed on the Property.

92.     The defendants, through their agents, Lennar and Wells Fargo, are liable to Blue Hills for all damages which Blue Hills has sustained as a result of their breaches of the Mortgage Agreement, Cash Management Agreement and Note, together with costs, interest and attorneys' fees.

93.     The defendants are also liable for their agents', Lennar and Wells Fargo, failure to properly perform their duties as Servicer and Special Servicer respectively, with respect to the Mortgage Loan Documents.

## Count II
### (Breach of Covenant of Good Faith and Fair Dealing)

94.     Blue Hills realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 93.

95.    The Mortgage Agreement, Cash Management Agreement and Note constitute contracts which required that the defendants and their agents, Lennar and Wells Fargo, act in good faith and deal fairly with Blue Hills.

96.    The defendants, directly and/or through their agents, Lennar and Wells Fargo, have breached the covenant of good faith and fair dealing under the Mortgage Agreement, Cash Management Agreement and Note by breaching the foregoing agreements, wrongfully defaulting Blue Hills and by wrongfully foreclosing on the Property.

97.    The defendants, directly and/or through their agents, Lennar and Wells Fargo, have also breached the covenant of good faith and fair dealing with respect to the Mortgage Agreement, Cash Management Agreement and the Note by repeatedly providing assurances to Blue Hills that they were working on a solution for Blue Hills and were looking forward to 'working successfully' with Blue Hills with respect to the Property when, in fact, they had neither the intention nor desire to do so.

98.    By virtue of the defendants' breaches of the covenant of good faith and fair dealing, Blue Hills has sustained damages.

99.    The defendants are liable to Blue Hills for all damages sustained by Blue Hills, together with costs, interest and attorneys' fees.

### Count III
(Violations of M.G.L. c. 93A)

100.    Blue Hills realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 99.

101.    The defendants, directly and/or through their agents, Lennar and Wells Fargo have engaged in unfair and deceptive acts and practices in violation of M.G.L. c. 93A, §§1, 2 and 11. These violations include, without limitation, the following:

- 19 -

a.      Committing breaches of the Mortgage Agreement, Cash Management

Agreement and Note by failing to disburse, upon Blue Hills' request, funds necessary to

make principal and interest payments under the Note;

b.      Providing the repeated assurances over a period of over six months until

the Equiserve Lease term ended, that Blue Hills would have access to its funds in the

Sub-accounts for marketing and re-letting the Property, but refusing to schedule a

meeting to discuss or agree to a process to give Blue Hills access to its own funds thus

effectively precluding Blue Hills from any realistic opportunity to re-lease the Property;

c.      Wrongfully foreclosing on the Property;

d.      Wrongfully declaring Blue Hills to be in default of the Mortgage

Agreement and Note;

e.      Breaching the covenant of good faith and fair dealing with respect to the

Mortgage Agreement, Cash Management Agreement and Note and with respect to their

dealings with Blue Hills generally;

f.      Failing to property allocate sufficient funds into the Tax Fund Sub-

account; and,

g.      Failing to pay real estate taxes.

102.    At all times material and relative hereto, the events, transactions and occurrences

described herein occurred substantially and primarily within the Commonwealth of

Massachusetts.

103.    The violations of M.G.L. c. 93A, §§2 and 11 described above were knowingly,

willfully and intentionally committed by the defendants directly and/or by their agents, Lennar

and Wells Fargo.

WHEREFORE, Blue Hills demands:

1.    That judgment be entered in its favor and against the defendants as to Counts I and II, for all damages Blue Hills has sustained, together with costs, interest and attorneys' fees;

2.    That, as to Count III, this Court determine Blue Hills' damages caused by the defendants and that those damages be trebled, and that Blue Hills be awarded its costs, interest and attorneys' fees; and,

3.    That Blue Hills be awarded such other and further relief as is proper and just.

BLUE HILLS OFFICE PARK LLC DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

BLUE HILLS OFFICE PARK LLC

By its attorneys,

Dated: November 17, 2005

/s/ Meredith A. Swisher
Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

#326445 v1/14500/9985

5-14-03; 5:39PM;EQS LEGAL                                    ;1 781 575 4210       # 2/ 2



**EQUISERVE®**



May 14, 2003

Blue Hills Office Park, LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02181
Attn: Dan Frank

Re:    Confirmation that Equiserve, Inc. (as successor to Equiserve Limited Partnership,
       "**Tenant**") will not exercise Tenant's option to extend the term of the Lease dated
       April 19, 1989 (as subsequently amended and assigned, the "**Lease**") with Blue
       Hills Office Park, LLC ("**Landlord**") covering a portion of a building commonly
       known and addressed as 150 Royall Street, Canton, Massachusetts (the
       "**Demised Premises**")

To Whom It May Concern:

        This letter shall constitute notice and confirmation from Tenant to Landlord that
Tenant will not exercise, and hereby waives Tenant's right to, extend the Term of the
Lease under and pursuant to Section 1.02 of the Lease.  Accordingly, the Lease shall
terminate and expire on July 31, 2004, in accordance with its terms.

**EQUISERVE, INC.** (successor to Equiserve Limited Partnership)

By: _____
Name: Stephen Cesso
Title:   General Counsel

I:\Exec\Eric\Realty\Canton No Extend Letter 2.doc

**Blue Hill 1255**

150 Royall Street
Canton, MA 02021

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

May 15, 2003



Kenneth M. Goldberg
DIRECT DIAL: (617) 790-3333
e-mail: kgoldberg@bgblaw.com

**VIA TELECOPIER**
Mr. Stephen Cesso, General Counsel
EquiServe, Inc.
150 Royall Street
Canton, MA  02021

RE:   Lease at 150 Royall Street, Canton, MA (the "Lease")
      Blue Hills Office Park, LLC as "Landlord", and
      EquiServe, Inc., as "Tenant"

Dear Mr. Cesso:

This acknowledges Landlord's receipt of Tenant's notice letter dated May 14, 2003, a copy of which is appended hereto ("Tenant's Waiver"). To avoid any confusion as to the interpretation of Tenant's Waiver, please countersign this letter where indicated to confirm that Tenant's Waiver shall, for all purposes, be construed such that any and all rights of the Tenant to extend the Lease Term or occupy the premises demised by the Lease beyond July 31, 2004 have been waived and terminated.

Very truly yours,

Blue Hills Office Park, LLC

Kenneth M. Goldberg, its attorney
duly authorized

AGREED TO AND SIGNED:
EquiServe, Inc.

By: _____
      Stephen Cesso, its General Counsel, duly authorized

cc.   Eric Theroff, Esq. / DST Systems, Inc. (via fax only 816-435-8630)

**Blue Hill
1711**

#269156 v1/14500/9547

EXHIBIT
Donovan
19
7fc 2/14/06

EXECUTED

CONFIDENTIAL COPY



## PURCHASE AND SALE AGREEMENT

THIS AGREEMENT made and entered into as of the 9th day of April, 2003, by and between Blueview Corporate Center, LLC, a Delaware limited liability company having a mailing address c/o National Development, 2310 Washington Street, Newton Lower Falls, Massachusetts 02462 ("Seller"), and DST Realty, Inc., a Missouri corporation, having a mailing address at 333 West Eleventh Street, Kansas City, Missouri 64105-1639 ("Buyer").

WITNESSETH THAT:

WHEREAS, Seller is the owner of the land (the "Land") in Canton, Massachusetts known as and numbered 250 Royall Street, shown as Lots 1 and 2 on a plan entitled "Plan of Land in Canton, MA," dated July 10, 2000, prepared by Toomey-Munson & Associates, Inc., recorded with the Norfolk Registry of Deeds as Plan No. 90 of 2001 (the "Record Plan"), such lots being more particularly described in **Exhibit A** attached hereto and made a part hereof; and

WHEREAS, Seller has improved the Land by means of constructing thereon a three story, approximately 188,950 gross square foot building (the "Building") with a fifty-eight (58) car parking garage located beneath the Building (the "Existing Garage") and accessory surface parking area providing parking for 620 vehicles, subject to reduction upon construction of the Garage, as defined in Section 6 (the "Parking Areas") (the Building, the Existing Garage, and the Parking Areas, together with all other improvements now existing on the Land collectively are sometimes referred to herein as the "Improvements").

WHEREAS, Buyer desires to purchase the Land, the Improvements and the other property hereinafter described in accordance with the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, Seller hereby agrees to sell, and Buyer hereby agrees to buy, the Land, together with the Building and the other Improvements on the Land (collectively, the "Premises"), and all rights, privileges, easements and appurtenances to the Land, including, without limitation, all easements, rights-of-way, and other appurtenances used or connected with the beneficial use or enjoyment thereof, and all right, title and interest in and to all streets, water courses or water bodies adjacent to, abutting or serving the Land (the Land, the Premises and all such other rights being hereinafter collectively called the "Real Property"), and together with the tangible personal property, chattels and equipment owned by Seller and listed on **Exhibit B** attached hereto and made a part hereof (the "Personal Property"), and together with all of Seller's right, title and interest (to the extent the same are assignable without the payment of any fee) in warranties, plans, specifications, licenses, approvals and permits issued by any Governmental Authority (as defined in Section 4), operation or service manuals, evidence of rights relating to real property, the personal property, or both, but not including those contracts, if any, that Buyer advises Seller in writing prior to the expiration of the Review Period (as defined in Section 4) that Buyer does not wish to assume (collectively, the "Permits, Plans and Contracts") (the Real Property, the Personal Property and the Permits, Plans and Contracts being sometimes hereinafter collectively called the "Property"), such purchase and sale to be on such terms and conditions, as follows:

ND0025

1.  Purchase Price. The Property is to be sold to Buyer for the sum of ███████ ██MILLION ██ HUNDRED ██████████E THOUSAND DOLLARS (███████ (the "Purchase Price"), which, less that portion of the Deposit (as defined in Section 2) then being held by the Escrow Agent (as defined in Section 2) in the form of cash, subject to adjustment pursuant to Section 14 hereof, and provided all of the conditions precedent hereunder to Buyer's obligation to consummate the Closing hereunder (the "Closing") have been satisfied (or waived by Buyer), Buyer shall pay to Seller on the Closing Date (as defined in Section 6) at the time of the delivery of the Deed (as defined in Section 3) by wiring immediately available Federal funds to such bank account as may be designated by Seller.

2.  Deposit. As soon as reasonably possible, but no later than Wednesday, April 16, 2003, Buyer will deliver to Lawyers Title Insurance Corporation, One Washington Mall, Boston, Massachusetts 02108 (the "Escrow Agent") an irrevocable standby letter of credit in the amount of ██Hundred Thousand Dollars ██████000.00) issued by Bank America naming Lawyers Title Insurance Corporation, Escrow Agent, as its beneficiary, having an expiration date no sooner than December 31, 2003 and issued in the form attached hereto as **Exhibit F** (together with any substitute or replacement letter of credit delivered in compliance with this Section 2, the "Letter of Credit"). If the Letter of Credit is not delivered by the date required hereunder, Buyer shall be in default under this Agreement and Seller shall have the right to enforce specific performance of Buyer's obligation to deliver the Letter of Credit or, at Seller's sole option, to terminate this Agreement, whereupon neither party shall have any rights or remedies hereunder, except as otherwise provided herein to survive the termination of this Agreement, including, without limitation, Seller's right to specifically enforce Buyer's obligation to so deliver the Letter of Credit. The Escrow Agent will provide Seller with prompt written notice upon receipt of the Deposit.

The Letter of Credit will be presented to the Escrow Agent and deposited hereunder in substitution of earnest money in the form of cash; the Letter of Credit, together with any cash received from draws thereunder, with all interest thereon, being collectively referred to herein as (the "Deposit"). The Deposit, including, without limitation, all interest thereon, shall be held and disposed of by the Escrow Agent in the manner hereinafter provided. If the parties perform all of their obligations under this Agreement, the Deposit then being held by the Escrow Agent shall be either (a) returned to Buyer, if the Deposit remains a Letter of Credit on the Closing Date, or (b) if cash, applied against the Purchase Price on the Closing Date. If the transaction contemplated hereby is not consummated on the Closing Date, the Deposit shall be disposed of in the manner hereinafter provided.

The Escrow Agent shall hold so much of the Deposit as is in the form of cash in an interest-bearing account or instrument and with a financial institution, both of which are mutually satisfactory to Seller and Buyer. Buyer and Seller hereby approve the investment of the Deposit in a money market deposit account with State Street Bank & Trust Company (the "Deposit Account").

Should Seller have cause to require that any portion of the Deposit, or all of it, be paid over to it due to a default by Buyer of any one or more of its obligations hereunder, Seller may direct Escrow Agent to draw upon the Letter of Credit. Upon receipt of such direction from Seller and notwithstanding delivery of notice from Buyer contesting the existence of such default

ND0026

or any other directions to the contrary, Escrow Agent shall, within two (2) Business Days (as defined in Section 4), draw upon the Letter of Credit and deposit all cash received therefrom in the Deposit Account, and pay therefrom so much or all of the Deposit as is required to be paid to Seller pursuant to the terms hereof. Not in limitation of any rights hereunder, Seller shall have the right to direct Escrow Agent to draw upon the Letter of Credit should the same continue to be held by Escrow Agent pending the Closing if this Agreement remains in force and effect on November 30, 2003, if by such date Buyer has not provided to Escrow Agent a substitute Letter of Credit issued by Bank America or a financial institution having a credit rating equal to or greater than that of Bank of America, which substitute Letter of Credit shall be substantially in the form attached hereto as **Exhibit F** and have an expiry date of no sooner than December 31, 2004.

3.    <u>Closing Deliveries.</u>  On the Closing Date, provided all of the conditions precedent hereunder to Seller's obligation to consummate the Closing have been satisfied, Seller shall execute and deliver to Buyer, or to a nominee controlled by or under common control with Buyer and designated by Buyer by written notice to Seller at least ten (10) days before the Closing Date:

(a)    a good and sufficient quitclaim deed (the "Deed") in the proper form for recording so as to convey to Buyer good, clear record, marketable and insurable title to the Real Property, free from all defects, liens and encumbrances except: (i) provisions of then existing building, zoning and environmental laws; (ii) real estate taxes and other governmental charges assessed but not yet due and payable on the Closing Date and any liens for municipal betterments assessed after the date of this Agreement; (iii) all matters of record as of the date of this Agreement, including matters that would be shown by an accurate survey of the Real Property; and (iv) all other rights, easements and other matters of record first arising after the date of this Agreement that do not prohibit or unreasonably interfere with the proposed use of the Property for first-class offices with parking as provided for herein (including within the Garage) and which do not adversely affect the value or utility to Buyer of the Real Property, but specifically excluding liens, attachments, mortgages or other encumbrances securing a monetary obligation or any other encumbrance placed upon the title to the Property by or with the express or implied consent of Seller, unless the same is consented to by Buyer, which consent shall not be unreasonably withheld or delayed.

(b)    an affidavit from Seller stating that Seller is not a "Foreign Person" under the Foreign Investment in Real Property Tax Act of 1980, in form and substance reasonably satisfactory to Buyer's counsel and otherwise in compliance with the Internal Revenue Code of 1986, as amended from time to time;

(c)    standard affidavits and indemnities regarding mechanics liens and parties in possession addressed to and in form and substance reasonably acceptable to Buyer's title insurer in order that such title insurer will issue Buyer an owner's title insurance policy without exception for mechanics' liens or the rights of parties in possession.

(d)    Form 1099 to be filed with the Internal Revenue Service;

ND0027

(e)    a certificate executed by Seller in the form of **Exhibit C** attached hereto and made a part hereof certifying that all of the representations, warranties and covenants made by Seller in this Agreement are true and complete as of the Closing Date, except as set forth in Section 7;

(g)    to the extent in Seller's possession, any original plans and permits and approvals issued by any Governmental Authority relating to the construction or operation of the Property, including, without limitation the Garage Permits and the Garage Plans (as such terms are defined in Section 6);

(h)    a Bill of Sale conveying all of Seller's right, title and interest in the Personal Property (being the tangible personal property listed on **Exhibit B** attached hereto) in form and substance reasonably satisfactory to Seller and Buyer, the Personal Property to be conveyed by Seller "as-is" with a warranty only against encumbrances expressly made by Seller, but without any other warranty or representation of any kind (including, without limitation, those of merchantability, fitness for any particular purpose or ownership), Buyer acknowledging that the Personal Property does not include all of the personal property owned by Seller located or used in connection with the Premises;

(i)    an Assignment and Assumption Agreement, in form and substance reasonably satisfactory to Seller and Buyer, assigning, setting over and transferring to Buyer without representation or warranty except as specifically set forth herein, all of Seller's interest in and to (a) the Garage Plans pursuant to instruments reasonably satisfactory to the parties, and (b) to the extent assignable without the need for payment of any fee, the plans and specifications for the Improvements; and

(j)    such evidence regarding the legal existence and good standing of Seller, and the authority of Seller to execute and deliver the Deed and the other documents required to be delivered by Seller hereunder, as Buyer, Buyer's counsel or Buyer's title insurer may reasonably request.

4.    <u>Review Period.</u>  Buyer shall have until 6:00 p.m. (Eastern Time) on the ▓▓▓▓▓▓ ▓▓▓▓▓ day after the date of this Agreement (the "Review Period") to investigate and to inspect the Property and all matters concerning the Property, including without limitation: (a) to review Seller's title to the Real Property, (b) subject to the terms and conditions of Buyer's right to access the Property set forth below, to make or have made such other surveys, studies, inspections and tests of the Property as Buyer desires, including, without limitation, engineering inspections of the Premises, inspections of the condition of the soils and subsurfaces of the Land, which studies, inspections and tests may include, without limitation, an assessment of the Property for the presence of any oil, hazardous material, hazardous waste or hazardous substance (hereinafter collectively called "Hazardous Substances") as those terms are defined by any applicable federal, state or local law, rule, regulation (hereinafter collectively called "Applicable Environmental Laws"), which terms shall also include, whether or not contained in the definitions in Applicable Environmental Laws, petroleum, solvents, asbestos, asbestos-containing materials, polychlorinated biphenyls and other chemicals which are dangerous to the environment or to human beings; (c) to contact and consult with any and all federal, state, municipal and other governmental bodies having jurisdiction over the Property, or any portion thereof ("Governmental Authorities") regarding the zoning, building code and other

-4-

ND0028

governmental permits and approvals necessary under any applicable laws, regulations, codes, orders, ordinances, rules and statutes now in effect, including, without limitation, the Applicable Environmental Laws (collectively referred to as "Applicable Laws") for the construction, use and operation of the Premises and the Garage (as defined in Section 6); and (d) to review all Permits, Plans and Contracts. All of the investigations described in this Section 4 shall be undertaken by Buyer at Buyer's sole cost and expense, including, without limitation, the cost of such surveys, inspections and tests.

If the ████████████day after the date of this Agreement is not a day on which national banks are open for business in Boston, Massachusetts (a "Business Day"), expiration of the Review Period shall be extended until the next succeeding Business Day.

If Buyer determines, in Buyer's sole discretion (i) the title to, or the physical or environmental condition of, the Property to be unsatisfactory in any manner, (ii) that the Property does not comply with Applicable Laws, or (iii) the Property is unsatisfactory for any other reason or for no reason at all, then Buyer may terminate this Agreement by giving written notice of such election to Seller and Escrow Agent on or before the expiration of the Review Period, whereupon the Escrow Agent shall (x) pay Seller any unpaid Garage Costs (as defined in Section 6) within five (5) business days of Buyer's receipt of a detailed invoice, failing which payment such Garage Costs may be taken from the Deposit, and (y) return the balance of the Deposit to Buyer, and this Agreement shall terminate and neither party shall have any rights or remedies hereunder, except as otherwise provided herein to survive the termination of this Agreement.

If notice of termination is not given by Buyer by the expiration of the Review Period (time being of the essence), Buyer shall, without limiting any of Seller's representations or warranties hereunder, be deemed to have approved the Property, including, without limitation: (a) the state of title to the Property as it exists on the date of this Agreement, (b) the environmental condition of the Property (except any condition first arising after the date of the latest environmental site assessment delivered to Buyer by Seller, or any later independent assessment obtained by Buyer in accordance with the foregoing provisions of this Section 4), (c) the physical condition of the Property (except any condition first arising after the date of Buyer's last inspection of the Property during the Review Period), (d) the compliance of the Property with all Applicable Laws, and (e) the Permits, Plans and Contracts. Buyer shall not be deemed to have approved any title matter arising after the date of this Agreement that does not conform to Section 3(a) hereof. Upon the expiration of the Review Period, the Deposit shall be non-refundable to Buyer, except in the event the Closing does not occur as a result of Seller's default under this Agreement or in the event of a failure of any condition precedent hereunder to Buyer's obligation to consummate the Closing.

. During the Review Period, Buyer and its representatives, contractors, architects and engineers, and each of their respective officers, directors, agents, employees and representatives shall, upon reasonable notice to Seller, have access to the Property at reasonable times and for reasonable periods (a) to show the Property to third-parties (including, without limitation, lenders, insurers or attorneys) and (b) to perform any and all tests, borings, inspections and measurements which are contemplated hereby and which are in Buyer's reasonable judgment necessary or appropriate; provided that in all cases, unless waived on each occasion by Seller, such representatives, contractors, architects and engineers shall be accompanied by a

ND0029

representative of Seller.   To the extent that any of such tests, borings or inspections reveal the existence of Hazardous Substances in, under or on the Premises not previously disclosed to Buyer, Buyer shall notify Seller of the same and provide Seller with a copy of any written reports or correspondence relating thereto within five (5) days of Buyer's receipt thereof.  Unless required by Applicable Law, neither Buyer nor any engineer or other representative of Buyer shall file any of findings or reports with any Governmental Authority without Seller's written authorization, it being agreed that Seller shall have a superior right to file any of such findings or reports on its own behalf.

After its inspections are completed, Buyer shall, at Buyer's sole cost and expense, repair any damage to the Property caused by Buyer or any of its representatives, contractors, architects or engineers so that the Property is substantially restored to its condition immediately prior to such damage. Buyer agrees to indemnify and hold Seller harmless from and against all claims, damages and liability arising out of or relating to the exercise by Buyer, or such any other person, of the access rights under this Section 4, including, without limitation, such claims, damages and liability for personal injury or property damage, and all costs and reasonable attorneys' fees, provided that Buyer shall have no liability to Seller arising out of the existence of Hazardous Substances not first introduced to the Property by Buyer or its representatives, employees or contractors, or the reporting of conditions of the Property revealed during the Review Period in accordance with Applicable Laws and the terms of this Agreement.  Nothing herein shall relieve Seller from responsibility for its own negligence or willful misconduct or the negligence or willful misconduct of its representatives, employees or contractors.

Prior to Buyer or any such other party entering the Property in the exercise of the access rights hereunder, Buyer shall deliver to Seller a Certificate of commercial general liability insurance naming Seller as an additional insured and evidencing coverage with such insurers as shall be reasonably satisfactory to Seller with limits no less than One Million Dollars ($1,000,000.00) per occurrence with respect to property damage and One Million Dollars ($1,000,000.00) per occurrence with respect to personal injury (including bodily injury and death) and with such deductibles and other coverages as Seller reasonably requests.

Such indemnity and other obligations of Buyer under this Section 4 shall survive the Closing or the earlier termination of this Agreement, provided, that, such indemnity shall survive for a period of ▮▮▮▮▮▮▮ from the Closing or such earlier termination, and any action brought on such indemnity shall be commenced within said ▮▮▮▮▮▮ period or shall be forever barred and waived.

5.    Condition of Property.  Without limiting Seller's express representations or warranties under this Agreement, Buyer and Seller agree that upon the consummation of the Closing, Buyer will be acquiring the Property in its "AS-IS" condition, with all faults, if any, and without any warranty, express or implied, except as expressly set forth in this Agreement to survive the Closing. By accepting the Deed and paying the Purchase Price, Buyer will be deemed to have acknowledged that (a) it is familiar with the Property and has had full opportunity, to the extent it desired to do so, to fully inspect and review (i) the environmental condition of the Property, (ii) the title to the Property, (iii) the compliance of the Property with Applicable Laws, (iv) the ability of Buyer to construct and operate the Garage in accordance with all Applicable Laws, and , (v) the Permits, Plans and Contracts, and (vi) such other

ND0030

engineering and other matters related to the Property as Buyer has found appropriate, and Buyer will, upon the Closing, be deemed to have acknowledged that Buyer is satisfied with each of the foregoing matters. Buyer hereby confirms that, except as set forth in Section 7 hereof, neither Seller nor any member, partner, director, officer, employee, agent or representative of Seller nor any other person purporting to act on behalf of Seller has made any representation upon which Buyer is relying with respect to the Property.

Without limiting Seller's representations and warranties in Section 7, Buyer hereby releases Seller, its members, partners, agents, representatives, employees, successors and assigns from and against any and all claims, demands and causes of action of any kind or character that Buyer may have relating to or arising out of (a) the condition of the Property, (b) the Garage, or (c) any other matter pertaining to the Property, as of the Closing hereunder. Such release by Buyer under this Section 5 shall survive the Closing or the earlier termination of this Agreement.

Except as otherwise provided in Section 10(a)(iii), Buyer hereby agrees that any loss, damage or deterioration in respect of the Improvements which may occur between the date of this Agreement and the Closing shall not give rise to any adjustment of the Purchase Price or any change in the rights and obligations of the parties.

    6.    <u>Permitting Period and Closing</u>.

    (a)    <u>Closing Date</u>. Subject to the provisions of this Agreement, the Deed and all of the other documents required to be executed and delivered by Seller hereunder (with the Deed, hereinafter called "Seller's Documents") shall be delivered to Buyer at 10:00 a.m., Eastern time, on the Closing Date at the offices of the Escrow Agent, One Washington Mall, 15th Floor, Boston, Massachusetts, unless otherwise agreed by the parties in writing.

For purposes of this Agreement, "Closing Date" shall mean the tenth (10th) Business Day after the later to occur of: (a) the expiration of the Review Period, and (b) the issuance of all zoning and other governmental permits and approvals exclusive of a building permit (collectively, the "Garage Permits") necessary under Applicable Laws for the construction and use of a parking structure (the "Garage") on the Land, subject only to such conditions as are typical in the ordinary course of permitting such projects in the Greater Boston area, with all appeal periods therefrom having run without appeal having been filed or if filed disposed of without the possibility of further appeal (the issuance of governmental permits and approvals and such expiration of appeal periods, the "Issuance" of such permits or approvals). The Garage will be designed to accommodate, together with the remaining surface parking on the Land, 959 parking spaces. There are currently approximately 47 parallel parking spaces on Royall Street that, together with the spaces designed to be included in the Garage and the remaining surface parking to be located on the Land, total approximately 1006 parking spaces. The Garage will be designed and located in accordance with the schematic site plan, garage elevation plan, and schematic layout plan listed on **Exhibit D** attached hereto and made a part hereof (collectively, the "Garage Plans"). Seller and Buyer acknowledge that they have reviewed and approved the Garage Plans. If the tenth (10th) Business Day after the later to occur of: (a) expiration of the Review Period; and (b) Issuance of the Garage Permits, shall not occur on a Business Day, then the Closing Date shall be extended to the next succeeding Business Day. Seller shall keep

ND0031

Buyer informed of its progress in obtaining the Garage Permits and shall give Seller written notice of the date of the Issuance of all of the Garage Permits (the "Permitting Date") and of the resulting Closing Date in accordance with the terms hereof.

Notwithstanding whether the Permitting Date has occurred, Buyer shall have the option of irrevocably accelerating the Closing Date by giving ten (10) Business Days' written notice of such election to Seller, whereupon the date set forth in such notice shall be the Closing Date for all purposes set forth herein. Upon the Closing after Buyer's exercise of such option, Seller will have no further obligations with respect to the Garage Permits.

(b)    Garage Permits.    Seller agrees, at Buyer's sole cost and expense as hereinafter provided, to use reasonable efforts to obtain the Garage Permits from and after the date of this Agreement. Obtaining the Garage Permits shall be a cooperative effort of Buyer and Seller, with Buyer having the right to approve any material changes to the Garage Plans and applications for the Garage Permits, all as hereinafter provided. Seller shall have the primary responsibility to select engineers, architects and other professionals to produce the Garage Plans and all other reports, plans, designs and specifications reasonably necessary in connection with designing the Garage and obtaining the Garage Permits, with Buyer having the right to approve such professionals, such approval not be unreasonably withheld or delayed. Buyer shall have the right to directly contact all design, engineering and other professionals involved in the Garage planning process, and shall have the right to attend all meetings with such professionals, representatives of Governmental Authorities or other persons (including without limitation representatives of communities potentially or actually affected by the Garage) held or attended by Seller or Seller's representatives (other than internal corporate meetings of Seller or meetings of Seller with its legal counsel, provided no other person outside of Seller or its counsel are present or participate in person, by telecommunications or otherwise).

Seller has delivered to Buyer a proposed form of application for a special permit from the Town of Canton for the Garage and Buyer has approved such application. Buyer shall have the right to approve (a) all other permit applications and other filings desired to be made by Seller in its efforts to obtain the Garage Permits, and (b) any material revisions to the Garage Plans requested by any Governmental Authority or Seller, in the case of clauses (a) and (b) such approval being deemed to have been given if not denied in writing received by Seller within three (3) Business Days of Buyer's receipt of the materials for which approval is sought; notwithstanding the foregoing, Buyer shall exercise its reasonable efforts to more promptly provide or deny such approval. Buyer will not withhold such approval unless, in Buyer's reasonable discretion, the submittal of such applications, the proposed revision to the Garage Plans or the taking of the action for which approval is requested without amendment would (i) increase the cost of the Garage by an amount in excess of Fifty Thousand Dollars ($50,000), when aggregated with the cost of all other requested changes or actions, (ii) materially decrease its utility to Buyer, (iii) materially and adversely affect the Property, or (iv) conflict with Seller's obligations under this Agreement. Seller shall simultaneously provide Buyer with a copy of any applications for any permits or approvals from any Governmental Authority. Seller shall provide Buyer with reasonable prior notice of any public hearings with any Governmental Authority regarding the Garage, and Buyer shall have the right, but not the obligation, to attend such meetings or hearings. Buyer may request that the Garage Plans or any such permit applications be amended in accordance with the foregoing provisions of this Section 6(b), provided, however,

ND0032

that, Buyer may not request that the Garage Plans or any such permit applications be amended if such amendment could delay the Issuance of the Garage Permits.

If the Permitting Date has not occurred by September 1, 2003 (the "Initial Permitting Period"), unless Buyer waives the occurrence of the Permitting Date and accelerates the Closing in accordance with the last paragraph of Section 6(a), this Agreement shall automatically terminate and neither party shall have any rights or remedies hereunder, except as otherwise provided herein to survive the termination of this Agreement, and the Escrow Agent shall (i) pay Seller any unpaid Garage Costs from the Deposit, and (ii) return the balance of the Deposit to Buyer; provided, however, that if, on the expiration of the Initial Permitting Period, all of the Garage Permits have been issued and the Permitting Period failed to occur solely as a result of the tolling of all applicable appeal periods from the issuance of the Garage Permits without appeal having been filed, then the Initial Permitting Period shall, without further action by the parties, be extended to allow for the tolling of such appeal periods without appeals being filed (the "Extended Permitting Period").

Without limiting Buyer's right to waive the occurrence of the Permitting Date and to accelerate the Closing in accordance with the last paragraph of Section 6(a), if the Permitting Date has not occurred by the expiration of the Extended Permitting Period, this Agreement shall automatically terminate and neither party shall have any rights or remedies hereunder, except as otherwise provided herein to survive the termination of this Agreement, and the Escrow Agent shall pay Seller from the Deposit any unpaid Garage Costs, and return the balance of the Deposit to Buyer. 

Notwithstanding the provisions of the foregoing paragraphs of this Section 6(b), if at any time prior to the expiration of the Permitting Period, as the same may be extended hereunder, any of the Governmental Authorities has denied any Garage Permit, or if Seller determines, in its reasonable discretion, that it is unlikely that Seller will obtain, prior to the expiration of the Initial Permitting Period, the Garage Permits, then Seller may elect to terminate this Agreement by giving written notice of such election to Buyer. Upon any such termination of this Agreement pursuant to this paragraph neither party shall have any rights or remedies hereunder, except as otherwise provided herein to survive the termination of this Agreement. Upon such termination, the Escrow Agent shall pay Seller from the Deposit any unpaid Garage Costs, and return the balance of the Deposit to Buyer. Nothing set forth in this paragraph shall be deemed to limit Buyer's right to waive the occurrence of the Permitting Date and to accelerate the Closing in accordance with the last paragraph of Section 6(a).

(c)    Garage Costs. Except as specifically otherwise provided in this paragraph, all of Seller's reasonable out-of-pocket costs to design the Garage to the extent necessary to obtain the Garage Permits (including, without limitation, permit application fees and reasonable engineers', architects', and attorneys' fees and expenses) (collectively, the "Garage Costs") shall be paid by Buyer whether or not the Permitting Date or Closing occurs (unless the Closing does not occur solely as a result of a willful default by Seller hereunder or the failure of any express representations and warranties made by Seller hereunder remaining true and correct on the Closing Date as a result of a voluntary act by Seller) and whether or not Buyer terminates this Agreement prior to the expiration of the Review Period under Section 4. Buyer acknowledges that Seller will commence its efforts to obtain the Garage Permits, at Buyer's cost as aforesaid,

ND0033

during the Review Period. Seller will have no obligation to construct the Garage or to pay for the cost thereof. If the Closing does not occur solely as a result of a willful default by Seller hereunder or the failure of any express representations and warranties made by Seller hereunder remaining true and correct on the Closing Date as a result of a voluntary act by Seller, then Buyer shall have no further obligation to pay any Garage Costs and Seller shall reimburse Buyer for all Garage Costs paid to Seller by Buyer or on behalf of Buyer from the Deposit within ten (10) Business Days after the termination of this Agreement, which obligation will survive such termination.

If this Agreement is terminated after the expiration of the Review Period for any reason other than a default by Buyer hereunder and, within two (2) years after such termination, either (a) Seller uses the Garage Plans without substantial modification in connection with the construction of the Garage for a party other than Buyer or any affiliate of Buyer and a building permit is issued for the Garage within such two (2) year period and any appeal period relating thereto runs without any appeal having been filed (or if filed disposed of without the possibility of further appeal), or (b) Seller obtains the Garage Permits and thereafter sells the Property to a party other than Buyer or any affiliate of Buyer and such purchaser obtains a building permit for the Garage within such two (2) year period and any such appeal period runs without any appeal having been filed (or if filed disposed of without the possibility of further appeal), then Seller agrees to reimburse Buyer for the Garage Costs paid hereunder to Seller by Buyer or on behalf of Buyer from the Deposit within ten (10) Business Days after the running of any appeal period relating to the issuance of such building permit without any appeal having been filed (or if filed, within ten (10) Business Days after disposed of without the possibility of further appeal). Seller's obligations under this Section shall survive the termination of this Agreement.

(d)    <u>Payment of Garage Costs</u>. Buyer will reimburse Seller for all unpaid Garage Costs at Closing and, except as specifically otherwise provided in Section 4(c), upon the earlier termination of this Agreement. Buyer will also reimburse Seller for Garage Costs within ten (10) Business Days after delivery of invoices from time to time delivered by Seller to Buyer documenting the Garage Costs in reasonable detail. Seller may invoice Buyer for Garage Costs during the term hereof no more frequently than once every thirty (30) days. Buyer's obligation to reimburse Seller for the Garage Costs shall be secured by the Deposit. If Buyer fails to reimburse Seller at Closing, the termination of this Agreement or within fifteen (15) Business Days of delivery of any such invoice, then Seller may from time to time request that the Escrow Agent release to Seller a portion of the Deposit to pay any such delinquent amount. Upon Escrow Agent's receipt of a certification from Seller that any such invoice from Seller for Garage Costs has not been paid at Closing, the earlier termination of this Agreement or within fifteen (15) Business Days of delivery thereof, together with a certification of the amount due, then the Escrow Agent shall deliver to Seller a sum from the Deposit in the amount so certified within two (2) Business Days of receipt of the certification, which sum shall be non-refundable to Buyer and not credited against the Purchase Price at Closing. The Escrow Agent shall continue to hold the remaining Deposit in accordance with the terms of this Agreement. Within two (2) Business Days after the release of any portion of the Deposit by the Escrow Agent, Buyer shall replenish the Deposit with cash in the sum of the amount released and the Escrow Agent shall hold such replenished sums with the balance of the Deposit in accordance with the terms of this Agreement.

ND0034

7. <u>Seller's Representations and Warranties</u>. As a material inducement for Buyer to enter into this Agreement and to consummate the Closing, Seller makes the following representations and warranties to Buyer as of the date hereof, which representations are true as of the date of this Agreement, shall be true and correct on the Closing Date as though such representations and warranties were made at and as of the Closing Date (except that such representations and warranties shall be treated as modified as of the Closing, and without breach of the foregoing obligation by Seller, by Seller's delivery at Closing of Seller's certification attached hereto as **Exhibit C**, reflecting the occurrence of any event or change in the state of facts effective after the date hereof and prior to the Closing, provided Buyer shall have the right to terminate this Agreement, if such certification delivered at Closing contains any material fact or information unsatisfactory to Buyer in Buyer's reasonable discretion, in which case the Escrow Agent shall, except as specifically provided in Section 6(c), pay Seller any unpaid Garage Costs from the Deposit and shall refund the balance of the Deposit to Buyer, and this Agreement shall terminate and neither party shall have any rights or remedies hereunder, except as stated herein to survive the termination of this Agreement).

7.1 <u>Seller's Authority</u>. Seller has full power and authority to execute and deliver this Agreement and to perform its obligations arising hereunder.

7.2 <u>Enforceability</u>. (a) This Agreement constitutes, and Seller's Documents will each constitute, the legal, valid and binding obligations of Seller, enforceable in accordance with their respective terms, covenants and conditions, subject only to bankruptcy, insolvency, reorganization and similar laws or equitable principles relating to or affecting the enforcement of creditors' rights generally, (b) there are no present claims, defenses (personal or otherwise) or offsets to the validity or enforceability against Seller of this Agreement or any of Seller's Documents and (c) Seller has not granted to any person other than Buyer a right of first refusal, option to purchase, or other right to purchase all or any part of the Property.

7.3 <u>No Conflict</u>. This Agreement and Seller's Documents do not and will not contravene any provision of (i) Seller's organizational documents or any other agreement to which Seller is a party or (ii) any present judgment, order, decree, writ or injunction affecting Seller.

7.4 <u>No Condemnation Proceedings</u>. There are no condemnation or eminent domain proceedings, or negotiations for the purchase of the Property in lieu of condemnation, commenced or, to Seller's actual knowledge, threatened in connection with the Property or any portion of the same.

7.5 <u>No Litigation</u>. There are no actual suits, actions or proceedings now pending with respect to all or part of the Property to which Seller is a party, nor has Seller received written notice of any threatened suits, actions or proceedings, nor to Seller's actual knowledge, are there any threatened suits, actions or proceedings with respect to all or any part of the Property.

7.6 <u>No Contracts</u>. Exhibit as disclosed on Exhibit G attached hereto and made a part hereof (the "Contract List"), there are no contracts (oral or written) relating to the Property to which Seller is a party and which shall survive the Closing. Except (a) as disclosed on the Contract List, and (b) the existing Management Agreement between Seller and National

-11-

Development Asset Management of New England Limited Partnership, which will not survive the Closing, there are no other contracts relating to the Property to which Seller is a party.

7.7    No Leases. There are no leases, licenses or other rental agreements or occupancy agreements (written or verbal) entered into by Seller that grant any possessory interest in and to all or any portion of the Property that will survive the Closing.

7.8    Environmental Violations. To Seller's actual knowledge, except as may be disclosed in any reports delivered to Buyer or any of Buyer's agents, including, without limitation the environmental site assessments and reports listed in **Exhibit E** attached hereto and made a part hereof, there are no material violations of Applicable Environmental Laws pertaining to the Property.

7.9    Notices of Violations or Investigations. Seller has not received any written notice of (a) any uncured violation of any Applicable Laws pertaining to the Property or any portion thereof, or (b) any pending or threatened investigation by any Governmental Authority regarding any violation of Applicable Laws.

Buyer acknowledges that, notwithstanding the provisions of this Section 7 requiring Seller to update representations as of the Closing Date, Buyer shall have no right to terminate this Agreement as a result of any change in the state of facts effective after the date hereof and prior to the Closing that makes any of Seller's representations and warranties untrue as of the Closing Date if such change in the state of facts results from an action by Seller otherwise permitted or required under the express terms of this Agreement without Buyer's consent.

The representations and warranties of Seller set forth in this Section 7 shall survive the Closing for a period of ▅▅▅▅▅▅ No claim for a breach of any representation or warranty of Seller shall be actionable or payable (a) if the breach in question results from or is based on a condition, state of facts or other matter which was known to Buyer prior to the Closing; and (b) unless the valid claims for all such breaches collectively aggregate more than ▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅▅▅, in which event the full amount of such claims shall be actionable subject to the limitations below; and (c) unless written notice containing a description of the specific nature of such breach shall have been given by Buyer to Seller prior to the expiration of said ▅▅▅▅ ▅▅▅▅▅▅ and an action shall have been commenced by Buyer against Seller within ▅▅▅▅▅ ▅▅▅▅▅▅ of the Closing. In no event shall Seller's aggregate liability to Buyer for breach of Seller's representations or warranties in this Agreement or the certificate to be delivered by Seller at Closing pursuant to Section 3(e) hereof excee▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ ▅▅▅▅▅▅▅▅in the aggregate.

8.    Buyer's Representations and Warranties. As a material inducement for Seller to enter into this Agreement and to consummate the Closing, Buyer makes the following representations and warranties to Seller as of the date hereof, which representations are true as of the date of this Agreement, shall be true and correct in all material respects on the Closing Date as though such representations and warranties were made at and as of the Closing Date and shall survive the Closing or the earlier termination of this Agreement:

ND0036

8.1    Buyer's Authority.   Buyer has full power and authority to execute and deliver this Agreement and to perform all obligations arising hereunder, provided, that, Buyer's obligation to consummate the Closing is subject to Buyer obtaining the approval of its Board of Directors prior to the expiration of the Review Period.   Upon the expiration of the Review Period without this Agreement having been terminated by Buyer in accordance with the provisions of Section 4, and not in limitation of any right of Buyer pursuant to the express terms of this Agreement to otherwise terminate this Agreement, Buyer's Board of Directors shall have approved Buyer consummating the Closing hereunder.   This Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable in accordance with its terms, covenants and conditions, subject only to bankruptcy, insolvency, reorganization and similar laws or equitable principles relating to or affecting the enforcement of creditors' rights generally, and there are no present claims, defenses (personal or otherwise) or offsets to the validity or enforceability against Buyer of this Agreement.

8.2    No Conflict.   This Agreement does not and will not contravene any provision of (i) Buyer's organizational documents or any other agreement to which Buyer is a party, or (ii) any present judgment, order, decree, writ or injunction affecting Buyer.

9.    Covenants.   Seller and Buyer covenant with each other that:

9.1    During the term of this Agreement, Seller shall not enter into any agreements, leases, letters of intent or other rental or occupancy agreements (written or verbal) which grant any ownership or possessory interest in and to all or any portion of the Property that will survive the Closing, without first obtaining in each instance Buyer's prior written consent, which consent Buyer may withhold in its sole and absolute discretion.   Nothing set forth herein shall prohibit Seller from continuing to market the Property or from entering into agreements relating to the Property, subject to Buyer's rights hereunder.

9.2    After the expiration of the Review Period, other than an instrument conforming with the provisions of Section 3(a), Seller shall not enter into any contract or other agreement with respect to all of any portion of the Property that will survive the Closing, without Buyer's prior written consent, which consent Buyer may withhold in its sole and absolute discretion. Seller may enter into any such contract or other agreement that will not survive the Closing without the need to obtain Buyer's consent.

9.3    On the Closing Date, Seller shall execute all applications and instruments, if any, required in connection with the transfer to Buyer of any Garage Permits or any zoning, building code and other governmental permits and approvals affecting the Property to the extent the same do not run with the Land without the need for an assignment, together with all applications therefor and plans, specifications, reports and supporting or preparatory work product therefore, subject to the provisions of Section 9.6 hereof (collectively, the "Governmental Approvals").

9.4    Other than Seller's efforts to obtain the Garage Permits, during the term of this Agreement, neither Seller, nor any agent of Seller, shall consent to, authorize or approve (but Seller shall have no obligation to contest or monitor) (i) any change to any Governmental Approvals or to any zoning or similar land use classification for the Land that would adversely

ND0037

affect the Land or (ii) any special assessments with respect to the Land, without the prior written consent of Buyer.

9.5    Each of the parties hereto agrees that it shall maintain the confidentiality of this Agreement, except only such disclosure (a) to its counsel, lenders, brokers and other consultants who require such information to advise it relating to the transaction contemplated hereby, or (b) to the extent it is required to disclose the same pursuant to Applicable Laws. Each party hereto shall direct such parties to maintain the confidentiality of this Agreement. Buyer shall maintain the confidentiality of all information that it receives from Seller or otherwise as a result of Buyer's due diligence investigation hereunder, except only such disclosure (i) to Buyer's counsel, lenders, brokers and other consultants who require such information to advise Buyer relating to the transaction contemplated hereby, or (ii) to the extent Buyer is required to disclose the same pursuant to Applicable Laws. Buyer shall direct such parties to maintain the information in confidence. Upon termination of this Agreement without the Deed being delivered hereunder, Seller shall retain ownership of the Garage Plans, and Buyer shall return to Seller all of the documents relating to the Property delivered by or on behalf of Seller to Buyer, its counsel or any of Buyer's other agents (collectively, the "Property Documents"). The parties' obligations under this Section shall survive the termination of this Agreement.

9.6    At Closing, Seller shall assign, without recourse or representation or warranty of any kind, to Buyer or Buyer's title nominee, as applicable, all of Seller's right, title and interest, if any, in and to the Property Documents, to the extent assignable without the payment of any fee. Seller shall obtain, at Seller's sole cost and expense, any consents or reliance letters from Seller's consultants relating to the Garage Plans. Buyer shall obtain, at Buyer's sole cost and expense, any consents or reliance letters from Seller's consultants relating to the Property Documents, provided, that, the Buyer's ability to obtain any such consent or reliance letter shall not be a condition of Buyer's obligation to consummate the Closing.

9.7    Buyer shall execute and deliver at Closing all of the Seller Documents to which Buyer is a party and all other documents or certificates required to be delivered by Buyer under any other provision of this Agreement. Buyer shall also execute and deliver to Seller such documents and certificates reasonably requested by Seller to confirm the legal existence and good standing of Buyer and the authority of Buyer to consummate the Closing and to execute and deliver the Seller Documents to which Buyer is a party.

9.8    At the Closing, Seller also shall deliver to Buyer (i) all keys to all locks on the Property in the possession of Seller, all pass or security codes for security systems affecting the Property, and originals or copies of the books and records and of all original documents in the possession of Seller which are reasonably necessary for the continued operation of the Property, and (ii) possession of the Property, subject to any encumbrances permitted hereunder.

9.9    Seller shall maintain no less than Eighteen Million Dollars ($18,000,000) of replacement cost insurance on the Building throughout the term of this Agreement and comprehensive general liability insurance in the amount currently maintained.

9.10    In the event of any condemnation or eminent domain taking prior to the Closing of all or any material portion of the Property, Buyer shall have the right to terminate this

ND0038

Agreement within seven (7) days after its receipt of notice thereof, whereupon Seller shall be entitled to any and all awards paid or payable with respect to any such taking and this Agreement shall terminate and Escrow Agent shall pay Seller any unpaid Garage Costs from the Deposit and shall refund the balance of the Deposit to Buyer.

9.11    Buyer shall advise Seller in writing prior to the expiration of the Review Period those contracts listed on the Contract List that Buyer does not wish to assume, provided that Buyer shall assume the Siemens Energy Management System contract referenced thereon to the extent the same is assignable without the payment of any fee.

10.   Conditions Precedent to Closing.

(a)   The following shall be conditions precedent to Buyer's obligation to consummate the Closing:

(i)   All of the representations and warranties made in this Agreement by Seller shall be true and correct in all material respects as of the Closing Date (subject to Section 7 hereof)

(ii)   All of the material covenants and agreements made by Seller in this Agreement shall have been fully and timely performed by the Closing Date.

(iii)  The physical condition of the Property shall be substantially the same on the Closing Date as it was on the date of Buyer's last inspection of the Property during the Review Period, reasonable wear and tear, and damage by insured casualty of less than **FIVE HUNDRED THOUSAND DOLLARS ($500,000.00)** excepted. Unless Seller shall have previously restored the Property to its former condition, Seller shall pay over or assign to Buyer at Closing all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by Seller for any partial restoration, plus the amount of any required deductible, provided that if Seller has commenced restoration of the Property, the amount paid over or assigned to Buyer is sufficient in Buyer's reasonable judgment to pay for a full restoration of the Property.

(b)   The following shall be conditions precedent to Seller's obligation to consummate the Closing:

(i)   All of the representations and warranties made in this Agreement by Buyer shall be true and correct as of the Closing Date.

(ii)   The Buyer shall pay Seller the Purchase Price (subject to the adjustments set forth in this Agreement) and all of the other material covenants and agreements made by Buyer in this Agreement shall have been fully and timely performed by the Closing Date.

11.   Extension to Perfect Title, Make Property Conform or Satisfy Closing Conditions. If Seller shall be unable to give title or to make conveyance, or deliver possession of the Property, all as herein stipulated (including, without limitation, the failure of any condition precedent to Buyer's obligation to consummate the Closing), or if at the time of Closing the Property does not conform with the provisions hereof, Seller shall use reasonable efforts to remove any defects in

-15-

ND0039

title, to make the Property conform with the provisions hereof or to satisfy all closing conditions, in which event the Closing Date shall be extended, without further action by the parties, up to thirty (30) days to allow Seller to so perform. Reasonable efforts as used herein shall not require Seller to expend any sums, commence any suits or take any action in order to remove any defects in title, to make the Property conform to the provisions hereof or to satisfy any other closing condition, except with respect to liens, mortgages or security interests affecting any portion of the Property voluntarily incurred by Seller (for each of which there shall be no limit).

Buyer shall have the election at either the original or extended time for performance, to accept such title as Seller can deliver to the Property in its then condition and to pay therefor the Purchase Price without deduction, in which case Seller shall convey such title, except that in the event of such conveyance in accord with the provisions of this Section 11: (a) if the Property shall be damaged by fire or other insured casualty, then, unless Seller shall have previously restored the Property to its former condition, Seller shall pay over or assign to Buyer at Closing all amounts recovered or recoverable on account of such insurance, less any amounts reasonably expended by Seller for any partial restoration, plus the amount of any required deductible, and (b) if any part of the Property has been taken or condemned by any action of a Governmental Authority or quasi-governmental authority or damaged by action of any Governmental Authority, then at Closing there shall be assigned and transferred to Buyer all rights of Seller in and to any and all damage awards for such condemnation or damage. If at the expiration of such extended time, Seller is unable to cure said defects, to make the Property conform or to satisfy all closing conditions, as the case may be, then Buyer shall have the option of terminating this Agreement by giving written notice to Seller by the expiration of such extended time, in which event the Escrow Agent shall pay Seller from the Deposit any unpaid Garage Costs (except as provided in Section 6(c)) and return the balance of the Deposit to Buyer, and this Agreement shall terminate and neither party shall have any rights or remedies hereunder, except as otherwise provided herein to survive such termination.

12. <u>Use of Purchase Money to Clear Title</u>. To enable Seller to make conveyance as herein provided, Seller may, at the time of delivery of the Deed, use any portion of the Purchase Price to clear title of any or all encumbrances or interests, provided that all instruments so procured are recorded and filed simultaneously with the delivery of the Deed or in the case of institutional mortgages provided that arrangements in accordance with customary conveyancing practices are made for a discharge to be promptly procured, recorded or filed after the delivery of the Deed.

13. <u>Title Standards.</u> Any title matter which is the subject of a title standard of the Massachusetts Conveyancer's Association at the time for delivery of the Deed hereunder shall be governed by said title standards to the extent applicable.

14. <u>Adjustments and Prorations</u>. All taxes (including, without limitation, real estate taxes, special assessments and taxes on the Personal Property, if any) for the then current fiscal period, charges for utilities or operating expenses for the Property (including, without limitation, water, electric, sewer, gas and fuel oil charges) shall be prorated to the Closing Date as if Buyer were vested with title to the Property during the entire day upon which the Closing occurs. If the amount of said taxes or assessments is not known on the Closing Date, they shall be apportioned on the basis of the amounts for the preceding year, with a reapportionment as soon as the new

ND0040

amounts can be ascertained. If such taxes and assessments shall thereafter be reduced by abatement, the amount of such abatement, less the reasonable cost of obtaining the same, shall be apportioned between the parties, provided that neither party shall be obligated to institute or prosecute proceedings for an abatement.

Seller shall not be obligated to assign to Buyer any fire, hazard or liability insurance policies which it holds respecting the Property and Seller shall have the right to any and all refunds or rebates resulting from the termination of such policies.

The provisions of this Section 14 shall survive delivery of the Deed.

15.    Costs. Seller shall pay the full amount of all sales, transfer, stamp or other taxes required in connection with the sale or transfer of the Property contemplated hereby. Seller and Buyer shall each pay all other expenses, charges or costs for which sellers and buyers, respectively, are customarily responsible in real estate transactions in Massachusetts. Subject to Buyer's obligation under this Agreement to pay that portion of Garage Costs attributable to Seller's reasonable legal fees and expense for obtaining the Garage Permits, each party shall be responsible for the cost of its respective counsel. Without limiting the generality of the provisions of Section 4, Buyer will be responsible for obtaining, at Buyer's cost and expense, updates to Seller's existing title policy and survey. The parties shall each pay one-half of he Escrow Agent's fees, if any, relating to the transaction contemplated hereunder, provided that Buyer shall pay any portion of the Escrow Agent's fees arising out of or relating to the presentation or drawing of the Letter of Credit.

16.    Brokerage Fees and Warranty. Seller and Buyer represent and warrant to each other that neither has dealt with any real estate agent or broker other than Trammell Crow Services, Inc. (the "Broker"), and was not called to the attention of the other as a result of any services or facilities of any such real estate agent or broker other than the Broker. Seller and Buyer shall indemnify, exonerate and hold the other harmless from and against any claim, loss, damage, cost or liability for any brokerage commission or fee which may be asserted against the other as a result of the other's breach of this warranty. Seller shall pay the Broker a broker's fee for professional services in the amount of Five Hundred Ten Thousand Dollars ($510,000) if and when the Closing occurs and the Purchase Price is paid, but not otherwise. The Broker hereby joins in the Agreement to warrant that the Broker is licensed as such in the Commonwealth of Massachusetts and to confirm the amount of such brokerage fee payable by Seller at Closing. The provisions of this Section shall survive delivery of the Deed hereunder.

17.    Seller's Performance. The acceptance of the Deed by Buyer shall be deemed to be a full performance and discharge of every agreement and obligation of Seller herein contained and expressed, except such as are, by the terms hereof, to survive, or to be performed after, the delivery of the Deed.

18.    Recording Prohibited. This Agreement shall not be recorded with the Norfolk Registry of Deeds or in any other office or place of public record. If Buyer shall record this Agreement or cause the same to be recorded, Seller may, at its option, elect to treat such as a default by Buyer under this Agreement.

ND0041

19.    Remedies. If Seller shall be in default of any material obligation under this Agreement, Buyer shall be entitled, as its sole remedy, either (a) to receive the return of the entire Deposit and any Garage Costs paid to Seller by Buyer hereunder, which return and payment shall operate to terminate this Agreement and release Seller from any and all liability hereunder, or (b) to enforce specific performance of Seller's obligation to execute and deliver the documents required to convey the Property. Buyer expressly waives its right to seek damages in the event of Seller's default hereunder, provided nothing set forth in this Section shall limit the provisions of Sections 16 and 26 of this Agreement obligating Seller to indemnify Buyer. Buyer shall be deemed to have elected to terminate this Agreement and receive back the Deposit and the Garage Costs if Buyer fails to file suit for specific performance against Seller in a court having jurisdiction in the county and state in which the Property is located, on or before thirty (30) days following the date upon which the Closing was to have occurred. No member, partner, officer, director, employee, agent, or representative of Seller shall have any personal liability in connection with this Agreement or the transaction contemplated hereby. The obligations of Seller hereunder are intended to be binding only on the property of Seller.

If Buyer defaults under this Agreement, the sole remedy, at law or in equity, of Seller shall be to retain the Deposit and the Garage Costs, which sums the parties fix and settle as liquidated damages for such default of Buyer, provided that nothing set forth in this Section shall limit the Buyer's obligation to deliver the Letter of Credit as required under Section 2 or the express provisions of this Agreement obligating Buyer to indemnify Seller or to replenish the Deposit in accordance with the provisions of Section 6. If Buyer defaults under this Agreement and the Deposit is then less than the original amount delivered to the Escrow Agent hereunder, nothing set forth in this Section shall limit Buyer's liability to Seller for any amount required to be replenished hereunder, which obligation shall survive the termination of this Agreement. No member, partner, officer, director, employee, agent, or representative of Buyer shall have any personal liability in connection with this Agreement or the transaction contemplated hereby.

20.    Waiver. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

21.    Notices. All notices required or permitted to be given hereunder shall be in writing and sent by overnight delivery service (such as Federal Express), in which case notice shall be deemed given on the day after the date sent, or by personal delivery, in which case notice shall be deemed given on the date received, or by facsimile, in which case notice shall be deemed given on the date when such facsimile was confirmed as received, to the appropriate address and facsimile number indicated below or at such other place or places, or facsimile number or numbers, as either Buyer, Seller or the Escrow Agent may, from time to time, respectively, designate in a written notice given to the other parties hereto in the manner described above.

ND0042

| | |
|---|---|
| To Seller: | Blueview Corporate Center, LLC<br>c/o National Development<br>2310 Washington Street<br>Newton Lower Falls, MA 02462<br>Attention: Theodore R. Tye and Peter Carbone<br>Facsimile Number: 617-965-7361 |
| With A Copy To: | Richard P. Schwartz, Esq.<br>Nutter, McClennen & Fish, LLP<br>World Trade Center West<br>155 Seaport Boulevard<br>Boston, MA 02210<br>Facsimile Number: 617-310-9232 |
| To Buyer: | Thomas McGee<br>DST Realty, Inc.<br>333 West Eleventh Street, Suite 101<br>Kansas City, Missouri 64105-1639<br>Facsimile Number: 816-435-8262 |
| With A Copy To: | Vincent Dasta<br>DST Realty, Inc.<br>333 West Eleventh Street, Suite 101<br>Kansas City, Missouri 64105-1639<br>Facsimile Number: 816-435-8262 |
| | and |
| | Donald E. Vaughan, Esq.<br>Burns and Levinson, LLP<br>125 Summer Street<br>Boston, MA 02110<br>Facsimile Number: 617-345-3237 |
| To Escrow Agent: | Lawyers Title Insurance Corporation<br>One Washington Mall<br>Boston, MA 02108<br>Attn: Carole Sawdon<br>Facsimile Number: (617) 619-4848 |

22.    <u>Entire Agreement</u>.  This instrument, executed in duplicate, sets forth the entire agreement between the parties and may not be canceled, modified, or amended except by a written instrument executed by Seller, Buyer and Escrow Agent.  This Agreement supersedes any prior agreements or memoranda between the parties hereto.

23.    <u>Escrow Agent Duties</u>.  The duties of Escrow Agent shall be determined by the express provisions of this Agreement and are purely ministerial in nature.  If there is any dispute

ND0043

between the parties hereto as to whether or not Escrow Agent is obligated to disburse or release the funds held under and pursuant to this Agreement, Escrow Agent shall not be obligated to make such disbursement or delivery, but in such event shall hold the funds until receipt by Escrow Agent of an authorization in writing signed by all persons having an interest in said dispute, directing the disposition of the funds, or in the absence of such authorization, Escrow Agent shall hold the funds until a final determination of the rights of the parties in an appropriate proceeding. If such written authorization is not given, or proceedings for such determination are not begun and diligently continued, Escrow Agent may, but is not required to, retain counsel and bring an appropriate action or proceeding for leave to deposit the funds pending such determination. Escrow Agent shall be reimbursed for all costs and expenses incurred by it in connection with such action or proceeding, including reasonable attorney's fees and disbursements, by the parties hereto. Upon delivery of the funds as provided herein, Escrow Agent shall have no further liability hereunder. If threatened with litigation, Escrow Agent is authorized by the undersigned to interplead all interested parties in any court of competent jurisdiction and to deposit the funds with the clerk of the court and thereupon Escrow Agent shall be fully relieved and discharged of any further responsibility under this Agreement. Escrow Agent may act as its own counsel hereunder.

Escrow Agent shall not be liable for any mistake of fact or error of judgment or any acts or omissions of any kind unless caused by its gross negligence or willful misconduct. The parties hereto each release Escrow Agent from any act done or omitted to be done by Escrow Agent in good faith in performance of its obligations and duties hereunder. Escrow Agent shall be entitled to rely on any instrument or signature believed by it to be genuine and may assume that any person purporting to give any writing, notice, or instruction in connection with this Agreement is duly authorized to do so by the party on whose behalf such writing, notice, or instruction is given.

The undersigned jointly and severally agree to protect and indemnify Escrow Agent for and hold it harmless against any loss, liability, or expense incurred without the willful misconduct or gross negligence on the part of Escrow Agent, arising out of or in connection with the acceptance of, or the performance of its duties under this Agreement, as well as the costs and expenses of defending against any claim or liability arising under this Agreement.

Seller represents that Seller's federal tax identification number is ███████ Buyer represents that Buyer's federal tax identification number is ███████

24.    Seller's Knowledge. Whenever the term "to Seller's actual knowledge," "to the best of the Seller's knowledge" or terms similar thereto are used in this Agreement, such terms shall mean to the knowledge of Theodore R. Tye and Peter Carbone, employees of National Development, an affiliate of one of Seller's managers, and shall not be construed, by imputation or otherwise, to refer to the knowledge of any other employee of National Development or of any member or manager of Seller or any other employee thereof, or to impose upon such parties any duty to investigate the matter to which such knowledge, or the absence thereof, pertains.

25.    Assignment. Without limiting Buyer's right to name a title nominee controlled by or under common control with Buyer in accordance with Section 3, neither Seller nor Buyer may assign this Agreement or any of their obligations hereunder.

ND0044

26. <u>Like-Kind Exchange</u>. The parties acknowledge that, subject to the terms and conditions of this Section 26, each party shall have the right to exchange the Property for property of a like kind in an exchange qualifying as a tax-free exchange under Section 1031 of the Internal Revenue Code of 1986, as amended (the "Code"). At either party's request, the other shall reasonably cooperate with the requesting party in attempting to implement such exchange as hereinafter provided, at the requesting party's sole cost and expense provided that: (a) the party to whom such request is made incurs no risk, cost or expense associated with the exchange, including, for example, but not by way of limitation, reasonable attorneys' fees and recordation costs; (b) the exchange does not delay the Closing ; (c) the requesting party agrees to indemnify and hold the other harmless from and against all liability arising out of its cooperation in effecting the exchange, including without limitation any tax liability or costs incurred arising from any tax proceedings or investigations conducted in connection with the exchange; (d) the requesting party hereby waives any and all claims it may have against the other resulting from the exercise by the requesting party of its right to cause an exchange as described in this Section 26; (e) neither party shall be required to take title to any exchange property in its name; and (f) any documentation required to be signed by either party shall be in form and substance reasonably satisfactory to such party. The parties hereto acknowledge that neither party shall not be deemed the other's agent in connection with said exchange. The parties expressly acknowledge that, in consummating the exchange contemplated by this Section 26, neither party is making any representations or warranties whatsoever with respect to whether or not the exchange contemplated by this Section will qualify as a tax-deferred exchange pursuant to the Code, and neither party shall have any liability whatsoever to the other in the event that it is determined or adjudged that this exchange transaction does not qualify as a tax-deferred exchange pursuant to the Code.

27. <u>Time</u>. It is agreed that time is of the essence of this Agreement.

28. <u>General Provisions</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by and against the parties hereto and their respective successors and permitted assigns. This Agreement may be executed in one or more counterparts each of which shall be deemed an original, and it shall be sufficient that the original or facsimile signature of each party appear on one or more such counterparts. The captions in this Agreement are inserted only for the purpose of convenient reference and in no way define, limit or prescribe the scope of this Agreement or any part hereof. If two or more persons or entities are named herein as Seller and/or Buyer, then each such person or entity shall be liable for the obligations of the Seller or the Buyer, as the case may be, and their obligations hereunder shall be joint and several. Neither the negotiations to date nor the preparation of this Agreement shall be deemed an offer by any party to the other, and neither party shall be bound except by the execution and delivery of this Agreement. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the parties hereto and their respective legal representatives, successors and permitted assigns.

29. <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts.

[signatures begin on next page]

ND0045

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed, as a sealed instrument, the day and year first above written.

SELLER:

BLUEVIEW CORPORATE CENTER, LLC,
a Delaware limited liability company

By:    ND Blueview Corporate Center LLC,
       a Massachusetts limited liability company,
       Its Manager

By:    NDNE 9/90, Inc., a Massachusetts
       corporation, its Manager

    By: _____
       Name: _Theodore R. Tye_
       Title: _Executive Vice President_

BUYER:

DST REALTY, INC., a Missouri corporation

By: _____
    Name: _____
    Title: _____

BROKER:

TRAMMELL    CROW    &    COMPANY,    a
_____ corporation

By: _____
    Name: _____
    Title: _____

ND0046

IN WITNESS WHEREOF, the parties hereto have caused these presents to be executed, as a sealed instrument, the day and year first above written.

SELLER:

BLUEVIEW CORPORATE CENTER, LLC,
a Delaware limited liability company

By:    ND Blueview Corporate Center LLC,
        a Massachusetts limited liability company,
        Its Manager

By:    NDNE 9/90, Inc., a Massachusetts
        corporation, its Manager

      By: _____
          Name:
          Title:


BUYER:

DST REALTY, INC., a Missouri corporation

By: _____
    Name: _Thomas R. McGee, Jr._
    Title: _Vice President_

BROKER:

                                     ~~SERVICES INC.~~
TRAMMELL    CROW      &  ~~COMPANY,~~     a
_DELAWARE_ corporation

By: _____
    Name: _RICHARD J. FREY_
    Title: _PRINCIPAL_

ND0047

ESCROW AGENT:

LAWYERS        TITLE        INSURANCE
CORPORATION, a Virginia corporation

By:  _____
     Name:  Carole C. Sawdon
     Title:  Vice-President

1201827.1

ND0048

LIST OF EXHIBITS

A -     Description of Land
B -     List of Personal Property
C -     Updated Representations and Warranties
D -     Garage Plans
E -     List of Environmental Assessments and
           Reports Delivered to Buyer
F-     Form of Letter of Credit
G-     Existing Contracts

ND0049

## EXHIBIT A

## DESCRIPTION OF LAND

### PARCEL ONE:

A parcel of land shown as Lot 1 on a plan entitled "Plan of Land in Canton, MA," dated July 10, 2000, prepared by Toomey-Munson & Associates, Inc., which plan was recorded with the Norfolk County Registry of Deeds on February 12, 2001 as Plan No. 90 of 2001, being more particularly bounded and described as follows:

Beginning at a point on the westerly side line of Green Street, at the southeasterly corner of Lot 2, as shown on said plan, and thence running:

S 16° 49'51" E        by Green Street, a distance of 54.99 feet; thence running;

S 14° 39'03" E        by Green Street, a distance of 105.37 feet; thence running;

S 16° 02'34" E        by Green Street, a distance of 103.56 feet; thence running;

S 19° 18'36" E        by Green Street, a distance of 79.28 feet; thence running;

S 16° 08'23" E        by Green Street, a distance of 44.04 feet; thence running;

S 17° 06'00" E        by Green Street, a distance of 47.46 feet; thence running;

S 14° 15'25" E        by Green Street, a distance of 50.57 feet; thence running;

S 16° 43'57" E        by Green Street, a distance of 103.93 feet; thence turning and running;

S 24° 49'46" W        by Green Street, a distance of 147.18 feet; thence turning and running;

N 58° 09'22" W        by Route 128, a distance of 816.89 feet; thence turning and running;

NORTHEASTERLY by Route 128, by a line curving to the right having a radius of 320 feet, a distance of 319.89 feet; thence running,

N 00° 52'46" W        by Route 128, a distance of 66.74 feet; thence turning and running;

N 75° 05'20" E        by Royall Street, a distance of 535.68 feet; thence turning and running;

S 14° 41'51" E        by Lot 2, a distance of 290.31 feet; thence turning and running;

N 56° 00'17" E        by Lot 2, a distance of 86.04 feet; thence running;

N 68° 08'17" E        by Lot 2, a distance of 52.19 feet; thence running;

-25-

ND0050

N 72° 54'14" E        by Lot 2, a distance of 32.27 feet; to the point of beginning.

PARCEL TWO:

A parcel of land shown as Lot 2 on a plan entitled "Plan of Land in Canton, MA," dated July 10, 2000, prepared by Toomey-Munson & Associates, Inc., which plan was recorded with the Norfolk County Registry of Deeds on February 12, 2001 as Plan No. 90 of 2001, being more particularly bounded and described as follows:

Beginning at a point on the southerly side line of Royall Street, at the northeasterly corner of Lot 1, as shown on said plan, and thence running:

N 75° 05'20" E        by Royall Street, a distance of 180.00 feet; thence turning and running;

S 01° 53'46" W        by Green Street, a distance of 75.04 feet; thence turning and running;

S 15° 56'37" E        by Green Street, a distance of 76.02 feet; thence running;

S 17° 22'56" E.       by Green Street, a distance of 106.88 feet; thence turning and running;

S 72° 54'14" W        by Lot 1, a distance of 32.27 feet; thence running

S 68° 08'17" W        by Lot 1, a distance of 52.19 feet; thence running;

S 56° 00'17" W        by Lot 1, a distance of 86.04 feet; thence turning and running;

N 14° 41'51" W        by Lot 1, a distance of 290.31 feet; to the point of beginning.

ND0051

EXHIBIT B

List of Personal Property

Four (4) unassembled 4' square center post picnic tables
Two (2) Fiberglass 6' ladders
Six (6) 40" round exterior patio tables, six (6) 8' burgundy umbrellas, six (6) 50 lb. bases, and twenty-four (24) black wrought iron side arm patio chairs
One (1) personal computer (17" color monitor with hard drive) that facilitates the Siemens Energy Management system for base building systems
Four (4) 5' plastic adjustable shelving systems
Approximately eight (8) pieces of artwork currently located within the building lobbies
Various fan powered terminal (FPT) boxes located within the building but not yet installed

Note: All office furniture currently located in the first floor marketing office, as well as the rooms located on the second floor, are not owned by Seller and therefore are not being conveyed as part of this transaction.

ND0052

<u>EXHIBIT C</u>

## CERTIFICATE REGARDING SELLER'S
## REPRESENTATIONS AND WARRANTIES

Reference is hereby made to that certain Purchase and Sale Agreement, dated as of March __, 2003 (the "Purchase and Sale Agreement"), by and among Blueview Corporate Center, LLC, a Delaware limited liability company (the "Seller") and DST Realty, Inc., a Missouri corporation ("DST"). The undersigned hereby certifies to DST [or DST's nominee] as follows:

There are no changes in the representations and warranties made by the Seller in the Purchase and Sale Agreement [or, list changes here].

This Certification is being given to DST [or DST's nominee] incident to the consummation of the sale of the Property (as defined under the Purchase and Sale Agreement) and it is intended that DST [or DST's nominee] shall rely upon the contents and accuracy of this Certification.

**EXECUTED** as a sealed instrument as of this __ day of _____, 200_.

SELLER:

BLUEVIEW CORPORATE CENTER, LLC,
a Delaware limited liability company

By:    ND Blueview Corporate Center LLC,
a Massachusetts limited liability company,
Its Manager

By:    NDNE 9/90, Inc., a Massachusetts
corporation, its Manager

By: _____
Name:
Title:

ND0053

EXHIBIT D

Garage Plan and Specifications

1.      A certain set plans entitled, "BlueView Corporate Center, Proposed Parking Structure", prepared by      Vanasse Hangen Brustlin, Inc., said plans being dated April 9, 2003 and consisting of seven (7) sheets.

2.      A certain set of floor plans and exterior elevation entitled, "BlueView Parking Garage", prepared by      Spagnolo/Gisness & Associates, Inc., said plans being dated April 7, 2003 and consisting of five (5) sheets      showing each floor layout, plus one (1) sheet showing the exterior elevation of the proposed garage      (hereinafter, the " SGA Plans"). Reduced copies of the SGA Plans are attached hereto.

3.      A certain specification entitled, "Outline Specification, BlueView Parking Garage", prepared by Cranshaw      Construction, said specification being dated March 21, 2003 and consisting of one (1) sheet (hereinafter,      the "Cranshaw Outline Specification"). A copy of the Cranshaw Outline Specification is attached hereto.

ND0054

Exhibit D (continued)

Cranshaw Construction
OUTLINE SPECIFICATION
BlueView Parking Garage
Royall St.
Canton, MA
March 21, 2003

## General Information

- Precast concrete parking garage to house 394 cars.
- Improvements as shown on drawing prepared by VHB dated 03/19/03 and SGA dated 3/21/03 included herewith.

## Site Improvements

- Remove existing pavement, excavate to subgrade. Remove pavement and fill from site.
- Provide erosion control.
- Provide de-watering (groundwater @ 5' +/-)
- Provide sewer connection to existing onsite sewer manhole.
- Provide site storm drainage to onsite detention basins with precast concrete pipe, catch basins, and manholes.
- Provide underground electric service.
- Provide site lighting utilizing wall mounted light fixtures as required.
- Provide 12" gravel under garage and pavement areas.
- Provide 3" bituminous pavement at on grade parking areas.
- Provide striping for all parking spaces.
- Allow $15,000 for planting and landscaping.
- Provide concrete sidewalks as required

## Garage

- Provide reinforced concrete foundations at exterior wall and interior footings.
- Provide precast concrete garage structure. Floor system shall be standard 6000psi precast concrete double Tees with a light broom finish. Spandrel panels will be precast concrete having a combination of exposed aggregate and smooth sand blast finish concrete. The aggregate will be from a local source to manufacturing plant. Columns will have a smooth precast concrete finish. The garage roof and parking decks will be waterproofed utilizing caulking, sealants and expansion joints as required.
- Two stairways will be provided. The stairs will be metal pan type with concrete treads. Stairways shall be unheated.
- Roofing at stairways will be standing seam metal over steel frame.
- Sprinkler system shall be standpipe system per local codes. The standpipe shall be dry with standard fire department connections.
- Plumbing system shall be storm system for roof level parking and sanitary system for all other level as required by code.
- Electrical system shall consist of main electric service, lighting and fire alarm system as required by code.

ND0055

EXHIBIT E

List of Environmental Assessments and Reports

1.    Correspondence from Sanborn, Head & Associates, Inc. dated March 27, 2003.

2.    Phase I Environmental Site Assessment dated December, 1999 prepared by Haley & Aldrich, Inc.

3.    Correspondence from Sanborn, Head & Associates, Inc., dated November 15, 2000.

4.    Documentation of Soil Management prepared by Sanborn, Head & Associates, Inc. dated February, 2002 consisting of two (2) volumes.

ND0056

EXHIBIT F


FORM OF LETTER OF CREDIT

(see attached)

-4-

ND0057

04/03/03  11:32 FAX 8173453299          BURNS LEVINSON LLP                         @002
"APR. 3. 2003  9:24AM  BA DST_REALTY_INC.'   213 945 6010  TO 91816 NO. 351   P. 2  P.01/01

**Bank of America**

**Draft**
**For Discussion**
**Purposes Only**

EXHIBIT F

PAGE: 1

DATE: APRIL 2, 2003

IRREVOCABLE STANDBY LETTER OF CREDIT NUMBER: 3055221

Lawyers Title
Insurance Co Corp,

BENEFICIARY                              APPLICANT
~~BONDAMERICA TITLE INSURANCE~~          DST REALTY, INC
~~COMPANY~~, ESCROW AGENT                C/O TOM MCGEE
ONE WASHINGTON MALL, 15TH FLOOR          SUITE 101, 333 W. 11TH STREET
BOSTON, MA 02108                         KANSAS CITY, MO 64105

REFERENCE: 150 ROYALL STREET
C/O CAROLE C. SAWDON

WORDING IS ACCEPTABLE              AMOUNT
                                  NOT EXCEEDING ▓▓▓▓▓▓▓▓▓▓
                                  NOT EXCEEDING FIVE HUNDRED THOUSAND
                                  AND 00/100'S US DOLLARS
                                  EXPIRATION
                                  DECEMBER 31, 2003 AT OUR COUNTERS

WE HEREBY ESTABLISH IN YOUR FAVOR OUR IRREVOCABLE STANDBY LETTER OF
CREDIT WHICH IS AVAILABLE WITH BANK OF AMERICA, N.A. BY PAYMENT
AGAINST PRESENTATION OF THE ORIGINAL OF THIS LETTER OF CREDIT AND
YOUR DRAFTS AT SIGHT DRAWN ON BANK OF AMERICA, N.A., ACCOMPANIED BY
THE DOCUMENT DETAILED BELOW:

A STATEMENT PURPORTEDLY SIGNED BY AN AUTHORIZED OFFICER OF THE
BENEFICIARY STATING THE FOLLOWING:
"THE BENEFICIARY IS ENTITLED TO DRAW ON THIS LETTER OF CREDIT BY,
UNDER AND PURSUANT TO THE TERMS AND CONDITIONS OF SECTION 2 OF THAT
CERTAIN PURCHASE AND SALE AGREEMENT DATED APRIL 2003
(THE "AGREEMENT") BETWEEN BIDVIEW CORPORATE CENTER, LLC (AS SELLER)
D DST REALTY, INC. (AS BUYER), IN BENEFICIARY'S CAPACITY AS "ESCROW
AGENT" UNDER SAID AGREEMENT."

WE HEREBY ENGAGE WITH YOU THAT DRAFT(S) DRAWN UNDER AND IN COMPLIANCE
WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED UPON
PRESENTATION TO US AT 333 SOUTH BEAUDRY AVENUE, 19TH FLOOR, MAIL
CODE: CA9-703-19-23, LOS ANGELES, CA 90017 ATTN: STANDBY LETTER OF
CREDIT DEPARTMENT.

THIS LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY
PRACTICES 1998, ICC PUBLICATION NO. 590.

IF YOU REQUIRE ANY ASSISTANCE OR HAVE ANY QUESTIONS REGARDING THIS
TRANSACTION, PLEASE CALL 213-345-0088.

---------- **Draft** ----------           ---------- **Draft** ----------
AUTHORIZED SIGNATURE                      AUTHORIZED SIGNATURE
**For Discussion**                        **For Discussion**
**Purposes Only**                         **Purposes Only**

Bank of America, N.A., Trade Operations
333 CA9-703-19-23
Beaudry Avenue, 19th Floor, Los Angeles CA 90017   ORIGINAL
01235 9-1999_CA919

♻ Recycled Paper

** TOTAL PAGE.01 **

04/03/03  THU 10:17  [TX/RX NO 5732]

ND0058

## EXHIBIT G

### LIST OF EXISTING CONTRACTS

Gurney Engineering Corporation – Water treatment program. This contract expires October 2003.
Tech Mechanical – HVAC equipment. This contract expires October 2003.
Siemens – Energy Management System. This contract expires December 31, 2005.
EL Harvey – Trash removal. This contract expires June 2005 with a thirty (30) day termination notice.
EDI – Fire alarm testing. This contract expires April 2003, is self renewing and has a thirty (30) day termination stipulation.
IDC Monitoring – Monitoring. This contract has a ninety (90) day termination notice.
Weed & Feed Professional Services – Tree/shrub and fertilization programs. These contracts expire November 2003.
MDC Landscaping - Landscaping. This contract runs through the landscaping season for 2003.

1201827.9

ND0059

# DEPOSITION EXHIBIT NO. 20

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) 03 01051 | Trial Court of Massachusetts Superior Court Department County: Norfolk |
|---|---|---|

| PLAINTIFF(S) Blue Hills Office Park LLC | DEFENDANT(S) BlueView Corporate Center LLC and Town of Canton Zoning Board of Appeals by its Members |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Jason A. Manekas, Esquire Bernkopf, Goodman & Baseman LLP 125 Summer Street, Suite 1300 Boston, MA 02110 (617) 790-3000 Board of Bar Overseers number: 632073 | ATTORNEY (if known) |

### Origin code and track designation

Place an x in one box only:

[X] 1. F01 Original Complaint
[ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
[ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

[ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
[ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
[ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| C02 | Zoning Appeal | ( F ) | ( ) Yes ( X ) No |

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
   1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
   2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
   3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
   4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
   5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
                                                                                    Subtotal $. . . . . . . . . . .
B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
F. Other documented items of damages (describe)
                                                                                            $. . . . . . . . . . .
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)
                                                                                            $. . . . . . . . . . .
                                                                                    TOTAL $. . . . . . . . . . .

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

RECEIVED
JUN 5 1903
TOWN CLERK
CANTON, MA

                                                                                    TOTAL $. . . . . . . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT
                    None.

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record _(signature)_                               DATE: 6/9/03

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000



EXHIBIT
Donova
20
KC   2/14/0K

BLUE HILL 1523

# CIVIL ACTION COVER SHEET
## INSTRUCTIONS

## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

| | CONTRACT | | | | REAL PROPERTY | | | | MISCELLANEOUS | |
|---|---|---|---|---|---|---|---|---|---|---|
| A01 | Services, labor and materials | (F) | C01 | Land taking (eminent domain) | (F) | | E02 | Appeal from administrative | (X) |
| A02 | Goods sold and delivered | (F) | C02 | Zoning Appeal, G.L. c.40A | (F) | | | Agency G.L. c. 30A | |
| A03 | Commercial Paper | (F) | C03 | Dispute concerning title | (F) | | E03 | Action against Commonwealth | |
| A08 | Sale or lease of real estate | (F) | C04 | Foreclosure of mortgage | (X) | | | Municipality, G.L. c.258 | (A) |
| A12 | Construction Dispute | (A) | C05 | Condominium lien and charges | (X) | | E05 | All Arbitration | (X) |
| A99 | Other (Specify) | (F) | C99 | Other (Specify) | (F) | | E07 | c.112,s.12S (Mary Moe) | (X) |
| | TORT | | | | | | E08 | Appointment of Receiver | (X) |
| B03 | Motor Vehicle negligence- | | | | EQUITABLE REMEDIES | | E09 | General contractor bond, | |
| | personal injury/property damage | (F) | D01 | Specific performance of contract | (A) | | | G.L. c.149,s.29,29a | (A) |
| B04 | Other negligence-personal | | D02 | Reach and Apply | (F) | | E11 | Workman's Compensation | (X) |
| | injury/property damage | (F) | D06 | Contribution or Indemnification | (F) | | E14 | Chapter 123A Petition-SDP | (X) |
| B05 | Products Liability | (A) | D07 | Imposition of Trust | (A) | | E15 | Abuse Petition, G.L.c.209A | (X) |
| B06 | Malpractice-medical | (A) | D08 | Minority Stockholder's Suit | (A) | | E16 | Auto Surcharge Appeal | (X) |
| B07 | Malpractice-other(Specify) | (A) | D10 | Accounting | (A) | | E17 | Civil Rights Act, G.L.c.12,s.11H | (A) |
| B08 | Wrongful death,G.L.c.229,s2A | (A) | D12 | Dissolution of Partnership | (A) | | E18 | Foreign Discovery proceeding | (X) |
| B15 | Defamation (Libel-Slander) | (A) | D13 | Declaratory Judgment G.L.c.231A | (A) | | E96 | Prisoner Cases | (F) |
| B19 | Asbestos | (A) | D99 | Other (Specify) | (F) | | E97 | Prisoner Habeas Corpus | (X) |
| B20 | Personal Injury-Slip&Fall | (F) | | | | | E99 | Other (Specify) | (X) |
| B21 | Environmental | (A) | | | | | | | |
| B22 | Employment Discrimination | (F) | | | | | | | |
| B99 | Other (Specify) | (F) | | | | | | | |

## TRANSFER YOUR SELECTION TO THE FACE SHEET.

### EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | (F) | ☒ Yes   ☐ No |

## SUPERIOR COURT RULE 29

**DUTY OF THE PLAINTIFF.** The plaintiff or his/her counsel shall set forth, on the face sheet (or attach additional sheets as necessary), a statement specifying in full and itemized detail the facts upon which the plaintiff then relies as constituting money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served on the defendant together with the complaint. If a statement of money damages, where appropriate is not filed, the Clerk-Magistrate shall transfer the action as provided in Rule 29(5)(C).

**DUTY OF THE DEFENDANT.** Should the defendant believe the statement of damages filed by the plaintiff in any respect inadequate, he or his counsel may file with the answer a statement specifying in reasonable detail the potential damages which may result should the plaintiff prevail. Such statement, if any, shall be served with the answer.

## A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT, BUFF COLOR PAPER.

## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN DISMISSAL OF THIS ACTION.

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO.

BLUE HILLS OFFICE PARK LLC,
Plaintiff

v.

BLUEVIEW CORPORATE CENTER LLC
AND PAUL R. CARROLL, JAMES F.
FITZGERALD, GREGORY PANDO,
CHARLES J. ARMANDO, AND ROBERT
QUIGLEY, AS THEY ARE MEMBERS AND
ASSOCIATE MEMBERS OF THE ZONING
BOARD OF APPEALS OF THE TOWN OF
CANTON, MASSACHUSETTS,
Defendants

03-01051

RECEIVED

JUN 9 2003

TOWN CLERK
CANTON, MA

## COMPLAINT

### I. INTRODUCTION

Plaintiff Blue Hills Office Park LLC files this Complaint, pursuant to G.L. c. 40A, §§ 9

and 17 and G.L. c. 249, § 4, appealing from a decision of the Town of Canton Zoning Board of

Appeals as the Special Permit Granting Authority for the Town of Canton ("ZBA"). The

decision ("Decision"), dated May 22, 2003 and filed with the Canton Town Clerk on May 23,

2003, granted a special permit to Defendant BlueView Corporate Center LLC (hereinafter,

"BlueView") for the construction of a 380-vehicle parking garage located at 250 Royall Street in

the Town of Canton, Norfolk County, Massachusetts (the "BlueView Property") and approved

an amended site plan. Plaintiff asserts that the Decision exceeds the authority of the ZBA, is

based on legally untenable grounds, and is unreasonable and capricious. Accordingly, Plaintiff

BLUE HILL 1524

requests that this Court annul the Decision. A certified copy of the Decision is attached hereto as Exhibit "A."

## II. <u>PARTIES</u>

1.      Plaintiff Blue Hills Office Park LLC is a Delaware limited liability company, qualified to do business in the Commonwealth of Massachusetts, with a place of business at One Washington Street, Wellesley, Massachusetts 02481, and is record owner of the property located at 150 Royall Street, Canton, Massachusetts. Plaintiff's property is located immediately across Green Street. Green Street is the only separation between Plaintiff's property and the BlueView Property.

2.      Defendant BlueView Corporate Center LLC is a Massachusetts limited liability company with a usual place of business at 2310 Washington Street, Newton, Massachusetts 02462, and is the owner of the BlueView Property.

3.      Defendant Paul R. Carroll is the Chairman of the ZBA and resides at 742 Washington Street, Canton, Massachusetts 02021.

4.      Defendant James F. Fitzgerald is a member of the ZBA and resides at 10 Williams Street, Canton, Massachusetts 02021.

5.      Defendant Gregory Pando is a member of the ZBA and resides at 481 York Street, Canton, Massachusetts 02021.

6.      Defendant Charles J. Armando is an associate member of the ZBA and resides at 4 Pleasant Garden Road, Canton, Massachusetts 02021.

7.      Defendant Robert Quigley is an associate member of the ZBA and resides at 89 Sherman Avenue, Canton, Massachusetts 02021.

**BLUE HILL 1525**

- 2 -

## III. FACTUAL BACKGROUND

8.      The BlueView Property was to include an office building of approximately 188,000 square feet with parking for 677 automobiles (the "BlueView Development").

9.      The BlueView Development was built pursuant to a Special Permit, Site Plan Approval and Variances granted by the ZBA in 2000 (the "2000 Special Permit"). A true and accurate copy of the 2000 Special Permit is attached hereto as Exhibit "B." The 2000 Special Permit also included certain variances from requirements under the Town of Canton Zoning By-Law, e.g., loading facilities.

10.      BlueView was the developer under the 2000 Special Permit and has been and continues to be the owner of the BlueView Property since the issuance of the 2000 Special Permit.

11.      The BlueView Development has been vacant since its completion and has never been placed into use or occupied.

12.      The 677 spaces for the parking of automobiles currently located at the BlueView Development exceeds the required parking of 497 spaces under the Town of Canton Zoning By-Law.

13.      When the 2000 Special Permit was granted, the ZBA raised concerns over the fact that the proposed parking significantly exceeded the minimum parking requirements.

14.      At the time of the issuance of the 2000 Special Permit, BlueView also filed for required approvals with the Town of Canton Conservation Commission, Town of Canton Planning Board, the Massachusetts Highway Department, and under the Massachusetts Environmental Policy Act, with respect to development of the BlueView Property.

- 3 -

BLUE HILL 1526

15.     In the aforementioned 2000 filings, BlueView made representations concerning the intensity and quality of the use of the proposed BlueView Development.

16.     On or about April 3, 2003, BlueView applied to the ZBA for a Special Permit, Site Plan Approval (modification) and variances (if needed) under the Town of Canton Zoning By-Laws affecting the BlueView Property ("Application"). A true and accurate copy of BlueView's Application is attached hereto as Exhibit "C."

17.     On May 1, 2003, the ZBA held a hearing on BlueView's Application. The hearing was continued until May 22, 2003 at 7:00 p.m. At the continued hearing on May 22, 2003, the ZBA heard further testimony on BlueView's Application, including that of Plaintiff. The ZBA then closed the hearing, voted unanimous approval of the Application, and issued and signed its Decision. The Decision was filed with the Canton Town Clerk on May 23, 2003.

18.     The Decision granted a Special Permit under Section 2.15.2C and Site Plan Approval under Section 3.0 of the Town of Canton Zoning By-Law to BlueView. The Special Permit and Site Plan Approval allow the construction of a 380-vehicle parking garage at the BlueView Property. *See* Exhibit "A."

19.     BlueView's proposed addition of the parking structure and the corresponding increase in the parking at the site by approximately forty percent (40%) so materially affects the overall use of the entire BlueView Development that the parking structure cannot be evaluated as a stand-alone project, but must be evaluated in connection with the BlueView Development as a whole. At present, there is no baseline for the use of BlueView Property as it has never been occupied or placed into use.

BLUE HILL 1527

20.    Notwithstanding that the BlueView Development has never been occupied or placed into use, BlueView sought permission from the ZBA to build the parking structure under Section 2.15.2C of the Town of Canton Zoning By-Law.

21.    In rendering its Decision, the ZBA failed to, *inter alia*, consider the impact of the increased parking and traffic on the overall use of the BlueView Property as opposed to the use for the 2000 Special Permit development. In fact, the ZBA failed to properly evaluate the impact of the parking structure to the BlueView Development as a whole and to adjoining premises. Further, the ZBA's Decision exceeded their authority under the Town of Canton Zoning By-Law.

22.    Under Section 4.06.5 of the Town of Canton Zoning By-Law, garages above grade or garages greater than twelve (12) feet below grade are not permitted in the limited industrial zone.

23.    The BlueView Property is located in the limited industrial (LI) zone.

24.    Section 2.15.2C of the Town of Canton Zoning By-Law provides, in pertinent part, that:

> In a Limited Industrial District, the Board of Appeals may, in a specific case, issue a special permit to allow above or below grade structured parking without regard to the height or depth limits set forth in Section 4.06.5. If the applicant demonstrates as a part of the Site Plan Review process (Section 3.0) that,
>
> C.1    the applicant has available space on the premises to comply with the otherwise applicable parking requirements of the by-law, and
>
> C.2    that the use of above and/or below grade structured parking would: (i) allow the applicant to preserve additional open space above that otherwise required by this by-law, (ii) decrease runoff from impervious surfaces, and (iii) would be effectively screened by trees of a minimum height of seven (7) feet; and

- 5 -

BLUE HILL 1528

C.3    that the side yard width is not less than sixty feet; and

C.4    That the lot on which such structured parking would be located is not less than eight (8) acres. The location(s) where conforming parking would otherwise be placed in the absence of such structured parking shall be shown on the Site Plan submitted for approval to the Zoning Board of Appeals. Such location(s) shall not be occupied by buildings in the future until the owner has demonstrated compliance with this section's requirements with respect to the existing as well as any additional proposed parking. Such structured parking shall not in any event exceed a height of thirty feet as measured from average finished grade to top of the uppermost deck (except for non-habitable structures, including walls and stairwells, as provide din Section 4.42) or extend more than twenty-four feet below finished grade level.

25.    Plaintiff submits that BlueView's Application and the Decision fail to satisfy the requirements of Section 2.15.2C.

26.    Section 2.15.2C.2 requires that "the use of above or below grade structured parking would preserve additional open space above that otherwise required."

27.    BlueView has failed to show that the 380-space structured parking garage will preserve additional open space above that required under the Town of Canton By-Law.

28.    There is insufficient open space anywhere on the BlueView Property which would allow anything even close to the number of spaces in the structured parking garage. The only potential areas where any significant parking could be physically placed on the BlueView Property is a parcel of residentially zoned land, which cannot be used for the parking of vehicles and must remain as a natural buffer, and on an area consisting of a drainage detention basin. *See* Exhibit "B" (discussing residential area).

29.    Section 2.15.2C also requires that the use of above or below grade structure parking would decrease runoff from impervious surfaces.

- 6 -

BLUE HILL 1529

30.    BlueView has failed to demonstrate that the use of above or below grade structured parking would decrease runoff from impervious surfaces.

31.    In addition, Section 2.15.2C.2 requires that the above or below grade structured parking would "be effectively screened by trees of a minimum of seven (7) feet."

32.    BlueView has failed to demonstrate that the parking structure, which is between twenty-three (23) feet and twenty-five (25) feet above grade, would be effectively screened by trees of a minimum height of seven (7) feet. The ZBA acknowledged the above fact by imposing a requirement that trees be at least ten (10) feet in height, although the proposed parking structure cannot be effectively screened by trees of either height.

33.    Section 2.15.2C also requires that the locations where conforming parking would otherwise be placed in the absence of such structured parking shall be shown on the Site Plan submitted for approval to the Zoning Board of Appeals.

34.    There is insufficient area anywhere at the BlueView Property to allow any meaningful additional parking spaces under current site conditions, let alone 380 additional parking spaces. Moreover, nowhere on the Site Plan is any such parking shown.

35.    Section 3.0 of the Town of Canton Zoning By-Law requires Site Plan Approval for any building, except a residential structure for single or two family use.

36.    Section 3.04 requires, *inter alia*, for site plan approval to be granted such that:

> the Board of Appeals shall assure, to a degree consistent with a reasonable use of the site for the purpose permitted or permissible by the regulations of the district in which located:
>
> 3.04.1  Protection of adjoining premises against detrimental or offensive uses on the site.
>
> 3.04.2  Convenience and safety of vehicular and pedestrian movement within the site, and in relation to adjacent streets, property or improvements.

- 7 -

BLUE HILL 1530

3.04.4  Adequacy of space for off-street loading and unloading of
vehicles, goods, products, materials and equipment incidental to
the normal operation of the establishment.

37.     The proposed parking structure is immediately in the sight line of Plaintiff's

Property, will partially block its view and will be detrimental and offensive to Plaintiff and the

inhabitants of Plaintiff's property.

38.     The addition of 380 spaces in a structured parking facility directly in the sight line

of Plaintiff's property will not assure the fulfillment of the general conditions for site plan

approval, but rather violates such requirements as it poses a detriment to Plaintiff's Property.

*See* Section 3.04.1 of the Town of Canton By-Law.

39.     The ZBA also failed to adequately consider the effect of the parking structure on

vehicular traffic on adjacent streets from a project which will provide for parking at a level

double the required amount.

40.     Further, the ZBA failed to adequately consider the effect of the increase of the

intensity of the use of the BlueView Property resulting from the increase in parking on the site

on loading, especially of loading and unloading of goods, products, materials and equipment, and

in light of the fact that under the 2000 Special Permit loading requirements had been reduced by

variance.

41.     For the reasons set forth above, the Decision exceeds the authority of the ZBA, is

based on legally untenable grounds, is unreasonable and capricious, and should be annulled.

## IV.  STANDING

42.     Plaintiff has standing to bring this action as it is a party-in-interest under G.L. c.

40A, §11 and also person aggrieved under G.L. c. 40A, § 17.

- 8 -

BLUE HILL 1531

43.    Plaintiff has standing to bring this action as its property abuts the BlueView Property affected by the Decision within the meaning of G.L. c 40A, § 11.

## V.  COUNTS

### COUNT I
### (Decision Exceeds ZBA's Authority – G.L. c. 40A)

44.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 43 of this Complaint.

45.    The ZBA failed to make sufficient findings to justify the granting of the relief requested under the Town of Canton Zoning By-Law.

46.    The granting of the Special Permit and the granting of Site Plan Approval exceeded the authority of the ZBA.

47.    The Decision to grant the Special Permit is not in harmony with the general purpose and intent of the Town of Canton Zoning By-Law.

48.    Plaintiff and its property will be adversely impacted by the Decision.

49.    As a result thereof, the ZBA's Decision should be annulled.

### COUNT II
### (Declaratory Judgment – G.L. c. 231A)

50.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 of this Complaint.

51.    An actual controversy exists between Plaintiff on the one hand, and the Defendants on the other hand, regarding the ZBA's Decision.

52.    Plaintiff is entitled to a binding declaration under M.G.L. c. 231A declaring and adjudging the parties' rights, duties and liabilities regarding the ZBA's Decision.

BLUE HILL 1532

53.    Plaintiff seeks a declaration that the ZBA's Decision was improper and should be annulled.

**COUNT III**
**(Certiorari – G.L. c. 249, § 4)**

54.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 53 of this Complaint.

55.    The ZBA approved an amended site plan for the BlueView Development.

56.    The ZBA's approval failed to take into account all of the applicable factors.

57.    In the event the Court determines that the site plan approval is separate and distinct from the special permit granted by the ZBA, Plaintiff would have no other means of review and/or appeal.

58.    As a result thereof, the ZBA's approval of an amended site plan should be annulled.

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.    As to Count I, issue an order annulling the ZBA's Decision;

2.    As to Count II, issue a declaratory judgment pursuant to G.L. c. 231A declaring and adjudging the parties' rights, duties, and obligations under the Town of Canton Zoning By-Law and annulling the ZBA's Decision;

3.    As to Count III, issue an order annulling the ZBA's approval of the amended site plan; and

- 10 -

BLUE HILL 1533

4.     Grant such other relief as this Court deems necessary and just.

Respectfully submitted,
Plaintiff
By their attorneys,

Gary P. Lilienthal, BBO No. 300200
Jason A. Manekas, BBO No. 632073
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300

Dated: June 9 , 2003
#270095 v2/14500/9547

- 11 -

BLUE HILL 1534

# DEPOSITION
# EXHIBIT NO. 21



CONFIDENTIAL

## SETTLEMENT AGREEMENT

This **Settlement Agreement** (the "Agreement") is entered into as of this 5th day of August, 2003 among Blue Hills Office Park LLC ("BHOP"), DST Realty, Inc. ("DST") and Blueview Corporate Center LLC (the "Blueview Seller").

WHEREAS, DST entered into, and there is outstanding the Purchase and Sale Agreement dated as of April 9, 2003 as amended to date (the "Purchase and Sale Agreement") pursuant to which the Blueview Seller agreed to sell and DST agreed to acquire the land and the improvements thereon located at 250 Royall Street, Canton, Massachusetts (the "Blueview Property"); and

WHEREAS, DST and the Blueview Seller have agreed to work towards an August 6, 2003 (the "Target Closing Date") closing under the Purchase and Sale Agreement; and

WHEREAS, it is a condition precedent to DST purchasing the Blueview Property pursuant to the Purchase and Sale Agreement that permits and variances necessary for construction of a parking garage upon the Blueview Property be obtained (the "Parking Garage"), which condition, subject to it not being appealed, was satisfied by issuance on May 22, 2003 of the Decision by the Town of Canton Zoning Board of Appeals in Case No. 26-03-MOD/SPA-SP (the "Decision"); and

WHEREAS, BHOP owns the property located at 150 Royall Street, Canton, Massachusetts which in part abuts the Blueview Property (the "150 Property"); and

WHEREAS, by Complaint filed in the Norfolk Superior Court (the "Court"), Civil Action No. 03-01051, BHOP commenced an action appealing the Decision principally on the basis that it was obtained in reliance upon an incorrect interpretation of the Town of Canton Zoning By-Law (the "Appeal"); and

WHEREAS, in recognition of the rights and claims of the parties, BHOP, DST and the Blueview Seller have negotiated a resolution which includes withdrawal by BHOP of its Appeal, payment by DST to BHOP and entry of additional agreements, all as herein specifically set forth;

NOW, THEREFORE, in consideration of the agreements and mutual undertakings set forth herein, the adequacy and sufficiency of which consideration the parties hereto acknowledge, the undersigned hereby act and agree as follows:

1.    <u>Payment to BHOP</u>.  Unless specifically excused from that payment by Paragraph 1.A., DST agrees to cause the sum of Two Million and no/100 ($2,000,000.00) Dollars to be released from the Escrow provided for below to BHOP (the "DST Payment") on the earlier of (i) the date on which DST acquires title to the Blueview Property; or (ii) September 2, 2003.

        A.    DST shall not be required to pay the DST Payment if DST does not acquire the Blueview Property only (i) on account of breach or failure of the Blueview Seller to convey possession and title to the Blueview Property in the condition as presently exists together with discharge of mortgages

Blue Hill
1844

outstanding on the Blueview Property (the "Title Condition"), or (ii) if there is issued a notice of taking by eminent domain or condemnation of a portion of the Property or casualty loss of improvements upon the Blueview Property that are not timely restored or there is an appeal filed prior to the August 4, 2003 expiration of the applicable appeal period in connection with the issuance of the decision by the Conservation Commission of the Town of Canton in DEP No. 124-880 by a party other than DST or any entity controlled or acting in collusion with DST, and the Purchase and Sale Agreement excuses DST from purchasing the Blueview Property on account thereof (an "Excused Non-Purchase"), or (iii) the occurrence or announcement of a sale or transfer of control to a third party of all or substantially all of the equity interests or assets of DST, DST's parent, or EquiServe, Inc., (being an affiliate of DST and the intended tenant of the Blueview Property) which in DST's judgment obviates the need to acquire the Blueview Property, provided, however, that the provisions of this subparagraph 1(A.)(iii) shall lapse and be of no further force or effect from and after September 3, 2003.

B.    The parties agree that time is of the essence in DST and the Blueview Seller closing their purchase and sale of the Blueview Property and the parties hereto performing their obligations and agreements set forth in this Agreement.

2.    <u>Escrow Agent and Escrow Agreement</u>. Lawyers Title Insurance Corporation, acting by and through its Boston, Massachusetts office, has agreed to serve as escrow agent (the "Escrow Agent") under the following terms (referred to herein collectively as the "Escrow" or "Escrow Agreement"):

A.    The parties hereto do hereby jointly and severally agree that the Escrow Agent shall incur no liability whatsoever in connection with its good faith performance under this Agreement, and do hereby jointly and severally release and waive any claims we may have against Escrow Agent which may result from its performance in good faith of its function under this Agreement, including but not limited to, a delay in the electronic wire transfer of funds. Escrow Agent shall be liable only for loss or damage caused directly by its acts of gross negligence or willful misconduct while performing as Escrow Agent under this Agreement.

B.    The Escrow Agent shall be entitled to rely upon the authenticity of any signature and the genuineness and validity of any writing received by Escrow Agent relating to this Agreement. Escrow Agent is not responsible for the nature, content, validity or enforceability of any of the escrow documents except for those documents prepared by Escrow Agent.

C.    In the event of any disagreement between the parties hereto resulting in conflicting instructions to, or adverse claims or demands upon the Escrow

2

Blue Hill
1845

CONFIDENTIAL

Agent with respect to the release of the escrow funds or the escrow documents, the Escrow Agent may refuse to comply with any such instruction, claim or demand so long as such disagreement shall continue and in so refusing the Escrow Agent shall not release the escrow funds or the escrow documents. The Escrow Agent shall not be or become liable in any way for its failure or refusal to comply with any such conflicting instructions or adverse claims or demands and it shall be entitled to continue to refrain from acting until such conflicting instructions or adverse claims or demands (a) shall have been adjusted by agreement and it shall have been notified in writing thereof by the parties hereto, or (b) shall have finally been determined in a court of competent jurisdiction.

D.     The Escrow Agent may at its sole discretion resign by giving (30) days written notice thereof to the parties hereto. The parties shall furnish to the Escrow Agent written instructions for the release of the escrow funds and escrow documents. If the Escrow Agent shall not have received such written instructions within the thirty (30) days, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor Escrow Agent and upon such appointment deliver the escrow funds and escrow documents to such successor. Costs and fees incurred by the Escrow Agent shall be paid equally by DST and BHOP.

E.     The parties hereto do hereby certify that they are aware that the Federal Deposit Insurance Corporation ("FDIC") coverages apply only to a cumulative maximum amount of $100,000 for each individual deposit for all of the depositor's accounts at the same or related institution. The parties hereto further understand that certain banking instruments such as, but not limited to, repurchase agreements and letters of credit are not covered at all by FDIC insurance.

F.     Further the parties hereto approve of Escrow Agent maintaining the account for holding of funds hereunder with State Street Bank and Trust Company. The parties hereto further understand that Escrow Agent assumes no responsibility for, nor will the parties hereto hold Escrow Agent liable for, a loss occurring which arises from the fact that the amount of the above account may cause the aggregate amount of any individual depositor's accounts to exceed $100,000 and that the excess amount is not insured by the Federal Deposit Insurance Corporation or that FDIC insurance is not available on certain types of bank instruments.

3.     Notice of Dismissal, Releases and DST Payment. Simultaneously with the execution hereof (i) the parties shall execute and deliver to the Escrow Agent the Notice of Dismissal of Appeal, a copy of which is annexed hereto as Exhibit A (the "Notice") and the Releases as set forth in Exhibit B-1 (from DST to BHOP), Exhibit B-2 (from BHOP to DST), Exhibit B-3 (from the Blueview Seller to BHOP), and Exhibit B-4 (from BHOP to the Blueview Seller) (the "Releases")

3

Blue Hill
1846

CONFIDENTIAL

to be held and disposed of pursuant to the terms hereof and (ii) DST shall make the DST Payment in escrow to the Escrow Agent, to be held and disbursed pursuant to the terms hereof.

4.    Disbursal from Escrow.  On the date the Escrow Payment is required by the first sentence of paragraph 1, above, to be released to BHOP, DST and BHOP shall instruct the Escrow Agent to deliver the DST Payment to BHOP, the Releases to the party being released thereby, and the Notice of Dismissal to DST, whereupon DST shall file the Notice of Dismissal with the Court. The deliveries described in this Section are collectively referred to as the "Disbursal." Notwithstanding the foregoing, the Releases from the Blueview Seller to BHOP and BHOP to the Blueview Seller shall be released only upon DST's acquisition of the Blueview Property and the agreements herein of DST applicable to the Blueview Property becoming effective.

5.    Acquisition of Blueview Property.  DST shall exercise its best efforts to close on its acquisition of the Blueview Property pursuant to the Purchase and Sale Agreement.  If a Title Condition or Excused Non-Purchase occurs, DST shall exercise its best efforts under the Purchase and Sale Agreement to require Blueview Seller to convey to it the Blueview Property in accordance with the terms of the Purchase and Sale Agreement.  If, despite such efforts, DST is not successful in so acquiring the Blueview Property on or before March 1, 2004, or if an Excused Non-Purchase occurs, DST shall have the right exercisable through 5:00 p.m. on March 1, 2004, to cause the Disbursal to occur, failing which each of DST and BHOP shall have the right (but not the obligation) to direct the Escrow Agent to return the DST Payment to DST, whereupon the Escrow Agent shall destroy the Notice of Dismissal and the Releases and this Agreement shall be of no further force or effect.  DST shall promptly direct Disbursal upon its acquisition of the Blueview Property pursuant to the Purchase and Sale Agreement.

6.    Joinder by the Blueview Seller.  The Blueview Seller joins in this Agreement solely for the purpose of (a) confirming its agreement to execute the Release required by Paragraph 3 above, (b) agreeing diligently to pursue closing its sale of the Blueview Property to DST pursuant to the Purchase and Sale Agreement and agreeing to keep BHOP advised of its progress with respect thereto, including advising BHOP of any issues it believes are likely to impair or cause postponement of that closing beyond September 2, 2003, (c) agreeing to timely and in all events on or before September 2, 2003, be ready, willing and able to deliver to DST such title as satisfies the Title Condition, (d) confirming that the Blueview Seller is not aware of any circumstance, fact or condition which would preclude or postpone either DST from acquiring the Blueview Property or the Blueview Seller's ability to convey the Blueview Property to DST timely on or before September 2, 2003 in accordance with the terms of the Purchase and Sale Agreement, and (e) agreeing to expend the efforts, subject to any limiting or monetary conditions set forth in the Purchase and Sale Agreement as presently outstanding to (i) cause the Blueview Seller's obligations under this paragraph to be satisfied and (ii) to prevent there being an Excused Non-Purchase.

7.    Future Development.

A.    DST, with respect to and upon its purchase of the Blueview Property, and BHOP with respect to the 150 Property, acknowledges that from time to time they, or their successors and assigns, may pursue variances, permits or other approvals from any local, state or other permit granting or other authorizing

<div align="center">4</div>

CONFIDENTIAL

agency or authority for additional construction or improvements upon or modification to then existing improvements upon the Blueview Property and/or the 150 Property, respectively, provided, however, such future development is principally (at least 75% based upon rentable area) for one or more of the following uses: office, research and development, medical or clinical principally out-patient facility, assembly, distribution or light manufacturing of products not in the ordinary course considered to cause a significant environmental risk to its abutters ("Future Development").

B.    DST agrees that it will not take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent BHOP from obtaining any permit or approval now or hereafter reasonably necessary for Future Development upon the 150 Property including, without limitation, not bringing any lawsuit, action, appeal or administrative proceeding and not influencing or encouraging any lawsuit, action, appeal or administrative proceeding to oppose, obstruct, interfere with or object to issuance or approval of any such permit or approval.

C.    BHOP agrees that it will not take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development of the Blueview Property including, without limitation, not bringing any lawsuit, action, appeal or administrative proceeding and not influencing or encouraging any lawsuit, action, appeal or administrative proceeding to oppose, obstruct, interfere with or object to issuance or approval of any such permit or approval.

D.    The provisions of this Paragraph 7 will be valid for ten (10) years from the date of this Agreement.

8.    Further Agreements.

A.    In connection with development of the Parking Garage, DST agrees that it shall not seek any material modification or material change to the locations, size or finish of the Parking Garage or the height of that structure from the plan therefor entitled "Blueview Corporate Center – Proposed Parking Structure" prepared by Vanasse Hangen Brustlin, Inc. and dated April 19, 2003, revised May 18, 2003 (the "Site Plans") without first obtaining prior written approval from BHOP, which is not to be unreasonably withheld, delayed or conditioned.

B.    DST agrees (i) to include within its final Parking Garage landscaping plan the plantings and trees depicted on the plan entitled "Landscape Plan", being one of the Site Plans to provide street-level screening of the Parking Garage from the 150 Property, (ii) to thereafter maintain those plantings and landscape improvements, (iii) to restrict parking on the top level of the Parking Garage

5

Blue Hill
1848

CONFIDENTIAL

to daily transient passenger vehicles (including sports utility vehicles) for Blueview Property employees, patrons and invitees, and (iv) to the extent snow is accumulated on the top level of the Parking Garage, it shall be removed or generally disbursed along the entire top floor perimeter. DST shall accept reasonable suggestions from BHOP with respect to the landscaping to screen the Parking Garage from the 150 Property. Subject to contrary direction by any one or more governmental authorities having jurisdiction thereover, DST also shall prune any trees planted on the Green Street side of the Parking Garage to a height at or below the highest level of the Parking Garage.

C.    DST shall accept reasonable suggestions from BHOP with respect to lighting of the Parking Garage such as to avoid creation of any significant ambient lighting beyond the Parking Garage or glare from such lighting into or onto any buildings situated upon the 150 Property.

D.    (Intentionally deleted.)

E.    Each of the parties signatory hereto agrees that its execution, delivery and performance of this Agreement have been duly authorized by all requisite actions and that this Agreement constitutes a legal, valid and binding obligation of it, enforceable against it in accordance with the terms set forth herein, without requiring any additional or precedent approval or other authorization.

F.    The Blueview Seller and DST agree not to terminate or otherwise modify the Purchase and Sale Agreement in a manner that may defeat the obligation or ability of DST to acquire the Blueview Property, or avoid DST's obligation to pay the DST Payment to BHOP hereunder. The Blueview Seller and DST agree that neither shall assign their rights under the Purchase and Sale Agreement; however, DST may designate an entity controlled by, or in common control with, DST, as the purchaser, in which event such designation or assignment shall obligate its designee or assignee to become jointly and severally bound by, and obligated for all of the agreements of DST set forth in this Agreement, and, in that event, the term "DST" herein shall include both DST and its designee or assignee, jointly and severally.

G.    Interest. All interest earned on the DST Payment prior to September 1, 2003 while held in escrow by the Escrow Agent shall be paid to DST, and all interest earned thereon from and after September 1, 2003 if the DST Payment is held in escrow by the Escrow Agent at that time, shall be paid to BHOP.

H.    (Intentionally deleted.)

I.    Rights Following Termination Without Payment. Should this Agreement be terminated without BHOP being entitled to receive the DST Payment, the

6

Blue Hill
1849

CONFIDENTIAL

rights of the parties concerning the Appeal shall return to *status quo ante*, with all parties reserving their rights in connection with the Appeal.

J.    <u>No Further Action on Appeal</u>. For so long as this Agreement remains in force and effect, no further action shall be taken in the Appeal by any of the parties hereto, except as required by Court order or applicable rules.

K.    <u>Confidentiality</u>. The terms of this Agreement are confidential, and shall not be disclosed without the parties' written consent to any person or entity other than the parties, their respective counsel and accountants, and any other persons to whom a party may have a legal duty to disclose the information. The parties shall be able to disclose that the Appeal has been settled. In the event that a party is required by subpoena or order, judgment, or decree of a court of competent jurisdiction or similar judicial tribunal to disclose the existence, terms, or contents of this Agreement, it shall, prior to such disclosure, promptly notify each party.

L.    <u>Representations and Warranties</u>. Each party to this Agreement represents and warrants to each other party to this Agreement that:

    a.    the parties signatory hereto represent and warrant that each has all requisite power and authority to execute, deliver and perform this Agreement and to implement the transactions contemplated hereby.

    b.    it had the opportunity to consult with the counsel of its choice about the terms and effect of this Agreement;

    c.    its execution, delivery, and performance of this Agreement, the consummation of the transactions contemplated hereby and its compliance with the provisions hereof will not violate any provisions of its articles or certificate of incorporation or bylaws or conflict with any law, rule, regulation, contract, or other instrument by which it or any of its assets is bound; and,

    d.    no consent, approval, or authorization of, or declaration to or filing with, any person is required for the valid authorization, execution, and delivery by it of this Agreement or for their consummation of the transactions contemplated hereby which has not been obtained prior to the date hereof.

M.    <u>Counterparts</u>. This Agreement may be executed in multiple originals, each of which is equally admissible in evidence and shall be one and the same instrument. This Settlement Agreement shall not take effect until each party has signed a counterpart.

N.    <u>Jurisdiction</u>. This Agreement and the agreements and obligations of the parties hereto shall be governed by and enforced and construed in accordance

7

Blue Hill
1850

**CONFIDENTIAL**

with, the laws of the Commonwealth of Massachusetts. Any action at law or in equity arising out of or relating to this Agreement shall be filed only in the Superior Court of Suffolk County Massachusetts, and the parties hereby consent and submit to the personal jurisdiction of that court for the purpose of litigating any such dispute.

O.    <u>Waiver.</u> The parties hereto waive all right to trial by jury, and expressly agree to bear their own cost of such litigation including, but not limited to, attorneys' fees; provided, however, to the extent a party is held to have breached its agreements herein, that party in breach shall be responsible to pay and reimburse the other party(ies) for its reasonable legal fees and costs incurred in that proceeding.

9.    <u>Binding Agreement.</u> This Agreement shall be binding upon and inure to the benefit to the parties signatory hereto and their respective successors and assigns. Not in limitation of the foregoing, the parties acknowledge that DST intends DST Realty of Massachusetts, Inc., ("DST MA") an affiliate of DST, to take title to the Blueview Property pursuant to the Purchase and Sale Agreement and all references to "DST" in this Agreement shall mean DST and DST MA, jointly and severally.

10.    <u>Amendment.</u> This Agreement may not be altered, amended or otherwise modified in any respect except by writing duly signed by the party or parties in which enforcement is being sought.

11.    <u>Integration.</u> This Agreement, including the deliveries required hereunder constitute the entire understanding and agreement among the parties signatory hereto and supersedes all prior negotiations or other proposed agreements whether written or oral with respect to the matters included herein. In construing the foregoing, this Agreement is not intended to, nor shall it alter or otherwise address or modify any lease or lease relationship applicable to all or any portion of the 150 Property.

12.    <u>Notice.</u> Any notice required by this Agreement shall be writing and made by hand delivery, by certified mail postage and certified charges prepaid, or by overnight national courier such as FedEx, addressed to the parties as follows:

A.    If to BHOP, then to

Blue Hills Office Park LLC
c/o Fineberg Management Company
One Washington Street, Suite 400
Wellesley, MA 02481
Attn.: Gerald S. Fineberg, President

with a copy to:

Kenneth M. Goldberg, Esq.
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, MA 02110

8

Settlement Agreement with EXHIBITS of Releases B-1 through B-4 attached AS SENT BY DONALD VAUGHAN

**Blue Hill
1851**

**CONFIDENTIAL**

B.   If to DST, then to

DST Realty, Inc.
333 West Eleventh Street
Kansas City, MO 64105-1639
Attn. Thomas R. McGee, President

with a copy to:

Donald E. Vaughan, Esq.
Burns & Levinson LLP
125 Summer Street
Boston, MA 02110

C.   If to the Blueview Seller,
then to

c/o National Development
2310 Washington Street
Newton Lower Falls, MA 02462
Attn: Theodore R. Tye,
Executive Vice President

with a copy to:

Robert A. Fishman, Esq.
Nutter, McClennen & Fish LLP
155 Seaport Blvd
Boston, MA 02210

[INTENTIONALLY BLANK]

9

Blue Hill
1852

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have signed this Agreement under seal as of the day and year first above-written.

"BHOP"                    Blue Hills Office Park LLC
                          By:  Blue Hills Management Corp.,
                               its  Manager

                          By:  _Gerald S. Fineberg_ (signature)
                               Name:  Gerald S. Fineberg
                               Title:  President & Treasurer


"DST"                     DST Realty, Inc.

                          By:  _____
                               Name:
                               Title:


"BLUEVIEW SELLER"         Blueview Corporate Center, LLC

                          By:  ND-Blueview Corporate
                               Center LLC, Its Manager
                          By:  NDNE 9/90, Inc., its Manager

                          By:  _____
                               Theodore R. Tye
                               Executive Vice President


"ESCROW AGENT"            Lawyers Title Insurance Corporation

                          By:  _____
                               Name:
                               Its:


10

Settlement Agreement with EXHIBITS of Releases B-1 through B-4 attached AS SENT BY DONALD VAUGHAN

Blue Hill
1853

**CONFIDENTIAL**

IN WITNESS WHEREOF, the undersigned have signed this Agreement under seal as of the day and year first above-written.

<u>"BHOP"</u>          Blue Hills Office Park LLC

By:     _____
        Name:
        Title:

<u>"DST"</u>           DST Realty, Inc.

By:     _____
        Name:
        Title:

<u>"BLUEVIEW SELLER"</u>     Blueview Corporate Center, LLC

By:     ND-Blueview Corporate
        Center LLC, Its Manager
By:     NDNE 9/90, Inc., Its Manager

By:     _____
        Theodore R. Tye
        Executive Vice President

<u>"ESCROW AGENT"</u>     Lawyers Title Insurance Corporation

By:     _____
        Name: CAROLE C. SAWSON
        Its: Vice President

00776765 v4

10

Blue Hill
1854

**CONFIDENTIAL**

IN WITNESS WHEREOF, the undersigned have signed this Agreement under seal as of the day and year first above-written.

<u>"BHOP"</u>    Blue Hills Office Park LLC

By: _____
Name:
Title:

<u>"DST"</u>    DST Realty, Inc.

By: _____
Name: *Thomas R. [illegible], Jr.*
Title: *Vice President*

<u>"BLUEVIEW SELLER"</u>  Blueview Corporate Center, LLC

BY: ND-Blueview Corporate
  Center LLC, Its Manager
By: NDNE 9/90, Inc., its Manager

By: _____
Theodore R. Tye
Executive Vice President

<u>"ESCROW AGENT"</u>  Lawyers Title Insurance Corporation

By: _____
Name:
Its:

00776765 v3

11

**Blue Hill**
**1855**

**CONFIDENTIAL**

Exhibit A
(Form of Notice of Dismissal)

## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.                                SUPERIOR COURT DEPARTMENT
                                           OF THE TRIAL COURT
                                           Civil Action No. 03-01051

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC | ) |
|     Plaintiff, | ) |
| v. | ) |
| BLUEVIEW CORPORATE CENTER LLC and PAUL R. CARROLL, JAMES F. FITZGERALD, GREGORY PANDO, CHARLES J. ARMANDO, and ROBERT QUIGLEY, AS THEY ARE MEMBERS AND ASSOCIATE MEMBERS OF THE ZONING BOARD OF APPEALS OF THE TOWN OF CANTON, MASSACHUSETTS | ) **NOTICE OF DISMISSAL** |
|     Defendants. | ) |

    Pursuant to Mass. R. Civ. P. Rule 41(a)(1)(i), notice is hereby given that the above action is dismissed <u>with prejudice</u> and without costs to any party.

                                BLUE HILLS OFFICE PARK LLC

                                By its Attorney,

                                Gary P. Lilienthal (BBO #300200)
                                Jason A. Manekas (BBO #632073)
                                Bernkopf, Goodman & Baseman LLP
                                125 Summer Street
                                Boston, MA  02110
                                (617) 790-3000

11

CONFIDENTIAL

Exhibit B-1
(Form of Release by DST of BHOP)

**RELEASE**

**(DST Realty, Inc., and DST Realty of Massachusetts, Inc.)**

**Dated:  As of August 5, 2003**

For the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, DST Realty, Inc., and DST Realty of Massachusetts, Inc., and their respective agents, representatives, attorneys, heirs, devisees, servants, successors, employees, subsidiaries, affiliates, related entities, and assigns (hereinafter collectively referred to as the "Releasing Parties") hereby remise, release, and forever discharge Blue Hills Office Park LLC, and its officers, directors, members, agents, representatives, attorneys, servants, employees, subsidiaries, affiliates, related entities, successors, and assigns (hereinafter collectively referred to as the "Released Parties") of and from all debts, demands, actions, causes of actions, suits, accounts, contracts, agreements, and damages in any and all claims, counterclaims, demands, and liabilities whatsoever of every kind, nature, and description whatsoever, both in law and equity, known or unknown, which the Releasing Parties now have, or ever did have, against the Released Parties from the beginning of the world through the date hereof with respect to the properties commonly known as 150 Royall Street and 250 Royall Street in Canton, Norfolk County, Massachusetts, including without limitation (i) any and all claims asserted or which could have been asserted in that certain action pending before the Norfolk Superior Court, Trial Division of The Commonwealth of Massachusetts, Civil Action, No. 03-01051 (the "Appeal"), and (ii) all other claims which relate or refer to the construction of a parking structure (the "Parking Structure") as

Blue Hill
1857

CONFIDENTIAL

authorized by the decision of the Town of Canton Zoning Board of Appeals, Case No. 70-03-MED/SPA-SP and all other permits and approvals issued concerning the Parking Structure. This Release is not intended to release or modify any of the agreements, undertakings, obligations or other provisions of the parties hereto set forth in that certain Settlement Agreement dated of even date by and among Blue Hills Office Park LLC, DST Realty, Inc., and others, to which the form of this release is attached as Exhibit B-1.

For such consideration, the Releasing Parties agree not to institute any action or suit, and will not implead, join, or seek contribution or indemnification or otherwise involving the Released Parties in any action or suit which relates to the matters released hereby or which has been, was or could been brought by any of the Releasing Parties against any of the Released Parties concerning the Parking Structure.

The within Release shall be governed and construed in accordance with the laws of The Commonwealth of Massachusetts, and is intended to take effect as a sealed instrument. The Releasing Parties specifically represent that (i) they have executed this instrument of their own free will and intend to be bound by its terms; (ii) that they have read and understand the provisions of this Release; (iii) that they voluntarily sign same for the purpose of making a full and final settlement of all claims and causes of action against the Released Parties concerning the Parking Structure; (iv) that it is the intention of the Releasing Parties that the within Release be a complete and total release of any and all claims concerning the Parking Structure other than those claims reserved herein; and (v) that they have reviewed same with counsel of their choosing, and that they are not relying upon any representation of law or fact set forth by the Released Parties or the Released Parties' counsel.

14

Blue Hill
1858

**CONFIDENTIAL**

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, the undersigned has signed this Release under seal as of the day and year first above-written.

DST Realty, Inc.

By: _____
      Name:
      Title:

DST Realty of Massachusetts, Inc.

By: _____
      Name:
      Title:

15

Blue Hill
1859

**CONFIDENTIAL**

Exhibit B-2
(Form of Release by BHOP of DST)

### RELEASE

### (Blue Hills Office Park LLC)

**Dated:  As of August 5, 2003**

For the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Blue Hills Office Park LLC and its respective agents, representatives, attorneys, heirs, devisees, servants, successors, employees, subsidiaries, affiliates, related entities, and assigns (hereinafter collectively referred to as the "Releasing Parties") hereby remise, release, and forever discharge DST Realty, Inc. and DST Realty of Massachusetts, Inc., and their respective officers, directors, members, agents, representatives, attorneys, servants, employees, subsidiaries, affiliates, related entities, successors, and assigns (hereinafter collectively referred to as the "Released Parties") of and from all debts, demands, actions, causes of actions, suits, accounts, contracts, agreements, and damages in any and all claims, counterclaims, demands, and liabilities whatsoever of every kind, nature, and description whatsoever, both in law and equity, known or unknown, which the Releasing Parties now have, or ever did have, against the Released Parties from the beginning of the world through the date hereof with respect to the properties commonly known as 150 Royall Street and 250 Royall Street in Canton, Norfolk County, Massachusetts, including without limitation (i) any and all claims asserted or which could have been asserted in that certain action pending before the Norfolk Superior Court, Trial Division of The Commonwealth of Massachusetts, Civil Action, No. 03-01051 (the "Appeal"), and (ii) all other claims which relate or refer to the construction of a parking structure (the "Parking Structure") as authorized by the decision of the Town of Canton Zoning Board of Appeals, Case No. 70-03-

**Blue Hill
1860**

CONFIDENTIAL

MED/SPA-SP and all other permits and approvals issued concerning the Parking Structure. This Release is not intended to release or modify any of the agreements, undertakings, obligations or other provisions of the parties hereto set forth in that certain Settlement Agreement dated of even date by and among Blue Hills Office Park LLC, DST Realty, Inc., and others, to which the form of this release is attached as Exhibit B-2.

For such consideration, the Releasing Parties agree not to institute any action or suit, and will not implead, join, or seek contribution or indemnification or otherwise involving the Released Parties in any action or suit which relates to the matters released hereby or which has been, was or could been brought by any of the Releasing Parties against any of the Released Parties concerning the Parking Structure.

The within Release shall be governed and construed in accordance with the laws of The Commonwealth of Massachusetts, and is intended to take effect as a sealed instrument. The Releasing Parties specifically represent that (i) they have executed this instrument of their own free will and intend to be bound by its terms; (ii) that they have read and understand the provisions of this Release; (iii) that they voluntarily sign same for the purpose of making a full and final settlement of all claims and causes of action against the Released Parties concerning the Parking Structure; (iv) that it is the intention of the Releasing Parties that the within Release be a complete and total release of any and all claims concerning the Parking Structure other than those claims reserved herein; and (v) that they have reviewed same with counsel of their choosing, and that they are not relying upon any representation of law or fact set forth by the Released Parties or the Released Parties' counsel.

BLUE HILLS OFFICE PARK LLC
By_____
    Gerald S. Fineberg,
    President and Treasurer

17

Settlement Agreement with EXHIBITS of Releases B-1 through B-4 attached AS SENT BY DONALD VAUGHAN

Blue Hill
1861

CONFIDENTIAL

18

Settlement Agreement with EXHIBITS of Releases B-1 through B-4 attached AS SENT BY DONALD VAUGHAN

Blue Hill
1862

CONFIDENTIAL

Exhibit B-3
(Form of Release by Blueview Seller of BHOP)

**RELEASE**

**(Blueview Corporate Center, LLC)**

**Dated:  As of August 5, 2003**

For the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt

and sufficiency of which are hereby acknowledged, Blueview Corporate Center, LLC and its

respective agents, representatives, attorneys, heirs, devisees, servants, successors, employees,

subsidiaries. affiliates, related entities, and assigns (hereinafter collectively referred to as the

"Releasing Parties") hereby remise, release, and forever discharge Blue Hills Office Park LLC, and

its officers, directors, members, agents, representatives, attorneys, servants, employees, subsidiaries,

affiliates, related entities, successors, and assigns (hereinafter collectively referred to as the

"Released Parties") of and from all debts, demands, actions, causes of actions, suits, accounts,

contracts, agreements, and damages in any and all claims, counterclaims, demands, and liabilities

whatsoever of every kind, nature, and description whatsoever, both in law and equity, known or

unknown, which the Releasing Parties now have, or ever did have, against the Released Parties

from the beginning of the world through the date hereof with respect to:  (i) any and all claims

asserted or which could have been asserted in that certain action pending before the Norfolk

Superior Court, Trial Division of The Commonwealth of Massachusetts, Civil Action, No. 03-

01051 (the "Appeal"), and (ii) all other claims which relate or refer to the construction of a parking

structure (the "Parking Structure") as authorized by the decision of the Town of Canton Zoning

Board of Appeals, Case No. 70-03-MED/SPA-SP and all other permits and approvals issued

concerning the Parking Structure.  This Release is not intended to release or modify any of the

Blue Hill
1863

CONFIDENTIAL

agreements, undertakings, obligations or other provisions of the parties hereto set forth in that certain Settlement Agreement dated of even date by and among Blue Hills Office Park LLC, Blueview Corporate Center, LLC, and others, to which the form of this release is attached as Exhibit B-3.

For such consideration, the Releasing Parties agree not to institute any action or suit, and will not implead, join, or seek contribution or indemnification or otherwise involving the Released Parties in any action or suit which relates to the matters released hereby or which has been, was or could been brought by any of the Releasing Parties against any of the Released Parties concerning the Parking Structure.

The within Release shall be governed and construed in accordance with the laws of The Commonwealth of Massachusetts, and is intended to take effect as a sealed instrument. The Releasing Parties specifically represent that (i) they have executed this instrument of their own free will and intend to be bound by its terms; (ii) that they have read and understand the provisions of this General Release; (iii) that they voluntarily sign same for the purpose of making a full and final settlement of all claims and causes of action against the Released Parties concerning the Parking Structure; (iv) that it is the intention of the Releasing Parties that the within Release be a complete and total release of any and all claims concerning the Parking Structure other than those claims reserved herein; and (v) that they have reviewed same with counsel of their choosing, and that they are not relying upon any representation of law or fact set forth by the Released Parties or the Released Parties' counsel.

BLUEVIEW CORPORATE CENTER, LLC

By:  ND – Blueview Corporate Center LLC,
     its Manager

Settlement Agreement with EXHIBITS of Releases B-1through B-4 attached AS SENT BY DONALD VAUGHAN

Blue Hill
1864

CONFIDENTIAL

By:  NDNE 9/90, Inc., its Manager


By: _____
       Theodore R. Tye
       Executive Vice President

Settlement Agreement with EXHIBITS of Releases B-1 through B-4 attached AS SENT BY DONALD VAUGHAN

Blue Hill
1865

CONFIDENTIAL

Exhibit B-4
(Form of Release by BHOP of Blueview Seller)

**RELEASE**

**(Blue Hills Office Park LLC)**

**Dated:  As of August 5, 2003**

For the sum of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Blue Hills Office Park LLC and its respective agents, representatives, attorneys, heirs, devisees, servants, successors, employees, subsidiaries, affiliates, related entities, and assigns (hereinafter collectively referred to as the "Releasing Parties") hereby remise, release, and forever discharge Blueview Corporate Center LLC, and its officers, directors, members, agents, representatives, attorneys, servants, employees, subsidiaries, affiliates, related entities, successors, and assigns (hereinafter collectively referred to as the "Released Parties") of and from all debts, demands, actions, causes of actions, suits, accounts, contracts, agreements, and damages in any and all claims, counterclaims, demands, and liabilities whatsoever of every kind, nature, and description whatsoever, both in law and equity, known or unknown, which the Releasing Parties now have, or ever did have, against the Released Parties from the beginning of the world through the date hereof  with respect to:  (i) any and all claims asserted or which could have been asserted in that certain action pending before the Norfolk Superior Court, Trial Division of The Commonwealth of Massachusetts, Civil Action, No. 03-01051 (the "Appeal"), and (ii) all other claims which relate or refer to the construction of a parking structure (the "Parking Structure") as authorized by the decision of the Town of Canton Zoning Board of Appeals, Case No. 70-03-MED/SPA-SP and all other permits and approvals issued concerning the Parking Structure.  This Release is not intended to release or modify any of the agreements, undertakings, obligations or other provisions of the parties hereto set forth in that certain Settlement

**Blue Hill
1866**

CONFIDENTIAL

Agreement dated of even date by and among Blue Hills Office Park LLC, Blueview Corporate Center, LLC, and others, to which the form of this release is attached as Exhibit B-4.

For such consideration, the Releasing Parties agree not to institute any action or suit, and will not implead, join, or seek contribution or indemnification or otherwise involving the Released Parties in any action or suit which relates to the matters released hereby or which has been, was or could been brought by any of the Releasing Parties against any of the Released Parties concerning the Parking Structure.

The within Release shall be governed and construed in accordance with the laws of The Commonwealth of Massachusetts, and is intended to take effect as a sealed instrument. The Releasing Parties specifically represent that (i) they have executed this instrument of their own free will and intend to be bound by its terms; (ii) that they have read and understand the provisions of this Release; (iii) that they voluntarily sign same for the purpose of making a full and final settlement of all claims and causes of action against the Released Parties concerning the Parking Structure; (iv) that it is the intention of the Releasing Parties that the within Release be a complete and total release of any and all claims concerning the Parking Structure other than those claims reserved herein; and (v) that they have reviewed same with counsel of their choosing, and that they are not relying upon any representation of law or fact set forth by the Released Parties or the Released Parties' counsel.

BLUE HILLS OFFICE PARK LLC
By: Blue Hills Management Corp., its Manager

By_____
    Name: Gerald S. Fineberg
    Title: President and Treasurer
    Duly Authorized

23

Blue Hill 1867



EXHIBIT
Donovan
22
%C  2/14/06

**From:**  mallegni@wellsfargo.com
**Sent:**  Thursday, July 15, 2004 4:00 PM
**To:**  Vickie Taylor
**Subject:** RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12

Vickie,

I spoke with the CFO Joe Donovan on this loan. Fleet has left the project.
The property is available for lease, but there are no prospects currently.
They currently have $4,118,062 in reserves and the loan is paid through
8/11/04. We'll track this closely and advise.

Curtis

-----Original Message-----
From: Vickie Taylor [mailto:VTaylor@lnrproperty.com]
Sent: Monday, July 12, 2004 10:25 AM
To: Curtis J. Mallegni (E-mail)
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID#
12


Can you help me on this? Did Fleet review their lease? If not, will the
borrower be able to keep the loan current on an almost vacant building. And
if so, for how long? This is a large loan and we are very concerned.


> -----Original Message-----
> From:        Vickie Taylor
> Sent: Tuesday, June 29, 2004 4:04 PM
> To:  'nhanvi@wellsfargo.com'
> Subject:     RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA /
> ID# 12
>
> I don't remember if I received a response from you on this.  Can you give
> me an update.  Thank you.
>
> -----Original Message-----
> From:        Vickie Taylor
> Sent: Friday, June 11, 2004 11:08 AM
> To:  'nhanvi@wellsfargo.com'
> Subject:     CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12
>
> I understand Fleet will not be renewing their lease when it expires in
> July 2004.  They occupy 96% of the property.  Has the borrower stated how
> he is going to keep the loan current until the finds a new tenant?  We are
> concerned as the property will be virtually 100% vacant.

10/24/2005

LNR02765

```
>
> Vickie M. Taylor
> Special Servicing Supervisor
> Lennar Partners, Inc.
> 1601 Washington Avenue, Ste. 700
> Miami Beach, FL  33139
> Phone: 305-695-5076
> Fax:  305-695-5601
>
>
```

LNR02766



# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

A request is hereby made for a withdrawal of $412,833.43 from the cash flow sub-account on this loan to be used to pay principal and interest as well as the advance the money due to pay real estate taxes. We have yet to receive real estate taxes from the tenant for the period of time that they were still in the building. Once received, we will deposit those sums into the operating account for you to sweep. Listed below is a breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| Real Estate Taxes | 158,181.19 |
| | $412,833.43 |

cc:   K. Goldberg, Esq.

**Blue Hill 1229**

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

# fineberg management, inc.



August 5, 2004

SENT VIA: Facsimile 1-925-691-5249

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA. 94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

    This letter is being sent to officially notify you that the tenant has fully vacated the building and at this time no replacement tenant has been found. Therefore, we request a meeting with the lender to discuss the loan status and the future performance of the loan.

    Based on our past experience, any decisions regarding the loan would need the approval of the Special Servicer; therefore, we request that the Special Servicer attend the meeting as well. Please let us know who the Special Servicer is and if we need to notify them or if you will handle that yourself.

Sincerely,

Joseph A. Donovan
CFO

cc:    K. Goldberg, Esq.

**Blue Hill 1249**

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

EXHIBIT
Donovan
25
DEC 2/14/06

on or
About         Aug 04
voice mail

My name is Tobe Warshaw with Cenar Partners in Miami my number is 305-695-5092

We are the special servicer on the Blue hills office Park loan   the file has been transfered to special servicing please call me

     Tobe Warshaw 305-695-5092

I will be faxing over to you all a letter to you  that we would like signed prior to engaging in discussion   The letter is made out addressed to Gerald Fineberg but we will fax it over to you all shortly   I'm calling to introduce myself I'll be faxing shortly

Blue Hill 1230

on on about
8/04
voice mail

got a call from
Eric Slotts Bowds + Co Boston
We are doing a appraisal in
regards to 150 Royall St in Canton
This is an introductory call that
We do on a new job to
understand whats going on at
a building. I drove by the
other day + saw that it was
empty please call
617-478-2090 Ext 108

Blue Hill 1231

# fineberg management, inc.



EXHIBIT
*Donovan*
26
*rec  2/14/06*

September 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA   94520

   RE: Blue Hills Office Park LLC
     Loan #76-0990083

Dear Mr. Parish,

  A request is hereby made for a withdrawal of $254,652.24 for the month of September from the cash flow sub-account on this loan to be used to pay principal and interest.   Attached is last month's letter.  As stated in the letter we did receive approximately one month's real estate tax from the tenant for $51,799.44 which was deposited and promptly swept by Wells Fargo; therefore, I assume that you have made the real estate tax payment to the town of Canton, MA.

  Listed below is a breakdown of the principal and interest payment as we calculated it.

  If you need any further information, please feel free to contact me.

    Principal $ 20,853.30
    Interest  <u>233,798.94</u>
        $254,652.24

Sincerely,

Joseph A. Donovan
CFO

Cc: Kenneth Goldberg
  Job Warshaw, Lennar Partners

Blue Hill 1228

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493





One Washington Street, Suite 402
Wellesley, Massachusetts 02481
Tel: 781-431-1108 • Fax: 781-431-7130

## FAX TRANSMITTAL

TO: _____ Curt Mallegni        415-975-7236

COMPANY NAME: _____ Wells Fargo

DATE: _____ August 13, 2004

FROM: _____ Joe Donovan

TRANSMITTED BY: _____ Carol Falvey

NUMBER OF PAGES (Including cover): __3__

COMMENTS: _____ Sorry we have been missing each other on the phone.

_____ I would like to get the special servicer involved.

_____ Attached are the recent correspondence.

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the recipient of this message is not the named recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this telecopy in error please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service. Thank you. .        h\fh\faxtrans.doc

Blue Hill 1245

# fineberg management, inc.

August 5, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

This letter is being sent to officially notify you that the tenant has fully vacated the building and at this time no replacement tenant has been found. Therefore, we request a meeting with the lender to discuss the loan status and the future performance of the loan.

Based on our past experience, any decisions regarding the loan would need the approval of the Special Servicer; therefore, we request that the Special Servicer attend the meeting as well. Please let us know who the Special Servicer is and if we need to notify them or if you will handle that yourself.

Sincerely,

Joseph A. Donovan
CFO

cc:   K. Goldberg, Esq.

Blue Hill 1246

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:    Blue Hills Office Park LLC
        Loan #76-0990083

Dear Mr. Parish,

      A request is hereby made for a withdrawal of $412,833.43 from the cash flow sub-account on this loan to be used to pay principal and interest as well as the advance the money due to pay real estate taxes. We have yet to receive real estate taxes from the tenant for the period of time that they were still in the building. Once received, we will deposit those sums into the operating account for you to sweep. Listed below is a breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

| | |
|---|---:|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| Real Estate Taxes | 158,181.19 |
| | $412,833.43 |

cc:  K. Goldberg, Esq.

Blue Hill 1247

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

```
                                                                      P. 1
        * * * COMMUNICATION RESULT REPORT ( AUG.13.2004  1:08PM ) * * *
                                                    TTI   FINEBERG MANAGEMENT
FILE MODE        OPTION              ADDRESS (GROUP)        RESULT      PAGE
911  MEMORY TX                       14159757236             OK       P. 3/3
```

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL              E-2) BUSY
E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION


CORP

One Washington Street, Suite 402
Wellesley, Massachusetts 02481
Tel: 781-431-1108 • Fax: 781-431-7130

## FAX TRANSMITTAL

TO: _____, Curt Mallegni _____ 415-975-7236 _____

COMPANY NAME: _____ Wells Fargo _____

DATE: _____ August 13, 2004 _____

FROM: _____ Joe Donovan _____

TRANSMITTED BY: _____ Carol Falvey _____

NUMBER OF PAGES (Including cover): ___3_____

COMMENTS: _____ Sorry we have been missing each other on the phone.

Blue Hill 1248

# DEPOSITION EXHIBIT NO. 28

FEB. 8.2005  3:00PM  FINEBERG MANAGEMENT                    NO.924  P.6/40
08/24/2004 TUE 13:58 FAX  305-695-5119                              @002/006

 **LENNAR PARTNERS**
An LNR Company



August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

Re:    Portfolio:              CS First Boston Mortgage, Series 1999-C1
       Loan to:                Blue Hills Office Park LLC
       Property Address:       150 Royall Street, Canton, MA 02021
       Loan No.:               76-0990083

Dear Borrower:

As a result of certain event(s) transpiring regarding your loan, certain servicing responsibilities have been transferred to Lennar Partners, Inc. as special servicer for JP Morgan Chase Bank, as Trustee for Credit Suisse First Boston Mortgage Securities Corp., Series 1999-C1.

I will be contacting you soon, as the Lennar Partners' asset manager assigned to your loan. In the meantime, if you have any questions or need any assistance with respect to your loan, you may contact me at (305) 695-5600, or write to me at the address provided below.

In addition, until further notice, inquiries, requests and other correspondence relating to your loan should be made and addressed to my attention at the address below. All payments will continue to be made in the same manner as previously done before the transfer of your loan to Lennar, unless you are otherwise notified differently.

Thank you for your cooperation and we look forward to a successful working relationship.

Sincerely,

Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

cc:    Debra Rudder – Wells Fargo Commercial Mortgage Servicing
       Patricia Prince – Lennar Partners/Servicing Dept.

                                              **Blue Hill 1233**

# DEPOSITION EXHIBIT NO. 29



**LENNAR PARTNERS**
An LNR Company

EXHIBIT
Donovan
28
76c  2/14/06

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

RE:   Loan in the original principal amount of $33,149,000.00 (the "Loan") to Blue Hills Office
      Park LLC (the "Borrower") held by JP Morgan Chase Bank, as trustee (the "Trustee")
      **Portfolio:**      CS First Boston Mortgage, Series 1999-C1
      **Loan No.:**       76-0990083

Dear Borrower:

Lennar Partners, Inc. (the "Special Servicer") is the Special Servicer with respect to the Loan
and has the authority, on behalf of the Trustee, to discuss and to meet with representatives of the
Borrower to review the status of the Loan and any issues arising under any of the documents
relating to the Loan (the "Loan Documents").

        We have agreed to discuss with your representatives the status of the Loan and the Loan
Documents provided that the following agreements and understandings govern. In order to ensure
that our discussions will be as open and productive as possible, we wanted to write to you to
confirm our mutual understanding that all discussions and/or negotiations will be governed by
the terms and conditions in this letter. If you are in agreement with such terms and conditions, we
would appreciate you acknowledging such by signing this letter in the space provided and
returning it to us.

1.  **Negotiations.**   The Borrower and the Special Servicer agree that any discussions,
    negotiations, correspondence or other communications relating to the Loan and the Loan
    Documents that the Borrower may have in the future or may have had with representatives of
    Wells Fargo Commercial Mortgage Servicing, the Master Servicer (the "Master Servicer"),
    or the Special Servicer, (any such discussions, negotiations or correspondence or other
    communications being hereinafter referred to as "Loan Communications") are not binding
    upon any of the Borrower, the Trustee, or Special Servicer (collectively the "Parties"). The
    Borrower also acknowledges and agrees that none of the Trustee, the Master Servicer or the
    Special Servicer is under any obligation to consent or otherwise agree to any Borrower
    request with respect to the Loan, or to modify the Loan or the Loan Documents. Each of the
    Parties understands and agrees that no Party shall have any defense to any action by one or
    more of the other Parties, nor assert any waiver by one or more of the other Parties, based on
    any Loan Communications.

2.  **Releases.**   The Parties hereby completely, irrevocably and unconditionally release and
    forever discharge each of the Parties from any and all claims and demands whatsoever, in
    law or equity, whether such claims are presently known or unknown, direct or indirect, fixed
    or contingent, which the Parties may have or may claim to have against the other caused by,
    or arising out of any Loan Communications.

Blue Hill 0482

3. <u>No Waivers.</u>   Each of the Parties acknowledge and agree that participation in the Loan Communications does not constitute by any Party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, of such Party under the Loan Documents, (b) a waiver or the release of any defaults under the Loan or the Loan Documents, or (c) a waiver, consent, release or modification of any right or remedy under any provision of the Loan Documents. None of the Parties intends to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties further understand and agree that no failure or delay in exercising any right or remedy with respect to the Loan or under the Loan Documents shall constitute a waiver of, or affect adversely in any manner, any of such rights and remedies nor shall any such failure or delay form the basis for any claim or cause of action.

4. <u>Only Written Agreements.</u> The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

5. <u>Authority.</u>  The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. The Special Servicer represents and warrants that it is empowered to act on behalf of the Trustee under the Loan Documents in the capacity of attorney-in-fact, and the person signing this Agreement on behalf of Special Servicer hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Trustee. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.

6. <u>Expenses.</u>  The Borrower agrees that it shall pay all costs of the Special Servicer in connection with Loan Communications, including but not limited to expenses for inspection of the property, legal fees and the fees of other professionals.

7. <u>Advice from Independent Counsel.</u> The Borrower acknowledges that independent counsel represents the Borrower, or if not so represented, that Borrower has been advised to obtain representation by independent counsel, and has fully reviewed the terms of this Agreement. Borrower acknowledges that Borrower executes this Agreement, based on its own independent judgment, on the advice of counsel, if represented, and is under no threat, coercion or duress from any Party.

8. <u>Settlement Negotiations.</u> Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor to be admissible as evidence in any administrative or judicial proceeding (i) between the Trustee, Borrower

Blue Hill   0483

and/or Special Servicer, or (ii) involving any of the Loan Documents or any of the property securing the Loan. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be used in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the Parties.

9.  **Information Request.** In order to enable the Special Servicer to properly evaluate the Borrower's request, the Borrower agrees to forward to the Special Servicer all the information checked on **Exhibit A**, which is attached hereto.

Additional information may be requested in the future. Thank you for your attention to this matter.

Lennar Partners, Inc., as Special Servicer

By: _____
Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

**ACKNOWLEDGED AND AGREED BY:**

Borrower:    Blue Hills Office Park LLC

By: _____
Name:
Title:

NOTICE TO CONSUMER BORROWERS AS REQUIRED BY FEDERAL FAIR DEBT COLLECTION PRACTICES ACT: We are attempting to collect debt and any information obtained will be used for that purpose.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID, SETTLED OR IS OTHERWISE NOT OBLIGATED: Please be advised that this letter constitutes neither a demand of payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, has paid, settled or is otherwise obligated by law.

cc:    Debra Rudder – Wells Fargo Commercial Mortgage Servicing
Pat Prince – Lennar Partners/Loan Servicing

Blue Hill 0484

**Exhibit A**

**Review Documentation**

1. <u>Borrower Information</u>

   ☑ A financial statement (balance sheet and income statements) of Borrower (including those of the individual members of the current Borrower) and guarantors, if any, prepared within 30 days of the date hereof, and as of year-end.

   ☑ Federal tax returns (signed copies) for the last two years (if applicable) for both Borrower and Guarantor (s) (if applicable).

2. <u>Property Information</u>

   ☑ Operating statements for the Property for the last 2 years and year-to-date (broken down by each month); Healthcare related properties should include detailed census data for each period.

   ☑ Current business plan for the Property, including the budget for this year, detailing revenue and expense projections, etc.

   ☑ Current rent roll with summary of lease expiration dates.

   ☑ Current census data describing the unit types, payment type, additional rents, detailed by tenant / unit.

   ☑ Operator / Management Agreement and resume of manager (current and any proposed revisions, if applicable).

   ☑ Any recent environmental assessments, structural or property inspection reports for the Property.

   ☑ Copies of all current leases, including related amendments and renewals.

   ☐ Sample copy of resident leases.

   ☑ Site Plan.

   ☑ Most recent tax bill on the Property

   ☑ A copy of the Certificate of Insurance for all insurance coverage(s) as required under the Loan Documents, along with a copy of the policy.

3. <u>Other</u>

   ☐ Copies of most recent regulatory surveys by state and/or local agencies showing that the facility is in compliance. Any noted defect(s) should be explained and proof provided of remediation of the defect(s).

   ☐ Copies of all licenses and/or permits required by the state or local authorities to operate the facility.

Blue Hill 0485





An LNR Company

September 17, 2004

BY FEDERAL EXPRESS

Mr. Joseph A. Donovan
Chief Financial Officer
Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts  02481



RECEIVED
SEP 3 0 2004
By

Re:   Blue Hills Office Park LLC Loan No. 76-0990083

Dear Mr. Donovan:

   The above-referenced loan has been transferred to Lennar Partners as special servicer and in that connection, we have received copies of your letters of August 2, 2004 and September 2, 2004 to Mr. Tim Parish of the Property Tax Department at Wells Fargo Commercial Mortgage Servicing. Following are our responses to your letters.

   First, you requested in your August 2 letter that the sum of $158,181.19 be advanced from the "cash flow sub-account" on deposit with the mortgagee in order to pay the real estate taxes due on August 2, 2004. We interpret your letter as a request under Section 6(c)(ix) of the Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 14, 1999 (the "Mortgage"). Pursuant to that section, however, releases from the Leasing Escrow Funds may only be made for "payment of principal and interest then due and payable on the Note". The withdrawal of funds from the Leasing Escrow Fund for payment of real estate taxes is not permitted under the Mortgage.

   Furthermore, under Section 5 of the Mortgage, the mortgagor is required timely to pay real estate taxes. Section 6(a) of the Mortgage provides for monthly deposits of real estate taxes in the Tax and Insurance Impound Fund, provided that so long as the "Bank of Boston Lease" remained in full force and effect, the Mortgagor was permitted to pay real estate taxes on a quarterly basis. The quarterly deposit of real estate taxes due on August 1, 2004 was not timely made and, furthermore, it is our understanding that the "Bank of Boston Lease" is no longer in full force and effect. In any event, the failure by the mortgagor either to make the quarterly escrow deposit on August 1, 2004 or to pay the quarterly installment of real estate taxes due on August 2, 2004 constituted an Event of Default under the Mortgage. The quarterly installment of taxes was made by the mortgagee out of its own funds in order to protect the mortgagee's collateral.

   Your letter of August 2 also requested a withdrawal of $254,652.24 from the Leasing Escrow Funds for payment of monthly principal and interest. Section 6(c)(ix) of the Mortgage

300 Crown Colony Drive • Quincy, Massachusetts 02169
Telephone: (617) 472-4540 • FAX (617) 472-4580

Joseph A. Donovan
September 17, 2004
Page 2

permits such application of Leasing Escrow Funds up to the so-called "Interim Reduction Amount", but only on certain conditions. One such condition is that no Event of Default shall have occurred and be continuing as of the date of the request for such disbursement. As described above, the loan was already in default at the time of your request due to the failure to make the quarterly tax payment then due. Furthermore, as described above, the Leasing Escrow Funds are only permitted to be used for payment of principal and interest then due and, accordingly, the loan was also in default upon mortgagor's failure to make payments of $11,921.89 on account of the insurance escrow and $67,054.42 on account of reserves and Mortgagor's failure to make a monthly tax escrow payment since the "Bank of Boston Lease" was no longer in full force and effect as of the August 11 payment date.

Your September 2, 2004 letter made a similar request for a withdrawal of $254,652.24 from the Leasing Escrow Funds to pay principal and interest due on September 11. Again, that request cannot be honored due to the above-described Events of Default. Furthermore, as stated above, the application of such funds to principal and interest leaves an outstanding payment obligation due on September 11 to cover taxes, insurance and reserves.

Please be advised that as a result of the above-described Events of Default, the above-referenced loan has been accelerated and that the Debt, including all sums due under the Note and the other Loan Documents, is immediately due and payable.

Sincerely,

Joseph A. Polcari
Asset Manager

~BOST1:308070.v2

Blue Hill 1226

# DEPOSITION EXHIBIT NO. 31



EXHIBIT
*Donovan*
*31*
*nkc 2/14/06*

*524*

**Wells Fargo**
**Commercial Mortgage Servicing**
**inv 524**

MEMO TO:                                    DATE:        5/12/2004

COPIES TO:                                  FROM:    **Elham Naoom**
                                                     **Operations**

SUBJECT:  WIRE INSTRUCTIONS

**CREDIT NAME:**  **Blue Hills Office Park LLC**
**ACCOUNT:**  **#870045770**

**BANK NAME:**  **Banknorth NA**
**ABA#:**  **211-370-545**
**ADDRESS:**  **Massachusetts**

**DEBIT ACCOUNT:**  **2058-507203**

**AMOUNT:**              **$174,305.85**

**LOAN #:**  **76-0990083  Monthly Sweep**
**REFERENCE:**  **Operating Expenses & Borrower Remainder**

**TEMPLATE:**  **Y**

**updated 2/11/00 pab**

AUTHORIZED BY: _____

CREATED BY: _____

revised 6-19-02 kmiller          VERIFIED BY: ___MAY 12 2004___

SENT BY: ___Æ 5/12/04___

I:Share\Ops\SpecialHandling\Inv524Lockbox\760990083.xls-OP&BorroweerWire

**WF01998**

Initiate Single Wire - Confirm

Page 1 of 1

 

### Wire Transfer

Contact Us

Help

Signed on As.

Wire Transfer Home
Reports

Initiate Templated Wires
Single Wire

Initiate Freeform Wire
Domestic
International
Book Transfer

Pending Wires
Awaiting Approval
Awaiting Repair
Unsuccessful
Future Dated

Wire Templates
Awaiting Approval
Awaiting Repair
Copy / Modify Templates
Create Template

**Initiate Single Wire - Confirmation**

**OK** Your sequence number is 015822

You may want to print this page for your records.

Today's Date: 05/12/2004

Today's Time: 04 14 PM ET

Debit Account  205850720 [121000248-WFRF WIP LINE]

Transfer Type:  DOM

Status:  ENTRD

Beneficiary:  BLUE HILLS OFFICE PARK LLC

Value Date  05/12/2004

Execution Date:  05/12/2004

Wire Amount:  174,305.85 USD

Print Page

© Copyright 1999-2003 Wells Fargo  All rights reserved

NAOOM, ELHAM M is logged into WEPOD Production

     Processing AU : 02058 - CMS OPERATIONS     

# WEPOD

### PROCESSING DATE: 05/12/2004

### Create Transaction Process

**Confirmation**

Your transaction has been submitted for approval.

The transaction set number is: 325429

| Trk #: 661019 | CMS Customer Account Charge - Debit | 6404259574 | 174,305.85 |
| Trk #: 661020 | Credit the CMS WIP Account | 02058 - 50720 | 174,305.85 |

**Do you want to create another Transaction Set?** [Yes] [No]

[Print]

5/12/2004

**WF02000**

Page: 1 Document Name: untitled

```
                    STFD 1 THF TRANSACTION STMT FORMAT        04/05/12 15.09.53
MENU        CO    182 OP            MS 50852 ACTION COMPLETE
ACTION            COID    114       ACCT COND
PROD CODE DDA    ACCT    6404259574    SHORT NAME BLUEHILLSOFPL
CURR CODE                PAGE    3   SEARCH FROM 104/03/05 THRU 104/05/07
ACTN    POST    EFFECTIVE    CHECK NUMBER    TRAN AMOUNT    D/C        BALANCE
        TRACE ID                     DESCRIPTION
_____  * 04/30                                15.00   C              361.74
        I-GEN104043000015800 MONTHLY SERVICE FEE REVERSAL
_____    05/07        EX    656044          517,946.26   C          518,308.00
        00000068009900299410 ln no 760990083  BLUE HILLS OFFICE PARK LLC wir
```

PF: 1-HELP 3-PLVL 6-INQ 7-SB 8-SF 9-ASUM ..-STMT



WF02001

Page: 1 Document Name: untitled

```
                    STFD 1 THF TRANSACTION STMT FORMAT        04/05/12 15.09.53
MENU        CO    182 OP              MS 50852 ACTION COMPLETE
ACTION            COID    114              ACCT COND
PROD CODE DDA     ACCT     6404259574      SHORT NAME BLUEHILLSOFPL
CURR CODE                 PAGE     3       SEARCH FROM 104/03/05 THRU 104/05/07
ACTN   POST    EFFECTIVE   CHECK NUMBER      TRAN AMOUNT  D/C         BALANCE
       TRACE ID                     DESCRIPTION
____  * 04/30                              15.00   C             361.74
       I-GEN104043000015800 MONTHLY SERVICE FEE REVERSAL
____    05/07       EX     656044       517,946.26  C           518,308.00
       00000068009900299410 ln no 760990083  BLUE HILLS OFFICE PARK LLC wir
```

PF: 1-HELP 3-PLVL 6-INQ 7-SB 8-SF 9-ASUM ...-STMT

Date: 5/12/2004 Time· 1:10:30 PM

**WF02002**

```
                          *** CURRENT STATUS *** ADR  NOTES
Acct No. 76-0990083 As Of  5/12/04
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
BLUE HILLS OFFICE PARK LLC              │CURRENT AMTS DUE
                                        │Next Payment Due Date    6/11/2004
                                        │Number of Payments Due         00
ONE WASHINGTON STREET, SUITE 400        │Regular Pmts Due              .00
WELLSLEY, MA            024810000       │Miscellaneous Amt             .00
1-781-239-1480    CIF Key LB HD OS SWP  │Late Charge Due               .00
- - - - - - - - - - - - - - - - - - - - │Suspense Escrow               .00
Int Rate  8.49000% Beg  9/99 End 10/29  │Buydown Cd/Amount  N _____ 00
Int Code      B66 Term 30 yrs 00  mos   │
Pmt Freq 01 Type P Hold   -   - Wrap    │Total Amount Due              .00
Asses LC Y  G/L 01 Language   ENGLISH   │Default Interest              .00
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
            CURRENT BALANCES  MONTHLY CONSTANTS│  YEAR TO DATE AMOUNTS PD
PRIN            32,028,486.69      254,652.24   │Prin          122,384.67
TAX ESCROW              .00              .00    │Interest    1,150,876.53
INS ESCROW        215,046.08       22,085.49    │Taxes         276,350.32
RESERVES        3,976,902.13       67,064.42    │Late Chge           .00
PMI/FHA                .00              .00     │Loan Adv            .00
MISC.                  .00              .00     │Mark Val            .00
ESCROW          4,191,948.21      343,802.15    │LTV Ratio          .000
    F12=Function Key Help Screen   Enter=Page 2  F9=Regulatory Rpt codes
```

WF02003

# DEPOSITION EXHIBIT NO. 32



**Wells Fargo**
**Commercial Mortgage Servicing**
**Inv 524**

MEMO TO:                                          DATE:        6/14/2004

COPIES TO:                                        FROM:        **Elham Naoom**
                                                              Operations

---

SUBJECT:  WIRE INSTRUCTIONS

| | |
|---|---|
| **CREDIT NAME:** | **Blue Hills Office Park LLC** |
| **ACCOUNT:** | **#870045770** |
| | |
| **BANK NAME:** | **Banknorth NA** |
| **ABA#:** | **211-370-545** |
| **ADDRESS:** | **Massachusetts** |
| | |
| **DEBIT ACCOUNT:** | 2058-507203 |
| | |
| **AMOUNT:** | **$173,063.76** |
| | |
| **LOAN #:** | **76-0990083  Monthly Sweep** |
| **REFERENCE:** | **Operating Expenses & Borrower Remainder** |
| | |
| **TEMPLATE:** | **Y** |

updated 2/11/00 pab

---

revised 6-19-02 kmiller

AUTHORIZED BY

CREATED BY                          JUN 1 4 2004

VERIFIED BY

SENT BY                             JUN 1 4 2004

*l Share\Ops\SpecialHandling\Inv524Lockbox\760990083.xls-OP&BorroweerWire*

WF02004

Initiate Single Wire - Confirm



**Wire Transfer**

Initiate Single Wire - Confirmation

Contact Us

Help

Signed on As.

Wire Transfer Home
Reports

Initiate Templated Wires
Single Wire

Initiate Freeform Wire
Domestic
International
Book Transfer

Pending Wires
Awaiting Approval
Awaiting Repair
Unsuccessful
Future Dated

Wire Templates
Awaiting Approval
Awaiting Repair
Copy / Modify Templates
Create Template

**Ok** Your sequence number is 016484

You may want to print this page for your records

Today's Date: 06/14/2004

Today's Time: 03.52 PM ET

Debit Account. 205850720 [121000248-WFRF WIP LINE]

Transfer Type: DOM

Status: ENTRD

Beneficiary. BLUE HILLS OFFICE PARK LLC

Value Date: 06/14/2004

Execution Date  06/14/2004

Wire Amount. 173,063.76 USD

[ Print Page ]

© Copyright 1999-2003 Wells Fargo  All rights reserved

WF02005

NAOOM, ELHAM M is logged into WEPOD Production                    Page 1 of 1

          Processing AU : 02058 - CMS OPERATIONS          

# WEPOD

### PROCESSING DATE: 06/14/2004

### Create Transaction Process

**Confirmation**
Your transaction has been submitted for approval.
The transaction set number is: 337858
Trk #: 688337        CMS Customer Account Charge - Debit   6404259574     173,063.76
Trk #: 688338        Credit the CMS WIP Account  02058 - 50720     173,063.76

**Do you want to create another Transaction Set?** | Yes | No |

Print

**WF02006**

```
Page: 1 Document Name: untitled
```

```
                    STFD 3 THF TRANSACTION STMT FORMAT        04/06/14 14.50.19
MENU       CO    182 OP                  MS 50852 ACTION COMPLETE
ACTION           COID   114          ACCT COND
PROD CODE DDA    ACCT      6404259574    SHORT NAME BLUEHILLSOFPL
CURR CODE              · PAGE     2   SEARCH FROM            THRU
ACTN   POST   EFFECTIVE   CHECK NUMBER    TRAN AMOUNT  D/C          BALANCE
       TRACE ID                DESCRIPTION
____   * 05/07        EX     656044        517,946.26  C          518,308.00
         00000068009900299410 ln no 760990083  BLUE HILLS OFFICE PARK LLC  wir
____   * 05/12        EX                    343,802.15  D          174,505.85
         091000011617316 WELLS FARGO CMS  CUSTODIAL  051104 ACH TRANSMIT
____   * 05/12            661019           174,305.85  D              200.00
         00000068009900301240 ln no 760990083  BLUE HILLS OFFICE PARK LLC
____   * 05/28            674897             2,592.31  C            2,792.31
         00000068009900306204 TENANT SWEEP INV 524 76-0990083
____   * 05/28 05/31/04                         71.08  C            2,863.39
         I-GEN104052800016965 INTEREST PAYMENT
____   * 05/28 05/31/04                         15.00  D            2,848.39
         I-GEN104052800016966 MONTHLY SERVICE FEE
____   * 05/28 05/31/04                         15.00  C            2,863.39
         I-GEN104052800016967 MONTHLY SERVICE FEE REVERSAL
____     06/04            680968            514,202.52  C          517,065.91
         00000068009900308832 TENANT DEPOSIT INV 524 LN 760990083
PF: 1-HELP 3-PLVL 6-INQ 7-SB 8-SF 9-ASUM ..-STMT
```

```
                                                   U · *

                                        517,065·91+
                                        343,802·15-
                                            200·00-
                              -001
                                        173,063·76*
```

WF02007

```
                              *** CURRENT STATUS *** ADR  NOTES
Acct No. 76-0990083 As Of  6/14/04
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
BLUE HILLS OFFICE PARK LLC          | CURRENT AMTS DUE
                                    | Next Payment Due Date      7/11/2004
                                    | Number of Payments Due          00
ONE WASHINGTON STREET, SUITE 400    | Regular Pmts Due               .00
WELLSLEY, MA           024810000    | Miscellaneous Amt              .00
1-781-239-1480    CIF Key LB HD OS SWP | Late Charge Due             .00
- - - - - - - - - - - - - - - - -   | Suspense Escrow                .00
Int Rate  8.49000% Beg  9/99 End 10/29 | Buydown Cd/Amount   N          00
Int Code      B66 Term 30 yrs 00  mos  |
Pmt Freq 01 Type P Hold   -   -  Wrap | Total Amount Due               .00
Asses LC Y  G/L 01 Language   ENGLISH | Default Interest               .00
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
            CURRENT BALANCES  MONTHLY CONSTANTS | YEAR TO DATE AMOUNTS PD
PRIN          32,007,989.38      254,652.24 | Prin          142,881.98
TAX ESCROW            .00              .00 | Interest     1,385,031.46
INS ESCROW       237,081.57       22,085.49 | Taxes         276,350.32
RESERVES       4,047,508.77       67,064.42 | Late Chge           .00
PMI/FHA               .00              .00 | Loan Adv            .00
MISC.                 .00              .00 | Mark Val            .00
ESCROW         4,284,590.34      343,802.15 | LTV Ratio          .000
   F12=Function Key Help Screen    Enter=Page 2  F9=Regulatory Rpt codes
```

WF02008

# DEPOSITION EXHIBIT NO. 35

01/07/04  2:54 pm

Pine Hills CP - 4791
December 2003

LOAN #7609006 3

Bil Page: 80

WF01414

# DEPOSITION EXHIBIT #36

Blue Hills DP - 450
March 2004

04/26/04  2:34 pm                                                                   all Pages  76

| Budget $/Unit | ELEMENT PERIOD Last Year $/Unit | Actual $/Unit | | Actual $/Unit | YEAR TO DATE Last Year $/Unit | Budget $/Unit |
|---|---|---|---|---|---|---|
| | | | INCOME | | | |
| 343,052  6.81 | 343,052  6.80 | 343,052  6.81 | Rent | 1,029,097  20.43 | 1,029,097  20.43 | 1,029,097  6.81 |
| 3,446  0.08 | 3,577  0.08 | 2,906  0.06 | Percentage Rent | 9,827  0.80 | 11,870  0.80 | 12,307  0.08 |
| 185,034  3.65 | 160,449  3.34 | 160,449  3.34 | CAM Income | 505,226  10.02 | 505,226  10.08 | 549,101  3.65 |
| 0  0.00 | 0  0.00 | 0  0.00 | Real Estate Taxes | 152,050  3.02 | 147,513  2.95 | 149,555  0.95 |
| 0  0.00 | 0  0.00 | 0  0.00 | Utilities | 0  0.00 | 0  0.00 | 0  0.00 |
| 16,332  32.43 | 4,101  0.14 | 2,446  1.77 | Payroll Reimb | 11,250  22.34 | 11,291  22.42 | 24,612  16.39 |
| 0  0.00 | 0  0.00 | 0  0.00 | Real Estate Tax Abatement | 0  0.00 | 0  0.00 | 0  0.00 |
| 390  0.01 | 4,600  0.09 | 3,996  0.08 | Other Income | 11,150  0.22 | 12,411  0.25 | 7,857  0.05 |
| 540,674  10.07 | 530,600  11.04 | 530,702  11.04 | TOTAL INCOME | 1,717,707  34.11 | 1,718,618  34.08 | 1,783,609  11.67 |

| | | | EXPENSES | | | |
| 19,810  0.39 | 16,606  0.33 | 13,029  0.26 | Maintenance Payroll | 44,948  0.91 | 53,591  1.06 | 57,804  0.38 |
| 1,240  0.02 | 1,240  0.02 | 1,822  0.04 | Insurance | 5,416  0.11 | 3,729  0.07 | 3,728  0.02 |
| 337  0.01 | 352  0.01 | 482  0.01 | Workers Compensation | 1,447  0.03 | 1,956  0.04 | 990  0.01 |
| 0  0.00 | 0  0.00 | 0  0.00 | Advertising & Promotion | 0  0.00 | 0  0.00 | 0  0.00 |
| 17,152  0.34 | 17,152  0.34 | 17,152  0.34 | Management Fees | 51,455  1.02 | 51,455  1.02 | 51,455  0.34 |
| 0  0.00 | 5,978  0.12 | 13,861  0.28 | Legal & Prof Fee | 14,236  0.28 | 6,075  0.12 | 0  0.00 |
| 0  0.00 | 0  0.00 | 0  0.00 | Dues & Subscriptions | 0  0.00 | 0  0.00 | 0  0.00 |
| 300  0.01 | 100  0.00 | 300  0.01 | Post & Phone | 786  0.02 | 567  0.01 | 1,156  0.01 |
| 0  0.00 | 0  0.00 | 0  0.00 | CAM Expenses | 0  0.00 | 0  0.00 | 0  0.00 |
| 7,353  0.15 | 10,656  0.21 | 15,449  0.30 | Insurance | 45,447  0.90 | 31,975  0.63 | 22,060  0.15 |
| 0  0.00 | 0  0.00 | 0  0.00 | Commissions | 0  0.00 | 0  0.00 | 0  0.00 |
| 4,244  0.08 | 6,877  0.14 | 4,467  0.09 | Materials | 14,860  0.30 | 16,843  0.33 | 12,462  0.08 |
| 1,506  0.03 | 3,913  0.08 | 544  0.01 | Repairs & Maintenance | 1,856  0.04 | 4,539  0.09 | 3,901  0.03 |
| 334  0.01 | 1,530  0.08 | 1,549  0.03 | Maint Contracts | 4,766  0.09 | 4,514  0.09 | 3,562  0.02 |
| 64,495  1.28 | 59,415  1.18 | 53,122  1.05 | Electric | 166,700  3.31 | 177,316  3.44 | 199,729  1.32 |
| 0  0.00 | 17,909  0.36 | 0  0.00 | Water & Sewer | 12,716  0.25 | 17,909  0.36 | 16,049  0.11 |
| 1,285  0.05 | 5,630  0.07 | 1,596  0.05 | Heating | 9,256  0.18 | 10,131  0.20 | 5,806  0.10 |
| 0  0.00 | 0  0.00 | 0  0.00 | Security | 0  0.00 | 0  0.00 | 0  0.00 |
| 0  0.00 | 0  0.00 | 0  0.00 | Permits & Licenses | 0  0.00 | 0  0.00 | 0  0.00 |
| 143,478  2.85 | 340  0.00 | 150  0.00 | Taxes | 155,102  3.08 | 260  0.00 | 143,636  0.95 |
| 0  0.00 | 75  0.00 | 75  0.00 | Exterminating | 300  0.01 | 225  0.00 | 150  0.00 |
| 2,772  0.06 | 0  0.00 | 2,137  0.04 | Trash Removal | 8,047  0.16 | 0  0.00 | 8,005  0.06 |
| 0  0.00 | 0  0.00 | 0  0.00 | Snow Removal | 0  0.00 | 0  0.00 | 0  0.00 |
| 16,050  0.31 | 30,305  0.60 | 20,095  0.40 | Cleaning Service | 60,020  1.20 | 63,804  1.27 | 58,369  0.33 |
| 1,350  0.03 | 1,616  0.03 | 230  0.00 | Miscellaneous | 1,440  0.08 | 4,629  0.09 | 3,467  0.02 |
| 282,444  5.61 | 167,466  3.33 | 145,889  2.90 | TOTAL EXPENSES | 596,348  11.80 | 461,031  9.77 | 560,907  3.87 |

| | | | NET OPERATING INCOME | | | |
| 263,621  5.01 | 364,900  7.07 | 378,823  7.44 | Interest Expense | 1,119,444  22.23 | 1,276,466  25.31 | 1,178,712  7.80 |
| 225,125  4.43 | 212,409  4.35 | 219,614  4.36 | Principle | 409,572  13.09 | 487,807  13.66 | 893,207  3.47 |
| 31,526  0.63 | 40,764  0.81 | 38,036  0.78 | PNIK Reserve | 74,305  1.48 | 76,870  1.53 | 70,666  0.47 |
| 4,897  0.34 | 7,670  15.23 | 7,906  15.66 | | 27,474  44.61 | 29,143  45.99 | 19,833  12.61 |

| 4,770  0.09 | 95,704  1.86 | 112,204  2.23 | Net Income/(Loss) | 332,015  6.59 | 487,566  9.68 | 305,702  2.42 |


EXHIBIT
GRACE  36

WF01264

# fineberg management, inc.

**EXHIBIT**
FRANK 37
3/16/06 DA

April 9, 2002

Mr. Vincent P. Dasta, President
DST Systems, Inc.
333 W. 11th Street, Suite 101
Kansas City, Missouri 64105-1639

Dear Mr. Dasta,

Responsive to our recent discussion on Equi-Serve extending its presence at 150 Royall Street, Canton, we are pleased to propose an arrangement for a simultaneous long term extension of the Lease and entry of an option to purchase, which if exercised for a future closing, would enable us to lock in the property sale price and Lease rate at current values. This proposal contemplates our giving Equi-Serve the option to purchase the property at a fixed price for closing in mid 2009, and could commit to a long term lease extension (i.e. 10-15 years) at the current rent.

This approach is intended to address the following concerns

### of Equi-Serve

1. by enabling Equi-Serve to assure its long term use, including via ownership, of the properties it occupies - including 150 Royall Street;

2. by enabling Equi-Serve to plan its capital expenditures for its own benefit, as the property owner;

3. by avoiding the disruption of a relocation of personnel from Canton, at which location Equi-Serve has already improved with significant capital expenditure;

4. by providing a long term fix on Equi-Serve's cost of occupancy at this location; and

### of the Landlord

1. by enabling it to match the timing of the sale of the property to its financing;

2. by allowing a period of time during which the Landlord can arrange to cover its tax liability by like-kind exchange, or otherwise; and

3. by exchanging the potential of a significantly increased sale price obtainable in the future for an assured continued stream of income.

We should schedule a meeting to further discuss this approach if it is of interest.

Very truly yours,

Daniel Frank

c: Thomas R. McGee, Jr

#243270 v1/14500/2295

Blue Hill 1253

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493



Tom R. McGee                    To: josephd@fine-hotels.com
08/07/02 09:28 AM               cc: Vince Dasta
                                Subject: Equiserve/Canton

Joe:

Dan Frank suggested I communicate with you regarding a discussion we had before Dan left on vacation regarding the Equiserve lease in the building your group owns in Canton, MA.

Previously we have had discussions with Dan about the possibility of purchasing the building, but we have concluded that our long term real estate needs for our operations in Boston are better served by focusing on other ownership opportunities.

It appears our time line will likely run beyond the expiration of our current lease term in July of 2004. We would propose amending the current lease to extend the term by two years with three one year options to extend.

We are in a position to relocate Equiserve to another leased facility that will be available before July 2004. For planning purposes we want to resolve in the next 60 days whether we will move Equiserve to another leased facility or extend the lease in Canton under the terms outlined above.

Blue Hill 1114

# fineberg management, inc.

September 20, 2002

**VIA TELECOPIER AND**
**FIRST CLASS MAIL**

EXHIBIT
FRANK  39
2 16 06 CA

Thomas R. McGee
DST Realty, Inc.
333 West 11th Street
Kansas City, MO 64105

RE:    Equiserve Lease Term

Dear Tom:

I am disappointed that a sale of 150 Royall Street, Canton to Equiserve or its affiliate may not work out; however, we are pleased to discuss a lease extension that accommodates Equiserve's timetable.

Our preference would be to arrange a three (3) year extension together with the right, upon 24 months' notice, to further extend for two (2) years. This approach is intended to give Equiserve approximately five (5) years at this present location from today, together with an additional two (2) years' coverage if needed.

I look forward to further discussing this proposal and suggest it be accomplished by a simple letter agreement amending the lease term.

We look forward to your continued association with us at 150 Royall Street.

Very truly yours,

Daniel Frank

KMG:kam
#253542 v1/99999/1

Blue Hill 1254

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493



# Piper Rudnick

One International Place, 21st Floor
Boston, Massachusetts 02110-2613
*main* 617.406.6000 *fax* 617.406.6100

E. RANDOLPH TUCKER
randy.tucker@piperrudnick.com
*direct* 617.406.6032

November 12, 2004

VIA ELECTRONIC TRANSMISSION

Kenneth M. Goldberg, Esq.
Bernkopf Goodman & Baseman, LLP
125 Summer Street
Boston, MA 02110-1621

Re:   Blue Hills Office Park LLC, Loan No. 76-0990083 (the "Loan")

Dear Ken:

As you know, we represent Lennar Partners as special servicer ("Lennar") in connection with the Loan. I am writing in response to your letter dated November 10, 2004 to Bruce Barnett of this office. Your letter refers to "requests, correspondence and requisitions" made by the Borrower over the last several months for the release of funds. Your letter states that Lennar has "consistently refused to reasonably or effectively respond to all of these Borrower requests."

Your letter leaves the mistaken impression that Lennar has been unresponsive to the Borrower's requests. Lennar has received only two letters from the Borrower requesting funds, and it responded to those requests in detail in a letter dated September 17, 2004. The Borrower never replied to Lennar's September 17 letter or made any further request for funds. For the reasons set forth in the September 17 letter, there is no basis for the claims in your letter that those funds belong to the Borrower or that Lennar sought to "procure" the Borrower's default under the Loan and Lennar denies them.

On October 18, 2004, Daniel Frank telephoned Lennar, identified himself as a principal of the Borrower and asked for a meeting to discuss the Loan. I believe that is the meeting request described in your letter. He was informed that in order for Lennar to postpone the foreclosure, it would be necessary for the Borrower to keep the loan current. Mr. Frank never relied. Thus, Lennar has responded to each of your client's requests, following which there has been no reply from the Borrower.

Sincerely,

E. Randolph Tucker

ERT/jmm
cc:   Andrew H. Cohn, Esq.

~BOST1:312518.v1
3D6477-18
*Piper Rudnick LLP*

Blue Hill 1217

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

    Plaintiff, Defendant-in-Counterclaim,

    v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

    Defendants, Plaintiffs-in-Counterclaim,

    v.

WILLIAM LANGELIER and GERALD
FINEBERG,

    Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## MANUAL FILING NOTIFICATION

Defendants give notice of the manual filing with the Clerk's office of **Exhibit 42, Fineberg Marketing Update** due to its voluminous size.

Dated:  May 17, 2006

## Dan Frank

| | |
|---|---|
| From: | Joseph_Plunkett@cushwake.com |
| Sent: | Tuesday, August 03, 2004 3:06 PM |
| To: | kgoldberg@bgplaw.com |
| Cc: | Larry Needle; Dan Frank |
| Subject: | draft - any comments?? ken i will call you |

Attachments:       Frank_8_3_04.doc



Frank_8_3_04.doc
(43 KB)


(See attached file: Frank_8_3_04.doc)


J.P. Plunkett
Senior Director
Cushman & Wakefield
Suite 1500, 125 Summer Street
Boston, MA 02110

office phone 617-204-4128
mobile phone 617-233-3271
facsimile 617-330-9499

Blue Hill 0774

1

August 3, 2004

Mr. Daniel Frank
President
Fine Hotels Corporation
One Washington Street, Suite 402
Wellesley, MA 02481

Re:     *150 Royall Street, Canton, Massachusetts*

Dear Dan:

It was great to catch up recently with you, Ken Goldberg, Larry Needel and Jerry Fineberg. Getting the
150 Royall team together was productive and helpful.

I figured that I'd summarize our meeting, as well as offer my thoughts on how we ought to best move
forward. As it relates to marketing efforts, the following action steps have taken place over the past seven
months:
- Regular, aggressive cold-calling/canvassing
- Proactive tracking of lease expirations.
- Subdivision space plans created by Marguiles Associates.
- Flyer created.
- Listed on CoStar.
- Canvassed 690 Canton Street, Westwood tenants being uprooted by New York Life.
- April 21 broker breakfast was a huge success with 43 attendees.
- Email out to 300 or so co-brokers and research services, regularly.
- Major mailers (75,000 SF+ companies) from Needham south to Braintree/Quincy and into Boston
  with follow-up calls ongoing.
- We are focused on prospects of 100k and up now, per Fineberg Cos.

The following companies have toured the site:

| Prospect | Comments |
|---|---|
| First Marblehead | Negotiating at One Cabot in Medford due to public transportation. |
| Travelers | Landed at 315 Norwood Park South in Norwood. |
| Firestone Financial | Landed at 25-27 Christina Street in Newton with a 10 year deal, $19.50 years 1-5, $20.50 years 6-10, $30-35 in work. |
| Softrax | We politely declined their 15,000 SF proposal. Renewed at 45 Shawmut in Canton. |
| Instron | Would have needed some fairly serious alterations made. Unlikely candidate due to its intense manufacturing component. Close to landing at Jet Spray site in Norwood on University Avenue for $13 NNN with $70 in work (50% is toward base building). |
| Aviva | Focusing on Boston, Braintree, Quincy and Route Three South due to MBTA Redline access and employee demographics. |
| New York Life | Wells Avenue, Newton cratered. Signed lease at 690 Canton Street in Westwood. |
| Allied Domecq/Dunkin Donuts | Signed at 130 Royall Street, Canton due to its October 2004 occupancy need and desire to be in a stand-alone facility. Started building its space out in March 2004. |
| Strauman | Signed a deal in Andover to be closer to other medical users. |

Blue Hill 0775

*Re:*    *150 Royall Street, Canton, MA*
         *August 3, 2004*
         *Page 2 of 2*

From a market perspective, things are interesting to say the very least. There is a significant pipeline of deal flow out there - for the most part in the 5,000 square foot and under range, probably some dozen plus of them from Route 109 south down through Quincy. I would label these as "small deals".

As it relates to "medium sized" deals in the 5,000 square foot plus up to 24,999 square foot range, activity is not as brisk, with about nine such requirements out there. So called "large deals", 25,000 square feet plus to 50,000 square feet are particularly sparse - and in almost all cases such tenants end up renewing with their existing landlords who do anything practical to keep them.

"Major deals" that are greater than 50,000 square feet are for all intents and purposes non-existent today, in the Route 128 South market. Some do exist Needham north, but with the bevy of options for these firms in the areas that they want to be in - it is quite a challenge attempting to get them to consider Canton.

Our target for 150 Royall Street is 100,000 square feet plus. These users today have 20 options within a 15-minute drive of 150 Royall Street.

The overall suburban market's vacancy is 25.5%. The 128 South submarket (of which Canton obviously is a part) has a vacancy of 20.5%, a figure that will approach the mid 20s by year's end once Blue Cross Blue Shield sheds 300,000 square feet in Quincy, and New York Life leaves 65,000 square feet in Norwood, to cite just two space sheddings. Canton alone has commercial vacancy of about 45%. Asking lease rates average $19.39 per square foot in 128 South, $20.26 in the overall Suburban Market. Absorption this year has been negative 159,043 square feet in 128 South and negative 189,949 in the overall suburbs.

While the tone of this letter may seem somber, I am cautiously optimistic about 150 Royall Street. Although there is no "low hanging" 100,000 square foot plus "fruit" out there today, that does not mean there will not be tomorrow. Once these deals are in the market, 150 Royall Street will likely compete favorably due to the building's competitive strengths that include Route 128 visibility and attractive on-site amenities. In order to win that elusive first deal that I believe will arrive sometime this fall, we need to do the following:

- Respond to RFPs within three business days of receiving them.
- Offer qualified prospects complimentary space planning
- Offer deals in the $17 going to say $24 range (gross, net of light/plug electrical) over a 10 year period with $20 - $40 in work, with anywhere from three to six months of free rent, and tenant representation commissions that in some instances could be as high as $8 - $10 per square foot.

I do believe that once we land that first deal, subsequent ones ought to be more landlord favorable because **a)** we will have gained some momentum and positive notoriety in the market and, **b)** the deals could be smaller ones, which often are at slightly higher rents.

We expect to achieve the projections above, but market conditions, as well know, can go up or down, at anytime. I firmly believe, however, in these projections as it relates to today's market.

Thanks again for the meeting. Our 110% effort continues.

Sincerely,

Joseph P. Plunkett

**Blue Hill 0776**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim,

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999–C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## MANUAL FILING NOTIFICATION

Defendants give notice of the manual filing with the Clerk's office of **Exhibit 44, Fineberg Companies Proposal** due to its voluminous size.

Dated:  May 17, 2006

# DEPOSITION EXHIBIT NO. 51

# EXCERPTED MATERIALS



EXHIBIT 51
Polcari
2/28/06   ttb

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.,
Depositor


WELLS FARGO BANK, NATIONAL ASSOCIATION,
Servicer


LENNAR PARTNERS, INC.,
Special Servicer


THE CHASE MANHATTAN BANK,
Trustee


NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION,
Certificate Administrator and Custodian


POOLING AND SERVICING AGREEMENT


Dated as of October 11, 1999


$1,187,129,449
Commercial Mortgage Pass-Through Certificates
Series 1999-C1

the related Mortgaged Property within the 12-month period immediately prior to the occurrence of such Appraisal Reduction Event. Instead, the Special Servicer may use such prior Appraisal in calculating any Appraisal Reduction with respect to such Loan.

With respect to each Loan as to which an Appraisal Reduction Event has occurred and which has become a Corrected Loan and has remained current for twelve consecutive Monthly Payments, taking into account any amendment or modification of such Loan, and with respect to which no other Appraisal Reduction Event has occurred and is continuing, the Special Servicer may within 30 days after the date of such twelfth Monthly Payment, order an Appraisal (which may be an update of a prior Appraisal), or with respect to any Loan with an outstanding principal balance less than $2,000,000, perform an internal valuation or obtain an Appraisal (which may be an update of a prior Appraisal), the cost of which shall be paid by the Servicer as a Servicing Advance. Based upon such Appraisal or internal valuation, the Special Servicer shall redetermine and report to the Trustee and the Servicer the amount of the Appraisal Reduction with respect to such Loan and such redetermined Appraisal Reduction shall replace the prior Appraisal Reduction with respect to such Loan.

Section 3.20    Modifications, Waivers, Amendments and Consents.

(a)    Subject to the provisions of this Section 3.20, the Servicer and the Special Servicer may, on behalf of the Trustee, agree to any modification, waiver or amendment of any term of any Loan without the consent of the Trustee or any Certificateholder.

(i)    For any Loan other than a Specially Serviced Loan and the L'Enfant Participation and subject to the rights of the Special Servicer set forth below, the Servicer shall be responsible subject to the other requirements of this Agreement with respect thereto, for any request by a Borrower for the consent of the mortgagee or a modification, waiver or amendment of any term thereof, provided that such consent or modification, waiver or amendment would not affect the amount or timing of any of the payment terms of such Loan, result in the release of the related Borrower from any material term thereunder, waive any rights thereunder with respect to any guarantor thereof or relate to the release or substitution of any material collateral for such Loan.    To the extent consistent with the foregoing, the Servicer shall be responsible for the following:

(A)    Approving any waiver affecting the timing of receipt of financial statements from any Borrower provided that such financial statements are delivered no less than quarterly and within 60 days of the end of the calendar quarter to which such financial statements relate;

(B)    Approving routine leasing activity with respect to leases for less than the lesser of (a) 30,000 square feet and (b) 20% of the related Mortgaged Property;

(C)    Approving annual budgets for the related Mortgaged Property, provided that no such budget (1) relates to a fiscal year in which an Anticipated Repayment Date occurs, (2) provides for the payment of operating expenses in an amount equal to more than 110% of the amounts budgeted therefor for the prior

CSFBMSC 00118

year or (3) provides for the payment of any material expenses to any affiliate of the Borrower (other than the payment of a management fee to any property manager if such management fee is no more than the management fee in effect on the Cut-off Date);

(D)     Waiving any provision of a Loan requiring the receipt of a rating confirmation if such Loan is not a Significant Loan and the related provision of such Loan does not relate to a "due-on-sale" or "due-on-encumbrance" clause (which shall be subject to the terms of Section 3.08 hereof); and

(E)     Subject to other restrictions herein regarding Principal Prepayments, waiving any provision of a Loan requiring a specified number of days notice prior to a Principal Prepayment.

(ii)     Notwithstanding the foregoing, the Servicer shall not waive, modify or amend the provisions of any Loan unless such waiver, modification or amendment would not constitute a "significant modification" under Treasury Regulations Section 1.860G-2(b).

(iii)     The Special Servicer shall be responsible for any request by a Borrower for the consent of the mortgagee and any modification, waiver or amendment of any term of any Loan for which the Servicer is not responsible, as provided above, or if such consent, request, modification, waiver or amendment relates to a Loan that is on the most recent Servicer Watch List, has a Debt Service Coverage Ratio (based on the most recently received financial statements and calculated on a trailing twelve month basis) less than the greater of 1.1x or 20% less than the Debt Service Coverage Ratio as of the Cut-off Date (unless such Loan is a credit lease loan) or with respect to which an event of default has occurred in the preceding 12 months.

(b)     All modifications, waivers or amendments of any Loan shall be (i) in writing and (ii) effected in accordance with the Servicing Standard.

(c)     Neither the Servicer nor the Special Servicer, on behalf of the Trustee, shall agree or consent to any modification, waiver or amendment of any term of any Loan that is not a Specially Serviced Loan if such modification, waiver or amendment would:

(i)     affect the amount or timing of any related payment of principal, interest or other amount (including Prepayment Premiums or Yield Maintenance Charges, but excluding Penalty Interest and other amounts payable as additional servicing compensation) payable thereunder;

(ii)     affect the obligation of the related Mortgagor to pay a Prepayment Premium or Yield Maintenance Charge or permit a Principal Prepayment during any period in which the related Note prohibits Principal Prepayments;

(iii)     except as expressly contemplated by the related Mortgage or pursuant to Section 3.09(e), result in a release of the lien of the Mortgage on any material portion of the related Mortgaged Property without a corresponding Principal Prepayment in an

CSFBMSC 00119

in such event, (i) the Depositor shall be deemed to have granted to the Trustee (in such capacity) a first priority security interest in the Depositor's entire right, title and interest in and to the assets comprising the Trust Fund, including without limitation, the Loans, all principal and interest received or receivable with respect to the Loans (other than principal and interest payments due and payable prior to the Cut-off Date and Principal Prepayments received prior to the Cut-off Date), all amounts held from time to time in the Collection Account, the Distribution Accounts and, if established, the REO Account, and all reinvestment earnings on such amounts, and all of the Depositor's right, title and interest in and to the proceeds of any title, hazard or other Insurance Policies related to such Loans and (ii) this Agreement shall constitute a security agreement under applicable law. This Section 10.07 shall constitute notice to the Trustee pursuant to any of the requirements of the applicable UCC.

Section 10.08 Successors and Assigns; Beneficiaries.

The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, and all such provisions shall inure to the benefit of the Certificateholders. No other person, including, without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement.

Section 10.09 Article and Section Headings.

The article and Section headings herein are for convenience of reference only, and shall not limit or otherwise affect the meaning hereof.

Section 10.10 Notices to Rating Agencies.

(a) The Trustee shall use reasonable efforts promptly to provide notice to each Rating Agency with respect to each of the following of which a Responsible Officer of the Trustee has actual knowledge:

(i) any material change or amendment to this Agreement;

(ii) the occurrence of any Event of Default that has not been cured;

(iii) the resignation or termination of the Servicer or the Special Servicer;

(iv) any change in the location of either of the Distribution Accounts;

(v) the repurchase of Loans by any Mortgage Loan Seller, FINOVA or FINOVA Capital pursuant to Section 7 of the related Mortgage Loan Purchase Agreement or Section 9.3 of the related FINOVA Mortgage Loan Purchase Agreement, as applicable; and

(vi) the final payment to any Class of Certificateholders.

(b) The Servicer shall use reasonable efforts promptly to provide notice to each Rating Agency with respect to each of the following of which it has actual knowledge:

CSFBMSC 00221

**Cowling, Larry C.**

| | |
|---|---|
| **From:** | O'Neal, Kathryn A |
| **Sent:** | Tuesday, August 17, 2004 9 51 AM |
| **To:** | Bass, Ilona M ; Beliz, Carmen H , Boi, Susie; Britton, Stephanie S.; Budgin, Bryan; Chung, Patrick; CMS CASH MANAGEMENT; CMS TAX; Cocco, Rusty E.; Connolly, Lisa; Delagarza, Jeannette V ; Fray, Joyce, Greene, Debra M.; Gremore, Maggie M.; Hancock, AnnMarie; Hayek, Doug R ; Huebner, David D., INVESTOR REPORTING, Kohal, Linda K.; Krueger, June, Kwong, Henry B ; Lai, Teresa; Lambson, Deborah E., Lapointe, Raymond L ; Lei-Morales, Stephanie S , Martin, Jill L ; McAdams, Stewart E.; Mooney, Pat J., Nhan, Vi, Nyholm, Christine T., Nziramasanga, Charles, O'Neill, Michael F ; Ross, Misty M ; Rudio, Fay H.; Shuheiber, Rania, Stephens, Kate, Swanson, Steven; Tso, Christine C ; Turnbow, Daniel T., Villanueva, Edward, West, Stephanie M , Wong, Nancy M ; zz.RMD LOAN SERV; Borstead, Juanita L.; Brewster, Jeanne M.; Bruning, Marlies; Burns, Sarah, Cowling, Larry C ; Gamage, Gary A., Landry, Susan M., Lewis, Troy D.; Mallegni, Curtis J., Mowbray, Scott; Murray, Ken V.; Poblete, M. Tessie; Rudder, Debra A ; Sutterfield, Noreen; Vaughn, Barbara; Yoo, Jimmy |
| **Subject:** | FW: Special Service Transfer Blue Hills Office Park LLC Loan #760990083 Pool CSFB 1999-C1 INV 524 - Lennar Partners, Inc Special Servicer - Loan Balance $31,979,793 66 |

Approved to transfer to Lennar as Special Servicer under the imminent default provisions of the PSA.

Kathryn O'Neal
Senior Vice President/Managing Director
Commercial Mortgage Servicing
Wells Fargo Bank
45 Fremont Street, 2nd Floor
San Francisco, California 94105

email  kathryno@wellsfargo com
office 415-396-0782
fax    415-975-7236

```
-----Original Message-----
From:    Mallegni, Curtis J.
Sent:    Monday, August 16, 2004 12:29 PM
To:      O'Neal, Kathryn A.
Subject: Special Service Transfer Blue Hills Office Park LLC Loan #760990083 Pool CSFB 1999-C1  INV 524 - Lennar Partners, Inc. Special
         Servicer - Loan Balance $31,979,793.66
```

It is recommended that the above referenced loan be transferred to the Special Servicer, Lennar Partners, Inc., on the basis of an imminent default as the transferring event under Section 1.01 of the Pooling and Servicing Agreement. The specifics are as follows·

Loan No.: 760990083
Loan Pool  CS First Boston Securities Corp. 1999 - C1 (Pool 524) - Lennar Partners, Inc. Special Servicer
Borrower: Blue Hills Office Park, LLC
Master Servicer. Wells Fargo Bank
Special Servicer. Lennar Partners, Inc
Asset Administration· Larry Cowling
Property Type· One (1) two-story class A office building, of 273,863 sf  known as Blue Hills Office Park located at 150
Royal Street, Canton, Mass 02021
Loan Amount: $31,979,793 66
Paid to Date· July 11, 2004
Next payment due - August 11, 2004
Payment now past due: $333,638 55 plus late charges of $7,639 57
Occupancy. Vacant - The single tenant Fleet Bank moved out at the end of July 2004
Details of transfer request

Loan is being transferred on the basis of imminent default under the Servicing transfer provisions of the Pooling and Servicing Agreement.

The Pooling and Servicing Agreement at page 52 provides the definition of a Service Transfer Event as, among

1

EXHIBIT 57
Polcari
2/28/06    HB

**other things,:** (iii) the Servicer determines that a payment default has occurred or is imminent and is not likely to be cured by the related Mortgagor within 60 days;

*Status:*

- This is a single tenant project of 273,863 sf, and the tenant - Fleet Bank vacated the property as of July 31, 2004
- The loan is the 12th largest loan in this pool
- The borrower has not made the August 2004 payment which is now past due
- There is a $4,121,728 reserve for releasing which the borrower has indicated they would like to use for debt service.
- The borrower has also requested in writing and in phone conversation a meeting with the Special Servicer - Lennar to discuss the loan status and the future performance of the loan.
- Given the size of the loan and the unoccupied status of the property, it is expected that in addition to the existing past due amounts, that further non-payments can be reasonably expected in the next 60 days which require the intercession of the Special Servicer Lennar Partners, Inc.

Based on these factors, it is recommended that this loan be transferred to the Special Servicer, Lennar Partners, Inc, on the basis of an imminent default under Section (iii) of the Service Transfer Events under the Pooling and Servicing Agreement.

Curtis J. Mallegni
45 Fremont Street
2nd Floor
San Francisco, CA 94105
MAC A0194-025
Phone (415) 396-6999
Fax (415) 975-7236

2

**WF01285**

ѕ



**LENNAR PARTNERS**
An LNR Company

EXHIBIT 60

Polcari
2/28/06    Hb

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

RE:  Loan in the original principal amount of $33,149,000.00 (the "Loan") to Blue Hills Office
Park LLC (the "Borrower") held by JP Morgan Chase Bank, as trustee (the "Trustee")
Portfolio:    CS First Boston Mortgage, Series 1999-C1
Loan No.:    76-0990083

Dear Borrower:

Lennar Partners, Inc. (the "**Special Servicer**") is the Special Servicer with respect to the Loan
and has the authority, on behalf of the Trustee, to discuss and to meet with representatives of the
Borrower to review the status of the Loan and any issues arising under any of the documents
relating to the Loan (the "**Loan Documents**").

We have agreed to discuss with your representatives the status of the Loan and the Loan
Documents provided that the following agreements and understandings govern. In order to ensure
that our discussions will be as open and productive as possible, we wanted to write to you to
confirm our mutual understanding that all discussions and/or negotiations will be governed by
the terms and conditions in this letter. If you are in agreement with such terms and conditions, we
would appreciate you acknowledging such by signing this letter in the space provided and
returning it to us.

1.   **Negotiations.**    The Borrower and the Special Servicer agree that any discussions,
negotiations, correspondence or other communications relating to the Loan and the Loan
Documents that the Borrower may have in the future or may have had with representatives of
Wells Fargo Commercial Mortgage Servicing, the Master Servicer (the "Master Servicer"),
or the Special Servicer, (any such discussions, negotiations or correspondence or other
communications being hereinafter referred to as "Loan Communications") are not binding
upon any of the Borrower, the Trustee, or Special Servicer (collectively the "Parties"). The
Borrower also acknowledges and agrees that none of the Trustee, the Master Servicer or the
Special Servicer is under any obligation to consent or otherwise agree to any Borrower
request with respect to the Loan, or to modify the Loan or the Loan Documents. Each of the
Parties understands and agrees that no Party shall have any defense to any action by one or
more of the other Parties, nor assert any waiver by one or more of the other Parties, based on
any Loan Communications.

2.   **Releases.**    The Parties hereby completely, irrevocably and unconditionally release and
forever discharge each of the Parties from any and all claims and demands whatsoever, in
law or equity, whether such claims are presently known or unknown, direct or indirect, fixed
or contingent, which the Parties may have or may claim to have against the other caused by,
or arising out of any Loan Communications.

Blue Hill 0482

3. **No Waivers.** Each of the Parties acknowledge and agree that participation in the Loan Communications does not constitute by any Party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, of such Party under the Loan Documents, (b) a waiver or the release of any defaults under the Loan or the Loan Documents, or (c) a waiver, consent, release or modification of any right or remedy under any provision of the Loan Documents. None of the Parties intends to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties further understand and agree that no failure or delay in exercising any right or remedy with respect to the Loan or under the Loan Documents shall constitute a waiver of, or affect adversely in any manner, any of such rights and remedies nor shall any such failure or delay form the basis for any claim or cause of action.

4. **Only Written Agreements.** The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

5. **Authority.** The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. The Special Servicer represents and warrants that it is empowered to act on behalf of the Trustee under the Loan Documents in the capacity of attorney-in-fact, and the person signing this Agreement on behalf of Special Servicer hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Trustee. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.

6. **Expenses.** The Borrower agrees that it shall pay all costs of the Special Servicer in connection with Loan Communications, including but not limited to expenses for inspection of the property, legal fees and the fees of other professionals.

7. **Advice from Independent Counsel.** The Borrower acknowledges that independent counsel represents the Borrower, or if not so represented, that Borrower has been advised to obtain representation by independent counsel, and has fully reviewed the terms of this Agreement. Borrower acknowledges that Borrower executes this Agreement, based on its own independent judgment, on the advice of counsel, if represented, and is under no threat, coercion or duress from any Party.

8. **Settlement Negotiations.** Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor to be admissible as evidence in any administrative or judicial proceeding (i) between the Trustee, Borrower

Blue Hill 0483

and/or Special Servicer, or (ii) involving any of the Loan Documents or any of the property securing the Loan. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be used in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the Parties.

9.  **Information Request.** In order to enable the Special Servicer to properly evaluate the Borrower's request, the Borrower agrees to forward to the Special Servicer all the information checked on **Exhibit A**, which is attached hereto.

Additional information may be requested in the future. Thank you for your attention to this matter.

<div align="center">Lennar Partners, Inc., as Special Servicer</div>

By: _____
         Job Warshaw
         Sr. Vice President
         Real Estate Finance & Servicing Group
         Lennar Partners, Inc.

**ACKNOWLEDGED AND AGREED BY:**

         Borrower:     Blue Hills Office Park LLC

         By: _____
                Name:
                Title:

NOTICE TO CONSUMER BORROWERS AS REQUIRED BY FEDERAL FAIR DEBT COLLECTION PRACTICES ACT: We are attempting to collect debt and any information obtained will be used for that purpose.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID, SETTLED OR IS OTHERWISE NOT OBLIGATED: Please be advised that this letter constitutes neither a demand of payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, has paid, settled or is otherwise obligated by law.

cc:     Debra Rudder – Wells Fargo Commercial Mortgage Servicing
        Pat Prince – Lennar Partners/Loan Servicing

Blue Hill 0484

Exhibit A

Review Documentation

1. Borrower Information

☑ A financial statement (balance sheet and income statements) of Borrower (including those of the individual members of the current Borrower) and guarantors, if any, prepared within 30 days of the date hereof, and as of year-end.

☑ Federal tax returns (signed copies) for the last two years (if applicable) for both Borrower and Guarantor (s) (if applicable).

2. Property Information

☑ Operating statements for the Property for the last 2 years and year-to-date (broken down by each month); Healthcare related properties should include detailed census data for each period.

☑ Current business plan for the Property, including the budget for this year, detailing revenue and expense projections, etc.

☑ Current rent roll with summary of lease expiration dates.

☑ Current census data describing the unit types, payment type, additional rents, detailed by tenant / unit.

☑ Operator / Management Agreement and resume of manager (current and any proposed revisions, if applicable).

☑ Any recent environmental assessments, structural or property inspection reports for the Property.

☑ Copies of all current leases, including related amendments and renewals.

☐ Sample copy of resident leases.

☑ Site Plan.

☑ Most recent tax bill on the Property

☑ A copy of the Certificate of Insurance for all insurance coverage(s) as required under the Loan Documents, along with a copy of the policy.

3. Other

☐ Copies of most recent regulatory surveys by state and/or local agencies showing that the facility is in compliance. Any noted defect(s) should be explained and proof provided of remediation of the defect(s).

☐ Copies of all licenses and/or permits required by the state or local authorities to operate the facility.



## LENNAR PARTNERS
An LNR Company

> **EXHIBIT** 62
>
> Polcari
> 2/28/06    +FB

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

RE:  Loan in the original principal amount of $33,149,000.00 (the "Loan") to Blue Hills Office
Park LLC (the "Borrower") held by JP Morgan Chase Bank, as trustee (the "Trustee")
Portfolio:        CS First Boston Mortgage, Series 1999-C1
Loan No.:        76-0990083

Dear Borrower:

Lennar Partners, Inc. (the "Special Servicer") is the Special Servicer with respect to the Loan
and has the authority, on behalf of the Trustee, to discuss and to meet with representatives of the
Borrower to review the status of the Loan and any issues arising under any of the documents
relating to the Loan (the "Loan Documents").

We have agreed to discuss with your representatives the status of the Loan and the Loan
Documents provided that the following agreements and understandings govern. In order to ensure
that our discussions will be as open and productive as possible, we wanted to write to you to
confirm our mutual understanding that all discussions and/or negotiations will be governed by
the terms and conditions in this letter. If you are in agreement with such terms and conditions, we
would appreciate you acknowledging such by signing this letter in the space provided and
returning it to us.

1. **Negotiations.**  The Borrower and the Special Servicer agree that any discussions,
negotiations, correspondence or other communications relating to the Loan and the Loan
Documents that the Borrower may have in the future or may have had with representatives of
Wells Fargo Commercial Mortgage Servicing, the Master Servicer (the "Master Servicer"),
or the Special Servicer, (any such discussions, negotiations or correspondence or other
communications being hereinafter referred to as "Loan Communications") are not binding
upon any of the Borrower, the Trustee, or Special Servicer (collectively the "Parties"). The
Borrower also acknowledges and agrees that none of the Trustee, the Master Servicer or the
Special Servicer is under any obligation to consent or otherwise agree to any Borrower
request with respect to the Loan, or to modify the Loan or the Loan Documents. Each of the
Parties understands and agrees that no Party shall have any defense to any action by one or
more of the other Parties, nor assert any waiver by one or more of the other Parties, based on
any Loan Communications.

2. **Releases.**  The Parties hereby completely, irrevocably and unconditionally release and
forever discharge each of the Parties from any and all claims and demands whatsoever, in
law or equity, whether such claims are presently known or unknown, direct or indirect, fixed
or contingent, which the Parties may have or may claim to have against the other caused by,
or arising out of any Loan Communications.

LNR03518

3. **No Waivers.**   Each of the Parties acknowledge and agree that participation in the Loan Communications does not constitute by any Party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, of such Party under the Loan Documents, (b) a waiver or the release of any defaults under the Loan or the Loan Documents, or (c) a waiver, consent, release or modification of any right or remedy under any provision of the Loan Documents. None of the Parties intends to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties further understand and agree that no failure or delay in exercising any right or remedy with respect to the Loan or under the Loan Documents shall constitute a waiver of, or affect adversely in any manner, any of such rights and remedies nor shall any such failure or delay form the basis for any claim or cause of action.

4. **Only Written Agreements.** The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

5. **Authority.** The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. The Special Servicer represents and warrants that it is empowered to act on behalf of the Trustee under the Loan Documents in the capacity of attorney-in-fact, and the person signing this Agreement on behalf of Special Servicer hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Trustee. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.

6. **Expenses.** The Borrower agrees that it shall pay all costs of the Special Servicer in connection with Loan Communications, including but not limited to expenses for inspection of the property, legal fees and the fees of other professionals.

7. **Advice from Independent Counsel.** The Borrower acknowledges that independent counsel represents the Borrower, or if not so represented, that Borrower has been advised to obtain representation by independent counsel, and has fully reviewed the terms of this Agreement. Borrower acknowledges that Borrower executes this Agreement, based on its own independent judgment, on the advice of counsel, if represented, and is under no threat, coercion or duress from any Party.

8. **Settlement Negotiations.** Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor to be admissible as evidence in any administrative or judicial proceeding (i) between the Trustee, Borrower

LNR03519

and/or Special Servicer, or (ii) involving any of the Loan Documents or any of the property securing the Loan. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be used in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the Parties.

9.  **Information Request.**  In order to enable the Special Servicer to properly evaluate the Borrower's request, the Borrower agrees to forward to the Special Servicer all the information checked on **Exhibit A**, which is attached hereto.

Additional information may be requested in the future.  Thank you for your attention to this matter.

Lennar Partners, Inc., as Special Servicer

By: _____

Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.


**ACKNOWLEDGED AND AGREED BY:**

Borrower:    Blue Hills Office Park LLC

By its manager:   Blue Hills Management Corp.

By: _____
Name:    Gerald S. Fineberg
Title:     President


NOTICE TO CONSUMER BORROWERS AS REQUIRED BY FEDERAL FAIR DEBT COLLECTION PRACTICES ACT: We are attempting to collect debt and any information obtained will be used for that purpose.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID, SETTLED OR IS OTHERWISE NOT OBLIGATED:  Please be advised that this letter constitutes neither a demand of payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, has paid, settled or is otherwise obligated by law.


cc:    Debra Rudder – Wells Fargo Commercial Mortgage Servicing
       Pat Prince – Lennar Partners/Loan Servicing

LNR03520

# DEPOSITION EXHIBIT NO. 63

## Barnett, Bruce

| | |
|---|---|
| **From:** | Kevin Wodicka [KWodicka@lnrproperty.com] |
| **Sent:** | Wednesday, April 28, 2004 9:07 AM |
| **To:** | Randy Wolpert; Larry Golinsky |
| **Subject:** | FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524 |

```
EXHIBIT 63
Polcare
2/28/06      Htb
```

Sounds like this loan should still be here. I doubt the master servicer is qualified to assess the leasing prospects for this property and start a dialogue with Fineberg. I will have Emily find out if the reserve can only be used for leasing. I would be concerned if the borrower can use it to pay debt service. With money in the reserve it shoud be interesting.

--------

**From:** Emily Cooper
**Sent:** Tuesday, April 27, 2004 6:46 PM
**To:** Michael Reed; Kevin Wodicka; Larry Golinsky
**Subject:**     FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

good fact.
-----Original Message-----
**From:** nhanvi@wellsfargo.com [mailto:nhanvi@wellsfargo.com]
**Sent:** Tuesday, April 27, 2004 6:45 PM
**To:** ecooper@lnrproperty.com
**Subject:** FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524


Emily,

It looks like the current amount available for leasing is $3,461,014 which maxes out at $4,250,000. Square footage is 273, 863 which works out to $12.64 psf.


Curtis

        -----Original Message-----
        **From:** Emily Cooper [mailto:ECooper@lnrproperty.com]
        **Sent:** Monday, April 26, 2004 8:32 AM
        **To:** 'nhanvi@wellsfargo.com'
        **Cc:** Michael Reed; Kevin Wodicka; Isaac Pesin
        **Subject:** CSFB 99 C1: Blue Hills Office


        Hello Vi,
        The single tenant in the Blue Hills Office building in CSFB 99 C1 will be vacating.  Is the lease reserve in place and if so, how much is currently in the reserve?

        Thanks,
        Emily


        Emily Finkelstein Cooper


LNR04203

Vice President, Investment Management
Lennar Partners
(305) 695-5251(Phone)
(305) 695-5601 (Fax)
ecooper@lnrproperty.com

LNR04204

2/24/2006

# DEPOSITION EXHIBIT NO. 69

CSFB 99 C1: Blue Hills Office Park

)

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Emily Cooper [IMCEAEX- _O=LNR_OU=MIAMI_CN=RECIPIENTS_CN=EFINKELSTEIN@lnrproperty.com] |
| **Sent:** | Monday, September 15, 2003 1:07 PM |
| **To:** | Jim Perillo |
| **Cc:** | Jayson Seidman; Vickie Taylor; Kevin Wodicka; Brandon Garson; Pablo Conill; Richard Le |
| **Subject:** | CSFB 99 C1: Blue Hills Office Park |

EXHIBIT 69
Polcari
2/28/06    tfb

Thanks Jim.
Equiserve owned by Fleet, who is on the lease, and the lease expires on 7/31/04. Vickie - can you pls see if this can be considered imminent default and if we can get it here?

Bwr is Gerald Feinberg, whom we are familiar with (difficult bwr in workout) - he owns some hotels around Boston in some of our deals. WIlliam Langlier is also part of the borrowing entity.

There is leasing escrow that has been funded over the Fleet lease term with a cap of $4.25MM. I will try to find out the exact balance, but based on the $52.2K/mo it's probably about $3MM, which is one year of debt service.

Per the updated 2 pager for Madison, there is 500K sf of new vacant space w/in 1/4 mile and market rent is $20 PSF vs Fleet's $15 PSF (net). Market is weak, not expected to pick up until 2004/2005.

We assigned an $8MM loss at the Madison roundtable, but did not add it to LPAMS. This deal is a "B3" and has the Holiday Inn Broadway ($35MM) and Sunpark St Louis among the SS assets and there are several large watchlist loans.

-----Original Message-----
From: Jim Perillo
Sent: Friday, September 12, 2003 3:01 PM
To: Emily Cooper
Subject: FW: Blue Hills Office Park, LLC

Hi Emily-

We probably want to watchlist this- the possible pool, tenant and the borrower name are in the e-mail below.

Thanks,

Jim

-----Original Message-----
From: Adam Berger [mailto:adam.s.berger@verizon.net]
Sent: Thursday, September 11, 2003 4:46 PM
To: JPerillo@LNRPROPERTY.COM; jpolcari@LNRPROPERTY.COM
Subject: Blue Hills Office Park, LLC

**LNR04051**

Gentlemen,

I was wondering if either of you could direct me to the right person at Lennar concerning the following situation.

CSFB originated a note on 9/15/99 in the amount of $33,149,000. The borrower is Blue Hills Office Park, LLC, and the property is located on 150 Royall in Canton, Massachusetts. I am told that the loan was part of the 1999 C-1 pool, and that Lennar is the special servicer.

The property is currently 100% occupied by Equiserve. They have announced that they are leaving the property at the expiration of their lease, which is imminent, as they have purchased the building next door from National Development.

As a result, there is going to be an empty, 20-year old 189,000 sf building. The Canton sub-market is very difficult; the National building sat vacant for two years before Equiserve made their offer, and there is another 175,000 sf newly constructed building on the same street that has been vacant for approximately the same time period.

While I would suspect that the note is still performing, I would like to speak to the appropriate person at Lennar to make sure that you know that you have an alternative to a re-structure of the note, which I would think that the borrower is going to request shortly. I would like to make an offer to purchase the note from Lennar, and therefore, if this loan is not in either of your territories, would appreciate if you could direct me to the appropriate person at Lennar.

Joe, I also remain interested in speaking with you about 19 Crosby.

Thanks,

Adam

**LNR04052**

2/23/2006

CSFB 1999-C1

| | | | | |
|---|---|---|---|---|
| Property Name: | Blue Hills Office Park | Units: | | utly Payment: | 254,652 | Portfolio#: | |
| Address: | 150 Royall Street | Square Feet: | 273,863 | 10/1/99 Balance: | 33,149,000 | Control#: | 7 |
| City/ST/Zip: | Canton, MA 02021 | Rooms: | | Updated Balance: | | Asset Manager: | RR |
| Type of Collateral: | Office | Current Rent: | | Interest Rate: | 8.49% | Current Status: | |
| Borrower: | Blue Hills Office Park LLC | Actual/Current Occup.: | 100.0% | Loan Type(Fix/Adj): | Fixed | Paid to Date: | |
| Address: | | Superior Lien Amt: | | Maturity / ARD: | 10/11/2009 | Originator U/W DSCR on NOI: | |
| City/ST/Zip: | | Equity Kicker (Y/N): | | Lien Position: | First | Original Amo Term: | 360 |
| Originator: | CSFB | Guarantee (Y/N): | | Recourse/Non/Silent: | Standard Current | Original Balloon/ARD Term: | 120 |
| Originator Loan No: 942235 | | Occup. at Origination: | 100.0% | First P&I Pay Date: | 11/11/1999 | Management Co.: | Fineberg Management |
| Prepym Provision: Lock/Defeasance 7/96 | | Appraised Current LTV: | 78.9% | Note Date: | 9/14/1999 | Eng. Firm: | Certified Environment, Inc |
| Original Balance: 33,149,000 | | Sub Servicing Fee: | | Appraisal Date: | 8/30/1999 | Env. Firm: | Certified Environment, Inc |
| Season: 0 | | Originator Underwritten NOI: | 3,841,253 | Appraisal Value: | 42,000,000 | Env. Recom.: | No further action |
| Lock-Box: Yes; Hard | | Annual Replacement Rsrv Payment: | 4,564 | Year Built: | 1970 | Env. holdback at Closing: | 0 |
| | | | | Year Renovated: | 1985 | FeeSimple/Leasehold: | Fee Simple |

**Loan Comments:**

This $33,149,000 first lien mortgage was originated on 9/14/99 to refinance the Blue Hills Office Park building in Canton, Ma. The note has a 8.49% interest rate and is for 30 years. However, the anticipated repayment date is 10/11/09. If not repaid by then, hyperamortization (additional interest of 2% of in a securitization) kicks in.

The borrower is a special purpose entity formed to own this property. The principals are Gerald Fineberg and William Langelier. Mr. Fineberg, in real estate since the 1960?s, has a net worth as of 12/98 of $143 million of which $21 million is liquid. Mr. Langelier founded The Langelier Co. in 1979, which specializes in equity capital for developers of subsidized multi-family housing. As of 1/99, his net worth was $13 million.

The loan requires a $4.25 million leasing escrow equal to 15 mo's debt service payable with an initial deposit of $125k, escrows of $9,928/mo and a cash flow sweep of $52,572/mo over the BoB lease term. Also, BoB has a 9 mo. notice of non-renewal providing a total of 24 mo's for re-tenanting. According to C&W, 24 mo's is adequate time to re-tenant this asset in this market.

**Valuation Assumptions:**

- Income is based on $/99 borrower rent roll. Five year renewal to Bank of Boston @ $15.30 psf net expiring 7/04. Also, $60k/yr is included for the cafeteria.
- Vacancy shown at market rate of 3%.
- Other income represents tenant reimbursements based on historical amounts.
- Expenses are shown at the 1998 rate of $8.69 psf increased by 2% with 2% annual increases thereafter.
- TI's in this market are $10 psf for renewal and $0 psf for renewals as per the appraiser.
- Commissions are based on 18% of the first years rent for new leases which equates to 3.6%/yr. 1/2 for renewals.
- Reserves are shown at $.16 psf as per the engineering report.
- Adjusted sale comparables ranged from $153-$165 psf. These were mostly single-tenanted bldgs. Multi-tenant bldgs (which Blue Hill could be made into) ranged from $153-$186 psf. The appraiser used $155 psf which seems reasonable considering the comparables.
- According to CB Richard Ellis' 1st Qtr 1999 National Investor Survey, cap rates for this property type averaged 9.4%. We will use 10% in this anlysis to be conservative.
- Based on this analysis, the strength and experience of the borrowers, provided Bank of Boston renew their lease, no loss is anticipated.

**Market Information:**

| | |
|---|---|
| Occupancy Rate: | 97.0% |
| Rental Rate: | $19.62 |
| Leasing Term (years): | 5 |
| Retention Ratio: | 0%/100% |
| **Tenant Improvements** | |
| New: | $10.00 |
| Renewal: | $0.00 |
| **Leasing Commissions** | |
| New: | 3.60% |
| Renewal: | 1.80% |
| **Capital Expenditures:** | |
| per Unit or SF: | $0.16 |
| as a % of Revenues: | 0.00% |

**Lease Rollovers:**

| | |
|---|---|
| 0.00 % in Year 1: | 0 |
| 0.00 % in Year 2: | 0 |
| 0.00 % in Year 3: | 0 |
| 0.00 % in Year 4: | 0 |
| 98.26 % in Year 5: | 269,111 |
| 0.00 % in Year 6: | 0 |
| 0.00 % in Year 7: | 0 |
| 0.00 % in Year 8: | 0 |
| 0.00 % in Year 9: | 0 |
| 0.00 % in Year 10: | 0 |
| **Total:** | 269,111 |

**Collateral Comments:**

- The collateral consists of a 273,863 rentable sf, 2-story Class A office building in Canton, Mass. Constructed in 1970 of steel framing with brick exterior and a flat, rubber roof, entirely renovated in 1985, it was configured in 1989 for The Bank of Boston. Amenities include a full service health club, state-of-the-art conference center and a 250 seat cafeteria. On approx. 20 acres, there is parking for 1,040 cars and access is provided by Royall Street. The property is at the intersection of Rte 128 (divided six-lane hwy) and I-95, approx. 12 miles south of the Boston, MA CBD.
- Canton is a well located, residential and industrial community. Mid-1999 unemployment was at 2.1%. The property is located in between two major submarkets, the Rte 128/Mass Pke and South Shore. Currently, there is high demand for large blocks of space. In the Rte 128/Mass Pke market, rental rates avg. $28-$33 psf while in the South Shore market, they avg. $18-$25 psf. Of 91 Class A buildings surveyed totaling 14 million sf, the vacancy rate was 3.3%.
- The appraiser examined rent comparables and determined an adjusted range of $17.72 to $22.99 psf.
- The main tenant, Bank of Boston, is paying $19.62 psf net. He felt that $17.50 psf would be the market rate for its subject.
- The main tenant, Boston EquiServe LP, a joint venture between Bank of Boston, (rated A by S&P) and State Street Bank and Trust, extended their lease for five yrs in 1999 giving them a 7/31/04 lease expiration. They are in 263,311 sf at a below market rate (set by an arbitrator at 90% of market) of $15.30 psf net with a five yr option at 90% of fair market rent. Another 2,532 sf is occupied by Marriott Services, Inc. on a MTM gross lease for the cafeteria. They pay % rent only. Their rent has been $52,437, $59,139, and $73,118 for 1996, 1997, and 1998, respectively.
- The Phase I ESA stated no environmental concerns were noted.
- The Engineering report noted no immediate deferred maintenance and identified $867k for renovating the common areas, $265k for parking lot overlay and $118k for replacement of HVAC heat pumps over a holding period of 12 years. They recommended $.16 psf for replacement costs.
- NOI was $3,734,900, $4,086,594, and $3,995,488 for 1996, 1997, and 1998, respectively.

**Valuation/Cash Flows:**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Future |
|---|---|---|---|---|---|---|
| Cash Flows: | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 44,458,939 |
| Losses: | | | | | | 0 |
| Total Losses: | | | | | | 0 |

**Performance Barometers at Resolution**

| | | | | | | |
|---|---|---|---|---|---|---|
| Loan per Yardstick: $ | | 107 | | | | 121 |
| Property Value: $ | | 151 | | | | 139 |
| Breakeven Cap Rate: | | 14.2% | | | | 11.4% |
| Breakeven Occupancy: | | 72.7% | | | | 78.9% |

**Manual Loss Adjustment:**

**Performance Barometers at Inception**

| | | |
|---|---|---|
| Loan per Yardstick: $ | | 121 |
| Property Value: $ | | 139 |
| Breakeven Cap Rate: | | 11.4% |
| Breakeven Occupancy: | | 78.9% |

| | | | |
|---|---|---|---|
| Balloon Payment Due: | 29,179,805 | Interest Rate: | 9.50% |
| Potential Prop. Value Shortfall: | None | DSCR: | 1.30x |
| Potential Refi Shortfall: | None | Amort (Yr): | 25 |

2/23/2006 - 7:46 PM

LNR04053

Asset Name: Blue Hills Office Park
Control: 7    Predicted Outcome:

| | Yardstick Measure | SF 273,863 |
|---|---|---|

## ASSUMPTIONS

**Loan:**

| | |
|---|---|
| 10/1/99 Balance: | 33,149,000 |
| Monthly Payment: | 254,652 |
| Interest Rate: | 8.49% |
| Maturity/Extension: | 10/11/2009 |
| Extension Fee: | 0 |
| Credit Loss - Flows/Balloon: | 0.00%  0.00% |
| Month of Default: | 0 |

**Asset:**

| | |
|---|---|
| Year of Foreclosure | 31 |
| Month of Foreclosure | 0 |
| Foreclosure Costs | 0 |
| Months of Lost CF | 0 |
| Deferred Maintenance | 0 |
| Sale in Year | 31 |
| Code: 1=F, 2=NP, 3=FS | 1 |

**Pricing / Sale:**

| | |
|---|---|
| Exit Cap Rate or Price: | 10.00% |
| Sales Costs: | 6.00% |
| Buyer Downpayment: | 100.00% |
| Financing Interest Rate: | 0.00% |
| Financing Term (Years): | 0 |
| Discount Rate: | 15.0% |

### Main Cash Flow Table

| Calendar Year | Historical 05/31/99 Trailing 12 | 1 11/99-10/00 | 2 11/00-10/01 | 3 11/01-10/02 | 4 11/02-10/03 | 5 11/03-10/04 | 6 11/04-10/05 | 7 11/05-10/06 | 8 11/06-10/07 | 9 11/07-10/08 | 10 11/08-10/09 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Loan Cash Flows:** | | | | | | | | | | | |
| Interest | | 2,802,952 | 2,780,627 | 2,756,332 | 2,728,892 | 2,701,117 | 2,669,803 | 2,635,723 | 2,598,635 | 2,558,273 | 2,375,842 |
| Principal | | 252,875 | 275,199 | 299,495 | 325,935 | 354,710 | 386,024 | 420,104 | 457,192 | 497,554 | 679,985 |
| Balloon Payment | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 29,179,805 |
| End of Period Balance | | 32,876,002 | 32,600,803 | 32,301,308 | 31,975,373 | 31,620,663 | 31,234,639 | 30,814,535 | 30,357,343 | 29,859,790 | 0 |
| **Collateral Cash Flows:** | | | | | | | | | | | |
| % Revenue Growth | | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% |
| Income per Yardstick | | 14.92 | 15.07 | 15.22 | 15.38 | 15.53 | 15.69 | 15.84 | 16.00 | 16.16 | 16.32 |
| Gross Revenue Potential | | 4,087,351 | 4,128,224 | 4,169,506 | 4,211,201 | 4,253,313 | 4,295,846 | 4,338,805 | 4,382,193 | 4,426,015 | 4,470,275 |
| % Vacancy | | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Other Income | | 2,300,126 | 2,346,129 | 2,393,051 | 2,440,912 | 2,489,730 | 2,539,525 | 2,590,315 | 2,642,122 | 2,694,964 | 2,748,863 |
| Total Income | | 6,264,856 | 6,350,506 | 6,437,472 | 6,525,777 | 6,615,444 | 6,706,496 | 6,798,956 | 6,892,849 | 6,988,199 | 7,085,030 |
| % Expense Growth | | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| Expenses per Yardstick | | 8.86 | 9.04 | 9.22 | 9.40 | 9.59 | 9.78 | 9.98 | 10.18 | 10.38 | 10.59 |
| Operating Expenses | | 2,426,426 | 2,474,955 | 2,524,454 | 2,574,943 | 2,626,442 | 2,678,971 | 2,732,550 | 2,787,201 | 2,842,945 | 2,899,804 |
| NOI After Reserve | 3,970,354 | 3,794,612 | 3,831,733 | 3,869,200 | 3,907,016 | 3,945,184 | 3,983,707 | 4,022,588 | 4,061,830 | 4,101,436 | 4,141,408 |
| Reserve | | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 |
| Capital Expense | | | | | | | | | | | |
| Net Cash Flow | 3,970,354 | 3,794,612 | 3,831,733 | 3,869,200 | 3,907,016 | 3,945,184 | 3,983,707 | 4,022,588 | 4,061,830 | 4,101,436 | 4,141,408 |
| Debt Service Coverage (NOI) | 1.30x | 1.24x | 1.25x | 1.27x | 1.28x | 1.29x | 1.30x | 1.32x | 1.33x | 1.34x | 1.36x |
| Debt Service Coverage (CF) | 1.30x | 1.24x | 1.25x | 1.27x | 1.28x | 1.28x | 1.30x | 1.32x | 1.33x | 1.34x | 1.36x |
| Prop. Value | 39,703,540 | 37,946,117 | 38,317,330 | 38,692,003 | 39,070,164 | 39,451,845 | 39,837,074 | 40,225,882 | 40,618,299 | 41,014,356 | 41,414,083 |
| LTV | 83.43% | 86.64% | 85.08% | 83.48% | 81.84% | 80.15% | 78.41% | 76.60% | 74.74% | 72.80% | No Debt |
| **Asset Cash Flows:** | | | | | | | | | | | |
| Interest | | 2,802,952 | 2,780,627 | 2,756,332 | 2,728,892 | 2,701,117 | 2,669,803 | 2,635,723 | 2,598,635 | 2,558,273 | 2,375,842 |
| Principal | | 252,875 | 275,199 | 299,495 | 325,935 | 354,710 | 386,024 | 420,104 | 457,192 | 497,554 | 679,985 |
| Balloon Payments | | | | | | | | | | | 29,179,805 |
| Collateral NOI (inc. lost mot.) | | | | | | | | | | | |
| Legal and Foreclosure Costs | | | | | | | | | | | |
| Deferred Maint. & Cap. Ex. | | | | | | | | | | | |
| Net Sales/Buyout Proceeds | | | | | | | | | | | |
| Delinquent Taxes | | | | | | | | | | | |
| Environmental Costs | | | | | | | | | | | |
| Other | 3,055,827 | | | | | | | | | | |
| Total Asset Cash Flow | | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 |
| Annual Net Present Value | $22,549,289 | | | | | | | | | | |
| Projected Losses | | | | | | | | | | | |
| Master Servicer Advancing | | | | | | | | | | | |

Total Losses:

CRD 1777-

| | | |
|---|---|---|
| Property Name: Blue Hills Office Park | Monthly Payment: 254,652 | Portfolio: |
| Address: 150 Royall Street | 10/1/99 Balance: 33,149,000 | Control#: |
| City/ST/Zip: Canton, MA 02021 | Updated Balance: | Asset Manager: |
| Type of Collateral: Office | Interest Rate: 8.49% | Current Status: |
| Borrower: Blue Hills Office Park LLC | Loan Type(Fix/Adj): Fixed | Paid to Date: |
| Address: | Maturity / ARD: 10/11/2009 | Originator U/W DSCR on NOI: |
| City/ST/Zip: | Lien Position: First | Original Amo Term: 360 |
| Originator: CSFB | Recourse/Non/Silent: Standard Current | Original Balloon/ARD Term: 120 |
| Originator Loan No: 942235 | First P&I Pay Date: 11/11/1999 | Management Co.: Fineberg Management |
| Prepymt Provision: Lock/3 Defeasance/5 yrs | - Note Date: 9/14/1999 | Eng. Firm: Certified Environments, Inc |
| Original Balance: 33,149,000 | Appraisal Date: 8/30/1999 | Env. Firm: Certified Environments, Inc |
| Season: 0 | Appraisal Value: 42,000,000 | Env. Recom.: No further action |
| Lock-Box: Yes; Hard | Year Built: 1970 | Env. holdback at Closing: 0 |
| | Year Renovated: 1985 | FeeSimple/Leasehold: Fee Simple |

| | |
|---|---|
| Units: | |
| Square Feet: 273,863 | |
| Rooms: | |
| Current Occup: 100.0% | |
| Actual/Current Occup: | |
| Superior Lien Amt: | |
| Equity Kicker (Y/N): | |
| Guarantee (Y/N): | |
| Occup. at Origination: 100.0% | |
| Appraised Current LTV: 78.9% | |
| Sub Servicing NOI: | |
| Originator Underwritten NOI: 3,841,253 | |
| Annual Replacement Rsrv Payment: 4,564 | |

**Collateral Comments:**

-Property-The collateral consists of a 273,863 rentable sf, 2-story Class A office building in Canton, Mass. Constructed in 1970 of steel framing with brick exterior and a flat, rubber roof, entirely renovated in 1985, it was configured in 1989 for The Bank of Boston (now Fleet Bank). Amenities include a full service health club, state-of-the-art conference center and a 250 seat cafeteria. On approx. 20 acres, there is parking for 1,040 cars and access is provided by Royall Street. Intersection of Rte 128 (divided six-lane hwy) and I-95, approx. 12 miles south of the Boston, Ma. CBD.

-Market-Canton is a well located, residential and industrial community. Mid-1999 unemployment was at 2.1% (now over 5%). The property is located in between two major submarkets, the Rte 128/Mass Pke and South Shore. Currently, there is high demand for large blocks of space. In the Rte 128/Mass Pke market, rental rates avg. $28-$33 psf while in the South Shore market, they avg. $18-$25 psf. Of 91 Class A buildings surveyed totaling 14 million sf, the vacancy rate was 3.3% (2002 is over 15% vacancy in south suburban Boston office market)

-Appraisal-He felt that $17.50 psf would be the market rate for the subject.

-Tenant-Boston EquiServe LP, a joint venture between Bank of Boston (now Fleet), (rated A by S&P) and State Street Bank and Trust, extended their lease for five yrs in 1999 giving them a 7/31/04 lease expiration. 2500 employees in 4 locations (NY, NJ, IL, MA) which process stock transfers without broker in 401 K's and for existing shareholders of a company. They are in 261,311 sf at a below market rate (set by an arbitrator at 90% of market) of $15.30 psf net with a five yr option at 90% of fair market rent. Another 2,532 sf is occupied by Marriott Services, Inc. on a MTM gross lease for the cafeteria. They pay % rent only. Their rent has been $52,437, $59,139, and $73,118 for 1996, 1997, and 1998, respectively.

-NOI was $3,734,900, $4,086,594, and $3,995,488 for 1996, 1997, and 1998, respectively.

2002 Market Update: desirable office market for back office of Boston based banks. Even with depressed office market in Boston, recent sale of downtown office building of same vintage was over $550/sf. Market vacancy has increased from 4% in 2000 to 15% in suburban Boston.

**Loan Comments:**

-Borrower- The principals are Gerald Fineberg and William Langelier. Mr. Fineberg, in real estate since the 1960's, has a net worth as of 12/98 of $143 million of which $21 million is liquid. Mr. Langelier founded The Langelier Co. in 1973 which specializes in equity capital for developers of subsidized multi-family housing. As of 1/99, his net worth was $13 million.

-Re-Leasing Escrow- The loan requires a $4.25 million leasing escrow equal to 15 mo's debt service payable with an initial deposit of $123k, escrows of $9,928/mo and a cash flow sweep of $52,572/mo over the BoB lease term. By mo 9, no notice of non-renewal providing a total of 24 mo's for re-tenanting. According to C&W, 24 mo's is adequate time to re-tenant this asset in this market.

-Broker- 500,000sf of vacant brand new office space within 1/4 mile of this property. Current asking rents of low 20's. Deal financed by Fidelity. Good back office location but really weak market right now. 50/50 on whether Fleet renews after 2004. Single tenant 10 year old building are tough. If Fleet stays no brainer if they leave in this market.... Confirmed by Fidelity- this market will not recover until 2004-2005 (just when Fleet is up for renewal) and they would be static if they could get tenant in at $25/sf with $25-20/sf TI's

**Valuation Assumptions:**

-Income is based on 8/99 borrower rent roll. Five year renewal to Bank of Boston/Fleet @ $15.30 psf net expiring 7/04. Also, $60k/yr is included for the cafeteria 2002, used actual income for 2001. Current market rent is $22/sf - this is equivalent of $30 with recovery.

-Vacancy shown at market of 3%, 2002- increased to 10% in 2004 (expiration of current lease and increased to 25% in 2005 then reduced to 10% at stabilization.

-Other income represents tenant reimbursements based on historical amounts. Took out reimbursables in 2005 to get to current gross market rent.

-Expenses are shown at the 1998 rate of $8.69 psf 2002-used actuals.

-Adjusted sale comparables ranged from $153-$165 psf. These were mostly single-tenanted bldgs. Multi-tenant bldgs (which Blue Hill could be made into) ranged from $153-$188 psf. Very soft market, but friend at State Street says unlikely tenant will move.

-Predicted outcome - If Fleet does not renew - there could be a two year cash flow problem, to put a $8 million loss in 2005 (total loss of $12.8 million but reduced loss due to above $4.25 million in reserve which will cover TOC but not 2 years of debt service and value shortfall (that brings loan to $72/SF)

| Market Information: | | |
|---|---|---|
| Occupancy Rate: | 78.0% | |
| Rental Rate: | $22.00 | |
| Leasing Term (years): | 5 | |
| Retention Ratio: | 0%/100% | |
| Tenant Improvements | | |
| New: | $10.00 | |
| Renewal: | $5.00 | |
| Leasing Commissions | | |
| New: | 3.60% | |
| Renewal: | 1.80% | |
| Capital Expend/Reserve: | | |
| per Units or SF: | $0.16 | |
| as % of Revenues: | 0.00% | |

| Lease Rollovers: | | |
|---|---|---|
| 0.00% in Year 1: | 0 | |
| 0.00% in Year 2: | 0 | |
| 0.00% in Year 3: | 0 | |
| 0.00% in Year 4: | 0 | |
| 98.25% in Year 5: | 269,111 | |
| 0.00% in Year 6: | 0 | |
| 0.00% in Year 7: | 0 | |
| 0.00% in Year 8: | 0 | |
| 0.00% in Year 9: | 0 | |
| 0.00% in Year 10: | 0 | |
| Total: | 269,111 | |

**Valuation Cash Flows:**

| Projected | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Future |
|---|---|---|---|---|---|---|
| Cash Flows: | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | (196,341) | 28,599,729 |
| Leases: | 0 | 0 | 0 | 0 | 0 | 8,579,665 |
| Total Leases: | 8,579,665 | | | | | 8,579,665 |

| Performance Barometers at Resolution | | Manual Loss Adjustment: | |
|---|---|---|---|
| | | Performance Barometers at Inception | |
| Loan per Yard/dick: $ | 121 | Loan per Yard/dick: $ | 121 |
| Property Value: $ | 139 | Property Value: $ | 139 |
| Breakeven Cap Rate: | NA | Breakeven Cap Rate: | 11.4% |
| Breakeven Occupancy: | NA | Breakeven Occupancy: | 78.9% |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | | | |
|---|---|---|---|---|---|---|---|---|
| Balloon Payment Due: | None | None | None | None | None | Interest | | Amort |
| Potential Prop. Value Shortfall: | | | | | | DSCR | Rate | (Yr) |
| Potential Refi Shortfall: | | | | | | 1.30x | 9.500% | 25 |

LNR04055

2/23/2006 - 7:47 PM

Asset Name: Blue Hills Office Park
Control: 7    Predicted Outcome:

| | Yardstick Measure |
|---|---|
| Su... | 273,863 |

## ASSUMPTIONS

**Logic:**

| | |
|---|---|
| 10/99 Balance: | 33,149,000 |
| Monthly Payment: | 254,652 |
| Interest Rate: | 8.49% |
| Maturity/Extension: | 10/11/2009 |
| Extension Fee: | 0 |
| Credit Loss – Flows/Balloon:  0.00% | 0 |
| Month of Default: | 8 |

**Asset:**

| | |
|---|---|
| Year of Foreclosure: | 5 |
| Month of Foreclosure: | 1 |
| Foreclosure Costs: | 50,000 |
| Months of Lost CF: | 0 |
| Deferred Maintenance: | 100,000 |
| Sale in Year: | 7 |
| Code: 1=P, 2=NP, 3=FS: | 2 |

**Pricing / Sale:**

| | |
|---|---|
| Exit Cap Rate or Price: | 10.00% |
| Sales Costs: | 6.00% |
| Buyer Downpayment: | 100.00% |
| Financing Interest Rate: | 0.00% |
| Financing Term (Years): | 0 |
| Discount Rate: | 15.0% |

| Calendar Year | Historical 05/31/99 Trailing 12 | 1 11/99-10/00 | 2 11/00-10/01 | Historical 12/31/2001 | 4 11/02-10/03 | 5 11/03-10/04 | 6 11/04-10/05 | 7 11/05-10/06 | 8 11/06-10/07 | 9 11/07-10/08 | 10 11/08-10/09 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Loan Cash Flows:** | | | | | | | | | | | |
| Interest | 2,802,952 | 2,780,627 | 2,756,332 | 2,756,332 | 2,729,892 | 452,250 | | | | | |
| Principal | 252,875 | 275,199 | 299,495 | 299,495 | 325,935 | 28,426 | | | | | |
| Balloon Payment | | | | | | | | | | | |
| End of Period Balance | 32,876,002 | 32,600,803 | 32,301,308 | 32,301,308 | 31,975,373 | | | | | | |
| **Collateral Cash Flows:** | | | | | | | | | | | |
| % Revenue Growth | | 1.00% | 2.00% | | 0.00% | 0.00% | 0.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| Income per Yardstick | 14.92 | 15.07 | 15.03 | 15.03 | 15.03 | 15.00 | 22.00 | 22.44 | 22.89 | 23.35 | 23.81 |
| Gross Revenue Potential | 4,087,351 | 4,128,224 | 4,116,388 | 4,116,388 | 4,116,388 | 4,116,388 | 6,024,986 | 6,145,486 | 6,268,395 | 6,393,763 | 6,521,639 |
| % Vacancy | 3.00% | 3.00% | 0.00% | 0.00% | 10.00% | 10.00% | 25.00% | 10.00% | 10.00% | 10.00% | 10.00% |
| Other Income | 2,300,126 | 2,346,129 | 2,750,000 | 2,750,000 | 2,600,000 | 2,652,000 | | | | | |
| Total Income | 6,264,856 | 6,350,506 | 6,866,388 | 6,866,388 | 6,716,388 | 6,356,749 | 4,518,740 | 5,530,937 | 5,641,556 | 5,754,387 | 5,869,475 |
| % Expense Growth | | 2.00% | 2.00% | | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| Expenses per Yardstick | 8.86 | 9.04 | 9.99 | 9.99 | 9.99 | 10.19 | 10.39 | 10.60 | 10.81 | 11.03 | 11.25 |
| Operating Expenses | 2,426,426 | 2,474,955 | 2,735,061 | 2,735,061 | 2,735,061 | 2,789,762 | 2,845,557 | 2,902,469 | 2,960,518 | 3,019,728 | 3,080,123 |
| NOI After Reserve | 3,794,612 | 3,831,733 | 4,087,509 | 4,087,509 | 3,937,509 | 3,523,169 | 1,629,364 | 2,584,650 | 2,637,220 | 2,690,841 | 2,745,534 |
| Reserve | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 |
| Capital Expense | | | | | | | | | | | |
| Net Cash Flow | 3,794,612 | 3,831,733 | 4,087,509 | 4,087,509 | 3,937,509 | (233,621) | 1,629,364 | 2,584,650 | 2,637,509 | 2,690,841 | 2,745,534 |
| Debt Service Coverage (NOI) | 1.30x | 1.24x | 1.25x | 1.34x | 1.29x | 7.33x | N/M | N/M | N/M | N/M | N/M |
| Debt Service Coverage (CF) | 1.30x | 1.24x | 1.25x | 1.34x | 1.29x | -0.49x | N/M | N/M | N/M | N/M | N/M |
| Prop. Value | 37,946,117 | 38,317,330 | 40,875,089 | 40,875,089 | 39,375,089 | 35,231,689 | 16,293,640 | 25,846,505 | 26,372,198 | 26,908,406 | 27,455,338 |
| LTV | 86.64% | 85.08% | 79.02% | 79.02% | 81.21% | N/A | N/A | N/A | N/A | N/A | N/A |
| **Asset Cash Flows:** | | | | | | | | | | | |
| Interest | 2,802,952 | 2,780,627 | 2,756,332 | 2,756,332 | 2,729,892 | 452,250 | | | | | |
| Principal | 252,875 | 275,199 | 299,495 | 299,495 | 325,935 | 28,426 | | | | | |
| Balloon Payments | | | | | | | | | | | |
| Collateral NOI (inc. lost mos.) | | | | | | 3,229,571 | 1,629,364 | 2,584,650 | | | |
| Legal and Foreclosure Costs | | | | | | (50,000) | | | | | |
| Deferred Maint. & Cap. Ex. | | | | | | (3,856,790) | | | | | |
| Net Sales/Buyout Proceeds | | | | | | | | 24,295,714 | | | |
| Delinquent Taxes | | | | | | | | | | | |
| Environmental Costs | | | | | | | | | | | |
| Other | | | | | | | | | | | |
| Total Asset Cash Flow | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | (195,541) | 1,629,364 | 26,880,365 | | | |
| Annual Net Present Value | $19,436,348 / 12,829,665 | | | | | | | | | | |
| Projected Losses | Total Losses: 12,829,665 | | | | | | | | | | |
| Master Servicer Advancing | 2,575,150 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | | | | | | |

2/23/2006 - 7:47 PM

LNR04056

# DEPOSITION EXHIBIT NO. 73

EXHIBIT 73
Polcari
2/28/06    ttb

**From:** Joe Polcari
**Sent:** Monday, September 13, 2004 11:21 AM
**To:** Larry Golinsky
**Subject:** Blue Hills

I spoke with David Tobin. He says you guys discussed a "mini-sale" with 10 or so assets. He is gathering information from the other AM's and hopes to get into the pricing soon. It sounds like perfect timing. I would like to jump in with this one, and told him that I would gather information on Blue Hills. The small number of assets is great, because we can flip this little group of loans without the brain damage that goes along with the larger sale.

1

LNR03419

# DEPOSITION EXHIBIT NO. 75

**EXHIBIT** 75

Polcari
2/28/06 ttb

| | |
|---|---|
| From: | Javier Benedit |
| Sent: | Wednesday, September 08, 2004 11:28 AM |
| To: | Larry Golinsky; Joe Polcari |
| Subject: | RE: Blue Hills |

Larry/Joe,

The Trustee would have to review a current appraisal or order a new one (at their discretion) and set the "fair price" according to such appraisal. We would then have to bid up to that "fair price" amount. The Trustee here is Wells Fargo, they may not be as lenient as Lasalle and may want to order their own appraisal. I have good contacts there, however, and may be able to work the process through.

Let me know if and when you need my assistance.

-----Original Message-----
| | |
|---|---|
| From: | Larry Golinsky |
| Sent: | Wednesday, September 08, 2004 12:20 PM |
| To: | Joe Polcari |
| Cc: | Javier Benedit |
| Subject: | RE: Blue Hills |

Question on #4 is whom runs the process? Us or the Trustee. If we run the process (loan sale or REO sale) can we collect offers and then come in and meet the highest offer?

-----Original Message-----
| | |
|---|---|
| From: | Joe Polcari |
| Sent: | Wednesday, September 08, 2004 11:47 AM |
| To: | Larry Golinsky |
| Cc: | Ciney Torres |
| Subject: | Blue Hills |

Larry, Ciney will be e-mailing to you Section 3.18 of the CSFB 1999-C1 PSA. Here is what is says:

1) We can purchase a Defaulted Loan (defined as a loan that is 60 days delinquent) at the Purchase Price (defined as the unpaid principal, accrued interest, unreimbursed advances and interest on advances). It appears that we have the first right of purchase, followed by the Servicer, followed by the Directing Certificateholder, which I read as Madison.

2) We can offer to sell a Defaulted Loan, not otherwise purchased by the parties mentioned above, if the SS determines that the sale would produce a greater recovery on a PV basis than would liquidation of the Mortgaged Property. The offering must be made for a period of at leat 20 days, but not more than 90 days. In the event that the bids do not equal or exceed the Purchase Price, the SS can accept what it determines to be a fair price.

3) We have to give the Trustee and Servicer three business days notice of our intent to sell a Defaulted Loan (or REO Property).

4) If the SS is the high bidder, then the Trust determines whether the SS bid is a "fair price". In determining this, the Trustee may rely on the opinion of an appraiser at the expense of the Trust Fund.

Section 3.18 also references Section 2.03(b), which deals with puts, and Section 9.01, which deals with the Loan Seller's ability to purchase the remaining loans if the pool balance drops below 1% of the original total balance.

The loan is not yet 60 days delinquent. I don't have the docs yet, but from speaking with Job, it appears that the borrower may have the right to use reserve funds to make P&I payments up to $1MM.

1

LNR03429

# DEPOSITION EXHIBIT NO. 80

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Kevin Wodicka [KWodicka@lnrproperty.com] |
| **Sent:** | Thursday, April 22, 2004 9:46 AM |
| **To:** | Bob Cherry; Ronald Schrager; Randy Wolpert; Larry Golinsky |
| **Subject:** | RE: Blue Hills Office Park |

EXHIBIT 80
Polcari
2/28/06    ttb

Borrower is Feinberg, and this is a fein potential mess for CSFB 1999-C1. Eric's number implies a $19.75MM loss. Randy Rosen thought maybe around $11.3MM loss. Either way we will have to discuss how we want to handle this in the meeting later today.

---

| | |
|---|---|
| **From:** | Bob Cherry |
| **Sent:** | Thursday, April 22, 2004 9:18 AM |
| **To:** | 'KWodicka@lnrproperty.com' |
| **Cc:** | 'rwolpert@lnrproperty.com'; 'RSchrager@lnrproperty.com' |
| **Subject:** | Fw: Blue Hills Office Park |

-----Original Message-----
From: Eric Schlager <EDS@Bulfinch.com>
To: Bob Cherry <BCherry@lnrproperty.com>
Sent: Wed Apr 21 22:53:15 2004
Subject: RE: Blue Hills Office Park

is borrower gerry feinberg?
building is old and tired and needs full rehab but in a decent location
right next to new dunkin donuts hq. i believe equiserve just bought
adjacent spec bldg.
lots of sf in a tough market today.
i am thinking $40-50psf with a 2 year lease up
$30psf in cap ex, $25psf in ti's, $10psf commission
all in basis of $100psf and try to get a net lease at $10-12.50psf
tough deal, not sure you want to own 275,000sf of vacant office space that
is 30yrs +old and rehabbed last almost 20yrs ago
need to see how close our cap x number is to give you a better feel but i
bet i am pretty close.
where did your boys value?

Eric D. Schlager
Chief Executive Officer
The Bulfinch Companies, Inc.
250 First Avenue, Suite 200
Needham, MA 02494
T (781) 707-4000 x130
F (781) 707-4001

LNR04191

www.bulfinch.com

-----Original Message-----
From: Bob Cherry [mailto:BCherry@lnrproperty.com]
Sent: Wednesday, April 21, 2004 7:12 PM
To: Eric Schlager
Subject: Fw: Blue Hills Office Park


Psf? You own it


-----Original Message-----
From: Kevin Wodicka <KWodicka@lnrmail.lnrproperty.com>
To: Bob Cherry <BCherry@lnrmail.lnrproperty.com>
Sent: Wed Apr 21 17:52:54 2004
Subject: Blue Hills Office Park


Bob,

I've got an asset in CSFB 99-C1 which could use an Eric Schlager test.  The
Property is:

Blue Hills Office Park
150 Royall Street
Canton, MA
273,863 sf building
Built 1970
Renovated in 1985


$32MM of debt ($117 psf)


Equiserve is essentially the only tenant; they will be vacating.  We will
have to discuss this in tomorrow afternoon's meeting.  We did some
reunderwriting work already but not digging the answer.  Thought we should
get another opinion.


Thanks,
Kevin


LNR04192

EXHIBIT 84

Polcari
3/1/06   tb

No. _____

Date. _____

— _____ review —

Chris B. — Blue Hills — @ 9/7/04

slipping

Ken Goldberg
given load for hotels

leverage in docs? Zero in hotel docs.
covenant to borrower

Sweeney doesn't file documents

put Deal w/ Ken Goldberg

Joe Donovan — principal financial guy.

Joe Warshaw — Blue Hills — 9/7/04

just got it

Ask held by MS.

Complicated waterfall reserve setups

refinance Cindy Tailor

Goldberg is a lawyer.

threat played out. first due 8/11. Set
gotten on 8/2 ably to use reserve funds to
pay debt service.

LNR03919

No. _____
Date. _____

Job spoke w/ him "yours i default".
Using [illegible] [illegible] to [illegible] loan [illegible]-

Allowed to use reserve money, per the docs.
p. 15 of the [illegible].
P&I pmts exp. to $1/mm.

Randy Tucker – **REDACTED**

Job doesn't want a [illegible] [illegible].

Send him a letter (RT) "i receipt of Aug 2
letter reg D5 funds – wouldn't ok for P&I –
[illegible] [illegible] escrow

Request for work – out there since August.

BK – full recourse to [illegible]

Blue Hills

1) notify the Trustee and the Service that the loan will
   become subject to foreclosure proceedings

2) We can purchase at a price equal to the Purchase Price

3) We can sell the loan not purchased by the SS MS Trust
   if sale would produce a greater recovery than would
   liquidation of the property. Offering of at least 20 days,
   not more than 90 days.

4) 3 Bus. Day notice to sell Defaulted loan

**LNR03920**

peredict - Grew - 1279 Boylston St
No. _____ letter to Grew
Date. _____                          617 390 8086

4) Basis price for the defaulted loan shall be determined
   by SS. If the highest bidder is the SS, will be determined
   by the Trustee.

5) Trust may rely on the opinion of a Appraiser

203(b) deals w/ parts of loan repurchase

9.01 deals w/ the loan Sellers ability to purchase the
      remaining loans if the balance is less than 1%
      of the original balance.

Borrower says he's not in default -
   got an argument.
      617 406 6032    RT

~~Stacy~~

Blue Hills  - CSFB 1999 -  Randy Tucker

REDACTED

LNR03921

_Debt exchange_

No. _____
Date. _____

REDACTED

LNR03922

No.

Date.

_Blue Hill_ — CSFB 1999-C1 —

273,000 sf Office Bldg in Canton Ma.
$33MM loan

Tenant was Barton Equision, a JV bet BofB
and State St.
Tenant vacated at end of July — at lease exp

Cash mgmt Agr. Rent went directly to lockbox

1) Tax and Ins. escrow
2) Debt Service (P:I)
3) Reserve for Replacement
4) Base leasing escrow
5) Cash flow leasing escrow
6) Op acct.

Since the tenant left in July — there was no
money deposited to refill the buckets.

The borrower sent a notice asking for us to make
the p&I from the leasing escrow

It appears that the loan doc allow the reserve
to be used to pay P:I up to a capped amt, we
think its $1MM.

They may have the right to do this, but they
would have to fund the escrow pmts out of
pocket to avoid default.

LNR03923

No. _____

Date. _____

We are considering sending a letter to the borrower giving them 4 days to fund the escrow. They would then be clearly in default if they don't comply.

Purchase by CPG.
- we can purchase a loan that is 60 days delinquent. The PP is unpaid principal, interest and advances

The loan
- We can also offer for sale if we determine that the sale would produce a greater recovery than would the liquidation of the property.

BOUT -

On for Jan 1.

- Work of Ready Reserve -

LNR03924

No. _____

Date. _____

PA    36.84    9/8 ✓
12    269.50    9/7 ✓
26.98    9/1
213.57    8/4 ✓
17.02    8/4 ✓
PA    600.00    8/4 ✓

713 458-7373

- Karen Stafford — Los Indios — 9/10/04

↑    Wachovia is now the MS.
GENSA

She is going to convert of Wachovia and
it may come back to us for approval.

David Tobin — Blue Hills —
$22.00/ft
Good study of mkt.

— June - sale —

Randy Shuler

**REDACTED**

No.
Date.

REDACTED

REDACTED

Medi Cal
for there is unusual for
the PA
puts the chg.

LNR03926

No. _____
Date. _____

Joe Donovan — Blue Hills — 9/16/04

- no hope for a tenant —
understands that we have to send an
acceleration letter.

He says there's only a few months worth
of escrow.

CPAMS comments —

up

Randy Posen — Blue Hills
Friend & Co.

Guy Lemer of CBRE

- Area Wide Murray — any d/s issues?

- 200 So Va. — status of refi.

- Info on N 30 Equities — Retain counsel.

- Respond to Beacon Hill.

- NW Greenwich

LNR03927

No. _____
Date. _____

Gary Lawson — Blue Hills

orig a urban bldg.
Boston Envelope Bldg.

Mike Vozzer - developer of Cross Colony
bought it and converted it to sweet - tenant

Sold to Finley in '88 for $3.1M
Guy bailed the pole.

Finley business are merill. Equi came
olog. Bou the bldg the had our.

Bought Gen bldg next door
135T ft w/ have TIs.

built party garage.

Equinie deal was out a the street
for slog turn.

Convert to NT fairly easily. Couple
of deals come around
Allied Trust own DP 180a
req. sold up at 120 Royall
Jean - 8 pro. - 120 Royall St. 160,000 sf

Problem - two had new bldg right next
down.

LNR03928

Mort Cornwin – prop mgmt.

No.
Date.

Ave bldg – 1 yr – 18 mos to find a tenant.

18% vacancy overall – 25% in prop subject [illegible] be coming

always been bad office. Used to be downtown.

Towns [illegible] than Waltham, Newton, Wellesley bonds hit due to Tech [illegible].

How do we split? Hold out for single user. Credit for 10 yrs sell for 7½ – 8 cap.

MT = slug it out never sell it for

MT = 100 – 250 sf in [illegible] bldg 25 – 30/ft in TIs.

Pretty [illegible] cap after 10 yrs.
[illegible] end [illegible] of life.

Play or Pray

No.
Date.

Eric Schloga — Blue Hills — 9/22/04

Gary Finley
need clat of cond

forwarded an e-mail a Bob Clay

cond

tiered, 1920's

prob to predict

Bought for 50/ft
+ 30 ft
80
10 c/cs
90
20 Com ceep
110

$17. 41 /ft gross rent — net $11/ft

9 exp. — 10 yr lease

John Verbellas —
Rents    17-19/ft    9-10 net
$30/ft TI's

If they are buyy, that's how they new
body

LNR03930

No.
Date.

by tenant is $100 ft
loss of capital.

market might be lower than 50/ft.

$48/ft

150 k sf

No. _____
Date. _____

Evan Klimek —   9/28/04
              North 30 Equities Inc.

- updated title
- Default letter
- Set up SPE

I will send our default letter — he will
follow up w/ his own.
Meanwhile we will get title at SPE
in line so we can file if we don't get
a response from the borrower

Randy Thalen — Bear Wea — 9/28/04

**REDACTED**

LNR03932

No. _____

Date. _____

W-M

Marcia / Jim Hordacre                    10/18/04

Hxxxxxxxx license from City to use
strip of city land between bldg
and ground lease.

Never got license.

Could potentially be comm

Mayor said we shouldn't hold up
closing

local council look into it


Dan Grat      Beve dells        10/18/04
junior partner

Jerry Feinberg

— Wellesley —

Told Carl that I want him to draft a
letter that protects us from foreclosure
claims in the event that we get the property.
— I don't want them claiming that we had a deal.
Come back — days to judgment. Once judgment
is issued, that can do us no good.

Randy Tucker        Brecksville        10/25/04

<div align="center">REDACTED</div>

Pothier - Scott
delightful respectful response
don't know skills

D. Lynch —        Rockford —        10/28/04
he has loan docs.
— fill in the numbers
— set up SPE.
— loan docs —

LNR03934

No.
Date.

Bruce Barrett          4/11/07          Blue Hills
Randy Tucker

REDACTED

REDACTED

LNR03935

— CN 3286616 —
— 781 982 8668 —

To Joe Polcari

206.99 x 2 = 413.8
+ 160.00
No.
Date.
+ 99.98
+ 22.95
+ 22.95
100.088
499.99 +
594.99
22.95
617.94

REDACTED

darrel dickson@ aol.com
tel (360)-802-0969
Darrell Dickson = Aspen - 11/11/04

$1.2 MM loan. He would come up w/
the difference bet. the loan and the
purchase $1.9MM.

~~Loan~~

They put up $1,350 M plus $1.9 MM debt

Sent packages out

_ Need to get value —

lots of construction. Too much competition.

He wants to use reserve for $1800 /mo. payment
Subdivide the plat. Sell off bldgs.

No. _____

Date. _____

Blue Hills  —  Bruce Barrett  —  11/18/04

**REDACTED**

John Ramey  —  Bartus   11/18/04

— ref. past def, reporting, transfer default

— Provide proposal — Just got financial stmts.

Clearing agent original borrower ( before transfer).

If value is sufficient to pay off debt why
would we ?
OBTAIN VALUE.

Deadline on claim ? Keep separate from file.

If we got past file it may be too late. We
would want to have the claim in motion
prior to end of file.

LNR03937

No.

Date.

Arthur Kiem
Receiver

mkt rent is $23.00/ft
this is 21.00/ft
∴ = $175k

Adds $2.5 mm

no dk to the

He is support of its text.

Rudy Tuber — 1/13/00 — Blue Hills

REDACTED

LNR03938

Ruggle - July, Aug, Sep

No.
Date.

We found out that we only had one parcel
when we did the file search.

415-591-3123

Tom Connolly - Oaks Service - 11/28/05

They went to defense. There no
need for lender consent.

Send Copy to MS.

Randy Tucker - Blue Hills - 1/27/05

REDACTED

LNR03939

# DEPOSITION EXHIBIT NO. 85

## Barnett, Bruce

| | |
|---|---|
| **From:** | Kevin Wodicka [KWodicka@lnrproperty.com] |
| **Sent:** | Thursday, August 19, 2004 2:24 PM |
| **To:** | Isaac Pesin; Michael Reed |
| **Subject:** | FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524 |

EXHIBIT 85
Polcaei
3/1/06    HB

Email exchange between Emily and myself on this loan.

---

**From:** Emily Cooper
**Sent:** Wednesday, April 28, 2004 10:04 AM
**To:** Kevin Wodicka
**Subject:**    RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

thanks

-----Original Message-----
**From:** Kevin Wodicka
**Sent:** Wednesday, April 28, 2004 10:03 AM
**To:** Emily Cooper
**Subject:**    RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

it's depends on the loan documents. Sometimes the language in the docs will permit the use of the reserve for debt service under certain conditions. Because this building was essentially single tenant, there will be no cash flow for a period time while a new tenant is found. The originator may required the escrow to ensure a default does not occur when the cash flow stops. In a good market, this is a great feature. In our case, it may be a long while before a tenant is found. In our case, I hope it is just a leasing reserve and that the Borrower will be forced to default. Then the lender usually gets control of the cash.

---

**From:** Emily Cooper
**Sent:** Wednesday, April 28, 2004 9:35 AM
**To:** Kevin Wodicka
**Subject:**    RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

I never knew that bwrs even had that option with leasing reserves. I'll ask.

-----Original Message-----
**From:** Kevin Wodicka
**Sent:** Wednesday, April 28, 2004 9:10 AM
**To:** Michael Reed; Larry Golinsky; Emily Cooper
**Subject:**    RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

let's ask one more question. Let's ask if the reserve can be used for anything other that leasing commissions or tenant improvements. If it could, for example, be used for debt

LNR04129

# DEPOSITION EXHIBIT NO. 86

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Larry Golinsky [LGolinsky@lnrproperty.com] |
| **Sent:** | Tuesday, April 27, 2004 9:52 AM |
| **To:** | Randy Wolpert |
| **Subject:** | RE: CSFB 99-C1/Blue Hills Office Park |

EXHIBIT 86
Polcari
3/1/06    HB

Will work on it. When was the Madison QPRM?

-----Original Message-----
**From:** Randy Wolpert
**Sent:** Tuesday, April 27, 2004 9:18 AM
**To:** Larry Golinsky
**Subject:** CSFB 99-C1/Blue Hills Office Park

We need to get this here. We discussed it at the Madison QPRM. A big problem. If you look at the 2-pager in the Madison book, it is FUGLY. The "F" could also stand for Feinberg.

-----Original Message-----
**From:** Kevin Wodicka
**Sent:** Thursday, April 22, 2004 9:46 AM
**To:** 'Bob Cherry'; Ronald Schrager; Randy Wolpert; Larry Golinsky
**Subject:** RE: Blue Hills Office Park

Borrower is Feinberg, and this is a fein potential mess for CSFB 1999-C1. Eric's number implies a $19.75MM loss. Randy Rosen thought maybe around $11.3MM loss. Either way we will have to discuss how we want to handle this in the meeting later today.

---

**From:** Bob Cherry
**Sent:** Thursday, April 22, 2004 9:18 AM
**To:** 'KWodicka@lnrproperty.com'
**Cc:** 'rwolpert@lnrproperty.com'; 'RSchrager@lnrproperty.com'
**Subject:** Fw: Blue Hills Office Park

-----Original Message-----
From: Eric Schlager <EDS@Bulfinch.com>
To: Bob Cherry <BCherry@lnrproperty.com>
Sent: Wed Apr 21 22:53:15 2004
Subject: RE: Blue Hills Office Park

is borrower gerry feinberg?
building is old and tired and needs full rehab but in a decent location
right next to new dunkin donuts hq. i believe equiserve just bought
adjacent spec bldg.
lots of sf in a tough market today.

RE: CSFB 99-C1/Blue Hills Office Park                                      Page 2 of 3

i am thinking $40-50psf with a 2 year lease up
$30psf in cap ex, $25psf in ti's, $10psf commission
all in basis of $100psf and try to get a net lease at $10-12.50psf
tough deal, not sure you want to own 275,000sf of vacant office space that
is 30yrs +old and rehabbed last almost 20yrs ago
need to see how close our cap x number is to give you a better feel but i
bet i am pretty close.
where did your boys value?

Eric D. Schlager
Chief Executive Officer
The Bulfinch Companies, Inc.
250 First Avenue, Suite 200
Needham, MA 02494
T (781) 707-4000 x130
F (781) 707-4001
www.bulfinch.com

-----Original Message-----
From: Bob Cherry [mailto:BCherry@lnrproperty.com]
Sent: Wednesday, April 21, 2004 7:12 PM
To: Eric Schlager
Subject: Fw: Blue Hills Office Park


Psf? You own it


-----Original Message-----
From: Kevin Wodicka <KWodicka@lnrmail.lnrproperty.com>
To: Bob Cherry <BCherry@lnrmail.lnrproperty.com>
Sent: Wed Apr 21 17:52:54 2004
Subject: Blue Hills Office Park

Bob,

I've got an asset in CSFB 99-C1 which could use an Eric Schlager test. The
Property is:

Blue Hills Office Park
150 Royall Street
Canton, MA
273,863 sf building
Built 1970
Renovated in 1985

$32MM of debt ($117 psf)

Equiserve is essentially the only tenant; they will be vacating. We will

have to discuss this in tomorrow afternoon's meeting.  We did some
reunderwriting work already but not digging the answer.  Thought we should
get another opinion.

Thanks,
Kevin

# DEPOSITION EXHIBIT NO. 87

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Kevin Wodicka [KWodicka@lnrproperty.com] |
| **Sent:** | Wednesday, April 28, 2004 9:10 AM |
| **To:** | Michael Reed; Larry Golinsky; Emily Cooper |
| **Subject:** | RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524 |

**EXHIBIT 80**
PsIcace
3/1/06  ttb

let's ask one more question.  Let's ask if the reserve can be used for anything other that leasing commissions or tenant improvements.  If it could, for example, be used for debt service, the borrower could just drain off the reserve and all would get is the empty building with an exhausted reserve.

---

**From:**  Emily Cooper
**Sent:**  Tuesday, April 27, 2004 6:46 PM
**To:**    Michael Reed; Kevin Wodicka; Larry Golinsky
**Subject:**     FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

good fact.
-----Original Message-----
**From:** nhanvi@wellsfargo.com [mailto:nhanvi@wellsfargo.com]
**Sent:** Tuesday, April 27, 2004 6:45 PM
**To:** ecooper@lnrproperty.com
**Subject:** FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524


Emily,

It looks like the current amount available for leasing is $3,461,014 which maxes out at $4,250,000. Square footage is 273, 863 which works out to $12.64 psf.


Curtis

> -----Original Message-----
> **From:** Emily Cooper [mailto:ECooper@lnrproperty.com]
> **Sent:** Monday, April 26, 2004 8:32 AM
> **To:** 'nhanvi@wellsfargo.com'
> **Cc:** Michael Reed; Kevin Wodicka; Isaac Pesin
> **Subject:** CSFB 99 C1: Blue Hills Office


> Hello Vi,
> The single tenant in the Blue Hills Office building in CSFB 99 C1 will be vacating.  Is the lease reserve in place and if so, how much is currently in the reserve?

> Thanks,
> Emily

> Emily Finkelstein Cooper
> Vice President, Investment Management

LNR04078

RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524                                    Page 2 of 2

Lennar Partners
(305) 695-5251(Phone)
(305) 695-5601 (Fax)
ecooper@lnrproperty.com

LNR04079

# DEPOSITION EXHIBIT NO. 93

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Randy Wolpert [RWolpert@lnrproperty.com] |
| **Sent:** | Monday, September 13, 2004 11:02 AM |
| **To:** | Javier Benedit |
| **Cc:** | Tom Nealon |
| **Subject:** | RE: CSFB 99-C1/Blue Hills Office Park |

EXHIBIT 93

Polcari
3/1/06 Hb

REDACTED

-----Original Message-----
From: Javier Benedit
Sent: Monday, September 13, 2004 11:00 AM
To: Randy Wolpert
Cc: Tom Nealon
Subject: RE: CSFB 99-C1/Blue Hills Office Park

REDACTED

-----Original Message-----
From: Randy Wolpert
Sent: Friday, September 10, 2004 4:50 PM
To: Javier Benedit
Cc: Tom Nealon
Subject: CSFB 99-C1/Blue Hills Office Park

REDACTED

-----Original Message-----
From: Joe Polcari
Sent: Thursday, September 09, 2004 7:54 PM
To: Randy Wolpert; 'dhall@lnrproperty.com'
Subject: RE: New Loans for Transfer Date: 8/18/2004

I didn't see it today - I had a PTO day. My plan is to schedule a site visit next week with the borrower so David and I can take a good look. Meanwhile, below is my interpretation of the relevant PSA section (3.18).

1) We can purchase a Defaulted Loan (defined as a loan that is 60 days delinquent) at the Purchase Price (defined as the

2/24/2006

LNR04265

unpaid principal, accrued interest, unreimbursed advances and interest on advances). It appears that we have the first right of purchase, followed by the Servicer, followed by the Directing Certificateholder, which I read as Madison.

2) We can offer to sell a Defaulted Loan, not otherwise purchased by the parties mentioned above, if the SS determines that the sale would produce a greater recovery on a PV basis than would liquidation of the Mortgaged Property. The offering must be made for a period of at leat 20 days, but not more than 90 days. In the event that the bids do not equal or exceed the Purchase Price, the SS can accept what it determines to be a fair price.

3) We have to give the Trustee and Servicer three business days notice of our intent to sell a Defaulted Loan (or REO Property).

4) If the SS is the high bidder, then the Trust determines whether the SS bid is a "fair price". In determining this, the Trustee may rely on the opinion of an appraiser at the expense of the Trust Fund.

-----Original Message-----
From: Randy Wolpert
To: Ronald Schrager; David Hall
Cc: Kevin Wodicka; David Team; Joe Polcari
Sent: 9/9/2004 10:09 AM
Subject: RE: New Loans for Transfer Date: 8/18/2004

David, I think Joe is going to see the property today, not sure if you've going with him and I don't know if you've had any further opportunity to ponder this. Keep us in the loop on your thoughts and I know Joe will keep you appraised of our plans. If we are going to pursue it internally, we'll need to discuss process, since the PSA will dictate how we need to go about this and we'll need to involve the trustee. Ultimately we'll have to be ready with our number as bids are coming in.

> -----Original Message-----
>From: Ronald Schrager
>Sent: Monday, August 23, 2004 3:56 PM
>To:  David Hall
>Cc:  Kevin Wodicka; Randy Wolpert; David Team
>Subject:    RE: New Loans for Transfer Date: 8/18/2004
>
>Here's my take based on your comments:
>
>Your valuation analysis seems to make sense--the biggest variable is
>how long it takes you to find the user. We can try and get you some
>market stuff if we have any but you would probably be able to get as
>good or better info. than we will get. From the CMBS side we will
>likely have to put this on the market immediately as the carry costs
>associated with this will kill us. At that point we essentially have a
>ROFR and will be able to see where the offers come in. If we think
>everyone is bottom feeding we can scoop this up at that point. My
>sense is this is well-located real estate and in a market recovery this
>is a good asset. Everything I'm hearing is that the market in general
>is starting to turn the corner. If you agree I think you should start
>to think about where you would feel comfortable owning this in the

LNR04266

>event we take this to market quickly.  We should be able to get you
>access to the building assuming the borrower is cooperating (I think he
>is as of now).  If we buy it for $60, spend $40 to bring in a tenant at
>$13NNN this could work unless in takes us several years to find a user.
>Or if this is multiple buildings could we multitenant?
>      -----Original Message-----
>    From:  David Hall
>    Sent:  Monday, August 23, 2004 11:05 AM
>    To:    Ronald Schrager
>    Cc:    Kevin Wodicka; Randy Wolpert; David Team
>    Subject:      RE: New Loans for Transfer Date: 8/18/2004
>
>    Ron,sorry for the delay on this.  here is my gut feel.
>
>    This all depends on the interior finishes and tenant upgrades
>for financial back office.  The only way to make money is to get
>comfortable that you've got plug-n-play, (or buy this real cheap).  If
>tenant walks in and needs $30 in TIs, then you're dead (if we have to
>start with $117 as basis).  This is a 12 -14 NNN market and you never
>want to let project costs the exceed $115 - $120.  I would say Fleet
>is likely to have done all the right things to make this work for its
>own operations - but I have not seen the inside.
>
>    So, if you have plug-n-play then dark value is 90 -100 but its
>still very scary at those numbers.  Safer underwriting is to assume
>$60--70 dark and know you're looking at 30 - 40 in cost to make a deal.
>Time to make a deal is obviously another problem - could be years not
>months with that new vacant building immediately next door.
>
>    Problem with this site has always been access.  Its just real
>tough to get to.  It has great signage on major highway but no
>interchange that serves it directly.  Thats why its back office -
>workers know how to get to the office but no -one else can find the
>place.
>
>    I do not see any other re-development play in terms of tear down
>for housing - etc.  Canton will never let that happen.
>
>    Would like to see any appraisal info and get a chance to see
>what brokers think.  My sense of the market could need some updating
>as things are starting to happen here.
>
>
>
>
>
>      -----Original Message-----
>    From:  Ronald Schrager
>    Sent:  Thursday, August 19, 2004 11:59 AM
>    To:    David Hall
>    Cc:    Kevin Wodicka; Randy Wolpert; David Team

LNR04267

>       Subject:     FW: New Loans for Transfer Date:
>8/18/2004
>
>       David,
>
>       Congrats on the Fan Pier deal.  Looks like you got us in
>a great position to outflank the local favorites.
>
>       Wanted to get a read from you on a potential mining
>opportunity, Blue Hills Office Park in Canton.  Here is what we know:
>
>       Gerald Fineberg is bwr.  100% occ as of 6/03.  A
>2-story, 274M s.f. Class A office building built in 1970.  Property was
>96% leased to Fleet Bank (formerly BankBoston, the name of the division
>in the building is Equiserve) until July 2004.  Fleet vacated at lease
>expiration, reportedly to a building they have purchased next door from
>National Development (which sat vacant for 2 years before this as is
>another 175ksf newly constructed building on same street).  Despite
>good back office location, mkt is soft and quasi-single tenant lease
>rolls.  Debt is $32MM or $117 psf.
>
>       Address is:
>       Blue Hills Office Park
>       150 Royall Street
>       Canton, MA 02021
>
>       Would like to know from you (1) what do you think the
>dark value of this is if we sold it today and (2) do you think this is
>an asset we would want to purchase vacant and redevelop.
>
>       Thanks.
>
>       Ron
>
>
>
>

LNR04268

# DEPOSITION EXHIBIT NO. 97

EXHIBIT 97
Polcari
2/1/06  th

From:         Isaac Pesin
Sent:         Wednesday, October 13, 2004 5:56 PM
To:           Joe Polcari
Subject:      RE: Blue Hills

Binders are already being produced.  LG can discuss @ mtg.  That's one hell of a loss- congrats

-----Original Message-----
From:         Joe Polcari
Sent:         Wednesday, October 13, 2004 6:54 PM
To:           Isaac Pesin
Subject:      Blue Hills

Isaac, Larry and I have been doing a little last minute tweaking, and we have changed Blue Hills' loss to
$18,590,000.

1

LNR03104

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Wednesday, October 13, 2004 5:59 PM |
| **To:** | Isaac Pesin |
| **Subject:** | RE: Blue Hills |

F-ing Skoko.  Always one step ahead.

-----Original Message-----

| | |
|---|---|
| **From:** | Isaac Pesin |
| **Sent:** | Wednesday, October 13, 2004 6:58 PM |
| **To:** | Joe Polcari |
| **Subject:** | RE: Blue Hills |

Skoko's healthcare turd wins...sorry

-----Original Message-----

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Wednesday, October 13, 2004 6:57 PM |
| **To:** | Isaac Pesin |
| **Subject:** | RE: Blue Hills |

Am I in first place?

-----Original Message-----

| | |
|---|---|
| **From:** | Isaac Pesin |
| **Sent:** | Wednesday, October 13, 2004 6:56 PM |
| **To:** | Joe Polcari |
| **Subject:** | RE: Blue Hills |

Binders are already being produced.  LG can discuss @ mtg.  That's one hell of a loss- congrats

-----Original Message-----

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Wednesday, October 13, 2004 6:54 PM |
| **To:** | Isaac Pesin |
| **Subject:** | Blue Hills |

Isaac, Larry and I have been doing a little last minute tweaking, and we have changed Blue Hills' loss to $18,590,000.

1

LNR03100

From:           David Hall
Sent:           Thursday, October 14, 2004 8:18 AM
To:             Joe Polcari
Subject:        RE: Blue Hills

40-ish

David S. Hall
Lennar Partners
300 Crown Colony Drive
Quincy, MA 02169

(617) 472-4540
(617) 472-4580 fax
(617) 930-3973 mobile

dhall@lnrproperty.com

-----Original Message-----
From:       Joe Polcari
Sent:       Wednesday, October 13, 2004 7:01 PM
To:         David Hall
Subject:    Blue Hills

David, I got your e-mail to Ron, which pretty much covers everything.  One more thing - what would you pay for it as is? (assuming you were interested, which I know you're not)

1

LNR03098

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Thursday, October 14, 2004 8:47 AM |
| **To:** | David Hall |
| **Subject:** | RE: Blue Hills |

just like you.

-----Original Message-----

| | |
|---|---|
| **From:** | David Hall |
| **Sent:** | Thursday, October 14, 2004 9:18 AM |
| **To:** | Joe Polcari |
| **Subject:** | RE: Blue Hills |

40-ish

David S. Hall
Lennar Partners
300 Crown Colony Drive
Quincy, MA 02169

(617) 472-4540
(617) 472-4580 fax
(617) 930-3973 mobile

dhall@lnrproperty.com

-----Original Message-----

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Wednesday, October 13, 2004 7:01 PM |
| **To:** | David Hall |
| **Subject:** | Blue Hills |

David, I got your e-mail to Ron, which pretty much covers everything. One more thing - what would you pay for it as is? (assuming you were interested, which I know you're not)

1

LNR03097

# LENNAR PARTNERS
### An LNR Company

SCANNED

309 12-3-2004

*Via Federal Express*

October 20, 2004

JP Morgan Chase Bank f/k/a                 Wells Fargo Commercial Mortgage Servicing
Chase Manhattan Bank                       45 Fremont Street, 2nd Floor
Institutional Trust Services               San Francisco, CA 94105
4 New York Plaza, 6th Floor                Attn: Ms. Debra Rudder
New York, New York  10004
Attn: Ms. Pei Yan Huang

Re:     Portfolio:          Credit Suisse First Boston Mortgage Securities Corp., Series 1999-C1
        Loan No.:           M760990083
        Borrower Name:      Blue Hills Office Park
        Property Address:   Blue Hills Office Park
                            150 Royal Street
                            Canton, MA 02021

Dear Ms. Huang and Ms. Rudder:

        We have received the above captioned loan for special servicing.  In accordance with Section 3.18(b) of the Pooling and Servicing Agreement dated as of 10-11-99, we are required to give notice that it has been "determined in good faith that such Defaulted Mortgage Loan will become subject to foreclosure proceedings".

Very truly yours,

*Vickie M. Taylor/cel*

Vickie M. Taylor
Special Servicing Supervisor

cc:     Patricia Prince - Lennar Partners/Director of Servicing
        Javier Benedit - Lennar Partners/Compliance
        Joe Polcari - Lennar Partners/Asset Manager

1601 Washington Avenue · Suite 700 · Miami Beach, Florida 33139
Telephone (305) 695-5600 · Fax (305) 695-5601

WF01413

| | |
|---|---|
| From: | Randall Rosen |
| Sent: | Monday, October 25, 2004 9:11 AM |
| To: | Joe Polcari; Larry Golinsky |
| Subject: | RE: Blue Hills |

I have talked to CBRE, Trammel Crow and the current group, C&W. C&W is having trouble because Fineberg's people blew their tops when they found out they were talking to us. The leasing guy also told me their is some good, recent tenant interest but he didn't elaborate. I'm thinking about going with C&W however we have had mgmt agreement issues with them in the past which need to be overcome first.

——Original Message——

| | |
|---|---|
| From: | Joe Polcari |
| Sent: | Friday, October 22, 2004 12:23 PM |
| To: | Larry Golinsky |
| Cc: | Randall Rosen |
| Subject: | Blue Hills |

David has been hearing alot of noise about tenant interest. One prospect is Equiserve, our former tenant and now neighbor. The info is coming from RBJ, a local broker who David knows, and who I've dealt with in the past.

Randy, if we go forward with our sale on Nov 12, who will we use as PM and listing agent?

1

LNR03087

**From:**       Joe Polcari
**Sent:**       Tuesday, October 26, 2004 5:12 PM
**To:**         Larry Golinsky
**Subject:**    Blue Hills

Larry, today David and I met with John O'Neil of National Development and Michael Frisoli of Richards Barry Joyce (brokers).  National Development built the building next to Blue Hills.  It sat vacant for two years before they sold it to Equiserve, who then constructed the garage.  RBJ is the broker that I mentioned to you earlier.  Judging from our conversations, there is tenant interest.  Obviously, RBJ was not going to give us alot of detail.  O'Neil offered us 50 cents on the dollar for the loan.  David and I agree that we should take this REO instead of including it in a note sale.  We can talk more about it at your leisure.

1

LNR03079

# DEPOSITION EXHIBIT NO. 103

EXHIBIT 103

Polcari
3/1/06 +h

| | |
|---|---|
| From: | Javier Benedit |
| Sent: | Tuesday, November 02, 2004 10:33 AM |
| To: | Joe Polcari; Larry Golinsky |
| Subject: | RE: Blue Hills |

On your first question, your interpretation is correct. If we do not elect to purchase the Defaulted Loan as SS or Directing Certificateholder at the "Purchase Price" (par) then we must go on to market the property for at least 20 days. If we bid on the property for an amount less than the Purchase Price then we must send an appraisal to the Trustee, or they have the right to obtain one on their own, for determination of "fair price".

As for your second question, an assignment of a bid is basically a sale, but although I often do a good job of pretending I'm an attorney I don't really know how it would be viewed legally. I would just check with Tom Nealon, but in my humble opinion I don't think its any different from a sale.

-----Original Message-----

| | |
|---|---|
| From: | Joe Polcari |
| Sent: | Tuesday, November 02, 2004 11:19 AM |
| To: | Javier Benedit; Larry Golinsky |
| Subject: | RE: Blue Hills |

Javier, I wanted to revisit this issue and make sure that we are complying with the PSA. We are discussing a note sale of this asset. My interpretation of the PSA (below) leads me to believe that we have to market the note for at least 20 days, after we provide 3 days notice of our intent to sell. If our Commercial Properties Group wants to bid on it, and is the high bidder, the Trust will be entitled to an appraisal to establish that our bid is a "fair price". Is there anything else I need to focus on?

One possible disposal approach involves us conducting the foreclosure sale, and then selling our winning bid. Under this scenario, we would not be selling the note, nor would we be selling the real estate. It's somewhere in between. Would this approach require us to do anything different as compared to a note sale?

-----Original Message-----

| | |
|---|---|
| From: | Javier Benedit |
| Sent: | Wednesday, September 08, 2004 12:34 PM |
| To: | Larry Golinsky; Joe Polcari |
| Subject: | RE: Blue Hills |

Not sure I understand , if we are buying what marketing would take place? Once Trustee determines fair price, if we are the buying party, we just pay such price for the asset and buy out of the Trust.

-----Original Message-----

| | |
|---|---|
| From: | Larry Golinsky |
| Sent: | Wednesday, September 08, 2004 12:31 PM |
| To: | Javier Benedit; Joe Polcari |
| Subject: | RE: Blue Hills |

Step #1 is we inform Trustee we are an interested party. Step #2 is we provide appraisal to Trustee, #3 step is they determine if it is a fair price. What happens after that and make sure you comment on whom runs the marketing process, if any.

-----Original Message-----

| | |
|---|---|
| From: | Javier Benedit |
| Sent: | Wednesday, September 08, 2004 12:28 PM |
| To: | Larry Golinsky; Joe Polcari |
| Subject: | RE: Blue Hills |

Larry/Joe,

The Trustee would have to review a current appraisal or order a new one (at their discretion) and set the "fair price" according to such appraisal. We would then have to bid up to that "fair price" amount. The Trustee here is Wells Fargo, they may not be as lenient as Lasalle and may want to order their own

1

LNR03041

# DEPOSITION EXHIBIT NO. 104

NOV. 15. 2004  3:22PM    CREDIT SUISSE FIRST BOSTON                    NO. 0902   P. 2/2

*OA*

## Management Committee Approval
### Annex A

Section 3.03 of the Madison Square Company, LLC Agreement (the "Agreement"), and the respective Pooling and Servicing/Servicing and Custodial Agreement, require that the members of the Management Committee approve the strategy set forth in the attached Operating Advisor Consent package for the following fund Asset:

**Loan number(s):**          M760990083
**Borrower:**                Blue Hills Office Park, LLC
**Transaction:**            Consent for Foreclosure
**Date of Operating Advisor Consent:**  November 3, 2004

In accordance with the Agreement we request approval of the proposed transaction within two (2) business days of receipt this notice. Otherwise, consent for the proposed transaction(s) shall be deemed given.

The undersigned are the members of the Management Committee of Madison Square Company, LLC (the "Parent") the sole member and sole manager of Madison Square Mortgage Securities, LLC (the "Company") that have been appointed by BPF/LNR Partnership as the Managing Member, BPF, LLC, LNR Madison Square, Inc., SunAmerica Life Insurance Company, Inc., and Credit Suisse First Boston respectively, and constitute all of the members of the Management Committee authorized to vote with respect to the matter described above. The undersigned hereby unanimously approve the proposed transaction as presented in the attached Operating Advisor Consent for the above described fund asset.

Approved by:
Madison Square Mortgage Securities LLC;
by its sole member and manager
Madison Square Company, LLC

---

Peter Bren, Managing Member

---
Ronald E. Schrager, Managing Member

---
Jeffrey P. Krasnoff, LNR Madison Square
Member

---
Mason Sleeper, CSFB Member

---

Stuart Miller, Managing Member

---
Richard Bren, BPF, LLC Member

---
Alan Nussenblatt, SunAmerica Member

**EXHIBIT** 104
Polcari
3/1/06   ttb

**TRUST00009**

**Management Committee Approval**
Annex A

Section 3.03 of the Madison Square Company, LLC Agreement (the "Agreement"), and the respective Pooling and Servicing/Servicing and Custodial Agreement, require that the members of the Management Committee approve the strategy set forth in the attached Operating Advisor Consent package for the following fund Asset:

Loan number(s):   M760990083
Borrower:   Blue Hills Office Park, LLC
Transaction:   Consent for Foreclosure
Date of Operating Advisor Consent: November 3, 2004

In accordance with the Agreement we request approval of the proposed transaction within two (2) business days of receipt this notice. Otherwise, consent for the proposed transaction(s) shall be deemed given.

The undersigned are the members of the Management Committee of Madison Square Company, LLC (the "Parent") the sole member and sole manager of Madison Square Mortgage Securities, LLC (the "Company") that have been appointed by BPF/LNR Partnership as the Managing Member, BPF, LLC, LNR Madison Square, Inc., SunAmerica Life Insurance Company, Inc., and Credit Suisse First Boston respectively, and constitute all of the members of the Management Committee authorized to vote with respect to the matter described above. The undersigned hereby unanimously approve the proposed transaction as presented in the attached Operating Advisor Consent for the above described fund asset.

Approved by:
Madison Square Mortgage Securities LLC;
by its sole member and manager
Madison Square Company, LLC

_____
Peter Bren, Managing Member

_____
Stuart Miller, Managing Member

_____
Ronald E. Schrager, Managing Member

_____
Richard Bren, BPF, LLC Member

_____
Jeffrey P. Krasnoff, LNR Madison Square Member

_____
Alan Nussenblatt, SunAmerica Member

_____
Mason Sleeper, CSFB Member

TRUST00010

 # Lennar Partners, Inc.

## ADVISOR CONSENT FOR
## FORECLOSURE

**Credit Suisse First Boston Mortgage Securities, Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1**

---

**Borrower:**
Blue Hills Office Park, LLC

**Property Address:**
150 Royall Street
Canton, MA  02021

**Loan No.:** M760990083

---

**Prepared by:**
Joseph A. Polcari Jr.
Asset Manager
November 3, 2004

TRUST00011

Advisor Consent for Foreclosure
November 9, 2004
Page -2


**SUBMITTED TO:**

Madison Square Mortgage Securities LLC; by its sole member and manager Madison Square
Company, LLC "Controlling Class".


**REQUESTED ACTION:**

Approval to foreclosure the mortgage, subject to receipt of a satisfactory Phase 1 environmental
site assessment.

PREPARED BY:

_____    4| 9|04
Joseph A. Polcari              Date
Asset Manager

RECOMMENDED BY:

_____    _____
Larry Golinsky                Date
Director of Asset Management

CONCURRENCE:

_____    _____
Javier Benedit                Date
Compliance Officer


_____    h|10|04
Randy Wolpert                 Date
Vice President


**APPROVED BY:**
Madison Square Mortgage Securities LLC; by its sole member and manager Madison Square
Company, LLC "Controlling Class".


By:_____
                              Date


**TRUST00012**

Advisor Consent for Foreclosure
November 3, 2004
Page -3

## BACKGROUND:

On 7/31/04, the lease for the building's sole tenant, Boston EquiServe, L.P., expired. The loan was transferred to the Special Servicer due to the subsequent failure of the borrower to make the monthly debt service payments. Initially, the borrower made a request to utilize the existing $4,121,000 replacement reserve to keep the loan current. The documents allowed this under certain limited circumstances, however such draws would be limited to principal and interest only, with the borrower responsible for the tax and insurance escrow payments. Given the fact that the borrower failed to keep the escrow payments current following the loss of the tenant, the borrower's request was rejected.

The loan has been accelerated and the foreclosure posting has commenced. A foreclosure sale will occur in November.

## DESCRIPTION OF LOAN:

| | | | |
|---|---|---|---|
| Borrower Type: | LLC | Current Int. Rate: | 8.49 |
| Origination Date: | 09/14/99 | Fixed / Variable: | Fixed Interest |
| Original Balance: | $ 33,149,000.00 | Payment Amount: | $ 254,652.24 |
| Current Balance: | $ 31,979,793.66 | Payment Type: | Fixed |
| Payment status: | Delinquent | Amortization: | Actual/360 |
| Next pay date: | 08/11/04 | R/E Tax Status: | Current |
| Maturity date: | 10/11/29 | Insurance Status: | Current |
| Prepymt. Prem.: | YM | Prior Liens: | None |
| Recourse: | Carveouts | Est. LTV Ratio: | 2.33 |
| Guarantors: | Gerald Fineberg, William Langelier | Est. DSCR: | 0 (property is vacant) |

The actual maturity date is 10/11/2029, however the anticipated repayment date is 10/11/09. At that time, hyperamortization (additional interest of 2% if in a securitization) begins. The borrower is a special purpose entity formed to own this property. The principals are Gerald Fineberg and William Langelier. Both men have signed a Guaranty dated 9/14/99, covering the usual carveouts, as well as making the guarantors liable for the full amount of the debt in the event of the Borrower filing a bankruptcy petition. The lender holds $4,125,000 in reserves, as required at origination to mitigate the risk of the tenant vacating the property. The reserves are broken down into a cash collateral reserve ($108,905); a tenant reserve ($599,347); a reserve for replacement ($352,251); and a miscellaneous reserve ($3,064,918).

## DESCRIPTION OF COLLATERAL:

| | | | |
|---|---|---|---|
| Property Type: | Office | Gross Square | 273,863 |

TRUST00013

Advisor Consent for Foreclosure
November 11, 2004
Page -4

## DESCRIPTION OF COLLATERAL:

| | | | |
|---|---|---|---|
| **Property Type:** | Office | **Gross Square Footage:** | 273,863 |
| **Year Built:** | 1970 | **No. of Units/Beds:** | N/A |
| **Year Renovated:** | 1989 | **Net Rentable Area:** | 273,863 |
| **Major Tenant:** | Vacant | **No. of Acres:** | 20 |

## DISCUSSION OF PROPERTY:

The property is a 273,863 sf, two-story Class B office building in Canton, twelve miles south of the Boston CBD. Amenities include a full service health club, state-of-the-art conference center and 250-seat cafeteria, all located directly off the vast atrium of the lobby area. There is parking for 1,040 cars and access is provided by Royall Street, which begins at the intersection of Rte 128 (divided six-lane hwy) and I-95. The building is located approximately ¾ miles down Royall. Although it is visible from I-95, access is difficult.

The building was constructed as a single-story 125,000 sf warehouse for Boston Envelope Company. It was sold to the existing principals in 1988 for $31,000,000. At that time, it was converted to two-story multi-tenant office use, including the addition of the atrium. The main tenant was Boston EquiServe LP, a joint venture between Bank of Boston and State Street Bank and Trust. EquiServe slowly increased its presence until it occupied the entire building. In 1999 EquiServe extended its lease for five years at $15.30/ft. At expiration on 7/31/04, it vacated. Another 2,532 sf was occupied by Marriott Services, Inc. on a month-to-month percentage rent lease for the cafeteria.

Upon lease expiration, EquiServe moved to its new location (next door at 250 Royall) in a spec building developed by National Development. EquiServe paid $135/ft, including some TI's, as well as paying for the construction of the adjacent parking garage.

Market rents are $17-20 gross and $7-11 net. Submarket occupancy is 82%, which compares favorably to 25% for the overall suburban Boston office market. The difference is that Quincy, Braintree and Canton house mainly back-office users, while Newton, Wellesley and Waltham (at 25%) consist of high-tech.

A review of the property by the Special Servicer's Commercial Properties Group reveals that it is not of the "plug and play" variety that would be expected given EquiServe's tenancy. It appears that the tenant knew it was leaving, and failed to maintain and upgrade the building over its final years in occupancy. Estimated tenant improvement costs to retenant would be $35-40/ft. The base building has a moderate amount of deferred maintenance, estimated at $15/ft. The HVAC systems are old and would likely need to be replaced. The parking lot is in need of repair.

**TRUST00014**

Advisor Consent for Foreclosure
November 11, 2004
Page -5

Although the building was once multi-tenant, it would no longer easily support this format. The huge common areas and the built-in amenities are clearly geared towards a single user, or two to three users of not less than 80-100,000 sf. The market is very thin for tenants of this magnitude. The Commercial Properties Group feels that the best approach is to market to a single user, which would pay more than a developer or investor. After subtracting the common area (15% of total area) the net space remaining for multi-tenant purposes would be approximately 233,000 sf. Local real estate professionals Eric Schlager and Gary Lemire agree that it could take 24 months or more to tenant the building. Large tenants (more than 100,000 sf) are very difficult to find in this market. Schlager estimates the as-is value at $50/ft.

Attached are two-pager analyses prepared using two scenarios. The first involves a foreclosure sale, followed by a fixed sale at $50/ft at the end of Year 1. This represents the broker's opinion of as-is value. The NPV is $14,299,000. The loss is $18,590,000. The second involves a foreclosure, followed by the lease-up of the property and the sale of the property at a 9% cap rate at the end of Year 2. The leasable square footage is reduced by the 15% common area. TI's are modeled at $40/ft, per broker estimates. The NPV is $13,076,000. The loss is $20,140,000. The lease-up scenario is very aggressive, in that it assumes that the building can be fully leased at market in little over one year. Both scenarios include the $4,125,000 reserve escrow in the asset cash flow section.

The Phase I environmental site assessment performed at origination stated no environmental concerns were noted. An update is close to completion and will be available prior to the foreclosure sale.

| Valuation Type: | BOV | Annualized NOI: | 0 |
|---|---|---|---|
| Valuation Date: | 10/15/04 | Occupied Space: | Vacant |
| "As-Is" Value: | $13,700,000 (fixed sale) | No. of Tenants: | Vacant |
| Stabilized Value: | N/A | Occupancy Rate: | 0 |

## ALTERNATIVES:

The first alternative to foreclosure is the sale of the note. This scenario is being explored at this time. Approval to proceed with the foreclosure is being sought as a fall-back position in the event that the note sale does not materialize. A second alternative involves the sale of the Trust's winning bid, post-foreclosure. This scenario would still require the consent requested herein.

TRUST00015

**Specially Serviced Loan Compliance Checklist**
**Pre-Foreclosure/Transition to REO Requirements**
To be completed with Operating Advisor Consent

| | | |
|---|---|---|
| Portfolio: | CSFB 1999-C1 | |
| Loan Name: | Blue Hills Office Park LLC | |
| Loan Number: | 760990083 | |
| Property Type | Office | |

| | |
|---|---|
| Status as of: | 11/3/2004 |
| Asset Manager: | J. Polcari |
| Transfer Date: | 8/18/2004 |
| REAM Asset Manager | R. Rosen |

## Specially Serviced Loan Requirements

| | Completed | N/A | | |
|---|---|---|---|---|
| 1 | ☑ | ☐ | Property Inspection | Date completed: 11/2/04 (part of appraisal) ✓ |
| 2 | ☐ | ☑ | Cost Estimate/Resolution Estimate | Date completed: n/c |
| 3 | ☑ | ☐ | Appraisal | Date completed: 11/2/04 (draft) |
| 4 | ☑ | ☐ | Asset Status Report (update if necessary) | Date sent: 11/5/2004 (due as of 8/18/04) ✓ |

## Pre-Foreclosure Requirements

| | Completed | N/A | (not applicable) | |
|---|---|---|---|---|
| 5 | ☑ | ☐ | Operating Advisor Consent | Date prepared: 11/3/2004 |
| 6 | ☑ | ☐ | Updated 2-pager with projected losses (copy to Surveillance Dept.) | Date prepared: 11/3/2004 |
| 7 | ☑ | ☐ | Pre-foreclosure notice to Trustee, if required for deal (attach copy) | Date sent: 10/14/2004  Foreclosure letter sent 10/20/04 |
| 8 | ☑ | ☐ | Environmental Assessment (summarize any issues below) | Date Ordered: 9/14/2004 ✓  Date completed: In Process |
| 9 | ☐ | ☑ | Rating Agency Notifications, if applicable (attach copy) | Date sent: |
| 10 | ☐ | ☑ | Deficiency Claim Notice (only req'd if there is a deficiency claim to pursue) | Date completed: |

## REAM Transition Requirements

| | Completed | N/A | (not applicable) | |
|---|---|---|---|---|
| 11 | ☐ | ☑ | Advise Corporate Risk Management of any unusual exposures at the property, such as storage tanks, environmental, autos, etc." | |
| 12 | ☑ | ☐ | REO Due Diligence Checklist | |
| 13 | | ☑ | Identify the number of vehicles associated with this property | |

## REMIC Considerations

| | Completed | N/A | (not applicable) | |
|---|---|---|---|---|
| 14 | ☐ | ☑ | Listing of Fixed Assets or Personal Property, if obtainable | |
| 15 | ☐ | ☑ | Analyze financial statements for sources of income | |
| 16 | ☑ | ☐ | Identify how property will be managed upon REO | |
| | ☐ | | Trade or business | |
| | ☑ | | Standard Property-all income represents "rents from real property" | |
| 17 | ☐ | ☑ | REMIC Tax Opinion | |

Asset Manager Comments: _____
_____
_____

Compliance Comments: _____
_____

Compliance Approval:
Name: _____  Date: 11/9/04  Follow up req'd    Yes    No    Item(s)#: _____

**TRUST00016**

**REO DUE DILIGENCE CHECKLIST**

**Asset Name:**                                    **Portfolio:**
**Asset Address:**                                 **Borrower:**
                                                   **Loan #:**
**Type:**                                          **Title Date:**

*Shaded items represent minimum transition requirements.*

| CATEGORY AND ITEM | Available (Y/N) | Provided (Date) | Not Avail. (X) | Not Appl. (N/A) |
|---|---|---|---|---|
| **Property Information** | | | | |
| 2. Historical financial statements (3 years). | X | | | |
| 3. Survey. | | | X | |
| 4. Site plan. | X | | | |
| 6. Insurance policies and schedule of premiums, copies of bills | X | | | |
| 7. Information on sale and marketing of the property, include | X | | | |
|     contacts and copies of any offers or letters of intent. | | | | |
| 8. FF&E contracts. | | | | X |
| 10. Energy usage/utility bills (last three years). | | | X | |
| 11. Payroll registry (full-time and part-time). | | | | X |
| 12. Promotional brochure for Property. | X | | | |
| 13. ADA compliance & applicable certificates. | | | X | |
| 14. Property Inspections / Photographs. | X | | | |
| 15. Detailed location map. | X | | | |
| 16. Summary of employee benefits. | | | X | |
| 17. List of any current litigation | X | | | |
| 18. Copy of Reciprocal Easement Agreements, if any. | | | | X |
| **Title Insurance / Real Estate Taxes/ Deposits** | | | | |
| 4. Status of tax certiorari proceeding. | | | | X |
| 5. Tax parcel map, if available. | | | X | |
| 7. List of all utility/other deposits. | | | X | |
|     options, rights of first offer, etc. | | | | |

TRUST00017

## REO DUE DILIGENCE CHECKLIST

**Asset Name:**                                     **Portfolio:**
**Asset Address:**                                  **Borrower:**
                                                    **Loan #:**
**Type:**                                           **Title Date:**

| CATEGORY AND ITEM | Available (Y/N) | Provided (Date) | Not Avail. (X) | Not Appl. (N/A) |
|---|---|---|---|---|
| **Operations - Income and Expenses** | | | | |
| 2. Copies of all lease abstracts. | | | | |
| 3. Copies of all leases or offers under negotiation, including renewals. | | | | X |
| 4. Copy of lease/floor plans. | | | | X |
| 6. Copy of all default notices. | | | | |
| 7. List of disputed billings & charges by tenants. | | | | X |
| 8. Detail of CAM and Real Estate tax and operating expense escalations/billings. | | | | X |
| 9. Detail of any percentage rents, if applicable. | | | | X |
| 10. Schedule of parking income, if any. | | | | X |
| 11. Schedule of storage income, if any. | | | | X |
| 12. Schedule of vending income, if any. | | | | X |
| 13. Schedule of antenna income, if any. | | | | X |
| 14. Schedule of any outstanding credit to tenants. | | | | X |
| 15. Schedule of historical sales for past 3 years. | | | | X |
| 16. Accounts receivable as of the most recent date. | | | | X |
| 17. Schedule of all tenant leasing renewal or expansion options, rights of first offers etc. | | | | X |
| 18. List of all security deposits currently held. | | | | X |
| 19. Copies of most recent tenant estoppel certificates. | | | | X |
| 20. Schedule of rent changes. | | | | X |
| 21. Copies of any department store agreements. | | | | X |
| 22. Historical schedule of tenant allowances. | | | | X |
| 23. Schedule of unpaid tenant allowances. | | | | X |
| 24. Detail of gift certificate account information. | | | | X |
| 25. Info on marketing fund or merchants association. | | | | X |
| 26. Accounts payable as of the most recent date. | | | | X |
| 27. Schedule of free rent or abatements, current and last 2 years. | | | | X |
| 28. Current operating budget. | | | | X |
| 29. List of pending bankruptcies. | | | | X |
| 30. Schedule of unpaid tenant coordination fees. | | | | X |

TRUST00018

# REO DUE DILIGENCE CHECKLIST

**Asset Name:**                                    Portfolio:
**Asset Address:**                                 Borrower:
                                                   Loan #:
**Type:**                                          Title Date:

| CATEGORY AND ITEM | Available (Y/N) | Provided (Date) | Not Avail. (X) | Not Appl. (N/A) |
|---|---|---|---|---|
| **Reports** | | | | |
| 1. Engineering reports | | | X | |
| 3. Market studies (competitive buildings etc.) | X | | | |
| 4. Traffic studies or exit surveys. | | | X | |
| 8. Asbestos Report/Survey | | | X | |
| 9. OM Manual (Asbestos) | | | X | |
| 10. UST Reports | | | | X |
| 11. Roofing reports | | | X | |
| 12. Verticle transportation reports | | | X | |
| 13. Paving maintenance plans | | | | X |
| 14. Security incident reports (monthly summaries), past 2 years | | | | X |
| 15. Parking ratio analysis | | | X | |
| 17. Property inventory list | | | | X |
| 18. List of commited special events and/or charitable contributions | | | | X |
| 19. Copies of any advertising or Public Relations related contracts | | | | X |
| **Receivership (if applicable)** | | | | |
| **Management / Brokerage Contracts** | | | | |
| 1. Copy of existing property management contract. | X | | | |
| 2. Agency leasing contracts and associated fee structures. | X | | | |
| 3. Current schedule of open brokerage commissions and 2 year history. | | | | X |
| 4. Schedule of commissions due upon renewal or expansion options, rights of first offer, etc. | | | | X |
| 5. Copies of any other agreements affecting the property other than "service contracts". | | | | X |

TRUST00019

# REO DUE DILIGENCE CHECKLIST

Asset Name:                                     Portfolio:
Asset Address:                                  Borrower:
                                                Loan #:
Type:                                           Title Date:

| CATEGORY AND ITEM | Available (Y/N) | Provided (Date) | Not Avail. (X) | Not Appl. (N/A) |
|---|---|---|---|---|
| **Zoning, Building Permits, Inspections and CO's** | | | | |
| 1. Attorney's zoning opinion & certificates from architects and engineers regarding zoning. | | | X | |
| 2. Building permits for base building. | X | | | |
| 3. Building permits for infrastructure. | X | | | |
| 4. Building permits for tenant space renovations. | | | | X |
| 5. Other pertinent building department records. | X | | | |
| 6. Building inspection certificates for base building. | X | | | |
| 7. Fire alarm inspection certificates. | | | X | |
| 8. Electrical inspection certificates. | | | X | |
| 9. Plumbing inspection certificates. | | | X | |
| 10. Fire safety inspection certificates (sprinklers/pressure). | | | X | |
| 11. Any violations (interior and exterior). | | | X | |
| 12. Certificates of Occupancy for base building. | X | | | |
| 13. Certificates of Occupancy for all tenant spaces. | X | | | |
| **Service Contracts** | | | | |
| 1. HVAC. | | | X | |
| 2. Control systems. | | | X | |
| 3. Filters. | | | X | |
| 4. Pest control. | | | X | |
| 5. Alarm system testing. | | | X | |
| 6. Water treatment. | | | X | |
| 7. Radio & music service. | | | X | |
| 8. Sprinklers & standpipes. | | | X | |
| 9. Cleaning. | | | X | |
| 10. Landscaping. | | | X | |
| 11. Security. | | | X | |
| 12. Window washing. | | | X | |
| 13. Roof. | | | X | |
| 14. Trash removal. | | | X | |
| 15. Snow removal. | | | X | |
| 16. Parking lot maintenance. | | | X | |
| 17. Telephone. | | | X | |
| 18. Electric service. | | | X | |
| 19. Computer service. | | | X | |
| 20. Interior design service. | | | X | |
| 21. Automatic door equipment. | | | X | |
| 22. Elevator/escalator. | | | X | |
| 23. Boiler maintenance. | | | X | |
| 24. Towel & uniform cleaning. | | | X | |
| 25. Applicable union contracts. | | | X | |

TRUST00020

## REO DUE DILIGENCE CHECKLIST

Asset Name:  
Asset Address:  

Portfolio:  
Borrower:  
Loan #:  
Title Date:  

Type:

| CATEGORY AND ITEM | Available (Y/N) | Provided (Date) | Not Avail. (X) | Not Appl. (N/A) |
|---|---|---|---|---|
| **Building Capital Cost Data** | | | | |
| 1. Capital expenditures last 5 years. | | | X | |
| 2. Detailed description of roof repairs (if applicable). | | | X | |
| 3. Current budget of committed capital. | | | X | |
| 4. Chart of accounts for capital items. | | | X | |
| 5. Projected capital expenditures. | | | X | |
| **Building Documents and Design & Construction** | | | | |
| 1. Architectural & engineering design contracts for on-going improvements. | | | X | |
| 2. Interior design contracts. | | | X | |
| 3. Other design contracts or consulting agreements. | | | X | |
| 4. Performance & payment bonds in effect. | | | X | |
| 5. Finishes, furnishings & equipment including handling installation contracts. | | | X | |
| 7. Construction contracts for on-going improvements. | | | X | |
| 8. Job meeting minutes for on-going improvements. | | | X | |
| 9. Contractor's requisitions for payment. | | | X | |
| 10. Construction contracts & correspondence pertaining to development agreement(s) for tenant spaces. | | | X | |
| 11. Sprinkler specifications. | | | X | |
| 12. HVAC specifications. | X | | | |
| 13. Building plans & specifications. | X | | | |
| 14. Fire safety plan. | | | X | |
| 15. Fire security system manual. | | | X | |
| 16. Method & calculation of gross & net building areas. | | | X | |
| 17. Emergency escalator & elevator control sequence. | | | X | |
| 18. Emergency generator controls. | | | X | |
| 19. Roof guarantees & specifications. | | | X | |
| 20. Other guarantees and warranties. | | | X | |
| 21. Certificate that building is not in flood plain. | | | X | |
| 22. History of flooding on site (if applicable). | | | X | |
| 23. Site utility plan. | | | X | |
| 24. Building tenant standards & sample tenant agreement. | | | X | |
| 25. Construction budget, if applicable. | | | X | |

TRUST00021

# DEPOSITION EXHIBIT NO. 106

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Monday, November 08, 2004 4:04 PM |
| **To:** | Randall Rosen |
| **Subject:** | RE: Blue Hills Office Park |

What the @#%!. I've got Larry AND you telling me to get this done. I'M NOT A MACHINE.

-----Original Message-----
From: Randall Rosen
Sent: Monday, November 08, 2004 4:56 PM
To: Joe Polcari
Subject: RE: Blue Hills Office Park


Joe, I'm planning a trip up north the week of Dec. 6th. You have to make this happen by then as I won't go there until April.

-----Original Message-----
From: Joe Polcari
Sent: Monday, November 08, 2004 4:35 PM
To: Larry Golinsky; Randall Rosen; Hector Gomez
Subject: FW: Blue Hills Office Park

**REDACTED**

Please see below. Based on this late-breaking information,                    . My
plan is to compress the monitoring well time frame to less than the 3-week estimate. Even if we have to pay double, it's worth it give the monthly advancing.

-----Original Message-----


**REDACTED**


EXHIBIT 106
Polcari
3/1/06  ttb

1

REDACTED

2

LNR02978

# DEPOSITION EXHIBIT NO. 107

| | |
|---|---|
| From: | Joe Polcari |
| Sent: | Monday, November 08, 2004 4:05 PM |
| To: | Larry Golinsky |
| Subject: | RE: Blue Hills Office Park |

Consider it owned.

-----Original Message-----
From: Larry Golinsky
Sent: Monday, November 08, 2004 4:56 PM
To: Joe Polcari
Subject: RE: Blue Hills Office Park

I don't want a conservative lawyer slowing us down. Please find out if there is another way of Scott getting comfortable ASAP. Take ownership of this situation and get it done. Delaying this forecloser is fraught with risk.

-----Original Message-----
From: Joe Polcari
Sent: Monday, November 08, 2004 4:54 PM
To: Larry Golinsky
Subject: RE: Blue Hills Office Park

To answer your first question regarding the timing of the Phase 1, it was ordered by me on 9/14/04. I was given a 10/7/04 due date, and have followed up with REAM regularly, pushing for the report's completion. I don't know why the report was so late.

Regarding a put,          REDACTED

-----Original Message-----

REDACTED

-----Original Message-----
From: Joe Polcari
Sent: Monday, November 08, 2004 4:35 PM
To: Larry Golinsky; Randall Rosen; Hector Gomez
Subject: FW: Blue Hills Office Park

1

EXHIBIT 107
Polcari
3/1/06  4h

LNR02975

Please see below.  Based on this late-breaking information,                                My plan is to compress the monitoring well time frame to less than the 3-week estimate.  Even if we have to pay double, it's worth it give the monthly advancing.

-----Original Message-----

**REDACTED**

2

# DEPOSITION EXHIBIT NO. 109

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Friday, November 19, 2004 1:06 PM |
| **To:** | 'Lgolinsky@lnrproperty.com' |
| **Subject:** | Blue Hills |

We own it. Our bid was 18.5MM. There were four other bidders. Bulfinch bid 15MM.

------------------------

Sent from my BlackBerry Wireless Handheld

EXHIBIT 109
Polcari
3/1/06 ttb

1

LNR02918

*Blue Hills : Client document*



## LENNAR PARTNERS
An LNR Company

Exhibit: *128*
Witness: *Warshaw*
Date: *3·2·06*
CM

**Asset Manager Log**

**Joe Polcari**

### Loan Information

| | |
|---|---|
| **Deal** | CSFB 99-C1 |
| **Loan Number** | M760990083 |
| **Borrower** | Blue Hills Office Park |
| **Loan Status** | Specially Serviced |
| **Transfer Date** | 8/18/2004 |

### Property Information

| | |
|---|---|
| **Property Name** | Blue Hills Office Park |
| **Property Address** | 150 Royall Street |
| | CantonMA02021 |
| **Property Type** | Office |

| Date Entered | Date Last Changed | Comments |
|---|---|---|
| 09/07/2004 | 09/07/2004 | call with Ken Goldberg, (and Steve Swiecicki)<br>Reebock moved out 12-15 years ago. Then rented to Bank of Boston for processing of pension plans/record keeping. State Street owned it, sold to Equiserve (?). They moved next door, tried to keep them with aggressive pricing on the lease. They have a good brokerage firm, a few people interested. |
| 08/25/2004 | 08/25/2004 | call with Ken Goldberg<br>617-790-3333. He is a lawyer, but not acting as counsel, but he is outside, he's worked with Jerry for 30+ years, he does the capital structuring. Joe Donavan is CFO, 781-239-1490. Discussed prenegotiation letter. He is meeting with jerry tomorrow, he'll get back with me. |
| 08/24/2004 | 08/24/2004 | call to Joseph Donavan, with Steve Sweicicki . Left message on voice mail. |

LNR03511

# DEPOSITION EXHIBIT NO. 134

| LOAN # | LOAN NAME | TRAN TYPE | DATE INCOMING | CLEAR DATE | WORK TYPE | TRACKING DATE/TIME | ITEM TYPE | SLA | COMMENTS 1 | COMMENTS 2 | SERVICER LAST NAME | SERVICER FIRST NAME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 4/3/2001 | 4/3/2001 | Escrow | 0403200135120160 | Tax Claim/Loss | 30 | faxed copy of Real Estate tax bill fax request from borrower regarding amount related to the customer | | Naoom | Elham |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 5/21/2001 | 5/22/2001 | Escrow | 05212001122131600 | Tax - Original Bill | | | | | |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 7/24/2001 | 11/7/2001 | Escrow | 07242001340351600 | Miscellaneous | 2 | | faxed authorization to draw funds | Lambson | Deborah |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 10/12/2001 | 11/5/2001 | Escrow | 10122001110006160 | Tax - Original Bill | 2 | TB K.Stephens | | | |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/24/2002 | 2/15/2002 | Escrow | 01202002257121600 | Tax Correspondence | | | Tracked to Jennifer Fitzpatrick. | Engelstad | Gail |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/7/2002 | 2/4/2002 | Escrow | 01072002215291600 | Tax - Original Bill | 2 | | faxed letter authorization to debit Lockbox account | Engelstad | Gail |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 4/23/2002 | 4/24/2002 | Escrow | 04232002105291600 | Tax - Original Bill | 2 | | recd via UPS | Engelstad | Gail |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 4/23/2002 | 4/24/2002 | Escrow | 04232001051131600 | Tax - Original Bill | 2 | | recd via UPS | Engelstad | Gail |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 4/24/2002 | 4/24/2002 | Escrow | 04242002105918160 | Tax - Original Bill | | | faxed. Letter of authorization to move funds to Tax escrow | Engelstad | Gail |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 4/11/2002 | 4/24/2002 | Escrow | 04112002356831600 | Tax - Original Bill | 5 | | recd via UPS | Engelstad | Gail |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 5/30/2002 | 5/30/2002 | Escrow | 05002002120943160 | Customer Service | | ELD 5/1/02 | faxed authorization to move funds to cover shortfall | Engelstad | Gail |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 5/30/2002 | 5/30/2002 | Escrow | 05102002413011600 | Customer Service | 2 | | faxed authorization to move funds | Naela | Naela |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 5/10/2002 | 5/30/2002 | Escrow | 05100024130316 00 | Customer Service | | | | Toish | Naela |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 6/17/2002 | 6/19/2002 | Escrow | 06172002422221600 | Cash Management | | ABA# changed to 211370545 Metrowest Bank to Bankbooth WIRE MEMO AND GAVE TO PAULINE TO CHANGE THE WIRE TEMPLATE | faxed FORWARDED TO KAREN MILLER AT 5:00 PM ON 6-18-02 | Miller | Karen |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 7/9/2002 | 9/17/2002 | Escrow | 07092002105529160 | Tax - Original Bill | 1 | TAX BILL -- ELD 8/1/02 paid taxes | | Fitzpatrick | Jennifer |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 10/8/2002 | 9/17/2002 | Escrow | 10082002244141600 | Tax - Original Bill | 2 | ELD 11/01/02D 7/26 | Recd via UPS | Lloyd | Brent |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/15/2003 | 1/31/2003 | Escrow | 01152000224271600 | Tax - Original Bill | 2 | Paid 1/29 | Recd via UPS | Lloyd | Brent |
| 760900083 | BLUE HILLS OFFICE PARK LLC | 1600 | 4/10/2003 | 4/18/2003 | Escrow | 04102003120253160 0 | Tax - Original Bill | 2 | Called and left a message for Carol faxed to the borrower shortage letter and mailed original on 4/11/2003. Taxes paid out on 4/16/2003 sent all back up to scan under tax disb. on 4/18/2003. mhD | FY2003 Real Estate Tax Bill | Kesler | Marchello |

EXHIBIT
134
Mallerali
7-8-06

**Blue Hills Office LLC**
**LOANCATOR Tracking Log**

| LOAN # | LOAN NAME | TRAN TYPE | DATE INCOMING | CLEAR DATE | WORK TYPE | TRACKING DATE/TIME | ITEM TYPE | SLA | COMMENTS 1 | COMMENTS 2 | SERVICER LAST NAME | SERVICER FIRST NAME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 5/21/2003 | 6/5/2003 | Escrow | 05212003b49431600 | Ins Premium Billing/Invoice | 2 | Sent shortage letter. Funds should be available on 6/4/03. Gave to Marchelle. | faxed along w/paid invoices | Hunt | Keesha L. |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/8/2004 | 1/9/2004 | Escrow | 010820041040261600 | Tax - Original Bill | 2 | Lerela is reporting the tax amount due, and it matches the amount on this bill. We will remit payment back through Lerela. Closing item. Tax Bill | 2004 Preliminary Real Estate | Lloyd | Brent |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 4/9/2004 | 4/28/2004 | Escrow | 0409200435207160 0 | Tax - Original Bill | 2 | Re tracked to Keesha on 4/12/04D ELD is 4/30/04 F/U 4/15/04. Taxes paid 4/28D | red via UPS | Hunt | Keesha L. |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 4/28/2004 | 4/28/2004 | Escrow | 04282004112843160 0 | Tax Correspondence | 5 | Completed 4/28 | faxed Auth. to transfer funds | Hunt | Keesha L. |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 6/8/2004 | 6/22/2004 | Escrow | 06082004325001600 | Ins Escrow Reimbursement | 3 | Rec'd request and approval of $50.00 fee to run an off scheduled analysis completed on 6/11/2004. Analysis effective 6/11/2004. Refund borrower on 6/22/2004 and mailed cover letter and analysis. Complete on 6/22/2004 | faxed along w/copies of paid receipts | Marchelle | |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 7/19/2004 | 7/20/2004 | Escrow | 07192004101191600 | Tax - Original Bill | 2 | We have received the tax amount back through Lerela, and will be paying from Lerela, and will be paying this bill. Closing item. | red via UPS | Lloyd | Brent |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 8/4/2004 | 8/19/2004 | Escrow | 0804200481634160 0 | Cash Management | 1 | referred request and approval of as the borrower is making request to the special servicer 08/11/04 | Rec'd via fax, borr requesting a debit out of their cash flow sub acct for their P&I and their tax transfer loan to Lennar "S" for Sept. shortage | Kesler | Brent |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 8/17/2004 | 8/19/2004 | Escrow | 0817200442631600 | Non-Monetary Action Form | 5 | Trckd to Elham N. on 8/23/04. Back up given to Rania. | cancel autodebit per hold code | Elham | Rania |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 8/20/2004 | 8/24/2004 | Escrow | 08202004331316 00 | Autodebit Form | 15 | cancel autodebit per hold code | Letter from Lennar regarding all loan payments & Billing notices to Borrowers | Stephens | Kate |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 8/27/2004 | 8/30/2004 | Escrow | 082720041151041600 | Customer Service | | Re tracked to Rania Shuheiber on 9/9/04D | letter regarding Tax Payment | Shuheiber | Rania |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 9/9/2004 | 9/9/2004 | Escrow | 0902200441211600 | Tax Correspondence | 5 | Re tracked to Rania Shuheiber on 9/9/04D | letter regarding Tax Payment | Shuheiber | Rania |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 10/25/2004 | 11/3/2004 | Escrow | 1025200430726160 0 | Special Servicer Fees | 5 | Loan in special servicing | rec'd via email | Shuheiber | Rania |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 10/29/2004 | 11/3/2004 | Escrow | 102920043086716 00 | Special Servicer Fees | 5 | | rec'd via email | Shuheiber | Rania |
| 70090083 | BLUE HILLS OFFICE PARK LLC | 1600 | 11/22/2004 | 12/3/2004 | Escrow | 1122004211011600 | Special Servicer Fees | 5 | Track out the The Cash Team for processing on 12/01/04 | EMAIL | Shuheiber | Rania |

Blue Hills Office LLC
LOANCATOR Tracking Log

| LOAN # | LOAN NAME | TRAN TYPE | DATE INCOMING | CLEAR DATE | WORK TYPE | TRACKING DATE/TIME | ITEM TYPE | SLA | COMMENTS 1 | COMMENTS 2 | SERVICER LAST NAME | SERVICER FIRST NAME |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 12/8/2004 | 12/8/2004 | Escrow | 12062004155371600 | Special Handling | 1 | | FAX | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 12/8/2004 | 12/16/2004 | Escrow | 12082004332201600 | Special Servicer Fees | 5 | Tracked to Cash Team for processing on 12/14/04 | FED EXP - OFFICERS | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 12/20/2004 | 12/22/2004 | Escrow | 12202004110769160 0 | Special Servicer Fees | 5 | | CERTIFICATE | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/4/2005 | 1/4/2005 | Escrow | 01042005110637160 0 | Special Servicer Fees | 5 | | EMAIL | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/5/2005 | 1/5/2005 | Escrow | 01052005338331600 | Special Servicer Fees | 5 | | FED EXP | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/5/2005 | 1/5/2005 | Escrow | 01062005353831600 | Research | 1 | | Disbursement Clearing | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/13/2005 | 1/27/2005 | Escrow | 01132005904171600 | Special Servicer Fees | 5 | | Outstanding check | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/13/2005 | 1/20/2005 | Escrow | 01132005694171600 | Special Servicer Fees | 5 | | EMAIL | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/14/2005 | 2/2/2005 | Escrow | 01142005121686160 0 | Special Servicer Fees | 5 | | recd Fed Ex | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/26/2005 | 2/14/2005 | Escrow | 01282005104566160 0 | Research | 1 | | Disbursement clearing | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/13/2005 | 1/27/2005 | Escrow | 01132005093341600 | Special Servicer Fees | 5 | | outstanding checks | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 1/27/2005 | 2/9/2005 | Escrow | 02022005210291600 | Special Servicer Fees | 5 | | EMAIL | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 2/9/2005 | 2/9/2005 | Escrow | 02022005210291600 | Special Servicer Fees | 5 | | recd via email | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 2/9/2005 | 2/9/2005 | Escrow | 02003200526241600 | Special Servicer Fees | 5 | Previously Tracked on 2/17. | Officer Cert. | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 2/22/2005 | 2/24/2005 | Escrow | 02222005421521600 | Special Servicer Fees | 5 | Amount should be for 62,208.23 | recd via email | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 2/22/2005 | 2/24/2005 | Escrow | 02222004205611600 | Special Servicer Fees | 5 | | recd via email | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 2/22/2005 | 2/24/2005 | Escrow | 02222005427461600 | Special Servicer Fees | 5 | | recd via email | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 3/2/2005 | 3/8/2005 | Escrow | 03032005115510160 0 | Special Servicer Fees | 5 | | recd via FED Ex | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 3/2/2005 | 3/8/2005 | Escrow | 03032005427461600 | Special Servicer Fees | 5 | | recd via FED Ex | Shuheber | Rania |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 3/22/2005 | 3/22/2005 | Escrow | 03222005341251600 | Special Servicer Fees | 5 | Tracked to Cash Team for processing on 03/23/05. | emailed | Guevara | Lisa |
| 760900063 | BLUE HILLS OFFICE PARK LLC | 1600 | 3/17/2005 | 3/22/2005 | Escrow | 03172005310451600 | Special Servicer Fees | 5 | | emailed | Shuheber | Rania |

WF01893

From:           mallegni@wellsfargo.com
Sent:           Thursday, July 15, 2004 4:00 PM
To:             Vickie Taylor
Subject:        RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12

Vickie,

I spoke with the CFO Joe Donovan on this loan. Fleet has left the project.
The property is available for lease, but there are no prospects currently.
They currently have $4,118,062 in reserves and the loan is paid through 8/11/04. We'll track this closely and advise.

Curtis

-----Original Message-----
From: Vickie Taylor [mailto:VTaylor@lnrproperty.com]
Sent: Monday, July 12, 2004 10:25 AM
To: Curtis J. Mallegni (E-mail)
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID#
12

Can you help me on this? Did Fleet review their lease? If not, will the borrower be able to keep the loan current on an almost vacant building. And if so, for how long? This is a large loan and we are very concerned.


> -----Original Message-----
> From:      Vickie Taylor
> Sent: Tuesday, June 29, 2004 4:04 PM
> To:   'nhanvi@wellsfargo.com'
> Subject:     RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA /
> ID# 12
>
> I don't remember if I received a response from you on this. Can you
> give me an update. Thank you.
>
> -----Original Message-----
> From:      Vickie Taylor
> Sent: Friday, June 11, 2004 11:08 AM
> To:   'nhanvi@wellsfargo.com'
> Subject:     CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12
>
> I understand Fleet will not be renewing their lease when it expires in
> July 2004. They occupy 96% of the property. Has the borrower stated
> how he is going to keep the loan current until the finds a new tenant?
> We are concerned as the property will be virtually 100% vacant.
>
> Vickie M. Taylor

1



EXHIBIT
136

LNR02873

# DEPOSITION EXHIBIT NO. 138

Tax Record for Single Loan

| Loan# | Seq | Month | Day | Year | Code | Trans Desc | Trans Amt | Trans Esc1 | Vendor |
|-------|-----|-------|-----|------|------|------------|-----------|------------|--------|
| 760990083 | 2 | 10 | 29 | 1999 | 09 | Escrow Payment | $ 49,617.03 | $ 49,617.03 | |
| 760990083 | 10 | 1 | 28 | 2000 | 09 | Escrow Payment | $ 150,799.89 | $ 150,799.89 | |
| 760990083 | 11 | 1 | 28 | 2000 | 29 | Tax Disbursment | $ 153,500.42 | $(153,500.42) | 299T |
| 760990083 | 8 | 4 | 21 | 2000 | 09 | Escrow Payment | $ 150,799.88 | $ 150,799.88 | |
| 760990083 | 9 | 4 | 24 | 2000 | 29 | Tax Disbursment | $ 153,500.41 | $(153,500.41) | 299T |
| 760990083 | 9 | 7 | 27 | 2000 | 09 | Escrow Payment | $ 160,414.32 | $ 160,414.32 | |
| 760990083 | 10 | 7 | 27 | 2000 | 29 | Tax Disbursment | $ 163,287.03 | $(163,287.03) | 299T |
| 760990083 | 9 | 10 | 16 | 2000 | 09 | Escrow Payment | $ 160,414.32 | $ 160,414.32 | |
| 760990083 | 10 | 10 | 16 | 2000 | 29 | Tax Disbursment | $ 163,287.03 | $(163,287.03) | 299T |
| 760990083 | 14 | 1 | 29 | 2001 | 46 | R.E. Tax Credit | $ 167,411.89 | $ 167,411.89 | |
| 760990083 | 16 | 1 | 29 | 2001 | 29 | Tax Disbursment | $ 163,287.03 | $(163,287.03) | 299T |
| 760990083 | 9 | 4 | 13 | 2001 | 09 | Escrow Payment | $ 68,795.93 | $ 68,795.93 | |
| 760990083 | 10 | 4 | 13 | 2001 | 29 | Tax Disbursment | $ 69,977.04 | $ (69,977.04) | 299T |
| 760990083 | 11 | 7 | 27 | 2001 | 09 | Escrow Payment | $ 151,114.34 | $ 151,114.34 | |
| 760990083 | 12 | 7 | 30 | 2001 | 29 | Tax Disbursment | $ 145,557.92 | $(145,557.92) | 299T |
| 760990083 | 13 | 10 | 30 | 2001 | 46 | R.E. Tax Credit | $ 142,997.11 | $ 142,997.11 | |
| 760990083 | 15 | 10 | 30 | 2001 | 29 | Tax Disbursment | $ 145,557.91 | $(145,557.91) | 299T |
| 760990083 | 13 | 1 | 24 | 2002 | 09 | Escrow Payment | $ 140,554.99 | $ 140,554.99 | |
| 760990083 | 14 | 1 | 25 | 2002 | 29 | Tax Disbursment | $ 143,072.06 | $(143,072.06) | 299T |
| 760990083 | 24 | 4 | 24 | 2002 | 46 | R.E. Tax Credit | $ 101,179.20 | $ 101,179.20 | |
| 760990083 | 26 | 4 | 24 | 2002 | 29 | Tax Disbursment | $ 143,072.05 | $(143,072.05) | 299T |
| 760990083 | 14 | 7 | 25 | 2002 | 46 | R.E. Tax Credit | $ 150,087.59 | $ 150,087.59 | |
| 760990083 | 16 | 7 | 26 | 2002 | 29 | Tax Disbursment | $ 150,087.59 | $(150,087.59) | 299T |
| 760990083 | 15 | 10 | 21 | 2002 | 46 | R.E. Tax Credit | $ 150,087.58 | $ 150,087.58 | |
| 760990083 | 17 | 10 | 22 | 2002 | 29 | Tax Disbursment | $ 150,087.58 | $(150,087.58) | 299T |
| 760990083 | 12 | 1 | 28 | 2003 | 09 | Escrow Payment | $ 147,513.32 | $ 147,513.32 | |
| 760990083 | 13 | 1 | 29 | 2003 | 29 | Tax Disbursment | $ 147,513.32 | $(147,513.32) | 299T |
| 760990083 | 12 | 4 | 16 | 2003 | 09 | Escrow Payment | $ 147,513.31 | $ 147,513.31 | |
| 760990083 | 13 | 4 | 16 | 2003 | 29 | Tax Disbursment | $ 147,513.31 | $(147,513.31) | 299T |
| 760990083 | 14 | 7 | 25 | 2003 | 46 | R.E. Tax Credit | $ 154,752.47 | $ 154,752.47 | |
| 760990083 | 16 | 7 | 25 | 2003 | 29 | Tax Disbursment | $ 154,752.47 | $(154,752.47) | 299T |
| 760990083 | 11 | 10 | 17 | 2003 | 09 | Escrow Payment | $ 154,752.47 | $ 154,752.47 | |
| 760990083 | 12 | 10 | 20 | 2003 | 29 | Tax Disbursment | $ 154,752.47 | $(154,752.47) | 299T |
| 760990083 | 8 | 1 | 23 | 2004 | 09 | Escrow Payment | $ 154,752.47 | $ 154,752.47 | |
| 760990083 | 9 | 1 | 26 | 2004 | 29 | Tax Disbursment | $ 154,752.47 | $(154,752.47) | 299T |
| 760990083 | 6 | 4 | 28 | 2004 | 09 | Escrow Payment | $ 121,597.85 | $ 121,597.85 | |
| 760990083 | 7 | 4 | 28 | 2004 | 29 | Tax Disbursment | $ 121,597.85 | $(121,597.85) | 299T |
| 760990083 | 6 | 7 | 29 | 2004 | 29 | Tax Disbursment | $ 158,181.19 | $(158,181.19) | 299T |
| 760990083 | 6 | 10 | 14 | 2004 | 09 | Escrow Payment | $ 51,908.89 | $ 51,908.89 | |
| 760990083 | 9 | 10 | 19 | 2004 | 29 | Tax Disbursment | $ 158,181.19 | $(158,181.19) | 299T |
| 760990083 | 37 | 11 | 23 | 2004 | 09 | Escrow Payment | $ 264,453.49 | $ 264,453.49 | |



EXHIBIT
138
Mallegni 3-8-06

WF03143

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim,

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## MANUAL FILING NOTIFICATION

Defendants give notice of the manual filing with the Clerk's office of **Exhibit 139, Notepad Entries** due to its voluminous size.

Dated:  May 17, 2006

RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA                    Page 1 of 2

---

## Barnett, Bruce

**From:** Larry Golinsky [LGolinsky@lnrproperty.com]
**Sent:** Wednesday, September 17, 2003 2:09 PM
**To:** Vickie Taylor; Emily Cooper
**Cc:** Jim Perillo
**Subject:** RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA

not much more to say

-----Original Message-----
From: Vickie Taylor
Sent: Wednesday, September 17, 2003 1:50 PM
To: Larry Golinsky; Emily Cooper
Cc: Jim Perillo
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA


Please see the Master Servicer's response below.  According to the PSA, the loan isn't imminent unless the borrower sends in writing his request to restructure the loan or we are within 60 days of the tenant vacating.  There is nothing at this point that triggers a transfer event.

-----Original Message-----
From: nhanvi@wellsfargo.com [mailto:nhanvi@wellsfargo.com]
Sent: Tuesday, September 16, 2003 3:37 PM
To: VTaylor@LNRPROPERTY.COM
Cc: mallegni@wellsfargo.com
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA


Vickie,

I just got off the phone with the borrower's representative and was informed that per his knowledge, the tenant will be vacating the property when their lease expires in July 2004.  The borrower has initiated marketing of the potential vacant space but has no information concerning any prospective tenants.  At this point in time the borrower is using a local leasing agent, but may expand their marketing when the lease expiration date approaches. If you have any other questions, please feel free to contact me.

Thanks,

Vi Nhan
Assistant Vice President/Credit Analyst
Wells Fargo Bank
Commercial Mortgage Servicing
Phone 415.396.8446
Fax  415.975.6477



LNR04068

## Barnett, Bruce

| | |
|---|---|
| **From:** | Daniel Boord [IMCEAEX-_O=LNR_OU=MIAMI_CN=RECIPIENTS_CN=DANIELB@lnrproperty.com] |
| **Sent:** | Thursday, August 12, 2004 12:58 PM |
| **To:** | Michael Reed |
| **Subject:** | FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12 |

going to be transferred shortly.

-----Original Message-----
From: Vickie Taylor
Sent: Thursday, August 12, 2004 12:38 PM
To: Daniel Boord
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID#
12


FYI

-----Original Message-----
From: mallegni@wellsfargo.com [mailto:mallegni@wellsfargo.com]
Sent: Wednesday, August 11, 2004 3:16 PM
To: VTaylor@lnrproperty.com
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID#
12


Vickie,

As a heads up, we have advanced the property tax payment of $158,181.19 for
this loan and the regular P & I payment is due today. I have a call into the
borrower to determine the status of payment. My suspicion is that they will
be seeking relief from their normal payments, so this loan may well be
coming to you very shortly. I'll keep you posted.


Curtis

-----Original Message-----
From: Mallegni, Curtis J.
Sent: Thursday, July 15, 2004 2:00 PM
To: 'Vickie Taylor'
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID#
12


Vickie,

I spoke with the CFO Joe Donovan on this loan. Fleet has left the project.



**LNR04088**

2/23/2006

# DEPOSITION EXHIBIT NO. 145

From:           Vickie Taylor
Sent:           Thursday, August 12, 2004 11:37 AM
To:             'mallegni@wellsfargo.com'
Subject:        RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12

Yes, please do. It has been on our radar for some time now.  Thanks.

-----Original Message-----
From: mallegni@wellsfargo.com [mailto:mallegni@wellsfargo.com]
Sent: Wednesday, August 11, 2004 3:16 PM
To: VTaylor@lnrproperty.com
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID#
12


Vickie,

As a heads up, we have advanced the property tax payment of $158,181.19 for this loan and the regular P & I
payment is due today. I have a call into the borrower to determine the status of payment. My suspicion is that
they will be seeking relief from their normal payments, so this loan may well be coming to you very shortly. I'll
keep you posted.

Curtis

-----Original Message-----
From: Mallegni, Curtis J.
Sent: Thursday, July 15, 2004 2:00 PM
To: 'Vickie Taylor'
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID#
12


Vickie,

I spoke with the CFO Joe Donovan on this loan. Fleet has left the project.
The property is available for lease, but there are no prospects currently.
They currently have $4,118,062 in reserves and the loan is paid through 8/11/04. We'll track this closely and
advise.

Curtis

-----Original Message-----
From: Vickie Taylor [mailto:VTaylor@lnrproperty.com]
Sent: Monday, July 12, 2004 10:25 AM
To: Curtis J. Mallegni (E-mail)
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID#
12

1



EXHIBIT
145
Mallegni

LNR02875

Can you help me on this? Did Fleet review their lease? If not, will the borrower be able to keep the loan current on an almost vacant building. And if so, for how long? This is a large loan and we are very concerned.

> -----Original Message-----
> From:      Vickie Taylor
> Sent: Tuesday, June 29, 2004 4:04 PM
> To:  'nhanvi@wellsfargo.com'
> Subject:     RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA /
> ID# 12
>
> I don't remember if I received a response from you on this.  Can you
> give me an update.  Thank you.
>
> -----Original Message-----
> From:      Vickie Taylor
> Sent: Friday, June 11, 2004 11:08 AM
> To:  'nhanvi@wellsfargo.com'
> Subject:     CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12
>
> I understand Fleet will not be renewing their lease when it expires in
> July 2004.  They occupy 96% of the property.  Has the borrower stated
> how he is going to keep the loan current until the finds a new tenant?
> We are concerned as the property will be virtually 100% vacant.
>
> Vickie M. Taylor
> Special Servicing Supervisor
> Lennar Partners, Inc.
> 1601 Washington Avenue, Ste. 700
> Miami Beach, FL  33139
> Phone: 305-695-5076
> Fax:  305-695-5601
>
>

2

LNR02876

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

    Plaintiff, Defendant-in-Counterclaim,

    v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

    Defendants, Plaintiffs-in-Counterclaim,

    v.

WILLIAM LANGELIER and GERALD
FINEBERG,

    Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## MANUAL FILING NOTIFICATION

Defendants give notice of the manual filing with the Clerk's office of **Exhibit 155, The Mortgage, Assignment of Leases and Rent s and Security Agreement** due to its voluminous size.

Dated:  May 17, 2006

# DEPOSITION EXHIBIT NO. 156

<div align="center">

**CASH MANAGEMENT AGREEMENT**

(this "<u>Agreement</u>")

dated as of September 14, 1999

among

</div>

**BLUE HILLS OFFICE PARK LLC**
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts  02481
(the "<u>Borrower</u>"),

**FINEBERG MANAGEMENT, INC.**
One Washington Street, Suite 400
Wellsley, MA  02481
(the "<u>Manager</u>"),

<div align="center">

and

</div>

**CREDIT SUISSE FIRST BOSTON**
     **MORTGAGE CAPITAL LLC**
11 Madison Avenue
New York, New York 10010
(together with its successors and
assigns, the "<u>Lender</u>")

WHEREAS, pursuant to the Mortgage, Assignment of Leases and Rents and Security Agreement, of even date herewith (the "<u>Mortgage</u>"), by and between the Lender and the Borrower, the Lender has provided financing (the "<u>Loan</u>") to the Borrower secured by the property or properties owned by the Borrower and described in the Mortgage (the "<u>Property</u>");

WHEREAS, the Lender has delivered to the Borrower's bank identified in <u>Exhibit A</u> hereto (the "<u>Clearing Bank</u>"), which is an Eligible Bank, maintaining the operating account or accounts of the Borrower (the "<u>Property Account</u>"), a Clearing Bank Instruction Letter attached as <u>Exhibit A</u> hereto (together with any modifications, amendments or replacements thereof, the "<u>Instruction Letter</u>"), which provides that all Rents (as defined in the Mortgage) be deposited in the account named therein (upon delivery of the Instruction Letter, a "<u>Clearing Account</u>") and swept periodically into the accounts established hereunder;

NOW THEREFORE, in consideration of the premises and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:



EXHIBIT
156
Marthy 2-7-06

Blue Hill 0116

Section 1.    Defined Terms.

(a)    As used herein the following capitalized terms shall have the respective meanings set forth below:

"Account Proceeds" shall mean any and all Rents and other revenue in connection with any Property that is deposited by any Clearing Bank, the Borrower, the Manager or otherwise into the Cash Collateral Account from time to time.

"Anticipated Repayment Date" means the "Anticipated Repayment Date" as defined in Section 1(b) of the Note.

"Borrower Remainder Account" shall mean the account of Borrower to which monies in the Borrower Remainder Sub-account are allocated in accordance with the terms of Section 3(b)(vii) hereof.

"Business Day" shall mean any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York or the city in which the Deposit Bank is located are required or permitted by law to be closed.

"Capital Expenditures" shall have the meaning ascribed to such term in the Note.

"Cash Collateral Account" shall have the meaning ascribed to such term in Section 2 hereof.

"Certificates" means the securities issued in connection with a Secondary Market Transaction.

"Clearing Account" shall have the meaning given such term in the Recitals.

"Clearing Bank" shall have the meaning given such term in the Recitals.

"Collateral" shall mean the Cash Collateral Account, the Tax and Insurance Impound Fund Account, all Permitted Investments and any and all proceeds and products thereof.

"Collection Period" with respect to any Payment Date, shall mean the period of days from the eleventh day of the month immediately preceding the Payment Date to the tenth day of the month in which such Payment Date occurs. With respect to the first Payment Date, the Collection Period shall commence on and include the date hereof and end on and include the tenth day of the calendar month of such first Payment Date.

"Deposit Bank" shall mean the Eligible Bank or Banks selected by the Lender to maintain the Cash Collateral Account.

"Eligible Account" shall mean either (i) an account or accounts maintained with an Eligible Bank or (ii) a Trust Account. Eligible Accounts may bear interest.

SRZNY\611528v5

Blue Hill  0117

"Eligible Bank" shall mean a bank that (i) satisfies the Rating Criteria and (ii) insures deposits held by such bank through the Federal Deposit Insurance Corporation.

"Instruction Letter" shall have the meaning ascribed to such term in the Recitals.

"Loan" shall have the meaning ascribed to such term in the Recitals.

"Loan Documents" shall have the meaning set forth for such term in the Mortgage.

"Monthly Leasing Escrow Fund Amount" (as used in Paragraph 6(c)(iii) of the Mortgage) shall mean the aggregate of the monthly payments required pursuant to Paragraphs 6(c)(i) and 6(c)(ii) of the Mortgage.

"Monthly Payment Amount" shall have the meaning given to such term in the Note.

"Mortgage" shall have the meaning given such term in the Recitals.

"Mortgage Satisfaction Event" shall mean the satisfaction in full of the Obligations.

"Mortgage Sub-accounts" shall have the meaning ascribed to such term in Section 2(c).

"Note" shall mean that certain Mortgage Note, of even date herewith, made by the Borrower in favor of the Lender and evidencing the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Obligations" shall mean any and all debt, liabilities and obligations of the Borrower to the Lender pursuant to or in connection with the Loan, whether now or hereafter existing, including without limiting the generality of the foregoing, the indebtedness evidenced by the Note, all interest accruing thereon, and any and all debt, liabilities and obligations of the Borrower under the Loan Documents.

"Operating Expenses" shall mean, collectively, Cash Expenses (as defined in the Note) and Extraordinary Expenses (as defined in the Note).

"Payment Date" shall have the meaning given to such term in the Note.

"Permitted Investments" shall mean any investment suitable for the investment of escrows and reserves established under mortgage loans included in a Secondary Market Transaction in which some or all of the Certificates issued are rated "AAA" (or the equivalent rating) by the Rating Agencies, as the standards therefor are established from time to time, or such investments which are otherwise acceptable to the Lender. Schedule 1 annexed hereto sets forth certain obligations and securities which are merely illustrative of Permitted Investments as of the date hereof.

"Person" shall mean any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether territorial, national,

Blue Hill   0118

federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Property" shall have the meaning ascribed to such term in the Recitals.

"Rating Agencies" shall mean (i) any nationally-recognized statistical rating organizations that provide a rating on any Certificates on the date of issuance of the Certificates or (ii) prior to the issuance of the Certificates, S&P and any other nationally-recognized statistical rating organizations that have been designated by the Lender in its sole discretion.

"Rating Criteria" with respect to any Person, shall mean that (i) the short-term unsecured debt obligations of such Person are rated at least "A-1" by S&P and, if rated by another Rating Agency, are rated in an equivalent category by such other Rating Agency, if deposits are held by such person for a period of less than 30 days, or (ii) the long-term unsecured debt obligations of such Person are rated at least "AA-" by S&P and, if rated by another Rating Agency, are rated in an equivalent category by such other Rating Agency, if deposits are held by such person for a period of 30 days or more.

"Rents" shall have the meaning ascribed to such term in the Mortgage.

"S&P" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Secondary Market Transaction" shall have the meaning given to such term in the Mortgage.

"Servicer" shall mean a servicer or account administrator of the Lender designated by and acting for the benefit of the Lender.

"Tax and Insurance Impound Fund Account" shall have the meaning ascribed to such term in Section 2(e) hereof.

"Trust Account" shall mean a segregated trust account maintained by a corporate trust department of a federal depository institution or a state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(B) which has corporate trust powers and is acting in its fiduciary capacity.

(b)      The meanings given to capitalized terms defined herein shall be equally applicable in both singular and plural forms of such terms.

(c)      Capitalized terms used and not defined herein shall have the respective meanings given to such terms in the Mortgage.

Blue Hill 0119

Section 2.     Establishment of the Cash Collateral Account and Tax and Insurance Impound Fund Account.

(a)     The Lender has established and will maintain while the Loan is outstanding a cash collateral account (which may be a book-entry sub-account of an Eligible Account) at the Deposit Bank (the "Cash Collateral Account") which shall be entitled "Credit Suisse First Boston Mortgage Capital LLC as Mortgagee of Blue Hills Office Park LLC Cash Collateral Account". In connection with a Secondary Market Transaction, the Lender shall have the right to cause Deposit Bank to entitle the Cash Collateral Account with such other designation as the Lender may select in its reasonable discretion to reflect such assignment or transfer. The Lender shall, or shall cause the Servicer to, cause the Deposit Bank to deposit into the Cash Collateral Account, all Rents and other amounts transferred to the Deposit Bank from the Clearing Bank. Notwithstanding anything to the contrary herein or in the other Loan Documents (but subject to the provisions of Section 2(d)(ii) hereof), all payments due from the Borrower, and Sub-account allocations to be made, pursuant to the Loan Documents shall be deemed paid, or allocated, as applicable, upon the receipt of such amounts in immediately available funds by the Deposit Bank, unless not transmitted in accordance with the Clearing Bank Instruction Letter, in which case upon the receipt of such amounts in immediately available funds in the Cash Collateral Account.

(b)     The Cash Collateral Account shall be an interest bearing account subject to and in accordance with the provisions of Sections 2(f) and 2(g) hereof. All interest income remaining in the Cash Collateral Account (other than the Tax and Insurance Impound Fund Account, if such account is established as a sub-account thereof) shall be for the benefit of the Borrower and credited to the Cash Collateral Account. The Cash Collateral Account (other than the Tax and Insurance Impound Fund Account, if such account is established as a sub-account thereof) shall be assigned the federal tax identification number of the Borrower, which number has been applied for. Borrower shall provide Lender or the Deposit Bank, at any time upon request of Lender, with a Form W-8 or W-9 to evidence Borrower is not subject to any back-up withholding under the United States Internal Revenue Code. Prior to application in accordance with the terms hereof, all amounts in the Cash Collateral Account shall remain an asset of Borrower, subject to the lien and security interest granted Lender hereunder, and subject to all of the terms and conditions of this Agreement and the other Loan Documents.

(c)     The following sub-accounts (collectively, the "Mortgage Sub-accounts") of the Cash Collateral Account shall be maintained on a ledger-entry basis:

(i)     "Tax and Insurance Impound Fund Sub-account";

(ii)     "Monthly Debt Service Sub-account";

(iii)     "Replacement Escrow Fund Sub-account";

(iv)     "Base Leasing Escrow Fund Sub-account";

(v)     "Cash Flow Leasing Escrow Fund Sub-account";

-5-

Blue Hill 0120

(vi)     "Operating Expense Sub-account";

(vii)    "Casualty and Condemnation Proceeds Sub-account";

(viii)   "Extraordinary Receipts Sub-account"; and

(ix)     "Borrower Remainder Sub-account".

Amounts allocated to the Mortgage Sub-accounts shall be disbursed in accordance with the terms of this Agreement and the Mortgage.

(d)     (i)     Concurrently herewith, the Lender has delivered an executed Instruction Letter to the Clearing Bank. Borrower shall not change the bank, bank location or account number of the Clearing Account without Lender's prior written consent. If the Clearing Account is so changed with Lender's consent, Lender's consent shall be conditioned upon the receipt by Lender, at least five (5) Business Days prior to the effectiveness of such change, of (A) a new letter substantially similar to the Instruction Letter with respect to such new bank, bank location or account number duly-executed by Borrower, and (B) such Clearing Bank's executed acknowledgment that its procedures with respect to the Clearing Account are governed by the Instruction Letter.

(ii)     At the election of the Lender, at any time from time to time within ten (10) Business Days after notice from the Lender, the Borrower will establish a new Eligible Account (which shall become the Clearing Account) at a bank reasonably selected by the Lender (which bank shall also be required to be reasonably satisfactory to the Borrower if the Lender makes such an election at a time that no Event of Default has occurred and is then continuing) and shall cause all funds in the existing Clearing Account to be transferred to the new Clearing Account and any future Rents from the Property to be deposited in such new Clearing Account. In such event, or if Lender shall amend the provisions of the Instruction Letter such that the timing of any disbursements to be made by the Clearing Bank from the Clearing Account into the Cash Collateral Account is delayed, then all payments due from the Borrower, and Sub-Account Allocations to be made, pursuant to the Loan Documents shall be deemed paid, or allocated, as applicable, upon the receipt of such amounts in immediately available funds in the Clearing Account.

(e)     The Lender may establish and maintain while the Loan is outstanding at the Deposit Bank one or more accounts (which may be a sub-account of the Cash Collateral Account) (the "Tax and Insurance Impound Fund Account") which shall be entitled "Credit Suisse First Boston Mortgage Capital LLC as Mortgagee of Blue Hills Office Park LLC Tax and Insurance Impound Fund Account". Amounts on deposit in the Tax and Insurance Impound Fund Account shall be disbursed at the direction of the Lender in accordance with the Mortgage. The Tax and Insurance Impound Fund Account shall be assigned the federal tax identification number of the Lender.

(f)     The Lender or the Servicer shall direct the Deposit Bank to invest amounts allocated to the Cash Collateral Account in Permitted Investments selected by the Lender

SRZNY\611528v5

Blue Hill 0121

(provided, however, that the Lender shall reasonably accommodate the Borrower's suggestions in selecting from among such Permitted Investments), and may (but shall not be obligated to) direct the Deposit Bank to invest amounts allocated to the Tax and Insurance Impound Fund Account in Permitted Investments selected by the Lender in its sole discretion. All earnings on such Permitted Investments on funds allocated to in such Accounts (other than the Tax and Insurance Impound Fund Subaccount) shall be for the benefit of the Borrower. The Lender or Servicer, as applicable, shall have liability for any loss in investments of funds that are invested in Permitted Investments but no such loss or liability shall affect Borrower's obligations to make all payments and deposits required to be made by Borrower under the Loan Documents.

(g)    It is the intention of the parties hereto that the entire amounts deposited in the Cash Collateral Account (or as much thereof as the Lender may reasonably arrange to invest) shall at all times be invested in Permitted Investments, and that such Accounts shall be so-called "zero balance" accounts. All funds in such Accounts that are invested in a Permitted Investment are deemed to be held in such Accounts for all purposes of the Mortgage and the other Loan Documents.

(h)    In order to further secure the performance by the Borrower of the Obligations and as a material inducement for the Lender to make the Loan in accordance with the terms of the Loan Documents, the Borrower hereby (i) requests that the Cash Collateral Account and the Tax and Insurance Impound Fund Account be established on its behalf at the Deposit Bank in the names set forth above and (ii) acknowledges that, subject to the terms, covenants and conditions of this Agreement, the Mortgage and the other Loan Documents, (A) the Cash Collateral Account and the Tax and Insurance Impound Fund Account will be subject to the sole dominion, control and discretion of the Lender (which may be exercised through the Servicer), (B) the Lender shall have the sole right to make withdrawals or transfers of funds from the Cash Collateral Account and the Tax and Insurance Impound Fund Account and (C) neither the Borrower nor any other Person claiming on behalf of or through the Borrower shall have any right or authority, whether express or implied, to make use of, or withdraw any funds, investments or other properties from, the Cash Collateral Account or the Tax and Insurance Impound Fund Account, or to give any instructions to the Deposit Bank with respect to the Cash Collateral Account or the Tax and Insurance Impound Fund Account.

Section 3.    <u>Allocation and Disbursement of Funds in the Cash Collateral Account</u>.

(a)    Commencing on the first Business Day of each Collection Period occurring prior to the Anticipated Repayment Date, the Lender or the Servicer shall allocate amounts deposited in the Cash Collateral Account from time to time during such Collection Period in the order and priority set forth in Section 8(a) of the Note. Commencing on or prior to the first Business Day of each Collection Period beginning on or after the Anticipated Repayment Date, the Lender or the Servicer shall allocate amounts deposited in the Cash Collateral Account from time to time during such Collection Period in the order and priority set forth in Section 9(b) of the Note.

-7-

Blue Hill 0122

(b)      The Lender or the Servicer shall disburse:

(i)      Amounts allocated to the Tax and Insurance Impound Fund Sub-account to the Tax and Insurance Impound Fund Account on each Payment Date for further disbursement therefrom as set forth in the Mortgage;

(ii)      Amounts allocated to the Monthly Debt Service Sub-account to the Lender on the related Payment Date;

(iii)      Amounts allocated to the Replacement Escrow Fund Sub-account as set forth in the Mortgage;

(iv)      Amounts allocated to the Base Leasing Escrow Fund Sub-account as set forth in the Mortgage;

(v)      Amounts allocated to the Cash Flow Leasing Escrow Fund Sub-account as set forth in the Mortgage;

(vi)      Amounts allocated to the Operating Expense Sub-account on the last Business Day of each week to the following account:

Bank:[Name of Bank holding Operating Account]
ABA#:
Attention:
Fax:
Account:  Fineberg Management, Inc. - Operating Account
Account #: _____

(vii)      Amounts allocated to the Borrower Remainder Sub-account (which shall no longer be considered Rents) on the last Business Day of each week to the following account:

Bank:[Name of Bank]
ABA#:
Attention:
Fax:
Account:  Blue Hills Office Park LLC
Account #: _____ ]

Section 4.    <u>Fees.</u>

(a)    The Borrower agrees to pay the fees of the Servicer and the Deposit Bank in accordance with the customary fees charged by the Deposit Bank and the Servicer for the services described herein, as such fees are established from time to time.

(b)    Upon the request of the Borrower, the Lender shall cause the Deposit Bank and the Servicer to include their fees in an account analysis statement.

SRZNY\611528v5

**Blue Hill 0123**

Section 5.     Termination.

(a)     The Lender may replace the Deposit Bank with a new Deposit Bank upon five (5) days' notice to the Borrower and the Clearing Bank.  The Borrower and Lender each hereby agrees to take all reasonable actions necessary to facilitate the transfer of the respective obligations, duties and rights of the Deposit Bank to the successor thereof selected by the Lender in its sole discretion.

(b)     The Lender shall terminate this Agreement upon the occurrence of a Mortgage Satisfaction Event and return to Borrower all monies then held in the Cash Collateral Agreement and the Tax and Insurance Impound Fund Account after liquidating all Permitted Investments, or, if requested by the Borrower, the Lender shall, at no cost to the Lender, cooperate in causing a transfer to the Borrower of a Permitted Investment held by the Lender at the time of the Mortgage Satisfaction Event, if the same is susceptible of transfer and not then easily liquidated.

Section 6.     Matters Concerning the Borrower.

(a)     Simultaneously with the execution hereof, and as a condition to the funding of the Loan, and hereafter during the term of the Loan, the Borrower shall cause each of the following to occur:

(i)     The Borrower or the Manager shall immediately instruct all Persons that presently or hereafter maintain open accounts with Borrower or the Manager or with whom the Manager or the Borrower presently or hereafter does business on an "accounts receivable" basis with respect to the Property to deliver all payments due under such accounts to the Clearing Bank at a lock box address at the Clearing Bank (the "Lock Box Address") in the form of cashier's checks or equivalent instruments for the payment of money.  Neither the Borrower nor the Manager shall direct any such Person to make payments due under such accounts in any other manner.

(ii)     Pursuant to an instruction letter in the form of Exhibit B hereto (a "Lessee Payment Direction Letter"), the Borrower or the Manager shall immediately notify and advise each tenant of the Property (collectively, the "Tenants") under each lease with respect to the Property (whether such lease is presently effective or executed after the date hereof), to send directly to the Lockbox Address promptly when due all payments, whether in the form of checks, cash, drafts, money orders or any other type of payment whatsoever of rent or any other item payable to the Borrower as landlord under such Leases.  The foregoing requirements need not be satisfied with respect to any Lease executed after the date hereof to the extent the terms and conditions of the Lessee Payment Direction Letter are incorporated in the applicable Lease.

(iii)     If notwithstanding the provisions of this Section 6(a), Borrower or Manager (or any affiliate thereof) receives any Rents, then (x) Borrower or Manager (or such affiliate) shall be deemed to hold such Rents in trust for Lender and (y) the Borrower and the Manager shall deposit with the Clearing Bank within one Business Day of receipt all such Rents received by the Borrower or the Manager (or such affiliate).

Blue Hill 0124

(b)    Upon request of Lender, Borrower shall deliver to Lender such evidence as Lender may reasonably request to evidence that Borrower is complying with the provisions of this Section 6(a). Without the prior written consent of the Lender, neither the Borrower nor the Manager shall (i) terminate, amend, revoke or modify any Lessee Payment Direction Letter in any manner or (ii) direct or cause any Tenant to pay any amount in any manner other than as provided specifically in the related Lessee Payment Direction Letter.

(c)    The Borrower hereby pledges, transfers and assigns to the Lender, and grants to the Lender, as additional security for the payment and performance of the Obligations, a continuing perfected first priority security interest in and to, and a first lien upon, (i) the Cash Collateral Account, the Clearing Account, the Tax and Insurance Impound Fund Account and all of the Borrower's right, title and interest in and to all cash, property or rights transferred to or deposited therein from time to time, (ii) all earnings, investments and securities held in the Cash Collateral Account and the Tax and Insurance Impound Fund Account in accordance with this Agreement and (iii) any and all proceeds of the foregoing. This Agreement and the pledge, assignment and grant of security interest made hereby shall secure payment of all amounts payable by the Borrower to the Lender under the Note and the other Obligations. The Borrower acknowledges that the Servicer, Clearing Bank and Deposit Bank are acting as the agent of, and at the direction of, the Lender in connection with the subject matter of this Agreement. The Borrower further agrees to execute, acknowledge, deliver, file or do at its sole cost and expense, all other acts, assignments, notices, agreements or other instruments as the Lender may reasonably require in order to effectuate, assure, convey, secure, assign, transfer and convey unto the Lender any of the rights granted by this Agreement and to more fully perfect and protect any lien or security interest granted hereby.

(d)    In its sole discretion, the Borrower may from time to time deposit amounts into the Cash Collateral Account in respect of any Mortgage Sub-account from sources of the Borrower other than those received by the Clearing Bank with respect to the then-current Collection Period; provided, that if the Borrower deposits such amounts, the amounts deposited shall be subject to all of the terms hereof as if not separately deposited by the Borrower, and may not be withdrawn except as otherwise provided for in this Agreement. Nothing contained herein shall impair or otherwise limit Borrower's obligations to timely make the payments (including, without limitation, interest and principal) required by the Note, the Mortgage and the other Loan Documents, it being understood that such payments shall be so timely made in accordance with the Loan Documents regardless of the amounts on deposit in the Clearing Account, Cash Collateral Account and/or Tax and Insurance Impound Fund Account; provided, however, that Lender agrees to distribute funds deposited in the Cash Collateral Account, to the extent and in the time and manner required pursuant to the terms of this Agreement, the Mortgage and the other Loan Documents.

(e)    The Borrower hereby covenants and agrees that, from and after the earlier to occur of (i) an Event of Default or (ii) the Anticipated Repayment Date, amounts allocated to the Operating Expense Sub-account with respect to the payment of Operating Expenses or Capital Expenditures shall be used only for payment of checks made by the Borrower for the payment of expenses incurred in the ordinary course of business of the ownership and operation

SRZNY\611528v5

Blue Hill 0125

of the Property or for the payment of expenditures approved by the Lender or otherwise permitted hereunder or under the other Loan Documents.

       (f)    If the actual Operating Expenses and Capital Expenditures paid during any Collection Period are (i) prior to the earlier to occur of (x) an Event of Default or (y) the Anticipated Repayment Date, in an amount such that the monthly operating income remaining after application of the amounts required to be applied pursuant to subparagraphs (8)(a)(i) through (8)(a)(viii) of the Note is insufficient to fully fund the Monthly Cash Flow Leasing Escrow Fund Amount, and (ii) thereafter, less than the amount transferred to the Operating Account, in either case during such Collection Period, the amount of such shortfall shall promptly be deposited by Borrower back into the Cash Collateral Account, in any event no later than twenty (20) days after the end of the applicable Collection Period, such amount to be applied in accordance with the Annual Budget (as defined in the Note) then applicable when such sum is redeposited into the Cash Account. Within twenty (20) days after the end of each Collection Period occurring commencing upon the earlier to occur of (x) an Event of Default or (y) the Anticipated Repayment Date, Borrower shall prepare and deliver to Lender a statement in form and substance reasonably satisfactory to Lender in all material respects setting forth all amounts expended for Operating Expenses and Capital Expenditures during such Collection Period, including showing variances from budget and setting forth a short explanation of any variance in excess of ten percent (10%) of the budget line item in question and identifying any payment made to an Affiliate and the reasons therefor. Each such statement shall be certified by an officer of Borrower as being true, correct and complete in all material respects and shall include a certification that all amounts transferred to the Operating Account pursuant to this Agreement were expended for Operating Expenses and Capital Expenditures in accordance with this Agreement or have been or are being returned to the Cash Collateral Account as provided above. Borrower shall promptly deliver to Lender such further written documentation (including, without limitation, invoices, canceled checks or copies of contracts) and information as Lender may reasonably request regarding any payments described in Borrower's statements. If Borrower shall fail to deposit any excess funds in the Cash Collateral Account or provide its required statements or, after written request of Lender, evidence of expenditures, in each case, within the time periods provided in the preceding sentences and such failure continues for ten (10) or more days after notice of such failure, then in addition to any other remedies which Lender may have with respect thereto, Lender may elect not to fund the Operating Expense Sub-account from monies in the Cash Collateral Account or Lender may continue to hold the funds in the Operating Expense Sub-account until such failure is cured.

      Section 7.    <u>Certain Matters Regarding the Lender.</u>

       (a)    The parties agree that the Deposit Bank shall pay over to the Lender all amounts deposited in any account maintained hereunder on demand, without notice to the Borrower, <u>provided</u>, that in making such demand, the Lender gives notice, in writing, signed by the Lender or an authorized agent thereof, that an Event of Default under the Mortgage has occurred and is continuing. Notwithstanding the foregoing, the Borrower shall not be deemed to have waived any rights the Borrower may have against the Lender if it is determined that the Lender acted improperly.

<div align="center">-11-</div>

Blue Hill 0126

(b)    Lender may exercise in respect of the Collateral all rights and remedies available to Lender hereunder or under the other Loan Documents or otherwise available at law or in equity. Without limiting the generality of the foregoing or the provisions of paragraph (a) above, upon the occurrence and during the continuance of an Event of Default, Borrower acknowledges and agrees that it will have no further right to request or otherwise require Lender to disburse funds from the Clearing Account, the Cash Collateral Account or the Tax and Insurance Escrow Account in accordance with the terms of this Agreement, it being agreed that Lender may, at its option, (i) direct the Deposit Bank to continue to hold the funds in the Cash Collateral Account and the Tax and Insurance Escrow Account and/or (ii) continue from time to time to apply all or any portion of the funds held in the Cash Collateral Account or Tax and Insurance Escrow Account to any payment(s) which such funds could have been applied to prior to such Event of Default (or to pay Cash Expenses, Net Capital Expenses and Extraordinary Expenses directly), to the extent and in such order and manner as Lender in its sole discretion may determine, and/or (iii) direct that the Deposit Bank or Clearing Bank from time to time disburse all or any portion of the funds held in the Cash Collateral Account or the Tax and Insurance Escrow Account or other Collateral then or thereafter held by the Deposit Bank or Clearing Bank, as applicable, to Lender, in which event Lender may apply the funds held in the Cash Collateral Account, the Tax and Insurance Escrow Account or other Collateral to the Obligations in any order and in such manner as Lender may determine in its sole discretion.

(c)    Upon the occurrence and during the continuance of any Event of Default, Lender may, at any time or from time to time, collect, appropriate, redeem, realize upon or otherwise enforce its rights with respect to the Collateral, without notice to Borrower and without the need to institute any legal action, make demand, exhaust any other remedies or otherwise proceed to enforce its rights.

(d)    No failure on the part of Lender to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right under this Agreement or the other Loan Documents. The remedies provided in this Agreement, the Note, the Mortgage and the other Loan Documents are cumulative and not exclusive of any remedies provided at law or in equity.

Section 8.    Casualty and Condemnation Proceeds
            Sub-account; Extraordinary Receipts Sub-account.

Notwithstanding anything to the contrary contained herein, but subject to the provisions of the Mortgage, the following items of Rents, as and when received, shall be deposited and held in the Mortgage Sub-accounts described below and shall be applied in the order of priority set forth in this Section 8, and Borrower shall advise Lender at the time of receipt thereof of the nature of such receipt so that Lender shall have sufficient time to instruct the Deposit Bank to deposit and hold such amounts in the appropriate Mortgage Sub-account:

(a)    Proceeds of any insurance (exclusive of rent or business interruption insurance, which shall be deemed Rents), which amounts shall be deposited in the Casualty and

-12-

Blue Hill  0127

Condemnation Proceeds Sub-account and shall be applied (by instructions of Lender or Servicer to the Deposit Bank) in accordance with the provisions of the Mortgage applicable thereto.

(b)    Condemnation awards, which amounts shall be deposited in the Casualty and Condemnation Proceeds Sub-account and shall be applied (by instructions of Lender or Servicer to the Deposit Bank) in accordance with the provisions of the Mortgage applicable thereto.

(c)    Real estate tax refunds (net of any reasonable and customary fees and disbursements of tax certiorari counsel deducted from such refund to pay such counsel's fee), which amount shall be deposited in the Extraordinary Receipts Sub-account and shall thereafter be transferred (by instructions of Lender to the Deposit Bank) to the Property Account to the extent required to pay refunds due to any tenants of the Property (based on a certificate of Borrower as to the tenants entitled to receive such refunds and the amounts thereof), except Lender reserves the right to pay (or have the Servicer pay) any such tenant directly using monies so deposited in the Extraordinary Receipts Sub-account, in lieu of transferring such monies to the Operating Account for such payment.  Lender or Servicer shall apply any excess. after the aforesaid payment, as if ordinary Rents deposited in the Cash Collateral Account.

(d)    Any other extraordinary event pursuant to which Borrower receives payments or income (in whatever form) derived from or generated by the use, ownership or operation of the Premises, not otherwise covered above (other than payments from any lessee under any Lease) shall be deposited in the Clearing Account and applied as ordinary Rents as if such amounts were ordinary Rents to be applied in accordance with the terms of this Agreement for the month in question.

(e)    If the fees and disbursements of tax certiorari counsel described in paragraph (c) above shall not have been deducted from the real estate tax refunds by such counsel prior to payment of such refunds to Borrower, then such fees and disbursements may be paid as part of Operating Expenses, provided such fees and disbursements are commercially reasonable. References to application of any amounts received by Borrower by reason of any action taken by Borrower under or with respect to a Lease, or otherwise, is not intended in any manner to allow Borrower to take such action in conflict with any other provision of the Loan Documents.

Section 9.    Successors and Assigns; Assignments; Agents.

(a)    This Agreement shall bind and inure to the benefit of and be enforceable by the Borrower, the Lender and the Manager and their respective successors and assigns.

(b)    The Lender shall have the right to assign or transfer rights and obligations under this Agreement without limitation. Any assignee or transferee shall be entitled to all the benefits afforded the Lender under this Agreement and the other Loan Documents; provided, that such assignee or transferee shall upon written request deliver to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement and the other Loan Documents and is also the assignee or transferee of the Note and the other Loan Documents.

Blue Hill  0128

(c)    The Borrower shall have the right to assign and transfer its rights and obligations hereunder only with the prior written consent of the Lender.

(d)    Any duties or actions of the Lender hereunder may be performed by the Lender or its agent(s), including without limitation, any Servicer or trustee in a Secondary Market Transaction, which includes the Loan.

Section 10.    Amendment.

This Agreement may be amended from time to time in writing by all parties hereto. All amendments to this Agreement shall be in writing.

Section 11.    Notices.

Notices to the parties hereto shall be addressed and delivered in the manner set forth in the Mortgage. Unless otherwise expressly provided herein, all such notices, to be effective, shall be in writing (including by facsimile), and shall be deemed to have been duly given or made (a) when delivered by hand or by nationally recognized overnight carrier, (b) upon receipt after being deposited in the mail, certified mail and postage prepaid or (c) in the case of facsimile notice, when sent and electronically confirmed, addressed as set forth above.

Section 12.    Limitation on Liability.

Lender shall not be liable for any acts, omissions, errors in judgment or mistakes of fact or law, including, without limitation, acts, omissions, errors or mistakes with respect to the Collateral, except for those arising as a result of Lender's acts of gross negligence or willful misconduct or as otherwise expressly provided in the Loan Documents. Without limiting the generality of the foregoing, except as otherwise expressly provided for herein or as required by applicable law, Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other right pertaining to any Collateral. Lender is hereby authorized by Borrower to act on any written instruction believed by Lender in good faith to have been given or sent by Borrower.

Section 13.    Mortgagee-in-Possession.

Borrower hereby confirms and agrees that notwithstanding the provisions of this Agreement, Borrower retains sole control of the operation and maintenance of the Property, subject to the obligations of Borrower under the Mortgage, the Assignment of Leases and Rents and the other Loan Documents, and Lender is not and shall not be deemed to be a mortgagee in possession.

Section 14.    Governing Law.

SRZNY\611528v5

Blue Hill 0129

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS.

[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]

SRZNY\611528v5

Blue Hill 0130

IN WITNESS WHEREOF, the parties hereto have executed this CASH MANAGEMENT AGREEMENT in several counterparts (each of which shall be deemed an original) as of the date first above written.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By:  Blue Hills Management Corp.,
     a Massachusetts corporation
     its manager

By:  _Gerald S. Fineberg_
     Gerald S. Fineberg
     President

CREDIT SUISSE FIRST BOSTON
    MORTGAGE CAPITAL LLC,
    as the Lender

By: _____
    Name:
    Title:

FINEBERG MANAGEMENT, INC.
a Massachusetts corporation

By:  _Gerald S. Fineberg_
     Name:  Gerald S. Fineberg
     Title:  President

SRZNY\611528v3

Blue Hill 0131

IN WITNESS WHEREOF, the parties hereto have executed this CASH MANAGEMENT AGREEMENT in several counterparts (each of which shall be deemed an original) as of the date first above written.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By:  Blue Hills Management Corp.,
     a Massachusetts corporation
     its manager

        By:  _____
             Gerald S. Fineberg
             President

CREDIT SUISSE FIRST BOSTON
    MORTGAGE CAPITAL LLC,
    as the Lender

By:  _____
     Name: MARK FIREMAN
     Title: VICE-PRESIDENT

FINEBERG MANAGEMENT, INC.
a Massachusetts corporation

By:  _____
     Name:
     Title:

Blue Hill 0132

<u>EXHIBIT A</u>

**CLEARING BANK INSTRUCTION LETTER**

September ___, 1999

MetroWest Bank
15 Park Street
P.O. Box 9111
Framingham, Massachusetts 01701

Re:  BLUE HILLS OFFICE PARK

Ladies and Gentlemen:

Blue Hills Office Park LLC (the "<u>Borrower</u>") has entered into a Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of September ___, 1999 (the "<u>Loan Agreement</u>"), with Credit Suisse First Boston Mortgage Capital LLC (together with its successors and assigns, the "<u>Lender</u>"), pursuant to which the Lender has provided financing to the Borrower secured by certain mortgages and/or deeds of trust on certain properties owned by the Borrower, including the property described in the caption of this letter (the "<u>Property</u>").  The Property is currently being managed by Fineberg Management, Inc. (the "<u>Manager</u>").

Currently, the [Borrower] [Manager] maintains the following account (the "<u>Property Account</u>") with you:

Name: [_____]
Account No.[_____]

The Borrower hereby notifies you that the Lender has required that it implement certain automatic clearing and processing functions and hereby instructs you, commencing on the date hereof, (the "<u>Sweep Commencement Date</u>"), to disburse all revenues from the Property ("<u>Revenues</u>") deposited in the Property Account from time to time in accordance with the following terms and provisions:

1.     Promptly upon receipt of this letter you shall establish a post office box address in which the Borrower shall cause all Revenues in the form of checks, money orders and similar instruments to be deposited.  Within one business day of receipt, you, as the "<u>Clearing Bank</u>," shall receive and process all Revenues and shall deposit the same into the Property Account referred to above, which Property Account, or an appropriate substitution or replacement thereof, shall thereafter be referred to as the "<u>Clearing Account</u>."  Checks made payable to the Borrower, the Manager, the Property or the Clearing Account shall be deemed suitable for deposit in the Clearing Account.  Items deposited with the Clearing Bank that are returned for insufficient or uncollected funds will be redeposited the first time.  Items returned

unpaid a second time shall be processed in accordance with the standard procedures of the Clearing Bank.

2.     The Clearing Account shall be an account of the Borrower but shall be under the sole dominion and control of the Lender and any servicer (a "Servicer") or other designee of the Lender named below or in a subsequent written notice from the Lender. The Clearing Account shall be assigned the federal tax identification number of the Borrower, which number has been applied for. You shall hold amounts on deposit in the Clearing Account as agent for the Lender and shall not commingle such amounts with any other amounts held by you on behalf of the Lender, the Borrower or any other person or entity. If, in accordance with your standard operating procedures, the Clearing Account may be established as a trust account for the benefit of the Lender, Borrower directs that the Clearing Account be maintained as such an account.

3.     The Borrower hereby notifies the Clearing Bank that, in accordance with the Mortgage, the Clearing Account and all amounts held therein from time to time, and all renewals, replacements and substitutions therefor, have been irrevocably pledged to the Lender as additional security for the loan evidenced by the Mortgage. In connection with such pledge, the Borrower hereby waives all right of withdrawal from the Clearing Account.

4.     The Borrower hereby irrevocably instructs and authorizes you, beginning on the date hereof, to disburse on the last business day of each week and on the eleventh day of each calendar month, (or, if the eleventh day of the month is a Saturday or Sunday or other day on which commercial banks in New York City re not open for general banking business (a "Business Day"), then on the next Business Day) via the ACH System, if available, or otherwise by wire transfer, all amounts constituting available funds on deposit in the Clearing Account to the following account:

> Bank: Bank One Texas, N.A.
> ABA#: 111000614
> Acct. Name: Cash Collateral Account
> Acct. No.: 1578611756
> Ref.: Blue Hills Office Park LLC

5.     If transferring such amounts by the ACH System and if required by Clearing Bank, each such transfer shall be initiated by the Lender or by the Servicer. If the Clearing Bank provides electronic data transfer services, the Clearing Bank shall provide the Lender and the Servicer access to the Clearing Bank's electronic data transfer system for purposes of effecting such transfers. At any time that funds may not be transferred as described above in this paragraph, the Clearing Bank shall transfer amounts by wire transfer of immediately available funds.

6.     The instructions set forth herein are irrevocable and are not subject to modification in any manner, except that the Lender or the Servicer may, by written notice to you, amend the instructions contained herein.

7.    In the event that the Clearing Bank fails to acknowledge that its procedures with respect to the Property Account are governed by this letter due to an objection to the terms hereof or otherwise, the Borrower hereby appoints the Lender as its attorney-in-fact with full authority to make changes to this letter and to execute on behalf of the Borrower any new or modified letter acceptable to the proposed Clearing Bank in the event that the Borrower fails to execute any such new or modified letter after written request to do so from the Lender.

8.    Matters not covered by this letter shall be determined in accordance with the customary procedures of the Clearing Bank and in the event of a conflict between the terms of this letter and the customary procedures of the Clearing Bank, the terms of this letter shall govern.

9.    The undersigned also notifies you that the name and address of the current Servicer with respect to the Cash Management Agreement is:

> ORIX Real Estate Capital Markets, LLC
> 1717 Main Street, 12th Floor
> Dallas, Texas  75201
> Attn:  John Lloyd

If you have any questions concerning this letter or the Cash Management Agreement, please contact Joseph Rubino of the Lender at (212) 325-6061 or John Lloyd of the Servicer at (214) 237-2079.

The address of the current Manager is:

> Fineberg Management, Inc.
> One Washington Street, Suite 400
> Wellsley, Massachusetts  02481

A-3

Blue Hill 0135

Please acknowledge receipt of this letter and your agreement to the terms described herein by executing and returning to the Borrower an acknowledgment in the form of Schedule 1 hereto.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company
By:  Blue Hills Management Corp.,
     a Massachusetts corporation
     its manager

By: _Gerald Fineberg_
    Name:  Gerald S. Fineberg
    Title:  President

Acknowledged and Agreed:

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC

By: _____
    Name: _____
    Title:

A-4

Blue Hill 0136

Please acknowledge receipt of this letter and your agreement to the terms described herein by executing and returning to the Borrower an acknowledgment in the form of Schedule 1 hereto.

BLUE HILLS OFFICE PARK LLC

By:_____
    Name:
    Title:

<u>Acknowledged and Agreed</u>:

CREDIT     SUISSE     FIRST     BOSTON
    MORTGAGE CAPITAL LLC

By:_____
    Name:
    Title:

A-4

**Blue Hill 0137**

FORM OF ACKNOWLEDGMENT                    **SCHEDULE 1**

September ____, 1999

Blue Hills Office Park LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481


Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
New York, New York 10010


Reference is made to that certain Clearing Bank Instruction Letter dated September ____, 1999 (the "Instruction Letter") from Blue Hills Office Park LLC (the "Borrower"). I, _____, on behalf of MetroWest Bank (the "Bank"), hereby acknowledge receipt of the instructions set forth in the Instruction Letter and notice of the pledges and security interest described therein. The Bank hereby agrees to perform the instructions set forth in the Instruction Letter upon the delivery by Credit Suisse First Boston Mortgage Capital LLC (the "Lender") of the Instruction Letter.

If you have any questions, please call Nancy L. Conley at (508) 620-0300.

METROWEST BANK


By:_____
     Name:
     Title:


LOCK BOX ADDRESS:

_____
_____
_____

**Blue Hill 0138**

## EXHIBIT B

### Form of Lessee Payment Direction Letter

FINEBERG MANAGEMENT, INC.
One Washington Street, Suite 400
Wellsley, MA 02481

September __, 1999

EquiServe Limited Partnership

―――――――――――――――――

―――――――――――――――――

Re:    Payment Direction Letter for Blue Hills Office Park
       150 Royall Street, Canton, Massachusetts

Dear Sirs:

Blue Hills Office Park LLC, the owner of the Blue Hills Office Park (the "Property"), has mortgaged the Property to Credit Suisse First Boston Mortgage Capital LLC (together with its successors and assigns, the "Lender") and has agreed that all rents due for the Property will be paid directly to a bank selected by the Lender. Therefore, from and after the date hereof, all rent to be paid by you under the lease between you and Blue Hills Office Park LLC (the "Lease") should be sent directly to the following address:

METROWEST BANK
[Lockbox Address]

All checks should be made out to the "Blue Hills Office Park".

These payment instructions cannot be withdrawn or modified without the prior written consent of the Lender or its agent (the "Servicer"), or pursuant to a joint written instruction from the Borrower and the Lender or the Servicer. Until you receive written instructions from the Lender or the Servicer, continue to send all rent payments due under the Lease to MetroWest Bank. All rent payments must be delivered to MetroWest Bank no later than the day on which such amounts are due under the Lease.

SRZNY\611528v5

**Blue Hill 0139**

If you have any questions concerning this letter, please contact the persons identified for notice purposes in the lease. We appreciate your cooperation in this matter.

FINEBERG MANAGEMENT, INC.


By:_____ _____
    Name:
    Title:

B-2

Blue Hill 0140

## SCHEDULE 1

**[Schedule commences on the following page]**

Blue Hill 0141

SRZNY\611528v5

**FORM OF ACKNOWLEDGMENT**                       **SCHEDULE 1**

September 13, 1999

Blue Hills Office Park LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481

Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
New York, New York 10010

Reference is made to that certain Clearing Bank Instruction Letter dated September ___, 1999 (the "Instruction Letter") from Blue Hills Office Park LLC (the "Borrower"). I, _____, on behalf of MetroWest Bank (the "Bank"), hereby acknowledge receipt of the instructions set forth in the Instruction Letter and notice of the pledges and security interest described therein. The Bank hereby agrees to perform the instructions set forth in the Instruction Letter upon the delivery by Credit Suisse First Boston Mortgage Capital LLC (the "Lender") of the Instruction Letter. **
The Bank shall be authorized on a monthly basis to withdraw from the so-called *

If you have any questions, please call Nancy l.. Conley at (508) 620-0300.

*Lock Box Account/Clearing Account.
up to $120.00 per month for monies due
the Bank for administrative fees in
connection with the herein described
arrangement..

METROWEST BANK

By: _Roger G. Leblond S.V.P._

Name: Roger G. Leblond

Title: Senior Vice President, Banking Operation

** In the event that the deposited item(s)
are returned to MetroWest Bank as uncollectible, after being deposited a
second time, then Credit Suisse First Boston Mortgage Capital LLC shall
return the wired funds to MetroWest Bank eliminating
any overdraft at MetroWest Bank.

**LOCK BOX ADDRESS:**

Blue Hills Office Park LLC
P.O. Box 9279
Boston, MA 02205-9279

_RM_
_9/13/99_

**Blue Hill 0142**



September 14, 1999

Lydia Chesnick, Esq.
Bernkopf, Goodman & Baseman LLP
125 Summer Street
Boston, MA 02110-1621

Re:    Gerald Fineberg
       Blue Hills Office Park

Dear Lydia:

Pursuant to our phone conversation, enclosed please find the original Acknowledgment Letter for the lock box/clearing account for the above referenced borrower.  I will again remind you that this account has not been set up as of today and should be prior to any funds being forwarded to the lock box address.  Please have the borrower contact me once said account is established.

Please feel free to call me with any questions you may have.

Sincerely,

Nancy L. Conley
Vice President

encl.

Blue Hill 0143

## AGREEMENT

This **Agreement** entered into as of the 31st of December, 2004, among the undersigned identified as the "Beneficiaries" of Royall Associates Realty Trust (the "Trust") to confirm their agreements generally responsive to the foreclosure recently held pursuant to which title to the real estate owned beneficially by the Trust has been, or is reasonably contemplated to forthwith be divested.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned agree as follows:

I.    Definitions.  The following definitions are applicable to this Agreement:

A.    The "Trust" is Royall Associates Realty Trust under Declaration of Trust dated July 13, 1987;

B.    The "Trustees" of the Trust are Gerald S. Fineberg ("Fineberg"), William J. Langelier ("Langelier") and Blue Hills Management Corp., a Massachusetts corporation ("BHM Corp.");

C.    The "Beneficiaries" of the Trust are Fineberg, Daniel Frank ("Daniel"), Gary Fineberg ("Gary"), Michelle Fineberg ("Michelle"), Langelier and Amy Badger ("Amy");

D.    The "Property" is the real estate together with the office building and other improvements thereon known and numbered as 150 Royall Street, Canton, Massachusetts, title to which, on behalf of the Trust, has been held in the name of Blue Hills Park LLC, a Delaware limited liability company (the "LLC"), of which BHM Corp. is the Manager, and of which the Trust is the sole Member;

E.    The "Foreclosure" is the action recently taken by the holder of the first mortgage on the Property resulting in the reported high bid by the first mortgage lender to the LLC and the assumption of management of the Property by the designee of the first mortgage lender from Fineberg Management Co., Inc., the prior manager of the Property designated to act in that capacity by the LLC ("Fineberg Management"); and

F.    The "Accounts" include (i) amounts presently, and hereafter from time to time, held on deposit and controlled by Fineberg Management as a result of its management of the Property (the "Property Account"), (ii) the "Initial Account" held in escrow by Kenneth M. Goldberg and Andrew H. Cohn (the "Escrow Agents"), and (iii) the "Supplemental Account" held by the Escrow Agents, all of which Accounts, including present approximate balances in each, being as set forth in the Schedule of



EXHIBIT
176
Langelier

BLUE HILL
5513

## AGREEMENT

Page 2

Accounts and Account Balances (the "Schedule of Accounts") initialed for acknowledgement by Fineberg and Langelier together herewith.

II.     Treatment of Accounts.

A.     The Accounts.  It is acknowledged that the Schedule of Accounts initialed herewith includes the Property Manager's good faith estimate of the present balance thereof.

B.     The Property Account.  The Property Manager shall prepare a final accounting of the Property Account on or before January 31, 2005, and send that accounting to Fineberg (on behalf of himself, Gary, Michelle and Daniel collectively herein sometimes called the "Fineberg Beneficiaries") and to Langelier (on behalf of himself and Amy, together herein sometimes called the "Langelier Beneficiaries").  After payment of Trust legal and accounting fees and such third party creditors as the Property Manager reasonably determines should be paid, the balance will be held as a reserve for future claims and liabilities of the LLC and/or the Trust until April 1, 2005, or such later date as Fineberg and Langelier jointly or both their respective counsel reasonably agree.

C.     The Initial Account.  Simultaneously herewith, the balance in the Initial Account (plus the amount in the Supplemental Account exceeding $2 Million Dollars) shall be released and paid over one-half to Kenneth M. Goldberg, Esq. for distribution among the Fineberg Beneficiaries as they may direct, and to one-half Andrew H. Cohn, Esq. for distribution to the Langelier Beneficiaries as they may direct.

D.     The Supplemental Account.  The Supplemental Account (net of the withdrawal referenced in 2(C) above) shall be distributed, first (i) upon execution hereof, 50% to Bernkopf Goodman LLP to continue to be held in escrow on behalf of the Fineberg Beneficiaries, and 50% to Wilmer Cutler Pickering Hale and Dorr LLP to continue to be held in escrow on behalf of the Langelier Beneficiaries, both subject to the terms of this Agreement (the "Supplemental Account Escrows"), then (ii) on January 20, 2005, one-half of the amount in each Supplemental Account Escrow shall be distributed to the Beneficiaries of each respective Supplemental Account Escrow, provided after such distribution the remaining Supplemental Account Escrow balances total at least 125% of any then

- 2 -

BLUE HILL
5514

**AGREEMENT**

Page 3

outstanding Indemnified Claims (hereafter defined), and then (iii) on April 1, 2005, the balance in the Supplemental Account Escrows shall be distributed 50% each to the Beneficiaries of the respective Supplemental Escrow Accounts, provided after such distribution the remaining Supplemental Account Escrow balances total at least 125% of any then outstanding Indemnified Claims. An outstanding Indemnified Claim shall be an Indemnified Claim (hereafter defined) that is then being actually asserted (A) in written form [whether by email, letter or otherwise] by or on behalf of the particular third party making the claim or (B) via a telephone call from the third party making the claim or from its counsel. Five (5) days prior to the foregoing January 20, 2005 and April 1, 2005 funds distribution dates, each escrow agent will have the opportunity to notify the other of the sum intended to be released from the Escrow Account he is administering on the next release date, and, unless a good faith written objection thereto (based upon the known existence of an outstanding Indemnified Claim) is received prior to that next release date from the other escrow agent, the sums to be released described in (ii) and (iii) immediately above shall be released to the Beneficiaries for whom those funds are then being held. In the event of an escrow holdback based on the existence of an outstanding Indemnified Claim, any balance remaining in the Supplemental Account Escrows at six (6) month intervals after April 1, 2005, or such earlier dates as the Supplemental Account Escrow Agents may then agree upon, shall be subject to the same request, objection and distribution procedure as set forth above applicable to the scheduled April 1, 2005 distribution.

III.    Jurisdiction. To the extent any dispute or issue arises between the Beneficiaries or any other party hereto, the parties hereto agree that jurisdiction for such dispute shall be by notice and service of process to Andrew H. Cohn, Esq. for and on behalf of any one or more of the Langelier Beneficiaries, and to Kenneth M. Goldberg, Esq. or Lydia G. Chesnick, Esq. for and on behalf of any one of the Fineberg Beneficiaries and Fineberg Management, with proper venue for adjudication of any such claim as the claimant determines either in the Suffolk Massachusetts County Superior Court or in the U.S. District Court for the District of Massachusetts.

IV.    LLC Claims. It is acknowledged that there exist the following two claims assertable by the LLC (the "LLC Claims"): the claim against the first mortgage lender for improper conduct including, without limitation, failure to respond to

- 3 -

US1DOCS 4885056v3

**BLUE HILL**
**5515**

**AGREEMENT**

Page 4

LLC's request for the release of reserve funds which could have maintained the loan current, attracted potential new tenants and potentially avoided foreclosure (the "Claim Against Lender"); and the claim against the owner of the newly constructed, abutting office building at 250 Royall Street for failure to construct those premises within the height and building envelope restrictions agreed upon with the LLC (the "Claim Against Abutter"). This confirms the agreement of the Beneficiaries that the Claim Against Lender will not be pursued unless and until otherwise determined by both Fineberg and Langelier, but shall be held for response in the event the lender asserts liability against LLC which may give rise to personal liability of one or more Beneficiaries under the loan. The Claim Against Abutter will also be held pending determination by counsel to both Fineberg and Langelier that the damages therefrom and likelihood of recovery after considering the cost thereof warrant pursuit of that claim.

V.    <u>Claims Against LLC</u>.  While the undersigned acknowledge that they have no basis to believe there will be any claims filed against the LLC or the Trust for which any Beneficiary may have personal liability, the parties recognize the possibility of such a claim being filed, and agree with respect thereto as follows:

A.    <u>Mortgage Lender Claim</u>.  The Beneficiaries acknowledge that a claim could be asserted by the holder of the first mortgage loan on the Property, however, the lack of likelihood of any such claim having been reviewed with counsel, the release and distribution of funds from escrow contemplated by Paragraph II above are predicated upon no such claims being filed ("Mortgage Lender Claims").

B.    <u>Misc. Creditors</u>.  While not anticipated, one or more claims could be filed against the LLC, the Trust or a Beneficiary which may give rise to personal liability of a Beneficiary ("Misc. Creditor Claims").

C.    <u>Indemnified Claims</u>.  Fineberg and Langelier hereby agree that each of them will indemnify the other to the extent of 50% of any loss, cost or expense either one of them incurs on account of his first mortgage loan guaranty or arising from his interest in the LLC, the Trust, BHM Corp. or Fineberg Management and which is reasonably believed to result, or likely to result in his or their personal liability (the "Indemnified Claim(s)"). Fineberg and Langelier agree that within five (5) days after written requisition therefor by either of them, first from the Property Account until it is exhausted, and then one-half from each Supplemental

- 4 -

BLUE HILL
5516

**AGREEMENT**

Page 5

Escrow Account, funds shall be released to the requisitioning party to pay (a) the cost of defense reasonably incurred by Fineberg and/or Langelier for an "Indemnified Liability" - herein defined as a cost arising from a claim asserted or which the requisitioning party reasonably believes may evolve into an Indemnified Claim, (b) the amount of an Indemnified Liability adjudicated as being owed, or (c) any settlement of an Indemnified Claim - and for settlements exceeding $10,000.00, consent of both Fineberg and Langelier shall be required. It is hereby further agreed that to the extent funds in the Supplemental Escrow Accounts and in the Property Account are insufficient to pay in full amounts indemnified hereunder, Fineberg and Langelier will pay from their own funds the amount of their indemnity hereunder within ten (10) days after request by the other party. Further, with respect to claims against any of the parties hereto that are not likely to incur personal liability to a Beneficiary (and therefore not giving rise to an Indemnified Liability) exceeding $10,000, same may be paid or settled, up to a total of $20,000 upon request of Andrew H. Cohn, as counsel to Langelier, or Kenneth M. Goldberg, as counsel to Fineberg; claims exceeding the foregoing limitation, shall require the consent of both counsel.

VI.   Tax Returns. A final tax return for the Trust, the LLC having been filed as a Disregarded Entity, shall be completed and filed for December 31, 2004 for calendar year 2004 by Rutfield & Hassey, CPA's. Prior to filing, a copy of that return shall be made available for review by Langelier and his accountant, Gerard P. Jarasitis, Edelstein & Company LLP, 24 School Street, Boston, MA 02108, Telephone: (617) 227-6161 x 224, Fax: (617) 589-0530 and Fineberg, with any reasonable input from either forwarded in writing within ten (10) days shall be included in the final returns as filed.

VII.  Miscellaneous.

A.   The Manager of the LLC and the Trustee of the Trust are hereby directed to take actions determined as being reasonably required to implement the terms of this Agreement. The parties agree that as a private matter, the existence and contents of this Agreement shall be held in strict confidence unless and until required by process of law to be disclosed by him/her; and, the other parties hereto shall be given at least five (5) days advance notice with copies of documents or other deliveries such disclosing party believes are required to be released to any third party. The Beneficiaries

- 5 -

BLUE HILL
5517

**AGREEMENT**

Page 6

shall be responsible to bear all costs invoiced to them for fees and costs of the Escrow Agent acting hereunder for that group of Beneficiaries.

B.   Each of Bernkopf Goodman LLP (and Kenneth M. Goldberg), on the one hand, and Wilmer Cutler Pickering Hale and Dorr LLP (and Andrew H. Cohn), on the other hand, will serve as escrow agents only to receive, hold, and deliver the Initial Account and the Supplemental Account Escrows (collectively the "Escrow Fund") in accordance with the terms of this Agreement. None of the escrow agents shall be liable to anyone for damages, losses or expenses except for willful default, nor shall any of the escrow agents be responsible for the acts or omissions of any other parties to the Agreement or any of the Beneficiaries. Each of the escrow agents is entitled to rely in good faith upon certificates, checks, documents, votes, instruments and statements of account rendered to each of them which each escrow agent believes to be genuine, not only as to their validity and effectiveness, but also as to the truth and accuracy of any information contained therein. Without limiting the generality of the foregoing, should any dispute arise with respect to the delivery or ownership or right of possession to the Escrow Fund or other property so held by any escrow agent in escrow, each escrow agent is authorized (but shall not be obligated) to retain in its respective possession such funds and property without liability to anyone until such dispute shall have been settled by mutual agreement of the parties concerned or by a final order, decree or judgment by a court of competent jurisdiction, and the time of appeal shall have expired without an appeal having been taken, but no escrow agent shall be under a duty whatsoever to institute or defend such proceedings. In addition, each escrow agent shall not be responsible for any checks or other instruments which are delivered to such escrow agent as part of the escrow fund being honored when presented. In no event shall any escrow agent be required to take any action unless and until indemnified to the escrow agent's satisfaction by the party requesting such action. Further, the act of serving as escrow agent hereunder shall not serve to disqualify any escrow agent from serving as a legal counsel to any of the parties hereto and all such objections are hereby expressly waived by the parties.

USIDOCS 4885056v3

BLUE HILL
5518

## AGREEMENT

Page 7

In witness thereof, the undersigned have signed this Agreement under seal, on the date and year first above-written.

BENEFICIARIES:                                    TRUSTEES:


_Gerald S. Fineberg_ (signature)                  _Gerald S. Fineberg_ (signature)
_____                           _____
Gerald S. Fineberg                                Gerald S. Fineberg, Trustee


_____                           _____
Gary Fineberg                                     William J. Langelier, Trustee


_____                           Blue Hills Management Corp., Trustee
Michelle Fineberg

                                                  By: _Gerald S. Fineberg_ (signature)
_____                               _____
Daniel Frank                                          Gerald S. Fineberg, Director


                                                  By: _____
_____                               _____
William J. Langelier                                  William J. Langelier, Director


_____
Amy Badger (by William J. Langelier)

- 7 -

BLUE HILL
5519

Original

## AGREEMENT

Page 7

In witness thereof, the undersigned have signed this Agreement under seal, on the date and year first above-written.

BENEFICIARIES:                                    TRUSTEES:

_Gerald S. Fineberg_                               _Gerald S. Fineberg_
Gerald S. Fineberg                                Gerald S. Fineberg, Trustee

_Gary Fineberg_                                   _____
Gary Fineberg                                     William J. Langelier, Trustee

_____                           Blue Hills Management Corp., Trustee
Michelle Fineberg

                                                  By: _Gerald S. Fineberg_
_____                               Gerald S. Fineberg, Director
Daniel Frank

                                                  By: _____
_____                               William J. Langelier, Director
William J. Langelier

_____
Amy Badger (by William J. Langelier)

- 7 -

USDOCS 4845059v6

BLUE HILL
5520

*original*

**AGREEMENT**

Page 7

In witness thereof, the undersigned have signed this Agreement under seal, on the date and year first above-written.

BENEFICIARIES:                          TRUSTEES:

*Gerald S. Fineberg* (signature)        *Gerald S. Fineberg* (signature)
_____                 _____
Gerald S. Fineberg                      Gerald S. Fineberg, Trustee


_____                 _____
Gary Fineberg                           William J. Langelier, Trustee


*Michelle Fineberg* (signature)         Blue Hills Management Corp., Trustee
_____
Michelle Fineberg

*Daniel Frank* (signature)              By: *Gerald S. Fineberg* (signature)
_____                 _____
Daniel Frank                            Gerald S. Fineberg, Director


_____                 By:_____
William J. Langelier                    William J. Langelier, Director


_____
Amy Badger (by William J. Langelier)

- 7 -

BLUE HILL
5521

CA SINA

## AGREEMENT

Page 7


In witness thereof, the undersigned have signed this Agreement under seal, on the date and year first above-written.

BENEFICIARIES:                          TRUSTEES:


_____               _____
Gerald S. Fineberg                       Gerald S. Fineberg, Trustee

_____               _____
Gary Fineberg                            William J. Langelier, Trustee


_____               Blue Hills Management Corp., Trustee
Michelle Fineberg

_____               By:_____
Daniel Frank                             Gerald S. Fineberg, Director

_____               By:_____
William J. Langelier                     William J. Langelier, Director

_____
Amy Badger (by William J. Langelier)


- 7 -

BLUE HILL
5522

original

**AGREEMENT**

Page 8

BERNKOPF GOODMAN LLP,
Escrow Agent for the Fineberg
Beneficiaries as hereinabove set forth

By

Kenneth M. Goldberg, Esq.

- 8 -

BLUE HILL
5523

USIDOCS 48850569

*original*

**AGREEMENT**

Page 9


WILMER CUTLER PICKERING HALE AND DORR LLP,
Escrow Agent for the Langelier
Beneficiaries as hereinabove set forth

By: _____
Andrew H. Cohn, Esq.


#302842 v2/14500/9547

- 9 -

BLUE HILL
5524

# SCHEDULE OF ACCOUNTS

I.    Property Account

$180,000
(1/12/05)

II.    Initial Account

$1,381,814.39
(12/31/04)

III.    Supplemental Account

$4,214,836.38
(12/31/04)

#305119 v1/99999/1

BLUE HILL
5525

# DEPOSITION EXHIBIT NO. 177

CONFIDENTIAL

Fineberg Royall Associates    Century Bank

BALANCE FORWARD →

| | | DETAIL | ✓ | DEBIT | CREDIT | BALANCE | PREVIOUS BALANCE |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |
| 14 | 8/8/03 | Wire In From IOLTA  B Knuth | | | 2,000,000 | | |
| 15 | | | | | | | |
| 16 | | | | | | | |



EXHIBIT
177
Langelier  7-10-06

BLUE HILL
5507

NAME **FINEBERG**
ADDRESS
CITY

**CONFIDENTIAL**

150 ROYALL ST.

KMG

| DATE | FOLIO | DETAIL | ✓ | DEBIT | CREDIT | BALANCE | PREVIOUS BALANCE |
|------|-------|--------|---|-------|--------|---------|------------------|
| 2 | 2/1/05 | WIRE-OUT | Wilmer, Cutler, et al (Chelea Pohl) | 1,000,000 — | | | |
| 4 | 2/0/05 | WIRE-OUT | 135- Century Model Mgr | 11,000,000 — | | | |

Safeguard
BUSINESS SYSTEMS, INC
FORM NO. ARL-7

ACCOUNTS RECEIVABLE LEDGER
ORDER FROM YOUR LOCAL SAFEGUARD DISTRIBUTOR
IF UNKNOWN, CALL 800-523-2422

© Safeguard Business Systems, Inc.

BLUE HILL
5508

CENTURY BANK INTEREST BEARING ACCOUNTS

TRANSFERRED 4/1/05 TO DANVERSBANK

**CONFIDENTIAL**

| Name | Account Number | Amount |
|------|----------------|--------|
| Fineberg - 150 Royall | 27908692 | 1,003,839.25 |

BLUE HILL
5509

# Danversbank
**One Conant Street Danvers, MA 01923**
BERNKOPF GOODMAN LLP

**CONFIDENTIAL**

```
111235302  Online Banking Transfer To CHECKING 27908692 At   04/05   1,003,839.25
  16:10
```

**BLUE HILL**
**5510**



ACCOUNT: 27008696   04/29/2005

**One Conant Street Danvers, MA 01923**

BERNKOPF GOODMAN LLP

**CONFIDENTIAL**

MONEYMARKET PERSONAL ACCOUNT

*Findberg - 150 Royal*

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| 111235302 Online Banking Transfer<br>  35707901 At 16:10 | 04/05 | 1,003,839.25 |
| INTEREST | 04/25 | 1,738.43 |

BLUE HILL
5511

Member FDIC
Member DIF

www.danversbank.com
978.777.2200

Page

| Transaction Type | Date | Document No. | | | Balance |
|---|---|---|---|---|---|

CONFIDENTIAL

Minutes of the Meeting of May 22, 2003.

PRESENT:    Paul B. Carroll, Chairman
            James F. Fitzgerald, Jr.
            Gregory L. Pando
            Robert J. Quigley, Alternate Member

ALSO
PRESENT:    Sue Franco, Recording Secretary

Mr. Carroll opened the Meeting at 7:00 p.m. in the Salah Hearing Room, Memorial Hall.

## Flatley Company – 25 Westchester Dr.

Attorney Suzanne Matthews and Mr. John Flatley came before the Board representing petitioner.

Attorney Matthews stated the Board previously granted a Variance for this property. One of the conditions of the decision was for petitioner to obtain the approval of his next door neighbor at 45 Westchester for the landscape plan and he now has that. She stated she would like to present the landscape plan to the Board for their approval. The two neighbors who had an issue with the variance were Mr. Slutsky at 45 Westchester Dr. and Mr. Kilduff at 50 Westchester Dr. She stated Mr. Slutsky has signed the landscape plan and is in agreement with it.

Mr. Kilduff requested to speak. He stated that it was his understanding that the the petitioner was supposed to try to appease the neighbors who had an issue and he stated no one has ever tried to appease him. He stated he received a plan from Atty. Matthews and was not aware of the polishing pool that is on the property.

Attorney Matthews stated that pool has been there since the beginning and it was required by the Conservation Commission in their Order of Conditions.

Mr. Flatley stated it is for treating water from the street drain into the wetlands.

Mr. Kilduff stated he should have been notified about the Conservation hearing.

Mrs. Kilduff stated there was no mention of a polishing pool to them and they were not given the opportunity to object to it.

BLUE HILL 1593

Zoning Board of Appeals
Meeting of May 22, 2003
Page 2 of 10

Attorney Matthews stated she got a certified list of abutters from the Conservation Commission and the Kilduff's are not on it, perhaps because they are across the street from the petitioned site.

Mr. Kilduff stated if there is a way that he can stop this, he will do it. He said he has a bad feeling about the polishing pool because he has sink holes in his driveway now and he does not want more water.

Mr. Carroll stated the Zoning Board has no authority regarding the polishing pool and that Mr. Kilduff will have to deal directly with the Conservation Commission.

Mr. Kilduff stated Mr. Flatley has done nothing to appease him.

Mr. Flatley stated he had a meeting with Mr. Kilduff two weeks ago and Mr. Kilduff asked for a deck to be constructed on the back of his home.

Mr. Fitzgerald stated that when the Board asked petitioner to try and appease the abutters, they meant in terms of landscaping, not remodeling. He asked Mr. Kilduff if he had any issue with the landscaping.

Mr. Kilduff stated he does not, he has an issue with the polishing pool.

Mr. Carroll moved to accept the landscape plan as submitted. The move was seconded and the Board voted unanimously to approve.

**Michael Razza – 104 Prospect St.**

Attorney Matthews stated she is requested a continuance to June 26, 2003. She stated the petitioner submitted plans to Tom Houston and some changes will be made.

**National Development – 250 Royall St.**

Attorney Richard Staiti, Mr. Steve Sesso, Mr. Peter Carbone, and Mr. Tighe came before the Board representing petitioner.

Attorney Staiti stated they have submitted the recommendations of the Planning Board and the Edwards & Kelcey report to the Board. He further stated there is a letter in file from the Friends of Little Blue supporting the petition. The Board had asked petitioner to try and resolve any issues with their neighbor at 150 Royall St., however, Atty. Staiti reported they were unable to do that. He stated they have lowered the height of the parking garage by 4'.

Zoning Board of Appeals
Meeting of May 22, 2003
Page 3 of 10

Mr. Carroll stated he spoke with Mr. Ed Lynch, a member of the Conservation Commission and he stated the Commission is in support of the project.

Mr. Pando stated he would require elevation plans referenced in the decision, if approved.

Attorney Gary Lillienthal requested to speak. He stated he represents the Blue Hill Office Park at 150 Royall Street. He stated his client has spoken with the petitioner, however, there has been no resolution. He stated his client is concerned that the proposal is based on a misinterpretation of the Zoning By-law. He stated it is impossible to make a determination for site plan approval without looking at the entire site and in terms of vehicular safety, the entire site should be reviewed. There are 670 existing parking spaces that have never been occupied. After the building has full occupancy, he feels it will have a major affect on the traffic. He further stated the proposal obstructs his client's current view from the southwest. He stated there is a large area of impervious surface which has not been dealt with. He does not believe Sec. 2.15.2.C of the Zoning By-law regarding additional open space has been met.

Mr. Carroll inquired as to whether Atty. Lillienthal had any mitigation ideas in terms of landscape.

Atty. Lillienthal stated he has not participated in any discussions between his client and the petitioner and at this time does not have any specific requests.

Mr. Carroll stated he has heard from various boards and town officials and it seems they are in support of the petition.

Mr. Fitzgerald and Mr. Pando stated they have no further questions.

Mr. Fitzgerald moved the petition of National Development Corporation and Equiserve for a modification of Site Plan Approval, and Special Permit (Use) to construct a parking garage at 250 Royall Street, subject to the following conditions:

1.    Petitioner shall adhere to the Planning Board recommendations dated May 21, 2003.
2.    The garage capacity shall not exceed 380 parking spaces.
3.    Construction shall be in accordance with a plan by VHB dated April 9, 2003 and revised on May 18, 2003.
4.    Petitioner shall obtain approvals from all other boards as required.

BLUE HILL 1595

The move was seconded and the Board voted unanimously to grant.

### Texaco – 731 Washington St.

Mr. Michael Loin came before the Board representing petitioner on the continued matter. He stated he received a positive recommendation from the Canton Center Design Review Board. He stated the Board recommended an overall reduction in height of the signage from 17.6' to 12'6'. He stated that although the petitioner had received previous approval for a Dunkin' Donuts sign at the site, they are not going forward with that sign at the present time. He stated there is a note on the site plan stating that any signage not shown on the plan shall be removed.

Mr. Carroll stated the petitioner has illegal signage up now.

Mr. Loin stated he is aware of that, but the proposed site plan would give a tool for enforcement to the Building Inspector.

Mr. Fitzgerald stated the proposed sign at 12'6' at the proposed location would block visibility.

Mr. Pando suggested moving the sign back 15' from the property line, which would bring it into conformance with the by-law.

Mr. Loin agreed.

Mr. Fitzgerald moved the petition of Motiva Enterprises, LLC for a Special Permit (Sign) to replace the existing sign at 731 Washington St. be granted, in accordance with the Canton Center Design Review Board report, except for sign location, which shall be in accordance with Exhibit A filed and dated with this Board May 22, 2003, and in accordance with the submitted site plan dated May 14, 2003, with Exhibit A superceding. The move was seconded and the Board voted unanimously to approve.

### Leo & Marie Sullivan – 515 Randolph St.

Mr. Alex Donovan and Mr. & Mrs. Sullivan came before the Board representing petitioner.

Mr. Donovan stated he is a family member and would be representing. He stated the Sullivan's are hoping to move the laundry and bathroom facilities to the first floor. He explained they are trying to get the entire living space, including a bedroom, on the first floor because they are elderly and have trouble getting up and down stairs.

Zoning Board of Appeals
Meeting of May 22, 2003
Page 5 of 10

Mr. Carroll stated the addition would encroach 15' into the rear yard setback.

Mr. Fitzgerald and Mr. Pando had no questions.

Mr. Fitzgerald moved the petition of Leo & Marie Sullivan for an Extension of Non-Conforming Building to construct an addition to the rear of the house be granted subject to the condition that addition encroach no further than 15' from the rear yard setback and petitioner shall submit a certified plot plan before obtaining a building permit.

The move was seconded and the Board voted unanimously to approve.

Eric Wade – 5 Cedarcrest Rd.

Mr. Eric Wade came before the Board representing himself. He stated he is requesting to extend the living area of his house and add one bedroom. The addition would be 28' by 34' with a full basement. He cited a growing family as his reason for the addition. He stated the addition would be 12' from the side yard setback and the required is 15'.

Mr. Fitzgerald moved the petition of Eric Wade for an Extension of Non-Conforming Building to construct a 28' by 34' addition which will encroach the side yard setback be granted, in accordance with the submitted plan by Leo J. Glover dated 4/7/03. The move was seconded and the Board voted unanimously to grant.

Michael Molway/F&R Realty Trust – 48 Pequit St.
FM Generator, Inc. – 35 Pequit St.

Atttorney Suzanne Matthews and Mr. Michael Molway came before the Board representing petitioner.

Attorney Matthews stated the issue at 35 Pequit St. is a violation of a special permit issued by a 1997 decision. She stated it is her position that the petitioner is in compliance with that decision. She stated the issue raised by the Building Inspector was for outside storage of equipment. She stated the petitioner is using one section of the area for parking of generators, which are registered by the Registry of Motor Vehicles. She stated the other side of the site is used by Sunrise Erectors to store equipment and supplies. She stated the site is located in a Industrial District and the uses being conducted are allowed.

BLUE HILL 1597

Mr. Fitzgerald stated he visited the site earlier in the day and found generators everywhere and not within the area that was supposed to be marked off for storage of generators. He stated the whole area was filled with forklifts, generators, and construction supplies. He stated in his opinion it looks like a contractor's yard. He stated there is no doubt in his mind the petitioner is in violation of the 1997 decision.

Attorney Matthews stated the generators are allowed to be stored in one portion of the lot.

Mr. Fitzgerald stated that is correct. He stated the generators are presently covering at least twice the amount of area they were supposed to and the area they were supposed to be kept in is not marked as required. He stated there are all types of construction materials where the 13 striped parking spaces were supposed to be located. He stated the intent of the 1997 decision was to keep in mind that the site is located in a mixed industrial and residential neighborhood.

Mr. Quigley stated this site has been a problem since 1997. He stated at that time, the Board tried to accommodate the petitioner with the outside storage request, but it was supposed to be kept in certain striped areas, which has not been done. He stated the decision called for the area in front to be open, which also has not been done. He stated the petitioner has zero credibility with him at this point and he believes he is in gross violation of the 1997 decision. He stated he wants to address the violations before hearing petitioner's other proposal for 46-48 Pequit Street. He stated Mr. Leary, who was the third member that sat on the 1997 hearing, was very specific in the decision in terms of conditions. He stated there were six conditions in that decision. The Board asked for reasonable conditions to be met in that decision and he has not seen that.

Attorney Matthews stated she was not involved in the 1997 decision and cannot make any arguments regarding that.

Mr. Quigley stated as part of that decision, the Board reserved the right to amend, modify or revoke the decision.

Mr. Fitzgerald stated that since 1997, the petitioner was given benefit by this Board, the Board made a number of conditions and for the last six years, the petitioner has failed to do those things.

Mr. Quigley stated that a safety concern was the reason they asked for certain areas to remain open.

BLUE HILL 1598

Zoning Board of Appeals
Meeting of May 22, 2003
Page 7 of 10

Mr. Fitzgerald stated there is a record of correspondence between the petitioner and the Building Inspector in 1997 where the petitioner questioned the definitions of outside storage and other things. He stated there has been no spirit of cooperation from petitioner at all.

Mr. Pando stated he sees no correlation between what was approved by this Board in 1997 and shown on the plan and what he saw in his site visit this evening. He stated the conditions set forth in the 1997 decision were done with petitioner's acceptance and he should abide by them.

Attorney Matthews stated that the letter the petitioner received from the Building Inspector was for violations of outside storage and not parking. She stated the letter informed petitioner he could either remove the outside storage or modify the site plan.

Mr. Dom Duganiero, 62 Kings Rd., spoke regarding the petition. He stated he lived on Pequit Street for twenty-seven years and his mother and sister still live there. He stated the site plan dated 7/24/97 has never been complied with. The storage area was not clearly designated and the parking striping was never done. He stated he does not see how any parking could fit on the site. He stated he does not believe the parking that takes place on the southerly side of Pequit St. by the employees was ever approved by the Board. He stated there is no greenbelt to screen from abutting residences and the property is unsightly. He respectfully requested that the ZBA deny the request for outside storage or reduce the size of outside storage, that the outside storage be screened from residential abutters, that both tenants be required to submit site plans for loading and unloading of equipment, that the parking areas used by employees be striped and maintained for parking. He stated Pequit St. has many small children living there and it is used as a cut-through for traffic trying to avoid the light at the Sherman St./Washington St. intersection. He stated the school buses use Pequit St. every day and there are times when trucks from the petitioner's site are parked on the street and traffic cannot get by. He further requested the Board make a condition to decision that a sidewalk be completed in accordance with town rules and regulations by the petitioner.

Attorney Matthews stated the issue she has on appeal is based upon the notification given to Mr. Molway by the building inspector, regarding whether or not the petitioner is using the proposed parking area for outside storage and the building inspector gave him the option of removing it or modifying the site plan.

Mr. Fitzgerald stated both cases have been opened up and the Board has listened to petitioner's appeal. He stated the opinion of the Board is that there are existing violations. He suggested to hold the matter for 30 days, during which time the petitioner shall comply with the 1997 decision in all respects. After the petitioner has done that, if

BLUE HILL 1599

he finds he needs relief from this Board, the Board will have a continued hearing.  In terms of 46-48 Pequit St., Mr. Fitzgerald suggested the petitioner clean up what he has done there.  He stated the petitioner cannot have a storage area in a residential district.  He requested petitioner remove the cars from the fenced-in area and the only cars that can park there are from 6:00 a.m. to 5:00 p.m. for contractors working at the site.

Attorney Matthews asked whether the Board would entertain a temporary permit.

Mr. Fitzgerald stated they would not.

Mr. Pando and Mr. Quigley agreed to the 30-day extension and to not issue any temporary permits.

Mr. Richard D'Attanasio, 87 Washington St., stated he is representing a direct abutter to the petition and he has an issue with loading and unloading of trucks on the street.

Mr. Fitzgerald stated there should be no trucks loading or unloading on the street and access to the property should be kept open for trucks to go in and out.  He stated it is time for the petitioner to rectify the situation and if he does not, the Board will get the Building Inspector involved.  He stated if the business has outgrown the site, perhaps the petitioner should look for a site more amenable to his business.

Mr. Fitzgerald continued the matter to June 26, 2003.

**Famoso Foods – 146 Will Dr.**

Attorney Paul Schneiders and Mr. Anthony Yebba came before the Board on the continued matter.

Mr. Horace MacNess and Mr. Tom Lyman, abutters to the petition, were also present.

Attorney Schneiders stated there will be five trucks per day that deliver and pick up, with 10 trucks total in the business.

Mr. Carroll suggested the petitioner post a bond to show good faith.  He stated Mr. Lyman suggested the Board make a requirement in the decision that if legal action is necessary in the future to enforce conditions of the decision, petitioner shall pay for legal expenses.

BLUE HILL 1600

Zoning Board of Appeals
Meeting of May 22, 2003
Page 9 of 10

Mr. Fitzgerald stated he likes the idea of a condition regarding a deed restriction for no future expansion. He stated that although the petitioner offered to have the school buses removed from the site, he does not want that.

Mr. Pando stated he is impressed with the sincerity the petitioner has approached the issues with. He stated concerning the deed restriction, he would have no problem with a condition stating the petitioner could request no more than a 5 to 10% future expansion.

Attorney Schneiders stated he received letters from the two closest abutters strongly supporting the petition. He asked if the Board would want to add a condition to reserve the right to have the buses removed if necessary.

Mr. Carroll stated they would.

Mr. Fitzgerald moved the petition of Famoso Foods for a modification of Site Plan Approval, Special Permits for Access Drive and Reduced Parking, and an Extension of Non-conforming Building be granted so that petitioner can add a 20,500 s.f. addition to the existing building at 146 Will Drive and that said allowance of petition be subject to conditions as indicated in the letter from Attorney Schneiders dated 5/20/03 and in the representations at this meeting, construction to be done in accordance with the submitted site plan by Toomey Munson Associates, dated 12/20/03 with revision dates of 2/14/03, 3/3/03, and 4/4/03 and that a condition of the decision be that the Board grants this permit subject to review in two years, reserving the right at that time to modify or amend decision if necessary and the cost of enforcement proceedings to be paid by petitioner and petitioner to post a $5000 bond. The move was seconded and the Board voted unanimously to grant.

<u>Grover Estates – Washington St.</u>

Attorney Schneiders and Mr. John Marini came before the Board representing petitioner.

Mr. Dean Miller and Ms. Kathy Keith were present representing the Design Review Board.

Mr. Miller stated he thinks the only question at this point is the issue of town acceptance of the deed in terms of parking lot and public ways. He said his Board approves of the landscape plan.

BLUE HILL 1601

Zoning Board of Appeals
Meeting of May 22, 2003
Page 10 of 10

Attorney Schneiders stated they added language worked out between the petitioner and Mr. Miller. He stated he submitted a proposed decision and a deed restriction labeled Exhibit A, regarding the condominium association maintaining landscaping. If there is a change or modification by the condominium owners, it would have to come before the ZBA and Design Review Board.

**Board Business**

Mr. Carroll moved to approve the Minutes of the Meetings of April 24, 2003, May 1, 2003, May 8, 2003, and May 15, 2003. The move was seconded and the Board voted unanimously to approve.

**Adjournment**

Mr. Pando moved to adjourn the Meeting at 10:25 p.m. The move was seconded and the Board voted unanimously to adjourn.

Respectfully submitted,

Paul B. Carroll
Chairman

/sf



BLUE HILLS OFFICE PARK
Loan Restructure

Blue Hill
5063



Commercial Mortgage Servicing
P.O. Box 4036, Concord, CA 94524
1320 Willow Pass Rd, Ste. 205
Concord, CA 94520
800 986-9711

July 16, 2004
Fax # 781 - 239 - 1493

BLUE HILLS OFFICE PARK LLC
ONE WASHINGTON STREET, SUITE 400
WELLSLEY, MA      02481-0000

Re:     Loan # 76-0990083
        Property Tax Shortage

Dear Mortgagor(s):

This letter is to inform you that your escrow account has insufficient funds to pay the 1st installment,
which is due and payable to the Town of Canton. Tax shortages are typically caused by an increase
in tax amounts billed by the Tax Collector over the prior year. The property taxes, which are payable
now, will be delinquent after 8/2/04. The taxes due are in the amount of $158181.19. Currently, your
tax escrow balance is $0.00, which indicates a shortage in the amount of $158181.19.

Please remit $158181.19 payable to Wells Fargo Bank, to my attention at the address below or via
wire instructions as follows:

*Express Mail address*                          *US Mail Address*
*Wells Fargo, Commercial Mortgage Servicing*    *Wells Fargo Commercial Mortgage Servicing*
*Attn:  Tim Parish, Property Tax Dept.*         *Attn: Tim Parish, Property Tax Dept.*
*1320 Willow Pass Road, Suite 205*              *P.O. Box 4036*
*Concord, CA 94520*                             *Concord, CA 94524*

*Wire Instructions:*    *Wells Fargo Bank, ABA #121-000-248*
                        *200 B Street, Santa Rosa, CA*
                        *Credit to:  Wells Fargo Commercial Mortgage Servicing*
                        *Account # 4535-078117*
                        *Reference:      For further credit to WFCMS loan #76-0990083*
                        *Property tax escrow shortage*
                        *Attn: Tim Parish*

These funds must be received in our office no later than 7/27/03 in order for us to issue payment to
the Town of Canton by 8/2/04.  Please include the loan number on your check to ensure proper
identification. Failure to remit the shortage amount within the specified time frame may result in
Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to
your loan.

Should you have any questions or concerns regarding this matter, please contact me at the toll free
number 1-800-986-9711 Ext 5303.

Sincerely,

Tim Parish
Operation Department                                    INV # 524

                                                    Blue Hill
                                                    5064

**BLUE HILLS OFFICE PARK, LLC**
150 ROYALL STREET
CANTON, MASSACHUSETTS 02021
(781) 828-6669

July 15, 2004

Ms. Linda O'Brien
Boston Equiserve, L.P.
150 Royall Street
Canton, MA 02021

Re: 2005 Fiscal Real Estate Tax, First Quarter, 150 Royall Street, Canton, MA

Dear Linda:

Enclosed are the first quarter Real Estate Taxes for fiscal year ending 6/30/2005:

| | |
|---|---|
| Your share per Lease Terms 263,245 square feet + 5,800 square feet (Health Club) | 98.2407% |
| Actual Real Estate Tax | $ 158,181.19 |
| Your share, per lease | x    98.2407% |
| First Quarter | $ 155,398.30 |
| Due for one month: | $ 51,799.44 |

Please make your check in the amount of $51,799.44 payable to Blue Hills Office Park, LLC and remit to:

Blue Hills Office Park, LLC (Metrowest Bank)
PO Box 9029
Framingham, MA 01701-9029

PLEASE NOTE THAT THIS BILL IS DUE BY AUGUST 1, 2004.

If you have any question regarding this invoice, please give me a call at my Canton office (781) 828-6669. Thank you.

Sincerely,

Lawrence G. Needle
Property Manager

S:\NEEDLE\RE Tax - Equiserve.doc

Blue Hill
5065

Banknorth Massachusetts

DATE 9/22/04

PRINT NAME
BLUE HILLS OFFICE PARK

29-0311-0592

CAD-03

PLEASE ENDORSE ALL CHECKS

**CHECKING DEPOSIT**

| | | |
|---|---|---|
| CURRENCY | | |
| COIN | | |
| LIST CHECKS | | |
| PARTITIONS | 25,000 | 00 |
| | | |
| CASH BACK | | |

CAD-03DCE

ACCOUNT NUMBER
0 8 7 0 0 4 5 7 7 0 $

TOTAL AMOUNT
2 5 0 0 0 0 0

⑆5230⑈1020⑉

D. ERWIN & ASSOCIATES LLC
ASCO POINTE ROAD
WAYZATA

ANCHOR BANK NATIONAL ASSOCIATION

1051

9/30/04

PAY TO THE
ORDER OF   Sinclair a. Management, Inc                    $25,000 00

Twenty five thousand dollars and no/100                         DOLLARS

MEMO Final payment on 150 Royal   EquiServe

⑈001051⑈ ⑆091014267⑈003230638⑈

Blue Hill
5066

**Banknorth** Massachusetts

DATE
08/17/04
PRINT NAME
BLUE HILLS OFFICE PARK

PLEASE ENDORSE ALL CHECKS

CAD-03

CHECKING DEPOSIT

CURRENCY

COIN

LIST CHECKS

EQUISERV 29,180 00
DRY COOLERS

CASH BACK

ACCOUNT NUMBER
0870045770 $

TOTAL AMOUNT
2918000

⑆5230⑆1020⑈

EQUISERVE
P.O. Box 43022, Providence, RI 02940-3022

NO. 507975

DATE OF
CHECK    07/30/04

DOLLARS
PAY $29,180.00

UMB BANK - MORRISONVILLE
MORRISONVILLE, IL

PAY  Twenty nine thousand one hundred eighty and 00/100 Dollars

CHECK NOT VALID AFTER 180 DAYS
TWO SIGNATURES REQUIRED IF OVER $10,000

TO THE ORDER OF

By
AUTHORIZED SIGNATURE

Fineberg Management
Fineberg Companies
One Washington St Ste 400
Wellesley, MA 02181

COUNTERSIGNATURE

⑆507975⑆ ⑆071119195⑆ 5008008310⑆

Blue Hill
5067

## EQUISERVE, INC.

| VOUCHER | INVOICE NUMBER AND DESCRIPTION | DATE | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
|---------|-------------------------------|------|--------------|----------|------------|
|         | 7/19/04                       | 07/19/04 | 29,180.00 |          | 29,180.00  |

REMITTANCE ADVICE                                          DETACH BEFORE DEPOSITING

EQ-0041 Nov 12/09

Blue Hill
5068

0057934

Blue Hill
5069

# Vasselin Mechanical Corp.

HVAC Services                                          617-332-7171
11 Gambier Road                                        1-800-230-HVAC
Newton, Massachusetts 02166                            FAX 617-332-3903

June 15, 2004

Royal Limited Partnership
150 Royal Street
Canton, MA

Our Price for the replacement of three (3) liebert dry coolers is
$29,180.00 This price includes the removal of the existing dry
coolers, two (2) DD0174A, one (1) DS0109A. Direct replacement of
the units, the removal of the units by crane, the recovery of the glycol
and refilling the systems. We will restart the system and test the
operation.

No work is to be performed on the liebert cooling units inside the
building.

Please note that delivery time is 4-6 weeks from time of order. An
order will not be placed with out a 50% deposit.

Sincerely,

Charles Vasselin

Blue Hill
5070

## EQUISERVE, INC.

| VOUCHER | INVOICE NUMBER AND DESCRIPTION | DATE | GROSS AMOUNT | DISCOUNT | NET AMOUNT |
|---------|-------------------------------|------|--------------|----------|------------|
|  | 7/19/04 | 07/19/04 | 29,180.00 |  | 29,180.00 |

REMITTANCE ADVICE                                    DETACH BEFORE DEPOSITING

EQ-0041 New 12/03

EQUISERVE
P.O. Box 43022 Providence, RI 02940-3022

NO. 507975

DATE OF CHECK    07/30/04        DOLLARS    ***$29,180.00

UMB BANK - MORRISONVILLE
MORRISONVILLE, IL

PAY   Twenty nine thousand one hundred eighty and 00/100 Dollars

CHECK NOT VALID AFTER 90 DAYS
TWO SIGNATURES REQUIRED IF OVER $10,000

TO THE ORDER OF

Fineberg Management
Fineberg Companies
One Washington St. Ste 400
Wellesley MA 02181

BY                          AUTHORIZED SIGNATURE

                            COUNTERSIGNATURE

⑈507975⑈ ⑇071119145⑇ 500800B310⑈

Blue Hill
5071

**D ERWIN & ASSOCIATES LLC**
2715 CASCO POINT ROAD
WAYZATA, MN 55391

ANCHOR BANK NATIONAL ASSOCIATION
75-1426-910

1617

8/20/2004

PAY TO THE
ORDER OF    FINEBERG MANAGEMENT, INC.    $ **50,000.00

Fifty Thousand and 00/100************************************************************ DOLLARS

FINEBERG MANAGEMENT, INC.
ONE WASHINGTON ST.
WELLESLEY, MA  02481

MEMO   EQUISERVE JOB/DOWNPAYMENT

⑈00ⅠⅬ17⑈ ⑈09Ⅰ0ⅠⅬ 2Ⅼ7⑈ 003230Ⅼ38⑈

---

**D ERWIN & ASSOCIATES LLC**
FINEBERG MANAGEMENT, INC.

EQUISERVE JOB                      8/20/2004         1617
                                                 50,000.00

Royall
operating acct.

---

Anchor Bank National Ass  EQUISERVE JOB/DOWNPAYMENT                      50,000.00

**Banknorth** Massachusetts                      CHECKING DEPOSIT

DATE 7/23/04                                      CURRENCY
PRINT NAME
Blue Hills Office Park                            COIN

                                                 LIST CHECKS   50,000  00

PLEASE ENDORSE ALL CHECKS

CAD-03                                            CASH BACK

                    ACCOUNT NUMBER                TOTAL AMOUNT
                    0870045770 $                  5000000

⑈5230⑈Ⅼ020⑈

                                                 Blue Hill
                                                 5072

Banknorth Massachusetts                                                          Page 1 of 1

## View Activity Search

**Account Number:**        0870045770
**Account Name:**          Blue Hills Office Park - OP

**Date:**      August 23, 2004

**Activity**   To sort by the column header, click on Date, Type, Description, Check Number, Credits or Debits.

| Date | Type | Description | Check Number | Credits | Debits |
|------|------|-------------|--------------|---------|--------|
| 08/23/2004 | OTHER DEPOSIT | DEPOSIT | | $50,000.00 | |
| Total | | | | $50,000.00 | $0.00 |

**File Type**                          **Delimeter**
¦ -- Please Select -- ▓                 ¦ -- Please Select -- ▓

Back  |  Download  |  Print  |

Blue Hill
5073

https://ecashmanager.banknorth.com/ma/AcctActivity.asp              8/24/2004

Banknorth Massachusetts

DATE 09/16/04

PRINT NAME

BLUE HILLS OFFICE PARK

CAD-03

PLEASE ENDORSE ALL CHECKS

| CHECKING DEPOSIT | | | |
|---|---|---|---|
| CURRENCY | | | |
| COIN | | | |
| LIST CHECKS | 25,000 | 00 | |
| PARTITIONS | | | |
| | | | |
| CASH BACK | | | |

ACCOUNT NUMBER

0 8 7 0 0 4 5 7 7 0 $

TOTAL AMOUNT

25 00 00

⑊5230⑊10 20⑊

D ERWIN & ASSOCIATES LLC
ANCHOR BANK NATIONAL ASSOCIATION    9/13/2004

11642

PAY TO THE FINEBERG MANAGEMENT INC
ORDER OF                                                                          **25,000.00

Twenty Five Thousand and 10/100                                                        DOLLARS

FINEBERG MANAGEMENT INC
ONE WASHINGTON ST
WRELESELY MA

MEMO PROGRESS PAYMENT EQUISERVE

⑊00L642⑊ ⑊091014267⑊003230638⑊

D ERWIN & ASSOCIATES LLC
FINEBERG MANAGEMENT, INC.

EQUISERVE JOB                                  9/13/2004                       25,000.00  11642

Anchor Bank National Ass    PROGRESS PAYMENT EQUISERVE                          25,000.00

Blue Hill
5074

# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:   Blue Hills Office Park LLC
      Loan #76-0990083

Dear Mr. Parish,

A request is hereby made for a withdrawal of $412,833.43 from the cash flow sub-account on this loan to be used to pay principal and interest as well as the advance the money due to pay real estate taxes. We have yet to receive real estate taxes from the tenant for the period of time that they were still in the building. Once received, we will deposit those sums into the operating account for you to sweep. Listed below is a breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| Real Estate Taxes | 158,181.19 |
| | $412,833.43 |

cc:   K. Goldberg, Esq.

Blue Hill
5075

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

FISCAL YEAR 2005 PRELIMINARY REAL ESTATE TAX BILL

Based on assessments as of January 1, 2004. Your Real Estate tax for fiscal year beginning July 1, 2004 and ending June 30, 2005 on the value of property described below.
*This form approved by the Department of Revenue*

| Parcel | 051-009 |
|--------|---------|
| Location | 150 ROYALL ST |
| Class | 340 |
| Book / Page | 13730/171 |

Remit Payments to: Town of Canton    OR   You can now pay your Real Estate bill on-line.
                    P.O. Box 529          Visit www.mcc.net/ebill to sign up.
                    Medford, MA 02155

BLUE HILLS OFFICE PARK LLC
FINEBERG MANAGEMENT INC
1 Washington St
WELLESLEY MA 02481-1711

**TOWN OF CANTON**
The Commonwealth of Massachusetts
Office of the Tax Collector
Office Hours: Mon, Wed - Fri 9:00AM - 5:00PM
Tues 9:00AM - 7:00PM

**TAXPAYER COPY**
See reverse side for important informat

Bill Number - 000006

Mailing Date June 30, 2004

| | |
|---|---|
| Preliminary Real Estate Tax: | $316,362.38 |
| 1ST Quarter Payment Due by August 2, 2004 | $158,181.19 |
| 2ND Quarter Payment Due by November 1, 2004 | $158,181.19 |

**THIS BILL IS PAYABLE IN 2 INSTALLMENTS**

Interest at the rate of 14% per annum will accrue on overdue amounts from the due date until payment is made.

---

FISCAL YEAR 2005 PRELIMINARY REAL ESTATE TAX BILL

Based on assessments as of January 1, 2004. Your Real Estate tax for fiscal year beginning July 1, 2004 and ending June 30, 2005 on the value of property described below.

| Parcel | 051-009 |
|--------|---------|
| Location | 150 ROYALL ST |
| Class | 340 |
| Book / Page | 13730/171 |

Remit Payments to: Town of Canton    OR   You can now pay your Real Estate bill on-line.
                    P.O. Box 529          Visit www.mcc.net/ebill to sign up.
                    Medford, MA 02155

BLUE HILLS OFFICE PARK LLC
FINEBERG MANAGEMENT INC
1 Washington St
WELLESLEY                MA    02481-1711

**TOWN OF CANTON**
The Commonwealth of Massachusetts

**RETURN WITH PAYMENT
IN ENVELOPE PROVIDED**

2nd Quarter Payment        Bill Number - 000006

| | |
|---|---|
| Preliminary Real Estate Tax: | $316,362.38 |
| 2nd Quarter Payment Due by November 1, 2004 | $158,181.19 |

TOTAL DUE BY November 1, $158,181.19

5009208200570000061550015818119B

---

FISCAL YEAR 2005 PRELIMINARY REAL ESTATE TAX BILL

Based on assessments as of January 1, 2004. Your Real Estate tax for fiscal year beginning July 1, 2004 and ending June 30, 2005 on property described below.

| Parcel | 051-009 |
|--------|---------|
| Location | 150 ROYALL ST |
| Class | 340 |
| Book / Page | 13730/171 |

Remit Payments to: Town of Canton    OR   You can now pay your Real Estate bill on-line.
                    P.O. Box 529          Visit www.mcc.net/ebill to sign up.
                    Medford, MA 02155

BLUE HILLS OFFICE PARK LLC
FINEBERG MANAGEMENT INC
1 Washington St
WELLESLEY                MA    02481-1711

**TOWN OF CANTON**
The Commonwealth of Massachusetts

**RETURN WITH PAYMENT
IN ENVELOPE PROVIDED**

1st Quarter Payment        Bill Number - 000006

| | |
|---|---|
| Preliminary Real Estate Tax: | $316,362.38 |
| 1st Quarter Payment Due by August 2, 2004 | $158,181.19 |

TOTAL DUE BY August 2, $158,181.19

Blue Hill
5076

# fineberg management, inc.

September 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

      RE:    Blue Hills Office Park LLC
             Loan #76-0990083

Dear Mr. Parish,

      A request is hereby made for a withdrawal of $254,652.24 for the month of September from the cash flow sub-account on this loan to be used to pay principal and interest.   Attached is last month's letter.  As stated in the letter we did receive approximately one month's real estate tax from the tenant for $51,799.44 which was deposited and promptly swept by Wells Fargo; therefore, I assume that you have made the real estate tax payment to the town of Canton, MA.

      Listed below is a breakdown of the principal and interest payment as we calculated it.

      If you need any further information, please feel free to contact me.

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| | $254,652.24 |

Sincerely,

Joseph A. Donovan
CFO

Cc:   Kenneth Goldberg
      Job Warshaw, Lennar Partners
      Gilbert Stone

Blue Hill
5077

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

Banknorth Massachusetts

Page 1 of 1

## View Activity Search

| | | |
|---|---|---|
| Account Number: | 0870045796 | |
| Account Name: | Blue Hills Office Park – LB | |

Date:    August 12, 2004

**Activity**  To sort by the column header, click on Date, Type, Description, Check Number, Credits or Debits.

| Date | Type | Description | Check Number | Credits | Debits |
|---|---|---|---|---|---|
| 08/12/2004 | OTHER DEPOSIT | LOCKBOX DEPOSIT | | $51,799.44 | |
| Total | | | | $51,799.44 | $0.00 |

**File Type**
-- Please Select --

**Delimeter**
-- Please Select --

Back    Download    Print

Blue Hill
5078

12/10/99  FRI 17:23 FAX 925 8915947        WELLS FARGO COMMERCIAL                    ☒001

Post-it Fax Note 7671  Date 12/10  5
To Paul Halloran
From Maggie

# Memorandum

**To:**    Paul Halloran        Via Facsimile: 781.239.1493

**CC:**    Stephanie Britton

**From:**   Maggie Gremore        925.677.5224 Direct Phone

**Date:**   12/10/99

**Re:**    Blue Hills Loan #76-0990083

---

In response to your questions as forwarded via Memorandum dated December 8, 1999, I offer the following:

1.   How much money did ORIX transfer to Wells Fargo?
     The funds were transferred in two separate transactions. The first transaction was a wire of $231,641.73, and represented all closing deposits (less any payments, plus accrued interest) for tax, insurance and reserves.
     Replacement Reserve:    $0.00
     Tenant Impr Reserve:    $19,892.00 (Closing deposit plus accrued interest)
     Cash Flow Reserve:     $105,335.70 (Closing deposit plus accrued interest)
     Tax Escrow:          $49,617.03 (Closing deposit minus tax pmt of $148,882.97)
     Insurance Escrow:      $56,800.00 (Closing deposit)

     The second transaction was a wire of $332,561.99, and represented the remaining balance in the Cash Sweep Clearing Account. These funds represented the following amounts:
     November P&I Pmt:     $254,652.24
     October Ins Pmt:      $9,600.00
     October Rep Esc Pmt:    $4,564.42
     October Base Leasing:    $9,927.92
     Oct Cash Flow Leasing:   $52,572.08

2.   How much if anything did Wells Fargo deduct for November?
     November deductions included the following:
     November Ins Pmt:      $9,600.00
     November Rep Esc Pmt:    $4,564.42
     Nov Base Leasing:      $9,927.92
     Nov Cash Flow Leasing:   $52,572.08
     Wired to Borrower:     $554,322.99

     Note: The Mortgage provides that Borrower will remit quarterly tax payments beginning with the payment due November 1999. Wells Fargo is not clear if the Clearing Account deposit of

1

Blue Hill
5079

12/10/99  FRI 17:23 FAX 925 6915947        WELLS FARGO COMMERCIAL                    ☑002

*December 10, 1999*

$146,263.67, made on 11/3/99 represents this quarterly deposit from the tenant.   As we were not sure, we did not deduct the payment from the Cash Flow.   We will adjust the December payment when you provide us with your explanation.

3.    $483,000 +/- was deposited into the lockbox for November.  Wells Fargo transferred
      $554,000 +/- to us for November – Where did the difference of $71,000 come from?

     See spreadsheets for actual activity to the Cash Sweep Clearing Account.  I believe the
     reconciliation will evidence that all funds are accounted for.

4.    Wells Fargo December Debt Service:  Please break down escrow due amount of $24,092.34.
      Breakdown:
      Monthly Insurance Pmt:          $9,600.00
      Monthly Rep Escrow Pmt:         $4,564.42
      Monthly Base Leasing Pmt:       $9,927.92

     In addition, there will be a monthly Cash Flow Leasing payment of $52,572.08, so long as the
     property is cash flowing. See the Mortgage for the terms and conditions for this account.

5.    Will the monthly charges be $278,744.58 per month?
      With the Cash Flow Leasing payment referenced above, the total monthly payment will be
      $331,406.66.

I hope these answers are sufficient for your questions.  In addition, the spreadsheets should provide a
clearer picture of how the monies were distributed.  I believe we are on target for the December
payment.  The only thing we need to clear up is whether or not we need to collect the quarterly tax
payment.  Please let us know what you determine.  Also, please call for any concerns or questions
you have regarding your accounts.

2

Blue Hill
5080

12/10/99  FRI 17:24 FAX 925 6915807       WELLS FARGO COMMERCIAL                    ☑003

760990083.xls
TransactionSummary

| Loan # 76-0990083  Blue Hills Office Park | | Orix # |
|---|---|---|
| Lockbox Account # 6404-259574 | | 197-000600 |
| Monthly Payment Amount (Strategy) | $331,316.66 | |
| AMOUNTS TO HOLDBACK | | |
| MONTHLY ESCROW CONSTANTS | | |
| | Insurance | $9,600.00 |
| | Debt Service | $254,652.24 |
| | Replacement Reserve | $4,564.42 |
| | Base Leasing | $9,927.92 |
| | C/F Leasing | $52,572.08 |
| | Monthly Amount Due | $331,316.66 |

| Date | Transactions | Beginning Balance | Daily Deposit | Ending Balance |
|---|---|---|---|---|
| Orix End | Balance | 332,561.99 | | |
| | | | | |
| WFB MRA transactions | | | | 0.00 |
| 11/03/99 | Initial Deposits | 0.00 | 332,561.99 | 332,561.99 |
| 11/04/99 | deposit | 332,561.99 | 146,263.67 | 478,825.66 |
| 11/08/99 | deposit | 478,825.66 | 3,402.82 | 482,228.48 |
| 11/15/99 | deposit | 482,228.48 | 480,075.59 | 962,304.07 |
| | Outgoing wire to borrower for | | | |
| (1) 11/17/1999 | Operating Expenses ($141,248.71) | 962,304.07 | (141,248.71) | 821,055.36 |
| | 2 Outgoing wires to borrower: | | | |
| | $4,648.15 - Operating Expenses | | | |
| | $408,426.13 - Borrower remaining | | | |
| (2) 11/19/1999 | balance | 821,055.36 | (691,818.86) | 129,236.50 |
| (3) NEW CYCLE BEGINS | | 129,236.50 | 0.00 | 129,236.50 |
| 11/19/99 | deposit | 129,236.50 | 871.63 | 130,108.13 |
| 11/24/99 | deposit | 130,108.13 | 3,242.08 | 133,350.21 |
| 11/30/99 | Interest Earned on MRA | 133,350.21 | 1,065.67 | 134,415.88 |
| MONTHEND BALANCE | | 134,415.88 | 0.00 | 134,415.88 |
| 12/08/99 | deposit | 134,415.88 | 7,078.16 | 141,494.04 |
| | | 141,494.04 | 0.00 | 141,494.04 |
| Today's Balance | Balance | 141,494.04 | 141,494.04 | 141,494.04 |

(1) Does the deposit of $146,263.67 represent the quarterly tax payment from the tenant????
(2) Total disbursement of $691,818.86 represents the following:

| | |
|---|---|
| Wire to Borrower as Nov Excess | 4,648.15 |
| Wire to Borrower as Nov Excess | 408,426.13 |
| November P&I Payment | 254,652.24 |
| November Ins Payment | 9,600.00 |
| November Replacement Reserve Pmt | 4,564.42 |
| November Base Leasing Reserve Pmt | 9,927.92 |
| | 691,818.86 |

(3) Balance of $129,236.50 remaining in account represents:

| | |
|---|---|
| October Insurance Payment | 9,600.00 |
| October Replacement Reserve Payment | 4,564.42 |
| October Base Leasing Reserve Payment | 9,927.92 |
| October Cash Flow Leasing | 52,572.08 |
| November Cash Flow Leasing | 52,572.08 |
| | 129,236.50 |

These funds will be moved over to the appropriate reserve or escrow buckets.
After disbursement of the Reserve and
Escrow payments, the balance in the account
for the beginning of the December cycle will be $12,257.54 ($141,494.04 - $129,236.50).

I:\Share\Ops\SpecialHandling\Inv524\Lockbox\760990083.xls-TransactionSummary\t                    12/10/1999

Blue Hill
5081

12/10/99  FRI 17:24 FAX 925 6915947    WELLS FARGO COMMERCIAL    @004

*Transfer Balances from ORIX for Tax, Ins, & Reserves

12/10/99 FRI 17:24 FAX 925 6915947 WELLS FARGO COMMERCIAL ☑005

ORIX

M3464

ORIX Real Estate Capital Markets, LLC
ACCOUNT STATUS SUMMARY
FOR 0/00/00 TO 99/99/99

12/02/99 Thursday
3:50 P.M.

LOAN NO: 19-7000800 BORROWER
BLUE HILLS OFFIC & PARK, LLC
C/O FINEBERG MANAGEMENT INC
ONE WASHINGTON STREET, SUITE 400
WELLESLEY, MA 024814900

TYPE- F
FREQ- 01

ORIG.LOAN 33149000.00
BEG 9/99
TERM 10 YRS 00 MOS.
MTD- 10/19

CUR. BAL .00
ORIG. BALANCE 8.49000%
INTEREST .00000
ORIG. RATE

CUR. DFLT INT BAL .00
DFLT INT RATE 5.00000%
DFLT INT RATE @ MATURE 5.00000%
NEXT PAYMENT DUE DATE 11/11/1999

| DATE | TRANSACTION CD FOR AMOUNT | CUR PRINCIPAL | GROSS INT | ESC & PMI | TAX ESCROW | INS ESCROW | RESERVES | ESCROW $ | MISC. FEES | SUSPENSE | LATE CHRG | BUY DOWN AMOUNT | PRINCIPAL BAL | O/L CD | EFFECTIVE DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| .... | BEGIN BALANCES | | | | | | | | | | | | .00 | | |
| 9/17/99 | NEW LOAN 33149000.00 | 33149000.00 | | | | | | | | | | | 33149000.00 | | |
| 9/17/99 | TAX ESC PMT 198300.00 | | | | 198300.00 | | | | | | | | 33149000.00 | | |
| 9/17/99 | INSUR PAYMT 56800.00 | | | | | 56800.00 | | | | | | | 33149000.00 | | |
| 9/17/99 | PMT REC'D 10/99 211076.26 | | 211076.26 (1) | | | | | | | | | | 33149000.00 | | 9/17/1999 |
| 9/17/99 | RESERVE PMT 19855.83 | | | | | | 19855.83 | | | | | | 33149000.00 | | 9/17/1999 |
| 9/17/99 | RESERVE PMT 105144.17 | | | | | | 105144.17 | | | | | | 33149000.00 | | 9/17/1999 |
| 10/07/99 | TAX DISB 140882.97 | 13529 | | | 140882.97- (3) | | | | | | | | 33149000.00 | | |
| 10/15/99 | RESERVE CR 36.17 | | | | | | 36.17 | | | | | | 33149000.00 | | 10/13/1999 |
| 10/15/99 | RESERVE CR 191.53 | | | | | | 191.53 | | | | | | 33149000.00 | | 10/15/1999 |
| 10/19/99 | TAX DEBIT 49617.03 | | | | * 49617.03- | | | | | | | | 33149000.00 | | 10/19/1999 |
| 10/19/99 | INSUR DEBIT 56800.00 | | | | | * 56800.00- | | | | | | | 33149000.00 | | 10/19/1999 |
| 10/19/99 | PRIN CR 33149000.00 | 33149000.00- | | | | | | | | | | | .00 | | 10/19/1999 |
| 10/19/99 | RESERVE DR 19892.00 | | | | | | * 19892.00- | | | | | | .00 | | 10/19/1999 |
| 10/19/99 | RESERVE DR 105335.70 | | | | | | * 105335.70- (2) | | | | | | .00 | | 10/19/1999 |
| | BALANCES TO DATE | | 211076.26 | | | | | | | | | | .00 | | |

TOTAL TAXES PAID
TOTAL INTEREST CREDITED TO ESCROW
TOTAL LATE CHARGES PAID
TOTAL BUY DOWN PAID

(1) 27 days stub interest - $33,149,000.00 × 8.49 ÷ 360 × 27

(2) Totals $175,227.70. Breakdown = Rep Res ⊖
Tax Ins 19,892.00 (Original Dep of $19,855.83 + interest)
Cash Flow 105,335.70 (Original Dep of $105,144.17 + interest)
175,227.70

(3) Tax payment by ORIX (reimbursed to Borrower?)

* Tax, Ins & Reserve Balances transfer to Wells Fargo Bank 10/19/99 = $231,644.73

Blue Hill
5083



UNITED STATES POSTAGE
$ 04.650
OCT 21 2004
PITNEY BOWES
02 1A
0004347901
MAILED FROM ZIPCODE 02110

**SCANNED**

CERTIFIED MAIL

7001 1340 0004 9583 6096

**Piper Rudnick**

One International Place, 21st Floor
Boston, MA 02110-2613

106477-18    BBH2200

Blue Hills Office Park LLC
Mr. Gerald S. Fineberg
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

Piper Rudnick LLP

Blue Hill
5084

*Prod 10.25.04*

# Piper Rudnick

One International Place, 21st Floor
Boston, Massachusetts 02110-2600
*main* 617.406.6000 *fax* 617.406.6100

BRUCE S. BARNETT
bruce.barnett@piperrudnick.com
*direct* 617.406.6002

October 21, 2004

RETURN RECEIPT REQUESTED
and FIRST CLASS MAIL

Blue Hills Office Park LLC
Mr. Gerald S. Fineberg (Cert. Mail No. 7001 1940 0004 9583 6096)
Mr. Joseph A. Donovan (Cert. Mail No. 7001 1940 0004 9583 6102)
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

Mr. William J. Langelier (Cert. Mail No. 7001 1940 0004 9583 6119)
c/o The Langelier Company
2045 Jackson Street
Suite 501
San Francisco, California 94109

Re:    Notice of Intention to Foreclose and Deficiency after Foreclosure of Mortgage

Gentlemen:

You are hereby notified in accordance with Massachusetts General Laws, Chapter 244,
§ 14 and Chapter 244, §17B, of the intention of CSFB 1999-C1 Royall Street, LLC (the "Bank"),
assignee of JP Morgan Chase Bank (formerly known as The Chase Manhattan Bank) as Trustee
for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial
Mortgage Pass-Through Certificates, Series 1999-C1, to foreclose under Power of Sale for
breach of condition, the mortgage now held by the Bank on property located at 150 Royall
Street, Canton, Massachusetts (the "Property"), given by Blue Hills Office Park LLC to Credit
Suisse First Boston Mortgage Capital LLC, dated as of September 14, 1999 and recorded at the
Norfolk County Registry of Deeds on September 15, 1999 in Book 13733, Page 428, to secure a
certain Mortgage Note made by Blue Hills Office Park LLC, for the whole, or part, of which you
may be liable to the Bank in case of a deficiency in the proceeds of the foreclosure sale.

*Piper Rudnick LLP*

Blue Hill
5085

# Piper Rudnick

Mr. Gerald S. Fineberg
Mr. Joseph A. Donovan
Mr. William J. Langelier
October 21, 2004
Page 2

You are hereby notified of the foreclosure sale of the Property at 10:00 AM on Friday, November 12, 2004, all in accordance with the enclosed legal notice of mortgagee's sale of real estate.

Very truly yours,

CSFB 1999-C1 ROYALL STREET, LLC, a
Delaware limited liability company

By: Lennar Massachusetts Partners, Inc., its
Manager

By: Piper Rudnick LLP, its attorney,

By: _____
Bruce S. Barnett

cc:    Stephen E. Nolan, Esq.
       E. Randolph Tucker, Esq.
       Staci Rutman
       Joseph Polcari
       Jeffrey Watkin, Esq.

-BOST1:311073.v1

Blue Hill
5086

Page 12

LEGAL NOTICE

## MORTGAGEE'S SALE OF REAL ESTATE

By virtue and in execution of the POWER OF SALE contained in a certain mortgage from BLUE HILLS OFFICE PARK LLC, to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, dated as of September 14, 1999 and recorded with Norfolk County Registry of Deeds (the "Records") in Book 13733, Page 428, of which mortgage the undersigned is the present holder, for breach of conditions contained in said mortgage and for the purpose of foreclosing, the same will be sold at Public Auction at 10:00 A.M. on the 12th day of November 2004, at the mortgaged premises located at 150 Royall Street, Canton, Massachusetts, all and singular the premises described in said mortgage, to wit:

[illegible text]

described herein, if any.

The premises to be sold shall also be subject to all leases and tenancies, if any there may be, having priority over said mortgage, to, tenancies or occupation by persons on the premises now or at the time of said auction which tenancies or occupation are subject to said mortgage, to rights or claims in personal property installed by tenants or former tenants now located on the premises and, also to all laws and ordinances including, but not limited to, all building, zoning and environmental laws and ordinances.

TERMS OF SALE: Fifty Thousand and no/100 Dollars ($50,000.00) shall be paid in cash or by certified or bank cashier's check by the purchaser at the time and place of sale.

The balance of the purchase price on a sale shall be paid in cash or by certified bank or cashier's check in or within thirty (30) days thereafter at the offices of Piper Rudnick LLP, One International Place, Boston, Massachusetts. The successful bidder and/or bidders shall be required to sign a Memorandum of Terms of Sale containing the above terms at the auction sale.

The Mortgagee reserves the right to postpone the sale to a later date by public proclamation at the time and date appointed for the sale and to further postpone at any adjourned sale date by public proclamation at the time and date appointed for the adjourned sale date.

In the event that the successful bidder at the foreclosure sale shall default in purchasing the within described property according to the terms of this Notice of Sale and/or terms of the Memorandum of Sale executed at the time of foreclosure, the Mortgagee reserves the right to sell the property by foreclosure deed to the second highest bidder provided that said second highest bidder shall deposit with Mortgagee's attorney, Piper Rudnick LLP, the amount of the required deposit as set forth herein within three (3) business days after written notice of the default of the previous highest bidder and title shall be conveyed to said second highest bidder within thirty (30) days of said written notice.

Other terms to be announced at the time and place of the sale.

CSFB-1999-C1 ROYALL STREET LLC, a Delaware limited liability company, present holder of said mortgage

[illegible] Canton, Massachusetts [illegible] Capital LLC, a Massachusetts corporation, its Manager

By Piper Rudnick LLP, its attorney

Bruce S. Barnett
c/o Piper Rudnick LLP
One International Place
Boston, Massachusetts 02110
(617) 406-6000

Grave Intentions will


# LENNAR PARTNERS
An LNR Company

September 17, 2004

BY FEDERAL EXPRESS



Mr. Joseph A. Donovan
Chief Financial Officer
Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

Re:    Blue Hills Office Park LLC Loan No. 76-0990083

Dear Mr. Donovan:

The above-referenced loan has been transferred to Lennar Partners as special servicer and in that connection, we have received copies of your letters of August 2, 2004 and September 2, 2004 to Mr. Tim Parish of the Property Tax Department at Wells Fargo Commercial Mortgage Servicing. Following are our responses to your letters.

First, you requested in your August 2 letter that the sum of $158,181.19 be advanced from the "cash flow sub-account" on deposit with the mortgagee in order to pay the real estate taxes due on August 2, 2004. We interpret your letter as a request under Section 6(c)(ix) of the Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 14, 1999 (the "Mortgage"). Pursuant to that section, however, releases from the Leasing Escrow Funds may only be made for "payment of principal and interest then due and payable on the Note". The withdrawal of funds from the Leasing Escrow Fund for payment of real estate taxes is not permitted under the Mortgage.

Furthermore, under Section 5 of the Mortgage, the mortgagor is required timely to pay real estate taxes. Section 6(a) of the Mortgage provides for monthly deposits of real estate taxes in the Tax and Insurance Impound Fund, provided that so long as the "Bank of Boston Lease" remained in full force and effect, the Mortgagor was permitted to pay real estate taxes on a quarterly basis. The quarterly deposit of real estate taxes due on August 1, 2004 was not timely made and, furthermore, it is our understanding that the "Bank of Boston Lease" is no longer in full force and effect. In any event, the failure by the mortgagor either to make the quarterly escrow deposit on August 1, 2004 or to pay the quarterly installment of real estate taxes due on August 2, 2004 constituted an Event of Default under the Mortgage. The quarterly installment of taxes was made by the mortgagee out of its own funds in order to protect the mortgagee's collateral.

Your letter of August 2 also requested a withdrawal of $254,652.24 from the Leasing Escrow Funds for payment of monthly principal and interest. Section 6(c)(ix) of the Mortgage

--BOST1:308070.v2

Blue Hill
5088

Joseph A. Donovan
September 17, 2004
Page 2

permits such application of Leasing Escrow Funds up to the so-called "Interim Reduction Amount", but only on certain conditions. One such condition is that no Event of Default shall have occurred and be continuing as of the date of the request for such disbursement. As described above, the loan was already in default at the time of your request due to the failure to make the quarterly tax payment then due. Furthermore, as described above, the Leasing Escrow Funds are only permitted to be used for payment of principal and interest then due and, accordingly, the loan was also in default upon mortgagor's failure to make payments of $11,921.89 on account of the insurance escrow and $67,054.42 on account of reserves and Mortgagor's failure to make a monthly tax escrow payment since the "Bank of Boston Lease" was no longer in full force and effect as of the August 11 payment date.

Your September 2, 2004 letter made a similar request for a withdrawal of $254,652.24 from the Leasing Escrow Funds to pay principal and interest due on September 11. Again, that request cannot be honored due to the above-described Events of Default. Furthermore, as stated above, the application of such funds to principal and interest leaves an outstanding payment obligation due on September 11 to cover taxes, insurance and reserves.

Please be advised that as a result of the above-described Events of Default, the above-referenced loan has been accelerated and that the Debt, including all sums due under the Note and the other Loan Documents, is immediately due and payable.

Sincerely,

Joseph A. Polcari
Asset Manager

BOST1:308070.v2

Blue Hill
5089

08/24/2004 TUE 14:00  FAX  305-695-5119                                    ⬚006/006

## Exhibit A

### Review Documentation

1. Borrower Information

   ☑ A financial statement (balance sheet and income statements) of Borrower (including those of the individual members of the current Borrower) and guarantors, if any, prepared within 30 days of the date hereof, and as of year-end.

   ☑ Federal tax returns (signed copies) for the last two years (if applicable) for both Borrower and Guarantor (s) (if applicable).

2. Property Information

   ☑ Operating statements for the Property for the last 2 years and year-to-date (broken down by each month); Healthcare related properties should include detailed census data for each period.

   ☑ Current business plan for the Property, including the budget for this year, detailing revenue and expense projections, etc.

   ☑ Current rent roll with summary of lease expiration dates.

   ☑ Current census data describing the unit types, payment type, additional rents, detailed by tenant / unit.

   ☑ Operator / Management Agreement and resume of manager (current and any proposed revisions, if applicable).

   ☑ Any recent environmental assessments, structural or property inspection reports for the Property.

   ☑ Copies of all current leases, including related amendments and renewals.

   ☐ Sample copy of resident leases.

   ☑ Site Plan.

   ☑ Most recent tax bill on the Property

   ☑ A copy of the Certificate of Insurance for all insurance coverage(s) as required under the Loan Documents, along with a copy of the policy.

3. Other

   ☐ Copies of most recent regulatory surveys by state and/or local agencies showing that the facility is in compliance. Any noted defect(s) should be explained and proof provided of remediation of the defect(s).

   ☐ Copies of all licenses and/or permits required by the state or local authorities to operate the facility.

Blue Hill
5090

# fineberg management, inc.

August 5, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

This letter is being sent to officially notify you that the tenant has fully vacated the building and at this time no replacement tenant has been found. Therefore, we request a meeting with the lender to discuss the loan status and the future performance of the loan.

Based on our past experience, any decisions regarding the loan would need the approval of the Special Servicer; therefore, we request that the Special Servicer attend the meeting as well. Please let us know who the Special Servicer is and if we need to notify them or if you will handle that yourself.

Sincerely,

Joseph A. Donovan
CFO

cc:   K. Goldberg, Esq.

Blue Hill
5091

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

```
                                                                    P. 1
        * * *  COMMUNICATION RESULT REPORT ( AUG. 5.2004 12:36PM ) * * *
                                                    TTI  FINEBERG MANAGEMENT
FILE MODE        OPTION            ADDRESS (GROUP)      RESULT      PAGE
669  MEMORY TX                     19256915249          OK         P. 1/1
```

```
REASON FOR ERROR
   E-1) HANG UP OR LINE FAIL              E-2) BUSY
   E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
```

# fineberg management, inc.

August 5, 2004

SENT VIA:  Facsimile  1-925-691-5249

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

        This letter is being sent to officially notify you that the tenant has fully vacated
the building and at this time no replacement tenant has been found.  Therefore, we
request a meeting with the lender to discuss the loan status and the future performance of
the loan.

Blue Hill
5092

# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

A request is hereby made for a withdrawal of $412,833.43 from the cash flow sub-account on this loan to be used to pay principal and interest as well as the advance the money due to pay real estate taxes. We have yet to receive real estate taxes from the tenant for the period of time that they were still in the building. Once received, we will deposit those sums into the operating account for you to sweep. Listed below is a breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| Real Estate Taxes | 158,181.19 |
| | $412,833.43 |

cc:    K. Goldberg, Esq.

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

Blue Hill
5093

25 - 6 91 - 5249



Commercial Mortgage Servicing
P.O. Box 4036, Concord, CA 94524
1320 Willow Pass Rd., Ste. 205
Concord, CA 94520
800 986-9711

July 16, 2004
Fax # 781 - 239 - 1493

BLUE HILLS OFFICE PARK LLC
ONE WASHINGTON STREET, SUITE 400
WELLSLEY, MA        02481-0000

Re:    Loan # 76-0990083
       Property Tax Shortage

Dear Mortgagor(s):

This letter is to inform you that your escrow account has insufficient funds to pay the 1st installment, which is due and payable to the Town of Canton. Tax shortages are typically caused by an increase in tax amounts billed by the Tax Collector over the prior year. The property taxes, which are payable now, will be delinquent after 8/2/04. The taxes due are in the amount of $158181.19. Currently, your tax escrow balance is $0.00, which indicates a shortage in the amount of $158181.19.

Please remit $158181.19 payable to Wells Fargo Bank, to my attention at the address below or via wire instructions as follows:

*Express Mail address*                              *US Mail Address*
*Wells Fargo, Commercial Mortgage Servicing*        *Wells Fargo Commercial Mortgage Servicing*
*Attn:  Tim Parish, Property Tax Dept.*             *Attn: Tim Parish, Property Tax Dept.*
*1320 Willow Pass Road, Suite 205*                  *P.O. Box 4036*
*Concord, CA 94520*                                 *Concord, CA 94524*

*Wire Instructions:*        *Wells Fargo Bank, ABA #121-000-248*
                           *200 B Street, Santa Rosa, CA*
                           *Credit to:  Wells Fargo Commercial Mortgage Servicing*
                           *Account # 4535-078117*
                           *Reference:      For further credit to WFCMS loan #76-0990083*
                           *Property tax escrow shortage*
                           *Attn:  Tim Parish*

These funds must be received in our office no later than 7/27/03 in order for us to issue payment to the Town of Canton by 8/2/04.  Please include the loan number on your check to ensure proper identification. Failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to your loan.

Should you have any questions or concerns regarding this matter, please contact me at the toll free number 1-800-986-9711 Ext 5303.

Sincerely,

Tim Parish
Operation Department                                INV # 524

Blue Hill
5094

449.35 0.
187.

**Banknorth Massachusetts**

DATE 9/22/04
PRINT NAME
BLUE HILLS OFFICE PARK

PLEASE ENDORSE ALL CHECKS

| CHECKING DEPOSIT | | |
|---|---|---|
| CURRENCY | | |
| COIN | | |
| LIST CHECKS | | |
| PARTITIONS | 25,000 | 00 |
| | | |
| CASH BACK | | |

ACCOUNT NUMBER
0 8 7 0 0 4 5 7 7 0 $

TOTAL AMOUNT
2 5 0 0 0 0

⑆5 230 ⑈ 10 20⑆

D. ERWIN & ASSOCIATES LLC
WAYZATA, MINNESOTA

ANCHOR BANK NATIONAL ASSOCIATION

9/20/04

PAY TO THE
ORDER OF   Sinclair a Management, Inc                    $25,000.00

Twenty five thousand dollars and no/100                    DOLLARS

MEMO   final payment on 150 Royal                    [signature]
EquiServe

⑆001251⑈ ⑉0401 4267⑈003230638⑈

Blue Hill
5095



**D ERWIN & ASSOCIATES LLC**
2715 CASCO POINT ROAD
WAYZATA, MN 55391

ANCHOR BANK NATIONAL ASSOCIATION
75-1426-910

1617

8/20/2004

PAY TO THE
ORDER OF    FINEBERG MANAGEMENT, INC.                    $ **50,000.00

Fifty Thousand and 00/100 ************************************************* DOLLARS

FINEBERG MANAGEMENT, INC.
ONE WASHINGTON ST
WELLESLEY, MA 02481

MEMO    EQUISERVE JOB/DOWNPAYMENT

⑈001617⑈ ⑆091014267⑆003230638⑈

---

**D ERWIN & ASSOCIATES LLC**

FINEBERG MANAGEMENT, INC.

EQUISERVE JOB                    8/20/2004              1617

                                                        50,000.00

---

**D ERWIN & ASSOCIATES LLC**
2715 CASCO POINT ROAD
WAYZATA, MN 55391

ANCHOR BANK NATIONAL ASSOCIATION
9/13/2004

1642

PAY TO THE
ORDER OF    FINEBERG MANAGEMENT, INC.                    $ **25,000.00

Twenty Five Thousand and 00/100 ************************************ DOLLARS

FINEBERG MANAGEMENT, INC.
ONE WASHINGTON ST
WELLESLEY, MA 02481

MEMO    PROGRESS PAYMENT EQUISERVE

⑈001642⑈ ⑆091014267⑆003230638⑈

---

**D ERWIN & ASSOCIATES LLC**

FINEBERG MANAGEMENT, INC.

EQUISERVE JOB                    9/13/2004              1642

                                                        25,000.00

Blue Hill
5096

# fineberg management, inc.

## FAX TRANSMITTAL

**TO:** D. Erwin

**COMPANY NAME:** _____

**FACSILMILE NUMBER:** _____

**DATE:** 8/20/04

**FROM:** D. Frank

_Waiting for check_

**TRANSMITTED BY:** _____

**NUMBER OF PAGES (Including cover):** _____

**COMMENTS:** _____

_____

_____

_____

_____

_____

_____

_____

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the recipient of this message is not the named recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this telecopy in error please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service. Thank you.    r:\belivimox.doc

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

Blue Hill
5097

<u>D ERWIN & ASSOCIATES LLC</u>

PURCHASE AGREEMENT

D. Erwin & Associates LLC, 2715 Casco Point Road, Wayzata, MN 55391 (Buyer) offers to purchase from Fineberg Management, Inc., One Washington Street, Wellesley, Massachusetts 02481 (Seller), approximately one thousand (1,000) Haworth Unigroup workstations (the "Workstations") for One Hundred Thousand Dollars ($100,000.00) payable in accordance with the following terms and conditions:

    1.    <u>Representations by Seller and Buyer</u>:

    Seller confirms that the Workstations are located at the Blue Hills Office Park, 150 Royall St., Canton, MA (the "Premises")

    The Seller warrants that it holds title to the Workstations and that the Workstations are free of all liens, encumbrances, or other security interests.

    Buyer represents and acknowledges that the Buyer is purchasing the Workstations in an "AS IS,            WHERE IS" condition.

    2.    <u>Removal Procedure</u>:

    The Buyer agrees to have the Workstations dismantled and removed from the Premises and loaded onto Buyer's designated trailers, all at Buyer's sole cost and risk and at no charge to the Seller. The Buyer agrees to pay for any packaging materials deemed necessary to transport said product. The Buyer shall complete the dismantling and removal process in a manner which does not damage any portion of the Premises, and shall hold Seller harmless for any loss, cost or damage incurred by or asserted against Seller in connection with the dismantling and/or removal of the Workstations from the Premises.

    3.    <u>Removal Time-line</u>:

    The dismantling and removal of the Workstations shall take place commencing as of the date of this Agreement and shall be completed by Buyer no later than September 24, 2004.

    4.    <u>Payment Terms</u>:

    Buyer shall pay Seller Fifty Thousand Dollars in good and immediately available funds ($50,000.00) simultaneously with Buyer's execution of this Agreement. The remaining Fifty Thousand Dollar ($50,000.00)

FROM :                          FAX NO. :                    Aug. 20 2004 10:14AM P3

payment is due and payable as follows by Bank or certified funds: 15-th 8/19/04
Twenty Five Thousand Dollars ($25,000.00) on September 1, 2004          ok
and the balance of Twenty Five Thousand Dollars ($25,000.00) (the        dle
"Final Payment") on September 10, 2004.         22nd ok. dle 8/19/04

Title to the Workstations will transfer to Buyer upon Buyer's making
of Final Payment to Seller

This Agreement shall be construed in accordance with and governed by the laws of the
Commonwealth of Massachusetts and is dated as of August 19, 2004.

Accepted By:                              SELLER

                                          Fineberg Management Inc.

BUYER                                     By:
D. Erwin & Associates LLC                     D.L. ERWIN, PRESIDENT
Date: 8|19|04                             Date: 8|20|04
        Daniel Frank, President and Treasurer

#296667 v1/99999/1

Blue Hill
5099

FAX NO. :                    Aug. 20 2004 10:13AM  P1



# D Erwin & Associates LLC
## "The Queens of Used Haworth™"
2715 Casco Point Road - Wayzata, MN 55391    **952.471.0363** (ph) - 952.471.9367 (fax)

Date  8 | 19 | 04

To   Dan Frank
     Larry Needle

                    781-239-1493

From   Dot Erwin

Number of pages (including cover sheet)  3

Special Instructions

For your review and action

            Thanks.   Dot.

Please call 952.471.0363 if you have any problems receiving this transmission.

# D Erwin & Associates LLC
## "The Queens of Used Haworth™"
2715 Casco Point Road - Wayzata, MN 55391    **952.471.0363** (ph) - 952.471.9367 (fax)

Blue Hill
5100

# the fineberg companies

February 8, 2005

Wells Fargo Bank, N. A.
1320 Willow Pass Road, Ste 205
Concord, CA  94520

Enclosed please find a copy of the IRS Form 1099C you sent out pertaining to the first Mortgage loan with Blue Hills Office Park LLC.  The information represented on that form is inaccurate.  It did not take into consideration the substantial funds in the various reserve accounts nor did it factor the substantial value bid upon foreclosure.

Please provide a written account of the loan balance and the application of reserve funds at the time of foreclosure as well as a full accounting of the foreclosure transaction.

We thereupon trust you will re-issue an amended 1099C.

Sincerely,

Joseph A. Donovan
CFO

Enclosure

one washington street, suite 400, wellesley, ma 02481 tel (781) 239-1480 fax (781) 239-1493

Blue Hill
5101

WELLS FARGO BANK, N. A.
1320 WILLOW PASS ROAD, STE 205
CONCORD, CA 94520
Important Tax Information Enclosed

BLUE HILLS OFFICE PARK LLC
FINEBERG MANAGEMENT, INC.
ONE WASHINGTON STREET, STE 400
WELLESLEY, MA 02481

☐ CORRECTED (if checked)

| CREDITOR'S name, street address, city, state, ZIP code | | OMB No. 1545-1424 | Cancellation Of Debt |
|---|---|---|---|
| WELLS FARGO BANK, N. A. STE 205 1320 WILLOW PASS ROAD, CONCORD, CA 94520 1-800-986-9711 | | **2004** Form 1099-C | Copy B For Debtor |

| CREDITOR'S Federal identification no. | DEBTOR'S identification number | 1 Date canceled | 2 Amount of debt canceled | This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if taxable income results from this transaction and the IRS determines that it has not been reported. |
|---|---|---|---|---|
| 94-1347393 | 9434B2845 | 11/19/2004 | $31,978,794.00 | |
| DEBTOR'S name, street address, city, state, and ZIP code | | 3 Interest if included in box 2 | 4 | |
| BLUE HILLS OFFICE PARK LLC FINEBERG MANAGEMENT, INC. ONE WASHINGTON STREET, STE 400 WELLESLEY, MA 02481 | | 5 Debt Description MORTGAGE- BLUE HILLS OFFICE PARK | | |

| Account number (optional) | 6 Bankruptcy (if checked) | 7 Fair market value of property |
|---|---|---|
| 760990083 | ☐ | $15,000,000.00 |

Form 1099-C                    (keep for your records)        Department of the Treasury - Internal Revenue Service

## Instructions for Debtor

If a Federal Government agency, certain agency connected with the Federal Government, financial institution, credit union, or an organization having a significant trade or business of lending money (such as a finance or credit card company) cancels or forgives a debt you owe of $600 or more, this form must be provided to you. Generally, if you are an individual, you must include the canceled amount on the "Other income" line of Form 1040. If you are a corporation, partnership, or other entity, report the canceled debt on your tax return. See the instructions for your tax return.

However, some canceled debts (such as certain student loans (see Pub. 525), certain debts reduced by the seller after purchase (see Pub. 334), qualified farm debt (see Pub. 225), qualified real property business debt (see Pub. 334), or debts canceled in bankruptcy (see Pub. 908)), are not includible in your income. Do not report a canceled debt as income if you did not deduct it but would have been able to do so on your tax return if you had paid it. Also, do not include canceled debts in your income to the extent you were insolvent. If you exclude a canceled debt from your income because it was canceled in a bankruptcy case or

during insolvency, or because the debt is qualified farm debt or qualified real property business debt, file Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment).

Box 1. Shows the date the debt was canceled.
Box 2. Shows the amount of debt canceled.
Box 3. Shows interest if included in the canceled debt in box 2. See Pub. 525, Taxable and Nontaxable Income.
Box 5. Shows a description of the debt. If box 7 is completed, box 5 shows a description of the property.
Box 6. If the box is marked, the creditor has indicated the debt was canceled in a bankruptcy proceeding.
Box 7. If, in the same calendar year, a foreclosure or abandonment of property occurred in connection with the cancellation of the debt, the fair market value of the property will be shown, or you will receive a separate Form 1099-A, Acquisition or Abandonment of Secured Property. You may have income or loss because of the acquisition or abandonment. See Pub. 544, Sales and Other Dispositions of Assets, for information about foreclosures and abandonments.

Blue Hill
5102

☒ CORRECTED (if check[ ])

| LENDER'S name, street address, city, state, ZIP code, and telephone no. | | OMB No. 1545-0877 | Acquisition or Abandonment of Secured Property |
|---|---|---|---|
| WELLS FARGO BANK, N.A.<br>1320 WILLOW PASS ROAD, SUITE 205<br>CONCORD, CA 94520<br>1-800-986-9711 | | **2004**<br>Form **1099-A** | |

| LENDER'S Federal identification number | BORROWER'S identification number | 1 Date of lender's acquisition or knowledge of abandonment<br>11/19/2004 | 2 Balance of principal outstanding<br>$31,979,793.66 | **Copy B**<br>**For Borrower** |
|---|---|---|---|---|
| 94-1347393 | 943482845 | | | |

BORROWER'S name

BLUE HILLS OFFICE PARK, LLC

| 3 | 4 Fair market value of property<br>$18,500,000.00 |
|---|---|

Street address (including FINEBERG MANAGEMENT, INC.
ONE WASHINGTON STREET, SUITE 400

| 5 Was borrower personally liable for repayment of the debt?<br>☒ Yes ☐ No |
|---|

City, state, and ZIP code
WELLESLEY, MA 02481

| 6 Description of property<br>MORTGAGE-BLUE HILLS OFFICE PARK-OFFICE |
|---|

Account number (optional)
760990083

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if taxable income results from this transaction and the IRS determines that it has not been reported.

Form **1099-A**         (keep for your records)         Department of the Treasury - Internal Revenue Service

---

X    ☐ CORRECTED (if checked)

| LENDER'S name, street address, city, state, ZIP code, and telephone no. | | OMB No. 1545-0877 | Acquisition or Abandonment of Secured Property |
|---|---|---|---|
| | | **2004**<br>Form **1099-A** | |

| LENDER'S Federal identification number | BORROWER'S identification number | 1 Date of lender's acquisition or knowledge of abandonment | 2 Balance of principal outstanding<br>$ | **Copy B**<br>**For Borrower** |
|---|---|---|---|---|

BORROWER'S name

| 3 | 4 Fair market value of property<br>$ |
|---|---|

Street address (including apt. no.)

| 5 Was borrower personally liable for repayment of the debt?<br>☐ Yes ☐ No |
|---|

City, state, and ZIP code

| 6 Description of property |
|---|

Account number (optional)

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if taxable income results from this transaction and the IRS determines that it has not been reported.

Form **1099-A**         (keep for your records)         Department of the Treasury - Internal Revenue Service

---

X    ☐ CORRECTED (if checked)

| LENDER'S name, street address, city, state, ZIP code, and telephone no. | | OMB No. 1545-0877 | Acquisition or Abandonment of Secured Property |
|---|---|---|---|
| | | **2004**<br>Form **1099-A** | |

| LENDER'S Federal identification number | BORROWER'S identification number | 1 Date of lender's acquisition or knowledge of abandonment | 2 Balance of principal outstanding<br>$ | **Copy B**<br>**For Borrower** |
|---|---|---|---|---|

BORROWER'S name

| 3 | 4 Fair market value of property<br>$ |
|---|---|

Street address (including apt. no.)

| 5 Was borrower personally liable for repayment of the debt?<br>☐ Yes ☐ No |
|---|

City, state, and ZIP code

| 6 Description of property |
|---|

Account number (optional)

This is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return, a negligence penalty or other sanction may be imposed on you if taxable income results from this transaction and the IRS determines that it has not been reported.

Form **1099-A**         (keep for your records)         Department of the Treasury - Internal Revenue Service

Blue Hill
5103





## LENNAR PARTNERS
### An LNR Company

TO:         Larry Needle

COMPANY:    The Fineberg Companies

FAX NO.     781-239-1493

FROM:       Randall Rosen

**LENNAR PARTNERS, an LNR Company**
1601 Washington Avenue
Suite 700
Miami Beach, Florida 33139
Phone: (305) 695-5358   Fax: (305) 695-5379

DATE:       11/23/2004                           TIME:     11:01 AM

No. of Pages:      2    including transmittal sheet.

If you do not receive or can not read any of the pages, please call:      Randall Rosen
at (305) 695-5358.

If this is a facsimile message, it is privileged/confidential and as such intended for the use of the individual or the entity named above. Any dissemination or copying is neither intended nor authorized unless by the person named herein or an employee of such person. If there is an error in transmission to the wrong entity, advise sender by telephone and return the original facsimile message to the above address. You will be reimbursed for postage. Thank you for your cooperation.

Blue Hill
5104

11/23/04  11:07 FAX 305 695   79      LNR                                              ☑002



**LENNAR PARTNERS**
An LNR Company

November 23, 2004

Larry Needle
The Fineberg Companies
One Washington Street, Suite 400
Wellesley, MA 02481

Re: 150 Royall Street, Canton, MA

Dear Mr. Needle:

This letter is to advise you that effective Friday, November 19, 2004, we have retained the firm of Finard & Company as the property management company for the above-referenced property.

Thank you in advance for all of your cooperation. If you need anything additional, please let me know.

Sincerely,

Randall Rosen, RPA, CPA
Vice President/Real Estate Asset Management

1601 Washington Avenue · Suite 700 · Miami Beach, Florida 33139
Telephone: (305) 695-5600 · Fax: (305) 695-5601

Blue Hill
5105

# fineberg management, inc.

September 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

RE:    Blue Hills Office Park LLC
        Loan #76-0990083

Dear Mr. Parish,

A request is hereby made for a withdrawal of $254,652.24 for the month of September from the cash flow sub-account on this loan to be used to pay principal and interest.   Attached is last month's letter.  As stated in the letter we did receive approximately one month's real estate tax from the tenant for $51,799.44 which was deposited and promptly swept by Wells Fargo; therefore, I assume that you have made the real estate tax payment to the town of Canton, MA.

Listed below is a breakdown of the principal and interest payment as we calculated it.

If you need any further information, please feel free to contact me.

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| | $254,652.24 |

Sincerely,

Joseph A. Donovan
CFO

Cc:    Kenneth Goldberg
        Job Warshaw, Lennar Partners

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493



One Washington Street, Suite 402
Wellesley, Massachusetts 02481
Tel: 781-431-1108 • Fax: 781-431-7130

## FAX TRANSMITTAL

**TO:** _____ Curt Mallegni    415-975-7236

**COMPANY NAME:** _____ Wells Fargo

**DATE:** _____ August 13, 2004

**FROM:** _____ Joe Donovan

**TRANSMITTED BY:** _____ Carol Falvey

**NUMBER OF PAGES (Including cover):** ___ 3 _____

**COMMENTS:** _____ Sorry we have been missing each other on the phone.

_____ I would like to get the special servicer involved.

_____ Attached are the recent correspondence.

_____

_____

_____

_____

_____

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the recipient of this message is not the named recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this telecopy in error please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service. Thank you.    x\fhs\faxtrans.doc

Blue Hill
5107

# fineberg management, inc.

August 5, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

RE:   Blue Hills Office Park LLC
      Loan #76-0990083

Dear Mr. Parish,

This letter is being sent to officially notify you that the tenant has fully vacated the building and at this time no replacement tenant has been found.  Therefore, we request a meeting with the lender to discuss the loan status and the future performance of the loan.

Based on our past experience, any decisions regarding the loan would need the approval of the Special Servicer; therefore, we request that the Special Servicer attend the meeting as well.  Please let us know who the Special Servicer is and if we need to notify them or if you will handle that yourself.

Sincerely,

Joseph A. Donovan
CFO

cc:   K. Goldberg, Esq.

Blue Hill
5108

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

A request is hereby made for a withdrawal of $412,833.43 from the cash flow sub-account on this loan to be used to pay principal and interest as well as the advance the money due to pay real estate taxes. We have yet to receive real estate taxes from the tenant for the period of time that they were still in the building. Once received, we will deposit those sums into the operating account for you to sweep. Listed below is a breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| Real Estate Taxes | 158,181.19 |
| | $412,833.43 |

cc:   K. Goldberg, Esq.

Blue Hill
5109

P. 1

* * * COMMUNICATION RESULT REPORT ( AUG.13.2004  1:08PM ) * * *

TTI  FINEBERG MANAGEMENT

| FILE MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|-----------|--------|-----------------|--------|------|
| 911  MEMORY TX | | 14159757236 | OK | P. 3/3 |

REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL        E-2) BUSY
  E-3) NO ANSWER               E-4) NO FACSIMILE CONNECTION

# Fine Hotels CORP

One Washington Street, Suite 402
Wellesley, Massachusetts 02481
Tel: 781-431-1108 • Fax: 781-431-7130

## FAX TRANSMITTAL

TO:         Curt Mallegni      415-975-7236

COMPANY NAME:    Wells Fargo

DATE:         August 13, 2004

FROM:        Joe Donovan

TRANSMITTED BY:    Carol Falvey

NUMBER OF PAGES (Including cover):   3

COMMENTS:     Sorry we have been missing each other on the phone.

Blue Hill
5110

*Recd 10.25.04*

# Piper Rudnick

One International Place, 21st Floor
Boston, Massachusetts 02110-2600
*main* 617.406.6000 *fax* 617.406.6100

BRUCE S. BARNETT
bruce.barnett@piperrudnick.com
*direct* 617.406.6002

October 21, 2004

RETURN RECEIPT REQUESTED
and FIRST CLASS MAIL

Blue Hills Office Park LLC
Mr. Gerald S. Fineberg (Cert. Mail No. 7001 1940 0004 9583 6096)
Mr. Joseph A. Donovan (Cert. Mail No. 7001 1940 0004 9583 6102)
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts  02481

Mr. William J. Langelier (Cert. Mail No. 7001 1940 0004 9583 6119)
c/o The Langelier Company
2045 Jackson Street
Suite 501
San Francisco, California  94109

      Re:    Notice of Intention to Foreclose and Deficiency after Foreclosure of Mortgage

Gentlemen:

      You are hereby notified in accordance with Massachusetts General Laws, Chapter 244, § 14 and Chapter 244, §17B, of the intention of CSFB 1999-C1 Royall Street, LLC (the "Bank"), assignee of JP Morgan Chase Bank (formerly known as The Chase Manhattan Bank) as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, to foreclose under Power of Sale for breach of condition, the mortgage now held by the Bank on property located at 150 Royall Street, Canton, Massachusetts (the "Property"), given by Blue Hills Office Park LLC to Credit Suisse First Boston Mortgage Capital LLC, dated as of September 14, 1999 and recorded at the Norfolk County Registry of Deeds on September 15, 1999 in Book 13733, Page 428, to secure a certain Mortgage Note made by Blue Hills Office Park LLC, for the whole, or part, of which you may be liable to the Bank in case of a deficiency in the proceeds of the foreclosure sale.

*Piper Rudnick LLP*

# Piper Rudnick

Mr. Gerald S. Fineberg
Mr. Joseph A. Donovan
Mr. William J. Langelier
October 21, 2004
Page 2

You are hereby notified of the foreclosure sale of the Property at 10:00 AM on Friday, November 12, 2004, all in accordance with the enclosed legal notice of mortgagee's sale of real estate.

Very truly yours,

CSFB 1999-C1 ROYALL STREET, LLC, a
Delaware limited liability company

By: Lennar Massachusetts Partners, Inc., its
Manager

By: Piper Rudnick LLP, its attorney,

By: _____
    Bruce S. Barnett

cc:   Stephen E. Nolan, Esq.
      E. Randolph Tucker, Esq.
      Staci Rutman
      Joseph Polcari
      Jeffrey Watkin, Esq.

~BOST1:311073.v1

Blue Hill
5112

Canton Citizen 10/14/04

**LEGAL NOTICE**
**MORTGAGEE'S SALE OF REAL ESTATE**

By virtue and in execution of the POWER OF SALE contained in a certain mortgage from BLUE HILLS OFFICE PARK LLC, to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, dated as of September 14, 1999 and recorded with Norfolk County Registry of Deeds (the "Records") in Book 13733, Page 428, of which mortgage the undersigned is the present holder, for breach of conditions contained in said mortgage and for the purpose of foreclosing the same will be sold at Public Auction at 10:00 A.M. on the 12th day of November, 2004, at the mortgaged premises located at 150 Royall Street, Canton, Massachusetts, all and singular the premises described in said mortgage, to wit:

The land situated in Canton, Norfolk County, Massachusetts shown as Lot C1 on a plan entitled "Plan of Land, Canton, Massachusetts" dated December 9, 1971 by Universal Engineering Corporation recorded with Norfolk Registry of Deeds as Plan 48 of 1972 in Plan Book 230 (hereinafter the "Plan") and being more particularly bounded and described as follows:

NORTHERLY AND NORTHWESTERLY by Royall Street, three hundred thirty six and [illegible] feet;

NORTHEASTERLY by Parcel A as shown on said Plan by two (2) lines measuring respectively six hundred thirty five and 82/100 ([illegible].82) feet and two hundred (200.00) feet;

NORTHWESTERLY by Parcel A as shown on said Plan, one hundred [illegible] (140.00) feet;

NORTHEASTERLY by Parcel [illegible] shown on said Plan, seven hundred nine and 37/100 (709.37) feet;

SOUTHWESTERLY by [illegible] Highway (Route [illegible]) [illegible] hundred sixteen and 18/[illegible] ([illegible]) feet;

SOUTHWESTERLY by Green Street, seven hundred sixty-six and [illegible]/100 (766.[illegible]) feet;

NORTHWESTERLY by land now or formerly [illegible], two hundred fifty [illegible] and [illegible]/100 ([illegible]) feet;

WESTERLY by land of said [illegible] two hundred three and 57/100 (203.57) feet; [illegible]

NORTHWESTERLY by land of [illegible] by two (2) lines [illegible] respectively eighty [illegible] and one hundred thirty [illegible]

[illegible] the premises are conveyed [illegible] with the benefit of all [illegible] restrictions, encumbrances, [illegible] conditions and other [illegible] of record and [illegible] over the mortgage described herein, if any.

The premises to be sold shall also be subject to all leases and tenancies, if any there may be, having priority over said mortgage, to tenancies or occupation by persons on the premises now or at the time of said auction which tenancies or occupation are subject to said mortgage, to rights or claims in personal property installed by tenants or former tenants now located on the premises and also to all laws and ordinances including, but not limited to, all building, zoning and environmental laws and ordinances.

TERMS OF SALE: Fifty Thousand and no/100 Dollars ($50,000.00) shall be paid in cash or by certified or bank cashier's check by the purchaser at the time and place of sale.

The balance of the purchase price on a sale shall be paid in cash or by certified bank or cashier's check in or within thirty (30) days thereafter at the offices of Piper Rudnick LLP, One International Place, Boston, Massachusetts. The successful bidder and/or bidders shall be required to sign a Memorandum of Terms of Sale containing the above terms at the Auction Sale.

The Mortgagee reserves the right to postpone the sale to a later date by public proclamation at the time and date appointed for the sale and to further postpone at any adjourned sale date by public proclamation at the time and date appointed for the adjourned sale date.

In the event that the successful bidder at the foreclosure sale shall default in purchasing the within described property according to the terms of this Notice of Sale and/or terms of the Memorandum of Sale executed at the time of foreclosure, the Mortgagee reserves the right to sell the property by foreclosure deed to the second highest bidder provided that said second highest bidder shall deposit with Mortgagee's attorneys, Piper Rudnick LLP, the amount of the required deposit as set forth herein within three (3) business days after written notice of the default of the previous high bidder and title shall be conveyed to the said second highest bidder within thirty (30) days of said written notice.

Other terms to be announced at the time and place of the sale.

CSFB 1999-C1 ROYALL STREET LLC, a Delaware limited liability company, present holder of said mortgage

By: Lennar Massachusetts Partners, Inc., a Massachusetts corporation, its Manager

By: Piper Rudnick LLP, its attorney

By: ______________________

Bruce S. Barnett
Piper Rudnick LLP
One International Place
Boston, Massachusetts 02110
(617) 406-6000

**Grave Intentions wil**

Blue Hill
5113

# fineberg management, inc.

## FAX TRANSMITTAL

**TO:** Job Warshaw

**COMPANY NAME:** Lennar Partners

**FACSILMILE NUMBER:** 305-695-5601

**DATE:** 8/26/04

**FROM:** Joe Donovan

**TRANSMITTED BY:** Carol Falvey

**NUMBER OF PAGES (Including cover):** 5

**COMMENTS:** RE: Blue Hills Office Park

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the recipient of this message is not the named recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this telecopy in error please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service. Thank you. s:\fncl\faxtrans.doc

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

Blue Hill
5114

08/24/2004 TUE 13:58   FAX   305-695-5119                                           ☑001/006



# LENNAR PARTNERS
## An LNR Company

TO:          Gerald S. Fineberg

COMPANY:     Fineberg Management, Inc.

FAX NO.      (781) 239-1493

FROM:        Job Warshaw

RE:          Blue Hills Office Park

**LENNAR PARTNERS, an LNR Company**
1601 Washington Avenue
7th Floor
Miami Beach, Florida 33139
Phone: (305) 695-5600   Fax: (305) 695-5601

DATE:        8/24/2004                    TIME:   1:45 PM
No. of Pages:        6          including transmittal sheet.

If you do not receive or can not read any of the pages, please call     Minerva Cruz
at (305) 695-5084.

If this is a facsimile message, it is privileged/confidential and as such intended for the use of the individual or the above. Any dissemination or copying is neither intended nor authorized unless by the person named herein or an If there is an error in transmission to the wrong entity, please promptly advise sender by telephone and return the to the above address. You will be reimbursed for postage. Thank you for your cooperation.



# LENNAR PARTNERS
An LNR Company

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

RE:  Loan in the original principal amount of $33,149,000.00 (the "Loan") to Blue Hills Office
     Park LLC (the "Borrower") held by JP Morgan Chase Bank, as trustee (the "Trustee")
     Portfolio:      CS First Boston Mortgage, Series 1999-C1
     Loan No.:       76-0990083

Dear Borrower:

Lennar Partners, Inc. (the "Special Servicer") is the Special Servicer with respect to the Loan
and has the authority, on behalf of the Trustee, to discuss and to meet with representatives of the
Borrower to review the status of the Loan and any issues arising under any of the documents
relating to the Loan (the "Loan Documents").

We have agreed to discuss with your representatives the status of the Loan and the Loan
Documents provided that the following agreements and understandings govern. In order to ensure
that our discussions will be as open and productive as possible, we wanted to write to you to
confirm our mutual understanding that all discussions and/or negotiations will be governed by
the terms and conditions in this letter. If you are in agreement with such terms and conditions, we
would appreciate you acknowledging such by signing this letter in the space provided and
returning it to us.

1.  **Negotiations.**  The Borrower and the Special Servicer agree that any discussions,
    negotiations, correspondence or other communications relating to the Loan and the Loan
    Documents that the Borrower may have in the future or may have had with representatives of
    Wells Fargo Commercial Mortgage Servicing, the Master Servicer (the "Master Servicer"),
    or the Special Servicer, (any such discussions, negotiations or correspondence or other
    communications being hereinafter referred to as "Loan Communications") are not binding
    upon any of the Borrower, the Trustee, or Special Servicer (collectively the "Parties"). The
    Borrower also acknowledges and agrees that none of the Trustee, the Master Servicer or the
    Special Servicer is under any obligation to consent or otherwise agree to any Borrower
    request with respect to the Loan, or to modify the Loan or the Loan Documents. Each of the
    Parties understands and agrees that no Party shall have any defense to any action by one or
    more of the other Parties, nor assert any waiver by one or more of the other Parties, based on
    any Loan Communications.

2.  **Releases.**  The Parties hereby completely, irrevocably and unconditionally release and
    forever discharge each of the Parties from any and all claims and demands whatsoever, in
    law or equity, whether such claims are presently known or unknown, direct or indirect, fixed
    or contingent, which the Parties may have or may claim to have against the other caused by,
    or arising out of any Loan Communications.

---

1601 Washington Avenue • Suite 700 • Miami Beach, Florida 33139
• Telephone: (305) 695-5600 • Fax: (305) 695-5601

Blue Hill
5116

3. <u>No Waivers.</u>   Each of the Parties acknowledge and agree that participation in the Loan Communications does not constitute by any Party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, of such Party under the Loan Documents, (b) a waiver or the release of any defaults under the Loan or the Loan Documents, or (c) a waiver, consent, release or modification of any right or remedy under any provision of the Loan Documents. None of the Parties intends to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties further understand and agree that no failure or delay in exercising any right or remedy with respect to the Loan or under the Loan Documents shall constitute a waiver of, or affect adversely in any manner, any of such rights and remedies nor shall any such failure or delay form the basis for any claim or cause of action.

4. <u>Only Written Agreements.</u> The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

5. <u>Authority.</u>   The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. The Special Servicer represents and warrants that it is empowered to act on behalf of the Trustee under the Loan Documents in the capacity of attorney-in-fact, and the person signing this Agreement on behalf of Special Servicer hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Trustee. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.

6. <u>Expenses.</u>   The Borrower agrees that it shall pay all costs of the Special Servicer in connection with Loan Communications, including but not limited to expenses for inspection of the property, legal fees and the fees of other professionals.

7. <u>Advice from Independent Counsel.</u>   The Borrower acknowledges that independent counsel represents the Borrower, or if not so represented, that Borrower has been advised to obtain representation by independent counsel, and has fully reviewed the terms of this Agreement. Borrower acknowledges that Borrower executes this Agreement, based on its own independent judgment, on the advice of counsel, if represented, and is under no threat, coercion or duress from any Party.

8. <u>Settlement Negotiations.</u>   Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor to be admissible as evidence in any administrative or judicial proceeding (i) between the Trustee, Borrower

Blue Hill
5117

and/or Special Servicer; or (ii) involving any of the Loan Documents or any of the property securing the Loan. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be used in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the Parties.

9.    **Information Request.**  In order to enable the Special Servicer to properly evaluate the Borrower's request, the Borrower agrees to forward to the Special Servicer all the information checked on Exhibit A, which is attached hereto.

Additional information may be requested in the future.  Thank you for your attention to this matter.

Lennar Partners, Inc., as Special Servicer

By: _____

Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

**ACKNOWLEDGED AND AGREED BY:**

Borrower:    Blue Hills Office Park LLC

By its manager:    Blue Hills Management Corp.

By: _____
Name:    Gerald S. Fineberg
Title:    President

NOTICE TO CONSUMER BORROWERS AS REQUIRED BY FEDERAL FAIR DEBT COLLECTION PRACTICES ACT:  We are attempting to collect debt and any information obtained will be used for that purpose.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID, SETTLED OR IS OTHERWISE NOT OBLIGATED:  Please be advised that this letter constitutes neither a demand of payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, has paid, settled or is otherwise obligated by law.

cc:    Debra Rudder – Wells Fargo Commercial Mortgage Servicing
       Pat Prince – Lennar Partners/Loan Servicing

Blue Hill
5118

P. 1

\* \* \* COMMUNICATION RESULT REPORT ( AUG.26.2004 2:05PM ) \* \* \*

TTI FINEBERG MANAGEMENT

| FILE | MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|------|------|--------|-----------------|--------|------|
| 239 | MEMORY TX | | 13056955601 | OK | P. 5/5 |

REASON FOR ERROR
 E-1) HANG UP OR LINE FAIL        E-2) BUSY
 E-3) NO ANSWER                   E-4) NO FACSIMILE CONNECTION

# fineberg management, inc.

## FAX TRANSMITTAL

TO: _____ Job Warshaw

COMPANY NAME: _____ Lennar Partners

FACSILMILE NUMBER: _____ 305-695-5601

DATE: _____ 8/26/04

FROM: _____ Joe Donovan

TRANSMITTED BY: _____ Carol Falvey

NUMBER OF PAGES (Including cover): ____5____

COMMENTS: _____ RE: Blue Hills Office Park

Blue Hill
5119

BLUE HILLS OFFICE PARK
ROYALL

Blue Hill
5120

Fedual # 04- 3482845

Blue Hill
5121

# DEPOSITION EXHIBIT NO. 318

01/08/02  7:0.

Blue Hills GP - 4,
December 2001

g11 Page: 8.

| | Budget $/Unit | CURRENT Last Year | PERIOD $/Unit | Actual $/Unit | | Actual $/Unit | YEAR TO Last Year | DATE $/Unit | Budget $/Unit |
|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | | | | | | | | | |
| Rent | 335,637 / 25.35 | 352,047 | 26.59 | 343,032 / 25.91 | | 4,116,588 / 310.93 | 4,162,378 | 314.40 | 1,006,912 / 6.34 |
| Percentage Rent | 3,424 / 0.00 | 8,539 | 0.13 | 3,132 / 0.00 | | 71,915 / 0.00 | 67,450 | 0.00 | 15,248 / 0.00 |
| CAM Income | 142,038 / 10.73 | 154,934 | 11.70 | 183,034 / 13.83 | | 2,055,095 / 155.08 | 1,903,589 | 143.77 | 426,115 / 2.68 |
| Real Estate Taxes | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 513,194 / 38.71 | 622,428 | 47.01 | 144,264 / 0.92 |
| Utilities | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 |
| Payroll Reimb | 2,400 / 18.13 | 2,400 | 18.13 | 2,400 / 18.13 | | 28,800 / 217.54 | 28,800 | 217.54 | 7,200 / 4.33 |
| Real Estate Tax Abatement | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 |
| Other Income | 4,218 / 0.32 | 12,538 | 0.95 | 2,318 / 0.18 | | 95,903 / 7.24 | 58,952 | 4.45 | 8,874 / 0.06 |
| **TOTAL INCOME** | 487,717 / 36.84 | 530,457 | 40.07 | 533,916 / 40.33 | | 6,881,236 / 519.77 | 6,843,597 | 516.95 | 1,608,612 / 10.13 |
| **EXPENSES** | | | | | | | | | |
| Maintenance Payroll | 280 / 0.02 | 32,153 | 2.43 | 18,860 / 1.42 | | 238,000 / 17.98 | 249,605 | 18.85 | 54,101 / 0.34 |
| Insurance | 1,759 / 0.13 | 1,850 | 0.14 | 1,240 / 0.09 | | 16,105 / 1.22 | 22,264 | 1.68 | 5,331 / 0.03 |
| Workers Compensation | 3,296 / 0.25 | 343 | 0.03 | 333 / 0.03 | | 4,013 / 0.30 | 4,340 | 0.33 | 4,684 / 0.03 |
| Advertising & Promotion | 0 / 0.00 | 881 | 0.07- | 0 / 1.30 | | 0 / 15.80 | 0 | 0.00 | 0 / 0.32 |
| Management Fees | 33,564 / 2.54 | 17,152 | 1.30 | 17,152 / 1.30 | | 209,118 / 15.80 | 207,668 | 15.69 | 50,344 / 0.32 |
| Legal & Prof Fees | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 20,006 / 1.51 | 33,769 | 2.55 | 2,947 / 0.02 |
| Dues & Subscriptions | 322 / 0.02 | 275 | 0.02 | 322 / 0.02 | | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 |
| Post & Phone | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 3,707 / 0.28 | 3,816 | 0.29 | 1,616 / 0.01 |
| CAM Expenses | 10,281 / 0.78 | 39,345 | 2.97 | 7,353 / 0.56 | | 52,354 / 3.95 | 102,417 | 7.74 | 0 / 0.00 |
| Insurance | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 0 / 0.00 | 0 | 0.00 | 24,455 / 0.15 |
| Commissions | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 300 / 0.02 | 0 | 0.00 | 0 / 0.00 |
| Utilities | 7,618 / 0.58 | 5,599 | 0.42 | 3,119 / 0.24 | | 52,531 / 3.97 | 74,143 | 5.60 | 2,980 / 0.02 |
| Repairs & Maintenance | 575 / 0.07 | 663 | 0.05 | 4,491 / 0.34 | | 126,578 / 9.58 | 87,715 | 6.63 | 22,338 / 0.14 |
| Maint Contracts | 90,794 / 6.86 | 4,751 | 0.36 | 4,890 / 0.37 | | 27,152 / 2.05 | 21,554 | 1.63 | 24,319 / 0.03 |
| Electric | 0 / 0.00 | 59,479 | 4.49 | 67,869 / 5.13 | | 943,386 / 71.26 | 742,360 | 56.07 | 4,719 / 0.89 |
| Water & Sewer | 877 / 0.07 | 2,044 | 0.15 | 73 / 0.01 | | 88,167 / 6.66 | 77,489 | 5.85 | 13,451 / 0.03 |
| Heating | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 16,430 / 1.24 | 14,186 | 1.07 | 1,055 / 0.01 |
| Security | 3 / 0.00 | 75 | 0.01 | 50 / 0.00 | | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 |
| Permits & Licenses | 0 / 0.00 | 75 | 0.01 | 75 / 0.00 | | 25 / 0.00 | 0 | 0.00 | 0 / 0.00 |
| Taxes | 0 / 0.00 | 0 | 0.00 | 300 / 0.02 | | 524,480 / 39.62 | 634,627 | 47.94 | 148,886 / 0.94 |
| Extermination | 4,519 / 0.34 | 3,719 | 0.28 | 1,125 / 0.08 | | 985 / 0.02 | 985 | 0.07 | 225 / 0.00 |
| Trash Removal | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 37,644 / 2.84 | 40,461 | 3.06 | 8,607 / 0.05 |
| Snow Removal | 0 / 0.00 | 0 | 0.00 | 100 / 0.01 | | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 |
| Cleaning Services | 15,535 / 1.17 | 16,133 | 1.22 | 3,473 / 0.26 | | 220,172 / 16.63 | 212,611 | 16.04 | 53,226 / 0.34 |
| Miscellaneous | 572 / 0.04 | 3,240 | 0.24 | 1,336 / 0.10 | | 16,349 / 1.23 | 23,980 | 1.81 | 2,322 / 0.02 |
| **TOTAL EXPENSES** | 170,473 / 12.88 | 186,242 | 14.07 | 148,140 / 11.19 | | 2,597,804 / 196.22 | 2,554,040 | 192.92 | 543,215 / 3.42 |
| **NET OPERATING INCOME** | 317,245 / 23.96 | 344,215 | 26.00 | 385,777 / 29.14 | | 4,283,452 / 323.55 | 4,289,558 | 324.01 | 1,065,398 / 6.71 |
| Interest Expense | 234,442 / 17.68 | 234,059 | 17.68 | 239,195 / 18.07 | | 2,599,552 / 196.36 | 2,850,500 | 215.31 | 687,865 / 4.33 |
| Principle Expense | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 | | 0 / 0.00 | 0 | 0.00 | 0 / 0.00 |
| Principle Reserve | 183,666 / 13.87- | 183,666 | 13.87- | 15,457 / 1.17 | | 456,275 / 34.46 | 0 | 0.00 | 0 / 0.00 |
| FREE Reserve | 4,703 / 35.52 | 8,672 | 65.51 | 4,564 / 34.48 | | 105,141 / 794.18 | 81,844 | 618.20 | 33,814 / 21.28 |
| **Net Income/(Loss)** | 78,100 / 5.90 | 285,150 | 21.54 | 126,560 / 9.56 | | 1,122,484 / 84.79 | 1,357,205 | 102.52 | 343,718 / 2.16 |

Blue Hill
5062

# DEPOSITION EXHIBIT #322

EXHIBIT
Fineberg
322
JKC   4/5/06

# BERNKOPF, GOODMAN & BASEMAN LLP
### COUNSELLORS AT LAW
### 125 SUMMER STREET
### BOSTON, MASSACHUSETTS 02110-1621
### TELEPHONE (617) 790-3000
### TELECOPIER (617) 790-3300

September 7, 1999

Lydia G. Chesnick, Esq.
DIRECT DIAL: (617) 790-3325
e-mail: lchesnick@bgblaw.com

## TELECOMMUNICATION TRANSMITTAL

TO:                                ANDREW COHEN, ESQUIRE

COMPANY:                           SCHULTE ROTH & ZABEL LLP

TELECOPIER NUMBER:     212-593-5955     TELEPHONE NUMBER:   212-

FROM:                              LYDIA G. CHESNICK    ATTORNEY NO.:  014

TOTAL NUMBER OF PAGES _3_ INCLUDING THIS COVER SHEET

*IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL BACK AS SOON AS POSSIBLE.*

PHONE:                             (617) 790-3000

TELECOMMUNICATOR:     Karen Fucillo

CLIENT/MATTER NO:     14500/9547

MESSAGE:

Please Note: The information contained in this facsimile message is privileged and confidential, and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please notify us immediately by telephone at (617) 790-3370. Thank you.

Blue Hill
3033

**BERNKOPF, GOODMAN & BASEMAN LLP**

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

September 7, 1999

Lydia G. Chesnick, Esq.
DIRECT DIAL: (617) 790-3325
e-mail: lchesnick@bgblaw.com

**VIA TELECOPIER**

Andrew Cohen, Esq.
Schulte Roth & Zabel LLP
900 Third Avenue
New York, New York 10022

  RE: **150 ROYALL STREET, CANTON, MA**

Dear Andy:

   As a follow-up to our discussion earlier today and your inquiry concerning prior securitized loans closed by entities owned or controlled by Gerald S. Fineberg, please be advised as follows:

   1. In December of 1996, Mr. Fineberg closed eight loans with The Chase Manhattan Bank through its conduit program, all of which were securitized. The loans totaled in excess of $75,000,000 and consisted of five loans each in the $10,000,000 - $16,000,000 range. In each case, Gerald S. Fineberg was the controlling principal owning between 95%-100% of the ownership interests in the respective owning entities.

   2. From the period from December, 1997 through mid-1999, Mr. Fineberg closed approximately 15 loans with Heller Financial through its conduit program. All or substantially all of those loans were securitized. The loans totaled approximately $45,000,000 and included at least two loans within their conduit program in the $12,800,000 range. Again, Mr. Fineberg was the controlling principal.

   3. In May of 1996, Mr. Fineberg closed a loan with GMAC through its conduit program. The loan was in the amount of $11,400,000 and was subsequently securitized.

   4. In 1999, Mr. Fineberg closed three transactions with GECC through its conduit program, the largest of which was $7,800,000. The loans totaled approximately $15,000,000. Again, Mr. Fineberg was the controlling principal.

Blue Hill
3034

BERNKOPF, GOODMAN & BASEMAN LLP

Andrew Cohen, Esq.
September 7, 1999
Page 2

We are in the process of obtaining the discussed documentation.

If you have any questions, please feel free to call me.

Very truly yours,

Lydia G. Chesnick

LGC/kf

cc:     Gerald S. Fineberg

#184212 v1/14500/9547

Blue Hill
3035

EXHIBIT
*Fineberg*
*324*
*JKC   4/5/06*

N

## UNIFORM COMMERCIAL CODE — FINANCING STATEMENT — FORM UCC-1    21894

INSTRUCTIONS
1. PLEASE TYPE this form. Fold only along perforation for mailing.
2. Remove Secured Party and Debtor Copies and send other 3 copies to the filing officer. Enclose filing fee.
3. When filing is to be with more than one office, UCC-2 may be placed over this set to avoid double typing.
4. If the space provided for any item(s) on the form is inadequate the item(s) should be continued on additional sheets, preferably 5" x 8" or 8" x 10". Only one copy of such additional sheets need be presented to the filing officer with a set of three copies of the financing statement. Long schedules of collateral, indentures, etc., may be on any size paper that is convenient for the secured party.
5. If collateral is crops or goods which are or are to become fixtures, describe generally the real estate and give name of record owner.
6. When a copy of the security agreement is used as a financing statement, it is requested that it be accompanied by a completed but unsigned set of these forms, without extra fee.
7. At the time of original filing, filing officer should return third copy as an acknowledgment. At a later time, secured party may date and sign termination legend and use third copy as a Termination Statement.

**MASSACHUSETTS**

This FINANCING STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code

| 1 Debtor(s) (Last Name First) and address(es) | 2 Secured Party(ies) and address(es) | 3 Maturity date (if any): |
|---|---|---|
| Blue Hills Office Park LLC c/o Fineberg Management, Inc. One Washington St., Suite 400 Wellsley, MA. 02481 | Credit Suisse First Boston Mortgage Capital LLC c/o Schulte Roth & Zabel LLP 900 Third Ave., N.Y., N.Y. Attn: S. Nemery | For Filing Officer (Date, Time, Number, and Filing Office) |

4 This financing statement covers the following types (or items) of property:

SEE SCHEDULE A ATTACHED HERETO AND MADE A PART HEREOF

5. Assignee(s) of Secured Party and Address(es)

Check ☒ if covered:    ☐ Proceeds of Collateral are also covered    ☒ Products of Collateral are also covered. No. of additional sheets presented:

Filed with: Secy of State of Mass.

BLUE HILLS OFFICE PARK LLC
By: Blue Hills Management Corp.
By: *Gerald S. Fineberg*
   Signature(s) of Debtor(s)
   Gerald S. Fineberg, Pres.

By:
   Signature(s) of Secured Party(ies)

FILING OFFICER COPY - ALPHABETICAL
STANDARD FORM — UNIFORM COMMERCIAL CODE — FORM UCC-1

**STATE OF MASSACHUSETTS**

REORDER FROM
**Registré, Inc.**
314 PIERCE ST.
P.O. BOX 218
ANOKA, MN 55303
(612) 421-1713

Blue Hill
2757

SCHEDULE A TO UCC-1 FINANCING STATEMENT INDICATING:

BLUE HILLS OFFICE PARK LLC as Debtor

and

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, as Secured Party

**This Financing Statement covers the following types or items of property:**

All of Debtor's right, title and interest in and to the following:

    1. All easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, all rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtsey and rights of curtsey, property, possession, claim and demand whatsoever, both at law and in equity, of Debtor of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

    2. All machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature, whether tangible or intangible, whatsoever owned by Debtor, or in which Debtor has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Debtor, or in which Debtor has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation, enjoyment and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "**Equipment**"), including any leases of any of the foregoing, any deposits existing at any time in connection with any of the foregoing, and the proceeds of any sale or transfer of the foregoing, and the right, title and interest of Debtor in and to any of the Equipment that may be subject to any "security interests" as defined in the Uniform Commercial Code, as adopted and enacted by the State or States where any of the Mortgaged Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of the Mortgage;

SR2HY\616956v1

Blue Hill
2758

3.    Awards or payments, including interest thereon, that may heretofore and hereafter be made with respect to the Premises and the Improvements, whether from the exercise of the right of eminent domain or condemnation (including, without limitation, any transfer made in lieu of or in anticipation of the exercise of said rights), or for a change of grade, or for any other injury to or decrease in the value of the Premises and Improvements;

4.    All leases, including, without limitation, that certain Lease by and between Debtor, successor-in-interest to Royall Associates Realty Trust, as lessor, and Boston EquiServe Limited Partnership ("The Bank of Boston"), successor-in-interest to The First National Bank of Boston, as lessee, dated April 19, 1989 (collectively, with all amendments thereto, the "**Bank of Boston Lease**"), and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises and the Improvements, including any extensions, renewals, modifications or amendments thereof (collectively, the "**Leases**") and all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Debtor or its agents or employees from any and all sources arising from or attributable to the Premises and the Improvements (the "**Rents**"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

5.    All proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation (subject, however, to the terms and conditions of the Mortgage) the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property;

6.    Upon any Event of Default, or if Debtor fails to act under circumstances when it is unreasonable not to so act, and as otherwise expressly provided in the Mortgage or in the other Loan Documents, the right, in the name and on behalf of Debtor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of Secured Party in the Mortgaged Property;

7.    All accounts, escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the Uniform Commercial Code, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, permits, consents, licenses, management agreements, contract rights (including, without limitation, any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair, or other work upon the Mortgaged Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Mortgaged Property), and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or

2

**Blue Hill
2759**

the conduct of any business or activities thereon (hereinafter collectively referred to as the "Intangibles"); and

        8.        Proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

      All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to such terms in that certain Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of September 1t, 1999 from Blue Hills Office Park LLC for the benefit of Credit Suisse First Boston Mortgage Capital LLC and recorded in the Office of the County Clerk in Norfolk County, Massachusetts, covering the Mortgaged Property (as defined in the Mortgage) described on Exhibit A attached hereto.

SR2Kr\616956v1

Blue Hill
2760

EXHIBIT
Fineberg
328
TC  4/5/06

Minutes of the Meeting of May 22, 2003.

PRESENT:    Paul B. Carroll, Chairman
                  James F. Fitzgerald, Jr.
                  Gregory L. Pando
                  Robert J. Quigley, Alternate Member

ALSO
PRESENT:    Sue Franco, Recording Secretary

Mr. Carroll opened the Meeting at 7:00 p.m. in the Salah Hearing Room, Memorial Hall.

### Flatley Company – 25 Westchester Dr.

Attorney Suzanne Matthews and Mr. John Flatley came before the Board representing petitioner.

Attorney Matthews stated the Board previously granted a Variance for this property. One of the conditions of the decision was for petitioner to obtain the approval of his next door neighbor at 45 Westchester for the landscape plan and he now has that. She stated she would like to present the landscape plan to the Board for their approval. The two neighbors who had an issue with the variance were Mr. Slutsky at 45 Westchester Dr. and Mr. Kilduff at 50 Westchester Dr. She stated Mr. Slutsky has signed the landscape plan and is in agreement with it.

Mr. Kilduff requested to speak. He stated that it was his understanding that the the petitioner was supposed to try to appease the neighbors who had an issue and he stated no one has ever tried to appease him. He stated he received a plan from Atty. Matthews and was not aware of the polishing pool that is on the property.

Attorney Matthews stated that pool has been there since the beginning and it was required by the Conservation Commission in their Order of Conditions.

Mr. Flatley stated it is for treating water from the street drain into the wetlands.

Mr. Kilduff stated he should have been notified about the Conservation hearing.

Mrs. Kilduff stated there was no mention of a polishing pool to them and they were not given the opportunity to object to it.

Zoning Board of Appeals
Meeting of May 22, 2003
Page 2 of 10

Attorney Matthews stated she got a certified list of abutters from the Conservation Commission and the Kilduff's are not on it, perhaps because they are across the street from the petitioned site.

Mr. Kilduff stated if there is a way that he can stop this, he will do it. He said he has a bad feeling about the polishing pool because he has sink holes in his driveway now and he does not want more water.

Mr. Carroll stated the Zoning Board has no authority regarding the polishing pool and that Mr. Kilduff will have to deal directly with the Conservation Commission.

Mr. Kilduff stated Mr. Flatley has done nothing to appease him.

Mr. Flatley stated he had a meeting with Mr. Kilduff two weeks ago and Mr. Kilduff asked for a deck to be constructed on the back of his home.

Mr. Fitzgerald stated that when the Board asked petitioner to try and appease the abutters, they meant in terms of landscaping, not remodeling. He asked Mr. Kilduff if he had any issue with the landscaping.

Mr. Kilduff stated he does not, he has an issue with the polishing pool.

Mr. Carroll moved to accept the landscape plan as submitted. The move was seconded and the Board voted unanimously to approve.

**Michael Razza – 104 Prospect St.**

Attorney Matthews stated she is requested a continuance to June 26, 2003. She stated the petitioner submitted plans to Tom Houston and some changes will be made.

**National Development – 250 Royall St.**

Attorney Richard Staiti, Mr. Steve Sesso, Mr. Peter Carbone, and Mr. Tighe came before the Board representing petitioner.

Attorney Staiti stated they have submitted the recommendations of the Planning Board and the Edwards & Kelcey report to the Board. He further stated there is a letter in file from the Friends of Little Blue supporting the petition. The Board had asked petitioner to try and resolve any issues with their neighbor at 150 Royall St., however, Atty. Staiti reported they were unable to do that. He stated they have lowered the height of the parking garage by 4'.

Zoning Board of Appeals
Meeting of May 22, 2003
Page 3 of 10

Mr. Carroll stated he spoke with Mr. Ed Lynch, a member of the Conservation Commission and he stated the Commission is in support of the project.

Mr. Pando stated he would require elevation plans referenced in the decision, if approved.

Attorney Gary Lillienthal requested to speak. He stated he represents the Blue Hill Office Park at 150 Royall Street. He stated his client has spoken with the petitioner, however, there has been no resolution. He stated his client is concerned that the proposal is based on a misinterpretation of the Zoning By-law. He stated it is impossible to make a determination for site plan approval without looking at the entire site and in terms of vehicular safety, the entire site should be reviewed. There are 670 existing parking spaces that have never been occupied. After the building has full occupancy, he feels it will have a major affect on the traffic. He further stated the proposal obstructs his client's current view from the southwest. He stated there is a large area of impervious surface which has not been dealt with. He does not believe Sec. 2.15.2.C of the Zoning By-law regarding additional open space has been met.

Mr. Carroll inquired as to whether Atty. Lillienthal had any mitigation ideas in terms of landscape.

Atty. Lillienthal stated he has not participated in any discussions between his client and the petitioner and at this time does not have any specific requests.

Mr. Carroll stated he has heard from various boards and town officials and it seems they are in support of the petition.

Mr. Fitzgerald and Mr. Pando stated they have no further questions.

Mr. Fitzgerald moved the petition of National Development Corporation and Equiserve for a modification of Site Plan Approval, and Special Permit (Use) to construct a parking garage at 250 Royall Street, subject to the following conditions:

1. Petitioner shall adhere to the Planning Board recommendations dated May 21, 2003.
2. The garage capacity shall not exceed 380 parking spaces.
3. Construction shall be in accordance with a plan by VHB dated April 9, 2003 and revised on May 18, 2003.
4. Petitioner shall obtain approvals from all other boards as required.

BLUE HILL 1595

Zoning Board of Appeals
Meeting of May 22, 2003
Page 4 of 10

The move was seconded and the Board voted unanimously to grant.

### Texaco – 731 Washington St.

Mr. Michael Loin came before the Board representing petitioner on the continued matter. He stated he received a positive recommendation from the Canton Center Design Review Board. He stated the Board recommended an overall reduction in height of the signage from 17.6' to 12'6'. He stated that although the petitioner had received previous approval for a Dunkin' Donuts sign at the site, they are not going forward with that sign at the present time. He stated there is a note on the site plan stating that any signage not shown on the plan shall be removed.

Mr. Carroll stated the petitioner has illegal signage up now.

Mr. Loin stated he is aware of that, but the proposed site plan would give a tool for enforcement to the Building Inspector.

Mr. Fitzgerald stated the proposed sign at 12'6' at the proposed location would block visibility.

Mr. Pando suggested moving the sign back 15' from the property line, which would bring it into conformance with the by-law.

Mr. Loin agreed.

Mr. Fitzgerald moved the petition of Motiva Enterprises, LLC for a Special Permit (Sign) to replace the existing sign at 731 Washington St. be granted, in accordance with the Canton Center Design Review Board report, except for sign location, which shall be in accordance with Exhibit A filed and dated with this Board May 22, 2003, and in accordance with the submitted site plan dated May 14, 2003, with Exhibit A superceding. The move was seconded and the Board voted unanimously to approve.

### Leo & Marie Sullivan – 515 Randolph St.

Mr. Alex Donovan and Mr. & Mrs. Sullivan came before the Board representing petitioner.

Mr. Donovan stated he is a family member and would be representing. He stated the Sullivan's are hoping to move the laundry and bathroom facilities to the first floor. He explained they are trying to get the entire living space, including a bedroom, on the first floor because they are elderly and have trouble getting up and down stairs.

BLUE HILL 1596

Mr. Carroll stated the addition would encroach 15' into the rear yard setback.

Mr. Fitzgerald and Mr. Pando had no questions.

Mr. Fitzgerald moved the petition of Leo & Marie Sullivan for an Extension of Non-Conforming Building to construct an addition to the rear of the house be granted subject to the condition that addition encroach no further than 15' from the rear yard setback and petitioner shall submit a certified plot plan before obtaining a building permit.

The move was seconded and the Board voted unanimously to approve.

### Eric Wade – 5 Cedarcrest Rd.

Mr. Eric Wade came before the Board representing himself. He stated he is requesting to extend the living area of his house and add one bedroom. The addition would be 28' by 34' with a full basement. He cited a growing family as his reason for the addition. He stated the addition would be 12' from the side yard setback and the required is 15'.

Mr. Fitzgerald moved the petition of Eric Wade for an Extension of Non-Conforming Building to construct a 28' by 34' addition which will encroach the side yard setback be granted, in accordance with the submitted plan by Leo J. Glover dated 4/7/03. The move was seconded and the Board voted unanimously to grant.

### Michael Molway/F&R Realty Trust – 48 Pequit St.
### FM Generator, Inc. – 35 Pequit St.

Attorney Suzanne Matthews and Mr. Michael Molway came before the Board representing petitioner.

Attorney Matthews stated the issue at 35 Pequit St. is a violation of a special permit issued by a 1997 decision. She stated it is her position that the petitioner is in compliance with that decision. She stated the issue raised by the Building Inspector was for outside storage of equipment. She stated the petitioner is using one section of the area for parking of generators, which are registered by the Registry of Motor Vehicles. She stated the other side of the site is used by Sunrise Erectors to store equipment and supplies. She stated the site is located in a Industrial District and the uses being conducted are allowed.

BLUE HILL 1597

Zoning Board of Appeals
Meeting of May 22, 2003
Page 6 of 10

Mr. Fitzgerald stated he visited the site earlier in the day and found generators everywhere and not within the area that was supposed to be marked off for storage of generators. He stated the whole area was filled with forklifts, generators, and construction supplies. He stated in his opinion it looks like a contractor's yard. He stated there is no doubt in his mind the petitioner is in violation of the 1997 decision.

Attorney Matthews stated the generators are allowed to be stored in one portion of the lot.

Mr. Fitzgerald stated that is correct. He stated the generators are presently covering at least twice the amount of area they were supposed to and the area they were supposed to be kept in is not marked as required. He stated there are all types of construction materials where the 13 striped parking spaces were supposed to be located. He stated the intent of the 1997 decision was to keep in mind that the site is located in a mixed industrial and residential neighborhood.

Mr. Quigley stated this site has been a problem since 1997. He stated at that time, the Board tried to accommodate the petitioner with the outside storage request, but it was supposed to be kept in certain striped areas, which has not been done. He stated the decision called for the area in front to be open, which also has not been done. He stated the petitioner has zero credibility with him at this point and he believes he is in gross violation of the 1997 decision. He stated he wants to address the violations before hearing petitioner's other proposal for 46-48 Pequit Street. He stated Mr. Leary, who was the third member that sat on the 1997 hearing, was very specific in the decision in terms of conditions. He stated there were six conditions in that decision. The Board asked for reasonable conditions to be met in that decision and he has not seen that.

Attorney Matthews stated she was not involved in the 1997 decision and cannot make any arguments regarding that.

Mr. Quigley stated as part of that decision, the Board reserved the right to amend, modify or revoke the decision.

Mr. Fitzgerald stated that since 1997, the petitioner was given benefit by this Board, the Board made a number of conditions and for the last six years, the petitioner has failed to do those things.

Mr. Quigley stated that a safety concern was the reason they asked for certain areas to remain open.

BLUE HILL 1598

Zoning Board of Appeals
Meeting of May 22, 2003
Page 7 of 10

Mr. Fitzgerald stated there is a record of correspondence between the petitioner and the Building Inspector in 1997 where the petitioner questioned the definitions of outside storage and other things. He stated there has been no spirit of cooperation from petitioner at all.

Mr. Pando stated he sees no correlation between what was approved by this Board in 1997 and shown on the plan and what he saw in his site visit this evening. He stated the conditions set forth in the 1997 decision were done with petitioner's acceptance and he should abide by them.

Attorney Matthews stated that the letter the petitioner received from the Building Inspector was for violations of outside storage and not parking. She stated the letter informed petitioner he could either remove the outside storage or modify the site plan.

Mr. Dom Duganiero, 62 Kings Rd., spoke regarding the petition. He stated he lived on Pequit Street for twenty-seven years and his mother and sister still live there. He stated the site plan dated 7/24/97 has never been complied with. The storage area was not clearly designated and the parking striping was never done. He stated he does not see how any parking could fit on the site. He stated he does not believe the parking that takes place on the southerly side of Pequit St. by the employees was ever approved by the Board. He stated there is no greenbelt to screen from abutting residences and the property is unsightly. He respectfully requested that the ZBA deny the request for outside storage or reduce the size of outside storage, that the outside storage be screened from residential abutters, that both tenants be required to submit site plans for loading and unloading of equipment, that the parking areas used by employees be striped and maintained for parking. He stated Pequit St. has many small children living there and it is used as a cut-through for traffic trying to avoid the light at the Sherman St./Washington St. intersection. He stated the school buses use Pequit St. every day and there are times when trucks from the petitioner's site are parked on the street and traffic cannot get by. He further requested the Board make a condition to decision that a sidewalk be completed in accordance with town rules and regulations by the petitioner.

Attorney Matthews stated the issue she has on appeal is based upon the notification given to Mr. Molway by the building inspector, regarding whether or not the petitioner is using the proposed parking area for outside storage and the building inspector gave him the option of removing it or modifying the site plan.

Mr. Fitzgerald stated both cases have been opened up and the Board has listened to petitioner's appeal. He stated the opinion of the Board is that there are existing violations. He suggested to hold the matter for 30 days, during which time the petitioner shall comply with the 1997 decision in all respects. After the petitioner has done that, if

BLUE HILL 1599

Zoning Board of Appeals
Meeting of May 22, 2003
Page 8 of 10

he finds he needs relief from this Board, the Board will have a continued hearing. In terms of 46-48 Pequit St., Mr. Fitzgerald suggested the petitioner clean up what he has done there. He stated the petitioner cannot have a storage area in a residential district. He requested petitioner remove the cars from the fenced-in area and the only cars that can park there are from 6:00 a.m. to 5:00 p.m. for contractors working at the site.

Attorney Matthews asked whether the Board would entertain a temporary permit.

Mr. Fitzgerald stated they would not.

Mr. Pando and Mr. Quigley agreed to the 30-day extension and to not issue any temporary permits.

Mr. Richard D'Attanasio, 87 Washington St., stated he is representing a direct abutter to the petition and he has an issue with loading and unloading of trucks on the street.

Mr. Fitzgerald stated there should be no trucks loading or unloading on the street and access to the property should be kept open for trucks to go in and out. He stated it is time for the petitioner to rectify the situation and if he does not, the Board will get the Building Inspector involved. He stated if the business has outgrown the site, perhaps the petitioner should look for a site more amenable to his business.

Mr. Fitzgerald continued the matter to June 26, 2003.

**Famoso Foods – 146 Will Dr.**

Attorney Paul Schneiders and Mr. Anthony Yebba came before the Board on the continued matter.

Mr. Horace MacNess and Mr. Tom Lyman, abutters to the petition, were also present.

Attorney Schneiders stated there will be five trucks per day that deliver and pick up, with 10 trucks total in the business.

Mr. Carroll suggested the petitioner post a bond to show good faith. He stated Mr. Lyman suggested the Board make a requirement in the decision that if legal action is necessary in the future to enforce conditions of the decision, petitioner shall pay for legal expenses.

Zoning Board of Appeals
Meeting of May 22, 2003
Page 9 of 10

Mr. Fitzgerald stated he likes the idea of a condition regarding a deed restriction for no future expansion. He stated that although the petitioner offered to have the school buses removed from the site, he does not want that.

Mr. Pando stated he is impressed with the sincerity the petitioner has approached the issues with. He stated concerning the deed restriction, he would have no problem with a condition stating the petitioner could request no more than a 5 to 10% future expansion.

Attorney Schneiders stated he received letters from the two closest abutters strongly supporting the petition. He asked if the Board would want to add a condition to reserve the right to have the buses removed if necessary.

Mr. Carroll stated they would.

Mr. Fitzgerald moved the petition of Famoso Foods for a modification of Site Plan Approval, Special Permits for Access Drive and Reduced Parking, and an Extension of Non-conforming Building be granted so that petitioner can add a 20,500 s.f. addition to the existing building at 146 Will Drive and that said allowance of petition be subject to conditions as indicated in the letter from Attorney Schneiders dated 5/20/03 and in the representations at this meeting, construction to be done in accordance with the submitted site plan by Toomey Munson Associates, dated 12/20/03 with revision dates of 2/14/03, 3/3/03, and 4/4/03 and that a condition of the decision be that the Board grants this permit subject to review in two years, reserving the right at that time to modify or amend decision if necessary and the cost of enforcement proceedings to be paid by petitioner and petitioner to post a $5000 bond. The move was seconded and the Board voted unanimously to grant.

**Grover Estates -- Washington St.**

Attorney Schneiders and Mr. John Marini came before the Board representing petitioner.

Mr. Dean Miller and Ms. Kathy Keith were present representing the Design Review Board.

Mr. Miller stated he thinks the only question at this point is the issue of town acceptance of the deed in terms of parking lot and public ways. He said his Board approves of the landscape plan.

BLUE HILL 1601

Zoning Board of Appeals
Meeting of May 22, 2003
Page 10 of 10

Attorney Schneiders stated they added language worked out between the petitioner and Mr. Miller. He stated he submitted a proposed decision and a deed restriction labeled Exhibit A, regarding the condominium association maintaining landscaping. If there is a change or modification by the condominium owners, it would have to come before the ZBA and Design Review Board.

**Board Business**

Mr. Carroll moved to approve the Minutes of the Meetings of April 24, 2003, May 1, 2003, May 8, 2003, and May 15, 2003. The move was seconded and the Board voted unanimously to approve.

**Adjournment**

Mr. Pando moved to adjourn the Meeting at 10:25 p.m. The move was seconded and the Board voted unanimously to adjourn.

Respectfully submitted,

Paul B. Carroll
Chairman

/sf

# DEPOSITION EXHIBIT NO. 334



EXHIBIT
Fineberg
334
DEC  4/5/06

BERNKOPF
GOODMAN LLP

November 10, 2004

KENNETH M. GOLDBERG
DIRECT DIAL: (617) 790-3333
E-MAIL: KGOLDBERG@BG-LLP.COM

*Via Hand Delivery*

Bruce S. Barnett, Esq.
Piper Rudnick LLP
One International Place, 21st Floor
Boston, MA  02110-2600

RE:    150 Royall Street, Canton, MA ("Mortgaged Premises")
       Blue Hills Office Park LLC ("Borrower")
       First Mortgage Loan No. 76-0990083 ("Loan") - Lennar Partners, Servicer ("Lender")

Dear Mr. Barnett:

This letter confirms our representation of the Borrower in connection with the Loan referenced above.

In connection with this representation, reference is hereby made to the Loan evidencing, documenting and governing instruments (the "Loan Documents"). Reference is also hereby made to the requests, correspondence and requisitions made and otherwise tendered by Borrower to Lender during the last several months for the release of its own funds - to wit from one or more of the Loan reserve accounts paid in by Borrower. Release of those funds had as their primary purpose to maintain current the obligations of the Borrower under the Loan Documents. My subsequent discussions with the Lender, on behalf of the Borrower, again requested (a) information on the procedure to requisition funds for the purpose of both keeping current payment obligations of the Borrower under the Loan Documents, and (b) direction as to the procedure to obtain release of funds to pay architecture, engineering and marketing costs as well as for building initial core improvements from said account(s). The second request was clearly explained by me to have as its purpose enabling the Borrower to attract replacement tenants to the Mortgaged Premises.

As you are aware, and in accordance with its terms, the lease with the tenant that previously occupied the entire Mortgaged Premises expired on or about July 31, 2004, thus requiring Borrower to pursue replacement tenants.

The Lender has consistently refused to reasonably or effectively respond to all of these Borrower requests. Most recently, within the last two weeks, the Borrower principals and their representatives requested a meeting with duly authorized representatives of Lender for the purpose of discussing the Loan, Loan conditions and Lender's unilateral refusal to release Borrower's own reserve funds for any purpose; and that refusal and course of Lender's conduct clearly procured the very defaults now being asserted. Once again, Lender's responses to these repeated requests were refusals to meet or discuss these matters.

Blue Hill 1219

125 SUMMER STREET
BOSTON, MA 02110-1621
617.790.3000   T
617.790.3300   F
WWW.BG-LLP.COM

BERNKOPF
GOODMAN LLP

Further reference is hereby made to the Loan Documents and to our advice to the Lender and its servicing agent of our representation of the Borrower; notwithstanding which, no copies of your notices of foreclosure were sent to counsel, same having been forwarded directly only to the Borrower and its principals.

Therefore, notice is hereby formally given that in the event the Lender, or any successor holder or servicing agent of the Loan, continues with the foreclosure process and/or fails to provide a reasonable opportunity for the Borrower to access its own assets and/or market the Mortgaged Premises to provide a source of revenue to service the Loan as contemplated by the terms of the Loan Documents, the Borrower will be left with no alternative than to seek direct, full and complete recourse against the Lender and its agents for its/their wrongful conduct and contractual breaches.

Very truly yours,
Blue Hills Office Park LLC

By: Kenneth M. Goldberg, its Attorney

KMG:jmj

cc:     Andrew H. Cohn, Esq.
        Mr. Gerald S. Fineberg
        Mr. William J. Langelier
        Mr. Daniel Frank

#301246 v1/14500/9547

Blue Hill 1220

# DEPOSITION
# EXHIBIT NO. 335



**BERNKOPF**
**GOODMAN** LLP

November 17, 2004

*Via Hand Delivery*

KENNETH M. GOLDBERG
DIRECT DIAL: (617) 790-3333
E-MAIL: KGOLDBERG@BG-LLP.COM

E. Randolph Tucker, Esq.
Piper Rudnick
One International Place
21st Floor
Boston, MA 02110-2600

Re:    Blue Hill Office Park LLC ("Borrower")
       Loan No. 76-0990083 ("Loan")
       JP Morgan Chase Bank, Trustee and its Services ("Lender")

Dear Randy:

The following is responsive to your letter of November 12, 2004 to me. That letter clearly reflects the recentness of your retention and consequent lack of familiarity with the Loan transaction and the prior and recent course of dealings between the Borrower and the various parties asserting, from time to time, representation and/or agency of the Lender.

At the time the Loan was committed and closed, the parties were fully aware that the Equiserve lease term, if not renewed, would end on July 31, 2004. The parties were also aware that, as an essentially single tenant office park, if Equiserve did not renew, market conditions would likely require improvements to re-structure the property as a multi-tenant property. In addition, the Lender knew that the ownership structure included a number of minority, non-controlling parties when it included the proscriptive SPE provisions in the Mortgage; accordingly, the Loan originally applied for and negotiated, and as closed, included the Borrower's proposal to set aside, from its own cash flow, substantial funds to address the possibility of non-renewal by Equiserve – in order to carry the Loan for a period of time and provide funds to address design of improvements and re-marketing to attract replacement tenants. The Loan application and commitment, included as "Loan Documents", provide that if the Equiserve lease is not extended, the funds in reserve would be available for Debt Service payments and, if the lease revenue were not sufficient to make those payments, then the money in the leasing reserve would be available. The foregoing clear intention and agreement of the parties has been controverted by Lennar's refusal to make funds available either for Debt Service, monthly payments required under the Loan Documents or for expenses to obtain new leases.

Your letter reflects a very one-sided and incomplete summary of the Loan Documents and the repeated requests of the Borrower to access its own funds reserved for the very events that

US1DOCS 4608285v1

125 SUMMER STREET
BOSTON, MA 02110-1621
617.790.3000   T
617.790.3300   F
WWW.BG-LLP.COM

**LNR03474**

E. Randolph Tucker
November 17, 2004
Page 2

BERNKOPF
GOODMAN LLP

actually occurred - there being no revenue after the Equiserve lease terminated either for Debt Service, re-marketing efforts or tenant improvements other than the reserves set aside for those purposes.

As early as May, 2004, the Borrower opened discussions with the Lender requesting a meeting to prepare for the Equiserve lease termination and to discuss the process of accessing its reserves.

A series of calls from the Borrower and counsel ensued over a period of months seeking to expedite the Lender designating a party with whom the Borrower could at least open discussions on these matters. It is hereby reiterated that the Borrower requested, as early as last June, meetings to address the process for requisitioning funds and accessing its reserves for commitments it wanted to make to re-market the property, including to engage an architect to design alternative re-structures of the property for multi-tenant use, and obtain approval by the Lender for changes to the building necessary to implement alternative re-marketing strategies. The Lender's continued non-responsiveness precluded the Borrower from making any long-range plans for the property, and paralyzed the Borrower's dealing with a number of recent prospective tenants interested in leasing 50,000-100,000 square feet. The Lender's request that Borrower simply send those tenant prospects to the Lender confirms the Lender's intentions.

Contrary to the assertions in your letter, there were repeated contacts and requests for meetings with the original Loan servicer and then with Lennar personnel, logs for which have been kept by both the Borrower and Borrower representatives and counsel. Discussions with Mr. Warshaw culminated in his committing to me to have our position with respect to requisitions reviewed by counsel after which a meeting would be arranged. Notwithstanding that commitment and my offer, on behalf of the Borrower, to pay his cost to visit the property, meet with third party marketing professionals and then with the Borrower to review its alternative plans, no response either to these Borrower proposals or requests were forthcoming. Instead, a new local representative of Lennar contacted the Borrower and there ensued a series of site visits and inspections which the Borrower was led to believe would provide the Lender with sufficient background for an informed meeting. Again, notwithstanding repeated requests to discuss the issue of accessing reserves, the Lender continued its stonewalling thus precluding the Borrower otherwise sourcing funds. It is noted that the Loan Documents prohibit the Borrower, as a single purpose entity, from incurring new debt to pay other than specific items, which items included neither real estate taxes nor alterations to the collateral without the Lender's consent.

The foregoing is intended only as a brief summary of what counsel has advised the Borrower, namely, (i) that Lender's deprivation of the Borrower accessing its own funds specifically set aside for the very purpose for which they were sought, (ii) Lender's breach of provisions of the Loan Documents, (iii) Lender's willful course of conduct which procured the very breach upon which it later relied to appropriate, for its own account, Borrower assets, and (iv) Lender's

US1DOCS 4808205v1

LNR03475

E. Randolph Tucker
November 17, 2004
Page 3

**BERNKOPF**
**GOODMAN** LLP

stifling any opportunity of the Borrower otherwise sourcing funds permitted by the Loan
Documents to avoid the very foreclosure it is now facing.

It is unreasonable that you are now justifying the Lender's transparent appropriation of
Borrower's funds, totaling more than $4 million, set aside to address the effect of the Equiserve
non-renewal -- the very purpose for which those reserves were established. The Borrower's
damages would thus be at least equal to recovery of those reserves in addition to its loss of
investment opportunity.

May I please hear from you in response to the foregoing in advance of the foreclosure so that the
Borrower may consider how best to protect its assets and interests.

Very truly yours,

Kenneth M. Goldberg

KMG:jmj

cc:     Gerald S. Fineberg
        William J. Langelier
        Andrew Cohn, Esq.
#301785 v1/14500/9547

US1DOCS 4808205v1

**LNR03476**

# DEPOSITION EXHIBIT NO. 336



**Piper Rudnick**

One International Place, 21st Floor
Boston, Massachusetts 02110-2613
main 617.406.6000 fax 617.406.6100

E. RANDOLPH TUCKER
randy.tucker@piperrudnick.com
direct 617.406.6032

November 18, 2004

BY HAND

Kenneth M. Goldberg, Esq.
Bernkopf Goodman & Baseman, LLP
125 Summer Street
Boston, MA 02110-1621

      Re:    <u>Blue Hills Office Park LLC, Loan No. 76-0990083 (the "Loan")</u>

Dear Ken:

      This is in response to your letter of November 17.

      The Mortgage, Assignment of Leases and Rents and Security Agreement, dated September 14, 1999 (the "Mortgage"), contains an agreement that is very different from the one described in your letters. Leasing Escrow Funds are <u>not</u>, as you suggest, generally available to the Borrower "to carry the Loan for a period of time and provide funds to address design of improvements and re-marketing to attract replacement tenants". Rather, the Mortgage provides that when certain conditions are met, the Leasing Escrow Funds are available for tenant improvements and leasing commissions <u>previously</u> paid by Borrower and a portion of the Leasing Escrow Funds (up to One Million Dollars ($1,000,000)) is available for principal and interest payments. None of the Borrower's requests for funds met the conditions of these provisions.

      As set forth in Mr. Polcari's letter of September 17, 2004, pursuant to Section 6(c)(ix) of the Mortgage, releases from the Leasing Escrow Funds may be made only for principal and interest payments. Other sizable monthly payments, such as real estate taxes, insurance and other reserves may not be paid from the Leasing Escrow Funds and therefore must be paid from operating income or by the Borrower. Moreover, no escrow funds may be released if an Event of Default has occurred and is continuing. An Event of Default occurred when Borrower failed either to timely make the quarterly tax escrow deposit or to pay the real estate tax payment due August 2, 2004. (By letter dated August 2, 2004, the Borrower requested the tax payment as an "advance" from the Leasing Escrow Funds, which the Mortgage does not permit.) Further Events of Default occurred on August 11, 2004, when Borrower failed to make required insurance and reserve payments, and in each month thereafter.

Blue Hill 1212

**Piper Rudnick**

Kenneth M. Goldberg, Esq.
November 18, 2004
Page 2

Pursuant to Section 6(c)(iv) of the Mortgage, money from the Leasing Escrow Funds is disbursable to the Borrower on a quarterly basis as reimbursement "for expenses reasonably *incurred* by [Borrower] for new Leases *entered into* by [Borrower]" (emphasis added). Disbursement is conditioned on delivery by Borrower to Lender of "copies of *paid* invoices … for tenant improvements and leasing commissions" (emphasis added) and "the newly executed Lease," among other things. These funds are available for amounts already expended by the Borrower on behalf of tenants who have already signed leases, not for prospective design work and marketing efforts.

The parties' intent, as reflected in the Loan Documents, was to permit the Borrower to draw for principal and interest payments up to One Million Dollars ($1,000,000), so long as Borrower kept current with tax and other payments and satisfied the other conditions to payment, such as staying out of default. If a tenant were in place, the escrow would be available to reimburse leasing commissions and tenant improvements. Both provisions require the Borrower to come out of pocket with substantial funds, which Borrower has not done here. Neither of your letters has referred to any provision of the Loan Documents to the contrary.

Without purporting to identify all points of disagreement with your letters, it is important to note that the Leasing Escrow Funds "constitute additional security for the Debt", Mortgage § 6(c)(v), and "[u]pon the occurrence of an Event of Default, [Lender] shall have no obligation to disburse any amounts held in … the Leasing Escrow Fund to the [Borrower] and may apply any sums then present in such fund[] to the payment of the Debt in any order in its sole discretion", Mortgage § 6(d). Moreover, under Section 7(b) of the Cash Management Agreement, the Borrower agreed that, upon an Event of Default, "it will have no further right to request or otherwise require Lender to disburse funds" from the escrow and reserve accounts.

For all of these reasons, the Lender was not obligated to disburse money from the Leasing Escrow Funds to the Borrower after the Equiserve lease terminated.

Sincerely,

*E. Randolph Tucker / jmm*

E. Randolph Tucker

ERT/jmm

cc:   Andrew Cohn, Esq. (by e-mail)

**Blue Hill 1213**

~BOST1:312878.v1 |11/18/04

# DEPOSITION EXHIBIT NO. 337



**EXHIBIT**
*Fineberg*
337
*Tec  4/5/06*

**BERNKOPF**
**GOODMAN|**LLP

November 18, 2004

KENNETH M. GOLDBERG
DIRECT DIAL: (617) 790-3233
E-MAIL: KGOLDBERG@BG-LLP.COM

## FACSIMILE TRANSMITTAL

TO:  E. Randolph Tucker, Esq                COMPANY:  Piper Rudnick

FACSIMILE NO:  617-406-6100                 TELEPHONE NO:  617-406-6032

FROM:  Kenneth M. Goldberg, Esquire         TRANSMITTED BY:  Jeanne M. Jones

TOTAL PAGES (INCLUDING COVER):  2           CLIENT/MATTER NO:  14500/9547

MESSAGE:

The information contained in this facsimile message is privileged and confidential, intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please notify us immediately by phone at 617.790.3000. Thank you.

125 SUMMER STREET
BOSTON, MA 02110-1631
617.790.3000  T
617.790.3300  F
WWW.BG-LLP.COM

LNR03469

**BERNKOPF GOODMAN** LLP

November 19, 2004

*Via Telecopy and Hand Delivery*

KENNETH M. GOLDBERG

DIRECT DIAL: (617) 790-3393

E-MAIL: KGOLDBERG@BG-LLP.COM.

B. Randolph Tucker, Esq.
Piper Rudnick
One International Place
21st Floor
Boston, MA  02110-2600

Re:    Blue Hill Office Park LLC ("Borrower")
       First Mortgage Loan No. 76-0990003 ("Loan")
       JP Morgan Chase Bank, Trustee and its Services ("Lender")

Dear Randy:

This acknowledges receipt of your letter of November 18, 2004 with respect to the Loan referenced above.

Your letter disregards the Lender's refusal to address issues of Loan governance and access to reserves beginning many months prior to the asserted default. Your reference to various provisions of the Loan Documents disregards other, clearly contrary terms in the same document and, taken together, do not warrant the Lender's conduct or your conclusions on these matters.

Nothing in your letter will dissuade the Borrower from its belief that the Lender, purposefully and with the intention to appropriate Borrower's cash reserves solely to its own benefit, acted in willful derogation of its legal and contractual obligations.

Once again this confirms the Borrower's request that the Lender forbear from any further foreclosure proceedings and make available properly authorized representatives at a meeting to consider a less adversary resolution of these issues.

Very truly yours,

Kenneth M. Goldberg

KMG:jm
cc:    Gerald S. Fineberg
       William J. Langelier
       Andrew Cohn, Esq.
#301974 v1/14500/9547

125 SUMMER STREET
BOSTON, MA 02110-1621
    617.790.3000    T
    617.790.3300    F
WWW.BG-LLP.COM

LNR03470

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim,

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## MANUAL FILING NOTIFICATION

Defendants give notice of the manual filing with the Clerk's office of **Exhibit 341, Expert Report of Eric S. Stotz** due to its voluminous size.

Dated:  May 17, 2006

~BOST1:419119.v1

# DEPOSITION EXHIBIT NO. 358



## UNITED STATES DISTRICT COURT
### FOR THE
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BLUE HILLS OFFICE PARK, LLC | ) | |
|     Plaintiff/Defendant-in-Counterclaim | ) | |
| | ) | |
| v | ) | |
| | ) | |
| J.P. MORGAN CHASE BANK, as | ) | CIVIL ACTION NO. 05-CV-10506(WGY) |
| Trustee for the Registered Holders of | ) | |
| Credit Suisse First Boston Mortgage | ) | |
| Securities Corp., Commercial Mortgage | ) | |
| Pass-Through Certificates, Series 1999-C1, | ) | |
|     Defendant | ) | |
| | ) | |
| | ) | |
| and CSFB 1999 – C1 ROYALL STREET, | ) | |
| LLC, | ) | |
|     Defendant/Plaintiff-in-Counterclaim | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM LANGELIER and GERALD | ) | |
| FINEBERG, | ) | |
|     Defendants-in-Counterclaim | ) | |

## EXPERT REPORT OF DAVID R. ANDELMAN, ESQUIRE

I am a lawyer licensed in the Commonwealth of Massachusetts and I am a principal in the law firm of Lourie & Cutler, P.C. A copy of my curriculum vitae is attached hereto as Exhibit A. I am being compensated for my professional services at the rate of $490.00 per hour. I have no publication written within the last ten years and I have not testified as an expert at a trial or by deposition within the preceding four years.

I am engaged by Bernkopf Goodman, LLP to determine if I can render certain opinions concerning the tax consequences to the Partners of Royall Associates Realty Trust ("Royall"), the sole member of Blue Hills Office Park, LLC ("Blue Hills") arising out of the foreclosure sale of the property located at 150 Royall Street, Canton, MA 02021 (the "Property") which foreclosure sale occurred on or about November 20, 2004, but which deed was not recorded until January 14, 2005. I have determined that I am able to render such opinions.

In connection with my engagement, I have reviewed the Federal Form 1065 U.S. Return and Partnership Income of Royall for the calendar year 2004 and have reviewed the work papers

prepared by Rutfield and Hassey, LLP, CPAs in connection with the preparation of the calendar year 2005 Form 1065 of Blue Hill Office Park, LLC.  Since Blue Hills has only one member, it is considered a "disregard entity" for tax purposes and all of its transactions are reported on the tax return of it sole member, Royall.  In particular, I have reviewed the amount of liability which was satisfied by the foreclosure sale and the tax basis of the Property foreclosed upon as set forth in the tax work papers of Royall.  At the time of the foreclosure sale, the outstanding liability to Wells Fargo Bank, NA was $31,979,793.66.  For federal and Massachusetts income tax purposes, the foreclosure sale is treated as a sale of the Property at the amount of the debt on the Property that was foreclosed, $31,979,793.66, provided there is no additional liability on any individuals with respect to the debt.  If the liability is satisfied in full, then it is the amount of the debt which is treated as the sale price, not the bid price.  Based upon the foreclosure sale of the Property, there is a significant gain to be realized by Royall.  Since Royall is treated as a partnership for federal and state income tax purposes such gains are allocable to the various partners of Royall in respect to their proportionate interests.

With respect to the Property's foreclosure sale, because of the recording of the deed in 2005, the gain for the foreclosure sale will be reportable as income in 2005.  Gain up to the amount of unrecaptured depreciation under Section 1250 is taxed at a rate of 15%.  Any balance of the gain would be taxable as long term capital gain at a 25% rate.  On the attached Exhibit B is set forth the name of each of the partners, the amount of gain that each will report due to the foreclosure sale, the portion of that gain that will be taxable at 25% and the portion of the gain that will be taxable at 15% for federal tax purposes and the portion of the gain that will be taxable at 5.3% for Massachusetts purposes.  There is also a calculation of what the amount of the tax would be with respect to each of the partners based upon the rates set forth on Exhibit B, giving effect to the tax benefit of the deduction of the Massachusetts tax in calculating the Federal tax.

In summary, the effect of the foreclosure sale of the Property was to cause each of the partners of Royall to recognize gains as set forth on the attached Exhibit B and to be subject to tax on those gains at the rates set forth on Exhibit B in the total amounts as set forth therein.  But for the foreclosure sale, the amount of gain set forth therein would not have been recognized and no taxes would be due with respect to the recognition of such gain.

This report is subject to revisions based upon any other information which is obtained during discovery in the above-captioned action.

David R. Andelman, Esq.

Dated:        March 31, 2006

f:\user\cvalley\corres\draft\blue hills office park llc.doc

EXHIBIT A

David R. Andelman, Esq.
Lourie & Cutler, P.C.
60 State Street, 9th Floor
Boston, MA 02109

Phone 617-742-6720
Fax 617-742-5720

Date of Birth:          August 19, 1939

Education:

University of Pennsylvania – B.S. in Economics 1961
Majored in Accounting

Harvard Law School – L.L.B. 1964

Admitted as a Lawyer in Massachusetts 1964

Principal:

Lourie & Cutler, P.C.

Lecturer in Law:

Boston University School of Law – 1972-1986

F:\users\cvalley\corres\draft\dra cv.doc

Exhibit B

ROYALL ASSOCIATES REALTY TRUST
The sole member of
Blue Hills Office Park, LLC

| Partner | Percentage Interest | Gain | Federal Gain Taxed at 25% | Gain Taxed at 15% | Mass. Gain Taxed at 5.3% | Total Taxes |
|---|---|---|---|---|---|---|
| Daniel Frank | 2.50% | $ 345,036 | $ 345,036 | $ - | $ 345,036 | $ 99,974 |
| Gerald Fineberg | 42.50% | $ 5,865,605 | $ 5,865,605 | $ - | $ 5,865,605 | $ 1,699,559 |
| Gary Fineberg | 2.50% | $ 345,036 | $ 345,036 | $ - | $ 345,036 | $ 99,974 |
| Michelle Fineberg | 2.50% | $ 345,036 | $ 345,036 | $ - | $ 345,036 | $ 99,974 |
| William A. Langelier | 48.75% | $ 9,902,799 | $ 9,902,799 | $ - | $ 9,902,799 | $ 2,869,336 |
| Amy Badger | 1.25% | $ 172,518 | $ 172,518 | $ - | $ 172,518 | $ 49,987 |
| Totals | 100.00% | $ 16,976,029 | $ 16,976,029 | $ - | $ 16,976,029 | $ 4,918,804 |

## BLUE HILLS OFFICE PARK, LLC.

### STATEMENT OF ASSETS, LIABILITIES, AND MEMBERS' EQUITY - INCOME TAX BASIS

### DECEMBER 31, 2002

#### ASSETS

**CURRENT**

| | | |
|---|---|---|
| Cash | | $ 140,555 |
| Escrow Accounts | | 2,842,988 |
| Due from Affiliate | | 7,093,888 |
| | | 10,077,431 |

**PROPERTY**

| | | |
|---|---|---|
| Land | $ 3,312,500 | |
| Buildings | 29,812,500 | |
| Building Improvements | 6,043,134 | |
| Furniture and Fixtures | 15,333 | |
| Motor Vehicles & Equipment | 1,260 | |
| | 39,184,727 | |
| Less:   Accumulated Depreciation | 17,135,808 | 22,048,919 |

**OTHER**

| | | |
|---|---|---|
| Deferred Costs, Net | | 444,502 |
| TOTAL ASSETS | | $ 32,570,852 |

#### LIABILITIES AND MEMBERS' EQUITY

**CURRENT LIABILITIES**

| | | |
|---|---|---|
| Mortgage Payable - Current Portion | | $ 270,897 |
| Due to Gerald S. Fineberg | | 25,000 |
| Due to William J. Langelier | | 25,000 |
| | | 320,897 |

**LONG TERM LIABILITIES**

| | | |
|---|---|---|
| Mortgage Notes Payable | $ 32,426,324 | |
| Less: Current Portion | 270,897 | 32,155,427 |

| | | |
|---|---|---|
| MEMBERS' EQUITY | | 94,528 |
| TOTAL LIABILITIES AND MEMBERS' EQUITY | | $ 32,570,852 |

See accompanying notes and Accountant's Report.

RUTRELD & HASSEY, LLP, CERTIFIED PUBLIC ACCOUNTANTS



EXHIBIT
Andelman
364

BLUE HILL
5526

## BLUE HILLS OFFICE PARK, LLC.

### STATEMENT OF ASSETS, LIABILITIES, AND MEMBERS' DEFICIT - MODIFIED TAX BASIS

### DECEMBER 31, 2003

#### ASSETS

| | | |
|---|---:|---:|
| **CURRENT** | | |
| Due from Affiliate | | $ 9,028,175 |
| Escrow Accounts | | 3,744,294 |
| | | 12,772,469 |
| | | |
| **PROPERTY** | | |
| Land | $ 3,119,071 | |
| Buildings | 28,071,642 | |
| Building Improvements | 6,043,134 | |
| Motor Vehicles & Equipment | 1,260 | |
| Furniture and Fixtures | 15,333 | |
| | 37,250,440 | |
| Less: Accumulated Depreciation | ( 18,253,970) | 18,996,470 |
| | | |
| **OTHER** | | |
| Deferred Costs, Net | | 427,434 |
| **TOTAL ASSETS** | | **$ 32,196,373** |

#### LIABILITIES AND MEMBERS' DEFICIT

| | | |
|---|---:|---:|
| **CURRENT LIABILITIES** | | |
| Mortgage Payable - Current Portion | | $ 297,902 |
| Cash Overdraft | | 30,931 |
| Due to Gerald S. Fineberg | | 25,000 |
| Due to William J. Langelier | | 25,000 |
| | | 378,833 |
| **LONG TERM LIABILITIES** | | |
| Mortgage Notes Payable | $ 32,150,871 | |
| Less: Current Portion | 297,902 | 31,852,969 |
| | | |
| **MEMBERS' DEFICIT** | | ( 35,429) |
| **TOTAL LIABILITIES AND MEMBERS' DEFICIT** | | **$ 32,196,373** |

See accompanying notes and Accountant's Report
ROTHBERG & HASSIN, LLP, *CERTIFIED PUBLIC ACCOUNTANTS*

EXHIBIT
Andelman
3 65
YKC 4/24/06

BLUE HILL
5527

ACCOUNTANTS
SUPPLY HOUSE

Andelman
367
KC  4/24/06

| Prepared By | | |
| Approved By | | |

Royal Associates
Due to/from Asset

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|
| | Capital Asset | | | | 1,379,749.82 | |
| | Cost Basis | | | | 23,150,241 | |
| | Rife Reserve | | | | 254,364,172 | |
| | FF&E Reserve | | | | 1,643,850,641 | |
| | Cash in Bond | | | | 263,467 | |
| | | | | | 15,382,271,515 | |
| | Second Mortgage Payable | | | | 8,222,872,463 | |
| | Due to/from Affiliate | | | | 7,043,381,795 | |
| 7403 | Basis Adjust. | | | | 1,930,232,271 | |
| | | | | | 9,023,474,438 | |

BLUE HILL
5529





# RUTFIELD & HASSEY, LLP.

CERTIFIED PUBLIC ACCOUNTANTS

E. Richard Rutfield, C.P.A.
Richard Hassey, C.P.A.

15 Court Square • Boston, MA 02108-2583
(617) 523-7846 • FAX (617) 523-5348

### FAX COVER SHEET

FAX NUMBER  (617) 523-5348                CONTACT  (617) 523-7846

TO:  _BG LLP_

ATTN:  _KEN G._

CLIENT: _____

ORIGINATOR: _____

SUBJECT: _ON 12/31/03  BHOP LLC_
_Due from Affeliate ↑   1,934,287_

_LAND  ↓   193,429_
_BLDG  ↓   1,740,858_
_        1,934,287_

_BASIS ADJUSTMENT   $2,000,000 —LEGAL_
_        COST._

DATE OF TRANSMISSION: _4/10/06_

NUMBER OF PAGES INCLUDING THIS PAGE: _7_

0-3

BLUE HILL
5530



# RUTFIELD & HASSEY, LLP.

*CERTIFIED PUBLIC ACCOUNTANTS*

E. Richard Rutfield, C.P.A.
Richard F. Hassey, C.P.A.

15 Court Square ● Boston, MA 02108-2588
(617) 523-7846 ■ FAX (617) 523-5348
WEB SITE: www.rutfieldandhassey.com
E-MAIL: info@rutfieldandhassey.com

*r hassey@ aol. Com*

Blue Hills Office Park



EXHIBIT
*Andelman*
369
JEC  4/24/06

| | Per t/b @ 1/1/2005 | Langelier adjustment | Cost to be dealt with |
|---|---|---|---|
| Building | 28,071,642 | (5,330,878) | 22,740,764 |
| Improvements | 6,043,134 | | 6 043,134 |
| Furniture & Fixtures | 16,593 | | 16,593 |
| | 34,131,369 | | 28 800,491 |
| Accum. Depreciation | 19,072,070 | (2,156,273) | 16 915,797 |
| Land | 3,119,071 | | 3 119,071 |
| Basis | 18,178,370 | | 15 003,765 |

BLUE HILL
5531

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>    Plaintiff, Defendant-in-Counterclaim,<br><br>    v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the<br>Registered Holders of Credit Suisse First Boston<br>Mortgage Securities Corp., Commercial Mortgage<br>Pass-Through Certificates, Series 1999-C1, and,<br>CSFB 1999–C1 ROYALL STREET, LLC,<br><br>    Defendants, Plaintiffs-in-Counterclaim,<br><br>    v.<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br><br>    Defendants-in-Counterclaim. | Civil Action No.  05-CV-10506 (WGY) |

## MANUAL FILING NOTIFICATION

Defendants give notice of the manual filing with the Clerk's office of **Exhibit 379,**

**Expert Report and Exhibits of Dr. Kenneth D. Gartrell** due to its voluminous size.


Dated:  May 17, 2006

# DEPOSITION EXHIBIT NO. 407



EXHIBIT
Riley
407
JCC 5/8/06

EXHIBIT B

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## OF
### BLUE HILLS OFFICE PARK LLC

## RECITALS

The undersigned member of Blue Hills Office Park LLC, a Delaware limited liability company (the "Company"), hereby adopts the following Limited Liability Company Operating Agreement (the "Operating Agreement"). Terms not defined in this paragraph shall have the meanings set forth in Article XIII hereof.

## ARTICLE I

### Formation: Members: Organization

Section 1.1. Formation.

(a)    Blue Hills Management Corp., as an authorized person within the meaning of the Act, is hereby authorized to execute, deliver and file any and all amendments to and restatements of the Company's Certificate of Formation.

(b)    The Members hereby agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein.

(c)    The name of the Company shall be Blue Hills Office Park LLC. The business of the Company may be conducted upon compliance with all applicable laws under any name jointly designated by a Supermajority Interest.

(d)    The principal place of business of the Company shall be at c/o Fineberg Management, Inc., One Washington Street, Wellesley, Massachusetts 02481. The Company may locate its places of business at any other place or places as a Supermajority Interest may deem advisable.

(e)    The Company's registered office in the State of Delaware shall be at the office of its registered agent at c/o National Registered Agents, Inc., 9 East Lookerman, Dover, Kent County, Delaware 19901, and the Company's registered agent in the Sate of Delaware shall be National Registered Agents, Inc. At any time, a Supermajority Interest may change the registered office and registered agent of the Company by directing Blue Hills Management Corp., as an authorized person under the Act, to file the address of the new registered office and/or the name of the new registered agent with the Secretary of State of the State of Delaware pursuant to the Act.

(f)    The Company shall have perpetual existence unless the Company is earlier dissolved in accordance with the provisions of this Operating Agreement.

Section 1.2. Organization and Powers. The Members or the Manager, if a Manager has been retained pursuant to the terms of this Operating Agreement or otherwise, shall file such certificates and documents as appropriate to comply with the applicable requirements for the operation of a

Blue Hill
1969

limited liability company in accordance with the laws of the State of Delaware and any other jurisdiction in which the Company elects to do business. Subject to all other provisions of this Operating Agreement, the Company is hereby authorized and empowered:

(a)    to acquire any property, real or personal, in fee or under lease, or any rights therein or appurtenant thereto, necessary or convenient for the business and operations of the Company;

(b)    to borrow money and to issue evidences of indebtedness and to secure the same by mortgage, pledge or other lien on its assets;

(c)    to pay and prepay in whole or in part, finance and refinance, decrease, increase, modify or extend any indebtedness, whether secured or unsecured, and in connection therewith to execute and deliver any and all loan evidencing, governing and security documents, together with extensions, renewals, or modifications of any such indebtedness, documents and/or instruments, or the mortgages or liens securing the same;

(d)    to employ a management company to manage its assets (including a company which may be an Affiliate);

(e)    to construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property necessary, convenient or incidental to accomplish the purposes of the Company; and

(f)    to carry on any other activities necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as such activities are not prohibited to be carried on or performed by a limited liability company under the laws of the State of Delaware.

Section 1.2. <u>Annual Meeting</u>. The annual meeting of the Voting Members of the Company shall be held on the first Tuesday in February of each year or on such other date designated by a Supermajority Interest. The purposes of such meeting shall be to review the performance of the leasing and management agents or agents for the Company's properties, to review the operations of the Company for the prior calendar year, and to consider such other business as may come before the meeting. If the date fixed for the annual meeting is a legal holiday in the State of Delaware, the meeting shall be held on the next succeeding business day.

Section 1.3. <u>Regular Meetings</u>. Regular meetings of the Voting Members of the Company may be held at such times as may be scheduled by Voting Members holding a Supermajority Interest.

Section 1.4. <u>Special Meetings</u>. Special meetings of the Voting Members of the Company shall only be held when called by all of the Voting Members.

Section 1.5. <u>Place</u>. Meetings of the Voting Members of the Company may be held within or without the State of Delaware at such place designated by the persons calling the meeting, unless a Supermajority Interest shall designate another place of meeting. If no place of meeting has been so designated, the meeting shall be held at the Company's registered office.

-2-

Blue Hill
1970

Section 1.6. <u>Notice of Special Meetings</u>.  Written notice stating the place, date and time of a special meeting, and the purposes for which the meeting has been called, shall be delivered to each Voting Member not less than five (5) nor more than sixty (60) days before the date set for the meeting, by or at the direction of the persons calling the meeting.  Notice may be given by: (a) mail, (b) nationally recognized overnight delivery service such as Federal Express, or (c) hand delivery, courier, facsimile transmission, or other form of electronic communication, if a receipt of such delivery, transmission or communication is retained by the sender.  Such notice shall be deemed to have been given: (i) if mailed, three (3) days after deposit thereof in the United States mail addressed to the Voting Member at its address as it appears on the books of the Company, with postage thereon prepaid, and (ii) if given by any of the other means authorized above, on the date sent as evidenced by the record of delivery or receipt, as applicable.

Section 1.7. <u>Notice of Adjourned Meetings</u>.  When a meeting has been adjourned to another time and place, it shall not be necessary to give any notice of the adjourned meeting if the date, time and place to which the meeting has been adjourned are announced at the meeting at which the adjournment is taken.

Section 1.8. <u>Waiver of Notice</u>.  Whenever any notice is required to be given to any Voting Member, a waiver thereof in writing signed by the Voting Member entitled to such notice, whether made before or after the time for notice to be given, is equivalent to the giving of notice.  Attendance in person at a meeting shall constitute a waiver of notice of such meeting, except when the Voting Member attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting has not been properly called or convened pursuant to this Operating Agreement.  Attendance of a Voting Member at a meeting also constitutes a waiver of any objection to the transaction of a particular type of business at the meeting that is not within the described purposes of the meeting, unless such Voting Member objects to the consideration of the item of business when it is presented.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Voting Members need be specified in any written waiver of notice.

Section 1.9. <u>Quorum and Voting</u>.  A Supermajority Interest of the Voting Members of the Company present in person or by proxy shall constitute a quorum at a meeting of Voting Members.  Once a Voting Member is present at a meeting, the Voting Member shall be deemed present for quorum purposes for the remainder of the meeting.

If a quorum of Voting Members is present, each matter requiring the approval of the Voting Members shall require the approval of a Supermajority Interest of Voting Members present in person or by proxy, unless otherwise provided by law, the Certificate of Formation or this Operating Agreement.

Section 1.10. <u>Voting of Interests</u>.  A Voting Member that is a corporation may vote by the officer, agent or proxy designated by the by-laws of the Voting Member; or, in the absence of any applicable by-law, by such person as the board of directors of the Voting Member may designate.  Proof of such designation may be made by presentation of a certified copy of the by-laws, corporate vote or other instrument of the Voting Member.  In the absence of any such designation, or in case of a conflicting designation by the Voting Member, the chairman of the board, president, any vice

-3-

president (in order of rank or seniority), secretary and treasurer of the Voting Member shall be presumed to possess, in that order, authority to vote on behalf of such Voting Member.

A Voting Member that is a partnership may vote by any general partner thereof or any person designated in writing by all of the general partners. Proof of a general partner's status may be established by presentation to the other Voting Members of a certified copy of the partnership agreement therefor and any certificates as to factual matters reasonably required by the other Voting Members.

A Voting Member that is any form of entity other than a corporation or partnership may vote in any manner authorized by a Supermajority Interest.

Section 1.11. Action by Members Without a Meeting. Any action required or permitted to be taken at any annual, regular or special meeting of Voting Members of the Company may be taken without a meeting and without prior notice, if consents in writing, setting forth the action so taken, shall be signed by Voting Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Voting Members were present and voted. In order to be effective, the written consents must be dated and signed by each consenting Voting Member and shall be effective as of the date when the last Voting Member necessary to make such written consent effective under the terms of the preceding sentence has signed such written consent.

Within ten (10) days after obtaining such authorization by written consent, written notice fairly summarizing the material features of the action taken by the written consent shall be given to those Voting Members who have not consented in writing; provided, however, that failure to give such notice to any of such Voting Members shall not invalidate or otherwise adversely affect the action taken by the written consent.

Section 1.12. Telephone Conference and Electronic Media. To the extent not prohibited or restricted by law or the Certificate of Formation, any meeting of the Voting Members may be conducted through the use of any means of communication by which all Voting Members participating may simultaneously hear each other during the meeting. A Voting Member participating in a meeting by this means is deemed to be present in person at the meeting.

Section 1.13. Proxy Voting. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Company before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy. A proxy may only be given verbally during a meeting taking place by teleconferencing and shall expire at the termination of said teleconference.

Blue Hill
1972

## ARTICLE II

### Ownership Interests

Upon its execution of this Operating Agreement, without the need for the consent or other action of any person or the need for any other agreement, Royall Associates Realty Trust, a Massachusetts trust, under a Declaration of Trust dated July 13, 1987 and recorded with the Norfolk County Registry of Deeds in Book 7658, Page 682, as the same may be amended of record to date, shall be admitted as the only Member of the Company, having contributed an undivided one hundred (100%) percent interest in the Property to the capital of the Company. Royall Associates Realty Trust shall own one hundred (100%) percent of the Percentage Interests in the Company.

This Article II shall be updated from time to time as is necessary to reflect accurately the information contained therein, including, without limitation, the admission of additional Members to the Company. Any revision to this Article II made in accordance with this Operating Agreement shall not be deemed an amendment to this Operating Agreement. Any reference in this Operating Agreement to this Article II shall be deemed to be a reference to this Article II as amended and in effect from time to time.

No Member shall be required to contribute or lend to the Company any additional amounts. If funds are needed, a Member may, but shall not be required to, contribute or lend monies to the Company. If a Member lends monies to the Company, those loans shall be repayable on demand, bear interest at an annual rate requested by the lending Member, such rate not to exceed eighteen (18%) percent per annum, and any and all such loans and interest thereon shall be repaid prior to any distributions to the Members.

No Member or Transferee shall have the right to receive property other than cash in return for its Capital Contributions unless a Supermajority Interest otherwise agrees in writing. No interest will be paid on Capital Contributions. No Member will be responsible or liable for the return of any Capital Contribution to any other Member.

The provisions of this Article II are not intended to be for the benefit of any creditor to whom any debts, liabilities or obligations are owed by the Company or any of its Members. No creditor shall obtain any rights under this Operating Agreement or shall by reason of this Operating Agreement have any right to make any claim with respect to any debt, liability or obligation against the Company.

## ARTICLE III

### Capital Accounts; Allocations of Net Profits and Net Losses

Section 3.1.  Capital Accounts.

(a)    An individual Capital Account shall be established and maintained for each Member. The original Capital Account established for any Member who acquires an interest in the Company by virtue of an assignment in accordance with the terms of this Operating Agreement shall be in the

-5-

Blue Hill
1973

same amount as, and shall replace, the Capital Account of the assignor of such interest and, for purposes of this Operating Agreement, such Member shall be deemed to have made the Capital Contributions made by the assignor of such interest (or made by such assignor's predecessor in interest). To the extent such Member acquires less than the entire interest in the Company of the assignor of the interest so acquired by such Member, the original Capital Account of such Member and its Capital Contributions shall be in proportion to the interest it acquires, and the Capital Account of the assignor who retains a partial interest in the Company, and the amount of its Capital Contributions, shall be reduced in proportion to the interest he or it retains.

(b)    The Capital Account of each Member shall be maintained in accordance with the following provisions:

(i)    to such Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Net Profits and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company assets that are distributed to such Member;

(ii)    to such Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any other Company assets that are distributed to such Member pursuant to any provision of this Operating Agreement, such Member's distributive share of Net Losses and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company; and

(iii)    in determining the amount of any liability for purposes of this subsection (b), there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the treasury regulations promulgated thereunder.

(c)    No Member shall ever have any obligation to contribute funds in order to restore his or its negative Capital Account.

Section 3.2.  Withdrawal or Reduction of Members' Contributions to Capital.

(a)    A Member shall not receive from the property of the Company any part of its Capital Contribution until all liabilities of the Company have been satisfied (whether by payment or reasonable provision for payment thereof).

(b)    A Member, irrespective of the nature of its Capital Contributions, has only the right to demand and receive cash in return for such Capital Contributions.

Section 3.3.  Net Profits and Net Losses.

(a)    Subject to the allocation rules of Section 3.4, Net Profits shall be allocated among the Members in proportion to such Members' Percentage Interests.

(b)    Subject to the allocation rules of Section 3.4, Net Losses shall be allocated among the Members in proportion to such Members' Percentage Interests.

-6-

Blue Hill
1974

Section 3.4. <u>Allocation Rules.</u>

(a)  In the event Members are admitted pursuant to this Operating Agreement on different dates, the Net Profits (or Net Losses) allocated to the Members for each year during which such Members are so admitted shall be allocated among the Members in proportion to the Percentage Interest each such Member holds from time to time during such year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Manager.

(b)  For purposes of determining the Net Profits, Net Losses or any other items allocable to any period, Net Profits, Net Losses and any such other items shall be determined on a daily, monthly, quarterly or other basis, as determined by the Manager using any method that is permissible under Section 706 of the Code and the treasury regulations promulgated thereunder.

(c)  Except as otherwise provided in this Operating Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for herein shall be divided among the Members in the same proportions as they share Net Profits and Net Losses.

(d)  The Members are aware of the income tax consequences of the allocations made by this Article III and hereby agree to be bound by the provisions of this Article III in reporting their shares of Company income and loss for income tax purposes.

Section 3.5. <u>Tax Allocations:  Section 704(c) of the Code.</u>

(a)  In accordance with Section 704(c) of the Code and the treasury regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

(b)  In the event the Gross Asset Value of any Company asset is adjusted pursuant to Paragraph (b) of the definition of "Gross Asset Value" contained in Article XIII hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the treasury regulations promulgated thereunder.

(c)  Any elections or other decisions relating to allocations under this Section 3.5, including the selection of any allocation method permitted under treasury regulation Section 1.704-3, shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Operating Agreement. Allocations pursuant to this Section 3.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items or distributions pursuant to any provision of this Operating Agreement.

-7-

**Blue Hill
1975**

Section 3.6.  Curative Allocations.

(a)     The provisions of this Agreement relating to the maintenance of Capital Accounts, the allocation of Net Profits or Net Losses and the distribution of Distributable Cash to the Members are intended to comply with the requirements of the Allocation Regulations by causing the amount of such Net Profits or Net Losses to be allocated to and among the Capital Accounts of the Members so that the Capital Accounts of each Member as of the end of each fiscal year of the Company is equal to the Hypothetical Liquidation Amount distributable to such Partner minus such Member's Share of Company Minimum Gain and Share of Member Minimum Gain, if any.  In addition, such provisions are intended to cause the amount distributable to the Members in an actual distribution pursuant to Article VIII to equal the amount that would be distributable to each Member if Article III and/or Article V rather than Article VIII applied to such distribution.

(b)     If the Company is advised at any time by its accountants or by tax counsel that the allocations of Net Profits or Net Losses for any fiscal year of the Company are unlikely to be respected for tax purposes or that an actual distribution to the Members at the end of such fiscal year computed in accordance with Article VIII would not result in each Member receiving the amount that he would have received if Article III and/or Article V rather than Article VIII applied to such hypothetical distribution, the Manager is authorized and empowered, without the Approval of the Members, to amend the provisions of this Agreement relating to the allocation of Net Profits or Net Losses (other than the Regulatory Allocations) for such fiscal year (and for subsequent fiscal years if necessary) to cure such defect consistent with the principles of Section 3.6(a) above.

Section 3.7.  Operating Distributions.  The Company shall at least once annually distribute Distributable Cash, if Distributable Cash is available, to Members in accordance with their Percentage Interests.

## ARTICLE IV

## Loans by Voting Member

A Voting Member may extend a loan or loans to the Company to pay operating expenses of the Company or for any other legitimate Company purpose with the approval of, and upon such terms as agreed to by those Original Voting Members (including for this purpose the Member(s) agreeing to make the loan(s) to the Company) holding a Supermajority Interest (or, if there are then no Original Voting Members then holding a Supermajority Interest), or as otherwise permitted in Article II hereof.  The determination of what constitute a legitimate Company purpose shall be made by the Manager in its sole discretion.

## ARTICLE V

## Rights and Obligations of Members

Section 5.1.  Limitation of Liability.  Except as otherwise provided in this Operating Agreement or the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and

-8-

Blue Hill

no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

Section 5.2. <u>List of Members</u>. Upon the written request of any Member for any purpose reasonably related to such Member's interest in the Company, the Manager shall provide to such Member a list showing the names, addresses and Membership interests of all Members.

Section 5.3. <u>Company Books</u>. The Manager shall maintain and preserve the accounts, books and other relevant Company documents. Upon reasonable written request, each Member shall have the right, at a time during ordinary business hours, as reasonably determined by the Manager, to inspect and copy, at the requesting Member's expense, the books and records of the Company for any purpose reasonably related to such Member's interest.

Section 5.4. <u>Priority and Return of Capital</u>. No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section 5.4 shall not apply to loans made to the Company by a Member.

Section 5.5. <u>Liability of a Member to the Company</u>. A Member who receives a distribution from the Company is liable to the Company or to others only to the extent provided by the Act and other applicable law.

<div align="center">ARTICLE VI</div>

<div align="center"><u>Transfers of Interests</u></div>

Section 1. <u>Transfers</u>. Notwithstanding anything to the contrary contained herein, no Member shall be permitted to transfer his, her or its interest in the Company without the prior written consent of a Supermajority Interest of the Original Voting Members, which may be withheld in their sole discretion. A Transferee shall not become a Member or Voting Member unless the Original Voting Members holding a Supermajority Interest agree in writing to the admission of the Transferee as a Member or Voting Member, as the case may be. If there are then no Original Voting Members, either of the foregoing may be accomplished by the prior written consent of the Voting Members then holding a Supermajority Interest.

A Transferee that does not become a Voting Member shall have no right to vote on any matter upon which Voting Members may vote, and shall only have the right to profits, losses, capital and distributions allocated upon to the transferred interest.

Any person or entity succeeding to the interest of a Member pursuant to the terms of this Article VI (a "Substitute Member"), whether as an Assignee or Transferee, shall assume and be subject to all of the applicable obligations of the transferring or assigning Member set forth in this Operating Agreement, including, without limitation, the provisions of Article IV hereof. In the event such Substitute Member shall fail to abide by the terms of this Operating Agreement, the transfer or Assignment of such interest to a Substitute Member, at the sole option of the Original Voting Members holding a Supermajority Interest (or, if there are then no Original Voting Members, by the

<div align="center">-9-</div>

<div align="right">Blue Hill<br>1977</div>

Voting Members then holding a Supermajority Interest), shall be deemed null and void and of no force or effect.

Section 2. <u>Restrictions.</u> In no event shall all or any part of a Member's Percentage Interest be Assigned to a minor or to an incompetent (other than to a member of a Member's Immediate Family).

The Manager may require as a condition of any Assignment of any Percentage Interest, that the assignor (i) assume all costs incurred by the Company in connection therewith, and (ii) furnish it with an opinion of counsel satisfactory to counsel to the Company that such sale, transfer, exchange or other disposition complies with applicable Federal and state securities laws and will not cause the Company to be taxed as an association.

Any Assignment in contravention of any of the provisions of this Operating Agreement shall be void and ineffectual and shall not bind, or be recognized by, the Company.

Section 3. <u>Assignees.</u> In the event of the death or incapacity of any Member, his legal representatives shall have such rights as are afforded them by law. The death of a Member shall not dissolve the Company.

An Assignee of a Member who does not become a Substitute Member in accordance with the provisions this Operating Agreement shall, if such Assignment is in compliance with the terms of this Operating Agreement, have the right to receive the same share of Net Profits, Net Losses and distributions of the Company to which the assigning Member would have been entitled if no such Assignment had been made by such Member.

Any Member who shall Assign all his interest in the Company shall cease to be a Member of the Company, and shall no longer have any rights or privileges or obligations of a Member except that, unless and until the Assignee of such Member is admitted to the Company as a Substitute Member in accordance with the provisions of this Operating Agreement, said assigning Member shall retain such statutory rights and be subject to all obligations of Members under this Operating Agreement and shall further be subject to such statutory obligations as may be applicable.

In the event of any Assignment of a Member's Percentage Interest, there shall be filed with the Company a duly executed and acknowledged counterpart of the instrument making such Assignment; such instrument must evidence the written acceptance of the Assignee to all the terms and provisions of this Operating Agreement; and if such an instrument is not so filed the Company need not recognize any such Assignment for any purpose.

An Assignee of a Member's interest as a Member who does not become a Substitute Member as provided in this Operating Agreement and who desires to make a further Assignment of his Percentage Interest shall be subject to the provisions of this Article VI to the same extent and in the same manner as any Member desiring to make an Assignment of his Percentage Interest.

<div align="center">-10-</div>

# ARTICLE VII

## Admission of New Voting Members

The Company may admit a person or entity as a Voting Member only if those Original Voting Members holding a Supermajority Interest consents thereto in writing. If there are then no Original Voting Members, then the foregoing shall be effected by written consent of the Voting Members then holding a Supermajority Interest.

# ARTICLE VIII

## Dissolution

Section 8.1. Events of Dissolution. The Company shall be dissolved upon the occurrence of any of the following:

    (a)    the sale or other disposition of all of the assets of the Company;

    (b)    the unanimous written agreement of all Members to dissolve; or

    (c)    upon the occurrence of any of the events described in Section 18-801(4) or (5) of the Act.

Each Member acknowledges and agrees that it shall not be permitted to resign as a Member of the Company and agrees to indemnify and hold harmless the Company and its Members from any and all loss, cost damage and expense, including reasonable attorneys' fees, sustained by the Company and/or its Members on account of any breach its agreement contained in this Article VIII. Any resignation shall not cause a dissolution of the Company.

Upon the death, retirement, resignation, Bankruptcy or dissolution of a Voting Member (except for an involuntary dissolution caused by the failure of such Voting Member to file an annual or other periodic report, if such Voting Member is reinstated within ninety (90) days after such voluntary dissolution), such Voting Member shall thereupon automatically become a Non-Voting Member.

Section 8.2. Distributions Upon Dissolution. In settling accounts after dissolution of the Company, the assets of the Company shall be applied in the following order:

    (a)    To pay those liabilities to creditors, in the order of priority as provided by law, including repayment of loans made by Members to the Company and amounts due from the Company to third party creditors, but excluding repayment to Members and Transferees of their contributions of capital to the Company;

    (b)    Those liabilities to Members and Transferees in respect of their contributions to capital of the Company; and

Blue Hill
1979

(c)     To the Members in accordance with their Percentage Interests.

Section 8.3.  Certificate of Cancellation.  If a dissolution of the Company occurs and all debts, liabilities and obligations of the Company have been satisfied (whether by payment or reasonable provision for payment) and all of the remaining property and assets of the Company have been distributed, a certificate of cancellation as required by the Act shall be executed and filed by the Manager of the Company, as an authorized person within the meaning of the Act, with the Secretary of State of the State of Delaware.

Section 8.4.  Effect of Filing Certificate of Cancellation.  Upon the filing of a certificate of cancellation with the Secretary of State of the State of Delaware pursuant to Section 8.3, the existence of the Company shall cease.

## ARTICLE IX

## Representations, Warranties and Covenants by the Members

Each Member represents to the Company and the other Members that it is duly authorized to enter into this Operating Agreement and to perform its obligations hereunder, and it has the ability to perform its obligations hereunder and if it is not a natural person, that it has been duly organized and is validly existing under the laws of the state of its organization.

Each Member (the "Indemnitor") shall indemnify and hold the Company and the other Members (collectively, the "Indemnitees") harmless from any and all liabilities, obligations, claims, contingencies, damages, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) that any or all of the Indemnitees may suffer or incur as a result of, or relating to: (a) the breach by the Indemnitor of any of the representations, warranties, covenants or agreements made by the Indemnitor in this Operating Agreement; (b) the gross negligence or intentional misconduct of the Indemnitor; or (c) acts by the Indemnitor that exceed the Indemnitor's authority under this Operating Agreement or as granted to such Indemnitor by the requisite vote, under this Operating Agreement, of the Members.

## ARTICLE X

## Amendment

This Operating Agreement may be amended only upon the written consent of a Supermajority Interest, except that any provisions hereof that require the consent of all of the Voting Members may be amended only upon the written consent of all of the Voting Members.

## ARTICLE XI

## Rights and Duties of Members

Section 11.1.  Management.  The business and affairs of the Company shall be managed by a manager (the "Manager") in accordance with this Operating Agreement.  Blue Hills Management

-12-

Blue Hill
1980

Corp. shall be the initial Manager of the Company. The Manager shall direct, manage and control the business and affairs of the Company. Except for situations in which the approval of all or a specified percentage of the Members is expressly required by this Operating Agreement or by a nonwaivable provision of the Act, the Manager shall make all decisions regarding matters relating to the Company and perform any and all other acts or activities necessary, appropriate, convenient, advisable or incidental to the management of the Company's business.

Section 11.2. <u>Certain Powers.</u>

(a)  The Manager shall have power and authority, on behalf of the Company to:

(i)   acquire property from any person as the Manager may determine, whether or not such person is directly or indirectly affiliated or connected with any Member;

(ii)  borrow money from banks, other lending institutions, any Member, or Affiliates of any Member, on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or, to the extent permitted under the Act and this Operating Agreement, by agents or employees associated with the Company unless expressly authorized by the Members to contract such debt or incur such liability;

(iii) purchase liability and other insurance to protect the Company's property and business;

(iv)  hold, own, operate and dispose of the Company's real and personal properties;

(v)   invest funds of the Company in time deposits, short-term governmental obligations, commercial paper or other investments;

(vi)  sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan as long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(vii) execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases and any other instruments or documents necessary, appropriate or convenient, advisable or incidental to the business of the Company;

(viii) employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(ix)  pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

Blue Hill
1981

(x)    enter into any and all other agreements on behalf of the Company; and

(xi)   do and perform all other acts as may be necessary, appropriate, convenient, advisable or incidental to the conduct of the Company's business.

(b)    The unanimous vote of all of the Members shall be required for the Company to merge or consolidate with or into, or convert into, another business entity. Unless authorized to do so by this Operating Agreement or by the Members, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge the Company's credit or to render the Company liable for any purpose. No Member shall have any power or authority to bind the Company unless such Member shall have been authorized by the Members to act as an agent of the Company.

Section 11.3. <u>Liability for Certain Acts</u>. The Manager and each Member shall perform its duties as a Member of the Company in good faith, in a manner it reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. Neither the Manager nor any Member shall be liable to the Company or to any other Member for any loss or damage sustained by the Company or such Member unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager or such Member.

Section 11.4. <u>Members Have No Exclusive Duty to Company</u>. The Manager, any Member and all Affiliates thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Operating Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper. No Manager, Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company, even if such opportunity is of a character that, if presented to the Company, could be taken by the Company, and any Manager, Member or Affiliate thereof shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity.

Section 11.5. <u>Bank Accounts</u>. The Manager may from time to time open bank accounts in the name of the Company, and the Manager shall be the only signatory thereon, unless Members owning a Supermajority Interest determine otherwise.

Section 11.6. <u>Indemnity of the Members, Employees and Other Agents</u>.

(a)    To the fullest extent permitted by applicable law, the Manager, a Member, any Affiliate of the Manager or such Member, any officers, directors, shareholders, partners, members, employees, representatives or agents of the Manager or such Member, or their respective Affiliates or any employee or agent thereof (each, a "Covered Person") shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Operating Agreement, except that no Covered Person shall be entitled to be

-14-

Blue Hill
1982

indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of fraud, deceit, gross negligence, willful misconduct or a wrongful taking with respect to such acts or omissions; provided, however, that any indemnity under this Section 11.6 shall be provided out of and to the extent of the assets of the of the Company only, and no Covered Person shall have any personal liability on account thereof.

(b)     To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 11.6.

(c)     The Company may purchase and maintain insurance, on behalf of Covered Persons and such other persons as the Manager shall determine, against any liability that may be asserted against or expenses that may be incurred by any such person in connection with the activities of the Company or such indemnitees, regardless of whether the Company would have the power to indemnify such person against such liability under the provisions of this Operating Agreement. The Company may enter into indemnity contracts with Covered Persons and such other persons as the Manager shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this Section 11.6 and containing such other procedures regarding indemnification are appropriate.

Section 11.7.  Salaries.  The salaries and other compensation of the Manager shall be fixed from time to time by an affirmative vote of Members holding a Supermajority Interest.

## ARTICLE XII

## Miscellaneous Provisions

Section 12.1.  Binding Effect.  This Operating Agreement is binding upon and inures to the benefit of the Members, and, to the extent permitted by this Operating Agreement, their respective legal representatives, successors and assigns.

Section 12.2.  Remedies for Breach.  The limited liability company interests of each member are unique chattels and each party to this Operating Agreement shall have the remedies that are available to it for the violation of any of the terms of this Operating Agreement, including, but not limited to, the equitable remedy of specific performance (except as otherwise provided by this Operating Agreement).

Section 12.3.  Governing Law.  This Operating Agreement and the rights of the parties hereunder shall be construed pursuant to the laws of the State of Delaware (without regard to conflict of law principles).

Section 12.4.  Waiver of Action for Partition.  Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

Blue Hill
1983

Section 12.5. Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

Section 12.6. Construction. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

Section 12.7. Waivers. The failure of any party hereto to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

Section 12.8. Rights and Remedies Cumulative. The rights and remedies provided by this Operating Agreement are cumulative, and the use of any right or remedy by any party hereto shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties hereto may have.

Section 12.9. Headings. The headings and subheadings in this Operating Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Operating Agreement or any provisions hereof.

Section 12.10. Severability. If any provision or term of this Operating Agreement is found to be invalid, void or unenforceable, the remainder of the provisions of this Operating Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. It is the intent of the parties hereto for the terms and conditions of this Operating Agreement to be interpreted to the greatest extent possible so as to remain valid and enforceable, and any provision or term of this Operating Agreement found by a court to be invalid, void or unenforceable, shall be rewritten by the court pursuant to this intent.

Section 12.11. Creditors. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of: (a) the Company; or (b) any Member.

Section 12.12. Counterparts. This Operating Agreement may be signed in multiple counterparts, all of which should be deemed an original and shall constitute one instrument.

Section 12.13. Integration. This Operating Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

Section 12.14. Merger, Consolidation and Conversion of the Company. The unanimous vote of all of the Members shall be required for the Company to merge or consolidate with or into, or convert into, another entity.

Blue Hill
1984

# ARTICLE XIII

## Definitions

For purposes of this Operating Agreement, the following terms shall be defined as follows:

"Act" shall mean the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq., as amended from time to time.

"Affiliate" shall mean a person controlling, controlled by or under common control with the person specified.

"Agreement" shall mean this Operating Agreement, as amended, modified, supplemented or restated from time to time.

"Allocation Regulations" shall mean the Treasury Regulations issued under Sections 704(b), 704(c) and 752 of the Code, as the same may be modified or amended from time to time. In the event that the Allocation Regulations are revised or amended subsequent to the date of this Operating Agreement, references herein to sections or paragraphs of the Allocation Regulations shall be deemed to be references to the applicable sections or paragraphs of the Allocation Regulations as then in effect.

"Approval" shall mean approved or consented to in writing by all of the Members and a writing evidencing such approval or consent.

"Assignment" shall mean, with respect to a Percentage Interest or part thereof, any offer, sale, assignment, transfer, hypothecation, pledge, gift or any other disposition, whether voluntary or by operation of law. The term "Assign" shall mean to effect an Assignment.

"Bankruptcy" shall mean a bankruptcy under the Federal Bankruptcy Act or insolvency under any state insolvency act.

"Book Value" shall mean: (a) the fair market value of any of the Company's Property at the time of its contribution to the Company by a Member, which amount shall be (i) determined by agreement of the Members and reflected in the Capital Account of the contributing Member as its capital contribution to the Company with respect to such property, and (ii) properly adjusted in accordance with Section 1.704-(b)(2)(iv)(f) and (g) of the Allocation Regulations to reflect depreciation, depletion, amortization and gain or loss, as computed for book purposes with respect to such contributed property; or (b) in the case of all other property of the Company, its Federal adjusted tax basis.

"Capital Account" shall mean, with respect to any Member, the capital account maintained for such Member in accordance with the provisions of Article III hereof. A separate Capital Account shall be maintained for each Member's interest in the Company.

-17-

"Capital Contribution" shall mean, with respect to any Member, any contribution to the Company in cash or other property (at such property's initial Gross Asset Value) by such Member whenever made.

"Certificate of Formation" shall mean, as of any date, the Certificate of Formation of the Company, as amended on or prior to such date.

"Company Minimum Gain" shall be determined by computing, with respect to each Non-Recourse Liability of the Company, the amount of gain (of whatever character), if any, that would be realized by the Company if it disposed of (in a taxable transaction) the property subject to such Non-Recourse Liability in full satisfaction thereof (and for no other consideration), and by then aggregating the amounts so computed.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute.

"Deficit Restoration Obligation" shall mean, for each Member, the sum of: (a) his or its allocable share (as determined under Section 752 of the Code and the Allocation Regulations), if any, of any recourse indebtedness of the Company with respect to which he or it bears the economic risk of loss; (b) any unconditional obligation of such Member to contribute additional amounts to the capital of the Company within the time period specified in the Allocation Regulations (to the extent not previously taken into account in determining such Member's share of the recourse indebtedness of the Company described in clause (a) of this definition); (c) such Member's share of Company Minimum Gain, if any; (d) such Member's share of Member Minimum Gain, if any; and (e) the maximum amount he or it may be obligated to contribute to the Company upon termination of the Company (to the extent not previously taken into account for purposes of any of the foregoing clauses).

"Depreciation" shall mean an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for the relevant period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for the relevant period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by Members holding a Supermajority Interest.

"Distributable Cash" shall mean all cash, revenues and funds received by the Company which, in the reasonable discretion of the Manager, is available for distribution to the Members, after the payment of all liabilities which are then due and payable, as well as such Reserves as the Manager deems reasonably necessary for the proper operation of the Company's business.

"Gross Asset Value" shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

Blue Hill
1986

(a)    the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by Members holding a Supermajority Interest;

(b)    the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange fore more than a *de minimis* Capital Contribution; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of treasury regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) of this sentence shall only be made if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members; and

(c)    the Gross Asset Value of any Company asset that is distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Manager.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Paragraph (a) or Paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Hypothetical Liquidation Amount" shall mean, with respect to any Member, the amount that would be distributed to such Member as of the end of each fiscal year of the Company if the Company were dissolved and liquidated and (a) all Company assets were sold for cash equal to their Book Value, (b) all Company liabilities were paid, and (c) the remaining cash of the Company was distributed to such Member in accordance with the provisions of Articles III and/or Article V rather than Article VIII.

"Immediate Family" shall mean with respect to any person, his spouse, parents, parents-in-law, issue, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children-in-law and grandchildren-in-law.

"Member" shall include: (a) those persons or entities listed in Article II; and (b) persons or entities hereafter admitted as members of the Company in accordance with this Operating Agreement.

"Member Minimum Gain" shall mean Company Minimum Gain attributable to Member Non-Recourse Debt.

"Member Non-Recourse Debt" shall mean any Non-Recourse Debt of the Company for which no Member bears the economic risk of loss (as defined in the Allocation Regulations).

"Member Non-Recourse Deductions" shall mean items of Company loss, deduction or Section 705(a)(2)(B) expenditures that are attributable to Member Non-Recourse Debt. For any Company taxable year, the amount of Member Non-Recourse Deductions with respect to any

Blue Hill
1987

Member Non-Recourse Debt equals the excess, if any, of the amount of the net increase during such year in the amount of Member Minimum Gain attributable to such Member Non-Recourse Debt over the aggregate amount of any distributions during such year to the Member that bears the economic risk of loss for such debt or proceeds of such debt that are allocable to an increase in the Member Minimum Gain attributable to such debt.

"Members" shall mean all Non-Voting Members and Voting Members.

"Net Profits" and "Net Losses" shall mean for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss for this purpose all items of income, gain, loss or deduction that are required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits and Net Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     any expenditures of the Company that are described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to treasury regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c)     in the event the Gross Asset Value of any Company asset is adjusted in accordance with Paragraph (b) or Paragraph (c) of the definition of Gross Asset Value above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(d)     gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; and

(e)     in lieu of the Depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition of "Depreciation" above.

"Non-Recourse Liability" shall mean any Company liability (or portion thereof) for which no Member bears the economic risk of loss (as defined in the Allocation Regulations).

"Non-Voting Members" shall mean Voting Members that have become Non-Voting Members under the terms of this Operating Agreement.

"Original Voting Members" shall mean those Voting Members who are Voting Members as of the date hereof or an assignee thereof who is a member of such Original Voting Member's

Blue Hill
1988

Immediate Family.  Except as provided in the immediately preceding sentence, no assignee of an Original Voting Member, regardless of whether such assignee becomes a Substitute Member, shall ever be considered an Original Voting Member.

"Percentage Interest" shall mean, for any Member, such Member's Percentage Interest as set forth in Article II, which Percentage Interest may be changed from time to time by the unanimous vote of the Members.

"Property" shall mean the real and personal property in Canton, Massachusetts, located at 150 Royall Street, and any other property as may hereafter be acquired by the Company.

"Regulatory Allocations" shall mean the allocations set forth in Article III hereof.

"Reserves" shall mean funds set aside or amounts allocated to reserves that shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the business of the Company, or incident to the liquidation of the Company pursuant to Section 12.03.

"Substitute Member" shall have the meaning set forth in Article VI, Section 1 of this Operating Agreement.

"Supermajority Interest" shall mean all of the Original Voting Members of the Company, or, if there are then no Original Voting Members, then the same percentage of Voting Members.

"Transferee" shall mean a permitted transferee of an interest in the Company owned by a Member or its Affiliate.

"Voting Members" shall mean (a) all of the undersigned Members to this Operating Agreement, except any Member that becomes a Non-Voting Member under the terms of this Operating Agreement; and (b) any individual or entity that is approved as a Voting Member upon a vote of all of the Voting Members.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

-21-

Blue Hill
1989

The undersigned have hereby executed the foregoing Limited Liability Company Operating Agreement as of the ___19th___ day of September, 1999.

SOLE MEMBER:

ROYALL ASSOCIATES REALTY TRUST

_Michelle Leville_
Witness

By: _Gerald S. Fineberg_
Gerald S. Fineberg, its Trustee
and not individually

_Judi Bance_
Witness

By: _____
William J. Langelier, its Trustee
and not individually

SOLE MANAGER:

BLUE HILLS MANAGEMENT CORP.

_Michelle Leville_
Witness

By: _Gerald S. Fineberg_
Gerald S. Fineberg, its President
and Treasurer

134140-1450/9547

-23-

Blue Hill
1990

# BLUE HILLS OFFICE PARK LLC

## FIRST AMENDMENT TO LIMITED LIABILITY COMPANY OPERATING AGREEMENT

Reference is made to the Limited Liability Operating Agreement of Blue Hills Office Park LLC (the "Company") dated as of September 14, 1999 (the "Agreement"), the Certificate of Formation of which was filed with the Delaware Secretary of State on September 14, 1999 (the "Certificate"), which Certificate was amended by a First Amendment to Certificate of Formation filed with the Delaware Secretary of State on September 14, 1999 (the "Amended Certificate").

The undersigned desire to amend the Agreement as follows:

1.     For so long as any mortgage lien held by Credit Suisse First Boston Mortgage Capital LLC (the "Lender") exists on the real property commonly known as and numbered 150 Royall Street, Canton, Massachusetts (the "Property") and owned of record by the Company, the sole purpose of the Company shall be as set forth in the Amended Certificate.

2.     For so long as any mortgage lien held by Lender exists on the Property, the Company shall be prohibited from engaging in the activities set forth in the Amended Certificate and shall otherwise observe the the covenants contained in the Amended Certificate.

Except as amended hereby, the Agreement shall remain in full force and effect unchanged.

EXECUTED as a sealed instrument as of the 14th day of September, 1999.

MANAGER:                         BLUE HILLS MANAGEMENT CORP.

                                 By: _____
                                     Gerald S. Fineberg, its President and
                                     Treasurer

SOLE MEMBER:                     ROYALL ASSOCIATES REALTY TRUST

                                 By: _____
                                     Gerald S. Fineberg, its Trustee
                                     and not individually

                                 By: _____
                                     William J. Langelier, its Trustee
                                     and not individually

184143-14900/9347

*In the event of any inconsistency between the terms of the Agreement   Operating   and the Amended Certificate, the terms of the Amended Certificate shall control.

Blue Hill
1991