UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>　　　Plaintiff, Defendant-in-Counterclaim,<br><br>　　　v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and, CSFB 1999–C1 ROYALL STREET, LLC,<br><br>　　　Defendants, Plaintiffs-in-Counterclaim,<br><br>　　　v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>　　　Defendants-in-Counterclaim. | Civil Action No.  05-CV-10506 (WGY) |

## AFFIDAVIT OF ERIC S. STOTZ IN SUPPORT OF DEFENDANTS' AND COUNTERCLAIMANTS' MOTIONS FOR SUMMARY JUDGMENT

I, Eric S. Stotz, depose and say as follows:

　　　1.　　Attached as exhibit A is a true and correct copy of my expert report in this matter.

　　　2.　　Attached as exhibit B is a true and correct copy of my expert rebuttal report in this matter.

　　　3.　　The factual statements in the two reports that are made upon my personal knowledge are true, and I believe to be true the factual statements not made on personal knowledge.

　　　4.　　My opinions set forth in the reports are good faith, truly held opinions based on facts stated in the report.

Signed under the pains and penalties of perjury this _15_ day of May, 2006.

_____
Eric S. Stotz

# STOTZ AFFIDAVIT EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>    Plaintiff, Defendant-in-Counterclaim,<br><br>    v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and, CSFB 1999–C1 ROYALL STREET, LLC,<br><br>    Defendants, Plaintiffs-in-Counterclaim,<br><br>    v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>    Defendants-in-Counterclaim. | Civil Action No. 05-CV-10506 (WGY) |

## **MANUAL FILING NOTIFICATION**

Defendants give notice of the manual filing with the Clerk's office of **Exhibit A to the Affidavit of Eric S. Stotz** due to its voluminous size.

Dated: May 17, 2006

~BOST1:419119.v1

# STOTZ AFFIDAVIT
# EXHIBIT B

EXHIBIT
Stotz
343
xc 4/21/06

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>Plaintiff, Defendant-in-Counterclaim.<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1,<br><br>and<br><br>CSFB 1999–C1 ROYALL STREET, LLC;<br><br>Defendants, Plaintiffs-in-Counterclaim,<br><br>v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>Defendants-in-Counterclaim. | Civil Action No. 05-CV-10506 (WGY) |

## EXPERT REBUTTAL REPORT OF ERIC S. STOTZ

**Introduction.**

I was asked by counsel of J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and CSFB 1999–C1 ROYALL STREET, LLC; to review the expert report produced by Kenneth D. Gartrell dated March 31, 2006. Specifically, I was asked to review his estimate of fair market value of the property located at 150 Royall Street in Canton, MA (the subject property).

1

**Summary of Opinion on Gartrell's Expert Report:**

After reviewing Gartrell's valuation analyses, I am of the opinion that his valuation analyses do not accurately reflect the fair market value of the subject property. The reasons for my opinion are summarized as follows.

1) The first analysis used, the so-called "Market Index Approach" is not a generally accepted methodology for applying a value to real estate (the <u>Uniform Standards for Professional Appraisal Practice</u> (USPAP) recognizes only three methodologies – the cost approach, the sales comparison approach, and the income approach, and does not list an "Index" type approach). Further Gartrell's Market Index Approach ignores the most important component of a real estate valuation technique – the current condition and status of the subject property as of the date of valuation.

2) Gartrell's "Comparable Transaction" approach, which corresponds somewhat to the recognized Sales Comparison Approach, was not developed following the standard methodology of the industry. Gartrell first lists 22 office building transactions, and then applies the same Market Index (as used in his Market Index Approach) to adjust the sales to the effective date of appraisal, but fails to make any additional adjustments. Gartrell then states that the most comparable property is 250 Royall Street, which was sold twice between 2003 and 2005. Even with his focus on a single property, Gartrell ignores the obvious differences between 250 Royall Street and the subject property, and fails to make any of the numerous adjustments typically applied in standard appraisal practice. The only attempt at any adjustment is the application of his "Market

Index Approach", which, by ignoring the differences between the buildings results in a mis-leading valuation conclusion.

3) Gartrell's third approach, "Discounted Cash Flow", is an accepted method of valuation. However, his assumptions are unsupported and unreasonable, including that the property, in 2005 through 2007, would lease up at the same market rate set for the property in 1999, adjusted solely by the same data as used in the "Market Index Approach". Gartrell's approach for estimating market rent is not a recognized methodology commonly used or accepted in the appraisal field. He supports his assumption of market rent by the same flawed methodology used in the "Market Transaction" analysis, by presenting rents observed in the market without attempting to adjust them to more closely compare them to the subject property.

