UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim,

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## AFFIDAVIT OF RONALD F. GREENSPAN IN SUPPORT OF DEFENDANTS' AND COUNTERCLAIMANTS' MOTIONS FOR SUMMARY JUDGMENT

I, Ronald F. Greenspan, depose and say as follows:

1.      Attached as exhibit A is a true and correct copy of my expert report in this matter.

2.      The factual statements in the report that are made upon my personal knowledge are true, and I believe to be true the factual statements not made on personal knowledge.

3.      My opinions set forth in the report are good faith, truly held opinions based on facts stated in the report.

Signed under the pains and penalties of perjury this **17**th day of May, 2006.

Ronald F. Greenspan

# GREENSPAN AFFIDAVIT EXHIBIT A

EXHIBIT

Greenspan
414

JFC  5-8-06

# EXPERT REPORT OF RONALD F. GREENSPAN

Submitted on behalf of Defendant and Plaintiff-in-Counterclaim in connection with Blue
Hills Office Park LLC (Plaintiff, Defendant-in-Counterclaim) v. J.P. Morgan Chase Bank
as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities
Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trust")
and CSFB 1999-C1 Royall Street, LLC (Defendants, Plaintiffs-in-Counterclaim) v.
William Langelier and Gerald Fineberg (Defendants-in-Counterclaim),
in the United States District Court for the District of Massachusetts,
Civil Action No. 05-CV-10506 (WGY)

## April 14, 2006

1.    I have been retained by DLA Piper Rudnick Gray Cary
LLP ("DLA Piper Rudnick") in connection with providing expert testimony in the
matter of Blue Hills Office Park LLC (Plaintiff, Defendant-in-Counterclaim)
("BHOP") v. J.P. Morgan Chase Bank as Trustee for the Registered Holders of
Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1 (the "Trust") and CSFB 1999-C1
Royall Street, LLC (Defendants, Plaintiffs-in-Counterclaim) v. William Langelier
and Gerald Fineberg (Defendants-in-Counterclaim) in the United States District
Court for the District of Massachusetts, Civil Action No. 05-CV-10506 (WGY)

2.    Attached hereto as Exhibit A is a list of the documents,
reports, models and data compilations that have been relied upon by me in the
preparation of this report.

3.    Attached hereto as Exhibit B is my current resume and
bibliography.

4.    Attached hereto as Exhibit C is my list of recent expert
testimony and deposition experience as required by the Federal Rules.

5.      I am a Senior Managing Director of FTI Consulting, Inc.   I lead the Corporate Finance Practice in the Western United States and the National Real Estate and Real Estate-Secured Debt Restructuring Practice.

6.      I have extensive experience involving the underwriting and securitization of loans secured by commercial property and the workout and restructuring of such loans.  From June 1985 until January 1987, I supervised and directed the commercial loan origination and underwriting functions of a $650,000,000 California-chartered savings and loan association and was a voting member of its loan committee.   I joined the predecessor of FTI (PricewaterhouseCoopers LLP) in 1991 to lead its real estate and real estate-secured loan restructuring group.   In the early 1990s, I was selected by the Resolution Trust Corporation ("RTC")[1] to be one of four members of its initial SWAT Team (Settlement/Workout Asset Team), whose task was to resolve very large (up to $150 Million), complex loans that were sub-performing (i.e., likely to default at maturity) or defaulted.  I served in this capacity during the time that the RTC was pioneering the commercial mortgage-backed securities ("CMBS") market, which provided a vehicle for the disposition of many of the loans handled by the SWAT team on which I served.

7.      During my tenure at FTI (and its predecessor entities), I have been engaged to evaluate commercial mortgage pools and to perform

---

[1] RTC was a quasi-governmental corporation established pursuant to an act of Congress in 1989 to address the large number of non-performing loans and other questionable investments owned by federally insured thrift institutions and the resulting failure of those institutions during a period generally known as the S & L Crisis.  During its tenure, the RTC seized and liquidated failed thrift institutions.  The rapid disposition of large numbers of these loans by the RTC in the early 1990s was facilitated by the development of structured finance securities through techniques that were ultimately employed in the creation of CMBS transactions.

consulting engagements for some of the largest participants (owners, creditors and originators) in the mortgage-backed securities industry. These engagements have involved such institutions as Amresco, Bank of America, Conseco Finance, ContiFinancial Corporation, CRIIMIMAE Inc., GMAC, Morgan Stanley, Orix, Prudential Insurance Company, SunAmerica Insurance Company, and Bank of Tokyo/Mitsubishi.

8.      Through these engagements I have actively negotiated, reviewed or monitored the workout and/or special servicing files for dozens of commercial real estate loans. For example, as the court-appointed Financial Advisor for the creditors of CriimiMae, my team and I reviewed the special servicing files for all impaired loans. At the time, CriimiMae was the largest holder of subordinated CMBS investor certificates (it was estimated to have acquired about 25% of all CMBS first-loss certificates issued in 1997 and 1998) and had one of, if not the, largest CMBS special servicer operations in the country. I performed a similar function for the lenders to Amresco, a leading Texas-based originator and servicer of CMBS loans. During the past four years I have worked extensively with Orix, one of the largest owners of CMBS subordinated certificates and servicers of CMBS loans, and the trustees (including LaSalle Bank) of trusts holding the mortgages that back such certificates. I have reviewed dozens of servicing files of impaired, defaulted and foreclosed loans.[2]

---

[2] An "impaired" loan is one that is currently performing (principal and interest payments are being made timely) but due to an adverse change in the borrower, property or market, continued payments or repayment at maturity is in doubt. A defaulted loan is one where the borrower is not then performing in accordance with the loan and mortgage terms. A foreclosed loan is one in which the foreclosure process has been completed and the property was either sold at foreclosure sale or ownership taken by the lender, in which case the real estate becomes what is known as Real Estate Owned (REO).

9.     Since 1991 I have also been involved on behalf of large real estate lenders and borrowers in the workout and restructuring of their real estate loans. Highlights of my career include serving as the financial advisor to the owners of Rockefeller Center (the two major owners were the Rockefeller family trust and a large Japanese investment firm) in 1994 when it filed bankruptcy and my work last year on International Place in Boston in connection with what was probably the largest real estate defaulted debt restructuring ($700Million) of the year.

10.     I have been qualified as an expert in real estate and real estate finance matters in dozens of jurisdictions and specifically with respect to the CMBS industry by the Supreme Court of New York and the Federal District Court in Maryland.

11.     I have analyzed the expert report of Richard A. Clarke ("Clarke") dated March 30, 2006 presented in this matter and other information pertaining to the actions of the parties and facts and circumstances related to that certain mortgage loan (the "Mortgage") for which BHOP was the Mortgagor and the Trust was, by assignment, the Mortgagee.  The Mortgage was secured by property located at 150 Royall Street, Canton, Massachusetts.  This report provides information and my opinions regarding the nature of the CMBS industry in general, the actions of the parties in this matter and the observations and opinions expressed by Clarke.

12.     My opinions are based on knowledge gained through (i) my education, experience and training; (ii) the results of research conducted under my

supervision within authoritative industry literature and sources that I have determined to be accurate and reliable; and (iii) analyses (conducted under my supervision and direction) of agreements, loan files, correspondence, depositions and other documents provided by DLA Piper Rudnick concerning this litigation.

