UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>    Plaintiff, Defendant-in-Counterclaim,<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and CSFB 1999–C1 ROYALL STREET, LLC,<br><br>    Defendants, Plaintiffs-in-Counterclaim,<br><br>v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>    Defendants-in-Counterclaim. | Civil Action No. 05-CV-10506 (WGY) |

**MEMORANDUM IN SUPPORT OF MOTION OF
DEFENDANTS AND PLAINTIFFS-IN-COUNTERCLAIM
<u>TO EXCLUDE TESTIMONY OF KENNETH GARTRELL</u>**

Defendants and Plaintiffs-in-Counterclaim J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") and CSFB 1999–C1 ROYALL STREET, LLC ("CSFB") (collectively, "the Lender") have moved to exclude the testimony of plaintiff's expert witness designee Dr. Kenneth Gartrell. Gartrell opines about the fair market value of the Blue Hills Office Park as of November 19, 2004, and the resulting loss of plaintiff's equity. Gartrell is not qualified to value real estate and his methods of real estate valuation do not meet the reliability requirements of Federal Rule of Evidence 702.

He also opines that plaintiff was damaged by lost loan reserves but gives no bases or reasons to support that conclusion. He opines that plaintiff was damaged by lost tax benefits of holding the property, but admits he was asked to assume that and knows nothing about it.

His opinions do not meet the standards of Federal Rule of Evidence 702 and his testimony should be excluded.

## I.  Background

In October 2004, an independent MAI appraisal[1] by Bonz & Company valued the Blue Hills Office Park at 150 Royall Street (the "Property") at $15 million as of October 18, 2004. Deposition Ex. 341 (Addendum).[2] A foreclosure sale of the property meeting all of the requirements of Massachusetts law produced a sales price of $18.5 million on November 19, 2004. Clarke Depo. at 262.[3] Plaintiff intends to offer the expert witness testimony of economist Dr. Gartrell, who opines that the fair market value of the Property as of November 19, 2004 was $44,391,805. Gartrell Depo. at 5; 81, 98, 133-34; Expert Report and Exhibits of Dr. Kenneth Gartrell ("Gartrell Report") Tables 5.1 and 7.1. Based on that value, he opines about plaintiff's lost equity in the Property. He also opines that plaintiff was damaged by the foreclosure by losing loan reserves and tax benefits. Gartrell Report ¶¶ 102-03.

---

[1] An MAI appraisal is one prepared by a member of the Appraisal Institute. The Appraisal Institute is an international membership association of professional real estate appraisers. See www.appraisalinstitute.org. Qualifications for membership are rigorous and include passing 11 examinations that reflect 380 hours of classroom instruction, passing a two-day comprehensive examination, receiving credit for 6,000 hours of experience, and receiving credit for a demonstration appraisal report on an income producing property. See www.appraisalinstitute.org/about/designations.asp.

[2] The factual materials cited by this memorandum are attached to the accompanying Affidavit of Bruce E. Falby. The deposition transcript of Dr. Gartrell is attached at Tab A and his report is attached at Tab B. The deposition exhibits are attached at numbered tabs matching their deposition exhibit number.

[3] The Clarke deposition transcript is included in the appendix of deposition transcripts submitted in support of the Trustee's and CSFB's motions for summary judgment.

~BOST1:417237.v1

**II.    The *Daubert* and *Kumho Tire* Standard.**

In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), the Supreme Court held that Federal Rule of Evidence 702[4] imposes a special obligation upon a trial judge "to ensure that any and all scientific testimony . . . is not only relevant, but reliable." Id. at 589. In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court extended this basic gatekeeping obligation to all expert testimony. Id. at 147-48. A trial court may consider one or more of the following Daubert factors in determining reliability of the expert testimony:

   a.   whether a "theory or technique . . . can be (and has been) tested";
   b.   whether it "has been subjected to peer review and publication";
   c.   whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
   d.   whether the theory or technique enjoys "general acceptance" within the "relevant scientific community."

