UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

       Plaintiff, Defendant-in-Counterclaim.

       v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and
CSFB 1999–C1 ROYALL STREET, LLC,

       Defendants, Plaintiffs-in-Counterclaim,

       v.

WILLIAM LANGELIER and GERALD
FINEBERG,

       Defendants-in-Counterclaim.

Civil Action No. 05-CV-10506 (WGY)

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
DEFENDANT AND PLAINTIFF-IN-COUNTERCLAIM J.P. MORGAN CHASE BANK,
AS TRUSTEE FOR THE REGISTERED HOLDERS OF CREDIT SUISSE
FIRST BOSTON MORTGAGE SECURITIES CORP., COMMERCIAL
<u>MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 1999-C1</u>**

Defendant and counterclaim-plaintiff J.P. Morgan Chase Bank, as Trustee for the

Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial

Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") submits this memorandum

in support of its motion for summary judgment as to all claims brought by and against it in this

jury-waived action.

## INTRODUCTION

The Trustee incorporates by reference the Introduction contained in the Memorandum In

Support of Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim CSFB

1999–C1 Royall Street, LLC ("CSFB") ("CSFB Summary Judgment Memorandum").

## SUMMARY OF UNDISPUTED FACTS

The relevant undisputed facts are set forth in the Joint Local Rule 56.1 Statement of

Undisputed Facts of the Trustee and CFSB ("Facts"), which is incorporated by reference herein.[1]

## DISCUSSION

**I.    THE LENDER IS ENTITLED TO SUMMARY JUDGMENT AS TO ALL
       COUNTS OF THE COUNTERCLAIM.**

The Trustee incorporates by reference the arguments set forth in the corresponding

Section I of the CSFB Summary Judgment Memorandum.

**II.   THE LENDER IS ENTITLED TO SUMMARY JUDGMENT AS TO ALL
       COUNTS OF THE SECOND AMENDED COMPLAINT.**

**A.    The Lender did not breach the Mortgage, Note, or Cash Management
       Agreement.**

Blue Hills alleges that the Trustee and CSFB (collectively, the "Lender") breached the

loan documents by (1) "failing and refusing to release funds on deposit in the Cash Collateral

---

[1] The Trustee presents the Facts as undisputed for purposes of the instant motion.  In the event that the Court denies this motion, the Trustee reserves the right to dispute certain of these facts at trial.

Account to Blue Hills;" (2) "failing and refusing to properly allocate sufficient funds in the Tax

Fund Sub-account to pay real estate taxes;" (3) "failing and refusing to pay real estate taxes;" and

(4) "wrongfully default[ing] Blue Hills and foreclos[ing] on the Property."  See Second

Amended Complaint ("SAC") ¶ 90-91.  It is undisputed, however, that (1) Blue Hills did not

fulfill the conditions precedent to a release of funds from the loan reserves; (2) Blue Hills asked

the Lender not to allocate funds to the tax escrow account to pay real estate taxes; (3) Blue Hills,

and not the Lender, failed and refused to pay real estate taxes; (4) numerous Events of Default

existed that warranted Lender's foreclosure sale of the property, which complied with

Massachusetts law and the loan documents; and (5) Lender's course of conduct with Blue Hills

was proper and did not estop Lender from foreclosing.

     1.    <u>Blue Hills failed to fulfill the conditions precedent to a disbursement of funds on deposit in the Cash Collateral Account.</u>

Blue Hills' August 2 and September 2 letters requested disbursements from the loan

reserves for principal and interest.[2]  Section 6(c)(ix) of the Mortgage allows up to $1 million of

the Leasing Escrow Funds to be used "solely" for application toward principal and interest under

certain conditions precedent.  Blue Hills did not meet these conditions.

     a.    <u>Blue Hills' Request Was Not Timely.</u>

The Mortgage required Blue Hills to "deliver" a written request to Lender "at least seven

(7) business days prior to the date of such requested disbursement."  Mortgage ¶ 6(c)(ix)(a).  A

written request is deemed "delivered" on the date the request is received by the Lender.

Mortgage ¶ 39.  Blue Hills mailed its August 2 request, which was not received until August 4,

---

[2]  Blue Hills' August 2 letter also requested a disbursement to pay real estate taxes due August 2.  Dep. Ex. 23.  It appears Blue Hills is not contending it was entitled to a disbursement for taxes, and the Mortgage in paragraphs 5 and 6 is clear that it was not so entitled.

2004, Facts ¶ 115, only five business days prior to the August 11, 2004 payment date for which the disbursement was requested.  For this reason alone, Blue Hills was not entitled to a disbursement for payment of principal and interest.  See Bache & Co v. International Controls Corp., 324 F. Supp. 998, 1004 (S.D.N.Y. 1971) (three calendar days notice did not satisfy contract requirement of five business days).

b.     Blue Hills Was in Default.

Even assuming a timely request, Blue Hills was not entitled to a disbursement for principal and interest if any Event of Default had occurred and was continuing as of the date of the request and the date for which the disbursement was requested (the August 11 payment date). Mortgage ¶ 6(c)(ix)(b).  There were several such Events of Default.

i.     Blue Hills' 2003 Defaults Precluded Access to the Reserves.

