UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>    Plaintiff, Defendant-in-Counterclaim.<br><br>    v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and CSFB 1999–C1 ROYALL STREET, LLC,<br><br>    Defendants, Plaintiffs-in-Counterclaim,<br><br>    v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>    Defendants-in-Counterclaim. | Civil Action No. 05-CV-10506 (WGY) |

**MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OF DEFENDANT AND
<u>PLAINTIFF-IN-COUNTERCLAIM CSFB 1999-C1 ROYALL STREET, LLC</u>**

Defendant and counterclaim-plaintiff CSFB 1999–C1 Royall Street, LLC submits this memorandum in support of its motion for summary judgment as to all claims brought by and against it in this jury-waived action.

## **INTRODUCTION**

In 1999, Blue Hills borrowed approximately $33 million from the predecessor of J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") and CSFB 1999–C1 Royall Street, LLC ("CSFB") (together, the "Lender"), secured by a mortgage and other loan documents. In 2004, due to Blue Hills' numerous defaults under the loan documents, the Lender foreclosed on the mortgaged property and was left with a $10.77 million deficiency on the loan, which it seeks to recover in this action. The loan was generally non-recourse to Blue Hills and its principals, as long as Blue Hills did not commit certain enumerated violations of the Loan Documents. Blue Hills did commit such violations when in 2003 and 2004 it transferred parts of the mortgaged property worth over $2 million without prior written consent of the Lender, and then intentionally concealed the transfers from the Lender. As a result, Blue Hills is liable for the full amount of the deficiency. Those same violations simultaneously triggered the liability of the guarantors, William Langelier and Gerald Fineberg, for the full amount of the deficiency. By its counterclaim in this action, Lender seeks recovery of the deficiency from Blue Hills, Fineberg and Langelier, and Lender's motion for summary judgment on its counterclaim should be granted.

As a result of the 2003 and 2004 transfers of mortgaged property and, independently, Blue Hills' decision to stop paying real estate taxes and all other amounts due under the loan documents (including principal, interest, and reserve payments) after its single tenant moved out

in July 2004, the Lender was justified in foreclosing on the Blue Hills' property in November 2004. In doing so, it abided by the terms of the loan documents and all other duties to the borrower. Moreover, Blue Hills suffered no damages as a result of the foreclosure, as its property was worth over $10 million less than the amount of the debt at the time of the foreclosure. Accordingly, Blue Hills' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Chapter 93A are without merit, and Lender's motion for summary judgment as to those claims should be granted.

## SUMMARY OF UNDISPUTED FACTS

The relevant undisputed facts are set forth in the Joint Local Rule 56.1 Statement of Undisputed Facts of CSFB and the Trustee ("Facts"), which is incorporated by reference herein.[1]

## DISCUSSION

I.  **THE LENDER IS ENTITLED TO SUMMARY JUDGMENT AS TO ALL COUNTS OF THE COUNTERCLAIM.**

   A.  **Blue Hills transferred parts of the Mortgaged Property without the prior written consent of the Lender in breach of the Mortgage and is thus Liable for the Deficiency.**

      1.  The Mortgaged Property includes the Zoning Appeal and the Payment.

"[W]here sophisticated parties choose to embody their agreement in a carefully crafted document, they are entitled to and should be held to the language they chose."[2] Anderson Street Assocs. v. City of Boston, 442 Mass. 812, 819 (2004)[3]; Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 853-54, 856 (1st Cir. 1987) ("it is no appropriate part of judicial

---

[1] CSFB presents the Facts as undisputed for purposes of the instant motion. In the event that the Court denies this motion, CSFB reserves the right to dispute certain of these facts at trial.

[2] The principals of Blue Hills, Langelier and Fineberg, had significant experience in the real estate finance markets when they negotiated the Loan Documents and they were represented by experienced counsel. Facts ¶¶ 7-9, 21.

[3] The loan documents are governed by Massachusetts law. See, e.g., Note ¶ 17.

business to rewrite contracts freely entered into between sophisticated business entities")
(quoting RCI Northeast Servs. Div. v. Boston Edison Co., 822 F.2d 199, 205 (1st Cir. 1987)).

