UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————
                                            )
BLUE HILLS OFFICE PARK LLC,                 )
        Plaintiff/Defendant-in-Counterclaim )
                                            )
v.                                          )  Civil Action No. 05-CV-10506 (WGY)
                                            )
J.P. MORGAN CHASE BANK, as Trustee for the  )
the Registered Holders of Credit Suisse First )
Boston Mortgage Securities Corp., Commercial )
 Mortgage Pass-Through Certificates, Series 1999-C1 )
        Defendant                           )
                                            )
and CSFB 1999 – C1 ROYALL STREET, LLC       )
        Defendant/Plaintiff-in-Counterclaim )
                                            )
and                                         )
                                            )
WILLIAM LANGELIER and GERALD FINEBERG       )
        Defendants-in-Counterclaim          )
———————————————————————)

## AFFIDAVIT OF PETER B. McGLYNN

Peter B. McGlynn, on oath, deposes and states as follows:

1.      I am a partner in the firm of Bernkopf Goodman LLP, which maintains a business address at 125 Summer Street, Boston, Massachusetts and am a member in good standing of the Massachusetts bar.  I am lead trial counsel for the plaintiff Blue Hills Office Park LLC ("Blue Hills") and the defendants-in-counterclaim William Langelier ("Langelier") and Gerald Fineberg ("Fineberg").  I am making this affidavit solely for the purpose of authenticating certain documents, including deposition transcripts, deposition exhibits, discovery responses and other documents in support of Blue Hills, Fineberg and Langelier's Motion for Summary Judgment as to All Counterclaims.

### Loan Documents

2.      A true copy of the Mortgage, Assignment of Rents and Security Agreement ("Mortgage Agreement"), Deposition Exhibit 155, Deposition of Curtis Mallegni dated March 8, 2006 ("Mallegni Deposition"), is attached hereto as **Exhibit "1."**

3.      A true copy of the Mortgage Note ("Note"), Deposition Exhibit 213, Deposition of Joseph Rubino dated March 17, 2006 ("Rubino Deposition"), is attached hereto as **Exhibit "2."**

4.      A true copy of the Cash Management Agreement ("CMA"), Deposition Exhibit 156, Deposition of Jill Martin dated March 9, 2006, is attached hereto as **Exhibit "3."**

5.      A true copy of the Guaranty, authenticated by Response No. 12 to J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 ("J.P. Morgan") and CSFB 1999-C1 Royall Street LLC's ("CSFB") Responses to Blue Hill, Langelier and Fineberg's First Set of Requests for Admission, is attached hereto as **Exhibit "4."**

#### Pleadings

6.      A true copy of CSFB's Answers Nos. 12 through 15 to Blue Hills' First Set of Interrogatories, is attached hereto as **Exhibit "5."**

7.      A true copy of CSFB's Answer No. 12 to Fineberg and Langelier's First Set of Interrogatories, is attached hereto as **Exhibit "6."**

8.      A true copy of J.P. Morgan and CSFB's Response Nos. 1, 2, 3, 4, 12, 20 and 27 to Blue Hills, Fineberg and Langelier's First Set of Requests for Admissions, is attached hereto as **Exhibit "7."**

9.      A true copy of Blue Hills' Second Supplemental Answer to Interrogatory No. 7 is attached hereto as **Exhibit "8."**

#### Excerpts of Deposition Transcripts

10.     True copies of excerpts of the Deposition of Gilbert Stone dated February 9, 2006 ("Stone Deposition") are attached hereto as **Exhibit "9."**

11.     True copies of excerpts of the Deposition of Joseph Donovan dated February 14, 2006 ("Donovan Deposition") are attached hereto as **Exhibit "10."**

12.     True copies of excerpts of the Deposition of Daniel Frank dated February 16, 2006 (Frank Deposition") are attached hereto as **Exhibit "11."**

2

13.    True copies of excerpts of the Deposition of Joseph Polcari, Vol. I dated February 28, 2006 ("Polcari Deposition, Vol. I")are attached hereto as **Exhibit "12."**

14.    True copies of excerpts of the Deposition of Joseph Polcari, Vol. II dated March 1, 2006 ("Polcari Deposition, Vol. II") are attached hereto as **Exhibit "13."**

15.    True copies of excerpts of the Deposition of Job Warshaw dated March 2, 2006 ("Warshaw Deposition") are attached hereto as **Exhibit "14."**

16.    True copies of excerpts of the Deposition of Randall Rosen dated March 2, 2006 ("Rosen Deposition") are attached hereto as **Exhibit "15."**

17.    True copies of excerpts of the Mallegni Deposition are attached hereto as **Exhibit "16."**

18.    True copies of excerpts of the Deposition of William Langelier dated March 10, 2006 ("Langelier Deposition") are attached hereto as **Exhibit "17."**

19.    True copies of excerpts of the Rubino Deposition are attached hereto as **Exhibit "18."**

20.    True copies of excerpts of the Deposition of Larry Needle dated March 17, 2006 ("Needle Deposition") are attached hereto as **Exhibit "19."**

21.    True copies of excerpts of the Deposition of Kenneth Goldberg dated April 7, 2006 ("Goldberg Deposition") are attached hereto as **Exhibit "20."**

22.    True copies of excerpts of the Deposition of David Andelman dated April 24, 2006 ("Andelman Deposition") are attached hereto as **Exhibit "21."**

<u>**Deposition Exhibits**</u>[1]

23.    A true copy of October 27, 1999 facsimile regarding payment of real estate taxes, Deposition Exhibit 1, Stone Deposition, is attached hereto as **Exhibit "22."**

24.    A true copy of letter dated July 16, 2004 to Blue Hills regarding property tax shortage, Deposition Exhibit 4, Stone Deposition, is attached hereto as **Exhibit "23."**

---

[1] The Deposition Exhibits were marked in chronological order from 1 - 417; the Exhibits were not re-numbered at the beginning of each deposition.

25.    A true copy of Blueview Corporate Center LLC's Special Permit Application, Deposition Exhibit 9, Stone Deposition, is attached hereto as **Exhibit "24."**

26.    A true copy of July 20, 1999 Mortgage Financing Application, Deposition Exhibit 14 Donovan Deposition, is attached hereto as **Exhibit "25."**

27.    A true copy of letter dated May 14, 2003 from Equiserve, Inc. ("Equiserve") to Blue Hills, Deposition Exhibit 17, Donovan Deposition, is attached hereto as **Exhibit "26."**

28.    A true copy of letter dated May 15, 2003 from Blue Hills to Equiserve, Deposition Exhibit 18, Donovan Deposition, is attached hereto as **Exhibit "27."**

29.    A true copy of Complaint filed in Civil Action No. 03-01051, Norfolk Superior Court ("Norfolk Action"), Deposition Exhibit 20, Donovan Deposition, is attached hereto as **Exhibit "28."**

30.    A true copy of Settlement Agreement dated August 5, 2003, Deposition Exhibit 21, Donovan Deposition, is attached hereto as **Exhibit "29."**

31.    A true copy of letter dated August 2, 2004 from Joseph Donovan ("Donovan") to Wells Fargo Commercial Mortgage Service ("Wells Fargo"), Deposition Exhibit 23, Donovan Deposition, is attached hereto as **Exhibit "30."**

32.    A true copy of letter dated August 5, 2004 from Donovan to Wells Fargo, Deposition Exhibit 24, Donovan Deposition, is attached hereto as **Exhibit "31."**

33.    A true copy of facsimile dated August 13, 2004 from Donovan to Curtis Mallegni ("Mallegni"), Deposition Exhibit 27, Donovan Deposition, is attached hereto as **Exhibit "32."**

34.    A true copy of letter dated October 21, 2004 from LNR Partners, Inc., formerly known as Lennar Partners, Inc. ("LNR") to Blue Hills, Deposition Exhibit 40, Frank Deposition, is attached hereto as **Exhibit "33."**

35.    A true copy of letter dated September 17, 2004 from LNR to Blue Hills, Deposition Exhibit 52, Polcari Deposition, Vol. I, is attached hereto as **Exhibit "34."**

36.    A true copy of letter dated September 2, 2004 from Donovan to Wells Fargo, Deposition Exhibit 54, Polcari Deposition, Vol. I, is attached hereto as **Exhibit "35."**

4

37.     A true copy of letter dated August 19, 2004 from Job Warshaw ("Warshaw") to Blue Hills, Deposition Exhibit 59, Polcari Deposition, Vol. I, is attached hereto as **Exhibit "36."**

38.     A true copy of second letter dated August 19, 2004 from Warshaw to Blue Hills, Deposition Exhibit 60, Polcari Deposition, Vol. I, is attached hereto as **Exhibit "37."**

39.     A true copy of August 24, 2004 facsimile from Warshaw to Blue Hills, Deposition Exhibit 61, Polcari Deposition, Vol. I, is attached hereto as **Exhibit "38."**

40.     True copies of e-mails between LNR and Wells Fargo dated April 2004, Deposition Exhibits 63, 81, 85 and 86, Polcari Deposition, Vol. I, are attached hereto as **Exhibit "39."**

41.     A true copy of e-mail between Wells Fargo and LNR regarding payment of taxes, Deposition Exhibit 65, Polcari Deposition, Vol. I, is attached hereto as **Exhibit "40."**

42.     True copies of e-mails between LNR and Wells Fargo dated September 2003, Deposition Exhibits 69, 70 and 71, Polcari Deposition, Vol. I, are attached hereto as **Exhibit "41."**

43.     True copies of e-mails between LNR and Wells Fargo dated August - November 2004, Deposition Exhibits 89, 106 and 107, Polcari Deposition, Vol. II, are attached hereto as **Exhibit "42."**

44.     A true copy of Proforma Closing Statement, Deposition Exhibit 122, Rosen Deposition, is attached hereto as **Exhibit "43."**

45.     A true copy of December 31, 2004 Agreement, Deposition Exhibit 176, Langelier Deposition, is attached hereto as **Exhibit "44."**

46.     A true copy of Blue Hills' client's funds accounts, Deposition Exhibit 177, Langelier Deposition, is attached hereto as **Exhibit "45."**

47.     A true copy of September 1, 1999 facsimile enclosing August 31, 1999 letter from David Doyle, Esq. to Joseph Rubino, Deposition Exhibit 182 Rubino Deposition, is attached hereto as **Exhibit "46."**

48.     A true copy of Draft Guaranty enclosed in September 1, 1999 letter, Excerpt of Deposition Exhibit 208 Rubino Deposition, is attached hereto as **Exhibit "47."**

5

49.     A true copy of CS First Boston 1999 Inter-Office Memorandum, Deposition Exhibit 217, Rubino Deposition, is attached hereto as **Exhibit "48."**

50.     True copies of letters between counsel for Blue Hills and counsel for CSFB dated November 2004, Deposition Exhibit 41, Needle Deposition, and Deposition Exhibits 334 - 337, Fineberg Deposition, are attached hereto as **Exhibit "49."**

51.     A true copy of Expert Report of David R. Andelman, Esq., Deposition Exhibit 358, Andelman Deposition, is attached hereto as **Exhibit "50."**

52.     A true copy of December 2003 Annual Report, Deposition Exhibit 410, Deposition of Patrick Riley dated May 2, 2006 ("Riley Deposition"), is attached hereto as **Exhibit "51."**

53.     A true copy of the foreclosure deed, Deposition Exhibit 411, Riley Deposition, is attached hereto as **Exhibit "52."**

## Additional Documents

54.     A true copy of a letter dated April 20, 2005 from CSFB to Fineberg and Langelier, authenticated by Response No. 27 to J.P. Morgan and CSFB's Responses to Blue Hill, Langelier and Fineberg's First Set of Requests for Admission, is attached hereto as **Exhibit "53."**

55.     A true copy of the docket sheet for the Norfolk Action printed from the Trial Court Website is attached hereto as **Exhibit "54."**

56.     A true copy of a Certificate issued by the Delaware Secretary of State confirming the formation date of CSFB is attached hereto as **Exhibit "55."**

Signed under the pains and penalties of perjury this 17th day of May 2006.


_____
/s/ *Peter B. McGlynn*
Peter B. McGlynn

#337493 v1/14500/9985

6

EXHIBIT 1

BK 13733PG428                    94/2235 90

T35860

BLUE HILLS OFFICE PARK LLC

and

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC
(Mortgagee)

MORTGAGE, ASSIGNMENT OF LEASES
AND RENTS AND SECURITY AGREEMENT

Dated:  As of September 14, 1999

PROPERTY LOCATION:

Blue Hills Office Park
150 Royall Street
Canton, Massachusetts

99 SEP 15 PM 1:32

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

Schulte Roth & Zabel LLP
900 Third Avenue
New York, New York 10022
Attention:  Susan Nemery

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY

BARRY T. HANNON, REGISTER

SRZHW\611479v8

EXHIBIT
155
3-8-06

CSFBMSC 02707

BK 1 3 7 3 3 PG 4 2 9

## TABLE OF CONTENTS

Granting Clause One.................................................................................................1
Granting Clause Two................................................................................................2
Granting Clause Three..............................................................................................2
Granting Clause Four................................................................................................2
Granting Clause Five................................................................................................3
Granting Clause Six..................................................................................................3
Granting Clause Seven..............................................................................................3
Granting Clause Eight...............................................................................................3

### PART I GENERAL PROVISIONS

1. Payment of Debt and Incorporation of Covenants, Conditions and Agreements .....................4
2. Warranty of Title...............................................................................................4
3. Insurance .........................................................................................................4
4. Casualty............................................................................................................7
5. Payment of Taxes, Etc. .......................................................................................10
6. Tax and Insurance Impound Fund; Replacement Escrow Fund; Leasing Escrow Fund .........11
7. Condemnation....................................................................................................16
8. Leases and Rents................................................................................................20
9. Maintenance and Use of Mortgaged Property .........................................................24
10. Transfer or Encumbrance of the Mortgaged Property ...............................................24
11. Representations and Covenants Concerning the Mortgagor and Mortgaged Property..........27
12. Single Purpose Entity/Separateness.......................................................................34
13. Estoppel Certificates and No Default Affidavits .....................................................37
14. Controlling Agreement .......................................................................................37
15. Changes in Laws Regarding Taxation ...................................................................38
16. No Credits on Account of the Debt........................................................................38
17. Documentary Stamps..........................................................................................38
18. Books and Records ............................................................................................38
19. Performance of Other Agreements ........................................................................40
20. Further Acts, Etc. .............................................................................................40
21. Recording of Mortgage, Etc................................................................................41
22. Reporting Requirements .....................................................................................41
23. Events of Default..............................................................................................42
24. Late Payment Charge.........................................................................................44
25. Right To Cure Defaults.......................................................................................44
26. Additional Remedies..........................................................................................44
27. Right of Entry ..................................................................................................47
28. Security Agreement ...........................................................................................48
29. Actions and Proceedings.....................................................................................49
30. Waiver of Setoff and Counterclaim ......................................................................49
31. Contest of Certain Claims...................................................................................49

CSFBMSC 02708

BK 1 3 7 3 3 PG 4 3 0

| 32. | Recovery of Sums Required to be Paid | 50 |
| 33. | Marshalling and Other Matters | 50 |
| 34. | Hazardous Substances | 50 |
| 35. | Asbestos | 51 |
| 36. | Environmental Monitoring | 52 |
| 37. | Handicapped Access | 53 |
| 38. | Indemnification | 54 |
| 39. | Notices | 55 |
| 40. | Authority | 56 |
| 41. | Waiver of Notice | 56 |
| 42. | Remedies of Mortgagor | 56 |
| 43. | Sole Discretion of Mortgagee | 56 |
| 44. | Non-Waiver | 56 |
| 45. | No Oral Change | 57 |
| 46. | Liability | 57 |
| 47. | Inapplicable Provisions | 57 |
| 48. | Headings, Etc. | 57 |
| 49. | Duplicate Originals | 57 |
| 50. | Definitions | 57 |
| 51. | Homestead | 58 |
| 52. | Assignments | 58 |
| 53. | Waiver of Jury Trial | 58 |
| 54. | Recourse Provisions | 58 |
| 55. | Defeasance | 60 |
| 56. | Cash Management Agreement | 63 |
| 57. | Miscellaneous | 63 |
| 58. | Management of the Mortgaged Property | 65 |
| 59. | Sale of Notes and Securitization | 65 |
| 60. | Securitization Indemnification | 67 |
| 61. | Servicer | 69 |

PART II STATE SPECIFIC PROVISIONS

EXHIBIT A LEGAL DESCRIPTION

SR2NY\611479v8

CSFBMSC 02709

BK 13733PG431

THIS MORTGAGE, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT (the "Mortgage"), made as of September 14, 1999, by BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company, having its principal place of business c/o Fineberg Management, Inc., One Washington Street, Suite 400, Wellsley, Massachusetts 02481 ("Mortgagor"), and to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, a Delaware limited liability company ("Mortgagee"), having its principal office at 11 Madison Avenue, New York, New York 10010.

WITNESSETH:

To secure the payment of an indebtedness in the original principal sum of THIRTY THREE MILLION ONE HUNDRED FORTY NINE THOUSAND AND 00/100 DOLLARS ($33,149,000.00), lawful money of the United States of America, to be paid with interest according to a certain mortgage note of even date herewith made by Mortgagor to Mortgagee (the mortgage note together with all extensions, renewals or modifications thereof being hereinafter collectively called the "Note", and the loan evidenced by the Note hereinafter being referred to as the "Loan") and all other sums due hereunder, under the other Loan Documents (hereinafter defined) and under the Note (said indebtedness and interest due under the Note and all other sums due hereunder under the Note and the other Loan Documents being hereinafter collectively referred to as the "Debt"), Mortgagor has mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, warranted, pledged, assigned, and hypothecated and by these presents does hereby deed, mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, assign and hypothecate unto Mortgagee, the real property described in Exhibit A attached hereto (the "Premises") and the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter located thereon (the "Improvements");

TOGETHER WITH: all right, title, interest and estate of Mortgagor now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and such property, rights, interests and estates hereinafter described are collectively referred to herein as the "Mortgaged Property"), in accordance with all of the terms and provisions of this Mortgage and of the other Loan Documents:

GRANTING CLAUSE ONE

All easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, all rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtsey and rights of curtsey, property, possession, claim and demand

CSFBMSC 02710

BK 1 3 7 3 3 PG 4 3 2

whatsoever, both at law and in equity, of Mortgagor of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

### GRANTING CLAUSE TWO

All machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including, without limitation, all heating, air conditioning, plumbing, lighting, communications and elevator fixtures) and other property of every kind and nature, whether tangible or intangible, whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements and all building equipment, materials and supplies of any nature whatsoever owned by Mortgagor, or in which Mortgagor has or shall have an interest, now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, or usable in connection with the present or future operation, enjoyment and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "Equipment"), including any leases of any of the foregoing, any deposits existing at any time in connection with any of the foregoing, and the proceeds of any sale or transfer of the foregoing, and the right, title and interest of Mortgagor in and to any of the Equipment that may be subject to any "security interests" as defined in the Uniform Commercial Code, as adopted and enacted by the State or States where any of the Mortgaged Property is located (the "Uniform Commercial Code"), superior in lien to the lien of this Mortgage;

### GRANTING CLAUSE THREE

Awards or payments, including interest thereon, that may heretofore and hereafter be made with respect to the Premises and the Improvements, whether from the exercise of the right of eminent domain or condemnation (including, without limitation, any transfer made in lieu of or in anticipation of the exercise of said rights), or for a change of grade, or for any other injury to or decrease in the value of the Premises and Improvements;

### GRANTING CLAUSE FOUR

All leases, including, without limitation, that certain Lease by and between Mortgagor, successor-in-interest to Royall Associates Realty Trust, as lessor, and Boston EquiServe Limited Partnership ("The Bank of Boston"), successor-in-interest to The First National Bank of Boston, as lessee, dated April 19, 1989 (collectively, with all amendments thereto, the "Bank of Boston Lease"), and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises and the Improvements, including any extensions, renewals, modifications or amendments thereof (collectively, the "Leases") and all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or

-2-

CSFBMSC 02711

BK13733PG433

employees from any and all sources arising from or attributable to the Premises and the Improvements (the "Rents"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

## GRANTING CLAUSE FIVE

All proceeds of and any unearned premiums on any insurance policies covering the Mortgaged Property, including, without limitation (subject, however, to the terms and conditions of this Mortgage) the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Mortgaged Property;

## GRANTING CLAUSE SIX

Upon any Event of Default, or if Mortgagor fails to act under circumstances when it is unreasonable not to so act, and as otherwise expressly provided in this Mortgage or in the other Loan Documents, the right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to commence any action or proceeding to protect the interest of Mortgagee in the Mortgaged Property;

## GRANTING CLAUSE SEVEN

All accounts, escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the Uniform Commercial Code, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, permits, consents, licenses, management agreements, contract rights (including, without limitation, any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair, or other work upon the Mortgaged Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Mortgaged Property), and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "Intangibles"); and

## GRANTING CLAUSE EIGHT

All proceeds, products, offspring, rents and profits from any of the foregoing, including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

TO HAVE AND TO HOLD the above granted and described Mortgaged Property unto and to the use and benefit of Mortgagee, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly pay to Mortgagee the Debt at the time and in the manner provided

SRZNY\611479v8

**CSFBMSC 02712**

BK 13733PG434

in the Note and this Mortgage and shall well and truly abide by and comply with each and every covenant and condition set forth herein, in the Note and in the other Loan Documents (hereinafter defined) in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

AND Mortgagor represents and warrants to and covenants and agrees with Mortgagee as follows:

## PART I

## GENERAL PROVISIONS

1.    **Payment of Debt and Incorporation of Covenants, Conditions and Agreements.** Mortgagor shall pay the Debt at the time and in the manner provided in the Note and in this Mortgage. All the covenants, conditions and agreements contained in (a) the Note and (b) all and any of the documents including the Note and this Mortgage now or hereafter executed by Mortgagor and/or others and by or in favor of Mortgagee, which evidences, secures or guarantees all or any portion of the payments due under the Note or otherwise is executed and/or delivered in connection with the Note and this Mortgage (the "**Loan Documents**") are hereby made a part of this Mortgage to the same extent and with the same force as if fully set forth herein.

2.    **Warranty of Title.** Mortgagor warrants that Mortgagor has good, marketable and insurable title to the Mortgaged Property and has the full power, authority and right to execute, deliver and perform its obligations under this Mortgage and to deed, encumber, mortgage, give, grant, bargain, sell, alienate, enfeoff, convey, confirm, pledge, assign and hypothecate the same and that Mortgagor possesses an unencumbered fee estate in the Premises and the Improvements and that it owns the Mortgaged Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown in the title insurance policy insuring the lien of this Mortgage (the "**Permitted Exceptions**") and that this Mortgage is and will remain a valid and enforceable first lien on and security interest in the Mortgaged Property, subject only to said exceptions. Mortgagor shall forever warrant, defend and preserve such title and the validity and priority of the lien of this Mortgage and shall forever warrant and defend the same to Mortgagee against the claims of all persons whomsoever.

3.    **Insurance.**

(a)    Mortgagor, at its sole cost and expense, for the mutual benefit of Mortgagor and Mortgagee, shall obtain and maintain during the entire term of this Mortgage (the "**Term**") policies of insurance against loss or damage by fire, lightning and such other perils as are included in a standard "all-risk" endorsement, and against loss or damage by all other risks and hazards covered by a standard extended coverage insurance policy including, without limitation, riot and civil commotion, vandalism, malicious mischief, burglary and theft. Such insurance shall be in an amount equal to the greatest of (i) the then full replacement cost of the Improvements and Equipment, without deduction for physical depreciation, (ii) the outstanding principal balance of the Loan, and (iii) such amount that the insurer would not deem Mortgagor

SRZNY\611479v8

CSFBMSC 02713

BK 13733PG435

a co-insurer under said policies.   The policies of insurance carried in accordance with this paragraph shall be paid annually in advance and shall contain "Replacement Cost" and "Agreed Amount" Endorsements with waivers of depreciation, and shall have a deductible no greater than (x) $10,000, or (y) five percent (5%) of Net Operating Income (as hereinafter defined), whichever is greater, unless otherwise agreed by Mortgagee.

        (b)    Mortgagor, at its sole cost and expense, for the mutual benefit of Mortgagor and Mortgagee, shall also obtain and maintain during the Term the following policies of insurance:

        (i)    Flood insurance if any part of the Mortgaged Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Program in an amount equal to the lesser of the outstanding principal amount of the Loan or the full replacement cost of the Improvements and Equipment, without deduction for physical depreciation (or such lesser amount as Mortgagee's insurance consultant shall require), plus such additional amount as Mortgagee's insurance consultant shall reasonably require.

        (ii)    Comprehensive public liability insurance, including broad form property damage, blanket contractual and personal injuries (including death resulting therefrom) coverages and containing minimum limits per occurrence of $1,000,000 and $2,000,000 in the aggregate for any policy year.   In addition, at least $5,000,000 excess and/or umbrella liability insurance shall be obtained and maintained for any and all claims, including all legal liability imposed upon Mortgagor and all court costs and attorneys' fees incurred in connection with the ownership, operation and maintenance of the Mortgaged Property.

        (iii)    Rental loss and/or business interruption insurance in an amount equal to the greater of (A) estimated gross revenues for twenty-four (24) months from the operations of the Mortgaged Property or (B) the projected operating expenses (including debt service) for twenty-four (24) months for the maintenance and operation of the Mortgaged Property.  The amount of such insurance shall be increased from time to time during the Term as and when new Leases and renewal Leases are entered into and the Rents increase or the estimate of (or the actual) gross revenue, as may be applicable, increases.

        (iv)    Insurance against loss or damage from (A) leakage of sprinkler systems and (B) explosion of steam boilers, air conditioning equipment, high pressure piping, machinery and equipment, pressure vessels or similar apparatus now or hereafter installed in the Improvements (without exclusion for explosions), to the extent that such items now or hereafter exist upon the Mortgaged Property, in an amount at least equal to the outstanding principal amount of the Note or $2,000,000, whichever is less.

        (v)    If the Mortgaged Property includes commercial property, worker's compensation insurance with respect to any employees of Mortgagor, as required by any governmental authority or legal requirement.

SRZNY\611479v8

**CSFBMSC 02714**

BK I 3 7 3 3 PG 4 3 6

(vi)    During any period of repair or restoration, builder's "all risk" insurance in an amount equal to not less than the full insurable value of the Mortgaged Property insuring against such risks (including, without limitation, fire and extended coverage and collapse of the Improvements to agreed limits) as Mortgagee may request, in form and substance acceptable to Mortgagee.

(vii)    If the Mortgaged Property is or becomes a legal "non-conforming" use, Ordinance or law coverage and insurance coverage to compensate for the cost of demolition and the increased cost of construction in amounts as requested by Mortgagee.

(viii)    Such other insurance as may from time to time be reasonably required by Mortgagee in order to protect its interests.

(c)    All policies of insurance (the **"Policies"**) required pursuant to this paragraph: (i) shall be issued by companies approved by Mortgagee and licensed to do business in the state where the Mortgaged Property is located, with a claims paying ability rating of "AA" or better by Standard & Poor's Rating Services, a division of the McGraw Hill Companies, Inc.; (ii) shall name Mortgagee and its successors and/or assigns as their interest may appear as the beneficiary/mortgagee; (iii) shall contain a non-contributory standard mortgagee clause and a Mortgagee's loss payable endorsement or their equivalents, naming Mortgagee as the person to which all payments made by such insurance company shall be paid; (iv) shall contain a waiver of subrogation against Mortgagee; (v) shall be maintained throughout the Term without cost to Mortgagee; (vi) shall be assigned and the originals delivered to Mortgagee; (vii) shall contain such provisions as Mortgagee deems reasonably necessary or desirable to protect its interest including, without limitation, endorsements providing that neither Mortgagor, Mortgagee nor any other party shall be a co-insurer under said Policies and that Mortgagee shall receive at least thirty (30) days prior written notice of any modification, reduction or cancellation; and (viii) shall be satisfactory in form and substance to Mortgagee and shall be approved by Mortgagee as to amounts, form, risk coverage, deductibles, loss payees and insureds. Mortgagor shall pay the premiums for such Policies (the **"Insurance Premiums"**) as the same become due and payable and shall furnish to Mortgagee evidence of the renewal of each of the Policies with receipts for the payment of the Insurance Premiums or other evidence of such payment reasonably satisfactory to Mortgagee (provided, however, that Mortgagor is not required to furnish such evidence of payment to Mortgagee in the event that such Insurance Premiums have been paid by Mortgagee pursuant to Paragraph 6 hereof). If Mortgagor does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Mortgagee may procure, but shall not be obligated to procure, such insurance and pay the Insurance Premiums therefor, and Mortgagor agrees to reimburse Mortgagee for the cost of such Insurance Premiums promptly on demand. Within thirty (30) days after request by Mortgagee, Mortgagor shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Mortgagee, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices.

(d)    Mortgagee agrees that the Policies provided by Mortgagor on the date hereof satisfy the current requirements hereunder.

SRZKY\611479v8

**CSFBMSC 02715**

BK 13733PG437

(e)    Notwithstanding anything to the contrary in this Mortgage or the other Loan Documents, business loss and rent insurance proceeds shall be considered Rents for all purposes.

4.    <u>Casualty</u>.

(a)    If the Mortgaged Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (an "Insured Casualty"), Mortgagor shall give prompt notice thereof to Mortgagee.  Following the occurrence of an Insured Casualty, Mortgagor, regardless of whether insurance proceeds are available, shall, unless Mortgagee shall have elected to apply the insurance proceeds in reduction of the Debt, then only if Mortgagor shall have failed to repay the Debt in full within one hundred and eighty (180) days after such application, promptly proceed to restore, repair, replace or rebuild the same to be of at least equal value and of substantially the same character as prior to such damage or destruction, all to be effected in accordance with applicable law.  The expenses incurred by Mortgagee in the adjustment and collection of insurance proceeds shall become part of the Debt and be secured hereby and shall be reimbursed by Mortgagor to Mortgagee upon demand.

(b)    Except to the extent provided in <u>Paragraph 4(c)</u> below, in case of loss or damages covered by any of the Policies, the following provisions shall apply:

(i)    In the event of an Insured Casualty that does not exceed $250,000.00, Mortgagor may settle and adjust any claim and agree with the insurance company or companies on the amount to be paid upon the loss, provided that such adjustment is carried out in a competent and timely manner.  In such case, Mortgagor is hereby authorized to collect and receipt for any such insurance proceeds, which shall be held in escrow by Mortgagor and applied by Mortgagor toward the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to the Insured Casualty, in the manner set forth below.  Mortgagor hereby covenants and agrees to commence and diligently to prosecute such restoring, repairing, replacing or rebuilding; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such restoring, repairing, replacing or rebuilding in excess of the net proceeds of insurance made available pursuant to the terms hereof.

(ii)    In the event of an Insured Casualty that is in excess of $250,000.00 but not in excess of thirty-five percent (35%) of the then outstanding principal balance of the Note, Mortgagor may settle and adjust any claim and agree with the insurance company or companies on the amount to be paid upon the loss, with Mortgagee's prior written consent, which shall not be unreasonably withheld; provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of <u>Paragraph 4(b)(iv)</u> below.  In such case, Mortgagor is hereby authorized to collect and receipt for any such insurance proceeds.  Notwithstanding the foregoing, in the event that Mortgagor shall not have finally settled and adjusted any such claim within one hundred eighty (180) days following the Insured Casualty, then and in that event, Mortgagee shall thereupon control the settlement and adjustment, and Mortgagee shall consult with Mortgagor in respect thereof; <u>provided</u>, <u>however</u>, that, should

CSFBMSC 02716

BK I 3 7 3 3 PG 4 3 8

Mortgagor and Mortgagee disagree as to such settlement or adjustment, then Mortgagee alone may settle and adjust the claim without the consent or agreement of Mortgagor and agree with the insurance company or companies on the amount to be paid on the loss. In any event, the proceeds of any such policy shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

(iii)    In the event an Insured Casualty shall exceed thirty-five percent (35%) of the then outstanding principal balance of the Note, Mortgagor may settle and adjust any claim and agree with the insurance company or companies on the amount to be paid upon the loss, with Mortgagee's prior written consent, which shall not be unreasonably withheld; provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 4(b)(iv) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such insurance proceeds. Notwithstanding the foregoing, the event that Mortgagor shall not have finally settled such claim within sixty (60) days following the Insured Casualty, then and in that event, Mortgagee shall thereupon control the settlement and adjustment, and Mortgagee shall consult with Mortgagor in respect thereof; provided, however, that, should Mortgagor and Mortgagee disagree as to such settlement or adjustment, then Mortgagee alone may settle and adjust the claim without the consent or agreement of Mortgagor and agree with the insurance company or companies on the amount to be paid on the loss. In any event, the proceeds of any such policy shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

(iv)    Mortgagee shall not unreasonably delay the granting or withholding of any consent requested of Mortgagee pursuant to the provisions of Paragraph 4(b)(ii) or 4(b)(iii), and if Mortgagee's disapproval of any proposed settlement or adjustment is not received by Mortgagor within forty-five (45) days following the receipt by Mortgagee of Mortgagor's request, Mortgagee shall be deemed to have granted its approval or consent, provided, however, that Mortgagor shall provide Mortgagee with written notice of, and request for approval or consent to, any proposed settlement or adjustment and provided, further, that such notice shall contain the following introductory sentence in conspicuous 14 point boldface type: "THIS IS A REQUEST FOR AN APPROVAL FROM MORTGAGEE BY MORTGAGOR, A RESPONSE TO WHICH MUST BE RECEIVED BY MORTGAGOR WITHIN FORTY-FIVE (45) DAYS OF MORTGAGEE'S RECEIPT HEREOF, OR SUCH APPROVAL SHALL BE DEEMED GRANTED."

(v)    In the event of an Insured Casualty where the loss is in an aggregate amount in excess of $250,000.00 but less than thirty-five percent (35%) of the original principal balance of the Note, and if, in the reasonable judgment of Mortgagee, the Mortgaged Property can be restored within twelve (12) months and prior to the Anticipated Repayment Date (as defined in the Note) to an economic unit not materially less valuable (including an assessment of the impact of the termination of any Leases due to such Insured Casualty) and not materially less useful than the same was immediately prior to the Insured Casualty, then, if no Event of Default (as hereinafter defined) shall have occurred and be then continuing, the proceeds of insurance (after reimbursement of any expenses incurred by Mortgagee) shall be applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the

SRZNY\611479v8

CSFBMSC 02717

BK 1 3 7 3 3 PG 4 3 9

Mortgaged Property or part thereof subject to the Insured Casualty, in the manner set forth below. Mortgagor hereby covenants and agrees to commence and diligently to prosecute such restoring, repairing, replacing or rebuilding; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such restoring, repairing, replacing or rebuilding in excess of the net proceeds of insurance made available pursuant to the terms hereof.

(vi)    Except as provided above, the proceeds of insurance collected upon any Insured Casualty shall, at the option of Mortgagee in its sole discretion, be applied to the payment of the Debt or applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to the Insured Casualty, in the manner set forth below. Any such application to the Debt shall be without any prepayment consideration except that if an Event of Default has occurred, then the Mortgagor shall pay to Mortgagee an additional amount equal to the Yield Maintenance Premium (hereinafter defined), if any, that would be required under Paragraph 55 hereof if Defeasance Collateral (hereinafter defined) was to be purchased by Mortgagor. Any such application to the Debt shall be applied to those payments of principal and interest last due under the Note but shall not postpone or reduce any payments otherwise required pursuant to the Note other than such last due payments. Upon any such application to the Debt, Mortgagor may within one hundred eighty (180) days after such application prepay the balance of the Debt without penalty or premium on not less than ten (10) days notice to Mortgagee and upon payment in full Mortgagee will release all collateral.

(vii)    In the event Mortgagor is entitled to reimbursement out of insurance proceeds held by Mortgagee, such proceeds shall be disbursed from time to time upon Mortgagee being furnished with (1) evidence satisfactory to it of the estimated cost of completion of the restoration, repair, replacement and rebuilding, (2) funds or, at Mortgagee's option, assurances satisfactory to Mortgagee that such funds are available, sufficient in addition to the proceeds of insurance to complete the proposed restoration, repair, replacement and rebuilding, and (3) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other reasonable evidences of cost, payment and performance as Mortgagee may reasonably require and approve. Mortgagee may, in any event, require that all plans and specifications for such restoration, repair, replacement and rebuilding be submitted to and approved by Mortgagee prior to commencement of work. No payment made prior to the final completion of the restoration, repair, replacement and rebuilding shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than proceeds of insurance shall be disbursed prior to disbursement of such proceeds; and at all times, the undisbursed balance of such proceeds remaining in the hands of Mortgagee, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Mortgagee by or on behalf of Mortgagor for that purpose, shall be at least sufficient in the reasonable judgment of Mortgagee to pay for the cost of completion of the restoration, repair, replacement or rebuilding, free and clear of all liens or claims for lien. Any surplus which may remain out of insurance proceeds held by Mortgagee after payment of such costs of restoration, repair, replacement or rebuilding shall be paid to Mortgagor.

-9-

SR2NY\611479v8

CSFBMSC 02718

BK I 3 7 3 3 PG 4 4 0

(c)    (i)    Notwithstanding the foregoing provisions of <u>Paragraph 4(b)</u>, for so long as the Boston SNDA (as defined in Paragraph 8(d) below is in full force and effect, all proceeds of insurance collected upon any Insured Casualty shall be payable to and held and maintained by Mortgagee or deposited by Mortgagee with a third party trustee selected by Mortgagee, and all such proceeds shall be applied by Mortgagee as provided in the Boston SNDA (if and to the extent that the provisions of the Boston SNDA are in conflict with the provisions of Paragraph 4(b), <u>provided</u>, <u>however</u>, that, in the event that any Insured Casualty shall occur within twelve (12) months prior to, or at any time after, the Anticipated Repayment Date, Mortgagee shall, at its option, apply the proceeds from the Insured Casualty to the payment of the Debt. If Mortgagee elects to ~~so~~ apply such proceeds to the payment of the Debt, Mortgagor may within one hundred eighty (180) days after such application prepay the balance of the Debt without penalty or premium on not less than ten (10) days notice to Mortgagee and upon payment in full Mortgagee will release all collateral.

(ii)    In the event that proceeds from any Insured Casualty are applied by Mortgagee as provided in the of Boston SNDA, Mortgagor shall restore and repair, or cause to be restored and repaired, the Mortgaged Property in the manner and upon such terms and conditions as required by the Bank of Boston Lease and (to the extent not in conflict with the Bank of Boston Lease) as would be required by a prudent interim construction lender, including, but not limited to (A) the deposit by Mortgagor with Mortgagee, within thirty (30) days after demand therefor, of any deficiency necessary in order to assure the availability of sufficient funds to pay for such restoration or repair, including Mortgagee's costs and expenses to be incurred in connection therewith; <u>provided</u>, <u>however</u>, that such funds shall be held in escrow by Mortgagee and disbursed as the first funds for restoration or repair, (B) the prior approval by Mortgagee of all plans and specifications, contractors and forms of construction contracts, and (C) the furnishing to Mortgagee of permits, bonds, lien waivers, invoices, receipts and affidavits from all contractors and subcontractors in form and substance reasonably satisfactory to Mortgagee in its discretion; <u>provided</u>, <u>however</u>, that, in the event that Mortgagor does not cause to be restored or repaired the Mortgaged Property in accordance with the foregoing provisions, and the same continues for thirty (30) days after notice from Mortgagee, the same shall be an Event of Default hereunder and Mortgagee may, in Mortgagee's absolute discretion and without regard to the adequacy of Mortgagee's security, elect to accelerate the maturity date of the Note, declare any and all of the Debt to be immediately due and payable and apply any sums then held by the Mortgagee or an insurance trustee pursuant to this <u>Paragraph 4</u> to the payment of the Debt in whatever order Mortgagee elects.

5.    <u>Payment of Taxes, Etc.</u> Subject to the provisions of <u>Paragraph 6</u> hereof and of the Cash Management Agreement, Mortgagor shall pay all taxes, assessments, water rates and sewer rents, now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof (the "Taxes") and all ground rents, maintenance charges, other impositions, and other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Premises, now or hereafter levied or assessed or imposed against the Mortgaged Property or any part thereof (the **"Other Charges"**) as the same become due and payable. Mortgagor will deliver to Mortgagee receipts for payment or other evidence satisfactory to Mortgagee that the Taxes and Other Charges have been so paid or are

CSFBMSC 02719

BK I 3 7 3 3 PG 4 4 I

not then delinquent no later than thirty (30) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Mortgagor shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Mortgaged Property, and shall promptly pay for all utility services provided to the Mortgaged Property. Mortgagor shall furnish to Mortgagee receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent (provided, however, that Mortgagor is not required to furnish such receipts for payment of Taxes in the event that such Taxes have been paid for by Mortgagee pursuant to Paragraph 6 hereof).

6.    **Tax and Insurance Impound Fund; Replacement Escrow Fund; Leasing Escrow Fund.**

(a)    Mortgagor shall pay to Mortgagee on the eleventh day of each calendar month (a) one-twelfth of the Taxes that Mortgagee estimates will be payable during the next ensuing twelve (12) months (provided, however, that, for so long as the Bank of Boston Lease shall be in full force and effect and shall permit The Bank of Boston to reimburse Mortgagor for such Taxes on a quarterly basis, Mortgagor may pay to Mortgagee, on a quarterly basis, one-quarter of such Taxes commencing with the eleventh day of November, 1999 and on the eleventh day of each third calendar month thereafter) in order to accumulate with Mortgagee sufficient funds to pay all such Taxes at least ten (10) days prior to their respective due dates, and (b) one-twelfth of the Insurance Premiums that Mortgagee estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Mortgagee sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (said amounts in (a) and (b) above hereinafter called the **"Tax and Insurance Impound Fund"**). Mortgagee will apply the Tax and Insurance Impound Fund to payments of Taxes and Insurance Premiums required to be made by Mortgagor pursuant to Paragraphs 3 and 5 hereof. In making any payment relating to the Tax and Insurance Impound Fund, Mortgagee may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If the amount of the Tax and Insurance Impound Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Paragraphs 3 and 5 hereof, Mortgagee shall, in its sole discretion, return any excess to Mortgagor or credit such excess against future payments to be made to the Tax and Insurance Impound Fund. In allocating such excess, Mortgagee may deal with the person shown on the records of Mortgagee to be the owner of the Mortgaged Property. If at any time Mortgagee determines that the Tax and Insurance Impound Fund is not or will not be sufficient to pay the items set forth in (a) and (b) above, Mortgagee shall notify Mortgagor of such determination and Mortgagor shall increase its monthly payments to Mortgagee by the amount that Mortgagee estimates is sufficient to make up the deficiency at least thirty (30) days prior to delinquency of the Taxes and/or expiration of the Policies, as the case may be. Until expended or applied as above provided, any amounts in the Tax and Insurance Impound Fund shall constitute additional security for the Debt. The Tax and Insurance Impound Fund shall not constitute a trust fund and may be commingled with other monies held

SRZMY\611479vB

CSFBMSC 02720

BK 13733PG442

by Mortgagee. No earnings or interest on the Tax and Insurance Impound Fund shall be payable to Mortgagor. If Mortgagee so elects at any time, Mortgagor shall provide, at Mortgagor's expense, a tax service contract for the Term issued by a tax reporting agency acceptable to Mortgagee. If Mortgagee does not so elect, Mortgagor shall reimburse Mortgagee for the cost of making annual tax searches throughout the Term.

(b)     Mortgagor shall pay to Mortgagee on the eleventh day of each calendar month the sum of Four Thousand Five Hundred Sixty Four and 42/100 Dollars ($4,564.42) which shall be deposited with and held by Mortgagee for replacement and repairs required to be made to the Mortgaged Property during the calendar year and for any other work approved by Mortgagee ("**Replacement Escrow Fund**"). Mortgagee shall make disbursements from the Replacement Escrow Fund as requested by Mortgagor, and approved by Mortgagee in its reasonable discretion, no more frequently than once in any thirty (30) day period of no less than $5,000.00 upon delivery by Mortgagor of Mortgagee's standard form of draw request accompanied by copies of paid invoices for the amounts requested and, if required by Mortgagee for requests in excess of $10,000.00 for a single item, lien waivers and releases from all parties furnishing materials and/or services in connection with the requested payment. Mortgagee may require an inspection of the Mortgaged Property at Mortgagor's expense prior to making a monthly disbursement in order to verify completion of replacements and repairs of items in excess of $10,000.00 for which reimbursement is sought. The Replacement Escrow Fund shall be held in an interest bearing account in Mortgagee's name as provided in the Cash Management Agreement. All earnings or interest on the Replacement Escrow Fund shall be and become part of such Replacement Escrow Fund and shall be disbursed as provided in this Paragraph 6(b). Until expended or applied as above provided, the Replacement Escrow Fund shall constitute additional security for the Debt. The Replacement Escrow Fund shall not constitute a trust fund and may be commingled with other monies held by Mortgagee.

(c)     (i)     Mortgagor (A) shall pay to Mortgagee on the date hereof the sum of $19,855.83, and (B) on the eleventh day of each calendar month during the Term shall pay to Mortgagee one-twelfth of $119,135, which shall be deposited with and held by Mortgagee for tenant improvement and leasing commission obligations incurred following the date hereof (the "**Base Leasing Escrow Fund**"). In addition, Mortgagor shall pay to Mortgagee for deposit in the Base Leasing Escrow Fund all funds received by Mortgagor from tenants in connection with the cancellation of any Leases, including, but not limited to, any cancellation fees, penalties, returns or refunds of tenant improvement allowances or leasing commissions, sums due in lieu of any lessee's obligation to remove tenant improvements or otherwise restore the leased premises or other charges.

(ii)     Mortgagor (A) shall pay to Mortgagee on the date hereof the sum of $105,144.17, and (B) on the eleventh day of each calendar month during the Term shall pay to Mortgagee the Monthly Cash Flow Leasing Escrow Fund Amount (as defined in Paragraph 6(c)(iii)), which shall be deposited with and held by Mortgagee for tenant improvement and leasing commission obligations incurred by Mortgagor following the date hereof (the "**Cash Flow Leasing Escrow Fund**" and, collectively with the Base Leasing Escrow Fund, the "**Leasing Escrow Funds**").

-12-

CSFBMSC 02721

BK I 3733PG443

(iii)    For purposes of this Mortgage, the term "Monthly Cash Flow Leasing Escrow Fund Amount" shall mean an amount equal to the lesser of (I) the amount remaining on deposit in the Cash Collateral Account immediately after application pursuant to subparagraphs 8(a)(i) through 8(a)(viii) of the Note, and (II) (A) prior to the Benchmark Reduction Date $52,572.08, and (B) from and after the Benchmark Reduction Date, the excess of (i) the aggregate of amounts separately calculated with respect to each Benchmark Lease by taking (y) the product of (A) $15 and (B) the number of rentable square feet of space leased pursuant to such Benchmark Lease, divided by (z) the number of months in the Benchmark Lease's then-current term rounded to the nearest integer, over (ii) $9,928. Notwithstanding the foregoing, for so long as the aggregate amount of Leasing Escrow Funds is $4,250,000, the term "Monthly Leasing Escrow Fund Amount" shall mean zero.

(iv)    Mortgagee shall make disbursements from the Leasing Escrow Funds, no more frequently than once in any ninety (90) day period, for expenses reasonably incurred by Mortgagor for new Leases entered into by Mortgagor in accordance with the provisions of Paragraph 8 below. All such expenses shall be approved by Mortgagee in its sole discretion (reasonably exercised). Mortgagee shall make disbursements as requested by Mortgagor on a quarterly basis in increments of no less than $5,000.00 upon delivery by Mortgagor of Mortgagee's standard form of draw request accompanied by copies of paid invoices for the amounts requested for tenant improvements and leasing commissions, the newly executed Lease, extension, renewal, or modification, with terms commensurate with the expired Lease (if not previously delivered), and, if required by Mortgagee, lien waivers and releases from all parties furnishing materials and/or services in connection with the requested payment. Mortgagee may require an inspection of the Mortgaged Property at Mortgagor's expense prior to making a quarterly disbursement in order to verify completion of improvements for which reimbursement is sought.

(v)    The Leasing Escrow Funds shall be held in an interest bearing account in Mortgagee's name as provided in the Cash Management Agreement. All earnings or interest on the Leasing Escrow Funds shall be and become part of such Leasing Escrow Funds and shall be disbursed as provided in this Paragraph 6(c). Until expended or applied as above provided, the Leasing Escrow Funds shall constitute additional security for the Debt. The Leasing Escrow Funds shall not constitute a trust fund and may be commingled with other monies held by Mortgagee.

(vi)    Mortgagee shall disburse to Mortgagor from the Leasing Escrow Funds, on a one-time basis, an amount equal to the Benchmark Reduction Amount (as hereinafter defined), upon the satisfaction of the following conditions precedent:

(a)    Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement (the "Benchmark Reduction Date"), a written request for such disbursement;

-13-

CSFBMSC 02722

BK 1 3 7 3 3 PG 4 4 4

      (b)    no Event of Default hereunder shall have occurred and be continuing as of the date of the request for such disbursement and on the Benchmark Reduction Date;

      (c)    delivery to Mortgagee of copies of a fully-executed Lease or Leases (each, a "Benchmark Lease"), each of which (I) is for a term that expires no earlier than three (3) years beyond the Anticipated Repayment Date (as defined in the Note); and (II) is with a tenant which is either (y) rated (i) "BBB" or higher by S&P, or (ii) "Baa 2" or higher by Moody's, or (z) has creditworthiness satisfactory to Mortgagee in its sole discretion;

      (d)    delivery to Mortgagee of current estoppel certificates from the tenant under each Benchmark Lease, certifying that the tenant has accepted the premises and is in occupancy and paying full unabated rent pursuant to its Benchmark Lease, and that, to the tenant's best knowledge, its Benchmark Lease is in full force and effect with no defaults beyond any applicable notice and cure periods; and

      (e)    Mortgagor provides evidence satisfactory to Mortgagee that the proforma Debt Service Coverage Ratio is equal to or greater than 1.20:1.0, calculated (I) as if the Benchmark Leases were the sole source of revenues for the Mortgaged Property and (II) with Operating Expenses being determined including the following assumptions: (v) assuming that the rent payable under each Benchmark Lease in the first lease year is less than or equal to the rent in each succeeding lease year; (w) an assumed 5% vacancy; (x) the greater of the actual management fee or an assumed management fee equal to 4% of Gross Income from Operations using an assumed 5% vacancy; (y) an assumed stabilized monthly contributions to the Replacement Escrow Fund Amount equal to $54,773 per year; and (z) an assumed stabilized monthly contribution to the Base Leasing Escrow Fund equal to $119,135 per year.

      (vii)    For purposes of this Mortgage, the term "Benchmark Reduction Amount" shall mean the amount on deposit in the Leasing Escrow Fund on any Benchmark Reduction Date but only to the extent same exceeds the Retained Amount (as hereinafter defined).

      (viii)    For purposes of this Mortgage, the term "Retained Amount" shall be an amount equal to the aggregate of the positive amounts, if any, separately calculated with respect to each Benchmark Lease as follows:

      (a)    the product of (I) $15 and (II) the number of square feet of space leased pursuant to such Benchmark Lease, divided by the number of months in the Benchmark Lease's full current term (not just the

-14-

CSFBMSC 02723

BK 1 3 7 3 3 PG 4 4 5

remaining balance of the term) rounded to the nearest integer, <u>multiplied by</u>

(b)    the number of months from the commencement date of the current term of the Benchmark Lease (not just the remaining balance of the term) until the Benchmark Reduction Date, rounded to the nearest integer, with the resulting amount <u>reduced by</u>

(c)    an amount in Mortgagee's sole judgment (reasonably exercised) equal to any interest which Mortgagee anticipates will accrue on the Retained Amount and (ii) all payments required to be deposited into the Leasing Escrow Funds from the Benchmark Reduction Date until the expiration of the Benchmark Lease.

(ix)    From time to time (but no more frequently than once in any thirty (30) day period), from and after the first time when the aggregate amount on deposit in the Leasing Escrow Funds equals or exceeds $2,750,000 Mortgagee shall disburse to Mortgagor from the Leasing Escrow Funds amounts aggregating up to the Interim Reduction Amount (as hereinafter defined), for application solely toward payment of principal and interest then due and payable on the Note, upon the satisfaction of the following conditions precedent:

(a)    Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement (each, an "<u>Interim Reduction Date</u>"), a written request for such disbursement;

(b)    no Event of Default hereunder shall have occurred and be continuing as of the date of the request for such disbursement and on the Interim Reduction Date;

(c)    the Benchmark Reduction Date shall not have occurred as of the Interim Reduction Date;

(d)    Net Operating Income (excluding interest on credit accounts) for the then-current debt service period is insufficient to pay principal and interest due and payable on the Note after application toward all contributions to the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Leasing Escrow Funds and any other reserves required to be funded and other payments required to be made under the Loan Documents; and

(e)    the expiration date of the then-current term of the Bank of Boston Lease is not later than three (3) years beyond the Anticipated Repayment Date, and The Bank of Boston has not, prior to the Interim Reduction Date, exercised any renewal or extension right which

-15-

CSFBMSC 02724

BK I 3 7 3 3 PG 4 4 6

will (effective after the Interim Reduction Date) have the effect of so extending the expiration date of the Bank of Boston Lease.

(x)    For purposes of this Mortgage, the "Interim Reduction Amount" shall mean an amount equal to the lesser of (a) $1,000,000 or (b) the amount on deposit in the Leasing Escrow Fund in excess of an amount equal to $2,750,000, less any amounts previously disbursed for tenant improvements and leasing commissions pursuant to Paragraph 6(c)(iv); provided, however, that no Interim Reduction Amount shall be disbursed so that the aggregate amount of all Interim Reduction Amount disbursements made by Mortgagee exceeds $1,000,000.

(xi)    Notwithstanding the foregoing provisions of this Paragraph 6(c), on the Anticipated Repayment Date the entire amount then held in the Leasing Escrow Funds shall be applied to the payment of the Debt in such order as Mortgagee shall determine in its sole discretion.

(d)    Mortgagor hereby pledges to Mortgagee and grants to Mortgagee a security interest in any and all monies now or hereafter deposited in the Tax and Insurance Impound Fund, the Replacement Escrow Fund and the Leasing Escrow Fund as additional security for the payment of the Debt. Upon the occurrence of an Event of Default, Mortgagee shall have no obligation to disburse any amounts held in the Tax and Insurance Impound Fund, the Replacement Escrow Fund and the Leasing Escrow Fund to the Mortgagor and may apply any sums then present in such funds to the payment of the Debt in any order in its sole discretion.

7.    Condemnation. (a) Mortgagor shall promptly give Mortgagee written notice of the actual or threatened commencement of any condemnation or eminent domain proceeding (a "Condemnation") and shall deliver to Mortgagee copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Mortgagor, regardless of whether an Award (hereinafter defined) is available, shall, unless Mortgagee shall have elected to apply the Award in reduction of the Debt, then only if Mortgagor shall have failed to repay the Debt in full within one hundred eighty (180) days after such application, promptly proceed to restore, repair, replace or rebuild the same to the extent practicable to be of at least equal value and of substantially the same character as prior to such Condemnation, all to be effected in accordance with applicable law.

(b)    Mortgagee is hereby irrevocably appointed as Mortgagor's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment ("Award") for any taking accomplished through a Condemnation (a "Taking") and to make any compromise or settlement in connection with such Condemnation, subject to the provisions of this Mortgage. Notwithstanding the foregoing:

(i)    In the event of an Award that does not exceed $250,000.00, Mortgagor may make any such settlement or compromise and adjust any claim provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 7(c) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such Award, which shall be held in escrow by Mortgagor and applied by

-16-

CSFBMSC 02725

BK 13733PG447

Mortgagor toward the cost of restoring the Mortgaged Property or part thereof subject to the Taking, in the manner set forth below. Mortgagor hereby covenants and agrees to commence and diligently to prosecute such Restoration; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such Restoration in excess of the net proceeds of insurance made available pursuant to the terms hereof.

        (ii)    In the event of an Award that is in excess of $250,000.00 but not in excess of thirty-five percent (35%) of the then outstanding principal balance of the Note, Mortgagor may make any such settlement or compromise and adjust any claim, with Mortgagee's prior written consent, which shall not be unreasonably withheld; provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 7(c) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such Award. Notwithstanding the foregoing, in the event that Mortgagor shall not have finally settled and adjusted any such claim within one hundred eighty (180) days following the Taking, then and in that event, Mortgagee shall thereupon control the negotiations and proceedings, and Mortgagee shall consult with Mortgagor in respect thereof; provided, however, that, should Mortgagor and Mortgagee disagree as to such settlement or adjustment, then Mortgagee alone may settle and adjust the claim without the consent or agreement of Mortgagor. In any event, the proceeds of any such Award shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

        (iii)    In the event an Award in excess of thirty-five percent (35%) of the then outstanding principal balance of the Note, Mortgagor may make any such settlement or compromise and adjust any claim with Mortgagee's prior written consent, which shall not be unreasonably withheld; provided that such adjustment is carried out in a competent and timely manner and subject to the provisions of Paragraph 7(c) below. In such case, Mortgagor is hereby authorized to collect and receipt for any such Award. Notwithstanding the foregoing, the event that Mortgagor shall not have finally settled such claim within sixty (60) days following the Taking, then and in that event, Mortgagee shall thereupon control the negotiations and proceedings, and Mortgagee shall consult with Mortgagor in respect thereof; provided, however, that, should Mortgagor and Mortgagee disagree as to such settlement or adjustment, then Mortgagee alone may settle and adjust the claim without the consent or agreement of Mortgagor. In any event, the Award shall be due and payable solely to Mortgagee and held in escrow by Mortgagee in accordance with the terms of this Mortgage.

        (c)    Mortgagee shall not unreasonably delay the granting or withholding of any consent requested of Mortgagee pursuant to the provisions of Paragraph 7(b), and if Mortgagee's disapproval of any proposed settlement or compromise or is not received by Mortgagor within forty-five (45) days following the receipt by Mortgagee of Mortgagor's request, Mortgagee shall be deemed to have granted its approval or consent, provided, however, that Mortgagor shall provide Mortgagee with written notice of, and request for approval or consent to, any proposed settlement or adjustment and provided, further, that such notice shall contain the following introductory sentence in conspicuous 14 point boldface type: "THIS IS A REQUEST FOR AN APPROVAL FROM MORTGAGEE BY MORTGAGOR, A RESPONSE

-17-

CSFBMSC 02726

BK 13733PG448

TO WHICH MUST BE RECEIVED BY MORTGAGOR WITHIN FORTY-FIVE (45) DAYS OF MORTGAGEE'S RECEIPT HEREOF, OR SUCH APPROVAL SHALL BE DEEMED GRANTED."

(d)    Notwithstanding any Taking by any public or quasi-public authority (including, without limitation, any transfer made in lieu of or in anticipation of such a Taking), Mortgagor shall continue to pay the Debt at the time and in the manner provided for in the Note, this Mortgage and the other Loan Documents and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Mortgagee to expenses of collecting the Award and to discharge of the Debt. Mortgagee shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note. Mortgagor shall cause any Award that is payable to Mortgagor to be paid directly to Mortgagee.

(e)    In the event of any Condemnation where the Award is in an aggregate amount in excess of $250,000 but less than thirty-five percent (35%) of the then outstanding original principal balance of the Note, and if, in the reasonable judgment of Mortgagee, the Mortgaged Property can be restored within twelve (12) months and prior to the Anticipated Repayment Date to an economic unit not less valuable (including an assessment of the impact of the termination of any Leases due to such Condemnation) and not materially less useful than the same was immediately prior to the Condemnation then, if no Event of Default shall have occurred and be then continuing, the proceeds of the Award (after reimbursement of any expenses incurred by Mortgagee) shall be applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to Condemnation, in the manner set forth below. Mortgagor hereby covenants and agrees to commence and diligently to prosecute such restoring, repairing, replacing or rebuilding; provided always, that Mortgagor shall pay all costs (and if required by Mortgagee, Mortgagor shall deposit the total thereof with Mortgagee in advance) of such restoring, repairing, replacing or rebuilding in excess of the Award made available pursuant to the terms hereof.

(f)    Except as provided above, the Award collected upon any Condemnation shall, at the option of Mortgagee in its sole discretion, be applied to the payment of the Debt or applied to reimburse Mortgagor for the cost of restoring, repairing, replacing or rebuilding the Mortgaged Property or part thereof subject to the Condemnation, in the manner set forth below. Any such application to the Debt shall be without any prepayment consideration except that if an Event of Default has occurred then the Mortgagor shall pay to Mortgagee an additional amount equal to the Yield Maintenance Premium, if any, that would be required under Paragraph 55 hereof if Defeasance Collateral was to be purchased by Mortgagor. Any such application to the Debt shall be applied to those payments of principal and interest last due under the Note but shall not postpone or reduce any payments otherwise required pursuant to the Note other than such last due payments. Upon any such application to the Debt, Mortgagor may within one hundred eighty (180) days after such application prepay the balance of the Debt without penalty or premium on not less than ten (10) days notice to Mortgagee and upon payment in full, Mortgagee will release all collateral. If the Mortgaged Property is sold, through foreclosure or otherwise, prior to the receipt by Mortgagee of such Award, Mortgagee shall have

-18-

CSFBMSC 02727

BK 13733PG449

the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of said Award sufficient to pay the Debt.

(g)    In the event Mortgagor is entitled to reimbursement out of the Award received by Mortgagee, such proceeds shall be disbursed from time to time upon Mortgagee being furnished with (1) evidence satisfactory to it of the estimated cost of completion of the restoration, repair, replacement and rebuilding resulting from such condemnation, (2) funds or, at Mortgagee's option, assurances satisfactory to Mortgagee that such funds are available, sufficient in addition to the proceeds of the Award to complete the proposed restoration, repair, replacement and rebuilding, and (3) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey and such other evidences of costs, payment and performance as Mortgagee may reasonably require and approve; and Mortgagee may, in any event, require that all plans and specifications for such restoration, repair, replacement and rebuilding be submitted to and approved by Mortgagee prior to commencement of work. No payment made prior to the final completion of the restoration, repair, replacement and rebuilding shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than proceeds of the Award shall be disbursed prior to disbursement of such proceeds; and at all times, the undisbursed balance of such proceeds remaining in hands of Mortgagee, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Mortgagee by or on behalf of Mortgagor for that purpose, shall be at least sufficient in the reasonable judgment of Mortgagee to pay for the costs of completion of the restoration, repair, replacement or rebuilding, free and clear of all liens or claims for lien. Any surplus which may remain out of the Award received by Mortgagee after payment of such costs of restoration, repair, replacement or rebuilding shall, in the sole and absolute discretion of Mortgagee, be retained by Mortgagee and applied to payment of the Debt.

(h)    (i)    Notwithstanding the foregoing provisions of this Paragraph 7, for so long as the Boston SNDA (as defined in Paragraph 8(d) below) is in full force and effect any Award shall be payable to and held and maintained by Mortgagee or deposited by Mortgagee with a third party trustee selected by Mortgagee and all such Awards shall be applied by Mortgagee as provided in the Boston SNDA (if and to the extent that the provisions of the Boston SNDA are in conflict with the foregoing provisions of this Paragraph 7), provided, however, that, in the event that any Condemnation shall occur within twelve (12) months prior to, or at any time after, the Anticipated Repayment Date, Mortgagee shall at its option apply the Award to the payment of the Debt. If Mortgagee elects to so apply the Award to the payment of the Debt, Mortgagee may within one hundred eighty (180) days after the Condemnation prepay the balance of the Debt without penalty or premium on not less than ten (10) days notice to Mortgagee, and upon payment in full, Mortgagee will release all collateral.

(ii)    In the event that the Award is applied by Mortgagee as provided in the Boston SNDA, Mortgagor shall restore, or cause to be restored, the Mortgaged Property in the manner and upon such terms and conditions as required by the Bank of Boston Lease and (to the extent not in conflict with the Bank of Boston Lease) as would be required by a

SR2NY\611479v8

CSFBMSC 02728

BK 13733PG450

prudent interim construction lender, including, but not limited to (A) the deposit by Mortgagor with Mortgagee, within thirty (30) days after demand therefor, of any deficiency necessary in order to assure the availability of sufficient funds to pay for such restoration or repair, including Mortgagee's costs and expenses to be incurred in connection therewith, provided, however, that such funds shall be held in escrow by Mortgagee and disbursed as the first funds for restoration, (B) the prior approval by Mortgagee of all plans and specifications, contractors and forms of construction contracts, and (C) the furnishing to Mortgagee of permits, bonds, lien waivers, invoices, receipts and affidavits from all contractors and subcontractors in form and substance reasonably satisfactory to Mortgagee in its discretion; provided, however, that, in the event that Mortgagor does not cause to be restored the Mortgaged Property in accordance with the foregoing provisions, the same shall be an Event of Default hereunder and Mortgagee may, in Mortgagee's absolute discretion and without regard to the adequacy of Mortgagee's security, elect to accelerate the maturity date of the Note, declare any and all of the Debt to be immediately due and payable and apply any sums then held by the Mortgagee or an insurance trustee pursuant to this Paragraph 7 to the payment of the Debt in whatever order Mortgagee elects.

8.    Leases and Rents.

(a)    Mortgagor does hereby absolutely and unconditionally assign to Mortgagee, all Mortgagor's right, title and interest in all current and future Leases and Rents, it being intended by Mortgagor that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment to Mortgagee shall not be construed to bind Mortgagee to the performance of any of the covenants, conditions or provisions contained in any such Lease or otherwise impose any obligation upon Mortgagee. Mortgagor agrees to execute and deliver to Mortgagee such additional instruments, in form and substance satisfactory to Mortgagee, as may hereafter be requested by Mortgagee to further evidence and confirm such assignment. Nevertheless, subject to the terms of this paragraph, Mortgagee grants to Mortgagor a revocable license to operate and manage the Mortgaged Property and to direct lessees to pay Rents in accordance with the Loan Documents. Upon an Event of Default, without the need for notice or demand, the license granted to Mortgagor herein shall automatically be revoked, and Mortgagee shall immediately be entitled to possession of all Rents, whether or not Mortgagee enters upon or takes control of the Mortgaged Property. Mortgagee is hereby granted and assigned by Mortgagor the right, at its option, upon revocation of the license granted herein, to enter upon the Mortgaged Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of the license may be applied toward payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper.

(b)    All Leases executed on or after the date hereof shall provide that they are subordinate to this Mortgage and that the tenant agrees to attorn to Mortgagee. None of the Leases shall contain any option to purchase, any right of first refusal to lease or purchase or any right to terminate the lease term (except (i) in the event of the destruction of all or substantially all of the Mortgaged Property or (ii) as expressly provided in the Bank of Boston Lease; provided, however, that for so long as the Mortgaged Property remains subject to this Mortgage, in the event that The Bank of Boston acquires title to the Mortgaged Property, as the

-20-

CSFBMSC 02729

BK I 3 7 3 3 PG 4 5 I

result of any right to purchase all or any part of the Mortgaged Property, whether pursuant to Section 20.01 of the Bank of Boston Lease or otherwise, such event shall be an Event of Default hereunder unless done in accordance with the provisions of that certain Subordination, Non-Disturbance and Attornment Agreement by and between Mortgagee and the Bank of Boston, dated the date hereof (the "Boston SNDA"). Mortgagor hereby covenants not to take any action which would trigger The Bank of Boston's rights under Section 20.01 of the Bank of Boston Lease. Leases executed after the date hereof shall not contain any provisions which adversely affect the Mortgaged Property or which might adversely affect the rights of any holder of the Loan without the prior written consent of Mortgagee. Each tenant shall conduct business only in that portion of the Mortgaged Property covered by its lease. Upon request, Mortgagor shall furnish Mortgagee with executed copies of all Leases.

(c)    Mortgagor shall not, without the prior consent of Mortgagee (i) enter into any Lease of all or any part of the Mortgaged Property in excess of ten percent (10%) of the gross leasable area of the Improvements (a "Major Lease"), provided, however, that Mortgagee's consent shall not be unreasonably withheld or delayed if (A) the proposed Major Lease is on a form approved by Mortgagee or on a form customarily used for first class office buildings in the vicinity of the Mortgaged Property and otherwise in compliance with the criteria set forth in this Paragraph 8(c)(i)(B)-(E), (B) the rent under the proposed Major Lease is at no less than market rent, (C) the primary use of the leased premises is office use, (D) the lessee under the proposed Major Lease is creditworthy, as determined by Mortgagee in its reasonable discretion considering the amount of space leased, the length of the term and the extent of tenant improvements and other concessions granted to the lessee by Mortgagor, and (E) if the term of the proposed Major Lease is greater than five (5) years, the Major Lease contains provisions for appropriate rent adjustments at least every (5) years, (ii) cancel, terminate, abridge or otherwise modify the terms of any Major Lease, or accept a surrender thereof, (iii) consent to any assignment of or subletting under any Major Lease not in accordance with its terms, (iv) cancel, terminate, abridge or otherwise modify any guaranty of any Major Lease or the terms thereof, (v) accept prepayments of installments of Rents for a period of more than one (1) month in advance or (vi) further assign the whole or any part of the Leases or the Rents. If Mortgagee fails to respond to a request for consent hereunder within ten (10) business days of receipt thereof, such consent shall be deemed granted, provided that (x) with respect to (i) above, Mortgagor has provided Mortgagee with all information obtained by Mortgagor in the ordinary course of its dealings with the proposed lessee relating to the proposed lessee's creditworthiness, a summary of the material economic terms of the proposed Major Lease, a self-addressed envelope and a reminder notice in capital letters that Mortgagee shall notify Mortgagor of any objection within ten (10) business days of the Mortgagor's request, setting forth reasonably sufficient detail in order to reasonably enable Mortgagor to either appropriately renegotiate the Lease terms or refute or resolve Mortgagee's objection, or the consent shall be deemed granted and (y) with respect to (ii)-(iv) above, such request shall have been accompanied by all information requested by Mortgagee or reasonably necessary for Mortgagee to evaluate such request and shall have clearly stated, in 14 point type or greater, that if Mortgagee fails to respond to such request within ten (10) business days, Mortgagee's consent shall be deemed to have been granted. In the event that Mortgagee rejects a proposed Major Lease, Mortgagee shall provide such rejection to Mortgagor in writing setting forth the reasons for such rejection. In

-21-

SRZHM611479v8

CSFBMSC 02730

BK 1 3 7 3 3 PG 4 5 2

addition, Mortgagor shall not (A) lease all or any part of the Mortgaged Property, (B) cancel, terminate, abridge or otherwise modify the terms of any Lease, or accept a surrender thereof, (C) consent to any assignment of or subletting under any Lease not in accordance with its terms or (D) cancel, terminate, abridge or otherwise modify any guaranty of any Lease or the terms thereof, unless such actions are exercised for a commercially reasonable purpose in arms-length transactions on market terms. Notwithstanding the foregoing, Mortgagee approves the further renewal or extension of the existing Bank of Boston Lease in accordance with the provisions thereof, on terms no less favorable than in effect on the date hereof.

(d)    Mortgagor (i) shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Mortgagee of all notices of default which Mortgagor shall send or receive thereunder; (iii) shall enforce all the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof, in a commercially reasonable manner; (iv) shall not collect any of the Rents more than one (1) month in advance; (v) shall not execute any other assignment of the lessor's interest in the Leases or the Rents; (vi) shall deliver to Mortgagee, upon request, tenant estoppel certificates from each commercial tenant at the Mortgaged Property in form and substance reasonably satisfactory to Mortgagee, provided that Mortgagor shall not be required to deliver such certificates more frequently than two (2) times in any calendar year; and (vii) shall execute and deliver at the request of Mortgagee all such further assurances, confirmations and assignments in connection with the Mortgaged Property as Mortgagee shall from time to time require.

(e)    All future security deposits of tenants, whether held in cash or any other form, shall not be commingled with any other funds of Mortgagor and, if cash, shall be deposited by Mortgagor at such commercial or savings bank or banks, or otherwise held in compliance with applicable law, as may be reasonably satisfactory to Mortgagee. Any bond or other instrument which Mortgagor is permitted to hold in lieu of cash security deposits under any applicable legal requirements shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as hereinabove described, shall be issued by an institution reasonably satisfactory to Mortgagee, shall, if permitted pursuant to any legal requirements, name Mortgagee as payee or mortgagee thereunder (or at Mortgagee's option, be fully assignable to Mortgagee) and shall, in all respects, comply with any applicable legal requirements and otherwise be reasonably satisfactory to Mortgagee. Mortgagor shall, upon request, provide Mortgagee with evidence reasonably satisfactory to Mortgagee of Mortgagor's compliance with the foregoing. Following the occurrence and during the continuance of any Event of Default, Mortgagor shall, upon Mortgagee's request, if permitted by any applicable legal requirements, turn over to Mortgagee the security deposits (and any interest theretofore earned thereon) with respect to all or any portion of the Mortgaged Property, to be held by Mortgagee subject to the terms of the Leases.

(f)    Representations regarding the Bank of Boston Lease. Mortgagor hereby represents and warrants to Mortgagee as follows:

CSFBMSC 02731

SRZNY\611479v8

BK 13733 PG 453

     (i)    Mortgagor has delivered to Mortgagee a true, correct and complete copy of the Bank of Boston Lease (including all amendments thereto and modifications thereof) and there are no other Leases affecting the Mortgaged Property as of the date hereof other than the Leases described in the rent roll delivered to Mortgagee in connection with this Mortgage;

     (ii)    To the best of Mortgagor's knowledge, the Bank of Boston Lease constitutes the legal, valid and binding obligation of Mortgagor and is enforceable against The Bank of Boston and no default exists, or with the passing of time or the giving of notice or both would exist, under the Bank of Boston Lease;

     (iii)    The Bank of Boston has not, as of the date hereof, paid rent more than one (1) month in advance, and the rents under the Bank of Boston Lease have not been waived, released, or otherwise discharged or compromised;

     (iv)    All work to be performed by Mortgagor under the Bank of Boston Lease has been timely performed in accordance with the Bank of Boston Lease, all contributions (if any) to be made by Mortgagor to the Bank of Boston have been timely made in accordance with the Bank of Boston Lease and all other conditions precedent to the Bank of Boston's obligations thereunder have been fully satisfied as of the date hereof;

     (v)    To the best of Mortgagor's knowledge and belief, The Bank of Boston is free from bankruptcy, reorganization or arrangement proceedings or a general assignment for the benefit of creditors; and

     (vi)    To the best of Mortgagor's knowledge, the Bank of Boston Lease does not provide any party with the right to obtain a lien or encumbrance upon the Mortgaged Property superior to the lien of this Mortgage.

     9.    <u>Maintenance and Use of Mortgaged Property</u>.  Mortgagor shall cause the Mortgaged Property to be maintained in a good and safe condition and repair.  The Improvements and the Equipment shall not be removed, demolished or materially altered (except for normal replacement of the Equipment and tenant improvement work performed in the ordinary course of Mortgagor's business) without the consent of Mortgagee.  Mortgagor shall promptly comply with all laws, orders and ordinances affecting the Mortgaged Property or the use thereof, subject to Mortgagor's right to contest as set forth in <u>Paragraph 31</u> hereof.

-23-

CSFBMSC 02732

BK 13733PG454

Mortgagor shall not initiate, join in, acquiesce in, or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Mortgaged Property or any part thereof. If under applicable zoning provisions the use of all or any portion of the Mortgaged Property is or shall become a nonconforming use, Mortgagor will not cause or permit such nonconforming use to be discontinued or abandoned without the express written consent of Mortgagee. Mortgagor shall not (i) change the use of the Mortgaged Property, (ii) permit or suffer to occur any waste on or to the Mortgaged Property or to any portion thereof or (iii) take any steps whatsoever to convert the Mortgaged Property, or any portion thereof, to a condominium or cooperative form of management. Mortgagor will not install or permit to be installed on the Premises any underground storage tank.

>        10.    <u>Transfer or Encumbrance of the Mortgaged Property.</u>

>        (a)    Mortgagor acknowledges that Mortgagee has examined and relied on the creditworthiness and experience of Mortgagor in owning and operating properties such as the Mortgaged Property in agreeing to make the Loan, and that Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for repayment of the Debt. Mortgagor acknowledges that Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should Mortgagor default in the repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property. Mortgagor shall not, without the prior written consent of Mortgagee or as otherwise expressly provided herein or in the other Loan Documents, sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof, or permit the Mortgaged Property or any part thereof to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred.

>        (b)    A sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer within the meaning of this <u>Paragraph 10</u> shall be deemed to include (i) an installment sales agreement wherein Mortgagor agrees to sell the Mortgaged Property or any part thereof for a price to be paid in installments; (ii) an agreement by Mortgagor leasing all or a substantial part of the Mortgaged Property for other than actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in, Mortgagor's right, title and interest in and to any Leases or any Rents; (iii) if Mortgagor, Guarantor or any general partner or managing member of Mortgagor or Guarantor is a corporation, the voluntary or involuntary sale, conveyance or transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock in all instances in one or a series of transactions by which an aggregate of more than 25% of such corporation's stock shall be vested in a party or parties who are not now stockholders or any change in the control of such corporation; (iv) if Mortgagor, any Guarantor or any member of Mortgagor or any Guarantor is a limited or general partnership, joint venture or limited liability company, the change, removal, resignation or addition of a general partner, member, non-member manager joint venturer or the transfer, assignment or pledge of any ownership interest of any general partner, member, non-member manager or joint venturer in Mortgagor or the transfer, assignment or pledge of any ownership interest in any general partner,

SRZNY\611479v8

CSFBMSC 02733

BK 1 3 7 3 3 PG 4 5 5

member, non-member manager or joint venturer; (v) if Mortgagor or any member of Mortgagor or any Guarantor is a limited partnership or limited liability company, the voluntary or involuntary sale, conveyance, transfer or pledge of any limited partnership interests or membership interests or the creation or issuance of new limited partnership interests or membership interests in either Mortgagor, Guarantor or any member of Mortgagor, by which an aggregate of more than 25% of such limited partnership interests or membership interests are held by, or pledged to, parties who are not currently limited partners or members; or (vi) the replacement of either of the "Guarantors" named as of the date hereof in that certain Guaranty, of even date herewith, made to Mortgagee in connection with the Loan (the "Key Principals") as the sole trustees of Royall Associates Realty Trust, provided, however, that, notwithstanding the foregoing subparagraphs (iii) or (v), so long as the Key Principals, their spouses or ex-spouses (provided, but only if such spouses or ex-spouses have control of the decision making with respect to the Mortgaged Property, such spouses or ex-spouses are in Mortgagor's reasonable judgment persons of good character and reputation), their direct descendants and their spouses, or any of them (including trusts for the benefit of the foregoing ("Key Principals Family Members")), or entities owned and controlled by any of them (i.e., ownership directly or indirectly of not less than 51% thereof with the ability to control or direct decision making ("Key Principals Entities")) shall in the aggregate be the owner of at least a 51% interest in the Mortgagor or the member of the Mortgagor and the Key Principals or, in the event of the death or incapacity of either Key Principal, one or more of the Key Principal Family Members, have effective control of the decision making with respect to the Mortgaged Property such entity or entities, the foregoing restrictions on transfer and/or any other such restrictions contained in this Mortgage shall not be or be deemed to have been violated so long as (I) Mortgagor shall give Mortgagee written notice of any such pending transfer, together with such information as shall allow Mortgagee to determine if such transfer complies with the requirements set forth in this proviso and (II) if not less than 51% of such interests are transferred, in one or more transactions, to Key Principals Family Members or Key Principals Entities, then, at Mortgagee's request, Mortgagee shall be provided with a non-consolidation opinion in connection therewith.

(c)    Mortgagee shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon Mortgagor's sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property without Mortgagee's consent. This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property regardless of whether voluntary or not, or whether or not Mortgagee has consented to any previous sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property.

(d)    Mortgagee's consent to one sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property shall not be deemed to be a waiver of Mortgagee's right to require such consent to any future occurrence of same. Any sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property made in contravention of this paragraph shall be null and void and of no force and effect.

SRZNY\611479v8

CSFBMSC 02734

BK 1 3 7 3 3 PG 4 5 6

(e)    Mortgagor agrees to bear and shall pay or reimburse Mortgagee on demand for all reasonable expenses (including, without limitation, reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Mortgagee in connection with the review, approval and documentation of any such sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer.

(f)    Mortgagee's consent to the sale or transfer of the Mortgaged Property will not be unreasonably withheld or conditioned after consideration of all relevant factors, provided that:

(i)    no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default shall have occurred and remain uncured;

(ii)    the proposed transferee ("Transferee") shall be a reputable entity or person of good character, creditworthy, with sufficient financial worth considering the obligations assumed and undertaken, as evidenced by financial statements and other information reasonably requested by Mortgagee with an organizational structure and documentation reasonably acceptable to Mortgagee;

(iii)    the Transferee and its property manager shall have sufficient experience in the ownership and management of properties similar to the Mortgaged Property, and Mortgagee shall be provided with reasonable evidence thereof (and Mortgagee reserves the right to approve the Transferee without approving the substitution of the property manager);

(iv)    Mortgagee, at its option, shall have recommendations in writing from the Rating Agencies (which Mortgagee and Mortgagor shall cooperate to obtain without unreasonable delay) to the effect that such transfer will not result in a requalification, reduction or withdrawal of any current securities rating assigned in a Securitization. The term "Rating Agencies" as used herein shall mean each of Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc., Moody's Investors Service, Inc., Duff and Phelps Credit Rating Co. and Fitch Investors Service, L.P., or any other nationally-recognized statistical rating agency which has been approved by Mortgagee;

(v)    the Transferee shall have executed and delivered to Mortgagee an assumption agreement in form and substance acceptable to Mortgagee, evidencing such Transferee's

-26-

CSFBMSC 02735

BK 13733PG457

agreement to abide and be bound by the terms of the Note, this Mortgage and the other Loan Documents, together with such legal opinions and title insurance endorsements as may be reasonably requested by Mortgagee; and

(vi)    Mortgagee shall have received an assumption fee equal to one percent (1%) of the Debt on the date of such assumption and the payment of, or reimbursement for, all costs and expenses incurred by Mortgagee in connection with such assumption (including reasonable attorneys' fees and costs).

11.    **Representations and Covenants Concerning the Mortgagor and Mortgaged Property.** Mortgagor represents, warrants and covenants as follows:

(a)    Organization and Existence.  Mortgagor is duly organized and validly existing as a limited liability company in good standing under the laws of Delaware and in all other jurisdictions in which Mortgagor is transacting business.  Mortgagor has the power and authority to execute, deliver and perform the obligations imposed on it under the Loan Documents and to consummate the transactions contemplated by the Loan Documents.

(b)    Authorization.    Mortgagor has taken all necessary actions for the authorization of the borrowing on account of the Loan and for the execution and delivery of the Loan Documents, including, without limitation, that those members of Mortgagor whose approval is required by the terms of Mortgagor's organizational documents have duly approved the transactions contemplated by the Loan Documents and have authorized execution and delivery thereof by the respective signatories.  To the best of Mortgagor's knowledge, no other consent by any local, state or federal agency is required in connection with the execution and delivery of the Loan Documents.

(c)    Valid Execution and Delivery.  All of the Loan Documents requiring execution by Mortgagor have been duly and validly executed and delivered by Mortgagor.

(d)    Enforceability. All of the Loan Documents constitute valid, legal and binding obligations of Mortgagor and are fully enforceable against Mortgagor in accordance with their terms by Mortgagee and its successors, transferees and assigns, subject only to bankruptcy laws and general principles of equity.

(e)    No Defenses.  The Note, this Mortgage and the other Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense, nor would the operation of any of the terms of the Note, this Mortgage or any

-27-

CSFBMSC 02736

BK 1 3 7 3 3 PG 4 5 8

of the other Loan Documents, or the exercise of any right thereunder, render this Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury.

(f)    Defense of Usury.  Mortgagor knows of no facts that would support a claim of usury to defeat or avoid its obligation to repay the principal of, interest on, and other sums or amounts due and payable under, the Loan Documents.

(g)    No Conflict/Violation of Law.  The execution, delivery and performance of the Loan Documents by the Mortgagor will not cause or constitute a default under or conflict with the organizational documents of Mortgagor, any Guarantor or any general partner or managing member of Mortgagor or any Guarantor.   The execution, delivery and performance of the obligations imposed on Mortgagor under the Loan Documents will not cause Mortgagor to be in default, including after due notice or lapse of time or both, under the provisions of any agreement, judgment or order to which Mortgagor is a party or by which Mortgagor is bound.

(h)    Compliance with Applicable Laws and Regulations.   All of the Improvements and the use of the Mortgaged Property comply with, and (subject to the provisions of Paragraphs 23(j) and 31 hereof) shall remain in compliance with, all applicable statutes, rules, regulations and private covenants now or hereafter relating to the ownership, construction, use or operation of the Mortgaged Property, including all applicable statutes, rules and regulations pertaining to requirements for equal opportunity, anti-discrimination, fair housing, environmental protection, zoning and land use. The Improvements comply with, and shall remain in compliance with, applicable health, fire and building codes. There is no evidence of any illegal activities relating to controlled substances on the Mortgaged Property.  All certifications, permits, licenses and approvals, including, without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Mortgaged Property as a an office building complex have been obtained and are in full force and effect.  All of the Improvements comply with all material requirements of any applicable zoning and subdivision laws and ordinances.

(i)    Consents Obtained.  All consents, approvals, authorizations, orders or filings with any court or governmental agency or body, if any, required for the execution, delivery and performance of the Loan Documents by Mortgagor have been obtained or made.

SRZNY\611479v8

CSFBMSC 02737

BK 13733PG459

(j)  No Litigation.  There are no pending actions, suits or proceedings, arbitrations or governmental investigations against the Mortgaged Property, an adverse outcome of which would materially affect the Mortgagor's performance under the Note, this Mortgage or the other Loan Documents.

(k)  Title.  The Mortgagor has good and marketable fee simple title to the Mortgaged Property, and good title to the Equipment, subject to no liens, charges or encumbrances other than the Permitted Exceptions.  The possession of the Mortgaged Property has been peaceful and undisturbed and title thereto has not been disputed or questioned to the best of Mortgagor's knowledge

(l)  Permitted Exceptions.  The Permitted Exceptions do not and will not materially and adversely affect (1) the ability of the Mortgagor to pay in full the principal and interest on the Note in a timely manner or (2) the use of the Mortgaged Property for the use currently being made thereof, the operation of the Mortgaged Property as currently being operated or the value of the Mortgaged Property.

(m)  First Lien.  Upon the execution by the Mortgagor and the recording of this Mortgage, and upon the execution and filing of UCC-1 financing statements or amendments thereto, the Mortgagee will have a valid first lien on the Mortgaged Property and a valid security interest in the Equipment subject to no liens, charges or encumbrances other than the Permitted Exceptions.

(n)  ERISA.  The Mortgagor has made and shall continue to make all required contributions to all employee benefit plans, if any, and the Mortgagor has no knowledge of any material liability which has been incurred by the Mortgagor which remains unsatisfied for any taxes or penalties with respect to any employee benefit plan or any multi-employer plan, and each such plan has been administered in compliance with its terms and the applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and any other federal or state law.

(o)  Contingent Liabilities.  The Mortgagor has no known material contingent liabilities.

(p)  No Other Obligations.  The Mortgagor has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Mortgagor is a party or by which the Mortgagor or the Mortgaged Property is otherwise bound, other than obligations incurred in the ordinary course of the operation of the Mortgaged Property and other than obligations under this Mortgage and the other Loan Documents.

-29-

SRZNY\611479v8

**CSFBMSC 02738**

BK 13733PG460

(q)   <u>Fraudulent Conveyance</u>.  The Mortgagor (1) has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (2) received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the Loans contemplated by the Loan Documents, the fair saleable value of the Mortgagor's assets exceed and will, immediately following the execution and delivery of the Loan Documents, exceed the Mortgagor's total liabilities, including, without limitation, subordinated, unliquidated, disputed or contingent liabilities.  The fair saleable value of the Mortgagor's assets is and will, immediately following the execution and delivery of the Loan Documents, be greater than the Mortgagor's probable liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured.  The Mortgagor's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  The Mortgagor does not intend to, and does not believe that it will, incur debts and liabilities (including, without limitation, contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of the Mortgagor).

(r)   <u>Investment Company Act</u>.  The Mortgagor is not (1) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (2) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (3) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

(s)   <u>Access/Utilities</u>.  The Mortgaged Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities.  All public utilities necessary to the continued use and enjoyment of the Mortgaged Property as presently used and enjoyed are either (i) located in the public right-of-way abutting the Mortgaged Property, such that all such utilities are connected so as to serve the Mortgaged Property without passing over other property, or (ii) are connected to the Mortgaged Property by means of a valid permanent easement, which easement parcel is contiguous to the Mortgaged Property and to public right-of-way in which the public utility is located.  All roads necessary for the full utilization of the Mortgaged Property for its current purpose have been completed and dedicated to public use and accepted by all governmental authorities or are the subject of access easements for the benefit of the Mortgaged Property.

CSFBMSC 02739

SRZNY\611479v8

BK I 3 7 3 3 PG 4 6 I

(t)     Taxes Paid.  Mortgagor has filed all federal, state, county and municipal
        tax returns required to have been filed by Mortgagor, and has paid all taxes
        which have become due pursuant to such returns or to any notice of
        assessment received by Mortgagor, and Mortgagor has no knowledge of
        any basis for additional assessment with respect to such taxes.

(u)     Single Tax Lot.  The Premises consists of a single lot or multiple tax lots;
        no portion of said tax lot(s) covers property other than the Premises or a
        portion of the Premises and no portion of the Premises lies in any other tax
        lot.

(v)     Special Assessments.  Except as disclosed in the title insurance policy,
        there are no pending or, to the knowledge of the Mortgagor, proposed
        special or other assessments for public improvements or otherwise
        affecting the Mortgaged Property, nor, to the knowledge of the Mortgagor,
        are there any contemplated improvements to the Mortgaged Property that
        may result in such special or other assessments.

(w)     Flood Zone.  The Mortgaged Property is not located in a flood hazard area
        as defined by the Federal Insurance Administration.

(x)     Seismic Exposure.  To the best of Mortgagor's knowledge, the Premises
        are not located in Zone 3 or Zone 4 of the "Seismic Zone Map of the U.S."

(y)     Misstatements of Fact.  No statement of fact made in the Loan Documents
        contains any untrue statement of a material fact or omits to state any
        material fact necessary to make statements contained herein or therein not
        misleading.  There is no fact presently known to the Mortgagor which has
        not been disclosed which adversely affects, nor as far as the Mortgagor can
        foresee, might adversely affect the business, operations or condition
        (financial or otherwise) of the representing party.

(z)     Condition of Improvements.  The Mortgaged Property has not been
        damaged by fire, water, wind or other cause of loss or any previous
        damage to the Mortgaged Property has been fully restored.

(aa)    No Insolvency or Judgment.  Neither Mortgagor or any member of
        Mortgagor, nor any guarantor of the Loan is currently (a) the subject of or
        a party to any completed or pending bankruptcy, reorganization or
        insolvency proceeding; or (b) the subject of any judgment unsatisfied of
        record or docketed in any court of the state in which the Mortgaged
        Property is located or in any other court located in the United States.  The
        Loan will not render the Mortgagor or any member of Mortgagor
        insolvent.  As used herein, the term "insolvent" means that the sum total of
        all of an entity's liabilities (whether secured or unsecured, contingent or
        fixed, or liquidated or unliquidated) is in excess of the value of all such

-31-

CSFBMSC 02740

BK 13733PG462

entity's non-exempt assets, i.e., all of the assets of the entity that are available to satisfy claims of creditors.

(bb) <u>No Condemnation</u>.  No part of any property subject to this Mortgage has been taken in condemnation or other like proceeding to an extent which would impair the value of the Mortgaged Property, this Mortgage or the Loan or the usefulness of such property for the purposes contemplated by the loan application relating to the Loan (the "**Loan Application**"), nor is any proceeding pending, threatened or known to be contemplated for the partial or total condemnation or taking of the Mortgaged Property.

(cc) <u>No Labor or Materialmen Claims</u>.  All parties furnishing labor and materials have been paid in full and, except for such liens or claims insured against by the policy of title insurance to be issued in connection with the Loan, there are no mechanics', laborers' or materialmens' liens or claims outstanding for work, labor or materials affecting the Mortgaged Property, whether prior to, equal with or subordinate to the lien of this Mortgage.

(dd) <u>No Purchase Options</u>.  No tenant, person, party, firm, corporation or other entity has an option to purchase the Mortgaged Property, any portion thereof or any interest therein.

(ee) <u>Leases</u>.  The Mortgaged Property is not subject to any Leases other than the Leases described in the rent roll delivered to Mortgagee in connection with this Mortgage.  No person has any possessory interest in the Mortgaged Property or right to occupy the same except under and pursuant to the provisions of the Leases.  As of the date hereof, (i) the Mortgagor is the owner and holder of the landlord's interest under each Lease; (ii) there are no prior assignments of any Lease or any portion of Rents which are presently outstanding and have priority over the Assignment of Leases and Rents (the "**Assignment of Leases and Rents**"), dated the date hereof, given by Mortgagor to Mortgagee and intended to be duly recorded; (iii) the Leases have not been modified or amended, except as disclosed to Mortgagee in writing on the date hereof; (iv) each Lease is in full force and effect; (v) neither Mortgagor nor any tenant under any Lease is in default under any of the terms, covenants or provisions of the Lease, and Mortgagor knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under any Lease; (vi) there are no offsets or defenses to the payment of any portion of the Rents; and (vii) all Rents due and payable under each Lease have been paid in full and no said Rents have been paid more than one (1) month in advance of the due dates thereof.

CSFBMSC 02741

SRZMY\611479v8

BK 13733PG463

(ff)   Appraisal.  All requirements and conditions of the appraisal of the Property submitted to Mortgagee as part of the Loan Application, upon which the value of the Mortgaged Property was conditioned, have been fully satisfied.

(gg)   Boundary Lines.  All of the Improvements which were included in determining the appraised value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property, and no easements or other encumbrances upon the Premises encroach upon any of the Improvements, so as to affect the value or marketability of the Mortgaged Property except those which are insured against by title insurance.

(hh)   Survey.  The survey of the Mortgaged Property delivered to Mortgagee in connection with this Mortgage, has been performed by a duly licensed surveyor or registered professional engineer in the jurisdiction in which the Mortgaged Property is situated, is certified to the Mortgagee, its successors and assigns, and the title insurance company, and is in accordance with the most current minimum standards for title surveys as determined by the American Land Title Association, with the signature and seal of a licensed engineer or surveyor affixed thereto, and does not fail to reflect any material matter affecting the Mortgaged Property or the title thereto.

(ii)   Forfeiture.  There has not been and shall never be committed by Mortgagor or any other person in occupancy of or involved with the operation or use of the Mortgaged Property any act or omission affording the federal government or any state or local government the right of forfeiture as against the Mortgaged Property or any part thereof or any monies paid in performance of Mortgagor's obligations under any of the Loan Documents.

(jj)   Management Agreement.  The Management Agreement, dated as of September 10, 1999 (the "Management Agreement") between Mortgagor and Fineberg Management, Inc. ("Manager") pursuant to which Manager operates the Mortgaged Property is in full force and effect and there is no default or violation by any party thereunder.  The fee due under the Management Agreement, and the terms and provisions of the Management Agreement, are subordinate to this Mortgage and Manager shall attorn to Mortgagee.  Mortgagor shall not terminate, cancel, modify, renew or extend the Management Agreement, or enter into any agreement relating to the management or operation of the Mortgaged Property with Manager or any other party without the express written consent of Mortgagee, which consent shall not be unreasonably withheld.  If at any time

SRZNY\611479v8

CSFBMSC 02742

BK 13733PG464

Mortgagee consents to the appointment of a new Manager, such new Manager and Mortgagor shall, as a condition of Mortgagee's consent, execute a Consent and Agreement of Manager in the form then used by Mortgagee.

(kk)    <u>No Broker</u>.  No financial advisors, brokers, underwriters, placement agents, agents or finders have been dealt with by the Mortgagor in connection with the Loan.

12.    <u>Single Purpose Entity/Separateness</u>.  Mortgagor represents, warrants and covenants as follows:

(a)    Mortgagor does not own and will not own any asset or property other than (i) the Mortgaged Property, and (ii) incidental personal property necessary for the ownership or operation of the Mortgaged Property.

(b)    Mortgagor will not engage in any business other than the ownership, management and operation of the Mortgaged Property and Mortgagor will conduct and operate its business as presently conducted and operated.

(c)    Mortgagor will not enter into any contract or agreement with any affiliate of the Mortgagor, any constituent party of Mortgagor, any guarantor (a "Guarantor") of the Debt or any part thereof or any affiliate of any constituent party or Guarantor, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any such party.

(d)    Mortgagor has not incurred and will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than (i) the Debt, (ii) unsecured trade and operational debt incurred in the ordinary course of business not outstanding for more than sixty (60) days with trade creditors and in amounts as are normal and reasonable under the circumstances, but, in no event, to exceed three percent (3%) of the outstanding principal balance of the Loan from time to time in the aggregate, (iii) debt incurred in the financing of equipment and other personal property used on the Premises, and (iv) indebtedness incurred in connection with restoring the Mortgaged Property in accordance with the provisions of <u>Paragraph 4</u> or <u>Paragraph 7</u> hereof.  No indebtedness other than the Debt may be secured (subordinate or <u>pari passu</u>) by the Mortgaged Property.

(e)    Mortgagor has not made and will not make any loans or advances to any third party (including any affiliate or constituent party, any Guarantor or any affiliate of any constituent party or Guarantor), and shall not acquire obligations or securities of its affiliates.

(f)    Mortgagor is and will remain solvent and Mortgagor will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

CSFBMSC 02743

SRZNY\611479v8

BK 13733PG465

(g)     Mortgagor has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Mortgagor will not, nor will Mortgagor permit any constituent party or Guarantor to amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, certificate of organization, trust or other organizational documents of Mortgagor or such constituent party or Guarantor without the prior written consent of Mortgagee.

(h)     Mortgagor will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party and Mortgagor will file its own tax returns unless required otherwise by applicable law. Mortgagor shall maintain its books, records, resolutions and agreements as official records.

(i)     Mortgagor will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any affiliate of Mortgagor, any constituent party of Mortgagor, any Guarantor or any affiliate of any constituent party or Guarantor), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its affiliates as a division or part of the other and shall maintain and utilize a separate telephone number and separate stationery, invoices and checks.

(j)     Mortgagor is adequately capitalized and will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(k)     Mortgagor will not seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of the Mortgagor.

(l)     Mortgagor will not commingle the funds and other assets of Mortgagor with those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party of Guarantor, or any other person.

(m)     Mortgagor has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other person.

(n)     Mortgagor does not and will not guarantee, become obligated for, or hold itself out to be responsible for the debts or obligations of any other person or entity or the decisions or actions respecting the daily business or affairs of any other person or entity.

(o)     Mortgagor will not permit any affiliate or constituent party independent access to its bank accounts.

(p)     Mortgagor shall pay the salaries of its own employees and maintain a sufficient number of employees in light of its contemplated business operations.

CSFBMSC 02744

SRZNY\611479v8

BK I 3 7 3 3 PG 4 6 6

(q)    (i) If Mortgagor is a limited partnership the general partner (an "**SPC Entity**") shall be a corporation whose sole asset is its interest in Mortgagor and the SPC Entity will at all times comply, and will cause Mortgagor to comply, with each of the representations, warranties, and covenants contained in this <u>Paragraph 12</u> as if such representation, warranty or covenant was made directly by such general partner;

(ii) if Mortgagor is a limited liability company, Mortgagor's manager (an "**SPC Entity**") shall at all time be a corporation owning no interest in any entity other than Mortgagor and the SPC Entity will at all times comply, and will cause Mortgagor to comply, with each of the representations, warranty and covenants contained in this <u>Paragraph 12</u> as if such representation warranty or covenant was made directly, to the extent applicable, by such manager; or

(iii)    If Mortgagor is a single member limited liability company the sole member (A) shall at all times fully comply with and cause Mortgagor to fully comply with each of the representation, warranties and covenants in this <u>Paragraph 12</u> as if such representation, warranty and covenant was made directly by such member, to the extent applicable, and (B) shall at all times have as a party in control for the purposes of the representations, warranties and covenants in this <u>Paragraph 12</u> (an "SPC Entity") a corporation owning no interest in any entity other than said sole member and the corporation will at all times comply with each of the representations, warranties and covenants in this <u>Paragraph 12</u> as if such representation, warranty and covenant was made directly by such corporation.

(r)    Mortgagor shall at all times cause there to be at least one duly appointed member of the board of directors (an "**Independent Director**") of the SPC Entity reasonably satisfactory to Mortgagee who shall not have been at the time of such individual's appointment, and may not have been at any time during the preceding five years (i) a shareholder of, or an officer, director, attorney, counsel, partner or employee of, Mortgagor or any of its shareholders, subsidiaries or affiliates, (ii) a customer of, or supplier to, Mortgagor or any of its shareholders, subsidiaries or affiliates, (iii) a person or other entity controlling or under common control with any such shareholder, partner, supplier or customer, or (iv) a member of the immediate family of any such shareholder, officer, director, partner, employee, supplier or customer of any other director of Mortgagor.  As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

(s)    Mortgagor shall not cause or permit the board of directors of the SPC Entity to take any action which, under the terms of any certificate of incorporation, by-laws or any voting trust agreement with respect to any common stock, requires a vote of the board of directors of the SPC Entity unless at the time of such action there shall be at least one member who is an Independent Director.

(t)    Mortgagor shall conduct its business and shall cause each Covered Party (as hereinafter defined) to conduct business so that the assumptions made with respect to

SR2NY\611479v8

CSFBMSC 02745

BK 13733PG467

each party (each, a "Covered Party") addressed in that certain opinion letter dated the date hereof (the "Insolvency Opinion") delivered by Bernkopf, Goodman & Baseman LLP in connection with the Loan shall be true and correct in all respects.

13.    <u>Estoppel Certificates and No Default Affidavits.</u>

After request by Mortgagee, Mortgagor shall within ten (10) days furnish Mortgagee with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the rate of interest of the Note, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, if any, (vi) that the Note, this Mortgage and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification; and (vii) reaffirming all representations and warranties of Mortgagor set forth herein and in the other Loan Documents as of the date requested by Mortgagee or, to the extent of any changes to any such representations and warranties, so stating such changes.

14.    <u>Controlling Agreement.</u>  It is expressly stipulated and agreed to be the intent of Mortgagor, and Mortgagee at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Mortgagee to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this <u>Paragraph 14</u> (and the similar paragraph contained in the Note) shall control every other covenant and agreement in this Mortgage and the other Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Debt, or if Mortgagee's exercise of the option to accelerate the maturity of the Note, or if any prepayment by Mortgagor results in Mortgagor having paid any interest in excess of that permitted by applicable law, then it is Mortgagor's and Mortgagee's express intent that all excess amounts theretofore collected by Mortgagee shall be credited on the principal balance of the Note and all other Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Mortgagor), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder.  All sums paid or agreed to be paid to Mortgagee for the use, forbearance, or detention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Debt until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.  Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Mortgagee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

SRZNY\611479v8

CSFBMSC 02746

BK 1 3 7 3 3 PG 4 6 8

15.   **Changes in Laws Regarding Taxation.** If any law is enacted or adopted or amended after the date of this Mortgage which deducts the Debt from the value of the Mortgaged Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Mortgagee's interest in the Mortgaged Property (other than a tax measured solely based upon the gross receipts of Mortgagee), Mortgagor will pay such tax, with interest and penalties thereon, if any. In the event Mortgagee is advised by counsel chosen by it that the payment of such tax or interest and penalties by Mortgagor would be unlawful or taxable to Mortgagee or unenforceable or provide the basis for a defense of usury, then in any such event, Mortgagee shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable without any prepayment consideration except that if an Event of Default has occurred, then the Mortgagor shall pay to Mortgagee an additional amount equal to the Yield Maintenance Premium, if any, that would be required under <u>Paragraph 55</u> hereof if Defeasance Collateral was to be purchased by Mortgagor.

16.   **No Credits on Account of the Debt.** Mortgagor will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Mortgaged Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Mortgaged Property, or any part thereof, for real estate tax purposes by reason of this Mortgage or the Debt. In the event such claim, credit or deduction shall be required by law, Mortgagee shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable without any prepayment consideration except that if an Event of Default has occurred, then the Mortgagor shall pay to Mortgagee an additional amount equal to the Yield Maintenance Premium, if any, that would be required under <u>Paragraph 55</u> hereof if Defeasance Collateral was to be purchased by Mortgagor.

17.   **Documentary Stamps.** If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note or this Mortgage, or impose any other tax or charge on the same, Mortgagor will pay for the same, with interest and penalties thereon, if any.

18.   **Books and Records.**

(a)   The financial statements heretofore furnished to Mortgagee are, as of the dates specified therein, complete and correct and fairly present the financial condition of the Mortgagor and any other persons or entities that are the subject of such financial statements, and are prepared in accordance with generally accepted accounting principles. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operation or business of Mortgagor from that set forth in said financial statements.

(b)   Mortgagor will maintain full and accurate books of accounts and other records reflecting the results of the operations of the Mortgaged Property and will furnish to Mortgagee on or before forty-five (45) days after the end of each calendar quarter the following items, each certified by Mortgagor as being true and correct: (i) a written statement (rent roll) dated as of the last day of each such calendar quarter identifying each of the Leases by

-38-

CSFBMSC 02747

BK 1 3 7 3 3 PG 4 6 9

the term, space occupied, rental required to be paid, security deposit paid, any rental concessions, and identifying any defaults or payment delinquencies thereunder; (ii) monthly and year to date operating statements prepared for each calendar month during each such calendar quarter, noting Net Operating Income (as hereinafter defined), Gross Income from Operations (as hereinafter defined), and Operating Expenses (as hereinafter defined), and including an itemization of actual (not pro forma) capital and other information necessary and sufficient under generally accepted accounting practices to fairly represent the financial position and results of operation of the Mortgaged Property during such calendar month, all in form satisfactory to Mortgagee; (iii) a property balance sheet for each such calendar quarter; (iv) a comparison of the budgeted income and expenses and the actual income and expenses for each calendar quarter and year to date together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such quarterly periods and year to date; and (v) a calculation reflecting the Debt Service Coverage Ratio (as hereinafter defined) as of the last day of each such calendar quarter. Until a Securitization has occurred, the Mortgagor shall, upon Mortgagee's request made not more than twice, furnish monthly each of the items listed in the immediately preceding sentence within twenty (20) days after the end of such month. Within one hundred twenty (120) days following the end of each calendar year, Mortgagor shall furnish statements of its financial affairs and condition including a balance sheet and a statement of profit and loss for the Mortgagor in such detail as Mortgagee may request, and setting forth the financial condition and the income and expenses for the Mortgaged Property for the immediately preceding calendar year, which statements shall be prepared by Mortgagor. Mortgagor's annual financial statements shall include (i) a list of the tenants, if any, occupying more than twenty (20%) percent of the total floor area of the Improvements, and (ii) a breakdown showing the year in which each Lease then in effect expires and the percentage of total floor area of the Improvements and the percentage of base rent with respect to which Leases shall expire in each such year, each such percentage to be expressed on both a per year and a cumulative basis. Mortgagor's annual financial statements shall be accompanied by a certificate executed by the chief financial officer of Mortgagor or the general partner of Mortgagor, as applicable, stating that each such annual financial statement presents fairly the financial condition of the Mortgaged Property being reported upon and shall be prepared by a "Big Six" accounting firm or other independent certified public accountant acceptable to Mortgagee (including Tobias and Fleischman). Each such annual financial statement shall be prepared in accordance with generally accepted accounting principles consistently applied. At any time and from time to time Mortgagor shall deliver to Mortgagee or its agents such other financial data as Mortgagee or its agents shall reasonably request with respect to the ownership, maintenance, use and operation of the Mortgaged Property.

(c)     For the purposes of this Mortgage, the following terms shall have the following meanings:

(i)     The term "Net Operating Income" shall mean the amount obtained by subtracting Operating Expenses from Gross Income from Operations.

(ii)     The term "Operating Expenses" shall mean the total of all expenditures, computed in accordance with generally accepted accounting principles, of

-39-

CSFBMSC 02748

BK I 3 7 3 3 PG 4 7 0

whatever kind relating to the operation, maintenance and management of the Mortgaged Property that are incurred on a regular monthly or other periodic basis, including without limitation, utilities, ordinary repairs and maintenance, insurance, license fees, property taxes and assessments, advertising expenses, management fees, payroll and related taxes, computer processing charges, operational equipment or other lease payments as approved by Mortgagee, and other similar costs, but excluding depreciation, debt service, capital expenditures, and contributions to the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Leasing Escrow Fund and any other reserves required under the Loan Documents.

   (iii) The term "Gross Income from Operations" shall mean all income, computed in accordance with generally accepted accounting principles, derived from the ownership and operation of the Mortgaged Property from whatever source, including, but not limited to, Rents, utility charges, escalations, forfeited security deposits, interest on credit accounts, service fees or charges, license fees, parking fees, rent concessions or credits, and other pass-through or reimbursements paid by tenants under the Leases of any nature but excluding sales, use and occupancy or other taxes on receipts required to be accounted for by Mortgagor to any government or governmental agency, refunds and uncollectible accounts, sales of furniture, fixtures and equipment, proceeds of casualty insurance and condemnation awards (other than business interruption or other loss of income insurance), and any disbursements to the Mortgagor from the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Leasing Escrow Fund, or any other escrow fund established by the Loan Documents.

   (iv) The term "Debt Service Coverage Ratio" shall mean a ratio for the applicable period in which: (A) the numerator is the Net Operating Income (excluding interest on credit accounts) for such period as set forth in the statements required hereunder; and (B) the denominator is the aggregate amount of principal and interest due and payable on the Note.

   19. Performance of Other Agreements.  Mortgagor shall observe and perform each and every term to be observed or performed by Mortgagor pursuant to the terms of any agreement or recorded instrument affecting or pertaining to the Mortgaged Property.

   20. Further Acts, Etc.  Mortgagor will, at the cost of Mortgagor, and without expense to Mortgagee, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, Uniform Commercial Code financing statements or continuation statements, transfers and assurances as Mortgagee shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Mortgagee the property and rights hereby deeded, mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Mortgagee, or for carrying out the intention or facilitating the performance of the terms of this Mortgage or for filing, registering or recording this Mortgage or for facilitating the sale of the Loan and the Loan Documents as described in Paragraph 59 below. Mortgagor, on demand, will execute and deliver and hereby authorizes Mortgagee to execute in the name of Mortgagor or without the signature of Mortgagor to the extent Mortgagee may lawfully do so, one or more financing statements, chattel mortgages or other instruments, to

SRZWY\611479v8

CSFBMSC 02749

BK 13733PG471

evidence more effectively the security interest of Mortgagee in the Mortgaged Property. Upon foreclosure, the appointment of a receiver or any other relevant action, Mortgagor will, at the cost of Mortgagor and without expense to Mortgagee, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of or the Mortgaged Property. Mortgagor grants to Mortgagee an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Mortgagee at law and in equity, including, without limitation, such rights and remedies available to Mortgagee pursuant to this paragraph.

21.    **Recording of Mortgage, Etc.** Mortgagor forthwith upon the execution and delivery of this Mortgage and thereafter, from time to time, will cause this Mortgage, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Mortgaged Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Mortgagee in, the Mortgaged Property. Mortgagor will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property and any instrument of further assurance, and all federal, state, county and municipal, taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Mortgage, any mortgage supplemental hereto, any security instrument with respect to the Mortgaged Property or any instrument of further assurance, except where prohibited by law so to do. Mortgagor shall hold harmless and indemnify Mortgagee, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of this Mortgage.

22.    **Reporting Requirements.** Mortgagor agrees to give prompt notice to Mortgagee of the insolvency or bankruptcy filing of Mortgagor or the death, insolvency or bankruptcy filing of any Guarantor.

23.    **Events of Default.** The Debt shall become immediately due and payable at the option of Mortgagee upon the happening of any one or more of the following events of default (each an "**Event of Default**"):

(a)    if any portion of the Debt is not paid on or before the related Payment Date (as defined in the Note) or, for any payment other than a Monthly Payment Amount (as defined in the Note), the date on which such payment is due;

(b)    subject to Mortgagor's right to contest as provided herein, if any of the Taxes or Other Charges are not paid when the same are due and payable (unless sums equaling the amount of Taxes and Other Charges then due and payable have been delivered to Mortgagee in accordance with Paragraph 6 hereof);

(c)    if the Policies are not kept in full force and effect, or if the Policies are not delivered to Mortgagee promptly after request;

-41-

CSFBMSC 02750

BK 1 3 7 3 3 PG 4 7 2

(d)    if Mortgagor transfers or encumbers any portion of the Mortgaged Property without Mortgagee's prior written consent, other than in accordance with Paragraph 10 hereof;

(e)    if any representation or warranty of Mortgagor, or of any Guarantor, made herein or in any other Loan Document or in any certificate, report, financial statement or other instrument or document furnished to Mortgagee shall have been false or misleading in any material respect when made;

(f)    if Mortgagor or any Guarantor shall make an assignment for the benefit of creditors or if Mortgagor shall generally not be paying its debts as they become due;

(g)    if a receiver, liquidator or trustee of Mortgagor or of any Guarantor shall be appointed or if Mortgagor or any Guarantor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Mortgagor or any Guarantor or if any proceeding for the dissolution or liquidation of Mortgagor or of any Guarantor shall be instituted; however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Mortgagor or such Guarantor, upon the same not being discharged, stayed or dismissed within ninety (90) days;

(h)    if Mortgagor shall be in default under any other mortgage or security agreement covering any part of the Mortgaged Property whether it be superior or junior in lien to this Mortgage, after applicable notice and cure periods, if any;

(i)    subject to Mortgagor's right to contest as provided herein, if the Mortgaged Property becomes subject to any mechanic's, materialman's or other lien and such lien is not removed of record or bonded within thirty (30) days of the filing or recording of such lien (except a lien for local real estate taxes and assessments not then due and payable);

(j)    if Mortgagor fails to cure any violations of laws or ordinances affecting or which may be interpreted to affect the Mortgaged Property within thirty (30) days after Mortgagor first receives notice of any such violations (or such longer period as shall be permitted without interest or penalty by law, ordinance or regulation, subject to and in accordance with all applicable provisions of Paragraph 31 hereof);

(k)    except as permitted in this Mortgage, the alteration, improvement, demolition or removal of any of the Improvements without the prior consent of Mortgagee;

(l)    if Mortgagor shall continue to be in default under any term, covenant, or provision of the Note or any of the other Loan Documents, beyond applicable cure periods contained in those documents, if any, or, if none, for thirty (30) days after Mortgagor first receives notice of such default;

(m)    if Mortgagor fails to cure a default under any other term, covenant or provision of this Mortgage within thirty (30) days after Mortgagor first receives notice of any

-42-

CSFBMSC 02751

BK 13733PG473

such default; provided, however, if such default is reasonably susceptible of cure, but not within such thirty (30) day period, then Mortgagor may be permitted up to an additional sixty (60) days to cure such default provided that Mortgagor diligently and continuously pursues such cure;

(n)    if without Mortgagee's prior written consent, (i) the Management Agreement is terminated, (ii) the ownership, management or control of Manager is transferred, (iii) there is a material change in the Management Agreement, or (iv) if there shall be a material default by Mortgagor under the Management Agreement; or

(o)    if Mortgagor ceases to continuously operate the Mortgaged Property or any material portion thereof as an office building for any reason whatsoever (other than temporary cessation in connection with any repair or renovation thereof undertaken with the consent of Mortgagee).

(p)    If Mortgagor is in default under the Bank of Boston Lease beyond applicable notice and cure periods, if any, such that The Bank of Boston has the right to terminate the Bank of Boston Lease, in whole or in part, or to offset or abate any rentals or other sums due thereunder or if at any time while the Debt is outstanding the Bank of Boston Lease shall cease to be in full force and effect, except as the result of the expiration of the term thereunder or in accordance with the provisions of this Mortgage; provided, however, that an offset or abatement of rent shall not constitute an Event of Default hereunder if such offset or abatement relates to an item which is the subject of additional rent, is an item or expense which is not susceptible to further offset or abatement beyond the then current offset or abatement, the aggregate of all currently outstanding unpaid and unresolved offsets and abatements, when taking into account the currently claimed offset or abatement, does not exceed $200,000 and within seven (7) days after payment of the rent which included such offset or abatement Mortgagor deposits with Mortgagee an amount equal to such offset or abatement to be held by Mortgagee as additional collateral for the Debt until the cause of the offset or abatement has been resolved and the correct abated or offset rent has been paid, as applicable.

24.    **Late Payment Charge.** If any portion of the Debt is not paid on or before the date which is three (3) days after the date on which such payment is due, Mortgagor shall pay to Mortgagee upon demand an amount equal to the lesser of three percent (3%) of such unpaid portion of the Debt or the maximum amount permitted by applicable law in order to defray a portion of the expenses incurred by Mortgagee in handling and processing such delinquent payment and to compensate Mortgagee for the loss of the use of such delinquent payment, and such amount shall be secured by this Mortgage.

25.    **Right To Cure Defaults.** Upon the occurrence of any Event of Default, Mortgagee may, but without any obligation to do so and without notice to or demand on Mortgagor and without releasing Mortgagor from any obligation hereunder, make or do the same in such manner and to such extent as Mortgagee may deem necessary to protect the security hereof. Mortgagee is authorized to enter upon the Mortgaged Property for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Mortgaged Property or to foreclose this Mortgage or collect the Debt, and the cost and expense thereof

-43-

CSFBMSC 02752

BK 1 3 7 3 3 PG 4 7 4

(including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest at the Default Rate (as defined in the Note) for the period after notice from Mortgagee that such cost or expense was incurred to the date of payment to Mortgagee, shall constitute a portion of the Debt, shall be secured by this Mortgage and the other Loan Documents and shall be due and payable to Mortgagee upon demand.

26. **Additional Remedies.**

(a)    Upon the occurrence of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Mortgaged Property by Mortgagee itself or otherwise, including, without limitation, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Mortgagee:

(i)    declare the entire Debt to be immediately due and payable;

(ii)    institute a proceeding or proceedings, judicial or nonjudicial, by advertisement or otherwise, for the complete foreclosure of this Mortgage in which case the Mortgaged Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(iii)    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Mortgage for the portion of the Debt then due and payable, subject to the continuing lien of this Mortgage for the balance of the Debt not then due;

(iv)    sell for cash or upon credit the Mortgaged Property or any part thereof and all estate, claim, demand, right, title and interest of Mortgagor therein and rights of redemption thereof, pursuant to the power of sale contained herein or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law;

(v)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, or in any of the other Loan Documents;

(vi)    recover judgment on the Note either before, during or after any proceedings for the enforcement of this Mortgage;

(vii)    apply for the appointment of a trustee, receiver, liquidator or conservator of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Mortgagor, any Guarantor or of any person, firm or other entity liable for the payment of the Debt;

CSFBMSC 02753

SRZNY\611479v8

BK I 3 7 3 3 PG 4 7 5

(viii)    enforce Mortgagee's interest in the Leases and Rents and enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys and dispossess Mortgagor and its agents and servants therefrom, and thereupon Mortgagee may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Mortgaged Property and conduct the business thereat; (B) complete any construction on the Mortgaged Property in such manner and form as Mortgagee deems advisable; (C) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property; (D) exercise all rights and powers of Mortgagor with respect to the Mortgaged Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents; and (E) apply the receipts from the Mortgaged Property to the payment of Debt, after deducting therefrom all expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the taxes, assessments insurance and other charges in connection with the Mortgaged Property, as well as just and reasonable compensation for the services of Mortgagee, its counsel, agents and employees;

(ix)    require Mortgagor to pay monthly in advance to Mortgagee, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Mortgaged Property occupied by Mortgagor and require Mortgagor to vacate and surrender possession to Mortgagee of the Mortgaged Property or to such receiver and, in default thereof, evict Mortgagor by summary proceedings or otherwise; or

(x)    pursue such other rights and remedies as may be available at law or in equity or under the Uniform Commercial Code including without limitation the right to receive and/or establish a lock box for all Rents proceeds from the Intangibles and any other receivables or rights to payments of Mortgagor relating to the Mortgaged Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Mortgaged Property, this Mortgage shall continue as a lien on the remaining portion of the Mortgaged Property.

(b)    The proceeds of any sale made under or by virtue of this paragraph, together with any other sums which then may be held by Mortgagee under this Mortgage, whether under the provisions of this paragraph or otherwise, shall be applied by Mortgagee to the payment of the Debt in such priority and proportion as Mortgagee in its sole discretion shall deem proper.

(c)    Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law, Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)    Upon the completion of any sale or sales pursuant hereto, Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the

-45-

CSFBMSC 02754

BK I 3 7 3 3 PG 4 7 6

accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Mortgagee is hereby irrevocably appointed the true and lawful attorney of Mortgagor, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose Mortgagee may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Mortgagor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any sale or sales made under or by virtue of this paragraph, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Mortgagor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Mortgagor and against any and all persons claiming or who may claim the same, or any part thereof from, through or under Mortgagor.

(e)     Upon any sale made under or by virtue of this paragraph, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Mortgagee may bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Mortgagee is authorized to deduct under this Mortgage.

(f)     No recovery of any judgment by Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of Mortgagor shall affect in any manner or to any extent the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any liens, rights, powers or remedies of Mortgagee hereunder, but such liens, rights, powers and remedies of Mortgagee shall continue unimpaired as before.

(g)     Mortgagee may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this paragraph at any time before the conclusion thereof, as determined in Mortgagee's sole discretion and without prejudice to Mortgagee.

(h)     Mortgagee may resort to any remedies and the security given by the Note, this Mortgage or the Loan Documents in whole or in part, and in such portions and in such order as determined by Mortgagee's sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Note, this Mortgage or any of the other Loan Documents. The failure of Mortgagee to exercise any right, remedy or option provided in the Note, this Mortgage or any of the other Loan Documents shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by the Note, this Mortgage or the other Loan Documents. No acceptance by Mortgagee of any payment after the occurrence of any Event of Default and no payment by Mortgagee of any obligation for which Mortgagor is liable hereunder shall be deemed to waive or cure any Event

SRZNY\6J1479v8

CSFBMSC 02755

BK 13733 PG477

of Default with respect to Mortgagor, or Mortgagor's liability to pay such obligation. No sale of all or any portion of the Mortgaged Property, no forbearance on the part of Mortgagee, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Mortgagee to Mortgagor, shall operate to release or in any manner affect the interest of Mortgagee in the remaining Mortgaged Property or the liability of Mortgagor to pay the Debt. No waiver by Mortgagee shall be effective unless it is in writing and then only to the extent specifically stated. All costs and expenses of Mortgagee in exercising the rights and remedies under this <u>Paragraph 26</u> (including reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Mortgagor immediately upon notice from Mortgagee, with interest at the Default Rate for the period after notice from Mortgagee and such costs and expenses shall constitute a portion of the Debt and shall be secured by this Mortgage.

(i)    The interests and rights of Mortgagee under the Note, this Mortgage or in any of the other Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Mortgagee may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Mortgagee may grant with respect to the Mortgaged Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, Guarantor or surety of any of the Debt.

27.    <u>Right of Entry</u>.  In addition to any other rights or remedies granted under this Mortgage, Mortgagee, and its agents, during the Term, shall have the right to enter and inspect the Mortgaged Property during normal business hours. The cost of such inspections or audits shall be borne by Mortgagor should Mortgagee determine that an Event of Default exists, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Mortgagee. The cost of such inspections, if not paid for by Mortgagor following demand, may be added to the principal balance of the sums due under the Note and this Mortgage and shall bear interest thereafter until paid at the Default Rate.

28.    <u>Security Agreement</u>.

(a)    This Mortgage is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code. The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property. Mortgagor by executing and delivering this Mortgage has granted and hereby grants to Mortgagee, as security for the Debt, a security interest in the Mortgaged Property to the full extent that the Mortgaged Property may be subject to the Uniform Commercial Code (said portion of the Mortgaged Property so subject to the Uniform Commercial Code being called in this paragraph the "Collateral"). This Mortgage shall also constitute a "fixture filing" for the purposes of the Uniform Commercial Code. As such, this Mortgage covers all items of the Collateral that are or are to become fixtures. Information concerning the security interest herein granted may be obtained from the parties at the addresses of the parties set forth in the first paragraph of this Mortgage.

SRZWY\611479v8

CSFBMSC 02756

(b) If an Event of Default shall occur, Mortgagee, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Mortgagee may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Mortgagee, Mortgagor shall at its expense assemble the Collateral and make it available to Mortgagee at a convenient place acceptable to Mortgagee. Mortgagor shall pay to Mortgagee on demand any and all expenses, including attorneys' fees and disbursements, incurred or paid by Mortgagee in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Mortgagee with respect to the Collateral sent to Mortgagor in accordance with the provisions hereof at least five (5) days prior to such action, shall constitute commercially reasonable notice to Mortgagor. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Mortgagee to the payment of the Debt in such priority and proportions as Mortgagee in its sole discretion shall deem proper. In the event of any change in name, identity or structure of any Mortgagor, such Mortgagor shall notify Mortgagee thereof and promptly after request shall execute, file and record such Uniform Commercial Code forms as are necessary to maintain the priority of Mortgagee's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Mortgagee shall require the filing or recording of additional Uniform Commercial Code forms or continuation statements, Mortgagor shall, promptly after request, execute, file and record such Uniform Commercial Code forms or continuation statements as Mortgagee shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Mortgagor's obligations under the Note, this Mortgage and any of the other Loan Documents. Mortgagor hereby irrevocably appoints Mortgagee as its attorney-in-fact, coupled with an interest, to file with the appropriate public office on its behalf any financing or other statements signed only by Mortgagee, as secured party, in connection with the Collateral covered by this Mortgage.

29. <u>Actions and Proceedings</u>. Upon any Event of Default, or if Mortgagor fails to act under circumstances under which it is unreasonable not to so act, after written notice from Mortgagee, Mortgagee shall have the right to appear in and defend any action or proceeding brought with respect to the Mortgaged Property and to bring any action or proceeding, in the name and on behalf of Mortgagor, which Mortgagee, in its sole discretion, decides should be brought to protect their interest in the Mortgaged Property. Mortgagee shall, at its option, be subrogated to the lien of any mortgage or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

30. <u>Waiver of Setoff and Counterclaim</u>. All amounts due under this Mortgage, the Note and the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever. Mortgagor hereby waives the right to assert a setoff, counterclaim (other than a mandatory or compulsory counterclaim) or deduction in any action or proceeding in

BK 13733PG479

which Mortgagee is a participant, or arising out of or in any way connected with this Mortgage, the Note, any of the other Loan Documents, or the Debt.

       31.   <u>Contest of Certain Claims</u>.  Notwithstanding any provisions of the Loan Documents to the contrary, Mortgagor shall not be in default for failure to pay or discharge Taxes, Other Charges or any Legal Requirement (as herein below defined) or mechanic's or materialman's lien asserted against the Mortgaged Property if, and so long as, (a) Mortgagor shall have notified Mortgagee of same within five (5) days of obtaining knowledge thereof; (b) Mortgagor shall diligently and in good faith contest the same by appropriate legal proceedings which shall operate to prevent the enforcement or collection of the same and the sale of the Mortgaged Property or any part thereof, to satisfy the same; (c) Mortgagor shall have furnished to Mortgagee a cash deposit, or an indemnity bond satisfactory to Mortgagee with a surety reasonably satisfactory to Mortgagee, in an amount equal to (i) 125% of the amount of the Taxes, Other Charges or mechanic's or materialman's lien claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith, to assure payment of the matters under contest and to prevent any sale or forfeiture of the Mortgaged Property or any part thereof or (ii) such other amount as a court shall designate, provided such amount shall have in fact been deposited with such court and to the extent that Mortgagee shall have reasonably determined that such deposit with such court shall prevent any such sale or forfeiture of the Mortgaged Property or any part thereof (in which event no additional deposit with Mortgagee shall be required); (d) Mortgagor shall promptly upon final determination thereof pay the amount of any such Taxes, Other Charges or claim so determined, together with all costs, interest and penalties which may be payable in connection therewith or shall comply with such Legal Requirement, as the case may be; (e) the failure to pay the Taxes, Other Charges or mechanic's or materialman's lien claim or to comply with such Legal Requirement does not constitute a default continuing beyond applicable notice and cure periods, if any, under any other deed of trust, mortgage or security interest covering or affecting any part of the Mortgaged Property; (f) notwithstanding the foregoing, Mortgagor shall immediately upon request of Mortgagee pay (and if Mortgagor shall fail so to do, Mortgagee may, but shall not be required to, pay or cause to be discharged or bonded against) any such Taxes, Other Charges or claim or comply with such Legal Requirement notwithstanding such contest, if in the opinion of Mortgagee, the Mortgaged Property or any part thereof or interest therein may be in danger of being sold, forfeited, foreclosed, terminated, canceled or lost and (g) in the case of a Legal Requirement, Mortgagee would not be in any danger of any criminal liability or any civil liability, for failure to comply therewith. As used herein, the term "Legal Requirements" shall mean all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of all government departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, which now or at any time hereafter may be applicable to the Mortgaged Property or any part thereof (whether to the use, operations, ownership or otherwise), or any of the adjoining sidewalks, curbs, vaults and vault space, if any, streets or ways, or any use or condition of the Mortgaged Property.  Mortgagee may pay over any such cash deposit or part thereof to the claimant entitled thereto at any time when, in the reasonable judgment of Mortgagee, the entitlement of such claimant is established.

-49-

CSFBMSC 02758

BK I 3 7 3 3 PG 4 8 0

32.    <u>Recovery of Sums Required to be Paid</u>. Upon any Event of Default, or if Mortgagor fails to act under circumstances under which it is unreasonable not to so act, after written notice from Mortgagee, Mortgagee shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Mortgagee thereafter to bring an action of foreclosure, or any other action, for a default or defaults by Mortgagor existing at the time such earlier action was commenced.

33.    <u>Marshalling and Other Matters</u>. Mortgagor hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Mortgaged Property or any part thereof or any interest therein.  Further, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Mortgage on behalf of Mortgagor, and on behalf of each and every person acquiring any interest in or title to the Mortgaged Property subsequent to the date of this Mortgage and on behalf of all persons to the extent permitted by applicable law.

34.    <u>Hazardous Substances</u>. Mortgagor hereby represents and warrants to Mortgagee that, to the best of Mortgagor's knowledge, after due inquiry and investigation except as disclosed in the report dated September 3, 1999, prepared by Certified Environmental Incorporated (the "Phase I Report") and delivered to Mortgagee in connection with the Loan: (a) the Mortgaged Property is not in direct or indirect violation of any local, state, federal or other governmental authority, statute, ordinance, code, order, decree, law, rule or regulation pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean-up including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), the Resource Conservation and Recovery Act, as amended ("RCRA"), the Emergency Planning and Community Right-to-Know Act of 1986, as amended, the Hazardous Substances Transportation Act, as amended, the Solid Waste Disposal Act, as amended, the Clean Water Act, as amended, the Clean Air Act, as amended, the Toxic Substance Control Act, as amended, the Safe Drinking Water Act, as amended, the Occupational Safety and Health Act, as amended, any state super-lien and environmental clean-up statutes, the Massachusetts Hazardous Waste Management Act (M.G.L. Chapter 21C) and the Massachusetts Oil and Hazardous Materials Release Prevention and Response Act (M.G.L. Chapter 21E), and all rules and regulations adopted in respect to the foregoing laws whether presently in force or coming into being and/or effectiveness hereafter (collectively, "**Environmental Laws**"); (b) the Mortgaged Property is not subject to any private or governmental lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous and/or toxic, dangerous and/or regulated, substances, wastes, materials, raw materials which include hazardous constituents, pollutants or contaminants including without limitation, petroleum, tremolite, anthlophylie, actinolite or polychlorinated biphenyls and any other substances or materials which are included under or regulated by Environmental Laws or which are considered by scientific opinion to be otherwise dangerous in terms of the health, safety and welfare of humans (collectively, "**Hazardous Substances**"); (c) no Hazardous Substances are or have been (including the period prior to Mortgagor's acquisition of the Mortgaged Property) discharged, generated, treated, disposed of or stored on, incorporated

-50-

CSFBMSC 02759

BK 1 3 7 3 3 PG 4 8 1

in, or removed or transported from the Mortgaged Property other than in compliance with all Environmental Laws; (d) no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Mortgaged Property; and (e) no underground storage tanks exist on any of the Mortgaged Property. So long as Mortgagor owns or is in possession of the Mortgaged Property, Mortgagor (i) shall keep or cause the Mortgaged Property to be kept free from Hazardous Substances, except such as are in compliance with all Environmental Laws, (ii) shall promptly notify Mortgagee if Mortgagor shall become aware of any Hazardous Substances on or near the Mortgaged Property in violation of any Environmental and/or if Mortgagor shall become aware that the Mortgaged Property is in direct or indirect violation of any Environmental Laws and/or if Mortgagor shall become aware of any condition on or near the Mortgaged Property which shall pose a threat to the health, safety or welfare of humans, and (iii) Mortgagor shall remove such Hazardous Substances and/or cure such violations and/or remove such threats, as applicable, as required by law, promptly after Mortgagor becomes aware of same, at Mortgagor's sole expense. Notwithstanding anything to the contrary in this paragraph, the Mortgagor and/or tenants on the Mortgaged Property may use and store amounts of Hazardous Substances at the Mortgaged Property if such use or storage is in connection with and in amounts consistent with normal office use and the ordinary cleaning and maintenance of the Mortgaged Property so long as such use and storage (A) does not violate any applicable Environmental Laws and (B) is not the subject of any specific recommendations in the Phase I Report. Nothing herein shall prevent Mortgagor from recovering such expenses from any other party that may be liable for such removal or cure. The obligations and liabilities of Mortgagor under this <u>Paragraph 34</u> shall survive any termination, satisfaction, or assignment of this Mortgage and the exercise by Mortgagee of any of its rights or remedies hereunder, including, without limitation, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure.

35.    <u>Asbestos</u>.    Mortgagor represents and warrants that, to the best of Mortgagor's knowledge, after due inquiry and investigation, no asbestos or any substance or material containing asbestos ("Asbestos") is located on the Mortgaged Property except as may have been disclosed in the Phase I Report delivered to Mortgagee in connection with the Loan. Mortgagor shall not install in the Mortgaged Property, nor permit to be installed in the Mortgaged Property, Asbestos and shall remove any Asbestos promptly upon discovery to the satisfaction of Mortgagee, at Mortgagor's sole expense. Mortgagor shall in all instances comply with, and ensure compliance by all occupants of the Mortgaged Property with, all applicable federal, state and local laws, ordinances, rules and regulations with respect to Asbestos, and shall keep the Mortgaged Property free and clear of any liens imposed pursuant to such laws, ordinances, rules or regulations. In the event that Mortgagor receives any notice or advice from any governmental agency or any source whatsoever with respect to Asbestos on, affecting or installed on the Mortgaged Property, Mortgagor shall immediately notify Mortgagee. The obligations and liabilities of Mortgagor under this <u>Paragraph 35</u> shall survive any termination, satisfaction, or assignment of this Mortgage and the exercise by Mortgagee of any of its rights or remedies hereunder, including but not limited to, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure.

SR2KY\611479v8

CSFBMSC 02760

BK 13733PG482

36.   <u>Environmental Monitoring.</u>   Mortgagor shall give prompt written notices to Mortgagee of: (a) any proceeding or written inquiry by any governmental agency with respect to the presence of any Hazardous Substance or Asbestos on, under, from or about the Mortgaged Property, (b) all claims made or threatened in each case in writing, by any third party against Mortgagor or the Mortgaged Property relating to any loss or injury resulting from any Hazardous Substance or Asbestos, and (c) Mortgagor's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Mortgaged Property that could cause the Mortgaged Property to be subject to any investigation or cleanup pursuant to any Environmental Law.  Mortgagor shall permit Mortgagee to join and participate in, as a party, at its own expense, if it so elects, any legal proceedings or actions initiated with respect to the Mortgaged Property in connection with any Environmental Law or Hazardous Substance, unless Mortgagor shall fail to act, under circumstances under which it is unreasonable not to act, in which event Mortgagor shall pay all reasonable attorneys' fees and disbursements incurred by Mortgagee in connection therewith.  Upon Mortgagee's request from time to time, if Mortgagee has determined (in the exercise of its reasonable judgment) that an adverse change in the condition of the Mortgaged Property has occurred which constitutes reasonable cause for the performance of an environmental inspection or audit of the Mortgaged Property, Mortgagor shall provide at Mortgagor's sole expense, (i) an inspection or audit of the Mortgaged Property prepared by a licensed hydrogeologist or licensed environmental engineer approved by Mortgagee indicating the presence or absence of Hazardous Substances on, in or near the Mortgaged Property, and (ii) an inspection or audit of the Mortgaged Property prepared by a duly qualified engineering or consulting firm approved by Mortgagee, indicating the presence or absence of Asbestos on the Mortgaged Property; provided, however, any such inspection or audit requested by Mortgagee, during the Term, in excess of one (1) inspection during each five (5) year period commencing upon the date hereof, shall be performed at Mortgagee's expense unless an Event of Default exists or Mortgagee has determined (in the exercise of its reasonable judgment) that reasonable cause exists for the performance of an environmental inspection or audit.  If Mortgagor fails to provide such inspection or audit within thirty (30) days after such request Mortgagee may order same, and Mortgagor hereby grants to Mortgagee and its employees and agents access to the Mortgaged Property and a license to undertake such inspection or audit.  The cost of such inspection or audit may be added to the Debt and shall bear interest thereafter until paid at the Default Rate.  In the event that any environmental site assessment report prepared in connection with such inspection or audit recommends (i) that an operations and maintenance plan be implemented for Asbestos or any Hazardous Substance, Mortgagor shall cause such operations and maintenance plan to be prepared and implemented at Mortgagor's expense upon request of Mortgagee, or (ii) site monitoring, containment, cleanup, removal, restoration, or other work of any kind is reasonably necessary or desirable under an applicable Environmental Law (the "Remedial Work"), Mortgagor shall commence and thereafter diligently prosecute to completion all such Remedial Work within thirty (30) days after written demand by Mortgagee for performance thereof (or any such shorter period of time as may be required under applicable law.)  All Remedial Work shall be performed by contractors approved in advance by Mortgagee, and under the supervision of a consulting engineer approved by Mortgagee.  All costs and expenses of such Remedial Work shall be paid by Mortgagor including, without limitation, Mortgagee's reasonable attorneys' fees and disbursements incurred in connection with monitoring or review of such Remedial Work.  In the event Mortgagor shall fail to timely commence, or

-52-

CSFBMSC 02761

BK I 3 7 3 3 PG 4 8 3

cause to be commenced, or fail to diligently prosecute to completion, such Remedial Work, Mortgagee may, but shall not be required to, cause such Remedial Work to be performed, and all costs and expenses thereof, or incurred in connection therewith, may be added to the Debt and shall bear interest thereafter until paid at the Default Rate.

37.    **Handicapped Access.**

(a)    Mortgagor agrees that the Mortgaged Property shall at all times strictly comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988 (if applicable), all state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "Access Laws").

(b)    Notwithstanding any provisions set forth herein or in any other document regarding Mortgagee's approval of alterations of the Mortgaged Property, Mortgagor shall not alter the Mortgaged Property in any manner which would increase Mortgagor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Mortgagee. The foregoing shall apply to tenant improvements constructed by Mortgagor or by any of its tenants. Mortgagee may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Mortgagee.

(c)    Mortgagor agrees to give prompt notice to Mortgagee of the receipt by Mortgagor of any complaints related to violation of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

38.    **Indemnification.** In addition to any other indemnifications provided herein or in the other Loan Documents, Mortgagor shall protect, defend, indemnify and save harmless Mortgagee from and against all liabilities, obligations, claims, demands, damages, penalties, causes of action, losses, fines, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements), imposed upon or incurred by or asserted against Mortgagee by reason of (a) ownership of this Mortgage, the Mortgaged Property or any interest therein or receipt of any Rents; (b) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Mortgaged Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) any use, nonuse or condition in, on or about the Mortgaged Property or any part thereof or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (d) any failure on the part of Mortgagor to perform or comply with any of the terms of this Mortgage; (e) performance of any labor or services or the furnishing of any materials or other property in respect of the Mortgaged Property or any part thereof; (f) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance or Asbestos on, from, or affecting the Mortgaged Property; (g) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous

-53-

CSFBMSC 02762

BK 1 3 7 3 3 PG 4 8 4

Substance or Asbestos; (h) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance or Asbestos; (i) any violation of the Environmental Laws, which are based upon or in any way related to such Hazardous Substance or Asbestos including, without limitation, the costs and expenses of any Remedial Work, attorney and consultant fees and disbursements, investigation and laboratory fees, court costs, and litigation expenses; (j) any failure of the Mortgaged Property to comply with any Access Laws; (k) any representation or warranty made in the Note, this Mortgage or any of the other Loan Documents being false or misleading in any material respect as of the date such representation or warranty was made; (l) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with the Loan, any Lease or other transaction involving the Mortgaged Property or any part thereof under any legal requirement or any liability asserted against Mortgagee with respect thereto; and (m) the claims of any lessee of any or any portion of the Mortgaged Property or any person acting through or under any lessee or otherwise arising under or as a consequence of any Lease. Any amounts payable to Mortgagee by reason of the application of this paragraph shall be secured by this Mortgage and shall become immediately due and payable and shall bear interest at the Default Rate from the date loss or damage is sustained by Mortgagee until paid. The obligations and liabilities of Mortgagor under this Paragraph 38 shall survive and termination, satisfaction, or assignment of this Mortgage and the exercise by Mortgagee of any of its rights or remedies hereunder, including, but not limited to, the acquisition of the Mortgaged Property by foreclosure or a conveyance in lieu of foreclosure, provided, however that Mortgagor shall have no obligations or liabilities under this Paragraph 38 to the extent the same arises out of Mortgagee's (or its agents' or employees') gross negligence or willful misconduct or willful breach of this Mortgage or any of the other Loan Documents or in connection with any event or condition that first arises from and after the date on which Mortgagee or any other party acquires title to the Mortgaged Property at a foreclosure sale or other transfer in lieu of foreclosure.

39.    Notices.  Any notice, report, demand or other instrument authorized or required to be given or furnished ("Notices") shall be in writing and shall be given as follows: (a) by hand delivery; (b) by deposit in the United States mail as first class certified mail, return receipt requested, postage paid; (c) by overnight nationwide commercial courier service; or (d) by telecopy transmission (other than for notices of default) with a confirmation copy to be delivered by duplicate notice in accordance with any of clauses (a)-(c) above, in each case, addressed to the party intended to receive the same at the following address(es):

Mortgagee:    Credit Suisse First Boston Mortgage Capital LLC
              Principal Transactions Group
              11 Madison Avenue
              New York, New York  10010
              Attention:  Asset Management
              Re:  Blue Hills Office Park/Joseph Rubino
              Telecopier:  (212) 325-8164

with copies to:    Credit Suisse First Boston Mortgage Capital LLC
                   Legal & Compliance Department

-54-

CSFBMSC 02763

BK I 3733 PG 485

11 Madison Avenue
New York, New York 10010
Attention: Colleen Graham, Esq.
Re: Blue Hills Office Park/Joseph Rubino - PTG
Telecopier: (212) 325-8220

and:          ORIX Real Estate Capital Markets, LLC
1717 Main Street
Dallas, Texas 75201
Attn: John Lloyd
Telecopier: (214) 237-2038
or any successor servicer of the Loan.

Mortgagor:     Blue Hills Office Park LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481

with a copy to:  Bernkopf, Goodman & Barenan LLP
125 Summer Street
Boston, Massachusetts 02110-1621
Attention: David Doyle, Esq.
Telecopier: (617) 790-3300

     Any party may change the address to which any such Notice is to be delivered, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this Paragraph 39. Notices shall be deemed to have been given on the date they are actually received; provided, that the inability to deliver Notices because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Notice for either party may be given by its respective counsel. Additionally, notice from Mortgagee may also be given by the Servicer.

    40.    **Authority**.

     (a)    Mortgagor (and the undersigned representative of Mortgagor, if any) represent and warrant that it (or they, as the case may be) has full power, authority and right to execute, deliver and perform its obligations pursuant to this Mortgage, and to deed, mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, hypothecate and assign the Mortgaged Property pursuant to the terms hereof and to keep and observe all of the terms of this Mortgage on Mortgagor's part to be performed.

     (b)    Mortgagor represents and warrants that Mortgagor is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended and the related Treasury Department regulations, including temporary regulations.

-55-

CSFBMSC 02764

BK 1 3 7 3 3 PG 4 8 6

41.    **Waiver of Notice.** Mortgagor shall not be entitled to any notices of any nature whatsoever from Mortgagee except with respect to matters for which this Mortgage specifically and expressly provides for the giving of notice by Mortgagee to Mortgagor and except with respect to matters for which Mortgagee is required by applicable law to give notice, and Mortgagor hereby expressly waives the right to receive any notice from Mortgagee with respect to any matter for which this Mortgage does not specifically and expressly provide for the giving of notice by Mortgagee to Mortgagor.

42.    **Remedies of Mortgagor.** In the event that a claim or adjudication is made that Mortgagee has acted unreasonably or unreasonably delayed acting in any case where by law or under the Note, this Mortgage or any of the other Loan Documents, it has an obligation to act reasonably or promptly, Mortgagee shall not be liable for any monetary damages (other than those directly resulting from gross negligence or willful misconduct of Mortgagee, but in no event shall Mortgagee be liable for any consequential damages) and Mortgagor's remedies shall be limited to injunctive relief or declaratory judgment or specific performance.

43.    **Sole Discretion of Mortgagee.** Wherever pursuant to this Mortgage, Mortgagee exercises any right given to it to consent or not consent or approve or disapprove, or any arrangement or term is to be satisfactory to Mortgagee, the decision of Mortgagee to consent or not consent, to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Mortgagee and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

44.    **Non-Waiver.** The failure of Mortgagee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Mortgage. Mortgagor shall not be relieved of Mortgagor's obligations hereunder by reason of (a) the failure of Mortgagee to comply with any request of Mortgagor or Guarantor to take any action to foreclose this Mortgage or otherwise enforce any of the provisions hereof or of the Note, or the other Loan Documents, (b) the release, regardless of consideration, of the whole or any part of the Mortgaged Property, or of any person liable for the Debt or any portion thereof, or (c) any agreement or stipulation by Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Mortgage or any of the other Loan Documents. Mortgagee may resort for the payment of the Debt to any other security held by Mortgagee in such order and manner as Mortgagee, in its sole discretion, may elect. Mortgagee may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Mortgagee thereafter to foreclose this Mortgage. The rights and remedies of Mortgagee under this Mortgage shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others. No act of Mortgagee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Mortgagee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

45.    **No Oral Change.** This Mortgage, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Mortgagor or Mortgagee, but only by an agreement in writing signed

-56-

CSFBMSC 02765

BK I 3 7 3 3 PG 4 8 7

by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

   46.   **Liability.** If Mortgagor consists of more than one person, the obligations and liabilities of each such person hereunder shall be joint and several. Subject to the provisions hereof requiring Mortgagee's consent to any transfer of the Mortgaged Property, this Mortgage shall be binding upon and inure to the benefit of Mortgagor and Mortgagee and their respective successors and assigns forever.

   47.   **Inapplicable Provisions.** If any term, covenant or condition of the Note or this Mortgage is held to be invalid, illegal or unenforceable in any respect, the Note and this Mortgage shall be construed without such provision.

   48.   **Headings, Etc.** The headings and captions of various paragraphs of this Mortgage are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

   49.   **Duplicate Originals.** This Mortgage may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

   50.   **Definitions.** Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Mortgage may be used interchangeably in singular or plural form and the word "Mortgagor" shall mean "each Mortgagor and any subsequent owner or owners of the Mortgaged Property or any part thereof or any interest therein," the word "Mortgagee" shall mean "Mortgagee and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Mortgage," the word "person" shall include an individual, corporation, limited liability company, partnership, trust, unincorporated association, government, governmental authority, and any other entity, and the words "Mortgaged Property" shall include any portion of the Mortgaged Property and any interest therein and the words "attorneys' fees" shall include any and all attorneys' fees, paralegal and law clerk fees, including, without limitation, fees at the pre-trial, trial and appellate levels incurred or paid by Mortgagee in protecting its interest in the Mortgaged Property and Collateral and enforcing its rights hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

   51.   **Homestead.** Mortgagor hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Mortgaged Property as against the collection of the Debt, or any part hereof.

   52.   **Assignments.** Mortgagee shall have the right to assign or transfer its rights under this Mortgage without limitation. Any assignee or transferee shall be entitled to all the benefits afforded Mortgagee under this Mortgage.

SRZNY\611479v8

**CSFBMSC 02766**

BK 1 3 7 3 3 PG 4 8 8

53.   <u>Waiver of Jury Trial</u>.   EACH OF MORTGAGOR AND MORTGAGEE HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE NOTE, THIS MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF MORTGAGOR AND MORTGAGEE, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  EACH OF MORTGAGOR AND MORTGAGEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MORTGAGOR.

54.   <u>Recourse Provisions</u>.   Subject to the qualifications below, Mortgagee shall not enforce the liability and obligation of Mortgagor, to perform and observe the obligations contained in this Mortgage, the Note or any of the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Mortgagor, except that Mortgagee may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Mortgagee to enforce and realize upon its interests under the Note, this Mortgage or the other Loan Documents or in the Mortgaged Property, the Rents or any other collateral given to Mortgagee pursuant to this Mortgage and the other Loan Documents; <u>provided, however</u>, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Mortgagor only to the extent of Mortgagor's interest in the Mortgaged Property, the Rents and in any other collateral given to Mortgagee, and Mortgagee, by accepting this Mortgage, the Note and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Mortgagor in any such action or proceeding under or by reason of or in connection with this Mortgage, the Note or any of the other Loan Documents. The provisions of this paragraph shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by this Mortgage, the Note or any of the other Loan Documents; (ii) impair the right of Mortgagee to name Mortgagor, as a party defendant in any action or suit for foreclosure and sale under this Mortgage; (iii) affect the validity or enforceability of any guaranty made in connection with the Loan or any rights and remedies of Mortgagee thereunder; (iv) impair the right of Mortgagee to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases and Rents executed in connection herewith; or (vi) constitute a waiver of the right of Mortgagee to enforce the liability and obligation of Mortgagor, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Mortgagee (including attorneys' fees and costs reasonably incurred), but in all events excluding, however, all consequential damages, arising out of or in connection with the following:

(a)    fraud or intentional misrepresentation by Mortgagor or any Guarantor in connection with the Loan;

SR2NY\611479v8

CSFBMSC 02767

BK 1 3 7 3 3 PG 4 8 9

(b)    intentional physical waste of the Mortgaged Property;

(c)    the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substance Indemnification Agreement of even date herewith given by Mortgagor to Mortgagee or in this Mortgage concerning Environmental Laws, Hazardous Substances and Asbestos;

(d)    the removal or disposal of any portion of the Mortgaged Property after an Event of Default;

(e)    the misapplication or conversion by Mortgagor of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Mortgaged Property, (ii) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, (iii) any Rents following an Event of Default or (iv) any Rents paid more than one month in advance;

(f)    failure to pay charges for labor or materials requested by Mortgagor or Mortgagor's failure to pay or escrow (in accordance with Paragraph 6 thereof) taxes or other charges that can create liens on any portion of the Mortgaged Property; and

(g)    any security deposits collected with respect to the Mortgaged Property which are not delivered to Mortgagee upon a foreclosure of the Mortgaged Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof.

Notwithstanding anything to the contrary in any of the Loan Documents (i) Mortgagee shall not be deemed to have waived any right which Mortgagee may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by this Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Mortgagee in accordance with the Loan Documents, and (ii) the Debt shall become fully recourse to Mortgagor in the event that: (A) the first full monthly payment of principal and interest under the Note is not paid when due; (B) Mortgagor intentionally fails to maintain its status as a single purpose entity in accordance with the provisions of this Mortgage; (C) Mortgagor fails to obtain Mortgagee's prior written consent before granting any subordinate financing or other voluntary lien encumbering the Mortgaged Property; (D) Mortgagor fails to obtain Mortgagee's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of this Mortgage; or (E) if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by Mortgagor or if any proceeding for the dissolution or liquidation of Mortgagor shall be instituted by Mortgagor or Guarantor.

SRZMY\611479v8

CSFBMSC 02768

BK 1 3 7 3 3 PG 4 9 0

55.    <u>Defeasance.</u>

(a)    Provided no Event of Default has occurred and is continuing, at any time after the date which (i) is two years after the "startup day," within the meaning of Section 860G(a)(9) of the Internal Revenue Code of 1986, as amended from time to time or any successor statute (the "<u>Code</u>"), of a "real estate mortgage investment conduit," within the meaning of Section 860D of the Code, that holds the Note or (ii) is four years after the date hereof, whichever shall first occur, and before the Anticipated Repayment Date, Mortgagor may cause the release of the Mortgaged Property from the lien of this Mortgage and the other Loan Documents upon the satisfaction of the following conditions:

(i)    not less than thirty (30) days prior written notice shall be given to Mortgagee specifying a date (the "<u>Release Date</u>") on which the Defeasance Collateral (as hereinafter defined) is to be delivered, such Release Date only to occur on a Payment Date (as defined in the Note);

(ii)    all accrued and unpaid interest and all other sums due under the Note and under the other Loan Documents up to the Release Date, including, without limitation, all reasonable costs and expenses incurred by Mortgagee or its agents in connection with such release (including, without limitation, the fees and expenses incurred by attorneys and accountants in connection with the review of the proposed Defeasance Collateral and the preparation of the Defeasance Security Agreement (as hereinafter defined) and related documentation), shall be paid in full on or prior to the Release Date; and

(iii)    Mortgagor shall deliver to Mortgagee on or prior to the Release Date:

(A)    an amount equal to that which is sufficient to purchase direct, non-callable obligations of the United States of America that provide for payments prior, but as close as possible, to all successive monthly Payment Dates occurring after the Release Date and assuming the Loan is paid in full on the Anticipated Repayment Date (as defined in the Note), with each such payment being equal to or greater than the amount of the corresponding installment of principal, interest and, if applicable, the fee of the Servicer required to be paid hereunder and/or under the Note (the "<u>Defeasance Collateral</u>"), each of which shall be duly endorsed by the holder thereof as directed by Mortgagee or accompanied by a written instrument of transfer in form and substance wholly satisfactory to Mortgagee (including, without limitation, such instruments as may be required by the depository institution holding such securities to effectuate book-entry transfers and pledges through the book-entry facilities of such institution) in order to create a first priority security interest therein in favor of

SRZNY\611479v8

CSFBMSC 02769

BK 1 3 7 3 3 PG 4 9 1

the Mortgagee in conformity with all applicable state and federal laws governing granting of such security interests;

(B)     a pledge and security agreement, in form and substance satisfactory to Mortgagee in its sole discretion, creating a first priority security interest in favor of Mortgagee in the Defeasance Collateral (the "Defeasance Security Agreement"), which shall provide, among other things, that any excess received by Mortgagee from the Defeasance Collateral over the amounts payable by Mortgagor hereunder shall be refunded to Mortgagor promptly after each Payment Date;

(C)     a certificate of Mortgagor certifying that all of the requirements set forth in this Paragraph 55 have been satisfied;

(D)     an opinion of counsel for Mortgagor in form and substance and delivered by counsel satisfactory to Mortgagee in its sole discretion stating, among other things, that (1) Mortgagee has a perfected first priority security interest in the Defeasance Collateral and that the Defeasance Security Agreement is enforceable against Mortgagor in accordance with its terms; and (2) that any REMIC Trust formed pursuant to a securitization will not fail to maintain its status as a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code as a result of such defeasance;

(E)     Mortgagor shall deliver evidence in writing from the applicable Rating Agencies (which Mortgagee and Mortgagor shall cooperate to obtain without unreasonable delay) to the effect that the collateral substitution will not result in a downgrading, withdrawal or qualification of the respective ratings in effect immediately prior to such defeasance event for any securities issued in connection with the securitization which are then outstanding;

(F)     a certificate from a firm of independent public accountants acceptable to Mortgagee certifying that the Defeasance Collateral is sufficient to satisfy the provisions of paragraph A above; and

(G)     such other incidental certificates, documents or instruments as Mortgagee may reasonably require.

(b)     Upon compliance with the requirements of this paragraph, the Mortgaged Property shall be released from the lien of this Mortgage and the other Loan Documents, and the Defeasance Collateral shall constitute the only collateral which shall secure the Note and all other obligations under the Loan Documents. Mortgagee will, at Mortgagor's expense, execute and deliver any agreements reasonably requested by Mortgagor to release the lien of this Mortgage from the Mortgaged Property. Mortgagor, pursuant to the Defeasance

SRZNY\611479v8

CSFBMSC 02770

BK 13733PG492

Security Agreement, shall authorize and direct that the payments received from Defeasance Collateral be made directly to Mortgagee and applied to satisfy the obligations of the Mortgagor under the Note.

(c)     Upon the release of the Mortgaged Property in accordance with this paragraph, Mortgagor may, or at option of Mortgagee shall, assign all its obligations under the Note, together with the pledged Defeasance Collateral, to a successor entity designated by Mortgagor and approved by Mortgagee in its reasonable discretion. Such successor entity shall execute an assumption agreement in form and substance satisfactory to Mortgagee in its sole discretion pursuant to which it shall assume Mortgagor's obligations under the Note and the Defeasance Security Agreement. As conditions to such assignment and assumption, Mortgagor shall (i) deliver to Mortgagee an opinion of counsel in form and substance and delivered by counsel satisfactory to Mortgagee in its sole discretion stating, among other things, that such assumption agreement is enforceable against Mortgagor and such successor entity in accordance with its terms and that the Note, the Defeasance Security Agreement and the other Loan Documents, as so assumed, are enforceable against such successor entity in accordance with their respective terms, and (ii) pay all costs and expenses incurred by Mortgagee or its agents in connection with such assignment and assumption (including, without limitation, the review of the proposed transferee and the preparation of the assumption agreement and related documentation). Upon such assumption, Mortgagor shall be relieved of its obligations hereunder, under the other Loan Documents and under the Defeasance Security Agreement other than those obligations which are specifically intended to survive the termination, satisfaction or assignment of this Mortgage or the exercise of Mortgagee's rights and remedies hereunder.

(d)     Upon the release of the Mortgaged Property in accordance with this paragraph, Mortgagor shall have no further right to prepay the Note pursuant to the other provisions of this paragraph or otherwise. In connection with the conditions set forth in subparagraph (a)(iii)(A) above, Mortgagor hereby appoints Mortgagee as its agent and attorney-in-fact for the purpose of purchasing the Defeasance Collateral with funds provided by the Mortgagor. Mortgagor shall pay any and all expenses incurred in the purchase of the Defeasance Collateral and any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the transfer of the Note or otherwise required to accomplish the agreements of this paragraph.

(e)     For purposes of this Mortgage the Note and the other Loan Documents, the term "Yield Maintenance Premium" shall mean the amount, if any, which, when added to the remaining principal amount of the Note, would be sufficient to purchase the Defeasance Collateral.

56.     <u>Cash Management Agreement</u>. On or before the date hereof Mortgagor covenants and agrees to enter into one or more servicing account agreements, lockbox servicing agreements and/or cash management agreements acceptable to Mortgagee between Mortgagor, Manager, Mortgagee and, as applicable, one or more certain financial institutions (together with any modification, amendment, substitution or replacement thereof, hereinafter collectively referred to as the "Cash Management Agreement"). During any Sweep Period (as defined in

CSFBMSC 02771

BK I 3 7 3 3 PG 4 9 3

the Cash Management Agreement), all Rents shall be applied as set forth in the Cash Management Agreement and the escrows and reserves required hereunder shall be funded as provided therein. The Mortgagor shall pay all costs and expenses of the Servicer and any bank as required under the Cash Management Agreement. Upon the occurrence of an Event of Default, Mortgagee may apply any sums then held pursuant to the Cash Management Agreement to the payment of the Debt in any order in its sole discretion. Until expended or applied, amounts held pursuant to the Cash Management Agreement shall constitute additional security for the Debt.

57.    **Miscellaneous.**

(a)     Any consent or approval by Mortgagee in any single instance shall not be deemed or construed to be Mortgagee's consent or approval in any like matter arising at a subsequent date, and the failure of Mortgagee to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Mortgagee be estopped from exercising such right, power, remedy, consent or approval at a later date. Any consent or approval requested of and granted by Mortgagee pursuant hereto shall be narrowly construed to be applicable only to Mortgagor and the matter identified in such consent or approval and no third party shall claim any benefit by reason thereof, and any such consent or approval shall not be deemed to constitute Mortgagee a venturer or partner with Mortgagor nor shall privity of contract be presumed to have been established with any such third party. If Mortgagee deems it to be in its best interest to retain assistance of persons, firms or corporations (including, without limitation, attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Mortgagor shall reimburse Mortgagee for all costs reasonably incurred in connection with the employment of such persons, firms or corporations.

(b)     Mortgagor covenants and agrees that during the Term, unless Mortgagee shall have previously consented in writing, (a) Mortgagor will take no action that would cause it to become an "**employee benefit plan**" as defined in 29 C.F.R. Section 2510.3-101, or "**assets of a governmental plan**" subject to regulation under the state statutes, and (b) Mortgagor will not sell, assign or transfer the Mortgaged Property, or any portion thereof or interest therein, to any transferee that does not execute and deliver to Mortgagee its written assumption of the obligations of this covenant. Mortgagor further covenants and agrees to protect, defend, indemnify and hold Mortgagee harmless from and against all loss, cost, damage and expense (including without limitation, all attorneys' fees and excise taxes, costs of correcting any prohibited transaction or obtaining an appropriate exemption) that Mortgagee may incur as a result of Mortgagor's breach of this covenant. This covenant and indemnity shall survive the extinguishment of the lien of this Mortgage by foreclosure or action in lieu thereof; furthermore, the foregoing indemnity shall supersede any limitations on Mortgagor's liability under any of the Loan Documents.

(c)     The Loan Documents contain the entire agreement between Mortgagor and Mortgagee relating to or connected with the Loan. Any other agreements relating to or

SRZNY\611479v8

CSFBMSC 02772

BK 1 3 7 3 3 PG 4 9 4

connected with the Loan not expressly set forth in the Loan Documents are null and void and superseded in their entirety by the provisions of the Loan Documents.

(d)    Mortgagor hereby covenants and agrees not to commit, permit or suffer to exist any act, omission or circumstance affording such right of forfeiture. In furtherance thereof, Mortgagor hereby indemnifies Mortgagee and agrees to defend and hold Mortgagee harmless from and against any loss, damage or injury by reason of the breach of the covenants and agreements or the representations and warranties set forth in this paragraph. Without limiting the generality of the foregoing, the filing of formal charges or the commencement of proceedings against Mortgagor or all or any part of the Mortgaged Property under any federal or state law for which forfeiture of the Mortgaged Property or any part thereof or of any monies paid in performance of Mortgagor's obligations under the Loan Documents is a potential result, shall, if not stayed or dismissed within sixty (60) days, at the election of Mortgagee, constitute an Event of Default hereunder without notice or opportunity to cure.

(e)    Mortgagor acknowledges that, with respect to the Loan, Mortgagor is relying solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Mortgagee or any parent, subsidiary or affiliate of Mortgagee. Mortgagor acknowledges that Mortgagee engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of the Mortgagor or its affiliates. Mortgagor acknowledges that it is represented by competent counsel and has consulted counsel before executing the Loan Documents.

(f)    Mortgagor covenants and agrees to pay Mortgagee upon receipt of written notice from Mortgagee, all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Mortgagee in connection with (i) the preparation, negotiation, execution and delivery of this Mortgage and the other Loan Documents; (ii) Mortgagor's performance of and compliance with Mortgagor's respective agreements and covenants contained in this Mortgage and the other Loan Documents on its part to be performed or complied with after the date hereof; (iii) Mortgagee's performance and compliance with all agreements and conditions contained in this Mortgage and the other Loan Documents on its part to be performed or complied with after the date hereof; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Mortgage and the other Loan Documents; and (v) the filing and recording fees and expenses, title insurance fees and expenses, and other similar expenses incurred in creating and perfecting the lien in favor of Mortgagee pursuant to this Mortgage and the other Loan Documents.

(g)    This Mortgage shall be governed by and construed in accordance with the laws of the State in which the Premises are located and the applicable laws of the United States of America.

58.    <u>Management of the Mortgaged Property.</u>

Mortgagor shall maintain the Management Agreement for the operation of the Mortgaged Property in full force and effect and timely perform all of Mortgagor's obligations

-64-

CSFBMSC 02773

BK 13733PG495

thereunder and enforce performance of all obligations of the Manager thereunder, and not permit the termination or amendment of such Management Agreement unless the prior written consent of Mortgagee is first obtained. Mortgagor will enter into and cause the Manager to enter into an assignment and subordination of such Management Agreement in form satisfactory to Mortgagee, assigning and subordinating the Manager's interest in the Mortgaged Property and all fees and other rights of the manager pursuant to such Management Agreement to the rights of Mortgagee. Upon an Event of Default, Mortgagor at Mortgagee's request made at any time while such Event of Default continues, shall terminate the Management Agreement and replace the Manager with a Manager approved by Mortgagee.

59.    Sale of Notes and Securitization.

At the request of the holder of the Note and, to the extent not already required to be provided by Mortgagor under this Agreement, Mortgagor shall use reasonable efforts to satisfy the reasonable market standards to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace or by the Rating Agencies in connection with the sale of the Note or participation therein or the first successful securitization (such sale and/or securitization, the "Secondary Market Transaction" or "Securitization") of rated single or multi-class securities (the "Securities") secured by or evidencing ownership interests in the Note and this Mortgage, including, without limitation, to:

(a)    (i)    provide such reasonable financial and other information with respect to the Mortgaged Property, the Mortgagor and the Manager as shall be in Mortgagor's or the Manager's possession or control, (ii) provide budgets relating to the Mortgaged Property (which may be accompanied by appropriate qualifications and reservations), and (iii) perform or permit or cause to be performed or permitted such site inspection, appraisals, market studies, environmental reviews and reports (Phase I's and, if and to the extent such Phase Is indicate are necessary, Phase II's), engineering reports and other due diligence investigations of the Mortgaged Property, as may be reasonably requested by the holder of the Note or the Rating Agencies or as may be necessary or appropriate in connection with the Secondary Market Transaction (collectively, the "Provided Information"), together, if customary, with appropriate verification and/or consents of the Provided Information through letters of auditors or opinions of counsel of independent attorneys acceptable to the Mortgagee and the Rating Agencies;

(b)    cause counsel to render opinions, which may be relied upon by the holder of the Note, the Rating Agencies and their respective counsel, agents and representatives, as to non-consolidation, fraudulent conveyance (to the extent relevant), and true sale or any other opinion customary in securitization transactions with respect to the Mortgaged Property and Mortgagor and its affiliates, which counsel and opinions shall be reasonably satisfactory to the holder of the Note and the Rating Agencies;

SRZNY\611479v8

CSFBMSC 02774

BK 1 3 7 3 3 PG 4 9 6

(c)    subject to the provisions entitled "Recourse Provisions" hereof, make such representations and warranties as of the closing date of the Securitization with respect to the Property, Mortgagor, and the Loan Documents as are customarily provided in securitization transactions and as may be reasonably requested by the holder of the Note or the Rating Agencies and consistent with the facts covered by such representations and warranties as they exist on the date thereof, including the representations and warranties made in the Loan Documents; and

(d)    execute such reasonable amendments to the Loan Documents and Mortgagor's organizational documents, enter into a lockbox or similar arrangement with respect to the Rents as may reasonably be requested by the holder of the Note or the Rating Agencies or otherwise to effect the Securitization; provided, however, that the Mortgagor shall not be required to modify or amend any Loan Document if such modification or amendment would (i) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, or (ii) modify or amend any other material economic term of the Loan.

All reasonable third party costs and expenses incurred by Mortgagor and/or Mortgagee in connection with Mortgagor's complying with requests made under this Section 59 shall be paid by the Mortgagor; provided, that Mortgagor's out-of-pocket, third party costs of such compliance shall not exceed $5,000 and Mortgagor need not expend any sums in excess of such amount in connection with its compliance or continue to comply once it has incurred unreimbursed costs in excess of $5,000.

In the event that the provisions of this Mortgage or any Loan Documents require the receipt of written confirmation from each Rating Agency with respect to the ratings on the Securities, or, in accordance with the terms of the transaction documents relating to a Secondary Market Transaction, such a rating confirmation is required in order for the consent of the Mortgagee to be given, the Mortgagor shall pay all of the costs and expenses of the Mortgagee, Servicer and each Rating Agency in connection therewith, and, if applicable, shall pay any fees imposed by any Rating Agency as a condition to the delivery of such confirmation.

60.    **Securitization Indemnification.**

(a)    Mortgagor understands that certain of the Provided Information and the financial reports delivered to Mortgagee hereunder (collectively, the "Required Records") may be included in disclosure documents in connection with the Secondary Market Transaction, including, without limitation, a prospectus, prospectus supplement or private placement memorandum (each, a "Disclosure Document") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "Securities Act"), or the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), or provided or made available to investors or prospective investors in the Securities, the Rating Agencies, and service providers relating to the Secondary Market Transaction.  In the

-66-

CSFBMSC 02775

BK I 3 7 3 3 PG 4 9 7

event that the Disclosure Document is required to be revised prior to the sale of all Securities, the Mortgagor will cooperate with the holder of the Note in updating the Disclosure Document by providing all current information necessary to keep the Provided Information and the Required Records disclosed in the Disclosure Document accurate and complete in all material respects.

(b)      Mortgagor agrees to (i) indemnify Mortgagee (and for purposes of this Paragraph 60, Mortgagee hereunder shall include its officers and directors), the affiliate of Credit Suisse First Boston ("First Boston") that has filed the registration statement relating to the securitization (the "Registration Statement"), each of its directors, each of its officers who have signed the Registration Statement and each person or entity who controls the affiliate within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "First Boston Group"), and First Boston, each of its directors and each person who controls First Boston within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act (collectively, the "Underwriter Group") for any losses, claims, damages or liabilities (the "Liabilities") to which Mortgagee, the First Boston Group or the Underwriter Group may become subject insofar as the Liabilities arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Provided Information or Required Records upon the omission or alleged omission to state in the Provided Information or Required Records a material fact required to be stated in the Provided Information or Required Records in order to make the statements in the Provided Information or Required Records, in light of the circumstances under which they were made not misleading, except to the extent that the Liabilities arise from (A) the gross negligence or willful misconduct of such indemnified party or (B) Provided Information to the extent contained in reports wholly prepared by third party consultants engaged by Mortgagee and (ii) reimburse Mortgagee, the First Boston Group or the Underwriter Group for any legal or other expenses reasonably incurred by Mortgagee, the First Boston Group or the Underwriter Group in connection with defending or investigating the Liabilities.

(c)      Promptly after receipt by an indemnified party under this Paragraph 60 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Paragraph 60, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.   In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.   After giving such notice and actually assuming such defense in accordance with the provisions of this Paragraph 60, the indemnifying party shall not be liable to such indemnified party for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the

-67-

CSFBMSC 02776

BK 1 3 7 3 3 PG 4 9 8

indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party or parties. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to another indemnified party.

(d)    In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Paragraph 60(b) or (c) is for any reason held to be unenforceable by an indemnified party in respect of any losses, claims, damages or liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Paragraph 60(b) or (c), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages or liabilities (or action in respect thereof); provided, however, that no person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) First Boston's and Mortgagor's relative knowledge and access to information concerning the matter with respect to which claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Mortgagee and Mortgagor hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(e)    The liabilities and obligations of both Mortgagor and Mortgagee under this Paragraph 60 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

61.    Servicer. At the option of Mortgagee, the Loan may be serviced by a servicer/trustee (the "Servicer") selected by Mortgagee and Mortgagee may delegate all or any portion of its responsibilities under this Mortgage and the other Loan Documents to the Servicer pursuant to a servicing agreement (the "Servicing Agreement") between Mortgagee and Servicer.

## PART II

### STATE SPECIFIC PROVISIONS

No Entry. Mortgagee may exercise any and all of its rights, remedies and options under this Mortgage and the other Loan Documents without the necessity of making an entry upon the Mortgaged Property and without the necessity of taking possession of the Mortgaged Property (whether by itself or though an agent).

Statutory Power of Sale. This Mortgage is upon the STATUTORY CONDITION and upon the further condition that all agreements of Mortgagor contained in this Mortgage and

SRZMY\613479v8

-68-

CSFBMSC 02777

BK 13733PG499

the other Loan Documents be fully performed, for breach of which (which for purposes hereof shall mean upon an Event of Default) Mortgagee shall have the STATUTORY POWER OF SALE. In the event of the exercise of the STATUTORY POWER OF SALE, Mortgagee may foreclose on and sell all or any part of the Mortgaged Property, and thereafter Mortgagee shall continue to have the STATUTORY POWER OF SALE so long as any portion of the Mortgaged Property remains subject to this Mortgage.

[No Further Text on this Page; Signature Page Follows]

SRZNY\611479v8

CSFBMSC 02778

BK 1 3 7 3 3 PG 5 0 0

IN WITNESS WHEREOF, Mortgagor has executed this instrument the day and year first above written.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By:  Blue Hills Management Corp.,
a Massachusetts corporation
its manager

By: _Gerald S. Fineberg_
Gerald S. Fineberg
President and Treasurer

CSFBMSC 02779

SR2NY\611479v4

BK 1 3 7 3 3 PG 5 0 1

## THE COMMONWEALTH OF MASSACHUSETTS

Suffolk _____, ss.                                    September 9 , 1999

       Then personally appeared the above-named Gerald S. Fineberg, President and Treasurer of Blue Hills Management Corp., a Massachusetts corporation, as aforesaid, in its capacity as the manager of Blue Hills Office Park LLC, a Delaware limited liability company, and acknowledged the foregoing instrument to be the free act and deed of said corporation; and the free act and deed of said limited liability company, before me

_Michelle Leveille_
NOTARY PUBLIC

**MICHELLE LEVEILLE**
**NOTARY PUBLIC**
My Commission Expires Nov. 25, 2005

My commission expires: _____

SRZNY\611479v4

CSFBMSC 02780

BK 1 3 7 3 3 PG 5 0 2

## Exhibit A

The land situated in Canton, Norfolk County, Massachusetts shown as Lot "C" on a plan entitled "Plan of Land, Canton, Massachusetts" dated December 9, 1971 by Universal Engineering Corporation, recorded with Norfolk Registry of Deeds as Plan 48 of 1972 in Plan Book 230 (hereinafter the "Plan"), and being more particularly bounded and described as follows:

| | |
|---|---|
| NORTHERLY AND NORTHWESTERLY: | by Royall Street, three hundred thirty-six and 65/100 (336.65) feet; |
| NORTHEASTERLY: | by Parcel A as shown on said Plan, by two (2) lines measuring, respectively, six hundred thirty-five and 82/100 (635.82) feet and two hundred (200.00) feet; |
| NORTHWESTERLY: | by Parcel A as shown on said Plan, one hundred forty (140.00) feet; |
| NORTHEASTERLY: | by Parcel B as shown on said Plan, seven hundred nine and 37/100 (709.37) feet; |
| SOUTHWESTERLY: | by Circumferential Highway (Route 128), eight hundred sixteen and 18/100 (816.18) feet; |
| SOUTHWESTERLY: | by Green Street, seven hundred sixty-six and 13/100 (766.13) feet; |
| NORTHWESTERLY: | by land now or formerly of Nocka, two hundred thirty-nine and 57/100 (239.57) feet; |
| WESTERLY: | by land of said Nocka, two hundred three and 57/100 (203.57) feet; and |
| NORTHWESTERLY: | by land of said Nocka, by two (2) lines measuring, respectively, eighty (80.00) feet and one hundred thirteen and 95/100 (113.95) feet. |

For title reference purposes see Deed recorded in the Norfolk Registry of Deeds on September 14, 1999 as Instrument No. 135114. Book 13730 pg. 171

#184661 v1/14500/9547

CSFBMSC 02781

EXHIBIT 2



## MORTGAGE NOTE
### (with defeasance and hyper-am)

$33,149,000.00                                            September 14, 1999

For value received, BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company, having its principal place of business c/o Fineberg Management, Inc., One Washington Street, Suite 400, Wellsley, Massachusetts 02481 (hereinafter referred to as "Maker"), promises to pay to the order of CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, a Delaware limited liability company ("Lender" and also sometimes "Payee"), having its principal office at 11 Madison Avenue, New York, New York 10010, or at such place as the holder hereof may from time to time designate in writing, the principal sum of THIRTY-THREE MILLION ONE HUNDRED FORTY NINE THOUSAND AND 00/100 DOLLARS ($33,149,000.00), in lawful money of the United States of America, with interest thereon to be computed on the unpaid principal balance from time to time outstanding at the Applicable Interest Rate (as hereinafter defined), and to be paid in installments, as follows:

A.    payment of interest only on the date hereof with respect to the interest accrual period from the date hereof to and including October 10, 1999; .

B.    constant payment of $254,652.24 (such amount hereinafter the "Monthly Payment Amount"), on the eleventh day of November, 1999 and on the eleventh day of each calendar month thereafter up to and including the eleventh day of September, 2029 (each a "Payment Date"); each of such payments to be applied (a) to the payment of interest computed at the Initial Term Interest Rate (as hereinafter defined); and (b) the balance applied toward the reduction of the principal sum;

and the balance of said principal sum together with all accrued and unpaid interest thereon shall be due and payable on the eleventh day of October, 2029 (the "Maturity Date"). Interest on the principal sum of this Note shall be calculated on the basis of the actual number of days elapsed and a three-hundred-sixty (360) day year. The constant payment required hereunder is based on an amortization schedule of three hundred sixty (360) months. For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods if the eleventh (11th) day of a given month is not a Business Day (as hereinafter defined), then amounts due on the Payment Date for such month shall be due on the next succeeding Business Day. All amounts due under this Note shall be payable without setoff, counterclaim or any other deduction whatsoever.

1.    As used in this Note:

(a)    The term "Annual Budget" shall mean an annual budget submitted by Maker to Payee in accordance with the terms of Paragraph 8(b) herein.

(b)    The term "Anticipated Repayment Date" shall mean October 11, 2009.

connection with a Securitization (as defined in the Mortgage) pursuant to which securities rated by any Rating Agency (as defined in the Mortgage) have been issued, such term shall mean a rate per annum equal to the Initial Term Interest Rate plus two (2) percentage points.

(n)    The term "Excess Cash Flow" shall mean, for any period, the sum (determined in accordance with generally accepted accounting principles, consistently applied) of (i) net operating income (calculated as all income derived from the operation of the Mortgaged Property after payment of taxes and expenses), plus (ii) depreciation and amortization (to the extent deducted in determining net operating income) for such period, plus (iii) disbursements from the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Base Leasing Escrow Fund (as defined in the Mortgage), the Cash Flow Leasing Escrow Fund or any other escrows or reserves approved by Payee or provided for under the Loan Documents, but, in each case, only to the extent disbursed to Maker and not applied to the payment of, or reimbursement for, taxes, insurance and other amounts for which such reserves were set aside, minus (x) actual payments of the regularly scheduled principal and interest payments (calculated at the Applicable Interest Rate, or at the Default Rate, if applicable) due and payable in accordance with this Note during an applicable period and other amounts paid under the Loan Documents to or for the benefit of Payee, minus (y) actual Capital Expenditures in excess of payments from the Replacement Escrow Fund, the Base Leasing Escrow Fund, the Cash Flow Leasing Escrow Fund and funding of reserves for working capital and Extraordinary Expenses as approved by Lender in its sole discretion, and minus (z) payments into the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Base Leasing Escrow Fund, the Cash Flow Leasing Escrow Fund and other reserves required under the Loan Documents.

(o)    The term "Extraordinary Expense" shall mean any extraordinary operating expense or capital expense not set forth in an Approved Annual Budget or allotted for in the Replacement Escrow Fund.

(p)    The term "Initial Term Interest Rate" shall mean a rate of Eight and Forty-Nine One-Hundredths percent (8.49%) per annum.

(q)    The term "Loan" shall mean that certain loan made by Payee to Maker contemporaneously herewith.

(r)    The term "Loan Documents" shall mean collectively this Note, the Mortgage, the Assignment of Leases and any and all other documents securing, evidencing, or guaranteeing all or any portion of the Loan or otherwise executed and/or delivered in connection with this Note and the Loan.

(s)    The term "Mortgage" shall mean that certain Mortgage, Assignment of Leases and Rents and Security Agreement of even date herewith in the amount of this Note given by Maker for the use and benefit of Payee covering the fee estate of Maker in certain premises as more particularly described therein.

3

S 002148

MORTGAGE NOTE
(with defeasance and hyper-am)

$33,149,000.00                                      September ___, 1999

    For value received, BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company, having its principal place of business c/o Fineberg Management, Inc., One Washington Street, Suite 400, Wellsley, Massachusetts 02481 (hereinafter referred to as "Maker"), promises to pay to the order of CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, a Delaware limited liability company ("Lender" and also sometimes "Payee"), having its principal office at 11 Madison Avenue, New York, New York 10010, or at such place as the holder hereof may from time to time designate in writing, the principal sum of THIRTY-THREE MILLION ONE HUNDRED FORTY NINE THOUSAND AND 00/100 DOLLARS ($33,149,000.00), in lawful money of the United States of America, with interest thereon to be computed on the unpaid principal balance from time to time outstanding at the Applicable Interest Rate (as hereinafter defined), and to be paid in installments, as follows:

    A.    payment of interest only on the date hereof with respect to the interest accrual period from the date hereof to and including October 10, 1999;

    B.    constant payment of $254,652.24 (such amount hereinafter the "Monthly Payment Amount"), on the eleventh day of November, 1999 and on the eleventh day of each calendar month thereafter up to and including the eleventh day of September, 2029 (each a "Payment Date"); each of such payments to be applied (a) to the payment of interest computed at the Initial Term Interest Rate (as hereinafter defined); and (b) the balance applied toward the reduction of the principal sum;

and the balance of said principal sum together with all accrued and unpaid interest thereon shall be due and payable on the eleventh day of October, 2029 (the "Maturity Date"). Interest on the principal sum of this Note shall be calculated on the basis of the actual number of days elapsed and a three-hundred-sixty (360) day year. The constant payment required hereunder is based on an amortization schedule of three hundred sixty (360) months. For purposes of making payments hereunder, but not for purposes of calculating interest accrual periods if the eleventh (11th) day of a given month is not a Business Day (as hereinafter defined), then amounts due on the Payment Date for such month shall be due on the next succeeding Business Day. All amounts due under this Note shall be payable without setoff, counterclaim or any other deduction whatsoever.

    1.    As used in this Note:

    (a)    The term "Annual Budget" shall mean an annual budget submitted by Maker to Payee in accordance with the terms of Paragraph 8(b) herein.

    (b)    The term "Anticipated Repayment Date" shall mean October 11, 2009.

S 002149

(c)    The term "Applicable Interest Rate" shall mean (a) from the date of this Note through but not including the Anticipated Repayment Date, the Initial Term Interest Rate, and (b) from and after the Anticipated Repayment Date through and including the date this Note is paid in full, the Extended Term Rate.

(d)    The term "Approved Annual Budget" shall mean each Annual Budget approved by Payee in accordance with the terms of Paragraph 8(b) hereof.

(e)    The term "Assignment of Leases" shall mean that certain Assignment of Leases and Rents of even date herewith executed by Maker in favor of Payee.

(f)    The term "Business Day" shall mean a day other than (i) a Saturday or Sunday, or (ii) any day on which commercial banks in New York City are not open for general banking business.

(g)    The term "Capital Expenditures" shall mean for any period, the amount expended for items capitalized under generally accepted accounting principles including expenditures for building improvements or major repairs, leasing commissions and tenant improvements.

(h)    The term "Cash Expenses" shall mean, for any period, the operating expenses for the Mortgaged Property (as defined in the Mortgage) as set forth in an Approved Annual Budget, to the extent that such expenses are actually incurred by Maker, minus payments into the Tax and Insurance Impound Fund (as defined in the Mortgage), the Base Leasing Escrow Fund (as defined in the Mortgage), the Replacement Escrow Fund (as defined in the Mortgage) and the Cash Flow Leasing Escrow Fund (as defined in the Mortgage).

(i)    The term "Cash Management Agreement" shall have the meaning assigned to such term in the Mortgage.

(j)    The term "Debt" shall mean, collectively, the whole of the outstanding principal sum of this Note, together with all interest accrued and unpaid thereon and all other sums due under the Loan Documents.

(k)    The term "Default Rate" shall mean a rate per annum which is equal to the lesser of (a) the maximum rate permitted by applicable law, or (b) five percent (5%) above the Applicable Interest Rate.

(l)    The term "Defeasance Option" shall mean the right and option of maker to release the Mortgaged Property (as defined in the Mortgage) from the lien of the Mortgage in accordance with the provision set forth in Paragraph 55 of the Mortgage.

(m)    The term "Extended Term Rate" shall mean a rate per annum equal to a rate per annum equal to the greater of (i) the Initial Term Interest Rate plus five (5) percentage points or (ii) the Treasury Rate plus five (5) percentage points; provided, however, that for so long as this Note is an asset of the trust, partnership, corporation or other entity formed in connection with a Securitization (as defined in the Mortgage) pursuant to which securities rated

2

by any Rating Agency (as defined in the Mortgage) have been issued, such term shall mean a rate per annum equal to the Initial Term Interest Rate plus two (2) percentage points.

(n)    The term "Excess Cash Flow" shall mean, for any period, the sum (determined in accordance with generally accepted accounting principles, consistently applied) of (i) net operating income (calculated as all income derived from the operation of the Mortgaged Property after payment of taxes and expenses), plus (ii) depreciation and amortization (to the extent deducted in determining net operating income) for such period, plus (iii) disbursements from the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Base Leasing Escrow Fund (as defined in the Mortgage), the Cash Flow Leasing Escrow Fund or any other escrows or reserves approved by Payee or provided for under the Loan Documents, but, in each case, only to the extent disbursed to Maker and not applied to the payment of, or reimbursement for, taxes, insurance and other amounts for which such reserves were set aside, minus (x) actual payments of the regularly scheduled principal and interest payments (calculated at the Applicable Interest Rate, or at the Default Rate, if applicable) due and payable in accordance with this Note during an applicable period and other amounts paid under the Loan Documents to or for the benefit of Payee, minus (y) actual Capital Expenditures in excess of payments from the Replacement Escrow Fund, the Base Leasing Escrow Fund, the Cash Flow Leasing Escrow Fund and funding of reserves for working capital and Extraordinary Expenses as approved by Lender in its sole discretion, and minus (z) payments into the Replacement Escrow Fund, the Tax and Insurance Impound Fund, the Base Leasing Escrow Fund, the Cash Flow Leasing Escrow Fund and other reserves required under the Loan Documents.

(o)    The term "Extraordinary Expense" shall mean any extraordinary operating expense or capital expense not set forth in an Approved Annual Budget or allotted for in the Replacement Escrow Fund.

(p)    The term "Initial Term Interest Rate" shall mean a rate of Eight and Forty-Nine One-Hundredths percent (8.49%) per annum.

(q)    The term "Loan" shall mean that certain loan made by Payee to Maker contemporaneously herewith.

(r)    The term "Loan Documents" shall mean collectively this Note, the Mortgage, the Assignment of Leases and any and all other documents securing, evidencing, or guaranteeing all or any portion of the Loan or otherwise executed and/or delivered in connection with this Note and the Loan.

(s)    The term "Mortgage" shall mean that certain Mortgage, Assignment of Leases and Rents and Security Agreement of even date herewith in the amount of this Note given by Maker for the use and benefit of Payee covering the fee estate of Maker in certain premises as more particularly described therein.

(t)    The term "Net Capital Expenditures" shall mean for any period the amount by which Capital Expenditures during such period exceeds reimbursements for such items during such period from any fund established pursuant to the Loan Documents.

3

S 002151

(u)    The term "Treasury Rate" shall mean, as of the Anticipated Repayment Date, the yield, calculated by linear interpolation (rounded to the nearest one-thousandth of one percent (*i.e.*, 0.001%)) of the yields of noncallable United States Treasury obligations with terms (one longer and one shorter) most nearly approximating the period from the Anticipated Repayment Date to the Maturity Date, as determined by Payee (absent manifest error) on the basis of Federal Reserve Statistical Release H.15-Selected Interest Rates under the heading U.S. Governmental Security/Treasury Constant Maturities, or if such publication or any successor publication shall cease to be published, such other recognized source of financial market information as shall be reasonably selected by Payee.

2.    This Note is evidence of the Loan and of the obligation of the Maker to repay the Loan in accordance with the terms hereof. This Note is secured, *inter alia*, by (a) the Mortgage, (b) an Assignment of Leases, and (c) the other Loan Documents.

3.    If any sum payable under this Note is not paid on or before the date which is three (3) days after the date on which it is due, Maker shall pay to Payee upon demand an amount equal to the lesser of three percent (3%) of such unpaid sum or the maximum amount permitted by applicable law in order to defray a portion of the expenses incurred by Payee in handling and processing such delinquent payment and to compensate Payee for the loss of the use of such delinquent payment. If the day when any payment required under this Note is due is not a Business Day, then payment shall be due on the first Business Day thereafter.

4.    The Debt or any portion thereof, shall without notice become immediately due and payable at the option of Payee upon the happening of any Event of Default (as defined in the Mortgage). In the event that it should become necessary to employ counsel to collect or enforce the Debt or to protect or foreclose the security therefor upon the happening of any Event of Default, Maker also shall pay on demand all costs of collection incurred by Payee, including attorneys' fees and costs reasonably incurred for the services of counsel whether or not suit be brought.

5.    Maker does hereby agree that upon the occurrence of an Event of Default (including upon the failure of Maker to pay the Debt in full on the Maturity Date), Payee shall be entitled to receive and Maker shall pay interest on the entire unpaid principal sum and any other amounts due at the Default Rate.

6.    Maker hereby agrees that upon the occurrence of an Event of Default Maker shall pay to Payee on the eleventh day of each month while such Event of Default continues, an aggregate amount equal to the Excess Cash Flow for the prior month, such Excess Cash Flow to be applied by Payee to the payment of the Debt in such order as Payee shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal. Interest at the Default Rate and Excess Cash Flow shall both be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt. Interest at the Default Rate shall be added to the Debt and shall be secured by the Mortgage. This paragraph, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Payee by reason of the occurrence of any Event of Default; the acceptance of any payment of

4

S 002152

Excess Cash Flow shall not be deemed to cure or constitute a waiver of any Event of Default; and Payee retains its rights under this Note to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default despite any payment of Excess Cash Flow.

       7.     This Note may not be prepaid prior to the Anticipated Repayment Date; provided, however, Maker shall have the right and option to release the Mortgaged Property from the lien of the Mortgage in accordance with the terms and provisions of the Defeasance Option. Notwithstanding the foregoing sentence, Maker shall have the privilege to prepay the entire principal balance of this Note and any other amounts outstanding on any Payment Date and upon not less than fifteen (15) days prior to written notice from Maker to Payee during the six (6) months preceding the Anticipated Repayment Date without payment of the Yield Maintenance Premium (as defined in the Mortgage) or any other premium or penalty or defeasance. Any prepayment prior to the Anticipated Repayment Date on a date other than a Payment Date, shall, in any event, include interest through the following Payment Date. In addition, on the Anticipated Repayment Date or on any Payment Date thereafter, the Maker may, at its option and upon thirty (30) days prior written notice from Maker to Payee, prepay in whole or in part, in $100,000 increments only, the outstanding principal balance of this Note and any other amounts outstanding without payment of the Yield Maintenance Premium or any other premium or penalty. If prior to the Anticipated Repayment Date and following the occurrence of any Event of Default, Maker shall tender payment of an amount sufficient to satisfy the Debt at any time prior to a sale of the Mortgaged Property, either through foreclosure or the exercise of the other remedies available to Payee under the Mortgage, such tender by Maker shall be deemed to be voluntary and Maker shall pay, in addition to the Debt, the Yield Maintenance Premium, if any, that would be required under the Defeasance Option.

       8.    (a)    From and after the date hereof, Maker shall cause all Rents (as defined in the Mortgage) to be deposited in the Clearing Account (as defined in the Cash Management Agreement). Commencing on the first day of each Collection Period (as defined in the Cash Management Agreement), all Rents deposited in the Cash Collateral Account (as defined in the Cash Management Agreement) shall be allocated in the following order of priority:

      (i)     First, to fund the Tax and Insurance Impound Fund Account (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Tax and Insurance Impound Fund on the related Payment Date in accordance with the terms and conditions of the Mortgage;

      (ii)    Second, to fund the Monthly Debt Service Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Monthly Payment Amount;

      (iii)   Third, to fund the Monthly Debt Service Subaccount with any other amounts due to the Payee under the Loan Documents not otherwise addressed by this Paragraph 8;

<div align="center">5</div>

S 002153

(iv)    Fourth, to fund the Replacement Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Replacement Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(v)    Fifth, to fund the Base Leasing Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the amount required to be deposited in the Base Leasing Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(vi)    Sixth, to fund the Operating Expense Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Cash Expenses, other than management fees payable to affiliates of Maker for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(vii)    Seventh, to fund the Operating Expense Subaccount with any Net Capital Expenditures for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(viii)    Eighth, to fund the Operating Expense Subaccount with any Extra-ordinary Expenses approved by Payee for the month in which such Collection Period ends, if any;

(ix)    Ninth, to fund the Cash Flow Leasing Escrow Fund Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is an amount equal to the Monthly Cash Flow Leasing Escrow Fund Amount (as such term in defined in paragraph (6)(c)(iii) of the Mortgage); and

(x)    Last, to fund the Borrower Remainder Sub-Account (as established pursuant to the Cash Management Agreement), any Rents remaining after making the foregoing payments.

Nothing in this Paragraph 8(a) shall limit, reduce or otherwise affect Maker's obligations to pay the Monthly Payment Amount, make payments to the Tax and Insurance Impound Fund, Base Leasing Escrow Fund, Replacement Escrow Fund or Cash Flow Leasing Escrow Fund due hereunder and pay other amounts due under the other Loan Documents, whether or not Rents are available to make such payments; provided, however, that Payee agrees to distribute amounts deposited in the Cash Collateral Account in the manner required pursuant to the terms of this Note, the Mortgage and the other Loan Documents. Maker represents and covenants that it will not make any distributions with respect to income for a given calendar month to its members or any of their affiliates during any month until the payments or deposits

6

S 002154

specified in <u>subparagraph (i)</u> through <u>(ix)</u>, and any Cash Expenses for the Mortgaged Property (as defined in the Mortgage) then due have been made in full with respect to such month on a timely basis.

(b)     For each fiscal year commencing after the date hereof, Maker shall submit to Payee for Payee's written approval an Annual Budget not later than sixty (60) days prior to the commencement of such fiscal year, in form satisfactory to Payee setting forth in reasonable detail budgeted monthly operating income and monthly operating capital and other expenses for the Mortgaged Property. From and after the earlier to occur of (i) an Event of Default or (ii) the Anticipated Repayment Date, each Annual Budget shall contain, among other things, limitations on management fees, third party service fees, and other expenses as the Maker may reasonably determine. Payee shall have the right to approve such Annual Budget, which approval shall not be unreasonably withheld (<u>provided, however</u>, that, prior to the earlier of (i) an Event of Default or (ii) the Anticipated Repayment Date, such approval shall be deemed given unless the monthly operating income remaining after application as set forth in <u>subparagraphs 8(a)(i)</u> through <u>8(a)(viii)</u> pursuant to such Annual Budget will not be sufficient at all times during the relevant fiscal year to fully fund the Monthly Cash Flow Leasing Escrow Fund Amount); and in the event that Payee objects to the proposed Annual Budget submitted by Maker, Payee shall advise Maker of such objections within fifteen (15) days after receipt thereof (and deliver to Maker a reasonably detailed description of such objections) and Maker shall within three (3) days after receipt of notice of any such objections revise such Annual Budget and resubmit the same to Payee. Payee shall advise Maker of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Maker a reasonably detailed description of such objections) and Maker shall revise the same in accordance with the process described in this subparagraph until the Payee approves an Annual Budget, provided, however, that if Payee shall not advise Maker of its objections to any proposed Annual Budget within the applicable time period set forth in this <u>Paragraph 8(b)</u>, then such proposed Annual Budget shall be deemed approved by Payee. Until such time that Payee approves or is deemed to approve a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that such Approved Annual Budget shall be adjusted to reflect actual increases in real estate taxes, insurance premiums and utilities expenses.

9.     In the event that Maker does not pay the Debt in full prior to the Anticipated Repayment Date, the provisions of <u>Paragraph 8</u> as set forth above shall remain in full force and effect, and the following subparagraphs also shall apply:

(a)     From and after the Anticipated Repayment Date, interest shall accrue on the unpaid principal balance from time to time outstanding on this Note at the Extended Term Rate. Interest accrued at the Extended Term Rate and not paid pursuant to this <u>Paragraph 9</u> shall be deferred and added to the Debt and shall earn interest at the Extended Term Rate to the extent permitted by applicable law (such accrued interest is hereinafter defined as "<u>Accrued Interest</u>"). All of the Debt, including any Accrued Interest, shall be due and payable on the Maturity Date.

(b)     All Rents deposited in the Cash Collateral Account during each Collection Period shall be allocated in the following order of priority, in each case to the extent sufficient funds remain therefor:

<center>7</center>

S 002155

(i)     First, to fund the Tax and Insurance Impound Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Tax and Insurance Impound Fund on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(ii)    Second, to fund the Monthly Debt Service Subaccount until the amount on deposit therein is equal to the Monthly Payment Amount (to be applied first to the payment of interest computed at the Initial Term Interest Rate with the remainder applied to the reduction of the outstanding principal balance of this Note);

(iii)   Third, to fund the Monthly Debt Service Subaccount with any other amounts due to the Payee under the Loan Documents and not otherwise addressed by this Paragraph 9;

(iv)    Fourth, to fund the Replacement Escrow Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Replacement Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(v)     Fifth, to fund the Base Leasing Escrow Fund Subaccount until the amount on deposit therein is equal to the amount required to be deposited in the Base Leasing Escrow Fund (as defined in the Mortgage) on the related Payment Date in accordance with the terms and conditions of the Mortgage;

(vi)    Sixth, to fund the Operating Expense Subaccount (as established pursuant to the Cash Management Agreement) until the amount on deposit therein is equal to the Cash Expenses, other than management fees payable to affiliates of Maker, for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(vii)   Seventh, to fund the Operating Expense Subaccount with any Net Capital Expenditures for the month in which such Collection Period ends pursuant to the terms and conditions of the related Approved Annual Budget;

(viii)  Eighth, to fund the Operating Expense Subaccount with any Extraordinary Expenses approved by Payee for the month in which such Collection Period ends, if any;

(ix)    Ninth, to fund the Monthly Debt Service Subaccount with any amount equal to the remaining principal balance of this Note, to be applied against the outstanding principal due under this Note until such principal amount is paid in full;

8

S 002156

(x)     Tenth, to fund the Monthly Debt Service Subaccount with any amount equal to any Accrued Interest, to be applied against the outstanding amount thereof until all such Accrued Interest has been repaid; and

(xi)    Last, to pay to Maker any excess amounts.

(c)     In the event that Maker must incur an Extraordinary Expense, then Maker shall promptly deliver to Payee a reasonably detailed explanation of such proposed Extraordinary Expense for the Payee's approval, which approval may be granted or denied in Payee's sole discretion.

(d)     Nothing in this Paragraph 9 shall limit, reduce or otherwise affect Maker's obligations to make payments of the Monthly Payment Amount, payments to the Tax and Insurance Impound Fund, the Replacement Escrow Fund, the Base Leasing Escrow Fund and the Cash Flow Leasing Escrow Fund due hereunder and under the other Loan Documents, whether or not Rents are available to make such payments; provided, however, that Payee agrees to distribute amounts deposited in the Cash Collateral Account in the manner required pursuant to the terms of this Note, the Mortgage and the other Loan Documents. Maker represents and covenants that it will not make any distributions with respect to income for a given calendar month to its members or any of their affiliates during any month until the payments or deposits specified in subparagraph (i) through (x), and any operating expenses then due for the Mortgaged Property (as defined in the Mortgage) have been made in full with respect to such month on a timely basis.

10.     It is expressly stipulated and agreed to be the intent of Maker and Payee at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Payee to contract for, charge, take, reserve, or receive a greater amount of interest than under state law) and that this paragraph (and the similar paragraph contained in the Mortgage) shall control every other covenant and agreement in this Note and the other Loan Documents. If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under this Note or under any of the other Loan Documents, or contracted for, charged, taken, reserved, or received with respect to the Debt, or if Payee's exercise of the option to accelerate the Maturity Date, or if any prepayment or the exercise of any Defeasance Option by Maker results in Maker having paid any interest in excess of that permitted by applicable law, then it is Payee's express intent that all excess amounts theretofore collected by Payee shall be credited on the principal balance of this Note and all other Debt and the provisions of this Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new documents, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder or thereunder. In connection with the foregoing, all sums paid or agreed to be paid to Payee for the use, forbearance, or retention of the Debt shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Debt until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the

9

S 002157

intention of Payee to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

      11.    This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Maker or Payee, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought. Whenever used, the singular number shall include the plural, the plural the singular, and the words "Payee" and "Maker" shall include their respective successors, assigns, heirs, executors and administrators. If Maker consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

      12.    Maker and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration (except as may be expressly provided for herein or in the other Loan Documents). No release of any security for the Debt or any person liable for payment of the Debt, no extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of the Loan Documents made by agreement between Payee and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Maker, and any other person or party who may become liable under the Loan Documents for the payment of all or any part of the Debt.

      13.    Subject to the qualifications below, Payee shall not enforce the liability and obligation of Maker or its constituent members, partners, shareholders, directors, employees or agents to perform and observe the obligations contained in this Note, the Mortgage or the other Loan Documents by any legal, equitable or other action or proceeding wherein a judgment shall be sought against Maker or its constituent members, partners, shareholders, directors, employees or agents, except that Payee may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Payee to enforce and realize upon its interest under this Note, the Mortgage and the other Loan Documents, or in the Mortgaged Property, the Rents, or any other collateral given to Payee pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Maker only to the extent of Maker's interest in the Mortgaged Property, in the Rents and in any other collateral given to Payee, and Payee, by accepting this Note, the Mortgage and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Maker in any such action or proceeding under or by reason of or under or in connection with this Note, the Mortgage or the other Loan Documents. The provisions of this paragraph shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Payee to name Maker as a party defendant in any action or suit for foreclosure and sale under the Mortgage; (c) affect the validity or enforceability of or any guaranty made in connection with the Loan or any of the rights and remedies of the Payee thereunder; (d) impair the right of Payee to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; or (f) constitute a waiver of the right of Payee to enforce the liability and obligation of Maker, by money judgment or otherwise, to the extent of

S 002158

any loss, damage, cost, expense, liability, claim or other obligation incurred by Payee including attorneys' fees and costs reasonably incurred, but in all events excluding, however, all consequential damages, arising out of or in connection with the following:

(i)     fraud or intentional misrepresentation by Maker or any guarantor in connection with the Loan;

(ii)    intentional physical waste of the Mortgaged Property;

(iii)   the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substance Indemnification Agreement of even date herewith given by Maker to Payee or in the Mortgage concerning environmental laws, hazardous substances or asbestos;

(iv)    the removal or disposal of any portion of the Mortgaged Property after an Event of Default;

(v)     the misapplication or conversion by Maker of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Mortgaged Property, (B) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, (C) any Rents following an Event of Default, or (D) any Rents paid more than one month in advance;

(vi)    failure to pay charges for labor or materials requested by Maker or to pay or escrow taxes (in accordance with Paragraph 6 of the Mortgage) or to pay other charges that can create liens on any portion of the Mortgaged Property; and

(vii)   any security deposits collected with respect to the Mortgaged Property which are not delivered to Payee upon a foreclosure of the Mortgaged Property or other action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Mortgage) prior to the occurrence of the Event of Default that gave rise to such sale or foreclosure or action in lieu thereof.

Notwithstanding anything to the contrary in this Note or any of the Loan Documents, (A) Payee shall not be deemed to have waived any right which Payee may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage  or to require that all collateral shall continue to secure all of the Debt owing to Payee in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Maker in the event that:  (i) the first full monthly payment of principal and interest under this Note is not paid when due; (ii) Maker intentionally fails to maintain its status as a single purpose entity, as required by, and in accordance with the terms and provisions

11

SR2NY\611471v7

S 002159

of, the Mortgage; (iii) Maker fails to obtain Payee's prior written consent before granting any subordinate financing or other voluntary lien encumbering the Mortgaged Property; (iv) Maker fails to obtain Payee's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by <u>Section 10</u> of the Mortgage or (v), or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Maker or if any proceeding for the dissolution or liquidation of Maker shall be instituted by Maker or any guarantor.

       14.    Maker (and the undersigned representative of Maker, if any) represents that Maker has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Note, the Mortgage and the other Loan Documents and that this Note, the Mortgage and the other Loan Documents constitute valid and binding obligations of Maker.

       15.    All notices or other communications required or permitted to be given pursuant hereto shall be given in the manner specified in the Mortgage directed to the parties at their respective addresses as provided therein.

       16.    EACH OF MAKER AND PAYEE HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH OF MAKER AND PAYEE, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF MAKER AND PAYEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF SUCH WAIVER.

       17.    This Note shall be governed by and construed in accordance with the laws of the State in which the Mortgaged Property is located and the applicable laws of the United States of America.

S 002160

Maker has duly executed this Note the day and year first above written.

**MAKER:**

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By:  Blue Hills Management Corp.,
     a Massachusetts corporation
     its manager

By:  _Gerald S. Fineberg_
     Gerald S. Fineberg
     President

Pay to the order of _____,
without recourse.

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC,
   a Delaware limited liability company

By: _____
        Name:
        Title:

SRZNY\611471v3

S 002161

# EXHIBIT 3

CASH MANAGEMENT AGREEMENT
(this "Agreement")
dated as of September 14, 1999

among

BLUE HILLS OFFICE PARK LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481
(the "Borrower"),

FINEBERG MANAGEMENT, INC.
One Washington Street, Suite 400
Wellsley, MA 02481
(the "Manager"),

and

CREDIT SUISSE FIRST BOSTON
        MORTGAGE CAPITAL LLC
11 Madison Avenue
New York, New York 10010
(together with its successors and
assigns, the "Lender")

WHEREAS, pursuant to the Mortgage, Assignment of Leases and Rents and Security Agreement, of even date herewith (the "Mortgage"), by and between the Lender and the Borrower, the Lender has provided financing (the "Loan") to the Borrower secured by the property or properties owned by the Borrower and described in the Mortgage (the "Property");

WHEREAS, the Lender has delivered to the Borrower's bank identified in Exhibit A hereto (the "Clearing Bank"), which is an Eligible Bank, maintaining the operating account or accounts of the Borrower (the "Property Account"), a Clearing Bank Instruction Letter attached as Exhibit A hereto (together with any modifications, amendments or replacements thereof, the "Instruction Letter"), which provides that all Rents (as defined in the Mortgage) be deposited in the account named therein (upon delivery of the Instruction Letter, a "Clearing Account") and swept periodically into the accounts established hereunder;

NOW THEREFORE, in consideration of the premises and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:



Blue Hill 0116

Section 1.    Defined Terms.

(a)    As used herein the following capitalized terms shall have the respective meanings set forth below:

"Account Proceeds" shall mean any and all Rents and other revenue in connection with any Property that is deposited by any Clearing Bank, the Borrower, the Manager or otherwise into the Cash Collateral Account from time to time.

"Anticipated Repayment Date" means the "Anticipated Repayment Date" as defined in Section 1(b) of the Note.

"Borrower Remainder Account" shall mean the account of Borrower to which monies in the Borrower Remainder Sub-account are allocated in accordance with the terms of Section 3(b)(vii) hereof.

"Business Day" shall mean any day other than a Saturday, Sunday or any day on which commercial banks in New York, New York or the city in which the Deposit Bank is located are required or permitted by law to be closed.

"Capital Expenditures" shall have the meaning ascribed to such term in the Note.

"Cash Collateral Account" shall have the meaning ascribed to such term in Section 2 hereof.

"Certificates" means the securities issued in connection with a Secondary Market Transaction.

"Clearing Account" shall have the meaning given such term in the Recitals.

"Clearing Bank" shall have the meaning given such term in the Recitals.

"Collateral" shall mean the Cash Collateral Account, the Tax and Insurance Impound Fund Account, all Permitted Investments and any and all proceeds and products thereof.

"Collection Period" with respect to any Payment Date, shall mean the period of days from the eleventh day of the month immediately preceding the Payment Date to the tenth day of the month in which such Payment Date occurs. With respect to the first Payment Date, the Collection Period shall commence on and include the date hereof and end on and include the tenth day of the calendar month of such first Payment Date.

"Deposit Bank" shall mean the Eligible Bank or Banks selected by the Lender to maintain the Cash Collateral Account.

"Eligible Account" shall mean either (i) an account or accounts maintained with an Eligible Bank or (ii) a Trust Account. Eligible Accounts may bear interest.

-2-

**Blue Hill 0117**

"Eligible Bank" shall mean a bank that (i) satisfies the Rating Criteria and (ii) insures deposits held by such bank through the Federal Deposit Insurance Corporation.

"Instruction Letter" shall have the meaning ascribed to such term in the Recitals.

"Loan" shall have the meaning ascribed to such term in the Recitals.

"Loan Documents" shall have the meaning set forth for such term in the Mortgage.

"Monthly Leasing Escrow Fund Amount" (as used in Paragraph 6(c)(iii) of the Mortgage) shall mean the aggregate of the monthly payments required pursuant to Paragraphs 6(c)(i) and 6(c)(ii) of the Mortgage.

"Monthly Payment Amount" shall have the meaning given to such term in the Note.

"Mortgage" shall have the meaning given such term in the Recitals.

"Mortgage Satisfaction Event" shall mean the satisfaction in full of the Obligations.

"Mortgage Sub-accounts" shall have the meaning ascribed to such term in Section 2(c).

"Note" shall mean that certain Mortgage Note, of even date herewith, made by the Borrower in favor of the Lender and evidencing the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Obligations" shall mean any and all debt, liabilities and obligations of the Borrower to the Lender pursuant to or in connection with the Loan, whether now or hereafter existing, including without limiting the generality of the foregoing, the indebtedness evidenced by the Note, all interest accruing thereon, and any and all debt, liabilities and obligations of the Borrower under the Loan Documents.

"Operating Expenses" shall mean, collectively, Cash Expenses (as defined in the Note) and Extraordinary Expenses (as defined in the Note).

"Payment Date" shall have the meaning given to such term in the Note.

"Permitted Investments" shall mean any investment suitable for the investment of escrows and reserves established under mortgage loans included in a Secondary Market Transaction in which some or all of the Certificates issued are rated "AAA" (or the equivalent rating) by the Rating Agencies, as the standards therefor are established from time to time, or such investments which are otherwise acceptable to the Lender. Schedule 1 annexed hereto sets forth certain obligations and securities which are merely illustrative of Permitted Investments as of the date hereof.

"Person" shall mean any individual, sole proprietorship, partnership, limited liability partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether territorial, national,

SRZNY\611528v6

Blue Hill  0118

federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"Property" shall have the meaning ascribed to such term in the Recitals.

"Rating Agencies" shall mean (i) any nationally-recognized statistical rating organizations that provide a rating on any Certificates on the date of issuance of the Certificates or (ii) prior to the issuance of the Certificates, S&P and any other nationally-recognized statistical rating organizations that have been designated by the Lender in its sole discretion.

"Rating Criteria" with respect to any Person, shall mean that (i) the short-term unsecured debt obligations of such Person are rated at least "A-1" by S&P and, if rated by another Rating Agency, are rated in an equivalent category by such other Rating Agency, if deposits are held by such person for a period of less than 30 days, or (ii) the long-term unsecured debt obligations of such Person are rated at least "AA-" by S&P and, if rated by another Rating Agency, are rated in an equivalent category by such other Rating Agency, if deposits are held by such person for a period of 30 days or more.

"Rents" shall have the meaning ascribed to such term in the Mortgage.

"S&P" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Secondary Market Transaction" shall have the meaning given to such term in the Mortgage.

"Servicer" shall mean a servicer or account administrator of the Lender designated by and acting for the benefit of the Lender.

"Tax and Insurance Impound Fund Account" shall have the meaning ascribed to such term in Section 2(e) hereof.

"Trust Account" shall mean a segregated trust account maintained by a corporate trust department of a federal depository institution or a state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations §9.10(B) which has corporate trust powers and is acting in its fiduciary capacity.

(b)    The meanings given to capitalized terms defined herein shall be equally applicable in both singular and plural forms of such terms.

(c)    Capitalized terms used and not defined herein shall have the respective meanings given to such terms in the Mortgage.

SRZNY\611528v5

Blue Hill  0119

Section 2.    Establishment of the Cash Collateral Account and Tax and Insurance Impound Fund Account.

(a)    The Lender has established and will maintain while the Loan is outstanding a cash collateral account (which may be a book-entry sub-account of an Eligible Account) at the Deposit Bank (the "Cash Collateral Account") which shall be entitled "Credit Suisse First Boston Mortgage Capital LLC as Mortgagee of Blue Hills Office Park LLC Cash Collateral Account". In connection with a Secondary Market Transaction, the Lender shall have the right to cause Deposit Bank to entitle the Cash Collateral Account with such other designation as the Lender may select in its reasonable discretion to reflect such assignment or transfer. The Lender shall, or shall cause the Servicer to, cause the Deposit Bank to deposit into the Cash Collateral Account, all Rents and other amounts transferred to the Deposit Bank from the Clearing Bank. Notwithstanding anything to the contrary herein or in the other Loan Documents (but subject to the provisions of Section 2(d)(ii) hereof), all payments due from the Borrower, and Sub-account allocations to be made, pursuant to the Loan Documents shall be deemed paid, or allocated, as applicable, upon the receipt of such amounts in immediately available funds by the Deposit Bank, unless not transmitted in accordance with the Clearing Bank Instruction Letter, in which case upon the receipt of such amounts in immediately available funds in the Cash Collateral Account.

(b)    The Cash Collateral Account shall be an interest bearing account subject to and in accordance with the provisions of Sections 2(f) and 2(g) hereof. All interest income remaining in the Cash Collateral Account (other than the Tax and Insurance Impound Fund Account, if such account is established as a sub-account thereof) shall be for the benefit of the Borrower and credited to the Cash Collateral Account. The Cash Collateral Account (other than the Tax and Insurance Impound Fund Account, if such account is established as a sub-account thereof) shall be assigned the federal tax identification number of the Borrower, which number has been applied for. Borrower shall provide Lender or the Deposit Bank, at any time upon request of Lender, with a Form W-8 or W-9 to evidence Borrower is not subject to any back-up withholding under the United States Internal Revenue Code. Prior to application in accordance with the terms hereof, all amounts in the Cash Collateral Account shall remain an asset of Borrower, subject to the lien and security interest granted Lender hereunder, and subject to all of the terms and conditions of this Agreement and the other Loan Documents.

(c)    The following sub-accounts (collectively, the "Mortgage Sub-accounts") of the Cash Collateral Account shall be maintained on a ledger-entry basis:

(i)    "Tax and Insurance Impound Fund Sub-account";

(ii)    "Monthly Debt Service Sub-account";

(iii)    "Replacement Escrow Fund Sub-account";

(iv)    "Base Leasing Escrow Fund Sub-account";

(v)    "Cash Flow Leasing Escrow Fund Sub-account";

-5-

Blue Hill 0120

(vi)      "Operating Expense Sub-account";

(vii)     "Casualty and Condemnation Proceeds Sub-account";

(viii)    "Extraordinary Receipts Sub-account"; and

(ix)      "Borrower Remainder Sub-account".

Amounts allocated to the Mortgage Sub-accounts shall be disbursed in accordance with the terms of this Agreement and the Mortgage.

(d)      (i)      Concurrently herewith, the Lender has delivered an executed Instruction Letter to the Clearing Bank.  Borrower shall not change the bank, bank location or account number of the Clearing Account without Lender's prior written consent.  If the Clearing Account is so changed with Lender's consent, Lender's consent shall be conditioned upon the receipt by Lender, at least five (5) Business Days prior to the effectiveness of such change, of (A) a new letter substantially similar to the Instruction Letter with respect to such new bank, bank location or account number duly-executed by Borrower, and (B) such Clearing Bank's executed acknowledgment that its procedures with respect to the Clearing Account are governed by the Instruction Letter.

(ii)      At the election of the Lender, at any time from time to time within ten (10) Business Days after notice from the Lender, the Borrower will establish a new Eligible Account (which shall become the Clearing Account) at a bank reasonably selected by the Lender (which bank shall also be required to be reasonably satisfactory to the Borrower if the Lender makes such an election at a time that no Event of Default has occurred and is then continuing) and shall cause all funds in the existing Clearing Account to be transferred to the new Clearing Account and any future Rents from the Property to be deposited in such new Clearing Account. In such event, or if Lender shall amend the provisions of the Instruction Letter such that the timing of any disbursements to be made by the Clearing Bank from the Clearing Account into the Cash Collateral Account is delayed, then all payments due from the Borrower, and Sub-Account Allocations to be made, pursuant to the Loan Documents shall be deemed paid, or allocated, as applicable, upon the receipt of such amounts in immediately available funds in the Clearing Account.

(e)      The Lender may establish and maintain while the Loan is outstanding at the Deposit Bank one or more accounts (which may be a sub-account of the Cash Collateral Account) (the "Tax and Insurance Impound Fund Account") which shall be entitled "Credit Suisse First Boston Mortgage Capital LLC as Mortgagee of Blue Hills Office Park LLC Tax and Insurance Impound Fund Account".  Amounts on deposit in the Tax and Insurance Impound Fund Account shall be disbursed at the direction of the Lender in accordance with the Mortgage. The Tax and Insurance Impound Fund Account shall be assigned the federal tax identification number of the Lender.

(f)      The Lender or the Servicer shall direct the Deposit Bank to invest amounts allocated to the Cash Collateral Account in Permitted Investments selected by the Lender

SRZNY\611528v5

Blue Hill 0121

(provided, however, that the Lender shall reasonably accommodate the Borrower's suggestions in selecting from among such Permitted Investments), and may (but shall not be obligated to) direct the Deposit Bank to invest amounts allocated to the Tax and Insurance Impound Fund Account in Permitted Investments selected by the Lender in its sole discretion.  All earnings on such Permitted Investments on funds allocated to in such Accounts (other than the Tax and Insurance Impound Fund Subaccount) shall be for the benefit of the Borrower.  The Lender or Servicer, as applicable, shall have liability for any loss in investments of funds that are invested in Permitted Investments but no such loss or liability shall affect Borrower's obligations to make all payments and deposits required to be made by Borrower under the Loan Documents.

(g)    It is the intention of the parties hereto that the entire amounts deposited in the Cash Collateral Account (or as much thereof as the Lender may reasonably arrange to invest) shall at all times be invested in Permitted Investments, and that such Accounts shall be so-called "zero balance" accounts.  All funds in such Accounts that are invested in a Permitted Investment are deemed to be held in such Accounts for all purposes of the Mortgage and the other Loan Documents.

(h)    In order to further secure the performance by the Borrower of the Obligations and as a material inducement for the Lender to make the Loan in accordance with the terms of the Loan Documents, the Borrower hereby (i) requests that the Cash Collateral Account and the Tax and Insurance Impound Fund Account be established on its behalf at the Deposit Bank in the names set forth above and (ii) acknowledges that, subject to the terms, covenants and conditions of this Agreement, the Mortgage and the other Loan Documents, (A) the Cash Collateral Account and the Tax and Insurance Impound Fund Account will be subject to the sole dominion, control and discretion of the Lender (which may be exercised through the Servicer), (B) the Lender shall have the sole right to make withdrawals or transfers of funds from the Cash Collateral Account and the Tax and Insurance Impound Fund Account and (C) neither the Borrower nor any other Person claiming on behalf of or through the Borrower shall have any right or authority, whether express or implied, to make use of, or withdraw any funds, investments or other properties from, the Cash Collateral Account or the Tax and Insurance Impound Fund Account, or to give any instructions to the Deposit Bank with respect to the Cash Collateral Account or the Tax and Insurance Impound Fund Account.

Section 3.    Allocation and Disbursement of Funds in the Cash Collateral Account.

(a)    Commencing on the first Business Day of each Collection Period occurring prior to the Anticipated Repayment Date, the Lender or the Servicer shall allocate amounts deposited in the Cash Collateral Account from time to time during such Collection Period in the order and priority set forth in Section 8(a) of the Note.  Commencing on or prior to the first Business Day of each Collection Period beginning on or after the Anticipated Repayment Date, the Lender or the Servicer shall allocate amounts deposited in the Cash Collateral Account from time to time during such Collection Period in the order and priority set forth in Section 9(b) of the Note.

SRZNY\611528v5

Blue Hill 0122

(b)     The Lender or the Servicer shall disburse:

(i)     Amounts allocated to the Tax and Insurance Impound Fund Sub-account to the Tax and Insurance Impound Fund Account on each Payment Date for further disbursement therefrom as set forth in the Mortgage;

(ii)     Amounts allocated to the Monthly Debt Service Sub-account to the Lender on the related Payment Date;

(iii)     Amounts allocated to the Replacement Escrow Fund Sub-account as set forth in the Mortgage;

(iv)     Amounts allocated to the Base Leasing Escrow Fund Sub-account as set forth in the Mortgage;

(v)     Amounts allocated to the Cash Flow Leasing Escrow Fund Sub-account as set forth in the Mortgage;

(vi)     Amounts allocated to the Operating Expense Sub-account on the last Business Day of each week to the following account:

Bank:[Name of Bank holding Operating Account]
ABA#:
Attention:
Fax:
Account:  Fineberg Management, Inc. - Operating Account
Account #:  _____

(vii)     Amounts allocated to the Borrower Remainder Sub-account (which shall no longer be considered Rents) on the last Business Day of each week to the following account:

Bank:[Name of Bank]
ABA#:
Attention:
Fax:
Account:  Blue Hills Office Park LLC
Account #:  _____]

Section 4.     Fees.

(a)     The Borrower agrees to pay the fees of the Servicer and the Deposit Bank in accordance with the customary fees charged by the Deposit Bank and the Servicer for the services described herein, as such fees are established from time to time.

(b)     Upon the request of the Borrower, the Lender shall cause the Deposit Bank and the Servicer to include their fees in an account analysis statement.

SRZNY\611528v5

Blue Hill 0123

Section 5.    Termination.

(a)    The Lender may replace the Deposit Bank with a new Deposit Bank upon five (5) days' notice to the Borrower and the Clearing Bank. The Borrower and Lender each hereby agrees to take all reasonable actions necessary to facilitate the transfer of the respective obligations, duties and rights of the Deposit Bank to the successor thereof selected by the Lender in its sole discretion.

(b)    The Lender shall terminate this Agreement upon the occurrence of a Mortgage Satisfaction Event and return to Borrower all monies then held in the Cash Collateral Agreement and the Tax and Insurance Impound Fund Account after liquidating all Permitted Investments, or, if requested by the Borrower, the Lender shall, at no cost to the Lender, cooperate in causing a transfer to the Borrower of a Permitted Investment held by the Lender at the time of the Mortgage Satisfaction Event, if the same is susceptible of transfer and not then easily liquidated.

Section 6.    Matters Concerning the Borrower.

(a)    Simultaneously with the execution hereof, and as a condition to the funding of the Loan, and hereafter during the term of the Loan, the Borrower shall cause each of the following to occur:

(i)    The Borrower or the Manager shall immediately instruct all Persons that presently or hereafter maintain open accounts with Borrower or the Manager or with whom the Manager or the Borrower presently or hereafter does business on an "accounts receivable" basis with respect to the Property to deliver all payments due under such accounts to the Clearing Bank at a lock box address at the Clearing Bank (the "Lock Box Address") in the form of cashier's checks or equivalent instruments for the payment of money. Neither the Borrower nor the Manager shall direct any such Person to make payments due under such accounts in any other manner.

(ii)    Pursuant to an instruction letter in the form of Exhibit B hereto (a "Lessee Payment Direction Letter"), the Borrower or the Manager shall immediately notify and advise each tenant of the Property (collectively, the "Tenants") under each lease with respect to the Property (whether such lease is presently effective or executed after the date hereof), to send directly to the Lockbox Address promptly when due all payments, whether in the form of checks, cash, drafts, money orders or any other type of payment whatsoever of rent or any other item payable to the Borrower as landlord under such Leases. The foregoing requirements need not be satisfied with respect to any Lease executed after the date hereof to the extent the terms and conditions of the Lessee Payment Direction Letter are incorporated in the applicable Lease.

(iii)    If notwithstanding the provisions of this Section 6(a), Borrower or Manager (or any affiliate thereof) receives any Rents, then (x) Borrower or Manager (or such affiliate) shall be deemed to hold such Rents in trust for Lender and (y) the Borrower and the Manager shall deposit with the Clearing Bank within one Business Day of receipt all such Rents received by the Borrower or the Manager (or such affiliate).

SRZNY\611528v5

Blue Hill 0124

(b)     Upon request of Lender, Borrower shall deliver to Lender such evidence as Lender may reasonably request to evidence that Borrower is complying with the provisions of this Section 6(a).  Without the prior written consent of the Lender, neither the Borrower nor the Manager shall (i) terminate, amend, revoke or modify any Lessee Payment Direction Letter in any manner or (ii) direct or cause any Tenant to pay any amount in any manner other than as provided specifically in the related Lessee Payment Direction Letter.

(c)     The Borrower hereby pledges, transfers and assigns to the Lender, and grants to the Lender, as additional security for the payment and performance of the Obligations, a continuing perfected first priority security interest in and to, and a first lien upon, (i) the Cash Collateral Account, the Clearing Account, the Tax and Insurance Impound Fund Account and all of the Borrower's right, title and interest in and to all cash, property or rights transferred to or deposited therein from time to time, (ii) all earnings, investments and securities held in the Cash Collateral Account and the Tax and Insurance Impound Fund Account in accordance with this Agreement and (iii) any and all proceeds of the foregoing.  This Agreement and the pledge, assignment and grant of security interest made hereby shall secure payment of all amounts payable by the Borrower to the Lender under the Note and the other Obligations.  The Borrower acknowledges that the Servicer, Clearing Bank and Deposit Bank are acting as the agent of, and at the direction of, the Lender in connection with the subject matter of this Agreement.  The Borrower further agrees to execute, acknowledge, deliver, file or do at its sole cost and expense, all other acts, assignments, notices, agreements or other instruments as the Lender may reasonably require in order to effectuate, assure, convey, secure, assign, transfer and convey unto the Lender any of the rights granted by this Agreement and to more fully perfect and protect any lien or security interest granted hereby.

(d)     In its sole discretion, the Borrower may from time to time deposit amounts into the Cash Collateral Account in respect of any Mortgage Sub-account from sources of the Borrower other than those received by the Clearing Bank with respect to the then-current Collection Period; provided, that if the Borrower deposits such amounts, the amounts deposited shall be subject to all of the terms hereof as if not separately deposited by the Borrower, and may not be withdrawn except as otherwise provided for in this Agreement.  Nothing contained herein shall impair or otherwise limit Borrower's obligations to timely make the payments (including, without limitation, interest and principal) required by the Note, the Mortgage and the other Loan Documents, it being understood that such payments shall be so timely made in accordance with the Loan Documents regardless of the amounts on deposit in the Clearing Account, Cash Collateral Account and/or Tax and Insurance Impound Fund Account; provided, however, that Lender agrees to distribute funds deposited in the Cash Collateral Account, to the extent and in the time and manner required pursuant to the terms of this Agreement, the Mortgage and the other Loan Documents.

(e)     The Borrower hereby covenants and agrees that, from and after the earlier to occur of (i) an Event of Default or (ii) the Anticipated Repayment Date, amounts allocated to the Operating Expense Sub-account with respect to the payment of Operating Expenses or Capital Expenditures shall be used only for payment of checks made by the Borrower for the payment of expenses incurred in the ordinary course of business of the ownership and operation

-10-

Blue Hill 0125

of the Property or for the payment of expenditures approved by the Lender or otherwise permitted hereunder or under the other Loan Documents.

(f)    If the actual Operating Expenses and Capital Expenditures paid during any Collection Period are (i) prior to the earlier to occur of (x) an Event of Default or (y) the Anticipated Repayment Date, in an amount such that the monthly operating income remaining after application of the amounts required to be applied pursuant to subparagraphs (8)(a)(i) through (8)(a)(viii) of the Note is insufficient to fully fund the Monthly Cash Flow Leasing Escrow Fund Amount, and (ii) thereafter, less than the amount transferred to the Operating Account, in either case during such Collection Period, the amount of such shortfall shall promptly be deposited by Borrower back into the Cash Collateral Account, in any event no later than twenty (20) days after the end of the applicable Collection Period, such amount to be applied in accordance with the Annual Budget (as defined in the Note) then applicable when such sum is redeposited into the Cash Account.  Within twenty (20) days after the end of each Collection Period occurring commencing upon the earlier to occur of (x) an Event of Default or (y) the Anticipated Repayment Date, Borrower shall prepare and deliver to Lender a statement in form and substance reasonably satisfactory to Lender in all material respects setting forth all amounts expended for Operating Expenses and Capital Expenditures during such Collection Period, including showing variances from budget and setting forth a short explanation of any variance in excess of ten percent (10%) of the budget line item in question and identifying any payment made to an Affiliate and the reasons therefor.  Each such statement shall be certified by an officer of Borrower as being true, correct and complete in all material respects and shall include a certification that all amounts transferred to the Operating Account pursuant to this Agreement were expended for Operating Expenses and Capital Expenditures in accordance with this Agreement or have been or are being returned to the Cash Collateral Account as provided above.  Borrower shall promptly deliver to Lender such further written documentation (including, without limitation, invoices, canceled checks or copies of contracts) and information as Lender may reasonably request regarding any payments described in Borrower's statements. If Borrower shall fail to deposit any excess funds in the Cash Collateral Account or provide its required statements or, after written request of Lender, evidence of expenditures, in each case, within the time periods provided in the preceding sentences and such failure continues for ten (10) or more days after notice of such failure, then in addition to any other remedies which Lender may have with respect thereto, Lender may elect not to fund the Operating Expense Sub-account from monies in the Cash Collateral Account or Lender may continue to hold the funds in the Operating Expense Sub-account until such failure is cured.

Section 7.    Certain Matters Regarding the Lender.

(a)    The parties agree that the Deposit Bank shall pay over to the Lender all amounts deposited in any account maintained hereunder on demand, without notice to the Borrower, provided, that in making such demand, the Lender gives notice, in writing, signed by the Lender or an authorized agent thereof, that an Event of Default under the Mortgage has occurred and is continuing.  Notwithstanding the foregoing, the Borrower shall not be deemed to have waived any rights the Borrower may have against the Lender if it is determined that the Lender acted improperly.

Blue Hill  0126

(b)    Lender may exercise in respect of the Collateral all rights and remedies available to Lender hereunder or under the other Loan Documents or otherwise available at law or in equity. Without limiting the generality of the foregoing or the provisions of paragraph (a) above, upon the occurrence and during the continuance of an Event of Default, Borrower acknowledges and agrees that it will have no further right to request or otherwise require Lender to disburse funds from the Clearing Account, the Cash Collateral Account or the Tax and Insurance Escrow Account in accordance with the terms of this Agreement, it being agreed that Lender may, at its option, (i) direct the Deposit Bank to continue to hold the funds in the Cash Collateral Account and the Tax and Insurance Escrow Account and/or (ii) continue from time to time to apply all or any portion of the funds held in the Cash Collateral Account or Tax and Insurance Escrow Account to any payment(s) which such funds could have been applied prior to such Event of Default (or to pay Cash Expenses, Net Capital Expenses and Extraordinary Expenses directly), to the extent and in such order and manner as Lender in its sole discretion may determine, and/or (iii) direct that the Deposit Bank or Clearing Bank from time to time disburse all or any portion of the funds held in the Cash Collateral Account or the Tax and Insurance Escrow Account or other Collateral then or thereafter held by the Deposit Bank or Clearing Bank, as applicable, to Lender, in which event Lender may apply the funds held in the Cash Collateral Account, the Tax and Insurance Escrow Account or other Collateral to the Obligations in any order and in such manner as Lender may determine in its sole discretion.

(c)    Upon the occurrence and during the continuance of any Event of Default, Lender may, at any time or from time to time, collect, appropriate, redeem, realize upon or otherwise enforce its rights with respect to the Collateral, without notice to Borrower and without the need to institute any legal action, make demand, exhaust any other remedies or otherwise proceed to enforce its rights.

(d)    No failure on the part of Lender to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right under this Agreement or the other Loan Documents. The remedies provided in this Agreement, the Note, the Mortgage and the other Loan Documents are cumulative and not exclusive of any remedies provided at law or in equity.

Section 8.    Casualty and Condemnation Proceeds Sub-account; Extraordinary Receipts Sub-account.

Notwithstanding anything to the contrary contained herein, but subject to the provisions of the Mortgage, the following items of Rents, as and when received, shall be deposited and held in the Mortgage Sub-accounts described below and shall be applied in the order of priority set forth in this Section 8, and Borrower shall advise Lender at the time of receipt thereof of the nature of such receipt so that Lender shall have sufficient time to instruct the Deposit Bank to deposit and hold such amounts in the appropriate Mortgage Sub-account:

(a)    Proceeds of any insurance (exclusive of rent or business interruption insurance, which shall be deemed Rents), which amounts shall be deposited in the Casualty and

-12-

Blue Hill 0127

Condemnation Proceeds Sub-account and shall be applied (by instructions of Lender or Servicer to the Deposit Bank) in accordance with the provisions of the Mortgage applicable thereto.

(b)     Condemnation awards, which amounts shall be deposited in the Casualty and Condemnation Proceeds Sub-account and shall be applied (by instructions of Lender or Servicer to the Deposit Bank) in accordance with the provisions of the Mortgage applicable thereto.

(c)     Real estate tax refunds (net of any reasonable and customary fees and disbursements of tax certiorari counsel deducted from such refund to pay such counsel's fee), which amount shall be deposited in the Extraordinary Receipts Sub-account and shall thereafter be transferred (by instructions of Lender to the Deposit Bank) to the Property Account to the extent required to pay refunds due to any tenants of the Property (based on a certificate of Borrower as to the tenants entitled to receive such refunds and the amounts thereof), except Lender reserves the right to pay (or have the Servicer pay) any such tenant directly using monies so deposited in the Extraordinary Receipts Sub-account, in lieu of transferring such monies to the Operating Account for such payment.  Lender or Servicer shall apply any excess, after the aforesaid payment, as if ordinary Rents deposited in the Cash Collateral Account.

(d)     Any other extraordinary event pursuant to which Borrower receives payments or income (in whatever form) derived from or generated by the use, ownership or operation of the Premises, not otherwise covered above (other than payments from any lessee under any Lease) shall be deposited in the Clearing Account and applied as ordinary Rents as if such amounts were ordinary Rents to be applied in accordance with the terms of this Agreement for the month in question.

(e)     If the fees and disbursements of tax certiorari counsel described in paragraph (c) above shall not have been deducted from the real estate tax refunds by such counsel prior to payment of such refunds to Borrower, then such fees and disbursements may be paid as part of Operating Expenses, provided such fees and disbursements are commercially reasonable. References to application of any amounts received by Borrower by reason of any action taken by Borrower under or with respect to a Lease, or otherwise, is not intended in any manner to allow Borrower to take such action in conflict with any other provision of the Loan Documents.

Section 9.     Successors and Assigns; Assignments; Agents.

(a)     This Agreement shall bind and inure to the benefit of and be enforceable by the Borrower, the Lender and the Manager and their respective successors and assigns.

(b)     The Lender shall have the right to assign or transfer rights and obligations under this Agreement without limitation.  Any assignee or transferee shall be entitled to all the benefits afforded the Lender under this Agreement and the other Loan Documents; provided, that such assignee or transferee shall upon written request deliver to the other parties hereto written confirmation that such assignee or transferee agrees to be bound by the terms of this Agreement and the other Loan Documents and is also the assignee or transferee of the Note and the other Loan Documents.

-13-

Blue Hill 0128

(c)    The Borrower shall have the right to assign and transfer its rights and obligations hereunder only with the prior written consent of the Lender.

(d)    Any duties or actions of the Lender hereunder may be performed by the Lender or its agent(s), including without limitation, any Servicer or trustee in a Secondary Market Transaction, which includes the Loan.

Section 10.    Amendment.

This Agreement may be amended from time to time in writing by all parties hereto. All amendments to this Agreement shall be in writing.

Section 11.    Notices.

Notices to the parties hereto shall be addressed and delivered in the manner set forth in the Mortgage. Unless otherwise expressly provided herein, all such notices, to be effective, shall be in writing (including by facsimile), and shall be deemed to have been duly given or made (a) when delivered by hand or by nationally recognized overnight carrier, (b) upon receipt after being deposited in the mail, certified mail and postage prepaid or (c) in the case of facsimile notice, when sent and electronically confirmed, addressed as set forth above.

Section 12.    Limitation on Liability.

Lender shall not be liable for any acts, omissions, errors in judgment or mistakes of fact or law, including, without limitation, acts, omissions, errors or mistakes with respect to the Collateral, except for those arising as a result of Lender's acts of gross negligence or willful misconduct or as otherwise expressly provided in the Loan Documents. Without limiting the generality of the foregoing, except as otherwise expressly provided for herein or as required by applicable law, Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not Lender has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any parties or any other right pertaining to any Collateral. Lender is hereby authorized by Borrower to act on any written instruction believed by Lender in good faith to have been given or sent by Borrower.

Section 13.    Mortgagee-in-Possession.

Borrower hereby confirms and agrees that notwithstanding the provisions of this Agreement, Borrower retains sole control of the operation and maintenance of the Property, subject to the obligations of Borrower under the Mortgage, the Assignment of Leases and Rents and the other Loan Documents, and Lender is not and shall not be deemed to be a mortgagee in possession.

Section 14.    Governing Law.

-14-

Blue Hill  0129

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF MASSACHUSETTS.

[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]

SRZNY\611528v5

Blue Hill 0130

IN WITNESS WHEREOF, the parties hereto have executed this CASH MANAGEMENT AGREEMENT in several counterparts (each of which shall be deemed an original) as of the date first above written.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By:  Blue Hills Management Corp.,
     a Massachusetts corporation
     its manager

By: _____
    Gerald S. Fineberg
    President

CREDIT SUISSE FIRST BOSTON
     MORTGAGE CAPITAL LLC,
     as the Lender

By: _____
    Name:
    Title:

FINEBERG MANAGEMENT, INC.
a Massachusetts corporation

By: _____
    Name: Gerald S. Fineberg
    Title: President

Blue Hill 0131

IN WITNESS WHEREOF, the parties hereto have executed this CASH MANAGEMENT AGREEMENT in several counterparts (each of which shall be deemed an original) as of the date first above written.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company

By:  Blue Hills Management Corp.,
     a Massachusetts corporation
     its manager

By:  _____
     Gerald S. Fineberg
     President

CREDIT SUISSE FIRST BOSTON
     MORTGAGE CAPITAL LLC,
     as the Lender

By:  _____
     Name: MARK FINERMAN
     Title: VICE-PRESIDENT

FINEBERG MANAGEMENT, INC.
a Massachusetts corporation

By:  _____
     Name:
     Title:

Blue Hill 0132

EXHIBIT A

CLEARING BANK INSTRUCTION LETTER

September ___, 1999

MetroWest Bank
15 Park Street
P.O. Box 9111
Framingham, Massachusetts 01701

Re: BLUE HILLS OFFICE PARK

Ladies and Gentlemen:

Blue Hills Office Park LLC (the "Borrower") has entered into a Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of September ___, 1999 (the "Loan Agreement"), with Credit Suisse First Boston Mortgage Capital LLC (together with its successors and assigns, the "Lender"), pursuant to which the Lender has provided financing to the Borrower secured by certain mortgages and/or deeds of trust on certain properties owned by the Borrower, including the property described in the caption of this letter (the "Property"). The Property is currently being managed by Fineberg Management, Inc. (the "Manager").

Currently, the [Borrower] [Manager] maintains the following account (the "Property Account") with you:

Name: [_____]
Account No.[_____]

The Borrower hereby notifies you that the Lender has required that it implement certain automatic clearing and processing functions and hereby instructs you, commencing on the date hereof, (the "Sweep Commencement Date"), to disburse all revenues from the Property ("Revenues") deposited in the Property Account from time to time in accordance with the following terms and provisions:

1.      Promptly upon receipt of this letter you shall establish a post office box address in which the Borrower shall cause all Revenues in the form of checks, money orders and similar instruments to be deposited. Within one business day of receipt, you, as the "Clearing Bank," shall receive and process all Revenues and shall deposit the same into the Property Account referred to above, which Property Account, or an appropriate substitution or replacement thereof, shall thereafter be referred to as the "Clearing Account." Checks made payable to the Borrower, the Manager, the Property or the Clearing Account shall be deemed suitable for deposit in the Clearing Account. Items deposited with the Clearing Bank that are returned for insufficient or uncollected funds will be redeposited the first time. Items returned

SRZNY\61152Bv5

Blue Hill 0133

unpaid a second time shall be processed in accordance with the standard procedures of the Clearing Bank.

2.      The Clearing Account shall be an account of the Borrower but shall be under the sole dominion and control of the Lender and any servicer (a "Servicer") or other designee of the Lender named below or in a subsequent written notice from the Lender. The Clearing Account shall be assigned the federal tax identification number of the Borrower, which number has been applied for. You shall hold amounts on deposit in the Clearing Account as agent for the Lender and shall not commingle such amounts with any other amounts held by you on behalf of the Lender, the Borrower or any other person or entity. If, in accordance with your standard operating procedures, the Clearing Account may be established as a trust account for the benefit of the Lender, Borrower directs that the Clearing Account be maintained as such an account.

3.      The Borrower hereby notifies the Clearing Bank that, in accordance with the Mortgage, the Clearing Account and all amounts held therein from time to time, and all renewals, replacements and substitutions therefor, have been irrevocably pledged to the Lender as additional security for the loan evidenced by the Mortgage. In connection with such pledge, the Borrower hereby waives all right of withdrawal from the Clearing Account.

4.      The Borrower hereby irrevocably instructs and authorizes you, beginning on the date hereof, to disburse on the last business day of each week and on the eleventh day of each calendar month, (or, if the eleventh day of the month is a Saturday or Sunday or other day on which commercial banks in New York City re not open for general banking business (a "Business Day"), then on the next Business Day) via the ACH System, if available, or otherwise by wire transfer, all amounts constituting available funds on deposit in the Clearing Account to the following account:

> Bank: Bank One Texas, N.A.
> ABA#: 111000614
> Acct. Name: Cash Collateral Account
> Acct. No.: 1578611756
> Ref.: Blue Hills Office Park LLC

5.      If transferring such amounts by the ACH System and if required by Clearing Bank, each such transfer shall be initiated by the Lender or by the Servicer. If the Clearing Bank provides electronic data transfer services, the Clearing Bank shall provide the Lender and the Servicer access to the Clearing Bank's electronic data transfer system for purposes of effecting such transfers. At any time that funds may not be transferred as described above in this paragraph, the Clearing Bank shall transfer amounts by wire transfer of immediately available funds.

6.      The instructions set forth herein are irrevocable and are not subject to modification in any manner, except that the Lender or the Servicer may, by written notice to you, amend the instructions contained herein.

SRZNY\611528v5

**Blue Hill 0134**

7.    In the event that the Clearing Bank fails to acknowledge that its procedures with respect to the Property Account are governed by this letter due to an objection to the terms hereof or otherwise, the Borrower hereby appoints the Lender as its attorney-in-fact with full authority to make changes to this letter and to execute on behalf of the Borrower any new or modified letter acceptable to the proposed Clearing Bank in the event that the Borrower fails to execute any such new or modified letter after written request to do so from the Lender.

8.    Matters not covered by this letter shall be determined in accordance with the customary procedures of the Clearing Bank and in the event of a conflict between the terms of this letter and the customary procedures of the Clearing Bank, the terms of this letter shall govern.

9.    The undersigned also notifies you that the name and address of the current Servicer with respect to the Cash Management Agreement is:

ORIX Real Estate Capital Markets, LLC
1717 Main Street, 12th Floor
Dallas, Texas  75201
Attn:  John Lloyd

If you have any questions concerning this letter or the Cash Management Agreement, please contact Joseph Rubino of the Lender at (212) 325-6061 or John Lloyd of the Servicer at (214) 237-2079.

The address of the current Manager is:

Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts  02481

A-3

SRZNY\611528v5

**Blue Hill 0135**

Please acknowledge receipt of this letter and your agreement to the terms described herein by executing and returning to the Borrower an acknowledgment in the form of Schedule 1 hereto.

BLUE HILLS OFFICE PARK LLC,
a Delaware limited liability company
By: Blue Hills Management Corp.,
    a Massachusetts corporation
    its manager

By: _____

Name: Gerald S. Fineberg

Title: President

Acknowledged and Agreed:

CREDIT    SUISSE    FIRST    BOSTON
    MORTGAGE CAPITAL LLC

By: _____

    Name: _____

    Title: _____

A-4

Blue Hill 0136

Please acknowledge receipt of this letter and your agreement to the terms described herein by executing and returning to the Borrower an acknowledgment in the form of Schedule 1 hereto.

BLUE HILLS OFFICE PARK LLC

By:_____
     Name:
     Title:

<u>Acknowledged and Agreed</u>:

CREDIT    SUISSE    FIRST    BOSTON
    MORTGAGE CAPITAL LLC

By:_____
     Name:
     Title:

A-4

**Blue Hill 0137**

FORM OF ACKNOWLEDGMENT                    **SCHEDULE 1**

September \_\_\_, 1999

Blue Hills Office Park LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481


Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
New York, New York 10010


      Reference is made to that certain Clearing Bank Instruction Letter dated September \_\_\_, 1999 (the "Instruction Letter") from Blue Hills Office Park LLC (the "Borrower"). I, _____, on behalf of MetroWest Bank (the "Bank"), hereby acknowledge receipt of the instructions set forth in the Instruction Letter and notice of the pledges and security interest described therein. The Bank hereby agrees to perform the instructions set forth in the Instruction Letter upon the delivery by Credit Suisse First Boston Mortgage Capital LLC (the "Lender") of the Instruction Letter.

      If you have any questions, please call Nancy L. Conley at (508) 620-0300.

METROWEST BANK


By:_____
   Name:
   Title:


LOCK BOX ADDRESS:

_____
_____
_____

Blue Hill 0138

## EXHIBIT B

### Form of Lessee Payment Direction Letter

FINEBERG MANAGEMENT, INC.
One Washington Street, Suite 400
Wellsley, MA  02481

September __, 1999

EquiServe Limited Partnership

_____

_____

Re:    Payment Direction Letter for Blue Hills Office Park
       150 Royall Street, Canton, Massachusetts

Dear Sirs:

Blue Hills Office Park LLC, the owner of the Blue Hills Office Park (the "Property"), has mortgaged the Property to Credit Suisse First Boston Mortgage Capital LLC (together with its successors and assigns, the "Lender") and has agreed that all rents due for the Property will be paid directly to a bank selected by the Lender.  Therefore, from and after the date hereof, all rent to be paid by you under the lease between you and Blue Hills Office Park LLC (the "Lease") should be sent directly to the following address:

METROWEST BANK
[Lockbox Address]

All checks should be made out to the "Blue Hills Office Park".

These payment instructions cannot be withdrawn or modified without the prior written consent of the Lender or its agent (the "Servicer"), or pursuant to a joint written instruction from the Borrower and the Lender or the Servicer.  Until you receive written instructions from the Lender or the Servicer, continue to send all rent payments due under the Lease to MetroWest Bank.  All rent payments must be delivered to MetroWest Bank no later than the day on which such amounts are due under the Lease.

SRZNY\611528v5

**Blue Hill  0139**

If you have any questions concerning this letter, please contact the persons identified for notice purposes in the lease. We appreciate your cooperation in this matter.

FINEBERG MANAGEMENT, INC.


By:_____ _____---
     Name:
     Title:

SRZNY\611528v5

Blue Hill  0140

SCHEDULE 1

[Schedule commences on the following page]

**Blue Hill 0141**

**SCHEDULE 1**

FORM OF ACKNOWLEDGMENT

September 13, 1999

Blue Hills Office Park LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, Massachusetts 02481

Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
New York, New York 10010

      Reference is made to that certain Clearing Bank Instruction Letter dated September ___, 1999 (the "Instruction Letter") from Blue Hills Office Park LLC (the "Borrower"). I, _____, on behalf of MetroWest Bank (the "Bank"), hereby acknowledge receipt of the instructions set forth in the Instruction Letter and notice of the pledges and security interest described therein. The Bank hereby agrees to perform the instructions set forth in the Instruction Letter upon the delivery by Credit Suisse First Boston Mortgage Capital LLC (the "Lender") of the Instruction Letter. **
The Bank shall be authorized on a monthly basis to withdraw from the so-called *
If you have any questions, please call Nancy L. Conley at (508) 620-0300.

*Lock Box Account/Clearing Account
up to $120.00 per month for monies due
the Bank for administrative fees in
connection with the herein described
arrangement.

METROWEST BANK

By: _Roger G. Leblond Sup_

Name: Roger G. Leblond
Title: Senior Vice President, Banking Operatio

** In the event that the deposited item(s)
are returned to MetroWest Bank as uncollectible, after being deposited a
second time, then Credit Suisse First Boston Mortgage Capital LLC shall
**LOCK BOX ADDRESS:** return the wired funds to MetroWest Bank eliminating
                 any overdraft at MetroWest Bank.

Blue Hills Office Park LLC
P.O. Box 9279
Boston, MA 02205-9279

_RGL 9/13/99_

**Blue Hill 0142**



September 14, 1999


Lydia Chesnick, Esq.
Bernkopf, Goodman & Baseman LLP
125 Summer Street
Boston, MA 02110-1621


Re:    Gerald Fineberg
       Blue Hills Office Park


Dear Lydia:

Pursuant to our phone conversation, enclosed please find the original **Acknowledgment Letter** for the lock box/clearing account for the above referenced borrower. I will again remind you that this account has not been set up as of today and should be prior to any funds being forwarded to the lock box address. Please have the borrower contact me once said account is established.

Please feel free to call me with any questions you may have.



Sincerely,

Nancy L. Conley
Vice President


encl.

Blue Hill 0143

EXHIBIT 4

# GUARANTY

This GUARANTY ("**Guaranty**") is executed as of September 14, 1999, by GERALD S. FINEBERG, individually and WILLIAM J. LANGELIER, individually (whether one or more collectively referred to as "**Guarantor**"), for the benefit of Credit Suisse First Boston Mortgage Capital LLC, a Delaware limited liability company ("**Lender**").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Mortgage Note, dated of even date herewith, executed by BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company ("**Borrower**"), and payable to the order of Lender in the original principal amount of $33,149,000.00 (together with all renewals, modifications, increases and extensions thereof, the "**Note**"), Borrower has become indebted, and may from time to time be further indebted, to Lender with respect to a loan ("**Loan**") which is secured by the lien and security interest of a Mortgage, Assignment of Leases and Rents and Security Agreement, of even date herewith (the "**Mortgage**"), and further evidenced, secured or governed by other instruments and documents executed in connection with the Loan (together with the Note and Mortgage, the "**Loan Documents**"); and

WHEREAS, Lender is not willing to make the Loan, or otherwise extend credit, to Borrower unless Guarantor unconditionally guarantees payment and performance to Lender of the Guaranteed Obligations (as herein defined); and

WHEREAS, Guarantor is the owner of a direct or indirect interest in Borrower, and Guarantor will directly benefit from Lender's making the Loan to Borrower.

NOW, THEREFORE, as an inducement to Lender to make the Loan to Borrower, and to extend such additional credit as Lender may from time to time agree to extend under the Loan Documents, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

## ARTICLE I

## NATURE AND SCOPE OF GUARANTY

**1.1    Guaranty of Obligation.**  Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

**1.2    Definition of Guaranteed Obligations.**  As used herein, the term "**Guaranteed Obligations**" means the obligations or liabilities of Borrower to Lender for any

loss, damage, cost, expense, liability, claim or other obligation incurred by Lender, including attorneys' fees and costs reasonably incurred, but in all events excluding, however, all consequential damages, which arise (i) prior to the release of the Mortgaged Property (as defined in the Mortgage) from the lien of the Mortgage and the other Loan Documents in accordance with <u>Section 55</u> of the Mortgage, or (ii) prior to a sale or transfer of the Mortgaged Property consented to by Lender arising out of or in connection with the following:

      (a)     fraud or intentional misrepresentation by Borrower or Guarantor in connection with the Loan;

      (b)     intentional physical waste of the Mortgaged Property (as defined in the Mortgage);

      (c)     the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substances Indemnification Agreement of even date herewith given by Borrower to Lender or in the Mortgage concerning environmental laws, hazardous substances or asbestos;

      (d)     the removal or disposal of any portion of the Mortgaged Property after an Event of Default (as defined in the Mortgage);

      (e)     the misapplication or conversion by Borrower of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Mortgaged Property, (ii) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, (iii) any Rents (as defined in the Mortgage) following an Event of Default, and (iv) any Rents paid more than one month in advance;

      (f)     failure to pay charges for labor or materials requested by Borrower or Guarantor or to pay or escrow taxes (in accordance with <u>Paragraph 6</u> of the Mortgage) or to pay other charges that can create liens on any portion of the Mortgaged Property; and

      (g)     any security deposits collected with respect to the Mortgaged Property which are not delivered to Lender upon a foreclosure of the Mortgaged Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Mortgage) prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof.

      Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (ii) Guarantor shall be liable for the full amount of the Debt in the event that (A) the first full monthly payment of principal and interest on the Note is not paid when due; (B) Borrower fails to maintain its status as a single purpose entity, as required by, and in accordance with, the Mortgage; (C) Borrower fails to obtain Lender's prior written consent to any subordinate

financing or other voluntary lien encumbering the Mortgaged Property; (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by <u>Section 10</u> of the Mortgage; or (E) if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Borrower or Guarantor or if any proceeding for the dissolution or liquidation of Borrower or Guarantor shall be instituted by Borrower or Guarantor.

1.3 **Nature of Guaranty.** This Guaranty is an irrevocable, absolute, continuing guaranty of payment and performance and not a guaranty of collection. This Guaranty may not be revoked by Guarantor and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by Guarantor and after (if Guarantor is a natural person) Guarantor's death (in which event this Guaranty shall be binding upon Guarantor's estate and Guarantor's legal representatives and heirs). The fact that at any time or from time to time the Guaranteed Obligations may be increased or reduced shall not release or discharge the obligation of Guarantor to Lender with respect to the Guaranteed Obligations. This Guaranty may be enforced by Lender and any subsequent holder of the Note and shall not be discharged by the assignment or negotiation of all or part of the Note.

1.4 **Guaranteed Obligations Not Reduced by Offset.** The Guaranteed Obligations and the liabilities and obligations of Guarantor to Lender hereunder, shall not be reduced, discharged or released because or by reason of any existing or future offset, claim or defense of Borrower, or any other party, against Lender or against payment of the Guaranteed Obligations, whether such offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

1.5 **Payment By Guarantor.** If all or any part of the Guaranteed Obligations shall not be punctually paid when due, whether at demand, maturity, acceleration or otherwise, Guarantor shall, immediately upon demand by Lender, and without presentment, protest, notice of protest, notice of non-payment, notice of intention to accelerate the maturity, notice of acceleration of the maturity, or any other notice whatsoever, pay in lawful money of the United States of America, the amount due on the Guaranteed Obligations to Lender at Lender's address as set forth herein. Such demand(s) may be made at any time coincident with or after the time for payment of all or part of the Guaranteed Obligations, and may be made from time to time with respect to the same or different items of Guaranteed Obligations. Such demand shall be deemed made, given and received in accordance with the notice provisions hereof.

1.6 **No Duty To Pursue Others.** It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which

3

shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

1.7    **Waivers.**  Guarantor agrees to the provisions of the Loan Documents, and hereby waives notice of (i) any loans or advances made by Lender to Borrower, (ii) acceptance of this Guaranty, (iii) any amendment or extension of the Note, the Mortgage or of any other Loan Documents, (iv) the execution and delivery by Borrower and Lender of any other loan or credit agreement or of Borrower's execution and delivery of any promissory notes or other documents arising under the Loan Documents or in connection with the Mortgaged Property, (v) the occurrence of any breach by Borrower or an Event of Default, (vi) Lender's transfer or disposition of the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, (viii) protest, proof of non-payment or default by Borrower, or (ix) any other action at any time taken or omitted by Lender, and, generally, all demands and notices of every kind in connection with this Guaranty, the Loan Documents, any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations and the obligations hereby guaranteed.

1.8    **Payment of Expenses.**  In the event that Guarantor should breach or fail to timely perform any provisions of this Guaranty, Guarantor shall, immediately upon demand by Lender, pay Lender all costs and expenses (including court costs and attorneys' fees) incurred by Lender in the enforcement hereof or the preservation of Lender's rights hereunder.  The covenant contained in this Section shall survive the payment and performance of the Guaranteed Obligations.

1.9    **Effect of Bankruptcy.**  In the event that, pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief law, or any judgment, order or decision thereunder, Lender must rescind or restore any payment, or any part thereof, received by Lender in satisfaction of the Guaranteed Obligations, as set forth herein, any prior release or discharge from the terms of this Guaranty given to Guarantor by Lender shall be without effect, and this Guaranty shall remain in full force and effect. It is the intention of Borrower and Guarantor that Guarantor's obligations hereunder shall not be discharged except by Guarantor's performance of such obligations and then only to the extent of such performance.

1.10    **Waiver of Subrogation, Reimbursement and Contribution.** Notwithstanding anything to the contrary contained in this Guaranty, Guarantor hereby unconditionally and irrevocably waives, releases and abrogates, for so long as any sums due under the Loan Documents remain unpaid, any and all rights it may now or hereafter have under any agreement, at law or in equity (including, without limitation, any law subrogating the Guarantor to the rights of Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from Borrower or any other party liable for payment of any or all of the Guaranteed Obligations for any payment made by Guarantor under or in connection with this Guaranty or otherwise.

4

**1.11   Borrower.** The term "Borrower" as used herein shall include any new or successor corporation, association, partnership (general or limited), joint venture, trust or other individual or organization formed as a result of any merger, reorganization, sale, transfer, devise, gift or bequest of Borrower or any interest in Borrower.

## ARTICLE II

## EVENTS AND CIRCUMSTANCES NOT REDUCING OR DISCHARGING GUARANTOR'S OBLIGATIONS

Guarantor hereby consents and agrees to each of the following, and agrees that Guarantor's obligations under this Guaranty shall not be released, diminished, impaired, reduced or adversely affected by any of the following, and waives any common law, equitable, statutory or other rights (including without limitation rights to notice) which Guarantor might otherwise have as a result of or in connection with any of the following:

**2.1   Modifications.** Any renewal, extension, increase, modification, alteration or rearrangement of all or any part of the Guaranteed Obligations, the Note, the Mortgage, the other Loan Documents, or any other document, instrument, contract or understanding between Borrower and Lender, or any other parties, pertaining to the Guaranteed Obligations or any failure of Lender to notify Guarantor of any such action.

**2.2   Adjustment.** Any adjustment, indulgence, forbearance or compromise that might be granted or given by Lender to Borrower or any Guarantor.

**2.3   Condition of Borrower or Guarantor.** The insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution or lack of power of Borrower, Guarantor or any other party at any time liable for the payment of all or part of the Guaranteed Obligations; or any dissolution of Borrower or Guarantor, or any sale, lease or transfer of any or all of the assets of Borrower or Guarantor, or any changes in the shareholders, partners or members of Borrower or Guarantor; or any reorganization of Borrower or Guarantor.

**2.4   Invalidity of Guaranteed Obligations.** The invalidity, illegality or unenforceability of all or any part of the Guaranteed Obligations, or any document or agreement executed in connection with the Guaranteed Obligations, for any reason whatsoever, including without limitation the fact that (i) the Guaranteed Obligations, or any part thereof, exceeds the amount permitted by law, (ii) the act of creating the Guaranteed Obligations or any part thereof is ultra vires, (iii) the officers or representatives executing the Note, the Mortgage or the other Loan Documents or otherwise creating the Guaranteed Obligations acted in excess of their authority, (iv) the Guaranteed Obligations violate applicable usury laws, (v) the Borrower has valid defenses, claims or offsets (whether at law, in equity or by agreement) which render the Guaranteed Obligations wholly or partially uncollectible from Borrower, (vi) the creation, performance or repayment of the Guaranteed Obligations (or the execution, delivery and performance of any document or instrument representing part of the Guaranteed Obligations or executed in connection with the Guaranteed Obligations, or given to secure the repayment of the Guaranteed Obligations) is illegal, uncollectible or unenforceable, or (vii) the Note, the Mortgage

5

or any of the other Loan Documents have been forged or otherwise are irregular or not genuine or authentic, it being agreed that Guarantor shall remain liable hereon regardless of whether Borrower or any other person be found not liable on the Guaranteed Obligations or any part thereof for any reason.

**2.5    Release of Obligors.**  Any full or partial release of the liability of Borrower on the Guaranteed Obligations, or any part thereof, or of any co-guarantors, or any other person or entity now or hereafter liable, whether directly or indirectly, jointly, severally, or jointly and severally, to pay, perform, guarantee or assure the payment of the Guaranteed Obligations, or any part thereof, it being recognized, acknowledged and agreed by Guarantor that Guarantor may be required to pay the Guaranteed Obligations in full without assistance or support of any other party, and Guarantor has not been induced to enter into this Guaranty on the basis of a contemplation, belief, understanding or agreement that other parties will be liable to pay or perform the Guaranteed Obligations, or that Lender will look to other parties to pay or perform the Guaranteed Obligations.

**2.6    Other Collateral.**  The taking or accepting of any other security, collateral or guaranty, or other assurance of payment, for all or any part of the Guaranteed Obligations.

**2.7    Release of Collateral.**  Any release, surrender, exchange, subordination, deterioration, waste, loss or impairment (including without limitation negligent, willful, unreasonable or unjustifiable impairment) of any collateral, property or security at any time existing in connection with, or assuring or securing payment of, all or any part of the Guaranteed Obligations.

**2.8    Care and Diligence.**  The failure of Lender or any other party to exercise diligence or reasonable care in the preservation, protection, enforcement, sale or other handling or treatment of all or any part of such collateral, property or security, including but not limited to any neglect, delay, omission, failure or refusal of Lender (i) to take or prosecute any action for the collection of any of the Guaranteed Obligations or (ii) to foreclose, or initiate any action to foreclose, or, once commenced, prosecute to completion any action to foreclose upon any security therefor, or (iii) to take or prosecute any action in connection with any instrument or agreement evidencing or securing all or any part of the Guaranteed Obligations.

**2.9    Unenforceability.**  The fact that any collateral, security, security interest or lien contemplated or intended to be given, created or granted as security for the repayment of the Guaranteed Obligations, or any part thereof, shall not be properly perfected or created, or shall prove to be unenforceable or subordinate to any other security interest or lien, it being recognized and agreed by Guarantor that Guarantor is not entering into this Guaranty in reliance on, or in contemplation of the benefits of, the validity, enforceability, collectibility or value of any of the collateral for the Guaranteed Obligations.

**2.10    Offset.**  The Note, the Guaranteed Obligations and the liabilities and obligations of the Guarantor to Lender hereunder shall not be reduced, discharged or released because of or by reason of any existing or future right of offset, claim or defense of Borrower against Lender, or any other party, or against payment of the Guaranteed Obligations, whether

such right of offset, claim or defense arises in connection with the Guaranteed Obligations (or the transactions creating the Guaranteed Obligations) or otherwise.

      **2.11    Merger.**  The reorganization, merger or consolidation of Borrower into or with any other corporation or entity.

      **2.12    Preference.**  Any payment by Borrower to Lender is held to constitute a preference under bankruptcy laws, or for any reason Lender is required to refund such payment or pay such amount to Borrower or someone else.

      **2.13    Other Actions Taken or Omitted.**  Any other action taken or omitted to be taken with respect to the Loan Documents, the Guaranteed Obligations, or the security and collateral therefor, whether or not such action or omission prejudices Guarantor or increases the likelihood that Guarantor will be required to pay the Guaranteed Obligations pursuant to the terms hereof, it is the unambiguous and unequivocal intention of Guarantor that Guarantor shall be obligated to pay the Guaranteed Obligations when due, notwithstanding any occurrence, circumstance, event, action, or omission whatsoever, whether contemplated or uncontemplated, and whether or not otherwise or particularly described herein, which obligation shall be deemed satisfied only upon the full and final payment and satisfaction of the Guaranteed Obligations.

# ARTICLE III

# REPRESENTATIONS AND WARRANTIES

      To induce Lender to enter into the Loan Documents and extend credit to Borrower, Guarantor represents and warrants to Lender as follows:

      **3.1    Benefit.**  Guarantor is an affiliate of Borrower, is the owner of a direct or indirect interest in Borrower, and has received, or will receive, direct or indirect benefit from the making of this Guaranty with respect to the Guaranteed Obligations.

      **3.2    Familiarity and Reliance.**  Guarantor is familiar with, and has independently reviewed books and records regarding, the financial condition of the Borrower and is familiar with the value of any and all collateral intended to be created as security for the payment of the Note or Guaranteed Obligations; however, Guarantor is not relying on such financial condition or the collateral as an inducement to enter into this Guaranty.

      **3.3    No Representation By Lender.**  Neither Lender nor any other party has made any representation, warranty or statement to Guarantor in order to induce the Guarantor to execute this Guaranty.

      **3.4    Guarantor's Financial Condition.**  As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, Guarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed its obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay its obligations and liabilities.

<div align="center">7</div>

3.5    **Legality.**  The execution, delivery and performance by Guarantor of this Guaranty and the consummation of the transactions contemplated hereunder do not, and will not, contravene or conflict with any law, statute or regulation whatsoever to which Guarantor is subject or constitute a default (or an event which with notice or lapse of time or both would constitute a default) under, or result in the breach of, any indenture, Mortgage, charge, lien, or any contract, agreement or other instrument to which Guarantor is a party or which may be applicable to Guarantor.  This Guaranty is a legal and binding obligation of Guarantor and is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights.

3.6    **Survival.**  All representations and warranties made by Guarantor herein shall survive the execution hereof.

## ARTICLE IV

## SUBORDINATION OF CERTAIN INDEBTEDNESS

4.1    **Subordination of All Guarantor Claims.**  As used herein, the term "Guarantor Claims" shall mean all debts and liabilities of Borrower to Guarantor, whether such debts and liabilities now exist or are hereafter incurred or arise, or whether the obligations of Borrower thereon be direct, contingent, primary, secondary, several, joint and several, or otherwise, and irrespective of whether such debts or liabilities be evidenced by note, contract, open account, or otherwise, and irrespective of the person or persons in whose favor such debts or liabilities may, at their inception, have been, or may hereafter be created, or the manner in which they have been or may hereafter be acquired by Guarantor.  The Guarantor Claims shall include without limitation all rights and claims of Guarantor against Borrower (arising as a result of subrogation or otherwise) as a result of Guarantor's payment of all or a portion of the Guaranteed Obligations.  Upon the occurrence of an Event of Default or the occurrence of an event which would, with the giving of notice or the passage of time, or both, constitute an Event of Default, Guarantor shall not receive or collect, directly or indirectly, from Borrower or any other party any amount upon the Guarantor Claims.

4.2    **Claims in Bankruptcy.**  In the event of receivership, bankruptcy, reorganization, arrangement, debtor's relief, or other insolvency proceedings involving Guarantor as debtor, Lender shall have the right to prove its claim in any such proceeding so as to establish its rights hereunder and receive directly from the receiver, trustee or other court custodian dividends and payments which would otherwise be payable upon Guarantor Claims.  Guarantor hereby assigns such dividends and payments to Lender.  Should Lender receive, for application upon the Guaranteed Obligations, any such dividend or payment which is otherwise payable to Guarantor, and which, as between Borrower and Guarantor, shall constitute a credit upon the Guarantor Claims, then upon payment to Lender in full of the Guaranteed Obligations, Guarantor shall become subrogated to the rights of Lender to the extent that such payments to Lender on the Guarantor Claims have contributed toward the liquidation of the Guaranteed Obligations, and such subrogation shall be with respect to that proportion of the Guaranteed Obligations which

8

would have been unpaid if Lender had not received dividends or payments upon the Guarantor Claims.

**4.3** **Payments Held in Trust.** In the event that, notwithstanding anything to the contrary in this Guaranty, Guarantor should receive any funds, payment, claim or distribution which is prohibited by this Guaranty, Guarantor agrees to hold in trust for Lender an amount equal to the amount of all funds, payments, claims or distributions so received, and agrees that it shall have absolutely no dominion over the amount of such funds, payments, claims or distributions so received except to pay them promptly to Lender, and Guarantor covenants promptly to pay the same to Lender.

**4.4** **Liens Subordinate.** Guarantor agrees that any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guarantor Claims shall be and remain inferior and subordinate to any liens, security interests, judgment liens, charges or other encumbrances upon Borrower's assets securing payment of the Guaranteed Obligations, regardless of whether such encumbrances in favor of Guarantor or Lender presently exist or are hereafter created or attach. Without the prior written consent of Lender, Guarantor shall not (i) exercise or enforce any creditor's right it may have against Borrower, or (ii) foreclose, repossess, sequester or otherwise take steps or institute any action or proceedings (judicial or otherwise, including without limitation the commencement of, or joinder in, any liquidation, bankruptcy, rearrangement, debtor's relief or insolvency proceeding) to enforce any liens, Mortgage, deeds of trust, security interests, collateral rights, judgments or other encumbrances on assets of Borrower held by Guarantor.

**ARTICLE V**

**MISCELLANEOUS**

**5.1** **Waiver.** No failure to exercise, and no delay in exercising, on the part of Lender, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right. The rights of Lender hereunder shall be in addition to all other rights provided by law. No modification or waiver of any provision of this Guaranty, nor consent to departure therefrom, shall be effective unless in writing and no such consent or waiver shall extend beyond the particular case and purpose involved. No notice or demand given in any case shall constitute a waiver of the right to take other action in the same, similar or other instances without such notice or demand.

**5.2** **Notices.** All notices given hereunder shall be in writing and shall be either hand delivered or mailed, by registered U.S. mail, Return Receipt Requested, first class postage prepaid, to the parties at their respective addresses below or at such other address for any party as such party may designate by notice to the other parties hereto:

9

SRZNY\611506v7

To Borrower:
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, MA  02481
Attn:  Gerald Fineberg

To Lender:

Credit Suisse First Boston Mortgage Capital LLC
Principal Transactions Group
11 Madison Avenue
New York, New York  10010
Attention:  Asset Management
Re:  Blue Hills Office
     Park/Joseph Rubino
Telecopier:  (212) 325-8164

with copies to:

Credit Suisse First Boston Mortgage Capital LLC
Legal and Compliance Department
11 Madison Avenue
New York, New York  10010
Attention:  Colleen Graham, Esq.
Re:  Blue Hills Office
     Park/Joseph Rubino
Telecopier:  (212) 325-8220

ORIX Real Estate Capital Markets, LLC
1717 Main Street
Dallas, TX  75201
Attn:  John Lloyd
Telecopier:  (214) 237-2038

or any other servicer of the Loan

To Guarantor:

GERALD S. FINEBERG
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellsley, MA  02481

SRZNY\611506v7

and

WILLIAM J. LANGELIER
c/o The Langelier Company
2045 Jackson Street
Suite 501
San Francisco, CA 94109

with copies to:

Bernkopf, Goodman & Baseman LLP
125 Summer Street
Boston, Massachusetts 02110-1621
Attention: David Doyle, Esq.
Telecopier: (617) 790-3300

and to:

Hale and Dorr
60 State Street
Boston, Massachusetts 02109
Attn: Andrew H. Cohen, Esq.
Telecopier: (617) 526-5000

     **5.3**   **Governing Law.** This Guaranty shall be governed by and construed in accordance with the laws of the State in which the real property encumbered by the Mortgage is located and the applicable laws of the United States of America.

     **5.4**   **Invalid Provisions.** If any provision of this Guaranty is held to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Guaranty, such provision shall be fully severable and this Guaranty shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Guaranty, and the remaining provisions of this Guaranty shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Guaranty, unless such continued effectiveness of this Guaranty, as modified, would be contrary to the basic understandings and intentions of the parties as expressed herein.

     **5.5**   **Amendments.** This Guaranty may be amended only by an instrument in writing executed by the party or an authorized representative of the party against whom such amendment is sought to be enforced.

     **5.6**   **Parties Bound; Assignment; Joint and Several.** This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors, assigns and legal representatives; provided, however, that Guarantor may not, without the prior written consent of Lender, assign any of its rights, powers, duties or obligations hereunder. If Guarantor

consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

     5.7    **Headings.**  Section headings are for convenience of reference only and shall in no way affect the interpretation of this Guaranty.

     5.8    **Recitals.**  The recital and introductory paragraphs hereof are a part hereof, form a basis for this Guaranty and shall be considered prima facie evidence of the facts and documents referred to therein.

     5.9    **Counterparts.**  To facilitate execution, this Guaranty may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Guaranty to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages.

     5.10    **Rights and Remedies.**  If Guarantor becomes liable for any indebtedness owing by Borrower to Lender, by endorsement or otherwise, other than under this Guaranty, such liability shall not be in any manner impaired or affected hereby and the rights of Lender hereunder shall be cumulative of any and all other rights that Lender may ever have against Guarantor. The exercise by Lender of any right or remedy hereunder or under any other instrument, or at law or in equity, shall not preclude the concurrent or subsequent exercise of any other right or remedy.

     5.11    **Other Defined Terms.**  Any capitalized term utilized herein shall have the meaning as specified in the Mortgage, unless such term is otherwise specifically defined herein.

     5.12    **Entirety.  THIS GUARANTY EMBODIES THE FINAL, ENTIRE AGREEMENT OF GUARANTOR AND LENDER WITH RESPECT TO GUARANTOR'S GUARANTY OF THE GUARANTEED OBLIGATIONS AND SUPERSEDES ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS, AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF. THIS GUARANTY IS INTENDED BY GUARANTOR AND LENDER AS A FINAL AND COMPLETE EXPRESSION OF THE TERMS OF THE GUARANTY, AND NO COURSE OF DEALING BETWEEN GUARANTOR AND LENDER, NO COURSE OF PERFORMANCE, NO TRADE PRACTICES, AND NO EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OR OTHER EXTRINSIC EVIDENCE OF ANY NATURE SHALL BE USED TO CONTRADICT, VARY, SUPPLEMENT OR MODIFY ANY TERM OF THIS GUARANTY AGREEMENT. THERE ARE NO ORAL AGREEMENTS BETWEEN GUARANTOR AND LENDER.**

SRZNY\611506v7

**5.13    Waiver of Right To Trial By Jury. GUARANTOR HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS GUARANTY, THE NOTE, THE MORTGAGE, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY GUARANTOR, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY GUARANTOR.**

**5.14    Cooperation**. Guarantor acknowledges that Lender and its successors and assigns may (i) sell this Guaranty, the Note and other Loan Documents to one or more investors as a whole loan, (ii) participate the Loan secured by this Guaranty to one or more investors, (iii) deposit this Guaranty, the Note and other Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets, or (iv) otherwise sell the Loan or interest therein to investors (the transactions referred to in clauses (i) through (iv) are hereinafter each referred to as **"Secondary Market Transaction"**). Guarantor shall reasonably cooperate with Lender in effecting any such Secondary Market Transaction and shall reasonably cooperate to implement all requirements imposed by any Rating Agency (as defined in the Mortgage) involved in any Secondary Market Transaction, provided, however, that Guarantor's cooperation shall not increase the Guaranteed Obligations or cause the Guarantor to incur any material costs.

In addition, Guarantor shall make available to Lender all information concerning its business and operations that Lender may reasonably request. Lender shall be permitted to share all such information with the investment banking firms, Rating Agencies, accounting firms, law firms and other third-party advisory firms involved with the Loan and the Loan Documents or the applicable Secondary Market Transaction. It is understood that the information provided by Guarantor to Lender may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus various investors may also see some or all of the information. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Guarantor in the form as provided by Guarantor. Lender may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

**5.15    Reinstatement in Certain Circumstances**. If at any time any payment of the principal of or interest under the Note or any other amount payable by the Borrower under the Loan Documents is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment has been due but not made at such time.

13

[No Further Text on this Page; Signature Page Follows]

SRZNY\611506v7

EXECUTED as of the day and year first above written.

**GUARANTOR:**

_____
GERALD S. FINEBERG, individually

_____
WILLIAM J. LANGELIER, individually

EXECUTED as of the day and year first above written.

**GUARANTOR**:

_____
GERALD S. FINEBERG, individually

_____
WILLIAM J. LANGELIER, individually

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC, <br><br>      Plaintiff, Defendant-in-Counterclaim. <br><br>      v. <br><br> CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., <br><br>      Defendant, <br><br>      and <br><br> CSFB 1999 – C1 ROYALL STREET, LLC; <br><br>      Defendant, Plaintiff-in-Counterclaim, <br><br>      v. <br><br> WILLIAM LANGELIER and GERALD FINEBERG, <br><br>      Defendants-in-Counterclaim. | Civil Action No.  05-CV-10506 (WGY) |

## CSFB 1999 – C1 ROYALL STREET, LLC'S ANSWERS TO BLUE HILLS OFFICE PARK LLC'S FIRST SET OF INTERROGATORIES

Defendant CSFB 1999 – C1 Royall Street, LLC  ("Lender") hereby answers Blue Hills Office Park LLC's First Set of Interrogatories to CSFB 1999-C1 Royall Street, LLC (the "Interrogatories").

### General Responses and Objections

A.       Lender objects to the Interrogatories, including the Definitions and instructions, to the extent that they purport to impose requirements, obligations, or duties beyond those required

~BOST1:393835.v2

**INTERROGATORY NO. 12**

Please state the basis of and identify in detail all facts and documents that support your contention that "Blue Hills did not meet the preconditions to a loan reserve disbursement for payment of principal and interest, building improvements, or marketing expenses that are set forth in the Mortgage Loan Documents" as alleged in CSFB's Seventh Affirmative Defense. In your answer, please identify all persons, other than counsel, who interpreted the loan documents and/or made the decision that Blue Hills did not meet the preconditions to a loan reserve disbursement for payment of principal and interest, building improvements, or marketing expenses that are set forth in the Mortgage Loan Documents. For each person identified, please include, without limitation, his or her full name, date or birth, social security number, residential address, job title or position, name of employer, business address, and relationship, if any to CSFB.

**RESPONSE NO. 12**

Lender objects to this Interrogatory as vague and ambiguous because the meaning of "interpreted the loan documents and/or made the decision" is unclear. Subject to and without waiving the foregoing and the General Objections, Lender answers as follows:

Section 6(b) of the Mortgage Agreement provides that the Replacement Escrow Fund may be used for "replacements and repairs required to be made to the Mortgaged Property … and for any other work approved by the Mortgagee," subject to certain frequency and dollar limits and to the Mortgagee's discretion. Section 6(b) requires that the Mortgagor submit a standard form draw request, copies of paid invoices for amounts requested, and, for items over $10,000.00, copies of lien waivers and releases from those providing materials or services for the work. The building improvements, marketing expenses, and principal and interest payments for which Blue Hills allegedly sought access to the reserves are not "replacement and repairs" required at the Property and Blue Hills did not and could not provide a draw request, copies of paid invoices, or lien waivers and releases for any amounts it sought.

Section 6(c) provides that the Leasing Escrow Funds may be used for "tenant improvement and leasing commission obligations" incurred by Blue Hills for new leases entered after the date of the Mortgage Agreement, subject to certain frequency and amount limits.

~BOST1:393835.v2

Section 6(c) requires that the Mortgagee submit a standard form draw request, copies of paid invoices for the amounts requested for tenant improvements and leasing commissions, the newly executed lease for which they were incurred, and lien waivers and releases from all parties furnishing materials or services in connection with the requested payments. The building improvements, marketing expenses, and principal and interest payments for which Blue Hills allegedly sought access to the reserves are not "tenant improvements and leasing commission obligations" incurred by Blue Hills for new leases. Blue Hills did not and could not provide a draw request, copies of paid invoices, any new lease, or lien waivers and releases for any amounts it sought.

Section 6(c) also provides that up to $1 million of the Leasing Escrow Funds may be applied toward "payment of principal and interest then due and payable on the Note," on satisfaction of the following conditions, among others: (1) Blue Hills must have delivered to the Mortgagee a written request for disbursement at least seven business days prior to the requested disbursement date; (2) no Event of Default under the mortgage shall have occurred and be continuing as of the date of the request for the disbursement and on the requested disbursement date; and (3) net operating income is insufficient to pay principal and interest due and payable on the Note.

By letter dated August 2, 2004, but not delivered on that date, Blue Hills requested use of the Leasing Escrow Fund to pay property taxes, principal and interest. This request was improper for the following reasons: 1) The Mortgage Agreement does not allow use of the Leasing Escrow Fund to pay taxes. 2) On information, Blue Hills' request was not delivered to Wells Fargo, the Mortgagee's servicer, until August 4, 2004, which is less than seven business days before August 11, 2004, the payment date for which the disbursements were required and

- 23 -

~BOST1:393835.v2

presumably requested. (Although Blue Hills' August request did not specify a requested disbursement date, the first possible date would have been August 13, 2004, which is seven business days after the request was delivered.) 3) There were numerous Events of Default outstanding and continuing as of the date of the request and/or the requested disbursement date, including the following:

a)   Blue Hills' settlement and dismissal of the Zoning Appeal and acceptance of the resulting payment (the "Payment") without the mortgagee's prior written consent constituted a breach of § 10 and an Event of Default under § 23(d) of the Mortgage Agreement that existed and continued from the time of the settlement.

b)   Blue Hills' failure to notify the mortgagee of its receipt of the Payment constituted a breach of Section 8 of the Cash Management Agreement and an Event of Default under § 23(l) of the Mortgage Agreement that existed and continued from the time of the settlement.

c)   Blue Hills' failure to deposit the Payment with the Clearing Bank within one Business Day of its receipt constituted a breach of Section 6(a)(iii) of the Cash Management Agreement and an Event of Default under § 23(l) of the Mortgage Agreement that existed and continued from at least the second business day following Blue Hills' receipt of the Payment.

d)   Blue Hills' failure to pay the property taxes due on August 2, 2004, or to deposit with the Mortgagee an amount sufficient to pay the taxes at least ten days prior to August 2, 2004, constituted a breach of § 6 of the Mortgage Agreement and an Event of Default under § 23(b) of the Mortgage Agreement that existed and continued on the date of the request and the requested disbursement date.

- 24 -

e)  Blue Hills' failure to make the monthly payments of principal and interest due on August 11, 2004, or to timely request an application of Leasing Escrow Funds to those payments, constituted an Event of Default under § 23(a) of the Mortgage Agreement that had occurred and was continuing as of the requested disbursement date.

f)  Blue Hills' failure to make the monthly Tax and Insurance Impound Fund payment, the monthly Replacement Escrow Fund payment, and the monthly Base Leasing Escrow Fund payment that was due on August 11, 2004, constituted an Event of Default under § 23(a) of the Mortgage Agreement that had occurred and was continuing as of the requested disbursement date.

By letter dated September 2, 2004, but not delivered on that date, Blue Hills requested use of the Leasing Escrow Fund to pay principal and interest. This request was improper for the following reasons: 1) On information, Blue Hills' request was not delivered to Wells Fargo, the Mortgagee's servicer, until September 3, 2004, which is less than seven business days before September 13, 2004, the payment date for which the disbursements were required and presumably requested. (Although Blue Hills' September request did not specify a requested disbursement date, the first possible date would have been September 14, 2004, which is seven business days after the request was delivered.) 2) There were numerous Events of Default outstanding and continuing as of the date of the request and/or the requested disbursement date, including all of those identified in the preceding paragraph as well as Blue Hills' failure to make the monthly principal, interest, tax, insurance, replacement and leasing payments due on September 13, 2004.

- 25 -

In accordance with Rule 33(d), Lender states that further information responsive to this Interrogatory may be ascertained from documents and business records Lender has produced or will produce in this action. Lender reserves the right to supplement this Answer as discovery proceeds.

After consulting with counsel, Mr. Polcari sent the September 17, 2004, letter that is attached as Exhibit L to the Complaint.

## INTERROGATORY NO. 13

Please state the basis of and identify in detail all facts and documents that support your contention that "the receipt of the Payment and dismissal of the Zoning Appeal constituted an assignment, transfer or conveyance of an interest in the Mortgaged Property, requiring Lender's prior written consent pursuant to section 10 of the Mortgage Agreement" as alleged in paragraph 31 of the Counterclaim filed by CSFB. In your answer, please identify all persons, other than counsel, who interpreted the loan documents and/or made the decision that the receipt of payment and dismissal of the Zoning Appeal required prior written consent in accordance with section 10 of the Mortgage Agreement. For each person identified, please include, without limitation, his or her full name, date or birth, social security number, residential address, job title or position, name of employer, business address, and relationship, if any to CSFB.

## RESPONSE NO. 13

Lender objects to this Interrogatory as vague and ambiguous because the meaning of "interpreted the loan documents and/or made the decision" is unclear. Subject to and without waiving the foregoing and the General Objections, Lender answers as follows:

Blue Hills brought the Zoning Appeal claiming that the proposed parking garage was immediately in the sight line of the Property, would partially block the view from the Property, and would be "detrimental and offensive" to Blue Hills and the inhabitants of the Property. Blue Hills further stated that the proposed parking structure posed a detriment to the Property. Blue Hills made its claims in a Complaint filed by Blue Hills Office Park LLC on June 9, 2003, against Blueview Corporate Center LLC and Paul R. Carroll, James F. Fitzgerald, Gregory

- 26 -

Pando, Charles J. Armando, and Robert Quigley, as they are members and associate members of the Zoning Board of Appeals of the Town of Canton, Massachusetts. Norfolk Superior Court, Civil Action No. 03-01051.

Blue Hills compromised its claims in the Zoning Appeal in exchange for the Payment. It agreed to waive all further rights of appeal of the special permit for the garage. The settlement is reflected by the Stipulation of Dismissal with prejudice and waiving all rights of appeal, filed September 5, 2003 in Norfolk Superior Court Civil Action No. 03-01051.

Granting Clause Seven of the Mortgage Agreement and the UCC Financing Statements define the "Mortgaged Property" to include "claims...and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon...."

It is a breach of § 10 of the Mortgage Agreement for Blue Hills to sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer any portion of the Mortgaged Property without the prior written consent of the mortgagee.

## INTERROGATORY NO. 14

**Please state the basis of and identify in detail all facts and documents that support your contentions that Blue Hills breached the Mortgage Agreement and Cash Management Agreement as alleged in Counts I and II of the Counterclaim filed by CSFB. In your answer, please identify each and every alleged breach and all language in the Mortgage Agreement and Cash Management Agreement that supports your contention.**

## RESPONSE NO. 14

Lender objects to this Interrogatory because it contains two discrete subparts (i.e., it is addressed to two counts of the Counterclaim) and thus constitutes two interrogatories under Rule 33(a). Lender objects to this Interrogatory because it is vague and ambiguous in that it does not

- 27 -

specify the contentions to which it is addressed. Subject to and without waiving the foregoing and the General Objections, Lender answers as follows:

Blue Hills compromised its Zoning Appeal in exchange for the Payment without the prior written consent of the mortgagee.

Blue Hills did not notify the mortgagee of its receipt of the Payment.

Blue Hills did not deposit the Payment into the Clearing Bank within one business day of receiving it.

Granting Clause Seven of the Mortgage Agreement and the UCC Financing Statements define the "Mortgaged Property" to include "claims...and causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon...."

It is a breach of § 10 of the Mortgage Agreement for Blue Hills to sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer any portion of the Mortgaged Property without the prior written consent of the mortgagee. It is an Event of Default under § 23(d) of the Mortgage Agreement for Blue Hills to transfer or encumber any portion of the Mortgaged Property without mortgagee's prior written consent, other than in accordance with § 10 of the Mortgage Agreement.

The Cash Management Agreement, by cross-reference to the Mortgage, defines "Rents" as "all rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties..., income, receivables, receipts, revenues, deposits ..., accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Mortgagor or its agents or employees from any and all

sources arising from or attributable to the Premises and the Improvements." Mortgage Granting Clause Four.

The Cash Management Agreement (§ 8) requires that Blue Hills notify the Mortgagee, at the time of receipt, of any Rents received in conjunction with "any extraordinary event pursuant to which Borrower receives payments or income (in whatever form) derived from or generated by the use, ownership or operation of the Premises."

The Cash Management Agreement (§ 6(a)(iii) ) requires Blue Hills to deposit with the Clearing Bank (as defined in the Cash Management Agreement) the payment received in connection with the settlement of the Zoning Appeal.

## INTERROGATORY NO. 15

**Please state the basis of and identify in detail all facts and documents that support your contentions that Blue Hills breached the implied covenant of good faith and fair dealing as alleged in Count III, is liable for intentional misrepresentations as alleged in Count IV, and violated M.G.L. c. 93A as alleged in Count VI of the Counterclaim filed by CSFB. In your answer, please identify each and every alleged misrepresentation or violation and the language in any document upon which you rely in support of your contentions.**

## RESPONSE NO. 15

Lender objects to this Interrogatory because it contains three discrete subparts (i.e., it is addressed to two counts of the Counterclaim) and thus constitutes two interrogatories under Rule 33(a). Lender objects to this Interrogatory because it is vague and ambiguous in that it does not specify the contentions to which it is addressed. Subject to and without waiving the foregoing and the General Objections, Lender answers as follows:

Blue Hills intentionally failed to notify its mortgagee of the Zoning Appeal, its compromise of that appeal, and its receipt of the settlement payment. Blue Hills intentionally

~BOST1:393835.v2

failed to obtain its mortgagee's prior written consent to the compromise of the Zoning appeal. Blue Hills intentionally failed to deposit the settlement payment into the Clearing Account.

The mortgagee reasonably and justifiably relied on Blue Hills' material omissions to act.

The loan documents provide Lender with numerous rights and remedies upon breach or default by Blue Hills, including without limitation the following:

Under § 4 of the Note, the Debt shall without notice become immediately due and payable at the option of Payee (Lender) upon the happening of any Event of Default (as defined in the Mortgage).

Under § 5 of the Note, upon the occurrence of an Event of Default, Payee shall be entitled to receive and Maker shall pay interest on the entire unpaid principal sum and any other amounts due at the Default Rate.

Under § 6 of the Note, upon the occurrence of an Event of Default, Maker (borrower) shall pay to Payee on the eleventh day of each month while such Event of Default continues, an aggregate amount equal to the Excess Cash Flow for the prior month, such Excess Cash Flow to be applied by Payee to the payment of the Debt in such order as Payee shall determine in its sole discretion, including, without limitation, alternating applications thereof between interest and principal. Interest at the Default Rate and Excess Cash Flow shall both be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt. Interest at the Default Rate shall be added to the Debt and shall be secured by the Mortgage.

Under § 6(e) of the Cash Management Agreement, upon an Event of Default, amounts allocated to the Operating Expense Sub-account with respect to the payment of Operating Expenses or Capital Expenditures shall be used only for payment of checks made by the Borrower for the payment of expenses incurred in the ordinary course of business of the

- 30 -

~BOST1:393835.v2

ownership and operation of the Property or for the payment of expenditures approved by the Lender or otherwise permitted hereunder or under the Loan Documents.

Under § 7(a) of the Cash Management Agreement, if an Event of Default under the Mortgage has occurred and is continuing, the Lender may make demand on the Deposit Bank to pay over to the Lender all amounts deposited in any account maintained under the Cash Management Agreement.

Under § 7(b) of the Cash Management Agreement, upon the occurrence and during the continuance of an Event of Default, Borrower will have no further right to request or otherwise require Lender to disburse funds from the Clearing Account, the Cash Collateral Account or the Tax and Insurance Escrow Account.  Lender may direct the Deposit Bank, inter alia, to disburse all or any portion of the funds held by the Deposit Bank or Clearing Bank to Lender, which then may apply the funds held in the Cash Collateral Account, the Tax and Insurance Escrow Account or other Collateral to the Obligations in any order and in such manner as Lender may determine in its sole discretion.

Under § 7(c ) of the Cash Management Agreement, upon the occurrence and during the continuance of any Event of Default, Lender may collect, appropriate, redeem, realize upon or otherwise enforce its rights with respect to the Collateral, without notice to Borrower and without the need to institute any legal action, make demand, exhaust any other remedies or otherwise proceed to enforce its rights.

Under Section 6(c)(ix) of the Mortgage Agreement, Lender may not disburse funds from the Leasing Escrow Funds if an Event of Default under the Mortgage Agreement has occurred or is continuing.

~BOST1:393835.v2

Under § 10(c) of the Mortgage Agreement, Mortgagee may declare the Debt immediately due and payable upon Mortgagor's sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Mortgaged Property without Mortgagee's consent.

Under § 23 of the Mortgage Agreement, the Debt shall become immediately due and payable at the option of Mortgagee upon the happening of an Event of Default.

Under § 26 of the Mortgage Agreement, upon the occurrence of an Event of Default, the Mortgagee may, among other things, (i) declare the entire Debt to be immediately due and payable; (ii) institute a foreclosure, (iii) institute proceedings for a partial foreclosure, (iv) sell the Mortgaged Property, (v) institute an action for specific performance of any covenant, condition, or agreement contained in the Loan Documents, (vi) recover judgment on the Note either before, during or after any proceedings for the enforcement of the Mortgage, (vii) apply for the appointment of a trustee, receiver, liquidator or conservator of the Mortgaged Property, (viii) enter into and take control of the Mortgaged Property, (ix) require Mortgagor to pay monthly rent (fair and reasonable rental value) for the use and occupation of any portion of the Mortgaged Property occupied by Mortgagor and require Mortgagor to vacate, and/or (x) pursue rights and remedies under the Uniform Commercial Code.

Lender reserves the right to supplement this Answer.

~BOST1:393835.v2

EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

Plaintiff, Defendant-in-Counterclaim.

v.

CREDIT SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORP.,

Defendant,

and

CSFB 1999 – C1 ROYALL STREET, LLC;

Defendant, Plaintiff-in-Counterclaim,

v.

WILLIAM LANGELIER and GERALD
FINEBERG,

Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## CSFB 1999 – C1 ROYALL STREET, LLC'S ANSWERS TO GERALD FINEBERG AND WILLIAM LANGELIER'S FIRST SET OF INTERROGATORIES

Defendant CSFB 1999 – C1 Royall Street, LLC  ("Lender") hereby answers Gerald Fineberg and William Langelier's First Set of Interrogatories to CSFB 1999-C1 Royall Street, LLC (the "Interrogatories"), as follows:

Under § 1.5 of the Guaranty, Fineberg and Langelier are required to pay any amount due on the Guaranteed Obligations (as defined therein) immediately upon demand. Lender demanded payment by letter dated April 20, 2005, from Mr. Tucker, on behalf of CSFB 1999 – C1 Royall Street, LLC, to Langelier and Fineberg, who have not made any payments under the Guaranty.

Lender reserves the right to supplement this Answer as discovery proceeds.

## INTERROGATORY NO. 11

Please state the basis of and identify in detail all facts and documents that support your contentions that Fineberg and Langelier violated M.G.L. c. 93A as alleged in Count VI of the Counterclaim filed by CSFB.

## RESPONSE NO. 11

Subject to and without waiving the General Objections, Lender answers as follows:

Blue Hills and Fineberg failed to notify the mortgagee of the Zoning Appeal, its compromise of that appeal, or its receipt of the settlement payment. Blue Hills intentionally failed to obtain its mortgagee's prior written consent to the compromise of the Zoning Appeal. Blue Hills intentionally failed to deposit the Payment into the Clearing Account.

Lender reserves the right to supplement this Answer as discovery proceeds.

## INTERROGATORY NO. 12

Please state the basis of and identify in detail all facts and documents that support your claim for damages in the amount of $10,770,847.00 plus $1,134,250.90 in interest as set forth in your Initial Disclosures.

## RESPONSE NO. 12

Subject to and without waiving the General Objections, Lender answers as follows:

~BOST1:393840.v2

As of November 11, 2004, the total debt owed by Blue Hills to Lender was $33,343,438.59, with a principal balance of $31,979,793.66. Interest on that principal balance from November 11, 2004, through the foreclosure on November 19 at the Mortgage Note default rate of 13.49 per cent is $95,868.31. The amount of the foreclosure bid ($18,500,000) and the reserves held by the Lender as of the foreclosure ($4,168,460.18) are credited against the total debt as of the time of the foreclosure. Interest at the default rate on the remaining debt ($10,770,846.72) from the foreclosure through August 31, 2005 (the date of the Initial Disclosures) is $1,150,281.55. (Lender states that the computation of damages included in the Initial Disclosure is erroneous because the amount of post-foreclosure interest stated in that document (and in the Interrogatory) was calculated on the basis of 365-day year instead of a 360-day year, as called for by the Mortgage Note.)

In accordance with Rule 33(d), Lender states that further information responsive to this Interrogatory may be ascertained from documents and business records Lender has produced or will produce in this action, including in particular a loan payoff statement calculated as of November 11, 2004. (Bates No. LNR03485.)

## INTERROGATORY NO. 13

Please identify all acts undertaken by CS Bank, CSFB, Wells Fargo or Lennar to sell, lease or market the Property to prospective buyers or tenants, both before and after the foreclosure sale. In your answer, please identify all documents supporting such efforts, including but not limited to, brokerage agreements, marketing brochures, inspections, appraisals, offers to purchase, purchase and sale agreements, and all other documents related to CSFB's marketing of, sale or lease of the Property.

## RESPONSE NO. 13

Lender objects to this Interrogatory to the extent it calls for identification of acts undertaken by those outside of its control or for documents outside of Lender's custody, possession or control. Lender further objects to this Interrogatory because it is overly broad and

~BOST1:393840.v2

EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1.,

      Defendant, Plaintiff-in-Counterclaim

      and

CSFB 1999 – C1 ROYALL STREET, LLC;

      Defendant, Plaintiff-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

**J.P. MORGAN CHASE BANK'S RESPONSE TO BLUE HILLS OFFICE PARK, LLC,
GERALD FINEBERG, AND WILLIAM LANGELIER'S
FIRST SET OF REQUESTS FOR ADMISSION**

Pursuant to Rule 36 of the Federal Rules of Civil Procedure and Local Rule 36.1,

defendant and plaintiff-in-Counterclaim J.P. Morgan Chase Bank, as Trustee for the Registered

Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-

Through Certificates, Series 1999-Cl ("J.P. Morgan"), responds to the Requests for Admission

(the "Requests") of Blue Hills Office Park LLC ("Blue Hills"), William Langelier and Gerald

Fineberg as follows:

~BOST1:409169.v7

## GENERAL OBJECTIONS

The General Objections, set forth below, apply to statements made and definitions and instructions contained in the Requests. They are incorporated into the following responses and shall be deemed continuing as to each Request, and are not waived, or in any way limited, by the specific response.

A.     J.P. Morgan objects to the Requests to the extent that they attempt to impose obligations on J.P. Morgan other than or beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Massachusetts and/or any applicable Order of the Court.

B.     J.P. Morgan objects to the Requests to the extent that they exceed the number of Requests for Admission allowed by Rule 26.1 of the Local Rules of the United States District Court for the District of Massachusetts and/or any applicable Order of the Court.

## REQUESTS

### REQUEST NO. 1

J.P. Morgan was assigned all of Credit Suisse First Boston Mortgage Capital LLC's rights, title, interest and obligations in the Loan by Assignment recorded in the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, Page 387.

### RESPONSE:

Admitted.

### REQUEST NO. 2

CSFB was assigned all of J.P. Morgan's rights, title, interest and obligations in the Loan on or about November 8, 2004 by Assignment recorded in the Norfolk County Registry of Deeds on November 10, 2004 in Book 21755, Page 477.

### RESPONSE:

Admitted.

2

~BOST1:409169.v7

**REQUEST NO. 3**

On or about November 19, 1999, Wells Fargo became the servicer of the Loan and was an agent of the Lender.

**RESPONSE:**

J.P. Morgan objects to this Request as vague and ambiguous. J.P. Morgan further objects to this Request on the ground it calls for a legal conclusion. Subject to and without waiving these or the General Objections, J.P. Morgan admits that, on or about November 19, 1999, Wells Fargo became the servicer of the Loan. J.P. Morgan further admits that, as servicer, Wells Fargo was the agent of the then-lender for the purposes set forth in a servicing agreement. Other than as expressly admitted and qualified herein, J.P. Morgan denies Request No. 3.

**REQUEST NO. 4**

Lennar was the Special Servicer for the Loan and was an agent of the Lender.

**RESPONSE:**

J.P. Morgan objects to this Request as vague and ambiguous. CSFB further objects to this Request on the ground it calls for a legal conclusion. Subject to and without waiving these or the General Objections, J.P. Morgan admits that Lennar was the special servicer for the Loan after about November 19, 1999, and that, as the special servicer, Lennar was the agent of the then-lender for the purposes set forth in a servicing agreement. Other than as expressly admitted and qualified herein, J.P. Morgan denies Request No. 4.

**REQUEST NO. 5**

Servicing of the Loan was transferred to Lennar as of August 17, 2004.

**RESPONSE:**

Denied.

3

**REQUEST NO. 10**

The document attached hereto as Exhibit "D" is a true and accurate copy of the Mortgage Agreement.

**RESPONSE:**

Admitted.

**REQUEST NO. 11**

The document attached hereto as Exhibit "E" is a true and accurate copy of the Cash Management Agreement.

**RESPONSE:**

J.P. Morgan admits that the document attached to the Requests as Exhibit "E" is a true and accurate copy of the Cash Management Agreement, except for the handwritten markings which appear on page 12 of Exhibit "E" but which do not appear on the Cash Management Agreement.

**REQUEST NO. 12**

The document attached hereto as Exhibit "F" is a true and accurate copy of the Guaranty.

**RESPONSE:**

Admitted.

**REQUEST NO. 13**

The document attached hereto as Exhibit "G" is a true and accurate copy of the August 2, 2004 letter received by Wells Fargo.

**RESPONSE:**

J.P. Morgan admits that the document attached to the Requests as Exhibit "G" is a true and accurate copy of a letter from Blue Hills to Wells Fargo marked with the date August 2, 2004. J.P. Morgan further admits that the document attached to the Requests as Exhibit "G" was eventually received by Wells Fargo. To the extent that this Request suggests that Exhibit "G"

~BOST1:409169.v7

**RESPONSE:**

J.P. Morgan objects to this Request as vague and ambiguous. J.P. Morgan further objects to this Request to the extent it seeks admission on a conclusion of law. Subject to and without waiving these or the General Objections, J.P. Morgan admits that it made the statements contained in the letter attached to the Requests as Exhibit "I." Other than as expressly admitted and qualified herein, J.P. Morgan denies Request No. 19.

**REQUEST NO. 20**

Prior to Lennar's letter dated September 17, 2004, Lender never sent Blue Hills any written notice that an Event of Default, as defined in the loan documents, had occurred.

**RESPONSE:**

Admitted.

**REQUEST NO. 21**

Blue Hills had no obligation under the loan documents to deposit funds for the payment of real estate taxes as of August 1, 2004.

**RESPONSE:**

J.P. Morgan objects to this Request as vague and ambiguous. J.P. Morgan further objects to this Request to the extent it seeks admission on a conclusion of law. Subject to and without waiving these or the General Objections, J.P. Morgan denies Request No. 21.

**REQUEST NO. 22**

Blue Hills had no obligation under the loan documents to deposit funds for the payment of real estate taxes until August 11, 2004.

**RESPONSE:**

J.P. Morgan objects to this Request as vague and ambiguous. J.P. Morgan further objects to this Request to the extent it seeks admission on a conclusion of law. Subject to and without waiving these or the General Objections, J.P. Morgan denies Request No. 22.

~BOST1:409169.v7

**REQUEST NO. 27**

The document attached hereto as Exhibit "J" is a true and accurate copy of the letter dated April 20, 2005 from Lender.

**RESPONSE:**

J.P. Morgan objects to this Request as vague and ambiguous. Subject to and without waiving these or the General Objections, J.P. Morgan admits that the document attached to the Requests as Exhibit "J" is a true and accurate copy of a letter dated April 20, 2005 from CSFB to Gerald Fineberg and William Langelier. Other than as expressly admitted and qualified herein, J.P. Morgan denies Request No. 27.

**REQUEST NO. 28**

Prior to its April 20, 2005 letter, Lender never sent Fineberg or Langelier any written notice of any liability, actual or potential, pursuant to the Guaranty.

**RESPONSE:**

Denied.

**REQUEST NO. 29**

The liability of Fineberg and Langelier under the Guaranty is limited.

**RESPONSE:**

J.P. Morgan objects to this Request as it is vague and ambiguous and seeks admission of a legal conclusion. Subject to and without waiving these or the General Objections, J.P. Morgan admits that the terms of the Guaranty speak for themselves. Other than as expressly admitted and qualified herein, J.P. Morgan denies Request No. 29.

**REQUEST NO. 30**

Section 10 of the Mortgage Agreement was intended to prevent transfers of Mortgaged Property to third parties without the Lender's consent.

10

~BOST1:409169.v7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1.,

      Defendant, Plaintiff-in-Counterclaim

      and

CSFB 1999 – C1 ROYALL STREET, LLC;

      Defendant, Plaintiff-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## CSFB 1999 – C1 ROYALL STREET, LLC'S RESPONSE TO BLUE HILLS OFFICE PARK, LLC, GERALD FINEBERG, AND WILLIAM LANGELIER'S FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Rule 36 of the Federal Rules of Civil Procedure and Local Rule 36.1,

defendant and plaintiff-in-Counterclaim CSFB 1999 – C1 Royall Street, LLC ("CSFB")

responds to the Requests for Admission (the "Requests") of Blue Hills Office Park LLC ("Blue

Hills"), William Langelier and Gerald Fineberg as follows:

## GENERAL OBJECTIONS

The General Objections, set forth below, apply to statements made and definitions and instructions contained in the Requests. They are incorporated into the following responses and shall be deemed continuing as to each Request, and are not waived, or in any way limited, by the specific response.

A.    CSFB objects to the Requests to the extent that they attempt to impose obligations on CSFB other than or beyond those imposed or authorized by the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the District of Massachusetts and/or any applicable Order of the Court.

B.    CSFB objects to the Requests to the extent that they exceed the number of Requests for Admission allowed by Rule 26.1 of the Local Rules of the United States District Court for the District of Massachusetts and/or any applicable Order of the Court.

## REQUESTS

### REQUEST NO. 1

J.P. Morgan was assigned all of Credit Suisse First Boston Mortgage Capital LLC's rights, title, interest and obligations in the Loan by Assignment recorded in the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, Page 387.

### RESPONSE:

Admitted.

### REQUEST NO. 2

CSFB was assigned all of J.P. Morgan's rights, title, interest and obligations in the Loan on or about November 8, 2004 by Assignment recorded in the Norfolk County Registry of Deeds on November 10, 2004 in Book 21755, Page 477.

### RESPONSE:

Admitted.

2

**REQUEST NO. 3**

On or about November 19, 1999, Wells Fargo became the servicer of the Loan and was an agent of the Lender.

**RESPONSE:**

CSFB objects to this Request as vague and ambiguous. CSFB further objects to this Request on the ground it calls for a legal conclusion. Subject to and without waiving these or the General Objections, CSFB admits that, on or about November 19, 1999, Wells Fargo became the servicer of the Loan. CSFB further admits that, as servicer, Wells Fargo was the agent of the then-lender for the purposes set forth in a servicing agreement. Other than as expressly admitted and qualified herein, CSFB denies Request No. 3.

**REQUEST NO. 4**

Lennar was the Special Servicer for the Loan and was an agent of the Lender.

**RESPONSE:**

CSFB objects to this Request as vague and ambiguous. CSFB further objects to this Request on the ground it calls for a legal conclusion. Subject to and without waiving these or the General Objections, CSFB admits that Lennar was the special servicer for the Loan after about November 19, 1999, and that, as the special servicer, Lennar was the agent of the then-lender for the purposes set forth in a servicing agreement. Other than as expressly admitted and qualified herein, CSFB denies Request No. 4.

**REQUEST NO. 5**

Servicing of the Loan was transferred to Lennar as of August 17, 2004.

**RESPONSE:**

Denied.

~BOST1:409595.v2

**REQUEST NO. 10**

The document attached hereto as Exhibit "D" is a true and accurate copy of the Mortgage Agreement.

**RESPONSE:**

Admitted.

**REQUEST NO. 11**

The document attached hereto as Exhibit "E" is a true and accurate copy of the Cash Management Agreement.

**RESPONSE:**

CSFB admits that the document attached to the Requests as Exhibit "E" is a true and accurate copy of the Cash Management Agreement, except for the handwritten markings which appear on page 12 of Exhibit "E" but which do not appear on the Cash Management Agreement.

**REQUEST NO. 12**

The document attached hereto as Exhibit "F" is a true and accurate copy of the Guaranty.

**RESPONSE:**

Admitted.

**REQUEST NO. 13**

The document attached hereto as Exhibit "G" is a true and accurate copy of the August 2, 2004 letter received by Wells Fargo.

**RESPONSE:**

CSFB admits that the document attached to the Requests as Exhibit "G" is a true and accurate copy of a letter from Blue Hills to Wells Fargo marked with the date August 2, 2004. CSFB further admits that the document attached to the Requests as Exhibit "G" was eventually received by Wells Fargo. To the extent that this Request suggests that Exhibit "G" was received by Wells Fargo on August 2, 2004, CSFB denies this Request. Other than as expressly admitted and qualified herein, CSFB denies Request No. 13.

5

these or the General Objections, CSFB admits that it made the statements contained in the letter

attached to the Requests as Exhibit "I." Other than as expressly admitted and qualified herein,

CSFB denies Request No. 19.

## REQUEST NO. 20

Prior to Lennar's letter dated September 17, 2004, Lender never sent Blue Hills any written notice that an Event of Default, as defined in the loan documents, had occurred.

## RESPONSE:

Admitted.

## REQUEST NO. 21

Blue Hills had no obligation under the loan documents to deposit funds for the payment of real estate taxes as of August 1, 2004.

## RESPONSE:

CSFB objects to this Request as vague and ambiguous. CSFB further objects to this

Request to the extent it seeks admission on a conclusion of law. Subject to and without waiving

these or the General Objections, CSFB denies Request No. 21.

## REQUEST NO. 22

Blue Hills had no obligation under the loan documents to deposit funds for the payment of real estate taxes until August 11, 2004.

## RESPONSE:

CSFB objects to this Request as vague and ambiguous. CSFB further objects to this

Request to the extent it seeks admission on a conclusion of law. Subject to and without waiving

these or the General Objections, CSFB denies Request No. 22.

## REQUEST NO. 23

Lender improperly declared that an Event of Default had occurred as of August 1, 2004 when Blue Hills did not deposit funds for the payment of real estate taxes as of that date.

8

**RESPONSE:**

CSFB objects to this Request as vague and ambiguous. CSFB further objects to this Request to the extent it seeks admission on a conclusion of law. Subject to and without waiving these or the General Objections, CSFB denies Request No. 23.

**REQUEST NO. 24**

No Event of Default, as defined in the loan documents, had occurred prior to August 2003.

**RESPONSE:**

CSFB objects to this Request as vague and ambiguous. CSFB further objects to this Request to the extent it seeks admission on a conclusion of law. CSFB further objects to this Request because it is premature as discovery has not yet been completed.

**REQUEST NO. 25**

Blue Hills requested in-person meeting with the Lender.

**RESPONSE:**

CSFB objects to this Request as vague and ambiguous. Subject to and without waiving this or the General Objections, CSFB admits Request No. 25.

**REQUEST NO. 26**

Lender refused Blue Hills' request for an in-person meeting and no in-person meeting ever occurred.

**RESPONSE:**

CSFB objects to this Request as vague and ambiguous. Subject to and without waiving this or the General Objections, CSFB denies Request No. 26.

**REQUEST NO. 27**

The document attached hereto as Exhibit "J" is a true and accurate copy of the letter dated April 20, 2005 from Lender.

9

**RESPONSE:**

CSFB objects to this Request as vague and ambiguous.  Subject to and without waiving

these or the General Objections, CSFB admits that the document attached to the Requests as

Exhibit "J" is a true and accurate copy of a letter dated April 20, 2005 from CSFB to Gerald

Fineberg and William Langelier.  Other than as expressly admitted and qualified herein, CSFB

denies Request No. 27.

**REQUEST NO. 28**

Prior to its April 20, 2005 letter, Lender never sent Fineberg or Langelier any written
notice of any liability, actual or potential, pursuant to the Guaranty.

**RESPONSE:**

Denied.

**REQUEST NO. 29**

The liability of Fineberg and Langelier under the Guaranty is limited.

**RESPONSE:**

CSFB objects to this Request as it is vague and ambiguous and seeks admission of a legal

conclusion.  Subject to and without waiving these or the General Objections, CSFB admits that

the terms of the Guaranty speak for themselves.  Other than as expressly admitted and qualified

herein, CSFB denies Request No. 29.

**REQUEST NO. 30**

Section 10 of the Mortgage Agreement was intended to prevent transfers of Mortgaged
Property to third parties without the Lender's consent.

**RESPONSE:**

CSFB objects to this Request as it is vague and ambiguous and calls for admission of the

state of mind of parties other than CSFB.  Subject to and without waiving these or the General

EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>      Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as<br>Trustee for the Registered Holders of<br>Credit Suisse First Boston Mortgage<br>Securities Corp., Commercial Mortgage<br>Pass-Through Certificates, Series 1999-C1,<br>      Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET,<br>LLC,<br>      Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>      Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

### BLUE HILLS OFFICE PARK LLC'S SECOND SUPPLEMENTATION TO ITS ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Blue Hills Office Park LLC ("Blue Hills") hereby supplements its answers to

Interrogatories 2, 7 and 11 of the First Set of Interrogatories propounded by the Defendants.

### GENERAL OBJECTIONS

Blue Hills objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure. Blue Hills also objects to each interrogatory to

the extent that each interrogatory is vague, overly broad, unduly burdensome, seeks information

that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence,

seeks information that is not in Blue Hills's possession, custody or control, seeks information

Fineberg Management Company, although he does not recall specific communications

responsive to Interrogatory No. 2.

**INTERROGATORY NO. 7**

State the basis for the allegation, in paragraph 38 of Blue Hills' First Amended
Complaint, that "[t]his information [that Equiserve notified Blue Hills that it would not be
exercising its option to renew the Equiserve lease] was communicated to either or both of the
defendants, through their agents, Wells Fargo."

**ANSWER NO. 7**

Equiserve notified Blue Hills of its intent not to exercise its option to extend its lease in

or about May 2003. Equiserve and Blue Hills then entered into a Lease Termination Agreement

dated as of August 5, 2003. Shortly thereafter, Joseph Donovan called Wells Fargo on the

telephone regarding, *inter alia*, Equiserve's notification to Blue Hills that it would not be

renewing its lease which would expire July 31, 2004. The date of this communication cannot be

recalled by Mr. Donovan, although he recalls speaking with Wells Fargo representatives in 2003

regarding the replacement of Equiserve as a tenant at the Property. In addition and without

limitation to the foregoing, and Blue Hills' answers to Defendants' Second Set of Interrogatories,

Blue Hills states that documents adduced on discovery thus far have confirmed that the

Defendants knew as early as the summer and fall of 2003 that Equiserve would not be renewing

its lease and also confirmed that they received information to that effect from Blue Hills

representatives.

**INTERROGATORY NO. 11**

State the amount of the Payment and describe the disposition of the Payment, and in your
answer:

        a)       identify each and every document which forms any part of the source of your
                  information regarding the amount of the Payment or the disposition of the
                  Payment;

# EXHIBIT 9

Gilbert W. Stone
Volume 1 - February 9, 2006

Exhibits:  1 - 12          Volume 1, Pages 1 - 167

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

                Defendant

(Complete caption on next page.)

----------------------------

30(b)(6)  DEPOSITION OF BLUE HILLS OFFICE PARK LLC

            BY GILBERT W. STONE

        Thursday, February 9, 2006, 10:05 a.m.

        DLA Piper Rudnick Gray Cary US LLP

        One International Place, 21st Floor

            Boston, Massachusetts

 ------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

            Farmer Arsenault Brock LLC

        50 Congress Street, Suite 415

        Boston, Massachusetts 02109

        617.728.4404  fax 617.728.4403

bb347439-5e5b-4e1b-8eb2-5a18c9c654d3

Gilbert W. Stone
Volume 1 - February 9, 2006

Page 46

```
1    escrow at the banks.  The invoices, the tax billings

2    are sent to the lender to pay.  There are some that

3    we pay in the building that don't have escrows.

4              (Discussion off the record.)

5       Q.  How are the tax payments handled for Blue

6    Hills Office Park LLC?

7              MR. McGLYNN:  At any time?

8       A.  He asked you a question.

9       Q.  He can do what he wants.

10             MR. McGLYNN:  Objection to the form.

11   Just trying to be helpful.

12      A.  We bill EquiServe, the tenant in Canton,

13   for most of the tax bill.  It is like 97, 98 percent

14   of the tax bill.  They send it to the lockbox.  The

15   lockbox transfers it to Wells Fargo.  And then they

16   pay the Town of Canton.

17      Q.  Was that how it was done throughout the

18   life of the loan?

19      A.  Yes.

20      Q.  So to go to Mr. McGlynn's objection, it

21   didn't change at any point?

22      A.  Not that I'm aware of.

23      Q.  Did you have anything to do with the

24   borrowing of the loan that Wells Fargo administered?
```

Gilbert W. Stone
Volume 1 - February 9, 2006

Page 56

1    went?

2        A.    Yes.

3        Q.    Then what happened?  What's the next step?

4        A.    I checked the lockbox to see that the money

5    had been received.  When it was, I made sure it

6    goes.

7        Q.    Where do the communications from and to

8    Wells Fargo fit into this?

9        A.    Generally, they didn't have the money yet

10   to make the payment.  So they would send out that

11   memo and say, hey, we don't have any reserve.  But

12   we would already be in motion to make sure that the

13   money was there.

14       Q.    So the typical sequence was Larry's memo

15   would go out to EquiServe.  Before the money came in

16   from EquiServe, there would be a shortage

17   notification from Wells Fargo, correct?

18       A.    The notification from Wells Fargo came in

19   after Larry had sent his memo.

20       Q.    I think that's what I said.  Maybe I

21   misspoke.

22       A.    Okay.

23       Q.    First Larry sends his memo to EquiServe,

24   right?

Gilbert W. Stone
Volume 1 - February 9, 2006

Page 94

1    Q.  When did EquiServe actually leave?

2    A.  The notice was July 31, 2004.  I believe

3    they stayed a half month.

4    Q.  When you say the notice was July 31, 2004,

5    do you mean that the notice said they would be

6    leaving on that day?

7    A.  Yes.

8    Q.  The notice was obviously in advance of that

9    day, correct?

10   A.  Yes.

11   Q.  There was a tax payment due on -- strike

12   that.  There was a tax payment due at the beginning

13   of August 2004, correct?

14   A.  Yes.

15   Q.  As that date approached, did you have any

16   discussion with anybody internally at Blue Hills or

17   Fineberg Management about how the real estate tax

18   payment due in August 2004 would be funded?

19   A.  There must have been.  I don't know an

20   exact conversation, but yes.

21   Q.  What's your general memory of that

22   conversation or conversations?

23          MR. McGLYNN:  Again, I don't want you to

24   speculate.  If you recall, fine.  If you don't

bb347439-5e5b-4e1b-8eb2-5a18c9c654d3

Gilbert W. Stone
Volume 1 - February 9, 2006

Page 95

1    recall, there's no crime in telling people that too.

2        A.    I don't know the exact conversation.

3        Q.    You have some memory.  I'm entitled to it.

4    What's your memory, however vague, of what the

5    conversation was?

6        A.    The money was not there and it wasn't going

7    to be paid.

8        Q.    Do you recall who that discussion was with?

9        A.    Joe Donovan.

10       Q.    Do you recall any other content of that

11   discussion?

12       A.    No.

13       Q.    As the date of the August tax payment

14   approached, did you have any discussion with anybody

15   at Wells Fargo about that tax payment?

16       A.    Not that I remember.

17       Q.    Did Wells Fargo send an escrow account

18   shortage notice in July 2004 as they usually did the

19   month before payment was due?

20       A.    To the best of my knowledge, they did.

21       Q.    Did you respond to that notice?

22       A.    Not that I'm aware of.

23       Q.    Do you typically keep notes of

24   conversations?

bb347439-5e5b-4e1b-8eb2-5a18c9c654d3

# EXHIBIT 10

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

Exhibits:  1-32          Volume 1, Pages 1-273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

         Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

              Defendant

(Complete caption on next page)

----------------------------

CONFIDENTIAL 30(b)(6) DEPOSITION OF BLUE HILLS

OFFICE PARK LLC by JOSEPH A. DONOVAN

Tuesday, February 14, 2006, 9:32 a.m.

DLA Piper Rudnick Gray Cary US LLP

One International Place, 21st Floor

Boston, Massachusetts


------- Reporter:  Joan M. Cassidy, RPR, CRR -------

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

258f568a-e5cf-4014-a6e3-a6c8384762b2

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

Page 26

1   at Inn America were now at Fine Hotels, including
2   the human resource director, Dennis Hatch.
3       Q. Anybody else?
4       A. Yes. There was probably a half a dozen
5   people.
6       Q. Can you name them, please.
7       A. Pete Phillips, Mike Attenborough, Carol
8   Falvey, Mary Doyle.
9       Q. Anybody else?
10      A. Off the top of my head, that's all I can
11  think of.
12      Q. What did you do as controller of Fine
13  Hotels Corp.?
14      A. I was in charge of the day-to-day
15  accounting for the hotels.
16      Q. How many hotels did Fine Hotels Corp. own
17  at that point?
18      A. I'm guessing about eight or eleven hotels.
19      Q. Did you have people reporting to you when
20  you were controller of Fine Hotels Corp.?
21      A. Yes, the controllers for each property
22  would report to me.
23      Q. How long did you have that job?
24      A. For about three years.

Page 27

1       Q. Through 1995?
2       A. That's approximately right.
3       Q. Then what happened?
4       A. I became CFO of both Fine Hotels and
5   Fineberg Management.
6       Q. And what's the relationship between Fine
7   Hotels and Fineberg Management?
8       A. They're both owned by Jerry Fineberg.
9       Q. What does Fineberg Management do?
10      A. Fineberg Management manages real estate
11  properties.
12      Q. Owned by whom?
13      A. Owned by Jerry Fineberg.
14      Q. What types of properties?
15      A. Residential apartment buildings, office
16  buildings, and retail space.
17      Q. Have you been CFO of Fine Hotels and
18  Fineberg Management since 1995?
19      A. Approximately, yes.
20      Q. Have you picked up any additional titles
21  along the way?
22      A. No.
23      Q. Are your duties and responsibilities in
24  that position the same today as they were when you

Page 28

1   started?
2       A. I also do most of the development as far as
3   looking for hotels.
4       Q. When did you start doing that?
5       A. Probably about 1998.
6       Q. Do you do anything else?
7       A. No.
8       Q. Can you describe what you do as the CFO,
9   that is, what duties and responsibilities that
10  position entails?
11      A. I'm responsible for the day-to-day
12  accounting for the different entities. I'm
13  responsible for looking at and evaluating
14  prospective hotel deals. I look at and evaluate in
15  conjunction with Larry Needle and Dan Frank any kind
16  of residential, retail or office building deals.
17      Q. Do you have any other duties and
18  responsibilities?
19      A. No, that pretty much encompasses it.
20      Q. During the period 1999 through 2004, did
21  you have the same duties and responsibilities as you
22  have just described?
23      A. Yes.
24      Q. Who reported to you during that period?

Page 29

1       A. Gil Stone from Fineberg Management, George
2   Salgado from Fine Hotels, Carol Falvey was my
3   administrative assistant.
4       Q. Anyone else?
5       A. No. Anyone else would have been reporting
6   to one of those two, first two that I mentioned.
7       Q. I take it George Salgado was the director
8   of accounting for Fine Hotels?
9       A. Yes, he is.
10      Q. During that same period, 1999 through 2004,
11  approximately how many properties was Fineberg
12  Management managing?
13      A. On the residential side we had roughly 1500
14  apartment units, we had three office buildings, and
15  we had three or four retail units.
16      Q. And were each of the properties owned by a
17  different single-purpose entity such as Blue Hills
18  Office Park LLC?
19      A. Many of them were but not all.
20      Q. Approximately how many single-purpose
21  entities were there during that five-year period,
22  1999 through 2004, whose properties Fineberg
23  Management or Fine Hotels managed?
24      A. Ballpark, between 30 and 50.

FARMER ARSENAULT BROCK

258f568a-e5cf-4014-a6e3-a6c8384762b2

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

122
1  settlement in connection with a lawsuit brought by
2  Blue Hills Office Park LLC?
3       MR. MCGLYNN: Objection.
4    A. The settlement was with the owners, and I'm
5  responsible for the operating books. I'm not
6  responsible for the owners' books.
7       MR. FALBY: Well, let's mark the
8  settlement agreement itself as Exhibit 21.
9       (Marked, Exhibit 21, Settlement
10  agreement.)
11      MR. MCGLYNN: This one, we should go
12  back and proceed under the confidentiality
13  stipulation.
14   Q. Do you recognize Exhibit 21 as the
15  settlement agreement that settled the zoning permit
16  appeal?
17   A. (Witness reviews document.) That's what it
18  looks like, yes.
19   Q. And the first paragraph says, "This
20  settlement agreement, the agreement, is entered into
21  as of this 5th day of August, 2003, among Blue Hills
22  Office Park LLC, DST Realty, Inc., and Blue View
23  Corporate Center LLC," correct?
24   A. Yes, that's what it says.

123
1    Q. It doesn't say it's a settlement agreement
2  entered into among the owners of Blue Hills Office
3  Park and the other parties, does it?
4    A. No, that's not what it says.
5    Q. So again I ask you, why, as the CFO of Blue
6  Hills Office Park, were you not concerned about the
7  disposition of a $2 million payment made pursuant to
8  a settlement agreement to which Blue Hills Office
9  Park was a party?
10   A. This is the first time I've seen the
11  settlement agreement.
12   Q. And prior to this moment you never realized
13  that the settlement of the lawsuit brought by Blue
14  Hills Office Park LLC was consummated in an
15  agreement to which Blue Hills Office Park LLC was a
16  party?
17   A. I knew there was a $2 million settlement.
18  I didn't know which parties made the settlement.
19   Q. Nor did you inquire?
20   A. No.
21   Q. After the lease termination agreement was
22  signed insuring that EquiServe would leave the Blue
23  Hills Office Park no later than July 31, 2004, did
24  Blue Hills Office Park LLC make any efforts to find

124
1  a replacement tenant?
2    A. Yes, they did.
3    Q. What efforts did Blue Hills make?
4    A. They hired a broker who started looking,
5  but I was not part of that process.
6    Q. Who was part of the process?
7    A. I believe it was Dan Frank and Larry
8  Needle.
9    Q. The broker was Cushman & Wakefield?
10   A. To the best of my knowledge, that's
11  correct.
12   Q. Do you know anything about the efforts that
13  Cushman & Wakefield made to find a replacement
14  tenant or tenants?
15   A. Just general information.
16   Q. What do you know?
17   A. I know they put together a brochure. I
18  know they brought a number of big clients through
19  looking at the building, including Dunkin' Donuts.
20   Q. What else do you know about the efforts of
21  Cushman & Wakefield to find replacement tenants for
22  EquiServe?
23   A. I didn't sit in on the meetings, so I don't
24  know what their effort was.

125
1    Q. Paragraph 40 of the second amended
2  complaint, which is Exhibit 15, talks about Cushman
3  & Wakefield's efforts. Could you read that to
4  yourself, please, and tell me when you've finished.
5    A. (Witness reviews document.) Just 40?
6    Q. Yes.
7    A. I've finished.
8    Q. Paragraph 40 returns to -- strike that.
9  Paragraph 40 refers to Cushman & Wakefield's initial
10  leasing efforts; do you see that?
11   A. Yes.
12   Q. Do you have any idea how long Cushman &
13  Wakefield's initial leasing efforts lasted?
14   A. No, I don't.
15   Q. Do you know what those initial leasing
16  efforts entailed?
17   A. Other than what I stated, that I knew there
18  was some kind of prospective tenants brought through
19  the building, that's all I know.
20   Q. Do you know whether Cushman & Wakefield
21  identified any serious prospects for the space?
22   A. In my personal opinion, I thought Dunkin'
23  Donuts, from what I heard, was a very serious
24  prospect.

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

126

1    Q. When did you consider, based on what you
2  had heard, that they were a serious prospect?
3    A. It would probably be in the late 2003/early
4  2004 time period.
5    Q. How close did Blue Hills come to signing a
6  deal with Dunkin' Donuts?
7    A. I don't know.
8    Q. At some point did you conclude that Dunkin'
9  Donuts was no longer a serious prospect for the
10  space at Blue Hills Office Park?
11    A. Yes.
12    Q. When?
13    A. I don't have a date. You'd have to ask
14  either Larry or Dan Frank.
15    Q. Was it prior to July 2004?
16    A. Yes.
17    Q. As of July 2004, did Blue Hills Office Park
18  have any serious prospects to replace EquiServe?
19    A. You'd have to ask Dan Frank and Larry
20  Needle that question.
21    Q. You don't know of any serious prospects
22  that existed as of July 2004 to move into the Blue
23  Hills Office Park, do you?
24    A. On July 2004? At that particular moment?

127

1  No, I didn't know of any.
2    Q. Do you know of any serious prospect that
3  you had for the Blue Hills Office Park in either
4  2003 or 2004 other than Dunkin' Donuts?
5    A. Off the top of my head, I've heard a half a
6  dozen names, but I can't remember any of them at the
7  moment.
8    Q. Is it your testimony that during the course
9  of 2003 and 2004 you heard from Larry Needle and
10  Daniel Frank the name of a half a dozen other
11  serious prospects for the space?
12    A. Yes, half a dozen, you know, is a number
13  I'm throwing out. There was a number of serious
14  prospects.
15    Q. What happened to them?
16    A. I don't know.
17    Q. Did they all lose interest in the space?
18    A. That I don't know.
19    Q. I asked you about July 2004. Let me ask
20  you about August. As of August 2004, did Blue Hills
21  Office Park have any serious prospects to take over
22  the space vacated by EquiServe?
23    A. At that particular moment, not that I know
24  of.

128

1    Q. In September 2004 did Blue Hills have any
2  serious prospects to take over the space vacated by
3  EquiServe?
4    A. Not that I know of.
5    Q. Let me just move that chronologically the
6  other way. As of June 2004, did Blue Hills have any
7  serious prospects to move into the office park after
8  EquiServe vacated?
9    A. I don't know at that point. I know there
10  was ongoing -- again, I'd defer to other people that
11  were involved.
12    Q. But you can state of your own knowledge
13  that as of July 2004 and thereafter there were no
14  serious prospects in terms of tenants to take over
15  the space vacated by EquiServe, did you?
16    A. From my own personal knowledge, I don't
17  know of any.
18    Q. And based on what you heard other people
19  talking about, you don't know of any -- strike that.
20  You didn't hear anyone else talking about any
21  serious prospects for the space in July and
22  thereafter, did you?
23    A. No, I did not.
24    Q. Paragraph 40 talks about how it became

129

1  apparent to Blue Hills that they would require
2  substantial sums of money to upgrade the property's
3  infrastructure. Do you know anything about that?
4    A. No, I wasn't part of that.
5    Q. Do you know who -- strike that. Do you
6  know to whom it became apparent that Blue Hills
7  would require substantial sums of money to upgrade
8  the property's infrastructure?
9    A. No, not by looking at it in that context in
10  that paragraph.
11    Q. Well, divorcing it from this paragraph, did
12  you ever discuss with anybody at Blue Hills in 2003
13  or 2004 that Blue Hills was going to need
14  substantial sums of money to upgrade the property's
15  infrastructure in order to attract any tenant?
16    A. We knew when we found a new tenant, we
17  would have to do quite a bit of tenant build-out,
18  whether that be a single tenant for the whole
19  building or multiple tenants for the building.
20    Q. In your view is tenant build-out the same
21  as upgrading a property's infrastructure? Because I
22  asked you about infrastructure and you answered with
23  build-out.
24    MR. MCGLYNN: Objection.

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

Page 164

1    Wells Fargo that the tenant has fully vacated the

2    building, correct?

3         A.   That's correct.

4         Q.   And at this point no replacement tenant has

5    been found, the letter says, correct?

6         A.   That's correct.

7         Q.   And you then request a meeting with the

8    lender to discuss the loan status and the future

9    performance of the loan, correct?

10        A.   That's what it says.

11        Q.   Did you receive a response to your request

12   for a meeting?

13        A.   From Wells Fargo?

14        Q.   Yes.

15        A.   Not that I'm aware of.

16        Q.   Did you receive a response to anybody --

17   let me start again.  Did you receive a response from

18   anybody to your request for a meeting?

19        A.   I believe I had some phone calls from

20   Lennar somewhere farther down the road.

21        Q.   Who at Lennar did you talk to?

22        A.   I talked to Joe Polcari.  I talked to Job

23   Warshaw.

24        Q.   Who did you talk to first?

258f568a-e5cf-4014-a6e3-a6c8384762b2

56 (Pages 218 to 221)

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

218

1  particular time.
2      Q. Can you explain why you say that?
3      A. Well, if they were telling Mr. Stone that
4  he needed the lien waiver, he would have come right
5  up to me and talked to me about it; and I don't
6  think -- I don't remember him ever coming up to me
7  and asking me for lien waivers.
8      Q. Well, does it make sense that Wells Fargo
9  wouldn't have called Blue Hills looking for the tax
10 money when it didn't come?
11     A. I don't know if they called on a quarterly
12 basis or not or if they just sent out the letter.
13     Q. Well, don't you think once they sent the
14 letter, when they didn't get the money they would
15 have called and said, "Hey, where's the money you
16 were supposed to send"?
17         MR. MCGLYNN: Objection.
18     A. They may have, but if Gil Stone had a phone
19 call like that, he would have been running right
20 down to my office, and certification just -- I don't
21 know what they mean by a certification. That
22 doesn't seem to make any sense to me. It's a
23 nonsensical request, as far as I'm concerned.
24     Q. You don't recall having any conversation

219

1  with Mr. Stone about this subject?
2      A. No.
3      Q. Now, Mr. Stone, as you probably know from
4  having looked at his transcript, doesn't remember
5  these conversations, nor, however, can he deny them.
6  Are you sure that this topic wasn't discussed with
7  Wells Fargo towards the end of July 2004?
8      A. I don't believe it was.
9      Q. Can you think of any reason why people at
10 Wells Fargo would be making notes about
11 conversations with Gil Stern at your telephone
12 number if they hadn't taken place?
13         MR. MCGLYNN: Objection.
14     A. I think you'd have to ask them.
15     Q. Because you can't think of any reason why
16 they would be at that point fabricating
17 conversations?
18         MR. MCGLYNN: Objection.
19     A. I don't know if they are or not. You have
20 to ask them.
21     Q. Can you think of any reason why they would?
22         MR. MCGLYNN: Objection.
23     A. I don't know. I don't work for Wells
24 Fargo. I don't know what the atmosphere is like

220

1  there.
2      Q. As between the two possibilities, that Gil
3  Stone's memory is faulty and people at Wells Fargo
4  were fabricating notes of conversations that didn't
5  happen, which do you think is more likely?
6          MR. MCGLYNN: Objection, calls for
7  speculation.
8          MR. FALBY: No, it doesn't.
9      A. Gil Stone is a very trustworthy,
10 hard-working guy that would be running right down to
11 my office with a -- any kind of phone conversation
12 like that, so I don't believe he ever had that phone
13 conversation.
14     Q. In fact, Wells Fargo advanced the money to
15 pay those taxes that were due; you know that now,
16 correct?
17     A. I knew that then.
18     Q. When did you find that out?
19     A. We contacted the town and saw that it was
20 paid.
21     Q. When did you do that?
22     A. Somewhere in August of '04.
23     Q. Stone Exhibit 6 says, "Advancing funds
24 today per ops," o-p-s, "manager approval"; do you

221

1  see that?
2      A. (Witness reviews document.) I see where you
3  are talking about, yes.
4      Q. And did you learn when you checked with the
5  town of Canton in August 2004 that in fact Wells
6  Fargo had paid the taxes before the end of July
7  2004?
8      A. No, I didn't. I found out that they had
9  paid the taxes. I didn't have any date when they
10 actually paid them.
11     Q. Do you now know, sitting here, that in fact
12 Wells Fargo advanced the money and paid the taxes
13 even before the end of July '04?
14         MR. MCGLYNN: Objection.
15     A. That's what this document says.
16     Q. Do you have any reason to doubt it?
17         MR. MCGLYNN: Objection.
18     A. I know the taxes were paid. I don't know
19 when they were paid.
20     Q. Do you have any reason to doubt that the
21 taxes were paid by Wells Fargo out of their own
22 monies before the end of July as Stone Exhibit 6
23 indicates?
24         MR. MCGLYNN: Objection, asked and

# EXHIBIT 11

Daniel Frank
Volume 1 - February 16, 2006

Exhibits:  33 - 44          Volume 1, Pages 1 - 211

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

              Defendant

(Complete caption on next page.)

----------------------------

INDIVIDUAL and 30(b)(6) DEPOSITION OF BLUE HILLS

OFFICE PARK LLC BY DANIEL FRANK

Thursday, February 16, 2006, 10:08 a.m.

DLA Piper Rudnick Gray Cary US LLP

One International Place, 21st Floor

Boston, Massachusetts

------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

576bc720-08cd-4d01-b32e-65ae1fc626ea

Daniel Frank
Volume 1 - February 16, 2006

Page 102

1       A.   Yes.

2       Q.   I take it you actually don't remember the

3   date, but you are pegging it at October 18 because

4   of the document you saw?

5       A.   Yes.  It could be the 17th.

6            MR. FALBY:   Let's mark as Exhibit 41 a

7   letter from Randy Tucker dated November 12, which

8   refers in the last paragraph to a conversation on

9   October 18.

10           (Marked, Exhibit 41, letter, Tucker to

11  Goldberg, 11/12/04.)

12      Q.   Okay.  I'm now handing you Exhibit 41.  Is

13  this the letter that you had in mind that refers to

14  an October 18 conversation between you and Lennar?

15      A.   Yes.

16      Q.   This letter says:  "On October 18, 2004,

17  Daniel Frank telephoned Lennar, identified himself

18  as the principal of the borrower, and asked for a

19  meeting to discuss the loan."

20           Is that an accurate statement?

21      A.   To discuss the loan and the future and how

22  we can straighten things out.

23      Q.   Two sentences later the letter says:  "He,"

24  Mr. Frank, "was informed that in order for Lennar to

Daniel Frank
Volume 1 - February 16, 2006

Page 135

1    people.   Then after this notice came, we knew that

2    we had to hire an exclusive agent.   So we

3    interviewed approximately five different firms, all

4    the majors, Crowe, Hunneman, Meredith & Grew, and,

5    of course, Cushman & Wakefield and settled on

6    Cushman & Wakefield.

7        Q.   Then what happened?

8        A.   Then what happened?   They started a

9    program.   We hired an architect to measure the

10   building, to lay it out, to make boards.   We,

11   through Cushman & Wakefield, had a mailer.   We

12   started to solicit other tenants that were in the

13   market.   We held an open house in April of 2004 at

14   which 43 brokers who hadn't been in the building in

15   years came.   We did all of that.   We started the

16   program.

17       Q.   Did Cushman & Wakefield identify any

18   prospective tenant?

19       A.   Yes.

20       Q.   One was New York Life?

21       A.   Yes.

22       Q.   Which came close, but went somewhere else?

23       A.   Yes.   The one that really came close was

24   Dunkin' Donuts, Allied Domecq, really close.

Daniel Frank
Volume 1 - February 16, 2006

Page 190

1      Q.   When you say Joe, you meant Joe Donovan?

2      A.   Yeah, sorry.

3      Q.   What counsel was involved?

4      A.   I think Lydia Chesnick came in.  I know

5   Lydia Chesnick came in to collect it.

6      Q.   Can you describe the computer system in

7   your office?

8      A.   I have a computer.

9      Q.   On your desk?

10     A.   No; behind me.

11     Q.   Does everybody have their own computer?

12     A.   Most people have a computer.

13     Q.   Do you know what search was done of the

14   computer system at Fineberg Management to respond to

15   our document request?

16     A.   It was a very thorough search engineered by

17   Joe.  What do you do?  You go through all of your

18   files and all of your -- I'm not that --

19     Q.   You don't know, do you?

20     A.   We went through --

21          MR. McGLYNN:  Objection.

22          Go ahead.

23     A.   We went through whatever buttons you have

24   to push.  We pushed out whatever we had.

# EXHIBIT 12

1

1                                    Volume: I
                                     Pages: 1-273
2                                    Exhibits: 45-83

3                  UNITED STATES DISTRICT COURT
              FOR THE DISTRICT MASSACHUSETTS
4

       - - - - - - - - - - - - - - - - - x
5
   BLUE HILLS OFFICE PARK, LLC,
6
                   Plaintiff/Defendant-in-Counterclaim,
7
             v.
8
   J.P. MORGAN CHASE BANK, as Trustee
9  for the Registered Holders of
   Credit Suisse First Boston Mortgage
10 Securities Corp., Commercial Mortgage
   Pass-Through Certificates, Series 1999-C1,
11
                   Defendant,
12
   and CSFB 1999-C1 ROYALL STREET, LCC,
13
                   Defendant/Plaintiff-in-Counterclaim,
14
   and
15
   WILLIAM LANGELIER and GERALD FINEBERG,
16
                   Defendants-in-Counterclaim.
17     - - - - - - - - - - - - - - - - - x

18             DEPOSITION of JOSEPH A. POLCARI, JR., a
   witness called by counsel for the Plaintiff/
19 Defendant-in-Counterclaim taken pursuant to the
   applicable provisions of the Federal Rules of
20 Civil Procedure, before Toni F. Beckwith,
   Registered Merit Reporter, CSR No. 111293 and
21 Notary Public in and for the Commonwealth of
   Massachusetts, at the Offices of Bernkopf
22 Goodman LLP, 125 Summer Street, Boston,
   Massachusetts, on Tuesday, February 28, 2006,
23 commencing at 9:50 a.m.

24

                  SHEA COURT REPORTING SERVICES
                        617 227-3097

14

```
 1          Q.  That's L E N N A R?

 2          A.  Correct.

 3          Q.  Did Lennar Partners undergo some name

 4    change so that it is not referred to as LNR?

 5          A.  Yes.

 6          Q.  So just for purposes of this       .

 7    deposition, can we agree if I refer to it as LNR

 8    or Lennar, that we can agree that it's Lennar

 9    Partners, Inc., of Miami Beach, Florida?

10          A.  LNR Partners, Inc., yes.

11          Q.  And Lennar or LNR Partners serves as

12    the special servicer under a pooling and

13    servicing agreement with respect to a series of

14    loans known as the 1 point 187,129,449 billion

15    dollar commercial mortgage pass-through

16    certificates Series 1999-C1; is that correct?

17          A.  Yes.

18          Q.  What I've put in front of you is a

19    document entitled Pooling and Servicing

20    Agreement?

21          A.  Yes.

22          Q.  And is that the pooling and servicing

23    agreement under which Lennar serves as special

24    servicer?
```

SHEA COURT REPORTING SERVICES
617 227-3097

15

1          A.  I'm not sure if this is the final

2     version, but this is the pooling and servicing

3     agreement.

4          Q.  If you want to take a look at it,

5     there are signature pages and there are

6     signatures on those pages.

7               MR. FALBY:  Take a look at it.

8               MR. MCGLYNN:  Can we have --

9          A.  Yes.

10              MR. MCGLYNN:  Can we have that marked

11     as the next exhibit, please, Toni.

12              (Exhibit 51 marked

13              for identification)

14          Q.  Just so I understand it, Mr. Polcari,

15     this agreement, which is now Polcari 51, has the

16     special servicer identified as Lennar Partners,

17     Inc., correct?

18          A.  Yes.

19          Q.  Is it your understanding that there is

20     a name change that has been effectuated with

21     respect to Lennar Partners, Inc., so it is now

22     known as LNR Partners, Inc.?

23          A.  Yes.

24          Q.  So as far as you know, LNR Partners,

A. I can't remember.

Q. Currently it's approximately 25?

A. Yes.

Q. Do you recall in 2004 whether you were involved in more, the same or less loans than 25?

A. No, I don't recall.

Q. Now, sir, you are familiar with Blue Hills Office Park, LLC, correct?

A. Yes.

Q. And you are also familiar with the real estate located at 150 Royall Street in Canton, Massachusetts?

A. Yes.

Q. And did you serve or are you serving as an asset manager with respect to the loan for that property?

A. I did serve, yes.

Q. When did you first become involved in serving as an asset manager for that loan, sir?

A. The beginning of September 2004.

Q. With respect to your duties as the asset manager for this particular property -- and just so we can shorthand this, during the

79

1    preparation for this deposition?

2         A.  Not that I can remember.

3         Q.  And the conversation or discussion you

4    had with counsel present, when did that occur?

5         A.  That was Thursday, this past Thursday.

6         Q.  In your September 17, 2004 letter you

7    indicate that the subject loan was in default,

8    among other things, correct?

9         A.  Yes.

10        Q.  And the basis upon which you

11   determined that the loan, with counsel's input,

12   that the loan was in default was that Blue Hills

13   had failed to make a payment of $158,181.19 for

14   real estate taxes due on or about August 2,

15   2004, correct?

16             MR. FALBY:  Objection.

17        A.  That's one of the defaults, yes.

18        Q.  Can you tell me what the other default

19   is, or other defaults, excuse me, as reflected

20   in your letter?

21        A.  The other default was the failure to

22   pay the other escrow payments due, and the

23   failure to pay the August 11 and September 11

24   debts service payments that were due.

SHEA COURT REPORTING SERVICES
617 227-3097

80

1          Q.  But the first event of default,

2     so-called, was the failure to pay the real

3     estate taxes allegedly due on or about August 2,

4     2004, correct?

5               MR. FALBY:  Objection.

6          A.  When you say first, you mean

7     chronologically?

8          Q.  Yes, sir.

9               MR. FALBY:  Objection.

10         A.  Yes.

11         Q.  Now, sir, you also indicate that it

12    was an event of default for the borrower not to

13    pay the principal and interest due on the note

14    on August 11 and September 11, 2004, correct?

15         A.  Give me a moment, please.

16         Q.  Sure.  Take your time and tell me when

17    you're through.

18              MR. MCGLYNN:  Let me just make a note

19    that the witness is looking at Polcari 52.

20              MR. FALBY:  Can you read back the

21    question, please?

22              (Record read)

23              MR. FALBY:  Objection.

24         A.  The default letter of September 17

                SHEA COURT REPORTING SERVICES
                        617 227-3097

81

1    doesn't specifically mention the failure to pay

2    the August 11 and September 11 payments.  It

3    addresses the failure to pay the taxes that were

4    due on the 2nd.

5         Q.  I'm sorry, have you finished your

6    answer?

7         A.  Yes, sir.

8         Q.  You are familiar with the various

9    escrow accounts that were created and funded

10   with respect to this loan, sir?

11        A.  I don't remember the details about the

12   escrow accounts.

13        Q.  Do you have any understanding as to

14   whether or not any portion of those escrow

15   accounts could have been used had there been no

16   event of default by the borrower to pay debt

17   service on this loan?

18        A.  I have a basic understanding that some

19   of the reserve funds under certain circumstances

20   could have been used to pay the debt service for

21   a period of time, yes.

22        Q.  And, in fact, that was one of the

23   things that you do recall having a discussion

24   about with Mr. Donovan on the 16th of September

SHEA COURT REPORTING SERVICES
617 227-3097

92

1    nonpayment of taxes due on August 2, 2004, that

2    had not been met by the borrower as of September

3    17, 2004?

4           MR. FALBY:  That he knew of at the

5    time?

6           MR. MCGLYNN:  Please, don't try and

7    editorialize my question.  The question stands.

8           MR. FALBY:  I'm objecting to the

9    question as unclear.  It's unclear.

10          MR. MCGLYNN:  You can object.  You

11   have objected.  Let's move on.

12       Q.  May I have an answer, sir?

13       A.  The borrower failed to pay the taxes

14   that were due August 2.  The borrower failed to

15   pay the other escrow items that were due on

16   August 11 and September 11 along with those debt

17   service payments; the borrower had settled a

18   lawsuit on his zoning appeal prior to this date,

19   borrower had submitted statements, financial

20   statements, for 2003 that didn't reflect the

21   payment of the settlement of the zoning appeal.

22       Q.  Have you finished your answer?

23       A.  That's to the best of my recollection

24   right now.

93

1          Q.   But as of September 17, 2004 you knew

2     nothing about the zoning appeal, correct?

3          A.   That's correct.

4          Q.   You knew nothing about the settlement

5     on the zoning appeal?

6          A.   Correct.

7          Q.   And therefore you could not make any

8     determination as to whether or not anything

9     pertaining to that zoning appeal or the

10    settlement thereof was an event of default under

11    the loan documents, right?

12         A.   As of September 17, that's correct.

13         Q.   You also indicated just a few seconds

14    ago that the borrower failed to make payments

15    into the escrow funds on August 11 and September

16    11, 2004?

17         A.   Correct.

18         Q.   What is your understanding of the

19    borrower's obligation to make those payments

20    into escrow when the tenant, in this case

21    Equiserve, has moved out of the premises?

22         A.   My understanding from the loan

23    documents and consulting with counsel is that

24    the requirement for the escrow payment doesn't

101

1    Management, from Job Warshaw, correct?

2         A.  Yes, sir.

3         Q.  And it indicates a transmission date

4    of 1:45 p.m. on August 24, 2004?

5         A.  Yes.

6         Q.  And that, you would agree with me,

7    coincides with the facsimile transmission legend

8    appearing at the top of the page, sir?

9         A.  There is a fax strip at the top that

10   says August 24 at 13:58.

11        Q.  And the fax number 305-695-5119.  Is

12   that a fax number or telephone number that's

13   familiar to you?

14        A.  No.

15        Q.  But you would agree with me 305 is the

16   area code for Florida?

17        A.  Yes.

18        Q.  In particular for Miami Beach,

19   Florida?

20        A.  Yes, it is.

21        Q.  Do you have any doubt, as you sit here

22   today, that this correspondence that is Polcari

23   Exhibit 61 was sent out by Mr. Warshaw at around

24   13:58 hours on August 24, 2004?

SHEA COURT REPORTING SERVICES
617 227-3097

102

1           MR. FALBY:  Objection.

2       A.  No.

3           MR. FALBY:  Pause so I can object.

4           THE WITNESS:  I apologize.

5       Q.  No doubt in your mind this was sent

6   out at that date and at that hour, sir?

7           MR. FALBY:  Objection.

8       A.  I have no reason to doubt it.  The

9   cover page says August 24.

10      Q.  So you'll agree with me, sir, that

11  despite the fact that the letters are dated,

12  both dated August 19, that Mr. Warshaw did not

13  send them out at least via fax until the 24th of

14  August at approximately 1:58 p.m., correct?

15          MR. FALBY:  Objection.

16      A.  I would not agree with that.

17      Q.  What is it that you disagree with in

18  connection with my question?

19      A.  This is a fax that was sent August

20  24th.  I don't know that he sent one prior to

21  that and the borrower asked him to send another

22  because something happened to it.

23      Q.  Have you ascertained whether or not,

24  sir, that Mr. Warshaw had sent this letter by

SHEA COURT REPORTING SERVICES
617 227-3097

EXHIBIT 13

1

1                                    Volume: II
                                     Pages: 1-243
2                                    Exhibits: 84-109

3              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT MASSACHUSETTS
4
     - - - - - - - - - - - - - - - - - - x
5
     BLUE HILLS OFFICE PARK, LLC,
6
               Plaintiff/Defendant-in-Counterclaim,
7
         v.
8
     J.P. MORGAN CHASE BANK, as Trustee
9    for the Registered Holders of
     Credit Suisse First Boston Mortgage
10   Securities Corp., Commercial Mortgage
     Pass-Through Certificates, Series 1999-C1,
11
               Defendant,
12
     and CSFB 1999-C1 ROYALL STREET, LCC,
13
               Defendant/Plaintiff-in-Counterclaim,
14
     and
15
     WILLIAM LANGELIER and GERALD FINEBERG,
16
               Defendants-in-Counterclaim.
17   - - - - - - - - - - - - - - - - - - x

18     CONTINUED DEPOSITION of JOSEPH A. POLCARI, JR.,
       a witness called by counsel for the Plaintiff/
19   Defendant-in-Counterclaim taken pursuant to the
     applicable provisions of the Federal Rules of
20   Civil Procedure, before Toni F. Beckwith,
     Registered Merit Reporter, CSR No. 111293 and
21   Notary Public in and for the Commonwealth of
     Massachusetts, at the Offices of Bernkopf
22   Goodman LLP, 125 Summer Street, Boston,
     Massachusetts, on Wednesday, March 1, 2006,
23   commencing at 9:30 a.m.

24

                     SHEA COURT REPORTING SERVICES
                           617 227-3097

187

1        A.  He is a lawyer that reviews the

2   Phase Is that we get.

3        Q.  Do you recall any

4   environmental-related problems on this building

5   or on this project?

6        A.  No, I don't.

7        Q.  Golinsky says to you, Back on track.

8   What does that mean?

9        A.  I have no idea.

10        Q.  All right.  Polcari 109, November 19,

11   2004, Friday, 1:06 p.m.  Your e-mail to

12   Mr. Golinsky is, We own it.  Our bid was

13   18.5 million?

14        A.  Yes.

15        Q.  Does that mean that there was a credit

16   bid submitted of 18.5 million?

17        A.  By the SPE.

18        Q.  By the SPE?

19        A.  Yes.

20        Q.  So then the SPE took title to the

21   building, correct?

22        A.  That's correct.

23        Q.  Now, I notice there was a, with

24   respect to Lennar in your Rule 30(b)(6)

188

```
 1    designation, my recollection is you said you

 2    were not involved in the marketing of this

 3    property?

 4         A.   That's correct.

 5         Q.   So you are not going to be the

 6    designee for Lennar for marketing this property

 7    after the SPE acquired the property?

 8              MR. FALBY:   That's Randy Rosen who

 9    will be here tomorrow morning at 9:00 a.m.

10         Q.   Do you have any knowledge about the

11    marketing of the property?

12         A.   I can't recall any right now.

13         Q.   So it would be Mr. Rosen that would

14    have the best knowledge, at least within the

15    Lennar organization, about the marketing of the

16    property and the retention of the brokers,

17    et cetera?

18              MR. FALBY:   Yes.

19         Q.   Okay.  Do you have any knowledge,

20    Mr. Polcari, about the sale of the property to

21    OneBeacon Insurance Group?

22         A.   Very basic knowledge.

23         Q.   It was sold to OneBeacon?

24         A.   That's my understanding.
```

SHEA COURT REPORTING SERVICES
617 227-3097

189

1          Q.   And it was sold for how much?

2          A.   I believe approximately $23 million.

3          Q.   What, if any, involvement did you have

4     in that sale?

5          A.   None.

6          Q.   Was that again Mr. Rosen that was

7     involved in that?

8          A.   Mr. Rosen, among others, yes.

9          Q.   I know we covered this in Day 1, you

10    don't have any specific knowledge of the terms

11    and provisions of Polcari 51, the pooling and

12    servicing agreement?

13              MR. FALBY:  Objection.

14         A.   I don't have any specific knowledge?

15    I don't know what you mean.

16         Q.   Well, all right.  Do you have any

17    knowledge of specific terms in the pooling and

18    servicing agreement relating to the special

19    servicer's ability to waive or modify provisions

20    in the loan documents?

21              MR. FALBY:  Objection.

22         A.   At this time, sitting here, I can't

23    tell you the answer.  I mean, I don't know what

24    it says about that.

# EXHIBIT 14

1

Volume:   1
Pages:    1-121
Exhibits: 127-129

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 05-CV-10506

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*x
BLUE HILLS OFFICE PARK, LLC
            Plaintiff/Defendant-in Counterclaim

        vs.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1,
            Defendant

And CFSB 1991-C1 Royall Street, LLC,
            Defendant/Plaintiff-in-Counterclaim

And

WILLIAM LANGELIER and GERALD FINEBERG,
            Defendants-in-Counterclaim
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*x

            DEPOSITION OF JOB LEE WARSHAW, a
 witness called on behalf of the Plaintiff, pursuant
 to the applicable provisions of the Federal Rules of
 Civil Procedure, before Camille Macomber, Registered
 Professional Reporter and Notary Public within and
 for the Commonwealth of Massachusetts, at the Law
 Offices of Bernkopf Goodman LLP, 125 Summer Street,
 Boston, Massachusetts, on Thursday, March 2, 2006,
 commencing at 1:10 p.m.

            SHEA COURT REPORTING SERVICES
        ONE UNION STREET, SECOND FLOOR
         BOSTON, MASSACHUSETTS 02108
              (617)227-3097

84

```
 1    Q    What do you recall of the prenegotiation letter
 2         that was discussed?
 3    A    What was that letter?
 4    Q    No, you say you discussed with Goldberg the
 5         prenegotiation letter in your log; correct?
 6    A    Yes.
 7    Q    What do you recall about the prenegotiation
 8         letter that was discussed?
 9    A    He acknowledged that they had received it, and
10         that he would be meeting with Gerry the next day
11         and would get back with me.  He said that was
12         part of -- the meeting with Gerry, I guess, was
13         getting the letter signed.
14    Q    And, in fact, the letter purporting to bear
15         Mr. Goldberg's signature came into your office
16         the next day; correct?
17    A    Once again, I don't recall when it came into my
18         possession, but we have discussed the fax.
19    Q    Assuming that the fax transmission legend is
20         accurate, it says that it was sent out by
21         Fineberg Management on August 26, 2004; correct?
22    A    That's what the fax ticker says.
23    Q    You will agree with me that the executed version
24         of this shows up in the Polcari 98 binder;
```

85

```
 1            correct?

 2       A    I agree.

 3       Q    After you received the signed prenegotiation

 4            letter from Mr. Fineberg, did you follow up and

 5            set up the meeting?

 6                 MR. BARNETT:  Objection.

 7       A    There was never a discussion of a meeting.

 8       Q    Do you know why not?

 9                 MR. BARNETT:  Objection.

10       A    There was no discussion of a meeting, so there

11            was no follow up required when there was never

12            one discussed.

13       Q    There was never any meeting discussed?

14       A    No.

15       Q    You never followed up?

16       A    There was no reason to follow up on something

17            that wasn't discussed.

18       Q    The only thing that was discussed relative to

19            any type of a get-together was the

20            prenegotiation letter; correct?

21       A    On the August 25th call?

22       Q    Um-hmm, correct.

23                 MR. BARNETT:  Objection to the

24            question.
```

```
 1    Q    You may answer.

 2    A    The only discussions were what was contained in

 3         the log on that call, and I would not have had

 4         any substantive discussions beyond that because

 5         I had not had the letter back at that point in

 6         time.

 7    Q    You will also agree with me, if you look at

 8         Polcari 58, which are the answers to

 9         interrogatories, that your August 24th call and

10         your August 25th call are not included in

11         response to Interrogatory Number 2; correct?

12    A    You're just asking Number 2 only?

13    Q    Um-hmm.

14    A    (Witness reviews document.) I do not see any

15         reference to August 24th or August 25th call.

16    Q    Isn't it a fair statement that you would not

17         have a meeting with the borrower, if you were

18         ever going to have a meeting with the borrower,

19         until the borrower agreed to the terms of the

20         prenegotiation letter; correct?

21    A    Yes, if there ever was going to be a meeting, I

22         would require the letter to be signed before

23         that time.

24    Q    The letter was signed?
```

87

```
 1    A    Yes, the letter was signed.
 2    Q    Directing your attention to Polcari 60, last
 3         page, Exhibit A, is that something that you
 4         prepared, Mr. Warshaw?
 5              MR. BARNETT:  Objection to prepare.
 6    Q    Let's even be more specific.  Do you see the
 7         little boxes that are checked off on Exhibit A?
 8    A    Yes.
 9    Q    Were you the checker?
10    A    Yes.
11    Q    Did you receive any of that information that is
12         listed on Exhibit A in each of the checked
13         boxes?
14              MR. BARNETT:  Objection.
15    A    Did I receive any of this information?
16    Q    Um-hmm.
17    A    I don't recall that I did.
18    Q    Did you have any of this information?
19    A    I don't remember what I had, but I don't
20         remember -- I have no recollection that they
21         sent us anything in response to this request.
22    Q    Now, directing your attention to 98, there is a
23         document, the first part of this exhibit, which
24         has LNR 03514.  Do you see that?
```

88

| 1 | A | Before I answer that, we were just discussing |
| 2 | | Exhibit 60, and I'm wondering if I could add to |
| 3 | | a earlier response to one of your questions |
| 4 | | regarding this letter. |
| 5 | Q | Well, there is a question pending before you, |
| 6 | | but all right.  What is it that you wish to add, |
| 7 | | sir? |
| 8 | A | Would you like me to answer this question first? |
| 9 | Q | No, go ahead, why don't you tell me what it is |
| 10 | | that you have to add first? |
| 11 | A | You asked earlier, I don't remember your words, |
| 12 | | but the question had to do with what is the |
| 13 | | intent of this letter or what does it |
| 14 | | accomplish.  I remember some question to that |
| 15 | | effect. |
| 16 | Q | I remember several. |
| 17 | A | I would like to add that this letter, a form |
| 18 | | letter that we use, but what it accomplishes is |
| 19 | | protecting us as to loan communications that any |
| 20 | | communications we have with the borrower won't |
| 21 | | be used in a legal proceeding, that we only have |
| 22 | | agreements on matters if they are reduced to |
| 23 | | writing, you know, we have authority to enter |
| 24 | | into those discussions.  There's important |

89

```
 1              things that it covers for us governing those

 2              discussions, and that's an important purpose and

 3              intent of this letter.

 4      Q       Thank you.  Now, going onto LNR 03514, which is

 5              part of Polcari 98.  It's called, "Specially

 6              Serviced Documentation Checklist."

 7      A       Yes.

 8      Q       The first series of boxes indicate documents or

 9              things that you already have in the file;

10              correct?

11                      MR. BARNETT:  Objection.

12      A       I don't prepare this checklist.

13      Q       It was prepared on 8/17, or at least it has a

14              date of 8/17/04?

15      A       That's the date.

16      Q       It says on the first column, "Documents

17              attached."  Right?

18      A       There is a column in the middle that says

19              "Documents attached."

20      Q       And certain of the boxes under that column are

21              X'd, meaning the documents were attached;

22              correct?

23      A       Certain items are X'd, I don't know -- I can't

24              tell you that the documents were attached.
```

90

```
 1    Q    Let's go down, with reference to those boxes
 2         that you checked off on Exhibit A on Polcari
 3         60 -- do you have Polcari 60, in front of you?
 4    A    Yes.
 5    Q    So let's take a look at the first one, at least,
 6         I'm going to select, and that's Item 15 on the
 7         checklist.  "Recent insurance policy."  Do you
 8         see that, Item 15, sir?
 9    A    I see that.
10    Q    The box is checked saying, "Recent insurance
11         policy is attached."  Correct?
12    A    You're asking on this checklist, does --
13    Q    Let's start again.  Please take a look at Item
14         15 on LNR 03514.
15    A    Yes.
16    Q    Look over at the column Documents Attached.  Do
17         you see that?
18    A    Yes.
19    Q    You see the box?
20    A    Yes.
21    Q    Does the box have an X in it?
22    A    Yes.
23    Q    Would you please turn to LNR 03715?
24    A    Um-hmm, yes.
```

91

| | | |
|---|---|---|
| 1 | Q | That's a Certificate of Insurance; correct? |
| 2 | A | Yes. |
| 3 | Q | For Blue Hills Office Park, LLC? |
| 4 | A | Yes. |
| 5 | Q | It's dated 5/18/04 up in the top right-hand |
| 6 | | corner? |
| 7 | A | I see it, yes. |
| 8 | Q | You know what a Certificate of Insurance is? |
| 9 | A | I'm not an insurance expert, but I have seen |
| 10 | | Certificates of Insurance. |
| 11 | Q | Also, if you can turn to LNR 03726 and 03727. |
| 12 | | Do you see them? |
| 13 | A | Yes. |
| 14 | Q | One is a letter from Carol Falvey at Fineberg |
| 15 | | Management indicating that she's enclosing a |
| 16 | | paid receipt and insurance certificates; |
| 17 | | correct? |
| 18 | A | Yes. |
| 19 | Q | The next page indicates that there's been a paid |
| 20 | | in full premium invoice from, it looks like HRH, |
| 21 | | describing property, general liability and |
| 22 | | umbrella insurance for the period 5/1/04 to |
| 23 | | 5/1/05? |
| 24 | A | I see an invoice from HRH, as you've described. |

92

| 1 | Q | Let's move on.  On 16 of the documentation |
| 2 | | checklist, Recent Real Estate Tax Bill, where it |
| 3 | | says document attached, and there's an X on that |
| 4 | | box.  Do you see that? |
| 5 | A | Yes. |
| 6 | Q | Would you please turn to -- |
| 7 | A | I would like to say something about the check on |
| 8 | | the recent insurance policy in the document you |
| 9 | | referred me to. |
| 10 | Q | Can we get an answer to my question first? |
| 11 | A | Okay. |
| 12 | | MR. BARNETT:  I don't think there's a |
| 13 | | question pending. |
| 14 | | MR. McGLYNN:  I was about ready to get |
| 15 | | it out. |
| 16 | Q | The recent real estate tax bill has document |
| 17 | | attached, and it's got an X; correct? |
| 18 | A | Yes. |
| 19 | Q | Would you please turn to LNR 03716 and 03717. |
| 20 | | These are copies of Town of Canton real estate |
| 21 | | tax bills? |
| 22 | A | Are you asking me if these are the copies of |
| 23 | | Canton's tax bills?  I have never seen a Canton |
| 24 | | tax bill. |

93

| 1 | Q | Does it say, "Town of Canton Taxpayer Copy," on |
| 2 | | LNR 03716? |
| 3 | A | Yes, it says that. |
| 4 | Q | Now sir, what is it that you wish to add with |
| 5 | | respect to the insurance policy, item 15 on the |
| 6 | | checklist? |
| 7 | A | I wanted to ask, is your question or this line |
| 8 | | of questions that the documents we're flipping |
| 9 | | to back and forth from the checklist to the |
| 10 | | actual documents, I don't have a recollection |
| 11 | | whether these -- you know, of ever seeing these |
| 12 | | documents. |
| 13 | Q | But you will agree with me that, at least, in |
| 14 | | the document Exhibit 98, and I will represent to |
| 15 | | you, Mr. Warshaw, that Mr. Polcari yesterday |
| 16 | | testified that he received the binder when he |
| 17 | | got the asset from you, and that generally this |
| 18 | | was the binder that he received. |
| 19 | A | I'm not familiar with his testimony, but if |
| 20 | | you're asking me are these documents in the same |
| 21 | | pile of documents as the checklist, yes, I |
| 22 | | acknowledge that. |
| 23 | Q | Let's continue.  Property Inspection, that box |
| 24 | | is checked; correct? |

101

```
1    A    That wasn't my answer.

2    Q    What is your answer?

3    A    That discussion never took place nor was there

4         ever a discussion of a meeting.

5    Q    Did you want to have a meeting?

6    A    I don't remember a preference either way.

7    Q    Do you recall having any discussions with

8         anybody about not having a meeting?

9    A    I recall no such discussions.

10   Q    You had a discussion on or about the 7th of

11        November with Joe Polcari; correct?

12             MR. BARNETT:  Objection.  Do you mean

13        the 7th of September?

14             MR. McGLYNN:  I'm sorry, did I say

15        November?  7th of September.  Thank you, Bruce.

16   Q    Do you recall having a discussion with Joe

17        Polcari on the 7th of September 2004?

18   A    Yes.

19   Q    According to the CSFB answer to interrogatories,

20        Exhibit 58, page 6, I believe, paragraph 11

21        summarizes what purports to be your discussion

22        with Mr. Polcari about the property; correct?

23             MR. BARNETT:  Objection.

24   Q    Do you see that, paragraph 11, sir?
```

# EXHIBIT 15

1

<div align="right">
Volume:   1
Pages:    1-121
Exhibits: 110-126
</div>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 05-CV-10506

*************************************************x
BLUE HILLS OFFICE PARK, LLC,
            Plaintiff/Defendant-in Counterclaim

        vs.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1,
            Defendant

And CFSB 1991-C1 Royall Street, LLC,
            Defendant/Plaintiff-in-Counterclaim

And

WILLIAM LANGELIER and GERALD FINEBERG,
            Defendants-in-Counterclaim
*************************************************x

            DEPOSITION OF RANDALL P. ROSEN, a
    witness called on behalf of the Plaintiff, pursuant
    to the applicable provisions of the Federal Rules of
    Civil Procedure, before Camille Macomber, Registered
    Professional Reporter and Notary Public within and
    for the Commonwealth of Massachusetts, at the Law
    offices of Bernkopf Goodman LLP, 125 Summer Street,
    Boston, Massachusetts, on Thursday, March 2, 2006,
    commencing at 9:07 a.m.

            SHEA COURT REPORTING SERVICES
            ONE UNION STREET, SECOND FLOOR
            BOSTON, MASSACHUSETTS 02108
                 (617)227-3097

```
 1           a sense of the normal turnaround time between

 2           transferring the asset to Lennar as special

 3           servicer and the time when it is either

 4           foreclosed on or a deed in lieu of foreclosure

 5           is provided?

 6                    MR. BARNETT:  Objection.

 7                    THE WITNESS:  Read it back, because I

 8           don't want to misstate...

 9                         (The last question was read.)

10      A    No.

11      Q    If I told you that in this particular case the

12           asset was transferred to Lennar as special

13           servicer on or about August 17, 2004 and that

14           the foreclosure occurred on or about

15           November 23, 2004, does that refresh your

16           recollection as to the amount of time that

17           Lennar served as special servicer on this

18           property before it was foreclosed?

19      A    All I can attest to is the approximate date of

20           when we foreclosed.  But based on what you just

21           said, that's a three-month period.

22      Q    Did you get any sense as part of your work on

23           this asset that there was any urgency within the

24           Lennar organization to foreclose on this
```

# EXHIBIT 16

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3                     --oOo--
 4   BLUE HILLS OFFICE PARK, LLC,           )
                                            )
 5     Plaintiff/Defendant-in-Counterclaim  )
                                            )
 6        vs.                               )Civil Action No.
                                            )05-CV-10506(WGY)
 7   J.P. MORGAN CHASE BANK, as Trustee for )
     the Registered Holders of Credit       )
 8   Suisse First Boston Mortgage Securities)
     Corp., Commercial Mortgage Pass-Through)
 9   Certificates, Series 1999-C1,          )
                                            )
10     Defendant                            )
                                            )
11   and CSFB 1999-C1 ROYALL STREET, LLC,   )
                                            )
12     Defendant/Plaintiff-in-Counterclaim  )
                                            )
13   and                                    )
                                            )
14   WILLIAM LANGELIER and GERALD FINEBERG, )
       Defendants-in-Counterclaim           )
15   _____   )
16
17          DEPOSITION OF CURTIS J. MALLEGNI
18   _____
19            Wednesday, March 8, 2006
20          Volume I   (Pages 1 - 247)
21
22
23   REPORTED BY:  CYNTHIA A. PACINI, CSR #6117, RMR, CRR
24   (03-378932)
25
```

Page 9

```
1              MR. BARNETT:  I don't think so by way of
2     preliminaries.
3              MR. McGLYNN:  Q.  Okay.  Would you please, for
4     the record, give us your full name and your home
5     address, Mr. Mallegni?
6          A.   It is Curtis, C-u-r-t-i-s.  Middle initial is
7     J.  Last name is M-a-l-l-e-g-n-i.  The address is 15
8     Beachmont, B-e-a-c-h-m-o-n-t, San Francisco.
9          Q.   Is that Beachmont Street, sir, or --
10         A.   It's Drive actually.  Beachmont Drive.
11         Q.   Okay.
12         A.   San Francisco, 94132.
13         Q.   And are you currently employed, sir?
14         A.   Yes, I am.
15         Q.   And by whom?
16         A.   Wells Fargo Bank.
17         Q.   And is that the proper name of the entity that
18    you work for, Wells Fargo Bank?
19         A.   Yes.  I think it's legally Wells Fargo Bank,
20    N.A.
21         Q.   And your office address for your place of
22    employment is where?
23         A.   45 Fremont Street, second floor, San
24    Francisco, California.
25         Q.   And how long have you worked for Wells Fargo
```

Curtis J. Mallegni                                                          03/08/2006

Page 15

1    commercial mortgage group of Wells Fargo Bank.

2        Q.    And is that based also on Fremont Street in

3    San Francisco?

4        A.    Correct.

5        Q.    And it's part of --

6        A.    There is another office though in Concord as

7    well at the Willow Pass Road address which appears, I

8    think, in one of the subpoenas.  1320 Willow Pass Road,

9    Concord.

10        Q.    And what in particular is located in the

11    Concord, California location?

12        A.    Documentation, operations, compliance number

13    of other groups.

14        Q.    And your office is located within Wells Fargo

15    Bank N.A.; correct?

16        A.    Yes.

17            MR. BARNETT:  Objection.

18            MR. McGLYNN:  Q.  And the 45 Fremont Street

19    address, is that the main headquarters for Wells Fargo?

20        A.    No.

21        Q.    Where is Wells Fargo's main headquarters?

22        A.    420 Montgomery Street.

23        Q.    And how long have you been the portfolio

24    manager for Wells Fargo?

25        A.    Since June of 2005.

Curtis J. Mallegni

```
 1                    What counsel has presented to me is Exhibit 51
 2      Polcari, which appears to be a copy of the pooling and
 3      servicing agreement dated October 11th, Wells Fargo
 4      Bank listed as servicer and Lennar Partners listed as
 5      special servicer generally.
 6                    MR. McGLYNN:  Q.  And you are familiar with
 7      this document; correct?
 8           A.    I am.
 9           Q.    And Wells Fargo in Polcari 51 is a so-called
10      master servicer; correct?
11           A.    That's correct.
12           Q.    And did you have any role either as an asset
13      manager or as a portfolio manager for Wells Fargo Bank
14      in connection with Wells Fargo's role as master servicer
15      under Polcari 51?
16           A.    Yes.
17           Q.    And what roles did you have?
18           A.    I was the asset manager assigned to this pool.
19           Q.    And your duties in connection with that
20      particular asset pool consisted of what, sir?
21           A.    As an asset manager, you are basically the
22      credit manager for all the loans in a particular pool.
23      And what that means is that you would monitor the credit
24      quality of the loans.  You would analyze and respond to
25      borrower requests as they came up as it related to the
```

Curtis J. Mallegni                                                              03/08/2006

Page 19

```
 1   collateral.  You would be somewhat involved in loan

 2   assumptions perhaps on a sale of the property.  Really

 3   all those kinds of things that would affect the normal

 4   real estate credit of the loans themselves.

 5       Q.   And you are -- when I say "you," can we agree

 6   when I'm talking about you, Wells Fargo is serving as

 7   the master servicer on behalf of a particular client or

 8   group of clients?

 9       A.   Well, we're --

10            MR. BARNETT:  Objection.  Go ahead.

11            THE WITNESS:  We're serving on behalf of the

12   trust.

13            MR. McGLYNN:  Q.  Right.  That's -- in this

14   particular instance, this is the trust where J.P. Morgan

15   Chase serves as the trustee?

16       A.   This document says Chase Manhattan Bank as

17   trustee.

18       Q.   And do you know what a special servicer is?

19       A.   Yes.

20       Q.   And in this particular PSA, Polcari 51, Lennar

21   Partners is the special servicer; correct?

22       A.   Correct.

23       Q.   Can you tell us -- do you have an

24   understanding as to what the role, the different roles

25   of master versus special servicers at least in
```

Curtis J. Mallegni

03/08/2006

Page 20

```
1    connection with this particular pool?

2         A.    Yes.

3         Q.    Can you please tell us what those are as you

4    understand them?

5         A.    Yes.  In general terms, starting with the

6    master servicer, the master servicer basically is

7    responsible for the administrative matters relative to a

8    loan.  That would be, for example, making sure payments

9    are collected, processing cash, making sure that

10   payments are on time, renewing insurance, disbursing

11   reserves and entertaining borrower requests that are

12   within the authority of the master servicer under the

13   pooling and servicing agreement.

14         In addition, the master servicer's

15   responsibility is to monitor the credit quality, prepare

16   watch lists and do those kinds of things.  So in real

17   general terms, those are the basic responsibilities of

18   the master servicer.

19         Q.    These -- the loans -- there are -- there are

20   pools of loans that, at least in this case, comprise the

21   Polcari 51; correct?

22              MR. BARNETT:   Objection.  Go ahead.

23              MR. McGLYNN:   Q.   You may answer.

24         A.    Yes.

25         Q.    And these loans are not -- these loans,
```

Curtis J. Mallegni

03/08/2006

Page 21

1    generally speaking, were not originated by Wells Fargo

2    Bank; correct?

3         A.    Not necessarily.

4         Q.    But --

5         A.    Now, I should clarify in this case, I don't

6    know who originated the loans.  In many cases, Wells

7    Fargo does originate a portion of the loans in the pool,

8    but I'm not familiar with the particulars of these

9    loans.

10        Q.    And Wells Fargo is compensated for its

11   services as master servicer?

12        A.    Yes.

13        Q.    Are you aware of how Wells Fargo is

14   compensated?

15             MR. BARNETT:  If you know.

16             THE WITNESS:  Honestly, I'd mislead you if --

17   I'd be guessing, so I don't know exactly how we're

18   compensated.

19             MR. McGLYNN:  Q.  But they are -- it is a

20   service fee or a charge that Wells Fargo collects from

21   the trust for the services that it performs as master

22   servicer; correct?

23        A.    Yes.

24             MR. BARNETT:  Objection.  Go ahead.

25             THE WITNESS:  Fees are a portion of the

```
 1   compensation.
 2            MR. McGLYNN:  Q.  And when you say there's a
 3   portion, is there any other form of compensation that
 4   Wells Fargo receives as master servicer?
 5            MR. BARNETT:  Objection.  He's testified he
 6   doesn't know the details.
 7            THE WITNESS:  Well, I know fees are, but I
 8   can't again give you a true picture of all the ways that
 9   we're compensated.  Fees -- perhaps there's collection
10   of late charges.  Each pool is different.
11            MR. BARNETT:  Don't speculate.
12            MR. McGLYNN:  Q.  Now, are you aware,
13   generally speaking, under Polcari 51, what circumstances
14   must exist before a loan transfers from master servicer
15   to special servicer?
16       A.   Yes.
17       Q.   Can you please tell us about what your
18   understanding of those conditions are or circumstances?
19       A.   There's a portion in this pooling and
20   servicing agreement which defines special service
21   transfers or, I think, service transfer events.  And
22   they're enumerated there, and there's seven or eight
23   items.  And those are the circumstances under which the
24   loans are transferred from the master servicer to the
25   special servicer.
```

Curtis J. Mallegni                                                          03/08/2006

Page 23

1          Q.    Okay.   And would it be a fair statement that
2     generally those circumstances can be briefly summarized
3     either that the loan is in default or the loan is in --
4     strike that -- default is imminent?
5               Are those essentially the conditions under
6     which transfer from master to special servicer would be
7     triggered?
8               MR. BARNETT:   Objection.
9               THE WITNESS:   That's one.   But they can
10    actually be in default as well.
11              MR. McGLYNN:   Q.   All right.   Do you have an
12    understanding as to what happens to Wells Fargo's fee
13    compensation once a loan is transferred over to the
14    special servicer?
15         A.    I don't.
16         Q.    Is there anyone within Wells Fargo that has
17    the role, if not the title, of transitioning loans from
18    master to special servicer or at least with respect to
19    Polcari 51?
20         A.    Yes.
21         Q.    Can you identify who that person is?
22         A.    The asset manager and the portfolio manager.
23         Q.    Okay.   And with respect to Polcari 51, would
24    that be you, sir?
25         A.    Yes.

Page 24

1          MR. BARNETT:   Objection on time frame.

2          MR. McGLYNN:   Well, I was just going to get to

3     that.

4          Q.   Now, when you served as asset manager up until

5     June of 2005, did you have a role in this transitioning

6     process at least with respect to Polcari 51?

7          A.   Yes.

8          Q.   And what role was that, sir?

9          A.   Was to recommend transfer.

10         Q.   And did you have a superior that you reported

11    to at that time?

12         A.   Yes.

13         Q.   Would he or she be known as the portfolio

14    manager?

15         A.   Correct.

16         Q.   Who was that person?

17         A.   Kathryn O'Neal.  O-n-e-a-l.

18         Q.   And Kathryn with a K?

19         A.   Yes.  Thank you.

20         Q.   And then you assumed Ms. O'Neal's position in

21    June of last year; correct?

22         A.   Correct.

23         Q.   What happened to Ms. O'Neal?

24         A.   She's now the head of the whole servicing

25    group.

Curtis J. Mallegni

03/08/2006

Page 25

1      Q.    Okay.  And this whole servicing group, is it

2  fair to say that it, too, is also part of Wells Fargo

3  Bank?

4      A.    Yes.

5      Q.    Did you have any involvement in connection

6  with the loan which comprises -- which is part of

7  Polcari 51 known as Blue Hills Office Park, LLC?

8      A.    Yes.

9      Q.    Can you tell us what your involvement was,

10 sir?

11     A.    Well, I was the asset manager for the pool and

12 Blue Hills was one of the loans in that pool.  And that

13 was my role.

14     Q.    And did you have within this pool, Polcari

15 51 -- and if we can agree, sometimes I may not get it

16 all out.  But if we talk about the pool, I'm only

17 talking about this one --

18     A.    Fair enough.

19     Q.    -- as opposed to any other pools you may have

20 been involved in.

21          Was there only one -- at the time you were

22 asset manager, was there only one asset manager for this

23 pool?

24     A.    Yes.

25     Q.    And you were it?

Curtis J. Mallegni

03/08/2006

Page 26

```
 1        A.    Yes.

 2        Q.    Did you have individuals, again with respect

 3   to this pool, that reported to you during your period as

 4   asset manager?

 5        A.    No.

 6        Q.    You were it?

 7        A.    Yes.

 8              MR. BARNETT:   Objection.

 9              MR. McGLYNN:   Q.   And approximately how

10   many -- you may answer.  Your counsel has to object for

11   the record and we just move on.  That's why we reserve

12   everything until the time of trial, so we're not

13   fighting with each other today about it.

14              And as portfolio manager, do you have

15   individuals with respect to this pool that report to

16   you?

17        A.    Yes.

18        Q.    Can you identify those individuals?

19        A.    Yes.

20        Q.    Would you please do so.

21        A.    I will.  Debra Rudder.

22        Q.    R-u-d-d-e-r?

23        A.    R-u-d-d-e-r, D-e-b-r-a.  Gary Gamage, G-a-r-y,

24   G-a-m-a-g-e.  Jimmy Yoo, Jimmy, G-i-m-m-y (sic), Y-o-o.

25   I'm sorry.  I misspoke.  Jimmy, J-i-m-my.  Jerry Stumpf,
```

```
 1    S-t-u-m-p-f.

 2         Q.    Is that Jerry with a G?

 3         A.    Jerry with a J.  Jeanne Brewster, J-e-a-n-n-e,

 4    Brewster, B-r-e-w-s-t-e-r.  Ken Murray, K-e-n, Murray,

 5    M-u-r-r-a-y.  And there's -- there's Lisa Connolly, but

 6    she is devoted to assumptions.  She is also in the asset

 7    management group.

 8         Q.    Thank you.  Now, you are familiar with a

 9    gentleman by the name of Brent Lloyd?

10         A.    Yes.

11         Q.    Who is Mr. Lloyd?

12         A.    Currently, Brent is in asset administration,

13    and he works for Wells Fargo Bank in the servicing group

14    in Concord.

15         Q.    Did he report to you in connection with

16    this pool while you served as asset manager?

17         A.    No.

18         Q.    Did he -- what role, if you know, did

19    Mr. Lloyd have for the years 2003 through 2005?

20               MR. BARNETT:  Objection.

21               MR. McGLYNN:  Q.  You may answer.

22         A.    He was in the tax department.

23         Q.    And what does the tax department do?

24         A.    In general terms, the tax department basically

25    makes sure that the taxes get paid on time for all the
```

Curtis J. Mallegni                                                    03/08/2006

Page 28

```
 1   loans.  They're involved with the reserves.  Any of our
 2   loans -- most of our loans have reserves for taxes.  And
 3   so they're involved basically in getting taxes paid on a
 4   timely basis.
 5        Q.   All right.  So this is Mr. Lloyd's tax
 6   department.  Would this be considered a back office
 7   operation for the work that you do as asset manager?
 8            MR. BARNETT:  Objection.
 9            THE WITNESS:  Well, if the objection -- yeah,
10   back office is a little vague, but essentially in common
11   colloquialism, yeah, he's more of a back office.
12            MR. McGLYNN:  Q.  Okay.  And Jill Martin, can
13   you identify who Ms. Martin is?
14        A.   Yes.
15        Q.   Who is she?
16        A.   Jill Martin is currently the payoff manager in
17   the operations group.
18        Q.   Is she also based in Concord?
19        A.   Correct.
20        Q.   Now, you are an employee of Wells Fargo Bank;
21   correct?
22        A.   Correct.
23        Q.   You get your paycheck from Wells Fargo?
24        A.   Correct.
25        Q.   And this is the same bank that people have
```

Curtis J. Mallegni                                                    03/08/2006

Page 29

1    checking accounts with, home loans with?  It's the same

2    Wells Fargo Bank that is located on Fremont and

3    Montgomery Street in San Francisco?

4              MR. BARNETT:  Objection.

5              MR. McGLYNN:  Q.  You may answer.

6        A.    Correct.

7        Q.    What are your office hours, sir, your working

8    hours?

9              MR. BARNETT:  Objection.

10             THE WITNESS:  I'm at work probably about 7:45.

11   I usually leave the office at 5:30 or so in the evening.

12             MR. McGLYNN:  Q.  Is the bank open on

13   Saturdays?

14             MR. BARNETT:  Objection.

15             THE WITNESS:  Some retail branches are open on

16   Saturday.  We are not open on Saturday.

17             MR. McGLYNN:  Q.  All right.  But the bank

18   retail branches are open on Saturdays or at least some

19   of them?

20       A.    Some of them are, but I can't speak

21   authoritatively on that.

22       Q.    Now, sir, do you have, with respect to Polcari

23   51 -- and I'll be happy to give you a copy to look at --

24   do you have any understanding of the types of standards

25   which Wells Fargo as master servicer must follow in

Curtis J. Mallegni

03/08/2006

Page 30

```
 1    connection with its role with, at least with respect to
 2    this pool?
 3              MR. BARNETT:   Objection.
 4              THE WITNESS:   Yes.
 5              MR. McGLYNN:   Q.   And direct your attention to
 6    3.01.  I'm going to try to give you a page number on
 7    that, but it is Section 3.01, which is on page 69 of
 8    Polcari 51.
 9        A.    Okay.
10        Q.    Please take a moment, take a look at it.
11        A.    Sure.
12        Q.    Read as much of it as you want.  Tell me when
13    you're through.
14        A.    You want me to read through all the way?
15        Q.    I'm going to confine my questions, at least at
16    this point --
17        A.    Okay.  I'll read it.
18        Q.    -- to 3.01(a).
19        A.    Okay.
20              (Discussion off the record.)
21              MR. McGLYNN:   Q.   Back on the record.  Have
22    you had a chance to review 3.01, at least 3.01(a),
23    Mr. Mallegni?
24        A.    Yes.
25        Q.    You're familiar with this particular section
```

Curtis J. Mallegni

03/08/2006

Page 31

```
 1    of this exhibit?

 2              MR. BARNETT:  Objection.

 3              THE WITNESS:  Generally, yes.

 4              MR. McGLYNN:  Q.  And this is a section of the

 5    PSA that defines the standards, among other things, the

 6    standards of care that both the servicer and the special

 7    servicer have to follow with respect to pooled loans?

 8              MR. BARNETT:  Objection.

 9              THE WITNESS:  Correct.

10              MR. McGLYNN:  Q.  And in this particular

11    document, the servicer, that's Wells Fargo; correct?

12        A.   Correct.

13        Q.   And the master servicer so far as you know is

14    Lennar Partners?

15        A.   Correct.

16        Q.   Is this pool still in existence?

17        A.   Yes, it is.

18        Q.   And this is not the first time you've seen

19    this document?

20        A.   No.

21        Q.   At the time -- and when did you first become

22    involved in being an asset manager for loans within this

23    pool?

24        A.   When I joined the group in June of 2002.

25        Q.   And at that time, did Wells Fargo provide you
```

Curtis J. Mallegni                                                    03/08/2006

Page 40

1    has come and asked you for a time extension to pay real

2    estate taxes?

3         A.    I can't remember.

4         Q.    Have you -- can you recall any examples with

5    respect to this pool where you have granted time

6    extensions for the payment of any obligations under any

7    loan documents by a borrower?

8         A.    I can't remember, although I would like to

9    clarify my answer.  As a matter of practice, timing of

10   payment is what it is so that I view it beyond the scope

11   of my authority to grant an extension, whatever that may

12   be.

13              So that if someone is late in their payment,

14   they pay when they can.  We monitor performance and

15   leave it at that.  So I would not formally extend the

16   payment date 'cause I think the language here precludes

17   me from doing that.

18        Q.    All right.  When you say you would monitor it,

19   is it a fair -- is it a fair statement to say that you

20   would monitor it and obviously follow up to make sure

21   that eventually that payment was made?

22        A.    Yes.

23        Q.    And is there any -- have there been times

24   where you have had borrowers at least within this asset

25   pool that have been late in making whatever payments

Curtis J. Mallegni

03/08/2006

Page 41

```
 1    they had to make under the loan documents?
 2         A.    Could I hear that again?  I'm sorry.
 3         Q.    I'll rephrase it.  Other than the Blue Hills
 4    Office Park, LLP, loan, have you had any other loans
 5    where the borrower has been late in making whatever
 6    payments are required under the loan documents?
 7         A.    In this pool?
 8         Q.    In this pool.
 9         A.    I know that to be the case.
10         Q.    And with respect to those late payments, tell
11    us what your standard procedure was.
12              MR. BARNETT:  Objection.
13              THE WITNESS:  I have to digress a bit here to
14    explain the process to try to help --
15              MR. McGLYNN:  Q.  All right.  Fair enough.
16         A.    -- you understand.
17         Q.    Fair.  Thank you.
18         A.    We have a collection group.  The collection
19    group monitors the timeliness of payments.  We also have
20    another group within servicing who prepares watch lists
21    and certain loans, among other things, if they're
22    delinquent, wind up on the watch list.
23              But to try to answer your question, I want to
24    come back to your question and answer it.  I would not
25    be intimately involved in the collection on a daily
```

Page 42

```
1    basis of the loan payments.  There's an escalation
2    process from the people who are actually working to
3    collect those payments, whereas if it got to be extreme
4    or, you know, an extended period of time, it would
5    escalate up.  We have reports that monitor
6    delinquencies, et cetera.
7         Q.    And then if it escalates up at least to a
8    certain level, it would escalate up to you as asset
9    manager?
10        A.    Yes.
11        Q.    And have you had occasions with respect to
12   this pool where loans have escalated up, in your words,
13   to you?
14        A.    Yes.
15        Q.    And, generally speaking, tell us what your
16   understanding of the process is when a delinquent loan
17   escalates up to you.
18             MR. BARNETT:  Objection.
19             MR. McGLYNN:  Q.  You may answer.
20        A.    Well, if the loan -- if a loan is delinquent,
21   you may perform sort of a cursory review of the whole
22   loan itself, what's going on with the property, consider
23   the rent role, and then perhaps -- and talk to the
24   analysts working on it.
25             You may -- it may prompt a telephone call
```

Page 43

```
 1    directly to the borrower to understand why payment is
 2    late, anything of that nature, and then make an
 3    evaluation if this is something that is symptomatic of a
 4    longer, larger problem or perhaps an interim struggle
 5    here, and you just make a subjective judgment on a
 6    case-by-case basis.
 7         Q.   So is it your understanding that there's no
 8    specific set of criteria or events that would trigger,
 9    for example, declaring a borrower to be in default?
10              MR. BARNETT:   Objection.
11              THE WITNESS:   Well, I think again that's a
12    facts and circumstances case.
13              MR. McGLYNN:   Q.   Now, is it the case that
14    the -- that -- again, we're confining ourselves to this
15    pool unless otherwise stated -- does Wells Fargo have
16    the ability to declare or deem some borrower to be in
17    default?
18         A.   Yes.
19         Q.   All right.   So that's something that Wells
20    Fargo has the ability to do within its role as master or
21    servicer under this PSA?
22         A.   That's my understanding.
23         Q.   All right.   So it's not a case where it has to
24    be transferred to the special servicer for a declaration
25    of default to be issued to the borrower?
```

Curtis J. Mallegni                                                03/08/2006

Page 44

```
 1        A.   Correct.

 2        Q.   That could come from your office?

 3        A.   Yes.

 4        Q.   Now, sir, you are of course familiar with the

 5   loan which is part of this or was part of this pool

 6   known as the Blue Hills Office Park, LLC, loan?

 7        A.   Yes.  Yes.

 8        Q.   And tell us what your involvement has been

 9   with respect to that particular loan.

10        A.   Well, I was the asset manager on this pool in

11   2004.  There was some activity which came to my

12   attention through Lennar, through the analysts that were

13   working on this particular loan and this pool, and then

14   later in communication with representatives of the

15   borrower.

16        Q.   And this loan was ultimately transferred to

17   Lennar as special servicer; correct?

18        A.   Correct.

19        Q.   And directing your attention to what's been

20   marked as Polcari 57.

21        A.   Can we --

22        Q.   We can certainly dispense with Polcari 51.

23        A.   Okay.

24             (Discussion off the record.)

25             MR. McGLYNN:   Q.   All right.   Polcari 51, can
```

Page 45

1    you --

2              MR. BARNETT:  Just --

3              MR. McGLYNN:  57.  Excuse me.  57.

4        Q.    Can you identify 57?

5        A.    Yes.  This is a transfer recommendation and

6    approval from me to Kathryn O'Neal as the portfolio

7    manager recommending the transfer of the Blue Hills loan

8    to Lennar, the special servicer.  LNR -- well, I guess

9    in this pool they're actually Lennar Partners.

10       Q.    And the e-mail up above on the first page of

11   Polcari 57 is an approval from Ms. O'Neal of that

12   transfer; correct?

13       A.    Correct.

14       Q.    And she approved that under the "imminent

15   default provisions of the PSA"?

16       A.    Correct.

17       Q.    And do you have an understanding as to what

18   she meant by "imminent default provisions of the PSA"?

19             MR. BARNETT:  Objection.

20             MR. McGLYNN:  Q.  You may answer.

21       A.    Yeah.  I don't know what she meant by that,

22   but I know what I meant.  An imminent default is a

23   situation where, because of the circumstances, in our

24   reasonable judgment a default in the near term is

25   imminent.

Curtis J. Mallegni                                                    03/08/2006

Page 46

1        Q.   Did you have an understanding as to what

2    those -- what that imminent default or default in the

3    near term, your words, consisted of with respect to the

4    Blue Hills Office Park loan?

5        A.   Well, ultimately the failure to continue to

6    make timely payments.

7        Q.   But at the time that you made this

8    recommendation to Ms. O'Neal on August 16, 2004, what

9    was it that you were referring to or thinking about in

10   your recommendation to transfer this to the special

11   servicer?

12       A.   What I was thinking about was the fact that

13   they had been proactively marketing based on the

14   information available to me this vacant space.  It was

15   huge.  Well, it was a big space.  I think it was over

16   250,000 feet.

17            They had been unsuccessful.  And later in

18   conversation correspondence with Mr. Donovan, he had

19   also requested a meeting with Lennar, which gave me the

20   sense that his intention was to try to work with an

21   authority that had some ability to make modifications to

22   change the loan or to do whatever he had in mind, which

23   again I don't want to speculate.  I'm not sure where

24   they were headed.

25       Q.   Thank you.  But it was your understanding of

Page 47

1    Polcari 51 (sic) that any modifications of the mortgage

2    or the note would require the consent of Lennar as the

3    special servicer?

4        A.   Any -- yes.

5        Q.   And it was your understanding that Wells Fargo

6    as the servicer or master servicer would not have the

7    authority to grant that type of a consent?

8        A.   If that's what they had in mind, yes.

9        Q.   Now, sir, the second page of this exhibit,

10   Polcari 51 (sic), there's a section entitled "Status."

11   Do you see that?

12       A.   Yes.

13       Q.   And these are various bullet points that you

14   summarized, I guess, to -- presumably to support your

15   conclusion or recommendation that the loan should be

16   transferred to Lennar Partners?

17       A.   Yes.

18       Q.   And one of the things you say that in the

19   bullet, fourth bullet down, it says, "There is a

20   $4,121,728 million reserve for re-leasing, which the

21   borrower has indicated they would like to use for debt

22   service."

23            Do you see that?

24       A.   Yes.

25       Q.   What did you mean by that, sir?

Page 48

1        A.    Well, that reflects conversation which must
2    have taken place between myself and a representative of
3    the borrower, probably -- likely Mr. Donovan, which
4    perhaps he suggested he would like to do that.
5        Q.    All right.  Do you recall if that was a
6    telephone conversation with Mr. Donovan that you had?
7        A.    I don't remember.
8        Q.    And your recollection is that Mr. Donovan had
9    asked to use a certain amount of this reserve for
10   payment of debt service?
11       A.    Yes.
12       Q.    You were familiar with the reserve
13   requirements for this particular loan involving Blue
14   Hills Office Park?
15            MR. BARNETT:  Objection.
16            THE WITNESS:  Generally, yes.
17            MR. McGLYNN:  Q.  And as of August 16th,
18   there was approximately $4.1 million in reserve for this
19   loan?
20       A.    Correct.
21            MR. BARNETT:  Objection.
22            MR. McGLYNN:  Q.  And did you have an
23   understanding as to what the borrower could do with
24   respect to this reserve money?
25            MR. BARNETT:  Objection.

Page 56

```
 1      A.    Yes.

 2      Q.    And the other one is Polcari 56; is that

 3   correct?

 4      A.    That's correct.

 5      Q.    And Polcari 56 is a multi-page document which

 6   has as its first page a fax transmittal letter addressed

 7   to you?

 8      A.    Correct.

 9      Q.    And you recall receiving this on or about the

10   13th of August, 2004?

11      A.    Yes.

12      Q.    And this was from Joseph Donovan?

13      A.    Yes.

14      Q.    And did this fax -- strike that.

15            Was this fax preceded by a phone call between

16   you and Mr. Donovan?

17      A.    Yes.  As I remember, Mr. Donovan and I were

18   trying to make contact.  I had made contact with him

19   about the status of the building in terms of the tenancy

20   and then I had gone on vacation for a week, and then I

21   think it says here "Sorry we have been missing each

22   other on the phone.  I would like to get this special

23   servicer involved."

24            So there was probably some voicemail back and

25   forth and then finally I had asked him for something in
```

Curtis J. Mallegni                                                          03/08/2006

Page 62

```
 1        A.    Yes, I'm with you.

 2        Q.    All right.  What does the date incoming

 3   signify?

 4              MR. BARNETT:  Objection.

 5              THE WITNESS:  I would from looking -- I don't

 6   know personally.

 7              MR. BARNETT:  If you don't -- don't speculate

 8   or guess.

 9              THE WITNESS:  Okay.  I don't know.

10              MR. McGLYNN:  Q.  Okay.  Do you know what the

11   clear date means?

12        A.    No, I don't know.

13        Q.    Do you know what work type means?

14        A.    No.

15        Q.    Do you know what tracking date/time means?

16        A.    No.

17        Q.    There's a very long number there.  Is that

18   something of a tracking number of a document?

19        A.    I don't know.

20        Q.    Item type, cash management.

21        A.    Don't know.  Again, I don't prepare this, so I

22   can't --

23        Q.    All right.  Do you know who, over on the far

24   right, servicer first name and last name, Elham Naoom --

25        A.    Yes.
```

Page 63

```
 1        Q.    Do you know who Elham Naoom is or was?

 2        A.    Yes.

 3        Q.    Can you tell us?

 4        A.    She works in operations.  Now actually she

 5   works in asset administration.

 6        Q.    All right.  Does she work out in Concord,

 7   California?

 8        A.    Yes.

 9        Q.    All right.  And she indicates that received

10   fax, borrower requesting debit out of their cash flow

11   subaccount for their P&I and their tax shortage.

12              Do you see that?

13              MR. BARNETT:  Objection.  Sorry.

14              THE WITNESS:  That's what it says, yes.

15              MR. McGLYNN:  Q.  And then that's comments --

16   "Comments 2."  And then under "Comments 1," "Referred

17   request to Curtis Mallegni as the borrower is making

18   request to the special servicer, 8/11/04."

19              Do you see that?

20        A.    I do.

21        Q.    Do you have any knowledge of what Ms. Naoom is

22   referring to?

23              MR. BARNETT:  Objection.  Foundation.

24              THE WITNESS:  I don't, other than what appears

25   there.
```

Curtis J. Mallegni                                              03/08/2006

Page 64

1              MR. McGLYNN:  Q.  Do you recall having any
2     communications written or oral from Elham Naoom or
3     anybody within her department concerning the borrower's
4     request --
5          A.   I don't --
6          Q.   -- as reflected in this Loancator document?
7              MR. BARNETT:  Objection.
8              THE WITNESS:  I don't --
9              MR. McGLYNN:  Q.  Excuse me?
10         A.   I don't remember.
11         Q.   You do not.  All right.
12              Okay.  Do you have any recollection of any
13    discussions with anybody within Wells Fargo concerning
14    the borrower's request to access reserve funds to pay
15    real estate taxes?
16              MR. BARNETT:  Before you answer that, I
17    don't -- I don't know with whom you've had those
18    discussions, but to the extent you had any with counsel,
19    then do not divulge the content or the substance of
20    communications with counsel; otherwise, answer the
21    question.
22              THE WITNESS:  Okay.
23              MR. McGLYNN:  Q.  Now, after all of that, do
24    you still remember the question?
25         A.   Yeah.  Did I have any -- well, I shouldn't ask

Curtis J. Mallegni                                                                    03/08/2006

Page 65

```
 1   the question.

 2       Q.   I'll ask the question.

 3       A.   Try again.  Sorry.

 4            MR. McGLYNN:  And we'll agree, Bruce, that if

 5   I ask the same question, you've already reserved your

 6   right to object.

 7       Q.   Did you have any discussions about the

 8   borrower's request to access reserve funds for real

 9   estate tax payments with anybody within Wells Fargo?

10       A.   Not that I can remember.

11       Q.   Do you -- did you -- once you returned from

12   vacation and you saw Mr. Donovan's August 13 fax --

13       A.   Yes.

14       Q.   -- which you have in front of you, what did

15   you do?

16            MR. BARNETT:  After getting the fax?

17            MR. McGLYNN:  After getting the fax, correct.

18            THE WITNESS:  I prepared the memo.  I prepared

19   the e-mail memo.

20            MR. McGLYNN:  Q.  This is the e-mail Polcari

21   57?

22       A.   Yes.

23       Q.   Did you have any further communications with

24   Mr. Donovan or anybody from Blue Hills Office Park

25   concerning any of the requests reflected in Polcari 56?
```

Curtis J. Mallegni                                                                    03/08/2006

Page 66

```
 1                MR. BARNETT:  I'm sorry.  Just a time frame.
 2      After receiving the fax?
 3                MR. McGLYNN:  After receiving the fax.
 4                THE WITNESS:  I may have.  I don't remember.
 5      I may have had -- if it was, it would have been with
 6      Mr. Donovan.
 7                MR. McGLYNN:  Q.  Now, if you can turn to,
 8      wherever it is here, Donovan 23, this is an August 2,
 9      2004 letter.
10           A.   Okay.
11           Q.   Correct?
12           A.   Yes.
13           Q.   And directing your attention to the Loancator.
14           A.   Yes.
15           Q.   Do you see this particular document logged in
16      to the Loancator tracking log?
17           A.   Well, I can't -- I see the fax and I see
18      Loancator, but not having received this at the time it
19      was addressed and not working with Loancator, I'd be
20      misleading you to say that this is this because I can't
21      make that connection.  I don't know that.
22           Q.   All right.  Fair enough.  But with respect to
23      that particular column that we've talked about here
24      where it says a date incoming of 8/4/2004 --
25           A.   Yes.
```

# EXHIBIT 17

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3                     --oOo--
 4   BLUE HILLS OFFICE PARK, LLC,            )
                                             )
 5      Plaintiff/Defendant-in-Counterclaim  )
                                             )
 6         vs.                               )Civil Action No.
                                             )05-CV-10506(WGY)
 7   J.P. MORGAN CHASE BANK, as Trustee for  )
     the Registered Holders of Credit        )
 8   Suisse First Boston Mortgage Securities )
     Corp., Commercial Mortgage Pass-Through )
 9   Certificates, Series 1999-C1,           )
                                             )
10      Defendant                            )
                                             )
11   and CSFB 1999-C1 ROYALL STREET, LLC,    )
                                             )
12      Defendant/Plaintiff-in-Counterclaim  )
                                             )
13   and                                     )
                                             )
14   WILLIAM LANGELIER and GERALD FINEBERG,  )
                                             )
15      Defendants-in-Counterclaim           )
     _____)
16
17           DEPOSITION OF WILLIAM J. LANGELIER
18   _____
19         Friday, March 10, 2006  (Pages 1 - 277)
20         (Pages 149-151 were marked CONFIDENTIAL)
21         (Pages 232-276 were marked CONFIDENTIAL)
22
23   REPORTED BY:  CYNTHIA A. PACINI, CSR #6117, RMR, CRR
24   (03-378689)
25
```

CONFIDENTIAL

Page 14

```
 1    absolutely certain.

 2         Q.    Had you ever seen the document signed by

 3    Mr. Fineberg before?

 4         A.    I just don't recall.

 5         Q.    Do you have in mind any other documents that

 6    Mr. McGlynn showed you?

 7         A.    Well, there were a lot of documents that

 8    flowed by me, Mr. Falby, but to recall them specifically

 9    at a moment's notice is difficult for me.  But certainly

10    a variety of documents that relate to this case.

11         Q.    I understand.  I'm just trying to get from you

12    any that stand out in your mind that you can remember

13    with specificity.

14         A.    Okay.

15         Q.    Are there any more?

16         A.    No.

17         Q.    Did you look at any documents on your own?

18         A.    Yes.

19         Q.    What did you look at?

20         A.    Oh, I looked at a reading file that was sent

21    to me by Mr. McGlynn's office.

22         Q.    What do you mean by reading file?

23         A.    Well, various documents that flowed back and

24    forth.  For example, I believe there were five or six

25    pages of handwritten notes from a Mr. Polcari, I
```

CONFIDENTIAL

Page 15

```
 1    believe.  I did look at that.  I looked at an e-mail

 2    that I had sent to Mr. Frank, other relevant documents

 3    that were in the reading file.

 4        Q.   Did you bring that reading file with you

 5    today?

 6        A.   No.

 7        Q.   Where is it?

 8        A.   It's at home.  At home.

 9             MR. FALBY:  Peter, do you have a copy with

10    you?

11             MR. McGLYNN:  No.

12             MR. FALBY:  Will you produce it to us, please?

13             MR. McGLYNN:  No, not without a court order.

14             MR. FALBY:  Q.  Did you look at any other

15    documents in preparation for testifying here today on

16    your own?

17        A.   Not that I can specifically recall, other

18    than, as I said, there was a general review, but to have

19    automatic recall of all the documents that I looked at,

20    I'm sorry, I can't do that.

21        Q.   Did you go back in any files that you maintain

22    and pull out documents on your own to look at as opposed

23    to looking at things your attorneys had given to you?

24        A.   I instructed my --

25             MR. McGLYNN:  Just a cautionary note.  No
```

CONFIDENTIAL

```
 1   discussion about any that you've had with any attorneys.

 2             THE WITNESS:  No.

 3             MR. McGLYNN:  Sorry.

 4             THE WITNESS:  I did forward to Mr. McGlynn's

 5   office the discovery file that you requested, anything

 6   that was relevant.  So I did go through the files that

 7   related to the loan back in '99 and forward that -- we

 8   did produce to Mr. McGlynn's office.  So, to that

 9   extent, yes.

10             MR. FALBY:  Q.  When did you do that?

11        A.   A few weeks ago, something like that.

12             MR. McGLYNN:  If you don't recall, just --

13   that's --

14             THE WITNESS:  Yeah.

15             MR. McGLYNN:  That's an answer.

16             MR. FALBY:  I think his answer was actually a

17   few weeks ago.

18             MR. McGLYNN:  Well, he looked at me and he had

19   a question mark, so --

20             THE WITNESS:  Yeah.  I think it was a few

21   weeks ago.

22             MR. FALBY:  Q.  Did Mr. Cohn send you any

23   documents to look at?

24        A.   No.

25             MR. McGLYNN:  You mean other than what he's
```

```
 1    previously testified to?

 2              MR. FALBY:  Q.  Well, did any of the documents

 3    that you have previously talked about come from

 4    Mr. Cohn?

 5         A.   No.

 6         Q.   Are there any other documents you've looked at

 7    in preparation for testifying?

 8         A.   No.

 9         Q.   Did you talk to anybody other than Mr. McGlynn

10    in preparation for testifying here today?

11         A.   Mr. Cohn.

12         Q.   When did you talk to him?

13         A.   He's my primary real estate lawyer, so I talk

14    to him almost every day, so, you know --

15         Q.   Let me rephrase the question then.

16              When did you talk to Mr. Cohn about your

17    deposition testimony?

18         A.   I don't recall the specific dates, although I

19    will say that they were simply general conversations.

20    There was no preparation.  You are going to have a

21    deposition, period.  So --

22         Q.   Leading up to this deposition, have you

23    discussed the substance of the lawsuit with him?

24              That could be a yes or no.

25              MR. McGLYNN:  Yes or no.  Yes or no.
```

CONFIDENTIAL

Page 18

```
 1              THE WITNESS:  Yes.
 2              MR. FALBY:  Q.  On more than one occasion?
 3      A.    Yes.
 4      Q.    Have you had any conversations with anyone
 5   other than attorneys to prepare for your deposition?
 6              MR. McGLYNN:  Again yes or no.
 7              THE WITNESS:  No.
 8              MR. FALBY:  Q.  You haven't spoken to
 9   Mr. Fineberg?
10      A.    No.
11      Q.    Have you spoken lately with him about the
12   lawsuit?
13      A.    No.
14      Q.    When's the last time you spoke to
15   Mr. Fineberg?
16      A.    Sometime in the early '90s probably.
17   Estimate.
18      Q.    The early '90s?
19      A.    Correct.
20      Q.    Did you talk to anybody else at Fineberg
21   Management in connection with your deposition
22   preparation?
23      A.    I stand corrected.  Now, I do recall having a
24   brief conversation with Mr. Frank.
25      Q.    Tell us about that conversation.
```

William J. Langelier                                                        03/10/2006

CONFIDENTIAL

Page 27

1        A.    No, I think he sued me.

2        Q.    For not making the capital call?

3        A.    Correct.

4        Q.    Were there -- well, strike that.

5              How far did that case get before it settled?

6        A.    I -- again understanding my age sometimes

7    dictates a fuzzy memory -- I think about six or eight

8    months, and then it was settled.

9        Q.    Were there depositions in that case?

10       A.    No.

11       Q.    Was there an exchange of documents?

12       A.    Not that I can recall.

13       Q.    What were the terms of the settlement?

14       A.    I just don't recall.

15       Q.    This was during the recession of the early

16   '90s?

17       A.    Correct.

18       Q.    The partnership needed money, didn't it?

19       A.    I believe so.

20       Q.    And you were having cash flow issues that

21   prevented you from making the call?

22       A.    I certainly was, yeah.

23       Q.    Which also led to the lawsuit by Shawmut Bank?

24       A.    Correct.

25       Q.    Have you spoken to Mr. Fineberg since that

William J. Langelier

CONFIDENTIAL

03/10/2006

Page 28

```
 1    lawsuit was settled?
 2        A.    In one or two meetings with Mr. Goldberg
 3    present, there was a conversation -- we had some
 4    conversations.
 5        Q.    When were those meetings?
 6        A.    Subsequent to the lawsuit, but, you know, in
 7    the last -- I'd say early '90s.  Somewhere in that
 8    range.
 9        Q.    Prior to the refinancing with Credit Suisse?
10        A.    Yes, that's right.
11        Q.    I take it that lawsuit between you chilled
12    your relationship, did it?
13        A.    Very well put.
14            MR. McGLYNN:  I'm going to object and ask you
15    to move on.  This is 15 years ago and well prior to the
16    genesis of this lawsuit.
17            MR. FALBY:  Q.  Have you done anything else to
18    prepare for your deposition that I haven't asked you
19    about?
20            MR. McGLYNN:  Asked and answered.  Objection.
21            THE WITNESS:  No.
22            MR. FALBY:  Q.  You have a bachelor of science
23    degree in economics from Villanova University, do you?
24        A.    Currently ranked number two in basketball.
25    Yes, I do.
```

William J. Langelier                                                    03/10/2006

CONFIDENTIAL

Page 45

1    interpretations of the rights under the loan documents

2    in this case; correct?

3         A.    Correct.

4         Q.    But you understand that the rights of the

5    parties, whatever they may be -- whoever is right,

6    whoever is wrong -- they're governed by what the loan

7    documents allow each side to do; correct?

8              MR. McGLYNN:  Objection.  Same instruction.

9              THE WITNESS:  I can't answer that question.

10             MR. FALBY:  Q.  Why not?

11        A.    Because I don't know the answer as a general

12   answer.

13        Q.    You brought the Blue Hills Office Park deal to

14   Mr. Fineberg, did you?

15        A.    Yes.

16        Q.    And originally Blue Hills Office Park was

17   owned by Royall Associates Realty Trust?

18        A.    Yes.

19        Q.    The beneficiary of which was Royall

20   Associates, the Massachusetts general partner we

21   mentioned earlier?

22        A.    Yes.

23        Q.    The trustees of which were Fineberg and you?

24        A.    Yes.

25        Q.    And the beneficiaries -- strike that.  The

William J. Langelier                                        03/10/2006

CONFIDENTIAL

Page 80

```
 1        A.    Correct.

 2        Q.    Turn back to the loan documents in 1999 with

 3   Credit Suisse.

 4        A.    Sure.

 5        Q.    Blue Hills Office Park -- at the -- strike

 6   that.

 7              From the Credit Suisse loan proceeds, Blue

 8   Hills Office Park received approximately $5.2 million;

 9   correct?

10        A.    Correct.

11        Q.    That was the amount left over after Sanwa --

12        A.    Sanwa.

13        Q.    -- Sanwa was repaid and various expenses were

14   paid as well?

15        A.    Correct.

16        Q.    And that $5.2 million was then distributed,

17   was it, to the beneficiaries of the Royall Associates

18   trust; that is, you and Mr. Fineberg?

19        A.    It was partially distributed, and there were

20   other monies set aside in reserve.  Voluntary reserves

21   that were not required by the lender.

22        Q.    How much money -- strike that.

23              What amount of the loan proceeds did you

24   receive?  In other words, what amount was distributed to

25   you?
```

William J. Langelier

03/10/2006

CONFIDENTIAL

Page 81

```
 1        A.    About approximately $2 million.  I believe

 2   that's the right number.  In that range.  And we

 3   reserved approximately a million dollars as well.  Rainy

 4   day reserve, shall we say.

 5        Q.    Blue Hills Office Park, LLC, was formed in

 6   connection with the loan closing to be the new owner of

 7   Blue Hills Office Park; correct?

 8        A.    The LLC, that's correct, yeah.  We were

 9   modernizing the documentation.

10        Q.    And Royall Associates Realty Trust, which had

11   owned the office park up to that point, deeded the

12   property to the new LLC?

13        A.    I believe that's what we did.

14        Q.    And the Royall Associates Realty Trust became

15   the sole member of the LLC?

16        A.    I believe that's right.

17        Q.    And to meet a requirement of the bank, an

18   additional trustee of the realty trust was appointed?

19        A.    I believe I recall that happening as well.

20        Q.    And that was Blue Hills Management Corp.?

21        A.    I believe that's right.

22        Q.    And that management corp. had to have a single

23   independent director, did it?

24        A.    I believe that's right.

25        Q.    And that became Susan Daly?
```

CONFIDENTIAL

Page 83

```
 1    recourse provisions, but I have to be -- my memory has
 2    to be refreshed.
 3              MR. FALBY:  Well, since we're suing you as a
 4    guarantor, I will refresh your memory to confirm that we
 5    have not made an egregious error.
 6              Let's mark as Exhibit 165 documents Bates
 7    stamped 5415 through 5434.
 8              (Whereupon, Deposition Exhibit 165 was
 9               marked for identification.)
10              THE WITNESS:  Yeah.  This is my assistant's
11    handwriting.
12              MR. FALBY:  Q.  Exhibit 165 attaches signature
13    pages to a guaranty that appear to have your signature
14    on them.  Is that your signature?
15         A.   Yes.
16         Q.   On the first couple pages?
17         A.   Yes.
18         Q.   Then there's a copy of a document called
19    "Guaranty" that begins on page 5421?
20         A.   Yes.
21         Q.   It ends with a signature page to which you
22    affixed your signature; correct?
23         A.   Correct.
24         Q.   Does this refresh your memory that in
25    connection with the Credit Suisse refinancing in 1999
```

CONFIDENTIAL

Page 84

```
 1    you signed a guaranty?

 2         A.    It was a limited guaranty.  That's what I

 3    would call it.  A limited guaranty, correct.

 4         Q.    Which made you liable under the circumstances

 5    set forth therein?

 6         A.    Bad boy stuff.

 7         Q.    That's a term of art in the industry, isn't

 8    it?

 9         A.    That's right.

10               MR. McGLYNN:  I don't know if it's a term of

11    art.

12               MR. FALBY:  Q.  Well, it's an expression

13    within the industry, isn't it?

14         A.    It's an expression.

15         Q.    And it refers to nonrecourse loans becoming

16    recourse when the borrower commits certain bad acts?

17         A.    Correct.

18         Q.    Which often include fraud?

19         A.    Correct.

20         Q.    Or some other violation of the loan documents?

21         A.    Correct.

22         Q.    And at the time, you obviously received the

23    guaranty; correct?

24         A.    Correct.

25         Q.    And you read it?
```

William J. Langelier

CONFIDENTIAL

03/10/2006

Page 129

1    know the precise account; correct?

2         A.    Before the foreclosure.  You said after.

3         Q.    I'm trying to lay a foundation here.

4              As of the foreclosure, November 2004, you

5    understood that the money was sitting in an account at

6    Bernkopf; correct?

7              MR. McGLYNN:  Objection.  You may answer.

8              THE WITNESS:  Correct.

9              MR. FALBY:  Q.  You didn't know the precise

10   account; correct?

11        A.    Correct.

12        Q.    But you understood that the $2 million payment

13   from the zoning appeal settlement had stayed in some

14   account at Bernkopf ever since it was paid in 2003 in

15   connection with the settlement of the zoning appeal;

16   correct?

17        A.    I believe that's correct.

18        Q.    After the foreclosure, what happened to the

19   $2 million payment that had been made in connection with

20   the settlement?

21        A.    That was -- part of the money stayed at

22   Bernkopf and part of the money was moved to a client

23   account, I believe, at Wilmer Hale for Andy Cohn to

24   control.  So that it was -- the 2 million was

25   essentially bifurcated 50-50.

EXHIBIT 18

1

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
2                     CHARLESTON DIVISION
3                       -  -  -  -  -
4     ------------------------------------x
      BLUE HILLS OFFICE PARK, LLC.,        :
5                                          :
                      Plaintiff,           :
6                                          :
          -vs-                             :    Case Number
7                                          :    05-CV-10506
      J.P. MORGAN CHASE BANK, as Trustee   :
8     For the Registered Holders of        :
      Credit Suisse First Boston           :
9     Mortgage Securities Corp.,           :
      Commercial Mortgage Pass-Through     :
10    Certificates, Series 1999-C-1,       :
                                           :
11                    Defendant.           :
      ------------------------------------x
12
13                      -  -  -  -  -
14
15         Deposition of JOSEPH F. RUBINO, the witness
16    herein, called for the purpose of Discovery Examination
17    by the Plaintiff, pursuant to the Federal Rules of
18    Civil Procedure, taken before Rita Rodriguez, a Notary
19    Public for South Carolina, at Stratus Business Center,
20    1156 Bowman Road, Mount Pleasant, South Carolina, on
21    Friday, March 17, 2006, commencing at 8:55 a.m.
22
                         -  -  -  -  -
23
24
25
```

10

1  A.   It was the origination of commercial mortgages
2       for the securitized industry as all conduit work,
3       which was originate mortgages for the purpose of
4       selling mortgages to investors.
5  Q.   And you did that from approximately May '97 to
6       April of 2003?
7  A.   Yes.
8  Q.   After that you became a consultant?
9  A.   I took a year off.
10 Q.   And what were the circumstances under which you
11      left CSFB?
12 A.   Voluntary resignation.
13 Q.   And as a consultant for CSFB, were you
14      essentially performing the same types of
15      services?
16 A.   Yes, I was.
17 Q.   Now, when you indicated that you were performing
18      work, I think you talked about it as conduit
19      work?
20 A.   Yes.
21 Q.   Am I correct in understanding your testimony?
22 A.   Yes.
23 Q.   What is a conduit lender?
24 A.   A conduit lender is one that originates loans for
25      the purpose of selling in a securitization to

11

1       investors.  Conduit is just a vehicle reference.
2  Q.   And was CSFB or at least the work that you were
3       doing at CSFB so-called conduit lending work?
4  A.   Yes.
5  Q.   And as I understand it, what CSFB would do would
6       be to originate the loan; correct?
7  A.   Yes.
8  Q.   Perform the due diligence necessary to underwrite
9       the loan; correct?
10 A.   Correct.
11 Q.   And package it up and then sell it in the
12      commercial mortgage backed securities market?
13 A.   Yes.
14 Q.   How does that work?  Could you summarize the
15      packaging and the selling of those loans into the
16      CMBS market, can you describe it for us?
17 A.   Yes.
18         MR. FALBY:  Let me object to the breath
19      of the question.
20         MR. McGLYNN:  It's a little bit murky
21      but I have a terrible head cold, if you would
22      indulge me.
23 A.   It works pretty much as I just described in terms
24      of my duties, which is, you learn of
25      opportunities to lend money, you compete for the

12

1       opportunity to lend the money, you bid the loan,
2       you quote the loan, the borrower accepts the
3       terms and conditions of the loan, you then take
4       it to the next step of due diligence and
5       underwriting of the documentation.
6         You ultimately, if everything is as
7       expected, you close the loan.  You put it on your
8       books, your balance sheet and you assign it to a
9       pool for securitization.
10 Q.   And that pool consists, at least generally
11      speaking, of a number of different loans that
12      then are managed by a trustee?
13 A.   Yes.
14 Q.   And how are those pools formed?
15         MR. FALBY:  Objection.  You can go
16      ahead.
17 Q.   You may answer.
18 A.   They're formed based on the balance sheet that
19      you have and you aggregate loans for ultimate
20      sale.
21 Q.   And what, if any, role does CSFB have in forming
22      these loan pools?
23         MR. FALBY:  Is your question directed
24      to any work there?
25         MR. McGLYNN:  Yes, everything,

13

1       obviously, relating to CSFB is during the period
2       11/96 to 4/05.
3  A.   CSFB is the original lender.
4  Q.   Does CSFB work with anybody to form these various
5       pools into which these loans are assigned or
6       transferred?
7  A.   I don't understand the question.
8  Q.   You are familiar with the property located at 150
9       Royall Street in Canton, Massachusetts?
10 A.   If that's the Blue Hills Office Park.
11 Q.   Yes, sir.
12 A.   Yes, I am.
13 Q.   And you were the originator on behalf of CSFB of
14      that particular loan?
15 A.   I was not the original originator.  I didn't
16      bring the deal in.  I was asked to work on the
17      deal after most of the marketing work, if you
18      will, was done by the originator to bring the
19      loan into the shop.
20 Q.   And that particular loan was then, after it
21      closed, it was assigned to a pool and J.P. Morgan
22      Chase served as trustee of that particular pool?
23 A.   I don't recall if they were the trustee or not.
24 Q.   What, if any, involvement, again, while you were
25      an employee or consultant of CSFB, did you have

4 (Pages 10 to 13)

**VERITEXT/SPHERION DEPOSITION SERVICES**
**(212) 490-3430**

14

1    in the formation of these various pools into
2    which these loans would be assigned?
3 A.   Other than originating individual loans for the
4    pools, I had no involvement in actually
5    constructing the entire pool. That was done by a
6    separate group that's called a securitization
7    group.
8 Q.   Was that a group within CSFB?
9 A.   Yes.
10 Q.   And that group was the one that would form the
11    various pools?
12 A.   Yes.
13 Q.   Were there any particular underwriting
14    requirements that existed either within CSFB or
15    otherwise in terms of the types of loans that
16    could go into these pools?
17 A.   Yes.
18 Q.   Do you have an understanding of what those rules
19    and regulations were?
20 A.   It would evolve as investor demand would change
21    and investor appetite. But there were various
22    minimum underwriting requirements such as,
23    depending on property type, such as debt service
24    coverage, loan to values, required documentation
25    matters, historical track record, property

15

1    performance.
2        But there were various financial covenant
3    type or, you know, coverages and loan to value
4    tests that generally our investors were looking
5    for in the context of individual property types.
6 Q.   What, if any, knowledge do you have as to how
7    these various loans within a pool are managed
8    once they become part of the pool?
9 A.   They're managed by, generally, initially a master
10    servicer. And the master servicer generally has
11    to, because they have a duty, if you will, to the
12    trustee, the bond holders, they generally have to
13    follow the documents as constructed.
14 Q.   When you talk about investors, are they able to
15    buy shares or certificates of a particular pool,
16    is that how it works?
17 A.   I don't think it's called shares. They're
18    called tranches. And every pool is tranched in
19    terms of triple A risk, double A risk, single A
20    risk, triple B risk, all the way down to
21    basically an equity risk. And investors with,
22    depending on what their investor criteria are,
23    could buy into the various tranches of the pool.
24 Q.   Do you know how those tranches are characterized
25    or categorized within a particular pool?

16

1 A.   No, I'm not --
2        MR. FALBY: Objection. I don't
3    understand the question so I object.
4 Q.   Go ahead. You can answer.
5 A.   I wasn't that -- I wasn't involved. That was
6    the securitization team's goal. And they would
7    create the pool and the pool characteristics
8    based on investor demand.
9 Q.   And what, if any, once these assets were assigned
10    to the pool, those loans were assigned to the
11    pool, were there reporting requirements by the
12    trustee in terms of the pool's performance?
13 A.   I'm not intimately familiar with them but, yes,
14    generally there were bond holder type reports
15    that I believe the master servicer and the
16    special servicer would put together that would
17    indicate how the pool was performing, whether a
18    loan had gone bad or whether it was on a watch
19    list or anything like that.
20 Q.   If you know, how does the investor or the
21    certificate holder understand how the loans and
22    the pools are performing?
23        MR. FALBY: You just said certificate
24    holder and he didn't say anything about that. Do
25    you mean anything in particular?

17

1        MR. McGLYNN: I'll strike that and
2    reformulate the question.
3 Q.   The investors in these pools, what are they
4    called, if you know?
5 A.   Generally referred to as bond holders.
6 Q.   The bond holders, is there a mechanism under
7    which the bond holders can determine how the pool
8    is performing?
9        MR. FALBY: Objection. He just
10    answered that.
11        Go ahead.
12 A.   Yes, they rely on reports that are prepared by or
13    reports where there is input from the master
14    servicer and the special servicer and also the
15    originators of the pools like a CSFB or a J.P.
16    Morgan or a Merrill who generally have their own
17    research departments that would publish research
18    based on how the pool has been performing.
19 Q.   So this is information that is accessible to bond
20    holders?
21 A.   Yes.
22 Q.   And you have an understanding that it is either
23    the duty or the obligation of either the trustee
24    or the servicer to prepare this information?
25        MR. FALBY: Objection to the extent

5 (Pages 14 to 17)

58

1  Q.  And that's 5 basis points to the total of 255
2      basis points; correct?
3  A.  Yes.
4  Q.  Is that also known as the spread?
5  A.  The 255 basis points?
6  Q.  Yes, sir.
7  A.  Yes.
8  Q.  And the benchmark is some form of a treasury bill
9      or treasury note?
10 A.  The ten-year treasury note.
11 Q.  Now, under those four paragraphs where it says
12     "Attached please find revised language in
13     connection with the 'cash flow sweep' which
14     captures our discussion."
15         Please take a moment to look at that and
16     then look at the Special Conditions: Cash flow
17     Sweep section on the attached page.
18 A.  Okay.
19 Q.  Do you recall having a discussion with either Mr.
20     Frank or Mr. Langelier about the reserves and the
21     cash flow sweep?
22 A.  Yes.
23 Q.  Can you tell us what you recall?
24 A.  No. I recall having conversations about it but I
25     can't recall the details about the conversations.

59

1  Q.  On the attached Special Conditions: Cash Flow
2      Sweep section it talks about a cap of 4.250
3      million.
4          Do you see that?
5  A.  Yes.
6  Q.  And that would be a total cap on the amount of
7      reserves that the borrower would have to fund in
8      connection with this particular loan?
9          MR. FALBY: Objection.
10 A.  Yes, subject to a top up provision, I believe,
11     and I'm not sure whether we had this in this
12     loan, but assuming we had top up provisions where
13     if he dipped into this they would have to bring
14     it back up.
15 Q.  In other words, if it dipped below the cap it
16     would have to be replenished?
17 A.  Yes.
18         - - - - -
19         (Thereupon, Rubino Exhibit
20          Number 185 was marked)
21         - - - - -
22 Q.  What we have marked as 185, this appears to be
23     the same document as 184.
24 A.  Yes.
25 Q.  But this has got some handwriting on it?

60

1  A.  Yes.
2  Q.  And this handwriting shows that you're sending
3      this from you to Tom something?
4  A.  Shuler.
5  Q.  Who is Tom Shuler?
6  A.  Tom Shuler was Bill Langelier's or, actually, he
7      was the borrower's mortgage broker.
8  Q.  Do you know what firm he was from?
9  A.  I can't remember the name of the firm. He was
10     out of the Washington D.C. area. I think it was
11     a firm with his own name in it.
12 Q.  Does he have big deals with mortgage brokers?
13 A.  Yes.
14 Q.  You say "The latest and greatest." Do you see
15     that?
16 A.  Yes.
17 Q.  Do you know what you meant by that?
18 A.  Yes, mortgage brokers, some mortgage brokers like
19     to be informed at all times of what's going on
20     with the deal so they can be intelligent with
21     their clients. And this is just the latest and
22     greatest developments.
23 Q.  So you're informing him as of -- I don't believe
24     there is any date on this. Is there any date
25     that you can point out to me on Rubino 185?

61

1  A.  I don't see one.
2          - - - - -
3          (Thereupon, Rubino Exhibit
4           Number 186 was marked)
5          - - - - -
6  Q.  Please take a moment and look at Rubino 186
7      (handing).
8          Tell me when you're through.
9  A.  I'm through.
10 Q.  This is a facsimile to you from Schulte, Roth &
11     Zabel?
12 A.  Yes.
13 Q.  And in particular from Andrew Cohen at Schulte,
14     Roth?
15 A.  Yes.
16 Q.  And you dealt with Mr. Cohen in connection with
17     this particular loan?
18 A.  Yes.
19 Q.  Did CSFB retain Schulte, Roth & Zabel as counsel?
20 A.  Yes.
21 Q.  And Mr. Cohen sent you a lease summary for the
22     so-called EquiServe First National Bank lease for
23     the building we are talking about?
24 A.  Yes.
25 Q.  On Page 2 of Mr. Cohen's or Schulte, Roth's lease

16 (Pages 58 to 61)

62
1    summary, Paragraph 2, take a moment and take a
2    look at that.
3         Do you see the underlined language?
4  A.  Yes.
5  Q.  Do you have an understanding -- this is a summary
6    of a particular provision in the subject lease?
7  A.  Yes.
8  Q.  And the original term or the initial term of this
9    lease expired July 31, 1999; correct?
10 A.  I don't have that memory.  But if that's the
11   case, that's the case.
12 Q.  And this particular language deals with what the
13   tenant has to do in terms of notifying the
14   landlord as to its intention to extend the lease?
15 A.  Yes.
16 Q.  And do you know why Mr. Cohen underlined this
17   particular language?
18        MR. FALBY:  Objection.
19 A.  No.
20 Q.  I'll represent to you it's the only section of
21   this document that appears to be underlined.
22        MR. FALBY:  Is there a question?
23        MR. McGLYNN:  No, that's just a
24   statement.
25        MR. FALBY:  There is no question.

63
1  Q.  The lease for this particular building that we're
2    talking about had one principal tenant; correct?
3  A.  As far as I recall, yes, there was one tenant.
4  Q.  That was EquiServe?  Do you recall the name
5    EquiServe?
6  A.  Yes.
7  Q.  And I guess that's an affiliate or owned by First
8    National Bank of Boston?
9  A.  Yes.
10 Q.  Your underwriting of this particular loan focused
11   in on this particular tenant; correct?
12 A.  Oh, yes.
13 Q.  Because obviously this was the primary if not the
14   exclusive source of cash flow for this building?
15 A.  I wouldn't say exclusive but it was the primary.
16 Q.  Roughly 96 or 97 percent of the rental income
17   came from EquiServe; correct?
18 A.  Yes.
19 Q.  It was important to you, from an underwriting
20   standpoint, to learn a little bit more about this
21   tenant?
22 A.  Yes, because you had a five-year lease that
23   expired halfway into the loan and you wanted to
24   make sure this was a tenant with good credit.
25 Q.  And, as I understand it, this was a ten-year

64
1    loan; correct?
2  A.  Correct.
3  Q.  And there was a possibility that this tenant
4    could decide to not renew the lease after the end
5    of that five-year lease term; correct?
6  A.  Correct.
7  Q.  And that was important as part of your
8    underwriting of this particular loan to know
9    that; correct?
10 A.  Yes.
11 Q.  What considerations did you have in terms of
12   underwriting this loan with respect to the fact
13   that EquiServe could move out halfway through the
14   loan term?
15        MR. FALBY:  Object to the form but you
16   can answer.
17 A.  The concerns were that you potentially had a
18   property with no tenant.  You had a nonrecourse
19   loan.  The lender was at risk if the tenant moved
20   out and you had a nonrecourse loan and you didn't
21   have any way to get a new tenant in.  So --
22 Q.  I'm sorry.  I'm sorry.  I didn't mean to
23   interrupt you.
24 A.  That is why the lender would have been very
25   focused on establishing some adequate level of

65
1    reserves such as the TI and leasing commission
2    account and the principal and interest account,
3    so that if the borrower was going to stay with
4    the property there would be ways to tide over the
5    property, which would protect the lender, and at
6    the same time enable the borrower to go out and
7    get a new tenant.
8  Q.  Have you finished?  It's not my intent to
9    interrupt you.  Sometimes you pause or trail off.
10   I interpret that as finishing the answer.
11        You said assuming the borrower was going
12   to stay with the property.  What did you mean by
13   that?
14 A.  What I mean is that this is a nonrecourse
15   business that we operated in.  And borrowers, as
16   it is nonrecourse, as long as borrowers comply
17   with the documents and don't do anything to
18   disturb or interrupt or interfere with the cash
19   flow due to the property or default in some other
20   way, as long as the borrower holds up his end of
21   the bargain, the lender understands that it's a
22   nonrecourse loan and borrowers, you know, when
23   circumstances like this happen, borrowers have
24   decisions to make.  And one is to continue to
25   comply with the loan documents to enable them to

17 (Pages 62 to 65)

62

1   summary, Paragraph 2, take a moment and take a
2   look at that.
3        Do you see the underlined language?
4  A.  Yes.
5  Q.  Do you have an understanding -- this is a summary
6   of a particular provision in the subject lease?
7  A.  Yes.
8  Q.  And the original term or the initial term of this
9   lease expired July 31, 1999; correct?
10 A.  I don't have that memory.  But if that's the
11  case, that's the case.
12 Q.  And this particular language deals with what the
13  tenant has to do in terms of notifying the
14  landlord as to its intention to extend the lease?
15 A.  Yes.
16 Q.  And do you know why Mr. Cohen underlined this
17  particular language?
18        MR. FALBY:  Objection.
19 A.  No.
20 Q.  I'll represent to you it's the only section of
21  this document that appears to be underlined.
22        MR. FALBY:  Is there a question?
23        MR. McGLYNN:  No, that's just a
24  statement.
25        MR. FALBY:  There is no question.

63

1  Q.  The lease for this particular building that we're
2   talking about had one principal tenant; correct?
3  A.  As far as I recall, yes, there was one tenant.
4  Q.  That was EquiServe?  Do you recall the name
5   EquiServe?
6  A.  Yes.
7  Q.  And I guess that's an affiliate or owned by First
8   National Bank of Boston?
9  A.  Yes.
10 Q.  Your underwriting of this particular loan focused
11  in on this particular tenant; correct?
12 A.  Oh, yes.
13 Q.  Because obviously this was the primary if not the
14  exclusive source of cash flow for this building?
15 A.  I wouldn't say exclusive but it was the primary.
16 Q.  Roughly 96 or 97 percent of the rental income
17  came from EquiServe; correct?
18 A.  Yes.
19 Q.  It was important to you, from an underwriting
20  standpoint, to learn a little bit more about this
21  tenant?
22 A.  Yes, because you had a five-year lease that
23  expired halfway into the loan and you wanted to
24  make sure this was a tenant with good credit.
25 Q.  And, as I understand it, this was a ten-year

64

1   loan; correct?
2  A.  Correct.
3  Q.  And there was a possibility that this tenant
4   could decide to not renew the lease after the end
5   of that five-year lease term; correct?
6  A.  Correct.
7  Q.  And that was important as part of your
8   underwriting of this particular loan to know
9   that; correct?
10 A.  Yes.
11 Q.  What considerations did you have in terms of
12  underwriting this loan with respect to the fact
13  that EquiServe could move out halfway through the
14  loan term?
15        MR. FALBY:  Object to the form but you
16  can answer.
17 A.  The concerns were that you potentially had a
18  property with no tenant.  You had a nonrecourse
19  loan.  The lender was at risk if the tenant moved
20  out and you had a nonrecourse loan and you didn't
21  have any way to get a new tenant in.  So --
22 Q.  I'm sorry. I'm sorry. I didn't mean to
23  interrupt you.
24 A.  That is why the lender would have been very
25  focused on establishing some adequate level of

65

1   reserves such as the TI and leasing commission
2   account and the principal and interest account,
3   so that if the borrower was going to stay with
4   the property there would be ways to tide over the
5   property, which would protect the lender, and at
6   the same time enable the borrower to go out and
7   get a new tenant.
8  Q.  Have you finished?  It's not my intent to
9   interrupt you.  Sometimes you pause or trail off.
10  I interpret that as finishing the answer.
11        You said assuming the borrower was going
12  to stay with the property.  What did you mean by
13  that?
14 A.  What I mean is that this is a nonrecourse
15  business that we operated in.  And borrowers, as
16  it is nonrecourse, as long as borrowers comply
17  with the documents and don't do anything to
18  disturb or interrupt or interfere with the cash
19  flow due to the property or default in some other
20  way, as long as the borrower holds up his end of
21  the bargain, the lender understands that it's a
22  nonrecourse loan and borrowers, you know, when
23  circumstances like this happen, borrowers have
24  decisions to make.  And one is to continue to
25  comply with the loan documents to enable them to

17 (Pages 62 to 65)

86

1 Q.   Fitch is one of the rating agencies?
2 A.   Fitch was one of the rating agencies that we made
3      reference to for the purposes of our underwriting
4      but I don't know if they were actually one of the
5      rating agencies who actually rated the deal.
6      You know, S&P and Fitch and Moody's guidelines.
7 Q.   Do you get these deals rated before they close?
8 A.   No.
9 Q.   You could only get them rated once they close?
10 A.  No, there was a process to go before you close.
11     But, at that time, we were very experienced in
12     this market and how the rating agencies thought
13     et cetera. So we had a good comfort level that
14     we knew how they would look at them.
15 Q.  And going on in that same line you have 1.20x
16     actual debt service coverage.
17 A.  Yes.
18 Q.  Does that mean that there was approximately
19     120 percent cash flow over debt service on this
20     particular loan?
21 A.  Yes, it means 120 percent of excess cash flow
22     after expenses over principal and interest.
23 Q.  Was that considered good at that time?
24         MR. FALBY: By whom?
25         MR. McGLYNN: By CSFB.

87

1          MR. FALBY: Objection.
2 A.   A 120 coverage is not considered a strong
3      coverage. It's an adequate coverage.
4 Q.   And then down below you have got the columns.
5      You have got at closing, at lease expiry and
6      these are various calculations of the debt
7      service coverage, among other things, at the loan
8      closing. And then at the lease expiratory for
9      the so-called Bank Boston or EquiServe lease.
10 A.  Yes.
11 Q.  And that lease expiry, is that at the end of the
12     five-year term that we have been talking about
13     during this deposition?
14 A.  Yes.
15 Q.  So that would have been five years into the
16     10-year term of this loan; correct?
17 A.  Roughly, yes.
18 Q.  Tell me what this shows then?
19 A.  What it shows is that, assuming that normal
20     payments of principal and interest are made, by
21     the time you get to the lease expiration the loan
22     will have amortized down to 31.8 million at that
23     date, which is the end of the lease.
24         And then it assumes that if you had the
25     same cash flows you would have a 125 coverage.

88

1 Q.   And looking back on Page 2 of this memo at the
2      top, that five-year term would expire somewhere
3      around August of 2004, at least according to your
4      memo?
5         MR. FALBY: Where are you?
6         MR. McGLYNN: Top of the second page of
7      the memo.
8 A.   If August was the right date or the end of July,
9      I don't know.
10 Q.  2004?
11 A.  Yes.
12 Q.  So basically you're saying that by July, August
13     2004, the loan is going to be paid down to a
14     little less than 32 million; correct?
15 A.  Yes, sir.
16 Q.  And that it's going to have a loan per square
17     foot of about $116?
18 A.  Yes.
19 Q.  And then you have got your interest rate and your
20     spread?
21 A.  Yes.
22 Q.  And then you have got CSFB net CF. What does
23     that mean?
24 A.  That's CSFB's net underwritten cash flow. That
25     is your numerator. Your numerator over your

89

1      principal and interest.
2 Q.   So that is annual cash flow of 3.642 million?
3 A.   Correct.
4 Q.   And then you divide it out and you get a DSC, at
5      least as of August 2, 3004, of 1.25?
6 A.   Yes.
7 Q.   But you would agree with me that if the tenant
8      did not extend the lease and there were no new
9      tenants that that DSC would go way down?
10 A.  There would be none. No cash flow. Unless the
11     borrower put it in.
12 Q.  This was a nonrecourse transaction; correct?
13 A.  Correct.
14 Q.  Now, down below under Deal Strengths.
15 A.  Yes.
16 Q.  The first one you have an investment rate 10 on
17     the building; correct?
18 A.  Yes.
19 Q.  And then the second bullet is that the
20     transaction structure provides for a strong
21     build-up of reserves during the first five loan
22     years; correct?
23 A.  Correct.
24 Q.  Was there any analysis done as to -- well, you
25     had made -- when I say "you," CSFB, had made a

23 (Pages 86 to 89)

190

1　　stuff is whited out. And I explained that that
2　　means that they redacted it because it contained
3　　attorney/client privileged information.
4　　　　　MR. McGLYNN: Thank you.
5　Q.　Do you recognize this, sir?
6　A.　Yes, it's the Cash Management Agreement.
7　Q.　Is this the first loan you had that had a Cash
8　　Management Agreement?
9　A.　No.
10　Q.　What is the purpose of the Cash Management
11　　Agreement in general?
12　A.　Because you have a nonrecourse loan and you're
13　　looking to protect the integrity of your assets
14　　and the revenue generating ability of your assets
15　　and all sources of income to your assets.
16　　　　　The purpose of the management account was
17　　to set out a mechanism whereby you would properly
18　　and appropriately have all funds accruing to the
19　　benefit of the asset flowing through and into
20　　various collateral accounts and subaccounts and
21　　escrow accounts such that if you at some point
22　　had a borrower who chose to step away from the
23　　property you would have the tenant or tenants to
24　　your property required to pay into a lock box and
25　　you still would have the benefit of the revenue

191

1　　flow despite the fact that you had a borrower
2　　that walked away. And it is designed to make the
3　　best attempt possible at keeping the borrower out
4　　of the flow of funds until the borrower is
5　　entitled to the funds.
6　Q.　It ties in with the reserve account language that
7　　we have discussed with respect to the mortgage
8　　agreement, among other things?
9　A.　Assuming this is the final document.
10　　　　　MR. FALBY: It's not.
11　Q.　Again, I preface this by saying generally.
12　A.　I'm trying to find something to make sure I can
13　　answer that question.
14　　　　　Yes, this document is meant to capture the
15　　various escrow funds, tax and insurance,
16　　replacement escrow, base leasing escrow, cash
17　　flow leasing escrow fund, operating expense
18　　account. This is meant to attach to the
19　　various -- and track and govern how the gross
20　　revenues from the property are allocated to the
21　　various funds and in what order.
22　Q.　This is a form document for CSFB, this Cash
23　　Management Agreement?
24　A.　I don't know whether the one in front of me is
25　　but they have a form Cash Management Agreement.

192

1　Q.　You can't identify this as being a form?
2　A.　Not unless I have someone at CSFB telling me that
3　　this was their base form document.
4　Q.　Do you know if this was a Schulte, Roth document
5　　in terms of who came up with it?
6　A.　I don't know. I don't know.
7　　　　　　- - - - -
8　　　　　(Thereupon, Rubino Exhibit
9　　　　　　Number 212 was marked)
10　　　　　　- - - - -
11　Q.　Take a moment to look at 212, Mr. Rubino, and
12　　tell me when you're through.
13　A.　Okay.
14　Q.　Generally, can you identify what Exhibit 212 is
15　　comprised of?
16　A.　You want me to take it apart and go through each
17　　one?
18　Q.　I said generally but you do it any way you want.
19　A.　I can see a draft of a Mortgage Note on top. I
20　　can see a draft of a Mortgage Assignment of Lease
21　　and Rents and Security Agreement. There is a
22　　Guarantee Agreement which makes the loan full
23　　recourse when the warm bodies don't do what
24　　they're supposed to do. There is an Assignment
25　　Subordination Management Agreement. There is an

193

1　　Environmental Indemnity. There is a Borrower's
2　　Certificate. A certificate regarding
3　　organizational documents. Green Bank
4　　instruction letter. There is a Cash Management
5　　Agreement.
6　　　　　And I don't know if I missed anything
7　　else.
8　　　　　MR. FALBY: You mentioned the agreement
9　　of leases and rents.
10　Q.　These are variants of the documents that are, the
11　　form documents used by CSFB for these types of
12　　loans?
13　　　　　MR. FALBY: Objection. No foundation.
14　A.　Assuming these were the form documents to start
15　　with.
16　　　　　MR. FALBY: Don't assume anything.
17　A.　I don't know.
18　Q.　Are they generally the type of documents that you
19　　have seen in the past with respect to similar
20　　loans as being the form documents of CSFB?
21　　　　　MR. FALBY: Object to the form. You
22　　can answer if you understand it.
23　A.　They're in the same form as the form documents
24　　but I don't know whether the substance is the
25　　same.

49 (Pages 190 to 193)

230

1   what would happen, our engineering would go out
2   and verify that the work has been done and we
3   would get a tenant estoppel.
4       It's the best way to satisfy ourselves
5   that the money that was reserved in this
6   particular fund was used for that purpose only
7   and not to be diverted or used for another
8   purpose like property taxes or anything else.
9 Q.   Drawing your attention to Section C (ix).  We
10  looked at this with Mr. McGlynn.  This is the
11  section that governs use of the money in the
12  leasing escrow funds to pay principal and
13  interest.
14 A.   Yes.
15 Q.   And it requires that various conditions be met
16  that are enumerated here; is that correct?
17 A.   Correct.
18 Q.   And rather than a separate principal and interest
19  reserve or escrow fund, this was an alternative
20  use of the leasing escrow fund monies up to a
21  limit of $1 million or less, under certain
22  circumstances, assuming that the mortgagor could
23  meet the terms and conditions allowing access to
24  that money?
25      MR. McGLYNN:  Objection.

231

1 A.   Yes.
2 Q.   To obviate that objection, let me ask you to
3   explain what paragraph (ix) allows the borrower
4   to do and where the money comes from?
5 A.   Paragraph (ix) is there to prepare for the
6   eventuality that EquiServe is no longer in the
7   building.  And so long as the borrower has
8   continued to demonstrate commitment to the
9   property by paying all the operating expense and
10  paying the taxes and funding all of the escrows,
11  the replacement reserve escrow, the tax insurance
12  escrows and everything that needs to be paid, as
13  long as he's funding those reserves, so long as
14  he has not been in default, so long as he hasn't
15  done anything to breach the documents, so long as
16  he's complied with this section, so long as it
17  shows that there is an insufficiency of net
18  operating income to cover debt service, then this
19  would allow the borrower to request a withdrawal
20  from the cash flow leasing escrow for the
21  component that's available for principal and
22  interest to pay principal and interest.
23 Q.   Did the lender and you, in particular, intend
24  that the borrower have access to reserves for the
25  purposes other than that are set forth in the

232

1   mortgage and other loan documents?
2       MR. McGLYNN:  Objection.
3 A.   No.
4 Q.   Was it the purpose of the reserves to allow
5   access for payment of items such as taxes that
6   the documents don't allow to be paid from the
7   reserve?
8       MR. McGLYNN:  Objection.
9 A.   No.
10 Q.   Why was it that the reserves were set up to
11  require the borrower to continue to make certain
12  payments such as taxes, the replacement escrow
13  reserve payment, the base leasing escrow fund
14  payment, even if EquiServe moved out and there
15  was no building cash flow?
16      MR. McGLYNN:  Objection.  Go ahead.
17 A.   The reason for that is that the borrower needs to
18  continue to show an interest and commitment to
19  the property.  If the borrower is not going to
20  pay property taxes out of his own pocket or he is
21  not going to pay the required reserves out of his
22  own pocket, then at that point it is clear that
23  the borrower is no longer interested in staying
24  with the property.
25      At that point, the borrower is sending

233

1   signals that they are no longer interested in
2   supporting the property and achieving or
3   proceeding along a path to restore the property
4   to a healthy condition.
5       At that point, that's when a lender has to
6   say, well, hang on a second.  If the borrower is
7   not going to do that then I ought to be the
8   beneficiary of any potential upside in the
9   property.
10      As soon as the borrower makes selections
11  not to pay what he's obligated to pay under the
12  documents, he is making a conscious decision to
13  give up his right to any economic benefits from
14  the property.
15      MR. FALBY:  Thank you, Mr. Rubino.
16          EXAMINATION
17 BY MR. McGLYNN:
18 Q.   Just a couple of quick questions, Mr. Rubino.
19  Directing your attention to the mortgage,
20  Paragraph 6.
21      If I heard you correctly on
22  cross-examination by Mr. Falby, there are certain
23  of these escrow funds that do not have to be
24  funded or did not have to be funded in the event
25  that EquiServe vacated the property?

59 (Pages 230 to 233)

# EXHIBIT 19

Page 1

```
 1                               Volume:   I
 2                               Pages :   1 - 188
 3                               Exhibits: 300 - 321
 4
 5               UNITED STATES DISTRICT COURT
 6           FOR THE DISTRICT OF MASSACHUSETTS
 7                      CIVIL ACTION NO. 05-CV-10506(WJY)
 8    - - - - - - - - - - - - - - - - - - - - - -
 9    BLUE HILLS OFFICE PARK LLC,
                Plaintiff, Defendant-in-Counterclaim,
10        Vs.
11    J.P. MORGAN CHASE BANK,  as Trustee for the Registered
      Holders of Credit Suisse First Boston Mortgage
12    Securities Corp., Commercial Mortgage Pass-Through
      Certificates, Series 1999-C1.,
13              Defendant.
14        and
15    CSFB 1999-C1 ROYALL STREET, LLC;
                Defendant, Plaintiff-in-Counterclaim,
16        Vs.
17    WILLIAM LANGELIER and GERALD FINEBERG,
                Defendants-in-Counterclaim.
18    --- - - - - - - - - - - - - - - - - - - - -
19            DEPOSITION OF LAWRENCE G. NEEDLE
20         Friday, March 17, 2006, 10:10 a.m.
21          DLA Piper Rudnick Gray Cary US LLP
22                   33 Arch Street
23               Boston, Massachusetts
24       Reporter:  Rosemary F. Grogan, CSR, RPR
```

Lawrence G. Needle                                                                    03/17/2006

CONFIDENTIAL

Page 58

1    Q.   What occasioned -- let me rephrase that.
2         What did he tell you?
3    A.   That he heard they were putting up -- they
4    would like to put up a parking garage next door.
5    Q.   Who's they?
6    A.   The owners of 250 Royall Street.
7    Q.   Did he tell you that EquiServe was working
8    with the owners of 250 Royall Street to put that parking
9    garage up?
10   A.   No, it was owned by National Development.
11   Q.   Did he indicate to you in any way that
12   EquiServe was involved with the parking garage next
13   door?
14   A.   No.
15   Q.   You came to understand that later?
16   A.   I believe that might have been on the permit
17   that was pulled or the request.
18   Q.   Your conversation with the security guard was
19   before you saw the --
20   A.   Correct.
21   Q.   Do you know what the security guard's name
22   was?
23   A.   No idea.
24   Q.   Did he tell you how he learned they were

Page 59

1    putting up a parking garage before?
2    A.   He lived in Canton for most of his life and
3    that was the word from people in the town.
4    Q.   Do you remember when this conversation
5    happened?
6    A.   Before we were officially made aware of it.
7    Q.   Do you remember when you were officially made
8    aware of it?
9    A.   No.
10   Q.   How were you officially made aware of it?
11   A.   I think we were notified as an abutter.
12   Q.   What prompted the security guard to tell you
13   there would be a parking garage next door?
14   A.   They're like bartenders.  They're just big on
15   gossip.
16   Q.   One of your sources for the scoop around the
17   building?
18        MS. SWISHER:  Objection.
19        MR. BARNETT:  Withdrawn.
20   BY MR. BARNETT:
21   Q.   What did you do, if anything, after the
22   security guard -- at 150 Royall Street; is that right?
23   A.   Yes.
24   Q.   After the security guard at 150 Royall Street

Page 60

1    informed you that your neighbor at 250 Royall Street
2    wanted to put up a parking garage?
3    A.   I mentioned it to Dan Frank when I returned to
4    the office that day.
5    Q.   Tell me everything you can remember about that
6    conversation with Dan Frank.
7    A.   I told him that the security guard heard that
8    the current owners of 250 Royall Street were going to
9    attempt to put a garage up there.
10   Q.   What did he say?
11   A.   He did not know about that.
12   Q.   Did you or he say anything else in that
13   conversation?
14   A.   Not that I recall.
15   Q.   What was your reaction when you heard they
16   wanted to put a parking garage next door?
17   A.   I thought it was interesting.
18   Q.   Why was it interesting?
19   A.   Didn't know where they were going to put it.
20   Q.   How did you think it would impact your
21   property at 150 Royall Street?
22   A.   Didn't give it any thought at that time.
23   Q.   Was there a time you did give it a thought?
24   A.   In the planning board meetings.

Page 61

1    Q.   Any other times?
2    A.   No.
3    Q.   Could you turn please to Exhibit 9 in that
4    book you have in front of you?  Can you review that and
5    let me know if you've seen it before?
6    A.   What is this?
7    Q.   Well, have you reviewed it?
8    A.   Yes.
9    Q.   Have you seen it before?
10   A.   I don't believe so.
11   Q.   A few minutes ago, you referred to --
12   A.   No, I did see it before.  I didn't see
13   EquiServe on it.
14   Q.   So you have seen it, Exhibit 9 before?
15   A.   That's how we found out that EquiServe was
16   involved with National Development.
17   Q.   Is this the permit you referred to a few
18   minutes ago in your testimony?
19   A.   Yes.
20   Q.   Is this something you received from the Town
21   of Canton?
22   A.   Yes.
23   Q.   Do you remember when you received it?
24   A.   No.

16 (Pages 58 to 61)

Lawrence G. Needle                                                                                03/17/2006

CONFIDENTIAL

Page 62

1    Q.  What did you think upon learning that
2  EquiServe was involved with National Development putting
3  up -- seeking to put up the garage next door?
4        MS. SWISHER: Objection.
5    A.  Rephrase the question.
6    Q.  How did you feel upon learning that EquiServe
7  was going to be seeking to build a parking garage next
8  door?
9    A.  Surprised.
10   Q.  Did you know at this point they were planning
11  on leaving?
12   A.  No.
13   Q.  You received this prior to the May 14th letter
14  we looked at a few minutes ago; is that right?
15   A.  Right, correct.
16   Q.  Were you the first person at Fineberg
17  Management to see the permit application that is in
18  Exhibit 9?
19   A.  I'm not sure.
20   Q.  Do you remember speaking with anyone at
21  Fineberg Management about Exhibit 9 at the time it came
22  in?
23   A.  I believe I did it with Dan Frank; spoke to
24  him about it.

Page 63

1    Q.  What did you say to him and what did he say to
2  you?
3    A.  Just said that National Development and
4  EquiServe apparently are involved in negotiations, if
5  they're trying build a garage together.
6    Q.  Is that what you said or is that what he said?
7    A.  That, I don't recall.
8    Q.  Did you speak to Mr. Fineberg about it?
9    A.  No.
10   Q.  Did you ever speak to Mr. Fineberg about the
11  parking garage application or permit at any time?
12   A.  I don't recall.
13   Q.  Did you ever speak to Mr. Langelier about it?
14   A.  No.
15   Q.  Did you ever speak to Mr. Donovan about it?
16   A.  No.
17   Q.  Did you ever speak to any lawyers about it?
18   A.  At what point in time?
19   Q.  Upon receiving --
20       MS. SWISHER: I just caution you not to
21  disclose any communications you had with your
22  attorney.
23  BY MR. BARNETT:
24   Q.  Well, let me ask it this way.  I'm not asking

Page 64

1  you to tell me what you said to your lawyers.
2        But after receiving permit application
3  that is Exhibit 9, when was the first time you spoke to
4  the lawyers about the --
5    A.  Not that I recall.
6    Q.  -- parking garage?  If you could let me finish
7  the question?
8        Do you recall attending meetings of the
9  Canton Zoning Board of Appeals concerning the
10  application to build a parking garage?
11   A.  Yes.
12   Q.  A minute ago, you referred to planning board
13  meetings.  My question is:  Do you remember planning
14  board meetings as distinct from the Zoning Board of
15  Appeals meetings?
16   A.  No, I believe I misspoke.
17   Q.  So it was zoning board meetings that you
18  remember attending?
19   A.  Yes.
20   Q.  Okay.  You attended those meetings with
21  counsel; is that right?
22   A.  Yes.
23   Q.  You spoke to counsel before going to those
24  meetings?

Page 65

1        MS. SWISHER: Yes or no.
2    A.  Yeah.
3    Q.  So sometime between the first meeting and
4  receiving the permit application, you had your first
5  conversation with counsel; stands to reason, doesn't it?
6        MS. SWISHER: Objection.
7    A.  Could you rephrase that?
8    Q.  Yes.
9        A few minutes ago you testified you
10  weren't sure when you first spoke to counsel after
11  receiving the permit application?
12   A.  Correct.
13   Q.  But you attended the zoning board hearings
14  with counsel and spoke to them at some point before the
15  first one?
16       MS. SWISHER: Objection --
17  BY MR. BARNETT:
18   Q.  -- correct?
19   A.  Before the first --
20   Q.  Zoning board hearing.
21   A.  Yes.
22   Q.  So then your first conversation was sometime
23  between receiving the permit and attending the first
24  hearing?

17 (Pages 62 to 65)

Lawrence G. Needle                                                           03/17/2006

CONFIDENTIAL

Page 138

1       So that's what this discussion was about,
2   how to go about finding them.
3       Q.   And it got Mr. Fineberg's personal involvement
4   at that point?  Let me rephrase that.
5            Mr. Fineberg became personally involved
6   in the meetings at that point?
7       A.   This meeting, yes.
8       Q.   Were you at many meetings with Mr. Goldberg
9   with respect to re-leasing the property?
10      A.   No.
11      Q.   Do you know Mr. Goldberg?
12      A.   Yes.
13      Q.   Did you interact with him in connection with
14  the effort to re-lease the property?
15      A.   Yes.
16      Q.   For what purposes did you interact with him?
17           MS. SWISHER:  I'll instruct you not to
18      disclose any communications you had with
19      Mr. Goldberg.
20  BY MR. BARNETT:
21      Q.   Did you interact with Mr. Goldberg for the
22  purpose of seeking legal advice or some other purpose?
23           MS. SWISHER:  Objection.  I don't think he
24      understands the question?

Page 139

1       A.   I don't understand that.
2       Q.   When you were talking to Mr. Goldberg about
3   re-leasing the building, were you seeking legal advice
4   on behalf of Blue Hills Office Park?
5       A.   No.
6       Q.   What did you talk to him about?
7            MS. SWISHER:  I'm going to instruct him not to
8       answer.  I don't think he understands where you're
9       going with the --
10      Q.   I'm asking him if he's seeking legal advice,
11  in which case he's telling me he wasn't, in which case
12  the conversations aren't privileged.  So I would like to
13  ask him what he talked about?
14           MS. SWISHER:  I'm going to ask him not to
15      answer because I don't think he can.  Whether the
16      witness can distinguish between legal advice and
17      conversation, if you can rephrase the question in
18      some other way?
19  BY MR. BARNETT:
20      Q.   Are you going to follow your lawyer's advice?
21      A.   Yes.
22      Q.   What types of things did Mr. Goldberg do on
23  behalf of Blue Hills Office Park?
24           MS. SWISHER:  I'm going to object to the form

Page 140

1   of the question.
2       A.   He was our attorney for Blue Hills Office
3   Park.
4       Q.   When you spoke to him, did you understand you
5   were speaking to him in his capacity as an attorney for
6   Blue Hills Office Park?
7       A.   Yes.
8       Q.   Does he have any other capacity with respect
9   to Blue Hills Office Park?
10      A.   No.
11      Q.   Do you know if he had any ownership interest
12  in Blue Hills Office Park?
13      A.   He does not.
14      Q.   Do you know if he has any ownership interest
15  in Fineberg Management Company?
16      A.   He does not.
17      Q.   Do you know those two things to be facts?
18      A.   Yes.
19      Q.   Do you know who Dan Madru, M-A-D-R-U, is?
20      A.   I believe he's the architect that did the
21  drawings for the property.
22      Q.   I would like to direct your attention to the
23  payment of property taxes for Blue Hills Office Park, if
24  I may?  You were aware, were you not, there was AN

Page 141

1   agreement between Blue Hills and Wells Fargo with
2   respect to the payment of property taxes whereby amounts
3   wouldn't be escrowed by Wells Fargo, but they would send
4   a deficiency notice when the property tax bill came due
5   and EquiServe would deposit money to cover the real
6   estate taxes?
7       A.   Yes.
8       Q.   Do you know how that agreement came about?
9       A.   The agreement with the previous lender was
10  that we would bill EquiServe in advance for the real
11  estate taxes collected from EquiServe and that money
12  would be sent directly to the previous lender.  And
13  Wells Fargo agreed to continue that, once they took -- I
14  guess, once the new loan took effect.
15      Q.   Do you know who the previous lender was?
16      A.   Don't know.
17      Q.   Can I direct your attention please to
18  Exhibit 1 in the book in front of you?  Exhibit 1
19  consists of three pages that do not have Bates labels on
20  them; the first of which is Fineberg Companies fax cover
21  sheet; is that correct?
22      A.   Correct.
23      Q.   I take it that's not your writing on the cover
24  sheet?

36 (Pages 138 to 141)

# EXHIBIT 20

Exhibit:   340                    Volume 1, Pages 1 - 210

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

BLUE HILLS OFFICE PARK LLC

           Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

                Defendant

(Complete caption on next page.)

CONTAINS INFORMATION SUBJECT

TO CONFIDENTIALITY STIPULATION

DEPOSITION OF KENNETH GOLDBERG

Friday, April 7, 2006, 9:42 a.m.

DLA Piper Rudnick Gray Cary US LLP

33 Arch Street, 26th Floor

Boston, Massachusetts

- - - - - - - Reporter:  David A. Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

18 (Pages 66 to 69)
CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

66

1  same. We are looking at this agreement, which is
2  Exhibit 176?
3     Q. Yes.
4     A. We are looking at that document schedule of
5  accounts that's appended to it and the term initial
6  account. Is that correct?
7     Q. Yes.
8     A. So now I will look at the document. It
9  certainly states in Subparagraph F of Roman I -- the
10  document speaks for itself -- the initial account
11  was at the time this was signed held in escrow by
12  Kenneth M. Goldberg and Andrew H. Cohn -- should
13  have been Cohen -- escrow agents.
14     Q. Was the money held in a client funds
15  account?
16     A. Yes, it says that.
17     Q. And for what client were those funds held?
18     A. I cannot tell you sitting here, except that
19  it was held for the client in this case, which would
20  have been the LLC or potentially if it was intended
21  to have been distributed to the beneficiaries of the
22  lower tier. I mean, this is a specific time. I
23  cannot tell you at that time whether or not that
24  was -- I just don't have the documents here.

67

1     Q. As of December 2004, had Blue Hills Office
2  Park LLC distributed the amounts in the initial
3  account to either its member or the beneficiaries of
4  the member?
5     A. We have an agreement dated December 31,
6  2004. The initial account by definition is defined
7  as on 12/31 as a million three and change. It was
8  obviously then held subsequently in accordance with
9  the terms distributed, paid out. Paid out.
10     Q. Please listen to my question.
11     A. Okay.
12     Q. As of December 2004 --
13     A. What date?
14     Q. Before -- as of the date of the execution
15  of this document --
16     A. Super. Go ahead.
17     Q. -- had the monies in the initial account
18  previously been distributed by Blue Hills Office
19  Park to its member or to the beneficiaries of the
20  member?
21     MR. McGLYNN: Objection as to form.
22     A. I can only tell you that on the date of the
23  execution of this document that there was
24  $1,381,814.39 held in escrow by Kenneth M. Goldberg

68

1  and Andrew H. Cohn.
2     Q. Held in escrow for who?
3     A. I don't know here sitting looking at this
4  document. I don't have the rest of the documents
5  here.
6     Q. That's all I want to know.
7     A. How would I know sitting here? I know we
8  were holding it and it told us what Andrew Cohn and
9  Kenneth Goldberg were supposed to do with the money.
10     Q. Was there an escrow agreement that governed
11  your holding in escrow of the funds of either Blue
12  Hills Office Park LLC or Royall Associates Realty
13  Trust or the members of the trust or the
14  beneficiaries of the trust?
15     A. I don't know whether there was a written
16  agreement or a letter of understanding between
17  Mr. Cohn and myself.
18     Q. As of December 31, 2004, had the $2 million
19  settlement payment stayed in the Century Bank
20  account into which it apparently was deposited on
21  August 8, 2003 as indicated by Exhibit 177?
22     MR. McGLYNN: Objection as to the form.
23     Can you read it back?
24     THE WITNESS: I understand it.

69

1     A. It appears that this record, if we are
2  tracing the funds, that money that was received
3  pursuant to the settlement agreement you've shown me
4  as Exhibit 21 was in a Banknorth IOLTA account. It
5  stayed in that account until it was transferred to a
6  Century Bank account. It appears, certainly given
7  the dates, that these would have been -- and my
8  memory is -- that these were the settlement funds
9  paid to Blue Hills Office Park pursuant to this
10  agreement and they stayed exactly where they were
11  unless and until they were transferred out for
12  interest purposes to another bank.
13     Q. Is the reference to the Banknorth IOLTA
14  account a reference to Bernkopf Goodman's IOLTA
15  account at Banknorth?
16     A. Yes, it is.
17     Q. Prior to August 8, 2003 the $2 million
18  payment had gone into the IOLTA account?
19     A. That is correct. And it stayed in an
20  escrow account at Bernkopf Goodman.
21     Q. I have seen reference to wires of monies
22  upon the conveyance of the property next to Blue
23  Hills Office Park that took place on August 6, two
24  days prior to August 8, 2003. Do you know if the $2

19 (Pages 70 to 73)

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

70

1 million settlement payment was actually wired into
2 Bernkopf Goodman's IOLTA account on August 6, 2003?
3    A. I don't know. I mean looking at this and
4 looking at the timing, I have to presume this is the
5 money. I don't know if it went somewhere before. I
6 don't know the answer.
7    Q. In any event, the payment first went to
8 Bernkopf Goodman's IOLTA account, correct?
9    A. That is correct.
10    Q. That contains monies that belonged to
11 different clients, does it?
12    A. Yes.
13    Q. And then a wire of the $2 million
14 settlement payment went shortly thereafter, it looks
15 like in a couple of days, into a Century Bank
16 account, correct?
17    A. I don't know that it was wired. It could
18 have been handled by check and opening of a new
19 account that earned interest.
20    Q. It says wire in from Banknorth IOLTA
21 account.
22    A. That shows when it came in from the
23 Banknorth account. I didn't write it, whether
24 that's reflective of the wire into the Banknorth

71

1 IOLTA account or out to Century Bank, but it clearly
2 traced that $2 million. It is a difference without
3 distinction.
4    Q. In any event, the money went from the
5 Banknorth IOLTA account maintained by Bernkopf
6 Goodman --
7    A. That is correct.
8    Q. -- to a particular client funds account
9 obtained by Bernkopf Goodman at Century Bank?
10    A. That is correct.
11    Q. The account was maintained under the name
12 Fineberg Royall Associates; is that correct?
13    A. I can't answer that. I don't have the
14 account. Whether the account was in the name of
15 them -- all we did here, this was obviously produced
16 to you as a record of our office's handwritten card
17 to show where the money was.
18    Q. If the Century Bank account was held for
19 your client Blue Hills Office Park LLC, do you know
20 why it is that somebody wrote not Blue Hills Office
21 Park but Fineberg Royall Associates on this ledger
22 sheet that has been produced to us as the record of
23 the disposition of the settlement payment?
24    A. The answer is yes. I think that from the

72

1 time of inception it is just a generic. I believe
2 that's a title, I believe, probably on our account
3 records. So that even if we sent bills, we just
4 internally identified Blue Hills Office Park LLC
5 under its prior -- under the name generically as
6 Royall Associates. That's what our office
7 characterized it and identified it as.
8        I don't know even if there is a Royall
9 Associates entity. That's what we called the
10 account for shorthand purposes in the office. It
11 might have said Fineberg-150 Royall Street, Canton,
12 which was just as likely. It was a way of
13 identifying whose money it was and whoever was the
14 owner there would have obviously been entitled to
15 it.
16    Q. So your testimony is that your office used
17 the words Fineberg Royall Associates to refer to
18 Blue Hills Office Park LLC?
19    A. No, what I said was very clear.
20    Q. If it was, I wouldn't have asked the
21 follow-up.
22    A. Well, let's try it again. Royall
23 Associates was a general term that we used for
24 matters we dealt with for 150 Royall Street, Canton.

73

1 Our office keeps its records generally consistent
2 with property addresses when we deal with real
3 estate transactions. By the same taken, it says
4 Fineberg. It certainly was not Fineberg's money.
5 And, therefore, there's no intent here to
6 specifically set out the legal entity who is the
7 holder, nor is it here intended to say that they are
8 Gerry Fineberg's money. Nor is it intended to say
9 that Mr. Fineberg has the right to decide what to do
10 with it. It is just simply the label that's put on
11 it for the purpose of our internally knowing that in
12 fact this related to 150 Royall Street. I can't
13 attribute any more to it than that.
14        Likely the account was not in that name.
15 It was in the Bernkopf Goodman name. We just called
16 it Royall Associates for I think literally for 10 or
17 15 years.
18    Q. So although it says Royall Associates, the
19 money was actually received by Blue Hills Office
20 Park LLC?
21    A. Yes. That's set out in writing in Exhibit
22 21. It is very clear.
23    Q. And the money was then held in that account
24 until the beneficiaries of Royall Associates Realty

32 (Pages 122 to 125)

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION

Kenneth Goldberg, April 7, 2006

122

1  But my memory, sitting here today, is that it was so
2  brief that it was -- I don't even remember if his
3  name was Joe Polcari and I'm getting confused with
4  subsequent discussions that I had with him in
5  connection with our mediation. I think it was --
6  the answer is I don't remember, sitting here of my
7  own memory, that he and I talked, other than in
8  mediation subsequently.
9     Q. Mr. Warshaw has notes of a conversation
10 with you on September 7, 2004.
11    A. Mm-hmm.
12    Q. Do you recall talking to Mr. Warshaw on or
13 about September 7, 2004?
14    A. That could have been then, as I said
15 before, a third telephone call that I had with him.
16 I remember I talked to him at least twice. It could
17 have been three times.
18    Q. Was the substance of your conversations
19 with Mr. Warshaw that you told me about this morning
20 meant to reflect the entirety of your conversation
21 with him, whether they took place during two calls
22 or three?
23    A. Yes. That is what I thought I said. I
24 just wasn't sure where the demarcation between one

123

1  and the other would be.
2     Q. In any of your conversations with
3  Mr. Warshaw, did you request of him that the
4  borrower have access to the reserve accounts to pay
5  debt service?
6     A. I think in the first telephone call there
7  was mention of, as I indicated, the various reserve
8  accounts and that we intended to access them. But
9  because the debt service account was quantifiable,
10 was a small amount, it was one of the reasons that
11 we needed to get the discussions going. Once again,
12 he said he didn't know what they were or didn't have
13 the documents. There was certainly a discussion
14 about reserves. It didn't go anywhere because it
15 was too early in his process, he said.
16    Q. Do you recall in your final conversation
17 with Mr. Warshaw that he told you that based on his
18 review of the file there were defaults under the
19 loan and that the borrower would not be eligible to
20 draw on the reserves as long as the loan was in
21 default?
22    A. No, that didn't happen.
23    Q. And do you recall that you responded that
24 the loan was not in default and that he had better

124

1  look at the loan documents again?
2     A. That's a little confounding. It was very
3  clear from the questions that I was putting to him
4  that he had not had an opportunity yet to review the
5  loan documents. It was we who were looking forward
6  to accessing reserve accounts about which he did not
7  know about in the first call and in the second call
8  he realized there was. He did not, nor did he have
9  the time to review -- it is an inconsistent position
10 to take.
11       He did not know enough about it. The
12 only discussion, as I reflected before, that we had
13 was whether or not the tenant leaving might have
14 been a default. He raised that. I said no, no,
15 that's not the deal. I said we set aside some of
16 the money for debt service payments. He said: I
17 can look at the loan documents.
18    Q. Do you recall any discussion with
19 Mr. Warshaw about the failure of the borrower to pay
20 real estate taxes at the beginning of August?
21    A. There was no discussion about that. That's
22 just....
23    Q. I appreciate that you can't remember
24 whether you had two or three conversations with

125

1  Mr. Warshaw. Can you tell me, how did your last
2  conversation with Mr. Warshaw end, whether it was
3  your second or third call? I think you told me that
4  your second call ended that you would get back to
5  him. Do you have any further memory beyond that?
6        MR. McGLYNN: I'm going to object. Can
7  you break that down, Bruce? I found it really hard
8  to follow.
9        MR. FALBY: Sure.
10       MR. McGLYNN: Thank you.
11    Q. Is the last thing that you remember saying
12 to Mr. Warshaw the statement that you testified to
13 that at the end of the second call you said you
14 would be getting back to him?
15    A. I think that's not what I said. What I
16 said was I was going to see Gerry -- during the
17 second call I'm clear that it was then that the
18 subject of this prenegotiation letter had come up
19 and I had a copy of it. I said that I had reviewed
20 it. I had a whole lot of experience with Lennar. I
21 looked at it. It was appropriate. I was going to
22 see Gerry the next day and we were going to sign it.
23 I would sign it and get it out to him.
24       I might have said -- I thought what I

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

126
1  said before was that I might have said I will call
2  you back, but I thought it was simply I'll get that
3  back to you. It was the prenegotiation letter that
4  my memory is that the end of that discussion focused
5  on. There might have been another call.
6      **Q. Is that the last thing you recall saying to**
7  **Mr. Warshaw in that conversation?**
8      A. In that discussion, yes.
9      **Q. Is there any other discussion that you**
10 **remember ending a different way?**
11     A. Yeah. The discussion, whichever was the
12 last discussion, was our proposal, I believe,
13 waiting for him to respond to let us know whether he
14 could come up to Boston either before, hopefully
15 before Labor Day, but as quickly as after possible
16 to have a meeting. I think that option was left --
17 that was left open for him to become sufficiently --
18 he didn't have the stuff yet. He had to look at the
19 loan documents. He had to talk to the lawyers to
20 see what these accounts were. There were millions
21 of dollars involved. It was clear we wanted that to
22 be productive.
23         The last thing I remember, therefore, is
24 that simply we were -- I was waiting for him to, for

127
1  the two of us or somebody to arrange with him that
2  follow-up meeting, which we both had discussed would
3  happen as soon as he was available and had enough
4  knowledge so that that would be productive. That
5  was the end of whatever the last call was.
6      **Q. What did he say on that subject?**
7      A. Just that he was going to get back to us
8  and let us know when he would come up or if he was
9  coming up or whether the meeting was down there.
10 Before we met, he had to get sufficiently familiar
11 with the file so that it could be productive.
12     **Q. Did you have any discussion with**
13 **Mr. Warshaw about his reviewing the loan documents**
14 **with counsel?**
15     A. Yes. He said he was going to review
16 documents. He had to go back and become familiar
17 with the documents and review them with counsel.
18     **Q. When did he say that?**
19     A. Whatever was -- I believe that was -- if I
20 had three calls, it was the second and third calls.
21 Otherwise, it was the second call.
22     **Q. If you had three calls, when was the third**
23 **call?**
24     A. I think it was just before or after Labor

128
1  Day.
2      **Q. And then what happened next with**
3  **Mr. Warshaw?**
4          MR. McGLYNN: Objection as to the form.
5      **Q. With respect to your communications with**
6  **Mr. Warshaw, did you ever talk to him again?**
7      A. I don't think so. I think we covered the
8  full discussions that I have had with him.
9      **Q. When and how did you learn that he was no**
10 **longer the asset manager on this loan?**
11         MR. McGLYNN: Objection.
12         You may answer.
13     A. I don't believe it was by call from him. I
14 believe it was somebody who called and told me. I
15 just was advised.
16     **Q. Do you remember who?**
17     A. Yes, I do.
18     **Q. Who?**
19     A. I don't want to get into this. I don't
20 want to get into a question of my waiving. I had a
21 call that provided that information generally by my
22 client.
23     **Q. Thereafter, did you have any discussion**
24 **with anybody who worked for Lennar -- I have asked**

129
1  you about Joe Polcari, but did you talk to anybody
2  else from Lennar after that about Blue Hills Office
3  Park?
4          MR. McGLYNN: Other than Mr. Warshaw and
5  Mr. Polcari?
6          MR. FALBY: I think so.
7      **Q. Let me make sure you know what I'm asking.**
8  **I think you've now told me everything that you can**
9  **remember about the two or three conversations that**
10 **you had with Mr. Warshaw, right?**
11     A. Yes.
12     **Q. The last of which took place either right**
13 **before or right after Labor Day of 2004, correct?**
14     A. That's my recollection, yes, sir.
15     **Q. You already told me you don't have any**
16 **recollection of ever talking to Mr. Polcari, at**
17 **least prior to the loan foreclosure, correct?**
18     A. No, that's not what I said. I said I don't
19 have any present memory. I may have had a brief
20 discussion with him. But I'm not sufficiently sure
21 to say that I did or did not.
22     **Q. Okay. I thought you ended up saying that**
23 **you have no recollection of any discussion.**
24     A. I'm not sufficiently sure to go one way or

FARMER ARSENAULT BROCK LLC

35 (Pages 134 to 137)

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

134

1  things here, sir. The amount in Subparagraph I and
2  Subparagraph II are two different transactions. I
3  think you've confused them.
4      Q. I don't think so. With me, look at
5  Paragraph C. Paragraph C talks about the balance in
6  the initial account plus the amount in the
7  supplemental account exceeding $2 million?
8      A. Paragraph C?
9      Q. Yes. I'll start again.
10     A. Give me a chance to read it.
11     Q. Fine.
12     A. I'm going to take a minute to review the
13  relationship between these two.
14         (Pause.)
15     A. Reading this I'm not -- I'll wait for a
16  question. You asked me to look at Paragraph C.
17     Q. Do you see that Paragraph C states that the
18  monies in the initial account plus all but $2
19  million of the supplemental account would be
20  released and paid over, one-half to you for
21  distribution among the Fineberg beneficiaries, and
22  one-half to Andrew Cohn for distribution to the
23  Langelier beneficiaries?
24     A. Yes, sir.

135

1      Q. And do you see that Paragraph D deals with
2  the remain $2 million that was not to be so
3  distributed?
4      A. No, I do not see that.
5      Q. You see it says the supplemental account
6  net of the withdrawal referenced in 2 C above?
7      A. I just don't read it that way.
8      Q. How do you read it?
9      A. I read it that the supplemental account net
10  of the withdrawal that was first referenced in 2 C,
11  which would have been the distribution of the
12  initial account, which was the hundred whatever, the
13  million 381. My reading of this and my memory of
14  what was intended, while I know a lot later than
15  this, is that Paragraph D, one in the hole, was
16  simply the implementation of the noninitial account
17  portion set out in Paragraph C.
18         What we are saying here is that what's
19  going to happen here is that half of the money
20  exceeding that $2 million was going to be
21  transferred out in accordance with Paragraph C. And
22  then on January 20th, which is more consistent with
23  this dating, one-half of the amount, a million
24  dollars, will be distributed. So all 1 was was a

136

1  reiteration of and implementation of Paragraph C,
2  cookie. That's the reason for the timing delay,
3  obviously.
4      Q. So what happened to the 1.3 million in the
5  initial account and the 2.2 million in the
6  supplemental account net of the 2 million referenced
7  in Paragraph C?
8      A. My memory was that -- it was -- we followed
9  the initiative here that was committed. We just did
10  what it said here. I think we just did what it
11  said. I don't have the documentation to confirm
12  that or our internal records to confirm that. I
13  never knew there was any question about it. We just
14  did what we said we were going to do, distributed it
15  consistently. That left the $2 million.
16     Q. Well, between the initial account and the
17  supplemental account there was a total of $5.6
18  million, right?
19     A. Yes, sir.
20     Q. So --
21     A. Approximately. A little less.
22     Q. So approximately 3.6 million of that was
23  distributed half to you to continue to be held in
24  escrow on behalf of the Fineberg beneficiaries?

137

1      A. No, I don't think that's what it says. I
2  think what happened here, the portion that equals a
3  million 381 and change in the initial account were
4  released and paid over half, at that point in time
5  then for distribution among the Fineberg
6  beneficiaries, and half to Andrew Cohn. I did that
7  and he did that.
8      Q. Okay.
9      A. That was one thing. The next thing is that
10  what happened is 2 million 214 and change, and that
11  went 50 percent to Wilmer, et cetera, and 50 percent
12  to Bernkopf, which was continued -- it went in
13  accordance with what we said. Whether or not that
14  went simultaneously or from a separate account or
15  whether or not, looking at this here, it might have
16  been from a CD and it took some time, I don't know
17  the timing of it, but that's certainly, since
18  there's never been a question raised and we did this
19  and intended something to happen within the
20  following month, that 2 million 214 was transferred
21  out.
22     Q. And it was placed in what are defined as
23  supplemental account escrows? My understanding of
24  this agreement, by the way, reads, Mr. Goldberg, is

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

150

1  that we would keep it there. That stayed. It
2  stayed.
3      Q. The 2.2 million that went into the
4  supplemental account escrow, at some point you
5  decided that could go and be distributed to the
6  beneficiaries?
7      A. Subsequently, yes.
8      Q. And it was?
9      A. Yes.
10     Q. All of it?
11     A. Yes. I believe so. I don't know.
12     Q. The $1 million that went to Wilmer Cutler
13 on February 1, 2005, who controls the disposition of
14 that money now?
15     A. I think Andy Cohn has that pursuant to this
16 agreement.
17     Q. At whose direction does he act?
18     A. We've got a signed agreement. It continues
19 to be held just here. At whose direction? He's
20 there as an escrow holder as I am an escrow holder.
21     Q. For the trustees and beneficiaries of the
22 Royall Associates Realty Trust?
23     A. I think it is probably for the -- I guess
24 it is for the LLC. It was their money that was

151

1  held. That's how it was suppose to continue to be
2  held as acknowledged by the beneficiaries. The
3  owner said here is what I want you to do with the
4  money.
5      Q. The people who actually appointed you the
6  escrow agents for the supplemental escrows that were
7  set up were the trustees and beneficiaries of Realty
8  Associates Realty Trust, correct?
9      A. No. They are the ones that said this is
10 what is going to happen. They can say this is what
11 you can do with this money. It doesn't say it was
12 their money. Depending on the genesis of the money,
13 it was considered to be different.
14     There was never a change, never a change
15 in the entitlement of whose money the $2 million is,
16 if that's what we are getting at here. That never
17 changed. It stayed where it was right from
18 inception. There was no change of ownership or
19 rights to it.
20     Q. Well, it was the beneficiaries and trustees
21 of the Royall Associates Realty Trust who determined
22 on December 31, 2004 in the agreement what would
23 happen to the money in the operating account, the
24 initial account, in the supplemental account,

152

1  correct?
2      A. No, they didn't determine it. What
3  happened was there was money in the operating
4  account. And we got the consent of all of the
5  parties who had an interest in the account to agree
6  what would happen to the money. Some of it stayed.
7  Some of it got transferred. Some of it got held.
8  This document didn't operate to transfer ownership
9  of any money. The money operates the transfer of
10 ownership of it, where it goes.
11     This is simply a consent, like you get a
12 shareholder consent to a transaction, to a
13 disposition of assets. It doesn't change who owns
14 the assets until you actually physically change who
15 has title to it. In money, as you know, it is the
16 physical possession of the funds that changes.
17 There was never a change of that $2 million
18 ownership.
19     Q. Isn't Exhibit 176 an agreement among and
20 between the beneficiaries of Royall Associates
21 Realty Trust to agree to the following provisions as
22 set forth therein?
23     A. Yes.
24     Q. And they agreed for the disposition of the

153

1  monies in the property account, the initial account
2  and the supplemental account as set forth herein,
3  correct?
4      A. They agreed that this is what was going to
5  happen and at what time to assets owned by entities
6  in which they had an interest.
7      Q. And what assets are you referring to?
8  Strike that. What entities are you referring to?
9      A. It referred to the entities of themselves
10 in respect of their capacities as owners. In that
11 case, beneficiaries of a trust. Second, it directed
12 what the trustees of the trust should and shouldn't
13 do, so there was no question as to authority and
14 control. And thirdly, with respect to Blue Hills
15 Office Park LLC assets, they agreed to what was to
16 happen to those assets held until a certain point in
17 time.
18     Q. So the agreement, Exhibit 176, is an
19 agreement as to what will happen to the assets --
20     A. -- of various entities and parties. It is
21 a direction letter.
22     Q. I have to ask the question.
23     A. Go ahead.
24     Q. The agreement dated December 31, 2004 is an

# EXHIBIT 21

David R. Andelman
Volume 1 - April 24, 2006

Page 1

Volume I, Pages 1-228

Exhibits: 358-373

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

----------------------------

BLUE HILLS OFFICE PARK LLC

      Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

      Defendants

(Complete caption on next page)

----------------------------

DEPOSITION OF DAVID R. ANDELMAN

Monday, April 24, 2006, 9:30 a.m.

DLA Piper Rudnick Gray Cary US LLP

33 Arch Street, 26th Floor

Boston, Massachusetts

-------Reporter:  Joan M. Cassidy, RPR, CRR-------

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

David R. Andelman
Volume 1 - April 24, 2006

Page 82

1    Q. Okay. When did you receive these balance
2 sheets, Exhibits 364, 365, and 366?
3    A. Sometime in April, after I had given my
4 first report but before the rebuttal report.
5    Q. So you did not use these documents in
6 formulating your opinions in your initial report; is
7 that right?
8    A. Correct.
9    Q. From whom did you receive them?
10    A. I'm not sure whether I received them from
11 Bernkopf Goodman or from Richard Hassey, probably
12 Bernkopf Goodman.
13    Q. No. 365 is -- let me rephrase that. Nos.
14 364 and 366 are titled "Blue Hills Statement of
15 Assets, Liabilities, and Members' Deficit -- Income
16 Tax Basis" (sic) followed by the date?
17    A. Uh-huh.
18    Q. And Exhibit 365 is titled "Statement of
19 Assets, Liabilities, and Members' Deficit --
20 Modified Tax Basis"; do you see that?
21    A. Yes.
22    Q. Do you know why that document, Exhibit 365,
23 has a different title?
24    A. No.

Page 83

1    Q. Did you create Documents 364, 365, and 366?
2    A. No.
3    Q. Did you participate in their creation?
4    A. No.
5    Q. What is modified tax basis?
6    A. I have no idea.
7    Q. In your experience as a tax lawyer, you
8 haven't come across that on a balance sheet or a
9 statement of assets and liabilities?
10    A. No.
11    Q. Or otherwise had a -- so this term is
12 completely unfamiliar to you?
13    A. Yes.
14    Q. What does "income tax basis" mean?
15    A. It usually means how you file your tax
16 return, same accounting method you would use to file
17 your tax return.
18    Q. What are the other accounting methods
19 besides income tax basis?
20    A. The most common one would be GAAP,
21 generally accepted accounting procedures.
22    Q. Okay. Are you familiar with an accounting
23 procedure called modified tax basis?
24    MR. MCGLYNN: Objection, asked and

Page 84

1 answered.
2    A. No.
3    Q. Thank you. Prior to my bringing your
4 attention to it this morning, had you noticed that
5 Exhibit 365 was identified as modified tax basis?
6    A. No.
7    Q. So you hadn't asked anyone about it?
8    A. Right, correct.
9    Q. The difference in the title hasn't figured
10 into your opinions, then, in this matter, I take it?
11    A. That's correct.
12    Q. Bringing your attention to Exhibit 366 --
13    A. Uh-huh.
14    Q. -- in the current -- withdraw that
15 question.
16    MR. BARNETT: Off the record.
17    (Discussion off the record and recess.)
18    MR. BARNETT: Would you mark these,
19 please.
20    (Marked, Exhibits 367-369, Worksheet for
21 Royall Associates, summary of due to and due from
22 account; Fax cover sheet to BG, LLP from Rutfield &
23 Hassey, Bates Blue Hill 5530; Summary of cost basis
24 for tax purposes in connection with property owned

Page 85

1 by Blue Hills Office Park on Rutfield & Hassey
2 letterhead, Bates Blue Hill 5531.)
3    Q. Mr. Andelman, the court reporter has handed
4 you three exhibits, which are labeled Exhibit 364,
5 365 and 366; is that right?
6    A. (Witness reviews documents.) No. 367, 368,
7 and 369.
8    Q. Thank you. Can you identify Exhibit 367,
9 please?
10    A. It's a worksheet for Royall Associates and
11 it appears to be the summary of the due to and due
12 from account.
13    Q. Is that what it says on the second line
14 there?
15    A. Yes.
16    Q. "Due to/from a-c-c-t," "from account"?
17    A. Yup.
18    Q. Did you prepare this document?
19    A. No.
20    Q. You received it from someone?
21    A. Yes.
22    Q. Do you recall whether it was from Bernkopf
23 Goodman or Rutfield & Hassey or somebody else?
24    A. My recollection is it was from Bernkopf

22 (Pages 82 to 85)

e8d2ac6e-4572-468c-9f53-c84de0fd786d

David R. Andelman
Volume 1 - April 24, 2006

Page 90

1    Q. Okay. The next line under "cash"
2  something?
3    A. I can't read it. Something "reserve."
4    Q. The next line?
5    A. I can't read that either.
6    Q. Then the one below that?
7    A. It says "FF&I," it looks like "reserve,"
8  furniture, fixture, and something reserve.
9    Q. Maybe "FF&E," equipment?
10    A. That could be. Below that it says "cash
11  in," it could be "cash in bank," but I'm guessing.
12    Q. You obviously didn't prepare Exhibit 367,
13  right?
14    A. Yes.
15    Q. Yes, I'm right that you did not prepare
16  Exhibit 367?
17    A. Yes, I did not prepare it.
18    Q. Below "cash in" something, perhaps "bank,"
19  there's a blank line, and then it says, I think,
20  "second mortgage payable"?
21    A. Yes.
22    Q. Do you know anything about what mortgage
23  that is referring to?
24    A. Not specifically. I have a recollection

Page 91

1  that somebody mentioned there is another liability
2  that Royall owed to somebody.
3    Q. And why does that show in the due to/from
4  account?
5    A. I'm not sure.
6    Q. Then below that it says "due to/from
7  affiliate."
8    A. Uh-huh.
9    Q. And there's a $7 million number?
10    A. Uh-huh.
11    Q. Do you agree with me that that number is
12  the same as is reflected on Exhibit 364, the asset
13  and liability statement for the year ending December
14  31, 2002?
15    A. For due from affiliate.
16    Q. Due from affiliate?
17    A. Yes.
18    Q. And then the remaining entry on Exhibit 367
19  is "2003 basis adjustment"; is that right?
20    A. Yes.
21    Q. 1.9 million and change?
22    A. Yes.
23    Q. Does that reflect a basis adjustment about
24  which you provided legal advice in 2003?

Page 92

1    A. Yes.
2    Q. Then the resulting number --
3    A. Excuse me. Let me correct that. I did not
4  see these documents or have this information when I
5  gave that letter in 2003. It wasn't on this basis.
6  You said -- you asked the question was that the --
7  I --
8    Q. I think my question was -- I don't want to
9  cut off your answer, but if I may help. I think my
10  question was, does the last entry on Exhibit 367
11  labeled "2003 basis adjustment" reflect the basis
12  adjustment about which you gave legal advice in
13  2003?
14    A. I believe that to be the case, but I don't
15  know for sure.
16    Q. When was the first time you saw Exhibit
17  367?
18    A. Probably on the 13th or 14th of April, when
19  I got the document.
20    Q. What use did you make of Exhibit 367 in
21  preparing your rebuttal report?
22    A. To reflect the fact that the 2-million-
23  dollar receipt had been taken into account in
24  preparing the tax returns and these, we will call

Page 93

1  them balance sheets and also reflected the fact that
2  they were -- that was reflected on the statements.
3    Q. So where on Exhibit 367 is the 2-million-
4  dollar payment reflected?
5    A. You have to go to Exhibit 368.
6    Q. All right. Take me there, please.
7    A. 368 shows the 2-million-dollar receipt less
8  legal costs for a net of 1,934,287, which is the
9  amount that's reflected as basis adjustment on
10  Exhibit 367.
11    Q. So the 2-million-dollar item identified
12  on -- or not identified on 368, but the amount of
13  $2 million on 368 represents the settlement payment
14  from the zoning appeal in 2003?
15    A. That's my understanding, yes.
16    Q. And approximately $65,000 of legal costs
17  were deducted from that?
18    A. Yes.
19    Q. Were those all your legal costs?
20    A. I doubt it.
21    Q. Do you remember the amount of your fee for
22  the work you did for Mr. Fineberg concerning this
23  basis adjustment in 2003?
24    A. I would not say I did it for Mr. Fineberg.

24  (Pages 90 to 93)

# EXHIBIT 22

OCT.27.1999  11:15AM    FINEBERG MANAGEMENT                    NO.615    P.1/3

# THE FINEBERG COMPANIES

ONE WASHINGTON STREET, STE #400
P.O. BOX 9139
WELLESLEY HILLS, MA. 02481
PHONE: (781) 239- 1480
FAX:    (781) 239-1493

EXHIBIT

Stone 1

2.9.06 DA

TO:- _ELHAM_

COMPANY: _WELLS FARGO_

FROM: _PAUL WALLGRAN_

DATE: _OCT 27, 99_

TOTAL NUMBER OF PAGES(INCLUDING COVER SHEET) _3_

COMMENTS: _____

1- LETTER A AGREEMENT

2- R/E TAX INVOICE

3- THIS BILL IS DUE ON

NOV 1, 1999

THANKS

OCT.27.1999  11:15AM    FINEBERG MANAGEMENT

BLUE HILLS OFFICE PARK, LLC
P.O. BOX 9139
WELLESLEY HILLS, MA. 02481

September 29, 1999

Jim Lingle
Orix Real Estate Capital Markets, LLC
1717 Main St., 12th Floor, TX1-2495
Dallas, TX 75201

Re: ORECM Loan #197000600
    Blue Hills Office Park, LLC

Dear Mr. Lingle:

Please let this letter serve as a recap of our agreement with our tenant at the above referenced location regarding the quarterly real estate tax payments to the Town of Canton.

We currently have an understanding with Equiserve that they will pay us in advance of the due date for the real estate taxes as long as we send them a receipted copy directly upon payment. In order to do so, we bring payment each quarter to the Town of Canton and immediately fax the receipted copy to the tenant and the mortgagee.

Because of the aforementioned agreement and the fact that the Town of Canton sends us the quarterly billing semi-annually, we have found that it is much more effective for us to pay the bills in person and to be funded in advance by the mortgagee

Should you have any questions please call me at (781) 239 – 1480

Sincerely,

Lawrence G. Needle
Blue Hills Office Park, LLC

THE COMB OCT. 27. 1999 M.11:15AMETTS FINEBERG MANAGEMENTNARY REAL ESTATE TAX BILL
TOWN OF CANTON

BILL NO. 615    P. 3/30
JUNE 30,1999    1170-04

Based on assessments as of January 1, 1999, Your Real Estate Tax
for fiscal year beginning July 1, 1999 and ending June 30, 2000 on
the parcel of real estate described below as follows    SEE REVERSE SIDE FOR IMPORTANT INFORMATION

This form approved by the Department of Revenue

MAKE PAYMENTS TO: TOWN OF CANTON
P.O. BOX 378
CANTON, MA 02021

OF RECORD

| PROPERTY DESCRIPTION |
|---|
| PARCEL 051-009 |
| LOCATION 00150 ROYALL ST |
| CLASS 340 |

ROYALL ASSOCIATES REALTY TRUST
FINEBERG G S & LANGELIER W TRS
1 Washington St
Wellesley           MA    02481-1706

| | |
|---|---|
| PRELIMINARY REAL ESTATE TAX | $297,765.94 |
| 1ST QTR INSTALLMENT | $148,882.97 |
| 2ND QTR INSTALLMENT | $148,882.97 |

2ND QTR TAX DUE 11/1/1999    $148,882.97

05700180000422 00001170042 0148882970

paid 148,882.97

EXHIBIT 23



Commercial Mortgage Servicing
P.O. Box 4036, Concord, CA 94524
1320 Willow Pass Rd., Ste. 205
Concord, CA 94520
800 986-9711

July 16, 2004
Fax # 781 - 239 - 1493

BLUE HILLS OFFICE PARK LLC
ONE WASHINGTON STREET, SUITE 400
WELLSLEY, MA      02481-0000

**EXHIBIT**
STone 4
2·9·06 04

Re:     Loan # 76-0990083
        Property Tax Shortage

Dear Mortgagor(s):

This letter is to inform you that your escrow account has insufficient funds to pay the 1st installment, which is due and payable to the Town of Canton. Tax shortages are typically caused by an increase in tax amounts billed by the Tax Collector over the prior year. The property taxes, which are payable now, will be delinquent after 8/2/04. The taxes due are in the amount of $158181.19. Currently, your tax escrow balance is $0.00, which indicates a shortage in the amount of $158181.19.

Please remit $158181.19 payable to Wells Fargo Bank, to my attention at the address below or via wire instructions as follows:

*Express Mail address*                          *US Mail Address*
*Wells Fargo, Commercial Mortgage Servicing*    *Wells Fargo Commercial Mortgage Servicing*
*Attn:  Tim Parish, Property Tax Dept.*         *Attn: Tim Parish, Property Tax Dept.*
*1320 Willow Pass Road, Suite 205*              *P.O. Box 4036*
*Concord, CA 94520*                             *Concord, CA 94524*

*Wire Instructions:*      *Wells Fargo Bank, ABA #121-000-248*
                          *200 B Street, Santa Rosa, CA*
                          *Credit to:  Wells Fargo Commercial Mortgage Servicing*
                          *Account # 4535-078117*
                          *Reference:      For further credit to WFCMS loan #76-0990083*
                          *Property tax escrow shortage*
                          *Attn:  Tim Parish*

These funds must be received in our office no later than 7/27/03 in order for us to issue payment to the Town of Canton by 8/2/04. Please include the loan number on your check to ensure proper identification. Failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to your loan.

Should you have any questions or concerns regarding this matter, please contact me at the toll free number 1-800-986-9711 Ext 5303.

Sincerely,

Tim Parish
Operation Department

INV # 524

Blue Hill 0469

EXHIBIT 24

EXHIBIT

STone 9
2-9-06 M

RECEIVED
APR 3 2003
TOWN CLERK
CANTON MA

Return Form, Fee & Plans for Board of Appeals to:
BUILDING DEPARTMENT, Lower Level, Memorial Hall, Canton, MA 02021          PLEASE PRINT

## Town of Canton
## BOARD OF APPEALS

Hearings 2nd and 4th THURS. evenings each month          DATE __April 4, 2003__

Petitioner's Name __National Development And Equiserve__

Owner's Name __BlueView Corporate Center LLC__

Address __2310 Washington St.__          Tel. No. __(617) 527-9800__

__Newton, MA          02462__

Petitioner's Attorney for case (if any) __Richard R. Staiti, Esq.__

LOCATION OF PROPERTY: 250 Royall Street          AREA ZONED FOR:  LI

IS PROPERTY LOCATED IN GROUNDWATER PROTECTION DISTRICT: ( ) YES  (x) NO

APPLICABLE SECTION ZONING BY-LAWS:          SIZE OF PARCEL          SIZE OF BLDG.
2.15.2(c) p.30   3.0 p.38          Acres. Sq.ft. __10.76 ±__          Sq. ft. __133,000 sf ±__
Sect.   Page   Sect.   Page

To enable the Board of Appeals and the Planning Board to give proper consideration to the plan submitted, such plan must incorporate the requirements listed in the Zoning By-law.

(x) SITE PLAN APPROVAL (Modification)          Indicate sq. ft. of building and other items as
Fill out this application in duplicate.          required in Art. III, 3.0 of Zoning By-law.
(1) copy to Planning Board with (3) copies of Plans.          Furnish seven (7) copies of site plan, 3 copies delivered
          to Planning Board two (2) weeks prior to Board of
          Appeals Hearing expedites decision.  Four (4) copies
          should accompany this request.

( ) SPECIAL PERMIT (Sign)          Copies of design of signs must be in triplicate. Indicate
          measurements, colors and location.

( ) SPECIAL PERMIT (Flood Plain)
(x) SPECIAL PERMIT (Use)
( ) SPECIAL PERMIT (Reduced Parking)
( ) SPECIAL PERMIT (Ground Water Protection)
( ) SPECIAL PERMIT (Telecommunication Tower)

(x) VARIANCE (if necessary)          Explain reason for request in detail below and enclose
          pertinent plans.

( ) EXTENSION OF NON-CONFORMING          Explain reason for request in detail below and enclose
    USE OR BUILDING          pertinent plans.

ADDITIONAL REMARKS (USE OF BUILDING OR PROPERTY)

Petitioner seeks  a Special Permit and approval of modification and amendment to
existing site plan for the property in order to construct a parking garage on
the property.

LIST OF ABUTTERS AND THEIR ABUTTERS: Obtain from Assessors Office, 1st FL. Town Hall. ATTACH LIST.

BLUEVIEW CORPORATE CENTER, LLC.
SIGNATURE OF APPLICANT __Weston R. Cutler__

By: Theodore R. Tye
SIGNATURE OF OWNER __Theodore R. Tye__

PETITIONER OR HIS REPRESENTATIVE MUST BE PRESENT AT THE HEARING

RECEIVED
APR 3 2003
Jean Finnegan
for Z.B.A.

RECEIVED
APR 1 4 2003
CANTON PLANNING BOARD

BLUE HILL 1566

EXHIBIT 25



**EXHIBIT**
Donovan
14
JKC 2/14/06

## MORTGAGE FINANCING APPLICATION

### DRAFT

July 20, 1999

Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
5th Floor
New York, New York 10010

Re:  $33.5 Million Financing on Blue Hills Office Park  (the
"Property")

Gentlemen:

      The purpose of this letter is to set forth the terms and conditions to be submitted to the investment committees of Credit Suisse First Boston Mortgage Capital LLC ("CSFB"; CSFB, its affiliates and their respective successors and assigns are hereinafter collectively referred to as the "Lender") in connection with the proposed first priority mortgage financing (the "Mortgage Financing") which the undersigned (the "Borrower") has requested to be provided by Lender.  The terms and conditions of the Mortgage Financing to be considered shall be those set forth herein, as supplemented by the terms and conditions set forth in the attached term sheet, which term sheet is incorporated into, and made a part of, this letter.

      Borrower acknowledges that it has paid to CSFB, simultaneously with the transmittal of this letter, a good faith deposit of $50,000 (the "Good Faith Deposit"). Borrower hereby agrees that the Good Faith Deposit will be held by CSFB and applied as hereinafter provided. Borrower further agrees to pay all out-of-pocket expenses actually incurred by CSFB in any way relating to the Mortgage Financing (including, without limitation, CSFB's due diligence in connection therewith) and to indemnify, defend and hold Lender harmless against all costs, expenses and damages incurred by such party as a result of or arising out of the Mortgage Financing.  Borrower hereby agrees that CSFB's out-of-pocket expenses will include the fees and disbursements of CSFB's external legal counsel and auditors, CSFB's expenses and the fees of all third parties relating to the due diligence review and the costs of an appraisal, an environmental report and a structural engineering report for the Property.  Borrower hereby agrees that the Good Faith Deposit will be used to reimburse CSFB or otherwise pay for these expenses.  If the Mortgage Financing is not made as a result of Lender's willful or negligent failure to perform as herein provided or, alternatively, upon the consummation of the Mortgage Financing, the unapplied portion of the Good Faith Deposit will be promptly returned to Borrower. The obligations in this paragraph will survive in the event the Mortgage Financing is terminated for any reason.

CSFBMSC 03049

It is anticipated that upon your receipt of the full amount of the Good Faith Deposit and your acceptance of this letter (which acceptance shall be evidenced by your countersigning a copy of this letter and returning the same to the undersigned), you will promptly begin your due diligence investigation of Borrower and the Property. The undersigned agrees to use its good faith efforts to cooperate with CSFB, and its counsel, agents and representatives, and provide CSFB, and its counsel, agents and representatives, with all reasonably requested information in order that CSFB may conduct its due diligence investigation and consummate the Mortgage Financing.

Borrower hereby acknowledges and represents that it is working solely with Lender to procure the Mortgage Financing for the Property and agrees not to, and will cause its principals and affiliates to not, obtain or attempt to arrange a financing for the Property (whether in the form of a permanent mortgage, bridge financing or otherwise) with any party other than Lender. Should Borrower or any principal or affiliate breach or violate the preceding sentence, CSFB will be entitled to retain the unapplied balance of the Good Faith Deposit and receive immediate payment, upon demand, of a break-up fee equal to 0.5% of the Mortgage Financing amount, which break up fee shall constitute liquidated damages, it being expressly acknowledged and agreed that Lender's actual damages in such instance will be impossible to calculate.

If, following CSFB's acceptance of this letter as hereinabove provided, the Mortgage Financing does not close on or prior to September 1, 1999, CSFB will have the option of terminating this letter and not proceeding with the Mortgage Financing, in which event Lender shall be entitled to retain the unapplied portion of the Good Faith Deposit.

Borrower understands and acknowledges that CSFB has not obtained internal investment committee approval for the Mortgage Financing and that its agreement to make the Mortgage Financing is subject to investment committee approval and the following conditions:

(a)     CSFB's satisfactory completion of due diligence and underwriting on the Property;

(b)     the absence of any development occurring with respect to the Property prior to the date on which the Mortgage Financing closing occurs which could, in CSFB's opinion, materially and adversely affect the net operating income or value of the Property or the ability of Borrower to service the Mortgage Financing;

(c)     the execution and delivery of definitive agreements and other documentation relating to the Mortgage Financing satisfactory to CSFB and its counsel;

(d)     the receipt of estoppels and subordination agreements from all tenants and from any ground lessor;

(e)     the receipt of financial statements from Borrower and each of the key principals identified on the attached term sheet for both the last concluded financial year and last concluded financial quarter

-2-

CSFBMSC 03050

preceding the date hereof, which financial statements shall be audited by an accounting firm acceptable to CSFB;

(f) the receipt of valid certificates of occupancy and zoning confirmation letters with respect to all of the improvements constructed upon the Property;

(g) no material adverse change in market conditions including, but not limited to, the liquidity of the fixed income market and/or the market for commercial mortgage backed securities, as determined by CSFB in its sole discretion, from the date hereof to the Closing Date; and

(h) the satisfaction of loan closing conditions customary for loans of this type, including, without limitation, receipt of an updated certified survey and a "clean" policy of mortgagee title insurance.

Borrower acknowledges and agrees that this letter and the attached term sheet do not set forth all of the terms and conditions of the Mortgage Financing, but are intended as an outline of the major points of understanding between the parties that will be set forth in the final loan documentation, which must be acceptable to CSFB in all respects.

This letter shall be governed by and construed and interpreted in accordance with the internal laws of the State of New York.

Please acknowledge your acceptance of the terms and conditions relating to the Mortgage Financing described herein by executing a copy of this letter. This letter must be executed and submitted by the Borrower by July 23, 1999 or this letter is considered void.

Sincerely,

By: _____

___

Name:
Title:

Acknowledged and Agreed to
as of this     day of     1999:

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC

By: _____
        Name:
        Title:

-3-

CSFBMSC 03051

DRAFT

**TERM SHEET**

This Term Sheet is attached to, and forms a part of, that certain letter dated July 20, 1999 from _____ to CSFB (the "Cover Letter"). All capitalized terms used and not otherwise defined in this Term Sheet have the meanings given to such terms in the Cover Letter.

| | | |
|---|---|---|
| **Property:** | Property Type: | Office |
| | Property Name: | Blue Hills Office Park |
| | Property Address: | 150 Royall Street<br>Canton, Massachusetts |
| | Interest of Borrower: | Fee Simple |

                        If any part of the Property is a ground leasehold interest, the terms of the related ground lease must be in accordance with the underwriting standards of CSFB and Standard & Poor's Ratings Services ("S&P").

**Borrower:**          A single-purpose, bankruptcy-remote corporation, limited liability company or limited partnership meeting the requirements of S&P and acceptable to Lender.

**Key Principals:**    Mr. William J. Langelier, general partner of Borrower, and Mr. Gerald S. Fineberg, general partner of Borrower.

**Manager:**           The Property will be managed by a Manager acceptable to CSFB (the "Manager"), who will be entitled to receive a fee of no more than 5.0% of effective gross revenue. The Manager must subordinate its rights under the related management agreement to Lender's lien.

                        The Property management agreement and the loan documents will provide that Lender may request that Borrower terminate and replace the Manager with an independent third party manager acceptable to Lender if (i) an event of default on the Mortgage Financing occurs, or (ii) if an event of default under the management agreement occurs.

**Terms of the Mortgage Financing:**

**Financing Amount:**  The amount of the Mortgage Financing will be no greater than $33,500,000. The exact amount of the Mortgage

<div align="center">-4-</div>

Applicant's Initials _____

CSFBMSC 03052

Financing will be based upon (1) a maximum loan-to-value ratio (based on an MAI appraisal of existing property only, excluding expansion parcels) of no greater than 80% and (2) a minimum debt service coverage ratio ("DSCR") of 1.20x calculated as the ratio of (a) underwritten net operating income ("NOI") for the Property (calculated as provided below) for a twelve-month period to (b) annual debt service on the Mortgage Financing using (A) the Interest Rate (as defined below) and (B) a 30-year amortization schedule and (3) a minimum DSCR of 1.0x calculated as the ratio of (a) NOI to (b) an amount equal to the principal amount of the Mortgage Financing multiplied by a debt service constant of not less than 10.09%.

**Closing Date:**

The funding of the Mortgage Financing (the "Closing") will occur only after, among other things, Lender and its counsel are fully satisfied with the terms of the loan documents, the results of CSFB's due diligence investigation and the investment committee of CSFB has approved the making of the Mortgage Financing.

**Maturity Date:**

The maturity date for the Mortgage Financing will be the date that is the 30th anniversary of the first Payment Date after the Closing.

**Anticipated Repayment Date:**

The date that is the 10th anniversary of the first Payment Date after the Closing.

**Interest Rate:**

The Mortgage Financing will bear interest at a fixed rate (the "Interest Rate") per annum equal to the greater of (A) the yield on the U.S. Treasury Note with a 5.50 % coupon maturing in May, 2009 (which yield shall be determined upon the earlier to occur of a rate lock and the Closing, as each such term is hereinafter defined) plus 245 basis points and (B) 7.75%. Interest on the Mortgage Financing will be payable monthly in arrears and calculated on an actual/360 basis.

**Default Interest:**

Upon the occurrence of an event of default, the Mortgage Financing will accrue interest at a rate per annum equal to the then-applicable interest rate (the Interest Rate or the Revised Interest Rate, as defined herein) plus 500 basis points.

-5-

Applicant's Initials _____

CSFBMSC 03053

**Amortization:** The Mortgage Financing will amortize over its term based on a 30 year amortization schedule. However, if the Mortgage Financing is not repaid on the Anticipated Repayment Date, the amortization of the Mortgage Financing will be accelerated as described below under "Hyper-Amortization".

**Payment Date:** Monthly payments on the Mortgage Financing will be due on the eleventh day of each calendar month (each, a "Payment Date"), commencing on the eleventh day of the second calendar month next succeeding the Closing. At the Closing, Borrower shall pay to Lender, or Lender may deduct from the proceeds of the Mortgage Financing, an amount equal to the interest payable with respect to the period commencing on the date of the Closing through and including the tenth day of the calendar month next succeeding the calendar month in which the Closing occurs.

**Cash Management:** Borrower will be required to establish an account (the "Clearing Account") at a bank (the "Lock Box Bank") into which all proceeds from the Property will be deposited. The Lock Box Bank will be selected by Borrower but must be acceptable to Lender. Lender may, or the Borrower or the Manager shall be required to notify each tenant, account debtor and credit card clearing bank to remit all amounts due with respect to the Property directly to a lock box maintained by the Lock Box Bank or to wire such amounts directly into the Clearing Account.

**Reserves:** Borrower will establish and maintain reserves for existing deferred maintenance, ongoing taxes and insurance premiums, ongoing capital expenditures and such other purposes as CSFB shall determine to be necessary as a result of its due diligence review. Borrower will also be required to fund on-going tenant improvement and leasing commission reserves. The deferred maintenance reserve will be funded at closing and will be 125% of the amount specified in the property condition report obtained by CSFB during its due diligence review and the capital expenditure reserve will not be required to be funded at closing but will be funded from monthly cash flow of the Property at $0.20 per square foot per annum (or such larger amounts determined by CSFB as a result of its due diligence review).

Applicant's Initials _____

CSFBMSC 03054

**Hyper-Amortization:**

**Revised Interest Rate:** If the Mortgage Financing is not prepaid on the Anticipated Repayment Date, the Mortgage Financing will accrue interest from such date at a rate (the "Revised Interest Rate") per annum equal to (i) the greater of (a) the Interest Rate plus 500 basis points and (b) the yield as of the Anticipated Repayment Date, calculated by linear interpolation of the yields of U.S. Treasury constant maturities with terms (one longer and one shorter) most nearly approximating that of non-callable U.S. Treasury obligations having maturities as close as possible to the Maturity Date, plus 500 basis points or (ii) so long as the note is an asset of a trust or other entity formed in connection with a rated securitization, a rate per annum equal to the Interest Rate plus 200 basis points. Interest that accrues on the Mortgage Financing at the Revised Interest Rate in excess of that accruing at the Interest Rate ("Excess Interest") shall be due and payable on the Maturity Date unless paid earlier out of Excess Cash Flow as described below. Unpaid Excess Interest will accrue interest at the Revised Interest Rate and shall be payable by Borrower on the Maturity Date.

**Accelerated Amortization:** In the event that the Mortgage Financing is not repaid on the Anticipated Repayment Date, all monthly cash flow remaining after funding the tax and insurance reserve, ground lease reserve (if any), scheduled debt service and capital expenditure reserve and any other reserves required by the Lender and paying budgeted operating expenses shall be applied to the unpaid principal balance of the Mortgage Financing until it is reduced to zero.

**Prepayment and Defeasance:**

**Prepayment:** Borrower may not voluntarily prepay the Mortgage Financing from the Closing through the date (the "Optional Prepayment Date") that is 3 months prior to the Anticipated Repayment Date. From and after the Optional Prepayment Date, Borrower may prepay the Mortgage Financing on any regularly scheduled Payment Date in whole only without penalty or premium. After the Anticipated Repayment Date, the Mortgage Financing may be prepaid in whole or in part on any regularly scheduled Payment Date without penalty or premium. Permitted partial prepayments shall be made in $100,000 increments only.

-7-                                   Applicant's Initials _____

CSFBMSC 03055

| | |
|---|---|
| **Defeasance:** | As described below, Borrower may obtain a release from its obligations under the Mortgage Financing by economically defeasing the entire Mortgage Financing on any Payment Date during the Defeasance Period (as defined below). In addition, if Borrower defeases the entire outstanding principal balance of the Mortgage Financing, Lender will release its lien on the Property. The "Defeasance Period" will be the period of time (a) commencing on the date that is the earlier of (i) four years following the full funding of the Mortgage Financing and (ii) two years after the securitization of the Mortgage Financing and (b) ending on the Anticipated Repayment Date. |
| | To defease the Mortgage Financing, Borrower must pay Lender an amount equal to the principal balance of the Mortgage Financing for which a release is sought plus an additional amount (the "Yield Maintenance Charge") such that, in the aggregate, such amounts are sufficient to enable Lender to purchase non-callable U.S. Treasury obligations whose payments (x) equal all successive payments on the Mortgage Financing (including servicing and assuming that the Mortgage Financing is paid in full on the Anticipated Repayment Date) and (y) occur on, or as close as possible to, each successive Payment Date. In order to deafease the Mortgage Financing, the Borrower must also provide a comfort letter from an accountant acceptable to the Lender, obtain a rating confirmation from the Rating Agencies, deliver various customary documents and opinions and pay all of the costs and expenses associated with such defeasance. |
| **Rated Transaction:** | Lender intends to transfer the Mortgage Financing to a trust or other similar securitization vehicle in a public or private offering. Borrower agrees to cooperate with Lender to effect this securitization. |
| **No Other Debt:** | Borrower will not be permitted to have any indebtedness (secured or unsecured) other than the Mortgage Financing, short term unsecured indebtedness incurred in the ordinary course of business and such other debt as may be specifically approved by Lender in its sole discretion. If Borrower is not a corporation, the general partner or managing member of Borrower will not be permitted to have any indebtedness or make any loans. The Borrower may have a secured partnership loan which is subject to a subordination/standstill agreement, is non-foreclosable, and |

<div align="center">-8-</div>

Applicant's Initials _____

CSFBMSC 03056

and pays interest only from excess cash flow remaining after all principal, interest and reserve account payments (including, but not limited to on-going capital expense and tenant improvement and leasing commission reserves and all cash flow sweep requirements) have been made. The holder of the partnership debt must be an "insider" for purposes of the bankruptcy code. The maximum amount of the partnership debt shall be_____ and the other terms must be acceptable to Lender.

**Reporting:** Borrower will provide Lender with unaudited monthly and quarterly and audited annual income statements. The annual income statements shall be audited by an accounting firm acceptable to Lender. The monthly and quarterly statements will be prepared on a cash basis and will be required to be delivered to Lender within 30 and 45 days, respectively, of the end of the applicable period, and the annual audited statement will be required to be delivered within 120 days of the end of each fiscal year. All financial statements shall be certified by the Chief Financial Officer and/or Key Principal(s) of Borrower.

**Recourse Liability:** The Mortgage Financing will be non-recourse, except as provided below and for which recourse may be had to Borrower and any or all of the Key Principals. The recourse exceptions will be:

(a) environmental matters;

(b) fraud and misrepresentation;

(c) misapplication of rents, security deposits, insurance and condemnation awards or other proceeds;

(d) misappropriation of any personal property which constitutes a portion of the collateral for the Mortgage Financing;

(e) breach of transfer restrictions, title related covenants, single purpose covenants and financing restrictions;

(f) physical waste;

(g) failure to pay property taxes or charges for labor or materials that create liens on the Property;

-9-                    Applicant's Initials _____

CSFBMSC 03057

(h)     failure to make the first full monthly payment on the Mortgage Financing; and

(i)     bankruptcy, insolvency or interference with Lender's pursuit of its rights or remedies.

**Documentation:**    The Mortgage Financing will be evidenced by financing documentation customary for similar transactions (including, without limitation, a hazardous substances indemnity agreement and a guaranty of recourse obligations executed by the Key Principals) and in any event in form and substance satisfactory to CSFB. All documentation evidencing the Mortgage Financing will be governed by the law in which the real property is located.

**Assignment:**    The Mortgage Financing may not be transferred or assigned by Borrower unless Borrower meets criteria set forth in the Mortgage Financing documentation and pays to Lender an assumption fee equal to 1% of the outstanding principal balance of the Mortgage Financing and any out-of-pocket costs in connection with such assumption.

**NOI Calculation:**    The NOI for the Property shall be the NOI which will be determined by CSFB prior to the Closing in accordance with CSFB's underwriting standards for financings of this type and in conformity to the extent possible with the standards of the Rating Agencies.

**Insurance:**    The Property will be covered by fire and casualty, machine and boiler, business interruption and liability insurance, all in form and substance satisfactory to CSFB. Additional insurance, such as flood, windstorm and earthquake, may be required. In general, the amount of the coverage relating to damage to the Property shall be in an amount not less than the greater of the full replacement cost of the Property and the principal balance of the Mortgage Financing, shall contain deductibles not in excess of the lesser of $25,000 and 5% of annual NOI. All insurance (except for earthquake or flood insurance) shall be written by carriers with an S&P rating of at least A. Business interruption insurance shall cover a period of not less than 18 months.

**Brokers:**    Borrower shall (i) represent to Lender the identity of all brokers engaged in connection with the Mortgage Financing, (ii) pay any and all commissions and other similar fees owing in connection with the Mortgage Financing, and (iii) indemnify and defend Lender from and

-10-                     Applicant's Initials _____

CSFBMSC 03058

against all costs and expenses incurred by Lender as a result of a breach of the foregoing or otherwise in connection with any claim for a brokerage commission or fee made against Lender with respect to the Mortgage Financing.

**Confidentiality:**           This term sheet and the letter to which it is attached is being delivered with the understanding that neither it nor its substance will be disclosed to any third person, except those who are in confidential relationships to Borrower (i.e., Borrower's principals, counsel, accountants and other retained business advisors) or as may be required by law.

**Special Conditions:**

**Cash Flow Sweep:**           Borrower will be required to sweep a pre-determined amount of the monthly "Excess Cash Flow" ( defined as monthly gross rent minus monthly payments of interest and principal on the first mortgage and other reserve requirements set forth on page 6) as an additional reserve for Tenant Improvements and Leasing Commissions such that the annual contribution to the reserve account for Tenant Improvements and Leasing Commissions shall equal $750,000 per annum until such time as $4,250,000 is in the account (the "Cap"). Interest on the account shall remain in the account and shall be included in arriving at the "Cap". [ Example: if annual collection pursuant to the ongoing Tenant Improvement and Leasing Commission reserve set forth on page 6 is $275,000 per annum an additional $475,000 per annum will be required pursuant to the Cash Flow Sweep.] The funds will be available to Borrower for the tenant improvements and leasing commissions necessary to re-lease the building. As the funds are depleted below the "Cap" the Cash Flow Sweep shall be re-instated until an amount equal to the "Cap" is in the reserve account. No further cash flow sweep shall be required if Bank of Boston renews its lease, or another investment grade tenant executes a new lease, for a period extending at least three (3) years beyond the term of the loan.

Applicant's Initials _____

CSFBMSC 03059

EXHIBIT 26

 EquiServe®

```
EXHIBIT
Donovan
17
DCC 2/14/06
```

May 14, 2003

Blue Hills Office Park, LLC
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02181
Attn: Dan Frank

Re:    Confirmation that Equiserve, Inc. (as successor to Equiserve Limited Partnership,
       "**Tenant**") will not exercise Tenant's option to extend the term of the Lease dated
       April 19, 1989 (as subsequently amended and assigned, the "**Lease**") with Blue
       Hills Office Park, LLC ("**Landlord**") covering a portion of a building commonly
       known and addressed as 150 Royall Street, Canton, Massachusetts (the
       "**Demised Premises**")

To Whom It May Concern:

       This letter shall constitute notice and confirmation from Tenant to Landlord that
Tenant will not exercise, and hereby waives Tenant's right to, extend the Term of the
Lease under and pursuant to Section 1.02 of the Lease.  Accordingly, the Lease shall
terminate and expire on July 31, 2004, in accordance with its terms.

**EQUISERVE, INC.** (successor to Equiserve Limited Partnership)

By: _____
Name: Stephen Cesso
Title:   General Counsel

L:\Exec\Eric\Realty\Canton No Extend Letter 2.doc

**Blue Hill 1255**

150 Royall Street
Canton, MA 02021

EXHIBIT 27

# BERNKOPF, GOODMAN & BASEMAN LLP
### COUNSELLORS AT LAW
### 125 SUMMER STREET
### BOSTON, MASSACHUSETTS 02110-1621
### TELEPHONE (617) 790-3000
### TELECOPIER (617) 790-3300
May 15, 2003



Kenneth M. Goldberg
DIRECT DIAL: (617) 790-3333
e-mail: kgoldberg@bgblaw.com

**VIA TELECOPIER**
Mr. Stephen Cesso, General Counsel
EquiServe, Inc.
150 Royall Street
Canton, MA  02021

> RE:    Lease at 150 Royall Street, Canton, MA (the "Lease")
> Blue Hills Office Park, LLC as "Landlord", and
> EquiServe, Inc., as "Tenant"

Dear Mr. Cesso:

This acknowledges Landlord's receipt of Tenant's notice letter dated May 14, 2003, a copy of which is appended hereto ("Tenant's Waiver"). To avoid any confusion as to the interpretation of Tenant's Waiver, please countersign this letter where indicated to confirm that Tenant's Waiver shall, for all purposes, be construed such that any and all rights of the Tenant to extend the Lease Term or occupy the premises demised by the Lease beyond July 31, 2004 have been waived and terminated.

Very truly yours,

Blue Hills Office Park, LLC

Kenneth M. Goldberg, its attorney
duly authorized

AGREED TO AND SIGNED:
EquiServe, Inc.

By: _____
Stephen Cesso, its General Counsel, duly authorized

cc.    Eric Theroff, Esq. / DST Systems, Inc. (via fax only 816-435-8630)

**Blue Hill
1711**

#269156 v1/14500/9547

EXHIBIT 28

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) 03 01051 | Trial Court of Massachusetts Superior Court Department County: Norfolk |
|---|---|---|

| LAINTIFF(S) Blue Hills Office Park LLC | DEFENDANT(S) BlueView Corporate Center LLC and Town of Canton Zoning Board of Appeals by its Members |
|---|---|
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Jason A. Manekas, Esquire Bernkopf, Goodman & Baseman, LLP 125 Summer Street, Suite 1300 Boston, MA 02110 790-3000 Board of Bar Overseers number: 632073 | ATTORNEY (if known) |

## Origin code and track designation

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)
- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

CODE NO.         TYPE OF ACTION (specify)      TRACK       IS THIS A JURY CASE?

C02              Zoning Appeal                 ( F )       ( ) Yes    ( X ) No

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
                                                                                    Subtotal $ . . . . . . . . . . .
B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ . . . . . . . . . . .
F. Other documented items of damages (describe)
                                                                                             $ . . . . . . . . . . .
G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

                                                                                             $ . . . . . . . . . . .
                                                                                    TOTAL $ . . . . . . . . . . .

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s)

*RECEIVED*
*JUN 9 2003*
*TOWN CLERK*
*CANTON, MA*

                                                                                    TOTAL $. . . . . . . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT
        None.

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record _Jason A. Manekas_              DATE: 6/9/03

AU/C-6 mtc005-11/99
A.O.S.C. 1-2000



EXHIBIT
Donova
20
JKC   7/14/04

BLUE HILL 1523

# CIVIL ACTION COVER SHEET
## INSTRUCTIONS

## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

| CONTRACT | | | REAL PROPERTY | | | MISCELLANEOUS | |
|---|---|---|---|---|---|---|---|
| A01 | Services, labor and materials | (F) | C01 | Land taking (eminent domain) | (F) | E02  Appeal from administrative | (X) |
| A02 | Goods sold and delivered | (F) | C02 | Zoning Appeal, G.L. c.40A | (F) | Agency G.L. c. 30A | |
| A03 | Commercial Paper | (F) | C03 | Dispute concerning title | (F) | E03  Action against Commonwealth | |
| A08 | Sale or lease of real estate | (F) | C04 | Foreclosure of mortgage | (X) | Municipality, G.L. c.258 | (A) |
| A12 | Construction Dispute | (A) | C05 | Condominium lien and charges | (X) | E05  All Arbitration | (X) |
| A99 | Other (Specify) | (F) | C99 | Other (Specify) | (F) | E07  c.112,s.12S (Mary Moe) | (X) |
| | TORT | | | | | E08  Appointment of Receiver | (X) |
| B03 | Motor Vehicle negligence- | | | EQUITABLE REMEDIES | | E09  General contractor bond, | |
| | personal injury/property damage | (F) | D01. | Specific performance of contract | (A) | G.L. c.149,s.29,29a | (A) |
| B04 | Other negligence-personal | | D02 | Reach and Apply | (F) | E11  Workman's Compensation | (X) |
| | injury/property damage | (F) | D06 | Contribution or Indemnification | (F) | E14  Chapter 123A Petition-SDP | (X) |
| B05 | Products Liability | (A) | D07 | Imposition of Trust | (A) | E15  Abuse Petition, G.L.c.209A | (X) |
| B06 | Malpractice-medical | (A) | D08 | Minority Stockholder's Suit | (A) | E16  Auto Surcharge Appeal | (X) |
| B07 | Malpractice-other(Specify) | (A) | D10 | Accounting | (A) | E17  Civil Rights Act, G.L.c.12,s.11H | (X) |
| B08 | Wrongful death,G.L.c.229,s2A | (A) | D12 | Dissolution of Partnership | (F) | E18  Foreign Discovery proceeding | (X) |
| B15 | Defamation (Libel-Slander) | (A) | D13 | Declaratory Judgment G.L.c.231A | (A) | E96  Prisoner Cases | (F) |
| B19 | Asbestos | (A) | D99 | Other (Specify) | (F) | E97  Prisoner Habeas Corpus | (X) |
| B20 | Personal Injury-Slip&Fall | (F) | | | | E99  Other (Specify) | (X) |
| B21 | Environmental | (A) | | | | | |
| B22 | Employment Discrimination | (F) | | | | | |
| B99 | Other (Specify) | (F) | | | | | |

## TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | (F) | ☒ Yes  ☐ No |

## SUPERIOR COURT RULE 29

**DUTY OF THE PLAINTIFF.** The plaintiff or his/her counsel shall set forth, on the face sheet (or attach additional sheets as necessary), a statement specifying in full and itemized detail the facts upon which the plaintiff then relies as constituting money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served on the defendant together with the complaint. If a statement of money damages, where appropriate is not filed, the Clerk-Magistrate shall transfer the action as provided in Rule 29(5)(C).

**DUTY OF THE DEFENDANT.** Should the defendant believe the statement of damages filed by the plaintiff in any respect inadequate, he or his counsel may file with the answer a statement specifying in reasonable detail the potential damages which may result should the plaintiff prevail. Such statement, if any, shall be served with the answer.

## A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT, BUFF COLOR PAPER.

## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.

COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO.

BLUE HILLS OFFICE PARK LLC,
Plaintiff

v.

BLUEVIEW CORPORATE CENTER LLC
AND PAUL R. CARROLL, JAMES F.
FITZGERALD, GREGORY PANDO,
CHARLES J. ARMANDO, AND ROBERT
QUIGLEY, AS THEY ARE MEMBERS AND
ASSOCIATE MEMBERS OF THE ZONING
BOARD OF APPEALS OF THE TOWN OF
CANTON, MASSACHUSETTS,
Defendants

03-01051

RECEIVED

JUN 9 2003

TOWN CLERK
CANTON, MA

## COMPLAINT

### I. INTRODUCTION

Plaintiff Blue Hills Office Park LLC files this Complaint, pursuant to G.L. c. 40A, §§ 9

and 17 and G.L. c. 249, § 4, appealing from a decision of the Town of Canton Zoning Board of

Appeals as the Special Permit Granting Authority for the Town of Canton ("ZBA"). The

decision ("Decision"), dated May 22, 2003 and filed with the Canton Town Clerk on May 23,

2003, granted a special permit to Defendant BlueView Corporate Center LLC (hereinafter,

"BlueView") for the construction of a 380-vehicle parking garage located at 250 Royall Street in

the Town of Canton, Norfolk County, Massachusetts (the "BlueView Property") and approved

an amended site plan. Plaintiff asserts that the Decision exceeds the authority of the ZBA, is

based on legally untenable grounds, and is unreasonable and capricious. Accordingly, Plaintiff

BLUE HILL 1524

requests that this Court annul the Decision.  A certified copy of the Decision is attached hereto as Exhibit "A."

## II. PARTIES

1.     Plaintiff Blue Hills Office Park LLC is a Delaware limited liability company, qualified to do business in the Commonwealth of Massachusetts, with a place of business at One Washington Street, Wellesley, Massachusetts 02481, and is record owner of the property located at 150 Royall Street, Canton, Massachusetts.  Plaintiff's property is located immediately across Green Street.  Green Street is the only separation between Plaintiff's property and the BlueView Property.

2.     Defendant BlueView Corporate Center LLC is a Massachusetts limited liability company with a usual place of business at 2310 Washington Street, Newton, Massachusetts 02462, and is the owner of the BlueView Property.

3.     Defendant Paul R. Carroll is the Chairman of the ZBA and resides at 742 Washington Street, Canton, Massachusetts 02021.

4.     Defendant James F. Fitzgerald is a member of the ZBA and resides at 10 Williams Street, Canton, Massachusetts 02021.

5.     Defendant Gregory Pando is a member of the ZBA and resides at 481 York Street, Canton, Massachusetts 02021.

6.     Defendant Charles J. Armando is an associate member of the ZBA and resides at 4 Pleasant Garden Road, Canton, Massachusetts 02021.

7.     Defendant Robert Quigley is an associate member of the ZBA and resides at 89 Sherman Avenue, Canton, Massachusetts 02021.

BLUE HILL 1525

- 2 -

## III. FACTUAL BACKGROUND

8.      The BlueView Property was to include an office building of approximately

188,000 square feet with parking for 677 automobiles (the "BlueView Development").

9.      The BlueView Development was built pursuant to a Special Permit, Site Plan

Approval and Variances granted by the ZBA in 2000 (the "2000 Special Permit"). A true and

accurate copy of the 2000 Special Permit is attached hereto as Exhibit "B." The 2000 Special

Permit also included certain variances from requirements under the Town of Canton Zoning By-

Law, e.g., loading facilities.

10.     BlueView was the developer under the 2000 Special Permit and has been and

continues to be the owner of the BlueView Property since the issuance of the 2000 Special

Permit.

11.     The BlueView Development has been vacant since its completion and has never

been placed into use or occupied.

12.     The 677 spaces for the parking of automobiles currently located at the BlueView

Development exceeds the required parking of 497 spaces under the Town of Canton Zoning By-

Law.

13.     When the 2000 Special Permit was granted, the ZBA raised concerns over the fact

that the proposed parking significantly exceeded the minimum parking requirements.

14.     At the time of the issuance of the 2000 Special Permit, BlueView also filed for

required approvals with the Town of Canton Conservation Commission, Town of Canton

Planning Board, the Massachusetts Highway Department, and under the Massachusetts

Environmental Policy Act, with respect to development of the BlueView Property.

- 3 -

BLUE HILL 1526

15.    In the aforementioned 2000 filings, BlueView made representations concerning the intensity and quality of the use of the proposed BlueView Development.

16.    On or about April 3, 2003, BlueView applied to the ZBA for a Special Permit, Site Plan Approval (modification) and variances (if needed) under the Town of Canton Zoning By-Laws affecting the BlueView Property ("Application"). A true and accurate copy of BlueView's Application is attached hereto as Exhibit "C."

17.    On May 1, 2003, the ZBA held a hearing on BlueView's Application. The hearing was continued until May 22, 2003 at 7:00 p.m. At the continued hearing on May 22, 2003, the ZBA heard further testimony on BlueView's Application, including that of Plaintiff. The ZBA then closed the hearing, voted unanimous approval of the Application, and issued and signed its Decision. The Decision was filed with the Canton Town Clerk on May 23, 2003.

18.    The Decision granted a Special Permit under Section 2.15.2C and Site Plan Approval under Section 3.0 of the Town of Canton Zoning By-Law to BlueView. The Special Permit and Site Plan Approval allow the construction of a 380-vehicle parking garage at the BlueView Property. *See* Exhibit "A."

19.    BlueView's proposed addition of the parking structure and the corresponding increase in the parking at the site by approximately forty percent (40%) so materially affects the overall use of the entire BlueView Development that the parking structure cannot be evaluated as a stand-alone project, but must be evaluated in connection with the BlueView Development as a whole. At present, there is no baseline for the use of BlueView Property as it has never been occupied or placed into use.

- 4 -

20.    Notwithstanding that the BlueView Development has never been occupied or

placed into use, BlueView sought permission from the ZBA to build the parking structure under

Section 2.15.2C of the Town of Canton Zoning By-Law.

21.    In rendering its Decision, the ZBA failed to, *inter alia*, consider the impact of the

increased parking and traffic on the overall use of the BlueView Property as opposed to the use

for the 2000 Special Permit development. In fact, the ZBA failed to properly evaluate the impact

of the parking structure to the BlueView Development as a whole and to adjoining premises.

Further, the ZBA's Decision exceeded their authority under the Town of Canton Zoning By-

Law.

22.    Under Section 4.06.5 of the Town of Canton Zoning By-Law, garages above

grade or garages greater than twelve (12) feet below grade are not permitted in the limited

industrial zone.

23.    The BlueView Property is located in the limited industrial (LI) zone.

24.    Section 2.15.2C of the Town of Canton Zoning By-Law provides, in pertinent

part, that:

> In a Limited Industrial District, the Board of Appeals may, in a
> specific case, issue a special permit to allow above or below grade
> structured parking without regard to the height or depth limits set
> forth in Section 4.06.5. If the applicant demonstrates as a part of
> the Site Plan Review process (Section 3.0) that,
>
> C.1    the applicant has available space on the premises to comply
>        with the otherwise applicable parking requirements of the
>        by-law, and
>
> C.2    that the use of above and/or below grade structured parking
>        would: (i) allow the applicant to preserve additional open
>        space above that otherwise required by this by-law, (ii)
>        decrease runoff from impervious surfaces, and (iii) would
>        be effectively screened by trees of a minimum height of
>        seven (7) feet; and

- 5 -

BLUE HILL 1528

C.3    that the side yard width is not less than sixty feet; and

C.4    That the lot on which such structured parking would be located is not less than eight (8) acres. The location(s) where conforming parking would otherwise be placed in the absence of such structured parking shall be shown on the Site Plan submitted for approval to the Zoning Board of Appeals. Such location(s) shall not be occupied by buildings in the future until the owner has demonstrated compliance with this section's requirements with respect to the existing as well as any additional proposed parking. Such structured parking shall not in any event exceed a height of thirty feet as measured from average finished grade to top of the uppermost deck (except for non-habitable structures, including walls and stairwells, as provide din Section 4.42) or extend more than twenty-four feet below finished grade level.

25.    Plaintiff submits that BlueView's Application and the Decision fail to satisfy the requirements of Section 2.15.2C.

26.    Section 2.15.2C.2 requires that "the use of above or below grade structured parking would preserve additional open space above that otherwise required."

27.    BlueView has failed to show that the 380-space structured parking garage will preserve additional open space above that required under the Town of Canton By-Law.

28.    There is insufficient open space anywhere on the BlueView Property which would allow anything even close to the number of spaces in the structured parking garage. The only potential areas where any significant parking could be physically placed on the BlueView Property is a parcel of residentially zoned land, which cannot be used for the parking of vehicles and must remain as a natural buffer, and on an area consisting of a drainage detention basin. *See* Exhibit "B" (discussing residential area).

29.    Section 2.15.2C also requires that the use of above or below grade structure parking would decrease runoff from impervious surfaces.

- 6 -

BLUE HILL 1529

30.    BlueView has failed to demonstrate that the use of above or below grade structured parking would decrease runoff from impervious surfaces.

31.    In addition, Section 2.15.2C.2 requires that the above or below grade structured parking would "be effectively screened by trees of a minimum of seven (7) feet."

32.    BlueView has failed to demonstrate that the parking structure, which is between twenty-three (23) feet and twenty-five (25) feet above grade, would be effectively screened by trees of a minimum height of seven (7) feet. The ZBA acknowledged the above fact by imposing a requirement that trees be at least ten (10) feet in height, although the proposed parking structure cannot be effectively screened by trees of either height.

33.    Section 2.15.2C also requires that the locations where conforming parking would otherwise be placed in the absence of such structured parking shall be shown on the Site Plan submitted for approval to the Zoning Board of Appeals.

34.    There is insufficient area anywhere at the BlueView Property to allow any meaningful additional parking spaces under current site conditions, let alone 380 additional parking spaces. Moreover, nowhere on the Site Plan is any such parking shown.

35.    Section 3.0 of the Town of Canton Zoning By-Law requires Site Plan Approval for any building, except a residential structure for single or two family use.

36.    Section 3.04 requires, *inter alia*, for site plan approval to be granted such that:

> the Board of Appeals shall assure, to a degree consistent with a reasonable use of the site for the purpose permitted or permissible by the regulations of the district in which located:
>
> 3.04.1 Protection of adjoining premises against detrimental or offensive uses on the site.
>
> 3.04.2 Convenience and safety of vehicular and pedestrian movement within the site, and in relation to adjacent streets, property or improvements.

- 7 -

BLUE HILL 1530

> 3.04.4 Adequacy of space for off-street loading and unloading of
> vehicles, goods, products, materials and equipment incidental to
> the normal operation of the establishment.

37.    The proposed parking structure is immediately in the sight line of Plaintiff's

Property, will partially block its view and will be detrimental and offensive to Plaintiff and the

inhabitants of Plaintiff's property.

38.    The addition of 380 spaces in a structured parking facility directly in the sight line

of Plaintiff's property will not assure the fulfillment of the general conditions for site plan

approval, but rather violates such requirements as it poses a detriment to Plaintiff's Property.

*See* Section 3.04.1 of the Town of Canton By-Law.

39.    The ZBA also failed to adequately consider the effect of the parking structure on

vehicular traffic on adjacent streets from a project which will provide for parking at a level

double the required amount.

40.    Further, the ZBA failed to adequately consider the effect of the increase of the

intensity of the use of the BlueView Property resulting from the increase in parking on the site

on loading, especially of loading and unloading of goods, products, materials and equipment, and

in light of the fact that under the 2000 Special Permit loading requirements had been reduced by

variance.

41.    For the reasons set forth above, the Decision exceeds the authority of the ZBA, is

based on legally untenable grounds, is unreasonable and capricious, and should be annulled.

## IV. STANDING

42.    Plaintiff has standing to bring this action as it is a party-in-interest under G.L. c.

40A, §11 and also person aggrieved under G.L. c. 40A, § 17.

- 8 -

BLUE HILL 1531

43.    Plaintiff has standing to bring this action as its property abuts the BlueView Property affected by the Decision within the meaning of G.L. c 40A, § 11.

## V. COUNTS

### COUNT I
### (Decision Exceeds ZBA's Authority – G.L. c. 40A)

44.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 43 of this Complaint.

45.    The ZBA failed to make sufficient findings to justify the granting of the relief requested under the Town of Canton Zoning By-Law.

46.    The granting of the Special Permit and the granting of Site Plan Approval exceeded the authority of the ZBA.

47.    The Decision to grant the Special Permit is not in harmony with the general purpose and intent of the Town of Canton Zoning By-Law.

48.    Plaintiff and its property will be adversely impacted by the Decision.

49.    As a result thereof, the ZBA's Decision should be annulled.

### COUNT II
### (Declaratory Judgment – G.L. c. 231A)

50.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 of this Complaint.

51.    An actual controversy exists between Plaintiff on the one hand, and the Defendants on the other hand, regarding the ZBA's Decision.

52.    Plaintiff is entitled to a binding declaration under M.G.L. c. 231A declaring and adjudging the parties' rights, duties and liabilities regarding the ZBA's Decision.

BLUE HILL 1532

53.    Plaintiff seeks a declaration that the ZBA's Decision was improper and should be annulled.

## COUNT III
### (Certiorari – G.L. c. 249, § 4)

54.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 53 of this Complaint.

55.    The ZBA approved an amended site plan for the BlueView Development.

56.    The ZBA's approval failed to take into account all of the applicable factors.

57.    In the event the Court determines that the site plan approval is separate and distinct from the special permit granted by the ZBA, Plaintiff would have no other means of review and/or appeal.

58.    As a result thereof, the ZBA's approval of an amended site plan should be annulled.

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.    As to Count I, issue an order annulling the ZBA's Decision;

2.    As to Count II, issue a declaratory judgment pursuant to G.L. c. 231A declaring and adjudging the parties' rights, duties, and obligations under the Town of Canton Zoning By-Law and annulling the ZBA's Decision;

3.    As to Count III, issue an order annulling the ZBA's approval of the amended site plan; and

BLUE HILL 1533

4.    Grant such other relief as this Court deems necessary and just.

Respectfully submitted,
Plaintiff
By their attorneys,

Gary P. Lilienthal, BBO No. 300200
Jason A. Manekas, BBO No. 632073
Bernkopf, Goodman & Baseman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300

Dated: June 9, 2003
#270095 v2/14500/9547

- 11 -

BLUE HILL 1534

EXHIBIT 39

FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524                    Page 1 of 2

**Barnett, Bruce**

**From:**    Kevin Wodicka [KWodicka@lnrproperty.com]
**Sent:**    Wednesday, April 28, 2004 9:07 AM
**To:**      Randy Wolpert; Larry Golinsky
**Subject:** FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524



Sounds like this loan should still be here. I doubt the master servicer is qualified to assess the leasing prospects for this property and start a dialogue with Fineberg. I will have Emily find out if the reserve can only be used for leasing. I would be concerned if the borrower can use it to pay debt service. With money in the reserve it shoud be interesting.

----------

**From:**    Emily Cooper
**Sent:**    Tuesday, April 27, 2004 6:46 PM
**To:**      Michael Reed; Kevin Wodicka; Larry Golinsky
**Subject:** FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

good fact.
-----Original Message-----
**From:** nhanvi@wellsfargo.com [mailto:nhanvi@wellsfargo.com]
**Sent:** Tuesday, April 27, 2004 6:45 PM
**To:** ecooper@lnrproperty.com
**Subject:** FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

Emily,

It looks like the current amount available for leasing is $3,461,014 which maxes out at $4,250,000. Square footage is 273, 863 which works out to $12.64 psf.

Curtis

       -----Original Message-----
       **From:** Emily Cooper [mailto:ECooper@lnrproperty.com]
       **Sent:** Monday, April 26, 2004 8:32 AM
       **To:** 'nhanvi@wellsfargo.com'
       **Cc:** Michael Reed; Kevin Wodicka; Isaac Pesin
       **Subject:** CSFB 99 C1: Blue Hills Office

       Hello Vi,
       The single tenant in the Blue Hills Office building in CSFB 99 C1 will be vacating. Is the lease reserve in place and if so, how much is currently in the reserve?

       Thanks,
       Emily

       Emily Finkelstein Cooper

Vice President, Investment Management
Lennar Partners
(305) 695-5251(Phone)
(305) 695-5601 (Fax)
ecooper@lnrproperty.com

LNR04204

## Barnett, Bruce

| | |
|---|---|
| **From:** | Kevin Wodicka [KWodicka@lnrproperty.com] |
| **Sent:** | Tuesday, April 27, 2004 5:34 PM |
| **To:** | Larry Golinsky |
| **Cc:** | Emily Cooper; Isaac Pesin; Michael Reed |
| **Subject:** | RE: Blue Hills Office Park |

**EXHIBIT** 81

Polcari
2/28/06   HB

The 96% tenant has noticed they will vacate in 7/04 at the expiration of their lease and the Borrower is Gerald Fineberg who has already given properties back to us that don't make sense. Given the market, I doubt this makes sense. One caveat—I think Mike Reed was following up on a reserve. If there is a huge reserve, debt service default may not be imminent.

----------

| | |
|---|---|
| **From:** | Larry Golinsky |
| **Sent:** | Tuesday, April 27, 2004 3:35 PM |
| **To:** | Kevin Wodicka |
| **Cc:** | Emily Cooper; Isaac Pesin |
| **Subject:** | Blue Hills Office Park |

Besides all of us being worried to death about this asset, is there anything we learned that I can use to try to get Wells to send for imminent default, or even for observation?

LNR04074

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Kevin Wodicka [KWodicka@lnrproperty.com] |
| **Sent:** | Thursday, August 19, 2004 2:24 PM |
| **To:** | Isaac Pesin; Michael Reed |
| **Subject:** | FW: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524 |

EXHIBIT 85
Polcari
3/1/06    ttb

Email exchange between Emily and myself on this loan.

---------

| | |
|---|---|
| **From:** | Emily Cooper |
| **Sent:** | Wednesday, April 28, 2004 10:04 AM |
| **To:** | Kevin Wodicka |
| **Subject:** | RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524 |

thanks

-----Original Message-----
**From:** Kevin Wodicka
**Sent:** Wednesday, April 28, 2004 10:03 AM
**To:** Emily Cooper
**Subject:** RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

it's depends on the loan documents. Sometimes the language in the docs will permit the use of the reserve for debt service under certain conditions. Because this building was essentially single tenant, there will be no cash flow for a period time while a new tenant is found. The originator may required the escrow to ensure a default does not occur when the cash flow stops. In a good market, this is a great feature. In our case, it may be a long while before a tenant is found. In our case, I hope it is just a leasing reserve and that the Borrower will be forced to default. Then the lender usually gets control of the cash.

---------

**From:** Emily Cooper
**Sent:** Wednesday, April 28, 2004 9:35 AM
**To:** Kevin Wodicka
**Subject:** RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

I never knew that bwrs even had that option with leasing reserves. I'll ask.

-----Original Message-----
**From:** Kevin Wodicka
**Sent:** Wednesday, April 28, 2004 9:10 AM
**To:** Michael Reed; Larry Golinsky; Emily Cooper
**Subject:** RE: CSFB 99 C1: Blue Hills Office Loan #760990083 Pool 524

let's ask one more question. Let's ask if the reserve can be used for anything other that leasing commissions or tenant improvements. If it could, for example, be used for debt

LNR04129

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Larry Golinsky [LGolinsky@lnrproperty.com] |
| **Sent:** | Tuesday, April 27, 2004 9:52 AM |
| **To:** | Randy Wolpert |
| **Subject:** | RE: CSFB 99-C1/Blue Hills Office Park |

EXHIBIT 86
Polcari
3/1/06   ttb

Will work on it.  When was the Madison QPRM?

-----Original Message-----
**From:** Randy Wolpert
**Sent:** Tuesday, April 27, 2004 9:18 AM
**To:** Larry Golinsky
**Subject:** CSFB 99-C1/Blue Hills Office Park

We need to get this here.  We discussed it at the Madison QPRM.  A big problem.  If you look at the 2-pager in the Madison book, it is FUGLY.  The "F" could also stand for Feinberg.

-----Original Message-----
**From:** Kevin Wodicka
**Sent:** Thursday, April 22, 2004 9:46 AM
**To:** 'Bob Cherry'; Ronald Schrager; Randy Wolpert; Larry Golinsky
**Subject:** RE: Blue Hills Office Park

Borrower is Feinberg, and this is a fein potential mess for CSFB 1999-C1.  Eric's number implies a $19.75MM loss.  Randy Rosen thought maybe around $11.3MM loss.  Either way we will have to discuss how we want to handle this in the meeting later today.

----------
**From:** Bob Cherry
**Sent:** Thursday, April 22, 2004 9:18 AM
**To:** 'KWodicka@lnrproperty.com'
**Cc:** 'rwolpert@lnrproperty.com'; 'RSchrager@lnrproperty.com'
**Subject:** Fw: Blue Hills Office Park

-----Original Message-----
From: Eric Schlager <EDS@Bulfinch.com>
To: Bob Cherry <BCherry@lnrproperty.com>
Sent: Wed Apr 21 22:53:15 2004
Subject: RE: Blue Hills Office Park

is borrower gerry feinberg?
building is old and tired and needs full rehab but in a decent location
right next to new dunkin donuts hq.  i believe equiserve just bought
adjacent spec bldg.
lots of sf in a tough market today.

2/24/2006                                                          LNR04197

i am thinking $40-50psf with a 2 year lease up
$30psf in cap ex, $25psf in ti's, $10psf commission
all in basis of $100psf and try to get a net lease at $10-12.50psf
tough deal, not sure you want to own 275,000sf of vacant office space that
is 30yrs +old and rehabbed last almost 20yrs ago
need to see how close our cap x number is to give you a better feel but i
bet i am pretty close.
where did your boys value?

Eric D. Schlager
Chief Executive Officer
The Bulfinch Companies, Inc.
250 First Avenue, Suite 200
Needham, MA 02494
T (781) 707-4000 x130
F (781) 707-4001
www.bulfinch.com

-----Original Message-----
From: Bob Cherry [mailto:BCherry@lnrproperty.com]
Sent: Wednesday, April 21, 2004 7:12 PM
To: Eric Schlager
Subject: Fw: Blue Hills Office Park


Psf? You own it



-----Original Message-----
From: Kevin Wodicka <KWodicka@lnrmail.lnrproperty.com>
To: Bob Cherry <BCherry@lnrmail.lnrproperty.com>
Sent: Wed Apr 21 17:52:54 2004
Subject: Blue Hills Office Park

Bob,

I've got an asset in CSFB 99-C1 which could use an Eric Schlager test. The
Property is:

Blue Hills Office Park
150 Royall Street
Canton, MA
273,863 sf building
Built 1970
Renovated in 1985

$32MM of debt ($117 psf)

Equiserve is essentially the only tenant; they will be vacating. We will

have to discuss this in tomorrow afternoon's meeting. We did some reunderwriting work already but not digging the answer. Thought we should get another opinion.

Thanks,
Kevin

EXHIBIT 40

FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12

---

**Barnett, Bruce**

---

| | |
|---|---|
| **From:** | Daniel Boord [IMCEAEX-_O=LNR_OU=MIAMI_CN=RECIPIENTS_CN=DANIELB@lnrproperty.com] |
| **Sent:** | Thursday, August 12, 2004 12:58 PM |
| **To:** | Michael Reed |
| **Subject:** | FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12 |

EXHIBIT 65

Polcari

2/23/06    ttb

going to be transferred shortly.

-----Original Message-----
From: Vickie Taylor
Sent: Thursday, August 12, 2004 12:38 PM
To: Daniel Boord
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12

FYI

-----Original Message-----
From: mallegni@wellsfargo.com [mailto:mallegni@wellsfargo.com]
Sent: Wednesday, August 11, 2004 3:16 PM
To: VTaylor@lnrproperty.com
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12

Vickie,

As a heads up, we have advanced the property tax payment of $158,181.19 for this loan and the regular P & I payment is due today. I have a call into the borrower to determine the status of payment. My suspicion is that they will be seeking relief from their normal payments, so this loan may well be coming to you very shortly. I'll keep you posted.

Curtis

-----Original Message-----
From: Mallegni, Curtis J.
Sent: Thursday, July 15, 2004 2:00 PM
To: 'Vickie Taylor'
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA / ID# 12

Vickie,

I spoke with the CFO Joe Donovan on this loan. Fleet has left the project.

**LNR04088**

2/23/2006

# EXHIBIT 41

CSFB 99 C1: Blue Hills Office Park                                           Page 1 of 2

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Emily Cooper [IMCEAEX-<br>_O=LNR_OU=MIAMI_CN=RECIPIENTS_CN=EFINKELSTEIN@lnrproperty.com] |
| **Sent:** | Monday, September 15, 2003 1:07 PM |
| **To:** | Jim Perillo |
| **Cc:** | Jayson Seidman; Vickie Taylor; Kevin Wodicka; Brandon Garson; Pablo Conill; Richard Le |
| **Subject:** | CSFB 99 C1: Blue Hills Office Park |

EXHIBIT 69
Polcari
2/28/06  ttb

Thanks Jim.
Equiserve owned by Fleet, who is on the lease, and the lease expires on 7/31/04. Vickie - can you pls see if this can be considered imminent default and if we can get it here?

Bwr is Gerald Feinberg, whom we are familiar with (difficult bwr in workout) - he owns some hotels around Boston in some of our deals. WIlliam Langlier is also part of the borrowing entity.

There is leasing escrow that has been funded over the Fleet lease term with a cap of $4.25MM. I will try to find out the exact balance, but based on the $52.2K/mo it's probably about $3MM, which is one year of debt service.

Per the updated 2 pager for Madison, there is 500K sf of new vacant space w/in 1/4 mile and market rent is $20 PSF vs Fleet's $15 PSF (net). Market is weak, not expected to pick up until 2004/2005.

We assigned an $8MM loss at the Madison roundtable, but did not add it to LPAMS. This deal is a "B3" and has the Holiday Inn Broadway ($35MM) and Sunpark St Louis among the SS assets and there are several large watchlist loans.


-----Original Message-----
From: Jim Perillo
Sent: Friday, September 12, 2003 3:01 PM
To: Emily Cooper
Subject: FW: Blue Hills Office Park, LLC


Hi Emily-

We probably want to watchlist this- the possible pool, tenant and the borrower name are in the e-mail below.

Thanks,

Jim

-----Original Message-----
From: Adam Berger [mailto:adam.s.berger@verizon.net]
Sent: Thursday, September 11, 2003 4:46 PM
To: JPerillo@LNRPROPERTY.COM; jpolcari@LNRPROPERTY.COM
Subject: Blue Hills Office Park, LLC

**LNR04051**

2/23/2006

CSFB 99 C1: Blue Hills Office Park                                    Page 2 of 2

Gentlemen,

I was wondering if either of you could direct me to the right person at Lennar concerning the following situation.

CSFB originated a note on 9/15/99 in the amount of $33,149,000. The borrower is Blue Hills Office Park, LLC, and the property is located on 150 Royall in Canton, Massachusetts. I am told that the loan was part of the 1999 C-1 pool, and that Lennar is the special servicer.

The property is currently 100% occupied by Equiserve. They have announced that they are leaving the property at the expiration of their lease, which is imminent, as they have purchased the building next door from National Development.

As a result, there is going to be an empty, 20-year old 189,000 sf building. The Canton sub-market is very difficult; the National building sat vacant for two years before Equiserve made their offer, and there is another 175,000 sf newly constructed building on the same street that has been vacant for approximately the same time period.

While I would suspect that the note is still performing, I would like to speak to the appropriate person at Lennar to make sure that you know that you have an alternative to a re-structure of the note, which I would think that the borrower is going to request shortly. I would like to make an offer to purchase the note from Lennar, and therefore, if this loan is not in either of your territories, would appreciate if you could direct me to the appropriate person at Lennar.

Joe, I also remain interested in speaking with you about 19 Crosby.

Thanks,

Adam

**LNR04052**

CSFB 1999-C1
7
RR

| Field | Value | Field | Value | Field | Value |
|---|---|---|---|---|---|
| Property Name: | Blue Hills Office Park | Units: | | .utility Payment: | 254,652 |
| Address: | 150 Royall Street | Square Feet: | 273,863 | 10/1/99 Balance: | 33,149,000 |
| City/St/Zip: | Canton, MA 02021 | Rooms: | | Updated Balance: | |
| Type of Collateral: | Office | Current Rent: | | Interest Rate: | 8.49% |
| Borrower: | Blue Hills Office Park LLC | Actual/Current Occup.: | 100.0% | Loan Type(Fix/Adj): | Fixed |
| Address: | | Superior Lien Amt: | | Maturity / ARD: | 10/11/2009 |
| City/St/Zip: | | Equity Kicker (Y/N): | | Lien Position: | First |
| Originator: | CSFB | Guarantee (Y/N): | | Recourse/Non/Silent: | Standard Current |
| Originator Loan No.: | 942235 | Occup. at Origination: | 100.0% | First P&I Pay Date: | 11/11/1999 |
| Prepymt Provision: Lock/24, Defeasance96_9/9/16 | | Appraised Current LTV: | 78.9% | Note Date: | 9/14/1999 |
| Original Balance: | 33,149,000 | Sub Servicing Fee: | | Appraisal Date: | 8/30/1999 |
| Season: 0 | | Originator Underwritten NOI: | 3,841,253 | Appraisal Value: | 42,000,000 |
| Lock-Box: Yes; Hard | | Annual Replacement Rsrv Payment: | 4,564 | Year Built: | 1970 |
| | | | | Year Renovated: | 1985 |

| Field | Value |
|---|---|
| Portfolio: | |
| Controll#: | 7 |
| Asset Manager: | RR |
| Current Status: | |
| Paid to Date: | |
| Originator U/W DSCR on NOI: | 1.26 |
| Original Amo Term: | 360 |
| Original Balloon/ARD Term: | 120 |
| Management Co.: | |
| Eng. Firm: | Fineberg Management / Certified Environments, Inc |
| Env. Firm: | Certified Environments, Inc |
| Env. Recom.: | No further action |
| FecSimple/LeaseHold: | Fee Simple |

## Loan Comments:

-This $33,149,000 first lien mortgage was originated on 9/14/99 to refinance the Blue Hills Office Park building in Canton, Ma. The note has a 8.49% interest rate and is for 30 years. However, the anticipated repayment date is 10/11/09. If not repaid by then, hyperamortization (additional interest of 2% if in a securitization) kicks in.

-The borrower is a special purpose entity formed to own this property. The principals are Gerald Fineberg and William Langelier. Mr. Fineberg, in real estate since the 1960's, has a net worth as of 12/98 of $143 million of which $21 million is liquid. Mr. Langelier founded The Langelier Co. in 1973 which specializes in the development of subsidized multi-family housing. As of 1/99, his net worth was $13 million.

-The loan requires a $4.23 million leasing escrow equal to 15 mo's debt service payable with an initial deposit of $1.25k, escrows of $9,928/mo and a cash flow sweep of $52,572/mo over the BoB lease term. Also, BoB has a 9 mo. notice of non-renewal providing a total of 24 mo's to re-tenanting. According to C&W, 24 mo's is adequate time to re-tenant this asset in this market.

## Valuation Assumptions:

-Income is based on 8/99 borrower rent roll. Five year renewal to Bank of Boston @ $15.30 psf rent expiring 7/04. Also, $60k/yr is included for the cafeteria.
-Vacancy shown at market rate of 3%.
-Other income represents tenant reimbursements based on historical amounts.
-Expenses are shown at the 1998 rate of $8.69 psf increased by 2% with 2% annual increases thereafter.
-TI's in this market are $10 psf for new and $0 psf for renewals as per the appraiser.
-Commissions are based on 18% of the first years rent for new leases which equates to 3.6%/yr. 1/2 for renewals.
-Reserves are shown at $.16 psf as per the engineering report.
-Adjusted sale comparables ranged from $153-$165 psf. These were mostly single-tenanted bldgs. Multi-tenant bldgs (which Blue Hill could be made into) ranged from $153-$188 psf. The appraiser used $155 psf which seems reasonable considering the comparables.
-According to CB Richard Ellis' 1st Qtr 1999 National Investor Survey, cap rates for this property type averaged 9.4%. We will use 10% in this anlysis to be conservative.
-Based on this analysis, the strength and experience of the borrowers, provided Bank of Boston renews their lease, no loss is anticipated.

## Market Information:

| Field | Value |
|---|---|
| Occupancy Rate: | 97.0% |
| Rental Rate: | $19.62 |
| Leasing Term (years): | 5 |
| Retention Ratio: | 0%/100% |
| Tenant Improvements New: | $10.00 |
| Renewal: | $0.00 |
| Leasing Commissions New: | 3.60% |
| Renewal: | 1.80% |
| Capital Expenditures: per Units or SF: | $0.16 |
| as a % of Revenues: | 0.0% |

| Lease Rollovers: | |
|---|---|
| 0.00 % in Year 1: | |
| 0.00 % in Year 2: | |
| 0.00 % in Year 3: | |
| 0.00 % in Year 4: | |
| 98.26 % in Year 5: | 269,111 |
| 0.00 % in Year 6: | |
| 0.00 % in Year 7: | |
| 0.00 % in Year 8: | |
| 0.00 % in Year 9: | |
| 0.00 % in Year 10: | |
| Total: | 269,111 |

## Collateral Comments:

-The collateral consists of a 273,863 rentable sf, 2-story Class A office building in Canton, Mass. Constructed in 1970 of steel framing with brick exterior and a flat, rubber roof, entirely renovated in 1985, it was configured in 1989 for The Bank of Boston. Amenities include a full service health club, state-of-the-art conference center and a 250 seat cafeteria. On approx. 20 acres, there is parking for 1,040 cars and access is provided by Royall Street. The property is at the intersection of Rte 128 (divided six-lane hwy) and I-95, approx. 12 miles south of the Boston, Ma. CBD.

-Canton is a well located, residential and industrial community. Mid-1999 unemployment was at 2.1%. The property is located in between two major submarkets, the Rte 128/Mass Pke and South Shore. Currently, there is high demand for large blocks of space. In the Rte 128/Mass Pke market, rental rates avg. $28-$33 psf while in the South Shore market, they avg $18-$25 psf. Of 91 Class A buildings surveyed totaling 14 million sf, the vacancy rate was 3.3%.

-The appraiser examined rent comparables and determined an adjusted range of $17.72 to $22.99 psf. The weighted avg. of six comps was $19.62 psf net. He felt that $17.50 psf would be the market rate for the subject.

-The main tenant, Boston EquiServe LP, a joint venture between Bank of Boston, (rated A by S&P) and State Street Bank and Trust, extended their lease for five yrs in 1999 giving them a 7/31/04 lease expiration. They are in 263,311 sf at a below market rate (set by an arbitrator at 90% of market) of $15.30 psf net with a five yr option at 90% of fair market rent. Another 2,532 sf is occupied by Marriott Services, Inc. on a MTM gross lease for the cafeteria. They pay % rent only. Their rent has been $52,437, $59,139, and $73,118 for 1996, 1997, and 1998, respectively.

-The Phase I ESA stated no environmental concerns were noted.

-The Engineering report noted no immediate deferred maintenance and identified $867k for renovating the common areas, $265k for parking lot overlay and $188k for replacement of HVAC heat pumps over a holding period of 12 years. They recommended $.16 psf for replacement costs.

-NOI was $3,734,900, $4,086,594, and $3,995,488 for 1996, 1997, and 1998, respectively.

## Valuation/Cash Flows:

| Projected | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Future |
|---|---|---|---|---|---|---|
| Cash Flows: | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 44,458,939 |
| Losses: | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Losses: | 0 | | | | | |
| Manual Loss Adjustment: | 0 | | | | | |

| Performance Barometers at Resolution | | Performance Barometers at Inception | |
|---|---|---|---|
| Loan per Yardstick: $ | 107 | Loan per Yardstick: $ | 121 |
| Property Value: $ | 151 | Property Value: $ | 139 |
| Breakeven Cap Rate: | 14.2% | Breakeven Cap Rate: | 11.4% |
| Breakeven Occupancy: | 72.7% | Breakeven Occupancy: | 78.9% |

| Field | Value | | |
|---|---|---|---|
| Balloon Payment Due: | 29,179,805 | | |
| Potential Prop. Value Shortfall: | None | DSCR | Interest Rate |
| Potential Refi Shortfall: | None | 1.30x | 9.50% |

Amort (Yrs): 25

2/23/2006 - 7:46 PM

Asset Name: Blue Hills Office Park    Predicted Outcome:
Control: 7

| Yardstick | SI |
|---|---|
| Measure | 273,863 |
| | 0 |

## ASSUMPTIONS

**Loan:**

| | |
|---|---|
| (04/19 Balance): | 33,149,000 |
| Monthly Payment: | 254,652 |
| Interest Rate: | 8.49% |
| Maturity/Extension: | 10/11/2009 |
| Extension Fee: | 0 |
| Credit Loss - Flows/Balloon 0.00% | 0 |
| Month of Default | 0 |

**Asset:**

| | |
|---|---|
| Year of Foreclosure | 31 |
| Month of Foreclosure | 0 |
| Foreclosure Costs | 0 |
| Months of Lost CF | 0 |
| Deferred Maintenance | 0 |
| Sale in Year | 31 |
| Code: 1=P, 2=NP, 3=FS | 1 |

**Pricing / Sale:**

| | |
|---|---|
| Exit Cap Rate or Price | 10.00% |
| Sales Costs | 6.00% |
| Buyer Downpayment | 100.00% |
| Financing Interest Rate | 0.00% |
| Financing Term (Years) | 0 |
| Discount Rate: | 15.0% |

| Calendar Year | Historical 05/31/99 Trailing 12 | 1 11/99-10/00 | 2 11/00-10/01 | 3 11/01-10/02 | 4 11/02-10/03 | 5 11/03-10/04 | 6 11/04-10/05 | 7 11/05-10/06 | 8 11/06-10/07 | 9 11/07-10/08 | 10 11/08-10/09 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Loan Cash Flows:** | | | | | | | | | | | |
| Interest | | 2,802,952 | 2,780,627 | 2,756,332 | 2,729,892 | 2,701,117 | 2,669,803 | 2,635,723 | 2,598,635 | 2,558,273 | 2,375,842 |
| Principal | | 252,875 | 275,199 | 299,495 | 325,935 | 354,710 | 386,024 | 420,104 | 457,192 | 497,554 | 679,985 |
| Balloon Payment | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| End of Period Balance | | 32,876,002 | 32,600,803 | 32,301,308 | 31,975,373 | 31,630,663 | 31,234,639 | 30,814,535 | 30,357,143 | 29,859,790 | 29,179,805 |
| **Collateral Cash Flows:** | | | | | | | | | | | |
| % Revenue Growth | | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% | 1.00% |
| Income per Yardstick | | 14.92 | 15.07 | 15.22 | 15.38 | 15.53 | 15.69 | 15.84 | 16.00 | 16.16 | 16.32 |
| Gross Revenue Potential | 4,142,482 | 4,087,351 | 4,128,224 | 4,169,506 | 4,211,201 | 4,253,313 | 4,295,846 | 4,338,805 | 4,382,193 | 4,426,015 | 4,470,275 |
| % Vacancy | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% |
| Other Income | 2,267,695 | 2,300,126 | 2,346,129 | 2,393,051 | 2,440,912 | 2,489,730 | 2,539,525 | 2,590,315 | 2,642,122 | 2,694,964 | 2,748,863 |
| Total Income | 6,410,177 | 6,264,856 | 6,350,506 | 6,437,472 | 6,525,777 | 6,615,444 | 6,706,496 | 6,798,956 | 6,892,849 | 6,988,199 | 7,085,030 |
| % Expense Growth | | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% |
| Expenses per Yardstick | | 8.86 | 9.04 | 9.22 | 9.40 | 9.59 | 9.78 | 9.98 | 10.18 | 10.38 | 10.59 |
| Operating Expenses | 2,439,823 | 2,426,426 | 2,474,955 | 2,524,454 | 2,574,943 | 2,626,442 | 2,678,971 | 2,732,550 | 2,787,201 | 2,842,945 | 2,899,804 |
| Reserve | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 |
| NOI After Reserve | 3,970,354 | 3,794,612 | 3,831,733 | 3,869,200 | 3,907,016 | 3,945,184 | 3,983,707 | 4,022,588 | 4,061,830 | 4,101,436 | 4,141,408 |
| Capital Expense | | | | | | 303,682 | | | | | |
| Net Cash Flow | 3,970,354 | 3,794,612 | 3,831,733 | 3,869,200 | 3,907,016 | 3,641,502 | 3,983,707 | 4,022,588 | 4,061,830 | 4,101,436 | 4,141,408 |
| Debt Service Coverage (NOI) | 1.30x | 1.24x | 1.25x | 1.27x | 1.28x | 1.29x | 1.30x | 1.32x | 1.33x | 1.34x | 1.36x |
| Debt Service Coverage (CF) | 1.30x | 1.24x | 1.25x | 1.27x | 1.28x | 0.10x | 1.30x | 1.32x | 1.33x | 1.34x | 1.36x |
| Prop. Value | 39,703,540 | 37,946,117 | 38,317,330 | 38,692,003 | 39,070,164 | 39,451,845 | 39,837,074 | 40,225,882 | 40,618,299 | 41,014,356 | 41,414,083 |
| LTV | 83.49% | 86.64% | 85.08% | 83.48% | 81.84% | 80.15% | 78.41% | 76.60% | 74.74% | 72.80% | No Debt |
| **Asset Cash Flows:** | | | | | | | | | | | |
| Interest | | 2,802,952 | 2,780,627 | 2,756,332 | 2,729,892 | 2,701,117 | 2,669,803 | 2,635,723 | 2,598,635 | 2,558,273 | 2,375,842 |
| Principal | | 252,875 | 275,199 | 299,495 | 325,935 | 354,710 | 386,024 | 420,104 | 457,192 | 497,554 | 679,985 |
| Balloon Payments | | | | | | | | | | | |
| Collateral NOI (inc. lost mos.) | | | | | | | | | | | |
| Legal and Foreclosure Costs | | | | | | | | | | | |
| Deferred Maint. & Cap. Ex. | | | | | | | | | | | |
| Net Sales/Buyout Proceeds | | | | | | | | | | | 32,235,631 |
| Delinquent Taxes | | | | | | | | | | | |
| Environmental Costs | | | | | | | | | | | |
| Other | | | | | | | | | | | |
| Total Asset Cash Flow | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 |
| Annual Net Present Value | $22,549,289 | | | | | | | | | | |
| Projected Losses | | | | | | | | | | | |
| Master Servicer Advancing | | | | | | | | | | | |

Total Losses:

2/23/2006 - 7:46 PM

LNR04054

| | |
|---|---|
| Property Name: Blue Hills Office Park | |
| Address: 150 Royall Street | |
| City/ST/Zip: Canton, MA 02021 | |
| Type of Collateral: Office | |
| Borrower: Blue Hills Office Park LLC | |
| Address: | |
| City/ST/Zip: | |
| Originator: CSFB | |
| Originator Loan No: 942235 | |
| Prepymt Provision: Lockd, Defeasance99.87cb | |
| Original Balance: 33,149,000 | |
| Seasn: 0 | |
| Lock-Box: Yes; Hard | |

| | |
|---|---|
| Units: | |
| Square Feet: | 273,863 |
| Rooms: | |
| Current Rent: | |
| Actual/Current Occup: | 100.0% |
| Superior Lien Amt: | |
| Equity Kicker (Y/N): | |
| Guarantee (Y/N): | |
| Occup. at Origination: | 100.0% |
| Appraised Current LTV: | 78.9% |
| Sub Servicing Fee: | |
| Originator Underwritten NOI: | 3,841,253 |
| Annual Replacement Rsrv Payment: | 4,564 |

| | |
|---|---|
| Monthly Payment: | 254,952 |
| 10/1/99 Balance: | 33,149,000 |
| Updated Balance: | |
| Interest Rate: | 8.49% |
| Loan Type(Fix/Adj): | Fixed |
| Maturity / ARD: | 10/11/2009 |
| Lien Position: | First |
| Recourse/Non/Silent: Standard Carveout | |
| First P&I Pay Date: | 11/11/1999 |
| - Note Date: | 9/14/1999 |
| Appraisal Date: | 8/30/1999 |
| Appraisal Value: | 42,000,000 |
| Year Built | 1970 |
| Year Renovated | 1985 |

| | |
|---|---|
| Portfolio: | 254,952 |
| Controll#: | |
| Asset Manager: | |
| Current Status: | |
| Paid to Date: | |
| Originator U/W DSCR on NOI: | 1.26 |
| Original Amo Term: | 360 |
| Original Balloon/ARD Term: | 120 |
| Management Co.: | Fineberg Management |
| Eng. Firm: | Certified Environments, Inc |
| Env. Firm: | Certified Environments, Inc |
| Env. Recom.: | No further action |
| Env. In/oldback at Closing: | 0 |
| FeeSimple/Leasehold: | Fee Simple |

**CSFB 1999-C***   7
**RR/PT**

**Loan Comments:**

-Borrower - The principals are Gerald Fineberg and William Langelier. Mr. Fineberg, in real estate since the 1960's, has a net worth as of 12/98 of $143 million of which $21 million is liquid. Mr. Langelier founded The Langelier Co. in 1973 which specializes in equity capital for developers of subsidized multi-family housing. As of 1/99, his net worth was $13 million.

-Re-Leasing Escrow - The loan requires a $4.25 million leasing escrow equal to 15 mo's debt service payable with an initial deposit of $125k, escrows of $9,928/mo and a cash flow sweep of $52,572/mo over the BofB lease term. Also, BofB has a 9 mo. notice of non-renewal providing a total of 24 mo's for re-tenanting. According to C&W, 24 mo's is adequate time to re-tenant this asset in this market. Current Broker info- 500,000sf of vacant brand new office space within 1/4 mile of this property. Current asking rents of low 20's. Deal financed by Fidelity. Good back office location but really week market right now. 50/50 on whether Fleet renews after 2004. Single tenant 30 year old building are tough. If Fleet stays no brainer if they leave in this market.... Confirmed by Fidelity- says market will not recover until 2004-2005 (just when Fleet is up for renewal) and they would be estatic if they could get tenant in at $25/sf with $25-20/sf TI's.

**Valuation Assumptions:**

-Income is based on 8/99 borrower rent roll. Five year renewal to Bank of Boston/Fleet @ $15.30 psf net expiring 7/04. Also, $60k/yr is included for the cafeteria 2002 - used actual number for 2001. Current market rent is $22/sf - this is equivalent of $30 with recoveries.

-Vacancy shown at market rate of 3% 2002- increased to 10% in 2004 (expiration of current lease and increased to 25% for 2005 then reduced to 10% at stabilization).

-Other income represents tenant reimbursements based on historical amounts. Took out reimbursables in 2005 to get to current gross market rent.

-Expenses are shown at the 1998 rate of $8.69 psf 2002-used actuals.

-Adjusted sale comparables ranged from $153-$165 psf. These were mostly single-tenanted bldgs. Multi-tenant bldgs (which Blue Hill could be made into) ranged from $153-$188 psf. Very soft market, but firend at State Street says unlikely tenant will move.

-Predicted outcome - If Fleet does not renew - there could be a two year cash flow problem, so put a $8 million loss in 2005 (total loss of $12.8 million but reduced loss due to there $4.25 million in reserve which will cover TI/LC but not 2 years of debt service and value shortfall (that brings loan to $72/SF.)

| | |
|---|---|
| **Market Information:** | |
| Occupancy Rate: | 78.0% |
| Rental Rate: | $22.00 |
| Leasing Term (years): | 5 |
| Retention Ratio: | 0%/100% |
| **Tenant Improvements** | |
| New: | $10.00 |
| Renewal: | $5.00 |
| **Leasing Commissions** | |
| New: | 3.60% |
| Renewal: | 1.80% |
| **Capital Expenditures:** | |
| per Units or SF: | $0.16 |
| as a % of Revenues: | 0.00% |
| **Lease Rollovers:** | |
| 0.00 % in Year 1: | 0 |
| 0.00 % in Year 2: | 0 |
| 0.00 % in Year 3: | 0 |
| 0.00 % in Year 4: | 0 |
| 98.26 % in Year 5: | 269,111 |
| 0.00 % in Year 6: | 0 |
| 0.00 % in Year 7: | 0 |
| 0.00 % in Year 8: | 0 |
| 0.00 % in Year 9: | 0 |
| 0.00 % in Year 10: | 0 |
| Total: | 269,111 |

**Collateral Comments:**

-Property-The collateral consists of a 273,863 rentable sf, 2-story Class A office building in Canton, Mass. Constructed in 1970 of steel framing with brick exterior and a flat, rubber roof, entirely renovated in 1985, it was configured in 1989 for The Bank of Boston (now Fleet Bank) Amenities include a full service health club, state-of-the-art conference center and a 250 seat cafeteria. On approx. 20 acres, three is parking for 1,040 cars and access is provided by Royall Street. Intersection of Rte 128 (divided six-lane hwy) and I-95, approx. 12 miles south of the Boston, Ma. CBD.

-Market-Canton is a well located, residential and industrial community. Mid-1999 unemployment was at 2.1% (now over 5%). The property is located in between two major submarkets, the Rte 128/Mass Pike and South Shore. Currently, there is high demand for large blocks of space, in the Rte 128/Mass Pike Class A buildings surveyed totaling 14 million sf, the vacancy rate was 3.3%(2002 is over 15% vacancy in south suburban Boston office market)

-Appraisal-He felt that $17.50 psf would be the market rate for the subject.

-Tenants Boston EquiServe LP, a joint venture between Bank of Boston (now Fleet), (rated A by S&P) and State Street Bank and Trust, extended their lease for five yrs in 1999 giving them a 7/31/04 lease expiration. 2500 employees in 4 locations (NY, NJ, IL, MA) which access stock transfers without brokers in 401 K's and for existing shareholders of a company. They are in 263,311 sf at a below market rate (set by an arbitrator at 90% of market) at $15.30 psf net with a five yr option at 90% of fair market rent. Another 2,532 sf is occupied by Marriott Services, Inc. on a MTM gross lease for the cafeteria.

-NOI was $3,734,900, $4,086,594, and $3,995,488 for 1996, 1997, and 1998, respectively.

2002 Market Update: desirable office market for back office of Boston based banks. Even with depressed office market in Boston, recent sale of downtown office building of same vintage was over $550/sf. Market vacancy has increased from 4% in 2000 to 15% in suburban Boston.

**Valuation/Cash Flows:**

| | Projected | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Future |
|---|---|---|---|---|---|---|---|
| Cash Flows: | | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | (196,541) | 28,509,729 |
| Losses: | | 0 | 0 | 0 | 0 | 0 | 8,579,665 |
| Total Losses: | 8,579,665 | | | | | Manual Loss Adjustment: | 0 |

| Performance Barometers at Resolution | | Performance Barometers at Inception | |
|---|---|---|---|
| Loan per Yardstick: $ | | Loan per Yardstick: $ | 121 |
| Property Value: $ | | Property Value: $ | 139 |
| Breakeven Cap Rate: | | Breakeven Cap Rate: | 11.4% |
| Breakeven Occupancy: | | Breakeven Occupancy: | 78.9% |

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | |
|---|---|---|---|---|---|---|
| Loan per Yardstick: $ | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | (196,541) | |
| Property Value: $ | 8,579,665 | | | | | |
| Breakeven Cap Rate: | | 89 | | | | |
| Breakeven Occupancy: | | NA | NA | NA | | |
| Balloon Payment Due: | None | None | | Interest Rate | Amort (Yrs) | |
| Potential Prop. Value Shortfall: | None | | DSCR | 9,500% | | |
| Potential Refi Shortfall: | 0 | | 1.30x | | 25 | |

LNR04055

2/23/2006 - 7:47 PM

Asset Name: Blue Hills Office Park
Control: 7    Predicted Outcome:

## ASSUMPTIONS

| Loan: | | | Asset: | | | Pricing / Sale: | |
|---|---|---|---|---|---|---|---|
| 10/1/99 Balance: | 33,149,000 | | Year of Foreclosure | 5 | | Exit Cap Rate or Price | 10.00% |
| Monthly Payment: | 254,652 | | Month of Foreclosure | 1 | | Sales Price | 6.00% |
| Interest Rate | 8.49% | | Foreclosure Costs | 50,000 | | Buyer Downpayment | 100.00% |
| Maturity/Extension | 10/1/2009 | | Months of Lost CF | 0 | | Financing Interest Rate | 0.00% |
| Extension Fee | 0 | | Deferred Maintenance | 100,000 | | Financing Term (Years) | 0 |
| Credit Loss - Flows/Balloon | 0.00% | 0.00% | Sale in Year | 7 | | Discount Rate: | 15.0% |
| Month of Default | | 8 | Code: 1=P, 2=NP, 3= FS | 2 | | | |

| | | | | | | | | | | | | Yardstick Measure | SF: 273,863 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Calendar Year | Historical 05/31/99 Trailing 12 | 1 11/99-10/00 | 2 11/00-10/01 | 3 Historical 12/31/2001 | 4 11/02-10/03 | 5 11/03-10/04 | 6 11/04-10/05 | 7 11/05-10/06 | 8 11/06-10/07 | 9 11/07-10/08 | 10 11/08-10/09 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Loan Cash Flows:** | | | | | | | | | | | | | |
| Interest | 2,802,952 | 2,780,627 | 2,756,332 | 2,729,892 | 452,250 | 0 | 0 | 0 | 0 | 0 | | |
| Principal | 252,875 | 275,199 | 299,495 | 325,935 | 28,426 | 0 | 0 | 0 | 0 | 0 | | |
| Balloon Payment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| End of Period Balance | 32,876,002 | 32,600,803 | 32,301,308 | 31,975,373 | 0 | 0 | 0 | 0 | 0 | | |
| **Collateral Cash Flows:** | | | | | | | | | | | | | |
| % Revenue Growth | | 1.00% | 2.00% | | 0.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | | |
| Income per Yardstick | 14.92 | 15.07 | 15.03 | 15.03 | 15.03 | 22.00 | 22.44 | 22.89 | 23.35 | 23.81 | | |
| Gross Revenue Potential | 4,142,482 | 4,087,351 | 4,128,224 | 4,116,388 | 4,116,388 | 6,024,986 | 6,145,486 | 6,268,395 | 6,393,763 | 6,521,639 | | |
| % Vacancy | 3.00% | 3.00% | | 10.00% | 25.00% | 10.00% | 10.00% | 10.00% | 10.00% | | |
| Other Income | 2,267,695 | 2,300,126 | 2,346,129 | 2,750,000 | 2,600,000 | 2,652,000 | | | | | | |
| Total Income | 6,410,177 | 6,264,856 | 6,350,506 | 6,866,388 | 6,716,388 | 6,356,749 | 4,518,740 | 5,530,937 | 5,641,556 | 5,754,387 | 5,869,475 | | |
| % Expense Growth | | 2.00% | 2.00% | | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | 2.00% | | |
| Expenses per Yardstick | 8.86 | 9.04 | 9.99 | 9.99 | 10.19 | 10.39 | 10.60 | 10.81 | 11.03 | 11.25 | | |
| Operating Expenses | 2,439,823 | 2,426,426 | 2,474,955 | 2,735,061 | 2,735,061 | 2,789,762 | 2,845,557 | 2,902,469 | 2,960,518 | 3,019,728 | 3,080,123 | | |
| Reserve | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | 43,818 | | |
| NOI After Reserve | 3,970,354 | 3,794,612 | 3,831,733 | 4,087,509 | 3,937,509 | 3,523,169 | 1,629,364 | 2,584,650 | 2,637,220 | 2,690,841 | 2,745,534 | | |
| Capital Expense | | | | | 3,756,790 | | | | | | | |
| Net Cash Flow | 3,970,354 | 3,794,612 | 3,831,733 | 4,087,509 | 3,937,509 | (233,621) | 1,629,364 | 2,584,650 | 2,637,220 | 2,690,841 | 2,745,534 | | |
| Debt Service Coverage (NOI) | 1.30x | 1.24x | 1.25x | 1.34x | 1.29x | 7.33x | N/M | N/M | N/M | N/M | N/M | | |
| Debt Service Coverage (CF) | 1.30x | 1.24x | 1.25x | 1.34x | 1.29x | -0.49x | N/M | N/M | N/M | N/M | N/M | | |
| Prop. Value | 39,703,540 | 37,946,117 | 38,317,330 | 40,875,089 | 39,375,089 | 35,231,689 | 16,293,640 | 25,846,505 | 26,372,198 | 26,908,406 | 27,455,338 | | |
| LTV | 83.49% | 86.64% | 85.08% | 79.02% | 81.21% | N/A | N/A | N/A | N/A | N/A | N/A | | |
| **Asset Cash Flows:** | | | | | | | | | | | | | |
| Interest | 2,802,952 | 2,780,627 | 2,756,332 | 2,729,892 | 452,250 | | | | | | | |
| Principal | 252,875 | 275,199 | 299,495 | 325,935 | 28,426 | | | | | | | |
| Balloon Payments | | | | | | | | | | | | |
| Collateral NOI (inc. lost mos.) | | | | | 3,229,571 | 1,629,364 | 2,584,650 | | | | | |
| Legal and Foreclosure Costs | | | | | (50,000) | | | | | | | |
| Deferred Maint. & Cap. Ex. | | | | | (3,856,790) | | | | | | | |
| Net Sales/Buyout Proceeds | | | | | | | 24,295,714 | | | | | |
| Delinquent Taxes | | | | | | | | | | | | |
| Environmental Costs | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Total Asset Cash Flow | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | (196,541) | 1,629,364 | 26,880,365 | | | | | |
| Annual Net Present Value | $19,436,348 | | | | | | | | | | | |
| Projected Losses | 12,829,665 | 12,829,665 | | | | | 12,829,665 | | | | | |
| Total Losses: | | | | | | | | | | | | |
| Master Servicer Advancing | | | | 2,575,150 | 3,055,827 | 3,055,827 | | | | | | |

2/3/2006 - 7:47 PM

LNR04056

Equiserve Bldg

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Joe Polcari [JPOLCARI@lnrproperty.com] |
| **Sent:** | Tuesday, September 16, 2003 10:19 AM |
| **To:** | Emily Cooper |
| **Cc:** | Larry Golinsky; David Hall |
| **Subject:** | Equiserve Bldg |

**EXHIBIT** 70
Polcari
2/28/06   tlb

A local broker has tipped us off that Equiserve is about to vacate the building at 150 Royall Drive in Canton, MA. The broker seems to think that we are involved in some way. I checked LPAMS, and the address does not come up. Perhaps this is in one of our portfolios, but has not made its way to us yet. Emily, have you heard anything about this?

Joseph A. Polcari, Jr.
Asset Manager
Lennar Partners, Inc.
1601 Washington Avenue, Suite 700
Miami Beach, Florida 33139
(305) 695-5072 - voice
(305) 695-5601 - fax
jpolcari@lnrproperty.com

This transmission is intended to be delivered only to the named addressee(s) and may contain information that is confidential, proprietary, attorney work-product or attorney-client privileged. If this information is received by anyone other than the named addressee(s), the recipient should immediately notify the sender by E-MAIL and by telephone (305/695-5600) and obtain instructions as to the disposal of the transmitted material. In no event shall this material be read, used, copied, reproduced stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s).

**LNR04065**

2/23/2006

**Barnett, Bruce**

| | |
|---|---|
| **From:** | Vickie Taylor [VTaylor@lnrproperty.com] |
| **Sent:** | Wednesday, September 17, 2003 1:50 PM |
| **To:** | Larry Golinsky; Emily Cooper |
| **Cc:** | Jim Perillo |
| **Subject:** | FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA |

> EXHIBIT 71
> Polcari
> 2/28/06      HB

Please see the Master Servicer's response below. According to the PSA, the loan isn't imminent unless the borrower sends in writing his request to restructure the loan or we are within 60 days of the tenant vacating. There is nothing at this point that triggers a transfer event.

-----Original Message-----
From: nhanvi@wellsfargo.com [mailto:nhanvi@wellsfargo.com]
Sent: Tuesday, September 16, 2003 3:37 PM
To: VTaylor@LNRPROPERTY.COM
Cc: mallegni@wellsfargo.com
Subject: RE: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA


Vickie,

I just got off the phone with the borrower's representative and was informed that per his knowledge, the tenant will be vacating the property when their lease expires in July 2004. The borrower has initiated marketing of the potential vacant space but has no information concerning any prospective tenants. At this point in time the borrower is using a local leasing agent, but may expand their marketing when the lease expiration date approaches. If you have any other questions, please feel free to contact me.

Thanks,

Vi Nhan
Assistant Vice President/Credit Analyst
Wells Fargo Bank
Commercial Mortgage Servicing
Phone 415.396.8446
Fax 415.975.6477

-----Original Message-----
From: Mallegni, Curtis
Sent: Friday, September 12, 2003 1:39 PM
To: Nhan, Vi
Subject: FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA


Vi,

Let me know if you have anything on this. Thanks.

LNR04066

2/23/2006

FW: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA                    Page 2 of 2

Curtis

-----Original Message-----
From: Vickie Taylor [mailto:VTaylor@LNRPROPERTY.COM]
Sent: Friday, September 12, 2003 1:07 PM
To: Curtis J. Mallegni (E-mail)
Subject: CSFB 1999-C1 / Blue Hills Office Park in Canton, MA

Can you give me the status on this property. We heard the tenant was going
to be vacating and not renewing their lease. We are concerned since this is
a $32 million loan that might potential be empty in the very near future.
Please let me know what you find out.

Vickie M. Taylor
Lennar Partners, Inc.
Effective December 2, 2002
1601 Washington Avenue
Suite 700
Miami Beach, FL  33139
Phone No. 305-695-5076
Fax No. 305-695-5601

This transmission is intended to be delivered only to the named addressee(s)
and may contain information that is confidential, proprietary, attorney
work-product or attorney-client privileged. If this information is received
by anyone other than the named addressee(s), the recipient should
immediately notify the sender by E-MAIL and by telephone (305/695-5600) and
obtain instructions as to the disposal of the transmitted material. In no
event shall this material be read, used, copied, reproduced stored or
retained by anyone other than the named addressee(s), except with the
express consent of the sender or the named addressee(s).

**LNR04067**

2/23/2006

EXHIBIT 42

# REDACTED



∴ If you like, I can go into alot
more detail about the escrow payments, P&I draws from the reserve account,
etc.

Regarding the note sale, in my mind, we should look at a one-off sale, as a
bulk sale will likely take longer.

I realize that advancing is the make or break part in this deal. We will
have all three approaches heading simultaneously towards the finish line.

-----Original Message-----
From: Randy Wolpert
Sent: Monday, September 13, 2004 11:11 AM
To: Joe Polcari; 'dhall@lnrproperty.com'
Cc: Larry Golinsky; Ronald Schrager
Subject: RE: New Loans for Transfer Date: 8/18/2004


Advancing is going to crush us on this if we don't act quickly to either get
title and sell as REO or sell the note.

-----Original Message-----
From: Joe Polcari
Sent: Thursday, September 09, 2004 7:54 PM
To: Randy Wolpert; 'dhall@lnrproperty.com'
Subject: RE: New Loans for Transfer Date: 8/18/2004


I didn't see it today - I had a PTO day. My plan is to schedule a site
visit next week with the borrower so David and I can take a good look.
Meanwhile, below is my interpretation of the relevant PSA section (3.18).

1) We can purchase a Defaulted Loan (defined as a loan that is 60 days
delinquent) at the Purchase Price (defined as the unpaid principal, accrued
interest, unreimbursed advances and interest on advances). It appears that
we have the first right of purchase, followed by the Servicer, followed by
the Directing Certificateholder, which I read as Madison.

2) We can offer to sell a Defaulted Loan, not otherwise purchased by the
parties mentioned above, if the SS determines that the sale would produce a
greater recovery on a PV basis than would liquidation of the Mortgaged
Property. The offering must be made for a period of at leat 20 days, but
not more than 90 days. In the event that the bids do not equal or exceed
the Purchase Price, the SS can accept what it determines to be a fair price.


3) We have to give the Trustee and Servicer three business days notice of
our intent to sell a Defaulted Loan (or REO Property).

4) If the SS is the high bidder, then the Trust determines whether the SS

10/19/2005

LNR00455

bid is a "fair price". In determining this, the Trustee may rely on the opinion of an appraiser at the expense of the Trust Fund.

-----Original Message-----
From: Randy Wolpert
To: Ronald Schrager; David Hall
Cc: Kevin Wodicka; David Team; Joe Polcari
Sent: 9/9/2004 10:09 AM
Subject: RE: New Loans for Transfer Date: 8/18/2004

David, I think Joe is going to see the property today, not sure if you've going with him and I don't know if you've had any further opportunity to ponder this. Keep us in the loop on your thoughts and I know Joe will keep you appraised of our plans. If we are going to pursue it internally, we'll need to discuss process, since the PSA will dictate how we need to go about this and we'll need to involve the trustee. Ultimately we'll have to be ready with our number as bids are coming in.

> -----Original Message-----
>From:  Ronald Schrager
>Sent:  Monday, August 23, 2004 3:56 PM
>To:   David Hall
>Cc:   Kevin Wodicka; Randy Wolpert; David Team
>Subject:     RE: New Loans for Transfer Date: 8/18/2004
>
 ·Here's my take based on your comments:
 ,
>Your valuation analysis seems to make sense--the biggest variable is
>how long it takes you to find the user. We can try and get you some
>market stuff if we have any but you would probably be able to get as
>good or better info. than we will get. From the CMBS side we will
>likely have to put this on the market immediately as the carry costs
>associated with this will kill us. At that point we essentially have a
>ROFR and will be able to see where the offers come in. If we think
>everyone is bottom feeding we can scoop this up at that point. My
>sense is this is well-located real estate and in a market recovery this
>is a good asset. Everything I'm hearing is that the market in general
>is starting to turn the corner. If you agree I think you should start
>to think about where you would feel comfortable owning this in the
>event we take this to market quickly. We should be able to get you
>access to the building assuming the borrower is cooperating (I think he
>is as of now). If we buy it for $60, spend $40 to bring in a tenant at
>$13NNN this could work unless in takes us several years to find a user.
>Or if this is multiple buildings could we multitenant?
>    -----Original Message-----
>   From:  David Hall
>   Sent:  Monday, August 23, 2004 11:05 AM
>   To:   Ronald Schrager
>   Cc:   Kevin Wodicka; Randy Wolpert; David Team
>   Subject:     RE: New Loans for Transfer Date: 8/18/2004

10/19/2005                                                    LNR00456

>
>      Ron, sorry for the delay on this. here is my gut feel.
>
>      This all depends on the interior finishes and tenant upgrades
>for financial back office.  The only way to make money is to get
>comfortable that you've got plug-n-play, (or buy this real cheap).  If
>tenant walks in and needs $30 in TIs, then you're dead (if we have to
>start with $117 as basis).  This is a 12 -14 NNN market and you never
>want to let project costs the exceed $115 - $120.  I would say Fleet
>is likely to have done all the right things to make this work for its
>own operations - but I have not seen the inside.
>
>      So, if you have plug-n-play then dark value is 90 -100 but its
>still very scary at those numbers.  Safer underwriting is to assume
>$60--70 dark and know you're looking at 30 - 40 in cost to make a deal.
>Time to make a deal is obviously another problem - could be years not
>months with that new vacant building immediately next door.
>
>      Problem with this site has always been access.  Its just real
>tough to get to.  It has great signage on major highway but no
>interchange that serves it directly.  Thats why its back office -
>workers know how to get to the office but no -one else can find the
>place.
>
>      I do not see any other re-development play in terms of tear down
>for housing - etc.  Canton will never let that happen.

      Would like to see any appraisal info and get a chance to see
>what brokers think.  My sense of the market could need some updating
>as things are starting to happen here.
>
>
>
>
>
>      -----Original Message-----
>      From:  Ronald Schrager
>      Sent:  Thursday, August 19, 2004 11:59 AM
>      To:   David Hall
>      Cc:   Kevin Wodicka; Randy Wolpert; David Team
>      Subject:     FW: New Loans for Transfer Date:
>8/18/2004
>
>      David,
>
>      Congrats on the Fan Pier deal.  Looks like you got us in
>a great position to outflank the local favorites.
>
>      Wanted to get a read from you on a potential mining
>opportunity, Blue Hills Office Park in Canton.  Here is what we know:
>

10/19/2005

LNR00457

>       Gerald Fineberg is bwr. 100% occ as of 6/03. A
>2-story, 274M s.f. Class A office building built in 1970. Property was
>96% leased to Fleet Bank (formerly BankBoston, the name of the division
>in the building is Equiserve) until July 2004. Fleet vacated at lease
>expiration, reportedly to a building they have purchased next door from
>National Development (which sat vacant for 2 years before this as is
>another 175ksf newly constructed building on same street). Despite
>good back office location, mkt is soft and quasi-single tenant lease
>rolls. Debt is $32MM or $117 psf.
>
>       Address is:
>       Blue Hills Office Park
>       150 Royall Street
>       Canton, MA 02021
>
>       Would like to know from you (1) what do you think the
>dark value of this is if we sold it today and (2) do you think this is
>an asset we would want to purchase vacant and redevelop.
>
>       Thanks.
>
>       Ron
>
>
>
>

10/19/2005

LNR00458

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Monday, November 08, 2004 4:04 PM |
| **To:** | Randall Rosen |
| **Subject:** | RE: Blue Hills Office Park |

What the @#%!. I've got Larry AND you telling me to get this done. I'M NOT A MACHINE.

-----Original Message-----
From: Randall Rosen
Sent: Monday, November 08, 2004 4:56 PM
To: Joe Polcari
Subject: RE: Blue Hills Office Park

Joe, I'm planning a trip up north the week of Dec. 6th. You have to make this happen by then as I won't go there until April.

-----Original Message-----
From: Joe Polcari
Sent: Monday, November 08, 2004 4:35 PM
To: Larry Golinsky; Randall Rosen; Hector Gomez
Subject: FW: Blue Hills Office Park

REDACTED

Please see below. Based on this late-breaking information,                                    .. My
plan is to compress the monitoring well time frame to less than the 3-week estimate. Even if we have to pay
double, it's worth it give the monthly advancing.

-----Original Message-----

REDACTED



EXHIBIT 106
Polcari
3/1/06   ttb

1

LNR02977

REDACTED

2

LNR02978

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Monday, November 08, 2004 4:05 PM |
| **To:** | Larry Golinsky |
| **Subject:** | RE: Blue Hills Office Park |

Consider it owned.

-----Original Message-----
From: Larry Golinsky
Sent: Monday, November 08, 2004 4:56 PM
To: Joe Polcari
Subject: RE: Blue Hills Office Park

I don't want a conservative lawyer slowing us down. Please find out if there is another way of Scott getting comfortable ASAP. Take ownership of this situation and get it done. Delaying this forecloser is fraught with risk.

-----Original Message-----
From: Joe Polcari
Sent: Monday, November 08, 2004 4:54 PM
To: Larry Golinsky
Subject: RE: Blue Hills Office Park

To answer your first question regarding the timing of the Phase 1, it was ordered by me on 9/14/04. I was given a 10/7/04 due date, and have followed up with REAM regularly, pushing for the report's completion. I don't know why the report was so late.

Regarding a put,          **REDACTED**

-----Original Message-----

**REDACTED**

-----Original Message-----
From: Joe Polcari
Sent: Monday, November 08, 2004 4:35 PM
To: Larry Golinsky; Randall Rosen; Hector Gomez
Subject: FW: Blue Hills Office Park

EXHIBIT 107
Polcari
3/1/06

1

LNR02975

Please see below.  Based on this late-breaking information,                                    My
plan is to compress the monitoring well time frame to less than the 3-week estimate.  Even if we have to pay
double, it's worth it give the monthly advancing.

-----Original Message-----

**REDACTED**

2

EXHIBIT 43

## Proforma Closing Statement



**Date:**           4/26/2005

**Deal:**           CSFB 99-C1

**Loan #:**         M760990083

**Property:**       Blue Hills Office Park

**Buyer Name:**     Onebeacon Insurance Group, LLC

**Scheduled Closing Date:**     4/29/2005

Exhibit: 122
Witness: Rosen
Date: 3.2.06  CM

| PURCHASE PRICE | | $23,000,000 |
|---|---|---|
| **LESS:** **CLOSING COSTS** | | |
| Broker Fees | $460,000 | |
| Legal Fees | $10,000 | |
| Title Fees | $0 | |
| Recording Fees | $50 | |
| Transfer Fees | $108,000 | |
| Other Fees | $5,000 | |
| **TOTAL CLOSING COSTS** | | $583,050 |
| **PRORATIONS** | | |
| Real Estate Taxes | ($109,510) | |
| Security Deposits | $0 | |
| Rental Income | $0 | |
| Other Prorations | $0 | |
| **TOTAL PRORATIONS** | | ($109,510) |
| **NET PROCEEDS** | | **$22,526,460** |

LNR03942

EXHIBIT 44

## AGREEMENT

This **Agreement** entered into as of the 31st of December, 2004, among the undersigned identified as the "Beneficiaries" of Royall Associates Realty Trust (the "Trust") to confirm their agreements generally responsive to the foreclosure recently held pursuant to which title to the real estate owned beneficially by the Trust has been, or is reasonably contemplated to forthwith be divested.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned agree as follows:

I.     Definitions.  The following definitions are applicable to this Agreement:

A.     The "Trust" is Royall Associates Realty Trust under Declaration of Trust dated July 13, 1987;

B.     The "Trustees" of the Trust are Gerald S. Fineberg ("Fineberg"), William J. Langelier ("Langelier") and Blue Hills Management Corp., a Massachusetts corporation ("BHM Corp.");

C.     The "Beneficiaries" of the Trust are Fineberg, Daniel Frank ("Daniel"), Gary Fineberg ("Gary"), Michelle Fineberg ("Michelle"), Langelier and Amy Badger ("Amy");

D.     The "Property" is the real estate together with the office building and other improvements thereon known and numbered as 150 Royall Street, Canton, Massachusetts, title to which, on behalf of the Trust, has been held in the name of Blue Hills Park LLC, a Delaware limited liability company (the "LLC"), of which BHM Corp. is the Manager, and of which the Trust is the sole Member;

E.     The "Foreclosure" is the action recently taken by the holder of the first mortgage on the Property resulting in the reported high bid by the first mortgage lender to the LLC and the assumption of management of the Property by the designee of the first mortgage lender from Fineberg Management Co., Inc., the prior manager of the Property designated to act in that capacity by the LLC ("Fineberg Management"); and

F.     The "Accounts" include (i) amounts presently, and hereafter from time to time, held on deposit and controlled by Fineberg Management as a result of its management of the Property (the "Property Account"), (ii) the "Initial Account" held in escrow by Kenneth M. Goldberg and Andrew H. Cohn (the "Escrow Agents"), and (iii) the "Supplemental Account" held by the Escrow Agents, all of which Accounts, including present approximate balances in each, being as set forth in the Schedule of

USIDOCS 4885056v3



BLUE HILL
5513

**AGREEMENT**

Page 2

Accounts and Account Balances (the "Schedule of Accounts") initialed for acknowledgement by Fineberg and Langelier together herewith.

II.    Treatment of Accounts.

A.    The Accounts. It is acknowledged that the Schedule of Accounts initialed herewith includes the Property Manager's good faith estimate of the present balance thereof.

B.    The Property Account. The Property Manager shall prepare a final accounting of the Property Account on or before January 31, 2005, and send that accounting to Fineberg (on behalf of himself, Gary, Michelle and Daniel collectively herein sometimes called the "Fineberg Beneficiaries") and to Langelier (on behalf of himself and Amy, together herein sometimes called the "Langelier Beneficiaries"). After payment of Trust legal and accounting fees and such third party creditors as the Property Manager reasonably determines should be paid, the balance will be held as a reserve for future claims and liabilities of the LLC and/or the Trust until April 1, 2005, or such later date as Fineberg and Langelier jointly or both their respective counsel reasonably agree.

C.    The Initial Account. Simultaneously herewith, the balance in the Initial Account (plus the amount in the Supplemental Account exceeding $2 Million Dollars) shall be released and paid over one-half to Kenneth M. Goldberg, Esq. for distribution among the Fineberg Beneficiaries as they may direct, and to one-half Andrew H. Cohn, Esq. for distribution to the Langelier Beneficiaries as they may direct.

D.    The Supplemental Account. The Supplemental Account (net of the withdrawal referenced in 2(C) above) shall be distributed, first (i) upon execution hereof, 50% to Bernkopf Goodman LLP to continue to be held in escrow on behalf of the Fineberg Beneficiaries, and 50% to Wilmer Cutler Pickering Hale and Dorr LLP to continue to be held in escrow on behalf of the Langelier Beneficiaries, both subject to the terms of this Agreement (the "Supplemental Account Escrows"), then (ii) on January 20, 2005, one-half of the amount in each Supplemental Account Escrow shall be distributed to the Beneficiaries of each respective Supplemental Account Escrow, provided after such distribution the remaining Supplemental Account Escrow balances total at least 125% of any then

- 2 -

BLUE HILL
5514

**AGREEMENT**

Page 3

outstanding Indemnified Claims (hereafter defined), and then (iii) on April 1, 2005, the balance in the Supplemental Account Escrows shall be distributed 50% each to the Beneficiaries of the respective Supplemental Escrow Accounts, provided after such distribution the remaining Supplemental Account Escrow balances total at least 125% of any then outstanding Indemnified Claims. An outstanding Indemnified Claim shall be an Indemnified Claim (hereafter defined) that is then being actually asserted (A) in written form [whether by email, letter or otherwise] by or on behalf of the particular third party making the claim or (B) via a telephone call from the third party making the claim or from its counsel. Five (5) days prior to the foregoing January 20, 2005 and April 1, 2005 funds distribution dates, each escrow agent will have the opportunity to notify the other of the sum intended to be released from the Escrow Account he is administering on the next release date, and, unless a good faith written objection thereto (based upon the known existence of an outstanding Indemnified Claim) is received prior to that next release date from the other escrow agent, the sums to be released described in (ii) and (iii) immediately above shall be released to the Beneficiaries for whom those funds are then being held. In the event of an escrow holdback based on the existence of an outstanding Indemnified Claim, any balance remaining in the Supplemental Account Escrows at six (6) month intervals after April 1, 2005, or such earlier dates as the Supplemental Account Escrow Agents may then agree upon, shall be subject to the same request, objection and distribution procedure as set forth above applicable to the scheduled April 1, 2005 distribution.

III.  Jurisdiction.  To the extent any dispute or issue arises between the Beneficiaries or any other party hereto, the parties hereto agree that jurisdiction for such dispute shall be by notice and service of process to Andrew H. Cohn, Esq. for and on behalf of any one or more of the Langelier Beneficiaries, and to Kenneth M. Goldberg, Esq. or Lydia G. Chesnick, Esq. for and on behalf of any one of the Fineberg Beneficiaries and Fineberg Management, with proper venue for adjudication of any such claim as the claimant determines either in the Suffolk Massachusetts County Superior Court or in the U.S. District Court for the District of Massachusetts.

IV.  LLC Claims.  It is acknowledged that there exist the following two claims assertable by the LLC (the "LLC Claims"):  the claim against the first mortgage lender for improper conduct including, without limitation, failure to respond to

- 3 -

BLUE HILL
5515

**AGREEMENT**

Page 4

LLC's request for the release of reserve funds which could have maintained the loan current, attracted potential new tenants and potentially avoided foreclosure (the "Claim Against Lender"); and the claim against the owner of the newly constructed, abutting office building at 250 Royall Street for failure to construct those premises within the height and building envelope restrictions agreed upon with the LLC (the "Claim Against Abutter"). This confirms the agreement of the Beneficiaries that the Claim Against Lender will not be pursued unless and until otherwise determined by both Fineberg and Langelier, but shall be held for response in the event the lender asserts liability against LLC which may give rise to personal liability of one or more Beneficiaries under the loan. The Claim Against Abutter will also be held pending determination by counsel to both Fineberg and Langelier that the damages therefrom and likelihood of recovery after considering the cost thereof warrant pursuit of that claim.

V.    Claims Against LLC. While the undersigned acknowledge that they have no basis to believe there will be any claims filed against the LLC or the Trust for which any Beneficiary may have personal liability, the parties recognize the possibility of such a claim being filed, and agree with respect thereto as follows:

  A.    Mortgage Lender Claim. The Beneficiaries acknowledge that a claim could be asserted by the holder of the first mortgage loan on the Property, however, the lack of likelihood of any such claim having been reviewed with counsel, the release and distribution of funds from escrow contemplated by Paragraph II above are predicated upon no such claims being filed ("Mortgage Lender Claims").

  B.    Misc. Creditors. While not anticipated, one or more claims could be filed against the LLC, the Trust or a Beneficiary which may give rise to personal liability of a Beneficiary ("Misc. Creditor Claims").

  C.    Indemnified Claims. Fineberg and Langelier hereby agree that each of them will indemnify the other to the extent of 50% of any loss, cost or expense either one of them incurs on account of his first mortgage loan guaranty or arising from his interest in the LLC, the Trust, BHM Corp. or Fineberg Management and which is reasonably believed to result, or likely to result in his or their personal liability (the "Indemnified Claim(s)"). Fineberg and Langelier agree that within five (5) days after written requisition therefor by either of them, first from the Property Account until it is exhausted, and then one-half from each Supplemental

-4-

BLUE HILL
5516

**AGREEMENT**

Page 5

Escrow Account, funds shall be released to the requisitioning party to pay (a) the cost of defense reasonably incurred by Fineberg and/or Langelier for an "Indemnified Liability" - herein defined as a cost arising from a claim asserted or which the requisitioning party reasonably believes may evolve into an Indemnified Claim, (b) the amount of an Indemnified Liability adjudicated as being owed, or (c) any settlement of an Indemnified Claim - and for settlements exceeding $10,000.00, consent of both Fineberg and Langelier shall be required.  It is hereby further agreed that to the extent funds in the Supplemental Escrow Accounts and in the Property Account are insufficient to pay in full amounts indemnified hereunder, Fineberg and Langelier will pay from their own funds the amount of their indemnity hereunder within ten (10) days after request by the other party.  Further, with respect to claims against any of the parties hereto that are not likely to incur personal liability to a Beneficiary (and therefore not giving rise to an Indemnified Liability) exceeding $10,000, same may be paid or settled, up to a total of $20,000 upon request of Andrew H. Cohn, as counsel to Langelier, or Kenneth M. Goldberg, as counsel to Fineberg; claims exceeding the foregoing limitation, shall require the consent of both counsel.

VI.   Tax Returns.  A final tax return for the Trust, the LLC having been filed as a Disregarded Entity, shall be completed and filed for December 31, 2004 for calendar year 2004 by Rutfield & Hassey, CPA's.  Prior to filing, a copy of that return shall be made available for review by Langelier and his accountant, Gerard P. Jarasitis, Edelstein & Company LLP, 24 School Street, Boston, MA  02108, Telephone: (617) 227-6161 x 224, Fax: (617) 589-0530 and Fineberg, with any reasonable input from either forwarded in writing within ten (10) days shall be included in the final returns as filed.

VII.   Miscellaneous.

A.   The Manager of the LLC and the Trustee of the Trust are hereby directed to take actions determined as being reasonably required to implement the terms of this Agreement.  The parties agree that as a private matter, the existence and contents of this Agreement shall be held in strict confidence unless and until required by process of law to be disclosed by him/her; and, the other parties hereto shall be given at least five (5) days advance notice with copies of documents or other deliveries such disclosing party believes are required to be released to any third party.  The Beneficiaries

- 5 -

BLUE HILL
5517

**AGREEMENT**

Page 6

        shall be responsible to bear all costs invoiced to them for fees and costs of the Escrow Agent acting hereunder for that group of Beneficiaries.

B.     Each of Bernkopf Goodman LLP (and Kenneth M. Goldberg), on the one hand, and Wilmer Cutler Pickering Hale and Dorr LLP (and Andrew H. Cohn), on the other hand, will serve as escrow agents only to receive, hold, and deliver the Initial Account and the Supplemental Account Escrows (collectively the "Escrow Fund") in accordance with the terms of this Agreement. None of the escrow agents shall be liable to anyone for damages, losses or expenses except for willful default, nor shall any of the escrow agents be responsible for the acts or omissions of any other parties to the Agreement or any of the Beneficiaries. Each of the escrow agents is entitled to rely in good faith upon certificates, checks, documents, votes, instruments and statements of account rendered to each of them which each escrow agent believes to be genuine, not only as to their validity and effectiveness, but also as to the truth and accuracy of any information contained therein. Without limiting the generality of the foregoing, should any dispute arise with respect to the delivery or ownership or right of possession to the Escrow Fund or other property so held by any escrow agent in escrow, each escrow agent is authorized (but shall not be obligated) to retain in its respective possession such funds and property without liability to anyone until such dispute shall have been settled by mutual agreement of the parties concerned or by a final order, decree of judgment by a court of competent jurisdiction, and the time of appeal shall have expired without an appeal having been taken, but no escrow agent shall be under a duty whatsoever to institute or defend such proceedings. In addition, each escrow agent shall not be responsible for any checks or other instruments which are delivered to such escrow agent as part of the escrow fund being honored when presented. In no event shall any escrow agent be required to take any action unless and until indemnified to the escrow agent's satisfaction by the party requesting such action. Further, the act of serving as escrow agent hereunder shall not serve to disqualify any escrow agent from serving as a legal counsel to any of the parties hereto and all such objections are hereby expressly waived by the parties.

-6-

BLUE HILL
5518

**AGREEMENT**

Page 7

In witness thereof, the undersigned have signed this Agreement under seal, on the date and year first above-written.

BENEFICIARIES:                              TRUSTEES:


_Gerald S. Fineberg_ (signature)           _Gerald S. Fineberg_ (signature)
_____                    _____
Gerald S. Fineberg                         Gerald S. Fineberg, Trustee


_____                    _____
Gary Fineberg                              William J. Langelier, Trustee


_____                    Blue Hills Management Corp., Trustee
Michelle Fineberg

                                           By: _Gerald S. Fineberg_ (signature)
_____                        _____
Daniel Frank                                   Gerald S. Fineberg, Director


                                           By: _____
_____                         William J. Langelier, Director
William J. Langelier


_____
Amy Badger (by William J. Langelier)

- 7 -

BLUE HILL
5519

Original

**AGREEMENT**

Page 7

In witness thereof, the undersigned have signed this Agreement under seal, on the date and year first above written.

BENEFICIARIES:                                    TRUSTEES:

_____          _____
Gerald S. Fineberg                              Gerald S. Fineberg, Trustee

_____          _____
Gary Fineberg                                   William J. Langelier, Trustee

_____          Blue Hills Management Corp., Trustee
Michelle Fineberg

_____          By: _____
Daniel Frank                                        Gerald S. Fineberg, Director

_____          By: _____
William J. Langelier                                 William J. Langelier, Director

_____
Amy Badger (by William J. Langelier)

- 7 -

USDOCS 4845054v8

BLUE HILL
5520

*Original*

## AGREEMENT

Page 7

In witness thereof, the undersigned have signed this Agreement under seal, on the date and year first above-written.

BENEFICIARIES:                                  TRUSTEES:

*[signature]*                                   *[signature]*
Gerald S. Fineberg                              Gerald S. Fineberg, Trustee

_____                         _____
Gary Fineberg                                   William J. Langelier, Trustee

*[signature]*                                   Blue Hills Management Corp., Trustee
Michelle Fineberg

*[signature]*                                   By: *[signature]*
Daniel Frank                                        Gerald S. Fineberg, Director

_____                         By: _____
William J. Langelier                                William J. Langelier, Director

_____
Amy Badger (by William J. Langelier)

- 7 -

US1DOCS 4885056v5

BLUE HILL
5521

**AGREEMENT**

Page 7


In witness thereof, the undersigned have signed this Agreement under seal, on the date and year first above-written.


BENEFICIARIES:                              TRUSTEES:


_____         _____
Gerald S. Fineberg                          Gerald S. Fineberg, Trustee


_____         _____
Gary Fineberg                               William J. Langelier, Trustee


_____         Blue Hills Management Corp., Trustee
Michelle Fineberg

                                            By:_____
_____             Gerald S. Fineberg, Director
Daniel Frank

                                            By:_____
_____             William J. Langelier, Director
William J. Langelier


_____
Amy Badger (by William J. Langelier)


- 7.-

BLUE HILL
5522

*original*

**AGREEMENT**

Page 8

BERNKOPF GOODMAN LLP,
Escrow Agent for the Fineberg
Beneficiaries as hereinabove set forth

By _____
Kenneth M. Goldberg, Esq.

- 8 -

USIDOCS 4885056v3

BLUE HILL
5523

*orginal*

**AGREEMENT**

Page 9

       WILMER CUTLER PICKERING HALE AND DORR LLP,
       Escrow Agent for the Langelier
       Beneficiaries as hereinabove set forth

By:    _____
        Andrew H. Cohn, Esq.

#302842 v2/14500/9547

- 9 -

BLUE HILL
5524

# SCHEDULE OF ACCOUNTS

I.    Property Account

$180,000
(1/12/05)

II.    Initial Account

$1,381,814.39
(12/31/04)

III.    Supplemental Account

$4,214,836.38
(12/31/04)

#305119 v1/99999/1

BLUE HILL
5525

EXHIBIT 45



CONFIDENTIAL

Fineberg Royall Associates    Century Bank

BALANCE FORWARD →

| | DETAIL | ✓ | DEBIT | CREDIT | BALANCE | PREVIOUS BALANCE |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | 9/8/03 | WIRE IN FROM IOLTA BKNWN | | | 10,000,000 | - |
| 15 | | | | | | |
| 16 | | | | | | |

EXHIBIT
177
Langelier   7-10-06
Jandberg No. 5208

BLUE HILL
5507

NAME
ADDRESS
CITY   FINEBERG

                150 ROYALL ST.
                CLAREFORD

**CONFIDENTIAL**

KMG

| | DATE | FOLIO | DETAIL | √ | DEBIT | CREDIT | BALANCE | PREVIOUS BALANCE |
|---|---|---|---|---|---|---|---|---|
| 2 | 9/1/05 | WIRE-OUT | Wilmer, Cutler, et al (Chris Davis) | | 1,000,000 — | | | |
| 3 | | | | | | | | |
| 4 | 9/6/05 | WIRE-OUT | 158-Century Radecogr | | 11,000,000 — | | | |
| 5 | | | | | | | | |
| 6 | | | | | | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |
| 9 | | | | | | | | |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | | | | | | | | |
| 21 | | | | | | | | |
| 22 | | | | | | | | |
| 23 | | | | | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |

**Safeguard**
BUSINESS SYSTEMS, INC.
FORM NO. ARL-7

**ACCOUNTS RECEIVABLE LEDGER**
ORDER FROM YOUR LOCAL SAFEGUARD DISTRIBUTOR,
IF UNKNOWN, CALL 800-523-2422

© Safeguard Business Systems, Inc.

BLUE HILL
5508

CENTURY BANK INTEREST BEARING ACCOUNTS

TRANSFERRED 4/1/05 TO DANVERSBANK

CONFIDENTIAL

| Name | Account Number | Amount |
|------|---------------|--------|
| Fineberg - 150 Royall | 27908692 | 1,003,839.26 |

BLUE HILL
5509



**Danversbank**
One Conant Street Danvers, MA 01923
BERNKOPF GOODMAN LLP

**CONFIDENTIAL**

111235302 Online Banking Transfer To CHECKING 27908692 At     04/05     1,003,839.25
16:10

**BLUE HILL**
**5510**

ACCOUNT:                     27008696   04/29/2005



**Danversbank**
One Conant Street Danvers, MA 01923
BERNKOPF GOODMAN LLP

# CONFIDENTIAL

MONEYMARKET PERSONAL ACCOUNT            *Fineberg - 150 Royal*

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| 111235302 Online Banking Transfer 35707901 At 16:10 | 04/05 | 1,003,839.25 |
| INTEREST | 04/25 | 1,738.43 |

BLUE HILL
5511

Member FDIC
Member DIF            www.danversbank.com
978.777.2200

Page

| Transaction Type | Date | No. | Document No. | Balance |
|---|---|---|---|---|

CONFIDENTIAL

BLUE HILL
5512

EXHIBIT 46



# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

September 1, 1999

David L. Doyle
DIRECT DIAL: (617) 790-3365
e-mail: ddoyle@bgblaw.com

## TELECOMMUNICATION TRANSMITTAL

**TO:**          MR. JOSEPH RUBINO

**COMPANY:**          CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC

**TELECOPIER NUMBER:**  212-325-8161  **TELEPHONE NUMBER:**  212-325-6061

**FROM:**          DAVID L. DOYLE, ESQ.          **ATTORNEY #:**  028

**TOTAL NUMBER OF PAGES** _____6_____ **INCLUDING THIS COVER SHEET**

*IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL BACK AS SOON AS POSSIBLE.*

**PHONE:**          (617) 790-3000

**TELECOMMUNICATOR:**  Mary V. Tierney

**CLIENT/MATTER NO:**   14500-9547

**MESSAGE:**

Joe:

*Here is the signed letter. Kindly return a countersignature. I have asked our client to wire transfer the remaining $30,000. Please expect two $15,000 wires.*

*David Doyle*                    CSFBMSC 03042

Please Note: The information contained in this facsimile message is privileged and confidential, intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please notify us immediately by telephone at (617) 790-3000. Thank you.

#183665 v1/99999/1

DAVID, I UNDERSTAND RE #9 THERE ARE SOME
"ENTITY" STRUCTURAL ISSUES STILL UNDER DISCUSSION –
HENCE OUR ACCEPTANCE IS SUBJECT TO A MUTUALLY
SATISFACTORY OUTCOME: JOE R

P.1                    SEP 01 '99 04:11PM BERNKOPF GOODMAN

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

August 31, 1999

David L. Doyle
DIRECT DIAL: (617) 790-3365
e-mail:  ddoyle@bgblaw.com

Mr. Joseph Rubino
Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue - 5th Floor
New York, New York  10010

RE:    $33,500,000 FINANCING ON BLUE HILLS OFFICE PARK (THE
"PROPERTY")

Dear Mr. Rubino:

Our client is prepared to proceed with a mortgage financing on terms generally as noted
in your draft Mortgage Financing Application dated July 20, 1999, with the language concerning
Cash Flow Sweep as revised August 19, 1999, subject to the following understandings:

1.    Non-Recourse.  The exceptions to the non-recourse Mortgage Financing shall be
the exceptions noted on the attached Exhibit A.

2.    Leases.  Lender approves the further renewal/extension of the existing Equiserve
lease on terms not less favorable than the renewal/extension terms provided in that lease.
Borrower must obtain Lender's approval for any other lease for more than ten (10%) percent of
the rentable square footage, which approval shall not be unreasonably withheld or delayed so
long as (a) such proposed lease is on a form approved by Lender or on a form customary for that
type of lease and otherwise in compliance with the criteria described herein, (b) the rent is at no
less than market rent, (c) the primary use is office, (d) the lease is with a creditworthy tenant, as
reasonably determined consistent with the size of the space, the length of the term and the extent
of tenant improvements and other concessions granted by Borrower, and (e) if the lease is for a
term greater than five (5) years, the lease has appropriate expense stops or adjustments at not less
than five (5) year intervals.  For each proposed lease for which approval is required, Borrower
shall provide Lender with information obtained in the ordinary course from the tenant
concerning its creditworthiness and with a summary of the material economic terms of the
proposed lease, a self addressed envelope and a reminder notice in capital letters that Lender
shall notify Borrower of any objections within 10 business days of the Borrower's request or the
consent request shall be deemed granted.  Any objections to Borrower's request shall be in
writing and include sufficient detail to enable Borrower to either appropriately renegotiate the
lease terms or refute and/or resolve Lender's issues.

CSFBMSC 03043

BERNKOPF, GOODMAN & BASEMAN LLP

Mr. Joseph Rubino
August 31, 1999
Page 2

    3.    Casualty/Condemnation. Lender agrees to release the proceeds from any casualty/condemnation loss for the purpose of restoring the Property, provided (a) there is then no Event of Default, (b) the loss does not occur during the last year of the loan term and (c) if Lender reasonably determines that funds in addition to the net loss proceeds are needed to pay the entire cost of the restoration, the Borrower deposits the necessary additional amount with Lender in escrow pending disbursement as the first restoration dollars. If the Lender elects not to release the proceeds because the loss occurred during the last year of the term, the Borrower may prepay the loan at par, and upon prepayment, the Lender will release all collateral.

    4.    SNDA and Estoppel. The terms of the SNDA and Estoppel required from the exiting tenant Equiserve shall be acceptable to the tenant and reasonably acceptable to the Lender. Lender acknowledges the tenant's rights to require application of insurance and condemnation proceeds as provided in the lease.

    5.    Interest Rate/Amount. If the Loan closes on or prior to September 10, 1999, the Mortgage Financing will bear interest at that fixed rate having a 245 basis point spread over ten (10) year Treasuries (determined at the earlier of rate lock or closing). The loan amount will be a maximum of $33,500,000; provided that the borrower may refuse a lower amount without cost other than for cost incurred by third parties consistent with the items and costs listed in 6, below, and any excess funds paid shall be immediately refunded. If the Loan closes after September 10, 1999 and before October 25, 19999, the spread will be 255 basis points.

    6.    Due Diligence/Costs. The amount payable by Borrower for the following services will not exceed the amount listed across from that service:

| | |
|---|---|
| Legal: | $25,000 absent extraordinary negotiations. |
| Environmental and Engineering: | $5,000 in the aggregate. |
| Lender's Due Diligence, including insurance review: | $10,000 |
| Appraisal: | $7,000 |

    Our client has separately forwarded a check in the amount of $20,000 as a deposit to be used toward paying these costs, understanding you have engaged third parties to perform the necessary tasks. The remaining portion of the good faith deposit shall be paid upon acceptance of this letter.

CSFBMSC 03044

Mr. Joseph Rubino
August 31, 1999
Page 3

BERNKOPF, GOODMAN & BASEMAN LLP

7.    <u>Cash Flow Sweep</u>.  Absent a continuing Event of Default, at such time (the "Redetermination Date") as there are leases in place from either investment grade tenants or other tenants, if any, whom Lender determines have satisfactory creditworthiness, which leases are sufficient to provide a DSCR of 1.20x and have terms extending not less than three (3) years after the Anticipated Repayment Date (a) Lender will release to Borrower all funds then in the additional reserve for Tenant Improvements and Leasing Commissions, except for the Necessary Escrow (defined below) and (b) the amount of the monthly contribution to that reserve will thereafter be the sum of the amounts determined for each such lease by dividing (1) the product of (i) $15 and (ii) such lease's square footage by (2) the number of months in the lease's term. As used herein, the term "Necessary Escrow" means (1) the sum of the amounts determined for each such lease by multiplying (x) that lease's portion of the monthly contribution determined pursuant to clause (b), above, by (y) the number of months from and after that lease's commencement date until the Redetermination Date, less (2) a reasonable allowance for the interest and appreciation reasonably expected to accrue on the Necessary Escrow and other funds to be held in reserve until the relevant dates of lease expiration.  Prior to the Redetermination Date, provided there is no Event of Default and Equiserve has not extended the term of its lease for a period extending at least three years after the Anticipated Repayment Date, the monies held in such reserve shall additionally be available for monthly debt service payments to the extent the monies generated from any existing leases in any month are insufficient to make such payments after payment of that month's property operating expenses and the other sums due under the Loan documents for that month, up to the lesser of (i) an aggregate $1,000,000 or (ii) the amount in the reserve from time to time  in excess of $2,750,000 less the amount of funds previously disbursed for tenant improvements and leasing commissions.

8.    <u>Defeasance/Optional Prepayment Date</u>.  The Defeasance Period shall end on the Optional Prepayment Date.  The Option Prepayment Date shall be the date six(6) months prior to the Anticipated Repayment Date.

9.    <u>Entity</u>:  The Borrower will be a newly created limited liability company or other single purpose, bankruptcy remote entity created for this transaction.  Another newly created entity (which need not be single purpose or bankruptcy remote entity) will be created to be the Borrower's sole member/partner/owner, except to the extent some minor interest may need to be held by another entity or person by statute.  The current property owner ("Current Owner") will be the sole member of the Borrowers' sole member/partner/owner, except to the extent some minor interest may need to be held by another entity or person by statute.  The terms of the Current Owner's now-existing junior mortgage debt (the "Current Indebtedness") will be modified to release the mortgage security and provide that (a) there can be no acceleration for so long as the Mortgage Financing remains outstanding, (b) no payments will be made on the Current Indebtedness except to the extent there is Excess Cash Flow remaining after the Cash Flow Sweep and (c) the Current Indebtedness will not be secured by any pledges of membership interests or other security.

CSFBMSC 03045

P.4                                                                          SEP 01 '99  04:12PM BERNKOPF GOODMAN

BERNKOPF, GOODMAN & BASEMAN LLP

Mr. Joseph Rubino
August 31, 1999
Page 4

    10.   <u>Management</u>.  The Property will be managed by either (a) Fineberg Management, Inc., or a successor professional management company reasonably acceptable to Lender and having substantial experience in management of similar properties, or (b) if the majority of the rentable square footage is leased to a single tenant, that tenant's management company.

    11.   <u>Transfer/Assignment</u>.  Any transfer restrictions will explicitly permit (a) transfers between Key Principals, their family members and/or entities for the benefit of such Key Principals and/or family members; provided that the present Key Principals, their family members and/or entities for the benefit of such Key Principals and/or family members retain at least a fifty-one (51%) percent combined interest in the ownership and control the management of the Borrower, and (b) transfers on account of death.

    12.   <u>Reserves</u>.  All monies to be deposited to reserves (excepting reserves for taxes or insurance or existing deferred maintenance) shall be invested in such "Permitted Investments" from among such of the Permitted Investments as may be suggested by Borrower and as can be accommodated reasonably by Lender.  As used herein the term "Permitted Investments" shall mean investments of the types illustrated by the various obligations or securities listed in the attached letter dated October 24, 1997 and/or defined as Permitted Investments in its attachments.

    Would you kindly countersign and return a copy of this letter to confirm these understandings.

Very truly yours,

David L. Doyle

CONFIRMED:
Credit Suisse First Boston Mortgage Capital LLC

By:_____

*See attached Exhibit A containing carve-outs to non-recourse provisions of the Mortgage Financing.*

DLD:mvt
cc:    Mr. Gerald S. Fineberg
       Mr. Daniel P. Frank
       Mr. Joseph Donovan
       Mr. William J. Langelier
       Kenneth M. Goldberg, Esquire

#183554 v1/14500/9547

**CSFBMSC 03046**

Mr. Joseph Rubino
August 31, 1999
Page 5


       Would you kindly countersign and return a copy of this letter to confirm these understandings.

                  Very truly yours,


                  David L. Doyle


CONFIRMED:
Credit Suisse First Boston Mortgage Capital LLC

By: _____


*See attached Exhibit A containing carve-outs to non-recourse provisions of the Mortgage Financing.*


DLD:mvt
cc:    Mr. Gerald S. Fineberg
       Mr. Daniel P. Frank
       Mr. Joseph Donovan
       Mr. William J. Langelier
       Kenneth M. Goldberg, Esquire
#183354 v1/14500/9547

P.6

AUG 31 '99  01:21PM BERNKOPF GOODMAN

BERNKOPF, GOODMAN & BASEMAN LLP

EXHIBIT A

EXCEPTIONS TO NON-RECOURSE

*(Blacklined against Lender's proposed loan document text, other than*
*conforming changes for defined terms such as Borrower/Maker or Lender/Payee)*

Lender's direct damages caused by: (i) fraud or intentional misrepresentation by Borrower or any guarantor in connection with the Loan; (ii) intentional physical waste of the Property; (iii) the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substance Indemnification Agreement of even date herewith given by Borrower to Lender or in the Mortgage concerning environmental, laws, hazardous substances of asbestos; (iv) the removal or disposal of any portion of the Property after an Event of Default; (v) the misapplication or conversion by Borrower of (a) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (b) any awards or other amounts received in connection with the condemnation of all or a portion of the Property, (c) any rents following an Event of Default, or (d) any Rents paid more than one month in advance; (vi) Borrower's failure to pay charges for labor or materials it requested or to pay or escrow taxes or other municipal charges that can create liens on any portion of the Property; and (vii) any security deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Property or other action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Mortgage) prior to the occurrence of the Event of Default that gave rise to such sale or foreclosure of action in lieu thereof.

Notwithstanding anything to the contrary in the Note or any of the Loan Documents, (a) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (b) the Debt shall be fully recourse to Borrower in the event that: (i) the first full monthly payment of principal and interest under the Note is not paid when due; (ii) Borrower intentionally fails to maintain its status as a single purpose entity, as required by, and in accordance with the terms and provisions of, the Mortgage; (iii) Borrower fails to obtain Lender's prior written consent before granting any subordinate financing or other voluptuary lien encumbering the Property; (iv) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage or (v) any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Borrower or if any proceeding for the dissolution or liquidation of Borrower shall be instituted by Borrower or any guarantor.

#183554 v1/14500/9547

**CSFBMSC 03048**

# MORTGAGE FINANCING APPLICATION

## DRAFT

July 20, 1999

Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue
5th Floor
New York, New York 10010

Re: $33.5 Million Financing on Blue Hills Office Park (the "Property")

Gentlemen:

The purpose of this letter is to set forth the terms and conditions to be submitted to the investment committees of Credit Suisse First Boston Mortgage Capital LLC ("CSFB"; CSFB, its affiliates and their respective successors and assigns are hereinafter collectively referred to as the "Lender") in connection with the proposed first priority mortgage financing (the "Mortgage Financing") which the undersigned (the "Borrower") has requested to be provided by Lender. The terms and conditions of the Mortgage Financing to be considered shall be those set forth herein, as supplemented by the terms and conditions set forth in the attached term sheet, which term sheet is incorporated into, and made a part of, this letter.

Borrower acknowledges that it has paid to CSFB, simultaneously with the transmittal of this letter, a good faith deposit of $50,000 (the "Good Faith Deposit"). Borrower hereby agrees that the Good Faith Deposit will be held by CSFB and applied as hereinafter provided. Borrower further agrees to pay all out-of-pocket expenses actually incurred by CSFB in any way relating to the Mortgage Financing (including, without limitation, CSFB's due diligence in connection therewith) and to indemnify, defend and hold Lender harmless against all costs, expenses and damages incurred by such party as a result of or arising out of the Mortgage Financing. Borrower hereby agrees that CSFB's out-of-pocket expenses will include the fees and disbursements of CSFB's external legal counsel and auditors, CSFB's expenses and the fees of all third parties relating to the due diligence review and the costs of an appraisal, an environmental report and a structural engineering report for the Property. Borrower hereby agrees that the Good Faith Deposit will be used to reimburse CSFB or otherwise pay for these expenses. If the Mortgage Financing is not made as a result of Lender's willful or negligent failure to perform as herein provided or, alternatively, upon the consummation of the Mortgage Financing, the unapplied portion of the Good Faith Deposit will be promptly returned to Borrower. The obligations in this paragraph will survive in the event the Mortgage Financing is terminated for any reason.

-1-

CSFBMSC 03049

It is anticipated that upon your receipt of the full amount of the Good Faith Deposit and your acceptance of this letter (which acceptance shall be evidenced by your countersigning a copy of this letter and returning the same to the undersigned), you will promptly begin your due diligence investigation of Borrower and the Property. The undersigned agrees to use its good faith efforts to cooperate with CSFB, and its counsel, agents and representatives, and provide CSFB, and its counsel, agents and representatives, with all reasonably requested information in order that CSFB may conduct its due diligence investigation and consummate the Mortgage Financing.

Borrower hereby acknowledges and represents that it is working solely with Lender to procure the Mortgage Financing for the Property and agrees not to, and will cause its principals and affiliates to not, obtain or attempt to arrange a financing for the Property (whether in the form of a permanent mortgage, bridge financing or otherwise) with any party other than Lender. Should Borrower or any principal or affiliate breach or violate the preceding sentence, CSFB will be entitled to retain the unapplied balance of the Good Faith Deposit and receive immediate payment, upon demand, of a break-up fee equal to 0.5% of the Mortgage Financing amount, which break up fee shall constitute liquidated damages, it being expressly acknowledged and agreed that Lender's actual damages in such instance will be impossible to calculate.

If, following CSFB's acceptance of this letter as hereinabove provided, the Mortgage Financing does not close on or prior to September 1, 1999, CSFB will have the option of terminating this letter and not proceeding with the Mortgage Financing, in which event Lender shall be entitled to retain the unapplied portion of the Good Faith Deposit.

Borrower understands and acknowledges that CSFB has not obtained internal investment committee approval for the Mortgage Financing and that its agreement to make the Mortgage Financing is subject to investment committee approval and the following conditions:

(a) CSFB's satisfactory completion of due diligence and underwriting on the Property;

(b) the absence of any development occurring with respect to the Property prior to the date on which the Mortgage Financing closing occurs which could, in CSFB's opinion, materially and adversely affect the net operating income or value of the Property or the ability of Borrower to service the Mortgage Financing;

(c) the execution and delivery of definitive agreements and other documentation relating to the Mortgage Financing satisfactory to CSFB and its counsel;

(d) the receipt of estoppels and subordination agreements from all tenants and from any ground lessor;

(e) the receipt of financial statements from Borrower and each of the key principals identified on the attached term sheet for both the last concluded financial year and last concluded financial quarter

-2-

CSFBMSC 03050

preceding the date hereof, which financial statements shall be audited by an accounting firm acceptable to CSFB;

(f)     the receipt of valid certificates of occupancy and zoning confirmation letters with respect to all of the improvements constructed upon the Property;

(g)     no material adverse change in market conditions including, but not limited to, the liquidity of the fixed income market and/or the market for commercial mortgage backed securities, as determined by CSFB in its sole discretion, from the date hereof to the Closing Date; and

(h)     the satisfaction of loan closing conditions customary for loans of this type, including, without limitation, receipt of an updated certified survey and a "clean" policy of mortgagee title insurance.

Borrower acknowledges and agrees that this letter and the attached term sheet do not set forth all of the terms and conditions of the Mortgage Financing, but are intended as an outline of the major points of understanding between the parties that will be set forth in the final loan documentation, which must be acceptable to CSFB in all respects.

This letter shall be governed by and construed and interpreted in accordance with the internal laws of the State of New York.

Please acknowledge your acceptance of the terms and conditions relating to the Mortgage Financing described herein by executing a copy of this letter. This letter must be executed and submitted by the Borrower by July 23, 1999 or this letter is considered void.

Sincerely,


By: _____

      ____
                Name:
                Title:


Acknowledged and Agreed to
as of this      day of        1999:

CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC

By: _____
        Name:
        Title:


-3-

CSFBMSC 03051

**DRAFT**

**TERM SHEET**

This Term Sheet is attached to, and forms a part of, that certain letter dated July 20, 1999 from _____ to CSFB (the "Cover Letter"). All capitalized terms used and not otherwise defined in this Term Sheet have the meanings given to such terms in the Cover Letter.

| | | |
|---|---|---|
| **Property:** | Property Type: | Office |
| | Property Name: | Blue Hills Office Park |
| | Property Address: | 150 Royall Street<br>Canton, Massachusetts |
| | Interest of Borrower: | Fee Simple |

If any part of the Property is a ground leasehold interest, the terms of the related ground lease must be in accordance with the underwriting standards of CSFB and Standard & Poor's Ratings Services ("S&P").

**Borrower:** A single-purpose, bankruptcy-remote corporation, limited liability company or limited partnership meeting the requirements of S&P and acceptable to Lender.

**Key Principals:** Mr. William J. Langelier, general partner of Borrower, and Mr. Gerald S. Fineberg, general partner of Borrower.

**Manager:** The Property will be managed by a Manager acceptable to CSFB (the "Manager"), who will be entitled to receive a fee of no more than 5.0% of effective gross revenue. The Manager must subordinate its rights under the related management agreement to Lender's lien.

The Property management agreement and the loan documents will provide that Lender may request that Borrower terminate and replace the Manager with an independent third party manager acceptable to Lender if (i) an event of default on the Mortgage Financing occurs, or (ii) if an event of default under the management agreement occurs.

**Terms of the Mortgage Financing:**

**Financing Amount:** The amount of the Mortgage Financing will be no greater than $33,500,000. The exact amount of the Mortgage

-4-                    Applicant's Initials _____

CSFBMSC 03052

Financing will be based upon (1) a maximum loan-to-value ratio (based on an MAI appraisal of existing property only, excluding expansion parcels) of no greater than 80% and (2) a minimum debt service coverage ratio ("DSCR") of 1.20x calculated as the ratio of (a) underwritten net operating income ("NOI") for the Property (calculated as provided below) for a twelve-month period to (b) annual debt service on the Mortgage Financing using (A) the Interest Rate (as defined below) and (B) a 30-year amortization schedule and (3) a minimum DSCR of 1.0x calculated as the ratio of (a) NOI to (b) an amount equal to the principal amount of the Mortgage Financing multiplied by a debt service constant of not less than 10.09%.

**Closing Date:** The funding of the Mortgage Financing (the "Closing") will occur only after, among other things, Lender and its counsel are fully satisfied with the terms of the loan documents, the results of CSFB's due diligence investigation and the investment committee of CSFB has approved the making of the Mortgage Financing.

**Maturity Date:** The maturity date for the Mortgage Financing will be the date that is the 30th anniversary of the first Payment Date after the Closing.

**Anticipated Repayment Date:** The date that is the 10th anniversary of the first Payment Date after the Closing.

**Interest Rate:** The Mortgage Financing will bear interest at a fixed rate (the "Interest Rate") per annum equal to the greater of (A) the yield on the U.S. Treasury Note with a 5.50 % coupon maturing in May, 2009 (which yield shall be determined upon the earlier to occur of a rate lock and the Closing, as each such term is hereinafter defined) plus 245 basis points and (B) 7.75%. Interest on the Mortgage Financing will be payable monthly in arrears and calculated on an actual/360 basis.

**Default Interest:** Upon the occurrence of an event of default, the Mortgage Financing will accrue interest at a rate per annum equal to the then-applicable interest rate (the Interest Rate or the Revised Interest Rate, as defined herein) plus 500 basis points.

-5-                    Applicant's Initials _____

**CSFBMSC 03053**

**Amortization:**　　The Mortgage Financing will amortize over its term based on a 30 year amortization schedule. However, if the Mortgage Financing is not repaid on the Anticipated Repayment Date, the amortization of the Mortgage Financing will be accelerated as described below under "Hyper-Amortization".

**Payment Date:**　　Monthly payments on the Mortgage Financing will be due on the eleventh day of each calendar month (each, a "Payment Date"), commencing on the eleventh day of the second calendar month next succeeding the Closing. At the Closing, Borrower shall pay to Lender, or Lender may deduct from the proceeds of the Mortgage Financing, an amount equal to the interest payable with respect to the period commencing on the date of the Closing through and including the tenth day of the calendar month next succeeding the calendar month in which the Closing occurs.

**Cash Management:**　　Borrower will be required to establish an account (the "Clearing Account") at a bank (the "Lock Box Bank") into which all proceeds from the Property will be deposited. The Lock Box Bank will be selected by Borrower but must be acceptable to Lender. Lender may, or the Borrower or the Manager shall be required to notify each tenant, account debtor and credit card clearing bank to remit all amounts due with respect to the Property directly to a lock box maintained by the Lock Box Bank or to wire such amounts directly into the Clearing Account.

**Reserves:**　　Borrower will establish and maintain reserves for existing deferred maintenance, ongoing taxes and insurance premiums, ongoing capital expenditures and such other purposes as CSFB shall determine to be necessary as a result of its due diligence review. Borrower will also be required to fund on-going tenant improvement and leasing commission reserves. The deferred maintenance reserve will be funded at closing and will be 125% of the amount specified in the property condition report obtained by CSFB during its due diligence review and the capital expenditure reserve will not be required to be funded at closing but will be funded from monthly cash flow of the Property at $0.20 per square foot per annum (or such larger amounts determined by CSFB as a result of its due diligence review).

Applicant's Initials _____

CSFBMSC 03054

**Hyper-Amortization:**

**Revised Interest Rate:** If the Mortgage Financing is not prepaid on the Anticipated Repayment Date, the Mortgage Financing will accrue interest from such date at a rate (the "Revised Interest Rate") per annum equal to (i) the greater of (a) the Interest Rate plus 500 basis points and (b) the yield as of the Anticipated Repayment Date, calculated by linear interpolation of the yields of U.S. Treasury constant maturities with terms (one longer and one shorter) most nearly approximating that of non-callable U.S. Treasury obligations having maturities as close as possible to the Maturity Date, plus 500 basis points or (ii) so long as the note is an asset of a trust or other entity formed in connection with a rated securitization, a rate per annum equal to the Interest Rate plus 200 basis points. Interest that accrues on the Mortgage Financing at the Revised Interest Rate in excess of that accruing at the Interest Rate ("Excess Interest") shall be due and payable on the Maturity Date unless paid earlier out of Excess Cash Flow as described below. Unpaid Excess Interest will accrue interest at the Revised Interest Rate and shall be payable by Borrower on the Maturity Date.

**Accelerated Amortization:** In the event that the Mortgage Financing is not repaid on the Anticipated Repayment Date, all monthly cash flow remaining after funding the tax and insurance reserve, ground lease reserve (if any), scheduled debt service and capital expenditure reserve and any other reserves required by the Lender and paying budgeted operating expenses shall be applied to the unpaid principal balance of the Mortgage Financing until it is reduced to zero.

**Prepayment and Defeasance:**

**Prepayment:** Borrower may not voluntarily prepay the Mortgage Financing from the Closing through the date (the "Optional Prepayment Date") that is 3 months prior to the Anticipated Repayment Date. From and after the Optional Prepayment Date, Borrower may prepay the Mortgage Financing on any regularly scheduled Payment Date in whole only without penalty or premium. After the Anticipated Repayment Date, the Mortgage Financing may be prepaid in whole or in part on any regularly scheduled Payment Date without penalty or premium. Permitted partial prepayments shall be made in $100,000 increments only.

Applicant's Initials _____

CSFBMSC 03055

| | |
|---|---|
| **Defeasance:** | As described below, Borrower may obtain a release from its obligations under the Mortgage Financing by economically defeasing the entire Mortgage Financing on any Payment Date during the Defeasance Period (as defined below). In addition, if Borrower defeases the entire outstanding principal balance of the Mortgage Financing, Lender will release its lien on the Property. The "<u>Defeasance Period</u>" will be the period of time (a) commencing on the date that is the earlier of (i) four years following the full funding of the Mortgage Financing and (ii) two years after the securitization of the Mortgage Financing and (b) ending on the Anticipated Repayment Date. |
| | To defease the Mortgage Financing, Borrower must pay Lender an amount equal to the principal balance of the Mortgage Financing for which a release is sought plus an additional amount (the "<u>Yield Maintenance Charge</u>") such that, in the aggregate, such amounts are sufficient to enable Lender to purchase non-callable U.S. Treasury obligations whose payments (x) equal all successive payments on the Mortgage Financing (including servicing and assuming that the Mortgage Financing is paid in full on the Anticipated Repayment Date) and (y) occur on, or as close as possible to, each successive Payment Date. In order to deafease the Mortgage Financing, the Borrower must also provide a comfort letter from an accountant acceptable to the Lender, obtain a rating confirmation from the Rating Agencies, deliver various customary documents and opinions and pay all of the costs and expenses associated with such defeasance. |
| **Rated Transaction:** | Lender intends to transfer the Mortgage Financing to a trust or other similar securitization vehicle in a public or private offering. Borrower agrees to cooperate with Lender to effect this securitization. |
| **No Other Debt:** | Borrower will not be permitted to have any indebtedness (secured or unsecured) other than the Mortgage Financing, short term unsecured indebtedness incurred in the ordinary course of business and such other debt as may be specifically approved by Lender in its sole discretion. If Borrower is not a corporation, the general partner or managing member of Borrower will not be permitted to have any indebtedness or make any loans. The Borrower may have a secured partnership loan which is subject to a subordination/standstill agreement, is non-foreclosable, and |

-8-                                          Applicant's Initials _____

CSFBMSC 03056

and pays interest only from excess cash flow remaining after all principal, interest and reserve account payments (including, but not limited to on-going capital expense and tenant improvement and leasing commission reserves and all cash flow sweep requirements) have been made. The holder of the partnership debt must be an "insider" for purposes of the bankruptcy code. The maximum amount of the partnership debt shall be_____ and the other terms must be acceptable to Lender.

**Reporting:** Borrower will provide Lender with unaudited monthly and quarterly and audited annual income statements. The annual income statements shall be audited by an accounting firm acceptable to Lender. The monthly and quarterly statements will be prepared on a cash basis and will be required to be delivered to Lender within 30 and 45 days, respectively, of the end of the applicable period, and the annual audited statement will be required to be delivered within 120 days of the end of each fiscal year. All financial statements shall be certified by the Chief Financial Officer and/or Key Principal(s) of Borrower.

**Recourse Liability:** The Mortgage Financing will be non-recourse, except as provided below and for which recourse may be had to Borrower and any or all of the Key Principals. The recourse exceptions will be:

(a)     environmental matters;

(b)     fraud and misrepresentation;

(c)     misapplication of rents, security deposits, insurance and condemnation awards or other proceeds;

(d)     misappropriation of any personal property which constitutes a portion of the collateral for the Mortgage Financing;

(e)     breach of transfer restrictions, title related covenants, single purpose covenants and financing restrictions;

(f)     physical waste;

(g)     failure to pay property taxes or charges for labor or materials that create liens on the Property;

-9-     Applicant's Initials _____

CSFBMSC 03057

(h)  failure to make the first full monthly payment on the Mortgage Financing; and

(i)  bankruptcy, insolvency or interference with Lender's pursuit of its rights or remedies.

**Documentation:**  The Mortgage Financing will be evidenced by financing documentation customary for similar transactions (including, without limitation, a hazardous substances indemnity agreement and a guaranty of recourse obligations executed by the Key Principals) and in any event in form and substance satisfactory to CSFB. All documentation evidencing the Mortgage Financing will be governed by the law in which the real property is located.

**Assignment:**  The Mortgage Financing may not be transferred or assigned by Borrower unless Borrower meets criteria set forth in the Mortgage Financing documentation and pays to Lender an assumption fee equal to 1% of the outstanding principal balance of the Mortgage Financing and any out-of-pocket costs in connection with such assumption.

**NOI Calculation:**  The NOI for the Property shall be the NOI which will be determined by CSFB prior to the Closing in accordance with CSFB's underwriting standards for financings of this type and in conformity to the extent possible with the standards of the Rating Agencies.

**Insurance:**  The Property will be covered by fire and casualty, machine and boiler, business interruption and liability insurance, all in form and substance satisfactory to CSFB. Additional insurance, such as flood, windstorm and earthquake, may be required. In general, the amount of the coverage relating to damage to the Property shall be in an amount not less than the greater of the full replacement cost of the Property and the principal balance of the Mortgage Financing, shall contain deductibles not in excess of the lesser of $25,000 and 5% of annual NOI. All insurance (except for earthquake or flood insurance) shall be written by carriers with an S&P rating of at least A. Business interruption insurance shall cover a period of not less than 18 months.

**Brokers:**  Borrower shall (i) represent to Lender the identity of all brokers engaged in connection with the Mortgage Financing, (ii) pay any and all commissions and other similar fees owing in connection with the Mortgage Financing, and (iii) indemnify and defend Lender from and

-10-                    Applicant's Initials _____

CSFBMSC 03058

against all costs and expenses incurred by Lender as a result of a breach of the foregoing or otherwise in connection with any claim for a brokerage commission or fee made against Lender with respect to the Mortgage Financing.

**Confidentiality:**    This term sheet and the letter to which it is attached is being delivered with the understanding that neither it nor its substance will be disclosed to any third person, except those who are in confidential relationships to Borrower (i.e., Borrower's principals, counsel, accountants and other retained business advisors) or as may be required by law.

**Special Conditions:**

**Cash Flow Sweep:**    Borrower will be required to sweep a pre-determined amount of the monthly "Excess Cash Flow" ( defined as monthly gross rent minus monthly payments of interest and principal on the first mortgage and other reserve requirements set forth on page 6) as an additional reserve for Tenant Improvements and Leasing Commissions such that the annual contribution to the reserve account for Tenant Improvements and Leasing Commissions shall equal $750,000 per annum until such time as $4,250,000 is in the account (the "Cap"). Interest on the account shall remain in the account and shall be included in arriving at the "Cap". [ Example: if annual collection pursuant to the ongoing Tenant Improvement and Leasing Commission reserve set forth on page 6 is $275,000 per annum an additional $475,000 per annum will be required pursuant to the Cash Flow Sweep.] The funds will be available to Borrower for the tenant improvements and leasing commissions necessary to re-lease the building. As the funds are depleted below the "Cap" the Cash Flow Sweep shall be re-instated until an amount equal to the "Cap" is in the reserve account. No further cash flow sweep shall be required if Bank of Boston renews its lease, or another investment grade tenant executes a new lease, for a period extending at least three (3) years beyond the term of the loan.

Applicant's Initials _____

CSFBMSC 03059

OCTOBER

| | OCTOBER | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | | | | | ALLOCATION TO SUB ACCOUNTS | | | | | | |
| | | | | | Blue Hills Office Park / Acc. # 167-461-1766 | | | | | | |
| | | | | | Loan # 197000600 | | | | | | |

| Date | Beginning Balance | DAILY DEPOSIT | TAX | INSURANCE | DEBT SERVICE | REPLACEMENT RESERVE | BASE LEASING ESCROW | CIF LEASING ESCROW | OPERATING EXPENSE | BORROWER REMAINDER | ENDING BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | $0.00 | $0.00 | | | | | | | | | $0.00 |
| 9/17/99 | $0.00 | $0.00 | 0.00 | 9,600.00 | 0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 |
| 10/1/99 | $0.00 | $466,903.52 | 0.00 | | 254,652.24 | $4,654.42 | $9,927.92 | $57,672.08 | $0.00 | | $466,903.52 |
| | $466,903.52 | $9,600.00 | 0.00 | | 0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $9,600.00 |
| | $9,600.00 | $9,600.00 | 0.00 | | 0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $9,600.00 |
| | $9,600.00 | $9,600.00 | 0.00 | | 0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $9,600.00 |
| | $9,600.00 | | | | | | | | | | $9,600.00 |

Post-it® Fax Note   7671  | Date | pages ▶ |
To Joe Kobiela | From JB... Lang |
Co./Dept. | Co. |
Phone # | Phone # |
Fax # 212 325-9514 | Fax # |

Page 1

**CSFBMSC 03060**

EXHIBIT 47

*A- Cohen C M2*
*B. Solzer*
*files 16398.*
*166*

## BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

September 1, 1999

David L. Doyle
DIRECT DIAL: (617) 790-3365
e-mail: ddoyle@bgblaw.com

<u>VIA FEDERAL EXPRESS</u>

Andrew Cohen, Esquire
Schulte Roth & Zabel LLP
900 Third Avenue
New York, New York 10022

RE:    150 ROYALL STREET, CANTON, MA

Dear Andy:

Enclosed are my initial comments on the following form loan documents you forwarded:

1.    Mortgage, Assignment of Leases and Rents and Security Agreement;
2.    Mortgage Note;
3.    Guaranty;
4.    Assignment of Leases and Rents; and
5.    Environmental and Hazardous Substance Indemnification Agreement.

If you have any problems reading my handwriting, please call. Toward expediting matters, these comments are provided before review of the documents by my client, and of course remain subject to further change.

Sincerely,

David Doyle

David L. Doyle

DLD:mvt
Enclosures
cc:    Daniel Frank [W/O ENCS.]
       Kenneth M. Goldberg, Esquire [W/O ENCS.]
#183980 v1/14500/9547



_____
(Mortgagor)


and


CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC
(Mortgagee)


**MORTGAGE, ASSIGNMENT OF LEASES
AND RENTS AND SECURITY AGREEMENT**


Dated:  As of _____, 199__


PROPERTY LOCATION:


DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:

Schulte Roth & Zabel LLP
900 Third Avenue
New York, New York 10022
Attention:  Susan Nemery


From Template:  SR2NY\352B43v1


S 000952

loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

       (a)     fraud or intentional misrepresentation by Borrower or Guarantor in connection with the Loan;

       (b)     the gross negligence or willful misconduct by Borrower;

       (c)     physical waste of the Mortgaged Property (as defined in the Mortgage);

       (d)     the breach of any representation, warranty, covenant or indemnification provision in that certain Environmental and Hazardous Substances Indemnification Agreement of even date herewith given by Borrower to Lender or in the Mortgage concerning environmental laws, hazardous substances or asbestos;

       (e)     the removal or disposal of any portion of the Mortgaged Property after an Event of Default (as defined in the Mortgage);

       (f)     the misapplication or conversion by Borrower of (i) any insurance proceeds paid by reason of any loss, damage or destruction to the Mortgaged Property, (ii) any awards or other amounts received in connection with the condemnation of all or a portion of the Mortgaged Property, (iii) any Rents (as defined in the Mortgage) following an Event of Default, and (iv) any Rents paid more than one month in advance;

       (g)     failure to pay charges for labor or materials or other charges that can create liens on any portion of the Mortgaged Property; and

       (h)     any security deposits collected with respect to the Mortgaged Property which are not delivered to Lender upon a foreclosure of the Mortgaged Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases (as defined in the Mortgage) prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof.

       Notwithstanding anything to the contrary in any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (ii) Guarantor shall be liable for the full amount of the Debt in the event that (A) the first full monthly payment of principal and interest on the Note is not paid when due; (B) Borrower fails to maintain its status as a single purpose entity, as required by, and in accordance with, the Mortgage; (C) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary lien encumbering the Mortgaged Property; (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein as required by the Mortgage; or (E) a receiver, liquidator or trustee of Borrower or Guarantor shall be appointed or if Borrower or Guarantor

2

S 001033

EXHIBIT 48

# CS FIRST BOSTON
## Inter-Office Memorandum



To:        Executive Committee

From:      Dean Cederquist/Joe Rubino/Rob Jacobs

Date:      September 1, 1999

Subject:   **Blue Hills Office Park , Canton, Mass ( Rte 128 Boston )**

**Preamble**

We anticipate closing this transaction by September 10th for inclusion in CSFB's 1999 C-1. As good faith money for due diligence was received only recently on August 25th, approval subject to satisfactory third party reports is recommended for a loan amount up to $33,500,000 ( maximum loan amount ).

If closing cannot be achieved for 1999C-1, the spread increases to 255bps ( versus 245 bps for 1999C-1).

**Request**

The Borrower, an SPE to be formed, sponsored by the Langelier Company and The Fineberg Companies , whose key principals are Bill Langelier and Jerry Fineberg, respectively, has requested that CS First Boston ("CSFB") provide financing for a fixed-rate first mortgage loan in an amount equal to $33.5 million. The borrower purchased the subject property in 1986 for $42.5 million and is seeking to refinance $28.6 million in existing debt.

**Borrower (Sponsors)**

Mr. Langelier has been active in the real estate business since 1973 and has ownership interests (10%-15%) in approximately 3 million s.f. of office space and minority ownership interests in 15,000 apartment units. Langelier's net worth is $15 million, of which $1.6 million is liquid, and annual free cash flow from real estate activities approximates 41 million.

Mr. Fineberg has an estimated net worth in excess of $100 million .... more to come.

**Collateral**

A 273,863 sf 2 story Class A suburban office property located on 20.2 acres with the sole NNN tenant being Equiserve, Bank of Boston's ( rated "A positive" by S&P ) stock transfer & clearing affilliate. Bank of Boston assigned the lease to Equiserve on the same terms and conditions of the underlying lease however Bank of Boston remains the primary Lessee under the lease. Equiserve is the largest corporate shareholder servicer in the United States and is owned by Bank of Boston (25%), Bank One (50%) and State Street Corp. (25%). The Property has been 100% leased by Bank of Boston since 1989 and serves as Equiserve's headquarters. The

bluehillscommemo.doc
11:08:03 PM

11/4/2005

CSFBMSC 04184

lease was recently renewed on August 1, 1999 for a period of five years ( August 2004 ) at 90% of Fair Market Rental Value pursuant to the first of two contractual five year extension options. Bank of Boston must give notice of renewal by October 2003 ( nine months in advance ) in order to exercise

## Market Analysis

The subject property lies in the Route 128 South office submarket outside of Boston which contains an inventory of 11 million s.f. The market vacancy for large blocks of single tenant space is expected to be less than 5%. Market rents range from $17-$20 NNN, whereas the in-place rent for the subject property is below market at $15.30 psf.

## Security

The Financing will be secured by *(i)* the First Mortgage; *(ii)* an assignment of leases and rents; *(iii)* any reserve(s), as required herein or as may be required by Lender, for deferred maintenance *(iv)* the real estate tax escrow account; and *(v)* such other documents as CS First Boston or its counsel deem appropriate to evidence the Financing (collectively, the "Loan Documents"). The Financing shall be non-recourse to the Borrower except for standard carve-outs.

## Pricing/Terms/Profitability

Proposed pricing/terms for the Loan is fixed at the 10-year treasury note plus 245 bps (actual/360 and including servicing) with a 30 year maturity, an anticipated hyper-am repayment date at the end of year 10 and a hard lock box. The loan will be locked out to prepayment for a period of two years after a securitization, after which the Borrower may defease the loan. Prepayment is open during the period six months prior to the anticipated repayment date.

Profitability is estimated at 1.5%.

## Transaction Structure-TI/LC & Downtime Reserves

Given the presence of a credit tenant, the transaction is structured such that, at the expiry of the lease in 2004, sufficient reserves will be held to cover releasing events. Depending upon the outcome of market due diligence and the appraisal, and keeping in mind that in-place rent is below market, we anticipate that $13.7 psf in reserves will be adequate at the end of the existing lease term to meet TI/LC needs and a six month downtime reserve ( which may be drawn upon by the Borrower ). Our underwriting set out below would require $2.39 million ($8.7 psf) of reserves at the end of the loan term based upon a 60/40 roll. We will be collecting approximately $3.75 million ($13.7 psf) by the end of the 5 year lease term in the form of $240,000 per annum in above-the-line ongoing collections for the loan term and a cash flow sweep over the lease term equal to $510,000 per annum ( not to exceed 75% of excess cash flow after reserves and debt service ). The $3.75 million is a cap which must be topped up if utilized. The balance of the $13.7 psf over the $8.7 psf, i.e. $5 psf will be the down time reserve.

In the event that Bank of Boston extends its lease ( or a substitute investment grade tenant is found ) for 3 years beyond the loan term on terms no less favorable, we have agreed to release the TI/LC and downtime reserve, to the extent not required for the extension, subject to reinstituting ongoing collection and the cash flow sweep up to the cap amount.

CSFBMSC 04185

## Underwriting/Debt Service Coverage

The Loan is underwritten, to a minimum 1.0x Fitch DSC (10.09% stress constant) and a 1.20x actual DSC. As per Fitch guidelines, we have underwritten the loan with a vacancy of 10%, management fee of 5%, 20 cents replacement reserves and TI's/LC's ( 97 cents per assumed occ. sf ) based upon anticipated market TI's/LC's of $10/$2 and 4%/2% utilizing a 60/40 roll probability.

Actual debt service coverage is calculated in the same manner as the Fitch underwriting except a market vacancy for single tenant space of 5 % is utilized. Based on the current 10-year US Treasury of 5.9%, the actual DSC today and the resulting loan amount is as follows:

| Loan Amt | Loan /SF | Index | Spread | CSFB Net CF | CSFB Loan DSC |
|---|---|---|---|---|---|
| **At Closing** | .. | | | | |
| $33,500,000 | $122 | 10-yr T | 2.45% | $3,642,068 | 1.20 |
| **At lease expiry** | | | | | |
| $31,948,000 | $116 | 10-yr T | 2.45% | $3,642,068 | 1.25 (@9.10% Act. Constant) |

## Third-Party Reports

Approval is subject to satisfactory completion of third party reports and subject to an LTV of no greater that 80%. Given the below market in-place rent and the investment grade nature of the tenant, the Borrower requested the 80% LTV.

## Deal Strengths

- The subject property is 100% occupied by a high quality investment grade tenant. The property is situated in a strong single tenant market with vacancy levels of 5% and market rents of $17-$20 NNN versus the subject's rent of $15.30 NNN.
- The transaction structure provides for a strong build-up of reserves during the first five loan years.

CSFBMSC 04186

**CSFB Risks**

Exposure to a single tenant, albeit investment grade, with five years remaining on their lease.

**CSFB Risk Mitigants**

$13.7 psf of reserves for TI/LC's and downtime by the expiry of the five year lease and below market in-place rent.

**Recommendation**

We recommend that CSFB provide the $33.5 million of requested financing subject to satisfactory completion of third party reports.

EXHIBIT 49

EXHIBIT
Fineberg
334
JKC  4/8/06

BERNKOPF
GOODMAN |LLP

November 10, 2004

KENNETH M. GOLDBERG
DIRECT DIAL: (617) 790-3333
E-MAIL: KGOLDBERG@BG-LLP.COM

*Via Hand Delivery*

Bruce S. Barnett, Esq.
Piper Rudnick LLP
One International Place, 21st Floor
Boston, MA  02110-2600

RE:    150 Royall Street, Canton, MA ("Mortgaged Premises")
       Blue Hills Office Park LLC ("Borrower")
       First Mortgage Loan No. 76-0990083 ("Loan") - Lennar Partners, Servicer ("Lender")

Dear Mr. Barnett:

This letter confirms our representation of the Borrower in connection with the Loan referenced above.

In connection with this representation, reference is hereby made to the Loan evidencing, documenting and governing instruments (the "Loan Documents"). Reference is also hereby made to the requests, correspondence and requisitions made and otherwise tendered by Borrower to Lender during the last several months for the release of its own funds - to wit from one or more of the Loan reserve accounts paid in by Borrower. Release of those funds had as their primary purpose to maintain current the obligations of the Borrower under the Loan Documents. My subsequent discussions with the Lender, on behalf of the Borrower, again requested (a) information on the procedure to requisition funds for the purpose of both keeping current payment obligations of the Borrower under the Loan Documents, and (b) direction as to the procedure to obtain release of funds to pay architecture, engineering and marketing costs as well as for building initial core improvements from said account(s). The second request was clearly explained by me to have as its purpose enabling the Borrower to attract replacement tenants to the Mortgaged Premises.

As you are aware, and in accordance with its terms, the lease with the tenant that previously occupied the entire Mortgaged Premises expired on or about July 31, 2004, thus requiring Borrower to pursue replacement tenants.

The Lender has consistently refused to reasonably or effectively respond to all of these Borrower requests. Most recently, within the last two weeks, the Borrower principals and their representatives requested a meeting with duly authorized representatives of Lender for the purpose of discussing the Loan, Loan conditions and Lender's unilateral refusal to release Borrower's own reserve funds for any purpose; and that refusal and course of Lender's conduct clearly procured the very defaults now being asserted. Once again, Lender's responses to these repeated requests were refusals to meet or discuss these matters.

125 SUMMER STREET
BOSTON, MA 02110-1621
617.790.3000  T
617.790.3300  F
WWW.BG-LLP.COM

Blue Hill 1219

BERNKOPF
GOODMAN|LLP

Further reference is hereby made to the Loan Documents and to our advice to the Lender and its servicing agent of our representation of the Borrower; notwithstanding which, no copies of your notices of foreclosure were sent to counsel, same having been forwarded directly only to the Borrower and its principals.

Therefore, notice is hereby formally given that in the event the Lender, or any successor holder or servicing agent of the Loan, continues with the foreclosure process and/or fails to provide a reasonable opportunity for the Borrower to access its own assets and/or market the Mortgaged Premises to provide a source of revenue to service the Loan as contemplated by the terms of the Loan Documents, the Borrower will be left with no alternative than to seek direct, full and complete recourse against the Lender and its agents for its/their wrongful conduct and contractual breaches.

Very truly yours,
Blue Hills Office Park LLC

By: Kenneth M. Goldberg, its Attorney

KMG:jmj

cc:    Andrew H. Cohn, Esq.
       Mr. Gerald S. Fineberg
       Mr. William J. Langelier
       Mr. Daniel Frank

#301246 v1/14500/9547

Blue Hill 1220



**Piper Rudnick**

One International Place, 21st Floor
Boston, Massachusetts 02110-2613
*main* 617.406.6000 *fax* 617.406.6100

E. RANDOLPH TUCKER
randy.tucker@piperrudnick.com
*direct* 617.406.6032

November 12, 2004

VIA ELECTRONIC TRANSMISSION

Kenneth M. Goldberg, Esq.
Bernkopf Goodman & Baseman, LLP
125 Summer Street
Boston, MA 02110-1621

Re:    Blue Hills Office Park LLC, Loan No. 76-0990083 (the "Loan")

Dear Ken:

As you know, we represent Lennar Partners as special servicer ("Lennar") in connection with the Loan. I am writing in response to your letter dated November 10, 2004 to Bruce Barnett of this office. Your letter refers to "requests, correspondence and requisitions" made by the Borrower over the last several months for the release of funds. Your letter states that Lennar has "consistently refused to reasonably or effectively respond to all of these Borrower requests."

Your letter leaves the mistaken impression that Lennar has been unresponsive to the Borrower's requests. Lennar has received only two letters from the Borrower requesting funds, and it responded to those requests in detail in a letter dated September 17, 2004. The Borrower never replied to Lennar's September 17 letter or made any further request for funds. For the reasons set forth in the September 17 letter, there is no basis for the claims in your letter that those funds belong to the Borrower or that Lennar sought to "procure" the Borrower's default under the Loan and Lennar denies them.

On October 18, 2004, Daniel Frank telephoned Lennar, identified himself as a principal of the Borrower and asked for a meeting to discuss the Loan. I believe that is the meeting request described in your letter. He was informed that in order for Lennar to postpone the foreclosure, it would be necessary for the Borrower to keep the loan current. Mr. Frank never replied. Thus, Lennar has responded to each of your client's requests, following which there has been no reply from the Borrower.

Sincerely,

E. Randolph Tucker

ERT/jmm
cc:    Andrew H. Cohn, Esq.

~BOST1:312518.v1
306477-18
*Piper Rudnick LLP*

**Blue Hill 1217**



**BERNKOPF GOODMAN** LLP

November 17, 2004

*Via Hand Delivery*

KENNETH M. GOLDBERG
DIRECT DIAL: (617) 790-3333
E-MAIL: KGOLDBERG@BG-LLP.COM

E. Randolph Tucker, Esq.
Piper Rudnick
One International Place
21st Floor
Boston, MA  02110-2600

Re:     Blue Hill Office Park LLC ("Borrower")
        Loan No. 76-0990083 ("Loan")
        JP Morgan Chase Bank, Trustee and its Services ("Lender")

Dear Randy:

The following is responsive to your letter of November 12, 2004 to me.  That letter clearly reflects the recentness of your retention and consequent lack of familiarity with the Loan transaction and the prior and recent course of dealings between the Borrower and the various parties asserting, from time to time, representation and/or agency of the Lender.

At the time the Loan was committed and closed, the parties were fully aware that the Equiserve lease term, if not renewed, would end on July 31, 2004.  The parties were also aware that, as an essentially single tenant office park, if Equiserve did not renew, market conditions would likely require improvements to re-structure the property as a multi-tenant property.  In addition, the Lender knew that the ownership structure included a number of minority, non-controlling parties when it included the proscriptive SPE provisions in the Mortgage; accordingly, the Loan originally applied for and negotiated, and as closed, included the Borrower's proposal to set aside, from its own cash flow, substantial funds to address the possibility of non-renewal by Equiserve – in order to carry the Loan for a period of time and provide funds to address design of improvements and re-marketing to attract replacement tenants.  The Loan application and commitment, included as "Loan Documents", provide that if the Equiserve lease is not extended, the funds in reserve would be available for Debt Service payments and, if the lease revenue were not sufficient to make those payments, then the money in the leasing reserve would be available.  The foregoing clear intention and agreement of the parties has been controverted by Lennar's refusal to make funds available either for Debt Service, monthly payments required under the Loan Documents or for expenses to obtain new leases.

Your letter reflects a very one-sided and incomplete summary of the Loan Documents and the repeated requests of the Borrower to access its own funds reserved for the very events that

125 SUMMER STREET
BOSTON, MA 02110-1621
617.790.3000  T
617.790.3300  F
WWW.BG-LLP.COM

E. Randolph Tucker
November 17, 2004
Page 2

BERNKOPF
GOODMAN|LLP

actually occurred - there being no revenue after the Equiserve lease terminated either for Debt
Service, re-marketing efforts or tenant improvements other than the reserves set aside for those
purposes.

As early as May, 2004, the Borrower opened discussions with the Lender requesting a meeting to
prepare for the Equiserve lease termination and to discuss the process of accessing its reserves.

A series of calls from the Borrower and counsel ensued over a period of months seeking to
expedite the Lender designating a party with whom the Borrower could at least open discussions
on these matters. It is hereby reiterated that the Borrower requested, as early as last June,
meetings to address the process for requisitioning funds and accessing its reserves for
commitments it wanted to make to re-market the property, including to engage an architect to
design alternative re-structures of the property for multi-tenant use, and obtain approval by the
Lender for changes to the building necessary to implement alternative re-marketing strategies.
The Lender's continued non-responsiveness precluded the Borrower from making any long-
range plans for the property, and paralyzed the Borrower's dealing with a number of recent
prospective tenants interested in leasing 50,000-100,000 square feet. The Lender's request that
Borrower simply send those tenant prospects to the Lender confirms the Lender's intentions.

Contrary to the assertions in your letter, there were repeated contacts and requests for meetings
with the original Loan servicer and then with Lennar personnel, logs for which have been kept
by both the Borrower and Borrower representatives and counsel. Discussions with Mr. Warshaw
culminated in his committing to me to have our position with respect to requisitions reviewed by
counsel after which a meeting would be arranged. Notwithstanding that commitment and my
offer, on behalf of the Borrower, to pay his cost to visit the property, meet with third party
marketing professionals and then with the Borrower to review its alternative plans, no response
either to these Borrower proposals or requests were forthcoming. Instead, a new local
representative of Lennar contacted the Borrower and there ensued a series of site visits and
inspections which the Borrower was led to believe would provide the Lender with sufficient
background for an informed meeting. Again, notwithstanding repeated requests to discuss the
issue of accessing reserves, the Lender continued its stonewalling thus precluding the Borrower
otherwise sourcing funds. It is noted that the Loan Documents prohibit the Borrower, as a single
purpose entity, from incurring new debt, to pay other than specific items, which items included
neither real estate taxes nor alterations to the collateral without the Lender's consent.

The foregoing is intended only as a brief summary of what counsel has advised the Borrower,
namely, (i) that Lender's deprivation of the Borrower accessing its own funds specifically set
aside for the very purpose for which they were sought, (ii) Lender's breach of provisions of the
Loan Documents, (iii) Lender's willful course of conduct which procured the very breach upon
which it later relied to appropriate, for its own account, Borrower assets, and (iv) Lender's

US1DOCS 4808205v1

LNR03475

E. Randolph Tucker
November 17, 2004
Page 3

BERNKOPF
GOODMAN|LLP

stifling any opportunity of the Borrower otherwise sourcing funds permitted by the Loan Documents to avoid the very foreclosure it is now facing.

It is unreasonable that you are now justifying the Lender's transparent appropriation of Borrower's funds, totaling more than $4 million, set aside to address the effect of the Equiserve non-renewal -- the very purpose for which those reserves were established. The Borrower's damages would thus be at least equal to recovery of those reserves in addition to its loss of investment opportunity.

May I please hear from you in response to the foregoing in advance of the foreclosure so that the Borrower may consider how best to protect its assets and interests.

Very truly yours,

Kenneth M. Goldberg

KMG:jmj

cc:    Gerald S. Fineberg
       William J. Langelier
       Andrew Cohn, Esq.
#301785 v1/14500/9547

US1DOCS 4903203v1

LNR03476



**Piper Rudnick**

One International Place, 21st Floor
Boston, Massachusetts 02110-2613
*main* 617.406.6000 *fax* 617.406.6100

E. RANDOLPH TUCKER
randy.tucker@piperrudnick.com
*direct* 617.406.6032

November 18, 2004

BY HAND

Kenneth M. Goldberg, Esq.
Bernkopf Goodman & Baseman, LLP
125 Summer Street
Boston, MA  02110-1621

      Re:    Blue Hills Office Park LLC, Loan No. 76-0990083 (the "Loan")

Dear Ken:

      This is in response to your letter of November 17.

      The Mortgage, Assignment of Leases and Rents and Security Agreement, dated September 14, 1999 (the "Mortgage"), contains an agreement that is very different from the one described in your letters. Leasing Escrow Funds are not, as you suggest, generally available to the Borrower "to carry the Loan for a period of time and provide funds to address design of improvements and re-marketing to attract replacement tenants". Rather, the Mortgage provides that when certain conditions are met, the Leasing Escrow Funds are available for tenant improvements and leasing commissions previously paid by Borrower and a portion of the Leasing Escrow Funds (up to One Million Dollars ($1,000,000)) is available for principal and interest payments. None of the Borrower's requests for funds met the conditions of these provisions.

      As set forth in Mr. Polcari's letter of September 17, 2004, pursuant to Section 6(c)(ix) of the Mortgage, releases from the Leasing Escrow Funds may be made only for principal and interest payments. Other sizable monthly payments, such as real estate taxes, insurance and other reserves may not be paid from the Leasing Escrow Funds and therefore must be paid from operating income or by the Borrower. Moreover, no escrow funds may be released if an Event of Default has occurred and is continuing. An Event of Default occurred when Borrower failed either to timely make the quarterly tax escrow deposit or to pay the real estate tax payment due August 2, 2004. (By letter dated August 2, 2004, the Borrower requested the tax payment as an "advance" from the Leasing Escrow Funds, which the Mortgage does not permit.) Further Events of Default occurred on August 11, 2004, when Borrower failed to make required insurance and reserve payments, and in each month thereafter.

Blue Hill 1212



<div align="right">Kenneth M. Goldberg, Esq.
November 18, 2004
Page 2</div>

Pursuant to Section 6(c)(iv) of the Mortgage, money from the Leasing Escrow Funds is disbursable to the Borrower on a quarterly basis as reimbursement "for expenses reasonably *incurred* by [Borrower] for new Leases *entered into* by [Borrower]" (emphasis added). Disbursement is conditioned on delivery by Borrower to Lender of "copies of *paid* invoices ... for tenant improvements and leasing commissions" (emphasis added) and "the newly executed Lease," among other things. These funds are available for amounts already expended by the Borrower on behalf of tenants who have already signed leases, not for prospective design work and marketing efforts.

The parties' intent, as reflected in the Loan Documents, was to permit the Borrower to draw for principal and interest payments up to One Million Dollars ($1,000,000), so long as Borrower kept current with tax and other payments and satisfied the other conditions to payment, such as staying out of default. If a tenant were in place, the escrow would be available to reimburse leasing commissions and tenant improvements. Both provisions require the Borrower to come out of pocket with substantial funds, which Borrower has not done here. Neither of your letters has referred to any provision of the Loan Documents to the contrary.

Without purporting to identify all points of disagreement with your letters, it is important to note that the Leasing Escrow Funds "constitute additional security for the Debt", Mortgage § 6(c)(v), and "[u]pon the occurrence of an Event of Default, [Lender] shall have no obligation to disburse any amounts held in ... the Leasing Escrow Fund to the [Borrower] and may apply any sums then present in such fund[] to the payment of the Debt in any order in its sole discretion", Mortgage § 6(d). Moreover, under Section 7(b) of the Cash Management Agreement, the Borrower agreed that, upon an Event of Default, "it will have no further right to request or otherwise require Lender to disburse funds" from the escrow and reserve accounts.

For all of these reasons, the Lender was not obligated to disburse money from the Leasing Escrow Funds to the Borrower after the Equiserve lease terminated.

Sincerely,

*E. Randolph Tucker / jmm*

E. Randolph Tucker

ERT/jmm

cc:    Andrew Cohn, Esq. (by e-mail)

**Blue Hill 1213**

~BOST1:312878.v1  |11/18/04

11/18/04  09:32 FAX          BERNKOPF GOODMAN                    ☑001



B E R N K O P F
G O O D M A N LLP

November 18, 2004

KENNETH M. GOLDBERG
DIRECT DIAL: (617) 770-3333
E-MAIL: KGOLDBERG@BG-LLP.COM

FACSIMILE  TRANSMITTAL

TO:  E. Randolph Tucker, Esq          COMPANY:  Piper Rudnick

FACSIMILE NO:  617-406-6100          TELEPHONE NO:  617-406-6032

FROM:  Kenneth M. Goldberg, Esquire          TRANSMITTED BY:  Jeanne M. Jones

TOTAL PAGES (INCLUDING COVER):  2          CLIENT/MATTER NO:  14500/9547

MESSAGE:

The information contained in this facsimile message is
privileged and confidential, intended only for the use of the
individual named above and others who have been specifically
authorized to receive such. If the recipient is not the intended
recipient, you are hereby notified that dissemination,
distribution or copying of this communication is strictly
prohibited. If you have received this communication in error,
or if any problems occur with transmission, please notify us
immediately by phone at 617.790.3000. Thank you.

123 SUMMER STREET
BOSTON, MA 02110-1621
617.790.3000  T
617.790.3300  F
WWW.BG-LLP.COM

LNR03469

11/19/04  09:32 FAX          BERNKOPF GOODMAN                    ☒002

BERNKOPF
GOODMAN LLP

November 19, 2004

*Via Telecopy and Hand Delivery*

KENNETH M. GOLDBERG
DIRECT DIAL: (617) 790-3333
E-MAIL: KGOLDBERG@BG-LLP.COM

B. Randolph Tucker, Esq.
Piper Rudnick
One International Place
21st Floor
Boston, MA 02110-2600

Re:     Blue Hill Office Park LLC ("Borrower")
        First Mortgage Loan No. 76-0990083 ("Loan")
        JP Morgan Chase Bank, Trustee and its Services ("Lender")

Dear Randy:

This acknowledges receipt of your letter of November 18, 2004 with respect to the Loan referenced above.

Your letter disregards the Lender's refusal to address issues of Loan governance and access to reserves beginning many months prior to the asserted default. Your reference to various provisions of the Loan Documents disregards other, clearly contrary terms in the same document and, taken together, do not warrant the Lender's conduct or your conclusions on these matters.

Nothing in your letter will dissuade the Borrower from its belief that the Lender, purposefully and with the intention to appropriate Borrower's cash reserves solely to its own benefit, acted in willful derogation of its legal and contractual obligations.

Once again this confirms the Borrower's request that the Lender forbear from any further foreclosure proceedings and make available properly authorized representatives at a meeting to consider a less adversary resolution of these issues.

Very truly yours,

Kenneth M. Goldberg

KMG:jmj
cc:     Gerald S. Fineberg
        William J. Langelier
        Andrew Cohn, Esq.
#301974 v1/14500/9547

125 SUMMER STREET
BOSTON, MA 02110-1621
617.790.3000  T
617.790.3300  F
WWW.BG-LLP.COM

LNR03470

EXHIBIT 50

EXHIBIT
Andelman
358
RCC 4/24/06

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BLUE HILLS OFFICE PARK, LLC | ) | |
|     Plaintiff/Defendant-in-Counterclaim | ) | |
| | ) | |
| v | ) | |
| | ) | |
| J.P. MORGAN CHASE BANK, as | ) | CIVIL ACTION NO. 05-CV-10506(WGY) |
| Trustee for the Registered Holders of | ) | |
| Credit Suisse First Boston Mortgage | ) | |
| Securities Corp., Commercial Mortgage | ) | |
| Pass-Through Certificates, Series 1999-C1, | ) | |
|     Defendant | ) | |
| | ) | |
| | ) | |
| and CSFB 1999 – C1 ROYALL STREET, | ) | |
| LLC, | ) | |
|     Defendant/Plaintiff-in-Counterclaim | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM LANGELIER and GERALD | ) | |
| FINEBERG, | ) | |
|     Defendants-in-Counterclaim | ) | |

**EXPERT REPORT OF DAVID R. ANDELMAN, ESQUIRE**

    I am a lawyer licensed in the Commonwealth of Massachusetts and I am a principal in the law firm of Lourie & Cutler, P.C. A copy of my curriculum vitae is attached hereto as Exhibit A. I am being compensated for my professional services at the rate of $490.00 per hour. I have no publication written within the last ten years and I have not testified as an expert at a trial or by deposition within the preceding four years.

    I am engaged by Bernkopf Goodman, LLP to determine if I can render certain opinions concerning the tax consequences to the Partners of Royall Associates Realty Trust ("Royall"), the sole member of Blue Hills Office Park, LLC ("Blue Hills") arising out of the foreclosure sale of the property located at 150 Royall Street, Canton, MA 02021 (the "Property") which foreclosure sale occurred on or about November 20, 2004, but which deed was not recorded until January 14, 2005. I have determined that I am able to render such opinions.

    In connection with my engagement, I have reviewed the Federal Form 1065 U.S. Return and Partnership Income of Royall for the calendar year 2004 and have reviewed the work papers

prepared by Rutfield and Hassey, LLP, CPAs in connection with the preparation of the calendar year 2005 Form 1065 of Blue Hills Office Park, LLC. Since Blue Hills has only one member, it is considered a "disregard entity" for tax purposes and all of its transactions are reported on the tax return of it sole member, Royall. In particular, I have reviewed the amount of liability which was satisfied by the foreclosure sale and the tax basis of the Property foreclosed upon as set forth in the tax work papers of Royall. At the time of the foreclosure sale, the outstanding liability to Wells Fargo Bank, NA was $31,979,793.66. For federal and Massachusetts income tax purposes, the foreclosure sale is treated as a sale of the Property at the amount of the debt on the Property that was foreclosed, $31,979,793.66, provided there is no additional liability on any individuals with respect to the debt. If the liability is satisfied in full, then it is the amount of the debt which is treated as the sale price, not the bid price. Based upon the foreclosure sale of the Property, there is a significant gain to be realized by Royall. Since Royall is treated as a partnership for federal and state income tax purposes such gains are allocable to the various partners of Royall in respect to their proportionate interests.

With respect to the Property's foreclosure sale, because of the recording of the deed in 2005, the gain for the foreclosure sale will be reportable as income in 2005. Gain up to the amount of unrecaptured depreciation under Section 1250 is taxed at a rate of 15%. Any balance of the gain would be taxable as long term capital gain at a 25% rate. On the attached Exhibit B is set forth the name of each of the partners, the amount of gain that each will report due to the foreclosure sale, the portion of that gain that will be taxable at 25% and the portion of the gain that will be taxable at 15% for federal tax purposes and the portion of the gain that will be taxable at 5.3% for Massachusetts purposes. There is also a calculation of what the amount of the tax would be with respect to each of the partners based upon the rates set forth on Exhibit B, giving effect to the tax benefit of the deduction of the Massachusetts tax in calculating the Federal tax.

In summary, the effect of the foreclosure sale of the Property was to cause each of the partners of Royall to recognize gains as set forth on the attached Exhibit B and to be subject to tax on those gains at the rates set forth on Exhibit B in the total amounts as set forth therein. But for the foreclosure sale, the amount of gain set forth therein would not have been recognized and no taxes would be due with respect to the recognition of such gain.

This report is subject to revisions based upon any other information which is obtained during discovery in the above-captioned action.

David R. Andelman, Esq.

Dated:        March 31, 2006

F:\users\valley\corrs\draft\blue hills office park llc.doc

EXHIBIT A

<div align="center">

David R. Andelman, Esq.
Lourie & Cutler, P.C.
60 State Street, 9th Floor
Boston, MA 02109

Phone 617-742-6720
Fax 617-742-5720

</div>

Date of Birth:          August 19, 1939

Education:

                      University of Pennsylvania – B.S. in Economics 1961
                             Majored in Accounting

                      Harvard Law School – L.L.B. 1964

                      Admitted as a Lawyer in Massachusetts 1964

Principal:

                      Lourie & Cutler, P.C.

Lecturer in Law:

                      Boston University School of Law – 1972-1986

Exhibit B

ROYALL ASSOCIATES REALTY TRUST
The sole member of
Blue Hills Office Park, LLC

| Partner | Percentage Interest | Gain | Federal | | Mass. Gain Taxed at 5.3% | Total Taxes |
|---------|---------------------|------|---------|--|--------------------------|-------------|
| | | | Gain Taxed at 25% | Gain Taxed at 15% | | |
| Daniel Frank | 2.50% | $ 345,036 | $ 345,036 | $ - | $ 345,036 | $ 99,974 |
| Gerald Fineberg | 42.50% | $ 5,865,605 | $ 5,865,605 | $ - | $ 5,865,605 | $ 1,899,559 |
| Gary Fineberg | 2.50% | $ 345,036 | $ 345,036 | $ - | $ 345,036 | $ 99,974 |
| Michelle Fineberg | 2.50% | $ 345,036 | $ 345,036 | $ - | $ 345,036 | $ 99,974 |
| William A. Langeller | 48.75% | $ 9,902,799 | $ 9,902,799 | $ - | $ 9,902,799 | $ 2,869,336 |
| Amy Badger | 1.25% | $ 172,518 | $ 172,518 | $ - | $ 172,518 | $ 49,987 |
| Totals | 100.00% | $ 16,976,029 | $ 16,976,029 | $ - | $ 16,976,029 | $ 4,918,804 |

EXHIBIT 51

EXHIBIT
Riley
4/0
JKC  5/2-06

BLUE HILLS OFFICE PARK, LLC.

ANNUAL REPORT

DECEMBER 31, 2003



BLUE HILL 6749



## RUTFIELD & HASSEY, LLP.

*CERTIFIED PUBLIC ACCOUNTANTS*

15 Court Square • Boston, MA 02108-2588
(617) 523-7846 • FAX (617) 523-5348

E. Richard Rutfield, C.P.A.
Richard Hassey, C.P.A.

To the Partners of
Blue Hills Office
  Park, LLC.
One Washington Street
Wellesley, MA  02481

    We have compiled the accompanying statement of assets, liabilities, and members' deficit – modified cash basis of BLUE HILLS OFFICE PARK, LLC. as of December 31, 2003, and the related statement of revenues, expenses and members' deficit – modified cash basis for the year then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

    A compilation is limited to presenting in the form of financial statements information that is the representation of management.  We have not audited or reviewed the accompanying financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

Boston, Massachusetts
April 2, 2004

**BLUE HILL 6750**

## BLUE HILLS OFFICE PARK, LLC.

## STATEMENT OF ASSETS, LIABILITIES, AND MEMBERS' DEFICIT - MODIFIED TAX BASIS

### DECEMBER 31, 2003

### ASSETS

| | | |
|---|---:|---:|
| **CURRENT** | | |
| Due from Affiliate | | $ 9,028,175 |
| Escrow Accounts | | 3,744,294 |
| | | 12,772,469 |
| **PROPERTY** | | |
| Land | $ 3,119,071 | |
| Buildings | 28,071,642 | |
| Building Improvements | 6,043,134 | |
| Motor Vehicles & Equipment | 1,260 | |
| Furniture and Fixtures | 15,333 | |
| | 37,250,440 | |
| Less: Accumulated Depreciation | ( 18,253,970) | 18,996,470 |
| **OTHER** | | |
| Deferred Costs, Net | | 427,434 |
| **TOTAL ASSETS** | | $ 32,196,373 |

### LIABILITIES AND MEMBERS' DEFICIT

| | | |
|---|---:|---:|
| **CURRENT LIABILITIES** | | |
| Mortgage Payable - Current Portion | | $ 297,902 |
| Cash Overdraft | | 30,931 |
| Due to Gerald S. Fineberg | | 25,000 |
| Due to William J. Langelier | | 25,000 |
| | | 378,833 |
| **LONG TERM LIABILITIES** | | |
| Mortgage Notes Payable | $ 32,150,871 | |
| Less: Current Portion | 297,902 | 31,852,969 |
| **MEMBERS' DEFICIT** | | ( 35,429) |
| **TOTAL LIABILITIES AND MEMBERS' DEFICIT** | | $ 32,196,373 |

See accompanying notes and Accountant's Report.
RUTHFIELD & HASSEY, LLP., *CERTIFIED PUBLIC ACCOUNTANTS*

BLUE HILL 6751

## BLUE HILLS OFFICE PARK, LLC.

### STATEMENT OF REVENUES, EXPENSES, AND MEMBERS' DEFICIT - MODIFIED TAX BASIS

### FOR THE YEAR ENDED DECEMBER 31, 2003

**INCOME**

| | | |
|---|---:|---:|
| Rent | | $ 4,116,388 |
| Real Estate Tax Escalator | | 596,491 |
| Cam Reimbursements | | 1,864,929 |
| Percent Rent | | 50,486 |
| Payroll Reimbursement | | 37,001 |
| Miscellaneous | | 8,420 |
| | | 6,673,715 |

**OPERATING EXPENSES**

| | | |
|---|---:|---:|
| Utilities | $ 945,320 | |
| Real Estate Taxes | 604,532 | |
| Cleaning | 263,417 | |
| Maintenance Labor | 221,484 | |
| Management Fees | 205,817 | |
| Insurance | 179,380 | |
| Repairs/Maintenance | 166,158 | |
| Legal and Other Professional | 86,686 | |
| Materials | 64,984 | |
| Payroll Taxes and Benefits | 19,544 | |
| Health Club | 12,319 | |
| Auto Leasing | 6,528 | |
| Trash Removal | 4,359 | |
| Fuel Expense | 3,000 | |
| Telephone | 2,837 | |
| Exterminating | 1,275 | |
| Permits and Licenses | 250 | |
| Local Taxes | 240 | |
| Postage Expense | 238 | |
| Dues and Subscriptions | 139 | 2,788,507 |
| | | 3,885,208 |

**OTHER INCOME**

| | | |
|---|---:|---:|
| Interest | | 40,440 |

**INCOME BEFORE INTEREST AND DEPRECIATION**

| | | |
|---|---:|---:|
| | | 3,925,648 |
| Interest | 2,780,375 | |
| Depreciation | 1,118,162 | |
| Amortization | 17,068 | 3,915,605 |

NET INCOME FOR THE YEAR ........................................ 10,043

Members' Earnings January 1, 2003 ........................ 94,528

104,571

Drawing ........................................................ ( 140,000)

Members' Deficit December 31, 2003 .................... ($ 35,429)

See accompanying notes and Accountant's Report.

RUTFIELD & HASSEY, LLP., *CERTIFIED PUBLIC ACCOUNTANTS*

BLUE HILL 6752

BLUE HILLS OFFICE PARK, LLC.

NOTES TO THE FINANCIAL STATEMENTS

DECEMBER 31, 2003

## NOTE 1 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of Presentation

The Partnership's financial statements have been prepared on the basis of accounting the Partnership uses for Federal income tax purposes, which is a comprehensive basis of accounting other than generally accepted accounting principles. Accordingly, the accompanying financial statements are not intended to be a presentation in conformity with generally accepted accounting principles. Under the Partnership's Federal income tax basis of accounting, revenue is recognized at the time cash is received, and expenses are recognized when obligations are paid. No valuation allowances are provided.

Property and Equipment

Property and equipment are stated at cost. Building and improvements are depreciated on a straight-line basis as allowed for tax purposes, generally 31.5 or 39 years. Depreciation expense for the year was $1,118,162.

Deferred Costs

Financing costs represent loan modification and extension fees, as well as legal costs paid in connection with the initial acquisitions and refinancing of the mortgage notes and promissory note payable, net of amortization. Financing costs are amortized over the lives of the underlying obligations, plus extension periods. Amortization of financing costs totaled $16,747.

Deferred leasing costs are being amortized over the term of the respective lease. Amortization of deferred leasing costs totaled $ 321.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and amounts of income and expenses during the reporting period. Actual results could differ from those estimates.

Taxes on Income

No provision for income taxes has been made in the financial statements of the Partnership since such taxes are the responsibility of the individual partners rather than of the Partnership.

## NOTE 2 - LINE OF BUSINESS

Blue Hills Office Park, LLC., is a Massachusetts LLC organized and formed as of September 14, 1999. The member of the LLC is Royall Associates Realty Trust. The Entity was formed to engage in the business of acquiring, financing, developing, owning, leasing and operating an office building located at 150 Royall Street in Canton, Massachusetts.

BLUE HILLS OFFICE PARK, LLC.

NOTES TO THE FINANCIAL STATEMENTS

DECEMBER 31, 2003
(Continued)

## NOTE 3 - MORTGAGE PAYABLE

In September 1999 the Entity secured a mortgage on the property in the amount of $33,149,000. The collateral is the real and personal property located at 150 Royall Street Canton, Mass and the assignment of leases and rents. The maturity date is October 11, 2029. The interest rate through October 11, 2009 is 8.49%. After that date the interest rate will go to 13.49% or the treasury rate plus 5% whichever is greater.

The maturities are as follows:

| | | |
|---|---|---:|
| 2004 | $ | 297,902 |
| 2005 | | 327,292 |
| 2006 | | 359,276 |
| 2007 | | 390,812 |
| 2008 | | 423,375 |
| Thereafter | | 30,352,214 |
| | | $ 32,150,871 |

The interest expense for the period was $2,780,375.

## NOTE 4 - RELATED PARTY TRANSACTIONS

The Partnership has entered into a management agreement with the Fineberg Management Company, Inc. (a business enterprise wholly-owned by Gerald S. Fineberg) to manage the office building owned by the Partnership. Under the terms of this agreement, the Partnership has agreed to pay the Fineberg Management Company, Inc. a management fee equal to 5% of gross base rents, as defined. Additional certain operating expenses incurred by Fineberg Management Company, Inc., on behalf of Partnership are reimbursed by the Partnership. The fee for 2003 was $123,492.

Under a separate consulting agreement, Fineberg Management, Inc., has agreed to pay the Montrachet Company, Inc. (a business enterprise owned by William J. Langelier) a consulting fee equal to 40% of management fees earned by Fineberg Management, Inc. The fee for 2003 was $82,328.

## NOTE 5 - RENTAL INCOME UNDER OPERATING LEASES

Future minimum rental income to be received on noncancelable operating leases as of December 31, 2003 is approximately $2,401,000 and extends through July 2004. Generally, leases are for terms of one to five years and contain renewal options. The leases allow for certain property operating costs to be passed on to the tenants. In 2003 98% of rental revenues were received from FleetBoston. The lease with FleetBoston expires on July 31, 2004.

**BLUE HILL 6754**

EXHIBIT 52

Bk 21988 Pg508 #5279
01-14-2005 @ 10:21a

EXHIBIT
*Riley*
*411*
KCC  5/2/06

## CERTIFICATE OF ENTRY

We hereby certify that on November 19, 2004 we were present and saw Bruce S. Barnett, attorney for CSFB 1999-C1 ROYALL STREET, LLC, as assignee and present holder of a mortgage given by BLUE HILLS OFFICE PARK LLC to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, dated as of September 14, 1999 and recorded with Norfolk County Registry of Deeds in Book 13733, Page 428, make an open, peaceable and unopposed entry on the premises described in said mortgage, for the purpose of foreclosing said mortgage for breach of condition thereof.

*E RANDOLPH TUCKER*

*Robert T. Hayes*

## COMMONWEALTH OF MASSACHUSETTS

Norfolk County, ss.

On this 19th day of November, 2004, before me, the undersigned notary public, personally appeared *E Randolph Tucker* and *Robert T Hayes* proved to me through satisfactory evidence of identification, which was (a current driver's license) (a current U.S. passport) (my personal knowledge of the identity of the principal), to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of (his) (her) knowledge and belief.

Notary Public *Stephen E Den*
My commission expires: 5- 3

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY

WILLIAM P. O'DONNELL, REGISTER

~BOST1:312331.v1

*150 royall st., Canton*

LNR00814

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY

*William P O'Donnell*

WILLIAM P. O'DONNELL, REGISTER

Bk 21988 Pg509 #5280
01-14-2005 @ 10:21a

## FORECLOSURE DEED

CSFB 1999-C1 ROYALL STREET, LLC, a Delaware limited liability company having a mailing address of c/o Lennar Partners, Inc., 1601 Washington Avenue, Suite 700, Miami Beach Florida 33139, as assignee and present holder of that certain Mortgage, Assignment of Leases and Rents and Security Agreement from BLUE HILLS OFFICE PARK LLC, a Delaware limited liability company to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, a Delaware limited liability company, recorded on September 15, 1999 with Norfolk County Registry of Deeds in Book 13733, Page 428, by power conferred in said mortgage and every other power for consideration of Eighteen Million Five Hundred Thousand Dollars ($18,500,000.00) paid, grants to CSFB 1999-C1 ROYALL STREET, LLC, the premises conveyed by said Mortgage located at 150 Royall Street, Canton, Massachusetts more particularly described as follows:

The land with the buildings thereon situated in Canton, Norfolk County, Massachusetts shown as Lot "C" on a plan entitled "Plan of Land, Canton, Massachusetts" dated December 9, 1971 by Universal Engineering Corporation, recorded with Norfolk Registry of Deeds as Plan 48 of 1972 in Plan Book 230 (hereinafter the "Plan"), and being more particularly bounded and described as follows:

| | |
|---|---|
| NORTHERLY AND NORTHWESTERLY: | by Royall Street, three hundred thirty-six and 65/100 (336.65) feet; |
| NORTHEASTERLY: | by Parcel A as shown on said Plan, by two (2) lines measuring, respectively, six hundred thirty-five and 82/100 (635.82) feet and two hundred (200.00) feet; |
| NORTHWESTERLY: | by Parcel A as shown on said Plan, one hundred forty (140.00) feet; |
| NORTHEASTERLY: | by Parcel B as shown on said Plan, seven hundred nine and 37/100 (709.37) feet; |
| SOUTHWESTERLY: | by Circumferential Highway (Route 128), eight hundred sixteen and 18/100 (816.18) feet; |
| SOUTHWESTERLY: | by Green Street, seven hundred sixty-six and 13/100 (766.13) feet; |
| NORTHWESTERLY: | by land now or formerly of Nocka, two hundred thirty-nine and 57/100 (239.57) feet; |
| WESTERLY: | by land of said Nocka, two hundred three and 57/100 (203.57) feet; and |

*150 Royall St., Canton*

2

LNR00815

NORTHWESTERLY:          by land of said Nocka, by two (2) lines measuring, respectively,
                        eighty (80.00) feet and one hundred thirteen and 95/100 (113.95)
                        feet.

    Insofar as now in force and applicable, the premises are conveyed subject to and with the
benefit of all liens, encumbrances, easements, restrictions and other matters appearing of record.

    Executed under seal as of this 29th day of November, 2004.

                                          CSFB 1999-C1 ROYALL STREET, LLC, a
                                          Delaware limited liability company, present holder
                                          of said mortgage

                                          By: Lennar Massachusetts Partners, Inc., a
                                              Massachusetts corporation, its Manager

                                          By: _____
                                              Randolph J. Wolpert
                                              Vice President

                                          By: _____
                                              Michael J. Sherman
                                              Assistant Treasurer

State of _Florida_
_Miami-Dade_ County, ss.

    On this _29_ day of _November_, 2004, before me, the undersigned notary public,
personally appeared Randolph J. Wolpert, Vice-President of Lennar Massachusetts Partners, Inc.
and Michael J. Sherman, Assistant Treasurer of Lennar Massachusetts Partners, Inc., proved to
me through satisfactory evidence of identification, which was (a current driver's license) (a
current U.S. passport) (my personal knowledge of the identity of the principal), to be the persons
whose names are signed on the preceding or attached document, and who swore or affirmed to
me that the contents of the document are truthful and accurate to the best of their knowledge and
belief.

                                          _____
                                          Notary Public
                                          My commission expires:



~BOST1:312338.v1

Executed under seal as of this 29th day of November, 2004

CSFB 1999-C1 ROYALL STREET, LLC, a
Delaware limited liability company,

By: Lennar Massachusetts Partners, Inc., a
   Massachusetts corporation, its Manager

By: _____
   Randolph J. Wolpert
   Vice President

By: _____
   Michael J. Sherman
   Assistant Treasurer

State of _Florida_____
_Miami - Dade_____ County, ss.

On this _29_ day of _November___, 2004, before me, the undersigned notary public,
personally appeared Randolph J. Wolpert, Vice President of Lennar Massachusetts Partners,
Inc. and Michael J. Sherman, Assistant Treasurer of Lennar Massachusetts Partners, Inc.
proved to me through satisfactory evidence of identification, which was (a current driver's
license) (a current U.S. passport) (my personal knowledge of the identity of the principal), to
be the person whose name is signed on the preceding or attached document, and who swore
or affirmed to me that the contents of the document are truthful and accurate to the best of
their knowledge and belief.

_____
Notary Public
My commission expires:



MARIA E. RUIZ
MY COMMISSION # DD 093329
EXPIRES: May 21, 2006
Bonded Thru Notary Public Underwriters

~BOST1:312351.v1

LNR00818

Bk 21988 Pg511  $5281
01-14-2005 @ 10#21a

## AFFIDAVIT OF SALE

We, RANDOLPH J. WOLPERT, Vice President, and MICHAEL J. SHERMAN, Treasurer of Lennar Massachusetts Partners, Inc., Manager of CSFB 1999-C1 ROYALL STREET, LLC, named in the foregoing Foreclosure Deed, make oath and say that the principal and interest obligations mentioned in the mortgage referred to in said Foreclosure Deed were not paid or tendered or performed when due or prior to the sale; and that we published on the 14th, 21st and the 28th days of October, 2004 and the 4th day of November, 2004 in the Canton Citizen, a newspaper published in Canton, Massachusetts, and having a circulation in Canton, Massachusetts, a Notice of Mortgagee's Sale of Real Estate, a true copy of which is attached hereto as Exhibit A.

We also complied with Massachusetts General Laws, Chapter 244, Section 14, as amended, by causing to be mailed the required notices by certified mail, return receipt requested.

Pursuant to said notice at the time and place therein appointed, CSFB 1999-C1 ROYALL STREET, LLC sold the mortgaged premises at public auction by Stephen E. Dean, a licensed auctioneer, to CSFB 1999-C1 ROYALL STREET, LLC , for consideration of Eighteen Million Five Hundred Thousand Dollars ($18,500,000.00) bid by said CSFB 1999-C1 ROYALL STREET, LLC being the highest bid made therefore at said auction.

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA
CERTIFY
*William P O'Donnell*
WILLIAM P. O'DONNELL, REGISTER

--BOST1:312351.v1

3

Exhibit A

## LEGAL NOTICE
## MORTGAGEE'S SALE OF
## REAL ESTATE

By virtue and in execution of the POWER OF SALE contained in a certain mortgage from BLUE HILLS OFFICE PARK LLC, to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, dated as of September 14, 1999 and recorded with Norfolk County Registry of Deeds (the "Records") in Book 13733, Page 428, of which mortgage the undersigned is the present holder, for breach of conditions contained in said mortgage and for the purpose of foreclosing, the same will be sold at Public Auction at 10:00 A.M. on the 12th day of November, 2004, at the mortgaged premises located at 150 Royall Street, Canton, Massachusetts, all and singular the premises described in said mortgage; to wit:

The land situated in Canton, Norfolk County, Massachusetts shown as Lot "C" on a plan entitled "Plan of Land, Canton, Massachusetts" dated December 9, 1971 by Universal Engineering Corporation, recorded with Norfolk Registry of Deeds as Plan 48 of 1972 in Plan Book 230 (herinafter the "Plan"), and being more particularly bounded and described as follows:

NORTHERLY AND NORTHWESTERLY: by Royall Street, three hundred thirty-six and 65/100 (336.65) feet;

NORTHEASTERLY: by Parcel A as shown on said Plan, by two (2) lines measuring, respectively, six hundred thirty-five and 82/100 (635.82) feet and two hundred (200.00) feet;

NORTHWESTERLY: by Parcel A as shown on said Plan, one hundred forty (140.00) feet;

NORTHEASTERLY: by Parcel B as shown on said Plan, seven hundred nine and 37/100 (709.37) feet;

SOUTHWESTERLY: by Circumferential Highway (Route 128), eight hundred sixteen and 18/100 (816.18) feet;

SOUTHWESTERLY: by Green Street, seven hundred sixty-six and 13/100 (766.13) feet;

NORTHWESTERLY: by land now or formerly of Nocka, two hundred thirty-nine and 57/100 (239.57) feet;

WESTERLY: by land of said Nocka, two hundred three and 57/100 (203.57) feet; and

NORTHWESTERLY: by land of said Nocka, by two (2) lines measuring, respectively, eighty (80.00) feet and one hundred thirteen and 95/100 (113.95) feet.

Insofar as now in force and applicable, the premises are conveyed subject to and with the benefit of all additional liens, encumbrances, easements, restrictions and other matters appearing of record and, having priority over the mortgage described herein, if any.

The premises to be sold shall also be subject to all leases and tenancies, if any there may be, having priority over said mortgage, to tenancies or occupation by persons on the premises now or at the time of said auction which tenancies or occupation are subject to said mortgage, to rights or claims in personal property installed by tenants or former tenants now located on the premises and also to all laws and ordinances including, but not limited to, all building, zoning and environmental laws and ordinances.

TERMS OF SALE: Fifty Thousand and nd/100 Dollars ($50,000.00) shall be paid in cash or by certified or bank cashier's check by the purchaser at the time and place of sale.

The balance of the purchase price on a sale shall be paid in cash or by certified bank or cashier's check in or within thirty (30) days thereafter at the offices of Piper Rudnick LLP, One International Place, Boston, Massachusetts. The successful bidder and/or bidders shall be required to sign a Memorandum of Terms of Sale containing the above terms at the Auction Sale.

The Mortgagee reserves the right to postpone the sale to a later date by public proclamation at the time and date appointed for the sale and to further postpone at any adjourned sale date by public proclamation at the time and date appointed for the adjourned sale date.

In the event that the successful bidder at the foreclosure sale shall default in purchasing the within described property according to the terms of this Notice of Sale and/or terms of the Memorandum of Sale executed at the time of foreclosure, the Mortgagee reserves the right to sell the property by foreclosure deed to the second highest bidder provided that said second highest bidder shall deposit with Mortgagee's attorneys, Piper Rudnick LLP, the amount of the required deposit as set forth herein within three (3) business days after written notice of the default of the previous high bidder and title shall be conveyed to the said second highest bidder within thirty (30) days of said written notice.

Other terms to be announced at the time and place of the sale.

CSFB 1999-C1 ROYALL STREET, LLC, a Delaware limited liability company, present holder of said mortgage

By: Lennar Massachusetts Partners, Inc., a Massachusetts corporation, its Manager

By: Piper Rudnick LLP, its attorney

By:

Bruce S. Barnett
Piper Rudnick LLP
One International Place
Boston, Massachusetts 02110
(617) 406-6000

LNR00819

EXHIBIT 53

# CSFB 1999-C1 ROYALL STREET, LLC
1601 Washington Avenue, Suite 700
Miami Beach, Florida 33139

April 20, 2005

RETURN RECEIPT REQUESTED
REGISTERED FIRST CLASS MAIL

COPY BY FEDERAL EXPRESS

Gerald S. Fineberg
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

William J. Langelier
c/o The Langelier Company
2045 Jackson Street
Suite 501
San Francisco, California 94109

Re:    Demand for Payment Under Guaranty, dated September 14, 1999
       Borrower: Blue Hills Office Park, LLC
       Property: 150 Royall St., Canton, MA

Gentlemen:

1999-C1 Royall Street, LLC, as assignee of a Note in the original principal amount of $33,149,000, together with the Mortgage, Guaranty and other loan documents, dated September 14, 1999 ("Loan Documents") given by Blue Hills Office Park, LLC ("Blue Hills") to Credit Suisse First Boston Mortgage Capital, LLC (hereafter, "Lender"), makes demand for payment pursuant to your personal Guaranty.

In June 2003, Blue Hills brought a lawsuit challenging a special permit issued by the Canton Zoning Board of Appeals. The permit was issued for construction of a parking garage by Blueview Corporate Center LLC, then-owner of the property located at 250 Royall Street. Without obtaining the prior written consent of the Lender, Blue Hills settled the lawsuit, dismissed all claims and accepted a substantial payment in connection therewith. The payment was not deposited to the Clearing Bank or otherwise conveyed to Lender. Both the settled claims and the settlement payment were subject to the Lender's security interest under the Loan Documents.

~BOST1:323865.v1 |4/21/05
306477-18
**Serving clients globally**

**LNR03943**

Gerald S. Fineberg
William J. Langelier
April 20, 2005
Page 2

You are liable under the Guaranty for payment of the full amount of the Debt on account of, inter alia, the failure of Blue Hills to obtain the prior written consent of the Lender before transferring an interest in the Mortgaged Property, in violation of Section 10 of the Mortgage. In addition, as provided in the Guaranty, you are liable for all loss, damages and expenses, including attorney's fees, arising from intentional misrepresentations by you or Blue Hills in connection with the matters described in the preceding paragraph.

As of November 19, 2004, after credit for the successful foreclosure bid and loan reserves, the Debt was $10,770,847, exclusive of any prepayment premium. Payment of $10,770,847 is hereby demanded. Section 1.5 of the Guaranty requires that you make payment immediately. Once payment of this amount is received, we will make an exact calculation of interest, expenses, and other amounts due and notify you promptly.

Payment should be sent to:

CSFB 1999-C1 Royall Street, LLC
1601 Washington Avenue, Suite 700
Miami Beach, Florida 33139

Thank you for your prompt attention to this matter.

Sincerely,

CSFB 1999-C1 ROYALL STREET, LLC

By its attorney,

E. Randolph Tucker
DLA PIPER RUDNICK GRAY CARY US LLP
One International Place, 21st Floor
100 Oliver Street
Boston, MA  02110-2613
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

cc:  David Doyle, Esq. (by hand)
     Andrew H. Cohn, Esq. (by hand)
     Peter B. McGlynn, Esq. (by hand)

~BOST1:323865.v1 |4/21/05
306477-18

**LNR03944**

EXHIBIT 54

# Commonwealth of Massachusetts
## NORFOLK SUPERIOR COURT
### Case Summary
### Civil Docket

## Blue Hills Office Park LLC v Blueview Corporate Center llc et al

Details for Docket: NOCV2003-01051

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | NOCV2003-01051 | **Caption:** | Blue Hills Office Park LLC v Blueview Corporate Center llc et al |
| **Filing Date:** | 06/09/2003 | **Case Status:** | Disposed: by Settlement |
| **Status Date:** | 09/05/2003 | **Session:** | Civil A-CtRm 10 |
| **Lead Case:** | NA | **Case Type:** | Complex |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 04/04/2004 |
| **Service Date:** | 06/30/2003 | **Disposition:** | 08/02/2004 |
| **Rule 15:** | 11/06/2003 | **Rule 12/19/20:** | 11/06/2003 |
| **Final PTC:** | 06/03/2004 | **Rule 56:** | 05/04/2004 |
| **Answer Date:** | | **Jury Trial:** | NO |

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | NOCV2003-01051 | **Caption:** | Blue Hills Office Park LLC v Blueview Corporate Center llc et al |
| **Filing Date:** | 06/09/2003 | **Case Status:** | Disposed: by Settlement |
| **Status Date:** | 09/05/2003 | **Session:** | Civil A-CtRm 10 |
| **Lead Case:** | NA | **Case Type:** | Zoning appeal (40A) |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 04/04/2004 |
| **Service Date:** | 06/30/2003 | **Disposition:** | 08/02/2004 |
| **Rule 15:** | 11/06/2003 | **Rule 12/19/20:** | 11/06/2003 |
| **Final PTC:** | 06/03/2004 | **Rule 56:** | 05/04/2004 |
| **Answer Date:** | | **Jury Trial:** | NO |

## Parties Involved

8 Parties Involved in Docket: NOCV2003-01051

| **Party Involved:** | | **Role:** | Defendant |
|---|---|---|---|
| **Last Name:** | Armando member | **First Name:** | Charles J |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| **Party Involved:** | | **Role:** | Defendant |
|---|---|---|---|
| **Last Name:** | Blueview Corporate Center llc | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| **Party Involved:** | | **Role:** | Defendant |
|---|---|---|---|
| **Last Name:** | Canton Board of Appeals | **First Name:** | Town of |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| **Party Involved:** | | **Role:** | Defendant |
|---|---|---|---|
| **Last Name:** | Carroll member | **First Name:** | Paul R |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| **Party Involved:** | | **Role:** | Defendant |
|---|---|---|---|
| **Last Name:** | Fitzgerald member | **First Name:** | James F |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |

**Telephone:**

| | | |
|---|---|---|
| **Party Involved:** | **Role:** | Defendant |
| **Last Name:** Pando member | **First Name:** | Gregory |
| **Address:** | **Address:** | |
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

| | | |
|---|---|---|
| **Party Involved:** | **Role:** | Defendant |
| **Last Name:** Quigley member | **First Name:** | Robert |
| **Address:** | **Address:** | |
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

| | | |
|---|---|---|
| **Party Involved:** | **Role:** | Plaintiff |
| **Last Name:** Blue Hills Office Park LLC | **First Name:** | |
| **Address:** | **Address:** | |
| **City:** | **State:** | |
| **Zip Code:** | **Zip Ext:** | |
| **Telephone:** | | |

---

## Attorneys Involved

13 Attorneys Involved for Docket: NOCV2003-01051

| | | |
|---|---|---|
| **Attorney Involved:** | **Firm Name:** | BERN05 |
| **Last Name:** Manekas | **First Name:** | Jason A |
| **Address:** 125 Summer Street | **Address:** | 13th floor |
| **City:** Boston | **State:** | MA |
| **Zip Code:** 02110 | **Zip Ext:** | |
| **Telephone:** 617-790-3000 | **Tel Ext:** | |
| **Fascimile:** 617-790-3300 | **Representing:** | Blue Hills Office Park LLC, (Plaintiff) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Pando member, Gregory (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Pando member, Gregory (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Fitzgerald member, James F (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Fitzgerald member, James F (Defendant) |

5/17/2006 11:57 AM

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Canton Board of Appeals, Town of (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Canton Board of Appeals, Town of (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Armando member, Charles J (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Armando member, Charles J (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Carroll member, Paul R (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Carroll member, Paul R (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Quigley member, Robert (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Quigley member, Robert (Defendant) |

# Calendar Events

No Calendar Events found for Docket: NOCV2003-01051.

There are currently no calendar events associated with this case.

# Full Docket Entries

17 Docket Entries for Docket: NOCV2003-01051

| Entry Date: | Paper No: | Docket Entry: |
| --- | --- | --- |
| 06/09/2003 | 1 | Appeal from Canton, MA Zoning Board filed entry fee $210 |
| 06/09/2003 | | Origin 1, Type C02, Track F. |
| 06/09/2003 | 2 | Civil action cover sheet filed |
| 06/09/2003 | | fast track notice sent to plff attorney |
| 06/25/2003 | 3 | Affidavit ofcompliance with G.L.c.40A, S17 (rec'd 6/24/03) |
| 07/08/2003 | 4 | ANSWER: Town of Canton Board of Appeals(Defendant) |
| 07/08/2003 | | ANSWER: Paul R Carroll member(Defendant) |
| 07/08/2003 | | ANSWER: Gregory Pando member(Defendant) |
| 07/08/2003 | | ANSWER: James F Fitzgerald member(Defendant) |
| 07/08/2003 | | ANSWER: Charles J Armando member(Defendant) |
| 07/08/2003 | | ANSWER: Robert Quigley member(Defendant) -track notice sent to |
| 07/08/2003 | | Attorney Saillant |
| 08/29/2003 | | Pleading, Notice of Dismissal, returned to Jason A Manekas, Esq.: |
| 08/29/2003 | | Should be a Stipulation of Dismissal, as defts have answered. Need |
| 08/29/2003 | | signatures of all counsel of record |
| 09/05/2003 | 5 | Stipulation of dismissal with prejudice, without costs. All rights |
| 09/05/2003 | 5 | of appeal are hereby waived (Rec'd. 9/4/03) |

# Commonwealth of Massachusetts
## NORFOLK SUPERIOR COURT
## Case Summary
## Civil Docket

## Blue Hills Office Park LLC v Blueview Corporate Center llc et al

Details for Docket: NOCV2003-01051

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | NOCV2003-01051 | **Caption:** | Blue Hills Office Park LLC v Blueview Corporate Center llc et al |
| **Filing Date:** | 06/09/2003 | **Case Status:** | Disposed: by Settlement |
| **Status Date:** | 09/05/2003 | **Session:** | Civil A-CtRm 10 |
| **Lead Case:** | NA | **Case Type:** | Complex |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 04/04/2004 |
| **Service Date:** | 06/30/2003 | **Disposition:** | 08/02/2004 |
| **Rule 15:** | 11/06/2003 | **Rule 12/19/20:** | 11/06/2003 |
| **Final PTC:** | 06/03/2004 | **Rule 56:** | 05/04/2004 |
| **Answer Date:** | | **Jury Trial:** | NO |

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | NOCV2003-01051 | **Caption:** | Blue Hills Office Park LLC v Blueview Corporate Center llc et al |
| **Filing Date:** | 06/09/2003 | **Case Status:** | Disposed: by Settlement |
| **Status Date:** | 09/05/2003 | **Session:** | Civil A-CtRm 10 |
| **Lead Case:** | NA | **Case Type:** | Zoning appeal (40A) |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 04/04/2004 |
| **Service Date:** | 06/30/2003 | **Disposition:** | 08/02/2004 |
| **Rule 15:** | 11/06/2003 | **Rule 12/19/20:** | 11/06/2003 |
| **Final PTC:** | 06/03/2004 | **Rule 56:** | 05/04/2004 |
| **Answer Date:** | | **Jury Trial:** | NO |

## Parties Involved

8 Parties Involved in Docket: NOCV2003-01051

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Armando member | **First Name:** | Charles J |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Blueview Corporate Center llc | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Canton Board of Appeals | **First Name:** | Town of |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Carroll member | **First Name:** | Paul R |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Fitzgerald member | **First Name:** | James F |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |

Telephone:

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Pando member | **First Name:** | Gregory |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Quigley member | **First Name:** | Robert |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Blue Hills Office Park LLC | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

## Attorneys Involved

13 Attorneys Involved for Docket: NOCV2003-01051

| | | | |
|---|---|---|---|
| **Attorney Involved:** | | **Firm Name:** | BERN05 |
| **Last Name:** | Manekas | **First Name:** | Jason A |
| **Address:** | 125 Summer Street | **Address:** | 13th floor |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-790-3000 | **Tel Ext:** | |
| **Fascimile:** | 617-790-3300 | **Representing:** | Blue Hills Office Park LLC, (Plaintiff) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Pando member, Gregory (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Pando member, Gregory (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Fitzgerald member, James F (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Fitzgerald member, James F (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Canton Board of Appeals, Town of (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Canton Board of Appeals, Town of (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | DeRensis | **First Name:** | Paul R |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | 1235 |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** | 617-951-2323 | **Representing:** | Armando member, Charles J (Defendant) |

| **Attorney Involved:** | | **Firm Name:** | DEUT01 |
|---|---|---|---|
| **Last Name:** | Saillant | **First Name:** | Kimberly M |
| **Address:** | 99 Summer Street | **Address:** | |
| **City:** | Boston | **State:** | MA |
| **Zip Code:** | 02110 | **Zip Ext:** | |
| **Telephone:** | 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** | 617-951-2323 | **Representing:** | Armando member, Charles J (Defendant) |

| | | |
|---|---|---|
| **Attorney Involved:** | **Firm Name:** | DEUT01 |
| **Last Name:** DeRensis | **First Name:** | Paul R |
| **Address:** 99 Summer Street | **Address:** | |
| **City:** Boston | **State:** | MA |
| **Zip Code:** 02110 | **Zip Ext:** | 1235 |
| **Telephone:** 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** 617-951-2323 | **Representing:** | Carroll member, Paul R (Defendant) |

| | | |
|---|---|---|
| **Attorney Involved:** | **Firm Name:** | DEUT01 |
| **Last Name:** Saillant | **First Name:** | Kimberly M |
| **Address:** 99 Summer Street | **Address:** | |
| **City:** Boston | **State:** | MA |
| **Zip Code:** 02110 | **Zip Ext:** | |
| **Telephone:** 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** 617-951-2323 | **Representing:** | Carroll member, Paul R (Defendant) |

| | | |
|---|---|---|
| **Attorney Involved:** | **Firm Name:** | DEUT01 |
| **Last Name:** DeRensis | **First Name:** | Paul R |
| **Address:** 99 Summer Street | **Address:** | |
| **City:** Boston | **State:** | MA |
| **Zip Code:** 02110 | **Zip Ext:** | 1235 |
| **Telephone:** 617-951-2300 | **Tel Ext:** | |
| **Fascimile:** 617-951-2323 | **Representing:** | Quigley member, Robert (Defendant) |

| | | |
|---|---|---|
| **Attorney Involved:** | **Firm Name:** | DEUT01 |
| **Last Name:** Saillant | **First Name:** | Kimberly M |
| **Address:** 99 Summer Street | **Address:** | |
| **City:** Boston | **State:** | MA |
| **Zip Code:** 02110 | **Zip Ext:** | |
| **Telephone:** 617-951-2300 | **Tel Ext:** | 126 |
| **Fascimile:** 617-951-2323 | **Representing:** | Quigley member, Robert (Defendant) |

# Calendar Events

No Calendar Events found for Docket: NOCV2003-01051.

There are currently no calendar events associated with this case.

# Full Docket Entries

17 Docket Entries for Docket: NOCV2003-01051

| Entry Date: | Paper No: | Docket Entry: |
| --- | --- | --- |
| 06/09/2003 | 1 | Appeal from Canton, MA Zoning Board filed entry fee $210 |
| 06/09/2003 | | Origin 1, Type C02, Track F. |
| 06/09/2003 | 2 | Civil action cover sheet filed |
| 06/09/2003 | | fast track notice sent to plff attorney |
| 06/25/2003 | 3 | Affidavit ofcompliance with G.L.c.40A, S17 (rec'd 6/24/03) |
| 07/08/2003 | 4 | ANSWER: Town of Canton Board of Appeals(Defendant) |
| 07/08/2003 | | ANSWER: Paul R Carroll member(Defendant) |
| 07/08/2003 | | ANSWER: Gregory Pando member(Defendant) |
| 07/08/2003 | | ANSWER: James F Fitzgerald member(Defendant) |
| 07/08/2003 | | ANSWER: Charles J Armando member(Defendant) |
| 07/08/2003 | | ANSWER: Robert Quigley member(Defendant) -track notice sent to |
| 07/08/2003 | | Attorney Saillant |
| 08/29/2003 | | Pleading, Notice of Dismissal, returned to Jason A Manekas, Esq.: |
| 08/29/2003 | | Should be a Stipulation of Dismissal, as defts have answered. Need |
| 08/29/2003 | | signatures of all counsel of record |
| 09/05/2003 | 5 | Stipulation of dismissal with prejudice, without costs. All rights |
| 09/05/2003 | 5 | of appeal are hereby waived (Rec'd. 9/4/03) |

EXHIBIT 55

# Delaware

PAGE   1

### The First State

    I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "CSFB 1999-C1 ROYALL STREET, LLC" IS
DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN
GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF
THIS OFFICE SHOW, AS OF THE FIFTEENTH DAY OF MAY, A.D. 2006.

    AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "CSFB 1999-C1
ROYALL STREET, LLC" WAS FORMED ON THE FIRST DAY OF SEPTEMBER,
A.D. 2004.

    AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE
BEEN PAID TO DATE.



*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

3849797   8300

060456606

AUTHENTICATION: 4744509

DATE: 05-15-06

EXHIBIT 29

EXHIBIT
Donovan
21
JEC 2/14/06

CONFIDENTIAL

## SETTLEMENT AGREEMENT

This **Settlement Agreement** (the "Agreement") is entered into as of this 5th day of August, 2003 among Blue Hills Office Park LLC ("BHOP"), DST Realty, Inc. ("DST") and Blueview Corporate Center LLC (the "Blueview Seller").

WHEREAS, DST entered into, and there is outstanding the Purchase and Sale Agreement dated as of April 9, 2003 as amended to date (the "Purchase and Sale Agreement") pursuant to which the Blueview Seller agreed to sell and DST agreed to acquire the land and the improvements thereon located at 250 Royall Street, Canton, Massachusetts (the "Blueview Property"); and

WHEREAS, DST and the Blueview Seller have agreed to work towards an August 6, 2003 (the "Target Closing Date") closing under the Purchase and Sale Agreement; and

WHEREAS, it is a condition precedent to DST purchasing the Blueview Property pursuant to the Purchase and Sale Agreement that permits and variances necessary for construction of a parking garage upon the Blueview Property be obtained (the "Parking Garage"), which condition, subject to it not being appealed, was satisfied by issuance on May 22, 2003 of the Decision by the Town of Canton Zoning Board of Appeals in Case No. 26-03-MOD/SPA-SP (the "Decision"); and

WHEREAS, BHOP owns the property located at 150 Royall Street, Canton, Massachusetts which in part abuts the Blueview Property (the "150 Property"); and

WHEREAS, by Complaint filed in the Norfolk Superior Court (the "Court"), Civil Action No. 03-01051, BHOP commenced an action appealing the Decision principally on the basis that it was obtained in reliance upon an incorrect interpretation of the Town of Canton Zoning By-Law (the "Appeal"); and

WHEREAS, in recognition of the rights and claims of the parties, BHOP, DST and the Blueview Seller have negotiated a resolution which includes withdrawal by BHOP of its Appeal, payment by DST to BHOP and entry of additional agreements, all as herein specifically set forth;

NOW, THEREFORE, in consideration of the agreements and mutual undertakings set forth herein, the adequacy and sufficiency of which consideration the parties hereto acknowledge, the undersigned hereby act and agree as follows:

1.　　<u>Payment to BHOP</u>. Unless specifically excused from that payment by Paragraph 1.A., DST agrees to cause the sum of Two Million and no/100 ($2,000,000.00) Dollars to be released from the Escrow provided for below to BHOP (the "DST Payment") on the earlier of (i) the date on which DST acquires title to the Blueview Property; or (ii) September 2, 2003.

　　　　A.　　DST shall not be required to pay the DST Payment if DST does not acquire the Blueview Property only (i) on account of breach or failure of the Blueview Seller to convey possession and title to the Blueview Property in the condition as presently exists together with discharge of mortgages

Blue Hill
1844

outstanding on the Blueview Property (the "Title Condition"), or (ii) if there is issued a notice of taking by eminent domain or condemnation of a portion of the Property or casualty loss of improvements upon the Blueview Property that are not timely restored or there is an appeal filed prior to the August 4, 2003 expiration of the applicable appeal period in connection with the issuance of the decision by the Conservation Commission of the Town of Canton in DEP No. 124-880 by a party other than DST or any entity controlled or acting in collusion with DST, and the Purchase and Sale Agreement excuses DST from purchasing the Blueview Property on account thereof (an "Excused Non-Purchase"), or (iii) the occurrence or announcement of a sale or transfer of control to a third party of all or substantially all of the equity interests or assets of DST, DST's parent, or EquiServe, Inc., (being an affiliate of DST and the intended tenant of the Blueview Property) which in DST's judgment obviates the need to acquire the Blueview Property, provided, however, that the provisions of this subparagraph 1(A.)(iii) shall lapse and be of no further force or effect from and after September 3, 2003.

B.     The parties agree that time is of the essence in DST and the Blueview Seller closing their purchase and sale of the Blueview Property and the parties hereto performing their obligations and agreements set forth in this Agreement.

2.     <u>Escrow Agent and Escrow Agreement</u>.  Lawyers Title Insurance Corporation, acting by and through its Boston, Massachusetts office, has agreed to serve as escrow agent (the "Escrow Agent") under the following terms (referred to herein collectively as the "Escrow" or "Escrow Agreement"):

A.     The parties hereto do hereby jointly and severally agree that the Escrow Agent shall incur no liability whatsoever in connection with its good faith performance under this Agreement, and do hereby jointly and severally release and waive any claims we may have against Escrow Agent which may result from its performance in good faith of its function under this Agreement, including but not limited to, a delay in the electronic wire transfer of funds.  Escrow Agent shall be liable only for loss or damage caused directly by its acts of gross negligence or willful misconduct while performing as Escrow Agent under this Agreement.

B.     The Escrow Agent shall be entitled to rely upon the authenticity of any signature and the genuineness and validity of any writing received by Escrow Agent relating to this Agreement.  Escrow Agent is not responsible for the nature, content, validity or enforceability of any of the escrow documents except for those documents prepared by Escrow Agent.

C.     In the event of any disagreement between the parties hereto resulting in conflicting instructions to, or adverse claims or demands upon the Escrow

2

**Blue Hill
1845**

CONFIDENTIAL

Agent with respect to the release of the escrow funds or the escrow documents, the Escrow Agent may refuse to comply with any such instruction, claim or demand so long as such disagreement shall continue and in so refusing the Escrow Agent shall not release the escrow funds or the escrow documents. The Escrow Agent shall not be or become liable in any way for its failure or refusal to comply with any such conflicting instructions or adverse claims or demands and it shall be entitled to continue to refrain from acting until such conflicting instructions or adverse claims or demands (a) shall have been adjusted by agreement and it shall have been notified in writing thereof by the parties hereto, or (b) shall have finally been determined in a court of competent jurisdiction.

D.    The Escrow Agent may at its sole discretion resign by giving (30) days written notice thereof to the parties hereto. The parties shall furnish to the Escrow Agent written instructions for the release of the escrow funds and escrow documents. If the Escrow Agent shall not have received such written instructions within the thirty (30) days, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor Escrow Agent and upon such appointment deliver the escrow funds and escrow documents to such successor. Costs and fees incurred by the Escrow Agent shall be paid equally by DST and BHOP.

E.    The parties hereto do hereby certify that they are aware that the Federal Deposit Insurance Corporation ("FDIC") coverages apply only to a cumulative maximum amount of $100,000 for each individual deposit for all of the depositor's accounts at the same or related institution. The parties hereto further understand that certain banking instruments such as, but not limited to, repurchase agreements and letters of credit are not covered at all by FDIC insurance.

F.    Further the parties hereto approve of Escrow Agent maintaining the account for holding of funds hereunder with State Street Bank and Trust Company. The parties hereto further understand that Escrow Agent assumes no responsibility for, nor will the parties hereto hold Escrow Agent liable for, a loss occurring which arises from the fact that the amount of the above account may cause the aggregate amount of any individual depositor's accounts to exceed $100,000 and that the excess amount is not insured by the Federal Deposit Insurance Corporation or that FDIC insurance is not available on certain types of bank instruments.

3.    <u>Notice of Dismissal, Releases and DST Payment.</u>  Simultaneously with the execution hereof (i) the parties shall execute and deliver to the Escrow Agent the Notice of Dismissal of Appeal, a copy of which is annexed hereto as Exhibit A (the "Notice") and the Releases as set forth in Exhibit B-1 (from DST to BHOP), Exhibit B-2 (from BHOP to DST), Exhibit B-3 (from the Blueview Seller to BHOP), and Exhibit B-4 (from BHOP to the Blueview Seller) (the "Releases")

<div align="center">3</div>

Blue Hill
1846

**CONFIDENTIAL**

to be held and disposed of pursuant to the terms hereof and (ii) DST shall make the DST Payment in escrow to the Escrow Agent, to be held and disbursed pursuant to the terms hereof.

4.    Disbursal from Escrow.  On the date the Escrow Payment is required by the first sentence of paragraph 1, above, to be released to BHOP, DST and BHOP shall instruct the Escrow Agent to deliver the DST Payment to BHOP, the Releases to the party being released thereby, and the Notice of Dismissal to DST, whereupon DST shall file the Notice of Dismissal with the Court. The deliveries described in this Section are collectively referred to as the "Disbursal." Notwithstanding the foregoing, the Releases from the Blueview Seller to BHOP and BHOP to the Blueview Seller shall be released only upon DST's acquisition of the Blueview Property and the agreements herein of DST applicable to the Blueview Property becoming effective.

5.    Acquisition of Blueview Property.  DST shall exercise its best efforts to close on its acquisition of the Blueview Property pursuant to the Purchase and Sale Agreement.  If a Title Condition or Excused Non-Purchase occurs, DST shall exercise its best efforts under the Purchase and Sale Agreement to require Blueview Seller to convey to it the Blueview Property in accordance with the terms of the Purchase and Sale Agreement.  If, despite such efforts, DST is not successful in so acquiring the Blueview Property on or before March 1, 2004, or if an Excused Non-Purchase occurs, DST shall have the right exercisable through 5:00 p.m. on March 1, 2004, to cause the Disbursal to occur, failing which each of DST and BHOP shall have the right (but not the obligation) to direct the Escrow Agent to return the DST Payment to DST, whereupon the Escrow Agent shall destroy the Notice of Dismissal and the Releases and this Agreement shall be of no further force or effect.  DST shall promptly direct Disbursal upon its acquisition of the Blueview Property pursuant to the Purchase and Sale Agreement.

6.    Joinder by the Blueview Seller.  The Blueview Seller joins in this Agreement solely for the purpose of (a) confirming its agreement to execute the Release required by Paragraph 3 above, (b) agreeing diligently to pursue closing its sale of the Blueview Property to DST pursuant to the Purchase and Sale Agreement and agreeing to keep BHOP advised of its progress with respect thereto, including advising BHOP of any issues it believes are likely to impair or cause postponement of that closing beyond September 2, 2003, (c) agreeing to timely and in all events on or before September 2, 2003, be ready, willing and able to deliver to DST such title as satisfies the Title Condition, (d) confirming that the Blueview Seller is not aware of any circumstance, fact or condition which would preclude or postpone either DST from acquiring the Blueview Property or the Blueview Seller's ability to convey the Blueview Property to DST timely on or before September 2, 2003 in accordance with the terms of the Purchase and Sale Agreement, and (e) agreeing to expend the efforts, subject to any limiting or monetary conditions set forth in the Purchase and Sale Agreement as presently outstanding to (i) cause the Blueview Seller's obligations under this paragraph to be satisfied and (ii) to prevent there being an Excused Non-Purchase.

7.    Future Development.

A.    DST, with respect to and upon its purchase of the Blueview Property, and BHOP with respect to the 150 Property, acknowledges that from time to time they, or their successors and assigns, may pursue variances, permits or other approvals from any local, state or other permit granting or other authorizing

4

Blue Hill
1847

CONFIDENTIAL

agency or authority for additional construction or improvements upon or modification to then existing improvements upon the Blueview Property and/or the 150 Property, respectively, provided, however, such future development is principally (at least 75% based upon rentable area) for one or more of the following uses: office, research and development, medical or clinical principally out-patient facility, assembly, distribution or light manufacturing of products not in the ordinary course considered to cause a significant environmental risk to its abutters ("Future Development").

B.    DST agrees that it will not take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent BHOP from obtaining any permit or approval now or hereafter reasonably necessary for Future Development upon the 150 Property including, without limitation, not bringing any lawsuit, action, appeal or administrative proceeding and not influencing or encouraging any lawsuit, action, appeal or administrative proceeding to oppose, obstruct, interfere with or object to issuance or approval of any such permit or approval.

C.    BHOP agrees that it will not take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development of the Blueview Property including, without limitation, not bringing any lawsuit, action, appeal or administrative proceeding and not influencing or encouraging any lawsuit, action, appeal or administrative proceeding to oppose, obstruct, interfere with or object to issuance or approval of any such permit or approval.

D.    The provisions of this Paragraph 7 will be valid for ten (10) years from the date of this Agreement.

8.    Further Agreements.

A.    In connection with development of the Parking Garage, DST agrees that it shall not seek any material modification or material change to the locations, size or finish of the Parking Garage or the height of that structure from the plan therefor entitled "Blueview Corporate Center – Proposed Parking Structure" prepared by Vanasse Hangen Brustlin, Inc. and dated April 19, 2003, revised May 18, 2003 (the "Site Plans") without first obtaining prior written approval from BHOP, which is not to be unreasonably withheld, delayed or conditioned.

B.    DST agrees (i) to include within its final Parking Garage landscaping plan the plantings and trees depicted on the plan entitled "Landscape Plan", being one of the Site Plans to provide street-level screening of the Parking Garage from the 150 Property, (ii) to thereafter maintain those plantings and landscape improvements, (iii) to restrict parking on the top level of the Parking Garage

5

Blue Hill
1848

CONFIDENTIAL

to daily transient passenger vehicles (including sports utility vehicles) for Blueview Property employees, patrons and invitees, and (iv) to the extent snow is accumulated on the top level of the Parking Garage, it shall be removed or generally disbursed along the entire top floor perimeter. DST shall accept reasonable suggestions from BHOP with respect to the landscaping to screen the Parking Garage from the 150 Property. Subject to contrary direction by any one or more governmental authorities having jurisdiction thereover, DST also shall prune any trees planted on the Green Street side of the Parking Garage to a height at or below the highest level of the Parking Garage.

C.    DST shall accept reasonable suggestions from BHOP with respect to lighting of the Parking Garage such as to avoid creation of any significant ambient lighting beyond the Parking Garage or glare from such lighting into or onto any buildings situated upon the 150 Property.

. D.    (Intentionally deleted.)

E.    Each of the parties signatory hereto agrees that its execution, delivery and performance of this Agreement have been duly authorized by all requisite actions and that this Agreement constitutes a legal, valid and binding obligation of it, enforceable against it in accordance with the terms set forth herein, without requiring any additional or precedent approval or other authorization.

F.    The Blueview Seller and DST agree not to terminate or otherwise modify the Purchase and Sale Agreement in a manner that may defeat the obligation or ability of DST to acquire the Blueview Property, or avoid DST's obligation to pay the DST Payment to BHOP hereunder. The Blueview Seller and DST agree that neither shall assign their rights under the Purchase and Sale Agreement; however, DST may designate an entity controlled by, or in common control with, DST, as the purchaser, in which event such designation or assignment shall obligate its designee or assignee to become jointly and severally bound by, and obligated for all of the agreements of DST set forth in this Agreement, and, in that event, the term "DST" herein shall include both DST and its designee or assignee, jointly and severally.

G.    Interest. All interest earned on the DST Payment prior to September 1, 2003 while held in escrow by the Escrow Agent shall be paid to DST, and all interest earned thereon from and after September 1, 2003 if the DST Payment is held in escrow by the Escrow Agent at that time, shall be paid to BHOP.

H.    (Intentionally deleted.)

I.    Rights Following Termination Without Payment. Should this Agreement be terminated without BHOP being entitled to receive the DST Payment, the

6

Blue Hill
1849

CONFIDENTIAL

rights of the parties concerning the Appeal shall return to *status quo ante*, with all parties reserving their rights in connection with the Appeal.

J.    No Further Action on Appeal. For so long as this Agreement remains in force and effect, no further action shall be taken in the Appeal by any of the parties hereto, except as required by Court order or applicable rules.

K.    Confidentiality. The terms of this Agreement are confidential, and shall not be disclosed without the parties' written consent to any person or entity other than the parties, their respective counsel and accountants, and any other persons to whom a party may have a legal duty to disclose the information. The parties shall be able to disclose that the Appeal has been settled. In the event that a party is required by subpoena or order, judgment, or decree of a court of competent jurisdiction or similar judicial tribunal to disclose the existence, terms, or contents of this Agreement, it shall, prior to such disclosure, promptly notify each party.

L.    Representations and Warranties. Each party to this Agreement represents and warrants to each other party to this Agreement that:

    a.    the parties signatory hereto represent and warrant that each has all requisite power and authority to execute, deliver and perform this Agreement and to implement the transactions contemplated hereby.

    b.    it had the opportunity to consult with the counsel of its choice about the terms and effect of this Agreement;

    c.    its execution, delivery, and performance of this Agreement, the consummation of the transactions contemplated hereby and its compliance with the provisions hereof will not violate any provisions of its articles or certificate of incorporation or bylaws or conflict with any law, rule, regulation, contract, or other instrument by which it or any of its assets is bound; and,

    d.    no consent, approval, or authorization of, or declaration to or filing with, any person is required for the valid authorization, execution, and delivery by it of this Agreement or for their consummation of the transactions contemplated hereby which has not been obtained prior to the date hereof.

M.    Counterparts. This Agreement may be executed in multiple originals, each of which is equally admissible in evidence and shall be one and the same instrument. This Settlement Agreement shall not take effect until each party has signed a counterpart.

N.    Jurisdiction. This Agreement and the agreements and obligations of the parties hereto shall be governed by and enforced and construed in accordance

7

Blue Hill
1850

**CONFIDENTIAL**

with, the laws of the Commonwealth of Massachusetts. Any action at law or
in equity arising out of or relating to this Agreement shall be filed only in the
Superior Court of Suffolk County Massachusetts, and the parties hereby
consent and submit to the personal jurisdiction of that court for the purpose of
litigating any such dispute.

O. <u>Waiver</u>. The parties hereto waive all right to trial by jury, and expressly
agree to bear their own cost of such litigation including, but not limited to,
attorneys' fees; provided, however, to the extent a party is held to have
breached its agreements herein, that party in breach shall be responsible to
pay and reimburse the other party(ies) for its reasonable legal fees and costs
incurred in that proceeding.

9. <u>Binding Agreement.</u> This Agreement shall be binding upon and inure to the benefit
to the parties signatory hereto and their respective successors and assigns. Not in limitation of the
foregoing, the parties acknowledge that DST intends DST Realty of Massachusetts, Inc., ("DST
MA") an affiliate of DST, to take title to the Blueview Property pursuant to the Purchase and Sale
Agreement and all references to "DST" in this Agreement shall mean DST and DST MA, jointly
and severally.

10. <u>Amendment.</u> This Agreement may not be altered, amended or otherwise modified in
any respect except by writing duly signed by the party or parties in which enforcement is being
sought.

11. <u>Integration.</u> This Agreement, including the deliveries required hereunder constitute
the entire understanding and agreement among the parties signatory hereto and supersedes all prior
negotiations or other proposed agreements whether written or oral with respect to the matters
included herein. In construing the foregoing, this Agreement is not intended to, nor shall it alter or
otherwise address or modify any lease or lease relationship applicable to all or any portion of the
150 Property.

12. <u>Notice.</u> Any notice required by this Agreement shall be writing and made by hand
delivery, by certified mail postage and certified charges prepaid, or by overnight national courier
such as FedEx, addressed to the parties as follows:

A.   If to BHOP, then to         Blue Hills Office Park LLC
                                 c/o Fineberg Management Company
                                 One Washington Street, Suite 400
                                 Wellesley, MA 02481
                                 Attn.: Gerald S. Fineberg, President

     with a copy to:

                                 Kenneth M. Goldberg, Esq.
                                 Bernkopf, Goodman & Baseman LLP
                                 125 Summer Street, Suite 1300
                                 Boston, MA 02110

8

**Blue Hill
1851**

CONFIDENTIAL

B.    If to DST, then to          DST Realty, Inc.
                                  333 West Eleventh Street
                                  Kansas City, MO 64105-1639
                                  Attn. Thomas R. McGee, President

      with a copy to:

                                  Donald E. Vaughan, Esq.
                                  Burns & Levinson LLP
                                  125 Summer Street
                                  Boston, MA 02110

C.    If to the Blueview Seller,
                    then to      c/o National Development
                                  2310 Washington Street
                                  Newton Lower Falls, MA 02462
                                  Attn: Theodore R. Tye,
                                  Executive Vice President

      with a copy to:

                                  Robert A. Fishman, Esq.
                                  Nutter, McClennen & Fish LLP
                                  155 Seaport Blvd
                                  Boston, MA 02210


                        [INTENTIONALLY BLANK]

Settlement Agreement with EXHIBITS of Releases B-1 through B-4 attached AS SENT BY DONALD VAUGHAN

                                                        Blue Hill
                                                           1852

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned have signed this Agreement under seal as of the day and year first above-written.

| | |
|---|---|
| "BHOP" | Blue Hills Office Park LLC<br>By:  Blue Hills Management Corp.,<br>its  Manager |

By:  *Gerald S. Fineberg* (signature)
Name:  Gerald S. Fineberg
Title:  President & Treasurer

| | |
|---|---|
| "DST" | DST Realty, Inc. |

By:  _____
Name:
Title:

| | |
|---|---|
| "BLUEVIEW SELLER" | Blueview Corporate Center, LLC |

By:    ND-Blueview Corporate
        Center LLC, Its Manager
By:    NDNE 9/90, Inc., its Manager

By:  _____
        Theodore R. Tye
        Executive Vice President

| | |
|---|---|
| "ESCROW AGENT" | Lawyers Title Insurance Corporation |

By:  _____
Name:
Its:

10

Blue Hill
1853

# EXHIBIT 30

EXHIBIT
Donovan
23
KC 2/14/06

# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:   Blue Hills Office Park LLC
      Loan #76-0990083

Dear Mr. Parish,

    A request is hereby made for a withdrawal of $412,833.43 from the cash flow
sub-account on this loan to be used to pay principal and interest as well as the advance
the money due to pay real estate taxes. We have yet to receive real estate taxes from the
tenant for the period of time that they were still in the building. Once received, we will
deposit those sums into the operating account for you to sweep. Listed below is a
breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

|                   |              |
|-------------------|-------------:|
| Principal         | $ 20,853.30  |
| Interest          | 233,798.94   |
| Real Estate Taxes | 158,181.19   |
|                   | $412,833.43  |

cc:   K. Goldberg, Esq.

**Blue Hill 1229**

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

EXHIBIT 31

# fineberg management, inc.



August 5, 2004

SENT VIA:   Facsimile  1-925-691-5249

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

RE:   Blue Hills Office Park LLC
      Loan #76-0990083

Dear Mr. Parish,

   This letter is being sent to officially notify you that the tenant has fully vacated
the building and at this time no replacement tenant has been found.  Therefore, we
request a meeting with the lender to discuss the loan status and the future performance of
the loan.

   Based on our past experience, any decisions regarding the loan would need the
approval of the Special Servicer; therefore, we request that the Special Servicer attend the
meeting as well.  Please let us know who the Special Servicer is and if we need to notify
them or if you will handle that yourself.

Sincerely,

Joseph A. Donovan
CFO


cc:   K. Goldberg, Esq.

                              Blue Hill 1249

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

EXHIBIT 32

 

One Washington Street, Suite 402
Wellesley, Massachusetts 02481
Tel: 781-431-1108 • Fax: 781-431-7130

## FAX TRANSMITTAL

TO: _____ Curt Mallegni          415-975-7236

COMPANY NAME: _____ Wells Fargo

DATE: _____ August 13, 2004

FROM: _____ Joe Donovan

TRANSMITTED BY: _____ Carol Falvey

NUMBER OF PAGES (Including cover): ___3___

COMMENTS: _____ Sorry we have been missing each other on the phone.

_____ I would like to get the special servicer involved.

_____ Attached are the recent correspondence.

The information contained in this facsimile message is legally privileged and confidential information intended only for the use of the individual or entity named above. If the recipient of this message is not the named recipient, you are hereby notified that any dissemination, distribution or copy of this telecopy is strictly prohibited. If you have received this telecopy in error please immediately notify us by telephone and return the original message to us at the address above via the United States Postal Service. Thank you.

Blue Hill 1245

# fineberg management, inc.

August 5, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

This letter is being sent to officially notify you that the tenant has fully vacated the building and at this time no replacement tenant has been found.  Therefore, we request a meeting with the lender to discuss the loan status and the future performance of the loan.

Based on our past experience, any decisions regarding the loan would need the approval of the Special Servicer; therefore, we request that the Special Servicer attend the meeting as well.  Please let us know who the Special Servicer is and if we need to notify them or if you will handle that yourself.

Sincerely,

Joseph A. Donovan
CFO

cc:   K. Goldberg, Esq.

Blue Hill 1246

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

# fineberg management, inc.

August 2, 2004

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA 94520

RE:    Blue Hills Office Park LLC
       Loan #76-0990083

Dear Mr. Parish,

A request is hereby made for a withdrawal of $412,833.43 from the cash flow sub-account on this loan to be used to pay principal and interest as well as the advance the money due to pay real estate taxes. We have yet to receive real estate taxes from the tenant for the period of time that they were still in the building. Once received, we will deposit those sums into the operating account for you to sweep. Listed below is a breakout of the money requested.

Sincerely,

Joseph A. Donovan
CFO

| | |
|---|---|
| Principal | $ 20,853.30 |
| Interest | 233,798.94 |
| Real Estate Taxes | 158,181.19 |
| | $412,833.43 |

cc:   K. Goldberg, Esq.

Blue Hill 1247

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

P. 1

* * * COMMUNICATION RESULT REPORT ( AUG.13.2004  1:08PM ) * * *

TTI  FINEBERG MANAGEMENT

| FILE | MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|------|------|--------|-----------------|--------|------|
| 911 | MEMORY TX | | 14159757296 | OK | P. 3/3 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

# Fine Hotels CORP

One Washington Street, Suite 402
Wellesley, Massachusetts 02481
Tel: 781-431-1108 • Fax: 781-431-7130

## FAX TRANSMITTAL

**TO:** Curt Mallegni          415-975-7236

**COMPANY NAME:** Wells Fargo

**DATE:** August 13, 2004

**FROM:** Joe Donovan

**TRANSMITTED BY:** Carol Falvey

**NUMBER OF PAGES (including cover):** 3

**COMMENTS:** Sorry we have been missing each other on the phone.

Blue Hill 1248

EXHIBIT 33



Recd 10-25-04

# Piper Rudnick

One International Place, 21st Floor
Boston, Massachusetts 02110-2600
*main* 617.406.6000 *fax* 617.406.6100

BRUCE S. BARNETT
bruce.barnett@piperrudnick.com
*direct* 617.406.6002

October 21, 2004

RETURN RECEIPT REQUESTED
and FIRST CLASS MAIL

Blue Hills Office Park LLC
Mr. Gerald S. Fineberg (Cert. Mail No. 7001 1940 0004 9583 6096)
Mr. Joseph A. Donovan (Cert. Mail No. 7001 1940 0004 9583 6102)
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

Mr. William J. Langelier (Cert. Mail No. 7001 1940 0004 9583 6119)
c/o The Langelier Company
2045 Jackson Street
Suite 501
San Francisco, California 94109

Re:    Notice of Intention to Foreclose and Deficiency after Foreclosure of Mortgage

Gentlemen:

You are hereby notified in accordance with Massachusetts General Laws, Chapter 244, § 14 and Chapter 244, §17B, of the intention of CSFB 1999-C1 Royall Street, LLC (the "Bank"), assignee of JP Morgan Chase Bank (formerly known as The Chase Manhattan Bank) as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, to foreclose under Power of Sale for breach of condition, the mortgage now held by the Bank on property located at 150 Royall Street, Canton, Massachusetts (the "Property"), given by Blue Hills Office Park LLC to Credit Suisse First Boston Mortgage Capital LLC, dated as of September 14, 1999 and recorded at the Norfolk County Registry of Deeds on September 15, 1999 in Book 13733, Page 428, to secure a certain Mortgage Note made by Blue Hills Office Park LLC, for the whole, or part, of which you may be liable to the Bank in case of a deficiency in the proceeds of the foreclosure sale.

*Piper Rudnick LLP*

**Blue Hill 1221**





SCANNED

30647-18    BB12200

Blue Hills Office Park LLC
Mr. Gerald S. Fineberg
c/o Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

7001 1940 0004 9583 6096

iper Rudnick

ne International Place, 21st Floor
oston, MA 02110-2613

Blue Hill 1222

**Piper Rudnick**

Mr. Gerald S. Fineberg
Mr. Joseph A. Donovan
Mr. William J. Langelier
October 21, 2004
Page 2

You are hereby notified of the foreclosure sale of the Property at 10:00 AM on Friday, November 12, 2004, all in accordance with the enclosed legal notice of mortgagee's sale of real estate.

Very truly yours,

CSFB 1999-C1 ROYALL STREET, LLC, a
Delaware limited liability company

By: Lennar Massachusetts Partners, Inc., its
Manager

By: Piper Rudnick LLP, its attorney,

By: _Bruce S. Barnett_

cc:    Stephen E. Nolan, Esq.
       E. Randolph Tucker, Esq.
       Staci Rutman
       Joseph Polcari
       Jeffrey Watkin, Esq.

Blue Hill 1223

~BOST1:311073.v1

Page 12

10/14

canton citizen
10/14/04

Blue Hill 1224

## LEGAL NOTICE
## MORTGAGEE'S SALE OF REAL ESTATE

By virtue and in execution of the POWER OF SALE contained in a certain mortgage from BLUE HILLS OFFICE PARK LLC, to CREDIT SUISSE FIRST BOSTON MORTGAGE CAPITAL LLC, dated as of September 14, 1999 and recorded with Norfolk County Registry of Deeds (the "Records") in Book 13733, Page 428, of which mortgage the undersigned is the present holder, for breach of conditions contained in said mortgage and for the purpose of foreclosing, the same will be sold at Public Auction at 10:00 A.M. on the 12th day of November, 2004, at the mortgaged premises located at 150 Royall Street, Canton, Massachusetts, all and singular the premises described in said mortgage, to wit:

The land situated in Canton, Norfolk County, Massachusetts shown as Lot "C" on a plan entitled "Plan of Land Canton, Massachusetts" dated December 9, 1972, by Universal Engineering Co. recorded with Norfolk County Registry as Plan 48 of 1972 in Plan Book 230 (hereinafter the "Plan") and being more particularly bounded and described as follows:

NORTHERLY and NORTHWESTERLY by Royall Street two hundred thirty and no/100 (230.00) feet;

NORTHEASTERLY by Parcel A as shown on said Plan, by two (2) lines measuring, respectively, six hundred twenty-five and 82/100 (625.82) feet and two hundred ...

NORTHWESTERLY by Parcel A as shown on said Plan, one hundred ... (100.00) feet;

NORTHEASTERLY by Parcel ... (32/100 (709.37) ...

EASTERLY by ... Highway (Route ... four hundred sixteen and 18/...

SOUTHWESTERLY by Green Street seven hundred sixty-six and ... (766.12) feet;

NORTHWESTERLY by land now ... ... hundred forty-nine and 70/100 (249.67) feet;

WESTERLY by land of said ... two hundred three and 57/100 ...

NORTHWESTERLY by land of ... two (2) lines, respectively, eighty ... and one hundred thirteen ...

... now in force and ... the benefit of all ... easements, encumbrances ... restrictions and other ... appearing of record and ... the mortgage ...

described herein, if any.

The premises to be sold shall also be subject to all leases and tenancies, if any there may be, having priority over said mortgage, to tenancies or occupation by persons on the premises now or at the time of said auction which tenancies or occupation are subject to said mortgage, to rights or claims in personal property installed by tenants or former tenants now located on the premises and also to all laws and ordinances including, but not limited to, all building, zoning and environmental laws and ordinances.

TERMS OF SALE: Fifty Thousand and no/100 Dollars ($50,000.00) shall be paid in cash or by certified or bank cashier's check by the purchaser at the time and place of sale.

The balance of the purchase price on a sale shall be paid in cash or by certified bank or cashier's check in or within thirty (30) days thereafter at the offices of Piper Rudnick LLP, One International Place, Boston, Massachusetts. The successful bidder and/or bidders shall be required to sign a Memorandum of Terms of Sale containing the above terms at the Auction Sale.

The Mortgagee reserves the right to postpone the sale to a later date by public proclamation at the time and date appointed for the sale and to further postpone at any adjourned sale date by public proclamation at the time and date appointed for the adjourned sale date.

In the event that the successful bidder at the foreclosure sale shall default in purchasing the within described property according to the terms of this Notice of Sale and/or terms of the Memorandum of Sale executed at the time of foreclosure, the Mortgagee reserves the right to sell the property by foreclosure deed to the second highest bidder provided that said second highest bidder shall deposit with Mortgagee's attorneys, Piper Rudnick LLP, the amount of the required deposit as set forth herein within three (3) business days after written notice of the default of the previous high bidder and title shall be conveyed to the said second highest bidder within thirty (30) days of said written notice.

Other terms to be announced at the time and place of the sale.

CSFB 1999-C1 ROYALL STREET LLC, a Delaware limited liability company, present holder of said mortgage
by: Lennar Massachusetts Partners Inc., a Massachusetts corporation, its Manager
By: Piper Rudnick LLP, its attorney
By:

Bruce S. Barnett
Piper Rudnick LLP
One International Place
Boston, Massachusetts 02110
(617) 406-6000

## Grave Intentions wil

EXHIBIT 34


## LENNAR PARTNERS
An LNR Company

September 17, 2004

```
┌──────────────────────┐
│  EXHIBIT 52          │
│  Polcari             │
│  2/28/06      ttb    │
└──────────────────────┘
```

BY FEDERAL EXPRESS

Mr. Joseph A. Donovan
Chief Financial Officer
Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, Massachusetts 02481

     Re:    <u>Blue Hills Office Park LLC Loan No. 76-0990083</u>

Dear Mr. Donovan:

       The above-referenced loan has been transferred to Lennar Partners as special servicer and in that connection, we have received copies of your letters of August 2, 2004 and September 2, 2004 to Mr. Tim Parish of the Property Tax Department at Wells Fargo Commercial Mortgage Servicing. Following are our responses to your letters.

       First, you requested in your August 2 letter that the sum of $158,181.19 be advanced from the "cash flow sub-account" on deposit with the mortgagee in order to pay the real estate taxes due on August 2, 2004. We interpret your letter as a request under Section 6(c)(ix) of the Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 14, 1999 (the "Mortgage"). Pursuant to that section, however, releases from the Leasing Escrow Funds may only be made for "payment of principal and interest then due and payable on the Note". The withdrawal of funds from the Leasing Escrow Fund for payment of real estate taxes is not permitted under the Mortgage.

       Furthermore, under Section 5 of the Mortgage, the mortgagor is required timely to pay real estate taxes. Section 6(a) of the Mortgage provides for monthly deposits of real estate taxes in the Tax and Insurance Impound Fund, provided that so long as the "Bank of Boston Lease" remained in full force and effect, the Mortgagor was permitted to pay real estate taxes on a quarterly basis. The quarterly deposit of real estate taxes due on August 1, 2004 was not timely made and, furthermore, it is our understanding that the "Bank of Boston Lease" is no longer in full force and effect. In any event, the failure by the mortgagor either to make the quarterly escrow deposit on August 1, 2004 or to pay the quarterly installment of real estate taxes due on August 2, 2004 constituted an Event of Default under the Mortgage. The quarterly installment of taxes was made by the mortgagee out of its own funds in order to protect the mortgagee's collateral.

       Your letter of August 2 also requested a withdrawal of $254,652.24 from the Leasing Escrow Funds for payment of monthly principal and interest. Section 6(c)(ix) of the Mortgage

--BOST1:308070.v2

Joseph A. Donovan
September 17, 2004
Page 2

permits such application of Leasing Escrow Funds up to the so-called "Interim Reduction Amount", but only on certain conditions. One such condition is that no Event of Default shall have occurred and be continuing as of the date of the request for such disbursement. As described above, the loan was already in default at the time of your request due to the failure to make the quarterly tax payment then due. Furthermore, as described above, the Leasing Escrow Funds are only permitted to be used for payment of principal and interest then due and, accordingly, the loan was also in default upon mortgagor's failure to make payments of $11,921.89 on account of the insurance escrow and $67,054.42 on account of reserves and Mortgagor's failure to make a monthly tax escrow payment since the "Bank of Boston Lease" was no longer in full force and effect as of the August 11 payment date.

Your September 2, 2004 letter made a similar request for a withdrawal of $254,652.24 from the Leasing Escrow Funds to pay principal and interest due on September 11. Again, that request cannot be honored due to the above-described Events of Default. Furthermore, as stated above, the application of such funds to principal and interest leaves an outstanding payment obligation due on September 11 to cover taxes, insurance and reserves.

Please be advised that as a result of the above-described Events of Default, the above-referenced loan has been accelerated and that the Debt, including all sums due under the Note and the other Loan Documents, is immediately due and payable.

Sincerely,

Joseph A. Polcari
Asset Manager

LNR03917

EXHIBIT 35

# fineberg management, inc.

September 2, 2004



EXHIBIT 54

Polcari

Hb    2/28/06

Mr. Tim Parish
Property Tax Department
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Road, Suite 205
Concord, CA  94520

    RE:    Blue Hills Office Park LLC
           Loan #76-0990083

Dear Mr. Parish,

      A request is hereby made for a withdrawal of $254,652.24 for the month of September from the cash flow sub-account on this loan to be used to pay principal and interest.   Attached is last month's letter.  As stated in the letter we did receive approximately one month's real estate tax from the tenant for $51,799.44 which was deposited and promptly swept by Wells Fargo; therefore, I assume that you have made the real estate tax payment to the town of Canton, MA.

      Listed below is a breakdown of the principal and interest payment as we calculated it.

      If you need any further information, please feel free to contact me.

            Principal      $ 20,853.30
            Interest        233,798.94
                           $254,652.24

Sincerely,

Joseph A. Donovan
CFO

Cc:    Kenneth Goldberg
       Job Warshaw, Lennar Partners

Blue Hill 1228

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

EXHIBIT 36



**LENNAR PARTNERS**
An LNR Company

EXHIBIT 59
Polcari
2/28/06    ttb

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

Re:     Portfolio:            CS First Boston Mortgage, Series 1999-C1
        Loan to:              Blue Hills Office Park LLC
        Property Address:     150 Royall Street, Canton, MA 02021
        Loan No.:             76-0990083

Dear Borrower:

As a result of certain event(s) transpiring regarding your loan, certain servicing responsibilities have been transferred to Lennar Partners, Inc. as special servicer for JP Morgan Chase Bank, as Trustee for Credit Suisse First Boston Mortgage Securities Corp., Series 1999-C1.

I will be contacting you soon, as the Lennar Partners' asset manager assigned to your loan. In the meantime, if you have any questions or need any assistance with respect to your loan, you may contact me at (305) 695-5600, or write to me at the address provided below.

In addition, until further notice, inquires, requests and other correspondence relating to your loan should be made and addressed to my attention at the address below. All payments will continue to be made in the same manner as previously done before the transfer of your loan to Lennar, unless you are otherwise notified differently.

Thank you for your cooperation and we look forward to a successful working relationship.

Sincerely,

Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

cc:     Debra Rudder — Wells Fargo Commercial Mortgage Servicing
        Patricia Prince — Lennar Partners/Servicing Dept.

Blue Hill 0481

EXHIBIT 37



**LENNAR PARTNERS**
An LNR Company

> **EXHIBIT** 60
> Polcari
> 2/28/06    ttb

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

RE: Loan in the original principal amount of $33,149,000.00 (the "Loan") to Blue Hills Office
   Park LLC (the "Borrower") held by JP Morgan Chase Bank, as trustee (the "Trustee")
   **Portfolio:**    **CS First Boston Mortgage, Series 1999-C1**
   **Loan No.:**    **76-0990083**

Dear Borrower:

Lennar Partners, Inc. (the "**Special Servicer**") is the Special Servicer with respect to the Loan
and has the authority, on behalf of the Trustee, to discuss and to meet with representatives of the
Borrower to review the status of the Loan and any issues arising under any of the documents
relating to the Loan (the "**Loan Documents**").

   We have agreed to discuss with your representatives the status of the Loan and the Loan
Documents provided that the following agreements and understandings govern. In order to ensure
that our discussions will be as open and productive as possible, we wanted to write to you to
confirm our mutual understanding that all discussions and/or negotiations will be governed by
the terms and conditions in this letter. If you are in agreement with such terms and conditions, we
would appreciate you acknowledging such by signing this letter in the space provided and
returning it to us.

1. **Negotiations.**   The Borrower and the Special Servicer agree that any discussions,
   negotiations, correspondence or other communications relating to the Loan and the Loan
   Documents that the Borrower may have in the future or may have had with representatives of
   Wells Fargo Commercial Mortgage Servicing, the Master Servicer (the "**Master Servicer**"),
   or the Special Servicer, (any such discussions, negotiations or correspondence or other
   communications being hereinafter referred to as "**Loan Communications**") are not binding
   upon any of the Borrower, the Trustee, or Special Servicer (collectively the "**Parties**"). The
   Borrower also acknowledges and agrees that none of the Trustee, the Master Servicer or the
   Special Servicer is under any obligation to consent or otherwise agree to any Borrower
   request with respect to the Loan, or to modify the Loan or the Loan Documents. Each of the
   Parties understands and agrees that no Party shall have any defense to any action by one or
   more of the other Parties, nor assert any waiver by one or more of the other Parties, based on
   any Loan Communications.

2. **Releases.**   The Parties hereby completely, irrevocably and unconditionally release and
   forever discharge each of the Parties from any and all claims and demands whatsoever, in
   law or equity, whether such claims are presently known or unknown, direct or indirect, fixed
   or contingent, which the Parties may have or may claim to have against the other caused by,
   or arising out of any Loan Communications.

3. **No Waivers.** Each of the Parties acknowledge and agree that participation in the Loan Communications does not constitute by any Party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, of such Party under the Loan Documents, (b) a waiver or the release of any defaults under the Loan or the Loan Documents, or (c) a waiver, consent, release or modification of any right or remedy under any provision of the Loan Documents. None of the Parties intends to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties further understand and agree that no failure or delay in exercising any right or remedy with respect to the Loan or under the Loan Documents shall constitute a waiver of, or affect adversely in any manner, any of such rights and remedies nor shall any such failure or delay form the basis for any claim or cause of action.

4. **Only Written Agreements.** The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

5. **Authority.** The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. The Special Servicer represents and warrants that it is empowered to act on behalf of the Trustee under the Loan Documents in the capacity of attorney-in-fact, and the person signing this Agreement on behalf of Special Servicer hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Trustee. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.

6. **Expenses.** The Borrower agrees that it shall pay all costs of the Special Servicer in connection with Loan Communications, including but not limited to expenses for inspection of the property, legal fees and the fees of other professionals.

7. **Advice from Independent Counsel.** The Borrower acknowledges that independent counsel represents the Borrower, or if not so represented, that Borrower has been advised to obtain representation by independent counsel, and has fully reviewed the terms of this Agreement. Borrower acknowledges that Borrower executes this Agreement, based on its own independent judgment, on the advice of counsel, if represented, and is under no threat, coercion or duress from any Party.

8. **Settlement Negotiations.** Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor to be admissible as evidence in any administrative or judicial proceeding (i) between the Trustee, Borrower

Blue Hill 0483

and/or Special Servicer, or (ii) involving any of the Loan Documents or any of the property securing the Loan. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be used in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the Parties.

9.     **Information Request.**  In order to enable the Special Servicer to properly evaluate the Borrower's request, the Borrower agrees to forward to the Special Servicer all the information checked on **Exhibit A**, which is attached hereto.

Additional information may be requested in the future.  Thank you for your attention to this matter.

Lennar Partners, Inc., as Special Servicer

By: _____
          Job Warshaw
          Sr. Vice President
          Real Estate Finance & Servicing Group
          Lennar Partners, Inc.

### ACKNOWLEDGED AND AGREED BY:

Borrower:     Blue Hills Office Park LLC

By: _____
          Name:
          Title:

NOTICE TO CONSUMER BORROWERS AS REQUIRED BY FEDERAL FAIR DEBT COLLECTION PRACTICES ACT:  We are attempting to collect debt and any information obtained will be used for that purpose.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID, SETTLED OR IS OTHERWISE NOT OBLIGATED:  Please be advised that this letter constitutes neither a demand of payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, has paid, settled or is otherwise obligated by law.

cc:     Debra Rudder – Wells Fargo Commercial Mortgage Servicing
          Pat Prince – Lennar Partners/Loan Servicing

**Exhibit A**

**Review Documentation**

1. Borrower Information

   ☑ A financial statement (balance sheet and income statements) of Borrower (including those of the individual members of the current Borrower) and guarantors, if any, prepared within 30 days of the date hereof, and as of year-end.

   ☑ Federal tax returns (signed copies) for the last two years (if applicable) for both Borrower and Guarantor (s) (if applicable).

2. Property Information

   ☑ Operating statements for the Property for the last 2 years and year-to-date (broken down by each month); Healthcare related properties should include detailed census data for each period.

   ☑ Current business plan for the Property, including the budget for this year, detailing revenue and expense projections, etc.

   ☑ Current rent roll with summary of lease expiration dates.

   ☑ Current census data describing the unit types, payment type, additional rents, detailed by tenant / unit.

   ☑ Operator / Management Agreement and resume of manager (current and any proposed revisions, if applicable).

   ☑ Any recent environmental assessments, structural or property inspection reports for the Property.

   ☑ Copies of all current leases, including related amendments and renewals.

   ☐ Sample copy of resident leases.

   ☑ Site Plan.

   ☑ Most recent tax bill on the Property

   ☑ A copy of the Certificate of Insurance for all insurance coverage(s) as required under the Loan Documents, along with a copy of the policy.

3. Other

   ☐ Copies of most recent regulatory surveys by state and/or local agencies showing that the facility is in compliance. Any noted defect(s) should be explained and proof provided of remediation of the defect(s).

   ☐ Copies of all licenses and/or permits required by the state or local authorities to operate the facility.

Blue Hill 0485

EXHIBIT 38

08/24/2004 TUE 13:58 FAX  305-695-5119                                    ☐001/006





**An LNR Company**

TO:            Gerald S. Fineberg

COMPANY:       Fineberg Management, Inc.

FAX NO.        (781) 239-1493

FROM:          Job Warshaw

RE:            Blue Hills Office Park

               LENNAR PARTNERS, an LNR Company
               1601 Washington Avenue
               7th Floor
               Miami Beach, Florida 33139
               Phone: (305) 695-5600   Fax: (305) 695-5601


DATE:          8/24/2004                    TIME:    1:45 PM
No. of Pages:       6        including transmittal sheet.

If you do not receive or can not read any of the pages, please call    Minerva Cruz
at (305) 695-5084.

If this is a facsimile message, it is privileged/confidential and as such intended for the use of the individual or the above. Any dissemination or copying is neither intended nor authorized unless by the person named herein or an If there is an error in transmission to the wrong entity, please promptly advise sender by telephone and return the to the above address. You will be reimbursed for postage.  Thank you for your cooperation.


                                                            Blue Hill 1232



**LENNAR PARTNERS**
An LNR Company

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

Re:    Portfolio:            CS First Boston Mortgage, Series 1999-C1
       Loan to:             Blue Hills Office Park LLC
       Property Address:     150 Royall Street, Canton, MA 02021
       Loan No.:            76-0990083

Dear Borrower:

As a result of certain event(s) transpiring regarding your loan, certain servicing responsibilities have been transferred to Lennar Partners, Inc. as special servicer for JP Morgan Chase Bank, as Trustee for Credit Suisse First Boston Mortgage Securities Corp., Series 1999-C1.

I will be contacting you soon, as the Lennar Partners' asset manager assigned to your loan. In the meantime, if you have any questions or need any assistance with respect to your loan, you may contact me at (305) 695-5600, or write to me at the address provided below.

In addition, until further notice, inquires, requests and other correspondence relating to your loan should be made and addressed to my attention at the address below. All payments will continue to be made in the same manner as previously done before the transfer of your loan to Lennar, unless you are otherwise notified differently.

Thank you for your cooperation and we look forward to a successful working relationship.

Sincerely,

Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

cc:    Debra Rudder – Wells Fargo Commercial Mortgage Servicing
       Patricia Prince – Lennar Partners/Servicing Dept.

                                                    Blue Hill 1233

# LENNAR PARTNERS
An LNR Company

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

RE:  Loan in the original principal amount of $33,149,000.00 (the "Loan") to Blue Hills Office
     Park LLC (the "Borrower") held by JP Morgan Chase Bank, as trustee (the "Trustee")
     Portfolio:      CS First Boston Mortgage, Series 1999-C1
     Loan No.:       76-0990083

Dear Borrower:

Lennar Partners, Inc. (the "Special Servicer") is the Special Servicer with respect to the Loan
and has the authority, on behalf of the Trustee, to discuss and to meet with representatives of the
Borrower to review the status of the Loan and any issues arising under any of the documents
relating to the Loan (the "Loan Documents").

        We have agreed to discuss with your representatives the status of the Loan and the Loan
Documents provided that the following agreements and understandings govern. In order to ensure
that our discussions will be as open and productive as possible, we wanted to write to you to
confirm our mutual understanding that all discussions and/or negotiations will be governed by
the terms and conditions in this letter. If you are in agreement with such terms and conditions, we
would appreciate you acknowledging such by signing this letter in the space provided and
returning it to us.

1.  **Negotiations.**  The Borrower and the Special Servicer agree that any discussions,
    negotiations, correspondence or other communications relating to the Loan and the Loan
    Documents that the Borrower may have in the future or may have had with representatives of
    Wells Fargo Commercial Mortgage Servicing, the Master Servicer (the "Master Servicer"),
    or the Special Servicer, (any such discussions, negotiations or correspondence or other
    communications being hereinafter referred to as "Loan Communications") are not binding
    upon any of the Borrower, the Trustee, or Special Servicer (collectively the "Parties"). The
    Borrower also acknowledges and agrees that none of the Trustee, the Master Servicer or the
    Special Servicer is under any obligation to consent or otherwise agree to any Borrower
    request with respect to the Loan, or to modify the Loan or the Loan Documents. Each of the
    Parties understands and agrees that no Party shall have any defense to any action by one or
    more of the other Parties, nor assert any waiver by one or more of the other Parties, based on
    any Loan Communications.

2.  **Releases.**  The Parties hereby completely, irrevocably and unconditionally release and
    forever discharge each of the Parties from any and all claims and demands whatsoever, in
    law or equity, whether such claims are presently known or unknown, direct or indirect, fixed
    or contingent, which the Parties may have or may claim to have against the other caused by,
    or arising out of any Loan Communications.

3. **No Waivers.** Each of the Parties acknowledge and agree that participation in the Loan Communications does not constitute by any Party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, of such Party under the Loan Documents, (b) a waiver or the release of any defaults under the Loan or the Loan Documents, or (c) a waiver, consent, release or modification of any right or remedy under any provision of the Loan Documents. None of the Parties intends to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties further understand and agree that no failure or delay in exercising any right or remedy with respect to the Loan or under the Loan Documents shall constitute a waiver of, or affect adversely in any manner, any of such rights and remedies nor shall any such failure or delay form the basis for any claim or cause of action.

4. **Only Written Agreements.** The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

5. **Authority.** The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. The Special Servicer represents and warrants that it is empowered to act on behalf of the Trustee under the Loan Documents in the capacity of attorney-in-fact, and the person signing this Agreement on behalf of Special Servicer hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Trustee. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.

6. **Expenses.** The Borrower agrees that it shall pay all costs of the Special Servicer in connection with Loan Communications, including but not limited to expenses for inspection of the property, legal fees and the fees of other professionals.

7. **Advice from Independent Counsel.** The Borrower acknowledges that independent counsel represents the Borrower, or if not so represented, that Borrower has been advised to obtain representation by independent counsel, and has fully reviewed the terms of this Agreement. Borrower acknowledges that Borrower executes this Agreement based on its own independent judgment, on the advice of counsel, if represented, and is under no threat, coercion or duress from any Party.

8. **Settlement Negotiations.** Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor to be admissible as evidence in any administrative or judicial proceeding (i) between the Trustee, Borrower

Blue Hill 1235

and/or Special Servicer, or (ii) involving any of the Loan Documents or any of the property securing the Loan. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be used in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the Parties.

9.  **Information Request.**  In order to enable the Special Servicer to properly evaluate the Borrower's request, the Borrower agrees to forward to the Special Servicer all the information checked on Exhibit A, which is attached hereto.

Additional information may be requested in the future.  Thank you for your attention to this matter.

Lennar Partners, Inc., as Special Servicer

By: _____
Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

**ACKNOWLEDGED AND AGREED BY:**

Borrower:      Blue Hills Office Park LLC

By: _____
Name:
Title:

NOTICE TO CONSUMER BORROWERS AS REQUIRED BY FEDERAL FAIR DEBT COLLECTION PRACTICES ACT:  We are attempting to collect debt and any information obtained will be used for that purpose.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID, SETTLED OR IS OTHERWISE NOT OBLIGATED:  Please be advised that this letter constitutes neither a demand of payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, has paid, settled or is otherwise obligated by law.

cc:     Debra Rudder – Wells Fargo Commercial Mortgage Servicing
        Pat Prince – Lennar Partners/Loan Servicing

Blue Hill 1236

Exhibit A

Review Documentation

1. Borrower Information

☑ A financial statement (balance sheet and income statements) of Borrower (including those of the individual members of the current Borrower) and guarantors, if any, prepared within 30 days of the date hereof, and as of year-end.

☑ Federal tax returns (signed copies) for the last two years (if applicable) for both Borrower and Guarantor (s) (if applicable).

2. Property Information

☑ Operating statements for the Property for the last 2 years and year-to-date (broken down by each month); Healthcare related properties should include detailed census data for each period.

☑ Current business plan for the Property, including the budget for this year, detailing revenue and expense projections, etc.

☑ Current rent roll with summary of lease expiration dates.

☑ Current census data describing the unit types, payment type, additional rents, detailed by tenant / unit.

☑ Operator / Management Agreement and resume of manager (current and any proposed revisions, if applicable).

☑ Any recent environmental assessments, structural or property inspection reports for the Property.

☑ Copies of all current leases, including related amendments and renewals.

☐ Sample copy of resident leases.

☑ Site Plan.

☑ Most recent tax bill on the Property

☑ A copy of the Certificate of Insurance for all insurance coverage(s) as required under the Loan Documents, along with a copy of the policy.

3. Other

☐ Copies of most recent regulatory surveys by state and/or local agencies showing that the facility is in compliance. Any noted defect(s) should be explained and proof provided of remediation of the defect(s).

☐ Copies of all licenses and/or permits required by the state or local authorities to operate the facility.

Blue Hill 1244