UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>  Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br> Mortgage Pass-Through Certificates, Series 1999-C1<br>  Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>  Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>  Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**BLUE HILLS OFFICE PARK LLC, GERALD FINEBERG AND
WILLIAM LANGELIER'S MEMORANDUM OF LAW
<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

## I. <u>INTRODUCTION</u>

Blue Hills Office Park LLC ("Blue Hills"), Gerald Fineberg ("Fineberg") and William Langelier ("Langelier") have moved for summary judgment to dismiss the Counterclaims filed by J.P. Morgan Chase Bank, Trustee for the Registered Holders of Credit Suisse Bank First Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1991-C1 ("J.P. Morgan") and CSFB 1999-C1 Royall Street, LLC ("CSFB").[1] The Counterclaims seek, *inter alia*, to metamorphorsize a non-recourse loan into a full liability personal guaranty, a result that contradicts both the relevant documentation and the facts extant.

## II. <u>SUMMARY OF UNDISPUTED FACTS</u>

Credit Suisse First Boston Mortgage Capital LLC[2] ("Credit Suisse") loaned approximately $33.1 million to Blue Hills (the "Loan") secured by a mortgage on Blue Hills' property located at 150 Royall Street, Canton, Massachusetts (the "Property"). The Loan closed on September 14, 1999. Blue Hills executed various Loan

---

[1] J.P. Morgan and CSFB (collectively, "Defendants") each filed identical Counterclaims.

[2] Credit Suisse was the Loan originator which subsequently assigned the Loan to J.P. Morgan, which in turn assigned the Loan to CSFB in 2004.

documents, including the Mortgage, Assignment of Rents and Security Agreement ("Mortgage Agreement"); Mortgage Note ("Note"); and Cash Management Agreement ("CMA") (collectively, the "Loan Documents"). Fineberg and Langelier executed a limited Guaranty ("Guaranty").

In its Complaint, Blue Hills seeks damages for multiple breaches of the Loan Documents committed by Defendants' and their disclosed agents' - Wells Fargo Commercial Mortgage Servicing ("Wells Fargo") and LNR Partners, Inc., formerly known as Lennar Partners, Inc. ("LNR"). Such breaches include wrongful declaration that Blue Hills had defaulted on the Loan and their refusal to release to Blue Hills funds held in certain Reserve Accounts that would have enabled Blue Hills to meet Loan obligations. These wrongful actions culminated in a foreclosure sale of the Property on November 19, 2004. Blue Hills' damages include, *inter alia,* a loss of approximately $4.1 million on deposit in Reserve Accounts, a tax liability in excess of nearly $5 million, and the loss of the Property.

The Counterclaims asserted against Blue Hills, Fineberg and Langelier allege Loan-related breaches relating to Blue Hills' filing in 2003 of an action in Norfolk Superior Court (the "Norfolk Action") appealing a zoning decision in connection with the abutting property located at 250 Royall Street, Canton, Massachusetts ("250 Royall"), the settlement of the Norfolk Action, and the receipt of settlement proceeds in the amount of $2,000,000 in exchange for the dismissal of the Norfolk Action ("Settlement Proceeds"). The Defendants assert that such violations triggered the personal liability of Fineberg and Langelier under the Guaranty for the full amount of the Loan's deficiency.

The filing of the Norfolk Action and the receipt of the Settlement Proceeds did not breach Blue Hills' obligations under the Loan Documents. Further, Blue Hills' actions did not trigger any of the narrow recourse provisions contained in the Guaranty.

The Court is also respectfully referred to the Blue Hills, Fineberg and Langelier's Local Rule 56.1 Statement of Undisputed Facts (the "Statement"), filed herewith.

### III. ARGUMENT

**A.    STANDARD OF LAW**

Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to serve the just, speedy and inexpensive determination

of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1). A party moving for summary judgment must show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In showing that no genuine issue of material fact exists, the movant need only show "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. at 325. This standard applies even if the "court is faced with summary judgment motions from different parties." *Fowler v. Boise Cascade Corp.*, 948 F.2d 49, 54 (1st Cir. 1991). Furthermore, a party moving for summary judgment need not make a showing of materials "negating the opponent's claim." *Celotex*, 477 U.S. at 318. The movant need only show "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.

In the main, the Counterclaims are based on one core contention; namely, that Blue Hills' failure to obtain the Defendants' consent to settle the Norfolk Action and its receipt of the Settlement Proceeds triggered Finberg and Langelier's "full liability" under Guaranty paragraph 1.2(ii)(D). A true copy of the Guaranty is attached to the Affidavit of Peter B. McGlynn ("McGlynn Affidavit") as Exhibit 4. Guaranty paragraph 5.3 states that the laws of the state – Massachusetts in this case – where the Property is located shall govern. "Under Massachusetts law, a guarantor's liability is determined by the terms of the guaranty agreements; as a general rule, the terms of the guaranty are not construed against the guarantor." *Laura Thorn, LTD v. Alletzhauser*, 71 F.3d 991, 993 (1st Cir. 1995). A guaranty is "to be construed strictly, and the guarantor is not be held liable for anything not in accord with the contract." *Zimetbaum v. Berenson*, 267 Mass. 250, 255 (1929).

As discussed, *infra*, the Loan Documents executed by Blue Hills, Fineberg and Langelier contain no language requiring them to have acted any differently than they did regarding the Norfolk Action and the Settlement Proceeds.

