UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates, Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**RULE 56.1 STATEMENT OF UNDISPUTED FACTS OF
PLAINTIFF AND DEFENDANTS-IN-COUNTERCLAIM**

Pursuant to Local Rule 56.1, Blue Hills Office Park LLC ("Blue Hills"), Gerald Fineberg ("Fineberg") and William Langelier ("Langelier") hereby submit this Statement of Undisputed Facts in Support of Motion of Blue Hills Office Park LLC, Gerald Fineberg and William Langelier for Summary Judgment as to All Counterclaims.

**The Parties**

**Blue Hills, Fineberg and Langelier**

1. Blue Hills is a Delaware limited liability company with a principal place of business at One Washington Street, Suite 400, Wellesley, Massachusetts 02481. *See* Deposition Exhibit 155, page 1, attached to Affidavit of Peter B. McGlynn, Esq. ("McGlynn Affidavit") as Exhibit 1.

2. Blue Hills is a so-called single purpose entity, formed in 1999 in connection with a refinancing of real property and a building thereon located at 150 Royall Street, Canton, Massachusetts and known as the Blue Hills Office Park (the "Property"). The Property consists of a two-story brick

building containing approximately 275,000 square feet of office space on 150 Royall Street, Canton, Massachusetts. *See* Deposition Exhibit 217, attached to McGlynn Affidavit as Exhibit 48.

3. The formation of Blue Hills as a single purpose entity was required as a precondition to the refinancing. *See* Deposition Exhibit 155, ¶ 12, attached to McGlynn Affidavit as Exhibit 1.

4. Blue Hills' sole member is Royall Associates Realty Trust ("Trust"). The Trust owned the Property prior to the 1999 re-financing. *See* Deposition Transcript of William Langelier ("Langelier Deposition"), page 45, lines 16 - 24; page 81, lines 14-16, attached to McGlynn Affidavit as Exhibit 17.

5. Fineberg and Langelier are the trustees of the Trust, as well as also being two of the six beneficiaries of the Trust. *See* Deposition Exhibit 176, attached to McGlynn Affidavit as Exhibit 44.

## Credit Suisse

6. Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse") is a Delaware limited liability company with a principal place of business in New York, New York. *See* Answers of CSFB 1999-C1 Royall Street LLC and J.P. Morgan to Plaintiff's Second Amended Complaint ("Answers to Second Amended Complaint")[1] ¶ 2; Deposition Exhibit 155, page 1, attached to McGlynn Affidavit as Exhibit 1.

7. In August 1999, Blue Hills and Credit Suisse agreed upon the general terms and conditions under which Credit Suisse would loan to Blue Hills approximately $33.1 million to be secured by the Property. *See* Deposition Exhibit 182, attached to McGlynn Affidavit as Exhibit 46.

8. On or about September 14, 1999, Credit Suisse loaned Blue Hills $33,149,000.00 (the "Loan"). *See* Counterclaims of CSFB 1999-C1 Royall Street LLC and J.P. Morgan ("Counterclaims")[2], ¶ 7.

---

[1] The Answers filed by J.P. Morgan and CSFB are identical.
[2] The Counterclaims filed by J.P. Morgan and CSFB are identical.

### J.P. Morgan

9.  J.P. Morgan Chase Bank, formerly Chase Manhattan Bank, as Trustee for the Registered Holders of Credit Suisse Bank First Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1991-C1 ("J.P. Morgan"), a New York banking corporation, is assignee of Credit Suisse's interests in the Loan. *See* Response No. 1 to Responses to Admissions to Blue Hills, Langelier and Fineberg's First Set of Requests for Admissions and CSFB's Response to Blue Hills, Langelier and Fineberg's First Set of Requests for Admissions (collectively "Responses to Admissions"), attached to McGlynn Affidavit as Exhibit 7.

10.  The assignment to J.P. Morgan of all of Credit Suisse's interests in and obligations under the Loan was recorded with the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, page 387. *See* Response No. 1 to Responses to Admissions, attached to McGlynn Affidavit as Exhibit 7.

11.  J.P. Morgan was record holder of the Loan until it assigned all of its right, title and interest in the Loan to CSFB 1999-C1 Royall Street, LLC ("CSFB") on or about November 10, 2004. *See* Response No. 2 to Responses to Admissions, attached to McGlynn Affidavit as Exhibit 7.

