UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates, Series<br>1999-C1,<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC,<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO
MOTION OF DEFENDANTS AND PLAINTIFFS-IN-COUNTERCLAIM
TO EXCLUDE EXPERT TESTIMONY OF DR. KENNETH GARTRELL**

## I. INTRODUCTION

Blue Hills Office Park LLC, Gerald Fineberg and William Langelier (collectively, "Blue Hills") submit this Memorandum of Law in Support of Opposition to Motion of Defendants and Plaintiffs-in-Counterclaim to Exclude Expert Testimony of Dr. Kenneth Gartrell ("Motion to Exclude"). Neither the relevant law nor the facts extant support the exclusion of expert testimony by Dr. Kenneth Gartrell ("Dr. Gartrell") at any stage of this jury-waived matter. Summarily, in the Memorandum in Support of Motion of Defendants and Plaintiffs-in-Counterclaim to Exclude Testimony of Kenneth Gartrell (the "Memorandum"), J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 ("J.P. Morgan") and CSFB 1999 – C1 Royall Street, LLC ("CSFB") (collectively, "Defendants") have

laboriously molded and manipulated both their asserted disagreements with Dr. Gartrell's opinions and the relevant legal standards to make the disingenuous case that mere differences in opinion constitute a legitimate reason for excluding Dr. Gartrell's testimony based on, *inter alia*, the putative reliability or relevance of the methodologies utilized.

## II. ARGUMENT

### A. The Legal Standard.

If specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002). Fed. R. Evid. 702 codifies the *Daubert* line of cases, under which the trial court performs a gate keeping function in regulating the admissibility of expert testimony. *United States v. Bueno*, 2006 WL 240060 (D. Mass.) citing *United States v. Diaz*, 300 F.3d at 73.

Pursuant to *Daubert* and its progeny, the gatekeeping function requires an evaluation of both the reliability and the relevance of proffered expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-95 (1993). The review for reliability requires the court to determine "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether the reasoning or methodology properly can be applied to the facts at issue. *Daubert*, 509 U.S. at 592-93; *Diaz*, 300 F.3d at 73. As for relevancy, "expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).

The inquiry as to the admissibility of expert opinions is a "flexible one" and there is no particular procedure that the court need exercise in executing its gatekeeping function. *U.S. v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002) quoting *Daubert*, 509 US at 594. The flexibility of the delineated standards is

underscored by the underlying principal that "the adversary system and party examination and cross examination are central." *U.S. v. Hines*, 55 F.Supp. 2d 62, 67 (D. Mass. 1999).

**B.     Case Background.**

Blue Hills commenced the instant action seeking damages for multiple breaches of certain loan documents committed by Defendants and their disclosed agents.  Such breaches include the wrongful declaration that Blue Hills had defaulted on the loan and the refusal to release to Blue Hills funds held in certain reserve accounts that would have enabled Blue Hills to meet its loan obligations.  These wrongful acts culminated in a foreclosure sale of the property located at 150 Royall Street, Canton, Massachusetts (the "Property") on November 19, 2004.  Blue Hills' damages include, *inter alia*, a loss of approximately $4.1 million on deposit in reserve accounts, a tax liability in excess of nearly $5 million, the loss of the Property and the loss of a significant amount of equity retained in the Property.

The calculation of Blue Hills' damages is not as simple as merely obtaining an appraisal of the current value of the Property.  The nature of Blue Hills' claims requires, *inter alia*, the determination of the fair market value of the Property as of the date of the foreclosure, November 29, 2004, and the calculation of the amount of additional funding Blue Hills would have had to invest in the Property to have avoided the foreclosure of the Property on November 19, 2004.  Needless to say, the many changes on the region's economic condition since 2004 make it impossible to determine the *quantum* of damages based solely on a current inspection and analysis of the Property.  The determination of damages to Blue Hills also involves a range of questions relating to organizations, business management, and corporate finance, such as investment decision-making, business strategy, and cash positioning, all of which are material to evaluating the actions and expectations of Blue Hills and the Defendants.  As discussed *infra*, these are areas in which Dr. Gartrell has training, experience, and expertise beyond mere asset valuation and which are required to evaluate the questions he was asked to consider in this case.

