UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates, Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**BLUE HILLS OFFICE PARK LLC, GERALD FINEBERG AND
WILLIAM LANGELIER'S MEMORANDUM IN OPPOSITION TO THOSE
PARTS OF THE MOTIONS FOR SUMMARY JUDGMENT OF DEFENDANTS
AND PLAINTIFFS-IN-COUNTERCLAIM J.P. MORGAN CHASE BANK, AS
TRUSTEE FOR THE REGISTERED HOLDERS OF CREDIT SUISEE FIRST
BOSTON MORTGAGE SECURITIES CORP., COMMERICAL MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 1999-1 AND CSFB 1999-C1 ROYALL
<u>STREET, LLC SEEKING DISMISSAL OF THE SECOND AMENDED COMPLAINT</u>**

The Defendants and Plaintiffs-in Counterclaim J.P. Morgan and CSFB (sometimes collectively referred to herein as the "Lender")[1] have moved for summary judgment seeking dismissal of Blue Hills' Second Amended Complaint. Presumably in an effort to comply with Local Rule 7.1(B)(4), J.P. Morgan and CSFB have filed separate motions and separate memoranda, each of maximum allowable length;

---

[1] As used herein, capitalized words and phrases shall have the same meaning ascribed in Blue Hills Office Park LLC, Gerald Fineberg and William Langelier's Memorandum in Support of Motion for Summary Judgment (the "Blue Hills Memorandum I") and in Blue Hills Office Park LLC, Gerald Fineberg and William Langelier's Memorandum in Opposition to CSFB 1999 - C1 Royall Street, LLC and J.P. Morgan Chase Bank, as Trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 Motions for Summary Judgment on their respective Counter-Claims (the "Blue Hills Memorandum II") both of which are incorporated herein by reference.

however, only the memorandum submitted by J.P. Morgan (the "J.P. Morgan Memorandum") addresses Blue Hills' Second Amended Complaint.

## I. INTRODUCTION

When notified by Blue Hills that Equiserve did not intend to extend the Lease beyond July 31, 2004, the Lender had a decision to make: whether to pursue a path which most likely would have resulted in the restructuring of the Loan with limited risk and with little or no loss to the Lender, or whether to remain idle in the hope that Blue Hills would default on the Loan thereby negating its access to over $4 million of escrowed reserve funds, and thus enabling Lender to either sell the Loan or to allow its Special Servicer, LNR to buy it.

Unfortunately, the Lender, through its agents, Wells Fargo and LNR, chose the latter path. Primarily in the business of lending, loan servicing and property ownership and management, LNR has garnered a reputation of being a "loan to own" lender and servicer. As the Loan's Special Servicer, LNR had the ability under the Pooling and Servicing Agreement dated October 11, 1999 (the "PSA") to restructure the Loan and, based on LNR's estimated projected foreclosure loss of up to of $20 million, had every reason to do so. Those reasons notwithstanding, the record of internal communications within LNR and between LNR and Wells Fargo demonstrate that LNR had no *bona fide* interest in attempting to restructure the Loan with Blue Hills. Quite likely, this lack of interest was based upon, among other things, LNR's prior dealings with Fineberg on other real estate projects and its desire to own the Loan.

The Property's foreclosure on November 19, 2004 yielded only $18.5 million via a credit bid by the Lender. Blue Hills' expert, Dr. Kenneth Gartrell ("Gartrell"), believes the Property was worth approximately $42 million or more at that time. Approximately five months after the foreclosure sale, the Lender sold the Property for $23 million. In addition to their loss of equity in the Property as a result of the foreclosure sale, Blue Hills, the Trust and its beneficiaries are now exposed to payment of a tax bill of over $4.9 million.

## II. STATEMENT OF UNDISPUTED FACTS

On or about September 14, 1999, Credit Suisse loaned Blue Hills approximately $33.1 million, secured by a mortgage on the Property. At Loan inception, the Credit Suisse was aware that the Lease would expire on July 31, 2004, and that it was the only revenue source available to service the Loan. In recognition of Blue Hills' need to spend money to attract new tenants in the event that Equiserve did not extend the Lease, Credit Suisse required Blue Hills to deposit substantial portions of its net cash flow into several reserve accounts earmarked for debt service, maintenance, real estate tax, insurance reserves and tenant improvements. Blue Hills Statement I,[2] ¶¶ 35-38.

On or about October 11, 1999, the Loan was "securitized" by its incorporation into a pool of loans sold to investors. Credit Suisse assigned all of its interests in and obligations under the Loan to J.P. Morgan. The loan pool was administered pursuant to the PSA, under which Wells Fargo was the Master Servicer and LNR was the Special Servicer. Blue Hill Statement I, ¶¶ 30-32.

The Loan Documents permitted the use of up to $1 million in the reserve accounts for payment of Loan principal and interest if Equiserve vacated the Property. Other reserve accounts were available to reimburse Blue Hills for leasing commissions, repairs and maintenance to the Property and the costs of tenant build-out work. As of August 2004, funds on deposit in the reserve accounts totaled approximately $4.1 million. Blue Hills Statement I, ¶¶ 39-41.

