UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates, Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**BLUE HILLS OFFICE PARK LLC, GERALD FINEBERG AND
WILLIAM LANGELIER'S MEMORANDUM IN OPPOSITION TO CSFB 1999-C1 ROYALL
STREET, LLC AND J.P. MORGAN CHASE BANK, AS TRUSTEE
FOR THE REGISTERED HOLDERS OF CREDIT SUISSE FIRST BOSTON MORTGAGE
SECURITIES CORP., COMMERCIAL MORTGAGE
PASS-THROUGH CERTIFICATES SERIES 1999-C1 MOTIONS
<u>FOR SUMMARY JUDGMENT ON THEIR RESPECTIVE COUNTERCLAIMS</u>**

### I.  INTRODUCTION

J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates Series 1999-C-1 ("J.P. Morgan"), CSFB 1999-C1 Royall Street, LLC ("CSFB") (J.P. Morgan and CSFB sometimes collectively referred to herein as the "Lender")[1] have filed identical motions seeking the entry of

---

[1] As used herein, capitalized words and phrases shall have the same meaning ascribed in Blue Hills Office Park LLC, Gerald Fineberg and William Langelier's Memorandum in Support of Motion for Summary Judgment (the "Blue Hills Memorandum I") and in Blue Hills Office Park LLC, Gerald Fineberg and William Langelier's Memorandum in Opposition to CSFB 1999 - C1 Royall Street, LLC and J.P. Morgan Chase Bank, as Trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 Motions for Summary Judgment on their respective Counter-Claims (the "Blue Hills Memorandum II") both of which are incorporated herein by reference.

summary judgment "as to all claims brought by and against" them. This memorandum addresses those portions of J.P. Morgan and CSFB's motions seeking entry of summary judgment in their favor on their Counterclaims. Although J.P. Morgan's and CSFB's Counterclaims and their Motions are identical, only the Memorandum in Support of Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim CSFB 1999-C1 Royall Street, LLC (the "CSFB Memorandum") discusses the bases upon which the Lender seeks summary judgment as to the Counterclaims.

In the CSFB Memorandum, the Lender has largely taken an "all or nothing" stance against Fineberg and Langelier. This is based upon the erroneous contention that because of the alleged failure to obtain Lender's consent under Section 10 of the Mortgage Agreement Blue Hills' settlement of the Norfolk Action and receipt of the Settlement Proceeds triggered Langelier and Fineberg's liability under the Guaranty for the full amount of the Loan deficiency under Guaranty paragraph 1.2(ii)(D) (approximately $11 million).

However, neither Blue Hills' settlement of the Norfolk Action nor its receipt of the Settlement Proceeds required Lender's prior approval under Section 10 of the Mortgage Agreement. Further, neither of these two events constitute an Event of Default under the Mortgage Agreement, thereby possibly triggering Fineberg and Langelier's limited liability under Guaranty paragraph 1.2(ii)(a) through (g). Additionally, the Lender has failed to demonstrate that any actionable fraud, intentional misrepresentation or violation of G.L. c. 93A occurred. In fact, Lender's fraud claim is vitiated by its failure to demonstrate either an actionable misrepresentation or that it reasonably relied on Blue Hills' purported failure to disclose the existence of the Norfolk Action or the Settlement Proceeds. Thus, Fineberg and Langelier are not liable under the Guaranty for any portion of the Loan deficiency nor for the amount of the Settlement Proceeds.

Finally, the Settlement Proceeds do not fall within any of the Mortgage Agreement's Granting Clauses and, accordingly, do not constitute part of Lender's collateral for the Loan. Even if they constituted part of Lender's collateral, Blue Hills is entitled to the distribution of those proceeds under the Mortgage Agreement and CMA.

## II.   FACTUAL BACKGROUND

Sometime in April 2003, Blue Hills learned that Blueview Corporate Center, LLC ("Blueview"), the owner of an office building and land located at 250 Royall Street, Canton, Massachusetts abutting the Property and Blue Hills' (then) tenant, Equiserve, filed a petition with the ZBA for a Special Permit and for approval of modifications and amendments to an existing site in order to construct a parking garage on Blueview's property (the "Petition").  Blue Hills Statement I[2], ¶ 24.  Upon inquiry, Blue Hills learned that Equiserve had not only already decided to vacate the Property when the Lease expired on July 31, 2004 but also planned to purchase 250 Royall.

To the extent that Equiserve's intentions in vacating the Property were unclear, by letter dated May 14, 2003, Equiserve's general counsel served notice on Blue Hills' property manager, Fineberg Management, Inc. ("FMI"), confirming that Equiserve would not be extending the Lease term beyond July 31, 2004:

> This letter shall constitute notice and confirmation from Tenant to Landlord that Tenant will not exercise, and hereby waives, Tenant's right to extend the Term of the Lease under and pursuant to Section 1.02 of the Lease.  Accordingly, the <u>Lease shall terminate and expire</u> on July 31, 2004 in accordance with its terms.  (emphasis added).

Blue Hills Statement I, ¶ 26.

The next day – May 15, 2003 – Equiserve re-confirmed to Blue Hills in writing that Equiserve had waived "for all purposes . . . any and all rights of the Tenant to extend the Lease Term or to occupy the premises demised by the Lease beyond July 31, 2004 . . . ."  Blue Hills Statement I, ¶ 27.

Although, since 2002, Blue Hills had engaged in discussions with Equiserve about extending the Lease beyond the July 31, 2004 expiration date, the May 14 and 15, 2003 correspondence exchanged between Blue Hills and Equiserve confirmed to Blue Hills that, for all intents and purposes, Equiserve was vacating the Property on or before July 31, 2004.  Blue Hills Statement I, ¶¶ 48 - 49.

