UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>Plaintiff/Defendant-in-Counterclaim | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-CV-10506 (WGY) |
| | ) | |
| J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates, Series 1999-C1<br>Defendant | ) | |
| | ) | |
| and CSFB 1999 – C1 ROYALL STREET, LLC<br>Defendant/Plaintiff-in-Counterclaim | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM LANGELIER and GERALD FINEBERG<br>Defendants-in-Counterclaim | ) | |

**AFFIDAVIT OF BRUCE D. LEVIN IN SUPPORT OF OPPOSITION TO
MOTION OF DEFENDANTS AND PLAINTIFFS-IN-COUNTERCLAIM
TO EXCLUDE EXPERT TESTIMONY OF DR. KENNETH GARTRELL**

Bruce D. Levin, on oath, deposes and states as follows:

1.      I am a member in good standing of the Massachusetts Bar and a partner in the law firm of

Bernkopf Goodman LLP, 125 Summer Street, Boston, Massachusetts.  I am counsel to Blue Hills Office

Park LLC, William Langelier and Gerald Fineberg in the above-captioned case.  I am making this

affidavit in support of Opposition to Motion of Defendants and Plaintiffs-In-Counterclaim to Exclude

Expert Testimony of Dr. Kenneth Gartrell.

2.      A true and complete copy of the Expert Report and Exhibits of Dr. Kenneth D. Gartrell is

attached hereto and incorporated herein by reference as Exhibit "A."

3.      A true and complete copy of the Rebuttal Report of Dr. Kenneth Gartrell is attached

hereto and incorporated herein by reference as Exhibit "B."

4.      A true and complete copy of the Slip Opinion in *Waste Management, Inc. v. Danis Industries,* United States District Court for the Southern District of Ohio (Western Division) Case No. 3:00 CV 256 (Rice, J.) is attached hereto and incorporated herein by reference as Exhibit "C."

5.      A true and complete copy of "Contract Design for Problem Asset Disposition" is attached hereto and incorporated herein by reference as Exhibit "D."

6.      A true and complete copy of the article "Benchmarking Real Estate Investment Performance:  The Application of Real Estate Indices" is attached hereto and incorporated herein by reference as Exhibit "E."

7.      A true and complete copy of "A Transaction-Based Index of Commercial Property and its Comparison to the NCREIF Index" is attached hereto and incorporated herein by reference as Exhibit "F."

8.      A true and complete copy of "Property-Level Benchmarking Real Estate Investment Performance: The Application of Real Estate Indices" is attached hereto and incorporated herein by reference as Exhibit "G."

9.      A true and complete copy of "A Repeat Sales Index for Commercial Real Estate – Using Sold Properties in the NCREIF Database" is attached hereto and incorporated herein by reference as Exhibit "H."

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 31ST DAY OF MAY, 2006.

                                        /s/ Bruce D. Levin
                                    Bruce D. Levin

#339253 v1/14500/9985

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>　　　Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as<br>Trustee for the Registered Holders of<br>Credit Suisse First Boston Mortgage<br>Securities Corp., Commercial Mortgage<br>Pass-Through Certificates, Series 1999-C1,<br>　　　Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET,<br>LLC,<br>　　　Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>　　　Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## CERTIFICATE OF SERVICE

I, Bruce D. Levin, hereby certify that I caused to be served via electronic service this 31st day of May, 2006 the **Affidavit of Bruce D. Levin in Support of Opposition to Motion of Defendants and Plaintiffs-in-Counterclaim to Exclude Expert Testimony of Dr. Kenneth Gartrell** upon Bruce S. Barnett, Esquire, Traci S. Feit, Esquire, E. Randolph Tucker, Esquire, Bruce E. Falby, Esquire, DLA Piper Rudnick Gray Cary US LLP, 33 Arch Street, 26th Floor, Boston, Massachusetts  02110.

/s/ Bruce D. Levin
Bruce D. Levin, Esquire
 BBO No. 548136
Bernkopf Goodman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:　(617) 790-3000
Facsimile:　(617) 790-3300
blevin@bg-llp.com

#339430 v1/14500/9985

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BLUE HILLS OFFICE PARK LLC, | ) | |
| Plaintiff / Defendant-in-Counterclaim | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J.P. MORGAN CHASE BANK, as | ) | |
| Trustee for the Registered Holders of | ) | |
| Credit Suisse First Boston Mortgage | ) | |
| Pass-Through Certificates, Series 1999-C1 | ) | Civil Action No. 05-CV-10506 (WGY) |
| Defendants | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM LANGELIER and | ) | |
| GERALD FINEBERG, | ) | |
| Defendant-in-Counterclaim | ) | |
| | ) | |

**EXPERT REPORT AND EXHIBITS OF
DR. KENNETH D. GARTRELL**

March 31, 2006

Kenneth D. Gartrell, PhD CPA
Managing Director
LECG, LLC
350 Massachusetts Avenue
Cambridge, MA 02139
Phone: 617.252.9994
Fax : 617.621.8018

# INDEX OF EXHIBITS

**EXHIBIT 1**    **Qualifications of Kenneth D. Gartrell, PhD CPA**

**EXHIBIT 2**    **Materials Reviewed**

**EXHIBIT 3**    **Economic Damages**
           Table 3.1    Summary of Economic Damages

**EXHIBIT 4**    **Greater Boston Commercial Real Estate Market**
           Figure 4.1    Suburban Office Values and Rents, 1996-2005
           Figure 4.2    Suburban Office Values and Rents, 1999-2005
           Table 4.1    Property Values, Rents, and Cap Rates, Q3 1999 - Q4 2005
           Table 4.2    Property Values, Rents, and Cap Rates, 1996-2005

**EXHIBIT 5**    **Indexed Market Value and Rent**
           Table 5.1    Calculation of Index Value and Rent

**EXHIBIT 6**    **Market Transactions**
           Table 6.1    Summary of Transactions for Suburban Office Space
           Table 6.2    Relative Market Prices
           Table 6.3    Transaction Prices Adjusted to Q4 2004
           Table 6.4    Market Value Implied by Adjusted Transaction Prices
           Table 6.5    Market Value Implied by Transactions for 250 Royall Street
           Figure 6.1    Increasing Market Rents, Observed and Indexed to Q4 2004
           Table 6.6    Observed Rents ($/SqFt)
           Table 6.7    Observed Rents ($/SqFt) Adjusted to Q4 2004

**EXHIBIT 7**    **Discounted Cash Flow Valuation**
           Table 7.1    DCF Results
           Table 7.2    DCF Inputs, Summary
           Table 7.3    DCF Inputs, Discount Rate Calculation

**EXHIBIT 8**    **DCF Valuation at Dunkin Donuts Lease Terms**
           Table 8.1    DCF Results
           Table 8.2    DCF Inputs, Summary

**EXHIBIT 9**    **Cash Positioning and Funding Requirements**
           Figure 9.1    Sources of Funds and Ending Cash Balances
           Figure 9.2    Reserve Account Activity Reconciliations

**EXHIBIT 10**    **Cash Positioning and Funding Requirements at Dunkin Donuts Lease Terms**
           Figure 10.1 Sources of Funds and Ending Cash Balances
           Figure 10.2 Reserve Account Activity Reconciliations

## I.    BACKGROUND

1.    My name is Kenneth D. Gartrell. I am an independent economic consultant and a
Managing Director of LECG, LLC ("LECG"), a global economic consulting firm
headquartered in Emeryville, California. My business address is 350 Massachusetts
Avenue, Cambridge MA 02139. My business telephone number is 617-252-9994.

2.    I was retained by the law firm Bernkopf Goodman LLP to determine whether or not
I could render independent expert opinions regarding the amount of economic
damages to Blue Hills Office Park LLC ("Blue Hills") in connection with the
foreclosure on the Blue Hills Office Park (the "Property") on or about November
19, 2004. Specifically, I was asked whether I could determine the fair market value
("FMV") of the Property at that time as a basis for calculating the present value of
the financial losses to Blue Hills, in cash and in equity, resulting from the loss of
the Property. In addition, I was asked whether I could determine the amount of
additional funding Blue Hills would have had to invest in the Property in order to
cover any immediate cash deficit at the time of, and to avoid, foreclosure. I have
determined, based on my review of the documents and other materials referenced
herein, that I can render such opinions.

3.    For my ongoing work in this engagement, LECG is being compensated for my time
at my standard hourly rate of $550. In addition, members of LECG assisted in my
work at my direction. LECG's fees and my personal compensation are realized
solely on a time and materials basis, without contingency to the outcome of this
matter.

## II.    QUALIFICATIONS

4.    I have attached my current resume as **Exhibit 1** to this report.    It lists all publications I have authored or co-authored and includes a complete list of prior testimony.    To supplement that information, I list here some qualifications most relevant to my work in this engagement.

5.    I hold an M.S. in Accountancy and a Ph.D. in Business Administration from the Graduate School of Management at Kent State University.    I also hold an MBA in financial economics from the William E. Simon Graduate School of Business Administration at the University of Rochester.

6.    For the last thirty years, I have been a licensed practicing Certified Public Accountant.    My license was granted in the state of Ohio and is now actively administered by the state of Massachusetts, with full reciprocity to all other states in the U.S.

7.    At the start of my business career, I spent eight years in the practice of professional accounting as an accountant and auditor for the firm of Ernst & Ernst, the predecessor to Ernst & Young.    During the next twelve years, I left the exclusive practice of public accounting to work as a corporate policy and business strategy consultant, complete a Ph.D., and teach at the graduate and undergraduate levels.    I have taught hundreds of sections of accounting, business policy/strategy, economics, finance, and investments at the graduate and undergraduate levels.

8.  In the last twelve years, I have progressively concentrated my professional time on management and economic consulting. In litigation, I have been retained by plaintiffs and defendants alike. I have been qualified on many occasions and in many forums as an independent expert.

9.  I have been qualified as an expert witness before U.S. District Courts, U.S. Bankruptcy Courts, the Federal Court of Claims, state courts including the Massachusetts Superior and Appellate Courts, the Delaware Chancery Court, the U.S. Federal Communications Commission, the U.S. Securities and Exchange Commission, and by arbitrators in private arbitration.

10. I have lived and worked in Boston for the last eleven years. I maintain active contacts in the Boston commercial real estate industry, to whom I provide frequent professional financial and managerial advice.

11. As a management consultant and an expert in corporate finance, I have worked on numerous engagements involving the management, transaction, and valuation of commercial real estate. Several such engagements have involved the real estate market in the Boston metropolitan area in the last five years, the most relevant time period in this litigation. For example:

    – I am an expert in a derivative action in Massachusetts Superior Court involving the Friendly Ice Cream Company. The financing terms and FMV of the company's substantial real estate portfolio from 2000 to today are important issues in the case. Since the company is headquartered in Wilbraham, Massachusetts, the portfolio includes many prime business properties in and around Boston, as well as properties throughout the Eastern U.S.

    – I am consulting to a local commercial real estate developer regarding the valuation of various retail store locations and economic damages

3

to the developer in connection with an alleged breach of contract and related property development transactions in and around 2004.

–   I am an economic expert in a case in Massachusetts Superior Court regarding the economic damages resulting from loan transactions to a manufacturing company's lease which were a prerequisite to the sale of the company in 2004. I calculated the gain obtained as a result of certain loan guarantees and lease amendments, as well as the value of rent and other partnership assets.

–   I provided replacement cost valuation information as of 2004 for an industrial park located outside of Worcester, Massachusetts which was damaged by fire in 2001. I analyzed the range of relevant conditions in the commercial real estate market to quantify the economic loss to the property owner.

–   I was an expert regarding the economic benefit to the New England economy of a proposed fifth runway expansion project at Boston's Logan Airport. My work, on behalf of the City of Boston, considered the direct effects of the proposed runway on land use, as well as the availability and value of commercial real estate in the greater Boston area looking forward from 2003.

–   For several years, I worked as an economic consultant on a range of issues following the Bank of New England bankruptcy, which generated the largest loss from bank failure in U.S. history. I managed an extensive effort to value all of the non-bank assets of the holding company. I analyzed the Bank's substantial portfolio of commercial real estate loans and leases, as well as its corporate and related commercial real estate assets.

12.   I also have worked on similar engagements outside of the Boston area involving commercial real estate. For example, I am an expert on a range of complex transaction and valuation issues relating to a dispute between The Danis Companies and Waste Management Corporation. In that case, I analyzed and valued a substantial commercial real estate portfolio, including several manufacturing sites and high-rise office buildings in Dayton, Ohio. Similarly, I am consulting on a dispute involving the management of a family trust with significant commercial real

estate holdings of one of the most successful private real estate developers in the U.S.

13.   In addition to my consulting work involving commercial real estate, I serve on the Board of Directors of a 600-unit residential property in Cleveland, Ohio, in partnership with another of the largest and most successful real estate development companies in the country.

## II.   RELIANCE

14.   **Exhibit 2** to this report lists the information I considered in the course of this engagement in addition to my professional training and experience and relevant standards.

15.   To calculate the economic damages to Blue Hills, I reviewed case-specific documents and information (e.g., court filings, agreements, appraisals, correspondence, loan documents, etc.) as well as relevant publicly-available information (e.g., analyst reports, published data on market values and rents, market transactions, etc.).   For additional factual background, I also interviewed members of the Blue Hills management team.

16.   In the future, I may rely on any additional information which becomes available as it relates to the substance of the analysis and opinions set forth in this report.

17.   Likewise, I may revise or extend my opinions as a result of ongoing analysis, in response to other expert reports, or as any additional relevant information becomes

available through discovery or otherwise.    Therefore, this report does not necessarily reflect each and every matter on which I ultimately may form opinions in the course of my ongoing work.    Additionally, as discovery in this case is incomplete as of the date of this report, I reserve the right to amend this report based on information adduced during any remaining discovery.

## III.    SUMMARY OF OPINIONS

18.    I have formed four primary opinions in this case,    To a reasonable degree of professional certainty, it is my opinion that:

19.    ¹At the date of foreclosure on or about November 19, 2004, the market conditions for commercial real estate in greater Boston's Central Business District ("CBD") and adjacent suburbs had returned to levels at, or above, conditions in existence in 1999 when the Property was refinanced at an FMV of $42 million.

20.    The FMV of the Property as of the date of foreclosure was no less than $44.4 million. At that value and date, Blue Hills' equity in the Property was approximately $5.8 million exclusive of mortgagee reserve deposits.

21.    Based on reasonable expectations regarding the stream of future cash flows the Property will generate net of the cost of any upfront improvements which may be required to realize that cash flow stream, the Property presented an immediate cash deficit at foreclosure.    However, the available cash on-hand in the mortgagee's required reserve accounts, in Blue Hills' own property accounts, and/or in available new cash from Blue Hills would have covered this cash deficit.    Any new cash

6

required from Blue Hills would not have been immediately needed and would have been relatively low compared to its equity interest in the Property.

22.    By foreclosing on the Property rather than recognizing its FMV and/or giving Blue Hills the opportunity to preserve its equity and the expected future cash flows from the Property, the Defendants caused economic harm to Blue Hills.[4] Blue Hills lost its equity in the Property, the balances in the mortgagee required reserve accounts, and the tax benefits associated with holding the Property.  In the aggregate, the direct economic damages to Blue Hills resulting from the foreclosure in November 2004 was at least $14.9 million.   **Exhibit 3** sets forth the economic damages calculation.

## IV.    BASIS OF OPINIONS

23.    The rest of this report discusses the basis for each of my four primary opinions.

24.    There are three generally-accepted approaches for deriving independent measures of the FMV of the Property as of the date of foreclosure on November 19, 2004: (1) the market index approach; (2) the market transactions approach; and (3) the income approach.

25.    The market index approach calculates the current FMV of the Property by adjusting its known FMV at a point in time by using observed market values to estimate the value change between that point in time and the valuation date.  This approach is a reliable way to account for changes in values over time.

26. The market transactions approach calculates the FMV of the Property by considering the prices paid in current transactions for comparable properties. This approach is a reliable way to account for variation in property values on an individual basis.

27. The income approach calculates the forward-looking expected future cash flows from owning and operating the property under foreseeable business and market conditions. This approach is a reliable way to account for the specific valuation effects of known economic considerations (e.g., occupancy rates, rents, operating expenses, improvements, etc.).

28. In this report, I discuss, and base my expert opinions on a combination of all three approaches to valuing the Property on or about the foreclosure date of November 19, 2004.

A.    **Prevailing Market Conditions Indicate an FMV of $44.4 Million**

29. As part of a refinancing with Blue Hills in the third quarter of 1999 (i.e., Q3 1999), the mortgagee had the Property independently appraised. The appraisal letter dated September 10, 1999 placed the value of the Property at $42 million as of August 30, 1999.[1] This valuation was based on 273,863 square feet ("sf") of rentable space leased at the time for $17.00/sf, which was lower than the prevailing market rents, ranging from $17.37/sf to $22.39/sf.[2] Based partly on this $42 million valuation,

---

[1]    Meredith & Grew Oncor International, Self-Contained Complete Appraisal Report, August 30, 1999 (LNR 03780-03781).
[2]    Ibid.

8

Blue Hills and the Defendants entered into a mortgage refinancing loan for $33.2 million on September 14, 1999.[3]

30. Between the time of the refinancing and the date of foreclosure on the Property on November 19, 2004, the commercial real estate market in the Boston metropolitan area had grown significantly until mid-2000 and had returned to levels at or above the property values observed in late 1999. The market reflected the expected adjustments resulting from the 2002 recession and had started to rebound. By Q4 2004, general economic conditions were in a strong pattern of recovery, the signs of which were evident in Boston area real estate prices.

### 1. Overall Market Conditions

31. The Boston area real estate market has been one of the strongest markets in the U.S. over the long term. The Greater Boston market is the economic and commercial center of New England as well as a strong secondary world financial center tied to New York City through the urban east coast network including Hartford, Connecticut and Providence, Rhode Island. In addition, Boston is one of the most popular U.S. destinations for domestic and international travel and tourism.

32. **Exhibit 4** shows market conditions in the greater Boston commercial real estate market. The figures and tables in Exhibit 4 show the relative market values, rents, capitalization rates, and trends in the downtown (CBD) and suburban markets. The market data reported in Exhibit 4 is published for the Boston metropolitan market by the National Real Estate Index within Global Real Analytics, a market leading

---

[3] Mortgage Assignment of Leases and Rents and Security Agreement, September 14, 1999.

source of information regarding publicly-traded real estate equity and debt securities, property valuation, and local real estate markets.[4]

33.  Figure 4.1 shows that the market enjoyed steady gains in property values and commercial rents form 1995 through late 2000. This expansion in values, accompanied by improvements in urban lifestyles, started as far back as the mid 1980s and resurged following the end of the 1992 recession. The trend lines in Figure 4.1 are displayed as indices based on the average selling prices and rental rates per square foot as of Q4 1995. Characteristic of long, steady periods of normal economic expansion, commercial real estate values and rents moved together, both nearly doubling at the peak of the expansion in mid-2000.

34.  In general, property values and rents are closely linked. The relationship is somewhat definitional, since rents are the basis for the income generated from the operation of commercial real estate and it is the net profit from this rental income after consideration of related expenses that is capitalized as the value of the property. It is also normal for values to lead rents through time. The leads and lags between the two measures simply reflect the dynamics of the market and usually represent the more comprehensive and forward looking nature of prices. Prices or values reflect more comprehensive long-run decisions, and rents, which are usually just one element of long-term rental agreements, often reflect current conditions, are based on a shorter time horizon, and are influenced by inducements and incentives which are smoothed out relative to property values over the life of long-term lease agreements.

---

[4]  See, e.g., http://www.graglobal.com.

10

35.  Figure 4.1 also shows the trends in market values and rents in the greater Boston commercial real estate market beyond 2000 also follow a normal pattern for a recession and recovery cycle, such as in the 2001 to 2004 period.  The relative decline in property values ended in late 2004 at their 1999 levels, and values have rebounded since then.  Notably, by the time of the foreclosure on the Property in Q4 2004, the greater Boston commercial real estate market was in full recovery and expansion. Indeed, Table 4.1 shows average prices per square foot had increased by 10.3% in downtown Boston and by 5.7% in the surrounding suburban markets since Q3 1999, the time at which the Defendants' appraiser valued the Property at $42 million.  That trend has continued from Q4 2004 up to the present, with values up an additional 13.3% and 6.74% in the downtown Boston and suburban markets, respectively.

36.  Rental rates in Figure 4.1 separate from property values in a different but typical pattern.  By early 2003, rents had fallen more, and more quickly, than property values.  They had fallen to levels at or below the levels last observed in the 1994 to 1995 period.  This pattern of the rents compared to the corresponding market values mostly reflects normal market dynamics.  Rents are bound to be more volatile than prices since recessions are periods of business reorganization and restructuring.  At such times, failing companies leave the market and are replaced by newcomers. With the decline in overall business activity, sharp temporary declines in rents occur because there are many new rental agreements and the rents are lowered in the early years of new leases as a competitive inducement to new tenants. Sometimes, there also are rent accommodations in existing leases to keep good

11

tenants from switching to new or better space as it becomes available when failing or reorganizing firms create additional capacity.

37.   It is also notable that throughout the recession of 2002, commercial construction and expansion of property development continued at a high rate. Many new buildings were constructed and leased during that period. This is a strong indication that the recession was not expected to be severe or of long duration, and it reflects why rents fell so far and were only beginning a slow climb to catch up with observed market values by late 2004.

38.   Figure 4.1 also makes the important point that by the time of foreclosure on the Property on November 19, 2004, the recession had ended and the current period of economic recovery was underway. While rents lagged market values, they were beginning to increase once again.

39.   A reasonable and knowledgeable person looking at the overall market for commercial real estate in greater Boston as of Q4 2004 would have to conclude that: (1) property values were about to resume the increasing trends of the 1990s, and (2) rents on commercial real estate were likely to increase significantly in the near future to converge with increasing property values. The dominant question would not have been *whether* rental rates would rise, but rather *when* and *how quickly*. All things considered, it is more likely than not that rent levels would be expected to rise in the near-term to meet the market characterized by higher and increasing values.

### 2. Suburban Market Conditions

40. As in any major metropolitan market, suburban commercial real estate values and rents are linked to the downtown CBD. In Boston, the dynamics of that relationship are similar to conditions in New York City, Washington, DC, San Francisco and Chicago. Namely, the CBD is a leading indicator of what will happen in the suburban markets. Values in the CBD and in suburban markets are imperfect substitutes for each other. Hence, whenever the value differences between the CBD and suburban space exceed a certain threshold, investment shifts from one area to the other.

41. Unlike in many other American cities, downtown Boston truly is the economic "hub" of the region. There are many sociological, geographic and demographic reasons for the centrality of the Boston CBD to the regional economy, making the relationship between the Boston CBD and the suburban markets pivotal in establishing what reasonable expectations would have been for the Property at the time of foreclosure in late 2004.

42. Figure 4.2 shows the same market values and rents as in Figure 4.1, but it shows them indexed to a common value as of Q3 1999, the date of the $33.2 million refinancing of the Property and the mortgagee's $42 million independent appraisal.

43. Figure 4.2 shows that by end of Q4 2004, there had been eleven straight quarters of increased commercial property values in the CBD with an increase in the rate of growth for each of the five prior quarters. While the return of the CBD was underway again after a brief decline in 2000 to 2001, the suburban values continued

to decline at a slow rate until early 2002. Then in the second quarter of 2004, the suburban market turned upward. Considering all relevant factors as of Q4 2004, the market appeared, and was expected, to be (and, indeed, was) stabilized at levels above Q3 1999 and was highly likely to increase further in step with the CBD trend. Likewise, rental rates in the suburban markets had stabilized in early 2003 and could be expected to increase once again going forward.

44.    The dynamics that link the market in the CBD to the suburban market are clear. In this case, the Property is located such that this link is of even greater significance. The Property is located directly off state Route 128, south of the Massachusetts Turnpike, and virtually at the intersection of US Interstates 93 and 95. It is located directly on the primary routes of commerce between the Boston and Providence CBDs, as well as suburban business districts in towns such as Dedham, Needham, Norwood, Quincy, and Westwood. To the extent the nearing completion of the Big Dig and airport access via the Williams tunnel result in more efficient travel into and out of Boston, it adds a level of market value to commercial property throughout this commercial network above the overall market averages for suburban property values and rents.

45.    As **Table 4.1** shows, suburban commercial real estate values rose more than 5.7 % from $190.35 in Q3 1999 to $201.19 in Q4 2004. For the reasons of the intra-market lags between the CBD and the suburban markets, as well as the normal lags between values and rents in transitional markets, the rents and the cap rates exhibit a different pattern. Coupled with the strong trend in the increase in values in the

14

CBD, the lag in the suburban cap rates indicates substantial upside in both suburban values and rents.

### 3. Practical Implications of Market Values for the Property

46.    At the time of the $33.2 million refinancing of the Property in Q3 1999, the corresponding $42 million appraisal placed a the Property's value at $153/sf. Table 4.2 shows the prevailing market value at the time was $190/sf, or approximately 19% higher. The appraisal noted that the "market" rent of $17/sf determined by an arbitrator also was below prevailing market rents at the time.

47.    The observed relationship between the Property's value and rent in Q3 1999 and prevailing market rates, taken together with the relative movement in the market since that time provides a benchmark for valuing the Property at other points in time, such as at the time of foreclosure in Q4 2004. The market index approach estimates the current FMV of the Property by adjusting its known FMV at a point in time (e.g., Q3 1999) by using the market index to estimate the change in asset value between that point in time and another date (e.g., Q4 2004). This approach is a reliable way to account for changes in commercial real estate values, on average, over time.

48.    **Exhibit 5** shows the valuation of the Property using the market index approach. The calculation starts with the independently determined FMV of $42 million for the Property in September 1999. Applying to this value the 5.7% increase observed in the market values of suburban commercial real estate between Q3 1999 and Q4 2004, yields a value of $44.4 million at or about the time of foreclosure in

November 2004.  Applying the same market adjustment to the $17/sf "market" rental rate established at arbitration in Q3 1999, the market rent for the Property in Q4 2004 was $17.97/sf.

49. Because the starting point for the indexed value is the actual September 1999 appraisal of the Property, this indexed value already accounts for the specific condition of the Property and any unique characteristics relative to the market (e.g., the starting FMV is 19% below market, so the resulting FMV is as well).  Given the overall market conditions and the changed structure of the CBD access patterns which existed by the end of 2004, it is difficult to find reasons to believe there was any systematic or permanent decline in the FMV of the Property relative to the market between Q3 1999 and Q4 2004, or since then.

50. Therefore, it is my opinion that conditions in the real estate market establish that the FMV of the Property was no less than $44.4 million at or about the date of foreclosure on November 19, 2004.

