UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates, Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF BLUE HILLS OFFICE PARK LLC,
GERALD FINEBERG AND WILLIAM LANGELIER'S OPPOSITIONS TO DEFENDANTS
AND PLAINTIFF-IN-COUNTERCLAIM'S MOTIONS FOR SUMMARY JUDGMENT**

Blue Hills Office Park LLC ("Blue Hills"), Gerald Fineberg ("Fineberg") and William Langelier ("Langelier") hereby submit this Statement of Undisputed Facts in Support of Blue Hills, Fineberg and Langelier's Oppositions[1] to Defendants and Plaintiffs-in-Counterclaim's Motions for Summary Judgment ("Blue Hills' Statement II").[2]

1.    As a "disregarded entity" for tax purposes, all of Blue Hills' income and expenses were properly recorded on the financial records of Blue Hills, sole member, Royall Associates Realty Trust.

---

[1] J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 ("J.P. Morgan") and CSFB 1999-C1 Royall Street, LLC ("CSFB") each filed Motions for Summary Judgment against Blue Hills, Fineberg and Langelier.  In response, Blue Hills, Fineberg and Langelier have submitted oppositions to each of the motions.

[2] Blue Hills, Fineberg and Langelier previously submitted Rule 56.1 Statement of Undisputed Facts ("Blue Hills Statement I") in support of their Motion for Summary Judgment as to All Counterclaims.  Blue Hills, Fineberg and Langelier also rely upon Blue Hills Statement I in support of their oppositions to both Motions for Summary Judgment submitted by J.P. Morgan and CSFB.  This Statement of Undisputed Facts in Support of Blue Hills, Fineberg and Langelier's Oppositions to Defendants and Plaintiff-in-Counterclaim's Motions for Summary Judgment ("Blue Hills Statement II") contains only facts not previously discussed in Blue Hills Statement I.

*See* Expert Report of David R. Andelman, Esq., Deposition Exhibit 358, attached as Exhibit 50 to the Affidavit of Peter B. McGlynn, ("McGlynn Affidavit") previously filed with the Court; Affidavit of Joseph Donovan ("Donovan Affidavit"), ¶ 6.

2. Defendants' expert, Eric Stotz ("Stotz"), a real estate appraiser, could not substantiate his opinion that any structure that interferes with the view of another structure or that adds "significantly" to traffic or congestion will have a detrimental impact on the value of the existing structure. Stotz could not testify as to the impact, if any, of the 250 Royall garage on the Property's value because he felt that it was "difficult" to do so. *See* Deposition Transcript of Eric Stotz dated April 21, 2006 ("Stotz Deposition"), page 94, lines 18-24 through page 95, lines 1-5; page 104, lines 21-24 through page 105, lines 1-2, attached to the Affidavit of Meredith A. Swisher ("Swisher Affidavit") as Exhibit 13.

3. Stotz does not quantify any alleged diminution in the value of the Property as a result of the garage in neither his expert report nor in his deposition. Stotz also failed to acknowledge the alleged significance of the new garage in his pre-foreclosure appraisal report prepared for LNR. *See* Stotz Deposition, page 87, line 12 through page 88, line 19, attached to the Swisher Affidavit as Exhibit 13.

4. Stotz acknowledges that he did not quantify any diminution in the Property's value nor was he even qualified to opine on the diminution of the value of property based upon undocumented traffic congestion or based upon the "less desirable view" that the garage would be for tenants in the Property. Stotz did not consult with any traffic consultants. His source of information was the Complaint filed in the Norfolk Action. *See* Stotz Deposition, pages 88 and 95, attached to the Swisher Affidavit as Exhibit 13.

5. Dr. Kenneth Gartrell ("Gartrell") stated that no diminution in value to the Property occurred. He also opined it possible that the Property's value may have been enhanced by the parking garage. *See* pages 8 and 9 of Rebuttal Report of Dr. Kenneth Gartrell ("Gartrell Report"), Deposition Exhibit 353, attached to the Swisher Affidavit as Exhibit 22.

6. While Equiserve remained a tenant in the Property, the monthly rental income was more than sufficient to fully fund all of the reserve accounts and to provide a surplus. The surplus was distributed to Blue Hills by Wells Fargo each month and deposited in Blue Hills' operating account. From 2003-2004, on average, Wells Fargo wired approximately $175,000.00 per month to Blue Hills' operating account. *See* Deposition Transcript of Joseph Donovan ("Donovan Deposition"), page 207, lines 1-5; pages 209-211, attached to the Swisher Affidavit as Exhibit 3; Donovan Affidavit, ¶ 9.

7. Blue Hills and Equiserve entered into a Lease Termination Agreement dated August 5, 2003. *See* Deposition Exhibit 10, attached to the Swisher Affidavit as Exhibit 14.

