UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>        Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br> Mortgage Pass-Through Certificates, Series 1999-C1<br>        Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>        Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>        Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## AFFIDAVIT OF MEREDITH A. SWISHER

Meredith A. Swisher, on oath, deposes and states as follows:

1.       I am an associate at the firm of Bernkopf Goodman LLP, which maintains a business address at 125 Summer Street, Boston, Massachusetts and am a member in good standing of the Massachusetts bar.  I am trial counsel for the plaintiff Blue Hills Office Park LLC ("Blue Hills") and the defendants-in-counterclaim William Langelier ("Langelier") and Gerald Fineberg ("Fineberg").  I am making this affidavit solely for the purpose of authenticating certain documents, including deposition transcripts, deposition exhibits, discovery responses and other documents in support of Blue Hills, Fineberg and Langelier's Opposition to Motion for Summary Judgment Defendant and Plaintiff-in-Counterclaim J.P. Morgan Chase Bank ("J.P. Morgan") as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates 1999-C1 ("J.P. Morgan") and Blue Hills, Fineberg and Langelier's Opposition to Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim CSFB 1999-C1 Royall Street, LLC ("CSFB").

2.      True copies of excerpts of the Deposition of David Andelman dated April 24, 2006 ("Andelman Deposition") are attached hereto as **Exhibit "1."**

3.      True copies of excerpts of the Deposition of Richard Clarke dated April 28, 2006 ("Clarke Deposition") are attached hereto as **Exhibit "2."**

4.      True copies of excerpts of the Deposition of Joseph Donovan dated February 14, 2006 ("Donovan Deposition") are attached hereto as **Exhibit "3."**

5.      True copies of excerpts of the Deposition of Gerald Fineberg dated April 5, 2006 ("Fineberg Deposition") are attached hereto as **Exhibit "4."**

6.      True copies of excerpts of the Deposition of Daniel Frank dated February 16, 2006 (Frank Deposition") are attached hereto as **Exhibit "5."**

7.      True copies of excerpts of the Deposition of Kenneth Goldberg dated April 7, 2006 ("Goldberg Deposition") are attached hereto as **Exhibit "6."**

8.      True copies of excerpts of the Deposition of William Langelier dated March 10, 2006 ("Langelier Deposition") are attached hereto as **Exhibit "7."**

9.      True copies of excerpts of the Deposition of Brent Lloyd dated March 9, 2006 ("Lloyd Deposition") are attached hereto as **Exhibit "8."**

10.     True copies of excerpts of the Deposition of Curtis Mallegni dated March 8, 2006 ("Mallegni Deposition") are attached hereto as **Exhibit "9."**

11.     True copies of excerpts of the Deposition of Larry Needle dated March 17, 2006 ("Needle Deposition") are attached hereto as **Exhibit "10."**

12.     True copies of excerpts of the Deposition of Joseph Polcari, Vol. I dated February 28, 2006 ("Polcari Deposition, Vol. I") and Deposition of Joseph Polcari, Vol. II dated March 1, 2006 (Polcari Deposition, Vol. II") are attached hereto as **Exhibit "11."**

13.     True copies of excerpts of the Deposition of Gilbert Stone dated February 9, 2006 ("Stone Deposition") are attached hereto as **Exhibit "12."**

2

14.     True copies of excerpts of the Deposition of Eric Stotz dated April 21, 2006 ("Stotz Deposition") are attached hereto as **Exhibit "13."**

15.     A true copy of the Lease Termination Agreement, Deposition Exhibit 10, Stone Deposition, is attached hereto as **Exhibit "14."**

16.     A true copy Job Warshaw's handwritten notes, Deposition Exhibit 25, Donovan Deposition, is attached hereto as **Exhibit "15."**

17.     A true copy of Pooling and Servicing Agreement (excerpted), Deposition Exhibit 51, Polcari Deposition, Vol. 1, is attached hereto as **Exhibit "16."**

18.     A true copy of an e-mail authorizing transfer to LNR, Deposition Exhibit 57, Polcari Deposition, Vol. 1, is attached hereto as **Exhibit "17."**

19.     A true copy of August 19, 2004 Letter from Job Warshaw to Blue Hills, Deposition Exhibit 62, Polcari Deposition, Vol. 1, is attached hereto as **Exhibit "18."**

20.     A true copy of an e-mail dated October 13, 2004 regarding $18,590,000 loss, Deposition Exhibit 97, Deposition of Joseph Polcari, Vol. II, is attached hereto as **Exhibit "19."**

21.     A true copy of Meeting Minutes of the Canton Zoning Board, Deposition Exhibit 304, Needle Deposition, is attached hereto as **Exhibit "20."**

22.     A true copy of Fax from Lydia Chesnick to Andrew Cohen dated September 7, 1999 re. Fineberg's securitized loans, Deposition Exhibit 322, Fineberg Deposition, is attached hereto as **Exhibit "21."**

23.     True copies of the Expert Report of Dr. Kenneth D. Gartrell, (excerpted), and the Rebuttal Report of Dr. Kenneth D. Gartrell, (excerpted), are attached hereto as **Exhibit "22."**

24.     A true copy of U.S. Tax Form 1065 for Royal Associates Realty Trust, Deposition Exhibit 363, Andelman Deposition, is attached hereto as **Exhibit "23."**

25.     True copies of a portion of Wells Fargo "Notes Maintenance," Deposition Exhibit 393, Clarke Deposition, are attached hereto as **Exhibit "24."**

3

26.     A true copy of Blue Hills Operating Agreement, Deposition Exhibit 407, Deposition of Patrick Riley dated May 2, 2006 ("Riley Deposition"), is attached hereto as **Exhibit "25."**

27.     True copies of excerpts from Deposition Exhibit 98, Polcari Deposition, Vol. II, are attached hereto as **Exhibit "26."**

28.     True copies of e-mails to and from LNR employees, Deposition Exhibits 73, 74, 75 and 103, Polcari Deposition, Vol. 1 and Vol. II, are attached hereto as **Exhibit "27."**

29.     A true copy of an e-mail dated September 9, 2004 re. "New Loans for Transfer Date" Deposition Exhibit 112, Deposition of Randall Rosen dated March 2, 2006 ("Rosen Deposition"), is attached hereto as **Exhibit "28."**

30.     A true copy of Response No. 13 of CSFB 1999 – C1 Royall Street, LLC's Answers to Blue Hills Office Park LLC, Gerald Fineberg and William Langelier's Second Set of Interrogatories, is attached hereto as **Exhibit "29."**

31.     True copies of excerpts from the Expert Report of Richard A. Clarke, are attached hereto as **Exhibit "30."**

32.     True copies of excerpts of the Deposition of Ronald Greenspan dated May 8, 2006 ("Greenspan Deposition") are attached hereto as **Exhibit "31."**

Signed under the pains and penalties of perjury this 31st day of May 2006.

_____
/s/ *Meredith A. Swisher*
Meredith A. Swisher

#339198 v2/14500/9985

4

EXHIBIT 1

Volume I, Pages 1-228

Exhibits: 358-373

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

       Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

       Defendants

(Complete caption on next page)

---------------------------

DEPOSITION OF DAVID R. ANDELMAN

Monday, April 24, 2006, 9:30 a.m.

DLA Piper Rudnick Gray Cary US LLP

33 Arch Street, 26th Floor

Boston, Massachusetts

-------Reporter:  Joan M. Cassidy, RPR, CRR-------

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

David R. Andelman
Volume 1 - April 24, 2006

78

1  Blue Hill 5532-5547.)
2      Q.  Mr. Andelman, the court reporter has handed
3  you what has been marked as Exhibit 363, which is a
4  documents Bates-labeled Blue Hill 5532 through Blue
5  Hill 5547.  Do you recognize this document?
6      A.  (Witness reviews document.)  Yes.
7      Q.  What is it?
8      A.  It's a Form 1065.  It's a U.S. return of
9  partnership income for Royall Associates Realty
10  Trust.
11      Q.  For the year 2004?
12      A.  For the year 2004, yes.
13      Q.  Can you look at the first and second pages
14  of Exhibit 363.
15      A.  Uh-huh.
16      Q.  They appear to me to be two copies of the
17  same page, and I'd like to ask you if you notice
18  anything different about them that I'm missing.
19      A.  (Witness reviews document.)  No, not that I
20  can notice.
21      Q.  Did the copy you received have two first
22  pages?
23      A.  I don't think so.
24      Q.  Okay.  Is this the entire Form 1065 for

79

1  2004 for Royall Associates that you received?
2      A.  Yes, I believe it is.
3      Q.  The first page at the bottom does not show
4  a signature.  Did you review a signed copy of this
5  return?
6      A.  Can I look at this other exhibit?
7      Q.  (Nodding.)
8      A.  (Witness reviews document.)  No, I did not.
9      Q.  You understand this to be the final return
10  for the year 2004?
11      A.  That's my understanding.
12      Q.  And your belief, if I understand your
13  prior -- let me rephrase that.  If I heard your
14  prior testimony correctly, you believe you received
15  this from Rutfield & Hassey; is that right?
16      A.  Yes.
17      Q.  Do you recall when you received it?
18      A.  After March 21.
19      Q.  You used this document in connection with
20  your first report in this matter; is that right?
21      A.  Yes.
22      Q.  Did you see any tax workpapers from the
23  preparation of this return?
24      A.  Just one sheet.

80

1      Q.  Is that a sheet we've seen today?
2      A.  Yes.
3      Q.  Have you seen any other tax returns for
4  Royall Associates Realty Trust?
5      A.  No.
6      Q.  At any time?
7      A.  Not that I recall.
8      Q.  Have you seen any tax returns of any entity
9  or individual other than Royall Associates in
10  connection with your work on this matter?
11      A.  No.
12          MR. BARNETT:  Joan, I'm going to ask you
13  to mark three exhibits separately but in the order
14  I'm giving them to you.
15          (Marked, Exhibits 364-366, Document
16  entitled "Blue Hills Office Park LLC, Statement of
17  Assets, Liabilities, and Members' Equity -- Income
18  Tax Basis, December 31, 2002," Bates Blue Hill 5526;
19  Document entitled "Blue Hills Office Park LLC,
20  Statement of Assets, Liabilities, and Members'
21  Deficit -- Modified Tax Basis, December 31, 2003,"
22  Bates Blue Hill 5527; Document entitled "Blue Hills
23  Office Park LLC, Statement of Assets, Liabilities,
24  and Members' Deficit -- Income Tax Basis, December

81

1  31, 2004," Bates Blue Hill 5528.)
2      Q.  Mr. Andelman, just so we are all on the
3  same page literally, has the reporter marked as
4  Exhibit 364 a statement of assets, liabilities, and
5  members' equity dated December 31, 2002?
6      A.  (Witness reviews document.)  Yes.
7      Q.  And is 365 the same -- a document -- a
8  similar document dated December 31, 2003?
9      A.  Yes, but just to clarify, these are all the
10  Blue Hills Office Park LLC.
11      Q.  Correct, thank you.  And the third she has
12  just handed you is dated December 31, 2004?
13      A.  Yes, Exhibit 366.
14      Q.  And it's Exhibit 366.  "Statement of
15  assets, liabilities, and members' equity" is a
16  fairly long title.  How do you refer to these
17  documents?
18      A.  Financial statement, although it's just a
19  statement of assets and liabilities, so that would
20  not totally be complete.  You could call it a
21  balance sheet.
22      Q.  Okay.  Can we call it a balance sheet for
23  today's purposes?
24      A.  Fine.

David R. Andelman
Volume 1 - April 24, 2006

---

**86**

1  Goodman.
2      Q. In connection with your work in this
3  matter?
4      A. Yes.
5      Q. Did you review this document in connection
6  with your initial report?
7      A. No.
8      Q. Was this document used in connection with
9  your rebuttal report?
10     A. Yes.
11     Q. Did you receive it after you had submitted
12  your initial report?
13     A. Yes.
14     Q. What does this document show?
15     A. It shows a bunch of numbers. I'm not sure
16  what you mean by "what does it show."
17     Q. I don't want to put words in your mouth,
18  but a few minutes ago you referred to it as the
19  statement of a due to/from account; is that right?
20     A. Yes.
21     Q. What is a due to/from account?
22     A. I believe this ties into -- this is the
23  detail of the current asset listed as due from
24  affiliate on the -- on Exhibit 366.

---

**87**

1      Q. So on Exhibit 366 under the heading
2  "Assets," the second current asset due from
3  affiliate is an amount of $9,028,174?
4      A.. Yes.
5      Q. And you believe that Exhibit 367 is the
6  detail behind that number?
7      A. Yes.
8      Q. What's your basis for that belief?
9      A. Well, for one thing, it's the same number.
10  Secondly, that's what a due to/due from account is,
11  so I assume even though Royall Associates doesn't
12  say who it's due from or due to, since it's a
13  positive number, I mean, I don't know, I just
14  assumed it was the same number.
15     Q. What is an amount that is due to or due
16  from an affiliate?
17     A. It means that Blue Hills Office Park LLC
18  has a receivable from Royall Associates. That's how
19  I interpret it.
20     Q. And is that receivable a loan?
21     A. I don't know. It doesn't necessarily have
22  to be a loan.
23     Q. What else could it be?
24     A. Just a combination of interaction of

---

**88**

1  receipts and disbursements back and forth. It's an
2  open account. I -- generally speaking, in the
3  vernacular, yes, it would be a loan. I see what you
4  are saying.
5      Q. It represents an amount that Blue Hills
6  Office Park has transferred to Royall Associates?
7      A. Yes.
8      Q. And the first line of Exhibit 367 is
9  capital account; is that right?
10     A. Yes.
11     Q. With a $13 million number?
12     A. (Witness reviews document.) Uh-huh.
13     Q. What are you referring to now, sir?
14     A. I'm looking at the 1065 tax return.
15     Q. What page of it?
16     A. Page 4 -- excuse me, it's actually --
17  because there's two page 1s, it's page 5, but it's
18  actually page 4.
19     Q. Showing Schedule L, M-1, and M-2?
20     A. Yes.
21     Q. Were you comparing that to the due from
22  account, or why did you refer to that page of the
23  1065 just now?
24     A. Because the first line says "capital

---

**89**

1  account," and I was just looking to see if that's
2  where the number came from.
3      Q. Is the capital account reflected on page 4
4  of the 1065?
5      A. Excuse me?
6      Q. Is the capital account reflected on page 4
7  of the 1065?
8      A. There is an amount there, yes.
9      Q. It's different from the amount shown on
10  Exhibit 367, isn't it?
11     A. Yes.
12     Q. By approximately $200,000?
13     A. (Witness nods.)
14     Q. Yes?
15     A. Yes.
16     Q. Do you know what the next entry is on
17  Exhibit 367?
18         MR. MCGLYNN: You mean after "capital
19  account"?
20         MR. BARNETT: After capital account,
21  yes, thank you.
22     A. It appears to say "cash" something or
23  other. I don't know if that says "cash basis" or --
24  I don't know what it is.

---

David R. Andelman
Volume 1 - April 24, 2006

214

1  were any.
2      MR. BARNETT: Well, I believe he just
3  testified he made some revisions before he sent it
4  out.
5      A. Well, the way I dictate there's always
6  drafts.
7      Q. I think I have one more question. At the
8  risk of redundancy, but just to make sure the record
9  is clear, you looked earlier at Exhibit 35, which is
10  the income and expense statement for the year ending
11  December 31, 2003; is that right?
12      A. Yes.
13      Q. And you agree with me, do you not, that the
14  2-million-dollar settlement payment does not appear
15  on that income and expense statement?
16      A. (Witness reviews document.) Yes.
17      Q. Thank you.
18      MR. BARNETT: Those are all the
19  questions I have.
20      MR. MCGLYNN: I just have a few,
21  Mr. Andelman.
22          CROSS-EXAMINATION
23  BY MR. MCGLYNN:
24      Q. Directing your attention to Exhibit 365 --

215

1  and you can use mine for the sake of expediency, use
2  my copy. This particular document is known as a
3  balance sheet, correct?
4      A. In the vernacular, yes.
5      Q. Balance sheet for Blue Hills Office Park
6  LLC, right?
7      A. Yes.
8      Q. And in this particular document there is
9  a -- under the assets section there is an item -- a
10  line item "due from affiliate"?
11      A. Yes.
12      Q. And that's 9,028,175, correct?
13      A. Yes.
14      Q. And that's the -- in that number is the
15  approximately $1.950 million that was the net amount
16  received from the EquiServe settlement, correct?
17      A. Yes.
18      Q. And to the best of your knowledge, based
19  upon your review of Exhibits 364 and 365 and 366,
20  the balance sheet for the year ended December 31,
21  2003, is the first year in which this particular
22  settlement sum was reported, correct?
23      A. Yes.
24      Q. And that was reported as a reduction in

216

1  basis, correct?
2      A. Well, two things, reduction in basis and
3  increase in the due from affiliate.
4      Q. And this is continued in the balance sheet
5  for Blue Hills Office Park for the year ended
6  December 31, 2004, correct?
7      A. Yes.
8      Q. And that's Exhibit 366. Now, sir, with
9  respect to your opinion which is reflected in your
10  initial report, Exhibit B, concerning the tax effect
11  of the foreclosure, other than the information that
12  you had to formulate the opinions set forth in your
13  affirmative report generally and in particular
14  Exhibit B, what other information, if it were made
15  available to you, would allow you to determine
16  whether the total tax amount on Exhibit B of
17  4,918,804 is fully correct and accurate?
18      MR. BARNETT: Objection.
19      Q. You may answer.
20      A. If you had copies or information as to what
21  their 2005 return looked like reporting this and
22  then you could do a calculation of what the 2005
23  return would look like without reporting this
24  income, then you could determine the true amount of

217

1  the additional total taxes.
2      Q. All right. And do you have an
3  understanding as to the status of the various 2005
4  income tax returns for the beneficiaries of Royall
5  Associates Realty Trust?
6      A. I've been told that both the Royall
7  Associates Realty Trust and all of the partners'
8  returns are under valid extensions for both state
9  and federal purposes.
10      Q. And once that information that is contained
11  in these 2005 income tax returns would be made
12  available, what would you do with that information
13  with respect to the dollar amounts contained on
14  Exhibit B?
15      A. Well, I'd confirm the amount of the gain,
16  that shouldn't change, but the amount of the tax
17  liability would be based upon, you know, other
18  transactions; but you could do a -- basically a .
19  what-if calculation, calculate the tax with this
20  gain, and then calculate the taxes without this
21  gain.
22      Q. Now, sir, Exhibit B in the opinion
23  contained in your affirmative expert report was
24  based upon the assumption that the indebtedness was

56 (Pages 218 to 221)

David R. Andelman
Volume 1 - April 24, 2006

218

1  nonrecourse to, in this case, Messrs. Langelier and
2  Fineberg, correct?
3      A. Correct.
4      Q. And assuming for the sake of this next
5  series of questions that the debt was fully recourse
6  to Messrs. Langelier and Fineberg -- would you
7  accept that assumption for me for purposes of these
8  questions?
9      A. Yes.
10     Q. Assuming that the debt was fully recourse,
11  what would be the tax effect on Messrs. Fineberg and
12  Langelier if the debt was in fact fully recourse?
13     A. With respect to the two of them, the
14  gain -- amount of gain would be -- to be recognized
15  would probably be based upon the auction price,
16  assuming that there was no other evidence that it
17  was not fair market value, and then they would --
18  and that's the only gain they'd have to report. And
19  they would leave open the amount of income with
20  respect to the recourse portion until there was a
21  resolution of that liability.
22     Q. And as I understand it, if the debt were
23  fully recourse and Messrs. Fineberg and Langelier
24  were forced to pay some but not all of the

219

1  deficiency, the balance that would be forgiven would
2  be taxable, correct?
3      A. Correct.
4      Q. Now, sir, you talked about an auction or
5  foreclosure sale in the context of fair market
6  value. You do not know as we sit here today whether
7  or not the auction sale yielded -- truly yielded a
8  fair market value for this particular property on
9  foreclosure, correct?
10     A. Correct.
11         MR. MCGLYNN: I have nothing further.
12         REDIRECT EXAMINATION
13  BY MR. BARNETT:
14     Q. You testified earlier, didn't you, that
15  absent evidence to the contrary, the auction price
16  is treated for tax purposes as the fair market value
17  of the property? Isn't that right?
18     A. Yes.
19     Q. And you testified earlier that you're not
20  aware of any evidence to suggest that the auction
21  price should not be treated as fair market value for
22  tax purposes; isn't that right?
23     A. Yes.
24     Q. Have you been asked to perform, to use your

220

1  words, a what-if calculation of taxes paid by the
2  partners after their 2005 returns are completed?
3      A. No.
4      Q. Do you know why Royall Associates and the
5  partners are under extension on their returns for
6  2005?
7      A. Why who?
8      Q. Royall Associates and the partners are
9  under extensions for their returns for 2005.
10     A. I would make the proposition that Fineberg
11  and Langelier are probably on extension all the
12  time, every year, until October.
13     Q. Why do you make that proposition?
14     A. Their returns are just too complicated.
15         MR. BARNETT: I have nothing further.
16         MR. MCGLYNN: One final question.
17         RECROSS-EXAMINATION
18  BY MR. MCGLYNN:
19     Q. In order to prepare the what-if
20  spreadsheet, you would need the information that is
21  contained in the tax returns which have not been
22  filed as of yet; is that correct?
23     A. Or prepared. Actually, what I said was
24  or -- as I understand it, or have not been prepared.

221

1          MR. MCGLYNN: Thank you, nothing
2  further.
3          MR. BARNETT: One more thing. It's not
4  a question. It's to reiterate our position with
5  respect to the documents concerning the witness's
6  work in 2003. It's our position we are entitled to
7  them. He did work on the very subject that is the
8  subject of one of the opinions in his rebuttal
9  report, he was aware of the fact that he did that
10  work prior to completing the rebuttal report, he was
11  aware of the substance of the advice he provided
12  prior to completing his rebuttal report, he had
13  conversation with Mr. Goldberg about it in
14  preparation for this deposition, he received a copy
15  of the letter he wrote in 2003 last Thursday as a
16  result of that conversation, and he reviewed it, by
17  his testimony today, in preparation for the
18  deposition.
19          It's clearly deeply related to the
20  opinions he's offered. He can't separate it from
21  his work in this matter. And on that basis I'm
22  going to suspend the deposition until such time as
23  we receive the 2003 letter and other documents in
24  his file related to the work he did in 2003.

FARMER ARSENAULT BROCK LLC

# EXHIBIT 2

Richard A. Clarke
Volume 1 - April 28, 2006

Volume I, Pages 1-363

Exhibits: 387-404

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

        Defendants

(Complete caption on next page)

----------------------------

DEPOSITION OF RICHARD A. CLARKE

Friday, April 28, 2006, 9:36 a.m.

DLA Piper Rudnick Gray Cary US LLP

33 Arch Street, 26th Floor

Boston, Massachusetts

--------Reporter:  Joan M. Cassidy, RPR, CRR-------

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

# Richard A. Clarke
## Volume 1 - April 28, 2006

Page 101

1    Q. You can certainly e-mail a proposal, can't
2  you?
3    A. There are all kinds of things that you
4  could do.
5    Q. There's all sorts of ways you can make a
6  proposal to a lender without having a sit-down
7  meeting, aren't there?
8    A. The answer is yes.
9    Q. Now, you say on page 23 and 24 that LNR was
10  conflicted in this case, right?
11    A. Yes.
12    Q. That's not an opinion you were asked to
13  give, is it?
14    A. No. I mean, in a report, whether you want
15  to call them opinions or judgments, I do make
16  judgments and opinions. That was a judgment that I
17  made, and it certainly is a part of the fifth
18  opinion that I gave -- whether it's the fifth or the
19  last opinion -- that I think LNR marched to a much
20  different drummer here, at least prior to the
21  foreclosure.
22    Q. Mr. Clarke, respectfully, if you just focus
23  on my question and just answer it, we will go a lot
24  faster.

Page 102

1      MR. MCGLYNN: Objection.
2      MR. FALBY: Just wait until I have done.
3    Q. Because you are giving big, long
4  explanations to things, respectfully, I haven't
5  asked. All I am saying is that Bernkopf Goodman in
6  their engagement letter didn't ask you to give an
7  opinion about whether LNR was conflicted or not,
8  right?
9      MR. MCGLYNN: I object. You have spent
10  half the morning asking him about the engagement
11  letter and the bullet points, and I would contend
12  all of that is subsumed under the first two bullet
13  points.
14      MR. FALBY: Coaching.
15    Q. Go ahead, Mr. Clarke. You are smarter than
16  he is. You don't need to accept that answer.
17      MR. MCGLYNN: And I will readily agree
18  with that.
19    A. As I worked on this, quite frankly, I
20  wondered why LNR proceeded so quickly on the
21  foreclosure; and I told Mr. McGlynn at some point,
22  maybe on March 20 or thereabouts, that that could be
23  the subject of an additional opinion, and so I did
24  it.

Page 103

1    Q. Okay. The only point is you came up with
2  that instead of being asked to come up with it,
3  right?
4    A. Well, in our meeting on March 15, we all
5  talked about what motivated LNR to do what they did;
6  and I don't think we discussed it extensively but as
7  I read the documents, it was very clear to me that
8  they were what we call "loan-to-own servicers."
9    Q. Anyway, you say it appears LNR got cold
10  feet about a note sale, correct?
11    A. Yes.
12    Q. When do you think they got cold feet about
13  a note sale?
14    A. Sometime prior to the foreclosure.
15    Q. What facts do you rely on in support of
16  your conclusion that LNR got cold feet about a note
17  sale?
18    A. The facts -- well, just as a basis, there
19  are all kinds of documents that show that LNR had an
20  interest in this property and had an interest to own
21  it. But when I saw in the foreclosure sale that
22  instead of bidding it outright they credit-bid the
23  property and later distributed all the proceeds to
24  the pool, I asked myself why the change of heart,

Page 104

1  which was abrupt. And I don't know, but they
2  certainly did have a change of heart at the last
3  minute.
4      But up until the date of foreclosure and
5  the way it was bid in, it was very clear to me that
6  they intended to own this property and to move
7  heaven and earth to get their hands on it.
8    Q. You said they got cold feet, but you don't
9  know why?
10    A. I don't know why.
11    Q. Would you agree, based on your 37 years of
12  commercial real estate lending experience, that
13  paying property taxes is a fundamental obligation of
14  a property owner?
15      MR. MCGLYNN: Objection.
16    A. It's also the fundamental obligation of a
17  lender that wants to preserve their collateral.
18    Q. But you have to answer my question,
19  Mr. Clarke.
20    A. It's an obligation of all the parties in
21  the transaction that the property taxes be paid.
22    Q. Would you agree it's a fundamental
23  obligation of a property owner to pay the real
24  estate taxes on the property?

26 (Pages 101 to 104)

d2316ae2-1f79-490e-9b5e-b071992040c0

42 (Pages 162 to 165)

Richard A. Clarke
Volume 1 - April 28, 2006

162

1 exhibit these documents that Mr. Clarke handed me
2 that pertain to taxes in the reserve accounts.
3         MR. MCGLYNN:  Are these your original --
4 are these part of your file, Dick?
5         THE WITNESS:  They are.
6         MR. MCGLYNN:  Then can we have a
7 stipulation, Bruce, that you can mark these but
8 substitute copies for the originals and return them
9 to Dick?
10        MR. FALBY:  Sure.
11        MR. MCGLYNN:  Thanks.
12        (Marked, Exhibit 393, Multiple documents
13 entitled "Notes Maintenance".)
14        Q.  Do you understand from your review of the
15 record, Mr. Clarke, that normally happened with
16 respect to taxes is that the money to pay the taxes
17 went into the borrower's lockbox account in
18 Massachusetts and then was swept to Wells Fargo's
19 account?
20        A.  Well, that's how it was supposed to work.
21 The documents that you have just marked I think show
22 you that there was a variety of ways that the tax
23 payment ended up being made during the course of the
24 relationship.

163

1        Q.  Can you point to any particular document
2 which indicates to you that the monies to pay the
3 taxes came out of any account other than the tax
4 reserve account?  And I'm specifically interested in
5 any document that shows the tax money coming out of
6 either the replacement reserve or the base leasing
7 reserve or the cash flow reserve.
8        A.  As I said in my report, there is an
9 inference from these documents that that may have
10 happened, and for example it says here --
11        Q.  On what page?  Read the Bates stamp at the
12 bottom.
13        A.  You have to take these in a sequence.  And
14 let me explain how these were pulled before I
15 answer.
16        Q.  That's fine.  All I am saying is, when you
17 refer to a page, please cite the document number in
18 the bottom right-hand corner, please.
19        A.  Okay.  Would you prefer I do that instead
20 of dates?
21        Q.  Yes.
22        A.  Okay.  Let's just walk through these and
23 see what they say, because again, you have to take
24 this as a sequence.  I have WF 01693.  There was a

164

1 movement of funds between escrow accounts, and I
2 don't know what tran 40 is, but that's quite
3 contrary to the way you told me that this was
4 supposed to be swept from an account into the tax
5 reserve account.
6        Just again, I can't tell from the codes
7 here, nor did I bother to, all I know is as we go
8 through these, you will see there is inconsistent
9 handling of the various escrow accounts and how
10 payments were made.
11        The next document is WF --
12        Q.  Hand them to me as you finish, will you?
13        A.  -- WF 01696.  Here the borrower wired funds
14 instead of having them swept, intended them for the
15 tax escrow account, it went into a different reserve
16 account, and now the borrower's authorizing the
17 transfer of funds from whatever that reserve account
18 was into the tax escrow account.
19        I have WF 01702.
20        Q.  Let me just ask you to pause.  You will be
21 able to finish.  But do you understand that the
22 lockbox reserve refers to the holding account at
23 Wells Fargo and not to a reserve account?
24        A.  It may well, it may well.  I'm just looking

165

1 at these in their entirety, and so that's why I made
2 testimony -- provided the testimony as well as the
3 inference in my report that these accounts were not
4 consistently handled either in accordance with the
5 agreement or in actual practice.
6        Q.  By "these accounts" what are you talking
7 about?
8        A.  The various reserve accounts and the
9 methodology used to fund them.  I have WF 01702.
10       Q.  Okay.
11       A.  Here's one which, again, I will just read
12 what it says.  "Gil Stone called" -- and I will
13 leave out some of the interim stuff.  "I told him
14 according to our note pads the installment was
15 already paid.  He states he did not pay the last
16 installment.  I called the assessor again, and they
17 show only one check being received, Check 1224.
18 This is not a manual check.  We paid with
19 Check 16065.  He is faxing his tax bill and a letter
20 granting permission to take money from, quote, one
21 of his accounts for the tax shortage."
22       Now, I don't know if one of those
23 accounts was the insurance account or what it might
24 have been, but -- it just says one of his accounts;

FARMER ARSENAULT BROCK LLC

43 (Pages 166 to 169)

Richard A. Clarke
Volume 1 - April 28, 2006

166

1 so again, I don't know which account was tapped, but
2 I'm trying to answer the question that was posed
3 this morning and showing you these things for
4 inconsistency.
5        Now, here's one, WF 01703. You
6 postulated that the way this worked is that they
7 just went ahead and swept funds, as you said, into
8 the lockbox account and then allocated them; and
9 here's one -- I will just read it. "Received
10 permission" -- well, again, this may not be an
11 inconsistency. "Received permission from borrower
12 and M. Gremore to transfer 101,000," in round
13 amount, "from lockbox sweep to tax escrow for
14 shortage of May 1, 2002 installment."
15        Now, this is on April 24; and again, I
16 just don't know why there would be a shortage or
17 whether it's just timing, but I'm just following
18 through in a sequence of these as I read them
19 originally.
20        And by the way, I didn't pull all the
21 notes maintenance; I just pulled these as indicative
22 of what I was seeing when I reviewed the documents.
23    Q. Okay. I'm not going to take the time to
24 have you go through the rest of hem because I won't

167

1 finish today if we do, so just hand them to me.
2 They say what they say.
3        MR. MCGLYNN: Are we going to have all
4 of those marked as one exhibit?
5        MR. FALBY: Yes.
6        MR. MCGLYNN: And that exhibit number
7 again is what?
8        MR. FALBY: 393.
9        MR. MCGLYNN: 393? Thank you.
10    Q. Did you see any reference in any of these
11 documents explicitly to either a replacement escrow
12 fund, a base leasing escrow fund, or a cash flow
13 leasing escrow fund?
14    A. I remember seeing references to the
15 insurance fund.
16    Q. That was not my question.
17    A. Okay. I'm doing the best I can, you know,
18 having read these things several months ago.
19    Q. No, I understand. I just wish you would
20 answer my question rather than a different question.
21 Did you see --
22        MR. MCGLYNN: Objection.
23    Q. Did you see any reference in these
24 documents to any of the replacement escrow fund, the

168

1 base leasing escrow fund, or the cash flow leasing
2 escrow fund?
3    A. Not the ones I have here, but there may be
4 some reference to those in the documents. These are
5 just samples.
6    Q. My question is, did you see any reference
7 in these documents that we have marked as Exhibit
8 339 to any of the replacement escrow fund, the base
9 leasing escrow fund, or the cash flow leasing escrow
10 fund?
11        MR. MCGLYNN: Objection.
12    A. Again, my answer is no, but I reserve the
13 right to check other ones because these are just
14 samples.
15    Q. That's not my question.
16        MR. MCGLYNN: Bruce, he's answered the
17 question.
18    Q. I don't know why you insist on embroidering
19 your answers with your advocacy. I think the record
20 will reflect why.
21        MR. MCGLYNN: You have asked it three
22 times, he has answered it three times the best he
23 can. The fact that you don't like the answer --
24        MR. FALBY: It's not really the best he

169

1 can.
2    Q. I said it this morning. I will say it
3 again. We will get done a lot faster if in answer
4 to my questions you don't editorialize yourself,
5 because you do in almost every instance; and the
6 inference is inescapable that you are an advocate
7 and you are being paid to give answers that are
8 helpful in your view to the people who have hired
9 you and who are paying you, which is fine. But in
10 answer to my questions, please just answer my
11 question, because I have to ask it again and again
12 until you just answer it, and it wastes a lot of
13 time.
14        MR. MCGLYNN: There is no question
15 pending, Dick. You don't have to even respond to
16 that. And quite frankly, it's inappropriate,
17 unprofessional, and just simply incorrect.
18    Q. *Did you conclude from this record that the
19 borrower made a practice during the course of this
20 loan of sending Wells Fargo money for the real
21 estate tax payments towards the end of the month
22 preceding the due date of the taxes?
23        MR. MCGLYNN: Objection as to the form.
24 Joan, can you read that back to me, please.

Richard A. Clarke
Volume 1 - April 28, 2006

| Page 205 |
|---|
| 1  A. I'm doing the best I can, but I would like |
| 2 to have at least as truthful an answer as I can give |
| 3 you. |
| 4  Q. I appreciate that, but a truthful answer |
| 5 doesn't in every instance require an explanation. |
| 6 My question -- |
| 7  A. You have gotten a fair number of yeses and |
| 8 noes. |
| 9  Q. Okay, well, give me some more. |
| 10  MR. MCGLYNN: Just say no. |
| 11  (Laughter.) |
| 12  Q. The loan pool into which this loan |
| 13 eventually went wasn't even created at the time the |
| 14 loan was made, correct? |
| 15  A. I'm not prepared to say that. It may have |
| 16 been in the process of being created. I mean, it's |
| 17 a pretty extensive pool, so I'm not prepared to say |
| 18 whether it was or not. It had to have been in |
| 19 process. |
| 20  Q. In any event, the pooling and servicing |
| 21 agreement had not been signed up as of the date that |
| 22 this loan was made by Credit Suisse to Blue Hills, |
| 23 right? |
| 24  A. That is correct. |

| Page 207 |
|---|
| 1  A. Not to my knowledge. |
| 2  Q. Did the borrower at any time up to November |
| 3 19, 2004, see the contents of this PSA? |
| 4  A. That I don't know. |
| 5  Q. Did the borrower ever rely in any way on |
| 6 the provisions of this PSA? |
| 7  MR. MCGLYNN: Objection. |
| 8  A. Referring to this PSA specifically, not to |
| 9 my knowledge. |
| 10  Q. Does a CMBS servicer in your view owe a |
| 11 duty to the borrower of a loan in the pool to |
| 12 service that loan in accordance with the servicing |
| 13 standard set forth in the PSA? |
| 14  A. Yes. |
| 15  Q. And your opinion here about Wells Fargo and |
| 16 LNR's failure to comply with the servicing standard |
| 17 assumes that there is such an obligation, correct? |
| 18  A. I have testified repeatedly that there's a |
| 19 duty by anybody administering a loan to act in |
| 20 accordance with industry standards, and I think the |
| 21 PSA is one indication of what those standards might |
| 22 be. |
| 23  THE WITNESS: (To the reporter) Did you |
| 24 get that, "has a duty"? |

| Page 206 |
|---|
| 1  Q. So obviously, the borrower didn't rely on |
| 2 the contents of the pooling and servicing agreement |
| 3 when it executed the loan documents, correct? |
| 4  A. Not on this particular pooling and |
| 5 servicing agreement. |
| 6  Q. And did the borrower, do you know, have any |
| 7 awareness at all when it borrowed money from Credit |
| 8 Suisse as to what the standard pooling and servicing |
| 9 agreement said? |
| 10  A. Yes. |
| 11  Q. What do you base that on? |
| 12  A. First of all, it was obvious from the |
| 13 closing documents that this was going into a conduit |
| 14 program. Secondly, they were experienced real |
| 15 estate people. And, thirdly, as Mr. Greenspan said, |
| 16 they knew or should have known the general terms and |
| 17 conditions that apply to conduit loans. |
| 18  Q. Did the borrower ever obtain a copy of this |
| 19 PSA -- I'm going to refer to the pooling and |
| 20 servicing agreement as "PSA"; is that okay, |
| 21 Mr. Clarke? |
| 22  A. Yes, sir. |
| 23  Q. Did the borrower here ever obtain a copy of |
| 24 the PSA? |

| Page 208 |
|---|
| 1  Q. I take it you view the servicing standard |
| 2 in the PSA as a sort of industry standard that sets |
| 3 a code of conduct for services? |
| 4  A. I've seen the exact same language in other |
| 5 servicing agreements, notably Wachovia, and there's |
| 6 only a limited number of servicers, so I would |
| 7 believe that it's fairly standard. |
| 8  Q. Have you seen any pooling and servicing |
| 9 agreements other than the one in this case and those |
| 10 used by Wachovia? |
| 11  A. I've seen them, but I just can't recall |
| 12 which ones they were. |
| 13  Q. Under what circumstances or contexts did |
| 14 you see them? |
| 15  A. Well, if I recall, when I say Wachovia, |
| 16 that also would include the predecessor, First |
| 17 Union. And, for example, as an advisor to Harold |
| 18 Brown for over a decade, Harold refinanced over a |
| 19 third of his properties out of bankruptcy using |
| 20 conduit programs primarily with First Union, so I'm |
| 21 familiar with First Union and then Wachovia. |
| 22  I have other clients that also, you |
| 23 know, have basically taken advantage of conduit |
| 24 situations; and so I have seen some other |

FARMER ARSENAULT BROCK LLC

d2316ae2-1f79-490e-9b5e-b071992040c0

# EXHIBIT 3

Joseph A. Donovan  –  Volume 1 – February 14, 2006
C O N F I D E N T I A L

Exhibits:  1-32          Volume 1, Pages 1-273

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

- - - - - - - - - - - - - - - - - - - - - - - - - -

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

            Defendant

(Complete caption on next page)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

CONFIDENTIAL 30(b)(6) DEPOSITION OF BLUE HILLS

OFFICE PARK LLC by JOSEPH A. DONOVAN

Tuesday, February 14, 2006, 9:32 a.m.

DLA Piper Rudnick Gray Cary US LLP

One International Place, 21st Floor

Boston, Massachusetts


- - - - - - - Reporter:  Joan M. Cassidy, RPR, CRR - - - - - - -

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

258f568a-e5cf-4014-a6e3-a6c8384762b2

8 (Pages 26 to 29)

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

26

1  at Inn America were now at Fine Hotels, including
2  the human resource director, Dennis Hatch.
3    **Q. Anybody else?**
4    A. Yes.  There was probably a half a dozen
5  people.
6    **Q. Can you name them, please.**
7    A. Pete Phillips, Mike Attenborough, Carol
8  Falvey, Mary Doyle.
9    **Q. Anybody else?**
10   A. Off the top of my head, that's all I can
11  think of.
12   **Q. What did you do as controller of Fine**
13  **Hotels Corp.?**
14   A. I was in charge of the day-to-day
15  accounting for the hotels.
16   **Q. How many hotels did Fine Hotels Corp. own**
17  **at that point?**
18   A. I'm guessing about eight or eleven hotels.
19   **Q. Did you have people reporting to you when**
20  **you were controller of Fine Hotels Corp.?**
21   A. Yes, the controllers for each property
22  would report to me.
23   **Q. How long did you have that job?**
24   A. For about three years.

27

1    **Q. Through 1995?**
2    A. That's approximately right.
3    **Q. Then what happened?**
4    A. I became CFO of both Fine Hotels and
5  Fineberg Management.
6    **Q. And what's the relationship between Fine**
7  **Hotels and Fineberg Management?**
8    A. They're both owned by Jerry Fineberg.
9    **Q. What does Fineberg Management do?**
10   A. Fineberg Management manages real estate
11  properties.
12   **Q. Owned by whom?**
13   A. Owned by Jerry Fineberg.
14   **Q. What types of properties?**
15   A. Residential apartment buildings, office
16  buildings, and retail space.
17   **Q. Have you been CFO of Fine Hotels and**
18  **Fineberg Management since 1995?**
19   A. Approximately, yes.
20   **Q. Have you picked up any additional titles**
21  **along the way?**
22   A. No.
23   **Q. Are your duties and responsibilities in**
24  **that position the same today as they were when you**

28

1  started?
2    A. I also do most of the development as far as
3  looking for hotels.
4    **Q. When did you start doing that?**
5    A. Probably about 1998.
6    **Q. Do you do anything else?**
7    A. No.
8    **Q. Can you describe what you do as the CFO,**
9  **that is, what duties and responsibilities that**
10  **position entails?**
11   A. I'm responsible for the day-to-day
12  accounting for the different entities.  I'm
13  responsible for looking at and evaluating
14  prospective hotel deals.  I look at and evaluate in
15  conjunction with Larry Needle and Dan Frank any kind
16  of residential, retail or office building deals.
17   **Q. Do you have any other duties and**
18  **responsibilities?**
19   A. No, that pretty much encompasses it.
20   **Q. During the period 1999 through 2004, did**
21  **you have the same duties and responsibilities as you**
22  **have just described?**
23   A. Yes.
24   **Q. Who reported to you during that period?**

29

1    A. Gil Stone from Fineberg Management, George
2  Salgado from Fine Hotels, Carol Falvey was my
3  administrative assistant.
4    **Q. Anyone else?**
5    A. No.  Anyone else would have been reporting
6  to one of those two, first two that I mentioned.
7    **Q. I take it George Salgado was the director**
8  **of accounting for Fine Hotels?**
9    A. Yes, he is.
10   **Q. During that same period, 1999 through 2004,**
11  **approximately how many properties was Fineberg**
12  **Management managing?**
13   A. On the residential side we had roughly 1500
14  apartment units, we had three office buildings, and
15  we had three or four retail units.
16   **Q. And were each of the properties owned by a**
17  **different single-purpose entity such as Blue Hills**
18  **Office Park LLC?**
19   A. Many of them were but not all.
20   **Q. Approximately how many single-purpose**
21  **entities were there during that five-year period,**
22  **1999 through 2004, whose properties Fineberg**
23  **Management or Fine Hotels managed?**
24   A. Ballpark, between 30 and 50.

Joseph A. Donovan -  Volume 1 - February 14, 2006
C O N F I D E N T I A L

---

30

1     Q. Who owned properties managed by Fineberg
2  Management or Fine Hotels that were not owned by a
3  single-purpose entity?
4     A. There are condos that were owned by the
5  same entity, multiple condos in different buildings.
6     Q. As CFO have you had dealings with lenders
7  on various properties?
8     A. Yes, I have.
9     Q. To what extent?
10     A. My job is to deal with lenders on just
11  about any property that if there arises a time for
12  refinancing -- any problems that might develop that
13  cannot be handled by either Gil Stone or George
14  Salgado.
15     Q. What kind of problems do you typically get
16  involved with with lenders?
17     A. Very few problems, actually.  Most of the
18  time it's the refinancing end of it.
19     Q. What problems have developed with lenders
20  over the years that Gil or George couldn't handle?
21     A. If there comes a time we're having trouble
22  making a mortgage payment.
23     Q. As to what properties has that happened?
24     A. That's happened to a few hotel properties,

---

31

1  that the market changed and they could no longer
2  meet their mortgage payments, especially after 9/11.
3     Q. Were there other properties where you had
4  trouble making the mortgage payment other than those
5  few hotels?
6     A. During that time period we were struggling
7  to make a lot of mortgage payments.
8     Q. So therefore, did you have --
9     A. Yeah, we didn't --
10     Q. Therefore, did you have fairly extensive
11  contact with lenders?
12     A. I have fairly extensive contact with
13  lenders all the time.  I'm constantly talking to
14  lenders.
15     Q. Other than the Blue Hills Office Park, have
16  any of the properties managed by Fineberg Management
17  or Fine Hotels been foreclosed upon while you've
18  been CFO?
19     A. Yes.
20     Q. Can you name them, please?
21     A. The Sturbridge hotel, the Lancaster hotel,
22  the Harrisburg hotel, the Boxborough hotel, and the
23  Worcester hotel.
24     Q. Can you tell me what lender you dealt with

---

32

1  on each of those projects?
2     A. On Sturbridge and Lancaster, it was Lennar
3  Partners.  On Harrisburg, it was GMAC.  On
4  Boxborough and Worcester, it was also GMAC.
5     Q. When was the Sturbridge hotel foreclosure?
6     A. Off the top of my head, I don't remember
7  the date.
8     Q. It was prior to the Blue Hills foreclosure,
9  wasn't it?
10     A. Yes, it was.
11     Q. When was the Lancaster hotel foreclosure?
12     A. Around the same time as the Sturbridge
13  foreclosure.
14     Q. Who at Lennar Partners did you deal with?
15     A. Chris Brown.
16     Q. Anyone else?
17     A. No.
18     Q. What other lenders have you dealt with in
19  connection with your duties as CFO?
20     A. A lot of my properties are financed by the
21  local banks.  I deal quite a bit with all the local
22  bankers around here.  GEMSA, GMAC.
23     Q. What's GEMSA?
24     A. That's GE combined with somebody else, and

---

33

1  they formed the name GEMSA, you know.  You may know
2  better than I do.
3     Q. Have you dealt with any other lenders?
4     A. CS First Boston, Heller Financial.
5     Q. Any others?
6     A. Off the top of my head, I think we've got
7  most of them, anyway.
8     Q. Can you give me the names of any other
9  properties other than the foreclosed hotels that
10  have had trouble making their mortgage payments?
11     A. Not off the top of my head, no.
12     Q. In your dealings with lenders, do you have
13  occasion to read loan documents?
14     A. Yes.
15     Q. Do you also help negotiate loan documents
16  when the properties managed by Fineberg Management
17  or Fine Hotels take out mortgage loans?
18     A. I'm not a lawyer.  I might help work on the
19  idea but not the terms themselves.
20     Q. Once a loan is made, do you typically
21  review the loan documents?
22     A. Somewhat, yes.
23     Q. When the property gets into trouble and is
24  having trouble making loan payments, do you

---

Joseph A. Donovan -   Volume 1 - February 14, 2006
C O N F I D E N T I A L

---

78

1  knowledge other than that gleaned from discussions
2  with counsel, please answer.  Otherwise, I'm
3  instructing you not to answer.
4      A. I'm not answering that.
5      Q. Did you understand that the garage would
6  have a negative impact on the traffic flow?
7      A. There was a possibility that could happen,
8  yes.
9      Q. Did you have an understanding that the
10 garage would interfere with the sight lines from the
11 Blue Hills Office Park?
12         MR. MCGLYNN:  Same objection, same
13 instruction.
14     A. I didn't see any sight line problems.
15     Q. Did you understand that the garage would
16 partially block the view of the Blue Hills Office
17 Park from Route 95?
18     A. There was a possibility it could partially
19 block it, yes.
20     Q. Did you view the possibility that the
21 garage would partially block the view of Blue Hills
22 Office Park from Route 95 as having a negative
23 impact on the office park?
24     A. In my opinion, no.

---

79

1      Q. Why not?
2      A. Because you could still see it no matter
3  what, and I don't know if it's all that important to
4  be able to see it from Route 95.
5      Q. You've heard leasing people tell you over
6  the years that it's a benefit to a property to be
7  visible from a major highway, correct?
8      A. I really don't deal with leasing people on
9  a normal basis.
10     Q. Well, you understand that it's generally
11 perceived as a positive if an office park is visible
12 from a nearby major highway, correct?
13     A. Okay, it would be.  In this case, though,
14 the building was always going to be visible.
15     Q. Notwithstanding the potential negative
16 impact on traffic and the possible partial
17 obstruction of the view of the building from Route
18 95, did you still consider the parking garage, all
19 in all, a positive development for Blue Hills Office
20 Park?
21         MR. MCGLYNN:  Objection as to form.
22     A. In my personal opinion, yes.
23     Q. Again, that's because you assumed that it
24 would be available for visitors and tenants of Blue

---

80

1  Hills Office Park to park in?
2      A. Yes.
3      Q. At some point did you learn that EquiServe
4  had entered into a purchase and sale agreement to
5  buy Blue View, the property across the street from
6  the Blue Hills Office Park?
7      A. Yes.
8      Q. When did you learn that?
9      A. I don't know.  I don't remember the date.
10     Q. What's your understanding of what an
11 abutter is and why an abutter has the right to
12 appeal a special permit given to a property?
13         MR. MCGLYNN:  Again, same objection,
14 same instruction, but if you have a personal
15 understanding, please answer.
16     A. My personal understanding is if you are an
17 abutter and something is different from what is set
18 out in the bylaws of the town, that you get notified
19 that there's a possibility that there may be a
20 change.
21     Q. And you understand that an abutter has the
22 right to raise objections to something going on
23 nextdoor that someone across town can't?
24     A. Yes.

---

81

1      Q. And that's because their property abuts the
2  property affected by the special permit?
3      A. That's my understanding, yes.
4      Q. Isn't it a fact that the proposed parking
5  garage was going to obstruct views from the Blue
6  Hills Office Park from the southwest?
7      A. I don't know.
8      Q. You didn't understand that that was the
9  case?
10     A. No.  That's the first time I've heard
11 somebody phrase it like that.
12         MR. FALBY:  Let's mark the next exhibit,
13 which is the purchase and sale agreement between DST
14 Realty and National Development.
15         (Marked, Exhibit 19, Purchase and sale
16 agreement between DST Realty and National
17 Development.)
18     Q. Have you seen Exhibit 19 before?
19     A. (Witness reviews document.)
20         MR. MCGLYNN:  Before we get into this, I
21 notice that this is confidential.  Is this -- this
22 is some of the documentation that was produced
23 subject to the confidentiality arrangement.  I don't
24 have a copy of that in front of me, but perhaps we

---

22 (Pages 82 to 85)

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

82

1  should have this portion of the transcript and the
2  exhibit impounded subject to that order.
3          MR. FALBY:  Well, let's make it subject
4  to the order, whatever it says.
5          MR. MCGLYNN:  That's fine.  I will agree
6  to it.  Okay.  I don't have a specific memory as to
7  whether or not we had to impound things, but I will
8  make my comment subject to whatever the terms of
9  that order are.
10         MR. FALBY:  Everybody remember when we
11 get off this to undo that designation because
12 usually when that happens, the rest of the
13 transcript remains confidential.
14         MR. MCGLYNN:  No, I understand.  I'll do
15 my best to assist.
16     A.  I'm sorry, what was the question?
17     Q.  Have you seen Exhibit 19 before?
18     A.  (Witness reviews document.) No, I have not.
19     Q.  Just so you know, DST Realty is the parent
20 of EquiServe as we understand it.  Does that ring
21 any bells?
22     A.  No, I had not seen anything with DST.
23     Q.  So when you learned that EquiServe had
24 entered into a purchase and sale agreement to buy

83

1  Blue View, you didn't see the actual agreement?
2      A.  No, I did not.
3      Q.  Did you -- strike that.  How did you learn
4  of it?
5      A.  I imagine it was in conversation.
6      Q.  With whom?
7      A.  With somebody in the office.
8      Q.  Do you remember --
9      A.  I don't remember who offhand.
10     Q.  Do you remember when the conversation was?
11     A.  No.
12     Q.  Was it at or around the same time that
13 EquiServe was applying for the special permit for
14 the garage?
15     A.  It may have been.  I don't know.
16     Q.  Did you learn at that time that the
17 purchase was conditioned on the town of Canton
18 approving the construction of a parking garage at
19 Blue View?
20     A.  Yes.
21     Q.  Did you learn of the purchase and sale
22 agreement and of that condition prior to the point
23 that Blue Hills appealed the garage special permit?
24     A.  I don't know.

84

1      Q.  Was it at or around that time?
2      A.  I really don't know.
3      Q.  At some point did you learn that the town
4  of Canton had granted the special permit?
5      A.  Yes.
6      Q.  Did you ever see the decision granting the
7  permit?
8      A.  No, I did not.
9      Q.  Did you discuss it with anybody?
10     A.  No.
11     Q.  How did you learn of it?
12     A.  Somebody in the office must have told me.
13     Q.  Do you remember any specifics?
14     A.  No.
15     Q.  Obviously, you've already told me, Blue
16 Hills filed a lawsuit appealing the special permit
17 grant, correct?
18     A.  Yes.
19     Q.  Did you see that complaint before it was
20 filed?
21     A.  No.
22     Q.  Did you ever see that complaint?
23     A.  No.
24     Q.  Do you know what it says?

85

1      A.  No.
2      Q.  Did anybody consult with you in the process
3  of drafting that complaint?
4      A.  No.
5      Q.  Did any of the attorneys at Bernkopf talk
6  to you about that complaint?
7          MR. MCGLYNN:  Yes or no.
8      A.  Yes.
9      Q.  When, at the time, before it was filed?
10     A.  It must have been at the time.
11     Q.  Who in particular?
12     A.  It probably would have been Ken Goldberg.
13     Q.  Did any other attorney at Bernkopf involved
14 with the complaint talk to you?
15     A.  No.
16     Q.  Did you have any understanding about what
17 the complaint said?
18     A.  No.
19     Q.  Who made the decision to file the complaint
20 appealing the special permit grant?
21     A.  I don't know.
22         (Discussion off the record.)
23         MR. FALBY:  Let's stop with the
24 confidentiality.  Let's mark as the next exhibit a

26 (Pages 98 to 101)

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

98

1    A. Okay.
2    Q. You understood that Wells Fargo was
3 servicing the loan for the actual lender, whoever
4 that was, right?
5    A. Right.
6    Q. And you understood Credit Suisse had
7 actually assigned the loan to somebody so that it
8 was no longer the lender, right?
9    A. I had no idea who was the lender, though.
10    Q. No, I'm just saying --
11    A. I knew Wells Fargo --
12        MR. MCGLYNN: One at a time.
13    Q. You understood that Credit Suisse was out
14 of the picture, right?
15    A. Yes.
16    Q. And they had assigned the loan to somebody;
17 you just didn't know who, right?
18    A. Right.
19    Q. And you understood whoever that was, Wells
20 Fargo was servicing the loan for them, right?
21    A. Right.
22    Q. And if the loan got in trouble, there would
23 be some special servicer involved, whether it was
24 Lennar or somebody else, right?

99

1    A. Right.
2    Q. So in any event, you didn't consider in the
3 summer of '03 whether the fact of the settlement
4 should be communicated to Wells Fargo or the lender,
5 right?
6    A. No.
7    Q. I'm making this distinction between Wells
8 Fargo and the lender. I guess it's more accurate to
9 say that any communications you had with the lender
10 would be with Wells Fargo at that point, right?
11    A. That's correct.
12    Q. Did you have anything to do with the
13 drafting of the settlement agreement or any of the
14 other documents that documented the settlement?
15    A. No, I did not.
16    Q. Did you read them?
17    A. No.
18    Q. And did you understand at the time that the
19 settlement removed any impediment to approval of the
20 garage by the town of Canton?
21    A. Yes.
22    Q. And did you understand at the time that the
23 settlement cleared the way for EquiServe to buy the
24 property across the street and move across the

100

1 street?
2    A. At the time I think I knew they were moving
3 across the street. I don't know if I knew they were
4 buying it or leasing it or what. I knew they were
5 moving.
6    Q. Did you understand at the time of the
7 settlement that as a result of the settlement you
8 weren't going to be slowing things down anymore and
9 EquiServe in fact would be leaving Blue Hills Office
10 Park for sure?
11    A. Yes.
12    Q. And indeed you understood that as part of
13 the settlement, EquiServe signed a lease termination
14 agreement confirming that they would unequivocally
15 be leaving the space as of July 31, 2004, correct?
16    A. Yes.
17    Q. So that the settlement, you understood at
18 the time, eliminated any possibility of EquiServe
19 staying in the office park that you had hoped might
20 be accomplished by the filing of the special permit
21 appeal, correct?
22    A. Yes.
23        MR. FALBY: I'm going to ask some
24 questions about the payment, so I assume we are

101

1 still confidential?
2        MR. MCGLYNN: We went out and now we
3 are --
4        MR. FALBY: Let's go back into
5 confidentiality plan or mode.
6    Q. Mr. Donovan, have you ever read the
7 granting clauses of the mortgage that is Exhibit C
8 to the second amended complaint?
9    A. I can't say that I have, no.
10    Q. That's not part of the mortgage that you
11 read at the time of the loan back in 1999?
12    A. To the best of my knowledge, I don't
13 remember reading that, no.
14    Q. You've already confirmed that Blue Hills
15 received a $2 million payment in connection with the
16 settlement of the special permit appeal, correct?
17    A. Yes.
18    Q. What was that for?
19    A. I'm sorry?
20    Q. What was that payment for?
21    A. Well, the settlement of 2 million was so
22 they could move forward with building their garage
23 and completing their office building.
24    Q. And why did Blue Hills get 2 million bucks?

28 (Pages 106 to 109)

Joseph A. Donovan -  Volume 1 - February 14, 2006
C O N F I D E N T I A L

106

1  without him knowing of it -- strike that -- without
2  him accounting for it?
3          MR. MCGLYNN:  You are asking him if he
4  saw that in the deposition transcript?
5          MR. FALBY:  Yes.
6      A.  I didn't see that in the deposition
7  transcript.
8      Q.  Are you aware of any other instance in
9  which one of the single-purpose entities whose
10 property Fineberg Management managed received a
11 large amount of money, whether through a settlement
12 or some other event, that you didn't account for in
13 the books and records of the entity?
14     A.  If it came to the entity, I'd make the
15 accounting for it.
16     Q.  Have you ever heard of another instance
17 like this settlement where there was some big amount
18 of money that was supposed to be paid that didn't
19 actually hit the books and records of the entity?
20     A.  Not that I'm aware of.
21         MR. MCGLYNN:  I don't want to interrupt
22 your thought.  It's almost 12:30.  Is this a good
23 time to break or -- I know you mentioned you wanted
24 to break at 12:15, but I didn't want to interrupt

107

1  your line of questioning.
2          MR. FALBY:  We can take a break now.
3  Sorry.  I didn't realize it.
4          MR. MCGLYNN:  That's okay with me.
5          (Discussion off the record.)
6          (Luncheon recess at 12:27 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

108

1          AFTERNOON SESSION (1:17 p.m.)
2          (Mr. Polcari entered the room.)
3  BY MR. FALBY:
4      Q.  Mr. Donovan, did you have any discussions
5  with Gil Stone about the settlement payment or how
6  to account for it?
7      A.  We talked about it after his session with
8  you the other day.
9      Q.  Was that the first time you'd ever
10 discussed the settlement payment with Mr. Stone?
11     A.  To the best of my knowledge, yes.
12     Q.  Tell me about the discussion the other day.
13     A.  He just said you were asking a lot of
14 questions about it.
15     Q.  Did you discuss with anyone at or around
16 the time of the settlement whether you needed the
17 lender's consent to take the settlement payment out
18 of Blue Hills?
19     A.  I knew there was a settlement.  I don't
20 know there's actually been a payment; and no, I did
21 not talk to anybody about that.
22     Q.  Did you consider at the time whether or not
23 the $2 million payment that Mr. Goldberg told you
24 was part of the settlement ought to be disclosed to

109

1  the lender?
2      A.  No, I didn't consider it at the time.
3      Q.  Did you know at the time that you needed
4  the lender's consent to convey the settlement monies
5  out of Blue Hills?
6      A.  I had no understanding that I needed the
7  lender's consent.
8      Q.  You've dealt with lenders before, right?
9      A.  Yes, I have.
10     Q.  You knew that if you told your lender about
11 this payment, they'd insist on reserving it or
12 applying it to the loan balance, right?
13         MR. MCGLYNN:  Objection as to form,
14 speculative, calls for speculation.
15     A.  I'm not going to speculate what the lenders
16 thought or didn't think.
17     Q.  Just because he says "speculation" doesn't
18 mean that you then say what he's telling you to say.
19 Please answer my question.  Do you have it in mind?
20         MR. MCGLYNN:  First of all --
21     A.  Would you repeat the question.
22     Q.  Sure.
23         MR. MCGLYNN:  Let me just add, Bruce,
24 I'm not telling him what to say; I'm voicing

Joseph A. Donovan -  Volume 1 - February 14, 2006
C O N F I D E N T I A L

118
1    A. I'm not sure. If you have a copy of it,
2  I'd be glad to look at it.
3    Q. Let me show you Exhibit 10, which is the
4  lease termination agreement.
5      MR. MCGLYNN: This is not subject, to my
6  knowledge, to the confidentiality stipulation, so we
7  can go off that stipulation.
8    A. (Witness reviews document.) Yes, I have
9  seen this.
10    Q. Did you see it at the time it was entered
11  into?
12    A. I don't know. I don't remember if I saw it
13  then or not.
14    Q. When do you remember seeing it?
15    A. I can't give you a time period.
16    Q. Did you see it in preparation for your
17  deposition?
18    A. No, I don't think I did.
19    Q. Did you see it at or around the time it was
20  signed in the summer of 2003?
21    A. I don't know when I actually saw it.
22    Q. Is there some other time you might have
23  seen it?
24      MR. MCGLYNN: Objection, asked and

119
1  answered.
2    A. I don't have a time period when I actually
3  saw it.
4    Q. What was the occasion that prompted you to
5  see the lease termination agreement, Exhibit 10?
6    A. I don't remember.
7    Q. Did you ever discuss it with anybody?
8    A. Not to my knowledge, no.
9    Q. You remember seeing it, but you have no
10  memory whatsoever of the circumstances?
11    A. No, not offhand, I do not.
12    Q. Nor do you have any memory of ever
13  communicating with anybody about it?
14    A. Offhand, I don't remember communicating
15  with anybody about this, no.
16    Q. When I ask you about communications, I'm
17  including anybody at Fineberg Management, Fine
18  Hotels, Blue Hills, EquiServe, National Development,
19  anybody. You don't recall ever communicating with
20  anybody about the lease termination agreement?
21    A. No, I do not, not off the top of my head.
22    Q. Do you know why Blue Hills didn't set aside
23  the $2 million settlement payment as a further loan
24  reserve?

120
1    A. No, I do not.
2    Q. Did you have any discussion with anybody
3  when you learned about the $2 million payment, about
4  reserving it for future use by Blue Hills?
5    A. No, I don't remember any discussion.
6    Q. And you don't remember any discussion with
7  anybody about who got the money or where it went?
8    A. No.
9    Q. Were you curious about who got the money
10  and where it went?
11      MR. MCGLYNN: Objection.
12    A. No.
13    Q. You were the controller for Blue Hills
14  Office Park LLC, were you?
15    A. I was the CFO for Fineberg Management.
16    Q. And among your duties was overseeing the
17  books and records of Blue Hills Office Park LLC?
18    A. That's correct.
19    Q. You were, in essence, the CFO of Blue Hills
20  Office Park LLC?
21    A. If you want to say that.
22    Q. Well, did you think of yourself that way?
23    A. I think I was in charge of the day-to-day
24  accounting.

121
1    Q. And you knew that Blue Hills had brought a
2  lawsuit, right?
3    A. Yes, I did.
4    Q. And you knew that Blue Hills was settling
5  that lawsuit?
6    A. I knew there was a settlement, yes.
7    Q. Who did you think was settling it if Blue
8  Hills wasn't settling the lawsuit that Blue Hills
9  brought?
10    A. I don't know.
11    Q. And as CFO it didn't occur to you to ask
12  who is getting the settlement payment?
13    A. No, it didn't.
14    Q. As CFO of Blue Hills Office Park LLC, you
15  didn't think you had any responsibility to account
16  for a settlement paid in connection with the
17  settlement of a lawsuit brought by Blue Hills Office
18  Park LLC?
19      MR. MCGLYNN: Objection.
20    A. No.
21    Q. Why not? I'll ask a complete question.
22  Why, as the CFO of Blue Hills Office Park LLC, did
23  you not think it was your responsibility to
24  determine what had happened to a $2 million

Joseph A. Donovan  -  Volume 1 - February 14, 2006
C O N F I D E N T I A L

122

1  settlement in connection with a lawsuit brought by
2  Blue Hills Office Park LLC?
3          MR. MCGLYNN:  Objection.
4      A.  The settlement was with the owners, and I'm
5  responsible for the operating books.  I'm not
6  responsible for the owners' books.
7          MR. FALBY:  Well, let's mark the
8  settlement agreement itself as Exhibit 21.
9          (Marked, Exhibit 21, Settlement
10  agreement.)
11          MR. MCGLYNN:  This one, we should go
12  back and proceed under the confidentiality
13  stipulation.
14      Q.  Do you recognize Exhibit 21 as the
15  settlement agreement that settled the zoning permit
16  appeal?
17      A.  (Witness reviews document.) That's what it
18  looks like, yes.
19      Q.  And the first paragraph says, "This
20  settlement agreement, the agreement, is entered into
21  as of this 5th day of August, 2003, among Blue Hills
22  Office Park LLC, DST Realty, Inc., and Blue View
23  Corporate Center LLC," correct?
24      A.  Yes, that's what it says.

123

1      Q.  It doesn't say it's a settlement agreement
2  entered into among the owners of Blue Hills Office
3  Park and the other parties, does it?
4      A.  No, that's not what it says.
5      Q.  So again I ask you, why, as the CFO of Blue
6  Hills Office Park, were you not concerned about the
7  disposition of a $2 million payment made pursuant to
8  a settlement agreement to which Blue Hills Office
9  Park was a party?
10      A.  This is the first time I've seen the
11  settlement agreement.
12      Q.  And prior to this moment you never realized
13  that the settlement of the lawsuit brought by Blue
14  Hills Office Park LLC was consummated through an
15  agreement to which Blue Hills Office Park LLC was a
16  party?
17      A.  I knew there was a $2 million settlement.
18  I didn't know which parties made the settlement.
19      Q.  Nor did you inquire?
20      A.  No.
21      Q.  After the lease termination agreement was
22  signed insuring that EquiServe would leave the Blue
23  Hills Office Park no later than July 31, 2004, did
24  Blue Hills Office Park LLC make any efforts to find

124

1  a replacement tenant?
2      A.  Yes, they did.
3      Q.  What efforts did Blue Hills make?
4      A.  They hired a broker who started looking,
5  but I was not part of that process.
6      Q.  Who was part of the process?
7      A.  I believe it was Dan Frank and Larry
8  Needle.
9      Q.  The broker was Cushman & Wakefield?
10      A.  To the best of my knowledge, that's
11  correct.
12      Q.  Do you know anything about the efforts that
13  Cushman & Wakefield made to find a replacement
14  tenant or tenants?
15      A.  Just general information.
16      Q.  What do you know?
17      A.  I know they put together a brochure.  I
18  know they brought a number of big clients through
19  looking at the building, including Dunkin' Donuts.
20      Q.  What else do you know about the efforts of
21  Cushman & Wakefield to find replacement tenants for
22  EquiServe?
23      A.  I didn't sit in on the meetings, so I don't
24  know what their effort was.

125

1      Q.  Paragraph 40 of the second amended
2  complaint, which is Exhibit 15, talks about Cushman
3  & Wakefield's efforts.  Could you read that to
4  yourself, please, and tell me when you've finished.
5      A.  (Witness reviews document.) Just 40?
6      Q.  Yes.
7      A.  I've finished.
8      Q.  Paragraph 40 returns to -- strike that.
9  Paragraph 40 refers to Cushman & Wakefield's initial
10  leasing efforts; do you see that?
11      A.  Yes.
12      Q.  Do you have any idea how long Cushman &
13  Wakefield's initial leasing efforts lasted?
14      A.  No, I don't.
15      Q.  Do you know what those initial leasing
16  efforts entailed?
17      A.  Other than what I stated, that I knew there
18  was some kind of prospective tenants brought through
19  the building, that's all I know.
20      Q.  Do you know whether Cushman & Wakefield
21  identified any serious prospects for the space?
22      A.  In my personal opinion, I thought Dunkin'
23  Donuts, from what I heard, was a very serious
24  prospect.

Page 137

1    A. No, I'm not.
2    Q. *All right. Well, I'm telling you that and
3  it's true. Taking what I'm telling you as true, how
4  do you reconcile the fact that the documents don't
5  allow use of the reserves to pay real estate taxes
6  with what you tell us is your understanding that you
7  were allowed to use the reserves to pay real estate
8  taxes?
9         MR. MCGLYNN: Objection as to form.
10  Would you please repeat that question.
11         *(Question read.)
12         MR. MCGLYNN: Further objection. That's
13  a hypothetical question and calls for a speculative
14  answer.
15    Q. What's the answer, Mr. Donovan?
16    A. When I wrote the letter, I thought we could
17  use it for real estate taxes.
18    Q. And now you realize you couldn't, right?
19         MR. MCGLYNN: Objection.
20    A. I don't. You say we can't, but that
21  doesn't mean it's a fact.
22    Q. We can go through the exercise of going
23  through all the documents, or you can just take it
24  from me -- let me leave the room and take it from

Page 138

1  Mr. McGlynn, who has conceded this fact before --
2  the loan documents don't allow it.
3         MR. MCGLYNN: I didn't realize I was
4  conceding anything. I didn't realize I was under
5  oath here, but for the record --
6         MR. FALBY: Do you want to take issue
7  with that statement?
8         MR. MCGLYNN: I haven't conceded
9  anything. I'm not the witness. Formulate proper
10  questions, and the witness will answer them.
11         I don't think there's anything pending
12  before you now, Joe.
13         THE WITNESS: There's no question
14  pending?
15    Q. I'll ask you a question. That's my job.
16  Given that the loan documents don't allow the use of
17  reserves to pay real estate taxes, what's the basis
18  for your understanding that you are allowed to use
19  the reserves to pay real estate taxes?
20    A. It was my understanding when I wrote the
21  letter that we could use it to pay real estate
22  taxes. It was my understanding that it was to use
23  the money to keep the property running until we
24  found a new tenant.

Page 139

1    Q. Was it your understanding when you wrote
2  your letter dated August 2, 2004, asking Wells Fargo
3  to apply the reserves to real estate taxes that you
4  were entitled under the loan documents to use the
5  reserves for that purpose?
6         MR. MCGLYNN: Objection, asked and
7  answered. I believe that this witness has answered
8  at least seven times now that that's what his
9  understanding was. Can we move on to something
10  else?
11         MR. FALBY: No, no, it isn't. I have
12  asked him a brand-new question. Please don't
13  interfere.
14    A. That was my understanding.
15    Q. Did you check the loan documents at that
16  point to confirm your understanding of them?
17    A. No, I did not.
18    Q. And have you since checked the loan
19  documents to confirm or debunk the notion that real
20  estate tax payments can be made from the reserve
21  accounts?
22    A. No, I have not.
23    Q. Sitting here today, do you know whether the
24  loan documents allow use of reserves to make real

Page 140

1  estate payments -- tax payments?
2    A. I don't know. I am just taking your word
3  for what you just said.
4         MR. MCGLYNN: Don't ever do that,
5  please, Joe.
6    Q. How much money did Blue Hills need to fix
7  up Blue Hills Office Park in order to attract a
8  tenant?
9    A. I do not know.
10    Q. Did Blue Hills -- strike that. Did Blue
11  Hills Office Park make any effort to find any new
12  partners to bring new money to the table?
13    A. That was a possibility once we sat down
14  with Lennar and had a chance to talk to them.
15    Q. Well, you never sat down with Lennar and
16  talked with them, did you?
17    A. No, we did not.
18    Q. So let me ask my question again. Did Blue
19  Hills make any effort to find any new partners to
20  bring new money into the project?
21    A. I did not personally, no.
22    Q. Do you know if anybody else did?
23    A. Not that I'm aware of.
24    Q. Did Blue Hills ever come up with a business

258f568a-e5cf-4014-a6e3-a6c8384762b2

Joseph A. Donovan -  Volume 1 - February 14, 2006
C O N F I D E N T I A L

---

154

1  remember.
2        MR. MCGLYNN:  Shall we get that marked
3  since the witness has --
4        MR. FALBY:  The witness just reviewed
5  his August 2, 2004 letter, which I'm going to mark
6  in a minute.
7        Q.  There was only one letter on that date,
8  right?
9        A.  Excuse me?
10       Q.  There was only one letter from you to Wells
11  Fargo on August 2, 2004, right?
12       A.  I believe so, yes -- in 2002, you mean?
13       Q.  2004.
14       A.  (Witness reviews document.) I sent out
15  another letter at about that same time.
16       Q.  Confirming that EquiServe had left the
17  building?
18       A.  That's probably -- yeah, if you could show
19  it to me.  (Witness reviews document.)  Okay.  That's
20  2005 so that's about the same time.
21       Q.  It's still 2004.  It's August.
22       A.  (Witness reviews document.) I mean August
23  5, 2004.
24       MR. FALBY:  Let me mark as Exhibit 22 a

---

155

1  document Bates-stamped LNR 2765 through 66.
2        MR. MCGLYNN:  Thank you.
3        (Marked, Exhibit 22, E-mail from C.
4  Mallegni to V. Taylor, Bates-stamped LNR 2765
5  through 66.)
6        A.  (Witness reviews document.)
7        Q.  Do you see that Exhibit 22 is an e-mail
8  from Mallegni at wellsfargo.com to Vickie Taylor?
9        A.  Yes.
10       Q.  And I'm referring to the first e-mail on
11  the page; do you see that?
12       A.  The one at the top?
13       Q.  Yes.  It's dated July 15, 2004.  It says,
14  "Vickie, I spoke with CFO Joe Donovan on this loan.
15  Fleet has left the project.  The property is
16  available for lease but there were no prospects
17  currently.  We currently have $4,118,062 in
18  reserves, and the loan is paid through 8/11/04.
19  We'll track this closely and advise"; do you see
20  that?
21       A.  Yes.
22       Q.  Does this refresh your memory about
23  speaking with Curtis Mallegni on or about July 15,
24  2004?

---

156

1        A.  I know I spoke to somebody.  I thought it
2  was in June, but that could be it, sure.
3        Q.  Did you tell Mr. Mallegni that the property
4  was available for lease but there were no prospects
5  currently?
6        A.  I probably did, yes.
7        Q.  'Cause both those facts were true at the
8  time, right?
9        A.  To the best of my knowledge, yes.
10       Q.  Does reviewing this e-mail prompt any
11  actual memory of the conversation?
12       A.  I know I had a conversation.  I thought --
13  when I said to you I thought it was June, this very
14  well could be the conversation I had.
15       Q.  Other than what Exhibit 22 says, do you
16  have any memory of the content of the conversation
17  that you apparently had in July of 2004 with Curtis
18  Mallegni?
19       A.  No.
20       Q.  Up to July of '04, had you requested any
21  meetings with Wells Fargo?
22       A.  Yes, I had.  I had asked to sit and talk to
23  whoever at Wells Fargo that needed to talk about the
24  loans.

---

157

1        Q.  Who had you asked that of at Wells Fargo?
2        A.  I don't remember any names.
3        Q.  When did you ask that?
4        A.  It would have been in the time period 2004.
5        Q.  Well, I had asked you about the three or
6  four telephone conversations you described in early 2004,
7  which you said were done by April or May.  And then
8  I went through each of the months up until July, and
9  you didn't tell me about any request for a meeting.
10  So was there some conversation you forgot about that
11  you now remember that you want to tell me about?
12       A.  No.
13       Q.  Well, in what conversation did you ask for
14  a meeting with Wells Fargo?
15       A.  I can't tell you which conversation.
16       Q.  Was it during one of the three or four
17  telephone conversations you described with somebody
18  at Wells Fargo where you told them that there was no
19  urgency because you expected to be able to replace
20  EquiServe when they moved out without any trouble?
21       A.  At that point I probably didn't ask.  The
22  only one I may have asked probably would have been
23  right here at this meeting, and I don't remember if
24  I did or not.

---

FARMER ARSENAULT BROCK

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

---

158

1    Q. So you don't actually remember whether you
2  asked for a meeting, correct?
3    A. I think I asked for a meeting, but I don't
4  remember -- I don't specifically remember.
5    Q. If you did ask for a meeting, you think it
6  was during the July 15 conversation with Curtis
7  Mallegni?
8    A. It's possible.
9    Q. But you don't know?
10   A. No.
11   Q. You don't really remember asking for a
12  meeting.  Do you remember what you were asking for a
13  meeting about, if you were?
14        MR. MCGLYNN:  Objection.
15   A. Could you rephrase that, please.
16   Q. Well, you don't really remember whether you
17  asked for a meeting or not, right?
18   A. I don't remember specifics, no.
19   Q. You think you might have, right?
20   A. I think I might have.
21   Q. And if you did, what were you asking for a
22  meeting about?
23   A. To talk about the continuation of the
24  mortgage.

---

159

1    Q. Why?
2        MR. MCGLYNN:  Objection.
3    A. At that point in time, we were getting near
4  the end of EquiServe moving out.
5    Q. By "that point in time" you are referring
6  to July 2004?
7    A. Yeah, the June/July time period, sure.
8    Q. Mr. Mallegni's e-mail recounting for Vickie
9  Taylor his conversation with you doesn't note any
10  request by you for a meeting; do you see that?
11   A. I see that.
12   Q. Did you have any communication with Wells
13  Fargo in August asking for a meeting?
14   A. Not that I'm aware of.
15   Q. Do you know if anybody else at Blue Hills
16  up through the end of July 2004 had asked Wells
17  Fargo for a meeting?
18   A. I don't know.
19   Q. You don't recall any discussion with
20  anybody else at Blue Hills on the topic of trying to
21  get a meeting with Wells Fargo at that point, do
22  you?
23   A. Not offhand, no.
24   Q. Tell me, if you can, if you did ask Curtis

---

160

1  Mallegni about having a meeting, do you have any
2  idea of his response?
3        MR. MCGLYNN:  Objection.
4    A. I don't know.
5    Q. Do you know if anybody at Wells Fargo ever
6  told anybody else at Blue Hills that they'd be
7  willing to have a meeting?
8    A. Not that I'm aware of.
9    Q. Because there never was a meeting, right?
10        MR. MCGLYNN:  Objection.
11   A. There was no meeting, no.
12   Q. Did anybody from Blue Hills ask Wells Fargo
13  for a meeting in August of '04?
14   A. I don't know.  Not that I'm aware of.
15   Q. Did you talk to anybody at Blue Hills about
16  whether they asked for a meeting?
17   A. Not that I can remember, no.
18   Q. Did you talk about whether you should ask
19  for a meeting?
20   A. Not that I can remember.
21   Q. Did you talk to anybody at Blue Hills about
22  whether Wells Fargo had refused to have a meeting?
23   A. Not that I can remember.
24   Q. Now, you learned at some point that Lennar

---

161

1  would be coming in as special servicer on the Blue
2  Hills loan, correct?
3    A. That's correct.
4    Q. When did you learn that?
5    A. I don't know.
6    Q. All right.  Let's mark your August 2 letter
7  as Exhibit 23.
8        (Marked, Exhibit 23, August 2, 2004
9  letter from witness to Wells Fargo.)
10   Q. Exhibit 23 is the August 2, 2004 letter
11  that you wrote to Wells Fargo that we've looked at
12  before today, correct?
13   A. (Witness reviews document.) Yes.
14   Q. It's addressed to Tim Parish at Wells
15  Fargo, correct?
16   A. That's correct.
17   Q. Why did you send it to him?
18   A. I must have had a conversation with him and
19  knew him by name.
20   Q. Was Tim Parish one of the people you were
21  talking to during the three or four telephone
22  conversations you've told me about that took place
23  in late '03 and early '04?
24   A. I don't know.

---

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

166

1    Q. What date do you put on Exhibit 25?
2    A. August 4.
3    Q. Are you sure that's August 4 as opposed to
4  August '04, that is, August 2004?
5    A. It could be August of '04, yeah, 2004.
6    Q. After Mr. Warshaw called and left the
7  voice-mail of introduction that we've marked as
8  Exhibit 25, did you subsequently actually talk to
9  him on the phone?
10    A. I can't remember.
11    Q. As you search your memory, I take it you
12  have no memory of actually talking live with Job
13  Warshaw, correct?
14    A. I can't remember talking to him. That
15  doesn't mean I didn't.
16    Q. I'm just saying, as you search your memory,
17  there's nothing there about a conversation --
18        MR. MCGLYNN: Objection.
19    Q. -- with Job Warshaw, right?
20    A. I can't remember talking to him.
21    Q. And you have no notes or memos or letters
22  or anything else in writing indicating that you ever
23  talked to him, correct?
24    A. No, I have no notes or memos.

167

1    Q. Do you have a memory of talking to
2  Mr. Polcari?
3    A. Yes, I do.
4    Q. When?
5    A. I don't have a good time -- time frame.
6    Q. Was it in August 2004; do you know?
7    A. I don't know.
8    Q. You sent another letter to Tim Parish dated
9  September 2, 2004, which we will mark as Exhibit 26.
10        (Marked, Exhibit 26, Letter to Tim
11  Parish from witness dated September 2, 2004.)
12    Q. Can you confirm that Exhibit 26 is a letter
13  you wrote to Mr. Tim Parish at Wells Fargo on
14  September 2, 2004, asking that reserve monies be
15  used to pay principal and interest due for
16  September?
17    A. (Witness reviews document.) Yes.
18    Q. Did you talk to Mr. Polcari before you sent
19  the September 2 letter to Mr. Parish?
20    A. I don't know.
21    Q. As of September 2 you knew that Lennar was
22  servicing the loan. Why did you send the September
23  2 letter to Tim Parish at Wells Fargo?
24    A. Because, number one, that's the address I

168

1  had. Number two, I copied in Job Warshaw on the
2  correspondence. I had no notification that it had
3  been transferred to a special servicer as far as I
4  knew at that point.
5    Q. Well, actually, there was an August 19
6  letter telling you that the loan had been
7  transferred to the special servicer. Do you
8  remember that?
9    A. Not offhand.
10    Q. Before we go to that August 19 letter,
11  looking at -- strike that. Looking at Exhibit 24,
12  the August 5, 2004 letter, do you see that it says
13  "sent via facsimile"?
14    A. Uh-huh.
15    Q. You have to say yes or no.
16    A. Yes.
17    Q. The August 2 letter doesn't say "sent via
18  facsimile," does it?
19    A. No.
20    Q. Do you know how Exhibit 23, the August 2
21  letter, was sent?
22    A. Not sitting here I don't, no.
23    Q. If you were going to send a letter by fax,
24  was it your practice to note on the letter that it

169

1  was going by fax?
2    A. It would usually be on there, but it
3  depended on who typed it for me. Sometimes whoever
4  was available, they might not have put that on
5  there.
6    Q. So you can't say for sure whether or not
7  the August 2 letter went by fax or mail?
8    A. No, I cannot.
9    Q. Do you have any memory of which way it
10  went?
11    A. No, not offhand.
12    Q. So do you have any idea whether the
13  September 2 letter went by fax or by mail?
14    A. I don't know offhand.
15    Q. Because the September 2 letter, Exhibit 26,
16  doesn't say on it that it was sent by fax either,
17  does it?
18    A. No, it does not.
19    Q. Now, in response to your -- let's do this
20  another way.
21        MR. FALBY: Let's mark as -- Exhibit 27,
22  are we up to?
23        MR. MCGLYNN: Yes.
24        MR. FALBY: -- documents Bates-stamped

48 (Pages 186 to 189)

Joseph A. Donovan -  Volume 1 - February 14, 2006
C O N F I D E N T I A L

186

1  **Mr. Polcari before Lennar sent its September 17**
2  **default notice?**
3      A. I don't know when my conversations with
4  Mr. Polcari took place.
5      **Q. Well, let me first show you the September**
6  **17 default notice.**
7          MR. FALBY:  We will mark it Exhibit 30.
8          (Marked, Exhibit 30, September 17
9  default notice.)
10         THE WITNESS:  Can we take a break to go
11  to the bathroom?
12         MR. FALBY:  Okay.
13         MR. MCGLYNN:  Off the record.
14         (Discussion off the record.)
15         (Recess.)
16  BY MR. FALBY:
17     **Q. I have handed you Exhibit 30.  Do you**
18  **recognize that as the letter that came to you dated**
19  **September 17, 2004, from Lennar defaulting Blue**
20  **Hills under the mortgage loan?**
21     A. (Witness reviews document.) Yes.
22     **Q. The first paragraph references your letters**
23  **of August 2, 2004, and September 2, 2004, to Tim**
24  **Parish, correct?**

187

1      A. Yes.
2      **Q. And it says, "Following are our responses**
3  **to your letters," correct?**
4          MR. MCGLYNN:  Do you want him to read
5  what it says?
6          MR. FALBY:  I'm asking him to agree with
7  me that the last --
8      A. I'm sorry, I didn't hear you.
9      **Q. The last sentence of the first paragraph**
10  **says, "The following are our responses to your**
11  **letters," correct?**
12     A. That's what it says, yes.
13     **Q. Prior to receiving this notice, had you**
14  **received any written response to your letters of**
15  **August 2 or September 2?**
16     A. No, I didn't.
17     **Q. Do you recall before you received Exhibit**
18  **30 that Mr. Polcari called you on the telephone as a**
19  **courtesy to let you know that this letter would be**
20  **coming?**
21     A. Not offhand, I don't remember that, no.
22     **Q. Does it refresh your memory to tell you**
23  **that you responded that you understood Lennar's**
24  **position?**

188

1      A. I don't remember saying that.
2      **Q. Do you remember telling Mr. Polcari during**
3  **that conversation that Blue Hills had no tenant**
4  **prospects at that time?**
5      A. I don't remember the conversation.
6      **Q. And do you recall telling Mr. -- let me**
7  **rephrase it.  Does it refresh your memory and cause**
8  **you to remember the conversation if I tell you that**
9  **you acknowledged to Mr. Polcari in that conversation**
10  **that it didn't really matter that access to the**
11  **reserves would be denied because you weren't going**
12  **to get a tenant in there within the four months**
13  **during which you were entitled to get access to the**
14  **reserves?**
15     A. No, I never remember saying that.
16     **Q. Does it refresh your memory if I tell you**
17  **that you said, in words or substance, the reserves**
18  **would not carry you forever?**
19     A. No, again, I don't remember the
20  conversation.
21     **Q. Can you unequivocally deny that the**
22  **conversation took place?**
23     A. I don't remember the conversation.
24     **Q. My question is a little different.  It's**

189

1  clear you don't remember it.  I'm asking you
2  something different.  Can you categorically state
3  that it did not take place?
4          MR. MCGLYNN:  Objection.
5      A. As far as I know, the conversation did not
6  take place.
7      **Q. That's because you don't remember it,**
8  **correct?**
9      A. That's correct.
10     **Q. My question is different.  It's whether you**
11  **can categorically deny it not because you have a**
12  **lack of memory, but because you are absolutely**
13  **certain that it never took place.**
14         MR. MCGLYNN:  Objection.
15     A. I don't categorically deny anything about
16  anything.
17     **Q. Well, you can probably --**
18         MR. MCGLYNN:  One at a time.  The
19  question's been asked and answered, Bruce.
20         MR. FALBY:  No, he's avoiding answering
21  my question.
22         MR. MCGLYNN:  Let's not characterize the
23  testimony.
24         MR. FALBY:  Let's not interfere with my

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

198

1          MR. FALBY: Reaching across the table?
2  You are hallucinating, Mr. McGlynn, be serious.
3          MR. MCGLYNN: I am looking at you
4  leaning towards this witness in an intimidating
5  fashion.
6          MR. FALBY: I'm looking at you getting
7  ready to attack me right now. It's very
8  threatening.
9          MR. MCGLYNN: My guess is that since
10 you've got about six or seven inches of height on me
11 and maybe a few more pounds in weight, that you are
12 not going to be intimidated by me staring at you.
13         MR. FALBY: I bet you weigh more than I
14 do.
15         MR. MCGLYNN: Can you unequivocally
16 state that I weigh more than you do?
17         MR. FALBY: No.
18         MR. MCGLYNN: Let's move on. You have
19 asked this ad nauseam.
20         MR. FALBY: Well, I am going to ask it
21 again.
22         MR. MCGLYNN: Okay, and I will keep
23 interposing an objection.
24         MR. FALBY: That's fine. Why don't you

199

1  have a standing objection to my question until I get
2  the answer I am entitled to get.
3    Q. I have asked you about a conversation that
4  Mr. Polcari says he had with you in which he called
5  you as a courtesy to tell you that the default
6  notice dated September 17 was coming, and you said
7  you don't remember any such conversation, correct?
8    A. That's correct.
9    Q. And my question to you very simply is, did
10 that conversation occur?
11         MR. MCGLYNN: Objection.
12   Q. "Yes," "no," or "I don't know"?
13   A. I can't answer it because I don't know.
14   Q. All right. After you received this
15 September 17 default notice, did you do anything?
16   A. I shared it with my lawyer.
17   Q. Who?
18   A. Ken Goldberg.
19   Q. Did you do anything else?
20   A. Not that I can remember.
21   Q. What was your reaction when you got the
22 September 17 default notice?
23   A. I was upset.
24   Q. Why?

200

1    A. Because I wanted to work out some kind of
2  deal.
3    Q. Were you upset for any other reason?
4    A. Yeah, this is a great asset, we didn't want
5  to lose it.
6    Q. Were you upset for any other reason?
7    A. Not that I can think of offhand.
8    Q. You told me that Exhibit 30 was the first
9  written response you had received to your August 2
10 and September 2 request for access to the reserve
11 funds, correct?
12   A. To the best of my knowledge, that's true.
13   Q. Had you received any nonwritten response to
14 your request before that date, whether in a
15 conversation in person or over the telephone or any
16 other way?
17   A. Not that I can remember, no.
18   Q. Prior to September 17, 2004, no one at
19 Wells Fargo or Lennar had ever told you that your
20 request for access to the reserve accounts had been
21 granted, correct?
22   A. That had been -- I'm sorry, I didn't hear
23 you.
24   Q. Prior to September 17, 2004, no one at

201

1  Wells Fargo or Lennar had ever told you that your
2  request for access to the reserve accounts had been
3  granted, correct?
4    A. Correct.
5    Q. Do you recall that Blue Hills received a
6  tax shortage notice from Wells Fargo in mid-July
7  2004?
8    A. Yes, I believe that was a standard notice
9  that we got every quarter.
10   Q. And do you recall discussing that notice
11 when it came in mid-month with Gil Stone?
12   A. I probably did, yes.
13   Q. What's your memory of that conversation?
14   A. Probably that it was a standard thing that
15 Wells Fargo -- the computer at Wells Fargo kicked
16 out every quarter, and under normal circumstances,
17 as soon as EquiServe gave us the money, we would
18 send it right to Wells Fargo and have the taxes
19 paid.
20   Q. You discussed all that with Gil Stone when
21 it came in?
22   A. That would be the normal discussion on a
23 quarterly basis.
24   Q. Did you have any other discussion with

FARMER ARSENAULT BROCK

53 (Pages 206 to 209)

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

206

1   **Q. Could you please answer my question.**
2         MR. MCGLYNN: Objection.
3   **Q. Nor did you expect, did you, that Wells**
4   **Fargo would be escrowing monies from rents to pay**
5   **real estate taxes due on August 1, correct?**
6         MR. MCGLYNN: Objection.
7   A. No, because I didn't think there was any
8   need to.
9   **Q. Well, I move to strike everything after no,**
10  **and I need to ask it again. Every time you add**
11  **something to the answer, I have to ask it again, so**
12  **it just keeps us here longer.**
13        MR. MCGLYNN: By the way, the mere fact
14  that you are moving to strike doesn't mean it's
15  stricken. You have put that on the record. We can
16  move on.
17        MR. FALBY: No, we can't move on because
18  if it's denied, I am entitled to a clean answer.
19  **Q. You didn't expect Wells Fargo in May, June,**
20  **or July to be taking from rents monies and putting**
21  **them in a tax escrow account to pay taxes due on**
22  **August 1, 2004, correct?**
23        MR. MCGLYNN: Objection.
24  A. No.

207

1   **Q. Each month Wells Fargo distributed net**
2   **rents to Blue Hills after paying debt service and**
3   **putting money in various escrow subaccounts,**
4   **correct?**
5   A. That's correct.
6   **Q. And that was approximately $175,000 a**
7   **month, correct?**
8   A. Off the top of my head, I don't know how
9   much it was.
10        MR. FALBY: Let's mark as Exhibit 31
11  documents relating to the distribution in May of
12  2004.
13        (Marked, Exhibit 31, Documents relating
14  to the distribution in May of 2004.)
15  **Q. Do you recognize Exhibit 31, Mr. Donovan?**
16  A. (Witness reviews document.) No, I've never
17  seen any of these before.
18  **Q. Do you recognize any of the pages of**
19  **Exhibit 31; that is, have you seen these pages**
20  **before or pages like them?**
21  A. Have I seen wire instructions before? Yes.
22  Have I seen this one? No, I haven't seen it.
23  **Q. Does this refresh your memory that Wells**
24  **Fargo in May of 2004 wired $174,000?**

208

1   A. That's what it looks like.
2   **Q. To Blue Hills?**
3   A. That's what it looks like.
4   **Q. And this represented net rents from the**
5   **Blue Hills Office Park, correct?**
6   A. I assume so. I mean, I've not seen this
7   one page. I don't know if that's what it is or not,
8   but I mean, it seems reasonable.
9         MR. FALBY: Let's mark a similar
10  document for June 2004 Bates-stamped WF 2004 through
11  2008.
12        (Marked, Exhibit 32, Documents relating
13  to distribution in June 2004, Bates-stamped WF 2004
14  through 2008.)
15  **Q. You probably haven't seen Exhibit 32 before**
16  **either, correct?**
17  A. (Witness reviews document.) No, I haven't.
18  **Q. It suggests that in June Wells Fargo sent**
19  **Blue Hills $173,063.76 in net rents, correct?**
20  A. That's what it suggests, yes.
21  **Q. Do you have any reason to doubt that that's**
22  **what happened?**
23  A. No.
24  **Q. I don't have one of these for July, but the**

209

1   number for July was similar. Is it consistent with
2   your memory that in July 2004 Wells Fargo remitted
3   approximately 170-something thousand in net rents to
4   Blue Hills?
5   A. I didn't see this on a monthly basis, so I
6   don't know how much they sent each month to Blue
7   Hills.
8   **Q. Do you have any reason to doubt that that**
9   **much was sent in July '04?**
10  A. It very well could have been.
11  **Q. Into what accounts did the net rents come**
12  **when they were refunded to Blue Hills?**
13  A. It's going into a Banknorth account.
14  **Q. Which account?**
15  A. Do you want the account number?
16  **Q. No. Was it an operating account?**
17  A. It must have been the operating account,
18  yes.
19  **Q. For Blue Hills?**
20  A. Yes.
21  **Q. Did Blue Hills have a separate operating**
22  **account?**
23  A. Yes.
24  **Q. Separate, that is, from a lockbox account?**

54 (Pages 210 to 213)

Joseph A. Donovan  -  Volume 1 - February 14, 2006
C O N F I D E N T I A L

210

1    A. Yes.
2    Q. Did you use the operating account to pay
3 bills?
4    A. Yes.
5    Q. And distribute monies to partners?
6    A. Yes.
7    Q. Do you know how much of the monthly net
8 rents was used to pay expenses in 2004?
9    A. No, I don't, offhand.
10    Q. Do you have any idea?
11    A. I don't have a clue.
12    Q. In each month was any remainder --
13    A. I don't know.
14    Q. Strike that. I've got to finish the
15 question. In each month was the difference between
16 net rents and expenses distributed to the partners?
17    A. Excuse me. Say that again.
18    Q. Was the difference between the net rents
19 and the monthly expenses each month distributed to
20 the partners on a monthly basis?
21    A. No.
22    Q. Did the net rents each month exceed the
23 amount of property expenses that were used to --
24 strike that. Did the net rents sent back -- did the

211

1 net rents sent back by Wells Fargo every month
2 exceed the monthly expenses for the property?
3    A. I think in most months it did, not in all
4 months.
5    Q. And what happened to the positive
6 difference?
7    A. I believe on an annual basis or maybe every
8 six months there may have been a distribution to the
9 partners.
10    Q. Was there a distribution by Blue Hills to
11 its partners at the end of 2003?
12    A. I don't remember offhand.
13    Q. As of -- strike that. As of July 2004, how
14 much money was in the operating account?
15    A. I don't know at this point.
16    Q. Was there a distribution of monies to the
17 Blue Hills partners from the operating account at
18 the end of July 2004?
19    A. I don't know.
20    Q. How come Blue Hills did not use the
21 leftover monies in the operating account to pay the
22 taxes due August 1, 2004?
23    A. Because in my opinion it didn't need to.
24    Q. Why not?

212

1    A. Because it was our money sitting in the
2 escrow account, and it was my opinion it could be
3 used for paying real estate taxes.
4    Q. And you don't know whether your opinion is
5 consistent with what the loan documents actually
6 say?
7    A. No.
8    Q. What monthly expenses did Blue Hills have
9 that it had to pay out of net rents?
10    A. Off the top of my head, I don't know.
11    Q. EquiServe had a triple net lease, right?
12    A. Pretty much, I think.
13    Q. Were there any expenses that Blue Hills
14 paid?
15    A. There was a lot of expenses that Blue Hills
16 paid.
17    Q. What were they?
18    A. Off the top of my head, I don't know. Gil
19 Stone handled that on a day-to-day basis.
20    Q. Do you have any idea of the approximate
21 amount of those expenses a month?
22    A. No, I don't.
23    Q. Do you have any idea of the approximate
24 amount of the distribution to the Blue Hills

213

1 partners at the end of 2003?
2    A. No, I don't.
3    Q. How were insurance premiums handled by Blue
4 Hills in 2004?
5    A. The insurance year for our company runs May
6 1 on, so we had a new insurance year, and we drew
7 the funds down to pay the insurance.
8    Q. When you say you drew the funds down, does
9 that mean Blue Hills took monies in the insurance
10 premium escrow subaccount to pay the insurance
11 premium?
12    A. Yes.
13    Q. The paperwork indicates that Blue Hills
14 paid those premiums and then sought reimbursement
15 from the subaccount. Is that how it worked?
16    A. Fine Hotels paid the premiums, and then I
17 think the subaccount -- then the money from Wells
18 Fargo reimbursed Fine Hotels.
19    Q. Is that the way it was typically handled?
20    A. Yes, we -- to get the discount on the
21 insurance, we'd do all the entities together so all
22 the liability insurance, all the umbrella insurance,
23 all the workers' comp insurance, all the property
24 insurance would be done as a group and then

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

Page 217

1  deposition Stone Exhibit 6, which is an account of
2  another conversation with Gil Stern and Wells Fargo
3  about paying the real estate taxes?
4      A. I saw a thing that said "Gil Stern." I
5  didn't realize there was two of them.
6      Q. Do you want to take a moment and just read
7  both of them? I'm going to ask you about them.
8      A. (Witness reviews documents.) Okay.
9      Q. Do you see that the account of a
10  conversation contained in Stone Exhibit 5 says, "I
11  have contacted Gil Stern, phone number
12  1-781-239-1480"? Do you see that?
13     A. Yes, I do see that.
14     Q. That's the phone number of Fineberg
15  Management, correct?
16     A. That's the Fineberg Management phone
17  number, yes.
18     Q. Do Stone Exhibits 5 and 6 refresh your
19  memory that when the tax shortage notice came in, or
20  shortly thereafter, in fact Mr. Stone did have
21  conversations with Wells Fargo folks about payment
22  of the real estate taxes?
23     A. I don't believe Mr. Stone had any
24  conversations about the real estate taxes at that

Page 218

1  particular time.
2      Q. Can you explain why you say that?
3      A. Well, if they were telling Mr. Stone that
4  he needed the lien waiver, he would have come right
5  up to me and talked to me about it; and I don't
6  think -- I don't remember him ever coming up to me
7  and asking me for lien waivers.
8      Q. Well, does it make sense that Wells Fargo
9  wouldn't have called Blue Hills looking for the tax
10  money when it didn't come?
11     A. I don't know if they called on a quarterly
12  basis or not or if they just sent out the letter.
13     Q. Well, don't you think once they sent the
14  letter, when they didn't get the money they would
15  have called and said, "Hey, where's the money you
16  were supposed to send"?
17         MR. MCGLYNN: Objection.
18     A. They may have, but if Gil Stone had a phone
19  call like that, he would have been running right
20  down to my office, and certification just -- I don't
21  know what they mean by a certification. That
22  doesn't seem to make any sense to me. It's a
23  nonsensical request, as far as I'm concerned.
24     Q. You don't recall having any conversation

Page 219

1  with Mr. Stone about this subject?
2      A. No.
3      Q. Now, Mr. Stone, as you probably know from
4  having looked at his transcript, doesn't remember
5  these conversations, nor, however, can he deny them.
6  Are you sure that this topic wasn't discussed with
7  Wells Fargo towards the end of July 2004?
8      A. I don't believe it was.
9      Q. Can you think of any reason why people at
10  Wells Fargo would be making notes about
11  conversations with Gil Stern at your telephone
12  number if they hadn't taken place?
13         MR. MCGLYNN: Objection.
14     A. I think you'd have to ask them.
15     Q. Because you can't think of any reason why
16  they would be at that point fabricating
17  conversations?
18         MR. MCGLYNN: Objection.
19     A. I don't know if they are or not. You have
20  to ask them.
21     Q. Can you think of any reason why they would?
22         MR. MCGLYNN: Objection.
23     A. I don't know. I don't work for Wells
24  Fargo. I don't know what the atmosphere is like

Page 220

1  there.
2      Q. As between the two possibilities, that Gil
3  Stone's memory is faulty and people at Wells Fargo
4  were fabricating notes of conversations that didn't
5  happen, which do you think is more likely?
6         MR. MCGLYNN: Objection, calls for
7  speculation.
8         MR. FALBY: No, it doesn't.
9      A. Gil Stone is a very trustworthy,
10  hard-working guy that would be running right down to
11  my office with a -- any kind of phone conversation
12  like that, so I don't believe he ever had that phone
13  conversation.
14     Q. In fact, Wells Fargo advanced the money to
15  pay those taxes that were due; you know that now,
16  correct?
17     A. I knew that then.
18     Q. When did you find that out?
19     A. We contacted the town and saw that it was
20  paid.
21     Q. When did you do that?
22     A. Somewhere in August of '04.
23     Q. Stone Exhibit 6 says, "Advancing funds
24  today per ops," o-p-s, "manager approval"; do you

55 (Pages 217 to 220)

258f568a-e5cf-4014-a6e3-a6c8384762b2

58 (Pages 226 to 229)

Joseph A. Donovan - Volume 1 - February 14, 2006

C O N F I D E N T I A L

226

1    A. I assume it was.
2    Q. Why do you assume it was?
3    A. Because that would be the normal procedure.
4    Q. You had the normal practice of following up
5    faxes by sending the original letter by mail?
6    A. Yeah, yeah. I mean, if we -- this did not
7    say fax on it, so normal procedure would be we would
8    have mailed the original letter.
9    Q. So the normal procedure when it doesn't say
10   "fax" is that you mailed it, right?
11   A. That's correct.
12   Q. And that Exhibit G to the second amended
13   complaint indicates that you also, two days later,
14   on August 4, faxed it, correct?
15   A. Right.
16   Q. Do you recall whether you faxed it in
17   response to some request from somebody or something?
18   A. I don't recall.
19   Q. 'Cause faxing it two days after its date
20   wasn't in your normal course, right?
21   A. Right.
22   Q. And the letter that you mailed on August 2
23   was going to California?
24   A. Yes.

227

1    Q. Likely not even received by August 4,
2    correct?
3    A. With the U.S. Postal Service, probably.
4    Q. Probably not?
5    A. Probably not received.
6    Q. Did you fax it on August 4 because somebody
7    called about something, and you said, "Oh, we sent a
8    letter, let me fax it to you"?
9    A. I don't remember.
10   Q. Did you get regular accounting statements
11   from Wells Fargo showing what amounts had been paid
12   towards the loan like a monthly accounting
13   statement?
14   A. Yes.
15   Q. At what point in the month?
16   A. I don't know.
17   Q. Did they come to you?
18   A. No.
19   Q. Did you ever look at them?
20   A. I've seen them in the files, but I
21   wouldn't -- I would not look at them on a normal
22   basis.
23   Q. Did any accounting statement come in August
24   or September indicating that Wells Fargo or Lennar

228

1    had applied any money from the reserves to pay
2    principal and interest or real estate taxes?
3    A. I don't know.
4    Q. As far as you know, did Lennar or Wells
5    Fargo ever take any money out of the reserve
6    accounts to pay anything?
7    A. I'm sorry?
8    Q. As far as you know, did Wells Fargo or
9    Lennar ever take any money out of the reserve
10   accounts to pay principal and interest or taxes?
11   A. Not that I'm aware of.
12   Q. At least through August 17, right?
13   A. Right.
14   Q. And eventually -- strike that. Eventually,
15   when there was a foreclosure, the reserves were
16   applied to the loan, right?
17   A. I would assume so.
18   Q. At any point between August 2, when you
19   sent off your first request for payment from the
20   reserves, until the September 17 default notice, did
21   you have any reason to believe that Wells Fargo or
22   Lennar had done what you requested and taken monies
23   out of the reserve accounts to apply them to
24   principal and interest and real estate taxes?

229

1    A. We contacted the town of Canton and found
2    out that the real estate taxes were paid, so we
3    assumed that Wells Fargo was responding to the
4    letter.
5    Q. Did you have any reason to believe that
6    Wells Fargo or Lennar had responded to the letter by
7    taking money from the reserves to pay principal and
8    interest?
9    A. We believed at that point that yes, that's
10   what they had done.
11   Q. And why did you think that?
12   A. Because the real estate taxes were paid.
13   Q. Is there any other basis for your belief
14   that Wells Fargo had acted favorably upon your
15   August 2 request and actually applied money from the
16   reserves to both real estate taxes and principal and
17   interest other than the fact that you determined
18   that the real estate taxes had been paid?
19        MR. MCGLYNN: Objection. You can
20   answer.
21   A. No.
22   Q. You never requested, did you, that Wells
23   Fargo or Lennar apply money in the reserve accounts
24   to pay the other monthly loan amounts that were due

Joseph A. Donovan -  Volume 1 - February 14, 2006
C O N F I D E N T I A L

---

**230**

1  on either August 11 or September 11, correct?
2      A.  What do you mean by "what other amounts"?
3  I mean, I requested real estate taxes, principal and
4  interest.  That's all I requested from them.
5      Q.  You knew, didn't you, that on August --
6  strike that.  You knew, didn't you, that on the 11th
7  of the month Blue Hills was also required to make
8  payments to various escrow subaccounts, correct?
9      A.  Under normal circumstances, yes.
10     Q.  Did you request at any point that those
11  payments be made from the reserve accounts or
12  otherwise waived?
13     A.  No, I did not.
14     Q.  Was that an oversight or did you think
15  something else.  Strike that.  Did you forget about
16  those amounts that were due?
17         MR. MCGLYNN:  Objection.
18     A.  At that point I was looking to draw down
19  the reserve.  I didn't think there was any need to
20  put more money into the reserve.
21     Q.  And why did you conclude that?
22     A.  'Cause I was drawing money out.
23     Q.  Did you confirm that understanding with
24  anybody at Wells Fargo or Lennar?

---

**231**

1      A.  No, I did not.
2      Q.  Did you attempt to confirm that
3  understanding by looking at the loan documents?
4      A.  No, I did not.
5      Q.  Did you attempt to confer -- strike that.
6  Did you attempt to confirm that understanding with
7  your attorney?
8         MR. MCGLYNN:  Yes or no.
9      A.  No.
10     Q.  Do you think that Lennar did anything wrong
11  in this case?  I will ask a better question.  Do you
12  think that Lennar did anything wrong in its handling
13  of the Blue Hills mortgage loan?
14         MR. MCGLYNN:  Objection as to form.
15     A.  Yes, I do.
16     Q.  What?
17     A.  I think they --
18     Q.  What do you think they did wrong?
19     A.  I think they stole the property from us,
20  and I think they stole the money from us.
21     Q.  And what's the basis of that belief?
22     A.  Back to my understanding of how the whole
23  mortgage was put together to begin with, I think
24  there was plenty of money put aside in the reserve

---

**232**

1  to keep us up and running until we found a new
2  tenant and to build out the property, and I don't
3  think Lennar gave us a chance at all.  I think they
4  just went directly ahead with the foreclosure.
5      Q.  Do you know whether there was any limit on
6  the amount of money in the reserve accounts that
7  could be used to pay debt service?
8      A.  At the time I wasn't aware of it, but I
9  think now, yes, there is, there was some kind of
10  limit.
11     Q.  And do you think that that limit is valid,
12  or is it superseded by your understanding that the
13  amounts could be used to pay debt service generally?
14         MR. MCGLYNN:  Objection as to form.
15     A.  I think it was a valid statement.
16     Q.  And do you now understand that the most
17  that could be taken from the reserve accounts to pay
18  principal and interest, assuming the conditions to
19  it -- to release of the monies were met, was a
20  million dollars?
21     A.  That's my understanding, yes.
22     Q.  Which was less than four months of debt
23  service, correct?
24     A.  That's about right.

---

**233**

1      Q.  As of August 2004, did you have any
2  prospect of getting a tenant in the door and paying
3  rent by January 1, 2005?
4      A.  In August we had no prospective tenants,
5  but whether we could have got somebody in the door
6  by January 1, that's anybody's guess at this point.
7      Q.  In the same way that you now realize that
8  the loan documents limit use of the reserves to pay
9  principal and interest to $1 million, do you now
10  understand that the loan documents do not allow use
11  of the monies to pay real estate taxes at all?
12     A.  No, I'm still not clear on that.
13     Q.  Even after meeting with Mr. McGlynn?
14         MR. MCGLYNN:  Objection.  And you don't
15  have to answer that question.
16     Q.  As of August 2005, how long had --
17         MR. MCGLYNN:  August 2005?
18     Q.  Sorry.  As of August 2004, how long had
19  Cushman & Wakefield been looking for a tenant for
20  the Blue Hills Office Park?
21     A.  I'm not sure when they were originally
22  hired.  You know, somewhere -- six months to a year.
23     Q.  In light of their lack of success in coming
24  up with a tenant, did you have any reasonable basis

---

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

---

238

1  wouldn't be able to sit here and tell you how much.
2      Q. So that would be a tax liability that Blue
3  Hills or its principals would incur that they
4  wouldn't have otherwise?
5      A. That's correct.
6      Q. Would there be any other way that you can
7  think of that Blue Hills would be damaged by the
8  loss of a property that was not worth as much as its
9  debt?
10      MR. MCGLYNN: Objection.
11      A. I think it was only a question of time when
12  the property would be worth more. I mean, you just
13  gave a perfect example. You foreclosed for one
14  price, you sold it for 5 million more. You have
15  OneBeacon moved in there now, and it's probably
16  worth as much, if not more, than it was two years
17  ago. So the real estate industry -- you know,
18  there's ups and downs in the real estate industry;
19  but that area is coming back very quickly, and I
20  believe that property would come back very quickly.
21      Q. Do you know if Blue Hills is working with
22  any type of expert to try and quantify damages in
23  this case?
24      A. Not that I've been made aware of.

---

239

1      Q. You haven't hired anybody, have you?
2      A. Absolutely not.
3      Q. Can you take out the August 19 letter from
4  Lennar, Exhibit 29. Actually, let me just have a
5  minute.
6      MR. MCGLYNN: Do you want to take a
7  two-minute break?
8      MR. FALBY: Yes.
9      (Recess.)
10  BY MR. FALBY:
11      Q. Mr. Donovan, I asked you what Lennar did
12  wrong. I didn't mean to leave out Wells Fargo. Do
13  you think that Wells Fargo did anything wrong with
14  respect to the Blue Hills mortgage loan?
15      A. Off the top of my head, I can't think of
16  anything.
17      Q. When you checked with the town of Canton in
18  August 2004 to see if the real estate taxes had been
19  paid, did you check and see what date they were
20  paid?
21      A. No, I did not.
22      Q. If Wells Fargo or Lennar on August 3 -- I
23  guess that's impossible. Let me rephrase the
24  question. If Wells Fargo or Lennar on August 4,

---

240

1  2004, had called you up and said, "No, we're not
2  going to use the reserve monies to pay principal and
3  interest or real estate taxes. In fact, we already
4  paid the real estate taxes out of our own money,"
5  would you have done anything differently than you
6  did?
7      A. Yes. I think we would have taken a serious
8  shot at paying them back the real estate taxes,
9  because when you look at it, it's a hundred thousand
10  for the real estate taxes versus losing an office
11  building worth well in excess of that.
12      Q. When you learned from the town of Canton
13  that the real estate taxes had been paid, did you
14  attempt to confirm with anyone at Wells Fargo or
15  Lennar the source of the monies that had paid the
16  taxes?
17      A. I didn't contact Lennar or Wells Fargo
18  about the taxes being paid.
19      Q. So the answer is no?
20      A. That's correct.
21      Q. Did you check with the town of Canton to
22  see if the taxes had been paid late?
23      A. No.
24      Q. Logically, if Wells Fargo had paid the

---

241

1  taxes only upon receiving your letter, they would
2  have paid them no sooner than August 4, when they
3  faxed them the letter, right?
4      A. That's probably true. I didn't think of
5  contacting the town for -- whether it was late or
6  not.
7      Q. And penalties would have been accrued,
8  correct?
9      A. In the town of Canton?
10      Q. The town of Canton would have assessed
11  penalties if the taxes hadn't been paid by August 2,
12  correct?
13      A. I don't know if they assess penalties or
14  they might have had interest or something.
15      Q. You did note when you checked with the town
16  of Canton that they had assessed neither interest
17  nor any penalties, correct?
18      A. I had somebody call to check to see if the
19  taxes had been paid. The answer I got back was the
20  taxes were paid.
21      Q. And the person didn't say, "Although they
22  were paid late; interest or penalties were
23  assessed," correct?
24      A. Right.

---

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

242

1     **Q. So the logical conclusion from what they**
2 **told you was that the taxes had been paid on time,**
3 **right?**
4     A. No, I just didn't even think of that,
5 whether they were paid on time or paid late. That
6 was not part of the equation.
7     **Q. Is it also a reason that Blue Hills didn't**
8 **pay the real estate taxes itself that Blue Hills'**
9 **principals had decided not to put any more money**
10 **into the Blue Hills Office Park until they were**
11 **confident that Lennar or Wells Fargo would work with**
12 **them on the loan?**
13     A. It was my belief at the time that we were
14 using our own money to pay part of the -- out of the
15 escrows to pay the real estate taxes and pay the --
16 so they were putting their own money in at that
17 time, the way we looked at it.
18     **Q. Well, then, I will rephrase the question.**
19 **Is a reason that the Blue Hills principals did not**
20 **put up additional monies to pay the taxes, that is,**
21 **monies apart from monies in the escrow account,**
22 **because they did not intend to put any more dollars**
23 **into the Blue Hills Office Park unless they had some**
24 **assurance from Wells Fargo or Lennar that Wells**

243

1 **Fargo or Lennar would work with them on the loan?**
2     MR. MCGLYNN: Objection.
3     A. I don't think it ever got to that point
4 because the foreclosure letter came out before we
5 realized that -- within a short time of the
6 foreclosure -- the foreclosure letter came out I
7 believe at the same time they said they would not
8 apply the real estate taxes.
9     **Q. That's not what I am asking. The real**
10 **estate taxes are due on August 1, right?**
11     A. Correct.
12     **Q. You know that to get there in time you've**
13 **got to send them before August 2, right?**
14     A. You're probably right.
15     **Q. And you know that it's the property owner's**
16 **obligation to pay the taxes no matter what, right?**
17     A. It's the property owner's obligation, yes.
18     **Q. So is the reason that Blue Hills didn't do**
19 **anything to pay the taxes on time that the Blue**
20 **Hills principals did not intend to take any**
21 **additional monies out of their pockets and put them**
22 **into the project until they got some assurance that**
23 **Lennar or Wells Fargo would work with them on the**
24 **loan?**

244

1     MR. MCGLYNN: Objection.
2     A. I don't think it ever got to that point
3 because I thought we were using our own money
4 already.
5     **Q. Well, it did get to that point because you**
6 **didn't make a request for application of the**
7 **reserves to the real estate taxes until August 2 in**
8 **a letter that you mailed, which by the time they got**
9 **it was going to be after the due date for the taxes,**
10 **right?**
11     A. Whether I was late with that letter or not
12 by a couple of days does not mean that they weren't
13 going to come out of their pockets for putting in
14 additional funds. I don't --
15     **Q. Just let me ask it this way --**
16     MR. MCGLYNN: Have you finished your
17 answer, Joe?
18     A. I don't see where one ties into the other.
19     **Q. Let me ask it this way: Why didn't Blue**
20 **Hills send Wells Fargo money with which to pay the**
21 **taxes in response to the tax shortage notice so that**
22 **the taxes could be paid on time?**
23     MR. MCGLYNN: Objection.
24     A. I'm back to the same thing we talked about

245

1 in the past. I thought the money could be used to
2 pay real estate taxes.
3     **Q. So why did you wait until after the taxes**
4 **were already past due to request that reserve monies**
5 **be used to pay the taxes?**
6     MR. MCGLYNN: Objection.
7     A. Probably because I'm a busy guy and it just
8 slipped. I was a couple days late.
9     **Q. You just overlooked it?**
10     A. I may have.
11     MR. MCGLYNN: Objection, asked and
12 answered.
13     **Q. It wasn't that big a deal?**
14     A. Of course, it's a big deal.
15     **Q. So how could you possibly have overlooked**
16 **it?**
17     A. I don't know if it is late. I mean,
18 what -- if you look at -- I think if you look at the
19 documents for Wells Fargo, when they request a tax
20 payment, I think it says right on the document that
21 they will charge us a $500 payment if we're late
22 paying, and so --
23     **Q. That's in Exhibit 3?**
24     A. (Witness reviews document.)

Joseph A. Donovan - Volume 1 - February 14, 2006
C O N F I D E N T I A L

---

262

1   Q.  What information did you provide that's
2   contained in answer to Interrogatory No. 2?
3       A.  As I see No. 2, they are looking for any
4   kind of written information, communication, and
5   there was a number of letters that I produced that
6   we've been talking about today, on August 2 and
7   August 5 and September.
8       Q.  Answer No. 2 also asks about oral
9   communications.  You have told us in the course of
10  today's testimony all of the oral communications
11  that you had with Wells Fargo or Lennar from late
12  2003 through September 2004, haven't you?
13      A.  To the best of my knowledge, yes.
14      Q.  You didn't leave any out, did you?
15      A.  I don't think so.
16      Q.  I didn't forget to ask about any, did I?
17      A.  I don't know.
18      Q.  Any other information in the interrogatory
19  answers that came from you?
20      A.  I'm just getting to No. 3 now.
21      Q.  Maybe I can short-circuit this.  Do you
22  know who drafted these answers?
23      A.  I'm assuming our attorneys drafted the
24  answers.

---

263

1       Q.  Did you review them at any point?
2       A.  Yes, I saw them.
3       Q.  Before they were finalized?
4       A.  Yes, I would assume I did.
5       Q.  Do you know for sure?  Do you know for sure
6   that you saw them before they were signed?
7       A.  I believe I did, yes.
8       Q.  Did you note any corrections as you read
9   them?
10      A.  I don't remember making any corrections.
11      Q.  Actually, why don't you take a minute and
12  do what you were doing.  Read the answer to No. 3.
13  I have a question about that.
14          MR. MCGLYNN:  Well, I guess he's got to
15  testify as to whether or not he's participated in
16  the answer to Interrogatory No. 3.
17          MR. FALBY:  That's fine.
18      A.  (Witness reviews document.) I don't think I
19  was part of putting together No. 3.
20      Q.  Do you know whether the statements in
21  answer to Interrogatory No. 3 are true?
22      A.  They seem to be true, yes.
23      Q.  Specifically, is the last sentence of
24  Interrogatory No. 3 true?  It states, "The terms of

---

264

1   the mortgage agreement, including inter alia, which
2   means among other things, Paragraph 6(b), 6(c)(i),
3   6(c)(ii), 6(c)(iv), 6(c)(ix) also confirm these
4   understandings referred to above."  Is that a true
5   statement?
6       A.  I assume so.
7       Q.  Based on that sentence, then, is it true
8   that the terms of the mortgage agreement, including,
9   among others, those referenced there, are consistent
10  with the understandings that Blue Hills had as to
11  when the loan reserves could be accessed?
12      A.  With the exception of my understanding
13  where I thought that the real estate taxes could be
14  paid out of the escrow funds, the others probably,
15  yes.
16      Q.  Now, wait a minute, Mr. Donovan.  You told
17  me you didn't know whether the documents allowed
18  payment of the real estate taxes out of the reserve
19  or not even sitting here today, didn't you?
20          MR. MCGLYNN:  Objection.
21      A.  You have been through this with me many
22  times today.
23      Q.  Didn't you tell me that even sitting here
24  today you still don't know whether the loan

---

265

1   documents allow payment of the real estate taxes?
2       A.  Yes.  And that's what I was just trying to
3   tell you then.
4       Q.  No, I asked you if the loan documents were
5   consistent with the understandings that Blue Hills
6   had; and you said, "Yes, with the exception of my
7   understanding that the real estate taxes could be
8   paid out of the reserves," obviously implying that
9   you thought that was inconsistent with the loan
10  documents.
11          MR. MCGLYNN:  Objection to the form.
12      Q.  And then I say, "Wait a minute.  You told
13  me you didn't know what the loan documents say about
14  the real estate taxes, so how can they be
15  inconsistent?"
16          MR. MCGLYNN:  Objection to form.
17      A.  I didn't know what the loan documents said
18  until we sat here today and you were going through
19  it point by point.
20      Q.  Sitting here now at 5 whatever it is --
21          MR. MCGLYNN:  Quarter of 6.
22      Q.  -- quarter of 6 on Valentine's Day,
23  February 14, 2006, do you know whether the mortgage
24  documents allow real estate taxes to be paid out of

---

# EXHIBIT 4

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Volume 1, Pages 1-256

Exhibits:  322-332, 334-339

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

                Defendant

(Complete caption on next page.)

---------------------------

 30(b)(6) DEPOSITION OF BLUE HILLS OFFICE PARK LLC

            By GERALD S. FINEBERG

      Wednesday, April 5, 2006, 9:39 a.m.

       DLA Piper Rudnick Gray Cary US LLP

          33 Arch Street, 21st Floor

            Boston, Massachusetts

------- Reporter:  Joan M. Cassidy, RPR, CRR -------

         Farmer Arsenault Brock LLC

        50 Congress Street, Suite 415

         Boston, Massachusetts 02109

       617.728.4404  fax 617.728.4403

3 (Pages 6 to 9)

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

6

1  Q. Did you then go into business for yourself?
2  A. Yes.
3  Q. And under what name did you do business?
4  A. Gerald Fineberg Associates.
5  Q. What year did you go into business for
6  yourself doing business under the name Gerald
7  Fineberg Associates?
8  A. Early '60s.
9  Q. And what was the business of Gerald
10 Fineberg Associates when you started?
11    A. Renting apartments, managing buildings,
12 apartment buildings.
13    Q. And have you continued since the early '60s
14 to rent apartments and manage apartment buildings?
15    A. Yes.
16    Q. And at some point did you start buying
17 apartment buildings?
18    A. Yes.
19    Q. When?
20    A. Early '60s.
21    Q. Over the last 40 plus years, can you tell
22 me approximately how many apartment buildings you've
23 bought?
24    A. A lot, hundreds, a hundred.

7

1    Q. And each time you bought one of those one
2  hundred or so apartment buildings, did you finance
3  it with mortgage financing?
4    A. Yes.
5    Q. Over the last 40 plus years, have you sold
6  apartment buildings?
7    A. Yes.
8    Q. Approximately how many?
9    A. I don't know. Many.
10    Q. How many do you own today?
11      MR. MCGLYNN: Apartment buildings?
12      MR. FALBY: Yes.
13    A. Thirty, forty, maybe more.
14    Q. Is it fair to say that you have sold
15 somewhere in the neighborhood of 60 or 70 buildings?
16    A. Yes.
17    Q. At some point you branched out into
18 commercial real estate as well, did you?
19    A. Yes.
20    Q. Approximately when was that?
21    A. In the '80s sometime.
22    Q. Your Website says that Fineberg Management
23 began expanding into commercial real estate in 1983.
24 Is that accurate?

8

1    A. That's the '80s.
2    Q. And beginning in the 1980s, you started
3  buying office buildings and retail space; is that
4  right?
5    A. That's correct.
6    Q. And over the last 20 plus years, how many
7  office buildings have you bought?
8    A. I don't know.
9    Q. Approximately?
10    A. Ten, twenty -- twenty.
11    Q. And each time that you bought an office
12 building, did you finance the purchase with mortgage
13 financing?
14    A. Yes.
15    Q. With commercial real estate lenders?
16    A. Yes.
17    Q. And when you bought those 20 plus office
18 buildings, -- strike that. When you bought those 20
19 or so office buildings, did you negotiate the
20 financing yourself?
21    A. Not always.
22    Q. Did you participate in the financing
23 negotiations for all of the buildings?
24    A. Not always.

9

1    Q. How many of the sales -- strike that. As
2  to how many of the office buildings did you
3  negotiate the financing?
4    A. I can't recall exactly, but...
5    Q. Most of them?
6      MR. MCGLYNN: Don't guess.
7    A. A lot of them, a lot of them.
8    Q. Similarly, with respect to the hundred or
9  so apartment buildings you've bought over the last
10 40 plus years, did you participate in negotiating
11 the mortgage financing to buy all of those
12 buildings?
13    A. Most of them.
14    Q. Who negotiated the mortgage financing as to
15 the apartment buildings and office buildings that
16 you bought that you didn't negotiate?
17    A. Either Dan Frank or my attorney.
18    Q. Which attorney?
19    A. Bernkopf Goodman.
20    Q. Were either you or Dan Frank involved as
21 the business people in all of the acquisitions that
22 you've had over the years?
23    A. Sorry. Could you repeat that.
24    Q. Sure. Were either you or Dan Frank

4 (Pages 10 to 13)

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

10

1  involved in the negotiation of the financing for all
2  of the acquisitions that you've done over the years?
3      A.  With our attorney, yes.
4      Q.  And how many retail buildings have you
5  bought in the last 20 plus years?
6      A.  A dozen -- ten, ten.
7      Q.  Each of those was financed with mortgage
8  financing, was it?
9      A.  Yes.
10     Q.  And with respect to most of those buildings
11 did you negotiate the financing with a commercial
12 real estate lender?
13     A.  Either myself, Dan Frank or the attorney.
14     Q.  With respect to how many of those ten or so
15 retail buildings did you personally participate in
16 negotiating the mortgage financing?
17     A.  Most of them.
18     Q.  And how many of the 20 or so office
19 buildings that you bought over time have you sold?
20     A.  Most of them.
21     Q.  And while you owned them you managed them,
22 did you?
23     A.  Yes.
24     Q.  How many of the ten or so retail buildings

11

1  that you bought over time have you sold?
2      A.  Half of them -- more than half.
3      Q.  Most of them?
4      A.  Most of them.
5      Q.  While you owned the retail space, I take it
6  you managed that space as well?
7      A.  Your.
8      Q.  Your Website today lists two office
9  buildings, 358 Chestnut Hill Avenue in Brighton and
10 One Washington Street in Wellesley.  Are those the
11 two remaining office buildings that you own today?
12     A.  Yes.
13     Q.  And your Website lists three retail spaces
14 in metro Boston and one in Freeport, Maine.  Do you
15 own those spaces?
16     A.  Yes.
17     Q.  Do you own any other retail spaces?
18     A.  What is listed there?  I'm sorry.
19     Q.  Let me --
20     A.  (Witness reviews document.)
21     Q.  While you look at that, I'll say for the
22 record that your Website lists 1410 Beacon Street in
23 Brookline, 294 Harvard Street in Brookline, and 320
24 Moody Street in Waltham, as well as 100 Main Street

12

1  in Freeport.
2      A.  We have all these.
3      Q.  Do you own any other retail buildings
4  today?
5      A.  Yes.
6      Q.  What other retail buildings do you own
7  today?
8      A.  There's one on Brighton Avenue.  It's new.
9      Q.  What address is that?
10     A.  I don't remember the number, but it's
11 Brighton Avenue in Boston.
12     Q.  In Brighton?
13     A.  Right, Brighton.
14     Q.  Is it fair to say that as of 1999, you had
15 40 years of experience in the real estate industry?
16     A.  Yes.
17     Q.  And you had substantial experience as of
18 1999 in acquiring residential and commercial real
19 estate buildings?
20     A.  Yes.
21     Q.  And in selling residential and commercial
22 real estate buildings?
23     A.  Yes.
24     Q.  And in financing commercial and residential

13

1  real estate buildings?
2      A.  Yes.
3      Q.  And in managing commercial and residential
4  real estate buildings?
5      A.  Yes.
6      Q.  As of 1999, were you still working
7  full-time?
8      A.  '99, yes.
9      Q.  I understand that today you spend some of
10 your time in Florida?
11     A.  Most of my time.
12     Q.  When are you here in Massachusetts?
13     A.  During the summer.
14     Q.  And the rest of the three seasons you spend
15 in Florida?
16     A.  Most of the other time in Florida, yes.
17     Q.  And how much time do you spend when you are
18 in Florida devoted to your -- strike that.  How
19 much time do you spend when you are in Florida
20 working on your real estate business?
21     A.  I don't know, not much.
22     Q.  How much time do you spend on it when you
23 are up here during the summer?
24     A.  Part-time.

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

---

**18**

1  points were?
2      A. I knew the basic points.
3      Q. What points did you know?
4      A. I knew the amounts and the rate.
5      Q. Did you know anything else?
6      A. Just what Mr. Goldberg explained to me, and
7  I can't recall right now, but he went over the
8  document with me.
9      Q. On that occasion did he actually sit with
10  loan documents and point out particular provisions?
11      A. No.
12      Q. On that occasion did he merely talk to you
13  and explain without showing you the documents the
14  salient points that were in them?
15      A. Yes.
16      Q. Can you recall any particular points that
17  were explained to you?
18      A. No.
19      Q. You knew in 1999, when you refinanced Blue
20  Hills Office Park with Credit Suisse, that that loan
21  was going to be securitized, correct?
22      A. Yes.
23      Q. And as of 1999 you had substantial
24  experience with securitized loans, did you not?

---

**19**

1          MR. MCGLYNN: Objection as to the form.
2  You may answer.
3      A. Yes.
4      Q. You had closed many securitized loans at
5  that point, hadn't you?
6      A. Yes.
7      Q. Let me show you a document that I'll mark
8  as our next exhibit.
9          MR. FALBY: Anybody know the number?
10          MR. MCGLYNN: I did not bring that
11  number with me. I would have if it was my
12  deposition. Do we have a courtesy copy, Bruce, for
13  counsel?
14          MR. FALBY: We sure do. Off the record
15  for a second.
16          (Recess.)
17  BY MR. FALBY:
18      Q. Mr. Fineberg, I've handed you a letter
19  dated September 7, 1999, from Bernkopf Goodman to
20  Schulte Roth, which represented Credit Suisse. This
21  letter responds, it says, to an inquiry regarding
22  prior securitized loans closed by entities owned or
23  controlled by Gerald S. Fineberg; do you see that?
24      A. (Witness reviews document.) Yes.

---

**20**

1      Q. Does this letter accurately describe the
2  securitized loans that you had closed as of
3  September 7, 1999?
4      A. Yes.
5      Q. I added up the loans listed here, and it
6  adds up to 27 securitized loans that you had done as
7  of September 7, 1999. Does that sound right?
8      A. Yes.
9      Q. And I added up the amounts listed in these
10  paragraphs. They added up to approximately $146
11  million at least. Does that sound about right for
12  the amount of money that you borrowed through
13  securitized loans as of this date?
14      A. Yes.
15      Q. As a result of your prior experience with
16  securitized loans, you knew that securitized loans
17  were assigned by the originating banks to loan
18  pools, correct?
19          MR. MCGLYNN: Objection. You may
20  answer.
21      A. Yes.
22      Q. And you knew that after the originating
23  bank assigned a loan to the loan pool, it would have
24  no further involvement with the loan thereafter,

---

**21**

1  correct?
2          MR. MCGLYNN: Objection.
3      A. Yes.
4      Q. And you knew that once the loan was
5  assigned to the pool, it would be serviced by a
6  servicer, correct?
7      A. Yes.
8      Q. And you knew that the servicers for the
9  loan pool serviced the loans in accordance with the
10  loan documents, correct?
11          MR. MCGLYNN: Objection, calls for a
12  legal conclusion and objection as to the form.
13      Q. You can answer.
14      A. Can you say that again.
15      Q. You knew that loan pool servicers serviced
16  the loans in their pools in accordance with the loan
17  documents of a particular loan, correct?
18          MR. MCGLYNN: Same objection.
19          THE WITNESS: Sorry?
20          MR. MCGLYNN: Same objection, Jerry.
21      I --
22      Q. He's just doing his job. You can answer.
23          MR. MCGLYNN: If you can answer, go
24  ahead, please.

---

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

22

1     A. Yes.
2     Q. And you knew that if the loan got in
3  trouble, it would go to a special servicer, correct?
4          MR. MCGLYNN: Objection.
5     A. Yes.
6     Q. And you knew that the task of the special
7  servicer was to deal with a troubled loan and either
8  try to work it out or take back a deed in lieu of
9  foreclosure or foreclose on the loan, correct?
10          MR. MCGLYNN: Objection, legal
11  conclusion and form.
12     A. Yes.
13     Q. Now, as of 1999, can you tell me how many
14  of the loans that are listed in this letter had
15  either gone into default or gotten into some other
16  kind of trouble and actually gone to a special
17  servicer?
18     A. No, I can't.
19     Q. As of September 7, 1999, you had had loans
20  that had been taken over by a special servicer,
21  correct?
22     A. I don't know.
23     Q. As of 1999, you had had securitized loans
24  where the property had actually been foreclosed

23

1  upon, did you not?
2     A. I don't know what these loans are.
3     Q. Fair enough.
4          MR. FALBY: Let's mark this letter dated
5  September 7, 1999, as Exhibit 322.
6          (Marked, Exhibit 322, Letter dated
7  September 7, 1999.)
8     Q. As of September 7, 1999 -- actually, before
9  I do that, I forgot to ask you about your hotel
10  business. You also, as part of your real estate
11  business, went into the hotel business around 1990,
12  did you?
13     A. Just before 1990, in the '80s.
14     Q. And you actually formed a separate company
15  called Fine Hotels, correct?
16     A. That's correct.
17     Q. And that was distinct from your other real
18  estate company which is called Fineberg Management?
19     A. Yes.
20     Q. When did Gerald Fineberg Associates become
21  Fineberg Management?
22     A. I can't recall but in the '70s.
23     Q. Now, as of 1999, approximately how many
24  hotels had you purchased?

24

1     A. 1990?
2     Q. 1999.
3     A. Oh, 1999. Seventeen or eighteen.
4     Q. All financed with mortgage financing from a
5  commercial real estate lender?
6     A. Yes.
7     Q. On deals, at least some of which you had
8  negotiated?
9     A. Yes.
10     Q. Now, as of 1999, some of those hotels had
11  been foreclosed upon, correct?
12     A. I don't know when -- the dates. Could you
13  help me?
14     Q. Sure. There was a hotel in Sturbridge,
15  Massachusetts, that was foreclosed upon; do you
16  recall that?
17     A. Yes.
18     Q. Who was the lender for that hotel?
19     A. Lennar.
20     Q. And what was the resolution of that hotel?
21  Was it a deed in lieu of foreclosure or an actual
22  foreclosure?
23     A. I'm not sure. I think it was a deed in
24  lieu. But I'm not sure. Can you help me?

25

1     Q. I think it was a deed in lieu.
2     A. It was a deed in lieu.
3          MR. MCGLYNN: Don't take his word for
4  it.
5     Q. I didn't do it, I'm pretty sure it was a
6  deed in lieu. Were you involved with negotiating
7  the deed in lieu of foreclosure for the Sturbridge
8  hotel?
9     A. Most of the negotiations were done by my
10  attorney.
11     Q. Ken Goldberg?
12     A. Yes.
13     Q. Did he consult with you from time to time
14  during the course of the negotiation?
15     A. Yes.
16     Q. So you were involved through him as that
17  progressed?
18     A. Yes.
19     Q. And do you recall that there was a hotel in
20  Lancaster, Pennsylvania, that went into default?
21     A. Yes.
22     Q. And you lost that hotel as well, correct?
23     A. Yes.
24     Q. And that was another deed in lieu of

8 (Pages 26 to 29)

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

---

26

1  foreclosure, was it?
2      A.  Yes.
3      Q.  Were you involved with the negotiation of
4  that deed in lieu of foreclosure?
5      A.  Again, that was Ken Goldberg who did the
6  negotiation, but he conferred with me.
7      Q.  You were the client who was directing him,
8  as the attorney, as he negotiated with Lennar, the
9  lender or the servicer for the lender?
10     A.  Yes.
11         MR. FALBY:  Off the record.
12         (Discussion off the record.)
13     Q.  When you did those -- strike that.  During
14  those negotiations with Lennar, did you sign
15  prenegotiation letters?
16     A.  I believe I did.
17     Q.  Do you understand what a prenegotiation
18  letter is?
19     A.  Yes.
20     Q.  What is it?
21     A.  It's a letter that says that you sign this
22  letter so that they will negotiate with you.
23     Q.  Do you understand why they want you to sign
24  it before they negotiate with you?

---

27

1      A.  Not exactly, no.
2      Q.  Do you understand that the point of it from
3  the lender's point of view is to prevent the
4  borrower from making any claims based on the
5  negotiations?
6         MR. MCGLYNN:  Objection as to form,
7  calls for a legal conclusion.
8      A.  I don't know.
9      Q.  And do you understand that the borrower in
10  those letters waives any right to complain about the
11  lender's failure to do something or something the
12  lender did in the course of the negotiations?
13         MR. MCGLYNN:  Same objections.
14     A.  I would ask my attorney and he would give
15  me the answer.
16     Q.  Based on your prior experience, do you have
17  any idea what the point of the prenegotiation letter
18  is, why it is that you're asked to sign it before
19  negotiations begin?
20     A.  I thought it was always automatic, to sit
21  down and negotiate.
22     Q.  I'm focusing on the letter itself.  Do you
23  understand what the point was of signing the letter
24  prior to doing any negotiating?

---

28

1      A.  I don't recall right now, no.  I'd have to
2  see it.
3      Q.  Let me show you Exhibit 62.  Do you
4  recognize this as the prenegotiation letter that you
5  were asked to sign in connection with the Blue Hills
6  Office Park loan?
7      A.  (Witness reviews document.) Yes.
8      Q.  Did you read it when you signed it?
9      A.  I can't recall, but I might have.
10     Q.  That is your signature on the last page,
11  correct?
12     A.  That is my signature.
13     Q.  And if you didn't read it, did your
14  attorney explain the significance of the letter
15  before you signed it?
16         MR. MCGLYNN:  Just answer yes or no.
17     A.  Yes.
18     Q.  And do you see that in the first paragraph
19  it says "negotiations," the last two sentences say
20  that the borrower agrees that none of the trustee,
21  the master servicer, or the special servicer is
22  under any obligation to consent or otherwise agree
23  to any borrower request?
24         MR. MCGLYNN:  You are referring, Bruce,

---

29

1  to the first numbered paragraph titled
2  "Negotiations" in bold?
3         MR. FALBY:  I am.
4         MR. MCGLYNN:  As opposed to the first
5  paragraph of the letter?
6         MR. FALBY:  Yes.
7         MR. MCGLYNN:  Maybe you can rephrase or
8  restate the question.
9         MR. FALBY:  Sure.
10     Q.  Do you see the paragraph numbered 1?  It
11  says "Negotiations."
12     A.  Yes.
13     Q.  Do you see the next-to-the-last sentence
14  that begins, "The borrower also acknowledges"?
15     A.  Yup, yes.
16     Q.  And do you see that it goes on to say as I
17  just read, that the borrower agrees that none of the
18  trustee, the master servicer, or the special
19  servicer is under any obligation to consent or
20  otherwise agree to any borrower request with respect
21  to the loan?
22     A.  Yes.
23     Q.  And do you see that the next paragraph says
24  that no party shall have any defense to any action

---

FARMER ARSENAULT BROCK LLC

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

30

1  nor assert any waiver based on any communications
2  that take place after the letter is signed?
3      A. I see it.
4      Q. And do you see that in the paragraph
5  numbered 2 the parties release any claims that they
6  might possibly have arising out of any
7  communications that take place after the letter is
8  signed?
9      A. Yes.
10     Q. And do you see on the next page in the
11 paragraph numbered 4 in the middle of the paragraph
12 that the parties agree that by signing the letter
13 they are precluded, that is, prevented, from
14 claiming that any agreement, consent, waiver,
15 release, modification, et cetera, of the loan has
16 been effected?  Do you see that?
17     MR. MCGLYNN:  You are asking him to read
18 it?
19     MR. FALBY:  Yes.
20     A. Yes.
21     Q. And did you understand that the letter said
22 these things and had this effect when you signed it?
23     MR. MCGLYNN:  Objection.
24     A. No.

31

1      Q. But you did either read the letter or have
2  it explained to you by your attorney before you
3  signed it; is that right?
4      A. Yes.
5      Q. And this Exhibit 62, is this similar in
6  form to prenegotiation letters that you had signed
7  in the past?
8      A. I think so.  I don't know for sure.  Once I
9  see one, I could tell you.
10     Q. And you do know that on prior occasions,
11 before discussing a troubled loan with a lender, you
12 were asked to sign prenegotiation letters like this
13 one, right?
14     A. Yes.  I thought it was automatic.
15     Q. Were there other hotels that you ended up
16 giving back to lenders prior to 1999?
17     A. When did -- off the record?
18     Q. You can go off the record, sure.
19     (Discussion off the record.)
20     Q. As of September 1999, when you borrowed
21 money from Credit Suisse, had you given back any
22 hotels to lenders other than Sturbridge or
23 Lancaster?
24     A. Yes.

32

1      Q. What other hotels had you given back?
2      A. There were a couple.  I can't recall right
3  now.  I'd have to look it up.
4      Q. Had you given back a hotel in Harrisburg?
5      A. Yes.
6      Q. And when did you give that back?
7      A. About a year before.
8      Q. Approximately 1998?
9      A. Yes.
10     Q. Who was the special servicer on that deal?
11     A. I don't know.
12     Q. Do you know who took it back?
13     A. I don't know.
14     Q. Was GMAC the lender on that?
15     A. They could have been, yes.
16     Q. Were you involved with the -- strike that.
17 Was Harrisburg a deed in lieu or a foreclosure?
18     A. I don't know.
19     Q. Were you involved in negotiating that
20 resolution, whether it was a deed in lieu or a
21 foreclosure?
22     A. Yes.
23     Q. And did you sign a prenegotiation letter
24 when you dealt with the Harrisburg default?

33

1      A. I don't know.  I might have.
2      Q. There was also a hotel in Boxborough that
3  you gave back, correct?
4      A. Yes -- no.  I think I sold it to -- I don't
5  know.  I owned the hotel.  I no longer own it.  I
6  don't know the circumstance.
7      Q. You're not sure whether you gave it back to
8  the lender or sold it?
9      A. Sold it to -- I think there was a
10 simultaneous sale.
11     Q. You sold Boxborough to a third party --
12     A. Right.
13     Q. -- after the loan went into default?
14     MR. MCGLYNN:  Objection.
15     Q. Did it not go into default?
16     A. Yes, it did go into default.
17     Q. And as part of the workout of that loan,
18 you ended up selling it to a third party?
19     A. Yes.
20     Q. And were you involved in that negotiation?
21     A. Yes, but mostly through my attorney.
22     Q. And the lender on the Boxborough hotel was
23 who?
24     A. I don't know.

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

34

1    Q. Who was the special servicer on that deal?
2    A. I don't know.
3    Q. Was there a special servicer? Was it a
4    securitized loan?
5    A. It was a securitized loan.
6    Q. But you don't remember the --
7    A. I don't remember the --
8    Q. I have to ask the question. You don't
9    remember who the special servicer was who serviced
10   the Boxborough loan?
11   A. I don't recall.
12   Q. Was there also a hotel in Worcester that
13   you ended up giving back?
14   A. Yes.
15   Q. Was that a deed in lieu of foreclosure or a
16   foreclosure sale?
17   A. It was the same as Boxborough. It was the
18   same transaction.
19   Q. With respect to the workout of the
20   Boxborough and Worcester hotels, did you sign a
21   prenegotiation letter before you dealt with the
22   lender on those deals?
23   A. I don't know.
24   Q. And you did participate in the negotiation

36

1    in Exhibit 322?
2    A. Well, Credit Suisse.
3    Q. Any others?
4    A. There may have been. I can't recall.
5    Q. Is Exhibit 322 accurate, that you had
6    closed securitized loans as of September 7, 1999,
7    with the Chase Manhattan Bank, Heller Finance, GMAC,
8    and GECC?
9    A. Yes.
10   Q. Now, after 1999 did any of your securitized
11   loans other than the Blue Hills loan ever go into
12   default?
13       MR. MCGLYNN: This is after September 7,
14   1999, Bruce?
15       MR. FALBY: Yes.
16   A. I can't recall.
17   Q. Did any of the loans listed in Exhibit 322
18   subsequently go into default, that is, subsequent to
19   September 7, 1999?
20       MR. MCGLYNN: Well, I'm going to just
21   object.
22   A. I don't know, they don't give addresses or
23   names.
24       MR. MCGLYNN: There's no enumeration of

35

1    of that workout?
2    A. Mostly with my attorney, yes.
3    Q. And what year was that?
4    A. (Pause.) Close --
5    Q. Was it --
6    A. Go ahead.
7    Q. What year was it?
8    A. I don't recall.
9    Q. Was it prior to September 7, 1999, when you
10   borrowed money from Credit Suisse?
11   A. I think so.
12   Q. Approximately what year?
13       MR. MCGLYNN: He said he didn't recall.
14   A. I don't recall.
15   Q. Was it before you gave back the Sturbridge
16   and Lancaster hotels?
17   A. It was either a little before or a little
18   after. I don't remember.
19   Q. Can you tell me the commercial real estate
20   lenders with whom you have closed securitized loans?
21   Some of them are in the letter we have marked as
22   Exhibit 322. I guess a better question would be,
23   are there any other lenders with whom you have ever
24   closed a securitized loan other than the ones listed

37

1    what those loans are on this exhibit, Bruce.
2    Q. Do you recall any securitized loans --
3    strike that. Were all of the hotels we've talked
4    about securitized loans?
5    A. Yes.
6    Q. And that is all of Lancaster, Sturbridge,
7    Harrisburg, Boxborough, and Worcester, correct?
8    A. Yes.
9    Q. Other than those five hotels and Blue Hills
10   Office Park, have you ever had a securitized loan go
11   into default or get into trouble?
12   A. Yes.
13   Q. What loan or loans?
14   A. A hotel in Mansfield.
15   Q. Who was the lender for that hotel?
16   A. I can't remember the name.
17   Q. What happened with that hotel?
18   A. Worked it out.
19   Q. In what way?
20   A. Renegotiated the loan and paid them money.
21   Q. Who was the special servicer on that loan?
22   A. I don't know the name.
23   Q. What year was that?
24   A. Around the same time.

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

38

1  Q. As what?
2  A. 1998, '99.
3  Q. And did you sign a prenegotiation letter on
4  that deal?
5  A. I can't recall.
6  Q. You assume you did because they were
7  automatic, but you don't remember?
8      MR. MCGLYNN: Objection.
9  A. Yes.
10  Q. The answer is yes?
11  A. Yes.
12  Q. Have you ever had any other securitized
13  loans go into default?
14  A. I might have. I can't remember right now.
15  Q. Did you ever have any property in Florida
16  that went in default?
17  A. Yes.
18  Q. What property was that?
19  A. Orlando.
20  Q. What kind of property was it, a hotel?
21  A. Hotel.
22  Q. Who was the lender on that?
23  A. I can't remember their name. I can't.
24  Q. Do you know who the special servicer was on

39

1  that loan?
2  A. No, I can't.
3  Q. It was a securitized loan?
4  A. Yes.
5  Q. What happened with that loan?
6  A. We gave it back.
7  Q. With a deed in lieu of foreclosure?
8  A. I can't remember.
9  Q. It was either a deed or a foreclosure sale?
10  A. Yes.
11  Q. When was that?
12  A. The year of the hurricanes in Orlando, two
13  years ago.
14  Q. 2004?
15  A. It could be.
16  Q. Was it before or after the Blue Hills
17  Office Park foreclosure sale?
18  A. I don't know.
19  Q. What hurricane are you thinking of?
20  A. The three that hit Orlando.
21  Q. How soon after the hurricanes was the
22  property given back?
23  A. Two or three months.
24  Q. I take it the hurricanes impacted your cash

40

1  flow and made it impossible to --
2  A. Close the hotel.
3  Q. The hurricanes caused you to close the
4  hotel?
5  A. Right, yes.
6  Q. So you were unable to make debt service
7  payments on the loan?
8  A. Yes.
9  Q. So you gave it back?
10  A. Yes.
11  Q. Are there any other securitized -- strike
12  that. On that Orlando deal, did you sign a
13  prenegotiation letter before you entered into the
14  negotiation?
15  A. I can't recall but I assume so.
16  Q. Are there any other properties that you've
17  financed through securitized loans that have
18  subsequently gone into default?
19  A. I can't recall right now.
20  Q. After you did the Blue Hills Office Park
21  refinancing in 1999, did you continue to close
22  additional securitized loans in the following years?
23  A. I don't know. I can't recall.
24  Q. Do you know if the Blue Hills Office Park

41

1  refinancing was the last securitized loan you've
2  ever done?
3  A. I don't recall if I did one after or not.
4      (The witness and his counsel confer.)
5      MR. MCGLYNN: Mr. Fineberg would like to
6  take a two-minute break.
7      MR. FALBY: Yes, sure.
8      MR. MCGLYNN: Off the record.
9      (Recess.)
10  BY MR. FALBY:
11  Q. Mr. Fineberg, in the fall of 2004, were you
12  down in Florida?
13  A. Yes -- well, some of the time.
14      MR. MCGLYNN: At any time?
15  Q. What part of the time?
16  A. I don't know.
17  Q. In 2004 had you settled into your present
18  pattern of spending all but the summer down in
19  Florida?
20  A. Most of it.
21  Q. So is it correct that in 2004 you spent the
22  summer up here and then went down to Florida in the
23  fall?
24  A. Yes.

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

**46**

1    A. Yes.

2    Q. I take it he negotiated it with Andrew

3  Cohn, Mr. Langelier's lawyer?

4    A. Yes.

5    Q. The agreement refers to various accounts.

6  Are you familiar with the accounts that were held or

7  controlled by Royall Associates Realty Trust as of

8  December 2004?

9    A. Which paragraph are you looking at?

10    Q. On page 2 there's a heading called

11  "Treatment of Accounts."

12    MR. MCGLYNN:  (Indicating.)

13    A. Oh, here.

14    Q. And then on page 2 there are descriptions

15  of three different accounts; do you see that?

16    MR. MCGLYNN:  (Indicating.)

17    A. Yes.

18    Q. One account is called the property account;

19  do you see that?

20    A. Yes.

21    Q. And it's basically described as an account

22  that Fineberg Management used to manage the Blue

23  Hills Office Park.  Are you familiar with that

24  property account?

**47**

1    MR. MCGLYNN:  Objection as to form.

2    A. That's the regular operating account?

3    Q. Yes.

4    A. Yes.

5    Q. The agreement talks about the property

6  manager preparing a final accounting of that

7  operating account.  Do you know if that happened?

8    A. I believe it did.

9    Q. Who did it?

10    A. I believe Joe Donovan did it.

11    Q. Do you know what happened to the money in

12  the property account?

13    A. No.

14    Q. The last page of the agreement -- keep your

15  finger on page 2 but look at the very last page.

16  The last page says that the property account has

17  $180,000 in it as of January 12, '05.  Do you see

18  that?

19    A. Yes.

20    Q. Do you know where that money went?

21    A. No, I don't.

22    Q. On page 2, Paragraph Roman IIB, as in

23  "boy," suggests that it would have been used to pay

24  expenses with the balance to be held as a reserve

**48**

1  for future claims and liabilities; do you see that?

2    A. Where are you looking, please?

3    Q. Paragraph Roman IIB.

4    MR. MCGLYNN:  Take a look at it.  And

5  then, Bruce, would you please repeat the question or

6  have it read back.

7    MR. FALBY:  Sure.

8    Q. Paragraph IIB --

9    A. Yes.

10    Q. -- refers to paying off third-party

11  creditors and then holding the balance as a reserve.

12    A. Yes.

13    Q. Do you see that?

14    A. Yes.

15    Q. Do you know if that happened?

16    A. Yes.  The money is still, as far as I know,

17  in a reserve account.

18    Q. All $180,000?

19    A. I don't know.

20    Q. Page 2 also talks about an initial account,

21  and the last page says the initial account contains

22  approximately $1.38 million; do you see that?

23    A. Yes.

24    Q. Do you know where that money came from?

**49**

1    A. I believe -- I think it came from the

2  refinancing.

3    Q. I understand from Mr. Langelier that there

4  was an excess of approximately $5.2 million from the

5  Credit Suisse refinancing; is that right?

6    A. That's correct.

7    Q. And approximately a million of that was put

8  in a reserve account?

9    A. Yes, this million 3 or -- yes.

10    Q. And that million had grown over time to be

11  approximately 1.3 by 2004?

12    A. Yes.

13    Q. And the remaining 4.2 million or

14  thereabouts from the Credit Suisse refinancing was

15  distributed to you and Mr. Langelier back in 1999,

16  was it?

17    A. Yes.

18    Q. You each got half of that?

19    A. Well, there were other partners.

20    Q. There were other minority partners with

21  small interests?

22    A. Yes.

23    Q. There were, as this agreement states, the

24  Fineberg beneficiaries and the Langelier

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

---

50

1  beneficiaries?
2      A.  Yes.
3      Q.  And each of those two groups got half of
4  the 4.2 million from the refinancing?
5      A.  Yes, but I -- yes.
6      Q.  Is there a "but"?
7      A.  No.  I don't know whether his beneficiary
8  got it.
9      Q.  In any event, you and the others who had
10  small interests, which included your children, Gary
11  and Michelle, and also Daniel Frank got a small
12  piece of that money?
13      A.  Yes.
14      Q.  And you got the lion's share as the
15  principal?
16      A.  Yes.
17          (The witness and his counsel confer.)
18          MR. MCGLYNN:  He's having a little
19  trouble hearing you, Bruce.
20          (Discussion off the record.)
21      Q.  The second page of Exhibit 176 also refers
22  to a supplemental account which the last page says
23  as of 12/31/04 contained $4.2 million; do you see
24  that?

---

51

1      A.  Yes.
2      Q.  Where did that $4.2 million come from?
3      A.  That came from some of the -- it came from
4  the account itself that we set aside for reserve for
5  a rainy day account.
6      Q.  Where had the money come from that you set
7  aside for the rainy day account?
8      A.  Oh, I'm sorry?
9      Q.  Where had the money come from that you had
10  set aside for the rainy day account?
11      A.  It came from the operating account, from
12  the distributions or profits, and from another
13  source, one other source.
14      Q.  What was the other source?
15      A.  It was a 2-million-dollar payment.
16      Q.  That was the 2-million-dollar settlement
17  payment made by DST, the affiliate of EquiServe, in
18  August 2003 to settle the special permit zoning
19  appeal brought by Blue Hills Office Park LLC?
20      A.  Yes.
21          MR. MCGLYNN:  Objection.
22      Q.  The answer was yes?
23      A.  Yes.
24      Q.  The remaining monies contained in the

---

52

1  supplemental account came from distribution of
2  profits, did they?
3      A.  I don't know how you classify it.  It just
4  came from the account.  I know it was in the
5  account.
6      Q.  Was this money that had been generated by
7  the property and distributed to the partners?
8      A.  It might have been, yes.
9      Q.  Is there any other possible source for it?
10          MR. MCGLYNN:  Objection.
11      A.  No.
12      Q.  Now, page 2 says that the monies in the
13  initial account as well as all but 2 million of the
14  supplemental account shall be released and paid over
15  to the beneficiaries.
16          MR. MCGLYNN:  Are you asking him to read
17  that, Bruce?
18      Q.  Do you see that in the paragraph titled
19  "The Initial Account"?
20      A.  Yes, I see that.
21      Q.  Was the $1.3 million in the initial account
22  actually distributed to the beneficiaries?
23      A.  I don't think so.  I don't know.  I don't
24  believe so.

---

53

1      Q.  Was all but 2 million of the supplemental
2  account distributed to the beneficiaries?
3      A.  No, no.
4      Q.  Is the 1.38 million in the initial account
5  still there?
6      A.  Yes.
7      Q.  Is the $4.2 million in the supplemental
8  account still there?
9      A.  I believe so.
10      Q.  None of the 1.38 million in the initial
11  account or the 4.2 million in the supplemental
12  account has been distributed to the beneficiaries of
13  the trust?
14      A.  I don't believe so.
15      Q.  I pointed out a moment ago the paragraph
16  that talks about $2 million being retained as a
17  reserve.  You see that, correct?
18      A.  Yes.
19      Q.  How was the amount of $2 million arrived
20  at?
21      A.  I don't know.  The attorneys did that.
22      Q.  Paragraph C and D on page 2 talk about
23  distributing monies from the initial account and the
24  supplemental account.  Do you know why the money was

---

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

58

1 coincidence that the $2 million reserve set up by
2 this agreement equals the $2 million amount of the
3 settlement payment?
4    A. I can't answer that.
5    Q. Do you see on page 4 in Roman Numeral V --
6 strike that.  Do you see on page 4 in the paragraph
7 Roman Numeral V, claims against LLC, that the
8 agreement discusses possible claims for which the
9 beneficiaries may have personal liability?
10       MR. MCGLYNN: Objection as to form.
11    A. I see it, yes.
12       MR. FALBY:  Good objection.
13    Q. Do you see the paragraph below that labeled
14 "Mortgage Lender Claim"?
15    A. Yes.
16    Q. In that paragraph the beneficiaries
17 acknowledge that a claim could be asserted by the
18 holder of the first mortgage loan on the property;
19 do you see that?
20    A. Yes, sir, yes.
21    Q. And do you recall that the claim that you
22 had in mind at the time was a claim against you for
23 having taken the 2-million-dollar settlement
24 payment?

59

1       MR. MCGLYNN: Objection, asked and
2 answered.
3    A. I don't know.  I don't know if that's -- if
4 that was before or after this agreement.
5    Q. Just to keep in mind, this agreement is a
6 month after the foreclosure.  Does that help you?
7       MR. MCGLYNN: Objection.
8    A. No.
9    Q. Then the agreement states that the lack of
10 likelihood of any such claim has been reviewed by --
11 with counsel; do you see that?
12       MR. MCGLYNN: That just calls for a yes
13 or no, if you can see it.
14    A. I see it, yes.
15    Q. And you had reviewed these matters with
16 counsel, correct?
17       MR. MCGLYNN: Again, that calls for a
18 yes or no.
19    A. I can't -- I really don't remember.
20    Q. Were you relying on advice of counsel with
21 respect to any claim that could be asserted by the
22 lender?
23    A. Yes.
24    Q. Did you rely on the advice of counsel at

60

1 the time of the zoning appeal settlement in not
2 reporting the settlement or the 2-million-dollar
3 payment to the lender?
4    A. Yes.
5    Q. And did you rely on the advice of counsel
6 at the time of the settlement in not seeking consent
7 to the distribution of the 2-million-dollar payment
8 from Blue Hills Office Park to the beneficiaries?
9       MR. MCGLYNN: Objection.
10    A. Yes, yes.
11    Q. And did you discuss at the time of the
12 settlement with Mr. Frank or Mr. Donovan whether or
13 not you should be informing the lender of the
14 settlement and the 2-million-dollar payment?
15       MR. MCGLYNN: Just I'm going to instruct
16 the witness if -- this just calls for a yes or no.
17 I don't want you to discuss the substance of any
18 discussion with Mr. Frank or Donovan if counsel were
19 present.
20    A. I don't recall.
21    Q. Sorry?
22    A. I don't recall.
23    Q. Do you recall discussions with anyone other
24 than counsel as to whether you ought to be seeking

61

1 consent of the lender to the settlement and to the
2 2-million-dollar payment and the conveyance of that
3 payment to Royall Associates Realty Trust?
4    A. I -- after talking with counsel, I didn't
5 believe it was necessary to get the lender's
6 approval.
7    Q. Did you rely on the advice of counsel that
8 you didn't need the consent of the lender to enter
9 into the settlement agreement itself?
10       MR. MCGLYNN: Objection.
11    A. Yes.
12       MR. FALBY:  Peter, are you going to
13 instruct him not to answer questions about his
14 discussion with counsel on those topics at the time?
15       MR. MCGLYNN: Yes.
16       THE WITNESS: On the what?
17    Q. Are you going to follow Mr. McGlynn's
18 instruction when he instructs you not to tell me
19 about conversations you had with counsel about
20 seeking consent from the lender to the settlement
21 agreement and the payment and the conveyance of it?
22    A. Yes, I am.
23    Q. Let me show you Exhibit 177.  These are
24 accounting records produced by your lawyers to us,

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

70

1  into which they were wired?
2      A. As far as I know.
3      Q. And what is the purpose of retaining that
4  money in those accounts?
5      A. Just the same answer I gave before, because
6  of the suit that Lennar brought.
7          Does that have the ticket on it?
8          MR. MCGLYNN: Did we mark these, Bruce?
9          MR. FALBY: I will be happy to.
10         MR. MCGLYNN: It doesn't have a ticket.
11         MR. FALBY: Good point. Let's mark the
12  document we were just looking at, Mr. Fineberg's
13  second supplement to his answers to our first set of
14  interrogatories as Exhibit 323.
15         (Marked, Exhibit 323, Mr. Fineberg's
16  second supplement to his answers to first set of
17  interrogatories.)
18     Q. When will the money in the accounts at
19  Bernkopf and Wilmer Cutler be released?
20         MR. MCGLYNN: Objection, calls for
21  speculation.
22     A. I don't know.
23     Q. Who will it be released to?
24         MR. MCGLYNN: Same objection.

71

1      A. I don't know.
2      Q. Who will decide when and to whom it is
3  released?
4      A. The attorneys and the clients too, I think,
5  but mostly the attorneys.
6      Q. And the clients are you and Mr. Langelier?
7      A. Yes.
8      Q. Back to the Credit Suisse refinancing, you
9  told me that you had very little involvement in
10  that, correct?
11     A. Yes.
12     Q. You were aware of the amount of the loan
13  and the interest rate, correct?
14     A. Yes.
15     Q. And the term of the loan, correct?
16     A. Yes.
17     Q. Were you aware of any other terms of the
18  loan?
19     A. I know that there were reserve accounts.
20     Q. And what did you know about that?
21     A. The reserve accounts were put aside at the
22  onset and monthly in a reserve account to be held
23  and used if EquiServe did not renew their lease.
24     Q. How do you know that?

72

1      A. I was told that, and that's why there was
2  such a large reserve account.
3      Q. Who told you that?
4      A. My attorney.
5      Q. Did you learn anything else about the
6  reserve accounts from your attorney?
7          MR. MCGLYNN: Again, I'm going to
8  instruct you not to disclose specific discussions;
9  but if you have an understanding of these reserve
10  accounts based upon those discussions, you can
11  testify.
12     A. I don't know.
13     Q. Do you know anything else about the reserve
14  accounts -- let me ask a better question. At the
15  time of the refinance of the Blue Hills Office Park,
16  did you know anything else about the reserve
17  accounts other than that they were put aside at the
18  onset and monthly to be held and used if EquiServe
19  did not renew its lease?
20     A. Yes, it was to pay for re-leasing the
21  property and to cover any shortfalls in the
22  property.
23     Q. Did you know anything else about the
24  reserve accounts at the time of the refinancing?

73

1      A. That's all I can recall right now.
2      Q. And your knowledge about the reserve
3  accounts came entirely from your attorneys, did it?
4      A. They explained it to me.
5      Q. You never had any discussions with anybody
6  at Credit Suisse, did you?
7      A. No.
8      Q. And you never actually looked at the loan
9  terms governing the reserves or access to them, did
10  you?
11     A. I might have, but I don't recall it.
12     Q. Sitting here today, do you have any memory
13  of ever reading loan document terms that addressed
14  the reserves or the terms under which Blue Hills
15  Office Park would have access to them?
16     A. When I did the loan?
17     Q. Yes.
18     A. No.
19     Q. Have you subsequently at any point looked
20  at the loan terms governing the reserves or access
21  to them?
22     A. With counsel, yes.
23     Q. When?
24     A. Just recently.

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

78

1  Q. What you thought back in 1999 was that if
2  EquiServe moved out, the borrower would be able to
3  get access to the reserves to pay any expense that
4  was due in order to tide over the property?
5      MR. MCGLYNN: Same objections.
6  A. I didn't think of it at that point, in '99.
7  Q. You didn't think of what?
8  A. Your question.
9  Q. *Back in 1999, at the time of the
10  refinancing, you didn't consider whether if
11  EquiServe moved out, Blue Hills Office Park would
12  continue to have to make payments due under the loan
13  other than principal and interest?
14  A. Repeat that, please.
15      *(Question read.)
16  A. I didn't consider it either way.
17  Q. And you did not discuss that topic with
18  your attorneys at the time?
19      MR. MCGLYNN: Objection.
20  A. At the time I didn't.
21  Q. When you refinanced with Credit Suisse, you
22  knew that the loan would be securitized, correct?
23  A. Yes.
24  Q. And that Credit Suisse would assign the

79

1  loan to a loan pool, correct?
2  A. Yes.
3  Q. That Credit Suisse, after it assigned that
4  loan, would no longer be involved with the loan,
5  correct?
6  A. Yes.
7  Q. And that any understandings with Credit
8  Suisse needed to be reflected in the loan documents
9  because Credit Suisse would no longer be in the
10  picture, correct?
11      MR. MCGLYNN: Objection.
12  A. I believe so.
13  Q. And you knew that after Credit Suisse
14  assigned the loan to a loan pool, the loan would be
15  serviced by a servicer, correct?
16      MR. MCGLYNN: Objection.
17  A. Yes.
18  Q. Or a special servicer if the loan got in
19  trouble, correct?
20      MR. MCGLYNN: Objection.
21  A. Yes.
22  Q. And as you told me before, you knew that
23  servicers administer loans according to the loan
24  documents, correct?

80

1      MR. MCGLYNN: Objection.
2  A. Yes.
3  Q. Did you ever see the mortgage loan
4  application for the Credit Suisse refinancing?
5  A. I don't recall it right now. I don't
6  recall seeing it.
7  Q. Typically, as of 2004, did you review
8  documents like mortgage loan applications --
9      MR. MCGLYNN: Objection.
10  Q. -- or did you rely on your counsel?
11      MR. MCGLYNN: Objection.
12  A. Mostly I relied on my counsel.
13  Q. Do you want me to show it to you?
14  A. I'd love to see it.
15      MR. MCGLYNN: While he's -- can we go
16  off the record?
17      (Discussion off the record.)
18  Q. Let me show you Exhibit 14, which is
19  labeled "Mortgage Financing Application." It's
20  dated July 20, 1999. Have you ever seen this?
21  A. (Witness reviews document.) I don't recall
22  seeing it but I must have. Did I sign it?
23  Q. No.
24  A. Oh.

81

1  Q. No signed copy has actually appeared in
2  this case. Have you seen Exhibit 14 before?
3  A. I don't recall seeing it, but I might have.
4  Q. The financing application consists of both
5  a letter and an attached term sheet. Do you recall
6  seeing either the letter or the term sheet?
7  A. I don't recall.
8  Q. Let me show you Exhibit 16, which is a
9  letter to Credit Suisse from your lawyers at
10  Bernkopf. My question is whether you've ever seen
11  this document.
12  A. (Witness reviews document.) I don't
13  remember reading it, but I do see that I was cc'd.
14  Q. As of August 31, 1999, if you were cc'd on
15  a letter, did you typically review it?
16  A. No, not always. I got it.
17  Q. It came into your office, and you may or
18  may not have looked at it?
19  A. Right.
20  Q. Do any of the sections of this letter,
21  Exhibit 16, look at all familiar?
22  A. They all do and they all don't.
23  Q. They all look alike?
24  A. Right.

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

---

82

1    MR. MCGLYNN:  Is this a good time,
2  Bruce, to take about a two-minute break?
3    MR. FALBY:  Yes, sure.
4    (Recess.)
5  BY MR. FALBY:
6    Q.  What was the name of the lawyer on whom you
7  relied in not informing or seeking consent from the
8  lawyer with respect to the settlement of the zoning
9  appeal, the 2-million-dollar settlement payment,
10  with a conveyance of that payment out of Blue Hills
11  Office Park LLC?
12    MR. MCGLYNN:  I'm going to object,
13  Bruce.  Do you want to take another stab at that
14  one?
15    MR. FALBY:  What did I do wrong?
16    MR. MCGLYNN:  I didn't even understand
17  the first of the three or four questions in there.
18    Q.  You relied on a lawyer in not informing the
19  lender of the settlement of the zoning appeal,
20  correct?
21    A.  Yes.
22    Q.  What was the name of that lawyer?
23    A.  Ken Goldberg.
24    Q.  *You relied on a lawyer in not informing

---

83

1  the lender of, or seeking consent to, the
2  2-million-dollar settlement of the zoning appeal,
3  correct?
4    A.  I don't understand.  Just repeat it.
5    *(Question read.)
6    A.  Yes.
7    Q.  And that was Ken Goldberg too?
8    A.  Yes.
9    Q.  And you relied on Ken Goldberg as well in
10  not informing the lender of, or seeking consent to,
11  the conveyance of that 2-million-dollar payment out
12  of Blue Hills Office Park LLC?
13    MR. MCGLYNN:  Objection as to form.
14    A.  Yes.
15    Q.  I'm just trying to get the name of the
16  lawyer.  It was Ken Goldberg, right?  Was it?
17    A.  Yes.
18    MR. FALBY:  Let me mark as the next
19  exhibit, 324, a document Bates-stamped Blue Hill
20  2757 through 2760.
21    (Marked, Exhibit 324, UCC financing
22  statement, Bates Blue Hill 2757 through 2760.)
23    Q.  Do you recognize Exhibit 324 as a UCC
24  financing statement, Mr. Fineberg?

---

84

1    A.  (Witness reviews document.)  Yes.
2    Q.  Of which you've signed many in your career?
3    A.  Yes.
4    Q.  And you understand that the point of a UCC
5  financing statement is to give notice to the world
6  of security interests in property?
7    MR. MCGLYNN:  Objection.
8    A.  Yes, yes.
9    Q.  And you signed this security statement in
10  connection with the -- strike that.  You signed this
11  UCC financing statement in connection with the
12  Credit Suisse refinancing of Blue Hills Office Park,
13  did you?
14    A.  Yes.
15    Q.  Attached to the first page of the financing
16  statement is a multi-page description of the
17  property in which Credit Suisse had an interest as a
18  secured party?
19    A.  Yes.
20    Q.  And did you read this description of the
21  property before you signed the financing statement?
22    A.  I might have.
23    Q.  Did you at least have it explained to you
24  by your attorney if you didn't read it?

---

85

1    A.  I might have.  I signed it.
2    Q.  Do you think you signed it without looking
3  at it or talking to your attorney about it?
4    MR. MCGLYNN:  Objection.
5    A.  I might have.  I could have.
6    Q.  Did you understand that the description of
7  the Blue Hills property that this says the lender
8  has an interest in is very broad?
9    MR. MCGLYNN:  Objection.
10    A.  Yes.
11    Q.  And that it states in Paragraph 1 -- it
12  includes on the fourth line all estates, rights,
13  titles, interests, privileges, liberties having to
14  do with the property?
15    A.  Yes.
16    MR. MCGLYNN:  Are you asking him to read
17  that and agree that's what it says?
18    A.  That's what it says.
19    Q.  And in Paragraph 4 do you see that the
20  sixth line up from the bottom of the paragraph
21  numbered 4, that it includes any income,
22  receivables, receipts, revenues, deposits, accounts,
23  cash, issues, profits, et cetera, of Blue Hills
24  Office Park?

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

90

1    MR. MCGLYNN: Objection.
2    A. No.
3    Q. Why not?
4    A. Because it had nothing to do with the
5  building. This was a case where we took -- this was
6  an action I took against or we took against DST.
7    Q. And you understood that the only reason you
8  were entitled to bring that action against DST was
9  because you owned the office park that was an
10  abutting property to 250 Royall Street, correct?
11    MR. MCGLYNN: Objection.
12    A. Yes.
13    Q. And yet notwithstanding that the only
14  reason you could bring the lawsuit was because you
15  were an abutter, you thought that had nothing to do
16  with the property?
17    MR. MCGLYNN: Objection.
18    A. Correct.
19    Q. Why did you appeal the issuance of the
20  special permit to 250 Royall Street to build a
21  parking garage?
22    A. Originally, when we thought of it, I
23  thought maybe if they didn't get the parking, that
24  maybe EquiServe might change their mind; but I

91

1  quickly relinquished that thought and brought it in
2  as a nuisance because they went ahead and took our
3  tenant, so I wanted to get even.
4    Q. Who actually brought the zoning appeal --
5  strike that. Who actually brought the special
6  permit appeal?
7    A. Which attorney?
8    Q. No, what entity or person.
9    A. Oh, I don't know.
10    Q. It was Blue Hills Office Park LLC, right?
11    A. Probably.
12    Q. Because that was the property owner of the
13  abutting property, right?
14    A. That's correct.
15    Q. And in the appeal, the entity which owned
16  the property at 150 Royall Street complained of
17  damage to the property that would be caused by
18  building a garage at 250 Royall Street, correct?
19    A. They did.
20    Q. And why did you settle the zoning appeal?
21    A. For money.
22    Q. And you understood that part of the
23  settlement included a lease termination agreement
24  that made certain that EquiServe would move out?

92

1    A. I don't know. I'd have to check on that.
2    Q. Do you recall that there was a lease
3  termination agreement as part of the settlement?
4    A. I think there was.
5    Q. And you understood, didn't you, that the
6  settlement which included this lease termination
7  agreement eliminated any possibility that EquiServe
8  would stay in your building?
9    MR. MCGLYNN: Objection.
10    A. Yes.
11    Q. Why did you keep the 2-million-dollar
12  settlement payment in the entity, in Blue Hills
13  Office Park LLC, as a reserve against the day that
14  you knew was coming a year later when EquiServe was
15  going to move out?
16    MR. MCGLYNN: Objection.
17    A. I sent it to the -- I never saw the money.
18  It went directly with the attorneys, and I kept it
19  in the special accounts.
20    Q. Did you yourself consider that you should
21  keep the 2-million-dollar settlement payment in the
22  hands of the entity Blue Hills Office Park LLC as a
23  reserve against the day you now knew was coming for
24  sure a year later when EquiServe would move out and

93

1  there would be no cash flow for the property?
2    A. I left that up to my -- to the two
3  attorneys, both Goldberg and Cohn.
4    MR. MCGLYNN: Cohn.
5    THE WITNESS: Cohn.
6    Q. Did you have any input into where the
7  2-million-dollar settlement payment went?
8    A. I don't recall. I've been -- I don't
9  recall.
10    Q. Did anyone from Fineberg Management that
11  you know have any input in deciding who got the
12  2-million-dollar settlement payment?
13    A. I knew it was sent to Attorney Goldberg and
14  Cohn.
15    Q. At whose direction?
16    A. Most likely mine, but I don't recall.
17    Q. The documents produced in the case as well
18  as your interrogatory answers indicate that the
19  2-million-dollar payment was placed into a client
20  account for the benefit of Royall Associates Realty
21  Trust. Do you know whether that is the case?
22    MR. MCGLYNN: Objection.
23    A. No, I don't.
24    Q. Assuming that's where the money went, my

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

---

94

1  question is why Blue Hills Office Park LLC didn't
2  keep the money as a future reserve.  And your answer
3  is you don't know?
4      A.  I don't know.  I thought I said that.
5      Q.  Do you recall having any discussions about
6  what ought to be done with the 2-million-dollar
7  settlement payment at the time it was made?
8      A.  No.  Mr. Goldberg handled it and said he
9  was going to put it in a reserve account.
10     Q.  What reserve account for whose benefit?
11     A.  I don't know that.
12     Q.  Did you get the approval of the lender to
13  the lease termination agreement that you signed as
14  part of the settlement?
15     A.  I don't know.
16     Q.  Do you know whether the loan documents
17  require approval of the lender for the modification
18  or termination of a lease of 10 percent or more of
19  the space?
20         MR. MCGLYNN:  Objection.
21     A.  I think it does, but I don't recall
22  specifically how much.
23     Q.  Given that, why didn't Blue Hills Office
24  Park LLC seek the consent of a lender to enter into

---

95

1  the lease termination agreement with EquiServe that
2  was part of the zoning appeal lawsuit settlement?
3      A.  I don't know.  That would have been handled
4  by my attorney.
5      Q.  Do you recall discussing that subject with
6  your attorney?
7      A.  No.
8      Q.  And when you refer to your attorney, again,
9  you are talking about Ken Goldberg?
10     A.  Whenever I refer to my attorney, it's Ken
11  Goldberg.
12     Q.  What should we call that guy sitting next
13  to you?
14     A.  Ken's associate.
15         (Laughter.)
16     Q.  Did you talk to anybody about whether the
17  settlement payment ought to be accounted for on the
18  books and records of Blue Hills Office Park LLC?
19     A.  No.
20     Q.  Do you know whether it was?
21     A.  I don't know.
22     Q.  Do you know whether it should have been?
23     A.  I don't know.
24     Q.  Did you ever think about that?

---

96

1      A.  I never thought of it.
2      Q.  The settlement of the zoning appeal removed
3  any impediment to construction of the garage
4  nextdoor, correct?
5         MR. MCGLYNN:  Objection.
6      A.  I believe so.
7      Q.  And it cleared the way for DST to buy the
8  property and build a garage?
9      A.  Yes.
10     Q.  And for EquiServe to move out of your
11  building into Blue View?
12     A.  Yes.
13     Q.  Again, as part of the settlement Blue Hills
14  and EquiServe signed a lease termination agreement?
15     A.  Yes.
16     Q.  And that agreement ensured and confirmed
17  that EquiServe would be moving out as of July 31,
18  '04?
19     A.  Yes.
20     Q.  And the settlement thereby eliminated any
21  possibility of EquiServe staying in your building at
22  Blue Hills Office Park?
23     A.  We were notified that they weren't anyhow,
24  that they definitely were moving.

---

97

1      Q.  And the settlement of the zoning appeal
2  that you at least initially had hoped would persuade
3  them to stay in the building eliminated any such
4  possibility, did it not?
5      A.  They said they were going to move anyhow.
6      Q.  And the settlement ensured it; it put the
7  nail in the coffin, so to speak?
8         MR. MCGLYNN:  Objection.
9      A.  That's a good way of putting it.
10     Q.  Were you involved in efforts to try to
11  re-lease Blue Hills Office Park?
12         MR. MCGLYNN:  Him personally?
13         MR. FALBY:  Yes.
14     A.  When?
15     Q.  In 2003 after the settlement.
16     A.  No.
17     Q.  Did you at some point become involved in
18  efforts to re-lease Blue Hills Office Park?
19     A.  In 2003?
20     Q.  At any point.
21     A.  Yes.
22     Q.  When?
23     A.  When Bank of Boston, which was the
24  predecessor to EquiServe, moved in.  They were the

---

FARMER ARSENAULT BROCK LLC

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

---

122

1   Q. Or about the sale of EquiServe
2   workstations?
3   A. I might have heard of it. I don't recall.
4   Q. You don't recall anybody discussing the
5   sale of the stations or what to do with them?
6   A. Maybe Dan Frank told me. I don't really
7   recall.
8   Q. Let me show you Exhibit 24. This is a
9   letter dated August 5, 2004, from Fineberg
10  Management to Wells Fargo. Did you see that letter
11  at or about the time it went out?
12  A. (Witness reviews document.) I didn't -- I
13  don't remember seeing this letter.
14  Q. Were you shown this letter in preparation
15  for your deposition?
16  A. I don't even remember it in preparation for
17  the deposition.
18  MR. FALBY: Shame on you, Mr. McGlynn.
19  Q. Now, did you know in August 2004 -- well,
20  strike that. Reading the letter now, you see that
21  the first paragraph talks about officially notifying
22  Wells Fargo that the tenant has moved out and that
23  no replacement tenant has been found; do you see
24  that?

---

123

1   A. Yes.
2   Q. And it requests a meeting with the lender
3   to discuss the loan status and the future
4   performance of the loan; do you see that?
5   A. Yes.
6   Q. In the second paragraph it talks about
7   involving a special servicer based on our past
8   experience, correct?
9   A. Yes.
10  Q. At that point, August 2004, you and others
11  at Fineberg Management did have past experience in
12  dealing with special servicers with respect to loans
13  that were in trouble, correct?
14  A. Yes.
15  Q. And those were all the hotels you told me
16  about that were eventually either given back or
17  foreclosed on, right?
18  A. Yes.
19  Q. Now, in August 2004 were you having
20  discussions with Dan Frank or Joe Donovan about
21  notifying Wells Fargo and requesting a meeting and
22  so forth?
23  A. Yes.
24  Q. What do you recall about that?

---

124

1   A. I kept asking Dan Frank when he's going to
2   sit down and meet with the special servicer, and I
3   told him that if he met with the special servicer,
4   I'd like to be there.
5   Q. And when were you asking Dan Frank to do
6   that?
7   A. I can't remember the date, but during the
8   course of the summer when we first notified them;
9   and after that I kept telling him to set up an
10  appointment with a special servicer.
11  Q. And what did Mr. Frank say in response to
12  your repeated requests?
13  A. He said he's been trying to get in touch
14  with them but hasn't been able to get an answer to
15  the meeting and hasn't heard anything from them.
16  Q. When did he tell you that?
17  A. Oh, I don't know, during the course of the
18  summer, all the while he notified them and -- right
19  through. He said he has never -- he hasn't got a
20  call back from them to have a meeting. I don't
21  think even to this day he's had a meeting.
22  Q. Do you know whether in response to the
23  August 5 letter there was any further communication
24  between Fineberg Management and Wells Fargo?

---

125

1   MR. MCGLYNN: Objection. Can you repeat
2   that, please, Bruce.
3   Q. Sure. Do you know, Mr. Fineberg, whether
4   after the August 5 letter went out, there was any
5   further communication between Fineberg Management
6   and Wells Fargo?
7   A. I do not know that.
8   Q. Do you know whether Joe Donovan was trying
9   to reach Wells Fargo on the phone?
10  A. I think he was.
11  Q. Do you know whether Wells Fargo was trying
12  to reach Joe Donovan on the phone?
13  A. I do not know that.
14  Q. Did you see Exhibit 56 -- strike that. Did
15  you see Exhibit 27 at the time?
16  A. (Witness reviews document.) I don't
17  remember reading it at the time. I remember reading
18  it in preparation.
19  Q. Did you know at the time that -- as of
20  August 2004, that Mr. Mallegni of Wells Fargo and
21  Mr. Donovan were trading calls and missing each
22  other?
23  A. No.
24  Q. Do you know whether they ever actually

---

126

1 spoke?

2    A. I don't know.

3    Q. If they did, do you know what they talked

4 about?

5    A. No, I don't.

6       MR. MCGLYNN: Is this a good time to

7 break, Bruce, or -- I mean, if you have any

8 follow-up questions to Exhibit 22 --

9       THE WITNESS: We can go a few more

10 minutes.

11       MR. MCGLYNN: That's why I asked, but he

12 had agreed to break at 12:30.

13       MR. FALBY: Whenever you want. This is

14 a fine time for me. I don't care.

15       MR. MCGLYNN: Okay.

16       (Discussion off the record.)

17       (Luncheon recess at 12:35 p.m.)

18

19

20

21

22

23

24

127

1       AFTERNOON SESSION (1:22 p.m.)

2 BY MR. FALBY:

3    Q. Mr. Fineberg, at the time of the Credit

4 Suisse refinancing in 1999, did you know to which

5 particular loan pool that loan was going to be

6 assigned?

7    A. No.

8    Q. Did you know who the trustee of that loan

9 pool was going to be?

10    A. No.

11    Q. Did you know who the servicer of that loan

12 pool was going to be?

13    A. No.

14    Q. Did you ever see any agreements among any

15 of the trustee or the special servicer or the

16 servicer?

17    A. No.

18    Q. When I asked that question, I was

19 referring, of course, to the Blue Hills loan. Did

20 you understand that?

21    A. Yes.

22    Q. Did anybody at Fineberg Management ever see

23 any agreement or agreements among any of the trustee

24 or the servicer or the special servicer for the loan

128

1 pool into which the Credit Suisse refinancing was

2 assigned?

3    A. Not that I know of.

4    Q. Do you know if there were any agreements

5 among the trustee, special servicer, or servicer?

6    A. I don't know.

7    Q. So obviously, if there were any such

8 agreements, you don't know what they said?

9    A. Right.

10    Q. Who made the decision to appeal the special

11 permit that was granted to build the parking garage

12 nextdoor?

13    A. I think it was a joint decision.

14    Q. Among whom?

15    A. Among Dan Frank, myself, Langelier, and

16 Goldberg, and Cohn.

17    Q. Blue Hills Office Park LLC as an entity was

18 formed in connection with the Credit Suisse

19 refinancing, correct?

20    A. Correct.

21    Q. It didn't exist before then, right?

22    A. Correct.

23    Q. Before that Royall Associates Realty Trust

24 owned the office park, correct?

129

1    A. That's right.

2    Q. After the Credit Suisse refinancing, who

3 made decisions in the ordinary course for the entity

4 Blue Hills Office Park LLC?

5       MR. MCGLYNN: Objection.

6    A. Who made decisions?

7    Q. Yes.

8    A. Langelier and Fineberg.

9    Q. You have referred today to referring Dan

10 Frank to talk to Ken Goldberg about things in August

11 of 2004; do you remember that?

12    A. Yes.

13    Q. Who at that point was making decisions as

14 to what actions would be taken by Blue Hills Office

15 Park LLC?

16    A. Well, I think the attorneys talked to their

17 clients and we -- and gave us advice on what to do.

18    Q. And then the clients, meaning you and

19 Langelier as principals, would make the ultimate

20 decision?

21    A. I think so.

22    Q. And was the same thing -- strike that.

23 With respect to the -- appealing the zoning appeal

24 and settling it and the handling of the settlement

34 (Pages 130 to 133)

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

---

130

1  payment, those decisions were made by whom?
2      A. Jointly.
3      Q. By you and Mr. Langelier jointly?
4      A. With the attorneys' consent (nodding).
5      Q. I assume you made decisions with your
6  attorney's input and recommendation, but the
7  ultimate decisions were made by you and
8  Mr. Langelier with respect to Blue Hills Office Park
9  LLC?
10     A. I think you could be correct.
11     Q. Am I correct?
12     A. I think so.
13         MR. MCGLYNN: Asked and answered.
14 Objection.
15     A. I think so.
16     Q. All right. Not only could I be, I am.
17         MR. MCGLYNN: That's objectionable too.
18         (Laughter.)
19     Q. Let me show you Exhibit 20, which is the
20 zoning appeal complaint filed by Blue Hills Office
21 Park LLC. Did you see this at or around the time it
22 was filed?
23     A. (Witness reviews document.) I don't
24 remember. I might have seen it, but I don't

---

131

1  remember it.
2      Q. Did you discuss the content of the zoning
3  appeal complaint with your attorney at the time?
4      A. Yes.
5      Q. Can you please turn to page 8 of the zoning
6  appeal complaint.
7      A. Yes.
8      Q. Paragraph 37 is one sentence long; do you
9  see that?
10     A. Yes.
11     Q. It says, quote, "The proposed parking
12 structure is immediately in the sight line of the
13 plaintiff's property, will partially block its view,
14 and it will be detrimental and offensive to
15 plaintiff and the inhabitants of plaintiff's
16 property," unquote. Did I read that correctly?
17     A. Yes.
18     Q. Keeping in mind that the plaintiff was Blue
19 Hills Office Park LLC, is this statement true, or
20 was it true at the time?
21     A. I thought it was true at the time, but it
22 proved to be not true.
23     Q. At the time you filed this complaint, did
24 you believe this statement was true? At the time

---

132

1  this complaint was filed, did you believe the
2  statement in Paragraph 37 to be true?
3      A. I didn't know. I thought it was true, but
4  after that --
5      Q. Subsequently, did you come to some
6  different view of the sentence in Paragraph 37?
7      A. Yes.
8      Q. What view did you come to?
9      A. I had a meeting with -- that I attended
10 with some people from National Development, and they
11 came in with a book with charts and models and
12 pictures, and after discussion they showed where
13 they had altered it so that the line of sight from
14 150 was not obstructed but was enhanced because they
15 took down the trees that were in front and they
16 lowered the two wells that they had for stairwells
17 above it and lowered the wall so that when you
18 looked out, you couldn't see it, and they went
19 through an extensive explanation of it.
20     Q. So is it the case that in response to your
21 complaint, they made alterations to the garage to
22 meet the objections stated in Paragraph 37?
23         MR. MCGLYNN: Objection.
24     A. Yes.

---

133

1      Q. Now, at the time you filed the zoning
2  complaint, was it true, as stated in Paragraph 38,
3  in your view that the addition of 380 spaces in a
4  structured parking facility directly in the sight
5  line of plaintiff's property posed a detriment to
6  plaintiff's property?
7      A. Well, I thought it would before I looked at
8  their plans. After I saw their plans and saw the
9  finished product, it's in a downhill, and you really
10 don't see it when you look out because the hill
11 comes down and the garage is there, so it really
12 didn't obstruct it after they made some changes.
13     Q. Focusing at -- strike that. Focusing on
14 the date on which the complaint was filed, which was
15 June 9, 2003, before any such changes, as of June 9,
16 2003, when Blue Hills Office Park LLC filed a
17 complaint, did you believe that the statement in
18 Paragraph 38, that the addition of the parking
19 facility would be a detriment to plaintiff's
20 property, was true?
21     A. June 9 what?
22     Q. 2003.
23     A. I can't remember exactly the dates, but I
24 thought, when I heard about it, just heard about it,

---

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

142

1    A. I don't know that.
2    Q. Well, didn't you reserve in the agreement
3  we started off with this morning a lawsuit against
4  them for not making all the alterations they
5  promised they would make?
6    A. I don't know about that.
7    Q. Let me show you. I refer you again to
8  Exhibit 176. You acknowledged that you have a claim
9  against the owner of the newly constructed office
10  building at 250 Royall street for failure to
11  construct those premises within the height and
12  building envelope restrictions agreed upon with the
13  LLC, and the agreement defined that as claim against
14  abutter.
15    A. (Witness reviews document.) I don't know
16  about it.
17    Q. Does that refresh your memory that in fact
18  the garage was not built in accordance with the
19  alterations you had been promised?
20    A. I thought it was.
21    Q. And yet you nonetheless signed an agreement
22  in which you acknowledged that it wasn't?
23    A. I can't recall why I signed it.
24    Q. To this day do you know whether the garage

143

1  was built within the height and building envelope
2  restrictions agreed upon with the building nextdoor?
3    A. I don't know. I know that till today it
4  doesn't block any sight line.
5    Q. It's your testimony that today, as built,
6  the parking garage has no impact whatsoever either
7  on the view from the building or on the view of the
8  building from the highway?
9    A. Right.
10    Q. At the time you settled the zoning appeal
11  for $2 million, did you have any discussion with
12  anyone other than your attorney, Ken Goldberg, about
13  whether the lender ought to be informed and its
14  consent obtained to keep that $2 million?
15    A. No, I talked only with Ken Goldberg.
16    Q. Similarly, did you discuss with anybody
17  else whether the fact of the settlement and how much
18  you were settling for, whether that should be
19  discussed with the lender and their consent
20  obtained?
21    A. I was told we had a right to keep the money
22  and we had a right to deposit it wherever we wanted.
23    Q. Mr. Goldberg told you that, did he?
24    A. Yes, sir.

144

1    Q. What else did he tell you on that subject?
2    A. That's all I can say.
3      MR. MCGLYNN: I'm going to instruct you
4  not to discuss any substantive discussions with your
5  attorneys.
6      MR. FALBY: Well, he just did, so I will
7  ask the question.
8      MR. MCGLYNN: Well, it came out so fast
9  that -- obviously, we don't have split-second
10  reaction time here.
11    Q. What else did Mr. Goldberg tell you on the
12  subject of whether you ought to be informing your
13  lender and seeking their consent to the settlement
14  and the disposition of the payment?
15    A. That's all he told me.
16      MR. MCGLYNN: Objection. I'm
17  instructing the witness not to answer.
18    Q. Were you interested in avoiding telling
19  your lender about the $2 million for fear they would
20  want some part of it?
21      MR. MCGLYNN: Objection.
22    A. No. I didn't think of that. I didn't
23  think of that.
24    Q. It didn't occur to you before you disposed

145

1  of $2 million of Blue Hills Office Park LLC assets
2  that the lender might have some interest in the
3  disposition of that $2 million?
4      MR. MCGLYNN: Asked and answered,
5  objection.
6    A. I was told I had the right to keep the
7  money, to not to tell them.
8    Q. Mr. Goldberg told you that?
9      MR. MCGLYNN: Objection.
10    A. That's right.
11    Q. And you relied on him, did you?
12    A. I always rely on him.
13    Q. Did you have any independent thought
14  yourself that maybe the lender would want to know
15  about $2 million that belonged to its single-purpose
16  borrower in all of whose assets it had a security
17  interest?
18    A. No.
19      MR. MCGLYNN: Objection, form, calls for
20  speculation.
21    A. No.
22    Q. It didn't occur to you?
23    A. No.
24    Q. And did you have any discussion on that

Page 158

1  going.  We wanted a global conference, not a
2  piecemeal conference.
3      Q.  Same answer for why you didn't pay the
4  escrow payments that Lennar said were in default as
5  of September 17, 2004?
6      A.  Yes.
7      Q.  Do you know if in response to the September
8  17, 2004 letter anybody from Blue Hills responded to
9  Lennar?
10     A.  I don't know for a fact, no.  I didn't.
11     Q.  After --
12     A.  I think Goldberg did, though.  I don't
13  know.
14     Q.  You don't know, right?
15     A.  I don't know, but I still think Goldberg
16  did.
17     Q.  Okay.  After Blue Hills received the
18  September 17, 2004 letter, did you offer to cure the
19  defaults that are listed here by paying the taxes
20  and the escrow payment?
21     A.  After that letter, everything went through
22  Goldberg.  We still requested a sit-down with
23  someone from Lennar to go over the whole situation,
24  but everything then went right through Ken Goldberg.

Page 159

1      Q.  Who after September 17, 2004, requested the
2  sit-down?
3      A.  I don't know.
4      Q.  I understand you referred it to Ken
5  Goldberg, but why, when you learned that a default
6  had been declared with respect to the amounts of
7  158,000 in taxes and 80,000 in escrow payments,
8  didn't you offer to cure the default?
9      A.  We were still waiting for a sit-down
10  meeting to discuss everything.
11     Q.  At some point you realized that sit-down
12  meeting wasn't going to occur, correct?
13     A.  I was still waiting.
14     Q.  At some point you realized it wasn't going
15  to happen, correct?
16     A.  Yes.
17     Q.  At that point did you consider offering to
18  cure the default?
19     A.  At that point it was turned over to
20  Goldberg and Andrew Cohn.
21     Q.  But you are the client.  You ultimately
22  make the decisions on Blue Hills with Mr. Langelier,
23  right?
24     A.  Yes.

Page 160

1      Q.  So why didn't you, as the client, in
2  consultation with Mr. Langelier, offer to cure the
3  default?
4      A.  Because we wanted to sit down and have a
5  meeting to go over it with Lennar, and we were
6  waiting.
7      Q.  But at the point you understood there
8  wasn't going to be a meeting, why didn't you, as
9  the owner, the guy in charge, offer to cure the default
10  or do something?
11     A.  I didn't think there was not going to be a
12  meeting.  In my experience with Lennar, there always
13  was a meeting.
14     Q.  At some point prior to November 18, 2004,
15  when Lennar conducted the foreclosure sale, you
16  realized there wasn't going to be a meeting, didn't
17  you?
18     A.  Yes.
19     Q.  And when you made that realization, why
20  didn't you offer to cure the default or do something
21  else to work out the loan?
22     A.  The only way you can work it out is to sit
23  down and talk about it.
24     Q.  Did you think that Lennar was obligated

Page 161

1  under the loan documents to meet with you?
2      A.  They were obligated morally and ethically
3  to sit down and talk to a borrower, yes.
4      Q.  I understand your feeling that they were
5  ethically and morally obligated to do that.  Do you
6  know independently yourself whether the loan
7  documents -- whether the loan documents obligated
8  Lennar to sit down with you?
9      A.  I think that's an attorney's decision to
10  make.  I think that's an attorney's --
11     Q.  You don't know?
12     A.  I'd leave that up to an attorney.
13     Q.  Well, you do know that even if you had a
14  meeting, Lennar wasn't obligated to agree to
15  anything you proposed, correct?
16     A.  They weren't obligated, but they were
17  obligated to meet with us.
18     Q.  Let's assume you had a meeting and they
19  refused to do anything that you wanted.  What would
20  you have done then?
21     A.  Oh, you're putting something in that I
22  can't tell you.  It depends what happens at the
23  meeting.
24     Q.  Well, let's say at the meeting they said,

41 (Pages 158 to 161)

42 (Pages 162 to 165)

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

162

1  "Forget it. We're not going to agree to anything.
2  Either bring the loan current or we're foreclosing."
3      A. I can't answer that the way you put it.
4  We're talking two years later.
5      Q. What did Blue Hills do in response to the
6  September 17, 2004 default notice that I've showed
7  you, which is Exhibit 30?
8      A. We turned it over to the attorneys to talk
9  to their attorneys, I guess.
10     Q. Let me show you Exhibit 175, which is a
11  November 3, 2004 e-mail from Bill Langelier to Dan
12  Frank. Have you ever seen this before?
13     A. (Witness reviews document.) No, not that I
14  remember.
15     Q. Did Mr. Frank ever tell you that Bill
16  Langelier had sent an e-mail on the subject of
17  trying to buy the debt at a discount?
18     A. I think he did say something to that effect
19  once, but I can't remember it.
20     Q. Take a moment and read this, if you would,
21  please.
22     A. (Witness reviews document.) This is a good
23  letter from Bill to Dan, but I didn't put much hope
24  or faith in his letter.

163

1      Q. Were you aware of this e-mail at the time?
2      A. I might have been. I can't recall right
3  now.
4      Q. In the fourth line Mr. Langelier says, "I
5  would hope that you and Jerry would want to defer
6  the foreclosure until the next tag shoe"; do you see
7  that?
8      A. Yes.
9      Q. Did you want to defer the foreclosure?
10     A. No.
11     Q. Why not?
12     A. It didn't matter to me, one year or the
13  next.
14     Q. Did you request that Lennar defer the
15  foreclosure?
16     A. No.
17     Q. The next line says, "I'm aware through Andy
18  Cohn that Jerry has looked into trying to buy the
19  debt at a discount." Did you look into trying to
20  buy the debt at a discount?
21     A. No.
22     Q. Why not?
23     A. I just didn't.
24     Q. Do you have any idea why Mr. Langelier

164

1  would be under the mistaken impression from Andy
2  Cohn that you had?
3      A. I don't know, not from me. We hadn't sat
4  down with Lennar. How can I make a statement like
5  that? Who would I make it to?
6      Q. As of November 3, were you interested in
7  buying the debt at a discount?
8      A. I don't recall ever making that statement
9  or hearing about it.
10     Q. Well, at the time, in your thoughts, were
11  you interested in trying to buy the debt at a
12  discount?
13     A. No.
14     Q. If you had had the opportunity to buy the
15  debt at a discount, would you have done so?
16     A. I don't know.
17     Q. Did you ever make a written proposal to
18  Lennar to buy the debt at a discount?
19     A. Not that I know of.
20     Q. Why not?
21     A. I want to sit down with them, I want to
22  talk with them. I don't just throw offers around on
23  anything. I didn't even know if it was for sale.
24     Q. Well, since you weren't getting

165

1  satisfaction on what you say was your request for a
2  meeting --
3      A. Uh-huh.
4      Q. -- did it occur to you simply to make a
5  proposal in writing to Lennar?
6      A. It didn't.
7      Q. Did it occur to you maybe that would be a
8  good idea?
9      A. I can't go back in my memory two years and
10  think what I should have done, could have done.
11     Q. No, I'm asking you what you remember. Do
12  you remember?
13     A. I don't remember.
14     Q. I mean, the obvious question is, you were
15  interested in having a meeting, and a meeting wasn't
16  happening. And you were interested nonetheless in
17  working out the loan. Why didn't you make a
18  proposal in writing?
19     A. Because if I made a proposal -- if they
20  wouldn't sit down with me and talk with me, there
21  wasn't going to be a written proposal. So you could
22  have another piece of evidence here to put a stamp
23  on? They wouldn't sit down. That's the first thing
24  you do. Then you make your proposal. You don't

43 (Pages 166 to 169)

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

166

1  just throw letters around.
2      Q. Mr. Langelier then discusses the
3  possibility of him jointly acquiring the debt with
4  you; do you see that?
5      A. Yup.
6      Q. Were you interested in that possibility?
7      A. That's his statement, not mine.
8      Q. Did you discuss with Mr. Langelier through
9  Mr. Frank or anyone else buying the debt with
10  Mr. Langelier?
11      A. No.
12      Q. Why not?
13      A. Same reason that I had for not doing it
14  myself. I wanted to sit down and have a meeting and
15  discuss it. I'm not going to give offers.
16      Q. Well, before you went to a meeting with
17  Lennar, wouldn't you at least be talking to your
18  equal partner to figure out what it is you would
19  want to offer at a meeting?
20      A. Well, I would think that Mr. Goldberg and
21  Mr. Cohn would talk to Langelier and Mr. Goldberg
22  would come back to me.
23      Q. Well, did you, in November, through
24  Mr. Frank or through Mr. Goldberg or anybody,

167

1  respond to this expression of interest that
2  Mr. Langelier had in possibly jointly acquiring the
3  debt with you?
4      A. Mr. Goldberg might have talked to Mr. Cohn
5  but I didn't.
6      Q. Do you recall talking to anybody about what
7  response should be made to this interest of
8  Mr. Langelier in jointly acquiring the debt with
9  you?
10      A. I left it up to Goldberg.
11      Q. Did you discuss it with Mr. Goldberg?
12      A. I might have.
13      Q. You don't remember?
14      A. I might have. I think I did.
15      Q. And what did you conclude? Were you
16  interested in jointly acquiring the debt with
17  Mr. Langelier?
18      A. I left it up to Goldberg to talk to
19  Mr. Cohn.
20      Q. I understand that, but did you, as the
21  client, the guy in charge, make any decision as to
22  whether you were interested in jointly acquiring the
23  debt with Mr. Langelier?
24      A. No, I didn't make a decision.

168

1      Q. Were you interested in that idea?
2      A. No.
3      Q. Did you instruct Mr. Goldberg to pursue it
4  further with Mr. Langelier's attorney?
5      A. Yes.
6      Q. And did he?
7      A. I don't know.
8      Q. Did he come back to you with some further
9  discussion on that subject?
10      A. I don't remember.
11      Q. He then continues in this e-mail, "I think
12  this," referring to jointly buying the debt with
13  you, "is a workable option that should be considered
14  by the partners that not only has profit potential
15  but will also defer the tax liability." Do you see
16  that?
17      A. Yes.
18      Q. Did you agree with that analysis at the
19  time?
20      A. I didn't even think about that analysis at
21  the time.
22      Q. Why not?
23      A. Because I turned the letter -- I didn't
24  read the letter. I left it up to Dan Frank and Ken

169

1  Goldberg, Andrew Cohn, and I stepped aside.
2      Q. I'm just curious why you stepped aside
3  since it was your asset and you were the principal.
4      A. Because I wanted them to read the letter
5  and make a decision. I don't understand -- I don't
6  know why, but if they wouldn't sit down with you and
7  just talk to you and have a meeting or give you any
8  indication, then how are you going to give them an
9  offer?
10      Q. In writing.
11      A. Or any kind of offer.
12      Q. I'm suggesting if they won't sit down with
13  you and talk to you, you can make an offer in
14  writing.
15      A. I don't do that.
16      Q. Why not?
17      A. I just don't. That's not my way. It's not
18  my style.
19      Q. In the third line up from the bottom,
20  Mr. Langelier says, "If, however, Jerry has decided
21  not to pursue the acquisition of the debt, please
22  let me know ASAP." As of November 3, 2004, had you
23  decided not to pursue the acquisition of the debt?
24      A. I don't even remember answering this

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

170

1  letter. I don't recall it at all.
2     Q. Putting aside the letter, just think back
3  to early November '04, two weeks before the
4  foreclosure. At that point had you decided not to
5  pursue the acquisition of the debt?
6     A. I made the same statement each time, that
7  if they wouldn't sit down and talk with me, how can
8  they make any deal with anyone? If they can't look
9  you in the eyes, you can't make a deal.
10     Q. And you weren't interested in making any
11  sort of proposal in writing or on the telephone or
12  any other way short of a meeting?
13     A. That's correct.
14     Q. Did you want to work with the lender to
15  restructure the loan?
16     A. I wanted to retain ownership of the
17  building, and I would have done anything to do that.
18     Q. You obviously did everything, because
19  you didn't make any offer to do so.
20        MR. MCGLYNN: Objection.
21     A. I don't generally make offers when people
22  don't want to talk to me. We had 6 million, 5
23  million plus dollars sitting there waiting. We had
24  the -- they knew we were asking for a meeting, and I

171

1  don't know what more you should do.
2     Q. Did you or anyone else ever tell Lennar
3  that you had 5 million plus dollars sitting there?
4     A. How could I -- I didn't tell them because
5  they never talked to me.
6     Q. Did anybody from your side ever tell Lennar
7  that you had 5 million plus dollars available to
8  devote to the property if they'd just sit down and
9  talk about it?
10     A. If they had called a meeting and sat down,
11  they sure as heck would have known because I would
12  have told them.
13     Q. But you weren't going to tell them unless
14  they agreed to a meeting?
15     A. How can you talk to -- make a business deal
16  of this magnitude without somebody sitting down and
17  being willing to -- if they're not willing to talk
18  to me, how can they be willing to do business with
19  me?
20     Q. I suppose you could make a proposal or at
21  least tell Lennar you were interested in keeping it
22  and actually had $5 million to devote to that
23  purpose if you felt like it, if they'd only sit down
24  with you. But you didn't do that?

172

1     A. Well, I also signed a letter that they sent
2  me. What do you call that letter?
3     Q. Prenegotiation letter.
4     A. If I didn't want to sit down with them, I
5  never would have signed a prenegotiation letter.
6  Generally, in my experience, when I sign a
7  prenegotiation letter, that means I want to sit down
8  with them and talk to them. And it said right in
9  that letter that "before we can sit down and talk to
10  you, you must sign this letter," so I signed it and
11  assumed that they were going to call me and talk to
12  me.
13     Q. Do you recall that you also agreed in that
14  letter -- do you also recall that you agreed in that
15  prenegotiation letter that you would send them a
16  business plan for the property?
17     A. There's no business plan to renting a
18  building. You rent a building. You have a tenant.
19  That's your business plan. But we did submit --
20  they had all the facts on just about everything we
21  did. We had sent them all the facts except the
22  business plan because it's a normal thing, a
23  business plan is: You rent out the building and the
24  rents pay for the expenses.

173

1     Q. Well, did you have a plan for the building
2  that would tide it over until you could get a tenant
3  in there?
4     A. Our $6 million plus. I had some extra
5  money and Langeller had more money. We really
6  wanted this building.
7     Q. So did you therefore put that in writing in
8  the form of a business plan and send it to Lennar as
9  you had agreed to do in the prenegotiation letter?
10     A. No, that's not a business plan.
11     Q. Where did the prenegotiation letter go?
12        MR. MCGLYNN: Well, that one, by the
13  way, if you are looking for the exhibit attached to
14  it, the one you handed out was incomplete.
15     Q. I'm handing you Exhibit 62. Do you see in
16  Paragraph 9 that you did agree to supply the
17  information requested that was listed in Exhibit A?
18     A. Yes.
19     Q. Let me find Exhibit A.
20        MR. MCGLYNN:  While you are looking for
21  it, do you want to take a two-minute break?
22        MR. FALBY:  Not unless you want to.
23        MR. MCGLYNN:  I mean, we can sit here
24  and watch you, but I don't think any of those copies

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

174

1  have what you are looking for.
2          MR. FALBY:  Why do you say that?
3          MR. MCGLYNN:  Because it's the same one
4  you handed to me.
5          MR. FALBY:  Your knowledge of my
6  documents is impressive yet flawed.
7          MR. MCGLYNN:  Well, we're still looking
8  and you can't find it.  Let's take a two-minute
9  break.
10         MR. FALBY:  Yes, touché.
11         MR. MCGLYNN:  Off the record.
12         (Recess.)
13  BY MR. FALBY:
14      Q.  I have handed you Exhibit 60, which has
15  Exhibit A to the prenegotiation letter, which
16  provides, among other things, the borrower would
17  provide a current business plan for the property,
18  including the budget for this year, detailing
19  revenue and expense projections, et cetera.
20          Having agreed to provide that, why
21  didn't you give Lennar in writing a plan for the
22  project with statements of where you expected money
23  to come from to tide you over until there was
24  revenue from the new tenant?

175

1      A.  I don't know.  There's no -- there was no
2  tenant so it was very difficult to make an accurate
3  business plan.  I was waiting to sit down with them
4  to go over it, because otherwise you can't do it.  I
5  was waiting for our meeting.
6      Q.  Did you have in mind some way to tide the
7  property over until a tenant could be found who
8  would pay rent?
9      A.  Yes.
10     Q.  And what was that plan?
11     A.  That plan was to access the reserve
12  accounts, to access the reserve accounts that we had
13  in the attorneys' office and, if need be, go into
14  our pockets for additional funds.
15     Q.  But you didn't put that plan in writing,
16  and you didn't furnish it to Lennar?
17     A.  That's correct.  I told you why.
18     Q.  Because you wanted a sit-down meeting?
19     A.  You have to have a sit-down meeting first
20  before you do anything.
21     Q.  Notwithstanding that, you had agreed in the
22  prenegotiation letter to provide a business plan for
23  what you would do with the property?
24     A.  I -- they had -- Lennar had almost all of

176

1  this information with them, and I would have
2  supplied it and I would have supplied a business
3  plan, but you have to sit down with Lennar in order
4  to make a business plan.
5      Q.  So -- strike that.  Although you had agreed
6  to provide a business plan, your plan for the
7  property, in this letter, you weren't going to
8  provide it until after you had a chance to sit down
9  with them and look them in the eye?
10     A.  Well, I wanted the meeting right away.
11  This would have taken time.  A lot of these things
12  would take time to get current.  I wanted to have a
13  meeting and get going with it.
14     Q.  When you didn't get a meeting right away,
15  why didn't you furnish the stuff you agreed to
16  furnish, including the business plan?
17     A.  They had most of the stuff.
18     Q.  They didn't have a business plan as to what
19  your plan was for the property, did they?
20     A.  They knew -- they had been in business.
21  They knew what you do with an empty building.  You
22  keep paying them until you find a tenant.  That was
23  the business plan, just go out and work our little
24  tails off until we found a tenant.  And then I told

177

1  you where the 6 million plus was coming from.
2      Q.  You never told Lennar where the 6 million
3  plus was coming from?
4      A.  I didn't, but --
5      Q.  You have to wait for me to finish the
6  question.  You never told Lennar that you had 6
7  million in reserve accounts held by Royall
8  Associates Realty Trust ready to devote to the
9  building, did you?
10     A.  I would have had I had a meeting.
11     Q.  But in advance of the meeting, you never
12  put that in a business plan of the sort that you
13  agreed to provide in the prenegotiation letter, did
14  you?
15     A.  Yes, that's correct.
16     Q.  Similarly, you didn't provide Lennar with
17  the financial statements of the guarantors,
18  yourself, to show your financial resources and
19  ability to contribute money to the property, did
20  you?
21     A.  I was waiting for the meeting to show them.
22     Q.  Notwithstanding you agreed to provide it in
23  the prenegotiation letter, you never did provide it
24  after signing that letter, did you?

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 182

1    Q.  When you say "obligation," you mean an
2  ethical and moral obligation?
3    A.  Ethical, moral, and probably legal.  I'll
4  have to check with an attorney on that.
5    Q.  Okay.  Now, did you think that when Lennar
6  would sit down with you, they had any obligation of
7  any sort to agree to your workout plan for the
8  property?
9    A.  That's up to them.  That's their decision.
10   Q.  They were free at a meeting to tell you to
11 pound sand, weren't they?
12   A.  Say that again.
13   Q.  They were free at a meeting to tell you to
14 pound sand, weren't they?
15   A.  Yes.
16        MR. MCGLYNN:  Objection.
17   Q.  What did you think the property was worth
18 as of November 2004?
19   A.  A lot of money.
20   Q.  How much?
21   A.  40-odd-million-dollars.
22   Q.  Did you have an appraisal done at that
23 time?
24   A.  No.

Page 183

1    Q.  What would you have paid for the property
2  as of November '04?
3        MR. MCGLYNN:  Objection.
4    A.  I can't answer that.
5    Q.  Why not?
6    A.  I don't know.  I know what it's worth.
7  What I'd pay for it, I don't know.
8    Q.  Would you have paid 40-odd-million-dollars
9  for the property as of November '04?
10   A.  I can't answer that.
11   Q.  Why not?
12   A.  I can't.  I don't know what I would have
13 done.  Looking back, I don't know what I would have
14 done.  I know what it was worth.  I know I wanted to
15 own it, but I didn't have to pay that because it
16 was -- the debt was only 33.
17   Q.  Why did you think the property was worth
18 40-odd-million-dollars?
19   A.  Because of what they got nextdoor and
20 what -- the rents they were getting around there,
21 and if we could get the rents, if we could find one
22 tenant, it would be worth that.
23   Q.  An empty property is not worth as much as a
24 tenanted property, is it?

Page 184

1    A.  No.
2    Q.  Did you think that it made sense to compare
3  the empty, dark Blue Hills Office Park to the
4  vibrant, fully tenanted buildings nextdoor when you
5  were considering its value?
6        MR. MCGLYNN:  Objection.
7    A.  I thought -- I'm valuing it with a tenant,
8  and we were going to get a tenant.
9    Q.  Well, you had been looking for a tenant for
10 18 months, right?
11   A.  But they also -- those vibrant buildings
12 nextdoor were looking for tenants for eight to ten,
13 twelve -- for two years and they found one.
14   Q.  You had been looking without success for a
15 tenant for 18 months, had you not?
16   A.  That's true, because the buildings
17 nextdoor, the vibrant buildings that were worth a
18 lot of money, got the tenants.
19   Q.  Because those were new buildings unlike
20 yours, correct?
21   A.  That's correct.
22   Q.  What was your equity in the building worth
23 as of November '04?
24   A.  $12 million plus.

Page 185

1    Q.  How do you calculate that?
2    A.  If the building was worth 40-odd-million
3  and the mortgage was 32 or whatever million.
4    Q.  So you are figuring the building was worth
5  around 45 million?
6    A.  44, yeah.
7    Q.  44 million.  Now, at the time did you think
8  the building was worth 44 million, or are you
9  telling me that because you have an expert now
10 that's telling you it's worth 44 million?
11        MR. MCGLYNN:  Objection.
12   A.  I'm telling you that right now for both
13 reasons.  Plus I have an expert that reconfirmed my
14 thinking and I read it yesterday.
15   Q.  But at the time -- even before your
16 economist opined that the fair market value as of
17 November '04 was 44 million, you at the time
18 actually thought it was worth that?
19   A.  I thought it was worth a lot more than the
20 mortgage; otherwise, I wouldn't have wanted to sit
21 down and try to save the building, have all this
22 money in reserve.
23   Q.  So if you thought you had $12 million worth
24 of equity, why in the world didn't you bring the

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

194
1 spend?
2    A. A million or two.
3    **Q. But no more?**
4    A. No, not until we got a tenant.
5    **Q. You know what the owner who bought it for**
6 **23 million is doing to it, don't you?**
7    A. No, I don't.
8    **Q. You haven't driven by and seen it?**
9    A. I haven't driven by it.
10   **Q. They're renovating the whole thing. You**
11 **can see right through it today; are you aware of**
12 **that?**
13   A. No. That doesn't mean they're right.
14   **Q. They are having to put into the building**
15 **about as much as they paid for it; are you aware of**
16 **that?**
17   A. So then it's worth 44 million.
18   **Q. Did the plan that you had in mind for the**
19 **building require -- let me back up. Your plan for**
20 **the building involved using money in the reserves**
21 **and also using the 5 plus million dollars you had in**
22 **an account being held by the attorneys for Royall**
23 **Associates, right?**
24   A. Yes.

195
1    **Q. And the plan also involved some period of**
2 **time where you would fix up the building and thereby**
3 **be able to attract a tenant, get them in there, and**
4 **fix up the building for them, right?**
5    A. Yes.
6    **Q. You anticipated, didn't you, that in order**
7 **to do all that you were going to have to modify the**
8 **loan document?**
9    A. Yes.
10   **Q. Did you think as of November 2004 that**
11 **Lennar had no legal right to foreclose on the**
12 **property?**
13   A. Say that once more.
14   **Q. Sure. As of November 2004, did you think**
15 **that Lennar had no legal right to foreclose on the**
16 **property?**
17   A. Yes.
18       MR. MCGLYNN: Objection.
19   **Q. So why didn't you sue to enjoin the**
20 **foreclosure?**
21   A. I was waiting for a meeting with our
22 attorneys to sit down and to discuss it.
23   **Q. They wouldn't give you a meeting either?**
24   A. Oh (gesturing).

196
1    **Q. Did you not have a meeting with your**
2 **attorneys?**
3    A. Not until after November.
4    **Q. How come you didn't have a meeting prior to**
5 **the foreclosure with your attorneys to talk about**
6 **trying to stop it?**
7    A. Well, we had time to do it. I was in
8 Florida and Mr. Langelier was in California. We
9 were waiting to get together when we got notice of
10 the suit.
11   **Q. You got notice of the suit or the**
12 **foreclosure?**
13   A. Of whatever, I don't know.
14   **Q. How come you didn't get on the telephone**
15 **and discuss with your attorneys a lawsuit to enjoin**
16 **the foreclosure?**
17   A. I don't know. I can't recall exactly the
18 timetable and what happened.
19   **Q. At some point did you make a decision not**
20 **to try to enjoin the foreclosure sale?**
21       MR. MCGLYNN: Objection.
22   A. I don't recall.
23   **Q. What you recall is that you were waiting**
24 **for the opportunity to have a meeting with your**

197
1 attorneys to discuss the possibility of trying to
2 stop the foreclosure, and before that meeting could
3 occur, the foreclosure took place?
4    A. I can't recall exactly the timetable there.
5 I'll have to check. I just can't remember.
6    **Q. Well, searching your memory -- I'll ask the**
7 **question again. Give me your best answer from your**
8 **memory. If you thought Lennar had no right to**
9 **foreclose on the property, why didn't you sue to**
10 **enjoin the foreclosure?**
11   A. I'll have to ask my attorney that. I don't
12 know why.
13   **Q. Did you ever discuss that with your**
14 **attorney, that is, the subject of suing to enjoin**
15 **the foreclosure?**
16       MR. MCGLYNN: Yes or no.
17   A. I don't recall.
18       MR. MCGLYNN: Or "I don't recall."
19   **Q. After the foreclosure sale how come you**
20 **didn't sue to set it aside?**
21       MR. MCGLYNN: Objection.
22   A. I don't know.
23   **Q. Did you discuss with your attorneys suing**
24 **to set aside the foreclosure sale?**

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

214

1    A. No.
2    Q. Never encouraged you to think they were
3  going to meet, right?
4    A. Silence.
5    Q. And your reaction to the silence was
6  basically, "Fine. If they're not going to meet,
7  we're not putting any money in"; is that right?
8    A. That's right.
9    Q. Even though the default they were
10  complaining about -- 158,000 in taxes, 80,000 of
11  escrow payments -- was small compared to what you
12  thought was your $12 million of equity,
13  notwithstanding that, because they weren't going to
14  meet with you, you weren't going to pay those
15  amounts?
16    A. That's right.
17    Q. Did you ever consider, Mr. Fineberg, that
18  putting something in writing to Lennar might make
19  them interested in meeting and accomplish what you
20  wanted, which was a sit-down meeting?
21    A. No, I didn't think it would work.
22    Q. Did you consider doing that, or did it just
23  not occur to you?
24    MR. MCGLYNN: Objection.

215

1    Q. Do you have my question in mind?
2    A. (Witness nods.) Just -- I considered it, I
3  just didn't think it would work.
4    Q. And even though you weren't getting a
5  meeting, you didn't think it was worth a try to
6  protect your $12 million in equity?
7    MR. MCGLYNN: Objection.
8    A. No, I left that up to Mr. Goldberg to try
9  to get a meeting to talk to them.
10    Q. Back when you settled the zoning appeal,
11  you said it didn't occur to you independently that
12  you needed to talk to the lender about it, right?
13    A. I was advised that I didn't have to talk to
14  the lender about it.
15    Q. Right, you were advised that by
16  Mr. Goldberg, right?
17    A. That's correct.
18    Q. Then I asked you whether independently you
19  considered whether you should go to the lender and
20  tell them about the settlement and the payment and
21  what you wanted to do with it, and you said, I
22  think, that independently you didn't think of that;
23  is that right?
24    A. Well, after talking with Mr. Goldberg and

216

1  getting his advice, I thought -- I came to that
2  opinion.
3    Q. That you didn't need to go?
4    A. Right.
5    Q. Who brought it up? Did Mr. Goldberg bring
6  it up, or did you bring if up?
7    MR. MCGLYNN: I want to instruct you not
8  to discuss any substantive discussions you had with
9  Attorney Goldberg.
10    MR. FALBY: I'll just state for the
11  record that he's told me all day about them, so he's
12  waived any privilege, if any, as to discussions --
13    MR. MCGLYNN: Well, we'll let the legal
14  scholars and the judge determine that.
15    MR. FALBY: That's fair enough, but I'll
16  just state you can't have it both ways.
17    Q. So before you talked to Mr. Goldberg on the
18  subject of whether you needed to go to the lender
19  with respect to the settlement or the payment or
20  conveying that to the realty trust, did you consider
21  that subject yourself? Were you thinking about
22  that?
23    A. I wasn't. I went to Mr. Goldberg
24  immediately and found -- and asked him the question.

217

1    Q. So you asked him the question whether you
2  had to go to the lender?
3    A. Yes.
4    Q. 'Cause it had occurred to you that you
5  might have to go to the lender?
6    A. He advised --
7    MR. MCGLYNN: Again, no substantive
8  discussion between you and your attorney.
9    A. No substantive discussion.
10    Q. I'm not asking that. I'm saying, before
11  you went to Mr. Goldberg, it had occurred to you
12  that you might have to go to the lender on this,
13  right?
14    MR. MCGLYNN: Objection. That's not his
15  testimony.
16    THE WITNESS: Should I answer?
17    MR. MCGLYNN: Do you understand the
18  question?
19    THE WITNESS: No.
20    Q. Before you went and talked to Mr. Goldberg
21  about this, it had occurred to you that you might
22  have to go to the lender, right?
23    MR. MCGLYNN: Objection.
24    A. I don't think so. I think he told me we

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

218

1  needed --
2       MR. MCGLYNN:  Again, don't discuss --
3     A.  No, I didn't.  I didn't even think about
4  it.
5     Q.  You told me a second ago that you went to
6  Mr. Goldberg and asked the question, right?
7     A.  Well, during the course of our
8  conversations --
9       MR. MCGLYNN:  All right.
10       THE WITNESS:  All right.
11       MR. MCGLYNN:  I'm going to instruct you
12  not to discuss what you discussed substantively with
13  Attorney Goldberg.
14     A.  I can't discuss it.
15     Q.  All right.  But if you've got a question in
16  your mind you are going to take to your lawyer,
17  obviously you thought about it, right?
18     A.  I could have.
19     Q.  And obviously what you were thinking about
20  that you wanted to get your lawyer's advice on was,
21  do we have to take this to the lender, right?
22     A.  Right.
23     Q.  So in fact, did you, before you talked to
24  Mr. Goldberg, consider whether or not you should go

219

1  to the lender and --
2     A.  I might have.
3     Q.  And then you decided to ask Mr. Goldberg
4  whether you had to?
5       MR. MCGLYNN:  Objection.  All right.
6  The answer is yes or no or you might have.
7     A.  I might have.
8     Q.  Well, did you?
9       MR. MCGLYNN:  He said he might have.
10     A.  I might have.  I can't recall.
11     Q.  So you don't recall, then, whether you
12  brought this question to Mr. Goldberg or whether he
13  brought it up to you?
14     A.  That's correct.
15     Q.  I take it sitting here today you are still
16  relying on your attorney's advice that
17  notwithstanding that Credit Suisse had security
18  interests in any lawsuit that had anything to do
19  with the property and any proceeds of any such
20  lawsuit and any payment that resulted from any such
21  lawsuit, that the $2 million that you got from the
22  zoning appeal that you brought as an abutter to
23  complain about damage to the property is not
24  anything that Credit Suisse has a security interest

220

1  in?
2       MR. MCGLYNN:  I'm going to object to
3  that question.
4     Q.  Is that right?
5       THE WITNESS:  Can I answer?
6       MR. MCGLYNN:  If you can answer that
7  question, then you are --
8     A.  That's right.
9       MR. MCGLYNN:  -- much smarter than
10  anybody else in this room.  Maybe you are.
11     A.  Do you want to read back the question?
12     Q.  Do you want to hear it again?
13     A.  No.
14     Q.  You understood it and you answered it?
15     A.  Yes.
16     Q.  (Gesturing.)
17     A.  Yes.
18     Q.  Now, in 1985 you purchased four properties
19  from Net Realty Holding Trust for 29.6 million
20  bucks, right?
21     A.  Yes.
22     Q.  And the beneficiary of Net Holding Trust or
23  Net Realty Holding Trust was a Teamsters pension
24  fund, right?

221

1     A.  Yes.
2     Q.  And you had attained access to Net real
3  estate properties as a result of a relationship you
4  had with Stephen Watchmaker and Neil Zais?
5     A.  Yes.
6     Q.  And Mr. Watchmaker did accounting work for
7  the Teamsters, did he?
8     A.  Yes.
9     Q.  And Mr. Zais -- am I pronouncing that
10  right?
11     A.  Zais, yes.
12     Q.  Mr. Zais was his partner?
13     A.  Yes.
14     Q.  And Mr. Zais was a friend of yours?
15     A.  Yes.
16     Q.  From college?
17     A.  Yes.
18     Q.  And you were also partners in several
19  ongoing business deals with both Mr. Watchmaker and
20  Mr. Zais?
21     A.  Yes.
22     Q.  Then in 1992 the U.S. attorney in Boston,
23  Wayne Budd in particular, indicted Watchmaker and
24  Zais on racketeering charges, right?

62 (Pages 242 to 245)

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

242

1  it. I don't remember discussing it or remember it.
2      Q. You told me before that sometimes you
3  looked at your cc's and sometimes you didn't. Do
4  you know if you looked at this one?
5      A. This looks familiar, but I can't remember.
6      Q. Do you know anything about the last 10,000
7  of rent that EquiServe paid that Blue Hills didn't
8  turn over to the lender?
9      A. No.
10         MR. MCGLYNN: Objection to the form.
11     A. What? I didn't hear you.
12     Q. Do you know anything about the last 10,000
13  of rent paid by EquiServe?
14     A. No.
15     Q. Do you know whether it was turned over to
16  the lender or not?
17     A. I don't know.
18     Q. Do you know whether it was deposited to the
19  lockbox account?
20     A. I don't know.
21     Q. As of August '03, did Blue Hills own --
22  strike that. As of August 2003, did Blue Hills
23  Office Park LLC own anything other than Blue Hills
24  Office Park?

243

1      A. Not that I know of.
2      Q. Did it have any bank accounts other than
3  the operating account that was controlled by
4  Fineberg Management?
5      A. I don't know.
6      Q. We've talked today about monies that built
7  up in reserve accounts, as you called them, for
8  Royall Associates Realty Trust, right?
9      A. Yes.
10     Q. And that was money distributed from Blue
11  Hills Office Park LLC to the trust, correct?
12     A. Yes, yes.
13     Q. Did Blue Hills ever retain money that was
14  available for distribution to the members?
15         MR. MCGLYNN: Objection as to form.
16     A. I don't know.
17     Q. Well, you and Bill Langelier made decisions
18  about distributing money, right?
19     A. Right.
20     Q. And Mr. Langelier at least was interested
21  in maximizing the benefits from his ownership of the
22  property. Were you similarly interested in
23  maximizing the benefits?
24     A. Yes.

244

1      Q. And did you therefore distribute monies as
2  often as the documents allowed?
3      A. Yes.
4      Q. So that any money that was in an account as
5  of August 2003 would have been the necessary money
6  to be used for operating expenses rather than some
7  big build-up of money available for distribution?
8      A. I don't understand, I don't understand.
9      Q. Okay. As of August 2003, presumably there
10  was still the operating account --
11     A. Right.
12     Q. -- that Fineberg Management operated?
13     A. Yes.
14     Q. It would have some amount of money in it to
15  pay operating expenses, right?
16     A. Yes.
17     Q. And that would be it for the assets of Blue
18  Hills Office Park, right, the park itself and the
19  operating account?
20     A. Yes.
21     Q. Do you know of any other assets that were
22  owned by Blue Hills Office Park as of August '03
23  rather than the operating account and the office
24  park itself?

245

1      A. No, I don't.
2      Q. And do you know how much money was usually
3  in the operating account?
4      A. No, I don't.
5      Q. We saw at the end there was $180,000 in it.
6  Was that the amount that was usually in it?
7      A. I don't know.
8      Q. I've also heard from Mr. Stone that
9  approximately $175,000 a month came back to Blue
10  Hills during the years '99 through 2004, after the
11  waterfall went through the various buckets that were
12  set up under the loan documents. Do you know
13  whether that's true or not?
14     A. I don't know.
15     Q. Do you know how much of that 175,000 a
16  month was used to pay operating expenses?
17     A. No.
18     Q. Is that amount of 175 -- strike that. If I
19  also learned from Mr. Stone that the amount of the
20  operating expenses every month was less than the
21  175,000 or so that was coming out to Blue Hills
22  every month -- okay? --
23     A. Yes.
24     Q. -- which suggests to me the amount in the

# EXHIBIT 5

Daniel Frank
Volume 1 - February 16, 2006

Exhibits:  33 - 44          Volume 1, Pages 1 - 211

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

                Defendant

(Complete caption on next page.)

-----------------------------

INDIVIDUAL and 30(b)(6) DEPOSITION OF BLUE HILLS

OFFICE PARK LLC BY DANIEL FRANK

Thursday, February 16, 2006, 10:08 a.m.

DLA Piper Rudnick Gray Cary US LLP

One International Place, 21st Floor

Boston, Massachusetts

------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

576bc720-08cd-4d01-b32e-65ae1fc626ea

2 (Pages 2 to 5)

Daniel Frank
Volume 1 - February 16, 2006

| | 2 |
|---|---|
| 1 | BLUE HILLS OFFICE PARK LLC |
| 2 | Plaintiff, Defendant-in-Counterclaim |
| 3 | vs. |
| 4 | J.P. MORGAN CHASE BANK, as Trustee for the |
| 5 | Registered Holders of Credit Suisse First Boston |
| 6 | Mortgage Securities Corp., Commercial Mortgage |
| 7 | Pass-Through Certificates, Series 1999-C1 |
| 8 | Defendant |
| 9 | and |
| 10 | CSFB 1999-C1 ROYALL STREET, LLC |
| 11 | Defendant, Plaintiff-in-Counterclaim |
| 12 | vs. |
| 13 | WILLIAM LANGELIER and GERALD FINEBERG |
| 14 | Defendants-in-Counterclaim |

**Page 4**

1    PROCEEDINGS - 10:08 a.m.
2    ------------------------
3    DANIEL FRANK, sworn
4    ------------------------
5    MR. McGLYNN:  Same stipulations?
6    MR. FALBY:  Yes, please.
7    EXAMINATION
8    BY MR. FALBY:
9    Q.  Mr. Frank, can you state your full name,
10   please.
11   A.  Daniel Frank.
12   Q.  No middle name?
13   A.  No.
14   Q.  What is your residential address?
15   A.  286 Clark Road, Brookline.
16   Q.  How long have you lived there?
17   A.  Let's see, '84.
18   Q.  Since 1984?
19   A.  Yes.
20   Q.  How old are you?
21   A.  I am just about ready to turn 70.  I'm old.
22   Q.  Are you employed?
23   A.  Yes.
24   Q.  Where do you work?

**Page 3**

1    APPEARANCES:
2    Bernkopf Goodman LLP
3        Peter B. McGlynn, Esq.
4        125 Summer Street
5        Boston, Massachusetts 02110
6        617.790.3000  fax: 617.790.3300
7        pmcglynn@bg-llp.com
8    for Blue Hills Office Park LLC,
9        William Langelier and Gerald Fineberg
10
11   DLA Piper Rudnick Gray Cary US LLP
12       Bruce E. Falby, Esq.
13       Traci S. Feit, Esq.
14       33 Arch Street, Floor 26
15       Boston, Massachusetts 02110
16       617.406.6000  fax: 617.406.6100
17       bruce.falby@dlapiper.com
18       traci.feit@dlapiper.com
19   for J. P. Morgan Chase Bank, Trustee
20   CSFB 1999-C1 Royall Street, LLC

**Page 5**

1    A.  I work at the Fineberg Companies, One
2    Washington Street, Wellesley.
3    Q.  What are the names of the Fineberg
4    Companies that you work for?
5    A.  Fineberg Management and Fine Hotels.
6    Q.  What is your position?
7    A.  I'm president of both companies.
8    Q.  How long have you been president of
9    Fineberg Management and Fine Hotels?
10   A.  I'll do it both ways.
11       MR. McGLYNN:  Let him get the question
12   out; then answer.
13   A.  Fineberg Management January of 2000; Fine
14   Hotels, January of 2003.
15   Q.  When did you first begin working for
16   Fineberg Management.
17   A.  Back in '72.
18   Q.  When did you go to work for Fine Hotels?
19   A.  That happened in the year 2003.
20   Q.  What is the business of Fineberg
21   Management?
22   A.  We own and manage real estate.
23   Q.  When you say we, who are you referring to?
24   A.  I'm referring to the company.

FARMER ARSENAULT BROCK LLC

7 (Pages 22 to 25)

Daniel Frank
Volume 1 - February 16, 2006

22

1    A. Not really.
2    Q. When you say not really instead of no, it
3  makes me ask: Were you involved at all?
4    A. No, no. Well, I mentioned my involvement.
5    Q. Other than responding to Mr. Rubino's
6  requests for the lease and for access to the
7  property by his environmental engineer and engineer,
8  were you at all involved in any other respect with
9  the Credit Suisse refinancing or the negotiation of
10  that loan?
11    A. I, coupled with Larry Needle, I think,
12  showed him the property.
13    Q. Did you have anything else to do with the
14  Credit Suisse refinancing?
15    A. I don't think so.
16    MR. McGLYNN:  Off the record.
17    (Discussion off the record.)
18    Q. Mr. Frank, was Gerry Fineberg involved in
19  the negotiation of the Credit Suisse loan to Blue
20  Hills?
21    A. I don't think so, but I'm not sure.
22    Q. Was Mr. Langelier involved in the
23  negotiation of the Credit Suisse loan to Blue Hills?
24    A. Yes.  He introduced us to Joe Rubino.

23

1    Q. Do you know if Mr. Langelier was involved
2  in the negotiation of any of the terms of the loan
3  from Credit Suisse?
4    A. I do not know.
5    Q. Was Mr. Needle involved in the negotiation
6  of any of the terms of the loan from Credit Suisse
7  to Blue Hills?
8    A. No.
9    Q. Do you know of anyone other than
10  Mr. Goldberg who was involved on behalf of Blue
11  Hills in negotiating the terms of the loan from
12  Credit Suisse?
13    A. Mr. Donovan.
14    Q. What involvement did Mr. Donovan have in
15  the negotiation of the terms of the loan from Credit
16  Suisse?
17    A. Supplied facts and figures.
18    Q. Did he have any other involvement in the
19  loan negotiation?
20    A. I don't know.  I doubt it.
21    Q. Did anyone else have any involvement --
22    A. I would imagine.
23    Q. Did anyone else have any involvement in the
24  negotiation of the Credit Suisse loan to Blue Hills?

24

1    A. I imagine Andy Cohn, Bill Langelier's
2  attorney did.
3    Q. Prior to the Blue Hills deal, had
4  Mr. Langelier done any deals with Fineberg
5  Management?
6    A. No.
7    Q. This was his first deal with them?
8    A. Yes.
9    Q. Has he done any deals since?
10    A. No.
11    Q. So this is the only deal that Mr. Langelier
12  has done with Mr. Fineberg?
13    A. That is correct.
14    Q. Do you know how Mr. Langelier's
15  participation in the Blue Hills deal came about?
16    A. He brought it to us.
17    Q. Prior to the Blue Hills transaction, did
18  Mr. Langelier know somebody at Fineberg?
19    A. Gerry Fineberg.
20    Q. How did he know him, do you know?
21    A. Socially.
22    Q. Do you know what prompted Mr. Langelier to
23  bring the Blue Hills deal to Fineberg Management?
24    A. No.  Aside from looking for a partner with

25

1  money.
2    Q. So as far as you know, what prompted
3  Mr. Langelier to bring the Blue Hills deal to
4  Fineberg Management was his desire to find a money
5  partner?
6    A. A partner.
7    Q. With money?
8    A. With money, sure.
9    Q. Is there a reason that Fineberg Management
10  has not done any deals with Mr. Langelier since the
11  Blue Hills transaction?
12    A. There's been no communication about other
13  deals; at least I haven't had any.  And then Bill
14  Langelier moved to San Francisco.  I forgot.
15    Q. Where did he live when he brought the Blue
16  Hills deal to Fineberg Management?
17    A. Brookline, I believe.
18    Q. At the time of the negotiation of the Blue
19  Hills loan, did you review the mortgage financing
20  application?
21    A. I may have looked at it.  I don't remember.
22    Q. Do you recall discussing any points about
23  the financing with anyone at Blue Hills?
24    A. I don't remember.

Daniel Frank
Volume 1 - February 16, 2006

38

1   A. Yes.
2   Q. You understand from that substantial
3   experience over the course of many years with
4   lenders that ultimately the terms of loans are
5   governed by the mortgage loan documents?
6   A. Yes.
7   Q. At some point, Mr. Frank, did you learn
8   that EquiServe, the tenant of Blue Hills Office
9   Park, had applied with the owner of the property
10  across the street for a special permit to build a
11  parking garage across the street?
12  A. I heard about it.
13  Q. When did you learn about that?
14  A. The exact date, I cannot say. I don't
15  remember the exact date.
16      MR. FALBY: Peter, can you put the book
17  of exhibits before the witness?
18      MR. McGLYNN: Sure. Would you like me
19  to turn to any particular one?
20      MR. FALBY: Number 9.
21  Q. We are showing you Exhibit 9, which is the
22  actual special permit application filed by EquiServe
23  and National Development on or about April 3, 2003.
24  First off, have you seen this document before?

39

1   A. It doesn't ring a bell.
2   Q. Does the date on the document help you
3   place in time when you heard that EquiServe had
4   applied for a special permit to build a parking
5   garage at the Blue View property across the street
6   from Blue Hills Office Park?
7   A. Somewhere I had heard that they were going
8   to build a garage.
9   Q. Can you place it in time at all?
10  A. No.
11  Q. How did you learn that EquiServe was going
12  to build a garage?
13  A. Through Larry Needle and perhaps through
14  Ken Goldberg. I'm not sure. No, through Larry
15  Needle.
16  Q. What did Mr. Needle say to you on that
17  subject?
18  A. That they were building a garage.
19  Q. Did he say anything else?
20  A. No.
21  Q. Did you say anything in response?
22  A. Where is it going to be.
23  Q. And he told you?
24  A. Come out and look.

40

1   Q. Did he show you where it was going to be?
2   A. Yeah.
3   Q. What was your reaction?
4   A. A garage that would be good for the
5   neighborhood, because there was a problem with
6   parking. We at the Blue Hills Office Park had four
7   spaces per every thousand square feet. So we were
8   in good shape. But cars were always spilling over
9   onto the streets. And it was at times difficult.
10  So a garage would be good.
11  Q. Did you have any reaction at the time to
12  learning of the garage beyond what you just told me?
13  A. No.
14  Q. Prior to learning about the garage, had you
15  been involved in efforts to try to keep EquiServe in
16  the Blue Hills Office Park either by extending their
17  lease or selling them the building?
18  A. Yes.
19  Q. Can you describe what efforts you made in
20  that regard?
21  A. Several years prior to this, I had a
22  sit-down meeting with Tom McGee and his boss. It
23  was at the Customs House. They wanted to discuss
24  the purchase of the building and/or an extension of

41

1   their lease.
2   Q. The special permit application was April of
3   2003?
4   A. This?
5   Q. Right.
6   A. Yes.
7   Q. When was the meeting with Mr. McGee and his
8   boss?
9   A. Sometime in 2002.
10  Q. Who was Mr. McGee?
11  A. He was with DST.
12  Q. How is DST related to EquiServe?
13  A. DST I believe is the parent company of
14  EquiServe.
15  Q. Who was Mr. McGee's boss with whom you met?
16  A. I can't remember his name. It begins with
17  a D.
18  Q. Can you tell me who said what at the
19  meeting between you, Mr. McGee and his boss?
20  A. I think Tom McGee took the lead. I'm not
21  sure exactly who took the lead. But there was
22  discussions about them staying and purchasing the
23  building.
24  Q. Do you remember any of the particulars

Daniel Frank
Volume 1 - February 16, 2006

74

1 correct?
2          MR. McGLYNN: Objection.
3     A. Say that again, please.
4     Q. Did the $2 million payment -- strike that.
5 Did Blue Hills Office Park LLC receive the $2
6 million settlement payment?
7     A. Not that I know of. You know what? The
8 answer is no.
9     Q. Why did you just change your answer?
10     A. Because when I realized what the question
11 was, I answered it.
12     Q. So no part of the $2 million settlement
13 payment ever came to Blue Hills Office Park LLC?
14     A. Not that I know of.
15     Q. And if it had, you would know, wouldn't
16 you?
17     A. More than likely, yes.
18     Q. I take it Mr. Fineberg made the decision as
19 to the disposition of the $2 million settlement
20 payment?
21     A. I do not.
22     Q. Were you involved in any discussions as to
23 the disposition of the $2 million settlement
24 payment?

75

1     A. I was not.
2     Q. Do you know if Mr. Langelier was involved
3 in any discussions about the disposition of the $2
4 million settlement payment?
5     A. I have no idea.
6     Q. Do you know why the $2 million settlement
7 payment that the settlement agreement specified
8 would be paid to Blue Hills Office Park was not in
9 fact paid to Blue Hills Office Park?
10     A. I have no idea.
11     Q. And you did not question that at the time
12 because it did not occur to you?
13     A. Correct. And I didn't feel there was any
14 reason to question.
15     Q. Why not?
16     A. Because anything that was coming to me
17 always came to me.
18     Q. Do you have any memory of any settlement
19 discussions at all?
20     A. None.
21     Q. You understood when the settlement was
22 struck that part of the settlement included a lease
23 termination agreement with EquiServe, correct?
24     A. No. A lease termination agreement? I knew

76

1 they were going to move at that point, that there
2 was no keeping them.
3     Q. You understood then as a result of the
4 settlement that EquiServe would definitely be moving
5 out?
6     A. Yes.
7     Q. And that the settlement of the lawsuit by
8 which you hoped to keep them in would ensure that
9 they would be leaving?
10     A. We were told by attorneys, our attorneys,
11 that we would not prevail.
12     Q. You need to answer my question. I'm
13 surprised Mr. McGlynn is letting you testify as to
14 what attorneys told you.
15          MR. McGLYNN: It came out so fast, I
16 didn't have an objection. I couldn't object.
17     Q. You understood, did you not, that the
18 settlement of the lawsuit ensured that EquiServe
19 would be moving out of the Blue Hills Office Park?
20          MR. McGLYNN: Again, I have instructed
21 you before, don't discuss the substance of
22 discussions that you have had with attorneys, Dan.
23     A. I think so.
24     Q. Exhibit 10 is the lease termination

77

1 agreement with EquiServe. Have you seen that
2 before?
3     A. I'm not sure.
4     Q. Did you review the documents settling the
5 appeal of the special permit at the time?
6     A. Did I review?
7     Q. Did you review the documents by which the
8 lawsuit appealing the special permit was settled at
9 the time of the settlement?
10     A. No.
11     Q. Having seen Exhibit 10, do you now remember
12 that part of the settlement included a lease
13 termination agreement with EquiServe?
14     A. I think so.
15     Q. The lease termination addressed, did it
16 not, the terms and conditions under which EquiServe
17 would be departing the Blue Hills Office Park on or
18 about July 31, 2004, correct?
19     A. Yes.
20     Q. Did you have any discussion with
21 Mr. Fineberg or Mr. Langelier at the time of the
22 settlement about disclosing the payment of $2
23 million to Blue Hills' lender?
24     A. I did not.

28 (Pages 106 to 109)

Daniel Frank
Volume 1 - February 16, 2006

106

1    Q. Did you ask him why Lennar didn't want to
2  have a meeting?
3    A. I don't remember what I asked him after
4  that. I was so shocked that we weren't going to
5  have a meeting and an opportunity to get things
6  straightened out.
7    Q. Did you ask Mr. Polcari why you couldn't
8  have a meeting?
9    A. Again, I was so shocked, I don't know what
10  else I said to him. But the conversation ended
11  shortly after. I thought we were going to have a
12  meeting.
13    Q. Why did you think you were going to have a
14  meeting?
15        MR. McGLYNN: Objection.
16    A. Because of the tone of our conversation on
17  the 18th of October. It was a very nice, short
18  conversation, very friendly.
19    Q. I'm a little confused. During that October
20  18 conversation, did Mr. Polcari commit to a meeting
21  or did he say that he would have to check with his
22  superiors and get back to you?
23    A. He did say that.
24    Q. Which?

107

1    A. That he would have to check with his
2  superiors and get back to me.
3    Q. So he did not during that conversation
4  agree with your request for a meeting, did he?
5    A. He said he would have to check with his
6  superiors and get back to me.
7    Q. So he didn't agree to a meeting, did he?
8    A. He said he would have to check with his
9  superiors and get back to me. So whatever that
10  means, that's what it means.
11    Q. Did you understand from what he said that
12  he was agreeing to a meeting or that he would have
13  to check with his superiors and get back to you?
14        MR. McGLYNN: Objection.
15    Q. Go ahead.
16    A. That he would check with his superiors and
17  get back to me.
18    Q. Have you told me everything that you and
19  Mr. Polcari said to each other during the
20  conversation on October 18 and the follow-up
21  conversation five or six business days later?
22    A. To the best of my recollection, yes.
23    Q. And you don't know of any documents that
24  exist in the world that would refresh your

108

1  recollection?
2    A. That is correct.
3    Q. Tell me about the first conversation that
4  you had with Mr. Polcari. When was it, to the best
5  of your memory?
6    A. In the summertime: Let's get together for
7  a meeting.
8    Q. What prompted you to speak with Mr. Polcari
9  in the summertime?
10    A. I say summertime. I should say summertime,
11  fall. Because we wanted to get this solved. We
12  wanted to find out a way to keep this particular
13  piece of property. We wanted to make it good. We
14  had two partners with deep pockets who were willing
15  to put up money. It was imperative that we have a
16  meeting.
17    Q. Did your conversation with Mr. Polcari
18  occur on the telephone?
19    A. Yes.
20    Q. Did it occur before or after Mr. Donovan
21  sent his August 5th letter asking for a meeting with
22  Wells Fargo?
23    A. Probably around the same time. I say
24  probably. I'm guessing.

109

1    Q. When did Lennar take over the loan as
2  special servicer?
3    A. I'm not quite sure.
4    Q. Did you call Mr. Polcari before or after
5  Lennar took over?
6    A. I must have called him. I don't know. I
7  don't know.
8    Q. Were you about to say that you must have
9  called him after Lennar took over?
10    A. I don't know how I would have gotten his
11  name. I really don't know.
12    Q. If you can turn in the exhibit book,
13  please, to Exhibit 28.
14    A. Yes.
15    Q. That is a letter dated August 19, 2004 from
16  Lennar in which it informed Blue Hills Office Park
17  that it was taking over as special servicer. Did
18  you see that at the time?
19    A. I think I did.
20    Q. And initially the asset manager from Lennar
21  who was involved was Joe Warshaw?
22    A. I've heard that name.
23    Q. Did you ever talk to him?
24    A. No.

Daniel Frank
Volume 1 - February 16, 2006

---

110

1    Q. He was replaced by Mr. Polcari. Do you
2 recall that sequence?
3    A. No.
4    Q. Do you have any reason to think that you
5 talked to Mr. Polcari before he took over for
6 Mr. Warshaw?
7    A. I don't know.
8    Q. Does it make sense to you that the
9 conversation with Mr. Polcari took place after
10 Mr. Polcari took over for Mr. Warshaw?
11    A. I don't know.
12    Q. If I tell you that Mr. Polcari had nothing
13 to do with Blue Hills Office Park until he took over
14 from Mr. Warshaw, does that help you?
15    A. No.
16    Q. In any event, you recall calling
17 Mr. Polcari and asking for a meeting?
18    A. Yes.
19    Q. Do you know whether it was before the
20 letter Mr. Polcari sent on September 17 defaulting
21 Blue Hills Office Park?
22    A. I really don't.
23    Q. In that conversation, did you do anything
24 other than ask Mr. Polcari for a meeting?

---

111

1    A. No.
2    Q. Did he respond?
3    A. Which conversation?
4    Q. The very first one.
5    A. No meeting, I think is what he said.
6    Q. Did you ask him why?
7    A. I don't remember.
8    Q. Did he say why there would be no meeting?
9    A. Again, I don't remember.
10    Q. If in that first conversation you asked for
11 a meeting and he said no, what prompted you to call
12 again on October 18 to ask again for a meeting?
13    A. I never give up. And in my own mind I did
14 not want to lose that asset. The partners did not
15 want to lose that asset. The partners were in a
16 position to come up with money. All we had to do
17 was sit down and figure out a plan. That's why it
18 was so important to have that meeting.
19    Q. Do you know why, if the partners were so
20 intent on keeping the property, they didn't pay the
21 real estate taxes or the debt service?
22    MR. McGLYNN: Objection.
23    A. All I can say is that if we knew we were
24 going to get foreclosed, we would have paid the

---

112

1 hundred thousand. A hundred thousand was not going
2 to stand in our way of making a deal. We wanted to
3 make a deal. I say deal. I really mean we wanted
4 to have a meeting so that we could figure out a
5 solution.
6    Q. Why in light of that didn't the principals
7 pay the real estate taxes?
8    A. I don't know. We wanted a meeting.
9    Q. I understand.
10    A. We wanted a meeting to get things resolved.
11    Q. And when you asked Joe Polcari for a
12 meeting when you first called him, he said no,
13 right?
14    A. Yes.
15    Q. Again, if you just focus on my question. I
16 know you wanted a meeting. You have told me that.
17    A. Yes.
18    Q. If the principals were so intent on keeping
19 the property, why didn't they pay the real estate
20 taxes that were due on August 2, 2004?
21    MR. McGLYNN: Objection.
22    A. Well, we made a request in writing to have
23 the principal, interest and taxes paid out of the
24 reserve accounts. Joe Donovan did that. I'm aware

---

113

1 of that letter. I guess you are too.
2    Q. And so, why didn't the Blue Hills Office
3 Park LLC pay the real estate taxes?
4    MR. McGLYNN: Objection.
5    A. Because we thought we were going to fund
6 it.
7    Q. When you say we, who do you mean?
8    A. I mean Lennar, whoever was holding the
9 money in the reserve accounts.
10    Q. And when you say we, who are you referring
11 to?
12    A. Blue Hills Office Park.
13    Q. Did you have anything to do with the
14 request for access to the reserves that was made on
15 August 2?
16    A. I did not.
17    Q. Do you know who made the decision to make
18 that request?
19    A. Joe Donovan.
20    Q. Did you discuss it with him?
21    A. I don't remember discussing it.
22    Q. Do you know if he discussed it with anybody
23 other than you?
24    A. I do not know.

---

32 (Pages 122 to 125)

Daniel Frank
Volume 1 - February 16, 2006

122

1  Mr. Needle had with Mr. Polcari?
2      A.  No.  There may have been a telephone
3  conversation, setting up the meetings.  I really
4  don't know.
5      Q.  Do you know of anyone other than you,
6  Mr. Donovan and Mr. Needle who had any conversation
7  or communication with Mr. Polcari on behalf of Blue
8  Hills Office Park?
9      A.  I do not know.
10     Q.  Did you talk to anyone at Lennar -- I may
11  have asked you this.  Did you talk to anyone at
12  Lennar other than Mr. Polcari?
13     A.  No one else.
14     Q.  Did anybody else at Blue Hills Office Park
15  talk to anyone at Lennar other than Mr. Warshaw or
16  Mr. Polcari?
17     A.  I don't know.
18     Q.  Have you told me about all the
19  conversations you do know about that took place
20  between Blue Hills Office Park and Lennar?
21     A.  I believe so.  To the best of my knowledge,
22  I believe so.
23         (A recess was taken.)
24     Q.  Mr. Frank, we've established that on August

123

1  5, 2004 Mr. Donovan asked for a meeting, correct?
2      A.  Yes.
3      Q.  At some point after that you asked
4  Mr. Polcari for a meeting, correct?
5      A.  Twice.
6      Q.  And you said it was imperative that you
7  have a meeting, correct?
8      A.  Yes.
9      Q.  Why did you want a meeting?
10     A.  I wanted a meeting to sit down and figure
11  out a way for us to retain the Blue Hills Office
12  Park.  I'll give you one example.  DST purchased the
13  adjoining building to us.  We all know that.  That's
14  one of the reasons why we are here.  They paid X.
15  And they sold it -- I think they paid 25 million.
16  They sold it for 40 to $50 million, and that's in a
17  short period of time.  So we knew that this piece of
18  property was going to come back.
19     Q.  What did you need from Lennar that you
20  required a meeting for?
21     A.  We needed to sit down with them, with
22  counsel, and figure out a way to keep this -- for us
23  to keep retention of the property, figure out a
24  plan.  We wanted to know about the funding.  We

124

1  wanted to be able, after we knew that you guys
2  weren't going to foreclose, to come up with some big
3  money, which we would need, the partners, and so we
4  needed the comfort of sitting down with you.
5      Q.  Why did you need to come up with big money?
6      A.  Well, because we had to take care of Blue
7  Hills Office Park from the standpoint of putting new
8  tenants in there, and so on.  That was going to cost
9  a few bucks, as well as taking care of some of the
10  interest structure, and so on.  So we knew that
11  above and beyond 4,100,000 that was sitting in
12  escrow accounts, we would have to come up with money
13  out of pocket.
14     Q.  Did you know that you were going to need to
15  modify the loan documents?
16     A.  I have to say that I can't answer those
17  kinds of questions.  Those are questions that we
18  would have counsel help us with and be with us while
19  we were sitting down with Lennar.
20     Q.  Did you have any tenant prospects as of
21  August 2004?
22     A.  Let's see.  Let's go back.  Yes, there were
23  some tenant prospects.  Interestingly, back in 2003
24  we were negotiating with two major tenants.  One of

125

1  them was New York Life.  The other one was Dunkin'
2  Donuts, Allied Domecq, I'm not sure that's how you
3  pronounce it.  It was a proposal that we sent out to
4  Allied Domecq to take somewhere between 150 to
5  210,000.  We had two, three, I don't know how many
6  showings.  They were red hot for the building.
7          What happens?  New York Life had signed
8  a letter of intent to move into 130 Royall.  And
9  that deal blew for some reason or another.  Since it
10  was 180,000 square feet, it was perfect for New York
11  Life, because their real requirement was 180, 188,
12  whatever it was, and it would be a single-tenant
13  building.  We were this close (indicating) to having
14  a major tenant, and then it would have been
15  gangbusters.
16     Q.  That was in 2003?
17     A.  The exact date in 2003, we would have to
18  consult the sheets.
19     Q.  Did you think in August 2004 that Lennar
20  was obligated to meet with you?
21     A.  Well, we thought it was the right thing to
22  do.  We thought that by not meeting with us that
23  they had kicked us in the good old rear end.
24     Q.  Did you think that the loan documents

Page 141

1 Commonwealth of Massachusetts?
2     A. For a short period of time. Just to give
3 you a little background, we owned a building
4 downtown at 150 Causeway Street which was basically
5 a building filled with government agencies, a
6 tremendous amount from the Commonwealth of
7 Massachusetts. So we knew the people, who to deal
8 with.
9     Q. I asked you about Cushman & Wakefield. You
10 told me about something you were doing on your own.
11 If you could focus on my question.
12     A. I will.
13     Q. As of July 2004, had Cushman & Wakefield
14 identified any tenant prospects that were still
15 viable?
16     A. The answer is no. But that changes daily.
17     Q. Although all of the prospects identified by
18 Cushman & Wakefield as of July 2004 were no longer
19 viable, you say you yourself were talking to the
20 Commonwealth of Massachusetts?
21     A. Yes.
22     Q. And what were they looking for?
23     A. Different departments. I was just trying
24 to get some leads and go after them.

Page 142

1     Q. Was there any particular agency that you
2 had identified at that point in time that needed a
3 large block of space such as was afforded by Blue
4 Hills Office Park?
5     A. I can't say a particular department, but
6 they were always sending out RFPs for space. Also,
7 Cushman & Wakefield was sending out mailers, was
8 canvassing, and was advertising and was doing a real
9 marketing effort to find us a tenant. Eventually we
10 would have found a tenant.
11     Q. You say that in the spirit of never giving
12 up?
13     A. I say that in the spirit of having done it
14 for a long time.
15     Q. The market in 2004 was pretty bad, wasn't
16 it?
17     A. Yes, it was.
18     Q. There was a vacancy rate in suburban office
19 space in Canton in particular of 45 percent, wasn't
20 there?
21     A. I don't think you are right. I think it
22 was 16 percent.
23     Q. One six percent?
24     A. Yes. Where did you find 45 percent? I

Page 143

1 don't mean to cross-examine you, counsel.
2     Q. In some document I'll show you.
3     A. Canton had the lowest rate, okay, of all
4 the suburban. It was 16 percent at some particular
5 time.
6     Q. As you were talking to the Commonwealth of
7 Massachusetts in July of 2004, were you responding
8 to any particular RFP?
9     A. No.
10     Q. Had you as of July 2004, identified any
11 agency or people within the Commonwealth of
12 Massachusetts government as prospective tenants?
13     A. No.
14         Okay, if you turn to Page -- if you look
15 at the 128 market, the rent vacancies, 15.3. Have
16 you got a magic marker?
17     Q. We'll not mark the exhibit. What's the
18 page?
19         MR. McGLYNN: 0896.
20     Q. What are you looking at on this page?
21     A. The 128 south, where Canton is part of.
22     Q. It says overall vacancy rate, correct?
23     A. Yeah. The next one is direct vacancy. I
24 think overall includes sublets. Actual is the

Page 144

1 direct vacancy rate. I believe 15.3 is the figure.
2 You can see that was better than any other comp.
3     Q. Had Cushman & Wakefield told you to expect
4 that rate to increase by the end of the year?
5     A. I don't remember, to be truthful.
6     Q. Which direction was the market going at the
7 time?
8     A. I don't remember. But it only takes one.
9 I've been through good markets, bad markets. It
10 only takes one. It only takes hard work and
11 plugging. And we had a great product.
12     Q. Do you recall Cushman & Wakefield telling
13 you in March 2004 that the vacancy rate would
14 increase towards the end of the year?
15     A. Yeah, but that was only a forecast. Again,
16 it only takes one.
17     Q. Did in fact the vacancy rate on the South
18 Shore corridor increase by the end of the year?
19     A. I don't know. I know in July it was the
20 smallest, 16.2. What am I saying? 15.3.
21     Q. How was the market as of early August when
22 you were looking for a meeting from Lennar?
23     A. It wasn't wonderful.
24     Q. In fact, it was pretty bad, wasn't it?

Daniel Frank
Volume 1 - February 16, 2006

Page 170

1  by March 11th.
2      Q. Now, where in the process of obtaining a
3  tenant would renovations to the common areas of Blue
4  Hills office space have come in?
5      A. You know what? I can't give you an answer.
6      Q. Is that a question for Larry Needle?
7      A. No. But it depends on what -- the common
8  areas were pretty good. They just needed some spit
9  and polish.
10     Q. Was Blue Hills Office Park going to have to
11  make substantial improvements to the building
12  infrastructure in order to attract a tenant?
13     A. No. You could attract a tenant with what
14  we have. Would we have to put in new vents for the
15  HVAC system? Of course. Would that take a little
16  bit of time? Yes. But in general, the building was
17  in good shape.
18     Q. In general, you wouldn't have needed to
19  make substantial improvements to the building
20  infrastructure in order to attract new tenants. Is
21  that true?
22     A. As the building stood through July 31st, it
23  was in great shape, okay, great shape. You had
24  people working there. It was really good. Then the

Page 171

1  tenant moves out and there's a little bit of
2  scuffing and a little bit of this and a little bit
3  of that. It was not going to be a big deal, but it
4  could add up to some serious money.
5      Q. As of July 31, 2004, did the building need
6  substantial work to its infrastructure in order to
7  attract a substantial tenant?
8      A. I don't think so. It needed some, but not
9  substantial. It needed tenant improvements.
10     Q. I'm not asking about tenant improvements.
11  I'm asking about improvements or renovations to the
12  building's infrastructure.
13     A. We are going to ask Larry Needle.
14     Q. Your answer is that it might have needed
15  some but not a lot, correct?
16     A. Yeah. But I'll defer to Larry.
17     Q. Do you remember talking to Spaulding & Slye
18  as one of the candidates to be the leasing agent?
19     A. Yeah.
20     Q. Do you remember reviewing their proposal?
21     A. I remember looking at it.
22         MR. FALBY: Let's mark that as the next
23  exhibit.
24         (Marked, Exhibit 44, Spaulding & Slye

Page 172

1  proposal.)
2      Q. Exhibit 44 is dated May 13, 2003. Do you
3  remember getting it on or about that day?
4      A. I don't remember getting it. I know we got
5  it.
6      Q. Do you recall at least skimming through
7  Spaulding & Slye's proposal?
8      A. Yes.
9      Q. Can you turn to Page 3 of their proposal?
10         MR. McGLYNN: Can you give us a Bates
11  number?
12         MR. FALBY: 0910.
13     Q. The last paragraph under the heading Our
14  Approach says: "The main objective of the 150
15  Royall Street assignment is to retain Boston
16  EquiServe as a tenant and then most expeditiously
17  lease up any remaining space."
18         Do you see that?
19     A. I do.
20     Q. Do you agree that the main objective with
21  respect to the office park was to retain Boston
22  EquiServe as a tenant?
23     A. We wanted to retain Boston EquiServe as a
24  tenant. We didn't need a broker to tell us that.

Page 173

1      Q. So you agree with their statement of
2  objective?
3      A. Yeah. But by May 13 -- when did we receive
4  the notice they were moving out?
5      Q. You told me earlier that when you got their
6  notice of termination on May 14th you didn't give
7  up?
8      A. Right, never give up.
9      Q. You never give up.
10     A. Go ahead, I'm sorry.
11     Q. In any event, as of May 13th, the day
12  before the May 14th notice you got from EquiServe,
13  did you still agree that the main objective was to
14  keep Boston EquiServe?
15     A. Yeah, but we also didn't hire this broker.
16  There must have been other things.
17     Q. I know that. My question is very simple.
18  Did you agree with their assessment that the main
19  objective was to keep Boston EquiServe?
20     A. That would have been one of our main
21  objectives. That was our main objectives.
22     Q. Was it the main objective?
23     A. That was one of our main objectives.
24     Q. What were your other main objectives?

Daniel Frank
Volume 1 - February 16, 2006

174

1   A. To rent it, no matter what.
2   Q. Page 914, please.
3   A. 914.
4   Q. On Page 914, Spaulding & Slye set forth
5   Scenario Number 1. Do you see that?
6   A. Yes.
7   Q. Scenario Number 1 says that Boston
8   EquiServe would renew, right size and consolidate,
9   correct?
10  A. That's what if.
11  Q. It is a what-if scenario, right?
12  A. Yes.
13  Q. They say: "Without a doubt this is the
14  most financially beneficial scenario for the
15  ownership." Do you see that in the last paragraph
16  of the scenario?
17  A. Yeah.
18  Q. Did you agree with that assessment at the
19  time?
20  A. We would have hired them if we agreed with
21  everything they said. I have no comment about that.
22  Yes, we wanted to keep them. We did everything in
23  our power to keep them. They wanted to move on.
24  Q. My only question is, as of May 13 when this

175

1   came your way, did you agree that the best scenario
2   was to keep EquiServe?
3   A. Yeah.
4   Q. That's why you filed the zoning appeal?
5   A. Right.
6   Q. Then Page 915, there's a scenario that they
7   envision that EquiServe does not renew. Do you see
8   that?
9   A. Yes.
10  Q. Spaulding & Slye then describes some of the
11  challenges that presents. Do you see that?
12  A. Yes.
13  Q. They said that one challenge would be a
14  lengthier lease-up period of two-plus years. Do you
15  see that?
16  A. Yes.
17  Q. Did you share Spaulding & Slye's assessment
18  that if EquiServe did move out it was going to take
19  up to two-plus years to lease up the building?
20  A. Not if you got a 225,000-square-foot
21  tenant. I can't answer that question. It is going
22  to take some time.
23  Q. The next assessment by Spaulding & Slye is
24  that current market conditions are unfavorable for

176

1   the foreseeable future. Did you share that
2   assessment as of May 2003?
3   A. As I mentioned several times before, it
4   only takes one.
5   Q. I know. I just want you to answer the
6   question.
7   A. It wasn't good. But things happen
8   overnight.
9   Q. I appreciate your spirit. As of May 2003,
10  is it true that market conditions were unfavorable?
11  A. They were not good.
12  Q. And for the foreseeable future, they
13  weren't going to get any better?
14  A. Well, I disagree with that. Because we
15  knew that all bad things must come to an end. I
16  don't know what period of time.
17  Q. Next line: "Direct competition is new
18  speculative buildings that have not leased in the
19  last two-plus years."
20      Is that an accurate statement of the
21  direct competition that Blue Hills Office Park faced
22  in May of 2003?
23  A. I don't know.
24  Q. Is that a factor that contributed to the

177

1   fact that by October 17, 2004 Cushman & Wakefield
2   despite their best efforts had not been able to find
3   a live tenant by that date?
4   A. They didn't want to give up. They kept
5   going, because they would have found a tenant. In
6   the year 2006 Blue Hills Office Park would have been
7   filled.
8   Q. I know I have asked a lot of questions.
9   Focus on them one at a time and we'll get out of
10  here. Does the direct competition that Spaulding &
11  Slye describes here, that is, there were new
12  speculative buildings that had not leased in the
13  last two-plus years, one of the factors that
14  resulted in Cushman & Wakefield not being able to
15  come up with a tenant for the building between May
16  2003 and October 2004?
17      MR. McGLYNN: Objection.
18  A. I don't even know. I can't make a comment.
19  Q. Let's focus on May 2003. Is it the case as
20  of May 2003 that the office park's direct
21  competition was new speculative buildings that had
22  not leased in the last two years?
23  A. I don't know. All I know is that we know
24  that 130 got leased. We know that 250 got leased.

EXHIBIT 6

Exhibit:  340          Volume 1, Pages 1 - 210

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

                Defendant

(Complete caption on next page.)

        CONTAINS INFORMATION SUBJECT

        TO CONFIDENTIALITY STIPULATION

        DEPOSITION OF KENNETH GOLDBERG

        Friday, April 7, 2006, 9:42 a.m.

        DLA Piper Rudnick Gray Cary US LLP

            33 Arch Street, 26th Floor

            Boston, Massachusetts

 - - - - - - - Reporter:  David A. Arsenault, RPR - - - - - - -

darsenault@fabreporters.com   www.fabreporters.com

        Farmer Arsenault Brock LLC

        50 Congress Street, Suite 415

        Boston, Massachusetts 02109

        617.728.4404   fax 617.728.4403

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

**58**

1  me which entity received and retained the $2 million
2  settlement payment?
3  A. I think I would need, to assist me to
4  accurately answer that, to look at one more
5  document.
6  Q. What document?
7  A. I'd like to look at, and it appears that
8  you may have it there, the settlement agreement
9  which gave rise to this payment.
10  MR. McGLYNN: While you are looking for
11  that, it jogs me to state on the record that, at
12  least with respect to the $2 million payment, that
13  we are discussing the subject of that
14  confidentiality stipulation. This portion of the
15  record should be subject to that confidentiality
16  stipulation.
17  Q. I will grant your wish and show you Exhibit
18  21, the settlement agreement.
19  A. Thank you for granting my wish.
20  Q. With the benefit of Exhibit 21, would you
21  tell me which entity received and retained the $2
22  million settlement payment.
23  A. I believe it was Blue Hills Office Park.
24  Q. LLC?

**59**

1  A. Yes.
2  Q. Let me show you Exhibit 176, an agreement
3  among the beneficiaries of Royall Associates Realty
4  Trust. Do you recognize that document?
5  A. Vaguely.
6  Q. Did you negotiate this --
7  A. I believe I did.
8  Q. I have to ask the question. Did you
9  negotiate Exhibit 176?
10  A. I believe I did.
11  Q. The document is an agreement among the
12  beneficiaries of Royall Associates Realty Trust,
13  correct?
14  A. Yes. Let me stop and look.
15  MR. McGLYNN: Take a moment and review
16  the document.
17  A. (Witness complies.)
18  Q. Having looked at the document, do you still
19  agree that this was an agreement among the
20  beneficiaries of Royall Associates Realty Trust?
21  A. Yes.
22  Q. The agreement refers to various accounts.
23  Do you see that?
24  A. Yes.

**60**

1  Q. One of the accounts to which the agreement
2  refers is a supplemental account. Do you see that?
3  A. Yes.
4  Q. That is defined as an account being held by
5  the escrow agents, a term defined as you and
6  Mr. Cohn?
7  A. I don't know where you are reading.
8  Q. The first page, last page, escrow agents is
9  defined as you and Mr. Cohn?
10  A. Yes.
11  Q. And the supplemental account refers to an
12  account held by you?
13  A. Yes.
14  Q. The balances of the accounts are listed on
15  the last page of the document, right?
16  A. Listed on the schedule of accounts.
17  Q. The supplemental account, according to this
18  document, contains $4.2 million, correct?
19  A. That is correct.
20  Q. That included, did it not, the $2 million
21  settlement payment?
22  A. It appears to, yes.
23  Q. Plus interest?
24  A. I'm going to presume so.

**61**

1  Q. And did the supplemental account -- strike
2  that. Is the supplemental account the same account
3  at Century Bank into which the $2 million settlement
4  payment was deposited according to Exhibit 177 on
5  August 8, 2003?
6  A. It appears to, yes.
7  Q. Did that same account also contain an
8  additional approximately $2.2 million worth of
9  funds?
10  A. Yes.
11  Q. And were those funds in the supplemental
12  account held for the benefit of the beneficiaries of
13  Royall Associates Realty Trust?
14  MR. McGLYNN: Objection.
15  A. No.
16  Q. For whom were those funds held?
17  A. I think that -- I don't want to get into
18  terms of art and start splitting hairs. I think
19  that this agreement was intended as an understanding
20  amongst the, quote, beneficiaries, the owners, as
21  you called them earlier, the venturers, to direct
22  what was going to happen to the funds.
23  Q. The venturers in what?
24  A. They are the venturers who owned various

FARMER ARSENAULT BROCK LLC

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

62

1 ownership interests in the real estate, the upper
2 tier which held title to the real estate, and in the
3 lower tier, the entity I'm just not sufficiently
4 familiar with. I think it might have been a trust.
5 So that it was generically, the owners were
6 directing what should happen to the money.
7        I think more importantly I should say it
8 differently. The owners were directing and
9 consenting to an understanding of what should happen
10 to the money.
11    Q. The money included the $4.2 million that
12 was held in the supplemental account at Century
13 Bank?
14    A. It included the $2 million that was held in
15 Century Bank.
16    Q. And did that account at Century Bank also
17 include the additional $2.2 million that combined
18 with the settlement payment equals the $4.2 million
19 balance reflected on the last page of the agreement?
20    A. It does not appear to. It looks like this
21 was a separate document, the Century Bank account,
22 since it is footed with the $2 million at the
23 bottom. I don't understand the difference you are
24 making here.

63

1    Q. Exhibit 177 has a first page that looks
2 like a deposit to an account?
3    A. Yes.
4    Q. I asked you before if that account also
5 contained the remainder of the 4.2 million that is
6 listed as the balance of the supplemental account in
7 last page of the agreement marked as 176. Do you
8 know whether the Century Bank account into which the
9 settlement payment was deposited also contained the
10 additional 2.2 million that combined with the
11 settlement payment equaled the $4.2 million balance
12 of the settlement account?
13    A. It appears this account contained $2
14 million. I believe there was another account at
15 Century Bank or elsewhere with the balance.
16    Q. And the Century Bank account containing the
17 $2 million was held for the benefit of the owners of
18 Blue Hills Office Park LLC?
19    A. It was held for the benefit of? I'm
20 confused, quite frankly. Let me see if I can ramble
21 on for a brief moment. It was held for the party
22 who received it, which was Blue Hills Office Park
23 LLC, I guess was the name of it. What happens here
24 is that ultimately that money in Blue Hills Office

64

1 Park is for the benefit of its owners.
2        The answer is that this then became a
3 document among the owners telling the escrow agents,
4 and agreeing by the parties on what should happen to
5 the money and who should continue to hold it, what
6 should be distributed.
7        So the answer is that this did not -- I
8 mean, if you are hunting for me to say there was a
9 transfer, there was none. The money was paid over
10 in accordance with the agreement that you have given
11 me a copy of, which is your Exhibit 21. And it is
12 continued to be held by the payee, which is the
13 language I used. I don't know what else to say to
14 you.
15        Yes, and to the extent that somebody
16 owns something, it benefits them. They are the
17 beneficiaries. They are called beneficiaries,
18 because I think it appears that the owner was a
19 trust. So you would call them beneficiaries, which
20 is what you have to call them. So I think there's a
21 confusion by you're saying for the benefit of the
22 beneficiaries. Well, they are beneficiaries of a
23 trust, like they may be stockholders of a
24 corporation.

65

1    Q. Was the Century Bank account into which the
2 settlement payment was placed a client fund account?
3    A. Yes.
4    Q. For what client were those funds held?
5    A. In this case they were held for Blue Hills
6 Office Park for the $2 million that we are talking
7 about which is the subject of the settlement which
8 is Exhibit 21.
9    Q. Were the additional $2.2 million in the
10 supplemental account also held in a client fund
11 account for the client Blue Hills Office Park LLC?
12    A. I don't know the answer to that. I would
13 presume so. I do not have anything in front of me
14 that shows that it was or was not. Looking at the
15 tenor of the document, it would appear that it
16 probably was.
17    Q. Similarly, was the initial account
18 referenced in the agreement, Exhibit 176, held in a
19 client funds account?
20        MR. McGLYNN: You're talking about the
21 initial account, the so-called property account?
22        MR. FALBY: No, I'm talking about the
23 initial account.
24    A. I want to make sure that we are using the

FARMER ARSENAULT BROCK LLC

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION

Kenneth Goldberg, April 7, 2006

66

1  same. We are looking at this agreement, which is
2  Exhibit 176?
3      Q. Yes.
4      A. We are looking at that document schedule of
5  accounts that's appended to it and the term initial
6  account. Is that correct?
7      Q. Yes.
8      A. So now I will look at the document. It
9  certainly states in Subparagraph F of Roman I -- the
10 document speaks for itself -- the initial account
11 was at the time this was signed held in escrow by
12 Kenneth M. Goldberg and Andrew H. Cohn -- should
13 have been Cohen -- escrow agents.
14     Q. Was the money held in a client funds
15 account?
16     A. Yes, it says that.
17     Q. And for what client were those funds held?
18     A. I cannot tell you sitting here, except that
19 it was held for the client in this case, which would
20 have been the LLC or potentially if it was intended
21 to have been distributed to the beneficiaries of the
22 lower tier. I mean, this is a specific time. I
23 cannot tell you at that time whether or not that
24 was -- I just don't have the documents here.

67

1      Q. As of December 2004, had Blue Hills Office
2  Park LLC distributed the amounts in the initial
3  account to either its member or the beneficiaries of
4  the member?
5      A. We have an agreement dated December 31,
6  2004. The initial account by definition is defined
7  as on 12/31 as a million three and change. It was
8  obviously then held subsequently in accordance with
9  the terms distributed, paid out. Paid out.
10     Q. Please listen to my question.
11     A. Okay.
12     Q. As of December 2004 --
13     A. What date?
14     Q. Before -- as of the date of the execution
15 of this document --
16     A. Super. Go ahead.
17     Q. -- had the monies in the initial account
18 previously been distributed by Blue Hills Office
19 Park to its member or to the beneficiaries of the
20 member?
21         MR. McGLYNN: Objection as to form.
22     A. I can only tell you that on the date of the
23 execution of this document that there was
24 $1,381,814.39 held in escrow by Kenneth M. Goldberg

68

1  and Andrew H. Cohn.
2      Q. Held in escrow for who?
3      A. I don't know here sitting looking at this
4  document. I don't have the rest of the documents
5  here.
6      Q. That's all I want to know.
7      A. How would I know sitting here? I know we
8  were holding it and it told us what Andrew Cohn and
9  Kenneth Goldberg were supposed to do with the money.
10     Q. Was there an escrow agreement that governed
11 your holding in escrow of the funds of either Blue
12 Hills Office Park LLC or Royall Associates Realty
13 Trust or the members of the trust or the
14 beneficiaries of the trust?
15     A. I don't know whether there was a written
16 agreement or a letter of understanding between
17 Mr. Cohn and myself.
18     Q. As of December 31, 2004, had the $2 million
19 settlement payment stayed in the Century Bank
20 account into which it apparently was deposited on
21 August 8, 2003 as indicated by Exhibit 177?
22         MR. McGLYNN: Objection as to the form.
23         Can you read it back?
24         THE WITNESS: I understand it.

69

1      A. It appears that this record, if we are
2  tracing the funds, that money that was received
3  pursuant to the settlement agreement you've shown me
4  as Exhibit 21 was in a Banknorth IOLTA account. It
5  stayed in that account until it was transferred to a
6  Century Bank account. It appears, certainly given
7  the dates, that these would have been -- and my
8  memory is -- that these were the settlement funds
9  paid to Blue Hills Office Park pursuant to this
10 agreement and they stayed exactly where they were
11 unless and until they were transferred out for
12 interest purposes to another bank.
13     Q. Is the reference to the Banknorth IOLTA
14 account a reference to Bernkopf Goodman's IOLTA
15 account at Banknorth?
16     A. Yes, it is.
17     Q. Prior to August 8, 2003 the $2 million
18 payment had gone into the IOLTA account?
19     A. That is correct. And it stayed in an
20 escrow account at Bernkopf Goodman.
21     Q. I have seen reference to wires of monies
22 upon the conveyance of the property next to Blue
23 Hills Office Park that took place on August 6, two
24 days prior to August 8, 2003. Do you know if the $2

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

**70**

1  million settlement payment was actually wired into
2  Bernkopf Goodman's IOLTA account on August 6, 2003?
3      A. I don't know. I mean looking at this and
4  looking at the timing, I have to presume this is the
5  money. I don't know if it went somewhere before. I
6  don't know the answer.
7      Q. In any event, the payment first went to
8  Bernkopf Goodman's IOLTA account, correct?
9      A. That is correct.
10     Q. That contains monies that belonged to
11 different clients, does it?
12     A. Yes.
13     Q. And then a wire of the $2 million
14 settlement payment went shortly thereafter, it looks
15 like in a couple of days, into a Century Bank
16 account, correct?
17     A. I don't know that it was wired. It could
18 have been handled by check and opening of a new
19 account that earned interest.
20     Q. It says wire in from Banknorth IOLTA
21 account.
22     A. That shows when it came in from the
23 Banknorth account. I didn't write it, whether
24 that's reflective of the wire into the Banknorth

**71**

1  IOLTA account or out to Century Bank, but it clearly
2  traced that $2 million. It is a difference without
3  distinction.
4      Q. In any event, the money went from the
5  Banknorth IOLTA account maintained by Bernkopf
6  Goodman --
7      A. That is correct.
8      Q. -- to a particular client funds account
9  obtained by Bernkopf Goodman at Century Bank?
10     A. That is correct.
11     Q. The account was maintained under the name
12 Fineberg Royall Associates; is that correct?
13     A. I can't answer that. I don't have the
14 account. Whether the account was in the name of
15 them -- all we did here, this was obviously produced
16 to you as a record of our office's handwritten card
17 to show where the money was.
18     Q. If the Century Bank account was held for
19 your client Blue Hills Office Park LLC, do you know
20 why it is that somebody wrote not Blue Hills Office
21 Park but Fineberg Royall Associates on this ledger
22 sheet that has been produced to us as the record of
23 the disposition of the settlement payment?
24     A. The answer is yes. I think that from the

**72**

1  time of inception it is just a generic. I believe
2  that's a title, I believe, probably on our account
3  records. So that even if we sent bills, we just
4  internally identified Blue Hills Office Park LLC
5  under its prior -- under the name generically as
6  Royall Associates. That's what our office
7  characterized it and identified it as.
8          I don't know even if there is a Royall
9  Associates entity. That's what we called the
10 account for shorthand purposes in the office. It
11 might have said Fineberg-150 Royall Street, Canton,
12 which was just as likely. It was a way of
13 identifying whose money it was and whoever was the
14 owner there would have obviously been entitled to
15 it.
16     Q. So your testimony is that your office used
17 the words Fineberg Royall Associates to refer to
18 Blue Hills Office Park LLC?
19     A. No, what I said was very clear.
20     Q. If it was, I wouldn't have asked the
21 follow-up.
22     A. Well, let's try it again. Royall
23 Associates was a general term that we used for
24 matters we dealt with for 150 Royall Street, Canton.

**73**

1  Our office keeps its records generally consistent
2  with property addresses when we deal with real
3  estate transactions. By the same token, it says
4  Fineberg. It certainly was not Fineberg's money.
5  And, therefore, there's no intent here to
6  specifically set out the legal entity who is the
7  holder, nor is it here intended to say that they are
8  Gerry Fineberg's money. Nor is it intended to say
9  that Mr. Fineberg has the right to decide what to do
10 with it. It is just simply the label that's put on
11 it for the purpose of our internally knowing that in
12 fact this related to 150 Royall Street. I can't
13 attribute any more to it than that.
14         Likely the account was not in that name.
15 It was in the Bernkopf Goodman name. We just called
16 it Royall Associates for I think literally for 10 or
17 15 years.
18     Q. So although it says Royall Associates, the
19 money was actually received by Blue Hills Office
20 Park LLC?
21     A. Yes. That's set out in writing in Exhibit
22 21. It is very clear.
23     Q. And the money was then held in that account
24 until the beneficiaries of Royall Associates Realty

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

74

1  Trust directed its disposition in this agreement
2  dated December 31, 2004; is that correct?
3     A.  No.
4     Q.  Did the money go somewhere else in the
5  meantime?
6     A.  Yes.
7     Q.  Where did it go?
8     A.  It shows you.  You just gave me the
9  documentation of that.
10    Q.  If you take a moment and look at the last
11 page.
12    A.  I guess maybe you are right.  Maybe I
13 misunderstood the question.
14    Q.  Sure.  If you want to look at the second
15 page.
16    A.  I did.
17    Q.  There's no transfer shown out of that
18 account until February 2005?
19    A.  Got it.
20    Q.  So my question was this.  The $2 million
21 settlement payment was held in the Century Bank
22 account reflected by the first page of Exhibit 177
23 until December 31, 2004 when its disposition was
24 directed by the beneficiaries of the Royall

75

1  Associates Realty Trust in the agreement that we
2  have marked as Exhibit 176, correct?
3     A.  I think your characterization is a little
4  bit misguided.  However, what we are saying here is
5  that the $2 million received under the settlement
6  agreement noted in Exhibit 21 came into Bernkopf
7  Goodman's IOLTA account at Banknorth and was then
8  set up separately in Century Bank and kept until
9  subsequently it was transferred out in accordance
10 with the consent and direction of the people who had
11 an equitable interest in it and as directed by this
12 December 31, 2004 agreement.
13    Q.  That was an agreement among the
14 beneficiaries of Royall Associates Realty Trust,
15 correct?
16    A.  Because they were the owners.  It is the
17 same as -- I don't want to be mischaracterized here.
18 Because they were the parties who if there were a
19 misdelivery of funds would have the right to object.
20 Just to make sure, since in an abundance of caution
21 by counsel, both Andy Cohn and Ken Goldberg, myself,
22 wanted to make sure that everybody who had a
23 potential right to the money or claim or beneficial
24 equitable interest in the money directed what we do

76

1  with it.  It is a very consistent thing.  That's all
2  it was.  It was people that had an interest directly
3  or indirectly in the money told us what to do with
4  it.
5     Q.  I'm simply trying to establish what
6  happened to the money.
7     A.  Okay.
8        MR. McGLYNN:  There's no question before
9  you.
10    Q.  The $2 million settlement payment stayed in
11 the Century Bank account held by Bernkopf Goodman
12 under the shorthand Fineberg Royall Associates until
13 its disposition was directed, to use the word you
14 just used, by the beneficiaries of Royall Associates
15 Realty Trust in the December 31, 2004 agreement that
16 we marked as Exhibit 176, correct?
17    A.  Yes, with one caveat.  It was not held in
18 an account called Fineberg Royall Associates.
19 That's simply the manner in which the bookkeeper at
20 Bernkopf Goodman identified the account.  We do that
21 by property address.  It was not an account Royall
22 Associates.  That's what the people did to identify
23 it.  That probably was the client number the way
24 they saw it for accounting, computer purposes.

77

1     Q.  So let me see if I can get it right.  The
2  $2 million settlement payment stayed in the Century
3  Bank account reflected on the first Page of Exhibit
4  177 until its disposition was directed by the
5  beneficiaries of Royall Associates Realty Trust in
6  the agreement dated December 31, 2004 that we've
7  marked as Exhibit 176, correct?
8     A.  By the beneficiaries and trustees who are a
9  party to that agreement, yes, that is correct.
10    Q.  How much time did your firm spend
11 considering the issue of whether the settlement of
12 the zoning appeal lawsuit or the disposition or
13 receipt of the settlement payment ought to be
14 reported to the lender?
15       MR. McGLYNN:  Objection.  I think that
16 gets into the province of work product.  I instruct
17 the witness not to answer.
18    Q.  Are you going to follow that instruction?
19    A.  Yes.
20    Q.  Did you report the determination that you
21 had made about whether the settlement or the payment
22 ought to be disclosed to the lender or its consent
23 obtained to any client?
24       MR. McGLYNN:  Yes or no.

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

78

1　　　THE WITNESS: Could you read the
2　question back. I must have misheard something.
3　　　(Question read by the reporter.)
4　　　THE WITNESS: Thank you.
5　　A. Yes.
6　　**Q. What client or clients?**
7　　A. I certainly reported that, without
8　intending to waive in any manner the privilege, but
9　trying to be responsive to your request, to
10　Mr. Fineberg, Mr. Langelier, Mr. Cohn, Mr. Frank,
11　the various capacities they held.
12　　**Q. Did you inform those clients of the reasons**
13　**for your determination?**
14　　　MR. McGLYNN: Yes or no or I don't know.
15　　A. Yes.
16　　**Q. And what were the reasons that you came to**
17　**that determination?**
18　　　MR. McGLYNN: Now I will instruct you
19　not to answer. That involves substantive
20　discussions with clients.
21　　A. I'm not going to answer.
22　　**Q. Putting aside your discussions with the**
23　**clients, what were the reasons that you determined**
24　**that the settlement and the payment and the**

79

1　disposition thereof didn't have to be disclosed to
2　the lender or its consent obtained?
3　　　MR. McGLYNN: I'm going to instruct the
4　witness not to answer that particular form of the
5　question. If you want to ask Mr. Goldberg whether
6　or not he has an opinion or position with respect to
7　the requirement of consent for this payment from the
8　lender, that I will permit. I don't want to get
9　into the substance of any discussions that
10　Mr. Goldberg had with any client.
11　　**Q. Well, as of the summer of 2003, what were**
12　**the reasons that -- strike that. As of the summer**
13　**of 2003, why did you determine that the settlement**
14　**and the settlement payment didn't have to be**
15　**disclosed to the lender?**
16　　　MR. McGLYNN: Objection as to the form.
17　　　If you can answer the question, you may
18　answer it.
19　　**Q. Let me ask you a different way. You came**
20　**to a determination that you didn't have to inform**
21　**the lender of the settlement or the payment or its**
22　**disposition or obtain the lender's consent thereto,**
23　**correct?**
24　　A. Yes.

80

1　　**Q. What were the reasons for that**
2　**determination?**
3　　A. I think it was clear from my review of the
4　loan documents that they had no interest in the
5　claim, no say in whether or not the claim, which
6　developed into an appeal, was made. I think the
7　documents just simply were clear that the lender had
8　no say in it, right to it, didn't have a lien on it.
9　And there was -- it just was outside the bounds of
10　the loan transaction. The collateral for the loan
11　was clear. It was the real estate.
12　　**Q. Have you finished your answer?**
13　　A. Of course. That's why I stopped.
14　　**Q. Did you have any conversations with anyone**
15　**from Wells Fargo about the Blue Hills Office Park**
16　**loan in 2003?**
17　　A. I don't think so. I don't recall any at
18　any point.
19　　**Q. I know of none. I'm just asking. I'm not**
20　**trying to trick you.**
21　　　MR. McGLYNN: Of course he was.
22　　A. I'm trying to think. The answer is I don't
23　believe so.
24　　**Q. Did you have any discussions with anyone**

81

1　from Wells Fargo in 2004 about the Blue Hills Office
2　Park loan?
3　　A. I don't believe so.
4　　**Q. Did you have any discussions with anyone**
5　**from Lennar Partners in 2004 about the Blue Hills**
6　**Office Park loan?**
7　　A. Yes.
8　　**Q. What was the first such conversation that**
9　**you had?**
10　　A. I had a conversation with a Mr. Brown in, I
11　would say, probably June or July of 2004.
12　　**Q. And how did you come to speak to Mr. Brown**
13　**about the Blue Hills Office Park loan?**
14　　A. There had been a very high level of
15　frustration by my client in trying to reach somebody
16　who would be responsive to talk about implementation
17　of the loan terms. I had found out that --
18　　**Q. My question was just simpler. How did you**
19　**know Mr. Brown?**
20　　A. How did I know him?
21　　**Q. Yes.**
22　　A. I had other transactions with him.
23　　**Q. You were dealing with Mr. Brown in**
24　**connection with a property owned by Fine Hotels or a**

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

82

1  single-purpose entity connected with that in
2  Sturbridge, Massachusetts?
3      A. I don't know whether or not it was at the
4  same time.
5      Q. Well, what transaction or transactions did
6  you have with Mr. Brown?
7      A. We had had a number of discussions relating
8  to this client and other clients and loans for which
9  Lennar was acting as special servicer or master
10 servicer.
11     Q. Do you recall what loans those were?
12     MR. McGLYNN: For other clients?
13     A. I think there were a couple of loans for
14 other clients for hotels in Massachusetts. There
15 was a property in Williamsburg, Virginia. There was
16 a property in Lancaster, Pennsylvania, a property in
17 Sturbridge. I think there were one or two others as
18 well. I just don't recall. I just had very
19 substantial dealings over the years with Lennar.
20     Q. What did you say to Mr. Brown on the
21 subject of the Blue Hills Office Park loan in June
22 or July of 2004?
23     A. Help. Could you find out, please, whether
24 or not you folks are the special servicer for that

83

1  loan and if so just let me know where it stands,
2  please. Because we were, the client was having a
3  problem getting any kind of meaningful response out
4  of Wells Fargo.
5      Q. Did you say anything else to him?
6      A. At that first discussion, no.
7      Q. Was this first discussion in person or over
8  the telephone?
9      A. Telephone. My memory is that it was over
10 the telephone.
11     Q. What did Mr. Brown say?
12     A. He said he would look into it and call me
13 back.
14     Q. Did he say anything else?
15     A. Not to my recollection.
16     Q. Have you told me everything that you can
17 remember that you said to Mr. Brown and he said to
18 you during that first conversation about the Blue
19 Hills Office Park in June or July of 2004?
20     A. Yes.
21     Q. Did you make any notes of that
22 conversation?
23     A. No.
24     Q. Did you memorialize that conversation in

84

1  any way, whether in an internal memo, an email, a
2  time entry, a phone log or any other written or
3  computer-generated method?
4      A. I'm not a big note-taker. I'm not a big
5  computer-generated. I'm not a typist. That leaves
6  me as an antiquated, old-fashioned person with what
7  I believe is a reasonably good memory. So I
8  committed it to my memory and we followed up in the
9  ordinary course.
10     Q. So the answer to my question is that you
11 did not memorialize the conversation in any way?
12     A. I do not recall that I did. I might have
13 had a doodle pad in front of me, but that's just not
14 my practice. It was not adversarial. There was no
15 reason for me to keep a record of it.
16     Q. Did you have any subsequent conversation
17 with Mr. Brown about the Blue Hills Office Park
18 loan?
19     A. Yes, I did.
20     Q. When was that?
21     A. Again, I can't be sure sitting here. I
22 believe it was probably just before or after July
23 4th, because my vacation schedule would be such. I
24 believe it was early in July, maybe in late June,

85

1  wherein -- I'm not sure whether he actually -- I
2  believe he actually called me back responsive to my
3  request that he let me know whether or not it was or
4  was not Lennar who was the special servicer.
5      Q. What did he say when he called you back?
6      A. He said that when Lennar was the special
7  servicer that the loan was not then -- let me think
8  about this clearly -- that the loan was not then in
9  transit to Lennar. I had told him I thought it was.
10 He told me that it was not, and he suggested to me
11 that we should be in touch, in contact with Wells
12 Fargo.
13         And he made a specific suggestion of how
14 we could, what we should say in order to expedite
15 getting the file over to Lennar. At that time we
16 had a little bit of discussion about just the
17 property and what was going on and why I told him
18 time was of the essence.
19     Q. Do you recall anything else that he said to
20 you during that call?
21     A. No. I think that was the essence of the
22 conversation that we had.
23     Q. Do you recall anything else that you had
24 said to him?

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

86

1    A. I think there was actually -- the call
2  might have lasted ten minutes. I certainly covered
3  the -- I referenced the essence of it. Once again,
4  I'm not sure if it was that call or the prior one or
5  a subsequent one where I asked him whether or not --
6  because I had experience dealing with him -- to whom
7  it would be assigned, and he made it clear to me
8  that he only dealt in hotel loans. I think only
9  dealing with the reason why time was of the essence,
10  that we were frustrated, that we had to get it
11  going; just a general discussion, and I had gotten
12  to know him well, about master servicers and general
13  servicers generally. Normal colloquy; that was the
14  essence of the discussion.
15    Q. Did you tell him why time was of the
16  essence?
17    A. Well, sure. We had discussed that. It was
18  a single -- again, we had -- the mention was that it
19  was a single-tenant property. There were a whole
20  host of ways that the client wanted to consider
21  going with the property. We wanted somebody to talk
22  to. He agreed that I was probably going to get
23  nowhere with Wells Fargo, that it had to be with the
24  special servicer.

87

1    Q. Did you say anything else about why time
2  was of the essence?
3    A. I think just -- again, I think I've covered
4  it.
5    Q. Did you say anything more specific about
6  the host of ways that the client wanted to go with
7  the property?
8    A. No. The only thing I did say to him was
9  that this was a property -- because we had another,
10  a bunch of transactions, wherein the client had
11  turned back the property consistent with the terms
12  of the documents. I told him this was different
13  where the client really did intend to keep it.
14  That's why I looked forward to getting it over to
15  somebody who would at least start to talk to us
16  about the terms under which we could recapitalize
17  the loan, et cetera, recapitalize the property.
18    Q. The bunch of transactions that you just
19  mentioned where you turned back the property
20  included the Sturbridge hotel that had been managed
21  by Fine Hotels?
22    A. It did.
23    Q. It also included the hotel in Lancaster
24  managed by Fine Hotels, correct?

88

1    A. It did.
2    Q. Those were both properties owned by
3  special-purpose entities of which the primary owner
4  was Mr. Fineberg?
5    A. Or entities in which Mr. Fineberg had an
6  interest, a controlling interest.
7    Q. Did you tell Mr. Brown why you were
8  frustrated?
9    A. I don't know whether it was in that call or
10  the prior one. We had had a series of discussions
11  over the last months or a year, whatever it was,
12  years, just with the typical kinds of difficulties
13  special servicers had with master servicers, just
14  getting things done and personnel issues. But I
15  think it was very clear from the discussion that --
16  what his advice was. And just make it known to
17  Wells Fargo and just get it done and that it needed
18  to be transferred.
19    Q. What did he say? You said he made a
20  specific suggestion about what you should say to get
21  the file over to Lennar.
22    A. He suggested that contact be made directly
23  with Wells Fargo and request them that it be
24  transferred to the special servicer since the loan

89

1  would have to be addressed given that the tenant was
2  leaving. And what were we going to do with the
3  property? We were facing a material change.
4    Q. Did you discuss anything else with
5  Mr. Brown during that second call?
6    A. I think related to this property, to the
7  best of my current recollection, we have covered it.
8    Q. I take it you have no written
9  memorialization of that call?
10    A. That is correct, I do not.
11    Q. Did you have any subsequent conversation
12  with Mr. Brown about Blue Hills Office Park?
13    A. Yes.
14    Q. When?
15    A. I think shortly afterwards. I think during
16  the a time when we were talking about something
17  else. By mid-July I spoke with him. He told me at
18  that time that the loan was being transferred. I
19  told him that we did make the call as he suggested
20  to Wells Fargo, and whatever he suggested that I say
21  it did cause an initiation of the transfer. The
22  presumption was that -- I believe that Chris Brown
23  also on his side, I think, helped get it over to
24  Lennar, since the client had had such little success

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

90

1  in dealing with Wells Fargo or getting anybody at
2  Wells Fargo in authority designated to handle that.
3          And I believe it was at that third call
4  or maybe even a subsequent one, I think it was the
5  third call that he told me that it was being
6  assigned to a fellow named Joe Warshaw there who
7  would be handling it; I would hear from him; and I
8  know he gave me his direct line.  But the boxes, all
9  the files had not come over yet, and to give it a
10 chance, and that he would call me, if not get back
11 to him.  That was sometime the end of July.  So he
12 was helpful.
13     Q.  Did he say anything else during that
14 conversation?
15     A.  I don't recall.  I think that was the
16 essence of it.  He was pleased that it finally was
17 en route.  I think he mentioned that he had a
18 positive thing to say about Joe Warshaw.  He was an
19 experienced guy and we would enjoy working together.
20     Q.  Did he say anything else?
21     A.  I don't recall, as it relates to this
22 property.
23     Q.  Did you say anything to Mr. Brown during
24 this third conversation about Blue Hills Office

91

1  Park?
2      A.  No more than we've already discussed.  It
3  would have been a stream of conversations that
4  related to what the property was and what was going
5  on in the market, et cetera, et cetera.
6      Q.  I'm asking you about this third
7  conversation where he called to tell you that the
8  loan was being transferred.  Do you have any memory
9  of what you said to him during that conversation?
10     A.  I think I have answered that.
11     Q.  Have you now told me everything that you
12 said him or he to you during this third
13 conversation?
14     A.  As I recall it now, we have covered the
15 subject matters discussed.
16     Q.  So you have told me everything?
17     A.  To the best of my recollection, yes, sir.
18     Q.  And you have no memorialization of that
19 conversation?
20     A.  If you're asking whether I took notes of
21 that conversation, I do remember writing down the
22 name Joe Warshaw, probably in my diary.  He gave me
23 a telephone number and I wrote it down.
24     Q.  Do you have any other memorialization of

92

1  that third conversation with Mr. Brown?
2      A.  No.
3      Q.  Did you have any other conversations with
4  Mr. Brown about Blue Hills Office Park after that?
5      A.  I think I might have been dealing with
6  Chris Brown about some other matters.  My memory is
7  that sometime in August I mentioned that I had
8  gotten in touch with Joe Warshaw.  My memory is,
9  just briefly, that I thanked him for whatever he did
10 to expedite getting the files over.  And to the
11 extent that he could be helpful in getting us
12 together as quickly as possible, that would be
13 great, that kind of thing.  He indicated that he's
14 going to call you.  I believe that's the last
15 discussion that I had with Chris Brown on the
16 subject of this property and loan.
17     Q.  In that answer you said that you told him
18 that you had gotten in touch with Joe Warshaw.  Is
19 that right?
20     A.  I believe by that time we had talked, yes.
21 That was responsive to your question and is there
22 any other discussion you had.  I said yes, that I
23 had a follow-up discussion with him to thank him,
24 blah, blah, blah, having heard from Joe Warshaw or

93

1  calling him or whatever.
2      Q.  I'm trying to focus on what by my count was
3  the fourth conversation, which I understood that it
4  was sometime in August when you mentioned to him
5  that you had gotten in touch with Joe Warshaw.  That
6  conversation.
7      A.  Yes, either that I had gotten in touch with
8  him.  I had gotten in touch with him.
9      Q.  I was confused.
10         MR. McGLYNN:  Let him finish the answer.
11         MR. FALBY:  Let me explain the issue.
12     Q.  I was confused because the end of your
13 answer was that Mr. Brown told you that Mr. Warshaw
14 would be calling you.
15     A.  That was the third time.
16     Q.  Okay.
17     A.  I appreciate the comment.
18     Q.  Let me ask again.  I was asking about the
19 fourth conversation, the one after you wrote down
20 Joe Warshaw's name and number.  Can you tell me
21 everything that Mr. Warshaw said to you -- strike
22 that.
23         Can you tell me everything that
24 Mr. Brown said to you and you said to him on the

FARMER ARSENAULT BROCK LLC

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

94

1  subject of Blue Hills Office Park during the fourth
2  conversation?
3      A. I think I already did. It was a call
4  generally on a very informal basis to say thank you.
5  I presumed that he had been helpful to expedite
6  this. A general discussion, anything that he could
7  do to keep this on the top burner because time was
8  important.
9      Q. Is that your full memory of the fourth
10  conversation with Mr. Brown?
11      A. Yes, it is. No, I did not memorialize it
12  except to recall it. I try to thank people when
13  they are responsive to a request.
14      Q. Did he say anything during that fourth
15  conversation?
16      A. Of course he said something. I don't
17  understand the question, did he say something.
18      Q. Do you remember anything he said?
19      A. I think he said Joe Warshaw was a good guy,
20  you will enjoy working with him. Whether or not
21  there was four calls or three, it could have been
22  three. But that's my memory sitting here today,
23  that there were four distinct discussions, some of
24  which may have been at another time relating to

95

1  other things. There were questions periodically
2  that Chris Brown had of me over the years and he
3  would call me on them.
4      Q. Do you recall any discussion that you ever
5  had at any point with Mr. Brown about Blue Hills
6  Office Park other than what you've already told me?
7      A. I believe that we have now discussed all of
8  my discussions that I had with Chris Brown relating
9  to Blue Hills Office Park.
10      Q. And have I exhausted your memory as to the
11  content of those calls?
12      A. I'm invigorated but not exhausted; but my
13  memory is exhausted about those calls, yes.
14      Q. When did you first speak to Mr. Warshaw
15  about the Blue Hills Office Park loan?
16      A. Sometime in the middle of August.
17      Q. That was a telephone call?
18      A. Yes.
19      Q. How long did that telephone call last?
20      A. Probably ten minutes.
21      Q. Did you call him or he call you?
22      A. I think he may have called me. I may have
23  called him. I'm not sure.
24      Q. What did he say during that conversation

96

1  and what did you say?
2      A. In an effort to be as exhaustive as
3  possible as to my present memory, I think the
4  discussion went as follows. He introduced himself.
5  He told me that he was the account officer who would
6  be in charge and handling the loan for the special
7  servicer. I know he mentioned to me that he was
8  pleased that there was somebody who had had
9  experience and understood the process, referring to
10  me. I know he referenced that he had spoken with
11  Chris Brown, about my discussions with Chris. I
12  know that we then discussed specifically -- I spent,
13  I think, five or ten minutes explaining to him the
14  borrower's perception of the current property, the
15  market, and we thought the opportunity to get this
16  matter resolved; and the commitment my client had to
17  pursue a number of alternative courses to
18  recapitalize the borrower, just that it fully
19  intended to keep the property.
20      I mentioned to him that -- it was clear
21  from the initial part of the discussion that he had
22  very little of the files there; requested that he
23  get to the special servicer lockbox accounts so that
24  he could confirm that there was a lot of money being

97

1  held, and that that money together with somebody who
2  was sufficiently well-heeled and committed to the
3  property gave us an opportunity to get this property
4  retenanted and get back on line.
5      The discussion ended with his again
6  committing to be responsive. He was going to try to
7  get more of the files. He said some of the boxes
8  had just arrived. He didn't know what the terms of
9  the loan documents were. There was a question that
10  he raised at the time, I remember that, about
11  whether or not losing the tenant primed the loan,
12  which meant that that would automatically call the
13  loan. I responded to him, no, no, no, that was not
14  the deal, that I was familiar with the deal having
15  been involved in the negotiation of its terms from
16  the inception. He said he couldn't comment on that,
17  that he hadn't gotten the loan documents yet. He
18  said he would get back to me. I urged him to do
19  that as quickly as possible.
20      We talked about general market
21  conditions as we perceived them here in Boston.
22      Q. What did you say about that?
23      A. We thought that -- based on my experience,
24  I had told him that I thought that we had sufficient

Case 1:05-cv-10506-WGY     Document 103-4     Filed 05/31/2006     Page 13 of 22
CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

98

1  experience. We felt that we were at the bottom of
2  the market and that we were starting to come back.
3  Actually, we felt pretty positive about it.
4      Q. Did you say anything else about general
5  market conditions?
6      A. I think there may have been a discussion
7  just generally. Thank you for asking, yes. I think
8  there was a discussion about our perception of what
9  had happened in Boston, that Boston was particularly
10  hard hit in the suburbs by 9/11 and the lack of
11  travel afterwards. But we think that the negative
12  absorption in the office market, et cetera, was
13  behind us.
14      Q. Did you say anything that you recall
15  specifically about the commitment to recapitalize
16  and your client's desire fully to keep the property?
17      A. I don't recall whether it was in that
18  discussion or a subsequent one, where there was just
19  a brief mention by me of the fact that there were
20  potentially a number of different avenues available
21  either by mez financing, additional capital by
22  equity, bringing in new partners, or by one or more
23  of the existing partners bringing in, adding new
24  funds. There were just a number of alternatives,

99

1  including seeking to attract tenant participation
2  and ownership. That's why I thought it was just
3  important to get somebody online with whom we could
4  interact to consider the various alternatives.
5      Q. What you just told me, did you tell
6  Mr. Warshaw that during your first conversation with
7  him?
8      A. I think I made it clear in my last answer
9  that I did not recall. My memory is that I think
10  that it was probably more toward the second
11  conversation.
12      Q. Did Mr. Warshaw say anything to you that
13  you haven't already told me about?
14      A. I think once again, the discussion was that
15  he was unsure what the terms of -- I think the most
16  specific mention I had was that we thought it would
17  be a 5 or $10 million turnaround, that there was 4
18  or $5 million in the escrow accounts. We were
19  talking about putting in, or raising, either way,
20  and attracting funds. We talked about needing to
21  take a look at the opportunity of either splitting
22  up the business -- as a matter of fact, I did. I
23  think in the second discussion --
24      Q. I want you to confine yourself to the first

100

1  discussion.
2      A. That's the end of it.
3      Q. During that first discussion, did you talk
4  about a 5 or $10 million turnaround?
5      A. I don't recall whether I put a number to it
6  then.
7      Q. Was that something you discussed in the
8  second conversation?
9      A. I think so. It could be partially in the
10  first. I quite frankly don't recall whether I put a
11  number to it.
12      Q. Do you recall anything else that
13  Mr. Warshaw said during the first conversation?
14      A. Just committed to get the box, review the
15  documents, he would get Wells Fargo to confirm as
16  best he could the amounts that were in the reserve
17  accounts. He just needed some time to review the
18  documents and he would get back to us pretty
19  promptly.
20      Q. And did you say anything else to him in
21  that first meeting that you haven't told me about?
22      A. I don't think so. It was a telephone call,
23  not a meeting.
24      Q. Did you say anything else to Mr. Warshaw

101

1  during that first telephone call that you haven't
2  told me about?
3      A. My memory is that we generally exhausted
4  the discussion.
5      Q. Did you tell Mr. Warshaw that you were a
6  lawyer but not acting as counsel in this
7  circumstance?
8      A. I have no memory of that. I understood
9  that that came up before. I think I could well have
10  mentioned that in fact -- I would never have said
11  I'm not a lawyer. And it was very clear to him what
12  my role was, given the fact that I know Chris Brown
13  had talked to him and we had had a number of deals
14  together, transactions, and we did act as counsel.
15  There's no way I would have said I'm not a lawyer.
16      The answer is that I did say to him that
17  we would be actively involved, potentially in
18  addressing capital requirements, which is one of the
19  things I do do personally in my practice.
20      Q. Did you tell him that you weren't acting as
21  counsel?
22      A. No, I would not have said that, because I
23  don't how you are. You either are or you are not a
24  lawyer. We do handle the transactions. So I would

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

102

1  have -- if we had discussions, I might have told him
2  that with respect to the Boston market, that we have
3  experience, that we are not typical of lawyers but
4  also as developers or co-developers.
5      Q. Were you acting as counsel when you talked
6  to Mr. Warshaw that first time?
7      A. I am what I am. I am a lawyer, and I do
8  represent the Fineberg companies, Mr. Fineberg's
9  company and his interests generally. The answer is,
10  I don't know how I can say that I'm not a lawyer. I
11  am a lawyer. Is it that I'm not dressed as a
12  lawyer? I mean, don't talk to me because I'm going
13  to take my lawyer? I don't quite understand the
14  significance.
15      Q. Were you talking to Mr. Warshaw in your
16  capacity as counsel to Blue Hills Office Park LLC?
17      A. That's who I am. That's who we were.
18      Q. Were you talking to Mr. Warshaw in your
19  capacity as a codeveloper with your client?
20      A. No.
21      Q. Did you tell Mr. Warshaw that you did the
22  capital structuring?
23      A. I believe there might have been a
24  discussion, that certainly I do -- part of my work

103

1  is to consult and provide advice with respect to
2  available sources of capital. I do that. I am a
3  lawyer. And I get paid for that, in spite of the
4  fact that I'm a lawyer. It is not not acting as a
5  lawyer. That's part of what my function is. That
6  could have been misconstrued as being two people,
7  but that's part of what I do as counsel.
8      Q. Did you give Mr. Warshaw Joe Donovan's
9  name, title and telephone number?
10      A. No.
11      Q. Did you discuss the prenegotiation letter
12  with Mr. Warshaw in that first conversation?
13      A. No.
14      Q. Did you tell Mr. --
15      A. I didn't have it yet.
16      Q. Did you tell Mr. Warshaw that you would be
17  meeting with Mr. Fineberg the next day and would get
18  back to him?
19      A. No.
20      Q. When was the next conversation that you had
21  with Mr. Warshaw?
22      A. It was probably seven to ten days later.
23      Q. What date was that?
24      A. I don't know. It was probably seven to ten

104

1  days after the first call, which was in the middle
2  of the month.
3      Q. So does that mean the second call was at
4  the end of the month?
5      A. Pretty near to the end of the month, yes,
6  sir.
7      Q. Who called who?
8      A. I believe I called him.
9      Q. Why did you call him?
10      A. I had received from a copy of a quote of a
11  letter from Lennar that was sent to me by my client.
12      Q. What client?
13          MR. McGLYNN: I'm sorry?
14      A. Blue Hills Office Park.
15      Q. What letter had you obtained from Blue
16  Hills Office Park?
17      A. It was a letter which bore Joe Warshaw's
18  signature, I believe. And it was a letter which was
19  very consistent with the scores of transactions I
20  had had previously with Lennar. It talked about
21  wanting to have, looking forward to meeting and
22  discussing the transaction, the status of the loan,
23  and asked for the borrower's consent that those
24  discussions or negotiations would not be construed

105

1  as an agreement unless and until a document were
2  executed by the parties.
3          I remember the famous thing by a lawyer
4  calling it a green, green letter. That it was to
5  promote a full -- green, green. We are going to be
6  able to go and sit and meet and have full and
7  productive discussions, but it was not going to be
8  binding until a deal were reached or not reached.
9      Q. Are you talking about the prenegotiation
10  letter?
11      A. Yes, it was the letter. That was, you
12  know, I don't know if it was part of one letter or
13  it came with a cover letter saying we were going to
14  meet, but in order to do that we were going to
15  discuss this thing, and in order to do that you have
16  got to consent to the following. I told him I was
17  going to see Gerry the next day.
18      Q. I haven't asked you about the conversation
19  yet.
20      A. I'm sorry, I thought you did. I thought
21  that's what you asked me about. That's all right.
22      Q. That's okay.
23          MR. McGLYNN: Is this a good time?
24          MR. FALBY: Why don't I finish.

Case 1:05-cv-10506-WGY    Document 103-4    Filed 05/31/2006    Page 15 of 22

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

106

1    Q. Why don't you tell me what he said to you
2    and you said to him during the second call that you
3    had with Mr. Warshaw.
4    A. I believe it was I who called him. As I
5    just indicated, it was responsive to that letter,
6    which I think was dated in the middle of the month,
7    somewhere around the 19th or 20th of August. I
8    thought I answered the question already. It was
9    over his signature, is my memory. It talked
10   about -- I said we were looking forward to meeting.
11   I'm going to be with Gerry the next day. And it
12   looked like the same, as I said to you, the format
13   that I had utilized in dealing with Chris Brown in
14   literally scores of other transactions with Lennar;
15   that I told him I would get it signed the next day
16   and get it back to him.
17   We talked a little bit more about the
18   property. I said this is where I'm not sure whether
19   the discussion of the specific capital needs. I
20   told him I was glad he was getting going on it. I
21   asked him whether he was able to confirm whether
22   there was the kinds of reserves there, that in fact
23   it was not a default for the lessee to leave. He
24   said he had not had a chance to review with any more

107

1    specifics, the loan documents, but he did know that
2    there was a lot of money in the account. He was
3    fully apprised of that.
4    I at the time talked about it would be
5    enormously helpful because we were facing -- I
6    remember this -- Labor Day. I told him if it would
7    expedite things so that it would not lose time, we
8    would fund his coming to Boston to look at the
9    market; that I didn't want the meeting, as I had
10   several times previously gone to Atlanta or Miami to
11   meet with Lennar, that I would want him to come up
12   here and look at the market to show him why we were
13   enthusiastic about the property. Told him once
14   again that the client was very committed to the
15   property and really did want to, was very -- wanted
16   to make it work.
17   The tenant was leaving. We acknowledged
18   that. This was going to take real effort. I think
19   it was at that time in that second call that we
20   mentioned, to give him some comfort, that we thought
21   it was going to be a 5 to $10 million turnaround.
22   There were all sorts of questions on how do you
23   address it, how to best attract tenants. I told him
24   to please make sure that he was comfortable that we

108

1    were on board. The borrower had a good relationship
2    with who we thought was going to be and had been a
3    very good lease broker. And we were generally
4    hopeful and optimistic that we would be able to make
5    it work.
6    I think his response was that he needed
7    a little bit more time. The boxes had just gotten
8    there with the information and he would get back to
9    me. I asked him whether or not it was possible
10   to -- that's when we talked about whether it was
11   possible to get him up to Boston before Labor Day.
12   He said he didn't think so but he said he would get
13   back to me if he could. That was the essence of the
14   conversation.
15   Q. Did you tell him where the $5 million was
16   going to come from?
17   A. I think the discussion was simply that we
18   thought it was a 5 to $10 million turnaround. And
19   that once again, we could -- both with the means of
20   the owners, their means and my experience in the --
21   not that that's what we were talking about -- that
22   my experience in the capital markets, that I did not
23   believe, given this property, that that would be
24   difficult to raise, arrange or to access.

109

1    Q. Was it during the second conversation that
2    you told him there were potentially a number of
3    different avenues to bring in new money?
4    A. I believe it was during that discussion.
5    That's why I said to him we have got to get you up
6    here. There were a series of options that we had to
7    get some feedback from him on, like bringing in
8    tenants who you would give a piece of the ownership
9    to. But all of those kinds of things were
10   precluded. What changes we would need to make to
11   the property physically. We would need to do that,
12   et cetera. My job was to make it clear to him that
13   my client wanted the property. Those were my
14   instructions and we intended to do what was
15   necessary to make it happen.
16   Q. Did you tell Mr. Warshaw during the second
17   conversation that the borrower had, in fact, 5 to $6
18   million set aside available to develop the property?
19   A. I'm not sure they would have dedicated 5 or
20   $6 million. I'm not sure that they wouldn't have.
21   I think it all depended upon the time parameters and
22   responses of the lender. I just tried to explain
23   that there was the means available based on my
24   experience, and the general means of the client.

29 (Pages 110 to 113)
CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

110

1  Q. I'm just trying to understand what you told
2  him. You said you told him that you had a
3  well-heeled client with means?
4      A. Yes.
5      Q. Did you tell him that the borrower had, in
6  fact, set aside substantial monies that were
7  available?
8      A. No. I think what I did say to him was that
9  I asked him whether he was aware from Chris Brown of
10 the client's means. I had just come through a
11 series of transactions with Mr. Brown, where he
12 solicited proposals on what Mr. Fineberg, in that
13 case, was prepared to pay to reacquire the property
14 if he was interested and whether or not that would
15 have to be conditioned upon getting financing. In
16 those transactions we made it clear that he was
17 capable of writing a check. They would not be
18 conditioned upon getting third-party financing.
19     Q. How big were those transactions?
20     A. They were certainly more than the kind of
21 additional equity that would been required for this
22 transaction.
23     Q. I know the Sturbridge loan was 16 and a
24 half million dollars. Could he write a check for 16

111

1  and a half million dollars?
2      A. I don't think we are talking about writing
3  a check. I don't think that's an appropriate
4  question of how much money my client had. That's
5  knowledge that I would obtain. I don't think that
6  it is appropriate to respond.
7      Q. You just talked about it in your previous
8  answer.
9      A. I said he was a man of substantial means
10 and a man capable of handling and funding the
11 equity. The best proof of that is, as you just
12 indicated, that they had 5 or $6 million in cash.
13     Q. You just said on the other deals --
14         THE WITNESS: I said what I said.
15         MR. McGLYNN: Do not argue, gentlemen.
16         MR. FALBY: I'm not arguing.
17     Q. You just said, sir --
18     A. I said what I said. We can look at it.
19     Q. -- on the other deals that you had done,
20 there had been a discussion of Mr. Fineberg
21 acquiring properties without the acquisition being
22 conditioned on getting third-party financing.
23     A. That is correct, without it being a
24 condition precedent to closing.

112

1      Q. What was the dollar amount of those
2  potential acquisitions? That's my question.
3      A. It was substantial.
4      Q. How big, what number?
5      A. I don't recall.
6      Q. Was it more than $10 million?
7      A. The answer is, at least one or more of them
8  was more than $10 million. And he had sources of
9  capital himself and/or with his lenders who would
10 make those funds available on a routine basis.
11     Q. Did you have such sources available to do a
12 transaction of $20 million or more?
13     A. You would have to ask Mr. Fineberg that.
14 If I have that information --
15     Q. I'm asking you --
16     A. Let me answer your question. If I have
17 that information, it is as a result of my acting as
18 Mr. Fineberg's attorney. I think it is an
19 inappropriate question. It is privileged.
20     Q. I'm following up on your question how he
21 could make offers on these other Chris Brown deals
22 not conditioned on third-party financing. I'm
23 trying to understand what amounts you were talking
24 about. You said it was more than 10 million. Was

113

1  it more than 20 million?
2      A. I don't recall.
3      Q. Was it more than 15 million?
4      A. I don't know. What is the point of
5  grinding away here? The point of the matter is that
6  we were talking about a 5 to $10 million
7  transaction. You are trying to pervert my answer.
8  You don't have to laugh at me. Your demeanor is
9  very unprofessional.
10     Q. I'm just smiling, not laughing.
11     A. You have got this giggling demeanor to try
12 to make fun of what I'm saying. I'm trying to be as
13 fully responsive as possible. We were talking about
14 the frame of reference of 5 or $10 million to turn a
15 property around. You are now asking me about 20,
16 30. It is not relevant.
17     Q. It is.
18     A. I don't need your testimony on the record.
19     Q. You told me that to show Mr. Warshaw just
20 what means Mr. Fineberg had that you talked about
21 the fact that on prior dealings with Mr. Brown he
22 had been prepared to acquire property without a
23 financing condition.
24     A. I did not say that, sir. What I said was

FARMER ARSENAULT BROCK LLC

30 (Pages 114 to 117)

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

114

1  that I'm presuming that since I knew that Chris
2  Brown had been in contact with and talked about this
3  matter that he was aware generally -- this was
4  responsive to the request you made, did I tell him
5  that they had $5 million. I said I presumed that as
6  a result of his discussion with Chris Brown that in
7  fact he was aware that Mr. Fineberg was in fact a
8  man of means and this kind of money, which was in
9  the range of 5 or $10 million, half of which was
10  going to be there, and that Mr. Fineberg had
11  contacts and means himself such that he did not have
12  to make his commitments conditioned upon his getting
13  third-party financing. That doesn't mean he's going
14  to write a check or not write a check. Let's not
15  make more of it than it is. I have been careful
16  with my answer.
17      Q. I'm trying to get your best memory of what
18  the amount of those transactions was that he could
19  do without getting third-party financing.
20      A. Why?
21      Q. You said 10 million or more. I'm trying to
22  figure out whether you have a better memory than
23  that, whether it was 15 million or more or 20
24  million or more. These are perfectly proper

115

1  questions.
2      A. Are we talking about the discussions that I
3  had with Joe Warshaw and what means, whether I did
4  or did not tell him that Mr. Fineberg had the means
5  specifically, specifically had that money set aside?
6  Wasn't that the frame of reference?
7      Q. I asked you about conversations with
8  Mr. Warshaw. You went off of what Mr. Warshaw must
9  have known because of dealings you had with
10  Chris Brown. You talked about particular offers
11  that Mr. Fineberg had made with respect to dealings
12  with Chris Brown where he considered buying
13  properties without the need of a financing
14  condition. I'm asking you what were the dollar
15  amounts of those potential transactions that
16  Mr. Fineberg could accomplish without needing
17  financing?
18      MR. McGLYNN: Objection. That question
19  is asked and answered. If you have any last answer,
20  then we are going to break for lunch.
21      A. I don't know.
22      Q. You told me that the transactions were 10
23  million or more. Is that the best memory that you
24  have?

116

1      A. The transactions that we discussed with
2  Chris Brown wherein Mr. Fineberg would provide
3  funding or would have available financing, we had
4  sources of financing, were greater than $10 million.
5      Q. Were they greater than $15 million?
6      A. I don't know the answer that related to my
7  transactions. Again, we are talking about what
8  commitment we had made to Chris Brown in other
9  transactions.
10      Q. That is all I'm asking.
11      A. The range is more than $10 million. I
12  don't remember any more specifically than that.
13      MR. McGLYNN: We are going to break for
14  lunch.
15
16
17
18      (A luncheon recess was taken.)
19      AFTERNOON SESSION
20      Q. Did Mr. Fineberg actually end up putting
21  any money into Sturbridge after the borrower went
22  into default?
23      A. I don't know. I have no way of knowing.
24      Q. Did Mr. Fineberg give back the keys to the

117

1  Sturbridge Hotel and walk away?
2      MR. McGLYNN: Objection as to the form.
3      You can answer.
4      A. Yes, ultimately.
5      Q. Similarly with the Lancaster Hotel, he gave
6  back the keys and walked away?
7      A. Mm-hmm, yes.
8      Q. With either one of those deals, did he
9  actually put any money into the property in an
10  attempt to do a workout with the lender?
11      A. Let me answer that and say that I would
12  have to guess that Mr. Fineberg funded losses in
13  operations to stave off a default in Sturbridge and
14  Lancaster that totalled a seven-figure amount.
15  After there was insufficient cash flow, he put in
16  hundreds of thousands of case dollars in both properties.
17      Q. Is it not the case that with respect to
18  Sturbridge, the Sturbridge Host Hotel went into
19  default of its debt service in October 2003 and
20  thereafter paid no debt service?
21      A. Yes, except for the prior year there was
22  insufficient cash flow similar to Royall and he put
23  in hundreds of thousands of dollars. So there was
24  substantial capital investment where there hadn't

FARMER ARSENAULT BROCK LLC

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

118

1  been for a long time; and perhaps in Sturbridge two
2  or three years, I would guess there are millions of
3  dollars that he has invested into properties that
4  he's, quote, given back to Lennar after the cash
5  flow became insufficient to service the debt.
6      Q. That wasn't my question. Let me rephrase
7  it to be clear.
8          After the borrower on the Sturbridge
9  Hotel went into default and stopped making loan
10 payments, Mr. Fineberg did not put any additional
11 money into the property, did he?
12     A. Not any additional money, that is correct.
13     Q. Similarly, with respect to Lancaster, after
14 the borrower went into default, Mr. Fineberg did not
15 put any money into that property, correct?
16     A. Any additional money into that property,
17 yes, sir.
18     Q. By additional, you mean in addition to the
19 money that he put into the property before the
20 default, correct?
21     A. Sufficient to make debt service payments
22 for a lengthy period of time, yes.
23     Q. I'm referring to the period after debt
24 service payments stopped. Are you with me?

119

1      A. Not by choice.
2      Q. After Lancaster --
3      A. Yes, he did not put additional money.
4      Q. Instead he gave back the keys and walked
5  way, correct?
6      A. Yes.
7      Q. Before lunch, did you tell me everything
8  that you said to Mr. Warshaw and he said to you
9  during the second conversation that you had with him
10 which you placed at the end of August 2004?
11     A. As I said to you, I'm not quite sure.
12 There's a bit of a merger in my mind. I had a
13 couple of calls. There may have been a third. I
14 think there were two telephone calls. One of them
15 was a little bit shorter than the other. Certainly
16 if I could -- the sum and substance of what I told
17 you with respect to both calls were had during the
18 first and/or second telephone call, yes, sir, in
19 their entirety.
20     Q. During the second telephone call at the end
21 of August, did you give Mr. Warshaw Joe Donovan's
22 name, title and phone number?
23     A. He already had it, sir.
24     Q. How did he already have it, do you know?

120

1      A. He had already been in touch with him, I
2  think. That was the contact person from the
3  servicer that came over with the information.
4  That's who he corresponded with as well.
5      Q. Do you yourself know whether Mr. Donovan
6  actually ever spoke to Mr. Warshaw?
7      A. No, I don't.
8      Q. Did you tell Mr. Warshaw during that second
9  conversation that after you met with Gerry the next
10 day you would get back to him?
11         MR. McGLYNN: Objection.
12     A. I said that we would -- I was meeting with
13 Gerry the next day and would get the prenegotiation
14 letter signed and then I would get back to him.
15     Q. Did you subsequently have any other
16 conversations with Mr. Warshaw?
17     A. I believe I did not. I'm not sure how I
18 learned that he, that the file had been assigned
19 from him. I don't know. I don't recall. I think
20 the answer is no, I did not get any subsequent
21 telephone call.
22     Q. Well, I think you said you left the second
23 call that you would get back to him. Did you at
24 some point try to get back to him?

121

1      A. No.
2      Q. Why not?
3      A. My memory is, I could be wrong. It could
4  have been he that called me to tell me that.
5  Sitting here today, I don't believe that's what
6  happened. I believe that somebody from Lennar, I
7  was advised that somebody from Lennar told me that
8  Mr. Warshaw was no longer on the case and there
9  would be somebody new assigned and that we would be
10 hearing from somebody, quote, new.
11     Q. Did you yourself ever have any conversation
12 with the new asset manager who was assigned to this
13 loan after Mr. Warshaw?
14     A. I believe a brief telephone call, yes.
15     Q. And who was that with?
16     A. I believe Mr. Polcari.
17     Q. When did you talk to Mr. Polcari?
18     A. Again, I hope I'm not stretching. But I do
19 believe that there was a brief telephone call. I
20 just don't recall. I don't recall sufficiently that
21 call. I don't want to speculate, sir.
22     Q. Does that mean you think you may have
23 talked to Mr. Polcari but you really can't remember?
24     A. I think I may have talked to Mr. Polcari.

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

---

122

1  But my memory, sitting here today, is that it was so
2  brief that it was -- I don't even remember if his
3  name was Joe Polcari and I'm getting confused with
4  subsequent discussions that I had with him in
5  connection with our mediation. I think it was --
6  the answer is I don't remember, sitting here of my
7  own memory, that he and I talked, other than in
8  mediation subsequently.
9      Q. Mr. Warshaw has notes of a conversation
10 with you on September 7, 2004.
11     A. Mm-hmm.
12     Q. Do you recall talking to Mr. Warshaw on or
13 about September 7, 2004?
14     A. That could have been then, as I said
15 before, a third telephone call that I had with him.
16 I remember I talked to him at least twice. It could
17 have been three times.
18     Q. Was the substance of your conversations
19 with Mr. Warshaw that you told me about this morning
20 meant to reflect the entirety of your conversation
21 with him, whether they took place during two calls
22 or three?
23     A. Yes. That is what I thought I said. I
24 just wasn't sure where the demarcation between one

---

123

1  and the other would be.
2      Q. In any of your conversations with
3  Mr. Warshaw, did you request of him that the
4  borrower have access to the reserve accounts to pay
5  debt service?
6      A. I think in the first telephone call there
7  was mention of, as I indicated, the various reserve
8  accounts and that we intended to access them. But
9  because the debt service account was quantifiable,
10 was a small amount, it was one of the reasons that
11 we needed to get the discussions going. Once again,
12 he said he didn't know what they were or didn't have
13 the documents. There was certainly a discussion
14 about reserves. It didn't go anywhere because it
15 was too early in his process, he said.
16     Q. Do you recall in your final conversation
17 with Mr. Warshaw that he told you that based on his
18 review of the file there were defaults under the
19 loan and that the borrower would not be eligible to
20 draw on the reserves as long as the loan was in
21 default?
22     A. No, that didn't happen.
23     Q. And do you recall that you responded that
24 the loan was not in default and that he had better

---

124

1  look at the loan documents again?
2      A. That's a little confounding. It was very
3  clear from the questions that I was putting to him
4  that he had not had an opportunity yet to review the
5  loan documents. It was we who were looking forward
6  to accessing reserve accounts about which he did not
7  know about in the first call and in the second call
8  he realized there was. He did not, nor did he have
9  the time to review -- it is an inconsistent position
10 to take.
11          He did not know enough about it. The
12 only discussion, as I reflected before, that we had
13 was whether or not the tenant leaving might have
14 been a default. He raised that. I said no, no,
15 that's not the deal. I said we set aside some of
16 the money for debt service payments. He said: I
17 can look at the loan documents.
18     Q. Do you recall any discussion with
19 Mr. Warshaw about the failure of the borrower to pay
20 real estate taxes at the beginning of August?
21     A. There was no discussion about that. That's
22 just....
23     Q. I appreciate that you can't remember
24 whether you had two or three conversations with

---

125

1  Mr. Warshaw. Can you tell me, how did your last
2  conversation with Mr. Warshaw end, whether it was
3  your second or third call? I think you told me that
4  your second call ended that you would get back to
5  him. Do you have any further memory beyond that?
6          MR. McGLYNN: I'm going to object. Can
7  you break that down, Bruce? I found it really hard
8  to follow.
9          MR. FALBY: Sure.
10         MR. McGLYNN: Thank you.
11     Q. Is the last thing that you remember saying
12 to Mr. Warshaw the statement that you testified to
13 that at the end of the second call you said you
14 would be getting back to him?
15     A. I think that's not what I said. What I
16 said was I was going to see Gerry -- during the
17 second call I'm clear that it was then that the
18 subject of this prenegotiation letter had come up
19 and I had a copy of it. I said that I had reviewed
20 it. I had a whole lot of experience with Lennar. I
21 looked at it. It was appropriate. I was going to
22 see Gerry the next day and we were going to sign it.
23 I would sign it and get it out to him.
24         I might have said -- I thought what I

---

FARMER ARSENAULT BROCK LLC

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

126

1  said before was that I might have said I will call
2  you back, but I thought it was simply I'll get that
3  back to you. It was the prenegotiation letter that
4  my memory is that the end of that discussion focused
5  on. There might have been another call.
6     **Q. Is that the last thing you recall saying to**
7  **Mr. Warshaw in that conversation?**
8     A. In that discussion, yes.
9     **Q. Is there any other discussion that you**
10 **remember ending a different way?**
11    A. Yeah. The discussion, whichever was the
12 last discussion, was our proposal, I believe,
13 waiting for him to respond to let us know whether he
14 could come up to Boston either before, hopefully
15 before Labor Day, but as quickly as after possible
16 to have a meeting. I think that option was left --
17 that was left open for him to become sufficiently --
18 he didn't have the stuff yet. He had to look at the
19 loan documents. He had to talk to the lawyers to
20 see what these accounts were. There were millions
21 of dollars involved. It was clear we wanted that to
22 be productive.
23        The last thing I remember, therefore, is
24 that simply we were -- I was waiting for him to, for

127

1  the two of us or somebody to arrange with him that
2  follow-up meeting, which we both had discussed would
3  happen as soon as he was available and had enough
4  knowledge so that that would be productive. That
5  was the end of whatever the last call was.
6     **Q. What did he say on that subject?**
7     A. Just that he was going to get back to us
8  and let us know when he would come up or if he was
9  coming up or whether the meeting was down there.
10 Before we met, he had to get sufficiently familiar
11 with the file so that it could be productive.
12    **Q. Did you have any discussion with**
13 **Mr. Warshaw about his reviewing the loan documents**
14 **with counsel?**
15    A. Yes. He said he was going to review
16 documents. He had to go back and become familiar
17 with the documents and review them with counsel.
18    **Q. When did he say that?**
19    A. Whatever was -- I believe that was -- if I
20 had three calls, it was the second and third calls.
21 Otherwise, it was the second call.
22    **Q. If you had three calls, when was the third**
23 **call?**
24    A. I think it was just before or after Labor

128

1  Day.
2     **Q. And then what happened next with**
3  **Mr. Warshaw?**
4        MR. McGLYNN: Objection as to the form.
5     **Q. With respect to your communications with**
6  **Mr. Warshaw, did you ever talk to him again?**
7     A. I don't think so. I think we covered the
8  full discussions that I have had with him.
9     **Q. When and how did you learn that he was no**
10 **longer the asset manager on this loan?**
11       MR. McGLYNN: Objection.
12       You may answer.
13    A. I don't believe it was by call from him. I
14 believe it was somebody who called and told me. I
15 just was advised.
16    **Q. Do you remember who?**
17    A. Yes, I do.
18    **Q. Who?**
19    A. I don't want to get into this. I don't
20 want to get into a question of my waiving. I had a
21 call that provided that information generally by my
22 client.
23    **Q. Thereafter, did you have any discussion**
24 **with anybody who worked for Lennar -- I have asked**

129

1  **you about Joe Polcari, but did you talk to anybody**
2  **else from Lennar after that about Blue Hills Office**
3  **Park?**
4        MR. McGLYNN: Other than Mr. Warshaw and
5  Mr. Polcari?
6        MR. FALBY: I think so.
7     **Q. Let me make sure you know what I'm asking.**
8  **I think you've now told me everything that you can**
9  **remember about the two or three conversations that**
10 **you had with Mr. Warshaw, right?**
11    A. Yes.
12    **Q. The last of which took place either right**
13 **before or right after Labor Day of 2004, correct?**
14    A. That's my recollection, yes, sir.
15    **Q. You already told me you don't have any**
16 **recollection of ever talking to Mr. Polcari, at**
17 **least prior to the loan foreclosure, correct?**
18    A. No, that's not what I said. I said I don't
19 have any present memory. I may have had a brief
20 discussion with him. But I'm not sufficiently sure
21 to say that I did or did not.
22    **Q. Okay. I thought you ended up saying that**
23 **you have no recollection of any discussion.**
24    A. I'm not sufficiently sure to go one way or

43 (Pages 166 to 169)

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

166

1  agreement, not Exhibit 177, but based on the
2  settlement agreement you can tell me that the
3  account referenced on the first page of Exhibit 177
4  is actually in the name of Blue Hills Office Park
5  LLC?
6         MR. McGLYNN: Objection.
7         A. I told you five times that I don't know in
8  what name it is. It could be Bernkopf Goodman &
9  Baseman, clients funds, which I believe it is. I
10 can't give you the exact name. I know it is not
11 Royall Associates. I know it is not Gerald Fineberg
12 nor Kenneth Goldberg nor Bruce Falby.
13        Q. You seem to know it is Blue Hills Office
14 Park LLC?
15        A. No. Once again, asking me the same
16 question 15 times won't change it. I don't have the
17 account record here. It is in a Bernkopf Goodman
18 clients funds account, the title of which I don't
19 know here. But I know we were accounting for it in
20 the same manner and for the same client as it was
21 originally received pursuant to the agreement.
22        Q. How do you know that?
23        A. Because I have an agreement and it is
24 signed. It says the payments go to Blue Hills

167

1  Office Park LLC. And that money went into our IOLTA
2  account and went directly in. And it was not -- it
3  just went directly from there into that account. It
4  stayed the same. It hasn't changed. That's how I
5  know.
6         Q. How do you know it didn't go from an IOLTA
7  account to an account set up for the benefit of
8  Royall Associates Realty Trust?
9         A. Because I'm the one that had custody of
10 that at my office and directed it. I never received
11 the direction that it be distributed. It stayed the
12 same.
13        Q. From whom do you take direction about
14 distributing the money of Blue Hills Office Park
15 LLC?
16        A. It would have to come from money that's in
17 escrow from Andrew Cohn and counsel to Fineberg on
18 behalf of the owners consenting to a change or all
19 of the owners telling me what to do, not one half,
20 not the other half. It was a mechanism to assure
21 that money stayed for the benefit of the entity
22 and/or the parties entitled to it.
23        Q. If you are so sure as the escrow agent of
24 the $2 million payment for whose benefit it was

168

1  being held, how come you don't know as the escrow
2  agent for whose benefit the $2.2 million is being
3  held?
4         MR. McGLYNN: Objection.
5         A. Because I'm not an accountant. That money
6  was not in my jurisdiction or my control from the
7  time it was generated.
8         Let's make it easy. That money came
9  from operations. I think that you have a
10 misunderstanding, sir, of, once again, where this
11 money came. The money came very clearly, the 2.2
12 came from the operation of the property. It was
13 from money in the lockbox account that was
14 distributed out. The point of the matter is,
15 whether or not when it was distributed out and the
16 money went into the account and ultimately ended up
17 here, did that in the interim get transferred. The
18 answer is I wouldn't know. It was not in my care or
19 custody simply from the beginning. That money came
20 from and it was generated from the tenant to Wells
21 Fargo, went through the accounts and distributed to
22 BHOP LLC.
23        In that process Bernkopf Goodman did not
24 have care, custody, control over any of that money.

169

1  We ended up with it in a manner of how to implement
2  the disposition of those funds. But from the time
3  the money was generated it was out of Bernkopf
4  Goodman's control.
5         Different: The $2 million came pursuant
6  to an agreement for the benefit of Blue Hills Office
7  Park into in fact an account, defined account,
8  separate account into our clients funds account and
9  has continued to stay there. I have never received
10 notice or direction that there's been a distribution
11 or change of rights of ownership of that asset,
12 period. That's the difference.
13        Q. And when did you get the 2.2 million of
14 monies that were also in the supplemental account
15 held by you as escrow agent?
16        A. Sometime prior to December 31st, 2004.
17        Q. You don't remember when or how or from
18 whom?
19        A. Not with enough specificity. It came from
20 the operating accounts. I don't know the answer to
21 that.
22        Q. Do you have any written memorialization in
23 any form of any of your conversations with Joe
24 Warshaw, contemporaneous, I mean?

44 (Pages 170 to 173)

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

---

170

1    A. No.
2    **Q. Your answer to who now controls the $2**
3    **million sitting in two separate accounts, one at**
4    **Bernkopf and one at Wilmer Hale, is that it is**
5    **subject to the December 31, 2004 agreement?**
6    A. Yes. I don't know that there's been any
7    agreement -- sitting here I don't recall that
8    there's been an agreement modifying it.
9    **Q. What's the fourth page of Exhibit 177?**
10   A. It just appears to be an acknowledgement of
11   the transfer from -- I just think this relates to
12   this account, the money was transferred, that we
13   were holding a million dollars to Danvers Bank
14   because there was a greater rate of interest there.
15   **Q. Did it get then transferred back to Century**
16   **Bank?**
17   A. I don't think so. I can't answer. This is
18   a process question. We may have wired into a
19   Bernkopf account at Danvers from which they open a
20   subaccount. I think that's the process that this
21   bank does. You have some posting of interest. I
22   think what it looks like happened, if I had to
23   guess, for a short period of time there was some
24   interest earned and it got posted later and opened

---

171

1    into a money market to earn greater interest. I
2    think from month to month the kind of accounts that
3    pay the higher interest rates changes.
4    **Q. Is the million dollars of holdback, what**
5    **you say is the settlement payment, now being held at**
6    **Danvers Bank?**
7    A. I believe that money is still at Danvers
8    Bank.
9    **Q. Transferred there from Century Bank on**
10   **April 5, 2005?**
11   A. I think so. That certainly appears -- I
12   think what happens, if you look at the third page,
13   Bruce, not to presume a first-name basis -- I think
14   you have to transfer it into a master account from
15   which the other is opened. You have got a transfer
16   on 4/1 to the Danvers Bank. You have got a
17   reference into an account to where it was earning
18   money and then a money market account to get a
19   higher rate of interest. You can see if you track
20   it the exact same amount went from one place to
21   another at the Danvers Bank.
22   **Q. In light of all that, I have to ask you to**
23   **explain the same answer to the interrogatory that I**
24   **showed you earlier that's contained in Exhibit 323.**

---

172

1    **On Page 14, the last line it says: "The intrabank**
2    **transfer referenced in these documents between**
3    **Century Bank and Danvers Bank was unrelated to the**
4    **payment."**
5        **Do you have any idea what that means?**
6    A. I have to go back and reread -- how do I
7    find the question? Here it is.
8        MR. FALBY: Did you just write him a
9    note, Peter?
10       MR. McGLYNN: No.
11       MR. FALBY: It sure looked like it.
12       MR. McGLYNN: I'm making notes to
13   myself. If you want to take a look, I've made all
14   sorts of notes on all these documents, including
15   this. If you would like, if you want to go off the
16   record I'll provide an explanation for that.
17       MR. FALBY: I'm not interested. I would
18   like to hear Mr. Goldberg's explanation.
19       MR. McGLYNN: I'm not sure Mr. Goldberg
20   provided any assistance in preparing these
21   documents. He may not know precisely what was
22   intended.
23       THE WITNESS: I think this is the same.
24   A. What am I missing?

---

173

1    **Q. Your explanation was plausible. I'm**
2    **wondering why it is that we have been told that the**
3    **Danvers Bank transfer has nothing to do with the**
4    **payment.**
5    A. I'm sorry. The last sentence?
6    Q. Yes.
7    A. It is wrong. I think it is just wrong. I
8    think it is as simple as that.
9    **Q. That clears that up. Can you read the last**
10   **page of Exhibit 177?**
11   A. Can I what?
12   **Q. Read it. Mr. McGlynn is trying to hide its**
13   **contents.**
14   A. Mr. Falby, that is a terrible thing to say.
15       MR. McGLYNN: Objection.
16   **Q. I said it in jest. It appears to have been**
17   **highlighted. In the copy it is hard to read.**
18       MR. McGLYNN: I got that from Attorney
19   Cohn. This is a Wilmer Cutler account.
20   A. The answer is no. Can you? Can you read
21   it?
22   **Q. The answer is no. We are still on the**
23   **record.**
24       MR. McGLYNN: This came from Attorney

---

FARMER ARSENAULT BROCK LLC

EXHIBIT 7

William J. Langelier                                         03/10/2006

CONFIDENTIAL

```
 1                  UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3                         --oOo--
 4    BLUE HILLS OFFICE PARK, LLC,          )
                                            )
 5       Plaintiff/Defendant-in-Counterclaim )
                                            )
 6          vs.                             )Civil Action No.
                                            )05-CV-10506(WGY)
 7    J.P. MORGAN CHASE BANK, as Trustee for )
      the Registered Holders of Credit       )
 8    Suisse First Boston Mortgage Securities)
      Corp., Commercial Mortgage Pass-Through)
 9    Certificates, Series 1999-C1,          )
                                            )
10       Defendant                          )
                                            )
11    and CSFB 1999-C1 ROYALL STREET, LLC,  )
                                            )
12       Defendant/Plaintiff-in-Counterclaim )
                                            )
13    and                                   )
                                            )
14    WILLIAM LANGELIER and GERALD FINEBERG, )
                                            )
15       Defendants-in-Counterclaim         )
      _____)
16
17          DEPOSITION OF WILLIAM J. LANGELIER
18       _____
19       Friday, March 10, 2006  (Pages 1 - 277)
20       (Pages 149-151 were marked CONFIDENTIAL)
21       (Pages 232-276 were marked CONFIDENTIAL)
22
23    REPORTED BY:  CYNTHIA A. PACINI, CSR #6117, RMR, CRR
24    (03-378689)
25
```

Page 38

1    A.   That I had certainly review capacity, but I
2  think Mr. Goldberg took the lead on that.
3    Q.   Blue Hills Office Park was the first and only
4  deal you've ever done with Mr. Fineberg?
5    A.   Correct.
6    Q.   I saw reference in the documents to
7  investments that you made in conventionally financed
8  apartments and office buildings of some $150 million
9  during the years 1983 to 1986; is that accurate?
10    MR. McGLYNN:  That you saw that?
11    MR. FALBY:  I'll rephrase the question.
12    Q.   Did you invest in conventionally financed
13  apartments and office buildings from 1983 through 1986
14  approximately $150 million?
15    A.   I don't know where you got that number;
16  however, it -- that might have related to equity
17  investments that were not all my money.  It was probably
18  99 percent third-party high net worth investor money.
19    Q.   I didn't mean to imply it was your money.
20    A.   Yeah, but that's entirely possible, yeah.
21    Q.   And then what have you done since 1999?
22    A.   Relative to?
23    Q.   Well, I know in 2001, you co-founded Kipling
24  Partners, LLC; correct?
25    A.   Correct.

Page 39

1    Q.   And that's a real estate co-investment firm
2  focused on income producing properties?
3    A.   Correct.
4    Q.   You invest other people's money, but you
5  co-invest with them at the same time?
6    A.   Correct.
7    Q.   With your partner whose name is?
8    A.   Richard Hake.
9    Q.   What did you do from '99 through 2001?
10    A.   Primarily invested for my own account with --
11  and watched over my existing portfolio.
12    Q.   So as of 1999, you had close to 30 years
13  experience in real estate, did you?
14    A.   That's correct.
15    Q.   And that encompassed all areas of real estate
16  including acquiring, developing, investing, financing
17  and disposing of properties?
18    A.   Pretty much so, yeah.
19    Q.   And as of 1999, you'd also been through the
20  recession of the early '90s?
21    A.   That's correct.
22    Q.   Which had given you firsthand experience with
23  defaulting on loans from lenders?
24    A.   Absolutely.
25    MR. McGLYNN:  Objection.

Page 40

1    MR. FALBY:  Q.  Which led to that Shawmut
2  lawsuit that I've asked you about?
3    A.   That is correct.
4    MR. McGLYNN:  Are we going to move on?
5    MR. FALBY:  I'm getting there.
6    MR. McGLYNN:  One of these days.
7    MR. FALBY:  Q.  You knew from experience --
8  you knew from your experience that the rights of a
9  borrower are governed by the loan documents, did you?
10    MR. McGLYNN:  Objection.
11    THE WITNESS:  Answer it?
12    MR. FALBY:  Yeah.  He's objecting for the
13  record.
14    THE WITNESS:  Oh, I thought -- see, I'm
15  inexperienced at this stuff.  I guess that's correct,
16  yeah.
17    MR. McGLYNN:  I don't want you to guess.
18    THE WITNESS:  Okay.  Would you rephrase --
19  would you ask me the question again, please, Mr. Falby?
20    MR. FALBY:  Q.  Sure.  As of 1999, you knew
21  from your experience including your experience with the
22  recession of the early '90s that the rights of a
23  borrower are governed by the loan documents it enters
24  into with its lenders; correct?
25    MR. McGLYNN:  Objection.

Page 41

1    THE WITNESS:  I just can't give you a
2  yes-or-no answer on that.
3    MR. FALBY:  Q.  Why not?
4    MR. McGLYNN:  Objection.
5    THE WITNESS:  Because I believe that there are
6  a lot of rights that borrowers have that are not in
7  writing in the loan documents.
8    MR. McGLYNN:  May I interrupt because I know
9  he's answered the question.
10    Does it make sense to take about a two-minute
11  break while your associate over there is opening all
12  those boxes?  It's a little bit disturbing.  About two
13  minutes.
14    MR. FALBY:  It's not disturbing me, but I
15  don't care.
16    MR. McGLYNN:  It's disturbing to me.  Actually
17  I can't focus in --
18    THE WITNESS:  Actually I need to take a
19  bathroom break if you don't mind.
20    MR. FALBY:  Okay.
21    MR. McGLYNN:  Two minutes.
22    (Recess taken from 9:56 to 9:59 a.m.)
23    MR. FALBY:  Q.  Back on the record.  As of
24  1999, Mr. Langelier, is it fair to say that when you
25  negotiated a loan with a commercial mortgage lender, you

Page 46

1  general partners of Royall Associates -- I think we
2  already went through this -- were you and Mr. Fineberg?
3      A.  I believe that's correct.
4      Q.  And eventually you each admitted some other
5  general partners with some minority stakes?
6      A.  I believe that's correct.
7      Q.  And by 1999, you had a mortgage loan with what
8  institution?
9      A.  Sanwa Bank.
10     Q.  And the maturity of that loan was June 30,
11  1999, was it?
12     A.  I don't recall, but it sounds about right.
13     Q.  Do you recall that when you went to Credit
14  Suisse to refinance, the maturity of the Sanwa loan had
15  come and gone?
16     A.  No.
17     Q.  What were the circumstances under which you
18  went to Credit Suisse?
19     A.  The loan -- the circumstances were that the
20  tenant extended the lease for five years and post lease
21  extension, we were then likely to be able to put a new
22  loan on the property because the rent had been
23  increased.
24     MR. FALBY:  All right.  Let me mark as the
25  next exhibit a series of documents, Bates stamped BLUE

Page 47

1  HILL 5454 through 5470.
2      (Whereupon, Deposition Exhibit 164 was
3  marked for identification.)
4      MR. FALBY:  Q.  Do you recognize Exhibit 164
5  as documents you produced in this case from the Blue
6  Hills file?
7      A.  Yes.
8      Q.  Exhibit 164 contains documents and information
9  that you were providing in connection with the Credit
10  Suisse refinancing?
11     A.  That's correct.
12     Q.  And the cover letter is from you to Mr. --
13  strike that.
14     The cover letter is from you to Ms. Kendall
15  Simmons --
16     A.  Correct.
17     Q.  -- of the Situs Companies, S-i-t-u-s?
18     A.  Correct.
19     Q.  And what was the Situs Companies?
20     A.  I believe they were a due diligence company
21  hired by Credit Suisse.
22     Q.  Can you turn, please, to the page Bates
23  stamped BLUE HILL 5460.
24     A.  Yeah.
25     Q.  You see this contains an explanation of

Page 48

1  delinquencies, defaults, foreclosures or deeds in lieu
2  of foreclosure occurring during the previous ten years?
3      A.  Right.
4      Q.  And your explanation is contained in the
5  second paragraph?
6      A.  Right.
7      Q.  The last sentence states, "The subject
8  property, Blue Hills Office Park, was never in default
9  or delinquent through the maturity of the note on
10  June 30, 1999."
11     A.  Yes.
12     Q.  Does that refresh your memory that the Sanwa
13  note matured on June 30, 1999?
14     A.  Yes.
15     Q.  By the time you went to Credit Suisse, the
16  maturity date on that note had come and gone?
17     A.  Yes.
18     Q.  And you were, in fact, in default of that loan
19  as of August 30, 1999?
20     MR. McGLYNN:  Objection.
21     THE WITNESS:  I wasn't aware that we were in
22  default because we might have had extensions from Sanwa,
23  but I wasn't aware of whether we were in default or not.
24  Certainly, at that time, I wouldn't have made that
25  statement had we been in default.

Page 49

1      MR. FALBY:  Q.  Well, I ask the question
2  because the statement is carefully phrased to say that
3  you were never in default through the maturity of the
4  note on June 30, 1999.
5      Do you see that?
6      MR. McGLYNN:  Objection.
7      THE WITNESS:  Yes.
8      MR. FALBY:  Q.  Which caused me to conclude
9  that after the maturity date, you were probably in
10  default.  But your testimony is you don't know whether
11  you were or not?
12     A.  Yes.
13     Q.  On the next page, BLUE HILL 5461.
14     A.  Yes.
15     Q.  You made various statements here under the
16  penalty of perjury, did you?
17     A.  Yes.
18     Q.  And among other things, you said, "The
19  undersigned, the borrowing entity, and its related
20  entities, have not been or are not currently a party to
21  any lawsuits other than a slip and fall lawsuit."
22     Do you see that?
23     A.  Yes.
24     Q.  As of August 30, 1999, in fact, you had in the
25  past been a party to at least one lawsuit with

13 (Pages 46 to 49)

William J. Langelier

CONFIDENTIAL

Page 78

1    Q.   Did you know at the time that the loan was
2    being negotiated that it would be syndicated after the
3    closing?
4    A.   No.
5    Q.   Did you know --
6    A.   Oh, my apologies.  Yes.  Given the nature of
7    the conduit loan, I knew that, yes.
8    Q.   You knew that Credit Suisse would soon after
9    the loan closed --
10   A.   Correct.
11   Q.   -- assign it to a loan pool?
12   A.   That's correct.
13   Q.   For syndication?
14   A.   Correct.  Correct.
15   Q.   And that Credit Suisse would no longer be
16   involved with the loan after its assignment thereof?
17   A.   That is correct.
18   Q.   Were you involved in discussions with the
19   building's sole tenant, Equiserve, directed toward
20   trying to get them to stay in the building?
21   MR. McGLYNN:  Can we have a time frame, Bruce,
22   please?
23   MR. FALBY:  Certainly.  In 2002 and 2003.
24   THE WITNESS:  I'm going to ask you to please
25   repeat that.

Page 79

1    MR. FALBY:  Q.  Sure.  You've told us already
2    that Equiserve's lease was going to run out on July 31,
3    2004; correct?
4    A.   Correct.
5    Q.   And Equiserve was the only tenant in the
6    building?
7    A.   Correct.
8    Q.   And obviously if you could get them to stay,
9    that's what you would like to do?
10   A.   Correct.
11   Q.   And efforts were made that Mr. Frank told me
12   about to try to get them to stay either by selling them
13   the building or by extending their lease?
14   A.   Correct.
15   Q.   Were you involved in those efforts?
16   A.   Brief discussions -- general discussions with
17   Mr. Frank as to what he was doing, mostly after the
18   fact.  You know, we're going to try to sell the building
19   to Equiserve.  Let's see what we could do.  And then
20   meetings happened and then he would report back to me
21   with how the meeting went, in general terms.  Very
22   general terms.
23   Q.   Did you ever meet with Equiserve yourself?
24   A.   No.
25   Q.   This was all related to you by Mr. Frank?

Page 80

1    A.   Correct.
2    Q.   Turn back to the loan documents in 1999 with
3    Credit Suisse.
4    A.   Sure.
5    Q.   Blue Hills Office Park -- at the -- strike
6    that.
7         From the Credit Suisse loan proceeds, Blue
8    Hills Office Park received approximately $5.2 million;
9    correct?
10   A.   Correct.
11   Q.   That was the amount left over after Sanwa --
12   A.   Sanwa.
13   Q.   -- Sanwa was repaid and various expenses were
14   paid as well?
15   A.   Correct.
16   Q.   And that $5.2 million was then distributed,
17   was it, to the beneficiaries of the Royall Associates
18   trust; that is, you and Mr. Fineberg?
19   A.   It was partially distributed, and there were
20   other monies set aside in reserve.  Voluntary reserves
21   that were not required by the lender.
22   Q.   How much money -- strike that.
23        What amount of the loan proceeds did you
24   receive?  In other words, what amount was distributed to
25   you?

Page 81

1    A.   About approximately $2 million.  I believe
2    that's the right number.  In that range.  And we
3    reserved approximately a million dollars as well.  Rainy
4    day reserve, shall we say.
5    Q.   Blue Hills Office Park, LLC, was formed in
6    connection with the loan closing to be the new owner of
7    Blue Hills Office Park; correct?
8    A.   The LLC, that's correct, yeah.  We were
9    modernizing the documentation.
10   Q.   And Royall Associates Realty Trust, which had
11   owned the office park up to that point, deeded the
12   property to the new LLC?
13   A.   I believe that's what we did.
14   Q.   And the Royall Associates Realty Trust became
15   the sole member of the LLC?
16   A.   I believe that's right.
17   Q.   And to meet a requirement of the bank, an
18   additional trustee of the realty trust was appointed?
19   A.   I believe I recall that happening as well.
20   Q.   And that was Blue Hills Management Corp.?
21   A.   I believe that's right.
22   Q.   And that management corp. had to have a single
23   independent director, did it?
24   A.   I believe that's right.
25   Q.   And that became Susan Daly?

21 (Pages 78 to 81)

CONFIDENTIAL

Page 98

1    Obviously, you're a 50 percent joint venture
2  partner in this deal; right?
3    A.  Right.
4    Q.  You've got your joint venture partner running
5  it day-to-day?
6    A.  Correct.
7    Q.  You're not keeping up on the day-to-day
8  details; that's their job?
9    A.  Correct.
10    Q.  But you obviously have an interest in the
11  property; right?
12    A.  Correct.
13    Q.  So it seems to me you'd want to be involved in
14  major decisions.
15    A.  Correct.
16    Q.  And I'm just curious how that came about, the
17  mechanics of that.
18    Did Mr. Frank know to consult you?  Was there
19  ever any discussion about it, or did it just kind of
20  happen?
21    MR. McGLYNN:  Objection.  You want to break
22  that up maybe a little bit, Bruce?
23    MR. FALBY:  I think he understands my
24  question.
25    Q.  You want me to rephrase it, or do you know

Page 99

1  what I'm asking?
2    MR. McGLYNN:  You have the right at any time
3  to ask that the question be repeated, Bill.
4    THE WITNESS:  If you could narrow that
5  question down a little bit.  My problem is it's so
6  general.  I'd appreciate it.
7    MR. FALBY:  Well, you wanted to be
8  involved in major decisions; correct?
9    A.  Yes.
10    Q.  Did you tell Mr. Frank that?
11    A.  No.
12    Q.  Did you understand that Mr. Frank knew that?
13    A.  No.  It was an unwritten -- it was an
14  unwritten style.  I mean, if we're partners, I don't
15  have to remind him verbally that I have to be involved.
16  It's a courtesy that's extended on both sides of the
17  joint venture.
18    Q.  Another way of saying, is that it's obvious
19  that --
20    A.  Well said.
21    Q.  -- one joint venture partner is going to
22  consult with the other on major decisions affecting the
23  property?
24    A.  That's right.
25    Q.  And your communications were with Mr. Frank

Page 100

1  rather than your true joint venture partner,
2  Mr. Fineberg, because you were no longer talking to him;
3  correct?
4    MR. McGLYNN:  Objection.
5    THE WITNESS:  That's not the real reason.
6    MR. FALBY:  Q.  What was the real reason?
7    A.  It was just easier because Dan was more
8  accessible than Jerry.  Jerry was a busy -- and is a
9  very busy man.
10    Q.  Did you ever attempt to talk to Jerry Fineberg
11  about any decisions facing Blue Hills Office Park at any
12  point after the Credit Suisse refinancing?
13    A.  No.
14    Q.  In any event, you were in agreement with the
15  proposal that Mr. Frank made in Exhibit 168?
16    A.  I was fundamentally in agreement with it,
17  that's correct.
18    Q.  And Mr. Frank sent out the proposal only after
19  consulting with you?
20    MR. McGLYNN:  Objection.
21    THE WITNESS:  He sent the proposal out only
22  after discussing in concept what he was going to
23  propose, but not the specifics of this letter, I don't
24  believe.  I don't recall seeing this letter before it
25  went out, but I don't think I did.

Page 101

1    MR. FALBY:  Q.  When you saw the letter after
2  it went out, was there anything in the letter that was
3  inconsistent with your discussion with Mr. Frank?
4    A.  No.
5    Q.  Mr. Frank subsequently informed you that
6  Equiserve had declined the proposal contained in
7  Exhibit 168?
8    A.  I believe that is correct, and I believe there
9  was a letter from Equiserve to that effect.
10    MR. FALBY:  Can we have the volume with
11  Exhibit 38 in it?
12    MR. McGLYNN:  Would you like him to turn to
13  Exhibit 38?
14    MR. FALBY:  I sure would.
15    MR. McGLYNN:  And here it is.
16    MR. FALBY:  Q.  I'm showing you Exhibit 38,
17  which is an e-mail in which Equiserve informed Fineberg
18  Management that it was not interested in purchasing Blue
19  Hills Office Park.
20    Do you know whether you saw this e-mail at the
21  time?
22    A.  I just can't recall.  I may have.  I just
23  can't recall.
24    Q.  In any event, you learned from Mr. Frank
25  through some means --

26 (Pages 98 to 101)

William J. Langelier

CONFIDENTIAL

Page 106

1  the special permit application.  Have you ever seen that
2  before?
3      A.  No.
4      Q.  At some point, did somebody at Fineberg
5  Management tell you that Equiserve was planning on
6  moving next door to 250 Royall Street?
7          MR. McGLYNN:  Somebody from Fineberg
8  Management, Bruce?  I'm not sure I heard you correctly.
9          MR. FALBY:  Q.  At some point, did you learn
10  from Fineberg Management that Equiserve was planning to
11  move next door to 250 Royall Street?
12      A.  Yes.
13      Q.  When did you learn that?
14      A.  I don't recall.
15      Q.  Did you learn that Equiserve or a related
16  entity had entered into a purchase and sale agreement to
17  buy 250 Royall Street?
18      A.  Yes.
19      Q.  And did you learn that that purchase and sale
20  agreement was conditioned on --
21      A.  Yes.
22      Q.  -- the grant of a special permit to build a
23  parking garage?
24      A.  Yes.
25      Q.  Who were you talking to about this?

Page 107

1      A.  Andy Cohn was providing me that information
2  via Ken Goldberg.
3      Q.  Did you talk to Mr. Frank about the special
4  permit appeal or the purchase and sale agreement or
5  Equiserve's plans to move next door?
6      A.  Generally, yes.
7      Q.  Can you tell me everything you can recall that
8  you said to Mr. Frank and that he said to you on this
9  subject?
10      A.  It's a very general question, catch-all
11  question, that -- I think he just basically told me the
12  facts.
13          They plan to move next door.  They want to
14  build a parking garage that will block our view, and
15  that's, you know, pretty much the essence of what we
16  talked about.  But here Goldberg and Cohn were in the
17  loop more than I was with Dan.
18      Q.  And did Mr. Frank tell you that the parking
19  garage would increase traffic congestion in the
20  neighborhood?
21      A.  No.
22      Q.  In addition to telling you that the parking
23  garage would block your view, did he say anything about
24  the parking garage interfering with the view of the
25  office park from the highway?

Page 108

1      A.  I don't recall.
2      Q.  Do you remember anything else that Mr. Frank
3  said to you about the --
4      A.  No.
5      Q.  -- subject of the parking garage?
6      A.  No.
7      Q.  What did you say to him?
8      A.  I just don't recall specifically what I said
9  to him.
10      Q.  Did you learn from somebody that Blue Hills
11  Office Park appealed a special permit that was granted
12  to Equiserve and National Development to build a parking
13  garage?
14      A.  Yes.
15      Q.  Before that special appeal -- strike that.
16          Before Blue Hills Office Park filed the
17  special permit appeal, were you consulted?
18      A.  Through Andy Cohn.
19      Q.  Did you participate in the decision to file
20  the special permit appeal?
21      A.  Through discussions with my attorney, Andy
22  Cohn.
23      Q.  Who you understood was then talking to Ken
24  Goldberg?
25      A.  Correct.

Page 109

1      Q.  Did you talk to Mr. Frank about whether Blue
2  Hills Office Park ought to appeal the special permit?
3      A.  No.
4      Q.  And what's your understanding of why Blue
5  Hills Office Park appealed the special permit?
6          MR. McGLYNN:  And again same instruction as
7  before.  If this is information that you obtained from
8  counsel, I'm advising you -- instructing you not to
9  disclose that.  If you have an independent
10  understanding, Bill, please feel free to say it now.
11          THE WITNESS:  I don't have an independent
12  understanding other than what my discussions with Andy
13  Cohn were.
14          MR. FALBY:  Peter, you're instructing him not
15  to answer as to that?
16          MR. McGLYNN:  You agreed that you will assume
17  that instruction was always going to be followed.
18  The answer is I'm instructing him and, yes, the witness
19  will follow, I presume, my instruction.
20          THE WITNESS:  Correct.
21          MR. FALBY:  Q.  Did you talk to anybody else
22  at Fineberg Management about the appeal, whether
23  Mr. Donovan or Mr. Needle?
24      A.  No.
25      Q.  Not Mr. Fineberg, we know that?

28 (Pages 106 to 109)

William J. Langelier

03/10/2006

CONFIDENTIAL

---

Page 110

1    A.   Right.
2    Q.   No one else?
3    A.   No one else.
4    Q.   You did talk to Mr. Frank, but you've told us
5    everything about that?
6    A.   To the best of my recollection.
7    Q.   And the rest of your conversations were with
8    Andy Cohn?
9    A.   Correct.
10   Q.   Did you see the complaint appealing the
11   special permit before it was filed?
12   A.   I don't recall seeing it.
13   Q.   Do you know if Andy Cohn saw it?
14   A.   He probably did.
15   Q.   Did you discuss its content with Andy Cohn?
16   A.   Did not.
17   Q.   Have you ever seen it?
18   A.   I have not -- to the best of my recollection,
19   I've never seen it.
20   Q.   What did it say?
21   A.   Very good question.
22        MR. McGLYNN:  That's a good follow-up
23   question, Bruce.
24        THE WITNESS:  Very good.  You don't mind my
25   standing, I hope.

---

Page 111

1        MR. FALBY:  Not at all.
2        THE WITNESS:  Thank you.
3        MR. FALBY:  Q.  Were you involved in the
4    decision to settle the zoning appeal?
5    A.   Yes, through Andy.
6    Q.   Why did Blue Hills Office Park settle the
7    zoning appeal?
8        He's looking at you, Mr. McGlynn.  Are you
9    going to object?
10       MR. McGLYNN:  If he has an independent
11   understanding, other than anything that he had discussed
12   with Andy Cohn, you're certainly welcome to do it.  But
13   if it's solely on the basis of anything he had with
14   Andy -- discussion with Andy Cohn, then don't discuss
15   that.
16       THE WITNESS:  Solely on the basis on
17   discussions with Andy Cohn at this point.  Andy and Ken
18   were -- Andy would report back to me on decisions
19   relating to this, and I discussed it with nobody else.
20   Not with Dan Frank or anybody else.
21       MR. FALBY:  Q.  Well, as 50 percent joint
22   venture partner, did you approve the decision to settle
23   the zoning appeal?
24   A.   I had discussions with Andy Cohn of that --
25   that relate -- that Andy would say to me -- can I talk

---

Page 112

1    about what Andy said to me?
2        MR. McGLYNN:  The question is, did you approve
3    the decision to settle?
4        THE WITNESS:  Yes.
5        MR. FALBY:  Q.  Why?
6        MR. McGLYNN:  Same instruction; same
7    limitation.
8        MR. FALBY:  I have to ask the question.  If he
9    instructs you not to answer, that's fine.  We just have
10   to do it.
11       THE WITNESS:  Are you instructing me to answer
12   or not answer?
13       MR. McGLYNN:  Let's do it -- I'll ask it on
14   the record.
15       Is information that you need to answer that
16   question based upon your discussions with Andy Cohn?
17       THE WITNESS:  Yes.
18       MR. McGLYNN:  Then I will instruct you not to
19   divulge the substance of those discussions.  If you had
20   any independent basis to respond to that question,
21   certainly feel free to do so, Bill.
22       THE WITNESS:  Okay.  I do not have any
23   independent basis.  It was all based on my conversation
24   with Andy Cohn.
25       MR. McGLYNN:  Okay.  Then I will instruct him

---

Page 113

1    not to divulge those.
2        Now, what I will do at the next break, Bruce,
3    is I will talk with Mr. Langelier and see if we can
4    parse through some of this and maybe there's a way of
5    finding some nonprivileged communications that we can
6    divulge.  But I don't want to take that time now, but I
7    will do it at the next break.
8        MR. FALBY:  Well, so our position is clear:
9    If you're instructing him not to answer, then we would
10   obviously take the position that he would be forever
11   precluded from testifying on this subject.  So if you
12   want to suffer that consequence, then I don't have any
13   problem at all with your instruction.  I'm just trying
14   to discover what's going to be, you know, evidence in
15   this case.
16       MR. McGLYNN:  No, I understand.  And as I told
17   you, at the break, I'll see if I can parse through this.
18   I mean, I certainly don't want to have that discussion
19   on the record in front of you because it may involve in
20   total privileged communications, but let's move on.
21       MR. FALBY:  Why don't you have that discussion
22   with him now because I suspect that all of these
23   discussions about the settlement, what it was for, the
24   payment, all of this stuff, he only discussed it with
25   Andy Cohn.

---

29 (Pages 110 to 113)

William J. Langelier

CONFIDENTIAL

Page 150

1    A.   Yeah, that's right.
2    Q.   And is it your understanding that those taxes
3  became due upon the foreclosure sale?
4    A.   Correct.
5    Q.   And is that part of the damage that you're
6  claiming in this case from the foreclosure?
7        THE WITNESS:  Can I answer that question?
8        MR. McGLYNN:  You may.
9        THE WITNESS:  Yes.
10       MR. FALBY:  Q.  And what is the amount of that
11  damage?
12    A.   Well, the damage would relate to the tax
13  liability associated with the foreclosure, which I can't
14  specifically quantify for you at this point.  But I
15  believe we have somebody who will do that that is a tax
16  professional.
17    Q.   Well, I understand there's a cancellation of
18  debt aspect to a foreclosure; right?
19    A.   Correct.
20    Q.   And that produces a tax consequence; correct?
21    A.   Correct.
22    Q.   But what we've been talking about here is a
23  separate tax consequence that taxes become due upon
24  distributed cash flows that were previously treated as
25  tax deferred.

Page 151

1    A.   Taxes -- you create what they call a negative
2  capital account, and the negative capital account is the
3  amount of tax losses you've taken over the years that
4  accumulate in this so-called account that become due on
5  a foreclosure and get recaptured, if you will.
6    Q.   And do you have any idea of the amounts?
7    A.   I don't.
8    Q.   None of us are tax professionals, but do you
9  understand that the recapture of the negative capital
10  account is different than the cancellation of debt?
11    A.   Correct.
12    Q.   Are there any other components of the tax
13  loss, to your knowledge, other than cancellation of debt
14  and recapture of a negative capital account?
15    A.   Not that I could think of offhand, but I'm --
16  but there possibly are.
17    Q.   Now, did you have discussions with Dan Frank
18  about whether there were any tenant prospects for the
19  office park in July of 2004?
20    A.   Yes.
21        MR. BARNETT:  Should we go off the
22  confidentiality?
23        MR. FALBY:  Yes.
24        MR. McGLYNN:  Fine.  Thank you.
25             --oOo--

Page 152

1        MR. FALBY:  Yes.  I'll ask that question again
2  so it's unconfidentialed.
3    Q.   Did you have any discussions with Dan Frank
4  about tenant prospects in July 2004?
5    A.   In the summer of 2004 would be a better answer
6  because I'm not sure about July.  Could have been June.
7  Sometime in the summer -- spring, summer, correct.
8    Q.   And what did Mr. Frank tell you about tenant
9  prospects as of the summer of 2004?
10    A.   Well, from memory, there were -- there were a
11  variety of prospects.  Again, the best of my
12  recollection, one of them, for example, was the State of
13  Massachusetts, and there was Dunkin' Donuts and a
14  variety of people that were coming through that were
15  being shown the property by Cushman & Wakefield, I
16  believe.  But other than that, I can't specifically
17  recall.
18    Q.   Now, do you want to turn to Exhibit 42,
19  please?  Did you receive the marketing update from
20  Cushman Wakefield dated July 21, 2004, that is marked
21  Exhibit 42?
22        MR. McGLYNN:  At any time?
23        MR. FALBY:  No, at or around July 21, 2004.
24        MR. McGLYNN:  If you spoke that, I just didn't
25  hear it.  Sorry.

Page 153

1        THE WITNESS:  I don't recall seeing this
2  marketing flyer, no.
3        MR. FALBY:  Q.  Can you turn, please, to
4  page 0842 within the document.
5    A.   Yes.
6    Q.   Do you recall seeing the two-page marketing
7  update that appears at this point within Exhibit 42?
8    A.   Yes, I saw this.
9    Q.   Did you see it in July of 2004?
10    A.   I don't recall, but if that's when it's dated,
11  I recall looking at this document.
12    Q.   And do you recall seeing that the status of
13  every prospect listed here was D, as in dead,
14  requirement?
15    A.   I didn't know that D stood for dead.
16    Q.   Look on the second page of the chart, there's
17  a legend at the bottom.
18    A.   Okay.  I never -- I never -- I didn't know it
19  was characterized that way.
20    Q.   Did you understand from looking at this
21  marketing update at pages 842 and 843 of Exhibit 42,
22  that as of July 2004, Blue Hills Office Park had no
23  active prospects?
24    A.   I wouldn't say that's the fact.  I would think
25  that there were no active prospects being presented by

LegaLink Boston, a Merrill Company
(617) 542-0039

William J. Langelier

CONFIDENTIAL

Page 154

1  the brokerage firm, but I'm not sure -- there was likely
2  to be active prospects that were not in writing that
3  were in the early stages and things like that.
4      Q.  Did Joe Donovan tell you in or around
5  July 2004 that he had reported to the lender that there
6  were no leasing prospects currently?
7      A.  No.
8      Q.  Well, after you looked at the marketing update
9  within Exhibit 42, did you believe that there were any
10 active or current prospects to re-lease a significant
11 portion of the Blue Hills Office Park space?
12     A.  I believe that the market was one that was
13 constantly moving and changing with new prospects coming
14 and going all the time.  That's the nature of the beast.
15     Q.  Did you learn of any prospects to lease a
16 significant portion of the Blue Hills Office Park after
17 July 21, 2004, other than the dead prospects listed
18 here?
19     A.  Yeah.  For example, I was told that the State
20 of Massachusetts was possibly in the loop and so was
21 Reebok possibly in the loop, just off the top of my
22 head.  These aren't mentioned in here, but --
23     Q.  Who told you that the State of Massachusetts
24 and Reebok were possibly in the loop?
25     A.  Dan Frank, as I recall.

Page 155

1      Q.  And do you know whether Dan Frank told the
2  lender that the State of Massachusetts and Reebok were
3  possible prospects to take a significant portion of the
4  Blue Hills Office Park?
5      A.  I don't know.
6      Q.  Do you know whether Mr. Donovan informed the
7  lender that no replacement tenant for Equiserve had been
8  found as of August 5, 2004?
9      A.  I don't know.
10     Q.  At the time of the settlement payment, did
11 you, yourself, look at the Credit Suisse loan documents
12 to see whether or not the payment of $2 million and the
13 settlement of that lawsuit were something that needed to
14 be reported to the lender?
15     A.  No.
16     Q.  It didn't occur to you to do that, did it?
17     A.  No.
18     Q.  Have you ever looked at the mortgage to see
19 whether causes of action relating to the property are
20 listed as part of the Mortgaged Property, capital M,
21 capital P, that is secured by the mortgage?
22     A.  No.
23         MR. McGLYNN:  Objection.
24         MR. FALBY:  Q.  Pointing you to Granting
25 Clause Seven of the mortgage, which is Exhibit C within

Page 156

1  Exhibit 15.
2      Q.  Do you see that included within the list of
3  mortgaged property in Granting Clause Seven are causes
4  of action that now or hereafter relate to, are derived
5  from, or are used in connection with the mortgaged
6  property or the use, operation, maintenance, occupancy
7  or enjoyment thereof?
8          MR. McGLYNN:  You're asking if he can see that
9  there; is that the question?
10         MR. FALBY:  Yes.
11         THE WITNESS:  Yes.
12         MR. FALBY:  Q.  Have you ever focused on that
13 language before?
14     A.  No.
15         MR. McGLYNN:  Objection.
16         MR. FALBY:  Q.  Do you see in Granting Clause
17 Four that the mortgaged property includes receipts,
18 revenues, deposits, cash, charges, and other
19 consideration of whatever form or nature received by or
20 paid to or for the account of or benefit of mortgagor or
21 its agents or employees from any and all sources arising
22 from or attributable to the premises and the
23 improvements?
24     A.  Yes.
25     Q.  Did you ever focus on that before?

Page 157

1      A.  No.
2      Q.  Did you ever consider whether that broad
3  description of consideration of whatever form or nature
4  received by or paid to or for the account of or benefit
5  of the mortgagor would include the settlement payment?
6          MR. McGLYNN:  Objection.
7          THE WITNESS:  No.
8          MR. FALBY:  Q.  Do you have any view on that
9  as you look at the language now?
10     A.  No.
11     Q.  That's a legal conclusion you would leave to
12 your attorney?
13     A.  Correct.
14         MR. McGLYNN:  I hope he would.
15         MR. FALBY:  Q.  And I take it your answer
16 would be the same as to whether a cause of action
17 brought to appeal a special permit by an abutting
18 mortgagor constitutes the kind of cause of action
19 described in Granting Clause Seven?
20     You would leave that to your attorney to
21 figure out?
22         MR. McGLYNN:  Objection.  You may answer.
23         THE WITNESS:  (Witness nods head.)
24         MR. FALBY:  Q.  I'm sorry.
25     A.  Yes, I would leave it to my attorney.

40 (Pages 154 to 157)

William J. Langelier

03/10/2006

CONFIDENTIAL

Page 182

1  them?
2          MR. McGLYNN:  Objection.
3          THE WITNESS:  We signed a prenegotiation
4  agreement, which is an indication to the lender we
5  wanted to talk, and I think the lender in presenting
6  that to us also indicated, at some point, they would be
7  willing to talk, then something happened where they
8  didn't.
9          But, as I said, Mr. Falby, I think it's a
10  question of business judgment.  You don't prematurely
11  put your cards face up on a table in a business
12  negotiation, and that was what -- clearly the reason why
13  nobody was going to put something in writing to the
14  lender until there was a sitdown; and the lender refused
15  to sit down.
16          MR. FALBY:  Q.  So I still don't understand
17  why you just didn't write a letter saying, "We'd like to
18  meet and here's some of the things we could discuss"
19  without binding yourself in any way to a proposal.
20          A.  Because we felt, and we continue to feel, that
21  it's a -- it's -- it was certainly a bad faith gesture
22  on the part of the lender refusing to meet with us.  We
23  made a good faith gesture by signing, Mr. Fineberg did,
24  by signing this agreement to sit down, checking off the
25  boxes, presenting information.

Page 183

1          And there was an adversarial tone set
2  immediately by Mr. Polcari not willing to sit down.  We
3  didn't want to walk in hat in hand with a proposal in
4  writing, general or otherwise, that would have shown
5  that we were not good businessmen or good negotiators.
6  We wanted to be able to have certainly the ability to
7  get a sense from the lender where they were coming from,
8  how they might consider a workout and within what
9  parameters they may work with us on it, and then put
10  something in writing, but they refused to meet with us.
11          Q.  Because they refused to meet with you, there
12  was no way you were going to do anything to try to
13  advance the ball beyond that?
14          A.  What else --
15          MR. McGLYNN:  Objection.
16          THE WITNESS:  -- could we have done?  They
17  refused to meet with us.
18          MR. FALBY:  Q.  You could have sent them a
19  written request for a meeting that actually listed
20  potential topics for discussion, for example?
21          MR. McGLYNN:  Objection.
22          THE WITNESS:  I put that in the speculative
23  category.  It's could have, should have, would have.
24  Hindsight's 20/20 on a lot of things.
25          MR. FALBY:  Q.  Well, obviously from our point

Page 184

1  of view, you didn't do anything.
2          A.  I understand you're filtering it in your
3  favor.
4          Q.  Well, as you are in yours --
5          A.  Of course.
6          Q.  -- from your secondhand perch out here on the
7  West Coast.
8          A.  Absolutely.  That's the way the legal ball
9  bounces, I guess; right?
10          Q.  But I'm a lawyer and you're a fact witness,
11  supposedly.
12          A.  There you go.
13          MR. McGLYNN:  I don't know if I should object
14  to the characterization of secondhand perch.  It's a
15  nice perch.
16          MR. FALBY:  Q.  There's obviously facts in the
17  chronology that either you haven't been told or you're
18  leaving out, and if there was what someone reasonably
19  sitting back would say was a failure of communication,
20  the question would be, well, why didn't the borrower, if
21  it was so anxious to meet, do something to interest
22  Lennar in meeting?  And I guess your answer is that
23  would be bad negotiating on the part of the borrower.
24          A.  Are you asking me a question?
25          MR. McGLYNN:  Objection.

Page 185

1          MR. FALBY:  Yeah.
2          MR. McGLYNN:  Object.
3          THE WITNESS:  I didn't quite understand the
4  question.
5          MR. FALBY:  I'll rephrase the question.
6          MR. McGLYNN:  Please.
7          MR. FALBY:  Q.  When you learned that Dan
8  Frank had supposedly requested a meeting and been
9  rebuffed, you thought the best course was then to
10  proceed to a foreclosure rather than do anything else to
11  try to work out this loan with Lennar?
12          MR. McGLYNN:  Objection.
13          THE WITNESS:  We sent Lennar a letter.  We
14  talked to Lennar and they -- they wrote us back and
15  refused to sit down, I believe, in a letter.
16          That was in writing; am I correct, Counsel?
17          MR. McGLYNN:  I'll let you testify as to your
18  best recollection.
19          THE WITNESS:  That's my best recollection.
20  And, you know, to suggest that the lender should be
21  absolved here because they were in the right by refusing
22  to sit down with us and discuss any early stage of
23  negotiations on a workout seems to me to be clearly, in
24  fact, distilling it in your favor, but the bottom line
25  is they clearly refused to meet with us.

47 (Pages 182 to 185)

William J. Langelier

CONFIDENTIAL

03/10/2006

Page 266

1  work the issues through.
2      Q.  You had a conversation --
3      A.  Even though the lender refused to, we thought
4  the lender would come around.
5      Q.  You had a conversation with Mr. Frank about a
6  standstill period?
7      A.  To a certain extent that we were hoping to get
8  a standstill period and a period of time in which we
9  could, in fact, meet with the lender, that the lender
10 would acquiesce or relent.
11     Q.  When did you have that conversation with
12 Mr. Frank?
13     A.  That was in the fall of '04.
14     Q.  Was it the same conversation in which he
15 related that he'd asked for a meeting and that Lennar
16 had refused?
17     A.  I don't recall.
18     Q.  What else did you or Mr. Frank say during that
19 conversation?
20     A.  I just don't recall.
21     Q.  Do you recall anything about your conversation
22 with Mr. Frank other than that you were discussing the
23 possibility of a standstill?
24     A.  Possibility of?
25     Q.  A standstill.

Page 267

1      A.  You know, this is a product of two minutes
2  here, five minutes there, 30 seconds, a variety of phone
3  calls over a course of, you know, a period of time that
4  I'm distilling for you to say that what we really were
5  hoping for is that the lender would show us some good
6  faith and meet with us.  And that was what we thought
7  would happen even the day before the foreclosure.
8      Q.  Did you ever request a standstill?
9      A.  No, I don't believe we did.
10     Q.  So you were having if not regular at least
11 periodic or more than one conversation with --
12     A.  A snippet here, a snippet there.  I'm sorry.
13     Q.  You have to wait until I'm done.
14     A.  I'm sorry.  Sure.
15     Q.  You were having conversations, plural, with
16 Mr. Frank in the fall of 2004?
17     A.  Correct.
18     Q.  Can you tell me anything more about what you
19 or he said during those conversations than you already
20 have?
21     A.  Just don't recall with specificity other than
22 the theme of them, which I think I just told you.
23     Q.  Which was that you'd like to get a standstill?
24     A.  Like to get a standstill, like to sit down
25 with the lender, maybe the lender will, you know, come

Page 268

1  around at the last minute, which is very often the case,
2  and that sort of thing.
3      Q.  And you understood, did you, that a standstill
4  would be an accommodation that the lender would make?
5      A.  Oftentimes is, yes, that's correct.
6      Q.  And did you know or understand whether a
7  standstill was something that you were entitled to or
8  that the lender was obligated to give you under the loan
9  documents?
10     A.  No.  It was -- the lender was not obligated to
11 give us this under the loan documents, correct.
12     Q.  It was something that you wanted to request
13 which you hoped they would accommodate you by granting?
14     A.  Yes.
15     Q.  Did you have conversations with anybody at
16 Fineberg Management other than Mr. Frank on the topic of
17 possibly working something out with Lennar?
18     A.  No.
19         MR. McGLYNN:  You mean other than what we've
20 talked about?
21         MR. FALBY:  Other than anything you've
22 testified to.
23         THE WITNESS:  No.
24         MR. FALBY:  Q.  Did you know that Mr. Fineberg
25 had walked away from two hotel properties in Sturbridge

Page 269

1  and Lancaster; that is, Sturbridge, Massachusetts and
2  Lancaster, Pennsylvania, shortly before July 31, 2004?
3      A.  No.
4      Q.  Did you know that Lennar was the special
5  servicer on those loans?
6      A.  No.
7      Q.  Lennar's only experience with Mr. Fineberg is
8  in connection with those two deals in which he turned
9  over the keys to the property.
10     A.  I don't see how that's relevant.
11     Q.  I'm asking you if you knew that.
12     A.  Oh, no.
13         MR. McGLYNN:  How we doing on time, Bruce?
14         MR. FALBY:  We're fine.
15         MR. McGLYNN:  I've got -- literally I've got
16 about two more minutes before we have to either conclude
17 or suspend.
18         MR. FALBY:  I was going to go until 5:00.
19         MR. McGLYNN:  I will not have enough time.
20         MR. FALBY:  Well, I don't think that's fair.
21         MR. McGLYNN:  Well, I told you this at 9:05
22 this morning.
23         MR. FALBY:  We've had this on the calendar for
24 weeks.  I'm entitled to seven hours, which I don't think
25 we've hit.

68 (Pages 266 to 269)

# EXHIBIT 8

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3                     --oOo--
 4   BLUE HILLS OFFICE PARK, LLC,            )
                                             )
 5      Plaintiff/Defendant-in-Counterclaim )
                                             )
 6        vs.                                )Civil Action No.
                                             )05-CV-10506(WGY)
 7   J.P. MORGAN CHASE BANK, as Trustee for )
     the Registered Holders of Credit        )
 8   Suisse First Boston Mortgage Securities)
     Corp., Commercial Mortgage Pass-Through)
 9   Certificates, Series 1999-C1,           )
                                             )
10      Defendant                            )
                                             )
11   and CSFB 1999-C1 ROYALL STREET, LLC,    )
                                             )
12      Defendant/Plaintiff-in-Counterclaim )
                                             )
13   and                                     )
                                             )
14   WILLIAM LANGELIER and GERALD FINEBERG,  )
                                             )
15      Defendants-in-Counterclaim           )
     _____)
16
17              DEPOSITION OF BRENT LLOYD
18       _____
19            Thursday, March 9, 2006
20            Volume I   (Pages 1 - 82)
21
22
23   REPORTED BY:  CYNTHIA A. PACINI, CSR #6117, RMR, CRR
24   (03-378690)
25
```

Page 26

1    Q. All right. And the town of Canton showed up
2 as being not postal protected?
3    A. Correct.
4    Q. So you had this discussion with Jill Martin.
5 And what happened after that?
6    A. I then went into Deborah Lambson's office and
7 talked with her regarding advancing payments.
8    Q. And Lambson is -- was your superior?
9    A. Yes.
10    Q. And you went -- for what purpose did you go
11 see Deborah Lambson?
12    A. For a backup purpose.
13    Q. A backup purpose being to get authorization to
14 pay the taxes?
15    A. Correct.
16    Q. Okay. And what happened after that?
17    A. I informed Deborah Lambson of the situation,
18 the severity of the situation with the due date. I
19 notified her that I've contacted Jill Martin and was
20 seeking her help with the reserves, and she told me to
21 let her know the status.
22    Q. Have you finished your answer?
23    A. Yes.
24    Q. And this was -- you indicated that you
25 notified Ms. Lambson about the severity of the

Page 27

1 situation.
2    Do you recall that testimony just a few
3 seconds ago?
4    A. Yes.
5    Q. Why was the situation so severe at least as
6 you understood it?
7    A. Our primary obligation in that department as
8 loan servicing representatives is to ensure taxes are
9 paid timely. Usually we get notifications of tax
10 amounts due a couple weeks prior to their due date.
11    In this case, we were at Thursday and we had
12 until Monday to get these taxes paid. The only way to
13 make the payment was overnight delivery, so this was a
14 severe situation.
15    Q. Well, what happened if you were a day or two
16 late?
17    MR. BARNETT: Objection.
18    THE WITNESS: If we are late with a payment,
19 then the taxes are delinquent.
20    MR. McGLYNN: Q. So what happens?
21    MR. BARNETT: Objection.
22    THE WITNESS: The taxing authority can put a
23 lien on the property.
24    MR. McGLYNN: Q. But you know that doesn't
25 happen if you're a day or two late?

Page 28

1    MR. BARNETT: Objection.
2    MR. McGLYNN: Q. Isn't that correct?
3    MR. BARNETT: Objection.
4    THE WITNESS: It's not my responsibility to
5 question that.
6    MR. McGLYNN: Q. Did you do any research as
7 to what the town of Canton would do in the event that a
8 tax payment was a few days late?
9    A. Since I was notified on July 29th, 2004, I
10 didn't have enough time to contact the agency as my
11 priority was to get the taxes paid.
12    Q. But you've been involved in facilitating the
13 payment of taxes to the town of Canton on this loan
14 since January 2002; correct?
15    A. That is incorrect.
16    Q. What's incorrect about my question?
17    A. I had paid sometimes to the town of Canton for
18 this loan, not every time.
19    Q. In other words, there's somebody else within
20 your department that was responsible for that?
21    A. Yes.
22    Q. Was there any time that you can recall the
23 taxes were paid late to the town of Canton on this
24 account?
25    A. There was not a time I can recall.

Page 29

1    Q. Okay. But you don't know, as you sit here
2 now, whether or not the town of Canton would have put a
3 lien if the taxes were a couple days late?
4    MR. BARNETT: Objection. You can answer.
5    THE WITNESS: There's no way of knowing what
6 they would have done with the property.
7    MR. McGLYNN: Q. All right. So did you get
8 authority from Deborah Lambson to pay the taxes?
9    A. Not at this point.
10    Q. All right. So did you hear back from Jill
11 Martin?
12    A. Yes, I did.
13    Q. Same day?
14    A. Same day.
15    Q. And what did she say?
16    A. She informed me that the borrower could not
17 just move money from the reserves, that they would
18 require what is known as a lien waiver in order to get
19 access to move this money.
20    Q. What kind of a lien waiver?
21    MR. BARNETT: Objection.
22    THE WITNESS: Since it's not -- I don't work
23 in the reserve department. I wasn't sure what the lien
24 waiver was.
25    MR. McGLYNN: Q. All right. So you didn't --

8 (Pages 26 to 29)

Page 34

1  WF01746.
2    A.  That says noncompliance with the notepad.
3    Q.  All right.  This is a summary of a
4  subsequent -- the subsequent telephone call that you had
5  with Mr. Stone concerning noncompliance?
6    A.  That is not my notepad.
7    Q.  This is not yours.  Now, how do you know that?
8    A.  Because on that day, there was two of us that
9  had received calls from Gil Stone.
10    Q.  When you say "two of us," two of us within
11  your department?
12    A.  Yes.
13    Q.  Who was the second of the two of us?
14    A.  The representative that was required to pay
15  the taxes.
16    Q.  And who was that?
17    A.  Deanna Engstrom.
18    Q.  Deanna Engstrom?
19    A.  Yes.
20    Q.  And Mr. Stone called Deanna Engstrom?
21    A.  I would believe either he called her or she
22  called him.
23    Q.  All right.  And does that particular -- and
24  your testimony today, sir, is that WF01746 is a notepad
25  prepared by Deanna Engstrom?

Page 35

1    A.  I believe so, yes.
2    Q.  All right.  Is there anything on this notepad
3  that indicates who the writer is?
4    A.  No.
5    MR. BARNETT:  Would you like him to compare it
6  to the exhibit that Ms. Martin compared them to?
7    MR. McGLYNN:  You know what, if you were
8  conducting this deposition, I'd let you do that, but I'm
9  going to do it.
10    MR. BARNETT:  It's your deposition.  I'm
11  sorry.
12    MR. McGLYNN:  Thanks.
13    Q.  WF01745, can you look at that?  Can you tell
14  whether or not that's -- can you tell from the face of
15  that document whether the -- strike that.
16    Can you tell from the face of that document
17  who prepared this?
18    A.  I can tell from looking at the notepad who
19  prepared it.
20    Q.  All right.  Did you prepare it?
21    A.  Yes.
22    Q.  You know that for a fact?
23    A.  Yes.
24    Q.  And you know for a fact that Deanna Engstrom
25  prepared 01746?

Page 36

1    A.  I believe she prepared it.
2    Q.  All right.  Why do you believe she prepared
3  it?
4    A.  Because she was the only representative, other
5  than myself, who was responsible for the payment of this
6  tax at this time.
7    Q.  What about Deborah Lambson?
8    A.  Deborah Lambson oversaw our group.
9    Q.  All right.  Now, you'll agree with me that the
10  notes appearing on WF01745 do not indicate that you
11  advised Mr. Stone that he was -- that nonpayment of
12  taxes constituted an event of default; correct?
13    A.  I believe the notepad is a summary, not a full
14  recap of the conversation.
15    Q.  Well, wouldn't that have been important to put
16  in that summary that you advised the borrower that
17  nonpayment of taxes constituted an event of default?
18    MR. BARNETT:  Objection to the vague term
19  "important."
20    MR. McGLYNN:  Q.  You may answer.
21    A.  In a notepad, you cannot reference speculation
22  of default.
23    Q.  It's okay to do it in a phone call, but not in
24  a notepad?
25    A.  You may give notice to a borrower if they are

Page 37

1  in event of default.
2    Q.  All right.  And did you -- is it your
3  testimony today, sir, that you gave Mr. Stone notice
4  that nonpayment of taxes constituted an event of
5  default?
6    A.  Yes.
7    Q.  And you had the authority to do that?
8    MR. BARNETT:  Objection.
9    MR. McGLYNN:  Q.  You may answer.
10    A.  The authority was irrelevant at this point.
11    Q.  Did you have authority to advise a borrower
12  that nonpayment of taxes constituted an event of default
13  as of July 29, 2004?
14    MR. BARNETT:  Objection.
15    THE WITNESS:  I gave him notice.  I did not
16  say that he would be in default.  I gave him notice that
17  if his taxes weren't paid, it could be an event of
18  default.
19    MR. McGLYNN:  Q.  How did you know it could be
20  an event of default?
21    A.  Because in the loan agreement, it specifies
22  that nonpayment of taxes can be an event.
23    Q.  Did you look at the loan agreement before you
24  gave that notification to Mr. Stone?
25    A.  No.

10 (Pages 34 to 37)

Page 38

1    Q.  Had you looked at the loan agreement?
2        MR. BARNETT:  Objection.  Asked and answered.
3  You can answer.
4        THE WITNESS:  I'm not for certain if I had or
5  had not.
6        MR. McGLYNN:  Q.  All right.  Did you send out
7  a query to Mr. Parish's group asking whether or not
8  nonpayment of taxes constituted an event of default?
9    A.  A query for a nonpayment of default?
10   Q.  Did you send out a query to Mr. Parish's
11 department as to whether or not on this loan nonpayment
12 of taxes constituted an event of default?
13   A.  Mr. Parish's group wouldn't have anything to
14 do with that.
15   Q.  You said Mr. Parish was involved in the client
16 solutions group.
17   A.  In the systems end.
18   Q.  Well, you indicated the main purpose was "to
19 run queries for various departments."
20       Do you recall that?
21   A.  Yes.
22   Q.  And query was your word?
23   A.  Queries are Strategy processed reports.
24   Q.  So now it's queries for reports as opposed to
25 specific information concerning a loan; correct?

Page 39

1        MR. BARNETT:  Objection.
2        MR. McGLYNN:  Q.  You may answer.
3    A.  Let me specify for the record.  Queries are
4  used primarily to run data from the Strategy system we
5  operate on.  They are not used to produce loan
6  agreements or any other core documents associated with a
7  loan.
8    Q.  What department -- have you finished your
9  answer?
10   A.  Yes.
11   Q.  What department would you have communicated
12 with to ascertain whether nonpayment of taxes would have
13 constituted an event of default for this loan?
14       MR. BARNETT:  Objection.  It either
15 mischaracterizes his testimony or calls for speculation,
16 but you can answer the question.
17       THE WITNESS:  If an event of default were to
18 occur, asset administration group would be contacted.
19       MR. McGLYNN:  Q.  And that was Mr. Curtis
20 Mallegni?
21       MR. BARNETT:  Objection.
22       THE WITNESS:  Curtis Mallegni was the overseer
23 of the asset managers.
24       MR. McGLYNN:  Q.  All right.  Now, when you
25 told Mr. Stone -- well, you told Mr. Stone that

Page 40

1  nonpayment of taxes would or might be an event of
2  default?  Which one?
3        MR. BARNETT:  Objection.  You can answer.
4        THE WITNESS:  It would be an event of default.
5        MR. McGLYNN:  Q.  All right.  And what did he
6  say?
7    A.  He said he would get back to me.
8    Q.  All right.  And you'll agree with me that
9  neither -- do you know if Ms. Engstrom advised Gil Stone
10 during her conversation that the borrower would be in
11 default for nonpayment of taxes?
12   A.  I do not know.
13   Q.  All right.  Does she record that type of
14 notification or advice to Mr. Stone in her notepad or
15 her note maintenance log?
16   A.  She refers in her notepad to the shortage and
17 the reserve department being contacted.
18   Q.  All right.  And that reserve department, is
19 that Jill Martin again?
20   A.  That would be her group.
21   Q.  Okay.  Now -- and after July 29, 2004, did you
22 have any further communications with Gil Stone?
23   A.  No.
24   Q.  And you'll agree with me also that you got
25 down there Gil Stern; correct?

Page 41

1    A.  There was a typo on the notepad.
2    Q.  Well, there's two typos, yours and Deanna
3  Engstrom's; correct?
4        MR. BARNETT:  Objection.
5        THE WITNESS:  Yes.
6        MR. McGLYNN:  Q.  Well, flip the page.  She's
7  got Gil Stern as well?
8        MR. BARNETT:  He's on her page.
9        MR. McGLYNN:  Q.  Okay.  So both you and
10 Deanna Engstrom had made a typographical error; correct?
11   A.  Based off of our conversations with Gil.
12   Q.  Two different people, same typographical
13 error; correct?
14   A.  Yes.
15   Q.  Two different phone calls; correct?
16   A.  Yes.
17   Q.  Now, take a look at Stone 4, which is right to
18 your left there.  Now, that's the tax deficiency
19 notification that was sent out on July 16, 2004?
20   A.  Yes.
21   Q.  All right.  And this is essentially the --
22 this notice or substantially similar notice was sent out
23 every quarter to this borrower?
24   A.  The taxes were due quarterly so a quarterly
25 notice was sent.

11 (Pages 38 to 41)

# EXHIBIT 9

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF MASSACHUSETTS
 3                     --oOo--
 4   BLUE HILLS OFFICE PARK, LLC,              )
                                               )
 5      Plaintiff/Defendant-in-Counterclaim    )
                                               )
 6         vs.                                  )Civil Action No.
                                               )05-CV-10506(WGY)
 7   J.P. MORGAN CHASE BANK, as Trustee for    )
     the Registered Holders of Credit          )
 8   Suisse First Boston Mortgage Securities)
     Corp., Commercial Mortgage Pass-Through)
 9   Certificates, Series 1999-C1,             )
                                               )
10      Defendant                              )
                                               )
11   and CSFB 1999-C1 ROYALL STREET, LLC,     )
                                               )
12      Defendant/Plaintiff-in-Counterclaim )
                                               )
13   and                                       )
                                               )
14   WILLIAM LANGELIER and GERALD FINEBERG, )
        Defendants-in-Counterclaim            )
15   _____)
16
17            DEPOSITION OF CURTIS J. MALLEGNI
18       _____
19             Wednesday, March 8, 2006
20             Volume I   (Pages 1 - 247)
21
22
23   REPORTED BY:  CYNTHIA A. PACINI, CSR #6117, RMR, CRR
24   (03-378932)
25
```

Curtis J. Mallegni

03/08/2006

Page 54

1    A.  Okay.
2    Q.  Is that the first letter you recall seeing?
3    A.  Well, it's not addressed to me.  It's
4 addressed to Tim Parish.
5    Q.  And who is or was Tim Parish?
6    A.  I don't know.
7    Q.  Do you know if Tim Parish worked for Wells
8 Fargo?
9    A.  I presume so.  There are 150 people in the
10 servicing group, so I don't know each one of them
11 personally.
12    Q.  Have you ever heard of Tim Parish before?
13    A.  I see him on the correspondence, but other
14 than that, no, I had not heard.
15    Q.  All right.
16    A.  Don't recall.  I think that's a better --
17    Q.  Do you know whether or not Mr. Parish in 2004
18 worked for the property tax department for Wells Fargo?
19    A.  I don't, but I have, you know --
20    MR. BARNETT:  Don't presume.
21    THE WITNESS:  I just don't know.
22    MR. McGLYNN:  Q.  All right.  But this letter,
23 Donovan 23, is addressed to Wells Fargo Commercial
24 Mortgage Servicing at the Willow Pass, Concord,
25 California address; correct?

Page 55

1    A.  Correct.
2    Q.  Is that the proper address located at -- of
3 Wells Fargo located up in Concord, California?
4    A.  Yes.
5    Q.  Okay.  All right.  Have you seen this
6 particular exhibit Donovan 23 prior to today?
7    A.  I think I have.  I think it was part of a fax
8 that I received from Mr. Donovan.
9    Q.  And that would be?
10    A.  Which had, I believe, two letters attached to
11 it.
12    Q.  Polcari 56.  Is that the fax that you're
13 referring to, sir?
14    A.  It looks a little different.  This is the fax,
15 to answer your question.
16    MR. BARNETT:  Go to the last page.  The last
17 page.  Okay.
18    THE WITNESS:  And this appears to be a copy of
19 the same letter that's attached to this fax.
20    MR. McGLYNN:  Q.  All right.
21    A.  Except that the number, as counsel has pointed
22 out, one says Blue Hills 1227.  The one you initially
23 presented says 1229 on it.
24    Q.  But they're separate exhibits at least marked
25 in these exhibits, correct?  One is Donovan 23?

Page 56

1    A.  Yes.
2    Q.  And the other one is Polcari 56; is that
3 correct?
4    A.  That's correct.
5    Q.  And Polcari 56 is a multi-page document which
6 has as its first page a fax transmittal letter addressed
7 to you?
8    A.  Correct.
9    Q.  And you recall receiving this on or about the
10 13th of August, 2004?
11    A.  Yes.
12    Q.  And this was from Joseph Donovan?
13    A.  Yes.
14    Q.  And did this fax -- strike that.
15       Was this fax preceded by a phone call between
16 you and Mr. Donovan?
17    A.  Yes.  As I remember, Mr. Donovan and I were
18 trying to make contact.  I had made contact with him
19 about the status of the building in terms of the tenancy
20 and then I had gone on vacation for a week, and then I
21 think it says here "Sorry we have been missing each
22 other on the phone.  I would like to get this special
23 servicer involved."
24       So there was probably some voicemail back and
25 forth and then finally I had asked him for something in

Page 57

1 writing, and this is what he provided.
2    Q.  Did you actually have a conversation with him?
3    A.  Yes.
4    Q.  All right.  And that was prior to August 13,
5 2004?
6    A.  Yes.
7    Q.  Do you recall, was it in August that you had
8 the conversation?
9    A.  I don't remember.
10    Q.  And were you on vacation when this particular
11 fax came in?
12    A.  No.  I believe I had returned.  I was in the
13 office.
14    Q.  And how long were you on vacation?
15    A.  A week.
16    Q.  Do you have any recollection of the
17 conversation that you had with Mr. Donovan?
18    A.  Not specifically.
19    Q.  Do you make notes or memoranda of
20 conversations that you have with borrowers, at least
21 when you were asset manager for Wells Fargo?
22    A.  Not always.  I do occasionally, but not
23 always.
24    Q.  Now, the letters that were attached to
25 Mr. Donovan's fax, Polcari 56, can you just turn to

15 (Pages 54 to 57)

Curtis J. Mallegni

03/08/2006

Page 70

1    Q.  And do you have an understanding of the
2  specific uses that Mr. Donovan had requested of the
3  reserve funds in Donovan 23?
4      MR. BARNETT:  Does he now have an
5  understanding?
6      MR. McGLYNN:  I'm going to ask him does he
7  have an understanding, then we can narrow it down.
8      THE WITNESS:  Well, the letter speaks for
9  itself.  And he is requesting a withdrawal from the cash
10  flow subaccount, so --
11      MR. McGLYNN:  Q.  And that letter requests
12  withdrawals from the cash flow subaccounts for two
13  purposes; correct?
14      MR. BARNETT:  Objection.
15      THE WITNESS:  Well, again, I did not deal with
16  the reserves.  I was in the escalation process, so I
17  wasn't dealing with these specific requests.
18      MR. McGLYNN:  Q.  But normally these requests,
19  if they came into, in this case, the reserve department,
20  would those be referred to you for --
21      A.  No.
22      Q.  -- an answer or recommendation?
23      A.  No, not necessarily, no.
24      Q.  So it would be within the power of the reserve
25  account to grant or deny access to reserve accounts as

Page 71

1  requested by a borrower?
2      MR. BARNETT:  Objection.
3      THE WITNESS:  Yes.  The reserve team reviews
4  the requests, determines if the conditions have been
5  met, and then concludes whether or not they can disburse
6  the reserve's monies.
7      MR. McGLYNN:  Q.  Okay.  And do you know
8  whether or not any member or members of the reserve team
9  ever advised Joseph Donovan or anybody from Blue Hills
10  Office Park that BHOP could or could not access reserve
11  accounts for the purposes requested in Donovan 23?
12      A.  I have no recollection of that.
13      Q.  Did you -- as reflected in your e-mail to
14  Ms. O'Neal, you knew at least at the time that you were
15  preparing this e-mail, that BHOP had requested a meeting
16  with the special servicer; correct?
17      A.  Correct.
18      Q.  And you know that Mr. Donovan had requested in
19  his letter of August 5, 2004, a meeting either with the
20  special servicer or a meeting between Wells Fargo and
21  the special servicer; correct?
22      MR. BARNETT:  Objection.
23      THE WITNESS:  I was aware of his request with
24  the special servicer.  I think one of the letters does
25  suggest more generically the lender or -- here, let me

Page 72

1  find it.
2      MR. McGLYNN:  Okay.
3      THE WITNESS:  Yeah.  It says, "Therefore, we
4  request a meeting with the lender to discuss the loan
5  status and future performance.  Based on our past
6  experience, any decisions regarding the loan would need
7  the approval of special servicer, therefore, we request
8  the special servicer attend the meeting as well."
9      MR. BARNETT:  I'll just note for the record
10  that the witness was reading from the August 5th
11  letter of Mr. Donovan marked Blue Hill 1246.
12      MR. McGLYNN:  Thank you, Bruce.
13      Q.  To your knowledge, did you have or did anybody
14  within the Wells Fargo organization have any
15  communications with Donovan or anybody else from Blue
16  Hills Office Park about granting his request for a
17  meeting with the lender?
18      A.  Well, the gist of my conversations -- I don't
19  know of any other people other than myself.  I speak for
20  myself.  And the gist of what I can recall of our
21  conversation was that he did want a meeting with Lennar
22  or with the special servicer, so to speak, or with the
23  special servicer.  And it was my sense of it that
24  Mr. Donovan understood that the special servicer had
25  authority and powers beyond the master servicer in terms

Page 73

1  of the loan.
2      Q.  And your recollection was that you had this
3  meeting with Mr. -- strike that -- this conversation
4  with Mr. Donovan before you went on vacation?
5      MR. BARNETT:  Objection.
6      THE WITNESS:  I don't remember when I had that
7  conversation.
8      MR. McGLYNN:  Q.  And you don't recall having
9  any -- making any notation or log of that discussion
10  with Mr. Donovan?
11      A.  I may have.  I've produced it if I have, but
12  as I sit here, I don't recall.
13      Q.  And would it be a fair statement that whatever
14  record you have of that discussion, that would not show
15  up on the Loancator?
16      A.  Correct.
17      Q.  This is for things that happen out in Concord,
18  California?
19      A.  Correct.
20      Q.  Okay.  And you only had one discussion with
21  Mr. Donovan that you can recall?
22      A.  Oh, I think I had a couple of discussions with
23  him.
24      Q.  And these were on the telephone?
25      A.  Yes.

19 (Pages 70 to 73)

# EXHIBIT 10

Lawrence G. Needle

CONFIDENTIAL

03/17/2006

Page 1

```
 1                                    Volume:   I

 2                                    Pages  :  1 - 188

 3                                    Exhibits: 300 - 321

 4

 5                    UNITED STATES DISTRICT COURT

 6                FOR THE DISTRICT OF MASSACHUSETTS

 7                       CIVIL ACTION NO. 05-CV-10506(WJY)

 8     - - - - - - - - - - - - - - - - - - - - - - -

 9     BLUE HILLS OFFICE PARK LLC,

               Plaintiff, Defendant-in-Counterclaim,

10        Vs.

11     J.P. MORGAN CHASE BANK,  as Trustee for the Registered

       Holders of Credit Suisse First Boston Mortgage

12     Securities Corp., Commercial Mortgage Pass-Through

       Certificates, Series 1999-C1.,

13               Defendant.

14        and

15     CSFB 1999-C1 ROYALL STREET, LLC;

               Defendant, Plaintiff-in-Counterclaim,

16        Vs.

17     WILLIAM LANGELIER and GERALD FINEBERG,

               Defendants-in-Counterclaim.

18     --- - - - - - - - - - - - - - - - - - - - - -

19              DEPOSITION OF LAWRENCE G. NEEDLE

20           Friday, March 17, 2006, 10:10 a.m.

21             DLA Piper Rudnick Gray Cary US LLP

22                     33 Arch Street

23                  Boston, Massachusetts

24        Reporter:  Rosemary F. Grogan, CSR, RPR
```

Page 74

1    Q.   And in his third sentence he said -- it says
2  that he said, His client has spoken with the petitioner,
3  but there's been no resolution?
4    A.   Yes.
5    Q.   Do you agree that the issue of the parking
6  garage hadn't been resolved as of May 22, 2003 at the
7  Board of Appeals meeting?
8    A.   Yes.
9    Q.   About four lines down from there, it states
10  that Mr. Lilienthal said after the building has full
11  occupancy, he feels it will have a major effect on the
12  traffic.  He further stated the proposal obstructs his
13  client's current view from the southwest.  He stated
14  there's a large area of impervious surface which has not
15  been dealt with.
16          Does that summarize your concerns at the
17  time of the May 22, 2003 meeting?
18    MS. SWISHER:  Objection.
19    A.   Yes.
20    Q.   Two paragraphs down from that it says:
21  Attorney Lilienthal stated he has not participated in
22  any discussions between his client and petitioner.
23          Does that refresh your recollection as to
24  whether any attorneys attended the meeting that he,

Page 75

1  Mr. Frank and Mr. Fineberg had with his architect?
2    A.   No.
3    Q.   The top of the next page, page 4 of 10 of the
4  internal pagination of this document, there's a note
5  that the motion to approve petition was unanimously
6  granted.  Do you see that?
7    A.   Yes.
8    Q.   So it was May 22, 2003 that the petition was
9  granted?
10    MS. SWISHER:  Objection.
11  BY MR. BARNETT:
12    Q.   At that Board of Appeals hearing?
13    A.   According to this, yes.
14    Q.   Between the first board of appeals hearing
15  that you attended, and then the document referred to
16  being held on May 1st, and this hearing on May 22nd,
17  other than meeting with Mr. Tye and his architect, what
18  did you do to respond to EquiServe and National
19  Development's petition to build a parking garage?
20    MS. SWISHER:  Objection.
21    A.   Can you rephrase that?
22    Q.   After the first hearing, but before the permit
23  was approved, you had a meeting with Mr. Tye and his
24  architect?

Page 76

1    A.   Correct.
2    Q.   What else did you do between the time of the
3  first meeting and the time the permit was approved in
4  response to the application for the permit?
5    A.   Beyond the fact they agreed to drop the
6  parking garage four feet at that first meeting, nothing;
7  four feet more into the ground at that first meeting,
8  nothing.
9    Q.   More into the ground, did you say?
10    A.   Correct.
11    Q.   Did you speak to Mr. Frank or Mr. Fineberg
12  about the parking garage outside of your meeting with
13  Mr. Tye and his architect?
14    A.   I don't recall.
15    Q.   Are you aware that DST Realty and National
16  Development had entered into a purchase and sale
17  agreement for DST Realty to buy 250 Royall Street?
18    A.   At what point in time?
19    Q.   Are you aware today?
20    A.   I am aware today.
21    Q.   Were you aware in May of 2003?
22    A.   I became aware sometime before they left the
23  building, but I couldn't be specific as to the date.
24    Q.   Have you ever seen that purchase and sale

Page 77

1  agreement?
2    A.   No.
3    Q.   Did you know that in May or June of 2003, were
4  you aware that the purchase and sale agreement was
5  conditioned on getting permits to build the parking
6  garage?
7    A.   Yes.
8    Q.   How did you come by that information?
9    A.   I believe I was told that by Dan Frank.
10    Q.   Within the time frame of May to June 2003, can
11  you be any more specific when Mr. Frank told you that?
12    A.   No.
13    Q.   In terms of whether it was before or after the
14  permit was granted?
15    A.   No.
16    Q.   What was the context of Mr. Frank telling you
17  that?
18    A.   I don't recall.
19    Q.   Did he ask you to do anything in connection
20  with telling you that?
21    A.   No.
22    Q.   And you said you never saw that purchase and
23  sale agreement?
24    A.   No.

20 (Pages 74 to 77)

Lawrence G. Needle                                                    03/17/2006

CONFIDENTIAL

---

Page 142

1    A.  No.
2    Q.  On the second page of Exhibit 1 is a letter to
3  Jim Lingle from you dated September 29, 1999; is that
4  right?
5    A.  Yes.
6    Q.  Is this a letter you referred to earlier this
7  morning as one you sent to the lender concerning
8  property taxes?
9    A.  Yes.
10    Q.  In the middle paragraph it says in the second
11  sentence:  In order to do so, we bring payment each
12  quarter to the Town of Canton and immediately fax the
13  receipted copy to the tenant and the mortgagee.
14        Do you see that?
15    A.  Yes.
16    Q.  Does that mean that Blue Hills Office Park
17  would pay the Town of Canton directly for the real
18  estate taxes under the prior arrangement?
19    A.  No, I don't believe that -- under the prior
20  arrangement with the previous lender, yes.
21    Q.  Under the prior arrangement with the previous
22  lender, Blue Hills Office Park paid the Town of Canton
23  directly without sending money through the lender; is
24  that right?

Page 143

1    A.  I'm not sure.  I'm not sure.  I do remember I
2  used to bring a check down, but I'm not sure if the
3  check was written from us or the previous lender.
4    Q.  I see.
5        So under the previous regime, you
6  yourself, sounds like, paid the property taxes by
7  bringing a check to the Town of Canton?
8    A.  Correct.
9    Q.  What you're unsure of is whether the check was
10  from an escrow account at the previous lender or
11  EquiServe or Blue Hills; the source of the check is
12  unclear, but you brought it to the Town of Canton?
13    A.  Correct.
14    Q.  And under the Credit Suisse loan that did not
15  happen; is that right?
16    A.  Correct.
17    Q.  You didn't bring the checks to the Town of
18  Canton?
19    A.  Not that I recall.
20    Q.  And no one else at Blue Hills brought the
21  checks --
22    A.  No.
23    Q.  -- to the Town of Canton?
24        And so the arrangement for property taxes

Page 144

1  changed between the previous lender under the Credit
2  Suisse loan at least with respect to Blue Hills Office
3  Park, bringing the check to the Town of Canton?
4    A.  Correct.
5    Q.  Do you remember if you got a response from
6  Wells Fargo -- let me rephrase that.
7        Do you remember if you got a response
8  from Jim Lingle at Orix to your letter that is included
9  in Exhibit 1?
10    A.  I don't remember.
11    Q.  Now, we saw the fax cover page for Exhibit 1
12  earlier, right?
13    A.  Yes.
14    Q.  And this fax is from Paul Halloran?
15    A.  Yes.
16    Q.  There was a time that you said you were
17  assistant to Paul Halloran --
18    A.  Yes.
19    Q.  -- is that right?
20        But that was not during the time this fax
21  was sent; isn't that right?
22    A.  No.
23    Q.  And that was not during the time you wrote the
24  September 29 letter that's page two of this exhibit; is

Page 145

1  that right?
2    A.  Yes.
3    Q.  Years before that?
4    A.  At least 10.
5    Q.  Do you know if Mr. Halloran got a response
6  from Wells Fargo to his fax of your letter, his fax
7  going to Elham at Wells Fargo?
8    A.  I don't know.
9    Q.  After the loan went to -- let me rephrase
10  that.
11        After the inception of the Credit Suisse
12  loan, what's your understanding of the process or
13  sequence of events by which the property taxes would be
14  paid for any given quarter?
15    A.  First and second quarter, I would bill the
16  tenant at least 30 days in advance and give them two
17  weeks prior to that due date to send the check to the
18  lock box for Wells Fargo.  The third quarter, I would
19  usually have to go to the Town of Canton in order to get
20  it on time because at that point the assessment usually
21  changed on the property.
22        So sometimes they had less than 30 days
23  to come up with the money, but they still had to send it
24  in to the lock box in all cases.

37 (Pages 142 to 145)

# EXHIBIT 11

1

1                                    Volume: I
                                     Pages: 1-273
2                                    Exhibits: 45-83

3                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT MASSACHUSETTS
4

- - - - - - - - - - - - - - - - - x
5
BLUE HILLS OFFICE PARK, LLC,
6
                 Plaintiff/Defendant-in-Counterclaim,
7
        v.
8
J.P. MORGAN CHASE BANK, as Trustee
9    for the Registered Holders of
     Credit Suisse First Boston Mortgage
10   Securities Corp., Commercial Mortgage
     Pass-Through Certificates, Series 1999-C1,
11
                 Defendant,
12
     and CSFB 1999-C1 ROYALL STREET, LCC,
13
                 Defendant/Plaintiff-in-Counterclaim,
14
     and
15
     WILLIAM LANGELIER and GERALD FINEBERG,
16
                 Defendants-in-Counterclaim.
17   - - - - - - - - - - - - - - - - - x

18              DEPOSITION of JOSEPH A. POLCARI, JR., a
     witness called by counsel for the Plaintiff/
19   Defendant-in-Counterclaim taken pursuant to the
     applicable provisions of the Federal Rules of
20   Civil Procedure, before Toni F. Beckwith,
     Registered Merit Reporter, CSR No. 111293 and
21   Notary Public in and for the Commonwealth of
     Massachusetts, at the Offices of Bernkopf
22   Goodman LLP, 125 Summer Street, Boston,
     Massachusetts, on Tuesday, February 28, 2006,
23   commencing at 9:50 a.m.

24

Page 33

1  taxes that were due August 2nd to the town of
2  Canton.
3      Q.  That's your recollection of the basis
4  upon which this loan was transferred to Lennar
5  as special servicer?
6      A.  Yes.
7          (Exhibit 57 marked
8           for identification)
9      Q.  You're looking at your counsel's copy,
10 but I'll read to you that it's Polcari 57, and
11 it's an e-mail.  Can you identify this e-mail?
12         MR. FALBY:  Beyond what it says?
13         MR. MCGLYNN:  Excuse me?
14         MR. FALBY:  Beyond what it says; are
15 you asking him if he's seen it before?
16         MR. MCGLYNN:  I think that's common
17 nomenclature, but I'll ask him.
18     Q.  Have you seen it before?
19     A.  I don't remember seeing this before.
20     Q.  Do you know who Kathryn O'Neal is?
21     A.  No.
22     Q.  Do you know who Larry Cowling is?
23     A.  I've heard the name.  I don't know
24 him.

Page 34

1      Q.  Do you know who Curtis Mallegni is?
2      A.  I've heard the name.
3      Q.  And does this Polcari 57 refresh your
4  recollection as to the exact date when this loan
5  was transferred over to Lennar as special
6  servicer?
7          MR. FALBY:  Objection.  He testified
8  to lack of memory.
9          MR. MCGLYNN:  He testified to August
10 19.
11         MR. FALBY:  On or about August 19.
12     A.  The e-mail is dated August 17.  I'm
13 not sure when the actual -- what constitutes a
14 transfer, when it was made.  My best
15 recollection was on or about the 19th, which
16 this would be on or about the 19th.
17     Q.  If you could turn, please, to the
18 second page of this document.
19     A.  Yes, sir.
20     Q.  First of all, before I ask you to do
21 that, you've never seen this document before?
22     A.  I said I don't remember seeing it.
23     Q.  Please turn to the second page.  And
24 it says, among other things, and I'm looking at

Page 35

1  the top, among other things, the servicer
2  determines that a payment default has occurred
3  or is imminent and is not likely to be cured by
4  the related mortgagor within 60 days.  Do you
5  see that?
6      A.  Yes.
7      Q.  Is that a provision within the pooling
8  and servicing agreement which can trigger a
9  transfer of the loan from the master or the
10 servicer to the special servicer, sir?
11         MR. FALBY:  Objection.
12     Q.  You may answer.
13     A.  That's what it says here.
14     Q.  Do you have any understanding as to
15 what the conditions are that would cause a loan
16 within this pool to be transferred from Wells
17 Fargo as servicer to Lennar as special servicer,
18 Mr. Polcari?
19     A.  I have very limited knowledge of that.
20 I don't really deal with the transfer part of
21 the loans.
22     Q.  Would that have been something that
23 would have been handled, at least in 2004, by
24 Larry Golinsky?

Page 36

1      A.  No.
2      Q.  Who would that have been handled by,
3  at least as of September 2004, within Lennar?
4      A.  The receiving part of it within Lennar
5  would have been handled, I believe, by Vicki
6  Taylor.
7      Q.  How are special servicer assignments
8  determined within Lennar, sir, if you know?
9      A.  You mean asset manager assignments?
10     Q.  Yes, sir.
11     A.  They are determined by Mr. Golinsky.
12     Q.  And in this particular instance, he
13 was the one that determined that you would be
14 the asset manager for this particular loan?
15         MR. FALBY:  Objection.
16     A.  I really can't answer that.  I'm not
17 sure who made the decision to assign it to me.
18 Initially it was not assigned to me.  Initially
19 it was assigned to Mr. Warshaw.
20     Q.  That's Mr. Job Warshaw?
21     A.  That's correct.
22     Q.  And you replaced Mr. Warshaw?
23     A.  As asset manager for this loan, yes.
24     Q.  That occurred prior to September 17,

9  (Pages 33 to 36)

Page 1

```
                    Volume: II
                    Pages: 1-243
                    Exhibits: 84-109
           UNITED STATES DISTRICT COURT
          FOR THE DISTRICT MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

BLUE HILLS OFFICE PARK, LLC,

        Plaintiff/Defendant-in-Counterclaim,

     v.

J.P. MORGAN CHASE BANK, as Trustee
for the Registered Holders of
Credit Suisse First Boston Mortgage
Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1,

        Defendant,

and CSFB 1999-C1 ROYALL STREET, LCC,

        Defendant/Plaintiff-in-Counterclaim,

and

WILLIAM LANGELIER and GERALD FINEBERG,

        Defendants-in-Counterclaim.
- - - - - - - - - - - - - - - - - x
    CONTINUED DEPOSITION of JOSEPH A. POLCARI, JR.,
a witness called by counsel for the Plaintiff/
Defendant-in-Counterclaim taken pursuant to the
applicable provisions of the Federal Rules of
Civil Procedure, before Toni F. Beckwith,
Registered Merit Reporter, CSR No. 111293 and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Bernkopf
Goodman LLP, 125 Summer Street, Boston,
Massachusetts, on Wednesday, March 1, 2006,
commencing at 9:30 a.m.
```

Page 2

1
   APPEARANCES:
2
3  BERNKOPF GOODMAN LLP
   By Peter B. McGlynn, Esquire
4  125 Summer Street
   Boston, Massachusetts 02110
5  Counsel for the Plaintiff/
   Defendant-in-Counterclaim
6
7  DLA PIPER RUDNICK GRAY CARY US LLP
   By Bruce E. Falby, Esquire
8  33 Arch Street, 26th Floor
   Boston, Massachusetts 02110
9  Counsel for the Defendants/
   Plaintiff-in-Counterclaim
10
11 (Exhibits retained by Attorney McGlynn)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1           I N D E X
2  Continued
3  Deposition of:   Direct Cross Redirect Recross
4  JOSEPH A. POLCARI, JR.
5    By Mr. McGlynn  7      235
6    By Mr. Falby      227
7
8
9
10       M A R K E D   T E S T I M O N Y
11
12       Page 104 Lines 22/24
13
14
15           E X H I B I T S
16  No.                    Page
17
18  84   Handwritten Notes          22
19  85   Series of E-mails Bates
20       Stamped LNR04129          78
21  86   Series of E-mails Bates
22       Stamped LNR04197-04199      89
23  87   Series of E-mails Bates
24       Stamped LNR04078-04079      94

Page 4

1  88   Series of E-mails Bates
2       Stamped LNR04222-04223      100
3  89   Series of E-mails Bates
4       Stamped LNR00455-00458      102
5  90   Series of E-mails Bates
6       Stamped LNR04209-04214      103
7  91   Series of E-mails Bates
8       Stamped LNR04215-04220      105
9  92   Series of E-mails Bates
10      Stamped LNR04230-04232      105
11 93   Series of E-mails Bates
12      Stamped LNR04265-04268      109
13 94   Series of E-mails Bates
14      Stamped LNR04269-04272      109
15 95   Series of E-mails Bates
16      Stamped LNR04273-04277      109
17 96   E-mail Bates Stamped
18      LNR03128                 111
19 97   Series of E-mails Bates
20      Stamped LNR03104,03100,
21      03098, 03097, WFO1413,
22      LNR03087, 03079          112
23 98   Binder                   135
24

1 (Pages 1 to 4)

Page 213

1   that all of the debt service for any month has
2   been paid and that the escrow accounts have been
3   funded, do you have an understanding as to what
4   happens to the surplus funds?
5       A. It depends on the circumstances.
6       Q. Well, in a nondefault circumstance.
7       A. In a nondefault circumstance? Again,
8   that's part of the same question you asked
9   before. I can't remember right now what happens
10  to the funds when they get deposited into a
11  clearing account.
12      Q. Who would have the best knowledge of
13  that within the Lennar organization with respect
14  to this loan?
15      A. At one time I had the best
16  understanding of that. What I'm saying to you
17  is, looking back now, I can't remember the
18  details of that. What I can say is that -- you
19  said this a nondefault situation?
20      Q. That is correct.
21      A. Well, in the situation we have here,
22  the zoning appeal -- the filing of the zoning
23  appeal forced the cause of action. The borrower
24  should have come to us before they settled the

Page 214

1   zoning appeal. If they had come to us at that
2   time, we would never have allowed the settlement
3   of the zoning appeal and the subsequent payment
4   of $2 million for then the money to flow
5   directly to the borrower.
6       Any discussion -- any settlement or
7   any consent we would give to the settlement of
8   the zoning appeal would have involved some
9   separate agreement whereby the proceeds would
10  have been paid -- would have been set up in a
11  reserve to cover the potential loss of the
12  tenant.
13      Q. So that would have been a requirement
14  of Lennar if it was a special servicer?
15      A. If we were the special servicer on
16  such a situation where the zoning appeal --
17  where we were being asked to consent to the
18  zoning appeal, the proceeds of the zoning appeal
19  would have been -- we would have had -- we would
20  have required them to be escrowed for the
21  potential loss of the tenant.
22      Q. Do you know whether Wells Fargo would
23  have required that?
24      A. I can't speak for Wells Fargo.

Page 215

1       Q. In a nondefault situation, do you have
2   an understanding as to whether it would be Wells
3   Fargo or some other entity that would have to
4   give its consent to the settlement of the zoning
5   appeal?
6       A. I can't answer that question.
7       Q. Turn, please, to Page 29 of your
8   answers to interrogatories.
9       A. Yes.
10      Q. Can you turn to the bottom of Page 29
11  over to Page 30?
12      A. Yes. Let me just read it, please.
13      Q. Sure.
14      A. We're talking about an interrogatory
15  in response to No. 15?
16      Q. Right. Where you state that the
17  mortgagee or the lender reasonably and
18  justifiably relied on Blue Hills' material
19  omissions to act. Do you see that?
20      A. I'm sorry. I don't.
21      Q. Perhaps --
22      A. Maybe it's the next page. Okay.
23      (Pause)
24      A. Okay.

Page 216

1       Q. Do you see that?
2       A. Yes.
3       Q. The material omissions, do you know
4   what you were referring to there?
5       A. Material omissions in my understanding
6   are Blue Hills' failure to notify the mortgagee
7   of the zoning appeal, Blue Hills' compromise of
8   that appeal in its receipt of the settlement
9   payment, done.
10      Q. Thank you. Please tell us how the
11  mortgagee reasonably -- I'm quoting from your
12  answer -- reasonably and justifiably end quote,
13  relied on these material omissions?
14      A. These answers were prepared with the
15  help of counsel. And reasonably and
16  justifiably, I didn't write those words.
17      Q. So you don't have an understanding as
18  to what they mean, sir?
19      A. To me reasonableness is somewhat of a
20  legal issue.
21      Q. I understand. I'm just asking if you
22  have an understanding.
23      A. I don't at this moment.
24      Q. Okay. And you did sign these answers

54 (Pages 213 to 216)

# EXHIBIT 12

# Gilbert W. Stone
## Volume 1 - February 9, 2006

Exhibits:  1 - 12            Volume 1, Pages 1 - 167

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

-----------------------------

BLUE HILLS OFFICE PARK LLC

Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

Defendant

(Complete caption on next page.)

------------------------------

30(b)(6)  DEPOSITION OF BLUE HILLS OFFICE PARK LLC

BY GILBERT W. STONE

Thursday, February 9, 2006, 10:05 a.m.

DLA Piper Rudnick Gray Cary US LLP

One International Place, 21st Floor

Boston, Massachusetts

------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

Gilbert W. Stone
Volume 1 - February 9, 2006

30

1 responsible for overseeing the financial
2 transactions between Fineberg Management and the
3 various lenders?
4     A. I did not have conversations generally with
5 them. My duty was to report to them the quarterly
6 statement.
7     Q. When you say them, your duty was to report
8 to the lenders the quarterly statement?
9     A. Yes.
10     Q. Of what?
11     A. The financial statement, the general
12 ledger.
13     Q. Was there a single-purpose entity that was
14 set up to own each of the different properties?
15     A. I didn't understand you.
16     Q. For each of the properties owned by
17 Fineberg Management, was there actually a
18 single-purpose entity set up that owned that
19 property?
20     A. Yes.
21     Q. So Fineberg Management managed the
22 buildings that were owned by these single-purpose
23 entities? Is that how it worked?
24     A. The single entity? I'm not sure what

31

1 you're saying.
2     Q. Are you familiar with the concept of a
3 single-purpose entity when it comes to real estate,
4 that is, an entity set up solely for the purpose of
5 owning one property?
6     A. There are those, yes.
7     Q. And were each of the properties that you
8 listed before owned by a single-purpose entity?
9     A. Yes.
10     Q. What was the relationship, if any, between
11 those single-purpose entities and Fineberg
12 Management?
13         MR. McGLYNN: Objection as to form.
14     Q. You can answer.
15         MR. McGLYNN: You can answer.
16     A. I'm not sure. I'm not sure what you mean
17 by that.
18     Q. The Blue Hills Office Park, for example,
19 was owned by Blue Hills Office Park LLC, correct?
20     A. Correct.
21     Q. What was the relationship between Blue
22 Hills Office Park LLC and Fineberg Management?
23     A. Fineberg Management oversaw the operation.
24     Q. Does Fineberg Management also oversee the

32

1 operation of the hotels owned by Fine Hotels?
2     A. No.
3     Q. Those are managed independently by Fine
4 Hotels?
5     A. Yes.
6     Q. Does Fine Hotels still exist?
7     A. Yes.
8     Q. Still six hotels?
9     A. Yes.
10     Q. The operations are separate from Fineberg
11 Management?
12     A. Yes.
13     Q. Do you have any ownership in Blue Hills
14 Office Park LLC?
15     A. No.
16     Q. Who owns it?
17     A. Gerald Fineberg.
18     Q. Do you know if anyone else has an interest
19 in it?
20     A. Bill Langelier.
21     Q. Anyone else?
22     A. Dan Frank.
23     Q. Anyone else?
24     A. Michelle Fineberg, Gary Fineberg. There's

33

1 an Amy Badger.
2     Q. Anyone else?
3     A. No.
4     Q. Do you have oversight responsibilities for
5 the accounting records of Blue Hills Office Park
6 LLC?
7     A. Yes.
8     Q. Similarly, do you have responsibility for
9 the accounting records of the other single-purpose
10 entities that own the various properties managed by
11 Fineberg Management?
12     A. Yes.
13     Q. Do each of those entities have separate
14 books and records?
15     A. Yes.
16     Q. So Blue Hills Office Park LLC, for example,
17 has its own set of accounting papers, including an
18 accounts payable ledger and accounts receivable
19 ledger and general ledger?
20     A. Yes.
21     Q. Do you have people who work for you on an
22 accounting staff?
23     A. Yes.
24     Q. How many?

Gilbert W. Stone
Volume 1 - February 9, 2006

---

34

1    A. Two. Cheryl Reardon.
2    Q. Who else?
3    A. Deb Griffin.
4    Q. From 1999 through 2004, was there anybody
5    else who worked for you on your accounting staff?
6    A. Paul Halloran.
7    Q. What was his position?
8    A. Accounting clerk.
9    Q. What years was he employed by Fineberg
10   Management?
11   A. I don't know the exact number.
12   Q. Can you give me the approximate dates of
13   his employment?
14   A. He probably goes back -- I shouldn't say --
15   somewhere around 1990 to 2001.
16   Q. Did he have responsibility for the
17   accounting of Blue Hills Office Park LLC?
18   A. He did the work. He did the entries and
19   recorded the entries that needed to be done.
20   Q. And who took over recording the entries and
21   doing the work for Blue Hills Office Park when he
22   left in 2001?
23   A. I did.
24   Q. Do you remember the month in 2001 that you

---

35

1    took over?
2    A. September.
3    Q. Did you continue to do the accounting work
4    for Blue Hills Office Park in September 2001 through
5    November 2004?
6    A. Yes.
7    Q. And to the extent there's been accounting
8    work since for that entity, have you done it?
9    A. Yes.
10   Q. Who is Carol Falvey?
11   A. Administrative assistant.
12   Q. To whom?
13   A. Joe Donovan.
14   Q. Mr. Donovan's position is what?
15   A. Chief financial officer.
16   Q. Of Fineberg Management?
17   A. The overall chief financial officer of Fine
18   Hotels and Fineberg Management.
19   Q. Do you report to him?
20   A. Yes.
21   Q. Who does he report to?
22   A. Gerald Fineberg.
23   Q. Does Mr. Fineberg have a title?
24   A. President.

---

36

1    Q. Of both?
2    A. Fine Hotels and Fineberg Management?
3    Well --
4         MR. McGLYNN: I don't want you to
5    speculate. If you don't know, say you don't know.
6    A. Gerald Fineberg is the owner. Dan Frank is
7    the president of the two.
8    Q. But Mr. Donovan reports to Mr. Fineberg,
9    not to Mr. Frank?
10   A. To the best of my knowledge.
11   Q. From 1999 to 2001 when Paul Halloran was
12   still there, what was your involvement with Blue
13   Hills Office Park LLC?
14   A. I oversaw his work.
15   Q. So what did that mean? Did you check it
16   periodically, every day, once in a while?
17        MR. McGLYNN: Objection.
18   Q. Only on Sundays?
19        MR. McGLYNN: Objection.
20   A. Monthly.
21   Q. During the period that he was doing the
22   accounting work for Blue Hills, was he the one who
23   had contact with the mortgage lender for Blue Hills?
24   A. He had contact with them, yes.

---

37

1    Q. Did you have any contact with them when he
2    was there?
3    A. Minimal, yes.
4    Q. What contact did you have with the lender
5    for Blue Hills when Paul Halloran was still
6    employed?
7    A. The payment of the real estate taxes.
8    Q. Did you have any other contact with the
9    lender while Paul Halloran was employed?
10   A. Not that I'm aware of.
11        MR. FALBY: Off the record.
12        (Discussion off the record.)
13        MR. McGLYNN: I want to let you know,
14   because you're starting to get into it a little bit,
15   we have designated Mr. Stone as a partial designee
16   for 30(b)(6) purposes for Topics 4 and 11 on your
17   30(b)(6) depo notice to Blue Hills Office Park LLC,
18   generally described as property tax payments,
19   property tax escrows. 11 is monies received by Blue
20   Hills on account of the property from September 14,
21   1999 to November 19, 2004. He's a partial designee
22   for those two topics.
23        MR. FALBY: Who is the other designee?
24        MR. McGLYNN: I believe it is going to

---

Gilbert W. Stone
Volume 1 - February 9, 2006

42

1   Q. Is it easier to think of it in terms of
2  number of hours per week?
3     A. It was just part of the job and things were
4  done when they needed to be done. They were
5  addressed when they came up, the financial
6  statement, the reconciliations were done. If
7  something was there, we looked at it.
8     Q. From 2001 through 2004 you were doing the
9  actual accounting work for Blue Hills yourself,
10 right?
11    A. Myself and staff, yes.
12    Q. I thought you said when Paul left you took
13 over and did the work.
14    A. I did not do the accounts payable.
15    Q. Who did that?
16    A. Cheryl Reardon, my staff.
17    Q. Who else worked on Blue Hills accounting
18 other than you and Cheryl Reardon during the period
19 September 2001 through September 2004?
20    A. That was it.
21    Q. Did Cheryl do anything other than accounts
22 payable?
23    A. No.
24    Q. What does it mean to do the accounts

43

1  payable; what did it mean?
2     A. The recording of the invoices and the
3  payment of the invoices.
4     Q. What did you do with respect to Blue Hills
5  from September 2001 through November 2004?
6     A. The recording of the receipts, the general
7  ledger, the account reconciliations.
8     Q. Did you have similar responsibilities to
9  the other single-purpose entities that owned the
10 other properties that Figeberg Management managed?
11    A. Yes. Not the receipts.
12    Q. So from 2001 through 2004, approximately
13 how many different sets of books and records were
14 you responsible for, given the number of different
15 entities?
16    A. Including residential?
17    Q. Yes, everything.
18    A. 50?
19    Q. With respect to those 50, did you do the
20 same types of things you did for Blue Hills?
21    A. The receipts were handled differently on
22 the other properties.
23    Q. How were they handled on the other
24 properties?

44

1     A. The checks were mailed to us and we
2  deposited them and recorded them to the bank.
3     Q. And that's opposed to what with respect to
4  Blue Hills? How was it handled with respect to Blue
5  Hills?
6     A. The checks were mailed into a lockbox at
7  Banknorth. And then they sent me copies of what
8  they received. That's what I made entries from.
9     Q. But in either event, did you record the
10 receipts?
11    A. On Blue Hills Office Park, yes.
12    Q. Did you record the receipts on the other
13 properties?
14    A. That was not my -- no, I don't do that.
15    Q. Who did that?
16    A. Deb Griffin.
17    Q. Did Cheryl Reardon do the accounts payable
18 for all of the entities?
19    A. Yes.
20    Q. And Deb Griffin did accounts receivable for
21 all of the entities except Blue Hills?
22    A. Yes.
23    Q. What did you do with respect to the
24 entities other than Blue Hills?

45

1        MR. McGLYNN: Objection to the form.
2     Q. What work did you do for the other entities
3  other than Blue Hills?
4     A. The account reconciliations, the bank
5  reconciliations, the general ledger, review the
6  accounts payable, review the accounts receivable.
7     Q. Is it fair to say that your time was more
8  or less evenly divided among the various 50
9  entities?
10    A. I think Blue Hills was minimal.
11    Q. You spent a minimal amount of time on Blue
12 Hills?
13    A. It wasn't a lot.
14    Q. Less time than some of the other entities?
15    A. Yes.
16    Q. Why? Why did it take less time?
17    A. There were just a couple of checks that
18 came in a month. The money was transferred to Wells
19 Fargo. I made sure that it was done. The general
20 ledger was fairly simple.
21    Q. Did you handle the real estate tax payments
22 and the insurance premium payments for the other 50
23 entities, the other 49 entities?
24    A. The others, most of the others there's an

25 (Pages 94 to 97)

Gilbert W. Stone
Volume 1 - February 9, 2006

94

1    Q. When did EquiServe actually leave?
2    A. The notice was July 31, 2004. I believe
3  they stayed a half month.
4    Q. When you say the notice was July 31, 2004,
5  do you mean that the notice said they would be
6  leaving on that day?
7    A. Yes.
8    Q. The notice was obviously in advance of that
9  day, correct?
10   A. Yes.
11   Q. There was a tax payment due on -- strike
12 that. There was a tax payment due at the beginning
13 of August 2004, correct?
14   A. Yes.
15   Q. As that date approached, did you have any
16 discussion with anybody internally at Blue Hills or
17 Fineberg Management about how the real estate tax
18 payment due in August 2004 would be funded?
19   A. There must have been. I don't know an
20 exact conversation, but yes.
21   Q. What's your general memory of that
22 conversation or conversations?
23      MR. McGLYNN: Again, I don't want you to
24 speculate. If you recall, fine. If you don't

95

1  recall, there's no crime in telling people that too.
2    A. I don't know the exact conversation.
3    Q. You have some memory. I'm entitled to it.
4  What's your memory, however vague, of what the
5  conversation was?
6    A. The money was not there and it wasn't going
7  to be paid.
8    Q. Do you recall who that discussion was with?
9    A. Joe Donovan.
10   Q. Do you recall any other content of that
11 discussion?
12   A. No.
13   Q. As the date of the August tax payment
14 approached, did you have any discussion with anybody
15 at Wells Fargo about that tax payment?
16   A. Not that I remember.
17   Q. Did Wells Fargo send an escrow account
18 shortage notice in July 2004 as they usually did the
19 month before payment was due?
20   A. To the best of my knowledge, they did.
21   Q. Did you respond to that notice?
22   A. Not that I'm aware of.
23   Q. Do you typically keep notes of
24 conversations?

96

1    A. No.
2    Q. Do you ever keep notes of conversations?
3      MR. McGLYNN: You mean in his entire
4  life?
5    A. Sometimes, yes.
6    Q. What prompts you to keep a note as opposed
7  to not keeping one?
8    A. To have a record of who I talked to or who
9  I left a message for in case they came back to me
10 and said we never heard from you.
11   Q. Does your Blue Hills file contain any
12 handwritten notes by you about conversations you've
13 had with folks at Wells Fargo?
14   A. There are some in there. Not about the
15 content; just that I talked with someone or left a
16 message for someone.
17   Q. And what notes did you make? We haven't
18 seen them, which is why I'm asking you. If I had
19 seen them, I would show them to you.
20   A. Just Post-its.
21   Q. Do you recall any particular notes you made
22 about any particular conversation?
23   A. No.
24   Q. Do you recall any of the names or dates of

97

1  the notes that you made?
2    A. No.
3    Q. I take it you didn't see any handwritten
4  notes that prompted you to recall speaking to
5  anybody at Wells Fargo about real estate tax
6  payments in July 2004 when you went through your
7  file?
8    A. I don't believe so, no.
9    Q. Did you see any documents when you met with
10 Mr. McGlynn that prompted any recollection about
11 conversations with Wells Fargo in July 2004?
12   A. I saw the document. I don't recall the
13 conversation.
14   Q. What document did you see?
15   A. It appeared to be a note written by someone
16 from Wells Fargo stating that he had a conversation
17 with Gil Stern. I don't recall that.
18   Q. Do you recall talking to Brent Lloyd in
19 particular about real estate tax payments in July
20 '04?
21   A. I don't recall.
22   Q. Did you have any conversations with Wells
23 Fargo in August 2004?
24   A. No.

31 (Pages 118 to 121)

Gilbert W. Stone
Volume 1 - February 9, 2006

---

118

1 conversations with Brent Lloyd, correct?
2     A. Yes.
3     Q. I guess the point is, you may have had such
4 a conversation but you don't recall it?
5     A. Yes.
6     Q. Let me show you another Wells Fargo
7 document that is similar, Bates-stamped WF 1746.
8         (Marked, Exhibit 6, WF 1746, notes
9 maintenance document.)
10     Q. Have you seen Exhibit 6 before in preparing
11 for your deposition?
12     A. I don't recall this one, no.
13     Q. Reading it, does it refresh your memory as
14 to any conversations that you had with Brent Lloyd
15 in July 2004?
16     A. No.
17     Q. So you don't recall having the conversation
18 that's described in Exhibit 6?
19     A. No, I don't.
20     Q. Can you state with certainty that you did
21 not have such a conversation, that is, can you
22 unequivocally deny it?
23     A. No.
24     Q. So the point is, you may have had such a

---

119

1 conversation but you don't recall the conversation?
2     A. That's correct.
3     Q. You mentioned that Joe Donovan asked you
4 for amounts so that he could request payment from
5 the reserve account. I think you said no, but let
6 me ask you again. Did you discuss with Mr. Donovan
7 whether monies could be taken out of the reserve
8 accounts to pay the taxes?
9         MR. McGLYNN: Objection. That has been
10 asked and answered.
11     A. Not until he was preparing that letter,
12 yes.
13     Q. So at that point can you tell me what the
14 discussion was?
15     A. He was going to request that Wells Fargo
16 meets the requirements from reserves.
17     Q. Did you discuss whether, when he requested
18 that, Wells Fargo would do it or not?
19     A. I don't believe so.
20     Q. In other words, did you discuss whether you
21 expected Wells Fargo to say yes or no to the
22 request?
23         MR. McGLYNN: Objection. Are you asking
24 him to speculate?

---

120

1         MR. FALBY: I'm asking for his memory.
2     A. I don't believe we talked about whether
3 they would pay it or not.
4     Q. Do you recall talking about whether they
5 would -- strike that. Do you recall talking about
6 whether the taxes and the principal and interest
7 qualified to be paid from the reserve accounts?
8     A. I don't believe so.
9     Q. These documents I've just shown you,
10 Exhibits 5 and 6, talk about conditions under which
11 taxes could be paid from the escrow account. Did
12 you see that when you read them?
13         MR. McGLYNN: Objection.
14     A. Yes.
15     Q. Did you have any conversation with
16 Mr. Donovan about conditions under which tax
17 payments could be made from the escrow account?
18     A. I don't believe so.
19     Q. Did you have any discussions with anybody
20 at Blue Hills or Fineberg Management whether tax
21 payments, principal and interest as of early August
22 could be paid from the reserve accounts?
23     A. No.
24     Q. Or any conditions that would have to be

---

121

1 satisfied before they could be paid from the escrow
2 accounts?
3     A. No.
4     Q. Did you ever hear anybody else discussing
5 that?
6     A. No.
7     Q. Do you know anything about that?
8     A. Anything about?
9     Q. About the conditions under which payments
10 can come out of the reserve accounts.
11     A. I didn't know at that time, but I have
12 since learned that funds could be available.
13     Q. How did you learn that?
14         MR. McGLYNN: I'll instruct you -- if
15 you learned it from counsel, I'll instruct you not
16 to answer.
17     Q. If Peter told you that, it is not a
18 credible source. But if anybody else did -- did you
19 hear about it from anybody other than that scoundrel
20 sitting there, saying that with a smile, pointing to
21 Mr. McGlynn?
22     A. No.
23         MR. McGLYNN: I may be a scoundrel, but
24 I'm Gil's scoundrel.

---

# EXHIBIT 13

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

30

1   voice-mail, correct?
2       A.  Yes.
3       Q.  And did you subsequently have a discussion
4   with Mr. Donovan?
5       A.  Yes.
6       Q.  Was that over the phone?
7       A.  Yes.
8       Q.  And who initiated that call, you or he?
9       A.  I don't recall.  You know, I know I called
10  him -- I made the initial call to him; and whether,
11  you know, he called back and left me a message and
12  then I called him back, or he called back and got
13  me, I don't recall, but we did have a conversation.
14      Q.  And during your discussion with
15  Mr. Donovan, can you tell us what you said and he
16  said?
17      A.  I recall a few things.  You know, my
18  initial inquiry was how could I get into the
19  property and do the tour that I needed to do to do
20  the appraisal.  He gave me Larry Needle's name and
21  number, and I took that down.  And then we -- I had
22  asked him what was going on with the property,
23  because I knew the situation with which Lennar
24  usually gets involved in these things, and that's

31

1   when he -- we talked a little bit about the
2   difficulties they were having with the property in
3   terms of it being vacant and not much, you know,
4   leasing activity they had seen with their brokers
5   and they hadn't been successful in leasing it up and
6   how much it was costing to hold onto it, and that's
7   when he told me that they were going to give the
8   keys back to Lennar.
9       Q.  And you recall Mr. Donovan saying that?
10      A.  Yes.
11      Q.  And you didn't make any notes of that
12  discussion, did you?
13      A.  No, no.  With Mr. Donovan -- he was the
14  initial contact, and I wasn't asking him any
15  physical descriptive information on the building or
16  anything because Larry Needle, the property manager,
17  was going to give me that from what I understood.
18      Q.  Did you report the substance of your
19  discussion to Cynthia Smith?
20      A.  No.
21      Q.  Did you report it to Joe Polcari?
22      A.  No.
23      Q.  You knew at the time that this property was
24  in foreclosure?

32

1           MR. FALBY:  Objection.  I'm objecting to
2   the characterization.  Obviously, you can tell what
3   you knew about the property.
4       A.  I knew foreclosure was a possibility in
5   situations such as this.  I knew that they were -- I
6   believe someone -- you know, I did hear the term
7   "default," meaning no payment of the mortgage
8   amount, and that was the extent of my knowledge.  I
9   did not -- you know, foreclosure is the actual act
10  of transferring the property to another entity, and
11  that had not occurred.
12      Q.  You knew at the time that you were
13  performing these appraisal services that foreclosure
14  sale advertisements had already been published in
15  the newspaper?
16          MR. FALBY:  Objection.
17      Q.  You may answer.
18      A.  No, actually, I did not know that.
19      Q.  When you do an appraisal, you do some
20  search of the records at the Registry of Deeds,
21  don't you?
22      A.  Yes.
23      Q.  In fact, attached to your report is a
24  property description?

33

1       A.  Yes.
2       Q.  Did you get that from the Registry of
3   Deeds?
4       A.  Property description, meaning a legal
5   description of the site the property is located on,
6   you know, we usually ask for it from the borrower or
7   the owner.  They usually have it attached to a deed
8   that they have had in their possession.  Sometimes
9   we get it from them, and sometimes we do get it from
10  the Registry of Deeds.
11      Q.  Do you know whether you got it from the
12  Registry of Deeds in this case?
13      A.  I don't recall.
14      Q.  You do recall going to the registry or
15  sending somebody from your office to the registry to
16  look up the status of the title of this property?
17      A.  With the information on-line now, sometimes
18  we don't go to the registry, we do an on-line
19  search.
20      Q.  You would agree with me if foreclosure had
21  been underway, there would be some kind of notice
22  recorded against this property at the Registry of
23  Deeds that foreclosure proceedings had started,
24  correct?

10 (Pages 34 to 37)

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

34

1        MR. FALBY: Objection.
2     A. Again, I just wasn't informed of any
3  foreclosure action underway by Lennar, and I didn't
4  do a specific search for that.
5     Q. But generally, you knew that when you got
6  an assignment from Lennar as a special servicer,
7  that either the loan for the property was in default
8  or there was some other trouble, I think you
9  characterized it as, involving the property,
10  correct?
11     A. Yes.
12     Q. And did either Cynthia or Polcari tell you
13  about any particular purpose for which they needed
14  your appraisal?
15     A. Not specifically. When -- in the past,
16  when I have done work for Lennar, you know, they
17  used my value to -- from my understanding, they used
18  my value to make a decision whether to foreclose,
19  whether to work out the loan, whether to extend the
20  terms of the loan; and it's a step in a decision-
21  making process.
22     Q. Did you have that specific understanding
23  with respect to this particular appraisal,
24  Mr. Stotz?

35

1     A. Yes.
2     Q. And was that explained to you by Ms. Smith?
3     A. Yes, maybe not in this context on this
4  property, but on previous properties we have
5  appraised for them.
6     Q. And did you have -- relative to your
7  appraisal services for Lennar with respect to this
8  property, did you have any discussions with
9  Mr. Polcari?
10     A. I don't recall specifically whether I had
11  discussions on this property. I have spoken with
12  Joe Polcari before because he's the asset manager
13  for a number of their properties in the Northeast,
14  and I don't recall if it was on this specific
15  property or another one.
16     Q. All right. Do you recall having any
17  specific discussions with Cynthia Smith concerning
18  this particular appraisal?
19     A. Again, you know, I discuss every property I
20  appraise with her. Typically, with her it's more
21  due-date-oriented; or if there's any issues that
22  come up in her review of my work, we discuss those.
23     Q. Do you recall having any other discussions
24  with any other representatives of Lennar concerning

36

1  this particular appraisal?
2     A. Not with Lennar.
3     Q. You indicated that you had -- this was a
4  telephone conversation that you had with Joe
5  Donovan, correct?
6     A. Yes.
7     Q. And he was the one that you recall telling
8  you the owner was going to, quote, "give back the
9  keys"?
10     A. Yes.
11     Q. And you recall that specifically?
12     A. Yes. I recall it specifically because it
13  surprised me. In all the work I had done for Lennar
14  before, I had never had an owner come out and admit
15  that to me.
16     Q. And you will agree with me that this
17  comment does not appear anywhere in your 100-and-
18  some-odd page October 18, 2004 report, correct?
19     A. Correct.
20     Q. And it does not appear in any
21  communications, notes, correspondence, memoranda,
22  meetings of minutes, summaries of telephone
23  conversations in connection with this appraisal
24  assignment, correct?

37

1     A. That's right.
2     Q. And it only appears for the first time in
3  your rebuttal report, correct?
4        MR. FALBY: In writing, you mean?
5        MR. MCGLYNN: In writing.
6     A. Yes.
7     Q. And how long did your discussion with --
8  had you known Joe Donovan?
9        MR. FALBY: Objection, asked and
10  answered. You can tell him again.
11     A. I had known him through a previous
12  appraisal I did on another one of their properties.
13  I did the appraisal for a financing institution. He
14  was my client contact at that point.
15     Q. Which financing institution?
16     A. People's Bank of Connecticut.
17     Q. Do you recall which property it was?
18     A. The Holiday Inn in Mansfield.
19     Q. Mansfield, Mass.?
20     A. Massachusetts.
21     Q. Was this a property that was, quote, "in
22  trouble"?
23     A. Not to my knowledge.
24     Q. This was an appraisal relating to some

FARMER ARSENAULT BROCK LLC

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

Page 86

1 subject building. And then subsequent to that we
2 went to the exterior, and I think we drove around it
3 because it was -- you know, it's a pretty big
4 building. So we drove around it and toured the
5 exterior of the building as well.
6     Q. Do you know what time of day it was?
7     A. I believe it was morning, maybe 9 o'clock,
8 9:30.
9     Q. And you drove -- where were you coming
10 from?
11     A. Probably the city, from our offices.
12         MR. FALBY: Use your memory. Don't
13 guess.
14         THE WITNESS: Okay.
15     A. My best recollection is we came from the
16 city.
17     Q. All right. So you come down what, the
18 Expressway, and then up 95?
19     A. I don't recall which direction we went, if
20 it was that way or out the Turnpike or down 128,
21 which would be the longer way, but...
22     Q. Did you get stuck in any traffic jams, or
23 did you experience any congestion?
24     A. I think the normal backups -- if it was --

Page 87

1         MR. FALBY: If you don't remember which
2 way you came --
3     A. Yeah. So, no, I don't recall.
4     Q. You toured the exterior of the building?
5     A. Yes.
6     Q. Did you look next door at 250 Royall?
7     A. Yes.
8     Q. Did you see the garage?
9     A. Yes.
10     Q. How come that's not mentioned here?
11     A. It's not part of the subject property.
12     Q. Okay. How come -- you will agree with me
13 that in your October 18, 2004 report, there is not
14 one single mention of the garage over at 250 Royall,
15 correct?
16     A. I can't say that with certainty, if it was
17 part of the property there. I'm not sure if it was
18 mentioned in the sale write-up or the information
19 used in the sales comparison approach. I mean, I
20 can spend some time looking for it, but --
21     Q. You can do that, but you can do that at the
22 break. But you will agree with me that the presence
23 of the garage did not factor into the value that you
24 arrived at as of October 18, 2004, correct?

Page 88

1     A. No, it was an adjacent property that was
2 existing at the time of the appraisal.
3     Q. And you didn't factor in any congestion
4 that would have reportedly resulted from the
5 presence of this garage next door?
6     A. No, not at this time, no.
7     Q. But you did in your rebuttal report -- I'm
8 sorry, you did in your expert report, correct?
9         MR. FALBY: Objection to that
10 characterization of what he did in his report.
11         MR. MCGLYNN: Well, we will get to that.
12     Q. But you will agree with me, sir, that in
13 your expert report you have indicated that there
14 would be a decline, a diminution in the value of 150
15 Royall because of the existence of the garage; isn't
16 that correct?
17     A. Yes, I stated that, yes.
18     Q. But you can't quantify it?
19     A. Right.
20     Q. And nothing had changed in terms of the
21 site or the building, the garage on the adjacent
22 site, between the time that you inspected the
23 property on October 18, 2004, and the date that you
24 issued your expert report, correct?

Page 89

1         MR. FALBY: I'll object. I didn't
2 understand that question. You can answer.
3     A. Okay. That's correct, but in my expert
4 report I was asked to give an opinion of the impact
5 of the construction of the garage, since it was
6 existing at the time of the October 2004 report, it
7 was there, and I was not -- it in no way -- it
8 existed at the time, and I appraised the subject
9 property with that garage there, and that was it.
10         In my expert report, I was asked to give
11 an opinion on the impact of the construction of the
12 garage. So you look at the subject property before
13 it was built and after it was built. It's a
14 separate exercise.
15     Q. I'm not sure I understand what you are
16 saying. Are you saying you are -- putting aside
17 your modification valuation, your valuation as of
18 October 18, 2004, was that this building was worth
19 15 million bucks?
20     A. Yes.
21     Q. And you considered all those things that
22 needed to be considered in order to arrive at that
23 figure of 15 million, correct?
24     A. Yes.

23 (Pages 86 to 89)

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

Page 90

1    Q. And you indicate on page 35 that there were
2   no physical factors that are noted that would
3   negatively impact on the value, correct?
4    A. Beyond what was appraised.
5    Q. Where does it say "beyond what was
6   appraised"?
7    A. From my point of view, it's understood in
8   the statement.
9    Q. I understand, but, you know, you will agree
10   with me that the reader may not have the benefit of
11   what's in your mind, only what you have written,
12   correct?
13        MR. FALBY: Objection.
14    A. Correct.
15    Q. Now, sir, in your expert report you're
16   saying that the presence of the garage would result
17   in some unquantified reduction in the value of 150
18   Royall Street, correct?
19    A. Yes.
20    Q. Now, just so I understand what you are
21   saying, you mean that it would be a reduction in the
22   value that you determined as of October 18, 2004, to
23   be $15 million?
24    A. No.

Page 91

1    Q. So you're saying that it would just have
2   some effect, adverse effect, on the value of the
3   property?
4        MR. FALBY: I object to your
5   characterization which implies two alternatives, and
6   I don't think you can characterize the actual facts.
7        MR. MCGLYNN: Bruce, all I need you to
8   do is say your objection, and we will move on.
9    Q. Now, sir, can I have an answer to my
10   question?
11    A. My expert report, I think it states the
12   opinion that the construction of the garage had a
13   negative impact on the value of the subject
14   property.
15    Q. And -- have you finished your answer?
16    A. Yes.
17    Q. And that negative impact would have been
18   included in your valuation as of October 18, 2004,
19   correct?
20    A. The garage was existing at the time of my
21   appraisal, as of October 2004, and it was considered
22   in the appraisal.
23    Q. And how do you know it was considered in
24   the appraisal?

Page 92

1    A. Because it was existing. It's part of the
2   office park, it's part of the neighborhood. It --
3    Q. Have you finished your answer?
4    A. Yes.
5    Q. All right. But you will agree with me that
6   you don't point out the presence of this garage in
7   your October 18, 2004 report, correct?
8        MR. FALBY: Objection. I think that you
9   have asked that and he's answered it and he said he
10   thinks he talks about it in some place.
11        MR. MCGLYNN: We will get to that.
12    Q. But I just need an answer to my question.
13        MR. FALBY: You keep asking the same
14   question. Do you expect to get a different answer?
15   Objection.
16    A. No.
17        MR. FALBY: Well, don't say no. You
18   said you talked about it in another place, right?
19        THE WITNESS: Yes, I could have.
20        MR. FALBY: Or may have.
21        MR. MCGLYNN: Bruce, I have to put you
22   under oath and start asking you questions.
23    Q. Now, sir, take a look, if you would, at
24   your rebuttal report.

Page 93

1        MR. FALBY: I will just note for the
2   record your questions are unfair; and unlike some
3   experts, Mr. Stotz is not a professional expert. He
4   doesn't have experience with people asking unclear
5   questions.
6    Q. Do you have your rebuttal report there,
7   sir?
8    A. Yes.
9    Q. All right. Would you turn to page 12, 13,
10   and 14, in particular 13 at the top. You say at the
11   top -- I'm not going to read the whole thing, but if
12   you want to read it into the record --
13        MR. FALBY: Are you in the rebuttal
14   report to which you referred Mr. Stotz?
15        MR. MCGLYNN: He's got it. You don't
16   have a copy?
17        MR. FALBY: It doesn't look like you are
18   in it, but whatever.
19        MR. MCGLYNN: I'm sorry, the expert
20   report, not the rebuttal report.
21    Q. Okay, sorry, and at page 13 --
22    A. Yes.
23    Q. -- you say, "it is apparent that the new
24   parking garage at the adjacent property did obstruct

24 (Pages 90 to 93)

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

Page 94

1  a portion of the subject's view from the highway,
2  and conversely from the building to the highway,"
3  correct?
4      A.  Yes.
5      Q.  You will agree with me that that's your
6  finding, correct?
7      A.  Yes.
8      Q.  And that's not contained in your October 18
9  report, correct?
10     A.  Not those words, no.
11     Q.  Not anything relating to the garage
12  obstructing the view of the building from the
13  highway, correct?
14         MR. FALBY:  Objection, mischaracterizes
15  his testimony.
16     Q.  You may answer.
17     A.  That's correct, nothing about that.
18     Q.  And going on, you say, "In my professional
19  opinion" -- page 13 -- "any structure that is built
20  that interferes with the view of another structure
21  from a major highway, or any structure that adds
22  significantly to the traffic congestion in an area,
23  will have a detrimental impact on the value of the
24  existing structure"; do you see that?

Page 95

1      A.  Yes.
2      Q.  You will agree with me that neither that
3  statement nor anything similar to that was contained
4  in your October 18 report?
5      A.  That's true.
6      Q.  Did you observe -- strike that.  Did you do
7  any traffic studies with respect to your
8  professional opinion as expressed on page 13 of your
9  expert report?
10     A.  No.
11     Q.  Did you consult with a traffic consultant?
12     A.  No.
13     Q.  Did you stand out there during rush hour
14  and see what the alleged traffic congestion in the
15  area was?
16     A.  No.  My primary source for that statement,
17  which refers to before the garage was built and then
18  after the garage was built, the fact that it would
19  add traffic, came from the complaint that was filed
20  by the subject building owners during that -- during
21  the process of approving the garage with the town of
22  Canton where they did state that the increased
23  traffic would have a detrimental effect on their
24  building.

Page 96

1      Q.  So you relied on what was contained in a
2  complaint, correct?
3      A.  And my general experience in those matters.
4      Q.  Well, I'm just looking at what you say.
5  You say "in my professional opinion."  Is that what
6  you said?
7      A.  Yes.
8      Q.  All right.  You don't say "in my
9  professional opinion, I can read what's contained in
10  a complaint," do you?
11         MR. FALBY:  Objection.  It says what it
12  says, and you just mischaracterized what he said,
13  and it's unfair to the witness.
14         MR. MCGLYNN:  No, it's not unfair.
15  These are perfectly legitimate questions.
16         MR. FALBY:  No, they're not legitimate
17  questions.  You are arguing with the witness.
18         MR. MCGLYNN:  I'm cross-examining the
19  witness.
20         MR. FALBY:  You are arguing with him to
21  no effect, no point.
22         MR. MCGLYNN:  Well, we will let the
23  record decide that.
24     Q.  Your statement here is it's in your

Page 97

1  professional opinion, correct?
2      A.  Yes.
3      Q.  You also indicate --
4         MR. FALBY:  Let me just note for the
5  record that you have just established something.  In
6  his professional opinion, any structure that adds
7  significantly to the traffic congestion will have an
8  impact, and he said that he relied, for a portion of
9  that, that it would have an impact, on the
10  statements of your clients.
11         MR. MCGLYNN:  Bruce, you know the rules.
12  Make your objection, no coaching of the witness.
13         MR. FALBY:  I'm actually not coaching
14  the witness.  What I am trying to do is just make
15  sure that the record is clear.
16         MR. MCGLYNN:  Well, you know what?  You
17  will have plenty of time to redirect this witness
18  after I finish, but no more coaching.
19         MR. FALBY:  I'm not coaching, Peter.
20  I'd appreciate it if you would stop
21  mischaracterizing what he says, which is what you
22  are doing.
23     Q.  All right.  Let's go on, sir.  You also
24  indicate on page 14, Paragraph No. 2, that "the

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

Page 102

1    MR. MCGLYNN:  I didn't say on the
2  original exhibit.
3    Q.  Did you conduct any measurements to
4  determine how much of the view from 150 Royall was
5  obstructed by this garage?
6    A.  No.
7    Q.  Did you get up on the second floor of 150
8  Royall to see whether or not the view from the
9  top -- the second floor of 150 Royall was obstructed
10  by the garage?
11    A.  During the tour we were on the second
12  floor, but I do not recall if we were in the exact
13  corner or the area where the view was obstructed.
14    Q.  You knew there were trees there as well,
15  correct?
16    A.  I don't know that.
17    Q.  There were trees that were on -- in front
18  of -- strike that -- in between 150 Royall and Route
19  95?
20    A.  What period of time are you talking?
21    Q.  When you did your field work.
22    A.  There are trees to the south, I believe.  I
23  don't believe there are trees or substantial trees
24  between the subject property and the parking garage.

Page 103

1    Q.  Take a look at page 40 of your October
2  report.
3    A.  Uh-huh.
4    Q.  Exhibit 16.  Do you see that?
5    A.  Yes.
6    Q.  Do you see where it shows little black
7  arrows?
8    A.  Yes.
9    Q.  What's the squiggly marking on the adjacent
10  lot?  What does that signify?
11    A.  That signifies some kind of growth.
12    Q.  Some kind of growth.  All right.  And that
13  growth is in between the building and Route 128,
14  correct?
15    MR. FALBY:  Tiny little bushes.
16    A.  To the -- I'd call that the southwest, yes.
17    Q.  Would those have an impact on -- how do you
18  describe it?
19    MR. MCGLYNN:  I'm going to try and find
20  his exact language in his expert report.
21    MR. FALBY:  Employee satisfaction?
22    Q.  -- employee satisfaction?
23    MR. MCGLYNN:  Thank you, Bruce.
24    A.  You are asking me if a view of trees would

Page 104

1  have an impact on employee satisfaction?
2    Q.  Yes.
3    A.  Compared to a view of the garage?
4    Q.  No trees.
5    A.  No trees?
6    MR. FALBY:  Object to the ambiguity of
7  the question.
8    Q.  You may answer.
9    A.  I have not -- I'd need to consider that a
10  little further, I think, before I answer that
11  question.  It's not something I'd want to answer off
12  the top of my head.
13    Q.  So is it your testimony today, sir, that if
14  the garage was not there, that your valuation of the
15  building as of October 18, 2004, would be greater
16  than $15 million?
17    A.  I can't say that with any certainty because
18  that wasn't the case as of that date.
19    Q.  Well, the garage was there at the time,
20  correct?
21    A.  Yes, but you are asking me to assume
22  something that was not in place.  I don't really
23  know the true extent that -- you know, what was
24  there in place of the garage prior to that, so it's

Page 105

1  difficult for me to say the impact on my estimate if
2  the garage wasn't there.
3    Q.  So what you are saying in your expert
4  report, at least as it relates to this garage, is
5  that it had a negative impact, correct?
6    A.  Yes.
7    Q.  You just can't quantify it?
8    A.  That's correct.
9    Q.  And you can't tell us whether or not it
10  would mean that the -- that without the garage, the
11  building would have been worth more than the $15
12  million that you valued it as of October 18, 2004?
13    A.  That's correct, I couldn't opine.
14    Q.  And your discussions or conversations with
15  Polcari -- excuse me, with Donovan and Needle, they
16  are not reflected in any notes or memoranda or
17  minutes that you or anybody at Bonz & Company
18  prepared, correct?
19    MR. FALBY:  Objection, asked and
20  answered.
21    A.  The -- I will say that my recollection of
22  the -- after I looked through the workpapers that
23  were provided by Bonz & Company in association with
24  the 2004 report, I did see a sheet recording some

27 (Pages 102 to 105)

# EXHIBIT 14

EXHIBIT

Stone 10
2-9-06 OA

## LEASE TERMINATION AGREEMENT

This **LEASE TERMINATION AGREEMENT** entered into as of this 5th day of August, 2003 between EquiServe, Inc., successor to Equiserve Limited Partnership, as "Tenant", and Blue Hills Office Park, LLC, as "Landlord", relating to the Lease dated April 19, 1989, as subsequently amended and assigned (the "Lease"), covering a portion of the premises commonly known and addressed as 150 Royall Street, Canton, Massachusetts (the "Demised Premises").

WHEREAS, the term of the Lease ends on July 31, 2004 and, for all purposes, Tenant has waived, relinquished and terminated its right to extend that term or in any manner to otherwise occupy the Demised Premises beyond July 31, 2004 (the "Termination Date"), except as herein specifically set forth; and

WHEREAS, Tenant, in making arrangements for its relocation from the Demised Premises, has worked with Landlord to reach agreements herein set forth as to the contents and condition of the Demised Premises upon it being vacated by Tenant;

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) paid by each party hereto to the other, and in consideration of the mutual agreements herein, the receipt and sufficiency of which consideration the undersigned acknowledge, Landlord and Tenant agree as follows:

1.    **Personalty, Fixtures & Equipment.**  At the Termination Date or the conclusion of the Holdover Period (defined in Section 4, below), as the case may be, or such earlier date upon which the Lease is properly terminated on account of Tenant's default, Tenant agrees to leave the following personalty or equipment at the Demised Premises:

>       (i)     Voice and data cabling and electric wiring and equipment other than non-telephone computers and computer equipment, handsets and telephone switching equipment;
>       (ii)    Security system including its wiring, cameras and monitors;
>       (iii)   All health club and cafeteria furniture, fixtures, equipment and inventory owned by Tenant or any affiliates of Tenant;
>       (iv)    Generator and its appurtenances;
>       (v)     Electric scissor lift utilized by Tenant at the Demised Premises;
>       (vi)    A minimum of sixty percent (60%) of the workstation partitions, tracks and wiring and related office furniture (collectively, "Workstations") presently located in the Demised Premises, provided that the Workstations removed from the Demised Premises shall be generally of the same quality, type and mix as those that remain in the Demised Premises, that those removed are removed to 250 Royall Street in Canton, Massachusetts, being the property to which Tenant intends to move, or are used as "trade-ins" for procuring furnishings for the same, and that the Workstations which remain in the Demised Premises shall remain in one or more contiguous areas; and

(vii) All HVAC, plumbing and electrical systems (including fixtures and equipment making up the same) presently located in the Demised Premises and placed therein by Tenant and not otherwise specifically dealt with in (i) through (vi) above.

The personalty or equipment to be left in the Demised Premises by Tenant by the terms of this Paragraph 1 described in the foregoing subsections (i) through (vi), inclusive, is referred to collectively as the "Yield Up Property." Tenant may, but is not obligated, to remove all its other personalty, fixtures and equipment (collectively, "Tenant Property") from the Demised Premises, and shall not remove or restore its alterations and modifications located therein. Title to the Yield Up Property and any other Tenant Property that remains at the Demised Premises on the Termination Date or at the conclusion of the Holdover Period, as the case may be, shall vest in Landlord on such date. Upon request of Landlord at or after such date, Tenant shall execute and deliver to Landlord a bill of sale in the form attached hereto as Exhibit A confirming transfer of title to the Yield Up Property. Any Tenant Property not removed at the Termination Date as that date is applicable to the Demised Premises not subject to holdover hereunder, and as applicable to the Holdover Premises, as applicable, shall be considered abandoned by Tenant and may be used or disposed of by Landlord as it determines, without Landlord or Tenant having any obligation to the other or any third party relating thereto, including, without limitation, any obligation of Landlord for an accounting thereof to Tenant or any third party.

2.    Condition of Yield Up Property and Other Equipment & Fixtures.  All Yield Up Property shall be maintained by Tenant through the Termination Date applicable to the Demised Premises in which they are located, in good operating condition. In addition, Tenant shall continue to maintain in good operating condition through the Termination Date the currently existing building systems (such as the plumbing, electrical and HVAC systems) and the components, fixtures and equipment comprising the same and shall leave the same in the Demised Premises as and when required to be vacated hereunder.

3.    Removal Damage.  Tenant shall use reasonable care in its move out and removal of Tenant Property. Damage caused by Tenant's move-out or removal of Tenant Property other than incidental blemishes in paint and finishes shall be repaired by Tenant to reasonably good condition. If Tenant breaches its obligations under this Section 3 and Landlord reasonably expends in excess of Ten Thousand Dollars ($10,000) to bring the Demised Premises into a condition consistent with this Section 3, Tenant shall be obligated to reimburse Landlord for such reasonable expenses in excess of Ten Thousand Dollars ($10,000) within seven (7) days of receipt of an invoice therefor.

4.    Holdover.  Tenant shall have the right to hold over in a portion of the Demised Premises (but not in the area shown as Bay 000 on the floor plan attached hereto as Exhibit B and incorporated herein by reference), provided that:

A.    Tenant gives Landlord written notice on or before January 15, 2004, of its intention to hold over, which notice shall identify the contiguous area on the first and/or second floor of the Demised Premises in which Tenant intends to hold over (the "Holdover Premises"), such notice also must

2

state the duration of the hold over through the end of a calendar month, but not beyond October 31, 2004 (the hold over termination date as so specified by Tenant, the "Holdover Termination Date"). The holdover notice must also identify the Yield Up Property which will be yielded up to Landlord on the Termination Date and generally describe the personal property Tenant intends to remove or leave at the Demised Premises on the original Termination Date and on the Holdover Termination Date. Tenant's right to holdover is further subject to the following conditions: (i) Tenant shall have then maintained its obligations under the Lease current, without default not cured within any applicable grace period; (ii) Tenant otherwise vacates the remaining Demised Premises (i.e., the non Holdover Premises) in the Building on or before July 31, 2004, and (iii) Tenant pays rent and additional rent for its holdover of the Holdover Premises, calculated at that rate per square foot equal to 110% times per the square foot rent under the Lease, which payment is to be made on or before July 1, 2004, together with other sums which accrue for Tenant's occupancy for the month of July, 2004;

B.  Landlord will have the right, in addition to any other remedies at law or under the Lease, to have Tenant vacate and to recover the Demised Premises as of the Termination Date and the Holdover Premises (if any) as of the Extended Termination Date (by summary process or specific performance, as Landlord determines), free and clear of any right or interest of Tenant therein. Landlord's cost in proceedings to recover possession, including but not limited to reasonable legal fees and related costs, shall be payable by Tenant within 7 days after being invoiced therefor. If Tenant holds over in any portion of the Demised Premises for which Tenant has no right to holdover in accordance with this Paragraph 4, Tenant shall be responsible for holdover rent for a full calendar month on account of Tenant occupying for all or any portion of a month, at a rate equal to the rent, additional rent and other sums which accrue with respect to its occupancy of the Demised Premises for the month of July, 2004, times 150%; and

C.  In the event of a holdover by Tenant pursuant to Paragraph 4.A above, the term "Termination Date" shall apply (i) to the Extended Termination Date for the Holdover Premises, but not later than October 31, 2004 as to the Holdover Premises, and (ii) to July 31, 2004 for the remaining portion of the Demised Premises.

5.  <u>Representations & Warranties</u>. Landlord and Tenant represent and warrant to the other as follows:

A.  It has all requisite corporate power and authority to execute, deliver and perform this Agreement without further authorization or condition precedent; and

B.  Its execution, delivery and performance of this Agreement constitutes a legal, valid and binding obligation enforceable in accordance with its terms effective and enforceable as of this date.

3

BLUE HILL    1605

6.  <u>Miscellaneous.</u>

A.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

B.  This Agreement shall be governed by and enforced and construed in accordance with the laws of the Commonwealth of Massachusetts. Any action at law or in equity arising out of or relating to this Agreement shall be filed only in the Superior Court of either Norfolk County or Suffolk County, Massachusetts, and the parties hereby consent and submit to the personal jurisdiction of such courts for the purpose of litigating any such action.

C.  The parties hereto waive all right to trial by jury, and expressly agree to bear their own costs of such litigation including, but not limited to, attorneys' fees; provided, however, to the extent a party is held to have breached its agreements herein, that liable party shall also be responsible to pay and reimburse the other party for its reasonable legal fees and costs incurred in that proceeding.

D.  This Agreement may not be altered, amended, or otherwise modified except by writing duly executed by an authorized representative of the party against which enforcement is sought.

E.  This Agreement constitutes the entire understanding of the parties hereto with respect to the condition of the Demised Premises and the Termination Date of the Lease.

F.  The recitals herein are incorporated within and made part of this Agreement.

**[Remainder of Page Intentionally Blank]**

4

BLUE HILL   1606

IN WITNESS WHEREOF, the undersigned have signed this Lease Termination Agreement under seal as of the day and year first above-written.

EquiServe, Inc., successor to
Equiserve Limited Partnership

TENANT:

By: *Morton B Comen*

Name: MORTON B. COMEE
Title: CHIEF OPERATING OFFICER

Blue Hills Office Park LLC

LANDLORD:

By: _____

Name: _____
Title: _____

00774994.7

5

BLUE HILL 1607

IN WITNESS WHEREOF, the undersigned have signed this Lease Termination Agreement under seal as of the day and year first above-written.

EquiServe, Inc., successor to Equiserve Limited Partnership

TENANT:                    By: _____
                                Name:
                                Title:

Blue Hills Office Park LLC
By:  Blue Hills Management Corp.,
     its Manager

LANDLORD:                  By: _Gerald S. Fineberg_
                                Name:  Gerald S. Fineberg
                                Title:    President and
                                          Treasurer

00774994.10
#274037 v1/14500/9547

5

BLUE HILL   1608

## EXHIBIT B

## FLOOR PLAN

BLUE HILL     1609



JUL-21-2003  11:53                    EQUISERV                    781 575 2654    P.02

BAY 000

BAY 300

BAY 400

BAY 100

BAY 200

**KEY:**
A - Technology Services
B - Fairway/AWD
C - Proxy
D - Telecommunications
E - Data Security
F - Audit
G - Image Center

H - Billing Project/Finance
J - Transfer Operations
J - Options
K - Human Resources
L - CLD (Training)
M - Quality
N - Corporate Actions/BAM

O - Shareholder Services
P - Employee Plans
Q - Stock Options
R - Shared (P&Q)
S - Facilities
T - Process Improvement
U - Database

OTH & SEELEN INC.
ARCHITECTURE INTERIOR DESIGN PLANNING

Subject: NOVEMBER 2000 SPACE ALLOCATION 1" = 60'-0"

Project: 1ST FLOOR - EQUISERVE

150 ROYALL STREET, CANTON, MA.

SC-1

BLUE HILL 1610

EXHIBIT 15



EXHIBIT
Denever
25
DEC 2/14/06

on or
about        Aug 04
voice mail

My name is Jobe Worshaw with Cenan Partners in Miami my number is 305-695-5092

we are the special servicer on the Blue hills office Park loan   the file has been transferred to special servicing please call me

Jobe Worshaw  305-695-5092

I will be faxing over to you all a letter to you  that we would like segned prior to engaging in discussion   The letter is made out addressed to Gerald Fineberg but we will fax it over to you all shortly   I'm calling to introduce myself I'll be faxing shortly

Blue Hill 1230

on on about
8/04

voice mail

got a call from
Eric Stotts Bonds & Co Boston
We are doing an appraisel in
regards to 150 Royall St in Canton
This is an introductory call that
We do on a new job to
understand whats going on at
a building. I drove by the
other day — saw that it was
empty please call
617-478-2090 Ext 108

Blue Hill 1231

EXHIBIT 16



**EXHIBIT** 51
Polcari
2/28/06     ttb

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.,
Depositor


WELLS FARGO BANK, NATIONAL ASSOCIATION,
Servicer


LENNAR PARTNERS, INC.,
Special Servicer


THE CHASE MANHATTAN BANK,
Trustee


NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION,
Certificate Administrator and Custodian


POOLING AND SERVICING AGREEMENT


Dated as of October 11, 1999


$1,187,129,449
Commercial Mortgage Pass-Through Certificates
Series 1999-C1

CSFBMSC 00001

the related Mortgaged Property within the 12-month period immediately prior to the occurrence of such Appraisal Reduction Event. Instead, the Special Servicer may use such prior Appraisal in calculating any Appraisal Reduction with respect to such Loan.

With respect to each Loan as to which an Appraisal Reduction Event has occurred and which has become a Corrected Loan and has remained current for twelve consecutive Monthly Payments, taking into account any amendment or modification of such Loan, and with respect to which no other Appraisal Reduction Event has occurred and is continuing, the Special Servicer may within 30 days after the date of such twelfth Monthly Payment, order an Appraisal (which may be an update of a prior Appraisal), or with respect to any Loan with an outstanding principal balance less than $2,000,000, perform an internal valuation or obtain an Appraisal (which may be an update of a prior Appraisal), the cost of which shall be paid by the Servicer as a Servicing Advance. Based upon such Appraisal or internal valuation, the Special Servicer shall redetermine and report to the Trustee and the Servicer the amount of the Appraisal Reduction with respect to such Loan and such redetermined Appraisal Reduction shall replace the prior Appraisal Reduction with respect to such Loan.

Section 3.20    Modifications, Waivers, Amendments and Consents.

(a)    Subject to the provisions of this Section 3.20, the Servicer and the Special Servicer may, on behalf of the Trustee, agree to any modification, waiver or amendment of any term of any Loan without the consent of the Trustee or any Certificateholder.

(i)    For any Loan other than a Specially Serviced Loan and the L'Enfant Participation and subject to the rights of the Special Servicer set forth below, the Servicer shall be responsible subject to the other requirements of this Agreement with respect thereto, for any request by a Borrower for the consent of the mortgagee or a modification, waiver or amendment of any term thereof, provided that such consent or modification, waiver or amendment would not affect the amount or timing of any of the payment terms of such Loan, result in the release of the related Borrower from any material term thereunder, waive any rights thereunder with respect to any guarantor thereof or relate to the release or substitution of any material collateral for such Loan. To the extent consistent with the foregoing, the Servicer shall be responsible for the following:

(A)    Approving any waiver affecting the timing of receipt of financial statements from any Borrower provided that such financial statements are delivered no less than quarterly and within 60 days of the end of the calendar quarter to which such financial statements relate;

(B)    Approving routine leasing activity with respect to leases for less than the lesser of (a) 30,000 square feet and (b) 20% of the related Mortgaged Property;

(C)    Approving annual budgets for the related Mortgaged Property, provided that no such budget (1) relates to a fiscal year in which an Anticipated Repayment Date occurs, (2) provides for the payment of operating expenses in an amount equal to more than 110% of the amounts budgeted therefor for the prior

CSFBMSC 00118

year or (3) provides for the payment of any material expenses to any affiliate of the Borrower (other than the payment of a management fee to any property manager if such management fee is no more than the management fee in effect on the Cut-off Date);

(D)    Waiving any provision of a Loan requiring the receipt of a rating confirmation if such Loan is not a Significant Loan and the related provision of such Loan does not relate to a "due-on-sale" or "due-on-encumbrance" clause (which shall be subject to the terms of Section 3.08 hereof); and

(E)    Subject to other restrictions herein regarding Principal Prepayments, waiving any provision of a Loan requiring a specified number of days notice prior to a Principal Prepayment.

(ii)    Notwithstanding the foregoing, the Servicer shall not waive, modify or amend the provisions of any Loan unless such waiver, modification or amendment would not constitute a "significant modification" under Treasury Regulations Section 1.860G-2(b).

(iii)    The Special Servicer shall be responsible for any request by a Borrower for the consent of the mortgagee and any modification, waiver or amendment of any term of any Loan for which the Servicer is not responsible, as provided above, or if such consent, request, modification, waiver or amendment relates to a Loan that is on the most recent Servicer Watch List, has a Debt Service Coverage Ratio (based on the most recently received financial statements and calculated on a trailing twelve month basis) less than the greater of 1.1x or 20% less than the Debt Service Coverage Ratio as of the Cut-off Date (unless such Loan is a credit lease loan) or with respect to which an event of default has occurred in the preceding 12 months.

(b)    All modifications, waivers or amendments of any Loan shall be (i) in writing and (ii) effected in accordance with the Servicing Standard.

(c)    Neither the Servicer nor the Special Servicer, on behalf of the Trustee, shall agree or consent to any modification, waiver or amendment of any term of any Loan that is not a Specially Serviced Loan if such modification, waiver or amendment would:

(i)    affect the amount or timing of any related payment of principal, interest or other amount (including Prepayment Premiums or Yield Maintenance Charges, but excluding Penalty Interest and other amounts payable as additional servicing compensation) payable thereunder;

(ii)    affect the obligation of the related Mortgagor to pay a Prepayment Premium or Yield Maintenance Charge or permit a Principal Prepayment during any period in which the related Note prohibits Principal Prepayments;

(iii)    except as expressly contemplated by the related Mortgage or pursuant to Section 3.09(e), result in a release of the lien of the Mortgage on any material portion of the related Mortgaged Property without a corresponding Principal Prepayment in an

# EXHIBIT 17

**Cowling, Larry C.**

| | |
|---|---|
| **From:** | O'Neal, Kathryn A |
| **Sent:** | Tuesday, August 17, 2004 9 51 AM |
| **To:** | Bass, Ilona M ; Beliz, Carmen H , Boi, Susie; Britton, Stephanie S.; Budgin, Bryan; Chung, Patrick; CMS CASH MANAGEMENT; CMS TAX; Cocco, Rusty E.; Connolly, Lisa; Delagarza, Jeannette V ; Fray, Joyce, Greene, Debra M.; Gremore, Maggie M.; Hancock, AnnMarie; Hayek, Doug R ; Huebner, David D., INVESTOR REPORTING, Kohal, Linda K.; Krueger, June, Kwong, Henry B ; Lai, Teresa; Lambson, Deborah E., Lapointe, Raymond L ; Lei-Morales, Stephanie S , Martin, Jill L ; McAdams, Stewart E.; Mooney, Pat J., Nhan, Vi, Nyholm, Christine T., Nziramasanga, Charles, O'Neill, Michael F ; Ross, Misty M ; Rudio, Fay H.; Shuheiber, Rania, Stephens, Kate, Swanson, Steven; Tso, Christine C ; Turnbow, Daniel T., Villanueva, Edward, West, Stephanie M , Wong, Nancy M ; zz.RMD LOAN SERV; Borstead, Juanita L.; Brewster, Jeanne M.; Bruning, Marlies; Burns, Sarah, Cowling, Larry C ; Gamage, Gary A., Landry, Susan M., Lewis, Troy D.; Mallegni, Curtis J., Mowbray, Scott; Murray, Ken V.; Poblete, M. Tessie; Rudder, Debra A ; Sutterfield, Noreen; Vaughn, Barbara; Yoo, Jimmy |
| **Subject:** | FW: Special Service Transfer Blue Hills Office Park LLC Loan #760990083 Pool CSFB 1999-C1  INV 524 - Lennar Partners, Inc  Special Servicer - Loan Balance $31,979,793 66 |

Approved to transfer to Lennar as Special Servicer  under the imminent default provisions of the PSA.

Kathryn O'Neal
Senior Vice President/Managing Director
Commercial Mortgage Servicing
Wells Fargo Bank
45 Fremont Street, 2nd Floor
San Francisco, California  94105

email  kathryno@wellsfargo com
office  415-396-0782
fax      415-975-7236

```
-----Original Message-----
```
| | |
|---|---|
| **From:** | Mallegni, Curtis J. |
| **Sent:** | Monday, August 16, 2004 12:29 PM |
| **To:** | O'Neal, Kathryn A. |
| **Subject:** | Special Service Transfer Blue Hills Office Park LLC Loan #760990083 Pool CSFB 1999-C1  INV 524 - Lennar Partners, Inc. Special Servicer - Loan Balance $31,979,793.66 |

It is recommended that the above referenced loan be transferred to the Special Servicer, Lennar Partners, Inc., on the basis of an imminent default as the transferring event under Section 1.01 of the Pooling and Servicing Agreement. The specifics are as follows

Loan No.: 760990083
Loan Pool  CS First Boston Securities Corp. 1999 - C1 (Pool 524) - Lennar Partners, Inc. Special Servicer
Borrower: Blue Hills Office Park, LLC
Master Servicer. Wells Fargo Bank
Special Servicer. Lennar Partners, Inc
Asset Administration  Larry Cowling
Property Type  One (1) two-story class A office building, of 273,863 sf  known as Blue Hills Office Park located at 150 Royal Street, Canton, Mass 02021
Loan Amount: $31,979,793 66
Paid to Date  July 11, 2004
Next payment due - August 11, 2004
Payment now past due: $333,638 55 plus late charges of $7,639 57
Occupancy. Vacant - The single tenant Fleet Bank moved out at the end of July 2004
Details of transfer request

Loan is being transferred on the basis of imminent default under the Servicing transfer provisions of the Pooling and Servicing Agreement.

**The Pooling and Servicing Agreement at page 52 provides the definition of a Service Transfer Event as, among**

1

**other things,:** (iii) the Servicer determines that a payment default has occurred or is imminent and is not likely to be cured by the related Mortgagor within 60 days;

Status:
- This is a single tenant project of 273,863 sf, and the tenant - Fleet Bank vacated the property as of July 31, 2004
- The loan is the 12th largest loan in this pool
- The borrower has not made the August 2004 payment which is now past due
- There is a $4,121,728 reserve for releasing which the borrower has indicated they would like to use for debt service.
- The borrower has also requested in writing and in phone conversation a meeting with the Special Servicer - Lennar to discuss the loan status and the future performance of the loan.
- Given the size of the loan and the unoccupied status of the property, it is expected that in addition to the existing past due amounts, that further non-payments can be reasonably expected in the next 60 days which require the intercession of the Special Servicer Lennar Partners, Inc.

Based on these factors, it is recommended that this loan be transferred to the Special Servicer, Lennar Partners, Inc, on the basis of an imminent default under Section (iii) of the Service Transfer Events under the Pooling and Servicing Agreement.

Curtis J. Mallegni
45 Fremont Street
2nd Floor
San Francisco, CA 94105
MAC A0194-025
Phone (415) 396-6999
Fax (415) 975-7236

2

WF01285

# EXHIBIT 18

AUG.25.2004   2:03PM   FINEBERG MANAGEMENT                    NO.239   P.3/5



**LENNAR PARTNERS**
An LNR Company

EXHIBIT 62
Polcari
2/23/06   +FB

August 19, 2004

Blue Hills Office Park LLC
C/O Fineberg Management, Inc.
One Washington Street, Suite 400
Wellesley, MA 02481
Attention: Gerald S. Fineberg

RE: Loan in the original principal amount of $33,149,000.00 (the "Loan") to Blue Hills Office
Park LLC (the "Borrower") held by JP Morgan Chase Bank, as trustee (the "Trustee")
Portfolio:      CS First Boston Mortgage, Series 1999-C1
Loan No.:      76-0990083

Dear Borrower:

Lennar Partners, Inc. (the "Special Servicer") is the Special Servicer with respect to the Loan
and has the authority, on behalf of the Trustee, to discuss and to meet with representatives of the
Borrower to review the status of the Loan and any issues arising under any of the documents
relating to the Loan (the "Loan Documents").

We have agreed to discuss with your representatives the status of the Loan and the Loan
Documents provided that the following agreements and understandings govern. In order to ensure
that our discussions will be as open and productive as possible, we wanted to write to you to
confirm our mutual understanding that all discussions and/or negotiations will be governed by
the terms and conditions in this letter. If you are in agreement with such terms and conditions, we
would appreciate you acknowledging such by signing this letter in the space provided and
returning it to us.

1. **Negotiations.**   The Borrower and the Special Servicer agree that any discussions,
negotiations, correspondence or other communications relating to the Loan and the Loan
Documents that the Borrower may have in the future or may have had with representatives of
Wells Fargo Commercial Mortgage Servicing, the Master Servicer (the "Master Servicer"),
or the Special Servicer, (any such discussions, negotiations or correspondence or other
communications being hereinafter referred to as "Loan Communications") are not binding
upon any of the Borrower, the Trustee, or Special Servicer (collectively the "Parties"). The
Borrower also acknowledges and agrees that none of the Trustee, the Master Servicer or the
Special Servicer is under any obligation to consent or otherwise agree to any Borrower
request with respect to the Loan, or to modify the Loan or the Loan Documents. Each of the
Parties understands and agrees that no Party shall have any defense to any action by one or
more of the other Parties, nor assert any waiver by one or more of the other Parties, based on
any Loan Communications.

2. **Releases.**   The Parties hereby completely, irrevocably and unconditionally release and
forever discharge each of the Parties from any and all claims and demands whatsoever, in
law or equity, whether such claims are presently known or unknown, direct or indirect, fixed
or contingent, which the Parties may have or may claim to have against the other caused by,
or arising out of any Loan Communications.

1601 Washington Avenue • Suite 700 • Miami Beach, Florida 33139
Telephone: (305) 695-5600 • Fax: (305) 695-5601

LNR03518

3. **No Waivers.** Each of the Parties acknowledge and agree that participation in the Loan Communications does not constitute by any Party (a) a renewal, extension or standstill arrangement as to the exercise of any rights, remedies or powers, of such Party under the Loan Documents, (b) a waiver or the release of any defaults under the Loan or the Loan Documents, or (c) a waiver, consent, release or modification of any right or remedy under any provision of the Loan Documents. None of the Parties intends to waive any defaults that may exist, or any right or remedies unless and until it expressly does so in writing. Furthermore, participation in the Loan Communications shall not prevent any Party from exercising any right, remedy or power available to such Party including, without limitation, all rights, remedies and powers granted under the Loan Documents or at law or in equity. The Parties further understand and agree that no failure or delay in exercising any right or remedy with respect to the Loan or under the Loan Documents shall constitute a waiver of, or affect adversely in any manner, any of such rights and remedies nor shall any such failure or delay form the basis for any claim or cause of action.

4. **Only Written Agreements.** The Parties acknowledge and agree that no compromise, consent, release, waiver, or modification agreement or understanding with respect to the Loan or the Loan Documents shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by the authorized representatives of all necessary Parties to any such agreement. The Parties acknowledge and agree that by executing this letter agreement, they are precluded from claiming that any agreement, consent, waiver, release, or modification, oral, express, implied, or otherwise, of the Loan or the Loan Documents, has been effected except in accordance with the terms of this letter. The Parties further acknowledge and agree that no Party is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents.

5. **Authority.** The Borrower represents and warrants that the Borrower is the borrower under the Loan Documents, and the person signing this Agreement on behalf of Borrower hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Borrower. The Special Servicer represents and warrants that it is empowered to act on behalf of the Trustee under the Loan Documents in the capacity of attorney-in-fact, and the person signing this Agreement on behalf of Special Servicer hereby represents and warrants that such person has the necessary power and authority to execute and deliver this Agreement on behalf of the Trustee. This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective successors, legal representative and assigns as applicable.

6. **Expenses.** The Borrower agrees that it shall pay all costs of the Special Servicer in connection with Loan Communications, including but not limited to expenses for inspection of the property, legal fees and the fees of other professionals.

7. **Advice from Independent Counsel.** The Borrower acknowledges that independent counsel represents the Borrower, or if not so represented, that Borrower has been advised to obtain representation by independent counsel, and has fully reviewed the terms of this Agreement. Borrower acknowledges that Borrower executes this Agreement, based on its own independent judgment, on the advice of counsel, if represented, and is under no threat, coercion or duress from any Party.

8. **Settlement Negotiations.** Borrower acknowledges and agrees that any conduct or statements, whether written, oral, telephonic or otherwise, made at any time in connection with the Loan Communications are without prejudice and, without exception, constitute settlement negotiations that are not to be disclosed to any other person nor to be admissible as evidence in any administrative or judicial proceeding (i) between the Trustee, Borrower

LNR03519

AUG.26.2004  2:04PM   FINEBERG MANAGEMENT                    NO.239   P.5/5

and/or Special Servicer, or (ii) involving any of the Loan Documents or any of the property securing the Loan. The Loan Communications, or any writings generated as a result of the Loan Communications, may not be used in any litigation to indicate culpability, weakness of position or an admission of liability, or to otherwise admit any obligations due and owing to or from the Parties.

9.   **Information Request.**   In order to enable the Special Servicer to properly evaluate the Borrower's request, the Borrower agrees to forward to the Special Servicer all the information checked on **Exhibit A**, which is attached hereto.

Additional information may be requested in the future.  Thank you for your attention to this matter.

Lennar Partners, Inc., as Special Servicer

By: _____
Job Warshaw
Sr. Vice President
Real Estate Finance & Servicing Group
Lennar Partners, Inc.

**ACKNOWLEDGED AND AGREED BY:**

Borrower:      Blue Hills Office Park LLC

By its manager:   Blue Hills Management Corp.

By: _____
Name:      Gerald S. Fineberg
Title:      President

NOTICE TO CONSUMER BORROWERS AS REQUIRED BY FEDERAL FAIR DEBT COLLECTION PRACTICES ACT:  We are attempting to collect debt and any information obtained will be used for that purpose.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID, SETTLED OR IS OTHERWISE NOT OBLIGATED:  Please be advised that this letter constitutes neither a demand of payment of the captioned debt nor a notice of personal liability to any recipient hereof who might have received a discharge of such debt in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, has paid, settled or is otherwise obligated by law.

cc:   Debra Rudder – Wells Fargo Commercial Mortgage Servicing
      Pat Prince – Lennar Partners/Loan Servicing

LNR03520

# EXHIBIT 19



**From:**          Isaac Pesin
**Sent:**          Wednesday, October 13, 2004 5:56 PM
**To:**            Joe Polcari
**Subject:**       RE: Blue Hills

Binders are already being produced.  LG can discuss @ mtg.  That's one hell of a loss- congrats

-----Original Message-----
**From:**          Joe Polcari
**Sent:**          Wednesday, October 13, 2004 6:54 PM
**To:**            Isaac Pesin
**Subject:**       Blue Hills

Isaac, Larry and I have been doing a little last minute tweaking, and we have changed Blue Hills' loss to
$18,590,000.

1

**From:** Joe Polcari
**Sent:** Wednesday, October 13, 2004 5:59 PM
**To:** Isaac Pesin
**Subject:** RE: Blue Hills

F-ing Skoko.  Always one step ahead.

-----Original Message-----
**From:** Isaac Pesin
**Sent:** Wednesday, October 13, 2004 6:58 PM
**To:** Joe Polcari
**Subject:** RE: Blue Hills

Skoko's healthcare turd wins...sorry

-----Original Message-----
**From:** Joe Polcari
**Sent:** Wednesday, October 13, 2004 6:57 PM
**To:** Isaac Pesin
**Subject:** RE: Blue Hills

Am I in first place?

-----Original Message-----
**From:** Isaac Pesin
**Sent:** Wednesday, October 13, 2004 6:56 PM
**To:** Joe Polcari
**Subject:** RE: Blue Hills

Binders are already being produced.  LG can discuss @ mtg.  That's one hell of a loss- congrats

-----Original Message-----
**From:** Joe Polcari
**Sent:** Wednesday, October 13, 2004 6:54 PM
**To:** Isaac Pesin
**Subject:** Blue Hills

Isaac, Larry and I have been doing a little last minute tweaking, and we have changed Blue Hills' loss to $18,590,000.

1

LNR03100

| From: | David Hall |
|---|---|
| Sent: | Thursday, October 14, 2004 8:18 AM |
| To: | Joe Polcari |
| Subject: | RE: Blue Hills |

40-ish

David S. Hall
Lennar Partners
300 Crown Colony Drive
Quincy, MA 02169

(617) 472-4540
(617) 472-4580 fax
(617) 930-3973 mobile

dhall@lnrproperty.com

-----Original Message-----
**From:** Joe Polcari
**Sent:** Wednesday, October 13, 2004 7:01 PM
**To:** David Hall
**Subject:** Blue Hills

David, I got your e-mail to Ron, which pretty much covers everything.  One more thing - what would you pay for it as is? (assuming you were interested, which I know you're not)

1

LNR03098

**From:**        Joe Polcari
**Sent:**        Thursday, October 14, 2004 8:47 AM
**To:**          David Hall
**Subject:**     RE: Blue Hills

just like you.

    -----Original Message-----
**From:**        David Hall
**Sent:**        Thursday, October 14, 2004 9:18 AM
**To:**          Joe Polcari
**Subject:**     RE: Blue Hills

40-ish

David S. Hall
Lennar Partners
300 Crown Colony Drive
Quincy, MA 02169

(617) 472-4540
(617) 472-4580 fax
(617) 930-3973 mobile

dhall@lnrproperty.com

    -----Original Message-----
**From:**        Joe Polcari
**Sent:**        Wednesday, October 13, 2004 7:01 PM
**To:**          David Hall
**Subject:**     Blue Hills

David, I got your e-mail to Ron, which pretty much covers everything. One more thing - what would you pay for it as is? (assuming you were interested, which I know you're not)

1

LNR03097

# LENNAR PARTNERS
An LNR Company

*Via Federal Express*

October 20, 2004

JP Morgan Chase Bank f/k/a
Chase Manhattan Bank
Institutional Trust Services
4 New York Plaza, 6th Floor
New York, New York 10004
Attn: Ms. Pei Yan Huang

Wells Fargo Commercial Mortgage Servicing
45 Fremont Street, 2nd Floor
San Francisco, CA 94105
Attn: Ms. Debra Rudder

Re:  Portfolio:        Credit Suisse First Boston Mortgage Securities Corp., Series 1999-C1
     Loan No.:         M760990083
     Borrower Name:    Blue Hills Office Park
     Property Address: Blue Hills Office Park
                       150 Royal Street
                       Canton, MA 02021

Dear Ms. Huang and Ms. Rudder:

   We have received the above captioned loan for special servicing. In accordance with Section 3.18(b) of the Pooling and Servicing Agreement dated as of 10-11-99, we are required to give notice that it has been "determined in good faith that such Defaulted Mortgage Loan will become subject to foreclosure proceedings".

Very truly yours,

*Vickie M. Taylor/eel*

Vickie M. Taylor
Special Servicing Supervisor

cc:  Patricia Prince - Lennar Partners/Director of Servicing
     Javier Benedit - Lennar Partners/Compliance
     Joe Polcari - Lennar Partners/Asset Manager

WF01413

| | |
|---|---|
| **From:** | Randall Rosen |
| **Sent:** | Monday, October 25, 2004 9:11 AM |
| **To:** | Joe Polcari; Larry Golinsky |
| **Subject:** | RE: Blue Hills |

I have talked to CBRE, Trammel Crow and the current group, C&W. C&W is having trouble because Fineberg's people blew their tops when they found out they were talking to us. The leasing guy also told me their is some good, recent tenant interest but he didn't elaborate. I'm thinking about going with C&W however we have had mgmt agreement issues with them in the past which need to be overcome first.

-----Original Message-----

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Friday, October 22, 2004 12:23 PM |
| **To:** | Larry Golinsky |
| **Cc:** | Randall Rosen |
| **Subject:** | Blue Hills |

David has been hearing alot of noise about tenant interest. One prospect is Equiserve, our former tenant and now neighbor. The info is coming from RBJ, a local broker who David knows, and who I've dealt with in the past.

Randy, if we go forward with our sale on Nov 12, who will we use as PM and listing agent?

1

LNR03087

| | |
|---|---|
| **From:** | Joe Polcari |
| **Sent:** | Tuesday, October 26, 2004 5:12 PM |
| **To:** | Larry Golinsky |
| **Subject:** | Blue Hills |

Larry, today David and I met with John O'Neil of National Development and Michael Frisoli of Richards Barry Joyce (brokers). National Development built the building next to Blue Hills. It sat vacant for two years before they sold it to Equiserve, who then constructed the garage. RBJ is the broker that I mentioned to you earlier. Judging from our conversations, there is tenant interest. Obviously, RBJ was not going to give us alot of detail. O'Neil offered us 50 cents on the dollar for the loan. David and I agree that we should take this REO instead of including it in a note sale. We can talk more about it at your leisure.

1

LNR03079

EXHIBIT 20



Minutes of the Meeting of May 22, 2003.

PRESENT:    Paul B. Carroll, Chairman
            James F. Fitzgerald, Jr.
            Gregory L. Pando
            Robert J. Quigley, Alternate Member

ALSO
PRESENT:    Sue Franco, Recording Secretary

Mr. Carroll opened the Meeting at 7:00 p.m. in the Salah Hearing Room, Memorial Hall.

### Flatley Company – 25 Westchester Dr.

Attorney Suzanne Matthews and Mr. John Flatley came before the Board representing petitioner.

Attorney Matthews stated the Board previously granted a Variance for this property. One of the conditions of the decision was for petitioner to obtain the approval of his next door neighbor at 45 Westchester for the landscape plan and he now has that. She stated she would like to present the landscape plan to the Board for their approval. The two neighbors who had an issue with the variance were Mr. Slutsky at 45 Westchester Dr. and Mr. Kilduff at 50 Westchester Dr. She stated Mr. Slutsky has signed the landscape plan and is in agreement with it.

Mr. Kilduff requested to speak. He stated that it was his understanding that the the petitioner was supposed to try to appease the neighbors who had an issue and he stated no one has ever tried to appease him. He stated he received a plan from Atty. Matthews and was not aware of the polishing pool that is on the property.

Attorney Matthews stated that pool has been there since the beginning and it was required by the Conservation Commission in their Order of Conditions.

Mr. Flatley stated it is for treating water from the street drain into the wetlands.

Mr. Kilduff stated he should have been notified about the Conservation hearing.

Mrs. Kilduff stated there was no mention of a polishing pool to them and they were not given the opportunity to object to it.

Attorney Matthews stated she got a certified list of abutters from the Conservation Commission and the Kilduff's are not on it, perhaps because they are across the street from the petitioned site.

Mr. Kilduff stated if there is a way that he can stop this, he will do it. He said he has a bad feeling about the polishing pool because he has sink holes in his driveway now and he does not want more water.

Mr. Carroll stated the Zoning Board has no authority regarding the polishing pool and that Mr. Kilduff will have to deal directly with the Conservation Commission.

Mr. Kilduff stated Mr. Flatley has done nothing to appease him.

Mr. Flatley stated he had a meeting with Mr. Kilduff two weeks ago and Mr. Kilduff asked for a deck to be constructed on the back of his home.

Mr. Fitzgerald stated that when the Board asked petitioner to try and appease the abutters, they meant in terms of landscaping, not remodeling. He asked Mr. Kilduff if he had any issue with the landscaping.

Mr. Kilduff stated he does not, he has an issue with the polishing pool.

Mr. Carroll moved to accept the landscape plan as submitted. The move was seconded and the Board voted unanimously to approve.

**Michael Razza – 104 Prospect St.**

Attorney Matthews stated she is requested a continuance to June 26, 2003. She stated the petitioner submitted plans to Tom Houston and some changes will be made.

**National Development – 250 Royall St.**

Attorney Richard Staiti, Mr. Steve Sesso, Mr. Peter Carbone, and Mr. Tighe came before the Board representing petitioner.

Attorney Staiti stated they have submitted the recommendations of the Planning Board and the Edwards & Kelcey report to the Board. He further stated there is a letter in file from the Friends of Little Blue supporting the petition. The Board had asked petitioner to try and resolve any issues with their neighbor at 150 Royall St., however, Atty. Staiti reported they were unable to do that. He stated they have lowered the height of the parking garage by 4'.

BLUE HILL 1594

Zoning Board of Appeals
Meeting of May 22, 2003
Page 3 of 10

Mr. Carroll stated he spoke with Mr. Ed Lynch, a member of the Conservation Commission and he stated the Commission is in support of the project.

Mr. Pando stated he would require elevation plans referenced in the decision, if approved.

Attorney Gary Lillienthal requested to speak. He stated he represents the Blue Hill Office Park at 150 Royall Street. He stated his client has spoken with the petitioner, however, there has been no resolution. He stated his client is concerned that the proposal is based on a misinterpretation of the Zoning By-law. He stated it is impossible to make a determination for site plan approval without looking at the entire site and in terms of vehicular safety, the entire site should be reviewed. There are 670 existing parking spaces that have never been occupied. After the building has full occupancy, he feels it will have a major affect on the traffic. He further stated the proposal obstructs his client's current view from the southwest. He stated there is a large area of impervious surface which has not been dealt with. He does not believe Sec. 2.15.2.C of the Zoning By-law regarding additional open space has been met.

Mr. Carroll inquired as to whether Atty. Lillienthal had any mitigation ideas in terms of landscape.

Atty. Lillienthal stated he has not participated in any discussions between his client and the petitioner and at this time does not have any specific requests.

Mr. Carroll stated he has heard from various boards and town officials and it seems they are in support of the petition.

Mr. Fitzgerald and Mr. Pando stated they have no further questions.

Mr. Fitzgerald moved the petition of National Development Corporation and Equiserve for a modification of Site Plan Approval, and Special Permit (Use) to construct a parking garage at 250 Royall Street, subject to the following conditions:

1.    Petitioner shall adhere to the Planning Board recommendations dated May 21, 2003.
2.    The garage capacity shall not exceed 380 parking spaces.
3.    Construction shall be in accordance with a plan by VHB dated April 9, 2003 and revised on May 18, 2003.
4.    Petitioner shall obtain approvals from all other boards as required.

BLUE HILL 1595

Zoning Board of Appeals
Meeting of May 22, 2003
Page 4 of 10

The move was seconded and the Board voted unanimously to grant.

## Texaco – 731 Washington St.

Mr. Michael Loin came before the Board representing petitioner on the continued matter. He stated he received a positive recommendation from the Canton Center Design Review Board. He stated the Board recommended an overall reduction in height of the signage from 17.6' to 12'6'. He stated that although the petitioner had received previous approval for a Dunkin' Donuts sign at the site, they are not going forward with that sign at the present time. He stated there is a note on the site plan stating that any signage not shown on the plan shall be removed.

Mr. Carroll stated the petitioner has illegal signage up now.

Mr. Loin stated he is aware of that, but the proposed site plan would give a tool for enforcement to the Building Inspector.

Mr. Fitzgerald stated the proposed sign at 12'6' at the proposed location would block visibility.

Mr. Pando suggested moving the sign back 15' from the property line, which would bring it into conformance with the by-law.

Mr. Loin agreed.

Mr. Fitzgerald moved the petition of Motiva Enterprises, LLC for a Special Permit (Sign) to replace the existing sign at 731 Washington St. be granted, in accordance with the Canton Center Design Review Board report, except for sign location, which shall be in accordance with Exhibit A filed and dated with this Board May 22, 2003, and in accordance with the submitted site plan dated May 14, 2003, with Exhibit A superceding. The move was seconded and the Board voted unanimously to approve.

## Leo & Marie Sullivan – 515 Randolph St.

Mr. Alex Donovan and Mr. & Mrs. Sullivan came before the Board representing petitioner.

Mr. Donovan stated he is a family member and would be representing. He stated the Sullivan's are hoping to move the laundry and bathroom facilities to the first floor. He explained they are trying to get the entire living space, including a bedroom, on the first floor because they are elderly and have trouble getting up and down stairs.

BLUE HILL 1596

Zoning Board of Appeals
Meeting of May 22, 2003
Page 5 of 10

Mr. Carroll stated the addition would encroach 15' into the rear yard setback.

Mr. Fitzgerald and Mr. Pando had no questions.

Mr. Fitzgerald moved the petition of Leo & Marie Sullivan for an Extension of Non-Conforming Building to construct an addition to the rear of the house be granted subject to the condition that addition encroach no further than 15' from the rear yard setback and petitioner shall submit a certified plot plan before obtaining a building permit.

The move was seconded and the Board voted unanimously to approve.

### Eric Wade – 5 Cedarcrest Rd.

Mr. Eric Wade came before the Board representing himself. He stated he is requesting to extend the living area of his house and add one bedroom. The addition would be 28' by 34' with a full basement. He cited a growing family as his reason for the addition. He stated the addition would be 12' from the side yard setback and the required is 15'.

Mr. Fitzgerald moved the petition of Eric Wade for an Extension of Non-Conforming Building to construct a 28' by 34' addition which will encroach the side yard setback be granted, in accordance with the submitted plan by Leo J. Glover dated 4/7/03. The move was seconded and the Board voted unanimously to grant.

### Michael Molway/F&R Realty Trust – 48 Pequit St.
### FM Generator, Inc. – 35 Pequit St.

Attorney Suzanne Matthews and Mr. Michael Molway came before the Board representing petitioner.

Attorney Matthews stated the issue at 35 Pequit St. is a violation of a special permit issued by a 1997 decision. She stated it is her position that the petitioner is in compliance with that decision. She stated the issue raised by the Building Inspector was for outside storage of equipment. She stated the petitioner is using one section of the area for parking of generators, which are registered by the Registry of Motor Vehicles. She stated the other side of the site is used by Sunrise Erectors to store equipment and supplies. She stated the site is located in a Industrial District and the uses being conducted are allowed.

BLUE HILL 1597

Zoning Board of Appeals
Meeting of May 22, 2003
Page 6 of 10

Mr. Fitzgerald stated he visited the site earlier in the day and found generators everywhere and not within the area that was supposed to be marked off for storage of generators. He stated the whole area was filled with forklifts, generators, and construction supplies. He stated in his opinion it looks like a contractor's yard. He stated there is no doubt in his mind the petitioner is in violation of the 1997 decision.

Attorney Matthews stated the generators are allowed to be stored in one portion of the lot.

Mr. Fitzgerald stated that is correct. He stated the generators are presently covering at least twice the amount of area they were supposed to and the area they were supposed to be kept in is not marked as required. He stated there are all types of construction materials where the 13 striped parking spaces were supposed to be located. He stated the intent of the 1997 decision was to keep in mind that the site is located in a mixed industrial and residential neighborhood.

Mr. Quigley stated this site has been a problem since 1997. He stated at that time, the Board tried to accommodate the petitioner with the outside storage request, but it was supposed to be kept in certain striped areas, which has not been done. He stated the decision called for the area in front to be open, which also has not been done. He stated the petitioner has zero credibility with him at this point and he believes he is in gross violation of the 1997 decision. He stated he wants to address the violations before hearing petitioner's other proposal for 46-48 Pequit Street. He stated Mr. Leary, who was the third member that sat on the 1997 hearing, was very specific in the decision in terms of conditions. He stated there were six conditions in that decision. The Board asked for reasonable conditions to be met in that decision and he has not seen that.

Attorney Matthews stated she was not involved in the 1997 decision and cannot make any arguments regarding that.

Mr. Quigley stated as part of that decision, the Board reserved the right to amend, modify or revoke the decision.

Mr. Fitzgerald stated that since 1997, the petitioner was given benefit by this Board, the Board made a number of conditions and for the last six years, the petitioner has failed to do those things.

Mr. Quigley stated that a safety concern was the reason they asked for certain areas to remain open.

BLUE HILL 1598

Mr. Fitzgerald stated there is a record of correspondence between the petitioner and the Building Inspector in 1997 where the petitioner questioned the definitions of outside storage and other things. He stated there has been no spirit of cooperation from petitioner at all.

Mr. Pando stated he sees no correlation between what was approved by this Board in 1997 and shown on the plan and what he saw in his site visit this evening. He stated the conditions set forth in the 1997 decision were done with petitioner's acceptance and he should abide by them.

Attorney Matthews stated that the letter the petitioner received from the Building Inspector was for violations of outside storage and not parking. She stated the letter informed petitioner he could either remove the outside storage or modify the site plan.

Mr. Dom Duganiero, 62 Kings Rd., spoke regarding the petition. He stated he lived on Pequit Street for twenty-seven years and his mother and sister still live there. He stated the site plan dated 7/24/97 has never been complied with. The storage area was not clearly designated and the parking striping was never done. He stated he does not see how any parking could fit on the site. He stated he does not believe the parking that takes place on the southerly side of Pequit St. by the employees was ever approved by the Board. He stated there is no greenbelt to screen from abutting residences and the property is unsightly. He respectfully requested that the ZBA deny the request for outside storage or reduce the size of outside storage, that the outside storage be screened from residential abutters, that both tenants be required to submit site plans for loading and unloading of equipment, that the parking areas used by employees be striped and maintained for parking. He stated Pequit St. has many small children living there and it is used as a cut-through for traffic trying to avoid the light at the Sherman St./Washington St. intersection. He stated the school buses use Pequit St. every day and there are times when trucks from the petitioner's site are parked on the street and traffic cannot get by. He further requested the Board make a condition to decision that a sidewalk be completed in accordance with town rules and regulations by the petitioner.

Attorney Matthews stated the issue she has on appeal is based upon the notification given to Mr. Molway by the building inspector, regarding whether or not the petitioner is using the proposed parking area for outside storage and the building inspector gave him the option of removing it or modifying the site plan.

Mr. Fitzgerald stated both cases have been opened up and the Board has listened to petitioner's appeal. He stated the opinion of the Board is that there are existing violations. He suggested to hold the matter for 30 days, during which time the petitioner shall comply with the 1997 decision in all respects. After the petitioner has done that, if

BLUE HILL 1599

Zoning Board of Appeals
Meeting of May 22, 2003
Page 8 of 10

he finds he needs relief from this Board, the Board will have a continued hearing. In terms of 46-48 Pequit St., Mr. Fitzgerald suggested the petitioner clean up what he has done there. He stated the petitioner cannot have a storage area in a residential district. He requested petitioner remove the cars from the fenced-in area and the only cars that can park there are from 6:00 a.m. to 5:00 p.m. for contractors working at the site.

Attorney Matthews asked whether the Board would entertain a temporary permit.

Mr. Fitzgerald stated they would not.

Mr. Pando and Mr. Quigley agreed to the 30-day extension and to not issue any temporary permits.

Mr. Richard D'Attanasio, 87 Washington St., stated he is representing a direct abutter to the petition and he has an issue with loading and unloading of trucks on the street.

Mr. Fitzgerald stated there should be no trucks loading or unloading on the street and access to the property should be kept open for trucks to go in and out. He stated it is time for the petitioner to rectify the situation and if he does not, the Board will get the Building Inspector involved. He stated if the business has outgrown the site, perhaps the petitioner should look for a site more amenable to his business.

Mr. Fitzgerald continued the matter to June 26, 2003.

### Famoso Foods – 146 Will Dr.

Attorney Paul Schneiders and Mr. Anthony Yebba came before the Board on the continued matter.

Mr. Horace MacNess and Mr. Tom Lyman, abutters to the petition, were also present.

Attorney Schneiders stated there will be five trucks per day that deliver and pick up, with 10 trucks total in the business.

Mr. Carroll suggested the petitioner post a bond to show good faith. He stated Mr. Lyman suggested the Board make a requirement in the decision that if legal action is necessary in the future to enforce conditions of the decision, petitioner shall pay for legal expenses.

BLUE HILL 1600

Zoning Board of Appeals
Meeting of May 22, 2003
Page 9 of 10

Mr. Fitzgerald stated he likes the idea of a condition regarding a deed restriction for no future expansion. He stated that although the petitioner offered to have the school buses removed from the site, he does not want that.

Mr. Pando stated he is impressed with the sincerity the petitioner has approached the issues with. He stated concerning the deed restriction, he would have no problem with a condition stating the petitioner could request no more than a 5 to 10% future expansion.

Attorney Schneiders stated he received letters from the two closest abutters strongly supporting the petition. He asked if the Board would want to add a condition to reserve the right to have the buses removed if necessary.

Mr. Carroll stated they would.

Mr. Fitzgerald moved the petition of Famoso Foods for a modification of Site Plan Approval, Special Permits for Access Drive and Reduced Parking, and an Extension of Non-conforming Building be granted so that petitioner can add a 20,500 s.f. addition to the existing building at 146 Will Drive and that said allowance of petition be subject to conditions as indicated in the letter from Attorney Schneiders dated 5/20/03 and in the representations at this meeting, construction to be done in accordance with the submitted site plan by Toomey Munson Associates, dated 12/20/03 with revision dates of 2/14/03, 3/3/03, and 4/4/03 and that a condition of the decision be that the Board grants this permit subject to review in two years, reserving the right at that time to modify or amend decision if necessary and the cost of enforcement proceedings to be paid by petitioner and petitioner to post a $5000 bond. The move was seconded and the Board voted unanimously to grant.

## Grover Estates -- Washington St.

Attorney Schneiders and Mr. John Marini came before the Board representing petitioner.

Mr. Dean Miller and Ms. Kathy Keith were present representing the Design Review Board.

Mr. Miller stated he thinks the only question at this point is the issue of town acceptance of the deed in terms of parking lot and public ways. He said his Board approves of the landscape plan.

BLUE HILL 1601

Zoning Board of Appeals
Meeting of May 22, 2003
Page 10 of 10

Attorney Schneiders stated they added language worked out between the petitioner and Mr. Miller. He stated he submitted a proposed decision and a deed restriction labeled Exhibit A, regarding the condominium association maintaining landscaping. If there is a change or modification by the condominium owners, it would have to come before the ZBA and Design Review Board.

**Board Business**

Mr. Carroll moved to approve the Minutes of the Meetings of April 24, 2003, May 1, 2003, May 8, 2003, and May 15, 2003. The move was seconded and the Board voted unanimously to approve.

**Adjournment**

Mr. Pando moved to adjourn the Meeting at 10:25 p.m. The move was seconded and the Board voted unanimously to adjourn.

Respectfully submitted,

Paul B. Carroll
Chairman

/sf

# EXHIBIT 21

EXHIBIT
Fineberg
322
NK    4/5/06

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

September 7, 1999

Lydia G. Chesnick, Esq.
DIRECT DIAL: (617) 790-3325
e-mail: lchesnick@bgblaw.com

## TELECOMMUNICATION TRANSMITTAL

**TO:**                ANDREW COHEN, ESQUIRE

**COMPANY:**           SCHULTE ROTH & ZABEL LLP

**TELECOPIER NUMBER:**    212-593-5955    **TELEPHONE NUMBER:**  2125932087 

**FROM:**              LYDIA G. CHESNICK    ATTORNEY NO.:  014

TOTAL NUMBER OF PAGES _3_ INCLUDING THIS COVER SHEET

*IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL BACK AS SOON AS POSSIBLE.*

**PHONE:**             (617) 790-3000

**TELECOMMUNICATOR:**   Karen Fucillo

**CLIENT/MATTER NO:**   14500/9547

**MESSAGE:**

Please Note: The information contained in this facsimile message is privileged and confidential, and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please notify us immediately by telephone at (617) 790-3370. Thank you.

Blue Hill
3033

**BERNKOPF, GOODMAN & BASEMAN LLP**

COUNSELLORS AT LAW

125 SUMMER STREET

BOSTON, MASSACHUSETTS 02110-1621

TELEPHONE (617) 790-3000

TELECOPIER (617) 790-3300

September 7, 1999

Lydia G. Chesnick, Esq.
DIRECT DIAL: (617) 790-3325
e-mail: lchesnick@bgblaw.com

**VIA TELECOPIER**

Andrew Cohen, Esq.
Schulte Roth & Zabel LLP
900 Third Avenue
New York, New York 10022

     RE:    **150 ROYALL STREET, CANTON, MA**

Dear Andy:

As a follow-up to our discussion earlier today and your inquiry concerning prior securitized loans closed by entities owned or controlled by Gerald S. Fineberg, please be advised as follows:

1.    In December of 1996, Mr. Fineberg closed eight loans with The Chase Manhattan Bank through its conduit program, all of which were securitized. The loans totaled in excess of $75,000,000 and consisted of five loans each in the $10,000,000 - $16,000,000 range. In each case, Gerald S. Fineberg was the controlling principal owning between 95%-100% of the ownership interests in the respective owning entities.

2.    From the period from December, 1997 through mid-1999, Mr. Fineberg closed approximately 15 loans with Heller Financial through its conduit program. All or substantially all of those loans were securitized. The loans totaled approximately $45,000,000 and included at least two loans within their conduit program in the $12,800,000 range. Again, Mr. Fineberg was the controlling principal.

3.    In May of 1996, Mr. Fineberg closed a loan with GMAC through its conduit program. The loan was in the amount of $11,400,000 and was subsequently securitized.

4.    In 1999, Mr. Fineberg closed three transactions with GECC through its conduit program, the largest of which was $7,800,000. The loans totaled approximately $15,000,000. Again, Mr. Fineberg was the controlling principal.

Blue Hill
3034

BERNKOPF, GOODMAN & BASEMAN LLP

Andrew Cohen, Esq.
September 7, 1999
Page 2

We are in the process of obtaining the discussed documentation.

If you have any questions, please feel free to call me.

Very truly yours,

Lydia G. Chesnick

LGC/kf

cc:     Gerald S. Fineberg

#184212 v1/14500/9547

**Blue Hill
3035**

EXHIBIT 22

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BLUE HILLS OFFICE PARK LLC, | ) | |
|     Plaintiff / Defendant-in-Counterclaim | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J.P. MORGAN CHASE BANK, as | ) | |
| Trustee for the Registered Holders of | ) | |
| Credit Suisse First Boston Mortgage | ) | |
| Pass-Through Certificates, Series 1999-C1 | ) | Civil Action No. 05-CV-10506 (WGY) |
|     Defendants | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WILLIAM LANGELIER and | ) | |
| GERALD FINEBERG, | ) | |
|     Defendant-in-Counterclaim | ) | |

**EXPERT REPORT AND EXHIBITS OF
DR. KENNETH D. GARTRELL**

March 31, 2006

Kenneth D. Gartrell, PhD CPA
Managing Director
LECG, LLC
350 Massachusetts Avenue
Cambridge, MA 02139
Phone: 617.252.9994
Fax : 617.621.8018

available through discovery or otherwise. Therefore, this report does not necessarily reflect each and every matter on which I ultimately may form opinions in the course of my ongoing work. Additionally, as discovery in this case is incomplete as of the date of this report, I reserve the right to amend this report based on information adduced during any remaining discovery.

## III. SUMMARY OF OPINIONS

18. I have formed four primary opinions in this case, To a reasonable degree of professional certainty, it is my opinion that:

19. At the date of foreclosure on or about November 19, 2004, the market conditions for commercial real estate in greater Boston's Central Business District ("CBD") and adjacent suburbs had returned to levels at, or above, conditions in existence in 1999 when the Property was refinanced at an FMV of $42 million.

20. The FMV of the Property as of the date of foreclosure was no less than $44.4 million. At that value and date, Blue Hills' equity in the Property was approximately $5.8 million exclusive of mortgagee reserve deposits.

21. Based on reasonable expectations regarding the stream of future cash flows the Property will generate net of the cost of any upfront improvements which may be required to realize that cash flow stream, the Property presented an immediate cash deficit at foreclosure. However, the available cash on-hand in the mortgagee's required reserve accounts, in Blue Hills' own property accounts, and/or in available new cash from Blue Hills would have covered this cash deficit. Any new cash

required from Blue Hills would not have been immediately needed and would have been relatively low compared to its equity interest in the Property.

22. By foreclosing on the Property rather than recognizing its FMV and/or giving Blue Hills the opportunity to preserve its equity and the expected future cash flows from the Property, the Defendants caused economic harm to Blue Hills. Blue Hills lost its equity in the Property, the balances in the mortgagee required reserve accounts, and the tax benefits associated with holding the Property. In the aggregate, the direct economic damages to Blue Hills resulting from the foreclosure in November 2004 was at least $14.9 million. **Exhibit 3** sets forth the economic damages calculation.

## IV. BASIS OF OPINIONS

23. The rest of this report discusses the basis for each of my four primary opinions.

24. There are three generally-accepted approaches for deriving independent measures of the FMV of the Property as of the date of foreclosure on November 19, 2004: (1) the market index approach; (2) the market transactions approach; and (3) the income approach.

25. The market index approach calculates the current FMV of the Property by adjusting its known FMV at a point in time by using observed market values to estimate the value change between that point in time and the valuation date. This approach is a reliable way to account for changes in values over time.

26. The market transactions approach calculates the FMV of the Property by considering the prices paid in current transactions for comparable properties. This approach is a reliable way to account for variation in property values on an individual basis.

27. The income approach calculates the forward-looking expected future cash flows from owning and operating the property under foreseeable business and market conditions. This approach is a reliable way to account for the specific valuation effects of known economic considerations (e.g., occupancy rates, rents, operating expenses, improvements, etc.).

28. In this report, I discuss, and base my expert opinions on a combination of all three approaches to valuing the Property on or about the foreclosure date of November 19, 2004.

A.  **Prevailing Market Conditions Indicate an FMV of $44.4 Million**

29. As part of a refinancing with Blue Hills in the third quarter of 1999 (i.e., Q3 1999), the mortgagee had the Property independently appraised. The appraisal letter dated September 10, 1999 placed the value of the Property at $42 million as of August 30, 1999.[1] This valuation was based on 273,863 square feet ("sf") of rentable space leased at the time for $17.00/sf, which was lower than the prevailing market rents, ranging from $17.37/sf to $22.39/sf.[2] Based partly on this $42 million valuation,

---

[1]  Meredith & Grew Oncor International, Self-Contained Complete Appraisal Report, August 30, 1999 (LNR 03780-03781).

[2]  Ibid.

8

Blue Hills and the Defendants entered into a mortgage refinancing loan for $33.2 million on September 14, 1999.[3]

30.  Between the time of the refinancing and the date of foreclosure on the Property on November 19, 2004, the commercial real estate market in the Boston metropolitan area had grown significantly until mid-2000 and had returned to levels at or above the property values observed in late 1999.  The market reflected the expected adjustments resulting from the 2002 recession and had started to rebound.  By Q4 2004, general economic conditions were in a strong pattern of recovery, the signs of which were evident in Boston area real estate prices.

### 1.  Overall Market Conditions

31.  The Boston area real estate market has been one of the strongest markets in the U.S. over the long term.  The Greater Boston market is the economic and commercial center of New England as well as a strong secondary world financial center tied to New York City through the urban east coast network including Hartford, Connecticut and Providence, Rhode Island.  In addition, Boston is one of the most popular U.S. destinations for domestic and international travel and tourism.

32.  **Exhibit 4** shows market conditions in the greater Boston commercial real estate market.  The figures and tables in Exhibit 4 show the relative market values, rents, capitalization rates, and trends in the downtown (CBD) and suburban markets.  The market data reported in Exhibit 4 is published for the Boston metropolitan market by the National Real Estate Index within Global Real Analytics, a market leading

---

[3]  Mortgage Assignment of Leases and Rents and Security Agreement, September 14, 1999.

source of information regarding publicly-traded real estate equity and debt securities, property valuation, and local real estate markets.[4]

33. Figure 4.1 shows that the market enjoyed steady gains in property values and commercial rents form 1995 through late 2000.   This expansion in values, accompanied by improvements in urban lifestyles, started as far back as the mid 1980s and resurged following the end of the 1992 recession.  The trend lines in Figure 4.1 are displayed as indices based on the average selling prices and rental rates per square foot as of Q4 1995.  Characteristic of long, steady periods of normal economic expansion, commercial real estate values and rents moved together, both nearly doubling at the peak of the expansion in mid-2000.

34. In general, property values and rents are closely linked.   The relationship is somewhat definitional, since rents are the basis for the income generated from the operation of commercial real estate and it is the net profit from this rental income after consideration of related expenses that is capitalized as the value of the property.  It is also normal for values to lead rents through time.  The leads and lags between the two measures simply reflect the dynamics of the market and usually represent the more comprehensive and forward looking nature of prices.  Prices or values reflect more comprehensive long-run decisions, and rents, which are usually just one element of long-term rental agreements, often reflect current conditions, are based on a shorter time horizon, and are influenced by inducements and incentives which are smoothed out relative to property values over the life of long-term lease agreements.

---

[4]   See, e.g., http://www.graglobal.com.

10

35.  Figure 4.1 also shows the trends in market values and rents in the greater Boston commercial real estate market beyond 2000 also follow a normal pattern for a recession and recovery cycle, such as in the 2001 to 2004 period.  The relative decline in property values ended in late 2004 at their 1999 levels, and values have rebounded since then.  Notably, by the time of the foreclosure on the Property in Q4 2004, the greater Boston commercial real estate market was in full recovery and expansion. Indeed, Table 4.1 shows average prices per square foot had increased by 10.3% in downtown Boston and by 5.7% in the surrounding suburban markets since Q3 1999, the time at which the Defendants' appraiser valued the Property at $42 million.  That trend has continued from Q4 2004 up to the present, with values up an additional 13.3% and 6.74% in the downtown Boston and suburban markets, respectively.

36.  Rental rates in Figure 4.1 separate from property values in a different but typical pattern.  By early 2003, rents had fallen more, and more quickly, than property values.  They had fallen to levels at or below the levels last observed in the 1994 to 1995 period.  This pattern of the rents compared to the corresponding market values mostly reflects normal market dynamics.  Rents are bound to be more volatile than prices since recessions are periods of business reorganization and restructuring.  At such times, failing companies leave the market and are replaced by newcomers.  With the decline in overall business activity, sharp temporary declines in rents occur because there are many new rental agreements and the rents are lowered in the early years of new leases as a competitive inducement to new tenants.  Sometimes, there also are rent accommodations in existing leases to keep good

tenants from switching to new or better space as it becomes available when failing or reorganizing firms create additional capacity.

37. It is also notable that throughout the recession of 2002, commercial construction and expansion of property development continued at a high rate. Many new buildings were constructed and leased during that period. This is a strong indication that the recession was not expected to be severe or of long duration, and it reflects why rents fell so far and were only beginning a slow climb to catch up with observed market values by late 2004.

38. Figure 4.1 also makes the important point that by the time of foreclosure on the Property on November 19, 2004, the recession had ended and the current period of economic recovery was underway. While rents lagged market values, they were beginning to increase once again.

39. A reasonable and knowledgeable person looking at the overall market for commercial real estate in greater Boston as of Q4 2004 would have to conclude that: (1) property values were about to resume the increasing trends of the 1990s, and (2) rents on commercial real estate were likely to increase significantly in the near future to converge with increasing property values. The dominant question would not have been *whether* rental rates would rise, but rather *when* and *how quickly*. All things considered, it is more likely than not that rent levels would be expected to rise in the near-term to meet the market characterized by higher and increasing values.

### 2. Suburban Market Conditions

40.  As in any major metropolitan market, suburban commercial real estate values and rents are linked to the downtown CBD.  In Boston, the dynamics of that relationship are similar to conditions in New York City, Washington, DC, San Francisco and Chicago. Namely, the CBD is a leading indicator of what will happen in the suburban markets.  Values in the CBD and in suburban markets are imperfect substitutes for each other. Hence, whenever the value differences between the CBD and suburban space exceed a certain threshold, investment shifts from one area to the other.

41.  Unlike in many other American cities, downtown Boston truly is the economic "hub" of the region.  There are many sociological, geographic and demographic reasons for the centrality of the Boston CBD to the regional economy, making the relationship between the Boston CBD and the suburban markets pivotal in establishing what reasonable expectations would have been for the Property at the time of foreclosure in late 2004.

42.  Figure 4.2 shows the same market values and rents as in Figure 4.1, but it shows them indexed to a common value as of Q3 1999, the date of the $33.2 million refinancing of the Property and the mortgagee's $42 million independent appraisal.

43.  Figure 4.2 shows that by end of Q4 2004, there had been eleven straight quarters of increased commercial property values in the CBD with an increase in the rate of growth for each of the five prior quarters.  While the return of the CBD was underway again after a brief decline in 2000 to 2001, the suburban values continued

13

to decline at a slow rate until early 2002. Then in the second quarter of 2004, the suburban market turned upward. Considering all relevant factors as of Q4 2004, the market appeared, and was expected, to be (and, indeed, was) stabilized at levels above Q3 1999 and was highly likely to increase further in step with the CBD trend. Likewise, rental rates in the suburban markets had stabilized in early 2003 and could be expected to increase once again going forward.

44.  The dynamics that link the market in the CBD to the suburban market are clear. In this case, the Property is located such that this link is of even greater significance. The Property is located directly off state Route 128, south of the Massachusetts Turnpike, and virtually at the intersection of US Interstates 93 and 95. It is located directly on the primary routes of commerce between the Boston and Providence CBDs, as well as suburban business districts in towns such as Dedham, Needham, Norwood, Quincy, and Westwood. To the extent the nearing completion of the Big Dig and airport access via the Williams tunnel result in more efficient travel into and out of Boston, it adds a level of market value to commercial property throughout this commercial network above the overall market averages for suburban property values and rents.

45.  As **Table 4.1** shows, suburban commercial real estate values rose more than 5.7 % from $190.35 in Q3 1999 to $201.19 in Q4 2004. For the reasons of the intra-market lags between the CBD and the suburban markets, as well as the normal lags between values and rents in transitional markets, the rents and the cap rates exhibit a different pattern. Coupled with the strong trend in the increase in values in the

14

CBD, the lag in the suburban cap rates indicates substantial upside in both suburban values and rents.

### 3.  Practical Implications of Market Values for the Property

46.  At the time of the $33.2 million refinancing of the Property in Q3 1999, the corresponding $42 million appraisal placed a the Property's value at $153/sf. Table 4.2 shows the prevailing market value at the time was $190/sf, or approximately 19% higher. The appraisal noted that the "market" rent of $17/sf determined by an arbitrator also was below prevailing market rents at the time.

47.  The observed relationship between the Property's value and rent in Q3 1999 and prevailing market rates, taken together with the relative movement in the market since that time provides a benchmark for valuing the Property at other points in time, such as at the time of foreclosure in Q4 2004. The market index approach estimates the current FMV of the Property by adjusting its known FMV at a point in time (e.g., Q3 1999) by using the market index to estimate the change in asset value between that point in time and another date (e.g., Q4 2004). This approach is a reliable way to account for changes in commercial real estate values, on average, over time.

48.  **Exhibit 5** shows the valuation of the Property using the market index approach. The calculation starts with the independently determined FMV of $42 million for the Property in September 1999. Applying to this value the 5.7% increase observed in the market values of suburban commercial real estate between Q3 1999 and Q4 2004, yields a value of $44.4 million at or about the time of foreclosure in

15

The DCF forecast projects annual cash flows over a finite (presumably foreseeable) period of time, and farther out on a normalized basis, called the terminal value or perpetuity value. Relative to the market-based valuation approaches, the DCF approach is simply a different means to same end, and the resulting value should reconcile to the market-based value.

### 1. Reasonable Expectations Indicate an FMV of At Least $44.4 Million

71. In forecasting the Property's expected future cash flows, I calculated the DCF value from an *ex-ante* forecast based on the information known about the Property at the time of foreclosure (i.e., late 2004) regarding its rentable space, realized rental rates, prospective (single v. multiple) tenants, and so on. I relied on the latest realization of the Property's actual performance at the time as the best predictor of its future performance.[7] On that basis, I forecasted the Property's rental revenue, operating expenses, capital improvements, capital expenditures, and resulting free cash flows on an annual basis for a ten-year forecast period plus a terminal value.

72. **Exhibit 7** shows the DCF calculations and the resulting $44.4 million ($162/sf) value. The tables in Exhibit 7 set forth all of the initial inputs used to start the valuation in 2004, the changes to the initial inputs for each subsequent year of the forecast period, and the discount rate used to express future cash flows at their present value as of late 2004.

---

[7] This is consistent with the well-known "random walk" theory that values do not follow time trends, so the most current realizations best predict future values.

73. Specifically:

    – Table 7.1 shows the results of the DCF calculations;

    – Table 7.2 lists all of the initial input values I used in the DCF
calculation; and

    – Table 7.3 shows calculated and observed required rates of return to
capital for real estate management companies, which informed the
discount rate I applied to the cash flows I calculated for each time
period.

74. The DCF calculation starts in late 2004 after the Equiserve lease expired and left
the Property. Table 7.1 first projects rental income from the Property becoming
"fully" occupied over a three-year period, starting at year-end 2005. In this context,
"fully" occupied means eventually renting out 260,170 sf, or 95% of the Property's
total 273,863 sf of rentable space. I forecasted that the Property would not be fully
rented until year-end 2007.[8] This framework reflects the likelihood the Property
would be rented to (approximately three equally-sized) multiple tenants, rather than
a single tenant, such as Equiserve. That presumption was a reasonable expectation
stated at the time,[9] but it was not a certainty. In fact, it may have been possible to
rent the Property to a new single tenant and avoid some of the expense of more
extensively retrofitting it to accommodate multiple tenants.[10]

---

[8]    For example, Lennar Corp. ("Lennar"), the Special Servicer of the Property's mortgage was advised it
mat have taken "24 months or more to tenant" the Property (LNR 03074).
[9]    Ibid. Lennar noted, "Large tenants (more than 100,000 sf) are very difficult to find these days."
[10]    All of the nearby commercial properties have single tenants, e.g., Allied Domecq (Dunkin Donuts'
parent company), Equiserve, and Reebok.

24

75. I projected the upfront improvements required to convert the Property for multiple tenant use to cost $30/sf, or more than $8.2 million in total.[11] This cost is realized in increments over three years in direct proportion to the new tenants' entry over the same time period. The full cost of the upfront improvements would be realized by year-end 2007, at which time the Property would have been fully (i.e., 95%) occupied from that point forward. The $8.2 million cost of improvements to attract and retain new tenants would have been in addition to the routine capital expenditures for normal operating fixed assets, which I projected at $0.20/sf based on documented information in the factual record.[12]

76. Even with the significant upfront improvements I include in the DCF calculation, I projected the Property's rental income to start at the same rental rate as contained in the Equiserve lease which expired on July 31, 2004, $17/sf, indexed to $17.97 to account for the 5.7% increase in real estate market values observed between the time the $17/sf rent was determined in late 1999 and the valuation date in late 2004.

77. I increased the rental rate by only 1.5% per year after 2004 to account for the expected upward trend in market rents I discussed previously. The disparity between prices and rents in late 2004 indicate that expected rent increases may have been much higher. Figure 6.1 and the underlying tables (Tables 6.6 and 6.7) show the actual increases in year-over-year rents within a sample of available lease agreements. Rents in the observed lease agreements increase from 1.4% per year to 5.0% per year, with an average increase of 3.4% per year a seven-year lease period.

---

[11]  $30/sf is at the high end of the range of improvement costs documented in the factual record. See, e.g., Frank Deposition, p. 158 (15-20%). Lennar assumed $40/sf in its 2004 DCF calculation (LNR 03074).
[12]  $0.20/sf is the same capital expenditure used in Lennar's 2004 DCF calculation (LNR 03074).

25

78. The $17/sf starting value in the Equiserve lease was set by arbitration at less than the prevailing market rents in 1999, which reportedly ranged from $17.37/sf to $22.39/sf.[13]   The prevailing market rate for commercial property in suburban Boston observed at the end of 2004 was $23.26/sf (see Table 4.2), or 23% higher than the $17.97/sf I applied in my DCF calculation.   By indexing from the $17/sf rate, my calculation implicitly assumes the Property would continue to rent for less than market rates throughout the forecast period – despite the significant upfront improvements I included which would have significantly increased the potential rents the Property could realize.   To the extent the Property would have realized higher rents than I projected, it would generate higher cash flows and a higher FMV as well.[14]

79. Real estate taxes would have been incurred in the last half of 2004 although the Property was vacant.   Thereafter, the tenants would cover a portion of the local property taxes in proportion to their share of total rented space.   I forecasted property taxes at their actual 2004 level of $632,725 per year (paid as $158,181 quarterly).   Likewise, the tenants would cover a pro-rata share of the management fee expenses, which I forecasted at 5% of rental income.

80. With that structure of revenues and expenses extended to each of the ten years in the forecast period, I calculated the free cash flow generated by the Property in each year in two steps:   (1) I subtracted net operating expenses from revenue to yield

---

[13]   Meredith & Grew Oncor International, Self-Contained Complete Appraisal Report, August 30, 1999 (LNR 03780-03781).
[14]   As I discuss in the next section, I calculated the effect of one such scenario based on observed data for an adjacent property.   It yields materially higher cash flows and FMV than I projected in Exhibit 7.

operating profit, and (2) I deducted capital expenditures from, and added back depreciation expense to, operating profit to yield free cash flow. I also calculated the value of free cash flows beyond the ten-year horizon of the forecast period. This terminal value represents the sale value of the Property at that future point in time.

81. As a final step in the valuation, I discounted the stream of expected future cash flows into an amount in present value terms as of year-end 2004. I discounted the cash flows at a 9% rate, which reflects the risks and required returns to real estate management companies at the time. This discount rate is consistent with contemporaneous figures published by Ibbotson Associates and with my own calculation using the well-known Capital Asset Pricing Mode ("CAPM")l[15] (See Table 7.3), which indicate a discount rate in the range of 8.8% to 9.0%.

82. The FMV of the Property based on its expected future cash flows as of year-end 2004 is the sum of the stream of expected future cash flows in present value terms. Simply put, the market value of this cash flow stream at year-end 2004 is the value of the Property based on its ability to generate cash flow going forward from that point at the projected levels.[16] Based on the DCF forecast I described above, Table 7.1 shows that the FMV of the Property at year-end 2004 reconciles to the $44.4 million value based on the indexed 1999 appraised value.

---

[15] The CAPM relies on actual historical and generally accepted data about: (i) risk-free returns at the time of the foreclosure, (ii) historical incremental returns to risky assets in the market (i.e., market risk premium), and (iii) the relationship between the returns to real estate management companies relative to the overall market return (i.e., the market beta). See, e.g., Brealey and Myers (2000) at pp. 195-203.

[16] A "positive net present value" project is one which yields a sufficient return to undertake because its internal rate of return exceeds the opportunity cost of capital. See, e.g., Brealey and Myers (2000) at pp. 93-150.

85. **Exhibit 8** shows the effect on the DCF calculation of making only those two changes. It forecasts the value of the Property under all of the same conditions as I applied in Exhibit 7, but it contemplates making even more upfront improvements (totaling $11.0 million) in order to command higher rents. The $21.25/sf rental rate I used in this calculation is still below the prevailing market rate at the time ($23.26/sf), and it could have been reasonably expected for making such extensive improvements.

86. Holding all other factors constant in the DCF calculation, the Dunkin Donuts' lease terms for the adjacent property yields an FMV of $51.8 million as of year-end 2004.

87. A total value of $51.8 million corresponds to $189/sf. This value is 17% higher than the baseline DCF value which I calculated, but it still reflects a discount of approximately 6% from the prevailing $201/sf market value for suburban Boston commercial real estate at the time. Placing a $51.8 million value on the Property at the time is no less reasonable than the $44.4 million baseline DCF value. It simply reflects the additional return realized over time from investing more money in the Property upfront to make improvements.

## D.   The Foreclosure Resulted in Economic Harm to Blue Hills

88. All three valuation approaches I considered (i.e., market index, market transactions, and income) indicate the FMV of the Property as of the date of foreclosure on November 19, 2004 exceeded the value of Blue Hills' debt obligation under the mortgage on the Property as refinanced in September 1999. Therefore, the FMV of

the Property at the time did not provide a reasonable economic justification for the foreclosure.

89. The short-term cash deficits which would have been generated while waiting to find a new tenant(s) and making upfront improvements to the Property also did not justify the foreclosure. The cash funding requirements would have been small relative to the FMV of the Property; there were sufficient funds in both the mortgage reserves and in reserve at Blue Hills to cover the expected funding requirements; and/or Blue Hills would have had a strong economic incentive to pay for any remaining cash deficits out of pocket to preserve the company's equity interest in the Property.

### 1. There Were Sufficient Funds to Meet Cash Deficits

90. The DCF calculations set forth the expected future cash flows generated by the Property looking forward from the foreclosure date. For example, Table 7.1 shows negative free cash flows at year-end 2004 and 2005 as a result of the low occupancy rates and upfront improvement costs, but positive cash flows thereafter. The cash flows in each year account for the Property's rental income, operating expenses, and capital expenditures.

91. However, under the Mortgage and Security Agreement for the Property, Blue Hills also had to pay principal and interest expenses and fund several mortgage reserve accounts. Therefore, to avoid foreclosure, the Property would have had to generate sufficient cash flow to at least cover its costs, service its debt, and meet its reserve

requirements. Otherwise, Blue Hills would have had to contribute additional cash to cover any shortfall in the cash requirements each year or face foreclosure.

92. **Exhibits 9 and 10** show the cash requirements, sources of funds, and the ending cash balances the Property would have realized in the baseline DCF (Exhibit 9) and in the DCF based on Dunkin Donuts lease terms (Exhibit 10). The ending cash position shows the cash balance after accounting for all sources and uses of funds (i.e., paying all costs by drawing funds from all available accounts). For each year of the forecast period, the amount of ending cash indicates whether the Property would have produced cash in excess of costs, or whether there would have been a cash deficit to be covered in any year.

93. I calculated the final cash balance in two steps. First, I calculated available cash from operations by subtracting from the free cash flows in each DCF valuation (Tables 7.1 and 8.1) payments for taxes and insurance, principal and interest, and reserve funding requirements, in that order. Then I applied to any deficits in available cash each year (i.e., negative cash balances) the funds available for use in the mortgage reserves, the Blue Hills property accounts, and/or additional cash infusions from Blue Hills.

94. **Table 9.1** shows the resulting cash position for the baseline DCF valuation. It shows the Property, as valued at $44.4 million, would have generated insufficient cash from operations to cover its taxes and insurance, principal and interest payments, and reserve requirements until after 2007. Fully (i.e., 95%) occupied in 2008 and thereafter, the Property would have yielded positive ending cash balances.

Table 9.2 shows the net effects of the corresponding accounting activity in the mortgage reserves and Blue Hills property accounts.

95. In 2004, there would have been sufficient funds in the various mortgage reserve accounts (approximately $4.2 million) to cover the $2.0 million cash deficit resulting from the lack of any rental income in the second half of the year to offset taxes/insurance and debt service expenses.    In 2005, the cost of upfront improvements would have resulted in a larger ($5.1 million) cash deficit, funded partially by the remaining mortgage reserves ($2.1 million) and partially with funds from Blue Hills' own property accounts ($3.0 million).    In 2006, ongoing improvements would have resulted in a $3.5 million deficit, funded almost entirely from the balance of the Blue Hills property accounts ($2.7 million) and by the additional infusion of $252,466 in cash.  Once the Property was fully occupied in 2007, it would have generated sufficient cash to fund the mortgage reserves, but it would have drawn down the balances immediately, and Blue Hills would have had to contribute $1.3 million in cash.  Thereafter, the Property's ending cash position in each year would have been positive.

96. Put simply, the calculations on Table 9.1 show the Property would have had sufficient mortgage reserves to cover much of its initial cash deficits, and Blue Hills had in its own reserve accounts sufficient additional funds to cover all but $1.5 million of the cash shortfalls of the first three years of operations after the foreclosure date and, even in the absence of those accounts, the two largest principals had sufficient net worth to fund any default if they wanted to.  Blue Hills would not have had to contribute additional cash until 2006.

97. At that point, Blue Hills would have had the strong economic incentive – and presumably the ability – to make the required cash payments of $252,466 in 2006 and $1.3 million in 2007 to preserve its $5.8 million equity interest in the Property going forward from the foreclosure date, to avoid the additional loss of its mortgage reserve balances and tax benefits of holding the Property, and to preserve the highly valuable option to capitalize on future increases in real estate values of the improved Property.

98. For example, capitalizing the expected operating income in Table 7.1 at the Anticipated Repayment Date of Blue Hills' mortgage on the Property at the end of 2009 implies a selling price in excess of $43 million.[17] Moreover, available market information indicates a strong upside potential for commercial real estate in suburban Boston (e.g., the resumption of increasing market values by year-end 2004, the likely significant future growth in rental rates to square with property values, the higher rents and purchase prices for adjacent properties, etc.). While I have not included the Property's significant forward-looking option value in my ultimate opinion of its market value of at least $44.4 million at the time of foreclosure, such option value actually exists and would most likely have been valued by Blue Hills in its decision to preserve its equity in the Property. Considering all of these factors, the amount of new cash Blue Hills would have expected to contribute was dramatically less than the potential value losses and tax liability associated with losing its interest in the Property altogether.

---

[17] Mortgage Note, September 14, 1999, B(1)(b). Table 7.1 projects operating income of $5.0 million. Capitalized at the average cap rate of 8.8 over the forecast period with full occupancy yields a FMV of 8.8 x $5.0 million, or $43.1 million.

99.  Table 10.1 shows the analogous cash position for the DCF valuation based on the Dunkin Donuts lease terms.  Table 10.2 shows the corresponding reserve account activity.  As in the baseline case, the Property, as valued at the higher $51.8 million figure, would have generated insufficient cash from operations to cover its expenses until after 2007.  Its initial cash deficits would have been slightly higher due to the higher cost of the upfront improvements.  Thereafter, however, the Property would have yielded disproportionately higher positive ending cash balances.

100.  The calculations in Table 10.1 show that at rents and tenant improvements based on the Dunkin Donuts lease, the mortgagee reserves and Blue Hills' Property accounts would have covered all but $2.8 million of the deficits of the first three years of operations after the foreclosure date.  As in the baseline case, Blue Hills would not have had to contribute additional cash until 2006.  At that point, it again would have had the economic incentive, and presumed ability, to make the required cash payments of $1.4 million in both 2006 and 2007 to preserve its much higher $13.2 million equity interest in the Property going forward from the foreclosure date.

101.  Therefore, it is my opinion that, given the opportunity, Blue Hills would have been willing and able to bridge any funding gap presented by the short-term vacancy in, and expected upfront improvements to, the Property.

## 2.  Economic Damages to Blue Hills are At Least $14.9 Million

102.  By foreclosing on the Property rather than giving Blue Hills the opportunity to preserve its equity and the expected future cash flows from the Property, the Defendants caused economic harm to Blue Hills.  Blue Hills lost entirely:  (1) its

34

equity in the Property, (2) the balances in its mortgage reserve accounts, and (3) the tax benefits associated with holding the Property.

103. Exhibit 3 summarizes the economic damages to Blue Hills using a $5.8 million equity value in the Property based on my ultimate valuation opinion. Adding to the equity value the $4.2 million in lost mortgage reserve balances and the $4.9 million in lost tax benefits,[18] yields direct economic damages to Blue Hills of $14.9 million at the date of foreclosure before considering the applicability or magnitude of any prejudgment interest at the discretion of the Court.

104. This is my opinion of economic damages to a reasonable degree of professional certainty based on all available information at this time. However, because that information includes several strong indications of upside potential in the Property's market value, Table 3.1 also shows an economic damages calculation starting from the higher $13.2 million equity value based on the Dunkin Donuts lease terms. That equity value implies $22.3 million in direct economic damages to Blue Hills.

## V.    CONCLUSION

105. My opinion to a reasonable degree of professional certainty is that the market conditions for commercial real estate in suburban Boston at the date of foreclosure on or about November 19, 2004, indicate a market value of $44.4 million based on the $42 million appraisal of September 1999. At a total FMV of $44.4 million, Blue Hills' equity interest in the Property would have been $5.8 million.

---

[18]    Expert Report of David Andelman, Exhibit B.

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,               )
     Plaintiff / Defendant-in-Counterclaim  )
                                  )
v.                                        )
                                  )
J.P. MORGAN CHASE BANK, as                )
Trustee for the Registered Holders of     )
Credit Suisse First Boston Mortgage       )
Pass-Through Certificates, Series 1999-C1 )      Civil Action No. 05-CV-10506 (WGY)
     Defendants                           )
                                  )
and                                       )
                                  )
WILLIAM LANGELIER and                     )
GERALD FINEBERG,                          )
     Defendant-in-Counterclaim            )
_____ )

REBUTTAL REPORT OF
DR. KENNETH D. GARTRELL

April 13, 2006

Kenneth D. Gartrell, PhD CPA
Managing Director
LECG, LLC
350 Massachusetts Avenue
Cambridge, MA 02139
Phone: 617.252.9994
Fax : 617.621.8018

## I.  BACKGROUND

1.  My name is Kenneth D. Gartrell. I am an independent economic consultant and a
    Managing Director of LECG, LLC ("LECG"), a global economic consulting firm
    headquartered in Emeryville, California.  My business address is 350 Massachusetts
    Avenue, Cambridge MA 02139.  My business telephone number is 617-252-9994.

2.  My affirmative expert report in this matter[1] ("Expert Report") detailed my
    professional qualifications and included as Exhibit 1 my full resume.

3.  My Expert Report also set forth my independent expert opinions regarding the fair
    market value ("FMV") of the Blue Hills Office Park (the "Property") on or about
    the date of foreclosure on November 19, 2004 as a basis for calculating the
    economic damages to Blue Hills Office Park LLC ("Blue Hills") resulting from the
    loss of the Property.  In my opinion, the Property's FMV at the date of foreclosure
    was at least $44.4 million, with significant upside potential, and the corresponding
    economic damages to Blue Hills in lost equity, reserve balances, and capital gains
    taxes were at least $14.9 million excluding interest.

4.  The law firm Bernkopf Goodman LLP asked me to review the Expert Report of
    Eric S. Stotz, dated March 31, 2006, ("Stotz Report") filed on behalf of the
    Defendants to determine whether or not the assumptions, analytical approach, or
    findings of the Stotz Report warrant specific response.

---

[1]  Expert Report and Exhibits of Dr. Kenneth D. Gartrell, dated March 31, 2006.

1

**ESS 151**

(g)   In his new appraisal of the Property as of August 2003,[11] Mr. Stotz applies an even higher discount rate (12.25%) than he used for his October 2004 valuation, saying, "investors lowered their return requirements" from 2003 to 2004.[12] However, the two sources of data on which he relied reflect little or no change.   The discount rates for the Boston market from the first source were 9% to 13% as of *both* Q2 2003 and Q3 2004; the second source reported discount rates ranging from 10% to 12% for Q2 2003 and from 9% to 12% for Q3 2004.[13]  Because Mr. Stotz admits he already assumed a rate at the "higher end" of the market in his October 2004 valuation, the data hardly justify another 25 percentage point increase to the discount rate for his August 2003 valuation.

(h)   By assuming arbitrarily high discount rates, Mr. Stotz underestimated both the present value of the expected future cash flows the Property would generate and its ultimate future sale value.   As a result, he significantly underestimated the Property's FMV.

12.   Fourth, I disagree with Mr. Stotz regarding the value implications of the new parking garage adjacent to the Property.   Construction of the parking garage most

---

[11]   The underlying data on which I based my valuation as of late 2004 also would be sufficient to determine the FMV of the Property as of August 2003.  Most likely, the value would not be materially different than the $44.4 million calculated in my Expert Report as of November 2004.  However, the observed increase in market values between Q3 1999 and Q3 2003 (6.7%) is greater than the change between Q3 1999 and Q4 2004 (5.7%), implying a higher expected rental rate at Q3 2003.  A higher rental rate and a potentially lower discount rate would result in a higher FMV for the Property at Q3 2003 relative to Q4 2004.

[12]   Stotz Report, p. 11.

[13]   Ibid. and Addendum to Stotz Report, p. 61.

8

ESS 158

likely had no material effect on the FMV of the Property, and it may have enhanced the Property's forward-looking option value.

(a) Mr. Stotz simply asserts the parking garage "negatively impacted" the FMV of the Property.[14] He does not attempt to quantify this effect; he just states, "it is extremely difficult to accurately measure."[15] Instead of an informed analysis, Mr. Stotz bases his opinion on "the sum of [his] experience" and on "various discussions with other real estate professionals."[16] His opinion lacks sufficient factual basis and ignores important facts on record and relevant economic factors to the contrary.

(b) Mr. Stotz assumes the value of the Property would be diminished because its view of the nearby highway would be partially blocked, which he argues "would increase traffic congestion" near the Property, "makes finding the building more difficult," and makes it "more difficult" for employees in the building to monitor and avoid heavy traffic on the highway.[17]

(c) However, there is no evidence any such conditions actually exist or, to the extent they do, have any material effect on the FMV of the Property.

(d) Whether the people working in the adjacent building park in an open lot or a covered building has no objectively clear or significant effect on the day-to-

---

[14] Stotz Report, p. 14.
[15] Ibid., p. 13.
[16] Ibid. Mr. Stotz does not identify anyone with whom he ostensibly spoke about the parking garage, so there is no way to independently evaluate the accuracy or reliability of such persons or discussions.
[17] Ibid., p. 14.

9

EXHIBIT 23

Form **1065**

## U.S. Return of Partnership Income

For calendar year 2004, or tax year beginning ............. , and ending .............

▶ **See separate instructions.**

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0099

**2004**

| Principal business activity | Use the IRS label. Other-wise, print or type. | Name of partnership | D Employer Identification number |
|---|---|---|---|
| REAL ESTATE | | ROYALL ASSOCIATES REALTY TRUST | 04-2973514 |
| Principal product or service | | Number, street, and room or suite no. If a P.O. box, see page 14 of the instructions. | E Date business started |
| RENTALS | | ONE WASHINGTON ST | 6/13/1987 |
| Business code number | | City or town, state, and ZIP code | F Total assets (see page 14 of the instructions) |
| 531120 | | WELLESLEY         MA 02481 | $ 26,853,987 |

Check applicable boxes: (1) ☐ Initial return  (2) ☐ Final return  (3) ☐ Name change  (4) ☐ Address change  (5) ☐ Amended return

Check accounting method: (1) ☒ Cash  (2) ☐ Accrual  (3) ☐ Other (specify) ▶ .............

Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ ............................................. 6

Caution: Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | | |
|---|---|---|---|---|
| Income | 1a | Gross receipts or sales | 1a | |
| | b | Less returns and allowances | 1b | 1c |
| | 2 | Cost of goods sold (Schedule A, line 8) | 2 | |
| | 3 | Gross profit. Subtract line 2 from line 1c | 3 | |
| | 4 | Ordinary income (loss) from other partnerships, estates, and trusts (attach sch.) | 4 | |
| | 5 | Net farm profit (loss) (attach Schedule F (Form 1040)) | 5 | |
| | 6 | Net gain (loss) from Form 4797, Part II, line 17 | 6 | |
| | 7 | Other income (loss) (attach statement) | 7 | |
| | 8 | Total income (loss). Combine lines 3 through 7 | 8 | |
| Deductions (see page 16 for limitations) | 9 | Salaries and wages (other than to partners) (less employment credits) | 9 | |
| | 10 | Guaranteed payments to partners | 10 | |
| | 11 | Repairs and maintenance | 11 | |
| | 12 | Bad debts | 12 | |
| | 13 | Rent | 13 | |
| | 14 | Taxes and licenses | 14 | |
| | 15 | Interest | 15 | |
| | 16a | Depreciation (if required, attach Form 4562) | 16a | 662,174 |
| | b | Less depreciation reported on Schedule A and elsewhere on return | 16b | 662,174 | 16c | 0 |
| | 17 | Depletion (Do not deduct oil and gas depletion.) | 17 | |
| | 18 | Retirement plans, etc. | 18 | |
| | 19 | Employee benefit programs | 19 | |
| | 20 | Other deductions (attach statement) | 20 | |
| | 21 | Total deductions. Add the amounts shown in the far right column for lines 9 through 20 | 21 | 0 |
| | 22 | Ordinary business income (loss). Subtract line 21 from line 8 | 22 | |

Sign Here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member) is based on all information of which preparer has any knowledge.

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

Signature of general partner or limited liability company member manager        Date

| Paid Preparer's Use Only | Preparer's signature | RICHARD HASSEY | Date | Check if self-employed ☐ | Preparer's SSN or PTIN P00035229 |
|---|---|---|---|---|---|
| | Firm's name (or yours if self-employed), address, and ZIP code | ROTFIELD & HASSEY, LLP, CPAS 15 COURT SQUARE BOSTON, MA         02108 | | EIN ▶ 04-2802193 | Phone no. 617-523-7846 |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Form **1065** (2004)

EXHIBIT
*Andelman*
363
*JCC* 4/24/06

COPY

BLUE HILL
5532

| Form **1065** | | **U.S. Return of Partnership Income** | | | | OMB No. 1545-0099 |
|---|---|---|---|---|---|---|
| Department of the Treasury Internal Revenue Service | | For calendar year 2004, or tax year beginning ............ , and ending ............ ▶ **See separate instructions.** | | | | **2004** |

| Principal business activity | Use the IRS label. Other- wise, print or type. | Name of partnership | **D** Employer identification number |
|---|---|---|---|
| REAL ESTATE | | ROYALL ASSOCIATES REALTY TRUST | 04-2973514 |
| Principal product or service RENTALS | | Number, street, and room or suite no. If a P.O. box, see page 14 of the instructions. ONE WASHINGTON ST | **E** Date business started 6/13/1987 |
| Business code number 531120 | | City or town, state, and ZIP code   WELLESLEY      MA 02481 | **F** Total assets (see page 14 of the instructions) $ 26,853,987 |

Check applicable boxes: (1) ☐ Initial return  (2) ☐ Final return  (3) ☒ Name change  (4) ☐ Address change  (5) ☐ Amended return

Check accounting method: (1) ☒ Cash  (2) ☐ Accrual  (3) ☐ Other (specify) ▶ ............................

Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ▶ .................. 6

Caution: Include only trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | 1a Gross receipts or sales .................... | 1a | | |
| | b Less returns and allowances ................. | 1b | | 1c |
| | 2 Cost of goods sold (Schedule A, line 8) ............................ | | 2 | |
| | 3 Gross profit. Subtract line 2 from line 1c ......................... | | 3 | |
| | 4 Ordinary income (loss) from other partnerships, estates, and trusts (attach sch.) ....... | | 4 | |
| | 5 Net farm profit (loss) (attach Schedule F (Form 1040)) .................. | | 5 | |
| | 6 Net gain (loss) from Form 4797, Part II, line 17 .................... | | 6 | |
| | 7 Other income (loss) (attach statement) ........................ | | 7 | |
| | 8 Total income (loss). Combine lines 3 through 7 ..................... | | 8 | |
| **Deductions** (see page 10 of the instructions for limitations) | 9 Salaries and wages (other than to partners) (less employment credits) ........... | | 9 | |
| | 10 Guaranteed payments to partners ........................... | | 10 | |
| | 11 Repairs and maintenance ............................. | | 11 | |
| | 12 Bad debts .................................. | | 12 | |
| | 13 Rent .................................... | | 13 | |
| | 14 Taxes and licenses ............................... | | 14 | |
| | 15 Interest ................................... | | 15 | |
| | 16a Depreciation (if required, attach Form 4562) ........ | 16a | 662,174 | |
| | b Less depreciation reported on Schedule A and elsewhere on return | 16b | 662,174 | 16c   0 |
| | 17 Depletion (Do not deduct oil and gas depletion.) ..................... | | 17 | |
| | 18 Retirement plans, etc. ............................. | | 18 | |
| | 19 Employee benefit programs ............................ | | 19 | |
| | 20 Other deductions (attach statement) ......................... | | 20 | |
| | 21 Total deductions. Add the amounts shown in the far right column for lines 9 through 20 ..... | | 21 | 0 |
| | 22 Ordinary business income (loss). Subtract line 21 from line 8 ............... | | 22 | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than general partner or limited liability company member) is based on all information of which preparer has any knowledge.

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

▶ _____   ▶ _____
Signature of general partner or limited liability company member manager    Date

**Paid Preparer's Use Only**

| Preparer's signature RICHARD HASSEY | Date | Check if self-employed ☐ | Preparer's SSN or PTIN P00035229 |
|---|---|---|---|
| Firm's name (or yours if self-employed), address, and ZIP code | ROTFIELD & HASSEY, LLP, CPAS 15 COURT SQUARE BOSTON, MA            02108 | | EIN ▶ 04-2802193 Phone no. 617-523-7846 |

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.                    Form **1065** (2004)

BLUE HILL
5533

Form 1065 (2004)  ROYALL ASSOCIATES REALTY TRUST        04-2973514        Page 2

## Schedule A    Cost of Goods Sold (see page 19 of the Instructions)

| | | |
|---|---|---|
| 1 | Inventory at beginning of year | **1** |
| 2 | Purchases less cost of items withdrawn for personal use | **2** |
| 3 | Cost of labor | **3** |
| 4 | Additional section 263A costs (attach statement) | **4** |
| 5 | Other costs (attach statement) | **5** |
| 6 | Total. Add lines 1 through 5 | **6** |
| 7 | Inventory at end of year | **7** |
| 8 | Cost of goods sold. Subtract line 7 from line 6. Enter here and on page 1, line 2 | **8** |

9a Check all methods used for valuing closing inventory:

(i) ☐ Cost as described in Regulations section 1.471-3

(ii) ☐ Lower of cost or market as described in Regulations section 1.471-4

(iii) ☐ Other (specify method used and attach explanation) ▶

b Check this box if there was a writedown of "subnormal" goods as described in Regulations section 1.471-2(c) ......... ▶ ☐

c Check this box if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ▶ ☐

d Do the rules of section 263A (for property produced or acquired for resale) apply to the partnership? ............ ☐ Yes  ☐ No

e Was there any change in determining quantities, cost, or valuations between opening and closing inventory? ......... ☐ Yes  ☐ No
  If "Yes," attach explanation.

## Schedule B    Other Information

| | | Yes | No |
|---|---|---|---|
| 1 | What type of entity is filing this return? Check the applicable box: | | |
| a | ☒ Domestic general partnership     b ☐ Domestic limited partnership | | |
| c | ☐ Domestic limited liability company     d ☐ Domestic limited liability partnership | | |
| e | ☐ Foreign partnership     f ☐ Other ▶ | | |
| 2 | Are any partners in this partnership also partnerships? | | X |
| 3 | During the partnership's tax year, did the partnership own any interest in another partnership or in any foreign entity that was disregarded as an entity separate from its owner under Regulations sections 301.7701-2 and 301.7701-3? If yes, see instructions for required attachment | | X |
| 4 | Did the partnership file Form 8893, Election of Partnership Level Tax Treatment, or an election statement under section 6231(a)(1)(B)(ii) for partnership-level tax treatment, that is in effect for this tax year? See Form 8893 for more details | | X |
| 5 | Does this partnership meet all three of the following requirements? | | |
| a | The partnership's total receipts for the tax year were less than $250,000; | | |
| b | The partnership's total assets at the end of the tax year were less than $600,000; and | | |
| | Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | |
| | If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; item F on page 1 of Form 1065; or item N on Schedule K-1. | | X |
| 6 | Does this partnership have any foreign partners? If "Yes," the partnership may have to file Forms 8804, 8805 and 8813. See page 20 of the instructions | | X |
| 7 | Is this partnership a publicly traded partnership as defined in section 469(k)(2)? | | X |
| 8 | Has this partnership filed, or is it required to file, Form 8264, Application for Registration of a Tax Shelter? | | X |
| 9 | At any time during calendar year 2004, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See page 20 of the instructions for exceptions and filing requirements for Form TD F 90-22.1. If "Yes," enter the name of the foreign country. ▶ | | X |
| 10 | During the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520. See page 21 of the instructions | | X |
| 11 | Was there a distribution of property or a transfer (e.g., by sale or death) of a partnership interest during the tax year? If "Yes," you may elect to adjust the basis of the partnership's assets under section 754 by attaching the statement described under Elections Made By the Partnership on page 9 of the instructions | | X |
| | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return ▶ | | |

## Designation of Tax Matters Partner (see page 21 of the instructions)

Enter below the general partner designated as the tax matters partner (TMP) for the tax year of this return:

| | | | |
|---|---|---|---|
| Name of designated TMP ▶ | GERALD FINEBERG | Identifying number of TMP ▶ | 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 |
| Address of designated TMP ▶ | ONE WASHINGTON ST. | | |
| | WELLESLEY          MA  02484 | | |

Form **1065** (2004)

BLUE HILL
5534

Form 1065 (2004)    ROYALL ASSOCIATES REALTY TRUST    04-2973514    Page **3**

| Schedule K | Partners' Distributive Share Items | | | Total amount |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) (page 1, line 22) | | 1 | |
| 2 | Net rental real estate income (loss) (attach Form 8825) | | 2 | 151,060 |
| 3a | Other gross rental income (loss) | 3a | | |
| b | Expenses from other rental activities (attach statement) | 3b | | |
| c | Other net rental income (loss). Subtract line 3b from line 3a | | 3c | |
| 4 | Guaranteed payments | | 4 | |
| 5 | Interest income | | 5 | 59,324 |
| 6 | Dividends: a  Ordinary dividends | | 6a | 2,240 |
| | b  Qualified dividends | 6b | | |
| 7 | Royalties | | 7 | |
| 8 | Net short-term capital gain (loss) (attach Schedule D (Form 1065)) | | 8 | |
| 9a | Net long-term capital gain (loss) (attach Schedule D (Form 1065)) | | 9a | 3,956 |
| b | Collectibles (28%) gain (loss) | 9b | | |
| c | Unrecaptured section 1250 gain (att. stmt.) | 9c | | |
| 10 | Net section 1231 gain (loss) (attach Form 4797) | | 10 | |
| 11 | Other income (loss) (attach statement) | | 11 | |
| 12 | Section 179 deduction (attach Form 4562) | | 12 | |
| 13a | Contributions | | 13a | |
| b | Deductions related to portfolio income (attach statement) | | 13b | |
| c | Investment interest expense | | 13c | |
| d | Section 59(e)(2) expenditures: | | | |
| | (1) Type ▶ | (2) Amount ▶ | 13d(2) | |
| e | Other deductions (attach statement) | | 13e | |
| 14a | Net earnings (loss) from self-employment | | 14a | 0 |
| b | Gross farming or fishing income | | 14b | |
| c | Gross nonfarm income | | 14c | |
| 15a | Low-income housing credit (section 42(j)(5)) | | 15a | |
| b | Low-income housing credit (other) | | 15b | |
| c | Qualified rehabilitation expenditures (rental real estate) (attach Form 3468) | | 15c | |
| d | Other rental real estate credits | | 15d | |
| e | Other rental credits | | 15e | |
| f | Other credits and credit recapture (attach statement) | | 15f | |
| 16a | Name of country or U.S. possession ▶ | | | |
| b | Gross income from all sources | | 16b | |
| c | Gross income sourced at partner level | | 16c | |
| | Foreign gross income sourced at partnership level | | | |
| d | Passive ▶ | e  Listed categories ▶ | f  General limitation ▶ | 16f |
| | Deductions allocated and apportioned at partner level | | | |
| g | Interest expense ▶ | h  Other ▶ | 16h | |
| | Deductions allocated and apportioned at partnership level to foreign source income | | | |
| i | Passive ▶ | j  Listed categories (attach statement) ▶ | k  General limitation ▶ | 16k |
| l | Foreign taxes: (1) Paid ▶ | (2) Accrued ▶ | 16l(2) | |
| m | Reduction in taxes available for credit (attach statement) | | 16m | |
| 17a | Post-1986 depreciation adjustment | | 17a | |
| b | Adjusted gain or loss | | 17b | |
| c | Depletion (other than oil and gas) | | 17c | |
| d | Oil, gas, and geothermal properties - gross income | | 17d | |
| e | Oil, gas, and geothermal properties - deductions | | 17e | |
| f | Other AMT items (attach statement) | | 17f | |
| 18a | Tax-exempt interest income | | 18a | |
| b | Other tax-exempt income        SEE STATEMENT 1 | | 18b | 63,256 |
| c | Nondeductible expenses        SEE STATEMENT 2 | | 18c | 181,992 |
| 19a | Distributions of cash and marketable securities | | 19a | |
| b | Distributions of other property | | 19b | |
| 20a | Investment income | | 20a | 61,564 |
| b | Investment expenses | | 20b | |
| c | Other items and amounts (attach statement) | | | |

Form **1065** (2004)

BLUE HILL
5535

**Analysis of Net Income (Loss)**

| 1 | Net Income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13e, and 16l(1), and 18l(2) | | | 1 | 216,580 |
|---|---|---|---|---|---|

| 2 | Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|---|
| a | General partners | | 216,580 | | | | |
| b | Limited partners | | | | | | |

**Note: Schedules L, M-1, and M-2 are not required if Question 5 of Schedule B is answered "Yes."**

**Schedule L   Balance Sheets per Books**

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1 Cash | | 2,166,208 | | 3,804,741 |
| 2a Trade notes and accounts receivable | | | | |
| b Less allowance for bad debts | | | | |
| 3 Inventories | | | | |
| 4 U.S. government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets (attach statement) SEE STMT 3 | | 5,337,106 | | 4,460,903 |
| 7 Mortgage and real estate loans | | | | |
| 8 Other investments (attach statement) | | | | |
| 9a Buildings and other depreciable assets | 34,131,370 | | 34,131,370 | |
| b Less accumulated depreciation | 18,253,970 | 15,877,400 | 19,072,070 | 15,059,300 |
| 10a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 11 Land (net of any amortization) | | 3,119,071 | | 3,119,071 |
| 12a Intangible assets (amortizable only) | 517,800 | | 409,972 | |
| b Less accumulated amortization | 90,366 | 427,434 | | 409,972 |
| 13 Other assets (attach statement) | | | | |
| 14 Total assets | | 26,927,219 | | 26,853,987 |

| Liabilities and Capital | | | | |
|---|---|---|---|---|
| 15 Accounts payable | | | | |
| 16 Mortgages, notes, bonds payable in less than 1 year | | 297,902 | | |
| 17 Other current liabilities (attach statement) | | 50,000 | | 50,000 |
| 18 All nonrecourse loans | | | | |
| 19 Mortgages, notes, bonds payable in 1 year or more | | 40,146,796 | | 40,273,621 |
| 20 Other liabilities (attach statement) | | | | |
| 21 Partners' capital accounts | | −13,567,479 | | −13,469,634 |
| 22 Total liabilities and capital | | 26,927,219 | | 26,853,987 |

**Schedule M-1   Reconciliation of Income (Loss) per Books With Income (Loss) per Return**

| 1 | Net income (loss) per books | 97,845 | 6 | Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | | |
|---|---|---|---|---|---|---|
| 2 | Income included on Sch. K, lines 1, 2, 3c, 5a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): | | a | Tax-exempt interest $ SEE STATEMENT 5 | | 63,256 |
| 3 | Guaranteed payments (other than health insurance) | | | | | 63,256 |
| 4 | Expenses recorded on books this year not included on Schedule K, lines 1 through 13e, 16l(1), and 16l(2) (itemize): | | 7 | Deductions included on Schedule K, lines 1 through 13e, 16l(1), and 16l(2), not charged against book income this year (itemize): | | |
| a | Depreciation $ | | a | Depreciation $ SEE STATEMENT 6 | | 1 |
| b | Travel and entertainment $ SEE STATEMENT 4 181,992 | 181,992 | 8 | Add lines 6 and 7 | | 63,257 |
| 5 | Add lines 1 through 4 | 279,837 | 9 | Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | | 216,580 |

**Schedule M-2   Analysis of Partners' Capital Accounts**

| 1 | Balance at beginning of year | −13,567,479 | 6 | Distributions: a Cash | | |
|---|---|---|---|---|---|---|
| 2 | Capital contributed: a Cash | | | b Property | | |
| | b Property | | 7 | Other decreases (itemize): | | |
| 3 | Net income (loss) per books | 97,845 | | | | |
| 4 | Other increases (itemize): | | 8 | Add lines 6 and 7 | | |
| 5 | Add lines 1 through 4 | −13,469,634 | 9 | Balance at end of year. Subtract line 8 from line 5 | | −13,469,634 |

Form **1065** (2004)

BLUE HILL
5536

| Form **8825** | Rental Real Estate Income and Expenses of a **Partnership or an S Corporation**<br>▶ See instructions on back.<br>▶ Attach to Form 1065, Form 1065-B, or Form 1120S. | OMB No. 1545-1186 |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service | | **2004** |

**Name** ROYALL ASSOCIATES REALTY TRUST

**Employer identification number** 04-2973514

Show the kind and location of each property. See page 2 for additional properties.

A  150 ROYALL STREET
.................................................

.................................................

B .................................................

C .................................................

D .................................................

|  | | **Properties** | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **D** |
| **Rental Real Estate Income** | | | | | |
| Gross rents | **2** | 4,087,916 | | | |
| **Rental Real Estate Expenses** | | | | | |
| Advertising | **3** | 208 | | | |
| Auto and travel | **4** | | | | |
| Cleaning and maintenance | **5** | 140,950 | | | |
| Commissions | **6** | 10,394 | | | |
| Insurance | **7** | 174,532 | | | |
| Legal and other professional fees | **8** | 77,188 | | | |
| Interest | **9** | 1,611,488 | | | |
| Repairs | **10** | 48,693 | | | |
| Taxes | **11** | 291,313 | | | |
| Utilities | **12** | 550,402 | | | |
| Wages and salaries | **13** | | | | |
| Depreciation (see instructions) | **14** | 662,174 | | | |
| Other (list) ▶<br>SEE STATEMENT 7 | **15** | 369,514 | | | |
| Total expenses for each property.<br>Add lines 3 through 15 | **16** | 3,936,856 | | | |

| | | |
|---|---|---|
| Total gross rents. Add gross rents from line 2, columns A through H | **17** | 4,087,916 |
| Total expenses. Add total expenses from line 16, columns A through H | **18** | 3,936,856) |
| Net gain (loss) from Form 4797, Part II, line 17, from the disposition of property from rental real estate activities | **19** | |
| Net income (loss) from rental real estate activities from partnerships, estates, and trusts in which this partnership or S corporation is a partner or beneficiary (from Schedule K-1) | **20a** | |

b  Identify below the partnerships, estates, or trusts from which net income (loss) is shown on line 20a. Attach a schedule if more space is needed:

(1) Name                                                          (2) Employer ID number

.................................................

.................................................

| | | |
|---|---|---|
| Net rental real estate income (loss). Combine lines 17 through 20a. Enter the result here and on:<br>● Form 1065 or 1120S: Schedule K, line 2, or<br>● Form 1065-B: Part I, line 4 | **21** | 151,060 |

For Paperwork Reduction Act Notice, see back of form.

Form **8825** (2004)

BLUE HILL
5537

SCHEDULE D
(Form 1065)

Department of the Treasury
Internal Revenue Service

**Capital Gains and Losses**

▶ Attach to Form 1065.

OMB No. 1545-0099

**2004**

Name of partnership

YALL ASSOCIATES REALTY TRUST

Employer identification number

04-2973514

**Short-Term Capital Gains and Losses-Assets Held 1 Year or Less**

| (a) Description of property (e.g., 100 shares of "Z" Co.) | (b) Date acquired (month, day, year) | (c) Date sold (month, day, year) | (d) Sales price (see instructions) | (e) Cost or other basis (see instructions) | (f) Gain or (loss) Subtract (e) from (d) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| | | |
|---|---|---|
| Short-term capital gain from installment sales from Form 6252, line 26 or 37 | 2 | |
| Short-term capital gain (loss) from like-kind exchanges from Form 8824 | 3 | |
| Partnership's share of net short-term capital gain (loss), including specially allocated short-term capital gains (losses), from other partnerships, estates, and trusts | 4 | |
| Net short-term capital gain or (loss). Combine lines 1 through 4 in column (f). Enter here and on Form 1065, Schedule K, line 8 or 11 | 5 | |

**Long-Term Capital Gains and Losses-Assets Held More Than 1 Year**

| (a) Description of property (e.g., 100 shares of "Z" Co.) | (b) Date acquired (month, day, year) | (c) Date sold (month, day, year) | (d) Sales price (see instructions) | (e) Cost or other basis (see instructions) | (f) Gain or (loss) Subtract (e) from (d) |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| | | |
|---|---|---|
| Long-term capital gain from installment sales from Form 6252, line 26 or 37 | 7 | |
| Long-term capital gain (loss) from like-kind exchanges from Form 8824 | 8 | |
| Partnership's share of net long-term capital gain (loss), including specially allocated long-term capital gains (losses), from other partnerships, estates, and trusts | 9 | |
| Capital gain distributions | 10 | 3,956 |
| Net long-term capital gain or (loss). Combine lines 6 through 10 in column (f). Enter here and on Form 1065, Schedule K, line 9a or 11 | 11 | 3,956 |

For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 1065.

Schedule D (Form 1065) 2004

BLUE HILL
5538

PARTNER 1
**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

| Final K-1 | Amended K-1 | OMB No. 1545-0099 |

**2004**

Tax year beginning 1/01/2004
and ending 12/31/2004

**Partner's Share of Income, Deductions, Credits, etc.**  ▶ See back of form and separate instructions.

**A**  Partnership's employer identification number
04-2973514

**B**  Partnership's name, address, city, state, and ZIP code
ROYALL ASSOCIATES REALTY TRUST

ONE WASHINGTON ST
WELLESLEY          MA  02481

**C**  IRS Center where partnership filed return
OGDEN, UT  84201-0011

**D**  ☐ Check if this is a publicly traded partnership (PTP)
**E**  ☐ Tax shelter registration number, if any _____
**F**  ☐ Check if Form 8271 is attached

**G**  Partner's identifying number
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

**H**  Partner's name, address, city, state, and ZIP code
DANIEL FRANK

286 CLARK ROAD
BROOKLINE          MA  02146

**I**  ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

☒ Domestic partner   ☐ Foreign partner

**K**  What type of entity is this partner?  INDIVIDUAL

**L**  Partner's share of profit, loss, and capital:

|  | Beginning | Ending |
|---|---|---|
| Profit | 2.500000 % | 2.500000 % |
| Loss | 2.500000 % | 2.500000 % |
| Capital | 2.500000 % | 2.500000 % |

**M**  Partner's share of liabilities at year end:

| Nonrecourse | $ |
|---|---|
| Qualified nonrecourse financing | $ |
| Recourse | $ 1,008,091 |

**N**  Partner's capital account analysis:

| Beginning capital account | $ -358,040 |
|---|---|
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ 2,446 |
| Withdrawals & distributions | $ ( ) |
| Ending capital account | $ -355,594 |

☒ Tax basis   ☐ GAAP   ☐ Section 704(b) book
☐ Other (explain)

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | | 15 | Credits & credit recapture |
| 2 | Net rental real estate income (loss) | -122 | | |
| 3 | Other net rental income (loss) | | 16 | Foreign transactions |
| 4 | Guaranteed payments | | | |
| 5 | Interest income | 1,483 | | |
| 6a | Ordinary dividends | 56 | | |
| 6b | Qualified dividends | | | |
| 7 | Royalties | | | |
| 8 | Net short-term capital gain (loss) | | | |
| 9a | Net long-term capital gain (loss) | 99 | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | | |
| 9c | Unrecaptured section 1250 gain | | | |
| 10 | Net section 1231 gain (loss) | | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | | B* | 1,582 |
| | | | C* | 652 |
| 12 | Section 179 deduction | | 19 | Distributions |
| 13 | Other deductions | | 20 | Other information |
| | | | A | 1,539 |
| 14 | Self-employment earnings (loss) | | | |

\* See attached statement for additional information.

For IRS Use Only

For Privacy Act and Paperwork Reduction Act Notice, see Instructions for Form 1065.          Schedule K-1 (Form 1065) 2004

A

BLUE HILL
5539

PARTNER # 2
chedule K-1
orm 1065)

2004

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0099

epartment of the Treasury
rnal Revenue Service

Tax year beginning  1/01/2004
and ending  12/31/2004

er's Share of Income, Deductions,
redits, etc.    ▶ See back of form and separate instructions.

**A** Partnership's employer identification number
04-2973514

**B** Partnership's name, address, city, state, and ZIP code
ROYALL ASSOCIATES REALTY TRUST

ONE WASHINGTON ST
WELLESLEY        MA 02481

**C** IRS Center where partnership filed return
OGDEN, UT 84201-0011

**D** ☐ Check if this is a publicly traded partnership (PTP)
**E** ☐ Tax shelter registration number, if any _____
**F** ☐ Check if Form 8271 is attached

**G** Partner's identifying number
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

**H** Partner's name, address, city, state, and ZIP code
GERALD FINEBERG

ONE WASHINGTON ST.
WELLESLEY        MA 02484

**I** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member
☐ Domestic partner    ☐ Foreign partner

**K** What type of entity is this partner?  INDIVIDUAL

**L** Partner's share of profit, loss, and capital:

|  | Beginning | Ending |
|---|---|---|
| Profit | 42.500000 % | 42.500000 % |
| Loss | 42.500000 % | 42.500000 % |
| Capital | 42.500000 % | 42.500000 % |

**M** Partner's share of liabilities at year end:
| Nonrecourse | $ |
| Qualified nonrecourse financing | $ |
| Recourse | $ 17,137,539 |

**I** Partner's capital account analysis:
| Beginning capital account | $ -5,931,445 |
| Capital contributed during the year | $ |
| Current year increase (decrease) | $ 41,584 |
| Withdrawals & distributions | $ ( ) |
| Ending capital account | $ -5,889,861 |

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

| | | |
|---|---|---|
| 1 | Ordinary business income (loss) | |
| 2 | Net rental real estate income (loss) | -2,068 |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | 25,213 |
| 6a | Ordinary dividends | 952 |
| 6b | Qualified dividends | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | 1,681 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| 14 | Self-employment earnings (loss) | |

| | | |
|---|---|---|
| 15 | Credits & credit recapture | |
| 16 | Foreign transactions | |
| 17 | Alternative minimum tax (AMT) items | |
| 18 | Tax-exempt income and nondeductible expenses | |
|  | B* | 26,884 |
|  | C* | 11,078 |
| 19 | Distributions | |
| 20 | Other information | |
|  | A | 26,165 |

***** See attached statement for additional information.**

For IRS Use Only

Privacy Act and Paperwork Reduction Act Notice, see instructions for Form 1065.

Schedule K-1 (Form 1065) 2004

BLUE HILL
5540

PARTNER# 3

Schedule K-1
(Form 1065)

Department of the Treasury
Internal Revenue Service

**2004**

OMB No. 1545-0099

☐ Final K-1    ☐ Amended K-1

Tax year beginning 1/01/2004
and ending 12/31/2004

**Partner's Share of Income, Deductions, Credits, etc.**    ▶ See back of form and separate instructions.

A  Partnership's employer identification number
04-2973514

B  Partnership's name, address, city, state, and ZIP code
ROYALL ASSOCIATES REALTY TRUST

ONE WASHINGTON ST
WELLESLEY        MA 02481

C  IRS Center where partnership filed return
OGDEN, UT 84201-0011

D  ☐ Check if this is a publicly traded partnership (PTP)
E  ☐ Tax shelter registration number, if any _____
F  ☐ Check if Form 8271 is attached

G  Partner's identifying number
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

H  Partner's name, address, city, state, and ZIP code
GARY FINEBERG

57 BROADLAWN PARK #15A
CHESTNUT HILL      MA 02167

I  ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

J  ☒ Domestic partner    ☐ Foreign partner

K  What type of entity is this partner? INDIVIDUAL

L  Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 2.500000 % | 2.500000 % |
| Loss | 2.500000 % | 2.500000 % |
| Capital | 2.500000 % | 2.500000 % |

M  Partner's share of liabilities at year end:

| | |
|---|---|
| Nonrecourse | $ _____ |
| Qualified nonrecourse financing | $ _____ |
| Recourse | $ 1,008,091 |

N  Partner's capital account analysis:

| | |
|---|---|
| Beginning capital account | $ -358,039 |
| Capital contributed during the year | $ _____ |
| Current year increase (decrease) | $ 2,446 |
| Withdrawals & distributions | $ ( _____ ) |
| Ending capital account | $ -355,593 |

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

| | | |
|---|---|---|
| 1 | Ordinary business income (loss) | -122 |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | |
| 4 | Guaranteed payments | |
| 5 | Interest income | 1,483 |
| 6a | Ordinary dividends | 56 |
| 6b | Qualified dividends | |
| 7 | Royalties | |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | 99 |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | |
| 10 | Net section 1231 gain (loss) | |
| 11 | Other income (loss) | |
| 12 | Section 179 deduction | |
| 13 | Other deductions | |
| 14 | Self-employment earnings (loss) | |

| | | |
|---|---|---|
| 15 | Credits & credit recapture | |
| 16 | Foreign transactions | |
| 17 | Alternative minimum tax (AMT) items | |
| 18 | Tax-exempt income and nondeductible expenses | |
| | B* | 1,581 |
| | C* | 652 |
| 19 | Distributions | |
| 20 | Other information | |
| | A | 1,539 |

\* See attached statement for additional information.

For IRS Use Only

Privacy Act and Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2004

BLUE HILL
5541

PARTNER# 4

Schedule K-1
(Form 1065)

**2004**

Department of the Treasury
Internal Revenue Service

□ Final K-1    □ Amended K-1    OMB No. 1545-0099

**Partner's Share of Income, Deductions, Credits, etc.** ▶ See back of form and separate instructions.

Tax year beginning __1/01/2004__
and ending __12/31/2004__

**Part I    Information About the Partnership**

A  Partnership's employer identification number
04-2973514

B  Partnership's name, address, city, state, and ZIP code
ROYALL ASSOCIATES REALTY TRUST

ONE WASHINGTON ST
WELLESLEY          MA 02481

C  IRS Center where partnership filed return
OGDEN, UT 84201-0011

D  □ Check if this is a publicly traded partnership (PTP)

E  □ Tax shelter registration number, if any _____

F  □ Check if Form 8271 is attached

**Part II    Information About the Partner**

G  Partner's identifying number
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

H  Partner's name, address, city, state, and ZIP code
MICHELLE FINEBERG

1272 BEACON ST., UNIT 3
BROOKLINE          MA 02446

I  ☒ General partner or LLC member-manager    □ Limited partner or other LLC member

J  ☒ Domestic partner    □ Foreign partner

K  What type of entity is this partner?  INDIVIDUAL

L  Partner's share of profit, loss, and capital:

|  | Beginning | Ending |
|---|---|---|
| Profit | 2.500000 % | 2.500000 % |
| Loss | 2.500000 % | 2.500000 % |
| Capital | 2.500000 % | 2.500000 % |

M  Partner's share of liabilities at year end:

Nonrecourse ............ $ _____
Qualified nonrecourse financing .... $ _____
Recourse ............ $  1,008,090

N  Partner's capital account analysis:

Beginning capital account ......... $  -77,269
Capital contributed during the year .. $ _____
Current year increase (decrease) ..... $  2,446
Withdrawals & distributions ........ $ ( _____ )
Ending capital account ............ $  -74,823

☒ Tax basis  □ GAAP  □ Section 704(b) book
□ Other (explain)

| | | | |
|---|---|---|---|
| 1 Ordinary business income (loss) | | 15 Credits & credit recapture | |
| 2 Net rental real estate income (loss) | -122 | | |
| 3 Other net rental income (loss) | | 16 Foreign transactions | |
| 4 Guaranteed payments | | | |
| 5 Interest income | 1,483 | | |
| 6a Ordinary dividends | 56 | | |
| 6b Qualified dividends | | | |
| 7 Royalties | | | |
| 8 Net short-term capital gain (loss) | | | |
| 9a Net long-term capital gain (loss) | 99 | 17 Alternative minimum tax (AMT) items | |
| 9b Collectibles (28%) gain (loss) | | | |
| 9c Unrecaptured section 1250 gain | | | |
| 10 Net section 1231 gain (loss) | | 18 Tax-exempt income and nondeductible expenses | |
| 11 Other income (loss) | | B* | 1,581 |
| | | C* | 651 |
| | | 19 Distributions | |
| 12 Section 179 deduction | | | |
| 13 Other deductions | | 20 Other information | |
| | | A | 1,539 |
| 14 Self-employment earnings (loss) | | | |

***** See attached statement for additional information.**

For IRS Use Only

Privacy Act and Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2004

BLUE HILL
5542

PARTNER# 5

Schedule K-1
(Form 1065)

**2004**

Department of the Treasury
Internal Revenue Service

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0099

Tax year beginning  1/01/2004
and ending  12/31/2004

**Partner's Share of Income, Deductions, Credits, etc.**   ▶ See back of form and separate instructions.

**A** Partnership's employer identification number
04-2973514

**B** Partnership's name, address, city, state, and ZIP code
ROYALL ASSOCIATES REALTY TRUST

ONE WASHINGTON ST
WELLESLEY          MA 02481

**C** IRS Center where partnership filed return
OGDEN, UT 84201-0011

**D** ☐ Check if this is a publicly traded partnership (PTP)
**E** ☐ Tax shelter registration number, if any _____
**F** ☐ Check if Form 8271 is attached

**G** Partner's identifying number
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

**H** Partner's name, address, city, state, and ZIP code
WILLIAM J. LANGELIER

2045 JACKSON ST.
SAN FRANCISCO          CA 94109

**I**
☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member
☒ Domestic partner    ☐ Foreign partner

**K** What type of entity is this partner?  INDIVIDUAL

**L** Partner's share of profit, loss, and capital:

|  | Beginning | Ending |
|---|---|---|
| Profit | 48.750000 % | 48.750000 % |
| Loss | 48.750000 % | 48.750000 % |
| Capital | 48.750000 % | 48.750000 % |

**M** Partner's share of liabilities at year end:
Nonrecourse ................ $ _____
Qualified nonrecourse financing $ _____
Recourse ................ $ 19,657,765

**N** Partner's capital account analysis:
Beginning capital account ....... $ -6,246,188
Capital contributed during the year .. $ 47,700
Current year increase (decrease) .... $ 47,700
Withdrawals & distributions ...... $ ( _____ )
Ending capital account ......... $ -6,198,488

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

| | |
|---|---|
| 1 Ordinary business income (loss) | 15 Credits & credit recapture |
| 2 Net rental real estate income (loss) * 153,555 | |
| 3 Other net rental income (loss) | 16 Foreign transactions |
| 4 Guaranteed payments | |
| 5 Interest income 28,920 | |
| 6a Ordinary dividends 1,092 | |
| 6b Qualified dividends | |
| 7 Royalties | |
| 8 Net short-term capital gain (loss) | 17 Alternative minimum tax (AMT) items |
| 9a Net long-term capital gain (loss) 1,929 | |
| 9b Collectibles (28%) gain (loss) | |
| 9c Unrecaptured section 1250 gain | |
| 10 Net section 1231 gain (loss) | 18 Tax-exempt income and nondeductible expenses |
| 11 Other income (loss) | B* 30,837 |
| | C* STMT |
| 12 Section 179 deduction | 19 Distributions |
| 13 Other deductions | 20 Other information |
| | A 30,012 |
| 14 Self-employment earnings (loss) | |

\* See attached statement for additional information.

For IRS Use Only

Privacy Act and Paperwork Reduction Act Notice, see Instructions for Form 1065.

Schedule K-1 (Form 1065) 2004

BLUE HILL
5543

PARTNER# 6
Schedule K-1
Form 1065)

**2004**

Department of the Treasury
Internal Revenue Service

Tax year beginning _1/01/2004_
and ending _12/31/2004_

**Partner's Share of Income, Deductions,
Credits, etc.** ▶ See back of form and separate instructions.

A Partnership's employer identification number
04-2973514

B Partnership's name, address, city, state, and ZIP code
ROYALL ASSOCIATES REALTY TRUST

ONE WASHINGTON ST
WELLESLEY          MA 02481

C IRS Center where partnership filed return
OGDEN, UT 84201-0011

D ☐ Check if this is a publicly traded partnership (PTP)
E ☐ Tax shelter registration number, if any _____
F ☐ Check if Form 8271 is attached

G Partner's identifying number
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

H Partner's name, address, city, state, and ZIP code
AMY BADGER

21 OLIVE STREET
NEWBURYPORT       MA 01950

I ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member
J ☒ Domestic partner    ☐ Foreign partner

K What type of entity is this partner? INDIVIDUAL

L Partner's share of profit, loss, and capital:

|  | Beginning | Ending |
|---|---|---|
| Profit | 1.250000 % | 1.250000 % |
| Loss | 1.250000 % | 1.250000 % |
| Capital | 1.250000 % | 1.250000 % |

M Partner's share of liabilities at year end:
Nonrecourse ........................ $ _____
Qualified nonrecourse financing .... $ _____
Recourse ........................... $ 504,045

N Partner's capital account analysis:
Beginning capital account .......... $ -596,498
Capital contributed during the year  $ _____
Current year increase (decrease) ... $ 1,223
Withdrawals & distributions ........ $ ( _____ )
Ending capital account ............. $ -595,275

☒ Tax basis  ☐ GAAP  ☐ Section 704(b) book
☐ Other (explain)

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) | 15 | Credits & credit recapture |
| 2 | Net rental real estate income (loss) -61 | | |
| 3 | Other net rental income (loss) | 16 | Foreign transactions |
| 4 | Guaranteed payments | | |
| 5 | Interest income 742 | | |
| 6a | Ordinary dividends 28 | | |
| 6b | Qualified dividends | | |
| 7 | Royalties | | |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) 49 | 17 | Alternative minimum tax (AMT) items |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | | |
| 10 | Net section 1231 gain (loss) | 18 | Tax-exempt income and nondeductible expenses |
| 11 | Other income (loss) | B* | 791 |
| | | C* | 326 |
| 12 | Section 179 deduction | 19 | Distributions |
| 13 | Other deductions | 20 | Other information |
| | | A | 770 |
| 14 | Self-employment earnings (loss) | | |

\* See attached statement for additional information.

For IRS Use Only

BLUE HILL
5544

04-2973514
FYE: 12/31/2004

# Federal Statements

### Statement 1 - Form 1065, Schedule K, Line 18b - Other Tax-exempt Income

| Description | Amount |
|---|---|
| TAX EXEMPT INTEREST | $ 63,256 |
| TOTAL | $ 63,256 |

### Statement 2 - Form 1065, Schedule K, Line 18c - Nondeductible Expenses

| Description | Amount |
|---|---|
| DECREASE IN MARKET VALUE | $ 26,066 |
| DEPRECIATION ADJUSTMENT | 155,926 |
| TOTAL | $ 181,992 |

1-2

BLUE HILL
5545

04-2973514
FYE: 12/31/2004

# Federal Statements

## Statement 3 - Form 1065, Schedule L, Line 6 - Other Current Assets

| Description | Beginning of Year | End of Year |
|---|---|---|
| IMPOVEMENTS/OPERATIONS- RESER | $ 1,592,812 | $ 254,385 |
| ESCOWED ACCOUNTS | 3,744,294 | 4,206,518 |
| TOTAL | $ 5,337,106 | $ 4,460,903 |

## Statement 4 - Form 1065, Sch M-1, Ln 4 - Expenses Recorded on Books, Not on Sch K

| Description | Amount |
|---|---|
| DECREASE IN MARKET VALUE | $ 26,066 |
| DEPRECIATION ADJUSTMENT | 155,926 |
| TOTAL | $ 181,992 |

## Statement 5 - Form 1065, Sch M-1, Ln 6 - Income Recorded on Books, Not on Sch K

| Description | Amount |
|---|---|
| TAX EXEMPT INTEREST | $ 63,256 |
| TOTAL | $ 63,256 |

## Statement 6 - Schedule M-1, Line 7 - Deductions Included in Sch K, Not on Books

| Description | Amount |
|---|---|
| ROUNDING ADJUSTMENT | $ 1 |
| TOTAL | $ 1 |

3-6

BLUE HILL
5546

04-2973514
FYE: 12/31/2004

# Federal Statements

## Statement 7 - 150 ROYALL STREET - Form 8825 - Other Expense

| Description | Amount |
|---|---|
| MANAGEMENT FEES | $ 130,352 |
| HEALTH CLUB | 719 |
| TELEPHONE | 1,478 |
| MAINTENANCE LABOR | 169,451 |
| MISCELLANEOUS | 600 |
| TRASH REMOVAL | 20,353 |
| MATERIALS | 24,955 |
| AUTO LEASING | 4,063 |
| EXTERMINATING | 475 |
| AMORTIZATION | 17,068 |
| TOTAL | $ 369,514 |

7

BLUE HILL
5547

# EXHIBIT 24

```
                UPDATE                                    Apr  1,2005 Friday
XG073-02                          Notes Maintenance                 2:57 P.M.
-------------------------------------------------------------------------------
  Account number  760990083  BLUE HILLS OF   Note date  10/24/2001
    ote type. . . . . . . . .          TX      TAX
  Reference number . . . . .  TAX SHORTAGE

                                  Note Text


     $98,587.19   (delbert stone will either wire in 10/25, or ov
     ernight a check.


     _____

     10/0 mr stone sent in $142,997.11 for tax escrow so he would
     have aditional funds in the acct. it was deposited to the
     reserve. doing tran 4o this date to transfer to tax escrow.

     _____

-------------------------------------------------------------------------------


 F1=Rtn/Nc                         F12=Edit    Enter=Process    Roll keys
```

EXHIBIT
Clarke
393
ze  4/28/06

WF01693

```
                UPDATE                                    Apr  1,2005 Friday
XG073-02                      Notes Maintenance               2:57 P.M.
------------------------------------------------------------------------
  Account number  760990083  BLUE HILLS OF   Note.date   1/24/2002
    ote type. . . . . . . . .             TX    TAX
  Reference number . . . . . .  TAX SHORTAGE

                              Note Text


      Borrower wired funds 1/18 and intended them for tax escrow a
      ccount  Wire went to lockbox reserve.  Borrower will fax le
      tter to autorize transfer to tax escrows.
```

------------------------------------------------------------------------

F1=Rtn/Nc                          F12=Edit    Enter=Process    Roll keys

WF01696

```
             UPDATE                                    Apr  1,2005 Friday
XG073-02                      Notes Maintenance              2:57 P.M.
-----------------------------------------------------------------------
  Account number  760990083   BLUE HILLS OF  Note date  4/22/2002
  Note type. . . . . . . . . .         TX      TAX
  Reference number . . . . . . TAX PMT DUE 5/1

                              Note Text


        gil stone called (781)239-1480  regarding tax next due 5/1/0
        2. i told him according to our note pads. the installment wa
        already paid. he states he did not pay the last installment
        i called the assessor again and they show only 1 check being
        received. ck #1224  this is not a manual check. we paid wit
        h check # 16065.
        he is faxing his tax bill & a letter granting permission to
        take money from one of his accts for the tax shortage.



-----------------------------------------------------------------------


  F1=Rtn/Nc                        F12=Edit    Enter=Process   Roll keys
```

WF01702

```
                UPDATE                                      Apr  1,2005 Friday
XG073-02                      Notes Maintenance                  2:57 P.M.
------------------------------------------------------------------------------
 Account number  760990083  BLUE HILLS OF   Note date   4/24/2002
 ote type. . . . . . . .          TX   TAX
 Reference number . . . . . .  TRANSFER FUNDS

                                Note Text

     received permission from borrower & m gremore to transfer
     $101,179.20 from lock box sweep to tax escrow for shortage
     of may 1  2002 installment.
     _____
     _____
     _____
     _____
     _____
     _____
     _____
     _____
------------------------------------------------------------------------------

 F1=Rtn/Nc                        F12=Edit    Enter=Process   Roll keys
```

WF01703

```
                                                    Apr  1,2005 Friday
            UPDATE              Notes Maintenance         2:58 P.M.
XG073-02
-------------------------------------------------------------------------
 Account number  760990083  BLUE HILLS OF  Note date  .7/25/2002 .
  ote type. . . . . . . . .            TX    TAX
 Reference number . . . . . TRANSFERED FUND
```

                              Note Text

Received a wire from the borrower for the shortage in the
amount of $100,083.59, but it was applied to the reserves
account. I have debited the reserves account and moved the
money into the tax escrow account.

```
-------------------------------------------------------------------------
```

F1=Rtn/Nc                          F12=Edit    Enter=Process   Roll keys

WF01712

```
XG073-02        UPDATE          Notes Maintenance          Apr  1,2005 Friday
                                                                  2:58 P.M.
------------------------------------------------------------------------
 Account number  760990083  BLUE HILLS OF  Note date . 10/21/2002
  ote type. . . . . . . .              TR    TRANSACTION NOTES
 Reference number . . . . .   2002100016
```

                                   Note Text


FUNDS ORIGINALLY APPLIED TO RESERVE 004 IS INCORRECT. FUNDS
ARE FOR A TAX SHORTAGE AND THEY SHOULD HAVE BEEN APPLIED TO
THE TAX ESCROW.

```
------------------------------------------------------------------------

 F1=Rtn/Nc                    F12=Edit    Enter=Process    Roll keys
```

WF01717

```
          UPDATE                                  Apr  1,2005 Friday
XG073-02                    Notes Maintenance          2:59 P.M.
----------------------------------------------------------------------
Account number  760990083  BLUE HILLS OF   Note date  .7/25/2003
 Note type. . . . . . . . .          TR    TRANSACTION NOTES
 Reference number . . . . . . 2003070015

                            Note Text


I have moved the funds from the reserve bucket 4 to credit
the tax escrow since this wire was for the tax shortage
in the amount of $154,752.47.
```

```
----------------------------------------------------------------------
```

```
F1=Rtn/Nc                    F12=Edit    Enter=Process   Roll keys
```

WF01733

```
                UPDATE                                    Apr  1,2005 Friday
  XG073-02                      Notes Maintenance                 3:00 P.M.
  --------------------------------------------------------------------------
    Account number  760990083  BLUE HILLS OF   Note date    4/28/2004
    ote type. . . . . . . . .                  TR    TRANSACTION NOTES
    reference number . . . . . .  2004040006
```

### Note Text

Funds were rec'd on 4/23/04 & deposited into acct# 640425957
4 due to Loan being Cash Mgmt loan.  Funds are for Tax short
age.  Borrower didn't reference "Tax shortage" on wire.

Debited funds from Acct# 6404259574 & applied to Tax escrow
with a back date of 4/23/04 (date funds were rec'd).

```
  --------------------------------------------------------------------------

  F1=Rtn/Nc                     F12=Edit    Enter=Process    Roll keys
```

WF01739

```
XG073-02        UPDATE          Notes Maintenance        Apr  1,2005 Friday
                                                               2:57 P.M.
-------------------------------------------------------------------------------
  Account number  760990083  BLUE HILLS OF   Note date  5/08/2002
    ote type. . . . . . . .          IS    INS
   eference number . . . . . .  _____
```

### Note Text

Gil Stone (781) 431 1108 will request that we transfer
insurance shortage of $518 251 24 from his lockbox excess
to his insurance escrow. He will fax letter to
Donna Loo's attention.

```
-------------------------------------------------------------------------------

F1=Rtn/Nc                       F12=Edit    Enter=Process    Roll keys
```

WF01704

```
              UPDATE                                    Apr  1,2005 Friday
XG073-02                      Notes Maintenance              3:01 P.M.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
 Account number   760990083  BLUE HILLS OF  Note date   7/29/2004
 *Note type. . . . . . . . . .        TX    TAX
 Reference number . . . . . . NO TAX DSBRSMNT

                          Note Text

     I have contacted Gil Stern phone #1-781-239-1480 and notifie
     d him that per his loan agreement the only way we could move
     money from his reserve account to his tax account is if he
     provides a certification letter, copy of lease, or leases,
     and Copy of Invoice/Lien Waiver.  Gil Advised that he did
     not have a Lien Waiver.  I have contacted Jill Martin and she
     referenced that without the Lien Waiver, Gil will not be
     able to move money from reserves to the tax escrow bucket.
     Escalating this matter to Deborah Lambson.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


 F1=Rtn/Nc                         F12=Edit    Enter=Process    Roll keys
```

WF01745

```
                UPDATE                                    Apr  1,2005 Friday
XG073-02                        Notes Maintenance                 3:01 P.M.
-------------------------------------------------------------------------
 Account number  760990083 . BLUE HILLS OF  Note date   7/29/2004
 'ote type. . . . . . . . .         TX    TAX
 .eference number . . . . .  NON COMPLIANCE
```

                              Note Text

I have called and talked with Gil Stern with regards to the
tax shortage that was billed 7/16/04 and due 7/27/04  Taxes
are due to the Town of Canton by 8/2/04  Gil stated that
their tenant moved out and there are no available funds to
pay taxes.  We contacted Reserve Dept per Borrower request
to find out if Reserve money could be moved to tax escrow;
Borrower unable to comply with requirements for transfering
reserve money for tax escrow.  Advancing funds today per
Ops Manager approval  Escalating to Asset Manager

---------------------------------------------------------------------

```
 F1=Rtn/Nc                          F12=Edit    Enter=Process   Roll keys
```

WF01746

```
        UPDATE                                    Apr  1,2005 Friday
XG073-02                    Notes Maintenance                3:01 P.M.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
  Account number  760990083  BLUE HILLS OF  Note date    8/12/2004
   ote type. . . . . . . . .            TR   TRANSACTION NOTES
   eference number . . . . . 2004080006
```

### Note Text

borrower is goint to special servicer reversed the payment
autodebit should have been stoped
He is in contact with curt Mallegni for possible transfer

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

```
F1=Rtn/Nc                        F12=Edit    Enter=Process    Roll keys
```

WF01747

```
          UPDATE                  Notes Maintenance              Apr  1,2005 Friday
XG073-02                                                              3:01 P.M.
-----------------------------------------------------------------------------
Account number  760990083  BLUE HILLS OF   Note date    8/20/2004
 ote type. . . . . . . .           TR   TRANSACTION NOTES
 eference number . . . . . . 2004080011

                              Note Text


     Hold code(s) S    override by SHUHEIR
     Funds in the amount of $ 51,908.89 has been placed into the
     suspense account.   Email sent to the Special Servicer on how
     to apply the funds.
     _____
     _____
     _____
     _____
     _____
     _____
     _____

-----------------------------------------------------------------------------

F1=Rtn/Nc                        F12=Edit    Enter=Process    Roll keys
```

WF01752

# EXHIBIT 25

EXHIBIT
Riley
407
MC 5/8/06

EXHIBIT B

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT
## OF
## BLUE HILLS OFFICE PARK LLC

### RECITALS

The undersigned member of Blue Hills Office Park LLC, a Delaware limited liability company (the "Company"), hereby adopts the following Limited Liability Company Operating Agreement (the "Operating Agreement"). Terms not defined in this paragraph shall have the meanings set forth in Article XIII hereof.

### ARTICLE I

### Formation; Members; Organization

Section 1.1. Formation.

(a)    Blue Hills Management Corp., as an authorized person within the meaning of the Act, is hereby authorized to execute, deliver and file any and all amendments to and restatements of the Company's Certificate of Formation.

(b)    The Members hereby agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein.

(c)    The name of the Company shall be Blue Hills Office Park LLC. The business of the Company may be conducted upon compliance with all applicable laws under any name jointly designated by a Supermajority Interest.

(d)    The principal place of business of the Company shall be at c/o Fineberg Management, Inc., One Washington Street, Wellesley, Massachusetts 02481. The Company may locate its places of business at any other place or places as a Supermajority Interest may deem advisable.

(e)    The Company's registered office in the State of Delaware shall be at the office of its registered agent at c/o National Registered Agents, Inc., 9 East Loockerman, Dover, Kent County, Delaware 19901, and the Company's registered agent in the Sate of Delaware shall be National Registered Agents, Inc. At any time, a Supermajority Interest may change the registered office and registered agent of the Company by directing Blue Hills Management Corp., as an authorized person under the Act, to file the address of the new registered office and/or the name of the new registered agent with the Secretary of State of the State of Delaware pursuant to the Act.

(f)    The Company shall have perpetual existence unless the Company is earlier dissolved in accordance with the provisions of this Operating Agreement.

Section 1.2. Organization and Powers. The Members or the Manager, if a Manager has been retained pursuant to the terms of this Operating Agreement or otherwise, shall file such certificates and documents as appropriate to comply with the applicable requirements for the operation of a

Blue Hill
1969

limited liability company in accordance with the laws of the State of Delaware and any other jurisdiction in which the Company elects to do business. Subject to all other provisions of this Operating Agreement, the Company is hereby authorized and empowered:

(a) to acquire any property, real or personal, in fee or under lease, or any rights therein or appurtenant thereto, necessary or convenient for the business and operations of the Company;

(b) to borrow money and to issue evidences of indebtedness and to secure the same by mortgage, pledge or other lien on its assets;

(c) to pay and prepay in whole or in part, finance and refinance, decrease, increase, modify or extend any indebtedness, whether secured or unsecured, and in connection therewith to execute and deliver any and all loan evidencing, governing and security documents, together with extensions, renewals, or modifications of any such indebtedness, documents and/or instruments, or the mortgages or liens securing the same;

(d) to employ a management company to manage its assets (including a company which may be an Affiliate);

(e) to construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property necessary, convenient or incidental to accomplish the purposes of the Company; and

(f) to carry on any other activities necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as such activities are not prohibited to be carried on or performed by a limited liability company under the laws of the State of Delaware.

Section 1.2. <u>Annual Meeting</u>. The annual meeting of the Voting Members of the Company shall be held on the first Tuesday in February of each year or on such other date designated by a Supermajority Interest. The purposes of such meeting shall be to review the performance of the leasing and management agents or agents for the Company's properties, to review the operations of the Company for the prior calendar year, and to consider such other business as may come before the meeting. If the date fixed for the annual meeting is a legal holiday in the State of Delaware, the meeting shall be held on the next succeeding business day.

Section 1.3. <u>Regular Meetings</u>. Regular meetings of the Voting Members of the Company may be held at such times as may be scheduled by Voting Members holding a Supermajority Interest.

Section 1.4. <u>Special Meetings</u>. Special meetings of the Voting Members of the Company shall only be held when called by all of the Voting Members.

Section 1.5. <u>Place</u>. Meetings of the Voting Members of the Company may be held within or without the State of Delaware at such place designated by the persons calling the meeting, unless a Supermajority Interest shall designate another place of meeting. If no place of meeting has been so designated, the meeting shall be held at the Company's registered office.

-2-

Blue Hill
1970

Section 1.6.  Notice of Special Meetings.  Written notice stating the place, date and time of a special meeting, and the purposes for which the meeting has been called, shall be delivered to each Voting Member not less than five (5) nor more than sixty (60) days before the date set for the meeting, by or at the direction of the persons calling the meeting.  Notice may be given by: (a) mail, (b) nationally recognized overnight delivery service such as Federal Express, or (c) hand delivery, courier, facsimile transmission, or other form of electronic communication, if a receipt of such delivery, transmission or communication is retained by the sender.  Such notice shall be deemed to have been given: (i) if mailed, three (3) days after deposit thereof in the United States mail addressed to the Voting Member at its address as it appears on the books of the Company, with postage thereon prepaid, and (ii) if given by any of the other means authorized above, on the date sent as evidenced by the record of delivery or receipt, as applicable.

Section 1.7.  Notice of Adjourned Meetings.  When a meeting has been adjourned to another time and place, it shall not be necessary to give any notice of the adjourned meeting if the date, time and place to which the meeting has been adjourned are announced at the meeting at which the adjournment is taken.

Section 1.8.  Waiver of Notice.  Whenever any notice is required to be given to any Voting Member, a waiver thereof in writing signed by the Voting Member entitled to such notice, whether made before or after the time for notice to be given, is equivalent to the giving of notice.  Attendance in person at a meeting shall constitute a waiver of notice of such meeting, except when the Voting Member attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting has not been properly called or convened pursuant to this Operating Agreement.  Attendance of a Voting Member at a meeting also constitutes a waiver of any objection to the transaction of a particular type of business at the meeting that is not within the described purposes of the meeting, unless such Voting Member objects to the consideration of the item of business when it is presented.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Voting Members need be specified in any written waiver of notice.

Section 1.9.  Quorum and Voting.  A Supermajority Interest of the Voting Members of the Company present in person or by proxy shall constitute a quorum at a meeting of Voting Members.  Once a Voting Member is present at a meeting, the Voting Member shall be deemed present for quorum purposes for the remainder of the meeting.

If a quorum of Voting Members is present, each matter requiring the approval of the Voting Members shall require the approval of a Supermajority Interest of Voting Members present in person or by proxy, unless otherwise provided by law, the Certificate of Formation or this Operating Agreement.

Section 1.10.  Voting of Interests.  A Voting Member that is a corporation may vote by the officer, agent or proxy designated by the by-laws of the Voting Member, or, in the absence of any applicable by-law, by such person as the board of directors of the Voting Member may designate.  Proof of such designation may be made by presentation of a certified copy of the by-laws, corporate vote or other instrument of the Voting Member.  In the absence of any such designation, or in case of a conflicting designation by the Voting Member, the chairman of the board, president, any vice

-3-

Blue Hill
1971

president (in order of rank or seniority), secretary and treasurer of the Voting Member shall be presumed to possess, in that order, authority to vote on behalf of such Voting Member.

A Voting Member that is a partnership may vote by any general partner thereof or any person designated in writing by all of the general partners. Proof of a general partner's status may be established by presentation to the other Voting Members of a certified copy of the partnership agreement therefor and any certificates as to factual matters reasonably required by the other Voting Members.

A Voting Member that is any form of entity other than a corporation or partnership may vote in any manner authorized by a Supermajority Interest.

Section 1.11. Action by Members Without a Meeting. Any action required or permitted to be taken at any annual, regular or special meeting of Voting Members of the Company may be taken without a meeting and without prior notice, if consents in writing, setting forth the action so taken, shall be signed by Voting Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Voting Members were present and voted. In order to be effective, the written consents must be dated and signed by each consenting Voting Member and shall be effective as of the date when the last Voting Member necessary to make such written consent effective under the terms of the preceding sentence has signed such written consent.

Within ten (10) days after obtaining such authorization by written consent, written notice fairly summarizing the material features of the action taken by the written consent shall be given to those Voting Members who have not consented in writing; provided, however, that failure to give such notice to any of such Voting Members shall not invalidate or otherwise adversely affect the action taken by the written consent.

Section 1.12. Telephone Conference and Electronic Media. To the extent not prohibited or restricted by law or the Certificate of Formation, any meeting of the Voting Members may be conducted through the use of any means of communication by which all Voting Members participating may simultaneously hear each other during the meeting. A Voting Member participating in a meeting by this means is deemed to be present in person at the meeting.

Section 1.13. Proxy Voting. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Company before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy. A proxy may only be given verbally during a meeting taking place by teleconferencing and shall expire at the termination of said teleconference.

Blue Hill
1972

## ARTICLE II

### Ownership Interests

Upon its execution of this Operating Agreement, without the need for the consent or other action of any person or the need for any other agreement, Royall Associates Realty Trust, a Massachusetts trust, under a Declaration of Trust dated July 13, 1987 and recorded with the Norfolk County Registry of Deeds in Book 7658, Page 682, as the same may be amended of record to date, shall be admitted as the only Member of the Company, having contributed an undivided one hundred (100%) percent interest in the Property to the capital of the Company. Royall Associates Realty Trust shall own one hundred (100%) percent of the Percentage Interests in the Company.

This Article II shall be updated from time to time as is necessary to reflect accurately the information contained therein, including, without limitation, the admission of additional Members to the Company. Any revision to this Article II made in accordance with this Operating Agreement shall not be deemed an amendment to this Operating Agreement. Any reference in this Operating Agreement to this Article II shall be deemed to be a reference to this Article II as amended and in effect from time to time.

No Member shall be required to contribute or lend to the Company any additional amounts. If funds are needed, a Member may, but shall not be required to, contribute or lend monies to the Company. If a Member lends monies to the Company, those loans shall be repayable on demand, bear interest at an annual rate requested by the lending Member, such rate not to exceed eighteen (18%) percent per annum, and any and all such loans and interest thereon shall be repaid prior to any distributions to the Members.

No Member or Transferee shall have the right to receive property other than cash in return for its Capital Contributions unless a Supermajority Interest otherwise agrees in writing. No interest will be paid on Capital Contributions. No Member will be responsible or liable for the return of any Capital Contribution to any other Member.

The provisions of this Article II are not intended to be for the benefit of any creditor to whom any debts, liabilities or obligations are owed by the Company or any of its Members. No creditor shall obtain any rights under this Operating Agreement or shall by reason of this Operating Agreement have any right to make any claim with respect to any debt, liability or obligation against the Company.

## ARTICLE III

### Capital Accounts; Allocations of Net Profits and Net Losses

Section 3.1.  Capital Accounts.

(a)    An individual Capital Account shall be established and maintained for each Member. The original Capital Account established for any Member who acquires an interest in the Company by virtue of an assignment in accordance with the terms of this Operating Agreement shall be in the

Blue Hill
1973

same amount as, and shall replace, the Capital Account of the assignor of such interest and, for purposes of this Operating Agreement, such Member shall be deemed to have made the Capital Contributions made by the assignor of such interest (or made by such assignor's predecessor in interest). To the extent such Member acquires less than the entire interest in the Company of the assignor of the interest so acquired by such Member, the original Capital Account of such Member and its Capital Contributions shall be in proportion to the interest it acquires, and the Capital Account of the assignor who retains a partial interest in the Company, and the amount of its Capital Contributions, shall be reduced in proportion to the interest he or it retains.

(b)     The Capital Account of each Member shall be maintained in accordance with the following provisions:

(i)     to such Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Net Profits and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company assets that are distributed to such Member;

(ii)     to such Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any other Company assets that are distributed to such Member pursuant to any provision of this Operating Agreement, such Member's distributive share of Net Losses and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company; and

(iii)     in determining the amount of any liability for purposes of this subsection (b), there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the treasury regulations promulgated thereunder.

(c)     No Member shall ever have any obligation to contribute funds in order to restore his or its negative Capital Account.

Section 3.2.  Withdrawal or Reduction of Members' Contributions to Capital.

(a)     A Member shall not receive from the property of the Company any part of its Capital Contribution until all liabilities of the Company have been satisfied (whether by payment or reasonable provision for payment thereof).

(b)     A Member, irrespective of the nature of its Capital Contributions, has only the right to demand and receive cash in return for such Capital Contributions.

Section 3.3.  Net Profits and Net Losses.

(a)     Subject to the allocation rules of Section 3.4, Net Profits shall be allocated among the Members in proportion to such Members' Percentage Interests.

(b)     Subject to the allocation rules of Section 3.4, Net Losses shall be allocated among the Members in proportion to such Members' Percentage Interests.

-6-

Blue Hill
1974

Section 3.4.  Allocation Rules.

(a)  In the event Members are admitted pursuant to this Operating Agreement on different dates, the Net Profits (or Net Losses) allocated to the Members for each year during which such Members are so admitted shall be allocated among the Members in proportion to the Percentage Interest each such Member holds from time to time during such year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Manager.

(b)  For purposes of determining the Net Profits, Net Losses or any other items allocable to any period, Net Profits, Net Losses and any such other items shall be determined on a daily, monthly, quarterly or other basis, as determined by the Manager using any method that is permissible under Section 706 of the Code and the treasury regulations promulgated thereunder.

(c)  Except as otherwise provided in this Operating Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for herein shall be divided among the Members in the same proportions as they share Net Profits and Net Losses.

(d)  The Members are aware of the income tax consequences of the allocations made by this Article III and hereby agree to be bound by the provisions of this Article III in reporting their shares of Company income and loss for income tax purposes.

Section 3.5.  Tax Allocations:  Section 704(c) of the Code.

(a)  In accordance with Section 704(c) of the Code and the treasury regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value.

(b)  In the event the Gross Asset Value of any Company asset is adjusted pursuant to Paragraph (b) of the definition of "Gross Asset Value" contained in Article XIII hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the treasury regulations promulgated thereunder.

(c)  Any elections or other decisions relating to allocations under this Section 3.5, including the selection of any allocation method permitted under treasury regulation Section 1.704-3, shall be made by the Manager in any manner that reasonably reflects the purpose and intention of this Operating Agreement.  Allocations pursuant to this Section 3.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses, other items or distributions pursuant to any provision of this Operating Agreement.

-7-

Blue Hill
1975

Section 3.6. <u>Curative Allocations</u>.

(a)    The provisions of this Agreement relating to the maintenance of Capital Accounts, the allocation of Net Profits or Net Losses and the distribution of Distributable Cash to the Members are intended to comply with the requirements of the Allocation Regulations by causing the amount of such Net Profits or Net Losses to be allocated to and among the Capital Accounts of the Members so that the Capital Accounts of each Member as of the end of each fiscal year of the Company is equal to the Hypothetical Liquidation Amount distributable to such Partner <u>minus</u> such Member's Share of Company Minimum Gain and Share of Member Minimum Gain, if any. In addition, such provisions are intended to cause the amount distributable to the Members in an actual distribution pursuant to Article VIII to equal the amount that would be distributable to each Member if Article III and/or Article V rather than Article VIII applied to such distribution.

(b)    If the Company is advised at any time by its accountants or by tax counsel that the allocations of Net Profits or Net Losses for any fiscal year of the Company are unlikely to be respected for tax purposes or that an actual distribution to the Members at the end of such fiscal year computed in accordance with Article VIII would not result in each Member receiving the amount that he would have received if Article III and/or Article V rather than Article VIII applied to such hypothetical distribution, the Manager is authorized and empowered, without the Approval of the Members, to amend the provisions of this Agreement relating to the allocation of Net Profits or Net Losses (other than the Regulatory Allocations) for such fiscal year (and for subsequent fiscal years if necessary) to cure such defect consistent with the principles of Section 3.6(a) above.

Section 3.7. <u>Operating Distributions</u>. The Company shall at least once annually distribute Distributable Cash, if Distributable Cash is available, to Members in accordance with their Percentage Interests.

## ARTICLE IV

### Loans by Voting Member

A Voting Member may extend a loan or loans to the Company to pay operating expenses of the Company or for any other legitimate Company purpose with the approval of, and upon such terms as agreed to by those Original Voting Members (including for this purpose the Member(s) agreeing to make the loan(s) to the Company) holding a Supermajority Interest (or, if there are then no Original Voting Members then holding a Supermajority Interest), or as otherwise permitted in Article II hereof. The determination of what constitute a legitimate Company purpose shall be made by the Manager in its sole discretion.

## ARTICLE V

### Rights and Obligations of Members

Section 5.1. <u>Limitation of Liability</u>. Except as otherwise provided in this Operating Agreement or the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and

-8-

Blue Hill

no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

Section 5.2. <u>List of Members</u>. Upon the written request of any Member for any purpose reasonably related to such Member's interest in the Company, the Manager shall provide to such Member a list showing the names, addresses and Membership interests of all Members.

Section 5.3. <u>Company Books</u>. The Manager shall maintain and preserve the accounts, books and other relevant Company documents. Upon reasonable written request, each Member shall have the right, at a time during ordinary business hours, as reasonably determined by the Manager, to inspect and copy, at the requesting Member's expense, the books and records of the Company for any purpose reasonably related to such Member's interest.

Section 5.4. <u>Priority and Return of Capital</u>. No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section 5.4 shall not apply to loans made to the Company by a Member.

Section 5.5. <u>Liability of a Member to the Company</u>. A Member who receives a distribution from the Company is liable to the Company or to others only to the extent provided by the Act and other applicable law.

ARTICLE VI

<u>Transfers of Interests</u>

Section 1. <u>Transfers</u>. Notwithstanding anything to the contrary contained herein, no Member shall be permitted to transfer his, her or its interest in the Company without the prior written consent of a Supermajority Interest of the Original Voting Members, which may be withheld in their sole discretion. A Transferee shall not become a Member or Voting Member unless the Original Voting Members holding a Supermajority Interest agree in writing to the admission of the Transferee as a Member or Voting Member, as the case may be. If there are then no Original Voting Members, either of the foregoing may be accomplished by the prior written consent of the Voting Members then holding a Supermajority Interest.

A Transferee that does not become a Voting Member shall have no right to vote on any matter upon which Voting Members may vote, and shall only have the right to profits, losses, capital and distributions allocated upon to the transferred interest.

Any person or entity succeeding to the interest of a Member pursuant to the terms of this Article VI (a "Substitute Member"), whether as an Assignee or Transferee, shall assume and be subject to all of the applicable obligations of the transferring or assigning Member set forth in this Operating Agreement, including, without limitation, the provisions of Article IV hereof. In the event such Substitute Member shall fail to abide by the terms of this Operating Agreement, the transfer or Assignment of such interest to a Substitute Member, at the sole option of the Original Voting Members holding a Supermajority Interest (or, if there are then no Original Voting Members, by the

-9-

Blue Hill
1977

Voting Members then holding a Supermajority Interest), shall be deemed null and void and of no force or effect.

Section 2. Restrictions. In no event shall all or any part of a Member's Percentage Interest be Assigned to a minor or to an incompetent (other than to a member of a Member's Immediate Family).

The Manager may require as a condition of any Assignment of any Percentage Interest, that the assignor (i) assume all costs incurred by the Company in connection therewith, and (ii) furnish it with an opinion of counsel satisfactory to counsel to the Company that such sale, transfer, exchange or other disposition complies with applicable Federal and state securities laws and will not cause the Company to be taxed as an association.

Any Assignment in contravention of any of the provisions of this Operating Agreement shall be void and ineffectual and shall not bind, or be recognized by, the Company.

Section 3. Assignees. In the event of the death or incapacity of any Member, his legal representatives shall have such rights as are afforded them by law. The death of a Member shall not dissolve the Company.

An Assignee of a Member who does not become a Substitute Member in accordance with the provisions this Operating Agreement shall, if such Assignment is in compliance with the terms of this Operating Agreement, have the right to receive the same share of Net Profits, Net Losses and distributions of the Company to which the assigning Member would have been entitled if no such Assignment had been made by such Member.

Any Member who shall Assign all his interest in the Company shall cease to be a Member of the Company, and shall no longer have any rights or privileges or obligations of a Member except that, unless and until the Assignee of such Member is admitted to the Company as a Substitute Member in accordance with the provisions of this Operating Agreement, said assigning Member shall retain such statutory rights and be subject to all obligations of Members under this Operating Agreement and shall further be subject to such statutory obligations as may be applicable.

In the event of any Assignment of a Member's Percentage Interest, there shall be filed with the Company a duly executed and acknowledged counterpart of the instrument making such Assignment; such instrument must evidence the written acceptance of the Assignee to all the terms and provisions of this Operating Agreement; and if such an instrument is not so filed the Company need not recognize any such Assignment for any purpose.

An Assignee of a Member's interest as a Member who does not become a Substitute Member as provided in this Operating Agreement and who desires to make a further Assignment of his Percentage Interest shall be subject to the provisions of this Article VI to the same extent and in the same manner as any Member desiring to make an Assignment of his Percentage Interest.

-10-

Blue Hill
1978

## ARTICLE VII

### Admission of New Voting Members

The Company may admit a person or entity as a Voting Member only if those Original Voting Members holding a Supermajority Interest consents thereto in writing. If there are then no Original Voting Members, then the foregoing shall be effected by written consent of the Voting Members then holding a Supermajority Interest.

## ARTICLE VIII

### Dissolution

Section 8.1. Events of Dissolution. The Company shall be dissolved upon the occurrence of any of the following:

(a)    the sale or other disposition of all of the assets of the Company;

(b)    the unanimous written agreement of all Members to dissolve; or

(c)    upon the occurrence of any of the events described in Section 18-801(4) or (5) of the Act.

Each Member acknowledges and agrees that it shall not be permitted to resign as a Member of the Company and agrees to indemnify and hold harmless the Company and its Members from any and all loss, cost damage and expense, including reasonable attorneys' fees, sustained by the Company and/or its Members on account of any breach its agreement contained in this Article VIII. Any resignation shall not cause a dissolution of the Company.

Upon the death, retirement, resignation, Bankruptcy or dissolution of a Voting Member (except for an involuntary dissolution caused by the failure of such Voting Member to file an annual or other periodic report, if such Voting Member is reinstated within ninety (90) days after such voluntary dissolution), such Voting Member shall thereupon automatically become a Non-Voting Member.

Section 8.2. Distributions Upon Dissolution. In settling accounts after dissolution of the Company, the assets of the Company shall be applied in the following order:

(a)    To pay those liabilities to creditors, in the order of priority as provided by law, including repayment of loans made by Members to the Company and amounts due from the Company to third party creditors, but excluding repayment to Members and Transferees of their contributions of capital to the Company;

(b)    Those liabilities to Members and Transferees in respect of their contributions to capital of the Company; and

-11-

Blue Hill
1979

(c)    To the Members in accordance with their Percentage Interests.

Section 8.3.  <u>Certificate of Cancellation</u>.  If a dissolution of the Company occurs and all debts, liabilities and obligations of the Company have been satisfied (whether by payment or reasonable provision for payment) and all of the remaining property and assets of the Company have been distributed, a certificate of cancellation as required by the Act shall be executed and filed by the Manager of the Company, as an authorized person within the meaning of the Act, with the Secretary of State of the State of Delaware.

Section 8.4.  <u>Effect of Filing Certificate of Cancellation</u>.  Upon the filing of a certificate of cancellation with the Secretary of State of the State of Delaware pursuant to Section 8.3, the existence of the Company shall cease.

## ARTICLE IX

## Representations, Warranties and Covenants by the Members

Each Member represents to the Company and the other Members that it is duly authorized to enter into this Operating Agreement and to perform its obligations hereunder, and it has the ability to perform its obligations hereunder and if it is not a natural person, that it has been duly organized and is validly existing under the laws of the state of its organization.

Each Member (the "Indemnitor") shall indemnify and hold the Company and the other Members (collectively, the "Indemnitees") harmless from any and all liabilities, obligations, claims, contingencies, damages, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) that any or all of the Indemnitees may suffer or incur as a result of, or relating to: (a) the breach by the Indemnitor of any of the representations, warranties, covenants or agreements made by the Indemnitor in this Operating Agreement; (b) the gross negligence or intentional misconduct of the Indemnitor; or (c) acts by the Indemnitor that exceed the Indemnitor's authority under this Operating Agreement or as granted to such Indemnitor by the requisite vote, under this Operating Agreement, of the Members.

## ARTICLE X

## Amendment

This Operating Agreement may be amended only upon the written consent of a Supermajority Interest, except that any provisions hereof that require the consent of all of the Voting Members may be amended only upon the written consent of all of the Voting Members.

## ARTICLE XI

## Rights and Duties of Members

Section 11.1.  <u>Management</u>.  The business and affairs of the Company shall be managed by a manager (the "Manager") in accordance with this Operating Agreement.  Blue Hills Management

Blue Hill
1980

Corp. shall be the initial Manager of the Company. The Manager shall direct, manage and control the business and affairs of the Company. Except for situations in which the approval of all or a specified percentage of the Members is expressly required by this Operating Agreement or by a nonwaivable provision of the Act, the Manager shall make all decisions regarding matters relating to the Company and perform any and all other acts or activities necessary, appropriate, convenient, advisable or incidental to the management of the Company's business.

Section 11.2. Certain Powers.

(a)   The Manager shall have power and authority, on behalf of the Company to:

(i)    acquire property from any person as the Manager may determine, whether or not such person is directly or indirectly affiliated or connected with any Member;

(ii)    borrow money from banks, other lending institutions, any Member, or Affiliates of any Member, on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager, or, to the extent permitted under the Act and this Operating Agreement, by agents or employees associated with the Company unless expressly authorized by the Members to contract such debt or incur such liability;

(iii)    purchase liability and other insurance to protect the Company's property and business;

(iv)    hold, own, operate and dispose of the Company's real and personal properties;

(v)    invest funds of the Company in time deposits, short-term governmental obligations, commercial paper or other investments;

(vi)    sell or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan as long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(vii)    execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property, assignments, bills of sale, leases and any other instruments or documents necessary, appropriate or convenient, advisable or incidental to the business of the Company;

(viii)    employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(ix)    pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

-13-

Blue Hill
1981

(x)     enter into any and all other agreements on behalf of the Company; and

(xi)    do and perform all other acts as may be necessary, appropriate, convenient, advisable or incidental to the conduct of the Company's business.

(b)     The unanimous vote of all of the Members shall be required for the Company to merge or consolidate with or into, or convert into, another business entity. Unless authorized to do so by this Operating Agreement or by the Members, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge the Company's credit or to render the Company liable for any purpose. No Member shall have any power or authority to bind the Company unless such Member shall have been authorized by the Members to act as an agent of the Company.

Section 11.3. <u>Liability for Certain Acts</u>. The Manager and each Member shall perform its duties as a Member of the Company in good faith, in a manner it reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. Neither the Manager nor any Member shall be liable to the Company or to any other Member for any loss or damage sustained by the Company or such Member unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager or such Member.

Section 11.4. <u>Members Have No Exclusive Duty to Company</u>. The Manager, any Member and all Affiliates thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Operating Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper. No Manager, Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company, even if such opportunity is of a character that, if presented to the Company, could be taken by the Company, and any Manager, Member or Affiliate thereof shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity.

Section 11.5. <u>Bank Accounts</u>. The Manager may from time to time open bank accounts in the name of the Company, and the Manager shall be the only signatory thereon, unless Members owning a Supermajority Interest determine otherwise.

Section 11.6. <u>Indemnity of the Members, Employees and Other Agents</u>.

(a)     To the fullest extent permitted by applicable law, the Manager, a Member, any Affiliate of the Manager or such Member, any officers, directors, shareholders, partners, members, employees, representatives or agents of the Manager or such Member, or their respective Affiliates or any employee or agent thereof (each, a "Covered Person") shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Operating Agreement, except that no Covered Person shall be entitled to be

-14-

Blue Hill
1982

indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of fraud, deceit, gross negligence, willful misconduct or a wrongful taking with respect to such acts or omissions; provided, however, that any indemnity under this Section 11.6 shall be provided out of and to the extent of the assets of the of the Company only, and no Covered Person shall have any personal liability on account thereof.

(b)    To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 11.6.

(c)    The Company may purchase and maintain insurance, on behalf of Covered Persons and such other persons as the Manager shall determine, against any liability that may be asserted against or expenses that may be incurred by any such person in connection with the activities of the Company or such indemnitees, regardless of whether the Company would have the power to indemnify such person against such liability under the provisions of this Operating Agreement. The Company may enter into indemnity contracts with Covered Persons and such other persons as the Manager shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this Section 11.6 and containing such other procedures regarding indemnification are appropriate.

Section 11.7. <u>Salaries</u>. The salaries and other compensation of the Manager shall be fixed from time to time by an affirmative vote of Members holding a Supermajority Interest.

## ARTICLE XII

### Miscellaneous Provisions

Section 12.1. <u>Binding Effect</u>. This Operating Agreement is binding upon and inures to the benefit of the Members, and, to the extent permitted by this Operating Agreement, their respective legal representatives, successors and assigns.

Section 12.2. <u>Remedies for Breach</u>. The limited liability company interests of each member are unique chattels and each party to this Operating Agreement shall have the remedies that are available to it for the violation of any of the terms of this Operating Agreement, including, but not limited to, the equitable remedy of specific performance (except as otherwise provided by this Operating Agreement).

Section 12.3. <u>Governing Law</u>. This Operating Agreement and the rights of the parties hereunder shall be construed pursuant to the laws of the State of Delaware (without regard to conflict of law principles).

Section 12.4. <u>Waiver of Action for Partition</u>. Each Member irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

Blue Hill
1983

Section 12.5. <u>Execution of Additional Instruments</u>. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

Section 12.6. <u>Construction</u>. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

Section 12.7. <u>Waivers</u>. The failure of any party hereto to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Operating Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

Section 12.8. <u>Rights and Remedies Cumulative</u>. The rights and remedies provided by this Operating Agreement are cumulative, and the use of any right or remedy by any party hereto shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties hereto may have.

Section 12.9. <u>Headings</u>. The headings and subheadings in this Operating Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Operating Agreement or any provisions hereof.

Section 12.10. <u>Severability</u>. If any provision or term of this Operating Agreement is found to be invalid, void or unenforceable, the remainder of the provisions of this Operating Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated. It is the intent of the parties hereto for the terms and conditions of this Operating Agreement to be interpreted to the greatest extent possible so as to remain valid and enforceable, and any provision or term of this Operating Agreement found by a court to be invalid, void or unenforceable, shall be rewritten by the court pursuant to this intent.

Section 12.11. <u>Creditors</u>. None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of: (a) the Company; or (b) any Member.

Section 12.12. <u>Counterparts</u>. This Operating Agreement may be signed in multiple counterparts, all of which should be deemed an original and shall constitute one instrument.

Section 12.13. <u>Integration</u>. This Operating Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

Section 12.14. <u>Merger, Consolidation and Conversion of the Company</u>. The unanimous vote of all of the Members shall be required for the Company to merge or consolidate with or into, or convert into, another entity.

Blue Hill
1984

## ARTICLE XIII

### Definitions

For purposes of this Operating Agreement, the following terms shall be defined as follows:

"Act" shall mean the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq., as amended from time to time.

"Affiliate" shall mean a person controlling, controlled by or under common control with the person specified.

"Agreement" shall mean this Operating Agreement, as amended, modified, supplemented or restated from time to time.

"Allocation Regulations" shall mean the Treasury Regulations issued under Sections 704(b), 704(c) and 752 of the Code, as the same may be modified or amended from time to time. In the event that the Allocation Regulations are revised or amended subsequent to the date of this Operating Agreement, references herein to sections or paragraphs of the Allocation Regulations shall be deemed to be references to the applicable sections or paragraphs of the Allocation Regulations as then in effect.

"Approval" shall mean approved or consented to in writing by all of the Members and a writing evidencing such approval or consent.

"Assignment" shall mean, with respect to a Percentage Interest or part thereof, any offer, sale, assignment, transfer, hypothecation, pledge, gift or any other disposition, whether voluntary or by operation of law. The term "Assign" shall mean to effect an Assignment.

"Bankruptcy" shall mean a bankruptcy under the Federal Bankruptcy Act or insolvency under any state insolvency act.

"Book Value" shall mean: (a) the fair market value of any of the Company's Property at the time of its contribution to the Company by a Member, which amount shall be (i) determined by agreement of the Members and reflected in the Capital Account of the contributing Member as its capital contribution to the Company with respect to such property, and (ii) properly adjusted in accordance with Section 1.704-(b)(2)(iv)(f) and (g) of the Allocation Regulations to reflect depreciation, depletion, amortization and gain or loss, as computed for book purposes with respect to such contributed property; or (b) in the case of all other property of the Company, its Federal adjusted tax basis.

"Capital Account" shall mean, with respect to any Member, the capital account maintained for such Member in accordance with the provisions of Article III hereof. A separate Capital Account shall be maintained for each Member's interest in the Company.

-17-

Blue Hill
1985

"Capital Contribution" shall mean, with respect to any Member, any contribution to the Company in cash or other property (at such property's initial Gross Asset Value) by such Member whenever made.

"Certificate of Formation" shall mean, as of any date, the Certificate of Formation of the Company, as amended on or prior to such date.

"Company Minimum Gain" shall be determined by computing, with respect to each Non-Recourse Liability of the Company, the amount of gain (of whatever character), if any, that would be realized by the Company if it disposed of (in a taxable transaction) the property subject to such Non-Recourse Liability in full satisfaction thereof (and for no other consideration), and by then aggregating the amounts so computed.

"Code" shall mean the Internal Revenue Code of 1986, as amended, or any successor statute.

"Deficit Restoration Obligation" shall mean, for each Member, the sum of: (a) his or its allocable share (as determined under Section 752 of the Code and the Allocation Regulations), if any, of any recourse indebtedness of the Company with respect to which he or it bears the economic risk of loss; (b) any unconditional obligation of such Member to contribute additional amounts to the capital of the Company within the time period specified in the Allocation Regulations (to the extent not previously taken into account in determining such Member's share of the recourse indebtedness of the Company described in clause (a) of this definition); (c) such Member's share of Company Minimum Gain, if any; (d) such Member's share of Member Minimum Gain, if any; and (e) the maximum amount he or it may be obligated to contribute to the Company upon termination of the Company (to the extent not previously taken into account for purposes of any of the foregoing clauses).

"Depreciation" shall mean an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for the relevant period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for the relevant period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by Members holding a Supermajority Interest.

"Distributable Cash" shall mean all cash, revenues and funds received by the Company which, in the reasonable discretion of the Manager, is available for distribution to the Members, after the payment of all liabilities which are then due and payable, as well as such Reserves as the Manager deems reasonably necessary for the proper operation of the Company's business.

"Gross Asset Value" shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

Blue Hill
1986

(a)     the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by Members holding a Supermajority Interest;

(b)     the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange fore more than a *de minimis* Capital Contribution; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of treasury regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i) and (ii) of this sentence shall only be made if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members; and

(c)     the Gross Asset Value of any Company asset that is distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Manager.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Paragraph (a) or Paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Profits and Net Losses.

"Hypothetical Liquidation Amount" shall mean, with respect to any Member, the amount that would be distributed to such Member as of the end of each fiscal year of the Company if the Company were dissolved and liquidated and (a) all Company assets were sold for cash equal to their Book Value, (b) all Company liabilities were paid, and (c) the remaining cash of the Company was distributed to such Member in accordance with the provisions of Articles III and/or Article V rather than Article VIII.

"Immediate Family" shall mean with respect to any person, his spouse, parents, parents-in-law, issue, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children-in-law and grandchildren-in-law.

"Member" shall include: (a) those persons or entities listed in Article II; and (b) persons or entities hereafter admitted as members of the Company in accordance with this Operating Agreement.

"Member Minimum Gain" shall mean Company Minimum Gain attributable to Member Non-Recourse Debt.

"Member Non-Recourse Debt" shall mean any Non-Recourse Debt of the Company for which no Member bears the economic risk of loss (as defined in the Allocation Regulations).

"Member Non-Recourse Deductions" shall mean items of Company loss, deduction or Section 705(a)(2)(B) expenditures that are attributable to Member Non-Recourse Debt. For any Company taxable year, the amount of Member Non-Recourse Deductions with respect to any

-19-

Blue Hill

Member Non-Recourse Debt equals the excess, if any, of the amount of the net increase during such year in the amount of Member Minimum Gain attributable to such Member Non-Recourse Debt over the aggregate amount of any distributions during such year to the Member that bears the economic risk of loss for such debt or proceeds of such debt that are allocable to an increase in the Member Minimum Gain attributable to such debt.

"Members" shall mean all Non-Voting Members and Voting Members.

"Net Profits" and "Net Losses" shall mean for each fiscal year, an amount equal to the Company's taxable income or loss for such fiscal year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss for this purpose all items of income, gain, loss or deduction that are required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profits and Net Losses pursuant to this definition shall be added to such taxable income or loss;

(b)     any expenditures of the Company that are described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to treasury regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c)     in the event the Gross Asset Value of any Company asset is adjusted in accordance with Paragraph (b) or Paragraph (c) of the definition of Gross Asset Value above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Profits or Net Losses;

(d)     gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; and

(e)     in lieu of the Depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition of "Depreciation" above.

"Non-Recourse Liability" shall mean any Company liability (or portion thereof) for which no Member bears the economic risk of loss (as defined in the Allocation Regulations).

"Non-Voting Members" shall mean Voting Members that have become Non-Voting Members under the terms of this Operating Agreement.

"Original Voting Members" shall mean those Voting Members who are Voting Members as of the date hereof or an assignee thereof who is a member of such Original Voting Member's

-20-

Blue Hill
1988

Immediate Family. Except as provided in the immediately preceding sentence, no assignee of an Original Voting Member, regardless of whether such assignee becomes a Substitute Member, shall ever be considered an Original Voting Member.

"Percentage Interest" shall mean, for any Member, such Member's Percentage Interest as set forth in Article II, which Percentage Interest may be changed from time to time by the unanimous vote of the Members.

"Property" shall mean the real and personal property in Canton, Massachusetts, located at 150 Royall Street, and any other property as may hereafter be acquired by the Company.

"Regulatory Allocations" shall mean the allocations set forth in Article III hereof.

"Reserves" shall mean funds set aside or amounts allocated to reserves that shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the business of the Company, or incident to the liquidation of the Company pursuant to Section 12.03.

"Substitute Member" shall have the meaning set forth in Article VI, Section 1 of this Operating Agreement.

"Supermajority Interest" shall mean all of the Original Voting Members of the Company, or, if there are then no Original Voting Members, then the same percentage of Voting Members.

"Transferee" shall mean a permitted transferee of an interest in the Company owned by a Member or its Affiliate.

"Voting Members" shall mean (a) all of the undersigned Members to this Operating Agreement, except any Member that becomes a Non-Voting Member under the terms of this Operating Agreement; and (b) any individual or entity that is approved as a Voting Member upon a vote of all of the Voting Members.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

Blue Hill
1989

The undersigned have hereby executed the foregoing Limited Liability Company Operating Agreement as of the 19th day of September, 1999.

SOLE MEMBER:

ROYALL ASSOCIATES REALTY TRUST

_Michelle Levielle_
Witness

By: _Gerald S. Fineberg_
Gerald S. Fineberg, its Trustee
and not individually

_Judi Bance_
Witness

By: _____
William J. Langelier, its Trustee
and not individually

SOLE MANAGER:

BLUE HILLS MANAGEMENT CORP.

_Michelle Levielle_
Witness

By: _Gerald S. Fineberg_
Gerald S. Fineberg, its President
and Treasurer

184140-14500/9547

-23-

Blue Hill
1990

## BLUE HILLS OFFICE PARK LLC

### FIRST AMENDMENT TO LIMITED LIABILITY COMPANY OPERATING AGREEMENT

Reference is made to the Limited Liability Operating Agreement of Blue Hills Office Park LLC (the "Company") dated as of September 14, 1999 (the "Agreement"), the Certificate of Formation of which was filed with the Delaware Secretary of State on September 14, 1999 (the "Certificate"), which Certificate was amended by a First Amendment to Certificate of Formation filed with the Delaware Secretary of State on September 14, 1999 (the "Amended Certificate").

The undersigned desire to amend the Agreement as follows:

1.      For so long as any mortgage lien held by Credit Suisse First Boston Mortgage Capital LLC (the "Lender") exists on the real property commonly known as and numbered 150 Royall Street, Canton, Massachusetts (the "Property") and owned of record by the Company, the sole purpose of the Company shall be as set forth in the Amended Certificate.

2.      For so long as any mortgage lien held by Lender exists on the Property, the Company shall be prohibited from engaging in the activities set forth in the Amended Certificate and shall otherwise observe the the covenants contained in the Amended Certificate.

*        Except as amended hereby, the Agreement shall remain in full force and effect unchanged.

EXECUTED as a sealed instrument as of the 14th day of September, 1999.

MANAGER:                        BLUE HILLS MANAGEMENT CORP.

                                By: _____
                                    Gerald S. Fineberg, its President and
                                    Treasurer

SOLE MEMBER:                    ROYALL ASSOCIATES REALTY TRUST

                                By: _____
                                    Gerald S. Fineberg, its Trustee
                                    and not individually

                                By: _____
                                    William J. Langelier, its Trustee
                                    and not individually

184143-1450/0/9347
    *In the event of any inconsistency between the terms of the Agreement        and
the Amended Certificate, the terms of the Amended Certificate shall control.

                                                        Operating

                                                Blue Hill
                                                1991

# EXHIBIT 26

760990083|Escrow Analysis - Corr|2004-08-13
JUN. 8.2004   2:08PM   FINEBERG MANAGEMENT                    NO.233    P.1/5

# fineberg management, inc.

June 8, 2004

**Sent Via FAX   925-691-5249**

Wells Fargo Bank
Dept 8778
Los Angeles, CA  90084-8778

TR# JUN 0 8 2004
*925001600* MK

Attention:  **Insurance Escrow Department**

RE:   **Loan No.:   76-0990083**
      **Blue Hills Office Park LLC**

Enclosed please find "Paid Receipts" and insurance certificates for Policy Year 5/1/04-
5/1/05 for Blue Hills Office Park.   Please refund to us the insurance escrow funds.

If you have any questions, please do not hesitate to call.

Sincerely,

*Carol Falvey*

Carol R. Falvey

one washington street, suite 400, wellesley, ma 02481  tel (781) 239-1480  fax (781) 239-1493

LNR03726

760990083|Escrow Analysis - Corr|2004-08-13

JUN. 8.2004 12:06PM FINEBERG MANAGEMENTan HRH Co                    NO.233    P. 2/5.  002/002

 **HRH.**

bith royal 5_hoh66 ━━━━━ **I N V O I C E** ━━━━━━━━

**Premium Paid In Full**

99 High Street, 28th Floor
Boston, MA 02110-2320

☎  617-348-1500
🖷  617-348-1990
🖳  www.hrh.com

Blue Hills Office Park LLC
c/o Fineberg Management
One Washington Street
Wellesley, MA 0481

| | |
|---|---|
| Invoice Date | 05/01/04 |
| Invoice No. | 1-2004 |
| Bill-To Code | FINHOT2 |
| Client Code | FINHOT2 |
| Inv Order No. | 24*26382 |

Named Insured: Blue Hills Office Park, LLC

Amount Remitted: $136,250

Please return this portion with your payment.

**Make checks payable to: HRH**

| Effective Date | Policy Period | Coverage Description | Transaction Amount |
|---|---|---|---|
| 05/01/04 | 05/01/04 to 05/01/05 | Property, General Liability and Umbrella<br><br>For:<br>150 Royall Street<br>Canton, MA 02021<br><br><br>Any questions, please call Julie Powers at (617) 348-1946<br><br>Please remit payment to:<br>HRH/Master (WAMA)<br>P.O. Box 18924<br>Newark, NJ 07191-8924<br><br><br><br>**Premium Paid in Full** | $136,250 |

**Amounts due and payable upon receipt**

LNR03727

7609900083|Escrow Analysis - Corr|2004-08-13

FW: Wells Fargo Insurance Escrow                                    Page 1 of 1

**Kesler, Marchelle**

| | |
|---|---|
| **From:** | Joseph Donovan [JOSEPHD@fine- |
| **Sent:** | Wednesday, June 09, 2004 11 12 AM |
| **To:** | blakemc@wellsfargo.com |
| **Cc:** | Gil Stone; Carol Falvey |
| **Subject:** | FW Wells Fargo Insurance Escrow |

Michelle,

RE  Loan #76-0990083   Blue Hills Office Park LLC

Please consider this email authorization to perform and insurance escrow analysis at a rate of $50

Thank you,

Joseph A  Donovan
CFO

----------------------------------------------------------------------------------
The information contained in this e-mail message is intended only for
the personal and confidential use of the recipient(s) named above. This
message may be an attorney-client communication and as such is
privileged and confidential. If the reader of this message is not the
intended recipient or an agent responsible for delivering it to the
intended recipient, you are hereby notified that you have received this
document in error and that any review, dissemination, distribution, or
copying of this message is strictly prohibited. If you have received
this communication in error, please notify us immediately by e-mail,
and delete the original message.

6/9/2004                                              **LNR03728**

760990083|Escrow Analysis - Corr|2004-08-13

```
        ACCOUNT ACTIVE TODAY    *** CURRENT STATUS *** ADR  NOTES
        Acct No. 76-0990083 As Of  6/11/04
- - - - - - - - - - - - - - - - - - - - - -
   BLUE HILLS OFFICE PARK LLC          | CURRENT AMTS DUE
                                       | Next Payment Due Date    6/11/2004
                                       | Number of Payments Due         01
   ONE WASHINGTON STREET, SUITE 400    | Regular Pmts Due        343,802.15
   WELLSLEY, MA         024810000      | Miscellaneous Amt              .00
   1-781-239-1480    CIF Key LB HD OS SWP | Late Charge Due              .00
- - - - - - - - - - - - - - - -        | Suspense Escrow                .00
   Int Rate  8.49000% Beg  9/99 End 10/29 | Buydown Cd/Amount  N          00
   Int Code     B66 Term 30 yrs 00  mos |
   Pmt Freq 01 Type P Hold   -   - Wrap | Total Amount Due         343,802.15
   Asses LC Y  G/L 01 Language  ENGLISH | Default Interest              .00
- - - - - - - - - - - - - - - -        |
            CURRENT BALANCES  MONTHLY CONSTANTS |  YEAR TO DATE AMOUNTS PD
    PRIN        32,028,486.69      254,652.24 | Prin          122,384.67
    TAX ESCROW           .00              .00 | Interest    1,150,876.53
    INS ESCROW      214,996.08       22,085.49 | Taxes         276,350.32
    RESERVES      3,980,444.35       67,064.42 | Late Chge           .00
    PMI/FHA              .00              .00 | Loan Adv            .00
    MISC.                .00              00  | Mark Val            .00
    ESCROW        4,195,440.43      343,802.15 | LTV Ratio          .000
        F12=Function Key Help Screen    Enter=Page 2  F9=Regulatory Rpt codes
```

**LNR03729**

760990083|Escrow Analysis - Corr|2004-08-13

```
                    Selected Trans      INQUIRIES              6/11/04 Friday
        X221A-01                     Transaction History        11:03 A.M.

        Account number  760990083 BLUE HILLS OF
                  Tran     Eff                        Paid For  Next Due      Prin
                  Date     Date  Description   Amount   Date     Date       Balance
                 ------------------------------------------------------------------------
        *    1  6/11/04  6/11 FIRE INS DR       50.00            6/11/04  32028486.69
        *    2  6/11/04       MSC RCV CR        50.00            6/11/04  32028486.69
             3  6/01/04       INT ON ESC      2625.86            6/11/04  32028486.69
             4  6/01/04       INT ON ESC        97.32            6/11/04  32028486.69
             5  6/01/04       INT ON ESC       514.16            6/11/04  32028486.69
             6  6/01/04       INT ON ESC       304.88            6/11/04  32028486.69
             7  5/11/04  5/11 PMT REC'D      343802.15  5/11/04  6/11/04  32028486.69
             8  5/03/04       INT ON ESC      2491.58            5/11/04  32056340.32
             9  5/03/04       INT ON ESC        93.90            5/11/04  32056340.32
            10  5/03/04       INT ON ESC       488.21            5/11/04  32056340.32
```

* = Transaction pending in daily file

Enter No. and press Enter to process for a full detail display.....  ...

F1=Rtn  F9=Chg View  F10=Print  F13=Reserves F20=G/L Hist  F23=Notes Roll Keys

LNR03730

760990083|Escrow Analysis – Corr|2004-08-13

```
                    ADD                                    Jun 11,2004 Friday
 XG073-02                      Notes Maintenance              11:03 A.M.
 ---------------------------------------------------------------------------
   Account number  760990083 BLUE HILLS OF  Note date   6/11/2004
 *Note type. . . . . . . . .            TR   TRANSACTION NOTES
   Reference number . . . . . 2004060006

                              Note Text


   Per borrowers written request to run an off scheduled
   anlaysis. Deducted the $50.00 fee per written request.



 ---------------------------------------------------------------------------

 F1=Rtn/Nc                          F12=Edit    Enter=Process
```

LNR03731

760990083|Escrow Analysis - Corr|2004-08-13

Message                                                        Page 1 of 2

## Kesler, Marchelle

**From:**    Joseph Donovan [JOSEPHD@fine-
**Sent:**    Wednesday, June 09, 2004 11:22 AM
**To:**      Marchelle.C.Blake@wellsfargo.com
**Subject:** RE: Wells Fargo Insurance Escrow

Marchelle,
Thank you and I apologize for the misspelling.
Joe Donovan
-----Original Message-----
**From:** Marchelle.C.Blake@wellsfargo.com [mailto:Marchelle.C.Blake@wellsfargo.com]
**Sent:** Wednesday, June 09, 2004 1:15 PM
**To:** Joe Donovan; blakemc@wellsfargo.com
**Cc:** Gil Stone; Carol Falvey
**Subject:** RE: Wells Fargo Insurance Escrow
**Importance:** High

Joseph,
Thank you  I will start the process on this tomorrow and issue you a refund check by next week  Please call me
should you have any questions


Marchelle C. Blake
Loan Service Representative
Wells Fargo Commercial Mortgage Servicing
1320 Willow Pass Rd (Suite 205)
Concord, CA 94520
Phone: 800-986-9711 Ext 5397
Fax # 925-691-5249
Email address: blakemc@wellsfargo.com

        -----Original Message-----
        **From:** Joseph Donovan [mailto:JOSEPHD@fine-hotels.com]
        **Sent:** Wednesday, June 09, 2004 11:12 AM
        **To:** blakemc@wellsfargo.com
        **Cc:** Gil Stone; Carol Falvey
        **Subject:** FW: Wells Fargo Insurance Escrow


        Michelle,

        RE:  Loan #76-0990083   Blue Hills Office Park LLC


        Please consider this email authorization to perform and insurance escrow analysis at a rate of $50

        Thank you

        Joseph A  Donovan
        CFO



6/17/2004

**LNR03732**

# EXHIBIT 27



**From:** Joe Polcari
**Sent:** Monday, September 13, 2004 11:21 AM
**To:** Larry Golinsky
**Subject:** Blue Hills

I spoke with David Tobin. He says you guys discussed a "mini-sale" with 10 or so assets. He is gathering information from the other AM's and hopes to get into the pricing soon. It sounds like perfect timing. I would like to jump in with this one, and told him that I would gather information on Blue Hills. The small number of assets is great, because we can flip this little group of loans without the brain damage that goes along with the larger sale.

LNR03419

EXHIBIT 74
Polcari
2/28/06  Hb

| | |
|---|---|
| From: | Larry Golinsky |
| Sent: | Wednesday, September 08, 2004 11:20 AM |
| To: | Joe Polcari |
| Cc: | Javier Benedit |
| Subject: | RE: Blue Hills |

Question on #4 is whom runs the process? Us or the Trustee. If we run the process (loan sale or REO sale) can we collect offers and then come in and meet the highest offer?

-----Original Message-----
| | |
|---|---|
| From: | Joe Polcari |
| Sent: | Wednesday, September 08, 2004 11:47 AM |
| To: | Larry Golinsky |
| Cc: | Ciney Torres |
| Subject: | Blue Hills |

Larry, Ciney will be e-mailing to you Section 3.18 of the CSFB 1999-C1 PSA. Here is what is says:

1) We can purchase a Defaulted Loan (defined as a loan that is 60 days delinquent) at the Purchase Price (defined as the unpaid principal, accrued interest, unreimbursed advances and interest on advances). It appears that we have the first right of purchase, followed by the Servicer, followed by the Directing Certificateholder, which I read as Madison.

2) We can offer to sell a Defaulted Loan, not otherwise purchased by the parties mentioned above, if the SS determines that the sale would produce a greater recovery on a PV basis than would liquidation of the Mortgaged Property. The offering must be made for a period of at leat 20 days, but not more than 90 days. In the event that the bids do not equal or exceed the Purchase Price, the SS can accept what it determines to be a fair price.

3) We have to give the Trustee and Servicer three business days notice of our intent to sell a Defaulted Loan (or REO Property).

4) If the SS is the high bidder, then the Trust determines whether the SS bid is a "fair price". In determining this, the Trustee may rely on the opinion of an appraiser at the expense of the Trust Fund.

Section 3.18 also references Section 2.03(b), which deals with puts, and Section 9.01, which deals with the Loan Seller's ability to purchase the remaining loans if the pool balance drops below 1% of the original total balance.

The loan is not yet 60 days delinquent. I don't have the docs yet, but from speaking with Job, it appears that the borrower may have the right to use reserve funds to make P&I payments up to $1MM.

1

LNR03430

EXHIBIT 75

Polcari
2/28/06

| | |
|---|---|
| From: | Javier Benedit |
| Sent: | Wednesday, September 08, 2004 11:28 AM |
| To: | Larry Golinsky; Joe Polcari |
| Subject: | RE: Blue Hills |

Larry/Joe,

The Trustee would have to review a current appraisal or order a new one (at their discretion) and set the "fair price" according to such appraisal. We would then have to bid up to that "fair price" amount. The Trustee here is Wells Fargo, they may not be as lenient as Lasalle and may want to order their own appraisal. I have good contacts there, however, and may be able to work the process through.

Let me know if and when you need my assistance.

-----Original Message-----

| | |
|---|---|
| From: | Larry Golinsky |
| Sent: | Wednesday, September 08, 2004 12:20 PM |
| To: | Joe Polcari |
| Cc: | Javier Benedit |
| Subject: | RE: Blue Hills |

Question on #4 is whom runs the process? Us or the Trustee. If we run the process (loan sale or REO sale) can we collect offers and then come in and meet the highest offer?

-----Original Message-----

| | |
|---|---|
| From: | Joe Polcari |
| Sent: | Wednesday, September 08, 2004 11:47 AM |
| To: | Larry Golinsky |
| Cc: | Ciney Torres |
| Subject: | Blue Hills |

Larry, Ciney will be e-mailing to you Section 3.18 of the CSFB 1999-C1 PSA. Here is what is says:

1) We can purchase a Defaulted Loan (defined as a loan that is 60 days delinquent) at the Purchase Price (defined as the unpaid principal, accrued interest, unreimbursed advances and interest on advances). It appears that we have the first right of purchase, followed by the Servicer, followed by the Directing Certificateholder, which I read as Madison.

2) We can offer to sell a Defaulted Loan, not otherwise purchased by the parties mentioned above, if the SS determines that the sale would produce a greater recovery on a PV basis than would liquidation of the Mortgaged Property. The offering must be made for a period of at least 20 days, but not more than 90 days. In the event that the bids do not equal or exceed the Purchase Price, the SS can accept what it determines to be a fair price.

3) We have to give the Trustee and Servicer three business days notice of our intent to sell a Defaulted Loan (or REO Property).

4) If the SS is the high bidder, then the Trust determines whether the SS bid is a "fair price". In determining this, the Trustee may rely on the opinion of an appraiser at the expense of the Trust Fund.

Section 3.18 also references Section 2.03(b), which deals with puts, and Section 9.01, which deals with the Loan Seller's ability to purchase the remaining loans if the pool balance drops below 1% of the original total balance.

The loan is not yet 60 days delinquent. I don't have the docs yet, but from speaking with Job, it appears that the borrower may have the right to use reserve funds to make P&I payments up to $1MM.

1

LNR03429



| From: | Javier Benedit |
|---|---|
| Sent: | Tuesday, November 02, 2004 10:33 AM |
| To: | Joe Polcari; Larry Golinsky |
| Subject: | RE: Blue Hills |

On your first question, your interpretation is correct. If we do not elect to purchase the Defaulted Loan as SS or Directing Certificateholder at the "Purchase Price" (par) then we must go on to market the property for at least 20 days. If we bid on the property for an amount less than the Purchase Price then we must send an appraisal to the Trustee, or they have the right to obtain one on their own, for determination of "fair price".

As for your second question, an assignment of a bid is basically a sale, but although I often do a good job of pretending I'm an attorney I don't really know how it would be viewed legally. I would just check with Tom Nealon, but in my humble opinion I don't think its any different from a sale.

> -----Original Message-----
> | From: | Joe Polcari |
> |---|---|
> | Sent: | Tuesday, November 02, 2004 11:19 AM |
> | To: | Javier Benedit; Larry Golinsky |
> | Subject: | RE: Blue Hills |

Javier, I wanted to revisit this issue and make sure that we are complying with the PSA. We are discussing a note sale of this asset. My interpretation of the PSA (below) leads me to believe that we have to market the note for at least 20 days, after we provide 3 days notice of our intent to sell. If our Commercial Properties Group wants to bid on it, and is the high bidder, the Trust will be entitled to an appraisal to establish that our bid is a "fair price". Is there anything else I need to focus on?

One possible disposal approach involves us conducting the foreclosure sale, and then selling our winning bid. Under this scenario, we would not be selling the note, nor would we be selling the real estate. It's somewhere in between. Would this approach require us to do anything different as compared to a note sale?

> -----Original Message-----
> | From: | Javier Benedit |
> |---|---|
> | Sent: | Wednesday, September 08, 2004 12:34 PM |
> | To: | Larry Golinsky; Joe Polcari |
> | Subject: | RE: Blue Hills |

Not sure I understand , if we are buying what marketing would take place? Once Trustee determines fair price, if we are the buying party, we just pay such price for the asset and buy out of the Trust.

> -----Original Message-----
> | From: | Larry Golinsky |
> |---|---|
> | Sent: | Wednesday, September 08, 2004 12:31 PM |
> | To: | Javier Benedit; Joe Polcari |
> | Subject: | RE: Blue Hills |

Step #1 is we inform Trustee we are an interested party. Step #2 is we provide appraisal to Trustee, #3 step is they determine if it is a fair price. What happens after that and make sure you comment on whom runs the marketing process, if any.

> -----Original Message-----
> | From: | Javier Benedit |
> |---|---|
> | Sent: | Wednesday, September 08, 2004 12:28 PM |
> | To: | Larry Golinsky; Joe Polcari |
> | Subject: | RE: Blue Hills |

Larry/Joe,

The Trustee would have to review a current appraisal or order a new one (at their discretion) and set the "fair price" according to such appraisal. We would then have to bid up to that "fair price" amount. The Trustee here is Wells Fargo, they may not be as lenient as Lasalle and may want to order their own

1

LNR03041

EXHIBIT 28

RE: New Loans for Transfer Date: 8/18/2004                                          Page 1 of 3

## Barnett, Bruce

Exhibit: 112
Witness: Rosen
Date: 3·2·06
CM

**From:**  Randy Wolpert [RWolpert@lnrproperty.com]
**Sent:**  Thursday, September 09, 2004 10:10 AM
**To:**  Ronald Schrager; David Hall
**Cc:**  Kevin Wodicka; David Team; Joe Polcari
**Subject:** RE: New Loans for Transfer Date: 8/18/2004

David, I think Joe is going to see the property today, not sure if you've going with him and I don't know if you've had any further opportunity to ponder this.  Keep us in the loop on your thoughts and I know Joe will keep you appraised of our plans.  If we are going to pursue it internally, we'll need to discuss process, since the PSA will dictate how we need to go about this and we'll need to involve the trustee.  Ultimately we'll have to be ready with our number as bids are coming in.

> -----Original Message-----
> **From:**  Ronald Schrager
> **Sent:**  Monday, August 23, 2004 3:56 PM
> **To:**  David Hall
> **Cc:**  Kevin Wodicka; Randy Wolpert; David Team
> **Subject:**  RE: New Loans for Transfer Date: 8/18/2004
>
> Here's my take based on your comments:
>
> Your valuation analysis seems to make sense--the biggest variable is how long it takes you to find the user.  We can try and get you some market stuff if we have any but you would probably be able to get as good or better info. than we will get.  From the CMBS side we will likely have to put this on the market immediately as the carry costs associated with this will kill us.  At that point we essentially have a ROFR and will be able to see where the offers come in.  If we think everyone is bottom feeding we can scoop this up at that point.  My sense is this is well-located real estate and in a market recovery this is a good asset.  Everything I'm hearing is that the market in general is starting to turn the corner.  If you agree I think you should start to think about where you would feel comfortable owning this in the event we take this to market quickly.  We should be able to get you access to the building assuming the borrower is cooperating (I think he is as of now).  If we buy it for $60, spend $40 to bring in a tenant at $13NNN this could work unless in takes us several years to find a user.  Or if this is multiple buildings could we multitenant?

> > -----Original Message-----
> > **From:**  David Hall
> > **Sent:**  Monday, August 23, 2004 11:05 AM
> > **To:**  Ronald Schrager
> > **Cc:**  Kevin Wodicka; Randy Wolpert; David Team
> > **Subject:**  RE: New Loans for Transfer Date: 8/18/2004
> >
> > Ron, sorry for the delay on this.  here is my gut feel.
> >
> > This all depends on the interior finishes and tenant upgrades for financial back office.  The only way to make money is to get comfortable that you've got plug-n-play, (or buy this real cheap).  If tenant walks in and needs $30 in TIs, then you're dead (if we have to start with $117 as basis).  This is a 12 -14 NNN market and you never want to let project costs the exceed $115 - $120.  I would say Fleet is likely to have done all the right things to make this work for its own operations - but I have not seen the inside.
> >
> > So, if you have plug-n-play then dark value is 90 -100 but its still very scary at those numbers.

2/24/2006

LNR04251

Safer underwriting is to assume $60--70 dark and know you're looking at 30 - 40 in cost to make a deal. Time to make a deal is obviously another problem - could be years not months with that new vacant building immediately next door.

Problem with this site has always been access. Its just real tough to get to. It has great signage on major highway but no interchange that serves it directly. Thats why its back office - workers know how to get to the office but no -one else can find the place.

I do not see any other re-development play in terms of tear down for housing - etc. Canton will never let that happen.

Would like to see any appraisal info and get a chance to see what brokers think. My sense of the market could need some updating as things are starting to happen here.

-----Original Message-----
**From:** Ronald Schrager
**Sent:** Thursday, August 19, 2004 11:59 AM
**To:** David Hall
**Cc:** Kevin Wodicka; Randy Wolpert; David Team
**Subject:** FW: New Loans for Transfer Date: 8/18/2004

David,

Congrats on the Fan Pier deal. Looks like you got us in a great position to outflank the local favorites.

Wanted to get a read from you on a potential mining opportunity, Blue Hills Office Park in Canton. Here is what we know:

Gerald Fineberg is bwr. 100% occ as of 6/03. A 2-story, 274M s.f. Class A office building built in 1970. Property was 96% leased to Fleet Bank (formerly BankBoston, the name of the division in the building is Equiserve) until July 2004. Fleet vacated at lease expiration, reportedly to a building they have purchased next door from National Development (which sat vacant for 2 years before this as is another 175ksf newly constructed building on same street). Despite good back office location, mkt is soft and quasi-single tenant lease rolls. Debt is $32MM or $117 psf.

Address is:
Blue Hills Office Park
150 Royall Street
Canton, MA 02021

Would like to know from you (1) what do you think the dark value of this is if we sold it today and (2) do you think this is an asset we would want to purchase vacant and redevelop.

Thanks.

Ron

LNR04252

RE: New Loans for Transfer Date: 8/18/2004                                    Page 3 of 3

LNR04253

EXHIBIT 29

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1.,

      Defendant, Plaintiff-in-Counterclaim

      and

CSFB 1999 – C1 ROYALL STREET, LLC;

      Defendant, Plaintiff-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

**CSFB 1999 – C1 ROYALL STREET, LLC'S ANSWERS TO BLUE HILLS OFFICE
PARK LLC, GERALD FINEBERG AND WILLIAM LANGELIER'S
SECOND SET OF INTERROGATORIES**

Defendant CSFB 1999 – C1 Royall Street, LLC ("CSFB") hereby answers the Second

Set of Interrogatories of Blue Hills Office Park LLC, Gerald Fineberg and William Langelier.

b. all communications or other documents that refer to, relate to or support the reasons for denial, including, without limitation, the present location and custodian of any copy thereof, the author of such documents, and the identities of all recipients of such documents.

## RESPONSE NO. 13

CSFB objects to this Interrogatory because it is overly broad and unduly burdensome. CSFB further objects to this Interrogatory to the extent that it calls for information protected by the attorney-client privilege and the work product doctrine. CSFB further objects to this Interrogatory to the extent it calls for identification of documents, correspondence, and communication outside of CSFB's custody, possession or control and/or to which CSFB was not a party. Subject to and without waiving the foregoing and the General Objections, CSFB answers as follows:

1. Exhibit G to Blue Hills' Second Amended Complaint demonstrates that although the document attached to the Requests as Exhibit "G" is dated August 2, 2004, it was not faxed to Wells Fargo until August 4, 2004.

2. Joseph Donovan, of Fineberg Management Inc., testified at his deposition on February 14, 2006 that the document attached to the Requests as Exhibit "G" may have been mailed to Wells Fargo on August 2, 2004, but was not faxed to Wells Fargo until August 4, 2004.

3. The Loancator Tracking Log (WF01891-01893) states that the document attached to the Requests as Exhibit "G" was received by Wells Fargo on August 4, 2004.

In accordance with Rule 33(d), CSFB states that further information responsive to this Interrogatory may be ascertained from documents and business records CSFB has produced or will produce in this action. CSFB reserves the right to supplement this Answer as discovery proceeds.

~BOST1:409598.v2

# EXHIBIT 30



**Richard A Clarke**

*Business and Credit Advisory Services*

March 30, 2006

Peter McGlynn, Esquire
Bernkopf Goodman LLP
125 Summer Street
Boston, Massachusetts 02110 1621

Re:   *Blue Hills Office Park LLC v. J.P. Morgan, et al.*
      Civil Action No. 05-10506-WGY

Dear Mr. McGlynn:

     Pursuant to your request, I submit this preliminary report concerning the subject litigation.

     You have asked as to whether or not I could render certain opinions in connection with the above referenced action as follows:

- Am I able to render an opinion within a reasonable degree of professional certainty as to whether or not Wells Fargo Commercial Mortgage Servicing ("Wells Fargo"), as Master Servicer, and/or Lennar Partners ("LNR"), as Special Servicer, adhered to the "Servicing Standards" of Master Servicer and Special Servicer respectively under that certain Pooling and Servicing Agreement ("Pooling and Servicing Agreement" or "PSA") between Credit Suisse First Boston Mortgage Securities Corp. and others dated October 11, 1999?

- Am I able to render an opinion within a reasonable degree of professional certainty as to whether or not Wells Fargo, as Master Servicer, and/or LNR, as Special Servicer, adhered to the industry standards for commercial loan mortgage servicers of commercial properties such as, for example, 150 Royall Street, Canton, Massachusetts?

- What, if any, reporting requirements to credit rating agencies did Wells Fargo, as Master Servicer, and LNR, as Special Servicer, have with respect to the loan granted by Credit Suisse First Boston Mortgage Securities Corp. to Blue Hills Office Park LLC ("BHOP")?

     I have determined, based upon my review of the documents and other materials which I considered and which are listed below, that I am able to render opinions with respect to each of the foregoing.

     My opinions as set forth herein as to certain lending and business issues relating to the BHOP claim against the various defendants are based on my knowledge and experience in these areas coupled with review of the documents and other materials identified herein.

*Richard A Clarke*
Business and Credit Advisory Services

4. LNR, as Special Servicer, deviated materially from the prevailing and applicable industry standards for third party loan servicing; and

5. LNR was interested in acquiring the Property, and was predisposed against one of BHOP's principals, Gerald Fineberg, which created serious conflicts of interest and contributed to LNR's rush to foreclose the Property and its failure to even meet with BHOP to consider workout alternatives.

<u>Supporting Discussion</u>

1. Wells Fargo, as Servicer, failed to adhere to the "Servicing Standards" set forth in the Pooling and Servicing Agreement.

Section 3.01 of the Pooling and Servicing Agreement provides in relevant part as follows:

> Each of the Servicer and the Special Servicer shall diligently service and administer the Loans on behalf of the Trust Fund and in the best interests of and for the benefit of the Certificate Holders as well (as determined by the Servicer or the Special Service as the case may be, in its good faith and reasonable judgment) in accordance with applicable law, the terms of the respective Loans or Specially Serviced Loans and to the extent consistent with the foregoing, the terms of this agreement . . . and to the extent consistent with the foregoing, in accordance with the higher of the following Standards of Care: (1) the same manner in which, and with same the care, skill, prudence and diligence with which, the Service or the Special Servicer, as the case may be, services and administers similar commercial or multifamily mortgage loans for other third-party portfolios giving due consideration to the customary and usual standards of practice of prudent institutional multifamily or commercial mortgage lenders servicing their own mortgage loans and (2) the same care, skill, prudence and diligence with which the Servicer or Special Servicer, as the case may be, services and administers similar commercial or multifamily mortgage loans owned by the Servicer or Special Servicer, in either case exercising reasonable business judgment and with a view to the maximization, on a present value basis (discounting at the related Mortgage Rate), of timely recovery of principal and interest on the Loans or Specially Serviced Loans, as applicable, but without regard to: (i) any relationship that the Servicer or Special Servicer, as the case may be, or any Affiliate thereof may have with the related Mortgagor or any other party to this Agreement; (ii) the ownership of any Certificate by the Servicer or Special Servicer, as the case may be, or any Affiliate thereof; (iii) the Servicer's obligation to make Advances; (iv) the Servicer's or Special Servicer's, as the case may be, right to receive compensation for its services hereunder or with respect to any

- 11 -

*Richard A Clarke*

Business and Credit Advisory Services

particular transaction; and (v) the Servicer's or Special Servicer's ownership, servicing or management of any other mortgage loans or mortgaged properties (the foregoing, collectively referred to as the "Servicing Standard").

In their Answers to BHOP's Second Amended Complaint, the Defendants each admit:

"that, pursuant to an agreement with other parties (not including plaintiff), LNR Partners agreed to administer and service certain loans, including the Blue Hills loan, in accordance with applicable law, the terms of the loans' documents and, to the extent not inconsistent with the foregoing, that other agreement and whichever standard is higher between the manner in which LNR Partners would administer loans owned by other third parties and the manner it administers loans owned by itself." Answer, ¶ 63.

The following discussion identifies conduct by Wells Fargo which, in my opinion, was in direct violation of the Servicing Standard contained in the Pooling and Servicing Agreement.

Section 3.01(a) of the PSA contains language which proscribes the conduct expected of Servicers (also known as Master Servicers) and Special Servicers in administering large pools of loans. The PSA applies a "prudent standard," not simply a prevailing standard. See Pooling and Servicing Agreement p. 69. This language is fairly typical in the segment of the banking industry which is also commonly known as Commercial Mortgage Backed Securities or CMBS lending. Although not generally a party to a PSA, every borrower, subject to the possibility of a new note holder and/or servicer, has the right to expect that its loan will be administered by the Servicer and Special Servicer according to the Servicing Standard. In order to have confidence in the treatment of each individual pooled loan, the marketplace – including lenders, borrowers, certificate holders – have a right to expect that pooled loans will be serviced strictly in accordance with the Servicing Standard. Fairness, predictability, professionalism and reasonable actions devoid of conflict or animus are all essential elements of the actions and conduct expected of Servicers and Special Servicers.

Section 3.01(a) of the PSA, incorporates the industry practices of a prudent institutional multifamily or commercial mortgagor. In particular, Wells Fargo, as the Servicer, and LNR, as the Special Servicer were required to service and administer all loans diligently and in accordance with the <u>higher</u> of the standards employed by them in administering commercial mortgage loans for other third-party portfolios or commercial mortgage loans owned by Wells Fargo or LNR.

Section 3.01(a), also requires the Servicer and Special Servicer to adhere to the following:

- The elevated level of skill, prudence and diligence adverted to above must be coupled with the exercise of reasonable business judgment with a view toward the maximization of the timely recovery of loan principal and interest;

- 12 -

*Richard A Clarke*
Business and Credit Advisory Services

- Wells Fargo and LNR each must disregard in the servicing of a loan any prior relationship either they or any affiliate thereof may have had with a mortgagor (which under the "Definitions" section of the PSA would include, in this case, BHOP and the two loan guarantors, Gerald Fineberg and William Langelier);

- Wells Fargo and LNR must disregard in the servicing of a loan their right to receive compensation under the PSA "with respect to any particular transaction";

- Wells Fargo and LNR must disregard their ownership, servicing or management of any other mortgage loan or properties.

The PSA also distinguishes between the roles of Servicer and Special Servicer and the responsibilities each of them has. In general, Wells Fargo was obliged to service BHOP's loan until it was transferred to LNR following default or where a default is imminent also known as a Servicing Transfer Event. Thereafter, upon a "Servicing Transfer Event,"[1] Wells Fargo was required to immediately give notice thereof to LNR and to deliver all related documents and files within five "Business Days" of the Servicing Transfer Event. However, under Section 3.21(a) of the PSA, Wells Fargo also had the obligation to continue to act as loan administrator until LNR had commenced servicing the BHOP Loan. Further, under Section 3.21(f), Wells Fargo was also required to provide LNR with information relating to the BHOP Loan "to enable [LNR] to negotiate with [BHOP] . . . ." Section 3.4(f) also obligated LNR to: "Use its reasonable best efforts to cause the related mortgagor to cure any default and/or remedy any such event, workout or modify the Loan consistent with the terms of this agreement . . . ."[2]

Under Section 3.09(a), Lennar had the right, consistent with the Servicing Standard, to foreclose upon the Property only if it continues to be in default and only so long "as . . . no satisfactory arrangements can be made for collection of delinquent payments . . . ."

Finally, under Section 3.20 of the PSA, LNR had the authority to reduce or forgive principal, accrued interest, prepayment or yield maintenance premiums and charges or forebear on the enforcement of any rights under any of the Loan Documents including the reduction of a borrower's monthly payment.

---

[1]  Defined in the Definitions section as "a material default of the loan or that a payment default is imminent and is not likely to be cured within 60 days."

[2]  Subsection (f) provides in relevant part as follows: "Upon receiving notice of . . . (ii) the existence of a material non-payment default or (iii) the request by a mortgagor for an amendment or modification of a Loan, the Servicer shall immediately give notice thereof and shall deliver copies of the [related files] to the Special Servicer and shall use its reasonable best efforts to provide the Special Servicer with all information relating to the Loan reasonably requested by the Special Servicer to enable it to negotiate with the related mortgagor . . . . The Servicer shall use its reasonable best efforts to comply with the preceding sentence within 5 Business Days . . . and upon receiving such documents and information, the Special Servicer shall use its reasonable best efforts to cause the related mortgagor to cure any default and/or remedy any such event, workout or modify the Loan consistent with the terms of this agreement and/or prepare for such proceedings."

- 13 -

### Richard A Clarke
*Business and Credit Advisory Services*

- As discussed earlier, LNR's concern about BHOP's entitlement to use the Reserve
  Accounts to pay debt service left them hopeful that BHOP would default on the Note
  before the Reserve Account had been depleted.

LNR's conduct, as amply documented by the documents and materials which I have
reviewed, demonstrates that LNR not only violated the letter and the spirit of Job Warshaw's written
commitment to meet with BHOP to discuss the Loan status, but it also violated the Servicing
Standard contained in Section 3.01 of the PSA; namely, LNR's assumption that because
Mr. Fineberg had allegedly "given back" two hotels, that Mr. Fineberg would not be interested in
working out the Note; and LNR's conduct was hopelessly conflicted by its strong desire to buy the
Note for its own account and "flip" it at a profit.

As noted in part 1 of the Supporting Discussion, LNR, a Special Servicer, was obligated
under Section 3.01 of the PSA to adhere to the higher of two standards of care recommended in
either case by the exercise of reasonable business judgment in a view to maximizing on a present
value basis the timely recovery of principal and interest on the Loan. In my opinion, LNR's conduct
fell far short of the Servicing Standard contained in Section 3.01 of the PSA.

The record shows that LNR, correctly or incorrectly, estimated the loss on this Note at
somewhere between $11 million and $20 million. This represented anywhere from one-third to two-
thirds of the Loan's principal balance. LNR also knew, or should have known, from information
contained in the Loan origination file that BHOP's principals had substantial net worths and that a
foreclosure sale could likely result in a large tax bill under IRS "debt forgiveness" rules. Despite
having this knowledge, LNR made no attempt to meet with BHOP and Messrs. Fineberg and
Langelier to see if they wished to develop some plan or proposal to infuse new capital into the
Property in exchange for Note forebearance or forgiveness by LNR.

In my opinion, the prudent and diligent course of action here would have been for LNR to
provide notification to BHOP of its failure to pay the real estate taxes and give them an opportunity
to promptly cure that failure (to the extent that there was no cure period in the Note or in the Loan
documents) and to request a proposal from BHOP on how the Property would be remarketed and
how long it would take for the Property to be fully tenanted or at least sufficiently tenanted to cover
debt service and reserve payment obligations.

At the time that LNR defaulted BHOP on September 17, 2004, LNR also was armed with the
knowledge that the real estate market was trending upward. Property values and rents were
increasing and large blocks of space in the area where the Property was situated were being leased up
and/or sold. LNR also knew that there was approximately $2.7 million in the Reserve Accounts
which, but for LNR's Note default, could have been accessed by BHOP for tenant improvements and
repairs.

In summary, in my opinion, Lennar had all of the necessary "ingredients" to achieve a
successful workout with BHOP:

- 19 -

# EXHIBIT 31

Ronald F. Greenspan
Volume 1 - May 8, 2006

Page 1

Volume I, Pages 1-312

Exhibits: 414-417

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

--------------------------

BLUE HILLS OFFICE PARK LLC

       Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

       Defendants

(Complete caption on next page)

----------------------------

DEPOSITION OF RONALD F. GREENSPAN

Monday, May 8, 2006, 9:30 a.m.

Bernkopf Goodman LLP

125 Summer Street, 13th Floor

Boston, Massachusetts

-------Reporter:  Joan M. Cassidy, RPR, CRR-------

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  Fax 617.728.4403

bb45bf9b-c091-466d-ab21-b7b7c48c3960

Page 89

1    A.  Only to the extent they are consistent with
2  the PSA terms, the law, and the loan documents.
3    Q.  And to the extent that they are consistent
4  with other provisions of the PSA, the law, and the
5  loan documents, can you generally -- can you
6  articulate for me generally what these two standards
7  here require of the servicer and the special
8  servicer?
9    A.  Yes.  The first one is the standard of
10  care, the skill, prudence, and diligence with which
11  they service loans for other third parties; and the
12  second one is the same care, skill, prudence and
13  diligence which they exercise in performing this --
14  yes, mortgages owned by such servicers or special
15  servicers.  It then goes on further and modifies
16  both of those to say that in all cases, both of
17  those cases, they have to "further exercise
18  reasonable business judgment with a view to the
19  maximization, on a present value basis (discounting
20  at the related mortgage rate), of timely recovery of
21  principal and interest" and then lists five things
22  they must disregard.
23    Q.  The so-called Romanettes, correct?
24    A.  Yes.

Page 90

1    Q.  Within that language it indicates the
2  servicer and the special servicer are to perform
3  these services, quote, "with a view to the
4  maximization on a present value basis (discounting
5  at the related mortgage rate), of timely recovery of
6  principal and interest on the loans"; do you see
7  that?
8    A.  Yes.
9    Q.  Do you have an understanding as to what is
10  intended or what is meant by that particular
11  language in 3.01(a)?
12    A.  Yes.
13    Q.  Can you please tell us.
14    A.  That the sole objective, consistent with
15  operating pursuant to the agreement, the law, and
16  the loan documents, is to create, as calculated on
17  what's known as a present-value basis, which means
18  discounting a stream of cash flows and discounting
19  them at the mortgage rate -- the objective is to
20  maximize that discounted value.
21    Q.  And is there, in your opinion, any
22  particular industry practice or procedure that would
23  be followed by servicers and special servicers to,
24  quote, maximize on a present-value basis the timely

Page 91

1  recovery of principal and interest?
2    A.  Yes.
3    Q.  What is your understanding of what that
4  practice or procedure would be?
5    A.  You evaluate the situation and the
6  alternatives and determine which path or paths is
7  likely to give you the highest present value.
8    Q.  Have you finished your answer?
9    A.  Yes.
10    Q.  When you say the "highest present value,"
11  you are talking about of the principal and interest
12  balance due at that time on the loan?
13    A.  Yes.
14    Q.  *Now, this evaluative process, does that --
15  do you have any understanding as to whether or not
16  there is any industry practice that instructs the
17  servicer or the special servicer on how best to
18  evaluate the situation to determine which path or
19  paths are going to lead to the timely -- or the
20  maximization of the timely recovery of principal and
21  interest?
22    MR. FALBY:  Objection.
23    A.  Can I hear the question again.
24    *(Question read.)

Page 92

1    A.  I'm sorry, I don't understand what you mean
2  by a "practice that instructs."
3    Q.  The evaluative process that a servicer or a
4  special servicer undertakes to -- and I'm
5  paraphrasing your previous answer -- determine which
6  path or paths to take, is that something that you
7  have been exposed to in your experience on an
8  industry-wide basis?
9    MR. FALBY:  Objection.
10    A.  I've certainly been exposed to it.  I don't
11  know what you mean by "on an industry-wide basis."
12    Q.  Are there any industry practices
13  governing -- strike that -- industry practices that
14  provide guidance on how this evaluative process
15  should be undertaken by a servicer or a special
16  servicer?
17    A.  I believe everybody in the industry knows
18  what "present value" means and how to conduct a
19  present valuing.  I don't know whether there is what
20  I'd describe as an authoritative or standardized
21  instruction manual.
22    Q.  Have you finished your answer?
23    A.  Yes.
24    Q.  Putting aside the instruction manual, are

23  (Pages 89 to 92)