UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br> Mortgage Pass-Through Certificates, Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>    Defendants-in-Counterclaim | )<br>)<br>)<br>)<br>)  Civil Action No. 05-CV-10506 (WGY)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**RESPONSE OF BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND
GERALD FINEBERG TO DEFENDANTS' AND PLAINTIFFS-IN COUNTERCLAIM'S
CORRECTED JOINT LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

## I.    Introductory Statements

       Blue Hills Office Park LLC ("Blue Hills"), Gerald Fineberg ("Fineberg") and William Langelier

("Langelier") hereby respond to Defendants' and Plaintiffs-in-Counterclaim's Corrected Joint Local Rule

56.1 Statement of Undisputed Facts in Support of their Motions for Summary Judgment ("J.P. Morgan

and CSFB's Statement").

       1.      The various statements labeled "J.P. Morgan and CSFB's Statement No." in this

Response are direct quotations taken from J.P. Morgan and CSFB's Statement.  So as to maintain

accuracy, Blue Hills, Fineberg and Langelier have endeavored not to alter the typographical errors,

grammatical mistakes, footnotes or erroneous citations or references contained in the original pleadings as

filed and served by J.P. Morgan Chase Bank ("J.P. Morgan") and CSFB 1999-C1 Royall Street LLC

("CSFB").

2.      In their Response, Blue Hills, Fineberg and Langelier have omitted the seventeen headings listed in the "Table of Contents" to J.P. Morgan and CSFB's Statement. These headings are conclusory statements and are not statements of fact to which a response is required.

3.      Some of the footnotes contained in J.P. Morgan and CSFB's Statement contain additional factual allegations that require a response. For those footnotes which Blue Hills, Fineberg and Langelier deemed to require a response, their response is included.

## II.      Responses

J.P. Morgan and CSFB's Statement No. 1.

Since the 1980s, Gerald Fineberg and William Langelier, through various entities, have owned and controlled certain property located at 150 Royall Street in Canton, Massachusetts (the "Property"). The Property is improved by a two-story brick building containing approximately 275,000 square feet of space and known as the Blue Hills Office Park. Second Amended Complaint ("SAC") SAC ¶ 6; BHOP Answer to Counterclaim ¶ 9; Advisor Consent for Foreclosure (Dep. Ex. 104) at Trust00013-14; Langelier 37-38; Frank 9.[1]

## RESPONSE NO. 1

Admit.

J.P. Morgan and CSFB's Statement No. 2.

In the summer of 1999, as the trustees of Royall Associates Realty Trust ("Royall Associates", a nominee trust which held record title to the Property), Fineberg and Langelier sought to refinance the mortgage on the Property. These efforts culminated in the loan that is at issue in this action. As part of the refinancing transaction, Fineberg and Langelier created plaintiff Blue Hills Office Park LLC ("Blue Hills" or "BHOP"), to which Royall Associates conveyed the property. Langelier 46-47, 82.

## RESPONSE NO. 2

Admitted in part. Langelier's testimony as referenced in Statement No. 24 is taken out of the context that Blue Hills was formed as a condition of the refinancing with Credit Suisse First Mortgage Capital LLC ("Credit Suisse"). Further, Royall Associates Realty Trust owned the

---

[1] **[J.P. Morgan and CSFB original footnote]** This Statement is supported by numerous simultaneously filed documents. Deposition transcripts are compiled in an Appendix of Deposition Transcripts being filed manually with the Clerk's office due to the voluminous size of each transcript; references to depositions are by the witness's last name and page number (e.g., Fineberg 22). Deposition exhibits are compiled in an Appendix of Deposition Exhibits being filed electronically (although select exhibits are being filed by manually due to their voluminous size); references to deposition exhibits are by descriptive label and/or "Dep. Ex. __." Affidavits of Joseph A. Polcari, Jr., Edward C. Brown, Curtis J. Mallegni, Stephen Goertzen, Ronald H. Greenspan, and Eric S. Stotz, and Bruce S. Barnett, most of which have their own attachments, are filed separately; references are by affiant's last name (e.g., Polcari Aff. ¶ __). Pleadings already on file with the Court are not being filed, in accordance with the electronic filing administrative procedures.

property located at 150 Royall Street, Canton, Massachusetts ("Property") prior to the refinancing. *See* **Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaims ("Blue Hills Statement I")[2], ¶¶ 2-4.**

J.P. Morgan and CSFB's Statement No. 3.

Blue Hills is a single-purpose entity whose sole business was to acquire and own the Property. First Amendment to Certificate of Formation of Blue Hills Office Park LLC (Barnett Aff. Ex. A).

**RESPONSE NO. 3**

**Admitted in part.  Blue Hills is a single purpose entity created at the request of Credit Suisse as a condition of the refinancing.  *See* Response No. 2.**

J.P. Morgan and CSFB's Statement No. 4.

Royall Associates is the sole member of Blue Hills.  The sole beneficiary of Royall Associates was a Massachusetts general partnership also known as Royall Associates.  (For simplicity, herein and in the defendants' summary judgment briefs, the trust and the partnership are generally both referred to as "Royall Associates.")  Its principal partners were Fineberg and Langelier.[3]  Langelier 46-47; BHOP Operating Agreement (Dep. Ex. 407) at 23.

**RESPONSE NO. 4**

**Admit.**

J.P. Morgan and CSFB's Statement No. 4, Footnote No. 2

Fineberg and Langelier, initially the only partners of Royall Associates, subsequently admitted additional minority partners who received small portions of their beneficial interests.  Langelier 46-47.  Langelier and the minor partners related to him are referred to as the "Langelier Beneficiaries;" Fineberg and the minor partners related to him are referred to as the "Fineberg Beneficiaries."

**RESPONSE TO FOOTNOTE NO. 2**

**Admitted in part.  Fineberg and Langelier were the initial partners and subsequently admitted additional partners.  However, "Fineberg Beneficiaries" and "Langelier Beneficiaries" as defined by Defendants, mischaracterizes the relationships between and among the beneficiaries. *See* Deposition Exhibit 176, attached to the Affidavit of Peter McGlynn ("McGlynn Affidavit"), previously filed with the Court.**

---

[2] **Blue Hills Statement I** refers to the Rule 56.1 Statement of Undisputed of Plaintiff and Defendants-in-Counterclaim.  **Blue Hills Statement II** refers to the Statement of Undisputed Facts in Support of Blue Hills, Fineberg and Langelier's Oppositions to Defendants and Plaintiff-in-Counterclaim's Motions for Summary Judgment.

[3] **[J.P. Morgan and CSFB original Footnote]**  Fineberg and Langelier, initially the only partners of Royall Associates, subsequently admitted additional minority partners who received small portions of their beneficial interests.  Langelier 46-47.  Langelier and the minor partners related to him are referred to as the "Langelier Beneficiaries;" Fineberg and the minor partners related to him are referred to as the "Fineberg Beneficiaries."

3

J.P. Morgan and CSFB's Statement No. 5.

Blue Hills is a "disregarded entity" for tax purposes, which means that it does not file an income tax return or pay income taxes. Rather, all of its taxable transactions are reported on the return of its member, Royall Associates. Andelman 123.

**RESPONSE NO. 5**

**Admit.**

J.P. Morgan and CSFB's Statement No. 6.

Royall Associates is treated as a partnership for tax purposes. It does not pay taxes at the partnership level, but rather its partners pay tax on its income and gains. Andelman 124-25.

**RESPONSE NO. 6**

**Admit.**

J.P. Morgan and CSFB's Statement No. 7.

As of 1999, Langelier had close to 30 years experience in real estate, including experience in acquiring, developing, investing, financing and disposing of real properties. Langelier also had experience dealing with lenders on defaulted loans. Langelier 31-40.

**RESPONSE NO. 7**

**Admit.**

J.P. Morgan and CSFB's Statement No. 8.

As of 1999, Fineberg had approximately 40 years of experience in the real estate industry. He had substantial experience in acquiring, financing, managing, and selling commercial and residential buildings. Fineberg 5, 12-13. By that time, he had bought approximately 20 office buildings and 10 retail buildings, all with mortgage financing from commercial real estate lenders. He had also purchased approximately 100 apartment buildings with mortgage financing and had sold about 60-70 of those. Fineberg 6-8, 10.

**RESPONSE NO. 8**

**Admitted in part. Statement No. 8 mischaracterizes Fineberg's deposition testimony to the extent it represents the number of years of Fineberg's experience and number of office buildings, retail buildings or apartment buildings as exact numbers. Fineberg had no recollection of any exact numbers. *See* Deposition Transcript of Gerald Fineberg ("Fineberg Deposition"), pages 6-8, 10, attached to the Affidavit of Meredith Swisher ("Swisher Affidavit") as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 9.

By 1999, Fineberg had closed at least 27 securitized loans adding up to approximately $146 million. Fineberg 18-20, 36; Dep. Ex. 322. By 2004, a number of these loans had gone into default and

4

Fineberg had deeded the properties to the lenders in lieu of foreclosure.  Fineberg 24-26, 31-34, 37-39, 123.

**RESPONSE NO. 9**

**Admitted in part.  Statement No. 9 mischaracterizes Fineberg's testimony regarding prior securitized loans.  Although Fineberg admits that he had closed approximately 27 securitized loans by 1999, it is inaccurate to state that "a number of these loans had gone into default . . ."  In the deposition testimony cited, Fineberg describes a few hotels that involved defaulted loans over the years, but he does not identify those hotels as among the securitized loans listed on Deposition Exhibit 322.  *See* Fineberg Deposition, pages 18-20, 24-26, 31-34, 36, 37-39 and 123, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 10.

