# PART 2 OF RESPONSE OF BLUE HILLS, FINEBERG AND LANGELIER'S TO DEFENDANTS AND PLAINTIFFS'-IN-COUNTERCLAIM'S CORRECTED JOINT LOCAL RULE 56.1 STATEMENT

conversation, but he is not sure that he did.  Donovan 158; Mallegni 86-88; July 15, 2004 Email from C. Mallegni to V. Taylor (Dep. Ex. 22, 136).

**RESPONSE NO. 97**

**Admitted in part.  Statement No. 97 mischaracterizes Donovan's testimony.  Donovan recalled speaking with someone at Wells Fargo in June or July 2004 but could not recall the date.  Donovan could not remember exactly what he said to the Wells Fargo representative and could only answer "I probably did, yes" to the question "did you tell Mr. Mallegni that the Property was available for lease but there were no prospects currently?"  *See* Donovan Deposition, page 156, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 98.

On or around July 31, 2004, Equiserve allowed its lease to expire without renewal, vacated the Property, and moved to Blueview.  SAC ¶ 52; Answer to Counterclaim ¶ 38; Langelier 107.

**RESPONSE NO. 98**

**Admitted in part.  Equiserve's Lease expired on July 31, 2004 and Equiserve did not exercise its option to renew.  The sources cited do not support the characterization of Equiserve "allowing" the Lease to expire.  *See* Langelier Deposition, page 107, attached to the Swisher Affidavit as Exhibit 7.**

J.P. Morgan and CSFB's Statement No. 99.

Blue Hills never signed a lease with a tenant to replace Equiserve, never spent money on tenant improvements for a replacement tenant for Equiserve, never presented Lender with any paid invoices for reimbursement for tenant improvements, never paid any leasing commissions, and never presented any leasing commission invoices to Lender.  Fineberg 113.

**RESPONSE NO. 99**

**Admitted in part.  Statement No. 99 takes Fineberg's testimony out of context.  Blue Hills, Fineberg and Langelier had no opportunity to find a replacement tenant because of Defendants' wrongful default and foreclosure.  *See* Second Amended Complaint.**

J.P. Morgan and CSFB's Statement No. 100.

Blue Hills knew that a quarterly real estate tax payment would be due to the Town of Canton on or before August 2, 2004, but did not set aside any monies from net rents of approximately $150,000 to $170,000 per month during May, June, or July 2004 to pay the taxes.  Donovan 204, 207-09, 215; Dep. Exs. 31, 32.

**RESPONSE NO. 100**

**Admitted in part.  Statement No. 100 deceptively implies that Blue Hills objected to setting aside monies, which was not required, in accordance with the alternative arrangement between Blue Hills and Wells Fargo for the payment of taxes.  *See* Blue Hills Statement I, ¶ 45.**

J.P. Morgan and CSFB's Statement No. 101.

At no time did Blue Hills suggest to Wells Fargo that it should start escrowing for real estate taxes while Equiserve was still paying rent, and Blue Hills did not expect Lender to begin escrowing for tax payments.  Stone 109, 148; Donovan 205-06.

**RESPONSE NO. 101**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that they made no suggestion to Wells Fargo regarding the escrowing for real estate taxes, but they state they had no obligation to do so.  In or about October 1999, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes.** *See* **Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 102.

By letter dated July 16, 2004 (attached to the SAC as Exhibit "F"; Dep. Ex. 4), Wells Fargo advised Blue Hills that the Tax and Insurance Fund  had insufficient funds to pay the first installment of taxes to the Town of Canton for 2004 and requested Blue Hills to deposit with Wells Fargo the sum of $158,181.19 by July 27, 2004.  This quarterly tax shortage notice was typical of notices that the Lender sent to Blue Hills every quarter.  SAC ¶ 48; Donovan 202.

**RESPONSE NO. 102**

**Admit.**

J.P. Morgan and CSFB's Statement No. 103.

In July 2004, when the shortage notice came from Wells Fargo, Stone asked Donovan how the taxes would be paid.  Donovan said that they were not going to pay the taxes at that point because they didn't have the funds.  They wanted to take it out of the escrow funds held by the Lender.  Stone 94-95, 100, 111; Donovan 204, 211-12.

**RESPONSE NO. 103**

**Admitted in part.  Statement No. 103 mischaracterizes the deposition testimony of Stone and Donovan.  Stone testified that he only had a vague memory of having a discussion with Donovan and that he did not recall the content of that discussion other than that "the money was not there and it wasn't going to be paid."** *See* **Stone Deposition, page 94, lines 15-24 through page 95, lines 1-12, attached to the Swisher Affidavit as Exhibit 12.**

J.P. Morgan and CSFB's Statement No. 104.

On July 29, 2004, Brent Lloyd (of Wells Fargo) spoke with Stone and stated that taxes were due.  Stone stated that the tenant had moved out and that there were no available funds to pay taxes.  Stone asked if there was any way Blue Hills could use reserve funds to make the tax payment.  Lloyd called him back later that day, after checking with the reserves department, to say that if he needed to use the reserve money to pay taxes, he would have to provide a lien waiver.  Stone said he did not have a lien waiver.  Lloyd told him that if he could not provide the lien waiver and could not pay the taxes, he would be in default of his loan agreement.  Stone said he would get back in touch with Lloyd but did not.  Lloyd testified to this conversation and memorialized it in contemporaneous notes.  Stone did not recall the conversation, but could not deny it.  Wells Fargo telephone records show two calls from Wells Fargo to

3

Blue Hills/Fineberg Management on July 29, 2004.  Stone 117-119, 124 -125; Dep. Ex. 5; Dep. Ex. 6; Dep. Ex. 8; Dep. Ex. 139 (WF1745); Lloyd 21-25, 33, 40-41, 61-62; Goertzen Aff. Ex. A. [1]

**RESPONSE NO. 104**

**Denied.  Statement No. 104 mischaracterizes the deposition testimony.  Blue Hills, Fineberg and Langelier admit only that Stone did not recall the conversation with Brent Lloyd in July 2004. Further, Wells Fargo never informed Blue Hills that it would be defaulted for failure to pay taxes. *See* Lloyd Deposition, pages 36-37; Stone Deposition, page 118, *see also* Blue Hills Statement I, ¶¶ 45 and 77, attached to the Swisher Affidavit as Exhibits 5 and 8.**

J.P. Morgan and CSFB's Statement No. 104, Footnote 6.

References to lien waivers and other documentation requirements in Lloyd's testimony and Dep. Exs. 5 and 6 make sense in light of Stone's request, i.e., whether there was anyway to use money in the reserves to pay taxes.  Even though the Mortgage does not have a reserve for paying taxes, if Blue Hills had been entitled to a reserve disbursement for some other reason (e.g., for having incurred leasing commission or tenant improvement expenses), funds could have been released on that basis (subject to appropriate documentation) and then applied by Wells Fargo to the Tax Fund rather than returned to Blue Hills.  Stone's response indicated he could not meet the documentation requirements for the potentially available reserve disbursements.

**RESPONSE TO FOOTNOTE 6**

**Denied.  Footnote 6 is unsupported by the referenced cites and is conclusory.  Lloyd testified that he didn't even know what a lien waiver was.  *See* Lloyd Deposition, page 29, lines 15-25, attached to the Swisher Affidavit as Exhibit 8.**

J.P. Morgan and CSFB's Statement No. 105.

Wells Fargo advanced the property tax payment out of its own funds on July 29, 2004.  Mallegni 156; Dep. Ex. 143; Lloyd 50-51.

**RESPONSE NO. 105**

**Admitted in part.  Donovan confirmed with the Town of Canton that the taxes had been paid and assumed that Wells Fargo paid them from reserve funds.  Blue Hills Statement I, ¶71.**

---

[1] **[J.P. Morgan and CSFB original Footnote]**  References to lien waivers and other documentation requirements in Lloyd's testimony and Dep. Exs. 5 and 6 make sense in light of Stone's request, i.e., whether there was anyway to use money in the reserves to pay taxes.  Even though the Mortgage does not have a reserve for paying taxes, if Blue Hills had been entitled to a reserve disbursement for some other reason (e.g., for having incurred leasing commission or tenant improvement expenses), funds could have been released on that basis (subject to appropriate documentation) and then applied by Wells Fargo to the Tax Fund rather than returned to the Blue Hills.  Stone's response indicated he could not meet the documentation requirements for the potentially available reserve disbursements.

J.P. Morgan and CSFB's Statement No. 106.

Prior to August 2, 2004, Blue Hills did not deposit with Wells Fargo any funds for payment of the taxes due on that date and it did not pay the taxes to the Town of Canton directly.  Polcari 32-33; Dep. Ex. 30.

## RESPONSE NO. 106

**Admitted in part.  Statement No. 106 implies that Blue Hills had an obligation to deposit money for the payment of taxes or to pay the taxes directly.  Blue and Wells Fargo had agreed to an alternative arrangement for the payment of taxes.   Moreover, funds had previously been transferred from various reserve accounts to cover tax and insurance shortages.  Blue Hills Statement 1, ¶ 43; Blue Hills Statement II, ¶ 16.**

J.P. Morgan and CSFB's Statement No. 107.

