UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim,

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S SUPPLEMENTAL APPENDIX OF DEPOSITION EXHIBITS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| |
|---|
| BLUE HILLS OFFICE PARK LLC,<br>     Plaintiff, Defendant-in-Counterclaim,<br>     v.<br>J.P. MORGAN CHASE BANK, as Trustee for the<br>Registered Holders of Credit Suisse First Boston<br>Mortgage Securities Corp., Commercial Mortgage<br>Pass-Through Certificates, Series 1999-C1, and,<br>CSFB 1999–C1 ROYALL STREET, LLC,<br>     Defendants, Plaintiffs-in-Counterclaim,<br>     v.<br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>     Defendants-in-Counterclaim. |

Civil Action No. 05-CV-10506 (WGY)

## AFFIDAVIT OF BRUCE S. BARNETT REGARDING
## SUPPLEMENTAL APPENDIX OF DEPOSITION EXHIBITS

I, Bruce S. Barnett, depose and say as follows:

1.     I am counsel to defendants/plaintiffs-in-counterclaim in this action. I have

personal knowledge of the matters set forth herein.

2.     I am filing herewith as Defendants' and Plaintiffs-in-Counterclaim's

Supplemental Appendix of Deposition Exhibits a true and correct copy of the following exhibits

marked at depositions in this matter, which are tabbed according to the numbers given to them in

the depositions. This filing contains exhibits or parts of exhibits referred to in Defendants' and

Plaintiffs-in-Counterclaim's Response to the Rule 56.1 Statement of Undisputed of Plaintiff and

Defendants-in-Counterclaim and in their memorandum of law in opposition to the defendants-in-

counterclaim's motion for summary judgment that were not included in the Appendix of

Deposition Exhibits they filed on May 17, 2005 [dckt. no. 75].

3.     Attached at Tab 51 is a true and correct copy of excerpts from Deposition Exhibit 51, specifically §§ 3.01 and 3.18 of the Pooling and Servicing Agreement.  Other excerpts of Exhibit 51 were included in the Appendix of Deposition Exhibits.

4.     Attached at Tab 160 is a true and correct copy of Deposition Exhibit 160.

5.     Attached at Tab 161 is a true and correct copy of Deposition Exhibit 161.

6.     Attached at Tab 315 is a true and correct copy Deposition Exhibit 315.

7.     Attached at Tab 340 is a true and correct copy of excerpts from Deposition Exhibit 340 comprising the exhibit's first page and a Due Enforceability Opinion given by Bernkopf, Goodman in connection with the Loan.

8.     Attached at Tab 390 is a true and correct copy of excerpts from Deposition Exhibit 390, the expert report of Richard Clarke.

SIGNED, under the penalties and perjury, this 31st day of May, 2006.

Bruce S. Barnett

# DEPOSITION EXHIBIT NO. 51

# EXCERPTED MATERIALS



EXHIBIT 51
Polcari
2/28/06    ttb

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.,
Depositor

WELLS FARGO BANK, NATIONAL ASSOCIATION,
Servicer

LENNAR PARTNERS, INC.,
Special Servicer

THE CHASE MANHATTAN BANK,
Trustee

NORWEST BANK MINNESOTA, NATIONAL ASSOCIATION,
Certificate Administrator and Custodian

POOLING AND SERVICING AGREEMENT

Dated as of October 11, 1999

$1,187,129,449
Commercial Mortgage Pass-Through Certificates
Series 1999-C1

## ARTICLE III

## ADMINISTRATION AND
## SERVICING OF THE TRUST FUND

Section 3.01    Servicer to Act as Servicer; Special Servicer to Act as Special Servicer; Administration of the Loans.

(a)    Each of the Servicer and the Special Servicer shall diligently service and administer the Loans (and, with respect to the Special Servicer, any REO Properties) it is obligated to service pursuant to this Agreement, subject to the servicing of the L'Enfant Participation by the L'Enfant Servicer and L'Enfant Special Servicer, on behalf of the Trust Fund and in the best interests of and for the benefit of the Certificateholders as well (as determined by the Servicer or the Special Servicer, as the case may be, in its good faith and reasonable judgment) in accordance with applicable law, the terms of the respective Loans or Specially Serviced Loans, and, to the extent consistent with the foregoing, the terms of this Agreement, in the case of the L'Enfant Participation and the Exchange Apartments Loan, the related Co-Lender Agreement, in the case of the L'Enfant Participation, the L'Enfant Participation Agreement, and, to the extent consistent with the foregoing, in accordance with the higher of the following standards of care: (1) the same manner in which, and with the same care, skill, prudence and diligence with which, the Servicer or Special Servicer, as the case may be, services and administers similar commercial or multifamily mortgage loans for other third-party portfolios, giving due consideration to the customary and usual standards of practice of prudent institutional multifamily or commercial mortgage lenders servicing their own mortgage loans and (2) the same care, skill, prudence and diligence with which the Servicer or Special Servicer, as the case may be, services and administers similar commercial or multifamily mortgage loans owned by the Servicer or Special Servicer, in either case exercising reasonable business judgment and with a view to the maximization, on a present value basis (discounting at the related Mortgage Rate), of timely recovery of principal and interest on the Loans or Specially Serviced Loans, as applicable, but without regard to: (i) any relationship that the Servicer or the Special Servicer, as the case may be, or any Affiliate thereof may have with the related Mortgagor or any other party to this Agreement; (ii) the ownership of any Certificate by the Servicer or the Special Servicer, as the case may be, or any Affiliate thereof; (iii) the Servicer's obligation to make Advances; (iv) the Servicer's or Special Servicer's, as the case may be, right to receive compensation for its services hereunder or with respect to any particular transaction; and (v) the Servicer's or Special Servicer's ownership, servicing or management of any other mortgage loans or mortgaged properties (the foregoing, collectively referred to as the "Servicing Standard"). Nothing herein contained shall be construed as an express or implied guarantee by the Servicer or the Special Servicer of the collectibility of payments on the Loans or shall be construed as impairing or adversely affecting any rights or benefits specifically provided by this Agreement to the Servicer or the Special Servicer, including with respect to Servicing Fees or Special Servicing Fees or, with respect to the Servicer, the right to be reimbursed for Advances.

Without limiting the foregoing, subject to Section 3.21, the Special Servicer shall be obligated to service and administer (i) any Loans as to which a Servicing Transfer Event has occurred and is continuing (each such Loan, a "Specially Serviced Loan"), and (ii) any REO

Properties. Notwithstanding the foregoing, the Servicer shall continue to make all calculations, and prepare, or cause to be prepared by the Special Servicer and delivered to the Trustee and the Certificate Administrator, all reports to the Trustee and the Certificate Administrator required hereunder with respect to the Specially Serviced Loans as if no Servicing Transfer Event had occurred and with respect to the REO Properties (and the related REO Loans) as if no REO Acquisition had occurred, and to render such incidental services with respect to such Specially Serviced Loan and REO Properties as are specifically provided for herein; *provided, however,* that the Servicer shall not be liable for failure to comply with such duties insofar as such failure results from a failure of the Special Servicer to provide sufficient information to the Servicer to comply with such duties or a failure of the Special Servicer to prepare and deliver to the Servicer reports required hereunder to be delivered by the Special Servicer to the Servicer. Each Loan that becomes a Specially Serviced Loan shall continue as such until satisfaction of the conditions specified in Section 3.21(a). Without limiting the foregoing, subject to Section 3.21, the Servicer shall be obligated to service and administer all Loans which are not Specially Serviced Loans; *provided, however,* that the Special Servicer shall make the inspections, use its reasonable best efforts to collect the statements and shall prepare the reports in respect of the related Mortgaged Properties with respect to Specially Serviced Loans in accordance with Section 3.12.

