UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>    Plaintiff, Defendant-in-Counterclaim,<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and, CSFB 1999–C1 ROYALL STREET, LLC,<br><br>    Defendants, Plaintiffs-in-Counterclaim,<br><br>v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>    Defendants-in-Counterclaim. | Civil Action No. 05-CV-10506 (WGY) |

### SECOND AFFIDAVIT OF BRUCE S. BARNETT IN SUPPORT OF DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S MOTIONS FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS-IN-COUNTERCLAIM'S MOTION FOR <u>SUMMARY JUDGMENT</u>

I, Bruce S. Barnett, depose and say as follows:

1. I am counsel to defendants/plaintiffs-in-counterclaim in this action. I have personal knowledge of the matters set forth herein.

2. Attached hereto as <u>Exhibit A</u> is a true and correct copy of Defendants' First Request for Production of Documents Addressed to Blue Hills Office Park LLC, William Langelier and Gerald Fineberg in this matter.

3.  Attached hereto as <u>Exhibit B</u> is a true and correct copy of a complete chain of emails produced by LNR Partners, Inc. in this matter, a portion of which was marked as Deposition Exhibit 89 by Blue Hills' counsel.

Signed under the pains and penalties of perjury this 31st day of May, 2006.

_____
Bruce S. Barnett

# SECOND AFFIDAVIT OF BRUCE BARNETT EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

    Plaintiff, Defendant-in-Counterclaim.

v.

CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.,

    Defendant,

and

CSFB 1999 – C1 ROYALL STREET, LLC;

    Defendant, Plaintiff-in-Counterclaim,

v.

WILLIAM LANGELIER and GERALD FINEBERG,

    Defendants-in-Counterclaim.

Civil Action No. 05-CV-10506 (WGY)

## DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS ADDRESSED TO BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, defendant Credit Suisse First Boston Mortgage Securities Corp. and defendant/counterclaim-plaintiff CSFB 1999 – C1 Royall Street, LLC hereby request that plaintiff/counterclaim-defendant Blue Hills Office Park LLC and counterclaim-defendants William Langelier and Gerald Fineberg serve written responses to this

~BOST1:390622.v4

First Request for Production of Documents and produce all responsive documents in their possession, custody or control at the offices of DLA Piper Rudnick Gray Cary US LLP, One International Place, 21st Floor, 100 Oliver Street, Boston, Massachusetts, 02110-2613, within thirty days of service of this request.

## DEFINITIONS AND INSTRUCTIONS

1. "Blue Hills," "you," and "your" refers to plaintiff Blue Hills Office Park, LLC, and each of its principals, members, managers, employees, agents, attorneys, assigns and affiliates, including but not limited to Fineberg Management, Inc., William J. Langelier, Gerald S. Fineberg, Joseph Donovan, Daniel Frank, and Larry Needle.

2. "Blueview" refers to the property and improvements located at 250 Royall Street and referenced at paragraph 25 of Lender's Counterclaim.

3. "Blueview LLC" refers to Blueview Corporate Center LLC, one-time owner of Blueview, referenced at paragraph 25 of Lender's Counterclaim, and each of its principals, members, managers, employees, agents, assigns, and affiliates.

4. "Cash Management Agreement" refers to the cash management agreement dated September 14, 1999 between Blue Hills and Credit Suisse First Boston, and attached to Blue Hills' First Amended Complaint as Exhibit "E"

5. "Clearing Account" has the meaning given to it in the Cash Management Agreement.

6. "Depositor" refers to defendant Credit Suisse Bank First Boston Mortgage Securities Corp. and each of its directors, officers, employees, agents, attorneys, assigns, and affiliates.

7. "Equiserve" refers to Equiserve Limited Partnership, the sole tenant of the Property as of September 14, 1999, and each of its principals, partners, managers, employees, agents, attorneys, assigns, and affiliates.

