UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

**DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S RESPONSE TO
RULE 56.1 STATEMENT OF UNDISPUTED FACTS OF
PLAINTIFF AND DEFENDANTS-IN-COUNTERCLAIM**

      Defendants and plaintiffs-in-counterclaim JP Morgan Chase Bank, as Trustee for the

Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial

Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") and CSFB 1999-C1 Royall

Street, LLC ("CSFB") submit this joint response to the Rule 56.1 Statement of Undisputed of

Plaintiff and Defendants-in-Counterclaim ("Blue Hills' Facts").  A separate memorandum of law

in opposition to the motion for summary judgment by Blue Hills Office Park LLC ("Blue Hills"),

William Langelier and Gerald Fineberg is being filed herewith.

## The Parties

### Blue Hills, Fineberg and Langelier

1.      *Blue Hills is a Delaware limited liability company with a principal place of business at One Washington Street, Suite 400, Wellesley, Massachusetts 02481. See Deposition Exhibit 155, page 1, attached to Affidavit of Peter B. McGlynn, Esq. ("McGlynn Affidavit") as Exhibit 1.*

**RESPONSE 1:** Undisputed.

2.      *Blue Hills is a so-called single purpose entity, formed in 1999 in connection with a refinancing of real property and a building thereon located at 150 Royall Street, Canton, Massachusetts and known as the Blue Hills Office Park (the "Property"). The Property consists of a two-story brick building containing approximately 275,000 square feet of office space on 150 Royall Street, Canton, Massachusetts. See Deposition Exhibit 217, attached to McGlynn Affidavit as Exhibit 48.*

**RESPONSE 2:** It is undisputed that Blue Hills is a single-purpose entity formed in

1999. The refinancing was of a prior loan (Langelier 46[1]), and the new loan was secured by a

mortgage and security agreement conveying a security interest in the real property and

improvements at 150 Royall Street, Canton, Massachusetts, as wells as numerous other elements

---

[1] References to deposition testimony are by witness last name and page number. Deposition transcripts are contained in Defendants' and Plaintiffs-in-Counterclaim's Appendix of Deposition Transcripts, manually filed as docket number 80 on May 17, 2006.

Deposition exhibits other than ones cited in the paragraph to which the Lender is responding are to Defendants' and Plaintiffs-in-Counterclaim's Appendix of Deposition Exhibits, filed as docket no. 75 on May 17, 2206 and identified herein as "Dep. Exs. App." or to Defendants' and Plaintiffs-in-Counterclaim's Supplemental Appendix of Deposition Exhibits, filed today and identified as "Dep. Exs. Supp. App."

References to other documents submitted by the Lender are to the Affidavit of Bruce S. Barnett in Support of Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment, filed May 17, 2006 as docket no. 72 and identified herein as "[First] Barnett Aff." and to the Second Affidavit of Bruce S. Barnett in Support of Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment, filed today and identified herein as "Second Barnett Aff."

Defendants' and Plaintiffs-in-Counterclaim's Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment, as corrected, filed as docket no. 86 on May 17, 2006, is identified herein as "Lender's Facts".

The respective memoranda of law by the Trustee and CSFB in support of their motions for summary judgment, filed on May 17, 2006 as docket nos. 84 and 87, are referred to as the "Trustee's Brief" and "CSFB's Brief."

Capitalized terms not defined herein (or in Blue Hills' Facts) have the meaning given to them in Lender's Facts.

of property detailed in the mortgage and defined collectively therein as "Mortgaged Property"

(Dep. Exs. App. 155, Mortgage pp. 1-3).

3.    *The formation of Blue Hills as a single purpose entity was required as a precondition to the refinancing.  See Deposition Exhibit 155, ¶ 12, attached to McGlynn Affidavit as Exhibit 1.*

**RESPONSE 3:**  Undisputed.

4.    *Blue Hills' sole member is Royall Associates Realty Trust ("Trust").  The Trust owned the Property prior to the 1999 re-financing.  See Deposition Transcript of William Langelier ("Langelier Deposition"), page 45, lines 16 - 24; page 81, lines 14-16, attached to McGlynn Affidavit as Exhibit 17.*

**RESPONSE 4:**  Undisputed.  Lender's Facts and the Trustee's Brief and CSFB's Brief

refer to the "Trust" as "Royall Associates."

5.    *Fineberg and Langelier are the trustees of the Trust, as well as also being two of the six beneficiaries of the Trust.  See Deposition Exhibit 176, attached to McGlynn Affidavit as Exhibit 44.*

**RESPONSE 5:**  The Lender disputes the incorrect assertion there are only two trustees of

the Trust/Royall Associates.  As Deposition Exhibit 176 indicates, Blue Hills Management Corp.

is the third trustee of the Trust/Royall Associates.  (Dep. Ex. 176.)  The Lender also notes that at

the time of the 1999 refinancing, Royall Associates General Partnership was the beneficiary of

the Trust/Royall Associates (Langelier 45), but by the end of 2004, the individual general

partners were identified as the beneficiaries (Dep. Ex. 176).

### *Credit Suisse*

6.    *Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse") is a Delaware limited liability company with a principal place of business in New York, New York.  See Answers of CSFB 1999-C1 Royall Street LLC and J.P. Morgan to Plaintiff's Second*

*Amended Complaint ("Answers to Second Amended Complaint") ¶ 2; Deposition Exhibit 155, page 1, attached to McGlynn Affidavit as Exhibit 1.*

**RESPONSE 6:**  Undisputed, although ¶ 2 of the Answers to Second Amended

Complaint does nothing to support the identity of Credit Suisse.


7.    *In August 1999, Blue Hills and Credit Suisse agreed upon the general terms and conditions under which Credit Suisse would loan to Blue Hills approximately $33.1 million to be secured by the Property.  See Deposition Exhibit 182, attached to McGlynn Affidavit as Exhibit 46.*

**RESPONSE 7:**  It is undisputed that Blue Hills and Credit Suisse were negotiating the

refinancing during the summer and early fall of 1999, including during August, and exchanged

the letter that is Dep. Ex. 182, among others.  The Lender disputes the implication that the terms

and conditions of the Loan are other than as set forth in the Note, Mortgage, and other Loan

Documents executed on September 14, 1999.  The undisputed evidence is to the contrary.  See

Dep. Exs. Supp. App. 340 (Bernkopf Goodman Due Enforceability Opinion Letter (Blue Hill

1950) and Exhibit A thereto (Blue Hill 1958) defining Loan Documents as ten documents dated

September 14, 1999).  The Lender disputes the suggestion that the Loan was secured only by the

real estate and improvements.  The Mortgage states that the Loan was also secured by the

numerous other elements of property set forth in the granting clauses of the Mortgage.

(Mortgage pp. 1-3.)


8.    *On or about September 14, 1999, Credit Suisse loaned Blue Hills $33,149,000.00 (the "Loan").  See Counterclaims of CSFB 1999-C1 Royall Street LLC and J.P. Morgan ("Counterclaims"), ¶ 7.*

**RESPONSE 8:**  Undisputed.


### ***J.P. Morgan***

9.      *J.P. Morgan Chase Bank, formerly Chase Manhattan Bank, as Trustee for the Registered Holders of Credit Suisse Bank First Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1991-C1 ("J.P. Morgan"), a New York banking corporation, is assignee of Credit Suisse's interests in the Loan.  See Response No. 1 to Responses to Admissions to Blue Hills, Langelier and Fineberg's First Set of Requests for Admissions and CSFB's Response to Blue Hills, Langelier and Fineberg's First Set of Requests for Admissions (collectively "Responses to Admissions"), attached to McGlynn Affidavit as Exhibit 7.*

**RESPONSE 9:**  The Lender disputes paragraph 9 only to the extent that the Trustee *was*

the assignee of Credit Suisse until it further assigned the Loan to CSFB.  See paragraph 11,

below.


10.     *The assignment to J.P. Morgan of all of Credit Suisse's interests in and obligations under the Loan was recorded with the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, page 387.  See Response No. 1 to Responses to Admissions, attached to McGlynn Affidavit as Exhibit 7.*

**RESPONSE 10:**  Undisputed.


11.     *J.P. Morgan was record holder of the Loan until it assigned all of its right, title and interest in the Loan to CSFB 1999-C1 Royall Street, LLC ("CSFB") on or about November 10, 2004.  See Response No. 2 to Responses to Admissions, attached to McGlynn Affidavit as Exhibit 7.*

**RESPONSE 11:**  Undisputed.


### *CSFB*

12.     *CSFB is a Delaware limited liability company formed in September 2004 with a principal place of business at 1601 Washington Avenue, Suite 700, Miami Beach Florida, 33139. See Answers to Second Amended Complaint, ¶ 3; Certificate issued by Delaware Secretary of State, attached to McGlynn Affidavit as Exhibit 55.*

**RESPONSE 12:**  Undisputed.


13.     *All of J.P. Morgan's rights, title interest and obligations in the Loan were assigned to CSFB by assignment recorded in Norfolk Registry of Deeds on November 10, 2004*

*in Book 21755, page 477. See Response No. 2 to Responses to Admissions, attached to McGlynn Affidavit as Exhibit 7.*

**RESPONSE 13:** Undisputed.

### Wells Fargo and LNR

*14.    Wells Fargo Bank Commercial Mortgage Servicing ("Wells Fargo") is a commercial loan servicer with a principal place of business in California. See Deposition Transcript of Curtis Mallegni ("Mallegni Deposition"), page 15, attached to McGlynn Affidavit as Exhibit 16.*

**RESPONSE 14:** Undisputed.

*15.    LNR Partners, Inc., formerly known as Lennar Partners, Inc. ("LNR"), is a Florida corporation with a principal place of business in Florida. See Counterclaims ¶ 1.*

**RESPONSE 15:** Undisputed, although ¶ 1 of the Counterclaim does not establish this fact.

*16.    Under a Pooling and Servicing Agreement ("PSA") dated October 11, 1999, Wells Fargo was the Master Servicer and LNR was the Special Servicer of the Loan. See Response Nos. 3 and 4 to Responses to Admissions; Mallegni Deposition, pages 30-31, attached to McGlynn Affidavit as Exhibits 7 and 16.*

**RESPONSE 16:** The Lender disputes only the incorrect suggestion that the formal title of Wells Fargo under the PSA is "Master Servicer"; formally it is the "Servicer." (Dep. Exs. App. 51.) It is undisputed that, in the language of the Commercial Mortgage-Backed Securities industry, Wells Fargo was the master servicer of the pool that included the Loan.

*17.    Wells Fargo and LNR were agents of J.P. Morgan and CSFB.  See Response Nos. 3 and 4 to Responses to Admissions, attached to McGlynn Affidavit as Exhibit 7.*

**RESPONSE 17:**  The Lender disputes any implication that Wells Fargo and LNR were agents of the Trustee and CSFB for any purposes other than those set forth in the PSA and for any time other than when Trustee and CSFB respectively held the Loan, all as stated in the cited Responses 3 and 4 to the Requests for Admissions.

