UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

                             Civil Action No.  05-CV-10506 (WGY)

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1,

      and

CSFB 1999–C1 ROYALL STREET, LLC;

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

**OPPOSITION OF PLAINTIFFS-IN-COUNTERCLAIM J.P. MORGAN CHASE BANK, AS TRUSTEE FOR THE REGISTERED HOLDERS OF CREDIT SUISSE FIRST BOSTON MORTGAGE  SECURITIES CORP., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 1999-C1 AND CSFB 1999-C1 ROYALL STREET, LLC TO MOTION OF DEFENDANTS-IN-COUNTERCLAIM FOR SUMMARY <u>JUDGMENT</u>**

Counterclaim-plaintiffs J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") and CSFB 1999–C1 Royall Street, LLC ("CSFB") (together, the "Lender") submit this opposition to the motion of defendants-in-counterclaim for summary judgment as to all counts of the counterclaim in this jury-waived action.  The Lender's affirmative case for why it is entitled to summary judgment on its counterclaim and why Blue Hills, Fineberg, and Langelier are liable for the deficiency is set forth in the Memorandum in Support of Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim CSFB 1999-C1 Royall Street, LLC ("CSFB Brief").  This opposition, which addresses points by Blue Hills, Langelier and Fineberg in their memorandum supporting their summary judgment motion ("Blue Hills Brief"), incorporates by reference and assumes familiarity with CSFB's Brief, the Trustee's memorandum of law, and their joint statement of undisputed facts submitted in support of their own motions for summary judgment ("Lender's Facts") (all of which were submitted on May 17, 2006).  The Trustee and CSFB also rely on their response ("Lender's Fact Response"), submitted herewith, to the statement of facts of Blue Hills, Langelier and Fineberg ("Blue Hills Facts").

## INTRODUCTION

In 1999, the Lender loaned approximately $33 million (the "Loan") to Blue Hills Office Park LLC ("Blue Hills" or "the borrower entity").  The Loan was secured by Blue Hills' real property (the "Premises"), improvements (the "Improvements"), and other property, rights, interests and estates (together with the Premises and Improvements, the "Mortgaged Property") set forth in the mortgage and security agreement (the "Mortgage").  In June 2003, Blue Hills brought an appeal of a zoning decision (the "Zoning Appeal") to prevent damage to the Mortgaged Property and the loss of its only tenant, Equiserve.  Lender's Facts ¶¶ 53-56.  Two

months later, Blue Hills settled the Zoning Appeal for $2 million (the "Payment"), on terms ensuring that the damage would occur and that Equiserve would move out a year later. Id. ¶¶ 57-59. Blue Hills and its principals (Messrs. Fineberg and Langelier, also the guarantors of the Loan (the "Guarantors")) handled the Payment so as to avoid the borrower entity entirely, bypassing Blue Hills' accounts and hiding the money in an attorney client funds account held for Blue Hills' owner, Royall Associates Realty Trust ("Royall Associates"), id. ¶¶ 65-66, 68-71, of which the Guarantors are the trustees and principal beneficiaries. Id. ¶¶ 2-4.[1]

In the year that followed, the Guarantors distributed all of Blue Hills' net income out of the borrower entity, including over $500,000 in the final quarter, Lender's Facts ¶¶ 100, 182, having obviously decided to walk away from the nonrecourse Loan and the Mortgaged Property if they could not find a tenant to replace Equiserve. When Equiserve moved out in August 2004, because Blue Hills had distributed all of its money to its owners, "funds were not available to pay the real estate taxes" of $158,000, Blue Hills Facts ¶ 69, or to make any other Loan payment. Having found no replacement tenant, the Guarantors caused Blue Hills to default on the Loan, despite having access to $5.6 million distributed from Blue Hills and hidden from the Lender in the accounts of Royall Associates. Dep. Ex. App. 176. Blue Hills and its principals submitted no workout proposals, acquiesced in the acceleration of the debt, and continued, by withholding financial statements, to conceal the money transferred out of the borrower entity. Lender's Facts ¶¶ 148-49, 154, 173.

After the foreclosure sale, Blue Hills' principals (the Guarantors) distributed to themselves $3.6 million from the $5.6 million in Royall Associates' accounts, but kept the remaining $2 million in reserve, anticipating that the Lender might discover and sue them for the

---

[1] Blue Hills' claim that it kept the Payment is contradicted by all admissible evidence and is supported only by deposition testimony of its own attorney not based on personal knowledge.

misappropriation of the Payment. Lender's Fact Response ¶¶ 97. The Lender discovered the theft and was in the process of preparing its complaint when Blue Hills commenced this lawsuit, id. – a lawsuit based on allegations that, in light of the evidence produced in discovery, lacked any good faith basis and were clearly contrived for litigation purposes.

Now, to avoid the consequences of its damage to and misappropriation of the Lender's collateral, Blue Hills' and the Guarantors' only defense is that the Loan documents do not mean what they say. When the Mortgage and Guaranty prohibit an unconsented-to transfer of the "Mortgaged Property or any part thereof," that really only means, they say, a transfer of the Premises and Improvements. When the Mortgage states that the Mortgaged Property includes "causes of action that relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof," that really only means, they say, causes of action specified elsewhere in the Mortgage and no others.

