UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates, Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**REPLY MEMORANDUM OF BLUE HILLS OFFICE PARK LLC,
GERALD FINEBERG AND WILLIAM LANGELIER IN FURTHER
<u>SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

### I.  <u>INTRODUCTION</u>

On May 17, 2006, Blue Hills, Fineberg and Langelier[1] (sometimes collectively referred to herein as the "Blue Hills Parties") moved for summary judgment seeking dismissal of all Counterclaims filed by the Lender. On May 31, 2006, the Lender filed an "Opposition of Plaintiffs-in-Counterclaim J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 and CSFB 1999-C1 Royall

---

[1] As used herein, capitalized words and phrases shall have the same meaning ascribed in Blue Hills Office Park LLC, Gerald Fineberg and William Langelier's Memorandum in Support of Motion for Summary Judgment (the "Blue Hills Memorandum I") and in Blue Hills Office Park LLC, Gerald Fineberg and William Langelier's Memorandum in Opposition to CSFB 1999 - C1 Royall Street, LLC and J.P. Morgan Chase Bank, as Trustee for the registered holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 Motions for Summary Judgment on their respective Counter-Claims (the "Blue Hills Memorandum II"), both of which are incorporated herein by reference.

Street LLC to Motion of Defendants-in-Counterclaim for Summary Judgment" (the "Opposition Memorandum").

This Reply Memorandum discusses some, but not all, of the issues raised in the Opposition Memorandum. The Blue Hills Parties believe that their contentions regarding the remaining issues have been addressed in Blue Hills Memorandum I and II.

## II.   FACTUAL BACKGROUND

The Blue Hills Parties respectfully refer the Court to the factual background information contained in parts I and II of Blue Hills Memoranda I and II. The remainder of this section deals with what the Blue Hills Parties maintain are the factual inaccuracies and mischaracterizations contained in the "Introduction" portion of the Opposition Memorandum.

Blue Hills commenced the Norfolk Action to appeal an adverse decision made by the ZBA. It did not do so "to prevent damage to the Mortgaged Property and the loss of its only tenant, Equiserve." Opposition Memorandum, p. 1 quoting from paragraphs 53-56 of the Lender's Joint Statement of Undisputed Facts ("Lender's Facts"). The quoted language is merely the Lender's assertion; it is not, however, a fact. Further, none of the quoted language is contained in paragraphs 53-56 of the Lender's Facts. Moreover, it is also disputed by the Blue Hills Parties. *See* Response Nos. 53-56 of Response of Blue Hills, Fineberg and Langelier to Defendants' and Plaintiffs-in-Counterclaim's Corrected Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment ("Blue Hills' Response"). Additionally, Equiserve notified Blue Hills of its intent not to renew the Lease on May 14, 2003 and irrevocably waived all Lease renewal rights by letter dated May 15, 2003, approximately three months prior to the execution of the Lease Termination Agreement. Blue Hills Statement I, ¶¶ 47-48.[2]

---

[2] "Blue Hills Statement I" refers to the Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaim previously filed with the Court. "Blue Hills Statement II" refers to the Blue Hills, Fineberg and Langelier's Statement of Undisputed Facts In Opposition to Defendants' Motions for Summary Judgment previously filed with the Court.

On page 2 of the Opposition Memorandum, the Lender states that "Blue Hills settled the Zoning Appeal for $2 million . . . on terms ensuring that the damage would occur and that Equiserve would move out a year later." Again, the quoted language is merely Lender's assertion; it is not fact (let alone an undisputed fact). In addition, the Lease Termination Agreement did not terminate the Lease as Lender incorrectly asserts. The Lease, due to expire on July 31, 2004, was not being renewed by Equiserve; an undisputed fact confirmed by letters predating the Lease Termination Agreement by almost three months. Blue Hills Statement I, ¶¶ 47-48; Blue Hills Statement II, ¶ 7.

The Lender offers no tangible evidence to support its assertion on page 2 of the Opposition Memorandum that Blue Hills "obviously decided to walk way from" the Loan. To the contrary, the following facts, either undisputed or unchallenged by the Lender, show that, by their words and actions, the Blue Hills Parties had a strong desire to work with the Lender's Servicer, Wells Fargo, and Special Servicer, LNR, to attempt a Loan restructuring:

- Joseph Donovan's written communications with Wells Fargo dated August 5 and 13, 2004 requesting a meeting with Wells Fargo and LNR;

- Gerald Fineberg's execution of LNR's Job Warshaw's August 19, 2004 letter in which Warshaw advised Blue Hills that LNR had authority to and agreed to meet with Blue Hills to discuss the Loan;

- Blue Hills' efforts, up until the November 19, 2004 foreclosure sale, to market the Property;

- Blue Hills Parties' accumulation of several millions of dollars, including the Settlement Proceeds, which were held in escrow by Blue Hills' attorneys to serve as "rainy day" Property reserve funds;

- Joseph Donovan's written communication dated August 2, 2004 and September 2, 2004 requesting access to Blue Hills' reserve accounts for payment of debt service on the Loan;

- The unrebutted deposition testimony of Fineberg, Langelier and Daniel Frank that they were willing and financially able to restructure the Loan;

- Dr. Kenneth Gartrell's ("Gartrell") expert opinion that, just prior to foreclosure, the value of the Property was approximately $42 million or greater; and,

- Fineberg and Langelier's exposure to approximately $4.9 million in "debt forgiveness" tax liability due to the foreclosure sale.

