UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| ) | |
| BLUE HILLS OFFICE PARK LLC, ) | |
|     Plaintiff/Defendant-in-Counterclaim ) | |
| ) | |
| v. ) | Civil Action No. 05-CV-10506 (WGY) |
| ) | |
| J.P. MORGAN CHASE BANK, as Trustee for ) | |
| the Registered Holders of Credit Suisse First ) | |
| Boston Mortgage Securities Corp., Commercial ) | |
|  Mortgage Pass-Through Certificates, Series 1999-C1 ) | |
|     Defendant ) | |
| ) | |
| and CSFB 1999 – C1 ROYALL STREET, LLC ) | |
|     Defendant/Plaintiff-in-Counterclaim ) | |
| ) | |
| and ) | |
| ) | |
| WILLIAM LANGELIER and GERALD FINEBERG ) | |
|     Defendants-in-Counterclaim ) | |

---

## AFFIDAVIT NO. 2 OF MEREDITH A. SWISHER

Meredith A. Swisher, on oath, deposes and states as follows:

1.    I am an associate at the firm of Bernkopf Goodman LLP, which maintains a business address at 125 Summer Street, Boston, Massachusetts and am a member in good standing of the Massachusetts bar. I am trial counsel for the plaintiff Blue Hills Office Park LLC ("Blue Hills") and the defendants-in-counterclaim William Langelier ("Langelier") and Gerald Fineberg ("Fineberg"). I am making this affidavit solely for the purpose of authenticating certain documents, including deposition transcripts and errata sheets in support of Blue Hills, Fineberg and Langelier's Reply Memorandum in Further Support of Their Motion for Summary Judgment.

2.    True copies of excerpts of the Deposition of Gerald Fineberg dated April 5, 2006 ("Fineberg Deposition") and the errata sheet from the Fineberg Deposition are attached hereto as **Exhibit "1."**

3.      True copies of excerpts of the Deposition of Kenneth Goldberg dated April 7, 2006 ("Goldberg Deposition") are attached hereto as **Exhibit "2."**

4.      True copies of excerpts of the Deposition of Gilbert Stone dated February 9, 2006 ("Stone Deposition") are attached hereto as **Exhibit "3."**

5.      True copies of excerpts of the Deposition of Richard Clarke dated April 28, 2006 ("Clarke Deposition") are attached hereto as **Exhibit "4."**

Signed under the pains and penalties of perjury this 12th day of June 2006.

_____
              /s/ *Meredith A. Swisher*
              Meredith A. Swisher

#340136 v1/14500/9985

2

EXHIBIT 1

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Volume 1, Pages 1-256

Exhibits:  322-332, 334-339

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

      Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

          Defendant

(Complete caption on next page.)

-----------------------------

30(b)(6) DEPOSITION OF BLUE HILLS OFFICE PARK LLC

By GERALD S. FINEBERG

Wednesday, April 5, 2006, 9:39 a.m.

DLA Piper Rudnick Gray Cary US LLP

33 Arch Street, 21st Floor

Boston, Massachusetts

------- Reporter:  Joan M. Cassidy, RPR, CRR -------

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

FARMER ARSENAULT BROCK LLC

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 89

1    A. Yes.
2    Q. It was a single-purpose entity, and in that
3  circumstance you knew that the lender was taking a
4  security interest in anything that the LLC owned,
5  correct?
6        MR. MCGLYNN: Objection.
7    A. Yes.
8    Q. And that anything that came to that entity,
9  any kind of proceeds or monies or anything, would
10 fall under the description of the property in which
11 Credit Suisse had a security interest; you
12 understood that, right?
13       MR. MCGLYNN: Objection. It calls for a
14 legal conclusion and objection as to form.
15   A. I don't agree with that.
16   Q. Why not?
17   A. Because it's too inclusive, and I just
18 can't -- and I can't agree with that.
19   Q. At the time of the zoning appeals
20 settlement in 2003, before you consulted counsel,
21 did you understand that the 2-million-dollar payment
22 that Blue Hills Office Park LLC was receiving was
23 something in which Credit Suisse had a security
24 interest?

Page 90

1        MR. MCGLYNN: Objection.
2    A. No.
3    Q. Why not?
4    A. Because it had nothing to do with the
5  building. This was a case where we took -- this was
6  an action I took against or we took against DST.
7    Q. And you understood that the only reason you
8  were entitled to bring that action against DST was
9  because you owned the office park that was an
10 abutting property to 250 Royall Street, correct?
11       MR. MCGLYNN: Objection.
12   A. Yes.
13   Q. And yet notwithstanding that the only
14 reason you could bring the lawsuit was because you
15 were an abutter, you thought that had nothing to do
16 with the property?
17       MR. MCGLYNN: Objection.
18   A. Correct.
19   Q. Why did you appeal the issuance of the
20 special permit to 250 Royall Street to build a
21 parking garage?
22   A. Originally, when we thought of it, I
23 thought maybe if they didn't get the parking, that
24 maybe EquiServe might change their mind; but I

Page 91

1  quickly relinquished that thought and brought it in
2  as a nuisance because they went ahead and took our
3  tenant, so I wanted to get even.
4    Q. Who actually brought the zoning appeal --
5  strike that. Who actually brought the special
6  permit appeal?
7    A. Which attorney?
8    Q. No, what entity or person.
9    A. Oh, I don't know.
10   Q. It was Blue Hills Office Park LLC, right?
11   A. Probably.
12   Q. Because that was the property owner of the
13 abutting property, right?
14   A. That's correct.
15   Q. And in the appeal, the entity which owned
16 the property at 150 Royall Street complained of
17 damage to the property that would be caused by
18 building a garage at 250 Royall Street, correct?
19   A. They did.
20   Q. And why did you settle the zoning appeal?
21   A. For money.
22   Q. And you understood that part of the
23 settlement included a lease termination agreement
24 that made certain that EquiServe would move out?

Page 92

1    A. I don't know. I'd have to check on that.
2    Q. Do you recall that there was a lease
3  termination agreement as part of the settlement?
4    A. I think there was.
5    Q. And you understood, didn't you, that the
6  settlement which included this lease termination
7  agreement eliminated any possibility that EquiServe
8  would stay in your building?
9        MR. MCGLYNN: Objection.
10   A. Yes.
11   Q. Why did you keep the 2-million-dollar
12 settlement payment in the entity, in Blue Hills
13 Office Park LLC, as a reserve against the day that
14 you knew was coming a year later when EquiServe was
15 going to move out?
16       MR. MCGLYNN: Objection.
17   A. I sent it to the -- I never saw the money.
18 It went directly with the attorneys, and I kept it
19 in the special accounts.
20   Q. Did you yourself consider that you should
21 keep the 2-million-dollar settlement payment in the
22 hands of the entity Blue Hills Office Park LLC as a
23 reserve against the day you now knew was coming for
24 sure a year later when EquiServe would move out and

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 177

1  you where the 6 million plus was coming from.
2      Q. You never told Lennar where the 6 million
3  plus was coming from --
4      A. I didn't, but --
5      Q. You have to wait for me to finish the
6  question. You never told Lennar that you had 6
7  million in reserve accounts held by Royall
8  Associates Realty Trust ready to devote to the
9  building, did you?
10     A. I would have had I had a meeting.
11     Q. But in advance of the meeting, you never
12 put that in a business plan of the sort that you
13 agreed to provide in the prenegotiation letter, did
14 you?
15     A. Yes, that's correct.
16     Q. Similarly, you didn't provide Lennar with
17 the financial statements of the guarantors,
18 yourself, to show your financial resources and
19 ability to contribute money to the property, did
20 you?
21     A. I was waiting for the meeting to show them.
22     Q. Notwithstanding you agreed to provide it in
23 the prenegotiation letter, you never did provide it
24 after signing that letter, did you?

