UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

**DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S RESPONSE TO
STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF BLUE HILLS OFFICE
PARK LLC, GERALD FINEBERG AND WILLIAM LANGELIER'S OPPOSITIONS TO
DEFENDANTS AND PLAINTIFF-IN-COUNTERCLAIM'S MOTIONs FOR SUMMARY
<u>JUDGMENT</u>**

      Defendants and plaintiffs-in-counterclaim JP Morgan Chase Bank, as Trustee for the

Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial

Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") and CSFB 1999-C1 Royall

Street, LLC ("CSFB") submit this joint response to the Statement of Undisputed Facts in Support

of Blue Hills Office Park, LLC, Gerald Fineberg and William Langelier's Oppositions to

Defendants and Plaintiff-in-Counterclaim's Motions for Summary Judgment (docket no. 99)

("Blue Hills Fact Statement II").  The Trustee and CSFB's response herein does not waive their

objection to the submission of a second statement of undisputed facts by Blue Hills, Langelier and Fineberg (collectively, the "Blue Hills Parties"), a document which is not contemplated by the Federal Rules of Civil Procedure or the Local Rules of this Court. The Blue Hills Parties have failed to file the statement required of them to support their opposition to the Lender's motion for summary judgment – a statement of the material facts as to which there exists a genuine dispute (Local Rule 56.1). For that reason alone, the Lender's motion for summary judgment on the claims of the Second Amended Complaint should be granted.

<u>Responses</u>

*1   As a "disregarded entity" for tax purposes, all of Blue Hills' income and expenses were properly recorded on the financial records of Blue Hills, sole member, Royall Associates Realty Trust. See Expert Report of David R. Andelman, Esq., Deposition Exhibit 358, attached as Exhibit 50 to the Affidavit of Peter B. McGlynn, ("McGlynn Affidavit") previously filed with the Court; Affidavit of Joseph Donovan ("Donovan Affidavit"), ¶ 6.*

**<u>Response No. 1</u>**  It is undisputed that Blue Hills is a disregarded entity <u>for tax purposes</u>, but there is no basis in the record to support the suggestion that Blue Hills is disregarded for any other purpose and that it did not have its own financial records and statements. Andelman's expert report, which the Blue Hills Parties chose not to quote, states that "[s]ince Blue Hills has only one member, it is considered a 'disregard entity' [sic] <u>for tax purposes</u> and all of its transactions are reported on the tax return of it [sic] sole member, Royall." Andelman Report at 2 (emphasis added). As stated in Bernkopf Goodman's nonconsolidation opinion issued at the closing of the Loan, "The Borrower [i.e., Blue Hills] does not commingle its assets or business functions with the assets or business functions of any Borrower Entity [e.g., Royall Associates] or any other entity. The bank accounts and funds of the Borrower are maintained separately from those of any Borrower Entity, and are maintained in the name of the Borrower. … Each of the Borrower and the Manager [i.e., Blue Hills Management Corp.] maintains separate and full entity records and financial records for itself only." (Dep. Exs. 2d Supp. App. 340 at Blue Hill

ep

2025-2026, definitions on Blue Hill 2024.)[1]  Blue Hills, Blue Hills Management Corp., and Royall Associates all confirmed the accuracy of those statements.  Id. at Blue Hill 2041-2043.  See also Mortgage ¶ 12(g) (Blue Hills covenanting that "Mortgagor has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence….") (Dep. Exs. App. 155); (Mortgage ¶ 12(h) (Blue Hills covenanting that "Mortgagor will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party and Mortgagor will file its own tax returns unless required otherwise by applicable law.  Mortgagor shall maintain its books, records, resolutions and agreements as official records.")

---

[1] References to deposition testimony are by witness last name and page number.  Deposition transcripts are contained in Defendants' and Plaintiffs-in-Counterclaim's Appendix of Deposition Transcripts, manually filed as docket number 80 on May 17, 2006.

