UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>    Plaintiff, Defendant-in-Counterclaim.<br><br>    v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1,<br><br>    and<br><br>CSFB 1999–C1 ROYALL STREET, LLC;<br><br>    Defendants, Plaintiffs-in-Counterclaim,<br><br>    v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>    Defendants-in-Counterclaim. | Civil Action No.  05-CV-10506 (WGY) |

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OF DEFENDANT AND PLAINTIFF-IN-COUNTERCLAIM
J.P. MORGAN CHASE BANK, AS TRUSTEE FOR THE REGISTERED HOLDERS OF
CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP.,
<u>COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 1999-C1</u>**

In its opposition memorandum to the Lender's motion for summary judgment on Blue Hills' claims in the Second Amended Complaint ("Blue Hills Opposition Brief I")[1], Blue Hills[2] turns the factual record on its head. Blue Hills argues that the Lender chose to remain idle and wait for Blue Hills to default, instead of pursuing a loan restructuring. Id. at 2. Blue Hills' explanation of the Lender's motive – a supposed desire to obtain a property that was worth far

---

[1] Other summary judgment submissions are identified herein as follows:

"Trustee's Brief" refers to docket no. 84, Memorandum in Support of Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1.

"Lender's Facts" refers to docket no. 86, Defendants' and Plaintiffs-in-Counterclaim's Corrected Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment.

"Lender's Fact Response" refers to docket no. 108, Defendants' and Plaintiffs-in-Counterclaim's Response to Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaim.

"Lender's Second Fact Response," filed today, refers to the Defendants' and Plaintiffs-in-Counterclaim's Response to Statement of Undisputed Facts in Support of Blue Hills Office Park, LLC, Gerald Fineberg and William Langelier's Oppositions to Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment.

"Blue Hills Fact Statement I" refers to docket no. 90, Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaim.

"Blue Hills Fact Statement II" refers to docket no. 99, Statement of Undisputed Facts in Support of Blue Hills Office Park, LLC, Gerald Fineberg and William Langelier's Oppositions to Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment.

"Blue Hills Fact Response" refers to docket no. 104, Response of Blue Hills Office Park LLC, William Langelier and Gerald Fineberg to Defendants' and Plaintiffs-in-Counterclaim's Corrected Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment.

"CSFB Reply Brief," filed today, refers to the Reply Memorandum in Support of Motion for Summary Judgment of Defendant and Plaintiff-In-Counterclaim CSFB 1999-C1 Royall Street, LLC.

Deposition testimony is cited by witnesses last name and transcript page number; the transcripts are contained in Defendants' and Plaintiffs-in-Counterclaim's Appendix of Deposition Transcripts [dckt. no. 80]. Deposition exhibits are cited to Defendants' and Plaintiffs-in-Counterclaim's Appendix of Deposition Exhibits ("Dep. Exs. App.") [dckt. no. 75]; Supplemental Appendix of Deposition Exhibits ("Dep. Exs. Supp. App.") [dckt no. 106]; and Second Supplemental Appendix of Deposition Exhibits ("Dep. Exs. 2d Supp. App.") [filed today].

Capitalized terms not defined herein have the meaning given to them in Lender's Facts.

[2] Although Blue Hills Opposition Brief I is made in the name of Blue Hills, Langelier, and Fineberg, the Lender refers herein only to Blue Hills, for simplicity and because Blue Hills is the only plaintiff named in the Second Amended Complaint.

less than the debt -- makes no sense. The factual record instead reflects the Lender making the best of a bad situation caused by Blue Hills' choice, after failing to find a replacement tenant, to walk away from the property, default on its nonrecourse loan, make no restructuring proposal, and acquiesce in foreclosure.

But even accepting Blue Hills' premise, its claims must fail. After Blue Hills defaulted, the Lender was not obligated by the Loan Documents or any other duty to Blue Hills to pursue, negotiate, or agree to a workout, even if Blue Hills had presented the Lender with a business plan or workout proposal, which it indisputably did not. Rather, the Lender was entirely within its legal rights to foreclose the mortgage and take back the collateral – an empty, twenty-year old building worth, according to a contemporaneous appraisal, over $18 million less than the $33.4 million debt it secured.

