UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1,

      and

CSFB 1999–C1 ROYALL STREET, LLC;

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF DEFENDANT AND PLAINTIFF-IN-COUNTERCLAIM
<u>CSFB 1991 C-1 ROYALL STREET, LLC</u>**

Blue Hills, Langelier and Fineberg's opposition to the Lender's motion for summary judgment on its counterclaim ("Blue Hills Opposition Brief II")[1] is more of the same arguments they put forth in support of their cross-motion – the Loan Documents do not mean what they say and Blue Hills never transferred the Payment to Royall Associates.  In making these arguments, Blue Hills, Langelier and Fineberg (collectively, the "Blue Hills Parties") are unrestrained by the factual record in this case.  They distort documents and misrepresent the undisputed facts and insist on blurring any distinction between the borrower Blue Hills, its member Royall Associates,

---

[1] Other summary judgment submissions are identified herein as follows:

"CSFB Brief" refers to docket no. 87, Memorandum in Support of Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim CSFB 1999-C1 Royall Street, LLC.

"Lender's Opposition Brief" refers to docket no. 109, Opposition of Plaintiffs-in-Counterclaim J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 and CSFB 1999-C1 Royall Street, LLC to Motion of Defendants-in-Counterclaim for Summary Judgment.

"Lender's Facts" refers to docket no. 86, Defendants' and Plaintiffs-in-Counterclaim's Corrected Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment.

"Lender's Fact Response" refers to docket no. 108, Defendants' and Plaintiffs-in-Counterclaim's Response to Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaim.

"Lender's Second Fact Response," filed today, refers to the Defendants' and Plaintiffs-in-Counterclaim's Response to Statement of Undisputed Facts in Support of Blue Hills Office Park, LLC, Gerald Fineberg and William Langelier's Oppositions to Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment.

"Blue Hills Fact Statement I" refers to docket no. 90, Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaim.

"Blue Hills Fact Statement II" refers to docket no. 99, Statement of Undisputed Facts in Support of Blue Hills Office Park, LLC, Gerald Fineberg and William Langelier's Oppositions to Defendants' and Plaintiffs-in-Counterclaim's Motions for Summary Judgment.

"Blue Hills Fact Response" refers to docket no. 104, Response of Blue Hills Office Park LLC, William Langelier and Gerald Fineberg to Defendants' and Plaintiffs-in-Counterclaim's Corrected Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment.

Deposition testimony is cited by witnesses last name and transcript page number; the transcripts are contained in Defendants' and Plaintiffs-in-Counterclaim's Appendix of Deposition Transcripts [dckt. no. 80].  Deposition exhibits are cited to Defendants' and Plaintiffs-in-Counterclaim's Appendix of Deposition Exhibits ("Dep. Exs. App.") [dckt. no. 75]; Supplemental Appendix of Deposition Exhibits ("Dep. Exs. Supp. App.") [dckt. no. 106]; and Second Supplemental Appendix of Deposition Exhibits ("Dep. Exs. 2d Supp. App.") [filed today].

Capitalized terms not defined herein have the meaning given to them in Lender's Facts.

and the beneficiaries/partners of Royall Associates, who are Langelier, Fineberg, and four people connected to them. They seek to have Blue Hills' status as a disregarded entity <u>for tax purposes</u> swallow its existence for all purposes. Creation of a new special purpose entity was a requirement of the refinancing, and the Blue Hills Parties cannot wish it away, however inconvenient it might be for the tale they tell.

## I.    BLUE HILLS HAS FAILED TO ESTABLISH THAT THE DOCUMENTS DO NOT MEAN WHAT THEY SAY.

As set forth in more detail in the CSFB Brief and the Lender's Opposition Brief, the granting clauses and section 10 of the mortgage mean what they say. The Zoning Appeal was Mortgaged Property, the settlement of which required the Lender's prior written consent. The Payment was also Mortgaged Property, the transfer of which required the Lender's prior written consent. Blue Hills' transfers of Mortgaged Property without the Lender's prior written consent make Blue Hills, Langelier and Fineberg liable for the full deficiency. The Blue Hills Parties' arguments to the contrary are to no avail.

