UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

       Plaintiff, Defendant-in-Counterclaim.

       v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1,

       and

CSFB 1999–C1 ROYALL STREET, LLC;

       Defendants, Plaintiffs-in-Counterclaim,

       v.

WILLIAM LANGELIER and GERALD
FINEBERG,

       Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## ASSENTED TO MOTION TO CORRECT SUMMARY JUDGMENT SUBMISSIONS

     Defendants and plaintiffs-in- counterclaim (collectively, the "Lender") hereby move,

with the assent with of the plaintiff and defendants-in-counterclaim (the "Blue Hills Parties"),

that the Lender be permitted to submit its second corrected joint Local Rule 56.1 statement of

undisputed facts (to replace the current docket number 86), and that the Blue Hills Parties be

permitted up until and including June 19, 2006, to submit a corrected version of their response to

docket number 86 (the response being docket number 104) if any corrections are warranted by

the changes made by the Lender's second corrected statement of facts.  Attached hereto as

Exhibit A is the Lender's second corrected statement of facts to replace the current docket no.

86. Attached hereto as Exhibit B is a redline showing the differences between the second

corrected statement of facts and the first corrected statement of facts, which is the current docket

entry number 86.

      WHEREFORE, the defendants and plaintiffs-in-counterclaim ask that the above-

requested relief be granted.

                        CSFB 1999-C1 ROYALL STREET, LLC,
and J.P. MORGAN CHASE BANK, as Trustee for
the Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1,

By their attorneys,

/s/ Bruce S. Barnett
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER RUDNICK GRAY CARY US LLP
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000

ASSENTED TO BY:

Attorneys for Defendant,

/s/ Meredith A. Swisher
Peter B. McGlynn, Esq. BBO #333660
Meredith A. Swisher, Esq., BBO #646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th Floor
Boston, MA 02110
(617) 790-3000

Dated: June 14, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

     Plaintiff, Defendant-in-Counterclaim.

     v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

     Defendants, Plaintiffs-in-Counterclaim,

     v.

WILLIAM LANGELIER and GERALD
FINEBERG,

     Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

**DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S**
**CORRECTED**
**JOINT LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

1.  Blue Hills Borrows $33 Million ...................................................................2

2.  Fineberg Management ...............................................................................4

3.  The Refinancing...........................................................................................5

4.  The Lockbox and the Escrow Funds Held by Lender....................................8

5.  Blue Hills and the Lender Enter Into an Agreement
    Concerning Payment of Property Taxes ......................................................10

6.  Blue Hills Settles a Property-Related Cause of Action and Transfers the
    Settlement Payment Without the Lender's Consent ....................................12

7.  Blue Hills Attempts (Unsuccessfully) to Find a New Tenant.......................20

8.  Events Preceding Equiserve's Departure.....................................................21

9.  Blue Hills Defaults with Respect to the August 2, 2004 Tax Payment ........24

10. Blue Hills Defaults on Other Loan Payments..............................................27

11. Work Stations Transfer ...............................................................................29

12. Loan Servicing Transferred to LNR ............................................................30

13. September 2004 Events................................................................................35

14. October 2004 Events....................................................................................37

15. The Foreclosure Sale....................................................................................38

16. Blue Hills' Negotiating Strategy..................................................................40

17. The Royall Associates Beneficiaries Split the Settlement Payment
    Amongst Themselves....................................................................................41

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S
## JOINT LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
## IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

In support of their Motions for Summary Judgment on all counts of the Complaint

by plaintiff Blue Hills Office Park LLC and on all counts of their counterclaim against

Blue Hills, Gerald Fineberg, and William Langelier, Defendants JP Morgan Chase Bank,

Trustee and CSFB 1999-C1 Royall Street, LLC submit this joint, concise statement of

material facts which they contend are not in genuine dispute and they will treat as

undisputed for purposes of their motions.  In doing so, Defendants do not concede them

all to be true for purposes of trial.  Not every fact included in this statement is material to

each alternative legal theory pursuant to which the Court may grant summary judgment

in this case.  Further, some facts are included solely to provide the Court with useful background information and context.

**1.    Blue Hills Borrows $33 Million**

1.    Since the 1980s, Gerald Fineberg and William Langelier, through various entities, have owned and controlled certain property located at 150 Royall Street in Canton, Massachusetts (the "Property").  The Property is improved by a two-story brick building containing approximately 275,000 square feet of space and known as the Blue Hills Office Park.  Second Amended Complaint ("SAC") SAC ¶ 6; BHOP Answer to Counterclaim ¶ 9; Advisor Consent for Foreclosure (Dep. Ex. 104) at Trust00013-14; Langelier 36-37; Frank 9.[1]

2.    In the summer of 1999, as the trustees of Royall Associates Realty Trust ("Royall Associates", a nominee trust which held record title to the Property), Fineberg and Langelier sought to refinance the mortgage on the Property.  These efforts culminated in the loan that is at issue in this action.  As part of the refinancing transaction, Fineberg and Langelier created plaintiff Blue Hills Office Park LLC ("Blue Hills" or "BHOP"), to which Royall Associates conveyed the property. Langelier 45-46, 81.

3.    Blue Hills is a single-purpose entity whose sole business was to acquire and own the Property.  First Amendment to Certificate of Formation of Blue Hills Office

---

[1] This Statement is supported by numerous simultaneously filed documents.  Deposition transcripts are compiled in an Appendix of Deposition Transcripts being filed manually with the Clerk's office due to the voluminous size of each transcript; references to depositions are by the witness's last name and page number (e.g., Fineberg 22).  Deposition exhibits are compiled in an Appendix of Deposition Exhibits being filed electronically (although select exhibits are being filed by manually due to their voluminous size); references to deposition exhibits are by descriptive label and/or "Dep. Ex. __." Affidavits of Joseph A. Polcari, Jr., Edward C. Brown, Curtis J. Mallegni, Stephen Goertzen, Ronald H. Greenspan, and Eric S. Stotz, and Bruce S. Barnett, most of which have their own attachments, are filed separately; references are

Park LLC (Barnett Aff. Ex. A).

4.      Royall Associates is the sole member of Blue Hills.  The sole beneficiary of Royall Associates was a Massachusetts general partnership also known as Royall Associates.  (For simplicity, herein and in the defendants' summary judgment briefs, the trust and the partnership are generally both referred to as "Royall Associates.")  Its principal partners were Fineberg and Langelier.[2]  Langelier 45-46; BHOP Operating Agreement (Dep. Ex. 407) at 23.

5.      Blue Hills is a "disregarded entity" for tax purposes, which means that it does not file an income tax return or pay income taxes.  Rather, all of its taxable transactions are reported on the return of its member, Royall Associates.  Andelman 123.

6.      Royall Associates is treated as a partnership for tax purposes.  It does not pay taxes at the partnership level, but rather its partners pay tax on its income and gains. Andelman 124-25.

7.      As of 1999, Langelier had close to 30 years experience in real estate, including experience in acquiring, developing, investing, financing and disposing of real properties.  Langelier also had experience dealing with lenders on defaulted loans. Langelier 30-39.

8.      As of 1999, Fineberg had approximately 40 years of experience in the real estate industry.  He had substantial experience in acquiring, financing, managing, and selling commercial and residential buildings.  Fineberg 5, 12-13.  By that time, he had

---

by affiant's last name (e.g., Polcari Aff. ¶ __).  Pleadings already on file with the Court are not being filed, in accordance with the electronic filing administrative procedures.

[2] Fineberg and Langelier, initially the only partners of Royall Associates, subsequently admitted additional minority partners who received small portions of their beneficial interests.  Langelier 45-46.  Langelier and the minor partners related to him are referred to as the "Langelier Beneficiaries;" Fineberg and the minor partners related to him are referred to as the "Fineberg Beneficiaries."

bought approximately 20 office buildings and 10 retail buildings, all with mortgage financing from commercial real estate lenders.  He had also purchased approximately 100 apartment buildings with mortgage financing and had sold about 60-70 of those. Fineberg 6-8, 10.

9.      By 1999, Fineberg had closed at least 27 securitized loans adding up to approximately $146 million.  Fineberg 18-20, 36; Dep. Ex. 322.  By 2004, a number of these loans had gone into default and Fineberg had deeded the properties to the lenders in lieu of foreclosure.  Fineberg 24-26, 31-34, 37-39, 123.

**2.      Fineberg Management**

10.      Since the 1970s, Fineberg has owned a company called Fineberg Management, Inc., which is a real estate management company.  Fineberg 23; Donovan 27; Frank 5.  It manages residential apartment buildings, office buildings, and retail space.  From 1999-2004, Fineberg Management was managing approximately 1500 apartment units, 3 office buildings, and 3 or 4 retail units through approximately 30-50 single purpose entities.  Donovan 27, 29; Frank 5-6.

11.      Fineberg Management managed the Property from the time Langelier and Fineberg acquired it until Defendants' foreclosure in November 2004.[3]

12.      Daniel Frank is the President of Fineberg Management and owns a 2.5% beneficial interest in Blue Hills.  Frank 5, 7.  From 1999-2004, as President of Fineberg Management, Frank oversaw Blue Hills' operations.  Frank 19-20.  Frank reports to Mr. Fineberg.  Frank 73, 188.

---

[3]  From September 14, 1999 through November 2004, Fineberg Management managed the property through Blue Hills Management Corp., a single-purpose entity created in connection with the 1999 refinancing. Fineberg is the President and Treasurer of Blue Hills Management Corp.  BHOP Operating Agreement at 23 (Dep. Ex. 407); Stone 31.

13.     Larry Needle was the property manager for the Property.  He reports to Daniel Frank.  Fineberg 106; Needle 22, 25.

14.     Joseph Donovan is the Chief Financial Officer of Fineberg Management, and has been since 1995.  Donovan was in charge of accounting for Blue Hills.  Donovan 27-28, 120.  Donovan reports to Daniel Frank or to Gerald Fineberg.  Frank 84.

15.     Gilbert Stone is the Director of Accounting for Fineberg Management, which oversaw the operations of Blue Hills Office Park LLC.  Stone 8, 31.  From 1999 to 2004, Stone did all of Blue Hills' accounting work other than accounts payable, Stone 42, and had oversight responsibilities for all accounting records of Blue Hills, Stone 33.  Stone was also responsible for reporting quarterly financial statements to the Lender.  Stone 30.  Stone reports to Joseph Donovan.  Stone 35; Donovan 27-29.

16.     Langelier and Fineberg, as Blue Hills' principals, made the ultimate decisions concerning actions taken by Blue Hills.  Fineberg 129-130; Langelier 97-99.

**3.     The Refinancing**

17.     Since 1989, the Property's sole tenant had been an affiliate of the Bank of Boston known as Boston Equiserve Limited Partnership ("Equiserve").  In mid-1999, Equiserve exercised an option to extend its lease until July 31, 2004, and it had an additional option to extend for another five years after that. Langelier, Fineberg, BHOP Answers to Defs.' First Set of Interrogatories, No. 3 (excerpts) (Barnett Aff. Ex. B); SAC ¶ 8; BHOP Answer to Counterclaim ¶ 10.

18.     With this 5-year lease extension in place, Fineberg and Langelier sought a loan from Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse"), which they knew would be a securitized loan secured by, inter alia, a mortgage on the Property.

Fineberg and Langelier knew that, because the loan was to be securitized, Credit Suisse would almost immediately assign the loan to a loan pool and would no longer be involved with the loan; the loan would be serviced by loan servicers, and the loan would be enforced according to its terms.  Langelier 46, 78; Fineberg 18-19, 21-22, 78-80; see also Frank 38; Donovan 57.

19.    They did not know in September 1999 to which loan pool the loan would be assigned, who the trustee of that loan pool would be, or who the servicers would be. Fineberg 127.

20.    Prior to entering into the loan with Credit Suisse, no one at Blue Hills ever saw any agreements among any of the future mortgagee, future master servicer, or future special servicer, knew whether there were any such agreements, or knew what the terms of those agreements were or would be.  Fineberg 127-128.

21.    On September 14, 1999, Blue Hills executed a mortgage note (the "Note", Barnett Aff. Ex. C[4]) to Credit Suisse in the principal amount of $33,149,000 and Credit Suisse loaned Blue Hills that amount (the "Loan").  Second Amended Complaint ("SAC") ¶¶ 15, 17; Note at p.1.  In negotiating the Loan, Fineberg and Langelier were represented by experienced counsel.  Langelier 55-56.

22.    The Loan was secured by numerous "Loan Documents," including a Mortgage, Assignment of Leases and Rents, and Security Agreement ("Mortgage", Dep. Ex. 155[5]), a Cash Management Agreement ("CMA", Dep. Ex. 156), and a Guaranty (Barnett Aff. Ex. D) executed by Fineberg and Langelier, all of which were executed on

---

[4] Some deposition testimony about the Note refers to it as Exhibit D to the Second Amended Complaint, which was marked in its entirety as Deposition Exhibit 15.
[5] Some deposition testimony about the Mortgage and the CMA refer to them as Exhibits C and E, respectively, to the Second Amended Complaint, which was Deposition Exhibit 15.

September 14, 1999. SAC ¶¶ 15, 17-18; BHOP Answer to Counterclaim ¶¶ 11, 16, 22;

Blue Hills Parties' Response to Defs.' First Requests for Admissions (excerpts) (Barnett

Aff. Ex. E).

24.	23.	The interest conveyed by the Mortgage included the Property, its

improvements, and other personal property of Blue Hills, tangible and intangible, referred

to collectively and defined in the Mortgage as the "Mortgaged Property."  SAC ¶¶ 15;

Mortgage at p.1; Fineberg 83-88.  Under paragraph 10 of the Mortgage, a conveyance or

transfer of the Mortgaged Property or any part thereof required the Lender's prior written

consent.

24.	Blue Hills received approximately $5.2 million in excess proceeds from

the Loan, $4 million of which was distributed to the beneficiaries of Royall Associates.

The Fineberg Beneficiaries and Langelier Beneficiaries each received $2 million.  About

$1.2 million was held in reserve by Royall Associates.  Langelier 80-81; Fineberg 49-50.

25.	In or about November 1999, the Loan was securitized with a pool of

approximately 150 other loans.  In this process, Credit Suisse assigned the Loan to J.P.

Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston

Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee"; together with its

assignee CSFB 1999-C1 Royall Street, LLC, the "Lender").  The Trustee entered a

Pooling and Servicing Agreement ("PSA") with Wells Fargo National Association

("Wells Fargo") as master servicer and LNR Partners, Inc. ("LNR", formerly known as

Lennar Partners, Inc.) as special servicer.  SAC ¶ 25; Pooling and Servicing Agreement

("PSA") (Dep. Ex. 51).

26.	In a CMBS pool, actual day-to-day, operational duties related to the

mortgages that are the assets of the Trust are delegated to the master servicer (who administers performing or non-defaulted mortgages according to the terms of the loan documents) and the special servicer (to whom servicing responsibility is transferred if a borrower requests a material modification to the terms of the loan or upon a default or the occurrence of an event of that substantially increases the likelihood of a default). Greenspan Report (Greenspan Aff. Ex. A) at 9.

27.     The provisions of the PSA are binding on and inure to the benefit of the successors and assigns of the parties to it and the certificate holders. "No other person, including, without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement." PSA (Dep. Ex. 51) at 215.

### 4.    The Lockbox and the Escrow Funds Held By Lender

28.     The Loan Documents required that Blue Hills deposit (or cause to be deposited) all rents received in connection with the Property into an account at its bank referred to as the "Lockbox," which was located in Massachusetts. Note (Barnett Aff. Ex. C) ¶ 8(a); Cash Management Agreement (Dep. Ex. 156) § 6(a); Dep. Ex. 12 at Blue Hill 0501.

29.     Under the Note and Mortgage, Blue Hills' principal and interest payments of $254,652.24 on the Loan were due on the 11th of each month. Blue Hills was also required to make payments on the 11th of each month to fund certain escrow accounts (also referred to as the "reserve accounts") held by the Lender and known as the "Tax and Insurance Impound Fund" (the "Tax Fund" or the "Tax Escrow"), "Replacement Escrow Fund," the "Base Leasing Escrow Fund," and the "Monthly Cash Flow Leasing Escrow Fund." Note at p.1; Mortgage ¶ 6(a)-(c). Payments to the Tax Fund to fund real estate

tax payments could be made quarterly so long as the Equiserve lease was in place. Mortgage ¶ 6(a).

30.     Under the CMA, so long as sufficient funds to cover these payments were deposited by Blue Hills in the Lockbox prior to the 11th of the month, the Lender would simply collect the funds from the Lockbox, apply the funds to the payments due from Blue Hills, and return the net rents to Blue Hills' operating account, which was separate from the Lockbox account.  Note ¶ 8(a); Cash Management Agreement §§ 2-3; Donovan 207, 209-10.

31.     Under the Loan Documents, the Base and Cash-Flow Leasing Escrow Funds are combined for purposes of controlling disbursements from them.  Mortgage ¶ 6(c).  The Leasing Escrow funds are available for tenant improvement and leasing commission expenses incurred by Blue Hills in connection with executed new leases, extensions, renewals, or modifications of a lease.  To obtain reimbursement for these items, Blue Hills is required to provide paid invoices for the tenant improvement and leasing commissions, a copy of the new lease, and, if required by the Lender, lien waivers and releases from parties providing materials or services in connection with the requested payment.  Mortgage ¶ 6(c)(iv).

32.     Subject to conditions, up to $1 million of the Leasing Escrow Funds are also available "for application solely toward payments of principal and interest" in the event that net operating income from the Property is insufficient to pay principal and interest in a given month.  The preconditions to an application of the reserves for this purpose include, among others: 1) that Blue Hills deliver a written request for the application to Lender at least seven business days prior to the date for which it requests a

disbursement; and 2) no Event of Default (as defined in the Mortgage) shall have

occurred and be continuing as of the date of the request and on the date for which the

disbursement is requested.  Mortgage ¶ 6(c)(ix).

5.    **Blue Hills and the Lender Enter Into an Agreement Concerning Payment of Property Taxes**

33.    Quarterly payments of property taxes on the Property were due to the

Town of Canton on Feb.1, May 1, Aug. 1, and Nov. 1 of each year.  Stone 81;

Donovan 202; Needle 146.

34.    Paragraph 5 of the Mortgage required that Blue Hills pay the property

taxes due on the Property in a timely manner, subject to paragraph 6.  Mortgage ¶ 5.

Blue Hills understood that paying property taxes is the obligation of the property owner.

Donovan 243.

