UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br> Mortgage Pass-Through Certificates, Series 1999-C1<br>        Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>        Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>    Defendants-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 05-CV-10506 (WGY) |

**RESPONSE OF BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND
GERALD FINEBERG TO DEFENDANTS' AND PLAINTIFFS-IN COUNTERCLAIM'S
CORRECTED JOINT LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN
SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

**I.    Introductory Statements**

Blue Hills Office Park LLC ("Blue Hills"), Gerald Fineberg ("Fineberg") and William Langelier ("Langelier") hereby respond to Defendants' and Plaintiffs-in-Counterclaim's Corrected Local Rule 56.1 Statement of Undisputed Facts in Support of their Motions for Summary Judgment ("J.P. Morgan and CSFB's Statement").

1.    The various statements labeled "J.P. Morgan and CSFB's Statement No." in this Response are direct quotations taken from J.P. Morgan and CSFB's Statement.  So as to maintain accuracy, Blue Hills, Fineberg and Langelier have endeavored not to alter the typographical errors, grammatical mistakes, footnotes or erroneous citations or references contained in the original pleadings as filed and served by J.P. Morgan Chase Bank ("J.P. Morgan") and CSFB 1999-C1 Royall Street LLC ("CSFB").

2.      In their Response, Blue Hills, Fineberg and Langelier have omitted the seventeen headings listed in the "Table of Contents" to J.P. Morgan and CSFB's Statement.  These headings are conclusory statements and are not statements of fact to which a response is required.

3.      Some of the footnotes contained in J.P. Morgan and CSFB's Statement contain additional factual allegations that require a response.  For those footnotes which Blue Hills, Fineberg and Langelier deemed to require a response, their response is included.

## II.      Responses

J.P. Morgan and CSFB's Statement No. 1.

Since the 1980s, Gerald Fineberg and William Langelier, through various entities, have owned and controlled certain property located at 150 Royall Street in Canton, Massachusetts (the "Property"). The Property is improved by a two-story brick building containing approximately 275,000 square feet of space and known as the Blue Hills Office Park.  Second Amended Complaint ("SAC") SAC ¶ 6; BHOP Answer to Counterclaim ¶ 9; Advisor Consent for Foreclosure (Dep. Ex. 104) at Trust00013-14; Langelier 36-37; Frank 9.[1]

**RESPONSE NO. 1**

    **Admit.**

J.P. Morgan and CSFB's Statement No. 2.

In the summer of 1999, as the trustees of Royall Associates Realty Trust ("Royall Associates", a nominee trust which held record title to the Property), Fineberg and Langelier sought to refinance the mortgage on the Property.  These efforts culminated in the loan that is at issue in this action.  As part of the refinancing transaction, Fineberg and Langelier created plaintiff Blue Hills Office Park LLC ("Blue Hills" or "BHOP"), to which Royall Associates conveyed the property. Langelier  45-46, 81.

**RESPONSE NO. 2**

    **Admitted in part.  Langelier's testimony as referenced in Statement No. 24 is taken out of the context that Blue Hills was formed as a condition of the refinancing with Credit Suisse First Mortgage Capital LLC ("Credit Suisse").  Further, Royall Associates Realty Trust owned the**

---

[1] **[J.P. Morgan and CSFB original footnote]**  This Statement is supported by numerous simultaneously filed documents.  Deposition transcripts are compiled in an Appendix of Deposition Transcripts being filed manually with the Clerk's office due to the voluminous size of each transcript; references to depositions are by the witness's last name and page number (e.g., Fineberg 22).  Deposition exhibits are compiled in an Appendix of Deposition Exhibits being filed electronically (although select exhibits are being filed by manually due to their voluminous size); references to deposition exhibits are by descriptive label and/or "Dep. Ex. __." Affidavits of Joseph A. Polcari, Jr., Edward C. Brown, Curtis J. Mallegni, Stephen Goertzen, Ronald H. Greenspan, and Eric S. Stotz, and Bruce S. Barnett, most of which have their own attachments, are filed separately; references are by affiant's last name (e.g., Polcari Aff. ¶ __).  Pleadings already on file with the Court are not being filed, in accordance with the electronic filing administrative procedures.

**property located at 150 Royall Street, Canton, Massachusetts ("Property") prior to the refinancing.** *See* **Rule 56.1 Statement of Undisputed Facts of Plaintiff and Defendants-in-Counterclaims ("Blue Hills Statement I")***, ¶¶ 2-4.**

J.P. Morgan and CSFB's Statement No. 3.

Blue Hills is a single-purpose entity whose sole business was to acquire and own the Property. First Amendment to Certificate of Formation of Blue Hills Office Park LLC (Barnett Aff. Ex. A).

**RESPONSE NO. 3**

**Admitted in part. Blue Hills is a single purpose entity created at the request of Credit Suisse as a condition of the refinancing.** *See* **Response No. 2.**

J.P. Morgan and CSFB's Statement No. 4.

Royall Associates is the sole member of Blue Hills. The sole beneficiary of Royall Associates was a Massachusetts general partnership also known as Royall Associates. (For simplicity, herein and in the defendants' summary judgment briefs, the trust and the partnership are generally both referred to as "Royall Associates.") Its principal partners were Fineberg and Langelier.[2] Langelier 45-46; BHOP Operating Agreement (Dep. Ex. 407) at 23.

**RESPONSE NO. 4**

**Admit.**

J.P. Morgan and CSFB's Statement No. 4, Footnote No. 2

Fineberg and Langelier, initially the only partners of Royall Associates, subsequently admitted additional minority partners who received small portions of their beneficial interests. Langelier 46-47. Langelier and the minor partners related to him are referred to as the "Langelier Beneficiaries;" Fineberg and the minor partners related to him are referred to as the "Fineberg Beneficiaries."

**RESPONSE TO FOOTNOTE NO. 2**

**Admitted in part. Fineberg and Langelier were the initial partners and subsequently admitted additional partners. However, "Fineberg Beneficiaries" and "Langelier Beneficiaries" as defined by Defendants, mischaracterizes the relationships between and among the beneficiaries.** *See* **Deposition Exhibit 176, attached to the Affidavit of Peter McGlynn ("McGlynn Affidavit"), previously filed with the Court.**

---

* **Blue Hills Statement I** refers to the Rule 56.1 Statement of Undisputed of Plaintiff and Defendants-in-Counterclaim. **Blue Hills Statement II** refers to the Statement of Undisputed Facts in Support of Blue Hills, Fineberg and Langelier's Oppositions to Defendants and Plaintiff-in-Counterclaim's Motions for Summary Judgment.

[2] **[J.P. Morgan and CSFB original Footnote]** Fineberg and Langelier, initially the only partners of Royall Associates, subsequently admitted additional minority partners who received small portions of their beneficial interests. Langelier 45-46. Langelier and the minor partners related to him are referred to as the "Langelier Beneficiaries;" Fineberg and the minor partners related to him are referred to as the "Fineberg Beneficiaries."

J.P. Morgan and CSFB's Statement No. 5.

Blue Hills is a "disregarded entity" for tax purposes, which means that it does not file an income tax return or pay income taxes. Rather, all of its taxable transactions are reported on the return of its member, Royall Associates. Andelman 123.

**RESPONSE NO. 5**

**Admit.**

J.P. Morgan and CSFB's Statement No. 6.

Royall Associates is treated as a partnership for tax purposes. It does not pay taxes at the partnership level, but rather its partners pay tax on its income and gains. Andelman 124-25.

**RESPONSE NO. 6**

**Admit.**

J.P. Morgan and CSFB's Statement No. 7.

As of 1999, Langelier had close to 30 years experience in real estate, including experience in acquiring, developing, investing, financing and disposing of real properties. Langelier also had experience dealing with lenders on defaulted loans. Langelier 30-39.

**RESPONSE NO. 7**

**Admit.**

J.P. Morgan and CSFB's Statement No. 8.

As of 1999, Fineberg had approximately 40 years of experience in the real estate industry. He had substantial experience in acquiring, financing, managing, and selling commercial and residential buildings. Fineberg 5, 12-13. By that time, he had bought approximately 20 office buildings and 10 retail buildings, all with mortgage financing from commercial real estate lenders. He had also purchased approximately 100 apartment buildings with mortgage financing and had sold about 60-70 of those. Fineberg 6-8, 10.

**RESPONSE NO. 8**

**Admitted in part. Statement No. 8 mischaracterizes Fineberg's deposition testimony to the extent it represents the number of years of Fineberg's experience and number of office buildings, retail buildings or apartment buildings as exact numbers. Fineberg had no recollection of any exact numbers. *See* Deposition Transcript of Gerald Fineberg ("Fineberg Deposition"), pages 6-8, 10, attached to the Affidavit of Meredith Swisher ("Swisher Affidavit") as Exhibit 4.**

4

J.P. Morgan and CSFB's Statement No. 9.

By 1999, Fineberg had closed at least 27 securitized loans adding up to approximately $146 million. Fineberg 18-20, 36; Dep. Ex. 322. By 2004, a number of these loans had gone into default and Fineberg had deeded the properties to the lenders in lieu of foreclosure. Fineberg 24-26, 31-34, 37-39, 123.

**RESPONSE NO. 9**

**Admitted in part. Statement No. 9 mischaracterizes Fineberg's testimony regarding prior securitized loans. Although Fineberg admits that he had closed approximately 27 securitized loans by 1999, it is inaccurate to state that "a number of these loans had gone into default . . ." In the deposition testimony cited, Fineberg describes a few hotels that involved defaulted loans over the years, but he does not identify those hotels as among the securitized loans listed on Deposition Exhibit 322. *See* Fineberg Deposition, pages 18-20, 24-26, 31-34, 36, 37-39 and 123, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 10.

Since the 1970s, Fineberg has owned a company called Fineberg Management, Inc., which is a real estate management company. Fineberg 23; Donovan 27; Frank 5. It manages residential apartment buildings, office buildings, and retail space. From 1999-2004, Fineberg Management was managing approximately 1500 apartment units, 3 office buildings, and 3 or 4 retail units through approximately 30-50 single purpose entities. Donovan 27, 29; Frank 5-6.

**RESPONSE NO. 10**

**Admitted in part. Statement No. 10 mischaracterizes the deposition testimony to the extent that it represents exact numbers of apartments, office building, retail buildings and single purpose entities managed by Fineberg Management, Inc.**

J.P. Morgan and CSFB's Statement No. 11.

Fineberg Management managed the Property from the time Langelier and Fineberg acquired it until Defendants' foreclosure in November 2004.[3]

**RESPONSE NO. 11**

**Denied. Langelier and Fineberg didn't "acquire" the Property. The Property was owned by Royall Associates Realty Trust until the refinancing with Credit Suisse in 1999, at which time ownership was transferred to Blue Hills. Blue Hills is a single purpose entity formed at the request of Credit Suisse. Fineberg Management managed the Property both before and after the 1999 refinancing. *See* Blue Hills Statement I, ¶¶ 2-4, 18.**

---

[3] **[J.P. Morgan and CSFB original Footnote]** From September 14, 1999 through November 2004, Fineberg Management managed the property through Blue Hills Management Corp., a single-purpose entity created in connection with the 1999 refinancing. Fineberg is the President and Treasurer of Blue Hills Management Corp. BHOP Operating Agreement at 23 (Dep. Ex. 407); Stone 31.

J.P. Morgan and CSFB's Statement No. 11, Footnote No. 3

From September 14, 1999 through November 2004, Fineberg Management managed the property through Blue Hills Management Corp., a single-purpose entity created in connection with the 1999 refinancing. Gerald Fineberg is the President and Treasurer of Blue Hills Management Corp. BHOP Operating Agreement at 23 (Dep. Ex. 407); Stone 31.

**RESPONSE TO FOOTNOTE NO. 3**

**Admitted in part. Blue Hills Management Corp. is a Massachusetts corporation formed on September 14, 1999. Blue Hills Management Corp. is the manager of Blue Hills Office Park, LLC. *See* Deposition Exhibit 407, attached to the Swisher Affidavit as Exhibit 25.**

J.P. Morgan and CSFB's Statement No. 12.

Daniel Frank is the President of Fineberg Management and owns a 2.5% beneficial interest in Blue Hills. Frank 5, 7. From 1999-2004, as President of Fineberg Management, Frank oversaw Blue Hills' operations. Frank 19-20. Frank reports to Mr. Fineberg. Frank 73, 188.

**RESPONSE NO. 12**

**Admit.**

J.P. Morgan and CSFB's Statement No. 13.

Larry Needle was the property manager for the Property. He reports to Daniel Frank. Fineberg 106; Needle 22, 25.

**RESPONSE NO. 13**

**Admit.**

J.P. Morgan and CSFB's Statement No. 14.

Joseph Donovan is the Chief Financial Officer of Fineberg Management, and has been since 1995. Donovan was in charge of accounting for Blue Hills. Donovan 27-28, 120. Donovan reports to Daniel Frank or to Gerald Fineberg. Frank 84.

**RESPONSE NO. 14**

**Admitted in part. Joseph Donovan ("Donovan") is the Chief Financial Officer of Fineberg Management. He is not "in charge of accounting." In response to the question "Can you describe what you do as the CFO. . . ?", posed at his deposition, Donovan answered, "I'm responsible for the day-to-day accounting for the different entities. I'm responsible for looking at and evaluating prospective hotel deals." *See* Deposition Transcript of Donovan ("Donovan Deposition"), page 28, lines 8-16, attached to the Swisher Affidavit as Exhibit 3. Gilbert Stone ("Stone") is the Director of Accounting for Blue Hills. *See* Response No. 15 below.**

6

J.P. Morgan and CSFB's Statement No. 15.

Gilbert Stone is the Director of Accounting for Fineberg Management, which oversaw the operations of Blue Hills Office Park LLC.  Stone 8, 31.  From 1999 to 2004, Stone did all of Blue Hills' accounting work other than accounts payable, Stone 42, and had oversight responsibilities for all accounting records of Blue Hills, Stone 33.  Stone was also responsible for reporting quarterly financial statements to the Lender.  Stone 30.  Stone reports to Joseph Donovan.  Stone 35; Donovan 27-29.

**RESPONSE NO. 15**

**Admitted in part.  Statement No. 15 takes Stone's testimony out of context to the extent it implies that Stone was solely responsible for all of Blue Hills' accounting work.  He testified that he has a staff that works for him.  In addition, Stone took over the duties of Paul Halloran in 2001 with the exception of accounts payable.  *See* Deposition Transcript of Gilbert Stone ("Stone Deposition") Pages 30-35 and 42, attached to the Swisher Affidavit as Exhibit 12.**

J.P. Morgan and CSFB's Statement No. 16.

Langelier and Fineberg, as Blue Hills' principals, made the ultimate decisions concerning actions taken by Blue Hills.  Fineberg 129-130; Langelier 97-99.

**RESPONSE NO. 16**

**Admitted in part.  While Langelier and Fineberg were primarily responsible for major decisions, Statement No. 16 mischaracterizes their testimony.  Fineberg stated that decisions were undertaken with the advice and input of attorneys.  Langelier testified that he did not keep up with the day to day details of running the Property.  *See* Fineberg Deposition, pages 129-130 and Deposition Transcript of William Langelier ("Langelier Deposition"), pages 98-100, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 17.

Since 1989, the Property's sole tenant had been an affiliate of the Bank of Boston known as Boston Equiserve Limited Partnership ("Equiserve").  In mid-1999, Equiserve exercised an option to extend its lease until July 31, 2004, and it had an additional option to extend for another five years after that. Langelier, Fineberg, BHOP Answers to Defs.' First Set of Interrogatories, No. 3 (excerpts) (Barnett Aff. Ex. B); SAC ¶ 8; BHOP Answer to Counterclaim ¶ 10.

**RESPONSE NO. 17**

**Admitted in part.  Equiserve occupied approximately 96% of the Property and was the principal tenant.  *See* Blue Hills Statement I, ¶ 20.**

J.P. Morgan and CSFB's Statement No. 18.

With this 5-year lease extension in place, Fineberg and Langelier sought a loan from Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse"), which they knew would be a securitized loan secured by, inter alia, a mortgage on the Property.  Fineberg and Langelier knew that, because the loan was to be securitized, Credit Suisse would almost immediately assign the loan to a loan pool and would no longer be involved with the loan; the loan would be serviced by loan servicers, and the loan

would be enforced according to its terms.  *See* Langelier 46, 78; Fineberg 18-19, 21-22, 78-80; *see also* Frank 38; Donovan 57.

**RESPONSE NO. 18**

     **Denied.  Statement No. 18 contains legal conclusions such as "the loan would be enforced according to its terms" and mischaracterizes the deposition testimony.  Although Fineberg and Langelier knew the Loan would be securitized and were familiar with securitized financing, they did not know in September 1999 the specifics of the loan pool or the identity of the servicers.  *See* Langelier Deposition, pages 47 and 79; Fineberg Deposition, pages 18-19, 21-22 and 78-80, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 19.

     They did not know in September 1999 to which loan pool the loan would be assigned, who the trustee of that loan pool would be, or who the servicers would be.  Fineberg 127.

**RESPONSE NO. 19**

     **Admitted in part.  Assuming that the term "they" in Statement No. 19 refers to Fineberg and Langelier, this Statement is only admitted in part.  Although Fineberg and Langelier did not know the identities of the trustee and servicers in September 1999, they were familiar with securitized financing.  *See* Fineberg Deposition, page 18, line 23 through page 19 line 6, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 20.

     Prior to entering into the loan with Credit Suisse, no one at Blue Hills ever saw any agreements among any of the future mortgagee, future master servicer, or future special servicer, knew whether there were any such agreements, or knew what the terms of those agreements were or would be.  Fineberg 127-128.

**RESPONSE NO. 20**

     **Denied.  At the time of the refinancing, Blue Hills, Fineberg and Langelier knew that the Loan would be securitized and that it would be serviced by a servicer/trustee pursuant to a servicing agreement.  *See* ¶¶ 60 and 61 of Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.  In addition, Fineberg and Langelier were familiar with securitized loans.  *See* Fineberg Deposition, page 18, line 23 through page 19 line 6; Langelier Deposition page 39, lines 12 through 18, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 21.

     On September 14, 1999, Blue Hills executed a mortgage note (the "Note", Barnett Aff. Ex. C[4]) to Credit Suisse in the principal amount of $33,149,000 and Credit Suisse loaned Blue Hills that amount (the "Loan").  Second Amended Complaint ("SAC") ¶¶ 15, 17; Note at p.1.  In negotiating the Loan, Fineberg and Langelier were represented by experienced counsel.  Langelier 55-56.

---

[4] **[J.P. Morgan and CSFB original Footnote]** Some deposition testimony about the Note refers to it as Exhibit D to the Second Amended Complaint, which was marked in its entirety as Deposition Exhibit 15.

