UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>　　　Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates,<br>Series 1999-C1<br>　　　Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>　　　Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and<br>GERALD FINEBERG<br>　　　Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**OPPOSITION OF BLUE HILLS OFFICE PARK LLC, GERALD FINEBERG AND
WILLIAM LANGELIER TO MOTION TO STRIKE ALTERATIONS TO DEPOSITION
TESTIMONY OF GERALD FINEBERG**

## I.     INTRODUCTION

Blue Hills Office Park LLC ("Blue Hills"), Gerald Fineberg ("Fineberg") and William

Langelier ("Langelier") hereby oppose the Defendants and Plaintiffs-in-Counterclaim's Motion

to Strike Alternations to Deposition Testimony of Gerald Fineberg ("Motion to Strike").  In

short, the Defendants, J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit

Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through

Certificates, Series 1999-C1 ("J.P. Morgan") and CSFB 1999 – C1 Royall Street, LLC ("CSFB")

(collectively, "Defendants"), have misstated the relevant legal standard governing deposition

errata sheets and have mischaracterized or have quoted portions of Gerald Fineberg's ("Fineberg") deposition testimony out of context. Moreover, the changes contained in Fineberg's errata sheet – intended to clarify his original deposition testimony - are consistent with Fineberg's testimony in other portions of his deposition transcript, in his answers to interrogatories, in documents produced during discovery, and in the deposition of testimony of other witnesses, including Kenneth Goldberg ("Goldberg"). Accordingly, the Motion to Strike must be denied.

## II.  FACTUAL BACKGROUND

The Defendants, as assignees of Credit Suisse First Boston Mortgage Capital, LLC ("Credit Suisse"), loaned approximately $33.1 million to Blue Hills (the "Loan") secured by a mortgage on Blue Hills' property located at 150 Royall Street, Canton, Massachusetts (the "Property"). The Loan closed on or about September 14, 1999. The formation of Blue Hills as a single purpose entity was required as a precondition to this 1999 refinancing. Blue Hills' sole member is Royall Associates Realty Trust ("Royall Trust"), which was the owner of the Property prior to the 1999 re-financing. Fineberg and Langelier are two of Royall Trust's trustees of the Royall Trust, as well as also being two of its six beneficiaries.

Blue Hills commenced the instant action seeking damages for multiple breaches of certain loan documents committed by Defendants and their disclosed agents. Such breaches include the Defendants wrongful declaration that Blue Hills defaulted on the Loan and the refusal to release to Blue Hills funds held in certain reserve accounts that would have enabled Blue Hills to meet its Loan obligations. These wrongful acts culminated in a foreclosure sale of the Property on November 19, 2004.

The Counterclaims asserted against Blue Hills, Fineberg and Langelier allege Loan-related breaches relating to Blue Hills' 2003 filing of an action in Norfolk Superior Court (the "Norfolk Action") appealing a zoning decision in connection with the abutting property located at 250 Royall Street, Canton, Massachusetts ("250 Royall"), the settlement of the Norfolk Action, and the receipt of $2,000,000 in settlement proceeds ("Settlement Proceeds") in exchange for the dismissal of the Norfolk Action. Defendants allege, *inter alia,* that the Loan documents required Blue Hills to obtain Defendants' prior written consent to the settlement of the Norfolk Action and that the Settlement Proceeds were transferred from Blue Hills in violation of the non-recourse provisions of the Loan.

Blue Hills, Fineberg and Langelier have consistently maintained, that no transfer of the Settlement Proceeds occurred. Although challenged by Defendants, it is undisputed that the Settlement Proceeds were deposited into Blue Hills' clients fund account at the offices of Bernkopf Goodman LLP on or about August 8, 2003. Bernkopf Goodman's accounting records identify the specific account into which the Settlement Proceeds were wired as "Fineberg Royall Associates." This account identifier was created at a time when the Royall Trust was the Property's fee owner and was not changed when Blue Hills was formed as a special purpose entity as required by Credit Suisse. The Settlement Proceeds remained in the Blue Hills' clients fund account at Bernkopf Goodman LLP until early 2005, when one-half of the proceeds – $1 million – were transferred to a clients fund account at Wilmer, Cutler, Pickering Hale and Dorr, LLP ("Wilmer Cutler"), a firm representing Langelier. In addition to the Settlement Proceeds, approximately $3.7 million - consisting of Property-related distributions were retained by Blue Hills as a "rainy day" reserve fund.

Ignoring the documents produced by Blue Hills, Fineberg, and Langelier, Fineberg's answers to interrogatories, and Goldberg's deposition testimony, the Defendants have, instead, chosen to distort Fineberg's deposition testimony to support their claim that the Settlement Proceeds were transferred from Blue Hills to the Royall Trust.  Fineberg was deposed on April 5, 2006 and provided his errata sheet to Defendants on June 7, 2006, the deadline agreed to by the parties.  A copy of Fineberg's errata sheet together with those pages of the deposition clarified by the errata sheet are attached hereto as Exhibit "A."  In the errata sheet, Fineberg made only five changes to the 255 pages of his deposition testimony.  Fineberg did not change or contradict his original answers; rather, Fineberg added language to clarify five of his answers.  As discussed below, the changes made by Fineberg are permitted by Fed. R. Civ. P. 30(e) and Defendants' Motion to Strike must be denied.

### III.    ARGUMENT

#### A.    The Changes to Fineberg's Deposition Are Permitted Under Fed. R. Civ. 30(e)

Fed. Rule Civ. P. 30(e) states, in pertinent part, that the "deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording, and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them . . . ."  The "express language of Rule 30(e) allows a deponent to change the substance of his answers." *Tingley Systems, Inc. v. CSC Consulting, Inc.,* 152 F.Supp. 2d 95 (2001), *citing Rios v. Bigler,* 847 F. Supp. 1538, 1546 (D. Kan. 1994).

"Rule 30(e) allows deponents to provide revised answers to deposition questions, including answers contradictory to those provided at the deposition.  The Rule does not require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes -

even if those reasons are unconvincing . . . ." *Elwell v. Conair, Inc.*, 145 F. Supp. 79, 86 (D. Me. 2001), citing *Great N. Storehouse, Inc. v. Peerless Ins. Co.*, 2000 WL 1901266 (D. Me. 2000) (stated reason for change to deposition testimony was "more complete answers"). Fineberg's reason for making the five changes to his deposition transcript was to clarify his original answers. Even if Fineberg's changes contradicted his original testimony – which they do not – such changes are permitted by Fed. R. Civ. P. 30(e). Each clarification to Fineberg's testimony is discussed *infra*.

