UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br> Mortgage Pass-Through Certificates,<br>Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and<br>GERALD FINEBERG<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## MOTION-*IN-LIMINE* TO BAR TESTIMONY OF
## ERIC S. STOTZ ON IMPACT OF PARKING GARAGE

Blue Hills Office Park LLC, William Langelier and Gerald Fineberg (collectively, "Blue Hills") hereby move that any testimony from Eric S. Stotz ("Stotz") as to the impact of a parking garage adjacent to land and buildings thereon located at 150 Royall Street, Canton, Massachusetts ("Property") on the valuation of the Property be barred. Further, Stotz should not be permitted to testify as to any valuation in which his opinions regarding the putative impact of the adjacent garage are a component.

In further support of this Motion, Blue Hills avers and assets as follows:

1.      In the Expert Report of Eric S. Stotz (the "Stotz Report"), Stotz states that he "was asked to give an opinion of the impact on value, if any, of a parking garage built in conjunction with the property located adjacent to the west of the subject property." Stotz Report, p. 2. A true copy of the Stotz Report (minus exhibits) is attached hereto and incorporated herein as Exhibit "A". Stotz provides the conclusory and unsupported opinion that "any structure that is built that interferes with the view of another structure from a major highway, or any structure that add [sic] significantly to the traffic congestion in an area, will have a detrimental impact on the value of the existing structure." Exhibit "A", Stotz Report, p. 13. Stotz is adamant that the construction of the garage on adjacent land "will have a negative impact" on the value of real property and a building thereon located at 150 Royall Street, Canton, Massachusetts (the "Property"). However, although this purported negative impact is a factor in his valuation analysis, he cannot quantify the effect of such alleged negative impact on the Property nor will he identify the weight and role of such opinion in his valuation. See Deposition Transcript of Eric Stotz dated April 21, 2006 ("Stotz Deposition"), p. 88, lines 18-19 and p. 90, lines 15-19, attached hereto and incorporated herein as Exhibit "B".

2.      At his deposition, Stotz all but admitted that his opinion on the adjacent garage is not based on recognized or reliable methodologies or that he has any relevant expertise. Stotz opines on traffic issues, but admits that he did not consult with a traffic consultant nor did he do any traffic studies. Stotz Deposition, p. 95, lines 11-12, attached hereto and incorporated herein as Exhibit "C". The sole source of his opinion regarding traffic that is identified with even a modicum of specificity is the Complaint filed by Blue Hills against the Town of Canton, Zoning Board of Appeals in Norfolk Superior Court Civil Action No. 2003-01051. Stotz Deposition, p. 95, lines 16-24 through p. 96, lines 1-3, attached hereto and incorporated herein as Exhibit "D".

Moreover, Stotz did not conduct any measurements to determine how much of the view from inside the Property may have been obstructed. Stotz Deposition, p. 102, lines 3-6, attached hereto and incorporated herein as Exhibit "E". Stotz has not identified any learned treatises or professional journals in support of his apparently intuitive opinions. Exhibit "A", Stotz Report, p. 13. In the main, his opinion is based on "[g]eneral conversations with those in real estate." Stotz Deposition p. 99, lines 4-10 attached hereto and incorporated herein as Exhibit "F". Curiously, despite his use of the garage as an unquantified yet allegedly significant factor in his valuation of the Property. Stotz failed to acknowledge the alleged significance of the garage in his pre-foreclosure appraisal report prepared for LNR. Stotz Deposition, p. 87, line 12 through p. 88, line 19, attached hereto and incorporated herein as Exhibit "G".

   3.  Stotz's opinion as to any alleged impact the adjacent parking garage has on the value of the Property has neither a cognizable professional basis nor a modicum of reliability. The Supreme Court asserted in *Daubert* that trial courts perform a "gatekeeping" role in regulating the admission of expert testimony under Fed. R. Evid. 701. 509 U.S. at 589-95 (1993). That screening function entails a preliminary evaluation of the proffered expert testimony for both reliability and relevance. *See, Daubert*, 509 U.S. 579, 591-95; *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 80 (1st Cir. 1998) (citing *Daubert*). The review for reliability encompasses an assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. As to the relevancy criterion, "expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d

at 81 (citation omitted) (citing *Daubert*, 509 U.S. at 591-92). The *Daubert* reliability

requirement applies to all expert testimony, not merely scientific testimony. *Kuhmo Tire Co. v.*

*Carmichael*, 526 U.S. 137, 150 (1999).

   4.  Stotz admits that the basis for his opinion on the impact of the garage on the

Property's value was "various discussions with other real estate professionals." Exhibit "A"

Stotz Report, p. 13. At his deposition, he indicated that his opinion was based on "general

conversations with those in real estate." Stotz Deposition, p. 99, attached hereto and

incorporated herein as Exhibit "H". Mere anecdotal evidence is insufficient to meet the *Daubert*

standard. *E.g., Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1316 (11th Cir. 1999); *In re:*

*TMI Litigation Cases Consolidated II*, 911 F.Supp. 775 (M.D. Penn. 1996); *WadeGreaux v.*

*Whitehall Labs*, 874 F.Supp. 1441, 1483 (D.V.I. 1994). Stotz's reference to "discussions" and

"other real estate professionals" could not be more evasive or vague and, certainly, is an

exemplar of "anecdotal evidence." Likewise, the professionality of Stotz's reliance on a

pleading filed by Blue Hills in other litigation as a source of information is, at minimum, highly

questionable. Moreover, the ephemerality and dubiousness of the putative basis of Stotz's

opinion leaves the Court unable to perform its "gate keeper" function of evaluating the relevancy

or reliability of information Stotz purportedly obtained from "discussions" with unidentified

"real estate professionals." Exhibit "A", Stotz Report, p. 13.

   5.  Stotz does not quantify any alleged diminution in the value of the Property as a

result of the garage in neither his expert report nor in his deposition. Having failed and refused

to quantify the alleged diminution of value in either his expert report or during deposition

testimony, he should not be allowed to "sand bag" Blue Hills at trial by either quantifying the

amount – for the first time – or using it as a "secret ingredient" in his valuation. *See, G.S.*

*Enterprises, Inc. v. Falmouth Marine*, 410 Mass. 262, 270-71 (1991). Absent quantification, his opinion is worthless as to any germane issues and, in fact, places his valuation of the Property in disrepute. Any valuation methodology that allows Stotz to add a significant "fudge factor" to his opinion based on purported conversations with unidentified "professionals" is highly suspect and lacks minimal indicia of reliability.

WHEREFORE, Blue Hills respectfully requests that this Court enter an order:

1.      Barring introduction of any testimony by Eric S. Stotz as to the impact of an adjacent parking garage on the Property; and

2.      Providing such other and further relief as is just and proper.

## LOCAL RULE 7.1(A)(2) CERTIFICATION

The undersigned counsel for Blue Hills certifies that she has conferred with counsel for Lender in a good faith attempt to resolve or narrow the issues presented by this Motion.

/s/Meredith A. Swisher

BLUE HILLS OFFICE PARK LLC, WILLIAM
LANGELIER AND GERALD FINEBERG,
By their attorneys,


/s/Meredith A. Swisher
Peter B. McGlynn, Esquire, BBO No. 333660
Meredith A. Swisher, Esquire, BBO No. 646866
Bernkopf Goodman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts  02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: September 11, 2006
#345096 v3/14500/9985

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1,

      and

CSFB 1999–C1 ROYALL STREET, LLC;

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## EXPERT REPORT OF ERIC S. STOTZ

**Introduction.**

I was retained by counsel for J. P. Morgan Chase Bank, as Trustee for the Registered Holders of

Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through

Certificates, Series 1999-C1 and CFSB 1999-C1 Royall Street LLC for my opinion on certain

matters relating to real estate value in the property located at 150 Royall Street located in

Canton, Massachusetts. In particular, I was retained by counsel for the following tasks.

