UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC, | ) |
|     Plaintiff/Defendant-in-Counterclaim | ) |
| | ) |
| v. | )  Civil Action No. 05-CV-10506 (WGY) |
| | ) |
| J.P. MORGAN CHASE BANK, as Trustee for the | ) |
| the Registered Holders of Credit Suisse First | ) |
| Boston Mortgage Securities Corp., Commercial | ) |
| Mortgage Pass-Through Certificates, Series 1999-C1 | ) |
|     Defendant | ) |
| | ) |
| and CSFB 1999 – C1 ROYALL STREET, LLC | ) |
|     Defendant/Plaintiff-in-Counterclaim | ) |
| | ) |
| and | ) |
| | ) |
| WILLIAM LANGELIER and GERALD FINEBERG | ) |
|     Defendants-in-Counterclaim | ) |

## PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

In accordance with Fed. R. Civ. P. 52(a) and Procedural Order Re: Final Pretrial

Conference/Trial dated July 7, 2006, Blue Hills Office Park LLC, ("Blue Hills"), William

Langelier ("Langelier") and Gerald Fineberg ("Fineberg") hereby submit the following Proposed

Findings of Fact and Rulings of Law.

## I.  FINDINGS OF FACT

### Blue Hills, Fineberg and Langelier

1.    Blue Hills is a Delaware limited liability company with a principal place of

business at One Washington Street, Suite 400, Wellesley, Massachusetts 02481.

2.    Blue Hills is a single purpose entity, formed in 1999 in connection with a

refinancing of a mortgage on its property located at 150 Royall Street, Canton, Massachusetts

and known as the Blue Hills Office Park (the "Property").

3.      The formation of Blue Hills as a single purpose entity was required as a precondition to the refinancing.

4.      Blue Hills is a "disregarded entity" for federal income tax purposes.

5.      Blue Hills' sole member is Royall Associates Realty Trust ("Trust").

6.      Prior to the refinancing in 1999, the Trust owned the Property.

7.      Fineberg and Langelier are two of the three trustees of the Trust, as well as also two of the six beneficiaries of the Trust.

**Credit Suisse First Boston Mortgage Capital LLC, J.P. Morgan Chase Bank and
CSFB 1999-C1 Royall Street LLC (sometimes collectively referred to herein as "Lender")**

8.      Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse") is a Delaware limited liability company with a principal place of business in New York, New York.

9.      J.P. Morgan Chase Bank, formerly Chase Manhattan Bank, as Trustee for the Registered Holders of Credit Suisse Bank First Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1991-C1 ("J.P. Morgan"),  is a New York banking corporation.

10.     CSFB 1999-C1 Royall Street, LLC ("CSFB") is a Delaware limited liability company formed in September 2004 with a principal place of business at 1601 Washington Avenue, Suite 700, Miami Beach Florida, 33139.

11.     All of Credit Suisse's rights, title, interest and obligations in the Loan were assigned to J.P. Morgan by assignment recorded with the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, page 387.

12.     J.P. Morgan was the record holder of the Loan until it assigned all its right, title and interest in the Loan to CSFB on or about November 10, 2004.

13.     All of J.P. Morgan's rights, title interest and obligations in the Loan were assigned to CSFB by assignment recorded in Norfolk Registry of Deeds on November 10, 2004 in Book 21755, page 477.

14.     After Credit Suisse originated the Loan, it was "securitized" and assigned to J.P. Morgan, as Trustee of a pool of loans.

15.     When the Loan was assigned to J.P. Morgan as trustee, servicing of the Loan was governed by a Pooling and Servicing Agreement ("PSA") dated October 11, 1999.

16.     Under the PSA, Wells Fargo Bank Commercial Mortgage Servicing ("Wells Fargo") was the Servicer and LNR Partners, Inc., formerly known as Lennar Partners, Inc. ("LNR") was the Special Servicer of the Loan.

17.     Wells Fargo and LNR were agents of J.P. Morgan.

18.     Wells Fargo and LNR were required to service and administer the Loan in accordance with applicable law, the terms of the Loan Documents, the PSA, and industry standards.

**The Loan and the Property**

19.     In August 1999, Blue Hills and Credit Suisse agreed upon the general terms and conditions under which Credit Suisse would loan $33,149,000.00 to Blue Hills.

20.     On or about September 14, 1999, Credit Suisse loaned $33,149,000.00 to Blue Hills (the "Loan").

21.     The Loan was secured by a mortgage on the Property.

22.     The Property consists of a two-story brick building containing approximately 275,000 square feet of space and is known as the Blue Hills Office Park.

23.     Fineberg Management, Inc. ("FMI"), a company affiliated with Fineberg, was retained by Blue Hills to manage the Property. FMI, which managed the Property prior to the 1999 refinancing, managed the Property until November 19, 2004.

**Loan Documents**

24.     The terms and conditions of the mortgage financing are contained in two separate documents:

- Mortgage Financing Application dated July 20, 1999 between Blue Hills and Credit Suisse together with a term sheet which was incorporated into and made a part of the letter.

- Letter of intent dated August 31, 1999 from Blue Hills to Credit Suisse and countersigned by Credit Suisse ("Letter of Intent").

25.     As part of the Loan closing held on September 14, 1999, Blue Hills executed various Loan documents dated September 14, 1999, including the following: Mortgage, Assignment of Rents and Security Agreement ("Mortgage"); Mortgage Note ("Note"); and Cash Management Agreement.

26.     Fineberg and Langelier also executed a Guaranty ("Guaranty") dated September 14, 1999.

27.     The Loan is non-recourse as to Blue Hills, Fineberg and Langelier except under certain limited circumstances set forth in the Mortgage, Note and Guaranty.

28.     The Letter of Intent contained the following proposed language for what became paragraph 1.2(ii)(D) of the Guaranty: "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage . . . ."

29.     While the Loan was being negotiated, successive drafts of paragraph 1.2(ii)(D) of the Guaranty prepared by Credit Suisse's counsel, Schulte Roth & Zabel, LLP, contained this language:  "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein as required by the Mortgage . . . ."

30.     The final version of the Guaranty executed by Fineberg and Langelier contained the following language:  "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage . . . ."

31.     The Cash Management Agreement required Blue Hills to deposit all of the "Rents" that it received in connection with the Lease into a "Clearing Account."

