UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br> Mortgage Pass-Through Certificates,<br>Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and<br>GERALD FINEBERG<br>    Defendants-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 05-CV-10506 (WGY) |

**BLUE HILLS OFFICE PARK LLC, GERALD FINEBERG
AND WILLIAM LANGELIER'S TRIAL MEMORANDUM**

## I.   INTRODUCTION

The gross mismanagement of a non-recourse loan to Blue Hills Office Park LLC ("Blue Hills") has not only significantly damaged Blue Hills but has resulted in JP Morgan Chase Bank ("J.P. Morgan") and CSFB 1999-C1 Royall Street, LLC ("CSFB") (sometimes collectively referred to herein as the "Lender") attempting to obfuscate their liability by lashing out at Blue Hills and its principals, William Langelier ("Langelier") and Gerald Fineberg ("Fineberg"). To distance itself from the wrongful acts of its agents, Lender – teasing and torturing the language of the pertinent loan documents – seeks to transform a non-recourse loan to Blue Hills into

something it simply was never intended to be; to wit, a full and personal guaranty by Langelier and Fineberg. The evidence adduced at trial will not only prove Lender's responsibility for significant losses suffered by Blue Hills but will unequivocably demonstate that neither Fineberg nor Langelier are personally liable to Lender for any amount.

## II.    FACTUAL BACKGROUND

### The Parties

### Blue Hills, Fineberg and Langelier

Blue Hills is a single purpose entity, formed in 1999 in connection with a refinancing of real property and a building thereon located at 150 Royall Street, Canton, Massachusetts and known as the Blue Hills Office Park (the "Property"). The Property consists of a two-story brick building containing approximately 275,000 square feet of office space on 150 Royall Street, Canton, Massachusetts.

The formation of Blue Hills as a single purpose entity was required as a precondition to the refinancing. Blue Hills' sole member is Royall Associates Realty Trust ("Trust"), which owned the Property prior to the 1999 re-financing. Fineberg and Langelier are the trustees of the Trust, as well as also being two of the six beneficiaries of the Trust. For tax purposes, it is a "disregarded entity."

### Credit Suisse

In August 1999, Blue Hills and Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse") agreed upon the general terms and conditions under which Credit Suisse would loan to Blue Hills approximately $33.1 million to be secured by the Property.

On or about September 14, 1999, Credit Suisse loaned $33,149,000.00 (the "Loan") to Blue Hills.

- 2 -

### J.P. Morgan

J.P. Morgan is assignee of Credit Suisse's interests in the Loan. J.P. Morgan was record holder of the Loan until it assigned all of its right, title and interest in the Loan to CSFB on or about November 10, 2004.

### CSFB

All of J.P. Morgan's rights, title interest and obligations in the Loan were assigned to CSFB by assignment recorded in Norfolk Registry of Deeds on November 10, 2004 in Book 21755, page 477.

### Wells Fargo and LNR

Wells Fargo Bank Commercial Mortgage Servicing ("Wells Fargo") and LNR Partners, Inc., formerly known as Lennar Partners, Inc. ("LNR"), are commercial loan servicers.

Under a Pooling and Servicing Agreement ("PSA") dated October 11, 1999, Wells Fargo was the Master Servicer and LNR was the Special Servicer of the Loan. At all times pertinent hereto, Wells Fargo and LNR acted as agents of J.P. Morgan and CSFB.

### Fineberg Management Inc.

Fineberg Management Inc. ("FMI"), a company affiliated with Fineberg, was retained by Blue Hills to manage the Property. FMI, which managed the Property prior to the 1999 refinancing, continued to manage the Property until November 19, 2004.

### The Property And The Lease

At the time of the Loan's inception, the Property was occupied primarily by one tenant, Equiserve, Inc. ("Equiserve"), which occupied approximately 96% of the building on the Property. Equiserve's lease with Blue Hills ("Lease") expired on July 31, 2004, although Equiserve retained an option to extend the Lease for an additional five-year term.

- 3 -

At the Loan's inception, all parties, including Credit Suisse, not only knew that the Lease would expire on July 31, 2004 but also knew that the Lease provided the only source of funds available to service the Loan.

### The Negotiation of the Loan and Loan Documents

The terms and conditions of the mortgage financing were contained in two separate documents:

- Mortgage Financing Application dated July 20, 1999 between Blue Hills and Credit Suisse together with a term sheet which was incorporated into and made a part of the letter.

- Letter of intent dated August 31, 1999 from Blue Hills to Credit Suisse, countersigned by Credit Suisse ("Letter of Intent").

As part of the Loan closing held on September 14, 1999, Blue Hills executed various Loan documents including the following: Mortgage, Assignment of Rents and Security Agreement ("Mortgage"); Mortgage Note ("Note"); and Cash Management Agreement ("CMA").

Fineberg and Langelier also executed a limited Guaranty ("Guaranty").

The Loan was secured by a mortgage on the Property.

As drafted, the Loan is non-recourse as to Blue Hills, Fineberg and Langelier except under certain limited circumstances which are set forth in the Mortgage, Note and Guaranty.

The Letter of Intent contained the following proposed language for what became paragraph 1.2(ii)(D) of the Guaranty: "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage . . . ." While the Loan was being negotiated, successive drafts of paragraph 1.2(ii)(D) of the Guaranty prepared by Credit Suisse's counsel, Schulte Roth & Zabel, LLP, contained this language: "Borrower fails to obtain Lender's prior written consent to any assignment, transfer,

- 4 -

or conveyance of the Mortgaged Property or any interest therein as required by the Mortgage….”
The final version of the Guaranty executed by Fineberg and Langelier contained the following
language: “Borrower fails to obtain Lender’s prior written consent to any assignment, transfer,
or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the
Mortgage ….”

## Loan Securitization And The Pooling Agreement

The Loan, originated by Credit Suisse, was securitized and assigned to J.P. Morgan, as
Trustee of a pool of loans.  Real estate loan securitization creates a secondary market for loans
secured by mortgages on real property.  Lenders originate loans and then sell a group of loans as
a pool to an entity that will issue securities.

An entity generally known as a “Master Servicer,” Wells Fargo in this case, is
responsible for collecting and tracking all mortgage payments and ensuring that all payments are
made to all the security holders.  Another entity, generally known as the “Special Servicer,” LNR
in this case, is charged with servicing the loans if the loans are in default for a certain period of
time or default is imminent.

When the Loan was assigned to J.P. Morgan as trustee, it became subject to the PSA.
Wells Fargo and LNR were required to service and administer the Loan in accordance with
applicable law, the terms of the Loan documents, and the PSA, as well as in accordance industry
standards.

## Cash Management and Reserve Accounts

When the Loan was negotiated, the parties intended significant cash reserves to be set
aside by Blue Hills.  It was contemplated that Blue Hills could access the reserve funds if
Equiserve did not renew its Lease and such funds were needed before a new tenant was in place.

The CMA required Blue Hills to deposit into a "Clearing Account" all of the "Rents" that it received in connection with the Lease. Funds deposited into the Clearing Account were then swept into a lender-controlled Cash Collateral Account and, thereafter, divided into nine separate sub-accounts maintained by the lender on a ledger entry basis. These sub-accounts included a "Tax and Insurance Impound Fund," a "Base Leasing Escrow Fund," and a "Cash Flow Leasing Escrow Fund." The accounts were maintained for, *inter alia*, payment of taxes, insurance and tenant improvements. These reserve accounts were intended to be accessible by Blue Hills for various purposes, including debt service. For example, Paragraph 6(c)(ix) of the Mortgage required J.P. Morgan to disburse  up to $1 million of funds (in excess of a minimum account balance of $2,750,000) to be used "solely toward payment or principal and interest then due and payable on the Note . . . ."

As of August 2004, Blue Hills had deposited approximately $4.1 million in the reserve accounts. In accordance with Paragraph 6(c)(ix) of the Mortgage, Blue Hills should have been able to access up to $1 million in August 2004.

## Payment of Real Estate Taxes

Although the Mortgage required Blue Hills to fund a reserve account for the payment of real estate taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement in October 1999. The agreement provided that Equiserve was to deposit real estate tax payments into the Clearing Account so that such sums could be swept into the Cash Collateral Account and used by Wells Fargo to pay the taxes. As a result of the foregoing arrangement, shortly before the taxes were due each quarter, Wells Fargo would issue a so-called "tax insufficiency" notice advising Blue Hills that the taxes were due.

- 6 -

The last notice received from Wells Fargo before Blue Hills was defaulted for failing to pay real estate taxes was dated July 16, 2004. This notice stated: "Failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to your loan." Wells Fargo did *not* send Blue Hills any notices that failure to timely pay the real estate taxes would constitute a default under the Loan.

### Blue Hills Is Notified In 2003 That The Lease Will Not Be Renewed

In April 2003, Blue Hills became aware that Equiserve intended to move out of the Property at the expiration of the Lease on July 31, 2004 and to relocate to the building located at 250 Royall Street, Canton, Massachusetts ("250 Royall"), which abuts Blue Hills' Property. By letter dated May 24, 2003, Equiserve notified Blue Hills of its intent not to exercise its option to extend the Lease. Blue Hills confirmed Equiserve's intent by a letter to Equiserve dated May 15, 2003.

