UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

     Plaintiff, Defendant-in-Counterclaim.

     v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

     Defendants, Plaintiffs-in-Counterclaim,

     v.

WILLIAM LANGELIER and GERALD
FINEBERG,

     Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## MEMORANDUM IN SUPPORT OF ADMISSION INTO EVIDENCE OF HANDWRITTEN NOTES MARKED FOR IDENTIFICATION AS EXHIBIT U-1

The defendants and plaintiffs-in-counterclaim, J.P. Morgan Chase Bank, as

Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities

Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee")

and CSFB 1999-C1 Royall Street LLC ("CSFB") (together with the Trustee, the

"Lender"), submit this memorandum in support of admission into evidence of the

handwritten notes marked for identification as Exhibit U-1.  These notes are business

records under Fed. R. Evid. 803(6) and are therefore admissible as evidence of the

conversations described therein.

The notes marked as Exhibit U-1 are the handwritten notes of Joseph Polcari, an

- 1 -

asset manager for LNR Partners, Inc, concerning the Blue Hills loan.  Polcari, TT 5 at 96.[1]  Mr. Polcari testified that he keeps notes of conversations he has as asset manager in the course of LNR's regularly conducted business activity, and that it was his regular practice to keep such notes.  Id.  Mr. Polcari made the notes contemporaneously with or within an hour or so of the conversations.  Id.  Mr. Polcari keeps his notes chronologically in binders, and maintains them in his office for his use as an asset manager in servicing the loans that are assigned to him.  Polcari, TT 5 at 97-98. Servicing loans is part of LNR's regularly conducted business.  Polcari, TT 5 at 98.

Blue Hills' argument seems to be that the notes are not business records because LNR does not have a company policy requiring that notes be taken of every conversation. This argument, however, does not take Exhibit U-1 outside the scope of Rule 803(6). See, e.g., Kassel v. Gannett Co., Inc., 875 F.2d 935 (1st Cir. 1989) (copy attached hereto as Exhibit A); U.S. v. Skeddle, 981 F. Supp. 1069 (N.D. Ohio 1997) (copy attached hereto as Exhibit B).

In Kassel v. Gannet Co., Inc., for example, the plaintiff had offered into evidence at trial certain contact report forms kept by an institution.  Id. at 944.  The contact report forms described telephone conversations with callers and were introduced as business records.  Id.  The defendant objected to their admission, based on testimony that the forms were not "usually" completed, but only when the author "perceived the need."  Id. The First Circuit upheld the District Court's decision to admit the contact forms, holding that completion of the reports qualified as a "regular" practice.  Id.  As the First Circuit stated:

---

[1] References to trial testimony are to the last name of the witness (e.g., Polcari), the volume of the trial transcript (e.g., TT 3), and the page of the transcript (e.g., at 42).

> While the business records exception does not extend to activity that is "casual or isolated," some degree of discontinuity or selectivity remains permissible. We have stated elsewhere that "non-routine" records made in the course of a regularly conducted business should be admissible under rule 803(6), so long as (i) they meet the other requirements of the rule, and (ii) the attendant circumstances do not indicate a lack of trustworthiness. Here, use of the contact forms was sufficiently regular to retain the "presumption of reliability" accorded to workaday business activities, which lies "at the heart of the hearsay exception."

Id. (citing Hiram Ricker & Sons v. Students Int'l Meditation Soc'y, 501 F.2d 550 (1st Cir. 1974), United States v. Grossman, 614 F.2d 295 (1st Cir. 1980), and Willco Englund Kuwait (Trading) S.A.K. v. deSavary, 843 F.2d 618 (1st Cir. 1988)).

Similarly, in U.S. v. Skeddle, 981 F. Supp. 1069 (N.D. Ohio 1997), the defendants objected to the admission of certain handwritten notes kept by the defendants' accountants. Id. The notes were made in the course of the accountants' regular business activity, and it was the accountants' regular practice to record such notes during client meetings. Id. at 1072-73. It was customary for the accountants to take notes at client meetings, place them in the client files, and refer to them at a later point in time. Id. The defendants, however, argued that because the accounting firm had no policy requiring employees to take notes during client meetings, and because the author of the notes did not always take such notes, the notes were not business records. Id.

The Skeddle court, relying in part on the First Circuit's decision in Kassel, rejected the defendants' arguments and held that the notes were admissible as business records because "the routineness or repetitiveness with which a record is prepared is not the touchstone of admissibility under the business records exception." Id. at 1073 (quoting United States v. Jacoby, 955 F.2d 1527, 1537 (11th Cir. 1992)). Rather, as the

- 3 -

court pointed out:

> The fact that the record is not of a type that is routinely kept does not necessarily require its exclusion. Nonroutine records made in the course of a regularly conducted "business" are generally admissible if they meet the other requirements of admissibility, unless "the sources of information or other circumstances indicate a lack of trustworthiness." Thus exclusion is mandated only when the facts of the case indicate unreliability. A contention without more that records of the type were not regularly kept should not overcome admissibility.

Id. (quoting from 5 J. Weinstein and M. Berger, Weinstein's Federal Evidence § 803.11[2], at 803-64 (2nd ed. 1997)). The court went on to admit the notes, holding that "unless there is some indication of untrustworthiness, business records should not be excluded based merely on the fact that they are not always kept." Id.

## CONCLUSION

For all of the reasons set forth above, the exhibit marked for identification as U-1 should be admitted into evidence.

Respectfully submitted,

CSFB 1999-C1 ROYALL STREET, LLC,
and J.P. MORGAN CHASE BANK, as
Trustee for the Registered Holders of Credit
Suisse First Boston Mortgage Securities
Corp., Commercial Mortgage Pass-Through
Certificates, Series 1999-C1,

By their attorneys,

/s/ Bruce E. Falby
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER US LLP
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000

Dated:  October 9, 2006

- 5 -

LEXSEE 1989 U.S. APP. LEXIS 7453

**JEFFREY KASSEL, Plaintiff, Appellee, v. GANNETT CO., INC., d/b/a "USA TO-DAY," Defendant, Appellant**

**No. 88-1766**

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

*875 F.2d 935; 1989 U.S. App. LEXIS 7453; 28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814*

**May 24, 1989**

**PRIOR HISTORY:** [**1]

Appeal from the United States District Court for the District of New Hampshire, Hon. Martin F. Loughlin, U.S. District Judge.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant newspaper challenged the judgment of the United States District Court for the District of New Hampshire, which held it liable for negligent defamation of appellee psychologist.

**OVERVIEW:** The newspaper published excerpts of an interview with the psychologist, which it admitted included an incorrectly attributed quote critical of Vietnam veterans. The court held that the psychologist was not a "public official" for libel law purposes because he did not have substantial responsibility over the conduct of government affairs. Therefore, the court held the correct standard was negligence rather than actual malice. The court affirmed because the jury supportably found that the newspaper's piece was defamatory and that the newspaper was negligent in publishing it. The court noted that despite the time to do so, the newspaper failed to attempt to determine whether the quote was accurate. However, the court remanded to the district court for a limited new trial on damages. The court held that New Hampshire law did not broadly allow recovery of damages for emotional distress; that the evidence provided regarding loss of future earnings was insufficient; and, that the district court's prohibition on admission of a brief the psychologist filed pro se in a different proceeding, in which he allegedly faulted a labor dispute for his reassignment, was error.

**OUTCOME:** The court affirmed the judgment below, which held the newspaper liable for negligent defamation

of the psychologist, but remanded to the district court for a limited new trial on the issue of damages.

**LexisNexis(R) Headnotes**

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Defamation > Public Figures*
*Torts > Intentional Torts > Defamation > General Overview*
[HN1] Short of imposing liability without fault, states may define appropriate standards regarding defamation of private individuals. New Hampshire allows "private person" recovery so long as negligence is proven. But, if the plaintiff is a "public figure," proof of negligence is not enough; the federal Constitution bars libel recoveries by public figures absent clear and convincing proof of "actual malice," i.e., knowledge of falsity or reckless disregard for truth.

*Torts > Intentional Torts > Defamation > General Overview*
[HN2] In a sense, every public employee is a "public official" -- but in the idiom of libel law, the term has a much narrower sweep. Generally speaking, the classification embraces only those public employees with substantial responsibility for or control over the conduct of governmental affairs.

*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Abuse of Public Office > Illegal Gratuities > Elements*
*Torts > Intentional Torts > Defamation > Defenses > Privileges > Constitutional Privileges*

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

[HN3] The First Amendment requires maximum latitude for uninhibited, robust, and wide-open discourse on issues of public importance. That philosophy necessarily implies a strong interest in debate about those persons who are in a position significantly to influence the resolution of such issues. The public official doctrine provides an extra measure of protection for speakers who dare to voice criticism of those responsible for government operations. Policymakers, upper-level administrators, and supervisors are caught up in the "public official" net for that reason: such plenipotentiaries occupy niches of apparent importance sufficient to give the public an independent interest in the qualifications and performances of the persons who hold them, beyond the general public interest in the qualifications and performance of all government employees.

*Torts > Intentional Torts > Defamation > General Overview*
[HN4] Government workers who, by virtue of their employment, may easily defuse erroneous or misleading reports without judicial assistance should likely be ranked as public officials for libel law purposes. Conversely, those who work for the sovereign, but who enjoy little or no sway over, or special access to, the news media are less likely to be trapped within the seine.

*Torts > Intentional Torts > Defamation > Defenses > Privileges > Constitutional Privileges*
*Torts > Negligence > Defenses > Assumption of Risk > Elements & Nature > Knowledge of Danger*
[HN5] Persons who actively seek positions of influence in public life do so with the knowledge that, if successful in attaining their goals, diminished privacy will result. The classic case, of course, is the aspirant to elective office: a candidate is on fair notice that adverse, even negligent, press coverage is a necessary consequence of that involvement in public affairs. The same can be said of individuals who accept appointments to powerful government positions. Those who would hold the reins of power know full well that the public's interest legitimately extends to anything which might touch on an official's fitness for office. Accordingly, journalists are entitled to act on the assumption that certain public officials have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.

*Torts > Intentional Torts > Defamation > General Overview*
[HN6] Many public-sector jobs seemingly imply no special prospect of life in a fishbowl. Those who have not

jumped into the net, that is, those who have accepted public employment but have not assumed an influential role in ordering society, cannot be said to have relinquished any significant part of their interest in safeguarding their good names.

*Torts > Intentional Torts > Defamation > Elements > Libel*
[HN7] Those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure. Media access does not weigh against an individual's private status where the access came after the alleged libel.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Employees*
[HN8] In New Hampshire, the linchpin of master-servant liability is whether on all the facts the community would consider the person an employee. The factfinder must assess the totality of the circumstances, with no single factor necessarily attaining talismanic importance. Given a minimally sufficient evidentiary predicate, determining the nature of the relationship between the hirer and the hiree is precisely the sort of mixed fact-law question which falls peculiarly within the competence of the jury qua factfinder.

*Civil Procedure > Judicial Officers > General Overview*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Employees*
*Labor & Employment Law > Employment Relationships > Independent Contractors*
[HN9] In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

creating the relation of master and servant; and (j) whether the principal is or is not in business.

***Torts > Intentional Torts > Defamation > Elements > Libel***
***Torts > Negligence > Proof > Custom > Professional Customs***
***Torts > Negligence > Standards of Care > Special Care > Highly Skilled Professionals***
[HN10] In most jurisdictions, libel is considered an ordinary tort, not a form of malpractice. New Hampshire is no exception; the actions of a journalist are judged not in comparison to prevailing professional standards, but according to customary tort criteria. In the last analysis, a journalist must behave like a reasonable person under all the circumstances.

***Torts > Intentional Torts > Defamation > Elements > Libel***
[HN11] Expert testimony regarding the standard of care is not an essential ingredient of a libel plaintiff's proof.

***Torts > Intentional Torts > Defamation > Elements > Libel***
[HN12] Due care in gathering information is not a technical matter for which a jury unaided by experts would have no basis for decision.

