UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>    Plaintiff, Defendant-in-Counterclaim.<br><br>    v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and, CSFB 1999–C1 ROYALL STREET, LLC,<br><br>    Defendants, Plaintiffs-in-Counterclaim,<br><br>    v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>    Defendants-in-Counterclaim. | Civil Action No.  05-CV-10506 (WGY) |

**MEMORANDUM OF CSFB 1999-C1 ROYALL STREET, LLC AND J.P. MORGAN CHASE BANK, TRUSTEE, IN SUPPORT OF DISMISSAL OF THE PLAINTIFF'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

The defendants and plaintiffs-in-counterclaim, J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") and CSFB 1999-C1 Royall Street LLC ("CSFB") (together with the Trustee, the "Lender"), submit this memorandum in support of dismissal of plaintiff Blue Hills Office Park, LLC's ("Blue Hills") claim for breach of the implied covenant of good faith and fair dealing. Blue Hills has failed to show any such breach and, as such, judgment should enter for the Lender.

**STATEMENT OF RELEVANT EVIDENCE**

Blue Hills' Property Tax Payment Default

The Mortgage required Blue Hills to pay the real estate taxes, see Ex. 5 § 5; Donovan, TT 3 at 42,[1] and provided that failure to pay the taxes was an immediate Event of Default. Ex. 5 § 23(b). Blue Hills knew that it was obligated to pay the taxes. Donovan, TT 3 at 42. The Mortgage provided that quarterly real estate tax payments would be escrowed in advance from property rents deposited into Blue Hills' lockbox account and actually paid to the Town of Canton by the Lender. Ex. 5 § 6(a); Donovan, TT 3 at 41. Because Blue Hills did not want to fund the tax escrow in advance, it requested in 1999 that real estate tax payments be handled differently. Donovan, TT 3 at 41; Ex. 53.

The Lender accommodated Blue Hills by allowing it to wait until shortly before the taxes were due before depositing into the lockbox the moneys required to pay the taxes. Donovan, TT 3, at 41-42. To satisfy its obligation to the Lender to pay the taxes, Blue Hills in turn obtained a large portion of the money to pay the taxes from its tenant Equiserve, which was obligated to Blue Hills under its lease. Id. at 42, 55. Blue Hills provided the rest of the money to pay the taxes. Id. at 55. Each quarter from 1999 to May 2004, Blue Hills supplied the money to pay the taxes sufficiently in advance of the due date to allow Lender to sweep the lockbox and pay the taxes on time. Id. at 43, 42.

This accommodation varied the timing of when Blue Hills provided the money to pay the taxes, but never varied the obligation of the Borrower to provide to the Lender monies to pay the taxes on time. Blue Hills knew that it was always the property owner's

---

[1] References to trial testimony are to the last name of the witness (e.g., Donovan), the volume of the trial transcript (e.g., TT 3), and the page of the transcript (e.g., at 42).

obligation to pay the taxes. Id. at 42. This accommodation benefited Blue Hills because rents that under the terms of the Mortgage would have been escrowed in advance to pay the taxes were instead distributed monthly to Blue Hills in the form of net cash flow. Donovan, TT 3 at 45, TT 2 at 102-03. The Borrower used the net cash flow to pay expenses and to make distributions to its partners. Id.

In the quarter preceding July 31, 2004, the Borrower knew it had a problem. Donovan, TT 3 at 44. Equiserve would be moving out on July 31, 2004 and only one month's worth of the taxes due August 1, 2004 would be available from Equiserve. Id. Nevertheless, Blue Hills did not set aside from the over $500,000 of net cash flows it received in May, June and July 2004 any monies to pay to the Lender the $158,181.19 of taxes that would become due on August 1, 2004. Id. at 44-45. Nor did it request or expect the Lender during that quarter to escrow monies from monthly rents to pay the taxes. Id.

In mid-July, 2004, Blue Hills received a routine quarterly tax shortage notice from the Lender stating that there was no money in the tax escrow fund to pay taxes and requesting that Blue Hills send $158,181.19 to the Lender by July 27 in order for the Lender to be able to issue payment to the Town of Canton by August 2, 2004 (August 1 being a Sunday). Donovan, TT 3 at 46; Ex. 65. The notice stated that failure to remit the funds by July 27 might result in the Lender advancing corporate funds and that should this occur a $500 fee would be assessed. Ex. 65. Although the notice did not remind the Blue Hills that its Loan Documents required it to pay the taxes and that failure to pay the taxes constituted an Event of Default, the Loan Documents contain no such notice requirement.

