UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC, <br><br> Plaintiff, Defendant-in-Counterclaim, <br><br> v. <br><br> J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1., and CSFB 1999–C1 ROYALL STREET, LLC, <br><br> Defendants, Plaintiffs-in-Counterclaim, <br><br> v. <br><br> WILLIAM LANGELIER and GERALD FINEBERG, <br><br> Defendants-in-Counterclaim. | Civil Action No. 05-CV-10506 (WGY) |

**MEMORANDUM IN SUPPORT OF RENEWED MOTION OF DEFENDANTS AND
PLAINTIFFS-IN-COUNTERCLAIM FOR JUDGMENT ON PARTIAL FINDINGS
PURSUANT TO FED. R. CIV. P. 52(C)**

Defendants and Plaintiffs-in-Counterclaim J.P. Morgan Chase Bank, as Trustee for the

Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial

Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") and CSFB 1999-C1 Royall

Street, LLC ("CSFB") (together with the Trustee, the "Lender") submit this memorandum in

support of their motion for judgment on partial findings pursuant to Fed. R. Civ. P. 52(c) as to all

counts of plaintiff's Second Amended Complaint.  The Lender intends to renew its motion at the

close of plaintiff's evidence on October 11, 2006.

The evidence presented at trial by Blue Hills Office Park LLC ("Blue Hills" or "BHOP") does not establish its right to recovery on its claims. Moreover, the evidence demonstrates that Blue Hills settled the zoning appeal and transferred the $2 million settlement payment (the "Payment") to its affiliates (the Royall Associates Realty Trust, Gerald Fineberg, William Langelier, and the other beneficiaries of the trust) in 2003 without the prior written consent of the Lender, in violation of Section 10 of the Mortgage. The evidence alternatively shows that Blue Hills failed to maintain its status as a single purpose entity, as required by and in accordance with Section 12 of the Mortgage. These defaults independently justify the Lender's 2004 denial of access to reserves, notice of default, and foreclosure. The Lender is therefore entitled to judgment in its favor as to all claims set forth in the Second Amended Complaint.

## SUMMARY OF EVIDENCE PRESENTED

### Blue Hills Borrows $33 Million

Gerald Fineberg and William Langelier, sophisticated and experienced real estate investors, have owned and controlled the real property and improvements known as the Blue Hills Office Park and located at 150 Royall Street in Canton, Massachusetts since 1987. Langelier, TT 1 at 27-32, 74-76, 108-09; Ex. 2. Fineberg and Langelier formed the Royall Associates Realty Trust ("Royall Associates") in 1987 specifically to take title to the property; Messrs. Fineberg and Langelier were the trustees and principal beneficiaries of Royall Associates. Langelier, TT 1 at 31-33, 63; Ex. 1. Since about 1989, the property's sole tenant had been an affiliate of the Bank of Boston known as Boston Equiserve Limited Partnership ("Equiserve"). Langelier, TT 1 at 39-41; Ex. 3. In mid-1999, Equiserve exercised an option to extend its lease until July 31, 2004, and it had an additional option to extend for another five years after that. Id.

- 2 -

With this 5-year lease extension in place, Fineberg and Langelier sought a loan (the "Loan") from Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse") to refinance the mortgage on the property, which they knew would be a securitized loan secured by, inter alia, a mortgage on the property. Langelier, TT 1 at 42-45. As part of the refinancing transaction, Credit Suisse required the formation of a single purpose entity, plaintiff Blue Hills, to which Royall Associates conveyed the property. Langelier, TT 1 at 49-50. As Mr. Langelier testified, the formation of Blue Hills was an "absolute requirement" of the lender. Id. Credit Suisse was unwilling to lend money to Royall Associates. Cohn, TT 4 at 82. Credit Suisse also required that Blue Hills maintain its single purpose entity status throughout the life of the Loan; specific single purpose entity covenants and requirements are set out in Section 12 of the Mortgage (titled "Single Purpose Entity/Separateness"). Ex. 5 § 12. Royall Associates is the sole member of Blue Hills. Langelier, TT 1 at 62. Fineberg and Langelier are the principal beneficiaries of Royall Associates.[1] Id.

The Loan closing was held on September 14, 1999, at which time Blue Hills executed a mortgage note (the "Note") to Credit Suisse in the principal amount of $33,149,000; a Mortgage, Assignment of Leases and Rents, and Security Agreement (the "Mortgage"); and a Cash Management Agreement (the "CMA"). Langelier, TT 1 at 65-66; Exs. 4, 5, 6. Fineberg and Langelier also executed a guaranty (the "Guaranty") of the Loan. Ex. 7. Blue Hills received approximately $5.2 million in excess proceeds from the Loan, $4 million of which was

---

[1] Fineberg and Langelier, initially the only partners of Royall Associates, subsequently admitted additional minority partners who received small portions of their beneficial interests. Langelier and the minor partners related to him are referred to as the "Langelier Beneficiaries;" Fineberg and the minor partners related to him are referred to as the "Fineberg Beneficiaries."

- 3 -

immediately distributed to the beneficiaries of Royall Associates. Langelier TT 1 at 67. About $1.2 million was held in a so-called "rainy day account" in a client funds account at Bernkopf Goodman (lawyers for Fineberg and his various entities) in the name of Royall Associates; this money was owned and controlled by Fineberg and Langelier and was not subject to any restriction or lien by the lender. Langelier TT 1 at 68-71; Cohn, TT 4 at 42-47; Ex. 182.

Because the Loan was generally non-recourse, the interest conveyed by the Mortgage, defined as the "Mortgaged Property," was very broad. The Mortgaged Property included Blue Hills' land, defined as the "Premises;" its building, defined as the "Improvements;" and all its other property, rights, interests and estates, tangible and intangible, described in eight comprehensive granting clauses of the mortgage. Mortgage (Ex. 5) pp. 1-3. Granting Clause Seven included as part of the Mortgaged Property "causes of action that now or hereafter relate to [or] are derived from" the Mortgaged Property. Granting Clause Eight made any proceeds of such a lawsuit part of the Mortgaged Property as well. To protect the value of the Mortgaged Property, the Mortgage required the Lender's prior written consent to any conveyance or transfer of any part of the Mortgaged Property. Mortgage § 10(a).

As planned, in or about November 1999, the Loan was securitized with a pool of approximately 150 other loans. In this process, Credit Suisse assigned the Loan to J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee"; together with its assignee CSFB 1999-C1 Royall Street, LLC, the "Lender"). Ex. 186.

**The Lockbox and the Escrow Funds Held By Lender**

As additional security for the Loan, the Loan Documents required (a) that Blue Hills deposit (or cause to be deposited) all rents received in connection with the property into an

account at its bank referred to as the "Lockbox," which was located in Massachusetts, and
(b) that in addition to principal and interest payments, Blue Hills make monthly payments to
fund certain escrow accounts held by the Lender.  Ex. 5 § 6; Cash Management Agreement (Ex.
6) § 6.  Under the Note and Mortgage, Blue Hills' principal and interest payments of
$254,652.24 on the Loan were due on the 11th of each month.  Note (Ex. 4) at p. 1.  Blue Hills'
monthly payments to fund the escrow accounts (also referred to as the "reserve accounts") were
also due on the 11th of each month.  Mortgage § 6(a).

One of the escrow accounts contemplated by the Mortgage was a tax escrow, to be used
by the Lender to pay the quarterly property taxes.  The Mortgage required Blue Hills to pay the
property taxes, see Ex. 5 § 5; Donovan, TT 3 at 42, and provided that failure to pay the taxes was
an immediate Event of Default.  Ex. 5 § 23(b).  Blue Hills knew that it was obligated to pay the
taxes.  Donovan, TT 3 at 42.  The Mortgage provided that quarterly real estate tax payments
would be escrowed in advance from property rents deposited into Blue Hills' lockbox account
and then actually sent by the Lender to the Town of Canton.  Ex. 5 § 6(a); Donovan, TT 3 at 41.
Because Blue Hills did not want to fund the tax escrow in advance, it requested in 1999 that real
estate tax payments be handled differently.  Donovan, TT 3 at 41; Ex. 53.

The Lender accommodated Blue Hills by allowing it to wait until shortly before the taxes
were due before depositing into the lockbox the moneys the Lender sent to the Town of Canton
to pay the taxes.  Donovan, TT 3 at 41-42.  To satisfy its obligation to the Lender to pay the
taxes, Blue Hills in turn obtained a large portion of the money to pay the taxes from its tenant
Equiserve, which was obligated to Blue Hills under its lease.  Id. at 42, 55.  Blue Hills provided
the rest of the money to pay the taxes.  Id. at 55.  Each quarter from 1999 to May 2004, Blue

- 5 -

Hills supplied the money to pay the taxes sufficiently in advance of the due date to allow the Lender to sweep the lockbox and pay the taxes on time.  Id. at 43, 42.

