UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates,<br>Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and<br>GERALD FINEBERG<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**PLAINTIFF'S MEMORANDUM CONCERNING THE**
**INADMISSIBILITY OF EMPLOYEE'S HANDWRITTEN NOTES**

**Introduction**

J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and CSFB 1999-C1 Royall Street, LLC (collectively, "the Lender") seeks to introduce as evidence certain handwritten notes by Joseph Polcari ("Polcari"), an employee of Lender's agent, LNR. These notes are inadmissible hearsay because, *inter alia*, they were not compiled as part of a company policy, it was not the regular practice of LNR to maintain such records, the

notes contain "totem pole" hearsay and the notes lack any indicia of reliability that would otherwise favor admissibility.

### **Federal Evidence Rule 803(6)**

The hearsay rule does not exclude from admission "a memorandum, report, record, or data compilation, in any form . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted activity, *and* if it was the regular practice *of that business* activity to make the memorandum, report, record or compilation . . . ." Fed. R. Evid. 803(6) (emphasis supplied). Thus, the exception requires both that: (1) the record be "kept in the course of a regularly conducted activity" and (2) it be the regular practice of that business activity" to have made such record. *Id., see, Petrocelli v. Gallison, M.D.*, 679 F.2d 286, 290 (1st Cir. 1982) (requires that record not only be made in course of business but the declarant be one who "report[s] to the record keeper as part of a regular business routine") (emphasis supplied).

As the Court has previously recognized, Fed. R. Evid. 803(6) may not be properly evoked absent the existence of a business duty to make and maintain messages. *United States v. Ferber*, 966 F. Supp. 90, 99 (D.Mass. 1997). To be admissible as "business records" under Fed. R. Evid. 803(6), notes must have been, *inter alia*, reported "to the maker of the record *as part of the usual business or professional routine of the employer*." *Petrucelli v. Fallison*, M.D. 679, F.2d at 289 (emphasis supplied). Thus, the business records exception requires that the records "be made pursuant to established company procedures . . . ." *City of Long Beach v. Standard Oil Company*, 46 F.3d 929, 937 (9th Cir. 1995) ("The basis for the business record exemption is that accuracy is assured because the maker of the record relies on the record in the ordinary course of business activities").

Such requirements are predicated – no doubt – on the inherent unreliability of an employee's own records. See *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) (observing that an employee's own records "may be and frequently are untrustworthy"); *Gatto v. Mortgage Specialists of Illinois*, 2006 WL 681063 *4 (N.D. Ill. March 13, 2006) (employee's own notes are not admissible because the making of the notes was not the regular practice of that business activity" and hence were unreliable). "Recordation of ordinary phone conversations . . . does not have the built-in indicia of reliability afforded by the existence of a legal duty [to create such records] . . . ." *Sable v. Mead Johnson*, 737 F. Supp. 135, 146 (D.Mass. 1990) (discussing Fed R. Evid. 803(8)(B)).

**Polcari's Handwritten Notes Do Not Meet the Standard Under Fed. R. Evid. 803(6)**

Polcari did not dispute that his handwritten notes of selected phone conversations were not created or maintained by him pursuant to a company policy requiring the creation and retention of notes. Polcari testimony, October 3, 2006, p. 120, lines 9-20. Adding further indicia of unreliability, Polcari testified that these notes weren't even kept in a notebook provided by his employer; rather, the notes were kept in a notebook purportedly purchased with his own funds. Polcari Testimony October 3, 2006, p. 124, lines 6-11. Copies of the pertinent section of Polcari's testimony is attached hereto and incorporated herein as Exhibit "A." Simply, it was not LNR's policy to require that such records be kept and, accordingly, the handwritten notes are not "business records." *Petrucelli v. Gallison, M.D.*, 679 F. 2d at 290.

