UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC, | ) |
|      Plaintiff/Defendant-in-Counterclaim | ) |
| | ) |
| v. | )   Civil Action No. 05-CV-10506 (WGY) |
| | ) |
| J.P. MORGAN CHASE BANK, as Trustee for | ) |
| the Registered Holders of Credit Suisse First | ) |
| Boston Mortgage Securities Corp., Commercial | ) |
|  Mortgage Pass-Through Certificates, | ) |
| Series 1999-C1 | ) |
|      Defendant | ) |
| | ) |
| and CSFB 1999 – C1 ROYALL STREET, LLC | ) |
|      Defendant/Plaintiff-in-Counterclaim | ) |
| | ) |
| and | ) |
| | ) |
| WILLIAM LANGELIER and | ) |
| GERALD FINEBERG | ) |
|      Defendants-in-Counterclaim | ) |

**MEMORANDUM OF BLUE HILLS OFFICE PARK LLC,
GERALD FINEBERG AND WILLIAM LANGELIER ON IMPLIED
COVENANT OF GOOD FAITH AND FAIR DEALING**

## I. INTRODUCTION

Pursuant to the Court's request on October 3, 2006, Blue Hills Office Park LLC, Gerald Fineberg and William Langelier (collectively, "Blue Hills") submits this memorandum as to the application of the implied covenant of good faith and fair dealing to the evidence adduced at trial. In particular, this memorandum addresses the bad faith actions undertaken by J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1, and CSFB 1999-C1 Royall Street, LLC (collectively, "the Lender") to not only deny Blue Hills access to its

*own* money but to wrongfully default Blue Hills so as to acquire the real property and a building

thereon located at 150 Royall Street, Canton, Massachusetts and known as the Blue Hills Office

Park (the "Property") at a bargain price at the foreclosure sale.

## II. LEGAL ANALYSIS

**A.     The Implied Covenant of Good Faith and Fair Dealing.**

**1.     Definition of the Duty.**

The implied covenant of good faith and fair dealing in every contract in Massachusetts,

requires the parties to "deal honestly and in good faith in both the performance and enforcement

of the terms of their contract . . . ."  *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200

(1993); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental*

*Retardation*, 424 Mass. 430 (1997).  This implied covenant – a term of every contract – serves to

guaranty that the parties "remain faithful to the intended and agreed expectations of the parties in

their performance."  *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385

(2004); *Ayash v. Dana-Farber Cancer Institute*, 443 Mass. 367 (2005) (covenant of good faith

"exists so that the objectives of the contract may be realized").  The implied covenant of good

faith and fair dealing provides that a party "shall [not] do anything which will have the effect of

or injuring the rights of the other party to receive the fruits of that contract."  *Drucker v. Roland*

*Wm. Jutras Associates, Inc.*, 37 Mass. 383, 385 (1976) citing *Uproar Co. v. National*

*Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir. 1936).  Moreover, a duty, although not expressed,

may be implied to obligate a party to take positive steps to cooperate in achieving another party's

contractual rights and objectives.  *Robert Brennan, et al. v. Carvel Corporation*, 1989 U.S. Dist.

LEXIS 16104 (D. Mass. July 25, 1989), citing *L.L. Hall Constr. Co. v. United States*, 379 F.2d

559 (Ct. Cl. 1966).

**2.    The Implied Duty Proscribes Misleading and Deceptive Behavior.**

"Recovery under the implied covenant 'requires conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage.'" *Jennings v. Nathanson*, 404 F.Supp. 2d 380, 399 (D. Mass. 2005), quoting *Christensen v. Kingston Sch. Comm.*, 360 F.Supp. 2d 212, 216 (D. Mass. 2005). "Harms suffered in a breach of the implied covenant of good faith and fair dealing generally involve deceit or 'unfair subterfuge' and usually are compounded by deceptive or unfair behavior that prevented – or at minimum diverted – the injured parties from seeking immediate redress." *Christensen v. Kingston Sch. Comm.*, 360 F.Supp. 2d at 226, quoting *Boston Pilots v. Motor Vessel Midnight Gambler and E. Coast Excursions, Inc.*, 357 F.3d 129, 135 (1st Cir. 2004). It is actionable for a party to knowingly and intentionally fail to comply with the "reasonable expectations" that a party willingly fostered. *Ugarit, Inc. v. Citizen's Bank of Massachusetts*, 2005 WL 2527392*3 (Mass. Super. June 3, 2005) ("failure by [a bank] to comply with the reasonable expectations that the loan officer allegedly knowingly and intentionally fostered, could constitute a breach of the implied covenant of good faith and fair dealing, as well as a [violation] under Chapter 93A").

