UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

     Plaintiff, Defendant-in-Counterclaim.

     v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

     Defendants, Plaintiffs-in-Counterclaim,

     v.

WILLIAM LANGELIER and GERALD
FINEBERG,

     Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
OF DEFENDANTS AND PLAINTIFFS-IN-COUNTERCLAIM J.P. MORGAN
CHASE BANK, AS TRUSTEE, AND CSFB 1999-C1 ROYALL STREET LLC
ON THEIR COUNTERCLAIMS**

     The defendants and plaintiffs-in-counterclaim, J.P. Morgan Chase Bank, as Trustee for

the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial

Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee") and CSFB 1999-C1 Royall

Street LLC ("CSFB") (together with the Trustee, the "Lender"), propose the following findings

of fact and conclusions of law on their counterclaims.

## FINDINGS OF FACT

**Blue Hills Borrows $33 Million**

1.      Gerald Fineberg and William Langelier, sophisticated and experienced real estate investors, have owned and controlled the real property and improvements known as the Blue Hills Office Park and located at 150 Royall Street in Canton, Massachusetts since 1987. Langelier, TT 1 at 27-32, 74-76, 108-09; Ex. 2.[1]

2.      Fineberg and Langelier formed the Royall Associates Realty Trust ("Royall Associates") in 1987 specifically to take title to the property; Messrs. Fineberg and Langelier were the trustees and principal beneficiaries of Royall Associates.  Langelier, TT 1 at 31-33, 63; Ex. 1.

3.      Since about 1989, the property's sole tenant had been an affiliate of the Bank of Boston known as Boston Equiserve Limited Partnership ("Equiserve").  Langelier, TT 1 at 39-41; Ex. 3.  In mid-1999, Equiserve exercised an option to extend its lease until July 31, 2004, and it had an additional option to extend for another five years after that.  Id.

4.      With this 5-year lease extension in place, Fineberg and Langelier sought a loan (the "Loan") from Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse") to refinance the mortgage on the property, which they knew would be a securitized loan secured by, inter alia, a mortgage on the property.  Langelier, TT 1 at 42-45.

5.      As part of the refinancing transaction, Credit Suisse required the formation of a single purpose entity, plaintiff Blue Hills, to which Royall Associates conveyed the property. Langelier, TT 1 at 49-50.  As Mr. Langelier testified, the formation of Blue Hills was an "absolute requirement" of the lender.  Id.  Credit Suisse was unwilling to lend money to Royall

---

[1] References to trial testimony are to the last name of the witness (e.g., Langelier), the volume of the trial transcript (e.g., TT 1), and the page(s) of the transcript (e.g., at 27-32).

Associates. Cohn, TT 4 at 82. Credit Suisse also required that Blue Hills maintain its single purpose entity status throughout the life of the Loan; specific single purpose entity covenants and requirements are set out in Section 12 of the Mortgage (titled "Single Purpose Entity/Separateness"). Ex. 5 § 12. Royall Associates is the sole member of Blue Hills. Langelier, TT 1 at 62. Fineberg and Langelier are the principal beneficiaries of Royall Associates.[2] Id.

6.    The Loan closing was held on September 14, 1999, at which time Blue Hills executed a mortgage note (the "Note") to Credit Suisse in the principal amount of $33,149,000; a Mortgage, Assignment of Leases and Rents, and Security Agreement (the "Mortgage"); and a Cash Management Agreement (the "CMA"). Langelier, TT 1 at 65-66; Exs. 4, 5, 6. Fineberg and Langelier also executed a guaranty (the "Guaranty") of the Loan. Ex. 7.

7.    Blue Hills received approximately $5.2 million in excess proceeds from the Loan, $4 million of which was immediately distributed to the beneficiaries of Royall Associates. Langelier TT 1 at 67. About $1.2 million was held in a so-called "rainy day account" in a client funds account at Bernkopf Goodman (lawyers for Fineberg and his various entities) in the name of Royall Associates; this money was owned and controlled by Fineberg and Langelier and was not subject to any restriction or lien by the lender. Langelier TT 1 at 68-71; Cohn, TT 4 at 42-47; Ex. 182.

8.    Because the Loan was generally non-recourse, the interest conveyed by the Mortgage, defined as the "Mortgaged Property," was very broad. The Mortgaged Property

---

[2] Fineberg and Langelier, initially the only partners of Royall Associates, subsequently admitted additional minority partners who received small portions of their beneficial interests. Langelier and the minor partners related to him are referred to as the "Langelier Beneficiaries;" Fineberg and the minor partners related to him are referred to as the "Fineberg Beneficiaries."

included Blue Hills' land, defined as the "Premises;" its building, defined as the

"Improvements;" and all its other property, rights, interests and estates, tangible and intangible,

described in eight comprehensive granting clauses of the mortgage.  Mortgage (Ex. 5) pp. 1-3.

Granting Clause Seven included as part of the Mortgaged Property "causes of action that now or

hereafter relate to [or] are derived from" the Mortgaged Property.  Granting Clause Eight made

any proceeds of such a lawsuit part of the Mortgaged Property as well.  To protect the value of

the Mortgaged Property, the Mortgage required the Lender's prior written consent to any

conveyance or transfer of any part of the Mortgaged Property.  Mortgage § 10(a).

9.     As planned, in or about November 1999, the Loan was securitized with a pool of

approximately 150 other loans.  In this process, Credit Suisse assigned the Loan to J.P. Morgan

Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Pass-

Through Certificates, Series 1999-C1 (the "Trustee"; together with its assignee CSFB 1999-C1

Royall Street, LLC, the "Lender").  Ex. 186.

**Fineberg Management**

10.     Since the 1970s, Fineberg has owned a company called Fineberg Management,

Inc., which is a real estate management company.  Fineberg Management managed the Property

from the time Langelier and Fineberg acquired it until Defendants' foreclosure in November

2004.

**The Lockbox and the Escrow Funds Held By Lender**

11.     As additional security for the Loan, the Loan Documents required (a) that Blue

Hills deposit (or cause to be deposited) all rents received in connection with the property into an

account at its bank referred to as the "Lockbox," which was located in Massachusetts, and

(b) that in addition to principal and interest payments, Blue Hills make monthly payments to

fund certain escrow accounts held by the Lender.  Ex. 5 § 6; Cash Management Agreement (Ex.

6) § 6.  Under the Note and Mortgage, Blue Hills' principal and interest payments of

$254,652.24 on the Loan were due on the 11th of each month.  Note (Ex. 4) at p. 1.  Blue Hills'

monthly payments to fund the escrow accounts (also referred to as the "reserve accounts") were

also due on the 11th of each month.  Mortgage § 6(a).

**Blue Hills Tries to Extend the Equiserve Lease**

12.     Blue Hills knew that its lease with Equiserve would expire in July 2004, unless

Equiserve exercised its option to extend the term of the lease an additional five years.  Langelier,

TT 1 at 81.  Therefore, in early 2002, Blue Hills began its effort to extend Equiserve's presence

in the building past July 2004.  Langelier, TT 1 at 81.  Blue Hills believed that the property

would be best served by keeping Equiserve in the office park.  Frank, TT 6 at 125.

**Zoning Appeal Lawsuit**

13.     In April 2003, however, Blue Hills learned that Equiserve and National

Development (the owner of "Blueview," the office building next to the property) had applied for

a special permit to build a parking garage at Blueview that would block the view from the

property.  Langelier, TT 1 at 124.

14.     Blue Hills learned that DST Realty, Inc. (an affiliate of Equiserve) had entered

into a purchase and sale agreement to buy Blueview, and that Equiserve planned to move out of

Blue Hills Office Park and into Blueview.  Fineberg, TT 7.  The purchase and move, however,

were conditioned on special permit approval of the parking garage by the Town of Canton.

Langelier TT 1 at 118-19; Fineberg, TT 7.

15.     On May 14, 2003, Equiserve notified Blue Hills of its intention not to extend its

lease past July 31, 2004.  Langelier, TT 1 at 84-85; Exs. 17, 18.