I.  **Market Index Approach**

Gartrell states that the "Market Index Approach" is a "generally-accepted approach" for deriving an independent measure of the FMV of the subject property. However, in my 20+ years of experience in valuing commercial real estate, I have never heard of this approach. I researched various sources for this term, and was only able to find references to the valuation of stock issues and/or the intent of certain investment funds ("index fund" that attempts to track the result of a certain target market), and a reference for forward-looking electric rate setting by electric utility companies. No reference to this approach was found in any real-estate appraisal-related sources. Most telling, however, is the lack of mention in the <u>Uniform Standards of Professional Appraisal Practice</u>

(USPAP), which recognizes three methodologies for valuing real estate: the cost approach, the sales comparison approach, and the income approach (Standards Rule 1-4 (a), (b), and (c)).

The deficiencies in this approach include the following.

1) Gartrell's approach ignores the status or condition of the subject property as of the valuation date by using as a base value an appraised value from 1999 and applying increases or decreases in that value based on the results of trends shown in a market-wide value index. There are significant differences between the condition of the subject property and its environs between the date of the 1999 appraisal and the date of foreclosure in late 2004. These include the fact that in 1999, the subject property was fully occupied, while in late 2004, the building had been vacant since the end of July, and brokers who were attempting to lease the property for the prior 18 months had not been successful in finding a tenant for the property. I learned this during the fieldwork phase of my appraisal of the subject property in the fall of 2004. In my appraisal practice, I personally inspect every building I appraise, both the interior and exterior. In the case of the subject, I was given the name of Mr. Joseph Donovan as a "property contact" to make arrangements to inspect the property. I contacted Mr. Donovan (sometime after being engaged to perform the appraisal on September 21, 2004 and prior to the date of inspection on October 18, 2004) and made arrangements for the property inspection with Mr. Larry Needle (property manager). It is my practice to always ask what the current condition and/or situation is with the building I am

4

appraising during these initial conversations. During my conversation with Mr. Donovan, I recall him using the phrases "give the keys back" (to Lennar) and "bleeding money". Mr. Donovan said in substance that they were planning to walk away from their investment in the property due to the lack of tenant prospects and high holding costs associated with owing a vacant investment property (real estate taxes, debt service, insurance, security, maintenance, etc.). When I inspected the subject property, Mr. Needle informed me that they had been unsuccessful in finding a tenant and were, in fact, "giving the keys back" to Lennar because the carrying costs of the property were high and their expectations of finding a tenant in the coming years so low. Also, in 1999, the subject had an arguably better location due to views to/from the subject to I-93/I-95. In 2002, the adjacent building at 250 Royall Street was built and a multi-level parking structure was added in 2003-2004 that partially obstructed the view of the subject building from the highway.

2) The Market Index referenced by Gartrell was derived from the Global Real Analytics National Real Estate Index: Market History Report; Boston CBD Office & Suburban Office, and Metro Market Outlook Report, 1985-2005. These index reports, as produced by Global Real Analytics, have their own limitations. They compile approximately 1,000 to 1,500 transactions within their 58 markets tracked, which averages to 17 to 25 transactions per market, an unspecified "many" of which are utilized to formulate local market benchmark prices. Also, the transactions include 6 different property types, implying an average of 3 to 5 transactions per property type per quarter are being reported for each market.

Global Real Analytics admits that "typically, in such cases, benchmark prices will reflect activity over more than one period (i.e. a 'rolling quarter average'). In those markets and property sectors where there is inadequate current investment activity to justify reporting a pure transaction-based price, the benchmark value is formulated based on historical sales data and current market factors, including the operating performance of 'like-kind' properties within the respective market and property sector. We realize, of course, that this necessitates an element of 'informed judgment' but disparities in local market size and liquidity over time sometimes dictate a modified, 'hybrid' approach." (quotes and information taken from "Methodology" section of their website selling Global Real Analytics index service – "www.graglobal.com"). These admissions cast doubts on the reliability of the data used to produce the index.

3) Further, the properties tracked are Class A properties, which typically reflect more investor interest than Class B properties. The subject, as of 2004, being close to 20 years old and not recently renovated, represents Class B space, so applying an index that bases changes on transactions of Class A buildings only is potentially misleading when applied to Class B buildings.

4) Also, the Global index likely overstates the recovery for a larger, older building such as the subject because the index includes buildings of all sizes. The index is likely skewed toward the market for smaller buildings due to the much larger pools of users looking for smaller spaces and investors who can afford to buy smaller buildings resulting in a higher number of smaller-building transactions. A

smaller-building based index overstates the recovery in value of larger buildings like the subject, which are not in as much demand by either tenants or investors.