13.    The opinions contained in this report are based on the information provided to me and that which I was able to obtain as of the date of this report. If, in the future, I become aware of additional relevant information, I reserve the right to modify my opinions as I deem appropriate in light of such additional information.

## SUMMARY OF MY OPINIONS

14.    My opinions are summarized as follows:

a.    It is well understood in the CMBS industry that the terms and provisions of the Pooling and Servicing Agreement ("PSA"), which is entered into by and between the Depositor, Trustee, Master Servicer and Special Servicer are (a) for the exclusive benefit of the parties to such agreement and indirectly the Certificate Holders who are the beneficiaries of the mortgage trust and (b) not intended to be for the benefit of nor confer any rights upon the mortgage borrowers who are not parties to the PSA.

b.    Wells Fargo Bank, National Association ("Wells Fargo") performed its duties as Master Servicer in August 2004 in accordance with

the Servicing Standard set forth in the PSA and in a proper and prudent manner, consistent with customary industry standards and practices.

       c.      Lennar Partners, Inc., aka LNR Partners, Inc. ("LNR") performed its duties as Special Servicer in accordance with the Servicing Standard set forth in the PSA and in a proper and prudent manner, consistent with customary industry standards and practices.

       d.      Customary real estate lending and servicing practices, especially in the CMBS industry, do not allow for loan terms to be modified except by express written agreement.

       e.      There was no conflict of interest created by LNR's alleged interest in purchasing the defaulted Mortgage nor would there have been a conflict created by an actual purchase of the Mortgage if LNR complied with the terms of the PSA, which expressly countenances and prescribes the manner of such a purchase.

## GENERAL DESCRIPTION OF THE CMBS INDUSTRY

       15.      In the Tax Reform Act of 1986, Congress enacted broad reforms to the tax code including the establishment of a new tax-oriented investment vehicle, the Real Estate Mortgage Investment Conduit ("REMIC"). These trust entities, when in compliance with specific rules enumerated in the Internal Revenue Code (Section 860), are treated as pass-through entities that are not subject to a trust-level tax.

16.    The first CMBS transaction, utilizing the newly enacted REMIC provisions of the tax code, occurred in 1989 and with it a new industry was born.    The CMBS market today is the second largest source of U.S. commercial mortgage funding, with $169.2 billion of CMBS loans issued in 2005 and over $600 Billion of CMBS loans presently outstanding (out of the total $2.53 Trillion commercial mortgage market).[3]    With such a pivotal and growing role for CMBS in the real estate finance market, the continued viability and stability of the CMBS industry is of paramount concern to all participants and is necessary for the smooth functioning of the economy in general.

17.    The CMBS marketplace exists alongside the conventional commercial real estate secured loan market and, while they both serve to finance commercial real estate, they exhibit very different characteristics.

18.    The CMBS financial structure was created to efficiently satisfy the financial objectives of different groups of investors who desire different rates of return and timing of interest income and principal repayment and who, in exchange, are willing to bear different degrees of risk associated with their investment.    Through financial structuring, the projected investment return and risk associated with a loan portfolio is divided among different classes of investors who are entitled to different priority in the cash flow produced by the entire loan portfolio.    This frequently better serves the needs of the investment community which purchases these interests, known as certificates, in the loan pool.    Borrowers also benefit because CMBS structures often provide greater

---

[3] Commercial MBS 2006 Outlook/2005 Review, Nomura Securities – U.S. Fixed Income Research, December 15, 2005.

leverage, lower interest rates, or more advantageous terms to a wider range of borrowers than would be available without utilization of the CMBS structure.

19.     In the conventional commercial real estate lending environment, a lender (typically a bank, insurance company or other financial institution) originates a loan secured by commercial real estate collateral. Depending on the nature of the originating lender, the resulting loan is either maintained in the investment portfolio of the originating lender or the loan (or a fractional interest in the loan) is sold to another institution as a "whole loan." All of the risks and benefits of ownership of the loan reside with the owner(s) of the note.    Accordingly, each owner (lender) can deal with each loan in the manner that best serves its particular interests.    From the borrower's perspective, it often has an on-going banking or borrowing relationship with the lending institution and often that relationship, and the servicing of the loan, is maintained by that institution throughout the life of the loan.

20.     By contrast, in a typical CMBS transaction, after the loan is funded it is then sold to a special-purpose, bankruptcy-remote entity (such as the Trust) that qualifies as a pass-through entity for tax purposes.    The acquiring entity (the Trust) acquires multiple loans and holds them together in what is referred to as the Mortgage Pool.    Once a loan is placed into the Mortgage Pool and interests in the Mortgage Pool are securitized (sold to investors), the mortgagor (borrower) generally has no further relationship with the entity that originated the loan (Credit Suisse First Boston in the instant matter).

21.     Interests in the trust are purchased by investors who hold securities (certificates) that are organized into different classes according to yield and risk.  The principal role of the trustee is to represent the interests of all of the certificateholders, serve as custodian for mortgage documents and make cash distributions to the certificateholders.  Thus the Trustee deals primarily with the obligations of the Trust vis-à-vis the certificateholders and, except for general custodial responsibility, has limited involvement with managing the assets of the trust.

22.     Actual day-to-day, operational duties related to the mortgages that are the assets of the Trust are delegated to professional loan servicing organizations, the master servicer, sub-servicers (if any) and the special servicer. Generally, the master servicer administers performing or non-defaulted mortgages according to the terms of the note, mortgage and related documents.  If a borrower requests a material modification to the terms of the loan, or upon a default or the occurrence of an event that substantially increases the likelihood of a default (known as a Servicing Transfer Event), the servicing responsibility is transferred from the master servicer to the special servicer.  Thereafter the special servicer is responsible for dealing with the borrower until the loan is either returned to a fully performing status or liquidated (via sale of the loan, foreclosure sale or repossession and sale of the collateral).

23.     The degree of latitude granted to the loan servicing entities, and the expectations of borrowers, are significantly restricted in the CMBS world when compared to traditional customs and practices among portfolio real estate

lenders. [4] The fact that the originating lender will no longer be involved with the loan and its servicing once it is securitized, and that investors not involved with the loan's origination will be the ultimate beneficiaries of, and will bear the risk of loss from, the loan, requires that all terms be well documented in the loan and mortgage documents and those documents be enforced strictly. Toward this end, the CMBS trust documents usually provide the following directions.

      a.      Servicing decisions are governed by the need for the servicer to act on behalf of the certificateholders as a whole. Since any deviation from the terms and conditions of a mortgage will result in advantages and disadvantages for different classes of certificateholders, all actions by the master servicer must be with the objective of collecting and monitoring the loans strictly in accordance with the terms of the specific mortgage loan documents.

      b.      Each CMBS trust defines the role of the Directing Certificateholder who is usually the holder of the most junior class of certificates, often described as the "first-loss" position. The terms of the CMBS trust generally provide that the Directing Certificateholder must approve the actions of the special servicer when dealing with significant modifications of mortgage terms and conditions and resolution and collection of defaulted loans. The Special Servicer is often an affiliate of the Directing Certificateholder since it is believed that this identity of

---

[4] Portfolio lenders include such institutions as banks and insurance companies who retain ownership of the whole loan without structured preferences in yield or term allocated between different ownership interests.

purpose presents the best opportunity to minimize the Directing Certificateholder's risk as the holder of the first loss certificates.