Daubert, 509 U.S. at 592-94; Kumho Tire, 526 U.S. at 149-50. Indeed, "a trial court should consider the[se] specific factors . . . where they are reasonable measures of the reliability of expert testimony." Kumho Tire, 526 U.S. at 152 (emphasis added).

Additional considerations that other courts have used in evaluating expert testimony include whether the expert conducted research independent of the litigation or instead developed his opinions expressly for the purpose of testifying; the qualifications of the expert;

---

[4] Rule 702 states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "[T]echnical knowledge may refer to an economist's opinion of damages based on a lost profit or going concern theory, an engineer's testimony regarding the safe design of equipment, or a financial expert's testimony regarding projected cash flows." Linda Sandstrom Simard & William G. Young, *Daubert's* Gatekeeper: The Role of the District Judge in Admitting Expert Testimony, 68 Tul. L. Rev. 1457, 1467 (1994).

3

and the relationship of the technique to methods that have been established as reliable. See

DiPetrillo v. Dow Chem. Co., 729 A.2d 677, 689 (R.I. 1999).

> [W]hen an expert proposes to testify to a theory that is not so well established that it may be considered accepted truth, a judge should require a clear articulation of the theory and its fundamental underpinnings. Once articulated, the court should consider whether the theory is logically sound. A judge may consider whether the theory is internally consistent, whether it provides an intelligible explanation for an observed phenomenon (a "purely tautological hypothesis" is of little or no explanatory value), and whether the theory is consistent with other theories that are accepted as fact within the particular field of endeavor.

Linda Sandstrom Simard & William G. Young, *Daubert's* Gatekeeper:  The Role of the

District Judge in Admitting Expert Testimony, 68 Tul. L. Rev. 1457, 1471-72 (1994).

**III.     Dr. Gartrell is Not Qualified to Value Real Estate.**

Dr. Gartrell is a consulting economist and accountant with business administration, economics, and accounting degrees.  He has practiced as an accountant and auditor; taught college courses in accounting, business policy/strategy, economics, finance, and investments; and, for the last twelve years, devoted his time to management and economic consulting. Gartrell Report at ¶¶ 5-8 & Ex. 1 thereto.  Gartrell is not a real estate appraiser and is not qualified to appraise real estate under state law[5] or the standards of the Appraisal Foundation.[6] Gartrell has no education, training or experience in real estate appraisal, Gartrell Depo. at 7-10. His education in real estate valuation has been in the context of courses on the broader topic of valuation generally (such as "modern corporate finance, financial theory, investments and

---

[5] 264 CMR 5:05 sets forth the requirements to become a certified real estate appraiser in Massachusetts.  They include 180 classroom hours in real estate appraisal, 3,000 hours of appraisal experience, various examinations, and continuing legal education requirements.  Id.  Gartrell does not meet these qualifications.  See Gartrell Depo. at 6.
[6] The Appraisal Foundation is a non profit organization authorized by the federal Financial Institutions Reform, Recovery and Enforcement Act of 1989 to promulgate appraisal standards and appraisal qualifications.  See www.appraisalfoundation.org.  Its professional standards are the same as those adopted in Massachusetts and are available on line at http://www.appraisalfoundation.org/s_appraisal/sec.asp?CID=76&DID=107.

advanced financial theory, option and commodities"). Id. at 33-34. Gartrell views the valuation of real estate as no different than the valuation of any other business asset or transaction, whether it be corporate stock or a leveraged recapitalization, all of which he says are valued using "the principles of modern corporate finance." Gartrell Depo. at 39-41, 57-58, 100-01.

Gartrell's comprehensive website, Deposition Ex. 374, lists 15 areas of litigation consulting expertise and 25 areas of applied substantive expertise in which he is qualified to give expert testimony. Gartrell Depo. at 17-22. Real estate valuation is not included. Deposition Ex. 384, at p. 4, 5. Although he has written many publications and conference papers in other areas, Gartrell Report Ex. 1, Gartrell has published nothing relating to real estate appraisal or real estate valuation. Gartrell Depo. at 34.