The first Events of Default to occur were Blue Hills' unauthorized 2003 transfers of Mortgaged Property upon the settlement of the Zoning Appeal and the transfer of the settlement Payment (the "2003 Transfer Defaults"), which were continuing as of August 2004.  While Lender was unaware of these Events of Default at the time of the requests for access to reserves – because Blue Hills concealed them – Lender is entitled to rely on them to deny access, absent detrimental reliance by Blue Hills on the reasons for default given in the Lender's September 17, 2004 notice of default.  See, e.g., New England Structures, Inc. v. Loranger, 354 Mass. 62, 66 (1968) (contractor could rely on grounds for terminating subcontract other than those stated in termination notice unless subcontractor established detrimental reliance on the fact that only another ground was given in the notice); College Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925) ("A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then

ignorant of the fact.").  There was no such reliance by Blue Hills, which never took any action to cure or address the noticed defaults.  The 2003 Transfers alone justify denying access to the reserves and Court need not consider any other basis for denying access.

ii.    A Tax Payment Default Also Precluded Access to the Reserves.

Paragraph 5 of the Mortgage required Blue Hills to pay the property taxes "[s]ubject to the provisions of Paragraph 6 hereof . . ."  Paragraph 6 required Blue Hills to pay amounts in advance to the Lender on a monthly or quarterly basis to be escrowed for taxes.  It was an Event of Default if "any of the Taxes or Other Charges are not paid when the same are due and payable (unless sums equaling the amount of Taxes and Other Charges then due and payable have been delivered to [the Lender] in accordance with Paragraph 6" of the Mortgage.  Mortgage ¶ 23(b).[3]

Blue Hills did not pay the $158,181.19 of property taxes due to the Town of Canton on August 2, 2004, nor did it deliver sums equaling the amount of property taxes due to the Lender in accordance with paragraph 6.  Facts ¶ 106.  Thus, an additional Event of Default occurred on August 2, 2004, and was continuing as of August 4, 2004 (the delivery date of the request) and August 11, 2004 (the requested disbursement date).

(a).    The Lender did not cause the Tax Default by not allocating funds to the tax escrow account.

Blue Hills claims that the Lender did not properly allocate Lockbox rents to the tax escrow fund (the "Tax Fund") to pay the taxes.  SAC ¶ 90.  The Cash Management Agreement ("CMA") provided that the Tax Fund would be funded out of Lockbox rent deposits.  CMA §§ 2 & 3.  However, shortly after the Loan was made, at Blue Hills' request, the parties agreed that the Lender would not escrow funds for taxes from Lockbox rents.  Instead, every quarter the

---

[3] Blue Hills was also required to pay the property taxes by virtue of the Mortgage's incorporation of the Statutory Condition found at Gen. Laws c. 183, § 20. See Mortgage Part II at 68.

Lender sent Blue Hills a deficiency notice two weeks before the taxes were due and Blue Hills provided monies to the Tax Fund obtained from Equiserve to pay the taxes on time. This allowed Lockbox rents that would otherwise have been escrowed for taxes to be distributed to Blue Hills instead. Facts ¶¶ 33-43. This agreement benefited Blue Hills, not the Lender.

The Lender was excused from allocating funds from the Lockbox rents by the parties' clear mutual agreement and longstanding joint course of conduct, which modified the provision concerning allocations to the Tax Fund. See N.E. Mut. Life Ins. Co. v. Stuzin, 1990 U.S. Dist. LEXIS 13137 * 6 (D. Mass. 1990).[4] Blue Hills' Rule 30(b)(6) designee on the subject, Donovan 14, Dep. Ex. 13 Topic 4, testified that he did not ask or expect the Lender to escrow monies to pay the taxes due on August 2, 2004. Donovan 205.

> (b)    The Lender did not cause the Tax Default by failing to pay the property taxes.

Blue Hills claims that the Lender had a duty to pay Blue Hills' property taxes out of the Tax Fund or to notify Blue Hills, 30 days in advance of the due date, that the Tax Fund contained insufficient funds to pay the taxes. SAC ¶¶ 79, 90, 96, 101. Yet, as discussed above, it was Blue Hills' obligation to ensure that the taxes were paid. That the Lender permitted Blue Hills to deposit the necessary funds in the Tax Fund shortly before the payment due date, rather than on a monthly or quarterly basis, did not relieve Blue Hills of this obligation. Mortgage ¶ 44 (agreement by Lender extending the time of payment or otherwise modifying Loan Document terms does not relieve Blue Hills of its obligations under the Mortgage). Furthermore, while the

---

[4] Alternatively, Blue Hills is equitably estopped from complaining that the Lender failed to allocate funds to the Tax Fund. The Lender reasonably relied upon Blue Hills' own statements and conduct, over a period of more than four years, to the effect that no funds were to be allocated by the Lender to the tax escrow on a monthly or quarterly basis. See, e.g., Precious Metals Assoc, Inc. v. Commodity Futures Trading Comm'n, 620 F.2d 900, 908 (1st Cir. 1980) (a party "'is estopped from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made.'") (quoting Bergeron v. Mansour, 152 F.2d 27, 30 (1st Cir. 1945)).

Mortgage required the Lender to "apply the [Tax Fund] to payments of Taxes . . . required to be made by [Blue Hills]," Mortgage ¶ 6(a), the Lender cannot "apply" the Tax Fund to anything unless Blue Hills first deposits funds into the Tax Fund.