The Mortgage[4] broadly defines the Lender's security interest, referred to as the "Mortgaged Property," to include: (1) the "Premises" (the real property located at 150 Royall Street); (2) the "Improvements" (the building known as Blue Hills Office Park); and (3) the "property, rights, interests, and estates" set forth in the Mortgage's Granting Clauses.  See Mortgage pp. 1-4.  The Granting Clauses state, *inter alia*, that the following "property, rights, interests, and estates" are part of the Mortgaged Property:

- "[a]wards or payments . . . that may heretofore and hereafter be made with respect to the Premises . . . for any other injury to or decrease in the value of the Premises and Improvements," Mortgage Granting Clause Three;

- "income . . . receipts, revenues . . . and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or employees from any and all sources arising from or attributable to the Premises and Improvements," Mortgage Granting Clause Four;

- "[a]ll . . . causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon," Mortgage Granting Clause Seven; and

- "[a]ll proceeds, products, offspring, rents and profits from any of the [Mortgaged Property]," Mortgage Granting Clause Eight.[5]

The Zoning Appeal and the Payment are therefore part of the Mortgaged Property.  The Zoning Appeal is included within the scope of Granting Clause Seven because it is a cause of

---

[4] Capitalized terms used herein have the same meaning as in the Facts.

[5] It is understandable that "Mortgaged Property" is so broadly defined in a non-recourse commercial real estate mortgage, as the lender in such transactions can generally only look to the mortgaged property in the event of a default.  See generally, Gregory M. Stein, The Scope of the Borrower's Liability in a Nonrecourse Real Estate Loan, 55 Wash. & Lee L. Rev. 1207, 1233-1237 (1998) (definition of mortgaged property takes on greater importance in nonrecourse loans, and will typically include intangible as well as physical property).  Blue Hills was well aware of the breadth of the Lender's security interest.  Fineberg 83-88.

action related to, derived from, and used in connection with the Mortgaged Property.  In fact, it is difficult to imagine a cause of action more closely related to the Mortgaged Property than the Zoning Appeal.  First, Blue Hills' standing to bring the Zoning Appeal derived from its ownership of the Mortgaged Property.[6]  Second, the basis of the Zoning Appeal was that the proposed parking structure would be "a detriment to" the Mortgaged Property.  Dep. Ex. 20 ¶ 38.  Blue Hills believed that it would negatively affect traffic on the streets adjacent to the Mortgaged Property, Facts ¶ 48, and would be "immediately in the sight line of [Blue Hills'] Property, will partially block its view and will be detrimental and offensive to [Blue Hills] and the inhabitants of [Blue Hills'] property."  Dep. Ex. 20 ¶ 37.  Third, a motivation of Blue Hills in bringing the Appeal was to keep its sole tenant Equiserve in the building, Facts ¶ 56, thereby preserving its cash flows and ability to service the debt.

Where, as here, a cause of action is specifically included in the list of property subject to a Mortgage, that cause of action is subject to the lender's security interest.  See, e.g., In re Gilley, 236 B.R. 448, 452-53 (Bankr. M.D. Fla. 1999) (holding that, where "rights" and "interests" in the real property were expressly subject to the mortgage, a claim for damage to the real property and the proceeds of that claim are subject to the mortgage).

The Payment is part of the Mortgaged Property for at least three independent reasons.  First, it represents the "proceeds" of the Zoning Appeal under Granting Clause Eight.  See In re Gilley, 236 B.R. at 452-53 (settlement payment for claim for damage to property constitutes

---

[6] Under Mass. Gen. Laws c.40A, § 17, only a "person aggrieved" may appeal the grant of a special permit.  A "party in interest," defined as "the petitioner, abutters, owners of land directly opposite on any public or private street or way, and [certain] abutters to the abutters," is presumed to be a "person aggrieved."  Mass. Gen. Laws c.40A, § 11; Marinelli v. Board of Appeals of Stoughton, 440 Mass. 255, 257-258 (2003).  Blue Hills based its standing to bring the Zoning Appeal on its status as a "party in interest," stating "[Blue Hills] has standing to bring this action as its property abuts the BlueView Property."  See Dep. Ex. 20 ¶ 43.  Blue Hills' principals knew that Blue Hills could bring the Zoning Appeal only because it owned the Mortgaged Property.  Facts ¶ 54.

"proceeds" of the claim). Second, it is "consideration" paid to Blue Hills arising from and attributable to the Premises and Improvements under Granting Clause Four. Third, it is an "award or payment" made for an injury to or decrease in value of the Mortgaged Property under Granting Clause Three. The Payment was made in exchange for, *inter alia*, Blue Hills' agreement to drop the Zoning Appeal, the basis of which was damage to the Mortgaged Property. The settlement ensured that the sole tenant Equiserve would vacate the Mortgaged Property as of July 31, 2004. Facts ¶ 59.