**B.    COUNTS I AND V OF THE COUNTERCLAIMS MUST BE DISMISSED AS THE UNDISPUTED FACTS AND APPLICABLE LOAN DOCUMENT PROVISIONS DEMONSTRATE THAT BLUE HILLS, FINEBERG AND LANGELIER ARE NOT LIABLE UNDER THE GUARANTY FOR THE LOAN DEFICIENCY.**

At the core of Defendants' allegations in Counts I and V of the Counterclaims is that Blue Hills' receipt of the Settlement Proceeds and the dismissal of the Norfolk Action allegedly constituted an "assignment, transfer or conveyance of an interest in the Mortgaged Property, requiring Lender's prior written consent pursuant to

Section 10 of the Mortgage Agreement." Counterclaims, ¶31. Full liability for the Loan deficiency, so Defendants allege, is based upon Guaranty paragraph 1.2(ii)(D) which provides that:

> Guarantor shall be liable for the full amount of the Debt[3] in the event that . . . (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer or conveyance of the Mortgaged Property[4] or any interest therein if required by <u>Section 10</u> of the Mortgage. (emphasis in original). McGlynn Affidavit, Exhibit 4.

Accordingly, under Guaranty paragraph 1.2(ii)(D), Defendants bear the burden of proving that:

- Blue Hills assigned, transferred or conveyed Mortgaged Property or any interest therein;
- Blue Hills failed to obtain Defendants' prior written consent to such assignment, transfer or conveyance; and,
- Defendants' consent to such assignment, transfer or conveyance was required by Section 10 of the Mortgage.

Based upon the uncontroverted facts, and Guaranty paragraph 1.2(ii)(D) and Section 10 of the Mortgage Agreement, Defendants will be unable to satisfy their burden with respect to any of the foregoing. A true copy of the Mortgage Agreement is attached to the McGlynn Affidavit as Exhibit 1.

**1.     Blue Hills Has Not Assigned, Transferred or Conveyed Any Mortgaged Property.**

Pursuant to the Settlement Agreement dated August 5, 2003 ("Settlement Agreement"), Blue Hills received the Settlement Proceeds in consideration of its dismissal of the Norfolk Action. Statement, ¶ 59. According to the Counterclaims, these two events – receipt of the Settlement Proceeds and dismissal of the Norfolk Action – required Defendants' prior written consent under Section 10 of the Mortgage Agreement. Counterclaims, ¶31. Aside from the Defendants' plaint that their consent for the settlement was neither sought nor given, there is no record evidence that the Defendants were displeased with the $2 million settlement amount or the settlement terms. Put simply, the Defendants are attempting to use the consent provisions in Section 10 of the Mortgage Agreement in a flawed defensive strategy to hold Fineberg and Langelier personally liable for a claimed $12 million plus loss which the Defendants sustained when they wrongfully foreclosed on the Property in November 19, 2004. Regardless of whether consent was required from the Defendants, there has been <u>no</u> assignment, transfer or conveyance of the Settlement Proceeds by Blue Hills.

---

[3] "Debt" is not defined in the Guaranty.

[4] "Mortgaged Property" is only defined in Guaranty paragraph 1.2(ii)(B), which deals with intentional physical waste of the Mortgaged Property, and which specifies that the definition of Mortgaged Property in the Mortgage Agreement shall govern.

The Settlement Proceeds were deposited into a client's funds account with Blue Hills' counsel immediately after it was received on August 8, 2003. The Settlement Proceeds were held in an account bearing the name "Fineberg Royall Associates,"[5] the generic name of the Blue Hills account. Statement, ¶ 60 and 61. The Settlement Proceeds constituted a portion of several million dollars of distributable Property income which had been voluntarily accumulated and retained by Blue Hills beginning shortly after the Loan's inception as a "rainy day" Property reserve fund. Statement, ¶ 96. This "rainy day" reserve fund was separate from and in addition to approximately $4.1 million of Blue Hills' funds on deposit in the Reserve Accounts (established pursuant to Section 6 of the Mortgage Agreement) as of August, 2004. Thereafter, pursuant to an Agreement dated December 31, 2004, one-half of the Settlement Proceeds – $1 million – held in the Blue Hills' client's funds account were transferred into a client's funds account with Langelier's attorney's law firm. Statement, ¶ 94. The Settlement Proceeds were properly recorded in Blue Hills' compiled financial statement for the year ended December 31, 2003 as a reduction in the Property's basis. That financial statement was prepared utilizing a legally permissible accounting method known as the income tax method of accounting. Statement, ¶ 62-64.

In short, the Settlement Proceeds have remained in Blue Hills' possession since they were received, were recorded in Blue Hills' financial books and records and have not been distributed to any of the beneficiaries of the Trust. As discussed *infra*, Blue Hills maintains that the Settlement Proceeds are not part of the Defendants' collateral.

    **2.** **Section 10 of the Mortgage Agreement Applies to the Transfer or Assignment of the Property, Not to Blue Hills' Receipt of the Settlement Proceeds and Dismissal of the Norfolk Action.**

The last sentence in Section 10(a) of the Mortgage Agreement contains the lynchpin of the Defendants' erroneous contention that Blue Hills' receipt of the Settlement Proceeds and dismissal of the Norfolk Action without the Defendants' consent renders Blue Hills, Langelier and Fineberg liable for the full amount of the Loan deficiency:

> Mortgagor shall not, without the prior written consent of the Mortgagee . . . sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof or permit the Mortgaged Property to be

---

[5] Royall Associates Realty Trust (the "Trust") was the former fee owner of the Property. As a condition of the Loan, Credit Suisse required that the owning entity be a single purpose bankruptcy remote entity. Thus, Blue Hills was formed to comply with Credit Suisse's requirements. The Trust is Blue Hills' sole member.

>sold, conveyed, alienated, mortgaged, encumbered, pledged, or otherwise transferred.