### CSFB

12.  CSFB is a Delaware limited liability company formed in September 2004 with a principal place of business at 1601 Washington Avenue, Suite 700, Miami Beach Florida, 33139. *See* Answers to Second Amended Complaint, ¶ 3; Certificate issued by Delaware Secretary of State, attached to McGlynn Affidavit as Exhibit 55.

13.  All of J.P. Morgan's rights, title interest and obligations in the Loan were assigned to CSFB by assignment recorded in Norfolk Registry of Deeds on November 10, 2004 in Book 21755, page 477. *See* Response No. 2 to Responses to Admissions, attached to McGlynn Affidavit as Exhibit 7.

**Wells Fargo and LNR**

14. Wells Fargo Bank Commercial Mortgage Servicing ("Wells Fargo") is a commercial loan servicer with a principal place of business in California. *See* Deposition Transcript of Curtis Mallegni ("Mallegni Deposition"), page 15, attached to McGlynn Affidavit as Exhibit 16.

15. LNR Partners, Inc., formerly known as Lennar Partners, Inc. ("LNR"), is a Florida corporation with a principal place of business in Florida. *See* Counterclaims ¶ 1.

16. Under a Pooling and Servicing Agreement ("PSA") dated October 11, 1999, Wells Fargo was the Master Servicer and LNR was the Special Servicer of the Loan. *See* Response Nos. 3 and 4 to Responses to Admissions; Mallegni Deposition, pages 30-31, attached to McGlynn Affidavit as Exhibits 7 and 16.

17. Wells Fargo and LNR were agents of J.P. Morgan and CSFB. *See* Response Nos. 3 and 4 to Responses to Admissions, attached to McGlynn Affidavit as Exhibit 7.

**Fineberg Management Company**

18. Fineberg Management Company ("FMC"), a company affiliated with Fineberg, was retained by Blue Hills to manage the Property. FMC managed the Property prior to the 1999 refinancing and continued to manage the Property until November 19, 2004. *See* Deposition Transcript of Joseph Donovan ("Donovan Deposition"), page 27, line 9 through page 28, line 23, attached to McGlynn Affidavit as Exhibit 10.

**The Property And The Lease**

19. The Loan was secured by a mortgage on the Property. *See* Counterclaims, ¶ 8.

20. At the time of the Loan's inception, the Property was occupied primarily by one tenant, Equiserve, Inc. ("Equiserve"), which occupied approximately 96% of the building on the Property. *See* Deposition Transcript of Joseph Rubino ("Rubino Deposition"), page 61, line 6 and page 63, line 18, attached to McGlynn Affidavit as Exhibit No. 18.

21.     Equiserve's lease with Blue Hills ("Lease") expired on July 31, 2004, although Equiserve retained an option to extend the Lease for an additional five-year term. *See* Rubino Deposition, page 88, lines 1-11, attached to McGlynn Affidavit as Exhibit 18.

22.     At the Loan's inception, all parties, including Credit Suisse, not only knew that the Lease would expire on July 31, 2004 but also knew that the Lease provided the only source of funds available to service the Loan. *See* Deposition Exhibits 182 and 217, attached to McGlynn Affidavit as Exhibits 46 and 48.

### The Negotiation of the Loan and Loan Documents

23.     The terms and conditions of the mortgage financing were contained in two separate documents:

- Mortgage Financing Application dated July 20, 1999 between Blue Hills and Credit Suisse together with a term sheet which was incorporated into and made a part of the letter. *See* Deposition Exhibit 14, attached to McGlynn Affidavit as Exhibit 25.

- Letter of intent dated August 31, 1999 from Blue Hills to Credit Suisse, countersigned by Credit Suisse ("Letter of Intent"). *See* Deposition Exhibit 182, attached to McGlynn Affidavit as Exhibit 46.

24.     As part of the Loan closing held on September 14, 1999, Blue Hills executed various Loan documents including the following: Mortgage, Assignment of Rents and Security Agreement ("Mortgage"); Mortgage Note ("Note"); and Cash Management Agreement. *See* Deposition Exhibits 155, 156, and 213, attached to McGlynn Affidavit as Exhibits 1, 2 and 3.