Pursuant to its expert disclosure obligations, on or about March 31, 2006, Blue Hills served on Defendants the Expert Report and Exhibits of Dr. Kenneth D. Gartrell (the "Gartrell Report").[1]

A Rebuttal Report of Dr. Kenneth Gartrell was served on Defendants on or about April 13, 2006 (the "Gartrell Rebuttal").[2]

### C. Dr. Gartrell is Qualified to Testify as to the Opinions Rendered

1. Dr. Gartrell's Qualifications Meet All Pertinent Standards for Admissibility.

Fed. R. Evid. 702 permits qualification of an expert based on knowledge, skill, experience, training or education. Fed. R. Evid. 702; *see, Tokio Marine & Fire Ins. Co., Ltd. v. Grove Mfg. Co.*, 958 F.2d 1169, 1175 (1st Cir. 1992). "A witness may qualify as an expert on *any one* of the five listed grounds." *U.S. v. Pavia*, 892 F.2d 148, 160 (1st Cir. 1989) (emphasis supplied).

Dr. Gartrell's qualifications for the opinions rendered are described in the Gartrell Report, which both describes his background and incorporates his *curriculum vitae*. The Gartrell Report describes, *inter alia*, Dr. Gartrell's educational background, professional licenses and professional experience. Gartrell Report, ¶1-8 and Exhibit 1. Defendants do not allege that the Gartrell Report is not fully compliant with all pertinent expert disclosure standards. Fed. R. Civ. P. 26 (a)(2). In the Gartrell Report, Dr. Gartrell provides, with particularity, information concerning his experience in the valuation of real estate holdings in the Boston Metropolitan Area. Gartrell Report, ¶11. Dr. Gartrell's relevant engagements include, without limitation, testifying in Massachusetts Superior Court regarding the financing terms and fair market value of the real estate portfolio of Friendly Ice Cream Company, consulting on a range of issues regarding the Bank of New England bankruptcy and serving as an expert for the City of Boston regarding the economic benefits of a proposed runway expansion of Logan Airport. Gartrell Report, ¶12. The

---

[1] The Gartrell Report is reproduced in its entirety as Tab B of the Affidavit of Bruce E. Falby in Support of Motion of Defendants and Plaintiff-in-Counterclaim to Exclude Testimony of Dr. Kenneth Gartrell. As a courtesy, a true and complete copy of the Gartrell Report is attached to the Affidavit of Bruce D. Levin in Support of the Opposition to Motion of Defendants and Plaintiffs-in-Counterclaim to Exclude Expert Testimony of Dr. Kenneth Gartrell ("Levin Affidavit") as Exhibit "A."

[2] A copy of the Gartrell Rebuttal is attached to the Levin Affidavit as Exhibit "B."

Gartrell Report also identifies similar engagements involving commercial real estate outside the Boston area. Gartrell Report, ¶12.

Defendants attempt an "end around" of Dr. Gartrell's prestigious qualifications by attempting to narrowly – and incorrectly – define the scope of opinions that need to be rendered relative to the above-captioned action. The gravamen of Defendants' objection to Dr. Gartrell's qualification as an expert is that "Gartrell is not a real estate appraiser and is not qualified to appraise real estate under state law or other standards of the Appraisal Foundation." Memorandum, p. 4. Dr. Gartrell's many academic and professional achievements do not include certification as a real estate appraiser. Defendants, of course, cannot identify any case law indicating that any particular approval certification is necessary, required or even helpful to the rendering of opinions of the sort contained in the Gartrell Report. Moreover, Massachusetts law specifically provides that certification requirements "shall not preclude a person who is not certified . . . from appraising real estate in connection with non-federally related transactions for compensation." M.G.L. c. 112, §174. In other words, the certification requirement misleadingly referenced by Defendants concerns the certification of individuals qualified to opine on the valuation of real property to be secured by loans from federally insured lending institutions. *See*, Title XI of the Financial Institutions Recover Reform and Enforcement Act of 1989, 12 U.S.C. §3331, *et seq.*