On or about May 14, 2003, Equiserve notified Blue Hills that it would not be exercising its option to extend the Lease; a fact that Wells Fargo and LNR were aware of by September 2003. Throughout the latter part of 2003 and into 2004, LNR and Wells Fargo exchanged several e-mails regarding the Loan, LNR's past dealings with Fineberg and LNR's strong interest in acquiring the Loan. Some examples of these e-mails are as follows:

---

[2] "Blue Hills Statement I" refers to the Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaim previously filed with the Court. "Blue Hills Statement II" refers to the Blue Hills, Fineberg and Langelier's Statement of Undisputed Facts In Opposition to Defendants' Motions for Summary Judgment. Blue Hills Statement II contains only facts not included in Blue Hills Statement I.

- One e-mail identified the borrower as "Gerald Fineberg, whom we are familiar with (<u>difficult bwr in workout</u>) . . . ." (emphasis added) Deposition Exhibit 69, attached as Exhibit 41 to the Affidavit of Peter B. McGlynn ("McGlynn Affidavit"), previously filed.

- In a similar vein, another e-mail states: "Borrower is Feinberg, and this is a fein potential mess for CSFB 1999-C1. . . If you look at the 2-pager in the Madison book, it is FUGLY. The "F" could also stand for Feinberg." Deposition Exhibit No. 86, attached to the McGlynn Affidavit as Exhibit 39; Blue Hills Statement I, ¶ 67.

- In another e-mail, LNR discusses the large amount of money Blue Hills deposited into reserve accounts and expressed concern that the they could be used for payment of debt service: "In our case, I hope that it is just a leasing reserve and that the Borrower will be <u>forced to default</u>. Then the lender usually gets control of the cash." (emphasis added) Deposition Exhibit 85, attached to the McGlynn Affidavit as Exhibit 39; Blue Hills Statement I, ¶ 68.

- In another e-mail, LNR viewed with disdain Fineberg's decision to provide LNR with deeds in lieu of foreclosure on two hotels unrelated to the Loan. Deposition Exhibit 69, attached to the McGlynn Affidavit as Exhibit 41.

- Beginning in early September, 2004 e-mails were exchanged between and among LNR representatives, including LNR's Chief Executive Officer, which demonstrated that the LNR was interested in purchasing the Loan as a "potential mining opportunity" for LNR. Blue Hills Statement II, ¶ 14.

- Additional e-mail shows that LNR's compliance staff was scrutinizing the PSA and checking with various contacts on how to get the necessary consents for LNR to purchase the Loan. Blue Hills Statement II, ¶ 15.

Shortly after the Loan's inception, Wells Fargo agreed to alter the provisions of the Mortgage Agreement so that Blue Hills would not be required to make monthly tax reserve deposits. Instead, Blue Hills would deposit the quarterly tax payment received from Equiserve into the Clearing Account. Each quarter, Wells Fargo sent a "tax insufficiency" notice to Blue Hills in advance of the date when payments were due.[3] Blue Hills Statement I, ¶ 43-44.

---

[3] These tax notices advised Blue Hills that failure to timely pay taxes could expose Blue Hills to -interest and penalties if they were assessed by the Town of Canton. The notice dated July 16, 2004 - the last tax notice sent before the Lender defaulted Blue Hills - stated that: "Failure to remit the shortage amount within the specified time frame <u>may result in Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would </u>be assessed to your loan." (emphasis added) Blue Hills Statement I, ¶¶ 44-45.

Because Equiserve was vacating the Property on or about July 31, 2004, Blue Hills would not be able to obtain all of the funds necessary to pay the real estate taxes from Equiserve.[4] Consequently, on August 2, 2004, Blue Hills' CFO, Joseph Donovan ("Donovan"), sent to Wells Fargo a written request for authority to withdraw $412,833.43 from the reserve accounts to pay principal and interest on the Loan due on August 11, 2004, and to pay the real estate taxes due on August 2, 2004. At the time, Donovan assumed that the reserve accounts were available for both of these purposes.[5] Although Wells Fargo did not respond to Donovan's August 2, 2004 letter, the real estate taxes were paid by Wells Fargo; a fact which Donovan confirmed with the Town of Canton. Blue Hills Statement I, ¶¶ 69-72.

Donovan sent another letter to Wells Fargo on August 5, 2004, requesting a meeting with both Wells Fargo and LNR to discuss the Loan status. After receiving no response from Wells Fargo, and trading telephone messages with Wells Fargo's Curtis Mallegni ("Mallegni"), Donovan sent Mallegni a fax on August 13, 2004, which enclosed his August 2, 2004 and August 5, 2004 letters and requested the involvement of the Loan's Special Servicer. On or about August 13, 2004, Mallegni referred the Loan to LNR. Servicing of the Loan was transferred LNR on or about August 17, 2004. Blue Hill Statement I, ¶¶ 74-78.