---

[2]  "Blue Hills Statement I" refers to the Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaim previously filed with the Court.  "Blue Hills Statement II" refers to the Blue Hills, Fineberg and Langelier's Statement of Undisputed Facts In Opposition to Defendants' Motions for Summary Judgment.  Blue Hills Statement II contains only facts not included in Blue Hills Statement I.

Cognizant that the ZBA would likely grant the Petition, Blue Hills devised a "nothing to lose and nothing to gain" stratagem to see if it could financially benefit from its opposition to the Petition. As expected, the ZBA granted the Special Permit over Blue Hills' objection. Thereafter, Blue Hills decided to take its opposition to the next level; namely, an appeal of the ZBA decision to the Norfolk Superior Court. Having in its favor little more than its standing as an abutter, Blue Hills asserted that the ZBA had exceeded its authority under G.L. c. 40A. Blue Hills also sought a declaratory judgment under G.L. c. 231A that the ZBA's decision was improper, and also sought *Certiorari* under G.L. c. 249, § 4 seeking annulment of the decision. Blue Hills Statement I, ¶¶52-56.

Faced with the risks and expenses of protracted litigation with Blue Hills, and anxious to sell its vacant property to Equiserve, Blueview quickly entered into settlement discussions with Blue Hills. These culminated in the parties' execution of a Settlement Agreement dated August 5, 2003, less than 60 days after the Norfolk Action had been commenced. No discovery in the Norfolk Action was undertaken. Blueview never challenged Blue Hills' standing to file the Norfolk Action via a motion to dismiss. Blue Hills Statement I, ¶57.

Under the Settlement Agreement, DST Realty Inc. ("DST"), the putative purchaser of the Blueview property, agreed to cause $2 million to be paid to Blue Hills in exchange for Blue Hills' agreement to dismiss the Norfolk Action. Mutual general releases of all claims were also exchanged, save for the parties' agreements not to oppose or interfere with each other's future plans to develop their respective properties. Consequently, the Norfolk Action was dismissed and the Settlement Proceeds were deposited in Blue Hills' client fund account at the offices of Bernkopf Goodman LLP on or about August 8, 2003. The specific account, titled "Royall Associates," was a carry over account name from the time period when the Trust was the Property's fee owner. The Settlement Proceeds were part of the several million dollars of Fineberg and Langelier's funds (who were the two principal Trust beneficiaries) which were earmarked as "rainy day" Property funds and kept on deposit with Bernkopf Goodman LLP. The Settlement Proceeds remained in the Blue Hills' escrow account at Bernkopf Goodman LLP until early 2005, when one-half of the proceeds – $1 million – were transferred to a client fund account at Wilmer,

Cutler, Pickering Hale and Dorr, LLP, a firm representing Langelier. The Settlement Proceeds continue to be held in escrow, in that same manner, as of this writing. Blue Hills Statement I, ¶¶61-61, 94-95.

The Settlement Proceeds were properly recorded on Blue Hills' books and records as a reduction in basis of the Property. Since the Loan's inception in September 1999, Blue Hills' books and records have been maintained in accordance with the Income Tax Method of accounting. Blue Hills Statement I, ¶¶62-64. Under that method of accounting, and in accordance with the applicable provisions of the Internal Revenue Code, Blue Hills was treated as a "disregarded" entity such that all income, expense, profit and loss is reported at the Trust and beneficiary levels. Blue Hills Statement II, ¶ 1.

Treatment of the Settlement Proceeds as a reduction in the Property's basis was contemporaneously recorded in Blue Hills' compiled financial statements prepared by its outside independent accounting firm, Rutfield and Hassey, CPA. This, and other financial information, was compiled and summarized by FMI and was annually sent to the Loan's Servicer, Wells Fargo. Blue Hills Statement II, ¶¶ 9 and 10.

Blue Hills, Fineberg and Langelier also respectfully refer to the Court to Blue Hills Statement I, Blue Hills Statement II and Response of Blue Hills, Langelier and Fineberg to Defendants' and Plaintiffs-In Counterclaim's Corrected Joint Local Rule 56.1 Statement Of Undisputed Facts in Support of Their Motions for Summary Judgment.

### III.   ARGUMENT

**A.   THE LENDER'S PRIOR WRITTEN CONSENT TO SETTLE THE NORFOLK ACTION OR TO RECEIVE THE SETTLEMENT PROCEEDS WAS NOT REQUIRED.**

As discussed in Blue Hills Memorandum I, the phrase Mortgaged Property takes on several different meanings in the Mortgage Agreement depending on the sectional context. In context, Section 10 of the Mortgage Agreement's use of the phrase Mortgaged Property relates to transfers, assignments and sales of the Property as opposed to, for example, chattel paper, income tax refunds, unearned insurance premiums and other personal property enumerated in the Granting Clauses. A copy of the Mortgage

Agreement is attached as Exhibit 1 to the Affidavit of Peter McGlynn ("McGlynn Affidavit") previously filed.