## B.    Comparable Transactions Indicate an FMV Over $35 Million

51. In addition to the market index values, contemporaneous arms-length transactions involving similar commercial properties are another source of reliable price signals about the FMV of the Property at the date of foreclosure.  A series of commercial real estate transactions in the two years prior to the Property's foreclosure provide numerous independent realizations of market values for other properties.  Between 2002 and 2004, I identified 22 separate transactions, totaling over $308 million in value and over 2.6 million square feet of commercial space.

16

52.  **Exhibit 6** shows the individual properties involved in each of the 22 transactions I
     identified between 2002 and 2004.  The tables and figures in Exhibit 6 show the
     transaction dates, buyers, property locations, rentable areas, and purchase prices
     (total and $/sf). They also show patterns of change in rental rates for various leasing
     transactions I identified.

53.  All of these market transactions are an important source of information regarding
     the value of the Property within this timeframe.  To the extent the real estate market
     for commercial property in suburban Boston is highly efficient, the "law of one
     price" must hold:  different market transactions should generate similar prices for
     similar properties.  Therefore, the prices in transactions for comparable properties,
     adjusted for observed changes in market values over time as reflected in the real
     estate index, should generate reliable market values.

### 1.  Market Transactions Reflect Unobserved Differences

54.  One complicating feature of using comparable transactions for valuing real estate
     rather than more commodity like assets is the fact that real estate transactions
     typically represent a complex bundle of assets and associated obligations, which are
     only partially observable. The sale price of a real estate asset depends critically on
     factors such as its specific location, its state of repair, its design and configuration
     as well as the terms of any tenants occupying or likely to occupy the building in
     question. This problem is exacerbated to the extent the market is "thin" (i.e., only
     relatively few buyers and sellers, no direct comparable properties, etc.). In that case,

the market transactions approach will reveal variation in property values on an individual basis for different property characteristics.

55. For these reasons, ideal comparable transactions involve properties in very close proximity to the property to be valued, of similar size, state of repair, occupancy, and lease characteristics.

56. In analyzing comparable transactions for the purposes of valuing the Property, I therefore proceeded from a general analysis of the 22 comparable market transactions I observed to transactions of properties as closely related to the Property as possible, both geographically and with respect to occupancy structure.

57. **Table 6.1** provides a summary of suburban office space sales between 2002 and 2004 I have been able to observe. The table includes the date of sale, the name of the buyer, the buildings location and size as well as its sale price in absolute terms and per square foot.

58. **Table 6.2** shows the observed percentage changes in suburban office space values relative to the date of foreclosure in late 2004. I derived the percentages in Table 6.2 directly from the index values in Table 4.2. Using the percentage changes from Table 6.2, I adjusted the values of the 22 comparable properties for the changes in general conditions of the real estate market discussed in the market section above. Table 6.3 shows the resulting values of comparable market transactions adjusted to November 19, 2004.

59.  Finally, because the 22 comparable properties differed substantially in size, I used the price per square foot implied by the adjusted transaction prices to calculate the hypothetical value of each of the 22 properties if each had a total rentable space of 273,863 sf, or exactly identical to the size of the Property.  Table 6.4 shows these implied values for each of the 22 properties as well as the mean, median, maximum, minimum and standard deviation of the values.

60.  Table 6.4 shows that the average implied value for the Property derived by this process is $29.3 million, within a wide range:  a maximum of $55.2 million, a minimum of $16.6 million, and a standard deviation of $9.7 million. The dispersion in the observed values – illustrated by the nearly $40 million difference between the maximum and the minimum values and a standard deviation equal to 1/3 of the average value – indicates that transaction prices are driven significantly by unobserved features of the transactions. In other words, the observed market average price from this relatively small sample of transactions is an unreliable predictor of the likely FMV of a specific property because there is no way to control for underlying property differences which are unobserved but which drive transaction prices.

## 2.  The Adjacent Property Indicates an FMV Over $35 Million

61.  Because of the practical difficulty in relying on the wide range of transaction prices observed for a wide range of properties, analyses based only on properties which more closely resemble the Property provide a better basis for determining its market

value. In particular, commercial properties in very close proximity and with a similar tenant structure provide a better basis for assessing the Property's FMV.

62. Within the relatively small sample of 22 comparable transactions, there is one example of a very close comparable to the Property. The single lessor of the Property prior to 2004, Equiserve, upon moving out of the Property, purchased a building next door at 250 Royall Street. Equiserve occupied that Property as a single tenant, exactly as it had occupied the Property.

63. **Table 6.5** shows the various observed market values of 250 Royall Street and the implied FMV of the Property. Equiserve purchased the 188,950 sf building in August 2003 for a price of $24.7 million. Adjusting for the small (0.9%) decrease in average prices between August 2003 and year-end 2004, this transaction took place at an equivalent price of $129.51/sf. At that price, the (273,863 sf) Property would be valued at $35.5 million as of August, 2003.

64. Two years after Equiserve purchased the property at 250 Royall Street, it sold that property. In August 2005, Inland Western purchased that property at a price nearly three times higher than the price Equiserve paid just two years prior: $68.8 million or $364/sf. This drastic price increase is not explained by the overall increase in market values. The market index values on Table 4.2 show that between the date on which Equiserve purchased (August 12, 2003) and sold the property (August 11, 2005), real estate values in the market overall increased by 5.0%. To calculate the value implied by the August 2005 transaction for the Property at the date of foreclosure, I used the index values to adjust the August 2005 purchase price down

by 5.6% to back-out from the transaction price the effect of that increase in market values between November 2004 and August 2005. Table 6.5 shows the indexed purchase price of $64.9 million, or $343/sf. At that price, the Property would be valued at over $94 million.

65.  The wide range of values implied by the 2003 and 2005 transactions for 250 Royall Street – the single best comparable property on the list of observed market transactions – further reflects the difficulty in relying too heavily on the results of the available comparable transactions for valuing the Property. Given a 5% increase in overall market conditions, it is unlikely a brand new building which sold for $24.7 million in August 2003 would sell two years later for $68.8 million, unless there were unobserved terms for which the difference in the observed prices reflects a market rate of compensation.

66.  Without knowing more about the reason for the significantly higher selling price for 250 Royall Street in 2005, it is my opinion, based on the observed prices in market transactions, that the FMV of the Property was at least $35.5 million as of the date of foreclosure on November 19, 2004, and it likely was significantly higher.

**C.    Discounted Cash Flows Indicate an FMV Over $44 Million**

67.  While the prevailing market conditions and observed market transactions inform my opinion of the Property's FMV as of the date of foreclosure, I also developed a detailed Discounted Cash Flow ("DCF") forecast to calculate the Property's FMV based on its own economic characteristics and relative market position as of late 2004. The DCF valuation provides specific revenue, cost, and cash flow figures,

which indicate the forward-looking profitability of the Property and its FMV at the time.

68. I developed the DCF forecast to determine how the Property's value based on its own expected future cash flows reconciled with the $44.4 million FMV I calculated based on its agreed-upon value of $42 million in late 1999 indexed for changes in market conditions to late 2004. The DCF valuation also accounts for the specific factors, which explain why the $44.4 million value may differ from the value implied by observed market transactions.[5]

69. The DCF approach directly reflects the Property's strategic opportunity set, whereas directly relying on the market transactions requires adjustments for underlying differences between the Property and the "comparable" properties exchanged in the market at the time. Unadjusted, a valuation derived from market transactions reflects unobserved economic considerations, which may not apply to the Property (e.g., different leasing terms). The DCF valuation more directly reflects the Property's set of strategic opportunities based on its own economic characteristics and thus addresses the potential problems associated with the unobserved features of comparable transactions with a material impact on the value of those "comparable" assets.

70. In a DCF context, the FMV of the Property equals the net present value ("NPV") of its forecasted future cash flows discounted at an appropriate risk-adjusted rate.[6]

---

[5]    The use of market multiples and DCF forecasts as complementary valuation approaches is consistent with industry custom and practice and the academic literature. See, *e.g.*, Kaplan and Ruback (1995).

[6]    A weighted average cost of capital ("WACC") is used to discount the forecasted cash flows back to present value.

22

The DCF forecast projects annual cash flows over a finite (presumably foreseeable) period of time, and farther out on a normalized basis, called the terminal value or perpetuity value. Relative to the market-based valuation approaches, the DCF approach is simply a different means to same end, and the resulting value should reconcile to the market-based value.

### 1. Reasonable Expectations Indicate an FMV of At Least $44.4 Million

71. In forecasting the Property's expected future cash flows, I calculated the DCF value from an *ex-ante* forecast based on the information known about the Property at the time of foreclosure (i.e., late 2004) regarding its rentable space, realized rental rates, prospective (single v. multiple) tenants, and so on. I relied on the latest realization of the Property's actual performance at the time as the best predictor of its future performance.[7] On that basis, I forecasted the Property's rental revenue, operating expenses, capital improvements, capital expenditures, and resulting free cash flows on an annual basis for a ten-year forecast period plus a terminal value.

72. **Exhibit 7** shows the DCF calculations and the resulting $44.4 million ($162/sf) value. The tables in Exhibit 7 set forth all of the initial inputs used to start the valuation in 2004, the changes to the initial inputs for each subsequent year of the forecast period, and the discount rate used to express future cash flows at their present value as of late 2004.

---

[7] This is consistent with the well-known "random walk" theory that values do not follow time trends, so the most current realizations best predict future values.

73. Specifically:

 &ndash; Table 7.1 shows the results of the DCF calculations;

 &ndash; Table 7.2 lists all of the initial input values I used in the DCF calculation; and

 &ndash; Table 7.3 shows calculated and observed required rates of return to capital for real estate management companies, which informed the discount rate I applied to the cash flows I calculated for each time period.

74. The DCF calculation starts in late 2004 after the Equiserve lease expired and left the Property. Table 7.1 first projects rental income from the Property becoming "fully" occupied over a three-year period, starting at year-end 2005. In this context, "fully" occupied means eventually renting out 260,170 sf, or 95% of the Property's total 273,863 sf of rentable space. I forecasted that the Property would not be fully rented until year-end 2007.[8] This framework reflects the likelihood the Property would be rented to (approximately three equally-sized) multiple tenants, rather than a single tenant, such as Equiserve. That presumption was a reasonable expectation stated at the time,[9] but it was not a certainty. In fact, it may have been possible to rent the Property to a new single tenant and avoid some of the expense of more extensively retrofitting it to accommodate multiple tenants.[10]

---

[8] For example, Lennar Corp. ("Lennar"), the Special Servicer of the Property's mortgage was advised it mat have taken "24 months or more to tenant" the Property (LNR 03074).

[9] Ibid. Lennar noted, "Large tenants (more than 100,000 sf) are very difficult to find these days."

[10] All of the nearby commercial properties have single tenants, e.g., Allied Domecq (Dunkin Donuts' parent company), Equiserve, and Reebok.

75. I projected the upfront improvements required to convert the Property for multiple tenant use to cost $30/sf, or more than $8.2 million in total.[11] This cost is realized in increments over three years in direct proportion to the new tenants' entry over the same time period. The full cost of the upfront improvements would be realized by year-end 2007, at which time the Property would have been fully (i.e., 95%) occupied from that point forward. The $8.2 million cost of improvements to attract and retain new tenants would have been in addition to the routine capital expenditures for normal operating fixed assets, which I projected at $0.20/sf based on documented information in the factual record.[12]

76. Even with the significant upfront improvements I include in the DCF calculation, I projected the Property's rental income to start at the same rental rate as contained in the Equiserve lease which expired on July 31, 2004, $17/sf, indexed to $17.97 to account for the 5.7% increase in real estate market values observed between the time the $17/sf rent was determined in late 1999 and the valuation date in late 2004.

77. I increased the rental rate by only 1.5% per year after 2004 to account for the expected upward trend in market rents I discussed previously. The disparity between prices and rents in late 2004 indicate that expected rent increases may have been much higher. Figure 6.1 and the underlying tables (Tables 6.6 and 6.7) show the actual increases in year-over-year rents within a sample of available lease agreements. Rents in the observed lease agreements increase from 1.4% per year to 5.0% per year, with an average increase of 3.4% per year a seven-year lease period.

---

[11] $30/sf is at the high end of the range of improvement costs documented in the factual record. See, e.g., Frank Deposition, p. 158 (15-20%). Lennar assumed $40/sf in its 2004 DCF calculation (LNR 03074).

[12] $0.20/sf is the same capital expenditure used in Lennar's 2004 DCF calculation (LNR 03074).

78.  The $17/sf starting value in the Equiserve lease was set by arbitration at less than the prevailing market rents in 1999, which reportedly ranged from $17.37/sf to $22.39/sf.[13]  The prevailing market rate for commercial property in suburban Boston observed at the end of 2004 was $23.26/sf (see Table 4.2), or 23% higher than the $17.97/sf I applied in my DCF calculation.  By indexing from the $17/sf rate, my calculation implicitly assumes the Property would continue to rent for less than market rates throughout the forecast period – despite the significant upfront improvements I included which would have significantly increased the potential rents the Property could realize.  To the extent the Property would have realized higher rents than I projected, it would generate higher cash flows and a higher FMV as well.[14]

79.  Real estate taxes would have been incurred in the last half of 2004 although the Property was vacant.  Thereafter, the tenants would cover a portion of the local property taxes in proportion to their share of total rented space.  I forecasted property taxes at their actual 2004 level of $632,725 per year (paid as $158,181 quarterly).  Likewise, the tenants would cover a pro-rata share of the management fee expenses, which I forecasted at 5% of rental income.

80.  With that structure of revenues and expenses extended to each of the ten years in the forecast period, I calculated the free cash flow generated by the Property in each year in two steps:  (1) I subtracted net operating expenses from revenue to yield

---

[13]  Meredith & Grew Oncor International, Self-Contained Complete Appraisal Report, August 30, 1999 (LNR 03780-03781).

[14]  As I discuss in the next section, I calculated the effect of one such scenario based on observed data for an adjacent property.  It yields materially higher cash flows and FMV than I projected in Exhibit 7.

operating profit, and (2) I deducted capital expenditures from, and added back depreciation expense to, operating profit to yield free cash flow. I also calculated the value of free cash flows beyond the ten-year horizon of the forecast period. This terminal value represents the sale value of the Property at that future point in time.

81. As a final step in the valuation, I discounted the stream of expected future cash flows into an amount in present value terms as of year-end 2004. I discounted the cash flows at a 9% rate, which reflects the risks and required returns to real estate management companies at the time. This discount rate is consistent with contemporaneous figures published by Ibbotson Associates and with my own calculation using the well-known Capital Asset Pricing Mode ("CAPM")I[15] (See Table 7.3), which indicate a discount rate in the range of 8.8% to 9.0%.

82. The FMV of the Property based on its expected future cash flows as of year-end 2004 is the sum of the stream of expected future cash flows in present value terms. Simply put, the market value of this cash flow stream at year-end 2004 is the value of the Property based on its ability to generate cash flow going forward from that point at the projected levels.[16] Based on the DCF forecast I described above, Table 7.1 shows that the FMV of the Property at year-end 2004 reconciles to the $44.4 million value based on the indexed 1999 appraised value.

---

[15]   The CAPM relies on actual historical and generally accepted data about: (i) risk-free returns at the time of the foreclosure, (ii) historical incremental returns to risky assets in the market (i.e., market risk premium), and (iii) the relationship between the returns to real estate management companies relative to the overall market return (i.e., the market beta). See, e.g., Brealey and Myers (2000) at pp. 195-203.

[16]   A "positive net present value" project is one which yields a sufficient return to undertake because its internal rate of return exceeds the opportunity cost of capital. See, e.g., Brealey and Myers (2000) at pp. 93-150.

**2. The Adjacent Property Indicates an FMV of $51.8 Million**

83.    While I believe the DCF calculation yields a reliable approximation of the
Property's FMV as of the date of foreclosure, there are several indications that the
value could be significantly higher.    The $44.4 million value corresponds to
$162/sf, or a discount of approximately 19% from the prevailing $201/sf market
value for suburban Boston commercial real estate at the time.    This is the result of
several factors including:

–    I projected rents known to be below market rates.

–    I grew the projected rents at just 1.5% per year, or far less than the
expected rate of growth consistent with the disparity between market
values and rental rates at year-end 2004 (see Exhibit 4).

–    I included relatively high ($8.2 million) upfront improvement costs, at
a cost ($30/sf) significantly higher than the rental rates, with no
corresponding increase in rents.

–    I assumed the Property would never be 100% occupied.

84.    To demonstrate the extent to which the FMV for the Property could exceed the
DCF value which I calculated, I re-calculated the DCF based on a change to just
two of the underlying inputs using the known leasing terms for the building
adjacent to the Property (130 Royall Street) at year-end 2004.    At the time, Dunkin
Donuts leased the adjacent building for $21.25/sf with a tenant improvement
allowance of $40/sf.

85. **Exhibit 8** shows the effect on the DCF calculation of making only those two changes. It forecasts the value of the Property under all of the same conditions as I applied in Exhibit 7, but it contemplates making even more upfront improvements (totaling $11.0 million) in order to command higher rents. The $21.25/sf rental rate I used in this calculation is still below the prevailing market rate at the time ($23.26/sf), and it could have been reasonably expected for making such extensive improvements.

86. Holding all other factors constant in the DCF calculation, the Dunkin Donuts' lease terms for the adjacent property yields an FMV of $51.8 million as of year-end 2004.

87. A total value of $51.8 million corresponds to $189/sf. This value is 17% higher than the baseline DCF value which I calculated, but it still reflects a discount of approximately 6% from the prevailing $201/sf market value for suburban Boston commercial real estate at the time. Placing a $51.8 million value on the Property at the time is no less reasonable than the $44.4 million baseline DCF value. It simply reflects the additional return realized over time from investing more money in the Property upfront to make improvements.

D.   **The Foreclosure Resulted in Economic Harm to Blue Hills**

88. All three valuation approaches I considered (i.e., market index, market transactions, and income) indicate the FMV of the Property as of the date of foreclosure on November 19, 2004 exceeded the value of Blue Hills' debt obligation under the mortgage on the Property as refinanced in September 1999. Therefore, the FMV of

the Property at the time did not provide a reasonable economic justification for the foreclosure.

89.   The short-term cash deficits which would have been generated while waiting to find a new tenant(s) and making upfront improvements to the Property also did not justify the foreclosure.   The cash funding requirements would have been small relative to the FMV of the Property; there were sufficient funds in both the mortgage reserves and in reserve at Blue Hills to cover the expected funding requirements; and/or Blue Hills would have had a strong economic incentive to pay for any remaining cash deficits out of pocket to preserve the company's equity interest in the Property.

### 1.   There Were Sufficient Funds to Meet Cash Deficits

90.   The DCF calculations set forth the expected future cash flows generated by the Property looking forward from the foreclosure date.   For example, Table 7.1 shows negative free cash flows at year-end 2004 and 2005 as a result of the low occupancy rates and upfront improvement costs, but positive cash flows thereafter.   The cash flows in each year account for the Property's rental income, operating expenses, and capital expenditures.

91.   However, under the Mortgage and Security Agreement for the Property, Blue Hills also had to pay principal and interest expenses and fund several mortgage reserve accounts.   Therefore, to avoid foreclosure, the Property would have had to generate sufficient cash flow to at least cover its costs, service its debt, and meet its reserve

requirements. Otherwise, Blue Hills would have had to contribute additional cash to cover any shortfall in the cash requirements each year or face foreclosure.

92.  **Exhibits 9 and 10** show the cash requirements, sources of funds, and the ending cash balances the Property would have realized in the baseline DCF (Exhibit 9) and in the DCF based on Dunkin Donuts lease terms (Exhibit 10). The ending cash position shows the cash balance after accounting for all sources and uses of funds (i.e., paying all costs by drawing funds from all available accounts). For each year of the forecast period, the amount of ending cash indicates whether the Property would have produced cash in excess of costs, or whether there would have been a cash deficit to be covered in any year.

93.  I calculated the final cash balance in two steps. First, I calculated available cash from operations by subtracting from the free cash flows in each DCF valuation (Tables 7.1 and 8.1) payments for taxes and insurance, principal and interest, and reserve funding requirements, in that order. Then I applied to any deficits in available cash each year (i.e., negative cash balances) the funds available for use in the mortgage reserves, the Blue Hills property accounts, and/or additional cash infusions from Blue Hills.

94.  **Table 9.1** shows the resulting cash position for the baseline DCF valuation. It shows the Property, as valued at $44.4 million, would have generated insufficient cash from operations to cover its taxes and insurance, principal and interest payments, and reserve requirements until after 2007. Fully (i.e., 95%) occupied in 2008 and thereafter, the Property would have yielded positive ending cash balances.

Table 9.2 shows the net effects of the corresponding accounting activity in the mortgage reserves and Blue Hills property accounts.

95. In 2004, there would have been sufficient funds in the various mortgage reserve accounts (approximately $4.2 million) to cover the $2.0 million cash deficit resulting from the lack of any rental income in the second half of the year to offset taxes/insurance and debt service expenses. In 2005, the cost of upfront improvements would have resulted in a larger ($5.1 million) cash deficit, funded partially by the remaining mortgage reserves ($2.1 million) and partially with funds from Blue Hills' own property accounts ($3.0 million). In 2006, ongoing improvements would have resulted in a $3.5 million deficit, funded almost entirely from the balance of the Blue Hills property accounts ($2.7 million) and by the additional infusion of $252,466 in cash. Once the Property was fully occupied in 2007, it would have generated sufficient cash to fund the mortgage reserves, but it would have drawn down the balances immediately, and Blue Hills would have had to contribute $1.3 million in cash. Thereafter, the Property's ending cash position in each year would have been positive.

96. Put simply, the calculations on Table 9.1 show the Property would have had sufficient mortgage reserves to cover much of its initial cash deficits, and Blue Hills had in its own reserve accounts sufficient additional funds to cover all but $1.5 million of the cash shortfalls of the first three years of operations after the foreclosure date and, even in the absence of those accounts, the two largest principals had sufficient net worth to fund any default if they wanted to. Blue Hills would not have had to contribute additional cash until 2006.

97.   At that point, Blue Hills would have had the strong economic incentive – and presumably the ability – to make the required cash payments of $252,466 in 2006 and $1.3 million in 2007 to preserve its $5.8 million equity interest in the Property going forward from the foreclosure date, to avoid the additional loss of its mortgage reserve balances and tax benefits of holding the Property, and to preserve the highly valuable option to capitalize on future increases in real estate values of the improved Property.

98.   For example, capitalizing the expected operating income in Table 7.1 at the Anticipated Repayment Date of Blue Hills' mortgage on the Property at the end of 2009 implies a selling price in excess of $43 million.[17]  Moreover, available market information indicates a strong upside potential for commercial real estate in suburban Boston (e.g., the resumption of increasing market values by year-end 2004, the likely significant future growth in rental rates to square with property values, the higher rents and purchase prices for adjacent properties, etc.).  While I have not included the Property's significant forward-looking option value in my ultimate opinion of its market value of at least $44.4 million at the time of foreclosure, such option value actually exists and would most likely have been valued by Blue Hills in its decision to preserve its equity in the Property. Considering all of these factors, the amount of new cash Blue Hills would have expected to contribute was dramatically less than the potential value losses and tax liability associated with losing its interest in the Property altogether.

---

[17]   Mortgage Note, September 14, 1999, B(1)(b).  Table 7.1 projects operating income of $5.0 million. Capitalized at the average cap rate of 8.8 over the forecast period with full occupancy yields a FMV of 8.8 x $5.0 million, or $43.1 million.

99.  Table 10.1 shows the analogous cash position for the DCF valuation based on the Dunkin Donuts lease terms.  Table 10.2 shows the corresponding reserve account activity.  As in the baseline case, the Property, as valued at the higher $51.8 million figure, would have generated insufficient cash from operations to cover its expenses until after 2007.  Its initial cash deficits would have been slightly higher due to the higher cost of the upfront improvements.  Thereafter, however, the Property would have yielded disproportionately higher positive ending cash balances.

100.  The calculations in Table 10.1 show that at rents and tenant improvements based on the Dunkin Donuts lease, the mortgagee reserves and Blue Hills' Property accounts would have covered all but $2.8 million of the deficits of the first three years of operations after the foreclosure date.  As in the baseline case, Blue Hills would not have had to contribute additional cash until 2006.  At that point, it again would have had the economic incentive, and presumed ability, to make the required cash payments of $1.4 million in both 2006 and 2007 to preserve its much higher $13.2 million equity interest in the Property going forward from the foreclosure date.

101.  Therefore, it is my opinion that, given the opportunity, Blue Hills would have been willing and able to bridge any funding gap presented by the short-term vacancy in, and expected upfront improvements to, the Property.

### 2.  Economic Damages to Blue Hills are At Least $14.9 Million

102.  By foreclosing on the Property rather than giving Blue Hills the opportunity to preserve its equity and the expected future cash flows from the Property, the Defendants caused economic harm to Blue Hills.  Blue Hills lost entirely:  (1) its

34

equity in the Property, (2) the balances in its mortgage reserve accounts, and (3) the tax benefits associated with holding the Property.

103. Exhibit 3 summarizes the economic damages to Blue Hills using a $5.8 million equity value in the Property based on my ultimate valuation opinion. Adding to the equity value the $4.2 million in lost mortgage reserve balances and the $4.9 million in lost tax benefits,[18] yields direct economic damages to Blue Hills of $14.9 million at the date of foreclosure before considering the applicability or magnitude of any prejudgment interest at the discretion of the Court.

104. This is my opinion of economic damages to a reasonable degree of professional certainty based on all available information at this time. However, because that information includes several strong indications of upside potential in the Property's market value, Table 3.1 also shows an economic damages calculation starting from the higher $13.2 million equity value based on the Dunkin Donuts lease terms. That equity value implies $22.3 million in direct economic damages to Blue Hills.

## V.    CONCLUSION

105. My opinion to a reasonable degree of professional certainty is that the market conditions for commercial real estate in suburban Boston at the date of foreclosure on or about November 19, 2004, indicate a market value of $44.4 million based on the $42 million appraisal of September 1999. At a total FMV of $44.4 million, Blue Hills' equity interest in the Property would have been $5.8 million.

---

[18]    Expert Report of David Andelman, Exhibit B.

106. Reasonable expectations regarding the stream of future cash flows the Property would have generated looking forward from the foreclosure date are consistent with an FMV of at least the $44.4 million market-based value, with significant upside potential.

107. Given the opportunity, Blue Hills would have been willing and able to preserve its equity interest in the Property by contributing sufficient cash to cover any short-term cash deficits associated with the Property. Any additional cash required would have been two years off and relatively low compared to the equity interest at stake.

108. By foreclosing on the Property rather than giving Blue Hills the opportunity to bridge any expected funding gaps with mortgage reserves, its own property accounts, or new cash, the Defendants caused economic damages to Blue Hills.