8. The Lease Termination Agreement provided that Equiserve would abandon certain workstations at the Property when they vacated in July 2004. Blue Hills sold the workstations for $100,000.00 in August 2004. Blue Hills did not believe these workstations were part of the Lender's collateral. *See* Donovan Affidavit, ¶ 8.

9. Since the Loan's inception, Blue Hills furnished to Wells Fargo Bank's Commercial Mortgage Servicing Group ("Wells Fargo") financial information concerning Blue Hills in both a quarterly and an annual basis. Generally, the information which Fineberg Management, Inc. ("FMI") furnished to Wells Fargo consisted of an income and expense statement, a rent roll (consisting of one page as Equiserve, Inc., which occupied approximately 96% of the subject property) and a one or two page statement of Blue Hills' assets and liabilities. Whether or not additional financial information was required by Wells Fargo, Wells Fargo never requested that Blue Hills furnish any such additional financial information. Had it done so - and had such information existed or could be prepared - the information would have been promptly sent to Wells Fargo. *See* Donovan Affidavit, ¶¶ 2-5.

10. For the years ended December 31, 2003 and 2004 – as in all previous years – the statements of assets and liabilities for Blue Hills were prepared by the accounting firm, Rutfield & Hassey CPA. Had Wells Fargo advised FMI that it had not received the 2003 statement of assets and liabilities –

or had misplaced it – FMI would have forwarded to Wells Fargo another copy of it. *See* Donovan Affidavit, ¶¶ 2-5.

11. On August 2, 2004, Joseph Donovan ("Donovan") mailed a written request to Wells Fargo seeking disbursement from the reserve accounts the sum of $412,833.43. Donovan faxed his August 2, 2004 letter to Wells Fargo on August 4, 2004. *See* CSFB's Answer No. 13 to Blue Hills, Fineberg and Langelier's Second Set of Interrogatories to CSFB, attached to the Swisher Affidavit as Exhibit 29.

12. At the time he sent his August 2, 2004 letter, Donovan believed that the reserve accounts could be accessed to pay real estate taxes. *See* Donovan Deposition, page 138, line 15 through page 139, line 14, attached to the Swisher Affidavit as Exhibit 3.

13. Wells Fargo claims its records describe a discussion with "Gil Stern" regarding access to the reserve accounts; neither Donovan or Gilbert Stone ("Stone") recall such a discussion. *See* Donovan Deposition, page 217, line 23 through page 218, line 7 and Deposition of Gilbert Stone ("Stone Deposition"), page 117, lines 9 – 19, attached to the Swisher Affidavit as Exhibits 3 and 12.

14. Beginning in early September 2004, e-mails were exchanged between and among LNR representatives, demonstrating that LNR was interested in purchasing the Loan as a "potential mining opportunity." *See* Deposition Exhibit 112, attached to the Swisher Affidavit as Exhibit 28.

15. Additional e-mails indicate that LNR was scrutinizing the Pooling and Servicing Agreement dated October 11, 1999 (the "PSA") and checking with various contacts on how to get the necessary consent for LNR to purchase the Loan. *See* Deposition Exhibits 73, 74, 75, 103 and 112, attached to the Swisher Affidavit as Exhibits 27 and 28.

16. Wells Fargo's records indicate that transfers in and out of the reserve accounts to cover tax, insurance and other shortages and adjustments were often handled between Wells Fargo and Blue Hills by telephone and fax, often with considerably far less than seven business days' notice. *See*

Deposition Exhibit 393 and excerpt from Deposition Exhibit 98, attached to the Swisher Affidavit as Exhibits 24 and 26.

17.     Borrowers involved in securitized loan transactions have the right to expect that the loan will be administered according to servicing standards.  *See* Deposition Transcript of Richard Clarke ("Clarke Deposition"), page 207 lines 10-14 and Deposition Transcript of Ronald Greenspan ("Greenspan Deposition"), page 89, lines 3-23, attached to the Swisher Affidavit as Exhibits 2 and 31.

18.     LNR had a reputation as a "loan to own" Lender; namely, it was less interested in working out its loans than of acquiring the secured properties for itself.  Clarke Deposition, page 103, lines 1-8, attached to the Swisher Affidavit as Exhibit 2.

> BLUE HILLS OFFICE PARK LLC, WILLIAM
> LANGELIER AND GERALD FINEBERG,
> By their attorneys,
>
> /s/ Meredith A. Swisher
> Peter B. McGlynn, Esquire (BBO No. 333660)
> Meredith A. Swisher, Esquire (BBO No. 646866)
> BERNKOPF GOODMAN LLP
> 125 Summer Street, Suite 1300
> Boston, Massachusetts 02110
> Telephone:     (617) 790-3000
> Facsimile:     (617) 790-3300
> pmcglynn@bg-llp.com
> mswisher@bg-llp.com

Dated:  May 31, 2006

#339229 v1/14500/9985