Since the 1970s, Fineberg has owned a company called Fineberg Management, Inc., which is a real estate management company.  Fineberg 23; Donovan 27; Frank 5.  It manages residential apartment buildings, office buildings, and retail space.  From 1999-2004, Fineberg Management was managing approximately 1500 apartment units, 3 office buildings, and 3 or 4 retail units through approximately 30-50 single purpose entities.  Donovan 27, 29; Frank 5-6.

**RESPONSE NO. 10**

**Admitted in part.  Statement No. 10 mischaracterizes the deposition testimony to the extent that it represents exact numbers of apartments, office building, retail buildings and single purpose entities managed by Fineberg Management, Inc.**

J.P. Morgan and CSFB's Statement No. 11.

Fineberg Management managed the Property from the time Langelier and Fineberg acquired it until Defendants' foreclosure in November 2004.[4]

**RESPONSE NO. 11**

**Denied.  Langelier and Fineberg didn't "acquire" the Property.  The Property was owned by Royall Associates Realty Trust until the refinancing with Credit Suisse in 1999, at which time ownership was transferred to Blue Hills.  Blue Hills is a single purpose entity formed at the request of Credit Suisse.  Fineberg Management managed the Property both before and after the 1999 refinancing.  *See* Blue Hills Statement I, ¶¶ 2-4, 18.**

J.P. Morgan and CSFB's Statement No. 11, Footnote No. 3

From September 14, 1999 through November 2004, Fineberg Management managed the property through Blue Hills Management Corp., a single-purpose entity created in connection with the 1999 refinancing. Gerald Fineberg is the President and Treasurer of Blue Hills Management Corp.  BHOP Operating Agreement at 23 (Dep. Ex. 407); Stone 31.

---

[4] **[J.P. Morgan and CSFB original Footnote]** From September 14, 1999 through November 2004, Fineberg Management managed the property through Blue Hills Management Corp., a single-purpose entity created in connection with the 1999 refinancing. Fineberg is the President and Treasurer of Blue Hills Management Corp. BHOP Operating Agreement at 23 (Dep. Ex. 407); Stone 31.

5

**RESPONSE TO FOOTNOTE NO. 3**

      **Admitted in part.  Blue Hills Management Corp. is a Massachusetts corporation formed on September 14, 1999.  Blue Hills Management Corp. is the manager of Blue Hills Office Park, LLC.  *See* Deposition Exhibit 407, attached to the Swisher Affidavit as Exhibit 25.**

J.P. Morgan and CSFB's Statement No. 12.

      Daniel Frank is the President of Fineberg Management and owns a 2.5% beneficial interest in Blue Hills.  Frank 5, 7.  From 1999-2004, as President of Fineberg Management, Frank oversaw Blue Hills' operations.  Frank 19-20.  Frank reports to Mr. Fineberg.  Frank 73, 188.

**RESPONSE NO. 12**

      **Admit.**

J.P. Morgan and CSFB's Statement No. 13.

      Larry Needle was the property manager for the Property.  He reports to Daniel Frank.  Fineberg 106; Needle 22, 25.

**RESPONSE NO. 13**

      **Admit.**

J.P. Morgan and CSFB's Statement No. 14.

      Joseph Donovan is the Chief Financial Officer of Fineberg Management, and has been since 1995.  Donovan was in charge of accounting for Blue Hills.  Donovan 27-28, 120.  Donovan reports to Daniel Frank or to Gerald Fineberg.  Frank 84.

**RESPONSE NO. 14**

      **Admitted in part.  Joseph Donovan ("Donovan") is the Chief Financial Officer of Fineberg Management.  He is not "in charge of accounting."  In response to the question "Can you describe what you do as the CFO. . . ?", posed at his deposition, Donovan answered, "I'm responsible for the day-to-day accounting for the different entities.  I'm responsible for looking at and evaluating prospective hotel deals."  *See* Deposition Transcript of Donovan ("Donovan Deposition"), page 28, lines 8-16, attached to the Swisher Affidavit as Exhibit 3.  Gilbert Stone ("Stone") is the Director of Accounting for Blue Hills.  *See* Response No. 15 below.**

J.P. Morgan and CSFB's Statement No. 15.

      Gilbert Stone is the Director of Accounting for Fineberg Management, which oversaw the operations of Blue Hills Office Park LLC.  Stone 8, 31.  From 1999 to 2004, Stone did all of Blue Hills' accounting work other than accounts payable, Stone 42, and had oversight responsibilities for all accounting records of Blue Hills, Stone 33.  Stone was also responsible for reporting quarterly financial statements to the Lender.  Stone 30.  Stone reports to Joseph Donovan.  Stone 35; Donovan 27-29.

**RESPONSE NO. 15**

**Admitted in part.  Statement No. 15 takes Stone's testimony out of context to the extent it implies that Stone was solely responsible for all of Blue Hills' accounting work.  He testified that he has a staff that works for him.  In addition, Stone took over the duties of Paul Halloran in 2001 with the exception of accounts payable.  *See* Deposition Transcript of Gilbert Stone ("Stone Deposition") Pages 30-35 and 42, attached to the Swisher Affidavit as Exhibit 12.**

J.P. Morgan and CSFB's Statement No. 16.

Langelier and Fineberg, as Blue Hills' principals, made the ultimate decisions concerning actions taken by Blue Hills.  Fineberg 129-130; Langelier 98-100.

**RESPONSE NO. 16**

**Admitted in part.  While Langelier and Fineberg were primarily responsible for major decisions, Statement No. 16 mischaracterizes their testimony.  Both Fineberg and Langelier qualify their statements by adding that decisions were undertaken with the advice and input of attorneys.  *See* Fineberg Deposition, pages 129-130 and Deposition Transcript of William Langelier ("Langelier Deposition"), pages 98-100, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 17.

Since 1989, the Property's sole tenant had been an affiliate of the Bank of Boston known as Boston Equiserve Limited Partnership ("Equiserve").  In mid-1999, Equiserve exercised an option to extend its lease until July 31, 2004, and it had an additional option to extend for another five years after that.  Langelier, Fineberg, BHOP Answers to Defs.' First Set of Interrogatories, No. 3 (excerpts) (Barnett Aff. Ex. B); SAC ¶ 8; BHOP Answer to Counterclaim ¶ 10.

**RESPONSE NO. 17**

**Admitted in part.  Equiserve occupied approximately 96% of the Property and was the principal tenant.  *See* Blue Hills Statement I, ¶ 20.**

J.P. Morgan and CSFB's Statement No. 18.

With this 5-year lease extension in place, Fineberg and Langelier sought a loan from Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse"), which they knew would be a securitized loan secured by, inter alia, a mortgage on the Property.  Fineberg and Langelier knew that, because the loan was to be securitized, Credit Suisse would almost immediately assign the loan to a loan pool and would no longer be involved with the loan; the loan would be serviced by loan servicers, and the loan would be enforced according to its terms.  *See* Langelier 47, 79; Fineberg 18-19, 21-22, 78-80; *see also* Frank 38; Donovan 57.

**RESPONSE NO. 18**

**Denied.  Statement No. 18 contains legal conclusions such as "the loan would be enforced according to its terms" and mischaracterizes the deposition testimony.  Although Fineberg and Langelier knew the Loan would be securitized and were familiar with securitized financing, they did not know in September 1999 the specifics of the loan pool or the identity of the servicers.  *See***

7

**Langelier Deposition, pages 47 and 79; Fineberg Deposition, pages 18-19, 21-22 and 78-80, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 19.

They did not know in September 1999 to which loan pool the loan would be assigned, who the trustee of that loan pool would be, or who the servicers would be.  Fineberg 127.

**RESPONSE NO. 19**

**Admitted in part.  Assuming that the term "they" in Statement No. 19 refers to Fineberg and Langelier, this Statement is only admitted in part.  Although Fineberg and Langelier did not know the identities of the trustee and servicers in September 1999, they were familiar with securitized financing.  *See* Fineberg Deposition, page 18, line 23 through page 19 line 6, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 20.

Prior to entering into the loan with Credit Suisse, no one at Blue Hills ever saw any agreements among any of the future mortgagee, future master servicer, or future special servicer, knew whether there were any such agreements, or knew what the terms of those agreements were or would be.  Fineberg 127-128.

**RESPONSE NO. 20**

**Denied.  At the time of the refinancing, Blue Hills, Fineberg and Langelier knew that the Loan would be securitized and that it would be serviced by a servicer/trustee pursuant to a servicing agreement.  *See* ¶¶ 60 and 61 of Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.  In addition, Fineberg and Langelier were familiar with securitized loans.  *See* Fineberg Deposition, page 18, line 23 through page 19 line 6; Langelier Deposition page 39, lines 12 through 18, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 21.

On September 14, 1999, Blue Hills executed a mortgage note (the "Note", Barnett Aff. Ex. C[5]) to Credit Suisse in the principal amount of $33,149,000 and Credit Suisse loaned Blue Hills that amount (the "Loan").   Second Amended Complaint ("SAC") ¶¶ 15, 17; Note at p.1.  In negotiating the Loan, Fineberg and Langelier were represented by experienced counsel.  Langelier 55-56.

**RESPONSE NO. 21**

**Admit.**

---

[5] **[J.P. Morgan and CSFB original Footnote]** Some deposition testimony about the Note refers to it as Exhibit D to the Second Amended Complaint, which was marked in its entirety as Deposition Exhibit 15.

J.P. Morgan and CSFB's Statement No. 22.