By letter dated and mailed on August 2, 2004 but not delivered to the Lender until on or after August 4, 2004, Blue Hills' Donovan requested a disbursement from the Leasing Escrow Funds to pay the real estate taxes due on August 2, 2004, as well as to pay principal and interest due on the Note for the month of August 2004.  BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, No. 9; SAC ¶ 54; Donovan 225-227, 162-163; Exhibit 23.  The payment of principal and interest was due on August 11.  Mortgage Note ¶ B.  Donovan made no effort to find out from Wells Fargo whether this request had been granted.  Donovan 223.

## RESPONSE NO. 107

**Admitted in part. Statement No. 107 incorrectly states that "Donovan made no effort" to find out if his request had been granted.  Blue Hills, Fineberg and Langelier admit that Donovan requested by letter to Wells Fargo dated August 2, 2004 disbursements for the payment of real estate taxes and for payment of principal and interest due on the Note.  Donovan mailed the letter and subsequently faxed the August 2, 2004 letter to Wells Fargo on August 4, 2004.  Blue Hills, Fineberg and Langelier admit that payment of principal and interest on the Note was due August 11, 2004.  Blue Hills, Fineberg and Langelier deny that Donovan made no effort to find out whether his request for disbursements had been granted.  Donovan testified that he checked with the Town of Canton to confirm that the taxes had indeed been paid.  Further, Wells Fargo never responded to Donovan's requests.  *See* Blue Hills Statement I, ¶ 69 through ¶ 72.**

J.P. Morgan and CSFB's Statement No. 108.

Donovan testified that he believed, based on his understanding of the 1999 Loan negotiations, that reserves could be accessed to pay taxes when Equiserve departed.  Donovan 53-55, 132-33, 135-39, 211-12.  He now knows that is not the case.  Id. 265-266.

## RESPONSE NO. 108

**Admitted in part.  Although Donovan believed that the reserves could be accessed to pay taxes, the statement that "he now knows that is not the case" is a mischaracterization.  Statement No. 108 takes Donovan's deposition testimony out of context.  In answer to the question, "Didn't you tell me that even sitting here today you still don't know whether the loan documents allow payment of real estate taxes," Donovan said "Yes.  And that's what I was just trying to tell you**

then." *See* **Donovan Deposition, page 264, lines 23 and 24 through page 265, lines 1-3, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 109.

Donovan testified he waited until the day the taxes were due to mail the request, which he knew would not arrive until after the taxes were due, because he was busy.  Donovan 243-45.

**RESPONSE NO. 109**

**Denied.  Statement No. 109 deceptively implies that Donovan intentionally made a late request.  In fact, Donovan timely requested disbursements from the reserve accounts.  Statement No. 109 mischaracterizes Donovan's testimony.  Donovan testified that, "[w]hen [Wells Fargo] request tax payments … it says right on the document that they will charge us a $500 payment if we are late paying."  *See* Donovan Deposition, page 245, lines 17-22, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 110.

This was the first request by Blue Hills to Wells Fargo for access to the Loan reserves for any purpose.  Donovan 163.

**RESPONSE NO. 110**

**Admitted in part.  Statement No. 110 is vague with respect to "this."  To the extent that "this" refers to the August 2, 2004 letter from Donovan, Blue Hills, Fineberg and Langelier admit that Blue Hills' first written request for access to the Loan reserves was by letter dated August 2, 2004 to Wells Fargo.**

J.P. Morgan and CSFB's Statement No. 111.

At some time in mid-August 2004, Blue Hills collected approximately $51,800.00, one month's worth of property taxes, from Equiserve and deposited the funds in the Lockbox.  The money was swept to Wells Fargo and applied to reduce the deficit in the Blue Hills tax escrow account, which was negative in the amount of the August payment (approximately $158,000.)  Donovan Sept. 2 Letter (Dep. Ex. 26); Tax Record for Single Loan (Dep. Ex. 138).

**RESPONSE NO. 111**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that Blue Hills collected portion of the quarterly taxes due from Equiserve and that those funds were deposited in the Lockbox.  Blue Hills, Fineberg and Langelier lack sufficient personal knowledge to either admit or deny how Wells Fargo applied the funds.**

J.P. Morgan and CSFB's Statement No. 112.

At some time in August, Donovan had someone at Fineberg Management confirm with the Town of Canton that the taxes had been paid.  This information from the Town, and nothing else, led Donovan to believe the requests in his August 2 letter has been granted.  Donovan did not ask the town <u>when</u> the taxes had been paid, nor did he contact Wells Fargo or LNR to confirm the source of the monies used to pay the taxes.  Donovan 229, 239, 240.

**RESPONSE NO. 112**

**Denied.  Statement No. 112 mischaracterizes Donovan's testimony.  After sending the August 2, 2004 letter to Wells Fargo, Donovan contacted the Town of Canton Treasurer's Office, which verified to Donovan that the taxes had been paid.  Consequently, Donovan assumed that the tax payment was made from the reserve accounts.** *See* **Blue Hills Statement I ¶ 71; Blue Hills Statement II, ¶¶ 12 and 16.**

J.P. Morgan and CSFB's Statement No. 113.

Donovan sent his August 2, 2004, letter requesting application of loan reserves to principal, interest, and real estate taxes to Tim Parrish of the Wells Fargo tax group, whose name was on the July 16 tax letter, not to Mallegni.  Dep. Ex. 23; Donovan 161.

**RESPONSE NO. 113**

**Admit.**

J.P. Morgan and CSFB's Statement No. 114.

The August 2, 2004 letter did not request payment of reserve fund payments due on August 11, 2004.  Donovan did not think there was any need to make those payments.  Dep. Ex. 23; Donovan 230-31; Stone 146-47 ("I hadn't thought about it.")

**RESPONSE NO. 114**

**Admitted in part.  Statement No. 114 takes Donovan's testimony out of context.  Blue Hills, Fineberg and Langelier admit that by the August 2, 2004 letter, Donovan did not request a disbursement for the payment of the reserve funds.  Donovan stated "At that point I was looking to draw down the reserve.  I didn't think there was any need to put more money into the reserve." Donovan Deposition, page 230, lines 14 - 22, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 115.

Donovan deposited the letter dated August 2 in the U.S. Mail on August 2, 2004 and faxed it to Wells Fargo on August 4, 2004.  Blue Hills, Fineberg and Langelier Answers to Defs' Second Interrogatories, No. 2 (Barnett Aff. Ex. J).  The Wells Fargo Loancator correspondence tracking system notes that it was received by Wells Fargo on August 4, 2004.  Dep. Ex. 134; Martin 62-69.

**RESPONSE NO. 115**

**Admit.**

J.P. Morgan and CSFB's Statement No. 116.

On August 5, 2004, Donovan sent another letter to Wells Fargo – again to Parish – officially notifying the Lender that Equiserve had vacated and that no replacement tenant had been found.  In that letter, Donovan requested a meeting with the Lender and asked that the special servicer be involved.  Donovan 163-64; Dep. Ex. 24.

**RESPONSE NO. 116**

**Admitted to the extent that Donovan's August 5, 2004 letter speaks for itself.**

J.P. Morgan and CSFB's Statement No. 117.

Thereafter, Mallegni and Donovan traded phone messages.  Mallegni was seeking to confirm whether Blue Hills would be making the loan payments due on August 11 (Dep. Ex. 145).  Donovan finally sent him the August 2 and August 5 letters by fax on August 13, noting in his cover sheet: "Sorry we have been missing each other on the phone.  I would like to get the special servicer involved.  Attached are the recent correspondence."  Dep. Ex. 27; Donovan 170; Mallegni 56-57.

**RESPONSE NO. 117**

**Admitted in part.  Statement No. 117 mischaracterizes Donovan's testimony.  Blue Hills, Fineberg and Langelier admit that Mallegni and Donovan traded phone messages and that Donovan sent Wells Fargo letters dated August 2, 2004, August 5, 2004 and a fax dated August 13, 2004, which enclosed the prior letters.  *See* Blue Hills Statement I, ¶¶ 73 - 76.  Mallegni testified that he had been on vacation and had not yet seen Donovan's correspondence.  Mallegni made no notes of any conversations with Donovan.  *See* Mallegni Deposition, pages 56 and 57, attached to the Swisher Affidavit as Exhibit 9.**

J.P. Morgan and CSFB's Statement No. 118.

Wells Fargo telephone records show three calls from Mallegni's extension (415-396-6994) to Blue Hills/Fineberg Management  (781-239-1480) on August 11 and 13, 2004.  Goertzen Aff. ¶ 3 and Ex. A; Mallegni Aff. ¶ 6; Barnett Aff. ¶ 2.