(b)     Subject only to the Servicing Standard and the terms of this Agreement and of the respective Loans, the Servicer and the Special Servicer each shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable. Without limiting the generality of the foregoing, each of the Servicer and the Special Servicer, in its own name, is hereby authorized and empowered by the Trustee and obligated to execute and deliver, on behalf of the Certificateholders and the Trustee or any of them, with respect to each Loan it is obligated to service under this Agreement, any and all financing statements, continuation statements and other documents or instruments necessary to maintain the lien created by the related Mortgage or other security document in the related Mortgage File on the related Mortgaged Property and related collateral; subject to Section 3.20, any and all modifications, waivers, amendments or consents to or with respect to any documents contained in the related Mortgage File; and any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments. Subject to Section 3.10, the Trustee shall furnish, or cause to be furnished, to the Servicer or the Special Servicer any limited powers of attorney and other documents necessary or appropriate to enable the Servicer or the Special Servicer, as the case may be, to carry out its servicing and administrative duties hereunder; *provided, however,* that the Trustee shall not be held liable for any negligence with respect to, or misuse of, any such power of attorney by the Servicer or the Special Servicer.

(c)     The relationship of each of the Servicer and the Special Servicer to the Trustee under this Agreement is intended by the parties to be that of an independent contractor and not that of a joint venturer, partner or agent.

Section 3.02    Collection of Loan Payments.

(a)     Each of the Servicer and the Special Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Loans it is obligated to service hereunder, and shall follow such collection procedures as are consistent with

CSFBMSC 00076

(ii)    the fees of such Independent Contractor (which shall be an expense of the Trust Fund) shall be reasonable and customary in light of the nature and locality of the Mortgaged Property;

(iii)    any such contract shall require, or shall be administered to require, that the Independent Contractor (A) pay all costs and expenses incurred in connection with the operation and management of such REO Property, including, without limitation, those listed in subsection (a) hereof, and (B) remit all related revenues collected (net of its fees and such costs and expenses) to the Special Servicer upon receipt;

(iv)    none of the provisions of this Section 3.17(c) relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the Special Servicer of any of its duties and obligations hereunder with respect to the operation and management of any such REO Property; and

(v)    the Special Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such REO Property.

The Special Servicer shall be entitled to enter into any agreement with any Independent Contractor performing services for it related to its duties and obligations hereunder for indemnification of the Special Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification.

Section 3.18    Sale of Defaulted Loans and REO Properties.

(a)    Each of the Servicer and the Special Servicer may sell or purchase, or permit the sale or purchase of, a Defaulted Loan or REO Property only on the terms and subject to the conditions set forth in this Section 3.18 or as otherwise expressly provided in or contemplated by Section 2.03(b) and Section 9.01.

(b)    If any Loan becomes a Defaulted Loan and the Special Servicer has determined in good faith that such Defaulted Loan will become subject to foreclosure proceedings, the Special Servicer shall promptly so notify in writing the Trustee and the Servicer. The Special Servicer (or the Servicer, if the Special Servicer does not exercise its option, or the Directing Certificateholder, if the Servicer does not exercise its option) may at its option purchase such Defaulted Loan from the Trust Fund, at a price equal to the Purchase Price. The Purchase Price for any Defaulted Loan purchased hereunder shall be deposited into the Collection Account. Upon receipt by the Trustee of an Officer's Certificate from the Special Servicer to the effect that such deposit has been made, the Trustee shall notify the Servicer. The Servicer shall then submit to the Custodian a Request for Release of the related Mortgage File and the Custodian shall release such Mortgage File to the Special Servicer, the Servicer or the Directing Certificateholder, as the case may be, and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, representation or warranty as shall be necessary to vest in the Special Servicer, the Servicer or the Directing Certificateholder (in that order), as the case may be, ownership of such Defaulted Loan.

CSFBMSC 00113

(c)     The Special Servicer may offer to sell any Defaulted Loan not otherwise purchased by the Special Servicer, the Servicer or the Directing Certificateholder pursuant to subsection (b) above, if and when the Special Servicer determines, consistent with the Servicing Standard, that such a sale would produce a greater recovery on a present value basis than would liquidation of the related Mortgaged Property. Such offering shall be made in a commercially reasonable manner for a period of not less than 20 days or more than 90 days. The Special Servicer shall accept the highest cash bid received from any Person for such Defaulted Loan in an amount at least equal to the Purchase Price therefor; *provided, however,* that in the absence of any such bid, the Special Servicer shall accept the highest cash bid received from any Person that is determined by the Special Servicer to be a fair price for such Defaulted Loan. In the absence of any bid determined as provided below to be fair, the Special Servicer shall proceed with respect to such Defaulted Loan in accordance with Section 3.09.

The Special Servicer shall use reasonable efforts to solicit bids for each REO Property in such manner as will be reasonably likely to realize a fair price within the time period provided for by Section 3.16(a). Such solicitation shall be made in a commercially reasonable manner for a period of not less than 90 days or more than 270 days. The Special Servicer shall accept the highest cash bid received from any Person for such REO Property in an amount at least equal to the Purchase Price therefor; *provided, however,* that in the absence of any such bid, the Special Servicer shall accept the highest cash bid received from any Person that is determined by the Special Servicer to be a fair price for such REO Property. If the Special Servicer reasonably believes that it will be unable to realize a fair price for any REO Property within the time constraints imposed by Section 3.16(a), then the Special Servicer shall dispose of such REO Property upon such terms and conditions as the Special Servicer shall deem necessary and desirable to maximize the recovery thereon under the circumstances and, in connection therewith, shall accept the highest outstanding cash bid, regardless of from whom received. If the Special Servicer determines with respect to any REO Property that the offers being made with respect thereto are not in the best interests of the Certificateholders and that the end of the period referred to in Section 3.16(a) with respect to such REO Property is approaching, the Special Servicer shall seek an extension of such period in the manner described in Section 3.16(a); *provided, however,* that the Special Servicer shall use its best efforts, consistent with the Servicing Standard, to sell any REO Property prior to three years prior to the Rated Final Distribution Date.

The Special Servicer shall give the Trustee and the Servicer not less than three Business Days' prior written notice of its intention to sell any Defaulted Loan or REO Property. No Interested Person shall be obligated to submit a bid to purchase any Defaulted Loan or REO Property, and notwithstanding anything to the contrary herein, neither the Trustee, in its individual capacity, nor any of its Affiliates may bid for or purchase any Defaulted Loan or any REO Property pursuant hereto.

(d)     Whether any cash bid constitutes a fair price for any Defaulted Loan or REO Property, as the case may be, for purposes of Section 3.18(c), shall be determined by the Special Servicer, if the highest bidder is a Person other than the Special Servicer or an Affiliate thereof, and by the Trustee, if the highest bidder is the Special Servicer or an Affiliate thereof. In determining whether any bid received from the Special Servicer or an Affiliate thereof represents a fair price for any Defaulted Loan or any REO Property, the Special Servicer and the

CSFBMSC 00114

Trustee may conclusively rely on the opinion of an Appraiser or other expert in real estate matters retained at the expense of the Trust Fund by (i) the Trustee, if the highest bidder is the Special Servicer or an Affiliate thereof or (ii) the Special Servicer, in any other case. In determining whether any bid constitutes a fair price for any Defaulted Loan or any REO Property, such Appraiser or other expert in real estate matters shall be instructed to take into account, as applicable, among other factors, the period and amount of any delinquency on the affected Defaulted Loan, the occupancy level and physical condition of the Mortgaged Property or REO Property, the state of the local economy and the obligation to dispose of any REO Property within the time period specified in Section 3.16(a). The Purchase Price for any Defaulted Loan or REO Property shall in all cases be deemed a fair price.