~BOST1:390622.v4

8.  "Lender" refers to defendant and plaintiff-in-counterclaim CSFB 1999 – C1 Royall Street, LLC and each of its members, managers, employees, agents, attorneys, assigns, and affiliates.

9.  "LNR Partners" refers to LNR Partners, Inc., formerly known as Lennar Partners, Inc., referenced at paragraph 46 of Blue Hills' First Amended Complaint, and each of its directors, officers, managers, employees, agents, attorneys, assigns, and affiliates.

10. "Loan" refers to the loan evidenced by the Mortgage Note.

11. "Mortgage Agreement" refers to the mortgage agreement dated September 14, 1999, between Blue Hills and Originator, and attached as Exhibit "C" to Blue Hills' First Amended Complaint.

12. "Mortgage Note" refers to the mortgage note dated September 14, 1999, between Blue Hills and Originator, and attached as Exhibit "D" to Blue Hills' First Amended Complaint.

13. "National Development" refers to National Development and each of its principals, directors, officers, managers, employees, agents, attorneys, assigns, affiliates and attorneys.

14. "Originator" refers to Credit Suisse First Boston Mortgage Capital, LLC and each of its members, managers, employees, agents, assigns, and affiliates.

15. "Payment" refers to the payment made to Blue Hills as part of the Settlement, and referenced at paragraph 29 of Lender's Counterclaim.

16. "Property" refers to the property located at 150 Royall Street, Canton, Massachusetts, known as the Blue Hills Office Park and referenced at paragraph 5 of plaintiff's First Amended Complaint.

17. "Wells Fargo" refers to Wells Fargo Bank, National Association and each of its directors, officers, employees, agents, attorneys, assigns, and affiliates.

~BOST1:390622.v4

18. "Settlement" refers to the settlement referenced at paragraph 29 of Blue Hills' Answer to Lender's Counterclaim, and consummated by the settlement agreement referenced at paragraph 29 of Lender's Counterclaim, pursuant to which Blue Hills received the Payment.

19. "Town of Canton" refers to the Town of Canton and each of its departments, boards, committees, employees, agents, and attorneys.

20. "Zoning Appeal" refers to the litigation initiated by the complaint filed by Blue Hills in Norfolk Superior Court on June 9, 2003 appealing the ZBA Decision, referenced at paragraph 26 of Lender's Counterclaim.

21. "ZBA Decision" refers to the decision of the Town of Canton Zoning Board of Appeals granting a special permit to Blueview LLC, referenced at paragraph 25 of Lender's Counterclaim.

22. If you withhold any document on a claim of privilege, work product or other reason for non-production, with respect to each document withheld state: (a) the author and recipients; (b) its date; (c) the subject matter of the document; (d) the nature of the document (e.g., letter, telegram, etc.); (e) the reason why the document is claimed to be privileged or to constitute work product; and (f) the paragraph of this request to which the document is responsive.

23. These requests are continuing and require supplemental responses to the extent required by Fed. R. Civ. P. 26(e).

**DOCUMENT REQUESTS**

1. All documents concerning the Loan.

2. All documents concerning the Zoning Appeal.

3. All documents concerning the Settlement.

4. All documents concerning the Payment.

5.  All documents listed on pages 4-5 of the Initial Disclosures of Blue Hills Office Park LLC, William Langelier and Gerald Fineberg.

6.  All documents concerning the "general terms and conditions of the contemplated mortgage financing," as that phrase is used at paragraph 7 of Blue Hills' First Amended Complaint.

7.  All documents concerning Property taxes and/or Property tax escrows.

8.  All documents concerning any negotiations relating to the Zoning Appeal, the Settlement, and/or the Payment.

9.  All documents concerning monies received by Blue Hills other than rents received from Equiserve.

10. All documents concerning any actual, considered, proposed, anticipated or pursued renovation, remodeling or re-leasing of the Property after Blue Hills learned that Equiserve would not be renewing its lease, including, without limitation, receipts for expenditures made to remodel or re-lease the Property, correspondence or other documents concerning communications with brokers, correspondence or other documents concerning communications with prospective tenants, and documents concerning actual and/or planned expenditures for re-leasing the Property.