### *Fineberg Management Company*

*18.    Fineberg Management Company ("FMC"), a company affiliated with Fineberg, was retained by Blue Hills to manage the Property.  FMC managed the Property prior to the 1999 refinancing and continued to manage the Property until November 19, 2004.  See Deposition Transcript of Joseph Donovan ("Donovan Deposition"), page 27, line 9 through page 28, line 23, attached to McGlynn Affidavit as Exhibit 10.*

**RESPONSE 18:**  Undisputed.

### *The Property And The Lease*

*19.    The Loan was secured by a mortgage on the Property.  See Counterclaims, ¶ 8.*

**RESPONSE 19:**  The Lender disputes the suggestions that the mortgage was the only security document and that the real estate and the improvements were the only collateral.  The evidence is undisputed that the Loan was secured by numerous loan documents in addition to the Mortgage, including without limitation an Assignment of Leases and Rents, a Guaranty by Fineberg and Langelier, a Cash Management Agreement, and UCC financing statements. (McGlynn Aff. Exs. 3, 4.)  It is also undisputed that the Mortgage conveyed a security interest in not only the real estate and the improvements but also numerous other elements of property set forth in eight granting clauses.  (Mortgage pp. 1-3.)

20.    At the time of the Loan's inception, the Property was occupied primarily by one tenant, Equiserve, Inc. ("Equiserve"), which occupied approximately 96% of the building on the Property.  See Deposition Transcript of Joseph Rubino ("Rubino Deposition"), page 61, line 6 and page 63, line 18, attached to McGlynn Affidavit as Exhibit No. 18.

**RESPONSE 20:**  Undisputed.

21.    Equiserve's lease with Blue Hills ("Lease") expired on July 31, 2004, although Equiserve retained an option to extend the Lease for an additional five-year term.  See Rubino Deposition, page 88, lines 1-11, attached to McGlynn Affidavit as Exhibit 18.

**RESPONSE 21:**  Undisputed, although the cited testimony says nothing about an option to extend and is unclear on the termination date.

22.    At the Loan's inception, all parties, including Credit Suisse, not only knew that the Lease would expire on July 31, 2004 but also knew that the Lease provided the only source of funds available to service the Loan.  See Deposition Exhibits 182 and 217, attached to McGlynn Affidavit as Exhibits 46 and 48.

**RESPONSE 22:**  It is undisputed that, at the Loan's inception, all parties knew the Lease would expire on July 31, 2004 (subject to Equiserve's option to extend for five years, see paragraph 21, above).  The Lender disputes the unsupported assertion that that all parties also knew at the Loan's inception that the Lease provided the only source of funds available to service the Loan.  Part of the reason Credit Suisse investigated the net worth and liquidity of Langelier and Fineberg was to obtain comfort that the principals of Blue Hills had money to put into the property in the event Equiserve left.  (Rubino 74-75.)  As it turns out, when Equiserve did depart, Blue Hills' principals had access to millions of dollars generated from their ownership of Blue Hills that they could have chosen to invest in the property, but they did not.  Lender incorporates by reference its response to paragraph 69, below.  Blue Hills, Langelier and Fineberg have not cited any evidence that all parties knew the Lease provided the only source of

funds available to service the loan, as neither Deposition Exhibit 182 nor 217 establishes that fact.

### The Negotiation of the Loan and Loan Documents

23.  *The terms and conditions of the mortgage financing were contained in two separate documents:*

- *Mortgage Financing Application dated July 20, 1999 between Blue Hills and Credit Suisse together with a term sheet which was incorporated into and made a part of the letter. See Deposition Exhibit 14, attached to McGlynn Affidavit as Exhibit 25.*

- *Letter of intent dated August 31, 1999 from Blue Hills to Credit Suisse, countersigned by Credit Suisse ("Letter of Intent"). See Deposition Exhibit 182, attached to McGlynn Affidavit as Exhibit 46.*

**RESPONSE 23:**  The Lender disputes these assertions. The undisputed evidence is that the terms and conditions of the financing were contained in the Mortgage and the other Loan Documents executed on September 14, 1999. (Bernkopf Goodman Due Enforceability Opinion, Dep. Exs. App. Supp. 340.) The Lender notes the Mortgage Financing Application and the Term Sheet cited by Blue Hills (and all other copies discovered in this litigation) are unsigned.

24.  *As part of the Loan closing held on September 14, 1999, Blue Hills executed various Loan documents including the following: Mortgage, Assignment of Rents and Security Agreement ("Mortgage"); Mortgage Note ("Note"); and Cash Management Agreement. See Deposition Exhibits 155, 156, and 213, attached to McGlynn Affidavit as Exhibits 1, 2 and 3.*

**RESPONSE 24:**  Undisputed.

25.  *Fineberg and Langelier also executed a Guaranty ("Guaranty"). See Langelier Deposition, page 83, line 12 through page 84, line 3, attached to McGlynn Affidavit as Exhibit 17; see Guaranty attached to McGlynn Affidavit as Exhibit 4.*

**RESPONSE 25:** Undisputed.

26.    As drafted, the Loan is non-recourse as to Blue Hills, Fineberg and Langelier except under certain limited circumstances which are set forth in the Mortgage, Note and Guaranty.  See Guaranty attached to McGlynn Affidavit as Exhibit 4; see Deposition Exhibits 155 and 156, attached to McGlynn Affidavit as Exhibit 1 and 3.

**RESPONSE 26:**  It is undisputed that the loan is recourse to Blue Hills, Fineberg and

Langelier under the circumstances set forth in the Note, Mortgage, Guaranty and other Loan

Documents.  (The Note is [First] Barnett Aff. Ex. C and McGlynn Aff. Ex. 2.)


27.    The Letter of Intent contained the following proposed language for what became paragraph 1.2(ii)(D) of the Guaranty:  "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage . . ."  See Deposition Exhibit 182, attached to McGlynn Affidavit as Exhibit 46.

**RESPONSE 27:**  It is undisputed that Exhibit A to the Letter of Intent contains the

quoted language.  Blue Hills, Langelier and Fineberg have not offered any evidence to establish

that the quoted portion of the Exhibit A "became" paragraph 1.2.(ii)(D) of the Guaranty.


28.    While the Loan was being negotiated, successive drafts of paragraph 1.2(ii)(D) of the Guaranty prepared by Credit Suisse's counsel, Schulte Roth & Zabel, LLP, contained this language:  "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein as required by the Mortgage. . ."  See Excerpt of Deposition Exhibit 208, attached to McGlynn Affidavit as Exhibit 47.

**RESPONSE 28:**  It is undisputed that the one draft of the Guaranty that is a part of

Deposition Exhibit 208 contains the quoted language.  Deposition Exhibits 209 and 212 contain

other drafts of the Guaranty with the same language.

29.    *The final version of the Guaranty executed by Fineberg and Langelier contained the following language:   "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage . . ."   See Guaranty, attached to McGlynn Affidavit as Exhibit 4.*

**RESPONSE 29:**  Undisputed, except to note that "Section 10" is underlined in the

Guaranty.


### *Loan Securitization And The Pooling Agreement*

30.    *Credit Suisse originated the Loan, which was securitized and assigned to J.P. Morgan, as Trustee of a pool of loans.   Real estate loan securitization creates a secondary market for loans secured by mortgages on real property.   Lenders originate loans and then sell a group of loans as a pool to an entity that will issue securities.   See Response No. 1 to Responses to Admissions attached to McGlynn Affidavit as Exhibit 7; see generally, 4. Law of Distressed Real Estate §56:14, Asset Securitization and Commercial Mortgage Backed Securities,*

**RESPONSE 30:**  Undisputed.


31.    *An entity generally known as a "Master Servicer," Wells Fargo in this case, is responsible for collecting and tracking all mortgage payments and ensuring that all payments are made to all the security holders.   See Mallegni Deposition, page 18, line 9 through page 20, lines 3-18, attached to McGlynn Affidavit as Exhibit 16.*

**RESPONSE 31:**  It is undisputed that Wells Fargo was the master servicer for the pool

that included the Blue Hills Loan.  The Lender disputes any suggestion that paragraph 31

provides a complete description of the role of the master servicer.  In the cited passages,

Mallegni testified that the role of the master servicer was set forth in the Pooling and Servicing

Agreement (Dep. Ex. App. 51) and includes all administrative matters related to a loan, including

making sure payments are timely and collected, processing cash, renewing insurance, disbursing

reserves, entertaining borrower requests that are within the authority of the master servicer under

the PSA, monitoring the credit quality of the loan, preparing watch lists, etc.

32.     Another entity, generally known as the "Special Servicer," LNR in this case, is charged with servicing the loans if the loans are in default for a certain period of time or default is imminent.  *See Mallegni Deposition, page 22, lines 22-25 through page 23, lines 1-10, attached to McGlynn Affidavit as Exhibit 16.*

**RESPONSE 32:**  It is undisputed that LNR was the special servicer for the pool that

included the Loan.  The Lender disputes any suggestion that paragraph 32 accurately describes

the duties of the special servicer, which are set forth in the Pooling and Servicing Agreement

(Dep. Ex. 51), or sets forth all of the circumstances which would trigger a transfer of a loan to

the special servicer.  In the cited passage, Mallegni -- who is employed by Wells Faro, not LNR

(Mallegni 9) -- testified that a section of the PSA defines the transfer events and that there are

seven or eight of them.


33.     When the Loan was assigned to J.P. Morgan as trustee, it became subject to the PSA under which, inter alia, Wells Fargo became the Master Servicer and LNR became the Special Servicer.  *See Polcari Deposition, Vol. 1, page 14, line 6 through page 15, line 18, attached to McGlynn Affidavit as Exhibit 12.*

**RESPONSE 33:**  It is undisputed that the Loan became part of the pool of assets created

by the PSA and that Wells Fargo became the master servicer and LNR became the special

servicer.  The Lender disputes the assertion that that the Loan "became subject to" the PSA.  The

PSA provides that each loan is to be serviced according to its terms.  (PSA ¶ 3.01(a) (Dep. Exs.

Supp. App. 51.)


34.     Wells Fargo and LNR were required to service and administer the Loan in accordance with applicable law, the terms of the Loan documents, and the PSA, as well as in accordance industry standards.  *See Answers to Second Amended Complaint, ¶63*

**RESPONSE 34:**  The Lender notes that cited paragraph 63 of the Answers to Second

Amended Complaint does not mention Wells Fargo.  Nevertheless, it is undisputed that pursuant

to and for the benefit of parties to the Pooling and Servicing Agreement (to which Blue Hills was

not a party), LNR and Wells Fargo agreed to service and administer the Loan in accordance with applicable law, the terms of the Loan Documents, and, to the extent not inconsistent with the foregoing, the PSA and whichever standard of care is higher between the manner in which LNR or Wells Fargo would administer loans owned by other third parties and the manner it administers loans owned by itself.  (Dep. Exs. Supp. App. 51.)  The Lender disputes the unsupported suggestion that Wells Fargo and LNR had other servicing obligations.  The Lender disputes the unsupported assertion that the duties and standards of the PSA run to the benefit of or are enforceable by Blue Hills, Langelier or Fineberg. (Dep. Exs. App. 51, PSA § 10.08.)  The Lender's obligations to Blue Hills, Langelier and Fineberg are set forth in the Loan Documents and/or established by applicable law.