This single purpose borrower's principals agreed to a settlement that left the Mortgaged Property impaired, making certain the loss of the only tenant, while they took the money and prepared to walk away if no replacement tenant were found. They converted over $2 million of the Lender's collateral for this nonrecourse Loan, knowing full well that the Lender's security interest extended to any property of the borrower in whatever form. Fineberg 83-88. They materially disregarded the best interests of the Mortgaged Property that would guide a borrower and guarantors of a full recourse loan. This is precisely the circumstance under which the exceptions to nonrecourse liability should and do apply. The loan documents mean what they say and must be enforced in accordance with their terms. Blue Hills and the Guarantors (together, the "Blue Hills Parties") are liable for the full amount of the $10.77 million deficiency (the "Deficiency").

## DISCUSSION

**I.    THE BLUE HILLS PARTIES' MOTION FOR SUMMARY JUDGMENT AS TO COUNTS I, II, AND V OF THE COUNTERCLAIM MUST BE DENIED.**

As the Blue Hills Parties recognize, there are exceptions (often referred to as "carveouts") to the non-recourse provisions of the Loan and Guaranty – exceptions for which the Lender bargained and to which the Blue Hills Parties agreed.  Those exceptions apply in this case, and the Blue Hills Parties are liable for the Deficiency, as a direct result of Blue Hills' knowing and willing violations of the Loan Documents.  Blue Hills (under the direction of the Guarantors) chose to repeatedly violate the terms of the Mortgage and, in so doing, triggered the Blue Hills Parties' liability for the Deficiency under the Mortgage and Guaranty.

### A.    The Lender is Entitled to Enforce the Loan Documents in Accordance with Their Terms

"Parties, particularly sophisticated parties contracting at arms length, should not be allowed to escape a provision for which they knowingly and voluntarily bargained."  Imex Corp. v. Nextel Commc'ns, Inc., 20 F. Supp. 2d 248, 251 (D. Mass. 1998) (Young, J.).  Sophisticated parties "are entitled to and should be held to the language they chose."  Anderson Street Assocs. v. City of Boston, 442 Mass. 812, 819 (2004)[2]; accord Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 853-54, 856 (1st Cir. 1987).

A nonrecourse loan is one where the borrower is not personally liable for the debt upon default, but rather, the creditor's recourse is to the property granted as security for the loan.  Heller Fin., Inc. v. Lee, 2002 U.S. Dist. LEXIS 15183, *2-5, 11 (N.D. Ill. Aug. 12, 2002).

> However, nonrecourse loans create issues in terms of the motivation of borrowers to act in the best interest of the lender and the lender's collateral.  As a result, lenders identif[y] defaults that pose[] special risks and carve[] them out of the general nonrecourse provision.  These carve-outs provide the protection that

---

[2] The loan documents are governed by Massachusetts law.  See, e.g., Note ¶ 17.

>lenders require, personal liability, to insure the incentive to repay the loan <u>and maintain the viability of the collateral</u>.

<u>Id.</u> at * 11 (emphasis added; citations and quotes omitted).

Courts enforce nonrecourse carveouts strictly in accordance with their terms, rejecting borrower and guarantor arguments of ambiguity and lack of harm.  <u>See, e.g., Heller Fin., Inc. v. Lee</u>, <u>supra</u>, at *11-16 (granting summary judgment enforcing carveout and making borrowers personally liable for full amount of approximately $5.3 million deficiency where borrower permitted liens totaling approximately $820,000 to be placed on the property);[3] <u>Heller Fin., Inc. v. Whitemark at Fox Glen, Ltd.</u>, 2004 U.S. Dist. LEXIS 18974 *3-6, 11-15 (N.D. Ill. 2004) (granting summary judgment enforcing nonrecourse carveout triggering borrower's liability for amount of unauthorized transfers to borrower's affiliates); <u>FDIC v. Prince George Corp.</u>, 58 F.3d 1041, 1046-47 (4th Cir. 1995) (enforcing plain terms of nonrecourse carveout and finding borrower personally liable to extent of impairment of access to collateral); <u>LaSalle Bank N.A. v. Mobile Hotel Props., LLC</u>, 367 F. Supp. 2d 1022, 1029-30 (E.D. La. 2004) (granting summary judgment enforcing liability under guaranty for full amount of the approximately $1 million deficiency where borrower made allegedly "innocuous" change to its status as a single purpose entity: "The language of the mortgage means what it says."); <u>First Nationwide Bank v. Brookhaven Realty Assocs.</u>, 637 N.Y.S.2d 418, 420-22 (N.Y. App. Div. 1996) (affirming summary judgment enforcing carveout provision imposing full liability for the deficiency on the individual partners of the borrower for bankruptcy filing that delayed but did not prevent a foreclosure sale).

### B.    The Blue Hills' Parties' Attempt to Avoid the Plain Language of the Documents is Unavailing

---

[3] Although the amount of the deficiency is not referenced in the opinion, the complaint in the <u>Lee</u> case (available online through Pacer) states that the deficiency was $5,313,759.