The Lender's spin on the circumstances leading up to and following Blue Hills' settlement of the Norfolk Action contained on page 2 of the Opposition Memorandum is equally spurious. Blue Hills had no duty to either obtain Lender's permission to settle the Norfolk Action or to disclose its receipt of the Settlement Proceeds. *See* part III (B)(3) in Blue Hills Memorandum I and part III (A) in Blue Hills Memorandum II. So, too, is the Lender's factual assertion that Blue Hills intentionally concealed the existence of the Settlement Proceeds. *Id.* The Settlement Proceeds were treated as a reduction in basis of the value of Blue Hills' land, buildings and equipment for tax purposes. That reduction in basis was duly reported in compiled financial statements for the period ended December 31, 2003 prepared by Blue Hills' outside accountants, Rutfield & Hassey. Blue Hills Statement I, ¶¶ 62-63; Donovan Affidavit, ¶ 4.[3] Those statements, as well as all other similar statements, were prepared annually in the regular course of business of Blue Hills' property manager, Fineberg Management, Inc. ("FMI"). Donovan Affidavit, ¶ 3.

The correspondence exchanged between FMI and Wells Fargo concerning the Property demonstrates that FMI promptly and properly responded to all Wells Fargo's requests for information and documentation. Thus, to the extent that Wells Fargo did not receive such information from FMI – and that is disputed – it would have been promptly provided by Blue Hills. Donovan Affidavit, ¶¶ 2-5. Further, given the large gaps in the documentation Wells Fargo had in its files and produced during the discovery phase of this case, it is plausible that Wells Fargo may have misplaced some of the information

---

[3] Affidavit of Joseph Donovan dated May 30, 2006 ("Donovan Affidavit") previously filed with the Court.

submitted by Blue Hills. However, such a contractual obligation – even if breached by Blue Hills – does not constitute actionable fraud, especially since Blue Hills had the ability under the Mortgage Agreement to cure such breach after notice thereof from the Lender, which notice was never given.

### III.    ARGUMENT

**A.    NO TRANSFER OF THE SETTLEMENT PROCEEDS OCCURRED.**

The Lender does not seriously challenge the Blue Hills Parties' assertion, set out in part III (B)(1) of Blue Hills Memorandum I and part III (C)(2) of Blue Hills Memorandum II, that no transfer of the Settlement Proceeds occurred. What the Lender attempts to do, however, is to mischaracterize the record evidence as "overwhelming undisputed evidence, that those funds . . . were distributed to Blue Hills' sole member, Royall Associates." Opposition Memorandum, at page 6. Such "evidence," as discussed, *infra*, is either deposition testimony taken out of context or simply doesn't exist.

    **1.    David Andelman's Deposition Testimony.**

Contrary to the Lender's assertion on page 6 of the Opposition Memorandum, Blue Hills' tax expert, David Andelman, ("Andelman"), never opined that the Settlement Proceeds had been transferred from Blue Hills to the Trust. Andelman did testify, however, that Blue Hills was a "disregarded entity" for tax purposes and that, consequently, income, expenses, profits and losses relating to the Property are recorded at the Trust level. Blue Hills Statement II, ¶ 1.

    **2.    Gilbert Stone and Joseph Donovan's Deposition Testimony.**

Although Gilbert Stone ("Stone") confirmed that the Settlement Proceeds were not deposited into the Lockbox Account (which, for reasons set forth in Blue Hills Memoranda I and II, was not required), he also testified that he did not know into what account it was deposited. *See* Deposition of Gilbert Stone, page 59, lines 14-15; page 61 lines 23-24; page 62, line 1, attached as Exhibit 3 to Affidavit No. 2 of Meredith Swisher ("Swisher Affidavit No. 2") filed herewith. However, the undisputed evidence shows that the Settlement Proceeds were wired to a clients' fund account with Blue Hills' counsel, Bernkopf

Goodman LLP ("Bernkopf Goodman"), and internally named "Fineberg Royall Associates," a generic name for Blue Hills related matters.