Page 178

1      A. I had other meetings with Lennar after the
2  prenegotiation letter and I didn't have to supply it
3  and they still sat down with me.
4      Q. I appreciate that. I'm just asking
5  questions. Notwithstanding you had agreed in the
6  prenegotiation letter to provide the financial
7  statements that are listed at the top of Exhibit A,
8  including your personal financial statements, you
9  never did so, did you?
10     A. That's correct. I was waiting for that
11 sit-down meeting.
12     Q. Now, you say now that you were willing to
13 put more money into the property, correct?
14     A. If I had to, yes.
15     Q. But you didn't tell Lennar that at the
16 time, correct?
17     A. Correct.
18     Q. Under what conditions were you willing to
19 put more money into the property?
20     A. That all depended on the deal we made with
21 Lennar after we sat down.
22     Q. Were you hoping to extend the loan term?
23     A. That would be probably one of the questions
24 I would ask Lennar.

Page 179

1      Q. Were you hoping for a standstill in debt
2  service payments?
3      A. No, I can't answer those questions until we
4  sit down and see what they say.
5      Q. Well, you must have had something in mind
6  for what you would have been willing to do, right?
7      A. Right.
8      Q. I'm just asking you what you were willing
9  to do.
10     A. We were willing to go out and spend the
11 money to get a tenant, use the reserve money to pay
12 the principal and interest, and once we got a
13 tenant, then we could go ahead and make a better
14 business plan 'cause we could then refinance the
15 building.
16     Q. Were you hoping for partial debt
17 forgiveness?
18     A. We didn't have any plan structured yet. We
19 were still waiting to see what their ideas were.
20     Q. Were you going to ask for partial debt
21 forgiveness?
22     A. No, not until we got a tenant and
23 refinanced.
24     Q. You said a few minutes ago you were willing

Page 180

1  to spend the money to get a tenant. What money are
2  you referring to?
3      A. Spend the money that we had in reserves
4  first.
5      Q. And you're referring to which reserves, the
6  reserves held by the bank or the reserves held by
7  Royall Associates Realty Trust that Lennar didn't
8  know about?
9      A. To spend the money that the bank had first
10 and then the money that we had in reserve at the
11 attorneys' office.
12     Q. And you said a minute ago you would use the
13 reserve money to pay principal and interest. Were
14 you referring then to the money that Royall
15 Associates Realty Trust had in reserve?
16     A. To be honest with you, I was counting the
17 reserves all in one. It didn't matter which.
18 Reserves are reserves. I didn't have it to spend --
19 I mean, it was in reserve, it wasn't fresh money
20 coming in.
21     Q. Your plan for how to save the building was
22 to use the money both in the reserves held by the
23 bank, which was about $4 million, plus the
24 approximately $6 million that was held by Royall

45 (Pages 177 to 180)

50bbd366-652f-4f3d-9824-d0f99d4eb7d8

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 181

1  Associates Trust of which Lennar had no knowledge,
2  to find a new tenant, and tide the property over
3  until that tenant could start paying the rent?
4      A. That's correct.
5      Q. And once you had a tenant in there and had
6  a guaranteed income stream, then your idea would be
7  to refinance the property?
8      A. That's correct.
9      Q. And at that point if you could obtain some
10 partial forgiveness of the debt, you would?
11     A. That's hoping way in the future. I didn't
12 get that far yet.
13     Q. But in any event, your anticipation was
14 that you would refinance on whatever terms you could
15 get?
16     A. That's correct.
17     Q. But you didn't want to tell Lennar this?
18         MR. MCGLYNN: Objection.
19     A. I couldn't tell Lennar this. They didn't
20 sit down with us. If a person is not willing to sit
21 down with you, then they're not willing to talk to
22 you. What good is it sending smoke screens up to
23 them and signals? I wanted to sit down. It was
24 their obligation to sit down with me.

Page 182

1      Q. When you say "obligation," you mean an
2  ethical and moral obligation?
3      A. Ethical, moral, and probably legal. I'll
4  have to check with an attorney on that.
5      Q. Okay. Now, did you think that when Lennar
6  would sit down with you, they had any obligation of
7  any sort to agree to your workout plan for the
8  property?
9      A. That's up to them. That's their decision.
10     Q. They were free at a meeting to tell you to
11 pound sand, weren't they?
12     A. Say that again.
13     Q. They were free at a meeting to tell you to
14 pound sand, weren't they?
15     A. Yes.
16         MR. MCGLYNN: Objection.
17     Q. What did you think the property was worth
18 as of November 2004?
19     A. A lot of money.
20     Q. How much?
21     A. 40-odd-million-dollars.
22     Q. Did you have an appraisal done at that
23 time?
24     A. No.

Page 183

1      Q. What would you have paid for the property
2  as of November '04?
3         MR. MCGLYNN: Objection.
4      A. I can't answer that.
5      Q. Why not?
6      A. I don't know. I know what it's worth.
7  What I'd pay for it, I don't know.
8      Q. Would you have paid 40-odd-million-dollars
9  for the property as of November '04?
10     A. I can't answer that.
11     Q. Why not?
12     A. I can't. I don't know what I would have
13 done. Looking back, I don't know what I would have
14 done. I know what it was worth. I know I wanted to
15 own it, but I didn't have to pay that because it
16 was -- the debt was only 33.
17     Q. Why did you think the property was worth
18 40-odd-million-dollars?
19     A. Because of what they got nextdoor and
20 what -- the rents they were getting around there,
21 and if we could get them, if we could find one
22 tenant, it would be worth that.
23     Q. An empty property is not worth as much as a
24 tenanted property, is it?

Page 184

1      A. No.
2      Q. Did you think that it made sense to compare
3  the empty, dark Blue Hills Office Park to the
4  vibrant, fully tenanted buildings nextdoor when you
5  were considering its value?
6         MR. MCGLYNN: Objection.
7      A. I thought -- I'm valuing it with a tenant,
8  and we were going to get a tenant.
9      Q. Well, you had been looking for a tenant for
10 18 months, right?
11     A. But they also -- those vibrant buildings
12 nextdoor were looking for tenants for eight to ten,
13 twelve -- for two years and they found one.
14     Q. You had been looking without success for a
15 tenant for 18 months, had you not?
16     A. That's true, because the buildings
17 nextdoor, the vibrant buildings that were worth a
18 lot of money, got the tenants.
19     Q. Because those were new buildings unlike
20 yours, correct?
21     A. That's correct.
22     Q. What was your equity in the building worth
23 as of November '04?
24     A. $12 million plus.

FARMER ARSENAULT BROCK LLC

50bbd366-652f-4f3d-9824-d0f99d4eb7d8

## 30(b)(6) Deposition by Gerald S. Fineberg
## Volume 1 – April 5, 2006

Page 185

1  Q. How do you calculate that?
2  A. If the building was worth 40-odd-million
3  and the mortgage was 32 or whatever million.
4  Q. So you are figuring the building was worth
5  around 45 million?
6  A. 44, yeah.
7  Q. 44 million. Now, at the time did you think
8  the building was worth 44 million, or are you
9  telling me that because you have an expert now
10 that's telling you it's worth 44 million?
11     MR. MCGLYNN: Objection.
12 A. I'm telling you that right now for both
13 reasons. Plus I have an expert that reconfirmed my
14 thinking and I read it yesterday.
15 Q. But at the time -- even before your
16 economist opined that the fair market value as of
17 November '04 was 44 million, you at the time
18 actually thought it was worth that?
19 A. I thought it was worth a lot more than the
20 mortgage; otherwise, I wouldn't have wanted to sit
21 down and try to save the building, have all this
22 money in reserve.
23 Q. So if you thought you had $12 million worth
24 of equity, why in the world didn't you bring the

Page 186

1  loan current at a cost of, at most, several hundred
2  thousand dollars?
3  A. Because that wasn't the way it was going to
4  go. You've got to understand, they would not sit
5  down with us. So if I put in money, they would just
6  hold back all the reserves again.
7  Q. You mentioned that Dan Frank said he had a
8  conversation with Lennar that he told you about?
9  A. Yeah.
10 Q. Did Mr. Frank tell you that when he, in the
11 one conversation he had in person with Lennar, when
12 he asked for a meeting, they said any meeting's got
13 to include a discussion of bringing the loan
14 current?
15 A. Yes.
16 Q. And then he never got back to Lennar. You
17 weren't interested in bringing the loan current?
18 A. I wasn't interested in paying them what
19 they wanted to do if they weren't interested in
20 sitting down with me. They wanted -- before they
21 would even sit down, they had all these demands.
22 They wouldn't even sit down. So I didn't trust
23 them.
24 Q. Well, what Mr. Frank was told is the