Deposition exhibits other than ones cited in the paragraph to which the Lender is responding are to Defendants' and Plaintiffs-in-Counterclaim's Appendix of Deposition Exhibits, filed as docket no. 75 on May 17, 2006 and identified herein as "Dep. Exs. App."; Defendants' and Plaintiffs-in-Counterclaim's Supplemental Appendix of Deposition Exhibits, filed May 31 as docket no. 106 and identified as "Dep. Exs. Supp. App."; or to Defendants' and Plaintiffs-in-Counterclaim's Second Supplemental Appendix of Deposition Exhibits ("Dep. Exs. 2d Supp. App.") filed today.

References to other documents submitted by the Lender are to exhibits to affidavits submitted by the Lender, including affidavits of witnesses Joseph Polcari (dckt. no. 73), Stephen Goertzen (dckt. no 74), Curtis Mallegni (dckt. no. 76), Eric Stotz (dckt. no. 77), Ronald Greenspan (dckt no. 78), Edward Brown (dckt. no. 79), and Jill Martin (filed today).  The Lender has submitted three attorneys affidavits transmitting documents:  Affidavit of Bruce S. Barnett in Support of Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment, filed May 17, 2006 as docket no. 72 and identified herein as "[First] Barnett Aff." ; Second Affidavit of Bruce S. Barnett in Support of Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment, filed May 31 as docket no. 107 and identified herein as "Second Barnett Aff."; and Third Affidavit of Bruce S. Barnett in Support of Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment, filed today and identified herein as "Third Barnett Aff."

Defendants' and Plaintiffs-in-Counterclaim's Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment, as corrected, filed as docket no. 86 on May 17, 2006, is identified herein as "Lender's Facts".

The respective memoranda of law by the Trustee and CSFB in support of their motions for summary judgment, filed on May 17, 2006 as docket nos. 84 and 87, are referred to as the "Trustee's Brief" and "CSFB's Brief."

"Blue Hills Fact Statement I" refers to docket no. 90, Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaim.

"Blue Hills Fact Response" refers to docket no. 104, Response of Blue Hills Office Park LLC, William Langelier and Gerald Fineberg to Defendants' and Plaintiffs-in-Counterclaim's Corrected Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment.

In practice, Blue Hills observed the distinction between itself and Royall Associates. (Donovan 120-122 ("I'm responsible for the operating books.  I'm not responsible for the owners' books.").)  Blue Hills had its own financial statements.  It had its own assets (including cash) and different liabilities from Royall Associates.  (Donovan Aff. Exs. A –C.)  For example, the balance sheet included in Royall Associates' 2004 tax return shows it was carrying $8 million in debt not present on the Blue Hills financial statement.  Compare 2004 Balance Sheet of Royall Associates (Royall Associates 2004 Form 1065 Schedule L (Swisher Aff. Ex. 23 at Blue Hill 5536))[2] with 2004 Balance Sheet of Blue Hills (Donovan Aff. Ex. C).

> *2.        Defendants' expert, Eric Stotz ("Stotz"), a real estate appraiser, could not substantiate his opinion that any structure that interferes with the view of another structure or that adds "significantly" to traffic or congesting will have a detrimental impact on the value of the existing structure.  Stotz could not testify as to the impact, if any, of the 250 Royall garage on the Property's value because he felt that it was "difficult" to do so.  See Deposition Transcript of Eric Stotz dated April 21, 2006 ("Stotz Deposition"), page 94, lines 18-24 through page 95, lines 1-5; page 104, lines 21-24 through page 105, lines 1-2, attached to the Affidavit of Meredith A. Swisher ("Swisher Affidavit") as Exhibit 13.*

**Response No. 2**  The Lender disputes the Blue Hills Parties characterization of Stotz's report and testimony, which speak for themselves.  Moreover, the term "substantiate" as used the first sentence of paragraph 2 is vague and ambiguous and Lender can not confirm or dispute it.  It is undisputed that Stotz stated in his report (and confirmed at his deposition) that it was his professional opinion as an appraiser that the erection of a new structure that interferes with the views from an existing structure or the view of the existing structure from a major highway, or that adds significantly to the traffic congestion in an area, will have a detrimental impact on the value of the other structure.  (Stotz Expert Report at 13-14 (Stotz Aff. Ex. A); Stotz 94-97.)  His

---

Capitalized terms not defined herein (or in Blue Hills' Facts) have the meaning given to them in Lender's Facts.
[2] Schedule L of the Form 1065 is the balance sheet of Royall Associates.  (Andelman 115-16.)

clear opinion is that the impact is negative.  He also said it would be difficult to accurately

quantify.  Id.