Apparently conceding that it has no case based on the Loan Documents, Blue Hills attempts to confuse the issues and stave off summary judgment by inventing courses of conduct wholly unsupported by the record and duties to Blue Hills that do not exist. Because there is nothing to any of these arguments, the Court should see through the obfuscation and grant the Lender's motion for summary judgment on the claims of the Second Amended Complaint.

I.  **THE LENDER IS ENTITLED TO SUMMARY JUDGMENT AS TO ALL COUNTS OF ITS COUNTERCLAIM.**

The Trustee incorporates by reference the arguments set forth in the corresponding Parts I and II of the Reply Memorandum In Support of Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim CSFB 1999-C1 Royall Street, LLC, filed today.

## II. BLUE HILLS CONCEDES ITS BREACH OF CONTRACT AND CHAPTER 93A CLAIMS AND HAS NO BASIS FOR ITS CLAIM FOR BREACH OF THE IMPLIED COVENANT.

### A. Blue Hills Does Not Attempt to Defend Its Breach of Contract Claim.

In apparent recognition of the utter lack of basis for its breach of contract claim, Blue Hills does not even attempt to argue that the Lender violated the Loan Documents. Its memorandum is completely silent on Blue Hills' contract claim, a concession that the Lender is entitled to summary judgment on it (and that it was Blue Hills, not the Lender, who failed to comply with the contract provisions). Similarly, Blue Hills' opposition makes no mention of its Chapter 93A claim, which should also be dismissed.

### B. Blue Hills Admits that It Failed to Comply with the Loan Documents and Seeks to Excuse its Breaches by Inventing Non-existent Courses of Conduct.

Blue Hills admits both the lateness of its request for access to the loan reserves – dated August 2 but delivered August 4[3] – and that the Loan Documents did not entitle it to have property taxes paid out of the reserves. To preserve a claim, Blue Hills fabricates a prior course of conduct in which, it says, the Lender previously accepted last-minute requests from Blue Hills to pay property taxes out of reserve accounts. This course of conduct argument is wholly a litigation invention of Blue Hills' expert designee Richard Clarke and its counsel. Trustee's Brief at 6-8. It has no basis in the testimony of the Blue Hills/Fineberg Management employees handling the tax payments and is contradicted by the very documents on which Blue Hills relies.

#### 1. Blue Hills' unequivocal testimony is that it or Equiserve sent funds for tax payments every quarter.

Blue Hills' witnesses -- Joseph Donovan, Gilbert Stone, and Larry Needle -- all testified that Blue Hills paid the taxes every quarter with money received from Equiserve and sent to

---

[3] Blue Hills' contention that its request, due August 2 and delivered via fax on August 4, was only one day late (not two), Blue Hills Opposition Brief I at 8, is inexplicable.

- 3 -

Wells Fargo.  Lender's Facts ¶¶ 33-43.  Indeed, on the basis of this testimony, Blue Hills presented as an undisputed fact in support of its motion for summary judgment that "Wells Fargo and Blue Hills agreed to an alternative arrangement in October 1999 under which Equiserve deposited the real estate tax payment into the Clearing Account so that it could be swept into the Cash Collateral Account and used by Wells Fargo to pay the taxes."  Blue Hills Fact Statement I ¶ 43.

There were no prior payments of taxes from reserve accounts.  As Fineberg Management's Chief Financial Officer Joseph Donovan confirmed, his August 2, 2004 letter to Wells Fargo was the first request Blue Hills ever made for access to any of the reserve accounts for any purpose.  Donovan 163.

In asking for the taxes to be paid out of the reserves, Donovan testified that he was relying on his erroneous belief, based on his memory of the negotiation of the Loan, that reserves were available for taxes once Equiserve moved out.  Lender's Facts 108.  He was not relying on any supposed prior course of conduct of being allowed to pay taxes out of the reserves.  There was no such course of conduct.[4]

By his own admission, the only reason Donovan was late in sending the August 2 letter was because he had been too busy.  Donovan 245 ("Probably because I'm a busy guy and it just slipped.  I was a couple days late.")  He was not relying on any prior course of conduct whereby Wells Fargo allowed late payments of taxes from reserve accounts.