### A.    The Zoning Appeal and the Payment Were Mortgaged Property.

#### 1.    <u>The Zoning Appeal was Mortgaged Property.</u>

In their Opposition Brief II, the Blue Hills Parties can contend that the Zoning Appeal (which it calls the Norfolk Action) was not Mortgaged Property under Granting Clause Seven only by leaving out "causes of action" from its list of covered intangibles and by failing to quote the entire relevant phrase from Granting Clause Seven. By that clause, the Lender's collateral includes all "<u>causes of action</u> that now or hereafter relate to, are derived from or are used in connection with <u>the Mortgaged Property</u>, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon." In Part III.E.3 on pages 14 and 15 of the Blue Hills Opposition Brief II, the Blue Hills Parties leave out the underlined words. "Causes of action that relate to or are derived from the Mortgaged Property" is every bit

- 2 -

as broad as the language the Blue Hills Parties posit would have included the Zoning Appeal, "causes of action arising directly or indirectly from the Property." Blue Hills Opposition Brief II at 15.[2]

In fact, it is undeniable that the Zoning Appeal was related to the Mortgaged Property. To the points made in the CSFB Brief at 2-4, the Lender adds the following: Not only did Blue Hills claim standing in the Zoning Appeal by virtue of its status as an abutter, it also claimed that it was a "person aggrieved under G.L. c. 40A, § 17," Zoning Appeal Complaint at ¶¶ 42-43 (Dep. Exs. App. 20), which means it claimed it would suffer "the type of tangible harm to its property interest . . . that is required for standing." Cummings v. City Council of Gloucester, 28 Mass. App. Ct. 345, 350 (1990) (internal quotations and citations omitted). These and the other allegations of the Zoning Appeal Complaint, of "detriment" and negative impact to the property, Dep. Exs. App. 20 ¶¶ 37-38, have the force of evidentiary admissions in this case. Martel v. Stafford, 992 F.2d 1244, 1248 (1st Cir. 1993) ("factual allegations in trial court pleadings" may "routinely be used in another case as evidentiary admissions of the party").

The Blue Hills Parties' position shows a disrespect for the judicial process. Blue Hills basically asks the Court in this action to disregard allegations it made to the state court in the Zoning Appeal as untrue and without basis. Meanwhile, the Blue Hills Parties cite no support in the record, and there is none, for their characterization of the Zoning Appeal as a "nothing to lose, nothing to gain" stratagem by which Blue Hills sought only a payment of money. Blue Hills Opposition Brief II at 4. In addition to the allegations of harm to the property in the Zoning

---

[2] The doctrine that documents are to construed against the drafter, as urged by Blue Hills (Opposition Brief II at 15), has no application in this case. Under Massachusetts law, it is an interpretive tool of "last resort" and is especially weak where, as here, the parties are sophisticated businesses represented by counsel. Principal Mut. Life. Ins. Co. v. Racal-Datacom, Inc., 233 F.3d 1, 4 (1st Cir. 2000).

Appeal complaint, Donovan, Frank and Fineberg all testified that the Zoning Appeal was brought with the hope that by slowing down or stopping construction of the garage, Blue Hills would be able to retain Equiserve as a tenant. Lender's Facts ¶ 56. Although Equiserve had notified Blue Hills of its intent not to extend its lease, Lender's Facts ¶ 49, its plan to move next door to Blueview depended on approval and construction of the garage, id. ¶¶ 46-47. Similarly, there is no evidence whatever in the record to support the Blue Hills Parties' characterization of Blueview's motives in settling the Zoning Appeal. Blue Hills Opposition Brief II at 4.

2.    The Payment was Mortgaged Property.

The Blue Hills Parties also selectively read the Mortgage granting clauses to contend that the Payment was not Mortgaged Property. For example, in excluding the Payment from Granting Clause Four (which they selectively quote only in a footnote two pages earlier), the Blue Hills Parties ignore that the provision's definition of Rents extends beyond "rents, rent equivalents, and monies payable as damages or in lieu of rents or rent equivalents" to include "all … income, receivables, receipts, revenues, deposits …, accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of [Blue Hills] or its agents or employees from any and all sources arising from or attributable to the Premises and the Improvements."