35.    Paragraph 6 of the Mortgage required Blue Hills to pay (through deposits

in the Lockbox) amounts in advance to the Lender on a monthly or quarterly basis to fund

the Tax Escrow, from which the Lender would draw to pay the quarterly property taxes.

Mortgage ¶ 6.

36.    The CMA effected the Tax Escrow funding by calling for the Lender to

allocate Lockbox rents to the Tax Fund.  CMA §§ 2 & 3.

37.    Around the same time that Wells Fargo became the servicer of the Loan,

at Blue Hills request, the Lender agreed that the Lender would not escrow funds for taxes

from the Lockbox rents.  Instead, the Lender permitted Blue Hills to collect the funds to

pay the quarterly taxes from its tenant, Equiserve, shortly before the payments were due

and deposit them in the Lockbox at that time.  Wells Fargo would then pay the property

taxes on time.  Donovan 202-203; Stone 46, 53-54, 56-57, 77-81, 85, 90, 124; Needle 33-

34, 141-142, 147-148; Polcari I 168-169; Lloyd 11-14; Dep. Ex. 1.

38.     The process from November 1999-May 2004 for Blue Hills' payment of property taxes was in accordance with the agreement between Blue Hills and Lender. Blue Hills billed Equiserve during the month prior to the quarterly payment due date. Equiserve would then deposit around 97% of the taxes due to the Lockbox.  Blue Hills would deposit the remaining 3% in the Lockbox at about the same time as the Equiserve deposit.  Wells Fargo would then collect the funds from the Lockbox shortly before the quarterly tax payment was due, and pay the property taxes to the Town of Canton on or before the due date.  Stone 46, 53-57, 77-82, 90; Donovan 202-03; Polcari I 168-69; Lloyd 11-15; Needle 32-33, 146-48.

39.     Wells Fargo sent a shortage notice to Blue Hills every quarter during the month prior to when taxes were due.  The notices typically came mid-month.  Stone 56-57, 81-82, 114, 116, 122-23.

40.     From the period of 1999 through May 2004, every time Wells Fargo sent its mid-month shortage notice, Blue Hills made sure the money to pay the property taxes was available in the Lockbox prior to the first of the next month and in time to make the payment by the payment date.  Stone 124.

41.     At no point were replacement or leasing escrow funds used to pay property taxes.  Donovan 163.

42.     [Intentionally omitted.]

43.     Blue Hills knew that this agreement meant that (a) the Lender did not escrow monies to pay the taxes from rents deposited in the Lockbox, and (b) the rents that otherwise would have been escrowed for taxes were distributed to Blue Hills instead.

Stone 77, 85; Donovan 202, 206-07; Needle 140-41.

**6.     Blue Hills Settles a Property-Related Cause of Action and Transfers the**

**Settlement Payment Without the Lender's Consent**

44.     In early 2002, Blue Hills began its effort to extend Equiserve's presence in

the building past the July 2004 expiration of its lease extension.  The parties first

discussed a possible long-term extension of the lease with an option for Equiserve to buy

the Property, and then a shorter-term lease extension.  Although they came to no

agreement, Frank maintained hope of keeping Equiserve in the Property up through the

middle of 2003.  Frank 41-61; Dep. Exs. 37, 38, 39.

45.     Blue Hills believed throughout this time that the best thing to do was to

get Equiserve to stay at the Property, "whether it was a sale with a long-term lease or a

short-term lease, get them to stay."  Frank 52; Langelier 79.

46.     During the month of April 2003, Blue Hills received a copy of a special

permit application filed with the Town of Canton by Equiserve and National

Development, owner (through a subsidiary, Blueview Corporate Center, LLC) of

adjacent property at 250 Royall Street known as "Blueview."  Needle 61-67; Dep. Ex. 9.

Equiserve and National Development were seeking to build a parking garage at

Blueview. Id.

47.     In May or June 2003, Blue Hills learned that DST Realty, Inc. (an affiliate

of Equiserve and DST Systems) had entered into a purchase and sale agreement to buy

Blueview.  Blue Hills also learned that DST Realty's purchase of Blueview was

conditioned on the Town of Canton approving the construction of the proposed parking

garage.  Donovan 80-83; Langelier 106; Needle 76-77; Purchase and Sale Agreement

(Dep. Ex. 19).

48.     On May 1, 2003, Larry Needle and Gary Lillienthal, an attorney representing Blue Hills, attended a Zoning Board of Appeals hearing concerning Equiserve's special permit application.  Lillienthal introduced Blue Hills as an abutter and stated that he felt the proposed garage would have a major effect on traffic and obstruct the view of Blue Hills from the south-west (i.e., from Route 128).  Minutes of Canton Zoning Board of Appeals ("ZBA") (Dep. Ex. 304) at 3-4; Blue Hills, Langelier & Fineberg's Response to Defs.' Second Requests For Admissions, No. 2 (excerpts) (Barnett Aff. Ex. F); Fineberg 135-39; Dep. Ex. 328; Needle 67-68.

49.     On or about May 15, 2003, Equiserve formally notified Blue Hills of its intent not to exercise its option to extend its lease past July 31, 2004.  Langelier, Fineberg, BHOP Answers to Defs.' First Set of Interrogatories, No. 7; Donovan 64-66; Dep. Exs. 17, 18; Langelier 104-105.

50.     On May 22, 2003, the Town of Canton granted the special permit (the "Special Permit") for a parking garage (which would add approximately 263 parking spaces) to Blueview Corporate Center LLC, then-owner of Blueview, which abuts the Property.  Needle 74-76; Dep. Ex. 304; ZBA Decision Granting Blue View Special Permit ("ZBA Decision," Barnett Aff. Ex. G).

51.     The document attached to Lenders' Second RFA as Exhibit "L" is a true and correct copy of the ZBA Decision.  Blue Hills' Parties Response to Defs.' Second Requests for Admissions, No. 15.

52.     Blue Hills continued to believe that the best option and most financially beneficial scenario for the future of the Property was to have Equiserve renew its lease, as

it had been advised by Spaulding & Slye, a real estate brokerage firm, in mid-May 2003. Frank 171-75; Dep. Ex. 44.

53.     On June 9, 2003, Blue Hills filed a complaint in Norfolk Superior Court appealing the ZBA Decision (the "Zoning Appeal" (Dep. Ex. 20)).  The complaint stated that the proposed garage "is immediately in the sight line of [the] Property, will partially block its view and will be detrimental and offensive to [Blue Hills] and inhabitants of [the] Property.  The addition of 380 spaces in a structured parking facility directly in the sight line of [the] Property will not assure the fulfillment of the general conditions for site plan approval, but rather violates such requirements as is poses a detriment to [the] Property."  Zoning Appeal ¶¶ 37-38.

54.     Blue Hills knew the only reason it could file the Zoning Appeal was because it owned the property abutting Blueview.  Frank 81; Fineberg 90; Zoning Appeal ¶ 43.

55.     The right to bring the Zoning Appeal of the Special Permit was Mortgaged Property under Granting Clause Seven of the Mortgage, as it was a "cause[] of action" that "related to, [was] derived from or [was] used in connection with the Mortgaged Property."  Mortgage Granting Clause Seven.

56.     Blue Hills hoped by appealing the special permit to "slow everything down," to hopefully persuade Equiserve to stay in Blue Hills Office Park, or to "stop them from building the garage," in hopes of keeping Equiserve in the building.  Donovan 87, 90-91; Frank 61-63, 174-75; Fineberg 90-91.

57.     During the summer of 2003 Blue Hills negotiated a settlement under which it agreed to accept a $2 million payment (the "Payment") to dismiss the Zoning

Appeal and to waive all further rights of appeal of the ZBA Decision. The terms of the settlement are set forth in a "Settlement Agreement" executed on August 5, 2003 (Dep. Ex. 21). As part of the settlement Blue Hills also executed a "Lease Termination Agreement" dated August 5, 2003 with Equiserve, Lease Termination Agreement (Dep. Ex. 10), and Releases dated August 5, 2003, BHOP Release of Blueview Corporate Center LLC (Barnett Aff. Ex. H). See also Blue Hills' Parties Response to Second RFA, No. 16; Donovan 96; Needle 83-85; Frank 77.

58.     As part of the settlement, Blue Hills agreed to, *inter alia*: (1) dismiss the Zoning Appeal, with prejudice (thereby forfeiting its right to contest the grant of the special permit); (2) waive its right to (at any time within 10 years of the date of the Settlement Agreement) "take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development" of the Blueview Property; (3) release DST and Blueview from any and all claims which Blue Hills had against DST and/or Blueview prior to or on the date of the Settlement Agreement; and (4) terminate Equiserve's lease as of July 31, 2004. Settlement Agreement ¶¶ 3, 7(c) and Exhibits B-2 and B-4 thereto. (Dep. Ex. 21.)

59.     Blue Hills knew that the settlement removed any impediment to approval of the garage by the Town of Canton, thus eliminating any possibility of Equiserve staying in the Property and clearing the way for Equiserve to move across the street. Donovan 99-100; Fineberg 92, 96-97. Blue Hills was aware that settling the Zoning Appeal would ensure that Equiserve would move its offices to Blueview. Frank 75-76.

60.     On August 4, 2003, an entity related to Equiserve (DST Realty of

Massachusetts, Inc.) purchased Blueview from Blueview Corporate Center, LLC. Counterclaim ¶ 33.

61.    The settlement of the Zoning Appeal was an assignment, transfer, or conveyance of part of the Mortgaged Property, as it constituted the transfer of the cause of action of the Zoning Appeal and other rights related to the Property (including the right to contest future development at Blueview).  Mortgage ¶ 10.  Paragraph 10(a) of the Mortgage required the Lender's prior written consent to the settlement of the Zoning Appeal.

62.    Without notifying the Lender or obtaining the Lender's prior written consent, Blue Hills agreed to the settlement, accepted the Payment, and executed the Settlement Agreement, the Lease Termination Agreement and Releases.  BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, Nos. 3, 4.  Blue Hills never notified the Lender of  the Zoning Appeal, the settlement of the Zoning Appeal (including the Lease Termination Agreement), or its receipt of the Payment. BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, Nos. 3, 4; BHOP Answer to Counterclaim ¶¶ 28-30.

63.    If Blue Hills had requested the Lender's consent to the Settlement, the Lender would not have allowed Blue Hills to keep $2 million.  Rather, the Lender would have required that the proceeds be placed into a reserve to cover the loss of the sole tenant of the Property.  Polcari II 213-14; Clarke 39, 41-42 (plaintiff's expert designee agreeing that a request by Blue Hills for consent to the settlement and disposition of the payment would have given the Lender the opportunity to require additional payments or reserves for the loan).

64.     Under the Pooling and Servicing Agreement, it was LNR as special servicer, and not Wells Fargo as Master Servicer, that would have responded to a request for consent to any transfers of Mortgaged Property.  Pooling and Servicing Agreement p. 113, § 3.20(a)(iii).

65.     No part of the Payment passed through any Blue Hills account.  Stone 59, 61-63, 70, 107-108, 137-138; Frank 74, 85.  The Payment was never recorded by Stone as a receipt for Blue Hills, even though it was Stone's responsibility to record all receipts for Blue Hills.  Stone 62-63, 108.

66.     Donovan did not think it was his responsibility to determine what had happened to the Payment because "the settlement was with the owners, and I'm responsible for the operating books.  I'm not responsible for the owners' books." Donovan 120-22.

67.     The Payment was Mortgaged Property under Granting Clause Eight of the Mortgage, as it is proceeds of the disposition of other Mortgaged Property, namely the Zoning Appeal cause of action and other rights transferred and released in the Settlement Agreement.  The Payment was  Mortgaged Property under Granting Clause Four, as it is "consideration" paid to Blue Hills arising from and attributable to the Premises and Improvements.  The Payment was  Mortgaged Property under Granting Three, as it is an "award or payment" made for an injury to or decrease in value of the Mortgaged Property.  The Mortgage in paragraph 10 required the prior written consent of the Lender to any transfer or conveyance of the Settlement Payment.  Mortgage ¶ 10 and Granting Clauses Three, Four, Eight.

68.     On or around August 8, 2003, without the prior written consent of Lender,

the settlement Payment was transferred to Bernkopf Goodman LLP's IOLTA account and then to a client fund account at Bernkopf Goodman LLP, where it remained until after the Lender's foreclosure.  Langelier 127-129; Dep. Ex. 177; Goldberg 69-70.  The client fund account was  controlled by Langelier and Fineberg as the trustees and beneficiaries of Royall Associates, as evidenced by their disposition of the fund through a subsequent agreement dated December 31, 2004, to which Blue Hills was not a party. (Dep. Ex. 176).  See infra ¶¶ 181-186.

69.    Regardless whether the settlement funds passed through the Blue Hills entity or were sent directly to Royall Associates, Blue Hills' outside accountants, Rutfield and Hassey, accounted for the Payment as a transfer to Royall Associates, as evidenced by a corresponding increase in the "Due From Affiliate" line on Blue Hills' balance sheet for the year ending December 31, 2003.  Andelman 86-88, 92-95; Dep. Exs. 364, 365, 367, 368.

70.    Blue Hills' tax lawyer and expert witness designee David Andelman testified that the item shown as "Due from Affiliate" represented an amount that Blue Hills transferred to Royall Associates.  Andelman 87-88.

71.    Blue Hills accounted for the Payment on its balance sheet as a reduction to the basis of the Property.  Andelman 92-93, 104-105 ("properly reflected on balance sheets"), 169-170; Dep. Exs. 364, 365, 368, 369.

72.     The transfer of the payment from Blue Hills to Royall Associates was a transfer of Mortgaged Property under Section 10 of the Mortgage.

73.    Blue Hills did not obtain the prior written consent of the Lender to transfer the Payment to Royall Associates.  Fineberg 59-61; Blue Hills, Langelier & Fineberg

Responses to Defs.' First Requests for Admissions, No. 3, 4. (Barnett Aff. Ex. E).

74.    Blue Hills considered whether to seek consent to the settlement and transfer of the Payment from the Lender but did not do so.  Fineberg testified that he relied on the advice of counsel, but his counsel instructed him not to answer questions about the substance of the advice, invoking the attorney-client privilege.  Fineberg 59-61, 82-83, 143-44, 216-219; see also Goldberg 41-43, 77-78.

75.    Fineberg and Langelier made the decisions to settle the Zoning Appeal and how to handle the settlement Payment.  Fineberg 129-30; Langelier 111-112.

76.    On September 5, 2003, a Stipulation of Dismissal of the Zoning Appeal signed by all counsel of record was filed with the court and all rights of appeal of the ZBA Decision were thereby waived by Blue Hills.  BHOP Answer to Counterclaim ¶ 35.

77.    On or around February 1, 2005, the Payment was conveyed from the client fund account controlled by Royall Associates to two separate client fund accounts.  Dep. Ex. 177.  One of the accounts is controlled by Fineberg and the other is controlled by Langelier.  Langelier 128-129; Fineberg 65-71.

78.    As a result of the accountants' treatment of the Payment as a basis reduction and not as income, it did not appear on the income and expense statements that Blue Hills provided quarterly to Lender.  Andelman 103-05; Dep. Exs. 35-36.

79.    Despite a clear requirement in the Mortgage that Blue Hills provide Lender a balance sheet showing assets and liabilities (which would have reflected the reduction in basis), Mortgage ¶ 18(b), Blue Hills never provided a balance sheet after receiving the Payment.  Affidavit of Curtis Mallegni ¶ 4.

7.    **Blue Hills Attempts (Unsuccessfully) to Find a New Tenant**

80.    Frank and Needle were in charge of the effort to find a new tenant for the Property, which began even before the May 14, 2003 notice from Equiserve (Dep. Ex. 17) was delivered to Blue Hills.  Frank 133-134.

81.    Blue Hills engaged Cushman and Wakefield as Blue Hills' exclusive leasing agent to actively market the Property.  SAC ¶ 39; Frank 134-135.

82.    Cushman and Wakefield actively but unsuccessfully marketed the Property for lease from May 2003 through at least November 4, 2004.  From May 2003 through November 2004, no letters of intent were ever signed by any prospective tenant. No new tenant was found.  Frank 133-34, 136-43, 148, 156, 162; Needle 107-14; Fineberg 100.

83.    The leasing market was "pretty bad" between May 2003 and the fall of 2004.  There was "clearly a downturn and a high vacancy rate in office properties." Frank Depo 142, 178; Langelier 145.

84.    As of July 21, 2004, there were no viable tenant prospects for the Property.  Frank 138-41; Dep. Ex. 42; Donovan 126-128; Needle 108-09, 137.

85.    As of August 2004, Cushman and Wakefield had no tenant prospects for the Property.  Frank 148; Fineberg 100; Donovan 126-28.  Blue Hills, with 275,000 square feet to fill, was looking for tenants taking 100,000 square feet or more.  In a report dated August 3, 2004, Joseph Plunkett, Cushman and Wakefield's lead broker for the Property, described their prospects.  According to Plunkett, "'Major deals' that are greater that 50,000 square feet are for all intents and purposes non-existent today, in the Route 128 South market," of which Canton is a part.  Users looking for 100,000+ square

feet "have 20 options within a 15-minute drive of 150 Royall Street."  Letter from Joseph

Plunkett to Daniel Frank dated August 3, 2004 (Dep. Ex. 43).

86.     Blue Hills continued looking for tenants right up to the time of the

foreclosure but never found one.  Langelier 160; Fineberg 110.

## 8.    **Events Preceding Equiserve's Departure**

87.     On or about September 16, 2003, Wells Fargo contacted Blue Hills and

was told that Equiserve would be vacating the Property in July 2004 and that marketing

of the Property had begun (although Blue Hills could give no information about

prospective tenants).  Wells Fargo communicated this information to LNR at the time.

Mallegni 144-46; Dep. Ex. 141; Email chain from September 2003 (Barnett Aff. Ex. I).

88.     From late 2003 through April or May 2004, Donovan had three or four

telephone conversations with people from Wells Fargo (whose names he does not recall)

concerning the Property.  There was no urgency to the calls.  He communicated that they

were looking for a tenant and thought they would have one in place around the time

Equiserve left.  Donovan 145-149.  He did not ask Wells Fargo for a meeting in any of

these calls.  Donovan 157-58.  He did not mention that Blue Hills had entered into a

Lease Termination Agreement with Equiserve or received a $2 million settlement

payment that it had transferred to its owners.  Donovan 146.

89.     By April 2004, LNR was estimating a loss from the Blue Hills Loan of

between $10 million and $20 million dollars (Dep. Ex. 80).  In the fall of 2004, its best

estimate of the loss was $18,590,000 (Dep. Ex. 97).