8

**RESPONSE NO. 21**

    **Admit.**

J.P. Morgan and CSFB's Statement No. 22.

    The Loan was secured by numerous "Loan Documents," including a Mortgage, Assignment of Leases and Rents, and Security Agreement ("Mortgage", Dep. Ex. 155[5]), a Cash Management Agreement ("CMA", Dep. Ex. 156), and a Guaranty (Barnett Aff. Ex. D) executed by Fineberg and Langelier, all of which were executed on September 14, 1999. SAC ¶¶ 15, 17-18; BHOP Answer to Counterclaim ¶¶ 11, 16, 22; Blue Hills Parties' Response to Defs.' First Requests for Admissions (excerpts) (Barnett Aff. Ex. E).

**RESPONSE NO. 22**

    **Admit.**

J.P. Morgan and CSFB's Statement No. 23.

    The interest conveyed by the Mortgage included the Property, its improvements, and other personal property of Blue Hills, tangible and intangible, referred to collectively and defined in the Mortgage as the "Mortgaged Property." SAC ¶¶ 15; Mortgage at p.1; Fineberg 83-88. Under paragraph 10 of the Mortgage, a conveyance or transfer of the Mortgaged Property or any part thereof required the Lender's prior written consent.

**RESPONSE NO. 23**

    **Denied. Statement No. 23 contains legal conclusions as to the definition of "Mortgaged Property" and the meaning of Section 10 of the Mortgage Agreement which cannot be characterized as a statement of undisputed fact. As set forth in Motion of Blue Hills, Fineberg and Langelier's for Summary Judgment as to all Counterclaims and Memorandum of Law of Blue Hills, Fineberg and Langelier in Support of Motion for Summary Judgment, ("Blue Hills' Summary Judgment Motion"), Blue Hills avers that J.P. Morgan and CSFB have, *inter alia*, improperly taken the definition of "Mortgaged Property" out of the context of Section 10 of the Mortgage Agreement. *See also* Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 24.

    Blue Hills received approximately $5.2 million in excess proceeds from the Loan, $4 million of which was distributed to the beneficiaries of Royall Associates. The Fineberg Beneficiaries and Langelier Beneficiaries each received $2 million. About $1.2 million was held in reserve by Royall Associates. Langelier 80-81; Fineberg 49-50.

**RESPONSE NO. 24**

    **Admitted in part. In 1999, Blue Hills received approximately $5.2 million dollars in proceeds in connection with the re-financing. Approximately $1 million was held in reserve as a**

---

[5] **[J.P. Morgan and CSFB original Footnote]** Some deposition testimony about the Mortgage and the CMA refer to them as Exhibits C and E, respectively, to the Second Amended Complaint, which was Deposition Exhibit 15.

"rainy day" account for Blue Hill's benefit and was not distributed to the beneficiaries of the Royall Associates Realty Trust.  Approximately $4.2 million was distributed to the beneficiaries of the Royall Associates Realty Trust.  Neither Fineberg nor Langelier could recall the amounts that were distributed to each of the beneficiaries.  *See* **Langelier Deposition, pages 80 - 81 and Fineberg Deposition, pages 49 - 50, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 25.

In or about November 1999, the Loan was securitized with a pool of approximately 150 other loans.  In this process, Credit Suisse assigned the Loan to J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee"; together with its assignee CSFB 1999-C1 Royall Street, LLC, the "Lender").   The Trustee entered a Pooling and Servicing Agreement ("PSA") with Wells Fargo National Association ("Wells Fargo") as master servicer and LNR Partners, Inc. ("LNR", formerly known as Lennar Partners, Inc.) as special servicer. SAC ¶ 25; Pooling and Servicing Agreement ("PSA") (Dep. Ex. 51).

**RESPONSE NO. 25**

**Admit.**

J.P. Morgan and CSFB's Statement No. 26.

In a CMBS pool, actual day-to-day, operational duties related to the mortgages that are the assets of the Trust are delegated to the master servicer (who administers performing or non-defaulted mortgages according to the terms of the loan documents) and the special servicer (to whom servicing responsibility is transferred if a borrower requests a material modification to the terms of the loan or upon a default or the occurrence of an event of that substantially increases the likelihood of a default).  Greenspan Report (Greenspan Aff. Ex. A) at 9.

**RESPONSE NO. 26**

**Admitted to the extent that Statement No. 26 contains a general description of CMBS pools, but denied to the extent that Statement No. 26 purports to define the obligations of Wells Fargo and LNR pursuant to the PSA and Loan Documents at  issue in this litigation.  *See* Blue Hills Statement I, ¶¶ 30-34.**

J.P. Morgan and CSFB's Statement No. 27.

The provisions of the PSA are binding on and inure to the benefit of the successors and assigns of the parties to it and the certificate holders.  "No other person, including, without limitation, any Mortgagor, shall be entitled to any benefit or equitable right, remedy or claim under this Agreement." PSA (Dep. Ex. 51) at 215.

**RESPONSE NO. 27**

**Admitted only to the extent that Statement No. 27 accurately quotes from page 251 of the PSA.  Blue Hills, Fineberg and Langelier deny all legal conclusions contained in Statement No. 27.  Wells Fargo and LNR acted as J.P. Morgan and CSFB's agents at all times pertinent hereto.  Blue Hills, Fineberg and Langelier were entitled to rely upon the servicing standards set forth in the PSA.  *See* Answers of CSFB 1999-C1 Royall Street LLC and J.P. Morgan to Plaintiff's Second Amended Complaint ("Answers") ¶ 63; J.P. Morgan and CSFB's Response Nos. 3 and 4 to Blue**

10

**Hills, Fineberg and Langelier's First Set of Requests for Admissions ("Responses to Admissions"), attached to the McGlynn Affidavit as Exhibit 7.  *See also*, Blue Hills, Fineberg and Langelier's Memorandum in Opposition to Defendants' Motion for Summary Judgment Seeking Dismissal of the Second Amended Complaint.**

J.P. Morgan and CSFB's Statement No. 28.

The Loan Documents required that Blue Hills deposit (or cause to be deposited) all rents received in connection with the Property into an account at its bank referred to as the "Lockbox," which was located in Massachusetts.  Note (Barnett Aff. Ex. C) ¶ 8(a); Cash Management Agreement (Dep. Ex. 156) § 6(a); Dep. Ex. 12 at Blue Hill 0501.

**RESPONSE NO. 28**

**Admitted in part.  Statement No. 28 is ambiguous as it defines neither "rents" or "Lockbox."  *See* Blue Hills Statement I, ¶¶ 36 and 37.**

J.P. Morgan and CSFB's Statement No. 29.

Under the Note and Mortgage, Blue Hills' principal and interest payments of $254,652.24 on the Loan were due on the 11th of each month.  Blue Hills was also required to make payments on the 11th of each month to fund certain escrow accounts (also referred to as the "reserve accounts") held by the Lender and known as the "Tax and Insurance Impound Fund" (the "Tax Fund" or the "Tax Escrow"), "Replacement Escrow Fund," the "Base Leasing Escrow Fund," and the "Monthly Cash Flow Leasing Escrow Fund."  Note at p.1; Mortgage ¶ 6(a)-(c).  Payments to the Tax Fund to fund real estate tax payments could be made quarterly so long as the Equiserve lease was in place.  Mortgage ¶ 6(a).

**RESPONSE NO. 29**

**Admitted in part.  Although the Mortgage Agreement required Blue Hills to fund a reserve account for the payment of taxes, in or about October 1999, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes.  *See* Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 30.

Under the CMA, so long as sufficient funds to cover these payments were deposited by Blue Hills in the Lockbox prior to the 11th of the month, the Lender would simply collect the funds from the Lockbox, apply the funds to the payments due from Blue Hills, and return the net rents to Blue Hills' operating account, which was separate from the Lockbox account.  Note ¶ 8(a); Cash Management Agreement §§ 2-3; Donovan 207, 209-10.

**RESPONSE NO. 30**

**Admitted in part.  The legal conclusions with respect to the CMA contained in Statement No. 30 are inconsistent with the cited portion of Donovan's deposition.  In response to the question, "Each month Wells Fargo distributed net rents to Blue Hills after paying debt service and putting money in various escrow subaccounts, correct?", Donovan answered "That's correct." In addition, Donovan testified that net rents were deposited in Blue Hills' operating account, an account that was maintained separately from the Lockbox account.  *See* Donovan Deposition, page 207, lines 1-5; page 209, lines 11-24 - page 210, line 1, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 31.

Under the Loan Documents, the Base and Cash-Flow Leasing Escrow Funds are combined for purposes of controlling disbursements from them.  Mortgage ¶ 6(c).  The Leasing Escrow funds are available for tenant improvement and leasing commission expenses incurred by Blue Hills in connection with executed new leases, extensions, renewals, or modifications of a lease.  To obtain reimbursement for these items, Blue Hills is required to provide paid invoices for the tenant improvement and leasing commissions, a copy of the new lease, and, if required by the Lender, lien waivers and releases from parties providing materials or services in connection with the requested payment.  Mortgage ¶ 6(c)(iv).

**RESPONSE NO. 31**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that the language contained in the Mortgage Agreement, ¶ 6(c)(iv) speaks for itself, but deny the legal conclusions contained in Statement No. 31.**

J.P. Morgan and CSFB's Statement No. 32.

Subject to conditions, up to $1 million of the Leasing Escrow Funds are also available "for application solely toward payments of principal and interest" in the event that net operating income from the Property is insufficient to pay principal and interest in a given month.  The preconditions to an application of the reserves for this purpose include, among others: 1) that Blue Hills deliver a written request for the application to Lender at least seven business days prior to the date for which it requests a disbursement; and 2) no Event of Default (as defined in the Mortgage) shall have occurred and be continuing as of the date of the request and on the date for which the disbursement is requested.  Mortgage ¶ 6(c)(ix).

**RESPONSE NO. 32**

**Admitted in part.  Statement No. 32 contains legal conclusions to which no response is required.  Blue Hills, Fineberg and Langelier admit that the language contained in the Mortgage Agreement, ¶ 6(c)(ix) speaks for itself, but deny the legal conclusions contained in Statement No. 32.  *See* Blue Hills Statement, ¶¶ 39-40.**

J.P. Morgan and CSFB's Statement No. 33.

Quarterly payments of property taxes on the Property were due to the Town of Canton on Feb.1, May 1, Aug. 1, and Nov. 1 of each year.  Stone 81; Donovan 202; Needle 146.

**RESPONSE NO. 33**

**Admitted to the extent that "Feb. 1, May 1, Aug. 1 and Nov. 1" did not fall on a weekend or holiday.**

J.P. Morgan and CSFB's Statement No. 34.

Paragraph 5 of the Mortgage required that Blue Hills pay the property taxes due on the Property in a timely manner, subject to paragraph 6.  Mortgage ¶ 5.  Blue Hills understood that paying property taxes is the obligation of the property owner.  Donovan 243.

12

**RESPONSE NO. 34**

     **Denied.  Although the Mortgage Agreement required Blue Hills to fund a reserve account for the payment of taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes.  *See* Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 35.

     Paragraph 6 of the Mortgage required Blue Hills to pay (through deposits in the Lockbox) amounts in advance to the Lender on a monthly or quarterly basis to fund the Tax Escrow, from which the Lender would draw to pay the quarterly property taxes.  Mortgage ¶ 6.

**RESPONSE NO. 35**

     **Denied.  Although the Mortgage Agreement required Blue Hills to fund a reserve account for the payment of taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes.  *See* Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 36.

     The CMA effected the Tax Escrow funding by calling for the Lender to allocate Lockbox rents to the Tax Fund.  CMA §§ 2 & 3.

**RESPONSE NO. 36**

     **Denied.  Statement No. 36 contains legal conclusions to which no response is required.  It is also vague with respect to the phrase, "CMA effected the Tax Escrow."  Although the Mortgage Agreement required Blue Hills to fund a reserve account for the payment of taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes.  *See* Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 37.

     Around the same time that Wells Fargo became the servicer of the Loan, at Blue Hills request, the Lender agreed that the Lender would not escrow funds for taxes from the Lockbox rents.  Instead, the Lender permitted Blue Hills to collect the funds to pay the quarterly taxes from its tenant, Equiserve, shortly before the payments were due and deposit them in the Lockbox at that time.  Wells Fargo would then pay the property taxes on time.  *See* Donovan 202-203; Stone 46, 53-54, 56-57, 77-81, 85, 90, 124; Needle 33-34, 141-142, 147-148; Polcari I 168-169; Lloyd 11-14; Dep. Ex. 1.

**RESPONSE NO. 37**

     **Admitted in part.  Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes in or about October 1999.  Wells Fargo may not have always paid the taxes on time.  *See* Blue Hills Statement I, ¶ 43; Blue Hills Statement II, ¶ 16.**

J.P. Morgan and CSFB's Statement No. 38.

     The process from November 1999-May 2004 for Blue Hills' payment of property taxes was in

13

accordance with the agreement between Blue Hills and Lender. Blue Hills billed Equiserve during the month prior to the quarterly payment due date. Equiserve would then deposit around 97% of the taxes due to the Lockbox. Blue Hills would deposit the remaining 3% in the Lockbox at about the same time as the Equiserve deposit. Wells Fargo would then collect the funds from the Lockbox shortly before the quarterly tax payment was due, and pay the property taxes to the Town of Canton on or before the due date. Stone 46, 53-57, 77-82, 90; Donovan 202-03; Polcari I 168-69; Lloyd 11-15; Needle 32-33, 146-48.

**RESPONSE NO. 38**

      **Admitted in part. Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes in or about October 1999. The taxes may not have always been paid "on or before the due date." *See* Blue Hills Statement I, ¶ 43; Blue Hills Statement II, ¶ 16.**

J.P. Morgan and CSFB's Statement No. 39.

      Wells Fargo sent a shortage notice to Blue Hills every quarter during the month prior to when taxes were due. The notices typically came mid-month. Stone 56-57, 81-82, 114, 116, 122-23.

**RESPONSE NO. 39**

      **Admitted in part. The so-called "tax insufficiency" notices sent to Blue Hills shortly before taxes were due merely advised Blue Hills that it would be subject to a fee if taxes were not paid. *See* Blue Hills Statement I, ¶¶ 43-45.**

J.P. Morgan and CSFB's Statement No. 40.

      From the period of 1999 through May 2004, every time Wells Fargo sent its mid-month shortage notice, Blue Hills made sure the money to pay the property taxes was available in the Lockbox prior to the first of the next month and in time to make the payment by the payment date. Stone 124.

**RESPONSE NO. 40**

      **Admitted in part. Blue Hills, Fineberg and Langelier admit that Wells Fargo sent so-called "tax insufficiency" letters to Blue Hills, but deny that Blue Hills "made sure the money was available" solely in response to the letters. Lawrence Needle ("Needle") testified that he would bill Equiserve at least 30 days in advance of the due date for the taxes and would give Equiserve two weeks to deposit the funds so that Wells Fargo could pay the taxes. *See* Deposition Transcript of Lawrence Needle ("Needle Deposition"), page 145, lines 11-24, attached to the Swisher Affidavit as Exhibit 10; *see also* Blue Hills Statement I, ¶¶ 43-45.**

J.P. Morgan and CSFB's Statement No. 41.

      At no point were replacement or leasing escrow funds used to pay property taxes. Donovan 163.

**RESPONSE NO. 41**

      **Denied. At times, Wells Fargo moved funds from various reserve accounts to pay the property taxes. *See* Deposition Exhibit 393; Deposition Transcript of Richard Clarke ("Clarke**

**Deposition"), pages 162-168, attached to the Swisher Affidavit as Exhibits 2; Blue Hills Statement II, ¶ 16.**

J.P. Morgan and CSFB's Statement No. 42.

[Intentionally omitted.]

**RESPONSE NO. 42**

[Intentionally omitted.]

J.P. Morgan and CSFB's Statement No. 43.

Blue Hills knew that this agreement meant that (a) the Lender did not escrow monies to pay the taxes from rents deposited in the Lockbox, and (b) the rents that otherwise would have been escrowed for taxes were distributed to Blue Hills instead. Stone 77, 85; Donovan 202, 206-07; Needle 140-41.

**RESPONSE NO. 43**

**Admitted in part. Blue Hills admits that funds were not escrowed for the payment of taxes in accordance with the alternative arrangement agreed to by Blue Hills and Wells Fargo in or about October 1999. Net rents were distributed to Blue Hills by Wells Fargo each month. *See* Response No. 30, above.**

J.P. Morgan and CSFB's Statement No. 44.

In early 2002, Blue Hills began its effort to extend Equiserve's presence in the building past the July 2004 expiration of its lease extension. The parties first discussed a possible long-term extension of the lease with an option for Equiserve to buy the Property, and then a shorter-term lease extension. Although they came to no agreement, Frank maintained hope of keeping Equiserve in the Property up through the middle of 2003. Frank 41-61; Dep. Exs. 37, 38, 39.

**RESPONSE NO. 44**

**Admitted in part. Equiserve confirmed its intent not to renew the Lease on May 14, 2003. Blue Hills Statement I, ¶ 48.**

J.P. Morgan and CSFB's Statement No. 45.

Blue Hills believed throughout this time that the best thing to do was to get Equiserve to stay at the Property, "whether it was a sale with a long-term lease or a short-term lease, get them to stay." Frank 52; Langelier 79.

**RESPONSE NO. 45**

**Admitted in part. Statement No. 45 does not define the phrase, "throughout this time." In 2002, Blue Hills proposed various options to Equiserve, but by May 14, 2003, Equiserve had confirmed its intent not to renew its Lease. The language quoted in Statement No. 45 is Frank's response to a question eliciting Frank's personal opinion about "the best thing to do with Equiserve" in 2002. In answer to the question, "And obviously if you could get [Equiserve] to stay,**

15

that's what you would like to do?", Langelier simply answered "correct." Langelier also testified that he relied on Frank for information; he never met with Equiserve. *See* **Blue Hills Statement I, ¶¶ 48-49; Langelier Deposition, page 79, attached to the Swisher Affidavit as Exhibit 7.**

J.P. Morgan and CSFB's Statement No. 46.

During the month of April 2003, Blue Hills received a copy of a special permit application filed with the Town of Canton by Equiserve and National Development, owner (through a subsidiary, Blueview Corporate Center, LLC) of adjacent property at 250 Royall Street known as "Blueview." Needle 61-67; Dep. Ex. 9. Equiserve and National Development were seeking to build a parking garage at Blueview. *Id.*

**RESPONSE NO. 46**

Admit.

J.P. Morgan and CSFB's Statement No. 47.