Defendants appear to rely upon the *Tingley* case for the proposition that Fineberg has not provided sufficient reasoning for the changes described his errata sheet. *Tingley* is distinguishable as the party in *Tingley* sought to *re-open* certain depositions rather than to strike the errata sheets. "The standard to reopen a deposition is whether the changes contained in the errata sheets "make the deposition incomplete or useless without further testimony." *Tingley*, 152 F. Supp. at 120. In *Tingley*, the deponents made 117 changes to the deposition transcripts, 22 of which were described in the motion before the court as "express examples of the 117 corrections." *Id.* at 119. In applying the standard applicable to reopen depositions, the court stated that "the number and type of changes made to the depositions justify a reopening for the limited purpose of inquiring into the reasons for the changed answers. . . ." *Tingley* is also distinguishable from the present case in that Fineberg makes only five changes to his transcript clarification as approved, to substantiate changes - and Defendants have not requested the opportunity to reopen his deposition.

Moreover, even if the Defendants moved to re-open Fineberg's deposition, the standards governing a motion to reopen Fineberg's deposition cannot be met by the Defendants. Fineberg did not change his deposition testimony in such a manner as to make the testimony "incomplete

or useless without further testimony," as the changes are *consistent* with Fineberg's testimony in other parts of the deposition transcript, his answers to interrogatories, documents produced by him, and testimony provided by Goldberg.

In addition, Defendants are not prejudiced by Fineberg's errata sheet. "If the original answer as well as the changes are made available to the jury when and if the deposition testimony is used at trial, the jurors should be able to discern the artful nature of the changes. For purposes of pre-trial motions, the plain language of Rule 30(e) should control. The motion to strike or suppress the errata sheet is denied." *Elwell,* 145 F. Supp. at 86-87; *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98 (2nd Cir. 1997). When and if Fineberg's deposition testimony is used at the trial of this matter, the Defendants will have the opportunity to introduce both the original testimony and the errata sheet.

## B. The Defendants Have Taken Fineberg's Testimony Out of Context

To support their contention that the Settlement Proceeds were transferred by Blue Hills in violation of Section 10 of the Mortgage Agreement, the Defendants latch onto a handful of questions and answers exchanged during Fineberg's deposition during which, they argue, Fineberg admitted that a transfer occurred. The Defendant's contentions are as disingenuous as they are incorrect. In each of the questions at issue, Defendants' counsel variously referred to the entity to which Defendants now claim the Settlement Proceeds were transferred to as the "Royall Associates Realty Trust", "Royall Associates Trust", "Royall Associates" and the "trust." Standing alone, this lack of precision in the Defendant's counsel's questioning warranted the clarifications made by Fineberg in his errata sheet. In addition, there were distributions of the "rainy day" reserve (not including the Settlement Proceeds) made to Fineberg and Langelier after the November, 2004 Property foreclosure sale that the Defendants do not

challenge, yet the Defendant's counsel's lack of precision in his questioning blurred the

distinction between the reserve funds which were distributed without objection and the

Settlement Proceeds which were not distributed..

    For example, the line of questioning on page 177 of the Fineberg's deposition transcript

focuses on Blue Hills' desire to meet with the Defendant and the fact that Blue Hills had

approximately $6 million in reserve funds which included the Settlement Proceeds:[1]

> Q.    When you didn't get a meeting right away, why didn't you furnish the stuff you agreed to furnish, including the business plan?
>
> A.    They had most of the stuff.
>
> Q.    They didn't have a business plan as to what your plan was for the property, did they?
>
> A.    They knew -- they had been in business.  They knew what you do with an empty building.  You keep paying them until you find a tenant.  That was the business plan, just go out and work our little tails off until we found a tenant.  And then I told you where the 6 million plus was coming from.
>
> Q.    You never told Lennar where the 6 million plus was coming from --
>
> A.    I didn't, but --
>
> Q.    You have to wait for me to finish the question.  You never told Lennar that you had 6 million in reserve accounts held by <u>Royall Associates Realty Trust</u> ready to devote to the building, did you?
>
> A.    I would have had I had a meeting.  **However, the money in the reserve accounts was always held by my attorneys for Blue Hills Office Park LLC.**
>
> Q.    But in advance of the meeting, you never put that in a business plan of the sort that you agreed to provide in the prenegotiation letter, did you?
>
> A.    Yes, that's correct.
>
> Q.    Similarly, you didn't provide Lennar with the financial statements of the guarantors, yourself, to show your financial resources and ability to contribute money to the property, did you?
>
> A.    I was waiting for the meeting to show them.
>
> Q.    Notwithstanding you agreed to provide it in the prenegotiation letter, you never did provide it after signing that letter, did you?

    (emphasis added)

---

[1] The clarifications contained in Fineberg's errata sheet are set out in bold face type.

Similarly, on pages 180-181 of Fineberg's deposition, the Defendant's counsel's line of questioning is unrelated to the Settlement Proceeds; rather, it focuses on Blue Hills' desire to use all of the reserve funds – which Fineberg considered to be "all in one" - until a new tenant could be located:

Q.    And you said a minute ago you would use the reserve money to pay principal and interest.  Were you referring then to the money that Royall Associates Realty Trust had in reserve?

A.    To be honest with you, I was counting the reserves all in one.  It didn't matter which.  Reserves are reserves.  I didn't have it to spend -- I mean, it was in reserve, it wasn't fresh money coming in.

Q.    Your plan for how to save the building was to use the money both in the reserves held by the bank, which was about $4 million, plus the approximately $6 million that was held by Royall Associates Trust of which Lennar had no knowledge, to find a new tenant, and tide the property over until that tenant could start paying the rent?

A.    That's correct, **but the approximately $6 million was held by Blue Hills Office Park LLC.**

Q.    And once you had a tenant in there and had a guaranteed income stream, then your idea would be to refinance the property?

A.    That's correct.

Q.    And at that point if you could obtain some partial forgiveness of the debt, you would?

A.    That's hoping way in the future.  I didn't get that far yet.

(emphasis added)

Again, on pages 194-195 of Fineberg's deposition, the Defendant's counsel's line of questioning focuses on Blue Hill's plans for the Property had Defendants met with Blue Hills and certain reserve funds:

Q.    They're renovating the whole thing.  You can see right through it today; are you aware of that?

A.    No.  That doesn't mean they're right.

Q.    They are having to put into the building about as much as they paid for it; are you aware of that?

A.    So then it's worth 44 million.

Q.    Did the plan that you had in mind for the building require -- let me back up.  Your plan for the building involved using money in the reserves and also using the 5 plus million dollars you had in an account being held by the attorneys for Royall Associates, right?