      1) I was asked to give an opinion of the value of the subject property as of October 18,

2004. In October, 2004, I prepared an appraisal report of the subject property. As first stated in

1

that report, it is my opinion that the value of the subject property, as of October 18, 2004, was $15,000,000. This opinion is explained and supported in Part 1 of this document following, and a complete copy of the appraisal prepared in October 2004 is attached as additional support.

2) I was asked to give an opinion of the value of the subject property as of August 8, 2003. I prepared a retrospective estimate as a complete appraisal report, in summary format. My estimate relies upon much of the findings in my October 2004 appraisal report as outlined above and attached hereto for the basis of analysis. Based on this retrospective value analysis, which is detailed as Part 2 following, it is my opinion that the retrospective value of the subject property, as of August 8, 2003, was $14,500,000.

3) I was asked to give an opinion of the impact on value, if any, of a parking garage built in conjunction with the property located adjacent to the west of the subject property. In particular, I was asked to review a zoning complaint brought by the subject property owners concerning the construction of this parking garage, re-visit the subject property, and form an opinion as to any likely impact on the subject property's value due to the construction of this garage. This is detailed as Part 3 as follows.


**Part 1) Opinion of Value as of October 18, 2004**

I prepared a complete, self-contained appraisal report on the subject property for Lennar Partners, on behalf of JPMorgan Chase Bank, a New York banking corporation, as Trustee for the Registered Holders of Credit Suisse First Boston Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (Lennar). The report was dated October 28, 2004 (date of report submission). The stated purpose of this appraisal was to estimate the "as-is" fee simple value of the property as of October 18, 2004 (the actual date of inspection of the

2

property), as well as an as-stabilized value. The intended user of this report was Lennar, and the intended use of the report was to assist in internal decision making purposes. After thoroughly reviewing this report in connection with this assignment, it is my current opinion that the report was reasonable and the value well supported, and that the value of the subject property, as of October 18, 2004, was $15,000,000. The reasons for my opinion are as follows.

At the time, suburban office market had been dramatically negatively impacted by the recession and high tech meltdown that had occurred in the previous years, but that market conditions were appearing to improve, with a cautiously positive outlook for the future. This cautious outlook formed the basis for the 18-month vacancy estimated to find a single tenant occupant for the subject building within the report.

The income approach was the primary approach employed in developing my opinion of value. The projected future cash flows were prepared using ARGUS lease by lease analysis software, which is widely used and accepted within the industry. Assumptions regarding the lease up of the subject building were made based on the market analysis information, with the assumption that the most likely tenant for the subject property would be a single-tenant, entire building user. The rental stream was not expected to start until March, 2006, which represented a vacancy period of 18 months from the October, 2004 effective as-is date. The rental rate for the tenant was estimated at $12.25 per square foot on a triple net basis (all operating expenses are passed through to the tenant), and building expenses were estimated based on historical levels and industry standards, with certain adjustments to reflect the vacancy in the early years of the analysis.

The cash flow prepared begins in October, 2004, with the first year ending September, 2005

(fiscal year 2005), and was taken out through fiscal 2017. This cash flow was used as to produce

the incomes used in the discounted cash flow methodology. A direct capitalization analysis was

not used for the as-is scenario because of the extreme variations in the cash flows over the first

few years due to the then-current vacancy in the building and necessary expenditures to secure a

tenant. My conclusion of the income approach was $14,800,000 for the as-is analysis.

A sales comparison approach was developed using five sales of comparable office properties

within a reasonable range of distance from the subject property. This approach estimated a value

as-stabilized first, then adjusted the stabilized value by the present value of the lost income and

costs to achieve stabilized occupancy (as taken from the income approach) to arrive at an

estimate of as-is value. The five sales ranged 120,960 to 345,410 square feet in size, and sold for

between $114 and $145 per square foot of building area prior to adjustments.

Adjustments were applied to these sales to more closely compare them to the subject property.

These adjustments included market conditions (appreciation/depreciation), Location, Building

Size, Quality of Construction, and Land to Building Ratio. The adjustment process reduced the

range of values to between $102 and $$112 per square foot. Sales #1 (adjusted price of $104.50

per square foot) and Sale 4 (adjusted price of $102.26 per square foot) were considered most

comparable to the subject, and we concluded at a unit value of $103 per square foot, which

resulted in a total value for the reported size of the subject building of 274,000 square feet at

roundly $28,200,000 on an as-stabilized basis.

4

The as-stabilized value estimate was reduced by the present value of the loss in income and the tenant improvement and leasing commission costs involved with obtaining a tenant for the building. The loss in income was calculated by comparing the estimated first three years actual income per the ARGUS analysis with the deflated stabilized (third year) cash flow amounts. The costs were taken directly from the ARGUS analysis, and totaled over $7 million for tenant improvements (based on an assumption of $25 per square foot) and almost $2 million for leasing commissions (based on $7 per square foot of lease area).

The total present value of the cost adjustment via this was $11,000,000, which was deducted from the as-stabilized value as shown above of $28,200,000 to result in an as-is value estimate via the sales comparison approach of $17,200,000.

The two approaches used were reconciled, with most weight on the income approach, to an as-is value of $15,000,000. As indicated previously, the complete, self-contained report is presented in its entirety as attached to this document.

**Part 2) Retrospective Value as of August 8, 2003**

**Introduction/Background**

I was asked to form an opinion of the retrospective market value of the marketable interest in the

subject property as of August 8, 2003. This "retrospective appraisal" is presented herein in

summary format, with the reader referenced to the "2004 appraisal" attached hereto. Even

though the 2004 appraisal has an effective date of value subsequent to the effective date of value

of this retrospective appraisal, the majority of information contained in the 2004 appraisal is still

relevant to this analysis, and, in the interest of economy, only those sections that are considered

significant to this retrospective appraisal will be laid out within the body of this report as

follows.

**Interest Appraised:**

The interest appraised as of the effective date of appraisal (August 8, 2003), is the leased fee

interest, due to the lease that was in place at the time to Equiserve. Leased fee interest is defined

as "An ownership interest held by a landlord with the right of use and occupancy conveyed by

lease to others. The rights of lessor (leased fee owner) and leased fee are specified by contract

terms contained within the lease" by the Appraisal Institute in its Dictionary of Real Estate

Appraisal.

6

**Summary of Lease:**

As of the effective date of appraisal, August 8, 2003, the former tenant in the building was still in occupancy. A summary of the lease is presented as follows:

| | |
|---|---|
| Landlord: | Royall Associated Realty Trust |
| Tenant: | The First National Bank of Boston |
| | (assigned through various entities, with the most recent being Equiserve) |
| Start Date: | August 1, 1989 |
| Term/End Date: | 10 Years / July 1, 1999 |
| Extensions: | Two five-year extensions at 90% of Fair Market Rent (as of 3 months prior to the commencement of the extenstion term) |
| Rent Schedule: | |
| | Years 1-5 $13.95 per rentable square foot |
| | Years 6-10 $17.75 per rentable square foot |
| Expense Basis: | NNN |
| Tenant Improvements: | $15.00 per rentable square foot |
| Leased Area: | 198,139 square feet (initially, subsequent Lease Amendments increased this amount - see below. |

Subsequent Amendments:

| Space/ Amend. # | Eff. Date | S.F. | Cumulative Occ. S.F. | Rent/ S.F. | Annual Rent |
|---|---|---|---|---|---|
| Original | 8/1/1989 | 198,139 | 198,139 | $17.75 | $3,516,967 |
| 1 | 1/30/1990 | 7,144 | 205,283 | $17.75 | $126,806 |
| 2 | 5/1/1993 | 13,903 | 219,186 | $4.00 | $55,612 |
| 3 | 11/1/1990 | 26,842 | 246,028 | $17.75 | $476,446 |
| 4 | 6/1/1994 | 5,293 | 251,321 | $17.75 | $93,951 |
| 5 | 8/12/1996 | 10,066 | 261,387 | $9.00 | $90,594 |
| 6 | 8/15/1997 | 1,924 | 263,311 | $9.00 | $17,316 |
| 7 | 4/3/2000 | No additions, place responsibility for operations on tenant. | | | |
| | | | Effective Rent as of 7/31/1999 | $16.63 | $4,377,692 |

| | |
|---|---|
| First Option Rent: | $15.30 per rentable square foot |
| August 1, 1999 - July 31, 2004 | |
| | (per rent payment request dated April 12, 2002 from property manager to tenant (Blue Hill Document #5267) |

This lease provides the rental revenue for the retrospective appraisal analysis for the period from August 2003 through July 31, 2004.