32.     Funds deposited into the Clearing Account were swept into a Lender-controlled Cash Collateral Account and, thereafter, divided into nine separate sub-accounts maintained by the Lender on a ledger entry basis.

33.     These sub-accounts, including a "Tax and Insurance Impound Fund," a "Base Leasing Escrow Fund," and a "Cash Flow Leasing Escrow Fund," were maintained for, *inter alia*, payment of taxes, insurance and tenant improvements.

34.     The reserve accounts could be accessed by Blue Hills for various purposes, including debt service.

35.     Paragraph 6(c)(ix) of the Mortgage required the Lender to disburse up to $1 million of funds (in excess of a minimum account balance of $2,750,000) to be used "solely toward payment of principal and interest then due and payable on the Note . . . ."

36.     As of August 2004, Blue Hills had deposited approximately $4.1 million in the reserve accounts.

37.     In accordance with Paragraph 6(c)(ix) of the Mortgage, Blue Hills should have been able to access up to $1 million of the reserve funds in August 2004.

### Equiserve

38.     At the Loan's inception, the Property was primarily occupied by one tenant, Equiserve, Inc. ("Equiserve"), which occupied approximately 96% of the building on the Property.

39.     Equiserve's lease with Blue Hills ("Lease") expired on July 31, 2004, although Equiserve retained an option to extend the Lease for an additional five-year term.

40.     At the Loan's inception, all parties knew not only that the Lease would expire on July 31, 2004 but also that the Lease provided the only source of funds available to service the Loan.

41.     While Equiserve remained a tenant in the Property, the monthly rental income was not only sufficient to fully fund all of the reserve accounts but also provided a surplus.  Each month, Wells Fargo distributed the surplus to Blue Hills by depositing it in Blue Hills' operating account.  From 2003-2004, Wells Fargo, on average, wired approximately $175,000.00 per month to Blue Hills' operating account.

### Payment of Taxes

42.     Although the Mortgage required Blue Hills to fund a reserve account for the payment of real estate taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement in October 1999.  Pursuant to this arrangement, Equiserve deposited the real estate tax payment into

the Clearing Account so that it could be swept into the Cash Collateral Account and used by Wells Fargo to pay the taxes.

43.    As a result of the foregoing arrangement, shortly before the taxes were due each quarter, Wells Fargo would issue a so-called "tax insufficiency" notice advising Blue Hills that the taxes were due.

44.    The last notice received from Wells Fargo before Blue Hills was defaulted for failing to pay real estate taxes, dated July 16, 2004, stated that "failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds.  Should this occur, a $500.00 fee would be assessed to your loan."

45.    Wells Fargo did not send Blue Hills any notices that failure to timely pay the real estate taxes would constitute a default under the Loan.

## Equiserve Does Not Extend The Lease

46.    In April 2003, Blue Hills learned that Equiserve intended to move out of the Property at the expiration of the Lease on July 31, 2004 and to relocate to the building located at 250 Royall Street, Canton, Massachusetts ("250 Royall"). 250 Royall abuts Blue Hills' Property.

47.    By letter dated May 14, 2003, Equiserve notified Blue Hills of its intent not to exercise its option to extend the Lease.

48.    By a letter to Equiserve dated May 15, 2003, Blue Hills confirmed Equiserve's intent not to exercise the Lease option.

49.    Blue Hills engaged Cushman and Wakefield, as exclusive leasing agent, to market the Property to find a replacement tenant.

50.    In 2003, Blue Hills advised Wells Fargo of Equiserve's notification of its intent not to renew the Lease.

51.    Wells Fargo and LNR knew, at least as early as September 2003, that Equiserve did not intend to renew the Lease.

## Norfolk Action

52.    In April 2003, the owner of 250 Royall, applied to the Town of Canton Zoning Board of Appeals ("ZBA") for a Special Permit to construct a parking garage.

53.    On May 22 2003, the ZBA – over Blue Hills' objections – issued a decision granting the Special Permit.

54.    On or about June 9, 2003, Blue Hills filed an appeal of the ZBA's decision in Norfolk Superior Court, Civil Action No. 2003-01051 ("Norfolk Action").

55.    In the Norfolk Action, Blue Hills asserted that the ZBA failed to comply with the applicable Canton ordinances and by-laws in permitting the parking garage to be built as proposed.

56.    Blue Hills alleged that in the Norfolk Action, *inter alia*, the height of the proposed parking garage would not comply with applicable ordinances and by-laws.

57.    In the Norfolk Action, Blue Hills did *not* claim that the ZBA's decision caused it any monetary damage nor did it seek monetary damages as a remedy.  Rather, Blue Hills sought only to have the ZBA's decision to grant the Special Permit annulled.

## Settlement Agreement and Settlement Proceeds

58.    Less than two months after filing the Norfolk Action, Blue Hills entered into a settlement agreement dated August 5, 2003 ("Settlement Agreement") with the owner of 250 Royall and DST Realty, Inc. ("DST"), an affiliate of Equiserve, which intended to purchase 250 Royall.

59.     DST's purchase of 250 Royall was conditioned upon the approval of all necessary permits for the construction of the parking garage.

60.     The settlement of the Norfolk Action was negotiated before any discovery was commenced or any challenge to Blue Hills' standing was raised.

61.     By the terms of the Settlement Agreement, Blue Hills agreed to dismiss the Norfolk Action upon the receipt of $2,000,000.00 ("Settlement Proceeds") from DST.

62.     The Settlement Proceeds were to be paid on the earlier of the date on which DST acquired title to the 250 Royall or on September 2, 2003.

63.     Upon the sale of the Property to DST, the Settlement Proceeds where wired to Bernkopf Goodman LLP's IOLTA account at Banknorth and, subsequently, to a Blue Hills client's funds account at Bernkopf Goodman LLP on August 8, 2003.

64.     The client's funds account at Bernkopf Goodman LLP was titled "Fineberg Royall Associates."  This internal client reference, a generic reference to the client, pre-dated the formation of Blue Hills.  The reference is not indicative of the ownership of the funds being held on behalf of any person or entity other than Blue Hills.

65.     The Settlement Proceeds were classified as a reduction in basis of the Property in the compiled financial statements of Blue Hills for the year ended December 31, 2003.  The Settlement Proceeds were not reported as income.