### The Norfolk Action

In April 2003, Blueview Corporate Center, LLC ("Blueview"), the owner of 250 Royall, applied to the Town of Canton's Zoning Board of Appeals ("ZBA") for a Special Permit to construct a parking garage. On May 22 2003, the ZBA issued a decision granting the Special Permit over Blue Hills' objections.

On or about June 9, 2003, Blue Hills filed an appeal of the ZBA's decision in Norfolk Superior Court, Civil Action No. 2003-01051 ("Norfolk Action"). Blueview and the members of the ZBA were named as parties to the Norfolk Action. In the Norfolk Action, Blue Hills asserted that the ZBA failed to comply with the applicable Canton ordinances and by-laws in permitting the parking garage to be built as proposed. Blue Hills alleged, *inter alia*, that the height of the

proposed parking garage would not comply with applicable ordinances and by-laws. Blue Hills did *not* claim that the ZBA's decision caused it any monetary damage nor did it seek monetary damages as a remedy. Rather, Blue Hills sought only to have the ZBA's decision to grant the Special Permit annulled.

Less than two months after filing the Norfolk Action, Blue Hills entered into a settlement agreement dated August 5, 2003 ("Settlement Agreement") with Blueview and DST Realty, Inc. ("DST"), an affiliate of Equiserve, which intended to purchase 250 Royall from Blueview. DST's purchase of 250 Royall was conditioned upon the approval of all necessary permits for the construction of the parking garage. The settlement was negotiated before any discovery was commenced or any challenge to Blue Hills' standing was raised. By the terms of the Settlement Agreement, Blue Hills agreed to dismiss the Norfolk Action upon the receipt of $2,000,000.00 ("Settlement Proceeds") from DST. The Settlement Proceeds were to be paid on the earlier of the date on which DST acquired title to the 250 Royall or on September 2, 2003.

**The Settlement Proceeds Are Kept In Clients' Funds Accounts**

Upon the sale of the Property to DST, the Settlement Proceeds where wired to Bernkopf Goodman LLP's IOLTA account at Banknorth and, subsequently, wired to a Blue Hills' clients' funds account at Bernkopf Goodman LLP on August 8, 2003.

The client funds account at Bernkopf Goodman LLP was titled "Fineberg Royall Associates." This internal client reference is a generic reference to the client, which reference pre-dated the formation of Blue Hills and is not indicative of the ownership of the funds being held on behalf of any person or entity other than Blue Hills. The Trust owned the Property before the 1999 refinancing, which required the single purpose entity, Blue Hills, to be formed.

- 8 -

The Settlement Proceeds were reflected on the compiled financial statements of Blue Hills for the year ended December 31, 2003 as a reduction in basis of the Property and were not reported as income. The reduction in basis recorded in Blue Hills' financial statement reflects the $2,000,000 in Settlement Proceeds less the approximately $65,000.00 in attorneys' fees incurred in obtaining the settlement. Blue Hills' financial statement was prepared utilizing a legally permissible accounting method known as the income tax method of accounting. This legally permissible accounting method allowed the deferment of any tax payment on the Settlement Proceeds.

### Blue Hills Advises Wells Fargo That Lease Will Not Be Renewed

In 2003, Blue Hills advised Wells Fargo of Equiserve's notification of its intent not to renew the Lease. Thus, Wells Fargo and LNR were aware, at least as early as September 2003, that Equiserve did not intend to renew the Lease. Moreover, as early as the Spring of 2004, LNR knew that, despite Blue Hill's efforts, there was a distinct possibility that a substitute for the Property's sole tenant would not be found and that any such failure would have severe repercussions.

The internal e-mail communications in April 2004, between Wells Fargo and LNR reveal not only that they were concerned about the Loan but also that they were predicting a "FUGLY" and "fein potential mess for CSFB 1999-C", as well as an estimated loss of between $11.3 million to $19.75 million. Wells Fargo and LNR's internal e-mails in April 2004 also show that they did not know that Blue Hills had a right of access to the reserve accounts for debt service. One e-mail states: "In our case, I hope it is just a leasing reserve and the Borrower will be forced to default."

- 9 -

**Blue Hills Requests Disbursements from the Reserve Accounts**

Because Equiserve was leaving the Property as of July 31, 2004, funds were not available to pay the real estate taxes due to the Town of Canton on August 2, 2004. Blue Hills' representative, Joseph Donovan ("Donovan"), the CFO of FMI, sent, on August 2, 2004, a written request to Wells Fargo seeking disbursement from the reserve accounts of the sum of $412,833.43, to be used to pay principal and interest due on the Note for the month of August, 2004, as well as for payment of the real estate taxes. Payments of principal and interest under the Note were due on August 11, 2004. Wells Fargo paid $158,181.19 in property taxes due to the Town of Canton on August 2, 2004.

After sending the August 2, 2004 letter to Wells Fargo, Donovan contacted the Treasurer's Office for the Town of Canton, which verified to Donovan that the taxes had been paid. Consequently, Donovan reasonably assumed that the tax payment had been made from the reserve accounts.

When Donovan's August 2, 2004 letter was sent to Wells Fargo, Blue Hills was not in default of its obligations under the Loan and, accordingly, was entitled to the disbursement of funds for principal and interest due under the Note. Donovan sent a subsequent letter dated August 5, 2004 to Wells Fargo, which requested a meeting with both Wells Fargo and LNR, the Special Servicer. On August 13, 2004, having received no response from Wells Fargo, Donovan sent a fax memorandum to Curtis Mallegni ("Mallegni"), Wells Fargo's Asset Manager stating: "Sorry we have been missing each other on the phone. I would like to get the special servicer involved." Copies of his August 2 and August 5, 2004 letters were attached to the memorandum.

Wells Fargo responded to neither Donovan's requests for a meeting nor for disbursements that were contained in his correspondence dated August 2, 5 and 13, 2004.

- 10 -

Moreover, Wells Fargo did not advise Blue Hills that Blue Hills' failure to pay the real estate

taxes constituted an Event of Default under the Loan.

By letter dated August 19, 2004, but not faxed until August 24, 2004, an LNR asset

manager, Job Warshaw ("Warshaw"), notified Blue Hills that the Loan servicing had been

transferred to LNR and that LNR looked forward to a "successful working relationship" with

Blue Hills.  No mention was made of Blue Hills' requests for disbursement or of a loan default.

Warshaw also sent Blue Hills another letter dated August 19, 2004, but not faxed until

August 24, 2004, in which he advised that LNR had "agreed to discuss the status of [the

Loan]…" and "any issues arising under [the Loan documents].  That second August 19, 2004

letter included a list of documents requested by LNR, all of which LNR or Wells Fargo already

had in their possession, except for Fineberg and Langelier's updated financial statements and a

business plan.

Thereafter, on August 26, 2004, Fineberg signed the letter received from LNR on August

24, 2006 and faxed the signed copy to LNR.  Although Fineberg signed this letter and LNR or

Wells Fargo had virtually all of the requested documents, LNR did not schedule a meeting.

On September 2, 2004, Donovan wrote to Wells Fargo requesting the disbursement of

$254,652.24 to pay principal and interest due on the Note for the month of September, 2004.

Although Joseph Polcari ("Polcari") replaced Warshaw as asset manager at LNR on September

7, 2004, he not only failed to contact Blue Hills but soon thereafter, sent Blue Hills a default

letter dated September 17, 2004.

## LNR Wrongfully Defaults Blue Hills And Forecloses On The Property

In his September 17, 2004 letter, Polcari informed Blue Hills that its request for

disbursement of real estate taxes had been denied, purportedly because the Mortgage did not

permit such disbursements, and that – as of August 2, 2004 – Blue Hills was in default under the Loan for failure to pay real estate taxes when due.  This September 17, 2004 default letter is the only notice of default ever sent to Blue Hills.  Thereafter, on or about October 18, 2004, Daniel Frank ("Frank"), Blue Hills' representative and President of FMC, requested a meeting with LNR.

By letter dated October 21, 2004, CSFB, as assignee of J.P. Morgan, gave notice of its intention to foreclose.  During the period from November 10 – November 19, 2004, several letters were subsequently exchanged between Attorney Kenneth Goldberg ("Goldberg"), counsel for Blue Hills, and counsel for LNR , whereby Blue Hills continued to request that LNR meet with it to consider alternatives to foreclosure.

The evidence adduced at trial will show that, Wells Fargo's and LNR's internal e-mails reveal that they greedily viewed Blue Hills default as an opportunity not only to acquire the $4.1 million in reserves but also to acquire the Property by quickly commencing foreclosure proceedings.

A foreclosure sale occurred on or about November 19, 2004, and the foreclosure deed was recorded on January 14, 2005 with the Norfolk County Registry of Deeds in Book 21988, page 509.  As a result of the foreclosure sale, Blue Hills has suffered significant damages, including tax liability of the Trust totaling nearly $5 million.

On or about April 29, 2005,  CSFB sold the Property to One Beacon Insurance Group for $23,000,000.

### The December 31, 2004 Agreement

By agreement dated December 31, 2004 (the "December 31, 2004 Agreement"), Fineberg and Langelier agreed to have one-half of the Settlement Proceeds from the Norfolk Action

remain in a client funds account at Bernkopf Goodman LLP, with the remaining half of the Settlement Proceeds to be held in a client funds account at Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Cutler"), a firm representing Langelier. One-half of the Settlement Proceeds were wired to a client's funds account at Wilmer Cutler in February 2005.