***Evidence > Authentication > General Overview***
***Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business***
[HN13] Fed. R. Evid. 803(6) provides that a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge shall not be excluded as hearsay if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, so long as properly authenticated and not transparently untrustworthy.

***Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business***
[HN14] While the business records exception does not extend to activity that is casual or isolated, some degree of discontinuity or selectivity remains permissible. Nonroutine records made in the course of a regularly conducted business should be admissible under Fed. R. Evid. 803(6) so long as (i) they meet the other requirements of

the rule, and (ii) the attendant circumstances do not indicate a lack of trustworthiness.

***Evidence > Procedural Considerations > Rulings on Evidence***
[HN15] The district court enjoys considerable latitude in admitting and excluding evidentiary proffers.

***Torts > Intentional Torts > Defamation > Elements > Libel***
[HN16] There is no requirement that an allegedly libelous statement be parsed so that its defamatory content is presented in isolation. The opposite is true: such statements must be read in the context of the publication taken as a whole. The jury ought to consider all the circumstances under which these words were written, their context, and the meaning which could reasonably be given to them by readers.

***Civil Procedure > Remedies > Damages > Punitive Damages***
***Torts > Intentional Torts > Defamation > Procedure***
***Torts > Intentional Torts > Defamation > Remedies > Damages***
[HN17] Both the federal Constitution and New Hampshire law constrain the recovery of compensatory damages in defamation cases. Read in the ensemble, these constraints impose significant limitations upon the types of damages which New Hampshire libel plaintiffs may recover from merely negligent defendants. The applicable federal curbs derive from the First Amendment, as weighed against a state's interest in compensating individuals for the harm caused by defamatory falsehood. Absent a demonstration of malice plaintiffs are barred from collecting either "presumed damages" for tarnished reputation, or punitive damages. Instead, recovery is limited to compensation for actual injury, described as follows: Actual injury is not limited to out-of-pocket loss the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

***Torts > Damages > Compensatory Damages > General Overview***
***Torts > Intentional Torts > Defamation > Procedure***
***Torts > Intentional Torts > Defamation > Remedies > General Overview***
[HN18] In New Hampshire, federal and state law interact in cases of negligent defamation to produce the following matrix: 1. General reputational damages are recover-

Case 1:05-cv-10506-WGY    Document 146-2    Filed 10/09/2006    Page 4 of 18

Page 4

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

able so long as supported by evidence of actual injury to reputation. 2. At least some special damages are recoverable (but even when the underlying psychic injuries are actual, and recovery would be permitted as a federal constitutional matter, it is problematic whether New Hampshire allows recovery for emotional distress and humiliation in cases of negligent defamation).

***Torts > Damages > Compensatory Damages > Lost Income > General Overview***

[HN19] In New Hampshire, a plaintiff has the burden of proving the extent and amount of his damages, and must also show that the damages which he seeks were caused by the alleged wrongful act. Although damages need not be proven with mathematical certainty or slide-rule precision, one seeking to recover for the loss of future earnings must produce sufficient data to demonstrate that future profits are reasonably certain to result. There is, of course, often more than one satisfactory method for proving damages, but a claimed element of loss must be computed in some rational way upon a firm factual base.

***Evidence > Hearsay > Exemptions > Statements by Party Opponents > General Overview***
***Evidence > Procedural Considerations > Rulings on Evidence***
***Evidence > Relevance > Confusion, Prejudice & Waste of Time***

[HN20] The district court must balance the prejudicial effect and probative value of each statement offered under Fed. R. Evid. 801(d)(2)(C), according to the calibration which Fed. R. Evid. 403 demands.

**COUNSEL:**

John B. McCrory with whom Richard D. Rochford, Jr., Nixon, Hargrave, Devans & Doyle, William L. Chapman and Orr & Reno, P.A., were on brief for Appellant.

Robert M. Larsen with whom Sulloway Hollis & Soden, Barry M. Scotch and Scotch & Zalinsky were on brief for Appellee.

**JUDGES:**

Campbell, Chief Judge, Torruella and Selya, Circuit Judges.

**OPINION BY:**

SELYA

**OPINION:**

[*937]  SELYA, Circuit Judge

Defendant-appellant Gannett Co. (Gannett) takes umbrage at a jury verdict returned against it following a libel trial in the United States District Court for the District of New Hampshire. The case was brought under diversity jurisdiction, *28 U.S.C. § 1332,* and implicates New Hampshire law. After reviewing the evidence and the inferences to be drawn therefrom in the light most favorable to the verdict-winner, *Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987),* and subjecting rulings with constitutional implications to *de novo* scrutiny to safeguard First Amendment concerns, *Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 499, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984),* [**2] we affirm the finding of liability, but vacate the award of damages and remand for a limited new trial.

**I.  A USA SNAPSHOT**

Dr. Jeffrey Kassel worked as a clinical psychologist at the Veterans' Administration (VA) hospital in Manchester, New Hampshire from 1977 until 1985. Kassel counseled veterans and their families, treated emergency cases, performed psychological evaluations, and led group therapy sessions. Many of his patients had served in the Vietnam War.

Enter USA Today (USA), a daily national newspaper published by Gannett. In April 1985, USA began planning a special feature commemorating the tenth anniversary of the fall of Saigon. At the time, Ron Wyman was USA's principal New Hampshire correspondent. Wyman was a moonlighter; his regular job was as a news editor for a Manchester television station. Noreen Kopenhaver, a USA executive, telephoned Wyman around April 14 and assigned him to gather material for the Vietnam issue. On Sunday, April 21 -- the deadline date -- Wyman telephoned Kassel, a social acquaintance, and asked if he would mind talking about Vietnam. The psychologist was hosting a cookout, but nevertheless invited Wyman to visit.

Wyman conducted the [**3]  interview in Kassel's yard, with the barbecue in full swing. More than chopped sirloin was grilled that day. The conversation between the correspondent and the psychologist lasted fifteen to twenty minutes. The gist of Kassel's remarks, Wyman recalled, was that American soldiers in Vietnam were victims, forced to fight in a war they did not want. In addition, Kassel -- who ten days earlier had read a *Wall Street Journal* article which stated that Vietnamese veterans were "somewhat amused by the idea that their painful experiences might leave them with 'post-traumatic stress disorder,' the scourge of many U.S. veterans" -- recalled telling the reporter that he might find a story angle in the attitudes of veterans from the other side.

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

Wyman read his notes to Kopenhaver over the telephone that evening. Five days later, USA published its Vietnam retrospective. On a page with paragraph-long remarks from each state, beneath the rubric "VIETNAM -- A USA PERSPECTIVE -- ACROSS THE USA," the following text appeared under the subheading "NEW HAMPSHIRE":

> "We've become a nation of hand wringers," says VA psychologist Jeff Kassel, 41, of Manchester. "It's amusing that vets feel they are [**4] the victims when the Vietnamese had the napalm and . . . bombs dropped on them." Kassel, who had a student deferment, says winning or losing "depends on whether it's the vet who lost his legs or the chairman of . . . Bell Helicopters."

[*938] Upon seeing the piece, Kassel complained to Wyman that USA inaccurately attributed to him the "it's amusing" sentence. He also rebuked the journalist because the source statement, as reported by the *Wall Street Journal*, had described Vietnamese attitudes, not American attitudes. n1 Kassel later made oral and written requests for retraction. Eventually, the newspaper sent a reporter to New Hampshire to investigate the story's accuracy. On June 10, USA printed a lengthy correction:

> A quote by Veterans Administration psychologist Jeff Kassel, Manchester, N.H., which appeared in April 26 editions should be clarified. Kassel was commenting for a USA TODAY special report on the Vietnam War and a portion of the quote attributed to Kassel -- "It's amusing that vets feel they are the victims when the Vietnamese had the napalm and . . . bombs dropped on them" -- was just part of a statement Kassel gave. In fact, he was quoting what [**5] he'd read in another news story, which said: "Vietnamese Vietnam veterans think it's amusing that American vets feel they are the victims when the Vietnamese had the napalm and . . . bombs dropped on them."

> Kassel, 39, who did not want to leave the wrong impression, said he has sympathy for American Vietnam veterans. "I have complete sympathy for anyone who spent time in Vietnam," he said. "I have spent my entire career trying to help people readjust to what happened to them in Vietnam. I consider most Vietnam veterans victims."

Meanwhile, the original (incorrect) report prompted a firestorm of hostile outcry, leading the VA to attempt Kassel's firing. According to the notice of proposed removal, the printed statements in USA "elicited adverse wide reaction from local, State, and national veterans' groups" and "destroyed [plaintiff's] credibility and usefulness . . . in the treatment of psychological illnesses of our veteran patients. . . ." Although the VA dropped severance proceedings after USA published its correction, the agency persisted in an effort to transfer Kassel involuntarily. In Kassel's view, the story as first printed wrecked his reputation among patients, [**6] veterans, and co-workers. He sued Gannett in August 1985, alleging that the incorrect attribution of the "it's amusing" quotation to him was libelous.

> n1 Additionally, Kassel pointed out two other bevues: (1) he was 39, not 41; and (2) after 1969, he had a high lottery number, not a student deferment.

Following nearly three years of pretrial wrangling, and a 12-day trial, a jury awarded Kassel damages of $ 300,000.

## II. NEWSMAKERS

It is well settled that, [HN1] short of imposing liability without fault, states may define appropriate standards regarding defamation of private individuals. *Gertz v. Robert Welch, Inc., 418 U.S. 323, 347, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974).* New Hampshire allows "private person" recovery so long as negligence is proven. *Duchesnaye v. Munro Enterprises, Inc., 125 N.H. 244, 480 A.2d 123, 126 (1984); McCusker v. Valley News, 121 N.H. 258, 428 A.2d 493, 494, cert. denied, 454 U.S. 1017, 70 L. Ed. 2d 415, 102 S. Ct. 552 (1981).* [**7] But, if the plaintiff is a "public figure," proof of negligence is not enough; the federal Constitution bars libel recoveries by public figures absent clear and convincing proof of "actual malice," *i.e.*, knowledge of falsity or reckless disregard for truth. *See Gertz, 418 U.S. at 342; New York Times Co. v. Sullivan, 376 U.S. 254, 279-80, 285-86, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964).*

There are various ways in which the *New York Times* standard can come into play. A defendant can assert, for example, that a particular complainant was either an all-purpose public figure or a limited-purpose public figure. *See Gertz, 418 U.S. at 345.* Gannett es-

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

chews these categorizations on appeal, n2 postulating that [*939] Kassel was stripped of "private person" shielding because, as an employee of the VA, he was a "public official."

> n2 Therefore, we have no occasion to decide whether Kassel, by thrusting himself into an on-going public controversy and/or by agreeing to be interviewed for a single newspaper article, became a limited-purpose public figure. *Compare, e.g., Gertz, 418 U.S. at 352.*

[**8]

A. *The "Public Official" Rule.*

[HN2] In a sense, every public employee is a "public official" -- but in the idiom of libel law, the term has a much narrower sweep. Generally speaking, the classification embraces only those public employees with "substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer, 383 U.S. 75, 85, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966)* (footnote omitted). The formulation, we suggest, is easier stated than applied. The Court "has not provided precise boundaries for the category of 'public official,'" *Hutchinson v. Proxmire, 443 U.S. 111, 119 n. 8, 61 L. Ed. 2d 411, 99 S. Ct. 2675 (1979)*, nor has it determined "how far down into the lower ranks of government employees" the designation should extend. *New York Times, 376 U.S. at 283 n.23; see generally Annot., 19 A.L.R.3d 1361 (1968).* One recurring question, exemplified by this case, is whether the "public official" label -- and its inevitable concomitant, the heightened level of proof demanded by *New York Times* -- should apply to relatively obscure bureaucratic functionaries laboring in governmental [**9] vineyards far from the center stage of political drama.