In any event, the Lender did tell Blue Hills that failure to pay the taxes would be a default. Blue Hills' accounting manager Gil Stone called Wells Fargo's Brent Lloyd on July 29, 2004 and said Blue Hills was going to have a problem making the tax payment. Lloyd Deposition at 32. (Donovan testified that Blue Hills spoke to Wells Fargo whenever it had a problem with the loan. Donovan, TT 3 at 47.) Mr. Stone asked if the real estate taxes could be paid from the loan reserves. Id. Mr. Lloyd checked and reported back to Mr. Stone that he could use reserve account money to pay the taxes only if he could provide a certification letter, copy of lease, copy of invoice, or lien waiver. Id. at 32, 35; Ex. 66. Indeed, these were the requirements for access to the tenant improvement and leasing commission reserve accounts (the "reserves" or "reserve accounts"). Donovan, TT 3 at 49, 37; Ex. 5 § 6(c)(iv).[2] Mr. Stone said he did not have a lien waiver. Lloyd Deposition at 32; Ex. 66. Mr. Lloyd responded that if he could not pay the taxes, the Borrower would be in default of its loan agreement. Lloyd Deposition at 32; see also Exs. 67, 68.

As accounting manager, Mr. Stone reported directly to Blue Hills' CFO, Joseph Donovan. Donovan, TT 2 at 98. It is a reasonable inference that Mr. Stone reported to Mr. Donovan that Wells Fargo had stated that the loan reserves could not be accessed to pay the taxes and that Blue Hills would be in default if it did not pay the taxes.

---

[2] As Mr. Donovan testified at TT 3 p. 35, the reserves that were keyed to Equiserve leaving were the tenant improvement and leasing commissions reserves specified in Mortgage Sections 6(c)(i) and (ii), defined in 6(c)(ii) as the Leasing Escrow Funds. These were the reserves from which up to $1 million could be obtained for principal and interest payments once Equiserve left, if Blue Hills was not in default and made a timely request. Ex. 5 § 6(c)(ix); Donovan, TT 3 p. 38-39. These were the reserves to which Blue Hills requested access for the first time in Mr. Donovan's August 2, 2004 letter. Donovan, TT 3 p. 50, 54. The Mortage's tax, insurance, and repair and replacement reserves were typical and not related to Equiserve leaving. Donovan, TT 3 at 35-36. Donovan's testimony about a return of over-escrowed monies pertained to the routine insurance reserve. Donovan, TT 2 at 111-12; Ex. 123.

Nonetheless, Blue Hills did not send any funds to Wells Fargo to pay the taxes due August 2, 2004. Nor did Blue Hills pay the taxes directly to the Town of Canton. Donovan, TT 3 p. 46-47. The one month's worth of real estate taxes ($51,000) paid by Equiserve was not deposited into Blue Hills' lockbox until mid-August, weeks after the August 2, 2004 due date. Id. p. 47. Wells Fargo paid the taxes on time with its own funds. Lloyd Deposition at 50-51; Ex. 67.

Notwithstanding Mr. Stone's conversations with Wells Fargo, Mr. Donovan on August 2, 2004 mailed a letter to Wells Fargo repeating Blue Hills' request for access to the loan reserves to pay the taxes due that same day. Donovan, TT 3 p. 50; Ex. 70. He knew the letter mailed to Wells Fargo in California would not arrive at Wells Fargo until after the taxes were past due. Donovan, TT 3 at 50-51. By the time the letter arrived on August 4, 2004, id. at 51, Blue Hills was already in default. Ex. 5 § 23(b).

Mr. Donovan, the CFO of a large real estate management firm, was sophisticated and had extensive dealings with real estate loans, lenders, and securitized loan servicers. Donovan, TT 3 at 26-28. Part of his job was to deal with lenders. Id. at 27-28. He had dealt with lenders and loan servicers in connection with all phases of loans, from loan negotiations to loan foreclosures. Id. at 28-33. He knew from his extensive experience that the rights of Blue Hills in this case were governed by the loan documents. Id. at 34. He understood in particular that Blue Hills' access to the loan reserves were governed by the terms of the loan documents. Id. at 39-40. Nonetheless, before mailing his August 2, 2004 request for access to the reserves, Mr. Donovan did not review the loan documents. Id. at 55.