This accommodation varied the timing of when Blue Hills provided the money to pay the taxes, but never varied the obligation of the Borrower to provide to the Lender monies to pay the taxes on time.  Blue Hills knew that it was always the property owner's obligation to pay the taxes.  Id. at 42.  This accommodation benefited Blue Hills because rents that under the terms of the Mortgage would have been escrowed in advance to pay the taxes were instead distributed monthly to Blue Hills in the form of net cash flow.  Donovan, TT 3 at 45.  The Borrower used the net cash flow to pay expenses and to make distributions to its partners.  Id.

**Blue Hills Tries to Extend the Equiserve Lease**

Blue Hills knew that its lease with Equiserve would expire in July 2004, unless Equiserve exercised its option to extend the term of the lease an additional five years.  Langelier, TT 1 at 81.  Therefore, in early 2002, Blue Hills began its effort to extend Equiserve's presence in the building past July 2004.  Langelier, TT 1 at 81.  Blue Hills believed that the property would be best served by keeping Equiserve in the office park.  Frank, TT 6 at 125.

In April 2003, however, Blue Hills learned that Equiserve and National Development (the owner of "Blueview," the office building next to the property) had applied for a special permit to build a parking garage at Blueview that would block the view from the property.  Langelier, TT 1 at 124.  Blue Hills learned that DST Realty, Inc. (an affiliate of Equiserve) had entered into a purchase and sale agreement to buy Blueview, and that Equiserve planned to move out of Blue Hills Office Park and into Blueview.  The purchase and move, however, were conditioned on special permit approval of the parking garage by the Town of Canton.  Langelier TT 1 at 118-19.  On May 14, 2003, Equiserve notified Blue Hills of its intention not to extend its lease past July

BOST1\443084.3

31, 2004.  Langelier, TT 1 at 84-85; Exs. 17, 18.

On May 22, 2003, Larry Needle (Blue Hills' property manager) and Gary Lillienthal (an attorney representing Blue Hills), attended a Town of Canton Zoning Board of Appeals hearing to oppose Equiserve's special permit application.  Ex. 19.  Lillienthal introduced Blue Hills as an abutter and stated that the proposed garage (which would add hundreds of parking spaces to the Blueview property) would have a major effect on traffic and obstruct the view of Blue Hills from the south-west (i.e., from Route 128).  Ex. 19 at 3.  At the meeting, over Blue Hills' objection, the Town of Canton granted the special permit (the "Special Permit") to Blueview Corporate Center LLC, which was at that time the owner of Blueview.  Id. p. 1, 12.

On June 9, 2003, Blue Hills filed a complaint in Norfolk Superior Court appealing the ZBA's decision to grant the special permit.  Ex. 21.  The zoning appeal lawsuit was part of the Mortgaged Property under Granting Clause Seven for at least three reasons.  First, Blue Hills' standing derived from its ownership of the Mortgaged Property.  Ex. 21 ¶¶ 1, 43.  Blue Hills understood it could appeal the special permit only because it owned the abutting Blue Hills Office Park.  Donovan, TT 3 at 88.  Second, the zoning appeal was based on damage to the property.  The complaint stated that the proposed garage "is immediately in the sight line of (the) Property, will partially block its view and will be detrimental and offensive to (Blue Hills) and inhabitants of (the) Property.  The addition of 380 spaces in a structured parking facility directly in the sight line of (the) Property…poses a detriment to (the) Property."  Ex. 21 ¶¶ 37-38.

Third, Blue Hills hoped that by appealing the special permit, it could delay or prevent the garage from being built and thereby keep Equiserve in the Blue Hills Office Park.  Donovan, TT 3 at 88-89; Frank, TT 6 at 127.  Blue Hills continued to believe that the best option for the future of the property was for Equiserve to stay at the property.  Frank, TT 6 at 127.  Two months after

- 7 -

it appealed the ZBA decision, however, Blue Hills changed course.

**The Blue Hills Principals Decide to Settle the Appeal**

In early August 2003, Blue Hills' principals caused Blue Hills to settle the zoning appeal in exchange for $2 million.  Langelier, TT 1 at 126.  Blue Hills and its principals knew that this settlement would remove any impediment to approval of the garage by the Town of Canton, thus eliminating any possibility of Equiserve staying in the property and clearing the way for Equiserve to move across the street to Blueview.  Donovan, TT 3 at 91-92.

Nevertheless, on August 5, 2003, Blue Hills executed a "Settlement Agreement" and a "Lease Termination Agreement" with Equiserve.  Langelier, TT 1 at 40; Exs. 24, 25.  The following day, DST Realty completed its purchase of Blueview.  Under the Settlement and Lease Termination Agreements, Blue Hills agreed to, inter alia: (1) dismiss the Zoning Appeal, with prejudice (thereby forfeiting its right to contest the grant of the special permit); (2) waive its right to (at any time within 10 years of the date of the Settlement Agreement) "take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development" of the Blueview property; (3) release DST and Blueview from any and all claims which Blue Hills had against DST and/or Blueview prior to or on the date of the Settlement Agreement; and (4) terminate Equiserve's lease as of July 31, 2004.  Exs. 24, 25.

Blue Hills settled the zoning appeal and executed the Lease Termination Agreement without notifying the Lender or seeking its consent, despite the fact that the rights given up by Blue Hills were part of the Lender's collateral under the Loan Documents.  Ex 5, Granting Clauses One, Three, Four, Seven, Eight;  Langelier, TT 1 at 40.

From Fineberg's and Langelier's perspective, there was good reason not to seek the

- 8 -

Lender's consent to the settlement. If Blue Hills had requested the Lender's consent to the settlement, the Lender would not have allowed Blue Hills' principals to keep the $2 million for themselves. Polcari, TT 5 at 87, 112-15. As Blue Hills' banking expert Richard Clarke testified, a request for consent would have given the Lender an opportunity to evaluate the settlement and determine if settling the appeal was in the property's best interests, if so to determine whether the amount of the settlement was appropriate, and if so to condition the settlement on requiring additional loan payments or reserving the proceeds to cover the loss of the sole tenant of the office park. Clarke, TT 6 at 73-75. Although Fineberg and Langelier considered whether to seek consent to the settlement, they decided instead to hide the $2 million Payment from the Lender. The Payment is Mortgaged Property both because it represents the proceeds of other Mortgaged Property, see Mortgage Granting Clause Eight, and because it is a payment made "with respect to the Premises and the Improvements…[for] injury to or decrease in the value of the Premises and Improvements, see Mortgage Granting Clause Three.

No part of the Payment passed through any Blue Hills bank account. Donovan, TT 3 at 93. Blue Hills did not receive the settlement payment and obtained no benefit from the settlement. Frank, TT 6 at 128-29. Blue Hills' CFO Joseph Donovan did not know if the payment was actually made. Donovan, TT 3 at 93. He did not try to determine what happened to the Payment because he believed the settlement was with the owners Fineberg and Langelier, and he was responsible for Blue Hills' operating books, not the owners' books. Id. at 97-98.

Instead, Fineberg and Langelier had the $2 million Payment transferred to Bernkopf Goodman LLP's IOLTA account on August 8, 2003, and then to an escrow account at Bernkopf Goodman LLP in the name of Royall Associates. Ex. 145 (record re "Fineberg Royall Associates" account). The Payment was held pursuant to a 1999 letter agreement that gave

Fineberg and Langelier complete control over the disposition of the Payment. Ex. 182. The Payment was commingled with the $1.2 million of excess proceeds from the 1999 Credit Suisse refinancing. Cohn, TT 4 at 46-47.

The Payment was not recorded as a receipt in the books of Blue Hills and therefore did not appear in financial statements supplied to the Lender. Exs. 47, 48. Blue Hills' outside accountants, Rutfield and Hassey, subsequently accounted for the disposition of the Payment as a transfer from Blue Hills to Royall Associates, as evidenced by a corresponding increase in the "Due From Affiliate" line on Blue Hills' balance sheet for the year ending December 31, 2003. Compare Ex. 32 at 6763 with Ex. 33 at 6751.[2] They also recorded the Payment as a reduction in basis, id., confirming that the Payment was made for an injury to or decrease in value of the property. Blue Hills never provided the Lender with copies of the financial statements prepared by Rutfield and Hassey, which would have reflected the receipt and transfer of the Payment. Donovan, TT 3 at 100-02. The Payment, along with the $1.2 million in excess refinancing proceeds, appears as a cash asset on the balance sheet of Royall Associates, Ex. 27 at 5536, not Blue Hills, Ex. 32, 33.