Moreover, the handwritten notes at issue are not records of business activity offered to prove whether or not certain events transpired. The notes allegedly taken by Polcari of phone conversations consist of hearsay in its rankest form. In particular, the notes purport to document conversations with LNR assistant manager, Job Warshaw, and with Joseph Donovan

- 3 -

("Donovan") of Fineberg Management, Inc. Both witnesses have been available for testimony (and Donovan has testified). In essence, Lender not only seeks to (selectively) admit Polcari's notes as proof of what various out-of-court declarants purportedly said but offers the testimony as proof of the truth of the matter purportedly asserted. No assurances of reliability are proffered; rather, Lender seeks to admit selected "totem pole" hearsay snippets from a pile of notes on various and sundry topics. *See, United States v. Ferber*, 966 F.Supp. at 96 ("when a hearsay statement has been conveyed through multiple out of court declarants, so called multiple or "totem pole" hearsay, each of the out of court statements must fall within one of the exceptions to the prohibition against the introduction of hearsay"). No proffer has been made as to what hearsay exception would be applicable to the numerous examples of embedded hearsay contained in the notes.

Finally, Lender removed several pages from the handwritten notes produced during discovery and submitted the selected pages – also redacted – as Exhibit U-1. Previously, the Lender designated the notes in their entirety as Trial Exhibit U, which was previously marked as Deposition Exhibit 84. In designating U-1 – which is approximately half the number of pages as Exhibit U – Lender failed to explain why only *selected* portions of notes allegedly maintained in a bound notebook could qualify as business records. Last week during trial, Lender's counsel held up a binder containing the notes. As Polcari deposition exhibit 84, the notes are approximately twenty (20) pages in length. Exhibit U-1, marked for identification by Lender is not only half of that length but is heavily redacted. Needless to say, the selective nature of the notes – which seem to consist of both privileged and non-privileged material – is not an indicia of reliability.

## **Cases Cited By Lender Are Distinguishable**

In *Kassel v. Gannett*, 875 F.2d 935 (1st Cir. 1989), certain "non-routine" business records are deemed admissible pursuant to Fed. R. Evid. 803(6). The operative term is "business record." The First Circuit held that reports by a Veterans Administration employee on specific *pre-printed report forms* qualified as business records even though there was testimony that an employee sometimes failed to complete and file such forms. In holding that "non-routine" records could, under certain circumstances, be admissible, it is expressly found that "(1) they [must] meet the other requirements of [Fed. R. Evid. 803(6)] and (ii) the attendant circumstances [may not] indicate a lack of trustworthiness." Further, testimony in *Kassel* established that employees were told that filled out forms "become[s] a permanent record . . . ." *Kassel v. Gannett*, 875 F.2d at 945. Thus, the case does not eliminate the requirement that preparation of the record have been made "as part of the usual business or professional routine *of the employer*." *Petrucelli v. Fallison, MD,* 679 F.2d at 289. Rather, it acknowledges that a failure in routine does not – in and of itself – negate the use of the business record exception *if* all other requirements for admissibility are present *and* other indicia of reliability are present.

Lender's reliance on *United States v. Skeddle*, 981 F.Supp. 1069 (N.D. Ohio 1997) is similarly misplaced. *Skeddle* provides for the admissibility of certain notes of client meetings maintained by an accounting firm. The court found the existence of an adequate foundation based on, *inter alia*, testimony that "it was customary for a [accounting firm employee] to take notes at client meetings, place them in the client files, and refer to them or direct others to refer to them, at a later point in time." *United States v. Skeddle*, 981 F.Supp. *Id.* at 1072. The court also found that although there was no formal company policy requiring such notetaking, the testimony of [individual familiar with the accounting firm's record keeping and files] . . .

indicate that it was a regular, although not universally followed, business practice." *United States v Skeddle*, 981 F.Supp. at 1073. In the instant case, there is no testimony as to the recordkeeping habits of anyone but Polcari (except to the extent that he testified that he was *not* acting pursuant to an established and enforced corporate policy). Moreover, accounting firms have professional obligations that make it much easier for a court to conclude that there was a *de facto* company policy regarding record keeping. At trial, Polcari testified that taking notes was "encouraged," a condition which is insufficient to buttress a claim that there was a *de facto* company policy. Moreover, professional obligations and ethics codes add an indicia of reliability in *Skeddle* that is lacking in Polcari's selective note takings. In taking (or not taking) notes, Polcari had to answer to neither his employer nor a professional licensing board.