**3.    The Implied Duty of Good Faith Can Override Express Terms of a Contract.**

Blue Hill's claim for breach of the implied covenant of good faith and fair dealing does not conflict with express contractual terms. In particular, Blue Hills does *not* contend it is a party to the Pooling and Servicing Agreement dated October 11, 1999 (Trial Exhibit 186) nor that it is entitled to any direct recovery thereunder. Even if, for the sake of argument, it did, Blue Hills has introduced significant evidence demonstrating that Lender and Blue Hills undertook a

course of conduct and engaged in a pattern of business activity that, at minimum, alters or ameliorates several contractual provisions.

To the extent, if any, that express contractual terms clash with Blue Hills' claims, such terms may be subordinate to Lender's duties by virtue or the power of the implied duty of good faith to override a range of express contractual terms. *Bohne v. Computer Associates International, Inc.*, 2006 WL 242335*4 (D. Mass. August 22, 2006) see also, *K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 759-60 (6th Cir. 1985) (ruling that the obligation of good faith imposed a duty on the defendant to give a period of notice to K.M.C. before refusing to advance funds under the loan agreement, as was defendant's right under the agreement); *Shell Oil Co. v. Marinello,* 63 N.J. 402) (N.J. 1973) (holding that the implicit duty of fair dealing precluded arbitrary termination even through the franchise agreement provided for termination without cause, because of the Franchisors "grossly disproportionate "bargaining power"). Thus, it logically follows that contract provisions may be overridden when those provisions operate in a way that is contrary to the covenant of good faith and fair dealing. *Bohne v. Computer Associates International*, 2006 WL 2423335*4, citing *Fortune v. National Cash Register Co.*, 373 Mass. 96, 104-05 (1977). Certainly, Lender may not refrain from its duties to act in good faith (as evidenced by several e-mails sent between and among LNR employees) to frustrate Blue Hills' legitimate aims and actions.

**B.    Lender's Deceptive and Duplicitous Actions.**

**1.    Introduction.**

Blue Hills does not contend that LNR was contractually obligated to work out the Loan; it wasn't. LNR was obligated, as part of its duty to perform its services in accordance with the Servicing Standard, to, at minimum, *explore* a work-out possibility with Blue Hills. *See, e.g.,*

Pooling and Servicing Agreement, Sections 3.01, 3.21, 3.09, 3.21. Trial Exhibit 186. Nonetheless, it pursued its default and failure remedies based on the pretext that Blue Hills had failed to pay the August 2, 2004 tax payment. No effort to assist Blue Hills or its principals to resolve matters by allowing them to provide the allegedly delinquent payment was ever attempted. In fact, Joseph Polcari ("Polcari") testified that although he considered giving Blue Hills four days to pay the outstanding taxes, he ultimately failed to do this. Polcari Testimony, Vol. 5, pages 70-71. Had LNR advised Blue Hills that it had to either arrange for payment or risk default on a $31 million loan and Blue Hills refused, that would have been the end of the debate. Despite having worked with Blue Hills to negotiate consensual deals on other properties owned by Blue Hills' principals, LNR refused to *communicate* with Blue Hills with respect to this Property. See Trial Exhibits 179-181. Unfortunately, LNR – in derogation of its implied duties of good faith and fair dealing – never pursued this path.