16.     On May 22, 2003, Larry Needle (Blue Hills' property manager) and Gary

Lillienthal (an attorney representing Blue Hills), attended a Town of Canton Zoning Board of Appeals hearing to oppose Equiserve's special permit application. Ex. 19. Lillienthal introduced Blue Hills as an abutter and stated that the proposed garage (which would add hundreds of parking spaces to the Blueview property) would have a major effect on traffic and obstruct the view of Blue Hills from the south-west (i.e., from Route 128). Ex. 19 at 3. At the meeting, over Blue Hills' objection, the Town of Canton granted the special permit (the "Special Permit") to Blueview Corporate Center LLC, which was at that time the owner of Blueview. Id. at 3; Ex. 20.

17.    On June 9, 2003, Blue Hills filed a complaint in Norfolk Superior Court appealing the ZBA's decision to grant the special permit. Ex. 21. The zoning appeal lawsuit was part of the Mortgaged Property under Granting Clause Seven for at least three reasons. First, Blue Hills' standing derived from its ownership of the Mortgaged Property. Ex. 21 ¶¶ 1, 43. Blue Hills understood it could appeal the special permit only because it owned the abutting Blue Hills Office Park. Donovan, TT 3 at 88; Fineberg, TT 7. Second, the zoning appeal was based on damage to the property. The complaint stated that the proposed garage "is immediately in the sight line of (the) Property, will partially block its view and will be detrimental and offensive to (Blue Hills) and inhabitants of (the) Property. The addition of 380 spaces in a structured parking facility directly in the sight line of (the) Property…poses a detriment to (the) Property." Ex. 21 ¶¶ 37-38.

18.    Third, Blue Hills hoped that by appealing the special permit, it could delay or prevent the garage from being built and thereby keep Equiserve in the Blue Hills Office Park. Donovan, TT 3 at 88-89; Frank, TT 6 at 127. Blue Hills continued to believe that the best option for the future of the property was for Equiserve to stay at the property. Frank, TT 6 at 127. Two months after it appealed the ZBA decision, however, Blue Hills changed course.

**The Blue Hills Principals Decide to Settle the Appeal**

19.     In early August 2003, Blue Hills' principals caused Blue Hills to settle the zoning appeal in exchange for $2 million.  Langelier, TT 1 at 126; Fineberg, TT 7.  Blue Hills and its principals knew that this settlement would remove any impediment to approval of the garage by the Town of Canton, thus eliminating any possibility of Equiserve staying in the property and clearing the way for Equiserve to move across the street to Blueview.  Donovan, TT 3 at 91-92; Fineberg, TT 7.  Nevertheless, on August 5, 2003, Blue Hills executed a "Settlement Agreement" and a "Lease Termination Agreement" with Equiserve.  Langelier, TT 1 at 40; Exs. 24, 25.  The following day, DST Realty completed its purchase of Blueview.

20.     Under the Settlement and Lease Termination Agreements, Blue Hills agreed to, inter alia: (1) dismiss the zoning appeal, with prejudice (thereby forfeiting its right to contest the grant of the special permit); (2) waive its right to (at any time within 10 years of the date of the Settlement Agreement) "take any direct or indirect action designed or intended to oppose, obstruct, interfere with or prevent DST from obtaining any permit or approval now or hereafter reasonably necessary for Future Development" of the Blueview property; (3) release DST and Blueview from any and all claims which Blue Hills had against DST and/or Blueview prior to or on the date of the Settlement Agreement; and (4) unequivocally terminate Equiserve's lease as of July 31, 2004.  Exs. 24, 25.

21.     The Settlement Agreement provides that the parking garage at the Blueview property would be built in accordance with the same plans (prepared by Vanasse, Hangen, Brustlin, Inc. and last revised on May 18, 2004) approved by the Town of Canton on May 22, 2003, before Blue Hills filed its June 9, 2004 complaint.  See Ex. 19 at 3; Ex. 20 at 3; Ex. 24 at 8.A.

22.     Blue Hills settled the zoning appeal and executed the Lease Termination

Agreement without notifying the Lender or seeking its consent, despite the fact that the rights given up by Blue Hills were part of the Lender's collateral under the Loan Documents. Ex 5, Granting Clauses One, Three, Four, Seven, Eight; Langelier, TT 1 at 40; Fineberg, TT 7; Frank, TT 6 at 130-31.

23.     From Fineberg's and Langelier's perspective, there was good reason not to seek the Lender's consent to the settlement. If Blue Hills had requested the Lender's consent to the settlement, the Lender would not have allowed Blue Hills' principals to keep the $2 million for themselves. Polcari, TT 5 at 87, 112-15. As Blue Hills' banking expert Richard Clarke testified, a request for consent would have given the Lender an opportunity to evaluate the settlement and determine if settling the appeal was in the property's best interests, if so to determine whether the amount of the settlement was appropriate, and if so to condition the settlement on requiring additional loan payments or reserving the proceeds to cover the loss of the sole tenant of the office park. Clarke, TT 6 at 73-75.[3]

24.     Although Fineberg and Langelier considered whether to seek consent to the settlement, Fineberg, TT 7, they decided instead to hide the $2 million Payment from the Lender. The Payment is Mortgaged Property both because it represents the proceeds of other Mortgaged Property, see Mortgage Granting Clause Eight, and because it is a payment made "with respect to the Premises and the Improvements…[for] injury to or decrease in the value of the Premises and Improvements, see Mortgage Granting Clause Three.

25.     No part of the Payment passed through any Blue Hills bank account. Donovan, TT 3 at 93; Stone, TT 8. Blue Hills did not receive the settlement payment and obtained no benefit from the settlement. Frank, TT 6 at 128-29. Blue Hills' CFO Joseph Donovan did not

---

[3] The Lender certainly could have conditioned its consent on a different use of the moneys than just allowing them to flow through the cash management agreement waterfall back to Blue Hills. Clarke, TT 6, at 75.

know if the payment was actually made.  Donovan, TT 3 at 93.  He did not try to determine what happened to the Payment because he believed the settlement was with the owners Fineberg and Langelier, and he was responsible for Blue Hills' operating books, not the owners' books.  Id. at 97-98.

26.    Instead, Fineberg and Langelier had the $2 million Payment transferred to Bernkopf Goodman LLP's IOLTA account on August 8, 2003, and then to an escrow account at Bernkopf Goodman LLP in the name of Royall Associates.  Ex. 145 (record re "Fineberg Royall Associates" account); Goldberg, TT 7.  The Payment was held pursuant to a 1999 letter agreement signed by counsel on behalf of Fineberg and Langelier that gave Fineberg and Langelier complete control over the disposition of the Payment.  Ex. 182; Cohn, TT 4 at 33-34, 43-44.  The Payment was commingled with the $1.2 million of excess proceeds from the 1999 Credit Suisse refinancing.  Cohn, TT 4 at 46-47.

27.    The Payment was not recorded as a receipt in the books of Blue Hills and therefore did not appear in financial statements supplied to the Lender.  Exs. 47, 48.  Blue Hills' outside accountants, Rutfield and Hassey, subsequently accounted for the disposition of the Payment as a transfer from Blue Hills to Royall Associates, as evidenced by a corresponding increase in the "Due From Affiliate" line on Blue Hills' balance sheet for the year ending December 31, 2003.  Compare Ex. 32 at 6763 with Ex. 33 at 6751.[4]  They also recorded the Payment as a reduction in basis, id., confirming that the Payment was made for an injury to or decrease in value of the property.

28.    Blue Hills never provided the Lender with copies of the financial statements prepared by Rutfield and Hassey, which would have reflected the receipt and transfer of the

---

[4] It is immaterial whether the transfer of the Payment to Royall Associates was a loan or a distribution.  See infra.

Payment.  Donovan, TT 3 at 100-02.  The Payment, along with the $1.2 million in excess refinancing proceeds, appears as a cash asset on the balance sheet of Royall Associates, Ex. 27 at 5536, not Blue Hills, Ex. 32, 33.

**Equiserve Vacates and Blue Hills Defaults**

29.    In the year following the secret August 2003 settlement of the zoning appeal, Fineberg and Langelier did nothing to prepare for the possibility that they would be unable to replace Equiserve once it moved out on July 31, 2004.  Although they worked with Cushman and Wakefield to actively market the property, they did not have Blue Hills put any money aside to cover property tax and reserve payments which would still be due when Equiserve left; instead they caused Blue Hills to distribute all of Blue Hills' net rents.  Donovan, TT 3 at 44-45.