## II.   Comparable Transaction Methodology

Gartrell reported that he identified 22 separate transactions between 2002 and 2004 for use in his Comparable Transaction section. In Paragraph 54, he states that "The sale price of a real estate asset depends critically on factors such as its specific location, its state of repair, its design and configuration as well as the terms of any tenants occupying or likely to occupy the building in question." This statement acknowledges that these factors are important, but he ignores them in his prior "Market Index Valuation". Additionally, he ignores these issues in this approach as well. Instead, he applies the same flawed Market Index Valuation methodology to the universe of the 22 transactions he collected, and applies a per square foot price, with no adjustments made to the comparable sales, to the subject's size to arrive at a range of values for the subject. This listing of transactions applied to a value index is not a recognized valuation methodology within a typical sales comparison approach. According to The Appraisal of Real Estate (12th Edition, 2001, as published by the Appraisal Institute) on page 426, the sales comparison approach will consider up to 10 factors of comparison, and make adjustments for each. One of these is "Market Conditions", which is comparable to Gartrell's Market Index adjustment. The lack of consideration of any of the other factors of adjustment results in a flawed analysis.

The flaw in this analysis is evident by examining the ranges of values illustrated by the comparable properties in their raw state and after adjustments are applied. The raw sales

data results in a range of unit values between $62.50 per square foot and $193.40 (Table 6.1 of Gartrell's report), or a spread of 209% between the low and high. After applying the valuation index adjustment to the sales data, the resulting "Indexed Purchase Price" unit values ranged between $60.52 and $201.56 per square foot (Table 6.3 of Gartrell's report), or a spread of 233%, a larger spread than the raw data showed.

The intent of a sales comparison approach is to make adjustments to the comparable sales to more closely compare them to the subject property, and the spread between the low and high unit values should be reduced through the adjustment process. The fact that the spread increases from the raw data to the "Indexed" data illustrates the folly in Gartrell's mixing of a sales comparison approach and his "market index methodology".

In paragraph 60, Gartrell reports that the high standard deviation in his sample (after indexing) indicates that "transaction prices are driven significantly by unobserved features of the transactions. In other words, the observed market average price from this relatively small sample of transactions is an unreliable predictor of the likely FMV of a specific property because there is no way to control for underlying property differences which are unobserved but which drive transaction prices." The fact that there are numerous distinctive features about properties that drive their value or valuation is why appraisers don't simply use averages and indices to value real estate. Rather, appraisers make a point of inspecting properties to assess the features that drive value (that are apparently unobserved by Gartrell) so they can make informed adjustments required by proper application of the sales comparison approach.

8

Gartrell does single out one property he presents as a "very close comparable to the Property". The building located at 250 Royall Street sold in August of 2003 to DST Realty (affiliate company at the time of Equiserve, the subject building's previous tenant), and then sold again from DST Realty to an affiliate of Inland Real Estate Group of Companies, an Oakbrook, IL based commercial real estate and finance company. He adjusts the first transaction's selling price by his "Index" to arrive at a value for the subject as of year end 2004 of $35.5 million based on a unit price of $129.51[1]. Again, he does not attempt to adjust the sale to more closely compare it to the subject, and this lack of proper methodology significantly overstates the value. The 250 Royall Street building, at the time of sale, was newly constructed, and any real estate professional (or licensed real estate appraiser) would consider this factor superior to the subject property in this regard and apply a downward adjustment for the fact. Also, the 250 Royall Street property is approximately 85,000 square feet smaller than the subject property, which also typically requires a downward adjustment (based on the fact that a larger building will typically sell for less on a per unit basis than a comparable smaller building). The building at 250 Royall Street has a superior location compared to the subject, based on exposure to I-93/I-95, which should also result in a downward adjustment to the unit price.

As part of my practice, I regularly research and confirm comparable sales for valuations

---

[1] Gartrell states in his paragraph 63 in his expert report that this value ($35.5 million) is as of August 2003, but, based on his analysis in paragraph 63, I have assumed that this is a typo and the value is as of year end 2004.

9

of real estate. In the case of 250 Royall Street, I recently discussed this sale with a representative of the seller, Mr. Tom McGhee of DST Realty. DST Realty is a wholly owned subsidiary of DST Systems. DST Systems was the parent company of Equiserve (the subject's tenant) before they sold Equiserve to an Australian company called Computershare in June 2004. According to Mr. McGhee, DST purchased 250 Royall Street from National Development of New England in August of 2003, when that building was still in shell condition (no interior build-out or final landscaping). DST subsequently spent over $20 million on interior build-out and the construction of an attached parking structure (that was the subject of legal action by the subject property's owners, who tried to block the construction of the garage). At the time of the sale of the Equiserve business to Computershare, DST Realty entered into a 15-year lease with Equiserve (whose parent company was DST Systems).