24.    The restrictions on the flexibility of servicers of CMBS pools are widely recognized within the commercial real estate industry. Describing the inherent and well-known limitations associated with being a borrower in the CMBS market, one author stated:

> "The holders of the debt [CMBS mortgage trusts and their beneficiaries] are not part of the [mortgage] issuance process. Borrowers in default, or in imminent default, must deal with a master servicer or a special servicer. The servicer's rights to agree to changes in the documentation are quite circumscribed. While borrowers can generally negotiate changes in the deal with conventional lenders who still own a large part of and service conventional loans, there is far less latitude in dealing with CMBS issues, where the holders are, by design, scattered among a multitude of different classes." [5]

25.    The commercial real estate lending market is generally quite competitive. Borrowers do business with lenders who are going to securitize their loans, and the restrictions this inherently instills, because borrowers receive compensating benefits, often in the form of higher loan amounts, lower interest rates, more liberal qualifying requirements and less restrictive loan covenants.[6]

---

[5] "Understanding the CMBS market in the hospitality sector," Daniel G. M. Marre, Journal of Retail & Leisure Property, March 8, 2004, Vol.4 No.2, pp 105-107

[6] The instant case offers a good example of this. The loan obtained by the defendants in 1999 refinanced an existing loan. Yet, the new loan terms allowed the borrower not only to repay the existing loan but also to generate excess proceeds of about $5.2 Million (of which the borrower's principals immediately distributed to themselves $4 Million). It is highly unlikely that a traditional real estate lender would have extended such generous terms given the vulnerability of this property to the actions of its single tenant at the relatively near-term expiration of its lease.

**THE PSA IS FOR THE EXCLUSIVE BENEFIT OF THE PARTIES TO THAT AGREEMENT AND, INDIRECTLY, THE CERTIFICATE HOLDERS. IT IS NOT INTENDED TO BE FOR THE BENEFIT OF NOR CONFER ANY RIGHTS UPON THE MORTGAGE BOROWERS**

26.    Due to the potential conflicts among the various classes of certificate holders that inevitably arise in the absence of a clear criteria for dealing with special servicing issues, many PSAs (including the one in this case) provide that the criteria to be applied in determining the appropriate Special Servicer course of action is the maximization of the net present value ("NPV") of the cash flow from the asset for the trust (consistent with the terms of the particular mortgage).   The most vulnerable certificate holders (those in the first-loss position) gain a degree of control by virtue of their usual designation as the Directing Certificateholder who must approve the actions to be taken by the special servicer. It is very common for the special servicer to be an affiliate of the Directing Certificateholder since this is believed to best protect the interests of the Directing Certificateholder which stands in a first loss position.   What is clear from these provisions in the PSA is that the special servicing and workout function is for the sole and exclusive benefit of the certificateholders (the beneficiaries of the trust) with particular regard for the interests of the first-loss position.  No borrower is a party to this PSA or any other CMBS pooling and servicing agreement.  Any action by a servicer that would benefit a borrower to the detriment of the certificateholders violates both the explicit terms of the PSA and the custom and practice within the CMBS industry.[7]  Moreover, even if a servicer were to take an action that did not maximize the NPV to the Trust, the

---

[7] Throughout this Report, when I refer to actions or non-actions by servicers, I am referring only to actions that are legal under prevailing state and federal laws and regulations.

duty violated runs only to the Trust and its certificateholders. There is no expectation, custom or practice in the CMBS industry that recognizes any affirmative obligation to the borrower created by the PSA.

27. Clarke opines that Wells Fargo and LNR failed to adhere to the "Servicing Standard" set forth in the PSA. Whether they did or not is irrelevant to the issues in the instant dispute since the borrower is not a party to the PSA and has no reasonable expectation of being a beneficiary of the servicing standards set forth in the PSA. In fact, the PSA is part of the documentation of the October 11, 1999 securitization only and did not even exist on September 14, 1999 when the borrower entered into its loan transaction. Moreover, for the reasons set forth below, I believe both servicers in fact adhered to the Servicing Standard set forth in the PSA and their respective industry servicing standards.

**WELLS FARGO, AS MASTER SERVICER, COMPLIED IN AUGUST, 2004 WITH THE SERVICING STANDARD[8] SET FORTH IN THE PSA AND ITS ACTIONS WERE PROPER, PRUDENT AND CONSISTENT WITH CUSTOMARY INDUSTRY STANDARDS**

28. As set forth in Section 3.01 of the PSA, the master servicer's duties are to collect and monitor the performing mortgage loans strictly according to their terms. If and when any modification to such terms that affects

---

[8] The Servicing Standard is a defined term set forth in Section 3.01(a) of the PSA. The Servicing Standard requires a standard of care that meets the higher of two tests, either how the Servicer services other loans, giving due consideration to customary and usual industry standards, or how the Servicer services loans it owns itself; provided further that in either case the servicer must exercise reasonable business judgment and with a view to maximize the present value of timely recovery of principal and interest on the loans. As no evidence has been presented in this case regarding (nor has Mr. Clarke rendered any opinions about) how Wells Fargo and LNR serviced other loans or loans they owned, my opinions do not address this portion of the Servicing Standard. Rather, my opinions pertain to those portions of the Servicing Standard that requires the servicers to perform in accordance with custom and usual standards of practice and whether they exercised reasonable business judgment with a view toward timely recovery.

the amount or timing of any payment by the borrower or the release of any material term of the mortgage is to be considered, all analysis and negotiation (if any) of such modification shall be conducted by the Special Servicer. Section 3.20(a)(i) of the PSA provides that the master servicer shall not modify any loan if such modification would affect the amount or timing of any payment terms of [the mortgage or] result in the release of the related Borrower from any material term thereunder. In addition, the Master Servicer cannot do anything that would constitute a "waiver, modification or amendment" that would constitute a material modification as defined by Treasury Regulations. PSA Section 3.20(a)(ii).

29.     Instead, the Special Servicer is responsible "for any request by a Borrower for any consent" dealing with an item "for which the Servicer is not responsible" as detailed above (and others). PSA Section 3.20(a)(iii). Only after such modification (if any) is completed and the loan is again performing according to its terms is servicing returned from the Special Servicer to Wells Fargo as the Master Servicer. PSA Section 3.21(a).

30.     These provisions of the PSA strictly limiting Wells Fargo's latitude and discretion are entirely consistent with custom and practice in the CMBS industry and would be expected by a borrower who availed itself of a CMBS loan. Under no circumstances should Wells Fargo have allowed or negotiated a modification or restructuring of the terms of this loan—this is beyond the intended and express scope and authority of the Master Servicer.

**LNR COMPLIED WITH THE SERVICING STANDARD SET FORTH IN THE PSA AND ITS ACTIONS AS SPECIAL SERVICER WERE PROPER, PRUDENT AND CONSISTENT WITH CUSTOMARY INDUSTRY STANDARDS AND PRACTICES**

31.     LNR's duties as special servicer under the PSA are to service an imminently or actually defaulted loan and/or deal with borrower requests for modification of loan terms. This includes the analysis and potential workout or modification of such loans: however, all considerations of a workout or modification are required to be undertaken with just one objective---to maximize the net present value to the Trust and its Certificateholders.