**IV.     Dr. Gartrell's Real Estate Valuation Opinions are Unreliable.**

As a matter of law, the "three generally-accepted methods for estimating the fair market value of real estate [are]:  (a) the depreciated reproduction cost method, which estimates value by taking construction costs less depreciation over time; (b) the comparable sales method, which relies on data of sales of comparable properties; and (c) the income capitalization approach, which is based on an estimate of the earnings the property will generate in the future." Northwest Assocs. v. Board of Assessors of Burlington, 392 Mass. 593, 594 (1984); Correia v. New Bedford Redev. Auth., 375 Mass. 360, 362 (1978); In Re:  150 North St. Assocs. Ltd. P'ship, 184 B.R. 1, *6 (D. Mass. 1995); see also Uniform Standard of Professional Appraisal Practice 1-4 (copy attached to Falby Affidavit at Tab C.)[7]

---

[7] Massachusetts law applies in this case under the loan documents at issue.

Dr. Gartrell's Report in paragraph 24 instead states that "there are three generally-accepted approaches for deriving independent measures of the FMV of the Property as of the date of foreclosure on November 19, 2004:  (1) <u>the market index approach</u>; (2) the market transactions approach; and (3) the income approach."  Gartrell Report at ¶ 24 (emphasis added).  Gartrell disingenuously substitutes his own "market index" approach for the reproductive cost method.

### A. **<u>Gartrell's Market Index Approach is Unreliable and Patently Flawed.</u>**

Paragraph 25 of Gartrell's Report describes his "market index approach" to real estate valuation:  "The market index approach calculates the current FMV of the Property by adjusting its known FMV at a point in time by using observed market values to estimate the value change between that point in time and the valuation date."

Gartrell's market index approach to real estate valuation is not generally accepted.  It is not recognized by the case law, the Appraisal Institute, the Appraisal Foundation, or by any real estate valuation or other publication, treatise, or textbook, to Gartrell's knowledge.  Gartrell Depo. at 50-54.  Indeed, Gartrell admits he knows of **no one** other than himself who uses the market index approach to real estate valuation.  <u>Id.</u> at 127, 55-57.  Gartrell borrowed the market index approach from the "realm of investment banking," where he says it is used "in the transaction valuation before the funding of critical financing events such as IPOs and bond issues. . . ."  Gartrell Depo. at 47-48.  According to Gartrell, the market index approach is also

~BOST1:417237.v1

commonly used in "the area of securities litigation." Id. at 48.[8] Gartrell's application of the market index approach to real estate valuation has not been subject to peer review or publication, Gartrell Depo. at 54-55, nor has it been tested. Id. at 57-59.

In this case, Gartrell used an index of suburban office space in the Boston area published by a company called Global Real Analytics ("GRA") and a $42 million appraised value of the Property from an August 30, 1999 appraisal by Meredith & Grew. (Deposition Ex. 381). He calculated a percentage change from the GRA value reported for the third quarter of 1999 to the value reported for the fourth quarter of 2004, which produced a 5.7% increase; and then increased the 1999 appraisal value of $42 million by that 5.7% to produce a fair market value of $44,391,805 as of November 19, 2004. Gartrell Report, Tables 4.2, 4.1, and 5.1; Gartrell Depo. at 133.

Gartrell was aware of the Bonz & Company appraisal of the Property prepared in October 2004. Id. at 72. He did no analysis or comparison of the August 1999 Meredith & Grew appraisal versus the October 2004 Bonz & Company appraisal before applying his market index approach. Id. at 72-73. After speaking with counsel for the borrower, Gartrell decided that his starting point for his indexing would be the August 1999 appraisal, id. at 72-74, even though he saw no difference in the credentials between the two appraisers and acknowledged that their approaches were the same. Id. at 74-75. Nothing other than advocacy on behalf of the party who hired him dictated that choice. Gartrell simply accepted and relied

---

[8] Gartrell testified at deposition that he has applied the market index approach to real estate in one other case, involving The Danis Companies, in which he said his method was admitted by a federal judge in the district court in Dayton, Ohio. On further inquiry, he acknowledged, however, that the case involved a bench trial, the court has not rendered a decision, it is unclear whether the court will accept his methodology, there were objections about using his method, and whether the judge should rely on his testimony to any extent has been the subject of extensive briefing. Gartrell Depo. at 49-50.

on the Meredith & Grew appraisal without any independent analysis or testing. Id. at 69-72, 74-78.