Blue Hills knowingly chose not to pay the taxes due on August 2, 2004, despite receiving net rents in the preceding quarter of some half a million dollars. Facts ¶¶ 43, 100. As it had every quarter since February 2000, the Lender sent Blue Hills a deficiency notice two weeks before the taxes were due, reminding Blue Hills that the Tax Fund had a $0 balance and instructing Blue Hills to deposit the necessary funds with the Lender.[5] When Blue Hills did not do so, the Lender was forced to pay Blue Hills' taxes out of its own pocket to protect its security interest in the Property. Facts ¶¶ 102-05.

(c).    Lender is not estopped from relying on the Tax Default.

Blue Hills has designated a purported banking expert, Richard Clarke, who opines, among other things, that, while Blue Hills did default by failing to pay the taxes due August 2, Lender's course of conduct induced that default and, therefore, Lender was not entitled to rely on that default to deny access to the loan reserves for principal and interest payments. Putting aside Clarke's qualifications, and whether this is a proper subject for expert testimony, this contention has no factual or legal support. The bases for Clarke's opinion are that tax payments had previously been handled in an inconsistent manner that led Blue Hills to think it could use reserves for taxes; that the deficiency notice sent by Wells Fargo on July 16, 2004 did not tell

---

[5] There was no 30-day notice requirement. The only reference in the Loan Documents to a 30-day limit relating to taxes is a Mortgage provision for the protection of the Lender requiring Blue Hills to deposit the necessary tax funds 30 days prior to the tax due date if requested. Mortgage ¶ 6(a) ("If at any time Mortgagee determines that the Tax [ ] Fund is not or will not be sufficient to pay [the taxes], Mortgagee shall notify Mortgagor of such determination and Mortgagor shall increase its monthly payments to Mortgagee by the amount that Mortgagee estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes"). That the Lender permitted Blue Hills to fund the Tax Fund shortly before the due date (rather than 30 days before the due date) does not relieve Blue Hills of its obligation to ensure that its taxes are paid. Mortgage ¶¶ 5, 23(b), 44.

Blue Hills it would be in default if it did not pay the taxes; and that Lender did not respond to Blue Hills' September 2 written request for payment of taxes from the reserves until September 17, 2004.  Clarke 230-31.

While the taxes were handled in a manner different from that set forth in the Loan Documents, there was nothing inconsistent about it.  Rather, as just described, there was an agreed-upon, unwavering course of conduct by which Blue Hills funded the taxes within a week or so of the due date.  At no point were replacement or leasing escrow funds used to pay taxes. Facts ¶¶ 41-42.  Blue Hills' CFO Donovan testified that he mistakenly believed that reserves could be used for taxes when Equiserve moved out based on his incorrect understanding of the 1999 negotiation of the Loan Documents, Facts ¶ 108, not on a subsequent course of conduct.

While the July 16, 2004 notice did not explicitly tell Blue Hills it would be in default if it failed to pay the taxes, Blue Hills  – run by experienced real estate investors and property managers – knew that paying taxes was the obligation of the property owner.  See, e.g., Donovan 243.  Moreover, a lender has no duty to tell a borrower it is or will be in default.  See Ferris v. Federal Home Loan Mortgage Corp., 905 F. Supp. 23, 29 (D. Mass. 1995) (in absence of explicit mortgage requirement, lender has no duty to promptly notify borrower of account shortfall). Further, it is undisputed that Blue Hills' accountant Gilbert Stone (who reports to Donovan) was told by Brent Lloyd of Wells Fargo on July 29, 2004, that reserve money could not be used for taxes and Blue Hills would be in default if it did not pay the taxes.[6]

---

[6] See Facts ¶ 104.  While Stone does not remember the conversation, his lack of memory does not warrant an inference that the conversation did not occur and does not create a dispute of fact as to whether it did.  See Ayer v. United States, 902 F.2d 1038, 1044-45 (1st Cir. 1990).  That the conversation occurred is corroborated by Lloyd's contemporaneous records, Dep. Exs. 6 and 8, and records of telephone calls from Wells Fargo to the Borrower, which show two calls to Fineberg Management on July 29.  Affidavit of Stephen Goertzen ¶ 3 and Ex. A thereto.

The timing of Lender's response to the reserve request mailed on August 2, 2004 does not excuse Blue Hills' tax default. By the time the Lender received the request on August 4, 2004, Blue Hills was already in default. The Lender did nothing to mislead Blue Hills into thinking its request had been granted. Silence cannot modify loan documents where nothing in the surrounding circumstances or the parties' prior course of conduct "justif[ies] the assumption that silence indicates assent to the proposal." Polaroid Corp. v. Rollins Envtl. Servs. (NJ), Inc., 416 Mass. 684, 691 (1993); accord McGurn v. Bell Microproducts, Inc., 284 F.3d 86, 90 (1st Cir. 2002). Donovan testified that the only basis for his belief that his request was granted is that Blue Hills learned from the Town of Canton sometime in August that the taxes had been paid. Facts ¶ 112. Yet, he did nothing to determine when or with what money the taxes had been paid. Id. The Lender had no legal obligation to tell Blue Hills its tax request was rejected. See Ferris, 905 F. Supp. at 28.

Finally, Blue Hills' litigation contention that the Blue Hills principals would have paid the taxes from their owns funds to avoid a tax default is disproved by the principals' insistence now that they would not put more money into the property until Lender had a meeting with them and by the fact that they made no offer or effort to cure the tax default (or any other defaults) at any point after receiving notice of the defaults on September 17, 2004. Fineberg 158-60.

iii.    Payment Defaults Precluded Access to the Reserves.