Indeed, Blue Hills' accounting of the Payment confirms that it was made for an injury to or decrease in value of the Mortgaged Property: Blue Hills accounted for the Payment on its books and records as a "return of capital," reducing its basis in the land and the buildings at the Property. Facts ¶ 71. The effect of this treatment was to avoid including the payment as "gross income" for the year in which it was received. While section 61 of the Internal Revenue Code defines gross income broadly as "all income from whatever source derived," 26 U.S.C. § 61, "receipts . . . properly chargeable to capital account" are proper adjustments to basis under IRC § 1016, and are excluded from gross income. See, e.g., Inaja Land Co. v. C.I.R., 9 T.C. 727, 745-736 (1947) (settlement paid for damages to land and property rights and for easement is capital recovery); Trunk v. C.I.R., 32 T.C. 1127, 1138-39 (1959) (payment for right to condemnation award is capital recovery); Case v. United States, 633 F.2d 1240, 1246 n.1 (6th Cir. 1980). To determine whether a litigation settlement is a capital recovery or ordinary income, "[t]he fund involved must be considered in the light of the claim from which it was realized and which is reflected in the petition filed." Inaja, supra at 735. The only conceivable basis on which Blue Hills could treat the Payment as a capital recovery is if it was compensation

for damages to or loss of value in the Property.[7]  Compare Bresler v. C.I.R., 65 T.C. 182, 184 (1975) (lost profits taxed as ordinary income); Raytheon Prod. Corp. v. C.I.R., 144 F.2d 110, 113 (1st Cir. 1944) (same); Rev. Rul. 73-161, 1973-1 C.B. 366.

> 2. **The Mortgage prohibits the transfer of Mortgaged Property or any part thereof without the prior written consent of the Lender.**

Paragraph 10(a) of the Mortgage, titled "Transfer or Encumbrance of the Mortgaged Property," states in part:

> [Blue Hills] shall not, without the prior written consent of [Lender] or as otherwise expressly provided herein or in the other Loan Documents, sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof, or permit the Mortgaged Property or any part thereof to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred.

(emphasis added). The importance of this provision is underscored by paragraph 23(d) of the Mortgage, which makes a violation of paragraph 10 an Event of Default, and by paragraph 13 of the Note, which states that "the Debt shall be fully recourse to [Blue Hills] in the event that . . . (iv) [Blue Hills] fails to obtain [Lender's] prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage."  Note ¶ 13 p. 11.

---

[7] Other types of capital recoveries recognized in the case law are not applicable here. See, e.g., Bresler v. C.I.R., 65 T.C. 182 (1975) (damages to goodwill appropriate basis adjustment); Rev. Rul. 67-33, 1967-2 C.B. 695 (anti-trust settlement compensating for having paid fixed, higher prices for materials is recovery of capital); Madison Fund, Inc. v. C.I.R., 365 F.2d 471, 472 (3d Cir. 1966) (settlement compensating investors for investment company's purchase of securities at inflated prices is recovery of capital).

> 3. **Blue Hills transferred Mortgaged Property without the prior written consent of the Lender.**
>> a. **Blue Hills' settlement of the Zoning Appeal constituted a transfer of part of the Mortgaged Property.**

Because the Zoning Appeal was part of the Mortgaged Property, Blue Hills was not permitted to "sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer" the Zoning Appeal without the Lender's prior written consent. On August 5, 2003, without the prior written consent of the Lender (in fact, without any notice to Lender whatsoever), Blue Hills entered into a settlement of the Zoning Appeal with DST, pursuant to which, in exchange for a payment of $2 million, Blue Hills agreed to, inter alia: (1) dismiss the Zoning Appeal, with prejudice (thereby forfeiting its right to contest the grant of the special permit); (2) waive its right to (at any time within 10 years of the date of the Settlement Agreement) "take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development" of the Blueview property; and (3) release DST and Blueview from any and all claims which Blue Hills had against DST and/or Blueview prior to or on the date of the Settlement Agreement. Facts ¶ 57-58, 62.

The settlement also included a Lease Termination Agreement terminating Equiserve's lease as of July 31, 2004.[8] Dep. Ex. 10. As Blue Hills has admitted, the settlement ensured that Equiserve, its sole tenant, would vacate Blue Hills and move to Blueview, and removed any impediment to Equiserve's building a parking garage that, in Blue Hills' words, would be

---

[8] Blue Hills independently breached the Mortgage by not seeking prior consent under paragraph 8(c) (ii) to the termination of its only tenant's lease. Fineberg 94-95.

"detrimental and offensive" to the Property. Facts ¶¶ 53, 59; Dep. Ex. 20 (Zoning Appeal ¶¶ 37-38).