The Defendants assert that the phrase "Mortgaged Property" in Section 10(a) must be construed as broadly as the definition of "Mortgaged Property" contained on page 1 of the Mortgage Agreement. However, Section 10, construed as a whole, and in conjunction with Guaranty paragraph 1.2(ii)(D), mandates a much narrower construction of the phrase "Mortgaged Property". Several reasons support this narrower construction. First, the general import of Section 10 is that Credit Suisse's consent is required for the alienation or transfer of the <u>Property</u>. Section 10(a) states that Credit Suisse has "examined and relied on the creditworthiness and experience of [Blue Hills] in <u>owning and operating properties such as the Mortgaged Property</u> . . . [s]o as to insure that should Mortgagor default in repayment of the Debt, Mortgagee can recover the Debt by a <u>sale of the Mortgaged Property</u>." (emphasis added) The quoted language evinces the parties' intent to define "Mortgaged Property" as the Property and not, for example, intangibles such as the Norfolk Action or the Settlement Proceeds.

Secondly, Section 10(b) enumerates the types of assignments and transfers included within the scope of Section 10, all of which involve the sale, encumbrance, transfer or leasing of the Property, the legal and beneficial ownership thereof, and/or the substitution of Fineberg and Langelier as guarantors. As with Section 10(a), the import of Section 10(b) is that the scope of the transactions (as to which prior written consent is required) <u>is limited to the Property</u>, the ownership interests therein and the substitution of the guarantors.

Third, Section 10(e) obligated Blue Hills to reimburse Credit Suisse for expenses and fees incurred in connection with its approval of the requested transfer or encumbrance including "title search costs and title insurance endorsement premiums." The enumerated expenses and fees in Section 10(e) are normally associated with real property, not litigation or settlement proceeds.

Fourth, Section 10(f) enumerates several preconditions to Credit Suisse's consent to a Section 10 sale or transfer, all of which are Property oriented:

- Section 10(f)(ii) requires that the proposed transferee "shall be a reputable entity or person of good character, creditworthy, with sufficient financial worth . . . ."

- Section 10(f)(ii) requires the proposed transferee and "its <u>property manager</u> to have "sufficient experience in the ownership and management of <u>properties similar to the Mortgaged Property</u> . . . ." (emphasis added)

- Section 10(f)(iv) entitles Credit Suisse to obtain rating agency recommendations to the transfer; and

- Most significantly, Section 10(f)(vi) entitles Credit Suisse to an assumption fee equal to 1% of the mortgage Debt, plus reimbursement of costs and expenses incurred in connection with the assumption. This subsection requires the payment of a fee if the Loan secured by the mortgage is being assumed by a new owner. This subsection has no relevance to the Norfolk Action or to the Settlement Proceeds. The Counterclaims do not seek any assumption fee for the allegedly improper transaction at issue.

The narrower construction of the phrase "Mortgaged Property" in Section 10 is also buttressed substantially by Section 50 in the Mortgage Agreement, which states that terms such as Mortgaged Property shall mean any portion of the Mortgaged Property and any interest therein "[u]nless the context clearly indicates a contrary intent or unless otherwise specifically provided herein . . . ." (emphasis added) Thus, Section 50 of the Mortgage Agreement articulated the parties' intention to ascribe different meanings to the phrase "Mortgaged Property" throughout the Mortgage Agreement. Section 10, is only one of several sections in the Mortgage Agreement where the sectional context clearly indicates that the phrase "Mortgage Property" refers to the Property. The following are examples:

- Section 4(a) describes Mortgaged Property that is damaged or destroyed by fire or other casualty.

- Section 5 describes taxes, assessments, water rates, sewer rents and other charges imposed against the Mortgaged Property.

- Section 6(b) establishes a replacement escrow fund for "replacement and repairs required to be made to the Mortgaged Property. . . ."

- Section 7(b)(i) requires condemnation awards to be held in escrow and applied "toward the cost of the restoring the Mortgaged Property or any part thereof subject to the Taking . . . ."

- Section 8(c) requires Credit Suisse's consent to certain leases "of all or any part of the Mortgaged Property . . . ."

- Section 9 requires Blue Hills to "cause the Mortgaged Property to be maintained in a good and safe condition and repair."

- Section 11(s) includes a representation by Blue Hills that the "Mortgaged Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities."

The objective manifestations of the parties' intent regarding Section 10 of the Mortgage Agreement could not be clearer. That section requires Credit Suisse's consent for significant actions affecting the Property and the Loan; a transfer of the Property or the ownership interest therein, and substitution of Fineberg and Langelier as

guarantors. Section 10 contains <u>no</u> consent requirement with respect to the settlement of the Norfolk Action or Blue Hills' receipt of the Settlement Proceeds.

      **3.**    **Neither Blue Hills' Receipt of the Settlement Proceeds Nor Its Dismissal of the Norfolk Action Required CSFB's Prior Consent, or Even Notice to CSFB.**

As discussed in Part III B-2 *supra*, Section 10 of the Mortgage Agreement requires Credit Suisse's consent <u>only</u> for certain transfers, sales and encumbrances relating to the Property. There is <u>no</u> express requirement in the Mortgage Agreement that Blue Hills was required to obtain Defendants' approval prior to its commencement of the Norfolk Action, or its settlement, or its dismissal or Blue Hills' receipt of the Settlement Proceeds, or even to provide the Defendants with notice of any of the foregoing. Nor can such requirement be implied. *Ayash v. Dana-Farber Cancer Institute,* 443 Mass. 367, 385 (2005). Indeed, whenever the Mortgage Agreement restricts Blue Hills' ability to settle claims without consent or requires notice to Credit Suisse, it does so in express terms. For example, in Section 4 of the Mortgage Agreement, Credit Suisse's consent is required before Blue Hills can settle and adjust insured casualty loss claims in excess of $250,000. Mortgage Agreement, §4(a) and (b)(ii) *et seq*. Section 4 also required that Blue Hills provide prompt notice to Credit Suisse of any casualty loss.