25.     Fineberg and Langelier also executed a Guaranty ("Guaranty"). *See* Langelier Deposition, page 83, line 12 through page 84, line 3, attached to McGlynn Affidavit as Exhibit 17; *see* Guaranty attached to McGlynn Affidavit as Exhibit 4.

26.     As drafted, the Loan is non-recourse as to Blue Hills, Fineberg and Langelier except under certain limited circumstances which are set forth in the Mortgage, Note and Guaranty. *See* Guaranty attached to McGlynn Affidavit as Exhibit 4; see Deposition Exhibits 155 and 156, attached to McGlynn Affidavit as Exhibit 1 and 3.

27.     The Letter of Intent contained the following proposed language for what became paragraph 1.2(ii)(D) of the Guaranty: "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage . . ." *See* Deposition Exhibit 182, attached to McGlynn Affidavit as Exhibit 46.

28.     While the Loan was being negotiated, successive drafts of paragraph 1.2(ii)(D) of the Guaranty prepared by Credit Suisse's counsel, Schulte Roth & Zabel, LLP, contained this language: "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein as required by the Mortgage. . ." *See* Excerpt of Deposition Exhibit 208, attached to McGlynn Affidavit as Exhibit 47.

29.     The final version of the Guaranty executed by Fineberg and Langelier contained the following language: "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage . . ." *See* Guaranty, attached to McGlynn Affidavit as Exhibit 4.

### Loan Securitization And The Pooling Agreement

30.     Credit Suisse originated the Loan, which was securitized and assigned to J.P. Morgan, as Trustee of a pool of loans. Real estate loan securitization creates a secondary market for loans secured by mortgages on real property. Lenders originate loans and then sell a group of loans as a pool to an entity that will issue securities. *See* Response No. 1 to Responses to Admissions attached to McGlynn Affidavit as Exhibit 7; *see generally*, 4. Law of Distressed Real Estate §56:14, Asset Securitization and Commercial Mortgage Backed Securities,

31.     An entity generally known as a "Master Servicer," Wells Fargo in this case, is responsible for collecting and tracking all mortgage payments and ensuring that all payments are made to all the security holders. *See* Mallegni Deposition, page 18, line 9 through page 20, lines 3-18, attached to McGlynn Affidavit as Exhibit 16.

32.     Another entity, generally known as the "Special Servicer," LNR in this case, is charged

with servicing the loans if the loans are in default for a certain period of time or default is imminent. *See* Mallegni Deposition, page 22, lines 22-25 through page 23, lines 1-10, attached to McGlynn Affidavit as Exhibit 16.

33. When the Loan was assigned to J.P. Morgan as trustee, it became subject to the PSA under which, *inter alia*, Wells Fargo became the Master Servicer and LNR became the Special Servicer. *See* Polcari Deposition, Vol. 1, page 14, line 6 through page 15, line 18, attached to McGlynn Affidavit as Exhibit 12.

34. Wells Fargo and LNR were required to service and administer the Loan in accordance with applicable law, the terms of the Loan documents, and the PSA, as well as in accordance industry standards. *See* Answers to Second Amended Complaint, ¶63.

### Cash Management and Reserve Accounts

35. When the Loan was negotiated, the parties intended significant cash reserves to be set aside by Blue Hills and contemplated that Blue Hills could access the reserve funds if Equiserve did not renew its Lease and such funds were needed before a new tenant was in place. *See* Rubino Deposition, page 63, line 1 through page 65, line 7; Deposition Exhibit 217, attached to McGlynn Affidavit as Exhibits 18 and 48.

36. The Cash Management Agreement required Blue Hills to deposit into a "Clearing Account" all of the "Rents" that it received in connection with the Lease. *See* Deposition Exhibit 156, attached to McGlynn Affidavit as Exhibit 3.

37. Funds deposited into the Clearing Account were then swept into a lender-controlled Cash Collateral Account and, thereafter, divided into nine separate sub-accounts maintained by the lender on a ledger entry basis. *See* Deposition Exhibit 156, attached to McGlynn Affidavit as Exhibit 3.