More importantly, it is a gross mischaracterization for Defendants to frame the task at hand as being the mere appraisal of real estate. The nature of Blue Hills' claims require, *inter alia*, not only the determination of the value of certain commercial real estate on or about November 19, 2004 but an evaluation of the Blue Hills' equity position and the determination of the adequacy of various reserve accounts relative to a restructuring of Blue Hills' interest in the Property. Neither the appraisal prepared by Bonz & Company in October 2004 – which is relatively contemporaneous to the date of the foreclosure of the Property – nor a mere "appraisal" of the Property today would serve to adequately quantify Blue Hills' damages. A mere "appraisal" of the Property would not consider, for example, the calculation of an appropriate discount rate, competing economic interests or the strategic value Blue Hills had in preserving its economic interest in the Property. The insight of a qualified economist capable of

factoring in and making appropriate adjustments for the significant changes in the local economy and real estate market is a *sine qua non* of any such quantification. As discussed, *infra*, the market index approach – one of three valuation techniques utilized by Dr. Gartrell – is a logical and accepted method of bridging the gap between the situation in November 2004 and the current need for a quantification of Blue Hills' damages in the instant litigation.

It is noteworthy that Defendants do not contradict Dr. Gartrell's position that "the valuation of real estate is no different than the valuation of any other business asset or transaction…" Memorandum, P. 5, citing Dr. Gartrell's Deposition at 39-41, 57-58 and 100-01. Defendants introduce no evidence to the contrary. Dr. Gartrell's experience in valuation of income producing entities is manifest. Gartrell Report, ¶¶ 1-12.

Undoubtedly, if Blue Hills sought to introduce the testimony of a certified appraiser to testify as to the effects various economic events since 2004 had on both the October 2004 appraisal of the Property and the current valuation of the Property, Defendants would adamantly protest Blue Hills' failure to introduce testimony from an economist capable of making the broader-based economic adjustments germane to the facts extent.

Even if, for the sake of argument, Dr. Gartrell's areas of financial and economic expertise did not directly correspond to the areas of specialization required for the opinions he renders in the instant litigation, any such deficiency should go only to the weight of his testimony. *Mitchell v. U.S.*, 141 F.3d 8 (1st Cir. 1998) (that physician not specialist in field on which he is giving opinion affects not admissibility of his testimony, but weight jury may place on it). The Gartrell Report amply demonstrates Dr. Gartrell's qualifications to opine as to economic and financial issues, in general, and the valuation of commercial real estate in the Boston Metropolitan area, in particular. Gartrell Report, ¶¶ 1-12 and Exhibit 1.

2. **Defendants' References to Dr. Gartrell's Expert Testimony in Unrelated Cases are Misplaced and Disingenuous.**

"Probing into the qualifications of an expert is a far cry from probing into differing judicial reactions to [the expert's] prior testimony in totally unrelated cases." *United States Football League v.*

*National Football League*, 842 F.2d 1335, 1375 (2nd Cir. 1988). Simply, "judicial findings in other cases proffered as evidence are generally characterized as inadmissible evidence." *Blue Cross and Blue Shield of N.J., Inc. v. Phillip Morris, Inc.*, 141 F.Supp. 2d 320, 322 (E.D.N.Y. 2001).