On August 19, 2004, LNR's Job Warshaw ("Warshaw") wrote Blue Hills advising them that the servicing of the Loan had been transferred to LNR and that LNR looked forward to a "successful working relationship" with Blue Hills. That same day, Warshaw sent another letter to Blue Hills advising that "we have agreed to discuss the status of your loan…" and that LNR had the authority "to meet with Blue Hills

---

[4] The real estate taxes due on August 2, 2004 were approximately $158,000 and Equiserve was liable for approximately one-third of that amount as its *pro rata* share of real estate taxes through July 31, 2004.

[5] In at least one prior instance, Wells Fargo apparently advanced the tax payment with its own funds and it was subsequently reimbursed upon Blue Hills' consent out of another reserve account. In other instances, funds were transferred from various reserve accounts into the Tax Escrow Account to cover tax payment shortages or to reallocate incorrectly allocated reserve account funds. See Deposition Exhibit 393 and portion of Deposition Exhibit 98, attached to the Swisher Affidavit as Exhibits 24 and 26.

to review the status of the Loan and any issues arising under [the Loan Documents]."[6] Warshaw's letter also included a list of information and documents requested by LNR, all of which were in the possession of LNR or Wells Fargo, except for Fineberg and Langelier's updated financial statements and a business plan. Blue Hills Statement I, ¶¶ 78-81. On September 2, 2004, Blue Hills again wrote to Wells Fargo requesting a disbursement from the reserve accounts to pay principal and interest due on September 11, 2004. Blue Hills Statement I, ¶ 83.

The only written response to <u>any</u> of Donovan's letters ever received by Blue Hills was LNR's letter dated September 17, 2004, by which LNR advised Blue Hills that the Loan had been defaulted as of August 2, 2004 because of Blue Hills' purported failure to pay real estate taxes and that, consequently, access to the reserve accounts to pay debt service for the months of August and September 2004 had been denied. LNR's September 17, 2004 letter also states that Blue Hills' failure to make August and September's debt service payments constituted events of default as well. LNR also informed Blue Hills that the Loan had been accelerated. Blue Hills Statement I, ¶¶ 84-86. Despite promises made by Warshaw in his August 19, 2004 letters, LNR never requested a meeting or extended the opportunity to meet with Blue Hills to discuss the Loan's status. Blue Hills Statement I, ¶ 82.

On October 21, 2004, LNR sent Blue Hills a notice of a foreclosure sale originally scheduled for November 12, 2004. The foreclosure sale, held on November 19, 2004, resulted in a "credit bid" for $18.5 million by LNR as agent for the Lender. Thereafter, the Property was transferred to CSFB, a newly formed entity, which sold the Property to One Beacon Insurance Group for $23 million – an approximate $4.5 million profit realized in about four months – on or about April 29, 2004. Blue Hills Statement I, ¶¶ 88, 91 and 93.

Blue Hills, Fineberg and Langelier also respectfully refer to the Court to Blue Hills Statement I, Blue Hills Statement II and Response of Blue Hills, Langelier and Fineberg to Defendants' and Plaintiffs-

---

[6] Blue Hills did not receive these letters until they were faxed by Warshaw on August 24, 2004. Warshaw provided no explanation why he waited five (5) days before sending out his two letters. Fineberg signified his acceptance to the terms thereof two days' later on August 26, 2004. Blue Hills Statement I, ¶¶ 78-81.

In Counterclaim's Corrected Joint Local Rule 56.1 Statement Of Undisputed Facts in Support of Their Motions for Summary Judgment.

### III. ARGUMENT

A.   **THROUGH ITS AGENTS, WELLS FARGO AND LNR, THE LENDER HAS BREACHED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.**

    1.   **Introduction.**

The implied covenant of good faith and fair dealing in every contract in Massachusetts, requires the parties to "deal honestly and in good faith in both the performance and enforcement of the terms of their contract . . . ." *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200 (1993); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation*, 424 Mass. 430 (1997). This implied covenant serves to guaranty that the parties "remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The implied covenant of good faith and fair dealing includes a covenant that a party "shall [not] do anything which will have the effect of or injuring the rights of the other party to receive the fruits of that contract." *Drucker v. Roland Wm. Jutras Associates, Inc.*, 37 Mass. 383, 385 (1976) citing *Uproar Co. v. National Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir. 1936). Moreover, a duty, although not expressed, may be implied which obligates a party to take positive steps to cooperate in achieving another party's contractual rights and objectives. *Robert Brennan, et al. v. Carvel Corporation*, 1989 U.S. Dist. LEXIS 16104 (D. Mass. July 25, 1989), citing *L.L. Hall Constr. Co. v. United States*, 379 F.2d 559 (Ct. Cl. 1966).