The Lender recognizes that the phrase Mortgaged Property comprises several different and separately identified asset types, including the land and building located at 150 Royall Street known as the Blue Hills Office Park. CSFB Memorandum, page 3. However, the Lender fails to recognize that, in the context of Section 10, the phrase Mortgaged Property can only logically refer to the Property and the legal and beneficial interests therein. In its one-half page analysis of Section 10(a), Lender emphasizes (underscores), without explanation or citation, the disjunctive phrase "or any part thereof" following "Mortgaged Property" in the last sentence of Section 10(a). To the extent that the Lender implies that this disjunctive phrase acts as a dragnet clause incorporating into the phrase Mortgaged Property in Section 10 every single asset described in all eight Granting Clauses, such implication is belied not only by the first two sentences in Section 10(a)[3] (which were <u>not</u> quoted by Lender), but also by Section 10(b), which articulates in greater detail the types of sales, transfers and conveyances covered by Section 10(a). See *Fried v. Fried*, 5 Mass. App. Ct. 660, 664 n.3 (1977) (construction of words in a carefully drawn document may be affected by varied use of the words in another part of the document).

Section 10(b)(ii), for example, describes leasing of all "<u>or a substantial part</u> of the Mortgaged Property for other than actual occupancy by a space tenant" (emphasis added), while Section 10(b)(iii) describes a <u>sale or transfer of more than 25%</u> of the mortgagor, guarantor or any general partner or managing member of the mortgagor or guarantor. Section 10(b)(iv) describes an assignment or pledge "<u>of any</u> ownership interests" (emphasis added) of any general partner, member or non-member manager or joint venturer in Blue Hills, and Section 10(b)(v) describes the transfer or pledge <u>of more than 25%</u> of

---

[3] The first two sentences in Section 10(a) – not quoted by Lender – are as follows:

> Mortgagor acknowledges that Mortgagee has examined and relied on the creditworthiness of Mortgagor in owning and operating properties such as the Mortgaged Property in agreeing to make the Loan, and that Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for repayment of the Debt. Mortgagor acknowledges that Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should the Mortgagor default in the repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property.

limited partnership interests or membership interests. Finally, Section 10(b)(vi) describes the transfer of <u>more than 51%</u> of the decision-making or control of the Blue Hills operations.

**B.     NEITHER BLUE HILLS' SETTLEMENT OF THE NORFOLK ACTION NOR ITS RECEIPT OF THE SETTLEMENT PROCEEDS REQUIRE LENDER'S PRIOR CONSENT UNDER SECTION 10 OF THE MORTGAGE AGREEMENT; CONSEQUENTLY, FINEBERG AND LANGELIER ARE NOT LIABLE FOR THE "FULL AMOUNT OF THE DEBT."**

The Lender's statements on pages 6 and 12 of the CSFB Memorandum that full recourse liability exists under Guaranty paragraph 1.2(ii)(D) if Blue Hills failed to obtain the Lender's consent "if required by Section 10 of the Mortgage . . ." are tacit acknowledgements by the Lender that if Section 10 did not require Lender's consent to settle the Norfolk Action and/or Blue Hills' receipt of the Settlement Proceeds, then there is <u>no</u> full recourse liability to Fineberg and Langelier. A copy of the Guaranty is attached to the McGlynn Affidavit as Exhibit 4.

As discussed in Parts III B-2 and 3 of Blue Hills Memorandum I, <u>no</u> provision in the Mortgage Agreement or the Note requires Blue Hills to obtain the Lender's prior consent to commence or settle the Norfolk Action or to receive the Settlement Proceeds. Moreover, in drafting the Mortgage Agreement, Credit Suisse recognized that certain types of Property-related claims could adversely impact on the Property's and/or the Mortgage's value. Consequently, Credit Suisse included express requirements for Lender's prior written consent in certain sections of the Mortgage Agreement. For example, the following sections in the Mortgage Agreement are sections in which the Lender's prior written consent to settle claims is expressly – and clearly - required: Mortgage Agreement Section 3 (Insurance), Section 4 (Casualty), Section 7 (Condemnation) , Section 8 (Leases and Rents), and Section 9 (Maintenance and Use of Mortgaged Property). None of these sections involve types of claims that are even remotely similar to the Norfolk Action.

If the Lender's expansive view of the phrase Mortgaged Property in Section 10 is extended to its illogical conclusion, Blue Hills would have been effectively precluded from conducting normal business operations absent Lender's prior written consent. For example, under the Lender's interpretation of Section 10, Blue Hills could not, without the Lender's consent, have donated a piece of used equipment to

- 7 -

charity, it could not have settled with a tenant for lease violations or for nonpayment of rent, nor could it have sold any materials, supplies or equipment in the ordinary course. Surely, this is not what the parties intended, nor is it a fair and reasonable construction of Section 10 of the Mortgage Agreement. *Charles I. Hosmer, Inc. v. Commonwealth*, 302 Mass. 495, 501 (1939) (contract must be considered as a "workable and harmonious means for carrying out and effectuating the intent of the parties"). "If literalness is sheer absurdity, we are to seek some other meaning whereby reasons will be instilled and absurdity avoided." *Outlet Embroidery Co. v. Derwent Mills,, Ltd.* 254 N.Y. 179, 183 (1930) (Cardoza, C.J.)

### C. NEITHER FINEBERG NOR LANGELIER ARE LIABLE UNDER PARAGRAPH 1.2(ii) (a)-(g) OF THE GUARANTY, THE "LIMITED LIABILITY" SECTION.

The Lender's stance regarding Fineberg and Langelier's liability under the Guaranty rises or falls on whether Blue Hills' settlement of the Norfolk Action and its receipt of the Settlement Proceeds required Lender's consent under Section 10 of the Mortgage Agreement. As demonstrated by Blue Hills, no such consent was required. In addition, neither of those two events triggered Fineberg and Langelier's limited liability under Guaranty paragraph 1.2(ii)(a)-(g).