109. Blue Hills direct economic damages include the loss of its $5.8 million equity in the Property, the loss of approximately $4.2 million in mortgage reserve balances, and the loss of approximately $4.9 million in tax benefits associated with holding the Property. Therefore, total economic damages to Blue Hills resulting from the foreclosure were at least $14.9 million on or about November 19, 2004, excluding interest.

Respectfully submitted,

*Kenneth D. Gartrell*

Kenneth D. Gartrell, Ph.D. CPA

March 31, 2006

36

# EXHIBIT 1
## Qualifications of Kenneth D. Gartrell, PhD CPA

**Office:**
350 Massachusetts Avenue, Suite 300
Cambridge, MA 02139
Phone:  617.252.9994
Fax:      617.621.8018



**Home Office**
164 West Newton Street
Boston, MA 02118
Phone: 617.358.99166
Fax: 775.884.9774

### DEGREES & CERTIFICATION

| | | |
|---|---|---|
| **Ph.D.** | Business Administration | Graduate School of Management<br>Kent State University, 1989<br>Kent, OH |

**Dissertation:**  "Corporate Strategies for Competitive Advantage:  The Combined Effects of Operating and Financial Activities on Shareholder Wealth."

| | | |
|---|---|---|
| **M.B.A.** | Finance | William E. Simon Graduate<br>School of Business Administration<br>University of Rochester, 1992<br>Rochester, NY |
| **M.S.** | Accounting | Graduate School of Management<br>Kent State University, 1975<br>Kent, OH<br>Beta Gamma Sigma<br>Beta Alpha Psi |
| **B.G.S.** | Concentrations in<br>Business & Economics,<br>Mathematics, Psychology, English and<br>International & American Politics | College of Arts & Sciences<br>Kent State University, 1973<br>Kent, OH |
| **C.P.A.** | | Ohio license no: 04-3-09336<br>Mass license no: 20796<br>Passed uniform CPA examination on first attempt. |

### EMPLOYMENT

**LECG, LLC** (August 2003-Present)
Cambridge, MA
Director (August 2003-December 2004)
Managing Director (January 2005-Present)

**The Brattle Group** (October 1998- July 2003)
Cambridge, MA
Senior Advisor (December 2001-July 2003)
Director (October 1998-December 2001)

**Putnam, Hayes & Bartlett, Inc.** (December 1994-September 1998)
Cambridge, MA
Principal

**The University of Rochester** (January 1989-December 1994)
William E. Simon Graduate School of Business Administration
Rochester, NY
Adjunct Faculty

**Rochester Institute of Technology** (September 1987-June 1993)
Rochester, NY
Associate Professor of Accounting. Finance and Management

**The University of Akron** (September 1982-June 1987)
Akron, OH
Assistant Professor of Management

**Baldwin-Wallace College** (September 1982-March 1984)
Berea, OH
Assistant Professor of Business Administration

**Ernst & Ernst** (May 1975-April 1982)
Akron, Cleveland and National Offices
Cleveland, OH
Senior Manager

**Peat, Marwick, Mitchell and Co.** (November 1974-April 1975)
Cleveland, OH
Audit Staff

## RESEARCH

**Recognition:**

Glueck Award for the best paper, *Congressional Politics and Corporate Mergers*, in the Business Policy and Planning Division at the 1986 National Meetings of the Academy of Management.

Invited participant in the New Faculty Colloquium for the Business Policy and Planning Division at the 1989 National Meetings of the Academy of Management.

**Publications and Conference Papers:**

"New Economy Litigation: Claims to Intellectual Property and Human Capital in a Global Institutional Environment Changing at the Speed of Thought," with Mark Sarro and Jürgen Weiss, International Society of New Institutional Economics, September 2001.

"Succeed in the New Economy: Bust the Fed's Bubble". Strategic Research Institute's Valuing New Economy Companies III, New York, NY (April 18-19, 2001).

"Become an Expert at Choosing Experts: Five Rules You Should Use in Healthcare *Qui Tam* Cases…Because Your Opponents Will." *ABA Tips Newsletter on Law & Medicine.* Spring 2001.

*Employee Ownership, Corporate Strategy and Economic Performance.* National Conference of the Foundation For Enterprise Development, San Diego CA (1993).

*Mergers and Political Conditions.* 1991 Annual Meetings of the Midwest Finance Association. St. Louis, Missouri.

"Industry Specialization, Innovation and Shareholder Value." *California Management Review* (1990).

*Economic and Accounting Performance Differences Between Frequently-Acquiring Diversifiers and Industry-Dominant Companies.* 1990 Southern Finance Association Conference.

*Diversification, Innovation and Shareholder Value.* For the 1989 International Strategic Management Society Conference. San Francisco, California.

*Executive Preferences, Strategy Content and Merger Frequency: Empirical Findings Encouraging a Positive Theory of Corporate Diversification.* For the 1989 International Strategic Management Society Conference. San Francisco, California.

"The Political Climate and Corporate Mergers: When Politics Affects Economics." *Western Political Quarterly* (1988), with T. Yantek.

*Business Mix and Corporate Strategy.* For the 1987 International Strategic Management Society Conference. Boston, Massachusetts, with Melcher.

"Leading Strategies: The Tradeoffs of Financial, Production and Marketing Activities." *The Handbook of Business Strategy: The 1986/1987 Yearbook.* Warren, Gorham & Lamont, New York (1986), with Melcher & Aragoyswamy.

*Congressional Politics and Corporate Mergers.* Best Papers Proceedings. National Academy of Management Conference (1986), with Yantek.

*Political Conditions and Corporate Mergers.* 1986 National Conference of the American Political Science Association, with T. Yantek.

*Strategy and Performance of Multi-Business Companies.* 1985 International Conference of the Strategic Management Society. Barcelona, Spain.

*A Model of Corporate Performance Under Varying International Reporting Standards and Economic Conditions. Proceedings.* Midwest Institute of Decision Science (1985).

*Theory of the Banking Firm: An Analysis of the Additivity and Substitutability of Current Empirical Research.* 1984 Southern Finance Association Conference. Atlanta, Georgia.

*The Effects of Accounting and Accountants on Corporate Policy.* 1984 International Conference of the Strategic Management Society. Paris, France.

**Testifying Experience:**

Expert Report of Dr. Kenneth D. Gartrell in *Barbara D. Williams, Daniel C. Farabee, and Carolyn J. Farabee v. Waddell & Reed Investment Management Company, et al.*, Case No. 04-450-CV-C-SOW, in the United States District of Missouri Central Division (March 2006).

Expert Report of Dr. Kenneth D. Gartrell in *Southeastern Regional Vocational Technical School District v. KPMG LLP, et al.*, Civil Action No. 03-3588-E, in the Superior Court Department of the Trial Court Suffolk Division for the Commonwealth of Massachusetts (January 2006).

Testimony of Kenneth D. Gartrell in re: *Estate of Phyllis Johnson v. Melvin Rose, Inc., Johnson Corrugated Products Corp., and Randy Johnson, et al.*, Civil Action No. 2004-622-A, in the Superior Court Department of the Trial Court of Worcester Division for the Commonwealth of Massachusetts (December 2005).

Expert Report of Dr. Kenneth D. Gartrell in *S. Prestley Blake v. Friendly Ice Cream Corporation and Donald Smith*, Civil Action No. 03-3, in the Superior Court Department of the Trial Court Hampden Division for the Commonwealth of Massachusetts (December 2005).

Testimony of Kenneth D. Gartrell at Gate Gourmet Inc. interest arbitration under the Railway Labor Act, Washington D.C. (October 2005).

Expert Report of Dr. Kenneth D. Gartrell in *In re: Welding Rod Products Liability Litigation*, Case No. 1:03-CV-17000, MDL Docket No. 1535, in the United States District Court for the Northern District of Ohio, Eastern Division (August 2005)

Testimony of Dr. Kenneth D. Gartrell in re: *Merek Rubin, individually and on behalf of Olympic Adhesives, Inc. v. John E. Murray, Jr., et al.*, in the Commonwealth of Massachusetts Superior Court, Civil Action No. 2000-433, Norfolk Superior Court (July 2005).

Deposition of Dr. Kenneth D. Gartrell in *L-3 Communications Corp. v. OSI Systems, Inc.*, Index No. 02 Civ. 9144 (DC), in the United States District Court for the Southern District of New York (July 2005).

Expert Report of Dr. Kenneth D. Gartrell in *L-3 Communications Corp. v. OSI Systems, Inc.*, Index No. 02 Civ. 9144 (DC), in the United States District Court for the Southern District of New York (June 2005).

Affidavit of Dr. Kenneth D. Gartrell in *S. Prestley Blake v. Friendly Ice Cream Corporation and Donald Smith*, Civil Action No. 03-3, in the Superior Court Department of the Trial Court Hampden Division for the Commonwealth of Massachusetts (June 2005).

Deposition of Dr. Kenneth D. Gartrell in *Kaiser Aluminum Corp., et al., Debtors*, Case No. 02-10429 (JKF), Chapter 11, in the United States Bankruptcy Court for the District of Delaware (March 2005).

Declarations (3) of Kenneth D. Gartrell in *United States v. Anne (Sandy) Batchelor-Robjohns, et al.*, Case No. 03-20164-Civ in the United States District Court for the Southern District of Florida, Miami Division (February 2005).

Testimony of Dr. Kenneth D. Gartrell in re: *Waste Management, Inc., et al. v. Danis Industries Corporation, Inc., et al.*, Case No. G3-00-256 in the United States District Court for the Southern District of Ohio, Western Division (December 2004).
Deposition of Dr. Kenneth D. Gartrell in *United States v. Anne (Sandy) Batchelor-Robjohns, et al.*, Case No. 03-20164-Civ in the United States District Court for the Southern District of Florida, Miami Division (November 2004).

Declaration of Dr. Kenneth D. Gartrell in *Kaiser Aluminum Corp., et al., Debtors*, Case No. 02-10429 (JKF), Chapter 11, in the United States Bankruptcy Court for the District of Delaware (October 2004).

Deposition of Dr. Kenneth D. Gartrell in *United States v. K-Sea Transportation Corporation and EW Holding Company*, Case No. 03-149T, in the United States District Court for the District of Rhode Island (November 2004).

Expert Report of Dr. Kenneth D. Gartrell in *United States v. K-Sea Transportation Corporation and EW Holding Company*, Case No. 03-149T, in the United States District Court for the District of Rhode Island (September 2004).

Declaration of Dr. Kenneth D. Gartrell in *In re: Welding Rod Products Liability Litigation*, Case No. 1:03-CV-17000, MDL Docket No. 1535, in the United States District Court for the Northern District of Ohio, Eastern Division (September 2004)

Expert Report of Dr. Kenneth D. Gartrell in *United States v. Anne (Sandy) Batchelor-Robjohns, et al.*, Case No. 03-20164-Civ in the United States District Court for the Southern District of Florida, Miami Division (August 2004).

Testimony of Dr. Kenneth D. Gartrell in *Dobler, et al. v. Montgomery Cellular Holding Co., Inc., et al.*, in the Court of Chancery of the State of Delaware In and For New Castle County, Civil Action No. 19211 (January 2004).

Deposition of Dr. Kenneth D. Gartrell in *Dobler, et al. v. Montgomery Cellular Holding Co., Inc., et al.*, in the Court of Chancery of the State of Delaware In and For New Castle County, Civil Action No. 19211 (December 2003).

Testimony of Dr. Kenneth D. Gartrell in *Morton P. Levine, Trustee for the Estate of Larry C. Johnson v. Richard M. Scott, et al.*, Case No. 98-CIV-8329 in the United States District Court for the Southern District of New York (November 2003).

Expert Report of Dr. Kenneth D. Gartrell in *Dobler, et al. v. Montgomery Cellular Holding Co., Inc., et al.*, in the Court of Chancery of the State of Delaware In and For New Castle County, Civil Action No. 19211 (November 2003).

Testimony of Kenneth D. Gartrell in re: *iJaal.com, et al. v. baazee.com, et al.*, in the United States District Court for the Southern District of New York, Case No. 99 CIV.9311 (October 2003).

Deposition of Dr. Kenneth D. Gartrell in *Morton P. Levine, Trustee for the Estate of Larry C. Johnson v. Richard M. Scott, et al.,* Case No. 98-CIV-8329 in the United States District Court for the Southern District of New York (October 2003).

Expert Report of Dr. Kenneth D. Gartrell in *Morton P. Levine, Trustee for the Estate of Larry C. Johnson v. Richard M. Scott, et al.,* Case No. 98-CIV-8329 in the United States District Court for the Southern District of New York (September 2003).

Expert Report of Dr. Kenneth D. Gartrell in re: *U.S. Telemetry-Baltimore, LLC v. Federal Communications Commission,* Case No. 03-51563 and *U.S. Telemetry-Atlantic City, LLC v. Federal Communications Commission,* Case No. 02-66907 in the United States Bankruptcy Court for the District of Maryland (August 2003).

Deposition of Dr. Kenneth D. Gartrell in re: *Pension Benefit Guaranty Corporation. v. Union Steel Products, Inc., et al.,* C.A. No. 1:01-CV-828 in the United States District Court for the Western District of Michigan, Southern Division (June 2003).

Deposition of Dr. Kenneth D. Gartrell in re: *Waste Management, Inc., et al. v. Danis Industries Corporation, Inc., et al.,* Case No. C-3-00-256 in the United States District Court for the Southern District of Ohio, Western Division (April 2003 and June 2003).

Rebuttal Report of Dr. Kenneth D. Gartrell in re: *Waste Management, Inc., et al. v. Danis Industries Corporation, Inc., et al.,* Case No. C-3-00-256 in the United States District Court for the Southern District of Ohio, Western Division (June 2003).

Expert Report of Dr. Kenneth D. Gartrell in re: *Waste Management, Inc., et al. v. Danis Industries Corporation, Inc., et al.,* Case No. C-3-00-256 in the United States District Court for the Southern District of Ohio, Western Division (March 2003 and May 2003).

Deposition of Dr. Kenneth D. Gartrell in re: *In-Sync interactive/Akron, Inc. et al. v. Federal Communications Commission,* Case No. LA 01-42617-ES in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (January 2003).

Deposition of Dr. Kenneth D. Gartrell in *Massachusetts Port Authority v. City of Boston, et al.,* Case No. 01-2731 BLS 2 in the Superior Court for the Commonwealth of Massachusetts (December 2002).

Expert Report of Dr. Kenneth D. Gartrell in re: *Pension Benefit Guaranty Corporation. v. Union Steel Products, Inc., et al.,* C.A. No. 1:01-CV-828 in the United States District Court for the Western District of Michigan, Southern Division (December 2002).

Reply Report and Exhibits of Dr. Kenneth D. Gartrell in re: *In-Sync interactive/Akron, Inc. et al. v. Federal Communications Commission,* Case No. LA 01-42617-ES in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (December 2002).

Expert Report of Dr. Kenneth D. Gartrell in re: *In-Sync interactive/Akron, Inc. et al. v. Federal Communications Commission,* Case No. LA 01-42617-ES in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (November 2002).

Testimony of Dr. Kenneth D. Gartrell in the Matter of Applications of Enron Corp. for Exemptions Under the Public Utility Holding Company Act of 1935, (Nos. 70-9661 and 70-10056), Administrative Proceeding File No. 3-10909, before the Securities and Exchange Commission (November 2002).

Deposition of Dr. Kenneth D. Gartrell in re: *Westside Cellular, Inc. d/b/a Cellnet, Inc. ("Cellnet") v. New Par, et al.*, Case No. 428050 in the Common Pleas Court of Cuyahoga County, Ohio, Civil Division (October 2002).

Expert Report of Kenneth D. Gartrell in re: *Westside Cellular, Inc. d/b/a Cellnet, Inc. ("Cellnet") v. New Par, et al.*, Case No. 428050 in the Common Pleas Court of Cuyahoga County, Ohio, Civil Division (August 2002).

Testimony of Kenneth D. Gartrell in re: *Dartnell Enterprises Inc. v. Compaq Computer Corp.*, before the CPR Institute for Dispute Resolution (August 2002).

Testimony of Kenneth D. Gartrell in re: *Cavalier Telephone LLC v. Virginia Electric and Power Company d/b/a Virginia Power*, before the Federal Communications Commission, Enforcement Bureau, Case No. EB-02-MD-005 (July 2002).

Expert Report of Kenneth D. Gartrell in re: *Dartnell Enterprises Inc. v. Compaq Computer Corp.*, before the CPR Institute for Dispute Resolution (May 2002).

Expert Report of Kenneth D. Gartrell in re: *Cavalier Telephone LLC v. Virginia Electric and Power Company d/b/a Virginia Power*, before the Federal Communications Commission, Enforcement Bureau, Case No. EB-02-MD-005 (April 2002).

Declaration of Kenneth D. Gartrell in re: *Brazos Electric Power Cooperative, Inc. v. the United States*, No. 98-837C in the United States Court of Federal Claims (December 2001).

Affidavit of Kenneth D. Gartrell in re: *Brazos Electric Power Cooperative, Inc. v. the United States*, No. 98-837C in the United States Court of Federal Claims (August 2001).

Expert Report of W. Patton Culbertson and Kenneth D. Gartrell in re: *Charles James Myer, et al. v. U.S. Trust Company of California, N.A. et al.*, in the United States District Court Middle District of Louisiana, Case No. 00-147-D-M3 (July 2001).

Deposition of Kenneth D. Gartrell in re: *iJaal.com, et al. v. baazee.com, et al.*, in the United States District Court for the Southern District of New York, Case No. 99 CIV.9311 (23 May 2001 and 9 July 2001).

Affidavit of Kenneth D. Gartrell in re: *Toys "R" US v. Central New England Warehouse Company, et al.*; in the Commonwealth of Massachusetts Superior Court, Civil Action No. 97-1562B (June 2001).

Expert Report of Kenneth D. Gartrell in re: *iJaal.com, et al. v. baazee.com, et al.*, in the United States District Court for the Southern District of New York, Case No. 99 CIV.9311 (March 2001).

Testimony of Kenneth D. Gartrell at arbitration hearing in re: *Safety Environmental Control, Inc. v. Minnesota Mining and Manufacturing Company*, in the United States District Court for the District of New Hampshire, Civil Action No. C-98-497-SD (November 2000).

Expert Report of Kenneth D. Gartrell in re: *Alevizopoulos, et al. v. Comcast, et al.*, in the United States District Court for the Southern District of New York, Civil Action 99 CIV.9311 (SAS) (October 2000).

Affidavit of Kenneth D. Gartrell in re: *United States of America v. Bausch & Lomb, Inc. and Consolidated Subsidiaries*, in the United States District Court for the Western District of New York, Civil No. 00-MC-6011 CJS (September 2000).

Expert Report of Kenneth D. Gartrell in re: *Kansas Personal Communications Services, Ltd, Debtor* in Proceedings Under Chapter 11 in the United States Bankruptcy Court for the District of Kansas, Case No. 99-21747-11-JAR (August 2000).

Testimony of Kenneth D. Gartrell in re: *Avery Dennison Corporation v. Four Pillars Enterprise Co., et al.,* in the United States District Court for the Northern District of Ohio, Eastern Division, Civil Action No. 97-CV-2282 (February 2000).

Expert Report of Kenneth D. Gartrell in re: *TNT USA, Inc., v. International Postal Consultants, Inc.*, in the United States District Court for the Southern District of New York, Civil Action 99 CIV.2222 (SAS) (January 2000).

Expert Report of Kenneth D. Gartrell in re: *Safety Environmental Control, Inc. v. Minnesota Mining and Manufacturing Company*, in the United States District Court for the District of New Hampshire, Civil Action No. C-98-497-SD (November 1999).

Testimony of Kenneth D. Gartrell in re: *United States of America v. Pin Yen Yang, et al.,* in the United States District Court for the Northern District of Ohio, Eastern Division, Case No. 1:97-CR-288 (September 1999).

Deposition of Kenneth D. Gartrell in re: *McCord Winn Textron, Inc. and BCAM International, Inc. v. Rostra Precision Controls, Inc.,* in the United States District Court of New Hampshire, Civil Action No. C-98-563-M (August 1999).

Affidavit of Kenneth D. Gartrell in re: *Howard Reisman, et al. v. KPMG Peat Marwick LLP,* in the Commonwealth of Massachusetts Superior Court, Civil Action No. 97-1383A (June 1999).

Deposition of Kenneth D. Gartrell in re: *Howard Reisman, et al. v. KPMG Peat Marwick LLP,* in the Commonwealth of Massachusetts Superior Court, Civil Action No. 97-1383A (April 1999).

Deposition of Kenneth D. Gartrell in re: *Health Management, Inc. Securities Litigation*, in the United States District Court of the Eastern District of New York, Civil Action No. 96-CV-889 (ADS) (ARL) (February 1999).

Deposition of Kenneth D. Gartrell in re: *Lincare, Inc. v. Leonard W. McCauliffe, Margaret R. McCauliffe and Wayne Moore*, in the United States District Court of the district of New Hampshire, Civil Action No. 95-613-M (January 1998).

Deposition of Kenneth D. Gartrell in re: *Bridgestone/Firestone v. International Ins. Co., et al.,* in the Court of Common Plea, Summit County, Ohio, Case No. CV-94-06-2057 (November 1997).

Testimony of Kenneth D. Gartrell in re: *United States Securities & Exchange Commission vs. VAS, Inc. and Vincent R. Valicenti,* in Administrative Proceeding 3-8850 of the United States Securities and Exchange Commission (January 1996).

8

Deposition of Kenneth D. Gartrell in re: *Michael F. Malone, et al., vs. Microdyne, et al., and Mayer and Judith Gross vs. Microdyne Corp., et al.*, in the United States District Court for the Eastern District of Virginia Alexandria Division, Civil Actions No. 91-1515-A and No. 92-1730-A (March 1993).

Deposition of Kenneth D. Gartrell in re: *General Acquisitions, Inc. vs. GenCorp, Inc., et al.*, in the United States District Court of the Southern District of Ohio Eastern Division, Civil Action No. C2-87-348 (March and April 1991).

**EXHIBIT 2**
**Materials Reviewed**

In writing this report, I have reviewed the following materials. Footnotes to the report and notes
to the attached exhibits indicate reliance on specific information.

| No. | Description |
|---|---|
| 1 | Agreement dated December 31, 2004; |
| 2 | Appraisal prepared by Bonz and Company for Lennar October 18, 2004; |
| 3 | Appraisal prepared by Meredith & Grew for Situs August 30, 1999; |
| 4 | Bloomberg; |
| 5 | Brealey and Myers, Principles of Corporate Finance, 2000, pp. 93-150; |
| 6 | Copies of LNR's "two-pagers" with respect to the BHOP property; |
| 7 | Copies of various leasing proposals from Cushman & Wakefield, Spaulding & Slye and others submitted to BHOP regarding BHOP's leasing efforts in 2003 and 2004; Including Summaries of Office Lease Comparables; Office Sale Comparables; and Prospect Reports; |
| 8 | Copy of the Cash Management Agreement (attached as Exhibit "E" to Second Amended Complaint; |
| 9 | Copy of the closing documents involving the sale of the BHOP property to One Beacon Insurance Group; |
| 10 | Copy of the deposition transcript of Daniel Frank; |
| 11 | Copy of the Mortgage Agreement (attached as Exhibit "C" to Second Amended Complaint); |
| 12 | Copy of the Note (attached as Exhibit "D" to Second Amended Complaint); |
| 13 | Counterclaim of J.P. Morgan Chase, Trustee and CSFB-1999 C1 against Blue Hills Office Park, LLC, Gerald Fineberg and William Langelier; |
| 14 | Deposition Transcripts for William Langelier and Larry Needle; |
| 15 | Expert Report of Richard Clark; |
| 16 | Expert Report of David Andelman; |
| 17 | Global Real Analytics National Real Estate Index: Market History Report; Boston CBD Office & Suburban Office, and Metro Market Outlook Report, 1985-2005; http://www.graglobal.com; |
| 18 | Grubb & Ellis Co., Jones Lang LaSalle Inc., Silverleaf Resorts Inc., Trammell Crow Co. From 10K and 10Q 2003-2004; |
| 19 | Ibbotson SBBI 2005 Yearbook, Long MRP, 2004; |
| 20 | Kaplan, Steven N. and Ruback, Richard S, "The Valuation of Cash Flow Forecasts: An Empirical Analysis, " Journal of Finance, September 1995; |
| 21 | Notice from Wells Fargo dated July 16, 2004; |
| 22 | Office Property Index Provided by Global Real Analytics; Mortgage Assignment of Leases and Rents and Security Agreement, September 14, 1999; |
| 23 | Second Amended Complaint filed by Blue Hills Office Park, LLC ("BHOP") against CSFB-1999 C1, et al.; |
| 24 | Tax bill from Town of Canton for taxes due August 2, 2004; |
| 25 | UST 30-Year Yield (12-Month Avg as of 12/31/04); |
| 26 | Various Quarterly Metro Market Outlook Reports Provided by Top Global Analytics , Q3 2004-Q2 2005; |
| 27 | Various Report Ratings on Property at 205 royall; 150 Rolay & 130 royall; http ://research .norfolkdeeds.org/ALIS/WW400R.HTM; |
| 28 | Wells Fargo account status screens showing reserves as of August 2004; |

**EXHIBIT 3**
**Economic Damages**

Table 3.1: Summary of Economic Damages

|  | Description | [a] | [b] |
|---|---|---|---|
|  |  | Based on | |
|  |  | Valuation of Dunkin Donuts Lease | Gartrell Baseline Valuation |
|  | Economic Losses to Blue Hills |  |  |
| [1] | Lost Equity Value in the Property | $ 13,229,094 | $ 5,824,941 |
| [2] | Reserve Account Balances | $ 4,153,827 | $ 4,153,827 |
| [3] | Lost Tax Benefit | $ 4,918,804 | $ 4,918,804 |
| [4] | **Total Damages, Excluding Interest** | $ 22,301,725 | $ 14,897,572 |

Sources and Notes:
[1] [a] : Table 8.1 [21]
[1] [b] : Table 7.1 [21]
[2] : Table 9.2
[3] : Andelman Report
[4] = Sum [1]..[3]