The Loan was secured by numerous "Loan Documents," including a Mortgage, Assignment of Leases and Rents, and Security Agreement ("Mortgage", Dep. Ex. 155[6]), a Cash Management Agreement ("CMA", Dep. Ex. 156), and a Guaranty (Barnett Aff. Ex. D) executed by Fineberg and Langelier, all of which were executed on September 14, 1999. SAC ¶¶ 15, 17-18; BHOP Answer to Counterclaim ¶¶ 11, 16, 22; Blue Hills Parties' Response to Defs.' First Requests for Admissions (excerpts) (Barnett Aff. Ex. E).

**RESPONSE NO. 22**

**Admit.**

J.P. Morgan and CSFB's Statement No. 23.

The interest conveyed by the Mortgage included the Property, its improvements, and other personal property of Blue Hills, tangible and intangible, referred to collectively and defined in the Mortgage as the "Mortgaged Property." SAC ¶¶ 15; Mortgage at p.1; Fineberg 83-88. Under paragraph 10 of the Mortgage, a conveyance or transfer of the Mortgaged Property or any part thereof required the Lender's prior written consent.

**RESPONSE NO. 23**

**Denied. Statement No. 23 contains legal conclusions as to the definition of "Mortgaged Property" and the meaning of Section 10 of the Mortgage Agreement which cannot be characterized as a statement of undisputed fact. As set forth in Motion of Blue Hills, Fineberg and Langelier's for Summary Judgment as to all Counterclaims and Memorandum of Law of Blue Hills, Fineberg and Langelier in Support of Motion for Summary Judgment, ("Blue Hills' Summary Judgment Motion"), Blue Hills avers that J.P. Morgan and CSFB have,** *inter alia,* **improperly taken the definition of "Mortgaged Property" out of the context of Section 10 of the Mortgage Agreement.** *See also* **Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 24.

Blue Hills received approximately $5.2 million in excess proceeds from the Loan, $4 million of which was distributed to the beneficiaries of Royall Associates. The Fineberg Beneficiaries and Langelier Beneficiaries each received $2 million. About $1.2 million was held in reserve by Royall Associates. Langelier 81-82; Fineberg 49-50.

**RESPONSE NO. 24**

**Admitted in part. In 1999, Blue Hills received approximately $5.2 million dollars in proceeds in connection with the re-financing. Approximately $1 million was held in reserve as a "rainy day" account for Blue Hill's benefit and was not distributed to the beneficiaries of the Royall Associates Realty Trust. Approximately $4.2 million was distributed to the beneficiaries of the Royall Associates Realty Trust. Neither Fineberg nor Langelier could recall the amounts that were**

---

[6] **[J.P. Morgan and CSFB original Footnote]** Some deposition testimony about the Mortgage and the CMA refer to them as Exhibits C and E, respectively, to the Second Amended Complaint, which was Deposition Exhibit 15.

**distributed to each of the beneficiaries. *See* Langelier Deposition, pages 80 - 81 and Fineberg Deposition, pages 49 - 50, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 25.

In or about November 1999, the Loan was securitized with a pool of approximately 150 other loans.  In this process, Credit Suisse assigned the Loan to J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee"; together with its assignee CSFB 1999-C1 Royall Street, LLC, the "Lender").   The Trustee entered a Pooling and Servicing Agreement ("PSA") with Wells Fargo National Association ("Wells Fargo") as master servicer and LNR Partners, Inc. ("LNR", formerly known as Lennar Partners, Inc.) as special servicer.  SAC ¶ 25; Pooling and Servicing Agreement ("PSA") (Dep. Ex. 51).

**RESPONSE NO. 25**

    **Admit.**

J.P. Morgan and CSFB's Statement No. 26.

In a CMBS pool, actual day-to-day, operational duties related to the mortgages that are the assets of the Trust are delegated to the master servicer (who administers performing or non-defaulted mortgages according to the terms of the loan documents) and the special servicer (to whom servicing responsibility is transferred if a borrower requests a material modification to the terms of the loan or upon a default or the occurrence of an event of that substantially increases the likelihood of a default).  Greenspan Report (Greenspan Aff. Ex. A) at 9.

**RESPONSE NO. 26**

    **Admitted to the extent that Statement No. 26 contains a general description of CMBS pools, but denied to the extent that Statement No. 26 purports to define the obligations of Wells Fargo and LNR pursuant to the PSA and Loan Documents at  issue in this litigation. *See* Blue Hills Statement I, ¶¶ 30-34.**

J.P. Morgan and CSFB's Statement No. 27.

The provisions of the PSA are binding on and inure to the benefit of the successors and assigns of the parties to it and the certificate holders.  "No other person, including, without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement." PSA (Dep. Ex. 51) at 215.

**RESPONSE NO. 27**

    **Admitted only to the extent that Statement No. 27 accurately quotes from page 251 of the PSA. Blue Hills, Fineberg and Langelier deny all legal conclusions contained in Statement No. 27. Wells Fargo and LNR acted as J.P. Morgan and CSFB's agents at all times pertinent hereto.  Blue Hills, Fineberg and Langelier were entitled to rely upon the servicing standards set forth in the PSA.  *See* Answers of CSFB 1999-C1 Royall Street LLC and J.P. Morgan to Plaintiff's Second Amended Complaint ("Answers") ¶ 63; J.P. Morgan and PSFB's Response Nos. 3 and 4 to Blue Hills, Fineberg and Langelier's First Set of Requests for Admissions ("Responses to Admissions"), attached to the McGlynn Affidavit as Exhibit 7.  *See also*, Blue Hills, Fineberg and Langelier's**

10

**Memorandum in Opposition to Defendants' Motion for Summary Judgment Seeking Dismissal of the Second Amended Complaint.**

J.P. Morgan and CSFB's Statement No. 28.

The Loan Documents required that Blue Hills deposit (or cause to be deposited) all rents received in connection with the Property into an account at its bank referred to as the "Lockbox," which was located in Massachusetts.  Note (Barnett Aff. Ex. C) ¶ 8(a); Cash Management Agreement (Dep. Ex. 156) § 6(a); Dep. Ex. 12 at Blue Hill 0501.

**RESPONSE NO. 28**

**Admitted in part.  Statement No. 28 is ambiguous as it defines neither "rents" or "Lockbox."**  *See* **Blue Hills Statement I, ¶¶ 36 and 37.**

J.P. Morgan and CSFB's Statement No. 29.

Under the Note and Mortgage, Blue Hills' principal and interest payments of $254,652.24 on the Loan were due on the 11th of each month.  Blue Hills was also required to make payments on the 11th of each month to fund certain escrow accounts (also referred to as the "reserve accounts") held by the Lender and known as the "Tax and Insurance Impound Fund" (the "Tax Fund" or the "Tax Escrow"), "Replacement Escrow Fund," the "Base Leasing Escrow Fund," and the "Monthly Cash Flow Leasing Escrow Fund."  Note at p.1; Mortgage ¶ 6(a)-(c).  Payments to the Tax Fund to fund real estate tax payments could be made quarterly so long as the Equiserve lease was in place.  Mortgage ¶ 6(a).

**RESPONSE NO. 29**

**Admitted in part.  Although the Mortgage Agreement required Blue Hills to fund a reserve account for the payment of taxes, in or about October 1999, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes.**  *See* **Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 30.

Under the CMA, so long as sufficient funds to cover these payments were deposited by Blue Hills in the Lockbox prior to the 11th of the month, the Lender would simply collect the funds from the Lockbox, apply the funds to the payments due from Blue Hills, and return the net rents to Blue Hills' operating account, which was separate from the Lockbox account.  Note ¶ 8(a); Cash Management Agreement §§ 2-3; Donovan 207, 209-10.

**RESPONSE NO. 30**

**Admitted in part.  The legal conclusions with respect to the CMA contained in Statement No. 30 are inconsistent with the cited portion of Donovan's deposition.  In response to the question, "Each month Wells Fargo distributed net rents to Blue Hills after paying debt service and putting money in various escrow subaccounts, correct?", Donovan answered "That's correct." In addition, Donovan testified that net rents were deposited in Blue Hills' operating account, an account that was maintained separately from the Lockbox account.**  *See* **Donovan Deposition, page 207, lines 1-5; page 209, lines 11-24 - page 210, line 1, attached to the Swisher Affidavit as Exhibit 3.**

11

J.P. Morgan and CSFB's Statement No. 31.

Under the Loan Documents, the Base and Cash-Flow Leasing Escrow Funds are combined for purposes of controlling disbursements from them. Mortgage ¶ 6(c). The Leasing Escrow funds are available for tenant improvement and leasing commission expenses incurred by Blue Hills in connection with executed new leases, extensions, renewals, or modifications of a lease. To obtain reimbursement for these items, Blue Hills is required to provide paid invoices for the tenant improvement and leasing commissions, a copy of the new lease, and, if required by the Lender, lien waivers and releases from parties providing materials or services in connection with the requested payment. Mortgage ¶ 6(c)(iv).

**RESPONSE NO. 31**

**Admitted in part. Blue Hills, Fineberg and Langelier admit that the language contained in the Mortgage Agreement, ¶ 6(c)(iv) speaks for itself, but deny the legal conclusions contained in Statement No. 31.**

J.P. Morgan and CSFB's Statement No. 32.

Subject to conditions, up to $1 million of the Leasing Escrow Funds are also available "for application solely toward payments of principal and interest" in the event that net operating income from the Property is insufficient to pay principal and interest in a given month. The preconditions to an application of the reserves for this purpose include, among others: 1) that Blue Hills deliver a written request for the application to Lender at least seven business days prior to the date for which it requests a disbursement; and 2) no Event of Default (as defined in the Mortgage) shall have occurred and be continuing as of the date of the request and on the date for which the disbursement is requested. Mortgage ¶ 6(c)(ix).