**RESPONSE NO. 118**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that Exhibit A to the Goertzen Affidavit appears to show three calls to Blue Hills on August 11 and August 13, 2004, ranging from 78 seconds to 144 seconds.  The records do not confirm that any conversations actually occurred.  *See* Goertzen Affidavit, Exhibit A; Deposition Exhibit 27, attached to the McGlynn Affidavit as Exhibit 32.**

J.P. Morgan and CSFB's Statement No. 119.

In the meantime, the August 11 payment date passed and Blue Hills did not make the principal, interest, or reserve fund payments due on August 11, 2004. Polcari I 32-33; Dep. Ex. 30; BHOP, Langelier and Fineberg Responses to Defs.' First Requests for Admissions, Nos. 10 & 11.

**RESPONSE NO. 119**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that Blue Hills did not make any payments of principal, interest or reserve funds on or before August 11, 2004.  Blue Hills, Fineberg and Langelier deny that such payments were due as Wells Fargo had not yet responded to their timely request for disbursements from the reserve funds.  *See* Blue Hills Statement I, ¶¶ 72-76.**

J.P. Morgan and CSFB's Statement No. 120.

Mallegni and Donovan spoke on or after August 11, 2004. The gist of Mallegni's conversations with Donovan was that Donovan wanted to get the loan transferred to the special servicer, which Donovan knew was the entity with power to address issues with the loan. Mallegni 72-73.

**RESPONSE NO. 120**

**Denied. When asked during his deposition if Mallegni had a conversation with Donovan, Mallegni responded "yes." When asked if that conversation occurred prior to August 13, 2004, Mallegni also responded "yes." However, Mallegni cannot remember whether or not he actually spoke to Donovan in the month of August, and when asked if he had any recollection of that conversation, Mallegni answered "not specifically." Further, when asked, "Prior to August 13, did you . . . have any discussion concerning either Mr. Donovan's August 5 or Mr. Donovan's August 2, 2004 letters, Mallegni answered with an unqualified "no." *See* Mallegni Deposition, page 57; pages 72, lines 13-25 through pages 73, lines 1-7, attached to the Swisher Affidavit as Exhibit 9.**

J.P. Morgan and CSFB's Statement No. 121.

On Monday, August 16 – the next business day after receiving the August 13 fax – Mallegni drafted a memorandum to transfer the loan to special servicing. Mallegni Dep. 45-47; Transfer Memorandum (Dep. Ex. 57).

**RESPONSE NO. 121**

**Admitted in part. Statement No. 121 mischaracterizes Mallegni's communications regarding transfer of servicing. Deposition Exhibit 57 is an e-mail from Mallegni to Kathryn A. O'Neal stating that "it is recommended that the above-referenced loan be transferred . . . ." The e-mail is dated Monday, August 16, 2004. *See* Deposition Exhibit 57, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 122.

At no time between August 2 and September 17 did Donovan seek confirmation from anyone at Wells Fargo or LNR that they were going to grant the requests for access to reserves. Donovan 163, 223. Nor did anyone at Wells Fargo or LNR inform him that his requests had been granted. Donovan 200-01.

**RESPONSE NO. 122**

**Denied. After receiving no response from Wells Fargo to his letter dated August 2, 2004, Donovan followed up with a letter to Wells Fargo dated August 5, 2004. After receiving no response to the August 2 and 5 letters, Donovan then sent both those letters by fax to Mallegni on August 13, 2004. Donovan also confirmed with the Town of Canton that the taxes had indeed been paid by Wells Fargo. By letters dated August 19, 2004 and faxed August 24, 2004 LNR notified Blue Hills that loan servicing had been transferred, that LNR looked forward to "successful working relationship" and that LNR had "agreed to discuss the status of the [the Loan] . . ." *See* Blue Hills Statement I, ¶¶ 70 through 80.**

J.P. Morgan and CSFB's Statement No. 123.

Donovan said he had no basis to believe Wells Fargo had acted favorably on the August 2 request for access to reserves other than the fact that the Town of Canton told him the taxes had been paid. Donovan 228-229, 240.

## RESPONSE NO. 123

**Denied. Statement No. 123 mischaracterizes Donovan's testimony. Donovan testified that he confirmed with the Town of Canton that the taxes had been paid. He did not say that "he had no basis to believe Wells Fargo had acted favorably . . . ." *See* Donovan Deposition, pages 228-229; 240, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 124.

Pursuant to the Lease Termination Agreement, approximately 1,000 Haworth Unigroup workstations (the "Workstations") became the property of Blue Hills upon Equiserve's departure. In or around August 2004, without notifying Lender and without obtaining Lender's prior written consent, Blue Hills sold the Workstations for $100,000 to D. Erwin & Associates LLC. Needle 91-95, 183-84; Dep. Ex. 305 at Blue Hills 5098.

## RESPONSE NO. 124

**Admitted in part. Statement No. 124 contains conclusory statements to which no response is required. Blue Hills, Fineberg and Langelier admit that workstations were left at the Property by Equiserve and that Blue Hills sold them in August 2004. Blue Hills denies that it had any obligation to obtain J.P. Morgan's consent. *See* Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1; Donovan Affidavit, ¶8; Blue Hills, Fineberg and Langelier's Memorandum in Opposition to Defendants' Motion for Summary Judgment Seeking Dismissal of the Second Amended Complaint.**

J.P. Morgan and CSFB's Statement No. 125.

The Workstations were Mortgaged Property under the Mortgage, Mortgage Granting Clause Two, and Blue Hills' sale of them was a transfer of Mortgaged Property in violation of Section 10 of the Mortgage.

## RESPONSE NO. 125

**Denied. Statement No. 125 contains only legal conclusions to which no response is required. Defendants improperly take the definition of "Mortgage Property" out of the context of Section 10 of the Mortgage Agreement. *See* Donovan Affidavit, ¶8; Mortgage Agreement, Section 10, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1; *See also*, Blue Hills, Fineberg and Langelier's Memorandum in Opposition to Defendants' Motion for Summary Judgment Seeking Dismissal of the Second Amended Complaint.**

J.P. Morgan and CSFB's Statement No. 126.

On or around August 18, 2004, certain servicing responsibilities for the Loan were transferred from Wells Fargo to LNR as the special servicer. SAC ¶ 64. A special servicer assumes certain servicing responsibilities for a loan when the loan is in trouble or in default. Donovan 59-60; Fineberg 21-22.

**RESPONSE NO. 126**

**Admitted in part. Statement No. 126 contains conclusory statements regarding the special servicer that are not contained in the cited deposition testimony. Further, Fineberg testified "Yes," when asked if a special servicer's task was to "work it out" with the borrower. *See* Fineberg Deposition, page 22, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 127.

At LNR, the loan was assigned to asset manager Job Warshaw, who sent the borrower two letters dated August 19, 2004. These letters were sent to Blue Hills by fax on August 24, 2004. Warshaw 34-35.

**RESPONSE NO. 127**

**Admit.**

J.P. Morgan and CSFB's Statement No. 128.

The shorter of the letters was a form letter that introduced Blue Hills to LNR and notified Blue Hills that certain servicing responsibilities for the loan had been transferred to LNR. The letter closed stating: "Thank you for your cooperation and we look forward to a successful working relationship." SAC ¶ 65; Dep. Ex. 28; Warshaw 27-28.

**RESPONSE NO. 128**

**Admit.**

J.P. Morgan and CSFB's Statement No. 129.

The longer of the two letters, a so-called "Prenegotiation Letter," was also a form letter which set forth the terms and conditions that would govern any discussions between LNR and Blue Hills regarding the Loan. Blue Hills was required to execute the Prenegotiation Letter as a prerequisite to substantive discussions about the Loan. SAC ¶ 66; Dep. Ex. 60; Polcari 64; Warshaw 28-35.

**RESPONSE NO. 129**

**Admitted in part. Blue Hills, Fineberg and Langelier admit that they received the August 19, 2004 letter (faxed to Blue Hills on August 24, 2004), which Fineberg executed and faxed back to LNR on August 26, 2004. *See* Blue Hills Statement I, ¶¶ 80 through 82. Blue Hills, Fineberg and Langelier deny the description of the letter as "Prenegotiation Letter" or "form letter."**

J.P. Morgan and CSFB's Statement No. 130.

Warshaw called Blue Hills on August 24, 2004, and left a message for Donovan introducing himself, stating that he was faxing the August 19 letters and that the Prenegotiation Letter had to be signed prior to any discussions, and asking that someone call him. Donovan 165; Warshaw 26-27, 42, 82; Voicemail transcription (Dep. Ex. 25); LNR Asset Manager Call Log (Dep. Ex. 128).

**RESPONSE NO. 130**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that Warshaw left a message for Donovan and that notes of that message were made.  Statement No. 130 does not reflect the voice-mail message in its entirety.  *See* Deposition Exhibit 25, attached to the Swisher Affidavit as Exhibit 15.**

J.P. Morgan and CSFB's Statement No. 131.

This call was returned on August 25 not by Donovan, but by Kenneth Goldberg, counsel to Blue Hills, Royall Associates, and Fineberg.  Warshaw 82-83; Goldberg 103-08, 119-20.