(e)     Subject to subsections (a) through (d) above, the Special Servicer shall act on behalf of the Trustee in negotiating and taking any other action necessary or appropriate in connection with the sale of any Defaulted Loan or REO Property, and the collection of all amounts payable in connection therewith. Any sale of a Defaulted Loan or any REO Property shall be final and without recourse to the Trustee or the Trust Fund, except, in the case of the Trust Fund, as shall be customary in deeds of real property, and if such sale is consummated in accordance with the terms of this Agreement, neither the Special Servicer nor the Trustee shall have any liability to any Certificateholder with respect to the purchase price therefor accepted by the Special Servicer or the Trustee.

Section 3.19    Additional Obligations of the Servicer and Special Servicer; Inspections; Appraisals.

(a)     The Servicer (or, with respect to each Specially Serviced Loan and REO Property and each Loan described in Section 3.19(d) below, the Special Servicer) shall physically inspect or cause to be physically inspected (at its own expense) each Mortgaged Property at such times and in such manner as are consistent with the Servicing Standard, but in any event shall inspect each Mortgaged Property (A) with a Stated Principal Balance equal to or greater than $2,500,000 or which constitutes at least 2.0% of the then-current aggregate principal balance of the Loans at least once every 12 months and (B) with a Stated Principal Balance of less than $2,500,000 and which does not constitute at least 2.0% of the then-current aggregate principal balance of the Loans, at least every 24 months, in each case commencing in December 1999 (or at such lesser frequency as each Rating Agency shall have confirmed in writing to the Servicer, will not result a downgrade, qualification or withdrawal of the then-current ratings assigned to any Class of the Certificates) and (C) if the Loan (i) becomes a Specially Serviced Loan, (ii) has a Debt Service Coverage Ratio of less than 1.0x or (iii) is delinquent for 60 days as soon as practicable and thereafter at least once every 12 months for so long as such condition exists. The Servicer or Special Servicer, as applicable, shall send (i) to DCR, within 20 days of completion, each inspection report and (ii) to Fitch and Moody's within 20 days of completion, each inspection report for Significant Loans.

(b)     Notwithstanding the provisions of Section 3.19(a), with respect to the Credit Lease Loans, the Servicer (or, if such Credit Lease Loan is a Specially Serviced Loan, the Special Servicer) shall physically inspect or cause to be physically inspected (at its own expense) each Mortgaged Property at least once (i) every 36 months, if the related Credit Tenant or Guarantor has a published rating of not less than "BBB," (ii) every 24 months if (A) the related

CSFBMSC 00115

# DEPOSITION EXHIBIT NO. 160

Tax Record for Single Loan

| Loan# | Seq | Month | Day | Year | Code | Trans Desc | Trans Amt | Trans Esc1 | Vendor |
|-------|-----|-------|-----|------|------|-----------|-----------|-----------|--------|
| 760990083 | 2 | 10 | 29 | 1999 | 09 | Escrow Payment | $ 49,617.03 | $ 49,617.03 | |
| 760990083 | 10 | 1 | 28 | 2000 | 09 | Escrow Payment | $ 150,799.89 | $ 150,799.89 | |
| 760990083 | 11 | 1 | 28 | 2000 | 29 | Tax Disbursment | $ 153,500.42 | $(153,500.42) | 299T |
| 760990083 | 8 | 4 | 21 | 2000 | 09 | Escrow Payment | $ 150,799.88 | $ 150,799.88 | |
| 760990083 | 9 | 4 | 24 | 2000 | 29 | Tax Disbursment | $ 153,500.41 | $(153,500.41) | 299T |
| 760990083 | 9 | 7 | 27 | 2000 | 09 | Escrow Payment | $ 160,414.32 | $ 160,414.32 | |
| 760990083 | 10 | 7 | 27 | 2000 | 29 | Tax Disbursment | $ 163,287.03 | $(163,287.03) | 299T |
| 760990083 | 9 | 10 | 16 | 2000 | 09 | Escrow Payment | $ 160,414.32 | $ 160,414.32 | |
| 760990083 | 10 | 10 | 16 | 2000 | 29 | Tax Disbursment | $ 163,287.03 | $(163,287.03) | 299T |
| 760990083 | 14 | 1 | 29 | 2001 | 46 | R.E. Tax Credit | $ 167,411.89 | $ 167,411.89 | |
| 760990083 | 16 | 1 | 29 | 2001 | 29 | Tax Disbursment | $ 163,287.03 | $(163,287.03) | 299T |
| 760990083 | 9 | 4 | 13 | 2001 | 09 | Escrow Payment | $ 68,795.93 | $ 68,795.93 | |
| 760990083 | 10 | 4 | 13 | 2001 | 29 | Tax Disbursment | $ 69,977.04 | $ (69,977.04) | 299T |
| 760990083 | 11 | 7 | 27 | 2001 | 09 | Escrow Payment | $ 151,114.34 | $ 151,114.34 | |
| 760990083 | 12 | 7 | 30 | 2001 | 29 | Tax Disbursment | $ 145,557.92 | $(145,557.92) | 299T |
| 760990083 | 13 | 10 | 30 | 2001 | 46 | R.E. Tax Credit | $ 142,997.11 | $ 142,997.11 | |
| 760990083 | 15 | 10 | 30 | 2001 | 29 | Tax Disbursment | $ 145,557.91 | $(145,557.91) | 299T |
| 760990083 | 13 | 1 | 24 | 2002 | 09 | Escrow Payment | $ 140,554.99 | $ 140,554.99 | |
| 760990083 | 14 | 1 | 25 | 2002 | 29 | Tax Disbursment | $ 143,072.06 | $(143,072.06) | 299T |
| 760990083 | 24 | 4 | 24 | 2002 | 46 | R.E. Tax Credit | $ 101,179.20 | $ 101,179.20 | |
| 760990083 | 26 | 4 | 24 | 2002 | 29 | Tax Disbursment | $ 143,072.05 | $(143,072.05) | 299T |
| 760990083 | 14 | 7 | 25 | 2002 | 46 | R.E. Tax Credit | $ 150,087.59 | $ 150,087.59 | |
| 760990083 | 16 | 7 | 26 | 2002 | 29 | Tax Disbursment | $ 150,087.59 | $(150,087.59) | 299T |
| 760990083 | 15 | 10 | 21 | 2002 | 46 | R.E. Tax Credit | $ 150,087.58 | $ 150,087.58 | |
| 760990083 | 17 | 10 | 22 | 2002 | 29 | Tax Disbursment | $ 150,087.58 | $(150,087.58) | 299T |
| 760990083 | 12 | 1 | 28 | 2003 | 09 | Escrow Payment | $ 147,513.32 | $ 147,513.32 | |
| 760990083 | 13 | 1 | 29 | 2003 | 29 | Tax Disbursment | $ 147,513.32 | $(147,513.32) | 299T |
| 760990083 | 12 | 4 | 16 | 2003 | 09 | Escrow Payment | $ 147,513.31 | $ 147,513.31 | |
| 760990083 | 13 | 4 | 16 | 2003 | 29 | Tax Disbursment | $ 147,513.31 | $(147,513.31) | 299T |
| 760990083 | 14 | 7 | 25 | 2003 | 46 | R.E. Tax Credit | $ 154,752.47 | $ 154,752.47 | |
| 760990083 | 16 | 7 | 25 | 2003 | 29 | Tax Disbursment | $ 154,752.47 | $(154,752.47) | 299T |
| 760990083 | 11 | 10 | 17 | 2003 | 09 | Escrow Payment | $ 154,752.47 | $ 154,752.47 | |
| 760990083 | 12 | 10 | 20 | 2003 | 29 | Tax Disbursment | $ 154,752.47 | $(154,752.47) | 299T |
| 760990083 | 8 | 1 | 23 | 2004 | 09 | Escrow Payment | $ 154,752.47 | $ 154,752.47 | |
| 760990083 | 9 | 1 | 26 | 2004 | 29 | Tax Disbursment | $ 154,752.47 | $(154,752.47) | 299T |
| 760990083 | 6 | 4 | 28 | 2004 | 09 | Escrow Payment | $ 121,597.85 | $ 121,597.85 | |
| 760990083 | 7 | 4 | 28 | 2004 | 29 | Tax Disbursment | $ 121,597.85 | $(121,597.85) | 299T |
| 760990083 | 6 | 7 | 29 | 2004 | 29 | Tax Disbursment | $ 158,181.19 | $(158,181.19) | 299T |
| 760990083 | 6 | 10 | 14 | 2004 | 09 | Escrow Payment | $ 51,908.89 | $ 51,908.89 | |
| 760990083 | 9 | 10 | 19 | 2004 | 29 | Tax Disbursment | $ 158,181.19 | $(158,181.19) | 299T |
| 760990083 | 37 | 11 | 23 | 2004 | 09 | Escrow Payment | $ 264,453.49 | $ 264,453.49 | |