11. All documents that concern any communications concerning the Loan, the Property, property tax payments or property tax escrow payments for the Property, the lease between Blue Hills and Equiserve, Equiserve's leaving the Property, Blue Hills' efforts to re-lease the Property, the Zoning Appeal, the Settlement, the Payment, or the ZBA Decision, including without limitation any between or among Blue Hills, its mortgagee, Originator, Depositor, Wells Fargo, LNR Partners, the Town of Canton, and/or Lender.

12. All documents that concern any communications concerning the origination of the Loan.

13. All documents that concern any communications among or between Blue Hills, Blueview and/or National Development.

14. All documents concerning or supporting Blue Hills' contention at paragraph 11 of Blue Hills' First Amended Complaint, that "[Originator] and Blue Hills agreed that the various required reserve deposits could be accessed by Blue Hills in the event that the Equiserve Lease was not renewed."

15. All documents concerning or supporting Blue Hills' contention at paragraph 12 of Blue Hills' First Amended Complaint, that "Blue Hills entered the above-described arrangement in reliance upon the foregoing provisions...."

16. All documents concerning or supporting Blue Hills' contention at paragraph 16 of Blue Hills' First Amended Complaint, that "[t]he terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note."

17. All documents concerning or supporting Blue Hills' contention at paragraph 38 of Blue Hills' First Amended Complaint, that "[t]his information was then communicated to either or both of the defendants, through their agent, Wells Fargo."

18. All documents concerning or supporting Blue Hills' contention at paragraph 40 of Blue Hills' First Amended Complaint, that Blue Hills' need for "substantial sums of money to upgrade the Property's infrastructure and to make tenant improvements" due to, allegedly, "the down turn in the real estate market coupled with a reduced number of tenants seeking larger blocks of rental space" was "the very contingency anticipated when the Term Sheet was executed."

~BOST1:390622.v4

19. All documents concerning or supporting Blue Hills' contention at paragraph 75 of Blue Hills' First Amended Complaint, that "[a]ll preconditions to Blue Hill's entitlement to disbursement of funds sufficient to pay principal and interest for August and September, 2004 had been satisfied."

20. All documents concerning or supporting Blue Hills' contention at paragraph 84 of Blue Hills' First Amended Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully defaulted Blue Hills."

21. All documents concerning or supporting Blue Hills' contention at paragraph 85 of Blue Hills' First Amended Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully withheld from Blue Hills those amounts which Blue Hills was rightfully entitled to receive out of the Cash Collateral Account."

22. All documents concerning or supporting Blue Hills' contention at paragraph 86 of Blue Hills' First Amended Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully refused to allow Blue Hills to utilize funds on deposit in the Cash Collateral Account to pay principal and interest under the Mortgage Agreement."

23. All documents concerning or supporting Blue Hills' contention at paragraph 87 of Blue Hills' First Amended Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully foreclosed on the Property."

24. All documents concerning the Clearing Account, including without limitation all account statements and transaction receipts.

25. All documents identified in Blue Hills' responses to Defendants' First Set of Interrogatories.

26. All documents identified in William Langelier's responses to Defendants' First Set of Interrogatories.

27. All documents identified in Gerald Fineberg's responses to Defendants' First Set of Interrogatories.

28. All documents concerning other lawsuits involving the Property.

29. All documents concerning or supporting your claims or defenses in this action.

30. All documents concerning or supporting your damages claims.

31. All documents relevant to the subject matter of this action.

> CSFB 1999 – C1 ROYALL STREET, LLC
> and CREDIT SUISSE FIRST BOSTON
> MORTGAGE SECURITY CORP.,
>
> By their attorneys,
>
> _/s/ Bruce S. Barnett_
> E. Randolph Tucker, BBO #503845
> Bruce E. Falby, BBO# 544143
> Bruce S. Barnett, BBO #647668
> Traci S. Feit, BBO #660688
> DLA PIPER RUDNICK GRAY CARY US LLP
> One International Place
> Boston, MA 02110
> (617) 406-6000