### *Cash Management and Reserve Accounts*

35.    *When the Loan was negotiated, the parties intended significant cash reserves to be set aside by Blue Hills and contemplated that Blue Hills could access the reserve funds if Equiserve did not renew its Lease and such funds were needed before a new tenant was in place. See Rubino Deposition, page 63, line 1 through page 65, line 7; Deposition Exhibit 217, attached to McGlynn Affidavit as Exhibits 18 and 48.*

**RESPONSE 35:**  It is undisputed that the parties intended, and the Loan Documents required, Blue Hills to fund a cash reserve that would be available for tenant improvements and leasing commissions, or for up to $1 million of principal and interest payments (approximately 4 months' worth) if Equiserve did not renew its lease and rent income did not cover principal and interest payments, all subject to the terms and conditions of the Mortgage.  (Mortgage ¶ 6(c).)  The Lender disputes any assertion that reserve funds held by the Lender were available (or were intended to be available) on terms other than as stated in the Mortgage.  The undisputed evidence

is to the contrary.  As Joseph Rubino, who originated the loan for Credit Suisse, testified at his

deposition:

> Paragraph [6(c)](ix) is there to prepare for the eventuality that Equiserve is no longer in the building.  And so long as the borrower has continued to demonstrate commitment to the property by paying all the operating expense and paying the taxes and funding all of the escrows, the replacement reserve escrow, the tax insurance escrows and everything that needs to be paid, as long as he's funding those reserves, so long as he has not been in default, so long as he hasn't done anything to breach the documents, so long as he's complied with this section, so long as it shows that there is an insufficiency of net operating income to cover debt service, then this would allow the borrower to request a withdrawal from the cash flow leasing escrow for the component that's available for principal and interest to pay principal and interest.

(Rubino 231.)  The Lender did not "intend that the borrower [would] have access to reserves for

the purposes other than [those] that are set forth in the mortgage and the loan documents."

(Rubino 231-32.)  It was not "the purpose of the reserves to allow access for payment of items

such as taxes that the documents don't allow to be paid from the reserve."  (Rubino 232; see also

Rubino 44-46, 90, 183-85.)

Even in the event of Equiserve's departure, Blue Hills was required to make payments to

the Tax and Insurance Escrows, the Replacement Reserve, and the Base Leasing Escrow

Reserve.  (Mortgage ¶¶ 6(a), (b) and c(i) (stating "Mortgagor shall pay" the amounts for taxes,

insurance, replacements, and base leasing escrow, and containing no suspension of the payment

requirements); ¶ 6(c)(ix)(d) (stating that, subject to conditions, leasing escrow reserves are

available for principal and interest if, after funding the tax, insurance, replacement and base

leasing escrows, net operating income is less than principal and interest payments).)  As Rubino

testified, those payments continue to be required because:

> ….the borrower needs to continue to show an interest and commitment to the property.  If the borrower is not going to pay property taxes out of his pocket or he is not going to pay the required reserves out of his own pocket, then at that

point it is clear that the borrower is no longer interested in staying with the property.

At that point, the borrower is sending signals that they are not longer interested in supporting the property and achieving or proceeding along a path to restore the property to a healthy condition.

At that point, that's when a lender has to say, well, hang on a second. If the borrower is not going to do that then I ought to be the beneficiary of any potential upside in the property.

As soon as the borrower make selections not to pay what he's obligated to pay under the documents, he is making a conscious decision to give up his right to any economic benefits from the property.

(Rubino 233; <u>see</u> <u>also</u> Rubino 207-08, 229-30.)

36.    *The Cash Management Agreement required Blue Hills to deposit into a "Clearing Account" all of the "Rents" that it received in connection with the Lease.  See Deposition Exhibit 156, attached to McGlynn Affidavit as Exhibit 3.*

**RESPONSE 36:**  Undisputed.

37.    *Funds deposited into the Clearing Account were then swept into a lender-controlled Cash Collateral Account and, thereafter, divided into nine separate sub-accounts maintained by the lender on a ledger entry basis.  See Deposition Exhibit 156, attached to McGlynn Affidavit as Exhibit 3.*

**RESPONSE 37:**  It is undisputed that paragraph 37 roughly describes the process contemplated by the Cash Management Agreement ("CMA"), which is Dep. Ex. 156.  The Lender disputes any suggestion that the CMA called for funds to be evenly divided among nine subaccounts.  Rather, it called for funds to be allocated to subaccounts according to the terms of the Loan Documents.  (CMA § 3(a).)

38.    These sub-accounts included a "Tax and Insurance Impound Fund," a "Base Leasing Escrow Fund," and a "Cash Flow Leasing Escrow Fund" which were maintained for, inter alia, payment of taxes, insurance and tenant improvements.  See Deposition Exhibit 156, attached to McGlynn Affidavit as Exhibit 3.

**RESPONSE 38:**  It is undisputed that paragraph 38 identifies three of the ledger-entry subaccounts called for by Section 2 of the CMA, which further states that Disbursements from the Tax and Insurance Impound Fund and Leasing Escrow Funds were to be made in accordance with the provisions of the Mortgage.  (CMA § 3(b).)

39.    The reserve accounts could be accessed by Blue Hills for various purposes, including debt service.  See Rubino Deposition page 231, lines 5-22; Deposition Exhibit 155, attached to McGlynn Affidavits as Exhibits 18 and 1.

**RESPONSE 39:**  It is undisputed that the different reserve accounts were established for various purposes set forth in the Mortgage and the funds in them might, subject to the conditions of the Loan Documents, be disbursed back to Blue Hills.  It is undisputed also that, subject to the provisions of Mortgage ¶ 6(c)(ix), up to $1 million of the Leasing Escrow Funds could be available to Blue Hills for application to payments of principal and interest.  (Mortgage ¶ 6; Rubino 231-32.)  The Lender incorporates by reference its response to paragraph 35, above.

40.    Paragraph 6(c)(ix) of the Mortgage required J.P. Morgan to disburse  up to $1 million of funds (in excess of a minimum account balance of $2,750,000) to be used "solely toward payment or principal and interest then due and payable on the Note . . . ."  See Deposition Exhibit 155, attached to McGlynn Affidavit as Exhibit 1.

**RESPONSE 40:**  It is undisputed that paragraph 6(c)(ix) of the Mortgage called for the Lender to disburse up to $1 million from the Leasing Escrow Funds (to the extent the Leasing Escrow Funds on deposit exceed $2.75 million) for application solely toward payment of principal and interest then due and payable on the Note, provided that Blue Hills met the requirements of paragraph 6(c)(ix), which included, among others:  (a) Blue Hills must deliver to

the Lender a written request for the disbursement at least seven business days prior to the

requested disbursement date; (b) there must not be an Event of Default that has occurred and is

continuing as of the date of the request and the requested disbursement date; and (c) net

operating income for the debt-service period must be insufficient to pay principal and interest

after it has been applied to all required contributions to the replacement reserve, the tax and

insurance impound fund, and the leasing escrow funds.

41.    *As of August 2004, Blue Hills had deposited approximately $4.1 million in the
reserve accounts.  See Mallegni Deposition, page 48, lines 17 -20, attached to McGlynn Affidavit
as Exhibit 16.*

**RESPONSE 41:**  It is undisputed that, as of August 2004, the total balance of all reserve

accounts for the Loan held by the Lender was approximately $4.1 million.  The Lender disputes

any suggestion that $4.1 million is the balance of the Leasing Escrow Funds from which the

principal and interest disbursement contemplated by Mortgage paragraph 6(c)(ix) would have

been drawn.  The cited passage of Mallegni's deposition does not provide any breakdown of the

$4.1 million in reserves.

42.    *In accordance with Paragraph 6(c)(ix) of the Mortgage, Blue Hills should have
been able to access up to $1 million in August 2004.  See Deposition Exhibit 155 and Mallegni
Deposition, page 48, lines 17-20, attached to McGlynn Affidavit as Exhibits 1 and 16.*

**RESPONSE 42:**  The Lender disputes this unsupported assertion.  The undisputed

evidence is that in August 2004 (and September 2004), Blue Hills did not meet the preconditions

to a disbursement under paragraph 6(c)(ix).

As an initial matter, its August request for a disbursement was untimely.  It is undisputed

that Blue Hills' first written request for access to the reserves  -- Donovan's letter dated August 2

-- was not delivered to the Lender seven business days prior to the August 11, 2004 payment date. While August 2 was seven business days before August 11, Donovan deposited the letter in the U.S. Mail on August 2 and faxed it to Wells Fargo on August 4. (Blue Hills, Fineberg and Langelier Answers to Defs' Second Interrogatories, No. 2 ([First] Barnett Aff. Ex. J); Donovan 163.) The Wells Fargo Loancator correspondence tracking system notes that the August 2 letter was received by Wells Fargo on August 4, 2004. (Dep. Exs. App. 134; Martin 61-68.)

Additionally, there were numerous Events of Default existing as of the date of the request (whether "date of request" be deemed the date of mailing (August 2) or of delivery (August 4)) and the date of the requested disbursement (the August 11 payment date). First, Events of Default had occurred in 2003 and were continuing throughout 2004 as a result of Blue Hills' transfers of Mortgaged Property in connection with the settlement of the Zoning Appeal and transfer of the $2 million settlement Payment to Royall Associates. (Lender's Facts ¶¶ 44-79; CSFB's Brief at 7-11.)

Second, a separate Event of Default occurred by August 2, 2004 and was continuing through the time of the foreclosure when Blue Hills neither paid the property tax bill of $158,181.19 due to the Town of Canton on August 2, 2004 nor delivered sums equaling that amount to the Lender in accordance with Mortgage ¶ 6. (Lender's Facts ¶¶ 100-112.)

Third, separate Events of Default occurred on August 11, 2004, when Blue Hills failed to make payments to the replacement, tax and insurance, and leasing escrow funds. (Lender's Facts ¶ 119.)

Blue Hills, Langelier and Fineberg cite no evidence to the contrary. Deposition Exhibit 155 is simply the Mortgage, and the cited passage of Mallegni's testimony merely states that the reserves contained $4.1 million as of August 16.