Faced with the undisputed facts concerning their conduct and the language of the Loan Documents, the Blue Hills Parties make the only argument left to them: that the undisputed facts do not mean what they seem and the Loan Documents do not mean what they say.  The Blue Hills Parties argue that they are not liable for the Deficiency because (1) Blue Hills never transferred the Payment; (2) the term "Mortgaged Property or any part thereof" in Mortgage Section 10 is limited to the Premises and Improvements (which they call the "Property"); (3) the term "causes of action" in Granting Clause Seven is limited to causes of action specifically mentioned elsewhere in the Mortgage; (4) the "full liability" provisions of the Guaranty should not be enforced on their terms; and (5) extrinsic evidence of drafts of the Guaranty limits the plain meaning of Mortgaged Property in Mortgage Section 10.  The Blue Hills Parties cite not a single case in support of these arguments, and they have no merit.

1.     Blue Hills transferred the $2 Million Settlement Payment to Royall Associates.

As an initial matter, the Blue Hills Parties argue that Blue Hills never transferred any Mortgaged Property because the Payment has "remained in Blue Hills' possession" since it was received.  Blue Hills Brief at 5.  Their argument, which does nothing to address the preceding Settlement of the Zoning Appeal, characterizes the Payment as "a portion of several million dollars of distributable Property income which had been voluntarily accumulated and retained by Blue Hills."  Id. at 5.  The overwhelming undisputed evidence is that those funds – including the Payment – were distributed to and retained by Blue Hills' member, Royall Associates:

- The Blue Hills Parties' own expert witness designee, David Andelman, testified that the Payment was recorded on Blue Hills' books as "due from affiliate," which represents "an amount that [Blue Hills] has transferred to Royall Associates." Andelman 88;

- Blue Hills' controller (Gilbert Stone) and Chief Financial Officer (Joseph Donovan) each testified that the Payment was never deposited in any Blue Hills bank account.  Lender's Facts ¶¶ 65-66.  Explaining why he did not think it was his responsibility to determine what happened to the Payment, Mr. Donovan

testified that "the settlement was with the owners, and I'm responsible for the operating books. I'm not responsible for the owners' books." Donovan 121-22;

- Mr. Fineberg testified that he never told the special servicer of the Loan that he "had 6 million in reserve accounts held by Royall Associates Realty Trust [including the Payment] ready to devote" to the Mortgaged Property. Fineberg 177;

- Mr. Fineberg testified that his plan for saving the Mortgaged Property was to use the reserve funds held by the Lender and the "approximately $6 million that was held by Royall Associates Trust of which LNR had no knowledge." Fineberg 180-81, 194;

- Richard Clarke, another expert witness designee retained by the Blue Hills Parties, states in his report, "Although LNR did not know it, BHOP's principals also had approximately $5.7 million [including the Payment] in 'rainy day' reserve accounts for the Property." Clarke Report at 20;

- The only account records that Blue Hills has produced concerning the Payment show that the Payment was held in the "Fineberg Royall Associates" client funds account. Dep. Ex. App. 177[4],[5];

- On December 31, 2004, approximately one month after the Lender foreclosed on the Mortgaged Property, the beneficiaries of Royall Associates entered into an agreement (the "Royall Agreement") directing the disposition of the Royall Associates reserve accounts (including the Payment). Dep. Ex. App. 176. Blue Hills was not a party to this agreement. Id.;

- Under the Royall Agreement, "Fineberg and Langelier agreed to have one-half of the [Payment] remain in a client funds account at Bernkopf Goodman LLP, with the remaining half of the [Payment] to be held in a client funds account at Wilmer Cutler Pickering Hale and Dorr ('Wilmer Cutler'), a firm that represents Langelier." Blue Hills Facts ¶ 94;

- The Royall Agreement is signed by Kenneth Goldberg, as "Escrow Agent for the Fineberg Beneficiaries," and by Andrew Cohn, as "Escrow Agent for the Langelier Beneficiaries." Dep. Ex. App. 176; and

---

[4] Blue Hills has produced no records of the account(s) holding the Payment – despite Lender's requests for all documents concerning the Payment and its disposition – other than Dep. Ex. App. 177, which bears the name "Fineberg Royall Associates." See Lender's Fact Response ¶ 61.

[5] Straining to explain this undisputed fact, Blue Hills argues that the name "Fineberg Royall Associates" is actually the "generic name of the Blue Hills account," and "is not indicative of the ownership of the funds being held on behalf of any person or entity other than Blue Hills." Blues Hills Brief 5; Blue Hills Facts ¶ 61. Apparently, as with the terms used in the Loan Documents, Blue Hills' position is that written words mean whatever Blue Hills (or in this case its lawyer, Kenneth Goldberg) says they mean. See Blue Hills Facts ¶ 61 (citing solely to the deposition of Kenneth Goldberg).

- As of August 2, 2004, having transferred all its money, Blue Hills admits it had no funds available to pay $158,000 of real estate taxes due to the Town of Canton. Blue Hills Facts ¶ 69.  <u>See also</u> Lender's Fact Response ¶¶ 60-62.

By contrast, the <u>only</u> purported proof cited by Blue Hills that the Payment was <u>not</u> transferred is the deposition testimony of Kenneth Goldberg, the attorney for Mr. Fineberg, Royall Associates, and Blue Hills who apparently advised them in 2003 as to how to handle the Settlement and the disposition of the Payment, Lender's Facts ¶ 74.  Blue Hills Brief at 5 (citing Blue Hills Facts ¶¶ 60-61).  Mr. Goldberg could not say whether Blue Hills or Royall Associates received and retained the $2 million Payment.  Goldberg 56-57.  Only after reviewing the Settlement Agreement, which provided for payment to Blue Hills, did he "believe it was Blue Hills Office Park," <u>id</u>. 58:

> Q.    [C]an you tell me which entity received and retained the $2 million settlement payment?
>
> A.    I think I would need, to assist me to accurately answer that, to look at one more document.
>
> Q.    What document?
>
> A.    I'd like to look at, and it appears that you may have it there, the settlement agreement which gave rise to this payment.