### 3. Gerald Fineberg's Deposition Testimony.

Contrary to the Lender's contention on page 6 of the Opposition Memorandum that Fineberg testified to having "$6 million in reserve accounts held by Royall Associates Realty Trust," the quoted language came directly from the Lender's counsel's question, and not from Fineberg. In response to the subject question, Fineberg responded by stating that he "would have had a meeting." Fineberg clarified the response in his Errata Sheet, by adding, "However, the money in the reserve accounts was always held by my attorneys for Blue Hills Office Park LLC." Errata Sheet, Fineberg Deposition, page 177, attached to the Swisher Affidavit No. 2 as Exhibit 1.

Fineberg also testified during his deposition that he never saw the Settlement Proceeds, since they went directly into "the special accounts" at Blue Hills' attorneys. Fineberg Deposition, page 92, lines 11-19, attached to Swisher Affidavit, Exhibit 4.[4]

### 4. The Documentary Evidence.

Blue Hills produced documents showing that the Settlement Proceeds were wired into Bernkopf Goodman's client's fund account at Century Bank on August 8, 2003. The client's fund account ledger card shows that the funds were identified as being held in the name of "Fineberg Royall Associates." Deposition Exhibit 177, attached to the McGlynn Affidavit as Exhibit 45.[5] Records were also produced by Blue Hills showing that one-half of the Settlement Proceeds were wired to Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Cutler"), counsel for Langelier, on February 1, 2005. Finally, internal records of Century Bank, Danversbank and Wilmer Cutler produced by Blue Hills corroborate the

---

[4] References to "Swisher Affidavit" refer to the previously filed Affidavit of Meredith Swisher dated May 31, 2006.

[5] References to "McGlynn Affidavit" refer to the previously filed Affidavit of Peter McGlynn dated May 17, 2006.

banking transactions revealed by Bernkopf Goodman and Wilmer Cutler's clients fund accounts.[6] None of this documentary evidence is rebutted by the Lender.

### 5. Kenneth Goldberg's Deposition Testimony.

In one of the Lender's more blatant mischaracterizations of deposition testimony, it asserts that Blue Hills' attorney, Kenneth Goldberg, presented the "only" proof that the Settlement Proceeds were not transferred and, further, that Goldberg did not testify on personal knowledge. Opposition Memorandum, page 8.

Goldberg was a co-escrow agent with Wilmer Cutler's Andrew Cohn ("Cohn"), both of whom participated in the negotiations of the Agreement dated December 31, 2004 and the Settlement Agreement. Deposition Exhibits 176 and 21, attached to the McGlynn Affidavit as Exhibits 29 and 44. What the documentary evidence[7] plainly shows is also corroborated in the following Goldberg deposition testimony; *vis,* that no transfer of the Settlement Proceeds occurred:

> **Q:** **If the Century bank account was held for your client Blue Hills Office Park LLC, do you know why it is that somebody wrote not Blue Hills Office Park but Fineberg Royall Associates on this ledger sheet that has been produced to us as the record of the disposition of the settlement payment?**
>
> A: The answer is yes. I think that from the time of inception it is just a generic. I believe that's a title, I believe, probably on our account records. So that even if we sent bills, we just internally identified Blue Hills Office Park LLC under its prior – under the name generically as Royall Associates. That's what our office characterized it and identified it as.
>
> I don't know even if there is a Royall Associates entity. That's what we called the account for shorthand purposes in this office. It might have said Fineberg – 150 Royall Street, Canton, which was just as likely. It was a way of identifying whose money it was and whoever was the owner there would have obviously been entitled to it.

Goldberg Deposition, pp. 71-72, attached to the Swisher Affidavit No. 2 as Exhibit 2.

---

[6] In the Opposition Memorandum, page 7, footnote 4, the Lender makes the misleading statement that Blue Hills has produced no records other than Deposition Exhibit 177 regarding the Settlement Proceeds. Exhibit 177, consisting of six pages, contains both Bernkopf Goodman and Wilmer Hale's accounting records, as well as bank records from Century Bank and Danversbank. Blue Hills' written responses to Lender's interrogatories also disclosed the receipt and disposition of the Settlement Proceeds.

[7] *See* Deposition Exhibit 177, attached to the McGlynn Affidavit as Exhibit 45.

> Q: **The $2 million settlement payment stayed in the Century Bank account held by Bernkopf Goodman under the shorthand Fineberg Royall Associates until its disposition was directed, to use the word you just used, by the beneficiaries of Royall Associates Realty Trust in the December 31, 2004 agreement that we marked as Exhibit 176, correct?**
>
> A: Yes, with one caveat. It was not held in an account called Fineberg Royall Associates. That's simply the manner in which the bookkeeper at Bernkopf Goodman identified the account. We do that by property address. It was not an account Royall Associates. That's what the people did to identify it. That probably was the client number the way they saw it for accounting, computer purposes.