Page 187

1  meeting is not going to be particularly productive
2  if it doesn't include a plan to bring the loan
3  current.
4  A. No, to bring the money in before the
5  meeting.
6  Q. So you understood that the condition to a
7  meeting was bringing the loan current; is that
8  right?
9  A. No, that was not the case. That was just
10 an afterthought by one of the people at Lennar. I
11 asked for a meeting with that -- when I signed that
12 letter, and they -- from that point on they didn't
13 sit down, they didn't return calls. And then when
14 he finally got ahold of someone, they said, "Well,
15 just send us the money. Then we'll think about
16 having a meeting."
17 Q. So what Mr. Frank said to you was that
18 Lennar had told him, "Just send the money to bring
19 the loan current, and then we'll have a meeting"?
20 A. Something to that effect.
21 Q. That's what you understood, anyway?
22 A. Yeah -- no, might have a meeting. There
23 was never a meeting set up.
24 Q. Did you bid at the foreclosure sale?

Page 188

1  A. No.
2  Q. Why not?
3  A. I just didn't.
4  Q. Why did you let a property worth 44 million
5  in your estimation go to somebody else for 18 1/2
6  million?
7  A. I just didn't. I don't know why I did
8  that. I just didn't go to the foreclosure sale.
9  Q. If the building was really worth 44
10 million, why didn't you refinance it with somebody?
11 A. I had to get a tenant first.
12 Q. Is it true that the building was worth only
13 44 million if it had a tenant?
14 A. It would be worth 44 million with a tenant.
15 We could have gotten a tenant.
16 Q. Was it worth 44 million without a tenant,
17 empty and dark?
18 A. It could be.
19 Q. Why didn't you try and sell the building
20 for 44 million?
21 A. I wanted to keep it and I wanted to get a
22 tenant and keep the things going. That's why when
23 we made the deal with Credit Suisse, that we had the
24 reserves, because everyone knew at the time that the

FARMER ARSENAULT BROCK LLC

50bbd366-652f-4f3d-9824-d0f99d4eb7d8

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 189

1  lease had five years with a five-year option, and at
2  the time it was presumed that they might leave, and
3  those reserves were set up to carry the building
4  until we do get a tenant.
5      Q. Mr. Fineberg, the truth is you couldn't
6  sell the building for anywhere near $44 million
7  without a tenant, correct?
8      A. That's your opinion.
9      Q. I'm asking your opinion.
10     A. I don't know. I didn't try --
11     Q. I'm suggesting --
12         MR. MCGLYNN: One at a time, guys.
13     A. Go ahead.
14         MR. MCGLYNN: I think you had the floor,
15  Jerry, to answer the question.
16     A. No, ask me the question.
17     Q. Sure. The truth is that you couldn't sell
18  the building in November of '04 for anything close
19  to $44 million because it was empty and dark,
20  correct? It didn't have a tenant?
21     A. I don't know. I didn't try to sell it. I
22  wanted to keep it, and I wanted to get a tenant and
23  keep the building.
24     Q. If you wanted to keep the building, why

Page 190

1  didn't you bid on it at the foreclosure?
2      A. I don't know.
3      Q. Did you explore refinancing the building in
4  the fall of '04?
5      A. No.
6      Q. Because you couldn't refinance it without a
7  tenant, right?
8      A. Because I had a mortgage.
9      Q. You couldn't refinance it without a tenant,
10  right?
11     A. I had a mortgage, I had a mortgage. I had
12  a 33 1/2-million-dollar mortgage, and I wanted to
13  keep it going. I was happy with the mortgage.
14     Q. Well, I don't know how you could be happy
15  when you've got a default notice and you were
16  proceeding to foreclosure.
17     A. I wasn't happy with the mortgagee, but I
18  was happy with the mortgage.
19     Q. In light of your unhappiness with the
20  mortgagee, did you attempt to refinance the building
21  with someone with whom you would be happy?
22     A. No.
23     Q. Why not?
24     A. Because I was happy with the mortgage. I

Page 191

1  wanted to work it out. I had the reserves set up.
2      Q. It is also true, isn't it, there was no
3  possible way you could refinance this mortgage
4  without a tenant in place, correct?
5      A. That's your opinion.
6      Q. No, I'm just asking your opinion.
7      A. I don't know.
8      Q. This is cross-examination, so to speak.
9  I'm suggesting to you things I think are true and
10  asking you to agree with them. If you think I'm
11  wrong, just say so.
12     A. I don't know.
13         MR. MCGLYNN: I think he's being polite.
14     A. I don't know.
15     Q. You don't know?
16     A. No.
17     Q. Did you think you could get $44 million
18  putting this building on the market when it was
19  empty and had no tenant?
20     A. I'm -- I never assumed that. I -- my
21  assumption is that if they had sat down and worked
22  out a plan and let us use the reserves, we would
23  have gotten a tenant and it would be worth 44
24  million just like nextdoor was sold for 60-odd

Page 192

1  million.
2      Q. Well, if this building was worth 44 million
3  or anything close to it, how was it that no one was
4  willing to bid more than 18 1/2 million for it at
5  the foreclosure sale?
6         MR. MCGLYNN: Objection, calls for
7  speculation.
8      Q. Do you know?
9      A. I don't know.
10     Q. And if it was worth 44 million with a
11  tenant, how is it that a real live single-purpose
12  user was only willing, a number of months later, to
13  pay 23 million for a building that you thought was
14  worth 44 million?
15         MR. MCGLYNN: Same objection.
16     A. I don't know.
17     Q. You don't know?
18     A. I don't know why.
19     Q. Having been in real estate for a long time,
20  over 40 years, you'd agree with me, would you not,
21  that the best indication of fair market value of a
22  property is what a real live buyer is willing to pay
23  for it in an arm's length transaction?
24     A. Yes, but I see two of them. I see one at

48 (Pages 189 to 192)

50bbd366-652f-4f3d-9824-d0f99d4eb7d8

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 193

1  250 Royall and one at 150 Royall.
2      Q. And those buildings are substantially
3  different, aren't they?
4      A. No.
5      Q. One is brand-new, right?
6      A. Yes.
7      Q. And one is old and tired, right?
8      A. Wrong. It's not old and tired. It's old
9  but not tired. It could be brushed up. And the one
10  for 60 million was much smaller, a hundred thousand
11  feet less, approximately.
12      Q. As of 2004, wasn't 150 Royall Street, your
13  building, in need of substantial renovation?
14      A. A little renovation, not much.
15      Q. It wasn't in need of substantial work to
16  the infrastructure?
17      A. It depends what you call infrastructure.
18      Q. Weren't you planning to have to spend
19  millions of dollars to improve the common areas and
20  the infrastructure in the hopes of attracting a
21  tenant to the building?
22      A. That's not a lot of money when you consider
23  44 million, if you have to spend a million or two.
24      Q. How much did you expect you'd have to

Page 194

1  spend?
2      A. A million or two.
3      Q. But no more?
4      A. No, not until we got a tenant.
5      Q. You know what the owner who bought it for
6  23 million is doing to it, don't you?
7      A. No, I don't.
8      Q. You haven't driven by and seen it?
9      A. I haven't driven by it.
10      Q. They're renovating the whole thing. You
11  can see right through it today; are you aware of
12  that?
13      A. No. That doesn't mean they're right.
14      Q. They are having to put into the building
15  about as much as they paid for it; are you aware of
16  that?
17      A. So then it's worth 44 million.
18      Q. Did the plan that you had in mind for the
19  building require -- let me back up. Your plan for
20  the building involved using money in the reserves
21  and also using the 5 plus million dollars you had in
22  an account being held by the attorneys for Royall
23  Associates, right?
24      A. Yes.