       *3.     Stotz does not quantify any alleged diminution in the value of the Property as a result of the garage in neither his expert report nor in his deposition.  Stotz also failed to acknowledge the alleged significance of the new garage in his pre-foreclosure appraisal report prepared for LNR.  See Stotz Deposition, page 87, line 12 through page 88, line 19, attached to the Swisher Affidavit as Exhibit 13.*

       **<u>Response No. 3</u>**  The term "acknowledge the alleged significance" as used in paragraph 3

is vague and ambiguous and the Lender can neither confirm nor deny it.  It is undisputed that

Stotz did not quantify the diminution in value of the property as a result of the construction of the

garage.  In the cited passage, he was not sure whether the garage was mentioned in his pre-

foreclosure report.  As he explained at his deposition, the addition of the garage to the Blueview

property was not an issue at the time of his October 2004 pre-foreclosure report, as it was by

then simply a part of an adjacent property which was considered in his appraisal.  (Stotz 88-92.)

       *4.     Stotz acknowledges that he did not quantify any diminution in the Property's value nor was he even qualified to opine on the diminution of the value of the property based upon undocumented traffic congestion or based upon the "less desirable view" that the garage would be for tenants in the Property.  Stotz did not consult with any traffic consultants.  His source of information was the Complaint filed in the Norfolk Action.  See Stotz Deposition, pages 88 and 95, attached to the Swisher Affidavit as Exhibit 13.*

       **<u>Response No. 4</u>**  It is undisputed that Stotz did not quantify the diminution in the

Property's value due to the construction of the garage.  It is also undisputed that he did not

consult with traffic consultants concerning the Property.  The Lender disputes the inaccurate

suggestion that Stotz's only source of information concerning the impact of the garage was the

complaint in the Zoning Appeal/Norfolk Action.  Stotz revisited the property while preparing his

report in this litigation and drove Route 128 in both directions to evaluate the views of the

Property.  (Stotz Report at 2, 12-13.)  While he stated that Blue Hills' allegation in the complaint

that the garage would result in increased traffic was the primary source for information about

traffic, he also reviewed the minutes of Canton Board of Appeals meeting on May 22, 2003

(Stotz Report at 13), at which Attorney Gary Lillienthal of Bernkopf Goodman, on behalf of

Blue Hills, stated that the garage would have "a major affect [sic] on the traffic" and that the

proposed garage "obstructs [Blue Hills'] current view from the southwest."  (Dep.  Exs. App.

304 at Blue Hill 1595.)

    *5.    Dr. Kenneth Gartell ("Gartell") stated that no diminution value to the Property occurred.  He also opined it possible that the Property's value may have been enhanced by the parking garage.  See pages 8 and 9 of Rebuttal Report of Dr. Kenneth Gartell ("Gartell Report"), Deposition Exhibit 353, attached to the Swisher Affidavit as Exhibit 22.*

    **Response No. 5**  The Lender disputes the assertion that Gartrell stated that no diminution

occurred.  Rather, as the cited pages reflect, the closest he comes to denying diminution is the

statement that construction of the garage "most likely had no material effect on the [fair market

value] of the Property."  (Gartrell Rebuttal at 8-9.)