---

[4] There is no support in the record for any suggestions that Donovan was considering anything else, and Blue Hills cites to nothing, notwithstanding Blue Hills' weak attempt in footnote 8 to insinuate that Donovan relied on the claimed course of conduct by stating that Donovan considered the "totality of all the facts."  Blue Hills Opposition Brief I at 10 n. 8.  He testified to no such thing.  Similarly, there is no support in the record for the suggestion at page 10 that there was some question about whether Blue Hills was obligated to pay the taxes after Equiserve left.  Blue Hills knew it had to pay the taxes.  Donovan 203-04; Stone 100, Lender's Facts ¶¶ 100-03.

> 2. **There is no course of conduct by which Wells Fargo funded tax payments out of loan reserves.**

Consistent with the testimony of Blue Hills' own witnesses, the account histories for the replacement, base leasing and cash flow leasing reserves show no disbursements to Blue Hills, nor any debits that correspond in amount or timing to the tax payments. Lender's Second Fact Response ¶ 16.

The only evidence cited by Blue Hills to support the supposed contrary course of conduct consists of certain Wells Fargo "Notes Maintenance" entries compiled in Dep. Ex. 393 that, on examination, refute rather than support its claim.[5] These documents merely reflect Wells Fargo's implementation of the undisputed tax payment agreement, by which Blue Hills or Equiserve would put the funds for payment in the lockbox at MetroWest/Banknorth, from which the funds would be wired or swept to Wells Fargo for payment of the taxes. Blue Hills Fact Statement I ¶¶ 43-44; Lender's Facts ¶¶ 33-43.[6]

Although the Notes Maintenance documents in Exhibit 393 for two of the quarterly tax payments – those due May 1, 2002 and November 1, 2002 – do not expressly reflect an incoming wire or lockbox sweep of tax funds from Blue Hills and Equiserve, other documents produced in this litigation demonstrate – as Blue Hills' witnesses uniformly testified -- that those payments

---

[5] Notes Maintenance entries, also referred to as Notepads, are comments that Wells Fargo personnel input into the loan accounting system. Martin 29; 31-32 (referring to Dep. Exs. App. 139).

[6] As stated in the Notepads, the incoming cash would sometimes be routed initially to Wells Fargo's "lockbox sweep reserve," which was reserve number 04, until it was identified as the tax payment and re-routed to the tax escrow. (The lock box sweep reserve was a default holding account for funds received from Blue Hills or tenants until they were otherwise applied to various Loan Payments or returned to the borrower. Affidavit of Jill L. Martin ¶ 3 (filed today).) For example, the first entry, dated October 24, 2001, states in part "mr. stone sent in $142,997.11 for the tax escrow so he would have additional funds in the acct. it was deposited to the reserve. doing tran 40 this date to transfer to tax escrow." Ex. 393 p. 1 (typos in original). The second, dated January 24, 2002, states "Borrower wired funds 1/18 and intended them for tax escrow account. wire went to lock box reserve. Borrower will fax letter to autorize transfer to tax escrows." Id. p. 2 (typos in original).

were handled according to the agreement and not drawn from the replacement or leasing reserves funded by the borrower. See Lender's Second Fact Response ¶ 16 (describing documents); Affidavit of Jill L. Martin (attaching documents) (both filed today).

In short, there is no basis whatever for Blue Hills' manufactured contention that loan reserves were used to fund tax payments at any point prior to August 2004.[7] Likewise, there is no basis whatever for Blue Hills suggestion that "Wells Fargo may not have always paid the taxes on time." See Blue Hills Fact Response ¶¶ 37, 38. Blue Hills cites no evidence, and the Tax Record for Single Loan shows that the disbursement was always made prior to the Feb. 1, May 1, Aug. 1 or Nov. 1 deadline. (Dep. Exs. Supp. App. 160).

3. <u>Blue Hills was obligated to pay the taxes without being told.</u>

Stripped of its faulty course-of-conduct foundation, Blue Hills' argument that the Lender was obligated to inform it that it was required to pay the taxes and that they could not be paid from the reserve accounts is even more specious. See <u>Ferris v. Federal Home Loan Mortgage Corp.</u>, 905 F. Supp. 23, 29 (D. Mass. 1995) (in absence of explicit mortgage requirement, lender has no duty to promptly notify borrower of account shortfall).