The undisputed facts confirm that the Payment was both Rents within the meaning of Granting Clause Four and a "payment … for … injury to or decrease in the value of the Premises and Improvements" within the meaning of Granting Clause Three. CSFB Brief at 4-6. The Blue Hills Parties' attempt to divorce the Payment from the Property is no more convincing than their effort to separate the Zoning Appeal. The Payment was the proceeds of the Zoning Appeal and other Property-associated rights that Blue Hills gave up in the settlement, see Lender's Facts ¶¶ 57-59, and Blue Hills accounted for it as a deduction to basis, id. ¶ 71, which can only be

- 4 -

done with a capital recovery, not with an item of ordinary income.  CSFB Brief at 5-6.  The Blue

Hills Parties have identified no basis for a capital recovery other than the Payment being

compensation for damage to or loss of value in the Property.[3]

**B.    Blue Hills Transferred Mortgaged Property in Violation of Mortgage Paragraph 10.**

The Blue Hills Parties do not dispute that the settlement of the Zoning Appeal was a

transfer of that cause of action and the other property-rights that were incorporated into the

settlement.  See CSFB Brief at 8-9 (citing Buckley v. John, 314 Mass. 719, 726 (1943) (receipt

of cash in return for release of claims is a conveyance); Sheffield Progressive, Inc. v. Kingston

Tool Co., 10 Mass. App. Ct. 47, 49-50 (1980) (release or waiver of rights to equity of more than

$2 million is a conveyance)).  Rather, they contend that paragraph 10 of the Mortgage – despite

facially applying to "the Mortgaged Property or any part thereof" – does not reach any causes of

action, or any Mortgaged Property other than the Premises and the Improvements, no matter how

significant.  The Lender has previously addressed these points, which find no support in the

language or purpose of the agreement.  CSFB Brief at 6; Lender's Opposition Brief at 9-12.  The

Blue Hills Parties' new argument – the slippery-slope point that a borrower would not be able to

conduct ordinary business if paragraph 10 applied to every last piece of equipment and office

supply – is unavailing in this case.  As the Blue Hills Parties admit, the Zoning Appeal was a

"unique" circumstance.  Blue Hills Opposition Brief II at 14-15.

---

[3] While the Blue Hills Parties state that tax law allows a recovery of lost profits to be treated as a return of capital, Blue Hills Opposition Brief II at 10, n.4, the single case they cite holds exactly the opposite. State Fish Corp. v. C.I.R., 48 T.C. 465, 472 (1967), affirms that "a judgment or a settlement to recompense for lost profits is taxable" and not a capital recovery.  The court determined that the settlement portion at issue was a return of capital because it was for damages to goodwill.  While there had been evidence of lost profits presented at the trial that preceded the settlement, "the element of lost profits was not there an independent basis for recovery but only an evidential factor in determining the actual damage to and diminution in value of the of goodwill."  Id. at 476.

Moreover, all the transfers alleged by the Lender were of material value.  The Mortgaged Property transferred in 2003 was material to the value of the Lender's collateral.  In settling the Zoning Appeal, Blue Hills gave up the right to contest the ZBA Decision, released all causes of action against DST and Blueview, forfeited the right to contest the issuance of any permits or approvals DST might seek for its adjoining property in the ensuring 10 years, and entered a Lease Termination Agreement with Equiserve.  Lender's Facts ¶¶ 57-58.  In transferring the Payment to Royall Associates, Blue Hills gave away $2 million of collateral, clearly a material amount.  The transfer of the Workstations in August and September of 2004 was also material. They were tangible pieces of the Mortgaged Property that were dismantled and removed in exchange for $100,000 shortly after Blue Hills defaulted on a $158,000 tax payment and decided to walk away from the property.[4]  This is not a case where the Court must decide whether to enforce Mortgage paragraph 10 and the full liability provisions of the Guaranty based on the transfer of an immaterial or inconsequential portion of Mortgaged Property in the ordinary course of business.