90.     As Fineberg Management was marketing the Property in the first half of

2004, Fineberg was in the process of walking away from two hotel properties that were in

CMBS pools for which LNR was the Special Servicer.  After the hotels — one in Sturbridge, Massachusetts and one in Lancaster, Pennsylvania — went into default, Fineberg executed deeds-in-lieu of foreclosure and turned the properties back to the Lender.  Brown Aff. ¶¶ 2-4; Goldberg 116-117.

91.     Frank and Donovan were involved in these transactions in their capacities as officers of Fine Hotels, an affiliate of Fineberg Management also owned by Fineberg. Donovan 27, 31-32; Frank 5; Fineberg 23.

92.     Goldberg and the Bernkopf Goodman firm represented Fineberg and Fine Hotels in connection with the deeds-in-lieu, which were handled by LNR asset manager Chris Brown.  The deed-in-lieu transactions closed in July 2004.  Brown Aff. ¶¶ 2-4.

93.     The Blue Hills Loan was mentioned in at least two conversations between Brown and Goldberg that were otherwise about Sturbridge and Lancaster.  According to Brown, Goldberg made a vague reference in one call to the fact that he had another loan that would be coming to LNR but would not say anything more about the loan or the property.  In a subsequent call, at Brown's prodding, Goldberg identified it as the Blue Hills property, adding that the property had a single tenant who was leaving after which there would be no income, and that the borrower was trying to get the loan transferred from the master servicer to the special servicer.  Brown did not suggest anything he should say to get the master servicer to make a transfer and did not do anything to get the loan transferred from the master servicer to LNR.  Brown Aff. ¶¶ 7-8.

94.     According to Brown, Goldberg never told him said, in form or substance, that "time was of the essence" with respect to transferring or servicing the Blue Hills loan and Goldberg did not say anything in any of their conversations that gave Brown the

impression that there was any urgency at all with respect to the loan or the property.
Goldberg never told Brown that his client was intent on or committed to keeping the Blue
Hills Property or that he was looking for an outcome different from the Sturbridge and
Lancaster transactions.  Goldberg never discussed with Brown the possibility of doing a
workout of the Blue Hills Loan.  He did not say that the borrower was exploring various
options with respect to the future of the Property and he did not say, in form or in
substance, that "there were a whole host of ways [his] client wanted to consider going
with the property."  Brown Aff. ¶¶ 9-10.

95.    Brown's conversations with Goldberg about Blue Hills left Brown with
the impression that Blue Hills would be giving the Property back to the lender, as they
had done in Sturbridge, Lancaster, and Williamsburg.  Brown Aff. ¶ 11.

96.    According to Goldberg:  He and Brown had three or four conversations
about the Blue Hills Loan.  Initially, Goldberg asked Brown whether LNR was the
special servicer for the Loan.  Brown called back to confirm that it was but the Loan had
not yet been transferred.  Brown offered a suggestion of what Blue Hills could say to
Wells Fargo to get the Loan transferred LNR.  Goldberg told Brown that, unlike some
other properties that had been turned back, his client really intended to keep Blue Hills,
that there were "a whole host of ways [his] client wanted to consider going with the
property" (although he provided no specifics), and that time was of the essence.  In a
subsequent call, Brown informed Goldberg that the Loan was being transferred and that
Job Warshaw would be the asset manager.  Goldberg made no notes or other
contemporaneous record supporting his account of these conversations.  Goldberg 81-95.

97.    Curtis Mallegni, a Wells Fargo asset manager, spoke with Donovan on or

about July 15, 2004.  Donovan told him that the tenant was leaving and that the Property

was available for lease, but there were no prospects.  Donovan might have asked for a

meeting with Wells Fargo to discuss the loan during this conversation, but he is not sure

that he did.  Donovan 158; Mallegni 86-88; July 15, 2004 Email from C. Mallegni to

V. Taylor (Dep. Ex. 22, 136).

       98.    On or around July 31, 2004, Equiserve allowed its lease to expire without

renewal, vacated the Property, and moved to Blueview.  SAC ¶ 52; Answer to

Counterclaim ¶ 38; Langelier 106.

       99.    Blue Hills never signed a lease with a tenant to replace Equiserve, never

spent money on tenant improvements for a replacement tenant for Equiserve, never

presented Lender with any paid invoices for reimbursement for tenant improvements,

never paid any leasing commissions, and never presented any leasing commission

invoices to Lender.  Fineberg 113.

**9.    <u>Blue Hills Defaults with Respect to the August 2, 2004 Tax Payment</u>**

       100.    Blue Hills knew that a quarterly real estate tax payment would be due to

the Town of Canton on or before August 2, 2004, but did not set aside any monies from

net rents of approximately $150,000 to $170,000 per month during May, June, or July

2004 to pay the taxes.  Donovan 204, 207-09, 215; Dep. Exs. 31, 32.

       101.    At no time did Blue Hills suggest to Wells Fargo that it should start

escrowing for real estate taxes while Equiserve was still paying rent, and Blue Hills did

not expect Lender to begin escrowing for tax payments.  Stone 109, 148;

Donovan 205-06.

       102.    By letter dated July 16, 2004 (attached to the SAC as Exhibit "F"; Dep.

Ex. 4), Wells Fargo advised Blue Hills that the Tax and Insurance Fund had insufficient funds to pay the first installment of taxes to the Town of Canton for 2004 and requested Blue Hills to deposit with Wells Fargo the sum of $158,181.19 by July 27, 2004. This quarterly tax shortage notice was typical of notices that the Lender sent to Blue Hills every quarter. SAC ¶ 48; Donovan 202.

103.    In July 2004, when the shortage notice came from Wells Fargo, Stone asked Donovan how the taxes would be paid. Donovan said that they were not going to pay the taxes at that point because they didn't have the funds. They wanted to take it out of the escrow funds held by the Lender. Stone 94-95, 100, 111; Donovan 204, 211-12.

104.    On July 29, 2004, Brent Lloyd (of Wells Fargo) spoke with Stone and stated that taxes were due. Stone stated that the tenant had moved out and that there were no available funds to pay taxes. Stone asked if there was any way Blue Hills could use reserve funds to make the tax payment. Lloyd called him back later that day, after checking with the reserves department, to say that if he needed to use the reserve money to pay taxes, he would have to provide a lien waiver. Stone said he did not have a lien waiver. Lloyd told him that if he could not provide the lien waiver and could not pay the taxes, he would be in default of his loan agreement. Stone said he would get back in touch with Lloyd but did not. Lloyd testified to this conversation and memorialized it in contemporaneous notes. Stone did not recall the conversation, but could not deny it. Wells Fargo telephone records show two calls from Wells Fargo to Blue Hills/Fineberg Management on July 29, 2004. Stone 117-119, 124 -125; Dep. Ex. 5; Dep. Ex. 6; Dep. Ex. 8; Dep. Ex. 139 (WF1745); Lloyd 20-24, 32, 39-40, 60-61; Goertzen Aff. Ex. A. [6]

---

[6] References to lien waivers and other documentation requirements in Lloyd's testimony and Dep. Exs. 5 and 6 make sense in light of Stone's request, i.e., whether there was anyway to use money in the reserves to

105.     Wells Fargo advanced the property tax payment out of its own funds on July 29, 2004.  Mallegni 156; Dep. Ex. 143; Lloyd 50-51.

106.     Prior to August 2, 2004, Blue Hills did not deposit with Wells Fargo any funds for payment of the taxes due on that date and it did not pay the taxes to the Town of Canton directly.  Polcari I 32-33; Dep. Ex. 30.

107.     By letter dated and mailed on August 2, 2004 but not delivered to the Lender until on or after August 4, 2004, Blue Hills' Donovan requested a disbursement from the Leasing Escrow Funds to pay the real estate taxes due on August 2, 2004, as well as to pay principal and interest due on the Note for the month of August 2004. BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, No. 9; SAC ¶ 54; Donovan 225-227, 162-163; Exhibit 23.  The payment of principal and interest was due on August 11.  Mortgage Note ¶ B.  Donovan made no effort to find out from Wells Fargo whether this request had been granted.  Donovan 223.

108.     Donovan testified that he believed, based on his understanding of the 1999 Loan negotiations, that reserves could be accessed to pay taxes when Equiserve departed. Donovan 53-55, 132-33, 135-39, 211-12.  He now knows that is not the case.  Id. 265-266.

109.     Donovan testified he waited until the day the taxes were due to mail the request, which he knew would not arrive until after the taxes were due, because he was busy.  Donovan 243-45.

---

pay taxes.  Even though the Mortgage does not have a reserve for paying taxes, if Blue Hills had been entitled to a reserve disbursement for some other reason (e.g., for having incurred leasing commission or tenant improvement expenses), funds could have been released on that basis (subject to appropriate documentation) and then applied by Wells Fargo to the Tax Fund rather than returned to Blue Hills. Stone's response indicated he could not meet the documentation requirements for the potentially available reserve disbursements.

110.    This was the first request by Blue Hills to Wells Fargo for access to the Loan reserves for any purpose.  Donovan 163.

111.    At some time in mid-August 2004, Blue Hills collected approximately $51,800.00, one month's worth of property taxes, from Equiserve and deposited the funds in the Lockbox.  The money was swept to Wells Fargo and applied to reduce the deficit in the Blue Hills tax escrow account, which was negative in the amount of the August payment (approximately $158,000.) Donovan Sept. 2 Letter (Dep. Ex. 26); Tax Record for Single Loan (Dep. Ex. 138).

112.    At some time in August, Donovan had someone at Fineberg Management confirm with the Town of Canton that the taxes had been paid.  This information from the Town, and nothing else, led Donovan to believe the requests in his August 2 letter has been granted.  Donovan did not ask the town <u>when</u> the taxes had been paid, nor did he contact Wells Fargo or LNR to confirm the source of the monies used to pay the taxes. Donovan 229, 239, 240.

**10.    Blue Hills Defaults on Other Loan Payments**

113.    Donovan sent his August 2, 2004, letter requesting application of loan reserves to principal, interest, and real estate taxes to Tim Parrish of the Wells Fargo tax group, whose name was on the July 16 tax letter, not to Mallegni.  Dep. Ex. 23; Donovan 161.

114.    The August 2, 2004 letter did not request payment of reserve fund payments due on August 11, 2004.  Donovan did not think there was any need to make those payments.  Dep. Ex. 23; Donovan 230-31; Stone 146-47 ("I hadn't thought about it.")

115.    Donovan deposited the letter dated August 2 in the U.S. Mail on August 2, 2004 and faxed it to Wells Fargo on August 4, 2004.  Blue Hills, Fineberg and Langelier Answers to Defs' Second Interrogatories, No. 2 (Barnett Aff. Ex. J).  The Wells Fargo Loancator correspondence tracking system notes that it was received by Wells Fargo on August 4, 2004.  Dep. Ex. 134; Martin 61-68.

116.    On August 5, 2004, Donovan sent another letter to Wells Fargo — again to Parish — officially notifying the Lender that Equiserve had vacated and that no replacement tenant had been found.  In that letter, Donovan requested a meeting with the Lender and asked that the special servicer be involved.  Donovan 163-64; Dep. Ex. 24.

117.    Thereafter, Mallegni and Donovan traded phone messages.  Mallegni was seeking to confirm whether Blue Hills would be making the loan payments due on August 11 (Dep. Ex. 145).  Donovan finally sent him the August 2 and August 5 letters by fax on August 13, noting in his cover sheet: "Sorry we have been missing each other on the phone.  I would like to get the special servicer involved.  Attached are the recent correspondence."  Dep. Ex. 27; Donovan 170; Mallegni 56-57.

118.    Wells Fargo telephone records show three calls from Mallegni's extension (415-396-6999) to Blue Hills/Fineberg Management  (781-239-1480) on August 11 and 13, 2004.  Goertzen Aff. ¶ 3 and Ex. A; Mallegni Aff. ¶ 6; Barnett Aff. ¶ 2.

119.    In the meantime, the August 11 payment date passed and Blue Hills did not make the principal, interest, or reserve fund payments due on August 11, 2004.  Polcari I 32-33; Dep. Ex. 30; BHOP, Langelier and Fineberg Responses to Defs.' First Requests for Admissions, Nos. 10 & 11.

120.    Mallegni and Donovan spoke on or after August 11, 2004.  The gist of

Mallegni's conversations with Donovan was that Donovan wanted to get the loan transferred to the special servicer, which Donovan knew was the entity with power to address issues with the loan.  Mallegni 72-73.

121.    On Monday, August 16 — the next business day after receiving the August 13 fax — Mallegni drafted a memorandum to transfer the loan to special servicing.  Mallegni Dep. 45-47; Transfer Memorandum (Dep. Ex. 57).

122.    At no time between August 2 and September 17 did Donovan seek confirmation from anyone at Wells Fargo or LNR that they were going to grant the requests for access to reserves.  Donovan 163, 223.  Nor did anyone at Wells Fargo or LNR inform him that his requests had been granted.  Donovan 200-01.

123.    Donovan said he had no basis to believe Wells Fargo had acted favorably on the August 2 request for access to reserves other than the fact that the Town of Canton told him the taxes had been paid.  Donovan 228-229, 240.

**11.    <u>Work Stations Transfer</u>**

124.    Pursuant to the Lease Termination Agreement, approximately 1,000 Haworth Unigroup workstations (the "Workstations") became the property of Blue Hills upon Equiserve's departure.  In or around August 2004, without notifying Lender and without obtaining Lender's prior written consent, Blue Hills sold the Workstations for $100,000 to D. Erwin & Associates LLC.  Needle 91-95, 183-84; Dep. Ex. 305 at Blue Hills 5098.

125.    The Workstations were Mortgaged Property under the Mortgage, Mortgage Granting Clause Two, and Blue Hills' sale of them was a transfer of Mortgaged Property in violation of Section 10 of the Mortgage.

12.    **Loan Servicing Transferred to LNR**

126.    On or around August 18, 2004, certain servicing responsibilities for the Loan were transferred from Wells Fargo to LNR as the special servicer.  SAC ¶ 64.  A special servicer assumes certain servicing responsibilities for a loan when the loan is in trouble or in default.  Donovan 59-60; Fineberg 21-22.

127.    At LNR, the loan was assigned to asset manager Job Warshaw, who sent the borrower two letters dated August 19, 2004.  These letters were sent to Blue Hills by fax on August 24, 2004.  Warshaw 34-35.

128.    The shorter of the letters was a form letter that introduced Blue Hills to LNR and notified Blue Hills that certain servicing responsibilities for the loan had been transferred to LNR.  The letter closed stating:  "Thank you for your cooperation and we look forward to a successful working relationship."  SAC ¶ 65; Dep. Ex. 28; Warshaw 27-28.

129.    The longer of the two letters, a so-called "Prenegotiation Letter," was also a form letter which set forth the terms and conditions that would govern any discussions between LNR and Blue Hills regarding the Loan.   Blue Hills was required to execute the Prenegotiation Letter as a prerequisite to substantive discussions about the Loan.  SAC ¶ 66; Dep. Ex. 60; Polcari I 64; Warshaw 28-35.

130.    Warshaw called Blue Hills on August 24, 2004, and left a message for Donovan introducing himself, stating that he was faxing the August 19 letters and that the Prenegotiation Letter had to be signed prior to any discussions, and asking that someone call him.  Donovan 165; Warshaw 26-27, 42, 82; Voicemail transcription (Dep. Ex. 25); LNR Asset Manager Call Log (Dep. Ex. 128).

131.    This call was returned on August 25 not by Donovan, but by Kenneth Goldberg, counsel to Blue Hills, Royall Associates, and Fineberg.  Warshaw 82-83; Goldberg 103-08, 119-20.

132.    Donovan himself never contacted Warshaw to ask for a meeting or to follow up on the request in his August 5 letter to Wells Fargo.  Warshaw 82; Donovan 166, 223.

133.    Warshaw recalls two calls with Goldberg.  According to Warshaw, the first call occurred on August 25, 2004.  Mr. Goldberg introduced himself as someone who had worked with Fineberg for 30 years doing capital structuring and who was a lawyer, but not calling in the capacity as an attorney for Blue Hills.  Goldberg and Warshaw discussed the Prenegotiation letter, which Goldberg had received, but it had not yet been executed. Goldberg indicated he would be seeing Mr. Fineberg the next day, when they would sign the letter and get back to Warshaw.  There were no substantive discussions of the loan during the first call because the Prenegotiation Letter had not been signed. Asset Manager Call Log (Dep. Ex. 128); Warshaw 60-63, 84-86.

134.    According to Warshaw, the second call occurred on September 7, 2004. Goldberg provided a short overview of what had happened at the Property, including that Equiserve, the sole tenant, had left and that Blue Hills had retained a leasing agent to try and release the space.  Goldberg also requested access to the reserves to pay debt service. Warshaw told him that, based on an introductory review of the file, Blue Hills was in default and he did not think it would be eligible to draw on the reserves so long as the Loan was in default.  There was discussion about why the Loan was in default, and Warshaw identified the failure to pay real estate taxes as one basis.  Goldberg disagreed,

stating that Blue Hills was not in default and instructing Warshaw to review the Loan Documents. The call then ended abruptly. Warshaw 56-61.

135.    According to Warshaw, Goldberg did not request, and there was no discussion of, a meeting with LNR in either of their phone calls. Warshaw 76, 84-86.

136.    Warshaw made contemporaneous notes of some of the things said during this conversation and also described the call to Polcari on or about September 7. Exhibit 128. Polcari made contemporaneous notes of his conversation with Warshaw, including noting that Warshaw told Goldberg "you're in default" and that "Borrower says he's not in default." Dep. Ex. 84 at LNR3919-3921; Polcari II 33-35, 50-52.

137.    Goldberg recalls two or three substantive calls with Warshaw, the first in the middle of August before he had received the Prenegotiation Letter. According to Goldberg, Warshaw stated that he had spoken to Chris Brown about Goldberg's conversations with Brown. Goldberg explained his client's perception of the Property and the market (which he thought was starting to come back), expressed his belief that there was an opportunity to get the matter resolved, and stated that his client was committed to pursuing a number of alternative courses to recapitalize Blue Hills and intended to keep the property. He asked Warshaw to confirm that there was a lot of money in reserve and said that the reserves, together with a well heeled and committed borrower, provided an opportunity to get the building re-tenanted and "back on line." The conversation ended with Warshaw stating that he was going to review the file and would get back to Goldberg. Goldberg 96-98.