In May or June 2003, Blue Hills learned that DST Realty, Inc. (an affiliate of Equiserve and DST Systems) had entered into a purchase and sale agreement to buy Blueview. Blue Hills also learned that DST Realty's purchase of Blueview was conditioned on the Town of Canton approving the construction of the proposed parking garage. Donovan 80-83; Langelier 106; Needle 76-77; Purchase and Sale Agreement (Dep. Ex. 19).

**RESPONSE NO. 47**

Admitted in part. Blue Hills, Fineberg and Langelier admit having learned that DST Realty, Inc. intended to purchase the property located at 250 Royall Street, Canton, Massachusetts, but state that the deposition testimony cited in Statement No. 47 is inaccurately summarized. The referenced testimony does not state that this information was learned in May or June 2003. *See* Donovan Deposition, pages 80-83; Needle Deposition, pages 76-77; Langelier Deposition, page 106, attached to the Swisher Affidavit as Exhibits 7 and 10.

J.P. Morgan and CSFB's Statement No. 48.

On May 1, 2003, Larry Needle and Gary Lilienthal, an attorney representing Blue Hills, attended a Zoning Board of Appeals hearing concerning Equiserve's special permit application. Lilienthal introduced Blue Hills as an abutter and stated that he felt the proposed garage would have a major effect on traffic and obstruct the view of Blue Hills from the south-west (i.e., from Route 128). Minutes of Canton Zoning Board of Appeals ("ZBA") (Dep. Ex. 304) at 3-4; Blue Hills, Langelier & Fineberg's Response to Defs.' Second Requests For Admissions, No. 2 (excerpts) (Barnett Aff. Ex. F); Fineberg 135-39; Dep. Ex. 328; Needle 67-68.

**RESPONSE NO. 48**

Admitted in part. Blue Hills, Fineberg, and Langelier admit that Needle and Mr. Lilienthal attending a ZBA hearing on May 1, 2003. Statement No. 48, however, does not accurately reflect the minutes of the meeting Mr. Lilienthal's statements are taken out of context. *See* Deposition Exhibit 304, attached to the Swisher Affidavit as Exhibit 20.

16

J.P. Morgan and CSFB's Statement No. 49.

On or about May 15, 2003, Equiserve formally notified Blue Hills of its intent not to exercise its option to extend its lease past July 31, 2004.  Langelier, Fineberg, BHOP Answers to Defs.' First Set of Interrogatories, No. 7; Donovan 64-66; Dep. Exs. 17, 18; Langelier 104-105.

**RESPONSE NO. 49**

**Admitted in part.  By letter dated May 14, 2003, Equiserve notified Blue Hills of its intent not to exercise its option to extend the Lease.  *See* Blue Hills Statement I, ¶ 48.**

J.P. Morgan and CSFB's Statement No. 50.

On May 22, 2003, the Town of Canton granted the special permit (the "Special Permit") for a parking garage (which would add approximately 263 parking spaces) to Blueview Corporate Center LLC, then-owner of Blueview, which abuts the Property.  Needle 74-76; Dep. Ex. 304; ZBA Decision Granting Blue View Special Permit ("ZBA Decision," Barnett Aff. Ex. G)

**RESPONSE NO. 50**

**Admit.**

J.P. Morgan and CSFB's Statement No. 51.

The document attached to Lenders' Second RFA as Exhibit "L" is a true and correct copy of the ZBA Decision.  Blue Hills' Parties Response to Defs.' Second Requests for Admissions, No.  15.

**RESPONSE NO. 51**

**Admit.**

J.P. Morgan and CSFB's Statement No. 52.

Blue Hills continued to believe that the best option and most financially beneficial scenario for the future of the Property was to have Equiserve renew its lease, as it had been advised by Spaulding & Slye, a real estate brokerage firm, in mid-May 2003.  Frank 171-75; Dep. Ex. 44.

**RESPONSE NO. 52**

**Denied.  Statement No. 52 mischaracterizes Frank's testimony.  In answer to the question "Did you agree with their assessment that the main objective was to keep Boston Equiserve?," Frank answered, "that would have been one of our objectives.  Frank also stated that the other main objective was "to rent it no matter what."  In addition, Frank confirmed that Blue Hills did not hire Spaulding and Slye.  *See* Frank Deposition, page 173 lines 11-24 to page 174, line 1, attached to the Swisher Affidavit as Exhibit 5.**

J.P. Morgan and CSFB's Statement No. 53.

On June 9, 2003, Blue Hills filed a complaint in Norfolk Superior Court  appealing the ZBA Decision (the "Zoning Appeal" (Dep. Ex. 20)).  The complaint stated that the proposed garage "is immediately in the sight line of [the] Property, will partially block its view and will be detrimental and

17

offensive to [Blue Hills] and inhabitants of [the] Property. The addition of 380 spaces in a structured parking facility directly in the sight line of [the] Property will not assure the fulfillment of the general conditions for site plan approval, but rather violates such requirements as is poses a detriment to [the] Property." Zoning Appeal ¶¶ 37-38.

**RESPONSE NO. 53**

**Admitted in part. Blue Hills, Fineberg and Langelier state that Statement No. 53 is misleading. Although the Complaint filed in 2003 appealing a zoning decision in connection with the abutting property located at 250 Royall Street, Canton, Massachusetts, (the "Norfolk Action"), contains the quoted language, the language is taken out of context. The only remedy Blue Hills sought in the Norfolk Action was the annulment of the ZBA's decision. *See* Blue Hills Statement I, ¶¶ 54-56.**

J.P. Morgan and CSFB's Statement No. 54.

Blue Hills knew the only reason it could file the Zoning Appeal was because it owned the property abutting Blueview. Frank 81; Fineberg 90; Zoning Appeal ¶ 43.

**RESPONSE NO. 54**

**Admitted in part. Statement No. 54 mischaracterizes the deposition testimony of Frank and Fineberg. In its Complaint, Blue Hills alleged that it had standing "as its property abuts the Blueview Property . . . within the meaning of G.L. c. 40A § 11." *See* Deposition Exhibit 20, ¶ 43, attached to the McGlynn Affidavit as Exhibit 28.**

J.P. Morgan and CSFB's Statement No. 55.

The right to bring the Zoning Appeal of the Special Permit was Mortgaged Property under Granting Clause Seven of the Mortgage, as it was a "cause[] of action" that "related to, [was] derived from or [was] used in connection with the Mortgaged Property." Mortgage Granting Clause Seven.

**RESPONSE NO. 55**

**Denied. Statement No. 55 contains legal conclusions as to the definition of "Mortgaged Property" and the meaning of Section 10 of the Mortgage Agreement which cannot be characterized as a statement of undisputed fact. As set forth in Blue Hills' Summary Judgment Motion, Blue Hills avers that J.P. Morgan and CSFB have, *inter alia*, improperly taken the definition of "Mortgaged Property" out of the context of Section 10 of the Mortgage Agreement. *See* also Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 56.

Blue Hills hoped by appealing the special permit to "slow everything down," to hopefully persuade Equiserve to stay in Blue Hills Office Park, or to "stop them from building the garage," in hopes of keeping Equiserve in the building. Donovan 87, 90-91; Frank 61-63, 174-75; Fineberg 90-91.

18

**RESPONSE NO. 56**

      **Denied.  The deposition testimony of Donovan, Frank and Fineberg referenced in Statement No. 56 has been taken out of context.  Blue Hills confirmed Equiserve's intent not to renew its Lease by letter dated May 15, 2003.  *See* Blue Hills Statement ¶¶ 47 and 48.  The reasons for the filing of the Norfolk Action are set forth in the Settlement Agreement: the ZBA decision was based upon an incorrect interpretation of the Canton By-Laws.  *See* Blue Hills Statement I, ¶¶ 54-55; Deposition Exhibit 21, attached to the McGlynn Affidavit as Exhibit 29.**

J.P. Morgan and CSFB's Statement No. 57.

      During the summer of 2003 Blue Hills negotiated a settlement under which it agreed to accept a $2 million payment (the "Payment") to dismiss the Zoning Appeal and to waive all further rights of appeal of the ZBA Decision.  The terms of the settlement are set forth in a "Settlement Agreement" executed on August 5, 2003 (Dep. Ex. 21).  As part of the settlement Blue Hills also executed a "Lease Termination Agreement" dated August 5, 2003 with Equiserve, Lease Termination Agreement (Dep. Ex. 10), and Releases dated August 5, 2003, BHOP Release of Blueview Corporate Center LLC (Barnett Aff. Ex. H).  See also Blue Hills' Parties Response to Second RFA, No. 16; Donovan 96; Needle 83-85; Frank 77.

**RESPONSE NO. 57**

      **Admitted in part.  Blue Hills entered into a Settlement Agreement dated August 5, 2003, the terms of which speak for themselves.  *See* Deposition Exhibit 21, attached to the McGlynn Affidavit as Exhibit 29.  The Lease Termination Agreement was a separate agreement with Equiserve dated August 5, 2003, which formalized the condition in which Equiserve would leave the Property.  *See* Deposition Exhibit 10, attached to the Swisher Affidavit as Exhibit 14.**

J.P. Morgan and CSFB's Statement No. 58.

      As part of the settlement, Blue Hills agreed to, *inter alia*: (1) dismiss the Zoning Appeal, with prejudice (thereby forfeiting its right to contest the grant of the special permit); (2) waive its right to (at any time within 10 years of the date of the Settlement Agreement) "take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development" of the Blueview Property; (3) release DST and Blueview from any and all claims which Blue Hills had against DST and/or Blueview prior to or on the date of the Settlement Agreement; and (4) terminate Equiserve's lease as of July 31, 2004.  Settlement Agreement ¶¶ 3, 7(c) and Exhibits B-2 and B-4 thereto.  (Dep. Ex. 21.)

**RESPONSE NO. 58**

      **Denied.  Statement No. 58 not only includes only selective excerpts of the terms of the Settlement Agreement but mischaracterizes some of the terms, which speak for themselves.  J.P. Morgan and CSFB fail to point out that the obligations and releases were mutual.  In addition, the Settlement Agreement does not terminate Equiserve's Lease.  *See* Deposition Exhibit 21, attached to the McGlynn Affidavit as Exhibit 29.**

19

J.P. Morgan and CSFB's Statement No. 59.

Blue Hills knew that the settlement removed any impediment to approval of the garage by the Town of Canton, thus eliminating any possibility of Equiserve staying in the Property and clearing the way for Equiserve to move across the street.  Donovan 99-100; Fineberg 92, 96-97.  Blue Hills was aware that settling the Zoning Appeal would ensure that Equiserve would move its offices to Blueview.  Frank 75-76.

**RESPONSE NO. 59**

**Denied.  Equiserve had already confirmed its intent not to renew its Lease by letter dated May 14, 2003.  *See* Blue Hill Statement I, ¶¶ 47 and 48.  Further, the facts asserted in Statement No. 58 are contained in the attorneys' questions, not the answers provided by Frank, Donovan and Fineberg.  *See* Donovan Deposition, pages 99-100; Finberg Deposition, pages 92, 96-97; Frank Deposition pages 75-76, attached to the Swisher Affidavit as Exhibits 3, 4 and 5.**

J.P. Morgan and CSFB's Statement No. 60.

On August 4, 2003, an entity related to Equiserve (DST Realty of Massachusetts, Inc.) purchased Blueview from Blueview Corporate Center, LLC.  Counterclaim ¶ 33.

**RESPONSE NO. 60**

**Admit.**

J.P. Morgan and CSFB's Statement No. 61.

The settlement of the Zoning Appeal was an assignment, transfer, or conveyance of part of the Mortgaged Property, as it constituted the transfer of the cause of action of the Zoning Appeal and other rights related to the Property (including the right to contest future development at Blueview).  Mortgage ¶ 10.  Paragraph 10(a) of the Mortgage required the Lender's prior written consent to the settlement of the Zoning Appeal.

**RESPONSE NO. 61**

**Denied.  Statement No. 61 contains only legal conclusions to which no response is required.  As fully briefed in Blue Hills' Summary Judgment Motion the settlement of the Norfolk Action was not a transfer of Mortgaged Property that required J.P. Morgan's consent under Section 10 of the Mortgage Agreement.  *See* also Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 62.

Without notifying the Lender or obtaining the Lender's prior written consent, Blue Hills agreed to the settlement, accepted the Payment, and executed the Settlement Agreement, the Lease Termination Agreement and Releases.  BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, Nos. 3, 4.  Blue Hills never notified the Lender of  the Zoning Appeal, the settlement of the Zoning Appeal (including the Lease Termination Agreement), or its receipt of the Payment.  BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, Nos. 3, 4; BHOP Answer to Counterclaim ¶¶ 28-30.

**RESPONSE NO. 62**

      **Denied.  Although Blue Hills, Fineberg and Langelier did not notify J.P. Morgan before filing or settling the Norfolk Action, they were under no obligation to do so.  Any implication to the contrary is misleading.  *See* Blue Hill's Summary Judgment Motion.**

J.P. Morgan and CSFB's Statement No. 63.

      If Blue Hills had requested the Lender's consent to the Settlement, the Lender would not have allowed Blue Hills to keep $2 million.  Rather, the Lender would have required that the proceeds be placed into a reserve to cover the loss of the sole tenant of the Property.  Polcari II 213-14; Clarke 39, 41-42 (plaintiff's expert designee agreeing that a request by Blue Hills for consent to the settlement and disposition of the payment would have given the Lender the opportunity to require additional payments or reserves for the loan).

**RESPONSE NO. 63**

      **Denied.  Statement No. 63 contains mere speculations and is based upon the incorrect assumption that consent was required.  *See* Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1; Blue Hills' Summary Judgment Motion.**

J.P. Morgan and CSFB's Statement No. 64.

      Under the Pooling and Servicing Agreement, it was LNR as special servicer, and not Wells Fargo as Master Servicer, that would have responded to a request for consent to any transfers of Mortgaged Property.  Pooling and Servicing Agreement p. 113, § 3.20(a)(iii).

**RESPONSE NO. 64**

      **Admitted in part.  Statement No. 64 is a conclusory statement that does not reflect the language in the PSA.  Section 3-20(a)(iii) of the PSA states, in pertinent part, that "The Special Servicer shall be responsible for any request by a Borrower for the consent of the mortgage and any modification, waiver or amend not of any term of any Loan for which the Servicer is not responsible . . ."  *See* portions of Deposition Exhibit 51, attached to the Swisher Affidavit as Exhibit 16.**

J.P. Morgan and CSFB's Statement No. 65.

      No part of the Payment passed through any Blue Hills account.  Stone 59, 61-63, 70, 107-108, 137-138; Frank 74, 85.  The Payment was never recorded by Stone as a receipt for Blue Hills, even though it was Mr. Stone's responsibility to record all receipts for Blue Hills.  Stone 62-63, 108.

**RESPONSE NO. 65**

      **Denied.  The $2 million in settlement proceeds ("Settlement Proceeds") received by Blue Hills in connection with the Norfolk Action have been held in clients' funds accounts for the benefit of Blue Hills since August 8, 2003.  *See* Blue Hills Statement I, ¶¶ 60 and 61,  94 and 95.**

J.P. Morgan and CSFB's Statement No. 66.

Donovan did not think it was his responsibility to determine what had happened to the Payment because "the settlement was with the owners, and I'm responsible for the operating books.  I'm not responsible for the owners' books."  Donovan 120-22.

**RESPONSE NO. 66**

**Denied.  Statement No. 66 takes Donovan's testimony out of context.  Donovan did not negotiate the settlement of the Norfolk Action or review the Settlement Agreement.  Donovan testified that he had never seen the Settlement Agreement.  *See* Donovan Deposition, pages 121-123, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 67.

The Payment was Mortgaged Property under Granting Clause Eight of the Mortgage, as it is proceeds of the disposition of other Mortgaged Property, namely the Zoning Appeal cause of action and other rights transferred and released in the Settlement Agreement.  The Payment was  Mortgaged Property under Granting Clause Four, as it is "consideration" paid to Blue Hills arising from and attributable to the Premises and Improvements.  The Payment was  Mortgaged Property under Granting Three, as it is an "award or payment" made for an injury to or decrease in value of the Mortgaged Property.  The Mortgage in paragraph 10 required the prior written consent of the Lender to any transfer or conveyance of the Settlement Payment.  Mortgage ¶ 10 and Granting Clauses Three, Four, Eight.

**RESPONSE NO. 67**

**Denied.  Statement No. 67 contains only legal conclusions to which no response is required.  As fully briefed in Blue Hills' Summary Judgment Motion, settlement of the Norfolk Action was not a transfer of Mortgaged Property that required J.P. Morgan's consent under Section 10 of the Mortgage Agreement.  *See* also Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 68.

On or around August 8, 2003, without the prior written consent of Lender, the settlement Payment was transferred to Bernkopf Goodman LLP's IOLTA account and then to a client fund account at Bernkopf Goodman LLP, where it remained until after the Lender's foreclosure.  Langelier 127-129; Dep. Ex. 177; Goldberg 69-70.  The client fund account was  controlled by Langelier and Fineberg as the trustees and beneficiaries of Royall Associates, as evidenced by their disposition of the fund through a subsequent agreement dated December 31, 2004, to which Blue Hills was not a party. (Dep. Ex. 176). See infra ¶¶ 181-186.

**RESPONSE NO. 68**

**Denied.  On August 8, 2003, the Settlement Proceeds were wired to a clients' funds account at Bernkopf Goodman LLP to be  held for the benefit of Blue Hills.  *See* Blue Hills Statement I, ¶¶ 60-61; 94-95.  The consent of J.P. Morgan or CSFB to the settlement of the Norfolk Action or receipt of the Settlement Proceeds by Blue Hills was not required.  *See* Response No. 62.**

22

J.P. Morgan and CSFB's Statement No. 69.

Regardless whether the settlement funds passed through the Blue Hills entity or were sent directly to Royall Associates, Blue Hills' outside accountants, Rutfield and Hassey, accounted for the Payment as a transfer to Royall Associates, as evidenced by a corresponding increase in the "Due From Affiliate" line on Blue Hills' balance sheet for the year ending December 31, 2003.  Andelman 86-88, 92-95; Dep. Exs. 364, 365, 367, 368.

**RESPONSE NO. 69**

**Denied.  Statement No. 69 mischaracterizes Andelman's testimony.  In the cited pages, Andelman proffered no testimony regarding the Settlement Proceeds.  The Settlement Proceeds were not transferred to Royall Associates Realty Trust.  *See* Andelman Deposition, pages 87-88, attached to the Swisher Affidavit as Exhibit 1.  *See also* Blue Hills Statement I, ¶¶ 60-61; 94-95.**

J.P. Morgan and CSFB's Statement No. 70.