A.       Yes, **except that the money held by my attorneys was held for Blue Hills Office Park LLC.**

Q.       And the plan also involved some period of time where you would fix up the building and thereby be able to attract a tenant, get them in there, and fix up the building for them, right?

A.       Yes.

Q.       You anticipated, didn't you, that in order to do all that you were going to have to modify the loan document?

A.       Yes.

(emphasis added)

Finally, on pages 242-243 of Fineberg's deposition, the line of questioning focuses on all

of the funds in the reserve account, not just the Settlement Proceeds:

Q.       As of August '03, did Blue Hills own -- strike that.  As of August 2003, did Blue Hills Office Park LLC own anything other than Blue Hills Office Park?

A.       Not that I know of.

Q.       Did it have any bank accounts other than the operating account that was controlled by Fineberg Management?

A.       I don't know.

Q.       We've talked today about monies that built up in reserve accounts, as you called them, for Royall Associates Realty Trust, right?

A.       Yes.

Q.       And that was money distributed from Blue Hills Office Park LLC to the trust, correct?

A.       Yes, yes. **Only some of the money in the reserve accounts was distributed.  The $2 million received from DST has never been distributed and is still being held by my attorneys and Bill Langelier's attorney for Blue Hills Office Park LLC.**

Q.       Did Blue Hills ever retain money that was available for distribution to the members?

MR. MCGLYNN:  Objection as to form.

A.       I don't know.

(emphasis added)

In addition, the consistency of Fineberg's answers is evident in deposition testimony not

referenced by Defendants in the Motion to Strike.  For example, on page 92 of Fineberg's

9

deposition transcript, Fineberg testified that the Settlement Proceeds were retained by Blue Hills'

attorneys in special accounts.

> Q:     Why did you keep the 2-million-dollar settlement payment in the entity, in <u>Blue Hills Office Park</u>
>        <u>LLC</u>, as a reserve against the day that you knew was coming a year later when Equiserve was
>        going to move out?"
>
> MR. MCGLYNN:  Objection.
>
> A:     " I sent it to the -- I never saw the money. It went directly with the attorneys, and I kept it in the
>        special accounts.

(emphasis added)

Here, Defendants' counsel's question refers to the Settlement Proceeds held by Blue

Hills, not the Royall Trust.  Fineberg's answer is consistent both with Fineberg's errata sheet as

well as interrogatory answers, documents produced and Goldberg's testimony, discussed *infra*.[2]

Fineberg's testimony appearing on pages 62-63 and 66 of his deposition transcript is also

consistent with Fineberg's errata sheet, his interrogatory answers, the documents Blue Hills

produced and in Goldberg's testimony that the Settlement Proceeds were held by Blue Hills

attorneys:

> Q:     Mr. Fineberg, the first page of Exhibit 177 looks like a ledger sheet from an account.  Across the
>        top it says "Fineberg Royall Associates."  Then it says "Century Bank."  My question to you is, do
>        you know where the 2-million-dollar settlement payment went when it was paid by DST to Blue
>        Hills Office Park?
>
> A.     No, I don't.
>
> Q.     We've been told it went into a client fund account.  Do you know that?
>
> A.     Yes, that I know.
>
> Q.     For whose benefit was that money held, which client, Royall Associates Realty Trust?
>
> A.     I don't know.  To the -- I don't know, but it went into the lawyers' account.
>
> Q.     Who presently has control of those accounts?
>
> A.     Mr. Goldberg and Mr. Cohn.
>
> Q.     And who are they answering to, which client, you?

---

[2] <u>See</u> Exhibit "B" attached hereto.

A.       Both, I think.  I can't answer that.

Q.       Well do you understand that you, Jerry Fineberg, have the ability to tell Ken Goldberg what to do
         with that 2 million?

A.       I don't think so.

Q.       Who do you think does have the ability to tell Mr. Goldberg what to do with the money?

A.       Both of us.

Q.       You and Mr. Langelier?

A.       I think so.

Q.       As the beneficiaries of the Royall Associates Realty Trust?

A.       I can't answer that.  That's getting into legal.

Fineberg Deposition, p. 66.[3]

## C.       The Sham Affidavit Rule is Inapplicable

The so-called "sham affidavit" rule has been held to apply to situations where a party

contradicts deposition testimony by an affidavit solely in an attempt to avoid summary judgment.

*See, e.g*. *Mahan v. Boston Water and Sewer Com'n*, 179 F.R.D. 49 (D. Mass. 1998).  The court

in *Mahan*, however, declined to extend the sham affidavit doctrine to a nonparty's affidavit that

contradicts a party's deposition testimony.  In addition, the court stated, "This Court agrees that

'a district court must consider all the evidence before it and cannot disregard a party's affidavit

merely because it conflicts to some degree with an earlier deposition . . . ."  *Id.,* citing *Kennett-*

*Murray Corp. v. Bone*, 622 F.2d 887 (5th Cir. 1980) (affidavit explained aspects of deposition

testimony and alleged inconsistency created by affidavit existed within deposition itself).

Defendants' argument that Blue Hills, Fineberg and Langelier have violated the sham

affidavit rule by changing Fineberg's deposition testimony to "manufacture" the fact that a

transfer of the Settlement Proceeds did not occur in an effort to defeat summary judgment is

---

[3] *Id*.

11

factually and legally erroneous.  In their opposition memoranda to the Defendant's motions for summary judgment, Blue Hills, Fineberg and Langelier rely on several different sources of undisputed evidence that no transfer of the Settlement Proceeds occurred and that the Settlement Proceeds have been held by counsel on behalf of Blue Hills since August 2003.  The changes contained in Finberg's errata do not "manufacture" these facts, they simply classify Fineberg's answers.

Furthermore, as briefed in Blue Hills, Fineberg and Langelier's summary judgment reply memoranda, Blue Hills produced documents showing that the Settlement Proceeds were wired into Bernkopf Goodman's clients fund account at Century Bank on August 8, 2003 which has identified the name "Fineberg Royall Associates" on the account ledger card.[4]  Records were also produced by Blue Hills showing that one-half of the Settlement Proceeds were wired to Wilmer Cutler, counsel for Langelier, on February 1, 2005.  Finally, the internal records of Century Bank, Danversbank and Wilmer Cutler also produced which corroborate the banking transactions revealed by Bernkopf Goodman and Wilmer Cutler's clients fund account records.  None of this documentary evidence is rebutted by the Defendants.