**Regional, Local Area & Neighborhood Data / Market Considerations**

The effective date of appraisal for this analysis (August 8, 2003) is roundly 13.5 months earlier than the 2004 appraisal attached. As of August 8, 2003, the general consideration was that the recession was over, but the overall regional and local economy had yet to "gain traction" for growth, as evidenced primarily by flat or negative job growth. In addition, the suburban office market had been negatively impacted during the early 2000's, with over 5.2 million square feet of negative absorption in 2001 and over 2.3 million square feet of negative absorption in 2002. With these statistics most recently available, the general outlook was for continued softness in the suburban office market that would extend through the next several years. This was a less favorable outlook, in general, than was alluded to in the 2004 appraisal report.

**Income Approach – As-Is (as of the effective date of appraisal, August 8, 2003)**

In this income approach, the cash flow was modified to begin as of the effective date of appraisal, August 8, 2003. The ARGUS lease by lease analysis program used for the original valuation was used as a basis for the analysis. As of the date of appraisal, the landlord was aware that the tenant would not be renewing their lease. This is in line with the analysis done for the original appraisal (the tenant had vacated the property), and I have assumed a similar lease-up date for the entire building as of March 1, 2006 subsequent to the current tenant vacating the property as of July 31, 2004. The rent for the re-leasing of the property was assumed to be at the same 10-year term, at $12.25 per square foot basis as used in the 2004 appraisal, with a $1.00 step as of the 6th year, on a triple net basis.

8

For building expenses, a similar level of expenses as in the 2004 appraisal were estimated, with the amounts adjusted downward for the difference in time by a 3% per year CPI assumption. The Equiserve lease calls for the building operating expenses to be reimbursed by the tenant, which I have accounted for. Subsequent to the tenant leaving, however, the reimbursement will cease until the building is re-leased. All other costs were adjusted as necessary as well. The adjusted cash flow is presented on the following page.

The following cash flow timing begins in August, 2003, corresponding to the effective date of appraisal. As the property was expected to be vacated in 1 year, then re-leased in March, 2006 (corresponding to the 2004 appraisal), the cash flow was extended out past the future lease turnover to estimate the reversion value of the property for the discounted cash flow analysis. Also, a direct capitalization analysis was not used for this valuation due to the expected severe variations in cash flow in the early years of the projections.

9

## Cash Flow Projection from ARGUS – (Start Date August 2003)

SCHEDULE OF PROSPECTIVE CASH FLOW
In Inflated Dollars for the Fiscal Year Beginning 8/1/2003

| For the Years Ending | Year 1 Jul-2004 | Year 2 Jul-2005 | Year 3 Jul-2006 | Year 4 Jul-2007 | Year 5 Jul-2008 | Year 6 Jul-2009 | Year 7 Jul-2010 | Year 8 Jul-2011 | Year 9 Jul-2012 | Year 10 Jul-2013 | Year 11 Jul-2014 | Year 12 Jul-2015 | Year 13 Jul-2016 | Year 14 Jul-2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **POTENTIAL GROSS REVENUE** | | | | | | | | | | | | | | |
| Base Rental Revenue | $4,028,658 | $3,235,181 | $3,295,167 | $3,356,500 | $3,356,500 | $3,356,500 | $3,356,500 | $3,356,500 | $3,355,500 | $3,355,500 | $3,356,500 | $3,356,500 | $3,911,175 | $4,687,720 |
| Absorption & Turnover Vacancy | | ($3,235,181) | ($1,896,625) | | | | | | | | | | ($3,171,930) | |
| Scheduled Base Rental Revenue | $4,028,658 | | $1,398,542 | $3,356,500 | $3,356,500 | $3,356,500 | $3,356,500 | $3,355,500 | $3,355,500 | $3,355,500 | $3,356,500 | $3,356,500 | $2,739,245 | $4,687,720 |
| Base Rental Step Revenue | | | | | | | | $114,167 | $274,000 | $274,000 | $274,000 | $274,000 | $159,833 | |
| **Expense Reimbursement Revenue** | | | | | | | | | | | | | | |
| Operating Expenses | $1,410,080 | | $716,831 | $1,932,913 | $2,121,195 | $2,184,831 | $2,250,376 | $2,317,887 | $2,387,424 | $2,459,046 | $2,532,818 | $2,609,802 | $1,803,041 | $2,512,671 |
| RE Taxes | $501,310 | | $140,347 | $431,172 | $559,438 | $620,313 | $649,147 | $688,621 | $688,680 | $709,340 | $730,620 | $752,539 | $678,955 | $798,389 |
| Management Fee | $128,260 | | $55,942 | $155,990 | $175,584 | $179,132 | $181,844 | $188,308 | $194,473 | $197,710 | $200,530 | $206,593 | $141,218 | $207,927 |
| Shuttle Bus | $71,229 | | $36,659 | $100,093 | $110,093 | $113,967 | $117,386 | $120,907 | $124,535 | $128,271 | $132,119 | $136,082 | $92,869 | $129,590 |
| Total Reimbursement Revenue | $2,108,879 | | $949,779 | $2,627,138 | $2,956,884 | $3,089,243 | $3,198,753 | $3,285,723 | $3,385,112 | $3,494,367 | $3,596,087 | $3,704,016 | $2,616,084 | $3,648,557 |
| **TOTAL POTENTIAL GROSS REVENUE** | $6,137,537 | | $2,348,321 | $5,983,638 | $6,323,384 | $6,454,743 | $6,555,253 | $6,766,390 | $7,025,612 | $7,124,867 | $7,226,587 | $7,334,516 | $5,515,162 | $8,336,277 |
| General Vacancy | ($306,877) | | ($59,708) | ($329,182) | ($316,168) | ($322,737) | ($327,763) | ($338,320) | ($351,281) | ($356,243) | ($361,329) | ($366,726) | | ($416,814) |
| Collection Loss | ($153,438) | | | ($149,591) | ($158,094) | ($161,369) | ($163,881) | ($169,160) | ($175,640) | ($178,122) | ($180,665) | ($183,363) | ($137,879) | ($208,407) |
| **EFFECTIVE GROSS REVENUE** | $5,677,222 | | $2,289,013 | $5,534,865 | $5,849,112 | $5,970,637 | $6,063,609 | $6,258,910 | $6,498,691 | $6,590,502 | $6,684,593 | $6,784,427 | $5,377,283 | $7,711,056 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | |
| Operating Expenses | $1,894,654 | $194,119 | $855,940 | $2,059,413 | $2,121,195 | $2,184,831 | $2,250,376 | $2,317,887 | $2,387,424 | $2,459,046 | $2,532,818 | $2,609,802 | $2,075,049 | $2,767,678 |
| RE Taxes | $553,723 | $335,250 | $295,774 | $432,000 | $600,319 | $606,417 | $649,147 | $688,621 | $688,680 | $709,340 | $730,620 | $752,539 | $775,115 | $798,389 |
| Management Fee | $170,317 | | $65,688 | $166,046 | $175,473 | $179,132 | $181,908 | $187,767 | $194,961 | $197,715 | $200,558 | $203,553 | $161,318 | $231,332 |
| Shuttle Bus | $98,309 | | $43,590 | $107,425 | $110,647 | $113,967 | $117,386 | $120,907 | $124,535 | $128,271 | $132,119 | $136,082 | $104,693 | $144,370 |
| **TOTAL OPERATING EXPENSES** | $2,717,003 | $529,369 | $1,367,392 | $2,764,884 | $3,007,634 | $3,084,364 | $3,198,817 | $3,295,182 | $3,395,600 | $3,496,372 | $3,596,095 | $3,700,956 | $3,116,175 | $3,941,749 |
| **NET OPERATING INCOME** | $2,960,219 | ($529,369) | $922,221 | $2,769,981 | $2,841,478 | $2,886,393 | $2,864,792 | $2,963,728 | $3,103,091 | $3,096,130 | $3,088,498 | $3,083,471 | $2,261,108 | $3,769,307 |
| **LEASING & CAPITAL COSTS** | | | | | | | | | | | | | | |
| Tenant Improvements | | $7,004,501 | | | | | | | | | | | $2,447,505 | |
| Leasing Commissions | | $1,961,260 | | | | | | | | | | | $2,635,769 | |
| Reserves | $52,937 | $56,160 | $54,525 | $57,845 | $59,581 | $61,368 | $63,209 | $65,106 | $67,059 | $69,071 | $71,143 | $73,277 | $75,475 | $77,739 |
| **TOTAL LEASING & CAPITAL COSTS** | $52,937 | $9,021,921 | $54,525 | $57,845 | $59,581 | $61,368 | $63,209 | $65,106 | $67,059 | $69,071 | $71,143 | $73,277 | $5,158,749 | $77,739 |
| **CASH FLOW BEFORE DEBIT SERVICE & TAXES** | $2,907,282 | ($9,551,290) | $867,696 | $2,712,136 | $2,781,897 | $2,824,935 | $2,801,583 | $2,898,622 | $3,036,032 | $3,027,059 | $3,017,355 | $3,010,194 | ($2,897,641) | $3,691,568 |