66.     The Settlement Proceeds constituted a portion of several million dollars of distributable Property income which had been voluntarily accumulated and retained by Blue Hills - beginning shortly after the Loan's inception - as the Property's "rainy day" reserve fund.

67.     This "rainy day" reserve fund was separate from and in addition to approximately $4.1 million of Blue Hills' funds on deposit in the reserve accounts as of August, 2004.

68.     Blue Hills' financial statements were prepared utilizing a legally permissible accounting method known as the income tax method of accounting.  This accounting method allows the deferment of any tax payment on the Settlement Proceeds.

69.     Blue Hills provided the Lender with all financial statements it requested related to the Property.

70.     Since the Loan's inception, FMI, on behalf of Blue Hills, has furnished financial information concerning Blue Hills to Wells Fargo on both a quarterly and an annual basis. Generally, the information FMI furnished to Wells Fargo consisted of an income and expense statement, a rent roll and a one or two page statement of Blue Hills' assets and liabilities. Regardless of whether additional financial information was required, Wells Fargo never requested that Blue Hills furnish any additional financial information. Had Wells Fargo requested additional financial information, Blue Hills would have been promptly sent it to Wells Fargo.

71.     For the years ended December 31, 2003 and 2004 – as in all previous years – the statements of assets and liabilities for Blue Hills were prepared by the certified public accounting firm of Rutfield & Hassey CPA.  Had Wells Fargo advised FMI that it had not received the 2003 statement of assets and liabilities – or that it had misplaced it – FMI would have forwarded a copy to Wells Fargo.

### Lease Termination Agreement

72.     Distinct from settlement of the Norfolk Action, Equiserve and Blue Hills executed a Lease Termination Agreement in August 2003.

73.     The Lease Termination Agreement did not terminate the Lease, which did not expire until July 31, 2004.

74.    Rather, the Lease Termination Agreement set forth, *inter alia*, the condition in which Equiserve would leave the Property upon moving out.

75.    The Lease Termination Agreement also provided that Equiserve would abandon certain workstations at the Property when it vacated the Property in July 2004.

76.    In August 2004, after Equiserve had vacated the Property, Blue Hills sold the abandoned workstations for $100,000.00.  The workstations had no foreseeable use and were not part of the Lender's collateral.

77.    The sale of the workstations did not constitute an Event of Default under the Loan Documents.

## December 31, 2004 Agreement

78.    Pursuant to an agreement dated December 31, 2004, Fineberg and Langelier agreed to have one-half of the Settlement Proceeds from the Norfolk Action – $1 million – wired from the Blue Hills' client's funds account to the client's funds account of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Cutler"), Langelier's attorney.  One-half of the Settlement Proceeds were wired to a client's funds account at Wilmer Cutler in February 2006.

79.    The Settlement Proceeds have remained in Blue Hills' possession since they were received.  The receipt of the Settlement Proceeds was duly recorded in Blue Hills' financial books and records and such funds have not been distributed to any of the Trust's beneficiaries.

## Blue Hills Requests Disbursements From The Reserve Accounts

80.    As early as the Spring of 2004, LNR knew that, despite Blue Hill's efforts, there was a distinct possibility that a substitute for Equiserve, the Property's sole tenant, would not be found.  Any such failure would have severe repercussions for Blue Hills' ability to service the Loan.

81.     Because Equiserve was to leave the Property as of July 31, 2004, funds were not available to pay the real estate taxes due to the Town of Canton on August 2, 2004.

82.     On August 2, 2004, Blue Hills' representative Joseph Donovan ("Donovan"), the CFO of FMI, sent a written request to Wells Fargo seeking disbursement of the sum of $412,833.43 from the reserve accounts.  This disbursement was to be used to pay principal and interest due on the Note for the month of August, 2004, as well as to pay real estate taxes.

83.     Wells Fargo paid $158,181.19 in property taxes due to the Town of Canton by August 2, 2004.

84.     After sending the August 2, 2004 letter to Wells Fargo, Donovan contacted the Town of Canton Treasurer's Office, which verified to Donovan that the taxes had been paid.

85.     Consequently, Donovan reasonably assumed that the tax payment was made from the reserve accounts.

86.     When Donovan's August 2, 2004 letter was sent to Wells Fargo, Blue Hills was not in default of its obligations under the Loan and, accordingly, was entitled to the disbursement of funds for principal and interest due under the Note.

87.     The next payment of principal and interest under the Note was not due until August 11, 2004.

88.     Donovan sent a subsequent letter to Wells Fargo dated August 5, 2004 requesting a meeting with both Wells Fargo and LNR, the Special Servicer.

89.     Having received no response from Wells Fargo, on August 13, 2004 Donovan sent a fax memorandum to Curtis Mallegni at Wells Fargo stating:  "Sorry we have been missing each other on the phone.  I would like to get the special servicer involved."  Donovan attached copies of his August 2 and August 5, 2004 letters to the memorandum.

## Donovan's Request Were Timely

90.     While Section 6(c)(ix)(a) of the Mortgage states, "Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement, or written request," this section does not define the term "delivered."

91.     Section 39 of the Mortgage requires that "notices shall be deemed to have been given on the date that they are actually received; provided, that the inability to deliver Notices because of a changed address will be deemed to be receipt of the Notice as of the date of such inability to deliver."

92.     Section 39 of the Mortgage required that such "notices" be provided to Credit Suisse and to ORIX Real Estate Capital Markets LLC ("ORIX"), the (then) Servicer.  However, by August 2004, J.P. Morgan – not Credit Suisse – was the Lender and Wells Fargo – not ORIX – was the Servicer.

93.     Donovan's August 2, 2004 letter was addressed to Tim Parish ("Parish") in the Wells Fargo's Property Tax Department because Parish signed Wells Fargo's July 16, 2004 tax insufficiency letter.

94.     Wells Fargo's records show that Donovan's August 2, 2004 letter was logged in as received as of August 4, 2004.

95.     Even assuming that Wells Fargo did not receive Donovan's letter before August 4, 2004, Donovan's letter was only one day late.

96.     Wells Fargo received actual notice of Donovan's request and the Lender has not presented any evidence that a one day delay caused it any prejudice.