The Settlement Proceeds continue to be held at Bernkopf Goodman and Wilmer Cutler for the benefit of Blue Hills and have never been distributed to the Trust's beneficiaries.

Based upon to the December 31, 2004 Agreement, there was approximately $5.6 million, inclusive of Settlement Proceeds, held by Blue Hills in a 'rainy day" reserve account.

### The Lender Lashes Out at Fineberg and Langelier

By letter dated April 20, 2005, *after* commencement of the above-captioned lawsuit, counsel for CSFB notified Langelier and Fineberg that CSFB was seeking from them the full deficiency owed under the Loan pursuant to the Guaranty. CSFB and J.P. Morgan now claim to be owed in excess of $11,000,000, calculated by taking the total amount of owed on November 19, 2004 offset by the foreclosure bid and reserve balance of $4.1 million.

### III.    THE PARTIES' CLAIMS

Blue Hills asserts causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing and violations of M.G.L. c 93A. The claims are predicated, in the main, on Lender's failure to adhere to both its own and industry standards regarding the servicing of the Loan and Lender's disingenuous acts designed to wrongfully obtain the Property and the reserve accounts, as discussed in Section II, *supra*.

Lender asserts causes of action against Blue Hills for breach of contract (relating to both the Mortgage and the CMA), breach of the implied covenant of good faith and fair dealing, intentional misrepresentation and violations of M.G.L. c. 93A. To up the ante, Lender ignores

- 13 -

the plain language of the Guaranty to assert causes of action against Fineberg and Langelier

under the Guaranty.  Causes of action for intentional misrepresentation and violations of M.G.L.

c. 93A are also asserted against Fineberg and Langelier.  As discussed in greater detail, *supra*,

Lender's claims are contrary to the language of the relevant documents and the agreements and

intentions of the parties.  Moreover, as a matter of law, Lender's attempt to impose liability

above and beyond that provided in the loan documents fails as a matter of law.

## IV.   <u>LEGAL ARGUMENTS</u>

**A.   THROUGH ITS AGENTS, WELLS FARGO AND LNR, THE LENDER HAS
SIGNIFICANTLY DAMAGED BLUE HILLS BY BREACHING THE IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING.**

### 1.   <u>Introduction.</u>

The implied covenant of good faith and fair dealing in every contract in Massachusetts,

requires the parties to "deal honestly and in good faith in both the performance and enforcement

of the terms of their contract . . . ."  *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200

(1993); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental

Retardation*, 424 Mass. 430 (1997).  This implied covenant serves to guaranty that the parties

"remain faithful to the intended and agreed expectations of the parties in their performance."

*Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  The implied

covenant of good faith and fair dealing includes a covenant that a party "shall [not] do anything

which will have the effect of or injuring the rights of the other party to receive the fruits of that

contract."  *Drucker v. Roland Wm. Jutras Associates, Inc.*, 37 Mass. 383, 385 (1976) citing

*Uproar Co. v. National Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir. 1936).  Moreover, a duty,

although not expressed, may be implied which obligates a party to take positive steps to

cooperate in achieving another party's contractual rights and objectives.  *Robert Brennan, et al.*

- 14 -

*v. Carvel Corporation*, 1989 U.S. Dist. LEXIS 16104 (D. Mass. July 25, 1989), citing *L.L. Hall*

*Constr. Co. v. United States*, 379 F.2d 559 (Ct. Cl. 1966).

Blue Hills had a right of access to approximately $4.1 million of its *own* money deposited

into the reserve accounts pursuant to Section 6 of the Mortgage, including up to of $1 million to

make principal and interest payments due on the Note.  To access the funds, only the following

three conditions must be satisfied:

- Blue Hills must "deliver" a written notice at least seven business days prior to the requested disbursement date;

- No Event of Default shall have occurred and be continuing as of the date of the request; and,

- Blue Hills' net operating income is insufficient to pay debt service due under the Note.

Section 6(c)(ix)(a) of the Mortgage does not define the term "delivered."  Section 39 of

the Mortgage requires that "notices shall be deemed to have been given on the date that they are

actually received; provided, that the inability to deliver Notices because of a changed address

will be deemed to be receipt of the Notice as of the date of such inability to deliver."  Section 39

of the Mortgage required that such "notices" be provided to Credit Suisse and to ORIX Real

Estate Capital Markets LLC ("ORIX"), the (then) Servicer.  However, by August 2004,

J.P. Morgan – not Credit Suisse – was the Lender and Wells Fargo – not ORIX – was the

Servicer.

Donovan's August 2, 2004 letter was addressed to Tim Parish ("Parish") in the Wells

Fargo's Property Tax Department because it was Parish who had signed Wells Fargo's July 16,

2004 tax insufficiency letter.  Wells Fargo's records show that Donovan's August 2, 2004 letter

was logged in as of August 4, 2004.  Thus, even assuming that Wells Fargo did not receive

Donovan's letter earlier, Donovan's letter was only *one* day late.  That Wells Fargo received

- 15 -

actual notice of Donovan's request is undisputed and the Lender has not presented any evidence that the one day delay caused it any prejudice.

In addition, the notice provisions contained in Section 39 of the Mortgage were not rigidly adhered to by Wells Fargo from Loan inception up to Donovan's August 2, 2004 letter. Contract modifications can be established by a party's prior course of conduct. *A. Leo Nash Steel Corp. v. Southern New England Steel Erection Co., Inc.*, 9 Mass. App. Ct. 377, 383 (1980). Wells Fargo's records show that requests for transfers in and out of the reserve accounts to cover tax, insurance and other shortages and adjustments were often handled by telephone and fax with far less than seven business day's notice. In one instance, Blue Hills requested release of money from the tax and insurance account by fax and the request was processed by Wells Fargo the next day.

Other than the nonpayment of real estate taxes, the Lender relies on the putative defaults committed by Blue Hills – dismissal of the Norfolk Action and receipt of the Settlement Proceeds – as support for its denial of Blue Hills' access to its reserve accounts. Blue Hills' actions with respect to the Norfolk Action and the Settlement Proceeds did not constitute Events of Default under the Mortgage. Finally, when Equiserve vacated the Property on or about July 31,2004, Blue Hills' rental income stream stopped. Thus, there does not appear to be any legitimate dispute that Blue Hills' had satisfied this precondition reserve account access to pay up to $1 million of debt service payments on the Loan.

## 2.    The Lender Also Had Contractual Obligations of Candor and Cooperation.

When Donovan sent his August 2, 2004 letter, he believed that the reserve accounts could be accessed to pay real estate taxes *in addition* to Blue Hills' undisputed right to access those accounts to pay debt service. Given the less than formal manner in which transfers within the

- 16 -

various reserve accounts were handled by Wells Fargo since the Loan's inception – including several instances when reserve accounts were used to fund the tax payments –  the parties' course of conduct permitted such access.  Indeed, as noted, *supra*, up until late July 2004, Wells Fargo's own records document mutual cooperation by Blue Hills and Wells Fargo in resolving various Loan and reserve account issues without adherence to the provisions of Section 39 of the Mortgage.

In these circumstances, Wells Fargo, as the Lender's agent, was no longer entitled to remain silent; it had an obligation to notify Blue Hills that it would disallow Blue Hills' access to the reserve accounts for payment of real estate taxes and provide Blue Hills with a reasonable amount of time to make that payment or reimburse Wells Fargo therefor.  Even when there is no specific duty to speak, silence alone can indicate assent to a proposal if this conclusion is reasonable because of a prior course of dealing, and suggests assent.  *McGurn v. Bell Microproducts, Inc.* 284 F. 3d 86, 90 (1st Cir. 2002).  *See also Shawmut Bank v. Wayman,* 34 Mass App. Ct. 20,25 (1993) (bank had a good faith duty to be honest in its dealing with the guarantor).

Wells Fargo and LNR's internal e-mails document the reasons why Blue Hills was never advised that access to the reserve accounts for payment of real estate taxes and debt service would be denied.  LNR had been monitoring the Loan for almost a year.  Its e-mails at that time express concern over Blue Hills' admitted ability to access the reserve accounts to pay debt service and its hope that Blue Hills could be *forced to default* before it could access the reserve accounts.  Additionally, LNR's prior dealings with Fineberg led it to conclude that Fineberg would be a hard negotiator in any Loan work-out.  Finally, LNR had its sights on purchasing the Loan to add it to its own portfolio.  LNR's internal e-mails also show that, despite Warshaw's

- 17 -

August 19, 2004 letters advising Blue Hills that LNR looked forward to working with Blue Hills and would meet with Blue Hills to discuss the Loan status, LNR never had any intention to do so.

In light of these facts, it is manifest that LNR and Wells Fargo's silence accomplished what LNR's Kevin Wodicka was hoping for in his April 28, 2004 e-mail:

> The originator may required (sic) the escrow to ensure a default does not occur when the cash flow stops.  In a good market, this is a great feature.  In our case, it may be a long while before a tenant is found.  In our case, I hope it is just a leasing reserve and *that [Blue Hills] will be forced to default.*

(emphasis added).

Had Blue Hills been notified that its request would be denied, it had every motivation (and the funding from the "rainy day" reserve) to pay the net amount due of approximately $106,000 to Wells Fargo for the August 2, 2004 real estate tax payment.