The caselaw does not leave us entirely rudderless on these uncertain seas. The Court has emphasized that the "public official" concept "cannot be thought to include all public employees." *Hutchinson, 443 U.S. at 119 n. 8.* Similarly, a need to prove actual malice does not arise "merely because a statement defamatory of some person in government employ catches the public's interest; that conclusion would virtually disregard society's interest in protecting reputation." *Rosenblatt, 383 U.S. at 86 n. 13.* Read together, the Court's defamation opinions reveal that the "public official" rule rests on a tripodal base. The trio of policy concerns which undergirds the caselaw can be instructive in attempting to assess the rule's range and reach.

B. *The Three-Legged Stool.*

The first leg of the stool is a frank recognition that [HN3] the First Amendment requires maximum latitude for "uninhibited, robust, and wide-open" discourse on issues of public importance. *New York Times, 376 U.S. at 270.* That philosophy necessarily implies "a strong interest in debate about those persons who [**10] are in a position significantly to influence the resolution of [such] issues." *Rosenblatt, 383 U.S. at 85.* The public official doctrine provides an extra measure of protection for speakers who dare to voice "criticism of those responsible for government operations." *Id.* Policymakers, upper-level administrators, and supervisors are caught up in the "public official" net for that reason: such plenipotentiaries occupy niches of "apparent importance" sufficient to give the public "an independent interest in the qualifications and performances of the person[s] who hold[$] [them], beyond the general public interest in the qualifications and performance of all government employees." *Id. at 86.*

How far the net is cast, and how fine its mesh is strung, depends upon a series of functional assessments. In general, we believe that government posts entailing no particular responsibility for governance are likely to slip between the strands. Thus, notwithstanding his notoriety and public concerns anent national security, "a night watchman accused of stealing state secrets" is not a public official. *Id. at 86 n. 13.* The inherent [**11] attributes of the position, not the occurrence of random events, must signify the line of demarcation.

The second leg of the stool implicates communication. Those who hold public office are frequently able to defend themselves in the media. That ability is tantamount to the ability to engage in self-help. When the need arises to respond to charges, such officeholders "usually enjoy [*940] significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Gertz, 418 U.S. at 344* (footnote omitted). States have a correspondingly smaller interest in protecting the reputations of prominent satraps than in shielding the images of other individuals who "lack effective opportunities for rebuttal" and are therefore "more vulnerable to injury" from adverse comments. *Id.* By allowing the press extra margin for error in reporting on people whose positions grant them the means efficaciously to answer, our jurisprudence balances the scales. It follows that [HN4] government workers who, by virtue of their employment, may easily defuse erroneous or misleading [**12] reports without judicial assistance should more likely be ranked as "public officials" for libel law purposes. Conversely, those who work for the sovereign, but who enjoy little or no sway over, or "special" access to, the news media are less likely to be trapped within the seine.

Case 1:05-cv-10506-WGY     Document 146-2     Filed 10/09/2006     Page 7 of 18

Page 7

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

The last leg of the stool recognizes the reality of assumed risks. [HN5] Persons who actively seek positions of influence in public life do so with the knowledge that, if successful in attaining their goals, diminished privacy will result. The classic case, of course, is the aspirant to elective office: a candidate is on fair notice that adverse, even negligent, press coverage is a "necessary consequence[] of that involvement in public affairs." *Gertz, 418 U.S. at 344.* The same can be said of individuals who accept appointments to powerful government positions. *See, e.g., Henry v. Collins, 380 U.S. 356, 357, 13 L. Ed. 2d 892, 85 S. Ct. 992 (1965)* (per curiam) (chief of police is public official). As Cervantes once wrote: "forewarn'd, forearmed." M. Cervantes, *Don Quixote de la Mancha* III, 10 (1615). Those who would hold the reins of power know full well that the public's [**13] interest legitimately extends to "anything which might touch on an official's fitness for office." *Gertz, 418 U.S. at 344-45* (quoting *Garrison v. Louisiana, 379 U.S. 64, 77, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964)).* Accordingly, journalists are "entitled to act on the assumption that [certain] public officials . . . have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them." *Id.* at 345.

On the other hand, [HN6] many public-sector jobs seemingly imply no special prospect of life in a fishbowl. Those who have not jumped into the net, that is, those who have accepted public employment but have not assumed "an influential role in ordering society," *Curtis Publishing Co. v. Butts, 388 U.S. 130, 164, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967)* (Warren, C.J., concurring in result), cannot be said to have relinquished any significant part of their interest in safeguarding their good names. *See Gertz, 418 U.S. at 345.*

C. *Application of the Rule.*

In this case, the district court determined that Kassel was not a "public official" for libel law purposes. We think that [**14] the three legs of the doctrinal stool -- character of employment, access to means of self-help, and assumed risk -- fully support the court's conclusion. We examine the evidence.

Kassel's job as a staff psychologist fell below the middle of the VA's organization chart. He did not routinely supervise, manage, or direct government operations. He did not formulate policy. He did not govern; Kassel was a clinician whose work, by and large, was confined to seeing patients and administering tests. n3 Although the taxpayers have a general interest in oversight of *any* publicly-funded employment, we discern no "independent" public interest in plaintiff's job performance. *See Rosenblatt, 383 U.S. at 86.* The staff psychologist's slot did not "invite public scrutiny and discussion [*941] of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Id.* at 86 n. 13.

> n3 Appellant claims that plaintiff decided who received certain veterans' benefits and who did not. The argument will not wash. While others may have utilized Kassel's notes and summaries in calculating disability payments, Kassel himself played no direct part in the decisionmaking process.

[**15]

By the same token, plaintiff had no preferred access to channels of self-help. His position commanded no extraordinary media exposure. His duties did not involve answering press inquiries; quite to the contrary, the VA employed its own media liaison person. Gannett says, accurately enough, that Kassel attracted considerable attention following publication of the Vietnam retrospective. But, that is bootstrapping of the most flagrant sort. As the Supreme Court has recognized in an analogous context, [HN7] "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson, 443 U.S. at 135.* Media access does not weigh against an individual's private status where, as here, the "access, such as it was, came after the alleged libel." *Id.*

The third leg of the stool is similarly shaped. We see no evidence that, by accepting employment as a staff psychologist in a VA hospital, Kassel assumed the risk of sensationalist media coverage. He did not publicly campaign for the job. Once hired, he dealt with his patients, to the exclusion of the general public. Beyond the penetralia of his treatment and consultation [**16] rooms, he wielded no special influence. Nothing in the record suggests that plaintiff could reasonably have anticipated widespread coverage of his performance and conduct. n4 To call non-supervisory staff doctors at a VA hospital "public officials" would undervalue privacy rights by "distort[ing] the plain meaning of the 'public official' category beyond all recognition." *Gertz, 418 U.S. at 351* (rejecting attempt to bring all lawyers under *New York Times* as "officers of the court"); *see also Harkaway v. Boston Herald Traveler Corp., 418 F.2d 56, 59 (1st Cir. 1969)* (similar).

> n4 The "public official" inquiry requires us to categorize the nature of the particular job which plaintiff accepted. It is thus irrelevant for our purposes that, along the way, Kassel agreed to be interviewed by Wyman. That behavior bears more upon the "public figure" inquiry than

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

upon "public official" status, and Gannett has not pursued the possibility that Kassel was a public figure. *See supra* note 2.

[**17]

In this case, the three legs of the stool rest on the same level and solidly support exemption from the rigors of *New York Times*. We decline to carve the contours of the "public official" designation more extravagantly and blur the taxonomy to the point where it loses all shape and meaning. We agree with the district court that plaintiff, though a public employee, was a private person for purposes of defamation law.

III.  HELP WANTED

Appellant protests that it cannot be held liable for Wyman's errors because he was an "independent contractor." *See United States v. Ottati & Goss, Inc., 630 F. Supp. 1361, 1408 (D.N.H. 1985)* (in general, "employer of an independent contractor is not liable for [contractor's] negligence") (applying New Hampshire law); *Carr v. Merrimack Farmers Exchange, 101 N.H. 445, 146 A.2d 276, 278 (1958)* (similar); *see also Nelson v. Globe Int'l, Inc., 626 F. Supp. 969, 978 (S.D.N.Y. 1986)* (newspaper stringer found to be independent contractor under New York law). In our judgment, the issue was correctly left to the jury.

[HN8] In New Hampshire, the linchpin of master-servant liability is "whether on [**18] all the facts the community would consider the person an employee." *Hunter v. R.G. Watkins & Son, Inc., 110 N.H. 243, 265 A.2d 15, 17 (1970); see also Burnham v. Downing, 125 N.H. 293, 480 A.2d 128, 130 (1984)* (existence of employer-employee relationship "depends upon the facts of each case"); *Continental Ins. Co. v. New Hampshire Ins. Co., 120 N.H. 713, 422 A.2d 1309, 1311 (1980)* (right of control over employee's performance is factual question). The factfinder must assess the totality of the circumstances, with no single factor necessarily attaining talismanic importance. *Burnham, 480 A.2d at 130;* [*942] *Hamel Real Estate, Inc. v. Shepherd, 121 N.H. 733, 433 A.2d 1320, 1321 (1981); Walker v. Charles DiPrizio & Sons, Inc., 115 N.H. 652, 348 A.2d 355, 357 (1975).* n5 Given a minimally sufficient evidentiary predicate, determining the nature of the relationship between the hirer and the hiree is precisely the sort of "mixed" fact-law question which falls peculiarly within the competence of the jury *qua* factfinder. *See, e.g., Wilson v. Nooter Corp., 475 F.2d 497, 501 [**19] (1st Cir.)* (question of which employer exercised right to control "borrowed" servant susceptible to resolution by jury), *cert. denied, 414 U.S. 865, 94 S. Ct. 116, 38 L. Ed. 2d 85 (1973); cf. Swift v. United States, 866 F.2d 507, 510-11 (1st Cir. 1989)* (evaluative applications of legal standards to circum-

stances of particular cases are ordinarily for the factfinder). As we said in *Wilson*:

New Hampshire, like some but not all jurisdictions, has decided to leave the marshalling and weighing of the factors, and the unavoidable policy judgments lurking beneath the surface of the amorphous 'control' test, to a properly instructed jury.

*Wilson, 475 F.2d at 502* (footnote omitted). n6 We see no reason to bar the jury from conducting a similar inquiry in this case.

n5 We reiterate a useful compendium of the most frequently encountered factors:

[HN9] In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Restatement (Second) of Agency § 220(2)* (1958). The New Hampshire Supreme Court has adopted this analysis. *See Burnham, 480 A.2d at 130; Walker, 348 A.2d at 357; Hunter, 265 A.2d at 17.* [**20]

n6 The New Hampshire Supreme Court has cited *Wilson* with apparent approval. *See Continental Ins., 422 A.2d at 1311.*

The trial court's instructions on the issue were impeccable. Thus, defendant is reduced to questioning the quantum of plaintiff's proof. The question is easily answered. There was competent evidence that Wyman (1) worked on a continuing basis as USA's New Hampshire correspondent; (2) called in stories daily (or nearly so); (3) spoke with his "editor," Kopenhaver, at least once a day, five days a week; (4) was paid not piecework but *per diem* for his daily submissions; (5) received paychecks directly from the newspaper; (6) understood that USA was looking for particular types of stories; and (7) wrote articles not in final form, but instead gathered and submitted factual material for rewrite by USA's editorial staff. With specific reference to the Vietnam retrospective, there was evidence that Kopenhaver gave Wyman fairly detailed instructions on the sort of people to interview and the kind of questions to ask.

We believe that these facts sufficed to [**21] create a jury question on the issue of Wyman's status. If permissible inferences favorable to Kassel were drawn, the circumstances supported the thesis that USA and the correspondent were juxtaposed as principal and agent. The quintessential "rational jury" could reasonably have found -- as this jury did -- that Wyman was not a freelance independent contractor, but rather a member of USA's reportorial staff.

**IV.   COVER STORY: EVIDENCE OF NEGLIGENCE**

Gannett claims that plaintiff's proof on the issue of fault was too exiguous because (1) there was no expert

testimony establishing [*943] an appropriate standard of care, and (2) there was no precise showing as to how the error actually occurred. The claims are meritless.