Before Mr. Stone's request, Blue Hills had never before asked Wells Fargo to use monies from the reserve accounts to pay real taxes or anything else. Donovan, TT 3 at 54. The Lender had never used the reserves before to pay the real estate taxes. Id. at 55. The monies to pay the taxes in the past had always come from Blue Hills, from its own monies and monies paid by its tenant EquiServe. Id.

Mr. Donovan testified that he mistakenly understood, despite having read the mortgage reserve provisions at the time of the loan, that the reserves could be used to pay real estate taxes. Donovan, TT 3 at 52, 54. He testified that this mistaken belief was based solely on his faulty memory of the loan negotiations. Id. at 53-54. His mistaken belief, if genuine, was not based on any prior occasion when the Lender had allowed taxes to be paid from the reserves, as there was no such occasion. Id. at 55.

After Mr. Donovan mailed his August 2 request, neither Wells Fargo nor LNR ever told him it was granted. Donovan, TT 3 at 57. He never checked with them to see if they had granted his request. Id. at 57-58. He sent his August 2 request to Wells Fargo's Curtis Mellegni on August 13, 2004, still seeking a response. Donovan, TT 2 at 134-36; Ex. 75. Mr. Donovan testified that he assumed Wells Fargo had granted his request to take monies from the reserves to pay the taxes, based solely on the fact that approximately two weeks after his request, he had Mr. Stone call the Town of Canton, which confirmed that the taxes had been paid. Donovan, TT 2 p. 132, TT 3 at 58-60. Mr. Donovan did not ask Wells Fargo whether the money to pay the taxes had come from the loan reserves or from Wells Fargo's own money. Id. at 58-59. Blue Hills' expert, Richard Clarke, admitted that Blue Hills in this case should have acted differently, including pressing for an answer to its request for access to the reserves and inquiring

BOST1\443023.2

into the basis on which the taxes were paid, instead of just assuming the taxes had been paid from the reserves. Clarke, TT 5 at 52-54.

Blue Hills' attorney Mr. Goldberg will testify (if he testifies consistently with his April 7, 2006 deposition testimony) that he spoke with LNR asset manager Job Warshaw in mid-August. Mr. Goldberg told Mr. Warshaw there were various reserve accounts and Blue Hills intended to access them and that was one of the reasons Blue Hills wanted to have discussions with the Lender. According to Mr. Goldberg, Mr. Warshaw said he did not know about the reserve accounts because he did not yet have the Loan Documents. Mr. Goldberg testified that he spoke to Mr. Warshaw again near the end of August, and perhaps again just before or after Labor Day (which fell on September 6), and again asked Mr. Warshaw about the reserve accounts, telling him that some of the reserve money was set aside for debt service payments. According to Mr. Goldberg, Mr. Warshaw said he had confirmed that there were reserves, but still needed to look at the Loan Documents before responding substantively. Mr. Goldberg never spoke to Mr. Warshaw again.

Taking Mr. Goldberg's testimony alone at face value, Blue Hills knew that its request for access to the reserves had not been granted.[3] In a later letter to Lender's counsel, Mr. Goldberg asserted that Blue Hills had the right to access the reserves for all payment obligations under the loan documents. Ex. 102. Mr. Goldberg's assertion was plain wrong. Ex. 5 §§ 6(b), 6(c)(iv), and 6(c)(ix); Donovan, TT 3 at 53-54. Mr. Donovan

---

[3] If necessary, Mr. Warshaw will testify that on September 7, 2004, he told Mr. Goldberg that, based on his preliminary review of the loan documents and file, Blue Hills was in default for not paying the taxes due on August 2, 2004 and therefore was not entitled to access the reserves to pay principal and interest. Mr. Polcari testified that Mr. Warshaw reported to him that he (Mr. Warshaw) had told Mr. Goldberg the Borrower was in default. Polcari, TT 4 at 46. Mr. Polcari's contemporaneous notes of his conversation with Mr. Warshaw are contained in Ex. U-1 at pages 3919-21.

talked to Mr. Goldberg before drafting the August 2 request for access to the reserves. Donovan, TT 3 at 57. If anyone led Blue Hills to believe that it could obtain monies from the reserves contrary to the terms of the mortgage, it was Mr. Goldberg, not the Lender.

LNR asset manager Joe Polcari called Mr. Donovan on or about September 16, 2004 to tell him a default notice accelerating the loan was coming. Mr. Donovan said he understood that LNR had to send an acceleration letter. He expressed no surprise, anger, or dismay. Polcari, TT 5 at 104-05; Donovan, TT 3 at 77. On September 17, 2004, the Lender in writing denied access to the loan reserves based on, among other things, Blue Hills' tax payment default on August 2, 2004. Ex. 88. The letter declared the loan in default and accelerated the loan. After receiving the September 17, 2004 default notice, Blue Hills did not respond. It made no offer to cure, and did not cure, any of the defaults described in the notice. As Borrower's expert Mr. Clarke agreed, Blue Hills never offered to pay a penny. Clarke, TT 6 at 54. Blue Hills took no action in response to the default notice.