**Blue Hills Attempts (Unsuccessfully) to Find a New Tenant**

In the year following the secret August 2003 settlement of the zoning appeal, Fineberg and Langelier did nothing to prepare for the possibility that they would be unable to replace Equiserve once it moved out on July 31, 2004. Although they worked with Cushman and Wakefield to actively market the property, they did not have Blue Hills put any money aside to cover property tax and reserve payments which would still be due when Equiserve left; instead

---

[2] It is immaterial whether the transfer of the Payment to Royall Associates was a loan or a distribution. See infra note 4.

they caused Blue Hills to distribute all of Blue Hills' net rents.  Donovan, TT 3 at 44-45.

Cushman and Wakefield actively but unsuccessfully marketed the property for lease through at

least November 4, 2004.  However the leasing market was "pretty bad," Frank, TT 6 at 124, and

no replacement tenant was found.  Langelier, TT 1 at 112-13.  At a meeting in late July 2004,

right before Equiserve vacated on July 31, 2004, Cushman and Wakefield told Blue Hills that

tenants of the sort Blue Hills was seeking, who wanted 100,000 plus square feet, were virtually

nonexistent and had 20 options within a 15 minute drive of Blue Hills Office Park.  Ex. 52.

**Equiserve Moves Out and Blue Hills Stops Making Payments to Lender**

In August 2004, Blue Hills failed to pay the quarterly property taxes due to the Town of

Canton, and failed to pay the monthly principal, interest, and escrow payments required by the

Mortgage.  Donovan, TT 3 at 46-47, 61.  Blue Hills instead requested – after the August 2, 2004

property tax due date had passed – that the Lender allocate funds from the reserve accounts to

make the property tax, principal, and interest payments.  Donovan, TT 3 at 50; Ex. 70.  Blue

Hills was not entitled to such an allocation because (1) the Loan Documents do not permit the

use of reserves to pay property taxes; and (2) because Blue Hills was in default as of August 2,

2004, it was not entitled to use the reserves to pay principal and interest.  Furthermore, there was

no course of conduct that ever varied the Loan Documents' requirements for access to the loan

reserves because there had never even been a request for access.  Donovan, TT 3 at 54-55, 60.

There was no course of conduct whereby loan reserves had ever been used to pay the taxes.  Id.

There was no course of conduct that varied Blue Hills' obligation to pay the taxes on time.  The

only course of conduct was a change, at Blue Hills' request, as to exactly when (in advance of

the due date) the Borrower would supply the monies to fulfill its obligation to pay the taxes.

In any event, Blue Hills did not request any allocation of funds from the reserve accounts

- 11 -

to make the August 11, 2004 escrow payments required by the Mortgage, nor would any such allocation have been permissible under the Mortgage. Donovan, TT 3 at 60. Then, in September 2004, Blue Hills again failed to pay the monthly principal, interest, and escrow payments. Donovan, TT 3 at 61. Again, Blue Hills requested that the Lender allocate funds from the reserve accounts to make principal and interest (but not escrow) payments. Ex. 87.

By letter dated September 17, 2004, the Lender notified Blue Hills that its requests for access to the reserve accounts were denied, that Blue Hills was in default for, *inter alia*, failing to pay the August 2, 2004 property taxes, and that the debt under the Note had been accelerated. Blue Hills never offered to cure the property tax payment default or made a proposal to the Lender concerning a possible workout of the Loan. Ex. 88. Blue Hills continued, by withholding requested financial statements, to conceal the $2 million settlement Payment.

By letter dated October 21, 2004, pursuant to Mass. Gen. Laws c.244, s. 14 and 17B, the Lender notified Fineberg and Langelier of its intention to foreclose on the Mortgaged Property and of Fineberg's and Langelier's potential liability to Lender under the Guaranty in case of a deficiency in the proceeds of the foreclosure sale. Ex. 96. Blue Hills still did not make any effort to cure the defaults or to provide the Lender with a proposal for working out the Loan. Donovan, TT 3 at 80-81; Polcari, TT 5 at 106.

The foreclosure sale was held on November 19, 2004. Polcari, TT 5 at 108-09. There were four people bidding on the property and CSFB 1999-C1 Royall Street, LLC made the high bid for $18.5 million. Id. Lender acted in accordance with all of the requirements of the Mortgage and Massachusetts law, including the requirements of General Laws Chapter 244, in conducting the foreclosure sale. Clarke, TT 6 at 56. As of the date of the foreclosure sale, the amount of the Debt, including principal, interest and late fees, was $33,439,307. Ex. 212. After

- 12 -

crediting the foreclosure bid ($18,500,000) and the reserves held by Lender as of the date of the sale ($4,168,460.18) against the outstanding debt, the deficiency after the foreclosure sale was $10,770,847.  Ex. 212.  Under the Note, the default interest rate is 13.49%.

**Following the Foreclosure, the Royall Associates Agree Amongst Themselves as to the Disposition of the Payment and Other Funds of the Royall Associates**

On December 31, 2004, the beneficiaries of Royall Associates entered into an agreement concerning various monies including the Payment (the "Royall Agreement").  Ex. 26.  Blue Hills is not a party to the Royall Agreement.  Id. The Royall Agreement addresses three accounts: a "Property Account" held and controlled by Fineberg Management, Inc. as a result of its management of the property; an "Initial Account" and a "Supplemental Account".  The "Initial Account" contained approximately $1.38 million, which was the $1.2 million of the 1999 refinancing proceeds plus interest.  The "Supplemental Account" contained approximately $2.2 million, consisting of the $2 million Payment plus interest.  The Initial Account and Supplemental Account, though referred to separately, were actually the same Royall Associates client fund account held by Bernkopf Goodman.

The Initial Account monies and the interest on the $2 million Payment were immediately released, 50% each to Goldberg and Cohn, for distribution to the Fineberg and Langelier Beneficiaries, respectively.  Under the Royall Agreement, $2 million in the Supplemental Account was distributed on February 1, 2005, $1 million to each of Goldberg and Cohn. Goldberg and Cohn are each holding $1 million "on behalf of" and "as escrow agents for" the Fineberg and Langelier Beneficiaries, respectively.  Cohn is holding Langelier's $1 million in a client funds account in the name of The Langelier Company, Inc.  Ex. 145; Cohn, TT 4 at 58. The monies are being held in escrow to protect Langelier and Fineberg against claims by the Lender against them personally.  Ex. 26 §§ II.D & V. C.

In or around December 2004, the Lender learned of the Zoning Appeal, the Settlement, and the Payment. Polcari, TT 5 at 112. Lender's counsel were in the process of preparing a complaint when Blue Hills commenced its action. Id. On April 20, 2005, Lender made written demand upon Fineberg and Langelier under the Guaranty. Stipulated Facts ¶ 65. Neither Fineberg nor Langelier has made payment under the Guaranty.

## ARGUMENT

**I.    RULE 52(C) AUTHORIZES THE COURT TO ENTER JUDGMENT AT THIS TIME IN FAVOR OF THE LENDER AS TO ALL CLAIMS SET FORTH IN THE SECOND AMENDED COMPLAINT.**

Rule 52(c) authorizes the Court to enter judgment "at any time that it can appropriately make a dispositive finding of fact on the evidence." See Fed. R. Civ. P. 52 advisory committee note. The rule provides, in relevant part:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue. . .

Fed. R. Civ. P. 52. The Court's task under Rule 52(c) is to "weigh the evidence, without drawing any special inferences in the non-movant's favor, resolve any conflicts in the evidence, and 'decide for itself where the preponderance lies.'" Feliciano v. Rullan, 378 F.3d 42, 59 (2004) (quoting Wright & Miller § 2573.1 at 479-99). The preponderance of the evidence presented here establishes the Lender's right to judgment in its favor as to all claims set forth in the Second Amended Complaint, as set forth more fully below.

- 14 -

## II.   BLUE HILLS' MATERIAL DEFAULTS IN 2003 WARRANT ENTRY OF JUDGMENT FOR THE LENDER.

Both Blue Hills' unauthorized settlement of the zoning appeal and transfer of the Payment in 2003 or, alternatively, Blue Hills' failure to maintain its status as a single purpose entity constitute Events of Default under the Mortgage.  Mortgage § 23(d), (l).  Upon the occurrence of an Event of Default, the Lender has "no obligation to disburse any amounts held in the [reserve accounts] and may apply any sums then present in such funds to the payment of the Debt in any order in its sole discretion."  Mortgage § 6(d).  The Lender is also entitled to declare the Debt immediately due and payable, and to foreclose the Mortgage.  Mortgage § 26(a)(i), (ii).  As such, Blue Hills cannot succeed on its claim that the Lender breached the Mortgage by failing to release reserve funds or that the Lender wrongfully foreclosed on the Mortgage.