## Conclusion

The handwritten notes are hearsay (and contain totem pole hearsay). Because, *inter alia*, they were not created by Polcari pursuant to a company policy – a fact *not* in dispute – the notes do not qualify as business records pursuant to Fed. R. Evid. 803(6) and accordingly are inadmissible.

BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
By their attorneys,

/s/ Meredith A. Swisher
Peter B. McGlynn, Esquire, BBO No. 333660
Meredith A. Swisher, Esquire, BBO No. 646866
Bernkopf Goodman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts  02110
Telephone:    (617) 790-3000
Facsimile:    (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: October 10, 2006
#346721 v1/14500/9985

# EXHIBIT A

119

```
 1   A   No.
 2   Q   Now, do you recall, sir -- strike that.
 3           The notes that are Exhibit U, I believe it's a U,
 4   U-1 for identification, do you have a set of those in front
 5   of you?
 6   A   I do.
 7   Q   All right.  This is your handwriting?
 8   A   Yes.
 9   Q   And these are on lined paper, correct?
10   A   Yes.
11   Q   And they were contained in a notebook.  I believe
12   Mr. Falby presented a notebook to you?
13   A   Yes.
14   Q   All right.  That notebook is not an LNR standard issue
15   notebook, correct?
16   A   That is correct.
17   Q   And these are your personal notes; isn't that correct,
18   sir?
19   A   I wouldn't say they're my personal notes.  What do you
20   mean?
21   Q   Well --
22   A   They're not, they're not -- they're my notes of
23   conversations, primarily conversations regarding loans.
24   Q   Directing your attention to Volume 2, Page 24, Line 10
25   of your deposition.  Would you please turn to that, sir.
```

120

1   A   Volume 2?

2   Q   Volume 2, Page 24, Line 10.

3   A   Yes.

4   Q   And I said, Question:  And these are your personal
5   notes?
6       And your answer was what, sir?

7   A   I'm sorry, I'm trying to find -- "Yes."  My answer was
8   "Yes."

9   Q   Now, sir, is there any -- at least at the time that you
10  prepared these notes, Lennar had no company policy
11  concerning the retention, or the requirement, requirement
12  that notes be, of meetings or conferences be taken, correct?

13  A   I'm not aware of any company policy, although it was
14  encouraged.

15  Q   Since you have Page 24 of Volume 2, take a look at
16  question on Line 20.  Do you see where I said:  And is there
17  any company policy with Lennar -- within Lennar to make
18  notes or memoranda of conferences?
19      And your answer is:  Not that I am aware of at this
20  time.
21      Do you see that?

22  A   Yes.

23  Q   And you'll agree with me that these personal notes you
24  just stick in a file someplace, correct?

25  A   I don't say I would stick in a file somewhere.  I mean,

121

1   they're kept in my notebook.
2   Q   Directing your attention to Page 25, Line 1.  I said:
3   These are just your personal notes that you stick in a file
4   someplace, correct?
5   A   Yes.
6   Q   And you say:  These are my personal notes that I keep in
7   a notebook.
8   A   That's correct.
9   Q   And the next question, I said:  What do you do with the
10  notebook once it's filled?
11          I put it on a shelf somewhere.
12          Next question:  Do you keep a notebook for each of
13  the loans within your portfolio?
14          The answer is what, sir?
15  A   "No."
16          MR. FALBY:  There's a confusion on the record now,
17  your Honor.  Could we read the questions, two questions
18  later from the deposition.
19          THE COURT:  You may on recross.
20          MR. FALBY:  Thank you, your Honor.
21          MR. McGLYNN:  Thank you, your Honor.
22          THE COURT:  Not now.
23          MR. McGLYNN:  One moment, your Honor.  I think I
24  may be done.
25  Q   Sir, with respect to the lease termination provisions in