The existence of a $4.1 million dollar reserve of *Blue Hills'* money make for strong parallels between the instant case and those cases in which a party acting with subterfuge and unfair behavior to deny a party money due and owed to it. See *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d at 226; *Jennings v. Nathanson*, 404 F. Supp. 2d at 398. In fact, the evidence adduced at trial demonstrates that not only did the parties modify their agreement through course of conduct but that Lender acted to lull Blue Hills into a false sense of security so that it could possibly obtain the Property at a bargain price, *and* grab the millions in Blue Hills' reserve account.

> 2.    **The Lender Leads Blue Hills into Believing that the Parties Would Cooperate to Insure Timely Payment of Taxes.**

Significant evidence was adduced at trial not only as to Lender's refusal to meet with Blue Hills, but of Lender's intentional diversion, deception and subterfuge designed to gain control of the Property.

Although Section 6 of the Mortgage required Blue Hills to fund a reserve account for the payment of real estate taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement in October 1999.  Pursuant to this arrangement, rather than requiring Blue Hills to deposit tax reserves monthly, Wells Fargo allowed Equiserve to deposit the real estate tax payment into the Clearing Account (Lockbox) at Metrowest Bank (subsequently BankNorth) so that the funds could be swept and used by Wells Fargo to pay the taxes.  Donovan Testimony, Vol. 2, page 104, lines 5-9; lines 24 - 25; page 105, lines 1-3; Trial Exhibit 53.  Implicit in this arrangement was the possibility that Equiserve might be late in paying its taxes.

Thus, as a result, shortly before the taxes were due each quarter, Wells Fargo would issue a so-called "tax insufficiency" notice advising Blue Hills that the taxes were due.  Donovan Testimony, Vol. 2, page 105, lines 4-24; Trial Exhibits 55, 65, 120, 136.  Wells Fargo sent these "tax insufficiency" notices four times each year.  The notices were sent approximately two to three weeks prior to the quarterly tax being due to the Town of Canton.  Donovan Testimony, Vol. 2, page  105, lines 11-18.

Each tax insufficiency notice merely stated that the either the failure to pay may result in penalties or interest to be assessed by the Tax Collector or that a $500 fee may be assessed to the Loan.  See, e.g. Trial Exhibits 55, 65, 120 and 136.  In fact, the last notice received from Wells Fargo before Blue Hills was defaulted for failing to pay real estate taxes, dated July 16, 2004, states that "failure to remit the shortage amount within the specified time frame *may result in*

*Wells Fargo Bank advancing corporate funds. Should this occur, a $500.00 fee would be assessed to your loan*." (emphasis added)  Trial Exhibit 65. Wells Fargo never sent Blue Hills any notice indicating that nonpayment or late payment of real estate taxes would result in any consequence other than those stated in the tax insufficiency letters.   Donovan Testimony, Vol. 2, page 108, lines 2-10; Trial Exhibits 55, 65, 120, 136.

In accordance with the alternative arrangement between Blue Hills and the Lender, after Equiserve deposited funds for payment of the real estate taxes into the Clearing Account, the funds were swept by and transferred to Wells Fargo.  If the funds needed to be transferred on a day other than a day when the funds would be automatically swept by Wells Fargo, Blue Hills requested the Clearing Bank to wire the funds to Wells Fargo.  Donovan Testimony, Vol. 2, page 108, lines 11-22; Trial Exhibits 119, 120,121, 122.  After Equiserve made the quarterly tax payment and deposited the funds, Blue Hills alerted Wells Fargo that the funds were available. Donovan Testimony, Vol. 2, page 111, lines 1-6; Trial Exhibit 146.  Blue Hills communicated informally with Wells Fargo by telephone calls, e-mails , faxes and letters from 1999 - 2004. Donovan Testimony, Vol. 2, page 111, lines 7-25.  Trial Exhibits 127, 128, 129, 130, 131, 132. At no time did Blue Hills and Wells Fargo adhere to any formal notice requirements when communicating with each other.  Thus, Lender seeks to transmogrify what should be, at worst, a $500 late payment fee into a multi-million dollar bonus.