30.    In August 2004, Blue Hills failed to pay the quarterly property taxes due to the Town of Canton, and failed to pay the monthly principal, interest, and escrow payments required by the Mortgage.  Donovan, TT 3 at 46-47, 61.  In September 2004, Blue Hills again failed to pay the monthly principal, interest, and escrow payments.  Donovan, TT 3 at 61.

31.    By letter dated September 17, 2004, the Lender notified Blue Hills that it was in default for, *inter alia*, failing to pay the August 2, 2004 property taxes, and that the debt under the Note had been accelerated.  Ex. 88.  Blue Hills never offered to cure the property tax payment default nor made a proposal to the Lender concerning a possible workout of the Loan. Blue Hills continued, by withholding financial statements requested by the Lender, Ex. 82 ¶ 9, to conceal the $2 million settlement Payment.

32.    By letter dated October 21, 2004, pursuant to Mass. Gen. Laws c.244, s. 14 and 17B, the Lender notified Fineberg and Langelier of its intention to foreclose on the Mortgaged Property.  Ex. 96.

33.     The foreclosure sale was held on November 19, 2004. Polcari, TT 5 at 108-09. There were four people bidding on the property and CSFB 1999-C1 Royall Street, LLC made the high bid for $18.5 million. Id.

34.     Lender acted in accordance with all of the requirements of the Mortgage and Massachusetts law, including the requirements of General Laws Chapter 244, in conducting the foreclosure sale. Clarke, TT 6 at 56.

35.     As of the date of the foreclosure sale, the amount of the Debt, including principal, interest and late fees, was $33,439,307. Ex. 212. After crediting the foreclosure bid ($18,500,000) and the reserves held by Lender as of the date of the sale ($4,168,460.18) against the outstanding debt, the deficiency after the foreclosure sale was $10,770,847. Ex. 212. Under the Note, the default interest rate is 13.49%. Ex. 4 ¶ 1(k)(c) and (p).

**Blue Hills Transfers More Mortgaged Property Without the Lender's Consent**

36.     Pursuant to the Lease Termination Agreement, approximately 1,000 Haworth Unigroup workstations (the "Workstations") became the property of Blue Hills upon Equiserve's departure. Ex. 25 ¶ 1(vi). These Workstations were in good condition and usable in connection with the present or future use of the Property. Erwin, TT 8.

37.     In or around August 2004, without notifying Lender and without obtaining Lender's prior written consent, Blue Hills sold the Workstations for $100,000 to D. Erwin & Associates LLC. Erwin, TT 8.

**Following the Foreclosure, the Royall Associates Agree Amongst Themselves as to the Disposition of the Payment and Other Funds of the Royall Associates**

38.     On December 31, 2004, the beneficiaries of Royall Associates entered into an agreement concerning various monies including the Payment (the "Royall Agreement"). Ex. 26. Blue Hills is not a party to the Royall Agreement. Id. The Royall Agreement addresses three

accounts: a "Property Account" held and controlled by Fineberg Management, Inc. as a result of its management of the property; an "Initial Account" and a "Supplemental Account". The "Initial Account" contained approximately $1.38 million, which was the $1.2 million of the 1999 refinancing proceeds plus interest. The "Supplemental Account" contained approximately $2.2 million, consisting of the $2 million Payment plus interest. The Initial Account and Supplemental Account, though referred to separately, were actually the same Royall Associates client fund account held by Bernkopf Goodman. Cohn, TT 4 at 46-47.

39.    The Initial Account monies and the interest on the $2 million Payment earned since August 2003 were immediately released, 50% each to Goldberg and Cohn, for distribution to the Fineberg and Langelier Beneficiaries, respectively. Cohn, TT 4 at 54. Under the Royall Agreement, $2 million in the Supplemental Account was distributed on February 1, 2005, $1 million to each of Goldberg and Cohn. Goldberg and Cohn are each holding $1 million "on behalf of" and "as escrow agents for" the Fineberg and Langelier Beneficiaries, respectively. Cohn is holding Langelier's $1 million in a client funds account in the name of The Langelier Company, Inc. Ex. 145; Cohn, TT 4 at 58.

40.    The monies are being held in escrow to protect Langelier and Fineberg against claims by the Lender against them personally. Ex. 26 §§ II.D & V. C; Cohn, TT 4 at 61-62. The interest on the funds is being used to pay some of the costs of defending against the Lender's claims against Fineberg and Langelier. Cohn, TT 4 at 60, 64. Under the Royall Agreement, in no event will any of the monies ever be made available to Blue Hills. Ex. 26 § V.C; Cohn, TT 4 at 66-67.

41.    The Royall Agreement contained a confidentiality clause. Ex. 26 § VII. A. Fineberg and Langelier and their attorneys agreed never to disclose the Payment to the Lender.

Cohn, TT 4 at 91.

42.      In or around December 2004, the Lender learned of the zoning appeal, the

Settlement, and the Payment from a third party.  Polcari, TT 5 at 112; Rosen, TT 8.  Lender's

counsel were in the process of preparing a complaint when Blue Hills commenced its action.  Id.

On April 20, 2005, Lender made written demand upon Fineberg and Langelier under the

Guaranty.  Stipulated Facts ¶ 65.  Neither Fineberg nor Langelier has made payment under the

Guaranty.

**Failure to Maintain Independent Director**

43.      Section 12(r) of the Mortgage required Blue Hills to cause there to be at least one

Independent Director of its manager, Blue Hills Management Corporation, at all times.  Ex. 5 §

12(r).  At the time of the refinancing, Susan Daly, a former secretary and part time paralegal at

Bernkopf Goodman, was named the Independent Director.  She never had anything to do with

the operations or management of Blue Hills.  Frank, TT 6 at 131-32; Goldberg TT 7.  In

particular, Ms. Daly had no involvement in any of the discussions or decisions about the zoning

appeal settlement or the settlement Payment.  Frank, TT 6 at 132-33.

**RULINGS OF LAW:  LENDER'S COUNTERCLAIM**

**Count I – Breach of Contract (Blue Hills)**

1.      The interest conveyed to the Lender by the Mortgage included the Property, its

improvements, and other personal property of Blue Hills, tangible and intangible, referred to

collectively and defined in the Mortgage as the "Mortgaged Property."  Mortgage at p.1.

2.      Under Section 10(a) of the Mortgage, a conveyance or transfer of the Mortgaged

Property or any part thereof required the Lender's prior written consent.

**The Zoning Appeal Was Mortgaged Property**

3.      The lawsuit appealing the Special Permit was Mortgaged Property under Granting

Clause Seven of the Mortgage, as it was a "cause() of action" that "related to, (was) derived from

or (was) used in connection with the Mortgaged Property."  Mortgage Granting Clause Seven.

4.      Blue Hills' standing to bring the zoning appeal lawsuit derived from its ownership

of the Mortgaged Property.  Under Mass. Gen. Laws c. 40A, § 17, only a "person aggrieved"

may appeal the grant of a special permit.  A "party in interest," defined as "the petitioner,

abutters, owners of land directly opposite on any public or private street or way, and (certain)

abutters to the abutters," is presumed to be a "person aggrieved."  Mass. Gen. Laws c. 40A, § 11;

Marinelli v. Board of Appeals of Stoughton, 440 Mass. 255, 257-258 (2003).  Moreover, where,

as here, a cause of action is specifically included in the list of property subject to a Mortgage,

that cause of action is subject to the lender's security interest.  See, e.g., In re Gilley, 236 B.R.

448, 452-53 (Bankr. M.D. Fla. 1999) (holding that, where "rights" and "interests" in the real

property were expressly subject to the mortgage, a claim for damage to the real property and the

proceeds of that claim are subject to the mortgage).