DST Systems sold Equiserve to Computershare for $216 million in cash plus 29.6 million shares of Computershare stock (total transaction valued at roundly $292 million). Subsequent to the sale of the business, DST Realty sold the real estate at 250 Royall Street to an affiliate of Inland Real Estate Group of Companies. Mr. McGhee indicated that the sales price paid was based on an approximately 7% overall capitalization rate, which applied to the reported purchase price of $68,777,000 indicates an income from the property of $4,814,300, or roundly $26 per square foot of building area (based on the 185,171 rentable square feet reported by CoStar Comps). This level of income can be roughly compared to the net lease rate for this property. The high price paid for this building in this transaction is reflective of the long term lease in place (15 years, with

13.5 years left at the transaction date and 3 five-year extension options), the high quality and credit worthiness of the tenant in place (the lease was guaranteed by Computershare), and the young age, superior location, and better condition of this property compared to the subject. Gartrell does not attempt to make any comparisons for these factors, and implies that the subject "would be valued at over $94 million" based on this information. While he doesn't offer the opinion that the subject is worth $94 million, it seems to have influenced him. At the conclusion of the section, he states "the Property was at least $35.5 million as of the date of foreclosure on November 19, 2004, and it likely was significantly higher." As I've set forth here and in my expert report dated March 31, 2006, the differences between the properties, which are apparently still unobserved by Gartrell, result in a value significantly less than $35.5 million.

### III.  Discounted Cash Flow Methodology

The discounted cash flow methodology (DCF) is an accepted valuation methodology, best used when there is a good track record of income from a commercial property. I consider several assumptions made within Gartrell's DCF to be unsupported or not reflective of the subject property, which skew the results significantly.

The most damaging assumption in this approach is the use of a rent that was set in 1999 for the subject's lease extension with Equiserve as a base (i.e. $17 per square foot), then adjusting it by his flawed "Market Index" methodology to arrive at $17.97 per square foot at year end 2004, and then increasing it further by 1.5% per year from 2004 throughout the lease up period (between 2005 and 2007). In my appraisal of the subject

11

property in October, 2004, I collected six comparable rentals for comparable buildings within the local market. These rents, prior to adjustments, ranged between $13.00 and $14.92 per square foot on a triple net basis. After adjustments, I concluded that a base rental rate of $12.25 per square foot, with a $1.00 step in year 5 (mid-point of an assumed 10-year lease term) was representative of an achievable rent for the subject property as of October, 2004. The methodology used in my appraisal is similar to the 1999 appraisal by M&G, and reflects current market conditions as of the effective dates of appraisal, and is the recognized approach for arriving at a market rent for an office building (see <u>USPAP</u> Standards Rule 1-4 (c) (i) as well as <u>The Appraisal of Real Estate</u>, 12th Edition, pages 499-501). Gartrell's significant overstatement of the market rent for the subject property results in an overstatement of revenue for the subject property of nearly 50%. Under the discounted cash flow methodology, with the assumed net lease terms, almost all of the overstated revenue would flow to the bottom line and directly impact the value in nearly the same ratio. Based on this difference, with no support from the then-current market, any appraisal professional would not rely on Gartrell's rental level and resulting overstated value conclusions.

**Conclusions on Gartrell's Expert Report:**

After reviewing the expert report of Gartrell, it is obvious to me that he did not complete the basic tasks typically involved in the appraisal of real estate – personal inspection of the property being appraised or the properties used as comparables. Lack of this personal knowledge, combined with the methodology used, results, in my opinion, in a highly inflated value for the subject property as of the date in question (late 2004).

Also, in typical appraisal practice, the three recognized separate valuation methodologies (income approach, sales comparison approach, and cost approach) are developed on individual and independent bases separate from each other. After developing each of the three typical approaches on an independent basis, the three results from those approaches are reconciled to a final value number (see <u>The Appraisal of Real Estate</u>, 12th Edition, 2001, published by the Appraisal Institute, pages 62-65). In Gartrell's report, he uses his flawed Market Index methodology in each of his three sections, which, in effect, ensures similar results from all three approaches. This defeats the "check and balance" system of using three independent approaches, and reinforces the serious flaws pointed out in Gartrell's attempt at placing a value on the subject property.

Signed:

*[signature]*

Eric S. Stotz, MAI

Date: April 14, 2006