32.     At the time LNR was evaluating the foreclosure of the Borrower's interest in the Property, the following situation presented itself which made it highly unlikely that any workout would be feasible that would satisfy the criteria mandated to LNR by the PSA Servicing Standard:

a.      In order to maintain the mortgage and secure a new tenant, the borrower [BHOP] would have had to invest additional capital totaling $12.2 million (after applying the $4.1 million in leasing reserves) to carry the debt through the Anticipated Repayment Date in 2009 (after which the interest rate on the note would have increased from 8.49% to 13.49%, creating an additional $1.5Million annual loss). See information contained in the appraisal obtained by LNR (LNR00984 through 1106). Then, even after the borrower spent $12.2 million of new capital, the estimated net proceeds from sale of the property in 2009 would have been $1.8 million less than the remaining principal balance of the Mortgage. No rational borrower would do this and no rational lender would (or

should) discharge its fiduciary duties to the Trust with the anticipation that a borrower would behave in a patently economically irrational manner.

b.       In early August 2004 when the Mortgage went into default, market conditions were not improving.   Rather, the overall suburban Boston commercial office market was exceptionally weak and this property's submarket appeared to be weakening further.   As reported to BHOP on August 3, 2004 by Cushman and Wakefield, its leasing broker:

> "[Prospective large tenants]...*have 20 options* [as alternatives to the subject property] *within a 15-minute drive of 150 Royall Street. The overall suburban market's vacancy is 25.5%.  The 128 South submarket (of which Canton obviously is a part) has a vacancy of 20.5%, a figure that will approach the mid 20s by year's end once Blue Cross Blue Shield sheds 300,000 square feet in Quincy, and New York Life leaves 65,000 square feet in Norwood, to cite just two space sheddings.  Canton alone has commercial vacancy of about 45%."* (Blue Hill 0776)

c.       Stabilized or normal vacancy rates in healthy commercial markets are often considered to range from 5% to 10%.  Vacancy rates in excess of 20% reflect very substantial over-supply, especially when the trend is negative.   Under such market conditions, tenants often readily obtain economic benefits to the long term detriment of property owners.

d.       Based on discussions with BHOP, LNR would be expected to believe that BHOP was not going to take any action to oppose the foreclosure action that had been initiated.  Polcari vol. 1 page 67.   This belief by a special servicer is consistent with what one would expect to be the rational economic behavior of a borrower presented with such an unfavorable situation.

e.    BHOP presented no affirmative proposal, fresh capital or turnaround plan as it had committed to do. In fact, we are now told by Mr. Donovan that the borrower also abandoned any efforts to prepare updated financial statements, another inescapable requirement if the servicer is to be in a position to consider a workout, purportedly because it received the notice of default. Donovan Deposition 179. The borrower's failure to perform any of these undertakings is not surprising since, if it were to make any additional investment in the property, it would constitute a classic case of "throwing good money after bad."

33.    The existence of any one of the foregoing facts makes the decision by LNR to initiate and complete the foreclosure on the Property prudent, reasonable and consistent with industry custom and practice. Cumulatively, these facts leave a special servicer no reasonable alternative.

34.    Industry practice, and the latitude of the special servicer to do what it deems appropriate (within the terms of the mortgage documents) was succinctly described in an article appearing in CMBS World, the official publication of the Commercial Mortgage Securities Association, when discussing the handling of potential CMBS Loan Extensions.[9]

> *"Given the special servicers' experience in loan workouts, the decision to extend a loan may mitigate loss severity. As noted, the alternative to loan extension could be a foreclosure and ultimate sale of the property, which subjects the trust to market risk, as well as expenses associated with legal fees, property appraisals and marketing. Of course, loan extensions [or work-outs] are not without risk as there is no guarantee that the borrower will be able to refinance going forward. To mitigate this risk, the special*

---

[9] A Loan Extension is the term that describes modifying a mortgage note to lengthen its term so as to defer its ultimate maturity. Under the Mortgage, a default constitutes a de facto maturity of the loan since the remaining balance becomes immediately due and payable.

*servicer generally looks to the borrower to provide two things: (1) fresh risk capital (most important), and (2) property management expertise. If a borrower is unwilling to commit fresh capital and simply wants to extend the loan on its existing terms (or revert to a cash flow mortgage until he turns the property around), the servicer is likely to view this as a "free option" and would likely move to take the collateral back. Of course it is unlikely that a borrower will risk additional capital unless there is equity in the property above the debt amount. If a borrower brings a specific expertise to a property (e.g., is an experienced owner, has a plan to turn the property around or is expected to fill a key vacancy near term), the servicer might consider a workout with less of a capital requirement than if the sponsorship is weak. **The commitment of capital and a credible plan to repay the loan are necessary to provide the servicer sufficient comfort that the extension is beneficial to the trust.**"* [10] (Emphasis added)

In the instant case, the Borrower provided neither a commitment of capital nor a credible business plan. In light of those key failings, LNR acted prudently and reasonably to protect the interests of the Trust and certificateholders.

   35. Clarke appears to opine further that LNR deviated from industry standards for third party loan servicing because of a unique assertion that, "Wells Fargo and LNR each must disregard in the servicing of a loan any prior relationship either they or any affiliate thereof may have had with a mortgagor..." Clarke pg. 13. He goes on to indicate this should apply to LNR's dealing with BHOP and its two loan guarantors, Gerald Fineberg and William Langelier. The only purported basis I can find for Clarke's assertion that LNR should be amnesic is the following clause in Section 3.01(a)(2) of the PSA which requires that the Servicer or Special Servicer exercise:

  *"...reasonable business judgment with a view to the maximization, on a present value basis (discounting at the related Mortgage Rate), of timely recovery of principal and interest on the Loans or Specially Serviced Loans, as applicable, but without regard to: (i) any relationship that the Servicer or Special Servicer, as the case may be, or any Affiliate thereof*

---

[10] "CMBS Loan Extensions: Opportunities and Risks in a Maturing Market," Lisa Pendergast, Eric Jenkins and John Kepner, CMBS World, Fall 2003.

> *may have with the related Mortgagor or any other party to this Agreement; ...(v) the Servicer's or Special Servicer's ownership, servicing or management of any other mortgage loans or mortgaged properties..."*

Aside from the fact that the PSA does not run to the benefit of the borrower, this clause has a meaning entirely different than the one ascribed by Clarke.

      36.     Section 3.01(a)(2)(i) applies to circumstances in which a servicer would have a conflict of interest in performing its duties <u>vis-à-vis the certificateholders</u> and is intended to prevent the special servicer from favoring its affiliates, or anybody else's interests over those of the certificateholders to whom it owes its duty. Clarke turns this provision on its head and interprets the language to mean that a servicer cannot use all the information it has about a defaulted, non-affiliated borrower and its principals to act in the best interests of the certificateholders. Not only does this misinterpret the provision of the PSA, but his position begs the question, "whose interest would be served by Clarke's interpretation?" Clearly, Clarke's interpretation is antithetical to the interests of the Trust and the certificateholders, to whom the servicers owe their duty.