Gartrell's market index approach is fundamentally flawed. As an initial matter, "an expert may not blindly rely on the conclusions of another and still meet the reliability requirements of Rule 702 and Daubert." United States of America v. Batchelor-Robjohns, 2005 U.S. Dist. LEXIS 13552, *15-18 (S.D. Fla. 2005) (excluding Dr. Gartrell's testimony of value of consideration paid in corporate transaction because he relied without independent testing on the valuations of another expert whose testimony was excluded); American Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569, 1580 (11th Cir. 1985) (expert opinions based upon opinions of others are normally inadmissible); In re TMI Litig., 193 F.3d 613, 716 (3d Cir. 1999) (expert's "failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under Daubert as it was not calculated to produce reliable results."); see Forrestal v. Magendantz, 848 F.2d 303, 309 (1st Cir. 1998) (expert opinion "would be inadmissible" if report of another "were the sole basis" of expert's opinion); Comm v. Gilbert, 366 Mass. 18, 25 (1974) (admitting testimony where expert "engaged in independent analysis . . . [and] was not merely mouthing another expert's opinion") (emphasis added); see also Ferrara & DiMercurio v. St. Paul Ins. Co., 240 F.3d 1, 9 (1st Cir. 2001). Gartrell's blind acceptance of the 1999 Meredith & Grew opinion of value as the foundation of his own opinion requires exclusion of his opinion of value. He could just as readily have started with the much more recent October 2004 Bonz & Company opinion of value.

Gartrell's market index approach to real estate valuation is also flawed because it does not value the Blue Hills Office Park in its condition as of November 19, 2004, but assumes the

~BOST1:417237.v1

condition of the property had remained unchanged since the August 30, 1999 Meredith & Grew appraisal date. As Gartrell admitted, "the index is being applied to the asset that was appraised and transacted upon in 1999 in that condition." Gartrell Depo. at 142. It assumes that the building in November 2004 was in the same physical condition and fully occupied, as in 1999, with a five year market rental lease in place with a five year renewal term. Id. at 142-43. The fallacy of this approach is that the property was vacant as of November 19, 2004, id. at 137, in a very difficult leasing environment, see Deposition Ex. 43, and was in need of renovation. Id. at 144. Gartrell agreed at deposition that vacant office buildings are not worth as much as office buildings fully leased at market rents. Id. at 145-46.[9] He also agreed that if he was trying to determine the value of the Blue Hills Office Park in its actual vacant, deteriorated state as of November 19, 2004, then a downward adjustment would be required. Gartrell Depo. at 144. However, he made no such adjustment. Gartrell Report, Table 5.1.

Moreover, Gartrell's market approach index approach depends on the integrity of the GRA value index. Gartrell Depo. at 195. Yet, that value index is completely suspect. Gartrell testified that the GRA index, set forth in Table 4.2 of his Report, contained substantially the same transactions listed in his Table 6.1 of suburban office sales reported to him by Cushman & Wakefield. Gartrell Depo. at 187-88. Yet, the prices in the GRA index (Table 4.2) are substantially higher than the prices of the transactions reported by Cushman & Wakefield (Table 6.1). Gartrell had no explanation for the difference. Gartrell Depo. at 191-92. He admitted that if the Cushman & Wakefield numbers are accurate, the impact on the application

---

[9] Indeed, the information on Boston suburban office building sales furnished to him by Cushman & Wakefield showed that the prices of vacant buildings were half to sixty percent lower than the prices of fully occupied buildings in the Boston suburban office market from 2002 to 2004. Gartrell Depo. at 146-49; Deposition Exs. 384 & 385.