Another independent Event of Default precluding Blue Hills' access to the reserves for payment of principal and interest occurred on August 11, 2004, when Blue Hills failed to make the reserve-account payments required by paragraphs 6(b) and 6(c) of the Mortgage.[7] Blue Hills

---

[7] The fact that Blue Hills' sole tenant had vacated the Property did not relieve Blue Hills of its obligation to make the monthly reserve payments. See Mortgage ¶¶ 6(b) and 6(c) ("Mortgagor shall pay to Mortgagee" such

*(footnote continued to next page)*

did not consider the need to make these payments when it mailed its August 2, 2004 request for access and did not pay them on August 11, 2004 when they became due. Facts ¶¶ 114, 119.

All of these defaults were continuing when Blue Hills made a September 2, 2004 request for reserves access and on the date it sought disbursement (i.e., the September 11 payment date). Additionally, as of September 11, there were additional defaults for failure to make the reserve payments due then. Therefore, access to the reserves in response to Blue Hills' August and September requests was properly denied.[8]

2.    The Lender foreclosed because Blue Hills repeatedly defaulted on its obligations under the Loan Documents.

a.    Numerous Defaults by Blue Hills Justified Foreclosure.

The Mortgage provides that "the Debt shall become immediately due and payable at the option of [Lender] upon the happening of any one" Event of Default. Mortgage ¶ 23. The Mortgage further provides that the Lender may foreclose the Mortgage upon the occurrence of any Event of Default. Mortgage ¶ 26(a). See, e.g., Colonial Operating Co. v. Poorvu et al., 306 Mass. 104, 107 (1940) (lender has a right to foreclose where mortgage requires borrower to pay real estate taxes and borrower fails to do so); Restatement (3d) of Property: Mortgages, § 8.1 (acceleration permitted for failure to pay mortgage debt and also defaults in mortgage covenants

_____

(footnote continued from previous page)
   amounts); Note ¶ 8(a) ("Nothing in this Paragraph. . . shall limit, reduce or otherwise affect [Blue Hills'] obligations to pay the Monthly Payment Amount, make payments to the Tax and Insurance Impound Fund, Base Leasing Escrow Fund, Replacement Escrow Fund or Cash Flow Leasing Escrow Fund due hereunder. . . whether or not Rents are available to make such payments.") (emphasis added).

[8]   The allegations of the Second Amended Complaint that the Lender prevented Blue Hills from re-tenanting the building by denying access to the reserves to pay for re-tenanting expenses are a fiction. Blue Hills never requested access to reserves before its letters dated August 2 and September 2 seeking payment of taxes and principal and interest. Donovan 163. Further, the only re-tenanting expenses payable from the reserves were reimbursement of paid tenant improvements and leasing commissions. Mortgage 6(c)(iv). Blue Hills never incurred any such expenses because it never found any replacement tenant(s). Fineberg 113.

to pay taxes and the like).[9]  By the time the Lender foreclosed on the Mortgage, Blue Hills had

caused no less than <u>twelve</u> Events of Default, as summarized below:

| Date of Event of Default | Undisputed Facts Underlying Event of Default | Applicable Loan Document Provisions |
|---|---|---|
| August 5, 2003 | Blue Hills settles the Zoning Appeal in exchange for a $2 million payment (the "Payment") without the prior written consent of the Lender. | Mortgage ¶¶ 10(a), 23(d) |
| August 8, 2003 | Blue Hills transfers the Payment to Royall Associates, without the prior written consent of the Lender. | Mortgage ¶¶ 10(a), 23(d) |
| August 2, 2004 | Blue Hills fails to pay property taxes owed to the Town of Canton. | Mortgage ¶¶ 5, 23(b) |
| August 11, 2004 | Blue Hills fails to pay principal and interest due on the Loan. | Mortgage ¶¶1, 23(a) |
| August 11, 2004 | Blue Hills fails to make required payments to the reserve accounts. | Mortgage ¶¶ 6, 23(a) |
| August 2004 | Blue Hills sells the Workstations for $100,000 without the prior written consent of the Lender. | Mortgage ¶¶ 10(a), 23(d) |
| September 11, 2004 | Blue Hills fails to pay principal and interest due on the Loan. | Mortgage ¶¶1, 23(a) |
| September 11, 2004 | Blue Hills fails to make required payments to the reserve accounts. | Mortgage ¶¶ 6, 23(a) |
| October 11, 2004 | Blue Hills fails to pay principal and interest due on the Loan. | Mortgage ¶¶1, 23(a) |
| October 11, 2004 | Blue Hills fails to make required payments to the reserve accounts. | Mortgage ¶¶ 6, 23(a) |
| November 11, 2004 | Blue Hills fails to pay principal and interest due on the Loan. | Mortgage ¶¶1, 23(a) |
| November 11, 2004 | Blue Hills fails to make required payments to the reserve accounts. | Mortgage ¶¶ 6, 23(a) |

b.    <u>Lender Was Not Estopped From Foreclosing.</u>

---

[9]  Any argument by Blue Hills that the Lender had some sort of improper motive for foreclosing is irrelevant to Blue Hills' breach of contract claim.  <u>See, e.g.</u>, <u>Fleming v. Dane</u>, 304 Mass. 46, 52 (1939) (mortgagee has a right to foreclose a mortgage that is in default without regard to its motives); <u>Colonial Operating</u>, 306 Mass. at 107.