The word "transfer" in the Mortgage is deemed to include, but is not limited to, several different means of parting with Mortgaged Property: Blue Hills may not "sell, convey, alienate, mortgage, encumber, pledge <u>or otherwise transfer</u>" any part of the Mortgaged Property. Mortgage ¶ 10(a) (emphasis added). The intent of paragraph 10 is expressly stated and illustrates why the word "transfer" is defined so broadly: "Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should Mortgagor default in the repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property." Mortgage ¶ 10(a). The Massachusetts Fraudulent Transfers Act, which has a similar purpose (maintaining the value of collateral as security for the borrower's debts), defines a "transfer" to include: "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, <u>release</u>, lease, and creation of a lien or other encumbrance." Mass. Gen. Laws c.109A, § 2 (emphasis added).[9]

By settling the Zoning Appeal, Blue Hills essentially sold valuable rights arising from its ownership of the Property: the right to contest the ZBA Decision, the right to pursue any causes of action Blue Hills had against DST and/or Blueview at the time of the settlement, and the right to contest the issuance of any permits or approvals sought by DST in connection with the Blueview property at any time within ten years of the Settlement Agreement. Dep. Ex. 21 (Settlement Agreement ¶¶ 3, 7(c)). The fact that these rights were things of value is obvious

---

[9] Similarly, the Bankruptcy Code defines a "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." 11 U.S.C. § 101(54).

given that DST was willing to pay $2 million to Blue Hills to give them up.[10] The rights forfeited by Blue Hills were part of the Mortgaged Property. Given these two facts, it is clear that Blue Hills transferred part of the Mortgaged Property in violation of section 10(a) of the Mortgage. See Buckley v. John, 314 Mass. 719, 726 (1943) (receipt of cash in return for release of claims is a conveyance); Sheffield Progressive, Inc. v. Kingston Tool Co., 10 Mass. App. Ct. 47, 49-50 (1980) (release or waiver of rights to equity of more than $2 million is a conveyance); In re Besing, 981 F.2d 1488, 1493-94 (5th Cir. 1993) (dismissal with prejudice of cause of action belonging to borrower is a "transfer" of property by borrower); In re e2 Commc'ns Inc., 320 B.R. 849, 855-857 (Bankr. N.D. Tex. 2004) ("common sense suggests that a release of claims is a 'transfer' of property").

                      b.        <u>Blue Hills transferred the Payment to its owners without the Lender's prior written consent.</u>

The Payment, like the Zoning Appeal, was a part of the Mortgaged Property. The Payment, however, never passed through any Blue Hills bank account, nor did Blue Hills ever notify the Lender of its receipt of the Payment. Facts ¶¶ 65, 62. Instead, without the Lender's consent, the Payment was transferred to a Bernkopf Goodman LLP client fund account controlled by Fineberg and Langelier, as trustees and beneficiaries of Royall Associates, where it remained until the Lender's foreclosure. Id. ¶ 68. This transfer was accounted for by Blue Hills as a transfer to Royall Associates, as evidenced by an increase in the "Due from Affiliate" line on Blue Hills' balance sheet for the year ending December 31, 2003. Id. ¶ 69. As Blue Hills' tax

---

[10] See also Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 856 (1st Cir. 1987) (agreement to forbear from pressing a claim is "the surrender of a thing of value and is a sufficient consideration for a contract.") (quoting Codman v. Dumaine, 249 Mass. 451, 458 (1924)).

lawyer and tax expert designee David Andelman testified, an amount recorded as "Due From Affiliate" is an amount that has been transferred to an affiliate by Blue Hills. Andelman 87-88.[11]

The client fund account was controlled by the trustees and beneficiaries of Royall Associates. An Agreement dated December 31, 2004 (the "Royall Agreement") dictated how the Payment would be allocated among the beneficiaries. Dep. Ex. 176. Blue Hills was not a party to the Royall Agreement, which split the Payment between the "Fineberg Beneficiaries" and the "Langelier Beneficiaries." Facts ¶¶ 181-86. The money now resides in two separate accounts, one controlled by Fineberg and the other by Langelier. Id. ¶ 77. Blue Hills' transfer of the Payment to Royall Associates without the Lender's prior written consent violated section 10 of the Mortgage.[12]

Any contention by Blue Hills that the transfer was a "loan" (a contention belied by the Royall Agreement) is of no import. A loan, like a distribution, is a transfer. See Dickman v. Comm'r of Internal Revenue, 465 U.S. 330, 338 (1984) (interest-free loan of funds is a transfer of property for tax purposes); Liberty Mut. Ins. Co. v. A.C. Martinelli Rogers Plastic Corp., 344 Mass. 498, 501 (1962) (transfers of checks held to be loans); New York Times Sales, Inc. v.