Another section in the Mortgage Agreement precludes Blue Hills from settling condemnation litigation or from accepting condemnation awards in excess of $250,000 without Credit Suisse's prior consent. Mortgage Agreement, Section 7(a) and (b). And, similar to Section 4, Blue Hills is required to provide Credit Suisse with prompt notice of any actual or threatened condemnation or eminent domain proceeding.

In a similar vein, the Mortgage Agreement also expressly requires notice to Credit Suisse and/or its prior written consent for other enumerated events or occurrences:

- Credit Suisse's prior written consent was required in Section 8(c) before Blue Hills could enter into a lease "of all or any part of the Mortgaged Property in excess of 10% of the gross leasable area . . . ."

- Credit Suisse's prior written consent was also required in Section 9 before Blue Hills discontinued or abandoned any non-conforming use of the Mortgaged Property.

- Under Section 31, Blue Hills' right to contest or refusal to pay taxes, charges or to comply with legal requirements was conditioned upon prior notice to Credit Suisse coupled with a delivery of a cash deposit or an indemnity bond.

- Section 29 of the Mortgage Agreement only gave Credit Suisse the right, after written notice to Blue Hills, to <u>defend</u> any action with respect to the Mortgaged Property, but <u>only</u> <u>after</u> an Event of Default or after Blue Hills failed to defend the action "under circumstances under which it is unreasonable not to so act."

The Norfolk Action was an affirmative claim brought by Blue Hills to challenge the propriety of the Town of Canton, Massachusetts Zoning Board of Appeals' ("ZBA") decision to grant an abutter a special permit to construct a garage. Aside from the issue of whether the Norfolk Action or the Settlement Proceeds constituted part of Credit Suisse's collateral under the Mortgage Agreement, neither of these fit into any of those sections of the Mortgage Agreement where Credit Suisse expressly requires prior notice and/or consent to the settlement of any affirmative claims asserted by Blue Hills.

  **4. The "Full Liability" Provisions of the Guaranty Are Limited to Acts Which Adversely Affect CSFB's Mortgagee Status and the Loan's Securitization.**

Guaranty paragraph 1.2 (ii) (A)-(E) imposes liability on Fineberg and Langelier for the "full amount of the Debt," but <u>only</u> in the following limited circumstances:

- The first full monthly payment of principal and interest on the Note is not paid when due. Guaranty, paragraph 1.2(ii)(A).

- Blue Hills fails to maintain its status as a single purpose entity. Guaranty, paragraph 1.2(ii)(B).

- Blue Hills fails to obtain Credit Suisse's prior consent to any subordinate financing or other voluntary lien encumbering the Mortgaged Property. Guaranty, paragraph 1.2(ii)(C).

- Blue Hills fails to obtain Credit Suisse's prior written consent to any assignment, transfer or conveyance of the Mortgaged Property or any interest therein "if required by Section 10 of the Mortgage. . . ." Guaranty, paragraph 1.2(ii)(D); and

- Blue Hills or the guarantors are the subject of any bankruptcy proceeding or other act of insolvency. Guaranty, paragraph 1.2(ii)(E).

Generally, all of the enumerated circumstances have the potential of adversely impacting either Credit Suisse's status as the sole mortgagee on the Property or its ability to transfer the Loan to a securitized loan pool, as contemplated by Sections 59, 60 and 61 of the Mortgage Agreement. These are the only events that expose Blue Hills, Fineberg, and Langelier for the "full amount of the Debt," and are in stark contrast to the acts enumerated in Guaranty paragraph 1.2(a)-(g) (described in Part III C, *infra*), which only expose Blue Hills,

Fineberg and Langelier to personal liability for the Defendants' actual loss sustained (excluding consequential damages) arising directly from the seven enumerated events in subparagraphs (a)-(g).

In light of the foregoing, it is an unreasonable and unwarranted interpretation of Guaranty paragraph 1.2(ii)(D) to conclude that Blue Hills' failure to obtain the Defendants' permission prior to settling the Norfolk Action and/or receiving the Settlement Proceeds triggered Blue Hills', Fineberg's and Langelier's full liability under the Guaranty, even if, *arguendo,* the Settlement Proceeds and the Norfolk Action constituted part of Defendants' Loan collateral.  There is nothing in the record of this case which even remotely suggests that the Norfolk Action or the Settlement Proceeds had the potential of impacting either the status of the Mortgage or the securitization of the Loan.

> 5. **The Chronology of Revisions Made to Paragraph 1.2(ii)(D) Prior to Loan Closing Demonstrates the Parties' Intention to Limit the Phrase "Mortgaged Property" in the Context of Section 10.**

The chronology of the revisions made to Guaranty paragraph 1.2(ii)(D) prior to the Loan closing demonstrates that the parties intended to limit the scope of consent-required transfers and assignments in the context of the "full liability" provisions of the Guaranty paragraph 1.2(ii)(D).  For example, in the letter of intent dated August 31, 1999 executed by Credit Suisse's loan originator, Joseph Rubino, the version of what is now Guaranty paragraph 1.2(ii)(D) read as follows:

> "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the <u>Property</u> or any interest therein as required by the Mortgage. . . ." (emphasis added)  Statement, ¶ 27.

This version of the paragraph shows that the parties intended to limit the provisions in paragraph 1.2(ii)(D) to an "assignment, transfer or conveyance of the Property, which was identified in the letter of intent as the "Blue Hills Office Park."

Thereafter, the initial drafts of the Guaranty prepared by Credit Suisse's counsel, Schulte Roth & Zabel LLC, contained this version of paragraph 1.2(ii)(D):

> "(D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the <u>Mortgaged Property</u> or any interest therein <u>as required by the Mortgage</u>." (emphasis added). Statement, ¶ 28.