38. These sub-accounts included a "Tax and Insurance Impound Fund," a "Base Leasing Escrow Fund," and a "Cash Flow Leasing Escrow Fund" which were maintained for, *inter alia*, payment

of taxes, insurance and tenant improvements. *See* Deposition Exhibit 156, attached to McGlynn Affidavit as Exhibit 3.

39. The reserve accounts could be accessed by Blue Hills for various purposes, including debt service. *See* Rubino Deposition page 231, lines 5-22; Deposition Exhibit 155, attached to McGlynn Affidavits as Exhibits 18 and 1.

40. Paragraph 6(c)(ix) of the Mortgage required J.P. Morgan to disburse up to $1 million of funds (in excess of a minimum account balance of $2,750,000) to be used "solely toward payment or principal and interest then due and payable on the Note . . . ." *See* Deposition Exhibit 155, attached to McGlynn Affidavit as Exhibit 1.

41. As of August 2004, Blue Hills had deposited approximately $4.1 million in the reserve accounts. *See* Mallegni Deposition, page 48, lines 17-20, attached to McGlynn Affidavit as Exhibit 16.

42. In accordance with Paragraph 6(c)(ix) of the Mortgage, Blue Hills should have been able to access up to $1 million in August 2004. *See* Deposition Exhibit 155 and Mallegni Deposition, page 48, lines 17-20, attached to McGlynn Affidavit as Exhibits 1 and 16.

### Payment of Real Estate Taxes

43. Although the Mortgage required Blue Hills to fund a reserve account for the payment of real estate taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement in October 1999 under which Equiserve deposited the real estate tax payment into the Clearing Account so that it could be swept into the Cash Collateral Account and used by Wells Fargo to pay the taxes. *See* Deposition Exhibit 1; Deposition Transcript of Lawrence Needle ("Needle Deposition"), page 140, line 22 and page 141, line 14; Deposition Transcript of Gilbert Stone ("Stone Deposition"), page 46, lines 5-16, attached to McGlynn Affidavit as Exhibits 22, 9 and 19.

44. As a result of the foregoing arrangement, shortly before the taxes were due each quarter, Wells Fargo would issue a so-called "tax insufficiency" notice advising Blue Hills that the taxes were due. *See* Stone Deposition, page 56, lines 14-19, attached to McGlynn Affidavit as Exhibit 9.

45. The last notice received from Wells Fargo before Blue Hills was defaulted for failing to pay real estate taxes was dated July 16, 2004 and stated that "Failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to your loan." *See* Deposition Exhibit 4, attached to McGlynn Affidavit as Exhibit 23.

46. Wells Fargo did not send Blue Hills any notices that failure to timely pay the real estate taxes would constitute a default under the Loan. *See* Deposition Exhibit 4 and Response No. 20 to Responses to Admissions, attached to McGlynn Affidavit as Exhibits 23 and 7.

### Blue Hills Is Notified In 2003 That The Lease Will Not Be Renewed

47. In April 2003, Blue Hills became aware that Equiserve intended to move out of the Property at the expiration of the Lease on July 31, 2004 and relocate to the building located at 250 Royall Street, Canton, Massachusetts ("250 Royall"), which abuts Blue Hills' Property. *See* Deposition Exhibit 9 and Needle Deposition, page 61, line 14 and page 63, line 5, attached to McGlynn Affidavit as Exhibits 24 and 19.

48. By letter dated May 14, 2003, Equiserve notified Blue Hills of its intent not to exercise its option to extend the Lease. *See* Deposition Exhibit 17, attached to McGlynn Affidavit as Exhibit 26.

49. Blue Hills confirmed Equiserve's intent by a letter to Equiserve dated May 15, 2003. *See* Deposition Exhibit 18, attached to McGlynn Affidavit as Exhibit 27.

### The Norfolk Action

50. In April 2003, Blueview Corporate Center, LLC ("Blueview"), the owner of 250 Royall, applied to the Town of Canton Zoning Board of Appeals ("ZBA") for a Special Permit to construct a parking garage. *See* Deposition Exhibit 9, attached to McGlynn Affidavit as Exhibit 24.