Moreover, the references made in the Memorandum to *Dobler v. Montgomery Cellular Holdings Co.*, 2004 WL 2271592 (Del. Ch. Oct. 4, 2002), *Brazos Elec. Power Cooperative v. U.S.*, 52 Fed. Supp. 121 (Ct. Cl. 2002) and *US v. Batchelor-Robjohns*, 2005 U.S. Dist. Lexis 13552, *15-18 (S.D. Fla. 2005) are inapt and disingenuous. None of these three cases question Dr. Gartrell's qualifications or ability to render expert opinions as to commercial real estate valuation nor criticizes the use of the market index approach. Neither the *Brazos* nor *Batchelor* case included any substantive issues of relevance to the arguments advanced in the Memorandum regarding Dr. Gartrell's real estate qualifications or the acceptance of the market index approach.

In the *Dobler* case, Dr. Gartrell applied the indexing approach. While the Delaware Chancery Court ultimately did not rely on Dr. Gartrell's testimony, it admitted his testimony and did not criticize the indexing approach. The quote included in the Memorandum from the *Dobler* case and the implication regarding the reliability of Dr. Gartrell's opinions in that case are based in error, taken out of context, and are irrelevant to the central questions of whether Dr. Gartrell is qualified to render opinions regarding commercial real estate assets and whether the indexing approach is a valid analytical tool in forming such opinions. Although Defendants know this is the case based on the various filings in *Dobler* and *Batchelor* on this issue, they seek to perpetuate misconceptions with an *ad hominem* attack designed to impugn Dr. Gartrell's reputation.

In *Batchelor-Robjohns*, a party was barred from introducing certain expert testimony as a sanction pursuant to Fed. R. Civ. P. 37(c)(1) for failing to timely make certain expert discovery disclosures. *US v. Batchelor-Robjohns*, 2005 WL 3105349 at *2 (S.D. FLA). In that case, Dr. Gartrell's opinions were expressly predicated on the testimony of an expert whose testimony was barred. In that, admittedly, the barred testimony was a crucial foundation of Dr. Gartrell's testimony, the court ruled that Dr. Gartrell's testimony, too, was barred. Neither Dr. Gartrell's qualifications nor the content of his

opinions rendered served as a basis for the decision to exclude his testimony. Exclusion was a sanction resulting from litigant misconduct. *Id.*

The Memorandum mocks Dr. Gartrell's testimony in a pending case in Ohio in which the market index approach is being applied by Dr. Gartrell to an extensive portfolio of commercial real estate properties. Memorandum, p. 7, n. 6. A decision has recently been issued in that case, *Waste Management, Inc. v. Danis Industries,* United States District Court for the Southern District of Ohio (Western Division) Case No. 3:00 CV 256 (Rice, J.), relative to the admissibility of Dr. Gartrell's testimony on, *inter alia*, a real estate valuation based, in part, on the market index approach.[3] The Court – tersely, logically and plainly – rules that "[b]efore hearing that testimony, [it] cannot ascertain whether it must be excluded in accordance with *Daubert*." Implicit in that finding is the common-sense notion that the gatekeeping function that may be necessary to avoid prejudicing an impressionable jury does not provide sufficient reason to prematurely rule on evidentiary issues in a bench trial. The *Danis* Court unequivocally admitted and heard Dr. Gartrell's testimony and presently is weighing its impact on the issues raised in that case. That Court in *Danis* considered precisely the same arguments Defendants make in their Memorandum regarding Dr. Gartrell's real estate qualifications and indexing approach. The clear-minded logic of its decision to admit the testimony provides a direct and strong precedent for this case.

    D.    **The Methodology Utilized is Valid, Relevant and Based on Reliable Data**

        1.    The Market Index Approach.

            a.    The Market Index Approach is widely accepted.

The market index approach calculates the current fair market value of a commercial property by adjusting its known fair market value at a particular point in time by utilizing observed market values to estimate the value change between that point in time and the valuation date. Gartrell Report, ¶24. Dr. Gartrell testified at his deposition that this approach is common in real estate and in other contexts, such

---

[3] A copy of the Opinion is attached to the Levin Affidavit as Exhibit "C."

as investment banking, corporate transactions, and securities litigation.  Dr. Gartrell has applied the index approach in his testimony in *Dobler* and in other valuation cases, and he applied the index approach to commercial real estate in his testimony before the US District Court in *Danis*.