Blue Hills had a right of access to approximately $4.1 million of its <u>own</u> money deposited into the reserve accounts pursuant to Section 6 of the Mortgage Agreement, including up to of $1 million to make principal and interest payments due on the Note. A copy of the Mortgage Agreement is attached to the McGlynn Affidavit as Exhibit 1. Only the following three conditions must be satisfied:

- Blue Hills must "deliver" a written notice at least seven business days prior to the requested disbursement date;

- No Event of Default shall have occurred and be continuing as of the date of the request; and,
- Blue Hills' net operating income is insufficient to pay debt service due under the Note.

Section 6(c)(ix)(a) of the Mortgage Agreement does not define the term "delivered." Section 39 of the Mortgage Agreement requires that "notices shall be deemed to have been given on the date that they are actually received; provided, that the inability to deliver Notices because of a changed address will be deemed to be receipt of the Notice as of the date of such inability to deliver." Section 39 of the Mortgage Agreement required that such "notices" be provided to Credit Suisse and to ORIX Real Estate Capital Markets LLC ("ORIX"), the (then) Servicer. However, by August 2004, J.P. Morgan – not Credit Suisse – was the Lender and Wells Fargo – not ORIX – was the Servicer.

Donovan's August 2, 2004 letter was addressed to Tim Parish ("Parish") in the Wells Fargo's Property Tax Department because it was Parish who had signed Wells Fargo's July 16, 2004 tax insufficiency letter. Wells Fargo's records show that Donovan's August 2, 2004 letter was logged in as of August 4, 2004. Blue Hills Statement II, ¶ 11. Thus, even assuming that Wells Fargo did not receive Donovan's letter earlier, Donovan's letter was only <u>one</u> day late. That Wells Fargo received actual notice of Donovan's request is undisputed and the Lender has not presented any evidence that the one day delay caused it any prejudice.[7]

In addition, the notice provisions contained in Section 39 of the Mortgage Agreement were not rigidly adhered to by Wells Fargo from Loan inception up to Donovan's August 2, 2004 letter. Under Massachusetts Law, contract modifications can be established by a party's prior course of conduct. *A. Leo Nash Steel Corp. v. Southern New England Steel Erection Co., Inc.*, 9 Mass. App. Ct. 377, 383 (1980). Wells Fargo's records show that requests for transfers in and out of the reserve accounts to cover

---

[7] On page 3 of the J.P. Morgan Memorandum, Lender cites *Bache & Co. v. International Controls Corp.* 324 F. Supp. 998 (S.D.N.Y. 1971) as supposed support for strict compliance with Section 39 of the Mortgage Agreement. *Bache* is distinguishable on a number of grounds. *Bache* dealt with a tender offer of securities, not a commercial loan, a significant difference since a strict enforcement of a notice provision is more appropriate with securities transactions because daily price fluctuations. Also, in *Bache*, the demand was made late on a Friday afternoon for delivery on Monday. In this case, Donovan's letter was sent seven business days in advance and was received no later than five business days in advance. Finally, in *Bache*, the lateness of the demand request was not necessarily determinative since the Court was persuaded that such a request never existed.

tax, insurance and other shortages and adjustments were often handled by telephone and fax with far less than seven business day's notice. In one instance, Blue Hills requested release of money from the tax and insurance account by fax and the request was processed by Wells Fargo the next day. Blue Hills Statement II, ¶ 16.

Other than the nonpayment of real estate taxes, the Lender relies on the putative defaults committed by Blue Hills – dismissal of the Norfolk Action and receipt of the Settlement Proceeds – as support for its denial of Blue Hills' access to its reserve accounts. For reasons set out in Blue Hills Memorandum I and Blue Hills Memorandum II, Blue Hills' actions with respect to the Norfolk Action and the Settlement Proceeds did not constitute Events of Default under the Mortgage Agreement.

Thus, at best for Lender, the timeliness of the notice and whether the parties' prior course of conduct waived strict compliance with the notice requirements constitute disputed issues of material fact.

Finally, when Equiserve vacated the Property on or about July 31, 2004, Blue Hills' rental income stream stopped. Thus, there does not appear to be any legitimate dispute that Blue Hills' had satisfied this precondition reserve account access to pay up to $1 million of debt service payments on the Loan.

2.      **The Lender Had Obligations of Candor and Cooperation.**

When Donovan sent his August 2, 2004 letter, he believed that the reserve accounts could be accessed to pay real estate taxes in addition to Blue Hills' undisputed right to access those accounts to pay debt service. Blue Hills Statement II, ¶ 12. Given the less than formal manner in which transfers within the various reserve accounts were handled by Wells Fargo since the Loan's inception – including several instances when reserve accounts were used to fund the tax payments – there is a disputed issue of material fact as to whether the parties' course of conduct permitted such access. Blue Hills Statement II, ¶ 16. Indeed, as noted, *supra*, up until late July 2004, Wells Fargo's own records document mutual cooperation by Blue Hills and Wells Fargo in resolving various Loan and reserve account issues without adherence to the provisions of Section 39 of the Mortgage Agreement. *See id.*