Based on the Lender's Counterclaims and the CSFB Memorandum, there are only three grounds on which limited liability could possibly exist against Fineberg and Langelier under the Guaranty paragraph 1.2(ii)(a)-(g):

- "(a) fraud or intentional misrepresentation by Borrower or Guarantor in connection with the Loan."

- "(d) the removal or disposal of any portion of the Mortgaged Property <u>after</u> an Event of Default (as defined in the Mortgage),"or

- "(e) the misapplication or conversion by Borrower of . . . (iii) any <u>Rents</u> (as defined in the Mortgage) <u>following</u> an Event of Default . . . ." (emphasis supplied).

### 1. No Fraud or Intentional Misrepresentation Was Committed by Blue Hills, Fineberg or Langelier.

The plain meaning of Guaranty paragraph 1.2(ii)(a), is that, to be actionable, the fraud or intentional misrepresentation must have induced Credit Suisse to grant the Loan. *Graphics Arts Finishers, Inc. v. Boston Redevelopment Authority*, 357 Mass. 40, 44 (1970). The Loan is defined on the

first page of the Guaranty as meaning the Mortgage Note in the principal amount of $33,149,000 and "all renewals, modifications, increases and extensions thereof." Black's Law Dictionary defines a loan as "a thing lent for the borrower's temporary use; esp., a sum of money lent at interest." Black's Law Dictionary, 947 (7th ed. 1999).

In context, the plain meaning of Guaranty paragraph 1.2(ii)(a) is that it relates to a fraud or misrepresentation which induced Credit Suisse to grant the Loan or any future extensions or modifications thereto. To the extent that Lender asserts (or the Court finds) that the clause is ambiguous, Massachusetts law provides that the terms of the Guaranty will not be construed against the guarantor. *Laura Thorn, LTD v. Alletzhauser*, 71 F. 3d 911, 993 (1st Cir. 1995). Neither the Counterclaims nor the CSFB Memorandum contain any facts – or even allegations – that Credit Suisse was fraudulently induced by Fineberg or Langelier to make the Loan. Thus, Lender has no valid claim under the Guaranty, paragraph 1.2(ii)(a).

Changing tack, and citing no provisions in any of the Loan Documents, Lender asserts on page 16 of the CSFB Memorandum that "with the intent to deceive the Lender, Blue Hills . . . failed to disclose the material facts that it was settling the Zoning Appeal and transferring $2 million of Mortgaged Property to Royall Associates." At the risk of being repetitive, no provision in the Mortgage Agreement required Blue Hills to obtain Lender's approval to settle the Norfolk Action or to receive the Settlement Proceeds. Furthermore, under Massachusetts law, where, as here, the parties dealt at arms' length, the mere silence or failure to discuss known facts does not constitute a representation to support a finding of fraud. *Brockton Olympia Realty Co. v. Lee*, 266 Mass. 550, 561 (1929).

Furthermore, this is not a case where Blue Hills has committed actionable fraud or intentional misrepresentation by failing to disclose the Settlement Proceeds in its financial statements. Section 18(b) of the Mortgage Agreement required Blue Hills to "furnish within 120 days following the end of each calendar year statements of its financial affairs and condition including a balance sheet and a statement of profit and loss . . . in such detail as Mortgagee may request . . . ." Since the Loan's inception, Blue Hills furnished Wells Fargo with information on its rent rolls and financial condition quarterly and annually.

Not only did Blue Hills believe that the information provided was compliant, but it never heard from Wells Fargo to the contrary. Blue Hills Statement II, ¶¶ 9-10.

The Affidavit of Curtis Mallegni ("Mallegni"), submitted by Lender in support of its summary judgment motion, does not contend that anything submitted by Blue Hills to Wells Fargo was inaccurate. Rather, Mallegni claims that Wells Fargo did not receive a statement of Blue Hills' assets and liabilities for the year ended 2003. However, Mallegni does not explain why Wells Fargo failed to pick up on this alleged discrepancy on or after February 23, 2004, when it received Blue Hills' 2003 year-end income statement, on or after May 16, 2004, after it received Blue Hills' first quarter 2004 income statement, or on or after August 12, 2004, when it received Blue Hills' second quarter income statement.

It is undisputed that Blue Hills prepared compiled financial statements on an annual basis. The statement for the year ended December 31, 2003 was created April 2, 2004 and shows the reduction-in-basis adjustment for the Property as a result of Blue Hills' receipt of the Settlement Proceeds.[4] Blue Hills believes that the information was transmitted to Wells Fargo sometime after April 2, 2004. Had Wells Fargo misplaced it (or it was misplaced when the Loan was handed off to LNR) and requested an additional copy from Blue Hills, it would have been promptly sent. Blue Hills Statement II, ¶¶ 9-10. As a side note, Mallegni, the Wells Fargo asset manager in charge the Loan, claimed in his deposition to have no recollection of FMI's Joseph Donovan ("Donovan") writing to Tim Parish in Wells Fargo's property tax department on August 2, 2004 requesting access to the reserve accounts to pay real estate taxes and principal and interest for August 2004 until Donovan re-faxed that and other correspondence directly to Mallegni on August 13, 2004. Blue Hills Statement I, ¶ 75; Deposition of Curtis Mallegni ("Mallegni Deposition"), page 55, attached as Exhibit 9 to the Affidavit of Meredith Swisher ("Swisher

---

[4] On pages 5 and 6 of its CSFB Memorandum, the Lender asserts that the "only conceivable basis" for taking a reduction in the basis of the Property upon the receipt of the Settlement Proceeds, was for damages to or loss of value in the Property. That is incorrect. Federal tax law also provides that a recovery may be treated as a return of capital even though the amount of the recovery includes lost profits. See *State Fish Corp. v. C.I.R.*, 48 T.C. 465, 474-477 (1967) (a recovery for damages for breach of a covenant not to compete was held to be capital in nature. The element of lost profits in such a situation is merely an evidential factor in determining actual damage).