**EXHIBIT 4**
**Greater Boston Commercial Real Estate Market**

Figure 4.1: Suburban Office Values and Rents, 1996-2005

Source: Table 4.2

Privileged and Confidential
Prepared at the Request of Counsel

PRELIMINARY DRAFT
3/31/2006

**EXHIBIT 4**
**Greater Boston Commercial Real Estate Market**

Figure 4.2:  Suburban Office Values and Rents, 1999-2005



Source:  Table 4.2

Privileged and Confidential
Prepared at the Request of Counsel

# EXHIBIT 4
## Greater Boston Commercial Real Estate Market

### Table 4.1: Property Values, Rents, and Cap Rates, Q3 1999 - Q4 2005

|  | [a] | [b] CBD | [c] | [d] | [e] | [f] Suburban | [g] | [h] | [i] |
|---|---|---|---|---|---|---|---|---|---|
|  | Period | Value ($/SqFt) | % Change | Value ($/SqFt) | % Change | Rent ($/SqFt) | % Change | Cap Rate | % Change |
| [1] | Q3 1999 | $291.88 |  | $190.35 |  | $34.41 |  | 9.4 |  |
| [2] | Q4 2004 | $322.01 | 10.3% | $201.19 | 5.7% | $23.26 | -32.4% | 8.4 | -10.6% |
| [3] | Q4 2005 | $360.75 | 23.6% | $214.00 | 12.4% | $23.88 | -30.6% | 7.8 | -17.0% |

Sources and Notes:
[1]...[3] [a] [b] [d] [f] [h] : Table 4.2
[2] [c] [e] [g] [i] =[2] / [1] - 1
[3] [c] [e] [g] [i] = [3] / . - 1

**EXHIBIT 4**
**Greater Boston Commercial Real Estate Market**

Table 4.2: Property Values, Rents, and Cap Rates, 1996-2005

| Year | Qtr | CBD Value ($/SqFt) | Suburban Value ($/SqFt) | Suburban Rent ($/SqFt) | Cap Rate |
|------|-----|-----|-----|-----|-----|
| 1995 | 4 | $207.79 | $128.97 | $25.05 | 10.1 |
| 1996 | 1 | $203.32 | $133.11 | $25.75 | 10.0 |
|      | 2 | $203.65 | $137.54 | $25.58 | 9.4 |
|      | 3 | $204.57 | $135.76 | $26.63 | 9.6 |
|      | 4 | $207.59 | $137.77 | $27.21 | 9.5 |
| 1997 | 1 | $225.79 | $139.20 | $29.31 | 9.8 |
|      | 2 | $231.86 | $143.16 | $31.68 | 9.5 |
|      | 3 | $257.17 | $144.02 | $32.14 | 9.9 |
|      | 4 | $260.52 | $149.86 | $32.77 | 9.8 |
| 1998 | 1 | $262.66 | $151.56 | $32.95 | 9.8 |
|      | 2 | $285.87 | $172.34 | $32.91 | 9.3 |
|      | 3 | $286.00 | $170.06 | $34.00 | 9.9 |
|      | 4 | $283.55 | $167.49 | $33.18 | 9.8 |
| 1999 | 1 | $300.08 | $175.53 | $34.23 | 9.7 |
|      | 2 | $308.35 | $182.55 | $34.32 | 9.4 |
|      | 3 | $291.88 | $190.35 | $34.41 | 9.4 |
|      | 4 | $300.75 | $193.61 | $35.59 | 9.4 |
| 2000 | 1 | $310.96 | $213.97 | $37.77 | 8.9 |
|      | 2 | $317.79 | $216.35 | $40.27 | 9.3 |
|      | 3 | $326.84 | $241.87 | $47.01 | 9.1 |
|      | 4 | $330.28 | $237.24 | $46.81 | 9.3 |
| 2001 | 1 | $324.92 | $239.38 | $45.90 | 9.1 |
|      | 2 | $319.83 | $227.66 | $42.80 | 9.4 |
|      | 3 | $313.35 | $224.47 | $40.06 | 9.2 |
|      | 4 | $302.17 | $224.54 | $39.04 | 9.0 |
| 2002 | 1 | $295.69 | $221.19 | $38.06 | 9.1 |
|      | 2 | $299.80 | $223.48 | $36.80 | 8.7 |
|      | 3 | $301.80 | $218.32 | $34.26 | 8.6 |
|      | 4 | $300.51 | $217.56 | $28.22 | 8.3 |
| 2003 | 1 | $302.47 | $211.64 | $31.95 | 8.5 |
|      | 2 | $301.18 | $207.76 | $30.78 | 8.5 |
|      | 3 | $299.68 | $203.07 | $24.98 | 8.5 |
|      | 4 | $299.90 | $196.58 | $24.55 | 8.7 |
| 2004 | 1 | $306.40 | $193.05 | $24.23 | 8.8 |
|      | 2 | $313.27 | $187.23 | $23.86 | 9.0 |
|      | 3 | $316.37 | $190.63 | $23.59 | 8.8 |
|      | 4 | $322.01 | $201.19 | $23.26 | 8.4 |
| 2005 | 1 | $328.40 | $209.17 | $22.97 | 8.0 |
|      | 2 | $338.69 | $210.45 | $23.25 | 7.9 |
|      | 3 | $353.36 | $213.23 | $23.57 | 7.8 |
|      | 4 | $360.75 | $214.00 | $23.88 | 7.8 |

Sources and Notes:

Global Real Analytics National Real Estate Index: Market History Report; Boston CBD
Office & Suburban Office, and Metro Market Outlook Report, 1985-2005

**EXHIBIT 5**
**Indexed Market Value and Rent**

Table 5.1: Calculation of Index Value and Rent

| Description | | [a] Actual 09/10/99 | | [b] Implied 11/12/04 |
|---|---|---|---|---|
| [1] Change in Market Value Q3 1999 to Q4 2004 | 5.7% | | | |
| [2] Fair Market Value | | $ 42,000,000 | $ | 44,391,805 |
| [3] Rent ($/SqFt) | | $ 17.00 | $ | 17.97 |

Sources and Notes:
[1] : 4.1 [2]
[2] [a] : Meredith & Grew August 30, 1999 Appraisal, # 14100A, LNR 03782
[2] [b] = [2][a] × ( [1] + [1] )
[3] [a] : Meredith & Grew August 30, 1999 Appraisal, # 14100A, LNR03780
[3] [b] = [3] [a] × ( 1 + [1] )

**EXHIBIT 6**
**Market Transactions**

Table 6.1: Summary of Transactions for Suburban Office Space

| | Qtr | Close | Buyer | Location | [a]<br>SqFt | [b]<br>$ | [c]<br>$/Sq.Ft |
|---|---|---|---|---|---|---|---|
| | | | | | | Purchase Price | |
| [1] | Q1 2002 | 01/07/02 | Taurus NE Investments | Quincy | 97,000 | 11,435,330 | 117.89 |
| [2] | | 02/07/02 | Centremark Properties | Stoughton | 55,000 | 7,050,000 | 128.18 |
| [3] | | 02/27/02 | 150 Newport Avenue Corp | Quincy | 120,960 | 17,500,000 | 144.68 |
| [4] | | 03/07/02 | Taurus NE Investments | Quincy | 125,000 | 14,738,250 | 117.91 |
| [5] | | 03/18/02 | 858 Realty Trust | Westwood | 42,400 | 3,225,000 | 76.06 |
| [6] | Q2 2003 | 05/01/03 | Vinco Properties | Rockland | 25,200 | 1,575,000 | 62.50 |
| [7] | | 05/01/03 | Vinco Properties | Rockland | 26,000 | 1,625,000 | 62.50 |
| [8] | | 05/01/03 | Vinco Properties | Rockland | 51,200 | 3,200,000 | 62.50 |
| [9] | | 05/28/03 | Berwind Property Group | Westwood | 161,843 | 18,500,000 | 114.31 |
| [10] | Q3 2003 | 07/01/03 | WND Capital Partners LLC | Weymouth | 100,000 | 10,250,000 | 102.50 |
| [11] | | 08/01/03 | Blue Cross Blue Shield | Quincy | 319,998 | 39,287,710 | 122.77 |
| [12] | | **08/12/03** | **Equiserve** | **Canton** | **188,950** | **24,700,000** | **130.72** |
| [13] | Q4 2003 | 12/01/03 | National Fire Protection Assoc | Quincy | 107,000 | 8,000,000 | 74.77 |
| [14] | | 12/01/03 | Blue Cross Blue Shield | Quincy | 328,000 | 39,300,000 | 119.82 |
| [15] | Q1 2004 | 01/01/04 | Eastport LLC | Quincy | 22,000 | 2,400,000 | 109.09 |
| [16] | | 01/01/04 | HRPT Property Trust | Norwell | 104,008 | 7,500,000 | 72.11 |
| [17] | | 02/25/04 | REIT Management & Research | Quincy | 45,586 | 7,704,034 | 169.00 |
| [18] | | 03/18/04 | Global Innovation Partners | Stoughton | 197,000 | 38,100,000 | 193.40 |
| [19] | | 03/25/04 | East-West Enterprises Co, Ltd | Danvers | 184,616 | 23,300,000 | 126.21 |
| [20] | Q2 2004 | 04/29/04 | Transwestern Investment Co | Waltham | 278,000 | 22,250,000 | 80.04 |
| [21] | | 05/01/04 | F.P. Giglio | Rockland | 26,000 | 2,376,660 | 91.41 |
| [22] | | 05/01/04 | F.P. Giglio | Rockland | 51,200 | 4,680,000 | 91.41 |
| [23] | Maximum | | | | 328,000 | 39,300,000 | 193.40 |
| [24] | Minimum | | | | 22,000 | 1,575,000 | 62.50 |
| [25] | Median | | | | 102,004 | 9,125,000 | 111.70 |
| [26] | **Average** | | | | 120,771 | 14,031,681 | **107.72** |
| [27] | **Standard Deviation** | | | | 94,546 | 12,432,775 | **34.64** |

Sources and Notes:
[1]..[13], [15]..[18] : Cushman & Wakefield, Inc. Office Sale Comparables 2002-2004, Blue Hill 0692-0695
[14], [19]..[22] : Cushman & Wakefield, Inc. Office Sale Comparables 2003-2004, Blue Hill 0877-0879
[23] = Maximum [1]..[27]
[24] = Minimum [1]..[27]
[25] = Median [1]...[27]
[26] = Average [1]..[27]
[27] = Standard Deviation [1]..[27]
[c] = [b] / [a]

**EXHIBIT 6**
**Market Transactions**

Table 6.2: Relative Market Prices

| Period | | [a]<br>Suburban<br>Value<br>($/SqFt) | [b]<br>Relative<br>Value at<br>Q4 2004 |
|--------|------|------|------|
| 2002 | Q1 | $221.19 | -9.0% |
|      | Q2 | $223.48 | -10.0% |
|      | Q3 | $218.32 | -7.8% |
|      | Q4 | $217.56 | -7.5% |
| 2003 | Q1 | $211.64 | -4.9% |
|      | Q2 | $207.76 | -3.2% |
|      | Q3 | $203.07 | -0.9% |
|      | Q4 | $196.58 | 2.3% |
| 2004 | Q1 | $193.05 | 4.2% |
|      | Q2 | $187.23 | 7.5% |
|      | Q3 | $190.63 | 5.5% |
|      | Q4 | $201.19 | Baseline |
| 2005 | Q1 | $209.17 | -3.8% |
|      | Q2 | $210.45 | -4.4% |
|      | Q3 | $213.23 | -5.6% |
|      | Q4 | $214.00 | -6.0% |

Sources and Notes:
Values are read from Table 4.2.
[a] : Table 4.2
[b] = [a]2004 / [a]t - 1

## EXHIBIT 6
## Market Transactions

Table 6.3: Transaction Prices Adjusted to Q4 2004

| | Transaction Date | | Buyer | Location | [a] SqFt | [b] Indexed Purchase Price $ | [c] $/Sq.Ft |
|---|---|---|---|---|---|---|---|
| | Qtr | Close | | | | | |
| [1] | Q1 2002 | 01/07/02 | Taurus NE Investments | Quincy | 97,000 | 10,401,347 | 107.23 |
| [2] | | 02/07/02 | Centremark Properties | Stoughton | 55,000 | 6,412,539 | 116.59 |
| [3] | | 02/27/02 | 150 Newport Avenue Corp | Quincy | 120,960 | 15,917,650 | 131.59 |
| [4] | | 03/07/02 | Taurus NE Investments | Quincy | 125,000 | 13,405,617 | 107.24 |
| [5] | | 03/18/02 | 858 Realty Trust | Westwood | 42,400 | 2,933,395 | 69.18 |
| [6] | Q2 2003 | 05/01/03 | Vinco Properties | Rockland | 25,200 | 1,525,194 | 60.52 |
| [7] | | 05/01/03 | Vinco Properties | Rockland | 26,000 | 1,573,613 | 60.52 |
| [8] | | 05/01/03 | Vinco Properties | Rockland | 51,200 | 3,098,806 | 60.52 |
| [9] | | 05/28/03 | Berwind Property Group | Westwood | 161,843 | 17,914,974 | 110.69 |
| [10] | Q3 2003 | 07/01/03 | WND Capital Partners LLC | Weymouth | 100,000 | 10,155,107 | 101.55 |
| [11] | | 08/01/03 | Blue Cross Blue Shield | Quincy | 319,998 | 38,923,989 | 121.64 |
| [12] | | **08/12/03** | **Equiserve** | **Canton** | **188,950** | **24,471,330** | **129.51** |
| [13] | Q4 2003 | 12/01/03 | National Fire Protection Assoc | Quincy | 107,000 | 8,187,608 | 76.52 |
| [14] | | 12/01/03 | Blue Cross Blue Shield | Quincy | 328,000 | 40,221,625 | 122.63 |
| [15] | Q1 2004 | 01/01/04 | Eastport LLC | Quincy | 22,000 | 2,501,197 | 113.69 |
| [16] | | 01/01/04 | HRPT Property Trust | Norwell | 104,008 | 7,816,239 | 75.15 |
| [17] | | 02/25/04 | REIT Management & Research | Quincy | 45,586 | 8,028,876 | 176.13 |
| [18] | | 03/18/04 | Global Innovation Partners | Stoughton | 197,000 | 39,706,496 | 201.56 |
| [19] | | 03/25/04 | East-West Enterprises Co, Ltd | Danvers | 184,616 | 24,282,450 | 131.53 |
| [20] | Q2 2004 | 04/29/04 | Transwestern Investment Co | Waltham | 278,000 | 23,908,976 | 86.00 |
| [21] | | 05/01/04 | F.P. Giglio | Rockland | 26,000 | 2,553,865 | 98.23 |
| [22] | | 05/01/04 | F.P. Giglio | Rockland | 51,200 | 5,028,944 | 98.22 |
| [23] | Maximum | | | | 328,000 | 40,221,625 | 201.56 |
| [24] | Minimum | | | | 22,000 | 1,525,194 | 60.52 |
| [25] | Median | | | | 102,004 | 9,171,357 | 107.24 |
| [26] | **Average** | | | | 120,771 | 14,044,084 | **107.11** |
| [27] | **Standard Deviation** | | | | 94,546 | 12,706,431 | **35.54** |

Sources and Notes:
[a] : Table 6.1 [a]
[b] = Table 6.1  [b] x Table 6.2 [b]
[c] = [b] / [a]
[23] = Maximum [1]..[22]
[24] = Minimum [1]..[22]
[25] = Median [1]..[22]
[26] = Average [1]..[22]
[27] = Standard Deviation [1]..[22]

**EXHIBIT 6**
**Market Transactions**

Table 6.4:  Market Value Implied by Adjusted Transaction Prices

| | | | | | [a] | [b] |
|---|---|---|---|---|---|---|
| | Transaction Date | | Buyer | Location | SqFt | Implied Value ($) |
| | Qtr | Close | | | | |
| | | | | 150 Royall | 273,863 | |
| [1] | Q1 2002 | 01/07/02 | Taurus NE Investments | Quincy | | 29,366,435 |
| [2] | | 02/07/02 | Centremark Properties | Stoughton | | 31,930,130 |
| [3] | | 02/27/02 | 150 Newport Avenue Corp | Quincy | | 36,038,818 |
| [4] | | 03/07/02 | Taurus NE Investments | Quincy | | 29,370,421 |
| [5] | | 03/18/02 | 858 Realty Trust | Westwood | | 18,946,898 |
| [6] | Q2 2003 | 05/01/03 | Vinco Properties | Rockland | | 16,575,164 |
| [7] | | 05/01/03 | Vinco Properties | Rockland | | 16,575,164 |
| [8] | | 05/01/03 | Vinco Properties | Rockland | | 16,575,164 |
| [9] | | 05/28/03 | Berwind Property Group | Westwood | | 30,314,864 |
| [10] | Q3 2003 | 07/01/03 | WND Capital Partners LLC | Weymouth | | 27,811,080 |
| [11] | | 08/01/03 | Blue Cross Blue Shield | Quincy | | 33,312,209 |
| [12] | | **08/12/03** | **Equiserve** | **Canton** | | **35,468,599** |
| [13] | Q4 2003 | 12/01/03 | National Fire Protection Assoc | Quincy | | 20,955,915 |
| [14] | | 12/01/03 | Blue Cross Blue Shield | Quincy | | 33,582,972 |
| [15] | Q1 2004 | 01/01/04 | Eastport LLC | Quincy | | 31,135,691 |
| [16] | | 01/01/04 | HRPT Property Trust | Norwell | | 20,580,905 |
| [17] | | 02/25/04 | REIT Management & Research | Quincy | | 48,234,374 |
| [18] | | 03/18/04 | Global Innovation Partners | Stoughton | | 55,198,680 |
| [19] | | 03/25/04 | East-West Enterprises Co, Ltd | Danvers | | 36,021,063 |
| [20] | Q2 2004 | 04/29/04 | Transwestern Investment Co | Waltham | | 23,553,179 |
| [21] | | 05/01/04 | F.P. Giglio | Rockland | | 26,900,356 |
| [22] | | 05/01/04 | F.P. Giglio | Rockland | | 26,899,252 |
| [23] | Maximum | | | | | 55,198,680 |
| [24] | Minimum | | | | | 16,575,164 |
| [25] | Median | | | | | 29,368,428 |
| [26] | **Average** | | | | | **29,333,970** |
| [27] | **Standard Deviation** | | | | | **9,732,110** |

Sources and Notes:
[a] : Table 7.2 [1]
[b] = [a] x Table 6.3 [c]
[23] = Maximum [1]..[22]
[24] = Minimum [1]..[22]
[25] = Median [1]..[22]
[26] = Average [1]..[22]
[27] = Standard Deviation [1]..[22]

**EXHIBIT 6**
**Market Transactions**

Table 6.5:  Market Value Implied by Transactions for 250 Royall Street

|  |  |  | [a] 250 Royall | | [b] 150 Royall |
|---|---|---|---|---|---|
| [1] | Rentable SqFt |  | 188,950 | | 273,863 |
|  |  |  | [c] | [d] | [e] |
|  |  |  | Price ($) | $/SqFt | Value ($) |
|  | **Equiserve Purchase** |  |  |  |  |
| [2] | Observed Purchase Price | 08/12/03 | $24,700,000 | $130.72 | $ 35,800,032 |
| [3] | Observed Market Value Change | 12/31/04 | -0.9% |  |  |
| [4] | Indexed Price | 12/31/04 | $24,471,330 | $129.51 | $ 35,468,599 |
|  | **Inland Western Purchase** |  |  |  |  |
| [5] | Observed Purchase Price | 08/11/05 | $68,777,000 | $364.00 | $ 99,684,972 |
| [6] | Observed Market Value Change | 12/31/04 | -5.6% |  |  |
| [7] | Indexed Price | 12/31/04 | $64,893,517 | $343.44 | $ 94,056,275 |

Sources and Notes:
[1] [a] : Table 6.1 [12] [a]
[1] [b] : Table 8.2 [1]
[2] [c] : Table 6.1 [12] [b]
[3] [c] : Table 6.2 [b]
[4] [c] = [2][c] x ( 1 + [3][c] )
[5] [c] : Norfolk County Registry of Deeds, Land Records for 250 Royall Street, Canton, MA, 8/11/05
[6] [c] : Table 6.2 [b]
[7] [c] : [5][c] x ( 1 + [6][c] )
[d] = [c] / [a]
[e] = [d] x [b]



EXHIBIT 6
Market Transactions

Figure 6.1: Increasing Market Rents, Observed and Indexed to Q4 2004

Source:  Tables 6.5 and 6.6

## EXHIBIT 6
### Market Transactions

Table 6.6: Observed Rents ($/SqFt)

|  | Date Occupied | Tenant | Location | SqFt | Term (Years) | Rent ($/SqFt) by Lease Year (i) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| [1] | Q2 2002 | U.S. Telecenters | Quincy | 5,384 | 5 | 14.00 | 17.00 | 17.50 | 18.00 | 18.50 | | | | | |
| [2] | Q3 2002 | Consolidated Mortgage | Quincy | 3,200 | 5 | 23.00 | 23.00 | 23.00 | 23.00 | 23.00 | | | | | |
| [3] |  | Granite Telecommunications | Braintree | 4,200 | 4 | 20.00 | 20.00 | 20.00 | 20.00 | | | | | | |
| [4] | Q4 2002 | Lambert Nielsen Eye Center | Quincy | 4,500 | 5 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | | | | |
| [5] |  | Radiuss Financial | Quincy | 6,794 | 5 | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | | | | | |
| [6] |  | eGulf Technologies | Quincy | 6,537 | 3 | 26.00 | 26.00 | 26.00 | | | | | | | |
| [7] | Q1 2003 | Washington Mutual Life | Braintree | 3,922 | 4 | 22.00 | 22.00 | 22.00 | 22.00 | | | | | | |
| [8] |  | HSNE | Quincy | 7,195 | 7 | 18.25 | 18.75 | 19.75 | 20.75 | 21.75 | 22.75 | 22.75 | | | |
| [9] |  | Xintra Institue | Quincy | 12,700 | 3 | 13.50 | 14.00 | 14.00 | | | | | | | |
| [10] | Q2 2003 | GreaterMedia | Braintree | 10,709 | 7 | 21.00 | 22.00 | 23.00 | 24.00 | 25.00 | 26.00 | 27.00 | | | |
| [11] |  | Physicians Home Care | Braintree | 4,759 | 5 | 18.65 | 19.15 | 20.15 | 22.15 | 23.15 | | | | | |
| [12] |  | Reliable Mortgage | Braintree | 3,440 | 3 | 18.50 | 20.00 | 21.50 | | | | | | | |
| [13] |  | Town & Country Credit Corp | Braintree | 2,305 | 5 | 20.50 | 20.50 | 20.50 | 20.50 | 20.50 | | | | | |
| [14] | Q3 2003 | Mandell, Consigl, & Wooley | Braintree | 2,305 | 5 | 19.75 | 19.75 | 19.75 | 21.75 | 21.75 | | | | | |
| [15] |  | Thomas Rielly | Quincy | 1,851 | 3 | 22.75 | 22.75 | 22.75 | | | | | | | |
| [16] |  | New Century Mortgage | Quincy | 2,800 | 3 | 22.00 | 22.00 | 22.00 | | | | | | | |
| [17] |  | The J. Jill Group | Quincy | 29,500 | 5 | 19.75 | 19.75 | 19.75 | 20.75 | 20.75 | | | | | |
| [18] |  | MGIC | Braintree | 7,999 | 5 | 19.75 | 19.75 | 19.75 | 21.75 | 21.75 | | | | | |
| [19] |  | Veddior North America | Braintree | 1,959 | 5 | 20.80 | 20.90 | 20.90 | 23.00 | 23.00 | | | | | |
| [20] |  | Volex Group | Quincy | 8,637 | 7 | 19.00 | 19.00 | 21.00 | 23.00 | 23.00 | 25.00 | 25.00 | | | |
| [21] | Q4 2003 | Insurance Services Office, Inc | Canton | 4,558 | 5 | 22.75 | 22.75 | 22.75 | 24.80 | 24.80 | | | | | |
| [22] | Q2 2004 | Dunkin Donuts (130 Royall) | Canton | 175,000 | 10 | 21.25 | 21.25 | 21.25 | 21.25 | 21.25 | 21.25 | 21.25 | 21.25 | 21.25 | 21.25 |
| [23] | Q3 2004 | CitiStreet Inc | Quincy | 168,000 | 7 | 24.50 | 24.50 | 24.50 | 24.50 | 26.50 | 26.50 | 26.50 | | | |
| [24] Average |  |  |  |  |  | 20.77 | 21.08 | 21.38 | 22.29 | 23.43 | 24.50 | 24.50 | | | |
| [25] Standard Deviation |  |  |  |  |  | 3.12 | 2.75 | 2.63 | 1.94 | 2.37 | 2.46 | | | | |
| [26] Average Year over Year % Change |  |  |  |  |  | 1.47% | 1.44% | 4.24% | 1.70% | 3.35% | 4.57% | | | | |
| [27] Average of Average % Change |  |  |  |  |  | 2.80% | | | | | | | | | |

Sources and Notes:
Cushman & Wakefield
[1], [21], [23]: Cushman & Wakefield of Massachusetts, Inc. Office Lease Comparables 2002-2004, Blue Hill 0654-0659
[22] : Benz and Company, Inc. Complete Appraisal, October, 28, 2004, LNR01092
[24] = Average [1], [23]
[25] = Standard Deviation [1], [23]
[26] = i / ( i -1 ) -1
[27] = Average of [26]