**RESPONSE NO. 32**

**Admitted in part. Statement No. 32 contains legal conclusions to which no response is required. Blue Hills, Fineberg and Langelier admit that the language contained in the Mortgage Agreement, ¶ 6(c)(ix) speaks for itself, but deny the legal conclusions contained in Statement No. 32. *See* Blue Hills Statement, ¶¶ 39-40.**

J.P. Morgan and CSFB's Statement No. 33.

Quarterly payments of property taxes on the Property were due to the Town of Canton on Feb.1, May 1, Aug. 1, and Nov. 1 of each year. Stone 81; Donovan 202; Needle 146.

**RESPONSE NO. 33**

**Admitted to the extent that "Feb. 1, May 1, Aug. 1 and Nov. 1" did not fall on a weekend or holiday.**

J.P. Morgan and CSFB's Statement No. 34.

Paragraph 5 of the Mortgage required that Blue Hills pay the property taxes due on the Property in a timely manner, subject to paragraph 6. Mortgage ¶ 5. Blue Hills understood that paying property taxes is the obligation of the property owner. Donovan 243.

**RESPONSE NO. 34**

**Denied. Although the Mortgage Agreement required Blue Hills to fund a reserve account for the payment of taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes. *See* Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 35.

Paragraph 6 of the Mortgage required Blue Hills to pay (through deposits in the Lockbox) amounts in advance to the Lender on a monthly or quarterly basis to fund the Tax Escrow, from which the Lender would draw to pay the quarterly property taxes. Mortgage ¶ 6.

**RESPONSE NO. 35**

**Denied. Although the Mortgage Agreement required Blue Hills to fund a reserve account for the payment of taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes. *See* Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 36.

The CMA effected the Tax Escrow funding by calling for the Lender to allocate Lockbox rents to the Tax Fund. CMA §§ 2 & 3.

**RESPONSE NO. 36**

**Denied. Statement No. 36 contains legal conclusions to which no response is required. It is also vague with respect to the phrase, "CMA effected the Tax Escrow." Although the Mortgage Agreement required Blue Hills to fund a reserve account for the payment of taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes. *See* Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 37.

Around the same time that Wells Fargo became the servicer of the Loan, at Blue Hills request, the Lender agreed that the Lender would not escrow funds for taxes from the Lockbox rents. Instead, the Lender permitted Blue Hills to collect the funds to pay the quarterly taxes from its tenant, Equiserve, shortly before the payments were due and deposit them in the Lockbox at that time. Wells Fargo would then pay the property taxes on time. *See* Donovan 202-203; Stone 46, 53-54, 56-57, 77-81, 85, 90, 124; Needle 33-34, 141-142, 147-148; Polcari I 168-169; Lloyd 12-15; Dep. Ex. 1.

**RESPONSE NO. 37**

**Admitted in part. Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes in or about October 1999. Wells Fargo may not have always paid the taxes on time. *See* Blue Hills Statement I, ¶ 43; Blue Hills Statement II, ¶ 16.**

J.P. Morgan and CSFB's Statement No. 38.

The process from November 1999-May 2004 for Blue Hills' payment of property taxes was in accordance with the agreement between Blue Hills and Lender. Blue Hills billed Equiserve during the month prior to the quarterly payment due date. Equiserve would then deposit around 97% of the taxes

13

due to the Lockbox.  Blue Hills would deposit the remaining 3% in the Lockbox at about the same time as the Equiserve deposit.  Wells Fargo would then collect the funds from the Lockbox shortly before the quarterly tax payment was due, and pay the property taxes to the Town of Canton on or before the due date.  Stone 46, 53-57, 77-82, 90; Donovan  202-03; Polcari I 168-69; Lloyd 11-15; Needle 32-33, 146-48.

**RESPONSE NO. 38**

        **Admitted in part.  Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes in or about October 1999.  The taxes may not have always been paid "on or before the due date."  *See* Blue Hills Statement I, ¶ 43; Blue Hills Statement II, ¶ 16.**

J.P. Morgan and CSFB's Statement No. 39.

        Wells Fargo sent a shortage notice to Blue Hills every quarter during the month prior to when taxes were due.  The notices typically came mid-month.  Stone 56-57, 81-82, 114, 116, 122-23.

**RESPONSE NO. 39**

        **Admitted in part.  The so-called "tax insufficiency" notices sent to Blue Hills shortly before taxes were due merely advised Blue Hills that it would be subject to a fee if taxes were not paid.  *See* Blue Hills Statement I, ¶¶ 43-45.**

J.P. Morgan and CSFB's Statement No. 40.

        From the period of 1999 through May 2004, every time Wells Fargo sent its mid-month shortage notice, Blue Hills made sure the money to pay the property taxes was available in the Lockbox prior to the first of the next month and in time to make the payment by the payment date.  Stone 124.

**RESPONSE NO. 40**

        **Admitted in part.  Blue Hills, Fineberg and Langelier admit that Wells Fargo sent so-called "tax insufficiency" letters to Blue Hills, but deny that Blue Hills "made sure the money was available" solely in response to the letters.  Lawrence Needle ("Needle") testified that he would bill Equiserve at least 30 days in advance of the due date for the taxes and would give Equiserve two weeks to deposit the funds so that Wells Fargo could pay the taxes.  *See* Deposition Transcript of Lawrence Needle ("Needle Deposition"), page 145, lines 11-24, attached to the Swisher Affidavit as Exhibit 10; *see also* Blue Hills Statement I, ¶¶ 43-45.**

J.P. Morgan and CSFB's Statement No. 41.

        At no point were replacement or leasing escrow funds used to pay property taxes.  Donovan 163.

**RESPONSE NO. 41**

        **Denied.  At times, Wells Fargo moved funds from various reserve accounts to pay the property taxes.  *See* Deposition Exhibit 393; Deposition Transcript of Richard Clarke ("Clarke Deposition"), pages 162-168, attached to the Swisher Affidavit as Exhibits 2; Blue Hills Statement II, ¶ 16.**

J.P. Morgan and CSFB's Statement No. 42.

[Intentionally omitted.]

**RESPONSE NO. 42**

[Intentionally omitted.]

J.P. Morgan and CSFB's Statement No. 43.

Blue Hills knew that this agreement meant that (a) the Lender did not escrow monies to pay the taxes from rents deposited in the Lockbox, and (b) the rents that otherwise would have been escrowed for taxes were distributed to Blue Hills instead. Stone 77, 85; Donovan 202, 206-07; Needle 140-41.

**RESPONSE NO. 43**

**Admitted in part. Blue Hills admits that funds were not escrowed for the payment of taxes in accordance with the alternative arrangement agreed to by Blue Hills and Wells Fargo in or about October 1999. Net rents were distributed to Blue Hills by Wells Fargo each month. *See* Response No. 30, above.**

J.P. Morgan and CSFB's Statement No. 44.

In early 2002, Blue Hills began its effort to extend Equiserve's presence in the building past the July 2004 expiration of its lease extension. The parties first discussed a possible long-term extension of the lease with an option for Equiserve to buy the Property, and then a shorter-term lease extension. Although they came to no agreement, Frank maintained hope of keeping Equiserve in the Property up through the middle of 2003. Frank 41-61; Dep. Exs. 37, 38, 39.

**RESPONSE NO. 44**

**Admitted in part. Equiserve confirmed its intent not to renew the Lease on May 14, 2003. Blue Hills Statement I, ¶ 48.**

J.P. Morgan and CSFB's Statement No. 45.

Blue Hills believed throughout this time that the best thing to do was to get Equiserve to stay at the Property, "whether it was a sale with a long-term lease or a short-term lease, get them to stay." Frank 52; Langelier 80.

**RESPONSE NO. 45**

**Admitted in part. Statement No. 45 does not define the phrase, "throughout this time." In 2002, Blue Hills proposed various options to Equiserve, but by May 14, 2003, Equiserve had confirmed its intent not to renew its Lease. While the quoted language is attributable to Daniel Frank ("Frank"), the cited testimony of Langelier has nothing to do with efforts to retain Equiserve as a tenant or buyer of the Property. *See* Blue Hills Statement I, ¶¶ 48-49; Langelier Deposition, page 80, attached to the Swisher Affidavit as Exhibit 7.**

15

J.P. Morgan and CSFB's Statement No. 46.

During the month of April 2003, Blue Hills received a copy of a special permit application filed with the Town of Canton by Equiserve and National Development, owner (through a subsidiary, Blueview Corporate Center, LLC) of adjacent property at 250 Royall Street known as "Blueview." Needle 61-67; Dep. Ex. 9. Equiserve and National Development were seeking to build a parking garage at Blueview. *Id.*

**RESPONSE NO. 46**

**Admit.**

J.P. Morgan and CSFB's Statement No. 47.

In May or June 2003, Blue Hills learned that DST Realty, Inc. (an affiliate of Equiserve and DST Systems) had entered into a purchase and sale agreement to buy Blueview. Blue Hills also learned that DST Realty's purchase of Blueview was conditioned on the Town of Canton approving the construction of the proposed parking garage. Donovan 80-83; Langelier 107; Needle 76-77; Purchase and Sale Agreement (Dep. Ex. 19).

**RESPONSE NO. 47**

**Admitted in part. Blue Hills, Fineberg and Langelier admit having learned that DST Realty, Inc. intended to purchase the property located at 250 Royall Street, Canton, Massachusetts, but state that the deposition testimony cited in Statement No. 47 is inaccurately summarized. The referenced testimony does not state that this information was learned in May or June 2003. *See* Donovan Deposition, pages 80-83; Needle Deposition, pages 76-77; Langelier Deposition, page 107, attached to the Swisher Affidavit as Exhibits 7 and 10.**

J.P. Morgan and CSFB's Statement No. 48.