**RESPONSE NO. 131**

**Admitted in part.  Goldberg testified that he had a conversation with Warshaw on or about August 25, 2004.  However, he did not testify that he was returning a telephone message left by Donovan.  *See* Goldberg Deposition, page 119 through 120, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 132.

Donovan himself never contacted Warshaw to ask for a meeting or to follow up on the request in his August 5 letter to Wells Fargo.  Warshaw 82; Donovan 166, 223.

**RESPONSE NO. 132**

**Denied.  Statement No. 132 takes Donovan's deposition testimony out of context.  In response to the question "As you search your memory, I take it that you have no memory of actually talking live with Job Warshaw, correct?"  Donovan responded "I can't remember talking to him.  That doesn't mean I didn't."  *See* Donovan Deposition, page 166, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 133.

Warshaw recalls two calls with Goldberg.  According to Warshaw, the first call occurred on August 25, 2004.  Mr. Goldberg introduced himself as someone who had worked with Fineberg for 30 years doing capital structuring and who was a lawyer, but not calling in the capacity as an attorney for Blue Hills.  Goldberg and Warshaw discussed the Prenegotiation letter, which Goldberg had received, but it had not yet been executed. Goldberg indicated he would be seeing Mr. Fineberg the next day, when they would sign the letter and get back to Warshaw.  There were no substantive discussions of the loan during the first call because the Prenegotiation Letter had not been signed. Asset Manager Call Log (Dep. Ex. 128); Warshaw 60-63, 84-86.

**RESPONSE NO. 133**

**Denied.  Goldberg's testimony contradicts Statement No. 133.  Goldberg denies introducing himself as someone who is a lawyer, but not calling in his capacity as an attorney.  Further, Goldberg recalls 2-3 calls with Warshaw.  Goldberg admits that he spoke with Warshaw on or about August 25, 2004 regarding the August 19, 2004 letter to be signed by Fineberg.  *See* Goldberg Deposition, page 101, 104-106, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 134.

According to Warshaw, the second call occurred on September 7, 2004. Goldberg provided a short overview of what had happened at the Property, including that Equiserve, the sole tenant, had left and that Blue Hills had retained a leasing agent to try and release the space. Goldberg also requested access to the reserves to pay debt service. Warshaw told him that, based on an introductory review of the file, Blue Hills was in default and he did not think it would be eligible to draw on the reserves so long as the Loan was in default. There was discussion about why the Loan was in default, and Warshaw identified the failure to pay real estate taxes as one basis. Goldberg disagreed, stating that Blue Hills was not in default and instructing Warshaw to review the Loan Documents. The call then ended abruptly. Warshaw 56-61.

## RESPONSE NO. 134

**Denied. Goldberg's testimony contradicts Statement No. 134. Goldberg denies that Warshaw informed him that Blue Hills was in default or that any call ended abruptly. In response to the question, "Do you recall in your final conversation with Mr. Warshaw that he told you that based on his review of the file there were defaults under the Loan and that the borrower would not be eligible to draw on t he reserves . . .?", Goldberg responded, "No that, didn't happen." Further, Goldberg testified that his last conversation with Warshaw ended with Warshaw needing to review the loan documents so that the next communication could be more productive. *See* Goldberg Deposition, page 126, lines 9-24 through page 127, lines 1-11; page 123, lines 16-22, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 135.

According to Warshaw, Goldberg did not request, and there was no discussion of, a meeting with LNR in either of their phone calls. Warshaw 76, 84-86.

## RESPONSE NO. 135

**Denied. Goldberg's testimony contradicts Statement No. 135. Goldberg testified that he and Warshaw did discuss a meeting. Goldberg Deposition, page 126, lines 11-34 to page 127, lines 1-5, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 136.

Warshaw made contemporaneous notes of some of the things said during this conversation and also described the call to Polcari on or about September 7. Exhibit 128. Polcari made contemporaneous notes of his conversation with Warshaw, including noting that Warshaw told Goldberg "you're in default" and that "Borrower says he's not in default." Dep. Ex. 84 at LNR3919-3921; Polcari II 33-35, 50-52.

## RESPONSE NO. 136

**Denied. Goldberg's testimony contradicts Statement No. 136. Goldberg denies that Warshaw informed him that Blue Hills was in default. *See* Goldberg Deposition, page 123, lines 16-22, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 137.

Goldberg recalls two or three substantive calls with Warshaw, the first in the middle of August before he had received the Prenegotiation Letter. According to Goldberg, Warshaw stated that he had spoken to Chris Brown about Goldberg's conversations with Brown. Goldberg explained his client's perception of the Property and the market (which he thought was starting to come back), expressed his belief that there was an opportunity to get the matter resolved, and stated that his client was committed to pursuing a number of alternative courses to recapitalize Blue Hills and intended to keep the property. He asked Warshaw to confirm that there was a lot of money in reserve and said that the reserves, together with a well heeled and committed borrower, provided an opportunity to get the building re-tenanted and "back on line." The conversation ended with Warshaw stating that he was going to review the file and would get back to Goldberg. Goldberg 96-98.

**RESPONSE NO. 137**

**Admitted in part. Statement No. 137 contains numerous statements purporting to summarize Goldberg's testimony. Blue Hills, Fineberg and Langelier deny that Statement No. 137 contains direct quotes or is a complete description of Goldberg's testimony regarding his communications with Warshaw. *See* Goldberg Deposition, pages 96-98, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 138.

According to Goldberg, in either a first or second call, Goldberg identified the alternatives by which his clients could bring new money to the Property, including by mezzanine financing, additional capital from the existing partners, new capital from new partners, or seeking tenant participation and ownership. In one of the calls, he stated his belief that it would require $5 or $10 million to turn around the Property. Goldberg 98-99.

**RESPONSE NO. 138**

**Admitted in part. Statement No. 138 contains numerous statements purporting to summarize Goldberg's testimony. Blue Hills, Fineberg and Langelier deny that Statement No. 138 contains direct quotes or is a complete description of Goldberg's testimony regarding his communications with Warshaw. *See* Goldberg Deposition, pages 96-98, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 139.

According to Goldberg, the second call came at the end of August and was prompted by the Prenegotiation Letter, which was of a type he had seen before. During the second call, Goldberg invited Warshaw (who was based in Miami) to visit the Property and assess the market at the Borrower's expense. Warshaw responded that he didn't think it was possible for him to get to Boston before Labor Day. Goldberg said he would get the Prenegotiation Letter signed during a meeting with Fineberg the next day and get back to Warshaw. Goldberg 106-107.

**RESPONSE NO. 139**

**Admitted in part. Statement No. 139 contains numerous statements purporting to summarize Goldberg's testimony. Blue Hills, Fineberg and Langelier deny that Statement No. 139**

**contains direct quotes or is a complete description of Goldberg's testimony regarding his communications with Warshaw.** *See* **Goldberg Deposition, pages 96-98, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 140.

According to Goldberg, his final conversation with Warshaw occurred either just before or just after Labor Day. Warshaw did not tell him that it appeared the Borrower was in default. Rather, Warshaw had not sufficiently examined the Loan Documents to provide a substantive response to Goldberg's request for access to the reserves. Goldberg's last conversation with Warshaw concluded with them waiting to arrange a meeting either in Boston, if Warshaw could visit, or in Miami. Goldberg 123-127.

**RESPONSE NO. 140**

**Admitted in part. Statement No. 140 contains numerous statements purporting to summarize Goldberg's testimony. Blue Hills, Fineberg and Langelier deny that Statement No. 140 contains direct quotes or that is a complete and accurate description of Goldberg's testimony regarding his communications with Warshaw.** *See* **Goldberg Deposition, pages 123-127, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 141.

Goldberg acknowledges that he did not tell Warshaw that the Blue Hills or Royall Associates had $5 to $6 million set aside, outside of the reserves held by the Lender, to invest in the Property. Goldberg said that his client was well heeled, and assumed that Warshaw had spoken to Brown about Fineberg's resources and that Brown had told Warshaw that Fineberg had made offers to LNR to acquire other mortgaged properties in proposals that did not contain financing contingencies. Goldberg 109-116.

**RESPONSE NO. 141**

**Admitted in part. Statement No. 141 contains conclusory statements that do not accurately represent Goldberg's testimony. Goldberg did not testify that Fineberg had made offers to LNR to "acquire other mortgaged properties in proposals that did not contain financing contingencies."** *See* **Goldberg Deposition, page 113, lines 19-24 through page 114, lines 1-16, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 142.

Goldberg has no contemporaneous notes or other record supporting his account of these conversations. Goldberg 169-70.

**RESPONSE NO. 142**

**Admitted in part. Statement No. 142 is vague and does not define "these conversations." In the referenced citation, Goldberg testified that he did not have any written memorializations of conversations with Warshaw.** *See* **Goldberg Deposition, page 169, lines 22-24 through page 170, lines 1, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 143.