EXHIBIT
169
Lloyd
3-8-06

WF03143

# DEPOSITION EXHIBIT NO. 161

## Lloyd, Brent T.

| | |
|---|---|
| **From:** | Lloyd, Brent T. |
| **Sent:** | Thursday, July 29, 2004 2:19 PM |
| **To:** | Engstrom, Deanna M. |
| **Subject:** | FW: Re: Loan # 76-0990083 Blue Hills Office Park LLC - Borrower cannot pay property taxes due 8/2/04 - |

| | |
|---|---|
| **Importance:** | High |

| | |
|---|---|
| **Follow Up Flag:** | LN # 76-0990083 Taxes need to be paid by 7/30/04 |
| **Due By:** | Thursday, July 29, 2004 2:00 PM |
| **Flag Status:** | Flagged |

Deanna,

Deborah wants to pay the taxes today for this account. Please get the check to me for signing ASAP, and overnight the check.

Thanks.

Brent

-----Original Message-----

| | |
|---|---|
| **From:** | Lloyd, Brent T. |
| **Sent:** | Thursday, July 29, 2004 1:24 PM |
| **To:** | Lambson, Deborah E. |
| **Cc:** | Engstrom, Deanna M. |
| **Subject:** | Re: Loan # 76-0990083 Blue Hills Office Park LLC - Borrower cannot pay property taxes due 8/2/04 - |
| **Importance:** | High |

Hi Deborah,

I wanted to advise that for the above referenced loan the borrower is not going to be able to make the payment for their taxes due on 8/2/04. I have spoken with Gil Stern (Borrower) phone # 1-781-239-1480, and he advised that his tenant is gone, and therefore he will not have the funds required to make the tax payment due in the amount of $158,181.19. I have attached notepads that both Deanna, and myself have placed on this account. I have verified that this agency is not postal protected, which means the taxes must be paid out tomorrow in order for the payment to reach the tax collector by 8/2/04. Can you please advise if you would like us to advance funds, and if so I will be sure to get the disbursement out first thing.



Loan # 76-0990083
Cannot Pay T...

Thanks.
**Brent Lloyd**
**Loan Servicing Supervisor**
**Wells Fargo Commercial Mortgage Servicing**
**1320 Willow Pass Road**
**Suite 205**
**Concord, CA 94520**
**Phone # 800-986-9711 Ext 5378**
**Fax # 925-691-5249**

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, please contact the sender by phone or reply email and destroy all copies of the original message.

1



EXHIBIT
161
Lloyd    7-8-06

WF02103

# DEPOSITION EXHIBIT NO. 315

**BLUE HILLS OFFICE PARK, LLC**
150 ROYALL STREET
CANTON, MASSACHUSETTS 02021
(781) 828-6669



July 15, 2004

Ms. Linda O'Brien
Boston Equiserve, L.P.
150 Royall Street
Canton, MA  02021

Re:  2005 Fiscal Real Estate Tax, First Quarter, 150 Royall Street, Canton, MA

Dear Linda:

Enclosed are the first quarter Real Estate Taxes for fiscal year ending 6/30/2005:

| | |
|---|---|
| Your share per Lease Terms 263,245 square feet + 5,800 square feet (Health Club) | 98.2407% |
| Actual Real Estate Tax | $ 158,181.19 |
| Your share, per lease | x      98.2407% |
| First Quarter | $  155,398.30 |
| Due for one month: | $ 51,799.44 |

Please make your check in the amount of $51,799.44 payable to Blue Hills Office Park, LLC and remit to:

Blue Hills Office Park, LLC (Metrowest Bank)
PO Box 9029
Framingham, MA  01701-9029

PLEASE NOTE THAT THIS BILL IS DUE BY AUGUST 1, 2004.

If you have any question regarding this invoice, please give me a call at my Canton office (781) 828-6669.  Thank you.

Sincerely,

Lawrence G. Needle
Property Manager

*S:\NEEDLE\RE Tax - Equiserve.doc*

Blue Hill
5185

**FISCAL YEAR 2005 PRELIMINARY REAL ESTATE TAX BILL**
Based on assessments as of January 1, 2004. Your Real Estate tax for fiscal year beginning July 1, 04 and ending June 30, 2005 on the value of property described below.

**TOWN OF CANTON**
The Commonwealth of Massachusetts
Office of the Tax Collector
Office Hours: Mon, Wed - Fri 9:00AM - 5:00PM
Tues 9:00AM - 7:00PM

**TAXPAYER COPY**
See reverse side for important informat

Mailing Date June 30, 2004

| Parcel | 051-009 |
| Location | 150 ROYALL ST |
| Class | 340 |
| Book / Page | 13730/171 |

Remit Payments to:  Town of Canton    OR    You can now pay your Real Estate bill on-line.
P.O. Box 529        Visit www.mcc.net/ebill to sign up.
Medford, MA 02155

BLUE HILLS OFFICE PARK LLC
FINEBERG MANAGEMENT INC
1 Washington St
WELLESLEY MA  02481-1711

| | |
|---|---|
| Preliminary Real Estate Tax: | $316,362.38 |
| 1ST Quarter Payment Due by August 2, 2004 | $158,181.19 |
| 2ND Quarter Payment Due by November 1, 2004 | $158,181.19 |

**THIS BILL IS PAYABLE IN 2 INSTALLMENTS**

Interest at the rate of 14% per annum will accrue on overdue amounts from the due date until payment is made.

---

**FISCAL YEAR 2005 PRELIMINARY REAL ESTATE TAX BILL**
Based on assessments as of January 1, 2004. Your Real Estate tax for fiscal year beginning July 1, 2004 and ending June 30, 2005 on the value of property described below.