Dated: September 15, 2005

# SECOND AFFIDAVIT OF BRUCE BARNETT EXHIBIT B

**From:** Joe Polcari [JPolcari@lnrmail.lnrproperty.com]
**Sent:** Thursday, October 07, 2004 4:39 PM
**To:** Randall Rosen
**Subject:** FW: Blue Hill Office Park

Here's David Hall's e-mail to Ron. I am talking with Mission Capital about the possible sale of the note, or of the winning bid. I will need to work with you to come up with a value to support the price. I am doing a two-pager which I will ask you to review.

-----Original Message-----
From: David Hall [mailto:DHall@lnrproperty.com]
Sent: Tuesday, October 05, 2004 1:32 PM
To: 'Ronald Schrager'; Joe Polcari; Randy Wolpert; 'dhall@lnrproperty.com'
Cc: Larry Golinsky; David Team
Subject: Blue Hill Office Park


Finally toured the building with Joe last Monday. I was on vacation last week. Sorry for the delay in getting you my thoughts.

It was not as good as I had hoped. Clearly the tenant knew they were leaving and stopped uprgrading and maintaining the facility over the past 24 months - so its lacks the plug-n-play attributes that I was looking for (and that a tenant would want). So we are looking at a big TI number to backfill the space ($35 best case, likely 40 plus). Base building also has alot of deferred maintenance. Looks tired - every common area needs new everything. HVAC Systems are old and would need to be replaced. New parking lot needed. Roof is fairly new and likely OK. Landscaping is tired. I would plug around $15 for base building. Another 8-10 for leasing costs.

Timing??? - must allow for 1 - 3 years to get it stabilized (but who knows)

Though it was once multi-tenant - I cannot imagine successfully subdividing the building for small tenants. This is clearly programmed for a single -user. Huge common areas and some built in amenities that are pretty attractive (food service, auditorium. fitness). It may work for 2-3 large users. In any event you cannot re-open with anything less than a 80-100,000 sf tenant.

market is very thin for these sized tenants and this particular sub-market is always thin, historically. Anything above 150,000 sf is just a guessing game - these sized deals are just very few and far between. So, buyer will underwrite this to allow for history to repeat - eg you do a successful lease-up and life is good for 5-7 years but then you risk losing your major tenant to a new development cycle - and your screwed for three years. So - reversion cap rate is high (even with credit), lease-up is long, costs are high, and market is thin. Said differently, if you try to underwite this as

a lease-up with reversion you will need to whack your model at all levels
and the deal won't work.

I think the best play is to take title and try to sell this as-is to a user
as opposed to developer/investor/oport fund. While still a tough deal,
instinct tells me this asset could be a solid corp real estate solution for
a growing company that prefers to own rather than lease, and they will pay
more. I would not limit the marketing as this too is a thin market - of
course you peddle it to anyone and everyone - but I would push brokers to
focus on user prospects.

Hope this is somewhat coherent. from CPG side, we will pay close attention
as you guys foreclose and start the marketing process and help in any way we
can. The ROFR angle is ideal - sorry I do not have better news on the
asset.

David S. Hall
Lennar Partners
300 Crown Colony Drive
Quincy, MA 02169

(617) 472-4540
(617) 472-4580 fax
(617) 930-3973 mobile

dhall@lnrproperty.com


-----Original Message-----
From: Ronald Schrager [mailto:rschrager@lnrproperty.com]
Sent: Monday, September 20, 2004 11:22 AM
To: Joe Polcari; Randy Wolpert; 'dhall@lnrproperty.com'
Cc: Larry Golinsky
Subject: RE: New Loans for Transfer Date: 8/18/2004


Do you have a view of the real estate?