### *Payment of Real Estate Taxes*

*43.     Although the Mortgage required Blue Hills to fund a reserve account for the payment of real estate taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement in October 1999 under which Equiserve deposited the real estate tax payment into the Clearing Account so that it could be swept into the Cash Collateral Account and used by Wells Fargo to pay the taxes. See Deposition Exhibit 1; Deposition Transcript of Lawrence Needle ("Needle Deposition"), page 140, line 22 and page 141, line 14; Deposition Transcript of Gilbert Stone ("Stone Deposition"), page 46, lines 5-16, attached to McGlynn Affidavit as Exhibits 22, 9 and 19.*

**RESPONSE 43:** The Lender disputes the assertion that Equiserve paid 100% of the tax bill. The undisputed evidence is that Equiserve paid approximately 97% of the taxes. (Lender's Facts ¶ 38.) The Lender notes that the practice of Blue Hills and the Lender under the agreement is set forth in more detail in Lender's Facts ¶¶ 33-43.

*44.     As a result of the foregoing arrangement, shortly before the taxes were due each quarter, Wells Fargo would issue a so-called "tax insufficiency" notice advising Blue Hills that the taxes were due. See Stone Deposition, page 56, lines 14-19, attached to McGlynn Affidavit as Exhibit 9.*

**RESPONSE 44:** The Lender disputes the implication that the tax insufficiency notice stated only that taxes were due. The insufficiency letters also stated that the funds in the Tax Escrow were less than the amount of the tax payment and directed Blue Hills promptly to deposit funds to make up the difference. (Dep. Exs. App. 3, 4.) The Lender notes that the practice of Blue Hills and the Lender under the agreement is set forth in more detail in Lender's Facts ¶¶ 33-43.

45. The last notice received from Wells Fargo before Blue Hills was defaulted for failing to pay real estate taxes was dated July 16, 2004 and stated that "Failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to your loan." See Deposition Exhibit 4, attached to McGlynn Affidavit as Exhibit 23.

**RESPONSE 45:** It is undisputed that Deposition Exhibit 4, dated July 16, 2004, is a copy of the last tax insufficiency notice sent by Wells Fargo before Blue Hills went into default by choosing not to pay the real estate taxes due August 2, 2004. It is also undisputed that the quoted words appear on Deposition Exhibit 4 after a sentence that states that the funds must be received by Wells Fargo no later than July 27. (Dep. Exs. App. 4.)

46. Wells Fargo did not send Blue Hills any notices that failure to timely pay the real estate taxes would constitute a default under the Loan. See Deposition Exhibit 4 and Response No. 20 to Responses to Admissions, attached to McGlynn Affidavit as Exhibits 23 and 7.

**RESPONSE 46:** It is undisputed that the tax insufficiency letter did not expressly state that failure to pay real estate taxes on time would constitute a default under the Loan Documents. The Lender disputes any assertion that such express written notice was necessary, because as a matter of law it was not. It is also undisputed that (a) under the Mortgage, Blue Hills was required to pay the property taxes or deposit with Lender sufficient funds to make the payment (Mortgage ¶¶ 5, 6) and it is an Event of Default for Blue Hills to fail to do so (Mortgage ¶ 23(b)); (b) Blue Hills knew that paying taxes is the obligation of the property owner (Donovan 243); (c) Blue Hills knew a tax payment was due on August 2, 2004, but did not set aside any monies from net rents of approximately $150,000 to $170,000 in each of May, June and July 2004 (Donovan 204, 207-209, 215); and (d) Blue Hills was told by Wells Fargo on July 29, 2004, that reserve funds could not be used to make the August 2 tax payment and that Blue Hills would be in default if it did not make its tax payment (Dep. Exs. App. 5, 6, 8; Lloyd 20-24, 32, 39-40, 60-61).

### *Blue Hills Is Notified In 2003 That The Lease Will Not Be Renewed*

47.    In April 2003, Blue Hills became aware that Equiserve intended to move out of the Property at the expiration of the Lease on July 31, 2004 and relocate to the building located at 250 Royall Street, Canton, Massachusetts ("250 Royall"), which abuts Blue Hills' Property. *See Deposition Exhibit 9 and Needle Deposition, page 61, line 14 and page 63, line 5, attached to McGlynn Affidavit as Exhibits 24 and 19.*

**RESPONSE 47:**  Undisputed.

48.    By letter dated May 14, 2003, Equiserve notified Blue Hills of its intent not to exercise its option to extend the Lease. *See Deposition Exhibit 17, attached to McGlynn Affidavit as Exhibit 26.*

**RESPONSE 48:**  Undisputed.

49.    Blue Hills confirmed Equiserve's intent by a letter to Equiserve dated May 15, 2003. *See Deposition Exhibit 18, attached to McGlynn Affidavit as Exhibit 27.*

**RESPONSE 49:**  Undisputed.

### *The Norfolk Action*

50.    In April 2003, Blueview Corporate Center, LLC ("Blueview"), the owner of 250 Royall, applied to the Town of Canton Zoning Board of Appeals ("ZBA") for a Special Permit to construct a parking garage. *See Deposition Exhibit 9, attached to McGlynn Affidavit as Exhibit 24.*

**RESPONSE 50:**  The Lender disputes paragraph 50 only to the extent that the

undisputed evidence is that National Development and Equiserve, not Blueview, are identified as

the petitioners on the Special Permit application.  (Dep. Ex. 9.)

51.    On May 22 2003, the ZBA issued a decision granting the Special Permit over Blue Hills' objections. *See Counterclaims ¶ 25.*

**RESPONSE 51:**  Undisputed.

52.     *On or about June 9, 2003, Blue Hills filed an appeal of the ZBA's decision in Norfolk Superior Court, Civil Action No. 2003-01051 ("Norfolk Action").  See Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.*

**RESPONSE 52**:  Undisputed.  Lender's Facts and the Trustee's Brief and CSFB's Brief

refer to the "Norfolk Action" as the "Zoning Appeal."

53.     *Blueview and the members of the ZBA were named as parties to the Norfolk Action.  See Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.*

**RESPONSE 53:**  Undisputed.

54.     *In the Norfolk Action, Blue Hills asserted that the ZBA failed to comply with the applicable Canton ordinances and by-laws in permitting the parking garage to be built as proposed.  See Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.*

**RESPONSE 54:**  It is undisputed that the assertions described in paragraph 54 are among

the allegations of the Norfolk Action/Zoning Appeal.

55.     *Blue Hills alleged, inter alia, that the height of the proposed parking garage would not comply with applicable ordinances and by-laws. See Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.*

**RESPONSE 55:**  It is undisputed that the assertion described in paragraph 55 is implied

by the allegations of the Norfolk Action/Zoning Appeal.

56.     *Blue Hills did not claim that the ZBA's decision caused it any monetary damage nor did it seek monetary damages as a remedy.  Rather, Blue Hills sought only to have the ZBA's decision to grant the Special Permit annulled.  See Deposition Exhibit 20, attached to McGlynn Affidavit as Exhibit 28.*

**RESPONSE 56:**  It is undisputed that Blue Hills did not seek monetary damages as a

remedy in the Norfolk Action/Zoning Appeal.  Blue Hills sought an annulment of the ZBA

decision and a declaratory judgment.  It is also undisputed also that monetary damages are not

available in a zoning appeal.  The Lender disputes any suggestion that Blue Hills did not allege

that its property would be harmed by the garage.  It is undisputed that Blue Hills alleged that the

proposed garage "is immediately in the sight line of [the] Property, will partially block its view

and will be detrimental and offensive to [Blue Hills] and inhabitants of [the] Property.  The

addition of 380 spaces in a structured parking facility directly in the sight line of [the] Property

will not assure the fulfillment of the general conditions for site plan approval, but rather violates

such requirements as is poses a detriment to [the] Property."  (Zoning Appeal ¶¶ 37-38.)


*57.    Less than two months after filing the Norfolk Action, Blue Hills entered into a settlement agreement dated August 5, 2003 ("Settlement Agreement") with Blueview and DST Realty, Inc. ("DST"), an affiliate of Equiserve, which intended to purchase 250 Royall from Blueview.  DST's purchase of 250 Royall was conditioned upon the approval of all necessary permits for the construction of the parking garage.  The settlement was negotiated before any discovery was commenced or any challenge to Blue Hills' standing was raised.  See Deposition Exhibit 21; Docket Sheet for the Norfolk Action, attached to McGlynn Affidavit as Exhibits 29 and 54.*

**RESPONSE 57:**  The Lender has no basis to dispute or not dispute the assertion that the

settlement of the Norfolk Action/Zoning Appeal was negotiated before any discovery was

commenced or any challenge to Blue Hills' standing was raised as the Blue Hills, Langelier and

Fineberg cite no evidence in support of that assertion.  The Lender agrees that the docket sheet

shows that no motion challenging standing was filed with the court.  The Lender further notes

that the copy of the settlement agreement attached at exhibit 29 to the McGlynn affidavit does

not include the exhibits to the agreement, which include Blue Hills' releases of the other parties

to the agreement.  For a complete copy of the settlement agreement, see Dep. Exs. App. 21.

58.    By the terms of the Settlement Agreement, Blue Hills agreed to dismiss the Norfolk Action upon the receipt of $2,000,000.00 ("Settlement Proceeds") from DST.    See Deposition Exhibit 21, attached to McGlynn Affidavit as Exhibit 29.

**RESPONSE 58**:  The Lender disputes the incorrect implication that paragraph 58 describes all the elements of the settlement.  The undisputed evidence is that, as part of the settlement, Blue Hills agreed to, *inter alia*: (1) dismiss the Zoning Appeal, with prejudice (thereby forfeiting its right to contest the grant of the special permit); (2) waive its right to (at any time within 10 years of the date of the Settlement Agreement) "take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development" of the Blueview Property; (3) release DST and Blueview from any and all claims which Blue Hills had against DST and/or Blueview prior to or on the date of the Settlement Agreement; and (4) terminate Equiserve's lease as of July 31, 2004.  (Settlement Agreement ¶¶ 3, 7(c) and Exhibits B-2 and B-4 thereto (Dep. Exs. App. 21); Lease Termination Agreement (Dep. Exs. App. 10).)

The evidence is also undisputed that by settling, Blue Hills also ensured that Equiserve would leave 150 Royall Street.  Blue Hills knew that building the garage was a condition of the sale of Blueview to DST Realty (Equiserve's affiliate).  Blue Hills brought the Norfolk Action/Zoning Appeal with hopes of persuading Equiserve to stay in Blue Hills Office Park or to delay or stop construction of the parking garage thereby keeping Equiserve in the building.  (Donovan 80-83, 87, 90-91; Frank 61-63, 174-75; Langelier 107-109; Fineberg 90-91.)  Blue Hills knew that the settlement removed any impediment to approval of the garage by the Town of Canton, thus eliminating any possibility of Equiserve staying in the Property and clearing the way for Equiserve to move across the street.  (Donovan 99-100; Fineberg 92, 96-97.)  Blue Hills was aware that settling the Zoning Appeal would ensure that Equiserve would move its offices to Blueview.  (Frank 75-76.)

Lender's Facts, the Trustee's Brief, and CSFB's Brief refer to the "Settlement Proceeds" as the "Payment."