Goldberg 57-58; <u>see also</u> Goldberg 55-61.

Mr. Goldberg did not testify from personal knowledge.  He came to a conclusion based on a document.  His testimony is inadmissible and does not create a genuine dispute of fact concerning the transfer of the Payment.  Fed. R. Evid. 602; <u>Barrett v. United States</u>, 965 F.2d 1184, 1195 (1ˢᵗ Cir. 1992).  The admissible evidence is undisputed that Blue Hills transferred the Payment to Royall Associates.  This transfer breached Mortgage ¶ 10(a), which prohibits unconsented-to transfers of any part of the Mortgaged Property, and triggered the Blue Hills' Parties liability for the Deficiency under the Mortgage and Guaranty.  <u>See</u> CSFB Brief at 2-11.

2.     <u>The "Mortgaged Property" is clearly and unambiguously defined in the Mortgage.</u>

The Blue Hills Parties assert that the term "Mortgaged Property" in Section 10 of the Mortgage does not mean what the Mortgage says it means. Blue Hills Brief at 5-11. The Mortgage defines the Mortgaged Property as the Premises, the Improvements, <u>and</u> all of the "property, rights, interests and estates" described in the eight Granting Clauses – including the Zoning Appeal and the Payment. Mortgage at 1. The Granting Clauses describe all of the following, *inter alia*, as part of the Mortgaged Property: furniture, furnishings, and other property located upon the Premises and Improvements, Granting Clause Two; awards or payments for any injury to or decrease in the value of the Premises and Improvements, Granting Clause Three; where Blue Hills unreasonably fails to act, the right to appear in, defend, or commence any action or proceeding to protect the interest of Lender in the Mortgaged Property, Granting Clause Six; all causes of action that relate to, are derived from or are used in connection with the Mortgaged Property, Granting Clause Seven; and all proceeds from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the Mortgaged Property, Granting Clause Eight.

Despite this unambiguous definition of the Mortgaged Property, the Blue Hills Parties argue that actually, in Paragraph 10 of the Mortgage, "Mortgaged Property" only means the Premises and Improvements, which they call the "Property." Blue Hills Brief at 6. Yet, as set forth above, the Mortgage clearly defines the Mortgaged Property to include a great deal more than the Premises and Improvements. Mortgage at 1-4; <u>see also</u> Mortgage ¶ 28. If the parties meant to refer only to the Premises and Improvements in Paragraph 10, they had a clear and obvious means of doing so: use the words "Premises and Improvements" rather than "Mortgaged Property." This is, in fact, exactly what the parties did in those sections of the Mortgage that are

meant to refer solely to the Premises and/or Improvements.  See Mortgage ¶¶ 2, 3, 5, 9, 11(u), 11(x), 23(k).

The "Mortgaged Property" is unambiguously defined in the Mortgage and, as such, the Blue Hills Parties' unsupported theories as to its meaning are entirely irrelevant.  See, e.g., Alison H. v. Byard, 163 F.3d 2, 6 (1st Cir. 1998) ("Under Massachusetts law, 'where the wording of the contract is unambiguous, the contract must be enforced according to its terms.'") (quoting Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1985)).  In any event, their arguments concerning the meaning of "Mortgaged Property" in Paragraph 10 of the Mortgage are incorrect.

The Blue Hills Parties argue that the language of Paragraph 10(a) "evinces the parties' intent to define 'Mortgaged Property' as the [Premises and Improvements]."  Blue Hills Brief at 6.  In support of this argument the Blue Hills Parties combine portions of two different sentences. The following are the complete sentences; the portions omitted by Blue Hills are in bold:

- Mortgagor acknowledges that Mortgagee has examined and relied on the creditworthiness and experience of Mortgagor in owning and operating properties such as the Mortgaged Property in agreeing to make the Loan, and that Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property **as a means of maintaining the value of the Mortgaged Property as security for repayment of the Debt.**  Mortgage ¶ 10(a).

- **Mortgagor acknowledges that Mortgagee has a valid interest in maintaining the value of the Mortgaged Property** so as to ensure that, should Mortgagor default in the repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property.  Id.