Goldberg Deposition, p. 76, attached to the Swisher Affidavit No. 2 as Exhibit 2.

> Q: **But this Exhibit 177, not to argue with you, doesn't tell you the client for whose benefit the $2 million is held, does it?**
>
> Mr. McGlynn: Objection, asked and answered.
>
> A: To me it does. The answer is clear. If I go back to where it came from, it is very clear here. Pursuant to [the Agreement], it was your LLC's money, the payment was made to the LLC, Paragraph 1, payment to BHOP. It is clear. That money got wired in, and it was never changed, into that same account; it's been in the same account from 8/8/03, when it was received. It stayed there for years until it was then transferred in 2/2/05 but retained, transferred into separate accounts, but there was no distribution or other change of ownership.

Goldberg Deposition, pp. 164-165, attached to the Swisher Affidavit No. 2 as Exhibit 2.

The Lender's assertion that Goldberg did not testify from personal knowledge is equally misleading and inaccurate. Opposition Memorandum, p. 8. The complete colloquy on the subject between Goldberg and Lender's counsel follows:

> Q: **Exhibit 177 looks like a ledger sheet of some kind with the handwriting at the top Fineberg Royall Associates Century Bank, correct?**
>
> A: That's what it says.
>
> Q: **There appears to be handwriting in the middle of the page that says: "8/8/03 wire in from Banknorth IOLTA, $2 million," Do you see that?**
>
> A: I don't. Yes, I do. I'm sorry. Yes.
>
> Q: **Looking these two documents, can you tell me which entity received and retained the $2 million settlement payment?**
>
> A: I think I would need, to assist me to accurately answer that, to look at one more document.

> Q: **What document?**
>
> A: I'd like to look at, and it appears that you may have it there, the settlement agreement which gave rise to this payment.
>
> Q: **I will grant your wish and show you Exhibit 21, the settlement agreement.**
>
> A: Thanks for granting my wish.
>
> Q: **With the benefit of Exhibit 21, would you tell me which entity received and retained the $2 million settlement payment?**
>
> A: I believe it was Blue Hills Office Park.
>
> Q: **LLC?**
>
> A: Yes.

Goldberg Deposition, pp. 57-59, attached to the Swisher Affidavit No. 2 as Exhibit 2.

As noted above, Goldberg was involved in the negotiation of both the Agreement dated December 31, 2004 and the Settlement Agreement, and had personal knowledge of the subject transactions. Goldberg's use of the Settlement Agreement to refresh his recollection is permitted under Fed. R. Evid. 612, which allows a witness to use a writing to refresh his or her memory while testifying. *See also United States v. Schwartzbaum,* 527 F.2d 249 (2nd Cir. 1975).

**B.    LENDER'S ARGUMENTS CONCERNING THE DEFNITION OF "MORTGAGED PROPERTY" SUPPORT BLUE HILLS' CONTENTION.**

The Lender does not directly challenge the analysis regarding the meaning of the phrase Mortgaged Property in Section 10(a) of the Mortgage Agreement contained in part III (B)(2) of Blue Hills Memorandum I. Rather, the Lender argues that the definition of Mortgaged Property contained on page 1 of the Mortgage Agreement includes all of the property rights, interests and estates described in all eight Granting Clauses. That argument, however, begs the question as to whether the phrase Mortgaged Property takes on a narrower meaning in the context of Section 10 of the Mortgage Agreement.

According to the Lender, the language in Section 10(a) of the Mortgage Agreement quoted on page 10 of the Opposition Memorandum constitutes "the clearest manifestation of the parties' intent with

respect to [Section 10(a)]: to maintain the value of the Mortgaged Property as security for repayment of the Debt." However, that statement merely states the obvious; namely, that the Mortgaged Property constituted security for the Loan. It does not militate against the Blue Hills Parties' contention that the phrase Mortgaged Property in Section 10 refers to the real estate and the building thereon, as opposed to, for example, furniture, equipment, causes in action and other, similar assets. [8]

Although the Mortgage Agreement separately defines Premises as the land and Improvements as the building, all that the Lender has shown by its reference on page 10 of the Opposition Memorandum to seven different sections in the Mortgage Agreement is that there are several sections in the Mortgage Agreement where the words Premises and Improvements are used interchangeably with the phrase Mortgaged Property:

- In Section 2 of the Mortgage Agreement, a warranty section, Blue Hills warrants that it has an unencumbered fee estate in the "Premises and Improvements," and that it "owns the Mortgaged Property free and clear of all liens . . . except for those exceptions shown in the title insurance policy insuring the lien of this Mortgage . . . ." Title insurance relates to real estate and not to general intangibles, equipment or choses in action.