Page 195

1      Q. And the plan also involved some period of
2  time where you would fix up the building and thereby
3  be able to attract a tenant, get them in there, and
4  fix up the building for them, right?
5      A. Yes.
6      Q. You anticipated, didn't you, that in order
7  to do all that you were going to have to modify the
8  loan document?
9      A. Yes.
10      Q. Did you think as of November 2004 that
11  Lennar had no legal right to foreclose on the
12  property?
13      A. Say that once more.
14      Q. Sure. As of November 2004, did you think
15  that Lennar had no legal right to foreclose on the
16  property?
17      A. Yes.
18          MR. MCGLYNN: Objection.
19      Q. So why didn't you sue to enjoin the
20  foreclosure?
21      A. I was waiting for a meeting with our
22  attorneys to sit down and to discuss it.
23      Q. They wouldn't give you a meeting either?
24      A. Oh (gesturing).

Page 196

1      Q. Did you not have a meeting with your
2  attorneys?
3      A. Not until after November.
4      Q. How come you didn't have a meeting prior to
5  the foreclosure with your attorneys to talk about
6  trying to stop it?
7      A. Well, we had time to do it. I was in
8  Florida and Mr. Langelier was in California. We
9  were waiting to get together when we got notice of
10  the suit.
11      Q. You got notice of the suit or the
12  foreclosure?
13      A. Of whatever, I don't know.
14      Q. How come you didn't get on the telephone
15  and discuss with your attorneys a lawsuit to enjoin
16  the foreclosure?
17      A. I don't know. I can't recall exactly the
18  timetable and what happened.
19      Q. At some point did you make a decision not
20  to try to enjoin the foreclosure sale?
21          MR. MCGLYNN: Objection.
22      A. I don't recall.
23      Q. What you recall is that you were waiting
24  for the opportunity to have a meeting with your

FARMER ARSENAULT BROCK LLC

50bbd366-652f-4f3d-9824-d0f99d4eb7d8

256

WITNESS: Gerald S. Fineberg
CASE: Blue Hills Office Park LLC v. J.P. Morgan Chase Bank, et al., etc.

### SIGNATURE PAGE/ERRATA SHEET

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 177 | 10 | should read, "I would have had I had a meeting. However, the money in the reserve accounts was always held by my attorneys for Blue Hills Office Park LLC." Reason: clarification |
| 181 | 4 | should read "That's correct, but the approximately $6 million was held by Blue Hills Office Park LLC." Reason: clarification |
| 194 | 4 | should read "Yes, except that the money in the account held by my attorneys was held for Blue Hills Office Park LLC." Reason: clarification |
| 243 | 9 | should read "Yes, although the money in the reserve account was held for Blue Hills Office Park LLC." Reason: clarification |
| 243 | 12 | should read "Only some of the money in the reserve accounts was distributed. The $2 million dollars received from DSI has never been distributed and is still being held by my attorneys and Bill Langelier's attorney for Blue Hills Office Park LLC." Reason: clarification |

I have read the transcript of my deposition taken 4/5/06. Except for any corrections or changes noted above I hereby subscribe to the transcript as an accurate record of the statements made by me.
Signed under the pains and penalties of perjury.

_Gerald S. Fineberg_ DATE 6-6-06
Deponent, Gerald S. Fineberg

EXHIBIT 2

Exhibit:  340                Volume 1, Pages 1 - 210

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

----------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

                Defendant

(Complete caption on next page.)

CONTAINS INFORMATION SUBJECT

TO CONFIDENTIALITY STIPULATION

DEPOSITION OF KENNETH GOLDBERG

Friday, April 7, 2006, 9:42 a.m.

DLA Piper Rudnick Gray Cary US LLP

33 Arch Street, 26th Floor

Boston, Massachusetts

------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   fax 617.728.4403

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

**54**

1  incorrectly. A conveyance is usually a transfer of
2  real estate. I don't think funds are applicable.
3      Q. Would you like me to rephrase the question?
4      MR. McGLYNN: I objected as to form.
5      Q. I'll rephrase it.
6      A. I think my answer a minute ago was
7  responsive; that is, the funds were handled
8  consistent with the terms of the loan documents.
9      Q. Did you conclude that Blue Hills Office
10 Park LLC could transfer the $2 million settlement
11 payment without having to inform the lender or
12 obtain the lender's consent?
13     MR. McGLYNN: Objection as to the form.
14     A. I don't know that it was transferred. I
15 just don't.
16     MR. FALBY: Well, I'm having trouble
17 with your objection, since at one point you offered
18 to stipulate that Blue Hills Office Park LLC
19 conveyed the settlement payment out of the entity.
20 I don't know what the point of your objection is.
21     MR. McGLYNN: If you can produce any
22 stipulation, I will certainly consider it.
23     MR. FALBY: I was just referring to your
24 word.

**55**

1      MR. McGLYNN: Start again, Bruce.
2      MR. FALBY: Okay.
3      MR. McGLYNN: I'm having trouble with
4  the way you are asking the questions. I'm not going
5  to tell you how to ask questions, but there's
6  certainly other ways to get the answer by asking
7  proper questions.
8      Q. Did Blue Hills Office Park LLC retain the
9  $2 million settlement payment? Did it keep it?
10     A. I believe that the funds were paid to and
11 retained at the time by counsel for the issuee of
12 the funds.
13     Q. And who was the issuee of the funds?
14     A. I don't, quite frankly, remember. I would
15 have to look at the documents to see who the parties
16 to them were. But the appropriate parties got the
17 funds and counsel held them.
18     Q. But you don't remember the name of the
19 party?
20     A. The party? What are you asking me here?
21     Q. You just said the appropriate party got the
22 funds.
23     A. I don't have the document in front of me;
24 nor do I have the record as to whether it was the

**56**

1  LLC or whether it was the lower tier. I just don't
2  recall, sitting here today, which, as you call it,
3  party did we consider the funds being paid to. I
4  don't have the documents in front of me. I don't
5  have the cash receipts register. They were held by
6  counsel then. I don't think they have been
7  transferred.
8      Q. You used the word "party," not me.
9      A. No, sir.
10     MR. McGLYNN: I think he used the word
11 "issuee."
12     MR. FALBY: I asked who is the issuee
13 and he said the proper party.
14     Q. I'm just trying to figure out, did the
15 owner of Blue Hills Office Park LLC, the owner of
16 Blue Hills Office Park, get the funds or did some
17 other entity, such as Royall Associates Realty
18 Trust, get the funds?
19     A. Yes. You asked me did A or B get the funds
20 and I said yes and you're laughing at me. What's
21 the problem?
22     Q. Did Blue Hills Office Park LLC get the
23 funds?
24     A. Blue Hills Office Park LLC or its member

**57**

1  got the funds. I don't remember, sitting here
2  today, who the parties to the agreement were, nor do
3  I have the register of the transfer of funds here.
4      Q. Let me show you Exhibit 177 and see if that
5  helps you. These are the records produced by your
6  client which purport to relate to the settlement
7  payment, at least that's what we've been informed.
8  If it helps you, I'll also show you Exhibit 323,
9  which are the interrogatory answers of Mr. Fineberg
10 which purport to describe the disposition of the
11 settlement payment. If you would like to take a
12 look at that, it is answer number 11 on Page 14.
13     A. Okay, I've read that.
14     Q. Please look at Exhibit 177.
15     A. Which is that. Yes.
16     Q. Exhibit 177 looks like a ledger sheet of
17 some kind with the handwriting at the top Fineberg
18 Royall Associates Century Bank, correct?
19     A. That's what it says.
20     Q. There appears to be handwriting in the
21 middle of the page that says: "8/8/03 wire in from
22 Banknorth IOLTA, $2 million." Do you see that?
23     A. I don't. Yes, I do. I'm sorry. Yes.
24     Q. Looking these two documents, can you tell

16 (Pages 58 to 61)
CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

58

1  me which entity received and retained the $2 million
2  settlement payment?
3     A. I think I would need, to assist me to
4  accurately answer that, to look at one more
5  document.
6     Q. What document?
7     A. I'd like to look at, and it appears that
8  you may have it there, the settlement agreement
9  which gave rise to this payment.
10    MR. McGLYNN: While you are looking for
11 that, it jogs me to state on the record that, at
12 least with respect to the $2 million payment, that
13 we are discussing the subject of that
14 confidentiality stipulation. This portion of the
15 record should be subject to that confidentiality
16 stipulation.
17    Q. I will grant your wish and show you Exhibit
18 21, the settlement agreement.
19    A. Thank you for granting my wish.
20    Q. With the benefit of Exhibit 21, would you
21 tell me which entity received and retained the $2
22 million settlement payment.
23    A. I believe it was Blue Hills Office Park.
24    Q. LLC?