    *6.    While Equiserve remained a tenant in the Property, the monthly rental income was more than sufficient to fully fund all of the reserve accounts and to provide a surplus.  The surplus was distributed to Blue Hills by Well Fargo each month and deposited in Blue Hills' operating account.  From 2003-2004, on average, Wells Fargo wired approximately $175,000.00 per month to Blue Hills' operating account.  See Deposition Transcript of Joseph Donovan ("Donovan Deposition"), page 207, lines 1-5; pages 209-211, attached to the Swisher Affidavit as Exhibit 3; Donovan Affidavit, ¶9.*

    **Response No. 6**.  Undisputed.  It is also undisputed that Blue Hills distributed profits to

its owners as often as possible.  Fineberg 243-44; Donovan 210-211.  It is further undisputed that

while Blue Hills paid property expenses out of its operating account, Donovan 210, Equiserve

had a triple-net lease pursuant to which it reimbursed Blue hills for virtually all property

expenses.  Donovan 212; Needle 163-173.


   *7.    Blue Hills and Equiserve entered into a Lease Termination Agreement dated August 5, 2003.  See Deposition Exhibit 10, attached to the Swisher Affidavit as Exhibit 14.*

   **Response No. 7**  Undisputed.


   *8.    The Lease Termination Agreement provided that Equiserve would abandon certain workstations at the Property when they vacated in July 2004.  Blue Hills sold the workstations for $100,000.00 in August 2004.  Blue Hills did not believe these workstations were part of the Lender's collateral.  See Donovan Affidavit, § 8.*

   **Response No. 8**  The Lender disputes the characterization that Equiserve abandoned the

Workstations.  As part of the negotiated Lease Termination Agreement, Equiserve agreed to

leave at the Property certain so-called "Yield Up Property," including the Workstations.

Pursuant to the express terms of the Lease Termination Agreement, title to the Yield Up Property

vested in Blue Hills on the termination date of July 31, 2004.  (Dep. Exs. App. 10 at ¶ 1.)  The

Lender notes that Donovan's asserted belief with respect to whether the Workstations were part

of the Lender's collateral is implausible (Donovan was a sophisticated Chief Financial Officer of

a multi-million dollar company experienced in dealing with lenders and reading loan documents,

Donovan 30-34, and knew that the Loan Documents controlled Blue Hills' rights, id. 56-58) and

irrelevant.  It is undisputed that the Workstations plainly were part of the Lender's collateral.

Granting Clause Two of the Mortgage includes, among other things, "[a]ll machinery, furniture,

furnishings, equipment, computer software and hardware, fixtures … and other property of every

kind and nature, whether tangible or intangible, whatsoever owned by Mortgagor, or in which

Mortgagor has or shall have an interest, now or hereafter located upon the Premises and the

Improvements, or appurtenant thereto, and usable in connection with the present or future

operation and occupancy of the Premises and Improvements."

9.      *Since the Loan's inception, Blue Hills furnished to Wells Fargo Bank's
Commercial Mortgage Servicing Group ("Wells Fargo") financial information concerning Blue
Hills in both a quarterly and annual basis.  Generally, the information which Fineberg
Management, Inc. ("FMI") furnished to Wells Fargo consisted of an income and expense
statement, a rent roll (consisting of one page as Equiserve, Inc., which occupied approximately
96% of the subject property) and a one or two page statement of Blue Hills' assets and
liabilities.  Whether or not additional financial information was required by Wells Fargo, Wells
Fargo never requested that Blue Hills furnish any such additional financial importation.  Had it
done so – and had such information existed or could be prepared – the information would have
been promptly sent to Wells Fargo.  See Donovan Affidavit, ¶¶ 2-5.*

**Response No. 9**  It is undisputed that Fineberg Management furnished Wells Fargo with

financial information concerning Blue Hills from time to time.  The Lender disputes the

implication in paragraph 9 that Fineberg Management (or anyone else) sent Wells Fargo any

statements of Blue Hills' assets and liabilities after August 2003, of which the Blue Hills Parties

have submitted no competent evidence.  Donovan does not state that anyone sent any such

statements, and the Lender has established that a comprehensive review of Wells Fargo's records

reveals none in its possession.  Compare Donovan Aff. ¶¶ 2-5 with Mallegni Aff. ¶¶ 3-5.