---

[7] Blue Hills is both inaccurate and misleading when, in trying to bolster its tax-payment course-of-conduct argument, it refers to an occasion when Wells Fargo allegedly "processed" a "requested release of money from the tax and insurance account" the "next day." Blue Hills Opposition Brief I at 9. A look to the cited paragraph of Blue Hills Fact Statement II, which in turn cites Exhibit 26 of the Swisher Affidavit, reveals the evidence in support of this claim consists of documents related to a reimbursement for Blue Hills' payment of <u>insurance premiums</u>, not taxes. It is undisputed that insurance premiums were handled in a manner completely different from the tax escrows. The insurance escrow was funded from the rents every month, but Fineberg Management would pay the premium directly and then seek reimbursement out of the insurance escrow. Donovan 213-14. The documents contained in Swisher Affidavit Exhibit 26 show Blue Hills submitting the paid receipt, asking for reimbursement, and then asking for an escrow analysis. The day after Blue Hills faxed its initial request, a Wells Fargo representative told Donovan she would "start the process" the next day. Pages of Exhibit 98 related to this transaction that Blue Hills omitted from Swisher Affidavit Exhibit 26 show that it was a full two weeks after the initial request that Wells Fargo sent the insurance premium reimbursement check to Blue Hills. Lender's Second Fact Response ¶ 16.

- 6 -

Lender had no obligation to tell Blue Hills what the Loan Documents make plain – that it is obligated to pay the taxes (Mortgage ¶ 5) or deposit with Wells Fargo funds sufficient to pay them (Mortgage ¶ 6).  Blue Hills knew it was obligated to pay the taxes, Donovan 243, Stone 100, and its expert designee admitted Blue Hills defaulted under the loan documents when it did not.  Clarke 87; <u>see</u> <u>also</u> Clarke 113 (access to reserves not allowed for payment of taxes).  Blue Hills' principals were sophisticated real estate investors, and Donovan himself was a sophisticated Chief Financial Officer of a multi-million dollar company experienced in dealing with lenders and reading loan documents.  Donovan 31 ("I'm constantly talking to lenders"), 30-34, 56-60.  Blue Hills and Donovan knew the Loan Documents controlled Blue Hills' rights, Donovan 56-58.  Donovan consulted with counsel before requesting that taxes be paid from the reserves.  Donovan 162.  Blue Hills and Donovan cannot reasonably have believed that the documents would be modified by the mere sending of a letter.  Donovan 61-62.[8]  <u>See</u> Trustee's Brief at 8.

In any event, it is absolutely undisputed that the Lender was <u>not</u> silent.  Brent Lloyd told Gilbert Stone on July 29, 2004 that Blue Hills could not access reserve accounts to pay the taxes and that it would be in default if it did not pay them.  Lender's Facts ¶ 104.  Stone's lack of memory of the conversation does not create a dispute of fact as to whether it occurred or what was said.  Stone 117-119, 125 ("Q. [Y]ou may have had such a conversation but you don't recall it?  A. Yes").  <u>See</u> <u>Ayer v. United States</u>, 902 F.2d 1038, 1044-45 (1st Cir. 1990).  Blue Hills ignores Lloyd's deposition testimony in trying raise doubts about the existence of the conversation by observing that the Wells Fargo notes refer to Gil Stern, not Gil Stone.  Blue

---

[8] "Q. You understood as a CFO experienced in dealing with lenders in good times and bad that the conditions under which Blue Hills would be able to access monies from the reserve were set forth in the loan documents, correct?  A.  Yes."  Donovan 61.