As exhaustively demonstrated in the Lender's Opposition Brief (at 6-8) and the Lender's Fact Response (at ¶ 61), Blue Hills transferred the Payment to its member Royall Associates upon its receipt in 2003.  To support its assertions to the contrary, the Blue Hills Parties do little more than suggest that there was no distinction between Blue Hills Office Park LLC and Royall

---

[4] Email messages sent to Frank and Needle by Dot Erwin, the purchaser of the Workstations, reflect her understanding – which could only have come from Blue Hills – that Blue Hills was expecting to turn the property back to the Lender.  For example, on October 12, 2004, about a month after Polcari's September 17 default notice, she writes to inquire about picking up remaining items at the Property and states, "I'm gathering this bldg. may be turned over already.  Any chance you can give me the name of the new contact person to see if they would like us to complete our removal??"  A week later, she writes again to Frank, asking, "Any chance you can share with me the name of the person/banker that's in charge of the bldg. at 150 Royal??  I'd just like to let him/her know that we can still clean out the bldg. instead of having them dumpster the remaining furniture."  Third Barnett Aff. Ex. E at Blue Hill 4763-4764.

Associates, Blue Hills Opposition Brief II at 5, 11-12, so that the transferred settlement proceeds "remained Blue Hills' property." Id. at 12.  The distinction between a limited liability company and its members is legally significant and cannot be ignored.  Blue Hills is organized under the laws of Delaware, and under Delaware law, an LLC is a separate legal entity distinct from its members.  6 Del. C. § 18-201(b).  A member, like Royall Associates, "has no interest in specific limited liability company property." 6 Del. C. § 18-701; see Hagan v. Adams Property Assocs., Inc., 253 Va. 217, 220, 482 S.E.2d 805, 807 (Va. 1997) (holding under comparable provision of Virginia LLC Act that "in contrast to a partnership, a limited liability company . . . is an entity separate from its members and, thus, the transfer of property from a member to the limited liability company is more than a change in the form of ownership; it is a transfer from one entity or person to another" and affirming that "transfer was a sale of the property").

The Blue Hills Parties cannot expand the fact that Blue Hills was disregarded for tax purposes to eliminate its legal existence for all purposes.  See In re: KRSM Props., LLC, 318 B.R. 712, 719 (9th Cir. 2004) ("A tax election to have an LLC disregarded as a taxable entity has no effect on the legal status of ownership of LLC assets.").  Blue Hills was a legal entity that the Lender required be created for the very reason that it had a separate legal existence and its assets were bankruptcy remote.  See Mortgage ¶ 12 (Single Purpose Entity/Separateness); Bernkopf Goodman Nonconsolidation Opinion from Closing (Dep. Exs. 2d Supp. App 340).  "LLCs remain separate and distinct from their members.  Indeed the separate and distinct nature of LLCs is their reason for existence."  Abrahim & Sons Enters. v. Equilon Enters., LLC, 292 F.3d 958, 962-63 (9th Cir. 2002) (rejecting invitation to disregard corporate form, and finding that contributions from members to LLC was a transfer of property).

Even as a practical matter, Blue Hills and Royall Associates were not financially the same entities, as the Blue Hills Parties assert.  The Rutfield & Hassey financial statements show

- 7 -

that Blue Hills had assets (including cash) separate from what it had transferred to its affiliate,

Royall Associates.  Also, the balance sheet included in Royall Associates' 2003 tax return shows

it was carrying $8 million in debt not present on the Blue Hills financial statement.  Lender's

Second Fact Response ¶ 1.

## II.    IN THE ALTERNATIVE, BLUE HILLS, LANGELIER AND FINEBERG ARE LIABLE FOR OVER $2.35 MILLION UNDER THE LIMITED CARVEOUTS OF THE GUARANTY AND MORTGAGE.