138.    According to Goldberg, in either a first or second call, Goldberg identified the alternatives by which his clients could bring new money to the Property, including by

mezzanine financing, additional capital from the existing partners, new capital from new partners, or seeking tenant participation and ownership.  In one of the calls, he stated his belief that it would require $5 or $10 million to turn around the Property. Goldberg 98-99.

139.    According to Goldberg, the second call came at the end of August and was prompted by the Prenegotiation Letter, which was of a type he had seen before.  During the second call, Goldberg invited Warshaw (who was based in Miami) to visit the Property and assess the market at the Borrower's expense.  Warshaw responded that he didn't think it was possible for him to get to Boston before Labor Day.  Goldberg said he would get the Prenegotiation Letter signed during a meeting with Fineberg the next day and get back to Warshaw.  Goldberg 106-107.

140.    According to Goldberg, his final conversation with Warshaw occurred either just before or just after Labor Day.  Warshaw did not tell him that it appeared the Borrower was in default.  Rather, Warshaw had not sufficiently examined the Loan Documents to provide a substantive response to Goldberg's request for access to the reserves.  Goldberg's last conversation with Warshaw concluded with them waiting to arrange a meeting either in Boston, if Warshaw could visit, or in Miami.  Goldberg 123-127.

141.    Goldberg acknowledges that he did not tell Warshaw that the Blue Hills or Royall Associates had $5 to $6 million set aside, outside of the reserves held by the Lender, to invest in the Property.  Goldberg said that his client was well heeled, and assumed that Warshaw had spoken to Brown about Fineberg's resources and that Brown had told Warshaw that Fineberg had made offers to LNR to acquire other mortgaged

properties in proposals that did not contain financing contingencies.  Goldberg 109-116.

142.    Goldberg has no contemporaneous notes or other record supporting his account of these conversations.  Goldberg 169-70.

143.    Goldberg never followed up with Warshaw about the meeting he says they discussed.  Goldberg 128.  Between his last conversation with Warshaw (around Labor Day) and November 10 (two days before the scheduled date of the foreclosure), his only subsequent contact with anyone connected to LNR was a call from an appraiser or environmental consultant looking for a survey.  Goldberg 130.

144.    Blue Hills executed the Prenegotiation Letter and returned it to the Lender on August 26, 2004.  Warshaw 36-37; Fineberg 149; Executed Prenegotiation Letter (Dep. Ex. 62).  By executing the Prenegotiation Letter, Blue Hills agreed that its terms and conditions would govern any discussions or negotiations.  Dep. Ex. 62, page 1.

145.    The Prenegotiation Letter states that Lender was not under any obligation to consent or otherwise agree to any Borrower request with respect to the Loan, or to modify the Loan or the Loan Documents.  Dep. Ex. 62, ¶ 1.

146.    The Prenegotiation Letter states that neither the Borrower nor the Lender "is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents."  Dep. Ex. 62, ¶ 4.

147.    By executing the Prenegotiation Letter, Blue Hills released the Lender from any all claims and demands, in law or in equity, known or unknown, direct or indirect, fixed or contingent, caused by or arising out of any discussions, negotiations, correspondence or other communications relating to the Loan and the Loan Documents

between the Borrower and Wells Fargo or LNR.  Dep. Ex. 62, ¶ 2.

148.    By executing the Prenegotiation Letter and "to enable [LNR] to properly evaluate the Borrower's request," Blue Hills agreed to provide to LNR all of the information designated on Exhibit A to the Letter.  Dep. Ex. 62, ¶ 9.   The designated information included: a) a financial statement prepared within 30 days of August 19, 2004 for the Borrower, its member, and any guarantors, including balance sheets and income statements; b) Federal tax returns for the last two years for the Borrower and the Guarantors; and c) a current business plan for the Property.  Ex. A to Dep. Ex. 62.

149.    Blue Hills did not send to LNR a current business plan, updated financial statements, or any of the other documents and information set out in Exhibit "A" to the Prenegotiation Letter.  Blue Hills never came up with a business plan specifying the upgrades to the Property that would be required or how much they would cost.  Donovan Depo 140-141, 176-177, 179-82; Fineberg 172-78.

**13.    September 2004 Events**

150.    On September 2, 2004, Donovan wrote to Wells Fargo, copying Warshaw, requesting a disbursement of escrow funds to pay principal and interest on the Note for the month of September 2004.  Donovan September 2 Letter (Dep. Ex. 26).

151.    On or around September 7, 2004, Joe Polcari became the LNR asset manager responsible for the Property.  Polcari I 40.  At the time he became asset manager for the Loan, Polcari spoke with Warshaw (as described in paragraph 136, above) and Brown.  Polcari II 17.

152.    Goldberg never spoke to Polcari about Blue Hills until a mediation in this matter held in January 2006.  Polcari Aff. ¶ 6; Goldberg 121-22, 129.

153.    Based on his fourteen years of experience with loan workouts, Polcari did not believe Blue Hills was interested in restructuring or reworking the Loan, because Blue Hills never proposed a restructuring and because Mr. Fineberg had just given back the Lancaster, Pennsylvania and Sturbridge, Massachusetts properties to LNR.  Between September 7, 2004 and September 17, 2004,  Blue Hills did not attempt to reach Polcari. Polcari I 236-38; Polcari II 119-24.

154.    Polcari called Donovan on or about September 16, 2004, as a courtesy to tell Donovan that he was sending Donovan a default letter.  Polcari described Donovan as acquiescent.  Donovan responded that he understood that LNR had to send the default letter, that they had no tenant prospects and no hope for finding one, and that the use of the reserves for debt service would not have a made a difference.  Donovan did not request a meeting or indicate that he had previously asked for a meeting that went unanswered.  Donovan had no workout proposal to offer.  Polcari testified to this conversation and memorialized it in contemporaneous notes.  Donovan testified that he did not recall this conversation and did not know whether it took place.  Polcari I 39, 45, 67-68, 70, 72; Polcari II 26-27, 38-39, 230-231; Polcari Handwritten Notes (Dep. Ex. 84 at LNR03927); Frank 120-121; Donovan 187-88, 199.

155.    Polcari sent Donovan a default letter dated September 17, 2004.  The letter informed Blue Hills that Blue Hills' requests for disbursements from the escrow funds were denied due to Blue Hills' defaults under the Mortgage and Note as of August 2, August 11, September 2, and September 11, 2004.  LNR further informed Blue Hills that the Note had been accelerated and was immediately due and payable.  SAC ¶ 73-74; SAC Exhibit L; September 17 notice of defaults (Dep. Ex. 30).

14.    **October 2004 Events**

156.    On or about October 18, 2004, Frank called Polcari and asked for a meeting between Blue Hills and LNR.  According to Polcari, and Fineberg's report of what Frank told him about the conversation, Polcari told Frank he would call Frank back with a response.  Polcari called him back within a couple of days and left a voicemail saying that any meeting would have to include a discussion of bringing the Loan current to be productive.  According to Polcari, Frank never responded to the voicemail.  Polcari II 73-74; Fineberg 186.

157.    According to Frank: Polcari said that he would have to talk his superiors. Polcari agreed to get back to Frank about the meeting, but never did.  When Frank placed a telephone call five or six days later to follow up on his request for a meeting, Polcari told him there would not be a meeting.  Frank 104-107.  Frank also had a memory of another conversation with Polcari in which Polcari declined to have a meeting, but he could not place it in time.  Frank 108-11.

158.    By letter dated October 21, 2004, pursuant to Mass. Gen. Laws c.244, s. 14 and 17B, Lender notified Fineberg and Langelier of its intention to foreclose on the Property and of Fineberg's and Langelier's potential liability to Lender under the Guaranty in case of a deficiency in the proceeds of the foreclosure sale.  SAC ¶ 83; SAC Exhibit M.

159.    On October 28, 2004, LNR received an independent MAI appraisal from Bonz & Company valuing the Blue Hills Office Park at $15 million as of October 18, 2004.  Dep. Ex. 341 Addendum.

160.    Sometime between September 21 and October 18, 2004, during the field

work phase of the study, the appraiser, Eric Stotz, spoke with Donovan to arrange a visit

to the Property and learn about its status and with Needle during the resulting visit.

While discussing the current condition and situation of the Property with Stotz, Donovan

used the phrases "bleeding money" and "give the keys back" to LNR.  Donovan said in

substance that Blue Hills was walking away from its investment in the property due to the

lack of tenant prospects and high holding costs associated with owning a vacant

investment property.  Stotz Expert Rebuttal Report (Exhibit B to Stotz Affidavit) at 4-5.

161.    When Stotz visited the Property, Needle informed him that Blue Hills had

been unsuccessful in finding a tenant and was, in fact, "giving the keys back" to LNR

because the carrying costs of the property were high and its expectations of finding a

tenant were so low.  Stotz Expert Rebuttal Report at 5.

**15.    The Foreclosure Sale**

162.    After the October 18 phone calls between Frank and Polcari, Blue Hills

did nothing to communicate with LNR until November 10, two days before the scheduled

foreclosure sale.  On November 10, Goldberg sent a letter to Bruce Barnett, counsel for

the Lender, stating that the Borrower was not in default and demanding access to the

reserves.  Dep. Ex. 334.  E. Randolph Tucker responded on behalf of Lender by his letter

dated November 12, 2004.  (Dep. Ex. 41.)

163.    On November 12, 2004, the foreclosure sale of the Property was

postponed by public proclamation, in accordance with Massachusetts law, until

November 19, 2004.  Polcari Aff. ¶ 4, Barnett Aff. ¶ 17.

164.    Another exchange of letters between counsel occurred on November 17-

19.  Dep. Exs. 335, 336, 337.

165.    The foreclosure sale was held on November 19, 2004.  There were four people bidding on the Property and CSFB 1999-C1 Royall Street, LLC made the high bid for $18.5 million.  Recorded Foreclosure Documents (Barnett Aff. Ex. K); Polcari Aff. ¶ 5; Email from J. Polcari to L. Golinsky, November 19, 2004 (Dep. Ex. 109).

166.    Lender acted in accordance with all of the requirements of the Mortgage and Massachusetts law, including the requirements of General Laws Chapter 244, in conducting the foreclosure sale.  Clarke 262; Recorded Foreclosure Documents.  In addition, Lender caused its auctioneer, Dean Associates, Inc., to run commercial advertisements of the foreclosure sale in the Boston Herald and the Boston Globe on Sunday, November 7, 2004.  Commercial Advertisements (Barnett Aff. Ex. L) SD001, SD002; Polcari Aff. ¶ 3.

167.    As of the date of the sale, the amount of the Debt, including principal, interest and late fees, was $33,439,307.  November 11, 2004 Payoff Statement  (Polcari Aff. Ex. A); CSFB 1999-C1 Royall Street, LLC's Answers to First Interrogatories of Langelier & Fineberg, No. 12 (Barnet Aff. Ex. M).

168.    After crediting the foreclosure bid ($18,500,000) and the reserves held by Lender as of the date of the sale ($4,168,460.18) against the outstanding debt, the deficiency after the foreclosure sale was $10,770,847.  November 11 Payoff Statement; CSFB 1999-C1 Royall Street LLC's Answers to First Interrogatories of Langelier and Fineberg, No. 12.

169.    Under the Note, the default interest rate is 13.49%.  Note ¶ 1(k), (p).

170.    Fineberg did not attend the foreclosure sale or bid on the Property. Fineberg 187-88.  At first he testified that he did not know why, id., and then claimed that

not attending was a mistake.  Id.  211-12.  He did not sue to enjoin the foreclosure or to have it set aside after the fact.  Fineberg 195-97.

**16.    Blue Hills' Negotiating Strategy**

171.    Fineberg testified that he had a plan for the future of Blue Hills that included using the $4.1 million in loan reserves and $5 to $6 million being held by attorneys for Royall Associates to fix up the building, attract a tenant, and then refinance the building.  Fineberg 194-95, 179-81.  Yet Fineberg told none of this to LNR. Id. 181.

172.    As of August 2004, Blue Hills would have needed a modification of the Loan Documents in order to re-tenant the Blue Hills Office Park and maintain ownership of the Property.  Blue Hills knew that a loan modification was required in order to make his plan for the Property work.  Fineberg 194-195; Donovan 236.

173.    Nevertheless, no one at Blue Hills ever sent the Lender a proposal to work out the Loan.  Polcari II 232; Fineberg 169-181; Langelier 179-183.

174.    Rather than send a written proposal to the Lender to encourage Lender to meet with them, Blue Hills claims it made a business decision not to propose anything to the Lender unless Lender agreed to meet with them in person first.  "I think it's a question of business judgment.  You don't prematurely put your cards face up on a table in a business negotiation."  "Without some indication from Lennar that they were willing to sit down with us or instruct us to submit something, we were not going to put our cards on the table prematurely."  Langelier 179-183, 205.

175.    Fineberg testified that he had decided not to put any money — not another penny — into Blue Hills until LNR gave him a sit-down meeting.  Fineberg 212-214, 158-60; Donovan 141.  Fineberg testified that he would not make LNR any type of

written proposal prior to having a sit-down meeting — doing so is "not [his] style." Fineberg 165-66, 169.

176.    Langelier testified that he believed that the Lender, by not meeting, was engaged in a game of "brinksmanship" and that Lender would come around and agree to a meeting before the foreclosure.  Langelier 199, 266, 268.

177.    LNR never encouraged Blue Hills to think they were going to meet. Fineberg 212-214; Frank 104-111.

178.    On other deals with LNR, Fineberg had made offers to LNR over the telephone or in writing before a meeting.  Goldberg 182-85, 188-91.  Fineberg had consummated at least one other deal with LNR without any sit down meeting at all. Goldberg 192-93.

179.    Fineberg did not want to defer the foreclosure and did not request that LNR defer the foreclosure.  Fineberg did not look into trying to buy the debt at a discount.  Fineberg 163.

180.    Blue Hills knew that LNR was not obligated to agree to any modification of the loan documents or enter a standstill agreement.  Langelier 268; Fineberg 161, 182.

## 17.    The Royall Associates Beneficiaries Split the Settlement Payment Amongst Themselves

181.    On December 31, 2004, the beneficiaries of Royall Associates entered into an agreement (the "Royall Agreement") concerning the treatment of three accounts: a "Property Account" held and controlled by Fineberg Management as a result of its management of the Property; an "Initial Account" held in escrow by Goldberg and Langelier's attorney Andrew Cohn; and a "Supplemental Account" held in escrow by

Goldberg and Cohn.  The "Initial Account" contained approximately $1.38 million, which was the portion of the 1999 refinancing proceeds not distributed to Fineberg and Langelier in 1999.  Fineberg 49.  The "Supplemental Account" contained approximately $4.2 million, which included the $2 million Payment.  Royall Agreement (Dep. Ex. 176); Fineberg 51.

182.    The remaining $2.2 million in the Supplemental Account came from distributions of operating profit from Blue Hills.  Fineberg 51-52, 102-103.  Blue Hills distributed monies to its owners as often as it could.  Fineberg 243-44.  Langelier recalled receiving directly approximately $200,000 each year from Blue Hills.  Langelier 143-44.  Langelier and Fineberg made decisions about distributions.  Fineberg 243-44.  Blue Hills had ample profits to make distributions, as it had over $785,000.00 of net income in 2003, Dep. Ex. 35, and over $1.1 million of net income in 2001, Dep. Ex. 318.

183.    Under the Royall Agreement, the Initial Account and all but $2 million of the Supplemental Account was released, 50% each to Goldberg and Cohn, for distribution to the Fineberg and Langelier Beneficiaries, respectively.  This distribution was expressly conditioned on the Lender not having filed any claims against Blue Hills or Royall Associates.  Royall Agreement Section V.A.

184.    Under the Royall Agreement, the remaining $2 million in the Supplemental Account is held in escrow by Goldberg and Cohn, as the escrow agents for the "Fineberg Beneficiaries" and the "Langelier Beneficiaries" as security against claims that may be asserted by the Lender against Fineberg or Langelier personally on their guaranty of the Debt or by anyone arising from their interest in Blue Hills, Royall Associates, Blue Hills Management Corp. or Fineberg Management.  The Supplemental

Account Escrows were to be distributed to the Royall Associates beneficiaries according to a schedule, but only if the remaining balance after such a distribution exceeded any outstanding indemnified claims. Langelier 214-221; Royall Agreement (Dep. Ex. 176); Fineberg 44-48, 51, 65-66; Goldberg 59-60.

185.    Fineberg and Langelier are the "clients" who currently have control of the $2 million.  Fineberg 71.

186.    The purpose of the Royall Agreement was to put into writing the agreement between the partners about any monies and any liabilities that the partnership will have.  Fineberg 45.

187.    In or around December 2004, the Lender learned of the Zoning Appeal and its settlement from a broker and reported it to counsel.  Polcari II 199; Rosen 117-118.

188.    On April 20, 2005, Lender made written demand upon Fineberg and Langelier under the Guaranty.  Counterclaim ¶ 41; Blue Hills Parties' Answers to Counterclaim ¶ 41.

189.    Neither Fineberg nor Langelier has made payment under the Guaranty. Counterclaim ¶ 42; Blue Hills Parties' Answers to Counterclaim ¶ 42.

190.    To determine the true tax, if any, paid by the partners of Royall Associates as a result of the foreclosure sale of the Property, one needs to review each partner's individual tax return for, at a minimum, the year in which the gain is reported and, ideally, for all the years they owned the Property.  There are various tax attributes an individual might have that would affect whether they actually pay tax on a gain they report.  These include passive activity losses, net operating losses, other capital losses,

possible limitations on basis, and any other items of income or expense that might exist on the personal level.  Andelman 216-217; Riley 42-43, 109.

191.    The only evidence of tax losses proffered by Blue Hills is a hypothetical chart created by its proffered expert of what "could be or would be" the "maximum tax liability . . . with respect to each of the individual partners." Andelman 113-114; Andelman Report (Dep. Ex. 358) at Ex. B.  Andelman did not review any individual tax return information for any Royall Associates partner. Andelman 148.  The only evidence Andelman can offer that any partner will actually pay taxes due to Blue Hills is a hearsay account of conversation with Fineberg's accountant about Fineberg's tax situation. Andelman 149, 151.

192.    Royall Associates is reporting gain from the foreclosure sale as realized in 2005.  Andelman 131-132.

193.    Blue Hills has refused to turn over in discovery any tax returns or tax work papers for the Royall Associates partners for any year, despite the Lenders' repeated demands for all documents related to damages. Barnett Aff. ¶ 13 and Exhibit N thereto.