Blue Hills' tax lawyer and expert witness designee David Andelman testified that the item shown as "Due from Affiliate" represented an amount that Blue Hills transferred to Royall Associates. Andelman 87-88.

**RESPONSE NO. 70**

**Denied.  Statement No. 70 is misleading as it takes Andelman's testimony out of context.  In the cited pages, Andelman proffered no testimony regarding the Settlement Proceeds.  The Settlement Proceeds were not transferred to Royall Associates Realty Trust.  *See* Response No. 69.**

J.P. Morgan and CSFB's Statement No. 71.

Blue Hills accounted for the Payment on its balance sheet as a reduction to the basis of the Property.  Andelman 92-93, 104-105 ("properly reflected on balance sheets"), 169-170; Dep. Exs. 364, 365, 368, 369.

**RESPONSE NO. 71**

**Admit.**

J.P. Morgan and CSFB's Statement No. 72.

The transfer of the payment from Blue Hills to Royall Associates was a transfer of Mortgaged Property under Section 10 of the Mortgage.

**RESPONSE NO. 72**

**Denied.  Statement No. 72 contains legal conclusions to which no response is required.  See Blue Hills' Summary Judgment Motion.  Further, the Settlement Proceeds were never transferred from the clients' funds account being held for the benefit of Blue Hills.  *See* Blue Hills Statement I, ¶¶ 60-61; 94-95.**

J.P. Morgan and CSFB's Statement No. 73.

      Blue Hills did not obtain the prior written consent of the Lender to transfer the Payment to Royall Associates.  Fineberg 59-61; Blue Hills, Langelier & Fineberg Responses to Defs.' First Requests for Admissions, No. 3, 4. (Barnett Aff. Ex. E.)

**RESPONSE NO. 73**

      **Denied.  The Settlement Proceeds were never transferred from clients' funds accounts being for the benefit of Blue Hills.  *See* Blue Hills Statement I, ¶¶ 60-61; 94-95.  Receipt of the Settlement Proceeds did not require the consent of J.P. Morgan or CSFB.  *See* Blue Hills' Summary Judgment Motion.**

J.P. Morgan and CSFB's Statement No. 74.

      Blue Hills considered whether to seek consent to the settlement and transfer of the Payment from the Lender but did not do so.  Fineberg testified that he relied on the advice of counsel, but his counsel instructed him not to answer questions about the substance of the advice, invoking the attorney-client privilege.  Fineberg 59-61, 82-83, 143-44, 216-219; see also Goldberg 41-43, 77-78.

**RESPONSE NO. 74**

      **Denied.  The deposition testimony of Fineberg and Goldberg in Statement No. 74 is taken out of context.  Statement No. 74 does not properly distinguish between the advice given Fineberg by Attorney Goldberg during the transactions at issue and  instructions given to Fineberg by Attorney McGlynn during the deposition.  Fineberg properly asserted attorney-client privilege during his deposition when he was questioned about the content of discussions with Attorney Goldberg relating to the settlement agreement.  *See* Fineberg Deposition, pages 59-61, 82-83, 143-44, 216-219, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 75.

      Fineberg and Langelier made the decisions to settle the Zoning Appeal and how to handle the settlement Payment.  Fineberg 129-30; Langelier 111-112.

**RESPONSE NO. 75**

      **Admitted in part.  Statement No. 75 is incomplete as it disregards the qualified statement asserted by Fineberg that although the "ultimate decisions" were made by the principals, such decisions were made only with the input of the attorneys for Langelier and Fineberg.  Moreover, Langelier testifies that his attorney's input was an integral part of his decision to settle.  *See* Fineberg Deposition, page 130, lines 4 through 9; Langelier Deposition, page 111, line 21 through page 112, line 17, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 76.

      On September 5, 2003, a Stipulation of Dismissal of the Zoning Appeal signed by all counsel of record was filed with the court and all rights of appeal of the ZBA Decision were thereby waived by Blue Hills.  BHOP Answer to Counterclaim ¶ 35.

24

**RESPONSE NO. 76**

      **Admitted in part.  Blue Hills, Fineberg and Langelier admit that a Stipulation of Dismissal was signed and filed with the Norfolk Superior Court.  The terms of the Stipulation of Dismissal speak for themselves.**

J.P. Morgan and CSFB's Statement No. 77.

      On or around February 1, 2005, the Payment was conveyed from the client fund account controlled by Royall Associates to two separate client fund accounts.  Dep. Ex. 177.  One of the accounts is controlled by Fineberg and the other is controlled by Langelier.  Langelier 128-129; Fineberg 65-71.

**RESPONSE NO. 77**

      **Denied.  The Settlement Proceeds were always held in clients' funds accounts for the benefit of Blue Hills.  *See* Blue Hills Statement I, ¶¶ 60-61; 94-95.**

J.P. Morgan and CSFB's Statement No. 78.

      As a result of the accountants' treatment of the Payment as a basis reduction and not as income, it did not appear on the income and expense statements that Blue Hills provided quarterly to Lender.  Andelman 103-05; Dep. Exs. 35-36.

**RESPONSE NO. 78**

      **Denied.  The Settlement Proceeds were properly treated as a reduction in basis, which is reflected upon the statements of assets and liabilities prepared by Blue Hills' accountant.  All information which Wells Fargo requested from Blue Hills was provided.  *See* Affidavit of Joseph Donovan ("Donovan Affidavit"), ¶¶2-5.**

J.P. Morgan and CSFB's Statement No. 79.

      Despite a clear requirement in the Mortgage that Blue Hills provide Lender a balance sheet showing assets and liabilities (which would have reflected the reduction in basis), Mortgage ¶ 18(b), Blue Hills never provided a balance sheet after receiving the Payment.  Affidavit of Curtis Mallegni ¶ 4.

**RESPONSE NO. 79**

      **Denied.  Statement No. 79 contains legal conclusions to which no response is required.  From the Loan's inception, Blue Hills provided Wells Fargo with rent rolls and operating statements.  Statement No. 79 deceptively implies that Blue Hills neglected to supply documents for the year 2003.  This was not the case.  All information which Wells Fargo requested from Blue Hills was provided.  *See* Donovan Affidavit, ¶¶2-5.**

J.P. Morgan and CSFB's Statement No. 80.

      Frank and Needle were in charge of the effort to find a new tenant for the Property, which began even before the May 14, 2003 notice from Equiserve (Dep. Ex. 17) was delivered to Blue Hills.  Frank 133-134.

**RESPONSE NO. 80**

     **Admitted in part.  Blue Hills, Fineberg and Langelier admit that Frank and Needle were involved in the effort to find a new tenant, but deny that they were the only Blue Hills' representatives involved in that effort.  *See* Langelier Deposition, page 152, line 3 through page 155, line 24, attached to the Swisher Affidavit as Exhibit 7.**

J.P. Morgan and CSFB's Statement No. 81.

     Blue Hills engaged Cushman and Wakefield as Blue Hills' exclusive leasing agent to actively market the Property.  SAC ¶ 39; Frank 134-135.

**RESPONSE NO. 81**

     **Admit.**

J.P. Morgan and CSFB's Statement No. 82.

     Cushman and Wakefield actively but unsuccessfully marketed the Property for lease from May 2003 through at least November 4, 2004.  From May 2003 through November 2004, no letters of intent were ever signed by any prospective tenant.  No new tenant was found.  Frank 133-34, 136-43, 148, 156, 162; Needle 107-14; Fineberg 100.

**RESPONSE NO. 82**

     **Admitted in part.  Statement No. 83 improperly characterizes Cushman and Wakefield's extensive efforts to market the Property.  *See* Frank Deposition, page 124, line 20 through page 125, line 15, attached the Swisher Affidavit as Exhibit 5.**

J.P. Morgan and CSFB's Statement No. 83.

     The leasing market was "pretty bad" between May 2003 and the fall of 2004.  There was "clearly a downturn and a high vacancy rate in office properties."  Frank Depo 142, 178; Langelier 145.

**RESPONSE NO. 83**

     **Denied.  Statement No. 83 takes the testimony of Frank and Langelier out of context.  The quoted language "pretty bad" is not the deposition testimony of either Frank or Langelier but rather the attorney's statement in formulating a question.  While Frank confirms that statement, Frank then challenges the assertion that the vacancy rates in Canton were 45%.  Frank states that he understood the vacancy rates to have been only 16% in Canton. *See* Frank Deposition, page 142, line 15, attached to the Swisher Affidavit as Exhibit 5.**

J.P. Morgan and CSFB's Statement No. 84.

     As of July 21, 2004, there were no viable tenant prospects for the Property.  Frank 138-41; Dep. Ex. 42; Donovan 126-128; Needle 108-09, 137.

26

**RESPONSE NO. 84**

      **Admitted in part.  Statement No. 84 mischaracterizes the testimony of Frank, Donovan and Needle, who never used the term "viable."  Rather that description is created through Defendants' questions.  While Blue Hills, Fineberg and Langelier admit that no tenant had been located, in answer to Defendants' question if tenant prospects were "viable," Frank stated "[t]he answer is no, but that changes daily."  *See* Frank Deposition, page 141, lines 9-24, attached to the Swisher Affidavit as Exhibit 5.**

J.P. Morgan and CSFB's Statement No. 85.

      As of August 2004, Cushman and Wakefield had no tenant prospects for the Property.  Frank 148; Fineberg 100; Donovan 126-28.  Blue Hills, with 275,000 square feet to fill, was looking for tenants taking 100,000 square feet or more.  In a report dated August 3, 2004, Joseph Plunkett, Cushman and Wakefield's lead broker for the Property, described their prospects.  According to Plunkett, "'Major deals' that are greater that 50,000 square feet are for all intents and purposes non-existent today, in the Route 128 South market," of which Canton is a part.  Users looking for 100,000+ square feet "have 20 options within a 15-minute drive of 150 Royall Street."  Letter from Joseph Plunkett to Daniel Frank dated August 3, 2004 (Dep. Ex. 43).

**RESPONSE NO. 85**

      **Denied.  Several viable tenant prospects had been produced.  *See* Frank Deposition, page 142, line 15.  *See also* Expert Report of Kenneth Gartrell, pages 11 through 15, Deposition Exhibit 354, attached to the Swisher Affidavit as Exhibit 22.**

J.P. Morgan and CSFB's Statement No. 86.

      Blue Hills continued looking for tenants right up to the time of the foreclosure but never found one.  Langelier 160; Fineberg 110.

**RESPONSE NO. 86**

      **Admitted in part.  Statement No. 86 is a mischaracterization of Blue Hills' attempts to find new tenants.  Indications of an improving market would have made the prospects of finding a tenant more likely had the wrongful foreclosure not occurred.  *See* Expert Report of Kenneth Gartrell, pages 11 through 15, Deposition Exhibit 354, attached to the Swisher Affidavit as Exhibit 22.**

J.P. Morgan and CSFB's Statement No. 87.

      On or about September 16, 2003, Wells Fargo contacted Blue Hills and was told that Equiserve would be vacating the Property in July 2004 and that marketing of the Property had begun (although Blue Hills could give no information about prospective tenants).  Wells Fargo communicated this information to LNR at the time. Mallegni 144-46; Dep. Ex. 141; Email chain from September 2003 (Barnett Aff. Ex. I).

**RESPONSE NO. 87**

      **Denied.   LNR learned as early as September 12, 2003 that Equiserve would be vacating the Property and initiated communications with Wells Fargo.  Wells Fargo phone records show no**

**outgoing calls to Blue Hills on September 16, 2003.  *See* Deposition Exhibit 71, attached to the McGlynn Affidavit as Exhibit 41.  *See also* Goertzen Affidavit, filed by Defendants, Exhibits A and B.**

J.P. Morgan and CSFB's Statement No. 88.

From late 2003 through April or May 2004, Donovan had three or four telephone conversations with people from Wells Fargo (whose names he does not recall) concerning the Property.  There was no urgency to the calls.  He communicated that they were looking for a tenant and thought they would have one in place around the time Equiserve left.  Donovan 145-149.  He did not ask Wells Fargo for a meeting in any of these calls.  Donovan 157-58.  He did not mention that Blue Hills had entered into a Lease Termination Agreement with Equiserve or received a $2 million settlement payment that it had transferred to its owners.  Donovan 146.

**RESPONSE NO. 88**

**Denied.  Blue Hills, Fineberg and Langelier admit that Donovan had several telephone conversations with Wells Fargo or LNR representatives, but deny that Statement No. 88 accurately characterizes Donovan's testimony.  Further Blue Hills, Fineberg and Langelier deny that the Settlement Proceeds were transferred from Blue Hills.  *See* Donovan Deposition, pages 157-158, attached to the Swisher Affidavit as Exhibit 3; Blue Hills Statement I ¶¶ 60-61; 94-95.**

J.P. Morgan and CSFB's Statement No. 89.

By April 2004, LNR was estimating a loss from the Blue Hills Loan of between $10 million and $20 million dollars (Dep. Ex. 80).  In the fall of 2004, its best estimate of the loss was $18,590,000 (Dep. Ex. 97).

**RESPONSE NO. 89**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit only that the referenced deposition exhibits contain internal e-mails estimating the loss from the Loan.  There is no mention of "best evidence."  In fact, Deposition Exhibit 97 states "[We] have been doing a little tweaking, and we have changed Blue Hills' loss to $18,590,000."  *See* Deposition Exhibit 97, attached to the Swisher Affidavit as Exhibit 19.**

J.P. Morgan and CSFB's Statement No. 90.

As Fineberg Management was marketing the Property in the first half of 2004, Fineberg was in the process of walking away from two hotel properties that were in CMBS pools for which LNR was the Special Servicer.  After the hotels – one in Sturbridge, Massachusetts and one in Lancaster, Pennsylvania – went into default, Fineberg executed deeds-in-lieu of foreclosure and turned the properties back to the Lender.  Brown Aff. ¶¶ 2-4; Goldberg 116-117.

**RESPONSE NO. 90**

**Admitted in part.  Statement No. 90 mischaracterizes Goldberg's deposition testimony.  Goldberg responded "Yes, ultimately" to the question "Did Finberg give back the keys to the Sturbridge Hotel and walk away?"  In addition, in response to the question "Similarly with the Lancaster Hotel, he gave back the keys and walked away?", Goldberg answered, "Mm-hmm yes."**

28

**Goldberg did not testify as to the timing of those transactions or comment on the marketing of the Property.** *See* **Goldberg Deposition, pages 116-117, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 91.

Frank and Donovan were involved in these transactions in their capacities as officers of Fine Hotels, an affiliate of Fineberg Management also owned by Fineberg.  Donovan 27, 31-32; Frank 5; Fineberg 23.

**RESPONSE NO. 91**

**Admitted in part.  Statement No. 91 doesn't reference what "these transactions" refers to. Assuming that "these transactions" refers to the Sturbridge and Lancaster Hotels, Blue Hills, Fineberg and Langelier admit that Sturbridge and Lancaster Hotels were managed by Fine Hotels. However, the deposition testimony cited does not support the blanket statement that Frank and Donovan "were involved in these transactions."** *See* **Donovan Deposition, pages 27, 31-32; Frank Deposition, page 5 and Fineberg Deposition, page 23, attached to the Swisher Affidavit as Exhibits 3, 4 and 5.**

J.P. Morgan and CSFB's Statement No. 92.

Goldberg and the Bernkopf Goodman firm represented Fineberg and Fine Hotels in connection with the deeds-in-lieu, which were handled by LNR asset manager Chris Brown.  The deed-in-lieu transactions closed in July 2004.  Brown Aff. ¶¶ 2-4.

**RESPONSE NO. 92**

**Admit.**

J.P. Morgan and CSFB's Statement No. 93.

The Blue Hills Loan was mentioned in at least two conversations between Brown and Goldberg that were otherwise about Sturbridge and Lancaster.  According to Brown, Goldberg made a vague reference in one call to the fact that he had another loan that would be coming to LNR but would not say anything more about the loan or the property.  In a subsequent call, at Brown's prodding, Goldberg identified it as the Blue Hills property, adding that the property had a single tenant who was leaving after which there would be no income, and that the borrower was trying to get the loan transferred from the master servicer to the special servicer.  Brown did not suggest anything he should say to get the master servicer to make a transfer and did not do anything to get the loan transferred from the master servicer to LNR.  Brown Aff. ¶¶ 7-8.

**RESPONSE NO. 93**

**Denied.  Statement No. 93 directly contradicts Goldberg's deposition testimony.  Goldberg testified that he communicated with Chris Brown of LNR and that Brown suggested that Blue Hills should be in touch with Wells Fargo.  In addition, Brown made a specific suggestion to Goldberg as to what Blue Hills should say in order to expedite transfer of the file to LNR.  Goldberg also conveyed to Brown that time was of the essence.** *See* **Goldberg Deposition, pages 85 and 86, attached to the Swisher Affidavit as Exhibit 6.**

29

<u>J.P. Morgan and CSFB's Statement No. 94.</u>

According to Brown, Goldberg never told him said, in form or substance, that "time was of the essence" with respect to transferring or servicing the Blue Hills loan and Goldberg did not say anything in any of their conversations that gave Brown the impression that there was any urgency at all with respect to the loan or the property. Goldberg never told Brown that his client was intent on or committed to keeping the Blue Hills Property or that he was looking for an outcome different from the Sturbridge and Lancaster transactions. Goldberg never discussed with Brown the possibility of doing a workout of the Blue Hills Loan. He did not say that the borrower was exploring various options with respect to the future of the Property and he did not say, in form or in substance, that "there were a whole host of ways [his] client wanted to consider going with the property." Brown Aff. ¶¶ 9-10.

**RESPONSE NO. 94**

**Denied. Statement No. 94 directly contradicts Goldberg's testimony. Goldberg testified that he told Brown that "time was of the essence". Further, Goldberg and Brown discussed "a whole host of ways that the client wanted to consider going with the Property." In addition, Brown agreed that Goldberg was going to get "nowhere with Wells Fargo, that it had to be with the special servicer."** *See* **Goldberg Deposition, page 86, attached to the Swisher Affidavit as Exhibit 6.**

<u>J.P. Morgan and CSFB's Statement No. 95.</u>

Brown's conversations with Goldberg about Blue Hills left Brown with the impression that Blue Hills would be giving the Property back to the lender, as they had done in Sturbridge, Lancaster, and Williamsburg. Brown Aff. ¶ 11.