In addition, in his answer to Defendants' Interrogatory No. 11[5], Fineberg also stated that the Settlement Proceeds were wired to a clients fund account at Bernkopf Goodman LLP in August 2003 and have not been distributed.

The Defendant's assertion that Blue Hills, Fineberg and Langelier are creating issues of fact to defeat summary judgment is also specious given Goldberg's deposition testimony.  As stated in the Blue Hills Reply, Goldberg was a co-escrow agent (along with Wilmer Cutler's

---

[4] See Exhibit "C" attached hereto.
[5] See Exhibit "D" attached hereto.

Andrew Cohn ("Cohn")) of the Settlement Proceeds. While Goldberg's testimony is set out in detail in the Reply, it is summarized below for ease of reference:

- During his deposition, in answer to the question, "For what client were those funds held?", Goldberg answered, "In this case they were held for Blue Hills Office Park for the $2 million that we are talking about . . ." Goldberg Deposition, page 65, lines 4-8.

- In answer to the question, "So although is says Royall , the money was actually received by Blue Hills Office Park LLC?", Goldberg answered, "Yes. That's set out in writing in Exhibit 21. It is very clear." Goldberg Deposition, page 73, lines 18 - 22.

- Further, in answer to the question, "But you do know, you say, that the $2 million settlement payment had not been distributed by the LLC to the realty trust?", Goldberg answered "I do know that and did say that because it had been in counsel's custody from inception and had not changed." Goldberg Deposition, page 157, lines 20 - 22.

- In answer to the question, "And who were the client or clients for whom those accounts were held?", Goldberg answered "I only can answer here that the $2 million, because I had custody of that from inception." Goldberg Deposition, page 164, lines 12 - 20. Goldberg further testified, "The answer is clear. If I go back to where it came from, it is very clear here. Pursuant to your Exhibit 21 settlement agreement, it was your LLC's money, the payment was made to the LLC, payment to BHOP. It is clear. That money got wired in, and it was never changed, into the same account; it's been in the same account from 8/8/03, when it was received . . . there was no distribution or other change of ownership." Goldberg Deposition, page 165, lines 2 - 13.

- Goldberg also testified that "The $2 million came pursuant to an agreement for the benefit of Blue Hills Office Park into in fact an account, defined account, separate account into our clients funds account and has continued to stay there." Goldberg Deposition, page 169, lines 5 - 9.

Copies of these referenced pages of Goldberg's deposition transcript referenced above are attached hereto as Exhibit "E." As Goldberg's deposition testimony, Fineberg's own testimony, and Fineberg's responses to written discovery consistently demonstrate that no transfer of Settlement Proceeds occurred, Fineberg's errata sheet cannot be declared a "sham" to defeat summary judgment for purposes of the "sham affidavit rule." *See Mahan,* 179 F.R.D. 49.

## IV.  <u>CONCLUSION</u>

The changes to Fineberg's deposition testimony are permissible under Fed. R. Civ. P. 30(e), do not violate the so-called "sham affidavit rule" and are necessary to clarify Fineberg's intent in answering the questions posed.  These changes are consistent with Fineberg's answer to Defendants' Interrogatory No. 11, the documents produced by Fineberg in discovery, the testimony of Goldberg and with Fineberg's own deposition testimony in the portions of the transcript not cited by Defendants.  Moreover, in the event that Fineberg's testimony is introduced at the trial of this matter, Defendants will have the opportunity to introduce both the original testimony and the errata sheet.  Accordingly, the Motion to Strike should be denied.

WHEREFORE, Blue Hills, Fineberg and Langelier respectfully request that this Court enter an order:

1.    Denying the Motion to Strike; and

2.    Providing such other and further relief as is necessary and just.

Respectfully submitted,

BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
By their attorneys,


/s/ Peter B. McGlynn
Peter B. McGlynn, Esquire (BBO No. 333660)
Meredith A. Swisher, Esquire (BBO No. 646866)
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: July 7, 2006
#341024 v3/14500/9985

EXHIBIT A

256

WITNESS: Gerald S. Fineberg
CASE: Blue Hills Office Park LLC v. J.P. Morgan Chase Bank, et al., etc.

### SIGNATURE PAGE/ERRATA SHEET

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|----------------------------------|
| 177 | 10 | should read, "I would have had I had a meeting. However, the money in the reserve accounts was always held by my attorneys for Blue Hills Office Park LLC." Reason: clarification |
| 181 | 4 | should read "That's correct, but the approximately $6 million was held by Blue Hills Office Park LLC." Reason: clarification |
| 194 | 4 | should read "Yes, except that the money in the account held by my attorneys was held for Blue Hills Office Park LLC." Reason: clarification |
| 243 | 9 | should read "Yes, although the money in the reserve account was held for Blue Hills Office Park LLC." Reason: clarification |
| 243 | 12 | should read "Only some of the money in the reserve accounts was distributed. The $2 million dollars received from DST has never been distributed and is still being held by my attorneys and Bill Langelier's attorney for Blue Hills Office Park LLC." Reason: clarification |

I have read the transcript of my deposition taken 4/5/06.
Except for any corrections or changes noted above I hereby
subscribe to the transcript as an accurate record of the
statements made by me.
Signed under the pains and penalties of perjury.

_Gerald S. Fineberg_ DATE _6-6-06_
Deponent, Gerald S. Fineberg

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 176

1    this information with them, and I would have

2    supplied it and I would have supplied a business

3    plan, but you have to sit down with Lennar in order

4    to make a business plan.

5        Q.  So -- strike that.  Although you had agreed

6    to provide a business plan, your plan for the

7    property, in this letter, you weren't going to

8    provide it until after you had a chance to sit down

9    with them and look them in the eye?

10       A.  Well, I wanted the meeting right away.

11   This would have taken time.  A lot of these things

12   would take time to get current.  I wanted to have a

13   meeting and get going with it.

14       Q.  When you didn't get a meeting right away,

15   why didn't you furnish the stuff you agreed to

16   furnish, including the business plan?

17       A.  They had most of the stuff.

18       Q.  They didn't have a business plan as to what

19   your plan was for the property, did they?

20       A.  They knew -- they had been in business.

21   They knew what you do with an empty building.  You

22   keep paying them until you find a tenant.  That was

23   the business plan, just go out and work our little

24   tails off until we found a tenant.  And then I told

50bbd366-652f-4f3d-9824-d0f99d4eb7d8

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 177

1    you where the 6 million plus was coming from.