**Discounted Cash Flow Analysis**

The following table summarizes then-current discount and capitalization rates as obtained

from investment surveys for that time period (August, 2003).

**Summary of Investment Rates**

Korpacz Survey of Real Estate Investors
Second Quarter, 2003

|  |  | Discount Rates | Going In Cap. Rates | Rev. Cap. Rates |
|---|---|---|---|---|
| Suburban Offices | Range | 9.50% - 13.00% | 8.00% - 12.00% | 8.75% - 12.00% |
|  | Average | 11.13% | 9.80% | 9.90% |
| Boston Offices | Range | 9.00% - 13.00% | 7.25% - 11.25% | 8.00% - 11.00% |
|  | Average | 11.01% | 9.25% | 9.43% |

RERC Real Estate Investment Survey
Spring 2003

|  |  | Discount Rates | Going In Cap. Rates | Rev. Cap. Rates |
|---|---|---|---|---|
| Suburban Offices | Range | 10.00% - 12.00% | 9.00% - 10.00% | 9.30% - 10.50% |
|  | Average | 11.40% | 9.50% | 9.90% |

These rates were generally in line with those as outlined in the 2004 appraisal report, with

the rates in the 2004 appraisal report being slightly lower as investors lowered their return

requirements over the time difference. However, it was known that the only tenant would

be vacating in one year's time, and there were no definitive prospects for the releasing of

the subject building at this time. Based on this, I have used a discount rate of 12.25% and

a reversionary capitalization rate of 10.0% for the discounted cash flow analysis, as

summarized in the following table.

### Discounted Cash Flow Analysis

| Year # | Fiscal Year | Cash Flow | Reversion Cap Rate | Cost of Sale | Net Reversion | Discount Rate 12.25% | PV of Cash Flow & Reversion |
|---|---|---|---|---|---|---|---|
| 1 | 2004 | $2,907,282 | | | | 0.89087 | $2,590,006 |
| 2 | 2005 | ($583,894) | | | | 0.79365 | ($463,406) |
| 3 | 2006 | ($8,099,701) | | | | 0.70704 | ($5,726,773) |
| 4 | 2007 | $2,712,136 | | | | 0.62988 | $1,708,308 |
| 5 | 2008 | $2,781,897 | | | | 0.56114 | $1,561,023 |
| 6 | 2009 | $2,824,935 | | | | 0.49990 | $1,412,181 |
| 7 | 2010 | $2,801,583 | | | | 0.44534 | $1,247,668 |
| 8 | 2011 | $2,898,622 | | | | 0.39674 | $1,150,008 |
| 9 | 2012 | $3,036,032 | | | | 0.35345 | $1,073,073 |
| 10 | 2013 | $3,027,059 | | | | 0.31487 | $953,142 |
| 11 | 2014 | $3,017,355 | | | | 0.28051 | $846,402 |
| 12 | 2015 | $3,010,194 | | | | 0.24990 | $752,243 |
| 13 | 2016 | ($2,897,641) | | | | 0.22263 | ($645,093) |
| 13 | 2016 | $3,691,568 | 10.00% | 2.00% | $36,177,366 | 0.22263 | $8,054,052 |
| | | | | | | | $14,512,834 |

Rounded Value:  $ 14,500,000

As shown, the estimated value via the income approach for the subject property is roundly $14,500,000.

I did not perform either a sales comparison approach nor a cost approach for this valuation analysis, due to the specified use of the appraisal and the widely varying incomes expected at the subject (no comparable sales with similar income patterns were found), and the fact that the income approach is the best methodology to arrive at a value for an income producing property such as the subject.

### 3) Impact of Adjacent Parking Garage on Subject Property

I was asked to form an opinion on the impact of the construction of a parking garage that was built at 250 Royall Street, the adjacent property to the west, which partially blocked the view of the subject from Route 128 (also known in the area as either I-93 to the east

12

or I-95 to the west). I drove the interstate highway system in both directions, and was able to view the subject building's southwestern corner from both directions. However, it is apparent that the new parking garage at the adjacent property did obstruct a portion of the subject's view from the highway, and conversely from the building to the highway.

I also reviewed the minutes of a meeting of the Canton Zoning Board of Appeals dated May 22, 2003, as well as the Complaint filed with the Superior Court of Massachusetts on June 9, 2003 concerning this issue.

In my professional opinion, any structure that is built that interferes with the view of another structure from a major highway, or any structure that add significantly to the traffic congestion in an area, will have a detrimental impact on the value of the existing structure. However, it is extremely difficult to accurately measure the impact. My opinion is based upon the general sum of my experience in the valuation and analysis of real estate and real estate markets, and not upon any single event. The portion of my experience that directly forms my opinion on this matter comes primarily from various discussions with other real estate professionals.

The construction of the garage adjacent to the subject property will have a negative impact on the subject due to the following factors:

1) Lack of visibility from a highway result in less exposure for any exterior signs advertising the tenant/company occupying the subject building, resulting in the loss of recognition from the passing public. Also, the lack of a view of the

13

building from a highway makes finding the building more difficult for
potential customers and/or new or potential employees.

2) The obstruction caused by the construction of a nearby building can
negatively impact the subject building tenants by creating a less desirable
view resulting in less employee satisfaction. Also, in the case of the subject,
the view of the major intersection of I-95 and I-93 was blocked. This
intersection's congestion causes many traffic back ups in the local area, and
without a view of the intersection, it becomes more difficult for the employees
in the subject building to getting caught in this traffic.

3) Finally, the construction of the garage, according to the documents reviewed,
would add significantly more cars to the adjacent site than current zoning
requires. This excess capacity, if allowed, would increase traffic congestion in
the area due to the higher number of cars in the immediate area.

These issues all negatively impacted the value of the subject building, and this was
alluded to in the Complaint filed with the court by the subject property's owner (page 8,
paragraph 37).