97.     The notice provisions contained in Section 39 of the Mortgage were not rigidly adhered to by Wells Fargo from Loan inception up to Donovan's August 2, 2004 letter.

98.    Wells Fargo's records indicate that transfers in and out of the reserve accounts to cover tax, insurance and other shortages and adjustments were often handled between Wells Fargo and Blue Hills by telephone and fax, often with considerably less than seven business days' notice.

99.    Wells Fargo's records show that requests for transfers in and out of the reserve accounts to cover tax, insurance and other shortages and adjustments were often handled by telephone and fax with much less than seven business day's notice.

100.    Although it is undisputed that Wells Fargo received Donovan's August 2, 2004 letter no later than August 4, 2004, Wells Fargo never notified Donovan in writing that the tax payment could not be made out of the reserve accounts.

101.    The only written notice sent by Wells Fargo was Parish's letter dated July 16, 2004, which advised Blue Hills that a late tax payment would merely result in a $500 late fee assessment and might require Wells Fargo to advance its own funds.

102.    Had Blue Hills been notified that its request for reserves to pay real estate tax would be denied, it would have paid the net amount due of approximately $106,000 to Wells Fargo for the August 2, 2004 real estate tax payment.

103.    Blue Hills and Wells Fargo's prior course of conduct entitled Blue Hills to have access to the reserve accounts to pay real estate taxes or, at minimum, required Wells Fargo to notify Blue Hills of the tax non-payment.  Moreover, prudent banking industry practice requires such notification.

104.    Neither J.P. Morgan nor its agents informed Blue Hills that it would be defaulted for failure to pay taxes or that reserve accounts could not be accessed to pay for real estate taxes.

105.    Wells Fargo's tax insufficiency notice dated July 16, 2004 advised Blue Hills that Wells Fargo may pay the tax and that Blue Hills could face a penalty of $500.00 for failure to pay.

### The Lender Refuses to Respond to Blue Hills

106.    Wells Fargo did not respond to Donovan's requests for a meeting nor his requests for disbursements, as contained in his correspondence of August 2, 5 and 13, 2004.  Moreover, Wells Fargo never advised Blue Hills that Blue Hills' failure to pay the real estate taxes constituted an Event of Default under the Loan.

107.    Kenneth Goldberg ("Goldberg"), counsel for Blue Hills, communicated with Chris Brown ("Brown") of LNR regarding, *inter alia*, the Loan and Wells Fargo's failure to respond to Blue Hills.  Brown suggested that Blue Hills should be in touch with Wells Fargo and made a specific suggestion to Goldberg as to what Blue Hills should say in order to expedite transfer of the file from Servicer Wells Fargo to Special Servicer LNR.  Goldberg conveyed to Brown that time was of the essence.

108.    By letter dated August 19, 2004, but not faxed until August 24, 2004, an LNR asset manager, Job Warshaw ("Warshaw"), notified Blue Hills that the Loan servicing had been transferred to LNR and that LNR looked forward to a "successful working relationship" with Blue Hills.  No mention was made of Blue Hills' requests for disbursement nor was mention made of the existence of any defaults under the Loan.

109.    Warshaw also sent Blue Hills a letter dated August 19, 2004, but not faxed until August 24, 2004, in which he stated that LNR had "agreed to discuss the status of [the Loan]…" and "any issues arising under [the Loan documents]."

110.    The second August 19, 2004 letter from Warshaw included a list of documents requested by LNR.  All of the documents requested, except for Fineberg and Langelier's updated financial statements and a business plan, were already in by LNR or Wells Fargo's possession.

111.    Goldberg had a conversation with Warshaw on or about August 25, 2004 regarding the August 19, 2004 letter to be signed by Fineberg.

112.    Thereafter, on August 26, 2004, Fineberg signed the letter received from LNR on August 24, 2006 and faxed the signed copy to LNR.  Although Fineberg had signed this letter and LNR or Wells Fargo had virtually all of the requested documents, LNR did not schedule a meeting.

113.    Goldberg and Warshaw discussed a meeting to be scheduled between the Lender and Blue Hills.

114.    Goldberg invited Warshaw to visit the Property and to assess the market at Blue Hills' expense.  Warshaw responded that he didn't think it was possible for him to get to Boston before Labor Day, 2004.

115.    Goldberg had a subsequent conversation with Warshaw which concluded with Warshaw indicating that he intended to review the Loan Documents so that the next communication could be more productive.

116.    On September 2, 2004, Donovan wrote to Wells Fargo requesting the disbursement of $254,652.24 to pay principal and interest due on the Note for the month of September, 2004.

117.    On September 7, 2004, Joseph Polcari ("Polcari") replaced Warshaw as asset manager at LNR.  Polcari's first contact with Blue Hills was a default letter dated September 17, 2004.

118.    When Polcari replaced Warshaw, he did not contact Blue Hills to schedule a meeting, as Goldberg and Warshaw had agreed upon.

119.    In his September 17, 2004 letter, Polcari informed Blue Hills that its request for disbursement of real estate taxes had been denied, purportedly because the Mortgage did not permit such disbursements.  Moreover, he declared that – as of August 2, 2004 – Blue Hills was in default under the Loan for failure to pay real estate taxes when due.

120.    This September 17, 2004 default letter is the only written notice of default ever sent to Blue Hills.

121.    Thereafter, on or about October 18, 2004, Daniel Frank ("Frank"), Blue Hills' representative and President of FMI, requested a meeting with LNR.

122.    Despite Warshaw's August 19, 2004 letters advising Blue Hills that LNR looked forward to working with Blue Hills and would meet with Blue Hills to discuss the Loan status, LNR never had any intention to do so.

123.    Lender through its agents, was not willing to meet with Blue Hills' representatives following Donovan's request for a meeting.

124.    Despite indications by its agents to the contrary, Lender never intended to meet with Blue Hills' representatives.

125.    Lender refrained from cooperating with Blue Hills in the hope that Blue Hills would default before it could gain access to the reserve accounts.

**The Foreclosure Sale**

126.    By letter dated October 21, 2004, CSFB, as assignee of J.P. Morgan, gave notice to Blue Hills of its intention to foreclose.

- 17 -

127.    During the period of November 10 – November 19, 2004, whereby Blue Hills continued to request that LNR meet with it to consider alternatives to foreclosure, several letters were subsequently exchanged between Goldberg and counsel for LNR.