As purported justification for its actions, the Lender claims that Blue Hills committed 12 Events of Default.  This is incorrect.  The alleged defaults relating to the Norfolk Action and the receipt of the Settlement Proceeds, were not defaults at all.  Blue Hills' failure to pay property taxes could and would have been prevented had the Lender not breached its duty to cooperate with Blue Hills.  Further, the workstations sale did not constitute an Event of Default.  The "domino effect" of the remaining defaults arises from the Lender's breach of the duty cooperate.

Blue Hills and Wells Fargo's prior course of conduct and the other circumstances adverted to, *supra*, entitled Blue Hills to have access to the reserve accounts to pay real estate taxes, or required notification to Blue Hills of the tax non-payment.  Prudent banking industry practice also required such notification.  Accordingly, Lender also breached contractual obligations by, *inter alia*, failing to allow Blue Hills access to *its* money in the reserve accounts

- 18 -

and by remaining silent in light of its obligations to speak.  At minimum, Lender had an obligation to respond to Blue Hills' numerous requests for both a meeting and for release of reserve funds, particularly in light of its indications that it was amenable to a consensual resolution of any problems extant.

**B.    LENDER AND ITS AGENTS, WELLS FARGO AND LNR, FAILED TO ADHERE TO PRUDENT BANKING PRACTICES AND BREACHED SECTION 3.01 OF THE PSA.**

Lender admits that LNR and Wells Fargo were obliged to administer and service the Loan in accordance with applicable law, the terms of the Loan Documents and, to the extent consistent therewith, the provisions of the servicing standard ("Servicing Standard") set out in Section 3.01 of the PSA.  The Lender has also admitted that Wells Fargo and LNR were its agents for the purposes set forth in the PSA.  As agents of a disclosed principle, Wells Fargo and LNR's actions were binding upon the Lender.  *Riverdale Mills Corp. v. U.S. F. A.A.* 417, F. Supp. 2d. 167, 170 (D. Mass 2006).

The Mortgage provides, *inter alia*, that the Loan will become part of a securitized loan pool and that Credit Suisse planned to delegate its responsibilities under the Loan Documents to a servicer pursuant to a servicing agreement.  Mortgage, Sections 59-61.  The PSA was executed less than a month after the Loan closing, at which time the Loan became part of a securitized loan pool administrated by Wells Fargo, as Servicer, and LNR, as Special Servicer.  Thus, under this typical securitized loan paradigm, the rights and responsibilities for administrating the Loan shifted from Credit Suisse, the loan originator, to J.P. Morgan, as Trustee, to Wells Fargo, as Servicer, and, finally, to LNR, as Special Servicer upon default or where default is imminent.

The Servicing Standard contained in Section 3.01 of the PSA establishes the touchstones governing Wells Fargo and LNR's conduct, and mandates that Wells Fargo and LNR must

- 19 -

conduct themselves in accordance with the *higher* of two standards: (1) the standard of care, skill, prudence and diligence employed in administering similar commercial or multi-family mortgage loans or, (2) standard of care, still, prudence and diligence employed in servicing and administering similar commercial or multi-family mortgage loans owned by Wells Fargo or LNR.  The Servicing Standard also obligated LNR and Wells Fargo to perform their services *without regard* to: (1) any relationship they or any affiliate may have had with the Blue Hills; (2) any compensation to be received under the PSA; and (3) their ownership, servicing or management of any other mortgage loans or mortgage properties.

Blue Hills' banking expert, Richard Clarke ("Clarke"), and Lender's banking expert, Ronald Greenspan, ("Greenspan") both agree that borrowers involved in securitized loan transactions have the right to expect that their loans will be administered by the Servicer and Special Servicer according to the Servicing Standard.  This expectation reflects the industry practice, which is also reinforced by the provisions in the Mortgage.  This expectation is important because in order to have confidence in the treatment of each individual pooled loan, the market place - including lenders, borrowers and certificate holders have the right to expect the pool loans will be serviced strictly in accordance with the Servicing Standard.

The Servicing Standard is reflective of the industry practices of prudent institutional multi-family and commercial mortgagors.  Thus, although the over-arching objective contained in Section 3.01 of the PSA is for the Servicer or Special Servicer to maximize "on a present value basis (discounting at the related Mortgage Rate)… timely recovery of interest and principle on the Loans …," standards of prudency dictate how that objective is best achieved.  In that regard, the PSA is replete with provisions which clearly contemplate that specially serviced loans

- 20 -

will be worked (as opposed to being foreclosed) out to the fullest extent practical and reasonable.

Consider the following:

- Section 3.02(1)(f) obligated Wells Fargo to provide LNR with information relating to the Loan "to enable [LNR] *to negotiate* with [Blue Hills]…." (emphasis added)
- Section 3.4(f) also obligated LNR to "use its reasonable best efforts to cause the related mortgagor to cure any default and/or remedy, any such event, *workout or modify* the Loan consistent with the terms of this Agreement…." (emphasis added)
- 3.09(a) provided LNR with the right, consistent with the Servicing Standard, to foreclose on the Property *only if* Blue Hills continues to be in default and only so long "*as…no satisfactory arrangements can be made for* collection of delinquent payments…." (emphasis added)
- Under Section 3.20 of the PSA, LNR had the authority, in accordance with the provisions therein, to reduce or forgive principle, accrued interest, prepayment or yield maintenance premiums or forebear on the enforcement on any rights under any of the Loan Documents including the reduction of a borrower's monthly payment.

Both Wells Fargo and LNR deviated substantially from the Servicing Standard, as well as the applicable industry standards for third party loan servicing. It is especially perplexing that both Wells Fargo and LNR failed to advise Blue Hills of the denial of its request for access to the reserve accounts to pay real estate taxes. Moreover, it is unprofessional that LNR was motivated to acquire the Loan while simultaneously being predisposed against working with Fineberg based on LNR's past dealings with him.

The point is not whether LNR was contractually obligated to work out the Loan; it wasn't. LNR was obligated, as part of its duty to perform its services in accordance with the Servicing Standard, to, at minimum, *explore* a work-out possibility with Blue Hills. The record is devoid of any evidence that LNR had any intention to do so. The bottom line is that LNR, as the Lender's agent, had estimated upwards of a $20 million loss on the Loan if it was foreclosed. Nonetheless, it pursued its default and failure remedies based on the pretext that Blue Hills had failed to pay the August 2, 2004 tax payment. No effort to assist Blue Hills' or its principals to resolve matters by coming up with the allegedly delinquent payment was ever attempted. Had

- 21 -

LNR advised Blue Hills that it had to either come up with the payment or risk default on a $31 million loan and Blue Hills refused, that would have been the end of the debate.  Unfortunately, LNR never pursued that path.

**C.    BLUE HILLS, FINEBERG AND LANGELIER ARE NOT LIABLE UNDER THE GUARANTY FOR THE LOAN DEFICIENCY.**

At the core of Lender's allegations is that Blue Hills' receipt of the Settlement Proceeds and the dismissal of the Norfolk Action allegedly constituted an "assignment, transfer or conveyance of an interest in the Mortgaged Property, requiring Lender's prior written consent pursuant to Section 10 of the Mortgage."  Counterclaims, ¶31.  Full liability for the Loan deficiency, so Lender alleges, is based upon Guaranty paragraph 1.2(ii)(D) which provides that:

> Guarantor shall be liable for the full amount of the Debt[1] in the event that . . . (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer or conveyance of the Mortgaged Property[2] or any interest therein if required by *Section 10* of the Mortgage.  (emphasis in original).

Accordingly, under Guaranty paragraph 1.2(ii)(D), Lender bears the burden of proving that:

- Blue Hills assigned, transferred or conveyed Mortgaged Property or any interest therein;

- Blue Hills failed to obtain Lender's prior written consent to such assignment, transfer or conveyance; and,

- Lender's consent to such assignment, transfer or conveyance was required by Section 10 of the Mortgage.

Based upon the uncontroverted facts, and Guaranty paragraph 1.2(ii)(D) and Section 10 of the Mortgage, Lender will be unable to satisfy their burden with respect to any of the foregoing.

---

[1]  "Debt" is not defined in the Guaranty.

[2]  "Mortgaged Property" is only defined in Guaranty paragraph 1.2(ii)(B), which deals with intentional physical waste of the Mortgaged Property, and which specifies that the definition of Mortgaged Property in the Mortgage shall govern.

- 22 -

1.    **Blue Hills Has Not Assigned, Transferred or Conveyed Any Mortgaged Property.**

Pursuant to the Settlement Agreement, Blue Hills received the Settlement Proceeds in consideration of its dismissal of the Norfolk Action. According to Lender's Counterclaims, these two events – receipt of the Settlement Proceeds and dismissal of the Norfolk Action – required Lender's prior written consent under Section 10 of the Mortgage. Aside from the Lender's plaint that their consent for the settlement was neither sought nor given, there is no record evidence that Lender was displeased with the $2 million settlement amount or the settlement terms. Put simply, the Lender is attempting to use the consent provisions in Section 10 of the Mortgage in a flawed defensive strategy to hold Fineberg and Langelier personally liable for a claimed $12 million plus loss which the Lenders sustained when they wrongfully foreclosed on the Property in November 19, 2004. Regardless of whether consent was required from Lender, there has been *no* assignment, transfer or conveyance of the Settlement Proceeds by Blue Hills.