A.  *Expert Testimony.*

[HN10] In most jurisdictions, libel is considered an ordinary tort, not a form of malpractice. *See* Simon, *Libel as Malpractice: News Media Ethics and the Standard of Care, 53 Fordham L.Rev. 449, 450 (1984)* (arguing for different approach). New Hampshire is no exception; the actions of a journalist are judged not in comparison to prevailing professional standards, but according to customary tort criteria. In the last [**22] analysis, a journalist must behave like a reasonable person under all the circumstances. *See Duchesnaye, 480 A.2d at 126* (test is whether evidence existed "from which a reasonable trier of fact could find that the defendant had failed to exercise reasonable care for the accuracy of the statements" published in newspaper report and editorial); *see also Nash v. Keene Publishing Corp., 127 N.H. 214, 498 A.2d 348, 355 (1985)* (applying test *sub silentio*). In both *Duchesnaye* and *Nash*, the New Hampshire Supreme Court allowed judges and juries, unassisted by experts, to decide the appropriate level of care. As we read the New Hampshire caselaw, [HN11] expert testimony regarding the standard of care is not an essential ingredient of a libel plaintiff's proof. n7

n7 Nor does New Hampshire have any statutory requirement to the contrary in libel cases. *Cf., e.g., N.H.Rev.Stat.Ann. § § 507-C:2*; 507-C:3 (in medical malpractice case, claimant must prove standard of care, and its violation, by competent expert testimony).

[**23]

Nor do the authorities, generally, support such an across-the-board requirement. Accepted practice may be evidence of due care, but it does not fix the standard: "Courts must in the end say what is required. . . ." *The T.J. Hooper, 60 F.2d 737, 740 (2d Cir.), cert. denied, 287 U.S. 662, 53 S. Ct. 220, 77 L. Ed. 571 (1932); see also Restatement (Second) of Torts § 295A (1965);* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts § 37 at 237-38 (5th ed. 1984).* Even in journalism, "negligence throughout a trade should not excuse its members from liability." *Schrottman v. Barnicle, 386 Mass. 627, 437 N.E.2d 205, 214 (1982); cf., e.g., McCabe v. Rattiner, 814 F.2d 839, 843 (1st Cir. 1987)* (district judge acted permissibly in refusal to allow expert testimony in libel case against newspaper); *Restatement (Second) of Torts § 580B,* comments (g) and (h). We agree with the Massachusetts Supreme Judicial Court that: [HN12] "Due care in gath-

ering information is not [a] technical matter for which a jury unaided by experts would have no basis for decision." *Schrottman, 437 N.E.2d at 215.* [**24] And in the case at bar, none of the activities undertaken by defendant or its hirelings were so arcane or complex as to demand explication by a professional.

B. *How the Bevue Occurred.*

We are also satisfied that plaintiff offered evidence of Gannett's fault sufficient to support the verdict. We begin with the unarguable: USA mangled Kassel's remarks. To be sure, the exact cause of the blunder was never precisely established, but all three likely causes -- the "it's amusing" language could have been misattributed by Wyman in the original interview, or garbled in the course of Wyman's transmission to Kopenhaver, or distorted during later editing -- landed squarely on defendant's doorstep. Moreover, Gannett's representatives confessed culpability after Kassel's job was threatened. A VA official recalled that Peter Johnson (the employee assigned by defendant to look into the brouhaha caused by the story) stated unequivocally that USA had "goofed," "made a mistake," and "misquoted" Kassel. Alice Lukin, an attorney for USA, told another witness that the newspaper would publish a "correction" of the paragraph, "thereby manifesting the paper's long-standing policy of correcting . [**25] . . error." While defendant accurately proclaims that all errors are not negligent in origin, the testimony described above stands as powerful evidence that USA personnel believed the newspaper was at fault in this instance. At the most, USA's (rather fanciful) suggestions [*944] that this was a case of nonnegligent error "are arguments as to what indicia of care might reasonably be expected, not absolute propositions of law etched in stone." *Levesque v. Anchor Motor Freight, Inc., 832 F.2d 702, 704 (1st Cir. 1987).* Such arguments were for the jury's resolution.

Then, too, whatever the reason for the original snafu, plaintiff's proof established that USA never verified its account of his statements. Following the backyard interview and prior to publication, no one revisited Kassel to check the Vietnam item for accuracy. Even Wyman was not contacted for purposes of verification; he heard nothing about the article from the time he transmitted the material to Kopenhaver until the day it was published. Kopenhaver did not edit Wyman's submission, but merely rerouted it to another desk; like Wyman, she heard nothing more about the material until after the publication [**26] date. A jury might reasonably have believed a more meaningful check for accuracy was required, particularly since USA had condensed the fruits of Kassel's 20-minute interview into a single paragraph and the newspaper had made at least two conscious alterations in the quotations (removing modifiers and inserting ellipses).

Failure to verify the story -- and thus to catch the error -- was independently actionable. This is especially so in a case like this one where (1) time was not a critical problem (there were four full working days between deadline and publication), and (2) the means of checking were readily at hand (a telephone call to plaintiff would have prevented the blunder). In light of these facts, we cannot gainsay the jury's determination that reasonable editors under the totality of the circumstances would have made some further attempt at confirmation. n8 Viewed in the requisite light, *Wagenmann, 829 F.2d at 200,* ample evidence existed for rational minds to adjudge USA guilty of negligence.

n8 Appellant places undue reliance on *Geiger v. Dell Publishing Co., 719 F.2d 515 (1st Cir. 1983),* for the proposition that publishers have no duty to check the accuracy of non-fiction material unless they have reason to believe it inaccurate. *Geiger* was decided under New York law, which required a plaintiff to prove that a media defendant had gathered its information "in a grossly irresponsible manner." *Id. at 517* (quoting *Chapadeau v. Utica Observer-Dispatch, Inc., 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569, 571 (1975)).* New Hampshire law contains no such requirement; simple negligence is enough. Accordingly, *Geiger* neither controls nor materially assists our inquiry.

[**27]

V. WHAT'S HOT

Appellant's assignments of error in the admission of evidence offer no incentive for reversal of the verdict on liability. We consider two items.

A. *The Forms.*

The district court admitted two "Report of Contact" forms filled out by Paul Lamberti, a ranking VA official in Manchester. The documents described telephone contacts with aides to Senators Rudman and Humphrey who had called the VA in response to constituent complaints about the USA article. The forms were introduced as business records under *Fed.R.Evid. 803(6)* over defendant's hearsay objection. n9

n9 [HN13] The rule provides that "[a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from

Case 1:05-cv-10506-WGY     Document 146-2     Filed 10/09/2006     Page 11 of 18

Page 11

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

information transmitted by, a person with knowledge" shall not be excluded as hearsay "if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation," so long as properly authenticated and not transparently untrustworthy. *Fed.R.Evid. 803(6).*

[**28]

At the expense of belaboring the obvious, we start by acknowledging that the VA, as an institution, keeps records. Those records, if compiled in compliance with the strictures of the rule, would not be excludable as hearsay. Defendant's principal challenge to the contact reports is that they were not recorded as a regular part of the VA's activities. This objection is based upon Lamberti's testimony that he did not "usually" complete such forms, but did so only when he "perceive[d] the need." We agree with the district judge that application [*945] of Rule 803(6) is not necessarily foreclosed by this fact.

The contact reports were typed on pre-printed government forms which included space for the name and address of the person contacted, and for a brief statement of the information requested and given. A legend on the form stated that it "must be filled out in ink or on typewriter, as it becomes a permanent record in veterans' folders." Lamberti served as the VA's "media liaison person" and "spokesperson" in the Manchester office. The processing of contact forms fell within his ordinary job duties. In this case, he personally made the contacts described and signed each form. [**29] He testified that they were completed "right after" or "soon after" the conversations they recounted.

Under the circumstances, we think the completion of these reports qualified as a "regular" practice. The fact that a form is not inscribed every time a telephone call is made or received has evidentiary significance, but does not, in itself, demand exclusion. [HN14] While the business records exception does not extend to activity that is "casual or isolated," *Hiram Ricker & Sons v. Students Int'l Meditation Soc'y, 501 F.2d 550, 554 (1st Cir. 1974),* some degree of discontinuity or selectivity remains permissible. *See, e.g., United States v. Grossman, 614 F.2d 295, 297 (1st Cir. 1980)* (manufacturer's annual catalog admissible under Rule 803(6)). We have stated elsewhere that "non-routine" records made in the course of a regularly conducted business should be admissible under Rule 803(6) so long as (i) they meet the other requirements of the rule, and (ii) the attendant circumstances do not indicate a lack of trustworthiness. *Willco Kuwait (Trading) S.A.K. v. deSavary, 843 F.2d 618, 628 (1st Cir. 1988). Accord* 4 J. Weinstein & M. Berger, [**30] *Weinstein's Evidence* § 803(6)[03] at 803-182 (1988).

Here, use of the contact forms was sufficiently regular to retain the "presumption of reliability" accorded to workaday business activities which lies "at the heart of the [hearsay] exception." *Hiram Ricker, 501 F.2d at 554.* And, there were adequate indicia of trustworthiness.

The long and short of it is that [HN15] the district court enjoys considerable latitude in admitting and excluding evidentiary proffers. *See, e.g., Linn v. Andover Newton Theological School, Inc., 874 F.2d 1,* slip op. at 5 (1st Cir. 1989); *Freeman v. Package Machinery Co., 865 F.2d 1331, 1339 (1st Cir. 1988); United States v. Tierney, 760 F.2d 382, 387-88* (1st Cir.), *cert. denied, 474 U.S. 843, 88 L. Ed. 2d 108, 106 S. Ct. 131 (1985).* Allowing these records to be introduced was well within the scope of that discretion. n10

> n10 Gannett also challenged the contact reports on the basis that they were "of questionable relevance" and more prejudicial than probative. We disagree. Like other evidence of veteran outrage, the contact forms established the article's effect upon Kassel's reputation. Moreover, "only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relevant weighing of probative value and unfair effect." *Freeman, 865 F.2d at 1340.* This is not such an instance.

[**31]

B. *The Board of Inquiry Report.*

Appellant challenges admission of the investigative report issued on May 24, 1985 by the VA's three member board of inquiry (Board). The district court was scrupulous in redacting the report, allowing only a small portion of it (comprising the Board's conclusions and recommendations) to go to the jury. This careful microsurgery notwithstanding, appellant claims error, arguing that the conclusions and recommendations were hearsay.

In our view, the extracts were not hearsay at all, for they were not offered "to prove the truth of the matter asserted." *Fed.R.Evid. 801(c).* Kassel offered the Board's report not to vouch for the conclusions reached, but simply to show the VA's state of mind. *See Conway v. Electro Switch Corp., 825 F.2d 593, 597-98 (1st Cir. 1987)* (discussing admissibility of evidence showing "institutional state-of-mind"); *cf. Fed.R.Evid. 803(3)* (statements "of the declarant's then existing state of mind" are not hearsay). In its written conclusions, the Board observed that "Dr. Kassel no longer has any degree of credibility [*946] in the performance of his responsibilities in the Mental Hygiene Clinic, [**32] " and "can no longer

provide any degree of valuable service in any aspect of the Psychiatry Service." Returning plaintiff to the Clinic, the Board found, "would put himself [sic], other staff and patients in jeopardy of physical harm." The report recommended that Kassel "be removed from any responsibilities putting him in direct or indirect contact with Vietnam veterans."

Considering that, throughout the case, plaintiff sought to link the Vietnam retrospective to various actions taken against him by his employer, such state-of-mind evidence was admissible. *Cf. Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 109 S. Ct. 439, 448-49, 102 L. Ed. 2d 445 (1988)* (statements of opinion contained in evaluative reports admissible under *Fed.R.Evid. 803(8)(C)*). Indeed, it strains credulity to suggest that insights into the VA's mindset were not crucial to the issue of special damages. The relevancy of the report, quite apart from its truthfulness, was apparent. The Board had been appointed by the VA director in Manchester (Kelleher). He charged it to investigate this very incident. The Board's conclusions thus constituted strong evidence of both the VA's institutional beliefs [**33] regarding Kassel and the VA's motivation in attempting to terminate his employment. The district court's careful pruning minimized untoward prejudice, kept the underlying hearsay out of the case, and ensured that the jury received the Board's opinion in as pristine a form as possible.