In summary, there was no course of conduct that ever varied the Loan Documents' requirements for access to the loan reserves because there had never even been a request for access. There was no course of conduct whereby loan reserves had ever been used to pay the taxes. There was no course of contact that varied Blue Hills' obligation to pay the taxes on time. The only course of conduct was a change, at Blue Hills' request, as to exactly when (in advance of the due date) the Borrower would supply the monies to the Lender to fulfill its obligation to pay the taxes.

The Lender did not lull the Borrower into thinking that access to the reserves to the pay the taxes would be allowed. There had never been a prior request by the

Borrower for access to the reserves. Wells Fargo told the Borrower on the telephone in July that the reserves could not be used to pay the taxes and that if the Borrower did not pay the taxes, it would be in default. LNR never gave any indication that access to the reserves would be granted.

Any belief by Mr. Donovan that access would be granted was unreasonable given that Wells Fargo told Mr. Stone that access was not permitted. Moreover, any such belief of Mr. Donovan was based solely, he testified, on his own mistaken memory of the loan negotiations and failure to read the Loan Documents. No behavior of the Lender induced his misunderstanding. His assumption that access had been granted is at odds with his resigned reaction on September 17, 2004 when he expressed no surprise at the default notice and said he understood why it was necessary.

Finally, the lapse of time before LNR in writing denied access to the loan reserves and gave notice of default did not induce any reliance on the part of Blue Hills. The best evidence of what Blue Hills would have done if it had received an earlier written response to its request for access to the reserves and/or an earlier notice of default is what it did when it received the September 17, 2004 response and notice of default: <u>Nothing</u>. Blue Hills' failure to come out of pocket for any amount after August 1, 2004, was not due to any Lender course of conduct. Instead, the evidence is clear that Blue Hills had decided, having found no tenant, to walk away from the property, just as Mr. Fineberg had done only weeks before in Sturbridge and Lancaster.

<u>Blue Hills' Escrow Payments Default</u>

Blue Hills neither made nor requested access to the reserves to make the escrow payments due to the Lender on August 11, 2004. Donovan, TT 3 at 60. These payments

were still due even after EquiServe left the building. Mortgage, Ex. 5 §§ 6(a)(b) & (c)(i). Blue Hills defaulted by failing to make those payments on August 11, 2004 and then again on September 11, 2004. Ex. 5 §§ 23(a)& (b); Clarke, TT 6 at 44-45. Those payment defaults precluded access to the reserves to pay principal and interest, independent of the tax payment default. Ex. 5 § 6(c)(ix); Donovan, TT 3 at 38-39.

2003 Transfer or SPE Violation Defaults

In addition, Blue Hills defaulted in 2003, when it failed to obtain the consent of the Lender to the settlement of the zoning appeal and to the transfer of the $2 million settlement payment (the "Payment"), Ex. 5 § 23(d), or, alternatively, when it violated many of the single purpose entity covenants of Section 12 of the Mortgage by concealing the Payment and commingling it with monies of its affiliates and guarantors. Ex. 5 §§ 12 and 23(e). Given Blue Hills' lack of any action in reliance on the defaults specified in the Lender's September 17, 2004 default notice (Blue Hills never attempted to cure the tax payment or other defaults specified therein), these defaults independently justify the Lender's denial of Blue Hills' request for access to the reserves in 2004.

## ARGUMENT

I. **BLUE HILLS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF LAW.**

Even drawing all inferences in favor of Blue Hills, the Massachusetts iteration of the implied covenant of good faith and fair dealing does not reach so far as to encompass the conduct alleged by Blue Hills in this case.[4] Blue Hills alleges that a course of

---

[4] As set forth in Section II, below, Blue Hills' claim for breach of the implied covenant fails for the additional reason that the evidence presented by Blue Hills establishes no course of conduct justifying or excusing Blue Hills' failure to make the property tax or other payments due to the Lender in August and September 2004.