Section 10 of the Mortgage required that Blue Hills obtain Lender's prior written consent to a transfer of "any part" of the Mortgaged Property.  The settlement of the zoning appeal lawsuit[3] and the transfer of the Payment out of Blue Hills were both transfers of part of the Mortgaged Property requiring the Lender's prior written consent.  See Mortgage § 10 and Granting Clauses Three (payments made with respect to the Premises and Improvements) , Four (any monies arising from or attributable to the Premises or Improvements), Seven (causes of action related to or derived from the Mortgaged Property) and Eight (proceeds of any of foregoing).  Blue Hills' failure to obtain such consent is an Event of Default under the

---

[3]  A settlement and release of claims constitutes a transfer.  See, e.g., Buckley v. John, 314 Mass. 719, 726 (1943) (receipt of cash in return for release of claims is a conveyance); Sheffield Progressive, Inc. v. Kingston Tool Co., 10 Mass. App. Ct. 47, 49-50 (1980) (release or waiver of rights to equity of more than $2 million is a conveyance); In re Besing, 981 F.2d 1488, 1493-94 (5th Cir. 1993) (dismissal with prejudice of cause of action belonging to borrower is a "transfer" of property by the borrower); In re e2 Commc'ns Inc., 320 B.R. 849, 855-857 (Bankr. N.D. Tex. 2004) ("common sense suggests that a release of claims is a 'transfer' of property").

Mortgage.[4]

The language of Section 10 requiring the Lender's prior written consent to "any transfer [of] the Mortgaged Property or any part thereof" is unambiguous and enforceable in accordance with its terms. <u>Alison H. v. Byard</u>, 163 F. 3d 2, 6 (1st Cir. 1998). The terms "transfer" and "Mortgaged Property" are broadly defined and the intent of Section 10 is expressly stated: to protect the Mortgagee's "valid interest in maintaining the value of the Mortgaged Property . . ." Ex. 5 § 10(a). Blue Hills argues that in Section 10 "Mortgaged Property" means only the real estate, but the Mortgage separately defines the real estate as the Premises (land) and Improvements (building). Had the parties intended to refer only to the Premises and Improvements in Section 10 they had a clear and obvious means of doing so: using those words, as they did in other parts of the Mortgage that refer solely to the Premises and/or Improvements. Ex. 5 §§ 2, 3, 5, 9, 11(u), 11(x), 23(k).

The other subsections of Section 10 are not to the contrary. Section 10(b) merely lists certain indirect transfers that are deemed included within the scope of 10(a). It does not purport to be exclusive and does not include even an outright sale of the entire Mortgaged Property. Section 10(e) requires Blue Hills to reimburse the Lender for "all reasonable expenses" incurred by the Lender in connection with the review of any transfer, including <u>without limitation</u> any title search costs and title insurance premiums. Section 10(e) does <u>not</u> say that only those transfers requiring a title search and title insurance are included within the scope of ¶ 10(a), and such a

---

[4] It is immaterial whether the transfer of the Payment to the Royall Associates Realty Trust was a loan or a distribution, for two reasons. First, a loan (like a distribution) is still a transfer. Second, any loan by Blue Hills to an affiliate of Blue Hills constitutes a failure to maintain single purpose entity status under Section 12 of the Mortgage, which itself is an Event of Default. <u>See</u> Mortgage § 12(e) ("Mortgagor has not made and will not make any loans or advances to any third party (including any affiliate or constituent party, any Guarantor or any affiliate of any constituent party or Guarantor)"); Mortgage § 23(l).

- 16 -

reading would exclude the transfers specified by 10(b).  Likewise, Section 10(f) lists conditions which may, to the extent they apply, permit the Lender to withhold consent.  It does not limit Section 10(a) to only those transfers as to which these conditions necessarily apply.

Blue Hills' slippery slope argument – that a borrower could not conduct ordinary business if Section 10 applied to every last piece of equipment and office supply – is inapplicable to this clearly material transfer not in the ordinary course.  The unambiguous Mortgage means what it says and must be enforced against this sophisticated borrower strictly in accordance with its terms.  Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 853-54 (1st Cir. 1987); Samos Imex Corp. v. Nextel Commc'ns, Inc., 20 F. Supp. 2d 248, 251 (D. Mass. 1998) (Young, J.).

Blue Hills ignores the settlement of the zoning appeal and focuses only on the Payment. It claims that it never transferred the Payment because the Payment has been held in various escrow accounts "for the benefit of Blue Hills" since the time the Payment was made.  The evidence refutes that the Payment was ever held for or used by Blue Hills.  Under the terms of the Royall Agreement, the $2 million will never be made available to Blue Hills for any purpose. Ex. 26 §§ II.D, V.C.  Even if Blue Hills prevailed on its Section 10 transfer arguments, however, it would only serve to establish a separate Event of Default under Section 12 of the Mortgage.

Under Section 12 of the Mortgage, Blue Hills agreed to abide by certain covenants required to maintain Blue Hills' single purpose entity status.  If the Mortgaged Property was not transferred, then Blue Hills violated numerous single purpose entity covenants.  Blue Hills violated, among others, Section 12(l) of the Mortgage ("Mortgagor will not commingle the funds and other assets of Mortgagor with those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party of Guarantor, or any other person"), Section 12(m) of the

- 17 -

Mortgage ("Mortgagor has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other person."), and Section 12(t), requiring it to conduct its business in accordance with the assumptions of the Bernkopf Goodman insolvency opinion[5], Exhibit 185.[6] Violation of these covenants is an Event of Default under the Mortgage. Mortgage § 23(l).

If Blue Hills did not simply transfer the Payment first to Royall Associates and then to Fineberg and Langelier, then it clearly commingled its funds with those of its affiliate(s) and maintained its assets in a manner that makes it difficult to identify and segregate Blue Hills' assets from those of its affiliate(s). The first escrow account into which the Payment was deposited was in the name of "Fineberg Royall Associates," Ex. 145, or "Royall Associates," Cohn, TT 4 at 33, 43. This account contained other funds owned by Fineberg and Langelier or Royall Associates. Cohn, TT 4 at 46-47. The money was held on behalf of Fineberg and Langelier and controlled by them. Ex. 182. Later, disposition of the Payment was directed by the December 2004 Royall Agreement, to which Blue Hills was not a party. Ex. 26. The Agreement directed that the monies "continue to be held on behalf of" the Fineberg and Langelier Beneficiaries by escrow agents acting on their behalf. Ex. 26 ¶ II.D. The monies now reside in a client funds account of The Langelier Company, Inc. at Wilmer Hale and an account

---

[5] Some of the assumptions set forth in the insolvency opinion which were violated by Blue Hills include that Blue Hills does not commingle its assets or business functions with the assets or business functions of its affiliates, that bank accounts and funds of the borrower are maintained separately from those of any affiliate, and are maintained in the name of the borrower; that assets are not transferred between the borrower and any affiliate with the intent to hinder, delay, or defraud creditors; and that Blue Hills will disclose all material transactions associated with the loan to the Lender in appropriate and timely communications. Ex. 185 at Blue Hill 2025-2029.

[6] Blue Hills also violated § 12(h) ("Mortgagor will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party…") and § 12(o) ("Mortgagor will not permit any affiliate of any constituent party independent access to its bank accounts.").

labeled "Fineberg 150 Royall Street" at Bernkopf Goodman.  Ex. 145.  Interest accruing on the

Payment has been used to pay for Langelier's and Fineberg's legal defense fees in connection

with the claims brought against them <u>personally</u>.  Cohn, TT 4 at 60, 64-65.

      Blue Hills' argument that Blue Hills and Royall Associates were "functionally the same,"

Cohn, TT 4 at 88-89, proves the violation of the single purpose entity covenants.  Ex. 5 § 12(t)

(incorporating Ex. 185); Ex. 185 at p. 2025 § 3 ("The Borrower does not commingle its assets or

business functions with the assets or business functions of [Royall Associates]").  Blue Hills is

organized under the laws of Delaware, and under Delaware law, an LLC is a separate legal entity

distinct from its members.  6 Del. C. § 18-201(b).  A member, like Royall Associates, "has no

interest in specific limited liability company property." 6 Del. C. § 18-701; <u>see</u> <u>Hagan v. Adams</u>

<u>Property Assocs., Inc.</u>, 253 Va. 217, 220, 482 S.E.2d 805, 807 (Va. 1997) (holding under

comparable provision of Virginia LLC Act that "in contrast to a partnership, a limited liability

company . . . is an entity separate from its members and, thus, the transfer of property from a

member to the limited liability company is more than a change in the form of ownership; it is a

transfer from one entity or person to another").