122

```
1    Exhibit 5, I believe you referred to Section 8 on Page 20
2    titled "Leases and Rents."
3         Tell me when you have that in front of you, sir.
4    A  Yes.
5    Q  And did I understand your testimony on
6    cross-examination, you do have familiarity with the
7    procedure that is set forth in Section 8 governing leases
8    and rents.  Is that -- am I understanding your testimony
9    correctly, sir?
10   A  I have some, I have some understanding of it.
11   Q  But you don't have any understanding specifically
12   concerning how the escrow provisions of Section 6 operate;
13   is that correct, sir?
14        MR. FALBY:  Objection; beyond the scope, your
15   Honor.
16        THE COURT:  It seems like it is, Mr. McGlynn.
17        MR. McGLYNN:  Well, I did inquire --
18        MR. FALBY:  I didn't ask him --
19        THE COURT:  No.  Mr. McGlynn.  It seems like it is,
20   and I invited him to answer.
21        MR. McGLYNN:  May I have --
22        THE COURT:  Mr. McGlynn.  Yes.
23        MR. McGLYNN:  Yes.  I'm sorry, I'm having trouble
24   hearing you, your Honor.
25        THE COURT:  It's my fault.  My impression is it's
```

```
1    beyond the scope.  What do you say about that?
2           MR. McGLYNN:  We did explore it on direct
3    examination and I believe this witness said he didn't have
4    any understanding.
5           THE COURT:  Well.
6           MR. McGLYNN:  I'm just reinforcing that or
7    reconfirming that.
8           THE COURT:  Yes.  But I have the direct.
9    Sustained.
10          MR. McGLYNN:  All right.  I have nothing further,
11   your Honor.
12          THE COURT:  Anything else, Mr. Falby?
13          MR. FALBY:  Just, just on the notes.
14                    RECROSS-EXAMINATION
15   BY  MR. FALBY
16   Q   Did you keep notes of important conversations on all the
17   loans you serviced?
18   A   Most of them.  Almost all of them.
19   Q   And did you keep the notes all in one chronological book
20   as to all loans you were servicing at that point in time?
21   A   I don't understand the question, I'm sorry.
22   Q   Mr. McGlynn read a question, do you keep a notebook for
23   each of the loans within your portfolio?  The answer was:
24   No.
25          And then the question two questions later was:  And
```

124

1    this notebook could have notes in there from several
2    different loans; is that correct?
3         Yes, you answered.
4         My question to you is, would you just explain your
5    practice about keeping notes and whether you have a notebook
6    for each loan or whether you keep all notes about the loans
7    you're working on at any particular time in one notebook?
8         MR. McGLYNN:  Objection as to form, your Honor.
9         THE COURT:  Overruled.
10   A   I understand.  I keep a notebook and I keep it
11   chronologically so that if something comes up on a loan I
12   would just make an entry for that loan.  So it is for many
13   different loans over a period of time.
14   Q   And Exhibit U-1, just for the record, contains only the
15   conversations with Blue Hills because we crossed out all the
16   other ones?
17   A   That's correct.
18        MR. FALBY:  Nothing further, your Honor.
19        THE COURT:  And nothing further for this witness?
20        MR. McGLYNN:  Nothing further here, your Honor.
21        THE COURT:  You may step down.
22        THE WITNESS:  Thank you.
23        (Whereupon the witness stepped down.)
24        THE COURT:  Call your next witness.
25        MR. McGLYNN:  Your Honor, at this time because of