In addition, Blue Hills communicated with Wells Fargo with respect to various issues in addition to the payment of real estate taxes.  For example, at times, Blue Hills also requested Wells Fargo - by e-mail, fax, telephone or letter - to perform insurance escrow analyses so that Blue Hills could be reimbursed for amounts advanced by Blue Hills for the payment of insurance or for excess funds in the insurance escrow account.   In response to Blue Hills' requests, Wells

Fargo completed the analyses and refunded any excess funds to Blue Hills.  Donovan Testimony, Vol. 2, page 112, lines 2 - 24; Trial Exhibits 123, 124, 125 133, 134.  Again, no formal notice requirements were necessary to effect these reimbursements.

From 1999 - 2004, Blue Hills or Fineberg Management, Inc. ("FMI") sent various notices to Wells Fargo, none of which complied with the formal notice provisions set forth in paragraph 39 of the Mortgage.  At no time did Wells Fargo or any other representative of the Lender object to the form of Blue Hills' communications.  Donovan Testimony, Vol. 2, page 115, lines 24-25; page 116, lines 1-20.  Thus, not only was Blue Hills justified in expecting a continuation of this process, but an unequivocal course of conduct altering the Mortgage is manifest.

### 3.    Despite the Course of Dealings, Lender Enforces "the Contract" as if Certain Events Never Happened.

As early as the Spring of 2004, LNR knew that, despite Blue Hill's efforts, there was a distinct possibility that a substitute for Equiserve, the Property's sole tenant, would not be found.  Any such failure would have severe repercussions for Blue Hills' ability to service the Loan.  See, e.g., Trial Exhibits 196-200.  Because Equiserve would leave the Property as of July 31, 2004, funds were not available to pay the real estate taxes due to the Town of Canton on August 2, 2004.  Donovan Testimony, Vol. 2, page 132, lines 7-16; Trial Exhibit 70.

On August 2, 2004, Blue Hills' representative Joseph Donovan ("Donovan"), the CFO of FMI, sent a written request to Wells Fargo seeking disbursement of the sum of $412,833.43 from the reserve accounts.  This disbursement was intended by Donovan to be used to pay principal and interest due on the Note for the month of August, 2004, as well as to pay quarterly real estate taxes.  Trial Exhibit  70; Donovan Testimony, Vol. 2, page 119, lines 3-14.

After sending the August 2, 2004 letter to Wells Fargo, Donovan contacted the Town of Canton Treasurer's Office, which verified to Donovan that the taxes had been paid.    Donovan

Testimony, Vol. 2, page 132, lines 7-16.  Consequently, Donovan reasonably assumed that the tax payment was made from the reserve accounts.  Donovan Testimony, Vol. 2, page 132, lines 7-16.  In fact, Wells Fargo paid $158,181.19 in property taxes due to the Town of Canton by August 2, 2004.  Polcari Testimony, Vol. 5, page 83, lines 8-12; page 84, lines 19-24.

Donovan received no response from Wells Fargo to his August 2, 2004 letter.  Donovan Testimony, Vol. 2, page 131, lines 13-21.  Donovan then sent a subsequent letter to Wells Fargo dated August 5, 2004 requesting a meeting with Wells Fargo and LNR, the Special Servicer.  Trial Exhibit 72;  Donovan Testimony, Vol. 2, page 132, lines 117-124.  Donovan also received no response from Wells Fargo to his August 5, 2004 letter.  Donovan Testimony, Vol. 2, page 3-6.

Having received no response from Wells Fargo, on August 13, 2004 Donovan sent a fax memorandum to Curtis Mallegni at Wells Fargo stating:  "Sorry we have been missing each other on the phone.  I would like to get the special servicer involved."  Donovan attached copies of his August 2 and August 5, 2004 letters to the memorandum.  Trial Exhibit  75.  Donovan Testimony, Vol. 2, page 135, lines 1-3; page 136, lines 11-20.  Again, Donovan received no response from Wells Fargo to the requests contained in his August 2, August 5, and August 13, 2005 letters.  Donovan Testimony, Vol. 2, page 136, lines 2-25; page 137, lines 1-2.