5.      Blue Hills, Fineberg, and Langelier (the "Blue Hills Parties") point to the specific

provisions of the Mortgage dealing with the settlement of condemnation or insured casualty

claims and argue that they were required to seek consent to settle only causes of action

specifically mentioned in the Mortgage.  To the contrary, those provisions demonstrate the

parties' intent to require the Lender's consent to the settlement of claims for damage to the

Property.  If the Blue Hills Parties were correct, the parties' intent was to require Blue Hills to

seek the Lender's consent to the settlement of a $250,001 insured casualty claim, but to permit

Blue Hills to settle for $2 million a claim alleging damage to the Mortgaged Property without

even notifying the Lender.  This construction of the Mortgage defies common sense.  <u>Cofman v.</u>
<u>Acton Corp.</u>, 958 F.2d 494, 497 (1st Cir. 1992) ("The construction of a written instrument to be
adopted is the one which appears to be in accord with justice and common sense and the
probable intention of the parties.").  Their interpretation would also render meaningless Granting
Clause Seven's general inclusion of "causes of action" within the definition of Mortgaged
Property.  Such an interpretation is to be avoided.  <u>Gibraltar Financial Corp. v. Lumbermens</u>
<u>Mut. Cas. Co.</u>, 400 Mass. 870, 872 (1987) ("It is a standard rule of construction that
interpretations which result in meaningless word are to be avoided").

### The Settlement of the Zoning Appeal Was A Transfer of Mortgaged Property

6.    The settlement of the zoning appeal was an assignment, transfer, or conveyance of
part of the Mortgaged Property, as it constituted the transfer of the cause of action of the zoning
appeal and other rights related to the Property (including the right to contest future development
at Blueview).  Therefore, Section 10(a) of the Mortgage required the Lender's prior written
consent to the settlement of the zoning appeal.

7.    The word "transfer" in the Mortgage is deemed to include, but is not limited to,
several different means of parting with Mortgaged Property: Blue Hills may not "sell, convey,
alienate, mortgage, encumber, pledge <u>or otherwise transfer</u>" any part of the Mortgaged Property.
Mortgage ¶ 10(a) (emphasis added).  The intent of Section 10 is expressly stated and illustrates
why the word "transfer" is defined so broadly: "Mortgagee has a valid interest in maintaining the
value of the Mortgaged Property so as to ensure that, should Mortgagor default in the repayment
of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property."  Mortgage
¶ 10(a).  The Massachusetts Fraudulent Transfers Act, which has a similar purpose (maintaining
the value of collateral as security for the borrower's debts), defines a "transfer" to include:

"every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, <u>release</u>, lease, and creation of a lien or other encumbrance."  Mass. Gen. Laws c. 109A, § 2 (emphasis added).[5]

8.     By settling the zoning appeal, Blue Hills gave up valuable rights arising from its ownership of the Property: the right to contest the ZBA Decision, the right to pursue any causes of action Blue Hills had against DST and/or Blueview at the time of the settlement, and the right to contest the issuance of any permits or approvals sought by DST in connection with the Blueview property at any time within ten years of the Settlement Agreement.  Settlement Agreement ¶¶ 3, 7(c).  The fact that these rights were things of value is obvious given that DST was willing to pay $2 million to Blue Hills to give them up.[6]  These rights forfeited by Blue Hills were part of the Mortgaged Property.  Given these two facts, it is clear that by settling the zoning appeal, Blue Hills transferred part of the Mortgaged Property in violation of Section 10(a) of the Mortgage.  <u>See</u> <u>Buckley v. John</u>, 314 Mass. 719, 726 (1943) (receipt of cash in return for release of claims is a conveyance); <u>Sheffield Progressive, Inc. v. Kingston Tool Co.</u>, 10 Mass. App. Ct. 47, 49-50 (1980) (release or waiver of rights to equity of more than $2 million is a conveyance); <u>In re Besing</u>, 981 F.2d 1488, 1493-94 (5th Cir. 1993) (dismissal with prejudice of cause of action belonging to borrower is a "transfer" of property by borrower); <u>In re e2 Commc'ns Inc.</u>, 320 B.R. 849, 855-857 (Bankr. N.D. Tex. 2004) ("common sense suggests that a release of claims is a 'transfer' of property").

9.     By settling the zoning appeal without seeking the Lender's consent, the Blue

---

[5]  Similarly, the Bankruptcy Code defines a "transfer" to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property."  11 U.S.C. § 101(54).

[6]  <u>See also</u> <u>Mathewson Corp. v. Allied Marine Indus., Inc.</u>, 827 F.2d 850, 856 (1st Cir. 1987) (agreement to forbear from pressing a claim is "the surrender of a thing of value and is a sufficient consideration for a contract.") (quoting <u>Codman v. Dumaine</u>, 249 Mass. 451, 458 (1924)).

Hills' parties deprived the Lender of the opportunity to evaluate the settlement and determine if settling the lawsuit was in the property's best interests, if so to determine whether the amount of the settlement was appropriate, and if so to condition the settlement on requiring additional loan payments or reserving the proceeds to cover the loss of the sole tenant of the office park. Clarke, TT 6 at 73-75. The Settlement Agreement allowed the garage to be built in accordance with the same plans approved by the Town of Canton before Blue Hills brought its lawsuit and about which the lawsuit complained. The Lender may well have had a different view of whether the settlement was appropriate.

### The Settlement Payment Was Mortgaged Property

10.    The settlement Payment was also Mortgaged Property. It was Mortgaged Property under Granting Clause Eight of the Mortgage, as it is proceeds of the disposition of other Mortgaged Property, namely the zoning appeal cause of action and other rights transferred and released in the Settlement Agreement. It was Mortgaged Property under Granting Clause Four, as it is "consideration" paid to Blue Hills arising from and attributable to the Premises and Improvements. Finally, the Payment was Mortgaged Property under Granting Clause Three, as it is an "award or payment" made for an injury to or decrease in value of the Mortgaged Property.

11.    Blue Hills' accounting of the Payment confirms that it was made for an injury to or decrease in value of the Mortgaged Property: Blue Hills accounted for the Payment on its books and records as a "return of capital," reducing its basis in the land and the buildings at the Property. The effect of this treatment was to avoid including the payment as "gross income" for the year in which it was received. While section 61 of the Internal Revenue Code defines gross income broadly as "all income from whatever source derived," 26 U.S.C. § 61, "receipts . . .

properly chargeable to capital account" are proper adjustments to basis under IRC § 1016, and are excluded from gross income.  See, e.g., Inaja Land Co. v. C.I.R., 9 T.C. 727, 745-736 (1947) (settlement paid for damages to land and property rights and for easement is capital recovery); Trunk v. C.I.R., 32 T.C. 1127, 1138-39 (1959) (payment for right to condemnation award is capital recovery); Case v. United States, 633 F.2d 1240, 1246 n.1 (6th Cir. 1980).

12.    To determine whether a litigation settlement is a capital recovery or ordinary income, "(t)he fund involved must be considered in the light of the claim from which it was realized and which is reflected in the petition filed."  Inaja, supra at 735.  The only conceivable basis on which Blue Hills could treat the Payment as a capital recovery is if it was compensation for damages to or loss of value in the Property.[7]  Compare Bresler v. C.I.R., 65 T.C. 182, 184 (1975) (lost profits taxed as ordinary income); Raytheon Prod. Corp. v. C.I.R., 144 F.2d 110, 113 (1st Cir. 1944) (same); Rev. Rul. 73-161, 1973-1 C.B. 366.

**The Transfer of the Settlement Payment Violated Mortgage Section 10(a)**

13.    As the Payment was Mortgaged Property, Blue Hills' transfer of the Payment to Royall Associates, and subsequently to Fineberg and Langelier, without the Lender's prior written consent violated Section 10 of the Mortgage.[8]  Any contention by Blue Hills that the transfer was a "loan" (a contention belied by the Royall Agreement) is of no import.  A loan, like a distribution, is a transfer.  See Dickman v. Comm'r of Internal Revenue, 465 U.S. 330, 338 (1984) (interest-free loan of funds is a transfer of property for tax purposes); Liberty Mut. Ins.

---

[7] Other types of capital recoveries recognized in the case law are not applicable here.  See, e.g., Bresler v. C.I.R., 65 T.C. 182 (1975) (damages to goodwill appropriate basis adjustment); Rev. Rul. 67-33, 1967-2 C.B. 695 (anti-trust settlement compensating for having paid fixed, higher prices for materials is recovery of capital); Madison Fund, Inc. v. C.I.R., 365 F.2d 471, 472 (3d Cir. 1966) (settlement compensating investors for investment company's purchase of securities at inflated prices is recovery of capital).