      37.     In fact, the duty and required behavior for servicers is exactly the opposite of Clarke's unique interpretation. Wells Fargo and LNR owe a duty to the Certificateholders to gather as much information as they reasonably can from any legitimate source and use it for the benefit of the Certificateholders. Every certificate holder in the $600 Billion CMBS industry (and the rating agencies that rate the certificates) would be appalled if the servicers were obligated to disregard actual knowledge that was obtained through appropriate channels to the detriment of the investing public. Gerald Fineberg, one of the two

principals of the Borrower and the principal of the property management company had just defaulted on and returned to LNR (as servicer for another CMBS pool) two properties in July, 2004. Donovan (deposition 31-32) acknowledges losing to lenders a total of five properties plus Blue Hills----such information is of vital importance to a servicer considering how to deal with a defaulted borrower and to ignore it would be inexcusable. The supposed requirement to ignore it is totally unfounded.

38.     The negotiation of a workout is an extension of credit in the same sense as the origination of a loan. Lenders often identify the standards for extension of credit as "The Four 'Cs' of Credit" --- Capacity (strength of cash flow to support the loan); Character (the credit and relevant business history of the borrower); Capital (reserve financial strength to support the loan during periods of adversity); and Collateral (the value and stability of the collateral as a source of repayment in the event of default).

39.     Just as credit and business history is a significant factor in the decision making process associated with the origination of mortgage loans, so too it is a significant factor in the decision to extend additional credit to borrowers with loans that have gone into default or are in danger of imminent default.

40.     By way of example, The Resolution Trust Corporation (and later the FDIC) in its efforts to resolve problem loans acquired from failed thrift institutions during the S&L crisis of the early 1990s had a clear policy that they would not negotiate a workout with any borrower that had, in a previous transaction, caused a loss associated with a default on another loan.

41.    Clarke makes a another series of accusations that essentially revolve around the proactive posture taken by LNR when it notified BHOP of its default, accelerated the note and then started the process leading to the eventual foreclosure.    His critique is not only inconsistent with prudent servicing custom and practice in the industry when dealing with a "no-equity" property, it is even inconsistent with his own writings. In his article entitled "Ten Principles Should Govern Commercial Problem Loan Resolution"[11]    he advocates "Proactivism" and "Dual Tracking."

> *"Proactivism. Bankers who "monitor" problem loans in the hope that the borrower will somehow rectify the situation or that a white-knight buyer will appear offering a full payout are victims of their own inaction.  While such euphoric solutions do sometimes occur, they are far from certain....**The length of any forbearance arrangement must be directly proportional to the borrower's level of effort in minimizing the lender's ongoing deficiency**.*
>
> *Dual Tracking.  **It is absurd to continue fruitless negotiations with an uncooperative borrower while time passes and, in all probability, your loan-to-collateral position is deteriorating**. Always provide the borrower with the opportunity for a consensual solution, but resort to unilateral remedies at the first sign of foot-dragging...**Once you have commenced litigation, not only is there continued opportunity for a negotiated solution but also the speed of reaching a favorable conclusion is actually enhanced. You, in effect, are taking control of transaction timing by turning on the litigation time clock...**"* (Emphasis added)

42.    Also, Clark's suggestion that the sending of the notice of default somehow served to inhibit or stop the negotiations or in some other way harmed the workout process is directly contradicted by his own writings (see quotation directly above). To the contrary, it is often a very effective tactic when dealing with a delinquent debtor to notice a default and sale.  Nothing gets a

---

[11] "Ten Principles Should Govern Commercial Problem Loan Resolution," Richard A. Clarke, The RMA Journal, June 2001

borrower's attention and separates the earnest from the "delayers" as a lender that has demonstrated its seriousness and makes it clear by actions that it will not countenance borrower delays while it holds a delinquent loan racking up further losses. The filing of a notice of default or a notice of sale can always be postponed or rescinded if the borrower indicates the desire and ability to come to the table with a more favorable proposal. A proactive posture on the part of the lender does not cut off negotiations nor prevent a borrower from curing its default—to the contrary, it often ensures a sense of urgency that accelerates completion of the workout process.

43. This theme appears repeatedly in "The Workout Manual," a somewhat dated publication from 1993, authored by Clarke, and quoted several times in his report.[12]

> a.  *"While different banks have different workout philosophies, this manual advocates a rigorous and aggressive approach. This can and should be done with the highest moral intent, which minimizes lender liability issues at the same time. Don't be a victim! A victim waits for things to happen rather than taking the initiative. A victim grants waivers without improving his or her position. A victim permits collateral deterioration while nonviable borrowers search for miracles."* (Page -x- )

> b.  *"Clearly, real estate problem loans are the prime challenge for many workout officers. Not surprisingly, the same tactics that work in commercial problem credits apply equally to real estate exposures. Therefore, common strategies are advanced throughout this manual, with specialized real estate issues identified as appropriate and where needed."* (Page -x-)

> c.  *"Action plans should be highly anticipatory and aggressive. Never, never, never delay the requirement for additional collateral or payment while you wait for the borrower to produce additional information. Remember that granting additional time for the "information exercise" is, in itself, a concession on your part. Start*

---

[12] The Workout Manual, Richard A. Clarke, Robert Morris Associates, 1993

*reducing the perceived deficiency in return for short extensions until the borrower proves to you that there is no longer a deficiency."* (Page 70)

d.     *"Do not be deterred by expected positive future events that are beyond your direct control, such as sale of assets, refinancing with another lender, or appearance of a new investor. The focus is to minimize deficiency while the borrower pursues one or more of these constructive strategies. Just as information gathering is a given in an action plan, not a focal point, always provide the borrower time for constructive solutions but only as long as the loan-to-collateral position is not deteriorating and the obligors are performing fully."* Page 70

e.     *"Action plans must be communicated clearly and decisively, focusing on how intended actions will resolve the key strategic problems. Avoid the following words: request, monitor, negotiate. Instead, require all obligors to perform within the limits of their financial resources. A sense of urgency is a must!"* Page 70.

44.     Thus, in his published writings, Clarke endorses proactive, no-nonsense, hard-nosed tactics when dealing with problem loans and problem borrowers. The actions taken by LNR read like a page taken from Clarke's own book. The Special Servicer was faced with a borrower that (i) had turned back the keys to its lender in July 2004, on two other properties, (ii) failed to come out of pocket for a $158,000 property tax obligation, (iii) failed to make required deposits to insurance and property tax escrow accounts, (iv) distributed to its principals the capital that would be needed by the Borrower to meet its obligations as they came due, (v) failed to provide any type of plan or proposal regarding how it intended to honor its financial commitments to its lender, (vi) never provided the servicer the financial statements agreed to in the August pre-negotiation letter, and (vii) had represented in a conversation on September 16, 2004, that there was no hope for a tenant to occupy the vacant property, the Borrower understood that the Servicer had to send the notice of default,that the debt service reserves would only carry the property for a few months (if they

could be used), and that access to those reserves would not make any difference in the outcome of this situation.    In view of these facts, the servicer cannot be faulted for proceeding with a legitimate, prudent course of conduct that is consistent with industry custom and practice in order to minimize the deterioration of its collateral and set in motion the customary enforcement process (foreclosure) available to a secured real estate lender.  The Trust's position, and thus the economic interest of the first loss certificateholder, was deteriorating at a rate of almost $8,000 per day and $240,000 per month.  It was well within BHOP's ability to prevent or cure the default that occurred.  BHOP and its guarantors must face the fact that they chose to do nothing as the time to resolve the defaults came and went.