~BOST1:417237.v1

of his market approach would be material. Id. at 196 ("one would have to say the index would look quite different at these prices").

Indeed, using a 1999 starting value from the GRA index (Table 4.2), and a 2004 ending value from the actual prices reported by Cushman & Wakefield (Table 6.1), Gartrell's market index approach produces a fair market value of $18.9 million. Gartrell Depo. at 196-98. This compares to the November 19, 2004 foreclosure sale price of $18.5 million.

### B. Gartrell Manipulated His Discounted Cash Flow Analysis To Reach The Precise Result Produced by His Market Index Approach.

After performing his mechanical "market index" approach by increasing Meredith & Grew's 1999 value of $42 million by 5.7% to produce a $44,391,805 value, Gartrell performed what his report (in paragraph 24) calls an "independent measure[] of the FMV of the Property," the income approach or discounted cash flow ("DCF") analysis. Gartrell Depo. at 78-79.

The DCF method requires a choice of numerous variables, or inputs, and assumptions. Gartrell Depo. at 84-89. The most important input is the expected gross income, i.e., the expected market rent.

Although labeling the DCF forecast an "independent measure" of fair market value, Gartrell manipulated the DCF inputs to produce precisely the same result as his market index approach. Gartrell testified that after performing the market index analysis, he performed the DCF forecast understanding "that they would have to reasonably agree." Gartrell Depo. at 80. Gartrell believes in the "one price" theory, which he described as a universal principal of economics that there cannot be different prices for the same asset. Id. at 92. He therefore had in mind when he did the DCF forecast that it should reconcile to the result produced by the market index approach. Id. at 93 ("I knew that, yes, uh-huh"). When the DCF forecast at first did not match the market index result, Gartrell adjusted the inputs to make it match, to the

10

precise dollar, producing the identical result of $44,391,805. Gartrell Depo. at 90-91, 97-98; compare Gartrell Report Tables 5.1 and 7.1.

This is not the first time that Gartrell has taken a pre-determined value and then manipulated his analysis to produce that result. His business valuation opinion in Dobler v. Montgomery Cellular Holding Co., Inc., 2004 Del. Ch. LEXIS 139 (2004), aff'd in part, reversed in part, 880 A.2d 206, 215 (Del. 2005) (exclusion of Gartrell valuation not appealed), was rejected by the Delaware Court of Chancery in part for precisely that reason. The court there stated:

> Additionally, when calculating the correct weighting for the EBITDA ratio between rural and regional, Gartrell abandoned his expert responsibilities. As he testified, he "just . . . let the market guide [MCHC's] strategy." He continued by saying that "mathematics itself solved for the simultaneous solution." The conclusion would appear inescapable that Gartrell established a pre-determined valuation figure to which he applied the EBITDA multiples. He then solved the equation algebraically to determine the rural and regional percentages needed to produce the pre-determined answer.

2004 Del. Ch. LEXIS 139, *46.[10]

Not only did Gartrell manipulate the DCF forecast to match his market index value, but his estimated rent number is patently flawed. Both the 1999 Meredith & Grew appraisal and the 2004 Bonz & Company appraisal followed standard appraisal practice by looking to comparable market rents and adjusting them for differences in the properties to estimate a market rent for use in their income approach to valuation. Gartrell Depo. at 75, 169-70.[11] Gartrell made up his own illogical method. Id. at 170-72.

---

[10] The Court of Claims in Brazos Electric Power Cooperative, Inc. v. United States, 52 Fed. Cl. 121 (2002), also rejected Gartrell's expert opinion, finding it "flawed," "irrelevant," "contradicted by the facts," "incorrect," "devoid of factual underpinning," and "speculation." Id. at 127, 128.