The Lender expects Blue Hills to argue that Lender is somehow estopped from relying on the defaults in and after August 2004 to justify the foreclosure because of Lender's course of conduct during that time. Any such estoppel argument cannot apply to the prior 2003 Transfer Defaults. These defaults independently justify foreclosure, without regard to estoppel.

An estoppel argument is meritless in any event. Blue Hills claims the Lender caused Blue Hills' defaults by denying access to the reserves. As explained above, the Lender did not cause Blue Hills' tax payment default. Nor did Lender induce Blue Hills' failure to make debt service and other loan payments by not responding in writing to the reserve requests until September 17. The disbursement requests did not even request payment from the reserves of the required replacement, leasing, and insurance fund payments. And the Lender did nothing prior to September 17 to mislead Blue Hills into thinking the requests for payment of debt service had been granted. Donovan never followed up to see if the requests would be granted and the Lender never said they would be. Facts ¶ 122. While LNR's Warshaw and Blue Hills' Goldberg discussed access to the reserves, Warshaw did not say the request would be granted.[10]

Blue Hills did not detrimentally rely before September 17, as shown by Donovan's reaction when LNR Asset Manager Polcari called to tell him that the default notice was coming. According to Polcari's contemporaneous notes and his memory, Donovan said that he understood that LNR had to send the default letter, that Blue Hills had no hope for a tenant, and that the use of the reserves for debt service would not have a made a difference. Facts ¶ 154. Donovan testified he did not recall this conversation and does not know if it took place. His lack

---

[10] Neither Warshaw nor Goldberg contend Warshaw promised access to reserves. Facts ¶¶ 133-42. The disputed elements of their discussion – including whether Warshaw told Goldberg that it appeared Blue Hills could not access loan reserves because it was in default (as Warshaw says) or did not tell him (as Goldberg says) – are immaterial for purposes of summary judgment.

of memory does not create a dispute of fact as to whether it occurred or what was said.  See Ayer

v. United States, 902 F.2d 1038, 1044-45 (1st Cir. 1990).  Any reliance is also disproved by Blue

Hills' SAC, which alleges that between the requests and the September 17 letter, Blue Hills had

"ever-pressing financial needs including the fact that neither Wells Fargo nor Lennar had

released any fund [for] principal and interest."  SAC ¶ 70.  In addition, Blue Hills made no effort

to cure its debt service defaults when it received notice of them on September 17.

　　　A second theme of Blue Hills' case is that it supposedly relied on Lender's alleged

promises of a face-to-face meeting at which they could discuss a workout of the Loan.  Crediting

Blue Hills version of the facts:

- Donovan asked Wells Fargo for a meeting by letter in early August and wanted to get the special servicer involved.  The loan was transferred to LNR, but Donovan never asked LNR for a meeting – he did not return Warshaw's call at the time of the transfer and he did not ask Polcari for a meeting when Polcari called to tell him the September 17 default letter was coming.  Facts ¶¶ 116, 120, 130-32, 154.

- Warshaw sent Blue Hills two letters dated August 19, 2004: one a brief introductory letter and the other a prenegotiation agreement setting forth the conditions of any discussions that might occur.  Blue Hills' makes much of the statement in the introductory letter that "we look forward to a successful working relationship," Dep. Ex. 28, and the statement in the prenegotiation letter that LNR is authorized to "discuss and meet" to review the loan, Dep. Ex. 29, contending these were promises to meet.  This interpretation is patently unreasonable, especially in light of the detailed terms and conditions of the prenegotiation letter, including a provision that neither the borrower nor the lender "is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents."  Dep. Ex. 29, ¶ 4.  See Hogan v. Riemer, 35 Mass. App. Ct. 360, 367 (1993) (holding, in a *residential* foreclosure case, that "[h]ighly generalized expressions of good will such as, 'We'll work with you,' … do not cause a borrower of ordinary perspicacity, who signs highly specific loan documents, reasonably to believe that the documents are without meaning.")

- Goldberg says that his conversations with Warshaw concluded with arrangements for a meeting pending, but Goldberg never followed up to obtain the meeting and, after Blue Hills received the default letter in mid-September, he made no attempt to contact Lender until almost two months later, two days before the scheduled foreclosure sale.  Facts ¶ 143.

- Dan Frank says he asked Polcari for meeting on October 18th and another occasion and was refused.  Facts ¶¶ 156-57.

Blue Hills makes much of the absence of a face to face meeting – its principals hide behind it to explain why they never presented LNR with a business plan, workout proposal, discounted pay-off offer, or even an indication that they had $5.7 million which they now say was available to put into the property.  It was, Langelier and Fineberg testified, bad negotiating to do any of those things before sitting across the table from a lender and looking in the eyes of its representatives.  It was simply not their "style."  They testified that they believed that LNR's pursuit of Lender's remedies under the Mortgage and the law was mere brinksmanship and that LNR would "come around" before the foreclosure and agree to meet.  Facts ¶¶ 174-76.