---

[11] The transfer of the Payment by Blue Hills to Royall Associates also breached several other provisions of the Mortgage. Blue Hills is prohibited under the Mortgage from making any "loans or advances to any third party (including any affiliate or constituent party, any Guarantor or any affiliate of any constituent party or Guarantor)." Mortgage ¶ 12(e). Blue Hills also violated paragraph 12(m) of the Mortgage, pursuant to which Blue Hills agreed to "maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party of Guarantor, or any other person." Finally, Blue Hills agreed to "maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character in light of its contemplated business operations." Mortgage ¶ 12(j). At the time of the transfer of the Payment, Blue Hills knew that Equiserve would be leaving the Property on or around July 31, 2004, and that there would be a property tax payment due on August 2, 2004, and principal, interest and reserve payments due on August 11 and each month thereafter. Given those facts, Blue Hills' transfer of the Payment violated paragraph 12(j). As Blue Hills' Chief Financial Officer stated as the August 2, 2004 tax deadline approached, "[W]e are not going to [pay the taxes] at this point. We don't have the funds." Stone Dep. 100, Facts ¶ 103.

[12] The Supreme Court has long held what is plain on its face -- a transfer of money is a transfer of property. See Pirie v. Chicago Title & Trust Co., 182 U.S. 438 (U.S. 1901).

Comm'r of Revenue, 40 Mass. App. Ct. 749, 753 (1996) (transfers at issue were either loans or dividends).

          c.        <u>Blue Hills transferred the Workstations without the Lender's prior written consent.</u>

On August 2, 2004, Blue Hills entered into an agreement to make another transfer of part of the Mortgaged Property without the Lender's consent. On August 19, 2004, Blue Hills sold 1,000 Haworth Unigroup workstations (the "Workstations") to D. Erwin & Associates LLC for $100,000. Facts ¶ 124. The Workstations were Mortgaged Property pursuant to Granting Clause Two, which includes "[a]ll machinery, furniture, furnishings, equipment . . . and other property of every kind and nature . . . whatsoever owned by Mortgagor . . . now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation, enjoyment and occupancy of the Premises and the Improvements."

          4.        <u>The Failures to Request Consent to Transfer Harmed the Lender.</u>

Blue Hills' failure to request consent of the Lender to settlement of the Zoning Appeal deprived the Lender of the opportunity to participate in and control the Zoning Appeal in order to protect its interest in the Mortgaged Property.

> Upon any Event of Default, <u>or if Mortgagor fails to act under circumstances under which it is unreasonable not to so act</u>, after written notice from Mortgagee, Mortgagee shall have the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its sole discretion, decides should be brought to protect their interest in the Mortgaged Property.

Mortgage ¶ 29 (emphasis added).

In addition, if Blue Hills had properly requested consent, the Lender would have required the settlement proceeds to be placed into an additional reserve to protect against the loss of

Equiserve. Polcari 213-14. Blue Hills' banking expert designee Richard Clarke agreed that a request for consent to the settlement of the Zoning Appeal or the disposition of the settlement proceeds would have given the Lender the opportunity to obtain additional loan payments or reserves. Clarke 41-42 ("It would have been an opportunity for a prudent lender to do that.")

In short, the failures to request consent to the settlement of the Zoning Appeal and transfer of the Payment resulted immediately in a $2 million loss of the Lender's collateral and ultimately in a $10.77 million loss on the Loan.[13] The failure to request consent to transfer of the Work Stations caused another $100,000 loss of collateral.

### 5. Blue Hills is liable for the Deficiency.

Under the terms of the Note and the Mortgage, "the Debt shall be fully recourse to [Blue Hills] in the event that: . . . (iv) [Blue Hills] fails to obtain [Lender's] prior written consent to any assignment, transfer or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage." Note § 13; Mortgage ¶ 54. Accordingly, as a result of the unauthorized transfers of Mortgaged Property identified above, Blue Hills is liable for the full amount of the deficiency remaining after the foreclosure sale. The Lender is entitled to enforce this provision of the loan documents. See, e.g., Heller Fin., Inc. v. Lee, 2002 U.S. Dist. LEXIS 15183, *2-5, *11-16 (N.D. Ill. 2002) (enforcing provision of loan agreement making borrower

---

[13] Blue Hills may suggest that Lender could not have reasonably withheld consent to the settlement and that, upon consent, the $2 million, if deposited in the Lockbox under the Cash Management Agreement, would simply have flowed back to Blue Hills after all loan payments that month were made. However, LNR, which would have responded to a request for consent, Facts ¶ 64, would have required the monies to be reserved, Polcari 213-14. Blue Hills' banking expert designee Richard Clarke agreed that the Lender could have conditioned its consent in this way. Clarke 39, 41-42. Thus, the $2 million payment would never have reached the Lockbox. In any event, because Blue Hills failed to seek prior consent, Massachusetts law precludes it from arguing after-the-fact that consent could not have been reasonably withheld or conditioned. Tage II Corp. v. Ducas Realty Corp., 17 Mass. App. Ct. 664, 666 (1984) ("the landlord might have had to strain its imagination, or that of its lawyer, to invent a reasonable ground for withholding or delaying consent: . . . That, however, is a challenge the landlord is entitled to receive under the lease.").