This language was contained in all successive revisions to Guaranty paragraph 1.2(ii)(D) except for the version of the Guaranty executed by Fineberg and Langelier, which provides as follows:

- 10 -

> "(D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage." (emphasis in original)

Thus, the evolution of Guaranty paragraph 1.2(ii)(D) demonstrates that the parties intended that the full liability provisions of the Guaranty could only be triggered in the event that there was an unconsented assignment or transfer, if – and only if – such consent was required by Section 10 of the Mortgage; a section which is limited to transfers, assignments and sales involving the Property.

C. **COUNT II OF THE COUNTERCLAIMS MUST BE DISMISSED AS BLUE HILLS HAD NO OBLIGATION TO NOTIFY THE DEFENDANTS OF ITS RECEIPT OF THE SETTLEMENT PROCEEDS, NOR DID IT HAVE ANY OBLIGATION TO DEPOSIT THE SETTLEMENT PROCEEDS IN THE CLEARING ACCOUNT; EVEN IF IT DID, BLUE HILLS WOULD HAVE BEEN ENTITLED TO THOSE PROCEEDS.**

Count II of the Counterclaims alleges that Blue Hills failed to deposit the Settlement Proceeds into the Clearing Account and failed to notify the Defendants thereof as purportedly required by the CMA. Counterclaims, ¶¶ 47 and 48. As an initial matter, CSFB was not even in existence until over a year after the Settlement Proceeds were received by Blue Hills; thus, Blue Hills would have been unable to provide CSFB with notice even if required by the CMA. Statement, ¶ 12.

CSFB's answers to Interrogatories state that it seeks damages of approximately $12 million, consisting of the total amount of Note indebtedness as of November 19, 2004, plus interest, minus credits purportedly for the foreclosure bid and Reserve Account balances. Statement, ¶ 98. However, none of the five enumerated events in Guaranty paragraph 1.2(ii)(A)-(E) which might conceivably expose Blue Hills, Fineberg and Langelier to full liability address a violation of the CMA. Consequently, Fineberg and Langelier are not liable under the Guaranty for the full amount of the Loan deficiency for any alleged breach of the CMA.

Even if one assumes, for purposes of this memorandum, that Blue Hills breached the CMA, at worst, Fineberg and Langelier's liability under Guaranty paragraph 1.2(ii)(a)-(g) is limited to "loss, damage, cost, expense, liability, claim or other obligation incurred by Lender, including attorneys' fees and costs reasonably incurred, but in all events excluding, however, all consequential damages . . . ." (emphasis added). The only provision contained in Guaranty paragraph 1.2(ii)(a)-(g) that even remotely relates to Count II of the Counterclaims is subsection (e), which provides for limited personal liability for Lender's direct loss resulting from: "[t]he misapplication or conversion by Borrower of . . . (iii) any Rents (as defined in the Mortgage)

- 11 -

following an Event of Default . . . ." Thus, under Guaranty paragraph 1.2(ii)(e)(iii), the Defendants bear the burden of proving:

- An Event of Default, followed by,
- A misappropriation or conversion of "Rents" (as defined in the Mortgage).

### 1. No Event of Default Occurred.

CSFB's answers to interrogatories assert that Blue Hills committed Events of Default under Sections 23(d) and (l) of the Mortgage Agreement by settling and dismissing the Norfolk Action, by accepting the Settlement Proceeds without Defendants' prior written consent <u>as required by Section 10 of the Mortgage Agreement</u> (a purported breach of Section 23(d)), and by failing to notify the Defendants of its receipt of the Settlement Proceeds. McGlynn Affidavit, Exhibit 5. As discussed in Part III B, *supra*, Section 10 of the Mortgage Agreement imposes no obligation on Blue Hills to give notice to or obtain the Defendants' consent for the dismissal of the Norfolk Action or to receive the Settlement Proceeds. Thus, no violation of Section 23(d) occurred.

Also, no Event of Default can occur under Section 23(l) of the Mortgage Agreement <u>unless</u> there has been a default which continues beyond any applicable cure period or, if none, for thirty days after Mortgagor receives notice of such default. Even if dismissal of the Norfolk Action and/or receipt of the Settlement Proceeds constituted an Event of Default under Section 23(l), nothing in the record shows that the Defendants ever gave notice of that default as required by Sections 23(l) and 39 of the Mortgage Agreement. Indeed, only one letter even mentions the Norfolk Action and the Settlement Proceeds. That letter, dated April 20, 2005 – after the Property had already been foreclosed and was in the process of being resold to One Beacon Insurance Group – and sent to Fineberg and Langelier by the Defendants' counsel, asserted that Fineberg and Langelier were liable for the full amount of the Debt because of their alleged violation of Section 10 of the Mortgage. Statement, ¶ 97. It contains no assertion that dismissal of the Norfolk Action or receipt of the Settlement Proceeds constituted a violation of the CMA or Section 23(l) of the Mortgage Agreement.

### 2. No Misappropriation or Conversion Occurred.

The Defendants also bear the burden of proving that there has been a "misapplication or conversion" of "Rents" following an Event of Default. The nouns "misapplication" and "conversion" are not defined in the

Mortgage Agreement. As such, unambiguous words in a contract must be construed in accordance with their ordinary and usual sense. *Computer Systems of America, Inc. v. Western Reserve Life Assur. Co. of Ohio*, 19 Mass. App. Ct. 430, 434 (1985). <u>Webster's Third International Dictionary</u> defines "misapplication" as "misuse or embezzlement of funds" and defines "conversion" as "an appropriation of and dealing with the property of another as if it were one's own without right." <u>Webster's Third International Dictionary</u>, pp. 1442, 499 (3d ed. 1971). Blue Hills did not engage in any conduct with respect to the Settlement Proceeds that fits either of these two definitions. As stated earlier, the Settlement Proceeds have remained Blue Hills' property since they were received by Blue Hills.