51. On May 22 2003, the ZBA issued a decision granting the Special Permit over Blue Hills' objections. *See* Counterclaims ¶ 25.

52. On or about June 9, 2003, Blue Hills filed an appeal of the ZBA's decision in Norfolk Superior Court, Civil Action No. 2003-01051 ("Norfolk Action"). *See* Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.

53. Blueview and the members of the ZBA were named as parties to the Norfolk Action. *See* Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.

54. In the Norfolk Action, Blue Hills asserted that the ZBA failed to comply with the applicable Canton ordinances and by-laws in permitting the parking garage to be built as proposed. *See* Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.

55. Blue Hills alleged, *inter alia*, that the height of the proposed parking garage would not comply with applicable ordinances and by-laws. *See* Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.

56. Blue Hills did *not* claim that the ZBA's decision caused it any monetary damage nor did it seek monetary damages as a remedy. Rather, Blue Hills sought only to have the ZBA's decision to grant the Special Permit annulled. *See* Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.

57. Less than two months after filing the Norfolk Action, Blue Hills entered into a settlement agreement dated August 5, 2003 ("Settlement Agreement") with Blueview and DST Realty, Inc. ("DST"), an affiliate of Equiserve, which intended to purchase 250 Royall from Blueview. DST's purchase of 250 Royall was conditioned upon the approval of all necessary permits for the construction of the parking garage. The settlement was negotiated before any discovery was commenced or any challenge to Blue Hills' standing was raised. *See* Deposition Exhibit 21; Docket Sheet for the Norfolk Action, attached to McGlynn Affidavit as Exhibits 29 and 54.

58. By the terms of the Settlement Agreement, Blue Hills agreed to dismiss the Norfolk Action upon the receipt of $2,000,000.00 ("Settlement Proceeds") from DST. *See* Deposition Exhibit 21, attached to McGlynn Affidavit as Exhibit 29.

59. The Settlement Proceeds were to be paid on the earlier of the date on which DST acquired title to the 250 Royall or on September 2, 2003. *See* Deposition Exhibit 21, attached to McGlynn Affidavit as Exhibit 29.

60. Upon the sale of the Property to DST, the Settlement Proceeds where wired to Bernkopf Goodman LLP's IOLTA account at Banknorth and then wired to a Blue Hills' clients' funds account at Bernkopf Goodman LLP on August 8, 2003. *See* Deposition Transcript of Kenneth Goldberg ("Goldberg Deposition"), page 69, lines 1-16, attached to McGlynn Affidavit as Exhibit 20.

61. The client funds account at Bernkopf Goodman LLP was titled "Fineberg Royall Associates." This internal client reference is a generic reference to the client, which reference pre-dated the formation of Blue Hills and is not indicative of the ownership of the funds being held on behalf of any person or entity other than Blue Hills. The Trust owned the Property before the 1999 refinancing, which required the single purpose entity, Blue Hills, to be formed. *See* Deposition Exhibit 177 and Goldberg Deposition, page 71, line 18 through page 72, Line 7, attached to McGlynn Affidavit as Exhibits 45 and 20.

62. The Settlement Proceeds were reflected on the compiled financial statements of Blue Hills for the year ended December 31, 2003 as a reduction in basis of the Property and were not reported as income. *See* Deposition Transcript of David Andelman ("Andelman Deposition"), page 91, lines 11-24 and Deposition Exhibit 410, attached to McGlynn Affidavit as Exhibits 21 and 51.

63. The reduction in basis recorded in Blue Hills' financial statement reflects the $2,000,000 in Settlement Proceeds less the approximately $65,000.00 in attorneys' fees incurred in obtaining the settlement. *See* Andelman Deposition, page 93, lines 3-18, attached to McGlynn Affidavit as Exhibit 21.

64. Blue Hills' financial statement was prepared utilizing a legally permissible accounting method known as the income tax method of accounting. This legally permissible accounting method allowed the deferment of any tax payment on the Settlement Proceeds. *See* Andelman Deposition, page 83, lines 7-21, attached to McGlynn Affidavit as Exhibit 21.