The market index approach is a recognized and logical approach to the valuation issues presented in this litigation.  The following are, without limitation, some professional journal articles discussing the market index approach applied in a real estate context:

- Benveniste, Larry; Capozza, Dennis R.; Kormendi, Roger; Wihelm, William, "Contract Design for Problem Asset Disposition," *Journal of the American Real Estate and Urban Economics Association* 22(1), Spring 1994, p. 149-167 ("In this paper, we develop a general framework for designing and evaluating asset management and disposition (AMD) contracts within a capital structure context. . . . The model highlights the potential for large efficiency gains from the use of indexing of contracts to market movements." (p. 151)).

- J. Maxwell, Kevin; Saint-Pierre, Paul, "Benchmarking Real Estate Investment Performance:  The Application of Real Estate Indices," *Journal of Property Management 63(3)*, May/June 1998, pp. 64-68 ("There are four principal methods for measuring the performance of private asset classes – indices, statistical universe/peer group comparisons, normal portfolio/portfolio opportunity distributions, and risk-adjusted performance measures." (p. 64)).  ("The most widely used index to benchmark real estate, The National Council of Real Estate Investment Fiduciaries (NCREIF) Property Index tracks quarterly total return performance and is published at least 90 days after the close of the previous quarter." (p. 64)).

- Gatzlaff, Dean; Geltner, David, "A Transaction-Based Index of Commercial Property and Its Comparison to the NCREIF Index," *Real Estate Finance*, Spring 1998, pp. 7-22 ("Value indexes that map the periodic movements of asset prices provide valuable information not only to economists studying the market, but to practitioners and investors participating in the market.  Understanding historical price volatility, correlations, and autocorrelations and identifying the timing and magnitudes of "peaks" and

"troughs" in the market, allows investors to develop better price expectations and to make more informed investment decisions." (p. 7)).

- Fisher, Jeff; Geltner, David, "Property-Level Benchmarking of Real Estate Development Investments Using the NCREIF Property Index," *Real Estate Finance* 18(4), Winter 2002, pp. 71-87 ("The NCREIF Property Index (NPI) is widely used as a benchmark for property-level performance of institutional 'core' real estate investments in the U.S." (p. 71)).

- Fisher, Jeffrey, D., "A Repeat Sales Index for Commercial Real Estate – Using Sold Properties in the NCREIF Database," *Real Estate Finance* 17(2), Summer 2000, pp. 66-71 ("we can calculate an index using the repeat sales methodology commonly used for residential real estate indices. This methodology was extended to total returns for commercial real estate . . . using only reappraisals of the property in what might be terms a 'repeat reappraisal index.' This addresses the problem of 'stale' appraisals . . ." (p. 66)).

The delineated articles from professional journals reveal that, if nothing else, the concept and use of market indexing for real estate valuation has been publicly disseminated and subject to peer review. *Daubert*, 509 U.S. at 593-94; *US v. Downing*, 753 F.2d 1224, 1237-42 (3rd Cir. 1985) (courts should consider "the existence of a body of professional literature appraising the process of technique, which tends to ensure widespread attention and critical scrutiny."). Defendants' claim that the methodology has not been subject to peer review is, as demonstrated *supra*, demonstrably false. Memorandum, p. 8.

    b. Dr. Gartrell's Analysis is Based on Reliable Data from Acknowledged Sources.

As an initial matter, it is axiomatic that an expert witness may base his opinion on facts and data if of a type reasonably relied upon by experts in the particular field in forming opinions or inferences. Fed. R. Evid. 703. *International Adhesive Coating Co., Inc. v. Bolton Emerson Intern, Inc.*, 851 F 2d 540 (1st Cir. 1988). Defendants' plaint that Dr. Gartrell's analysis blindly relies on the inadmissible or unreliable conclusions of others is specious. In particular, the assertion that National Real Estate Index ("NREI") value index "is completely suspect" is as unsubstantiated as it is wrong. Memorandum, p. 9.