*A fortiori,* Donovan had a reasonable basis to believe that real estate taxes could be and were being paid out of the reserve accounts, aside from the fact that the Town of Canton confirmed such payment.[8] Moreover, Donovan's request came at a time when there was a question as to whether Blue Hills was to continue the tax payment arrangement previously agreed upon (i.e., Blue Hills would deposit Equiserve's tax payment into the Clearing Account upon its receipt) or whether Blue Hills was required to begin making monthly tax deposits into reserve accounts. There is no dispute that Wells Fargo received Donovan's August 2, 2004 letter no later than August 4, 2004. Yet, Wells Fargo never notified Donovan in writing that the tax payment could not be made out of the reserve accounts.[9] Indeed, the only written notice sent by Wells Fargo was Parish's letter dated July 16, 2004, advising Blue Hills that a late tax payment would merely result in a $500 late fee assessment and might require Wells Fargo to advance its own funds. Blue Hills Statement I, ¶ 45.

In these circumstances, Wells Fargo, as the Lender's agent, was no longer entitled to remain silent; it had an obligation to notify Blue Hills that it would disallow Blue Hills' access to the reserve accounts for payment of real estate taxes and provide Blue Hills with a reasonable amount of time to make that payment or reimburse Wells Fargo therefor. Even when there is no specific duty to speak, silence alone can indicate assent to a proposal if this conclusion is reasonable because of a prior course of dealing, and suggests assent. *McGurn v. Bell Microproducts, Inc.* 284 F. 3d 86, 90 (1st Cir. 2002).[10] *See*

---

[8] On page 8 of the J.P. Morgan Memorandum, Lender asserts that Donovan's only basis for his belief that the real estate taxes had been paid his telephone call to the Town of Canton Treasurer's office. Donovan, who is not a lawyer, simply concluded that based on the totality of all the facts, the taxes could be paid from the reserve accounts. Blue Hills Statement II, ¶ 12; Blue Hills Statement I, ¶ 71.

[9] Wells Fargo's records describe a purported discussion that Wells Fargo's Brent Lloyd had with a "Gil Stern" at Blue Hills. There was no Gil Stern working at Blue Hills, only a Gil Stone. Beyond that, the purported discussion Lloyd had with "Mr. Stern" on July 29, 2004 involved accessing the reserve accounts in the absence of a "lien waiver." Lien waivers would only be required if access to the repair and maintenance or tenant improvement reserve accounts was requested. Stone has no recollection of the discussion and Donovan states unequivocally that Stone would have alerted him about the discussion if, in fact, it occurred. Blue Hills Statement II, ¶ 13.

[10] Blue Hills' banking expert, Richard A. Clarke ("Clarke") opines that given LNR's belief that, in foreclosure, the Loan deficiency could be up to $20,000,000 and that Blue Hills' principles had substantial net worths and were faced with a potential large "debt forgiveness" tax obligation to the Internal Revenue Service, the "prudent and diligence course of action" would have been for Wells Fargo and LNR to provide such notification and provide an opportunity for Blue Hills to cure the tax payment default. Expert Report of Richard Clarke ("Clarke Report"), page 19, attached to the Swisher Affidavit as Exhibit 30.

*also Shawmut Bank v. Wayman,* 34 Mass App. Ct. 20,25 (1993) (bank had a good faith duty to be honest in its dealing with the guarantor).

Wells Fargo and LNR's internal e-mails document the reasons why Blue Hills was never advised that access to the reserve accounts for payment of real estate taxes and debt service would be denied. LNR had been monitoring the Loan for almost a year. Its e-mails at that time express concern over Blue Hills' admitted ability to access the reserve accounts to pay debt service and its hope that Blue Hills could be <u>forced to default</u> before it could access the reserve accounts. Additionally, LNR's prior dealings with Fineberg led it to conclude that Fineberg would be a hard negotiator in any Loan work-out. Finally, LNR had its sights on purchasing the Loan to add it to its own portfolio. LNR's internal e-mails also show that, despite Warshaw's August 19, 2004 letters advising Blue Hills that LNR looked forward to working with Blue Hills and would meet with Blue Hills to discuss the Loan status, LNR never had any intention to do so.[11]  Blue Hills Statement, II, ¶¶ 14-15.

In light of these facts, it is manifest that LNR and Wells Fargo's silence accomplished what LNR's Kevin Wodicka was hoping for in his April 28, 2004 e-mail:

> The originator may required (sic) the escrow to ensure a default does not occur when the cash flow stops. In a good market, this is a great feature. In our case, it may be a long while before a tenant is found. In our case, I hope it is just a leasing reserve and <u>that [Blue Hills] will be forced to default</u>. Deposition Exhibit 85, attached to the McGlynn Affidavit as Exhibit 39; Blue Hills Statement I, ¶ 68.

(emphasis added).

Had Blue Hills been notified that its request would be denied, it had every motivation (and the funding from the "rainy day" reserve)[12] to pay the net amount due of approximately $106,000 to Wells Fargo for the August 2, 2004 real estate tax payment.