Affidavit"). Perhaps, Mallegni was also unaware that the 2003 Blue Hills' financial statements had been received by Wells Fargo.

Even if the evidence that the Lender has cobbled together rose to the level of fraud or intentional misrepresentation, the Lender cannot prove its detrimental reliance thereon. Lender asserts that it would have conditioned consent to the settlement by requiring Blue Hills to place the Settlement Proceeds in a special reserve account.[5] However, in the absence of any consent requirement, the Lender could only require Blue Hills to deposit the Settlement Proceeds in the Clearing Account. It could not mandate any "special reserve" for the Settlement Proceeds as surmised by Polcari in his deposition. Deposition of Joseph Polcari, Vol. II, page 214, attached as Exhibit 11 to the Swisher Affidavit. Accordingly, as discussed, *infra*, Blue Hills would have been entitled to a distribution of the Settlement Proceeds.

### 2. Blue Hills Has Not Removed or Disposed of Any Portion of the Mortgaged Property After an Event of Default.

Guaranty paragraph 1.2(ii)(d) prohibits the removal or disposal of any portion of the Mortgaged Property <u>following</u> an Event of Default.[6] The only related Event of Default alleged by the Lender in the CSFB Memorandum is that a transfer of Settlement Proceeds from Blue Hills to Fineberg and Langelier occurred. This allegation is erroneous.

Nonetheless, the Lender baldly asserts that there was a transfer of the Settlement Proceeds to the Trust, as purportedly evidenced by an increase as the "Due from Affiliate" line on Blue Hills' balance sheet for the year ended December 31, 2003. CSFB Memorandum, page 9. This too is incorrect. Under the Income Tax Method of accounting, which was the method of accounting employed by Blue Hills since the Loan's inception, Blue Hills was allowed to record the Settlement Proceeds as a reduction in

---

[5] On page 11 of the CSFB Memorandum, Lender states that Blue Hills' banking expert, Richard Clarke, agreed in his deposition that a request for consent to settlement of the Norfolk Action would have given the Lender an opportunity to obtain additional loan reserves. However, conveniently omitted from the CSFB Memorandum is the fact that Mr. Clarke's answer was in response was to a hypothetical question requiring Mr. Clarke to <u>assume</u> that the Lender's prior consent to settling the Norfolk Action was required.

[6] This provision would also have been unnecessary based on the Lender's erroneous interpretation of the phrase "Mortgaged Property" in Section 10 of the Mortgage Agreement since removal of Mortgage Property, either pre- and post-default, would require Lender's consent.

basis in the Property which also impacts the Trust since Blue Hills is a "disregarded entity" under the Code. As a "disregarded entity" for tax purposes, all of Blue Hills' income and expense was properly recorded at the Trust level. Blue Hills Statement II, ¶ 1. The Settlement Proceeds have remained in Blue Hills' client funds accounts since their receipt on or about August 8, 2003 and have remained Blue Hills' property since receipt. Blue Hills Statement I, ¶¶60-61; 94-95.

### 3. There Has Been No Misapplication or Conversion of "Rents" Following an Event of Default.

Guaranty paragraph 1.2(ii)(e)(iii) prohibits the misapplication or conversion by Blue Hills of "any Rents (as defined in the Mortgage) following an Event of Default. . . ."[7] As discussed on page 13 of the Blue Hills Memorandum I, the enumerated types of "Rents" under Granting Clause Four were generated as a result of the use, enjoyment or occupation of the Property. The Settlement Proceeds are not "Rents" under the Mortgage Agreement for several reasons:

- The Settlement Proceeds were not compensation for damage or injury to the Property. Blue Hills' Complaint in the Norfolk Action neither sought nor alleged damages as a result of the proposed construction of the garage on Blueview's property. The dismissal of the Norfolk Action only meant that Blueview's garage could be constructed.[8]

- The Settlement Proceeds do not relate to any real estate related revenue such as, for example, lease income, a tax refund, reimbursement of an insurance claim for a physical loss or reimbursement for an eminent domain taking.

- Most significantly, none of the "Mortgaged Property" generated the Settlement Proceeds; rather, they were derived from Blue Hills' agreement to dismiss the Norfolk Action. The Settlement Proceeds were paid by DST and Blue View to eliminate the risks of continued litigation and the possibility that the Norfolk Action would not be adjudicated for several years.

---

[7] "Rents" is defined in Granting Clause Four as "all leases . . . and other agreements . . . affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the [Property] . . . and all rents, rent equivalents, monies payable as damages or in lieu of rent or rent equivalents . . . or other consideration of whatever form or nature received by or paid to or for the account of or benefit of [Blue Hills] . . . arising from or attributable to the [Property]. . . ."

[8] Lender's real estate appraiser, Eric Stotz ("Stotz"), does not quantify any alleged diminution in the value of the Property as a result of the garage in either his expert report or in his deposition testimony. In fact, he fails to even acknowledge the alleged significance of the new garage in his pre-foreclosure appraisal report prepared for LNR. Blue Hills Statement II, ¶ 2. On the other hand, Blue Hills' expert, Dr. Kenneth Gartrell ("Gartrell"), opines that not only would the garage not diminish the value of the Property, but that it could significantly enhance its value. Blue Hills Statement II, ¶ 5.