## EXHIBIT 6
### Market Transactions

Table 6.7: Observed Rents ($/SqFt) Adjusted to Q4 2004

| Date Occupied | Tenant | Location | SqFt | Term (Years) | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Q2 2002 | U.S. Telecenters | Quincy | 5,384 | 5 | 12.60 | 15.30 | 15.75 | 16.20 | 16.65 | | | | | |
| Q3 2002 | Consolidated Mortgage | Quincy | 3,200 | 5 | 21.20 | 21.20 | 21.20 | 21.20 | 21.20 | | | | | |
| | Granite Telecommunications | Braintree | 4,200 | 4 | 18.43 | 18.43 | 18.43 | 18.43 | | | | | | |
| Q4 2002 | Lambert Nielsen Eye Center | Quincy | 4,500 | 5 | 23.12 | 23.12 | 23.12 | 23.12 | 23.12 | | | | | |
| | Radnus Financial | Quincy | 6,794 | 5 | 23.12 | 23.12 | 23.12 | 23.12 | 23.12 | | | | | |
| | eGulf Technologies | Quincy | 6,537 | 3 | 24.04 | 24.04 | 24.04 | | | | | | | |
| Q1 2003 | Washington Mutual Life | Braintree | 3,922 | 4 | 20.91 | 20.91 | 20.91 | 20.91 | | | | | | |
| | HSNE | Quincy | 7,195 | 7 | 17.35 | 17.82 | 18.77 | 19.73 | 20.68 | 21.63 | 21.63 | | | |
| | Xintra Institue | Quincy | 12,700 | 3 | 12.83 | 13.31 | 13.31 | | | | | | | |
| Q2 2003 | GreaterMedia | Braintree | 10,799 | 7 | 20.34 | 21.30 | 22.27 | 23.24 | 24.21 | 25.18 | 26.15 | | | |
| | Physicians Home Care | Braintree | 4,759 | 5 | 18.06 | 18.54 | 19.51 | 21.45 | 22.42 | | | | | |
| | Reliable Mortgage | Braintree | 3,440 | 3 | 17.91 | 19.37 | 20.82 | | | | | | | |
| | Town & Country Credit Corp | Braintree | 2,305 | 5 | 19.85 | 19.85 | 19.85 | 19.85 | 19.85 | | | | | |
| Q3 2003 | Mandell, Consigli, & Wooley | Braintree | 2,305 | 3 | 19.57 | 19.57 | 19.57 | | | | | | | |
| | Thomas Realty | Quincy | 1,861 | 3 | 22.54 | 22.54 | 22.54 | | | | | | | |
| | New Century Mortgage | Quincy | 2,800 | 3 | 21.80 | 21.80 | 21.80 | | | | | | | |
| | The J. Jill Group | Quincy | 29,500 | 6 | 19.57 | 19.57 | 19.57 | 20.56 | 20.56 | 20.56 | | | | |
| | MGIC | Quincy | 7,999 | 5 | 19.57 | 19.57 | 19.57 | 21.55 | 21.55 | | | | | |
| | Vecfdor North America | Braintree | 1,959 | 7 | 20.71 | 20.71 | 20.71 | 22.79 | 22.79 | 22.79 | 22.79 | | | |
| | Volex Group | Quincy | 8,637 | 7 | 18.62 | 18.82 | 20.81 | 22.79 | 22.79 | 24.77 | 24.77 | | | |
| Q4 2003 | Insurance Services Office, Inc | Quincy | 4,568 | 5 | 23.28 | 23.28 | 23.28 | 23.28 | 25.38 | | | | | |
| Q2 2004 | Dunkin Donuts (130 Royall) | Canton | 175,000 | 10 | 22.83 | 22.83 | 22.83 | 22.83 | 22.83 | 22.83 | 22.83 | 22.83 | 22.83 | 22.83 |
| Q3 2004 | CitiStreet Inc | Quincy | 168,000 | 7 | 25.86 | 25.86 | 25.86 | 25.86 | 25.86 | 27.97 | 27.97 | | | |
| [2] | Average | | | 5 | 20.19 | 20.47 | 20.77 | 21.70 | 22.16 | 23.50 | 24.67 | | | |
| [3] | Standard Deviation | | | 2 | 3.21 | 2.83 | 2.71 | 2.32 | 2.21 | 2.61 | 2.63 | | | |
| [4] | Average Year over Year % Change | | | | | 1.41% | 1.44% | 4.48% | 2.13% | 6.44% | 4.98% | | | |
| [5] | Average of Average % Change | | | | | 3.41% | | | | | | | | |

Sources and Notes:
[1](a) = Table 6.6 [b] x (1+ Table 6.2 [b])
[1](b) = [a] x (Table 6.5 t / Table 6.5 t - 1)
[2] = Average of [1]
[3] = Standard Deviation of [1]
[4] = t / ( t - 1 ) -1
[5] = Average of [4]

**EXHIBIT 7**
**Discounted Cash Flow Valuation**

Table 7.1: DCF Results

| | | [a] 0 | 1 | 2 | 3 | 4 | [a] 5 | 6 | 7 | 8 | 9 | 10 | [a] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period | | | | | | | | | | | | | Terminal Value |
| Year | | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | |
| [1] | % Occupied | | 32% | 63% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | |
| [2] | Occupied Space (SqFt) | | 86,723 | 173,447 | 260,170 | 260,170 | 260,170 | 260,170 | 260,170 | 260,170 | 260,170 | 260,170 | |
| [3] | Rent ($/SqFt) | | 18.23 | 18.50 | 18.77 | 19.05 | 19.33 | 19.62 | 19.91 | 20.20 | 20.50 | 20.80 | |
| | **Operating Revenue** | | | | | | | | | | | | |
| [4] | Rental Income | | 1,581,224 | 3,209,054 | 4,884,553 | 4,955,556 | 5,029,619 | 5,103,780 | 5,178,994 | 5,255,337 | 5,332,805 | 5,411,415 | |
| [5] | Reimb. Income | | | | | | | | | | | | |
| | Reimb. Real Estate Taxes | | 200,363 | 400,726 | 601,089 | 601,089 | 601,089 | 601,089 | 601,089 | 601,089 | 601,089 | 601,089 | |
| [6] | Management Fees | | 25,035 | 101,630 | 232,046 | 235,436 | 238,907 | 242,429 | 246,002 | 249,628 | 253,308 | 257,042 | |
| [7] | **Total** | | 1,806,622 | 3,711,410 | 5,717,688 | 5,793,080 | 5,869,615 | 5,947,277 | 6,026,085 | 6,106,054 | 6,187,202 | 6,269,546 | |
| | **Operating Expenses** | | | | | | | | | | | | |
| [8] | Improvements | 316,352 | 2,601,698 | 2,601,698 | 3,012,493 | | | | | | | | |
| [9] | Real Estate Taxes | | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | |
| [10] | Management Fees | | 78,051 | 160,453 | 244,228 | 247,826 | 251,481 | 255,188 | 258,950 | 262,767 | 266,640 | 270,571 | |
| [11] | Depreciation | | 31,624 | 64,181 | 97,691 | 99,131 | 100,592 | 102,075 | 103,580 | 105,107 | 106,656 | 108,228 | |
| [12] | **Total** | 316,352 | 3,345,109 | 3,459,058 | 3,987,136 | 979,684 | 984,798 | 989,988 | 995,254 | 1,000,598 | 1,006,021 | 1,011,524 | |
| [13] | Operating Profit | (316,352) | (1,538,485) | 252,353 | 1,730,521 | 4,813,397 | 4,884,817 | 4,957,289 | 5,030,830 | 5,105,455 | 5,181,181 | 5,258,022 | |
| [14] | Less: Capital Expenditures | 27,346 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | |
| [15] | Plus: Depreciation | | 31,624 | 64,181 | 97,691 | 99,131 | 100,592 | 102,075 | 103,580 | 105,107 | 106,656 | 108,228 | |
| [16] | Free Cash Flow | (343,749) | (1,561,635) | 261,761 | 1,773,440 | 4,857,765 | 4,930,636 | 5,004,592 | 5,079,636 | 5,155,790 | 5,233,064 | 5,311,476 | 59,016,416 |
| [17] | Discount Factor | 1.000 | 0.917 | 0.842 | 0.772 | 0.708 | 0.650 | 0.596 | 0.547 | 0.502 | 0.460 | 0.422 | 0.422 |
| [18] | Free Cash Flow (PV) | (343,749) | (1,432,692) | 220,319 | 1,369,421 | 3,441,356 | 3,204,575 | 2,984,075 | 2,778,736 | 2,587,517 | 2,409,448 | 2,243,626 | 24,929,173 |

| | | | | | Average |
|---|---|---|---|---|---|
| | | | | | 8.5 |

| | | | [f] Cap Rate | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 9.2 | 9.1 | 9.0 | 8.9 | 8.8 | 8.7 | 8.6 | 8.4 |

| | | | [e] |
|---|---|---|---|
| | $ | $/SqFt | Market |
| [19] | DCF Value | 44,391,805 | 162.09 | |
| [20] | Market Value of Debt | 38,566,864 | 201.19 | |
| [21] | Blue Hills Equity Value | 5,824,941 | -18.4% | |

Sources and Notes:
[1] = Table 7.2 [5] x Table 7.2 [6] (1 + 1) + Table 7.2 [6] / Table 7.2 [8]
[2] = [1] x Table 7.2 [1]
[3] = [1] x (1 + Table 7.2 [2])
[4] = [2] x [3]
[5] = [1] x [9]
[6] = [1] x [10]
[7] = Sum [4, 6]
[8] = Table 7.2 [9]
[9] = Table 7.2 [10] / 2
[10] = [7] x [11] x (1 + Table 7.2 [11])
[11] = Table 7.2 [12] x [4]
[12] = Table 7.2 [14] x [4]
[13] = Sum [8] - [11]
[14] = [7] - [12]
[15] = [14] - Table 7.2 [9] x (1 + 1 + Table 7.2 [13]) / 2
[16] = [1] x Table 7.2 [1]
[17] = [4] + [16] - [14]
[18] = [17] + [11] + Table 7.2 [15] [6] + 1
[19] = [11] + Table 7.2 [15] [6] x 1
[20] = [17] * WP 7
[21] = [19] [6] [6] / [19] [6] + 1 - 1
[22] = [19] x [26]

**EXHIBIT 7**
**Discounted Cash Flow Valuation**

Table 7.2: DCF Inputs, Summary

| | Description | Units | Value |
|---|---|---|---|
| | Occupancy | | |
| [1] | Rentable Area | SqFt | 273,863 |
| [2] | Expected Rent at Q4 2004 | $/SqFt | $17.97 |
| [3] | Expected Increase | %/Year | 1.5% |
| | | | |
| [4] | Full Occupancy Rate | % | 95% |
| [5] | Time to Full Occupancy | Years | 3 |
| | | | |
| | Initial Improvements | | |
| [6] | Area Improved | SqFt | 273,863 |
| [7] | Cost | $/SqFt | $30.00 |
| [8] | Total Cost | $ | $ 8,215,890 |
| | | | |
| | Real Estate Taxes | | |
| [9] | Quarterly | $ | $ 158,181 |
| [10] | Annual | $ | $ 632,725 |
| [11] | Expected Increase | % Year | 0.0% |
| | | | |
| [12] | Management Fees | % Rental Income | 5.0% |
| [13] | Capital Expenditures | $/SqFt | $0.20 |
| [14] | Depreciation | % Rental Income | 2.0% |
| | | | |
| [15] | Discount Rate | %/Year | 9.0% |

Sources and Notes:
[1] : Meredith & Grew August 30, 1999 Appraisal, # 14100A, LNR 03780
[2] = Table 5.1[3] [b]
[3] : Per Gartrell
[4] : Per Gartrell
[5] : Per Gartrell
[6] : [1]
[7] : Per Gartrell; see, e.g., Frank Deposition, p. 158
[8] = [6] + [7]
[9] : Fiscal Year 2005 Preliminary Real Estate Tax Bill, Blue Hill 0474-0475
[10] = [9] x 4
[11] : Per Gartrell
[12] : Per Gartrell
[13] : Per Gartrell; see, e.g., Lennar 2004 DCF, LNR03075
[14] : Per Gartrell
[15] : Table 7.3 [19]

**EXHIBIT 7**
**Discounted Cash Flow Valuation**

Table 7.3: DCF Inputs, Discount Rate Calculation

| ($'000) | | Grubb & Ellis Co. | Jones Lang LaSalle Inc. | Silverleaf Resorts Inc. | Trammell Crow Co. |
|---|---|---|---|---|---|
| [1] | Risk-Free Rate | 5.11% | | | |
| [2] | Market Risk Premium | 6.90% | | | |
| | **Calculation of Unlevered Beta** | | | | |
| [3] | Levered Beta (B) | 0.71 | 0.79 | 1.22 | 0.83 |
| [4] | Long Term Debt | $25,000 | $40,585 | $253,193 | $163,637 |
| [5] | Cash and Cash Equivalents | $36,972 | $30,143 | $14,363 | $8 |
| [6] | Total Net Debt | $0 | $10,442 | $238,830 | $163,629 |
| [7] | Market Capitalization | $55 | $1,188,219 | $50,867 | $644,807 |
| [8] | Net Debt / Total Capital (D/TV) | 0.0% | 0.9% | 82.4% | 20.2% |
| [9] | Net Debt / Equity Capital | 0.0% | 0.9% | 469.5% | 25.4% |
| [10] | Marginal Tax Rate (t) | 0.0% | 25.4% | 0.2% | -22.0% |
| [11] | Unlevered Beta | 0.71 | 0.78 | 0.21 | 0.63 |
| [12] | Interest Expense | -$1,467 | $9,292 | $17,627 | $4,573 |
| [13] | Total Debt | $25,000 | $58,911 | $253,193 | $144,970 |
| [14] | Cost of Debt | -5.9% | 15.8% | 7.0% | 3.2% |
| [15] | **Company WACCs** | **10.0%** | **10.6%** | **8.1%** | **9.4%** |

| | | Cost | Weight | Wtd Cost |
|---|---|---|---|---|
| [20] | Equity | 10.36% | 74.1% | 7.68% |
| [21] | Debt | 5.05% | 25.9% | 1.31% |
| [22] | **Avg WACC** | | | **8.98%** |

| | | |
|---|---|---|
| [16] | Avg. Debt / Equity | 13.1% |
| [17] | Avg. Unlevered Beta | 0.67 |
| [18] | Avg. Marginal Tax Rate | 0.2% |
| [19] | Avg. Levered Beta | 0.76 |

| **Ibbotson\*** | | |
|---|---|---|
| 2003 | 2004 | 2005 |
| 7.66% | 6.82% | 8.75% |

\*Cost of Capital Yearbook
SIC Code 653 (Real Estate Managers)

**Sources and Notes:**

| | |
|---|---|
| [1] | : UST 30-Year Yield (12-Month Avg as of 12/31/04) |
| [2] | : Ibbotson SBBI 2005 Yearbook, Long MRP (2004) |
| [3] | : Bloomberg |
| [4],[5] | : Company Financials |
| [6] | = [4] - [5] |
| [7],[10] | : Company Financials |
| [8] | = [6] / ([6] + [7]) |
| [9] | = [8] / (1 + [8]) |
| [11] | = [3] / (1 + [8] x (1 - t)) |
| [12] | : Company Financials |
| [13] | : Company Financials |
| [14] | = [12] / [13] |
| [15] | = ([1]+[2] x [3]) x (1 - [8]) + [8] x [14] x (1 - t) |
| [16] | = Median [9] |
| [17] | = Median [11] |
| [18] | = Median [10] |
| [19] | = [17] x (1 + [16] x (1 - [18])) |
| [20] | = [1] + ([2] x [19]) |
| [21] | = Median [[14] x (1 - [18])] |
| [22] | = [20] + [21] |

**EXHIBIT 8**
**DCF Valuation at Dunkin Donuts Lease Terms**

Table 8.1: DCF Results

| Period | 0 | 1 | 2 | 3 | 4 | 5 [b] | 6 | 7 | 8 | 9 | 10 | [a] Terminal Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | |
| % Occupied | - | 32% | 63% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | 95% | |
| Occupied Space (SqFt) | - | 86,723 | 173,447 | 260,170 | 260,170 | 260,170 | 260,170 | 260,170 | 260,170 | 260,170 | 260,170 | |
| Rent ($SqFt) | - | 21.56 | 21.88 | 22.20 | 22.53 | 22.86 | 23.20 | 23.54 | 23.89 | 24.24 | 24.60 | |
| **Operating Revenue** | | | | | | | | | | | | |
| Rental Income | - | 1,870,035 | 3,785,202 | 5,776,720 | 5,861,874 | 5,948,283 | 6,035,966 | 6,124,941 | 6,215,228 | 6,306,846 | 6,399,814 | |
| Reim. Income | | | | | | | | | | | | |
| Real Estate Taxes | - | 200,363 | 400,726 | 601,089 | 601,089 | 601,089 | 601,089 | 601,089 | 601,089 | 601,089 | 601,089 | |
| Management Fees | - | 29,609 | 120,181 | 274,394 | 278,439 | 282,543 | 286,708 | 290,935 | 295,223 | 299,575 | 303,991 | |
| **Total** | - | 2,100,007 | 4,316,109 | 6,652,203 | 6,741,402 | 6,831,915 | 6,923,763 | 7,016,964 | 7,111,540 | 7,207,508 | 7,304,894 | |
| **Operating Expenses** | | | | | | | | | | | | |
| Improvements | 316,362 | 3,468,931 | 3,468,931 | 4,016,657 | - | - | - | - | - | - | - | |
| Real Estate Taxes | - | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | |
| Management Fees | - | 93,502 | 189,760 | 288,838 | 293,094 | 297,414 | 301,798 | 306,247 | 310,761 | 315,342 | 319,991 | |
| Depreciation | - | 37,401 | 75,904 | 115,534 | 117,237 | 118,966 | 120,719 | 122,499 | 124,305 | 126,137 | 127,996 | |
| **Total** | 316,362 | 4,232,559 | 4,367,320 | 5,053,763 | 1,043,056 | 1,049,105 | 1,055,242 | 1,061,471 | 1,067,791 | 1,074,204 | 1,080,712 | |
| **Operating Profit** | (316,362) | (2,132,552) | (51,211) | 1,598,450 | 5,698,346 | 5,782,810 | 5,868,520 | 5,955,494 | 6,043,749 | 6,133,305 | 6,224,182 | |
| Less: Capital Expenditures | 27,386 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | |
| Plus: Depreciation | - | 37,401 | 75,904 | 115,534 | 117,237 | 118,966 | 120,719 | 122,499 | 124,305 | 126,137 | 127,996 | |
| **Free Cash Flow** | (343,749) | (2,149,923) | (30,079) | 1,659,212 | 5,760,810 | 5,847,003 | 5,934,467 | 6,023,220 | 6,113,281 | 6,204,670 | 6,297,406 | 69,871,172 |
| Discount Factor | 1.000 | 0.917 | 0.842 | 0.772 | 0.708 | 0.650 | 0.596 | 0.547 | 0.502 | 0.460 | 0.422 | 0.422 |
| **Free Cash Flow (PV)** | (343,749) | (1,972,407) | (25,317) | 1,281,216 | 4,081,103 | 3,800,151 | 3,538,529 | 3,294,908 | 3,068,050 | 2,856,802 | 2,660,092 | 29,556,579 |

| | $ | [c] $/SqFt | [d] Market |
|---|---|---|---|
| [19] DCF Value | 51,786,857 | 188.13 | 201.19 |
| [20] Market Value of Debt | 38,566,864 | | -6.0% |
| [21] Blue Hills Equity Value | 13,229,094 | | |

| | | | | [f] Cap Rate | | | | Average |
|---|---|---|---|---|---|---|---|---|
| | 9.1 | 9.0 | 8.8 | 8.7 | 8.6 | 8.4 | 8.3 | 8.6 |

Sources and Notes:
[1] = Table 8.2 [5] x Table 8.2 [4] x (t - 1) + Table 8.2 [13] / Table 8.2 [5]
[2] = [1] x Table 8.2
[3] = [9] x (1 + Table 8.2 [3])
[4] = [2] x [3]
[5] = [1] x [19]
[6] = [1] x [10]
[7] = Sum [4] [6]
[8] = Table 8.2 [8]
[9] = Table 6.6 [8] / 2
[10] = Table 8.2.2 x ( 1 + Table 6.7 )
[11] = Table 8.2 [14] x [4]
[12] = Sum [8]..[11]

[13] = [7] - [12]
[14] [w] = Table 8.2 [3] x Table 8.2 [13] / 2
[15] [w] = Table 8.2 [7] x Table 8.2 [13]
[16] = [11]
[16] = [13] - [14] + [15]
[17] = 1 / (1 + Table 8.2 [15] ) ^t
[18] = [16] x [17]
[19] = Sum [18]
[19] [a] = [19] [d] [(19] [e] - 1
[19] [d] = Table 8.2 [15] [(19] [e] - 1
[19] [f] = [19] [d] / 0.77218348506106... -1
[20] [a] = WP 7
[20] = [19] [d] / [19] [a] -1
[21] = [19] + [20]

**EXHIBIT 8**
**DCF Valuation at Dunkin Donuts Lease Terms**

Table 8.2: DCF Inputs, Summary

|  | Description | Units | Value |
|---|---|---|---|
|  | **Occupancy** |  |  |
| [1] | Rentable Area | SqFt | 273,863 |
| [2] | Expected Rent at Q4 2004 | $/SqFt | $21.25 |
| [3] | Expected Increase | %/Year | 1.5% |
|  |  |  |  |
| [4] | Full Occupancy Rate | % | 95% |
| [5] | Time to Full Occupancy | Years | 3 |
|  |  |  |  |
|  | **Initial Improvements** |  |  |
| [6] | Area Improved | SqFt | 273,863 |
| [7] | Cost | $/SqFt | $40.00 |
| [8] | Total Cost | $ | $ 10,954,520 |
|  |  |  |  |
|  | **Real Estate Taxes** |  |  |
| [9] | Quarterly | $ | $ 158,181 |
| [10] | Annual | $ | $ 632,725 |
| [11] | Expected Increase | % Year | 0.0% |
|  |  |  |  |
| [12] | Management Fees | % Rental Income | 5.0% |
| [13] | Capital Expenditures | $/SqFt | $0.20 |
| [14] | Depreciation | % Rental Income | 2.0% |
|  |  |  |  |
| [15] | Discount Rate | %/Year | 9.0% |

Sources and Notes:
[1] = Table 7.2[1]
[2] : Bonz and Company, Inc. Complete Appraisal, October, 28, 2004, LNR01092
[3] = Table 7.2 [3]
[4] = Table 7.2 [4]
[5] = Table 7.2 [5]
[6] = Table 7.2 [6]
[7] : Bonz and Company, Inc. Complete Appraisal, October, 28, 2004, LNR01092
[8] = [6] + [7]
[9] = Table 7.2 [9]
[10] = Table 7.2 [10]
[11] = Table 7.2 [11]
[12] = Table 7.2 [12]
[13] = Table 7.2 [13]
[14] = Table 7.2 [14]
[15] = Table 7.2 [15]

EXHIBIT 9
Cash Positioning and Funding Requirements

Table 9.1: Sources of Funds and Ending Cash Balances

| | Year | $/Month | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [1] | Free Cash Flow | | (343,749) | (1,561,635) | 281,761 | 1,773,440 | 4,857,755 | 4,930,636 | 5,004,692 | 5,079,638 | 5,155,790 | 5,233,064 | 5,311,476 |
| [2] | Net Real Estate Taxes | | 316,362 | 432,362 | 231,999 | 31,636 | 31,636 | 31,636 | 31,636 | 31,636 | 31,636 | 31,636 | 31,636 |
| [3] | Free Cash Flow Before Net Taxes | | (27,386) | (1,129,273) | 483,760 | 1,805,076 | 4,889,392 | 4,962,273 | 5,036,228 | 5,111,274 | 5,187,426 | 5,264,700 | 5,343,114 |
| | Debt Service | | | | | | | | | | | | |
| | Principal | | 176,109 | 383,312 | 417,152 | 453,980 | 494,058 | 537,675 | 585,143 | 636,801 | 693,019 | 754,201 | 820,784 |
| | Interest | | 1,351,805 | 2,672,514 | 2,638,675 | 2,601,847 | 2,551,769 | 2,518,152 | 2,470,684 | 2,419,026 | 2,362,808 | 2,301,626 | 2,235,043 |
| [4] | Total | | 1,527,913 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 |
| | Required Reserves | | | | | | | | | | | | |
| | Tax | 52,727 | 316,362 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 |
| | Insurance | 11,922 | 71,531 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 |
| | Tax/Insurance | | 387,894 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 |
| | Replacement Escrow | 4,564 | 27,387 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 |
| | Base Leasing | 9,928 | 59,568 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 |
| | Cash Flow Leasing | 52,572 | | | | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 |
| [5] | Total | | 474,848 | 949,695 | 949,695 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 |
| [6] | Available Cash from Operations | | (2,030,147) | (5,134,795) | (3,511,762) | (2,831,311) | 253,004 | 325,885 | 399,841 | 474,887 | 551,039 | 628,313 | 706,727 |
| | Available Cash from Reserves | | | | | | | | | | | | |
| | Tax/Insurance Reserve | | 35,706 | — | 493,760 | 775,787 | — | — | — | — | — | — | — |
| | Replacement Escrow | | 351,622 | — | — | 54,773 | — | — | — | — | — | — | — |
| | Base Leasing | | 598,278 | — | — | 119,135 | — | — | — | — | — | — | — |
| | Cash Flow | | 1,044,482 | 2,123,680 | — | 630,865 | — | — | — | — | — | — | — |
| [7] | Total | | 2,030,147 | 2,123,680 | 493,760 | 1,580,560 | — | — | — | — | — | — | — |
| [8] | Blue Hills Property Accounts | | — | 3,011,115 | 2,765,536 | — | — | — | — | — | — | — | — |
| [9] | Additional Cash from Blue Hills | | — | — | 252,466 | 1,250,751 | — | — | — | — | — | — | — |
| [10] | Ending Cash Position | | — | — | — | — | 253,004 | 325,885 | 399,841 | 474,887 | 551,039 | 628,313 | 706,727 |

Sources and Notes:
[1] = Table 7.1 [16]
[2] = Table 7.1 [9] - Table 7.1 [5]
[3] = [1] + [2]
[4] = Per Mortage Note September 14, 1999
[5] = Per Security Agreement September 14, 1999
[6] = [3] - [4] - [5]
[7] = Per Security Agreement September 14, 1999
[8] = Agreement, December 31, 2004, Blue Hill $525
[9] = Calculated
[10] = Sum [6], [9]

EXHIBIT 9
Cash Positioning and Funding Requirements

Table 9.2: Reserve Account Activity Reconciliations

| Year | Initial Values | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mortgage Reserve Accounts** | | | | | | | | | | | | |
| *Tax/Insurance* | | | | | | | | | | | | |
| Beginning | | 35,766 | - | 493,760 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 |
| Funding | | 35,766 | - | 493,760 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 |
| Uses | | | | | | | | | | | | |
| [1] Ending | 35,766 | - | - | - | | | | | | | | |
| *Replacement Escrow* | | | | | | | | | | | | |
| Beginning | | 351,622 | - | - | - | 54,773 | 54,773 | 109,546 | 164,319 | 219,092 | 273,865 | 328,638 |
| Funding | | 351,622 | - | - | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 |
| Uses | | | | | 54,773 | | | | | | | |
| [2] Ending | 351,622 | - | | | | 54,773 | 109,546 | 164,319 | 219,092 | 273,865 | 328,638 | 383,411 |
| *Base Leasing* | | | | | | | | | | | | |
| Beginning | | 598,278 | - | - | - | | 119,135 | 238,270 | 357,405 | 476,540 | 595,675 | 714,810 |
| Funding | | 598,278 | - | - | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 |
| Uses | | | | | 119,135 | | | | | | | |
| [3] Ending | 598,278 | - | - | - | | 119,135 | 238,270 | 357,405 | 476,540 | 595,675 | 714,810 | 833,945 |
| *Cash Flow* | | | | | | | | | | | | |
| Beginning | | 3,168,162 | 2,123,680 | - | - | 630,865 | 630,865 | 1,261,730 | 1,892,595 | 2,523,460 | 3,154,325 | 3,535,190 |
| Funding | | - | 2,123,680 | - | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 380,865 | (118,135) |
| Uses | | 1,044,482 | | | 630,865 | | | | | | | |
| [4] Ending | 3,168,162 | 2,123,680 | 2,123,680 | - | - | 630,865 | 1,261,730 | 1,892,595 | 2,523,460 | 3,154,325 | 3,535,190 | 3,416,055 |
| [5] Leasing Escrow Funds | 3,765,440 | 2,123,680 | - | - | - | 750,000 | 1,500,000 | 2,250,000 | 3,000,000 | 3,750,000 | 4,250,000 | 4,250,000 |
| [6] Total Mortgage Reserves | 4,153,827 | 2,123,680 | - | - | 804,773 | 804,773 | 1,609,546 | 2,414,319 | 3,219,092 | 4,023,865 | 4,578,638 | 4,633,411 |
| **Blue Hills Property Accounts** | | | | | | | | | | | | |
| Beginning | | 5,776,651 | 5,776,651 | 3,209,064 | - | - | - | - | - | - | - | - |
| Funding | | - | 3,011,115 | 2,765,536 | - | - | - | - | - | - | - | - |
| Uses | | - | - | - | | | | | | | | |
| [7] Ending | 5,776,651 | 5,776,651 | 2,765,536 | 2,765,536 | - | - | - | - | - | - | - | - |
| [8] Rental Income | | - | 1,581,224 | 3,209,064 | 4,884,553 | 4,556,556 | 5,028,619 | 5,103,760 | 5,178,994 | 5,255,337 | 5,332,805 | 5,411,415 |
| [9] Cash Collateral Balance | | (2,002,761) | (2,424,299) | (795,458) | 878,031 | 951,033 | 1,024,097 | 1,098,238 | 1,173,472 | 1,249,814 | 1,327,283 | 1,405,683 |