On May 1, 2003, Larry Needle and Gary Lilienthal, an attorney representing Blue Hills, attended a Zoning Board of Appeals hearing concerning Equiserve's special permit application. Lilienthal introduced Blue Hills as an abutter and stated that he felt the proposed garage would have a major effect on traffic and obstruct the view of Blue Hills from the south-west (i.e., from Route 128). Minutes of Canton Zoning Board of Appeals ("ZBA") (Dep. Ex. 304) at 3-4; Blue Hills, Langelier & Fineberg's Response to Defs.' Second Requests For Admissions, No. 2 (excerpts) (Barnett Aff. Ex. F); Fineberg 135-39; Dep. Ex. 328; Needle 67-68.

**RESPONSE NO. 48**

**Admitted in part. Blue Hills, Fineberg, and Langelier admit that Needle and Mr. Lilienthal attending a ZBA hearing on May 1, 2003. Statement No. 48, however, does not accurately reflect the minutes of the meeting Mr. Lilienthal's statements are taken out of context. *See* Deposition Exhibit 304, attached to the Swisher Affidavit as Exhibit 20.**

J.P. Morgan and CSFB's Statement No. 49.

On or about May 15, 2003, Equiserve formally notified Blue Hills of its intent not to exercise its option to extend its lease past July 31, 2004. Langelier, Fineberg, BHOP Answers to Defs.' First Set of

16

Interrogatories, No. 7; Donovan 64-66; Dep. Exs. 17, 18; Langelier 105-106.

**RESPONSE NO. 49**

      **Admitted in part.  By letter dated May 14, 2003, Equiserve notified Blue Hills of its intent not to exercise its option to extend the Lease.  *See* Blue Hills Statement I, ¶ 48.**

J.P. Morgan and CSFB's Statement No. 50.

      On May 22, 2003, the Town of Canton granted the special permit (the "Special Permit") for a parking garage (which would add approximately 263 parking spaces) to Blueview Corporate Center LLC, then-owner of Blueview, which abuts the Property. Needle 74-76; Dep. Ex. 304; ZBA Decision Granting Blue View Special Permit ("ZBA Decision," Barnett Aff. Ex. G)

**RESPONSE NO. 50**

      **Admit.**

J.P. Morgan and CSFB's Statement No. 51.

      The document attached to Lenders' Second RFA as Exhibit "L" is a true and correct copy of the ZBA Decision.  Blue Hills' Parties Response to Defs.' Second Requests for Admissions, No.  15.

**RESPONSE NO. 51**

      **Admit.**

J.P. Morgan and CSFB's Statement No. 52.

      Blue Hills continued to believe that the best option and most financially beneficial scenario for the future of the Property was to have Equiserve renew its lease, as it had been advised by Spaulding & Slye, a real estate brokerage firm, in mid-May 2003.  Frank 171-75; Dep. Ex. 44.

**RESPONSE NO. 52**

      **Denied.  Statement No. 52 mischaracterizes Frank's testimony.  In answer to the question "Did you agree with their assessment that the main objective was to keep Boston Equiserve?," Frank answered, "that would have been one of our objectives.  Frank also stated that the other main objective was "to rent it no matter what."  In addition, Frank confirmed that Blue Hills did not hire Spaulding and Slye.  *See* Frank Deposition, page 173 lines 11-24 to page 174, line 1, attached to the Swisher Affidavit as Exhibit 5.**

J.P. Morgan and CSFB's Statement No. 53.

      On June 9, 2003, Blue Hills filed a complaint in Norfolk Superior Court  appealing the ZBA Decision (the "Zoning Appeal" (Dep. Ex. 20)).  The complaint stated that the proposed garage "is immediately in the sight line of [the] Property, will partially block its view and will be detrimental and offensive to [Blue Hills] and inhabitants of [the] Property.  The addition of 380 spaces in a structured parking facility directly in the sight line of [the] Property will not assure the fulfillment of the general conditions for site plan approval, but rather violates such requirements as is poses a detriment to [the] Property."  Zoning Appeal ¶¶ 37-38.

**RESPONSE NO. 53**

      **Admitted in part.  Blue Hills, Fineberg and Langelier state that Statement No. 53 is misleading.  Although the Complaint filed in 2003 appealing a zoning decision in connection with the abutting property located at 250 Royall Street, Canton, Massachusetts, (the "Norfolk Action"), contains the quoted language, the language is taken out of context.  The only remedy Blue Hills sought in the Norfolk Action was the annulment of the ZBA's decision.  *See* Blue Hills Statement I, ¶¶ 54-56.**

J.P. Morgan and CSFB's Statement No. 54.

      Blue Hills knew the only reason it could file the Zoning Appeal was because it owned the property abutting Blueview.  Frank 81; Fineberg 90; Zoning Appeal ¶ 43.

**RESPONSE NO. 54**

      **Admitted in part.  Statement No. 54 mischaracterizes the deposition testimony of Frank and Fineberg.  In its Complaint, Blue Hills alleged that it had standing "as its property abuts the Blueview Property . . . within the meaning of G.L. c. 40A § 11."  *See* Deposition Exhibit 20, ¶ 43, attached to the McGlynn Affidavit as Exhibit 28.**

J.P. Morgan and CSFB's Statement No. 55.

      The right to bring the Zoning Appeal of the Special Permit was Mortgaged Property under Granting Clause Seven of the Mortgage, as it was a "cause[] of action" that "related to, [was] derived from or [was] used in connection with the Mortgaged Property."  Mortgage Granting Clause Seven.

**RESPONSE NO. 55**

      **Denied.  Statement No. 55 contains legal conclusions as to the definition of "Mortgaged Property" and the meaning of Section 10 of the Mortgage Agreement which cannot be characterized as a statement of undisputed fact.  As set forth in Blue Hills' Summary Judgment Motion, Blue Hills avers that J.P. Morgan and CSFB have, *inter alia*, improperly taken the definition of "Mortgaged Property" out of the context of Section 10 of the Mortgage Agreement. *See* also Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 56.

      Blue Hills hoped by appealing the special permit to "slow everything down," to hopefully persuade Equiserve to stay in Blue Hills Office Park, or to "stop them from building the garage," in hopes of keeping Equiserve in the building.  Donovan 87, 90-91; Frank 61-63, 174-75; Fineberg 90-91.

**RESPONSE NO. 56**

      **Denied.  The deposition testimony of Donovan, Frank and Fineberg referenced in Statement No. 56 has been taken out of context.  Blue Hills confirmed Equiserve's intent not to renew its Lease by letter dated May 15, 2003.  *See* Blue Hills Statement ¶¶ 47 and 48.  The reasons for the filing of the Norfolk Action are set forth in the Settlement Agreement: the ZBA decision was based upon an incorrect interpretation of the Canton By-Laws.  *See* Blue Hills Statement I, ¶¶ 54-55; Deposition Exhibit 21, attached to the McGlynn Affidavit as Exhibit 29.**

J.P. Morgan and CSFB's Statement No. 57.

During the summer of 2003 Blue Hills negotiated a settlement under which it agreed to accept a $2 million payment (the "Payment") to dismiss the Zoning Appeal and to waive all further rights of appeal of the ZBA Decision. The terms of the settlement are set forth in a "Settlement Agreement" executed on August 5, 2003 (Dep. Ex. 21). As part of the settlement Blue Hills also executed a "Lease Termination Agreement" dated August 5, 2003 with Equiserve, Lease Termination Agreement (Dep. Ex. 10), and Releases dated August 5, 2003, BHOP Release of Blueview Corporate Center LLC (Barnett Aff. Ex. H). See also Blue Hills' Parties Response to Second RFA, No. 16; Donovan 96; Needle 83-85; Frank 77.

**RESPONSE NO. 57**

**Admitted in part. Blue Hills entered into a Settlement Agreement dated August 5, 2003, the terms of which speak for themselves. *See* Deposition Exhibit 21, attached to the McGlynn Affidavit as Exhibit 29. The Lease Termination Agreement was a separate agreement with Equiserve dated August 5, 2003, which formalized the condition in which Equiserve would leave the Property. *See* Deposition Exhibit 10, attached to the Swisher Affidavit as Exhibit 14.**

J.P. Morgan and CSFB's Statement No. 58.

As part of the settlement, Blue Hills agreed to, *inter alia*: (1) dismiss the Zoning Appeal, with prejudice (thereby forfeiting its right to contest the grant of the special permit); (2) waive its right to (at any time within 10 years of the date of the Settlement Agreement) "take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development" of the Blueview Property; (3) release DST and Blueview from any and all claims which Blue Hills had against DST and/or Blueview prior to or on the date of the Settlement Agreement; and (4) terminate Equiserve's lease as of July 31, 2004. Settlement Agreement ¶¶ 3, 7(c) and Exhibits B-2 and B-4 thereto. (Dep. Ex. 21.)

**RESPONSE NO. 58**

**Denied. Statement No. 58 not only includes only selective excerpts of the terms of the Settlement Agreement but mischaracterizes some of the terms, which speak for themselves. J.P. Morgan and CSFB fail to point out that the obligations and releases were mutual. In addition, the Settlement Agreement does not terminate Equiserve's Lease. *See* Deposition Exhibit 21, attached to the McGlynn Affidavit as Exhibit 29.**

J.P. Morgan and CSFB's Statement No. 59.