Goldberg never followed up with Warshaw about the meeting he says they discussed. Goldberg 128. Between his last conversation with Warshaw (around Labor Day) and November 10 (two days before the scheduled date of the foreclosure), his only subsequent contact with anyone connected to LNR was a call from an appraiser or environmental consultant looking for a survey. Goldberg 130.

**RESPONSE NO. 143**

**Denied. Warshaw was replaced by Polcari on or about September 7, 2004 and Polcari never followed up with Goldberg. *See* Polcari Deposition, Vol. 1, page 36, attached to the Swisher Affidavit as Exhibit 11.**

J.P. Morgan and CSFB's Statement No. 144

Blue Hills executed the Prenegotiation Letter and returned it to the Lender on August 26, 2004. Warshaw 36-37; Fineberg 149; Executed Prenegotiation Letter (Dep. Ex. 62). By executing the Prenegotiation Letter, Blue Hills agreed that its terms and conditions would govern any discussions or negotiations. Dep. Ex. 62, page 1.

**RESPONSE NO. 144**

**Admitted in part. Statement No. 144 contains conclusory statements to which no response is required. Blue Hills, Fineberg and Langelier admit that Fineberg executed the letter from LNR dated August 19, 2004 (faxed to Blue Hills on August 24, 2004) and faxed the executed letter to LNR on August 26, 2004. Blue Hills, Fineberg and Langelier admit that Deposition Exhibit 62 speaks for itself and denies Defendants' mischaracterizations. *See* Blue Hills Statement I ¶¶ 78-82.**

J.P. Morgan and CSFB's Statement No. 145.

The Prenegotiation Letter states that Lender was not under any obligation to consent or otherwise agree to any Borrower request with respect to the Loan, or to modify the Loan or the Loan Documents. Dep. Ex. 62, ¶ 1.

**RESPONSE NO. 145**

**Admitted in part. Statement No. 145 contains conclusory statements to which no response is required. Moreover, it mischaracterizes language contained in Deposition Exhibit 62 which speaks for itself. *See* Deposition Exhibit 62, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 146.

The Prenegotiation Letter states that neither the Borrower nor the Lender "is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents. Dep. Ex. 62, ¶ 4.

**RESPONSE NO. 146**

**Admitted in part. Statement No. 146 contains conclusory statements to which no response is required. Moreover, it mischaracterizes language contained in Deposition Exhibit 62, which speaks for itself. *See* Deposition Exhibit 62, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 147.

By executing the Prenegotiation Letter, Blue Hills released the Lender from any all claims and demands, in law or in equity, known or unknown, direct or indirect, fixed or contingent, caused by or arising out of any discussions, negotiations, correspondence or other communications relating to the Loan and the Loan Documents between the Borrower and Wells Fargo or LNR.  Dep. Ex. 62, ¶ 2.

**RESPONSE NO. 147**

**Denied.  Statement No. 147 contains legal conclusions to which no response is required.  Moreover, it mischaracterizations language contained in Deposition Exhibit 62, which speaks for itself.  *See* Deposition Exhibit 62, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 148.

By executing the Prenegotiation Letter and "to enable [LNR] to properly evaluate the Borrower's request," Blue Hills agreed to provide to LNR all of the information designated on Exhibit A to the Letter. Dep. Ex. 62, ¶ 9.   The designated information included: a) a financial statement prepared within 30 days of August 19, 2004 for the Borrower, its member, and any guarantors, including balance sheets and income statements; b) Federal tax returns for the last two years for the Borrower and the Guarantors; and c) a current business plan for the Property.  Ex. A. to Dep. Ex. 62.

**RESPONSE NO. 148**

**Denied.  Statement No. 148 contains conclusory statements to which no response is required.  Further, LNR  had almost all of the requested documents yet failed to schedule a meeting with Blue Hills after receiving the executed letter on August 26, 2004.  LNR defaulted Blue Hills on September 17, 2004 before any meeting could be scheduled or any additional documents could be provided.  *See* Blue Hills Statement I, ¶ 81-82, ¶ 84-85; Deposition Exhibit 62, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 149.

Blue Hills did not send to LNR a current business plan, updated financial statements, or any of the other documents and information set out in Exhibit "A" to the Prenegotiation Letter.  Blue Hills never came up with a business plan specifying the upgrades to the Property that would be required or how much they would cost.  Donovan Depo 140-141, 176-177, 179-82; Fineberg 172-78.

**RESPONSE NO. 149**

**Denied.  *See* Response No. 148, incorporated herein.**

J.P. Morgan and CSFB's Statement No. 150.

On September 2, 2004, Donovan wrote to Wells Fargo, copying Warshaw, requesting a disbursement of escrow funds to pay principal and interest on the Note for the month of September 2004. Donovan September 2 Letter (Dep. Ex. 26).

**RESPONSE NO. 150**

      **Admitted to the extent that the September 2, 2004 letter speaks for itself.**

J.P. Morgan and CSFB's Statement No. 151.

      On or around September 7, 2004, Joe Polcari became the LNR asset manager responsible for the Property. Polcari I 40. At the time he became asset manager for the Loan, Polcari spoke with Warshaw (as described in paragraph 136, above) and Brown. Polcari II 17.

**RESPONSE NO. 151**

      **Admitted to the extent that Polcari replaced Warshaw. Blue Hills, Fineberg and Langelier deny the communications referenced in J.P. Morgan and CSFB's Statement No. 136. *See* Response No. 136, incorporated herein.**

J.P. Morgan and CSFB's Statement No. 152.

      Goldberg never spoke to Polcari about Blue Hills until a mediation in this matter held in January 2006. Polcari Aff. ¶ 6; Goldberg 121-22, 129.

**RESPONSE NO. 152**

      **Denied. The Goldberg's testimony directly contradicts Statement No. 152. Goldberg testifies that he believed he had a brief telephone conversation with Polcari. *See* Goldberg Deposition, page 121, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 153.

      Based on his fourteen years of experience with loan workouts, Polcari did not believe Blue Hills was interested in restructuring or reworking the Loan, because Blue Hills never proposed a restructuring and because Mr. Fineberg had just given back the Lancaster, Pennsylvania and Sturbridge, Massachusetts properties to LNR. Between September 7, 2004 and September 17, 2004, Blue Hills did not attempt to reach Polcari. Polcari I 236-38; Polcari II 119-24.

**RESPONSE NO. 153**

      **Denied. Statement No. 153 is simply a summary of Polcari's opinions and not a statement of undisputed fact. Further, Statement No. 153 is misleading because it fails to state that Polcari replaced Warshaw as the asset manager on or about September 7, 2004. Warshaw had sent two letters to Blue Hills on August 24, 2004 and had a conversation with Goldberg on or about September 7, 2004. At the end of Warshaw's discussions with Goldberg, Warshaw stated that he would review the loan documents and get back to Goldberg to schedule a meeting. When Polcari took over, he did not attempt to follow up with Goldberg or any other representative of Blue Hills. *See* Blue Hills Statement I, ¶¶ 81-84; *see also* Response No. 134.**

J.P. Morgan and CSFB's Statement No. 154.

      Polcari called Donovan on or about September 16, 2004, as a courtesy to tell Donovan that he was sending Donovan a default letter. Polcari described Donovan as acquiescent. Donovan responded that he understood that LNR had to send the default letter, that they had no tenant prospects and no hope

for finding one, and that the use of the reserves for debt service would not have a made a difference. Donovan did not request a meeting or indicate that he had previously asked for a meeting that went unanswered. Donovan had no workout proposal to offer. Polcari testified to this conversation and memorialized it in contemporaneous notes. Donovan testified that he did not recall this conversation and did not know whether it took place. Polcari I 39, 45, 67-68, 70, 72; Polcari II 26-27, 38-39, 230-231; Polcari Handwritten Notes (Dep. Ex. 84 at LNR03927); Frank 120-121; Donovan 187-88, 199.

**RESPONSE NO. 154**

**Denied. Statement No. 154 contains a series of assertions about Polcari's alleged communications with Donovan. It also contains the statement that Donovan had no recollection of having any such conversation. As Statement No. 154 contains these contradictory statements, no further response is required. Donovan further stated, "As far as I know, the conversation did not take place."** *See* **Donovan Deposition, pages 188 and 189, lines 1 through 6, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 155.

Polcari sent Donovan a default letter dated September 17, 2004. The letter informed Blue Hills that Blue Hills' requests for disbursements from the escrow funds were denied due to Blue Hills' defaults under the Mortgage and Note as of August 2, August 11, September 2, and September 11, 2004. LNR further informed Blue Hills that the Note had been accelerated and was immediately due and payable. SAC ¶ 73-74; SAC Exhibit L; September 17 notice of defaults (Dep. Ex. 30).

**RESPONSE NO. 155**

**Admitted in part. Blue Hills, Fineberg and Langelier admit that Polcari sent Donovan a default letter dated September 17, 2004, but deny that Statement No. 155 accurately reflects the contents of the letter.** *See* **Deposition Exhibit 52, attached to the McGlynn Affidavit as Exhibit 34.**

J.P. Morgan and CSFB's Statement No. 156.