**TOWN OF CANTON**
The Commonwealth of Massachusetts

**RETURN WITH PAYMENT
IN ENVELOPE PROVIDED**

2nd Quarter Payment

| Parcel | 051-009 |
| Location | 150 ROYALL ST |
| Class | 340 |
| Book / Page | 13730/171 |

Remit Payments to:  Town of Canton    OR    You can now pay your Real Estate bill on-line.
P.O. Box 529        Visit www.mcc.net/ebill to sign up.
Medford, MA 02155

BLUE HILLS OFFICE PARK LLC
FINEBERG MANAGEMENT INC
1 Washington St
WELLESLEY          MA    02481-1711

| | |
|---|---|
| Preliminary Real Estate Tax: | $316,362.38 |
| 2nd Quarter Payment Due by November 1, 2004 | $158,181.19 |

5009208200570000061550015818119B

---

**FISCAL YEAR 2005 PRELIMINARY REAL ESTATE TAX BILL**
Based on assessments as of January 1, 2004. Your Real Estate tax for fiscal year beginning July 1, 2004 and ending June 30, 2005 on the value of property described below.

**TOWN OF CANTON**
The Commonwealth of Massachusetts

**RETURN WITH PAYMENT
IN ENVELOPE PROVIDED**

1st Quarter Payment

| Parcel | 051-009 |
| Location | 150 ROYALL ST |
| Class | 340 |
| Book / Page | 13730/171 |

Remit Payments to:  Town of Canton    OR    You can now pay your Real Estate bill on-line.
P.O. Box 529        Visit www.mcc.net/ebill to sign up.
Medford, MA 02155

BLUE HILLS OFFICE PARK LLC
FINEBERG MANAGEMENT INC
1 Washington St
WELLESLEY          MA    02481-1711

| | |
|---|---|
| Preliminary Real Estate Tax: | $316,362.38 |
| 1st Quarter Payment Due by August 2, 2004 | $158,181.19 |

5009208200570000061550015818119B

Blue Hill
5186

# DEPOSITION
# EXHIBIT NO. 340

# EXCERPTED
# MATERIALS



**EXHIBIT**
Goldberg 340
67.06 DA

# BERNKOPF, GOODMAN & BASEMAN LLP
### COUNSELLORS AT LAW
### 125 SUMMER STREET
### BOSTON, MASSACHUSETTS 02110-1621
### TELEPHONE (617) 790-3000
### TELECOPIER (617) 790-3300

September 14, 1999

Lydia G. Chesnick, Esq.
DIRECT DIAL: (617) 790-3325
e-mail: lchesnick@bgblaw.com

## TELECOMMUNICATION TRANSMITTAL

TO:               ANDREW COHEN, ESQUIRE

COMPANY:      SCHULTE ROTH & ZABEL LLP

TELECOPIER NUMBER:    212-593-5955        PHONE NO:  212-756-2105

FROM:           LYDIA G. CHESNICK   ATTORNEY NO.:  014

TOTAL NUMBER OF PAGES _98_ INCLUDING THIS COVER SHEET

*IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL BACK AS SOON AS POSSIBLE.*

PHONE:             (617) 790-3000

TELECOMMUNICATOR:    Karen Fucillo

CLIENT/MATTER NO:     14500/9547

MESSAGE:

     Attached are copies of the following executed opinions, the originals of which are being Federal Expressed for your receipt on Wednesday: **(1)** Due Enforceability Opinion - all executed Exhibits have been appended other than Exhibit B-3 which is the Delaware Certificate from the Secretary of State and is to be delivered post-closing. Upon our delivery, please append the Delaware LLC Certificate as Exhibit B-3; and **(2)** Non-Consolidation Opinion.

                      Lydia

**FAXED**

Please Note: The information contained in this facsimile message is privileged and confidential, and is intended only for the use of the individual named above and others who have been specifically authorized to receive such. If the recipient is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, or if any problems occur with transmission, please notify us immediately by telephone at (617) 790-3370. Thank you.

**Blue Hill
1946**

# BERNKOPF, GOODMAN & BASEMAN LLP

COUNSELLORS AT LAW

125 SUMMER STREET

BOSTON, MASSACHUSETTS 02110-1621

TELEPHONE (617) 790-3000

TELECOPIER (617) 790-3300

September 14, 1999

Lydia G. Chesnick, Esq.
DIRECT DIAL: (617) 790-3325
e-mail: lchesnick@bgblaw.com

**VIA FEDERAL EXPRESS**

Andrew Cohen, Esq.
Schulte Roth & Zabel LLP
900 Third Avenue
New York, New York 10022

**RE:    150 ROYALL STREET, CANTON, MA**

Dear Andy:

Enclosed please find the following original documents:

1.    Due Enforceability Opinion - all executed Exhibits have been appended other than Exhibit B-3 which is the Delaware Certificate from the Secretary of State and is to be delivered post-closing.  Upon our delivery, please append the Delaware LLC Certificate as Exhibit B-3; and

2.    Non-Consolidation Opinion.

Very truly yours,

Lydia G. Chesnick

LGC/kf
Enclosure

cc:    Gerald S. Fineberg

#184212 v1/14500/9547

Blue Hill
1947

**BERNKOPF, GOODMAN & BASEMAN LLP**

COUNSELLORS AT LAW
125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110-1621
TELEPHONE (617) 790-3000
TELECOPIER (617) 790-3300

September 14, 1999

Credit Suisse First Boston Mortgage Capital LLC
11 Madison Avenue-5th Floor
New York, New York 10010

RE:  **$33,500,000.00 loan (the "Loan") from Credit Suisse First Boston Mortgage Capital LLC ("Lender") to Blue Hills Office Park LLC, a Delaware limited liability company ("Borrower"), which Loan is secured, in part, by a Mortgage on the property commonly known as and numbered 150 Royall Street, Canton, Massachusetts (the "Property")**

Ladies and Gentlemen:

This firm has acted as counsel for Borrower, Blue Hills Management Corp., a Massachusetts corporation (the "Corporation"), in its capacity as the sole manager (the "Manager") of Borrower and Gerald S. Fineberg and (for the purpose of execution of the Loan Documents hereafter defined) William J. Langelier, each in their individual capacities as guarantors and environmental indemnitors of the Loan (collectively, the "Guarantors") in connection with the Loan. Borrower, the Corporation and Guarantors are sometimes collectively referred to as the "Parties".

The Loan is evidenced and secured by, and we have received and reviewed, the documents and instruments identified on Exhibit A annexed hereto. The documents identified on Exhibit A may be referred to herein collectively as the "Loan Documents". All capitalized references to specific Loan Documents contained in this opinion shall have the meanings set forth in the attached Exhibit A.

In connection with the foregoing, we have examined and are relying upon the organizational, governing, authority and informational documents relating to Borrower and the Corporation listed on Exhibit B (collectively, the "Constituent Documents") and Exhibit C (the "Borrower Information Letter") annexed hereto for the purpose of rendering this opinion letter, together with such other documentation as we have deemed necessary or desirable to enable us to formulate the opinions expressed herein. Exhibits A, B, and C are sometimes collectively hereafter referred to as the "Exhibits". All capitalized references to specific organizational documents contained in this opinion shall have the meanings set forth in the Exhibits.