-----Original Message-----
From: Joe Polcari
Sent: Monday, September 13, 2004 11:50 AM
To: Randy Wolpert; 'dhall@lnrproperty.com'
Cc: Larry Golinsky; Ronald Schrager
Subject: RE: New Loans for Transfer Date: 8/18/2004


I'm working a couple of different angles. The ideal situation involves the
borrower giving us the deed like he did in Chris' deal.

**REDACTED**

**REDACTED**

:. If you like, I can go into alot more detail about the escrow payments, P&I draws from the reserve account, etc.

Regarding the note sale, in my mind, we should look at a one-off sale, as a bulk sale will likely take longer.

I realize that advancing is the make or break part in this deal. We will have all three approaches heading simultaneously towards the finish line.

-----Original Message-----
From: Randy Wolpert
Sent: Monday, September 13, 2004 11:11 AM
To: Joe Polcari; 'dhall@lnrproperty.com'
Cc: Larry Golinsky; Ronald Schrager
Subject: RE: New Loans for Transfer Date: 8/18/2004


Advancing is going to crush us on this if we don't act quickly to either get title and sell as REO or sell the note.

-----Original Message-----
From: Joe Polcari
Sent: Thursday, September 09, 2004 7:54 PM
To: Randy Wolpert; 'dhall@lnrproperty.com'
Subject: RE: New Loans for Transfer Date: 8/18/2004


I didn't see it today - I had a PTO day. My plan is to schedule a site visit next week with the borrower so David and I can take a good look. Meanwhile, below is my interpretation of the relevant PSA section (3.18).

1) We can purchase a Defaulted Loan (defined as a loan that is 60 days delinquent) at the Purchase Price (defined as the unpaid principal, accrued interest, unreimbursed advances and interest on advances). It appears that we have the first right of purchase, followed by the Servicer, followed by the Directing Certificateholder, which I read as Madison.

2) We can offer to sell a Defaulted Loan, not otherwise purchased by the parties mentioned above, if the SS determines that the sale would produce a greater recovery on a PV basis than would liquidation of the Mortgaged Property. The offering must be made for a period of at leat 20 days, but not more than 90 days. In the event that the bids do not equal or exceed the Purchase Price, the SS can accept what it determines to be a fair price.


3) We have to give the Trustee and Servicer three business days notice of our intent to sell a Defaulted Loan (or REO Property).

4) If the SS is the high bidder, then the Trust determines whether the SS

10/19/2005

LNR00455

bid is a "fair price". In determining this, the Trustee may rely on the opinion of an appraiser at the expense of the Trust Fund.


-----Original Message-----
From: Randy Wolpert
To: Ronald Schrager; David Hall
Cc: Kevin Wodicka; David Team; Joe Polcari
Sent: 9/9/2004 10:09 AM
Subject: RE: New Loans for Transfer Date: 8/18/2004

David, I think Joe is going to see the property today, not sure if you've going with him and I don't know if you've had any further opportunity to ponder this. Keep us in the loop on your thoughts and I know Joe will keep you appraised of our plans. If we are going to pursue it internally, we'll need to discuss process, since the PSA will dictate how we need to go about this and we'll need to involve the trustee. Ultimately we'll have to be ready with our number as bids are coming in.