59.    *The Settlement Proceeds were to be paid on the earlier of the date on which DST acquired title to the 250 Royall or on September 2, 2003.  See Deposition Exhibit 21, attached to McGlynn Affidavit as Exhibit 29.*

**RESPONSE 59:**  Undisputed.

60.    *Upon the sale of the Property to DST, the Settlement Proceeds where wired to Bernkopf Goodman LLP's IOLTA account at Banknorth and then wired to a Blue Hills' clients' funds account at Bernkopf Goodman LLP on August 8, 2003.  See Deposition Transcript of Kenneth Goldberg ("Goldberg Deposition"), page 69, lines 1-16, attached to McGlynn Affidavit as Exhibit 20.*

**RESPONSE 60:**  The Lender disputes the unsupported assertion that the clients' funds account was held for Blue Hills.  The undisputed evidence about the disposition of the Settlement Proceeds/Payment firmly establishes that Blue Hills either never received the Settlement Proceeds/Payment or transferred it to the Trust/Royall Associates immediately up receipt and that it was held for the benefit of the Trust/Royall Associates until February 2005, when it was transferred to two accounts controlled by Fineberg and Langelier.  (Lender's Facts ¶¶ 68, 181-186; Fineberg 68-70; Langelier 220-221.)

•    Rutfield and Hassey, Blue Hills' outside accountants, accounted for the Payment as a transfer to the Trust/Royall Associates, as evidenced by an increase in the "Due From Affiliate" line on Blue Hills' balance sheet for the year ending December 31, 2003.  (Andelman 86-88, 92-95; Dep. Exs. App. 364, 365, 367, 368.)

- Blue Hills' tax expert designee David Andelman testified that the "Due from Affiliate" entry "represents an amount that Blue Hills Office Park has transferred to the Trust/Royall Associates." (Andelman 88.)

- The only records of the client funds account into which the Payment was transferred in August 2003 are titled "Fineberg  Royall Associates", not "Blue Hills." (Dep. Ex. 177.)

- No part of the Payment passed through any Blue Hills account, and it was never recorded as a receipt for Blue Hills by Gilbert Stone, the in-house accountant whose job was to record all receipts for Blue Hills. (Stone 59, 61-63, 107-108, 137-138; Frank 74, 85.) Stone testified that this was unusual, and he and Donovan testified that they knew of no other instance in which a large payment to any of the many entities managed by Fineberg Management had not been recorded as a receipt by the entity. (Stone 68-69; Donovan 106.) Donovan, who had ultimate responsibility at Fineberg Management for Blue Hills accounting, could not even confirm that a payment had been made. He testified that "the settlement was with the owners . . . . I'm not responsible for the owners' books." (Donovan 120-22.)

- The beneficiaries of the Trust/Royall Associates controlled the disposition of the Payment, along with other funds in a so-called Supplemental Account, through a December 31, 2004 agreement (the "Royall Agreement") to which Blue Hills was not a party. (Dep. Exs. App. 176.) The other funds in the Supplemental Account were amounts that had been generated by the Property and distributed to the partners/beneficiaries of the Trust/Royall Associates. (Fineberg 51-52, 102-103.)

- Fineberg acknowledged repeatedly that the approximately $6 million of funds addressed by the Royall Agreement, which included the Payment (Finberg 50-51), were held by the Trust/Royall Associates:

> Q:     . . . . You never told Lennar that you had 6 million in reserve accounts held by Royall Associates Realty Trust ready to devote to the building, did you?
>
> A:     I would have had I had a meeting.

(Fineberg 177  (emphasis added).)

> Q:     Your plan for how to save the building was to use the money both in the reserves held by the bank, which was about $4 million, plus the approximately $6 million that was held by Royall Associates Trust of which Lennar had no knowledge, to find a new tenant, and tide the property over until that  tenant could start paying the rent?
>
> A:     That's correct.

(Fineberg 180-81 (emphasis added).)

> Q:     . . . . Your plan for the building involved using money in the reserves and also using the 5 plus million dollars you had in an account being held by the attorneys for Royall Associates, right?
>
> A:     Yes.

(Fineberg 194  (emphasis added).)

- Blue Hills, Langelier and Fineberg's expert designee Richard Clarke made a similar admission in his report, stating that, "[a]lthough LNR did not know it, BHOP's principals had approximately $5.7 million in 'rainy day' reserve

accounts for the Property. Ex. 176." (Clarke Report p. 20 (emphasis added),

Dep. Exs. Supp. App. 390.)

- Finally, the contention that funds were never transferred out of Blue Hills is irreconcilably inconsistent with Blue Hills, Langelier and Fineberg's oft stated position in this litigation that, as of August 2004, Blue Hills had no funds with which to pay real estate taxes or debt service. See, e.g., Paragraph 69, below. If Blue Hills was holding $2 million in its own name, it would have had funds to pay the $158,000 tax bill.

The only purported proof that the Payment was not transferred out of Blue Hills is the deposition testimony of Kenneth Goldberg, attorney for Fineberg and Royall Associates. Initially, Goldberg testified repeatedly that he did not know whether Blue Hills or Royall Associates received the money. (Goldberg 54-57.) After being shown his firm's client-funds account records, Goldberg still claimed he could not tell which entity received the funds without seeing the Settlement Agreement. (Goldberg 57-58.) Goldberg's only basis for testifying to his "belief" that Blue Hills received and retained the Payment was seeing that it was the party to the Settlement Agreement (Dep. Ex. 21). (Goldberg 58, 73.) Goldberg's ultimate claimed clarity that the Payment was held for Blue Hills contrasts with his inability to state whether the other $2.2 million in the Supplemental Account or an additional $1.3 million (identified as the "Initial Account" in the Royall Agreement) was held in client accounts for Blue Hills or some other entity. (Goldberg 65, 66.)

Goldberg testified inconsistently with respect to whether the Payment had been combined with $2.2 million of other monies in a single account referred to as the "Supplemental Account" in the Royall Agreement of Dec. 31, 2004. First, he said the Payment and the other $2.2 million

were in one account (Goldberg 61) then, after a document suggested to him that the Payment was held separately, he said he believed the other $2.2 million was in another account (Goldberg 63). It is undisputed that the other $2.2 million in the Supplemental Account were funds that had been previously distributed to the Royall Associates beneficiaries.  (Fineberg 52.)

Goldberg's testimony was not based on personal knowledge but consisted merely of speculation, conjecture, and conclusions drawn from documents.

61.     *The client funds account at Bernkopf Goodman LLP was titled "Fineberg Royall Associates."  This internal client reference is a generic reference to the client, which reference pre-dated the formation of Blue Hills and is not indicative of the ownership of the funds being held on behalf of any person or entity other than Blue Hills.  The Trust owned the Property before the 1999 refinancing, which required the single purpose entity, Blue Hills, to be formed. See Deposition Exhibit 177 and Goldberg Deposition, page 71, line 18 through page 72, Line 7, attached to McGlynn Affidavit as Exhibits 45 and 20.*

**RESPONSE 61:**  The Lender disputes the unsupported assertion that the funds were held in the clients' funds account on behalf of Blue Hills Office Park.  Lender incorporates by reference its response to paragraph 60, above.  The Court should disregard Goldberg's self-serving suggestion that the title of his firm's statement of the account does not mean what it says. Deposition Exhibit 177 contains the only documents Blue Hills has produced related to the clients' funds accounts and the disposition of the Settlement Proceeds/Payment, despite the Lender's discovery request for "[a]ll documents concerning the Payment" (Defendants' First Request for Production of Documents, No. 4 (Second Barnett Aff. Ex. A).)  While Goldberg testified that other records of the accounts would identify for whose benefit the funds were held (Goldberg 65, 66, 68, 71), Blue Hills' failure to produce any such records warrants an inference that the accounts were held just as labeled – for the Trust/Royall Associates.

62.     *The Settlement Proceeds were reflected on the compiled financial statements of Blue Hills for the year ended December 31, 2003 as a reduction in basis of the Property and were not reported as income.  See Deposition Transcript of David Andelman ("Andelman*

Deposition"), page 91, lines 11-24 and Deposition Exhibit 410, attached to McGlynn Affidavit as Exhibits 21 and 51.

**RESPONSE 62:**  Undisputed.  It is undisputed also that the Dec. 31, 2003 financial statements show that the Settlement Proceeds/Payment were transferred to Royall Associates, as reflected by an increase in the "Due from Affiliate" line in the same amount as the decrease in basis -- $1,934,287 (which represents the Payment less attorneys' fees).  (Andelman 86-88, 92-95; Dep. Exs. App. 364, 365, 367, 368.)

63.    The reduction in basis recorded in Blue Hills' financial statement reflects the $2,000,000 in Settlement Proceeds less the approximately $65,000.00 in attorneys' fees incurred in obtaining the settlement.  See Andelman Deposition, page 93, lines 3-18, attached to McGlynn Affidavit as Exhibit 21.

**RESPONSE 63:**  Undisputed.  The Lender incorporates by reference its response to paragraph 62.

64.    Blue Hills' financial statement was prepared utilizing a legally permissible accounting method known as the income tax method of accounting.  This legally permissible accounting method allowed the deferment of any tax payment on the Settlement Proceeds.  See Andelman Deposition, page 83, lines 7-21, attached to McGlynn Affidavit as Exhibit 21.

**RESPONSE 64**:  Blue Hills, Langelier and Fineberg have failed to provide evidence to establish this point.  The cited Andelman testimony merely identifies the income tax basis of accounting as a method of accounting.  It does not say for what if any purposes it is a legally permissible method and does not state that it allowed the deferment of any tax payment on the Settlement Proceeds/Payment.

### **_Blue Hills Advises Wells Fargo That Lease Will Not Be Renewed_**

65.    In 2003, Blue Hills advised Wells Fargo of Equiserve's notification of its intent not to renew the Lease and Wells Fargo and LNR were aware, at least as early as September 2003, that Equiserve did not intend to renew the Lease.  See Blue Hills, Second Supplemental

*Answers to Interrogatories, No. 7 and Deposition Exhibits 69 and 71, attached to McGlynn Affidavit as Exhibits 9 and 41.*

**RESPONSE 65:**  It is undisputed that Blue Hills advised Wells Fargo in September 2003 that Equiserve did not intend to renew the Lease.  Blue Hills, Langelier and Fineberg have not cited any evidence establishing an earlier date.

66.    *As early as the Spring of 2004, LNR knew that, despite Blue Hill's efforts, there was a distinct possibility that a substitute for the Property's sole tenant would not be found and that any such failure would have severe repercussions.  See Deposition Exhibits 63, 81 and 86, attached to McGlynn Affidavit as Exhibit 39.*

**RESPONSE 66:**  It is undisputed that, as of April 2004, LNR believed that Equiserve would be leaving the Property and that no tenant had been found and LNR had estimated the potential loss on the loan to be $10 million to $20 million.  The cited deposition exhibits make no reference any other "severe repercussions" and the Lender is unable to further respond to that vague assertion.