The language omitted by the Blue Hills Parties constitutes the clearest manifestation of the parties' intent with respect to Paragraph 10(a): to maintain the value of the Mortgaged Property as security for repayment of the Debt.[6]  The intent of the parties, moreover, is to be

---

[6] The amount of money recoverable upon a "sale of the Mortgaged Property" depends not only on the value of the Premises and Improvements, but on the value of the entire Mortgaged Property, including all property rights, tangible and intangible, described in the Granting Clauses of the Mortgage.

gathered from "a fair construction of the contract as a whole and not by special emphasis upon any one part." Ucello v. Cosentino, 354 Mass. 48, 51 (1968). The Mortgage as a whole demonstrates the parties' intent to broadly define the Mortgaged Property and to prohibit unauthorized transfers of any part of the Mortgaged Property. See Mortgage at pp. 1-4; ¶ 9 (Improvements and Equipment shall not be removed, demolished, or materially altered without Lender's consent); ¶ 10; ¶ 12(e) (Blue Hills shall not make any loans or advances to any third party, including affiliates); ¶ 23(d) (unauthorized transfer or encumbrance of any portion of the Mortgaged Property is an Event of Default); ¶ 28(a) ("The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property."); ¶ 50 (default rule is that the term "Mortgaged Property" "shall include any portion of the Mortgaged Property and any interest therein").[7]

The Blue Hills Parties next argue that the scope of Paragraph 10(a) is limited to the types of transfers listed in Paragraph 10(b). Paragraph 10(b) merely lists certain indirect transfers that are deemed included within the scope of 10(a). It does not purport to be exclusive; indeed, it does not even include an outright sale of the Mortgaged Property or any part thereof.

Similarly, the Blue Hills Parties' argument that Paragraphs 10(e)-(f) somehow change the meaning of Paragraph 10 is incorrect. Paragraph 10(e) requires Blue Hills to reimburse the Lender for "all reasonable expenses" incurred by the Lender in the connection with the review of any transfer, including (if incurred) title search costs and title insurance endorsement premiums. Paragraph 10(e) does not say that only those transfers requiring a title search and title insurance are included within the scope of ¶ 10(a), and such a reading would exclude even the transfers specified by 10(b). Likewise, Paragraph 10(f) lists conditions which may, to the extent they

_____

[7] This was also the Lender's subjective intent. See Rubino 173, 30-31, 65-66.

apply, permit the Lender to withhold consent. It does not purport to limit Paragraph 10(a) to only those transfers as to which these conditions necessarily apply.

Finally, the Blue Hills Parties curiously rely on Paragraph 50 of the Mortgage. Paragraph 50 states, "Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, . . . the words 'Mortgaged Property' shall include any portion of the Mortgaged Property and any interest therein." Mortgage ¶ 50 (emphasis added). Given that the parties used the phrase "Mortgaged Property or any part thereof" in Paragraph 10(a), the parties' intent was obviously not to deviate from the almost identical definition set forth in Paragraph 50.

       3.      The Zoning Appeal is a "cause of action" within the scope of Granting Clause Seven.

The Blue Hills Parties argue that Blue Hills was not required under the terms of the Loan Documents to obtain the Lender's prior written consent to the Settlement or disposition of the Payment. Blue Hills Brief at 8. This argument ignores both Mortgage Paragraph 10(a) and Granting Clause Seven, which provides that "causes of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property" are part of the Mortgaged Property. The Zoning Appeal is clearly such a cause of action, the settlement of which was a transfer requiring consent under Mortgage Paragraph 10(a). See CSFB Brief at 2-4 and 7-9.

The Blue Hills Parties point to the specific provisions of the Mortgage dealing with the settlement of condemnation or insured casualty claims and argue that they were required to seek consent to settle only causes of action specifically mentioned in the Mortgage. To the contrary, those provisions demonstrate the parties' intent to require the Lender's consent to the settlement of claims for damage to the Property. If the Blue Hills Parties were correct, the parties' intent was to require Blue Hills to seek the Lender's consent to the settlement of a $250,001 insured casualty claim, but to permit Blue Hills to settle for $2 million a claim alleging damage to the Mortgaged Property without even notifying the Lender. This construction of the Mortgage

defies common sense.  Cofman v. Acton Corp., 958 F.2d 494, 497 (1st Cir. 1992) ("The

construction of a written instrument to be adopted is the one which appears to be in accord with

justice and common sense and the probable intention of the parties.").  Their interpretation would

also render meaningless Granting Clause Seven's general inclusion of "causes of action" within

the definition of Mortgaged Property.  Such an interpretation is to be avoided.  Gibraltar

Financial Corp. v. Lumbermens Mut. Cas. Co., 400 Mass. 870, 872 (1987) ("It is a standard rule

of construction that interpretations which result in meaningless word are to be avoided").

Although the parties may not have specified the precise cause of action brought by Blue

Hills in this instance (the Zoning Appeal), the parties (1) made causes of action relating to the

Mortgaged Property such as the Zoning Appeal part of the Mortgaged Property, and (2) forbade

unconsented-to transfers of the Mortgaged Property.  The only reasonable construction of the

Mortgage is that Blue Hills was required to obtain the Lender's prior written consent to the

settlement of the Zoning Appeal.  Kingstown Corp. v. Black Cat Cranberry Corp., 65 Mass. App.

Ct. 154, 158 (2005) (reading of a contract which gives a reasonable meaning to all provisions is

preferred).[8]

Notably, the Blue Hills Parties' own banking expert designee, Richard Clarke, does not

testify in support of their interpretation of the Mortgage.  Though asked by their counsel to opine

whether the Lender's consent was required to settle the Zoning Appeal and whether the $2

million Settlement Payment was part of the Lender's collateral, Depo. Ex. 389, Clarke chose not

to do so.  Clarke 18, 32, 42-43.