- In Section 3 – the insurance section – the phrase Mortgaged Property, in context, plainly refers to the Property. An "area identified by the Federal Emergency Management Area as an area having special flood hazards" and business interruption insurance for "rental loss and or business interruption" relate to the real property, not to intangibles like claims and choses in action.

---

[8] Lender implies that Blue Hills' use of certain portions of Section 10(a) in Blue Hills Memorandum I was somehow misleading. This is incorrect. The language quoted in Blue Hills Memorandum I was designed to show the reader that the portion of Section 10(a) of the Mortgage Agreement describing Blue Hills' experience in owning and operating "properties such as the Mortgaged Property" supported Blue Hills' conclusion that Section 10 referred only to the Property rather than every single asset described in the eight Granting Clauses. In any event, the entire section was quoted in Blue Hills Memorandum II in footnote 3.

>  Mortgage Agreement, Section 3(b)(i) and (iii).  Section 3(b)(vii) also describes the Mortgaged Property in terms of being or becoming a "legal, 'non-conforming' use," another unambiguous reference to real property.

- Section 5 defines Taxes as being "assessed or imposed against the Mortgaged Property."  Section 6 required Blue Hills to deposit one-twelfth of the Taxes monthly into the tax Reserve Account.  It is undisputed that the Taxes referred to in Section 6 relate to the real estate taxes assessed by the Town of Canton, Massachusetts.

- Section 9 describes restrictive covenants, zoning laws and other public and private restrictions limiting or defining the uses "which may be made of the Mortgaged Property . . . ."  This clause unambiguously refers to real property.

- Although Section 11(u) only employs the word Premises, use of the phrase Mortgaged Property, (in several other parts of Section 11), in context, refers to real property.  *See* e.g., Section 11(l)(2), (s), (w), (z), (bb), (cc), (ee), (gg) and (hh).

- Section 23 utilizes the phrases Mortgaged Property and Improvements, interchangeably, when referring to the Blue Hills' office building located on the land.  *See* e.g., Section 23(i), (k) and (o).

The Lender's remaining two arguments located at the bottom of page 11 and top of page 12 of the Opposition Memorandum, warrant only two brief comments.  First, the Blue Hills Parties do not contend that Sections 10(b), (e) and (f) of the Mortgage Agreement change the meaning of Section 10(a).  Rather, as noted on page 6 of Blue Hills Memorandum I, these sections demonstrate that the types of transfers requiring Lender's prior written consent under Section 10 are limited to the Property, the beneficial interests therein and substitution of guarantors.[9]

---

[9] Section 10(b), as noted in Blue Hills Memorandum I, enumerates the types of transfer and assignments within the scope of Section 10.  Section 10(b) is an extension of Section 10(a).

Secondly, contrary to the Lender's comment, there is nothing "curious" about the Blue Hills Parties' reliance on Section 50 of the Mortgage Agreement. The consistent position of Blue Hills Parties is objectively manifested in Section 50; namely, that the parties intended that the definition of Mortgaged Property be limited in Section 10 of the Mortgage Agreement to the real property and the building located thereon.

C.  **THE NORFOLK ACTION IS NOT A "CAUSE OF ACTION" WITHIN THE SCOPE OF GRANTING CLAUSE SEVEN.**

The Blue Hills Parties respectfully refer the Court to the arguments contained in part III (C)(4) of Blue Hills Memorandum I and part III (C)(3) of Blue Hills Memorandum II; arguments which are not seriously rebutted by the Lender in part I (B)(3) of the Opposition Memorandum.

With respect to Granting Clause Seven of the Mortgage Agreement, even if, for arguments sake, the Norfolk Action was within its scope, it is not the type of transaction requiring Lender's consent under Section 10 of the Mortgage Agreement. Furthermore, as Lender acknowledges, there are express sections in the Mortgage Agreement where its consent is required prior to Blue Hills' settlement of condemnation and insured casualty claims. However, it is an impermissible leap of contract interpretation to expand the express provisions in the insurance and condemnation sections of the Mortgage Agreement into a general requirement that all Property damage claim settlements require Lender's consent. The leap becomes truly Bunyanesque where, as here, no Property damage is involved.

The Blue Hills Parties' final comment to part I (B)(3) of the Opposition Memorandum is noteworthy only because the Lender stated that it was "notabl[e]" that Blue Hills' banking expert, Richard Clarke, ("Clark") did not provide his expert opinion on the interpretation of the Mortgage Agreement. Opposition Memorandum, p. 13. As Clarke advised the Lender's counsel during his deposition, he is not a lawyer and does not feel qualified to interpret legal language in a complex document. Clarke Deposition, page 43, lines 11-17, attached to Swisher Affidavit No. 2 as Exhibit 4. Moreover, since interpreting legal documents is normally reserved for the Court, expert opinions thereon are generally inadmissible. *Nieves-Villaneuva v. Soto-Rivera,* 133 F.3d 92, 99 (1st Cir. 1997) (purely legal questions,

- 12 -

such as interpretation of unambiguous contract, are the exclusive domain of the judge); *Foisy v. Royal Maccabees Life Insurance Co.,* 356 F.3d 141, 148-49 (1st Cir. 2004) (under Massachusetts law, construction of an unambiguous contract is a question of law reserved for the court).