59

1     A. Yes.
2     Q. Let me show you Exhibit 176, an agreement
3  among the beneficiaries of Royall Associates Realty
4  Trust. Do you recognize that document?
5     A. Vaguely.
6     Q. Did you negotiate this --
7     A. I believe I did.
8     Q. I have to ask the question. Did you
9  negotiate Exhibit 176?
10    A. I believe I did.
11    Q. The document is an agreement among the
12 beneficiaries of Royall Associates Realty Trust,
13 correct?
14    A. Yes. Let me stop and look.
15    MR. McGLYNN: Take a moment and review
16 the document.
17    A. (Witness complies.)
18    Q. Having looked at the document, do you still
19 agree that this was an agreement among the
20 beneficiaries of Royall Associates Realty Trust?
21    A. Yes.
22    Q. The agreement refers to various accounts.
23 Do you see that?
24    A. Yes.

60

1     Q. One of the accounts to which the agreement
2  refers is a supplemental account. Do you see that?
3     A. Yes.
4     Q. That is defined as an account being held by
5  the escrow agents, a term defined as you and
6  Mr. Cohn?
7     A. I don't know where you are reading.
8     Q. The first page, last page, escrow agents is
9  defined as you and Mr. Cohn?
10    A. Yes.
11    Q. And the supplemental account refers to an
12 account held by you?
13    A. Yes.
14    Q. The balances of the accounts are listed on
15 the last page of the document, right?
16    A. Listed on the schedule of accounts.
17    Q. The supplemental account, according to this
18 document, contains $4.2 million, correct?
19    A. That is correct.
20    Q. That included, did it not, the $2 million
21 settlement payment?
22    A. It appears to, yes.
23    Q. Plus interest?
24    A. I'm going to presume so.

61

1     Q. And did the supplemental account -- strike
2  that. Is the supplemental account the same account
3  at Century Bank into which the $2 million settlement
4  payment was deposited according to Exhibit 177 on
5  August 8, 2003?
6     A. It appears to, yes.
7     Q. Did that same account also contain an
8  additional approximately $2.2 million worth of
9  funds?
10    A. Yes.
11    Q. And were those funds in the supplemental
12 account held for the benefit of the beneficiaries of
13 Royall Associates Realty Trust?
14    MR. McGLYNN: Objection.
15    A. No.
16    Q. For whom were those funds held?
17    A. I think that -- I don't want to get into
18 terms of art and start splitting hairs. I think
19 that this agreement was intended as an understanding
20 amongst the, quote, beneficiaries, the owners, as
21 you called them earlier, the venturers, to direct
22 what was going to happen to the funds.
23    Q. The venturers in what?
24    A. They are the venturers who owned various

FARMER ARSENAULT BROCK LLC

CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

70

1 million settlement payment was actually wired into
2 Bernkopf Goodman's IOLTA account on August 6, 2003?
3    A. I don't know. I mean looking at this and
4 looking at the timing, I have to presume this is the
5 money. I don't know if it went somewhere before. I
6 don't know the answer.
7    Q. In any event, the payment first went to
8 Bernkopf Goodman's IOLTA account, correct?
9    A. That is correct.
10    Q. That contains monies that belonged to
11 different clients, does it?
12    A. Yes.
13    Q. And then a wire of the $2 million
14 settlement payment went shortly thereafter, it looks
15 like in a couple of days, into a Century Bank
16 account, correct?
17    A. I don't know that it was wired. It could
18 have been handled by check and opening of a new
19 account that earned interest.
20    Q. It says wire in from Banknorth IOLTA
21 account.
22    A. That shows when it came in from the
23 Banknorth account. I didn't write it, whether
24 that's reflective of the wire into the Banknorth

71

1 IOLTA account or out to Century Bank; but it clearly
2 traced that $2 million. It is a difference without
3 distinction.
4    Q. In any event, the money went from the
5 Banknorth IOLTA account maintained by Bernkopf
6 Goodman --
7    A. That is correct.
8    Q. -- to a particular client funds account
9 obtained by Bernkopf Goodman at Century Bank?
10    A. That is correct.
11    Q. The account was maintained under the name
12 Fineberg Royall Associates; is that correct?
13    A. I can't answer that. I don't have the
14 account. Whether the account was in the name of
15 them -- all we did here, this was obviously produced
16 to you as a record of our office's handwritten card
17 to show where the money was.
18    Q. If the Century Bank account was held for
19 your client Blue Hills Office Park LLC, do you know
20 why it is that somebody wrote not Blue Hills Office
21 Park but Fineberg Royall Associates on this ledger
22 sheet that has been produced to us as the record of
23 the disposition of the settlement payment?
24    A. The answer is yes. I think that from the

72

1 time of inception it is just a generic. I believe
2 that's a title, I believe, probably on our account
3 records. So that even if we sent bills, we just
4 internally identified Blue Hills Office Park LLC
5 under its prior -- the name generically as
6 Royall Associates. That's what our office
7 characterized it and identified it as.
8        I don't know even if there is a Royall
9 Associates entity. That's what we called the
10 account for shorthand purposes in the office. It
11 might have said Fineberg-150 Royall Street, Canton,
12 which was just as likely. It was a way of
13 identifying whose money it was and whoever was the
14 owner there would have obviously been entitled to
15 it.
16    Q. So your testimony is that your office used
17 the words Fineberg Royall Associates to refer to
18 Blue Hills Office Park LLC?
19    A. No, what I said was very clear.
20    Q. If it was, I wouldn't have asked the
21 follow-up.
22    A. Well, let's try it again. Royall
23 Associates was a general term that we used for
24 matters we dealt with for 150 Royall Street, Canton.

73

1 Our office keeps its records generally consistent
2 with property addresses when we deal with real
3 estate transactions. By the same taken, it says
4 Fineberg. It certainly was not Fineberg's money.
5 And, therefore, there's no intent here to
6 specifically set out the legal entity who is the
7 holder, nor is it here intended to say that they are
8 Gerry Fineberg's money. Nor is it intended to say
9 that Mr. Fineberg has the right to decide what to do
10 with it. It is just simply the label that's put on
11 it for the purpose of our internally knowing that in
12 fact this related to 150 Royall Street. I can't
13 attribute any more to it than that.
14        Likely the account was not in that name.
15 It was in the Bernkopf Goodman name. We just called
16 it Royall Associates for I think literally for 10 or
17 15 years.
18    Q. So although it says Royall Associates, the
19 money was actually received by Blue Hills Office
20 Park LLC?
21    A. Yes. That's set out in writing in Exhibit
22 21. It is very clear.
23    Q. And the money was then held in that account
24 until the beneficiaries of Royall Associates Realty

20 (Pages 74 to 77)
CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

74

1  Trust directed its disposition in this agreement
2  dated December 31, 2004; is that correct?
3      A. No.
4      Q. Did the money go somewhere else in the
5  meantime?
6      A. Yes.
7      Q. Where did it go?
8      A. It shows you. You just gave me the
9  documentation of that.
10     Q. If you take a moment and look at the last
11  page.
12     A. I guess maybe you are right. Maybe I
13  misunderstood the question.
14     Q. Sure. If you want to look at the second
15  page.
16     A. I did.
17     Q. There's no transfer shown out of that
18  account until February 2005?
19     A. Got it.
20     Q. So my question was this. The $2 million
21  settlement payment was held in the Century Bank
22  account reflected by the first page of Exhibit 177
23  until December 31, 2004 when its disposition was
24  directed by the beneficiaries of the Royall