10.      *For the years ended December 31, 2003 and 2004 – as in all previous years – the
statements of assets and liabilities for Blue Hills were prepared by the accounting firm,
Rutfield & Hassey CPA.  Had Wells Fargo advised FMI that it had not received the 2003
statement of assets and liabilities – or had misplaced it – FMI would have forwarded to Wells
Fargo another copy of it.  See Donovan Affidavit, ¶¶ 2-5.*

**Response No. 10**.  The Lender disputes any suggestion that Fineberg Management or

anyone else sent Wells Fargo a statement of assets and liabilities for the years ended

December 31, 2003 and 2004, as the Blue Hills Parties have submitted no competent evidence

supporting that assertion.  The Lender incorporates by reference its response to paragraph 9,

above.  To the extent the Blue Hills Parties contend the Rutfield & Hassey statement of assets

and liabilities would have been sent to Wells Fargo, the Lender also notes that the prior

statements Blue Hills had submitted differed dramatically in format from the Rutfield & Hassey

statements.  Compare, e.g., Donovan Aff. Ex. A (Rutfield & Hassey Year End 2002 Statement)

with Mallegni Aff. Ex. A at WF3172-3173 (Year End 2002 Statement Submitted to Lender).


*11.    On August 2, 2004, Joseph Donovan ("Donovan") mailed a written request to Wells Fargo seeking disbursement from the reserve accounts the sum of $412,833.43.  Donovan faxed his August 2, 2004 letter to Wells Fargo on August 4, 2004.  See CSFB's Answer No. 13 to Blue Hills, Fineberg and Langelier's Second Set of Interrogatories to CSFB, attached to the Swisher Affidavit as Exhibit 29.*

**Response No. 11**.  Undisputed.  The Lender notes for clarification it is undisputed that

Donovan's request dated August 2, 2004, was sent by regular mail on August 2, 2004.  (Answers

of Blue Hills Office Park LLC to Defendants' Second Set of Interrogatories, No. 2 ([First]

Barnett Aff. Ex. J).)


*12.    At the time he sent his August 2, 2004 letter, Donovan believed that the reserve accounts could be accessed to pay real estate taxes.  See Donovan Deposition, page 138, line 15 through page 139, line 14, attached to the Swisher Affidavit as Exhibit 3.*

**Response No. 12**  The Lender responds that Donovan's asserted belief, if genuinely held,

had no basis and that (1) his erroneous belief does not change the Loan Documents, which

indisputably did not permit use of the reserves to pay taxes, as Donovan now acknowledges,

Donovan 265-66; (2) Donovan was a sophisticated Chief Financial Officer of a multi-million

dollar company experienced in dealing with lenders and reading loan documents, Donovan 30-

34; (3) Donovan was well aware at the time that the terms of the loan documents governed

access to the reserves, Donovan 61; (4) Donovan consulted with counsel before requesting that

the taxes be paid from the reserves, Donovan 162; and (5) it is undisputed that Gil Stone of Blue

Hills was informed by Brent Lloyd of Wells Fargo on July 29, 2004, that Blue Hills could not

use reserve funds to make the tax payment.  Lender incorporates by reference its response to

paragraph 13, below.

13.     *Wells Fargo claims its record describe a discussion with "Gil Stern" regarding access to the reserve accounts; neither Donovan or Gilbert Stone ("Stone") recall such a discussion.  See Donovan Deposition, page 217, line 23 through page 218, line 7 and Deposition of Gilbert Stone ("Stone Deposition"), page 117, lines 9-19, attached to the Swisher Affidavit as Exhibits 3 and 12.*

**Response No. 13**.  While it is undisputed that Donovan and Stone testified that they did

not recall the conversation (Stone twice testified that he "may have had such a conversation but

[he] [didn't] recall it" (Stone 118-119)), Brent Lloyd of Wells Fargo testified that he spoke with

Stone on July 29, 2004 and told him that the reserves could not be used and Blue Hills would be

in default if it did not pay the taxes.  Stone's absence of memory does not create a dispute as to

whether the conversation happened.  Lloyd also testified that he had spoken to Stone on prior

occasions and that the misnaming of Stone as "Stern" in his and a colleague's contemporaneous

notes was a typo. (Dep. Exs. App. 5, 6, 8; Lloyd 20-24, 32, 39-41, 60-61.)  Stone confirmed that

he had had other conversations with Lloyd.  (Stone 117-118.)  The Lender notes that "Wells

Fargo" has made no claims in this matter.