Hills Opposition Brief I at 10 n. 9; Blue Hills Fact Statement II ¶ 13. Lloyd testified that the misnaming was a typo, that he spoke to Stone (whom he knew from prior conversations), and that he told Stone the reserves could not be used and Blue Hills would be in default if it did not pay. Lender's Second Fact Response ¶ 13.[9] Blue Hills' present insistence that it was never told it could not use reserves for tax payments and that it would have paid the taxes if only it had been informed is belied not only by its inaction in the face of Stone's conversation with Lloyd but by the undisputed facts that when its request was denied in writing on September 17, 2004, it expressed no surprise, made no offer to make the tax payment or other reserve payments, and acquiesced in the Lender's move toward foreclosure. Lender's Facts ¶¶ 154-55; Fineberg 158-60; see also Trustee's Brief at 8.

        C.        **The Lender Had No Duty to Blue Hills to Work Out the Loan or Explore the Possibility of a Work Out.**

Admitting as it must that the Lender had no duty to agree to a loan work out, Blue Hills Opposition Brief I at 15, Blue Hills relies on its expert designee Richard Clarke as its sole support for the notion that the Lender was "obligated, as part of its duty to perform its services in accordance with the servicing standard [of the PSA], to, at a minimum, explore the workout possibility with Blue Hills." Id.

As an initial matter, the Court must note that Blue Hills flatly misstates the record by saying that the Lender's expert, Ronald Greenspan, "agree[d] that borrowers involved in

---

[9] References to lien waivers and other documentation requirements in Lloyd's testimony and Dep. Exs. 5 and 6 make sense in light of Stone's request, i.e., whether there was any way to use money in the reserves to pay taxes. Even though the Mortgage does not have a reserve for paying taxes, if Blue Hills had been entitled to a reserve disbursement for some other reason (e.g., for having incurred leasing commission or tenant improvement expenses), funds could have been released on that basis (subject to appropriate documentation) and then applied by Wells Fargo to the Tax Fund rather than returned to Blue Hills. Stone's response indicated he could not meet the documentation requirements for the potentially available reserve disbursements.

securitized loan transactions have the right to expect that their loans will be administered … according to the Servicing Standard [of the PSA]." Id. at 13.  In fact, in both Greenspan's report and in his deposition, he says precisely the opposite:  "[T]he borrower is not a party to the PSA and has no reasonable expectation of being a beneficiary of the servicing standards set forth in the PSA."  Greenspan Aff. Ex. A ¶ 27; Greenspan 131-134.  In the testimony cited by Blue Hills, Greenspan describes the servicing standard but says nothing about whether Blue Hills is entitled to rely on it.  Greenspan 89.[10]

Moreover, Blue Hills' claim is expressly refuted by the PSA itself:  "The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto, and all such provisions shall inure to the benefit of the Certificateholders.  <u>No other person, including, without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement</u>."  PSA § 10.8 (emphasis added). (Dep. Ex. App. 51).  Blue Hills' opposition brief ignores both Section 10.8 of the PSA and the case law cited by the Lender in the Trustee's Brief at 14 n. 11.  See 767 Third Ave. LLC v. Orix Capital Markets LLC, 2006 N.Y. App. Div. LEXIS 1868, **4 (N.Y. App. Div. Feb. 14, 2006) (borrower lacks standing to enforce pooling and servicing agreement).

The law is clear that, irrespective of the claimed source, a lender has no duty to negotiate with its borrower or work out a loan.  See, e.g., MDFC Loan Corp. v. First Shopping Center P'ship, 1996 WL 99909, *5 n.4 (N.D. Ill. Mar 01, 1996) (finding no cause of action based on refusal to work out loan, and noting that "this court has not been able to locate any caselaw

---

[10] Blue Hills' Opposition Briefs and its response to the Lender's statement of facts are rife with such inaccurate and misleading characterizations of the record.  While the Lender points out some of them in its reply memoranda, it does not have the space to make comprehensive corrections.  The Lender relies on its own Statement of Undisputed Facts and its Responses to Blue Hills' statements of undisputed facts.  The Lender urges the Court to rely on the record evidence, not Blue Hills' descriptions of it.

- 9 -

recognizing a commercial lender's implied obligation to negotiate a workout with borrower"); Travelers Ins. Co. v. Corporex Properties, Inc., 798 F. Supp. 423, 424-425 (E.D. Ky. 1992) (duty of good faith does not require commercial lender to work out loan in default); Teachers Ins. & Annuity Ass'n of America v. Broad & Hanranhan Ltd. P'ship, 1997 WL 781927 (Conn. Super. Dec. 12, 1997) (finding that "lender has no legal duty whatsoever to forego the remedies it bargained for and negotiate a restructuring of a debt after default"); see also cases cited in Trustee's Brief at 15.