If the Court concludes that none of Blue Hills' transfers of Mortgaged Property required

the Lender's prior written consent under Paragraph 10 of the Mortgage and thus do not make

Blue Hills, Langelier and Fineberg liable for the full deficiency, they are nevertheless liable

under the limited liability carveouts of the Guaranty and Mortgage for the Lender's loss,

damages and costs of over $2.35 million directly caused by Blue Hills' actions with respect to

the Payment ($2 million), the Workstations ($100,000), and taxes ($264,000).

In addition to its full liability triggers, the Guaranty makes Langelier and Fineberg, and

the Mortgage makes Blue Hills, liable for the Lender's "loss, damage, cost, [or]expense …

including attorneys' fees and costs reasonably incurred" which arise out of or in connection with:

    (a)     fraud or intentional misrepresentation by Borrower or Guarantor in connection with the Loan;

    …

    (d)     the removal or disposal of any portion of the Mortgaged Property after an Event of Default (as defined in the Mortgage);

    (e)     the misapplication or conversion by Borrower of … (iii) any Rents (as defined in the Mortgage) following an Event of Default; [and]

    (f)     failure to … pay or escrow taxes (in accordance with Paragraph 6 of the Mortgage).

Guaranty ¶ 1.2 ([First] Barnett Aff. Ex. D); Mortgage ¶ 54 (Dep. Exs. App. 155).  Blue Hills,

Langelier and Fineberg are liable to the Lender under each of these provisions.

- 8 -

**A.    Blue Hills Committed Fraud in Connection with the Loan.**

As set forth in more detail in Part II of the Lender's Opposition Brief at 16-18, Blue Hills

committed fraud by failing to give the Lender notice of the Payment, as required by Paragraph 8

of the Cash Management Agreement.[5]  If it had been notified, the Lender could have taken action

to protect its collateral.

1.    <u>The fraud carveout is not limited to fraud in the inducement</u>.

Langelier's and Fineberg's guaranty extends to "fraud or intentional misrepresentation by

Borrower or Guarantor in connection with the Loan."  Guaranty 1.2(ii)(a).  The "Loan" is

defined by the Guaranty to be the indebtedness of Blue Hills to the Lender, Guaranty p. 1, and

thus the fraud carveout extends to anything having to do with the loan and the relationship

between Blue Hills and the Lender, including without limitation the initial transaction, the

subsequent repayment of the loan, or the collateral.  There is no basis in the text of the Guaranty

for the Blue Hills Parties' contention that the carveout is limited to fraud in the inducement.  The

carveout is not so limiting, and it is the "Note", not the "Loan", that is defined as the Mortgage

Note "and all renewals, modifications, increases and extensions thereof."  <u>Compare</u> Blue Hills

Opposition Brief II at 8-9 <u>with</u> Guaranty p. 1.

The lone authority cited by the Blue Hills Parties for the proposition that the carveout

must mean fraud in the inducement is a non-loan case that merely recites the Restatement of

Torts' summary of the elements of an action for deceit:  "One who fraudulently makes a

misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or

refrain from action in reliance thereon in a business transaction is liable to the other for the harm

---

[5]  As noted, the Lender is assuming for this Part II that its consent to transfers of Mortgaged Property were not required under Paragraph 10 of the Mortgage.  As set forth in Part II of the Lender's Opposition Brief, the failure to seek that consent was another fraudulent act.

caused to him by his justifiable reliance upon the misrepresentation." <u>See</u> <u>Graphics Arts</u>
<u>Finishers, Inc. v. Boston Redev. Auth.</u>, 357 Mass. 40, 44 (1970) (quoting Restatement of Torts
§ 525). The Blue Hills Parties' suggestion that fraud can only occur if the misrepresentation
induces the victim to take affirmative action is contrary to the law. A failure to act due to
ignorance of the fraud, when one would have acted if one had known, is the legal equivalent of
taking affirmative action. <u>See</u> <u>Fottler v. Moseley</u>, 179 Mass. 295, 299 (1901). Here, the Lender
would have exercised its remedies under the Loan Documents at the time of the settlement or the
subsequent transfer of the Payment had it been informed of the developments. <u>See</u> CSFB Brief
at 16.