Respectfully submitted,

CSFB 1999-C1 ROYALL STREET, LLC,
and J.P. MORGAN CHASE BANK, as
Trustee for the Registered Holders of Credit
Suisse First Boston Mortgage Securities
Corp., Commercial Mortgage Pass-Through
Certificates, Series 1999-C1,

By their attorneys,

/s/ Bruce E. Falby
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER RUDNICK GRAY CARY US LLP
33 Arch Street, 26th Floor
(617) 406-6000

Dated:  May 17, 2006

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC, | |
| Plaintiff, Defendant-in-Counterclaim. | |
| v. | Civil Action No.  05-CV-10506 (WGY) |
| J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and, CSFB 1999–C1 ROYALL STREET, LLC, | |
| Defendants, Plaintiffs-in-Counterclaim, | |
| v. | |
| WILLIAM LANGELIER and GERALD FINEBERG, | |
| Defendants-in-Counterclaim. | |

**DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S
CORRECTED
JOINT LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

1.     Blue Hills Borrows $33 Million .................................................................. 2

2.     Fineberg Management .............................................................................. 4

3.     The Refinancing ....................................................................................... 5

4.     The Lockbox and the Escrow Funds Held by Lender ................................ 8

5.     Blue Hills and the Lender Enter Into an Agreement
    Concerning Payment of Property Taxes .................................................. 10

6.     Blue Hills Settles a Property-Related Cause of Action and Transfers the
    Settlement Payment Without the Lender's Consent ................................ 12

7.     Blue Hills Attempts (Unsuccessfully) to Find a New Tenant ................... 20

8.     Events Preceding Equiserve's Departure ................................................ 21

9.     Blue Hills Defaults with Respect to the August 2, 2004 Tax Payment ..... 24

10.    Blue Hills Defaults on Other Loan Payments ......................................... 27

11.    Work Stations Transfer .......................................................................... 29

12.    Loan Servicing Transferred to LNR ....................................................... 30

13.    September 2004 Events .......................................................................... 35

14.    October 2004 Events ............................................................................. 37

15.    The Foreclosure Sale ............................................................................. 38

16.    Blue Hills' Negotiating Strategy ............................................................ 40

17.    The Royall Associates Beneficiaries Split the Settlement Payment
   Amongst Themselves ............................................................................. 41

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

       Plaintiff, Defendant-in-Counterclaim.

       v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

       Defendants, Plaintiffs-in-Counterclaim,

       v.

WILLIAM LANGELIER and GERALD
FINEBERG,

       Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## DEFENDANTS' AND PLAINTIFFS-IN-COUNTERCLAIM'S JOINT LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

In support of their Motions for Summary Judgment on all counts of the Complaint

by plaintiff Blue Hills Office Park LLC and on all counts of their counterclaim against

Blue Hills, Gerald Fineberg, and William Langelier, Defendants JP Morgan Chase Bank,

Trustee and CSFB 1999-C1 Royall Street, LLC submit this joint, concise statement of

material facts which they contend are not in genuine dispute and they will treat as

undisputed for purposes of their motions.  In doing so, Defendants do not concede them

all to be true for purposes of trial.  Not every fact included in this statement is material to

each alternative legal theory pursuant to which the Court may grant summary judgment

in this case.  Further, some facts are included solely to provide the Court with useful background information and context.

1.    **Blue Hills Borrows $33 Million**

1.    Since the 1980s, Gerald Fineberg and William Langelier, through various entities, have owned and controlled certain property located at 150 Royall Street in Canton, Massachusetts (the "Property").  The Property is improved by a two-story brick building containing approximately 275,000 square feet of space and known as the Blue Hills Office Park.  Second Amended Complaint ("SAC") SAC ¶ 6; BHOP Answer to Counterclaim ¶ 9; Advisor Consent for Foreclosure (Dep. Ex. 104) at Trust00013-14; Langelier 36-37-38; Frank 9.[1]

2.    In the summer of 1999, as the trustees of Royall Associates Realty Trust ("Royall Associates", a nominee trust which held record title to the Property), Fineberg and Langelier sought to refinance the mortgage on the Property.  These efforts culminated in the loan that is at issue in this action.  As part of the refinancing transaction, Fineberg and Langelier created plaintiff Blue Hills Office Park LLC ("Blue Hills" or "BHOP"), to which Royall Associates conveyed the property. Langelier 46-47, 82.45-46, 81.

3.    Blue Hills is a single-purpose entity whose sole business was to acquire and

---

[1] This Statement is supported by numerous simultaneously filed documents.  Deposition transcripts are compiled in an Appendix of Deposition Transcripts being filed manually with the Clerk's office due to the voluminous size of each transcript; references to depositions are by the witness's last name and page number (e.g., Fineberg 22).  Deposition exhibits are compiled in an Appendix of Deposition Exhibits being filed electronically (although select exhibits are being filed by manually due to their voluminous size); references to deposition exhibits are by descriptive label and/or "Dep. Ex. __." Affidavits of Joseph A. Polcari, Jr., Edward C. Brown, Curtis J. Mallegni, Stephen Goertzen, Ronald H. Greenspan, and Eric S. Stotz, and Bruce S. Barnett, most of which have their own attachments, are filed separately; references are by affiant's last name (e.g., Polcari Aff. ¶ __).  Pleadings already on file with the Court are not being filed, in accordance with the electronic filing administrative procedures.

own the Property.  First Amendment to Certificate of Formation of Blue Hills Office Park LLC (Barnett Aff. Ex. A).

4.    Royall Associates is the sole member of Blue Hills.  The sole beneficiary of Royall Associates was a Massachusetts general partnership also known as Royall Associates.  (For simplicity, herein and in the defendants' summary judgment briefs, the trust and the partnership are generally both referred to as "Royall Associates.")  Its principal partners were Fineberg and Langelier.[2]  Langelier 45-46 47; BHOP Operating Agreement (Dep. Ex. 407) at 23.

5.    Blue Hills is a "disregarded entity" for tax purposes, which means that it does not file an income tax return or pay income taxes.  Rather, all of its taxable transactions are reported on the return of its member, Royall Associates.  Andelman 123.

6.    Royall Associates is treated as a partnership for tax purposes.  It does not pay taxes at the partnership level, but rather its partners pay tax on its income and gains. Andelman 124-25.

7.    As of 1999, Langelier had close to 30 years experience in real estate, including experience in acquiring, developing, investing, financing and disposing of real properties.  Langelier also had experience dealing with lenders on defaulted loans. Langelier 31 30-40 39.

8.    As of 1999, Fineberg had approximately 40 years of experience in the real estate industry.  He had substantial experience in acquiring, financing, managing, and selling commercial and residential buildings.  Fineberg 5, 12-13.  By that time, he had

---

[2]  Fineberg and Langelier, initially the only partners of Royall Associates, subsequently admitted additional minority partners who received small portions of their beneficial interests.  Langelier 46-47 45-46. Langelier and the minor partners related to him are referred to as the "Langelier Beneficiaries;" Fineberg and the minor partners related to him are referred to as the "Fineberg Beneficiaries."

bought approximately 20 office buildings and 10 retail buildings, all with mortgage financing from commercial real estate lenders. He had also purchased approximately 100 apartment buildings with mortgage financing and had sold about 60-70 of those. Fineberg 6-8, 10.

9.     By 1999, Fineberg had closed at least 27 securitized loans adding up to approximately $146 million. Fineberg 18-20, 36; Dep. Ex. 322. By 2004, a number of these loans had gone into default and Fineberg had deeded the properties to the lenders in lieu of foreclosure. Fineberg 24-26, 31-34, 37-39, 123.

**2.     Fineberg Management**

10.     Since the 1970s, Fineberg has owned a company called Fineberg Management, Inc., which is a real estate management company. Fineberg 23; Donovan 27; Frank 5. It manages residential apartment buildings, office buildings, and retail space. From 1999-2004, Fineberg Management was managing approximately 1500 apartment units, 3 office buildings, and 3 or 4 retail units through approximately 30-50 single purpose entities. Donovan 27, 29; Frank 5-6.

11.     Fineberg Management managed the Property from the time Langelier and Fineberg acquired it until Defendants' foreclosure in November 2004.[3]

12.     Daniel Frank is the President of Fineberg Management and owns a 2.5% beneficial interest in Blue Hills. Frank 5, 7. From 1999-2004, as President of Fineberg Management, Frank oversaw Blue Hills' operations. Frank 19-20. Frank reports to Mr. Fineberg. Frank 73, 188.

---

[3] From September 14, 1999 through November 2004, Fineberg Management managed the property through Blue Hills Management Corp., a single-purpose entity created in connection with the 1999 refinancing. Fineberg is the President and Treasurer of Blue Hills Management Corp. BHOP Operating Agreement at 23 (Dep. Ex. 407); Stone 31.

13.    Larry Needle was the property manager for the Property.  He reports to Daniel Frank.  Fineberg 106; Needle 22, 25.

14.    Joseph Donovan is the Chief Financial Officer of Fineberg Management, and has been since 1995.  Donovan was in charge of accounting for Blue Hills.  Donovan 27-28, 120.  Donovan reports to Daniel Frank or to Gerald Fineberg.  Frank 84.

15.    Gilbert Stone is the Director of Accounting for Fineberg Management, which oversaw the operations of Blue Hills Office Park LLC.  Stone 8, 31.  From 1999 to 2004, Stone did all of Blue Hills' accounting work other than accounts payable, Stone 42, and had oversight responsibilities for all accounting records of Blue Hills, Stone 33.  Stone was also responsible for reporting quarterly financial statements to the Lender.  Stone 30.  Stone reports to Joseph Donovan.  Stone 35; Donovan 27-29.

16.    Langelier and Fineberg, as Blue Hills' principals, made the ultimate decisions concerning actions taken by Blue Hills.  Fineberg 129-130; Langelier ~~98~~97-~~100~~99.

3.    **The Refinancing**

17.    Since 1989, the Property's sole tenant had been an affiliate of the Bank of Boston known as Boston Equiserve Limited Partnership ("Equiserve").  In mid-1999, Equiserve exercised an option to extend its lease until July 31, 2004, and it had an additional option to extend for another five years after that. Langelier, Fineberg, BHOP Answers to Defs.' First Set of Interrogatories, No. 3 (excerpts) (Barnett Aff. Ex. B); SAC ¶ 8; BHOP Answer to Counterclaim ¶ 10.

18.    With this 5-year lease extension in place, Fineberg and Langelier sought a loan from Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse"), which

they knew would be a securitized loan secured by, inter alia, a mortgage on the Property. Fineberg and Langelier knew that, because the loan was to be securitized, Credit Suisse would almost immediately assign the loan to a loan pool and would no longer be involved with the loan; the loan would be serviced by loan servicers, and the loan would be enforced according to its terms.  Langelier 47, 7946, 78; Fineberg 18-19, 21-22, 78-80; see also Frank 38; Donovan 57.

19.    They did not know in September 1999 to which loan pool the loan would be assigned, who the trustee of that loan pool would be, or who the servicers would be. Fineberg 127.

20.    Prior to entering into the loan with Credit Suisse, no one at Blue Hills ever saw any agreements among any of the future mortgagee, future master servicer, or future special servicer, knew whether there were any such agreements, or knew what the terms of those agreements were or would be.  Fineberg 127-128.

21.    On September 14, 1999, Blue Hills executed a mortgage note (the "Note", Barnett Aff. Ex. C[4]) to Credit Suisse in the principal amount of $33,149,000 and Credit Suisse loaned Blue Hills that amount (the "Loan").  Second Amended Complaint ("SAC") ¶¶ 15, 17; Note at p.1.  In negotiating the Loan, Fineberg and Langelier were represented by experienced counsel.  Langelier 55-56.

22.    The Loan was secured by numerous "Loan Documents," including a Mortgage, Assignment of Leases and Rents, and Security Agreement ("Mortgage", Dep. Ex. 155[5]), a Cash Management Agreement ("CMA", Dep. Ex. 156), and a Guaranty

---

[4] Some deposition testimony about the Note refers to it as Exhibit D to the Second Amended Complaint, which was marked in its entirety as Deposition Exhibit 15.

[5] Some deposition testimony about the Mortgage and the CMA refer to them as Exhibits C and E, respectively, to the Second Amended Complaint, which was Deposition Exhibit 15.

(Barnett Aff. Ex. D) executed by Fineberg and Langelier, all of which were executed on September 14, 1999. SAC ¶¶ 15, 17-18; BHOP Answer to Counterclaim ¶¶ 11, 16, 22; Blue Hills Parties' Response to Defs.' First Requests for Admissions (excerpts) (Barnett Aff. Ex. E).

23.    The interest conveyed by the Mortgage included the Property, its improvements, and other personal property of Blue Hills, tangible and intangible, referred to collectively and defined in the Mortgage as the "Mortgaged Property."  SAC ¶¶ 15; Mortgage at p.1; Fineberg 83-88.  Under paragraph 10 of the Mortgage, a conveyance or transfer of the Mortgaged Property or any part thereof required the Lender's prior written consent.

24.    Blue Hills received approximately $5.2 million in excess proceeds from the Loan, $4 million of which was distributed to the beneficiaries of Royall Associates.  The Fineberg Beneficiaries and Langelier Beneficiaries each received $2 million.  About $1.2 million was held in reserve by Royall Associates.  Langelier 80-81-82; Fineberg 49-50.

25.    In or about November 1999, the Loan was securitized with a pool of approximately 150 other loans.  In this process, Credit Suisse assigned the Loan to J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee"; together with its assignee CSFB 1999-C1 Royall Street, LLC, the "Lender").  The Trustee entered a Pooling and Servicing Agreement ("PSA") with Wells Fargo National Association ("Wells Fargo") as master servicer and LNR Partners, Inc. ("LNR", formerly known as Lennar Partners, Inc.) as special servicer. SAC ¶ 25; Pooling and Servicing Agreement ("PSA") (Dep. Ex. 51).

26.     In a CMBS pool, actual day-to-day, operational duties related to the mortgages that are the assets of the Trust are delegated to the master servicer (who administers performing or non-defaulted mortgages according to the terms of the loan documents) and the special servicer (to whom servicing responsibility is transferred if a borrower requests a material modification to the terms of the loan or upon a default or the occurrence of an event of that substantially increases the likelihood of a default). Greenspan Report (Greenspan Aff. Ex. A) at 9.

27.     The provisions of the PSA are binding on and inure to the benefit of the successors and assigns of the parties to it and the certificate holders.  "No other person, including, without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement."  PSA (Dep. Ex. 51) at 215.

**4.     The Lockbox and the Escrow Funds Held By Lender**

28.     The Loan Documents required that Blue Hills deposit (or cause to be deposited) all rents received in connection with the Property into an account at its bank referred to as the "Lockbox," which was located in Massachusetts.  Note (Barnett Aff. Ex. C) ¶ 8(a); Cash Management Agreement (Dep. Ex. 156) § 6(a); Dep. Ex. 12 at Blue Hill 0501.

29.     Under the Note and Mortgage, Blue Hills' principal and interest payments of $254,652.24 on the Loan were due on the 11th of each month.  Blue Hills was also required to make payments on the 11th of each month to fund certain escrow accounts (also referred to as the "reserve accounts") held by the Lender and known as the "Tax and Insurance Impound Fund" (the "Tax Fund" or the "Tax Escrow"), "Replacement Escrow Fund," the "Base Leasing Escrow Fund," and the "Monthly Cash Flow Leasing

Escrow Fund." Note at p.1; Mortgage ¶ 6(a)-(c). Payments to the Tax Fund to fund real estate tax payments could be made quarterly so long as the Equiserve lease was in place. Mortgage ¶ 6(a).

30.    Under the CMA, so long as sufficient funds to cover these payments were deposited by Blue Hills in the Lockbox prior to the 11th of the month, the Lender would simply collect the funds from the Lockbox, apply the funds to the payments due from Blue Hills, and return the net rents to Blue Hills' operating account, which was separate from the Lockbox account. Note ¶ 8(a); Cash Management Agreement §§ 2-3; Donovan 207, 209-10.

31.    Under the Loan Documents, the Base and Cash-Flow Leasing Escrow Funds are combined for purposes of controlling disbursements from them. Mortgage ¶ 6(c). The Leasing Escrow funds are available for tenant improvement and leasing commission expenses incurred by Blue Hills in connection with executed new leases, extensions, renewals, or modifications of a lease. To obtain reimbursement for these items, Blue Hills is required to provide paid invoices for the tenant improvement and leasing commissions, a copy of the new lease, and, if required by the Lender, lien waivers and releases from parties providing materials or services in connection with the requested payment. Mortgage ¶ 6(c)(iv).

32.    Subject to conditions, up to $1 million of the Leasing Escrow Funds are also available "for application solely toward payments of principal and interest" in the event that net operating income from the Property is insufficient to pay principal and interest in a given month. The preconditions to an application of the reserves for this purpose include, among others: 1) that Blue Hills deliver a written request for the

application to Lender at least seven business days prior to the date for which it requests a

disbursement; and 2) no Event of Default (as defined in the Mortgage) shall have

occurred and be continuing as of the date of the request and on the date for which the

disbursement is requested.  Mortgage ¶ 6(c)(ix).

5.    **Blue Hills and the Lender Enter Into an Agreement Concerning Payment of Property Taxes**

33.    Quarterly payments of property taxes on the Property were due to the Town

of Canton on Feb.1, May 1, Aug. 1, and Nov. 1 of each year.  Stone 81; Donovan 202;

Needle 146.

34.    Paragraph 5 of the Mortgage required that Blue Hills pay the property taxes

due on the Property in a timely manner, subject to paragraph 6.  Mortgage ¶ 5.  Blue Hills

understood that paying property taxes is the obligation of the property owner.  Donovan

243.

35.    Paragraph 6 of the Mortgage required Blue Hills to pay (through deposits in

the Lockbox) amounts in advance to the Lender on a monthly or quarterly basis to fund

the Tax Escrow, from which the Lender would draw to pay the quarterly property taxes.

Mortgage ¶ 6.

36.    The CMA effected the Tax Escrow funding by calling for the Lender to

allocate Lockbox rents to the Tax Fund.  CMA §§ 2 & 3.

37.    Around the same time that Wells Fargo became the servicer of the Loan, at

Blue Hills request, the Lender agreed that the Lender would not escrow funds for taxes

from the Lockbox rents.  Instead, the Lender permitted Blue Hills to collect the funds to

pay the quarterly taxes from its tenant, Equiserve, shortly before the payments were due

and deposit them in the Lockbox at that time.  Wells Fargo would then pay the property

taxes on time.  Donovan 202-203; Stone 46, 53-54, 56-57, 77-81, 85, 90, 124; Needle 33-34, 141-142, 147-148; Polcari I 168-169; Lloyd 1211-1514; Dep. Ex. 1.