**RESPONSE NO. 95**

**Denied. Statement No. 95 directly contradicts Goldberg's testimony. Further, Brown's "impression" is not a statement of undisputed facts. Goldberg testified that he told Brown that "time was of the essence." Goldberg and Brown discussed "a whole host of ways that the client wanted to consider going with the Property." In addition, Brown agreed that Goldberg was going to get "nowhere with Wells Fargo, that it had to be with the special servicer."** *See* **Goldberg Deposition, page 86, attached to the Swisher Affidavit as Exhibit 6.**

<u>J.P. Morgan and CSFB's Statement No. 96.</u>

According to Goldberg: He and Brown had three or four conversations about the Blue Hills Loan. Initially, Goldberg asked Brown whether LNR was the special servicer for the Loan. Brown called back to confirm that it was but the Loan had not yet been transferred. Brown offered a suggestion of what Blue Hills could say to Wells Fargo to get the Loan transferred LNR. Goldberg told Brown that, unlike some other properties that had been turned back, his client really intended to keep Blue Hills, that there were "a whole host of ways [his] client wanted to consider going with the property" (although he provided no specifics), and that time was of the essence. In a subsequent call, Brown informed Goldberg that the Loan was being transferred and that Job Warshaw would be the asset manager. Goldberg made no notes or other contemporaneous record supporting his account of these conversations. Goldberg 81-95.

**RESPONSE NO. 96**

      **Admitted in part.  Statement No. 96 is only Defendants' summary of Goldberg's deposition testimony.  Blue Hills, Fineberg and Langelier admit only that the deposition testimony speaks for itself and deny Defendants' characterizations.  *See* Goldberg Deposition, pages 81 through 95, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 97.

      Curtis Mallegni, a Wells Fargo asset manager, spoke with Donovan on or about July 15, 2004. Donovan told him that the tenant was leaving and that the Property was available for lease, but there were no prospects.  Donovan might have asked for a meeting with Wells Fargo to discuss the loan during this conversation, but he is not sure that he did.  Donovan 158; Mallegni 86-88; July 15, 2004 Email from C. Mallegni to V. Taylor (Dep. Ex. 22, 136).

**RESPONSE NO. 97**

      **Admitted in part.  Statement No. 97 mischaracterizes Donovan's testimony.  Donovan recalled speaking with someone at Wells Fargo in June or July 2004 but could not recall the date. Donovan could not remember exactly what he said to the Wells Fargo representative and could only answer "I probably did, yes" to the question "did you tell Mr. Mallegni that the Property was available for lease but there were no prospects currently?"  *See* Donovan Deposition, page 156, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 98.

      On or around July 31, 2004, Equiserve allowed its lease to expire without renewal, vacated the Property, and moved to Blueview.  SAC ¶ 52; Answer to Counterclaim ¶ 38; Langelier 106.

**RESPONSE NO. 98**

      **Admitted in part.  Equiserve's Lease expired on July 31, 2004 and Equiserve did not exercise its option to renew.  The sources cited do not support the characterization of Equiserve "allowing" the Lease to expire.  *See* Langelier Deposition, page 107, attached to the Swisher Affidavit as Exhibit 7.**

J.P. Morgan and CSFB's Statement No. 99.

      Blue Hills never signed a lease with a tenant to replace Equiserve, never spent money on tenant improvements for a replacement tenant for Equiserve, never presented Lender with any paid invoices for reimbursement for tenant improvements, never paid any leasing commissions, and never presented any leasing commission invoices to Lender.  Fineberg 113.

**RESPONSE NO. 99**

      **Admitted in part.  Statement No. 99 takes Fineberg's testimony out of context.  Blue Hills, Fineberg and Langelier had no opportunity to find a replacement tenant because of Defendants' wrongful default and foreclosure.  *See* Second Amended Complaint.**

J.P. Morgan and CSFB's Statement No. 100.

Blue Hills knew that a quarterly real estate tax payment would be due to the Town of Canton on or before August 2, 2004, but did not set aside any monies from net rents of approximately $150,000 to $170,000 per month during May, June, or July 2004 to pay the taxes.  Donovan 204, 207-09, 215; Dep. Exs. 31, 32.

**RESPONSE NO. 100**

**Admitted in part.  Statement No. 100 deceptively implies that Blue Hills objected to setting aside monies, which was not required, in accordance with the alternative arrangement between Blue Hills and Wells Fargo for the payment of taxes.  *See* Blue Hills Statement I, ¶ 45.**

J.P. Morgan and CSFB's Statement No. 101.

At no time did Blue Hills suggest to Wells Fargo that it should start escrowing for real estate taxes while Equiserve was still paying rent, and Blue Hills did not expect Lender to begin escrowing for tax payments.  Stone 109, 148; Donovan 205-06.

**RESPONSE NO. 101**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that they made no suggestion to Wells Fargo regarding the escrowing for real estate taxes, but they state they had no obligation to do so.  In or about October 1999, Wells Fargo and Blue Hills agreed to an alternative arrangement for the payment of taxes.  *See* Blue Hills Statement I, ¶ 43.**

J.P. Morgan and CSFB's Statement No. 102.

By letter dated July 16, 2004 (attached to the SAC as Exhibit "F"; Dep. Ex. 4), Wells Fargo advised Blue Hills that the Tax and Insurance Fund  had insufficient funds to pay the first installment of taxes to the Town of Canton for 2004 and requested Blue Hills to deposit with Wells Fargo the sum of $158,181.19 by July 27, 2004.  This quarterly tax shortage notice was typical of notices that the Lender sent to Blue Hills every quarter.  SAC ¶ 48; Donovan 202.

**RESPONSE NO. 102**

**Admit.**

J.P. Morgan and CSFB's Statement No. 103.

In July 2004, when the shortage notice came from Wells Fargo, Stone asked Donovan how the taxes would be paid.  Donovan said that they were not going to pay the taxes at that point because they didn't have the funds.  They wanted to take it out of the escrow funds held by the Lender.  Stone 94-95, 100, 111; Donovan 204, 211-12.

**RESPONSE NO. 103**

**Admitted in part.  Statement No. 103 mischaracterizes the deposition testimony of Stone and Donovan.  Stone testified that he only had a vague memory of having a discussion with Donovan and that he did not recall the content of that discussion other than that "the money was**

32

not there and it wasn't going to be paid." *See* **Stone Deposition, page 94, lines 15-24 through page 95, lines 1-12, attached to the Swisher Affidavit as Exhibit 12.**

J.P. Morgan and CSFB's Statement No. 104.

On July 29, 2004, Brent Lloyd (of Wells Fargo) spoke with Stone and stated that taxes were due. Stone stated that the tenant had moved out and that there were no available funds to pay taxes. Stone asked if there was any way Blue Hills could use reserve funds to make the tax payment. Lloyd called him back later that day, after checking with the reserves department, to say that if he needed to use the reserve money to pay taxes, he would have to provide a lien waiver. Stone said he did not have a lien waiver. Lloyd told him that if he could not provide the lien waiver and could not pay the taxes, he would be in default of his loan agreement. Stone said he would get back in touch with Lloyd but did not. Lloyd testified to this conversation and memorialized it in contemporaneous notes. Stone did not recall the conversation, but could not deny it. Wells Fargo telephone records show two calls from Wells Fargo to Blue Hills/Fineberg Management on July 29, 2004. Stone 117-119, 124 -125; Dep. Ex. 5; Dep. Ex. 6; Dep. Ex. 8; Dep. Ex. 139 (WF1745); Lloyd 20-24, 32, 39-40, 60-61; Goertzen Aff. Ex. A. [6]

**RESPONSE NO. 104**

**Denied. Statement No. 104 mischaracterizes the deposition testimony. Blue Hills, Fineberg and Langelier admit only that Stone did not recall the conversation with Brent Lloyd in July 2004. Further, Wells Fargo never informed Blue Hills that it would be defaulted for failure to pay taxes. *See* Lloyd Deposition, pages 36-37; Stone Deposition, page 118, *see also* Blue Hills Statement I, ¶¶ 45 and 77, attached to the Swisher Affidavit as Exhibits 5 and 8.**

J.P. Morgan and CSFB's Statement No. 104, Footnote 6.

References to lien waivers and other documentation requirements in Lloyd's testimony and Dep. Exs. 5 and 6 make sense in light of Stone's request, i.e., whether there was anyway to use money in the reserves to pay taxes. Even though the Mortgage does not have a reserve for paying taxes, if Blue Hills had been entitled to a reserve disbursement for some other reason (e.g., for having incurred leasing commission or tenant improvement expenses), funds could have been released on that basis (subject to appropriate documentation) and then applied by Wells Fargo to the Tax Fund rather than returned to Blue Hills. Stone's response indicated he could not meet the documentation requirements for the potentially available reserve disbursements.

**RESPONSE TO FOOTNOTE 6**

**Denied. Footnote 6 is unsupported by the referenced cites and is conclusory. Lloyd testified that he didn't even know what a lien waiver was. *See* Lloyd Deposition, page 29, lines 15-25, attached to the Swisher Affidavit as Exhibit 8.**

---

[6] **[J.P. Morgan and CSFB original Footnote]**  References to lien waivers and other documentation requirements in Lloyd's testimony and Dep. Exs. 5 and 6 make sense in light of Stone's request, i.e., whether there was anyway to use money in the reserves to pay taxes. Even though the Mortgage does not have a reserve for paying taxes, if Blue Hills had been entitled to a reserve disbursement for some other reason (e.g., for having incurred leasing commission or tenant improvement expenses), funds could have been released on that basis (subject to appropriate documentation) and then applied by Wells Fargo to the Tax Fund rather than returned to the Blue Hills. Stone's response indicated he could not meet the documentation requirements for the potentially available reserve disbursements.

33

J.P. Morgan and CSFB's Statement No. 105.

Wells Fargo advanced the property tax payment out of its own funds on July 29, 2004.  Mallegni 156; Dep. Ex. 143; Lloyd 50-51.

**RESPONSE NO. 105**

**Admitted in part.  Donovan confirmed with the Town of Canton that the taxes had been paid and assumed that Wells Fargo paid them from reserve funds.  Blue Hills Statement I, ¶71.**

J.P. Morgan and CSFB's Statement No. 106.

Prior to August 2, 2004, Blue Hills did not deposit with Wells Fargo any funds for payment of the taxes due on that date and it did not pay the taxes to the Town of Canton directly.  Polcari 32-33; Dep. Ex. 30.

**RESPONSE NO. 106**

**Admitted in part.  Statement No. 106 implies that Blue Hills had an obligation to deposit money for the payment of taxes or to pay the taxes directly.  Blue and Wells Fargo had agreed to an alternative arrangement for the payment of taxes.   Moreover, funds had previously been transferred from various reserve accounts to cover tax and insurance shortages.  Blue Hills Statement 1, ¶ 43; Blue Hills Statement II, ¶ 16.**

J.P. Morgan and CSFB's Statement No. 107.

By letter dated and mailed on August 2, 2004 but not delivered to the Lender until on or after August 4, 2004, Blue Hills' Donovan requested a disbursement from the Leasing Escrow Funds to pay the real estate taxes due on August 2, 2004, as well as to pay principal and interest due on the Note for the month of August 2004.  BHOP, Langelier, Fineberg Responses to Defs.' First Requests for Admissions, No. 9; SAC ¶ 54; Donovan 225-227, 162-163; Exhibit 23.  The payment of principal and interest was due on August 11.  Mortgage Note ¶ B.  Donovan made no effort to find out from Wells Fargo whether this request had been granted.  Donovan 223.

**RESPONSE NO. 107**

**Admitted in part. Statement No. 107 incorrectly states that "Donovan made no effort" to find out if his request had been granted.  Blue Hills, Fineberg and Langelier admit that Donovan requested by letter to Wells Fargo dated August 2, 2004 disbursements for the payment of real estate taxes and for payment of principal and interest due on the Note.  Donovan mailed the letter and subsequently faxed the August 2, 2004 letter to Wells Fargo on August 4, 2004.  Blue Hills, Fineberg and Langelier admit that payment of principal and interest on the Note was due August 11, 2004.  Blue Hills, Fineberg and Langelier deny that Donovan made no effort to find out whether his request for disbursements had been granted.  Donovan testified that he checked with the Town of Canton to confirm that the taxes had indeed been paid.  Further, Wells Fargo never responded to Donovan's requests.  *See* Blue Hills Statement I, ¶ 69 through ¶ 72.**

34

J.P. Morgan and CSFB's Statement No. 108.

Donovan testified that he believed, based on his understanding of the 1999 Loan negotiations, that reserves could be accessed to pay taxes when Equiserve departed. Donovan 53-55, 132-33, 135-39, 211-12. He now knows that is not the case. Id. 265-266.

**RESPONSE NO. 108**

**Admitted in part. Although Donovan believed that the reserves could be accessed to pay taxes, the statement that "he now knows that is not the case" is a mischaracterization. Statement No. 108 takes Donovan's deposition testimony out of context. In answer to the question, "Didn't you tell me that even sitting here today you still don't know whether the loan documents allow payment of real estate taxes," Donovan said "Yes. And that's what I was just trying to tell you then." *See* Donovan Deposition, page 264, lines 23 and 24 through page 265, lines 1-3, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 109.

Donovan testified he waited until the day the taxes were due to mail the request, which he knew would not arrive until after the taxes were due, because he was busy. Donovan 243-45.

**RESPONSE NO. 109**

**Denied. Statement No. 109 deceptively implies that Donovan intentionally made a late request. In fact, Donovan timely requested disbursements from the reserve accounts. Statement No. 109 mischaracterizes Donovan's testimony. Donovan testified that, "[w]hen [Wells Fargo] request tax payments … it says right on the document that they will charge us a $500 payment if we are late paying." *See* Donovan Deposition, page 245, lines 17-22, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 110.

This was the first request by Blue Hills to Wells Fargo for access to the Loan reserves for any purpose. Donovan 163.

**RESPONSE NO. 110**

**Admitted in part. Statement No. 110 is vague with respect to "this." To the extent that "this" refers to the August 2, 2004 letter from Donovan, Blue Hills, Fineberg and Langelier admit that Blue Hills' first written request for access to the Loan reserves was by letter dated August 2, 2004 to Wells Fargo.**

J.P. Morgan and CSFB's Statement No. 111.

At some time in mid-August 2004, Blue Hills collected approximately $51,800.00, one month's worth of property taxes, from Equiserve and deposited the funds in the Lockbox. The money was swept to Wells Fargo and applied to reduce the deficit in the Blue Hills tax escrow account, which was negative in the amount of the August payment (approximately $158,000.) Donovan Sept. 2 Letter (Dep. Ex. 26); Tax Record for Single Loan (Dep. Ex. 138).

35

**RESPONSE NO. 111**

  **Admitted in part.  Blue Hills, Fineberg and Langelier admit that Blue Hills collected portion of the quarterly taxes due from Equiserve and that those funds were deposited in the Lockbox.  Blue Hills, Fineberg and Langelier lack sufficient personal knowledge to either admit or deny how Wells Fargo applied the funds.**

J.P. Morgan and CSFB's Statement No. 112.

  At some time in August, Donovan had someone at Fineberg Management confirm with the Town of Canton that the taxes had been paid.  This information from the Town, and nothing else, led Donovan to believe the requests in his August 2 letter has been granted.  Donovan did not ask the town when the taxes had been paid, nor did he contact Wells Fargo or LNR to confirm the source of the monies used to pay the taxes.  Donovan 229, 239, 240.

**RESPONSE NO. 112**

  **Denied.  Statement No. 112 mischaracterizes Donovan's testimony.  After sending the August 2, 2004 letter to Wells Fargo, Donovan contacted the Town of Canton Treasurer's Office, which verified to Donovan that the taxes had been paid.  Consequently, Donovan assumed that the tax payment was made from the reserve accounts.  *See* Blue Hills Statement I ¶ 71; Blue Hills Statement II, ¶¶ 12 and 16.**

J.P. Morgan and CSFB's Statement No. 113.

  Donovan sent his August 2, 2004, letter requesting application of loan reserves to principal, interest, and real estate taxes to Tim Parrish of the Wells Fargo tax group, whose name was on the July 16 tax letter, not to Mallegni.  Dep. Ex. 23; Donovan 161.

**RESPONSE NO. 113**

  **Admit.**

J.P. Morgan and CSFB's Statement No. 114.

  The August 2, 2004 letter did not request payment of reserve fund payments due on August 11, 2004.  Donovan did not think there was any need to make those payments.  Dep. Ex. 23; Donovan 230-31; Stone 146-47 ("I hadn't thought about it.")

**RESPONSE NO. 114**

  **Admitted in part.  Statement No. 114 takes Donovan's testimony out of context.  Blue Hills, Fineberg and Langelier admit that by the August 2, 2004 letter, Donovan did not request a disbursement for the payment of the reserve funds.  Donovan stated "At that point I was looking to draw down the reserve.  I didn't think there was any need to put more money into the reserve."  Donovan Deposition, page 230, lines 14 - 22, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 115.

  Donovan deposited the letter dated August 2 in the U.S. Mail on August 2, 2004 and faxed it to Wells Fargo on August 4, 2004.  Blue Hills, Fineberg and Langelier Answers to Defs' Second

Interrogatories, No. 2 (Barnett Aff. Ex. J).  The Wells Fargo Loancator correspondence tracking system notes that it was received by Wells Fargo on August 4, 2004.  Dep. Ex. 134; Martin 61-68.

**RESPONSE NO. 115**

 **Admit.**

J.P. Morgan and CSFB's Statement No. 116.

  On August 5, 2004, Donovan sent another letter to Wells Fargo – again to Parish – officially notifying the Lender that Equiserve had vacated and that no replacement tenant had been found.  In that letter, Donovan requested a meeting with the Lender and asked that the special servicer be involved. Donovan 163-64; Dep. Ex. 24.

**RESPONSE NO. 116**

 **Admitted to the extent that Donovan's August 5, 2004 letter speaks for itself.**

J.P. Morgan and CSFB's Statement No. 117.

  Thereafter, Mallegni and Donovan traded phone messages.  Mallegni was seeking to confirm whether Blue Hills would be making the loan payments due on August 11 (Dep. Ex. 145).  Donovan finally sent him the August 2 and August 5 letters by fax on August 13, noting in his cover sheet: "Sorry we have been missing each other on the phone.  I would like to get the special servicer involved. Attached are the recent correspondence."  Dep. Ex. 27; Donovan 170; Mallegni 56-57.

**RESPONSE NO. 117**

 **Admitted in part.  Statement No. 117 mischaracterizes Donovan's testimony.  Blue Hills, Fineberg and Langelier admit that Mallegni and Donovan traded phone messages and that Donovan sent Wells Fargo letters dated August 2, 2004, August 5, 2004 and a fax dated August 13, 2004, which enclosed the prior letters.  *See* Blue Hills Statement I, ¶¶ 73 - 76.  Mallegni testified that he had been on vacation and had not yet seen Donovan's correspondence.  Mallegni made no notes of any conversations with Donovan.  *See* Mallegni Deposition, pages 56 and 57, attached to the Swisher Affidavit as Exhibit 9.**

J.P. Morgan and CSFB's Statement No. 118.