2        Q.   You never told Lennar where the 6 million

3    plus was coming from --

4        A.   I didn't, but --

5        Q.   You have to wait for me to finish the

6    question.  You never told Lennar that you had 6

7    million in reserve accounts held by Royall

8    Associates Realty Trust ready to devote to the

9    building, did you?

10       A.   I would have had I had a meeting.

11       Q.   But in advance of the meeting, you never

12   put that in a business plan of the sort that you

13   agreed to provide in the prenegotiation letter, did

14   you?

15       A.   Yes, that's correct.

16       Q.   Similarly, you didn't provide Lennar with

17   the financial statements of the guarantors,

18   yourself, to show your financial resources and

19   ability to contribute money to the property, did

20   you?

21       A.   I was waiting for the meeting to show them.

22       Q.   Notwithstanding you agreed to provide it in

23   the prenegotiation letter, you never did provide it

24   after signing that letter, did you?

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 180

1   to spend the money to get a tenant.  What money are

2   you referring to?

3       A.  Spend the money that we had in reserves

4   first.

5       Q.  And you're referring to which reserves, the

6   reserves held by the bank or the reserves held by

7   Royall Associates Realty Trust that Lennar didn't

8   know about?

9       A.  To spend the money that the bank had first

10  and then the money that we had in reserve at the

11  attorneys' office.

12      Q.  And you said a minute ago you would use the

13  reserve money to pay principal and interest.  Were

14  you referring then to the money that Royall

15  Associates Realty Trust had in reserve?

16      A.  To be honest with you, I was counting the

17  reserves all in one.  It didn't matter which.

18  Reserves are reserves.  I didn't have it to spend --

19  I mean, it was in reserve, it wasn't fresh money

20  coming in.

21      Q.  Your plan for how to save the building was

22  to use the money both in the reserves held by the

23  bank, which was about $4 million, plus the

24  approximately $6 million that was held by Royall

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 181

1    Associates Trust of which Lennar had no knowledge,

2    to find a new tenant, and tide the property over

3    until that tenant could start paying the rent?

4        A.  That's correct.

5        Q.  And once you had a tenant in there and had

6    a guaranteed income stream, then your idea would be

7    to refinance the property?

8        A.  That's correct.

9        Q.  And at that point if you could obtain some

10   partial forgiveness of the debt, you would?

11       A.  That's hoping way in the future.  I didn't

12   get that far yet.

13       Q.  But in any event, your anticipation was

14   that you would refinance on whatever terms you could

15   get?

16       A.  That's correct.

17       Q.  But you didn't want to tell Lennar this?

18            MR. MCGLYNN:  Objection.

19       A.  I couldn't tell Lennar this.  They didn't

20   sit down with us.  If a person is not willing to sit

21   down with you, then they're not willing to talk to

22   you.  What good is it sending smoke screens up to

23   them and signals?  I wanted to sit down.  It was

24   their obligation to sit down with me.

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 194

1   spend?

2       A.  A million or two.

3       Q.  But no more?

4       A.  No, not until we got a tenant.

5       Q.  You know what the owner who bought it for

6   23 million is doing to it, don't you?

7       A.  No, I don't.

8       Q.  You haven't driven by and seen it?

9       A.  I haven't driven by it.

10      Q.  They're renovating the whole thing.  You

11  can see right through it today; are you aware of

12  that?

13      A.  No.  That doesn't mean they're right.

14      Q.  They are having to put into the building

15  about as much as they paid for it; are you aware of

16  that?

17      A.  So then it's worth 44 million.

18      Q.  Did the plan that you had in mind for the

19  building require -- let me back up.  Your plan for

20  the building involved using money in the reserves

21  and also using the 5 plus million dollars you had in

22  an account being held by the attorneys for Royall

23  Associates, right?

24      A.  Yes.

FARMER ARSENAULT BROCK LLC

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 195

1    Q.  And the plan also involved some period of

2    time where you would fix up the building and thereby

3    be able to attract a tenant, get them in there, and

4    fix up the building for them, right?

5    A.  Yes.

6    Q.  You anticipated, didn't you, that in order

7    to do all that you were going to have to modify the

8    loan document?

9    A.  Yes.

10    Q.  Did you think as of November 2004 that

11    Lennar had no legal right to foreclose on the

12    property?

13    A.  Say that once more.

14    Q.  Sure.  As of November 2004, did you think

15    that Lennar had no legal right to foreclose on the

16    property?

17    A.  Yes.

18          MR. MCGLYNN:  Objection.

19    Q.  So why didn't you sue to enjoin the

20    foreclosure?

21    A.  I was waiting for a meeting with our

22    attorneys to sit down and to discuss it.

23    Q.  They wouldn't give you a meeting either?

24    A.  Oh (gesturing).

FARMER ARSENAULT BROCK LLC

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 242

1    it.  I don't remember discussing it or remember it.

2        Q.  You told me before that sometimes you

3    looked at your cc's and sometimes you didn't.  Do

4    you know if you looked at this one?

5        A.  This looks familiar, but I can't remember.

6        Q.  Do you know anything about the last 10,000

7    of rent that EquiServe paid that Blue Hills didn't

8    turn over to the lender?

9        A.  No.

10           MR. MCGLYNN:  Objection to the form.

11        A.  What?  I didn't hear you.

12        Q.  Do you know anything about the last 10,000

13   of rent paid by EquiServe?

14        A.  No.

15        Q.  Do you know whether it was turned over to

16   the lender or not?

17        A.  I don't know.

18        Q.  Do you know whether it was deposited to the

19   lockbox account?

20        A.  I don't know.

21        Q.  As of August '03, did Blue Hills own --

22   strike that.  As of August 2003, did Blue Hills

23   Office Park LLC own anything other than Blue Hills

24   Office Park?

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 243

1      A.  Not that I know of.

2      Q.  Did it have any bank accounts other than

3  the operating account that was controlled by

4  Fineberg Management?

5      A.  I don't know.

6      Q.  We've talked today about monies that built

7  up in reserve accounts, as you called them, for

8  Royall Associates Realty Trust, right?

9      A.  Yes.

10     Q.  And that was money distributed from Blue

11 Hills Office Park LLC to the trust, correct?

12     A.  Yes, yes.

13     Q.  Did Blue Hills ever retain money that was

14 available for distribution to the members?

15         MR. MCGLYNN:  Objection as to form.

16     A.  I don't know.

17     Q.  Well, you and Bill Langelier made decisions

18 about distributing money, right?

19     A.  Right.

20     Q.  And Mr. Langelier at least was interested

21 in maximizing the benefits from his ownership of the

22 property.  Were you similarly interested in

23 maximizing the benefits?