**Qualifications of Eric Stotz, Publications, other Work, and Compensation**

Currently, I am President and Principal of SCA (Stotz Commercial Appraisal, Inc.),
which I formed in September 2005, and am active in the appraisal of all types of real
estate. I have a Bachelor of Science from the Whittemore School of Business at the
University of New Hampshire in 1981. I worked for the Sheraton Hotel Corporation in

14

various management positions in New York City for over three years, and then worked

for Pannell Kerr Forster, an accounting firm, primarily providing consulting services and

appraisal services for hotels and other types of property from 1984 through 1991. I have

been actively involved in the appraisal of real estate since 1986. I was admitted to

membership in the Appraisal Institute (MAI designation) in 1992. I was a senior

employee or partner in the firm of Bonz and Company, Inc. (and predecessor firms) from

1991 through September 2005, where I managed a staff of up to 8 appraisal professionals.

During my career, I have appraised numerous office buildings, as well as numerous other

property types.


I have not published any professional papers in the preceding ten years, and I have not

acted as an expert witness at trial or deposition in the previous four years. My

compensation for this work is $125 per hour for non-deposition or trial time, and $250

per hour for time being deposed or during trial testimony.


Signed:


Eric S. Stotz, MAI

Date: March 31, 2006

EXHIBIT B

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

Page 86

1  subject building. And then subsequent to that we
2  went to the exterior, and I think we drove around it
3  because it was -- you know, it's a pretty big
4  building. So we drove around it and toured the
5  exterior of the building as well.
6      Q. Do you know what time of day it was?
7      A. I believe it was morning, maybe 9 o'clock,
8  9:30.
9      Q. And you drove -- where were you coming
10  from?
11      A. Probably the city, from our offices.
12          MR. FALBY: Use your memory. Don't
13  guess.
14          THE WITNESS: Okay.
15      A. My best recollection is we came from the
16  city.
17      Q. All right. So you come down what, the
18  Expressway, and then up 95?
19      A. I don't recall which direction we went, if
20  it was that way or out the Turnpike or down 128,
21  which would be the longer way, but...
22      Q. Did you get stuck in any traffic jams, or
23  did you experience any congestion?
24      A. I think the normal backups -- if it was --

Page 87

1          MR. FALBY: If you don't remember which
2  way you came --
3      A. Yeah. So, no, I don't recall.
4      Q. You toured the exterior of the building?
5      A. Yes.
6      Q. Did you look next door at 250 Royall?
7      A. Yes.
8      Q. Did you see the garage?
9      A. Yes.
10      Q. How come that's not mentioned here?
11      A. It's not part of the subject property.
12      Q. Okay. How come -- you will agree with me
13  that in your October 18, 2004 report, there is not
14  one single mention of the garage over at 250 Royall,
15  correct?
16      A. I can't say that with certainty, if it was
17  part of the property there. I'm not sure if it was
18  mentioned in the sale write-up or the information
19  used in the sales comparison approach. I mean, I
20  can spend some time looking for it, but --
21      Q. You can do that, but you can do that at the
22  break. But you will agree with me that the presence
23  of the garage did not factor into the value that you
24  arrived at as of October 18, 2004, correct?

Page 88

1      A. No, it was an adjacent property that was
2  existing at the time of the appraisal.
3      Q. And you didn't factor in any congestion
4  that would have reportedly resulted from the
5  presence of this garage next door?
6      A. No, not at this time, no.
7      Q. But you did in your rebuttal report -- I'm
8  sorry, you did in your expert report, correct?
9          MR. FALBY: Objection to that
10  characterization of what he did in his report.
11          MR. MCGLYNN: Well, we will get to that.
12      Q. But you will agree with me, sir, that in
13  your expert report you have indicated that there
14  would be a decline, a diminution in the value of 150
15  Royall because of the existence of the garage; isn't
16  that correct?
17      A. Yes, I stated that, yes.
18      Q. But you can't quantify it?
19      A. Right.
20      Q. And nothing had changed in terms of the
21  site or the building, the garage on the adjacent
22  site, between the time that you inspected the
23  property on October 18, 2004, and the date that you
24  issued your expert report, correct?

Page 89

1          MR. FALBY: I'll object. I didn't
2  understand that question. You can answer.
3      A. Okay. That's correct, but in my expert
4  report I was asked to give an opinion of the impact
5  of the construction of the garage, since it was
6  existing at the time of the October 2004 report, it
7  was there, and I was not -- it in no way -- it
8  existed at the time, and I appraised the subject
9  property with that garage there, and that was it.
10          In my expert report, I was asked to give
11  an opinion on the impact of the construction of the
12  garage. So you look at the subject property before
13  it was built and after it was built. It's a
14  separate exercise.
15      Q. I'm not sure I understand what you are
16  saying. Are you saying you are -- putting aside
17  your modification valuation, your valuation as of
18  October 18, 2004, was that this building was worth
19  15 million bucks?
20      A. Yes.
21      Q. And you considered all those things that
22  needed to be considered in order to arrive at that
23  figure of 15 million, correct?
24      A. Yes.

23 (Pages 86 to 89)

02130b7b-15ad-4c00-9a36-484780af018e

Eric S. Stotz, MAI
Volume 1 – April 21, 2006

Page 90

1    Q. And you indicate on page 35 that there were
2  no physical factors that are noted that would
3  negatively impact on the value, correct?
4    A. Beyond what was appraised.
5    Q. Where does it say "beyond what was
6  appraised"?
7    A. From my point of view, it's understood from
8  the statement.
9    Q. I understand, but, you know, you will agree
10  with me that the reader may not have the benefit of
11  what's in your mind, only what you have written,
12  correct?
13      MR. FALBY: Objection.
14    A. Correct.
15    Q. Now, sir, in your expert report you're
16  saying that the presence of the garage would result
17  in some unquantified reduction in the value of 150
18  Royall Street, correct?
19    A. Yes.
20    Q. Now, just so I understand what you are
21  saying, you mean that it would be a reduction in the
22  value that you determined as of October 18, 2004, to
23  be $15 million?
24    A. No.

Page 91

1    Q. So you're saying that it would just have
2  some effect, adverse effect, on the value of the
3  property?
4      MR. FALBY: I object to your
5  characterization which implies two alternatives, and
6  I don't think you can characterize the actual facts.
7      MR. MCGLYNN: Bruce, all I need you to
8  do is say your objection, and we will move on.
9    Q. Now, sir, can I have an answer to my
10  question?
11    A. My expert report, I think it states the
12  opinion that the construction of the garage had a
13  negative impact on the value of the subject
14  property.
15    Q. And -- have you finished your answer?
16    A. Yes.
17    Q. And that negative impact would have been
18  included in your valuation as of October 18, 2004,
19  correct?
20    A. The garage was existing at the time of my
21  appraisal, as of October 2004, and it was considered
22  in the appraisal.
23    Q. And how do you know it was considered in
24  the appraisal?

Page 92

1    A. Because it was existing. It's part of the
2  office park, it's part of the neighborhood.  It --
3    Q. Have you finished your answer?
4    A. Yes.
5    Q. All right.  But you will agree with me that
6  you don't point out the presence of this garage in
7  your October 18, 2004 report, correct?
8      MR. FALBY: Objection. I think that you
9  have asked that and he's answered it and he said he
10  thinks he talks about it in some place.
11      MR. MCGLYNN: We will get to that.
12    Q. But I just need an answer to my question.
13      MR. FALBY: You keep asking the same
14  question. Do you expect to get a different answer?
15  Objection.
16    A. No.
17      MR. FALBY: Well, don't say no.  You
18  said you talked about it in another place, right?
19      THE WITNESS: Yes, I could have.
20      MR. FALBY: Or may have.
21      MR. MCGLYNN: Bruce, I have to put you
22  under oath and start asking you questions.
23    Q. Now, sir, take a look, if you would, at
24  your rebuttal report.