128.    A foreclosure sale was held on or about November 19, 2004.  The foreclosure deed was recorded on January 14, 2005 with the Norfolk County Registry of Deeds in Book 21988, page 509.

129.    At the foreclosure sale, CSFB credit bid $18,500,000 and acquired title to the Property.

130.    As a result of the foreclosure sale, Blue Hills has suffered significant damages, including:

- Lost equity value in the subject property:  $5,824,941.00.

- Reserve account balances:  $4,153,827.00.

- Lost tax benefit:  $4,918,804.00.

Total damages including interest:  $14,897,572.00.

131.    On or about April 29, 2005, CSFB sold the Property to One Beacon Insurance Group for $23,000,000.

## **Experts**

132.    Defendants' expert, Eric Stotz ("Stotz"), a real estate appraiser, cannot substantiate his opinion that any structure that interferes with the view of another structure or that adds "significantly" to traffic or congestion will have a detrimental impact on the value of the existing structure.

133.    Because it is not based on a reliable methodology, Stotz's testimony as to the impact, if any, of the 250 Royall garage on the Property's value is improper.

134.    Stotz does not quantify any alleged diminution in the value of the Property as a result of the garage in neither his expert report nor in his deposition.

135.    Stotz failed to acknowledge the alleged significance of the new garage in his pre-foreclosure appraisal report prepared for LNR.

136.    Stotz acknowledges that he did not quantify any diminution in the Property's value and he was not even qualified to opine on the diminution of the value of property based upon either undocumented traffic congestion or upon the "less desirable view" that the garage would allegedly provide to the Property's tenants.

137.    Stotz admits that he did not consult with any traffic consultants.

138.    Stotz's only source of information regarding any alleged diminution of values is the Complaint filed by Blue Hills in the Norfolk Action.

139.    Dr. Kenneth Gartrell ("Gartrell"), an economist retained by Blue Hills, believes that no diminution in value to the Property occurred.  Further, he believes that the Property's value may have been enhanced by the parking garage.

**PSA and the Servicing Standard**

140.    The Servicing Standard contained in Section 3.01 of the PSA establishes the touchstones governing Wells Fargo and LNR's conduct.  The Servicing Standard mandates that Wells Fargo and LNR must conduct themselves in accordance with the <u>higher</u> of two standards: (1) the standard of care, skill, prudence and diligence employed in administering similar commercial or multi-family mortgage loans or, (2) standard of care, still, prudence and diligence employed in servicing and administering similar commercial or multi-family mortgage loans owned by Wells Fargo or LNR.  The Servicing Standard also obligates LNR and Wells Fargo to perform their services <u>without regard</u> to: (1) any relationship they or any affiliate may have had

with the Blue Hills; (2) any compensation to be received under the PSA; and (3) their ownership, servicing or management of any other mortgage loans or mortgage properties.

141.    Both Blue Hills' banking expert, Richard A. Clarke ("Clarke"), and Lender's banking expert, Ronald Greenspan, ("Greenspan") agree that borrowers involved in securitized loan transactions have the right to expect that their loans will be administered by the Servicer and Special Servicer according to the Servicing Standard.

142.    To have confidence in the treatment of each individual pooled loan, the marketplace – including lenders, borrowers and certificate holders – has the right to expect that the pool loans will be serviced in strict accordance with the Servicing Standard.

143.    The Servicing Standard is a standard of prudency, reflecting the industry practices of prudent institutional multi-family and commercial mortgagors.

144.    Although the over-arching objective contained in Section 3.01 of the PSA is for the Servicer or Special Servicer to maximize "on a present value basis (discounting at the related Mortgage Rate)… timely recovery of interest and principle on the Loans …," standards of prudency dictate how that objective is best achieved.

145.    The PSA is replete with provisions which contemplate that specially serviced loans will be worked out (as opposed to being foreclosed) to the fullest extent practical and reasonable.

146.    Both Wells Fargo and LNR substantially deviated from the Servicing Standard, as well as the applicable industry standards for third party loan servicing.

147.    Wells Fargo's and LNR's internal e-mails from August through November 2004, reveal that they awaited an opportunity to acquire the $4.1 million in reserves, as well as to quickly commence foreclosure proceedings or otherwise acquire the Property.

148.    LNR had been monitoring the Loan for almost a year before the foreclosure of the Property on November 19, 2004.

149.    LNR expressed concern over Blue Hills' admitted ability to access the reserve accounts to pay debt service and its hope that Blue Hills could be forced to default before it could access the reserve accounts.

150.    LNR's prior dealings with Fineberg led it to conclude that Fineberg would be a hard negotiator in any Loan work-out.

151.    Both Wells Fargo and LNR failed to advise Blue Hills of the denial of its request for access to the reserve accounts to pay real estate taxes.

152.    LNR's intent to acquire the Loan while simultaneously being predisposed against working with Fineberg based on LNR's past dealings with him is unprofessional and contravenes prudent servicing standards.

### Lender Cannot Recover Under Section 10 of the Mortgage

153.    Blue Hills, Fineberg or Langelier did not transfer the Settlement Proceeds in violation of Section 10 of the Mortgage.

154.    Blue Hills, Fineberg and Langelier did not need to obtain the Lender's consent to settle the Norfolk Action.

155.    The Settlement Proceeds are not Mortgaged Property under Section 10 of the Mortgage.

156.    Section 10 of the Mortgage, construed as a whole, and in conjunction with Guaranty paragraph 1.2(ii)(D), mandates a narrow construction of the phrase "Mortgaged Property."

157.    The general import of Section 10 of the Mortgage is that Credit Suisse's consent is required for the alienation or transfer of the Property.  Section 10(a) states that Credit Suisse has "examined and relied on the creditworthiness and experience of [Blue Hills] in owning and operating properties such as the Mortgaged Property . . . [s]o as to insure that should Mortgagor default in repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property."  The quoted language evinces the parties' intent to define "Mortgaged Property" as the Property and not, for example, intangibles such as the Norfolk Action or the Settlement Proceeds.

158.    Section 10(b) of the Mortgage enumerates the types of assignments and transfers included within the scope of Section 10, all of which involve the sale, encumbrance, transfer or leasing of the Property, the legal and beneficial ownership thereof, and/or the substitution of Fineberg and Langelier as guarantors.