The Settlement Proceeds were deposited into a client's funds account with Blue Hills' counsel immediately after it was received on August 8, 2003. The Settlement Proceeds were held in an account bearing the name "Fineberg Royall Associates,"[3] the generic name of the Blue Hills account. The Settlement Proceeds constituted a portion of several million dollars of distributable Property income which had been voluntarily accumulated and retained by Blue Hills beginning shortly after the Loan's inception as a "rainy day" Property reserve fund. This "rainy day" reserve fund was separate from and in addition to approximately $4.1 million of Blue Hills' funds on deposit in the Reserve Accounts (established pursuant to Section 6 of the

---

[3] The Trust was the former fee owner of the Property. As a condition of the Loan, Credit Suisse required that the owning entity be a single purpose bankruptcy remote entity. Thus, Blue Hills was formed to comply with Credit Suisse's requirements. The Trust is Blue Hills' sole member.

Mortgage) as of August, 2004. Thereafter, pursuant to an Agreement dated December 31, 2004, one-half of the Settlement Proceeds – $1 million – held in the Blue Hills' client's funds account were transferred into a client's funds account with Langelier's attorney's law firm. The Settlement Proceeds were properly recorded in Blue Hills' compiled financial statement for the year ended December 31, 2003 as a reduction in the Property's basis. That financial statement was prepared utilizing a legally permissible accounting method known as the income tax method of accounting.

In short, the Settlement Proceeds have remained in Blue Hills' possession since they were received, were recorded in Blue Hills' financial books and records and have not been distributed to any of the beneficiaries of the Trust. Moreover, as discussed *infra*, Blue Hills maintains that the Settlement Proceeds are not part of Lender's collateral.

**2.    Section 10 of the Mortgage Applies to the Transfer or Assignment of the Property, Not to Blue Hills' Receipt of the Settlement Proceeds and Dismissal of the Norfolk Action.**

The last sentence in Section 10(a) of the Mortgage contains the lynchpin of Lender's erroneous contention that Blue Hills' receipt of the Settlement Proceeds and dismissal of the Norfolk Action without Lender's consent renders Blue Hills, Langelier and Fineberg liable for the full amount of the Loan deficiency:

> Mortgagor shall not, without the prior written consent of the Mortgagee . . . sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof or permit the Mortgaged Property to be sold, conveyed, alienated, mortgaged, encumbered, pledged, or otherwise transferred.

Lender assert that the phrase "Mortgaged Property" in Section 10(a) must be construed as broadly as the definition of "Mortgaged Property" contained on page 1 of the Mortgage. However, Section 10, construed as a whole, and in conjunction with Guaranty paragraph

- 24 -

1.2(ii)(D), mandates a much narrower construction of the phrase "Mortgaged Property".  Several reasons support this narrower construction.  First, the general import of Section 10 is that Credit Suisse's consent is required for the alienation or transfer of the *Property*.  Section 10(a) states that Credit Suisse has "examined and relied on the creditworthiness and experience of [Blue Hills] in *owning and operating properties such as the Mortgaged Property* . . . [s]o as to insure that should Mortgagor default in repayment of the Debt, Mortgagee can recover the Debt by a *sale of the Mortgaged Property*."  (emphasis added)  The quoted language evinces the parties' intent to define "Mortgaged Property" as the Property and not, for example, intangibles such as the Norfolk Action or the Settlement Proceeds.

Secondly, Section 10(b) enumerates the types of assignments and transfers included within the scope of Section 10, all of which involve the sale, encumbrance, transfer or leasing of the Property, the legal and beneficial ownership thereof, and/or the substitution of Fineberg and Langelier as guarantors.  As with Section 10(a), the import of Section 10(b) is that the scope of the transactions (as to which prior written consent is required) *is limited to the Property,* the ownership interests therein and the substitution of the guarantors.

Third, Section 10(e) obligated Blue Hills to reimburse Credit Suisse for expenses and fees incurred in connection with its approval of the requested transfer or encumbrance including "title search costs and title insurance endorsement premiums."  The enumerated expenses and fees in Section 10(e) are normally associated with real property, not litigation or settlement proceeds.

Fourth, Section 10(f) enumerates several preconditions to Credit Suisse's consent to a Section 10 sale or transfer, all of which are Property oriented:

- 25 -

- Section 10(f)(ii) requires that the proposed transferee "shall be a reputable entity or person of good character, creditworthy, with sufficient financial worth . . . ."

- Section 10(f)(ii) requires the proposed transferee and "its *property manager* to have "sufficient experience in the ownership and management of <u>properties similar to the Mortgaged Property</u> . . . ."  (emphasis added)

- Section 10(f)(iv) entitles Credit Suisse to obtain rating agency recommendations to the transfer; and

- Most significantly, Section 10(f)(vi) entitles Credit Suisse to an assumption fee equal to 1% of the mortgage Debt, plus reimbursement of costs and expenses incurred in connection with the assumption.  This subsection requires the payment of a fee if the Loan secured by the mortgage is being assumed by a new owner.  This subsection has no relevance to the Norfolk Action or to the Settlement Proceeds.  The Counterclaims do not seek any assumption fee for the allegedly improper transaction at issue.

The narrower construction of the phrase "Mortgaged Property" in Section 10 is also buttressed substantially by Section 50 in the Mortgage, which states that terms such as Mortgaged Property shall mean any portion of the Mortgaged Property and any interest therein "*[u]nless the context clearly indicates a contrary intent* or unless otherwise specifically provided herein . . . ."  (emphasis added)  Thus, Section 50 of the Mortgage articulated the parties' intention to ascribe different meanings to the phrase "Mortgaged Property" throughout the Mortgage.  Section 10, is only one of several sections in the Mortgage where the sectional context clearly indicates that the phrase "Mortgage Property" refers to the Property.  The following are examples:

- Section 4(a) describes Mortgaged Property that is damaged or destroyed by fire or other casualty.

- Section 5 describes taxes, assessments, water rates, sewer rents and other charges imposed against the Mortgaged Property.

- Section 6(b) establishes a replacement escrow fund for "replacement and repairs required to be made to the Mortgaged Property. . . ."

- Section 7(b)(i) requires condemnation awards to be held in escrow and applied "toward the cost of the restoring the Mortgaged Property or any part thereof subject to the Taking . . . ."

- 26 -

- Section 8(c) requires Credit Suisse's consent to certain leases "of all or any part of the Mortgaged Property . . . ."

- Section 9 requires Blue Hills to "cause the Mortgaged Property to be maintained in a good and safe condition and repair."

- Section 11(s) includes a representation by Blue Hills that the "Mortgaged Property has adequate rights of access to public ways and is served by adequate water, sewer, sanitary sewer and storm drain facilities."

The objective manifestations of the parties' intent regarding Section 10 of the Mortgage could not be clearer. That section requires Credit Suisse's consent for significant actions affecting *the Property* and the Loan; a transfer of the Property or the ownership interest therein, and substitution of Fineberg and Langelier as guarantors. Section 10 contains *no* consent requirement with respect to the settlement of the Norfolk Action or Blue Hills' receipt of the Settlement Proceeds.

> **3.      Neither Blue Hills' Receipt of the Settlement Proceeds Nor Its Dismissal of the Norfolk Action Required CSFB's Prior Consent, or Even Notice to CSFB.**

As discussed, *supra*, Section 10 of the Mortgage requires Credit Suisse's consent *only* for certain transfers, sales and encumbrances relating to the Property. There is *no* express requirement in the Mortgage that Blue Hills was required to obtain Lender's approval prior to its commencement of the Norfolk Action, or its settlement, or its dismissal or Blue Hills' receipt of the Settlement Proceeds, or even to provide Lender with notice of any of the foregoing. Nor can such requirement be implied. *Ayash v. Dana-Farber Cancer Institute,* 443 Mass. 367, 385 (2005). Indeed, whenever the Mortgage restricts Blue Hills' ability to settle claims without consent or requires notice to Credit Suisse, it does so in express terms. For example, in Section 4 of the Mortgage, Credit Suisse's consent is required before Blue Hills can settle and adjust insured casualty loss claims in excess of $250,000. Mortgage, §4(a) and (b)(ii) *et seq.* Section 4 also required that Blue Hills provide prompt notice to Credit Suisse of any casualty loss.

- 27 -

Another section in the Mortgage precludes Blue Hills from settling condemnation litigation or from accepting condemnation awards in excess of $250,000 without Credit Suisse's prior consent.  Mortgage, Section 7(a) and (b).  And, similar to Section 4, Blue Hills is required to provide Credit Suisse with prompt notice of any actual or threatened condemnation or eminent domain proceeding.

In a similar vein, the Mortgage also expressly requires notice to Credit Suisse and/or its prior written consent for other enumerated events or occurrences:

- Credit Suisse's prior written consent was required in Section 8(c) before Blue Hills could enter into a lease "of all or any part of the Mortgaged Property in excess of 10% of the gross leasable area . . . ."

- Credit Suisse's prior written consent was also required in Section 9 before Blue Hills discontinued or abandoned any non-conforming use of the Mortgaged Property.

- Under Section 31, Blue Hills' right to contest or refusal to pay taxes, charges or to comply with legal requirements was conditioned upon prior notice to Credit Suisse coupled with a delivery of a cash deposit or an indemnity bond.