## VI.  MONEYLINE

USA launches a raft of attacks aimed at the damage award. We examine the relevant issues one by one.

### A. *Causation.*

Defendant asserts that Kassel's damages were not linked specifically to the "it's amusing" sentence, as opposed to the other (accurate) quotations contained in the article. But, the mills of the law do not grind so fine. [HN16] There is no requirement that an allegedly libelous statement be parsed so that its defamatory content is presented in isolation. The opposite is true: such statements "must be read in the context of the publication taken as a whole." *Duchesnaye, 480 A.2d at 125; see also Morrissette v. Cowette, 122 N.H. 731, 449 A.2d 1221, 1222 (1982); Thomson v. Cash, 119 N.H. 371, 402 A.2d 651, 653 (1979).* The jury ought to consider "all the circumstances under which these words were written, their context, [**34] [and] the meaning which could reasonably be given to them by readers. . . ." *Chagnon v. Union Leader Corp., 103 N.H. 426, 174 A.2d 825, 831 (1961), cert. denied, 369 U.S. 830, 82 S. Ct. 846, 7 L. Ed. 2d 795 (1962).*

Context is vital. The "it's amusing" statement, conceded on appeal to be false and defamatory, could rea-

sonably be said to have tainted the rest of Kassel's comments, making them appear insensitive of -- and derisive toward -- veterans of the Vietnam conflict. Read alone, the sentences which bracketed the offending sentence are not noticeably anti-veteran. But, they take on markedly different connotations when read in conjunction with Kassel's supposed assertion that the plight of American soldiers was somehow "amusing" compared with that of their Vietnamese counterparts. Seen in this (false) light, the "hand wringers" statement seems to refer to veterans who wrongly "feel they are the victims," and the remark about veterans who have lost their legs strikes a shockingly callous note.

In contrast, when Kassel's actual utterances are truthfully reported, the entire paragraph is transformed. Its tenor becomes positive and empathic. [**35] The "hand wringers" statement becomes a comment not on veterans, but on the media blitz accompanying the tenth anniversary of the war's end. And the statement as to loss of limb takes on a solicitous tone, evincing understanding rather than contempt. The trial testimony, we suggest, makes this very point rather forcefully. To cite one example, Kelleher (the director of the medical center) wrote to plaintiff on the heels of Gannett's published correction as follows: "It is my belief that the clarification printed [*947] by USA . . . changed the content of your statement to the point that I must conclude that the proposed letter of removal was in error." To mention another example, Dr. Anzola, chief of staff at the Manchester VA hospital, testified that the "winning or losing" sentence could appear sympathetic to veterans if the "it's amusing" quotation were replaced with Kassel's (authentic) statement that Vietnam was a "big tragedy".

The reactions of these readers provide adequate evidence that the misquotation damaged plaintiff, in part, by creating a misleading context which infected the remainder of the paragraph. The complete text was thus a proper predicate for liability. [**36] Gannett cannot so easily separate the hemlock from the nectar with which it was intermixed.

### B. *Proof of Injury.*

Once satisfied that causation was established, we turn our attention to proof of harm. [HN17] Both the federal Constitution and New Hampshire law constrain the recovery of compensatory damages in defamation cases. Read in the ensemble, these constraints impose significant limitations upon the types of damages which New Hampshire libel plaintiffs may recover from "merely negligent" defendants.

The applicable federal curbs derive from the First Amendment, as weighed against a state's interest in compensating individuals for the harm caused by defamatory falsehood. *See Gertz, 418 U.S. at 341-42.* Absent a dem-

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

onstration of *New York Times* malice -- and Kassel concedes there was no such showing here -- plaintiffs are barred from collecting either "presumed damages" for tarnished reputation, or punitive damages. *Id. at 349-50.* Instead, recovery is limited to compensation for "actual injury," described as follows:

> Actual injury is not limited to out-of-pocket loss. . . . the more customary types of actual harm inflicted by defamatory [**37] falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.

*Id. at 350.* The demands of the Constitution can be satisfied, for example, if the evidence shows that a libelous report caused a plaintiff anxiety, concern and feared humiliation; it suffices that the intangible suffering was genuine and resulted directly and naturally from the defamation. *Time, Inc. v. Firestone, 424 U.S. 448, 460-61, 47 L. Ed. 2d 154, 96 S. Ct. 958 (1976); see also* Mather, *Experience With Gertz "Actual Injury" in Defamation Cases, 38 Baylor L.Rev. 917, 933-34 (1986).*

Prior to *Gertz*, New Hampshire law allowed defamation victims to recover from "merely negligent" defendants general presumed damages, *i.e.*, "all damages which would normally result from such a defamation, such as harm to . . . reputation," without any requirement that specific damages be proven. *Chagnon, 174 A.2d at 835.* The victim could also recover at least some special damages, defined as "specific harm to . . . personal reputation . . . business reputation and credit reputation, [**38] loss of business and any other damage which . . . resulted as the normal and direct consequence of the defamation." *Id.* There is no indication that the availability of such damages under state law has been lessened in the post-Gertz era.

[HN18] In New Hampshire, then, federal and state law interact in cases of negligent defamation to produce the following matrix:

1. General reputational damages are recoverable so long as supported by evidence of actual injury to reputation.

2. At least some special damages are recoverable (but even when the underlying psychic injuries are actual, and *Gertz* would therefore permit recovery as a federal constitutional matter, it is problematic whether New Hampshire allows recovery for emotional distress and humiliation in cases of negligent defamation). n11

n11 We treat with this precise subject at greater length *infra*.

[*948] In the case at bar, Kassel provided plethoric evidence that USA's piece tarnished his image. As the Board observed:

> Reaction [**39] from veterans, representatives of veterans' organizations, VA employees and other professionals working directly and indirectly with Vietnam veterans has unanimously been [one] of outrage, calling for a range of responses from questioning Dr. Kassel's suitability for VA employment to demands for his dismissal from the Veterans Administration.

The Manchester chapter of Disabled American Veterans (DAV) dispatched a delegation to demand that Kassel be fired. The VA was deluged with anti-Kassel calls and letters, many "extremely negative" and "extremely hostile." The associate director of the hospital recalled that the article spurred more public comment than almost any other VA incident in memory. Kassel received threats of violence at his office and at home. n12

n12 Kassel remembered callers stating on the "that they were going to hurt me. In one case a veteran said he would kill me. On one occasion a veteran said that the next time I saw my name in the papers, it would be in the obituary." Dr. Anzola testified that some veterans had indicated "that there will be some harm to come to Dr. Kassel." Michael Lassonde, DAV representative, confirmed hearing a rumor about "someone trying to establish monies to have a hit man go after Dr. Kassel. . . ." This is but a sampler of the evidence on the point.

[**40]

We need not paint the lily. Plaintiff's reputation was obviously trampled in the aftermath of USA's publication. There was sufficient proof of actual injury.

C. *Damages.*

Having determined that the evidence was sufficient to establish both causation and injury, we focus on the damage award. The injury to plaintiff's reputation by USA was compensable, *see supra*, and the jury must be

accorded considerable latitude in translating the harm into dollars. After all, reputational losses "are not readily measurable in monetary terms." W. Keeton, D. Dobbs, R. Keeton & D. Owen, *supra*, § 116A at 843; *see also Gertz, 418 U.S. at 349-50; cf.* W. Shakespeare, *Othello*, Act III, sc. iii, 11. 155-61 ("he that filches from me my good name robs me of that which not enriches him and makes me poor indeed"). Despite the deference due the jury, however, we think that three assignments of error bearing on the issue of damages have merit. In combination, certainly, if not singly, these errors require that we vacate the award.

1. *Emotional Distress.* In Part VI(B), *supra*, we reserved our discussion of whether one negligently defamed may recover damages for [**41] emotional distress under New Hampshire law. In the case at bar, the district court resolved this issue in plaintiff's favor and charged the jury that:

> If you decide for Dr. Kassel on the issue of liability, then with respect to compensatory damages, you must fix the amount of money which will reasonably and fairly compensate him for any of the following elements of damages proved by the evidence to have resulted from the defendant's publication. . . . the pain[,] discomfort, personal humiliation, mental and emotional anguish and suffering experienced by him as a result of the defamatory publication. . . .

Appellant took a timely, specific objection to this portion of the charge. We believe that the objection was well-founded; this instruction, unconditioned on proof of malice, was erroneous under existing New Hampshire law.

In pre-Gertz libel cases, only when malice was proven could the New Hampshire factfinder take into account "considerations which cannot be made the subject of exact pecuniary compensation . . . [such as] mental distress and vexation, what in common language might be spoken of as offences to the feelings, insult, degradation, [and] offences [**42] against honest pride. . . ." *Chagnon, 174 A.2d at 835-36* (quoting *Bixby v. Dunlap, 56 N.H. 456, 462-63 (1876)). Accord Baer v. Rosenblatt, 106 N.H. 26, 203 A.2d 773, 781 (1964), rev'd on other grounds, 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669* [*949] *(1966).* n13 Although *Gertz* lent a constitutional cachet to broader formulations of recoverable damages, New Hampshire's post-Gertz caselaw, *e.g., McCusker, 428 A.2d at 494; Thomson, 402 A.2d at 654,*

does not purport to abrogate the *Chagnon/Baer* construct. Fairly read, the newer cases do nothing more than paraphrase the *Gertz* holding that compensatory damages may be recovered upon a showing of negligence.

> n13 The reference to "malice" which appears in both *Chagnon* and *Baer* is ambiguous; the state supreme court might have meant *either New York Times* malice *or* common law malice as developed in other areas of tort law. We need not resolve the amphiboly; neither type of malice was proven in this case.

[**43]

Nor is there a tide running from which we can presume that New Hampshire is now ready, regardless of prior precedent, to abandon its long-held rule. We recognize that in *Corso v. Merrill, 119 N.H. 647, 406 A.2d 300, 304-06 (1979),* the New Hampshire Supreme Court discarded the "zone of danger" approach, allowing recovery for certain negligently-inflicted emotional injuries because "freedom from mental distress . . . is today worthy of legal protection." *406 A.2d at 304.* But, the state court took great care to confine the principle within close boundaries, stipulating that plaintiffs may recover for emotional distress only when the psychic injury is foreseeable, *id.* at 303; occurs in the course of contemporaneous observation or perception of an accident, *id.* at 306; and manifests itself by way of physical symptoms, *id.* at 304. These perimeters have been vigilantly policed. Later cases have refused recovery for emotional distress stemming from so-called "wrongful birth," *Smith v. Cote, 128 N.H. 231, 513 A.2d 341, 351 (1986);* negligent misrepresentation, *Crowley v. Global Realty, Inc., 124 N.H. 814, 474 A.2d 1056, 1058 (1984);* [**44] breach of contract, *id.* at 1057; medical malpractice perpetrated on one's child, *Nutter v. Frisbie Memorial Hospital, 124 N.H. 791, 474 A.2d 584, 587 (1984);* and bad-faith denial of insurance coverage, *Jarvis v. Prudential Ins. Co., 122 N.H. 648, 448 A.2d 407, 410 (1982). See also Croteau v. Olin Corp., 704 F. Supp. 318, 319 (D.N.H. 1989)* (predicting that New Hampshire Supreme Court would not allow recovery in product liability action for physical injury caused by emotional distress); *cf. Chamberlin v. 101 Realty, Inc., 626 F. Supp. 865, 868-69 (D.N.H. 1985)* (discussing broader extent to which New Hampshire law permits recovery for *intentional* infliction of emotional distress).