- 10 -

BOST1\443023.2

conduct initiated at Blue Hills' request and solely for its benefit – one which merely permitted Blue Hills to vary the timing of its property tax payment while still requiring Blue Hills to furnish the money to pay taxes to the Town of Canton on time – somehow "lulled" it into believing it was excused from its contractual and statutory obligation to pay the property taxes. Therefore, Blue Hills argues, the Lender breached the implied covenant when it declared that Blue Hills' failure to pay the property taxes was an Event of Default and denied access to the loan reserves for payments of principal and interest on that basis.

Blue Hills' argument is meritless. The implied covenant of good faith and fair dealing "cannot be used to contradict clear contractual terms." McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 302 (1st Cir. 2004) (citing Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004) (implied covenant "may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship.")). Rather, the implied covenant exists so that the objectives of the contract may be realized. Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 385 (2005) (citing Crellin Technologies, Inc. v. Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir. 1994)). As the Massachusetts Supreme Judicial Court has held, "[t]he purpose of the covenant of good faith and fair dealing is not to supply contractual terms that the parties are free to negotiate." Id., 441 Mass. at 388.

The Lender was not required to provide Blue Hills with notice of the fact that under the Mortgage, a failure to pay property taxes is an Event of Default. See Mortgage § 26(a) ("[u]pon the occurrence of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights

BOST1\443023.2

against Mortgagor…"); <u>Ferris v. Federal Home Loan Mortgage Corp.</u>, 905 F. Supp. 23, 29 (D. Mass. 1995) (in absence of explicit mortgage requirement, lender has no duty to promptly notify borrower of account shortfall).  Lender had no obligation to tell Blue Hills what the Loan Documents make plain – that it was obligated to pay the taxes (Mortgage § 5) or deposit with the Lender funds sufficient to pay them (Mortgage § 6), and that a failure to pay property taxes was an Event of Default (Mortgage § 23(b)).

The fact that the Lender permitted Blue Hills to adjust the timing of its property tax payment (while still requiring Blue Hills to furnish the money to pay the taxes to the Town of Canton on time) did not relieve Blue Hills of its ultimate obligation to pay property taxes.  First, a course of conduct that merely modifies the <u>timing</u> of performance does not justify a complete <u>failure</u> of performance.  Second, Section 44 of the Mortgage specifically provides that "Mortgagor shall not be relieved of Mortgagor's obligations hereunder by reason of... (c) any agreement or stipulation by Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Mortgage, or any of the other Loan Documents."  Section 44 also states that the "failure of Mortgagee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Mortgage."  The Mortgage thus expressly permits the Lender to make accommodations to Blue Hills without relinquishing its right to insist that Blue Hills meet its fundamental payment obligations.  <u>Id.</u>

Added impropriety is required to constitute a breach of the implied covenant in the commercial setting.  In <u>Zuker v. General Electric Capital Corp.</u>, 20 F. Supp. 2d 254 (D. Mass. 1998), the court denied a lender's motion to dismiss the borrower's breach of implied covenant claim because the complaint sufficiently alleged that the lender,

through false assurances to the borrower, knowingly lulled the borrower "into believing that the credit committee's approval was a mere institutional formality," which intentionally induced the borrower's performance of conditions beneficial to the lender. 20 F. Supp. 2d at 263.  The lender in Zuker was alleged to have accepted those benefits with knowledge that the credit committee in fact had no intention of approving the deal. Id.  The borrower also alleged that the lender "decided to use credit committee disapproval as a pretext to obtain consideration not contemplated by the parties in the Settlement Agreement." Id. at 257.  Zuker is inapplicable to this case for three reasons. First, the Lender here is not alleged to have made any false assurances, knowing or otherwise, to Blue Hills.  Second, the Lender received no benefit as a result of Blue Hills' decision not to pay its property taxes.  Third, Zuker involves an extortionate use of contract terms not present here.

Similarly, in Ugarit, Inc. v. Citizens Bank of Mass., 20 Mass. L. Rep. 33 (Super. Ct. June 3, 2005), the court denied the lender's motion for summary judgment on the borrower's implied covenant claim because the lender had allegedly represented that the borrower's line of credit would remain open unless the lender gave the borrower notice. Id., 20 Mass. L. Rep. at *7-8.  The lender's representation was made knowingly and was allegedly intended to induce the borrower's reliance; therefore, the court held, the lender's subsequent failure to comply with the borrower's reasonable expectations could constitute a breach of the implied covenant.  Id.  In this case, unlike Ugarit and Zuker, the Lender is not alleged to have made any misrepresentations to Blue Hills, and even the Lender's supposed "course of conduct" is not alleged to have been intended to induce Blue Hills to do – or not do – anything.