      The Blue Hills Parties cannot expand the fact that Blue Hills was disregarded <u>for tax</u>

<u>purposes</u> to eliminate its legal existence for all purposes.  See <u>In re: KRSM Props., LLC</u>, 318

B.R. 712, 719 (9th Cir. 2004) ("A tax election to have an LLC disregarded as a taxable entity has

no effect on the legal status of ownership of LLC assets.").  Blue Hills was a legal entity that the

Lender required be created for the very reason that it had a separate legal existence and its assets

were distinct.  <u>See</u> Ex. 5 § 12; Ex. 185.  "LLCs remain separate and distinct from their members.

Indeed the separate and distinct nature of LLCs is their reason for existence."  <u>Abrahim & Sons</u>

<u>Enters. v. Equilon Enters., LLC</u>, 292 F.3d 958, 962-63 (9th Cir. 2002) (rejecting invitation to

- 19 -

disregard corporate form, and finding that contributions from members to LLC was a transfer of property).  Blue Hills and Royall Associates were not financially the same entities, as the Blue Hills Parties assert.  Royall Associates had a separate $8 million in debt, Cohn, TT 4 at 118-119; Fineberg and Langelier exposed the Payment to claims of Royall Associates creditors by depositing it into a Royall Associates account.  Id.

The Lender is entitled to rely on Blue Hills' 2003 Events of Default (which the Lender did not discover until after the foreclosure sale) in defense of Blue Hills' contract claims.  See, e.g., New England Structures, Inc. v. Loranger, 354 Mass. 62, 66 (1968) (contractor could rely on grounds for terminating subcontract other than those stated in termination notice unless subcontractor established detrimental reliance on the fact that only another ground was given in the notice); College Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925) ("A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact.").

**III.    EVEN IF BLUE HILLS' 2003 DEFAULTS DID NOT WARRANT ENTRY OF JUDGMENT IN THE LENDER'S FAVOR, BLUE HILLS HAS FAILED TO PROVE ITS CLAIMS BY A PREPONDERANCE OF THE EVIDENCE.**

Blue Hills' 2003 Events of Default foreclose Blue Hills' breach of contract, breach of implied covenant, and c. 93A claims.  Even if they did not, however, Blue Hills' claims would fail because Blue Hills has failed to prove its case.  The evidence presented by Blue Hills instead demonstrates that the Lender did not breach the Loan Documents, did not breach the implied covenant of good faith and fair dealing, and did not breach Mass. Gen. Laws c. 93A.

**A.    The Lender Did Not Breach the Loan Documents.**

Blue Hills' admitted failure to pay the property taxes due on August 2, 2004 was an Event of Default justifying the Lender's denial of access to the reserves for principal and interest,

declaration of default and subsequent foreclosure.  Under the Mortgage, the Lender may

foreclose the Mortgage upon the occurrence of any Event of Default.  Mortgage § 26(a).  See,

e.g., Colonial Operating Co. v. Poorvu et al., 306 Mass. 104, 107 (1940) (lender has a right to

foreclose where mortgage requires borrower to pay real estate taxes and borrower fails to do so);

Restatement (3d) of Property: Mortgages, § 8.1 (acceleration permitted for failure to pay

mortgage debt and also defaults in mortgage covenants to pay taxes and the like).  By the time

the Lender foreclosed on the Mortgage, Blue Hills had caused numerous Events of Default:

| Date of Event of Default | Undisputed Facts Underlying Event of Default | Applicable Loan Document Provisions |
|---|---|---|
| August 5, 2003 | Blue Hills settles the Zoning Appeal in exchange for the $2 million Payment without the Lender's prior written consent. | Mortgage §§ 10(a), 23(d) |
| August 8, 2003 | Blue Hills either transfers the Payment to Royall Associates without the prior written consent of the Lender, or commingles the Payment with Royall Associates' assets. | Mortgage §§ 10(a), 12(l), 12(m), 23(d), 23(l) |
| August 2, 2004 | Blue Hills fails to pay property taxes owed to the Town of Canton. | Mortgage §§ 5, 23(b) |
| August 11, 2004 | Blue Hills fails to pay principal and interest due on the Loan. | Mortgage §§1, 23(a) |
| August 11, 2004 | Blue Hills fails to make required payments to the reserve accounts. | Mortgage §§ 6, 23(a) |
| August 2004 | Blue Hills sells the Workstations for $100,000 without the prior written consent of the Lender. | Mortgage §§ 10(a), 23(d) |
| September 11, 2004 | Blue Hills fails to pay principal and interest due on the Loan. | Mortgage §§1, 23(a) |
| September 11, 2004 | Blue Hills fails to make required payments to the reserve accounts. | Mortgage §§ 6, 23(a) |
| October 11, 2004 | Blue Hills fails to pay principal and interest due on the Loan. | Mortgage §§1, 23(a) |
| October 11, 2004 | Blue Hills fails to make required payments to the reserve accounts. | Mortgage §§ 6, 23(a) |
| November 11, 2004 | Blue Hills fails to pay principal and interest due on the Loan. | Mortgage §§1, 23(a) |
| November 11, 2004 | Blue Hills fails to make required payments to the reserve accounts. | Mortgage §§ 6, 23(a) |

- 21 -

The Lender's actions were justified by the property tax default; additionally, the Lender is entitled to rely on the subsequent defaults to justify the foreclosure because Blue Hills did not detrimentally rely on any conduct or statement of the Lender with respect to the nature of Blue Hills' defaults. Blue Hills never offered or made any effort to cure the property tax default, or any other of its defaults, for that matter. Therefore, the Lender did not breach the Loan Documents when it foreclosed on the property.[7]

### B. The Lender Did Not Breach the Implied Covenant of Good Faith and Fair Dealing.

In support of its argument that Blue Hills has not shown any breach of the implied covenant of good faith and fair dealing, the Lender incorporates its separately filed memorandum in support of dismissal of the plaintiff's claim for breach of the implied covenant of good faith and fair dealing. For the Court's convenience, a copy of that memorandum is attached hereto as Exhibit A.

### C. The Lender Did Not Violate Mass. Gen. Laws c. 93A.

The Lender did not breach Mass. Gen. Laws c. 93A because the Lender's conduct in relation to the Loan was not unfair or deceptive. The Lender simply adhered to the terms of the Loan Documents. Cases such as Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451 (1991) and Kattar v. Demoulas, 433 Mass. 1 (2000), are inapplicable here. The Lender did not attempt to use its contractual rights as leverage to obtain some advantage to which Lender was not entitled under the Loan Documents. Also, in Anthony's, supra at 474-76, Demoulas, supra at 12-14, and like cases, the defendant had breached the contract in question in the course of

---

[7]  Any argument by Blue Hills that the Lender had some sort of improper motive for foreclosing is irrelevant to Blue Hills' breach of contract claim. See, e.g., Fleming v. Dane, 304 Mass. 46, 52 (1939) (mortgagee has a right to foreclose a mortgage that is in default without regard to its motives); Colonial Operating, 306 Mass. at 107.

- 22 -

pressing for the undeserved advantage.  As discussed above, Lender did not breach the Mortgage or other Loan Documents.

<b><u>CONCLUSION</u></b>

For the reasons set forth above, the Lender respectfully requests that the Court enter judgment in its favor on all counts of Blue Hills' Second Amended Complaint.

Respectfully submitted,

J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., and
CSFB 1999-C1 ROYALL STREET, LLC

By their attorneys,

/s/ Bruce E. Falby
_____
E. Randolph Tucker (BBO #503845)
Bruce E. Falby (BBO #544143)
Bruce S. Barnett (BBO #647666)
Traci S. Feit (BBO #660688)
DLA PIPER US LLP
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000 (*telephone*)
(617) 406-6100 (*fax*)

Dated:  October 10, 2006

- 23 -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim.

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## MEMORANDUM OF CSFB 1999-C1 ROYALL STREET, LLC AND J.P. MORGAN CHASE BANK, TRUSTEE, IN SUPPORT OF DISMISSAL OF THE PLAINTIFF'S CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

      The defendants and plaintiffs-in-counterclaim, J.P. Morgan Chase Bank, as

Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities

Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee")

and CSFB 1999-C1 Royall Street LLC ("CSFB") (together with the Trustee, the

"Lender"), submit this memorandum in support of dismissal of plaintiff Blue Hills Office

Park, LLC's ("Blue Hills") claim for breach of the implied covenant of good faith and

fair dealing.  Blue Hills has failed to show any such breach and, as such, judgment should

enter for the Lender.