As discussed, *supra*, the delineated events are contrary to the established course of dealing between the parties and, thus, contrary to established and reasonable expectations.  Moreover, Blue Hills' expert, Richard Clarke ("Clarke"), opined that LNR and Wells Fargo violated the servicing standards, as discussed *infra*, by their "failure to respond to repeated meeting requests by the borrower."  Clarke Testimony, Vol. 6, page 8-9.

4.    **Donovan's Requests Were Timely.**

While Section 6(c)(ix)(a) of the Mortgage states, "Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement, or written request," this section does not define the term "delivered."  Trial Exhibit 5.

Section 39 of the Mortgage requires that "notices shall be deemed to have been given on the date that they are actually received; provided, that the inability to deliver Notices because of a changed address will be deemed to be receipt of the Notice as of the date of such inability to deliver."  Trial Exhibit 5.  Section 39 of the Mortgage also requires that such "notices" be provided to Credit Suisse and to ORIX Real Estate Capital Markets LLC ("ORIX"), the (then) Servicer.  However, by August 2004, J.P. Morgan – not Credit Suisse – was the Lender and Wells Fargo – not ORIX – was the Servicer.    Trial Exhibit 5; Stipulated Facts, No. 29.

Donovan's August 2, 2004 letter was addressed to Tim Parish ("Parish") in the Wells Fargo's Property Tax Department because Parish signed Wells Fargo's July 16, 2004 tax insufficiency letter.   Donovan Testimony, Vol. 2, page 119, lines 9-17.  Trial Exhibit 65. Moreover, Wells Fargo's records show that Donovan's August 2, 2004 letter was logged in as received as of August 4, 2004.  See Trial Exhibit 114.  Thus, even assuming that Wells Fargo did not receive Donovan's letter before August 4, 2004, Donovan's letter was only one day late. Trial Exhibit 114.  More importantly, the notice provisions contained in Section 39 of the Mortgage were not strictly adhered to by Wells Fargo or Blue Hills at any time from 1999 through 2004, including the September 17, 2004 default letter to Blue Hills.  Polcari Testimony, Vol. 5, page 68, lines 1-11.

5.    **The Lender Breached its Implied Duties by Ignoring Valid Requests.**

Wells Fargo did not respond to Donovan's requests for a meeting nor his requests for disbursements, as contained in his correspondence of August 2, 5 and 13, 2004.  Moreover, prior to September 17, 2004, Wells Fargo never sent Blue Hills a notice informing Blue Hills a failure to pay the real estate taxes constituted an Event of Default under the Loan.  Donovan Testimony, Vol. 2, page 131, lines 13-21; page 133 lines 3-6. Job Warshaw ("Warshaw"), an LNR asset manager, left Donovan a voice mail message in August 2004, but did not mention Donovan's requests for access to the reserves or for a meeting with the Lender.  Donovan Testimony, Vol. 2, page 137, lines 3- 16; Trial Exhibit 72.

By letter dated August 19, 2004, but not faxed until August 24, 2004, Warshaw notified Blue Hills that the Loan servicing had been transferred to LNR and that LNR looked forward to a "successful working relationship" with Blue Hills.  No mention was made of Blue Hills' requests for disbursements nor was mention made of the existence of any defaults under the Loan.  Trial Exhibit 79; Stipulated Facts, No. 54.

Warshaw also sent Blue Hills a letter dated August 19, 2004, but not faxed until August 24, 2004, in which he stated that LNR had "agreed to discuss the status of [the Loan]…" and "any issues arising under [the Loan documents].    Trial Exhibits 80-81; Stipulated Facts, No. 55.

The second August 19, 2004 letter from Warshaw included a list of documents requested by LNR.  All of the documents requested, except for Fineberg and Langelier's updated financial statements and a business plan, were already in by LNR or Wells Fargo's possession.  Donovan Testimony, Vol. 2, page 142, lines 11-25; page 143, lines 1-18; Donovan Testimony, Vol. 3, page 7, lines 9-5; page 8, lines 1-19; Trial Exhibit 143.