[8] The Supreme Court has long held what is plain on its face -- a transfer of money is a transfer of property.  See Pirie v. Chicago Title & Trust Co., 182 U.S. 438 (U.S. 1901).

Co. v. A.C. Martinelli Rogers Plastic Corp., 344 Mass. 498, 501 (1962) (transfers of checks held

to be loans); New York Times Sales, Inc. v. Comm'r of Revenue, 40 Mass. App. Ct. 749, 753

(1996) (transfers at issue were either loans or dividends).

  14. The language of Section 10 is unambiguous and enforceable in accordance with

its terms.  Alison H. v. Byard, 163 F. 3d 2, 6 (1st Cir. 1998) ("Under Massachusetts law, 'where

the wording of the contract is unambiguous, the contract must be enforced according to its

terms.'") (quoting Edmonds v. United States, 642 F.2d 877, 881 (1st Cir. 1985)).  The terms

"transfer" and "Mortgaged Property" are broadly defined and the intent of Section 10 is

expressly stated:  to "maintain[] the value of the Mortgaged Property . . ."  Ex. 5 § 10(a).  Blue

Hills argues that in Section 10 "Mortgaged Property" means only the real estate, but the

Mortgage separately defines the real estate as the Premises (land) and Improvements (building).

Had the parties intended to refer only to the Premises and Improvements in Section 10 they had a

clear and obvious means of doing so:  using those words, as they did in other parts of the

Mortgage that refer solely to the Premises and/or Improvements.  Ex. 5 §§ 2, 3, 5, 9, 11(u),

11(x), 23(k).

  15. The intent of the parties, moreover, is to be gathered from "a fair construction of

the contract as a whole and not by special emphasis upon any one part."  Ucello v. Cosentino,

354 Mass. 48, 51 (1968).  The Mortgage as a whole demonstrates the parties' intent to broadly

define the Mortgaged Property and to prohibit unauthorized transfers of any part of the

Mortgaged Property.  See Mortgage at pp. 1-4; ¶ 9 (Improvements and Equipment shall not be

removed, demolished, or materially altered without Lender's consent); ¶ 10; ¶ 12(e) (Blue Hills

shall not make any loans or advances to any third party, including affiliates); ¶ 23(d)

(unauthorized transfer or encumbrance of any portion of the Mortgaged Property is an Event of

Default); ¶ 28(a) ("The Mortgaged Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Mortgagor in the Mortgaged Property."); ¶ 50 (default rule is that the term "Mortgaged Property" "shall include any portion of the Mortgaged Property and any interest therein").

16.     The other subsections of Section 10 are not to the contrary.  Section 10(b) merely lists certain indirect transfers that are deemed included within the scope of 10(a).  It does not purport to be exclusive and does not include even an outright sale of the entire Mortgaged Property.  Section 10(e) requires Blue Hills to reimburse the Lender for "all reasonable expenses" incurred by the Lender in connection with the review of any transfer, including without limitation any title search costs and title insurance premiums.  Section 10(e) does not say that only those transfers requiring a title search and title insurance are included within the scope of  ¶ 10(a), and such a reading would exclude the transfers specified by 10(b).  Likewise, Section 10(f) lists conditions which may, to the extent they apply, permit the Lender to withhold consent. It does not limit Section 10(a) to only those transfers as to which these conditions necessarily apply.

17.     Blue Hills' slippery slope argument – that a borrower would not be able to conduct ordinary business if Section 10 applied to every last piece of equipment and office supply – is inapplicable to this clearly material two million dollar transfer not in the ordinary course.

18.     The unambiguous Mortgage means what it says and must be enforced against this sophisticated borrower strictly in accordance with its terms.  Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 853-54 (1st Cir. 1987); Samos Imex Corp. v. Nextel Commc'ns, Inc., 20 F. Supp. 2d 248, 251 (D. Mass. 1998) (Young, J.).

**Blue Hills Violated Numerous Single Purpose Entity Covenants**

19.    Blue Hills ignores the point that the settlement of the zoning appeal was an unconsented to transfer.  It focuses only on the Payment.  It claims that it never transferred the Payment because the Payment has been held in various escrow accounts "for the benefit of Blue Hills" since the time the Payment was made.  The evidence refutes that the Payment was ever held for or used by Blue Hills.  Even if Blue Hills prevailed on its Section 10 transfer arguments, however, it would only serve to establish a separate basis for full recourse liability.

20.    Under Section 12 of the Mortgage, Blue Hills agreed to abide by certain covenants required to maintain Blue Hills' single purpose entity status.  If the Mortgaged Property was not transferred, then Blue Hills violated numerous single purpose entity covenants.  Blue Hills violated, among others, Section 12(l) of the Mortgage ("Mortgagor will not commingle the funds and other assets of Mortgagor with those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party of Guarantor, or any other person"), Section 12(m) of the Mortgage ("Mortgagor has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any affiliate or constituent party, any Guarantor, or any affiliate of any constituent party or Guarantor, or any other person."), and Section 12(t), requiring it to conduct its business in accordance with the assumptions of the Bernkopf Goodman insolvency opinion,[9] Ex. 185.[10]

21.    If Blue Hills did not simply transfer the Payment first to Royall Associates and

---

[9] Some of the assumptions set forth in the insolvency opinion which were violated by Blue Hills include that Blue Hills does not commingle its assets or business functions with the assets or business functions of its affiliates, that bank accounts and funds of the borrower are maintained separately from those of any affiliate, and are maintained in the name of the borrower; that assets are not transferred between the borrower and any affiliate with the intent to hinder, delay, or defraud creditors; and that Blue Hills will disclose all material transactions associated with the loan to the Lender in appropriate and timely communications.  Ex. 185 at Blue Hill 2025-2029.

[10] Blue Hills also violated § 12(h) ("Mortgagor will maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party…") and § 12(o) ("Mortgagor will not permit any affiliate of any constituent party independent access to its bank accounts.").

then to Fineberg and Langelier, then it clearly commingled its funds with those of its affiliate(s) and maintained its assets in a manner that makes it difficult to identify and segregate Blue Hills' assets from those of its affiliate(s).  The first escrow account into which the Payment was deposited was in the name of "Fineberg Royall Associates," Ex. 145, or "Royall Associates," Cohn, TT 4 at 33, 43.  This account contained other funds owned by Fineberg and Langelier or Royall Associates.  Cohn TT 4 at 46-47.  The money was held on behalf of Fineberg and Langelier and controlled by them.  Ex. 182.

22.     At the end of 2004, disposition of the Payment was directed by the December 31, 2004 Royall Agreement, to which Blue Hills was not a party.  Ex. 26.  Interest on the Payment earned through that date has already been paid to Fineberg and Langelier.  Cohn, TT 4 at 54. The Agreement directed that the monies "continue to be held on behalf of" the Fineberg and Langelier Beneficiaries by escrow agents acting on their behalf.  The monies now reside in a client funds account of The Langelier Company, Inc. at Wilmer Hale and an account in the name of "Fineberg 150 Royall Street" at Bernkopf Goodman.  Ex. 145.  Interest accruing on the Payment has been used to pay for Langelier's and Fineberg's legal defense fees in connection with the claims brought against them personally.  Cohn, TT 4 at 60, 64-65.

23.     Blue Hills' argument that Blue Hills and Royall Associates were "functionally the same," Cohn, TT 4 at 88-89, proves the violation of the single purpose entity covenants. Mortgage § 12(t) (incorporating Ex. 185); Insolvency Opinion at p. 2025 § 3 ("The Borrower does not commingle its assets or business functions with the assets or business functions of [Royall Associates]").  Blue Hills is organized under the laws of Delaware, and under Delaware law, an LLC is a separate legal entity distinct from its members.  6 Del. C. § 18-201(b).  A member, like Royall Associates, "has no interest in specific limited liability company property."

6 Del. C. § 18-701; see Hagan v. Adams Property Assocs., Inc., 253 Va. 217, 220, 482 S.E.2d

805, 807 (Va. 1997) (holding under comparable provision of Virginia LLC Act that "in contrast

to a partnership, a limited liability company . . . is an entity separate from its members and, thus,

the transfer of property from a member to the limited liability company is more than a change in

the form of ownership; it is a transfer from one entity or person to another" and affirming that

"transfer was a sale of the property").