45.    Clarke also claims that LNR violated the PSA's servicing standards by moving to foreclosure sale in less than the 90 days marketing period set forth on page 108 of the PSA.  This is incorrect for three reasons.  First, the PSA sets forth rights and duties among its signatories (the servicers and the trust) and creates no rights in the borrowers, whose interests (especially when they have defaulted) are often at odds with the parties to the PSA.  Second, the foreclosure occurred on November 19, 2004, which is more than 90 days after the borrower went into default (August 2, 2004) and more than 60 days after the lender formally notified borrower of its default (August 19, 2004).  There was no surprise here for the borrower.  Custom and practice (and every PSA I have ever seen) place no limitations on how fast a servicer can move to foreclosure provided it complies with applicable law (and gets any approval from the Directing

Certificateholder). All of the mandated steps were done here, as Massachusetts law requires as little as 21 days notice and publication. Third, and probably most importantly, this is another case of Clarke completely inverting the meaning of the PSA. The paragraph to which he refers (Section 3.18) has nothing to do with time to foreclose (and one would never expect the PSA to limit the speed with which a servicer can foreclose since prudent lenders typically want a quick foreclosure option so long as it complies with applicable law). Rather, the paragraph expressly says that its 90 day marketing period only applies to the disposition of a defaulted loan (or real estate owned, which by definition only exists after a foreclosure has occurred) and only if the Special Servicer has determined that a sale of the loan rather than a foreclosure would produce the highest net return to the Trust. The complete discretion to determine whether to foreclose or to sell the defaulted note is specifically bestowed upon the Special Servicer and there is no time constraints whatsoever in the PSA if the Special Servicer pursues the foreclosure route as was done in the instant case.

46.     Clarke also alleges that it is an apparently inappropriate "conflict of interest" for an affiliate of LNR to have an interest in purchasing the defaulted promissory note or the real estate after foreclosure. Nothing could be further from the truth or customary industry practice. One needs only look at the PSA in this transaction: it establishes specific provisions that address how the Special Servicer and its affiliates (and Master Servicer if the Special Servicer does not avail itself of what the PSA actually terms its purchase option) can buy the note. It was expressly intended from the time that the PSA was signed , that the

Special Servicer (or Master Servicer) could buy defaulted notes from the trust, as often happens during the servicing of a CMBS loan pool (one should note that in fact LNR did not buy the mortgage note or the real estate in this case).13 The guiding objective of the PSA is to minimize losses for the Trust and the Certificateholders---having a mechanism for the Special Servicer (at its option) to bid for defaulted notes ensures another potential buyer which can only serve to help the trust.

### CUSTOMARY REAL ESTATE LENDING AND SERVICNG PRACTICES, ESPECIALLY IN THE CMBS INDUSTRY, DO NOT ALLOW FOR LOAN TERMS TO BE MODIFIED EXCEPT BY EXPRESS WRITTEN AGREEMENT

47.    In real estate mortgage finance in general and CMBS in particular, the rights and obligations of the borrower and lender are specifically enumerated in the loan documents between the lender and the borrower.  In this instance, the Mortgage and Note were heavily negotiated between the borrower and the loan originator, with each represented by competent counsel. Furthermore, the principals and representatives of the borrower were highly experienced real estate professionals.  Accordingly, BHOP clearly knew or should have known its rights and obligations and industry standards would have it accept responsibility for its actions in light of the terms and conditions expressly contained in the loan documents.  Throughout his report, Clarke inexplicitly

---

[13] It is also clear that the parties knew how to prohibit a party to the PSA from being able to purchase a defaulted note.  Paragraph 3.18(c) of the PSA specifically prohibits the Trustee from purchasing a defaulted note from the Trust.  This same section 3.18 specifically permits the Special Servicer to purchase such notes.

assigns to Wells Fargo and LNR the responsibility to describe to BHOP all of the relevant provisions of the loan documents and the range of outcomes that could result from BHOP's actions. This amounts to a total shift of responsibility from the normal custom and practice among the sophisticated parties engaged in commercial mortgage finance transactions.

48.    Clarke opines that when a borrower makes a request of a lender, silence can be deemed to be acceptance (Clarke Page 18). He is specifically referring to the period between August 2 and September 17, 2004 and the Borrower's desire to use the debt service reserve to pay property taxes instead. In my entire career, I have no recollection of ever seeing any loan documents nor am I aware of any generally accepted custom and practice in the CMBS market that provides that the borrower can interpret silence as authorization to amend, effectively, the terms and conditions of the note and mortgage.14 As noted above, the functioning of the CMBS marketplace, which involves the holding of mortgages by parties other than those who originate them, depends entirely upon the ability of investors to analyze the terms of the pooled mortgages and have them enforced according to their terms. It would be antithetical to this marketplace for a borrower to be able to send a letter or place a call to a servicer and have such letter or call serve to modify the binding loan documents absent a formal written modification agreement.

---

[14] In addition to disagreeing with Clarke's views on whether silence can operate to modify executed loan documents, I am advised that the Defendant's strenuously disagree with the characterization that Wells Fargo and LNR were "silent". There was both written and oral communications between both servicers and the Borrower during the period at issue.

## CONCLUSION

49.     As someone who has devoted a significant portion of my career to dealing with distressed commercial real estate, I have experienced first hand the aggressive actions that borrowers will take when there is a sincere desire to retain ownership of a property. Similarly, I have seen many instances in which borrowers realize that their equity has already vanished and, regardless of their financial ability to provide continued support to the property, they elect to acquiesce to a foreclosure or grant a deed in lieu of foreclosure. Although some real estate owners may get emotionally attached to certain "trophy" buildings, in virtually every other instance, the decision to continue to support a money-losing property or to abandon it is based on objective economics.

50.     It is readily apparent in most instances when a borrower has an economic motivation to retain ownership. They aggressively pursue the lender with plans, proposals and promises. By the same token, it is also readily apparent when a borrower has decided that it doesn't make sense to "throw good money after bad" and therefore allows the lender to recover its collateral without objection.

51.     In this instance, it is apparent to me that BHOP knew that this property was an economic "train wreck" when it realized it could not replace Equiserve, the sole tenant, when its lease at the subject property expired in July 2004. Had BHOP wanted to save the property, it could have at least marshaled the cash flow that was being generated at the property to meet the short falls that were sure to come when the Equiserve rent ceased. However, other than the

required reserve payments during the waning months of the Equiserve lease, the principals of BHOP withdrew from the Borrower all of the cash generated monthly by the property. These are the actions of a borrower that is preparing to abandon its property not invest in its future.

52.    Based on information subsequently learned, it appears that BHOP made the decision to abandon this property and therefore did not cure the August 2004 payment defaults, although it clearly had the ability but not any economic incentive to do so. In fact, it seems that BHOP even failed to advise Mr. Langelier (its principal and one of the Guarantors) that it was allowing the foreclosure to proceed. On November 4, 2004, Mr. Langelier sent an email to Dan Frank and Joe Donovan. He expressed surprise that he hadn't received any notification regarding the foreclosure notice and the "dispute over the application of reserve funds." In this email, he proposes several possible negotiation strategies to purchase the note at a discount without any consideration of a workout leading to repayment of the loan. However, none of these strategies was ever put forward to LNR. Blue Hill 5310.

_Ronald Greenspan_

Ronald F. Greenspan

# EXHIBIT A

## Documents Relied Upon

Second Amended Complaint (Donovan Exhibit 15).

Mortgage Note, dated September 14, 1999.