[11] This is the approach required by Uniform Standard of Appraisal Practice 1-4(c)(i) promulgated by the Appraisal Foundation ("When an income approach is applicable, an appraiser must: analyze such comparable rental data as are available . . . to estimate the gross income potential of the property") (available on line at

11

Gartrell took a 1999 market net rent of $17 from the 1999 Meredith & Grew appraisal and increased it by the 5.7% increase from the GRA **value** index to estimate a net rent of $17.97 as of 2004.  Gartrell Depo. at 157; Gartrell Report Table 5.1.  He did so notwithstanding that GRA also publishes a **rent** index for the Boston suburban office market, which Gartrell reported in the same table in his report.  Gartrell Report, Table 4.2.  While the value index had risen by 5.7% from 1999 to 2004, the rent index had **fallen** by 32.4%.  Gartrell Depo. at 157; Gartrell Report Table 4.1.  Applying the rent index decrease of 32.4% to the $17 net rent from the 1999 appraisal produces an estimated net rent of $11.49, less than the market net rent of $12.25 estimated by Bonz & Company in its October 2004 appraisal based on comparable market rents.  Gartrell Depo. at 157-58.  Thus, Gartrell's method estimated a starting rent some 50% greater than indicated by market rents, vastly overstating the revenue of his DCF forecast.[12]

Gartrell purported to support his estimate of rent by comparing it to what he deemed the most comparable rent of all, the rent paid by Dunkin Donuts at the property next door, 130 Royall Street.  Gartrell Depo. at 168, 170.  He recalculated his DCF forecast using (a) the rent from the Dunkin Donuts lease as of year end 2004, $21.25, and (b) that lease's tenant improvement allowance of $40/s.f.  Gartrell Report ¶¶ 83-87.  This yielded a fair market value of $51.8 million as of year end 2004, a value Gartrell concluded in his report was "no less reasonable than the $44.4 million baseline DCF value."  Id. ¶ 87; Gartrell Depo. at 173-74.

---

http://commerce.appraisalfoundation.org/html/USPAP2005/toc.htm) (copy attached to Falby Affidavit as Exhibit C.)

[12] On a gross rent basis, Gartrell's method illogically assumed that the building could achieve a gross rent of $28.38 when actual market gross rents that he observed averaged $20.77 and the GRA index of gross market rents was $22.97.  Gartrell Depo. at 164-68.

However, Gartrell erroneously treated the Dunkin Donuts' $21.25 rent as a net rent, whereas he now realizes it was a gross rent.[13]  Gartrell Depo. at 174, 180-81.  Gartrell agreed at deposition that a reasonably equivalent net rent number was $13.25, which when plugged into his DCF forecast would produce a value quite close to the Bonz & Company value of $14.8 million resulting from its income approach calculation in October 2004.  Gartrell Depo. at 176-79.  Because the corrected comparison disproves his value, Gartrell now rejects the 130 Royall Street/Dunkin Donuts lease comparison as "highly unreasonable."  Gartrell Depo. at 178, 182 ("it's missing something"), 185 ("the weight of that has to be ignored"), 186.[14]

### C. Gartrell's Comparable Sales Approach Is Flawed.

Gartrell also purported to do a comparable sales approach to determine value.  Gartrell Report ¶¶ 51-60.  A comparable sales analysis examines prices of sales of similar properties and adjusts them "consider[ing] the quality of construction, occupancy, and locational differences."  Deposition Exhibit 381 p. 64 (1999 Meredith & Grew Appraisal).  Gartrell acknowledged that "the sales price of a real estate asset depends critically on factors such as its specific location, its state of repair, its design and configuration as well as the terms of any tenants occupying or likely to occupy the building in question."  Gartrell Report ¶ 54.  Yet his

---

[13] Under a gross lease, the landlord receives a stipulated gross rent and is required to pay the property's operating expenses and taxes.  Under a net lease, the tenant pays a lower net rent but is required to pay the operating expenses and taxes.  Gartrell 155-56.

[14] Gartrell's calculation of a discount rate for his DCF model was also patently flawed and Gartrell was unable to make sense of it at his deposition.  See Gartrell Depo. at 233-240.  He admitted that the cost of debt ought to be higher, which raises the discount rate, id. at 238-39, and would reduce the present value of future income.

13

comparable sales approach, like his market index approach, did not account for these factors driving real estate value.