Even crediting their testimony about wanting a meeting (Donovan and Blue Hills' property manager were meanwhile telling an appraiser who inspected the property that Blue Hills had decided to give the keys back, Facts ¶¶ 159-61), they cannot hold LNR responsible for their gross misjudgment when LNR did nothing to mislead them.  To the extent they contend that Lender had an obligation to meet with them to work toward a resolution, their position is unsupported in the law and the loan documents.  The Mortgage allows foreclosure without notice except as required by state law.  And the law is clear that a Lender has no obligation to negotiate with a borrower in default.  <u>See</u>, <u>e.g.</u>, <u>Citizens Bank of Mass. v. Business Prods. Online, Inc.</u>, 2006 Mass. Super. LEXIS 64, *10 (Mass. Super. Ct. 2006) (lender not required to negotiate manner in which debtor's obligation is to be satisfied after default where contract does not contain such a requirement).[11]  Further, Blue Hills' witnesses acknowledged that any workout of

---

[11] Blue Hills' designated banking expert Clarke opines that LNR and Wells Fargo failed to meet the servicing standard set forth in their Pooling & Servicing Agreement ("PSA") with the Trustee.  However, the Borrower, who is not a party to that agreement, has no right to rely on the standard set forth therein and no standing to claim it is

*(footnote continued to next page)*

the Loan would have required a loan modification, to which the Lender was not obligated to

agree.  Facts ¶¶ 172, 180.

Indeed, given the undisputed facts of the situation facing Lender in August and

September 2004, it had little choice but to proceed to foreclosure.  All objective signs were that

the borrower was walking away from the property.  Fineberg had just recently done so with

respect to hotels in Sturbridge, Mass. and Lancaster, Penn., for which LNR was the special

servicer.  Facts ¶¶ 90-92.  After Equiserve moved out, Blue Hills stopped making any loan

payments.  It let the property taxes go unpaid after being told it would be in default by doing so,

and it failed to make the reserve payments required each month.  The Lender reasonably

interpreted Donovan's September 16 statements as acquiescence to a foreclosure.  Donovan

confirmed that there was "no hope" for a tenant.  Although promising to do so when it

countersigned the prenegotiation letter, Blue Hills provided no business plan for the Property nor

any current financial statements for Blue Hills, Royal Associates, or Fineberg and Langelier, the

guarantors.  Id. ¶¶ 148-49.  Nor did Blue Hills present any workout plan.  Id. ¶ 173.

Given this lack of interest by the borrower, LNR was faced with a seriously under-water

asset in a bad market.  LNR had been predicting a potential loss on the Blue Hills loan of over

$10 million since April 2004.  Id. ¶ 89.  This was re-emphasized by the appraisal it received from

Bonz & Company on October 28, 2004, which valued the property in "as-is" condition at $15

_____

(*footnote continued from previous page*)

    harmed by LNR's and Wells Fargo's alleged failure to live up to it.  Indeed, the PSA expressly provides,  "The
provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors and
assigns of the parties hereto, and all such provisions shall inure to the benefit of the Certificateholders.  No other
person, including, without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or
claim under this Agreement." PSA § 10.8 (emphasis added).  See also Trimless-Flashless Design, Inc. v. Augat,
Inc., 2002 U.S. Dist. LEXIS 22769, *4 (D. Mass. Nov. 21, 2002) ("'The law in Massachusetts is well settled that
an action on a contract must be brought by a party to the contract.'") (internal citations omitted); 767 Third Ave.
LLC v. Orix Capital Markets LLC, 2006 N.Y. App. Div. LEXIS 1868, **4 (N.Y. App. Div. Feb. 14, 2006)
(borrower lacks standing to enforce pooling and servicing agreement).

million while the outstanding Debt was over $30 million.  Id. 159.  In these circumstances,

proceeding to foreclosure was entirely reasonable.[12]

> **B.**   **The Lender did not breach the implied covenant of good faith and fair dealing.**

"Harms suffered in a breach of the implied covenant of good faith and fair dealing

generally involve deceit or 'unfair subterfuge' and usually are 'compounded by deceptive or

unfair behavior that prevented – or at a minimum diverted – the injured parties from seeking

immediate redress.'"  Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (D. Mass.

2005) (internal citations omitted).  As discussed above, Lender did nothing unfair or deceptive.

The implied covenant did not require LNR to meet with Blue Hills to attempt to work out the

Loan.  The covenant may not be invoked to "create rights and duties not otherwise provided for

in the existing contractual relationship."  Uno Rests. v. Boston Kenmore Realty, 441 Mass. 376,

385 (2004).  As one court has stated:

> "By urging this court to find that the Bank had a good faith duty to
> affirmatively cooperate in their efforts to restructure the loan
> agreement, in effect the debtors ask us to expand the existing duty
> of good faith to create obligations on the parties in addition to
> those contained in the contract – a free-floating duty of good faith
> unattached to the underlying legal document.  This we will not
> do."

Rosemont Gardens Funeral Chapel-Cemetery, Inc. v. Trustmark National Bank, 330 F. Supp. 2d

801, 810 (S.D. Miss. 2004) (internal citations omitted); accord Citizens Bank of Mass. v.

Business Prods. Online, 2006 Mass. Super. LEXIS 64, *10 (Mass. Super. Ct. 2006).

> **C.**   **The Lender did not act unfairly or deceptively.**

---

[12]  Internal LNR emails show that LNR was understandably concerned about the loan and the size of the potential
loss and had been considering how best to deal with it, consistent with its obligations as special servicer to
preserve value and protect the interests of the Trust.  See Dep. Exs. 63, 69, 73, 75, 85- 87, 93, 103, 106, 107.