personally liable for full amount of approximately $5.3 million deficiency where borrower permitted liens totaling approximately $820,000 to be placed on the property);[14] see also Samos Imex Corp. v. Nextel Commc'ns, Inc., 20 F. Supp. 2d 248, 251 (D. Mass. 1998) (Young, J.) ("Parties, particularly sophisticated parties contracting at arms length, should not be allowed to escape a provision for which they knowingly and voluntarily bargained."); Clean Harbors, Inc. v. John Hancock Life Ins. Co., 64 Mass. App. Ct. 347, 355-56 (2005) (prepayment premium enforced according to its terms).

    **B.**    **The Lenders are entitled to summary judgment on their claim against Fineberg and Langelier for payment under the Guaranty.**

"A guaranty is a contract 'like all other contracts'" and "[w]hen the words of the guaranty 'are clear they alone determine the meaning.'" Federal Fin. Co. v. Savage, 431 Mass. 814, 817 (2000) (enforcing guaranty in arms length transaction between sophisticated individuals that resulted in defendant's company receiving bank loans, lest unfairness be visited on lender and certainty in loan transactions be upset) (internal citations omitted).  Under the Guaranty, Fineberg and Langelier are "liable for the full amount of the Debt" in the event that Blue Hills "fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage."  Guaranty § 1.2.  Thus, for all of the reasons set forth in section I.A. herein, Fineberg and Langelier are liable for the deficiency.  See also LaSalle Bank N.A. v. Mobile Hotel Props., LLC, 367 F. Supp.2d 1022, 1029-30 (E.D. La. 2004) (enforcing liability under guaranty for full amount of the approximately $1 million deficiency where borrower made allegedly "innocuous" change to its

---

[14] Although the amount of the deficiency is not referenced in the opinion, the complaint in the Heller Fin. case (available online through Pacer) states that the deficiency was $5,313,759.

status as a single purpose entity: "The language of the mortgage means what it says. . . [The borrower's change of status] triggered the full recourse provision of the mortgage.").

### C. The Lender has been damaged in the amount of the Deficiency.

The amount of the deficiency after the foreclosure sale was $10,770, 847, calculated as follows. The total debt, including principal, interest and late fees, immediately prior to the sale was $33,439,307.[15] The amount of the foreclosure bid ($18,500,000) and the reserves held by the Lender as of the foreclosure ($4,168,460.18) are credited against the total, yielding the deficiency of debt as of the time of the foreclosure. Facts ¶¶ 167-68.

The Lender is also entitled to prejudgment interest since the November 19, 2004 date of foreclosure at the contractual default rate of 13.49%. Note ¶ 1(k), (p).[16]

### D. The Lender is entitled to summary judgment on its claims for breach of the implied covenant of good faith and fair dealing, fraud, and violation of Mass. Gen. Laws c.93A.

Blue Hills not only violated its contractual duties to the Lender, it did so with the intent to benefit its principals at the expense of the Lender, and concealed its wrongful conduct from the Lender. In so doing, Blue Hills breached the implied covenant of good faith and fair dealing; Blue Hills, Fineberg and Langelier committed fraud and violated Mass. Gen. Laws c.93A.

---

[15] This comprises the total debt (excluding prepayment premium) as of November 11, 2004 of $33,343,438.59, of which the principal balance was $31,979,793.66, plus per diem default interest at the note rate of 13.49 per cent, which totaled $95,868.31. See Polcari Aff. Ex. A.

[16] State law is applied in diversity actions to determine "whether and how much pre-judgment interest should be awarded." Fratus v. Republic W. Ins. Co., 147 F.3d 25, 30 (1st Cir. 1998); Saint Gobain Indus. Ceramics, Inc. v. Wellons Inc., 246 F.3d 64, 69 n.1 (1st Cir. 2001). Under Massachusetts law, the contract rate of interest governs. See M.G.L. c. 231 § 6C (providing that "interest shall be added … to the amount of damages, at the contract rate, if established); Fratus, supra, at 31 (parties may contractually provide alternate interest rate).