**3.  The Settlement Proceeds Are Not "Rents."**

The Settlement Proceeds are not "Rents" under the CMA.[6] A true copy of the CMA is attached to the McGlynn Affidavit as Exhibit 3. The plain meaning of the modifying phrase in Granting Clause Four "arising from or attributable to the [Property]"[7] requires that there be a close nexus between the Property and the money or other consideration in order for them to be called "Rents." The enumerated combinations and permutations of the money and other consideration which constitute "Rents" under Granting Clause Four all have one thing in common: they all were generated as a result of the use, enjoyment or occupation of the Property. The plain meaning of the word "Rents" supports this conclusion as well.[8] That Credit Suisse intended to distinguish "Rents" from other types of collateral in the Mortgage Agreement is also borne out by the fact that there are eight Granting Clauses and only one – Granting Clause Four – involves "Rents." It is also clear that Credit Suisse intended to distinguish between "Rents" and other types of collateral in the CMA generally and Section 8 in

---

[6] The CMA employs the same definition of "Rents" as contained in the Mortgage Agreement. "Rents" is defined in Granting Clause Four as "all leases . . . and other agreements . . . affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the [Property] . . . and all rents, rent equivalents, monies payable as damages or in lieu of rent or rent equivalents . . . or other consideration of whatever form or nature received by or paid to or for the account of or benefit of [Blue Hills] . . . arising from or attributable to the [Property]. . . ."

[7] <u>Webster's Third New International Dictionary</u> defines "arising" as " to originate from a specified source" and "attributed" as "caused or brought about by: regard as occurring in consequence of or on account of" and "to regard as possessed, owned, originated, characterized or described as indicated." <u>Webster's Third New International Dictionary</u>, 117, 141-142 (3d ed. 1971). Cases that have interpreted the language "arising from" or "attributed to" have similarly defined these terms. "'Arising out of' is ordinarily held to mean originating from, growing out of, flowing from, incident to or having connection with," and the proponent bears the burden of proving that a "reasonably apparent causal connection" must exist. *Murdock v. Dinsmoor*, 892 F.2d 7 (1st Cir. 1989).

[8] <u>Webster's Third New International Dictionary</u> defines "rents" as "property that the owner allows another to use in exchange for payment". <u>Webster's Third New International Dictionary</u>, 1923 (3d ed. 1971).

- 13 -

particular. As set out in footnote 6 of this memorandum, the CMA adopted the definition of "Rents" contained in the Mortgage Agreement, not the arguably broader definition of Mortgaged Property contained on page 1 of the Mortgage Agreement. Additionally, Section 8 of the CMA only deals with "items of Rents" and the scope of that phrase is "subject to the provisions of the Mortgage [Agreement] . . . ."

In addition, for the same reasons that the Settlement Proceeds are not "Rents," they were not the result of an "extraordinary event . . . derived from or generated by the <u>use, ownership or operation</u> of the [Property]" as provided in Section 8(d) of the CMA. "Extraordinary event" is undefined in the CMA. However, the plain meaning of that phrase in the context of Section 8(d) is that proceeds from an "extraordinary event" must come from or be generated by "use, ownership or operation of the "Property." As discussed *infra,* the Settlement Proceeds neither came from nor were generated by the use, ownership or operation of the Property.

### 4. The Settlement Proceeds Were Not Derived From Nor Generated From the Use, Ownership or Operation of the Property.

The Settlement Agreement enabled the proposed parking garage on the 250 Royall Street property to be constructed. It also required Blue Hills' to waive its claim that the ZBA erroneously interpreted the Canton By-law when it issued the special permit for the garage. Statement, ¶ 53-57. As several facts in the record demonstrate, the Settlement Proceeds were paid in consideration of Blue Hills' dismissal of the Norfolk Action, not as compensation for any diminution in the value of the Property or for the loss of Equiserve as a tenant. In the Norfolk Action, Blue Hills sought no damages at all, let alone damages for any diminution in the value of the Property. And, as the Settlement Agreement's preamble states, Blue Hills appealed the ZBA's decision "principally on the basis that it was obtained in reliance upon an incorrect interpretation of the Town of Canton Zoning By-law . . . ." A true copy of the Settlement Agreement is attached to the McGlynn Affidavit as Exhibit 29. Furthermore, prior to commencement of the Norfolk Action, Equiserve had already confirmed to Blue Hills that it had no intention of exercising its option to extend the Lease. Statement, ¶¶ 47-49. Thus, there was no landlord-tenant relationship to be salvaged by Blue Hills.

The Defendants apparently rely on two paragraphs – 37 and 38 – in Blue Hills Complaint in the Norfolk Action as an admission that Blue Hills believed that the proposed garage would reduce the value of the Property. That reliance is wrong for several reasons. First, as the "Introduction" to the Complaint states, the gravamen of

the Norfolk Action was that the ZBA decision exceeded its authority in granting the special permit. Secondly, all counts in that Complaint seek rescission of the special permit because it violated the Canton Zoning By-law. Thirdly, paragraph 37 merely asserted that the proposed garage would be detrimental and offensive to Blue Hills – not that the Property would decrease in value – while paragraph 38 restates that the ZBA's approval violated Section 3.04.1 of the Canton By-law. Finally, under Massachusetts law, pleadings in a complaint are binding only in the <u>trial</u> of the case in which the pleadings were filed. *Hibernia Savings Bank v. Bomba*, 35 Mass. App. Ct. 378, 384 (1993).