### Blue Hills Advises Wells Fargo That Lease Will Not Be Renewed

65. In 2003, Blue Hills advised Wells Fargo of Equiserve's notification of its intent not to renew the Lease and Wells Fargo and LNR were aware, at least as early as September 2003, that Equiserve did not intend to renew the Lease. *See* Blue Hills, Second Supplemental Answers to Interrogatories, No. 7 and Deposition Exhibits 69 and 71, attached to McGlynn Affidavit as Exhibits 9 and 41.

66. As early as the Spring of 2004, LNR knew that, despite Blue Hill's efforts, there was a distinct possibility that a substitute for the Property's sole tenant would not be found and that any such failure would have severe repercussions. *See* Deposition Exhibits 63, 81 and 86, attached to McGlynn Affidavit as Exhibit 39.

67. The internal e-mail communications in April 2004, between Wells Fargo and LNR reveal not only that they were concerned about the Loan but also that they were predicting a "FUGLY" and "fein potential mess for CSFB 199-C", as well as an estimated loss of between $11.3 million to $19.75 million. *See* Deposition Exhibit 86, attached to McGlynn Affidavit as Exhibit 39.

68. Wells Fargo and LNR's internal e-mails in April 2004 also show that they did not know that Blue Hills had a right of access to the reserve accounts for debt service. One e-mail states "In our case, I hope it is just a leasing reserve and the Borrower will be forced to default." *See* Deposition Exhibit 85, attached to McGlynn Affidavit as Exhibit 39.

### Blue Hills Requests Disbursements from the Reserve Accounts

69. Because Equiserve was leaving the Property as of July 31, 2004, funds were not available to pay the real estate taxes due to the Town of Canton on August 2, 2004. On August 2, 2004, Blue Hills' representative Joseph Donovan ("Donovan"), the CFO of FMC, sent a written request to Wells Fargo seeking disbursement from the reserve accounts of the sum of $412,833.43, to be used to pay principal and interest due on the Note for the month of August, 2004, as well as for payment of the real estate taxes. *See* Deposition Exhibit 23, attached to McGlynn Affidavit as Exhibit 30.

70. Wells Fargo paid $158,181.19 in property taxes due to the Town of Canton on August 2, 2004. *See* Deposition Exhibits 65, attached to McGlynn Affidavit as Exhibits 40.

71. After sending the August 2, 2004 letter to Wells Fargo, Donovan contacted the Town of Canton Treasurer's Office, which verified to Donovan that the taxes had been paid. Consequently, Donovan assumed that the tax payment was made from the reserve accounts. *See* Donovan Deposition, page 220, lines 17-22, attached to McGlynn Affidavit as Exhibit 10.

72. Payments of principal and interest under the Note were due on August 11, 2004. *See* Deposition Exhibit 156, attached to McGlynn Affidavit as Exhibit 3.

73. At the time Donovan's August 2, 2004 letter was sent to Wells Fargo, Blue Hills was not in default of its obligations under the Loan and was entitled to the disbursement of funds for principal and interest due under the Note. *See* Deposition Exhibit 155, attached to McGlynn Affidavit as Exhibit 1.

74. Donovan sent a subsequent letter to Wells Fargo dated August 5, 2004 requesting a meeting with both Wells Fargo and LNR, the Special Servicer. *See* Deposition Exhibit 24 attached to McGlynn Affidavit as Exhibit 31.

75. On August 13, 2004, having received no response from Wells Fargo, Donovan sent a fax memorandum to Mallegni stating, "Sorry we have been missing each other on the phone. I would like to get the special servicer involved" and attached copies of his August 2 and August 5, 2004 letters. *See* Deposition Exhibit 27, attached to McGlynn Affidavit as Exhibit 32.

76. Wells Fargo did not respond to Donovan's requests for a meeting or for disbursements contained in his August 2, 5 and 13, 2004 correspondence. *See* Donovan Deposition, page 164, lines 7-20 and Deposition Exhibits 23, 24 and 27 attached to McGlynn Affidavit as Exhibits 10, 30, 31 and 32.

77. Wells Fargo did not advise Blue Hills that Blue Hills' failure to pay the real estate taxes constituted an Event of Default under the Loan. *See* Deposition Exhibit 4, and Response No. 20 to Responses to Admissions, attached to McGlynn Affidavit as Exhibits 23 and 7.