The NREI is a reliable source of market data for the Boston Metropolitan area. Gartrell Report, ¶32. It is published by Global Real Analytics, a leading international provider of specialized news and information for the commercial real estate industry. According to its website, *www.graglobal.com*, subscribers to its services include the Comptroller of the Currency, the Office of Thrift Supervision, and numerous investment banks, universities and commercial lenders. In that the source on which Dr. Gartrell relies has been disclosed and is of the type allowed by Fed R. Evid 703, Defendants are free to disagree with both the merits of the source and Dr. Gartrell's application thereof; they may not, however, have his testimony excluded based on unsubstantiated allegations and conclusory accusations that the testimony is barred because Dr. Gartrell did not personally mine each nugget of data relied upon.

      c.      The Use of the Market Index Approach is Rational and Logical.

Market conditions are a significant determinant of value in any context. A real estate index is a reflection of overall market conditions. Gartrell Report, ¶31-39. Adjusting an appraisal of the Property obtained in 1999 for market conditions is inherently logical. The basis for using the 1999 appraisal is described in detail. Gartrell Report, ¶29-30. Among the reasons for using the 1999 appraisal as a starting point were that, *inter alia*, it was the most recent appraisal not created in the context of the foreclosure and because it served as the basis for the refinancing transaction that is the genesis of the instant action. Needless to say, however, absent application of pertinent economic indices, the 1999 appraisal would not be directly relevant to a valuation as of November 19, 2004. Bridging such a gap between appraisals for a particular property are one of the primary reasons real estate market indices such as the NCREIF index and NREI data are published and commonly applied. The data indices utilized in the analysis performed by Dr. Gartrell are recognized resources and are available to Defendants for review.

      2.      The Discounted Cash Flow Method Was Properly Utilized.

          a.      The Use of Discounted Cash Flow Analysis is Widely Accepted.

Defendants do not – and cannot credibly – dispute the reliability of the use of a discounted cash flow methodology for the purposes needed in the instant litigation. *See, Northwest Assocs. v. Board of Assessors of Burlington*, 392 Mass. 593, 594 (1984). Unable to credibly dismiss the entire methodology

in a wholesale manner, Defendants resort to *ad hominem* acts on Dr. Gartrell and inapt analogies to testimony on different matters in different cases. As discussed, *supra*, references to judicial findings in other cases are "generally characterized as inadmissible evidence." *Blue Cross and Blue Shield of N.J., Inc. v. Phillip Morris, Inc.*, 141 F.Supp. 2d at 322. In the instant case, they are also just plainly mischaracterized. One important reason such findings are inadmissible is to prevent the perpetuation of false or misleading information from case to case, which is precisely what the Defendants attempt to do.

      b.     The "Law of One Price" is a Widely Accepted Principle.

As part of the smear campaign, Defendants insinuate that the "one price" theory is somehow novel, unusual or unreliable. Memorandum, p. 10. To the contrary, it is a fundamental and universally accepted principle of economics which is found in most introductory economic and finance texts. *E.g.*, Brealy, Richard, *Principles of Corporate Finance*, p. 796 (6th Ed. McGraw Hill); Bodie, Ziv, *Investments*, p. 133 (3rd Ed. Irwin). It stands for nothing more than the basic principle that "an identical good must sell at the same price in all markets." Samuelson, *Economics*, p. 670 (15th Ed. McGraw Hill). Though a relatively simple idea in concept, it is important to Dr. Gartrell's analysis in that it reconciles the values he calculated based on the indexed 1999 appraisal value and his discounted cash flow value.