---

[11] In *Hogan v. Riemer* 35 Mass. App. Ct. 360 (1993), a case relied upon by the Lender, the Court distinguished the "highly generalized" expressions of goodwill in that case from other situations where the "statements might be construed as promises of forbearance in the face of less than full performance of a borrower's obligations or a request for a refinancing plan based on financial realities. *Id.* 367.

[12] Blue Hills Statement I, ¶ 96.

As purported justification for its actions, the Lender claims that Blue Hills committed 12 Events of Default. This is incorrect. As discussed in Blue Hills Memorandum I and Blue Hills Memorandum II, the first alleged defaults relating to the Norfolk Action and the receipt of the Settlement Proceeds, were not defaults at all. Blue Hills' failure to pay property taxes could and should have been prevented had the Lender not breached its duty to cooperate with Blue Hills. Further, the workstations sale did not constitute an Event of Default. The "domino effect" of the remaining defaults arises from the Lender's breach of the duty cooperate.

Thus, there are disputed issues of material fact as to whether Blue Hills and Wells Fargo's prior course of conduct and the other circumstances adverted to, *supra*, either entitled Blue Hills to have access to the reserve accounts to pay real estate taxes, or required notification to Blue Hills of the tax non-payment, as well as whether prudent banking industry practice required such notification.

**B.    LENDER AND ITS AGENTS, WELLS FARGO AND LNR, FAILED TO ADHERE TO PRUDENT BANKING PRACTICES AND BREACHED SECTION 3.01 OF THE PSA.**

Lender admits that LNR and Wells Fargo were obliged to administer and service the Loan in accordance with applicable law, the terms of the Loan Documents and, to the extent consistent therewith, the provisions of the servicing standard ("Servicing Standard") set out in Section 3.01 of the PSA. Blue Hills Statement I, ¶¶ 14-17; 33-34. The Lender has also admitted that Wells Fargo and LNR were its agents for the purposes set forth in the PSA. Blue Hills Statement I, ¶ 17. As agents of a disclosed principle, Wells Fargo and LNR's actions were binding upon the Lender. *Riverdale Mills Corp. v. U.S. F. A.A.* 417, F. Supp. 2d. 167, 170 (D. Mass 2006).

The Mortgage Agreement provides, *inter alia*, that the Loan will become part of a securitized loan pool and that Credit Suisse planned to delegate its responsibilities under the Loan Documents to a servicer pursuant to a servicing agreement. Mortgage Agreement, Sections 59-61, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1. The PSA was executed less than a month after the Loan closing, at which time the Loan became part of a securitized loan pool administrated by Wells Fargo, as Servicer, and LNR, as Special Servicer. Thus, under this typical securitized loan paradigm, the

rights and responsibilities for administrating the Loan shifted from Credit Suisse, the loan originator, to J.P. Morgan, as Trustee, to Wells Fargo, as Servicer, and, finally, to LNR, as Special Servicer upon default or where default is imminent.  Blue Hills Statement I, ¶¶ 30-32.

The Servicing Standard contained in Section 3.01 of the PSA establishes the touchstones governing Wells Fargo and LNR's conduct, and mandates that Wells Fargo and LNR must conduct themselves in accordance with the <u>higher</u> of two standards: (1) the standard of care, skill, prudence and diligence employed in administering similar commercial or multi-family mortgage loans or, (2) standard of care, still, prudence and diligence employed in servicing and administering similar commercial or multi-family mortgage loans owned by Wells Fargo or LNR.  Relevant portions of the PSA, Deposition Exhibit 51 are attached to the Swisher Affidavit as Exhibit 16.  The Servicing Standard also obligated LNR and Wells Fargo to perform their services <u>without regard</u> to: (1) any relationship they or any affiliate may have had with the Blue Hills; (2) any compensation to be received under the PSA; and (3) their ownership, servicing or management of any other mortgage loans or mortgage properties.

Blue Hills' banking expert, Clarke, and Lender's banking expert, Ronald Greenspan, ("Greenspan") both agree that borrowers involved in securitized loan transactions have the right to expect that their loans will be administered by the Servicer and Special Servicer according to the Servicing Standard.  Blue Hills Statement II, ¶ 17.  This expectation reflects the industry practice, which is also reinforced by the provisions in the Mortgage Agreement.  As Clarke notes, this expectation is important "(i) in order to have confidence in the treatment of each individual pooled loan, the market place - including lenders, borrowers and certificate holders have the right to expect the pool loans will be serviced strictly in accordance with the Servicing Standard."  Clarke Report, page 12, attached to the Swisher Affidavit as Exhibit 30.