In short, neither Blue Hills, Fineberg or Langelier are liable for violation of the Guaranty, paragraph 1.2(ii)(e)(iii).

### D.  BLUE HILLS DID NOT VIOLATE SECTION 8(c)(ii) OF THE MORTGAGE AGREEMENT.

The Lender's contention that Blue Hills violated Section 8(c)(ii) of the Mortgage Agreement by terminating the Lease without Lender's consent is relegated to a footnote on page 7 of the CSFB Memorandum. This contention completely ignores uncontested facts. As of May 15, 2003, Equiserve had confirmed – twice – that it had absolutely no intention of extending the Lease term. Blue Hills Statement I, ¶¶ 48-49. Consequently, there was no Lease to terminate. Further, despite its title, the Lease Termination Agreement neither terminated the (soon to expire) Lease, nor released claims, if any, which Blue Hills had against Equiserve.

### E.  THE SETTLEMENT PROCEEDS DO NOT CONSTITUTE "MORTGAGED PROPERTY" UNDER ANY OF THE GRANTING CLAUSES AND, EVEN IF THEY DID, THOSE PROCEEDS WOULD HAVE BEEN DISTRIBUTABLE TO BLUE HILLS UNDER THE MORTGAGE AGREEMENT AND THE CASH MANAGEMENT AGREEMENT.

The Lender asserts that the Norfolk Action and the Settlement Proceeds constitute collateral under Granting Clauses Three, Four, Seven and/or Eight. CSFB Memorandum, page 3. None of these Granting Clauses is applicable, however.

#### 1.  The Settlement Proceeds Do Not Constitute "Mortgaged Property" Under Granting Clause Three.

In relevant part, Granting Clause Three provides that "Mortgaged Property" includes "[a]wards or payments . . . that may heretofore or hereafter be made with respect to the Premises and the Improvements, whether from the right of <u>eminent domain</u> or <u>condemnation</u> . . . or for a <u>change of grade</u>, or for any <u>other injury to</u> or <u>decrease in the value</u> of the Premises and Improvements . . . ." (emphasis added). There can be little doubt that the plain meaning of Granting Clause Three is that the "award" or "payment" must arise from either an eminent domain or condemnation taking or for injury to or decrease in the value of the Property (i.e., the land) and the Improvements (i.e., the building). The Settlement Proceeds fit into none of those categories.

Further, Lender's expert, Stotz, could only muster up general, untested and unsubstantiated statements that any structure that interferes with the view of another structure or that adds "significantly" to traffic or congestion will have a detrimental impact on the value of the existing structure. Stotz could not measure the impact on the Property's value because he felt that it was "difficult" to do so. Blue Hills Statement II, ¶ 2. During his deposition, Stotz also acknowledged that he did not quantify the Property's diminution in value nor was he qualified to opine on the diminution of the value of property based upon either undocumented traffic congestion or based upon the "less desirable view" that the garage would purportedly provide for tenants in the Property. Blue Hills Statement II, ¶¶ 3-4. On the other hand, Gartrell states not only that no diminution in value occurred but, also, that the value may have been enhanced. Blue Hills Statement II, ¶ 5.

### 2.  **The Settlement Proceeds Do Not Constitute "Rents" Under Granting Clause Four.**

"Rents," under Granting Clause Four, must be generated as a result of the use, enjoyment or occupation of the Property. The Settlement Proceeds fit in none of those categories. The plain meaning of the word "Rents" supports this conclusion as well. That Credit Suisse intended to distinguish "Rents" from other types of collateral in the Mortgage Agreement is also borne out by the fact that there are eight Granting Clauses and only one – Granting Clause Four – involves "Rents."

### 3.  **The Norfolk Action Was Not Related to, Derived From or Used in Connection With the "Use, Operation, Maintenance, Occupancy or Enjoyment of the Property" Under Granting Clause Seven.**

Granting Clause Seven enumerates so-called "Intangibles" as collateral. Like Granting Clause Four, intangibles are items such as chattel paper, accounts, trademarks, trade names, construction and design contracts and tax refunds which relate to the use, operation or occupancy of the Property. The <u>only</u> nexus between the Norfolk Action and the Property was potentially Blue Hills' tenuous status as an abutter.[9] That Blue Hills was able to take advantage of a unique situation to obtain a $2 million settlement from Blueview and DST in consideration of dismissal of the Norfolk Action is uncontested.

---

[9] Standing for an abutter under G.L. c. 40A, § 17 is presumed, but is rebuttable if no tangible harm to the abutter's property interest is shown. *Cummings v. City Council of Gloucester*, 28 Mass. App. Ct. 345, 349-50 (1990).

The Norfolk Action was <u>not</u> the result of any damage or destruction to the Property nor does it even relate to any tenant or other Property-related income generating source.

As has been discussed in this memorandum and in Blue Hills Memorandum I, Credit Suisse knew how to create express rights and obligations under the Mortgage Agreement. It had the ability to insert words or phrases in Granting Clause Seven which could have, for example, granted it a security interest in causes of action arising "directly or indirectly" from the Property.[10] It chose not to do so. Credit Suisse could also have inserted language to the effect that all causes of action brought by Blue Hills – for any reason – constituted the Lender's collateral. It chose not to do this either. Thus, the objective manifestations of Credit Suisse's intent was to place limitations on the scope of its collateral under Granting Clause Seven. If ambiguous, such language – drafted by Credit Suisse – must be construed against Credit Suisse. *Chelsea Industries, Inc. v. Accuray Leasing Corp.*, 699 F. 2d 58, 61 (1st. Cir. 1983).