Sources and Notes:
[1]-[4]: Per Security Agreement September 14, 1999
[5] = [3] + [4]
[6] = Sum [1]-[4]
[7]: Calculated
[8]: Table 7.1 [4]
[9]: Calculated

EXHIBIT 10
Cash Positioning and Funding Requirements at Dunkin Donuts Lease Terms

Table 10.1: Sources of Funds and Ending Cash Balances

| | $/Month | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Year** | | | | | | | | | | | | |
| [1] Free Cash Flow | | (343,749) | (2,149,923) | (30,079) | 1,659,212 | 5,760,810 | 5,847,003 | 5,934,467 | 6,023,220 | 6,113,261 | 6,204,670 | 6,297,405 |
| [2] Net Real Estate Taxes | | 316,362 | 432,352 | 231,999 | 31,636 | 31,636 | 31,636 | 31,636 | 31,636 | 31,636 | 31,636 | 31,636 |
| [3] Free Cash Flow Before Net Taxes | | (27,386) | (1,717,562) | 201,920 | 1,690,848 | 5,792,447 | 5,878,640 | 5,966,103 | 6,054,856 | 6,144,917 | 6,236,306 | 6,329,042 |
| **Debt Service** | | | | | | | | | | | | |
| Principal | | 176,109 | 383,312 | 417,152 | 453,980 | 494,058 | 537,675 | 585,143 | 636,801 | 693,019 | 754,201 | 820,784 |
| Interest | | 1,351,805 | 2,672,514 | 2,638,675 | 2,601,847 | 2,561,769 | 2,518,152 | 2,470,684 | 2,419,026 | 2,362,808 | 2,301,626 | 2,235,043 |
| [4] Total | | 1,527,913 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 | 3,055,827 |
| **Required Reserves** | | | | | | | | | | | | |
| Tax | 52,727 | 316,382 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 | 632,725 |
| Insurance | 11,922 | 71,531 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 | 143,063 |
| Tax/Insurance | | 387,894 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 |
| Replacement Escrow | 4,564 | 27,387 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 |
| Base Leasing | 9,928 | 59,558 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 |
| Cash Flow Leasing | 52,572 | | | | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 |
| [5] Total | | 474,848 | 949,695 | 949,695 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 | 1,580,560 |
| [6] Available Cash from Operations | | (2,030,147) | (5,723,084) | (3,803,603) | (2,945,539) | 1,156,059 | 1,242,252 | 1,329,716 | 1,418,469 | 1,508,530 | 1,599,919 | 1,692,654 |
| **Available Cash from Reserves** | | | | | | | | | | | | |
| Tax/Insurance Reserve | | 35,766 | | 201,920 | 775,787 | | | | | | | |
| Replacement Escrow | | 351,622 | | | 54,773 | | | | | | | |
| Base Leasing | | 598,278 | 2,123,680 | | 119,135 | | | | | | | |
| Cash Flow | | 1,044,482 | | | 630,865 | | | | | | | |
| [7] Total | | 2,030,147 | 2,123,680 | 201,920 | 1,580,560 | | | | | | | |
| [8] Blue Hills Property Accounts | | | 3,599,404 | 2,177,247 | | | | | | | | |
| [9] Additional Cash from Blue Hills | | | | 1,424,436 | 1,364,978 | | | | | | | |
| [10] Ending Cash Position | | | | | | 1,156,059 | 1,242,252 | 1,329,716 | 1,418,469 | 1,508,530 | 1,599,919 | 1,692,654 |

Sources and Notes:
[1] = Table 8.1 [16]
[2] = Table 8.1 [9] - Table 8.1 [6]
[3] = [1] + [2]
[4] = Per Mortage Note September 14, 1999
[5] = Per Security Agreement September 14, 1999
[6] = [3] - [4] - [5]
[7] = Per Security Agreement September 14, 1999
[8] = Agreement, December 31, 2004, Blue Hill 5525
[9] = Calculated
[10] = Sum [6],[9]

EXHIBIT 10
## Cash Positioning and Funding Requirements at Dunkin Donuts Lease Terms

### Table 10.2: Reserve Account Activity Reconciliations

| Year | Initial Values | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mortgage Reserve Accounts** | | | | | | | | | | | | |
| *Tax/Insurance* | | | | | | | | | | | | |
| Beginning | | 35,766 | - | - | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 |
| Funding | | | | | | | | | | | | |
| Uses | | 35,766 | - | 201,920 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 | 775,787 |
| Ending | 35,766 | | - | - | - | - | - | - | - | - | - | - |
| [1] | | | | | | | | | | | | |
| *Replacement Escrow* | | | | | | | | | | | | |
| Beginning | | 351,622 | - | - | - | 54,773 | 54,773 | 109,546 | 164,319 | 219,092 | 273,865 | 328,638 |
| Funding | | | | | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 | 54,773 |
| Uses | | 351,622 | - | - | 54,773 | 54,773 | 54,773 | | | | | |
| Ending | 351,622 | | - | - | 54,773 | 54,773 | 109,546 | 164,319 | 219,092 | 273,865 | 328,638 | 383,411 |
| [2] | | | | | | | | | | | | |
| *Base Leasing* | | | | | | | | | | | | |
| Beginning | | 598,278 | - | - | - | 119,135 | 119,135 | 238,270 | 357,405 | 476,540 | 595,675 | 714,810 |
| Funding | | | | | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 | 119,135 |
| Uses | | 598,278 | - | - | 119,135 | 119,135 | 119,135 | | | | | |
| Ending | 598,278 | | - | - | 119,135 | 119,135 | 238,270 | 357,405 | 476,540 | 595,675 | 714,810 | 833,945 |
| [3] | | | | | | | | | | | | |
| *Cash Flow* | | | | | | | | | | | | |
| Beginning | | 3,168,162 | - | - | - | 630,865 | 630,865 | 1,261,730 | 1,892,595 | 2,523,460 | 3,154,325 | 3,535,190 |
| Funding | | 1,044,482 | - | - | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 630,865 | 380,865 | (119,135) |
| Uses | | 2,123,680 | | | 630,865 | 630,865 | | | | | | |
| Ending | 3,168,162 | 2,123,680 | - | - | 630,865 | 630,865 | 1,261,730 | 1,892,595 | 2,523,460 | 3,154,325 | 3,535,190 | 3,416,055 |
| [4] | | | | | | | | | | | | |
| [5] Leasing Escrow Funds | 3,766,440 | 2,123,680 | - | - | - | 750,000 | 1,500,000 | 2,250,000 | 3,000,000 | 3,750,000 | 4,250,000 | 4,250,000 |
| [6] Total Mortgage Reserves | 4,153,827 | 2,123,680 | - | - | 804,773 | 804,773 | 1,600,546 | 2,414,319 | 3,219,092 | 4,023,865 | 4,578,638 | 4,633,411 |
| [7] *Blue Hills Property Accounts* | | | | | | | | | | | | |
| Beginning | 5,776,651 | 5,776,651 | 5,776,651 | 2,177,247 | | | | | | | | |
| Funding | | - | 3,599,404 | | | | | | | | | |
| Uses | | (2,002,761) | 2,177,247 | | | | | | | | | |
| Ending | 5,776,651 | 5,776,651 | 2,177,247 | | | | | | | | | |
| [8] Rental Income | | - | 1,870,035 | 3,795,202 | 5,681,874 | 5,948,283 | 6,035,966 | 6,124,941 | 6,215,228 | 6,306,846 | 6,399,814 | |
| [9] Cash Collateral Balance | | (2,002,761) | (2,135,487) | (210,320) | 1,771,199 | 1,856,352 | 1,942,761 | 2,030,443 | 2,119,419 | 2,209,705 | 2,301,323 | 2,394,292 |

Sources and Notes:
[1],[4]: Per Security Agreement September 14, 1999
[3] = [3] + [4]
[6] = Sum [1] [4]
[7]: Calculated
[8]: Table 8.1 [4]
[9]: Calculated

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>　　　Plaintiff / Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as<br>Trustee for the Registered Holders of<br>Credit Suisse First Boston Mortgage<br>Pass-Through Certificates, Series 1999-C1<br>　　　Defendants<br><br>and<br><br>WILLIAM LANGELIER and<br>GERALD FINEBERG,<br>　　　Defendant-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Civil Action No. 05-CV-10506 (WGY) |

**REBUTTAL REPORT OF
DR. KENNETH D. GARTRELL**

April 13, 2006

Kenneth D. Gartrell, PhD CPA
Managing Director
LECG, LLC
350 Massachusetts Avenue
Cambridge, MA 02139
Phone:  617.252.9994
Fax :  617.621.8018

## I.     BACKGROUND

1.     My name is Kenneth D. Gartrell. I am an independent economic consultant and a Managing Director of LECG, LLC ("LECG"), a global economic consulting firm headquartered in Emeryville, California.  My business address is 350 Massachusetts Avenue, Cambridge MA 02139.  My business telephone number is 617-252-9994.

2.     My affirmative expert report in this matter[1] ("Expert Report") detailed my professional qualifications and included as Exhibit 1 my full resume.

3.     My Expert Report also set forth my independent expert opinions regarding the fair market value ("FMV") of the Blue Hills Office Park (the "Property") on or about the date of foreclosure on November 19, 2004 as a basis for calculating the economic damages to Blue Hills Office Park LLC ("Blue Hills") resulting from the loss of the Property.  In my opinion, the Property's FMV at the date of foreclosure was at least $44.4 million, with significant upside potential, and the corresponding economic damages to Blue Hills in lost equity, reserve balances, and capital gains taxes were at least $14.9 million excluding interest.

4.     The law firm Bernkopf Goodman LLP asked me to review the Expert Report of Eric S. Stotz, dated March 31, 2006, ("Stotz Report") filed on behalf of the Defendants to determine whether or not the assumptions, analytical approach, or findings of the Stotz Report warrant specific response.

---

[1]     Expert Report and Exhibits of Dr. Kenneth D. Gartrell, dated March 31, 2006.

5.    This report summarizes my responses to the Stotz Report and my ultimate opinions on the FMV of the Property, both of which are preliminary since my review of the Stotz Report is ongoing, as is my analysis to the extent additional information becomes available from discovery or otherwise prior to deposition or trial.

6.    For my ongoing work in this engagement, LECG is being compensated for my time at my standard hourly rate of $550.

7.    The footnotes to this report list the additional material I reviewed subsequent to my Expert Report in the course of preparing this rebuttal.

## II.   RESPONSIVE OPINIONS

8.    The Stotz Report materially errs in calculating the FMV of the Property for at least four reasons.

9.    First, the Stotz Report relies on a limited sample of comparable properties and excludes available information on several contemporaneous commercial real estate transactions, leases and market conditions in suburban Boston.

    (a)    Mr. Stotz considers just five transactions. My Expert Report includes information on a "relatively small sample" of 22 transactions of properties in the two years prior to the date of foreclosure.[2] The practical importance of relying on a wider sample of market transactions is it reveals the wide

---

[2]    See, e.g., Expert Report, pp. 16-21 and Exhibit 6.

disparity in observed prices which make them an unreliable predictor of the likely FMV of the Property due to underlying differences which are unobserved but which drive transaction prices.

(b)    Both the Stotz Report and my Expert Report include the building next door to the Property, which Equiserve purchased in August 2003. That property is the single best comparable for the Property. Equiserve purchased the property at a price of $131/sf in 2003 and sold it for $364/sf in 2005. Rather than relying on this information, Mr. Stotz applied subjective "adjustments" to the range of his observed transaction prices ($114/sf and $145/sf) to decrease the transaction prices by as much as 23% to a range of $102/sf to $112/sf.

(c)    After further adjusting downward the value of the Property by approximately $11 million for expected tenant improvements, commissions, and "loss in income", Mr. Stotz values the Property at $17.2 million using the comparable transactions. Applied to the 273,863 sf of the Property, this value is $62.81/sf, or 45% lower than the lowest price observed in the five transactions included in the Stotz report. That value is unreliably low, and the ad hoc adjustments which generated it are imprecise.

10.    Second, the Stotz Report relies on a discounted cash flow forecast based on inappropriate assumptions regarding the rental rate the Property can reasonably expect to realize over time.

3

(a)   Mr. Stotz uses an artificially low rental rate.  He "assumed an effective current market rent of $12.25 per square foot on a triple net basis,"[3] ostensibly based on the observed rents for six comparable properties.  However, without any explanation, his assumption is lower than the range of observed rents, which he reports to have been $13.00/sf to $14.92/sf on a triple net basis.[4]  There is no reasonable basis, and Mr. Stotz offers no reason, to simply assume the Property would realize rents lower than even the *lowest* observed market rates at the time.

(b)   The arbitrarily low rental rate on which Mr. Stotz relies is especially low given his concurrent assumption of over $7 million in tenant improvements at $25/sf, or more than twice the assumed rental rate.  The two figures are internally inconsistent.  Likewise, there is no reasonable basis for Mr. Stotz' unsubstantiated opinion that the Property's on-site cafeteria, fitness center, auditorium, extensive foyer, and courtyard were "over-improvements" which would not be valued in the market at the time.[5]

(c)   The arbitrarily low rental rate on which Mr. Stotz relies is not just less than the entire range of observed rents for comparable properties; it is significantly lower than the rental rate the Property actually realized.  Under the Equiserve lease which expired on July 31, 2004, the rent was set (reportedly "below

---

[3]   Addendum to Stotz Report, p. 55.
[4]   Ibid., p. 50.
[5]   Ibid., p. 54.

market"[6]) at $17/sf net. Adjusting for market changes, that rate would have been $17.97/sf net at the time of foreclosure in late 2004.[7] Mr. Stotz' "assumed" rate of $12.25/sf triple net implies building expenses would consume 32% of net rental income. This assumption is inconsistent with the substantial up-front tenant improvements Mr. Stotz also assumes.

(d)    By assuming an arbitrarily low rental rate, Mr. Stotz underestimated the rental income the Property would generate and significantly underestimated the Property's FMV.

11.    Third, the Stotz Report relies on a discounted cash flow forecast based on inappropriate assumptions regarding the discount rate at which to value the expected future cash flows the Property will generate.

(a)    Mr. Stotz applies an excessively high discount rate in his discounted cash flow valuations of the Property. In his 2004 appraisal for Lennar, "a discount rate of 12.00% was assumed."[8] Mr. Stotz admits this rate is "at the higher end of the range" of required returns observed in the suburban real estate market in Boston or nationally. He rationalizes the use of a high discount rate by suggesting he assumed "reasonable" rental rates and costs in his cash flow valuation, and because the Property would require an initial lease-up period at substantial cost. Neither explanation justifies applying an excessively high

---

[6]    Meredith & Grew Oncor International, Self-Contained Complete Appraisal Report, August 30, 1999 (LNR 03780-81) reports prevailing market rents of $17.37/sf to $22.39/sf.
[7]    Expert Report, Table 5.1.
[8]    Addendum to Stotz Report, p. 62.

discount rate, nor offsets the significant negative impact of such a discount rate on the resulting FMV of the Property.

(b)    The factors Mr. Stotz uses to rationalize his high discount rate are already taken into account in his cash flow valuation and, therefore, require no additional adjustment via an inflated discount rate.

(c)    For example, even if his calculations actually were to have assumed a "reasonable" rent, there would have been no valid reason to knowingly over-discount reasonable levels of expected revenue to the Property.  Since Mr. Stotz actually assumed arbitrarily low rents, the application of an excessively high discount rate to the corresponding expected future cash flows only exacerbates the extent to which his calculations underestimate the true FMV of the Property.

(d)    Neither assumption is a reason to also assume an excessively high discount rate.  Mr. Stotz explicitly accounts for the valuation effects of the lease-up period and associated costs, so there is no valid reason to adjust for them again by inflating the discount rate.  He assumed it would take 18 months to rent the Property and start to realize rental revenue, so his cash flow valuation includes no revenue in that initial period.  That has a direct valuation effect.  So does the assumption of substantial leasing and capital costs (approximately $9 million) in the first 18 months of the valuation.

(e)    The appropriate discount rate reflects the risks to commercial property investors inherent in the market for factors already accounted for in the valuation.  Mr. Stotz correctly states, "Appropriate discount and capitalization rates must represent the <u>minimum</u> annual rate of return before income taxes to attract equity capital"[9] However, he admits he chose a rate at the "higher end" of the market for reasons which do not properly inform the choice of a reasonable discount rate.

(f)    To the extent market conditions are known or can be reasonably projected, they should be incorporated into the calculation directly so they have direct effects on the ultimate valuation.  They should not be lumped into the discount rate to inflate it by an arbitrarily-chosen and unspecified amount.[10]  Doing so ignores the fundamental financial principles underlying the meaning and proper determination of an appropriate discount rate.  It is a tacit admission of no confidence in the precision and reliability of the underlying projected future cash flows.  Doing so when the underlying cash flows already are adjusted for the particular conditions at issue simply is incorrect.

---

[9]    Ibid., p. 60.  Emphasis added.
[10]   Introductory principles of corporate finance warn against applying such "fudge factors" to discount rates to compensate for imprecisely calculating the underlying cash flows.  See, e.g., Richard A. Brealey and Stewart C. Myers, *Principles of Corporate Finance*, 6th Ed. (2000) at p. 238.

7

(g)    In his new appraisal of the Property as of August 2003,[11] Mr. Stotz applies an even higher discount rate (12.25%) than he used for his October 2004 valuation, saying, "investors lowered their return requirements" from 2003 to 2004.[12] However, the two sources of data on which he relied reflect little or no change.  The discount rates for the Boston market from the first source were 9% to 13% as of *both* Q2 2003 and Q3 2004; the second source reported discount rates ranging from 10% to 12% for Q2 2003 and from 9% to 12% for Q3 2004.[13] Because Mr. Stotz admits he already assumed a rate at the "higher end" of the market in his October 2004 valuation, the data hardly justify another 25 percentage point increase to the discount rate for his August 2003 valuation.

(h)    By assuming arbitrarily high discount rates, Mr. Stotz underestimated both the present value of the expected future cash flows the Property would generate and its ultimate future sale value.  As a result, he significantly underestimated the Property's FMV.

12.    Fourth, I disagree with Mr. Stotz regarding the value implications of the new parking garage adjacent to the Property.  Construction of the parking garage most

---

[11]    The underlying data on which I based my valuation as of late 2004 also would be sufficient to determine the FMV of the Property as of August 2003. Most likely, the value would not be materially different than the $44.4 million calculated in my Expert Report as of November 2004. However, the observed increase in market values between Q3 1999 and Q3 2003 (6.7%) is greater than the change between Q3 1999 and Q4 2004 (5.7%), implying a higher expected rental rate at Q3 2003. A higher rental rate and a potentially lower discount rate would result in a higher FMV for the Property at Q3 2003 relative to Q4 2004.

[12]    Stotz Report, p. 11.

[13]    Ibid. and Addendum to Stotz Report, p. 61.

likely had no material effect on the FMV of the Property, and it may have enhanced the Property's forward-looking option value.

(a)    Mr. Stotz simply asserts the parking garage "negatively impacted" the FMV of the Property.[14] He does not attempt to quantify this effect; he just states, "it is extremely difficult to accurately measure."[15]    Instead of an informed analysis, Mr. Stotz bases his opinion on "the sum of [his] experience" and on "various discussions with other real estate professionals."[16] His opinion lacks sufficient factual basis and ignores important facts on record and relevant economic factors to the contrary.

(b)    Mr. Stotz assumes the value of the Property would be diminished because its view of the nearby highway would be partially blocked, which he argues "would increase traffic congestion" near the Property, "makes finding the building more difficult," and makes it "more difficult" for employees in the building to monitor and avoid heavy traffic on the highway.[17]

(c)    However, there is no evidence any such conditions actually exist or, to the extent they do, have any material effect on the FMV of the Property.

(d)    Whether the people working in the adjacent building park in an open lot or a covered building has no objectively clear or significant effect on the day-to-

---

[14]    Stotz Report, p. 14.
[15]    Ibid., p. 13.
[16]    Ibid. Mr. Stotz does not identify anyone with whom he ostensibly spoke about the parking garage, so there is no way to independently evaluate the accuracy or reliability of such persons or discussions.
[17]    Ibid., p. 14.

day volume of cars in and around the Property.  Likewise, there is no realistic indication the Property is significantly more difficult to find because it is situated next to a smaller parking building.  And there is no reason the FMV of the Property itself would be dependent on the ability of workers to monitor highway traffic patterns for their personal convenience

(e)    In fact, the parking garage does not materially affect the visibility of the highway from the Property.  Because the parking building is on a lower terrace than the Property, only the highway view from the street level is obstructed.  But that is not new: that view was blocked previously by the pine tree buffer between the highway and Property.  All other views from the Property on all sides are unobstructed, including the scenic eastward view of the Blue Hills, which likely holds much more value to the people working at the Property than the view to the highway.

(f)    In his deposition testimony, Fineberg Management CFO, Joseph A. Donovan, affirmed my opinion regarding the lack of "any sight line problems" caused by the parking garage, as well as the relative lack of importance of a completely clear view to the highway.[18]  He said he viewed it as "a positive step because we've always been short of parking there."[19]

(g)    Factual evidence and economic reasoning indicate the new parking garage may have increased the FMV of the Property:

---

[18]    Deposition of Joseph A. Donovan, pp. 78-79
[19]    Ibid., pp. 72-73.

(h)    The new parking garage improved the adjacent property, which most likely had a direct positive effect on the FMV of all nearby properties due to the "neighborhood" effect.

(i)    Blue Hills' zoning appeal of the proposed garage[20] and the ultimate settlement of the appeal had the benefit of assuring the new building adjacent to the Property would be occupied and off the market. It also granted Blue Hills the ability to develop the Property in the future without opposition from the owners of the adjacent building.[21]

(j)    The new garage created a potentially valuable, and still present, option for the Property to work out an option to use the garage at some point in the future.

(k)    Taken together, the factual record and economic factors regarding the adjacent parking garage indicate its construction had either no material effect on the FMV of the Property or, more likely, enhanced its option value from that point forward.

13.    Mr. Stotz offers no opinion regarding the existence or extent of economic damages to Blue Hills as a result of the foreclosure of the Property in November 2004.

---

[20]    Complaint, *Blue Hills Office Park, LLC v. Blueview Corporate Center LLC, et al.*, June 9, 2003 (Blue Hill 1524-34).

[21]    Settlement Agreement, August 5, 2003, pp. 4-5 (Blue Hill 1847-48).

11

14. My review of the Stotz Report and my independent analysis are ongoing. I may revise or extend my opinions as any additional relevant information becomes available through discovery or otherwise. Therefore, this report and my Expert Report do not necessarily reflect each and every matter on which I ultimately may form expert opinions in this matter.

Respectfully submitted,

Kenneth D. Gartrell, Ph.D. CPA

April 13, 2006

# EXHIBIT C

OIN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WASTE MANAGEMENT, INC., et al.,          :

        Plaintiffs,          :

                              :          Case No. 3:00cv256

        vs.          :

                              JUDGE WALTER HERBERT RICE

DANIS INDUSTRIES CORPORATION,          :
et al.,          :

        Defendants.          :

---

**DECISION AND ENTRY OVERRULING, WITHOUT PREJUDICE, DEFENDANTS' MOTION IN LIMINE (DOC. #300); DECISION AND ENTRY OVERRULING, WITHOUT PREJUDICE, PLAINTIFFS' MOTION IN LIMINE (DOC. #302)**

---

    Two Motions in Limine, one filed by Defendants (Doc. #300) and one filed by Plaintiffs (Doc. #302), are pending in this litigation.  With each, the moving parties seek to prevent their opponents from introducing certain expert testimony.

    In particular, Defendants request that the Court prevent Plaintiffs' accounting expert, Donald Nicholson ("Nicholson"), from offering his opinion that the financial statements of The Danis Company ("TDC") substantially understated its liability or that of its subsidiary, Danis Industries Corporation ("Danis"), for the cleanup of the Valleycrest Landfill.  The Defendants argue that Nicholson lacks the expertise to render such opinions and that the Plaintiffs have violated Rule

26(a)(2)(B) of the Federal Rules of Civil Procedure, because Nicholson's report failed to disclose the basis of his opinions and the data and information he relied upon to reach them. Simply stated, until the Court has heard Nicholson's direct examination, which will include his opinions and the bases for same, as well as an explanation of the data and information upon which he relied to reach those opinions, it is not possible to determine whether the Defendants' request to exclude same is warranted.

With their Motion in Limine (Doc. #302), the Plaintiffs argue that the Court should exclude certain testimony from two of Defendants' designated expert witnesses, Gayle Koch ("Koch") and Kenneth Gartrell ("Gartrell").[1] In support of that request, the Plaintiffs rely upon <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579 (1993), and its progeny. In response, the Defendants argue that the matters relied upon by Plaintiffs constitute fodder for cross-examination, rather than rendering the testimony of Koch and Gartrell unreliable. Before hearing that testimony, this Court cannot ascertain whether it must be excluded in accordance with <u>Daubert</u>.