Blue Hills knew that the settlement removed any impediment to approval of the garage by the Town of Canton, thus eliminating any possibility of Equiserve staying in the Property and clearing the way for Equiserve to move across the street. Donovan 99-100; Fineberg 92, 96-97. Blue Hills was aware that settling the Zoning Appeal would ensure that Equiserve would move its offices to Blueview. Frank 75-76.

19

**RESPONSE NO. 59**

      **Denied. Equiserve had already confirmed its intent not to renew its Lease by letter dated May 14, 2003.** *See* **Blue Hill Statement I, ¶¶ 47 and 48. Further, the facts asserted in Statement No. 58 are contained in the attorneys' questions, not the answers provided by Frank, Donovan and Fineberg.** *See* **Donovan Deposition, pages 99-100; Finberg Deposition, pages 92, 96-97; Frank Deposition pages 75-76, attached to the Swisher Affidavit as Exhibits 3, 4 and 5.**

J.P. Morgan and CSFB's Statement No. 60.

      On August 4, 2003, an entity related to Equiserve (DST Realty of Massachusetts, Inc.) purchased Blueview from Blueview Corporate Center, LLC. Counterclaim ¶ 33.

**RESPONSE NO. 60**

      **Admit.**

J.P. Morgan and CSFB's Statement No. 61.

      The settlement of the Zoning Appeal was an assignment, transfer, or conveyance of part of the Mortgaged Property, as it constituted the transfer of the cause of action of the Zoning Appeal and other rights related to the Property (including the right to contest future development at Blueview). Mortgage ¶ 10. Paragraph 10(a) of the Mortgage required the Lender's prior written consent to the settlement of the Zoning Appeal.

**RESPONSE NO. 61**

      **Denied. Statement No. 61 contains only legal conclusions to which no response is required. As fully briefed in Blue Hills' Summary Judgment Motion the settlement of the Norfolk Action was not a transfer of Mortgaged Property that required J.P. Morgan's consent under Section 10 of the Mortgage Agreement.** *See* **also Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 62.

      Without notifying the Lender or obtaining the Lender's prior written consent, Blue Hills agreed to the settlement, accepted the Payment, and executed the Settlement Agreement, the Lease Termination Agreement and Releases. BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, Nos. 3, 4. Blue Hills never notified the Lender of the Zoning Appeal, the settlement of the Zoning Appeal (including the Lease Termination Agreement), or its receipt of the Payment. BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, Nos. 3, 4; BHOP Answer to Counterclaim ¶¶ 28-30.

**RESPONSE NO. 62**

      **Denied. Although Blue Hills, Fineberg and Langelier did not notify J.P. Morgan before filing or settling the Norfolk Action, they were under no obligation to do so. Any implication to the contrary is misleading.** *See* **Blue Hill's Summary Judgment Motion.**

J.P. Morgan and CSFB's Statement No. 63.

If Blue Hills had requested the Lender's consent to the Settlement, the Lender would not have allowed Blue Hills to keep $2 million.  Rather, the Lender would have required that the proceeds be placed into a reserve to cover the loss of the sole tenant of the Property.  Polcari 213-14; Clarke 39, 41-42 (plaintiff's expert designee agreeing that a request by Blue Hills for consent to the settlement and disposition of the payment would have given the Lender the opportunity to require additional payments or reserves for the loan).

**RESPONSE NO. 63**

**Denied.  Statement No. 63 contains mere speculations and is based upon the incorrect assumption that consent was required.  *See* Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1; Blue Hills' Summary Judgment Motion.**

J.P. Morgan and CSFB's Statement No. 64.

Under the Pooling and Servicing Agreement, it was LNR as special servicer, and not Wells Fargo as Master Servicer, that would have responded to a request for consent to any transfers of Mortgaged Property.  Pooling and Servicing Agreement p. 113, § 3.20(a)(iii).

**RESPONSE NO. 64**

**Admitted in part.  Statement No. 64 is a conclusory statement that does not reflect the language in the PSA.  Section 3-20(a)(iii) of the PSA states, in pertinent part, that "The Special Servicer shall be responsible for any request by a Borrower for the consent of the mortgage and any modification, waiver or amend not of any term of any Loan for which the Servicer is not responsible . . ."  *See* portions of Deposition Exhibit 51, attached to the Swisher Affidavit as Exhibit 16.**

J.P. Morgan and CSFB's Statement No. 65.

No part of the Payment passed through any Blue Hills account.  Stone 59, 61-63, 70, 107-108, 137-138; Frank 74, 85.  The Payment was never recorded by Stone as a receipt for Blue Hills, even though it was Mr. Stone's responsibility to record all receipts for Blue Hills.  Stone 62-63, 108.

**RESPONSE NO. 65**

**Denied.  The $2 million in settlement proceeds ("Settlement Proceeds") received by Blue Hills in connection with the Norfolk Action have been held in clients' funds accounts for the benefit of Blue Hills since August 8, 2003.  *See* Blue Hills Statement I, ¶¶ 60 and 61,  94 and 95.**

J.P. Morgan and CSFB's Statement No. 66.

Donovan did not think it was his responsibility to determine what had happened to the Payment because "the settlement was with the owners, and I'm responsible for the operating books.  I'm not responsible for the owners' books."  Donovan 120-22.

21

**RESPONSE NO. 66**

**Denied. Statement No. 66 takes Donovan's testimony out of context. Donovan did not negotiate the settlement of the Norfolk Action or review the Settlement Agreement. Donovan testified that he had never seen the Settlement Agreement. *See* Donovan Deposition, pages 121-123, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 67.

The Payment was Mortgaged Property under Granting Clause Eight of the Mortgage, as it is proceeds of the disposition of other Mortgaged Property, namely the Zoning Appeal cause of action and other rights transferred and released in the Settlement Agreement. The Payment was Mortgaged Property under Granting Clause Four, as it is "consideration" paid to Blue Hills arising from and attributable to the Premises and Improvements. The Payment was Mortgaged Property under Granting Three, as it is an "award or payment" made for an injury to or decrease in value of the Mortgaged Property. The Mortgage in paragraph 10 required the prior written consent of the Lender to any transfer or conveyance of the Settlement Payment. Mortgage ¶ 10 and Granting Clauses Three, Four, Eight.

**RESPONSE NO. 67**

**Denied. Statement No. 67 contains only legal conclusions to which no response is required. As fully briefed in Blue Hills' Summary Judgment Motion, settlement of the Norfolk Action was not a transfer of Mortgaged Property that required J.P. Morgan's consent under Section 10 of the Mortgage Agreement. *See* also Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 68.

On or around August 8, 2003, without the prior written consent of Lender, the settlement Payment was transferred to Bernkopf Goodman LLP's IOLTA account and then to a client fund account at Bernkopf Goodman LLP, where it remained until after the Lender's foreclosure. Langelier 128-130; Dep. Ex. 177; Goldberg 69-70. The client fund account was controlled by Langelier and Fineberg as the trustees and beneficiaries of Royall Associates, as evidenced by their disposition of the fund through a subsequent agreement dated December 31, 2004, to which Blue Hills was not a party. (Dep. Ex. 176). See infra ¶¶ 181-186.

**RESPONSE NO. 68**

**Denied. On August 8, 2003, the Settlement Proceeds were wired to a clients' funds account at Bernkopf Goodman LLP to be held for the benefit of Blue Hills. *See* Blue Hills Statement I, ¶¶ 60-61; 94-95. The consent of J.P. Morgan or CSFB to the settlement of the Norfolk Action or receipt of the Settlement Proceeds by Blue Hills was not required. *See* Response No. 62.**

J.P. Morgan and CSFB's Statement No. 69.

Regardless whether the settlement funds passed through the Blue Hills entity or were sent directly to Royall Associates, Blue Hills' outside accountants, Rutfield and Hassey, accounted for the Payment as a transfer to Royall Associates, as evidenced by a corresponding increase in the "Due From Affiliate" line on Blue Hills' balance sheet for the year ending December 31, 2003. Andelman 86-88, 92-95; Dep. Exs. 364, 365, 367, 368.

22

**RESPONSE NO. 69**

**Denied.  Statement No. 69 mischaracterizes Andelman's testimony.  In the cited pages, Andelman proffered no testimony regarding the Settlement Proceeds.  The Settlement Proceeds were not transferred to Royall Associates Realty Trust.  *See* Andelman Deposition, pages 87-88, attached to the Swisher Affidavit as Exhibit 1.  *See also* Blue Hills Statement I, ¶¶ 60-61; 94-95.**

J.P. Morgan and CSFB's Statement No. 70.

Blue Hills' tax lawyer and expert witness designee David Andelman testified that the item shown as "Due from Affiliate" represented an amount that Blue Hills transferred to Royall Associates. Andelman 87-88.

**RESPONSE NO. 70**

**Denied.  Statement No. 70 is misleading as it takes Andelman's testimony out of context.  In the cited pages, Andelman proffered no testimony regarding the Settlement Proceeds.  The Settlement Proceeds were not transferred to Royall Associates Realty Trust.  *See* Response No. 69.**

J.P. Morgan and CSFB's Statement No. 71.

Blue Hills accounted for the Payment on its balance sheet as a reduction to the basis of the Property.  Andelman 92-93, 104-105 ("properly reflected on balance sheets"), 169-170; Dep. Exs. 364, 365, 368, 369.

**RESPONSE NO. 71**

**Admit.**

J.P. Morgan and CSFB's Statement No. 72.

The transfer of the payment from Blue Hills to Royall Associates was a transfer of Mortgaged Property under Section 10 of the Mortgage.