On or about October 18, 2004, Frank called Polcari and asked for a meeting between Blue Hills and LNR. According to Polcari, and Fineberg's report of what Frank told him about the conversation, Polcari told Frank he would call Frank back with a response. Polcari called him back within a couple of days and left a voicemail saying that any meeting would have to include a discussion of bringing the Loan current to be productive. According to Polcari, Frank never responded to the voicemail. Polcari II 73-74; Fineberg 186.

**RESPONSE NO. 156**

**Denied. Statement No. 156 mischaracterizes the deposition testimony of Frank, Polcari and Fineberg. Blue Hills, Fineberg and Langelier admit only that Frank called Polcari and requested a meeting and that Polcari indicated that the Loan had to be brought current. Statement No. 156 is misleading in that it fails to acknowledge subsequent communications between LNR and Blue Hills. By letter dated October 19, 2004, LNR initiated foreclosure proceedings, one day after Frank had a discussion with Polcari. Thereafter, Goldberg and counsel for LNR exchanged several written communications before the foreclosure sale.** *See* **Blue Hills Statement I, ¶¶ 87-89;** *see also* **Statement No. 157, acknowledging disputed issues of fact on this testimony.**

J.P. Morgan and CSFB's Statement No. 157.

According to Frank: Polcari said that he would have to talk his superiors.  Polcari agreed to get back to Frank about the meeting, but never did.  When Frank placed a telephone call five or six days later to follow up on his request for a meeting, Polcari told him there would not be a meeting.  Frank 104-107.  Frank also had a memory of another conversation with Polcari in which Polcari declined to have a meeting, but he could not place it in time.  Frank 108-11.

**RESPONSE NO. 157**

**Admitted in part.  Statement No. 157 is an incomplete summary of Frank's deposition testimony.  *See* Frank Deposition, pages 108-111, attached to the Swisher Affidavit as Exhibit 5.**

J.P. Morgan and CSFB's Statement No. 158.

By letter dated October 21, 2004, pursuant to Mass. Gen. Laws c.244, s. 14 and 17B, Lender notified Fineberg and Langelier of its intention to foreclose on the Property and of Fineberg's and Langelier's potential liability to Lender under the Guaranty in case of a deficiency in the proceeds of the foreclosure sale.  SAC ¶ 83; SAC Exhibit M.

**RESPONSE NO. 158**

**Admitted in part.  Statement No. 158 contains legal conclusions to which no response is required.  Further, the terms of the October 21, 2004 letter speak for themselves.  *See* Deposition Exhibit 40, attached to the McGlynn Affidavit as Exhibit 33.**

J.P. Morgan and CSFB's Statement No. 159.

On October 28, 2004, LNR received an independent MAI appraisal from Bonz & Company valuing the Blue Hills Office Park at $15 million as of October 18, 2004.  Dep. Ex. 341 Addendum.

**RESPONSE NO. 159**

**Admitted in part.  The October 28, 2004 appraisal speaks for itself. Gartrell disputes the values contained in the appraisal.  *See* portions of The Expert Report of Dr. Kenneth Gartrell, Deposition Exhibit 354, attached to the Swisher Affidavit as Exhibit 22.**

J.P. Morgan and CSFB's Statement No. 160.

Sometime between September 21 and October 18, 2004, during the field work phase of the study, the appraiser, Eric Stotz, spoke with Donovan to arrange a visit to the Property and learn about its status and with Needle during the resulting visit.  While discussing the current condition and situation of the Property with Stotz, Donovan used the phrases "bleeding money" and "give the keys back" to LNR.  Donovan said in substance that Blue Hills was walking away from its investment in the property due to the lack of tenant prospects and high holding costs associated with owning a vacant investment property.  Stotz Expert Rebuttal Report (Exhibit B to Stotz Affidavit) at 4-5.

**RESPONSE NO. 160**

**Denied.  Donovan denies making any such statements.  *See*, Donovan Affidavit, ¶7.  Donovan testified to the contrary that he was "upset" at the receipt of the default notice because he**

**wanted to "work out a deal" and because he felt the property was a "great asset, we didn't want to lose it." Moreover, Eric Stotz ("Stotz") admits that he never made mention of any alleged comments in his notes, letters, telephone calls or other communications, including his initial expert report. It is only in Stotz's rebuttal report that he makes such an assertion for the first time. *See* Deposition of Eric Stotz ("Stotz Deposition"), page 31, lines 10-22 and page 36, line 3 through page 37, line 1; Donovan Deposition, page 199, line 21 through page 200, line 5, attached to the Swisher Affidavit as Exhibits 3 and 13.**

J.P. Morgan and CSFB's Statement No. 161.

When Stotz visited the Property, Needle informed him that Blue Hills had been unsuccessful in finding a tenant and was, in fact, "giving the keys back" to LNR because the carrying costs of the property were high and its expectations of finding a tenant were so low. Stotz Expert Rebuttal Report at 5.

**RESPONSE NO. 161**

**Denied. Needle had no such discussions with Stotz. In fact, Stotz admits that he never made mention of any such comment by Needle in his notes, letters, telephone calls or other communications, including his initial expert report. It is only in his rebuttal report that Stotz makes such an assertion for the first time. *See* Stotz Deposition, page 31, lines 10-22 and page 36, line 3 through page 37, line 1, attached to the Swisher Affidavit as Exhibits 10 and 13.**

J.P. Morgan and CSFB's Statement No. 162.

After the October 18 phone calls between Frank and Polcari, Blue Hills did nothing to communicate with LNR until November 10, two days before the scheduled foreclosure sale. On November 10, Goldberg sent a letter to Bruce Barnett, counsel for the Lender, stating that the Borrower was not in default and demanding access to the reserves. Dep. Ex. 334. E. Randolph Tucker responded on behalf of Lender by his letter dated November 12, 2004. (Dep. Ex. 41.)

**RESPONSE NO. 162**

**Denied. Statement No. 162 fails to acknowledge Frank's subsequent telephone conference with Polcari, LNR's letter dated October 19, 2004 initiating foreclosure proceedings and the subsequent communications between Goldberg and counsel from LNR. *See* J.P. Morgan and CSFB's Statement No. 157 and Blue Hills Statement I, ¶¶ 87-89.**

J.P. Morgan and CSFB's Statement No. 163.

On November 12, 2004, the foreclosure sale of the Property was postponed by public proclamation, in accordance with Massachusetts law, until November 19, 2004. Polcari Aff. ¶ 4, Barnett Aff. ¶ 17.

**RESPONSE NO. 163**

**Admitted in part. Statement No. 163 contains legal conclusions to which no responsive is required. Blue Hills, Fineberg and Langelier admit that the foreclosure sale occurred on November 19, 2004.**

J.P. Morgan and CSFB's Statement No. 164.

Another exchange of letters between counsel occurred on November 17-19. Dep. Exs. 335, 336, 337.

**RESPONSE NO. 164**

**Admitted in part. Several letters were subsequently exchanged between Goldberg and counsel for LNR during the period November 10 – November 19, 2004, whereby Blue Hills continued to request LNR to meet with it to consider alternatives to foreclosure. See Blue Hills Statement I, ¶ 89.**

J.P. Morgan and CSFB's Statement No. 165.

The foreclosure sale was held on November 19, 2004. There were four people bidding on the Property and CSFB 1999-C1 Royall Street, LLC made the high bid for $18.5 million. Recorded Foreclosure Documents (Barnett Aff. Ex. K) Polcari Aff. ¶ 5; Email from J. Polcari to L. Golinsky, November 19, 2004 (Dep. Ex. 109).

**RESPONSE NO. 165**

**Admitted in part. Blue Hills, Fineberg and Langelier admit that a foreclosure sale of the Property was held on November 19, 2004, but are without personal knowledge or information with respect to the number of bidders present.**

J.P. Morgan and CSFB's Statement No. 166.

Lender acted in accordance with all of the requirements of the Mortgage and Massachusetts law, including the requirements of General Laws Chapter 244, in conducting the foreclosure sale. Clarke 262; Recorded Foreclosure Documents. In addition, Lender caused its auctioneer, Dean Associates, Inc., to run commercial advertisements of the foreclosure sale in the Boston Herald and the Boston Globe on Sunday, November 7, 2004. Commercial Advertisements (Barnett Aff. Ex. L) SD001, SD002; Polcari Aff. ¶ 3.

**RESPONSE NO. 166**

**Denied. Statement No. 166 contains legal conclusions to which no response is required. Blue Hills, Fineberg and Langelier maintain that J.P. Morgan and CSFB's foreclosure of the Property was wrongful. *See* Second Amended Complaint, Counts 1-3.**

J.P. Morgan and CSFB's Statement No. 167.

As of the date of the sale, the amount of the Debt, including principal, interest and late fees, was $33,439,307. November 11, 2004 Payoff Statement (Polcari Aff. Ex. A); CSFB 1999-C1 Royall Street, LLC's Answers to First Interrogatories of Langelier & Fineberg, No. 12 (Barnet Aff. Ex. M.)