Blue Hill
1950

BERNKOPF, GOODMAN & BASEMAN LLP

Credit Suisse First Boston Mortgage Capital LLC
September 14, 1999
Page 2

The opinions set forth below are qualified as stated therein and are further qualified by the following:

1.   The opinions are based upon the state of events existing as of the date of this letter, including, without limitation, the information and documents contained in the Exhibits and existing Massachusetts laws, ordinances and regulations in effect as of the date hereof and as they presently apply and we expressly disclaim any obligation to advise you about any changes or events hereafter arising. With respect to all opinions contained herein respecting the validity and enforceability of the Loan Documents, we bring to your attention that the Borrower is a Delaware limited liability company and note that the Loan Documents have expressly stipulated that they are to be construed and enforced in accordance with the laws of either the State of New York, the Commonwealth of Massachusetts (the "Commonwealth"), or combinations thereof, as the case may be. This opinion is qualified and limited by the fact that we are Massachusetts attorneys licensed to practice and practicing only in the Commonwealth and do not opine as to the laws of any state other than the Commonwealth with the exception that in the rendering of this opinion, we have reviewed the statute generally referred to as the Delaware General Corporation Law. In light of the immediately preceding sentence and in rendering the opinions contained in this letter in any manner related to the laws of the State of Delaware, we have, subject to the limitations in the immediately preceding sentence, relied specifically and solely upon the following: (a) the Constituent Documents relating solely to Borrower; (b) the assumption that the relevant laws of the State of Delaware are the same and will be applied in the same manner as the laws of the Commonwealth; (c) the effectiveness of the statement in the Note that it shall be governed by the laws of the Commonwealth and (d) that the transaction will be closed and the Note signed in the Commonwealth of Massachusetts. To the extent the laws of any other jurisdiction are applicable, with your permission, we have assumed for purposes of this opinion that such jurisdiction would apply the substantive and procedural laws applicable in the Commonwealth without regard to conflicts of law provisions. As a consequence and without opining as to the validity or enforceability of the designation of a particular state's laws as the applicable law in and with respect to various provisions of the Loan Documents, we have assumed for the purposes of rendering all of our opinions herein that the laws of the Commonwealth have been designated as the applicable law in and with respect to the various provisions of the Loan Documents and our opinions herein are limited accordingly.

Blue Hill
1951

BERNKOPF, GOODMAN & BASEMAN LLP

Credit Suisse First Boston Mortgage Capital LLC
September 14, 1999
Page 3

2.  We have assumed the competency of all parties signing the Loan Documents and
    other documents on behalf of all parties other than Borrower, the Corporation and
    Guarantors, the genuineness of all signatures on behalf of all parties other than
    Borrower, the Corporation and Guarantors, the authenticity of all documents
    submitted to us as originals, the conformity to original documents of all
    documents submitted to us as certified or photostatic copies, and the accuracy and
    completeness of all records made available to us.

3.  We have assumed that:  (a) the Loan Documents executed by you have been duly
    authorized, executed and delivered by you, are within your corporate power in
    your principal place of business, are your legal, valid and binding obligations in
    your principal place of business, and that you are in material compliance with all
    applicable laws, rules and regulations governing the conduct of your business
    with respect to this transaction in your principal place of business; (b) the Loan
    Documents will be enforced in circumstances and in a manner which are
    commercially reasonable; and (c) all terms, provisions and conditions relating to
    the transaction referred to in this opinion letter are correctly and completely
    reflected in the Loan Documents.

4.  Except as otherwise noted, the opinions hereafter expressed are qualified to the
    extent that:  (a) the characterization of, and the enforceability of any rights or
    remedies in any agreement or instrument may be limited by applicable
    bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or
    transfer, equitable subordination, or similar laws and doctrines affecting the rights
    of creditors generally and general equitable principles; (b) the availability of
    specific performance, injunctive relief or any other equitable remedy is subject to
    the discretion of a court of competent jurisdiction; (c) the provisions of any
    document, agreement or instrument that: (i) may require indemnification for
    liabilities under the provisions of any laws or in respect to the neglect or wrongful
    conduct of the indemnified party or its representatives or agents or (ii) purport to
    confer, waive or consent to the jurisdiction of any court, may not be enforceable;
    (d) any provisions of the Loan Documents waiving any right granted by
    constitutional, common or statutory law may be unenforceable as against public
    policy; and (e) any provisions of the Loan Documents granting so-called "self-
    help" or extra judicial remedies may not be enforceable.  We further advise you
    that the award and amount of attorneys' fees are subject to the discretion of the

Blue Hill
1952

BERNKOPF, GOODMAN & BASEMAN LLP

Credit Suisse First Boston Mortgage Capital LLC
September 14, 1999
Page 4

Court before which any proceeding involving the Loan Documents may be brought.

5. We express no opinion with respect to the title to all or any portion of the Property or any other collateral for the Loan or the priority of any lien or security interest arising under the Loan Documents, and we understand that you are relying upon title insurance or other sources in connection with such matters. We express no opinion with respect to any matter involving the Loan or the Loan Documents that may involve or be subject to any securities law, rule, regulation or order, including, but not limited to, the Securities Act of 1933, the Securities Exchange Act of 1934 and/or Massachusetts General Laws ("M.G.L.") Chapter 110A and the rules and regulations promulgated thereunder. Without limitation, we express no opinion as to the need, if any, for Lender to qualify to do business in the Commonwealth or any other state by virtue of making the Loan.

6. Enforcement by you of specific rights under the Loan Documents may require a judgment or decree of a court of competent jurisdiction after prior notice to one or more of the Parties and an opportunity by one or more of the Parties to be heard by an appropriate tribunal.

7. We understand that as to the existence of court actions, suits, proceedings, orders, judgments, decrees and/or pending litigation affecting Borrower, the Corporation and/or the Guarantors, you will be relying upon the pending litigation and judgment searches being obtained by you in connection with the Loan Documents and we express no opinion with respect to such matters, with the qualifications that, as you requested, we have sent you under separate cover certain searches and will be sending you further searches requested by you and conducted by Intercounty Clearance Corporation (collectively "Searches"). In addition, this firm has no actual knowledge that the Searches are inaccurate. We further bring to your attention that we are acting as special counsel to William J. Langelier only in connection with the Loan and do not represent him generally.

8. Without limiting the generality of any of the foregoing, we further express no opinion as to the validity and enforceability of any of the specific provisions of the Loan Documents, if any exist, which:

    (a)     Provide that your delay will never operate as a waiver;

Blue Hill
1953

BERNKOPF, GOODMAN & BASEMAN LLP

Credit Suisse First Boston Mortgage Capital LLC
September 14, 1999
Page 5

> (b)    Specify your rights to manage all or any part of the Property and your
> obligations to account therefor in a manner inconsistent with applicable
> law concerning the rights and duties of any assignee or mortgagee in
> possession;
>
> (c)    Designate personal property as fixtures, to the extent inconsistent with
> applicable law;
>
> (d)    Appoint you as any of the Parties' attorney-in-fact, to the extent that
> applicable statutory or case law invalidates such appointments; or
>
> (e)    Entitle you to collect rents from the Property prior to taking possession of
> the Property, or after a bankruptcy or similar proceedings in the event that
> you do not perform the obligations which you are legally required to
> perform under applicable law before or after, as applicable, your exercise
> of any such right to collect rents.

9.    Whenever our opinion, with respect to the existence or absence of facts, is
qualified by the phrase "to our knowledge" or a phrase of similar import, it is
intended to indicate that during the course of our representation in connection
with the subject transaction no information has come to our attention which gave
us current actual knowledge of the existence or absence of such facts. Except to
the extent expressly set forth herein, we have not undertaken any independent
investigation to determine the existence or absence of such facts, and no inference
as to our knowledge of the existence or absence of such facts should be drawn
from the fact of our representation of the parties.

We point out that any provision of the Loan Documents which permits you to make
determinations or take actions may be subject to a requirement that such determinations be made
or such actions be taken on a reasonable basis and in good faith, and we assume that you will
make all determinations and take all actions under the Loan Documents in a commercially
reasonable manner and in good faith.

Our qualified opinions that the Loan Documents are enforceable against certain of the
Parties in accordance with their terms, are further subject to: (i) the willingness of a court to
grant relief or enforce remedies contained in the Loan Documents to the extent such decisions
may be based upon the exercise of the court's discretion; (ii) the qualifications and assumptions
set forth herein; and (iii) the application of any laws of any jurisdiction other than the
Commonwealth.