> -----Original Message-----
>From: Ronald Schrager
>Sent: Monday, August 23, 2004 3:56 PM
>To: David Hall
>Cc: Kevin Wodicka; Randy Wolpert; David Team
>Subject: RE: New Loans for Transfer Date: 8/18/2004
>
>Here's my take based on your comments:
>
>Your valuation analysis seems to make sense--the biggest variable is
>how long it takes you to find the user. We can try and get you some
>market stuff if we have any but you would probably be able to get as
>good or better info. than we will get. From the CMBS side we will
>likely have to put this on the market immediately as the carry costs
>associated with this will kill us. At that point we essentially have a
>ROFR and will be able to see where the offers come in. If we think
>everyone is bottom feeding we can scoop this up at that point. My
>sense is this is well-located real estate and in a market recovery this
>is a good asset. Everything I'm hearing is that the market in general
>is starting to turn the corner. If you agree I think you should start
>to think about where you would feel comfortable owning this in the
>event we take this to market quickly. We should be able to get you
>access to the building assuming the borrower is cooperating (I think he
>is as of now). If we buy it for $60, spend $40 to bring in a tenant at
>$13NNN this could work unless in takes us several years to find a user.
>Or if this is multiple buildings could we multitenant?
>      -----Original Message-----
>      From: David Hall
>      Sent: Monday, August 23, 2004 11:05 AM
>      To: Ronald Schrager
>      Cc: Kevin Wodicka; Randy Wolpert; David Team
>      Subject: RE: New Loans for Transfer Date: 8/18/2004

> Ron, sorry for the delay on this. here is my gut feel.
>
> This all depends on the interior finishes and tenant upgrades
>for financial back office. The only way to make money is to get
>comfortable that you've got plug-n-play, (or buy this real cheap). If
>tenant walks in and needs $30 in TIs, then you're dead (if we have to
>start with $117 as basis). This is a 12 -14 NNN market and you never
>want to let project costs the exceed $115 - $120. I would say Fleet
>is likely to have done all the right things to make this work for its
>own operations - but I have not seen the inside.
>
> So, if you have plug-n-play then dark value is 90 -100 but its
>still very scary at those numbers. Safer underwriting is to assume
>$60--70 dark and know you're looking at 30 - 40 in cost to make a deal.
>Time to make a deal is obviously another problem - could be years not
>months with that new vacant building immediately next door.
>
> Problem with this site has always been access. Its just real
>tough to get to. It has great signage on major highway but no
>interchange that serves it directly. Thats why its back office -
>workers know how to get to the office but no -one else can find the
>place.
>
> I do not see any other re-development play in terms of tear down
>for housing - etc. Canton will never let that happen.
>
> Would like to see any appraisal info and get a chance to see
>what brokers think. My sense of the market could need some updating
>as things are starting to happen here.
>
>
>
>
>
>
> -----Original Message-----
> From: Ronald Schrager
> Sent: Thursday, August 19, 2004 11:59 AM
> To: David Hall
> Cc: Kevin Wodicka; Randy Wolpert; David Team
> Subject: FW: New Loans for Transfer Date:
>8/18/2004
>
> David,
>
> Congrats on the Fan Pier deal. Looks like you got us in
>a great position to outflank the local favorites.
>
> Wanted to get a read from you on a potential mining
>opportunity, Blue Hills Office Park in Canton. Here is what we know:
>

10/19/2005

LNR00457

>     Gerald Fineberg is bwr. 100% occ as of 6/03. A
>2-story, 274M s.f. Class A office building built in 1970. Property was
>96% leased to Fleet Bank (formerly BankBoston, the name of the division
>in the building is Equiserve) until July 2004. Fleet vacated at lease
>expiration, reportedly to a building they have purchased next door from
>National Development (which sat vacant for 2 years before this as is
>another 175ksf newly constructed building on same street). Despite
>good back office location, mkt is soft and quasi-single tenant lease
>rolls. Debt is $32MM or $117 psf.
>
>     Address is:
>     Blue Hills Office Park
>     150 Royall Street
>     Canton, MA 02021
>
>     Would like to know from you (1) what do you think the
>dark value of this is if we sold it today and (2) do you think this is
>an asset we would want to purchase vacant and redevelop.
>
>     Thanks.
>
>     Ron
>
>
>
>

10/19/2005

LNR00458