67.    *The internal e-mail communications in April 2004, between Wells Fargo and LNR reveal not only that they were concerned about the Loan but also that they were predicting a "FUGLY" and "fein potential mess for CSFB 199-C", as well as an estimated loss of between $11.3 million to $19.75 million.  See Deposition Exhibit 86, attached to McGlynn Affidavit as Exhibit 39.*

**RESPONSE 67:**  The Lender disputes the incorrect assertion that Deposition Exhibit 86 includes any messages to or from Wells Fargo.  It is undisputed that LNR was concerned about the $10 million to $20 million loss it was predicting on the Loan.

68.    *Wells Fargo and LNR's internal e-mails in April 2004 also show that they did not know that Blue Hills had a right of access to the reserve accounts for debt service. One e-mail states "In our case, I hope it is just a leasing reserve and the Borrower will be forced to default." See Deposition Exhibit 85, attached to McGlynn Affidavit as Exhibit 39.*

**RESPONSE 68**:  The Lender disputes Blue Hills, Langelier and Fineberg's misleading characterization of the evidence.  The chain of emails in Exhibit 85 does not contain any messages to or from Wells Fargo.  Exhibit 85 reflects exchanges among LNR personnel as they are trying to investigate the situation with the Loan and the Property at a time when LNR was not servicing the loan and months before Blue Hills made any request for access to the reserve accounts.  The quoted statement is from an individual in LNR's surveillance department, not the asset management group that services loans, who was never involved in servicing the Loan, interacting with Blue Hills, or making decisions about the outcome of the Loan.  (Polcari I 112-113, 253-254.)  In Exhibit 85, Wodicka was taking an opportunity to educate a subordinate, Emily Cooper, about the types of reserve arrangements that can be in place on different loans.  Wodicka was not referring to anything LNR could do to force Blue Hills to default.  In discussing Exhibit 85, Wodicka told Polcari, "[A] borrower can never  be forced into default.  A borrower is either in default or not in default based on the loan documents."  (Polcari II 87.)

### Blue Hills Requests Disbursements from the Reserve Accounts

69.    *Because Equiserve was leaving the Property as of July 31, 2004, funds were not available to pay the real estate taxes due to the Town of Canton on August 2, 2004.  On August 2, 2004, Blue Hills' representative Joseph Donovan ("Donovan"), the CFO of FMC, sent a written request to Wells Fargo seeking disbursement from the reserve accounts of the sum of $412,833.43, to be used to pay principal and interest due on the Note for the month of August, 2004, as well as for payment of the real estate taxes.  See Deposition Exhibit 23, attached to McGlynn Affidavit as Exhibit 30.*

**RESPONSE 69:**  The Lender disputes the assertion that Equiserve's departure was the reason Blue Hills had no funds available to pay the real estate taxes.  The undisputed evidence is

that Blue Hills did not have funds in August 2004 because it had distributed all its funds to its member, the Trust/Royall Associates.  It is also undisputed that Blue Hills' principals could have made the property tax (and other) payments with funds from any of a number of sources:

- The owners of Blue Hills – the beneficiaries/partners of Royall Associates – had at their disposal for investment in the Property approximately $5.6 million that they had previously caused Blue Hills to distribute to Royall Associates.  See response to paragraph 60, above.

- Blue Hills received net rents each month from Lender in the amount of approximately $150,000 to $170,000 dollars.  In the months of May, June and July alone it received approximately $500,000 in net rents that it could have put aside for the August payments; instead it distributed them to Royall Associates.. Dep. Exs. App. 31, 32; Donovan 204, 207-209; Stone 77; Fineberg 243-44 (testifying that Blue Hills distributed monies to its owners as often as it could.)

- The principals of Blue Hills – Fineberg and Langelier – were wealthy men with other resources available to invest in the project if they chose to do so. (Langelier 217; Goldberg 96-97, 108-116; Rubino 74-75.)

Lenders look to borrowers to come out of pocket to pay obligations for which loan reserves are not available, such as tax payments, to demonstrate their commitment to the property.  This is especially true of non-recourse loans where, when the loan gets into trouble, borrowers have a choice of committing to the property or walking away and turning it back to the Lender.  (Rubino 65-66, 92, 221-225, 229-233.)

70.    *Wells Fargo paid $158,181.19 in property taxes due to the Town of Canton on August 2, 2004.  See Deposition Exhibits 65, attached to McGlynn Affidavit as Exhibits 40.*

**RESPONSE 70:**  The Lender disputes the suggestion that Wells Fargo sent the payment to the Town of Canton on or after August 2, 2004.  The undisputed evidence establishes that Wells Fargo advanced the property tax payment out of its own funds on July 29, 2004.  (Lloyd 50-51, 55-56, 60-61; Dep. Exs. App. 6; Dep. Exs. Supp. App. 160, 161.)  It is also undisputed that the next property tax payment was due on November 1, 2004.  (Dep. Exs. Supp. App. 315.)

71.    *After sending the August 2, 2004 letter to Wells Fargo, Donovan contacted the Town of Canton Treasurer's Office, which verified to Donovan that the taxes had been paid. Consequently, Donovan assumed that the tax payment was made from the reserve accounts.  See Donovan Deposition, page 220, lines 17-22, attached to McGlynn Affidavit as Exhibit 10.*

**RESPONSE 71:**  The Lender disputes any implication that Donovan checked with the Town of Canton prior to August 11.  Donovan could not testify to a date any more specific than "somewhere in August of '04."  (Donovan 220.)

72.    *Payments of principal and interest under the Note were due on August 11, 2004. See Deposition Exhibit 156, attached to McGlynn Affidavit as Exhibit 3.*

**RESPONSE 72:**  It is undisputed that payments of principal and interest under the Note were due on August 11, 2004, along with payments to the tax, insurance, replacement, and base leasing escrows under the Mortgage.  (Mortgage ¶ 6(a)-(c).)

73. At the time Donovan's August 2, 2004 letter was sent to Wells Fargo, Blue Hills was not in default of its obligations under the Loan and was entitled to the disbursement of funds for principal and interest due under the Note. See Deposition Exhibit 155, attached to McGlynn Affidavit as Exhibit 1.

**RESPONSE 73:** The Lender disputes these unsupported assertions. The Lender incorporates by reference its response to paragraph 42, above. Blue Hills, Langelier and Fineberg have cited no evidence in support of these assertions.

74. Donovan sent a subsequent letter to Wells Fargo dated August 5, 2004 requesting a meeting with both Wells Fargo and LNR, the Special Servicer. See Deposition Exhibit 24 attached to McGlynn Affidavit as Exhibit 31.

**RESPONSE 74:** Undisputed.

75. On August 13, 2004, having received no response from Wells Fargo, Donovan sent a fax memorandum to Mallegni stating, "Sorry we have been missing each other on the phone. I would like to get the special servicer involved" and attached copies of his August 2 and August 5, 2004 letters. See Deposition Exhibit 27, attached to McGlynn Affidavit as Exhibit 32.

**RESPONSE 75:** The Lender disputes the unsupported assertion that Donovan had received no response from Wells Fargo. The quotation included in paragraph 75 shows that he had been exchanging telephone messages with Mallegni prior to sending his fax. An August 11 email from Mallegni to LNR, cited by Blue Hills elsewhere in its Statement of Facts, states that Mallegni called Donovan on August 11. (Dep. Ex. 65 (McGlynn Aff. Ex. 40).) Wells Fargo telephone records show three calls from Mallegni's extension (415-396-6999)[2] to Blue Hills/Fineberg Management (781-239-1480) on August 11 and 13, 2004. (Goertzen Aff. ¶ 3 and Ex. A; Mallegni Aff. ¶ 6; [First] Barnett Aff. ¶ 2.) The Lender also notes that Donovan's letters were sent to Tim Parish in the Wells Fargo tax department and not to Mallegni, the asset manager with whom Donovan had spoken in July. (Dep. Ex. 65; Donovan 155-156.)

76.     *Wells Fargo did not respond to Donovan's requests for a meeting or for disbursements contained in his August 2, 5 and 13, 2004 correspondence.  See Donovan Deposition, page 164, lines 7-20 and Deposition Exhibits 23, 24 and 27 attached to McGlynn Affidavit as Exhibits 10, 30, 31 and 32.*

**RESPONSE 76**:  It is undisputed that Wells Fargo did not have a sit-down meeting with

Blue Hills and did not approve or deny the disbursement request in Donovan's letter dated

August 2, 2004.  The Lender disputes the incorrect implication that Wells Fargo did nothing in

response to Donovan's communications.  The undisputed evidence is to the contrary.  As noted

in the response to the preceding paragraph, Donovan and Mallegni exchanged phone messages

between August 11 and 13.  The gist of their communications was that Donovan wanted to get

the loan transferred to the special servicer.  (Mallegni 72-73.)  Mallegni caused Wells Fargo to

transfer servicing of the Loan to LNR through his transfer memorandum of August 16, which

was the next business day after Donovan sent him the August 13 facsimile.  (Mallegni 45-47,

Dep. Exs. App. 57.)


77.     *Wells Fargo did not advise Blue Hills that Blue Hills' failure to pay the real estate taxes constituted an Event of Default under the Loan.  See Deposition Exhibit 4, and Response No. 20 to Responses to Admissions, attached to McGlynn Affidavit as Exhibits 23 and 7.*

**RESPONSE 77:**  The Lender disputes this assertion.  The Lender incorporates by

reference its response to paragraph 46, above.

---

[2] Lender notes that, due to a typo, Mallegni's extension is misidentified as 415-396-699<u>4</u> in Lender's Facts ¶ 118.  It is correctly stated in his affidavit.

78.    By letter dated August 19, 2004, but not faxed until August 24, 2004, an LNR asset manager, Job Warshaw ("Warshaw"), notified Blue Hills that the Loan servicing had been transferred to LNR and that LNR looked forward to a "successful working relationship" with Blue Hills.  No mention was made of Blue Hills' requests for disbursement or of a loan default. See Deposition Exhibit 59, attached to McGlynn Affidavit as Exhibit 36.

**RESPONSE 78**:  Undisputed, except to note that the letter states that "certain servicing

responsibilities" have been transferred to LNR.  It is also undisputed that the letter also states

that "[a]ll payments will continue to be made in the same manner as previously done before the

transfer of your loan to [LNR]" (Dep. Ex. 59) and that the reference to a successful working

relationship is tied in the same sentence to LNR thanking Blue Hills in advance for its

cooperation.  As noted in Lender's Facts and in the response to paragraph 80 below, it is

undisputed that Blue Hills did not cooperate because it did not provide the materials required by

the other August 19 letter from Warshaw (i.e., the Prenegotiation Letter referred to in the next

paragraph).


79.    Warshaw also sent Blue Hills another letter dated August 19, 2004, but not faxed until August 24, 2004, in which he advised that LNR had "agreed to discuss the status of [the Loan]…" and "any issues arising under [the Loan documents].  See Deposition Exhibit 61 and Polcari Deposition, Vol. I, page 101, line 21 through page 102, line 9, attached to McGlynn Affidavit as Exhibits 12, 37 and 38.