---

[8] The Blue Hills Parties' contention at page 9 of their brief, that Paragraph 29 of the Mortgage Agreement only gave the Lender the right to defend an action brought with respect to the Mortgaged Property, is wrong.  Paragraph 29 states that if Blue Hills "fails to act under circumstances under which it is unreasonable not to so act...[Lender] shall have the right...to bring any action or proceeding, in the name and on behalf of [Blue Hills], which [Lender], in its sole discretion, decides should be brought. . . ." Mortgage ¶ 29.

4.     The Guaranty is enforceable on its terms.

The Guarantors admit that they are liable for the full amount of the Debt if Blue Hills
fails to obtain the Lender's prior written consent to any "assignment, transfer or conveyance of
the Mortgaged Property or any interest therein," if Paragraph 10 of the Mortgage so requires.
Blue Hills Brief at 9.  They argue, however, that this Guaranty provision should only be enforced
if it "has the potential of adversely impacting either [Lender's] status as the sole mortgagee on
the Property or its ability to transfer the Loan to a securitized loan pool."  Id.  The Guarantors
provide no support for this invented rule, which has no basis in law or fact.

As noted above in section A, as matter of law, the plain language of the contract governs.
Courts enforce full liability nonrecourse carveouts according to their terms, even if the
consequence of the triggering action was not severe.  In First Nationwide Bank v. Brookhaven
Realty Assocs., 637 N.Y.S.2d 418 (N.Y. App. Div. 1996), for example, the court enforced a
carveout provision imposing full personal liability for the deficiency on the individual partners of
the borrower, despite the fact that the conduct triggering full liability (the commencement of a
bankruptcy proceeding not resolved within 90 days of its filing) did not deprive the lender of its
collateral, but merely delayed the foreclosure sale.  Id. at 420-21.

As a factual matter, in this case, the unconsented-to transfer did have a severe impact on
the Lender's collateral and the status of the Mortgage.  The settlement of the Zoning Appeal
impaired the entire mortgage by guaranteeing the loss of Blue Hills' only tenant, resulting a year
later in payment defaults, a foreclosure sale, and the Deficiency.  Under these circumstances,
imposing liability on Blue Hills and the Guarantors for the full amount of the Deficiency is both
compelled by the plain language of the contracts and appropriate.  An unconsented-to transfer of
a part of the Mortgaged Property has the potential to cause great harm, as it did here.  The parties
did not prohibit transfers, but required that Blue Hills seek consent so that the Lender could

decide which transfers it was willing to risk.  The Lender should not be forced to accept the consequences of a transfer that it was never given the chance to approve or disapprove.  Rather, the parties (through Paragraph 10 and the nonrecourse carveouts) agreed that the consequence of an unconsented-to transfer would be full liability for Blue Hills and the Guarantors.

At minimum, even if the Court were to find that the Settlement and transfer of the Settlement Payment did not violate Paragraph 10(a), the transfer, conversion, and removal of the Settlement Payment and Workstations, see CSFB Brief page 11, fraudulent concealment of the transfers from the Lender, failure to notify the Lender of and deposit the Payment in the lockbox pursuant to the Cash Management Agreement ("CMA"), and failure to pay taxes trigger liability under Guaranty Paragraph 1.2 (a), (d), (e), and (f) and Mortgage Paragraph 54 (a), (d), (e), and (f) for the loss, damage and cost directly caused thereby, namely the loss of over $2.35 million and attorneys' fees and costs reasonably incurred.[9]  See, e.g., Heller Financial, Inc. v. Whitemark at Fox Glen, Ltd., 2004 U.S. Dist. LEXIS 18974 * 5-6, 13-14 (N.D. Ill. 2004) (enforcing nonrecourse carveout triggering borrower's liability for amount of unauthorized transfers – described as loans – to borrower's affiliates); FDIC v. Prince George Corp., 58 F.3d 1041, 1047

---

[9] To be clear, the Lender's position is that had Blue Hills abided by the Loan documents, it would have sought the Lender's consent to the settlement of the Zoning Appeal before the Payment ever existed. The CMA never would have come into play because the Lender would have conditioned its consent to a settlement on setting aside any settlement proceeds as an additional loan reserve.  See CSFB Brief at 11-12 & n.13.  However, were the Court to find that the settlement of the Zoning Appeal and transfer of the Payment were not subject to the transfer provisions of Paragraph 10, the failure to deposit the Payment in the Lockbox and give Lender notice of its receipt were breaches of CMA Paragraphs 8 and 8(d), requiring notice of and deposit of extraordinary payments derived from or generated by, inter alia, ownership of the Premises.  The CMA breaches were Events of Default under Paragraph 23(l) of the Mortgage, with the Lender's delayed notice excused due to Blue Hills' own lack of notice and concealment of the breaches.  Cf. M.G.L. c. 260, § 12.  The Lender at the latest gave notice by its Counterclaim.  The Blue Hills Parties denied any breach and have never cured.  Thus, at the least, Fineberg and Langelier are liable under the Guaranty for the amount of the Payment.  They are also liable for the $100,000 received for the Workstations, Lender's Facts 124, and for some $264,000 of unpaid taxes due August 2 and November 1, 2004, see Supplemental Appendix of Deposition Exhibits, Exhibit 315.

(4th Cir. 1995) (enforcing nonrecourse carveout and finding borrower personally liable to extent

of impairment of access to collateral); Vista Development Joint Venture II v. Pacific Mutual Life

Ins. Co., 822 S.W. 2d 305, 308 (Tex. App. 1992) (enforcing nonrecourse carveout for failure to

pay taxes).