D.  **THE GUARANTY IMPOSES NO LIABILITY ON THE BLUE HILLS PARTIES FOR EITHER SETTLEMENT OF THE NORFOLK ACTION OR ITS RECEIPT OF THE SETTLEMENT PROCEEDS.**

With respect to part I (B)(4) of the Opposition Memorandum, Blue Hills respectfully refers the Court to parts III (B)(4) and (5) of Blue Hills Memorandum I and parts III B and C of Blue Hills Memorandum II.

In typical fashion, in part I (B)(4) of the Opposition Memorandum, the Lender (again) mischaracterizes Blue Hills' contentions:

> [The Blue Hills Parties] argue, however, that this Guaranty provision should only be enforced if it 'has the potential of adversely impacting either [Lender's] status as the sole mortgagee on the Property or its ability to transfer the Loan to a securitized loan pool.' *Id.* The Guarantors provide no support for this invented rule which has no basis in law or in fact.

Opposition Memorandum, p. 14, quoting from Blue Hills Memorandum I, p. 9.

The argument advanced by the Blue Hills Parties on page 9 of the Blue Hills Memorandum I is not an "invented rule"; rather, page 9 fairly summarizes the types of events and circumstances – non-existent here – which would expose Fineberg and Langelier for the "full amount of the Debt" under Guaranty paragraph 1.2(ii)(A)-(E). In general, these events and circumstances would have the potential of impacting the Lender's status as sole mortgagee and its ability to transfer the Loan to a securitized loan pool.

Part I (B)(4) of the Opposition Memorandum also raises, for the first time, a claim that the Lender has been damaged in the amount of $2.35 million. This newly minted claim is at variance with not only the Lender's motions for summary judgment, but its answers to Blue Hills' interrogatories requesting information on its damages. Defendants' Answers to Interrogatory No. 12, attached to the McGlynn Affidavit as Exhibit 6.

Moreover, for reasons discussed in part III C of Blue Hills Memoranda I and II, neither Fineberg nor Langelier have committed any offenses which triggered any of the so-called limited liability provisions in Guaranty paragraph 1.2(ii)(a)-(g).

E.   **BLUE HILLS HAD NO DUTY TO NOTIFY THE LENDER ABOUT THE NORFOLK ACTION.**

   1.   **As Blue Hills Had No Contractual Duty To Notify The Lender, There Has Been No Misrepresentation.**

Even if, for the sake of argument, Blue Hills' failure to notify the Lender about the Norfolk Action could constitute an actionable representation, the Mortgage Agreement did not require any Lender notification prior to Blue Hills' settlement of that action.  Aware that Section 10(a) of the Mortgage Agreement contains no support for its contention that Blue Hill was required to seek consent, the Lender throws one more section of the Mortgage Agreement (Section 18) and one more section of the CMA (Section 8) into the mix.  However, neither section 18 of the Mortgage Agreement nor section 8 of the CMA establish that Blue Hills had a cognizable duty to obtain Lender's advance consent.  Absent a recognized duty to speak, a failure to speak is insufficient to establish an actionable misrepresentation. *Wade v. Ford Motor Co.*, 341 Mass. 596, 597-98 (1961) (allegations of nonfeasance insufficient absent a duty to speak or act); *Phinney v. Friedman*, 224 Mass. 531, 532 (1916) ("it is settled that mere silence . . . does not of itself constitute fraud").

Section 18 of the Mortgage Agreement provides, in pertinent part, that "[w]ithin one hundred twenty (120) days following the end of each calendar year, [Blue Hills] shall furnish statements of its financial affairs and condition . . . in such detail as [Lender] may request . . . ."  It is a legally unsupported leap to say that the failure to abide by a contractual obligation to provide the Lender with quarterly financials is tantamount to fraud.  In fact, any such failure would not even be an event of default under the Mortgage Agreement because, *inter alia*, Blue Hills was not notified of such alleged breach of the

contractual obligation and not given at least 30 days to cure. Mortgage Agreement, Sections 23(l) and (m).[10]

Section 8 of the CMA - titled "Casualty and Condemnation Proceeds Sub-account; Extraordinary Receipts Sub-account" is inapplicable to the facts extant here. Such section provides, in pertinent part, that proceeds from "[a]ny other extraordinary event . . . derived from or generated by the use, ownership or operation of the Premises . . ." shall be deposited in a Clearing Account. CMA, Section 8(d). As its title indicates, the section was designed to cover proceeds resulting from the partial or total destruction or loss of the Property and/or its income-producing value, e.g., casualty and condemnation or other similar extraordinary events. Further, the limitations of the phrase "derived from or generated by the use, ownership or operation of the Premises . . ." does not indicate the funds received in settlement of litigation concerning an abutting property are properly under its aegis.