75

1  Associates Realty Trust in the agreement that we
2  have marked as Exhibit 176, correct?
3      A. I think your characterization is a little
4  bit misguided. However, what we are saying here is
5  that the $2 million received under the settlement
6  agreement noted in Exhibit 21 came into Bernkopf
7  Goodman's IOLTA account at Banknorth and was then
8  set up separately in Century Bank and kept until
9  subsequently it was transferred out in accordance
10  with the consent and direction of the people who had
11  an equitable interest in it and as directed by this
12  December 31, 2004 agreement.
13     Q. That was an agreement among the
14  beneficiaries of Royall Associates Realty Trust,
15  correct?
16     A. Because they were the owners. It is the
17  same as -- I don't want to be mischaracterized here.
18  Because they were the parties who if there were a
19  misdelivery of funds would have the right to object.
20  Just to make sure, since in an abundance of caution
21  by counsel, both Andy Cohn and Ken Goldberg, myself,
22  wanted to make sure that everybody who had a
23  potential right to the money or claim or beneficial
24  equitable interest in the money directed what we do

76

1  with it. It is a very consistent thing. That's all
2  it was. It was people that had an interest directly
3  or indirectly in the money told us what to do with
4  it.
5      Q. I'm simply trying to establish what
6  happened to the money.
7      A. Okay.
8         MR. McGLYNN: There's no question before
9  you.
10     Q. The $2 million settlement payment stayed in
11  the Century Bank account held by Bernkopf Goodman
12  under the shorthand Fineberg Royall Associates until
13  its disposition was directed, to use the word you
14  just used, by the beneficiaries of Royall Associates
15  Realty Trust in the December 31, 2004 agreement that
16  we marked as Exhibit 176, correct?
17     A. Yes, with one caveat. It was not held in
18  an account called Fineberg Royall Associates.
19  That's simply the manner in which the bookkeeper at
20  Bernkopf Goodman identified the account. We do that
21  by property address. It was not an account Royall
22  Associates. That's what the people did to identify
23  it. That probably was the client number the way
24  they saw it for accounting, computer purposes.

77

1      Q. So let me see if I can get it right. The
2  $2 million settlement payment stayed in the Century
3  Bank account reflected on the first Page of Exhibit
4  177 until its disposition was directed by the
5  beneficiaries of Royall Associates Realty Trust in
6  the agreement dated December 31, 2004 that we've
7  marked as Exhibit 176, correct?
8      A. By the beneficiaries and trustees who are a
9  party to that agreement, yes, that is correct.
10     Q. How much time did your firm spend
11  considering the issue of whether the settlement of
12  the zoning appeal lawsuit or the disposition or
13  receipt of the settlement payment ought to be
14  reported to the lender?
15        MR. McGLYNN: Objection. I think that
16  gets into the province of work product. I instruct
17  the witness not to answer.
18     Q. Are you going to follow that instruction?
19     A. Yes.
20     Q. Did you report the determination that you
21  had made about whether the settlement or the payment
22  ought to be disclosed to the lender or its consent
23  obtained to any client?
24        MR. McGLYNN: Yes or no.

FARMER ARSENAULT BROCK LLC

40 (Pages 154 to 157)
CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

154
1  agreement among the parties to it as to what will
2  happen to the assets of, among other entities, Blue
3  Hills Office Park LLC?
4      A. What's to happen to assets, what they
5  consent happening to assets, right.
6      Q. Is there any reason why Blue Hills Office
7  Park LLC is not a party to this agreement?
8      A. Yes, because it is the owners -- it is an
9  agreement of the owners directing the parties,
10  including the trustees and/or the LLC --
11  directing -- the money was held in various accounts
12  and it directed what was to happen. It is not
13  unusual that there would be, for example, a
14  shareholders direction. That's what this is, a
15  shareholders direction. In this case, the
16  shareholders are beneficiaries. They are saying
17  here is what we want to happen. Since we are all
18  the shareholders and owners and we include all of
19  the officers and directors, here is what is to
20  happen to the LLC and the trust money.
21      Q. And which money belonged to the LLC and
22  which money belonged to the trust?
23      A. Well, at that point in time there was
24  operating money. So operating money at that point

155
1  in time was probably in the operating account of the
2  operating manager. And that money was held on
3  behalf of the LLC.
4      Other money that had been held and might
5  have been distributed, I don't know, to the owners,
6  because that came from the cash flow released from
7  the lockbox account, at that point in time I don't
8  know for tax purposes and for practical purposes
9  whether it had been bookkept, accounted for as
10  having been distributed. The answer is as simple as
11  that. To the extent that it showed for
12  distribution, it would show on a K 1 and it would
13  have been distributed. I can't answer that sitting
14  here. That's an accounting question.
15      However, we have now talked about the
16  1.3, the 2.2. As to the $2.0 million, we know where
17  that was because we had the money, the law firms had
18  the money. That never moved from where it was from
19  the time it originally was received pursuant to an
20  agreement. It is as simple as that. I'm sure that
21  it was accounted for as being owned by the LLC.
22      Sorry for the long-winded answer. I'm
23  trying to be comprehensive to move this along.
24      Q. Was the $2.2 million in the supplemental

156
1  account, which is the amount apart from the
2  settlement payment, held by the law firms as of
3  December 31, 2004?
4      A. I believe so. Didn't it say that here?
5  Yes, it says that here.
6      Q. Had that amount, on that date, been
7  distributed by the LLC to its member Royall
8  Associates Realty Trust, if you know?
9      A. At some point in time -- you keep asking
10  the same question over and over. This has got to be
11  the 10th or 12th time.
12      Q. This would go faster if you give short
13  answers.
14      A. I don't need to be lectured.
15      Q. You seem to be criticizing my questions.
16      A. It is the same thing over and over.
17      Q. I'm asking you very specific questions.
18      A. I have answered the question time and time
19  again.
20      Q. You give long answers answering things that
21  I haven't asked. I have to ask it again to get the
22  answer to my question.
23      MR. McGLYNN: Bruce, you will admit I
24  have sat through a lot of depositions with you in

157
1  this case. You do tend to ask long-winded questions
2  that tend to be hard to understand. If you have a
3  precise question that you want the answer to, let's
4  ask it and move on to a different topic. I agree it
5  has been asked and answered several times.
6      MR. FALBY: It was the answers that were
7  long-winded, not my questions.
8      Q. Is the $2.2 million that was held in the
9  supplemental account -- strike that. Was the $2.2
10  million that was held in the supplemental account
11  money that had already been distributed by the LLC
12  to its member, the realty trust?
13      A. When?
14      Q. As of December 31, $2004.
15      A. I don't know. Because I'm not -- I don't
16  have the accounting records.
17      Q. But you do know, you say, that the $2
18  million settlement payment had not been distributed
19  by the LLC to the realty trust?
20      A. I do know that and did say that because it
21  had been in counsel's custody from inception and had
22  not changed.
23      Q. Was the $2 million payment recorded as a
24  receipt by Blue Hills Office Park LLC in its books

42 (Pages 162 to 165)
CONTAINS INFORMATION SUBJECT TO CONFIDENTIALITY STIPULATION
Kenneth Goldberg, April 7, 2006

162

1  **Bernkopf Goodman?**
2  A. Yes.
3  **Q. Was any of the money in a client funds**
4  **account of Wilmer Cutler?**
5  A. What funds are we talking about? The
6  additional 2.2? Can we go back to your yellow
7  sheet? You had 1.3, 2.2, 2.0. Are you asking me
8  about the 2.2?
9  **Q. Yes. I'm asking you about the 2.2.**
10 **Because the agreement talks about a single**
11 **supplemental account containing 4.2 million.**
12 A. No. I think the agreement defines a number
13 of dollars totaling 4.214 as the supplemental
14 account. It does not presume that it is in one
15 account. It could have been in two or three
16 accounts.
17 **Q. The agreement says the accounts include the**
18 **supplemental account held by the escrow agents.**
19 A. Where are you reading?
20 **Q. Paragraph F as in Frank, on Page 1 of**
21 **Exhibit 176.**
22 A. The accounts, plural, include amounts
23 presently held on deposit and controlled by the
24 management company. We talked about that and