14.     *Beginning in early September 2004, e-mails were exchanged between and among LNR representatives, demonstrating that LNR was interested in purchasing the Loan as a "potential mining opportunity."  See Deposition Exhibit 112, attached to the Swisher Affidavit as Exhibit 28.*

**Response No. 14**  It is undisputed that (1) LNR considered purchasing the Loan out of

the pool or purchasing the Property if the Lender took it back via a foreclosure or deed-in-lieu

(both of which are expressly contemplated by the Pooling and Servicing Agreement (PSA

§ 3.18) (Dep. Exs. Supp. App. 51)), (2) there were emails exchanged among LNR personnel on

those topics, and (3) some of these emails referred to a potential acquisition of the Property as a

"mining opportunity."  It is also undisputed that LNR's interest cooled significantly once its

representative viewed the property.  (Second Barnett Aff. Ex. B (continuation of the email chain

included in Dep. Ex. 112).)


15.    *Additional e-mails indicted that LNR was scrutinizing the Pooling and Servicing Agreement dated October 11, 1999 (the "PSA") and checking with various contacts on how to get the necessary consent for LNR to purchase the Loan.  See Deposition Exhibits 73, 74, 75, 103 and 112, attached to the Swisher Affidavit as Exhibits 27 and 28.*

**Response No. 15**.  Undisputed, although the Lender notes that Deposition Exhibit 73

concerns a potential sale of the note to a third party and has nothing to do with LNR possibly

purchasing the Loan.


16.    *Wells Fargo's records indicate that transfers in and out of the reserve accounts to cover tax, insurance and other shortages and adjustments were often handled between Wells Fargo and Blue Hills by telephone and fax, often with considerably far less than seven business days' notice.  See Deposition Exhibit 393 and excerpt from Deposition Exhibit 98, attached to the Swisher Affidavit as Exhibits 24 and 26.*

**Response to No. 16**  The Lender disputes Blue Hills' unsupported assertion that Wells

Fargo ever paid any real estate taxes out of any of the Loan's replacement or leasing escrow

reserves called for by the mortgage and funded by Blue Hills.  The undisputed evidence is that

no such payments were ever made.

Blue Hills' witnesses -- Joseph Donovan, Gilbert Stone, and Larry Needle -- all testified

that Blue Hills paid the taxes every quarter with money received from Equiserve and sent to

Wells Fargo.  (Lender's Facts ¶¶ 33-43.)  Donovan's August 2 letter to Wells Fargo was the first

request Blue Hills ever made for access to any of the reserve accounts for any purpose. (Donovan 163.)

The account histories for the replacement, base leasing and cash flow leasing reserves show no disbursements to Blue Hills, nor any debits that correspond in amount or timing to the tax payments. (Replacement Reserve (#001) Account History Report (Martin Aff. ¶ 5 & Ex. A); Tenant Improvement (Base Leasing Escrow) Reserve (#002) Account History Report (Martin Aff. ¶ 6 & Ex. B); Miscellaneous (Cash Flow Leasing Escrow) Reserve (#005) Account History Report (Martin Aff. ¶ 9 & Ex. E); Cash Collateral Reserve (#003) Account History Report (Martin Aff. ¶ 7 & Ex. C).)[3]

The documents contained in Deposition Exhibit 393 are select Wells Fargo Notes Maintenance entries, also referred to as Notepads, which are comments that Wells Fargo personnel input into the loan accounting system. (Martin 29; 31-32 (referring to Dep. Exs. App. 139).) The Notepads reflect Wells Fargo's implementation of the undisputed tax payment agreement, by which Blue Hills or Equiserve would put the funds for payment in the lockbox at Metrowest/Banknorth, from which the funds would be wired or swept to Wells Fargo for payment of the taxes. (Blue Hills Fact Statement I ¶¶ 43-44; Lender's Facts ¶¶ 33-43.)