Aside from the inapplicability of the PSA, Blue Hills raises the bar for disingenuousness by blaming the Lender for failing to "explore" a workout when Blue Hills does not and can not dispute the following:

- The Prenegotiation Letter stated that neither party was obligated to negotiate toward or agree to a workout. Dep. Exs. App. 62 ¶ 4.

- After executing the Prenegotiation Letter, Blue Hills never sent LNR any of the information that it agreed to provide and which it knew and agreed was a precondition to negotiations, including a business plan for the property and updated financial statements and recent tax returns for Blue Hills, Royall Associates, or Fineberg and Langelier. Donovan 140-41, 176-77, 179-82; Lender's Facts ¶ 149.

- Blue Hills never made any workout, modification, or forbearance proposal of any kind to LNR. Fineberg 169-81; Langelier 178-83; Polcari II 227-33; Lender's Facts ¶¶ 171-180.

- Blue Hills acquiesced in the September 17, 2004 default notice and loan acceleration when Polcari spoke with Donovan in mid-September. Lender's Facts

- 10 -

> ¶ 154. (Notably, in his affidavit, Donovan does not deny or refute Polcari's undisputed testimony regarding their conversation.)

- Blue Hills' property manager Larry Needle told LNR's appraiser Eric Stotz that Blue Hills was walking away from the property. Lender's Facts ¶ 161. (Notably, Blue Hills has submitted no affidavit from Needle disputing Stotz's account of their conversation.)[11]

## III. BLUE HILLS HAS OFFERED NO EVIDENCE THAT IT SUFFERED ANY DAMAGES.

As demonstrated in the Trustee's Brief, Blue Hills has no claim for a loss of equity in the property or for the reserves. The foreclosure sale established the fair market value of the Property as $18.5 million as against a debt of $33.4 million – Blue Hills had no equity. The reserves were held as security for the debt and, upon an event of default, could be applied to the debt by Lender in any manner it saw fit. (Trustee's Brief at 16-18).

### A. There Is No Genuine Issue as to Whether the Foreclosure Sale Price Invalidates the Sale and Calls into Question the Bid Price as Fair Market Value of the Property.

There is no evidence of impropriety in the conduct of the foreclosure sale. Blue Hills points to nothing besides the difference between the foreclosure price of $18.5 million and its alleged fair market value of $44 million. While courts have recognized the possibility that a foreclosure price might be so grossly inadequate as to indicate bad faith or a want of reasonable

---

[11] At deposition, Blue Hills' expert designee Clarke testified to a long list of actions that Blue Hills could have taken to attempt to avoid foreclosure. Among other things, he admitted that Blue Hills could have 1) pressed for an answer to its August 2 request for access to reserves, Clarke 181; 2) inquired into the basis on which the tax payment had been made, id. 184, 3) complied with the prenegotiation letter by providing financial statements, id. 185-87, 199; and 4) made a good faith payment toward its payment defaults to show a willingness to come out of pocket and get negotiations started. Clarke 183, 200-201.

judgment, the Lender is aware of no case – including the one cited by Blue Hills – finding a price so low that the inference of bad faith was warranted.

As an initial matter, Blue Hills has no valid basis for comparison. The First Circuit recognizes that a real estate appraisal is the appropriate benchmark against which to measure the auction price. See States Resources Corp. v. The Architectural Team, Inc., 433 F.3d 73, 81 (1st Cir. 2005). Blue Hill's alleged fair market value of $44 million is based soled on the incompetent, non-appraisal opinion of Kenneth Gartrell. The Lender incorporates by reference the arguments made in its motion to exclude Gartrell's testimony. The professional appraiser hired by the Lender in advance of the foreclosure found the property to be worth $15 million as of October 18, 2004, a month before the foreclosure. See Stotz Aff. Ex. A Addendum.