2.    <u>Blue Hills failed to provide balance sheets to the Lender.</u>

Through the affidavit of Wells Fargo asset manager Curtis Mallegni, the Lender has
established that, after August 2003 when the Payment was made, Blue Hills did not provide
Wells Fargo with the statements of assets and liabilities required by the Mortgage. <u>See</u> CSFB
Brief at 15-16; Lender's Facts ¶ 79; Mallegni Affidavit ¶ 4 [dckt. no. 76]. The Blue Hills Parties
have not established a genuine dispute about this fact. The most they can muster is the statement
"Blue Hills believes the information was transmitted to Wells Fargo sometime on or after
April 2, 2004." Blue Hills Opposition Brief II at 10. The only support for this assertion is a
generic statement by Donovan in his affidavit, not tied to any date or even approximate
timeframe within the five-year life of the Loan, that "[g]enerally, the information which
[Fineberg Management] furnished to Wells Fargo consisted of an income and expense statement,
a rent roll ..., and a one or two page statement of Blue Hills' assets and liabilities." Donovan
Aff. ¶ 2. Donovan's statement does not establish a genuine issue because 1) there is no
indication it is made on personal knowledge; 2) he studiously avoids saying that Blue Hills
actually sent a statement of assets and liabilities to the Lender after August 2003; and 3) he

- 10 -

neither cites nor attaches documentary evidence proving that any such papers were sent. While

he does attach financial statements for Blue Hills that were produced late in the litigation, there

is no proof of transmittal to Wells Fargo. This failure of proof cannot defeat the Lender's

properly supported motion. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (once the

moving party has made "a preliminary showing that there is no genuine issue of material fact

which requires resolution in the crucible of a trial . . . the burden shifts to the nonmovant to

demonstrate, through specific facts, that a trialworthy issue remains").

Moreover, Donovan's apparent belief that the Rutfield & Hassey financial statements

would have been sent to Wells Fargo is inconsistent with Blue Hills' past practice: The format

of the prior asset and liability statements submitted to the Lender is dramatically different from

that of the Rutfield & Hassey statements. Compare, e.g., Donovan Aff. Ex. A (Rutfield &

Hassey Year End 2002 Statement) with Mallegni Aff. Ex. A at WF3172-3173 (Year End 2002

Statement Submitted to Lender).

### B.    Blue Hills Removed Mortgaged Property After an Event of Default.

Blue Hills, Langelier and Fineberg removed and disposed of Mortgaged Property after

Events of Default when they transferred the Payment to Royall Associates. See Part I.B above.

The Events of Default were the failures to notify the Lender of the receipt of the Payment and to

deposit it in the lockbox, as required by the Cash Management Agreement ("CMA") in Sections

8 and 8(d).[6] (Again, this alternative argument assumes consent to the transfer of the Payment

was not required under Mortgage ¶ 10(a). If consent had been sought, the Payment would never

have reached the CMA lockbox. CSFB Brief at 11-12 and n. 13; Lender's Opposition Brief at

15 n. 9.) The Payment was Rents under the CMA, which adopts the definition of Rents in the

---

[6] The CMA is found at Dep. Exs. App. 156.

Mortgage.  See Part I.A.2 above.  Section 8 required that the Borrower deposit in the lockbox and notify the Lender of Rents from any "extraordinary event pursuant to which Borrower receives payments or income (in whatever form) derived from or generated by the use, ownership or operation of the Premises." CMA § 8(d).  The Blue Hills Parties themselves characterize the settlement and payment as a "unique situation."  Blue Hills Opposition Brief II at 14.