38.     The process from November 1999-May 2004 for Blue Hills' payment of property taxes was in accordance with the agreement between Blue Hills and Lender. Blue Hills billed Equiserve during the month prior to the quarterly payment due date. Equiserve would then deposit around 97% of the taxes due to the Lockbox.  Blue Hills would deposit the remaining 3% in the Lockbox at about the same time as the Equiserve deposit.  Wells Fargo would then collect the funds from the Lockbox shortly before the quarterly tax payment was due, and pay the property taxes to the Town of Canton on or before the due date.  Stone 46, 53-57, 77-82, 90; Donovan 202-03; Polcari I 168-69; Lloyd 11-15; Needle 32-33, 146-48.

39.     Wells Fargo sent a shortage notice to Blue Hills every quarter during the month prior to when taxes were due.  The notices typically came mid-month.  Stone 56-57, 81-82, 114, 116, 122-23.

40.     From the period of 1999 through May 2004, every time Wells Fargo sent its mid-month shortage notice, Blue Hills made sure the money to pay the property taxes was available in the Lockbox prior to the first of the next month and in time to make the payment by the payment date.  Stone 124.

41.     At no point were replacement or leasing escrow funds used to pay property taxes.  Donovan 163.

42.     [Intentionally omitted.]

43.     Blue Hills knew that this agreement meant that (a) the Lender did not escrow monies to pay the taxes from rents deposited in the Lockbox, and (b) the rents

that otherwise would have been escrowed for taxes were distributed to Blue Hills instead. Stone 77, 85; Donovan 202, 206-07; Needle 140-41.

6.      **Blue Hills Settles a Property-Related Cause of Action and Transfers the Settlement Payment Without the Lender's Consent**

44.      In early 2002, Blue Hills began its effort to extend Equiserve's presence in the building past the July 2004 expiration of its lease extension.  The parties first discussed a possible long-term extension of the lease with an option for Equiserve to buy the Property, and then a shorter-term lease extension.  Although they came to no agreement, Frank maintained hope of keeping Equiserve in the Property up through the middle of 2003.  Frank 41-61; Dep. Exs. 37, 38, 39.

45.      Blue Hills believed throughout this time that the best thing to do was to get Equiserve to stay at the Property, "whether it was a sale with a long-term lease or a short-term lease, get them to stay."  Frank 52; Langelier 80.79.

46.      During the month of April 2003, Blue Hills received a copy of a special permit application filed with the Town of Canton by Equiserve and National Development, owner (through a subsidiary, Blueview Corporate Center, LLC) of adjacent property at 250 Royall Street known as "Blueview."  Needle 61-67; Dep. Ex. 9. Equiserve and National Development were seeking to build a parking garage at Blueview. Id.

47.      In May or June 2003, Blue Hills learned that DST Realty, Inc. (an affiliate of Equiserve and DST Systems) had entered into a purchase and sale agreement to buy Blueview.  Blue Hills also learned that DST Realty's purchase of Blueview was conditioned on the Town of Canton approving the construction of the proposed parking

garage.  Donovan 80-83; Langelier 107106; Needle 76-77; Purchase and Sale Agreement

(Dep. Ex. 19).

48.    On May 1, 2003, Larry Needle and Gary Lillienthal, an attorney

representing Blue Hills, attended a Zoning Board of Appeals hearing concerning

Equiserve's special permit application.  Lillienthal introduced Blue Hills as an abutter

and stated that he felt the proposed garage would have a major effect on traffic and

obstruct the view of Blue Hills from the south-west (i.e., from Route 128).  Minutes of

Canton Zoning Board of Appeals ("ZBA") (Dep. Ex. 304) at 3-4; Blue Hills, Langelier &

Fineberg's Response to Defs.' Second Requests For Admissions, No. 2 (excerpts)

(Barnett Aff. Ex. F); Fineberg 135-39; Dep. Ex. 328; Needle 67-68.

49.    On or about May 15, 2003, Equiserve formally notified Blue Hills of its

intent not to exercise its option to extend its lease past July 31, 2004.  Langelier,

Fineberg, BHOP Answers to Defs.' First Set of Interrogatories, No. 7; Donovan 64-66;

Dep. Exs. 17, 18; Langelier 105-106.104-105.

50.    On May 22, 2003, the Town of Canton granted the special permit (the

"Special Permit") for a parking garage (which would add approximately 263 parking

spaces) to Blueview Corporate Center LLC, then-owner of Blueview, which abuts the

Property.  Needle 74-76; Dep. Ex. 304; ZBA Decision Granting Blue View Special

Permit ("ZBA Decision," Barnett Aff. Ex. G).

51.    The document attached to Lenders' Second RFA as Exhibit "L" is a true

and correct copy of the ZBA Decision.  Blue Hills' Parties Response to Defs.' Second

Requests for Admissions, No. 15.

52.    Blue Hills continued to believe that the best option and most financially

beneficial scenario for the future of the Property was to have Equiserve renew its lease, as it had been advised by Spaulding & Slye, a real estate brokerage firm, in mid-May 2003.  Frank 171-75; Dep. Ex. 44.

53.    On June 9, 2003, Blue Hills filed a complaint in Norfolk Superior Court appealing the ZBA Decision (the "Zoning Appeal" (Dep. Ex. 20)).  The complaint stated that the proposed garage "is immediately in the sight line of [the] Property, will partially block its view and will be detrimental and offensive to [Blue Hills] and inhabitants of [the] Property.  The addition of 380 spaces in a structured parking facility directly in the sight line of [the] Property will not assure the fulfillment of the general conditions for site plan approval, but rather violates such requirements as is poses a detriment to [the] Property."  Zoning Appeal ¶¶ 37-38.

54.    Blue Hills knew the only reason it could file the Zoning Appeal was because it owned the property abutting Blueview.  Frank 81; Fineberg 90; Zoning Appeal ¶ 43.

55.    The right to bring the Zoning Appeal of the Special Permit was Mortgaged Property under Granting Clause Seven of the Mortgage, as it was a "cause[] of action" that "related to, [was] derived from or [was] used in connection with the Mortgaged Property."  Mortgage Granting Clause Seven.

56.    Blue Hills hoped by appealing the special permit to "slow everything down," to hopefully persuade Equiserve to stay in Blue Hills Office Park, or to "stop them from building the garage," in hopes of keeping Equiserve in the building.  Donovan 87, 90-91; Frank 61-63, 174-75; Fineberg 90-91.

57.    During the summer of 2003 Blue Hills negotiated a settlement under which

it agreed to accept a $2 million payment (the "Payment") to dismiss the Zoning Appeal and to waive all further rights of appeal of the ZBA Decision.  The terms of the settlement are set forth in a "Settlement Agreement" executed on August 5, 2003 (Dep. Ex. 21).  As part of the settlement Blue Hills also executed a "Lease Termination Agreement" dated August 5, 2003 with Equiserve, Lease Termination Agreement (Dep. Ex. 10), and Releases dated August 5, 2003, BHOP Release of Blueview Corporate Center LLC (Barnett Aff. Ex. H).  See also Blue Hills' Parties Response to Second RFA, No. 16; Donovan 96; Needle 83-85; Frank 77.

58.    As part of the settlement, Blue Hills agreed to, *inter alia*: (1) dismiss the Zoning Appeal, with prejudice (thereby forfeiting its right to contest the grant of the special permit); (2) waive its right to (at any time within 10 years of the date of the Settlement Agreement) "take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development" of the Blueview Property; (3) release DST and Blueview from any and all claims which Blue Hills had against DST and/or Blueview prior to or on the date of the Settlement Agreement; and (4) terminate Equiserve's lease as of July 31, 2004.  Settlement Agreement ¶¶ 3, 7(c) and Exhibits B-2 and B-4 thereto.  (Dep. Ex. 21.)

59.    Blue Hills knew that the settlement removed any impediment to approval of the garage by the Town of Canton, thus eliminating any possibility of Equiserve staying in the Property and clearing the way for Equiserve to move across the street.  Donovan 99-100; Fineberg 92, 96-97.  Blue Hills was aware that settling the Zoning Appeal would ensure that Equiserve would move its offices to Blueview.  Frank 75-76.

60.    On August 4, 2003, an entity related to Equiserve (DST Realty of Massachusetts, Inc.) purchased Blueview from Blueview Corporate Center, LLC. Counterclaim ¶ 33.

61.    The settlement of the Zoning Appeal was an assignment, transfer, or conveyance of part of the Mortgaged Property, as it constituted the transfer of the cause of action of the Zoning Appeal and other rights related to the Property (including the right to contest future development at Blueview).  Mortgage ¶ 10.  Paragraph 10(a) of the Mortgage required the Lender's prior written consent to the settlement of the Zoning Appeal.

62.    Without notifying the Lender or obtaining the Lender's prior written consent, Blue Hills agreed to the settlement, accepted the Payment, and executed the Settlement Agreement, the Lease Termination Agreement and Releases.  BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, Nos. 3, 4.  Blue Hills never notified the Lender of  the Zoning Appeal, the settlement of the Zoning Appeal (including the Lease Termination Agreement), or its receipt of the Payment. BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, Nos. 3, 4; BHOP Answer to Counterclaim ¶¶ 28-30.

63.    If Blue Hills had requested the Lender's consent to the Settlement, the Lender would not have allowed Blue Hills to keep $2 million.  Rather, the Lender would have required that the proceeds be placed into a reserve to cover the loss of the sole tenant of the Property.  Polcari II 213-14; Clarke 39, 41-42 (plaintiff's expert designee agreeing that a request by Blue Hills for consent to the settlement and disposition of the payment would have given the Lender the opportunity to require additional payments or

reserves for the loan).

64.    Under the Pooling and Servicing Agreement, it was LNR as special servicer, and not Wells Fargo as Master Servicer, that would have responded to a request for consent to any transfers of Mortgaged Property.  Pooling and Servicing Agreement p. 113, § 3.20(a)(iii).

65.    No part of the Payment passed through any Blue Hills account.  Stone 59, 61-63, 70, 107-108, 137-138; Frank 74, 85.  The Payment was never recorded by Stone as a receipt for Blue Hills, even though it was Stone's responsibility to record all receipts for Blue Hills.  Stone 62-63, 108.

66.    Donovan did not think it was his responsibility to determine what had happened to the Payment because "the settlement was with the owners, and I'm responsible for the operating books.  I'm not responsible for the owners' books." Donovan 120-22.

67.    The Payment was Mortgaged Property under Granting Clause Eight of the Mortgage, as it is proceeds of the disposition of other Mortgaged Property, namely the Zoning Appeal cause of action and other rights transferred and released in the Settlement Agreement.  The Payment was  Mortgaged Property under Granting Clause Four, as it is "consideration" paid to Blue Hills arising from and attributable to the Premises and Improvements.  The Payment was  Mortgaged Property under Granting Three, as it is an "award or payment" made for an injury to or decrease in value of the Mortgaged Property.  The Mortgage in paragraph 10 required the prior written consent of the Lender to any transfer or conveyance of the Settlement Payment.  Mortgage ¶ 10 and Granting Clauses Three, Four, Eight.

68.     On or around August 8, 2003, without the prior written consent of Lender, the settlement Payment was transferred to Bernkopf Goodman LLP's IOLTA account and then to a client fund account at Bernkopf Goodman LLP, where it remained until after the Lender's foreclosure.  Langelier 128127-130129; Dep. Ex. 177; Goldberg 69-70. The client fund account was  controlled by Langelier and Fineberg as the trustees and beneficiaries of Royall Associates, as evidenced by their disposition of the fund through a subsequent agreement dated December 31, 2004, to which Blue Hills was not a party. (Dep. Ex. 176).  See infra ¶¶ 181-186.

69.     Regardless whether the settlement funds passed through the Blue Hills entity or were sent directly to Royall Associates, Blue Hills' outside accountants, Rutfield and Hassey, accounted for the Payment as a transfer to Royall Associates, as evidenced by a corresponding increase in the "Due From Affiliate" line on Blue Hills' balance sheet for the year ending December 31, 2003.  Andelman 86-88, 92-95; Dep. Exs. 364, 365, 367, 368.

70.     Blue Hills' tax lawyer and expert witness designee David Andelman testified that the item shown as "Due from Affiliate" represented an amount that Blue Hills transferred to Royall Associates.  Andelman 87-88.

71.     Blue Hills accounted for the Payment on its balance sheet as a reduction to the basis of the Property.  Andelman 92-93, 104-105 ("properly reflected on balance sheets"), 169-170; Dep. Exs. 364, 365, 368, 369.

72.      The transfer of the payment from Blue Hills to Royall Associates was a transfer of Mortgaged Property under Section 10 of the Mortgage.

73.     Blue Hills did not obtain the prior written consent of the Lender to transfer

the Payment to Royall Associates.  Fineberg 59-61; Blue Hills, Langelier & Fineberg

Responses to Defs.' First Requests for Admissions, No. 3, 4. (Barnett Aff. Ex. E).

74.    Blue Hills considered whether to seek consent to the settlement and transfer

of the Payment from the Lender but did not do so.  Fineberg testified that he relied on the

advice of counsel, but his counsel instructed him not to answer questions about the

substance of the advice, invoking the attorney-client privilege.  Fineberg 59-61, 82-83,

143-44, 216-219; see also Goldberg 41-43, 77-78.

75.    Fineberg and Langelier made the decisions to settle the Zoning Appeal and

how to handle the settlement Payment.  Fineberg 129-30; Langelier 112-113.111-112.

76.    On September 5, 2003, a Stipulation of Dismissal of the Zoning Appeal

signed by all counsel of record was filed with the court and all rights of appeal of the

ZBA Decision were thereby waived by Blue Hills.  BHOP Answer to Counterclaim ¶ 35.

77.    On or around February 1, 2005, the Payment was conveyed from the client

fund account controlled by Royall Associates to two separate client fund accounts.  Dep.

Ex. 177.  One of the accounts is controlled by Fineberg and the other is controlled by

Langelier.  Langelier 128-129-30; Fineberg 65-71.

78.    As a result of the accountants' treatment of the Payment as a basis

reduction and not as income, it did not appear on the income and expense statements that

Blue Hills provided quarterly to Lender.  Andelman 103-05; Dep. Exs. 35-36.

79.    Despite a clear requirement in the Mortgage that Blue Hills provide Lender

a balance sheet showing assets and liabilities (which would have reflected the reduction

in basis), Mortgage ¶ 18(b), Blue Hills never provided a balance sheet after receiving the

Payment.  Affidavit of Curtis Mallegni ¶ 4.

7.    **Blue Hills Attempts (Unsuccessfully) to Find a New Tenant**

80.    Frank and Needle were in charge of the effort to find a new tenant for the Property, which began even before the May 14, 2003 notice from Equiserve (Dep. Ex. 17) was delivered to Blue Hills.  Frank 133-134.

81.    Blue Hills engaged Cushman and Wakefield as Blue Hills' exclusive leasing agent to actively market the Property.  SAC ¶ 39; Frank 134-135.

82.    Cushman and Wakefield actively but unsuccessfully marketed the Property for lease from May 2003 through at least November 4, 2004.  From May 2003 through November 2004, no letters of intent were ever signed by any prospective tenant.  No new tenant was found.  Frank 133-34, 136-43, 148, 156, 162; Needle 107-14; Fineberg 100.

83.    The leasing market was "pretty bad" between May 2003 and the fall of 2004.  There was "clearly a downturn and a high vacancy rate in office properties."  Frank Depo 142, 178; Langelier 146. 145.

84.    As of July 21, 2004, there were no viable tenant prospects for the Property.  Frank 138-41; Dep. Ex. 42; Donovan 126-128; Needle 108-09, 137.

85.    As of August 2004, Cushman and Wakefield had no tenant prospects for the Property.  Frank 148; Fineberg 100; Donovan 126-28.  Blue Hills, with 275,000 square feet to fill, was looking for tenants taking 100,000 square feet or more.  In a report dated August 3, 2004, Joseph Plunkett, Cushman and Wakefield's lead broker for the Property, described their prospects.  According to Plunkett, "'Major deals' that are greater that 50,000 square feet are for all intents and purposes non-existent today, in the Route 128 South market," of which Canton is a part.  Users looking for 100,000+ square feet "have 20 options within a 15-minute drive of 150 Royall Street."  Letter from Joseph

Plunkett to Daniel Frank dated August 3, 2004 (Dep. Ex. 43).

86.    Blue Hills continued looking for tenants right up to the time of the
foreclosure but never found one.  Langelier ~~161~~160; Fineberg 110.

### 8.    Events Preceding Equiserve's Departure

87.    On or about September 16, 2003, Wells Fargo contacted Blue Hills and was
told that Equiserve would be vacating the Property in July 2004 and that marketing of the
Property had begun (although Blue Hills could give no information about prospective
tenants).  Wells Fargo communicated this information to LNR at the time. Mallegni
~~145~~144 ~~47~~46; Dep. Ex. 141; Email chain from September 2003 (Barnett Aff. Ex. I).

88.    From late 2003 through April or May 2004, Donovan had three or four
telephone conversations with people from Wells Fargo (whose names he does not recall)
concerning the Property.  There was no urgency to the calls.  He communicated that they
were looking for a tenant and thought they would have one in place around the time
Equiserve left.  Donovan 145-149.  He did not ask Wells Fargo for a meeting in any of
these calls.  Donovan 157-58.  He did not mention that Blue Hills had entered into a
Lease Termination Agreement with Equiserve or received a $2 million settlement
payment that it had transferred to its owners.  Donovan 146.

89.    By April 2004, LNR was estimating a loss from the Blue Hills Loan of
between $10 million and $20 million dollars (Dep. Ex. 80).  In the fall of 2004, its best
estimate of the loss was $18,590,000 (Dep. Ex. 97).

90.    As Fineberg Management was marketing the Property in the first half of
2004, Fineberg was in the process of walking away from two hotel properties that were in
CMBS pools for which LNR was the Special Servicer.  After the hotels — one in

Sturbridge, Massachusetts and one in Lancaster, Pennsylvania — went into default, Fineberg executed deeds-in-lieu of foreclosure and turned the properties back to the Lender.  Brown Aff. ¶¶ 2-4; Goldberg 116-117.

91.     Frank and Donovan were involved in these transactions in their capacities as officers of Fine Hotels, an affiliate of Fineberg Management also owned by Fineberg. Donovan 27, 31-32; Frank 5; Fineberg 23.