  Wells Fargo telephone records show three calls from Mallegni's extension (415-396-699 6999) to Blue Hills/Fineberg Management  (781-239-1480) on August 11 and 13, 2004.  Goertzen Aff. ¶ 3 and Ex. A; Mallegni Aff. ¶ 6; Barnett Aff. ¶ 2.

**RESPONSE NO. 118**

 **Admitted in part.  Blue Hills, Fineberg and Langelier admit that Exhibit A to the Goertzen Affidavit appears to show three calls to Blue Hills on August 11 and August 13, 2004, ranging from 78 seconds to 144 seconds.  The records do not confirm that any conversations actually occurred. *See* Goertzen Affidavit, Exhibit A; Deposition Exhibit 27, attached to the McGlynn Affidavit as Exhibit 32.**

37

<u>J.P. Morgan and CSFB's Statement No. 119.</u>

In the meantime, the August 11 payment date passed and Blue Hills did not make the principal, interest, or reserve fund payments due on August 11, 2004. Polcari I 32-33; Dep. Ex. 30; BHOP, Langelier and Fineberg Responses to Defs.' First Requests for Admissions, Nos. 10 & 11.

**<u>RESPONSE NO. 119</u>**

**Admitted in part. Blue Hills, Fineberg and Langelier admit that Blue Hills did not make any payments of principal, interest or reserve funds on or before August 11, 2004. Blue Hills, Fineberg and Langelier deny that such payments were due as Wells Fargo had not yet responded to their timely request for disbursements from the reserve funds. _See_ Blue Hills Statement I, ¶¶ 72-76.**

<u>J.P. Morgan and CSFB's Statement No. 120.</u>

Mallegni and Donovan spoke on or after August 11, 2004. The gist of Mallegni's conversations with Donovan was that Donovan wanted to get the loan transferred to the special servicer, which Donovan knew was the entity with power to address issues with the loan. Mallegni 72-73.

**<u>RESPONSE NO. 120</u>**

**Denied. When asked during his deposition if Mallegni had a conversation with Donovan, Mallegni responded "yes." When asked if that conversation occurred prior to August 13, 2004, Mallegni also responded "yes." However, Mallegni cannot remember whether or not he actually spoke to Donovan in the month of August, and when asked if he had any recollection of that conversation, Mallegni answered "not specifically." Further, when asked, "Prior to August 13, did you . . . have any discussion concerning either Mr. Donovan's August 5 or Mr. Donovan's August 2, 2004 letters, Mallegni answered with an unqualified "no." _See_ Mallegni Deposition, page 57; pages 72, lines 13-25 through pages 73, lines 1-7, attached to the Swisher Affidavit as Exhibit 9.**

<u>J.P. Morgan and CSFB's Statement No. 121.</u>

On Monday, August 16 – the next business day after receiving the August 13 fax – Mallegni drafted a memorandum to transfer the loan to special servicing. Mallegni Dep. 45-47; Transfer Memorandum (Dep. Ex. 57).

**<u>RESPONSE NO. 121</u>**

**Admitted in part. Statement No. 121 mischaracterizes Mallegni's communications regarding transfer of servicing. Deposition Exhibit 57 is an e-mail from Mallegni to Kathryn A. O'Neal stating that "it is recommended that the above-referenced loan be transferred . . . ." The e-mail is dated Monday, August 16, 2004. _See_ Deposition Exhibit 57, attached to the Swisher Affidavit as Exhibit 18.**

<u>J.P. Morgan and CSFB's Statement No. 122.</u>

At no time between August 2 and September 17 did Donovan seek confirmation from anyone at Wells Fargo or LNR that they were going to grant the requests for access to reserves. Donovan 163, 223. Nor did anyone at Wells Fargo or LNR inform him that his requests had been granted. Donovan 200-01.

**RESPONSE NO. 122**

      **Denied.  After receiving no response from Wells Fargo to his letter dated August 2, 2004, Donovan followed up with a letter to Wells Fargo dated August 5, 2004.  After receiving no response to the August 2 and 5 letters, Donovan then sent both those letters by fax to Mallegni on August 13, 2004.  Donovan also confirmed with the Town of Canton that the taxes had indeed been paid by Wells Fargo.  By letters dated August 19, 2004 and faxed August 24, 2004 LNR notified Blue Hills that loan servicing had been transferred, that LNR looked forward to "successful working relationship" and that LNR had "agreed to discuss the status of the [the Loan] . . . ."  *See* Blue Hills Statement I, ¶¶ 70 through 80.**

J.P. Morgan and CSFB's Statement No. 123.

      Donovan said he had no basis to believe Wells Fargo had acted favorably on the August 2 request for access to reserves other than the fact that the Town of Canton told him the taxes had been paid. Donovan 228-229, 240.

**RESPONSE NO. 123**

      **Denied.  Statement No. 123 mischaracterizes Donovan's testimony.  Donovan testified that he confirmed with the Town of Canton that the taxes had been paid.  He did not say that "he had no basis to believe Wells Fargo had acted favorably . . . ."  *See* Donovan Deposition, pages 228-229; 240, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 124.

      Pursuant to the Lease Termination Agreement, approximately 1,000 Haworth Unigroup workstations (the "Workstations") became the property of Blue Hills upon Equiserve's departure.  In or around August 2004, without notifying Lender and without obtaining Lender's prior written consent, Blue Hills sold the Workstations for $100,000 to D. Erwin & Associates LLC.  Needle 91-95, 183-84; Dep. Ex. 305 at Blue Hills 5098.

**RESPONSE NO. 124**

      **Admitted in part.  Statement No. 124 contains conclusory statements to which no response is required.  Blue Hills, Fineberg and Langelier admit that workstations were left at the Property by Equiserve and that Blue Hills sold them in August 2004.  Blue Hills denies that it had any obligation to obtain J.P. Morgan's consent.  *See* Mortgage Agreement, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1; Donovan Affidavit, ¶8; Blue Hills, Fineberg and Langelier's Memorandum in Opposition to Defendants' Motion for Summary Judgment Seeking Dismissal of the Second Amended Complaint.**

J.P. Morgan and CSFB's Statement No. 125.

      The Workstations were Mortgaged Property under the Mortgage, Mortgage Granting Clause Two, and Blue Hills' sale of them was a transfer of Mortgaged Property in violation of Section 10 of the Mortgage.

**RESPONSE NO. 125**

    **Denied.  Statement No. 125 contains only legal conclusions to which no response is required.  Defendants improperly take the definition of "Mortgage Property" out of the context of Section 10 of the Mortgage Agreement.  *See* Donovan Affidavit, ¶8; Mortgage Agreement, Section 10, Deposition Exhibit 155, attached to the McGlynn Affidavit as Exhibit 1; *See also*, Blue Hills, Fineberg and Langelier's Memorandum in Opposition to Defendants' Motion for Summary Judgment Seeking Dismissal of the Second Amended Complaint.**

<u>J.P. Morgan and CSFB's Statement No. 126.</u>

    On or around August 18, 2004, certain servicing responsibilities for the Loan were transferred from Wells Fargo to LNR as the special servicer.  SAC ¶ 64.  A special servicer assumes certain servicing responsibilities for a loan when the loan is in trouble or in default.  Donovan 59-60; Fineberg 21-22.

**RESPONSE NO. 126**

    **Admitted in part.  Statement No. 126 contains conclusory statements regarding the special servicer that are not contained in the cited deposition testimony.  Further, Fineberg testified "Yes," when asked if a special servicer's task was to "work it out" with the borrower.  *See* Fineberg Deposition, page 22, attached to the Swisher Affidavit as Exhibit 4.**

<u>J.P. Morgan and CSFB's Statement No. 127.</u>

    At LNR, the loan was assigned to asset manager Job Warshaw, who sent the borrower two letters dated August 19, 2004.  These letters were sent to Blue Hills by fax on August 24, 2004.  Warshaw 34-35.

**RESPONSE NO. 127**

    **Admit.**

<u>J.P. Morgan and CSFB's Statement No. 128.</u>

    The shorter of the letters was a form letter that introduced Blue Hills to LNR and notified Blue Hills that certain servicing responsibilities for the loan had been transferred to LNR.  The letter closed stating:  "Thank you for your cooperation and we look forward to a successful working relationship."  SAC ¶ 65; Dep. Ex. 28; Warshaw 27-28.

**RESPONSE NO. 128**

    **Admit.**

<u>J.P. Morgan and CSFB's Statement No. 129.</u>

    The longer of the two letters, a so-called "Prenegotiation Letter," was also a form letter which set forth the terms and conditions that would govern any discussions between LNR and Blue Hills regarding the Loan.  Blue Hills was required to execute the Prenegotiation Letter as a prerequisite to substantive discussions about the Loan.  SAC ¶ 66; Dep. Ex. 60; Polcari 64; Warshaw 28-35.

40

**RESPONSE NO. 129**

  **Admitted in part. Blue Hills, Fineberg and Langelier admit that they received the August 19, 2004 letter (faxed to Blue Hills on August 24, 2004), which Fineberg executed and faxed back to LNR on August 26, 2004. *See* Blue Hills Statement I, ¶¶ 80 through 82. Blue Hills, Fineberg and Langelier deny the description of the letter as "Prenegotiation Letter" or "form letter."**

J.P. Morgan and CSFB's Statement No. 130.

  Warshaw called Blue Hills on August 24, 2004, and left a message for Donovan introducing himself, stating that he was faxing the August 19 letters and that the Prenegotiation Letter had to be signed prior to any discussions, and asking that someone call him. Donovan 165; Warshaw 26-27, 42, 82; Voicemail transcription (Dep. Ex. 25); LNR Asset Manager Call Log (Dep. Ex. 128).

**RESPONSE NO. 130**

  **Admitted in part. Blue Hills, Fineberg and Langelier admit that Warshaw left a message for Donovan and that notes of that message were made. Statement No. 130 does not reflect the voice-mail message in its entirety. *See* Deposition Exhibit 25, attached to the Swisher Affidavit as Exhibit 15.**

J.P. Morgan and CSFB's Statement No. 131.

  This call was returned on August 25 not by Donovan, but by Kenneth Goldberg, counsel to Blue Hills, Royall Associates, and Fineberg. Warshaw 82-83; Goldberg 103-08, 119-20.

**RESPONSE NO. 131**

  **Admitted in part. Goldberg testified that he had a conversation with Warshaw on or about August 25, 2004. However, he did not testify that he was returning a telephone message left by Donovan. *See* Goldberg Deposition, page 119 through 120, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 132.

  Donovan himself never contacted Warshaw to ask for a meeting or to follow up on the request in his August 5 letter to Wells Fargo. Warshaw 82; Donovan 166, 223.

**RESPONSE NO. 132**

  **Denied. Statement No. 132 takes Donovan's deposition testimony out of context. In response to the question "As you search your memory, I take it that you have no memory of actually talking live with Job Warshaw, correct?" Donovan responded "I can't remember talking to him. That doesn't mean I didn't." *See* Donovan Deposition, page 166, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 133.

  Warshaw recalls two calls with Goldberg. According to Warshaw, the first call occurred on August 25, 2004. Mr. Goldberg introduced himself as someone who had worked with Fineberg for 30 years doing capital structuring and who was a lawyer, but not calling in the capacity as an attorney for

Blue Hills. Goldberg and Warshaw discussed the Prenegotiation letter, which Goldberg had received, but it had not yet been executed. Goldberg indicated he would be seeing Mr. Fineberg the next day, when they would sign the letter and get back to Warshaw. There were no substantive discussions of the loan during the first call because the Prenegotiation Letter had not been signed. Asset Manager Call Log (Dep. Ex. 128); Warshaw 60-63, 84-86.

## RESPONSE NO. 133

**Denied. Goldberg's testimony contradicts Statement No. 133. Goldberg denies introducing himself as someone who is a lawyer, but not calling in his capacity as an attorney. Further, Goldberg recalls 2-3 calls with Warshaw. Goldberg admits that he spoke with Warshaw on or about August 25, 2004 regarding the August 19, 2004 letter to be signed by Fineberg. *See* Goldberg Deposition, page 101, 104-106, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 134.

According to Warshaw, the second call occurred on September 7, 2004. Goldberg provided a short overview of what had happened at the Property, including that Equiserve, the sole tenant, had left and that Blue Hills had retained a leasing agent to try and release the space. Goldberg also requested access to the reserves to pay debt service. Warshaw told him that, based on an introductory review of the file, Blue Hills was in default and he did not think it would be eligible to draw on the reserves so long as the Loan was in default. There was discussion about why the Loan was in default, and Warshaw identified the failure to pay real estate taxes as one basis. Goldberg disagreed, stating that Blue Hills was not in default and instructing Warshaw to review the Loan Documents. The call then ended abruptly. Warshaw 56-61.

## RESPONSE NO. 134

**Denied. Goldberg's testimony contradicts Statement No. 134. Goldberg denies that Warshaw informed him that Blue Hills was in default or that any call ended abruptly. In response to the question, "Do you recall in your final conversation with Mr. Warshaw that he told you that based on his review of the file there were defaults under the Loan and that the borrower would not be eligible to draw on t he reserves . . .?", Goldberg responded, "No that, didn't happen." Further, Goldberg testified that his last conversation with Warshaw ended with Warshaw needing to review the loan documents so that the next communication could be more productive. *See* Goldberg Deposition, page 126, lines 9-24 through page 127, lines 1-11; page 123, lines 16-22, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 135.

According to Warshaw, Goldberg did not request, and there was no discussion of, a meeting with LNR in either of their phone calls. Warshaw 76, 84-86.

## RESPONSE NO. 135

**Denied. Goldberg's testimony contradicts Statement No. 135. Goldberg testified that he and Warshaw did discuss a meeting. Goldberg Deposition, page 126, lines 11-34 to page 127, lines 1-5, attached to the Swisher Affidavit as Exhibit 6.**

42

J.P. Morgan and CSFB's Statement No. 136.

Warshaw made contemporaneous notes of some of the things said during this conversation and also described the call to Polcari on or about September 7. Exhibit 128. Polcari made contemporaneous notes of his conversation with Warshaw, including noting that Warshaw told Goldberg "you're in default" and that "Borrower says he's not in default." Dep. Ex. 84 at LNR3919-3921; Polcari II 33-35, 50-52.

**RESPONSE NO. 136**

**Denied. Goldberg's testimony contradicts Statement No. 136. Goldberg denies that Warshaw informed him that Blue Hills was in default. *See* Goldberg Deposition, page 123, lines 16-22, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 137.

Goldberg recalls two or three substantive calls with Warshaw, the first in the middle of August before he had received the Prenegotiation Letter. According to Goldberg, Warshaw stated that he had spoken to Chris Brown about Goldberg's conversations with Brown. Goldberg explained his client's perception of the Property and the market (which he thought was starting to come back), expressed his belief that there was an opportunity to get the matter resolved, and stated that his client was committed to pursuing a number of alternative courses to recapitalize Blue Hills and intended to keep the property. He asked Warshaw to confirm that there was a lot of money in reserve and said that the reserves, together with a well heeled and committed borrower, provided an opportunity to get the building re-tenanted and "back on line." The conversation ended with Warshaw stating that he was going to review the file and would get back to Goldberg. Goldberg 96-98.

**RESPONSE NO. 137**

**Admitted in part. Statement No. 137 contains numerous statements purporting to summarize Goldberg's testimony. Blue Hills, Fineberg and Langelier deny that Statement No. 137 contains direct quotes or is a complete description of Goldberg's testimony regarding his communications with Warshaw. *See* Goldberg Deposition, pages 96-98, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 138.

According to Goldberg, in either a first or second call, Goldberg identified the alternatives by which his clients could bring new money to the Property, including by mezzanine financing, additional capital from the existing partners, new capital from new partners, or seeking tenant participation and ownership. In one of the calls, he stated his belief that it would require $5 or $10 million to turn around the Property. Goldberg 98-99.

**RESPONSE NO. 138**

**Admitted in part. Statement No. 138 contains numerous statements purporting to summarize Goldberg's testimony. Blue Hills, Fineberg and Langelier deny that Statement No. 138 contains direct quotes or is a complete description of Goldberg's testimony regarding his communications with Warshaw. *See* Goldberg Deposition, pages 96-98, attached to the Swisher Affidavit as Exhibit 6.**

43

J.P. Morgan and CSFB's Statement No. 139.

According to Goldberg, the second call came at the end of August and was prompted by the Prenegotiation Letter, which was of a type he had seen before.  During the second call, Goldberg invited Warshaw (who was based in Miami) to visit the Property and assess the market at the Borrower's expense.  Warshaw responded that he didn't think it was possible for him to get to Boston before Labor Day.  Goldberg said he would get the Prenegotiation Letter signed during a meeting with Fineberg the next day and get back to Warshaw.  Goldberg 106-107.

**RESPONSE NO. 139**

**Admitted in part.  Statement No. 139 contains numerous statements purporting to summarize Goldberg's testimony.  Blue Hills, Fineberg and Langelier deny that Statement No. 139 contains direct quotes or is a complete description of Goldberg's testimony regarding his communications with Warshaw.  *See* Goldberg Deposition, pages 96-98, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 140.

According to Goldberg, his final conversation with Warshaw occurred either just before or just after Labor Day.  Warshaw did not tell him that it appeared the Borrower was in default.  Rather, Warshaw had not sufficiently examined the Loan Documents to provide a substantive response to Goldberg's request for access to the reserves.  Goldberg's last conversation with Warshaw concluded with them waiting to arrange a meeting either in Boston, if Warshaw could visit, or in Miami.  Goldberg 123-127.

**RESPONSE NO. 140**

**Admitted in part.  Statement No. 140 contains numerous statements purporting to summarize Goldberg's testimony.  Blue Hills, Fineberg and Langelier deny that Statement No. 140 contains direct quotes or that is a complete and accurate description of Goldberg's testimony regarding his communications with Warshaw.  *See* Goldberg Deposition, pages 123-127, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 141.

Goldberg acknowledges that he did not tell Warshaw that the Blue Hills or Royall Associates had $5 to $6 million set aside, outside of the reserves held by the Lender, to invest in the Property.  Goldberg said that his client was well heeled, and assumed that Warshaw had spoken to Brown about Fineberg's resources and that Brown had told Warshaw that Fineberg had made offers to LNR to acquire other mortgaged properties in proposals that did not contain financing contingencies.  Goldberg 109-116.