24     A.  Yes.

EXHIBIT B

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Volume 1, Pages 1-256

Exhibits:  322-332, 334-339

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

              Defendant

(Complete caption on next page.)

----------------------------

30(b)(6) DEPOSITION OF BLUE HILLS OFFICE PARK LLC

        By GERALD S. FINEBERG

Wednesday, April 5, 2006, 9:39 a.m.

DLA Piper Rudnick Gray Cary US LLP

33 Arch Street, 21st Floor

Boston, Massachusetts

------- Reporter:  Joan M. Cassidy, RPR, CRR -------

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404  fax 617.728.4403

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 92

1    A.   I don't know.  I'd have to check on that.

2    Q.   Do you recall that there was a lease

3 termination agreement as part of the settlement?

4    A.   I think there was.

5    Q.   And you understood, didn't you, that the

6 settlement which included this lease termination

7 agreement eliminated any possibility that EquiServe

8 would stay in your building?

9         MR. MCGLYNN:  Objection.

10    A.   Yes.

11    Q.   Why did you keep the 2-million-dollar

12 settlement payment in the entity, in Blue Hills

13 Office Park LLC, as a reserve against the day that

14 you knew was coming a year later when EquiServe was

15 going to move out?

16         MR. MCGLYNN:  Objection.

17    A.   I sent it to the -- I never saw the money.

18 It went directly with the attorneys, and I kept it

19 in the special accounts.

20    Q.   Did you yourself consider that you should

21 keep the 2-million-dollar settlement payment in the

22 hands of the entity Blue Hills Office Park LLC as a

23 reserve against the day you now knew was coming for

24 sure a year later when EquiServe would move out and

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 62

1   which we've been told relate to the settlement

2   payment of $2 million.

3        A.   (Witness reviews document.)

4            MR. MCGLYNN:   You know what, Bruce?

5   None of us thought about it, but obviously this is

6   subject to the confidentiality stipulation.   So we

7   should probably mark this portion of the transcript

8   dealing with all of this, and prior to this,

9   Mr. Fineberg's testimony concerning the

10  2-million-dollar settlement.

11           MR. FALBY:   Maybe when you get it, you

12  can designate the pages.

13           MR. MCGLYNN:   I'll do that.   This is

14  more of a reminder to me than to you.

15       Q.   Mr. Fineberg, the first page of Exhibit 177

16  looks like a ledger sheet from an account.   Across

17  the top it says "Fineberg Royall Associates."   Then

18  it says "Century Bank."   My question to you is, do

19  you know where the 2-million-dollar settlement

20  payment went when it was paid by DST to Blue Hills

21  Office Park LLC?

22       A.   No, I don't.

23       Q.   We've been told it went into a client fund

24  account.   Do you know that?

50bbd366-652f-4f3d-9824-d0f99d4eb7d8

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 63

1     A.  Yes, that I know.

2     Q.  For whose benefit was that money held,

3  which client, Royall Associates Realty Trust?

4     A.  I don't know.  To the -- I don't know, but

5  it went into the lawyers' account.

6     Q.  But you don't know which client account?

7     A.  I don't understand.

8     Q.  Lawyers hold money in different accounts.

9  Sometimes they hold it in a client account for the

10  benefit of a particular client.  Do you know for

11  whose benefit Bernkopf was holding this $2 million,

12  whether it was for the benefit of Royall Associates

13  Realty Trust or your personal benefit?  Do you know?

14     A.  I don't know.

15     Q.  Do you know what happened to that $2

16  million once it was wired to the Bernkopf account?

17     A.  No, I don't.

18     Q.  Do you know that subsequently -- strike

19  that.  Do you know if any of it was ever wired

20  anywhere thereafter?

21     A.  As far as I know, the attorneys, Cohn and

22  Goldberg, still have it.

23     Q.  Do you remember the 4.2 million that the

24  December agreement said was in the supplemental

30(b)(6) Deposition by Gerald S. Fineberg
Volume 1 - April 5, 2006

Page 66

1    Q.  Who presently has control of those

2    accounts?

3    A.  Mr. Goldberg and Mr. Cohn.

4    Q.  And who are they answering to, which

5    client, you?

6    A.  Both, I think.  I can't answer that.

7    Q.  Well, do you understand that you, Jerry

8    Fineberg, have the ability to tell Ken Goldberg what

9    to do with that 2 million?

10   A.  I don't think so.

11   Q.  Who do you think does have the ability to

12   tell Mr. Goldberg what to do with the money?

13   A.  Both of us.

14   Q.  You and Mr. Langelier?

15   A.  I think so.

16   Q.  As the beneficiaries of the Royall

17   Associates Realty Trust?

18   A.  I can't answer that.  That's getting into

19   legal.

20   Q.  So whether it's on your own individual

21   behalf or as beneficiaries of a trust or as trustees

22   of a trust or whatever, you don't know the capacity,

23   but you do know that you and Mr. Langelier have the

24   ability to control the disposition of the settlement

50bbd366-652f-4f3d-9824-d0f99d4eb7d8

EXHIBIT C

**CONFIDENTI**

Fineberg Royall Associates    Century

BALANCE FORWARD →

| | DETAIL | ✓ | DEBIT | CREDIT | BALANCE | PREVIOUS BALANCE |
|---|---|---|---|---|---|---|
| 1 | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |
| 9 | | | | | | |
| 10 | | | | | | |
| 11 | | | | | | |
| 12 | | | | | | |
| 13 | | | | | | |
| 14 | 8/8/03  Wire In From IOLTA  B Knuth | | | 10,000,000 — | | |

**BLUE HILL**

NAME
ADDRESS
CITY

FINEBERG

150 ROYALL ST.
CLANTON

**CONFIDENTIAL**

KMG

[BALANCE FORWARD →]

| DATE | FOLIO | DETAIL | √ | DEBIT | CREDIT | BALANCE | PREVIOUS BALANCE |
|------|-------|--------|---|-------|--------|---------|------------------|
| 2/1/05 | WIRE-OUT | Wilmer, Cutler, et al (Hale + Dorr) | | 1,000,000 | — | | |
| 2/9/05 | WIRE-OUT | 15B - Century Model aa? | | 1,000,000 | — | | |

**Safeguard** BUSINESS SYSTEMS, INC.
PRINTED U.S.A.
FORM NO. ARL-7

**ACCOUNTS RECEIVABLE LEDGER**
ORDER FROM YOUR LOCAL SAFEGUARD DISTRIBUTOR.
IF UNKNOWN, CALL 800-523-2422

© Safeguard Business Systems, Inc.