Page 93

1      MR. FALBY: I will just note for the
2  record your questions are unfair; and unlike some
3  experts, Mr. Stotz is not a professional expert.  He
4  doesn't have experience with people asking unclear
5  questions.
6    Q. Do you have your rebuttal report there,
7  sir?
8    A. Yes.
9    Q. All right.  Would you turn to page 12, 13,
10  and 14, in particular 13 at the top.  You say at the
11  top -- I'm not going to read the whole thing, but if
12  you want to read it into the record --
13      MR. FALBY: Are you in the rebuttal
14  report to which you referred Mr. Stotz?
15      MR. MCGLYNN: He's got it.  You don't
16  have a copy?
17      MR. FALBY: It doesn't look like you are
18  in it, but whatever.
19      MR. MCGLYNN: I'm sorry, the expert
20  report, not the rebuttal report.
21    Q. Okay, sorry, and at page 13 --
22    A. Yes.
23    Q. -- you say, "it is apparent that the new
24  parking garage at the adjacent property did obstruct

24 (Pages 90 to 93)

02130b7b-15ad-4c00-9a36-484780af018e

# EXHIBIT C

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

---

Page 94

1  a portion of the subject's view from the highway,
2  and conversely from the building to the highway,"
3  correct?
4      A.  Yes.
5      Q.  You will agree with me that that's your
6  finding, correct?
7      A.  Yes.
8      Q.  And that's not contained in your October 18
9  report, correct?
10     A.  Not those words, no.
11     Q.  Not anything relating to the garage
12  obstructing the view of the building from the
13  highway, correct?
14         MR. FALBY:  Objection, mischaracterizes
15  his testimony.
16     Q.  You may answer.
17     A.  That's correct, nothing about that.
18     Q.  And going on, you say, "In my professional
19  opinion" -- page 13 -- "any structure that is built
20  that interferes with the view of another structure
21  from a major highway, or any structure that adds
22  significantly to the traffic congestion in an area,
23  will have a detrimental impact on the value of the
24  existing structure"; do you see that?

---

Page 95

1      A.  Yes.
2      Q.  You will agree with me that neither that
3  statement nor anything similar to that was contained
4  in your October 18 report?
5      A.  That's true.
6      Q.  Did you observe -- strike that.  Did you do
7  any traffic studies with respect to your
8  professional opinion as expressed on page 13 of your
9  expert report?
10     A.  No.
11     Q.  Did you consult with a traffic consultant?
12     A.  No.
13     Q.  Did you stand out there during rush hour
14  and see what the alleged traffic congestion in the
15  area was?
16     A.  No.  My primary source for that statement,
17  which refers to before the garage was built and then
18  after the garage was built, the fact that it would
19  add traffic, came from the complaint that was filed
20  by the subject building owners during that -- during
21  the process of approving the garage with the town of
22  Canton where they did state that the increased
23  traffic would have a detrimental effect on their
24  building.

---

Page 96

1      Q.  So you relied on what was contained in a
2  complaint, correct?
3      A.  And my general experience in those matters.
4      Q.  Well, I'm just looking at what you say.
5  You say "in my professional opinion."  Is that what
6  you said?
7      A.  Yes.
8      Q.  All right.  You don't say "in my
9  professional opinion, I can read what's contained in
10  a complaint," do you?
11         MR. FALBY:  Objection.  It says what it
12  says, and you just mischaracterized what he said,
13  and it's unfair to the witness.
14         MR. MCGLYNN:  No, it's not unfair.
15  These are perfectly legitimate questions.
16         MR. FALBY:  No, they're not legitimate
17  questions.  You are arguing with the witness.
18         MR. MCGLYNN:  I'm cross-examining the
19  witness.
20         MR. FALBY:  You are arguing with him to
21  no effect, no point.
22         MR. MCGLYNN:  Well, we will let the
23  record decide that.
24     Q.  Your statement here is it's in your

---

Page 97

1  professional opinion, correct?
2      A.  Yes.
3      Q.  You also indicate --
4         MR. FALBY:  Let me just note for the
5  record that you have just established something.  In
6  his professional opinion, any structure that adds
7  significantly to the traffic congestion will have an
8  impact, and he said that he relied, for a portion of
9  that, that it would have an impact, on the
10  statements of your clients.
11         MR. MCGLYNN:  Bruce, you know the rules.
12  Make your objection, no coaching of the witness.
13         MR. FALBY:  I'm actually not coaching
14  the witness.  What I am trying to do is just make
15  sure that the record is clear.
16         MR. MCGLYNN:  Well, you know what?  You
17  will have plenty of time to redirect this witness
18  after I finish, but no more coaching.
19         MR. FALBY:  I'm not coaching, Peter.
20  I'd appreciate it if you would stop
21  mischaracterizing what he says, which is what you
22  are doing.
23     Q.  All right.  Let's go on, sir.  You also
24  indicate on page 14, Paragraph No. 2, that "the

---

FARMER ARSENAULT BROCK LLC

02130b7b-15ad-4c00-9a36-484780af018e

# EXHIBIT D

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

---

**Page 94**

1 a portion of the subject's view from the highway,
2 and conversely from the building to the highway,"
3 correct?
4    A. Yes.
5    Q. You will agree with me that that's your
6 finding, correct?
7    A. Yes.
8    Q. And that's not contained in your October 18
9 report, correct?
10    A. Not those words, no.
11    Q. Not anything relating to the garage
12 obstructing the view of the building from the
13 highway, correct?
14       MR. FALBY: Objection, mischaracterizes
15 his testimony.
16    Q. You may answer.
17    A. That's correct, nothing about that.
18    Q. And going on, you say, "In my professional
19 opinion" -- page 13 -- "any structure that is built
20 that interferes with the view of another structure
21 from a major highway, or any structure that adds
22 significantly to the traffic congestion in an area,
23 will have a detrimental impact on the value of the
24 existing structure"; do you see that?

---

**Page 95**

1    A. Yes.
2    Q. You will agree with me that neither that
3 statement nor anything similar to that was contained
4 in your October 18 report?
5    A. That's true.
6    Q. Did you observe -- strike that. Did you do
7 any traffic studies with respect to your
8 professional opinion as expressed on page 13 of your
9 expert report?
10    A. No.
11    Q. Did you consult with a traffic consultant?
12    A. No.
13    Q. Did you stand out there during rush hour
14 and see what the alleged traffic congestion in the
15 area was?
16    A. No. My primary source for that statement,
17 which refers to before the garage was built and then
18 after the garage was built, the fact that it would
19 add traffic, came from the complaint that was filed
20 by the subject building owners during that -- during
21 the process of approving the garage with the town of
22 Canton where they did state that the increased
23 traffic would have a detrimental effect on their
24 building.

---

**Page 96**

1    Q. So you relied on what was contained in a
2 complaint, correct?
3    A. And my general experience in those matters.
4    Q. Well, I'm just looking at what you say.
5 You say "in my professional opinion." Is that what
6 you said?
7    A. Yes.
8    Q. All right. You don't say "in my
9 professional opinion, I can read what's contained in
10 a complaint," do you?
11       MR. FALBY: Objection. It says what it
12 says, and you just mischaracterized what he said,
13 and it's unfair to the witness.
14       MR. MCGLYNN: No, it's not unfair.
15 These are perfectly legitimate questions.
16       MR. FALBY: No, they're not legitimate
17 questions. You are arguing with the witness.
18       MR. MCGLYNN: I'm cross-examining the
19 witness.
20       MR. FALBY: You are arguing with him to
21 no effect, no point.
22       MR. MCGLYNN: Well, we will let the
23 record decide that.
24    Q. Your statement here is it's in your

---

**Page 97**

1 professional opinion, correct?
2    A. Yes.
3    Q. You also indicate --
4       MR. FALBY: Let me just note for the
5 record that you have just established something. In
6 his professional opinion, any structure that adds
7 significantly to the traffic congestion will have an
8 impact, and he said that he relied, for a portion of
9 that, that it would have an impact, on the
10 statements of your clients.
11       MR. MCGLYNN: Bruce, you know the rules.
12 Make your objection, no coaching of the witness.
13       MR. FALBY: I'm actually not coaching
14 the witness. What I am trying to do is just make
15 sure that the record is clear.
16       MR. MCGLYNN: Well, you know what? You
17 will have plenty of time to redirect this witness
18 after I finish, but no more coaching.
19       MR. FALBY: I'm not coaching, Peter.
20 I'd appreciate it if you would stop
21 mischaracterizing what he says, which is what you
22 are doing.
23    Q. All right. Let's go on, sir. You also
24 indicate on page 14, Paragraph No. 2, that "the