159.    As with Section 10(a), the import of Section 10(b) of the Mortgage is that the scope of the transactions (as to which prior written consent is required) is limited to the Property, the ownership interests therein and the substitution of the guarantors.

160.    Section 10(e) of the Mortgage obligated Blue Hills to reimburse Credit Suisse for expenses and fees incurred in connection with its approval of the requested transfer or encumbrance including "title search costs and title insurance endorsement premiums."  The enumerated expenses and fees in Section 10(e) are normally associated with real property, not litigation or settlement proceeds.

161.    Section 10(f) of the Mortgage enumerates several preconditions to Credit Suisse's consent to a Section 10 sale or transfer, all of which are Property oriented:

- Section 10(f)(ii) requires that the proposed transferee "shall be a reputable entity or person of good character, creditworthy, with sufficient financial worth . . . ."

- Section 10(f)(ii) requires the proposed transferee and "its property manager to have "sufficient experience in the ownership and management of properties similar to the Mortgaged Property . . . ."

- Section 10(f)(iv) entitles Credit Suisse to obtain rating agency recommendations to the transfer; and

- Most significantly, Section 10(f)(vi) entitles Credit Suisse to an assumption fee equal to 1% of the mortgage Debt, plus reimbursement of costs and expenses incurred in connection with the assumption. This subsection requires the payment of a fee if the Loan secured by the mortgage is being assumed by a new owner. This subsection has no relevance to the Norfolk Action or to the Settlement Proceeds. The Counterclaims do not seek any assumption fee for the allegedly improper transaction at issue.

162.    The narrow construction of the phrase "Mortgaged Property" in Section 10 is also buttressed substantially by Section 50 in the Mortgage, which states that terms such as Mortgaged Property shall mean any portion of the Mortgaged Property and any interest therein "[u]nless the context clearly indicates a contrary intent or unless otherwise specifically provided herein . . . ."  (emphasis added)

163.    Section 50 of the Mortgage articulated the parties' intention to ascribe different meanings to the phrase "Mortgaged Property" throughout the Mortgage.

164.    Section 10 requires Credit Suisse's consent for significant actions affecting the Property and the Loan; a transfer of the Property or the ownership interest therein, and substitution of Fineberg and Langelier as guarantors.

165.    Section 10 of the Mortgage contains <u>no</u> consent requirement with respect to the settlement of the Norfolk Action or Blue Hills' receipt of the Settlement Proceeds.

166.    The Settlement Proceeds are not "Rents" under the Cash Management Agreement.

167.    There is no personal liability for Fineberg and Langelier under the Guaranty.

168.    J.P. Morgan and CSFB are liable to Blue Hills for breach of contract.

169.    J.P. Morgan and CSFB are liable to Blue Hills for breach of the implied covenant of good faith and fair dealing.

170.    J.P. Morgan and CSFB are liable to Blue Hills for violations of M.G.L. c. 93A.

171.    Blue Hills is not liable to J.P. Morgan or CSFB for breach of the Mortgage.

172.    Blue Hills is not liable to J.P. Morgan or CSFB for breach of the Cash Management Agreement.

173.    Blue Hills is not liable to J.P. Morgan or CSFB for breach of implied covenant of good faith and fair dealing.

174.    Blue Hills, Fineberg and Langelier are not liable to J.P. Morgan or CSFB for intentional misrepresentation.

175.    Blue Hills, Fineberg and Langelier are not liable to J.P. Morgan or CSFB for violations of M.G.L. c. 93A.

## II.  RULINGS OF LAW

### Breach of the Implied Covenant of Good Faith and Fair Dealing

1.      The implied covenant of good faith and fair dealing in every contract in Massachusetts requires the parties to "deal honestly and in good faith in both the performance and enforcement of the terms of their contract . . . ."  *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200 (1993); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation*, 424 Mass. 430 (1997).

2.      This implied covenant serves to guaranty that the parties "remain faithful to the intended and agreed expectations of the parties in their performance."  *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

3.      The implied covenant of good faith and fair dealing includes a covenant that a party "shall [not] do anything which will have the effect of or injuring the rights of the other party to receive the fruits of that contract."  *Drucker v. Roland Wm. Jutras Associates, Inc.*, 37 Mass. 383, 385 (1976) citing *Uproar Co. v. National Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir. 1936).

4.      Although not expressed, a duty of an obligating party is to take positive steps to cooperate in achieving another party's contractual rights and objectives is implied.  *Robert Brennan, et al. v. Carvel Corporation*, 1989 U.S. Dist. LEXIS 16104 (D. Mass. July 25, 1989), citing *L.L. Hall Constr. Co. v. United States*, 379 F.2d 559 (Ct. Cl. 1966).

5.      The implied covenant of good faith and fair dealing does not create contractual obligations that are "not otherwise provided for in the existing contractual relationship."  *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005).

6.    The requirement of good faith "is circumscribed by the obligations – the contractual 'fruits' – actually contained" in the written contract. *Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001).

## Breach of Contract

7.    A contract "is to be read 'in a manner to give effect to the chief design to be accomplished by the instrument,' and [courts] are to look 'through the form to the substance and purpose of the agreement' and to mould the decree 'in accordance with what the parties may fairly be presumed to have intended.'" *Kerrigan v. Boston*, 361 Mass. 24, 33 (1972), quoting *Clark v. State St. Trust Co.*, 270 Mass. 140, 152-153 (1930); *MacDonald v. Gough*, 326 Mass. 93, 96 (1950).

8.    A contract must be construed with reference to the situation of parties when they made it and to objectives sought to be accomplished. *Starr v. Fordham*, 420 Mass. 178 (1995).

9.    A contract is to be construed to give reasonable effect to each of its provisions. *J.A. Sullivan Corp. v. Commonwealth of Massachusetts*, 397 Mass. 789 (1986); *Sarvis v. Cooper*, 40 Mass. App. Ct. 471 (1996).

10.    When an essential term of a contract is missing, that contract is ambiguous, and it falls to the court to interpret the contract sensibly in light of the terms of the document taken as a whole and surrounding facts. *Snow v. Fitian*, 1998 Mass. App. Div. 227.

11.    A contract is to be construed as meaningful and not illusory. *Cofman v. Acton Corp.*, 958 F.2d 494 (1st Cir. 1992). A contract will not be construed so as to render any of its terms meaningless. *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957 (D. Mass. 1991).