- Section 29 of the Mortgage only gave Credit Suisse the right, after written notice to Blue Hills, to *defend* any action with respect to the Mortgaged Property, but *only after* an Event of Default or after Blue Hills failed to defend the action "under circumstances under which it is unreasonable not to so act."

The Norfolk Action was an affirmative claim brought by Blue Hills to challenge the propriety of the ZBA's decision to grant an abutter a special permit to construct a garage.  Aside from the issue of whether the Norfolk Action or the Settlement Proceeds constituted part of Credit Suisse's collateral under the Mortgage, neither of these fit into any of those sections of the Mortgage where Credit Suisse expressly requires prior notice and/or consent to the settlement of any affirmative claims asserted by Blue Hills.

- 28 -

**4.     The "Full Liability" Provisions of the Guaranty Are Limited to Acts Which
Adversely Affect CSFB's Mortgagee Status and the Loan's Securitization.**

Guaranty paragraph 1.2 (ii) (A)-(E) imposes liability on Fineberg and Langelier for the

"full amount of the Debt," but *only* in the following limited circumstances:

- The first full monthly payment of principal and interest on the Note is not paid
  when due.  Guaranty, paragraph 1.2(ii)(A).

- Blue Hills fails to maintain its status as a single purpose entity.  Guaranty,
  paragraph 1.2(ii)(B).

- Blue Hills fails to obtain Credit Suisse's prior consent to any subordinate
  financing or other voluntary lien encumbering the Mortgaged Property.
  Guaranty, paragraph 1.2(ii)(C).

- Blue Hills fails to obtain Credit Suisse's prior written consent to any
  assignment, transfer or conveyance of the Mortgaged Property or any interest
  therein "if required by Section 10 of the Mortgage. . . ."  Guaranty, paragraph
  1.2(ii)(D); and

- Blue Hills or the guarantors are the subject of any bankruptcy proceeding or
  other act of insolvency.  Guaranty, paragraph 1.2(ii)(E).

Generally, all of the enumerated circumstances have the potential of adversely impacting

either Credit Suisse's status as the sole mortgagee on the Property or its ability to transfer the

Loan to a securitized loan pool, as contemplated by Sections 59, 60 and 61 of the Mortgage.

These are the only events that expose Blue Hills, Fineberg, and Langelier for the "full amount of

the Debt," and are in stark contrast to the acts enumerated in Guaranty paragraph 1.2(a)-(g),

which only expose Blue Hills, Fineberg and Langelier to personal liability for Lender's actual

loss sustained (excluding consequential damages) arising directly from the seven enumerated

events in subparagraphs (a)-(g).

In light of the foregoing, it is an unreasonable and unwarranted interpretation of Guaranty

paragraph 1.2(ii)(D) to conclude that Blue Hills' failure to obtain Lender's permission prior to

settling the Norfolk Action and/or receiving the Settlement Proceeds triggered Blue Hills',

- 29 -

Fineberg's and Langelier's full liability under the Guaranty. This is true even if, *arguendo,* the Settlement Proceeds and the Norfolk Action constituted part of Lender's Loan collateral. There is nothing even remotely suggesting that the Norfolk Action or the Settlement Proceeds had the potential of impacting either the status of the Mortgage or the securitization of the Loan.

> **5.    The Chronology of Revisions Made to Paragraph 1.2(ii)(D) Prior to Loan Closing Demonstrates the Parties' Intention to Limit the Phrase "Mortgaged Property" in the Context of Section 10.**

The chronology of the revisions made to Guaranty paragraph 1.2(ii)(D) prior to the Loan closing demonstrates that the parties intended to limit the scope of consent-required transfers and assignments in the context of the "full liability" provisions of the Guaranty paragraph 1.2(ii)(D). For example, in the letter of intent dated August 31, 1999 executed by Credit Suisse's loan originator, Joseph Rubino, the version of what is now Guaranty paragraph 1.2(ii)(D) read as follows:

> "Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the *Property* or any interest therein as required by the Mortgage. . . ." (emphasis added) Statement, ¶ 27.

This version of the paragraph shows that the parties intended to limit the provisions in paragraph 1.2(ii)(D) to an "assignment, transfer or conveyance of the Property, which was identified in the letter of intent as the "Blue Hills Office Park."

Thereafter, the initial drafts of the Guaranty prepared by Credit Suisse's counsel, Schulte Roth & Zabel LLC, contained this version of paragraph 1.2(ii)(D):

> "(D)  Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the *Mortgaged Property* or any interest therein *as required by the Mortgage.*" (emphasis added).  Statement, ¶ 28.

This language was contained in all successive revisions to Guaranty paragraph 1.2(ii)(D) except

for the version of the Guaranty executed by Fineberg and Langelier, which provides as follows:

> "(D)  Borrower fails to obtain Lender's prior written consent to
> any assignment, transfer, or conveyance of the Mortgaged Property
> or any interest therein if required by *Section 10* of the Mortgage."
> (emphasis in original)

Thus, the evolution of Guaranty paragraph 1.2(ii)(D) demonstrates that the parties

intended that the full liability provisions of the Guaranty could *only* be triggered in the event that

there was an unconsented assignment or transfer, if – and only if – such consent was required by

Section 10 of the Mortgage; a section which is limited to transfers, assignments and sales

involving the Property.

**D.    BLUE HILLS HAD NO OBLIGATION TO NOTIFY LENDER OF ITS RECEIPT
OF THE SETTLEMENT PROCEEDS, NOR DID IT HAVE ANY OBLIGATION
TO DEPOSIT THE SETTLEMENT PROCEEDS IN THE CLEARING
ACCOUNT; EVEN IF IT DID, BLUE HILLS WOULD HAVE BEEN ENTITLED
TO THOSE PROCEEDS.**

Lender alleges that Blue Hills failed to deposit the Settlement Proceeds into the Clearing

Account and failed to notify the Lender thereof as purportedly required by the CMA.  As an

initial matter, CSFB was not even in existence until over a year *after* the Settlement Proceeds

were received by Blue Hills; thus, Blue Hills would have been unable to provide CSFB with

notice even if required by the CMA.

CSFB's answers to Interrogatories state that it seeks damages of approximately

$12 million, consisting of the total amount of Note indebtedness as of November 19, 2004, plus

interest, minus credits purportedly for the foreclosure bid and Reserve Account balances.

However, none of the five enumerated events in Guaranty paragraph 1.2(ii)(A)-(E) which might

conceivably expose Blue Hills, Fineberg and Langelier to full liability address a violation of the

CMA.  Consequently, Fineberg and Langelier are *not liable* under the Guaranty for the full amount of the Loan deficiency for any alleged breach of the CMA.

Even assuming that Blue Hills breached the CMA, at worst, Fineberg and Langelier's liability under Guaranty paragraph 1.2(ii)(a)-(g) is limited to "*loss*, damage, cost, expense, liability, claim or other obligation *incurred by Lender*, including attorneys' fees and costs reasonably incurred, but in all events *excluding, however, all consequential damages* . . . ." (emphasis added).  The only provision contained in Guaranty paragraph 1.2(ii)(a)-(g) that even remotely relates to Lender's cause of action for breach of the CMA is subsection (e), which provides for limited personal liability for Lender's direct loss resulting from: "[t]he misapplication or conversion by Borrower of . . . (iii) any Rents (as defined in the Mortgage) following an Event of Default . . . ."  Thus, under Guaranty paragraph 1.2(ii)(e)(iii), the Lender bears the burden of proving:

- An Event of Default, followed by,
- A misappropriation or conversion of "Rents" (as defined in the Mortgage).

### 1.    <u>No Event of Default Occurred.</u>

CSFB's answers to interrogatories assert that Blue Hills committed Events of Default under Sections 23(d) and (1) of the Mortgage by settling and dismissing the Norfolk Action, by accepting the Settlement Proceeds without Lender's prior written consent *as required by Section 10 of the Mortgage* (a purported breach of Section 23(d)), and by failing to notify Lender of its receipt of the Settlement Proceeds.  As discussed, *supra*, Section 10 of the Mortgage imposes no obligation on Blue Hills to give notice to or obtain Lender's consent for the dismissal of the Norfolk Action or to receive the Settlement Proceeds.  Thus, no violation of Section 23(d) occurred.

- 32 -

Also, no Event of Default can occur under Section 23(l) of the Mortgage *unless* there has been a default which continues beyond any applicable cure period or, if none, for thirty days after Mortgagor receives notice of such default. Even if dismissal of the Norfolk Action and/or receipt of the Settlement Proceeds constituted an Event of Default under Section 23(l), nothing in the record shows that Lender ever gave notice of that default as required by Sections 23(l) and 39 of the Mortgage . Indeed, only one letter even mentions the Norfolk Action and the Settlement Proceeds. That letter, dated April 20, 2005 – after the Property had already been foreclosed and was in the process of being resold to One Beacon Insurance Group – and sent to Fineberg and Langelier by Lender's counsel, asserted that Fineberg and Langelier were liable for the full amount of the Debt because of their alleged violation of Section 10 of the Mortgage. It contains no assertion that dismissal of the Norfolk Action or receipt of the Settlement Proceeds constituted a violation of the CMA or Section 23(l) of the Mortgage.