The common strand which ties these cases together seems to be a wariness about the ease of claiming, and the difficulty of measuring, psychic harm. The New Hampshire courts recognize that the imposition of emotional distress damages, if not closely cabined, might

become an instrument of oppression; courts "would run the risk of penalizing and over-deterring merely negligent conduct." *Cote, 513 A.2d at 351.* That [**45] policy consideration takes on particular strength in an environment dominated by First Amendment imperatives. Freedom of the press requires that unbounded speculation by juries be discouraged, lest other speakers be chilled by the threat which such awards entail. *See Lerman v. Flynt Distributing Co., 745 F.2d 123, 141 (2d Cir. 1984), cert. denied, 471 U.S. 1054, 85 L. Ed. 2d 479, 105 S. Ct. 2114 (1985).* Furthermore, in light of the fact that libel law is intended to protect a plaintiff's interest in reputation, it seems anomalous to permit recovery for emotional distress independent of either reputational injury or malice. *See* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *supra*, § 116A at 844-45.

Given these factors, it would be rash to assume that the *Chagnon/Baer* formulation no longer represents the law of New Hampshire. Although it is possible that the state supreme court might be ready to adopt a different view, we cannot lightly indulge such speculation. Where a directly pertinent precedent of the state's highest court obtains, a federal court applying state law must be hesitant to blaze a new (and contrary) trail. Absent more solid [**46] evidence than is available here, *see, e.g., Provencher v. Berman, 699 F.2d 568, 570 (1st [*950] Cir. 1983); Mason v. American Emery Wheel Works, 241 F.2d 906, 909-10* (1st Cir.), *cert. denied, 335 U.S. 715, 78 S. Ct. 17, 2 L. Ed. 2d 32 (1957),* a diversity court must take state law as it finds it: "not as it might conceivably be, some day; nor even as it should be." *Plummer v. Abbott Laboratories, 568 F. Supp. 920, 927 (D.R.I. 1983); see also Moores v. Greenberg, 834 F.2d 1105, 1107 n. 3 (1st Cir. 1987)* (in diversity jurisdiction, task is to determine state law, not fashion a rule which the federal court, independently, might deem best). And when state law has been authoritatively declared, the federal tribunal should apply that law according to its tenor. If plaintiff, fully chargeable with knowledge of the decided New Hampshire cases, nonetheless chose to reject a state-court forum in favor of a federal forum, he is in a perilously poor position to grumble when we follow existing state precedent. *Cf. Freeman, 865 F.2d at 1349* (party removing case from state court "hard put [**47] to complain if the federal court follows state practice in regard to state-law claims"). A plaintiff "who seeks out a federal forum in a diversity action should anticipate no more." *Plummer, 568 F. Supp at 927.* n14

n14 We have considered, but decline to employ, certification of this question to the state supreme court. *Accord Fischer v. Bar Harbor Banking & Trust Co., 857 F.2d 4, 8 (1st Cir. 1988), cert. denied, 489 U.S. 1018, 109 S. Ct.*

1135, 103 L. Ed. 2d 196 (1989); Cantwell v. University of Massachusetts, 551 F.2d 879, 880 (1st Cir. 1977).* Such a course seems particularly inadvisable in this case, since other infirmities in the verdict, discussed *infra*, will require a new trial on damages in any event. The district court, of course, remains free to certify the question, or not, after remand.

It follows, therefore, that the jury ought not to have been instructed on emotional distress damages. Moreover, the error requires reversal. [**48] Despite the fact that USA urged the adoption of a special verdict form which would have solved the present problem, the court rejected the suggestion and the jury returned only a general verdict. Such a circumstance usually necessitates a new trial because "there is no way to know that the invalid claim . . . was not the sole basis for the verdict." *United New York & New Jersey Sandy Hook Pilots Assoc. v. Halecki, 358 U.S. 613, 619, 3 L. Ed. 2d 541, 79 S. Ct. 517 (1959). Accord Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co., 370 U.S. 19, 29-30, 8 L. Ed. 2d 305, 82 S. Ct. 1130 (1962); Maryland v. Baldwin, 112 U.S. 490, 493, 28 L. Ed. 822, 5 S. Ct. 278 (1884); Brochu v. Ortho Pharmaceutical Corp., 642 F.2d 652, 662 (1st Cir. 1981).* In this instance, we cannot say the error was harmless. A substantial amount of plaintiff's proof addressed the emotional distress issue; indeed, the evidence on the topic was so voluminous and pervasive that Kassel tells us "there was sufficient evidence of emotional distress, alone, to support a jury verdict of $ 300,000." Appellee's Brief at 44.

2. [**49] *Earnings.* The trial court also charged on loss of future earnings. While prospective pecuniary injury is a recognized element of actual damages for defamation, *Chagnon, 174 A.2d at 835,* the proof elicited at trial was too flimsy to allow the jury to consider the matter on this occasion.

[HN19] In New Hampshire, a plaintiff "has the burden of proving the extent and amount of [his] damages," *Whitehouse v. Rytman, 122 N.H. 777, 451 A.2d 370, 372 (1982); Hangar One, Inc. v. Davis Assoc., Inc., 121 N.H. 586, 431 A.2d 792, 795 (1981),* and must also show "that the damages which he seeks were caused by the alleged wrongful act." *Grant v. Town of Newton, 117 N.H. 159, 370 A.2d 285, 287 (1977); see also Progressive Survey, Inc. v. Pearson, 120 N.H. 58, 410 A.2d 1123, 1125 (1980).* Although damages need not be proven with mathematical certainty or sliderule precision, one seeking to recover for the loss of future earnings "must produce sufficient data to demonstrate that [future] profits are reasonably certain to result." *Dunlop v. Daigle, 122 N.H. 295, 444 A.2d 519, 522 (1982)* (per curiam). [**50] *Accord Petrie-Clemons v. Butterfield, 122 N.H.*

*120, 441 A.2d 1167, 1171 (1982).* There is, of course, "often more than one satisfactory method" for proving damages, *Northern Heel Corp. v.* [*951] *Compo Indus., Inc., 851 F.2d 456, 473 (1st Cir. 1988),* but a claimed element of loss must be computed in some rational way upon a firm factual base.

The record on lost earnings is too thin to cast a shadow. While we know that Kassel made roughly $ 50,000 per year at the VA, he offered no evidence as to when -- or whether -- the VA stopped paying his salary after the Vietnam story appeared. Plaintiff testified that in March 1988 he was "medically retired," and that he now receives a government pension (amount unspecified). We are given no inkling as to whether the USA piece had anything to do with Kassel's eventual retirement; plaintiff failed to state the nature of his medical problems and offered no evidence linking these problems to the libel. n15

n15 The district court denied USA's motion for a directed verdict on this point, stating that there was "no competent medical evidence . . . that [Kassel] was terminated because of his medical condition [as opposed to the USA piece]." That resupinate ruling stands the law on its head. It was plaintiff's burden to offer evidence that he lost his job because of USA's publication, *see Grant, 370 A.2d at 287,* rather than defendant's burden to show the opposite. And, when defense counsel pressed on to insist that, in any event, "there is no evidence in the record from which a jury could calculate what th[e] damages [for future lost earnings] ought to be," the court responded enigmatically: "I'll deny the motion. Exception noted."

[**51]

To be sure, Kassel testified at length concerning difficulties he encountered at work following USA's gaffe. He now points, in particular, to testimony anent his stint at Bedford, where the VA placed him in a basement office, provided him with no job description, and gave him nothing to do. After three days, Kassel "couldn't take it any more," and left. Such evidence was useful for proving, say, general damage to plaintiff's career -- but it does not address the issue of lost income or diminished earning capacity. The record fails to reflect for how long, if at all, his salary continued. Unlike *Van Hooijdonk v. Langley, 111 N.H. 32, 274 A.2d 798, 800 (1971),* relied upon by the district court, this was not a case where plaintiff's ability to prove future damages was stymied by defendant's wrongful conduct. It would have been a simple matter for plaintiff to chart his earnings during the rele-

vant period and to lay a foundation against which future losses could be measured. He never did so.

There is little point in flogging a dead horse. Given the gaps in the proof, the jury should not have been instructed on the issue of future earnings.

3. *The Brief.* When [**52] plaintiff challenged his reassignment to Bedford, he filed a labor grievance against the VA. In that proceeding, he maintained that the VA initiated a series of adverse personnel actions in reprisal for his union activities and prior successful grievances. After an arbitrator ruled in the VA's favor, Kassel appealed to the United States Court of Appeals for the Federal Circuit. n16 He signed and filed a 49-page *pro se* brief (Brief). He charged therein that the VA's true motive was a desire to "get even" for prior asserted grievances; that the USA article was being used as an "absurd pretext" for his transfer; that the VA "mounted a media campaign" to disgrace him; and that "the whole world knew" USA had misquoted Kassel once the newspaper published the correction. The Brief contained numerous variations on the same themes.

n16 Although irrelevant to either the merits of this case or to the evidentiary question, we take judicial notice that the Federal Circuit eventually dismissed the appeal for want of jurisdiction because the underlying arbitral decision (involving a reassignment without a concomitant reduction in pay or grade) was not subject to judicial review. *See Kassel v. VA,* No. 87-3472 (Fed.Cir. Aug. 3, 1988) (unpublished order).

[**53]

Plaintiff moved to bar any use of the document at trial, on the ground that it would tend to confuse the jury. USA responded that, since Kassel was claiming to have been transferred because of the newspaper article, his assertions that other factors caused the move were classic admissions against interest. It beseeched the court not to "rule out a whole area of cross-examination" by blanket exclusion of the document, but to "take [particular statements] up as they come along." The district court, without any on-the-record explanation [*952] of its reasons, ruled in plaintiff's favor. It declared that statements from the Brief were "not admissible, period." We assume, as plaintiff suggests, that the court acted under *Fed.R.Evid. 403* ("although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury") and banned the Brief as overly confusing.

We have vouchsafed district courts "wide discretion in steadying the Rule 403 seesaw," *Onujiogu v. United*

*States, 817 F.2d 3, 6 (1st Cir. 1987); see also Freeman, 865 F.2d at 1340* (quoted [**54] *supra* note 10). Yet there are boundaries to this latitude, exceeded in this case. We recognize that numerous statements from the Brief might well have confused the venire or unduly protracted the proceedings by inviting lengthy detours through matters of peripheral interest. But, the exclusion ordered by the district court was *total*. Therein lay the rub -- and the lower court's error. Whatever might be said of *most* of the Brief, not *all* the proffered statements were beyond the pale. By way of illustration, and disclaiming any attempt at comprehensiveness, we have listed in an appendix a sampling of the sort of statements which appellant was likely entitled to use at the trial.

We are unable to discern -- and neither appellee nor the district court have explained -- how these selected statements were prone to sidetrack or mislead jurors who heard the case in chief. That they were highly relevant cannot be gainsaid; each declaration is directly "contrary to [plaintiff's] position at trial." *United States v. Palow, 777 F.2d 52, 56 (1st Cir. 1985), cert. denied, 475 U.S. 1052, 89 L. Ed. 2d 585, 106 S. Ct. 1277 (1986); cf. Estate of Spinosa v. Int'l Harvester Co., 621 F.2d 1154, 1157 (1st Cir. 1980).* [**55] Thus, the statements were admissions against interest, and presumably admissible. *See, e.g., Williams v. Union Carbide Corp., 790 F.2d 552, 556 (6th Cir.), cert. denied, 479 U.S. 992, 93 L. Ed. 2d 592, 107 S. Ct. 591 (1986); Walaschek & Associates, Inc. v. Crow, 733 F.2d 51, 54 (7th Cir. 1984); Glaesman v. Shop-Rite Foods, Inc., 438 F.2d 341, 342 (10th Cir. 1971) (per curiam); Gallis v. Peelle Co., 264 F.2d 663, 665 (2d Cir. 1959); see generally Fed.R.Evid. 801(d)(2)(A)* (a "party's own statement in either an individual or a representative capacity" is not hearsay if "offered against [the] party").