In sum, mere forebearance or accommodation followed by insistence on contract terms would not violate the implied covenant, but is instead expressly permitted by the loan documents. A party's exercise of contractual rights does not violate the implied covenant of good faith and fair dealing. <u>Citizens Bank v. Business Products Online, Inc.</u>, 20 Mass. L. Rep. 507 (Mass. Super. 2006) (bank did not violate implied covenant by acting within its negotiated, contractual rights); <u>see also</u> <u>Christensen v. Kingston Sch. Comm.</u>, 360 F. Supp. 2d 212, 226 (parties to an arms-length transaction can act in their own self-interest so long as they honor their contractual obligations) (quoting Tory A. Weigand, <u>The Duty of Good Faith and Fair Dealing in Commercial Contracts in Massachusetts</u>, 88 Mass. L. Rev. 174, 184 (2004)). As one court has stated:

> To find, as the [borrower] urges, a result directly contrary to the literal contract terms would make it virtually impossible for parties to plan or express their relationships. [. . .]
>
> The [borrower] claims that he relied on the plaintiff's forbearance to his detriment. This is balanced by the plaintiffs' justifiable reliance on the written contract, which stated that forbearance would not result in a relinquishment of his rights.

<u>B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp.</u>, 799 F. Supp. 1250, 1255 (D. Mass. 1992) (applying Connecticut law).

## II. **BLUE HILLS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS DEVOID OF EVIDENTIARY SUPPORT.**

Blue Hills admits both the lateness of its request for access to the loan reserves – dated August 2 but delivered August 4 – and that the Loan Documents did not entitle it to have property taxes paid out of the reserves. Blue Hills further admits that it did not make the escrow payments due to the Lender on August 11 or September 11, 2004, and

that it did not request access to the reserves to make those payments. Blue Hills nevertheless contends that it should prevail on its implied covenant claim because the Lender allegedly engaged in a course of conduct which led Blue Hills to believe that:

  (1)    a failure to pay the real estate taxes would not constitute an Event of Default, despite the fact that the Mortgage states the contrary in Section 24(b);

  (2)    a request for access to the reserve accounts to pay real estate taxes would be granted, notwithstanding that the Loan Documents do not entitle Blue Hills to apply reserve account funds to payment of real estate taxes;

  (3)    a failure to make required escrow payments would not constitute an Event of Default, despite the fact that the Mortgage states the contrary in Section 23(a) ; and

  (4)    a request for access to the reserve accounts to pay principal and interest would be granted notwithstanding that the conditions to access were not met because the request was late and because Blue Hills was in default for not paying the taxes and required payments to the reserve accounts. Ex. 5 § 6(c)(ix).

The evidence presented at trial simply cannot support these far-fetched allegations. As set forth in the Statement of Evidence (above), there was never any course of conduct where Blue Hills was excused from paying the property taxes, or where the Lender permitted Blue Hills to pay the property taxes with monies from the reserve accounts. There was never any course of conduct where the Lender permitted access to the reserve accounts on an informal basis or despite a failure to fulfill the conditions precedent. In fact, there was never a request by Blue Hills for access to the reserves prior to its August 2, 2004 letter, and prior to the request, Wells Fargo had already told the Borrower that taxes could not be paid from the reserves. Ex. 66, 67, 68. Nor was there ever a time when Blue Hills failed to make a required monthly payment and such failure was excused or ignored by the Lender. Prior to August 2, 2004, Blue Hills had always made its property tax, principal, interest, and escrow payments on time.

Blue Hills had no basis to believe that the Lender would permit Blue Hills to breach its obligations under the Mortgage and take no action to enforce the Lender's rights under the Loan Documents.  As such, Blue Hills' claim that the Lender's exercise of its rights under the Mortgage was a breach of the implied covenant of good faith and fair dealing must fail.

## CONCLUSION

For the reasons stated above, the Lender requests that Blue Hills' claim for breach of the implied covenant of good faith and fair dealing be dismissed.

>Respectfully submitted,
>
>CSFB 1999-C1 ROYALL STREET, LLC, and J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1,
>
>By their attorneys,
>
>/s/ Bruce E. Falby
>_____
>E. Randolph Tucker, BBO #503845
>Bruce E. Falby, BBO #544143
>Bruce S. Barnett, BBO #647666
>Traci S. Feit, BBO #660688
>DLA PIPER US LLP
>33 Arch Street, 26th Floor
>Boston, MA 02110
>(617) 406-6000

Dated:  October 10, 2006