- 1 -

## STATEMENT OF RELEVANT EVIDENCE

Blue Hills' Property Tax Payment Default

The Mortgage required Blue Hills to pay the real estate taxes, see Ex. 5 § 5; Donovan, TT 3 at 42,[1] and provided that failure to pay the taxes was an immediate Event of Default.  Ex. 5 § 23(b).  Blue Hills knew that it was obligated to pay the taxes. Donovan, TT 3 at 42.  The Mortgage provided that quarterly real estate tax payments would be escrowed in advance from property rents deposited into Blue Hills' lockbox account and actually paid to the Town of Canton by the Lender.  Ex. 5 § 6(a); Donovan, TT 3 at 41.  Because Blue Hills did not want to fund the tax escrow in advance, it requested in 1999 that real estate tax payments be handled differently.  Donovan, TT 3 at 41; Ex. 53.

The Lender accommodated Blue Hills by allowing it to wait until shortly before the taxes were due before depositing into the lockbox the moneys required to pay the taxes.  Donovan, TT 3, at 41-42.  To satisfy its obligation to the Lender to pay the taxes, Blue Hills in turn obtained a large portion of the money to pay the taxes from its tenant Equiserve, which was obligated to Blue Hills under its lease.  Id. at 42, 55.  Blue Hills provided the rest of the money to pay the taxes.  Id. at 55.  Each quarter from 1999 to May 2004, Blue Hills supplied the money to pay the taxes sufficiently in advance of the due date to allow Lender to sweep the lockbox and pay the taxes on time.  Id. at 43, 42.

This accommodation varied the timing of when Blue Hills provided the money to pay the taxes, but never varied the obligation of the Borrower to provide to the Lender monies to pay the taxes on time.  Blue Hills knew that it was always the property owner's

---

[1] References to trial testimony are to the last name of the witness (e.g., Donovan), the volume of the trial transcript (e.g., TT 3), and the page of the transcript (e.g., at 42).

BOST1\443023.2

obligation to pay the taxes.  Id. at 42.  This accommodation benefited Blue Hills because

rents that under the terms of the Mortgage would have been escrowed in advance to pay

the taxes were instead distributed monthly to Blue Hills in the form of net cash flow.

Donovan, TT 3 at 45, TT 2 at 102-03.  The Borrower used the net cash flow to pay

expenses and to make distributions to its partners.  Id.

In the quarter preceding July 31, 2004, the Borrower knew it had a problem.

Donovan, TT 3 at 44.  Equiserve would be moving out on July 31, 2004 and only one

month's worth of the taxes due August 1, 2004 would be available from Equiserve.  Id.

Nevertheless, Blue Hills did not set aside from the over $500,000 of net cash flows it

received in May, June and July 2004 any monies to pay to the Lender the $158,181.19 of

taxes that would become due on August 1, 2004.  Id. at 44-45.  Nor did it request or

expect the Lender during that quarter to escrow monies from monthly rents to pay the

taxes.  Id.

In mid-July, 2004, Blue Hills received a routine quarterly tax shortage notice from

the Lender stating that there was no money in the tax escrow fund to pay taxes and

requesting that Blue Hills send $158,181.19 to the Lender by July 27 in order for the

Lender to be able to issue payment to the Town of Canton by August 2, 2004 (August 1

being a Sunday).  Donovan, TT 3 at 46; Ex. 65.  The notice stated that failure to remit the

funds by July 27 might result in the Lender advancing corporate funds and that should

this occur a $500 fee would be assessed.  Ex. 65.  Although the notice did not remind the

Blue Hills that its Loan Documents required it to pay the taxes and that failure to pay the

taxes constituted an Event of Default, the Loan Documents contain no such notice

requirement.

- 3 -

In any event, the Lender did tell Blue Hills that failure to pay the taxes would be a default. Blue Hills' accounting manager Gil Stone called Wells Fargo's Brent Lloyd on July 29, 2004 and said Blue Hills was going to have a problem making the tax payment. Lloyd Deposition at 32. (Donovan testified that Blue Hills spoke to Wells Fargo whenever it had a problem with the loan. Donovan, TT 3 at 47.) Mr. Stone asked if the real estate taxes could be paid from the loan reserves. Id. Mr. Lloyd checked and reported back to Mr. Stone that he could use reserve account money to pay the taxes only if he could provide a certification letter, copy of lease, copy of invoice, or lien waiver. Id. at 32, 35; Ex. 66. Indeed, these were the requirements for access to the tenant improvement and leasing commission reserve accounts (the "reserves" or "reserve accounts"). Donovan, TT 3 at 49, 37; Ex. 5 § 6(c)(iv).[2] Mr. Stone said he did not have a lien waiver. Lloyd Deposition at 32; Ex. 66. Mr. Lloyd responded that if he could not pay the taxes, the Borrower would be in default of its loan agreement. Lloyd Deposition at 32; see also Exs. 67, 68.

As accounting manager, Mr. Stone reported directly to Blue Hills' CFO, Joseph Donovan. Donovan, TT 2 at 98. It is a reasonable inference that Mr. Stone reported to Mr. Donovan that Wells Fargo had stated that the loan reserves could not be accessed to pay the taxes and that Blue Hills would be in default if it did not pay the taxes.

---

[2] As Mr. Donovan testified at TT 3 p. 35, the reserves that were keyed to Equiserve leaving were the tenant improvement and leasing commissions reserves specified in Mortgage Sections 6(c)(i) and (ii), defined in 6(c)(ii) as the Leasing Escrow Funds. These were the reserves from which up to $1 million could be obtained for principal and interest payments once Equiserve left, if Blue Hills was not in default and made a timely request. Ex. 5 § 6(c)(ix); Donovan, TT 3 p. 38-39. These were the reserves to which Blue Hills requested access for the first time in Mr. Donovan's August 2, 2004 letter. Donovan, TT 3 p. 50, 54. The Mortage's tax, insurance, and repair and replacement reserves were typical and not related to Equiserve leaving. Donovan, TT 3 at 35-36. Donovan's testimony about a return of over-escrowed monies pertained to the routine insurance reserve. Donovan, TT 2 at 111-12; Ex. 123.

Nonetheless, Blue Hills did not send any funds to Wells Fargo to pay the taxes due August 2, 2004.  Nor did Blue Hills pay the taxes directly to the Town of Canton. Donovan, TT 3 p. 46-47.  The one month's worth of real estate taxes ($51,000) paid by Equiserve was not deposited into Blue Hills' lockbox until mid-August, weeks after the August 2, 2004 due date.  Id. p. 47.  Wells Fargo paid the taxes on time with its own funds.  Lloyd Deposition at 50-51; Ex. 67.

Notwithstanding Mr. Stone's conversations with Wells Fargo, Mr. Donovan on August 2, 2004 mailed a letter to Wells Fargo repeating Blue Hills' request for access to the loan reserves to pay the taxes due that same day.  Donovan, TT 3 p. 50; Ex. 70.  He knew the letter mailed to Wells Fargo in California would not arrive at Wells Fargo until after the taxes were past due.  Donovan, TT 3 at 50-51.  By the time the letter arrived on August 4, 2004, id. at 51, Blue Hills was already in default.  Ex. 5 § 23(b).

Mr. Donovan, the CFO of a large real estate management firm, was sophisticated and had extensive dealings with real estate loans, lenders, and securitized loan servicers. Donovan, TT 3 at 26-28.  Part of his job was to deal with lenders.  Id. at 27-28.  He had dealt with lenders and loan servicers in connection with all phases of loans, from loan negotiations to loan foreclosures.  Id. at 28-33.  He knew from his extensive experience that the rights of Blue Hills in this case were governed by the loan documents.  Id. at 34. He understood in particular that Blue Hills' access to the loan reserves were governed by the terms of the loan documents.  Id. at 39-40.  Nonetheless, before mailing his August 2, 2004 request for access to the reserves, Mr. Donovan did not review the loan documents. Id. at 55.

Before Mr. Stone's request, Blue Hills had never before asked Wells Fargo to use monies from the reserve accounts to pay real taxes or anything else.  Donovan, TT 3 at 54.  The Lender had never used the reserves before to pay the real estate taxes.  Id. at 55.  The monies to pay the taxes in the past had always come from Blue Hills, from its own monies and monies paid by its tenant EquiServe.  Id.

Mr. Donovan testified that he mistakenly understood, despite having read the mortgage reserve provisions at the time of the loan, that the reserves could be used to pay real estate taxes.  Donovan, TT 3 at 52, 54.  He testified that this mistaken belief was based solely on his faulty memory of the loan negotiations.  Id. at 53-54.  His mistaken belief, if genuine, was not based on any prior occasion when the Lender had allowed taxes to be paid from the reserves, as there was no such occasion.  Id. at 55.