Kenneth Goldberg ("Goldberg"), counsel for Blue Hills, had a conversation with Warshaw on or about August 25, 2004 regarding the August 19, 2004 letter to be signed by Fineberg. Thereafter, on August 26, 2004, Fineberg signed the letter received from LNR on August 24, 2006 and faxed the signed copy to LNR. Although Fineberg had signed this letter and LNR or Wells Fargo had virtually all of the requested documents, LNR did not schedule a meeting. Stipulated Facts, No. 56; Donovan Testimony, Vol. 2, page 142, lines 11-25; page 143, lines 1-18; Donovan Testimony, Vol. 3, page 7, lines 9-5; page 8, lines 1-19; Trial Exhibits 82, 83 and 143.

Goldberg and Warshaw discussed a meeting to be scheduled between the Lender and Blue Hills. Goldberg invited Warshaw to visit the Property and to assess the market at Blue Hills' expense. Warshaw responded that he didn't think it was possible for him to get to Boston before Labor Day, 2004. Goldberg had a subsequent conversation with Warshaw which concluded with Warshaw indicating that he intended to review the Loan Documents so that the next communication could be more productive.

On September 2, 2004, Donovan wrote to Wells Fargo requesting the disbursement of $254,652.24 to pay principal and interest due on the Note for the month of September, 2004. Donovan Testimony, Vol. 3, page 20, lines 4-16; Trial Exhibit 87. Again, Donovan received no response until the September 17, 2004 default letter. On September 7, 2004, Polcari replaced Warshaw as asset manager at LNR. Polcari's first contact with Blue Hills was the default letter dated September 17, 2004. Stipulated Facts, No. 58. When Polcari replaced Warshaw, he did not contact Blue Hills to schedule a meeting, as Goldberg and Warshaw had agreed upon.

In his September 17, 2004 letter, Polcari informed Blue Hills that its request for disbursement of real estate taxes had been denied, purportedly because the Mortgage did not

permit such disbursements.  Moreover, he declared that – as of August 2, 2004 – Blue Hills was in default under the Loan for failure to pay real estate taxes when due.  Trial Exhibit 88; Stipulated Facts, No. 59.  This September 17, 2004 default letter is the only written notice of default ever sent to Blue Hills.  Trial Exhibits 117, 118, 88; Polcari Testimony, Vol. 5, page 60, lines 19-25; page 61, lines 1-13.

Despite Warshaw's August 19, 2004 letters advising Blue Hills that LNR looked forward to working with Blue Hills and would meet with Blue Hills to discuss the Loan status, LNR never had any intention to do so.  Lender through its agents, was not willing to meet with Blue Hills' representatives following Donovan's request for a meeting.

Despite indications by its agents to the contrary, Lender never intended to meet with Blue Hills' representatives.  Lender refrained from cooperating with Blue Hills in the hope that Blue Hills would default before it could gain access to the reserve accounts.

### 6.    Lender's Agent Violated the PSA and the Servicing Standard.

The Servicing Standard contained in Section 3.01 of the PSA establishes the touchstones governing Wells Fargo and LNR's conduct.  The Servicing Standard mandates that Wells Fargo and LNR must conduct themselves in accordance with the higher of two standards: (1) the standard of care, skill, prudence and diligence employed in administering similar commercial or multi-family mortgage loans or, (2) standard of care, still, prudence and diligence employed in servicing and administering similar commercial or multi-family mortgage loans owned by Wells Fargo or LNR.  The Servicing Standard also obligates LNR and Wells Fargo to perform their services without regard to: (1) any relationship they or any affiliate may have had with the Blue Hills; (2) any compensation to be received under the PSA; and (3) their ownership, servicing or management of any other mortgage loans or mortgage properties.  Trial Exhibit 186.