     24.    The Blue Hills Parties cannot expand the fact that Blue Hills was disregarded for

tax purposes to eliminate its legal existence for all purposes.  See In re: KRSM Props., LLC, 318

B.R. 712, 719 (9th Cir. 2004) ("A tax election to have an LLC disregarded as a taxable entity has

no effect on the legal status of ownership of LLC assets.").  Blue Hills was a legal entity that the

Lender required be created for the very reason that it had a separate legal existence and its assets

would be protected from the claims of creditors of its affiliates.  See Mortgage, Ex. 5 § 12

(Single Purpose Entity/Separateness); Ex. 185, Bernkopf Goodman Insolvency Opinion.  "LLCs

remain separate and distinct from their members.  Indeed the separate and distinct nature of

LLCs is their reason for existence."  Abrahim & Sons Enters. v. Equilon Enters., LLC, 292 F.3d

958, 962-63 (9th Cir. 2002) (rejecting invitation to disregard corporate form, and finding that

contributions from members to LLC was a transfer of property).

     25.    Blue Hills and Royall Associates were not financially the same entities, as the

Blue Hills Parties assert.  Royall Associates had its own $8 million in debt, Cohn TT 4 at 118-19;

Fineberg and Langelier exposed the Payment to claims of Royall Associates creditors by

depositing it into a Royal Associates account.  Id.  The money being held by Wilmer Hale is now

exposed to claims of creditors of The Langelier Company, Inc.

     26.    The failure of Blue Hills to cause its manager Blue Hills Management

Corporation at all times to have an Independent Director was an additional single purpose entity covenant violation. Ex. 5 § 12(r).

### The Workstations Were Mortgaged Property and Were Transferred in Violation of Section 10(a)

27.     The Workstations were Mortgaged Property under the Mortgage, Mortgage Granting Clause Two, as they were furniture located upon the Premises and Improvements and usable in connection with the present or future operation and occupancy of the Premises and Improvements.  Blue Hills' sale of the Workstations without the Lender's consent was a transfer of Mortgaged Property in violation of Section 10 of the Mortgage.

### The Unconsented-to Transfers of Parts of the Mortgaged Property, and Intentional Violation of Numerous Singe Purpose Entity Covenants, Make the Debt Fully Recourse to the Borrower

28.     Under the terms of the Note and the Mortgage, "the Debt shall be fully recourse to (Blue Hills) in the event that: . . . (iv) (Blue Hills) fails to obtain (Lender's) prior written consent to any assignment, transfer or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage."  Note § 13; Mortgage ¶ 54.  Accordingly, as a result of the unauthorized transfers of Mortgaged Property identified above, Blue Hills is liable for the full amount of the deficiency remaining after the foreclosure sale.

29.     In addition, under the terms of the Note and Mortgage, "the Debt shall be fully recourse to (Blue Hills) in the event that: . . . (ii) (Blue Hills) intentionally fails to maintain its status as a single purpose entity, as required by, and in accordance with the terms and provisions of, the Mortgage."  Note § 13; Mortgage § 54.  Accordingly, because Blue Hills intentionally violated several of the covenants set forth at Section 12 of the Mortgage, Blue Hills is liable for the full amount of the deficiency remaining after the foreclosure sale.  Id.

30.     The Lender is entitled to enforce these provisions of the Loan Documents.  See,

e.g., Heller Fin., Inc. v. Lee, 2002 U.S. Dist. LEXIS 15183, *2-5, *11-16 (N.D. Ill. 2002)

(enforcing provision of loan agreement making borrower personally liable for full amount of

approximately $5.3 million deficiency where borrower permitted liens totaling approximately

$820,000 to be placed on the property);[11] see also Samos Imex Corp. v. Nextel Commc'ns, Inc.,

20 F. Supp. 2d 248, 251 (D. Mass. 1998) (Young, J.) ("Parties, particularly sophisticated parties

contracting at arms length, should not be allowed to escape a provision for which they knowingly

and voluntarily bargained."); Clean Harbors, Inc. v. John Hancock Life Ins. Co., 64 Mass. App.

Ct. 347, 355-56 (2005) (prepayment premium enforced according to its terms).

     31.    A nonrecourse loan is one where the borrower is not personally liable for the debt

upon default, but rather, the creditor's recourse is to the property granted as security for the loan.

Heller Fin., Inc. v. Lee, 2002 U.S. Dist. LEXIS 15183, *2-5, 11 (N.D. Ill. Aug. 12, 2002).

> However, nonrecourse loans create issues in terms of the
> motivation of borrowers to act in the best interest of the lender and
> the lender's collateral.  As a result, lenders identify[y] defaults that
> pose[] special risks and carve[] them out of the general
> nonrecourse provision.  These carve-outs provide the protection
> that lenders require, personal liability, to insure the incentive to
> repay the loan <u>and maintain the viability of the collateral</u>.

Id. at *11 (emphasis added; citations and quotes omitted).

     32.    Courts enforce nonrecourse carveouts strictly in accordance with their terms,

rejecting borrower and guarantor arguments of ambiguity and lack of harm.  See, e.g., Heller

Fin., Inc. v. Lee, supra, at *11-16[12]; Heller Fin., Inc. v. Whitemark at Fox Glen, Ltd., 2004 U.S.

Dist. LEXIS 18974 *3-6, 11-15 (N.D. Ill. 2004) (granting summary judgment enforcing

nonrecourse carveout triggering borrower's liability for amount of unauthorized transfers to

---

[11] Although the amount of the deficiency is not referenced in the opinion, the complaint in the Heller Fin. case (available online through Pacer) states that the deficiency was $5,313,759.

[12] Although the amount of the deficiency is not referenced in the opinion, the complaint in the Lee case (available online through Pacer) states that the deficiency was $5,313,759.

borrower's affiliates); <u>FDIC v. Prince George Corp.</u>, 58 F.3d 1041, 1046-47 (4th Cir. 1995)

(enforcing plain terms of nonrecourse carveout and finding borrower personally liable to extent

of impairment of access to collateral); <u>LaSalle Bank N.A. v. Mobile Hotel Props., LLC</u>, 367 F.

Supp. 2d 1022, 1029-30 (E.D. La. 2004) (granting summary judgment enforcing liability under

guaranty for full amount of the approximately $1 million deficiency where borrower made

allegedly "innocuous" change to its status as a single purpose entity: "The language of the

mortgage means what it says."); <u>First Nationwide Bank v. Brookhaven Realty Assocs.</u>, 637

N.Y.S.2d 418, 420-22 (N.Y. App. Div. 1996) (affirming summary judgment enforcing carveout

provision imposing full liability for the deficiency on the individual partners of the borrower for

bankruptcy filing that delayed but did not prevent a foreclosure sale); <u>Vista Development Joint</u>

<u>Venture II v. Pacific Mutual Life Ins. Co.</u>, 822 S.W. 2d 305, 308 (Tex. App. 1992) (enforcing

nonrecourse carveout for failure to pay taxes).

      33.    Where, as here, "sophisticated parties choose to embody their agreement in a

carefully crafted document, they are entitled to and should be held to the language they chose."

<u>Anderson Street Assocs. v. City of Boston</u>, 442 Mass. 812, 819 (2004)[13]; <u>Mathewson Corp. v.</u>

<u>Allied Marine Indus., Inc.</u>, 827 F.2d 850, 853-54, 856 (1st Cir. 1987) ("it is no appropriate part

of judicial business to rewrite contracts freely entered into between sophisticated business

entities") (quoting <u>RCI Northeast Servs. Div. v. Boston Edison Co.</u>, 822 F.2d 199, 205 (1st Cir.

1987)).

      34.    <u>LaSalle Bank N.A. v. Mobile Hotel Properties, LLC</u> is directly on point here with

respect to Blue Hills' violations of the single purpose entity covenants.  In <u>LaSalle</u>, the mortgage

was non-recourse but provided that it would become fully recourse in the event that

---

[13] The Loan Documents are governed by Massachusetts law.  <u>See</u>, <u>e.g.</u>, Note ¶ 17.