Mortgage, Assignment of Leases and Rents and Security Agreement, dated September 14, 1999.

Report by Richard A. Clarke, dated March 30, 2006.

The Pooling and Servicing Agreement dated October 11, 1999.

Commercial MBS 2006 Outlook/2005 Review, Nomura Securities – U.S. Fixed Income Research, December 15, 2005.

"Borrower Guide to CMBS," Commercial Mortgage Securities Association, 2004.

"Understanding the CMBS market in the hospitality sector," Daniel G. M. Marre, Journal of Retail & Leisure Property, March 8, 2004, Vol.4 No.2, pp 105-107.

"CMBS Loan Extensions: Opportunities and Risks in a Maturing Market," Lisa Pendergast, Eric Jenkins and John Kepner, CMBS World, Fall 2003.

Complete Appraisal Self Contained Report for 150 Royall Street Canton, Massachusetts, dated October 18, 2004 (LNR00984 – LNR01106).

Cushman and Wakefield Leasing Broker email to BHOP, dated August 2004 (Blue Hill 0776).

Email from Mr. Langelier to Dan Frank and Joe Donovan, dated November 4, 2004 (Blue Hill 5310).

"Ten Principles Should Govern Commercial Problem Loan Resolution," Richard A. Clarke, The RMA Journal, June 2001.

The Workout Manual, Richard A. Clarke, Robert Morris Associates, 1993.

Letter from Dan Frank to Joseph Plunkett, dated August 3, 2004 (Needle Exhibit 312).

Asset Manager Log from Warshaw (Warshaw Exhibit 128).

Email from Curtis Mallegni to Kathryn O'Neal recommending transfer of Loan to Special Servicer, dated August 16, 2004 (Polcari Exhibit 57).

**EXHIBIT A**

**Documents Relied Upon**

Fax Transmittal from Joe Donovan to Curtis Mallegni containing August 2 and August 5 letters, dated August 13, 2004 (Donovan Exhibit 27).

Notice from Lennar to BHOP, dated August 19, 2004 (Donovan Exhibit 28).

Deposition transcripts of the following:

- Joseph Polcari ("Polcari"), Vols I and II, LNR SVP and Asset Manager;

- Randall Rosen ("Rosen"), LNR Real Estate Asset Manager;

- Gilbert Stone ("Stone"), Director of Accounting of Fineberg Management, Inc.;

- Joseph Donovan ("Donovan"), CFO of Fineberg affiliates, Fineberg Management, Inc.;

- Daniel Frank ("Frank"), President of Fineberg Management, Inc.;

- Draft deposition transcript of William Langelier ("Langelier"), one of the two largest BHOP principals;

- Draft deposition transcript of Brent Lloyd ("Lloyd"), Wells Fargo loan servicing representative;

- Draft deposition transcript of Curtis Mallegni ("Mallegni"), Wells Fargo Asset Manager;

- Draft deposition transcript of Jill Martin ("Martin"), Wells Fargo AVP and Loan Servicing Manager;

- Draft deposition transcript of Kenneth Goldberg ("Goldberg"), BHOP Attorney

# EXHIBIT B

## RONALD F. GREENSPAN

| | |
|---|---|
| **Position** | Senior Managing Director/West Region Leader, Corporate Finance Practice<br>FTI Consulting, Inc., Los Angeles, CA (successor to<br>PricewaterhouseCoopers LLP Business Recovery Practice) |
| **Education** | B.A., U.C.L.A. (Economics), Summa cum laude, 1976<br>J.D., Harvard Law School, Magna cum laude, 1979 |
| **Professional<br>Affiliations** | Member, Commercial Mortgage Securities Association<br>Member, Urban Land Institute<br>Fellow, American College of Bankruptcy<br>Member of Board of Directors and Vice-President of Los Angeles Bankruptcy Forum<br>Member, American Bankruptcy Institute<br>Member, Association of Insolvency Restructuring Advisors<br>Certified Insolvency and Restructuring Advisor |

**Range of
Experience**

Mr. Greenspan is an internationally respected real estate and finance professional with twenty-five years of diverse, hands-on experience in the areas of real estate investment and development, initial and restructured debt and equity financing, acquisitions and dispositions, and law. Mr. Greenspan applies his broad background to a wide variety of consulting, litigation and bankruptcy engagements.

His particular areas of expertise include:

Structuring and negotiating real estate and portfolio acquisitions, dispositions, financings, ground leases, office, retail and residential leases, management agreements, partnership agreements, participating loan agreements, and domestic and international partnerships and joint ventures.

Civil litigation support including analysis and expert witness testimony regarding liability, valuation, and damages.

Analyzing, structuring and implementing loan modification and workout agreements for real estate projects, loan portfolios and real estate-intensive operating businesses from both lender and borrower perspectives.

Preparing cash flow, disposition and valuation analyses for office, retail, hospitality, "special purpose", and residential developments.

Bankruptcy consulting, including development and/or feasibility analyses of Plans of Reorganization on behalf of secured creditors, unsecured creditor committees, debtors, and trustees.

**Range of**

Mr. Greenspan has been involved extensively in cross-Pacific business transactions



**EXHIBIT B**

**RONALD F. GREENSPAN**

| | |
|---|---|
| **Experience (continued)** | for more than a decade: first, during the "Japanese bubble" and "Asian miracle", and recently during their new financial troubles. Mr. Greenspan served as the Leader of the PricewaterhouseCoopers' Asian Theater Real Estate Practice from 1998 to 1999. He supervised the establishment of offices in Tokyo, Seoul, Bangkok and Jakarta and was involved in assisting ailing North East Asia financial institutions and banks, and assisting U.S. investors acquire Asian assets. |

Also of particular note, in 1992 Mr. Greenspan was appointed as one of the four initial voting members of, and real estate advisor to, the Resolution Trust Corporation Western Region Settlement/Workout Asset Team (SWAT) which was responsible for resolving complex loan credits and defensive litigation with book values up to $100 million. In this capacity and as an initial member of the California SWAT Team, he participated in the resolution of over $2 billion of troubled credits.

Mr. Greenspan practiced law until 1983 and was an active member of the Real Estate Section of the California Bar Association until 2001. As a lawyer, he represented a broad range of financial institutions, commercial and residential developers, landlords, syndicators, and substantial foreign and domestic real estate investors. Also, Mr. Greenspan has held a California Real Estate Broker's license since 1986, which license is inactive as required by his current employer.

| | |
|---|---|
| **Professional and Business History** | FTI Consulting, Senior Managing Director, Corporate Finance Practice (formerly PricewaterhouseCoopers LLP Business Recovery Practice), 1991 – Present. Los Angeles Land Companies (diversified real estate development, construction, management & brokerage), Chief Operating Officer, 1987 - 1991. Brookside Savings & Loan Association, Member of Board of Directors and Executive Vice President, 1985 - 1987. The Heritage Group (nationwide real estate investment company), Executive Vice President, 1983 - 1985. Stroock & Stroock & Lavan/Prince & Littenburg, Attorney, 1979 - 1983. |
| **Articles Authored** | ABI Journal, "UnTill We Meet Again: Why Till Might Not Be the Last Word on Cram Down Interest Rates" (2004) ABI Journal, "The Un-real World of Troubled REITs" (2001) American Banker, "When are Servicing Rights Born?" (2000) American Banker, "Fight for Survival: Subprime Lending Whereto From Here" (1999) Urban Land Institute, Market Profile for Honolulu Metropolitan Area (1999) Urban Land Institute, Market Profile for Hawaii's Neighbor Islands (1999) Urban Land Institute, Market Profile for Honolulu Metropolitan Area (1998) American Banker, "Who Receives Property Tax "Refunds"?" (1995) |
| **Selected Speeches and** | 2005 "What's New in Distressed Real Estate: The Forthcoming Crisis and Implications of the Recent Supreme Court _Till_ Decision", as part of Association of |