Gartrell took the per square foot price of all 22 suburban office transactions reported to him by Cushman & Wakefield (Gartrell Depo. at 110-11), adjusted them by his market index approach to reflect an implied value as of the fourth quarter of 2004, multiplied them by the Property's square footage to arrive at a range of prices for the Property, and then averaged the prices to produce a $29 million number. Apparently because that number is significantly less than $44 million, Gartrell concluded that the average price is an unreliable predictor of value because there is "no way" to control for the differences in the properties. Gartrell Report ¶ 60. He made no effort to do what appraisers do, which is to examine the differences between the properties and adjust the sales prices to account for those differences. Gartrell Depo. at 192; see Deposition Exhibit 381 pp. 64-66 (1999 Meredith & Grew appraisal's sales comparison analysis).

Instead, Gartrell turned to another neighboring property, at 250 Royall Street, and relied solely on its August 2003 selling price to impute a value of $35.5 million for the Property. Gartrell Depo. at 199-200. Yet, he again failed to adjust for obvious differences between the two properties, including the better condition of 250 Royall Street. Id. at 200-01. Notably, Bonz & Company also used the August 2003 sale of 250 Royall Street as one of six comparable sales in its October 2004 appraisal and made appropriate adjustments. Deposition Exhibit 341 Addendum pp. 66-74. Ultimately, Gartrell ended up ignoring his sales comparison value anyway. He concluded that the value of the Property was $44.4 million based solely on his market index approach and his "consistent" DCF forecast. Gartrell Report, "Conclusion," ¶¶105-106.

14

### D. **Gartrell's Valuation Opinions Should be Excluded.**

Applying the principles of Daubert and Kumho Tire, the Court should exclude Gartrell's valuation testimony as unreliable. His valuation approaches are not logically sound. His market index approach satisfies none of the Daubert factors of reliability – it has not been tested or subjected to peer review and publication and does not enjoy general acceptance. It also contradicts established methods of valuation. Further, by valuing the Property as if it were in the same condition in November 2004 as in August 1999, it values the wrong asset. It is also based on a suspect index of values.

Meanwhile, Gartrell's application of two of the three recognized tests for real estate valuation was so manipulated and flawed as to make their results entirely unreliable. He rigged his DCF forecast to produce the same result as his market index approach. His estimated rent input ignores market rents and is obviously overstated. His sales comparison approach does not adjust comparable sales to account for the differences that he acknowledges drive property values, and he ultimately ignores it in favor of his market index approach in any event.

Finally, Gartrell is not qualified to opine as to real estate values, and he developed his opinions solely for purposes of this litigation.

## V. **Gartrell's Other Opinions are Equally Unreliable.**

Gartrell opines at the end of his report that plaintiff "lost balances in its mortgage reserve accounts" and thereby incurred $4.2 million in damages. Gartrell Report ¶¶ 102-03. That is all he says about reserves. The opinion should be excluded as he gives no bases or reasons therefore.

15

Gartrell similarly opines that plaintiff lost "the tax benefits associated with holding the Property." Id. He knows nothing about supposed tax benefits and was asked to assume them. He footnotes a report by David Andelman, which he has not read. He has no opinion of his own about the tax benefits. Gartrell Depo. at 209-11. His assumption about taxes should be excluded.

## CONCLUSION

Gartrell's testimony is unreliable, manipulated, illogical, flawed, and unsupported. For all the reasons stated above, the Lender urges that the Court exclude it from evidence under Federal Rule of Evidence 702.

Respectfully submitted,

J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., and
CSFB 1999-C1 ROYALL STREET, LLC
By their attorneys,

/s/ Bruce E. Falby
E. Randolph Tucker (BBO #503845)
Bruce E. Falby (BBO #544143)
Bruce S. Barnett (BBO #647666)
Traci S. Feit (BBO #660688)
DLA PIPER RUDNICK GRAY CARY US LLP
33 Arch Street, 26th Floor
Boston, MA 02110-1447
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Dated: May 17, 2006