Blue Hills' Chapter 93A claim fails because the Lender's conduct in relation to the loan was not unfair or deceptive. Cases such as <u>Anthony's Pier Four, Inc. v. HBC Associates</u>, 411 Mass. 451 (1991), and <u>Kattar v. Demoulas</u>, 433 Mass. 1 (2000), are inapplicable here. LNR did not attempt to use its contractual rights as leverage to obtain some advantage to which Lender was not entitled under the Loan Documents. Also, in <u>Anthony's</u>, <u>supra</u> at 474-76, <u>Demoulas</u>, <u>supra</u> at 12-14, and like cases, the defendant has breached the contract in question in the course of pressing for the undeserved advantage. As demonstrated in Part II.A., Lender did not breach the Mortgage. Rather, it adhered to the terms of the bargain struck in the Loan Documents and foreclosed on the security for its dramatically underwater Loan.

**D.     Blue Hills has not suffered any damages.**

Blue Hills claims to have suffered three types of damages in this action: (1) loss of equity in the Property of $5.8 million based on an alleged value of $44 million; (2) loss of $4 million held in the reserve accounts; and (3) lost tax benefits amounting to $4.9 million. <u>See</u> Dep. Ex. 379 (Exhibit 3 thereto). Blue Hills has no reasonable expectation of proving that it suffered these alleged damages, and therefore the Lender is entitled to summary judgment on all counts.

1.     <u>Blue Hills had no equity in the Property at the time of the foreclosure sale.</u>

At the time of the foreclosure sale, Blue Hills owed $33,439,307 on the Loan. The foreclosure price on November 19, 2004 was $18.5 million and the appraised value as of October 18, 2004 was $15 million. Given these facts, it is obvious that Blue Hills could not have lost any equity as a result of the foreclosure sale because it had no equity to lose – the Property was worth millions less than Blue Hills owed on the Loan. <u>See</u> 22 Am. Jur. 2d. Damages § 96 ("there can be no recovery for loss of equity if the owner had no equity at the time.").

As a matter of law, the value of the Property is "set conclusively by the final bid accepted at the foreclosure sale," which in this case was $18.5 million. <u>Duclersaint v. Federal Nat'l</u>

Mortgage Assoc., 427 Mass. 809, 812 (1998); see also Rodriguez v. First Union Nat'l Bank, 61 Mass. App. Ct. 438, 443-44 (2004). Only if a foreclosure sale is invalid can the Court consider other evidence of the value of the Property at the time of the sale. See, e.g., Debral Realty, Inc. v. Marlboro Cooperative Bank, 1996 Mass. Super. LEXIS 315, *10 (Mass. Super. Oct. 10, 1996). A sale is "invalid" only if (1) there was no basis for the foreclosure, i.e., the mortgagor was not in default under the loan documents, see Sandler v. Green, 287 Mass. 404, 407 (1934); or (2) the mortgagee conducts the foreclosure sale in bad faith or fails to put forth reasonable diligence in conducting the sale, see, e.g., States Res. Corp. v. Capizzi, 2005 U.S. Dist. LEXIS 956, *27 (D. Mass. Jan. 20, 2005) (applying Massachusetts law). Here, there was clearly a contractual basis for the foreclosure, and there is no evidence that the Lender conducted the foreclosure sale in bad faith or without reasonable diligence.[13]

A foreclosure price may be disregarded if the "price obtained for the Property at auction was 'so gross as to indicate bad faith, or a want of reasonable judgment and discretion'" in the Lender's conduct of the foreclosure. Capizzi, supra at *40. Blue Hills cannot make that showing here. Blue Hills has produced no reliable evidence to support its claim that the Property was worth $44 million at the time of the foreclosure.[14] Even if Blue Hills could prove that the Property was worth $44 million, the foreclosure sale price of $18.5 million amounts to approximately 42% of $44 million. Under Massachusetts law, absent other evidence of bad faith or improper conduct, a price disparity of 42% of fair market value is not "so gross as to indicate

---

[13] The duty of reasonable diligence requires "effort and attention by the mortgagee to conduct the sale of the property fairly and in good faith through the observance of the procedural requirements of the statutes and the mortgage." Seppala & Aho Constr. Co., Inc. v. Peterson, 373 Mass. 316, 326 (1977). Blue Hills' banking expert designee Richard Clarke admitted that the Lender conducted the foreclosure sale in compliance with Massachusetts statute. Clarke 262. The Lender went beyond the requirements of Massachusetts law by advertising the sale in the Boston Globe and Herald. Facts ¶ 166.

[14] See Lender's motion to exclude the testimony of Blue Hills' expert designee Dr. Gartrell, submitted herewith.

bad faith or lack of reasonable diligence." See Resolution Trust Corp. v. Carr, 13 F.3d 425, 430 (1st Cir. 1993) (citing cases discussing price disparity); Leone v. Fleet Nat'l Bank, 63 Mass. App. Ct. 1115, *2 (2005) (unpublished decision) (valid sale where bid price was "less than one-third of value assigned . . . by expert"); accord FDIC v. Elder Care Servs., Inc., 82 F.3d 524, 527 (1st Cir. 1996).  Therefore, as a matter of law, the fair market value of the Property at the time of the foreclosure sale is $18.5 million.  Blue Hills had no equity in the Property.