1.      <u>Blue Hills breached the implied covenant of good faith and fair dealing.</u>

The implied covenant of good faith and fair dealing provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Uproar Co. v. National Broad. Co.</u>, 81 F.2d 373, 377 (1st Cir. 1936); <u>see also</u> <u>Uno Rests. v. Boston Kenmore Realty</u>, 441 Mass. 376, 385 (2004); <u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 411 Mass. 451, 471 (1991). A breach of the implied covenant generally involves "deceit or 'unfair subterfuge' and usually [is] 'compounded by deceptive or unfair behavior that prevented – or at a minimum diverted – the injured parties from seeking immediate redress.'" <u>Christensen v. Kingston Sch. Comm.</u>, 360 F. Supp. 2d 212, 226 (D. Mass. 2005) (quoting <u>Boston Pilots v. Motor Vessel Midnight Gambler et al.</u>, 357 F.3d 129, 135 (1st Cir. 2004)). That is exactly what happened here.

Blue Hills not only breached the Loan Documents, it concealed its breaches from the Lender so as to prevent the Lender from seeking immediate redress under the Loan Documents. Blue Hills considered whether to report the Zoning Appeal and settlement to the Lender, but deliberately did not do so. Facts ¶ 74. Thereafter, although Blue Hills had conversations with the Lender about Equiserve leaving and tenant prospects going forward, Blue Hills did not inform the Lender that it had agreed to termination of Equiserve's lease and received a $2 million settlement payment that it had transferred to its owners. Facts ¶ 88.[17] Despite a requirement that Blue Hills furnish the Lender with annual balance sheets of assets and liabilities, which would have reflected the Payment and reduction in basis, Blue Hills provided

---

[17] Blue Hills continued to conceal information about the disposition of the Payment even in this action, refusing to allow discovery on the subject until the Lender filed a motion to compel. <u>See</u> Motion to Compel of Defendants and Plaintiffs-in-Counterclaim CSFB and the Trustee dated February 17, 2006.

no balance sheet for 2003 or thereafter.  Id. ¶ 79.  The Lender learned of the Zoning Appeal and Payment from a third party only after the foreclosure.  Id. ¶ 187.

As noted above, if the Lender had known of the Zoning Appeal or the Payment, the Lender could have taken control of the action or required that the Payment be placed in an additional loan reserve.  If after the Settlement Agreement and related agreements were executed (or after the Payment had been transferred to Royall Associates), Blue Hills had notified the Lender of its improper transfer of Mortgaged Property, the Lender could have exercised its remedies under the Mortgage, including taking possession of the Payment, accelerating the Debt and commencing foreclosure proceedings – all of which would have resulted in the Lender suffering a smaller loss than the $10.77 million loss it ultimately incurred.

2. Blue Hills, Fineberg and Langelier Defrauded the Lender.

The same facts make Blue Hills, as well as Fineberg and Langelier, liable for fraud.  With the intent to deceive the Lender, Blue Hills and its principals failed to disclose the material facts that it was settling the Zoning Appeal and transferring $2 million of Mortgaged Property to Royall Associates.  Blue Hills was contractually obligated to disclose those facts and the Lender was damaged by the loss of that collateral.  See Chiarella v. U.S., 445 U.S. 222, 235 (1980) (a duty to speak is a predicate for fraud based on non-disclosure); Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir.1986) (stating elements of fraud); Alpine v. Friend Bros., 244 Mass. 164, 167 (1923) (describing action for fraud for "failure to disclose known facts when there was a duty … to disclose; that it was intended that it should be acted upon, as it was, and that damage directly resulted therefrom").  Fineberg and Langelier are personally liable for Blue Hills' fraud under section 1.2(a) of the Guaranty.

       3.      <u>Blue Hills, Fineberg and Langelier violated Mass. Gen. Laws c.93A.</u>

"Conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or deceptive trade practice for c.93A purposes." <u>Towner v. Bennington Constr. Co.</u>, 2005 Mass. Super. LEXIS 534, *37-38 (Oct. 12, 2005) (citing <u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 411 Mass. 451, 474 (1991)).  Blue Hills' conduct, as described above, violated known contractual arrangements and was clearly intended to benefit the beneficiaries of the sole member of Blue Hills – at the expense of the Lender.  As Messrs. Fineberg and Langelier were at all relevant times the ultimate decisionmakers for Blue Hills, they are also directly liable for violations of c.93A.