Plainly and simply, the Settlement Proceeds resulted from Blue Hills' exploitation of a very unique situation not contemplated by the parties in 1999. Equiserve had confirmed to Blue Hills that it was not renewing the Lease, and that its planned purchase of the 250 Royall Street property was expressly conditioned upon the owner's construction of the parking garage. The owner of 250 Royall Street was faced with the potential loss of Equiserve as a buyer and a two or three year hiatus before the Norfolk Action would be adjudicated. That the 250 Royall Street owner was anxious to settle – and settle quickly – is evidenced by settlement of the Norfolk Action within 60 days of its commencement. No discovery was conducted and no motions were filed challenging Blue Hills' status to appeal the ZBA's decision. Statement, ¶ 57.

Finally, even if the Settlement Proceeds were required to be deposited in the Clearing Account under the CMA, the <u>entire</u> amount of the Settlement Proceeds would have been distributable shortly thereafter to Blue Hills under the CMA, as the rents generated under the Lease were sufficient to fully fund, on a monthly basis, all of the cash collateral sub-accounts specified in the CMA. According to Section 3(b)(vii) of the CMA, after the monthly debt service has been paid and all escrow accounts have been funded, the balance flows into the "Borrower Remainder Sub-account (<u>which shall no longer be considered Rents</u>)" and then disbursed to Blue Hills. (emphasis added). McGlynn Affidavit, Exhibit 3.

**D.    COUNT IV SHOULD BE DISMISSED AS CSFB CANNOT PROVE EITHER THE EXISTENCE OF AN ACTIONABLE MISREPRESENTATION OR JUSTIFIABLE RELIANCE.**

A claim for damages for deceit requires proof that: (1) the defendant made a misrepresentation of fact; (2) that such misrepresentation was made with the intent to induce another to act upon it; (3) it was made with knowledge of its untruth; (4) it was intended that it be acted upon; and (5) damage directly resulted therefrom.

*Graphic Arts Finishers, Inc. v. Boston Redevelopment Authority*, 357 Mass. 40, 44 (1970). For silence to constitute an actionable representation, there must be a legal duty for the defendant to speak. *Spencer v. Gabriel*, 328 Mass. 1 (1951). The duty to speak is limited to situations where there is a fiduciary duty or when a "half-truth" is made. *See*, *Swinton v. Whitinsville Savings Bank*, 311 Mass. 677 (1942); *Gishen v. Dura Corp.*, 362 Mass. 177 (1972).

### 1. There Has Been No Actionable Misrepresentation.

The gravamen of the Defendants' claim for "intentional misrepresentation" is that Blue Hills purportedly "had a duty to notify the Lender prior to executing the Settlement Agreement" and allegedly "failed to notify the Lender prior [to doing so]." Counterclaims, ¶¶55 and 56. For reasons discussed in Part III B-3, the Mortgage Agreement simply does not require any notification to the Defendants from Blue Hills regarding any non-Property related settlements. Neither the Mortgage Agreement not the CMA required that Blue Hills, Fineberg or Langelier notify the Defendants of litigation except in cases of condemnation and other similar and limited circumstances. Further, even if certain language in the Loan Documents required such notification, the mere failure to do so would not constitute fraud. A promise constitutes an actionable representation only if, at the time the promise was made, an intention to carry out the promise did not exist. *Botti v. Iovino*, 337 Mass. 775 (1958). There is little doubt that the Norfolk Action was not within the contemplation of the parties when the Loan was closed in 1999.

Additionally, proof of a "bare nondisclosure," or the mere failure to speak when there is no particular duty to speak, are insufficient to establish a misrepresentation. *Kannavos v. Annino*, 356 Mass. 42, 46-49 (1969). It is not sufficient for a party to prove a mere nonfeasance or failure to speak or act unless a duty to speak or act is also established. *Wade v. Ford Motor Co.*, 341 Mass. 596, 597-598 (1961). Mere silence does not usually amount to a breach of duty. *Phinney v. Friedman*, 224 Mass. 531 (1916). Absent a contractual obligation to speak – which is not contained in the Loan Documents – no such duty is owed.

### 2. There Has Been No Justifiable Reliance.

"Reliance is an element of actionable fraud." *Nei v. Burley,* 388 Mass. 307, 311 (1983). Moreover, such reliance on the putatively false statement must be reasonable and justifiable under the circumstances. *Collins v. Huculak,* 57 Mass. App. Ct. 387, 392 (2003). Further, detrimental reliance must be property plead and proven.

*Powell v. Rasmussen*, 355 Mass. 117, 118-119 (1969).  Neither Count IV of the Counterclaims, nor the Defendants' discovery responses contain any factual or legal bases showing that the Defendants detrimentally relied on Blue Hills' silence regarding the Norfolk Action or the Settlement Proceeds.  Based on the undisputed facts of record, no detrimental reliance actually occurred.  Indeed, one of the Defendants, CSFB, did not even come into existence until September 1, 2004, approximately 2½ months before the Property was foreclosed. Statement, ¶ 12.  Therefore, it strains credulity for CSFB to claim detrimental reliance.

It is also amply documented that the Defendants, through their Servicer, Wells Fargo, and Special Servicer, LNR, anxiously awaited an opportunity to default Blue Hills, to scoop approximately $4.1 million of Blue Hills' money in the Reserve Accounts and to either acquire the Property or to quickly dispose of it on foreclosure.  Statement, ¶ 90.  Are the Defendants' now claiming that their default/foreclosure juggernaut would have been slowed or curtailed had they known of the existence of the Norfolk Action and the Settlement Proceeds?  Given the Defendants well documented intransigence to a Loan restructuring  – or even a meeting – with Blue Hills, that scenario was highly unlikely.

        **3.**      **<u>The Putative Fraud Has Not Been – and Cannot Be – Plead with Particularity.</u>**

Fed. R. Civ. P. 9(b) requires that allegations of fraud be plead with "particularity."  Fed. R. Civ. P. 9(b); *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985).  Claims of misrepresentation cannot stand unless the complaint contains specific facts as to the "time, place and content of the alleged false or fraudulent representations."  *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991).  Additionally, the claimant must allege facts and circumstances showing that the misrepresentations were false when made and not merely wrong in hindsight.  *Steiner v. Unitrode Corp.*, 834 F. Supp. 40, 43 (D. Mass. 1993).