78. By letter dated August 19, 2004, but not faxed until August 24, 2004, an LNR asset manager, Job Warshaw ("Warshaw"), notified Blue Hills that the Loan servicing had been transferred to LNR and that LNR looked forward to a "successful working relationship" with Blue Hills. No mention was made of Blue Hills' requests for disbursement or of a loan default. *See* Deposition Exhibit 59, attached to McGlynn Affidavit as Exhibit 36.

79. Warshaw also sent Blue Hills another letter dated August 19, 2004, but not faxed until August 24, 2004, in which he advised that LNR had "agreed to discuss the status of [the Loan]…" and "any issues arising under [the Loan documents]. *See* Deposition Exhibit 61 and Polcari Deposition, Vol. I, page 101, line 21 through page 102, line 9, attached to McGlynn Affidavit as Exhibits 12, 37 and 38.

80. The second August 19, 2004 letter included a list of documents requested by LNR, all of which LNR or Wells Fargo already had in their possession, except for Fineberg and Langelier's updated financial statements and a business plan. *See* Deposition Transcript of Job Warshaw ("Warshaw Deposition"), page 87, line 2 through page 93, line 27 and Deposition Exhibits 60 and 61, attached to McGlynn Affidavit attached as Exhibits 14, 37 and 38.

81. Thereafter, on August 26, 2004, Fineberg signed the letter received from LNR on August 24, 2006 and faxed the signed copy to LNR. *See* Warshaw Deposition, page 84, line 19 - page 85, line 2 and Goldberg Deposition, page 125, lines 21-23, attached to McGlynn Affidavit as Exhibits 14 and 20.

82. Although Fineberg signed this letter and LNR or Wells Fargo had virtually all of the requested documents, LNR did not schedule a meeting. *See* Warshaw Deposition, page 86, lines 3-14, attached to McGlynn Affidavit as Exhibit 14.

83. On September 2, 2004, Donovan wrote to Wells Fargo requesting the disbursement of $254,652.24 to pay principal and interest due on the Note for the month of September, 2004. *See* Deposition Exhibit 54, attached to McGlynn Affidavit as Exhibit 35.

84. On September 7, 2004, Joseph Polcari ("Polcari") replaced Warshaw as asset manager at LNR. Polcari did not follow up with Blue Hills and, thereafter, sent Blue Hills a default letter dated

September 17, 2004. *See* Warshaw Deposition, page 101, line 16 through page 102, line 14 and Deposition Exhibit 52, attached to McGlynn Affidavit as Exhibits 14 and 34.

### **LNR Wrongfully Defaults Blue Hills And Forecloses On The Property**

85. In his September 17, 2004 letter, Polcari informed Blue Hills that its request for disbursement of real estate taxes had been denied purportedly because the Mortgage did not permit such disbursements and that Blue Hills was in default under the Loan as of August 2, 2004 for failure to pay real estate taxes when due. *See* Deposition Exhibit 52, attached to McGlynn Affidavit as Exhibit 34.

86. This September 17, 2004 default letter is the <u>only</u> notice of default ever sent to Blue Hills from the closing of the Loan in 1999. *See* Response No. 20, to Responses to Admissions attached to McGlynn Affidavit as Exhibit 7.

87. Thereafter, on or about October 18, 2004, Daniel Frank ("Frank"), Blue Hills' representative and President of FMC, requested a meeting with LNR. *See* Frank Deposition, page 102, lines 10-22; Deposition Exhibit 41; attached to McGlynn Affidavit as Exhibits 11 and 49.

88. By letter dated October 21, 2004, CSFB, as assignee of J.P. Morgan, gave notice of its intention to foreclose. *See* Deposition Exhibit 40, attached to McGlynn Affidavit as Exhibit 33.

89. Several letters were subsequently exchanged between Goldberg and counsel for LNR during the period November 10 – November 19, 2004, whereby Blue Hills continued to request LNR to meet with it to consider alternatives to foreclosure. *See* Deposition Exhibits 41, 334-337, attached to McGlynn Affidavit as Exhibit 49.

90. From August through November 2004, Wells Fargo's and LNR's internal e-mails reveal that they awaited an opportunity to acquire the $4.1 million in reserves and to either acquire the Property or to quickly commence foreclosure proceedings. *See* Deposition Exhibits 85, 89, 106 and 107, attached McGlynn Affidavit as Exhibit 42.