While Defendants are certainly entitled to dispute the opinions reached by Dr. Gartrell, Defendants' credibility is not enhanced by disparaging a concept so universal as to be defined in Paul Samuelson's iconoclastic introductory economics textbook. *Id*. Based on the foregoing, the "law of one price" cannot be rightfully labeled obscure nor can it be summarily dismissed as merely something "Dr. Gartrell believes," as if it were not so widely accepted principle in economics and finance.

      3.     Comparable Sales Approach.

The use of a comparable sales approach to value is also widely accepted for the purposes needed in the instant litigation. *See, Northwest Assocs. v. Board of Assessors of Burlington*, 392 Mass. at 594. The manifest acceptance of the comparable sales approach methodology forces Defendants to float unsubstantiated allegations mischaracterizing Dr. Gartrell's analysis as "flawed." Without exception, the Defendants plaints concerning the use of the comparable sales approach are legitimate fodder for cross-

examination (although of highly questionable value). To the extent the criticisms are accurate - and Blue Hills disputes such accuracy - they question neither the soundness of the methodology nor indicate that the testimony is mere conjecture to the extent necessary to overcome the presumption or admissibility with it then left to the fact finder to determine how much weight to give the testimony. *Lepages Inc. v. 3M*, 324 F. 3d, 141, 165 (3rd Cir. 2003).

Not only is the comparable sales approach methodology a legitimate, accepted methodology, but the Memorandum does not dispute that Dr. Gartrell has adequately identified the predicates and data underlying his opinions.

### III. CONCLUSION

For the foregoing reasons, the Motion to Exclude Expert Testimony should be denied. Dr. Gartrell should be permitted to testify as to the opinions rendered in the Gartrell Report and the Gartrell Rebuttal.

Respectfully submitted,

BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
By their attorneys,

/s/ Bruce D. Levin
Peter B. McGlynn, Esquire
 BBO No. 333660
Bruce D. Levin, Esquire
 BBO No. 548136
Meredith A. Swisher, Esquire
 BBO No. 646866
Bernkopf Goodman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:   (617) 790-3000
Facsimile:   (617) 790-3300
pmcglynn@bg-llp.com
blevin@bg-llp.com
mswisher@bg-llp.com

Dated: May 31, 2006
#338835 v2/14500/9985

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,  )<br>    Plaintiff/Defendant-in-Counterclaim )<br>)<br>v.  )<br>)<br>J.P. MORGAN CHASE BANK, as )<br>Trustee for the Registered Holders of )<br>Credit Suisse First Boston Mortgage )<br>Securities Corp., Commercial Mortgage )<br>Pass-Through Certificates, Series 1999-C1, )<br>    Defendant )<br>)<br>and CSFB 1999 – C1 ROYALL STREET, )<br>LLC, )<br>    Defendant/Plaintiff-in-Counterclaim )<br>)<br>and )<br>)<br>WILLIAM LANGELIER and GERALD )<br>FINEBERG, )<br>    Defendants-in-Counterclaim ) | Civil Action No. 05-CV-10506 (WGY) |

## CERTIFICATE OF SERVICE

    I, Bruce D. Levin, hereby certify that I caused to be served via electronic service this 31st day of May, 2006 the **Memorandum of Law in Support of Opposition to Motion of Defendants and Plaintiffs-in-Counterclaim to Exclude Expert Testimony of Dr. Kenneth Gartrell** upon Bruce S. Barnett, Esquire, Traci S. Feit, Esquire, E. Randolph Tucker, Esquire, Bruce E. Falby, Esquire, DLA Piper Rudnick Gray Cary US LLP, 33 Arch Street, 26th Floor, Boston, Massachusetts 02110.

                                                     /s/ Bruce D. Levin
                                                   Bruce D. Levin, Esquire
                                                   BBO No. 548136
                                                   Bernkopf Goodman LLP
                                                   125 Summer Street, Suite 1300
                                                   Boston, Massachusetts 02110
                                                   Telephone:    (617) 790-3000
                                                   Facsimile:    (617) 790-3300
                                                   blevin@bg-llp.com

#339430 v1/14500/9985