Clarke also opines in his expert report that this Servicing Standard is a prudency standard reflective of the industry practices of prudent institutional multi-family and commercial mortgagors. Thus, although the over-arching objective contained in Section 3.01 of the PSA is for the Servicer or

Special Servicer to maximize "on a present value basis (discounting at the related Mortgage Rate)… timely recovery of interest and principle on the Loans …," standards of prudency dictate how that objective is best achieved. In that regard, the PSA is replete with provisions which clearly contemplate that specially serviced loans will be worked (as opposed to being foreclosed) out to the fullest extent practical and reasonable. Clarke Report, page 11, attached to the Swisher Affidavit as Exhibit 30. Consider the following:

- Section 3.02(1)(f) obligated Wells Fargo to provide LNR with information relating to the Loan "to enable [LNR] <u>to negotiate</u> with [Blue Hills]…." (emphasis added) *Id.* at 13.

- Section 3.4(f) also obligated LNR to "use its reasonable best efforts to cause the related mortgagor to cure any default and/or remedy, any such event, <u>workout or modify</u> the Loan consistent with the terms of this Agreement…." (emphasis added) *Id.*

- 3.09(a) provided LNR with the right, consistent with the Servicing Standard, to foreclose on the Property <u>only if</u> Blue Hills continues to be in default and only so long "<u>as…no satisfactory arrangements can be made for</u> collection of delinquent payments…." (emphasis added) *Id.*

- Under Section 3.20 of the PSA, LNR had the authority, in accordance with the provisions therein, to reduce or forgive principle, accrued interest, prepayment or yield maintenance premiums or forebear on the enforcement on any rights under any of the Loan Documents including the reduction of a borrower's monthly payment. *Id.*

According to Clarke, both Wells Fargo and LNR deviated substantially from the Servicing Standard, as well as the applicable industry standards for third party loan servicing. Although Clarke lists several bases to support his opinion, he found it especially perplexing that both Wells Fargo and LNR failed to advise Blue Hills of the denial of its request for access to the reserve accounts to pay real estate taxes. He also found it unprofessional that LNR was motivated to acquire the Loan while simultaneously being predisposed against working with Fineberg based on LNR's past dealings with him:

> LNR's conduct, as amply documented … demonstrates not only that LNR violated the letter and spirit of [Warshaw's] written commitment to meet with [Blue Hills] …. but it also violated the Servicing Standard…; namely, LNR's assumption that because Mr. Fineberg had allegedly "given back" two hotels, that Mr. Fineberg would not be interested in working out the Note; LNR's conduct was hopelessly conflicted by its

> strong desire to by the Note for its own account and "flip" it at a profit.[13] Clarke Report, page 19, attached to the Swisher Affidavit as Exhibit 30.
>
> …The record shows the LNR … estimated the loss on this Note at somewhere between $11 million and $20 million dollars… LNR also knew or should have known, that "Blue Hills" principles had substantial net worths and a foreclosure sale could likely result in a large tax bill under IRS "Debt Forgiveness" rules. Despite this knowledge, LNR made no attempt to meet with [Blue Hills]…. *Id.*
>
> In my opinion, the prudent and diligent course of action here would have been LNR to provide notification to [Blue Hills] its failure to pay real estate taxes and give them an opportunity to promptly cure that default…and to request a proposal…on how the Property could be re-marketed and how long it would take for the Property to be fully tenanted…." Clarke also opined that LNR had all the necessary "ingredients" to achieve a successful work-out with Blue Hills. *Id.*

The point is not whether LNR was contractually obligated to work out the Loan; it wasn't. LNR was obligated, as part of its duty to perform its services in accordance with the Servicing Standard, to, at minimum, <u>explore</u> a work-out possibility with Blue Hills. The record is devoid of any evidence that LNR had any intention to do so. The bottom line here is that LNR, as the Lender's agent, had estimated upwards of a $20 million loss on the Loan if it was foreclosed, it, nonetheless, pursued its default and failure remedies based on the pretext that Blue Hills had failed to pay the August 2, 2004 tax payment. No effort to assist Blue Hills' or its principals to resolve matters by coming up with the allegedly delinquent payment was ever attempted. Had LNR advised Blue Hills that it had to either come up with the payment or risk default on a $31 million loan and Blue Hills refused, that would have been the end of the debate. Unfortunately, LNR never pursued that path.

---

[13] Clarke also testified during his deposition that LNR had acquired a reputation as a "loan to own" Lender; vis, it was less interested in working out those loans where by foreclosure or deed-in-lieu of foreclosure, LNR could acquire them for its own portfolio. Blue Hills Statement II, ¶ 18.

    **C.    BLUE HILLS HAS SUFFERED DAMAGES FOR THE LOSS OF EQUITY IN ITS PROPERTY, THE LOSS OF THE RESERVE ACCOUNTS AND THE ADVERSE TAX CONSEQUENCES RESULTING FROM LENDER'S ACTIONS.**

    1.    <u>**Disputed issues of fact exist as to the loss of equity and reserve accounts.**</u>

Willful blindness to the obvious is the possible explanation by which Lender can aver that there are not disputed facts as to whether the foreclosure was in bad faith or invalid. As discussed in great detail, *supra*, Blue Hills sets forth facts indicating that, *inter alia,* the foreclosure of the Property was contrary not only to the existing contractual obligations and their good faith penumbra, but also the parties' established course of conduct. *See*, *Sandler v. Green*, 287 Mass 404, 407 (1934) (an action at law exists for conduct of a foreclosure where there has been no breach of any condition of the mortgage).