Stated another way, Credit Suisse had the ability to draft the Mortgage Agreement such that any existing asset or any asset which came into Blue Hills' possession in the future would constitute collateral for the Loan. It did not do so. Since the Norfolk Action challenged the ZBA's decision solely on the basis of Blue Hills' status as an abutter, the Norfolk Action is insufficiently related to the Property to constitute part of Lender's collateral under Granting Clause Seven.

4. **The Settlement Proceeds Are Not Proceeds, Products, Offspring, Rents or Profits From the Collateral Described in Granting Clauses One Through Seven.**

For all of the reasons adverted to above, the Settlement Proceeds can only constitute products or offspring if they relate to any of the collateral described in Granting Clauses One through Seven. For reasons previously discussed, the Settlement Proceeds are not collateral under any of the provisions, in

---

[10] "Directly" means "without any intervening agency or instrumentality or determining influence" or "without divergence from the source or original." Webster's Third International Dictionary, 641 (3d ed. 1971). "Indirect" is defined as "not proceeding straight from one point to another." Webster's Third International Dictionary, 1151, 499 (3d ed. 1971).

Granting Clauses One through Seven and consequently, they cannot be products under Granting Clause Eight.[11]

### F. IF BLUE HILLS WERE REQUIRED TO DEPOSIT THE SETTLEMENT PROCEEDS INTO THE CLEARING ACCOUNT, THE PROCEEDS WOULD BE DISTRIBUTABLE TO BLUE HILLS.

As noted earlier in this memorandum, the Settlement Proceeds are not "Rents" under the Mortgage Agreement. If, however, they were "Rents," and they had to be deposited into a Clearing Account, they would be periodically swept into a Cash Collateral Account at the Deposit Bank. Mortgage Agreement, Section 6; CMA, Section 2. This is colloquially known as a "lock box" arrangement, since the Clearing Account is under the sole control of the Lender. The Cash Collateral Account is divided into sub-accounts maintained on a ledger entry basis at the Deposit Bank (the "Reserve Accounts"). CMA, Section 2(c). A copy of the CMA is attached to the McGlynn Affidavit as Exhibit 3. These accounts are as follows:

1. Tax and Insurance Impound Fund Sub-Account which provides that Borrower shall pay Lender $1/12^{th}$ of the Tax and Insurance Premium as estimated by Lender to be due during the following twelve (12) month period which payment shall be made on the 11th day of each month;

2. Monthly Debt Service Sub-Account for monthly payments of principal and interest on the Loan;

3. Replacement Escrow Fund Sub-Account which provides that Borrower shall pay to Lender $4,564.42 for this account on the 11th day of each month;

4. Base Leasing Escrow Fund Sub-Account which provides that Borrower shall pay to Lender $19,855.83 on the date of the closing, and shall pay $9,927.92 to Lender for this account on the 11th day of each month thereafter;

5. Cash Flow Leasing Escrow Fund Sub-Account which provides that Borrower shall pay to Lender $105,144.17 on the closing date and shall deposit with Lender on the 11th day of each month prior to the Benchmark Reduction Date (as that term is defined in the

---

[11] On page 11 of the CSFB Memorandum, Lender asserts that certain workstations were sold by Blue Hills on August 19, 2004 for $100,000. These workstations were abandoned by Equiserve upon Lease expiration and became Blue Hills' property under paragraph 1(vi) of the Lease Termination Agreement. Blue Hills did not believe that these workstations constituted part of the Lender's collateral. Moreover, they were sold approximately one month prior to Blue Hills' receipt of Lender's default letter dated September 17, 2004. Blue Hills Statement II, ¶ 8; For the same reasons that settlement of the Norfolk Action did not require Lender's prior consent, Blue Hills contends that it did not require Lender's consent to sell the workstations under Section 10 of the Mortgage Agreement. Accordingly, Blue Hills committed no Event of Default under Section 23(d) of the Mortgage Agreement by selling the workstations.

     Mortgage) the lesser of the amount remaining on deposit in the Cash Collateral Account and $52,572.08;

6. Operating Expense Sub-Account which provides that the amounts allocated to the Operating Expense Sub-Account shall be deposited on the last business day of each week to FMI's Operating Account;

7. Casualty and Condemnation Proceeds Sub-Account; and,

8. Borrower Remainder Sub-Account which provides that the amounts allocated to the Borrower Remainder Sub-Account shall no longer be considered "Rents" and shall be deposited on the last business day of each week into Blue Hills' account.

  The Borrower Remainder Sub-Account contained unrestricted funds which Blue Hills could utilize to pay for upkeep and maintenance of the Property. Funds remaining thereafter are distributable to the Trust beneficiaries, including Fineberg and Langelier.[12] The foregoing arrangement – and Blue Hills' unfettered access to funds in the Borrower Remainder Sub-Account – continues, according to the CMA, until an Event of Default.[13]

  There can be little dispute that while Equiserve remained as a tenant in the Property, the monthly rental income was more than sufficient to fully fund all of the reserve accounts and, on average, a monthly surplus distributed to Blue Hills and deposited into Blue Hills' operating account. Blue Hills Statement II, ¶ 6. Thus, when Blue Hills received the Settlement Proceeds on August 8, 2003, the reserve accounts were fully funded and there were surplus funds distributed into Blue Hills' operating account. These funds were available for Blue Hill's use. Accordingly, if the Settlement Proceeds were deposited into the Clearing Account along with the Equiserve "Rents," the surplus funds – consisting of the Settlement Proceeds and the other surplus money – would have been made available to Blue Hills for its unrestricted use under the provisions of Section 3(b)(vii) of the CMA.