Accordingly, the Court overrules Defendants' Motion in Limine (Doc. #300) and Plaintiffs' Motion in Limine (Doc. #302), without prejudice to renewal in post-trial briefing. If such a motion is renewed and the Court agrees that the testimony in question should be excluded, it will strike that expert testimony and will not rely upon same in its findings of fact and conclusions of law. Of course, the parties remain free to argue in their post-trial submissions that the reasons they have set

---

[1] This motion is the refiling of the similar earlier by Plaintiffs to exclude the same expert testimony. <u>See</u> Doc. #222.

- 2 -

forth in their Motion in Limine, for precluding the expert testimony in question,

alternatively support the Court's finding that such testimony is not persuasive.


September 3, 2004

WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT


Copies to:

Counsel of record.

# EXHIBIT D

**Contract design for problem asset disposition**
Benveniste, Larry; Capozza, Dennis R; Kormendi, Roger; Wilhelm, William
*Journal of the American Real Estate and Urban Economics Association;* Spring 1994; 22, 1; ProQuest Direct Complete
pg. 149

*Journal of the American Real Estate and Urban Economics Association*
*1994, V22, 1: pp. 149-167*

## Contract Design for Problem Asset Disposition

Larry Benveniste,* Dennis R. Capozza,** Roger Kormendi**
and William Wilhelm*

*As a result of declining real estate values and the receivership of numerous financial institutions, government regulators like the Resolution Trust Corporation (RTC) and Federal Deposit Insurance Corporation (FDIC) have large inventories of distressed assets. This paper develops a model of the principal/agent issues associated with management and disposition of problem assets. In the model, optimal contracts balance risk sharing with incentives for effort. We argue that the RTC will minimize the ultimate cost of the thrift crisis by placing managerial control of distressed assets in the private sector, while retaining full or partial ownership of the assets for risk-sharing purposes. Recoveries are maximized, however, only when an asset manager is incented to expend a first-best level of effort by indexing asset management and disposition contracts to market movements.*

The Resolution Trust Corporation (RTC) has sold over $170 billion in assets, over half of the total seized from failed thrift institutions.[1] The bulk of these have been marketable assets like mortgage-backed securities and performing loans. Much of the remainder is illiquid distressed assets such as real estate and nonperforming loans. Distressed assets pose special problems for the RTC. These assets often require specialized asset management and disposition resources that are concentrated in the private sector. Because of the magnitude of the thrift crisis and the RTC's finite life,[2] the RTC has neither the incentive nor the budget to duplicate this

*Boston College, Chestnut Hill, Massachusetts 02167
**University of Michigan, Ann Arbor, Michigan 48063

---

[1] More precisely, as of September 1991, $179 billion had been sold of the $344 billion in assets it had acquired. (*Wall Street Journal*, 10/3/91).

[2] The finite life of the RTC creates an incentive problem for employees of an in-house effort to liquidate assets. Good performance means that the employee must eliminate his own job by liquidating the assets.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

150  *Benveniste, Capozza, Kormendi and Wilhelm*

expertise.[3] Thus, maximizing the net present value of distressed assets means transferring control of problem assets to the private sector.

One approach is to sell distressed assets outright to private asset managers. In this case, the bundling of assets and the design of auction mechanisms for efficient liquidation of such bundles should be the primary focus of the RTC's efforts. Given the extraordinary number of distressed assets in their inventory, efficiencies can undoubtedly be realized by bundling assets for sale.[4]

We argue, however, that selling assets outright may not maximize value. Distressed assets are concentrated in the southwest and western regions of the country and more recently in New England. These pools pose substantial idiosyncratic risks for the potential acquirers who have the local market expertise needed to manage the assets. This local market expertise gives acquirers an advantage when acquiring local assets, but at the same time, a local focus makes it difficult to efficiently diversify. As a result, acquirers purchase pools only at significant discounts. For example, the winning bidder for a pool of assets from two failed Texas thrifts recently paid an estimated 70% of fair market value.[5,6]

The problem is further aggravated when capital market financing is limited as suggested in the popular press (for example, *Business Week*, December 24, 1990). This liquidity constraint is particularly binding where the concentration of assets is great, as it is in regions like Texas. With large percentages of both lenders and normal purchasers in receivership,

---

[3] Kane (1990) argues that such constraints on the RTC's salvage activities reflect political and bureaucratic efforts to delay official recognition of the magnitude of the thrift crisis.

[4] See the recent work of Crockett (1990) and Vandell and Riddiough (1991) for discussion of the sale of distressed assets and the impact on markets.

[5] Maxxam, Inc. was the winning bidder for certain assets of the Alamo and Commonwealth savings and loans that were auctioned in 1992. Their bid was 70% of the value established under the marking instructions specified in the transaction.

[6] Curry, Blalock and Cole (1991) outline some of the issues that arise when trying to assess recovery percentages. They report average recoveries for the Federal Savings and Loan Insurance Corporation (FSLIC) on a sample of 236 assets of 64% of net transfer value which is the historic cost less amortization while the loan was current and less any writedowns prior to takeover by the FSLIC.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

financing, if available, is provided by nontraditional lenders who can demand large premiums for new activities.

The Federal Deposit Insurance Corporation (FDIC) and RTC, as agencies of the federal government, maintain a comparative advantage in bearing the idiosyncratic risks and providing liquidity. Thus, we argue that the FDIC and RTC will minimize the ultimate cost of the thrift crisis by placing managerial control of distressed assets in the private sector, while retaining full or partial ownership of the assets for risk-sharing purposes.[7]

In this paper, we develop a general framework for designing and evaluating asset management and disposition (AMD) contracts within a capital structure context.[8] Within this framework, we analyze a specific RTC contract, the standard asset management and disposition agreement (SAMDA) and highlight the potential sources of inefficiency. We then use the framework to design a contract that more efficiently aligns the interests of managers and the RTC. The model highlights the potential for large efficiency gains from the use of indexing of contracts to market movements.

Our analysis is in the spirit of the literature devoted to the resolution of principal-agent problems in the modern corporation (for example, Jensen and Meckling 1976). It is well understood that agency problems can be eliminated by simply requiring that managers retain the entire equity stake in the assets they manage. This solution leads to inefficient risk sharing. On the other hand, reducing the manager's equity stake to improve risk sharing weakens the incentive to expend effort and resources in the management of the assets, since the manager will no longer realize the full value of his efforts. Thus, an efficient AMD contract seeks the optimal tradeoff between risk sharing and incentives toward managerial effort.

Of course, the incentive for managers to expend a suboptimal level of effort can be mitigated through a variety of monitoring and bonding

---

[7] In practice, this advantage in bearing idiosyncratic risks and providing liquidity can be compromised by inadequate funding of the agencies. This could produce an efficient solution involving third-party financing. We assume that Congress, if confronted with a lower cost alternative, will provide adequate funding. Also, we note that the models of this paper specifically address the renegotiated contracts arising from the so-called "1988 deals." These renegotiated contracts are being held by the FDIC, which is less constrained by liquidity than the RTC.

[8] The framework we characterize was applied by the RTC in the restructuring of two large portfolios of assets. For a description of the implementation of this framework in the New West Federal Savings and Loan transaction see Karr (1993).

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

mechanisms (compare Smith and Warner 1979). In fact, there is extensive monitoring in current management agreements. The shear number and variety of assets that need management, however, makes monitoring particularly costly. Given the resource constraints faced by the RTC, we conjecture that on the margin it is advantageous to substitute improved contract incentives for monitoring and bonding mechanisms.

In the next section, we develop the general framework for the design and evaluation of asset management and disposition contracts. The fundamental goal is to balance optimally the incentive for a manager to expend effort created by an equity stake against the undiversifiable idiosyncratic risk imposed by equity. In the third section, we show that the widely used SAMDA contract may not achieve the first-best expenditure of managerial effort nor is it likely to achieve an optimal balance between risk sharing and managerial incentives. In the fourth section, we show that the first-best effort expenditure can be obtained by using an indexed debt contract to assign the idiosyncratic risk exposure to the federal government. A final section concludes and discusses how to adjust capital structure to avoid adverse selection when the asset manager has private information about an asset pool.

## The Model

### The Owner-Manager's Problem

The owner of a distressed asset faces two alternatives: dispose of the asset in its distressed state or devote effort to stabilizing[9] the asset prior to liquidation. We assume throughout that efforts to stabilize distressed assets represent positive net present value projects. Thus, under perfect market conditions, the owner's problem reduces to determining the optimal level of effort to devote to asset stabilization.

We formalize this intuition in a simple two-period model. At time zero, the owner can either liquidate the asset or expend effort, $e$, to stabilize the asset and then liquidate it at time one. The asset is assumed to generate no income prior to time one. If effort is expended, the value of the asset at time one will be composed of two elements. First is the random

---

[9] Stabilizing the asset usually means correcting deferred maintenance problems and leasing the building to market occupancy rates. Stabilization may take several years to complete.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Case 1:05-cv-10506-WGY    Document 98-4    Filed 05/31/2006    Page 24 of 44

value of the asset independent of any stabilization effort. We define $\bar{y}$ ($> -1$) to be the one-period random yield generated by the asset, $r_f$ to be the risk-free rate of interest, and assume that $E(\bar{y}) = r_f$. Therefore, the asset's risk is strictly idiosyncratic and can be efficiently diversified by the owner-manager.

The second element reflects the contribution of stabilization efforts to the asset's present value. This contribution is represented by the function $h(e)$. We assume that the technology represented by $h(\cdot)$ is certain and concave with $h(0) = 0$, $h'(e) > 0$, $h''(e) < 0$, and $h'(0) = \infty$. Thus, the random value of the stabilized asset at time one is

$$\tilde{P}_1(e) = (1 + \bar{y})P_0 + (1 + r_f)h(e), \tag{1}$$

where $P_0$ is the initial value of the portfolio and $P_1(e)$ is the value in time one.

The present value of the asset for a given level of effort is then

$$P_0(e) = E[\tilde{P}_1(e)](1 + r_f)^{-1} = P_0 + h(e). \tag{2}$$

The opportunity cost of expending effort at time zero to stabilize and dispose of the distressed asset, $c(e)$, is convex in effort with $c(0) = 0$, $c'(e) > 0$, $c''(e) > 0$, and $c'(0) = 0$. In the contracts we analyze, the direct property costs[10] of managing an asset pool are usually reimbursed and can present fewer monitoring problems. We ignore the direct costs in the model by assuming full reimbursement. Thus, the costs in $c(\cdot)$ are indirect costs like the opportunity cost of the manager's time and effort that cannot be easily reimbursed or monitored.

---

[10] For example, expenses like property maintenance, property management, legal expenses, brokerage and leasing commissions are normally reimbursed. In the deals to date, direct costs have been reimbursed from asset cash flow before distribution of cash flow occurs. This amounts to a sharing of costs consistent with the sharing of cash flows and therefore does not distort incentives. The reimbursed costs are those that are easily observed. Those that are not reimbursed are largely unobservable. While expense reimbursement is not without its own set of incentive and monitoring problems, they are of second order to the monitoring of indirect costs like the manager's time and effort. These are the primary source of moral hazard and thus the focus of our analysis.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

154 *Benveniste, Capozza, Kormendi and Wilhelm*

If the asset owner's objective is to maximize the net present value of the asset, the owner's objective function can be expressed as[11]

$$\max_{e \geq 0} : P_0(e) - c(e) = P_0 + h(e) - c(e). \tag{3}$$

The necessary and sufficient condition for maximization of equation (3) is the standard first-order condition calling for expenditure of effort, $\bar{e}$, such that the marginal benefit of effort is equal to its marginal cost, or

$$h'(\bar{e}) - c'(\bar{e}) = 0. \tag{4}$$

Thus, in this simple two-period model where the asset owner is able to diversify idiosyncratic risk, concentration of ownership and control of the asset produces the first-best expenditure of effort, $\bar{e}$. As our introductory discussion suggests, however, at least two factors preclude the RTC and private sector managers from fulfilling both the ownership and control functions. First, the specialized resources necessary for efficient management of distressed assets are concentrated in the private sector of the economy. Second, the federal government has a comparative advantage in the diversification of the idiosyncratic risks associated with distressed assets.

*Separation of Ownership from Control*

We capture this intuition in the model by assuming that the owner of the asset can efficiently diversify idiosyncratic risk but does not have the technology to manage the asset efficiently. However, the owner can contract with a risk averse manager with access to the technology $h(\bullet)$. To capture the manager's inability to diversify idiosyncratic risk,[12] we assume the manager has a quadratic utility function[13] over the uncertain distribution of time-one wealth, $(\tilde{w}_m)$, of the form

$$U(w_m) = (1 + r_f)^{-1}[E(w_m) - a\sigma_w^2], \tag{5}$$

---

[11] Although the cost of the thrift crisis will be minimized by maximizing the net present value of failed thrift assets, political considerations may require that speed of resolution take precedence when the two are in conflict.

[12] For the model of this paper to apply, we need only that the acquirers (managers) are less diversified than the RTC. Given the size and diversity of the RTC portfolio, this condition is easily met for most potential acquirers.

[13] Any concave utility is sufficient to illustrate our results.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

where $\sigma_w^2$ is the variance of $w_m$. Thus, the manager's utility is the certainty equivalent value of future wealth discounted to the present at the risk-free rate of interest.

Both the owner and the manager observe the initial unstabilized value of the asset, $P_0$, the distribution of the asset's random yield, $\bar{y}$, and the manager's production technology, $h(\bullet)$. Because only the manager can observe his effort, $e$, only the manager can disentangle the realization of $\bar{y}$ from the final period-one value of $P_1$. Further, the manager's production technology, although observed by the owner, cannot be credibly conveyed to the capital markets so that securitization is costly.[14] This rules out securitization in these situations. Finally, the opportunity cost of the manager's effort, $c(e)$, is known only to the manager, and the manager bears the entire cost of his efforts.

The owner optimally designs a contract so that the manager's incentives are compatible with the owner's objective to maximize the present value of the asset. If the owner could observe the realization of the manager's effort, the interests of the owner and manager could be aligned by a contract allocating to the manager his entire contribution to the asset's value, $h(e)$, and the (risky) residual to the owner. Since the owner cannot observe the effect of the manager's effort, however, the manager will have an incentive to expend less than the optimal effort and understate the realization of $\bar{y}$.

The owner can also write a contract conditioned on total proceeds from sale of the asset. For example, consider a contract with both a fixed payment independent of the realization of $\bar{y}$ and a variable payment conditioned on total proceeds which are a function of $\bar{y}$. The contract commits the manager to making a fixed payment $D_1$ to the owner upon liquidation of the asset at time one and entitles the manager to some fraction, $\alpha$, of the residual cashflow generated by the asset. The owner determines both $D_1$ and the manager's fractional residual claim, $\alpha$. The manager, in turn, takes these elements of the contract as given and expends effort $e$ to maximize his utility of wealth. The management contract can be characterized (loosely) as a partnership between the owner and manager with recourse

---

[14] While securitization is always possible, the relative costs of contracting with the government are lower. The government would also be a desirable intermediary in any effort to securitize distressed assets. In this case, the government would act as an agent for the ultimate owners of the assets by supervising the management contract. If the government attached a guarantee to any securitization, it would retain an equity stake through the guarantee.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

debt, $D_0 = D_1(1 + r_f)^{-1}$, and equity shares $\alpha$ and $(1 - \alpha)$ split between the manager and owner, respectively.[15] The optimal contract design selects a capital structure which balances risk-sharing considerations against managerial incentives toward expenditure of effort.[16]

*The Manager's Optimization*

We express the manager's random payoff from the contract at time one as

$$\alpha[\bar{P}_1(e) - D_1] = \alpha[(1 + \bar{y})P_0 + (1 + r_f)h(e) - D_1]. \tag{6}$$

Using equations (5) and (6), the manager's objective function, if he chooses not to liquidate the asset immediately, can be expressed as

$$\max_{e \geq 0} : \alpha[P_0 + h(e) - D_1(1 + r_f)^{-1}] - c(e) - a\alpha^2\sigma_y^2 P_0^2. \tag{7}$$

The first-order condition for maximization of equation (7) is thus,

$$\alpha h'(\underline{e}) - c'(\underline{e}) = 0, \tag{8}$$

where $\underline{e}$ is the manager's optimal expenditure of effort.

Equations (7) and (8) highlight the two key dimensions of the problem of aligning the interests of the owner and the manager. From equation (8), it is clear that the manager's effort is a function of $\alpha$ which we rep-

---

[15] We note in passing that $D_1$ could be made contingent on market-wide information ("indexed"). We discuss this possibility in the next section. With an indexed contract, the manager's residual cash flow is never negative so that bonding arrangements are unnecessary. Notice also that this contract structure separates the expertise in stabilizing from capital since $D$ can be set so that the owner (RTC) provides almost all the capital. If the owner has an enforceable claim on the manager in states where the value of the portfolio falls below $D$, there will be no distortions in incentives. On the other hand, if the owner does not have recourse to the manager in these states, the contract will have the usual incentive problems of risky debt. In this case, a slightly more complicated model is needed, and optimization occurs over both $\alpha$ and $D$. In the extension of the next section, $D$ is indexed to market movements. In this contract, the owner bears the entire residual risk, and the incentive problems with risky debt disappear.

[16] We have referred to the model as a two-period model, but strictly speaking, it is a two-date one-time interval model. The one-time interval precludes the modeling of a reputation return. However, since the RTC is a limited life agency without the ability to play a multi-period game with reputational returns, there is no compelling reason to include a reputation game.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

resent as $e(\alpha)$. Given the assumptions on $h(\bullet)$ and $c(\bullet)$, it can be shown that $e$ is an increasing function of $\alpha$. Thus the first-best expenditure of effort, $\bar{e}$, is achieved only when the management contract allocates the entire residual cashflow to the manager ($\alpha = 1$).

For the manager to hold the asset into period 1, the value of the expected payoff to holding, $\alpha[P_0 + h(e) - D_0] - c(e) - a\alpha^2\sigma_y^2 P_0^2$, must exceed the payoff from immediate liquidation, $\alpha[P_0 - D_0]$. This implies that $\alpha h(e) - c(e) - a\alpha^2\sigma_y^2 P_0^2$ must be positive. Even if the manager is granted the entire residual cashflow, a very risk-averse manager may not expend the first-best level of effort. Rather, if this risk term, $a\alpha^2\sigma^2 P^2$, is large relative to the present value of the manager's expected proceeds from stabilizing the asset, $\alpha h(e) - c(e)$, the manager will simply liquidate the asset immediately. Assuming the manager's production technology is unique, he will then realize $P_0$ immediately. If the manager is granted only a fraction of the residual cashflow so that the manager's optimal effort, $e$, is less than the first-best effort, $\bar{e}$, the incentive to liquidate the asset immediately is heightened.

Note also that the fixed payment, $D$, in the contract has no influence on the level of effort expended nor does it influence the risk term in the manager's objective function. This implies that the owner of the asset influences the manager's optimal expenditure of effort only through the management contract's allocation of residual cash flows to the manager. Thus the owner optimizes the present value of its claim on the cashflows from the asset by setting $\alpha$ alone. This arises because the manager cannot affect the risk of the asset.

On the other hand, the fixed payment, $D$, does influence the value of the contract to the manager and the amount he will be willing to pay for the contract. In a liquidity constrained market where potential bidders on real estate are poorly capitalized and institutions hesitate to lend, it will be desirable to set the fixed payment close to $P_0$ so that the contract can be bought with little capital. We pursue this issue in the next section.

### The Owner's Optimization

The present value of the owner's stake is composed of three elements in the present example. First, the owner receives at the outset of the contract a cashflow reflecting the value of the contract to the manager. We assume the owner conducts an auction among competitive managers which in-

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

*158  Benveniste, Capozza, Kormendi and Wilhelm*

duces the managers to bid their reservation price for the contract.[17] Thus the manager is willing to pay the owner of the asset

$$\alpha\{P_0 + h[e(\alpha)] - D(1 + r_f)^{-1}\} - c[e(\alpha)] - a\alpha^2 P_0^2 \sigma_y^2 \qquad (9)$$

to enter into the contract. The owner also receives $D_1$ and a share of the asset's residual cashflow at time one. The present value of $D_1$ is just $D_1 (1 + r_f)^{-1}$, and the present value of the owner's share of the asset's residual cashflow is

$$(1 - \alpha)\{P_0 + h[e(\alpha)] - D_1(1 + r_f)^{-1}\}. \qquad (10)$$

Combining these three elements, we express the owner's objective function as

$$\max_{\alpha \geq 0} : P_0 + h[e(\alpha)] - c[e(\alpha)] - a\alpha^2 P_0^2 \sigma_y^2, \qquad (11)$$

where $e(\alpha)$ is the solution to the agent's problem.

Equation (11) can be interpreted as the initial value, $(P_0)$, plus the value the manager is willing to pay for the contract, $(h(e) - c(e) - a\alpha^2\sigma_{yP}^2 0$. Equation (11) shows that the owner can improve the incentives toward effort faced by the manager by increasing $\alpha$ but only at the cost of a demand for a higher risk premium. Figure 1 illustrates that while agency costs are falling as $\alpha$ increases, risk-sharing costs are rising. As a result, an interior maximum is reached at $\alpha^*$ where total costs are minimized and total expected revenue is maximized.

The owner's first-order condition is

$$h'[e(\alpha^*)] \, e'(\alpha^*) - c'[e(\alpha^*)] \, e'(\alpha^*) - 2a\alpha^* P_0^2 \sigma_y^2 = 0. \qquad (12)$$

---

[17] Kormendi, Bernard, Pirrong and Snyder (1989) discuss this issue in the context of the 1988 FSLIC-assisted acquisitions. Recent asset pool offerings by the RTC's National Sales Center call for potential acquirers to bid both a price and a cash down payment with the remainder to be financed by the RTC. Following Samuelson's (1986) analysis of the tradeoff between risk sharing and efficient contractor selection in contingent contracts, the capital structure component of the bid would appear to offer the potential for more accurately identifying efficient asset managers. Of course if the market for management services is not competitive, some excess returns may accrue to managers and bids may be below the manager's reservation price.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

*Contract Design for Problem Asset Disposition* 159

**Figure 1** ■ Net Proceeds to the Owner.



The figure shows the net proceeds to the owner or the share allocated to the manager, $\alpha$, varies. The owner's optimization balances agency and risk-sharing costs at $\alpha^*$.

The owner solves equation (12) by setting the manager's equity share to $\alpha^*$. When solving this problem, the best outcome for the owner occurs when the manager is risk neutral, that is, $a = 0$. In this case, $\alpha^* = 1$ and the first-best level of effort is achieved. From (11) it can be seen that as managerial risk aversion increases, the value of the asset to the owner decreases. This effect is only partially offset by allocating a smaller equity share to the manager. Finally, it can be shown that $\alpha$, and therefore $e$, is a decreasing function of $a$. Thus, it is always true that $\alpha \leq 1$.

**Indexing**

It is possible to use a cost of carry as a risk-sharing device to improve managerial incentives. Suppose there exists an observable random variable that is correlated with $\bar{y}$. The ability to contract on the observable

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

random variable creates an opportunity for the owner to absorb some or all of the risk by indexing $D_1$ to the observable random variable. In other words, design the contract such that the manager's payoff is

$$\alpha[\bar{P}_1(e) - D(1 + \bar{I})] = \alpha[(1 + \bar{y})P_0 + (1 + r_f)h(e) - (1 + \bar{I})D], \quad (13)$$

where $\bar{I}$ is observable and correlated with $\bar{y}$. If $\bar{I}$ is perfectly correlated with $\bar{y}$, it is possible to set $D$ such that the manager's problem becomes

$$\max_{e \geq 0} : h(e) - c(e). \quad (14)$$

In other words, indexed debt permits the assignment of the entire risky component of the asset's payoff to the owner. Thus the owner optimally assigns the entire value of the manager's production technology to the manager so that the manager is induced to achieve the optimal effort expenditure $\bar{e}$. Assuming that the auction for the contract induces the bidding of reservation prices by potential managers, each manager will bid the surplus generated by his optimal expenditure of effort, $h(\bar{e}) - c(\bar{e})$. The present value to the owner of putting the asset out for management is then

$$P_0 + h(\bar{e}) - c(\bar{e}), \quad (15)$$

so that the owner realizes the maximized net present value of the asset.

Of course, if $\bar{I}$ and $\bar{y}$ are not perfectly correlated, the manager's effort will be observed with error. Given the wide range of distressed assets under the control of the RTC, it is unlikely that there exists an observable index which is perfectly correlated with $\bar{y}$. Thus the benefits of using a noisy, albeit informative, index must be weighed against the additional risk introduced by the index. Harris and Raviv (1978) suggest that contracting on noisy information will be acceptable to risk-averse parties only under a limited set of circumstances. Holmstrom (1979) and Shavell (1979) show, however, that use of such information generally leads to Pareto improvement of the terms of the contract. The RTC is currently evaluating the potential for using existing real estate indexes (such as the Russell and National Real Estate Investment (NREI) indexes) in the design of contracts similar to an indexed version of the benchmark contract.[18]

---

[18] There are other implementation issues with indexing. While indexed contracts are common in some settings, they are not widely used in the real estate industry. Potential managers are unfamiliar both with the concept and the proposed indices. As a result, there is considerable hesitancy to contract contingently. If indexed contracts become more common, this inertia should disappear.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

## Analysis of Existing RTC Contracts

In this section, we use the results established in the previous section as benchmarks to evaluate the performance of existing and proposed contracts.

### The SAMDA Contract

The SAMDA is one of the RTC's most widely used management contracts. The SAMDA has been applied mainly to relatively small pools, but recently it was used for an asset pool with an estimated value of $1 billion.

The SAMDA contract managers can earn both management fees and disposition fees. The asset pool underlying the contract is assigned an "estimated realized value" (ERV) designed to serve as a substitute for marking the assets to market. The contract is then bid competitively for the two elements of the fee structure. The (annual) management fee is bid as a percentage of the remaining balance (ERV) of the pool. The disposition fee is a percentage of net proceeds from asset sales and operations. Proceeds are net of direct management expenses and an assessment reflecting the owner's (RTC's) cost of financing the asset pool. Indirect management expenses are borne by the manager. The management fee is not conditioned on the performance of the assets, and therefore, has no impact on the manager's incentives toward effort other than it reduces the manager's incentive to liquidate the asset pool. Thus, we focus mainly on the disposition fee structure of the contract.