**RESPONSE NO. 72**

**Denied.  Statement No. 72 contains legal conclusions to which no response is required.  See Blue Hills' Summary Judgment Motion.  Further, the Settlement Proceeds were never transferred from the clients' funds account being held for the benefit of Blue Hills.  *See* Blue Hills Statement I, ¶¶ 60-61; 94-95.**

J.P. Morgan and CSFB's Statement No. 73.

Blue Hills did not obtain the prior written consent of the Lender to transfer the Payment to Royall Associates.  Fineberg 59-61; Blue Hills, Langelier & Fineberg Responses to Defs.' First Requests for Admissions, No. 3, 4. (Barnett Aff. Ex. E.)

**RESPONSE NO. 73**

      **Denied.  The Settlement Proceeds were never transferred from clients' funds accounts being for the benefit of Blue Hills.  *See* Blue Hills Statement I, ¶¶ 60-61; 94-95.  Receipt of the Settlement Proceeds did not require the consent of J.P. Morgan or CSFB.  *See* Blue Hills' Summary Judgment Motion.**

J.P. Morgan and CSFB's Statement No. 74.

      Blue Hills considered whether to seek consent to the settlement and transfer of the Payment from the Lender but did not do so.  Fineberg testified that he relied on the advice of counsel, but his counsel instructed him not to answer questions about the substance of the advice, invoking the attorney-client privilege.  Fineberg 59-61, 82-83, 143-44, 216-219; see also Goldberg 41-43, 77-78.

**RESPONSE NO. 74**

      **Denied.  The deposition testimony of Fineberg and Goldberg in Statement No. 74 is taken out of context.  Statement No. 74 does not properly distinguish between the advice given Fineberg by Attorney Goldberg during the transactions at issue and  instructions given to Fineberg by Attorney McGlynn during the deposition.  Fineberg properly asserted attorney-client privilege during his deposition when he was questioned about the content of discussions with Attorney Goldberg relating to the settlement agreement.  *See* Fineberg Deposition, pages 59-61, 82-83, 143-44, 216-219, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 75.

      Fineberg and Langelier made the decisions to settle the Zoning Appeal and how to handle the settlement Payment.  Fineberg 129-30; Langelier 112-113.

**RESPONSE NO. 75**

      **Admitted in part.  Statement No. 75 is incomplete as it disregards the qualified statement asserted by Fineberg that although the "ultimate decisions" were made by the principals, such decisions were made only with the input of the attorneys for Langelier and Fineberg.  Moreover, Langelier testifies that his attorney's input was an integral part of his decision to settle.  *See* Fineberg Deposition, page 130, lines 4 through 9; Langelier Deposition, page 111, line 21 through page 112, line 17, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 76.

      On September 5, 2003, a Stipulation of Dismissal of the Zoning Appeal signed by all counsel of record was filed with the court and all rights of appeal of the ZBA Decision were thereby waived by Blue Hills.  BHOP Answer to Counterclaim ¶ 35.

**RESPONSE NO. 76**

      **Admitted in part.  Blue Hills, Fineberg and Langelier admit that a Stipulation of Dismissal was signed and filed with the Norfolk Superior Court.  The terms of the Stipulation of Dismissal speak for themselves.**

J.P. Morgan and CSFB's Statement No. 77.

On or around February 1, 2005, the Payment was conveyed from the client fund account controlled by Royall Associates to two separate client fund accounts. Dep. Ex. 177. One of the accounts is controlled by Fineberg and the other is controlled by Langelier. Langelier 129-30; Fineberg 65-71.

**RESPONSE NO. 77**

**Denied. The Settlement Proceeds were always held in clients' funds accounts for the benefit of Blue Hills.** *See* **Blue Hills Statement I, ¶¶ 60-61; 94-95.**

J.P. Morgan and CSFB's Statement No. 78.

As a result of the accountants' treatment of the Payment as a basis reduction and not as income, it did not appear on the income and expense statements that Blue Hills provided quarterly to Lender. Andelman 103-05; Dep. Exs. 35-36.

**RESPONSE NO. 78**

**Denied. The Settlement Proceeds were properly treated as a reduction in basis, which is reflected upon the statements of assets and liabilities prepared by Blue Hills' accountant. All information which Wells Fargo requested from Blue Hills was provided.** *See* **Affidavit of Joseph Donovan ("Donovan Affidavit"), ¶¶2-5.**

J.P. Morgan and CSFB's Statement No. 79.

Despite a clear requirement in the Mortgage that Blue Hills provide Lender a balance sheet showing assets and liabilities (which would have reflected the reduction in basis), Mortgage ¶ 18(b), Blue Hills never provided a balance sheet after receiving the Payment. Affidavit of Curtis Mallegni ¶ 4.

**RESPONSE NO. 79**

**Denied. Statement No. 79 contains legal conclusions to which no response is required. From the Loan's inception, Blue Hills provided Wells Fargo with rent rolls and operating statements. Statement No. 79 deceptively implies that Blue Hills neglected to supply documents for the year 2003. This was not the case. All information which Wells Fargo requested from Blue Hills was provided.** *See* **Donovan Affidavit, ¶¶2-5.**

J.P. Morgan and CSFB's Statement No. 80.

Frank and Needle were in charge of the effort to find a new tenant for the Property, which began even before the May 14, 2003 notice from Equiserve (Dep. Ex. 17) was delivered to Blue Hills. Frank 133-134.

**RESPONSE NO. 80**

**Admitted in part. Blue Hills, Fineberg and Langelier admit that Frank and Needle were involved in the effort to find a new tenant, but deny that they were the only Blue Hills' representatives involved in that effort.** *See* **Langelier Deposition, page 152, line 3 through page 155, line 24, attached to the Swisher Affidavit as Exhibit 7.**

25

J.P. Morgan and CSFB's Statement No. 81.

Blue Hills engaged Cushman and Wakefield as Blue Hills' exclusive leasing agent to actively market the Property.  SAC ¶ 39; Frank 134-135.

**RESPONSE NO. 81**

**Admit.**

J.P. Morgan and CSFB's Statement No. 82.

Cushman and Wakefield actively but unsuccessfully marketed the Property for lease from May 2003 through at least November 4, 2004.  From May 2003 through November 2004, no letters of intent were ever signed by any prospective tenant.  No new tenant was found.  Frank 133-34, 136-43, 148, 156, 162; Needle 107-14; Fineberg 100.

**RESPONSE NO. 82**

**Admitted in part.  Statement No. 83 improperly characterizes Cushman and Wakefield's extensive efforts to market the Property.  *See* Frank Deposition, page 124, line 20 through page 125, line 15, attached the Swisher Affidavit as Exhibit 5.**

J.P. Morgan and CSFB's Statement No. 83.

The leasing market was "pretty bad" between May 2003 and the fall of 2004.  There was "clearly a downturn and a high vacancy rate in office properties."  Frank Depo 142, 178; Langelier 146.

**RESPONSE NO. 83**

**Denied.  Statement No. 83 takes the testimony of Frank and Langelier out of context.  The quoted language "pretty bad" is not the deposition testimony of either Frank or Langelier but rather the attorney's statement in formulating a question.  While Frank confirms that statement, Frank then challenges the assertion that the vacancy rates in Canton were 45%.  Frank states that he understood the vacancy rates to have been only 16% in Canton. The cited page for Langelier says nothing about the state of the real estate market.  *See* Frank Deposition, page 142, line 15, attached to the Swisher Affidavit as Exhibit 5.**

J.P. Morgan and CSFB's Statement No. 84.

As of July 21, 2004, there were no viable tenant prospects for the Property.  Frank 138-41; Dep. Ex. 42; Donovan 126-128; Needle 108-09, 137.

**RESPONSE NO. 84**

**Admitted in part.  Statement No. 84 mischaracterizes the testimony of Frank, Donovan and Needle, who never used the term "viable."  Rather that description is created through Defendants' questions.  While Blue Hills, Fineberg and Langelier admit that no tenant had been located, in answer to Defendants' question if tenant prospects were "viable," Frank stated "[t]he answer is no, but that changes daily."  *See* Frank Deposition, page 141, lines 9-24, attached to the Swisher Affidavit as Exhibit 5.**

26

J.P. Morgan and CSFB's Statement No. 85.

As of August 2004, Cushman and Wakefield had no tenant prospects for the Property.  Frank 148; Fineberg 100; Donovan 126-28.  Blue Hills, with 275,000 square feet to fill, was looking for tenants taking 100,000 square feet or more.  In a report dated August 3, 2004, Joseph Plunkett, Cushman and Wakefield's lead broker for the Property, described their prospects.  According to Plunkett, "'Major deals' that are greater that 50,000 square feet are for all intents and purposes non-existent today, in the Route 128 South market," of which Canton is a part.  Users looking for 100,000+ square feet "have 20 options within a 15-minute drive of 150 Royall Street."  Letter from Joseph Plunkett to Daniel Frank dated August 3, 2004 (Dep. Ex. 43).

**RESPONSE NO. 85**

**Denied.  Several viable tenant prospects had been produced.  *See* Frank Deposition, page 142, line 15.  *See also* Expert Report of Kenneth Gartrell, pages 11 through 15, Deposition Exhibit 354, attached to the Swisher Affidavit as Exhibit 22.**

J.P. Morgan and CSFB's Statement No. 86.

Blue Hills continued looking for tenants right up to the time of the foreclosure but never found one.  Langelier 161; Fineberg 110.