**RESPONSE NO. 167**

      **Admitted in part.  Blue Hills, Fineberg and Langelier admit that the cited references reflect Defendants' calculated amount of principal, interest and late fees, but deny that any such amount was due.  Blue Hills maintains that J.P. Morgan and CSFB wrongfully defaulted Blue Hills and foreclosed on the Property.  *See* Second Amended Complaint, Counts 1-3.**

J.P. Morgan and CSFB's Statement No. 168.

      After crediting the foreclosure bid ($18,500,000) and the reserves held by Lender as of the date of the sale ($4,168,460.18) against the outstanding debt, the deficiency after the foreclosure sale was $10,770,847.  November 11 Payoff Statement; CSFB 1999-C1 Royall Street LLC's Answers to First Interrogatories of Langelier and Fineberg, No. 12.

**RESPONSE NO. 168**

      **Admitted in part.  Blue Hills, Fineberg and Langelier admit that Defendants claim $10,770,847 as the deficiency amount, but deny any such amount is due.  Blue Hills maintains that J.P. Morgan and CSFB wrongfully defaulted Blue Hills and foreclosed on the Property.  *See* Second Amended Complaint, Counts 1-3.**

J.P. Morgan and CSFB's Statement No. 169.

      Under the Note, the default interest rate is 13.49%.  Note ¶ 1(k), (p).

**RESPONSE NO. 169**

      **Admitted in part. The interest rate in the Note in the cited paragraph speaks for itself.  *See* Note, attached to the McGlynn Affidavit as Exhibit 2.**

J.P. Morgan and CSFB's Statement No. 170.

      Fineberg did not attend the foreclosure sale or bid on the Property.  Fineberg 187-88.  At first he testified that he did not know why, id., and then claimed that not attending was a mistake.  Id.  211-12.  He did not sue to enjoin the foreclosure or to have it set aside after the fact.  Fineberg 195-97.

**RESPONSE NO. 170**

      **Denied.  Statement No. 170 mischaracterizes Fineberg's testimony.  The statement selectively excerpts Fineberg's testimony, taking it out of context and in so doing misrepresents Fineberg's motives in not attending the sale or failing to enjoin the foreclosure.  Fineberg testified that right up until the time of the foreclosure he continued to hold out hope of having a meeting with the lender and that he " wanted to retain ownership of the  building, and [he] would have done anything to do that."  *See* Fineberg Deposition, page 170, line 14 through 17, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 171.

      Fineberg testified that he had a plan for the future of Blue Hills that included using the $4.1 million in loan reserves and $5 to $6 million being held by attorneys for Royall Associates to fix up the building, attract a tenant, and then refinance the building.  Fineberg 194-95, 179-81.  Yet Fineberg told

none of this to LNR. Id. 181.

**RESPONSE NO. 171**

**Admitted in part.  Statement No. 171 mischaracterizes Fineberg's testimony.  Fineberg states that he believed that he exhibited good faith by signing the August 19, 2004 letter (received August 24, 2004) and in so doing indicated his willingness to meet with J.P. Morgan to work out details of a restructured loan.  Blue Hills, Fineberg and Langelier deny that funds were being held for "Royall Associates"; and funds were held for the benefit of Blue Hills.  *See* Blue Hills Statement I, ¶¶ 60-61; 94-95; Fineberg Deposition page 171, line 1 through 12 and page 175 line 6 through page 176 line 4, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 172.

As of August 2004, Blue Hills would have needed a modification of the Loan Documents in order to re-tenant the Blue Hills Office Park and maintain ownership of the Property.  Blue Hills knew that a loan modification was required in order to make his plan for the Property work.  Fineberg 194-195; Donovan 236.

**RESPONSE NO. 172**

**Denied.  Statement No. 172 takes the testimony of Fineberg and Donovan out of context. Fineberg "anticipated" that modification of the Loan Documents may have been required but since no negotiations were entered to due to LNR's failure to meet with Blue Hills, to say that a modification was necessary is speculative.  *See* Fineberg Deposition, pages 194-195, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 173.

Nevertheless, no one at Blue Hills ever sent the Lender a proposal to work out the Loan.  Polcari II 232; Fineberg 169-181; Langelier 180-84.

**RESPONSE NO. 173**

**Denied.  Statement No. 170 contains an improper conclusory statement that fails to acknowledge the course of communications between the parties. LNR represented that it would get back to Blue Hills to schedule a meeting.  *See* Response Nos. 134 and 153, incorporated herein.**

J.P. Morgan and CSFB's Statement No. 174.

Rather than send a written proposal to the Lender to encourage Lender to meet with them, Blue Hills claims it made a business decision not to propose anything to the Lender unless Lender agreed to meet with them in person first.  "I think it's a question of business judgment.  You don't prematurely put your cards face up on a table in a business negotiation."  "Without some indication from Lennar that they were willing to sit down with us or instruct us to submit something, we were not going to put our cards on the table prematurely."  Langelier 180-84, 206.

**RESPONSE NO. 174**

**Denied. Statement No. 174 takes the Langelier's testimony out of context. Langelier's cited testimony regarding "a question of business judgment" is a statement of general principle and not applied specifically to a decision regarding the Property. Langelier further testified that the business decision made by J.P. Morgan not to meet with Blue Hills exhibited what he felt was "bad faith from the lender." Langelier also testified that he and Fineberg had repeatedly tried to meet with J.P. Morgan and Fineberg had signed the August 19, 2004 letter. See Langelier Deposition, page 182, lines 14-25, attached to the Swisher Affidavit as Exhibit 7.**

J.P. Morgan and CSFB's Statement No. 175.

Fineberg testified that he had decided not to put any money — not another penny — into Blue Hills until LNR gave him a sit-down meeting. Fineberg 212-214, 158-60; Donovan 141. Fineberg testified that he would not make LNR any type of written proposal prior to having a sit-down meeting — doing so is "not [his] style." Fineberg 165-66, 169.

**RESPONSE NO. 175**

**Denied. Statement No. 175 takes Fineberg's testimony out of context and fails to acknowledge the series of written communications with LNR and Wells Fargo as well as Goldberg's discussions with Warshaw. See Blue Hills Statement I, ¶¶ 78-84; J.P. Morgan and CSFB Statements 137-140.**

J.P. Morgan and CSFB's Statement No. 176.

Langelier testified that he believed that the Lender, by not meeting, was engaged in a game of "brinksmanship" and that Lender would come around and agree to a meeting before the foreclosure. Langelier 200, 267, 269.

**RESPONSE NO. 176**

**Denied. Statement No. 176 takes Langelier's testimony out of context and fails to acknowledge the series of written communications with LNR and Wells Fargo as well as Goldberg's discussions with Warshaw. See Blue Hills Statement I, ¶¶ 78-84; J.P. Morgan and CSFB Statements 137-140.**

J.P. Morgan and CSFB's Statement No. 177.

LNR never encouraged Blue Hills to think they were going to meet. Fineberg 212-214; Frank 104-111.

**RESPONSE NO. 177**

**Denied. On August 24, 2004, LNR faxed Blue Hills two letters dated August 19, 2004, both indicating LNR's willingness to meet. Warshaw and Goldberg specifically discussed scheduling a meeting. See Blue Hills Statement I, ¶¶ 78-84; Response No. 135.**

J.P. Morgan and CSFB's Statement No. 178.

On other deals with LNR, Fineberg had made offers to LNR over the telephone or in writing before a meeting. Goldberg 182-85, 188-91. Fineberg had consummated at least one other deal with LNR without any sit down meeting at all. Goldberg 192-93.

**RESPONSE NO. 178**

**Admitted in part. Statement No. 178 takes Goldberg's testimony out of context and fails to recognize that Fineberg's prior dealings with LNR were through a different entity. Moreover, Fineberg testified that most of those negotiations were conducted by his attorney. *See* Fineberg Deposition, pages 23-25, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 179.

Fineberg did not want to defer the foreclosure and did not request that LNR defer the foreclosure. Fineberg did not look into trying to buy the debt at a discount. Fineberg 163.

**RESPONSE NO. 179**

**Denied. The cited language in Statement 179 takes Fineberg's testimony out of context. In his testimony, Fineberg emphasized that he expected and hoped to be able to retain the Property if the Lender would only negotiate with him in good faith. *See* Fineberg Deposition, pages 163-166; page 170, lines 14-17, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 180.

Blue Hills knew that LNR was not obligated to agree to any modification of the loan documents or enter a standstill agreement. Langelier 182, 269; Fineberg 161, 182.

**RESPONSE NO. 180**

**Denied. Statement No. 180 is a conclusory statement to which no response is required and mischaracterizes Langelier and Fineberg's deposition testimony. Further, the testimony on the cited pages has nothing to do with Statement No. 180. In fact, Fineberg testified that he believed LNR was obligated to meet with Blue Hills. *See* Langelier Deposition, pages 182, 269; Fineberg Deposition, pages 161, 182, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 181.