Blue Hill
1954

BERNKOPF, GOODMAN & BASEMAN LLP

Credit Suisse First Boston Mortgage Capital LLC
September 14, 1999
Page 6

Based upon the foregoing, and subject to the other qualifications set forth in this opinion, we are of the opinion that:

1. Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware. Borrower is registered to do business in the Commonwealth under the laws of the Commonwealth.

2. Borrower has the requisite power and authority to own, lease and operate the Property and to execute, deliver and perform Borrower's obligations under the Loan Documents.

3. The Corporation has been duly incorporated and organized and is validly existing and in good standing under the laws of the Commonwealth. The Corporation has the corporate power and authority to execute and deliver, as the Manager of Borrower, the Loan Documents to which it is a party.

4. Neither Borrower nor the Corporation is a foreign national, and there is no restriction under applicable federal or Massachusetts law which prohibits or prevents Borrower or the Corporation from performing their obligations under the Loan Documents. All material licenses, permits and approvals to the extent required of a limited liability company under applicable federal and Massachusetts law to enable Borrower to own and manage the Property have been obtained by or on behalf of Borrower.

5. The execution and delivery of the Loan Documents by Borrower and the performance of Borrower's obligations under the Loan Documents have been duly authorized by all requisite actions of Borrower and the Loan Documents have been duly executed and delivered by Borrower. The Corporation has the requisite power and authority, as the Manager of Borrower, to bind Borrower in any or all matters relating to the Loan including, without limitation, the power to enter into the Loan on behalf of Borrower and to execute and deliver all documents and instruments required in connection with the Loan in its capacity as the Manager of Borrower.

6. The Loan Documents are the valid and the binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as may be limited by (i) bankruptcy, insolvency, reorganization or other similar laws affecting the rights and remedies of creditors and secured parties generally and (ii)

Blue Hill
1955

BERNKOPF, GOODMAN & BASEMAN LLP

Credit Suisse First Boston Mortgage Capital LLC
September 14, 1999
Page 7

the willingness of a court to grant relief or enforce remedies contained in the Loan
Documents and general principles of equity (regardless of whether considered in a
proceeding in equity or at law), provided however, that (with the exception of the
economic consequences of any judicial, administrative or procedural delay which
may be imposed by, relating to or resulting from laws, rules, regulations,
constitutional requirements or other matters) this qualification will not ultimately
prohibit the practical realization of the material economic benefits intended by the
Loan Documents.

7. The execution and delivery by Borrower of the Loan Documents do not, and the
payment by Borrower of the indebtedness evidenced by the Note will not, (a)
conflict with or violate any provisions of the Constituent Documents or (b) to the
best of our knowledge (i) conflict with or violate or result in a breach of any of the
provisions of, or constitute a default under, or result in the creation or imposition
of a lien, charge or encumbrance upon any of the properties or assets of Borrower
pursuant to any agreement or instrument to which Borrower is a party or by which
any of its properties is bound (except as provided in the Loan Documents) or (ii)
conflict with or violate any judgment, order, writ, injunction or decree binding on
Borrower.

8. Provided that Lender is subject to control, regulation or examination by any state
or federal regulatory agency or has filed and will continue to file the required
notice with the Attorney General of the Commonwealth pursuant to M.G.L.
Chapter 271, Section 49(d), the contract rate of interest provided for in the Note
does not violate the applicable usury laws in force and effect as of this date under
the laws of the Commonwealth.

9. Pursuant to the requirements of Massachusetts General Laws Chapter 106,
Section 9-401, the "proper place[s] to file [financing statements] in order to
perfect a security interest" under Massachusetts General Laws, Chapter 106,
Section 9-401(1) are, with respect to fixtures, in the office where the mortgage on
the real estate would be filed or recorded and, in all other cases (except with
respect to farm equipment and products and consumer goods), with the
Massachusetts Secretary of State and, in addition, in the office of the clerk of the
municipality in which the debtor's place of business is located if such place of
business is debtor's only place of business within the Commonwealth of
Massachusetts. For the purposes of this opinion, the Borrower's principal place
of business is One Washington Street, Wellesley, Massachusetts 02481.
Notwithstanding the foregoing, we have advised you that prudent practice may

Blue Hill
1956

BERNKOPF, GOODMAN & BASEMAN LLP

Credit Suisse First Boston Mortgage Capital LLC
September 14, 1999
Page 8

also dictate that a financing statement be filed with the Canton Town Clerk. The Financing Statements are in appropriate form for filing and, if requested by Lender, this firm will arrange for the filing of the Financing Statements and a search to be performed post-filing at each of the locations of filing.

10.    Guarantors have full authority and legal right to execute and deliver the Loan Documents and to perform their respective obligations under those of the Loan Documents executed by each of them.

11.    The Loan Documents executed and delivered by Guarantors are the valid and binding obligations of Guarantors and are enforceable against Guarantors in accordance with their respective terms.

This opinion letter has been furnished to you solely in connection with this transaction and on the condition that the opinion expressed herein may not be published or otherwise communicated by you to any other party except your successor or assigns or any duly authorized and acting agency which rates the Loan, without our specific prior written approval in each instance. No one other than you and the entities specified in the preceding sentence may rely upon the opinions expressed herein.

Very truly yours,

*Bernkopf, Goodman & Baseman LLP*

BERNKOPF, GOODMAN & BASEMAN LLP

#184350 v1/14500/9547

**Blue Hill
1957**

## LIST OF EXHIBITS

EXHIBIT A:      Loan Documents

EXHIBIT B:      Constituent Documents

EXHIBIT C:      Borrower Information Letter

Blue Hill
1958

**EXHIBIT A**

**THE LOAN DOCUMENTS**

The following documents are each dated as of September **M**, 1999, unless otherwise indicated:

1.    $33,500,000.00 Mortgage Note (the "Note");

2.    Mortgage, Assignment of Leases and Rents and Security Agreement (the "Mortgage");

3.    Assignment of Leases and Rents;

4.    Guaranty;

5.    Environmental and Hazardous Substance Indemnification Agreement;

6.    UCC-1 Financing Statements (the "Financing Statements");

7.    Cash Management Agreement;

8.    Assignment and Subordination of Management Agreement;

9.    Certificate of Borrower; and

10.    Certificate as to Independent Director.

Blue Hill
1959

## EXHIBIT B

## CONSTITUENT DOCUMENTS

1.  Certificate of Formation and First Amendment to Certificate of Formation (collectively, the "Certificate of Formation") of Blue Hills Office Park LLC, copies of which are attached to the Manager's Certificate;

2.  Manager's Certificate attached as Exhibit B-1 and to which copies of the Certificate of Formation and Limited Liability Company Operating Agreement and First Amendment to Limited Liability Company Operating Agreement (collectively, the "Operating Agreement") of Blue Hills Office Park LLC are attached;

3.  Application for Registration as a Foreign Limited Liability Company of Blue Hills Office Park LLC attached as Exhibit B-2;

4.  Certificate of Legal Existence and Good Standing issued by the Secretary of State of the State of Delaware for Blue Hills Office Park LLC attached as Exhibit B-3;

5.  Articles of Organization of Blue Hills Management Corp. attached as Exhibit B-4;

6.  By-Laws of Blue Hills Management Corp. attached as Exhibit B-5;

7.  Certificate of Legal Existence and Good Standing issued by the Secretary of State of the Commonwealth of Massachusetts for Blue Hills Management Corp. attached as Exhibit B-6;

8.  Clerk's Certificate of Blue Hills Management Corp. attached as Exhibit B-7; and

9.  Action by Consent of the Board of Directors of Blue Hills Management Corp. attached as Exhibit B-8;

## EXHIBIT B-1

### BLUE HILLS OFFICE PARK LLC

### MANAGER'S CERTIFICATE

The undersigned, being the sole Manager (the "Manager") of Blue Hills Office Park LLC, a Delaware limited liability company (the "Borrower"), hereby certifies to Credit Suisse First Boston Mortgage Capital LLC (the "Lender") and Bernkopf, Goodman & Baseman LLP as follows:

1.  The undersigned is the only Manager of the Borrower.

2.  True copies of the Certificate of Formation and First Amendment to Certificate of Formation (collectively, the "Certificate of Formation") and the Borrower's Operating Agreement and First Amendment to Operating Agreement (collectively, the "Agreement") are attached hereto as Exhibits A and B, respectively.