**RESPONSE 79**:  The Lender disputes Blue Hills, Langelier and Fineberg's incomplete

and inaccurate characterization of Exhibit 61.  Paragraph 79 misquotes the second, longer

August 19 letter, which is referred to as the "Prenegotiation Letter."  It is undisputed that the

Prenegotiation Letter states that LNR's agreement to discuss the status of the loan is conditioned

on the agreements and understandings set forth in the Prenegotiation Letter.  It is also undisputed

that LNR and representatives of the Borrower discussed the status of the Loan when Warshaw

spoke to Goldberg on or about September 7, 2004, and when Polcari spoke to Donovan on or

about September 16, 2004.  (Lenders Facts ¶¶ 133-142, 154.)

80.     The second August 19, 2004 letter included a list of documents requested by LNR, all of which LNR or Wells Fargo already had in their possession, except for Fineberg and Langelier's updated financial statements and a business plan.  See Deposition Transcript of Job Warshaw ("Warshaw Deposition"), page 87, line 2 through page 93, line 27 and Deposition Exhibits 60 and 61, attached to McGlynn Affidavit attached as Exhibits 14, 37 and 38.

**RESPONSE 80:**  The Lender disputes this incorrect, unsupported assertion by Blue Hills, Langelier and Fineberg.  The undisputed evidence shows that, by executing the Prenegotiation Letter and "to enable [LNR] to properly evaluate the Borrower's request," Blue Hills agreed to provide to LNR all of the information designated on Exhibit A to the Letter. (Dep. Ex. 62, ¶ 9.)  The materials cited by Blue Hills, Langelier and Fineberg in support of paragraph 80 do not come close to establishing that the Lender already had all of the requested materials except for Fineberg's and Langelier's updated financial statements and a business plan. Indeed, the cited materials do not establish that the Lender had any one of the twelve checked items on Exhibit A to the Letter at any particular time.[3]  (Lender acknowledges that as of August 2004 there was no "current lease" to be had.)

It is undisputed that the designated information included: a) a financial statement prepared within 30 days of August 19, 2004 for Blue Hills, its member (i.e., Royall Associates), and the guarantors (i.e., Fineberg and Langelier), including balance sheets and income statements; b) Federal tax returns for the last two years for Blue Hills, Langelier, and Fineberg; and c) a current business plan for the Property, including the budget for the year, detailing revenue and expense projections.  (Ex. A to Dep. Ex. 62.)  These were the most important documents for LNR to evaluate the future of the Loan secured by an empty building with no tenant prospects.  It is also undisputed that, after executing the Prenegotiation Letter, Blue Hills,

---

[3] While the Warshaw testimony refers to an insurance *certificate*, there is no evidence LNR had the *policy*, which Blue Hills had agreed to provide.  Also, there is no evidence that the tax bills referred to in the Warshaw testimony were the most recent, which Blue Hills had agreed to provide.

Langelier and Fineberg did not send to LNR a current business plan, updated financial statements for any of the designated entities or individuals, tax returns for any period for any entity or individual, or any of the other documents and information set out in Exhibit "A" to the Prenegotiation Letter.  Blue Hills never came up with a business plan specifying the upgrades to the Property that would be required or how much they would cost.  (Donovan 140-141, 176-177, 179-82; Fineberg 172-78.)  As Blue Hills, Langelier and Fineberg's expert designee Richard Clarke admitted, it "obviously" would have been of interest and "certainly" would have been helpful to LNR (and perhaps would have made a difference in the outcome) if LNR had received financial information for Langelier and Fineberg.  (Clarke 186-87.)

81.     Thereafter, on August 26, 2004, Fineberg signed the letter received from LNR on August 24, 2006 and faxed the signed copy to LNR.  See Warshaw Deposition, page 84, line 19 - page 85, line 2 and Goldberg Deposition, page 125, lines 21-23, attached to McGlynn Affidavit as Exhibits 14 and 20.

**RESPONSE 81:**  Undisputed.

82.     Although Fineberg signed this letter and LNR or Wells Fargo had virtually all of the requested documents, LNR did not schedule a meeting.  See Warshaw Deposition, page 86, lines 3-14, attached to McGlynn Affidavit as Exhibit 14.

**RESPONSE 82:**  It is undisputed that LNR and Blue Hills' representatives never scheduled or held an in-person meeting.  On Blue Hills' version of the facts, the only people who discussed a meeting with LNR were Goldberg (in a conversation with Warshaw around Labor Day) and Frank (in a conversation with Polcari in October).  Goldberg contends he and Warshaw discussed setting up a meeting but did not schedule one during their last conversation around Labor Day.  It is undisputed that Goldberg never followed up with Warshaw or Polcari to

arrange a meeting (Goldberg 128-130) and made no further request for one until his letter to Lender's counsel on November 19, 2004 (the morning of the foreclosure sale) (Dep. Ex. 337). According to Frank, he asked Polcari for meeting and was told a few days later that there would be no meeting.  (Frank 104-107.)

The Lender disputes the unsupported assertion that LNR or Wells Fargo had "virtually all of the requested documents."  The evidence is undisputed that that LNR did not have the most important documents that Blue Hills had agreed to provide when it executed the Prenegotiation Letter and Blue Hills, Langelier and Fineberg have not established that it or Wells Fargo had the others.  Lender incorporates by reference its response to paragraph 80.

*83.     On September 2, 2004, Donovan wrote to Wells Fargo requesting the disbursement of $254,652.24 to pay principal and interest due on the Note for the month of September, 2004.  See Deposition Exhibit 54, attached to McGlynn Affidavit as Exhibit 35.*

**RESPONSE 83:**  Undisputed.  It is also undisputed that the letter was not received by Wells Fargo until September 3, 2004.  (Dep. Exs. App. 134 at 2 (Wells Fargo Loancator record).)

*84.     On September 7, 2004, Joseph Polcari ("Polcari") replaced Warshaw as asset manager at LNR.  Polcari did not follow up with Blue Hills and, thereafter, sent Blue Hills a default letter dated September 17, 2004.  See Warshaw Deposition, page 101, line 16 through page 102, line 14 and Deposition Exhibit 52, attached to McGlynn Affidavit as Exhibits 14 and 34.*

**RESPONSE 84:**  Paragraph 84 is vague in that the meaning of "follow up with" is not clear, nor is it clear what Polcari might have followed up with respect to, and thus the Lender cannot agree or dispute that Polcari did not follow up with Blue Hills.  It is undisputed that Polcari replaced Warshaw on September 7 and that Polcari did not contact Blue Hills (and was not contacted by Blue Hills or anyone on its behalf) until he spoke with Donovan on or about

September 16, 2004, as a courtesy to tell Donovan that he was sending Donovan the September

17, 2004, default letter.  Polcari I 39.

### *LNR Wrongfully Defaults Blue Hills And Forecloses On The Property*

*85.    In his September 17, 2004 letter, Polcari informed Blue Hills that its request for disbursement of real estate taxes had been denied purportedly because the Mortgage did not permit such disbursements and that Blue Hills was in default under the Loan as of August 2, 2004 for failure to pay real estate taxes when due.  See Deposition Exhibit 52, attached to McGlynn Affidavit as Exhibit 34.*

**RESPONSE 85:**  The Lender disputes the unsupported characterization that the reasons

given for the denial of the tax payment request were "purported."

*86.    This September 17, 2004 default letter is the only notice of default ever sent to Blue Hills from the closing of the Loan in 1999.  See Response No. 20, to Responses to Admissions attached to McGlynn Affidavit as Exhibit 7.*

**RESPONSE 86:**  It is undisputed that the September 17 default letter is the only written

notice of default sent to Blue Hills.  There is no genuine issue that Blue Hills was informed

orally by Brent Lloyd on July 29, 2004, that it would be in default if it did not pay its real estate

taxes.  (Response to Paragraph 46, above.)  Job Warshaw testified that he told Goldberg on or

about September 7 that it appeared that Blue Hills was in default.  (Warshaw Dep. 56-61;

Lender's Facts ¶ 134.)

*87.    Thereafter, on or about October 18, 2004, Daniel Frank ("Frank"), Blue Hills' representative and President of FMC, requested a meeting with LNR.  See Frank Deposition, page 102, lines 10-22; Deposition Exhibit 41; attached to McGlynn Affidavit as Exhibits 11 and 49.*

**RESPONSE 87:** Undisputed.  According to Polcari, his response to Frank's request was

a voicemail in which he said that, for any meeting to be productive, it would have to include

discussion of Blue Hills bringing the loan current.  According to Polcari, Frank never responded

to the voicemail.  (Polcari II 73-74.)


88.    *By letter dated October 21, 2004, CSFB, as assignee of J.P. Morgan, gave notice of its intention to foreclose.  See Deposition Exhibit 40, attached to McGlynn Affidavit as Exhibit 33.*

**RESPONSE 88:**  It is undisputed that CSFB sent notice of its intention to foreclose to

Blue Hills, Fineberg, and Langelier on October 21, 2004.  It is also undisputed also that notice

was published in the Canton Citizen, a newspaper published in Canton, Mass., for four

consecutive weeks starting October 14, 2004.  (Dep. Ex. 411 at LNR00817 (McGlynn Aff. Ex.

52).)  It is also undisputed that commercial advertisements of the foreclosure sale ran in the

Boston Herald and the Boston Globe on Sunday, November 7, 2004.  ([First] Barnett Aff. Ex. L

(SD001, SD002); Polcari Aff. ¶ 3.)


89.    *Several letters were subsequently exchanged between Goldberg and counsel for LNR during the period November 10 – November 19, 2004, whereby Blue Hills continued to request LNR to meet with it to consider alternatives to foreclosure.  See Deposition Exhibits 41, 334-337, attached to McGlynn Affidavit as Exhibit 49.*

**RESPONSE 89**:  The Lender disputes Blue Hills, Langelier and Fineberg's inaccurate

characterization of the letters.  Only the last of Goldberg's November letters, which was sent on

the morning of the foreclosure sale, requested a meeting with LNR.  While his other letters

allude to borrower requests for meetings prior to Donovan's August 5, 2004 letter, discovery has

yielded no evidence of any such requests, and Donovan does not remember asking for a meeting

prior to his August 5, 2004 letter.  (Donovan 157-58.)