       5.      The extrinsic evidence cited by Blue Hills disproves their position.

     The Blue Hills Parties cite drafts of the Guaranty, which they say prove that the term

Mortgaged Property in Mortgage Section 10 means the "Property," i.e., the Premises and

Improvements.  Although this extrinsic evidence is not properly considered where, as here, the

language of the contract is unambiguous, see, e.g., FDIC v. Singh, 977 F.2d 18, 24 n. 7 (1st Cir.

1992), it shows that Blue Hills wanted to limit the Guaranty trigger to transfers of the real

"Property," but that the Lender insisted that a transfer of the broader "Mortgaged Property"

would trigger the Guaranty, and Blue Hills agreed.  Blue Hills' Facts ¶¶ 27-29.

## II.    THE BLUE HILLS PARTIES' MOTION FOR SUMMARY JUDGMENT AS TO COUNT IV OF THE COUNTERCLAIM MUST BE DENIED.

     The Blue Hills Parties contend that they are entitled to summary judgment as to the

Lender's fraud claim because (1) Blue Hills had no duty to notify the Lender of the Settlement or

the Payment; (2) even if Blue Hills had such a duty, "the mere failure to do so would not

constitute fraud;" (3) "no detrimental reliance actually occurred;" and (4) the fraud claim has not

been pled with particularity.  Blue Hills Brief at 15-17.  These arguments have no merit.

     First, Blue Hills had a duty under the Mortgage to notify the Lender of the Settlement, the

receipt of the Payment, and the disposition of the Payment.  Paragraph 10 of the Mortgage

required Blue Hills to obtain the prior written consent of the Lender to the Settlement and to

transfer of any Settlement proceeds.  In order to obtain such consent Blue Hills would have had

to notify the Lender.  Paragraph 18 of the Mortgage required Blue Hills to provide the Lender

with a quarterly balance sheet listing Blue Hills' assets and liabilities, which would have

included the Payment.  Alternatively, Paragraph 8 of the CMA required notice of receipt of the

Payment.  See note 9, supra.  As the Blue Hills Parties concede, a contractual "duty to speak,"

together with a failure to speak, is sufficient to establish an actionable misrepresentation.  Blue

Hills Brief at 16; see also Chiarella v. U.S., 445 U.S. 222, 235 (1980) (a duty to speak is a

predicate for fraud based on non-disclosure); Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st

Cir.1986) (stating elements of fraud); Alpine v. Friend Bros., 244 Mass. 164, 167 (1923)

(describing action for fraud for "failure to disclose known facts when there was a duty . . . to

disclose; that it was intended that it should be acted upon, as it was, and that damage directly

resulted therefrom").

        Second, the Blue Hills Parties' unsupported assertion that "even if certain language in the

Loan Documents required such notification, the mere failure to do so would not constitute

fraud," Blue Hills Brief at 16, is nonsensical.  The Blue Hills Parties base this assertion on their

accurate but inapplicable statement of the law concerning promises as actionable

misrepresentations ("[a] promise constitutes an actionable representation only if, at the time the

promise was made, an intention to carry out the promise did not exist.").  Blue Hills Brief at 16.

The Blue Hills Parties miss the point: the Lender does not contend that Blue Hills' promises to

notify the Lender were fraudulent when made, but that Blue Hills' failure to notify the Lender

was itself an actionable misrepresentation.

        Third, the Lender detrimentally relied on Blue Hills' silence, as shown by its failure to

exercise its remedies under the Loan Documents at the time of the Settlement or subsequent

transfer of the Payment.  See CSFB Brief at 16.  A failure to act, when one would have acted

(had one known of the fraud) is the legal equivalent of taking affirmative action.  Fottler v.

Moseley, 179 Mass. 295, 299 (1901) (plaintiff who, as a result of the defendant's fraud, failed to

act when otherwise he would have acted has established reliance).

Finally, it is unclear exactly what the Blue Hills Parties have in mind when they complain that (a) the Lender has not alleged the "time, place and content" of Blue Hills' misrepresentation and (b) the Lender has failed to "adduce any evidence" that Blue Hills' failure to speak was "false." Given that the Lender's fraud claim is based on Blue Hills' silence, the "time, place and content" of Blue Hills' silence has been sufficiently alleged and proven by the undisputed facts – Blue Hills failed, at any time, in any place, to notify the Lender of the Settlement and Payment. Blue Hills' failure to do so was "false" in that it conveyed the impression that there was no Settlement and no Payment.

## III.    THE BLUE HILLS PARTIES' MOTION FOR SUMMARY JUDGMENT AS TO COUNT III OF THE COUNTERCLAIM MUST BE DENIED.

Blue Hills argues that the Lender's claim for breach of the implied covenant of good faith and fair dealing is an attempt to "impute to Blue Hills, Fineberg and Langelier duties to which it never agreed to be bound." Blue Hills Brief at 18. The Loan Documents conclusively demonstrate otherwise. Blue Hills, Fineberg and Langelier agreed to become personally liable for, inter alia, (a) "fraud or intentional misrepresentation by Mortgagor or any Guarantor in connection with the Loan" and (b) a failure to obtain Lender's prior written consent to any "assignment, transfer or conveyance of the Mortgaged Property or any interest therein [...]." Mortgage ¶ 54, Guaranty ¶ 1.2. The undisputed facts show that (a) Blue Hills fraudulently failed to notify the Lender of the Settlement, Lease Termination Agreement, and Payment and that (b) Blue Hills failed to obtain the Lender's prior written consent to the Settlement and the transfer of the Payment.