### 2. Legal Duties and Contractual Obligations are Distinguishable.

The Lender fails to cite any cases where a contractual duty to speak gives rise to a claim of fraud based on nondisclosure. In *Chiarella v. U.S.*, 445 U.S. 222, 235 (1980), a case cited by the Lender, the United States Supreme Court held that there can be no fraud since there was no duty to speak created by <u>federal securities law</u>. *Id.* This is quite different than what the Lender is attempting to do here; namely, turn a contractual provision requiring updated financial information into a common law or statutory duty to speak such that Blue Hills' alleged failure to provide such information is actionable fraud.

---

[10] Section 18 of the Mortgage Agreement required Blue Hills to provide quarterly and annual reports on income, expense, budgets, rent rolls and its financial condition accompanied by a certificate executed by Blue Hills' CFO. Based upon the FRE 1006 compilation prepared by and attached to the Affidavit No. 2 of Peter B. McGlynn ("McGlynn Affidavit No. 2") as Exhibit A, the contents of Wells Fargo's records reveal that many of the documents purportedly required from Blue Hills were missing from Wells Fargo's files. Whether Wells Fargo misplaced them or they were never sent by Blue Hills is a disputed fact. Donovan Affidavit, ¶ 2-5. However, it is undisputed that whenever Wells Fargo requested information from Blue Hills, it was promptly transmitted by Blue Hills to Wells Fargo. Donovan Affidavit, ¶¶ 2-5. Additionally, even if, *arguendo*, Blue Hills failed to provide the requested documentation, under Sections 23(l) and (m) of the Mortgage Agreement, Blue Hills had not less than 30 days to deliver the records to Wells Fargo before an event of default occurred as a result. With respect to any alleged failure by Blue Hills to provide the requisite documentation under Section 18 of the Mortgage Agreement, Lender has offered <u>no evidence</u> that notice of such failure was given to Blue Hills as required by Sections 23(l) and (m) and that Blue Hills failed to cure within 30 days thereafter.

There is an explicit distinction between having a duty to speak arising out of either the common law or a statute, and a duty that arises out of a contractual obligation. "The general rule is that silence, in order to be an actionable fraud, must relate to a material matter known to the party and which is his <u>legal duty</u> to communicate to the other contracting party." *Williams v. East Coast Sales, Inc.*, 59 N.C. App. 700, 703 (1982) quoting 37 Am.Jur.2d Fraud § 145 (1967); s*ee also Moser v. Spizzirro*, 295 N.Y.S. 2d 188, 189 (2d Dep't 1968), *aff'd*, 25 N.Y. 2d 941 (1969) ("The mere silence of defendant, unaccompanied by some act or conduct which deceived plaintiffs, was not an actionable fraud in the absence of any confidential or fiduciary relationship.")  In *Williams*, the defendant had a <u>statutory</u> duty under North Carolina law to disclose facts about a mobile home. *Williams*, 59 N.C. App. at 700.

Cases that have found the existence of a duty to speak in the context of a claim of fraud concern fiduciary and "special" relationships (e.g. family member) or instances where a partial disclosure of half-truths obligates further disclosure.  In *Urman v. South Boston Sav. Bank*, 424 Mass. 165 (1997), the court held that the bank, as a seller of a condominium, could not be liable to purchaser for undisclosed toxic waste problems absent a fiduciary relationship to the buyer. *Id.,* s*ee also United States v. LaMacchia,* 871 F. Supp. 535, 542 (D. Mass. 1994) (absent a fiduciary or some special statutory duty, nondisclosure cannot constitute fraud).

"Absent a <u>fiduciary relationship</u>, there is no obligation on the part of the seller to disclose the defects of the property he is selling." *Shanley v. Rockland Trust Company*, 2000 WL 1476109 at 2 (Mass. App. Ct.) (emphasis supplied). "Nondisclosure of material information may become actionable as misrepresentation only if there is a fiduciary relationship or a similar relationship involving trust and confidence.  Such relationships may arise where there is evidence of dependence upon another's judgment in business and property matters." *Id*. at *3, citing *Nolan & Sartorio,* Tort Law §142 at p. 238

(2d ed. 1989).[11] In the instant case, sophisticated parties with legal counsel, such as Lender, cannot credibly claim such dependence.