163

1  referred to that before. The initial account held
2  by -- and that's the million 3 account -- and the
3  supplemental account held by the escrow agents,
4  plural, all of which accounts, plural, including the
5  present approximate balances of each, meaning they
6  are plural, are set forth in the schedule, called
7  the schedule of accounts. The numbers exceeding the
8  initial account and the property account are defined
9  as the supplemental account. You are characterizing
10 this in a manner that clearly is not here.
11 **Q. Doesn't this say the supplemental account,**
12 **singular, held by the escrow agents, contains $4.2**
13 **million?**
14 A. It says here the supplemental account,
15 which is also -- let's go back to that. It is my
16 understanding -- we are going to get into defined
17 terms. That was intended as a definition of
18 dollars. We call that group of dollars the
19 supplemental account that we are addressing here.
20      Now, was it more than one account? My
21 memory is that I believe it was more than one
22 account.
23 **Q. And who held the accounts, the escrow**
24 **accounts, you and Mr. Cohn, or just Bernkopf**

164

1  **Goodman?**
2  A. I do not know the answer to who held the
3  2.2. The only information I have in front of me
4  relates to the $2 million account.
5  **Q. So you don't know whether the $2 million**
6  **account also contained the other 2.2 million that's**
7  **defined as being included in the supplemental**
8  **account or not, correct?**
9  A. I believe that in fact this was a separate
10 account. And there was one or more other accounts
11 which totaled 2.2-million-plus dollars.
12 **Q. And who were the client or clients for whom**
13 **those accounts were held?**
14 A. They were either the LLC, the trust or the
15 beneficiaries. I can't answer that sitting here
16 now. That's an accounting question. I only can
17 answer here the $2 million, because I had custody of
18 that from inception. And here is the information
19 documenting it, you have given me as Exhibit 177.
20 Same question again.
21 **Q. But this Exhibit 177, not to argue with**
22 **you, doesn't tell you the client for whose benefit**
23 **the $2 million is held, does it?**
24      MR. McGLYNN: Objection; asked and

165

1  answered.
2  A. To me it does. The answer is clear. If I
3  go back to where it came from, it is very clear
4  here. Pursuant to your Exhibit 21 settlement
5  agreement, it was your LLC's money, the payment was
6  made to the LLC, Paragraph 1, payment to BHOP. It
7  is clear. That money got wired in, and it was never
8  changed, into the same account; it's been in the
9  same account from 8/8/03, when it was received. It
10 stayed there for years until it was then transferred
11 in 2/2/05 but retained, transferred into separate
12 accounts, but there was no distribution or other
13 change of ownership.
14 **Q. Actually, it was first transferred into an**
15 **IOLTA account, right?**
16 A. Yes.
17 **Q. And then transferred into a Century Bank**
18 **account, correct?**
19 A. Because we had to set up separate accounts.
20 That's just a process question. The IOLTA account,
21 we opened a separate account for this money
22 separately, a separate account.
23 **Q. And you are confident without checking the**
24 **names of those accounts, based on the settlement**

EXHIBIT 3

Gilbert W. Stone
Volume 1 - February 9, 2006

Exhibits:  1 - 12          Volume 1, Pages 1 - 167

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

                Defendant

(Complete caption on next page.)

-----------------------------

30(b)(6)  DEPOSITION OF BLUE HILLS OFFICE PARK LLC

            BY GILBERT W. STONE

        Thursday, February 9, 2006, 10:05 a.m.

        DLA Piper Rudnick Gray Cary US LLP

        One International Place, 21st Floor

            Boston, Massachusetts

    ------- Reporter:  David A. Arsenault, RPR -------

    darsenault@fabreporters.com   www.fabreporters.com

            Farmer Arsenault Brock LLC

        50 Congress Street, Suite 415

        Boston, Massachusetts 02109

        617.728.4404   fax 617.728.4403

bb347439-5e5b-4e1b-8eb2-5a18c9c654d3

Gilbert W. Stone
Volume 1 - February 9, 2006

Page 57

1     A. Yes.
2     Q. Then typically, you get a notice from Wells
3  Fargo that they need money to pay the taxes,
4  correct?
5     A. Yes.
6     Q. Then you check in the lockbox to make sure
7  the money has come in, correct?
8     A. Yes.
9     Q. And when it comes in, do you typically then
10  send something to Wells Fargo informing them of that
11  and authorizing them to take the money out?
12     A. Yes.
13     Q. And then they take the lockbox monies and
14  put it in the reserve account and pay the taxes?
15     A. Yes.
16     Q. Who had control over the lockbox account?
17     A. Wells Fargo.
18     Q. When I say lockbox account, I'm referring
19  to the account that was maintained at MetroWest Bank
20  that later became Banknorth. Is that what you're
21  referring to?
22     A. That's right.
23     Q. Did you have another name for that other
24  than lockbox account, or is that what you referred

Page 58

1  to it as?
2     A. The Blue Hills Office Park lockbox account.
3     Q. And that's where EquiServe paid their rent?
4     A. Yes.
5     Q. Were there any other receipts that ever
6  went into that lockbox account other than rent
7  payments from EquiServe and money with which to pay
8  the taxes?
9     A. Yes.
10     Q. What?
11     A. There was a restaurant that we collected a
12  percentage from. At one point there was a UPS box
13  that sent money in. I believe those were the only
14  payments we received.
15     Q. What years did the restaurant operate and
16  make payments to the lockbox?
17     A. For five years, at least.
18     Q. 1999 through 2004?
19     A. Yes.
20     Q. How about the UPS box, did it make payments
21  to the lockbox account throughout the period 1999
22  through 2004?
23     A. No.
24     Q. When did it make payments?

Page 59

1     A. I take that back. I'm not sure. I know
2  they made payments. For some reason, I thought they
3  stopped, but I'm not sure.
4     Q. Did any monies during the years 1999
5  through 2004 go into the Blue Hills lockbox account
6  other than rent and real estate tax payments by
7  EquiServe, monies from the restaurant, or monies
8  from UPS?
9     A. Not that I'm aware of.
10     Q. You are aware, are you not, that in 2003
11  Blue Hills Office Park LLC received a $2 million
12  payment from National Development?
13     A. Yes.
14     Q. Which did not go into the lockbox, correct?
15     A. Not that I'm aware of.
16     Q. Were there any other receipts of monies by
17  Blue Hills Office Park during the years 1999 through
18  2004 that did not go into the lockbox other than
19  that $2 million payment from National Development in
20  2003?
21          MR. McGLYNN: Objection.
22          Could you repeat that or read it back,
23  please.
24          (Question read by the reporter.)

Page 60

1     A. Not that I'm aware of.
2     Q. You seem a little uncertain. Is there any
3  uncertainty in your mind at this point?
4          MR. McGLYNN: Objection. It
5  mischaracterizes what the witness's demeanor is.
6     A. I'm trying to answer to the best of my
7  knowledge. It's been a while.
8     Q. You are familiar with the accounting
9  records. You are familiar with the receipts because
10  you reviewed them on a monthly basis, correct?
11     A. Correct.
12     Q. And you cannot remember any other receipts
13  by Blue Hills Office Park LLC from 1999 through 2004
14  that didn't go into the lockbox other than the $2
15  million payment, correct?
16     A. To the best of my knowledge, yes.
17     Q. Can you say unequivocally that there were
18  no such payments?
19          MR. McGLYNN: Objection.
20     A. No.
21          MR. McGLYNN: Objection; asked and
22  answered.
23     Q. You are the director of accounting. You
24  are responsible for the office records of Blue Hills

15 (Pages 57 to 60)

bb347439-5e5b-4e1b-8eb2-5a18c9c654d3

Gilbert W. Stone
Volume 1 - February 9, 2006

Page 61

1  Office Park. You review the receipts monthly. I'm
2  curious as to why you are unable to say for certain
3  whether or not there were other receipts that didn't
4  go in the lockbox.
5      MR. McGLYNN: Objection as to form. It
6  was asked and answered.
7      I don't want you to speculate or guess.
8      A. I don't know. I don't know if there were
9  other payments.
10     Q. It's possible that there were other
11 receipts that you are not remembering now?
12     MR. McGLYNN: Objection.
13     Don't speculate; don't guess.
14     A. I don't know.
15     Q. Into what account did the $2 million
16 payment from National Development go?
17     MR. McGLYNN: Objection. We have not
18 disclosed that at this point, although I indicated
19 to you, Bruce, earlier, we did agree and we were
20 willing to stipulate that it did not go into the
21 lockbox account.
22     MR. FALBY: He's already said that.
23     Q. What account did the $2 million payment go
24 into?