As stated in the Notepads, the incoming cash would sometimes be routed initially to Wells Fargo's "lockbox sweep reserve," which was reserve number 004, until it was identified as the tax payment and re-routed to the tax escrow. The lockbox sweep reserve was a default holding account for funds received from Blue Hills or tenants until they were applied to various Loan payments or returned to the borrower. (Martin Aff. ¶ 3.) For example, the first entry in Deposition Exhibit 393, dated October 24, 2001, states in part "mr. stone sent in $142,997.11 for

---

[3] The so-called Cash Collateral Reserve (#003) held the original cash flow leasing escrow deposit made at closing of $105,144.17. Martin Aff. ¶ 7.

the tax escrow so he would have additional funds in the acct. it was deposited to the reserve. doing tran 40 this date to transfer to tax escrow." (Ex. 393 p. 1 (errors in original).) The second, dated January 24, 2002, states "Borrower wired funds 1/18 and intended them for tax escrow account. wire went to lockbox reserve. Borrower will fax letter to autorize transfer to tax escrows." (Id. p. 2 (errors in original).)

This temporary placement of funds from the Blue Hills or Equiserve in the lockbox sweep reserve occurred in connection with the quarterly tax payments due May 1, 2002 and November 1, 2002, although the Notepads included in Deposition Exhibit 393 that are associated with those payments do not expressly reflect an incoming wire or lockbox sweep of tax funds.

Documents related to the April 2002 Notepads, for example, show that a wire was received by Wells Fargo from Banknorth on April 19, 2002, in the amount of $140,554.99 and directed to reserve 004. (Incoming Cash Action Form (Martin Aff. ¶ 10 & Ex. F); Lockbox Sweep Reserve History (Martin Aff. Ex. D).) Stone directed Wells Fargo to move the deposit into the real estate tax escrow. (Stone Letter to Gail Engelstad, 4/23/2002 (Third Barnett Aff. Ex. A).) The $101,179.20 referred to in the April 24, 2002 Notepad was debited from the Lockbox Reserve and transferred to the Tax Account on April 24. The tax payment was disbursed from the Tax Account to the Town of Canton that same day. (Lockbox Sweep Reserve History; Tax Record for Single Loan (Dep. Exs. Supp. App. 160).)

Documents related to the October 2002 Notepad show that Blue Hills transferred $150,087.58, the exact amount of the tax payment due November 1, 2002, from its operating account at Banknorth Massachusetts to the lockbox account on October 17, 2002. (Banknorth Transfer History (Third Barnett Aff. Ex. B); Letter from Stone to Wells Fargo, 6/17/2002, re sale of Metrowest Bank to Banknorth Massachusetts identifying operating account number (Third

Barnett Aff. Ex. C)[4]; Letter from Stone to Banknorth, 7/24/2002, identifying lockbox account number (Third Barnett Aff. Ex. D); Town of Canton Preliminary Real Estate Tax Bill (showing amount due on Aug. 1 and Nov. 1, 2002) (Martin Aff. Ex. G).)  When received by Wells Fargo on October 18, 2002, the funds were applied to the lockbox sweep reserve (004), then moved to the tax escrow on October 21.  (Lockbox Sweep Reserve History; Transaction History (Martin Aff. Ex. H); Notepad (Ex. 393 at WF01717); Tax Record for Single Loan (Dep. Exs. App. Supp. 160).)

The documents included in Swisher Affidavit Exhibit 26 (which are excerpts from Deposition Exhibit 98) have nothing to do with Blue Hills' real estate tax payments but rather relate to a reimbursement for Blue Hills' payment of insurance premiums, not taxes.  It is undisputed that insurance premiums were handled in a manner completely different from the tax escrows.  The insurance escrow was funded from the rents every month, but Fineberg Management would pay the premium directly and then seek reimbursement out of the insurance escrow.  (Donovan 213-14.)  The documents contained in Exhibit 26 show Blue Hills submitting the paid receipt, asking for reimbursement, and then asking for an escrow analysis.  The day after Blue Hills faxed its initial request, a Wells Fargo representative told Donovan she would "start the process" the next day.  (Swisher Aff. Ex. 26 at LNR03732.)  Pages of Exhibit 98 related to this transaction that the Blue Hills Parties omitted from Swisher Affidavit Exhibit 26 show that it was a full two weeks after the initial request that Wells Fargo sent the insurance premium reimbursement check to Blue Hills.  (Dep. Exs. 2d Supp. App. 98.)