Even accepting Gartrell's valuation, the cases cited in States Resources Corp, Blue Hills' lone authority on this point, establish that the disparity between auction price and claimed value in this case – where the bid was 42% of the claimed value -- does not invalidate the sale. Id. at 81-82 (citing cases holding, as a matter of law, that bid prices that were 25%, 39%, 55%, 60%, and 68% of the claimed fair market value were not evidence of bad faith or lack of diligence).

**B.    Blue Hills Has Neither Established Standing to Recover Asserted Tax Losses of the Beneficiaries of Its Member Nor Proven Any Such Losses.**

Continuing its disregard for the distinction between Blue Hills, Royall Associates, and the Royall Associates partners/beneficiaries, see CSFB Reply Brief at 6-8, Blue Hills invites the Court to disregard its lack of standing to recover the tax damages allegedly suffered by the

- 12 -

partners of Royall Associates.[12] According to Blue Hills, the inquiry into whether it is a proper plaintiff to recover those alleged damages puts "form over substance" because the individuals who supposedly suffered the damages would have standing to recover damages from the Lender. Whatever standing they might have, the indisputable facts remain that Blue Hills itself has suffered no tax losses and none of the individual partners (only two of whom are parties to this suit as defendants-in-counterclaim) have asserted any claim against the Lender in this action or any other.

In any event, Blue Hills Opposition Brief I offers no evidence or argument to rebut the point that Blue Hills has not proven that any of the partners of Royall Associates has actually suffered any tax loss. (Trustee's Brief at 19.)

### C. The Asserted Tax Losses Are Not Recoverable.

Blue Hills' assertion that "recovery of tax effects is not contrary" to general principles supporting damage awards is misleading, and glosses over entirely the specific and necessary circumstances that permit recovery of tax consequences as an element of damages in the limited cases to consider the issue. Indeed, none of the cases that Blue Hills relies on supports its position in this case. See McGuire v. City of Jersey City, 125 N.J. 310, 324, 325 (1991) (considering limited instances where courts have permitted recovery of "a one time tax loss for a definite amount" and finding claims "too speculative" where tax credits "depend[] on many conjectural variables" such as "presumptions about income, other transactions, and the state of tax laws…."). In contract actions, recovery has been limited to those cases where "lost tax

---

[12] Contrary to Blue Hills' suggestion, the claimed tax damages are different from its other claimed damages. While it is undisputed that Blue Hills was disregarded for tax purposes and suffered no tax losses, it is obviously not disregarded for other purposes. Blue Hills was the owner of (and thus holder of any equity in) the Property, the borrower on the Loan, and the entity to which any future profits would flow. See CSFB Reply Brief at 6-8 (LLC is distinct legal entity with its own assets).

benefits . . . were an <u>essential issue in the contract</u>" or where "both parties knew that plaintiff entered the contract in part to gain the tax credit." <u>Pruett v. Erickson Air-Crane Co.</u>, 183 F.R.D. 248, 252 (D. Or. 1998); <u>see</u> <u>Beggs v. Dougherty Overseas, Inc.</u>, 287 F.2d 80, 83 (1961) (allowing tax items as an element of damages in a wrongful discharge case where the "tax benefits accruing from lengthy foreign employment were <u>very much in the minds of the parties</u> when the contracted") (emphasis added); <u>Walker v. Signal Cos.</u>, 149 Cal. Rptr. 119, 122, 124 (Cal. App. 1978) (finding that jury was properly instructed on "special damages . . . i.e., the possible adverse tax impact if the residence were not completed in a timely fashion" where contract requested specific date for completion so that plaintiff could defer capital gains tax associated with sale of residence).

## CONCLUSION

For all of the foregoing reasons, and those stated in CSFB's and the Trustee's memoranda in support of their motions for summary judgment, their motions for summary judgment as to Blue Hills' claims in the Second Amended Complaint should be granted.

Respectfully submitted,

June 12, 2006

J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1,

By its attorneys,

/s/ Bruce E. Falby
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA P<small>IPER</small> R<small>UDNICK</small> G<small>RAY</small> C<small>ARY</small> US LLP
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000

- 14 -

- 15 -

~BOST1:422314.v1