These breaches of the CMA were Events of Default under Mortgage ¶ 23(*l*), which defines as an Event of Default a default under any term of the Loan Documents that continues beyond applicable cure periods, or, if none, for thirty days after Mortgagor receives notice of the default.  The Lender gave Blue Hills notice of the CMA breaches, at the latest, in its counterclaim, in response to which Blue Hills did not cure, but denied any breach.  Any delay in giving notice was excused by Blue Hills' own failure to give notice of the Payment in violation of Section 8 and its concealment of the transfer thereof.  Cf. M.G.L c. 260, § 12 (fraudulent concealment of cause of action tolls statute of limitations).  This concealment caused the Lender not to learn of Blue Hills' failure to notify it of or to deposit the Payment until after the foreclosure sale.  Polcari II 199; Rosen 117-18; Lender's Facts ¶ 187.

Separately, Blue Hills' sale and allowance of the removal of the Workstations in August and September 2004 constituted removal of Mortgage Property after an Event of Default (the Default being the failure to pay or deposit escrow funds for the taxes due on August 2, 2004).  The Workstations were the office cubicles left behind by Equiserve when it vacated, Needle 90-91, and they became property of Blue Hills pursuant to the Lease Termination Agreement.  Dep. Exs. App. 10 ¶ 1; Lender's Second Fact Response ¶ 8.  The Blue Hills Parties do not deny -- – nor could they -- that the Workstations were Mortgaged Property.  They assert only that Blue Hills "did not believe" the Workstations were collateral, Blue Hills Opposition Brief II at 16

- 12 -

n. 11, as if that error excuses their misappropriation. Blue Hills sold them for $100,000 and allowed the buyer to dismantle and remove them. <u>See</u> August 20, 2004 Purchase Agreement (Dep. Exs. App. 305 at Blue Hill 5098-5099).

        **C.**    **Blue Hills, Langelier and Fineberg Converted Rents After an Event of Default.**

Blue Hills' transfer of the Payment to Royall Associates upon its receipt was separately a conversion of Rents by Fineberg and Langelier after the Events of Default occasioned by Blue Hills' failure to notify the Lender of its receipt of the Payment and its failure to deposit the Payment into the lockbox.

        **D.**    **Blue Hills Failed to Pay Taxes.**

The Lender was damaged by Blue Hills' undisputed failure to pay taxes in August and November 2004. As shown by the tax bill for those two payments, the total tax due on those dates was $316,362.38, which Wells Fargo paid on behalf of the Lender. (<u>See</u> Town of Canton Fiscal Year 2005 Preliminary Real Estate Tax Bill (Dep. Exs. Supp. App. 315); Tax Record for Single Loan (Dep. Exs. Supp. App. 160); Email correspondence re advances for November tax payment (Martin Aff. Ex. I).). The deposit of one-month's tax payment received from Equiserve (shown on the tax escrow history as $51,908.89) is a credit against the amounts advanced, reducing the loss due to failure to pay taxes to $264,453.49. (Dep. Exs. Supp. App. 160; Blue Hills' Fact Response ¶ 111).

        **III.**    **THE LENDER IS ENTITLED TO SUMMARY JUDGMENT AS TO ALL COUNTS OF THE SECOND AMENDED COMPLAINT.**

CSFB incorporates by reference the arguments set forth in Parts II and III of the Reply Memorandum In Support of Motion for Summary Judgment of Defendant and Plaintiff-in-Counterclaim J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse

First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, filed today.

## CONCLUSION

For all of the foregoing reasons, and those stated in CSFB's and the Trustee's memoranda in support of their motions for summary judgment and in opposition to the cross-motion of the Blue Hills Parties, CSFB's and the Trustee's motions for summary judgment on their counterclaim should be granted and the cross-motion of the Blue Hills Parties should be denied. CSFB and the Trustee request an award of damages in the amount of the full deficiency, $10.77 million, plus interest and attorneys' fees, as provided in the Loan Documents. Alternatively, CSFB and the Trustee request an award of $2.364 million (the amount of the Payment, Workstations proceeds, and unpaid taxes), trebled to $7.092 million, with interest and attorneys' fees.

Respectfully submitted,

June 12, 2006                                    CSFB 1999-C1 ROYALL STREET, LLC,

By its attorneys,

/s/ Bruce E. Falby
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER RUDNICK GRAY CARY US LLP
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000

- 14 -