92.     Goldberg and the Bernkopf Goodman firm represented Fineberg and Fine Hotels in connection with the deeds-in-lieu, which were handled by LNR asset manager Chris Brown.  The deed-in-lieu transactions closed in July 2004.  Brown Aff. ¶¶ 2-4.

93.     The Blue Hills Loan was mentioned in at least two conversations between Brown and Goldberg that were otherwise about Sturbridge and Lancaster.  According to Brown, Goldberg made a vague reference in one call to the fact that he had another loan that would be coming to LNR but would not say anything more about the loan or the property.  In a subsequent call, at Brown's prodding, Goldberg identified it as the Blue Hills property, adding that the property had a single tenant who was leaving after which there would be no income, and that the borrower was trying to get the loan transferred from the master servicer to the special servicer.  Brown did not suggest anything he should say to get the master servicer to make a transfer and did not do anything to get the loan transferred from the master servicer to LNR.  Brown Aff. ¶¶ 7-8.

94.     According to Brown, Goldberg never told him said, in form or substance, that "time was of the essence" with respect to transferring or servicing the Blue Hills loan and Goldberg did not say anything in any of their conversations that gave Brown the impression that there was any urgency at all with respect to the loan or the property.

Goldberg never told Brown that his client was intent on or committed to keeping the Blue Hills Property or that he was looking for an outcome different from the Sturbridge and Lancaster transactions. Goldberg never discussed with Brown the possibility of doing a workout of the Blue Hills Loan. He did not say that the borrower was exploring various options with respect to the future of the Property and he did not say, in form or in substance, that "there were a whole host of ways [his] client wanted to consider going with the property." Brown Aff. ¶¶ 9-10.

95.    Brown's conversations with Goldberg about Blue Hills left Brown with the impression that Blue Hills would be giving the Property back to the lender, as they had done in Sturbridge, Lancaster, and Williamsburg. Brown Aff. ¶ 11.

96.    According to Goldberg: He and Brown had three or four conversations about the Blue Hills Loan. Initially, Goldberg asked Brown whether LNR was the special servicer for the Loan. Brown called back to confirm that it was but the Loan had not yet been transferred. Brown offered a suggestion of what Blue Hills could say to Wells Fargo to get the Loan transferred LNR. Goldberg told Brown that, unlike some other properties that had been turned back, his client really intended to keep Blue Hills, that there were "a whole host of ways [his] client wanted to consider going with the property" (although he provided no specifics), and that time was of the essence. In a subsequent call, Brown informed Goldberg that the Loan was being transferred and that Job Warshaw would be the asset manager. Goldberg made no notes or other contemporaneous record supporting his account of these conversations. Goldberg 81-95.

97.    Curtis Mallegni, a Wells Fargo asset manager, spoke with Donovan on or about July 15, 2004. Donovan told him that the tenant was leaving and that the Property

was available for lease, but there were no prospects.  Donovan might have asked for a

meeting with Wells Fargo to discuss the loan during this conversation, but he is not sure

that he did.  Donovan 158; Mallegni 86-88; July 15, 2004 Email from C. Mallegni to V.

Taylor (Dep. Ex. 22, 136).

98.    On or around July 31, 2004, Equiserve allowed its lease to expire without

renewal, vacated the Property, and moved to Blueview.  SAC ¶ 52; Answer to

Counterclaim ¶ 38; Langelier 107.106.

99.    Blue Hills never signed a lease with a tenant to replace Equiserve, never

spent money on tenant improvements for a replacement tenant for Equiserve, never

presented Lender with any paid invoices for reimbursement for tenant improvements,

never paid any leasing commissions, and never presented any leasing commission

invoices to Lender.  Fineberg 113.

**9.    <u>Blue Hills Defaults with Respect to the August 2, 2004 Tax Payment</u>**

100.   Blue Hills knew that a quarterly real estate tax payment would be due to the

Town of Canton on or before August 2, 2004, but did not set aside any monies from net

rents of approximately $150,000 to $170,000 per month during May, June, or July 2004

to pay the taxes.  Donovan 204, 207-09, 215; Dep. Exs. 31, 32.

101.   At no time did Blue Hills suggest to Wells Fargo that it should start

escrowing for real estate taxes while Equiserve was still paying rent, and Blue Hills did

not expect Lender to begin escrowing for tax payments.  Stone 109, 148; Donovan

205-06.

102.   By letter dated July 16, 2004 (attached to the SAC as Exhibit "F"; Dep. Ex.

4), Wells Fargo advised Blue Hills that the Tax and Insurance Fund  had insufficient

funds to pay the first installment of taxes to the Town of Canton for 2004 and requested Blue Hills to deposit with Wells Fargo the sum of $158,181.19 by July 27, 2004. This quarterly tax shortage notice was typical of notices that the Lender sent to Blue Hills every quarter. SAC ¶ 48; Donovan 202.

103. In July 2004, when the shortage notice came from Wells Fargo, Stone asked Donovan how the taxes would be paid. Donovan said that they were not going to pay the taxes at that point because they didn't have the funds. They wanted to take it out of the escrow funds held by the Lender. Stone 94-95, 100, 111; Donovan 204, 211-12.

104. On July 29, 2004, Brent Lloyd (of Wells Fargo) spoke with Stone and stated that taxes were due. Stone stated that the tenant had moved out and that there were no available funds to pay taxes. Stone asked if there was any way Blue Hills could use reserve funds to make the tax payment. Lloyd called him back later that day, after checking with the reserves department, to say that if he needed to use the reserve money to pay taxes, he would have to provide a lien waiver. Stone said he did not have a lien waiver. Lloyd told him that if he could not provide the lien waiver and could not pay the taxes, he would be in default of his loan agreement. Stone said he would get back in touch with Lloyd but did not. Lloyd testified to this conversation and memorialized it in contemporaneous notes. Stone did not recall the conversation, but could not deny it. Wells Fargo telephone records show two calls from Wells Fargo to Blue Hills/Fineberg Management on July 29, 2004. Stone 117-119, 124 -125; Dep. Ex. 5; Dep. Ex. 6; Dep. Ex. 8; Dep. Ex. 139 (WF1745); Lloyd 21-25, 33, 40-41, 61-62 20-24, 32, 39-40, 60-61;

Goertzen Aff. Ex. A. [6]

105.    Wells Fargo advanced the property tax payment out of its own funds on July 29, 2004.  Mallegni 156; Dep. Ex. 143; Lloyd 50-51.

106.    Prior to August 2, 2004, Blue Hills did not deposit with Wells Fargo any funds for payment of the taxes due on that date and it did not pay the taxes to the Town of Canton directly.  Polcari I 32-33; Dep. Ex. 30.

107.    By letter dated and mailed on August 2, 2004 but not delivered to the Lender until on or after August 4, 2004, Blue Hills' Donovan requested a disbursement from the Leasing Escrow Funds to pay the real estate taxes due on August 2, 2004, as well as to pay principal and interest due on the Note for the month of August 2004. BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, No. 9; SAC ¶ 54; Donovan 225-227, 162-163; Exhibit 23.  The payment of principal and interest was due on August 11.  Mortgage Note ¶ B.  Donovan made no effort to find out from Wells Fargo whether this request had been granted.  Donovan 223.

108.    Donovan testified that he believed, based on his understanding of the 1999 Loan negotiations, that reserves could be accessed to pay taxes when Equiserve departed. Donovan 53-55, 132-33, 135-39, 211-12.  He now knows that is not the case.  Id. 265-266.

---

[6]  References to lien waivers and other documentation requirements in Lloyd's testimony and Dep. Exs. 5 and 6 make sense in light of Stone's request, i.e., whether there was anyway to use money in the reserves to pay taxes.  Even though the Mortgage does not have a reserve for paying taxes, if Blue Hills had been entitled to a reserve disbursement for some other reason (e.g., for having incurred leasing commission or tenant improvement expenses), funds could have been released on that basis (subject to appropriate documentation) and then applied by Wells Fargo to the Tax Fund rather than returned to Blue Hills. Stone's response indicated he could not meet the documentation requirements for the potentially available reserve disbursements.

109.   Donovan testified he waited until the day the taxes were due to mail the request, which he knew would not arrive until after the taxes were due, because he was busy.  Donovan 243-45.

110.   This was the first request by Blue Hills to Wells Fargo for access to the Loan reserves for any purpose.  Donovan 163.

111.   At some time in mid-August 2004, Blue Hills collected approximately $51,800.00, one month's worth of property taxes, from Equiserve and deposited the funds in the Lockbox.  The money was swept to Wells Fargo and applied to reduce the deficit in the Blue Hills tax escrow account, which was negative in the amount of the August payment (approximately $158,000.) Donovan Sept. 2 Letter (Dep. Ex. 26); Tax Record for Single Loan (Dep. Ex. 138).

112.   At some time in August, Donovan had someone at Fineberg Management confirm with the Town of Canton that the taxes had been paid.  This information from the Town, and nothing else, led Donovan to believe the requests in his August 2 letter has been granted.  Donovan did not ask the town <u>when</u> the taxes had been paid, nor did he contact Wells Fargo or LNR to confirm the source of the monies used to pay the taxes. Donovan 229, 239, 240.

**10.   <u>Blue Hills Defaults on Other Loan Payments</u>**

113.   Donovan sent his August 2, 2004, letter requesting application of loan reserves to principal, interest, and real estate taxes to Tim Parrish of the Wells Fargo tax group, whose name was on the July 16 tax letter, not to Mallegni.  Dep. Ex. 23; Donovan 161.

114.   The August 2, 2004 letter did not request payment of reserve fund

payments due on August 11, 2004.  Donovan did not think there was any need to make

those payments.  Dep. Ex. 23; Donovan 230-31; Stone 146-47 ("I hadn't thought about

it.")

115.    Donovan deposited the letter dated August 2 in the U.S. Mail on August 2,

2004 and faxed it to Wells Fargo on August 4, 2004.  Blue Hills, Fineberg and Langelier

Answers to Defs' Second Interrogatories, No. 2 (Barnett Aff. Ex. J).  The Wells Fargo

Loancator correspondence tracking system notes that it was received by Wells Fargo on

August 4, 2004.  Dep. Ex. 134; Martin 62̶61-69̶.68.

116.    On August 5, 2004, Donovan sent another letter to Wells Fargo — again to

Parish — officially notifying the Lender that Equiserve had vacated and that no

replacement tenant had been found.  In that letter, Donovan requested a meeting with the

Lender and asked that the special servicer be involved.  Donovan 163-64; Dep. Ex. 24.

117.    Thereafter, Mallegni and Donovan traded phone messages.  Mallegni was

seeking to confirm whether Blue Hills would be making the loan payments due on

August 11 (Dep. Ex. 145).  Donovan finally sent him the August 2 and August 5 letters

by fax on August 13, noting in his cover sheet: "Sorry we have been missing each other

on the phone.  I would like to get the special servicer involved.  Attached are the recent

correspondence."  Dep. Ex. 27; Donovan 170; Mallegni 56-57.

118.    Wells Fargo telephone records show three calls from Mallegni's extension

(415-396-6994̶6999) to Blue Hills/Fineberg Management  (781-239-1480) on August 11

and 13, 2004.  Goertzen Aff. ¶ 3 and Ex. A; Mallegni Aff. ¶ 6; Barnett Aff. ¶ 2.

119.    In the meantime, the August 11 payment date passed and Blue Hills did not

make the principal, interest, or reserve fund payments due on August 11, 2004. Polcari I

32-33; Dep. Ex. 30; BHOP, Langelier and Fineberg Responses to Defs.' First Requests for Admissions, Nos. 10 & 11.

120.   Mallegni and Donovan spoke on or after August 11, 2004.  The gist of Mallegni's conversations with Donovan was that Donovan wanted to get the loan transferred to the special servicer, which Donovan knew was the entity with power to address issues with the loan.  Mallegni 72-73.

121.   On Monday, August 16 — the next business day after receiving the August 13 fax — Mallegni drafted a memorandum to transfer the loan to special servicing. Mallegni Dep. 45-47; Transfer Memorandum (Dep. Ex. 57).

122.   At no time between August 2 and September 17 did Donovan seek confirmation from anyone at Wells Fargo or LNR that they were going to grant the requests for access to reserves.  Donovan 163, 223.  Nor did anyone at Wells Fargo or LNR inform him that his requests had been granted.  Donovan 200-01.

123.   Donovan said he had no basis to believe Wells Fargo had acted favorably on the August 2 request for access to reserves other than the fact that the Town of Canton told him the taxes had been paid.  Donovan 228-229, 240.

**11.     Work Stations Transfer**

124.   Pursuant to the Lease Termination Agreement, approximately 1,000 Haworth Unigroup workstations (the "Workstations") became the property of Blue Hills upon Equiserve's departure.  In or around August 2004, without notifying Lender and without obtaining Lender's prior written consent, Blue Hills sold the Workstations for $100,000 to D. Erwin & Associates LLC.  Needle 91-95, 183-84; Dep. Ex. 305 at Blue Hills 5098.

125.   The Workstations were Mortgaged Property under the Mortgage, Mortgage Granting Clause Two, and Blue Hills' sale of them was a transfer of Mortgaged Property in violation of Section 10 of the Mortgage.

**12.    Loan Servicing Transferred to LNR**

126.   On or around August 18, 2004, certain servicing responsibilities for the Loan were transferred from Wells Fargo to LNR as the special servicer.  SAC ¶ 64.  A special servicer assumes certain servicing responsibilities for a loan when the loan is in trouble or in default.  Donovan 59-60; Fineberg 21-22.

127.   At LNR, the loan was assigned to asset manager Job Warshaw, who sent the borrower two letters dated August 19, 2004.  These letters were sent to Blue Hills by fax on August 24, 2004.  Warshaw 34-35.

128.   The shorter of the letters was a form letter that introduced Blue Hills to LNR and notified Blue Hills that certain servicing responsibilities for the loan had been transferred to LNR.  The letter closed stating:  "Thank you for your cooperation and we look forward to a successful working relationship."  SAC ¶ 65; Dep. Ex. 28; Warshaw 27-28.

129.   The longer of the two letters, a so-called "Prenegotiation Letter," was also a form letter which set forth the terms and conditions that would govern any discussions between LNR and Blue Hills regarding the Loan.   Blue Hills was required to execute the Prenegotiation Letter as a prerequisite to substantive discussions about the Loan.  SAC ¶ 66; Dep. Ex. 60; Polcari I 64; Warshaw 28-35.

130.   Warshaw called Blue Hills on August 24, 2004, and left a message for Donovan introducing himself, stating that he was faxing the August 19 letters and that

the Prenegotiation Letter had to be signed prior to any discussions, and asking that

someone call him.  Donovan 165; Warshaw 26-27, 42, 82; Voicemail transcription (Dep.

Ex. 25); LNR Asset Manager Call Log (Dep. Ex. 128).

131.   This call was returned on August 25 not by Donovan, but by Kenneth

Goldberg, counsel to Blue Hills, Royall Associates, and Fineberg.  Warshaw 82-83;

Goldberg 103-08, 119-20.

132.   Donovan himself never contacted Warshaw to ask for a meeting or to

follow up on the request in his August 5 letter to Wells Fargo.  Warshaw 82; Donovan

166, 223.

133.   Warshaw recalls two calls with Goldberg.  According to Warshaw, the first

call occurred on August 25, 2004.  Mr. Goldberg introduced himself as someone who had

worked with Fineberg for 30 years doing capital structuring and who was a lawyer, but

not calling in the capacity as an attorney for Blue Hills.  Goldberg and Warshaw

discussed the Prenegotiation letter, which Goldberg had received, but it had not yet been

executed. Goldberg indicated he would be seeing Mr. Fineberg the next day, when they

would sign the letter and get back to Warshaw.  There were no substantive discussions of

the loan during the first call because the Prenegotiation Letter had not been signed. Asset

Manager Call Log (Dep. Ex. 128); Warshaw 60-63, 84-86.

134.   According to Warshaw, the second call occurred on September 7, 2004.

Goldberg provided a short overview of what had happened at the Property, including that

Equiserve, the sole tenant, had left and that Blue Hills had retained a leasing agent to try

and release the space.  Goldberg also requested access to the reserves to pay debt service.

Warshaw told him that, based on an introductory review of the file, Blue Hills was in

default and he did not think it would be eligible to draw on the reserves so long as the Loan was in default. There was discussion about why the Loan was in default, and Warshaw identified the failure to pay real estate taxes as one basis. Goldberg disagreed, stating that Blue Hills was not in default and instructing Warshaw to review the Loan Documents. The call then ended abruptly. Warshaw 56-61.

135.    According to Warshaw, Goldberg did not request, and there was no discussion of, a meeting with LNR in either of their phone calls. Warshaw 76, 84-86.

136.    Warshaw made contemporaneous notes of some of the things said during this conversation and also described the call to Polcari on or about September 7. Exhibit 128. Polcari made contemporaneous notes of his conversation with Warshaw, including noting that Warshaw told Goldberg "you're in default" and that "Borrower says he's not in default." Dep. Ex. 84 at LNR3919-3921; Polcari II 33-35, 50-52.

137.    Goldberg recalls two or three substantive calls with Warshaw, the first in the middle of August before he had received the Prenegotiation Letter. According to Goldberg, Warshaw stated that he had spoken to Chris Brown about Goldberg's conversations with Brown. Goldberg explained his client's perception of the Property and the market (which he thought was starting to come back), expressed his belief that there was an opportunity to get the matter resolved, and stated that his client was committed to pursuing a number of alternative courses to recapitalize Blue Hills and intended to keep the property. He asked Warshaw to confirm that there was a lot of money in reserve and said that the reserves, together with a well heeled and committed borrower, provided an opportunity to get the building re-tenanted and "back on line." The conversation ended with Warshaw stating that he was going to review the file and

would get back to Goldberg.  Goldberg 96-98.

138.   According to Goldberg, in either a first or second call, Goldberg identified the alternatives by which his clients could bring new money to the Property, including by mezzanine financing, additional capital from the existing partners, new capital from new partners, or seeking tenant participation and ownership.  In one of the calls, he stated his belief that it would require $5 or $10 million to turn around the Property. Goldberg 98-99.

139.   According to Goldberg, the second call came at the end of August and was prompted by the Prenegotiation Letter, which was of a type he had seen before.  During the second call, Goldberg invited Warshaw (who was based in Miami) to visit the Property and assess the market at the Borrower's expense.  Warshaw responded that he didn't think it was possible for him to get to Boston before Labor Day.  Goldberg said he would get the Prenegotiation Letter signed during a meeting with Fineberg the next day and get back to Warshaw.  Goldberg 106-107.