**RESPONSE NO. 141**

**Admitted in part.  Statement No. 141 contains conclusory statements that do not accurately represent Goldberg's testimony.  Goldberg did not testify that Fineberg had made offers to LNR to "acquire other mortgaged properties in proposals that did not contain financing contingencies."  *See* Goldberg Deposition, page 113, lines 19-24 through page 114, lines 1-16, attached to the Swisher Affidavit as Exhibit 6.**

44

J.P. Morgan and CSFB's Statement No. 142.

Goldberg has no contemporaneous notes or other record supporting his account of these conversations.  Goldberg 169-70.

**RESPONSE NO. 142**

**Admitted in part.  Statement No. 142 is vague and does not define "these conversations."  In the referenced citation, Goldberg testified that he did not have any written memorializations of conversations with Warshaw.  *See* Goldberg Deposition, page 169, lines 22-24 through page 170, lines 1, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 143.

Goldberg never followed up with Warshaw about the meeting he says they discussed.  Goldberg 128.  Between his last conversation with Warshaw (around Labor Day) and November 10 (two days before the scheduled date of the foreclosure), his only subsequent contact with anyone connected to LNR was a call from an appraiser or environmental consultant looking for a survey.  Goldberg 130.

**RESPONSE NO. 143**

**Denied.  Warshaw was replaced by Polcari on or about September 7, 2004 and Polcari never followed up with Goldberg.  *See* Polcari Deposition, Vol. 1, page 36, attached to the Swisher Affidavit as Exhibit 11.**

J.P. Morgan and CSFB's Statement No. 144

Blue Hills executed the Prenegotiation Letter and returned it to the Lender on August 26, 2004.  Warshaw 36-37; Fineberg 149; Executed Prenegotiation Letter (Dep. Ex. 62).  By executing the Prenegotiation Letter, Blue Hills agreed that its terms and conditions would govern any discussions or negotiations.  Dep. Ex. 62, page 1.

**RESPONSE NO. 144**

**Admitted in part.  Statement No. 144 contains conclusory statements to which no response is required.  Blue Hills, Fineberg and Langelier admit that Fineberg executed the letter from LNR dated August 19, 2004 (faxed to Blue Hills on August 24, 2004) and faxed the executed letter to LNR on August 26, 2004.  Blue Hills, Fineberg and Langelier admit that Deposition Exhibit 62 speaks for itself and denies Defendants' mischaracterizations.  *See* Blue Hills Statement I ¶¶ 78-82.**

J.P. Morgan and CSFB's Statement No. 145.

The Prenegotiation Letter states that Lender was not under any obligation to consent or otherwise agree to any Borrower request with respect to the Loan, or to modify the Loan or the Loan Documents.  Dep. Ex. 62, ¶ 1.

**RESPONSE NO. 145**

**Admitted in part.  Statement No. 145 contains conclusory statements to which no response is required.  Moreover, it mischaracterizes language contained in Deposition Exhibit 62 which speaks for itself.  *See* Deposition Exhibit 62, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 146.

The Prenegotiation Letter states that neither the Borrower nor the Lender "is obligated to reach any agreement or to negotiate for the purpose of reaching any agreement with respect to any Borrower request for consent, waiver, release, or modification of the Loan or Loan Documents. Dep. Ex. 62, ¶ 4.

## RESPONSE NO. 146

**Admitted in part.  Statement No. 146 contains conclusory statements to which no response is required.  Moreover, it mischaracterizes language contained in Deposition Exhibit 62, which speaks for itself.  *See* Deposition Exhibit 62, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 147.

By executing the Prenegotiation Letter, Blue Hills released the Lender from any all claims and demands, in law or in equity, known or unknown, direct or indirect, fixed or contingent, caused by or arising out of any discussions, negotiations, correspondence or other communications relating to the Loan and the Loan Documents between the Borrower and Wells Fargo or LNR.  Dep. Ex. 62, ¶ 2.

## RESPONSE NO. 147

**Denied.  Statement No. 147 contains legal conclusions to which no response is required.  Moreover, it mischaracterizations language contained in Deposition Exhibit 62, which speaks for itself.  *See* Deposition Exhibit 62, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 148.

By executing the Prenegotiation Letter and "to enable [LNR] to properly evaluate the Borrower's request," Blue Hills agreed to provide to LNR all of the information designated on Exhibit A to the Letter.  Dep. Ex. 62, ¶ 9.   The designated information included: a) a financial statement prepared within 30 days of August 19, 2004 for the Borrower, its member, and any guarantors, including balance sheets and income statements; b) Federal tax returns for the last two years for the Borrower and the Guarantors; and c) a current business plan for the Property.  Ex. A. to Dep. Ex. 62.

## RESPONSE NO. 148

**Denied.  Statement No. 148 contains conclusory statements to which no response is required.  Further, LNR  had almost all of the requested documents yet failed to schedule a meeting with Blue Hills after receiving the executed letter on August 26, 2004.  LNR defaulted Blue Hills on September 17, 2004 before any meeting could be scheduled or any additional documents could be provided.  *See* Blue Hills Statement I, ¶ 81-82, ¶ 84-85; Deposition Exhibit 62, attached to the Swisher Affidavit as Exhibit 18.**

J.P. Morgan and CSFB's Statement No. 149.

Blue Hills did not send to LNR a current business plan, updated financial statements, or any of the other documents and information set out in Exhibit "A" to the Prenegotiation Letter.  Blue Hills never came up with a business plan specifying the upgrades to the Property that would be required or how much they would cost.  Donovan Depo 140-141, 176-177, 179-82; Fineberg 172-78.

**RESPONSE NO. 149**

     **Denied.** *See* **Response No. 148, incorporated herein.**

J.P. Morgan and CSFB's Statement No. 150.

     On September 2, 2004, Donovan wrote to Wells Fargo, copying Warshaw, requesting a disbursement of escrow funds to pay principal and interest on the Note for the month of September 2004. Donovan September 2 Letter (Dep. Ex. 26).

**RESPONSE NO. 150**

     **Admitted to the extent that the September 2, 2004 letter speaks for itself.**

J.P. Morgan and CSFB's Statement No. 151.

     On or around September 7, 2004, Joe Polcari became the LNR asset manager responsible for the Property. Polcari I 40. At the time he became asset manager for the Loan, Polcari spoke with Warshaw (as described in paragraph 136, above) and Brown. Polcari II 17.

**RESPONSE NO. 151**

     **Admitted to the extent that Polcari replaced Warshaw. Blue Hills, Fineberg and Langelier deny the communications referenced in J.P. Morgan and CSFB's Statement No. 136.** *See* **Response No. 136, incorporated herein.**

J.P. Morgan and CSFB's Statement No. 152.

     Goldberg never spoke to Polcari about Blue Hills until a mediation in this matter held in January 2006. Polcari Aff. ¶ 6; Goldberg 121-22, 129.

**RESPONSE NO. 152**

     **Denied. The Goldberg's testimony directly contradicts Statement No. 152. Goldberg testifies that he believed he had a brief telephone conversation with Polcari.** *See* **Goldberg Deposition, page 121, attached to the Swisher Affidavit as Exhibit 6.**

J.P. Morgan and CSFB's Statement No. 153.

     Based on his fourteen years of experience with loan workouts, Polcari did not believe Blue Hills was interested in restructuring or reworking the Loan, because Blue Hills never proposed a restructuring and because Mr. Fineberg had just given back the Lancaster, Pennsylvania and Sturbridge, Massachusetts properties to LNR. Between September 7, 2004 and September 17, 2004. Blue Hills did not attempt to reach Polcari. Polcari I 236-38; Polcari II 119-24.

**RESPONSE NO. 153**

     **Denied. Statement No. 153 is simply a summary of Polcari's opinions and not a statement of undisputed fact. Further, Statement No. 153 is misleading because it fails to state that Polcari replaced Warshaw as the asset manager on or about September 7, 2004. Warshaw had sent two letters to Blue Hills on August 24, 2004 and had a conversation with Goldberg on or about**

47

September 7, 2004.  At the end of Warshaw's discussions with Goldberg, Warshaw stated that he would review the loan documents and get back to Goldberg to schedule a meeting.  When Polcari took over, he did not attempt to follow up with Goldberg or any other representative of Blue Hills.  *See* **Blue Hills Statement I, ¶¶ 81-84;** *see also* **Response No. 134.**

J.P. Morgan and CSFB's Statement No. 154.

Polcari called Donovan on or about September 16, 2004, as a courtesy to tell Donovan that he was sending Donovan a default letter.  Polcari described Donovan as acquiescent.  Donovan responded that he understood that LNR had to send the default letter, that they had no tenant prospects and no hope for finding one, and that the use of the reserves for debt service would not have a made a difference.  Donovan did not request a meeting or indicate that he had previously asked for a meeting that went unanswered.  Donovan had no workout proposal to offer.  Polcari testified to this conversation and memorialized it in contemporaneous notes.  Donovan testified that he did not recall this conversation and did not know whether it took place.  Polcari I 39, 45, 67-68, 70, 72; Polcari II 26-27, 38-39, 230-231; Polcari Handwritten Notes (Dep. Ex. 84 at LNR03927); Frank 120-121; Donovan 187-88, 199.

**RESPONSE NO. 154**

Denied.  Statement No. 154 contains a series of assertions about Polcari's alleged communications with Donovan.  It also contains the statement that Donovan had no recollection of having any such conversation.  As Statement No. 154 contains these contradictory statements, no further response is required.  Donovan further stated, "As far as I know, the conversation did not take place."  *See* **Donovan Deposition, pages 188 and 189, lines 1 through 6, attached to the Swisher Affidavit as Exhibit 3.**

J.P. Morgan and CSFB's Statement No. 155.

Polcari sent Donovan a default letter dated September 17, 2004.  The letter informed Blue Hills that Blue Hills' requests for disbursements from the escrow funds were denied due to Blue Hills' defaults under the Mortgage and Note as of August 2, August 11, September 2, and September 11, 2004.  LNR further informed Blue Hills that the Note had been accelerated and was immediately due and payable.  SAC ¶ 73-74; SAC Exhibit L; September 17 notice of defaults (Dep. Ex. 30).

**RESPONSE NO. 155**

Admitted in part.  Blue Hills, Fineberg and Langelier admit that Polcari sent Donovan a default letter dated September 17, 2004, but deny that Statement No. 155 accurately reflects the contents of the letter.  *See* **Deposition Exhibit 52, attached to the McGlynn Affidavit as Exhibit 34.**

J.P. Morgan and CSFB's Statement No. 156.

On or about October 18, 2004, Frank called Polcari and asked for a meeting between Blue Hills and LNR.  According to Polcari, and Fineberg's report of what Frank told him about the conversation, Polcari told Frank he would call Frank back with a response.  Polcari called him back within a couple of days and left a voicemail saying that any meeting would have to include a discussion of bringing the Loan current to be productive.  According to Polcari, Frank never responded to the voicemail.  Polcari II 73-74; Fineberg 186.

48

**RESPONSE NO. 156**

    Denied.  Statement No. 156 mischaracterizes the deposition testimony of Frank, Polcari and Fineberg.  Blue Hills, Fineberg and Langelier admit only that Frank called Polcari and requested a meeting and that Polcari indicated that the Loan had to be brought current.  Statement No. 156 is misleading in that it fails to acknowledge subsequent communications between LNR and Blue Hills.  By letter dated October 19, 2004, LNR initiated foreclosure proceedings, one day after Frank had a discussion with Polcari.  Thereafter, Goldberg and counsel for LNR exchanged several written communications before the foreclosure sale.  *See* Blue Hills Statement I, ¶¶ 87-89; *see also* Statement No. 157, acknowledging disputed issues of fact on this testimony.

J.P. Morgan and CSFB's Statement No. 157.

    According to Frank: Polcari said that he would have to talk his superiors.  Polcari agreed to get back to Frank about the meeting, but never did.  When Frank placed a telephone call five or six days later to follow up on his request for a meeting, Polcari told him there would not be a meeting.  Frank 104-107.  Frank also had a memory of another conversation with Polcari in which Polcari declined to have a meeting, but he could not place it in time.  Frank 108-11.

**RESPONSE NO. 157**

    Admitted in part.  Statement No. 157 is an incomplete summary of Frank's deposition testimony.  *See* Frank Deposition, pages 108-111, attached to the Swisher Affidavit as Exhibit 5.

J.P. Morgan and CSFB's Statement No. 158.

    By letter dated October 21, 2004, pursuant to Mass. Gen. Laws c.244, s. 14 and 17B, Lender notified Fineberg and Langelier of its intention to foreclose on the Property and of Fineberg's and Langelier's potential liability to Lender under the Guaranty in case of a deficiency in the proceeds of the foreclosure sale.  SAC ¶ 83; SAC Exhibit M.

**RESPONSE NO. 158**

    Admitted in part.  Statement No. 158 contains legal conclusions to which no response is required.  Further, the terms of the October 21, 2004 letter speak for themselves.  *See* Deposition Exhibit 40, attached to the McGlynn Affidavit as Exhibit 33.

J.P. Morgan and CSFB's Statement No. 159.

    On October 28, 2004, LNR received an independent MAI appraisal from Bonz & Company valuing the Blue Hills Office Park at $15 million as of October 18, 2004.  Dep. Ex. 341 Addendum.

**RESPONSE NO. 159**

    Admitted in part.  The October 28, 2004 appraisal speaks for itself.  Gartrell disputes the values contained in the appraisal.  *See* portions of The Expert Report of Dr. Kenneth Gartrell, Deposition Exhibit 354, attached to the Swisher Affidavit as Exhibit 22.

J.P. Morgan and CSFB's Statement No. 160.

    Sometime between September 21 and October 18, 2004, during the field work phase of the study,

49

the appraiser, Eric Stotz, spoke with Donovan to arrange a visit to the Property and learn about its status and with Needle during the resulting visit.  While discussing the current condition and situation of the Property with Stotz, Donovan used the phrases "bleeding money" and "give the keys back" to LNR.  Donovan said in substance that Blue Hills was walking away from its investment in the property due to the lack of tenant prospects and high holding costs associated with owning a vacant investment property.  Stotz Expert Rebuttal Report (Exhibit B to Stotz Affidavit) at 4-5.

**RESPONSE NO. 160**

> **Denied.  Donovan denies making any such statements.  *See*, Donovan Affidavit, ¶7.  Donovan testified to the contrary that he was "upset" at the receipt of the default notice because he wanted to "work out a deal" and because he felt the property was a "great asset, we didn't want to lose it."  Moreover, Eric Stotz ("Stotz") admits that he never made mention of any alleged comments in his notes, letters, telephone calls or other communications, including his initial expert report.  It is only in Stotz's rebuttal report that he makes such an assertion for the first time.  *See* Deposition of Eric Stotz ("Stotz Deposition"), page 31, lines 10-22 and page 36, line 3 through page 37, line 1; Donovan Deposition, page 199, line 21 through page 200, line 5, attached to the Swisher Affidavit as Exhibits 3 and 13.**

J.P. Morgan and CSFB's Statement No. 161.

When Stotz visited the Property, Needle informed him that Blue Hills had been unsuccessful in finding a tenant and was, in fact, "giving the keys back" to LNR because the carrying costs of the property were high and its expectations of finding a tenant were so low.  Stotz Expert Rebuttal Report at 5.

**RESPONSE NO. 161**

> **Denied.  Needle had no such discussions with Stotz.  In fact, Stotz admits that he never made mention of any such comment by Needle in his notes, letters, telephone calls or other communications, including his initial expert report.  It is only in his rebuttal report that Stotz makes such an assertion for the first time.  *See* Stotz Deposition, page 31, lines 10-22 and page 36, line 3 through page 37, line 1, attached to the Swisher Affidavit as Exhibits 10 and 13.**

J.P. Morgan and CSFB's Statement No. 162.

After the October 18 phone calls between Frank and Polcari, Blue Hills did nothing to communicate with LNR until November 10, two days before the scheduled foreclosure sale.  On November 10, Goldberg sent a letter to Bruce Barnett, counsel for the Lender, stating that the Borrower was not in default and demanding access to the reserves.  Dep. Ex. 334.  E. Randolph Tucker responded on behalf of Lender by his letter dated November 12, 2004.  (Dep. Ex. 41.)

**RESPONSE NO. 162**

> **Denied.  Statement No. 162 fails to acknowledge Frank's subsequent telephone conference with Polcari, LNR's letter dated October 19, 2004 initiating foreclosure proceedings and the subsequent  communications between Goldberg and counsel from LNR.  *See* J.P. Morgan and CSFB's Statement No. 157 and Blue Hills Statement I, ¶¶ 87-89.**

J.P. Morgan and CSFB's Statement No. 163.

On November 12, 2004, the foreclosure sale of the Property was postponed by public proclamation, in accordance with Massachusetts law, until November 19, 2004.  Polcari Aff. ¶ 4, Barnett Aff. ¶ 17.


**RESPONSE NO. 163**

**Admitted in part.  Statement No. 163 contains legal conclusions to which no responsive is required.  Blue Hills, Fineberg and Langelier admit that the foreclosure sale occurred on November 19, 2004.**

J.P. Morgan and CSFB's Statement No. 164.

Another exchange of letters between counsel occurred on November  17-19.  Dep. Exs. 335, 336, 337.

**RESPONSE NO. 164**

**Admitted in part. Several letters were subsequently exchanged between Goldberg and counsel for LNR during the period November 10 – November 19, 2004, whereby Blue Hills continued to request LNR to meet with it to consider alternatives to foreclosure. See Blue Hills Statement I, ¶ 89.**

J.P. Morgan and CSFB's Statement No. 165.

The foreclosure sale was held on November 19, 2004.  There were four people bidding on the Property and CSFB 1999-C1 Royall Street, LLC made the high bid for $18.5 million.  Recorded Foreclosure Documents (Barnett Aff. Ex. K)  Polcari Aff. ¶ 5; Email from J. Polcari to L. Golinsky, November 19, 2004 (Dep. Ex. 109).

**RESPONSE NO. 165**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that a foreclosure sale of the Property was held on November 19, 2004, but are without personal knowledge or information with respect to the number of bidders present.**

J.P. Morgan and CSFB's Statement No. 166.

Lender acted in accordance with all of the requirements of the Mortgage and Massachusetts law, including the requirements of General Laws Chapter 244, in conducting the foreclosure sale.  Clarke 262; Recorded Foreclosure Documents.  In addition, Lender caused its auctioneer, Dean Associates, Inc., to run commercial advertisements of the foreclosure sale in the Boston Herald and the Boston Globe on Sunday, November 7, 2004.  Commercial Advertisements (Barnett Aff. Ex. L)  SD001, SD002; Polcari Aff. ¶ 3.

**RESPONSE NO. 166**

      **Denied.  Statement No. 166 contains legal conclusions to which no response is required. Blue Hills, Fineberg and Langelier maintain that J.P. Morgan and CSFB's foreclosure of the Property was wrongful.  *See* Second Amended Complaint, Counts 1-3.**

J.P. Morgan and CSFB's Statement No. 167.