BLUE HILL
5508

CENTURY BANK INTEREST BEARING ACCOUNTS

TRANSFERRED 4/1/05 TO DANVERSBANK

**CONFIDENTIAL**

| Name | Account Number | Amount |
|------|----------------|--------|
| Fineberg - 150 Royall | 27908692 | 1,003,839.25 |

BLUE HILL
5509

# Danversbank

One Conant Street Danvers, MA 01923
BERNKOPF GOODMAN LLP

**CONFIDENTIAL**

111235302 Online Banking Transfer To CHECKING 27908692 At    04/05    1,003,839.25
16:10

BLUE HILL
5510

Member FDIC
Member DIF                    www.danversbank.com
978.777.2200

ACCOUNT
27008696    04/29/2005

# Danversbank
### One Conant Street Danvers, MA 01923
### BERNKOPF GOODMAN LLP

## CONFIDENTIAL

MONEYMARKET PERSONAL ACCOUNT

*Fineberg - 150 Royal*

| DESCRIPTION | DATE | AMOUNT |
|---|---|---|
| 111235302 Online Banking Transfer 35707901 At 16:10 | 04/05 | 1,003,839.25 |
| INTEREST | 04/25 | 1,738.43 |

BLUE HILL
5511

Member FDIC
Member DIF     www.danversbank.com
978.777.2200

| Transaction Type | Date | Item No. | Document No | Amount | Description | Balance |
|---|---|---|---|---|---|---|

CONFIDENTIAL

BLUE HILL
5512

EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim )<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as<br>Trustee for the Registered Holders of<br>Credit Suisse First Boston Mortgage<br>Securities Corp., Commercial Mortgage<br>Pass-Through Certificates, Series 1999-C1,<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET,<br>LLC,<br>    Defendant/Plaintiff-in-Counterclaim )<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**GERALD FINEBERG'S SECOND SUPPLEMENTAL TO HIS ANSWERS
TO DEFENDANTS' FIRST SET OF INTERROGATORIES**

Gerald Fineberg ("Fineberg") hereby supplements his answers to Interrogatories 2, 7 and

11 of the First Set of Interrogatories by the Defendants as follows:

**GENERAL OBJECTIONS**

Fineberg objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure. Fineberg also objects to each interrogatory to the

extent that each interrogatory is vague, overly broad, unduly burdensome, seeks information that

dated as of August 5, 2003. Shortly thereafter, Joseph Donovan called Wells Fargo on the

telephone regarding, *inter alia*, Equiserve's notification to Blue Hills that it would not be

renewing its lease which would expire July 31, 2004. The date of this communication cannot be

recalled by Mr. Donovan, although he recalls speaking with Wells Fargo representatives in 2003

regarding the replacement of Equiserve as a tenant at the Property. In addition and without

limitation to the foregoing, and Fineberg's answers to Defendants' Second Set of Interrogatories,

Fineberg states that documents adduced on discovery thus far have confirmed that the

Defendants knew as early as the summer and fall of 2003 that Equiserve would not be renewing

its lease and also confirmed that they received information to that effect from Blue Hills

representatives.

## INTERROGATORY NO. 11

State the amount of the Payment and describe the disposition of the Payment, and in your
answer:

      a)      identify each and every document which forms any part of the source of your
            information regarding the amount of the Payment or the disposition of the
            Payment;

      b)      identify each and every person who received any portion of the Payment; and

      c)      identify each and every bank account into which any portion of the Payment was
            deposited.

## ANSWER NO. 11

**THE FOLLOWING ANSWER IS SUBJECT TO THE STIPULATION REGARDING THE PRESERVATION OF CONFIDENTIAL MATERIALS DATED DECEMBER 6, 2005.**

Fineberg objects to this interrogatory to the extent that it is overly broad, unduly burdensome, vague and ambiguous, seeks information that is subject to attorney-client privilege, and seeks information on the receipt, "disposition" of, and bank accounts related to the settlement amount that is privileged, irrelevant and not likely to lead to the discovery of admissible evidence. Fineberg further objects to this interrogatory to the extent its multiple subparts exceed the limit on interrogatories under the court order governing discovery. Without waiving these objections, and subject to the Confidentiality Stipulation, Fineberg states that the amount of the Payment was $2,000,000, as set forth in the Settlement Agreement, which was produced on December 8, 2005 and stamped 1844 - 1855, and marked "Confidential." Fineberg further states that in accordance with the terms of the Settlement Agreement, the Payment was wired to Bernkopf Goodman LLP on or about August 8, 2003. Thereafter, one-half of the Payment was then deposited in a clients' fund account at Bernkopf Goodman LLP and one-half was deposited in a client funds' account at Wilmer Cutler Pickering Hale and Dorr LLP. Thereafter, the Payment has never been distributed out of such clients funds' accounts. Copies of the Bernkopf Goodman LLP and Wilmer Cutler Pickering Hale and Dorr, LLP clients' fund accounting ledger sheets and/or bank statements are attached hereto as documents bate-stamped Blue Hill 5507-5511. The intra bank transfer referred to in these documents between Century Bank and Danversbank was unrelated to the Payment.

- 14 -

EXHIBIT E

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER
Kenneth Goldberg, April 7, 2006

Exhibit:  340            Volume 1, Pages 1 - 210

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10506 (WJY)

---------------------------

BLUE HILLS OFFICE PARK LLC

        Plaintiff, Defendant-in-Counterclaim

vs.

J.P. MORGAN CHASE BANK, et al.

            Defendant

(Complete caption on next page.)

        CONTAINS INFORMATION SUBJECT

        TO CONFIDENTIALITY STIPULATION

        DEPOSITION OF KENNETH GOLDBERG

        Friday, April 7, 2006, 9:42 a.m.

        DLA Piper Rudnick Gray Cary US LLP

        33 Arch Street, 26th Floor

        Boston, Massachusetts

------- Reporter:  David A. Arsenault, RPR -------

darsenault@fabreporters.com  www.fabreporters.com

        Farmer Arsenault Brock LLC

        50 Congress Street, Suite 415

        Boston, Massachusetts 02109

        617.728.4404  fax 617.728.4403

FARMER ARSENAULT BROCK LLC

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER
Kenneth Goldberg, April 7, 2006

Page 65

1     Q.  Was the Century Bank account into which the

2   settlement payment was placed a client fund account?

3     A.  Yes.

4     Q.  For what client were those funds held?

5     A.  In this case they were held for Blue Hills

6   Office Park for the $2 million that we are talking

7   about which is the subject of the settlement which

8   is Exhibit 21.