---

25 (Pages 94 to 97)

02130b7b-15ad-4c00-9a36-484780af018e

EXHIBIT E

# Eric S. Stotz, MAI
## Volume 1 – April 21, 2006

1    MR. MCGLYNN: I didn't say on the
2 original exhibit.
3    Q. Did you conduct any measurements to
4 determine how much of the view from 150 Royall was
5 obstructed by this garage?
6    A. No.
7    Q. Did you get up on the second floor of 150
8 Royall to see whether or not the view from the
9 top -- the second floor of 150 Royall was obstructed
10 by the garage?
11    A. During the tour we were on the second
12 floor, but I do not recall if we were in the exact
13 corner or the area where the view was obstructed.
14    Q. You knew there were trees there as well,
15 correct?
16    A. I don't know that.
17    Q. There were trees that were on -- in front
18 of -- strike that -- in between 150 Royall and Route
19 95?
20    A. What period of time are you talking?
21    Q. When you did your field work.
22    A. There are trees to the south, I believe. I
23 don't believe there are trees or substantial trees
24 between the subject property and the parking garage.

1    Q. Take a look at page 40 of your October
2 report.
3    A. Uh-huh.
4    Q. Exhibit 16. Do you see that?
5    A. Yes.
6    Q. Do you see where it shows little black
7 arrows?
8    A. Yes.
9    Q. What's the squiggly marking on the adjacent
10 lot? What does that signify?
11    A. That signifies some kind of growth.
12    Q. Some kind of growth. All right. And that
13 growth is in between the building and Route 128,
14 correct?
15    MR. FALBY: Tiny little bushes.
16    A. To the -- I'd call that the southwest, yes.
17    Q. Would those have an impact on -- how do you
18 describe it?
19    MR. MCGLYNN: I'm going to try and find
20 his exact language in his expert report.
21    MR. FALBY: Employee satisfaction?
22    Q. -- employee satisfaction?
23    MR. MCGLYNN: Thank you, Bruce.
24    A. You are asking me if a view of trees would

1 have an impact on employee satisfaction?
2    Q. Yes.
3    A. Compared to a view of the garage?
4    Q. No trees.
5    A. No trees?
6    MR. FALBY: Object to the ambiguity of
7 the question.
8    Q. You may answer.
9    A. I have not -- I'd need to consider that a
10 little further, I think, before I answer that
11 question. It's not something I'd want to answer off
12 the top of my head.
13    Q. So is it your testimony today, sir, that if
14 the garage was not there, that your valuation of the
15 building as of October 18, 2004, would be greater
16 than $15 million?
17    A. I can't say that with any certainty because
18 that wasn't the case as of that date.
19    Q. Well, the garage was there at the time,
20 correct?
21    A. Yes, but you are asking me to assume
22 something that was not in place. I don't really
23 know the true extent that -- you know, what was
24 there in place of the garage prior to that, so it's

1 difficult for me to say the impact on my estimate if
2 the garage wasn't there.
3    Q. So what you are saying in your expert
4 report, at least as it relates to this garage, is
5 that it had a negative impact, correct?
6    A. Yes.
7    Q. You just can't quantify it?
8    A. That's correct.
9    Q. And you can't tell us whether or not it
10 would mean that the -- that without the garage, the
11 building would have been worth more than the $15
12 million that you valued it as of October 18, 2004?
13    A. That's correct, I couldn't opine.
14    Q. And your discussions or conversations with
15 Polcari -- excuse me, with Donovan and Needle, they
16 are not reflected in any notes or memoranda or
17 minutes that you or anybody at Bonz & Company
18 prepared, correct?
19    MR. FALBY: Objection, asked and
20 answered.
21    A. The -- I will say that my recollection of
22 the -- after I looked through the workpapers that
23 were provided by Bonz & Company in association with
24 the 2004 report, I did see a sheet recording some

02130b7b-15ad-4c00-9a36-484780af018e

EXHIBIT F

Eric S. Stotz, MAI
Volume 1 – April 21, 2006

Page 98

1  obstruction caused by construction of the -- by the
2  construction of a nearby building can negatively
3  impact the subject building tenants by creating a
4  less desirable view, resulting in less employee
5  satisfaction," correct?
6      A. Yes.
7      Q. And is that your professional opinion?
8      A. Yes.
9      Q. And do you consider yourself an expert on
10  employee satisfaction?
11      A. Having been responsible for the
12  satisfaction of employees at Bonz & Company, I think
13  I have some experience in that.
14      Q. And what studies have you done, sir, to
15  determine that, whether or not employees are going
16  to be more or less satisfied because their
17  building -- strike that -- their view of a highway
18  may be partially obstructed?
19      A. During the peak of the market in 2000, we
20  were forced to move from some office space in our
21  offices in downtown Boston, from a 4th floor space
22  to a basement space and therefore gave up views; and
23  based on the feedback from the employees in my
24  company, the next lease we signed was for a space on

Page 99

1  the 3rd and 4th floors of a building with air and --
2  you know, light and views. That's one portion of
3  what forms my opinion.
4      Q. What's the other portion?
5      A. General conversations with those in real
6  estate. Again, you know, talking with brokers,
7  views with -- buildings with views -- employers who
8  move into those buildings are willing to pay higher
9  rents because -- there are of a number of factors
10  which include employee satisfaction.
11      Q. By the way, this building, or at least at
12  the time you made your inspection in October of '04,
13  this was a Class A building so-called, correct?
14      MR. FALBY: Objection.
15      Q. You may answer.
16      A. I would not classify it as a Class A
17  building.
18      Q. What would you classify it as?
19      A. Class B.
20      Q. This was a Class B building. What is the
21  difference between an A and B building?
22      A. In this case the primary difference is the
23  age of the base building. I believe in a number of
24  places Class A buildings are defined as buildings

Page 100

1  that are recently constructed. The age of this
2  building, that it's -- it was basically rebuilt in
3  the mid-'80s or 1984 or '85, it's 20 years old or
4  more -- makes it impossible to classify it as a
5  Class A building because of that factor.
6      Q. So your determination of whether it's a
7  Class A or Class B building is just by age alone?
8      A. That's the primary factor in this case.
9      Q. So would the White House be a Class A or
10  Class B building?
11      A. Class B.
12      Q. It would?
13      A. Yes.
14      Q. In your professional opinion?
15      A. Yes.
16      Q. The BankBoston building or what was the
17  BankBoston building, that was built in the '70s,
18  right?
19      A. Right.
20      Q. Is that a Class A or B?
21      A. Well, it's a different story with downtown
22  buildings. With a highrise building like that, you
23  might be able to classify that as a Class A
24  building.

Page 101

1      Q. You might?
2      A. Yes, it's not an exact science.
3      Q. Do you indicate anywhere in your October
4  18, 2004 report whether this building, the subject
5  building at 150 Royall, was a Class A or Class B
6  building?
7      A. I believe I do, but I'd have to review the
8  report and find it.
9      Q. If you could just make a note of that. I
10  would like you to do that at the break, and I will
11  make a note of it as well to remind you. Now, with
12  respect to --
13      MR. FALBY: You didn't make a note.
14      MR. MCGLYNN: Huh?
15      MR. FALBY: You didn't make a note.
16      MR. MCGLYNN: See that little star
17  (indicating)?
18      MR. FALBY: Okay, let the record reflect
19  you made a note.
20      MR. MCGLYNN: Don't write on the
21  exhibit, please.
22      THE WITNESS: Oh, okay.
23      MR. FALBY: You told him to make a note
24  of it.