12.     A contract should be construed to give it effect as a rational business instrument. *Finn v. McNeil*, 23 Mass. App. Ct. 367 (1987).

13.     Under Massachusetts law, commercial contracts must be construed in accordance with common sense interpretation required for contracts in general, as business transactions entered into by practical people to accomplish an honest and straightforward end.  *Fleet Nat. Bank v. H&D Entertainment, Inc.*, 96 F.3d 532 (1st Cir. 1996).

14.     All provisions of a contract "must be presumed to have been designedly employed, and must be given meaning and effect, whenever practical, when construed with all the other phraseology contained in the instrument, which must be considered as a workable and harmonious means for carrying out and effectuating the intent of the parties."  *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789 (1986); *see, G.M. Abodeely Ins. Agency v. Commerce Ins. Co.* , 41 Mass. App. 274 (1996).

15.     Contract modifications can be established by a party's prior course of conduct. *A. Leo Nash Steel Corp. v. Southern New England Steel Erection Co., Inc.*, 9 Mass. App. Ct. 377, 383 (1980).

16.     As there is no express requirement in the Mortgage that Blue Hills was  required to obtain Lender's approval prior to its commencement of the Norfolk Action, or its settlement, or its dismissal or Blue Hills' receipt of the Settlement Proceeds, or even to provide Lender with notice of any of the foregoing, such requirement cannot be implied.  *Ayash v. Dana-Farber Cancer Institute,* 443 Mass. 367, 385 (2005).

17.     Unambiguous words in a contract must be construed in accordance with their ordinary and usual sense. *Computer Systems of America, Inc. v. Western Reserve Life Assur. Co. of Ohio*, 19 Mass. App. Ct. 430, 434 (1985).

18.     Under the doctrine *expresio unus est exclusio alterius*, when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded. *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1997).

19.     The applicable principle, *ejusdem generis*, provides that:  "a subsequent specification impliedly limits the meaning of a proceeding generalization."  *Schjeldahl Co. v. Local Lodge 1680 of the District Lodge #64 of International Assoc. of Machinists*, 393 F.2d 502 (1st Cir. 1968).

20.     Where general words follow specific words in an enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated in the preceding specific words.  *Ferguson v. Host International, Inc.*, 53 Mass. App. Ct. 96 (2001).

21.     The terms of the Guaranty will not be construed against the guarantor. *Laura Thorn, Ltd. v. Alletz Hauser*, 71 F.3d 991 (1st Cir. 1995).

22.     Even if there is no specific duty to speak, silence alone can indicate assent to a proposal if this conclusion is reasonable because of a prior course of dealing, and suggests assent.  *McGurn v. Bell Microproducts, Inc.* 284 F. 3d 86, 90 (1st Cir. 2002); *see also Shawmut Bank v. Wayman,* 34 Mass App. Ct. 20,25 (1993) (bank had a good faith duty to be honest in its dealing with the guarantor).

## Foreclosure

23.     Blue Hills sets forth facts indicating that, *inter alia,* the foreclosure of the

Property was contrary not only to the existing contractual obligations and their good faith

penumbra, but also to the parties' established course of conduct.  *See*, *Sandler v. Green*, 287

Mass 404, 407 (1934) (an action at law exists for conduct of a foreclosure where there has been

no breach of any condition of the mortgage).

24.     The Property's foreclosure sale price of $18,500,000.00 was so grossly

disproportionate to fair market value as to call the validity of the foreclosure into question.  *See*,

*States Resources Corp. v. The Architectural Team, Inc.,* 433 F.3d 73, 80-84 (1ˢᵗ Cir. 2005).

## Agency

25.     As agents of a disclosed principle, Wells Fargo and LNR's actions were binding

upon the Lender.  *Riverdale Mills Corp. v. U.S. F. A.A.* 417, F. Supp. 2d. 167, 170 (D. Mass

2006).

## Misrepresentation

26.     Absent a recognized duty to speak, a failure to speak is insufficient to establish an

actionable misrepresentation.  *Wade v. Ford Motor Co.*, 341 Mass. 596, 597-98 (1961)

(allegations of nonfeasance insufficient absent a duty to speak or act); *Phinney v. Friedman*, 224

Mass. 531, 532 (1916) ("it is settled that mere silence . . . does not of itself constitute fraud").

27.     "The general rule is that silence, in order to be an actionable fraud, must relate to

a material matter known to the party and which is his legal duty to communicate to the other

contracting party."  *Williams v. East Coast Sales, Inc.*, 59 N.C. App. 700, 703 (1982) quoting 37

Am.Jur.2d Fraud § 145 (1967); s*ee also Moser v. Spizzirro*, 295 N.Y.S. 2d 188, 189 (2d Dep't

1968), *aff'd*, 25 N.Y. 2d 941 (1969) ("The mere silence of defendant, unaccompanied by some

act or conduct which deceived plaintiffs, was not an actionable fraud in the absence of any confidential or fiduciary relationship.")

28.     "Nondisclosure of material information may become actionable as misrepresentation only if there is a fiduciary relationship or a similar relationship involving trust and confidence.  Such relationships may arise where there is evidence of dependence upon another's judgment in business and property matters."  *Shanley v. Rockland Trust Company*, 2000 WL 1476109 at 2 (Mass. App. Ct.) at *3, citing *Nolan & Sartorio,* Tort Law §142 at p. 238 (2d ed. 1989).

29.     "The general rule is that silence, in order to be an actionable fraud, must relate to a material matter known to the party and which is his *legal duty* to communicate to the other contracting party."  *Williams v. East Coast Sales, Inc.*, 59 N.C. App. 700, 298 S.E.2d 80 (1982) quoting 37 Am.Jur.2d Fraud § 145, p. 199 (1967).  *See also*; *Moser v. Spizzirro*, 31 A.D.2d 537, 295 N.Y.S.2d 188 (2d Dep't 1968), order aff'd, 25 N.Y.2d 941, 305 N.Y.S.2d 153, 252 N.E.2d 632 (1969) (The mere silence of defendant, unaccompanied by some act or conduct which deceived plaintiffs, was not an actionable fraud in the absence of any confidential or fiduciary relationship.)  In *Williams*, the defendant had a statutory duty under North Carolina law to disclose facts about a mobile home.