## 2.    No Misappropriation or Conversion Occurred.

Lender also bear the burden of proving that there has been a "misapplication or conversion" of "Rents" following an Event of Default. The nouns "misapplication" and "conversion" are not defined in the Mortgage. As such, unambiguous words in a contract must be construed in accordance with their ordinary and usual sense. *Computer Systems of America, Inc. v. Western Reserve Life Assur. Co. of Ohio*, 19 Mass. App. Ct. 430, 434 (1985). *Webster's Third International Dictionary* defines "misapplication" as "misuse or embezzlement of funds" and defines "conversion" as "an appropriation of and dealing with the property of another as if it were one's own without right." *Webster's Third International Dictionary*, pp. 1442, 499 (3d ed. 1971). Blue Hills did not engage in any conduct with respect to the Settlement Proceeds that fits

- 33 -

either of these two definitions. As stated earlier, the Settlement Proceeds have remained Blue

Hills' property since they were received by Blue Hills.

### 3.    The Settlement Proceeds Are Not "Rents."

The Settlement Proceeds are not "Rents" under the CMA.[4]  The plain meaning of the

modifying phrase in Granting Clause Four "arising from or attributable to the [Property]"[5]

requires that there be a close nexus between the Property and the money or other consideration in

order for them to be called "Rents."  The enumerated combinations and permutations of the

money and other consideration which constitute "Rents" under Granting Clause Four all have

one thing in common:  they all were generated as a result of the use, enjoyment or occupation of

the Property.  The plain meaning of the word "Rents" supports this conclusion as well.[6]  That

Credit Suisse intended to distinguish "Rents" from other types of collateral in the Mortgage is

also borne out by the fact that there are eight Granting Clauses and only one – Granting Clause

Four – involves "Rents."  It is also clear that Credit Suisse intended to distinguish between

"Rents" and other types of collateral in the CMA generally and Section 8 in particular.  As set

out in footnote 6 of this memorandum, the CMA adopted the definition of "Rents" contained in

the Mortgage, not the arguably broader definition of Mortgaged Property contained on page 1 of

---

[4]  The CMA employs the same definition of "Rents" as contained in the Mortgage.  "Rents" is defined in Granting Clause Four as "all leases . . . and other agreements . . . affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the [Property] . . . and all rents, rent equivalents, monies payable as damages or in lieu of rent or rent equivalents . . . or other consideration of whatever form or nature received by or paid to or for the account or benefit of [Blue Hills] . . . arising from or attributable to the [Property]. . . ."

[5]  *Webster's Third New International Dictionary* defines "arising" as " to originate from a specified source" and "attributed" as "caused or brought about by:  regard as occurring in consequence of or on account of" and "to regard as possessed, owned, originated, characterized or described as indicated."  *Webster's Third New International Dictionary*, pp. 117, 141-142 (3d ed. 1971).  Cases that have interpreted the language "arising from" or "attributed to" have similarly defined these terms.  "'Arising out of' is ordinarily held to mean originating from, growing out of, flowing from, incident to or having connection with," and the proponent bears the burden of proving that a "reasonably apparent causal connection" must exist.  *Murdock v. Dinsmoor*, 892 F.2d 7 (1st Cir. 1989).

[6]  *Webster's Third New International Dictionary* defines "rents" as "property that the owner allows another to use in exchange for payment."  *Webster's Third New International Dictionary*, p. 1923 (3d ed. 1971).

the Mortgage. Additionally, Section 8 of the CMA only deals with "items of Rents" and the scope of that phrase is "subject to the provisions of the Mortgage . . . ."

In addition, for the same reasons that the Settlement Proceeds are not "Rents," they were not the result of an "extraordinary event . . . derived from or generated by the *use, ownership or operation* of the [Property]" as provided in Section 8(d) of the CMA. "Extraordinary event" is undefined in the CMA. However, the plain meaning of that phrase in the context of Section 8(d) is that proceeds from an "extraordinary event" must come from or be generated by "use, ownership or operation of the "Property." As discussed, *infra,* the Settlement Proceeds neither came from nor were generated by the use, ownership or operation of the Property.

**4.    The Settlement Proceeds Were Neither Derived From Nor Generated From the Use, Ownership or Operation of the Property.**

The Settlement Agreement enabled the proposed parking garage on the 250 Royall Street property to be constructed. It also required Blue Hills' to waive its claim that the ZBA erroneously interpreted the Canton By-law when it issued the special permit for the garage. As several facts in the record demonstrate, the Settlement Proceeds were paid in consideration of Blue Hills' dismissal of the Norfolk Action, not as compensation for any diminution in the value of the Property or for the loss of Equiserve as a tenant. In the Norfolk Action, Blue Hills sought no damages at all, let alone damages for any diminution in the value of the Property. And, as the Settlement Agreement's preamble states, Blue Hills appealed the ZBA's decision "principally on the basis that it was obtained in reliance upon an incorrect interpretation of the Town of Canton Zoning By-law . . . ." Furthermore, prior to commencement of the Norfolk Action, Equiserve had already confirmed to Blue Hills that it had no intention of exercising its option to extend the Lease. Thus, there was no landlord-tenant relationship to be salvaged by Blue Hills.

- 35 -

Lender apparently relies on two paragraphs – 37 and 38 – in Blue Hills Complaint in the Norfolk Action as an admission that Blue Hills believed that the proposed garage would reduce the value of the Property. That reliance is wrong for several reasons. First, as the "Introduction" to the Complaint states, the gravamen of the Norfolk Action was that the ZBA decision exceeded its authority in granting the special permit. Secondly, all counts in that Complaint seek rescission of the special permit because it violated the Canton Zoning By-law. Thirdly, paragraph 37 merely asserted that the proposed garage would be detrimental and offensive to Blue Hills – not that the Property would decrease in value – while paragraph 38 restates that the ZBA's approval violated Section 3.04.1 of the Canton By-law. Finally, under Massachusetts law, pleadings in a complaint are binding only in the *trial* of the case in which the pleadings were filed. *Hibernia Savings Bank v. Bomba*, 35 Mass. App. Ct. 378, 384 (1993).

Plainly and simply, the Settlement Proceeds resulted from Blue Hills' exploitation of a very unique situation not contemplated by the parties in 1999. Equiserve had confirmed to Blue Hills that it was not renewing the Lease, and that its planned purchase of the 250 Royall Street property was expressly conditioned upon the owner's construction of the parking garage. The owner of 250 Royall Street was faced with the potential loss of Equiserve as a buyer and a two or three year hiatus before the Norfolk Action would be adjudicated. That the 250 Royall Street owner was anxious to settle – and settle quickly – is evidenced by settlement of the Norfolk Action within 60 days of its commencement. No discovery was conducted and no motions were filed challenging Blue Hills' status to appeal the ZBA's decision.

Finally, even if the Settlement Proceeds were required to be deposited in the Clearing Account under the CMA, the *entire* amount of the Settlement Proceeds would have been distributable shortly thereafter to Blue Hills under the CMA, as the rents generated under the

- 36 -

Lease were sufficient to fully fund, on a monthly basis, all of the cash collateral sub-accounts specified in the CMA.  According to Section 3(b)(vii) of the CMA, after the monthly debt service has been paid and all escrow accounts have been funded, the balance flows into the "Borrower Remainder Sub-account (*which shall no longer be considered Rents*)" and then disbursed to Blue Hills.  (emphasis added).

**E.     AS BLUE HILLS, FINEBERG AND LANGELIER FULFILLED ALL OBLIGATIONS UNDER THE LOAN DOCUMENTS, LENDERS CAUSES OF ACTION AGAINST THEM MUST FAIL.**

**1.     Because Lender Can Prove Neither the Existence of an Actionable Misrepresentation nor Justifiable Reliance, the Cause of Action for <u>Intentional Misrepresentation Must be Dismissed.</u>**

A claim for damages for deceit requires proof that:  (1) the defendant made a misrepresentation of fact; (2) that such misrepresentation was made with the intent to induce another to act upon it; (3) it was made with knowledge of its untruth; (4) it was intended that it be acted upon; and (5) damage directly resulted therefrom.  *Graphic Arts Finishers, Inc. v. Boston Redevelopment Authority*, 357 Mass. 40, 44 (1970).  For silence to constitute an actionable representation, there must  be a legal duty for the defendant to speak.  *Spencer v. Gabriel*, 328 Mass. 1 (1951).  The duty to speak is limited to situations where there is a fiduciary duty or when a "half-truth" is made.  *See, Swinton v. Whitinsville Savings Bank*, 311 Mass. 677 (1942); *Gishen v. Dura Corp.*, 362 Mass. 177 (1972).

The gravamen of Lender's claim for "intentional misrepresentation" is that Blue Hills purportedly "had a duty to notify the Lender prior to executing the Settlement Agreement" and allegedly "failed to notify the Lender prior [to doing so]."  The Mortgage, however, simply does not require any notification to the Lender from Blue Hills regarding any non-Property related settlements.  Neither the Mortgage not the CMA required that Blue Hills, Fineberg or Langelier

- 37 -

notify Lender of litigation except in cases of condemnation and other similar and limited circumstances.  Further, even if certain language in the Loan Documents required such notification, the mere failure to do so would not constitute fraud.   A promise constitutes an actionable representation only if, at the time the promise was made, an intention to carry out the promise did not exist.  *Botti v. Iovino*, 337 Mass. 775 (1958).  There is little doubt that the Norfolk Action was not within the contemplation of the parties when the Loan was closed in 1999.