We recently canvassed the law on the admission of prior inconsistent pleadings as admissions against interest, and rejected "a flat rule admitting or excluding" such allegations. *Vincent v. Louis Marx & Co., 874 F.2d 36,* slip op. at 11 (1st Cir. 1989). We determined that [HN20] the district court must balance the prejudicial effect and probative value of each statement offered under *Fed.R.Evid. 801(d)(2)(C),* according to the calibration which Rule 403 demands. *See id.* [**56] That is precisely the procedure which should have been followed here. It was not. Since Kassel, at different points in the Brief, had flatly contradicted the theory of damages which he advanced before the district court, those particular statements should not have been excluded. In prohibiting all references to any part of the Brief, the district judge threw out the baby with the bath water. n17 On retrial, the court should consider the introduction of each proffered admission as presenting a separate question under *Fed.R.Evid. 403.*

n17 We do not view our decision on this point as inconsistent with the holding of *Hardy v. Johns-Manville Sales Corp., 851 F.2d 742 (5th Cir. 1988).* We share the reluctance of the Fifth Circuit routinely to treat appellate briefs submitted by a party in one action as evidentiary admissions against that party in another action. *See id. at 745-46.* The case at bar, however, presents the sort of "highly unusual circumstances" which the *Hardy* court, *id. at 746,* was careful to note might favor admissibility: the appellate brief was written not by an attorney, but by plaintiff himself; the issue (what motivated the VA to mount an adverse personnel action) seems common to both cases; and Kassel's claims in the Brief, on the whole, did not purport to be other than his views "of what the real world facts are." *Id. at 745.*

[**57]

Importantly, we believe that wholesale suppression of the Brief necessitates retrial on the issue of damages, but not liability. By and large, those statements [*953] which were likely admissible concerned putative reasons for the adverse personnel actions directed at plaintiff, and the article's impact upon various segments of the reading public. Such questions bore heavily on the existence and extent of plaintiff's injuries. Conversely, the Brief apparently had no particular bearing upon the liability issues. Kassel never attempted to persuade the Federal Circuit that the Vietnam article was not defamatory or that USA had been either accurate or careful. To the extent that portions of the Brief might conceivably trench upon the matter of liability at all, we believe their relevance to be tangential, their cumulative weight to be slight, and their exclusion, if error at all, to have been entirely benign.

We have also considered plaintiff's assertion that the blanket banning of the Brief was harmless error. The question is close (although some of the admissions were powerful stuff). The fact that, during cross-examination, defense counsel asked a number of times whether plaintiff [**58] had made certain statements in a "public document" is counterbalanced because, generally, Kassel's answers were uncertain or qualified. Of course, due to the total bar, USA was denied the opportunity to confront him directly with the actual statements. And, we are not operating in a vacuum; we must gauge the harmfulness of the wholesale exclusion not as an isolated matter, but in conjunction with the errors committed in the charge. *See supra* Parts VI(C)(1), (2). When all are taken collectively, we believe that USA is entitled to a new trial on damages.

D. *Scope of Retrial.*

875 F.2d 935, *; 1989 U.S. App. LEXIS 7453, **;
28 Fed. R. Evid. Serv. (Callaghan) 488; 16 Media L. Rep. 1814

Although damages must be relitigated, there is no basis in the record for trying liability anew. The jury verdict holding Gannett responsible stands unsullied, free of discernible taint. The issues -- liability on the one hand, damages on the other -- and the proof adduced on them were sufficiently distinct that requiring a full retrial "would be judicially wasteful, as well as unfair to the plaintiff[]." *Maxey v. Freightliner Corp., 727 F.2d 350, 352 (5th Cir. 1984). See* 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2814 at 93 (1973) ("if an error at the trial [**59] requires a new trial on one issue, but this issue is separate from the other issues in the case and the error did not affect the determination of the other issues, the scope of the new trial may be limited to the single issue") (footnote omitted). Put another way, the nisi prius roll reflects "no inextricable considerations" militating in favor of a complete new trial on all issues. *Winn v. Lafayette Town House, 839 F.2d 835, 837 (1st Cir. 1988).* n18

n18 We deem it open on retrial for plaintiff to attempt to produce competent evidence to link his medical retirement and/or the loss of discernible future earnings to dissemination of the libel.

VII.  A QUICK READ

The headlines are these. The jury supportably found that USA's piece was defamatory and that defendant was negligent in publishing it. Because these issues were fully and fairly tried, and because Kassel was not a "public official" for libel law purposes, the findings suffice to sustain the jury's verdict on liability. As to [**60] damages, however, the combined effect of the three errors which we have discussed, *see supra* Part VI, require that there be a limited new trial.

We need go no further. What USA wrought was not amusing. It should pay Kassel for its carelessness, but in an amount fixed by a properly-instructed jury and on the basis of a better-developed evidentiary record. *The judgment below is affirmed as to liability, but vacated as to amount. The case is remanded for a new trial on damages. Each party shall bear his/its own costs.*

APPENDIX

Representative Excerpts from the Federal Circuit Brief

1.  "VA tried to fire, then involuntarily transfer Kassel because he was misquoted [*954] -- clearly an absurd pretext and a continuation of their psychological warfare against Kassel." Brief at 1.

2.  "Since the misquote . . . there had been no complaints about Kassel's work or from his patients. The whole world knew by the summer that Kassel had been misquoted. . . ." Brief at 7.

3.  "It is Kassel's contention that VA wanted to 'get rid of' him and considered him an undesirable employee long before the USA piece." Brief at 36-37.

4.  "No doubt some vets were annoyed or even outraged [**61] by the misquote, [but] the number was small . . . and was far smaller after the whole world knew Kassel was misquoted." Brief at 41.

5.  "After the correction, the 'outrage' subsided." *Id.*

6.  "Besides, just because a handful of people 'claimed' Kassel was damaged by the misquote, does not prove he actually was. There isn't the slightest evidence that a majority of readers or vets felt this way." Brief at 42-43.

LEXSEE 1997 U.S. DIST. LEXIS 18717

**United States of America, Plaintiff, v. Ronald W. Skeddle, et al., Defendants.**

**3:95CR736**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, WESTERN DIVISION**

*981 F. Supp. 1069; 1997 U.S. Dist. LEXIS 18717*

**October 21, 1997, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants were charged with wire and mail fraud, money laundering, and conspiracy. The government proposed to introduce into evidence under the business records exception to the hearsay rule certain handwritten documents prepared by one defendant and his accounting partner. Defendants objected to the admission of the documents.

**OVERVIEW:** The notes pertained to accounting services provided to defendants and several corporations owned by defendants. Most of the notes were taken by one defendant during or shortly after meeting with other defendants. The accounting firm's former office administrator identified the note's authors and that the notes pertained to the accounting firm's representation of other defendants. The court admitted most of the notes under Fed. R. Evid. 803(6), the business records exception to the hearsay rule. The court addressed the four requirements for the admission of business records and found that the four requirements were meet. The court found that the records were made in the course of a regularly conducted business activity; that the records were kept in the regular course of that business; that the regular practice of that business was to have made the records; and that the records were made by persons with knowledge of the transaction or from information transmitted by a person with knowledge. The court refused to admit two documents because it was not established when they were made and the risk of unfair prejudice outweighed their probative value under Fed. R. Evid. 403.

**OUTCOME:** The court admitted the government's proposed evidence, except for the two undated documents.

**LexisNexis(R) Headnotes**

*Evidence > Hearsay > Exceptions > Business Records > Admissibility in Criminal Trials*
*Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business*
[HN1] Fed. R. Evid. 803(6) provides an exception to the hearsay rule for a memorandum of acts or events made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

*Evidence > Documentary Evidence > Writings > General Overview*
*Evidence > Hearsay > Exceptions > Business Records > Admissibility in Criminal Trials*
[HN2] A proponent of an alleged business record must lay a foundation for its admissibility through the testimony of a qualified witness. This involves showing that (1) the record was made in the course of a regularly conducted business activity; (2) the record was kept in the regular course of that business; (3) the regular practice of that business was to have made the record; and (4) the record was made by a person with knowledge of the transaction or from information transmitted by a

981 F. Supp. 1069, *; 1997 U.S. Dist. LEXIS 18717, **

person with knowledge. The standard for knowledge required of a foundation witness is very liberal. All that is required is that the witness be familiar with the record keeping system. A witness does not need to have personal knowledge of the record in order to lay a proper foundation for its admissibility. Rather, the witness's lack of personal knowledge goes to the credibility that should be accorded that witness's testimony.

***Evidence > Documentary Evidence > Writings > General Overview***
***Evidence > Hearsay > Exceptions > Business Records > Admissibility in Criminal Trials***
[HN3] The business records exception is based on the theory that records kept as part of a regular routine carry special guarantees of trustworthiness. As such, a business record that is nothing but an isolated and unique incident is inadmissible. However, the routineness or repetitiveness with which a record is prepared is not the touchstone of admissibility under the business records exception. The fact that the record is not of a type that is routinely kept does not necessarily require its exclusion. Non-routine records made in the course of a regularly conducted "business" are generally admissible if they meet the other requirements of admissibility, unless the sources of information or other circumstances indicate a lack of trustworthiness. Thus exclusion is mandated only when the facts of the case indicate unreliability. A contention without more that records of the type were not regularly kept should not overcome admissibility. Thus, unless there is some indication of untrustworthiness, business records should not be excluded based merely on the fact that they are not always kept.

***Evidence > Hearsay > Exceptions > Business Records > Admissibility in Criminal Trials***
[HN4] In the usual case, the time of the event and the time of the entry will be self-evidence on the face of the record and it would seem to involve a great and unnecessary burden to further require separate evidence as to the time of the entries. However, when proffered business records are undated, the proponent bears the burden of demonstrating that such documents were prepared contemporaneously with the event they recite.

**COUNSEL:** [**1] For RONALD W SKEDDLE, defendant: Jon D. Richardson, Sr., Esq., Kaplan, Richardson, Rost & Helmick, Toledo, OH.

For RONALD W SKEDDLE, defendant: William M. Connelly, Esq., Connelly, Soutar & Jackson, Toledo, OH.

For RONALD W SKEDDLE, defendant: Ronald W Skeddle, Perrysburg, OH.

For RONALD W SKEDDLE, defendant: Peter R. Ginsberg, Esq., Gold & Wachtel, New York, NY.

For RONALD W SKEDDLE, defendant: Robert Gold, Esq., Michael Sommer, Esq., McDermott, Will & Emery, New York, NY.

For DARRYL J COSTIN, defendant: Sheldon S. Wittenberg, Esq., Wittenberg & Phillips, Toledo, OH.

For DARRYL J COSTIN, defendant: Brendan V. Sullivan, Jr., Esq., Barry S. Simon, Esq., Marcie R. Ziegler, Esq., Williams & Connolly, Washington, DC.

For DARRYL J COSTIN, defendant: Darryl J Costin, Perrysburg, OH.

For EDWARD B BRYANT, defendant: Jerome Phillips, Esq., Wittenberg & Phillips, Toledo, OH.

For EDWARD B BRYANT, defendant: Richard A. Hibey, Esq., Gordon A. Coffee, Esq., Michael K. Atkinson, Esq., Douglas N. Greensburg, Esq., Winston & Strawn, Washington, DC.

For EDWARD B BRYANT, defendant: Edward B Bryant, Toledo, OH.

For DAVID L HERZER, defendant: Gerald [**2] Arthur Messerman, Esq., Messerman & Messerman, Cleveland, OH.

For DAVID L HERZER, defendant: David L Herzer, Vermilion, OH.

For JOSEPH G CORSARO, defendant: Niki Z. Schwartz, Esq., Gold, Rotatori, Schwartz & Gibbons, Cleveland, OH.

For JOSEPH G CORSARO, defendant: John E. Martindale, Esq., Martindale, Bryztwa & Quick, Cleveland, OH.

For JOSEPH G CORSARO, defendant: Joseph G

981 F. Supp. 1069, *; 1997 U.S. Dist. LEXIS 18717, **2

Corsaro, Bay Village, OH.

For JOHN R PURSER, defendant: John J. Callahan, Esq., Toledo, OH.

For JOHN R PURSER, defendant: John R Purser, Whitehouse, OH.

For CLARENCE H MARTIN, defendant: John Czarnecki, Esq., Cooper, Walinski & Cramer, Toledo, OH.

For CLARENCE H MARTIN, defendant: Clarence H Martin, Gahanna, OH.