After Mr. Donovan mailed his August 2 request, neither Wells Fargo nor LNR ever told him it was granted.  Donovan, TT 3 at 57.  He never checked with them to see if they had granted his request.  Id. at 57-58.  He sent his August 2 request to Wells Fargo's Curtis Mellegni on August 13, 2004, still seeking a response.  Donovan, TT 2 at 134-36; Ex. 75.  Mr. Donovan testified that he assumed Wells Fargo had granted his request to take monies from the reserves to pay the taxes, based solely on the fact that approximately two weeks after his request, he had Mr. Stone call the Town of Canton, which confirmed that the taxes had been paid.  Donovan, TT 2 p. 132, TT 3 at 58-60.  Mr. Donovan did not ask Wells Fargo whether the money to pay the taxes had come from the loan reserves or from Wells Fargo's own money.  Id. at 58-59.  Blue Hills' expert, Richard Clarke, admitted that Blue Hills in this case should have acted differently, including pressing for an answer to its request for access to the reserves and inquiring

- 6 -

into the basis on which the taxes were paid, instead of just assuming the taxes had been

paid from the reserves.  Clarke, TT 5 at 52-54.

Blue Hills' attorney Mr. Goldberg will testify (if he testifies consistently with his

April 7, 2006 deposition testimony) that he spoke with LNR asset manager Job Warshaw

in mid-August.  Mr. Goldberg told Mr. Warshaw there were various reserve accounts and

Blue Hills intended to access them and that was one of the reasons Blue Hills wanted to

have discussions with the Lender.  According to Mr. Goldberg, Mr. Warshaw said he did

not know about the reserve accounts because he did not yet have the Loan Documents.

Mr. Goldberg testified that he spoke to Mr. Warshaw again near the end of August, and

perhaps again just before or after Labor Day (which fell on September 6), and again

asked Mr. Warshaw about the reserve accounts, telling him that some of the reserve

money was set aside for debt service payments.  According to Mr. Goldberg,

Mr. Warshaw said he had confirmed that there were reserves, but still needed to look at

the Loan Documents before responding substantively.  Mr. Goldberg never spoke to

Mr. Warshaw again.

Taking Mr. Goldberg's testimony alone at face value, Blue Hills knew that its

request for access to the reserves had not been granted.[3]  In a later letter to Lender's

counsel, Mr. Goldberg asserted that Blue Hills had the right to access the reserves for all

payment obligations under the loan documents.  Ex. 102.  Mr. Goldberg's assertion was

plain wrong.  Ex. 5 §§ 6(b), 6(c)(iv), and 6(c)(ix); Donovan, TT 3 at 53-54.  Mr. Donovan

---

[3] If necessary, Mr. Warshaw will testify that on September 7, 2004, he told Mr. Goldberg that, based on his preliminary review of the loan documents and file, Blue Hills was in default for not paying the taxes due on August 2, 2004 and therefore was not entitled to access the reserves to pay principal and interest.  Mr. Polcari testified that Mr. Warshaw reported to him that he (Mr. Warshaw) had told Mr. Goldberg the Borrower was in default.  Polcari, TT 4 at 46.  Mr. Polcari's contemporaneous notes of his conversation with Mr. Warshaw are contained in Ex. U-1 at pages 3919-21.

talked to Mr. Goldberg before drafting the August 2 request for access to the reserves. Donovan, TT 3 at 57. If anyone led Blue Hills to believe that it could obtain monies from the reserves contrary to the terms of the mortgage, it was Mr. Goldberg, not the Lender.

LNR asset manager Joe Polcari called Mr. Donovan on or about September 16, 2004 to tell him a default notice accelerating the loan was coming. Mr. Donovan said he understood that LNR had to send an acceleration letter. He expressed no surprise, anger, or dismay. Polcari, TT 5 at 104-05; Donovan, TT 3 at 77. On September 17, 2004, the Lender in writing denied access to the loan reserves based on, among other things, Blue Hills' tax payment default on August 2, 2004. Ex. 88. The letter declared the loan in default and accelerated the loan. After receiving the September 17, 2004 default notice, Blue Hills did not respond. It made no offer to cure, and did not cure, any of the defaults described in the notice. As Borrower's expert Mr. Clarke agreed, Blue Hills never offered to pay a penny. Clarke, TT 6 at 54. Blue Hills took no action in response to the default notice.

In summary, there was no course of conduct that ever varied the Loan Documents' requirements for access to the loan reserves because there had never even been a request for access. There was no course of conduct whereby loan reserves had ever been used to pay the taxes. There was no course of contact that varied Blue Hills' obligation to pay the taxes on time. The only course of conduct was a change, at Blue Hills' request, as to exactly when (in advance of the due date) the Borrower would supply the monies to the Lender to fulfill its obligation to pay the taxes.

The Lender did not lull the Borrower into thinking that access to the reserves to the pay the taxes would be allowed. There had never been a prior request by the

- 8 -

Borrower for access to the reserves.  Wells Fargo told the Borrower on the telephone in July that the reserves could not be used to pay the taxes and that if the Borrower did not pay the taxes, it would be in default.  LNR never gave any indication that access to the reserves would be granted.

Any belief by Mr. Donovan that access would be granted was unreasonable given that Wells Fargo told Mr. Stone that access was not permitted.  Moreover, any such belief of Mr. Donovan was based solely, he testified, on his own mistaken memory of the loan negotiations and failure to read the Loan Documents.  No behavior of the Lender induced his misunderstanding.  His assumption that access had been granted is at odds with his resigned reaction on September 17, 2004 when he expressed no surprise at the default notice and said he understood why it was necessary.

Finally, the lapse of time before LNR in writing denied access to the loan reserves and gave notice of default did not induce any reliance on the part of Blue Hills.  The best evidence of what Blue Hills would have done if it had received an earlier written response to its request for access to the reserves and/or an earlier notice of default is what it did when it received the September 17, 2004 response and notice of default:  Nothing.  Blue Hills' failure to come out of pocket for any amount after August 1, 2004, was not due to any Lender course of conduct.  Instead, the evidence is clear that Blue Hills had decided, having found no tenant, to walk away from the property, just as Mr. Fineberg had done only weeks before in Sturbridge and Lancaster.

Blue Hills' Escrow Payments Default

Blue Hills neither made nor requested access to the reserves to make the escrow payments due to the Lender on August 11, 2004.  Donovan, TT 3 at 60.  These payments

were still due even after EquiServe left the building.  Mortgage, Ex. 5 §§ 6(a)(b) & (c)(i).

Blue Hills defaulted by failing to make those payments on August 11, 2004 and then

again on September 11, 2004.  Ex. 5 §§ 23(a)& (b); Clarke, TT 6 at 44-45.  Those

payment defaults precluded access to the reserves to pay principal and interest,

independent of the tax payment default.  Ex. 5 § 6(c)(ix); Donovan, TT 3 at 38-39.

<u>2003 Transfer or SPE Violation Defaults</u>

In addition, Blue Hills defaulted in 2003, when it failed to obtain the consent of

the Lender to the settlement of the zoning appeal and to the transfer of the $2 million

settlement payment (the "Payment"), Ex. 5 § 23(d), or, alternatively, when it violated

many of the single purpose entity covenants of Section 12 of the Mortgage by concealing

the Payment and commingling it with monies of its affiliates and guarantors.  Ex. 5 §§ 12

and 23(e).  Given Blue Hills' lack of any action in reliance on the defaults specified in the

Lender's September 17, 2004 default notice (Blue Hills never attempted to cure the tax

payment or other defaults specified therein), these defaults independently justify the

Lender's denial of Blue Hills' request for access to the reserves in 2004.

<u>**ARGUMENT**</u>

I.     <u>**BLUE HILLS' CLAIM FOR BREACH OF THE IMPLIED COVENANT
       OF GOOD FAITH AND FAIR DEALING FAILS AS A MATTER OF
       LAW.**</u>

Even drawing all inferences in favor of Blue Hills, the Massachusetts iteration of

the implied covenant of good faith and fair dealing does not reach so far as to encompass

the conduct alleged by Blue Hills in this case.[4]  Blue Hills alleges that a course of

---

[4] As set forth in Section II, below, Blue Hills' claim for breach of the implied covenant fails for the
additional reason that the evidence presented by Blue Hills establishes no course of conduct justifying or
excusing Blue Hills' failure to make the property tax or other payments due to the Lender in August and
September 2004.

conduct initiated at Blue Hills' request and solely for its benefit – one which merely permitted Blue Hills to vary the timing of its property tax payment while still requiring Blue Hills to furnish the money to pay taxes to the Town of Canton on time – somehow "lulled" it into believing it was excused from its contractual and statutory obligation to pay the property taxes. Therefore, Blue Hills argues, the Lender breached the implied covenant when it declared that Blue Hills' failure to pay the property taxes was an Event of Default and denied access to the loan reserves for payments of principal and interest on that basis.