Blue Hills' banking expert, Clarke, opined that borrowers involved in securitized loan transactions have the right to expect that their loans will be administered by the Servicer and Special Servicer according to the Servicing Standard. Clarke Testimony, Vol. 6, page 60, lines 14-18; Trial Exhibit GE. Although the over-arching objective contained in Section 3.01 of the PSA is for the Servicer or Special Servicer to maximize "on a present value basis (discounting at the related Mortgage Rate)… timely recovery of interest and principle on the Loans …," standards of prudency dictate how that objective is best achieved. Clarke Testimony, Vol. 6, page 9, lines 1-6; Trial Exhibit 186.

Both Wells Fargo and LNR substantially deviated from the Servicing Standard, as well as the applicable industry standards for third party loan servicing. Clarke Testimony, Vol. 6, page 8, lines 20-21. A typical lender would have gone to much greater lengths to give proper notices and to communicate with the borrower. Clarke Testimony, Vol. 6, pages 11 and 12. Wells Fargo's and LNR's internal e-mails from August through November 2004, reveal that they awaited an opportunity to acquire the $4.1 million in reserves, as well as to quickly commence foreclosure proceedings or otherwise acquire the Property. Trial Exhibits 196-208.

**7.    Lender's Bad Faith is Manifest in Several E-Mail Messages.**

As early as April 2004, the Lender's internal e-mails reveal its desire for Blue Hills to default and for the Lender to retain the amounts in the reserve accounts. For example, Lender expressed its belief that the Blue Hills Loan "will hit CSFB99-C1 hard." Trial Exhibit 196. In addition, the Lender's e-mails reveal its awareness that Equiserve would move out in July 2004, that Gerald Fineberg was the borrower, and that it was "worried to death about this asset." Trial Exhibit 197. The Lender also expressed its desire that the reserves to which Blue Hills has access is "just a leasing reserve and that the Borrower will be forced to default," (Trial Exhibit

- 14 -

198) and its concern that "the borrowers could just draw off the reserves and all [we] would get is the empty building with an exhausted reserve." Trial Exhibit 200. LNR desired to control the servicing of the Loan as early as April 2004 and described the situation as "FUGLY" and a "fein potential mess." Trial Exhibit 199.

In fact, LNR had been monitoring the Loan for almost a year before the foreclosure of the Property on November 19, 2004. Trial Exhibits 188-208; Polcari Testimony, Vol. 5, page 13, lines 2-11. LNR's prior dealings with Fineberg also led it to conclude that Fineberg would be a hard negotiator in any Loan work-out. Trial Exhibit 191. LNR's intent to acquire the Loan while simultaneously being predisposed against working with Fineberg based on LNR's past dealings with him is unprofessional and contravenes prudent servicing standards. Clarke Testimony, Vol. 6, pages 36-37.

The aforesaid actions reveal not only a lack of honesty and good faith in the performance and enforcement of contract terms but demonstrate conduct – undertaken in bad faith – to deprive Blue Hills of significant fruits; to wit, the Property and approximately $4.1 million in reserves. *See, Jennings v. Nathanson*, 404 F.Supp. 2d at 399; *Christensen v. Kingston Sch. Comm.*, 360 F.Supp. 2d at 266. The egregious nature of Lender's actions is compounded by the fact that – by virtue of equity in the Property and significant reserves – foreclosure was not necessary to protect Lender's interests. Rather, Lender acted not only to enrich itself but did so as to deprive Blue Hills of significant economic fruit.

### III. <u>CONCLUSION</u>

For the foregoing reasons, judgment as to liability should be entered in Blue Hills' favor and Blue Hills should be allowed to proceed to introduce evidence of its damages attributable to Lender's breach of the implied covenant of good faith and fair dealing.

BLUE HILLS OFFICE PARK LLC, WILLIAM
LANGELIER AND GERALD FINEBERG,
By their attorneys,


 /s/ Meredith A. Swisher
Peter B. McGlynn, Esquire, BBO No. 333660
Meredith A. Swisher, Esquire, BBO No. 646866
Bernkopf Goodman LLP
125 Summer Street, Suite 1300
Boston, Massachusetts  02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300
pmcglynn@bg-llp.com
Dated: October 11, 2006        mswisher@bg-llp.com
#347143 v3/14500/9985