"Mortgagor…fails to maintain its status as a single purpose entity, [] as required by, and in accordance with the provisions of, this Mortgage." Id., 367 F. Supp. 2d at 1029.  Like the mortgage in this case, the LaSalle mortgage contained a "Single Purpose Entity/Separateness" provision listing numerous covenants defining and describing the scope and limits of the single purpose entity and separateness requirements.  Id. at 1029-30.  The borrower in LaSalle amended its Articles of Organization in violation of one of those covenants.  Id.  The LaSalle court held that the borrower was fully liable for the debt because "the Borrower's violation of any one of the [single purpose entity] covenants listed are sufficient to make the Mortgage a full recourse obligation," and "[t]he language of the Mortgage means what it says."  Id. (emphasis added).

35.    The deficiency of a mortgagor, and the obligation of a guarantor of the debt, is established by the amount of the foreclosure sale.  Where the mortgagee buys the property at the sale, the deficiency is not reduced by a subsequent resale for an amount greater than the foreclosure bid.  Davis v. Newburyport Five Cents Savings Bank, 311 Mass. 377, 386-87 (1942); McKnight v. United States, 259 F.2d 540, 544-45 (9th Cir. 1958); Boston Federal Savings Bank v. Trafton, 3 Mass. L. Rep. 140, 1994 WL 878799 (Mass. Super. Ct. Dec. 5, 1994).

36.    Defendants-in-counterclaim are entitled under Count I to recover from Blue Hills the full amount of the $10,770,847 deficiency resulting from the November 19, 2004 foreclosure sale, plus interest since that date at the Note's Default rate of 13.49%,[14] plus reasonable attorneys' fees and disbursements pursuant to Section 26(h) of the Mortgage.

## Count V – Guaranty (Fineberg and Langelier)

37.    Under the Guaranty, Fineberg and Langelier are "liable for the full amount of the Debt" in the event that Blue Hills "fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required

---

[14] See Note, Ex. 4 ¶ 1(k)(c) and (p).

by <u>Section 10</u> of the Mortgage," <u>or</u> in the event that Blue Hills "fails to maintain its status as a single purpose entity, as required by, and in accordance with, the Mortgage."  Guaranty § 1.2. Blue Hills transferred Mortgaged Property without the Lender's prior written consent and violated the single purpose entity covenants.  Thus, Fineberg and Langelier are liable for the full amount of the deficiency.

38.     A guaranty is a contract 'like all other contracts'" and "(w)hen the words of the guaranty 'are clear they alone determine the meaning.'"  <u>Federal Fin. Co. v. Savage</u>, 431 Mass. 814, 817 (2000) (enforcing guaranty in arms length transaction between sophisticated individuals that resulted in defendant's company receiving bank loans, lest unfairness be visited on lender and certainty in loan transactions be upset) (internal citations omitted).

39.     As noted above, "Parties, particularly sophisticated parties contracting at arms length, should not be allowed to escape a provision for which they knowingly and voluntarily bargained."  <u>Samos Imex Corp. v. Nextel Commc'ns, Inc.</u>, 20 F. Supp. 2d 248, 251 (D. Mass. 1998) (Young, J.).  Sophisticated parties "are entitled to and should be held to the language they chose."  <u>Anderson Street Assocs. v. City of Boston</u>, 442 Mass. 812, 819 (2004); <u>accord</u> <u>Mathewson Corp. v. Allied Marine Indus., Inc.</u>, 827 F.2d 850, 853-54, 856 (1st Cir. 1987).

40.     As noted above, courts enforce nonrecourse carveouts strictly in accordance with their terms.  **"[M]otive . . . is irrelevant."**  <u>LaSalle Bank N.A. v. Mobile Hotel Props., LLC</u>, 367 F. Supp. 2d 1022, 1029-30 (E.D. La. 2004) (emphasis added) (granting summary judgment enforcing liability under guaranty for full amount of the approximately $1 million deficiency where borrower made allegedly "innocuous" change to its status as a single purpose entity:  "The language of the mortgage means what it says.").

41.     As matter of law, the plain language of the contract governs.  Courts enforce full

liability nonrecourse carveouts even if the consequence of the triggering action was not severe. In First Nationwide Bank v. Brookhaven Realty Assocs., 637 N.Y.S.2d 418 (N.Y. App. Div. 1996), for example, the court enforced a carveout provision imposing full personal liability for the deficiency on the individual partners of the borrower, despite the fact that the conduct triggering full liability (the commencement of a bankruptcy proceeding not resolved within 90 days of its filing) did not deprive the lender of its collateral, but merely delayed the foreclosure sale. Id. at 420-21.

42.    As a factual matter, in this case, the unconsented-to transfer and violations of the single purpose entity covenants did have a severe impact on the Lender's collateral and the status of the Mortgage.  The settlement of the Zoning Appeal impaired the entire mortgage by guaranteeing the loss of Blue Hills' only tenant, resulting a year later in payment defaults, a foreclosure sale, and the Deficiency.  Blue Hills' commingling of the Payment with funds of its member, and failure to maintain separate accounts so that Blue Hills' assets would be easily identifiable, exposed the Lender's collateral to claims of Royall Associates' creditors.  Under these circumstances, imposing liability on Blue Hills and the Guarantors for the full amount of the Deficiency is both compelled by the plain language of the contracts and appropriate.

43.    Defendants-in-counterclaim are entitled under Count V to recover against each of Fineberg and Langelier the full amount of the $10,770,847 deficiency resulting from the November 19, 2004 foreclosure sale, plus interest since that date at the Note's Default rate of 13.49%, plus reasonable attorneys' fees and disbursements pursuant to Section 26(h) of the Mortgage.

**Count III – Breach of Implied Covenant of Good Faith and Fair Dealing (Blue Hills)**

44.     The implied covenant of good faith and fair dealing provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Uproar Co. v. National Broad. Co., 81 F.2d 373, 377 (1st Cir. 1936); see also Uno Rests. v. Boston Kenmore Realty, 441 Mass. 376, 385 (2004); Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991).  A breach of the implied covenant generally involves "deceit or 'unfair subterfuge' and usually (is) 'compounded by deceptive or unfair behavior that prevented – or at a minimum diverted – the injured parties from seeking immediate redress.'"  Christensen v. Kingston Sch. Comm., 360 F. Supp. 2d 212, 226 (D.Mass. 2005) (quoting Boston Pilots v. Motor Vessel Midnight Gambler et al., 357 F.3d 129, 135 (1st Cir. 2004)).

45.     Blue Hills' failure to notify the Lender of the Zoning Appeal, failure to obtain the prior written consent of the Lender to the Settlement or the Payment, failure to notify the Lender of its receipt of the Payment, failure to obtain the prior written consent to a transfer of the Payment, and failure to comply with the single purpose entity covenants was deceptive and prevented the Lender from seeking immediate redress.

46.     Blue Hills violated the implied covenant of good faith and fair dealing and the Lender was damaged as a result.

47.     Defendants-in-counterclaim are entitled under Count III to recover against Blue Hills the full amount of the $10,770,847 deficiency resulting from the November 19, 2004 foreclosure sale, plus interest since that date at the Note's Default rate of 13.49%, plus reasonable attorneys' fees and disbursements pursuant to Section 26(h) of the Mortgage.

**Count IV – Intentional Misrepresentation (Blue Hills, Fineberg, and Langelier)**

48.    Blue Hills had a duty to notify the Lender of the Settlement, its receipt of the Payment, and its transfer of the Payment.

49.    Blue Hills' failure to notify the Lender of the Settlement, its receipt of the Payment, and its transfer of the Payment constituted intentional misrepresentations.  Blue Hills was contractually obligated to disclose those facts and the Lender was damaged by the loss of that collateral.  See Chiarella v. U.S., 445 U.S. 222, 235 (1980) (a duty to speak is a predicate for fraud based on non-disclosure); Turner v. Johnson & Johnson, 809 F.2d 90, 95 (1st Cir.1986) (stating elements of fraud); Alpine v. Friend Bros., 244 Mass. 164, 167 (1923) (describing action for fraud for "failure to disclose known facts when there was a duty … to disclose; that it was intended that it should be acted upon, as it was, and that damage directly resulted therefrom").