**EXHIBIT B**

**RONALD F. GREENSPAN**

Page 3

| | |
|---|---|
| **Presentations** | Insolvency and Restructuring Advisors' 21st Annual Bankruptcy & Restructuring Conference, Boston, Massachusetts |

2005 "Fraud: Easy to Allege, Hard to Prove?", Turnaround Management Association, Los Angeles, California

2004 "First Meeting With Debtor"; "Negotiating the Workout Settlement Agreement and Peaceful Foreclosure"; "Overview of Bankruptcy Concepts Related to Workouts"; "Bankruptcy Workshop", Executive Enterprises' Commercial Loan Workouts, Las Vegas, Nevada

2004 "Real Estate Market Trends", Dallas, Texas

2003 "Introduction to Restructurings & Reorganizations for Asset Based Lenders"; Chicago, Illinois and New York, New York

2002 and 2001, "Introduction to Bankruptcy", presented as part of Executive Enterprises' Loan Workout & Restructuring Two-Day Seminar; Los Angeles, California and Las Vegas, Nevada

2000 Residential Finance Corporation presentation, "Sub-prime and Warehouse Lending", Minneapolis, Minnesota

2000 Executive Forum on Warehouse Lending Issues, Chicago, Illinois

1999 Chase Bank High Yield Conference, New York

1999 Co-chair, First Annual Global Real Estate Investment Conference (with Starwood Capital Partners), San Francisco, California

1999 Annual Meeting of American College of Mortgage Attorneys, Colorado Springs, Colorado

1999 ABI Battleground West, Los Angeles

1999 Presentation to Annual Meeting of Asian Real Estate Society, Taipei, Taiwan

1999 O'Melveny & Myers/PwC sponsored Asian Investment Seminar, New York

1999 American Bankruptcy Institute First Annual New York City Bankruptcy Conference

1999 Corporate Recovery Symposium, Vail, Colorado

1999 Lambda Alpha presentation, "Japan – Riding the Tsunami", Los Angeles

1999 American Bankruptcy Institute Battleground West, Los Angeles

1998 Electronics Manufacturing Association, "Asian Crisis," Los Angeles

1998 Asian Business League, Los Angeles

1998 Timberline Users Conference, Portland, Oregon

1998 National Conference of Bankruptcy Judges, Dallas, Texas

1998 Seattle General Counsel Forum, Seattle, Washington

1998 Asian Wall Street Journal

1998 Los Angeles Business Journal – Leaders of Finance & Banking

1997 Timberline Users Conference, Portland, Oregon

1997 Asian Real Estate Society Annual Conference, Hong Kong

1996 Strategic Research Institute, New York

1996 Pacific Resources Conference, Laguna Nigel, California Moderator of Emerging Trends Panel

| | |
|---|---|
| **Selected Speeches and Presentations** | 1995 Arizona Bar Association Annual Meeting of Insolvency Practitioners, Phoenix, Arizona; "Interest Rates in Real Estate Reorganizations" |

1995 Annual Meeting–California State Bar Association, San Francisco, "Confirmation of Real Estate Single Asset Plans of Reorganization"



**EXHIBIT B**

**RONALD F. GREENSPAN**

Page 4

**(continued)**     1994 Panel leader and moderator, Pacific Resources Conference, Laguna Nigel, California
1994 Instructor, Distressed Real Estate, Northwest Center for Continuing Education, San Diego, California
1994 Instructor, Price Waterhouse Tax Managers Group Seminars, Orlando, Florida
1993 Instructor, U.C. Irvine Extension, Real Estate Finance

F T I

# EXHIBIT C

## List of Expert Testimony and Deposition

| | DEPOSITION | TESTIMONY |
|---|---|---|
| In re Ronald Williams, Palo Alto Town & Country Village, Inc. USBC - Southern District of California | X | X |
| In re Criimi Mae, Inc. USBC - District or Maryland | X | X |
| Fidelity Bond vs. Brand USBC - Eastern District of Pennsylvania | X | |
| In re Pacific American Mortgage Company USBC - Central District of California | | X |
| In re Maxicare, Inc. USBC - Central District of California | X | X |
| In re Aladdin Gaming LLC USBC – Nevada | | X |
| In re Sandpiper-Golf Trust LLC v. Sandpiper at SBCR, LLC JAMS - Oxnard, California | X | X |
| In re Sutter's Place, Inc., dba Bay 101, Petitioner in the City of San Jose, State of California, Gaming Control Administration | X | X |
| In re Sierra Hospitality Northern District of California | X | X |
| In re New Hotels, Inc. Central District of California | X | |
| In re Peregrine Systems, Inc. USBC - District of Delaware | X | X |
| In re Ardent Communications, Inc. USBC - District of Columbia | X | |
| LaSalle Bank National Association v. Lehman Brothers Holdings, Inc. USDC - Maryland | X | X |
| In re Maple Leaf Farms, Inc. v. American Appraisal Associates, Inc., et al Central District of California | X | |
| California Hotel Acquisition Company, LLC v. The Community Redevelopment Agency of the City of Los Angeles, California Los Angeles Superior Court | X | |
| American West Homes, Incorporated v. SoCal Housing Partners, L.L.C. Central District of California | X | X |
| In re Heilig-Meyers Company USBC – Eastern District of Virginia | X | X |
| In re Scott Cable Communications, Inc. USBC – District of Delaware | X | X |
| In re Commercial Money Center, Inc. USBC – Southern District of California | X | X |



# EXHIBIT C

## List of Expert Testimony and Deposition

| | DEPOSITION | TESTIMONY |
|---|---|---|
| In re United States of America v. State Street Bank & Trust Company<br>　　USBC – District of Delaware | X | |
| In re Botanical Extracts, Inc., Hauser Technical Services, Inc., Zetapharm, Inc., d/b/a BI Nutriceuticals<br>　　USBC – Central District of California | | X |
| In re Wells Fargo Bank Minnesota N.A. et al v. UBS Warburg Real Estate Securities and UBS Paine Webber<br>　　District Court of Dallas County, Texas | X | X |
| In re LaSalle Bank National Association et al v. UBS Warburg Real Estate Securities and UBS Paine Webber<br>　　District Court of Dallas County, Texas | | X |
| In re Wells Fargo Bank Minnesota N.A. et al v. Salomon Brothers Realty Corp., UBS Warburg Real Estate Securities, Inc., and Artesia Mortgage Capital Corporation<br>　　District Court of Dallas County, Texas | | X |
| In re Wells Fargo Bank Minnesota N.A. et al v. Lehman Brothers Holdings, Inc.<br>　　District Court of Dallas County, Texas | | X |
| In re Brobeck, Phleger and Harrison LLP<br>　　USBC – Northern District of California | | X |
| In re South Coast Property Company 96-A, L.P.<br>　　USBC – Central District of California | X | X |