      2.    Blue Hills was not damaged by the "loss" of funds in the reserve accounts.

Blue Hills essentially claims to have owned the reserve funds.  However, the reserve funds constituted "additional security for the Debt" until expended or applied.  Mortgage ¶¶ 6(b), 6(c)(v).  If Blue Hills had met the preconditions for access to reserves to pay principal and interest, those funds would simply have been applied by the Lender to the Loan amounts due, not turned over to Blue Hills.  Upon an Event of Default, the Lender had the right to apply the reserve funds to the Debt.  Mortgage ¶ 6(d).  Given Blue Hills' twelve Events of Default, the Lender had the right to and did apply the funds in the reserve accounts to the balance of Blue Hills' Debt.[15]  Even if Blue Hills had met the conditions for access to the reserves for principal and interest, that would have only carried the debt service for four months.[16]  As Blue Hills' Donovan acknowledged, both to Polcari on September 16, 2004 and at his deposition, that would not have been enough time to avoid a subsequent default.  Facts ¶ 154; Donovan 236.

      3.    Blue Hills suffered no lost tax benefits as a result of the foreclosure.

          a.    Blue Hills lacks standing to assert claims of tax damages.

---

[15] The Lender credited the full amount of the reserves as of the time of the foreclosure against the debt in determining the deficiency.  Facts ¶ 168.

[16] The Mortgage capped the reserves available for Principal and Interest at $1,000,000, which would have almost covered four monthly payments of $254,000 each.  Mortgage ¶ 6(c)(x).

Blue Hills did not suffer any tax losses.  The Royall partners are "personally liable for any tax resulting from the capital gains derived from the sale of the LLC property."  In re: KRSM Props., LLC, 318 B.R. 712, 719 (9th Cir. 2004).  Blue Hills, a disregarded entity for tax purposes, does not have standing to assert the partners' claims of tax damages.  See Association of Merger Dealers, LLC v. Tosco Corp., 167 F. Supp. 2d 65, 70 (D.D.C. 2001) (no standing where allegations of damages "concern only … members, not the organization itself" and "relief sought … is strictly for its members") (emphasis added); Sylvia's Haven, Inc. v. Massachusetts Dev. Fin. Agency, 397 F. Supp. 2d 202, 220-222 (D. Mass. 2005).[17]  See Facts ¶¶ 5-6.

       b.      Blue Hills has not proven the tax losses of the Royall Partners.

Despite specific requests, Blue Hills has produced no admissible evidence – such as tax returns or workpapers – that the Royall partners will actually pay taxes as a result of the foreclosure.  Facts ¶ 193.  Numerous individual tax attributes such as capital losses may offset the gain due to the foreclosure sale, and these cannot be determined without reviewing the taxpayer's returns.  Blue Hills has offered only a hypothetical chart of what "could be, or would be" the "maximum" tax consequences to the Partners created by its expert designee David Andelman.  Facts ¶¶ 190-91.  Thus, even if Blue Hills has standing to seek damages on behalf of the Partners, it can not prove that any partner has sustained any such damages.

       c.      Tax Payments on Capital gains are not recoverable as an element of damages in this case.

Even if Blue Hills had standing and there was proof of  individuals' tax payments, Blue Hills could not recover capital gains tax payments as an element of damages.  These gains were

---

[17]  Allowing "associations to proceed on behalf of their members" on claims for money damages is improper because such relief necessarily requires the direct participation of the individual members.  Sanner v. Board of Trade, 72 F.3d 918, 923 (7th Cir. 1995); International Ass'n of Firefighters v. Spokane Airports, 45 P.3d 186, 190 (Wash. 2002) (federal courts do not accord associational standing for member's damages if organization has no injury to itself or assignment of damages claim); see Warth v. Seldin, 422 U.S. 490, 515-516 (1975).

not reasonably foreseeable when the parties entered into the Mortgage.  The mortgage itself is silent on the issue.  The Lender has found no decisions, in this jurisdiction, or any other, awarding damages to compensate for capital gains realized because of an alleged wrongful foreclosure.  See Pruett v. Erickson Air-Crane Co., 183 F.R.D. 248, 252 (D. Or. 1998) ("whether tax consequences can constitute an element of damages is a question of state law").  Cf. In re: Fricker, 113 B.R. 856, 870 (E.D. Pa. 1990) (debtor could not recover tax damages on sale of property without proof that defendant-creditor proximately caused damages; "sale…was necessary measure to make up for…delinquencies").  Also, BHOP cannot show, with any degree of certainty, that these capital gains would not have been incurred absent the foreclosure, for example, upon a future sale.  See Pruett, supra at 253; Eckert Cold Storage, Inc. v. Behl, 943 F. Supp. 1230, 1235 (E.D. Cal. 1996) (inquiry into tax consequences is "speculative"); McGuire v. City of Jersey City, 125 N.J. 310, 324, 325 (1991) ("recovery … is too speculative" where " [tax] 'loss' turns on presumptions about income, other transactions, and the state of the tax laws over a period of … years").

## CONCLUSION

For all of the foregoing reasons and those set forth in the CSFB Summary Judgment Memorandum, the Trustee requests summary judgment on its counterclaim and an award of damages in the amount of $10.77 million plus interest and attorneys fees, as provided in the Loan Documents.  Alternatively, the Trustee requests an award of $2.1 million (the amount of the transferred Mortgaged Property), trebled to $6.3 million, with interest and attorneys fees. Judgment should enter in its favor dismissing all claims of Blue Hills' Second Amended Complaint.

Respectfully submitted,

J.P. MORGAN CHASE BANK, as Trustee
for the Registered Holders of Credit Suisse
First Boston Mortgage Securities Corp.,
Commercial Mortgage Pass-Through
Certificates, Series 1999-C1,
By its attorneys,


/s/ Bruce E. Falby
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER RUDNICK GRAY CARY US LLP
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000

Dated:  May 17, 2006