      Messrs. Fineberg and Langelier directed Blue Hills to settle the Zoning Appeal, Fineberg 129-30, Langelier 111-12, knowing that in doing so they were ensuring that Blue Hills' only tenant would vacate the property and move across the street.  Fineberg 95-96.  Also at their direction, Fineberg 129-30, Blue Hills transferred the Payment to Royall Associates for their own benefit.  They concealed the existence of the Payment from the Lender.  The Lender suffered the loss of the $2 million Payment, which it would have required to be used toward the loan if it had been informed of the transactions and asked for consent, Facts ¶ 63, and was left with impaired collateral.  The transfer of the money under these circumstance amounted to deceptive conversion of funds to which Lender was entitled, which is a violation of Chapter 93A.[18]  <u>See</u> <u>Ravech v. Wheeler</u>, 2001 Mass. Super. LEXIS 198, *15-16 (Mass. Sup. Ct. April 18,

---

[18] Because the transfers of the Zoning Appeal and the Payment were unauthorized, the Lender had "an immediate right to the collateral, permitting [Lender] to maintain an action for conversion." <u>See</u>, e.g., <u>Harley-Davidson Motor Co., Inc. v. Bank of New England – Old Colony, N.A.</u>, 897 F.2d 611, 617 (1st Cir. 1990).  Even if the Lender did not have an immediate right to the collateral, "the overriding rule...is that an action for conversion lies to recover damage to or loss of a chattel by one whose ownership <u>or security interest</u> is harmed." <u>Mancuso v. Gen.

*(footnote continued to next page)*

2001). Blue Hills' decision not to report the settlement of the Zoning Appeal or the Payment to the Lender was willful and knowing. Fineberg considered seeking consent, but did not do so. Fineberg 116-120. Thus, the Lender should receive multiple damages on its Chapter 93A claim. See also Ravech v. Wheeler, supra, *16 (awarding double damage for "conduct particularly deceptive [due to] the fact that [defendant] never intended to pay [plaintiff] or even to the broach the subject of these payments").[19]

## II.   THE LENDER IS ENTITLED TO SUMMARY JUDGMENT AS TO ALL COUNTS OF BLUE HILLS' SECOND AMENDED COMPLAINT.

CSFB incorporates by reference the arguments set forth in the corresponding Section II of the Memorandum In Support of Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 for Summary Judgment (the "Trustee's Summary Judgment Memorandum").

---

*(footnote continued from previous page)*
Motors Acceptance Corp., 1993 Mass. App. Div. 136, 136 (Mass. App. Div. 1993) (emphasis added); see also Laurin v. DeCarolis Constr. Co., Inc., 372 Mass. 688, 690 (1977).

[19] Although Fineberg testified that he consulted and relied on counsel in not seeking consent, Blue Hills may not assert a reliance on counsel defense to a willful and knowing chapter 93A violation. Even assuming reliance on counsel is a valid defense, the defense was not pled and Blue Hills invoked the attorney client privilege in response to questions about the advice given by its attorney, Fineberg 61, 143-44, 216-18; Goldberg 41-43, 77-78; which precludes Blue Hills from relying on that advice now. "A party cannot use 'the attorney-client privilege as both a sword and a shield.'" In re PolyMedica Corp. Secs. Litig., --- F.R.D. ----, 2006 WL 891079, *4 (D. Mass. Apr. 7, 2006) (quoting In re Keeper of the Records, 348 F.3d 16, 24 (1st Cir. 2003)). By asserting the privilege, Blue Hills waived any advice of counsel defense. See Columbia Pictures Telev., Inc. v. Krypton Broad., Inc., 259 F.3d 1186, 1196 (9th Cir. 2001) (court properly precluded use of advice of counsel defense on basis of unfairness to opposing party); Troublé v. Wet Seal, Inc., 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) (holding that defendant "waived any available advice of counsel defense by objecting, based on the attorney client privilege, to [plaintiff's] discovery requests"). Any such reliance was also patently unreasonable. Fineberg 83-88, 219-20.

## **CONCLUSION**

For all of the foregoing reasons and those set forth in the Trustee's Summary Judgment Memorandum, CSFB's motion for summary judgment should be granted in its entirety.  CSFB should be awarded judgment on its counterclaim in the amount of $10.77 million plus interest and attorneys fees, as provided in the Loan Documents.  Alternatively, CSFB is entitled to $2.1 million (the amount of the transferred Mortgaged Property), trebled to $6.3 million, with interest and attorneys fees.  Judgment should enter in its favor dismissing all claims of the Second Amended Complaint.

> Respectfully submitted,
>
> CSFB 1999-C1 ROYALL STREET, LLC,
> By its attorneys,
>
> /s/ Bruce E. Falby
> E. Randolph Tucker, BBO #503845
> Bruce E. Falby, BBO #544143
> Bruce S. Barnett, BBO #647666
> Traci S. Feit, BBO #660688
> DLA PIPER RUDNICK GRAY CARY US LLP
> 33 Arch Street, 26th Floor
> Boston, MA  02110-1447
> (617) 406-6000

Dated:  May 17, 2006