The period for discovery in this case having concluded, the Defendants have failed to adduce any evidence that the "representation" – Blue Hills' silence in this case –was false.  No other "representation" has been identified nor has the legal factual genesis of the putative "duty to notify the Lender" been described.

**E.   AS THE DEFENDANTS CANNOT IMPLY CONTRACTUAL DUTIES TO WHICH THE PARTIES DID NOT AGREE, SUMMARY JUDGMENT IS PROPER AS TO COUNT III OF THE COUNTERCLAIMS.**

Unsure of whether it can convince this Court that the plain language of the Loan Documents mean something other than the obvious, the Defendants impermissibly reach for the "implied duty of good faith and fair dealing" to impute to Blue Hills, Fineberg and Langelier duties to which it never agreed to be bound.

The Defendants' attempts to imply their way into a viable contract claim ignores that any duty of good-faith performance is "circumscribed by the obligations . . . actually contained in the agreement." *See Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001) (special master erred by using the duty of good faith and fair dealing to impose obligations "that exist nowhere in the agreement between the parties"). For this reason, Massachusetts law permits plaintiffs to invoke the covenant of good faith to enforce the terms of a contract, but not to impose additional requirements to which the parties did not agree in their contract. *See, e.g., Eigerman v. Putnam Investments, Inc.,* 66 Mass. App. Ct. 222 (2006). Simply put, the written instrument controls. New or independent rights or duties separate from those already in a contract cannot be added under the guise of the implied covenant of good faith and fair dealing." B*ateman v. F.D.I.C.*, 112 F. Supp. 2d 89 (D. Mass. 2000).

Courts are particularly loathe to judicially imply additional terms in a contract where, as here, the parties entered into a detailed written agreement whereby they articulated the specific obligations they assumed, but did not provide for the additional duties that plaintiffs claim in after-the-fact litigation. The "doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded." *See Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 495 (1st Cir. 1997) (quoting *Plumbers & Steamfitters Local 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1449 (11th Cir. 1991)), abrogated on other grounds by *Steel Co. v. Citizens For A Better Environ.*, 523 U.S. 83 (1998).

Here, the Loan documents are exceptionally detailed as to the narrow circumstances under which Blue Hills, Fineberg and Langelier have any personal liability to the Defendants. The facts extant simply do not fit into the narrow exceptions to what is expressly designated a non-recourse loan.

**F.    EVEN IF THERE WAS A BREACH OF CONTRACT, SUMMARY JUDGMENT IS PROPER AS TO COUNT VI OF THE COUNTERCLAIMS AS ANY SUCH BREACH IS INSUFFICIENT TO SUPPORT A CHAPTER 93A CLAIM.**

The Chapter 93A claim in Count VI of the Counterclaims is essentially a cut-and-paste of their failed implied contract allegations, which no matter how generously construed are not sufficiently egregious to trigger the statute. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). To state a claim, plaintiffs must allege an "unfair or deceptive" act or practice that would "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Id.*

Massachusetts courts have repeatedly rejected attempts to elevate contract claims into 93A claims because, absent something more, a breach of contract simply does "not rise to the level of rascality required" by the statute. *See Ahern v. Scholz*, 85 F.3d 774, 799-800. (1st Cir. 1996). To give rise to liability under Chapter 93A, plaintiffs must allege that defendants intentionally breached "in disregard of known contractual arrangements and intended to secure benefits for the breaching party," *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (1991), or that their conduct had an "extortionate quality that gives it the rancid flavor of unfairness." *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992).

There is a distinction between the exceptional contract-based claim that may also give rise to liability under Chapter 93A and the standard-issue breach of contract pleading that plaintiffs often, but impermissibly, attempt to re-plead under Section 11 and that should be dismissed on the pleadings:

> [I]f it is apparent from the complaint that the underlying contract dispute involves nothing more than reasonably conflicting interpretations of a genuinely ambiguous contract term, a court might properly dismiss an associated Chapter 93A claim at the outset . . . . Generalizing, if it clearly appears from the complaint and the contract itself that reasonable people might reach different conclusions regarding the merits of the underlying contract dispute, then, absent special circumstances, a court should at least give serious consideration to the early dismissal of the 93A count for failure to state a claim.

*Citicorp N. Am., Inc. v. Ogden Martin Sys. of Haverhill*, 8 F. Supp. 2d 72, 77 (D. Mass. 1998). Summary judgment is appropriate on a finding that the misrepresentations on which plaintiff based her claim for fraudulent misrepresentation in violation of Chapter 93A did not rise to the "rascality standard." *Tagliente v. Himmer*, 949 F.2d 1 (1st Cir. 1991).

There are no "special circumstances" alleged. The Counterclaims do not allege that anyone acted in flagrant disregard of any known contractual right, much less interpreted a contract in a manner that was "so unreasonable as to support a finding of bad faith and unfairness." *See Citicorp N. Am. Inc.,* 8 F. Supp. 2d at 79.

It is also not alleged by the Defendants that the supposed breach of the contract was "extortionate." *Atkinson*, 33 Mass. App. Ct. at 226.

### IV.  CONCLUSION

For the foregoing reasons, summary judgment should enter in favor of Blue Hills, Fineberg and Langelier as to all counts in the Counterclaim.

Respectfully submitted,

BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
By their attorneys,

/s/ Peter B. McGlynn
Peter B. McGlynn, Esquire (BBO No. 333660)
Meredith A. Swisher, Esquire (BBO No. 646866)
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:	(617) 790-3000
Facsimile:	(617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated:  May 17, 2006

#337435 v3/14500/9985