91. A foreclosure sale occurred on or about November 23, 2004, and the foreclosure deed was recorded on January 14, 2005 with the Norfolk County Registry of Deeds in Book 21988, page 509.

*See* Deposition Transcript of Randall Rosen ("Rosen Deposition"), page 81, lines 1-4; Polcari Deposition, Vol. II, page 187, lines 10-22 and Deposition Exhibit 411, attached to McGlynn Affidavit, Exhibits 15, 13 and 52.

92.  As a result of the foreclosure sale, Blue Hills has suffered significant damages, including tax liability of the Trust totaling nearly $5 million.  *See* Deposition Exhibit 358, attached to McGlynn Affidavit as Exhibit 50.

93.  On or about April 29, 2005, CSFB sold the Property to One Beacon Insurance Group for $23,000,000.  *See* Deposition Exhibit 122 and Polcari Deposition, Vol. II, pages 188-189, attached to McGlynn Affidavit as Exhibits 43 and 13.

### The December 31, 2004 Agreement

94.  By agreement between Fineberg and Langelier dated December 31, 2004 (the "December 31, 2004 Agreement"), Fineberg and Langelier agreed to have one-half of the Settlement Proceeds from the Norfolk Action remain in a client funds account at Bernkopf Goodman LLP, with the remaining half of the Settlement Proceeds to be held in a client funds account at Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Cutler"), a firm that represents Langelier, where they still remain.  One-half of the Settlement Proceeds were wired to a client's funds account at Wilmer Cutler in February 2005.  *See* Langelier Deposition, page 129, lines 12-25; Deposition Exhibit 176; Deposition Exhibit 177 and Goldberg Deposition, page 134, lines 17-24 through page 150, lines 3-16, attached to McGlynn Affidavit as Exhibits 17, 44, 45 and 20.

95.  The Settlement Proceeds continue to be held at Bernkopf Goodman and Wilmer Cutler for the benefit of Blue Hills and have never been distributed to the Trust's beneficiaries.  *See* Goldberg Deposition, page 150, lines 3-16 and page 134, lines 17-24 attached to McGlynn Affidavit as Exhibit 20.

96.  Based upon to the December 31, 2004 Agreement, there was approximately $5.6 million, inclusive of Settlement Proceeds, held by Blue Hills in a 'rainy day' reserve account.  *See* Goldberg

Deposition, page 136, lines 16-19 and Langelier Deposition, page 80, lines 10-25 through page 81, lines 1-4, attached to McGlynn Affidavit as Exhibits 20 and 17.

### J.P. Morgan and CSFB's Claims for Damages

97.     By letter dated April 20, 2005, after commencement of the above-captioned lawsuit, counsel for CSFB notified Langelier and Fineberg that CSFB was seeking the full deficiency owed under the Loan pursuant to the Guaranty. *See* April 20, 2005 letter, authenticated by Response No. 27 to Responses to Admissions and Counterclaims, attached to McGlynn Affidavit as Exhibits 53 and 7.

98.     CSFB and J.P. Morgan now claim to be owed in excess of $11,000,000, calculated by taking the total amount of owed on November 19, 2004 offset by the foreclosure bid and reserve balance of $4.1 million. *See* CSFB's Answer to Interrogatory No. 12, attached to McGlynn Affidavit as Exhibit 6.

                                                BLUE HILLS OFFICE PARK LLC, WILLIAM
                                                LANGELIER AND GERALD FINEBERG,
                                                By their attorneys,


                                                /s/ Meredith A. Swisher
                                                Peter B. McGlynn, Esquire (BBO No. 333660)
                                                Meredith A. Swisher, Esquire (BBO No. 646866)
                                                BERNKOPF GOODMAN LLP
                                                125 Summer Street, Suite 1300
                                                Boston, Massachusetts 02110
                                                Telephone:      (617) 790-3000
                                                Facsimile:      (617) 790-3300
                                                pmcglynn@bg-llp.com
                                                mswisher@bg-llp.com

Dated: May 17, 2006

#338099 v6/14500/9985