Gartrell opines, *inter alia*, that the fair market value at the Property greatly exceeded the price at which Lender obtained the Property. Expert Report and Exhibits of Dr. Kenneth D. Gartrell ("Gartrell Report"), ¶¶ 71-82, attached to the Swisher Affidavit as Exhibit 22. In that fair market value was in excess of $44,000,000.00, Blue Hills can safely aver that the sale price of $18,500,000.00 was so grossly disproportionate to fair market value as to call the validity of the foreclosure into question. *See*, *States Resources Corp. v. The Architectural Team, Inc.,* 433 F.3d 73, 80-84 (1st Cir. 2005).

Gartrell is also unequivocal as to both the existence of equity in the Property at the time of foreclosure and the sufficiency of funds in the various reserve accounts to cover the $2 million cash deficit resulting from the lack of any rental income in the second half of 2004. In fact, Gartrell opined that Blue Hills suffered economic damages of at least $14.9 million as a result of Lender's wrongful acts. Gartrell Report, ¶¶ 88-104, attached to the Swisher Affidavit as Exhibit 22.

    2.    <u>**Tax losses are a recoverable element of damages.**</u>

It is axiomatic that the goal of damages is to place the injured party in the same position as if the defendant had rightly performed its obligations. *E. Mass. St. Ry. Co. v. Union St. Ry. Co.*, 269 Mass 329, 333 (1929). Recoverable losses include those that would not have occurred but for the defendant's wrongful acts. *Charlotte Theaters, Inc. v. Gateway Co.,* 191 F. Supp. 834, 844 (D. Mass), vac. on other

grounds, 297 F. 2d 483 (1st Cir. 1961). Recovery for negative tax effects is not contrary to these rules. *E.g., Beggs v. Dougherty Overseas, Inc.,* 287 F.2d 80 (2nd Cir. 1961) (Recovery for loss of a tax benefit for foreign employment by wrongfully discharged employee); *W.H. Walker, et al v. Signal Companies, Inc.;* 84 Cal. App. 3d (CA., 4th Div. 1998) (Recovery of damages for capital gains tax liabilities) *Pruett v. Erickson Air-Crane Co.*, 183 F.R.D. 248 (D. Oregon 1986) (tax liability may constitute an element of damages if it is a natural and proximate result of wrongful act).

      3.    **The "Standing" issues raised by Lender are inapplicable and inapt.**

The raising of form over substance is but a minor aspect of the specious nature of Lender's claim that Blue Hills lacks standing to recover for tax losses attributable to Lender's misconduct. A review of the case law relied upon by Lender leaves unanswered the question of why tax-related damages claimed by Blue Hills raise standing issues any different than those resulting from Blue Hills' pursuit of other forms of recoverable damages. Equally absent is any explanation as to why Blue Hills - a single purpose entity created at Lender's behest - is unable to receive damages which may eventually be passed-through to others with a vested interest in Blue Hills. The relationship between the substantive law of other states on associational standing and the instant case is, at best, highly attenuated. See, e.g. *Association of Merger Dealers LLC v. Tosco Corp.,* 167 F. Supp. 2d 65 (D.D.C. 2001) (Virginia substantive law does not recognize associational standing in certain circumstances). Moreover, Blue Hills is not suing Lender pursuant to federal statutes providing limited standing nor is this a case where all parties necessary for the granting of proper relief are not parties to the action. See, *Sylvia's Haven, Inc. v. Massachusetts Development Finance Agency,* 307 F. Supp 2d 202 (D. Mass 2005) (holding that there is no private right of action under the McKinney Act).

The putative applicability of certain cases cited by Defendants is, at best, perplexing. *In re. KRSM Props. LLC*, 318 B.R. 712, 719 (9th Cir. 2004) concerns the standing of the owners of a California LLC to intervene in an action brought by the corporate entities Chapter 7 bankruptcy trustee against federal and state taxing authorities. The case provides no support for Defendants' averment as to the

personal liability of Fineberg and Langelier for certain tax liabilities. Memorandum, page 20. Even if, for the sake of argument, these with interests in Blue Hills have suffered negative tax consequences caused by Defendants' wrongful conduct, as injured parties, such individuals have standing to recover damages from defendants. *Id.* page 717 (finding that "owners [of the California LLC at issue] have appellate standing").

## IV.  CONCLUSION

For the foregoing reasons, the Lenders' Motions for Summary Judgment should be denied.

Respectfully submitted,

BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
By their attorneys,

/s/ Meredith A. Swisher
Peter B. McGlynn, Esquire (BBO No. 333660)
Bruce D. Levin, Esquire (BBO No. 548136)
Meredith A. Swisher, Esquire (BBO No. 646866)
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:     (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com
blevin@bg-llp.com

Dated: May 31, 2006
#339167 v6/14500/9985