  The Lender's only response to this scenario – relegated to a footnote on page 12 of the CSFB Memorandum – is that Lender would have withheld its consent to the Norfolk Action settlement unless hypothetical restrictions were placed on Blue Hills' use of the Settlement Proceeds. These restrictions are

---

[12] As noted in Blue Hills Statement I, ¶96, although not required by the terms of the Loan Documents, several million dollars of otherwise distributable funds were maintained in Blue Hills' own escrow accounts as a "rainy day" Property reserve.

[13] The term "Event of Default" is not specifically defined in the CMA although under Section 7(a), it appears to refer to Events of Default under the Mortgage Agreement.

not contained in either the Mortgage Agreement or in the CMA. Moreover, as has been amply demonstrated in this memorandum and in Blue Hills Memorandum I, <u>no</u> consent to Blue Hills' settlement of the Norfolk Action or its receipt of the Settlement Proceeds was required.

### G.   FINEBERG AND LANGELIER DID NOT VIOLATE OF G.L. c. 93A.

Again hitching its wagon to Section 10 of the Mortgage Agreement, the Lender asserts on page 17 of the CSFB Memorandum that Blue Hills' settlement of the Norfolk Action and its purported concealment of the existence of the Settlement Proceeds from the Lender constituted unfair or deceptive trade practices under G.L. c. 93A. The Lender assigns the following three bases in support of its claim:

- Fineberg and Langelier directed Blue Hills to settle the Norfolk Action knowing that they were "ensuring that Blue Hills' only tenant would vacate the property and move across the street." CSFB's Memorandum, page 17. However, this misconstrues the Lease Termination Agreement and the operative facts. Blue Hills Statement II, ¶¶ 7. As of May 15, 2003, Equiserve had waived and released all rights to extend the Lease which ended July 31, 2004. Blue Hills Statement I, ¶48.

- "Blue Hills transferred the [Settlement Proceeds to the Trust] for [Fineberg's and Langelier's] own benefit." CSFB Memorandum, page 17. Although neither Section 10 of the Mortgage Agreement nor any other portion thereof precluded any transfer of the Settlement Proceeds, no such transfer in fact occurred here. The Settlement Proceeds remain at present in Blue Hills' counsel's client's fund accounts at two different law firms. Blue Hills Statement I, ¶¶60-61, 94-95.

- Blue Hills "concealed the existence of the [Settlement Proceeds] from the Lender." CSFB Memorandum, page 17. However, the Lender has adduced no evidence where there was any intention to conceal the Settlement Proceeds, nor, as noted earlier, was there any obligation to obtain Lender's consent or even give it any notification upon settling the Norfolk Action. Further, the Settlement Proceeds were reported as a reduction in the basis for the Property and were contained in contemporaneously prepared financial statements which were sent to Wells Fargo. Blue Hills Statement II, ¶¶ 1, 9, 10.

Having established that Blue Hills had no contractual obligation to obtain Lender's consent prior to settling the Norfolk Action or to receiving the Settlement Proceeds, as well as no similar obligation to notify the Lender, it follows that there has been no violation of G.L. c. 93A, let alone a "willful and knowing" violation. In a case involving commercially sophisticated parties, conduct must "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979).

Even if, *arguendo*, there was some duty to notify the Lender of Blue Hills' receipt of the Settlement Proceeds under Section 8(d) of the CMA (which for reasons advanced in Blue Hills Memorandum I was not required), a breach of such duty does not constitute a violation of Chapter 93A. "Just as every lawful act is not thereby automatically free from scrutiny as to its unfairness under Chapter 93A, so not every unlawful act is automatically an unfair (or deceptive) one under G.L. c. 93A." *Mechanics National Bank v. Killeen*, 377 Mass. 100, 109 (1979) (citation omitted); see also *Framingham Auto Sales, Inc. v. Workers' Credit Union*, 41 Mass. App. Ct. 416 (1996) (mere breach of a legal obligation under commercial law without more does not amount to an unfair or deceptive practice under Chapter 93A); *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992) (failure to perform obligation under a written lease is not a G.L. c. 93A violation unless breach has an "extortionate" quality given it the rancid flavor of unfairness).

Moreover, even to the extent that the Lender could successfully prove that Chapter 93A violations occurred with respect to any alleged failure of Blue Hills to notify Lender of receipt of the Settlement Proceeds, for reasons discussed in Section F, *supra*, the Lender would not have suffered any damages.

## IV.    CONCLUSION

For the reasons set forth herein and in Blue Hills Memorandum I, J.P. Morgan and CSFB's Motions for Summary Judgment on their Counterclaims should be denied. Concomitantly, Blue Hills' Motion for Summary Judgment dismissing the Counterclaims should be granted.

        Respectfully submitted,

        BLUE HILLS OFFICE PARK LLC, WILLIAM
        LANGELIER AND GERALD FINEBERG,
        By their attorneys,


        /s/ Meredith A. Swisher
        Peter B. McGlynn, Esquire (BBO No. 333660)
        Meredith A. Swisher, Esquire (BBO No. 646866)
        BERNKOPF GOODMAN LLP
        125 Summer Street, Suite 1300
        Boston, Massachusetts 02110
        Telephone:    (617) 790-3000
        Facsimile:    (617) 790-3300
        pmcglynn@bg-llp.com
        mswisher@bg-llp.com

Dated: May 31, 2006

#338941 v2/14500/9985

Case 1:05-cv-10506-WGY    Document 96    Filed 05/31/2006    Page 20 of 20