### Early Liquidation

The SAMDA contract defines the manager's disposition fee as a continuous function of net proceeds from sale. In our framework, net proceeds from sale at time one is defined by

$$S - kM_0 = \bar{P}_1(e) - kM_0 = [(1 + \bar{y})P_0 + (1 + r_f)h(e)] - kM_0, \tag{16}$$

where $S$ is sales, $M_0$ is the asset pool's time-zero ERV and $k$ is the cost of capital per dollar of ERV. The cost of capital is usually a fixed spread above Treasury rates. It was introduced to offset the manager's incentive to hold the assets for capital appreciation while expending little or no effort on their management and disposition.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

In practice, the manager's disposition fee in the SAMDA contract is a continuous function of proceeds from sales in equation (16). However, a simple discrete version of SAMDA highlights the managerial incentive problem created by the contract. We simplify the SAMDA contract by assuming a dollar threshold, $t$, for net proceeds from sales, $S - kM_0$. For $S - kM_0 \le t$, the manager's share of net proceeds from sales is $\alpha_1$. For $S - kM_0 > t$, the manager's share of net proceeds in excess of $t$ is $\alpha_2$ where $\alpha_2 \ge \alpha_1$. Therefore, the manager's random payoff at time one is

$$\alpha_1 t + \alpha_2(S - kM_0 - t) = \alpha_1 t + \alpha_2[(1 + \bar{y})P_0 + (1 + r_f)h(\mathrm{e}) - t]$$
$$- \alpha_2 kM_0 \quad \text{for } S - kM > t. \tag{17}$$

Recall that the manager's payoff at time one from the benchmark contract analyzed in equation (6) of the first section was

$$\alpha[\tilde{P}_1(e) - D_1] = \alpha[(1 + \bar{y})P_0 + (1 + r_f)h(e) - D_1]. \tag{6}$$

For comparison purposes, set $\alpha_1 = 0$, $D_1 = t$ and subtract equation (6) from equation (17). The resulting difference between the two payoffs is the cost of capital assessment, $\alpha_2 kM_0$, imposed by SAMDA. If the manager holds assets until time one, the cost of capital assessment has no effect on the manager's marginal conditions. Therefore, the SAMDA contract can produce incentives toward effort identical to those produced by the benchmark contract. However, since the cost of capital assessment is zero if the assets are liquidated immediately (at time zero), there is an incentive to sell assets early ("dump" assets) under the SAMDA contract. Further, even if the manager is risk-neutral and given the entire residual cashflow ($\alpha_2 = 1$), the incentive toward early liquidation persists under the SAMDA contract. This contrasts with the benchmark contract where risk-neutrality eliminates the incentive to dump assets and ownership of the entire residual cashflow produces the first-best expenditure of effort.

*An Illustrative Example*

The incentive to liquidate assets early at the lowest possible resource and opportunity costs translates directly into the loss of positive net present value projects. For example, consider an asset for which $P_0 = \$1$ million and given an expenditure of effort of $e$ would generate $E[P_0(1 + \bar{y}) + h(e)] = \$1.05$ million at time one.[19] Assume that $k = 10\%$, $\alpha_1 = 0$,

---

[19] This example is based on an example in Mid America Institute for Public Policy Research, Smith Breeden Associates, Inc., and Cooter and Gell (February 4, 1991).

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

$\alpha_2 = 5\%$, $M_0 = P_0$ and that a risk-neutral manager applies a discount rate of 10% to the time-one cashflows. Thus the manager's efforts to stabilize the asset represent a project with a net present value of $45.5 thousand (=$50,000/1.1) (ignoring opportunity costs and other indirect costs). Note, however, that if the manager simply sells the asset in its distressed state, he will realize a fee of $50 thousand (=1 million x 5%) On the other hand, if the manager were to expend effort to stabilize the asset, upon disposition of the asset he would earn a fee of $52.5 thousand (=11.05 million × 5%). Since the present value of this fee is only $47.7 thousand (=$52,500/1.1), the manager will reject the positive net present value project in favor of selling the asset at its distressed value.

In the present example, the manager's decision could be reversed by simply eliminating the cost of capital charged against net proceeds. Thus SAMDA may not provide incentives for optimal managerial effort since some assets may be sold too early. The management fee in the SAMDA contract, however, could be used to offset this incentive to dump. If the management fee is set equal to $\alpha_2 k M_0$, the incentive to sell early can be eliminated. In the illustrative example above, this is a management fee of .5%. In practice, the management fee is bid and can deviate widely from the offsetting value. On balance, SAMDA managers may have either an incentive to dump or hold depending on the relative sizes of the management fee and cost of carry.

In the actual SAMDA contract, the manager's disposition fee is a continuous function of net proceeds from sales and is defined by

$$\int_0^N \alpha(q/M_0) \, dq = \alpha N^2/M_0, \tag{18}$$

where $N$ is the net proceeds from the sale ($= S - kM_0$). Since $\alpha(q/M_0)$ is the manager's share of the $q$th dollar of net proceeds, the cost of capital assessment imposed by the SAMDA contract effectively reduces the manager's ownership stake over time, and thus, creates the incentive for the manager to liquidate assets despite the opportunity to enhance their net present value through continued management of the asset. Note, however, that the inclusion of the cost of capital assessment is not inherently inconsistent with the interests of efficient managerial incentives. The benchmark contract also imposed an implicit cost of carry in the form of the fixed (debt) payment, $D_1$. Introduced in this manner, however, the cost of capital assessment does not influence the manager's incentives toward effort. Thus it is the manner in which the cost of capital assess-

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

ment is introduced that influences managerial incentives, not the assess-
ment itself.[20]

## Conclusion

In this paper, we have developed a framework for the design and eval-
uation of asset management and disposition contracts. Since market im-
perfections limit the potential for outright sale of failed thrift assets by
the RTC, efficient design of AMD contracts is particularly important. The
RTC's portfolio will be maximized only through significant expenditure
of effort and resources to stabilize and dispose of the assets. The goal of
the contracts is to optimally trade off managerial incentives toward effort
with the manager's share of the undiversifiable risk. We have demon-
strated that the widely used SAMDA contract can not achieve the first-
best expenditure of managerial effort nor is it likely to achieve an optimal
balance between risk sharing and managerial incentives. We show that
an indexed contract can achieve the first-best effort expenditure by per-
mitting the assignment of the entire idiosyncratic risk exposure to the
federal government.

There remain important elements of the principal-agent relationship be-
tween the RTC and asset managers that we have not examined. For ex-
ample, given the size and diversity of their portfolio, it is unlikely that
the RTC could condition its liquidation decisions on all information rel-
evant to the valuation of the portfolio. If the RTC portfolio is liquidated
on an asset-by-asset basis or through pooling of relatively homogeneous
assets, opportunities arise for acquirers with private information about
idiosyncratic risks, such as regional economic forces, to self-select into
the bidding process.[21] The RTC must be particularly sensitive to the risk

---

[20] It can be argued that the market imperfections hindering sale may be elimi-
nated if the RTC were to create a larger market by being more willing to take
writedowns. The advantage of a properly designed contract is that it minimizes
the need for writedowns.

[21] The adverse selection problem arising in this context is widely recognized to
act as a wedge between buyers and sellers. Akerlof (1970) provides the seminal
treatment of this problem. Rock (1986) and Glosten and Milgrom (1985) analyze
the consequences of adverse selection for primary and secondary equity markets,
respectively. Amihud and Mendelson (1986) provide evidence that the required
rate of return on stocks is positively related to the bid-ask spread. Glosten and
Harris (1988), in turn, present evidence consistent with an adverse selection com-
ponent in the bid-ask spread.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

of being exploited by privately informed acquirers of assets in the wake of the widely criticized 1988 FSLIC-assisted acquisitions.[22,23]

Although we have not developed this element of the problem formally, it is clear within the capital structure framework developed here that AMD contract design can be used to offset the risk of adverse selection. Specifically, if $\bar{I}$ and $\bar{y}$ are less than perfectly correlated and the manager has private information about $\bar{y}$, the manager effectively gains a larger share of the equity in the asset pool than is warranted by the price they will pay for the contract. One potential solution to this problem is to attach a short position in a call option with a strike price at some level above the original mark-to-market value of the pool to the existing capital structure implied by the general contract discussed in the second and third sections. The call option then reduces the manager's equity share by capping unforeseen gains in the value of the asset that arise from economic forces beyond the stabilization and disposition activities of the manager.[24]

*The financial support of KCBG Financial Sciences and the Garn Institute of Finance, and the helpful comments of Eli Berkovitch, Ronen Israel, Naveen Khanna, Greg Niehaus and participants in workshops at the University of Michigan, the University of Texas and the University of South Carolina as well as the reviewers and Kerry Vandell are gratefully acknowledged. The usual disclaimer applies.*

---

[22] The so-called 1988 deals have been widely criticized as government giveaways as a result of, among other things, Federal Home Loan Bank Board and FSLIC efforts to complete as many assisted transactions as possible prior to December 31, 1988, at which point the tax benefits associated with certain forms of assistance were to be reduced by 50%. See Kormendi, Bernard, Pirrong and Snyder (1989) for a discussion of the 1988 FSLIC-assisted transactions.

[23] Benveniste and Spindt (1990), Benveniste and Wilhelm (1990) and Benveniste, Marcus and Wilhelm (1991) suggest one avenue for mitigating the consequences of adverse selection. In these papers, an intermediary uses its leverage over privately informed agents to induce the revelation of private information. The intermediary's leverage derives from the maintenance of long-term business relationships with informed agents and the consequent ability to sanction those identified as having exploited private information. Unfortunately, the months or years of investment and managerial effort necessary to stabilize many of RTC's distressed assets suggests that an acquirer will be identified as having exploited private information only after a relatively long period of time, during which it would be possible to further exploit their private information by participating in the bidding for additional asset pools. The RTC's power to sanction privately informed acquirers is further limited by the finite life of the agency established by the Financial Institutions Reform, Recovery and Enforcement Act.

[24] See Mid America Institute for Public Policy Research, Smith Breeden Associates, Inc., and Cooter and Gell (June 26, 1991) for an example of a contract that implicitly makes use of this insight.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

166  *Benveniste, Capozza, Kormendi and Wilhelm*

## References

Akerlof, G.A. 1970. The Market for Lemons. *Quarterly Journal of Economics* 84: 488–500.

Amihud, Y. and H. Mendelson. 1986. Asset Pricing and the Bid-Ask Spread. *Journal of Financial Economics* 17: 223–250.

Benveniste, L.M., A.J. Marcus and W.J. Wilhelm. 1992. What's Special about the Specialist? *Journal of Financial Economics*, 32: 61–86.

Benveniste, L.M. and P.A. Spindt. 1990. How Investment Bankers Determine the Offer Price and Allocation of New Issues. *Journal of Financial Economics* 24: 343–62.

Benveniste, L.M. and W.J. Wilhelm. 1990. A Comparative Analysis of IPO Proceeds under Alternative Regulatory Environments. *Journal of Financial Economics* 28: 173–207.

Crockett, J.H. 1990. Workouts, Deep Pockets, and Fire Sales: An Analysis of Distressed Real Estate. *Journal of the American Real Estate and Urban Economics Association,* 18: 76–90.

Curry, T., J. Blalock and R. Cole. 1991. Recoveries on Distressed Real Estate and the Relative Efficiency of Public vs. Private Management. *Journal of the American Real Estate and Urban Economics Association* 19: 495–515.

Glosten, L.R. and L.E. Harris. 1988. Estimating the Components of the Bid/ Ask Spread. *Journal of Financial Economics* 21: 123–42.

Glosten, L.R. and P.R. Milgrom. 1985. Bid, Ask, and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders. *Journal of Financial Economics* 14: 71–100.

Harris, M. and A. Raviv. 1978. Some Results on Incentive Contracts with Application to Education and Employment, Health Insurance, and Law Enforcement. *American Economic Review* 68: 20–30.

Holmstrom, B. 1979. Moral Hazard and Observability. *Bell Journal of Economics* 10: 74–91.

Jensen, M.C. and W.H. Meckling. 1976. Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure. *Journal of Financial Economics* 3: 305–60.

Kane, E.J. 1990. Principal-Agent Problems in S&L Salvage. *Journal of Finance* 45: 755–64.

Karr, A.R. 1993. Keystone Joins FDIC in Selling Thrift's Assets. *Wall Street Journal,* (July 6): A4.

Kormendi, R.C., V.L. Bernard, S.C. Pirrong and E.A. Snyder. 1989. Crisis Resolution in the Thrift Industry: Beyond the December Deals, *Report of the Mid America Institute Task Force on the Thrift Crisis.*

Mid America Institute for Public Policy Research, Smith Breeden Associates, Inc., and Cooter and Gell. 1991. Restructuring the 1988 FSLIC-assisted transactions: Asset management, incentives, and model terms. (February 4).

Mid America Institute for Public Policy Research, Smith Breeden Associates, Inc., and Cooter and Gell. 1991. Incentive contracts for asset management and disposition: Recommendations for restructuring the 1988 FSLIC-assisted transactions. (June 26).

Rock, K. 1986. Why New Issues are Underpriced. *Journal of Financial Economics* 15: 187–212.

Samuelson, W. 1986. Bidding for Contracts. *Management Science* 32: 1533–50.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Shavell, S. 1979. Risk Sharing and Incentives in the Principal and Agent Relationship. *Bell Journal of Economics* 10: 55–73.

Smith, C.W. and J.B. Warner. 1979. On Financial Contracting: An Analysis of Bond Covenants. *Journal of Financial Economics* 7: 117–61.

Vandell, K.D. and T.J. Riddiough. 1991. The Impact of RTC Dispositions on Local Housing and Real Estate Markets. *Housing Policy Debate* 2: 49–92.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

# EXHIBIT E

*Journal of Property Management;* May/Jun 1998; 63, 3; ProQuest Direct Complete
pg. 64



ASSET MANAGEMENT

## Benchmarking Real Estate Investment Performance

# The Application of Real Estate Indices

*Ed. Note: This article is the second in a JPM series on benchmarking practices in real estate management. It is based on a presentation by Mr. Maxwell at the 1997 Institute of Real Estate Management Asset Management Symposium.*

**by Kevin J. Maxwell and Paul S. Saint-Pierre**

Nearly all of the real estate newsletters and conferences that were targeted to pension funds in 1997 had benchmarking and performance measurement as major topics. Why was this topic so popular? The relatively poor performance experienced by pension funds with their real estate investments in the late '80s and throughout the '90s is a big factor. Another contributing factor is the perception that real estate performance measurement and benchmarking practices significantly lag behind benchmarking techniques for other asset classes, such as stocks and bonds.

When you can pick up the daily financial newspapers and find at least eleven stock indices, four bond indices, and four mutual fund indices reflecting the previous day's market close, real estate does appear to be lagging behind. The most widely used index to benchmark real estate, the National Council of Real Estate Investment Fiduciaries (NCREIF) Property Index, tracks quarterly total return performance and is published at least 90 days after the close of the previous quarter.

While this disparity may cause you to shake your head, comparing real estate to stock benchmarks like the S&P 500 is like comparing apples to oranges. Stocks are publicly-traded investments, while most real estate is still

owned and traded privately (Figure 1). However, when you compare real estate benchmarking efforts to other private asset classes (e.g. private equity, venture capital, and hedge funds), then the relative efforts are commendable.

### Benchmarking Options

To understand the value and the limitations of real estate benchmark practices, it is useful to review the more widely-used real estate benchmarks and how they are employed by pension funds and other real estate investors to evaluate real estate performance. It only includes private real estate performance and excludes publicly-traded real estate investments, such as REIT stocks. There are four principal methods for measuring the performance of private asset classes—indices, statistical universe/peer group comparisons, normal portfolio/portfolio opportunity distributions, and risk-adjusted performance measures.

### Indices

Any discussion of institutional real estate benchmarks necessarily begins with the NCREIF indices. Today, NCREIF maintains several indices, including composite total return and property type/geographic sub-indices.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Key features of the NCREIF Property Index include:

- Index series dates back to 1978.
- The index tracks the property-level performance of over 2,500 properties valued at over $60 billion.
- Calculations are based on quarterly returns of individual properties before deduction of management fees.
- Each property's return is weighted by its market value
- All properties have been acquired on behalf of tax-exempt institutions and held in a fiduciary environment.
- All properties are existing, investment-grade commercial properties.
- Each property's market value is determined by real estate appraisal methodology, consistently applied.

The NCREIF Property Index accounts for approximately 25 percent of the investment-grade real estate owned directly by pension funds and other institutional investors. In contrast, the S&P 500 accounts for 70 percent of the stock market capitalization.

The NCREIF Property Index is a property-level index, which makes it a good benchmark for individual property performance, but not for evaluating fund manager performance. Nevertheless, many pension plans compare their real estate managers' performance to either the entire NCREIF Property Index or one or more its sub-indices. For example, if a real estate advisor manages a private investment fund of regional malls in the East, a pension fund may be inclined to compare the overall fund performance to the NCREIF property sub-index of regional malls in the East.

Understandably, the NCREIF Performance Index is widely used because it provides much more information then is available from any other real estate index. For example, the third-quarter 1997 NCREIF "Metropolitan Statistical Area Detailed Quarterly Performance Report" tracked the performance of 22 office buildings in the Houston MSA alone, a level of detail unavailable from other indices.

To properly select and apply an index for performance benchmarking purposes, the analyst must understand the index design and computation methodology. One important design feature is whether the index member returns are weighed on a market value or equal unit weight basis. The popular Dow Jones Industrial Average is calculated on an equal value basis. The NCREIF Property Index is a



**FIGURE 1: INSTITUTIONAL REAL ESTATE EQUITY**

As of 6/30/96 (in Billions)

- $26.9 Foreign Investors 10.6%
- $2.1 Savings Associations 0.8%
- $54.6 Life Insurance Companies 21.5%
- $4.3 Commercial Banks 1.7%
- $56.1 REIT's 22.0%
- $110.4 Pension Funds 43.4%

Total - $254 Billion

Source: The Equitable Real Estate

**FIGURE 2: STATISTICAL UNIVERSE/ PEER GROUP COMPARISONS**

Examples

- IPC Portfolio Index
- Evaluation Associates Index
- Callan Real Estate Composite Index
- Russell Performance Index
- Wilshire Real Estate Fund Index

**FIGURE 3: UNIVERSAL PERFORMANCE**

Gross Return Before Fees    Return Percentages

| | '93 | '94 | '95 | '96 |
|---|---|---|---|---|
| High | 15.0 | 17.2 | 16.5 | 14.1 |
| First Quartile | 13.3 | 13.6 | 15.2 | 12.0 |
| Median | 9.0 | 11.9 | 12.9 | 8.1 |
| Third Quartile | 6.0 | 9.0 | 5.6 | 5.0 |
| Low | 3.0 | 3.7 | 4.5 | 2.6 |
| Your Performance | 4.8 | 10.1 | 13.0 | 5.9 |

★ Your Fund's Performance

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

## FIGURE 4: RISK ADJUSTED PERFORMANCE MEASURES

**Example**

**Sharpe Ratio = Return (i) — Return (TBill)**

**Volatility (i)**

(i) = Investment
(TBill) = Risk Free Treasury Bill

## FIGURE 5: PENSION FUND PERFORMANCE MEASUREMENT

| | | |
|---|---|---|
| | Gross Fund Return | 10.7% |
| Less: | Risk Free Return | 8.4% |
| Equals | Gross Risk Premium Earned | 2.3% |
| | Asset Mix: Active vs. Passive Decision Management | |
| Less: | Operating Costs | 0.3% |
| Equals | Net Risk Premium Earned | 2.0% |
| Less: | Cost of Risk Capital | 1.6% |
| Equals | Risk Adjusted Net Value Added | 0.4% |

Source: Cost Effective Management

market value-weighted index similar to the S&P 500 Index; this means that the return on a $100 million property will carry more weight in the index compared to the returns generated by a $10 million property. It would not be appropriate to use an equally-weighted index for real estate benchmarking purposes since it is unrealistic to acquire and own real estate assets in equally sized units.

Another factor to consider in benchmarking is to ensure that both the portfolio returns and index returns are computed on a time-weighted basis. Time-weighted returns, as contrasted with dollar-weighted returns (also referred to as Internal Rate of Return), ignore the return impacts due to the timing of cash flows. Manager performance standards promulgated by the Association of Investment Management Research require that stock, bond, and real estate investment managers use time-weighted returns for reporting investment performance. It may not be unusual for some real estate managers to report their performance on the basis of cash flows, which would not be comparable to any index in which the underlying methodology resulted in time-weighted returns. The computation of Internal Rate of Return based on cash flow is equivalent to the computation of dollar-weighted returns.

## Peer Benchmarks

A second technique for evaluating investment managers' performance is peer evaluations, that is, comparing the manager's performance results with a group of similar real estate managers. This is referred to as a statistical universe, or peer group, comparison. Figure 2 provides a listing of real estate manager and/or fund performance indices that may be employed in this technique. These manager/fund indices are usually published by investment consulting firms. The consultants compile the manager/fund performance data, produce time-weighted indicies, and also have the capability to calculate quartile performance results. For example, a specific fund featuring a regional mall investment strategy may be charted relative to the quartile performance for 25 funds that featured a similar strategy over the same period.

Figure 3 is a hypothetical report that displays the annual performance for all funds that are grouped into a statistical universe report. The table in Figure 3 discloses the highest return, the first-quartile breakpoint, the median, the third-quartile breakpoint, and the lowest return as compared to the subject fund labeled "Your Performance." In 1996, the peer group returns ranged from a low of 2.6 percent to a high of 14.1 percent, with a median of 8.1 percent. In comparison, the subject fund's performance of 5.9 percent placed it in the third quartile of relative performance.

To maximize the benefits from peer group analysis, investors employing this method need to be fully informed about the universe design methodology and peer group selection criteria and limitations of this approach. Otherwise eligible funds may be excluded for various reasons by the universe creators and

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

publishers (e.g. ambiguous strategy classifications, incomplete information, and shareholder classifications). Additionally, some fund manager may not fully cooperate with the regular reporting process. Again, time-weighted return calculations for both the subject fund and the peer universe will ensure a consistent comparison.

## Portfolio Distribution

A third benchmarking technique is known as normal portfolio, or portfolio opportunity, distribution. The goal of this approach is to measure the added value produced by the investment manager relative to a randomly generated investment portfolio with the same investment strategy. This technique first identifies the specific investment objectives, establishes the opportunity set in which the manager may invest, and then randomly generates portfolios that are created, measured, and weighted into a benchmark return series. This type of analysis is quantitative and requires extensive data to be valid. Additionally, it is quite difficult to apply this technique to private real estate given both the data requirement, the ambiguity that is frequently associated with investment objectives, and the fact that all real estate investment opportunities are not equally accessible to all market participants.

## Risk-Adjusted Measures

Risk-adjusted performance measures are based on the underlying expectation that high (low) risk portfolios should generate high (low) returns. Figure 4 presents the calculation of the Sharpe Ratio, which represents one method to evaluate risk-

## How Pension Funds Are Measured

Pension fund administrators strive to maintain the right balance between risk and reward at a reasonable cost. Through active management, they try to create value for the fund's beneficiaries.

As shown in Figure 5, one pension fund consultant, Keith Ambachtsheer of Cost Effective Management, describes a process that pension funds may employ to evaluate their own performance in communications that are directed to the plan beneficiaries. In determining how you will be evaluated on real estate performance, it is useful to understand how real estate money managers are scored. At the end of any investment period, the portfolio gross return is calculated, in this case 10.7 percent. This represents the total return for the year for all of the funds' assets. From this, we can subtract what the pension plan assets would have generated if they were all invested in risk-free assets (such as U.S. Government Bonds, shown at 8.4 percent). This results in a gross risk premium earned, calculated as 2.3 percent.

The pension plan manager endeavors to produce this premium

by doing two things: selecting an asset mix beyond just investing in Treasuries and by actively managing those assets versus just buying index funds. Subtraction of the pension fund's costs to manage these assets (0.3 percent) results in a net risk premium earned, calculated as 2 percent.

Finally, a risk premium for investing in risky assets is deducted, which is 1.6 percent in the example. This represents the "charge" for taking on increased return volatility, which is calculated by applying a 15-percent hurdle rate to an increase in the standard deviation of return times two (5.3% x 2 x .15). The result is a risk-adjusted, value-added return that, hopefully, is positive. In this example, the amount is 0.4 percent, showing the benefit to the plan's beneficiaries of having the plan administrator diversify and actively manage their assets.

Also note that while 0.4 percent may not seem like a great deal, it can represent a significant amount of money when a fund manager is overseeing millions in assets.

*Kevin J. Maxwell and Paul S. Saint-Pierre*

adjusted returns. The portfolio performance premium (return in excess of the risk-free rate) is divided by the measured volatility (standard deviation) of the portfolio. The resulting ratio expresses the amount of premium return per unit of risk. High ratios represent superior performance since the ratios adjust the returns for the risks incurred. This technique may be applied to the real estate asset class provided all portfo-

lios use a comparable basis of determining periodic values and measuring volatility.

## Finding the Best Benchmark

Given the complexities associated with the four benchmarking methods presented in this article, some people may try to keep the process simple and just compare manager performance to public real estate benchmarks such as the National

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Association of Real Estate Investment Trusts (NAREIT) indices consisting of publicly-traded REITs. After all, stock managers compare themselves to the S&P 500 Index.

However, these indices have changed significantly in recent years with the rapid growth of both the market capitalization and the index members (number of companies). In addition, public real estate security indexes still represent a small portion of the real estate universe. Finally, the underlying financial and operating characteristics of associated real estate companies may be quite different from the investment portfolio of properties being reviewed. Benchmarking analysis with real estate security indexes are to be encouraged, but with the caveat that other benchmarking techniques should also be employed and that extensive disclosures should emphasize the differences between the subject portfolio and the benchmark index employed.

Over time, practitioners will continue to improve upon the most basic technique for benchmarking real estate management performance, which is called "the herbal tea and granola approach" by investment consultant Jeffrey Slocum. This method basically boils down to a three step process of evaluating the manager against:

- what he was told to do,
- the strategy he said he was going to apply, and
- his ability to stay within established risk guidelines.

As the name implies, this approach is more hands-on and statistically less rigorous than the other benchmarking techniques we have described. But given the complex nature of the other approaches, it may give the investor the best qualitative measure of whether the manager met the original expectations established.

# There's Gold In Them Thar' Keys...

Make sure your community doesn't come up empty while prospecting. With KeyTrak® at your side, you'll strike the mother lode. KeyTrak features an automated prospect management software package designed especially for multifamily communities. It's the only system that is 100% effective in prospect data collection -- nobody will ever fall through the cracks again. Minimize your vacant days and maximize your profits. Prepare for the journey to success. Don't wind up a flash in the pan.

### Call toll-free: 1 (888) KEY-TRAK Ext. 512
(539-8725)



**The leader in key control.**

 LISTED

Visit our web site at
*www.keytrak.com.*

*For more data, circle no. 154 on card.*

Kevin J. Maxwell is senior vice president of The O'Connor Group, a real estate investment company in New York City.

Paul S. Saint-Pierre is the senior equity analyst at Putnam, Lovel, and Thornton in San Francisco.

### Errata

In the story "Choosing a Tree Maintenance Specialist" in the March/April issue of *JPM,* the tree care specialists cited in the article should be Certified Arborists, certified by the International Society of Arboriculture.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.