**RESPONSE NO. 86**

**Admitted in part.  Statement No. 86 is a mischaracterization of Blue Hills' attempts to find new tenants.  Indications of an improving market would have made the prospects of finding a tenant more likely had the wrongful foreclosure not occurred.  *See* Expert Report of Kenneth Gartrell, pages 11 through 15, Deposition Exhibit 354, attached to the Swisher Affidavit as Exhibit 22.**

J.P. Morgan and CSFB's Statement No. 87.

On or about September 16, 2003, Wells Fargo contacted Blue Hills and was told that Equiserve would be vacating the Property in July 2004 and that marketing of the Property had begun (although Blue Hills could give no information about prospective tenants).  Wells Fargo communicated this information to LNR at the time. Mallegni 145-47; Dep. Ex. 141; Email chain from September 2003 (Barnett Aff. Ex. I).

**RESPONSE NO. 87**

**Denied.   LNR learned as early as September 12, 2003 that Equiserve would be vacating the Property and initiated communications with Wells Fargo.  Wells Fargo phone records show no outgoing calls to Blue Hills on September 16, 2003.  *See* Deposition Exhibit 71, attached to the McGlynn Affidavit as Exhibit 41.  *See also* Goertzen Affidavit, filed by Defendants, Exhibits A and B.**

J.P. Morgan and CSFB's Statement No. 88.

From late 2003 through April or May 2004, Donovan had three or four telephone conversations with people from Wells Fargo (whose names he does not recall) concerning the Property.  There was no urgency to the calls.  He communicated that they were looking for a tenant and thought they would have

27

one in place around the time Equiserve left.  Donovan 145-149.  He did not ask Wells Fargo for a meeting in any of these calls.  Donovan 157-58.  He did not mention that Blue Hills had entered into a Lease Termination Agreement with Equiserve or received a $2 million settlement payment that it had transferred to its owners.  Donovan 146.

## RESPONSE NO. 88

**Denied.  Blue Hills, Fineberg and Langelier admit that Donovan had several telephone conversations with Wells Fargo or LNR representatives, but deny that Statement No. 88 accurately characterizes Donovan's testimony.  Further Blue Hills, Fineberg and Langelier deny that the Settlement Proceeds were transferred from Blue Hills.  *See* Donovan Deposition, pages 157-158, attached to the Swisher Affidavit as Exhibit 3; Blue Hills Statement I ¶¶ 60-61; 94-95.**

J.P. Morgan and CSFB's Statement No. 89.

By April 2004, LNR was estimating a loss from the Blue Hills Loan of between $10 million and $20 million dollars (Dep. Ex. 80).  In the fall of 2004, its best estimate of the loss was $18,590,000 (Dep. Ex. 97).

## RESPONSE NO. 89

**Admitted in part.  Blue Hills, Fineberg and Langelier admit only that the referenced deposition exhibits contain internal e-mails estimating the loss from the Loan.  There is no mention of "best evidence."  In fact, Deposition Exhibit 97 states "[We] have been doing a little tweaking, and we have changed Blue Hills' loss to $18,590,000."  *See* Deposition Exhibit 97, attached to the Swisher Affidavit as Exhibit 19.**

J.P. Morgan and CSFB's Statement No. 90.

As Fineberg Management was marketing the Property in the first half of 2004, Fineberg was in the process of walking away from two hotel properties that were in CMBS pools for which LNR was the Special Servicer.  After the hotels – one in Sturbridge, Massachusetts and one in Lancaster, Pennsylvania – went into default, Fineberg executed deeds-in-lieu of foreclosure and turned the properties back to the Lender.  Brown Aff. ¶¶ 2-4; Goldberg 116-117.

## RESPONSE NO. 90

**Admitted in part.  Statement No. 90 mischaracterizes Goldberg's deposition testimony.  Goldberg responded "Yes, ultimately" to the question "Did Finberg give back the keys to the Sturbridge Hotel and walk away?"  In addition, in response to the question "Similarly with the Lancaster Hotel, he gave back the keys and walked away?", Goldberg answered, "Mm-hmm yes."  Goldberg did not testify as to the timing of those transactions or comment on the marketing of the Property.  *See* Goldberg Deposition, pages 116-117, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 91.

Frank and Donovan were involved in these transactions in their capacities as officers of Fine Hotels, an affiliate of Fineberg Management also owned by Fineberg.  Donovan 27, 31-32; Frank 5; Fineberg 23.

**RESPONSE NO. 91**

**Admitted in part.  Statement No. 91 doesn't reference what "these transactions" refers to.  Assuming that "these transactions" refers to the Sturbridge and Lancaster Hotels, Blue Hills, Fineberg and Langelier admit that Sturbridge and Lancaster Hotels were managed by Fine Hotels.  However, the deposition testimony cited does not support the blanket statement that Frank and Donovan "were involved in these transactions."  _See_ Donovan Deposition, pages 27, 31-32; Frank Deposition, page 5 and Fineberg Deposition, page 23, attached to the Swisher Affidavit as Exhibits 3, 4 and 5.**

J.P. Morgan and CSFB's Statement No. 92.

Goldberg and the Bernkopf Goodman firm represented Fineberg and Fine Hotels in connection with the deeds-in-lieu, which were handled by LNR asset manager Chris Brown.  The deed-in-lieu transactions closed in July 2004.  Brown Aff. ¶¶ 2-4.

**RESPONSE NO. 92**

**Admit.**

J.P. Morgan and CSFB's Statement No. 93.

The Blue Hills Loan was mentioned in at least two conversations between Brown and Goldberg that were otherwise about Sturbridge and Lancaster.  According to Brown, Goldberg made a vague reference in one call to the fact that he had another loan that would be coming to LNR but would not say anything more about the loan or the property.  In a subsequent call, at Brown's prodding, Goldberg identified it as the Blue Hills property, adding that the property had a single tenant who was leaving after which there would be no income, and that the borrower was trying to get the loan transferred from the master servicer to the special servicer.  Brown did not suggest anything he should say to get the master servicer to make a transfer and did not do anything to get the loan transferred from the master servicer to LNR.  Brown Aff. ¶¶ 7-8.

**RESPONSE NO. 93**

**Denied.  Statement No. 93 directly contradicts Goldberg's deposition testimony.  Goldberg testified that he communicated with Chris Brown of LNR and that Brown suggested that Blue Hills should be in touch with Wells Fargo.  In addition, Brown made a specific suggestion to Goldberg as to what Blue Hills should say in order to expedite transfer of the file to LNR.  Goldberg also conveyed to Brown that time was of the essence.  _See_ Goldberg Deposition, pages 85 and 86, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 94.

According to Brown, Goldberg never told him said, in form or substance, that "time was of the essence" with respect to transferring or servicing the Blue Hills loan and Goldberg did not say anything in any of their conversations that gave Brown the impression that there was any urgency at all with respect to the loan or the property.  Goldberg never told Brown that his client was intent on or committed to keeping the Blue Hills Property or that he was looking for an outcome different from the Sturbridge and Lancaster transactions.  Goldberg never discussed with Brown the possibility of doing a workout of the Blue Hills Loan.  He did not say that the borrower was exploring various options with respect to the

29

future of the Property and he did not say, in form or in substance, that "there were a whole host of ways [his] client wanted to consider going with the property."  Brown Aff. ¶¶ 9-10.

**RESPONSE NO. 94**

Denied.  **Statement No. 94 directly contradicts Goldberg's testimony.  Goldberg testified that he told Brown that "time was of the essence".  Further, Goldberg and Brown discussed "a whole host of ways that the client wanted to consider going with the Property."  In addition, Brown agreed that Goldberg was going to get "nowhere with Wells Fargo, that it had to be with the special servicer."** *See* **Goldberg Deposition, page 86, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 95.

Brown's conversations with Goldberg about Blue Hills left Brown with the impression that Blue Hills would be giving the Property back to the lender, as they had done in Sturbridge, Lancaster, and Williamsburg.  Brown Aff. ¶ 11.

**RESPONSE NO. 95**

Denied.  **Statement No. 95 directly contradicts Goldberg's testimony.  Further, Brown's "impression" is not a statement of undisputed facts.  Goldberg testified that he told Brown that "time was of the essence."  Goldberg and Brown discussed "a whole host of ways that the client wanted to consider going with the Property."  In addition, Brown agreed that Goldberg was going to get "nowhere with Wells Fargo, that it had to be with the special servicer."** *See* **Goldberg Deposition, page 86, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 96.

According to Goldberg:  He and Brown had three or four conversations about the Blue Hills Loan.  Initially, Goldberg asked Brown whether LNR was the special servicer for the Loan.  Brown called back to confirm that it was but the Loan had not yet been transferred.  Brown offered a suggestion of what Blue Hills could say to Wells Fargo to get the Loan transferred LNR.  Goldberg told Brown that, unlike some other properties that had been turned back, his client really intended to keep Blue Hills, that there were "a whole host of ways [his] client wanted to consider going with the property" (although he provided no specifics), and that time was of the essence.  In a subsequent call, Brown informed Goldberg that the Loan was being transferred and that Job Warshaw would be the asset manager.  Goldberg made no notes or other contemporaneous record supporting his account of these conversations.  Goldberg 81-95.

**RESPONSE NO. 96**

Admitted in part.  **Statement No. 96 is only Defendants' summary of Goldberg's deposition testimony.  Blue Hills, Fineberg and Langelier admit only that the deposition testimony speaks for itself and deny Defendants' characterizations.** *See* **Goldberg Deposition, pages 81 through 95, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 97.

Curtis Mallegni, a Wells Fargo asset manager, spoke with Donovan on or about July 15, 2004.  Donovan told him that the tenant was leaving and that the Property was available for lease, but there were no prospects.  Donovan might have asked for a meeting with Wells Fargo to discuss the loan during this