On December 31, 2004, the beneficiaries of Royall Associates entered into an agreement (the "Royall Agreement") concerning the treatment of three accounts: a "Property Account" held and controlled by Fineberg Management as a result of its management of the Property; an "Initial Account" held in escrow by Goldberg and Langelier's attorney Andrew Cohn; and a "Supplemental Account" held in escrow by Goldberg and Cohn. The "Initial Account" contained approximately $1.38 million, which was the portion of the 1999 refinancing proceeds not distributed to Fineberg and Langelier in 1999. Fineberg 49. The "Supplemental Account" contained approximately $4.2 million, which included the $2 million Payment. Royall Agreement (Dep. Ex. 176); Fineberg 51.

**RESPONSE NO. 181**

**Admitted only to the extent that the terms of the December 31, 2004 Agreement speak for themselves.  *See* Deposition Exhibit 176, attached to the McGlynn Affidavit as Exhibit 44.**

J.P. Morgan and CSFB's Statement No. 182.

The remaining $2.2 million in the Supplemental Account came from distributions of operating profit from Blue Hills.  Fineberg 51-52, 102-103.  Blue Hills distributed monies to its owners as often as it could.  Fineberg 243-44.  Langelier recalled receiving directly approximately $200,000 each year from Blue Hills.  Langelier 144-45.  Langelier and Fineberg made decisions about distributions.  Fineberg 243-44.  Blue Hills had ample profits to make distributions, as it had over $785,000.00 of net income in 2003, Dep. Ex. 35, and over $1.1 million of net income in 2001, Dep. Ex. 318.

**RESPONSE NO. 182**

**Admitted in part. Statement No. 182 takes Fineberg's testimony out of context.  Fineberg testified that he doesn't have any clear memory of how the distributions were made from the operating profit.  Fineberg said nothing about making distributions to the owners "as often as it could."  Neither Fineberg nor Langelier testified that Blue Hills "had ample profits."  *See* Fineberg Deposition, pages 243-44, s*ee also*, Deposition Exhibit 176, attached to the McGlynn Affidavit as Exhibit 44, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 183.

Under the Royall Agreement, the Initial Account and all but $2 million of the Supplemental Account was released, 50% each to Goldberg and Cohn, for distribution to the Fineberg and Langelier Beneficiaries, respectively.  This distribution was expressly conditioned on the Lender not having filed any claims against Blue Hills or Royall Associates.  Royall Agreement Section V.A.

**RESPONSE NO. 183**

**Admitted only to the extent that the terms of the December 31, 2004 Agreement speak for themselves.  Goldberg testified that the Settlement Proceeds were deposited and held in a clients' funds account for Blue Hills Office Park.  *See* Deposition Exhibit 176, attached to the McGlynn Affidavit as Exhibit 44; *See also* Goldberg Deposition, page 65, lines 4-8, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 184.

Under the Royall Agreement, the remaining $2 million in the Supplemental Account is held in escrow by Goldberg and Cohn, as the escrow agents for the "Fineberg Beneficiaries" and the "Langelier Beneficiaries" as security against claims that may be asserted by the Lender against Fineberg or Langelier personally on their guaranty of the Debt or by anyone arising from their interest in Blue Hills, Royall Associates, Blue Hills Management Corp. or Fineberg Management.  The Supplemental Account Escrows were to be distributed to the Royall Associates beneficiaries according to a schedule, but only if the remaining balance after such a distribution exceeded any outstanding indemnified claims. Langelier 215-22; Royall Agreement (Dep. Ex. 176); Fineberg 44-48, 51, 65-66; Goldberg 59-60.

**RESPONSE NO. 184**

**Admitted only to the extent that the terms of the December 31, 2004 Agreement speak for themselves.  *See* Response No. 183, incorporated herein.**

J.P. Morgan and CSFB's Statement No. 185.

Fineberg and Langelier are the "clients" who currently have control of the $2 million.  Fineberg 71.

**RESPONSE NO. 185**

**Denied.  Statement No. 185 takes Fineberg's testimony out of context.  Further, Blue Hills has maintained control of the Settlement Proceeds since receipt on or about August 8, 2003.  *See* Blue Hills Statement I, ¶¶ 91-96.**

J.P. Morgan and CSFB's Statement No. 186.

The purpose of the Royall Agreement was to put into writing the agreement between the partners about any monies and any liabilities that the partnership will have.  Fineberg 45.

**RESPONSE NO. 186**

**Admitted in part.  Statement No. 186 does not acknowledge that the December 31, 2004 Agreement sets forth the purpose of the agreement between the parties.  The terms of the December 31, 2004 Agreement speak for themselves.  *See* Depo. Exhibt 176, attached to the McGlynn Affidavit as Exhibit 44.**

J.P. Morgan and CSFB's Statement No. 187.

In or around December 2004, the Lender learned of the Zoning Appeal and its settlement from a broker and reported it to counsel.  Polcari I 199; Rosen 117-118.

**RESPONSE NO. 187**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that J.P. Morgan learned of the settlement of the Norfolk Action, but cannot independently confirm the source of the information.**

J.P. Morgan and CSFB's Statement No. 188.

On April 20, 2005, Lender made written demand upon Fineberg and Langelier under the Guaranty.  Counterclaim ¶ 41; Blue Hills Parties' Answers to Counterclaim ¶ 41.

**RESPONSE NO. 188**

**Admitted to the extent that the April 20, 2005 letter speaks for itself.**

J.P. Morgan and CSFB's Statement No. 189.

Neither Fineberg nor Langelier has made payment under the Guaranty.  Counterclaim ¶ 42; Blue Hills Parties' Answers to Counterclaim ¶ 42.

**RESPONSE NO. 189**

  **Admitted in part.  Blue Hills, Fineberg and Langelier admit that no payment was made, but deny that any money is owed.  *See* Blue Hills, Fineberg and Langelier's Answers to Counterclaim; Blue Hills Summary Judgment Motion; Blue Hills', Fineberg and Langelier's Memoranda in Opposition to Defendants' Motions for Summary Judgment.**

J.P. Morgan and CSFB's Statement No. 190.

  To determine the true tax, if any, paid by the partners of Royall Associates as a result of the foreclosure sale of the Property, one needs to review each partner's individual tax return for, at a minimum, the year in which the gain is reported and, ideally, for all the years they owned the Property. There are various tax attributes an individual might have that would affect whether they actually pay tax on a gain they report.  These include passive activity losses, net operating losses, other capital losses, possible limitations on basis, and any other items of income or expense that might exist on the personal level.  Andelman 216-217; Riley 42-43, 109.

**RESPONSE NO. 190**

  **Admitted in part.  Statement 190 is not a complete list of all factors that must be considered or that may affect the preparation of tax returns for Royall Associates Realty Trust.  *See* Andelman Deposition, pages 216 - 219, attached to the Swisher Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 191.

  The only evidence of tax losses proffered by Blue Hills is a hypothetical chart created by its proffered expert of what "could be or would be" the "maximum tax liability . . . with respect to each of the individual partners." Andelman 113-114; Andelman Report (Dep. Ex. 358) at Ex. B.  Andelman did not review any individual tax return information for any Royall Associates partner. Andelman 148.  The only evidence Andelman can offer that any partner will actually pay taxes due to Blue Hills is a hearsay account of conversation with Fineberg's accountant about Fineberg's tax situation.  Andelman 149, 151.

**RESPONSE NO. 191**

  **Denied.  Statement No. 191 not only mischaracterizes of Andelman's Expert Report and deposition testimony but contains erroneous conclusory statements.  The 2005 tax returns for Royall Associates Realty Trust and for the individual partners have not yet been prepared. Extensions of the time for filing such returns has been obtained.  Andelman could confirm the numbers set forth in his Expert Report upon the filing of those tax returns.  *See* Andelman Deposition, page 217, line 6, attached to the Swisher Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 192.

  Royall Associates is reporting gain from the foreclosure sale as realized in 2005.  Andelman 131-132.

**RESPONSE NO. 192**

  **Admit.**

J.P. Morgan and CSFB's Statement No. 193.

Blue Hills has refused to turn over in discovery any tax returns or tax work papers for the Royall Associates partners for any year, despite the Lenders' repeated demands for all documents related to damages.  Barnett Aff. ¶ 13 and Exhibit N thereto.

**RESPONSE NO. 193**

**Denied.  Blue Hills, Fineberg and Langelier have complied with all applicable discovery obligations.  All documents considered by Andelman in forming his expert opinion on tax liability and writing his expert report, including the 2004 tax return prepared on behalf of Royall Associates Realty Trust, have been produced.  As the individual tax returns that Defendants seek were neither reviewed nor considered by Mr. Andelman, no legal obligation to produce such documents exists. No 2005 tax returns are available.  *See* Andelman Deposition, page 80 attached to the Swisher Affidavit as Exhibit 1.**

Respectfully submitted,

BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG, By their attorneys,

/s/ Meredith A. Swisher
Peter B. McGlynn, Esquire (BBO No. 333660)
Meredith A. Swisher, Esquire (BBO No. 646866)
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: May 31, 2006
#338700 v6/14500/9985