3.  The Agreement and Certificate of Formation have not been revoked, terminated or further amended as of the date hereof.

4.  The Agreement and Certificate of Formation are in full force and effect.

5.  The Borrower is duly organized and validly existing under the laws of the State of Delaware.

6.  Pursuant to the Agreement, the Borrower has the purpose and power to: (a) borrow money and secure the borrowing with a mortgage; and (b) execute and deliver any documents to effect the foregoing or as may be necessary, convenient, desirable or incidental thereto.

7.  Pursuant to the Agreement, the Manager has the exclusive right and power to manage and operate the Borrower and to take such actions on its behalf as the Manager deems necessary or appropriate to accomplish its purposes.

8.  The Manager has deemed it necessary and appropriate to enter into a $33,500,000.00 loan transaction (the "Loan") with Lender, and in connection with the Loan, to execute and deliver such documents (the "Loan Documents") as the Lender deems necessary or appropriate, including, without limitation, the following:

    (a)  $33,500,000.00 Mortgage Note;
    (b)  Mortgage, Assignment of Leases and Rents and Security Agreement;
    (c)  Assignment of Leases and Rents;
    (d)  Guaranty;
    (e)  Environmental and Hazardous Substance Indemnification Agreement;
    (f)  UCC-1 Financing Statements;

**Blue Hill
1961**

(g)   Cash Management Agreement;
(h)   Assignment and Subordination of Management Agreement;
(i)   Certificate of Borrower;
(j)   ~~Required Repairs Agreement~~
(k)   ~~Operation and Maintenance Agreement;~~
(l)   Certificate as to Independent Director;

any of which may contain such terms and conditions as the Manager deems necessary or appropriate and may be signed and delivered by the Manager, and all of which when so delivered shall be binding on the Borrower.

The undersigned makes the foregoing certifications (collectively, the "Certifications") and acknowledges that Lender will be relying upon the Certifications in entering into the Loan, and Bernkopf, Goodman & Baseman LLP will be relying upon the Certifications in rendering its legal opinion to the Lender concerning, among other things, the Borrower's due authorization, execution and delivery of the Loan Documents.

EXECUTED as an instrument under seal this _14th_ day of September, 1999.

MANAGER:             BLUE HILLS MANAGEMENT CORP.

By: _Gerald S. Fineberg_
Gerald S. Fineberg, its President

Blue Hill
1962

# DEPOSITION EXHIBIT NO. 390

# EXCERPTED MATERIALS

*Richard A Clarke*
*Business and Credit Advisory Services*

March 30, 2006

Peter McGlynn, Esquire
Bernkopf Goodman LLP
125 Summer Street
Boston, Massachusetts 02110 1621

Re:   *Blue Hills Office Park LLC v. J.P. Morgan, et al.*
      Civil Action No. 05-10506-WGY

Dear Mr. McGlynn:

Pursuant to your request, I submit this preliminary report concerning the subject litigation.

You have asked as to whether or not I could render certain opinions in connection with the above referenced action as follows:

- Am I able to render an opinion within a reasonable degree of professional certainty as to whether or not Wells Fargo Commercial Mortgage Servicing ("Wells Fargo"), as Master Servicer, and/or Lennar Partners ("LNR"), as Special Servicer, adhered to the "Servicing Standards" of Master Servicer and Special Servicer respectively under that certain Pooling and Servicing Agreement ("Pooling and Servicing Agreement" or "PSA") between Credit Suisse First Boston Mortgage Securities Corp. and others dated October 11, 1999?

- Am I able to render an opinion within a reasonable degree of professional certainty as to whether or not Wells Fargo, as Master Servicer, and/or LNR, as Special Servicer, adhered to the industry standards for commercial loan mortgage servicers of commercial properties such as, for example, 150 Royall Street, Canton, Massachusetts?

- What, if any, reporting requirements to credit rating agencies did Wells Fargo, as Master Servicer, and LNR, as Special Servicer, have with respect to the loan granted by Credit Suisse First Boston Mortgage Securities Corp. to Blue Hills Office Park LLC ("BHOP")?

I have determined, based upon my review of the documents and other materials which I considered and which are listed below, that I am able to render opinions with respect to each of the foregoing.

My opinions as set forth herein as to certain lending and business issues relating to the BHOP claim against the various defendants are based on my knowledge and experience in these areas coupled with review of the documents and other materials identified herein.

### Richard A Clarke
*Business and Credit Advisory Services*

- The record demonstrates that BHOP was very interested in meeting with LNR to discuss the Loan.

- Although the Note was non-recourse, LNR had certain leverage points including loss of the Property's equity upon foreclosure and a potentially large tax bill to BHOP's principals following foreclosure.

- BHOP's principals had substantial net worths and liquidity more than sufficient to provide capital to the Property so long as LNR demonstrated a willingness to work with them.

- There were substantial reserve accounts which allowed payment of $1 million in debt service (slightly less than 4 months worth of debt service payments) and approximately $2.7 million which could have been used to fund improvements for new tenants and repairs.

- Although LNR did not know it, BHOP's principals also had approximately $5.7 million in "rainy day" reserve accounts for the Property. Draft Langelier Deposition Exhibit No. 176.

- Property values in the south suburban Boston area were starting to trend upward as were rents.

- LNR believed that, upon foreclosure, the PSA's Trustee could lose upwards of $20 million, a fact warranting special diligence consistent with the Servicing Standard and reflective of the prudent industry practices.

Further, LNR employees, including its 30(b)(6) designees were unaware of waterfall and reserve access provisions and were similarly unable to administer these provisions. See, for example, Polcari Deposition Exhibit No. 74, Vol. II pp. 190-195.

Sec.3.09(a) of the PSA also requires that an attempt be made to reach "satisfactory arrangements" with a borrower prior to foreclosure with p. 119 also requiring an attempt to negotiate before exercising remedies. As documented earlier, no such attempt was made by LNR in the face of several requests by BHOP. Polcari did not adequately explain why he avoided negotiations with BHOP, see Polcari Deposition pp. 49, 52, 71-77, 236-244, Vol. II pp. 10-21, 122, 133, 153, and stated in his deposition to the effect that borrowers should call every day until an audience is granted. Polcari Deposition Vol. II p. 122. Mr. Polcari also admitted in his deposition that he did not review fully the "binder" being transferred from Wells Fargo. See, for example, Polcari Deposition Exhibit No. 71, pp.38-39, 49, 73-74, 128, 240-243, Vol. II pp. 138.

LNR was obligated to get a fair price and was required to market the property for at least 90 days and maximize its present value. Pooling and Servicing Agreement pp. 108, 131. The chronology set forth earlier regarding little or no dialogue with BHOP followed by a rush to foreclose leads to the conclusion that the actions of LNR here were imprudent and ill advised. While the Property sale did take several months there was no time or apparent effort to advertise the