90.    *From August through November 2004, Wells Fargo's and LNR's internal e-mails reveal that they awaited an opportunity to acquire the $4.1 million in reserves and to either*

*acquire the Property or to quickly commence foreclosure proceedings. See Deposition Exhibits 85, 89, 106 and 107, attached McGlynn Affidavit as Exhibit 42.*

**RESPONSE 90**:  The Lender disputes Blue Hills, Langelier and Fineberg's inaccurate characterizations of these email messages.  The cited deposition exhibits contain no messages to or from anyone at Wells Fargo.  The LNR internal emails reflect its appropriate concern that the Loan has an outstanding balance of over $30 million and is secured by an empty 275,000 square foot office building worth $15 million, according to LNR's appraiser.  (Lender's Facts ¶ 159.)  Each month, the Lender had to advance $254,000 in principal and interest payments to the pool's certificate holders.  The LNR emails reflect LNR's consideration of all possible avenues of addressing the situation, including selling the Note to a third-party, buying the Note itself, and taking the Property back through foreclosure or a deed-in-lieu and then selling it.  See Depositions Exhibits 85, 89, 106, 107 and Exhibit B to the Second Barnett Affidavit, which is the complete chain of emails of which a portion was marked as Deposition Exhibit 89 by Blue Hills' counsel.  The first two pages of the email chain, not part of Deposition Exhibit 89, reflect LNR's pessimistic view of the Property as an investment asset (for either itself or third parties) due to the improvements that would be necessary and the unsuitability of the property for multiple tenants.  They also reflect Polcari's recognition the Fineberg had recently walked away from the Lancaster and Sturbridge properties.

The Pooling and Servicing Agreement expressly permitted LNR to either purchase the Note or buy the property after the Lender took title through a foreclosure or deed-in-lieu.  (PSA §3.18, Dep. Exs. Supp. App. 51.)  (There is no way that LNR could buy the property directly prior to Lender taking title, as suggested by paragraph 90.)

The email messages do not "reveal" that Lender awaited an opportunity to "acquire" the reserves.  The cited emails reflect concern over the status of the reserves, which were held by the

Lender, were security for the underwater loan (Mortgage ¶ 6(c)(v)) and to which Borrower had

forfeited all rights when it chose to go into default (Mortgage ¶ 6(d); Cash Management

Agreement § 7(b)).  After the foreclosure, all of the reserves were credited against the

outstanding Debt.  (CSFB's Answers to First Interrogatories No. 12, McGlynn Aff. Ex. 6.)


*91.    A foreclosure sale occurred on or about November 23, 2004, and the foreclosure deed was recorded on January 14, 2005 with the Norfolk County Registry of Deeds in Book 21988, page 509.  See Deposition Transcript of Randall Rosen ("Rosen Deposition"), page 81, lines 1-4; Polcari Deposition, Vol. II, page 187, lines 10-22 and Deposition Exhibit 411, attached to McGlynn Affidavit, Exhibits 15, 13 and 52.*

**RESPONSE 91:**  The Lender disputes the incorrect date of the foreclosure sale.  The

undisputed evidence establishes that the foreclosure occurred on  November 19, 2004.

(Recorded Foreclosure Documents ([First] Barnett Aff. Ex. K); Polcari Aff.  ¶ 5; Email from J.

Polcari to L. Golinsky, November 19, 2004 (Dep. Exs. App. 109).)


*92.    As a result of the foreclosure sale, Blue Hills has suffered significant damages, including tax liability of the Trust totaling nearly $5 million.  See Deposition Exhibit 358, attached to McGlynn Affidavit as Exhibit 50.*

**RESPONSE 92:**  Paragraph 92 contains a legal conclusion as to which no response in

required.  It is undisputed that the Trust/Royall Associates had no tax liability.  Blue Hills' own

tax expert designee, David Andelman, testified that the Trust/Royall Associates is treated as a

partnership for tax purposes and that it does not pay taxes at the partnership level, but rather its

partners pay tax on its income and gains.  (Andelman 123-25.)  There is no evidence that any tax

payer or group of tax payers has suffered any proved tax liability.  Andelman testified that his

chart represented what "<u>could be</u> or would be" the "<u>maximum</u> tax liability . . . with respect to

each of the individual partners." (Andelman 113-114; Andelman Report (Dep. Exs. App. 358) at

Ex. B.)  Plaintiff has presented no admissible evidence of what tax liability any tax payer has

actually suffered as a result of the foreclosure sale.


93.     On or about April 29, 2005,  CSFB sold the Property to One Beacon Insurance Group for $23,000,000.  See Deposition Exhibit 122 and Polcari Deposition, Vol. II, pages 188-189, attached to McGlynn Affidavit as Exhibits 43 and 13.

**RESPONSE 93:**  Undisputed.


### *The December 31, 2004 Agreement*

94.     By agreement between Fineberg and Langelier dated December 31, 2004 (the "December 31, 2004 Agreement"), Fineberg and Langelier agreed to have one-half of the Settlement Proceeds from the Norfolk Action remain in a client funds account at Bernkopf Goodman LLP, with the remaining half of the Settlement Proceeds to be held in a client funds account at Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Cutler"), a firm that represents Langelier, where they still remain.  One-half of the Settlement Proceeds were wired to a client's funds account at Wilmer Cutler in February 2005.  See Langelier Deposition, page 129, lines 12-25; Deposition Exhibit 176; Deposition Exhibit 177 and Goldberg Deposition, page 134, lines 17-24 through page 150, lines 3-16, attached to McGlynn Affidavit as Exhibits 17, 44, 45 and 20.

**RESPONSE 94:**  The Lender disputes Blue Hills' inaccurate assertions.  The undisputed

evidence is that the December 31, 2004/Royall Agreement is among all of the beneficiaries of

Royall Associates (not only Langelier and Fineberg).  The Royall Agreement is also signed by

Fineberg, Langelier and Blue Hills Management Corp. as the Trustees of Royall Associates and

by attorneys Goldberg and Andrew Cohn as escrow agents.  The Royall Agreement directs the

disposition of, among other things, a so-called "Supplemental Account" containing

approximately $4.2 million, which Langelier, Fineberg and Goldberg have testified included the

Zoning Appeal settlement Payment.   The Royall Agreement directs that $2.2 million of the

Supplemental Account be distributed to the beneficiaries and that the remaining $2 million be

directed to "Supplemental Account Escrows" held by the law firms.

It is also undisputed that the Supplemental Account Escrows held by Wilmer Hale and

Bernkopf Goodman are controlled by Langelier and Fineberg, the respective clients of the firms.

(Fineberg 69-70; Langelier 220-221; Royall Agreement.)


95.    *The Settlement Proceeds continue to be held at Bernkopf Goodman and Wilmer Cutler for the benefit of Blue Hills and have never been distributed to the Trust's beneficiaries. See Goldberg Deposition, page 150, lines 3-16 and page 134, lines 17-24 attached to McGlynn Affidavit as Exhibit 20.*

**RESPONSE 95**  The evidence is undisputed that the amounts in the clients' funds

accounts are not held for the benefit of Blue Hills and were distributed to the Trust/Royall

Associates in 2003 and to Fineberg and Langelier in 2005.  Lender incorporates by reference its

response to paragraphs 60 & 94, above.


96.    *Based upon to the December 31, 2004 Agreement, there was approximately $5.6 million, inclusive of Settlement Proceeds, held by Blue Hills in a 'rainy day" reserve account. See Goldberg Deposition, page 136, lines 16-19 and Langelier Deposition, page 80, lines 10-25 through page 81, lines 1-4, attached to McGlynn Affidavit as Exhibits 20 and 17.*

**RESPONSE 96:**  The assertion that the funds were held by Blue Hills is not supported

by any evidence.  The December 31, 2004/Royall Agreement itself and extensive other evidence

demonstrates that the Settlement Proceeds/Payment and other funds subject to the Royall

Agreement were held by the Trust/Royall Associates and controlled by the beneficiaries thereof.

The Lender incorporates by reference its response to paragraphs 60 and 94, above.

### *J.P. Morgan and CSFB's Claims for Damages*

97.    By letter dated April 20, 2005, after commencement of the above-captioned lawsuit, counsel for CSFB notified Langelier and Fineberg that CSFB was seeking the full deficiency owed under the Loan pursuant to the Guaranty.    See April 20, 2005 letter, authenticated by Response No. 27 to Responses to Admissions and Counterclaims, attached to McGlynn Affidavit as Exhibits 53 and 7.

**RESPONSE 97:**  Undisputed.  It is undisputed as well that, due to Blue Hills'

concealment, the Lender had not learned of the Norfolk Action/Zoning Appeal, the settlement of

it, and the Settlement Proceeds/Payment until December 2004.  At that time, Polcari consulted

with counsel and directed counsel to draft a complaint against Blue Hills, Langelier and

Fineberg.  (Polcari II 199-200, 233, 237-38.[4])

It is also undisputed that Langelier and Fineberg had been anticipating since 2004 a claim

by the Lender arising out of the settlement of the Zoning Appeal and the receipt and distribution

of the Settlement Proceeds/Payment.  In the December 31, 2004/Royall Agreement, Langelier,

Fineberg and the other beneficiaries expressly acknowledge that "a claim could be asserted by

the holder of the first mortgage loan on the Property [i.e., the Lender]" and set aside $2 million

of the Supplemental Account to be held in Supplemental Account Escrows in anticipation of it.

Any release of funds from the escrows is "predicated upon no such claims being filed."  (Royall

Agreement ¶ V.)  In the agreement, the beneficiaries also agreed to hold Blue Hills' claim

against the Lender for defensive use in the event the Lender brought a claim against them.

(Royall Agreement ¶ IV.)  Fineberg and Langelier further agreed to indemnify each other for

50% of any loss, cost, or expense either incurs "on account of his first mortgage loan guaranty or

---

[4] Lender's Facts ¶187 miscites this testimony by Polcari as being Volume I of his deposition; it is in Volume II.

arising from his interest in [Blue Hills], the Trust, [Blue Hills Management Corp.][5], or Fineberg

Management."  (Royall Agreement ¶ V.C.)

Fineberg testified that he might have been anticipating a suit from the Lender over the $2

million at the time the December 31, 2004/Royall Agreement was executed and could not say

whether it was mere coincidence that the amount of the Supplemental Account Escrow was

exactly the same as the amount of the Settlement Proceeds/Payment.  (Fineberg 55-58.)  He also

testified that the money was put in escrow "because of the suit that Lennar brought"; i.e., the

Counterclaim.  (Fineberg 70.)


*98.    CSFB and J.P. Morgan now claim to be owed in excess of $11,000,000, calculated by taking the total amount of owed on November 19, 2004 offset by the foreclosure bid and reserve balance of $4.1 million.  See CSFB's Answer to Interrogatory No. 12, attached to McGlynn Affidavit as Exhibit 6.*

**RESPONSE 98:**  Undisputed.  The Lender also seeks interest from the date of the

foreclosure at the contractual default interest rate.  (CSFB's Answer to Interrogatory No. 12.)

---

[5] Blue Hills Management Corp. is the nominal manager of Blue Hills Office Park, LLC.

Respectfully submitted,

CSFB 1999-C1 ROYALL STREET, LLC,
and J.P. MORGAN CHASE BANK, as
Trustee for the Registered Holders of Credit
Suisse First Boston Mortgage Securities
Corp., Commercial Mortgage Pass-Through
Certificates, Series 1999-C1,

By their attorneys,
/s/ Bruce S. Barnett

E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER RUDNICK GRAY CARY US LLP
33 Arch Street, 26th Floor
(617) 406-6000

Dated:  May 31, 2006