The Lender's claim for breach of the implied covenant of fair dealing is obviously not an attempt to "imply [its] way into a viable contract claim." Rather, the Lender's claim is based on Blue Hills' deceptive and unfair behavior that prevented the Lender from taking immediate

redress for Blue Hills' breaches of the Loan Documents.  This is exactly the type of behavior that the implied covenant of good faith and fair dealing prohibits.  See CSFB Brief at 15-16.

## IV.     THE BLUE HILLS PARTIES' MOTION FOR SUMMARY JUDGMENT AS TO COUNT VI OF THE COUNTERCLAIM MUST BE DENIED.

The Blue Hills Parties argue that the Lender's claim under Mass. Gen. Laws c.93A should be rejected as an attempt to "elevate contract claims into 93A claims."  Blue Hills Brief at 19.  This argument fails to take into account the entirety of the conduct on which the Lender's c.93A claim is based.  The Blue Hills Parties did not merely breach the Loan Documents; they knowingly and willingly committed tortious acts.

The Blue Hills Parties' intentional misrepresentations alone are sufficient to permit recovery under c.93A.  See, e.g., Zayre Corp. v. Computer Sys. of America, Inc., 24 Mass. App. Ct. 559, 570 n. 23 (1987) ("Business strategy 'in the rough and tumble of the world of commerce' should not use conscious misrepresentation as a competitive weapon."); VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 620 (1994) ("'misrepresentation in the common law sense would be the basis for a c.93A claim'") (quoting Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979)).  Likewise, the Guarantors' conversion of the Payment provides an independent basis for their liability under c.93A.  See Ravech v. Wheeler, 2001 Mass. Super. LEXIS 198, *15-16 (Mass. Sup. Ct. April 18, 2001); Dufault v. Dufault, 1992 Mass. App. Div. 54, *4 (1992) (plaintiff in conversion action need only have a property interest in the converted property, regardless of whether he has an immediate right to possession). [10]

---

[10]   The Lender need not prove each element of the common law claims of fraud and conversion in order to recover for the underlying conduct under c.93A.  See, e.g., Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703-04 (1975) (c.93A claims not "subject to the traditional limitations of preexisting causes of action such as tort for fraud and deceit.").

Additionally, the Blue Hills Parties' transfer of the $2 million Payment to the Guarantors, combined with Blue Hills' subsequent failure to pay real estate taxes due on August 2 and November 1, 2004 is a form of bad faith tortious waste.  See, e.g., Nippon Credit Bank, Ltd. v. 1333 North California Boulevard, 103 Cal. Rptr. 2d 421, 428 (Cal. Ct. App. 2001) (nonrecourse borrower liable for bad faith waste where borrower transferred $1.7 million to its affiliates and failed to pay a $358,000 tax installment due); see also Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 118, 223 (2d Cir. 1994) (nonrecourse borrower liable for bad faith waste where borrower transferred capital to its owners, leaving it incapable of paying property taxes and unable to meet its loan payments).  At the time of the transfer of the Payment, the Blue Hills Parties knew the real estate taxes would still need to be paid when Equiserve moved out.  The Blue Hills Parties nevertheless made the transfer, concealed the transfer to prevent the Lender from seeking to restrain the transfer, and failed to pay taxes owed by Blue Hills.

The Blue Hills Parties' conduct – including the Settlement, the transfer of the Payment, the concealment of the Settlement and Payment transfer, distribution of all other net income, the transfer of the Workstations, and the failure to pay real estate taxes – considered as a whole, was an effort to "extract as much money from the [Mortgaged Property] as possible before walking away from it."  Nippon, 103 Cal. Rptr. 2d 421 at 431.  This behavior was not only in breach of the Loan Documents but was tortious, unfair, and deceptive in violation of c.93A.  See also CSFB Brief at 17-18.

## CONCLUSION

For all of the foregoing reasons, and those stated in CSFB's and the Trustee's memoranda in support of their own motions for summary judgment, the Blue Hills Parties' motion for summary judgment should be denied in its entirety, and the motions of CSFB and the Trustee should be granted.

## REQUEST FOR ORAL ARGUMENT

      CSFB and the Trustee respectfully request oral argument on the summary judgment

motion of the Blue Hills Parties and on their own motions for summary judgment.

                                Respectfully submitted,

May 31, 2006                 CSFB 1999-C1 ROYALL STREET, LLC,
                                and J.P. MORGAN CHASE BANK, as
                                Trustee for the Registered Holders of
                                Credit Suisse First Boston Mortgage
                                Securities Corp., Commercial Mortgage
                                Pass-Through Certificates, Series 1999-C1,

                                By their attorneys,


                                /s/ Bruce E. Falby
                                E. Randolph Tucker, BBO #503845
                                Bruce E. Falby, BBO #544143
                                Bruce S. Barnett, BBO #647666
                                Traci S. Feit, BBO #660688
                                DLA PIPER RUDNICK GRAY CARY US LLP
                                33 Arch Street, 26th Floor
                                Boston, MA  02110-1447
                                (617) 406-6000