### F.   THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CANNOT CREATE NEW CONTRACTUAL OBLIGATIONS.

The Mortgage Agreement did not require Blue Hills to obtain Lender's consent to settle the Norfolk Action, nor was Blue Hills obligated to deposit its Settlement Proceeds in the Clearing Account. In light of Lender's acknowledgment that the terms of the Mortgage Agreement are enforceable according to their plain meaning, its attempt to stretch those terms to create obligations not contained therein is both puzzling and misguided. The implied covenant of good faith and fair dealing does not create contractual obligations that are "not otherwise provided for in the existing contractual relationship." *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005).

Moreover, the requirement of good faith "is circumscribed by the obligations – the contractual 'fruits' – actually contained" in the written contract. *Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001). While the Lender may be entitled to the fruits springing forth from the Property – both bitter and sweet – Lender would be hard-pressed to credibly assert that the Settlement Proceeds, which were derived from a lawsuit against an abutter and not generated from neither operation of the Property or as compensation for damage to or government confiscation of the Property, were a contemplated fruit of the parties' contractual arrangements.

### G.   NO FRAUD OR MISREPRESENTATION OCCURRED.

As discussed in greater detail, *supra* and in Blue Hills Memoranda I and II, there was no misrepresentation, intentional or otherwise by the Blue Hills' parties. Accordingly, Lender can prove neither deceptive nor unfair conduct. This is particularly true in regard to the heightened standard

---

[11] On page 18 of the Opposition Memorandum, Lender feigns misunderstanding of the applicability of Fed. R. Civ. P. 9(b) to this case. There is a good reason why Lender may be required to allege the "time, place and content" of the alleged misrepresentation; namely, absent a legal duty to speak, silence may not constitute an actionable representation. *Swinton v. Whitinsville Savings Bank*, 311 Mass. 677, 678-79 (1942). Lender has failed to identify any cognizable legal duty. Accordingly, if Blue Hills' silence is the sole basis for Lender's claim of fraud, the entry of summary judgment in Blue Hills' favor is mandated. If Lender relies on any affirmative representation as the basis of its fraud claim, it is required to have pleaded the details of any such representation. Fed. R. Civ. P. 9(b).

applicable to commercial disputes. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979) (necessary to "attain a level of rascality . . . [in] the rough and tumble world of commerce.") *Id.*; *Spence v. Boston Edison Co.*, 390 Mass. 604, 616 (1983) (an act that might be unfair, if practiced on a "commercial innocent," may be common practice among businesses). G.L. c. 93A, §11 "does not contemplate an overly precise standard of ethical or moral behavior. It is the standard of the commercial marketplace." *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996); *Shepard's Pharmacy Inc. v. Stop & Shop Cos.*, 37 Mass. App. Ct. 516, 520 (1994).

Lender's plaints regarding "conversion" are not only baseless, but must be viewed in light of Lender's attempt to amend its Counterclaims to add, *inter alia*, a claim for conversion. Lender's motion for leave to amend was denied. Moreover, because Blue Hills is ultimately entitled to the funds at issue, the Lender cannot prove a *prima facie* case for conversion. *See Abington National Bank v. Ashwood Homes, Inc.*, 14 Mass. App. Ct. 503, 507 (1985) (stating elements of conversion).

Further and moreover, the cases cited by Lender as indicating that the purported failure to pay real estate taxes constituted "waste" are inapposite to the case extant. The cases relied upon by Lender – which have facts indicating that nonpayment was in bad faith – are distinguishable from the present case in which, *inter alia*, there was confusion concerning the payment of real estate taxes. Moreover, in the cases relied upon by Lender, significant funds were misappropriated by the borrower on or <u>after</u> the date when certain tax payments were due. *Nippon Credit Bank, Ltd. v. 1333 North California Boulevard*, 103 Cal. Rptr. 2d 423, 428 (Cal. Ct. App. 2001); *Travelers Insurance Co. v. Third Associates*, 14 F.3d 114, 118 (2nd Cir. 1994). The present case is not one in which real estate taxes would have been paid but for Blue Hills' receipt of the Settlement Proceeds. The Settlement Proceeds were neither produced by operation of the Property nor were they ever intended (or earmarked) for payment of tax expenses.

## IV.   CONCLUSION

For the foregoing reasons, the Blue Hills Parties respectfully request that the Court grant their motion for summary judgment and grant them such other and further relief as is proper and just.

>Respectfully submitted,
>
>BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
>By their attorneys,
>
>
>      /s/ Peter B. McGlynn
>Peter B. McGlynn, Esquire (BBO No. 333660)
>Meredith A. Swisher, Esquire (BBO No. 646866)
>BERNKOPF GOODMAN LLP
>125 Summer Street, Suite 1300
>Boston, Massachusetts 02110
>Telephone:    (617) 790-3000
>Facsimile:     (617) 790-3300
>pmcglynn@bg-llp.com
>mswisher@bg-llp.com

Dated:  June 12, 2006
#339501 v1/14500/9985