Page 62

1      A. I don't know.
2      Q. You don't know?
3      A. No. It did not go into Banknorth.
4      Q. Didn't you account for the $2 million
5  payment as part of your duties as director of
6  accounting?
7      MR. McGLYNN: Objection.
8      A. I don't know. I don't think I made an
9  entry. I haven't seen it.
10     Q. You have no memory of making any accounting
11 record with respect to Blue Hills' receipt of $2
12 million from National Development?
13     A. No.
14     Q. How did you know about the receipt?
15     A. I was told.
16     Q. Why was there a $2 million receipt that was
17 not accounted for?
18     MR. McGLYNN: Objection.
19     A. I don't know.
20     Q. Were you told not to make an accounting
21 record recording the receipt of the $2 million from
22 National Development?
23     A. No.
24     Q. Did anybody record it as a receipt

Page 63

1  anywhere?
2      A. I don't know.
3      Q. You did not record it as a receipt for Blue
4  Hills Office Park LLC?
5      A. Correct.
6      Q. Although it was your responsibility to
7  record all receipts for Blue Hills Office Park LLC,
8  correct?
9      A. Yes.
10     Q. Do you have any idea where that money went?
11     MR. McGLYNN: I don't want you to guess.
12     A. Bernkopf?
13     Q. Is it your understanding that the $2
14 million payment went directly from National
15 Development to Bernkopf?
16     MR. McGLYNN: Objection. I'm going to
17 instruct the witness not to answer this question.
18     Q. Will you answer my question?
19     MR. McGLYNN: I'm instructing him not
20 to. We've indicated that we object to inquiry into
21 the disposition of that fund.
22     MR. FALBY: I know your point. I have
23 to ask him.
24     Q. Are you going to answer the question?

Page 64

1      MR. McGLYNN: I'm instructing him not
2  to.
3      Q. Are you going to follow your attorney's
4  advice?
5      A. Yes.
6      Q. Did anybody tell you why it was that a
7  receipt of $2 million by Blue Hills Office Park LLC
8  was not to be recorded in the books and records of
9  Blue Hills Office Park LLC?
10     MR. McGLYNN: Objection. You've already
11 asked. He answered that question.
12     Q. Can you answer my question, please?
13     A. No.
14     Q. Did you have any discussion with anybody
15 about that payment and how it would be accounted
16 for?
17     A. No.
18     Q. You learned of it at the time, did you?
19     A. I don't know when I learned of it.
20     Q. Who did you learn of it from?
21     A. Joe Donovan.
22     Q. What did Mr. Donovan tell you about it?
23     MR. McGLYNN: Again, if it requires you
24 to disclose the disposition of those funds, I'm

16 (Pages 61 to 64)

bb347439-5e5b-4e1b-8eb2-5a18c9c654d3

# EXHIBIT 4

Richard A. Clarke
Volume 1 - April 28, 2006

Page 1

Volume I, Pages 1-363

Exhibits: 387-404

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

          Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

          Defendants

(Complete caption on next page)

----------------------------

DEPOSITION OF RICHARD A. CLARKE

Friday, April 28, 2006, 9:36 a.m.

DLA Piper Rudnick Gray Cary US LLP

33 Arch Street, 26th Floor

Boston, Massachusetts

-------Reporter:  Joan M. Cassidy, RPR, CRR-------

jcassidy@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404   Fax 617.728.4403

Richard A. Clarke
Volume 1 - April 28, 2006

Page 41

1    Q.  I want you to assume as an expert witness
2  sitting here with me today that the lender's consent
3  was required to settlement of the zoning appeal and
4  transfer of that money by the borrower to its
5  affiliate.  Are you with me?
6    A.  Well, I am, but LNR I don't think was the
7  lender.  I think it was CSFB here.  We have to go
8  back to the definitions again.
9    Q.  I don't understand that comment.  I'm
10  simply asking you to assume that the lender's
11  consent was required.
12        MR. MCGLYNN:  Objection.  Why don't you
13  start again, Bruce.
14    Q.  Okay.  I want you to assume that the
15  lender's consent, whoever the lender was, CSFB or
16  its agents or servicers -- that the lender's consent
17  was required to settlement of the zoning appeal and
18  the disposition of the settlement payment.  Okay?
19    A.  Okay.
20    Q.  Now, assuming that were true, then that
21  would have allowed the servicer or the special
22  servicer, whoever was involved, an opportunity to
23  obtain additional payments or reserve funds or
24  collateral for the loan, correct?

Page 42

1        MR. MCGLYNN:  Objection, improper
2  hypothetical and calls for a speculative answer.
3    A.  Well, as a general matter, yes.  Again, I
4  don't think I got a complete hypothetical, but as a
5  general matter, I've learned that in credit
6  situations that an answer that applies to one
7  situation could be quite different in another,
8  depending on other circumstances.
9    Q.  If it were Wells Fargo whose consent was
10  required, this would be an opportunity for Wells
11  Fargo to obtain additional payments or reserves in
12  the same way that you say that they could have had
13  they reappraised the property in 2003 and threatened
14  the borrower with default, correct?
15        MR. MCGLYNN:  Objection as to form and
16  hypothetical and speculation.
17    A.  It would have been an opportunity for a
18  prudent lender to do that.
19    Q.  Let me refer you back to your engagement
20  letter, Exhibit 389.  Bullet 5 on page 2 of the
21  engagement letter asks whether you can opine as to
22  whether or not the 2-million-dollar settlement
23  payment in the settlement of the lawsuit constituted
24  a violation of Section 10 of the mortgage, correct?

Page 43

1    A.  Yes.
2    Q.  And you chose not to opine on that question
3  in the same way that you chose not to opine on
4  Bullets 3 and 4, correct?
5    A.  Yes, I considered Bullets 3, 4, and 5 all
6  part of the same issue.
7    Q.  Did you choose not to opine on Bullets 3,
8  4, and 5 because you suspected or thought that the
9  answer would be unfavorable to the borrower who had
10  retained you?
11    A.  No, I didn't know what the answer was.  And
12  I felt that I was not the right person to render
13  that judgment; in other words, yeah, I could have
14  given an opinion, but I chose not to because, again,
15  of the legal intensity of the issues as well as the
16  fact that I had not had that happen to me in my own
17  personal experience.
18    Q.  But you didn't view your interpretation of
19  the pooling and servicing agreement and its
20  applications to the actions of the servicers in this
21  case to involve the same complexity?
22    A.  I think other issues that I opined on were
23  much more simple and straightforward and very
24  prevalent in the marketplace for lenders dealing in

Page 44

1  these kinds of transactions.
2    Q.  Bullet Point 6.  You were asked to render
3  an opinion as to whether or not after EquiServe
4  moved out the borrower had to continue funding the
5  reserve accounts in the mortgage agreement, correct?
6    A.  Yes.
7    Q.  And did you reach an opinion on that
8  subject?
9    A.  It's an interesting question.  I haven't
10  read this for some time.  Give me a moment. (Witness
11  reviews document.) I never formed an opinion on that
12  simply because it appeared there was a mutual
13  agreement between the parties to handle the reserve
14  account on a quarter-by-quarter basis.  In other
15  words, early on in this transaction, the way that
16  the reserve account or the reserve accounts were
17  funded changed over time, and it appeared to be
18  almost by mutual consent so that I really did not
19  give an explicit opinion on that.  I've obviously
20  considered it and I have some documents here today
21  that have a bearing on that, but I just didn't know
22  where I would go with that.
23    Q.  Well, what was the discussion on Bullet
24  Point 6 at your meeting with Bernkopf Goodman?