The documents contained in Swisher Affidavit Exhibits 24 and 26 do not make reference to any shortages or adjustments for any purpose other than real estate taxes (the vast majority) or

---

[4] The letter refers to the account into which Wells Fargo transferred excess funds, which is undisputed to be the operating account.  Blue Hills Fact Response ¶ 30.

insurance premiums (Exhibit 26).  None of the documents pertain to any request for access to the

Leasing Escrow Funds pursuant to Mortgage ¶ 6(c)(ix), thus the reference to seven business days

notice in paragraph 16 is inapposite.

17.     *Borrowers involved in securitized loan transactions have the right to expect that
the loan will be administered according to servicing standards.  See Deposition Transcript of
Richard Clarke ("Clarke Deposition"), page 207 lines 10-14 and Deposition Transcript of
Ronald Greenspan ("Greenspan Deposition"), page 89, lines 3-23, attached to the Swisher
Affidavit as Exhibits 2 and 31.*

**Response to No. 17**.  The Lender disputes this immaterial assertion.  The Lender

assumes that the Blue Hills Parties are referring to the servicing standard of the Pooling and

Servicing Agreement ("PSA"), as that is the subject of the cited deposition passages.   The PSA

expressly refutes paragraph 17:  "The provisions of this Agreement shall be binding upon and

inure to the benefit of the respective successors and assigns of the parties hereto, and all such

provisions shall inure to the benefit of the Certificateholders.  <u>No other person, including,</u>

<u>without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or</u>

<u>claim under this Agreement</u>."  (PSA § 10.8 (emphasis added) (Dep. Exs. App. 51).)  Contrary to

the Blue Hills Parties' false statement, Greenspan expressly rejected the statement in

paragraph 17.  In both his report and in his deposition,  he states that "the borrower is not a party

to the PSA and has no reasonable expectation of being a beneficiary of the servicing standards

set forth in the PSA."  (Greenspan 131-134; Greenspan Report ¶ 27 (Greenspan Affidavit Ex.

A).)  In the testimony cited by the Blue Hills Parties, Greenspan describes the servicing standard

but says nothing about whether Blue Hills is entitled to rely on it.  (Greenspan 89.)

18.     *LNR had a reputation as a "loan to own" Lender, namely, it was less interested
in working out its loans than of acquiring the secured properties for itself.  Clark Deposition,
page 103, lines 1-8, attached to the Swisher Affidavit as Exhibit*

**Response to No. 18**  The Lender disputes this immaterial assertion.  The record contains

no evidence about LNR having a reputation as a so-called "loan to own" Lender.  Clarke's

testimony, the only cited support about that reputation, makes clear that his characterization of

LNR was based on his review of documents supplied to him by counsel for the Blue Hills Parties

in this case.  (Clarke 103 ("[A]s I read the documents, it was very clear to me that they were

what we call 'loan-to-own servicers.").)  Moreover, Clarke does not explain what he means by

"loan-to-own".


                                                Respectfully submitted,

                                                CSFB 1999-C1 ROYALL STREET, LLC,
                                                and J.P. MORGAN CHASE BANK, as
     Trustee for the Registered Holders of Credit
     Suisse First Boston Mortgage Securities
     Corp., Commercial Mortgage Pass-Through
     Certificates, Series 1999-C1,

     By their attorneys,


                    /s/ Bruce S. Barnett
     ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
     E. Randolph Tucker, BBO #503845

Dated:  June 12, 2006             Bruce E. Falby, BBO #544143
     Bruce S. Barnett, BBO #647666
     Traci S. Feit, BBO #660688
     DLA PIPER RUDNICK GRAY CARY US
     LLP
     33 Arch Street, 26th Floor
     (617) 406-6000