140.   According to Goldberg, his final conversation with Warshaw occurred either just before or just after Labor Day.  Warshaw did not tell him that it appeared the Borrower was in default.  Rather, Warshaw had not sufficiently examined the Loan Documents to provide a substantive response to Goldberg's request for access to the reserves.  Goldberg's last conversation with Warshaw concluded with them waiting to arrange a meeting either in Boston, if Warshaw could visit, or in Miami.  Goldberg 123-127.

141.   Goldberg acknowledges that he did not tell Warshaw that the Blue Hills or Royall Associates had $5 to $6 million set aside, outside of the reserves held by the

Lender, to invest in the Property. Goldberg said that his client was well heeled, and assumed that Warshaw had spoken to Brown about Fineberg's resources and that Brown had told Warshaw that Fineberg had made offers to LNR to acquire other mortgaged properties in proposals that did not contain financing contingencies. Goldberg 109-116.

142. Goldberg has no contemporaneous notes or other record supporting his account of these conversations. Goldberg 169-70.

143. Goldberg never followed up with Warshaw about the meeting he says they discussed. Goldberg 128. Between his last conversation with Warshaw (around Labor Day) and November 10 (two days before the scheduled date of the foreclosure), his only subsequent contact with anyone connected to LNR was a call from an appraiser or environmental consultant looking for a survey. Goldberg 130.

144. Blue Hills executed the Prenegotiation Letter and returned it to the Lender on August 26, 2004. Warshaw 36-37; Fineberg 149; Executed Prenegotiation Letter (Dep. Ex. 62). By executing the Prenegotiation Letter, Blue Hills agreed that its terms and conditions would govern any discussions or negotiations. Dep. Ex. 62, page 1.

145. The Prenegotiation Letter states that Lender was not under any obligation to consent or otherwise agree to any Borrower request with respect to the Loan, or to modify the Loan or the Loan Documents. Dep. Ex. 62, ¶ 1.

146. The Prenegotiation Letter states that neither the Borrower nor the Lender "is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents." Dep. Ex. 62, ¶ 4.

147. By executing the Prenegotiation Letter, Blue Hills released the Lender from

any all claims and demands, in law or in equity, known or unknown, direct or indirect, fixed or contingent, caused by or arising out of any discussions, negotiations, correspondence or other communications relating to the Loan and the Loan Documents between the Borrower and Wells Fargo or LNR.  Dep. Ex. 62, ¶ 2.

148.   By executing the Prenegotiation Letter and "to enable [LNR] to properly evaluate the Borrower's request," Blue Hills agreed to provide to LNR all of the information designated on Exhibit A to the Letter.  Dep. Ex. 62, ¶ 9.   The designated information included: a) a financial statement prepared within 30 days of August 19, 2004 for the Borrower, its member, and any guarantors, including balance sheets and income statements; b) Federal tax returns for the last two years for the Borrower and the Guarantors; and c) a current business plan for the Property.  Ex. A to Dep. Ex. 62.

149.   Blue Hills did not send to LNR a current business plan, updated financial statements, or any of the other documents and information set out in Exhibit "A" to the Prenegotiation Letter.  Blue Hills never came up with a business plan specifying the upgrades to the Property that would be required or how much they would cost.  Donovan Depo 140-141, 176-177, 179-82; Fineberg 172-78.

**13.    September 2004 Events**

150.   On September 2, 2004, Donovan wrote to Wells Fargo, copying Warshaw, requesting a disbursement of escrow funds to pay principal and interest on the Note for the month of September 2004.  Donovan September 2 Letter (Dep. Ex. 26).

151.   On or around September 7, 2004, Joe Polcari became the LNR asset manager responsible for the Property.  Polcari I 40.  At the time he became asset manager for the Loan, Polcari spoke with Warshaw (as described in paragraph 136, above) and

Brown.  Polcari II 17.

152.    Goldberg never spoke to Polcari about Blue Hills until a mediation in this matter held in January 2006.  Polcari Aff. ¶ 6; Goldberg 121-22, 129.

153.    Based on his fourteen years of experience with loan workouts, Polcari did not believe Blue Hills was interested in restructuring or reworking the Loan, because Blue Hills never proposed a restructuring and because Mr. Fineberg had just given back the Lancaster, Pennsylvania and Sturbridge, Massachusetts properties to LNR.  Between September 7, 2004 and September 17, 2004,  Blue Hills did not attempt to reach Polcari.  Polcari I 236-38; Polcari II 119-24.

154.    Polcari called Donovan on or about September 16, 2004, as a courtesy to tell Donovan that he was sending Donovan a default letter.  Polcari described Donovan as acquiescent.  Donovan responded that he understood that LNR had to send the default letter, that they had no tenant prospects and no hope for finding one, and that the use of the reserves for debt service would not have a made a difference.  Donovan did not request a meeting or indicate that he had previously asked for a meeting that went unanswered.  Donovan had no workout proposal to offer.  Polcari testified to this conversation and memorialized it in contemporaneous notes.  Donovan testified that he did not recall this conversation and did not know whether it took place.  Polcari I 39, 45, 67-68, 70, 72; Polcari II 26-27, 38-39, 230-231; Polcari Handwritten Notes (Dep. Ex. 84 at LNR03927); Frank 120-121; Donovan 187-88, 199.

155.    Polcari sent Donovan a default letter dated September 17, 2004.  The letter informed Blue Hills that Blue Hills' requests for disbursements from the escrow funds were denied due to Blue Hills' defaults under the Mortgage and Note as of August 2,

August 11, September 2, and September 11, 2004.  LNR further informed Blue Hills that the Note had been accelerated and was immediately due and payable.  SAC ¶ 73-74; SAC Exhibit L; September 17 notice of defaults (Dep. Ex. 30).

**14.    October 2004 Events**

156.    On or about October 18, 2004, Frank called Polcari and asked for a meeting between Blue Hills and LNR.  According to Polcari, and Fineberg's report of what Frank told him about the conversation, Polcari told Frank he would call Frank back with a response.  Polcari called him back within a couple of days and left a voicemail saying that any meeting would have to include a discussion of bringing the Loan current to be productive.  According to Polcari, Frank never responded to the voicemail.  Polcari II 73-74; Fineberg 186.

157.    According to Frank: Polcari said that he would have to talk his superiors. Polcari agreed to get back to Frank about the meeting, but never did.  When Frank placed a telephone call five or six days later to follow up on his request for a meeting, Polcari told him there would not be a meeting.  Frank 104-107.  Frank also had a memory of another conversation with Polcari in which Polcari declined to have a meeting, but he could not place it in time.  Frank 108-11.

158.    By letter dated October 21, 2004, pursuant to Mass. Gen. Laws c.244, s. 14 and 17B, Lender notified Fineberg and Langelier of its intention to foreclose on the Property and of Fineberg's and Langelier's potential liability to Lender under the Guaranty in case of a deficiency in the proceeds of the foreclosure sale.  SAC ¶ 83; SAC Exhibit M.

159.    On October 28, 2004, LNR received an independent MAI appraisal from

Bonz & Company valuing the Blue Hills Office Park at $15 million as of October 18, 2004. Dep. Ex. 341 Addendum.

160.   Sometime between September 21 and October 18, 2004, during the field work phase of the study, the appraiser, Eric Stotz, spoke with Donovan to arrange a visit to the Property and learn about its status and with Needle during the resulting visit. While discussing the current condition and situation of the Property with Stotz, Donovan used the phrases "bleeding money" and "give the keys back" to LNR. Donovan said in substance that Blue Hills was walking away from its investment in the property due to the lack of tenant prospects and high holding costs associated with owning a vacant investment property. Stotz Expert Rebuttal Report (Exhibit B to Stotz Affidavit) at 4-5.

161.   When Stotz visited the Property, Needle informed him that Blue Hills had been unsuccessful in finding a tenant and was, in fact, "giving the keys back" to LNR because the carrying costs of the property were high and its expectations of finding a tenant were so low. Stotz Expert Rebuttal Report at 5.

**15.   The Foreclosure Sale**

162.   After the October 18 phone calls between Frank and Polcari, Blue Hills did nothing to communicate with LNR until November 10, two days before the scheduled foreclosure sale. On November 10, Goldberg sent a letter to Bruce Barnett, counsel for the Lender, stating that the Borrower was not in default and demanding access to the reserves. Dep. Ex. 334. E. Randolph Tucker responded on behalf of Lender by his letter dated November 12, 2004. (Dep. Ex. 41.)

163.   On November 12, 2004, the foreclosure sale of the Property was postponed by public proclamation, in accordance with Massachusetts law, until November 19, 2004.

Polcari Aff. ¶ 4, Barnett Aff. ¶ 17.

164.    Another exchange of letters between counsel occurred on November 17-19. Dep. Exs. 335, 336, 337.

165.    The foreclosure sale was held on November 19, 2004.  There were four people bidding on the Property and CSFB 1999-C1 Royall Street, LLC made the high bid for $18.5 million.  Recorded Foreclosure Documents (Barnett Aff. Ex. K); Polcari Aff.  ¶ 5; Email from J. Polcari to L. Golinsky, November 19, 2004 (Dep. Ex. 109).

166.    Lender acted in accordance with all of the requirements of the Mortgage and Massachusetts law, including the requirements of General Laws Chapter 244, in conducting the foreclosure sale.  Clarke 262; Recorded Foreclosure Documents.  In addition, Lender caused its auctioneer, Dean Associates, Inc., to run commercial advertisements of the foreclosure sale in the Boston Herald and the Boston Globe on Sunday, November 7, 2004.  Commercial Advertisements (Barnett Aff. Ex. L) SD001, SD002; Polcari Aff. ¶ 3.

167.    As of the date of the sale, the amount of the Debt, including principal, interest and late fees, was $33,439,307.  November 11, 2004 Payoff Statement  (Polcari Aff. Ex. A); CSFB 1999-C1 Royall Street, LLC's Answers to First Interrogatories of Langelier & Fineberg, No. 12 (Barnet Aff. Ex. M).

168.    After crediting the foreclosure bid ($18,500,000) and the reserves held by Lender as of the date of the sale ($4,168,460.18) against the outstanding debt, the deficiency after the foreclosure sale was $10,770,847.  November 11 Payoff Statement; CSFB 1999-C1 Royall Street LLC's Answers to First Interrogatories of Langelier and Fineberg, No. 12.

169.    Under the Note, the default interest rate is 13.49%.  Note ¶ 1(k), (p).

170.    Fineberg did not attend the foreclosure sale or bid on the Property. Fineberg 187-88.  At first he testified that he did not know why, <u>id</u>., and then claimed that not attending was a mistake.  <u>Id</u>.  211-12.  He did not sue to enjoin the foreclosure or to have it set aside after the fact.  Fineberg 195-97.

## 16.    <u>Blue Hills' Negotiating Strategy</u>

171.    Fineberg testified that he had a plan for the future of Blue Hills that included using the $4.1 million in loan reserves and $5 to $6 million being held by attorneys for Royall Associates to fix up the building, attract a tenant, and then refinance the building.  Fineberg 194-95, 179-81.  Yet Fineberg told none of this to LNR. <u>Id</u>. 181.

172.    As of August 2004, Blue Hills would have needed a modification of the Loan Documents in order to re-tenant the Blue Hills Office Park and maintain ownership of the Property.  Blue Hills knew that a loan modification was required in order to make his plan for the Property work.  Fineberg 194-195; Donovan 236.

173.    Nevertheless, no one at Blue Hills ever sent the Lender a proposal to work out the Loan.  Polcari II 232; Fineberg 169-181; Langelier ~~180-84~~179-183.

174.    Rather than send a written proposal to the Lender to encourage Lender to meet with them, Blue Hills claims it made a business decision not to propose anything to the Lender unless Lender agreed to meet with them in person first.  "I think it's a question of business judgment.  You don't prematurely put your cards face up on a table in a business negotiation."  "Without some indication from Lennar that they were willing to sit down with us or <u>instruct us to submit something</u>, we were not going to put our cards on the table prematurely."  Langelier ~~180-84, 206.~~179-183, 205.

175.   Fineberg testified that he had decided not to put any money — not another penny — into Blue Hills until LNR gave him a sit-down meeting.  Fineberg 212-214, 158-60; Donovan 141.  Fineberg testified that he would not make LNR any type of written proposal prior to having a sit-down meeting — doing so is "not [his] style." Fineberg 165-66, 169.

176.   Langelier testified that he believed that the Lender, by not meeting, was engaged in a game of "brinksmanship" and that Lender would come around and agree to a meeting before the foreclosure.  Langelier ~~200, 267, 269.~~199, 266, 268.

177.   LNR never encouraged Blue Hills to think they were going to meet. Fineberg 212-214; Frank 104-111.

178.   On other deals with LNR, Fineberg had made offers to LNR over the telephone or in writing before a meeting.  Goldberg 182-85, 188-91.  Fineberg had consummated at least one other deal with LNR without any sit down meeting at all. Goldberg 192-93.

179.   Fineberg did not want to defer the foreclosure and did not request that LNR defer the foreclosure.  Fineberg did not look into trying to buy the debt at a discount. Fineberg 163.

180.   Blue Hills knew that LNR was not obligated to agree to any modification of the loan documents or enter a standstill agreement.  Langelier ~~182, 269~~268; Fineberg 161, 182.

**17.   The Royall Associates Beneficiaries Split the Settlement Payment Amongst Themselves**

181.   On December 31, 2004, the beneficiaries of Royall Associates entered into

an agreement (the "Royall Agreement") concerning the treatment of three accounts: a "Property Account" held and controlled by Fineberg Management as a result of its management of the Property; an "Initial Account" held in escrow by Goldberg and Langelier's attorney Andrew Cohn; and a "Supplemental Account" held in escrow by Goldberg and Cohn.  The "Initial Account" contained approximately $1.38 million, which was the portion of the 1999 refinancing proceeds not distributed to Fineberg and Langelier in 1999.  Fineberg 49.  The "Supplemental Account" contained approximately $4.2 million, which included the $2 million Payment.  Royall Agreement (Dep. Ex. 176); Fineberg 51.

182.   The remaining $2.2 million in the Supplemental Account came from distributions of operating profit from Blue Hills.  Fineberg 51-52, 102-103.  Blue Hills distributed monies to its owners as often as it could.  Fineberg 243-44.  Langelier recalled receiving directly approximately $200,000 each year from Blue Hills.  Langelier ~~144~~143-~~45.~~44.  Langelier and Fineberg made decisions about distributions.  Fineberg 243-44.  Blue Hills had ample profits to make distributions, as it had over $785,000.00 of net income in 2003, Dep. Ex. 35, and over $1.1 million of net income in 2001, Dep. Ex. 318.

183.   Under the Royall Agreement, the Initial Account and all but $2 million of the Supplemental Account was released, 50% each to Goldberg and Cohn, for distribution to the Fineberg and Langelier Beneficiaries, respectively.  This distribution was expressly conditioned on the Lender not having filed any claims against Blue Hills or Royall Associates.  Royall Agreement Section V.A.

184.   Under the Royall Agreement, the remaining $2 million in the Supplemental Account is held in escrow by Goldberg and Cohn, as the escrow agents for the "Fineberg

Beneficiaries" and the "Langelier Beneficiaries" as security against claims that may be asserted by the Lender against Fineberg or Langelier personally on their guaranty of the Debt or by anyone arising from their interest in Blue Hills, Royall Associates, Blue Hills Management Corp. or Fineberg Management.  The Supplemental Account Escrows were to be distributed to the Royall Associates beneficiaries according to a schedule, but only if the remaining balance after such a distribution exceeded any outstanding indemnified claims. Langelier 215214-22221; Royall Agreement (Dep. Ex. 176); Fineberg 44-48, 51, 65-66; Goldberg 59-60.

185.   Fineberg and Langelier are the "clients" who currently have control of the $2 million.  Fineberg 71.

186.   The purpose of the Royall Agreement was to put into writing the agreement between the partners about any monies and any liabilities that the partnership will have. Fineberg 45.

187.   In or around December 2004, the Lender learned of the Zoning Appeal and its settlement from a broker and reported it to counsel.  Polcari III 199; Rosen 117-118.

188.   On April 20, 2005, Lender made written demand upon Fineberg and Langelier under the Guaranty.  Counterclaim ¶ 41; Blue Hills Parties' Answers to Counterclaim ¶ 41.

189.   Neither Fineberg nor Langelier has made payment under the Guaranty. Counterclaim ¶ 42; Blue Hills Parties' Answers to Counterclaim ¶ 42.

190.   To determine the true tax, if any, paid by the partners of Royall Associates as a result of the foreclosure sale of the Property, one needs to review each partner's individual tax return for, at a minimum, the year in which the gain is reported and,

ideally, for all the years they owned the Property. There are various tax attributes an individual might have that would affect whether they actually pay tax on a gain they report. These include passive activity losses, net operating losses, other capital losses, possible limitations on basis, and any other items of income or expense that might exist on the personal level. Andelman 216-217; Riley 42-43, 109.

191.   The only evidence of tax losses proffered by Blue Hills is a hypothetical chart created by its proffered expert of what "could be or would be" the "maximum tax liability . . . with respect to each of the individual partners." Andelman 113-114; Andelman Report (Dep. Ex. 358) at Ex. B. Andelman did not review any individual tax return information for any Royall Associates partner. Andelman 148. The only evidence Andelman can offer that any partner will actually pay taxes due to Blue Hills is a hearsay account of conversation with Fineberg's accountant about Fineberg's tax situation. Andelman 149, 151.

192.   Royall Associates is reporting gain from the foreclosure sale as realized in 2005. Andelman 131-132.

193.   Blue Hills has refused to turn over in discovery any tax returns or tax work papers for the Royall Associates partners for any year, despite the Lenders' repeated demands for all documents related to damages. Barnett Aff. ¶ 13 and Exhibit N thereto.

Respectfully submitted,

CSFB 1999-C1 ROYALL STREET, LLC, and J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1,

By their attorneys,

Dated:  May 17, 2006

/s/ Bruce E. Falby
_____
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA Piper Rudnick Gray Cary US LLP
33 Arch Street, 26th Floor
(617) 406-6000

Document comparison done by DeltaView on Friday, June 02, 2006 5:00:58 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://BOSTDMS/BOST1/419626/1 |
| Document 2 | interwovenSite://BOSTDMS/BOST1/421268/1 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 39 |
| Deletions | 41 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 80 |