      As of the date of the sale, the amount of the Debt, including principal, interest and late fees, was $33,439,307.  November 11, 2004 Payoff Statement  (Polcari Aff. Ex. A); CSFB 1999-C1 Royall Street, LLC's Answers to First Interrogatories of Langelier & Fineberg, No. 12 (Barnet Aff. Ex. M.)

**RESPONSE NO. 167**

      **Admitted in part.  Blue Hills, Fineberg and Langelier admit that the cited references reflect Defendants' calculated amount of principal, interest and late fees, but deny that any such amount was due.  Blue Hills maintains that J.P. Morgan and CSFB wrongfully defaulted Blue Hills and foreclosed on the Property.  *See* Second Amended Complaint, Counts 1-3.**

J.P. Morgan and CSFB's Statement No. 168.

      After crediting the foreclosure bid ($18,500,000) and the reserves held by Lender as of the date of the sale ($4,168,460.18) against the outstanding debt, the deficiency after the foreclosure sale was $10,770,847.  November 11 Payoff Statement; CSFB 1999-C1 Royall Street LLC's Answers to First Interrogatories of Langelier and Fineberg, No. 12.

**RESPONSE NO. 168**

      **Admitted in part.  Blue Hills, Fineberg and Langelier admit that Defendants claim $10,770,847 as the deficiency amount, but deny any such amount is due.  Blue Hills maintains that J.P. Morgan and CSFB wrongfully defaulted Blue Hills and foreclosed on the Property.  *See* Second Amended Complaint, Counts 1-3.**

J.P. Morgan and CSFB's Statement No. 169.

      Under the Note, the default interest rate is 13.49%.  Note ¶ 1(k), (p).

**RESPONSE NO. 169**

      **Admitted in part. The interest rate in the Note in the cited paragraph speaks for itself.  *See* Note, attached to the McGlynn Affidavit as Exhibit 2.**

J.P. Morgan and CSFB's Statement No. 170.

      Fineberg did not attend the foreclosure sale or bid on the Property.  Fineberg 187-88.  At first he testified that he did not know why, id., and then claimed that not attending was a mistake.  Id. 211-12.  He did not sue to enjoin the foreclosure or to have it set aside after the fact.  Fineberg 195-97.

**RESPONSE NO. 170**

**Denied.  Statement No. 170 mischaracterizes Fineberg's testimony.  The statement selectively excerpts Fineberg's testimony, taking it out of context and in so doing misrepresents Fineberg's motives in not attending the sale or failing to enjoin the foreclosure.  Fineberg testified that right up until the time of the foreclosure he continued to hold out hope of having a meeting with the lender and that he " wanted to retain ownership of the  building, and [he] would have done anything to do that."  *See* Fineberg Deposition, page 170, line 14 through 17, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 171.

Fineberg testified that he had a plan for the future of Blue Hills that included using the $4.1 million in loan reserves and $5 to $6 million being held by attorneys for Royall Associates to fix up the building, attract a tenant, and then refinance the building.  Fineberg 194-95, 179-81.  Yet Fineberg told none of this to LNR. Id. 181.

**RESPONSE NO. 171**

**Admitted in part.  Statement No. 171 mischaracterizes Fineberg's testimony.  Fineberg states that he believed that he exhibited good faith by signing the August 19, 2004 letter (received August 24, 2004) and in so doing indicated his willingness to meet with J.P. Morgan to work out details of a restructured loan.  Blue Hills, Fineberg and Langelier deny that funds were being held for "Royall Associates"; and funds were held for the benefit of Blue Hills.  *See* Blue Hills Statement I, ¶¶ 60-61; 94-95; Fineberg Deposition page 171, line 1 through 12 and page 175 line 6 through page 176 line 4, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 172.

As of August 2004, Blue Hills would have needed a modification of the Loan Documents in order to re-tenant the Blue Hills Office Park and maintain ownership of the Property.  Blue Hills knew that a loan modification was required in order to make his plan for the Property work.  Fineberg 194-195; Donovan 236.

**RESPONSE NO. 172**

**Denied.  Statement No. 172 takes the testimony of Fineberg and Donovan out of context.  Fineberg "anticipated" that modification of the Loan Documents may have been required but since no negotiations were entered to due to LNR's failure to meet with Blue Hills, to say that a modification was necessary is speculative.  *See* Fineberg Deposition, pages 194-195, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 173.

Nevertheless, no one at Blue Hills ever sent the Lender a proposal to work out the Loan.  Polcari II 232; Fineberg 169-181; Langelier 179-183.

**RESPONSE NO. 173**

      **Denied.  Statement No. 170 contains an improper conclusory statement that fails to acknowledge the course of communications between the parties. LNR represented that it would get back to Blue Hills to schedule a meeting.  *See* Response Nos. 134 and 153, incorporated herein.**

J.P. Morgan and CSFB's Statement No. 174.

      Rather than send a written proposal to the Lender to encourage Lender to meet with them, Blue Hills claims it made a business decision not to propose anything to the Lender unless Lender agreed to meet with them in person first.  "I think it's a question of business judgment.  You don't prematurely put your cards face up on a table in a business negotiation."  "Without some indication from Lennar that they were willing to sit down with us or <u>instruct us to submit something</u>, we were not going to put our cards on the table prematurely."  Langelier 179-183, 205.

**RESPONSE NO. 174**

      **Denied.  Statement No. 174 takes the Langelier's testimony out of context. Langelier's cited testimony regarding "a question of business judgment" is a statement of general principle and not applied specifically to a decision regarding the Property.  Langelier further testified that the business decision made by J.P. Morgan not to meet with Blue Hills exhibited what he felt was "bad faith from the lender."  Langelier also testified that he and Fineberg had repeatedly tried to meet with J.P. Morgan and Fineberg had signed the August 19, 2004 letter.  *See* Langelier Deposition, page 182, lines 14-25, attached to the Swisher Affidavit as Exhibit 7.**

J.P. Morgan and CSFB's Statement No. 175.

      Fineberg testified that he had decided not to put any money — not another penny — into Blue Hills until LNR gave him a sit-down meeting.  Fineberg 212-214, 158-60; Donovan 141.  Fineberg testified that he would not make LNR any type of written proposal prior to having a sit-down meeting — doing so is "not [his] style."  Fineberg 165-66, 169.

**RESPONSE NO. 175**

      **Denied.  Statement No. 175 takes Fineberg's testimony out of context and fails to acknowledge the series of written communications with LNR and Wells Fargo as well as Goldberg's discussions with Warshaw.  *See* Blue Hills Statement I, ¶¶ 78-84; J.P. Morgan and CSFB Statements 137-140.**

J.P. Morgan and CSFB's Statement No. 176.

      Langelier testified that he believed that the Lender, by not meeting, was engaged in a game of "brinksmanship" and that Lender would come around and agree to a meeting before the foreclosure. Langelier 199, 266, 268.

**RESPONSE NO. 176**

      **Denied.  Statement No. 176 takes Langelier's testimony out of context and fails to acknowledge the series of written communications with LNR and Wells Fargo as well as Goldberg's**

54

discussions with Warshaw.  *See* **Blue Hills Statement I, ¶¶ 78-84; J.P. Morgan and CSFB Statements 137-140.**

J.P. Morgan and CSFB's Statement No. 177.

LNR never encouraged Blue Hills to think they were going to meet.  Fineberg 212-214; Frank 104-111.

**RESPONSE NO. 177**

**Denied.  On August 24, 2004, LNR faxed Blue Hills two letters dated August 19, 2004, both indicating LNR's willingness to meet.  Warshaw and Goldberg specifically discussed scheduling a meeting.  *See* Blue Hills Statement I, ¶¶ 78-84; Response No. 135.**

J.P. Morgan and CSFB's Statement No. 178.

On other deals with LNR, Fineberg had made offers to LNR over the telephone or in writing before a meeting.  Goldberg 182-85, 188-91.  Fineberg had consummated at least one other deal with LNR without any sit down meeting at all.  Goldberg 192-93.

**RESPONSE NO. 178**

**Admitted in part.  Statement No. 178 takes Goldberg's  testimony out of context and fails to recognize that Fineberg's prior dealings with LNR were through a different entity.  Moreover, Fineberg testified that most of those negotiations were conducted by his attorney.  *See* Fineberg Deposition, pages 23-25, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 179.

Fineberg did not want to defer the foreclosure and did not request that LNR defer the foreclosure. Fineberg did not look into trying to buy the debt at a discount.  Fineberg 163.

**RESPONSE NO. 179**

**Denied.  The cited language in Statement 179 takes Fineberg's testimony out of context.  In his testimony, Fineberg  emphasized that he expected and hoped to be able to retain the Property if the Lender would only negotiate with him in good faith.  *See* Fineberg Deposition, pages 163-166; page 170, lines 14-17, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 180.

Blue Hills knew that LNR was not obligated to agree to any modification of the loan documents or enter a standstill agreement.  Langelier 268; Fineberg 161, 182.

**RESPONSE NO. 180**

**Denied.  Statement No. 180 is a conclusory statement to which no response is required and mischaracterizes Langelier and Fineberg's deposition testimony.  Fineberg testified that he believed LNR was obligated to meet with Blue Hills.  Fineberg Deposition, pages 161, 182, attached to the Swisher Affidavit as Exhibits 4 and 7.**

J.P. Morgan and CSFB's Statement No. 181.

On December 31, 2004, the beneficiaries of Royall Associates entered into an agreement (the "Royall Agreement") concerning the treatment of three accounts: a "Property Account" held and controlled by Fineberg Management as a result of its management of the Property; an "Initial Account" held in escrow by Goldberg and Langelier's attorney Andrew Cohn; and a "Supplemental Account" held in escrow by Goldberg and Cohn.  The "Initial Account" contained approximately $1.38 million, which was the portion of the 1999 refinancing proceeds not distributed to Fineberg and Langelier in 1999.  Fineberg 49.  The "Supplemental Account" contained approximately $4.2 million, which included the $2 million Payment.  Royall Agreement (Dep. Ex. 176); Fineberg 51.

**RESPONSE NO. 181**

**Admitted only to the extent that the terms of the December 31, 2004 Agreement speak for themselves.  *See* Deposition Exhibit 176, attached to the McGlynn Affidavit as Exhibit 44.**

J.P. Morgan and CSFB's Statement No. 182.

The remaining $2.2 million in the Supplemental Account came from distributions of operating profit from Blue Hills.  Fineberg 51-52, 102-103.  Blue Hills distributed monies to its owners as often as it could.  Fineberg 243-44.  Langelier recalled receiving directly approximately $200,000 each year from Blue Hills.  Langelier 143-44.  Langelier and Fineberg made decisions about distributions.  Fineberg 243-44.  Blue Hills had ample profits to make distributions, as it had over $785,000.00 of net income in 2003, Dep. Ex. 35, and over $1.1 million of net income in 2001, Dep. Ex. 318.

**RESPONSE NO. 182**

**Admitted in part. Statement No. 182 takes Fineberg's testimony out of context.  Fineberg testified that he doesn't have any clear memory of how the distributions were made from the operating profit.  Fineberg said nothing about making distributions to the owners "as often as it could." Neither Fineberg nor Langelier testified that Blue Hills "had ample profits. "  *See* Fineberg Deposition, pages 243-44, *see also*, Deposition Exhibit 176, attached to the McGlynn Affidavit as Exhibit 44, attached to the Swisher Affidavit as Exhibit 4.**

J.P. Morgan and CSFB's Statement No. 183.

Under the Royall Agreement, the Initial Account and all but $2 million of the Supplemental Account was released, 50% each to Goldberg and Cohn, for distribution to the Fineberg and Langelier Beneficiaries, respectively.  This distribution was expressly conditioned on the Lender not having filed any claims against Blue Hills or Royall Associates.  Royall Agreement Section V.A.

**RESPONSE NO. 183**

**Admitted only to the extent that the terms of the December 31, 2004 Agreement speak for themselves.  Goldberg testified that the Settlement Proceeds were deposited and held in a clients' funds account for Blue Hills Office Park.  *See* Deposition Exhibit 176, attached to the McGlynn Affidavit as Exhibit 44; *See also* Goldberg Deposition, page 65, lines 4-8, attached to the Swisher Affidavit as Exhibit 6.**

56

J.P. Morgan and CSFB's Statement No. 184.

Under the Royall Agreement, the remaining $2 million in the Supplemental Account is held in escrow by Goldberg and Cohn, as the escrow agents for the "Fineberg Beneficiaries" and the "Langelier Beneficiaries" as security against claims that may be asserted by the Lender against Fineberg or Langelier personally on their guaranty of the Debt or by anyone arising from their interest in Blue Hills, Royall Associates, Blue Hills Management Corp. or Fineberg Management.  The Supplemental Account Escrows were to be distributed to the Royall Associates beneficiaries according to a schedule, but only if the remaining balance after such a distribution exceeded any outstanding indemnified claims. Langelier 214-221; Royall Agreement (Dep. Ex. 176); Fineberg 44-48, 51, 65-66; Goldberg 59-60.

## RESPONSE NO. 184

**Admitted only to the extent that the terms of the December 31, 2004 Agreement speak for themselves.  *See* Response No. 183, incorporated herein.**

J.P. Morgan and CSFB's Statement No. 185.

Fineberg and Langelier are the "clients" who currently have control of the $2 million.  Fineberg 71.

## RESPONSE NO. 185

**Denied.  Statement No. 185 takes Fineberg's testimony out of context.  Further, Blue Hills has maintained control of the Settlement Proceeds since receipt on or about August 8, 2003.  *See* Blue Hills Statement I, ¶¶ 91-96.**

J.P. Morgan and CSFB's Statement No. 186.

The purpose of the Royall Agreement was to put into writing the agreement between the partners about any monies and any liabilities that the partnership will have.  Fineberg 45.

## RESPONSE NO. 186

**Admitted in part.  Statement No. 186 does not acknowledge that the December 31, 2004 Agreement sets forth the purpose of the agreement between the parties.  The terms of the December 31, 2004 Agreement speak for themselves.  *See* Depo. Exhibit 176, attached to the McGlynn Affidavit as Exhibit 44.**

J.P. Morgan and CSFB's Statement No. 187.

In or around December 2004, the Lender learned of the Zoning Appeal and its settlement from a broker and reported it to counsel.  Polcari II 199; Rosen 117-118.

## RESPONSE NO. 187

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that J.P. Morgan learned of the settlement of the Norfolk Action, but cannot independently confirm the source of the information.**

J.P. Morgan and CSFB's Statement No. 188.

On April 20, 2005, Lender made written demand upon Fineberg and Langelier under the Guaranty.  Counterclaim ¶ 41; Blue Hills Parties' Answers to Counterclaim ¶ 41.

**RESPONSE NO. 188**

**Admitted to the extent that the April 20, 2005 letter speaks for itself.**

J.P. Morgan and CSFB's Statement No. 189.

Neither Fineberg nor Langelier has made payment under the Guaranty.  Counterclaim ¶ 42; Blue Hills Parties' Answers to Counterclaim ¶ 42.

**RESPONSE NO. 189**

**Admitted in part.  Blue Hills, Fineberg and Langelier admit that no payment was made, but deny that any money is owed.  *See* Blue Hills, Fineberg and Langelier's Answers to Counterclaim; Blue Hills Summary Judgment Motion; Blue Hills', Fineberg and Langelier's Memoranda in Opposition to Defendants' Motions for Summary Judgment.**

J.P. Morgan and CSFB's Statement No. 190.

To determine the true tax, if any, paid by the partners of Royall Associates as a result of the foreclosure sale of the Property, one needs to review each partner's individual tax return for, at a minimum, the year in which the gain is reported and, ideally, for all the years they owned the Property. There are various tax attributes an individual might have that would affect whether they actually pay tax on a gain they report.  These include passive activity losses, net operating losses, other capital losses, possible limitations on basis, and any other items of income or expense that might exist on the personal level.  Andelman 216-217; Riley 42-43, 109.

**RESPONSE NO. 190**

**Admitted in part.  Statement 190 is not a complete list of all factors that must be considered or that may affect the preparation of tax returns for Royall Associates Realty Trust.  *See* Andelman Deposition, pages 216 - 219, attached to the Swisher Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 191.

The only evidence of tax losses proffered by Blue Hills is a hypothetical chart created by its proffered expert of what "could be or would be" the "maximum tax liability . . . with respect to each of the individual partners." Andelman 113-114; Andelman Report (Dep. Ex. 358) at Ex. B.  Andelman did not review any individual tax return information for any Royall Associates partner. Andelman 148.  The only evidence Andelman can offer that any partner will actually pay taxes due to Blue Hills is a hearsay account of conversation with Fineberg's accountant about Fineberg's tax situation.  Andelman 149, 151.

**RESPONSE NO. 191**

**Denied.  Statement No. 191 not only mischaracterizes of Andelman's Expert Report and deposition testimony but contains erroneous conclusory statements.  The 2005 tax returns for Royall Associates Realty Trust and for the individual partners have not yet been prepared.**

**Extensions of the time for filing such returns has been obtained. Andelman could confirm the numbers set forth in his Expert Report upon the filing of those tax returns.** *See* **Andelman Deposition, page 217, line 6, attached to the Swisher Affidavit as Exhibit 1.**

J.P. Morgan and CSFB's Statement No. 192.

Royall Associates is reporting gain from the foreclosure sale as realized in 2005. Andelman 131-132.

**RESPONSE NO. 192**

**Admit.**

J.P. Morgan and CSFB's Statement No. 193.

Blue Hills has refused to turn over in discovery any tax returns or tax work papers for the Royall Associates partners for any year, despite the Lenders' repeated demands for all documents related to damages. Barnett Aff. ¶ 13 and Exhibit N thereto.

**RESPONSE NO. 193**

**Denied. Blue Hills, Fineberg and Langelier have complied with all applicable discovery obligations. All documents considered by Andelman in forming his expert opinion on tax liability and writing his expert report, including the 2004 tax return prepared on behalf of Royall Associates Realty Trust, have been produced. As the individual tax returns that Defendants seek were neither reviewed nor considered by Mr. Andelman, no legal obligation to produce such documents exists. No 2005 tax returns are available.** *See* **Andelman Deposition, page 80 attached to the Swisher Affidavit as Exhibit 1.**

Respectfully submitted,

BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
By their attorneys,

/s/ Meredith A. Swisher
Peter B. McGlynn, Esquire (BBO No. 333660)
Meredith A. Swisher, Esquire (BBO No. 646866)
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:     (617) 790-3000
Facsimile:      (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: June 16, 2006
#338700 v8/14500/9985