9     Q.  Were the additional $2.2 million in the

10  supplemental account also held in a client fund

11  account for the client Blue Hills Office Park LLC?

12    A.  I don't know the answer to that.  I would

13  presume so.  I do not have anything in front of me

14  that shows that it was or was not.  Looking at the

15  tenor of the document, it would appear that it

16  probably was.

17    Q.  Similarly, was the initial account

18  referenced in the agreement, Exhibit 176, held in a

19  client funds account?

20          MR. McGLYNN:  You're talking about the

21  initial account, the so-called property account?

22          MR. FALBY:  No, I'm talking about the

23  initial account.

24    A.  I want to make sure that we are using the

f38a81f3-93bb-4e68-9b30-372388443761

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER
Kenneth Goldberg, April 7, 2006

Page 73

1  Our office keeps its records generally consistent

2  with property addresses when we deal with real

3  estate transactions.  By the same taken, it says

4  Fineberg.  It certainly was not Fineberg's money.

5  And, therefore, there's no intent here to

6  specifically set out the legal entity who is the

7  holder, nor is it here intended to say that they are

8  Gerry Fineberg's money.  Nor is it intended to say

9  that Mr. Fineberg has the right to decide what to do

10  with it.  It is just simply the label that's put on

11  it for the purpose of our internally knowing that in

12  fact this related to 150 Royall Street.  I can't

13  attribute any more to it than that.

14          Likely the account was not in that name.

15  It was in the Bernkopf Goodman name.  We just called

16  it Royall Associates for I think literally for 10 or

17  15 years.

18      Q.  So although it says Royall Associates, the

19  money was actually received by Blue Hills Office

20  Park LLC?

21      A.  Yes.  That's set out in writing in Exhibit

22  21.  It is very clear.

23      Q.  And the money was then held in that account

24  until the beneficiaries of Royall Associates Realty

FARMER ARSENAULT BROCK LLC

f38a81f3-93bb-4e68-9b30-372388443761

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER
Kenneth Goldberg, April 7, 2006

Page 157

1  this case.  You do tend to ask long-winded questions

2  that tend to be hard to understand.  If you have a

3  precise question that you want the answer to, let's

4  ask it and move on to a different topic.  I agree it

5  has been asked and answered several times.

6          MR. FALBY:  It was the answers that were

7  long-winded, not my questions.

8      Q.  Is the $2.2 million that was held in the

9  supplemental account -- strike that.  Was the $2.2

10 million that was held in the supplemental account

11 money that had already been distributed by the LLC

12 to its member, the realty trust?

13     A.  When?

14     Q.  As of December 31, $2004.

15     A.  I don't know.  Because I'm not -- I don't

16 have the accounting records.

17     Q.  But you do know, you say, that the $2

18 million settlement payment had not been distributed

19 by the LLC to the realty trust?

20     A.  I do know that and did say that because it

21 had been in counsel's custody from inception and had

22 not changed.

23     Q.  Was the $2 million payment recorded as a

24 receipt by Blue Hills Office Park LLC in its books

FARMER ARSENAULT BROCK LLC

f38a81f3-93bb-4e68-9b30-372388443761

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER
Kenneth Goldberg, April 7, 2006

Page 164

1    Goodman?

2        A.  I do not know the answer to who held the

3    2.2.  The only information I have in front of me

4    relates to the $2 million account.

5        Q.  So you don't know whether the $2 million

6    account also contained the other 2.2 million that's

7    defined as being included in the supplemental

8    account or not, correct?

9        A.  I believe that in fact this was a separate

10   account.  And there was one or more other accounts

11   which totalled 2.2-million-plus dollars.

12       Q.  And who were the client or clients for whom

13   those accounts were held?

14       A.  They were either the LLC, the trust or the

15   beneficiaries.  I can't answer that sitting here

16   now.  That's an accounting question.  I only can

17   answer here the $2 million, because I had custody of

18   that from inception.  And here is the information

19   documenting it, you have given me as Exhibit 177.

20   Same question again.

21       Q.  But this Exhibit 177, not to argue with

22   you, doesn't tell you the client for whose benefit

23   the $2 million is held, does it?

24           MR. McGLYNN:  Objection; asked and

f38a81f3-93bb-4e68-9b30-372388443761

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER
Kenneth Goldberg, April 7, 2006

Page 165

1    answered.

2       A.  To me it does.  The answer is clear.  If I

3    go back to where it came from, it is very clear

4    here.  Pursuant to your Exhibit 21 settlement

5    agreement, it was your LLC's money, the payment was

6    made to the LLC, Paragraph 1, payment to BHOP.  It

7    is clear.  That money got wired in, and it was never

8    changed, into the same account; it's been in the

9    same account from 8/8/03, when it was received.  It

10   stayed there for years until it was then transferred

11   in 2/2/05 but retained, transferred into separate

12   accounts, but there was no distribution or other

13   change of ownership.

14      Q.  Actually, it was first transferred into an

15   IOLTA account, right?

16      A.  Yes.

17      Q.  And then transferred into a Century Bank

18   account, correct?

19      A.  Because we had to set up separate accounts.

20   That's just a process question.  The IOLTA account,

21   we opened a separate account for this money

22   separately, a separate account.

23      Q.  And you are confident without checking the

24   names of those accounts, based on the settlement

f38a81f3-93bb-4e68-9b30-372388443761

CONTAINS INFORMATION SUBJECT TO PROTECTIVE ORDER
Kenneth Goldberg, April 7, 2006

Page 169

1    We ended up with it in a manner of how to implement

2    the disposition of those funds.  But from the time

3    the money was generated it was out of Bernkopf

4    Goodman's control.

5                Different:  The $2 million came pursuant

6    to an agreement for the benefit of Blue Hills Office

7    Park into in fact an account, defined account,

8    separate account into our clients funds account and

9    has continued to stay there.  I have never received

10   notice or direction that there's been a distribution

11   or change of rights of ownership of that asset,

12   period.  That's the difference.

13       Q.  And when did you get the 2.2 million of

14   monies that were also in the supplemental account

15   held by you as escrow agent?

16       A.  Sometime prior to December 31st, 2004.

17       Q.  You don't remember when or how or from

18   whom?

19       A.  Not with enough specificity.  It came from

20   the operating accounts.  I don't know the answer to

21   that.

22       Q.  Do you have any written memorialization in

23   any form of any of your conversations with Joe

24   Warshaw, contemporaneous, I mean?