FARMER ARSENAULT BROCK LLC

02130b7b-15ad-4c00-9a36-484780af018e

EXHIBIT G

Eric S. Stotz, MAI
Volume 1 - April 21, 2006

Page 86

1  subject building. And then subsequent to that we
2  went to the exterior, and I think we drove around it
3  because it was -- you know, it's a pretty big
4  building. So we drove around it and toured the
5  exterior of the building as well.
6      Q. Do you know what time of day it was?
7      A. I believe it was morning, maybe 9 o'clock,
8  9:30.
9      Q. And you drove -- where were you coming
10  from?
11     A. Probably the city, from our offices.
12         MR. FALBY: Use your memory. Don't
13  guess.
14         THE WITNESS: Okay.
15     A. My best recollection is we came from the
16  city.
17     Q. All right. So you come down what, the
18  Expressway, and then up 95?
19     A. I don't recall which direction we went, if
20  it was that way or out the Turnpike or down 128,
21  which would be the longer way, but...
22     Q. Did you get stuck in any traffic jams, or
23  did you experience any congestion?
24     A. I think the normal backups -- if it was --

Page 87

1         MR. FALBY: If you don't remember which
2  way you came --
3      A. Yeah. So, no, I don't recall.
4      Q. You toured the exterior of the building?
5      A. Yes.
6      Q. Did you look next door at 250 Royall?
7      A. Yes.
8      Q. Did you see the garage?
9      A. Yes.
10     Q. How come that's not mentioned here?
11     A. It's not part of the subject property.
12     Q. Okay. How come -- you will agree with me
13  that in your October 18, 2004 report, there is not
14  one single mention of the garage over at 250 Royall,
15  correct?
16     A. I can't say that with certainty, if it was
17  part of the property there. I'm not sure if it was
18  mentioned in the sale write-up or the information
19  used in the sales comparison approach. I mean, I
20  can spend some time looking for it, but --
21     Q. You can do that, but you can do that at the
22  break. But you will agree with me that the presence
23  of the garage did not factor into the value that you
24  arrived at as of October 18, 2004, correct?

Page 88

1      A. No, it was an adjacent property that was
2  existing at the time of the appraisal.
3      Q. And you didn't factor in any congestion
4  that would have reportedly resulted from the
5  presence of this garage next door?
6      A. No, not at this time, no.
7      Q. But you did in your rebuttal report -- I'm
8  sorry, you did in your expert report, correct?
9         MR. FALBY: Objection to that
10  characterization of what he did in his report.
11        MR. MCGLYNN: Well, we will get to that.
12     Q. But you will agree with me, sir, that in
13  your expert report you have indicated that there
14  would be a decline, a diminution in the value of 150
15  Royall because of the existence of the garage; isn't
16  that correct?
17     A. Yes, I stated that, yes.
18     Q. But you can't quantify it?
19     A. Right.
20     Q. And nothing had changed in terms of the
21  site or the building, the garage on the adjacent
22  site, between the time that you inspected the
23  property on October 18, 2004, and the date that you
24  issued your expert report, correct?

Page 89

1         MR. FALBY: I'll object. I didn't
2  understand that question. You can answer.
3      A. Okay. That's correct, but in my expert
4  report I was asked to give an opinion of the impact
5  of the construction of the garage, since it was
6  existing at the time of the October 2004 report, it
7  was there, and I was not -- it in no way -- it
8  existed at the time, and I appraised the subject
9  property with that garage there, and that was it.
10        In my expert report, I was asked to give
11  an opinion on the impact of the construction of the
12  garage. So you look at the subject property before
13  it was built and after it was built. It's a
14  separate exercise.
15     Q. I'm not sure I understand what you are
16  saying. Are you saying you are -- putting aside
17  your modification valuation, your valuation as of
18  October 18, 2004, was that this building was worth
19  15 million bucks?
20     A. Yes.
21     Q. And you considered all those things that
22  needed to be considered in order to arrive at that
23  figure of 15 million, correct?
24     A. Yes.

FARMER ARSENAULT BROCK LLC

02130b7b-15ad-4c00-9a36-484780af018e

EXHIBIT H

# Eric S. Stotz, MAI
## Volume 1 – April 21, 2006

### Page 98

1  obstruction caused by construction of the -- by the
2  construction of a nearby building can negatively
3  impact the subject building tenants by creating a
4  less desirable view, resulting in less employee
5  satisfaction," correct?
6     A. Yes.
7     Q. And is that your professional opinion?
8     A. Yes.
9     Q. And do you consider yourself an expert on
10 employee satisfaction?
11    A. Having been responsible for the
12 satisfaction of employees at Bonz & Company, I think
13 I have some experience in that.
14    Q. And what studies have you done, sir, to
15 determine that, whether or not employees are going
16 to be more or less satisfied because their
17 building -- strike that -- their view of a highway
18 may be partially obstructed?
19    A. During the peak of the market in 2000, we
20 were forced to move from some office space in our
21 offices in downtown Boston, from a 4th floor space
22 to a basement space and therefore gave up views; and
23 based on the feedback from the employees in my
24 company, the next lease we signed was for a space on

### Page 99

1  the 3rd and 4th floors of a building with air and --
2  you know, light and views. That's one portion of
3  what forms my opinion.
4     Q. What's the other portion?
5     A. General conversations with those in real
6  estate. Again, you know, talking with brokers,
7  views with -- buildings with views -- employers who
8  move into those buildings are willing to pay higher
9  rents because -- there are of a number of factors
10 which include employee satisfaction.
11    Q. By the way, this building, or at least at
12 the time you made your inspection in October of '04,
13 this was a Class A building so-called, correct?
14    MR. FALBY: Objection.
15    Q. You may answer.
16    A. I would not classify it as a Class A
17 building.
18    Q. What would you classify it as?
19    A. Class B.
20    Q. This was a Class B building. What is the
21 difference between an A and B building?
22    A. In this case the primary difference is the
23 age of the base building. I believe in a number of
24 places Class A buildings are defined as buildings

### Page 100

1  that are recently constructed. The age of this
2  building, that it's -- it was basically rebuilt in
3  the mid-'80s or 1984 or '85, it's 20 years old or
4  more -- makes it impossible to classify it as a
5  Class A building because of that factor.
6     Q. So your determination of whether it's a
7  Class A or Class B building is just by age alone?
8     A. That's the primary factor in this case.
9     Q. So would the White House be a Class A or
10 Class B building?
11    A. Class B.
12    Q. It would?
13    A. Yes.
14    Q. In your professional opinion?
15    A. Yes.
16    Q. The BankBoston building or what was the
17 BankBoston building, that was built in the '70s,
18 right?
19    A. Right.
20    Q. Is that a Class A or B?
21    A. Well, it's a different story with downtown
22 buildings. With a highrise building like that, you
23 might be able to classify that as a Class A
24 building.

### Page 101

1     Q. You might?
2     A. Yes, it's not an exact science.
3     Q. Do you indicate anywhere in your October
4  18, 2004 report whether this building, the subject
5  building at 150 Royall, was a Class A or Class B
6  building?
7     A. I believe I do, but I'd have to review the
8  report and find it.
9     Q. If you could just make a note of that. I
10 would like you to do that at the break, and I will
11 make a note of it as well to remind you. Now, with
12 respect to --
13    MR. FALBY: You didn't make a note.
14    MR. MCGLYNN: Huh?
15    MR. FALBY: You didn't make a note.
16    MR. MCGLYNN: See that little star
17 (indicating)?
18    MR. FALBY: Okay, let the record reflect
19 you made a note.
20    MR. MCGLYNN: Don't write on the
21 exhibit, please.
22    THE WITNESS: Oh, okay.
23    MR. FALBY: You told him to make a note
24 of it.

FARMER ARSENAULT BROCK LLC

02130b7b-15ad-4c00-9a36-484780af018e