## M.G.L. c. 93A

30.     General Laws chapter 93A, § 2 makes unlawful any "[u]nfair . . . acts or practices in the conduct of any trade or commerce."  This prohibition is "extended to those engaged in trade or commerce in business transactions with others similarly engaged" by M.G.L. c. 93A § 11.  *Datacom Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 779 (1986).

31.    A finding of a violation of M.G.L. c. 93A requires at least a minimum threshold demonstration of "unfair or deceptive acts." *Spence v. Boston Edison Co.*, 390 Mass. 604, 615 (1983). Generally, conduct is "unfair" if "without necessarily having been previously considered unlawful [it] offends public policy . . . whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness." *Spence*, 390 Mass. at 615, citing, *Federal Trade Comm. v. Sperry & Hutchinson*, 405 U.S. 233, 244-245 (1972).

32.    Conduct is "deceptive" if it "possesses a tendency to deceive" or if it creates an overall impression which is misleading. *Leardi v. Brown*, 394 Mass. 151, 156 (1985). To be "deceptive," an act must be found to be such that "it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Lowell Gas Co. v. Attorney General*, 377 Mass. 37, 51 (1979).

33.    The standard for unlawful conduct is higher for a business plaintiff pursuant to M.G.L. c. 93A §11 than it is for a consumer plaintiff. In a case under M.G.L. c. 93A § 11, a purported unfair or deceptive trade practice must be such that "[t]he objectionable conduct . . . attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Levings v. Forbes & Wallace, Inc.,* 8 Mass. App. 498 (1979); *V.S.H. Realty, Inc. v. Texaco, Inc*., 757 F.2d 411 (D. Ma. 1981).

34.    To prevail under M.G.L. c. 93A, a claimant must prove that any unfair or deceptive trade practice was the cause of his loss; namely, that there was a causal connection between the unfair and deceptive trade practice and that the injury was a foreseeable consequence of the unfair or deceptive trade practice. *E.g., Kohl v. Silver Lake Motors, Inc.*, 369 Mass. 795 (1950); *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841 (1983).

35.    Multiple damages may not be awarded unless the violation of M.G.L. c. 93A is knowing or willful.  A willful or knowing violation occurs when one intentionally or knowingly acts to cause harm.  In order to establish a "willful or knowing" violation there must be some evidence that the defendant had a subsequently culpable state of mind.  *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760 (1986).  *Computer Systems Engineering, Inc. v. Quantel Corp.*, 571 F. Supp. 1365 (D. Mass. 1983).

36.    To demonstrate a violation of G.L. c. 93A there must be some conduct alleged that falls "within . . . the penumbra of some common-law, statutory, or other established concept of unfairness . . . is immoral, unethical, oppressive or unscrupulous [and] . . . causes substantial injury to [other businesses]." *Linkage Corporation v. Trustees of Boston University*, 425 Mass. 1, 27 (1997) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).

37.    Where commercial entities are involved, conduct will not be unfair or deceptive unless some type of greater "rascality" is shown.  *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 477 (1991).

38.    A breach of contract or legal obligation, without more, does not violate G.L. c. 93A.  *See, e.g., Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 100-101 (1979); *Framingham Auto Sales, Inc. v. Workers Credit Union*, 41 Mass. App. Ct. 416, 418 (1996); *Cahill v. TIG Premier Ins. Co.*, 20 F. Supp. 2d 141 (D. Mass. 1998); *George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129 (D. Mass. 1998); *Davis v. Dawson, Inc.*, 15 F.Supp. 2d 64 (D. Mass. 1998).

39.    G.L. c. 93A, §11 "does not contemplate an overly precise standard of ethical or moral behavior.  It is the standard of the commercial marketplace."  *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996); *Shepard's Pharmacy Inc. v. Stop & Shop Cos.*, 37 Mass. App. Ct. 516, 520 (1994).

40.     Lender can prove neither deceptive nor unfair conduct.  This is particularly true in regard to the heightened standard applicable to commercial disputes.  *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979) (necessary to "attain a level of rascality . . . [in] the rough and tumble world of commerce.") *Id.*; *Spence v. Boston Edison Co.*, 390 Mass. 604, 616 (1983) (an act that might be unfair, if practiced on a "commercial innocent," may be common practice among businesses).

## Damages

41     It is axiomatic that the goal of damages is to place the injured party in the same position as if the defendant had rightly performed its obligations.  *E. Mass. St. Ry. Co. v. Union St. Ry. Co.*, 269 Mass 329, 333 (1929).

42.     Recoverable losses include those that would not have occurred but for the defendant's wrongful acts.  *Charlotte Theaters, Inc. v. Gateway Co.,* 191 F. Supp. 834, 844 (D. Mass), vac. on other grounds, 297 F. 2d 483 (1st Cir. 1961).

43.     Recovery for negative tax effects is not contrary to these rules. *E.g., Beggs v. Dougherty Overseas, Inc.,* 287 F.2d 80 (2nd Cir. 1961) (Recovery for loss of a tax benefit for foreign employment by wrongfully discharged employee); *W.H. Walker, et al v. Signal Companies, Inc.;* 84 Cal. App. 3d (CA., 4th Div. 1998) (Recovery of damages for capital gains tax liabilities) *Pruett v. Erickson Air-Crane Co.*, 183 F.R.D. 248 (D. Oregon 1986) (tax liability may constitute an element of damages if it is a natural and proximate result of wrongful act).

44.     The burden of proving an affirmative defense rests upon the party that asserted that defense.  *Equity Credit Corp. v. Treadwell*, 338 Mass. 99, 102 (1958).

45.     Pleadings in a complaint are binding only in the <u>trial</u> of the case in which the pleadings were filed. *Hibernia Savings Bank v. Bomba*, 35 Mass. App. Ct. 378, 384 (1993).

BLUE HILLS OFFICE PARK LLC, WILLIAM
LANGELIER AND GERALD FINEBERG,
By their attorneys,


/s/ Meredith A. Swisher
Peter B. McGlynn, Esquire (BBO No. 333660)
Meredith A. Swisher, Esquire (BBO No. 646866)
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:      (617) 790-3000
Facsimile:      (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: September 12, 2006
#344227 v4/14500/9985