Additionally, proof of a "bare nondisclosure," or the mere failure to speak when there is no particular duty to speak, are insufficient to establish a misrepresentation.  *Kannavos v. Annino*, 356 Mass. 42, 46-49 (1969).  It is not sufficient for a party to prove a mere nonfeasance or failure to speak or act unless a duty to speak or act is also established.  *Wade v. Ford Motor Co.*, 341 Mass. 596, 597-598 (1961).  Mere silence does not usually amount to a breach of duty. *Phinney v. Friedman*, 224 Mass. 531 (1916).  Absent a contractual obligation to speak – which is not contained in the Loan Documents – no such duty is owed.

"Reliance is an element of actionable fraud." *Nei v. Burley,* 388 Mass. 307, 311 (1983). Moreover, such reliance on the putatively false statement must be reasonable and justifiable under the circumstances. *Collins v. Huculak,* 57 Mass. App. Ct. 387, 392 (2003).  Further, detrimental reliance must be properly plead and proven.  *Powell v. Rasmussen*, 355 Mass. 117, 118-119 (1969).  No factual or legal bases can prove that the Lender detrimentally relied on Blue Hills' silence regarding the Norfolk Action or the Settlement Proceeds.  Indeed, CSFB, did not even come into existence until September 1, 2004, approximately 2½ months before the Property was foreclosed.  Thus, it strains credulity for CSFB to claim detrimental reliance.

- 38 -

It is also amply documented that Lender, through its Servicer, Wells Fargo, and Special Servicer, LNR, anxiously awaited an opportunity to default Blue Hills, to scoop approximately $4.1 million of Blue Hills' money in the Reserve Accounts and to either acquire the Property or to quickly dispose of it on foreclosure. Can Lender now credibly claim that their default/foreclosure juggernaut would have been slowed or curtailed had they known of the existence of the Norfolk Action and the Settlement Proceeds? Given Lender's well documented intransigence to a Loan restructuring – or even a meeting – with Blue Hills, that scenario is highly unlikely.

### 2.  Implied Contractual Duties Beyond Cannot be Created Beyond the Parameters of the Pertinent Documentation.

Unsure of whether it can convince this Court that the plain language of the Loan Documents mean something other than the obvious, Lender impermissibly reaches for the "implied duty of good faith and fair dealing" to impute to Blue Hills, Fineberg and Langelier duties to which they never agreed to be bound.

Lender's attempts to imply its way into a viable contract claim ignores that any duty of good-faith performance is "circumscribed by the obligations . . . actually contained in the agreement." *See Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001) (special master erred by using the duty of good faith and fair dealing to impose obligations "that exist nowhere in the agreement between the parties"). For this reason, Massachusetts law permits plaintiffs to invoke the covenant of good faith to enforce the terms of a contract, but not to impose additional requirements to which the parties did not agree in their contract. *See, e.g., Eigerman v. Putnam Investments, Inc.*, 66 Mass. App. Ct. 222 (2006). Simply put, the written instrument controls. New or independent rights or duties separate from those already in a contract cannot be added

- 39 -

under the guise of the implied covenant of good faith and fair dealing." B*ateman v. F.D.I.C.*, 112 F. Supp. 2d 89 (D. Mass. 2000).

Courts are particularly loathe to judicially imply additional terms in a contract where, as here, the parties entered into a detailed written agreement whereby they articulated the specific obligations they assumed, but did not provide for the additional duties that plaintiffs claim in after-the-fact litigation. The "doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded." *See Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489, 495 (1st Cir. 1997) (quoting *Plumbers & Steamfitters Local 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1449 (11th Cir. 1991)), abrogated on other grounds by *Steel Co. v. Citizens For A Better Environ.*, 523 U.S. 83 (1998).

Here, the Loan documents are exceptionally detailed as to the narrow circumstances under which Blue Hills, Fineberg and Langelier have any personal liability to Lender. The facts extant simply do not fit into the narrow exceptions to what is expressly designated a non-recourse loan.

### 3.    Lender Cannot Prove Sufficient Facts to Demonstrate the Existence of a Claim Pursuant to M.G.L. c. 93A.

Lender's Chapter 93A claim is essentially a cut-and-paste of their failed implied contract allegations, which no matter how generously construed are not sufficiently egregious to trigger the statute. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979). To state a claim pursuant to Chapter 93A, plaintiffs must allege an "unfair or deceptive" act or practice that would "attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Id.* Lender cannot do so.

- 40 -

Massachusetts courts have repeatedly rejected attempts to elevate contract claims into 93A claims because, absent something more, a breach of contract simply does "not rise to the level of rascality required" by the statute. *See Ahern v. Scholz*, 85 F.3d 774, 799-800. (1st Cir. 1996). To give rise to liability under Chapter 93A, plaintiffs must prove that defendants intentionally breached "in disregard of known contractual arrangements and intended to secure benefits for the breaching party," *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 474 (1991), or that their conduct had an "extortionate quality that gives it the rancid flavor of unfairness." *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992).

There is a distinction between the exceptional contract-based claim that may also give rise to liability under Chapter 93A and the standard-issue breach of contract pleading that plaintiffs often, but impermissibly, attempt to re-plead under Section 11 and that should be dismissed on the pleadings:

> [I]f it is apparent from the complaint that the underlying contract dispute involves nothing more than reasonably conflicting interpretations of a genuinely ambiguous contract term, a court might properly dismiss an associated Chapter 93A claim at the outset . . . . Generalizing, if it clearly appears from the complaint and the contract itself that reasonable people might reach different conclusions regarding the merits of the underlying contract dispute, then, absent special circumstances, a court should at least give serious consideration to the early dismissal of the 93A count for failure to state a claim.

*Citicorp N. Am., Inc. v. Ogden Martin Sys. of Haverhill*, 8 F. Supp. 2d 72, 77 (D. Mass. 1998).

There are no "special circumstances" alleged. Lender cannot credibly contend that anyone acted in flagrant disregard of any known contractual right, much less interpreted a contract in a manner that was "so unreasonable as to support a finding of bad faith and unfairness." *See Citicorp N. Am. Inc.,* 8 F. Supp. 2d at 79. Moreover, it is also not even alleged

- 41 -

by Lender that the supposed breach of the contract was "extortionate." *Atkinson*, 33 Mass. App.

Ct. at 226.

## V.    DAMAGES

For its damages, Blue Hills expects to offer documentary and testimonial evidence that it

has suffered the following damages:

- Lost equity value in the subject property:  $5,824,941.00.

- Reserve account balances:  $4,153,827.00.

- Lost tax benefit:  $4,918,804.00.

Total damages including interest:  $14,897,572.00.

In support of its claims for damages, Blue Hills intends to call, *inter alia*, Dr. Kenneth D.

Gartrell ("Gartrell"), a highly experienced economist as its expert witness.  Gartrell is expected

to testify that, among other things that the fair market value of the Property as of the date of

foreclosure on November 19, 2004 exceeded the value of Blue Hills' debt obligations.

Additionally, Gartrell is expected to testify that there were sufficient funds in the reserve

accounts to meet any initial cash deficits attributable to the loss of Equiserve as tenant.

Foreclosure was, thus, unnecessary and economically unproductive.  Gartrell's testimony is

expected to prove that Blue Hills suffered economic damages of at least $14.9 million, excluding

interest, as a result of foreclosure.  The components of the loss, as indicated, *supra*, include the

loss of its $5.8 million equity on the Property, the loss of approximately $4.2 million in mortgage

reserve balances and the loss of approximately $4.9 million in tax benefits associated with

holding the Property.  Relative to the deleterious and significant impact the wrongful foreclosure

had on Blue Hills and its principals, Blue Hills also introduced testimony from Attorney David

Andelman, an expert on tax issues relating to commercial real estate.

As for Lender's alleged damages, the testimony to be adduced at trial will demonstrate, first and foremost, that Fineberg and Langelier have no personal liability to Lender in any amount.  Assuming, *arguendo*, that there is any personal liability, Gartrell's expert testimony is expected to show, *inter alia*, not only that the foreclosure sale price was markedly inadequate. Further, it appears uncontested that Lender was able to quickly "flip" the Property to One Beacon Insurance Group for $23,000,000.  Moreover, cross-examination of Eric Stotz, retained by Lender to opine as to the valuation of the Property at various times pertinent hereto, will show the gross disparities and the reckless methodology utilized by Lender in its valuation of the Property used to justify , *inter alia*, the ridiculously low sum received at the foreclosure sale. Stotz's low-ball valuation of the Property is predicated on little more than rank hearsay.

## V.    <u>CONCLUSION</u>

By the testimony of both lay witnesses and experts, as well as considerable documentary evidence, Blue Hills will prove that judgment should enter in its favor in an amount at least equal to $14,897,572.00.  Moreover, Lender's attempt to convert a non-recourse loan into personal guarantees is manifestly baseless.  Accordingly, judgment should enter in favor of Fineberg and Langelier as to all causes of action asserted by Lender.

BLUE HILLS OFFICE PARK LLC, WILLIAM
LANGELIER AND GERALD FINEBERG,
By their attorneys,
<u>/s/Meredith A. Swisher</u>
Peter B. McGlynn, Esquire, BBO No. 333660
Meredith A. Swisher, Esquire, BBO No. 646866
Bernkopf Goodman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: September 12, 2006
#344141 v8/14500/9985