For DAVID M HOBE, defendant: J. Michael Murray, Esq., Berkman, Gordon, Murray, Palda & DeVan, Cleveland, OH.

For DAVID M HOBE, defendant: David M Hobe, Strongsville, OH.

For FLOYD A TROUTEN, III, defendant: Norman G. Zemmelman, Esq., Britz & Zemmelman, Toledo, OH.

For FLOYD A TROUTEN, III, defendant: Sander Schwartz, Esq., Cook, Riley, Smith, Nance & Schwartz, Cleveland, OH.

For FLOYD A TROUTEN, III, defendant: Floyd A Trouten, III, Strongsville, [**3] OH.

For FLOYD A TROUTEN, III, defendant: Richard G. Lillie, Esq., Lillie & Holderman, Cleveland, OH.

For U. S.: Robert William Kern, Esq., Office Of The U.S. Attorney, Cleveland, OH.

For U. S.: Thomas A. Karol, Esq., Office Of The U.S. Attorney, Toledo, OH.

**JUDGES:** James G. Carr, United States District Judge.

**OPINION BY:** James G. Carr

**OPINION:**

[*1071] Order

This is a criminal case in which defendants are charged with wire and mail fraud, money laundering and conspiracy. The government proposes to introduce into evidence under the business records exception to the hearsay rule documents handwritten by defendant David Hobe and one of his accounting partners, Floyd Trouten, III. (Doc. 782). Defendants Skeddle, Costin & Bryant and defendant Hobe filed memoranda in opposition to this proffered evidence, arguing that the government has not laid a proper foundation for admissibility of the notes. (Docs. 783,     ). For the following reasons and to extent set forth below, I shall allow the government to introduce the business records evidence.

During trial testimony on October 17, 1997, defendants Hobe and Costin objected to the admissibility of certain handwritten notes identified by government [**4] witness Judy Jurcago, a former office administrator of the accounting firm of Hobe & Lucas. Most, if not all, of these notes were primarily authored by David Hobe or Floyd Trouten, accountants at Hobe & Lucas. The notes, which pertain to Hobe & Lucas's representation of the defendants Skeddle, Costin and Bryant and certain corporations formed by them, were proffered as business records of Hobe & Lucas.

Defendants contend that Ms. Jurcago failed to establish a proper foundation for admitting Hobe's handwritten notes, because she lacks personal knowledge as to the contents of the notes or the actual circumstances of their recordation and because she fails to demonstrate that the notes were business records of Hobe & Lucas.

[*1072] **Discussion**

[HN1] *Fed. R. Evid. 803(6)* provides an exception to the hearsay rule for:

> A memorandum . . . of acts [or] events . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, . . . all as shown by the testimony of the custodian or other qualified witness, unless [**5] the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Case 1:05-cv-10506-WGY    Document 146-3    Filed 10/09/2006    Page 4 of 6

Page 4

981 F. Supp. 1069, *1072; 1997 U.S. Dist. LEXIS 18717, **5

[HN2] The proponent of an alleged business record must lay a foundation for its admissibility through the testimony of a qualified witness. Under Sixth Circuit precedent, this involves showing that (1) the record was made in the course of a regularly conducted business activity; (2) the record was kept in the regular course of that business; (3) the regular practice of that business was to have made the record; and (4) the record was made by a person with knowledge of the transaction or from information transmitted by a person with knowledge. *United States v. Fawaz, 881 F.2d 259, 266 (6th Cir. 1989)* (citing *Redken Laboratories v. Levin, 843 F.2d 226, 229 (6th Cir.), cert. denied, 488 U.S. 852, 102 L. Ed. 2d 110, 109 S. Ct. 137 (1988)).*

In the Sixth Circuit, "the standard for knowledge required of a foundation witness is very liberal . . . 'all that is required is that the witness be familiar with the record keeping system.'" *United States v. Selby, 1994 U.S. App. LEXIS 21293, *26-27* (filed Aug. 8, 1994) (quoting *United States v. Hathaway, 798 F.2d 902, 906 (6th [**6] Cir. 1986)).* A witness does not need to have personal knowledge of the record in order to lay a proper foundation for its admissibility. *United States v. Sachs, 801 F.2d 839, 843 (6th Cir. 1986).* Rather, the witness's lack of personal knowledge goes to the credibility that should be accorded that witness's testimony. *Id.*

Defendants contend that the government, through Jurcago, has failed to satisfy any of the four foundational requirements established by the Sixth Circuit. I disagree: Jurcago's testimony demonstrates that the notes were made in the course of Hobe & Lucas's regular business activity, that the notes were kept as part of the regular course of that business, and that it was a regular practice of employees of Hobe & Lucas to record such notes during meetings with clients. Moreover, the substantial majority of the notes were indisputably made by Hobe, who, based on Jurcago's testimony, had personal knowledge of the event that these notes describe.

The government has met the first and second foundational requirements for admissibility of the Hobe & Lucas notes. Jurcago, the former office manager and firm administrator of Hobe & Lucas, testified during voir dire [**7] that she recognized the names of the individuals and entities reported in the proffered notes as those of Hobe & Lucas clients. Moreover, she stated that the activities reported in the notes pertain to services provided by Hobe & Lucas as part of its regular business

with these clients; the notes discuss and analyze salary, payroll, fringe benefits, and other services performed by Hobe & Lucas in the ordinary course of business. Jurcago's testimony therefore satisfies the requirement that the record be made in the course of the recorder's regular business activity.

In addition to her more conclusory testimony that the notes were kept in the ordinary course of business, Jurcago testified several times that it was customary for a Hobe & Lucas employee to take notes at client meetings, place them in the client files, and refer to them, or direct others to refer to them, at a later point in time. Her testimony in this regard amounts to a showing that the notes in question were kept as part of the regular course of Hobe & Lucas's business.

It is the third requirement -- that it be the recorder's regular business practice to keep such records -- that creates the most disagreement between [**8] the parties. Specifically, the defendants argue that, because Hobe & Lucas had no policy requiring employee to take notes during client meetings, and because, according to Jurcago, defendant Hobe had no routine practice of taking such notes, the third requirement cannot be satisfied.

[*1073] [HN3] The business records exception is based on the theory that records kept as part of a regular routine carry special guarantees of trustworthiness. As such, a business record that is nothing but an isolated and unique incident is inadmissible. *United States v. Freidin, 849 F.2d 716, 720 (2d Cir. 1988).*

However, "the routineness or repetitiveness with which a record is prepared is not the touchstone of admissibility under the business records exception." *United States v. Jacoby, 955 F.2d 1527, 1537 (11th Cir. 1992).* Indeed, as one source has stated:

> The fact that the record is not of a type that is routinely kept does not necessarily require its exclusion. Non-routine records made in the course of a regularly conducted "business" are generally admissible if they meet the other requirements of admissibility, unless "the sources of information or other circumstances indicate a lack of trustworthiness." [**9] Thus exclusion is

Case 1:05-cv-10506-WGY     Document 146-3     Filed 10/09/2006     Page 5 of 6

Page 5

981 F. Supp. 1069, *1073; 1997 U.S. Dist. LEXIS 18717, **9

mandated only when the facts of the case indicate unreliability. A contention without more that records of the type were not regularly kept should not overcome admissibility."

5 J. Weinstein and M. Berger, *Weinstein's Federal Evidence § 803.11*[2], at 803-64 (2nd ed. 1997) (quoting *Fed. R. Evid. 803(6)*). Thus, unless there is some indication of untrustworthiness, business records should not be excluded based merely on the fact that they are not always kept.

In *Kassel v. Gannett Co., 875 F.2d 935,* (1st Cir. 1989), the First Circuit faced in a situation similar to the one presented here. At the trial level, the plaintiff offered under the business records exception contact reports prepared by an institution. The defendant challenged the records, claiming that because they were only completed when the institution's employee "perceived the need," they did not satisfy the hearsay exception. *Id. at 944.*

In upholding the trial court's admission of the record, the First Circuit held that the fact that the report was not "usually" completed did not necessarily foreclose application of Rule 803(6). *Id. at 944-45.* The court went on to state that "while [**10] the business records exception does not extend to activity that is 'casual or isolated,' some degree of discontinuity or selectivity remains permissible." *Id. at 945.* See also *Jacoby, 955 F.2d at 1537* (business record admissible where it was prepared whenever employee "believed it necessary to explain something or make a record of an unusual circumstance").

While Jurcago testified that she had been present at meetings where Hobe did not take notes, she also stated that she had seen Hobe take notes at client meetings from time to time. Jurcago also testified that it was customary for notes of this sort to be taken and placed in files by Hobe & Lucas employees who wanted to memorialize what had happened at client meetings for future reference. Therefore, although there was no formal policy requiring such notetaking, the testimony of Jurcago, who was familiar with Hobe & Lucas's record keeping and files, and the existence of numerous notes taken by Hobe & Lucas employees including Hobe and Trouten, indicate that it was a regular, although not universally followed, business practice.

Furthermore, there is no indication that the notes are untrustworthy. While they may be subject [**11] to more than one interpretation, that alone does not render them unreliable or suspect. Moreover, it would be disingenuous to allow the defendants to claim that the source of the information indicates lack of trustworthiness: the defendants themselves and the corporations they established are the clients referenced in the notes, and presumably the source of the information.

The final of the four Sixth Circuit requirements -- that the record be prepared by one with personal knowledge or from information transmitted by one with personal knowledge -- is likewise satisfied. As has been noted, the notes in question pertain to accounting services provided to the defendants and several corporations owned by them. Therefore, the notes taken by Hobe were presumably based on information transmitted by the defendants, who had personal knowledge of their own financial affairs.

[*1074] Courts have also required that business records be prepared at or near the time of the event which they memorialize. When documents are dated, this requirement is usually a mere technicality:

> [HN4] In the usual case, the time of the event and the time of the entry will be self-evidence on the face of the record and "it [**12] would seem to involve a great and unnecessary burden to further require separate evidence as to the time of the entries."

Weinstein, supra, § 803.11[2] at 803-74 (quoting Laughlin, Business Entries and the Like, *46 Iowa L. Rev. 276, 291-296*). However, when proffered business records are undated, the proponent bears the burden of demonstrating that such documents were prepared contemporaneously with the event they recite. *Muzzleman v. National Rail Passenger Corp., 839 F. Supp. 1094, 1098-99 (D. Del. 1993).* See also *Redken Lab, 843 F.2d at 229* (undated records not admissible).

The defendants challenge the introduction into evidence of two undated documents, GX 3098 and GX 3002, which are notes of Floyd Trouten, III, on several bases, including the four foundational requirements discussed above, Rule 403 and the Confrontation Clause. However, defendants' strongest contention regarding

981 F. Supp. 1069, *1074; 1997 U.S. Dist. LEXIS 18717, **12

these documents is their attack on its lack of verifiable contemporaneity.

The government attempts to demonstrate that these documents were created contemporaneously with the events they discuss by putting the documents in the context of documents that were bates stamped before and after them. [**13] While I find the government's proffer to be quite ambitious, I believe exclusion of these two documents is proper, especially in light of the Jurcago's testimony that she had not seen these documents until she appeared before the grand jury, and still did not recognize them as notes that she had ever seen in a Hobe & Lucas file.

As to those two documents, I find, as well, that the risk of unfair prejudice that would result from juror speculation about their meaning and significance outweighs their probative value, which, in turn, depends on inferences drawn from such speculation. Thus, *Fed. R. Evid. 403* requires their exclusion.

As to the other challenged documents, I find that the risk of unfair prejudice, confusion, or delay is not so substantial that the probative value of the documents is outweighed. Unlike the two Trouten documents, these documents are, for the most part, notes of one of the defendants taken during or shortly after meetings with others of the defendants, and were identified by the witness as such. Therefore, their probative value is not as suspect as that of the two Trouten documents, and they are admissible under *Fed. R. Evid. 403*.

Accordingly, it is hereby [**14]

**ORDERED THAT**, with the exception of GX 3002 and GX 3098, the government's proposed evidence of business records shall be admitted.

**So ordered.**

James G. Carr

United States District Judge