Blue Hills' argument is meritless. The implied covenant of good faith and fair dealing "cannot be used to contradict clear contractual terms." McAdams v. Massachusetts Mut. Life Ins. Co., 391 F.3d 287, 302 (1st Cir. 2004) (citing Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004) (implied covenant "may not be invoked to create rights and duties not otherwise provided for in the existing contractual relationship.")). Rather, the implied covenant exists so that the objectives of the contract may be realized. Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 385 (2005) (citing Crellin Technologies, Inc. v. Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir. 1994)). As the Massachusetts Supreme Judicial Court has held, "[t]he purpose of the covenant of good faith and fair dealing is not to supply contractual terms that the parties are free to negotiate." Id., 441 Mass. at 388.

The Lender was not required to provide Blue Hills with notice of the fact that under the Mortgage, a failure to pay property taxes is an Event of Default. See Mortgage § 26(a) ("[u]pon the occurrence of any Event of Default, Mortgagee may take such action, without notice or demand, as it deems advisable to protect and enforce its rights

- 11 -

against Mortgagor…"); <u>Ferris v. Federal Home Loan Mortgage Corp.</u>, 905 F. Supp. 23, 29 (D. Mass. 1995) (in absence of explicit mortgage requirement, lender has no duty to promptly notify borrower of account shortfall). Lender had no obligation to tell Blue Hills what the Loan Documents make plain – that it was obligated to pay the taxes (Mortgage § 5) or deposit with the Lender funds sufficient to pay them (Mortgage § 6), and that a failure to pay property taxes was an Event of Default (Mortgage § 23(b)).

The fact that the Lender permitted Blue Hills to adjust the timing of its property tax payment (while still requiring Blue Hills to furnish the money to pay the taxes to the Town of Canton on time) did not relieve Blue Hills of its ultimate obligation to pay property taxes. First, a course of conduct that merely modifies the <u>timing</u> of performance does not justify a complete <u>failure</u> of performance. Second, Section 44 of the Mortgage specifically provides that "Mortgagor shall not be relieved of Mortgagor's obligations hereunder by reason of... (c) any agreement or stipulation by Mortgagee extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Mortgage, or any of the other Loan Documents." Section 44 also states that the "failure of Mortgagee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Mortgage." The Mortgage thus expressly permits the Lender to make accommodations to Blue Hills without relinquishing its right to insist that Blue Hills meet its fundamental payment obligations. <u>Id.</u>

Added impropriety is required to constitute a breach of the implied covenant in the commercial setting. In <u>Zuker v. General Electric Capital Corp.</u>, 20 F. Supp. 2d 254 (D. Mass. 1998), the court denied a lender's motion to dismiss the borrower's breach of implied covenant claim because the complaint sufficiently alleged that the lender,

through false assurances to the borrower, knowingly lulled the borrower "into believing

that the credit committee's approval was a mere institutional formality," which

intentionally induced the borrower's performance of conditions beneficial to the lender.

20 F. Supp. 2d at 263. The lender in <u>Zuker</u> was alleged to have accepted those benefits

with knowledge that the credit committee in fact had no intention of approving the deal.

<u>Id.</u> The borrower also alleged that the lender "decided to use credit committee

disapproval as a pretext to obtain consideration not contemplated by the parties in the

Settlement Agreement." <u>Id</u>. at 257. <u>Zuker</u> is inapplicable to this case for three reasons.

First, the Lender here is not alleged to have made any false assurances, knowing or

otherwise, to Blue Hills. Second, the Lender received no benefit as a result of Blue Hills'

decision not to pay its property taxes. Third, <u>Zuker</u> involves an extortionate use of

contract terms not present here.

  Similarly, in <u>Ugarit, Inc. v. Citizens Bank of Mass.</u>, 20 Mass. L. Rep. 33 (Super.

Ct. June 3, 2005), the court denied the lender's motion for summary judgment on the

borrower's implied covenant claim because the lender had allegedly represented that the

borrower's line of credit would remain open unless the lender gave the borrower notice.

<u>Id.</u>, 20 Mass. L. Rep. at *7-8. The lender's representation was made knowingly and was

allegedly intended to induce the borrower's reliance; therefore, the court held, the

lender's subsequent failure to comply with the borrower's reasonable expectations could

constitute a breach of the implied covenant. <u>Id.</u> In this case, unlike <u>Ugarit</u> and <u>Zuker</u>, the

Lender is not alleged to have made any misrepresentations to Blue Hills, and even the

Lender's supposed "course of conduct" is not alleged to have been intended to induce

Blue Hills to do – or not do – anything.

In sum, mere forebearance or accommodation followed by insistence on contract terms would not violate the implied covenant, but is instead expressly permitted by the loan documents. A party's exercise of contractual rights does not violate the implied covenant of good faith and fair dealing. Citizens Bank v. Business Products Online, Inc., 20 Mass. L. Rep. 507 (Mass. Super. 2006) (bank did not violate implied covenant by acting within its negotiated, contractual rights); see also Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (parties to an arms-length transaction can act in their own self-interest so long as they honor their contractual obligations) (quoting Tory A. Weigand, The Duty of Good Faith and Fair Dealing in Commercial Contracts in Massachusetts, 88 Mass. L. Rev. 174, 184 (2004)). As one court has stated:

> To find, as the [borrower] urges, a result directly contrary to the literal contract terms would make it virtually impossible for parties to plan or express their relationships. [. . .]
>
> The [borrower] claims that he relied on the plaintiff's forbearance to his detriment. This is balanced by the plaintiffs' justifiable reliance on the written contract, which stated that forbearance would not result in a relinquishment of his rights.

B.P.G. Autoland Jeep-Eagle, Inc. v. Chrysler Credit Corp., 799 F. Supp. 1250, 1255 (D. Mass. 1992) (applying Connecticut law).

## II.    BLUE HILLS' CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IS DEVOID OF EVIDENTIARY SUPPORT.

Blue Hills admits both the lateness of its request for access to the loan reserves – dated August 2 but delivered August 4 – and that the Loan Documents did not entitle it to have property taxes paid out of the reserves. Blue Hills further admits that it did not make the escrow payments due to the Lender on August 11 or September 11, 2004, and

BOST1\443023.2

that it did not request access to the reserves to make those payments. Blue Hills

nevertheless contends that it should prevail on its implied covenant claim because the

Lender allegedly engaged in a course of conduct which led Blue Hills to believe that:

(1) a failure to pay the real estate taxes would not constitute an Event of Default, despite the fact that the Mortgage states the contrary in Section 24(b);

(2) a request for access to the reserve accounts to pay real estate taxes would be granted, notwithstanding that the Loan Documents do not entitle Blue Hills to apply reserve account funds to payment of real estate taxes;

(3) a failure to make required escrow payments would not constitute an Event of Default, despite the fact that the Mortgage states the contrary in Section 23(a) ; and

(4) a request for access to the reserve accounts to pay principal and interest would be granted notwithstanding that the conditions to access were not met because the request was late and because Blue Hills was in default for not paying the taxes and required payments to the reserve accounts. Ex. 5 § 6(c)(ix).

The evidence presented at trial simply cannot support these far-fetched allegations.

As set forth in the Statement of Evidence (above), there was never any course of conduct

where Blue Hills was excused from paying the property taxes, or where the Lender

permitted Blue Hills to pay the property taxes with monies from the reserve accounts.

There was never any course of conduct where the Lender permitted access to the reserve

accounts on an informal basis or despite a failure to fulfill the conditions precedent. In

fact, there was never a request by Blue Hills for access to the reserves prior to its August

2, 2004 letter, and prior to the request, Wells Fargo had already told the Borrower that

taxes could not be paid from the reserves. Ex. 66, 67, 68. Nor was there ever a time

when Blue Hills failed to make a required monthly payment and such failure was excused

or ignored by the Lender. Prior to August 2, 2004, Blue Hills had always made its

property tax, principal, interest, and escrow payments on time.

- 15 -

Blue Hills had no basis to believe that the Lender would permit Blue Hills to breach its obligations under the Mortgage and take no action to enforce the Lender's rights under the Loan Documents.  As such, Blue Hills' claim that the Lender's exercise of its rights under the Mortgage was a breach of the implied covenant of good faith and fair dealing must fail.

### CONCLUSION

For the reasons stated above, the Lender requests that Blue Hills' claim for breach of the implied covenant of good faith and fair dealing be dismissed.

Respectfully submitted,

CSFB 1999-C1 ROYALL STREET, LLC, and J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1,

By their attorneys,

/s/ Bruce E. Falby
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER US LLP
33 Arch Street, 26th Floor
Boston, MA 02110
(617) 406-6000

Dated:  October 10, 2006

- 16 -