50.    The Lender detrimentally relied on Blue Hills' silence, as shown by its failure to exercise its remedies under the Loan Documents at the time of the Settlement or under the Loan Documents at the time of the Settlement or subsequent transfer of the Payment.  A failure to act, when one would have acted (had one known of the fraud) is the legal equivalent of taking affirmative action.  Fottler v. Moseley, 179 Mass. 295, 299 (1901) (plaintiff who, as a result of the defendant's fraud, failed to act when otherwise he would have acted has established reliance).

51.    As a result of Blue Hills' fraud, the Lender was damaged.

52.    Fineberg and Langelier are personally liable for Blue Hills' intentional misrepresentations under Section 1.2(a) of the Guaranty.

53.    Defendants-in-counterclaim are entitled under Count IV to recover from Blue Hills, Fineberg, and Langelier $2 million plus interest since August 5, 2003 at the Note's Default rate of 13.49%, plus reasonable attorneys' fees and disbursements pursuant to Mortgage Section

26(h).

## Count VI – Violations of M.G.L. c. 93A (Blue Hills, Fineberg, and Langelier)

54.    The Blue Hills Parties violated Mass. Gen. Laws c. 93A.  "Conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or deceptive trade practice for c. 93A purposes."  Towner v. Bennington Constr. Co., 2005 Mass. Super. LEXIS 534, *37-38 (Oct. 12, 2005) (citing Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991)).  Blue Hills' conduct, as described above, violated known contractual arrangements and was clearly intended to benefit the beneficiaries of the sole member of Blue Hills – at the expense of the Lender.  As Messrs. Fineberg and Langelier were at all relevant times the ultimate decisionmakers for Blue Hills, they are also directly liable for violations of c. 93A.

55.    The failure to maintain the single purpose entity status of Blue Hills was in disregard of the Mortgage and was intended to secure benefits for Fineberg, Langelier, and the other beneficiaries of Royall Associates (namely, keeping the Payment hidden from and out of the reach of the Lender).

56.    The transfer of the Payment also amounted to deceptive conversion of funds to which Lender was entitled, which is a violation of Chapter 93A.[15]  See Ravech v. Wheeler, 2001 Mass. Super. LEXIS 198, *15-16 (Mass. Sup. Ct. April 18, 2001).  Blue Hills' decision not to report the settlement of the Zoning Appeal or the Payment to the Lender was willful and knowing.  Thus, the Lender should receive multiple damages on its Chapter 93A claim. See also

---

[15] Because the transfers of the Zoning Appeal and the Payment were unauthorized, the Lender had "an immediate right to the collateral, permitting (Lender) to maintain an action for conversion."  See, e.g., Harley-Davidson Motor Co., Inc. v. Bank of New England – Old Colony, N.A., 897 F.2d 611, 617 (1st Cir. 1990).  Even if the Lender did not have an immediate right to the collateral, "the overriding rule...is that an action for conversion lies to recover damage to or loss of a chattel by one whose ownership or security interest is harmed."  Mancuso v. Gen. Motors Acceptance Corp., 1993 Mass. App. Div. 136, 136 (Mass. App. Div. 1993) (emphasis added); see also Laurin v. DeCarolis Constr. Co., Inc., 372 Mass. 688, 690 (1977).

Ravech v. Wheeler, supra, *16 (awarding double damage for "conduct particularly deceptive (due to) the fact that (defendant) never intended to pay (plaintiff) or even to the broach the subject of these payments").

57.    Furthermore, the Blue Hills Parties' intentional misrepresentations support recovery under c. 93A.  See, e.g., Zayre Corp. v. Computer Sys. of America, Inc., 24 Mass. App. Ct. 559, 570 n. 23 (1987) ("Business strategy 'in the rough and tumble of the world of commerce' should not use conscious misrepresentation as a competitive weapon."); VMark Software, Inc. v. EMC Corp., 37 Mass. App. Ct. 610, 620 (1994) ("'misrepresentation in the common law sense would be the basis for a c. 93A claim'") (quoting Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979)).  Likewise, the Guarantors' conversion of the Payment provides an independent basis for their liability under c. 93A.  See Ravech v. Wheeler, 2001 Mass. Super. LEXIS 198, *15-16 (Mass. Sup. Ct. April 18, 2001); Dufault v. Dufault, 1992 Mass. App. Div. 54, *4 (1992) (plaintiff in conversion action need only have a property interest in the converted property, regardless of whether he has an immediate right to possession).[16]

58.    Additionally, the Blue Hills Parties' transfer of the $2 million Payment to the Guarantors, combined with Blue Hills' subsequent failure to pay real estate taxes due on August 2 and November 1, 2004 is a form of bad faith tortious waste.  See, e.g., Nippon Credit Bank, Ltd. v. 1333 North California Boulevard, 103 Cal. Rptr. 2d 421, 428 (Cal. Ct. App. 2001) (nonrecourse borrower liable for bad faith waste where borrower transferred $1.7 million to its affiliates and failed to pay a $358,000 tax installment due); see also Travelers Ins. Co. v. 633 Third Assocs., 14 F.3d 114, 118, 223 (2d Cir. 1994) (nonrecourse borrower liable for bad faith

---

[16] The Lender need not prove each element of the common law claims of fraud and conversion in order to recover for the underlying conduct under c. 93A.  See, e.g., Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703-04 (1975) (c. 93A claims not "subject to the traditional limitations of preexisting causes of action such as tort for fraud and deceit.").

waste where borrower transferred capital to its owners, leaving it incapable of paying property taxes and unable to meet its loan payments).  At the time of the transfer of the Payment, the Blue Hills Parties knew the real estate taxes would still need to be paid when Equiserve moved out. The Blue Hills Parties nevertheless made the transfer, concealed the transfer to prevent the Lender from seeking to restrain the transfer, and failed to pay taxes owed by Blue Hills.

59.    The Blue Hills Parties' conduct – including the Settlement, the transfer of the $2 million Payment, the concealment of the Settlement and Payment transfer, distribution of all other net income, the transfer of the $100,000 Workstations, and the failure to pay $264,000 in real estate taxes – considered as a whole, was a knowing and willful effort to "extract as much money from the [Mortgaged Property] as possible before walking away from it." Nippon, 103 Cal. Rptr. 2d 421 at 431.  This behavior was not only in breach of the Loan Documents but was tortious, unfair, and deceptive in violation of c. 93A.

60.    Blue Hills may not assert a reliance on counsel defense to a willful and knowing chapter 93A violation.  Even assuming reliance on counsel is a valid defense, the defense was not pled and Blue Hills invoked the attorney client privilege in response to questions about the advice given by its attorney, which precludes Blue Hills from relying on that advice now.  "A party cannot use 'the attorney-client privilege as both a sword and a shield.'" In re PolyMedica Corp. Secs. Litig., --- F.R.D. ----, 2006 WL 891079, *4 (D. Mass. Apr. 7, 2006) (quoting In re Keeper of the Records, 348 F.3d 16, 24 (1st Cir. 2003)).  By asserting the privilege, Blue Hills waived any advice of counsel defense.  See Columbia Pictures Telev., Inc. v. Krypton Broad., Inc., 259 F.3d 1186, 1196 (9th Cir. 2001) (court properly precluded use of advice of counsel defense on basis of unfairness to opposing party); Troublé v. Wet Seal, Inc., 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) (holding that defendant "waived any available advice of counsel

defense by objecting, based on the attorney client privilege, to (plaintiff's) discovery requests"). Any such reliance was also patently unreasonable.

61.    Defendants-in-counterclaim are entitled to recover under Count VI from Blue Hills, Fineberg, and Langelier actual damages of $2,364,000, trebled to $7,092,000, plus interest at the statutory rate plus reasonable attorneys' fees, disbursements and costs.

Respectfully submitted,

CSFB 1999-C1 ROYALL STREET, LLC, and J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1,

By their attorneys,

/s/ Bruce E. Falby
E. Randolph Tucker, BBO #503845
Bruce E. Falby, BBO #544143
Bruce S. Barnett, BBO #647666
Traci S. Feit, BBO #660688
DLA PIPER US LLP
33 Arch Street, 26th Floor
Boston, MA  02110-1447
(617) 406-6000

Dated:  October 12, 2006