UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-Counterclaim<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the<br>the Registered Holders of Credit Suisse First<br>Boston Mortgage Securities Corp., Commercial<br>Mortgage Pass-Through Certificates, Series 1999-C1<br>    Defendant<br><br>and CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD FINEBERG<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

**SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

In accordance with Fed. R. Civ. P. 52(a)  Blue Hills Office Park LLC, ("Blue Hills"),

William Langelier ("Langelier") and Gerald Fineberg ("Fineberg") hereby submit the following

Supplemental Proposed Findings of Fact and Rulings of Law.

## I. <u>FINDINGS OF FACT</u>

### <u>Blue Hills, Fineberg and Langelier</u>

1.     Blue Hills is a Delaware limited liability company with a principal place of

business at One Washington Street, Suite 400, Wellesley, Massachusetts 02481.  Joint Statement

of Stipulated Facts ("Stipulated Facts"), No. 9; Trial Exhibits 111, 112.

2.     Blue Hills is a single purpose entity, formed in 1999 in connection with a

refinancing of a mortgage on its property located at 150 Royall Street, Canton, Massachusetts

and known as the Blue Hills Office Park (the "Property").  Trial Transcript Volume 1, William

Langelier ("Langelier Testimony, Vol."), page 61, lines 14-20; Trial Exhibit 111; Stipulated Facts No. 9.

3.    The formation of Blue Hills as a single purpose entity was required as a precondition to the refinancing. Stipulated Facts, No. 12; Langelier Testimony, Vol. 1, page 50, lines 2-9.

4.    Blue Hills is a "disregarded entity" for federal income tax purposes.  Stipulated Facts,  No. 66.

5.    Blue Hills' sole member is Royall Associates Realty Trust ("Trust").  Langelier Testimony, Vol. 1, page 64, lines 20-24; Stipulated Facts, No. 10.

6.    The Trust was formed to acquire title to the Property in 1987.  Langelier Testimony, Vol. 1, page 63, lines 12-16.

7.    Prior to the refinancing in 1999, the Trust owned the Property.  Stipulated Facts, No. 6.

8.    Fineberg and Langelier are two of the three trustees of the Trust, as well as also two of the six beneficiaries of the Trust.  Langelier Testimony, Vol. 1, page 63, lines 18-25; page 64,  lines 1-11; Stipulated Facts, No. 11.

**Credit Suisse First Boston Mortgage Capital LLC, J.P. Morgan Chase Bank and
CSFB 1999-C1 Royall Street LLC (sometimes collectively referred to herein as "Lender")**

9.    Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse") is a Delaware limited liability company with a principal place of business in New York, New York.   Stipulated Facts, No. 7.

10.    J.P. Morgan Chase Bank, formerly Chase Manhattan Bank, as Trustee for the Registered Holders of Credit Suisse Bank First Mortgage Securities Corp., Commercial

2

Mortgage Pass-Through Certificates, Series 1991-C1 ("J.P. Morgan"), is a New York banking corporation. Stipulated Facts, No. 26.

11.    CSFB 1999-C1 Royall Street, LLC ("CSFB") is a Delaware limited liability company formed in September 2004 with a principal place of business at 1601 Washington Avenue, Suite 700, Miami Beach Florida, 33139. Stipulated Facts, No. 62.

12.    All of Credit Suisse's rights, title, interest and obligations in the Loan were assigned to J.P. Morgan by assignment recorded with the Norfolk County Registry of Deeds on April 20, 2000 in Book 14112, page 387. Stipulated Facts, No. 28.

13.    J.P. Morgan was the record holder of the Loan until it assigned all its right, title and interest in the Loan to CSFB on or about November 10, 2004. Stipulated Facts, No. 60.

14.    All of J.P. Morgan's rights, title interest and obligations in the Loan were assigned to CSFB by assignment recorded in Norfolk Registry of Deeds on November 10, 2004 in Book 21755, page 477. Stipulated Facts, No. 61.

15.    After Credit Suisse originated the Loan, it was "securitized" and assigned to J.P. Morgan, as Trustee of a pool of loans. Stipulated Facts No. 27.

16.    When the Loan was assigned to J.P. Morgan as trustee, servicing of the Loan was governed by a Pooling and Servicing Agreement ("PSA") dated October 11, 1999. Trial Exhibit 186; Trial Transcript Volume 4, Joseph Polari (Polcari Testimony Vol."), page 135, lines 3-25; page 136; lines 1-6.

17.    Under the PSA, Wells Fargo Bank Commercial Mortgage Servicing ("Wells Fargo") was the Servicer and LNR Partners, Inc., formerly known as Lennar Partners, Inc. ("LNR") was the Special Servicer of the Loan. Trial Exhibit 186; Polcari Testimony, Vol. 4, page 135, lines 3-12.

3

18.      Wells Fargo and LNR were agents of J.P. Morgan.  Trial Exhibits 117 and 118. Polcari Testimony Vol. 4, page 132; lines 13-20.

19.      Wells Fargo and LNR were required to service and administer the Loan in accordance with applicable law, the terms of the Loan Documents, the PSA, and industry standards.  Trial Transcript, Volume 6, Richard Clarke ("Clarke Testimony Vol."), page 8, lines 20-25; page 9; lines 1-14.

<u>**The Loan and the Property**</u>

20.      Royall Associates Realty Trust acquired the Property on July 13, 1987.  Trial Langelier Testimony, Vol. 1, page 30, lines 23-25; page 33, lines 18-22; Trial Exhibit 2.

21.      On or about September 14, 1999, Credit Suisse loaned $33,149,000.00 to Blue Hills (the "Loan").  Langelier Testimony, Vol. 1, page 65, lines 20-25.  Stipulated Facts, No. 8.

22.      The Loan was secured by a mortgage on the Property.  Trial Exhibit 5.

23.      The Property is a two-story brick building containing approximately 275,000 square feet of rental office space.  Langelier Testimony, Vol. 1, page 33, lines 5-9; Trial Exhibit 144.

24.      Fineberg Management, Inc.  ("FMI"), a company affiliated with Fineberg managed the Property from 1987 to 2004, before and after the 1999 re-financing.  Langelier Testimony, Vol. 1, page 37, lines 3-8; page 71, lines 7-9; Stipulated Facts, No. 21.

25.      As part of the Loan closing held on September 14, 1999, Blue Hills executed various Loan documents dated September 14, 1999, including the following:  Mortgage, Assignment of Rents and Security Agreement ("Mortgage"); Mortgage Note ("Note"); and Cash Management Agreement.  Trial Exhibits 4, 5, 6; Stipulated Facts, No. 14.

26.     Fineberg and Langelier also executed a Guaranty ("Guaranty") dated September 14, 1999.  Trial Exhibit 7; Stipulated Facts, No. 14.

27.     The Loan is non-recourse as to Blue Hills, Fineberg and Langelier except under certain limited circumstances set forth in the Mortgage, Note and Guaranty.  Stipulated Facts, No. 15.

28.     The Cash Management Agreement required Blue Hills to deposit all of the "Rents" that it received in connection with the Lease into a "Clearing Account."  Trial Exhibit 6.

29.     The "Clearing Account" under the CMA was initially maintained at MetroWest Bank and subsequently maintained at BankNorth Massachusetts.  Stipulated Facts, No. 16.

30.     Funds deposited into the Clearing Account were swept into a Lender-controlled Cash Collateral Account and, thereafter, divided into nine separate sub-accounts maintained by the Lender on a ledger entry basis.  Trial Exhibit 6.

31.     These sub-accounts, including a "Tax and Insurance Impound Fund," a "Base Leasing Escrow Fund," and a "Cash Flow Leasing Escrow Fund," were maintained for, *inter alia*, payment of taxes, insurance and tenant improvements.  Trial Exhibit 6.

32.     The reserve accounts could be accessed by Blue Hills for various purposes, including debt service.  Trial Exhibit 6.

33.     Paragraph 6(c)(ix) of the Mortgage required the Lender to disburse up to $1 million of funds (in excess of a minimum account balance of $2,750,000) to be used "solely toward payment of principal and interest then due and payable on the Note . . . ."  Trial Exhibit 5.

34.     As of August 2004, Blue Hills had deposited approximately $4.1 million in the reserve accounts.  Trial Transcript Volume 2, Joseph Donovan ("Donovan Testimony, Vol."), page 27, lines 19 - 23; Trial Exhibit 147.

35.    In accordance with Paragraph 6(c)(ix) of the Mortgage, Blue Hills should have been able to access up to $1 million of the reserve funds in August 2004.  Trial Exhibit 5.

## Equiserve

36.    At the Loan's inception, the Property was primarily occupied by one tenant, Equiserve, Inc. ("Equiserve"), which occupied approximately 96% of the building on the Property.  Stipulated Facts, No. 19.

37.    Equiserve's lease with Blue Hills ("Lease") expired on July 31, 2004, although Equiserve retained an option to extend the Lease for an additional five-year term.  Langelier Testimony, Vol. 1, page 41, lines 3-9; lines 22-24.  Stipulated Facts, No. 20.

38.    While Equiserve remained a tenant in the Property, the monthly rental income was sufficient not only to fully fund all of the reserve accounts but also provided a surplus.  Each month, Wells Fargo distributed the surplus to Blue Hills by depositing it in Blue Hills' operating account.   There were no restrictions or liens on the surplus  wired to Blue Hills' operating account.  Donovan Testimony, Vol. 2, page 102, lines 12-19.

## Payment of Taxes

39.    Although the Mortgage required Blue Hills to fund a reserve account for the payment of real estate taxes, Wells Fargo and Blue Hills agreed to an alternative arrangement in October 1999.  Pursuant to this arrangement, Equiserve deposited the real estate tax payment into the Clearing Account so that it could be swept into the Cash Collateral Account and used by Wells Fargo to pay the taxes.  Donovan Testimony, Vol. 2, page 104, lines 5-9; lines 24 - 25; page 105, lines 1-3; Trial Exhibit 53.

40.    As a result of the foregoing arrangement, shortly before the taxes were due each quarter, Wells Fargo would issue a so-called "tax insufficiency" notice advising Blue Hills that

the taxes were due.  Donovan Testimony, Vol. 2, page 105, lines 4-24; Trial Exhibits 55, 65, 120, 136.

41.     Wells Fargo sent the  "tax insufficiency" notices four times each year.  The notices were sent approximately two to three weeks prior to the quarterly tax being due to the Town of Canton.  Donovan Testimony, Vol. 2, page  105, lines 11-18.

42.     After Equiserve deposited funds for payment of the real estate taxes, the funds were swept and transferred to Wells Fargo.  If the funds needed to be transferred on a day other than a day when the funds would be automatically swept by Wells Fargo, Blue Hills requested the Clearing Bank to wire the funds to Wells Fargo.  Donovan Testimony, Vol. 2, page 108, lines 11-22; Trial Exhibits 119, 120,121, 122.

43.     After Equiserve made the quarterly tax payment and deposited the funds, Blue Hills alerted Wells Fargo that the funds were available.  Donovan Testimony, Vol. 2, page 111, lines 1-6; Trial Exhibit 146.

44.     Blue Hills communicated with Wells Fargo by telephone calls, e-mails , faxes and letters from 1999 - 2004.  Donovan Testimony, Vol. 2, page 111, lines 7-25.  Trial Exhibits 127, 128, 129, 130, 131, 132.

45.     At times, Blue Hills requested Wells Fargo to perform insurance escrow analyses so that Blue Hills could be reimbursed for amounts advanced by Blue Hills for the payment of insurance or for excess funds in the insurance escrow account.  In response, Wells Fargo completed the analyses and refunded any excess funds  to Blue Hills.  Such communications may be made by via e-mail, telephone, fax or letter.  Donovan Testimony, Vol. 2, page 112, lines 2 - 24; Trial Exhibits 123, 124, 125, 133, 134.

46.     From 1999 - 2004, Blue Hills or FMI sent various notices to Wells Fargo, none of which complied with the formal notice provisions set forth in paragraph 39 of the Mortgage.  At no time did Wells Fargo or any other representative of the Lender object to the form of Blue Hills' communications.  Donovan Testimony, Vol. 2, page 115, lines 24-25; page 116, lines 1-20.

47.     The last notice received from Wells Fargo before Blue Hills was defaulted for failing to pay real estate taxes, dated July 16, 2004, stated that "failure to remit the shortage amount within the specified time frame may result in Wells Fargo Bank advancing corporate funds.  Should this occur, a $500.00 fee would be assessed to your loan."  Trial Exhibit 65.

48.     Wells Fargo never informed Blue Hills that nonpayment or late payment of real estate taxes would result in any consequence other than those stated in the tax insufficiency letters.  Donovan Testimony, Vol. 2, page 108, lines 2-10; Trial Exhibits 55, 65, 120.

### Equiserve Does Not Extend The Lease

49.     In 2002, Daniel Frank ("Frank"), President of Blue Hills Office Park LLC, met and communicated with Vincent Dasta and Thomas McGee of Equiserve/DST in order to discuss Equiserve's purchase or extension of the lease on the Property.  Equiserve had no interest in pursuing these options.  Frank Testimony, Vol. 6, page 101 - 103, Trial Exhibits 10, 11, and 12.

50.     Thomas McGee informed Frank that that under no circumstances would Equiserve be staying in the Property at 150 Royall St.  Frank Testimony, Vol. 6, page 110 and 112, line 12.

51.     In the spring of 2003, Frank discovered that Equiserve planned to purchase and move to the adjacent property at 250 Royall St.  Frank Testimony, Vol. 6, page 105-106 and Trial Exhibit 13.

52.    In April 2003, Blue Hills learned that Equiserve intended to move out of the Property at the expiration of the Lease on July 31, 2004 and to relocate to the building located at 250 Royall Street, Canton, Massachusetts ("250 Royall").  Stipulated Facts, Nos. 31-33.

53.    By letter dated May 14, 2003, Equiserve notified Blue Hills of its intent not to exercise its option to extend the Lease.  Trial Exhibit 17; Langelier Testimony, Vol. 1, page 83, lines 17-24; Stipulated Facts, No. 35.

54.    By a letter to Equiserve dated May 15, 2003, Blue Hills confirmed Equiserve's intent not to exercise the Lease option.  Trial Exhibit 18; Langelier Testimony, Vol. 1, page 84, lines 7-12; Stipulated Facts, No. 36.

55.    Blue Hills engaged Cushman and Wakefield, as exclusive leasing agent, to market the Property to find a replacement tenant.  Stipulated Facts, No. 47.

56.    In September 2003, Blue Hills advised Wells Fargo of Equiserve's notification of its intent not to renew the Lease.  Stipulated Facts, No. 46; Donovan Testimony, Vol. 2, page 118, lines 1-5.

57.    Wells Fargo and LNR knew, at least as early as September 2003, that Equiserve did not intend to renew the Lease.  Stipulated Facts, No. 46.

## Norfolk Action

58.    In April 2003, Equiserve and National Development, applied to the Town of Canton Zoning Board of Appeals ("ZBA") for a Special Permit to construct a parking garage. Stipulated Facts, No. 32.

59.    On May 22 2003, the ZBA – over Blue Hills' objections – issued a decision granting the Special Permit.  Stipulated Facts, No. 38; Trial Exhibits 19 and 20.

9

60.     On or about June 9, 2003, Blue Hills filed an appeal of the ZBA's decision in Norfolk Superior Court, Civil Action No. 2003-01051 ("Norfolk Action").  Trial Exhibit 21; Stipulated Facts, No. 39

61.     In the Norfolk Action, Blue Hills asserted that the ZBA failed to comply with the applicable Canton ordinances and by-laws in permitting the parking garage to be built as proposed.  Trial Exhibit 21.

62.     In the Norfolk Action, Blue Hills did *not* claim that the ZBA's decision caused it any monetary damage nor did it seek monetary damages as a remedy.  Rather, Blue Hills sought only to have the ZBA's decision to grant the Special Permit annulled.  Trial Exhibit 21.

63.     Blue Hills met with National Development both before and after the May 22, 2003 Decision was issued on May 16, 2003 and June 17, 2003. Trial Transcript Volume 7, Kenneth Goldberg ("Goldberg Testimony, Vol. 7"), page 11, lines 22-25.

64.     The plans were revised as a result of the Blue Hills' concerns.  Blue Hills did not receive the revised plans until after the filing of the Norfolk Action.  Trial Transcript Volume 7, Kenneth Goldberg ("Goldberg Testimony Vol.") page 12, lines 13-15; Trial Exhibit 213.

## Settlement Agreement and Settlement Proceeds

65.     Less than two months after filing the Norfolk Action, Blue Hills entered into a settlement agreement dated August 5, 2003 ("Settlement Agreement") with the owner of 250 Royall and DST Realty, Inc. ("DST"), an affiliate of Equiserve, which intended to purchase 250 Royall.   Trial Exhibit 24; Stipulated Facts, No. 40.

66.     DST's purchase of 250 Royall was conditioned upon the approval of all necessary permits for the construction of the parking garage.  Trial Exhibit 24.

67.     There is no record evidence that the settlement of the Norfolk Action resulted in any diminution in the value of the Property.

68.     Lender has failed to quantify any diminution of value of the Property as a result of the settlement of the Norfolk Action.

69.     By the terms of the Settlement Agreement, Blue Hills agreed to dismiss the Norfolk Action upon the receipt of $2,000,000.00 ("Settlement Proceeds") from DST.  Trial Exhibit 24; Stipulated Facts, No. 41.

70.     The Settlement Proceeds were to be paid on the earlier of the date on which DST acquired title to the 250 Royall or on September 2, 2003.  Trial Exhibit 24; Stipulated Facts, No. 42.

71.     Upon the sale of the Property to DST, the Settlement Proceeds were wired to Bernkopf Goodman LLP's IOLTA account at Banknorth and, subsequently, to a Blue Hills client's funds account at Bernkopf Goodman LLP on August 8, 2003.  Stipulated Facts, No. 44.

72.     The client's funds account at Bernkopf Goodman LLP was titled "Fineberg Royall Associates."  Trial Exhibit 145.

73.     The Settlement Proceeds were held for the benefit of Blue Hills.  Goldberg Testimony, Vol. 8, page 27, lines 16-23.  There is no evidence to the contrary.

74.     The Settlement Proceeds were classified as a reduction in basis of the Property in the compiled financial statements of Blue Hills for the year ended December 31, 2003.  The Settlement Proceeds were not reported as income.  Trial Transcript, Volume 8, David Andelman.

75.     The Trust voluntarily accumulated several millions of dollars in "rainy day" funds.  Langelier Testimony, Vol. 1, page 67, lines 12-20.

76.     This "rainy day" reserve fund was separate from and in addition to approximately $4.1 million of Blue Hills' funds on deposit in the reserve accounts as of August, 2004. Langelier Testimony, Vol. 1, page 68, lines 1-15.

77.     The "rainy day" reserve fund was held for partnership purposes such as re-tenanting the Property in accordance with a letter agreement dated September 10, 1999.  Trial Exhibit 182; Trial Transcript Volume 4, Andrew Cohn ("Cohn Testimony Vol"), page 14, lines 17-20.

78.     The Settlement Proceeds were not commingled with the rainy day funds. Goldberg Testimony, Vol. 8, page 86, lines 1-13.

79.     Blue Hills' financial statements were prepared utilizing a legally permissible accounting method known as the income tax method of accounting.  This accounting method allows the deferment of any tax payment on the Settlement Proceeds.  Trial Exhibit 31.

80.     Blue Hills provided the Lender with all financial statements it requested related to the Property.  Trial Exhibits 135, 137, 138, 139, 140, 141, 142, 151-174; Donovan Testimony Vol. 3, page 25, lines 5-22.

81.     Since the Loan's inception, FMI, on behalf of Blue Hills, has furnished financial information concerning Blue Hills to Wells Fargo on both a quarterly and an annual basis. Regardless of whether additional financial information was required, Wells Fargo never requested that Blue Hills furnish any additional financial information. Had Wells Fargo requested additional financial information, Blue Hills would have been promptly sent it to Wells Fargo.  Donovan Testimony, Vol. 3, page 25, lines 5-22; Trial Exhibits 135, 137, 138, 139, 140, 141, 142, 151-174; Stone Testimony, Vol. 8.

12

82.     For the years ended December 31, 2003 and 2004 – as in all previous years – the statements of assets and liabilities for Blue Hills were prepared by the certified public accounting firm of Rutfield & Hassey CPA.  Trial Exhibits 29 - 34; Donovan Testimony, Vol. 2, p. 99, lines 8-22.

## Lease Termination Agreement

83.     Distinct from settlement of the Norfolk Action, Equiserve and Blue Hills executed a Lease Termination Agreement in August 2003.  Trial Exhibit 25.

84.     The Lease Termination Agreement did not terminate the Lease, which expired by its own terms on July 31, 2004.   Trial Exhibits 17, 18 and 25.

85.     Rather, the Lease Termination Agreement set forth, *inter alia*, the condition in which Equiserve would leave the Property upon moving out.  Trial Exhibit 25.

86.     The Lease Termination Agreement also provided that Equiserve would abandon certain workstations at the Property when it vacated the Property in July 2004.  Trial Exhibit 25.

87.     In August 2004, after Equiserve had vacated the Property, Blue Hills sold the abandoned workstations for $100,000.00.  The workstations had no foreseeable use and were not part of the Lender's collateral.  The testimony of Dorothy Erwin had no bearing on the use of the work stations at the Property or whether they were the Lender's collateral.  Trial Exhibits 5, 90-92; Erwin Testimony, Vol. 8.

88.     Blue Hills was informed by its brokers that the Property would be more marketable if the work stations were removed.  Needle Testimony, Vol. 8.

89.     The sale of the workstations did not constitute an Event of Default under the Loan Documents.   Trial Exhibit 5.

13

90.     Thereafter, Blue Hills used funds in its operating account to pay for various expenses related to the upkeep and maintenance of the property. Trial Transcript Volume 8, Lawrence Needle.

### December 31, 2004 Agreement

91.     Pursuant to an agreement dated December 31, 2004, Fineberg and Langelier agreed to have one-half of the Settlement Proceeds from the Norfolk Action – $1 million – wired from the Blue Hills' client's funds account to the client's funds account of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Cutler"), Langelier's attorney.  One-half (one million dollars) of the Settlement Proceeds were wired to a client's funds account at Wilmer Cutler in February 2006.  Trial Exhibits 26 and 145; Cohn Testimony, Vol. 3, page 139, lines 17-25; Cohn Testimony, Vol. 4, page 21, lines 4-18.

92.     The Settlement Proceeds have remained in Blue Hills' possession since they were received.  The receipt of the Settlement Proceeds was duly recorded in Blue Hills' financial books and records and such funds have not been distributed to any of the Trust's beneficiaries.  Cohn Testimony, Vol. 3, page 20, lines 9-21; Goldberg Testimony, Vol. 7, page 20, lines 16-22 and page24, line 7-12.

93.     The Settlement Proceeds were not deposited into the same account as the $1.2 million from the 1999 refinancing.  Goldberg Testimony, Vol. 8, page 86, lines 8-13.

94.     The $2 million in settlement proceeds were wired into and IOLTA account at Bernkopf  Goodman and then to a clients' fund account maintained by Bernkopf where it sat until early February 2005 when one-half of the settlement amount - $1 million – was wired into a clients' fund account at Wilmer Cutler Pickering Hale & Dorr LLP.  Goldberg Testimony, Vol. 7, page 26, lines 16-22.

14

95.     The Settlement Proceeds were duly recorded in Blue Hills' financial reports.

David Andelman Testimony, Vol. 8.  Trial Exhibit 30.

**Blue Hills Requests Disbursements From The Reserve Accounts**

96.     As early as the spring of 2004, LNR knew that, despite Blue Hill's efforts, there

was a distinct possibility that a substitute for Equiserve, the Property's sole tenant, would not be

found.  Any such failure would have severe repercussions for Blue Hills' ability to service the

Loan.  Trial Exhibits 196-200.

97.     Because Equiserve was to leave the Property as of July 31, 2004, funds were not

available to pay the real estate taxes due to the Town of Canton on August 2, 2004.  Donovan

Testimony, Vol. 2, page 132, lines 7-16; Trial Exhibit 70.

98.     On August 2, 2004, Blue Hills' representative Joseph Donovan ("Donovan") the

CFO of FMI, sent a written request to Wells Fargo seeking disbursement of the sum of

$412,833.43 from the reserve accounts.  This disbursement was to be used to pay principal and

interest due on the Note for the month of August, 2004, as well as to pay real estate taxes.  Trial

Exhibit  70; Donovan Testimony, Vol. 2, page 119, lines 3-14.

99.     Wells Fargo paid $158,181.19 in property taxes due to the Town of Canton by

August 2, 2004.  Polcari Testimony, Vol. 5, page 83, lines 8-12; page 84, lines 19-24.

100.    After sending the August 2, 2004 letter to Wells Fargo, Donovan contacted the

Town of Canton Treasurer's Office, which verified to Donovan that the taxes had been paid.

Donovan Testimony, Vol. 2, page 132, lines 7-16.

101.    Consequently, Donovan reasonably assumed that the tax payment was made from

the reserve accounts.  Donovan Testimony, Vol. 2, page 132, lines 7-16.

15

102.    Donovan received no response from Wells Fargo to his August 2, 2004 letter. Donovan Testimony, Vol. 2, page 131, lines 13-21.

103.    The next payment of principal and interest under the Note was not due until August 11, 2004.  Trial Exhibit 4.

104.    Donovan sent a subsequent letter to Wells Fargo dated August 5, 2004 requesting a meeting with Wells Fargo and LNR, the Special Servicer.  Trial Exhibit 72;  Donovan Testimony, Vol. 2, page 132, lines 117-124.

105.    Donovan received no response from Wells Fargo to his August 5, 2004 letter. Donovan Testimony, Vol. 2, page 133, lines 3-6.

106.    Having received no response from Wells Fargo, on August 13, 2004 Donovan sent a fax memorandum to Curtis Mallegni at Wells Fargo stating:  "Sorry we have been missing each other on the phone.  I would like to get the special servicer involved."  Donovan attached copies of his August 2 and August 5, 2004 letters to the memorandum.  Trial Exhibit 75; Donovan Testimony, Vol. 2, page 135, lines 1-3; page 136, lines 11-20.

107.    Donovan received no response from Wells Fargo to the requests contained in his August 2, August 5, and August 13, 2005 letters.  Donovan Testimony, Vol. 2, page 136, lines 2-25; page 137, lines 1-2.

### Donovan's Request Were Timely

108.    While Section 6(c)(ix)(a) of the Mortgage states, "Mortgagor shall have delivered to Mortgagee, at least seven (7) business days prior to the date of such requested disbursement, or written request," this section does not define the term "delivered."  Trial Exhibit 5.

109.    Section 39 of the Mortgage requires that "notices shall be deemed to have been given on the date that they are actually received; provided, that the inability to deliver Notices

16

because of a changed address will be deemed to be receipt of the Notice as of the date of such inability to deliver."   Trial Exhibit 5.

110.    Section 39 of the Mortgage required that such "notices" be provided to Credit Suisse and to ORIX Real Estate Capital Markets LLC ("ORIX"), the (then) Servicer.  However, by August 2004, J.P. Morgan – not Credit Suisse – was the Lender and Wells Fargo – not ORIX – was the Servicer.    Trial Exhibit 5; Stipulated Facts, No. 29.

111.    Donovan's August 2, 2004 letter was addressed to Tim Parish ("Parish") in the Wells Fargo's Property Tax Department because Parish signed Wells Fargo's July 16, 2004 tax insufficiency letter.   Donovan Testimony, Vol. 2, page 119, lines 9-17.  Trial Exhibit 65.

112.    Wells Fargo's records show that Donovan's August 2, 2004 letter was logged in as received as of August 4, 2004.  Trial Exhibit 114.

113.    Even assuming that Wells Fargo did not receive Donovan's letter before August 4, 2004, Donovan's letter was only one day late.  Trial Exhibit 114.

114.    Wells Fargo received actual notice of Donovan's request and the Lender has not presented any evidence that a one day delay caused it any prejudice.  Trial Exhibit 143

115.    The notice provisions contained in Section 39 of the Mortgage were not rigidly adhered to by Wells Fargo from Loan inception up to Donovan's August 2, 2004 letter. Donovan Testimony, Vol. 2, page 115, lines 24-25; page 116, lines 1-20.

116.    Wells Fargo's records indicate that transfers in and out of the reserve accounts to cover tax, insurance and other shortages and adjustments were often handled between Wells Fargo and Blue Hills by telephone and fax, often with considerably less than seven business days' notice.  Donovan Testimony, Vol. 2, page 111, lines 7-25; page 112, lines 2-24; Trial Exhibits 123-134.

17

117.    Although it is undisputed that Wells Fargo received Donovan's August 2, 2004 letter no later than August 4, 2004, Wells Fargo never notified Donovan in writing that the tax payment could not be made out of the reserve accounts.  Donovan Testimony, Vol. 2, page 131, lines 13-21.

118.    The only written notice sent by Wells Fargo was Parish's letter dated July 16, 2004, which advised Blue Hills that a late tax payment would merely result in a $500 late fee assessment and might require Wells Fargo to advance its own funds.   Trial Exhibit 65.

119.    Blue Hills and Wells Fargo's prior course of conduct entitled Blue Hills to have access to the reserve accounts to pay real estate taxes or, at minimum, required Wells Fargo to notify Blue Hills of the tax non-payment.  Moreover, prudent banking industry practice requires such notification.  Clarke Testimony, Vol. 6, page 13, lines 16-25; page 14, lines 1-4.

120.    Neither J.P. Morgan nor its agents informed Blue Hills that it would be defaulted for failure to pay taxes or that reserve accounts could not be accessed to pay for real estate taxes prior to the September 17, 2004 letter. Trial Exhibit 117 (Requests for Admissions), Page 8, Request No. 20.

121.    Wells Fargo's tax insufficiency notice dated July 16, 2004 advised Blue Hills that Wells Fargo may pay the tax and that Blue Hills could face a penalty of $500.00 for failure to pay.  Trial Exhibit 65.

**The Lender Refuses to Respond to Blue Hills**

122.    Wells Fargo did not respond to Donovan's requests for a meeting nor his requests for disbursements, as contained in his correspondence of August 2, 5 and 13, 2004.  Moreover, prior to September 17, 2004, Wells Fargo never sent  Blue Hills a notice informing Blue Hills

18

that the failure to pay the real estate taxes constituted an Event of Default under the Loan. Donovan Testimony, Vol. 2, page 131, lines 13-21; page 133 lines 3-6.

123.    Job Warshaw ("Warshaw"), an LNR asset manager,  left Donvovan a voice mail message in August 2004.  Donovan Testimony, Vol. 2, page 137, lines 3- 16; Trial Exhibit 72.

124.    By letter dated August 19, 2004, but not faxed until August 24, 2004, Warshaw notified Blue Hills that the Loan servicing had been transferred to LNR and that LNR looked forward to a "successful working relationship" with Blue Hills.  No mention was made of Blue Hills' requests for disbursement nor was mention made of the existence of any defaults under the Loan.  Trial Exhibit 79; Stipulated Facts, No. 54.

125.    Warshaw also sent Blue Hills a letter dated August 19, 2004, but not faxed until August 24, 2004, in which he stated that LNR had "agreed to discuss the status of [the Loan]…" and "any issues arising under [the Loan documents].    Trial Exhibits 80-81; Stipulated Facts, No. 55.

126.    The second August 19, 2004 letter from Warshaw included a list of documents requested by LNR.  All of the documents requested, except for Fineberg and Langelier's updated financial statements and a business plan, were already in by LNR or Wells Fargo's possession. Donovan Testimony, Vol. 2, page 142, lines 11-25; page 143, lines 1-18; Donovan Testimony, Vol. 3, page 7, lines 9-5; page 8, lines 1-19; Trial Exhibit 143.

127.    Thereafter, on August 26, 2004, Fineberg signed the letter received from LNR on August 24, 2006 and faxed the signed copy to LNR.  Although Fineberg had signed this letter and LNR or Wells Fargo had virtually all of the requested documents, LNR did not schedule a meeting.  Stipulated Facts, No. 56; Donovan Testimony, Vol. 2, page 142, lines 11-25; page 143,

19

lines 1-18; Donovan Testimony, Vol. 3, page 7, lines 9-5; page 8, lines 1-19; Trial Exhibits 82, 83 and 143.

128.    Goldberg and Warshaw discussed a meeting to be scheduled between the Lender and Blue Hills.  Goldberg Testimony, Vol. 8, pages 44-45.

129.    Goldberg invited Warshaw to visit the Property and to assess the market at Blue Hills' expense.  Goldberg Testimony, Vol. 8, page 44.

130.    Goldberg had a subsequent conversation with Warshaw which concluded with Warshaw indicating that he intended to review the Loan Documents and would then contact Goldberg.  Goldberg Testimony, Vol. 8, pages 44 and 45.

131.    On September 2, 2004, Donovan wrote to Wells Fargo requesting the disbursement of $254,652.24 to pay principal and interest due on the Note for the month of September, 2004.    Donovan Testimony, Vol. 3, page 20, lines 4-16; Trial Exhibit 87.

132.    On September 7, 2004, Joseph Polcari ("Polcari") replaced Warshaw as asset manager at LNR.  Polcari's first contact with Blue Hills was a default letter dated September 17, 2004.    Stipulated Facts, No. 58.

133.    When Polcari replaced Warshaw, he did not contact Blue Hills to schedule a meeting, as Goldberg and Warshaw had agreed upon.  Polcari Testimony, Vol. 5, page 61, lines 11-16.

134.    Polcari called Donovan on September 16, 2004.  They did not discuss Donovan's requests for access to the reserves.  Polcari Testimony, Vol. 5, page 62, lines 8-14.

135.    In his September 17, 2004 letter, Polcari informed Blue Hills that its request for disbursement of real estate taxes had been denied, purportedly because the Mortgage did not permit such disbursements.  Moreover, he declared that – as of August 2, 2004 – Blue Hills was

20

in default under the Loan for failure to pay real estate taxes when due.  Trial Exhibit 88;

Stipulated Facts, No. 59.

136.    This September 17, 2004 default letter is the only written notice of default ever

sent to Blue Hills.  Trial Exhibits 117, 118, 88; Polcari Testimony, Vol. 5, page 60, lines 19-25;

page 61, lines 1-13.

137.    Thereafter, on or about October 18, 2004, Daniel Frank ("Frank"), Blue Hills'

representative and President of FMI, requested a meeting with LNR.  Trial Exhibit 103.

**The Foreclosure Sale**

138.    By letter dated October 21, 2004, CSFB, as assignee of J.P. Morgan, gave notice

to Blue Hills of its intention to foreclose.  Stipulated Facts, No. 63, Trial Exhibit 96.

139.    During the period of November 10 – November 19, 2004, whereby Blue Hills

continued to request that LNR meet with it to consider alternatives to foreclosure, several letters

were subsequently exchanged between Goldberg and counsel for LNR.  Trial Exhibits 102-106.

140.    A foreclosure sale was held on or about November 19, 2004.  The foreclosure

deed was recorded on January 14, 2005 with the Norfolk County Registry of Deeds in Book

21988, page 509.  Stipulated Facts, No. 64; Trial Exhibit 109.

141.    At the foreclosure sale, CSFB credit bid $18,500,000 and acquired title to the

Property.  Trial Exhibits 109-110.

142.    On or about April 29, 2005, CSFB sold the Property to One Beacon Insurance

Group for $23,000,000.  Stipulated Fact and Trial Exhibit CI.

**PSA and the Servicing Standard**

143.    The Servicing Standard contained in Section 3.01 of the PSA establishes the

touchstones governing Wells Fargo and LNR's conduct.  The Servicing Standard mandates that

Wells Fargo and LNR must conduct themselves in accordance with the <u>higher</u> of two standards: (1) the standard of care, skill, prudence and diligence employed in administering similar commercial or multi-family mortgage loans or, (2) standard of care, still, prudence and diligence employed in servicing and administering similar commercial or multi-family mortgage loans owned by Wells Fargo or LNR.  The Servicing Standard also obligates LNR and Wells Fargo to perform their services <u>without regard</u> to: (1) any relationship they or any affiliate may have had with the Blue Hills; (2) any compensation to be received under the PSA; and (3) their ownership, servicing or management of any other mortgage loans or mortgage properties.  Trial Exhibit 186.

144.    Blue Hills' banking expert, Richard A. Clarke ("Clarke") opined that borrowers involved in securitized loan transactions have the right to expect that their loans will be administered by the Servicer and Special Servicer according to the Servicing Standard.  Clarke Testimony, Vol. 6, page 60, lines 14-18; Trial Exhibit GE.

145.    To have confidence in the treatment of each individual pooled loan, the marketplace – including lenders, borrowers and certificate holders – has the right to expect that the pool loans will be serviced in strict accordance with the Servicing Standard.  Clarke Testimony, Vol. 6, page 19, lines 2-5; Trial Exhibit GE.

146.    The Servicing Standard is a standard of prudency, reflecting the industry practices of prudent institutional multi-family and commercial mortgagors.  Clarke Testimony, Vol. 6, page 9, lines 1-6.

147.    Although the over-arching objective contained in Section 3.01 of the PSA is for the Servicer or Special Servicer to maximize "on a present value basis (discounting at the related Mortgage Rate)… timely recovery of interest and principle on the Loans …," standards of

22

prudency dictate how that objective is best achieved. Clarke Testimony, Vol. 6, page 9, lines 1-6; Trial Exhibit 186.

148.    The PSA is replete with provisions which contemplate that specially serviced loans will be worked out (as opposed to being foreclosed) to the fullest extent practical and reasonable. Trial Exhibit 186.

149.    Both Wells Fargo and LNR substantially deviated from the Servicing Standard, as well as the applicable industry standards for third party loan servicing. Clarke Testimony, Vol. 6, page 8, lines 20-21.

150.    Wells Fargo's and LNR's internal e-mails from August through November 2004, reveal that they awaited an opportunity to acquire the $4.1 million in reserves, as well as to quickly commence foreclosure proceedings or otherwise acquire the Property. Trial Exhibits 196-208.

151.    LNR had been monitoring the Loan for almost a year before the foreclosure of the Property on November 19, 2004. Trial Exhibits 188-208; Polcari Testimony, Vol. 5, page 13, lines 2-11.

152.    LNR expressed concern over Blue Hills' admitted ability to access the reserve accounts to pay debt service and its hope that Blue Hills could be forced to default before it could access the reserve accounts. Trial Exhibits 198; Polcari Testimony, Vol. 5, page 35, lines 5-18.

153.    LNR's prior dealings with Fineberg led it to conclude that Fineberg would be a hard negotiator in any Loan work-out. Trial Exhibit 191.

154.    LNR's intent to acquire the Loan while simultaneously being predisposed against working with Fineberg based on LNR's past dealings with him is unprofessional and contravenes prudent servicing standards.  Clarke Testimony, Vol. 6, pages 36-37.

155.    No evidence introduced that settlement in any way diminished value of Property.

156.    Blue Hills did not terminate the Lease, which expired on July 31, 2004 of its own terms when Equiserve notified Blue Hills of its intent not to renew.  Trial Exhibits 17-18.

## II.  RULINGS OF LAW

### Breach of Contract

1.    At the core of Lender's allegations is that Blue Hills' receipt of the $2,000,000.00 Settlement Proceeds and the dismissal of the Norfolk Action allegedly constituted an "assignment, transfer or conveyance of an interest in the Mortgaged Property, requiring Lender's prior written consent pursuant to Section 10 of the Mortgage."  Counterclaims, ¶31.

2.    Full liability for the Loan deficiency, so Lender alleges, is based upon Guaranty paragraph 1.2(ii)(D) which provides that:

> Guarantor shall be liable for the full amount of the Debt in the event that . . . (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer or conveyance of the Mortgaged Property or any interest therein if required by *Section 10* of the Mortgage.  (emphasis in original).  Trial Exhibit 7.

3.    Accordingly, under Guaranty paragraph 1.2(ii)(D), Lender bears the burden of proving that:

- Blue Hills assigned, transferred or conveyed Mortgaged Property or any interest therein;

- Blue Hills failed to obtain Lender's prior written consent to such assignment, transfer or conveyance; and,

24

- Lender's consent to such assignment, transfer or conveyance was required by Section 10 of the Mortgage.

Trial Exhibit 7.

4.    Section 10 of the Mortgage, construed as a whole, and in conjunction with Guaranty paragraph 1.2(ii)(D), mandates a narrow construction of the phrase "Mortgaged Property." Trial Exhibit 5.

5.    The general import of Section 10 of the Mortgage is that Credit Suisse's consent is required for the alienation or transfer of the Property. Section 10(a) states that Credit Suisse has "examined and relied on the creditworthiness and experience of [Blue Hills] in owning and operating properties such as the Mortgaged Property . . . [s]o as to insure that should Mortgagor default in repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property." The quoted language evinces the parties' intent to define "Mortgaged Property" as the Property and not, for example, intangibles such as the Norfolk Action or the Settlement Proceeds. Trial Exhibit 5.

6.    Section 10(b) of the Mortgage enumerates the types of assignments and transfers included within the scope of Section 10, all of which involve the sale, encumbrance, transfer or leasing of the Property, the legal and beneficial ownership thereof, and/or the substitution of Fineberg and Langelier as guarantors. Trial Exhibit 5.

7.    As with Section 10(a), the import of Section 10(b) of the Mortgage is that the scope of the transactions (as to which prior written consent is required) is limited to the Property, the ownership interests therein and the substitution of the guarantors. Trial Exhibit 5.

8.    Section 10(e) of the Mortgage obligated Blue Hills to reimburse Credit Suisse for expenses and fees incurred in connection with its approval of the requested transfer or

25

encumbrance including "title search costs and title insurance endorsement premiums." The

enumerated expenses and fees in Section 10(e) are normally associated with real property, not

litigation or settlement proceeds. Trial Exhibit 5.

       9.    Section 10(f) of the Mortgage enumerates several preconditions to Credit Suisse's

consent to a Section 10 sale or transfer, all of which are Property oriented:

- Section 10(f)(ii) requires that the proposed transferee "shall be a reputable entity or person of good character, creditworthy, with sufficient financial worth . . . ."

- Section 10(f)(ii) requires the proposed transferee and "its property manager to have "sufficient experience in the ownership and management of properties similar to the Mortgaged Property . . . ."

- Section 10(f)(iv) entitles Credit Suisse to obtain rating agency recommendations to the transfer; and

- Section 10(f)(vi) entitles Credit Suisse to an assumption fee equal to 1% of the mortgage Debt, plus reimbursement of costs and expenses incurred in connection with the assumption. This subsection requires the payment of a fee if the Loan secured by the mortgage is being assumed by a new owner. This subsection has no relevance to the Norfolk Action or to the Settlement Proceeds. The Counterclaims do not seek any assumption fee for the allegedly improper transaction at issue. Trial Exhibit 5

      10.    The narrow construction of the phrase "Mortgaged Property" in Section 10 is also

buttressed substantially by Section 50 in the Mortgage, which states that terms such as

Mortgaged Property shall mean any portion of the Mortgaged Property and any interest therein

"*[u]nless the context clearly indicates a contrary intent* or unless otherwise specifically provided herein . . . ." (emphasis added). Trial Exhibit 5.

11.     Section 50 of the Mortgage articulated the parties' intention to ascribe different meanings to the phrase "Mortgaged Property" throughout the Mortgage. Trial Exhibit 5.

12.     Section 10 requires Credit Suisse's consent for significant actions affecting the Property and the Loan; a transfer of the Property or the ownership interest therein, and substitution of Fineberg and Langelier as guarantors.  Trial Exhibit 5

13.     Section 10 of the Mortgage contains <u>no</u> consent requirement with respect to the settlement of the Norfolk Action or Blue Hills' receipt of the Settlement Proceeds. Trial Exhibit 5 and Goldberg Testimony, Vol. 8, page 77, lines 23-25; page 78, lines 1-25; page 79, lines 1-10.

14.     The Settlement Proceeds are not "Rents" under the Cash Management Agreement.  Trial Exhibit 6.

15.     Blue Hills, Fineberg or Langelier did not transfer the Settlement Proceeds in violation of Section 10 of the Mortgage.

16.     Blue Hills, Fineberg and Langelier did not need to obtain the Lender's consent to settle the Norfolk Action.

17.     The Settlement Proceeds are not Mortgaged Property under Section 10 of the Mortgage.

18.     A contract "is to be read 'in a manner to give effect to the chief design to be accomplished by the instrument,' and [courts] are to look 'through the form to the substance and purpose of the agreement' and to mould the decree 'in accordance with what the parties may fairly be presumed to have intended.'"  *Kerrigan v. Boston*, 361 Mass. 24, 33 (1972), quoting

27

*Clark v. State St. Trust Co.*, 270 Mass. 140, 152-153 (1930); *MacDonald v. Gough*, 326 Mass. 93, 96 (1950).

19.    A contract must be construed with reference to the situation of parties when they made it and to objectives sought to be accomplished.  *Starr v. Fordham*, 420 Mass. 178 (1995).

20.    A contract is to be construed to give reasonable effect to each of its provisions. *J.A. Sullivan Corp. v. Commonwealth of Massachusetts*, 397 Mass. 789 (1986); *Sarvis v. Cooper*, 40 Mass. App. Ct. 471 (1996).

21.    When an essential term of a contract is missing, that contract is ambiguous, and it falls to the court to interpret the contract sensibly in light of the terms of the document taken as a whole and surrounding facts.  *Snow v. Fitian*, 1998 Mass. App. Div. 227.

22.    A contract is to be construed as meaningful and not illusory.  *Cofman v. Acton Corp.*, 958 F.2d 494 (1st Cir. 1992).  A contract will not be construed so as to render any of its terms meaningless.  *Baybank Middlesex v. 1200 Beacon Properties, Inc.*, 760 F.Supp. 957 (D. Mass. 1991).

23.    A contract should be construed to give it effect as a rational business instrument. *Finn v. McNeil*, 23 Mass. App. Ct. 367 (1987).

24.    Under Massachusetts law, commercial contracts must be construed in accordance with common sense interpretation required for contracts in general, as business transactions entered into by practical people to accomplish an honest and straightforward end.  *Fleet Nat. Bank v. H&D Entertainment, Inc.*, 96 F.3d 532 (1st Cir. 1996).

25.    All provisions of a contract "must be presumed to have been designedly employed, and must be given meaning and effect, whenever practical, when construed with all the other phraseology contained in the instrument, which must be considered as a workable and

28

harmonious means for carrying out and effectuating the intent of the parties." *J.A. Sullivan Corp. v. Commonwealth*, 397 Mass. 789 (1986); *see, G.M. Abodeely Ins. Agency v. Commerce Ins. Co.* , 41 Mass. App. 274 (1996).

26.     Unambiguous words in a contract must be construed in accordance with their ordinary and usual sense. *Computer Systems of America, Inc. v. Western Reserve Life Assur. Co. of Ohio*, 19 Mass. App. Ct. 430, 434 (1985).

27.     Under the doctrine *expresio unus est exclusio alterius*, when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded. *Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1997).

28.     The applicable principle, *ejusdem generis*, provides that:  "a subsequent specification impliedly limits the meaning of a proceeding generalization."  *Schjeldahl Co. v. Local Lodge 1680 of the District Lodge #64 of International Assoc. of Machinists*, 393 F.2d 502 (1st Cir. 1968).

29.     Where general words follow specific words in an enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated in the preceding specific words.  *Ferguson v. Host International, Inc.*, 53 Mass. App. Ct. 96 (2001).

30.     The terms of the Guaranty will not be construed against the guarantor. *Laura Thorn, Ltd. v. Alletz Hauser*, 71 F.3d 991 (1st Cir. 1995).

31.     In accordance with the Settlement Agreement dated August 5, 2003, the $2,000,000 in Settlement Proceeds were wired to the IOLTA account of Bernkopf Goodman & Baseman, LLP ("Bernkopf") and then to a clients' funds account maintained by Bernkopf.  See Joint Statement of Stipulated Facts, No. 44.

32.     Pursuant to an agreement dated December 31, 2004, one-half of the Settlement

Proceeds from the Norfolk Action – $1 million – were wired from the Blue Hills' client's funds account to the client's funds account of Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Cutler"), William Langelier's attorney.  One-half (one million dollars) of the Settlement Proceeds were wired to a client's funds account at Wilmer Cutler in February 2006.  Trial Exhibits 26 and 145; Trial Transcript Volume 3, Andrew Cohn Testimony ("Cohn Testimony"), page 139, lines 17-25; Cohn Testimony, Vol. 4, page 21, lines 4-18.

33.    The Settlement Proceeds have remained in Blue Hills' possession since they were received on or about August 8, 2003.  The receipt of the Settlement Proceeds was duly recorded in Blue Hills' financial books and records and such funds have not been distributed to any of the Trust's beneficiaries.  Cohn Testimony, Vol. 3, page 20, lines 9-21.

34.    The Settlement Proceeds were never commingled with any other funds.  They were wired into Bernkopf's clients' fund account bearing the name "Fineberg Royall Associates," a separate account held on behalf of Blue Hills.  Trial Exhibits 26, 145; Goldberg Testimony, Vol. 8, page 86, lines 8-13.

35.    There is unrebutted testimony by Goldberg and Cohn that the Settlement Proceeds were always held for the benefit of Blue Hills.  Goldberg Testimony, Vol. 8, page 27, lines 9-23.

36.    Under bankruptcy law, once a debtor-depositor transfers funds to an escrow account *held for the benefit of another party,* those assets are not part of the bankruptcy estate.  *Davis v. Cox*, 356 F.3d 76 (1st Cir. 2004); *Davis v. Cox*, 356 F.3d 76, 84 (1st Cir. 2004) (holding that spouse in a divorce had an inchoate equitable interest in court-ordered escrow accounts); *Gulf Petroleum, S.A. v. Collazo,* 316 F.2d 257, 261 (1st Cir. 1963) (Courts of bankruptcy recognize that money held in escrow is not property which vests in the trustee in bankruptcy ....").  Blue Hills has offered unrebutted testimony that the settlement funds held in

30

the escrow account named Royall Associates was held for the benefit of Blue Hills. As a practical matter, these funds could not be in jeopardy in the event of a Royall Associates bankruptcy. This is precisely the rationale behind prohibiting transfer of mortgaged property and conclusively demonstrates why no transfer could have occurred.

37.    Lender has asserted that Blue Hills has violated section 1.2 of the Guaranty. This section provides, *inter alia*, that the guarantors may be responsible for the full amount of the debt if the "[b]orrower fails to maintain its status as a single purpose entity, as required by, and in *accordance with the Mortgage*. . . ." (emphasis supplied). Lender has also failed to prove that the single purpose entity status of Blue Hills has been disregarded, changed or terminated.

38.    As an initial matter, any putative breach of a representation or warranty in the pertinent loan documents is not consonant with a "disregard" of the single purpose entity. In fact, there is significant evidence that, *inter alia*, the single purpose entity was created at the Lender's behest, that the Settlement Proceeds did not constitute collateral and that no harm accrued to Lender as a result of the receipt and handling of the Settlement Proceeds.

39.    The phrase, "in accordance with the Mortgage" unambiguously directs the reader to this clause's counterpart found in Section 54 of the Mortgage Agreement, which requires that "[m]ortgagor *intentionally* fails to maintain its status as a single purpose entity in accordance with the provisions of the mortgage." (emphasis supplied).

40.    The presence of the modifier "intentionally" readily distinguishes the instant case from any case finding that motive is irrelevant. Lender's attempt to buttress its argument by referencing Section 12(l) of the Mortgage Agreement is unavailing. Lender has not proved that any commingling has occurred.

41.    The funds from the settlement entered into distinct and separate accounts that did

31

not include funds from the guarantors or any other related entity.  It is clear that Lender is

attempting to exalt semantics over economic realities by emphasizing the name of the accounts

in which the settlement was held.

42.    Even if, *arguendo*, any commingling occurred, Lender has not identified any

harm that has befallen it because of any such putative mistake.

43.    A mere breach of a representation or warranty is not consonant with "disregard"

of the single purpose entity.

44.    The major case that Lender cites in support of its position that the single purpose

entity was disregarded is readily distinguishable.  In *LaSalle Bank v. Mobile Hotel Props.,* 367

F.Supp. 2d 1022, 1029 (E.D. La. 2004), the loan documents had a carve-out provision where full

recourse liability would be triggered if the "mortgagor…fails to maintain its status as a single

purpose entity."  However, in *LaSalle*, the borrower *intentionally amended its articles of*

*organization* thereby changing its purpose from "sole purpose…" to "any lawful activity" two

weeks after its first of many failures to make a monthly payment.  *Id.* at 1025.   No facts in the

case even come close to the circumstances of *LaSalle*.

45.    Further, in *LaSalle*, the recourse clause did not include the condition

"intentionally" present in Section 54 of the Mortgage Agreement.  *Id.* at 1029.  The *LaSalle*

court, applying Alabama law, noted that the *intent* of the borrower was irrelevant after the

borrower argued that the their amended language, as amended, was merely "boilerplate" and

"innocuous".  *Id. at* 1030.  In the instant case, proof of "intent" to fail to maintain status is

required.  Lender has failed to prove the existence of any such intent.

46.    The phrase "in accordance with the mortgage" is *directly related* to the recourse

provisions found in section 54 of the mortgage agreement which requires that defendants show

that BHOP *"intentionally" failed to maintain its status as a single purpose entity*.  So unlike *Lasalle v. Mobil Hotel Properties,* a case relied on by the defendants, *motive* or intent here *is quite relevant*.

47.    The Defendants have produced *no evidence* that Blue Hills intentionally failed to maintain its single purpose entity status.

48.    Moreover, it is an *impermissible leap* to claim that a single event of commingling in violation of section 12(l) is tantamount *to an intentional failure to maintain blue hills' status as a single purpose entity*.

49.    Lender has failed to introduce any evidence that either putative commingling or any putative breach of representations and warranties regarding the single purpose entity status have harmed Lender in any manner or to any extent.

50.    The purpose of these recourse carve-outs is to protect the Lender's interest in the collateral.  Lender did not prove that the treatment of the settlement proceeds was inconsistent with this purpose nor did it demonstrate that Lender's collateral was ever threatened, let alone harmed.

51.    Lender has not identified *any* precedent for a breach of any of the representations and warranties regarding a single purpose entity to "explode" the legal status of the entity.  Any improper activity is, at worst, *damnum absque injuria*.

52.    Lender has failed to prove any personal liability of William Langelier and Gerald Fineberg.  The record fails to reflect the existence of any defaults sufficient to trigger liability pursuant to Section 10 of the Mortgage Agreement but the evidence adduced at trial demonstrates that the Settlement Proceeds from the Norfolk Action were properly handled and were neither assigned, transferred or conveyed in derogation of the pertinent loan documents nor

33

any legal obligations of Blue Hills, Fineberg or Langelier.

53.     Further, because of the course of dealing between Blue Hills and Lender – as well as the implied covenant of good faith and fair dealing – there has not been any default by Blue Hills.  Thus, not only was the foreclosure wrongful but – absent proof of the existence of a default – there has not been any trigger to personal liability.

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

54.     The implied covenant of good faith and fair dealing in every contract in Massachusetts requires the parties to "deal honestly and in good faith in both the performance and enforcement of the terms of their contract . . . ."  *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200 (1993); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation*, 424 Mass. 430 (1997).

55.     This implied covenant serves to guaranty that the parties "remain faithful to the intended and agreed expectations of the parties in their performance."  *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

56.     The implied covenant of good faith and fair dealing includes a covenant that a party "shall [not] do anything which will have the effect of or injuring the rights of the other party to receive the fruits of that contract."  *Drucker v. Roland Wm. Jutras Associates, Inc.*, 37 Mass. 383, 385 (1976) citing *Uproar Co. v. National Broadcasting Co.*, 81 F.2d 373, 377 (1st Cir. 1936).

57.     The implied covenant of good faith and fair dealing does *not* create contractual obligations that are "not otherwise provided for in the existing contractual relationship."  *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005).  Massachusetts law permits plaintiffs to invoke the covenant of good faith to enforce the terms of a contract but not to impose

34

additional requirements to which the parties did not agree in their contract. *See, e.g., Eigerman v. Putnam Investments, Inc.*, 66 Mass. App. Ct. 222 (2006).

58.    The requirement of good faith "is circumscribed by the obligations – the contractual 'fruits' – actually contained" in the written contract. *Accusoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001).  The written instrument controls.  New or independent rights or duties separate from those already in a contract cannot be added under the guise of the implied covenant of good faith and fair dealing. *Bateman v. FDIC*, 112 F.Supp. 2d 89 (D. Mass. 2000).

59.    The Loan documents are exceptionally detailed as to the narrow circumstances under which Blue Hills, Fineberg and Langelier have any personal liability to Lender.  The facts extant do not fit into the narrow exceptions to which is expressly designated a non-recourse loan.

60.    There is nothing in the Mortgage Agreement requiring Lender's prior approval to commence or settle the zoning appeal, nor can such requirement be implied.

**Misrepresentation**

61.    A claim for damages for deceit requires proof that:  (1) the defendant made a misrepresentation of fact; (2) that such misrepresentation was made with the intent to induce another to act upon it; (3) it was made with knowledge of its untruth; (4) it was intended that it be acted upon; and (5) damage directly resulted therefrom. *Graphic Arts Finishers, Inc. v. Boston Redevelopment Authority*, 357 Mass. 40, 44 (1970).

62.    The gravamen of Lender's claim for "intentional misrepresentation" is that Blue Hills purportedly "had a duty to notify the Lender prior to executing the Settlement Agreement" and allegedly "failed to notify the Lender prior [to doing so]."  The Mortgage, however, simply does not require any notification to the Lender from Blue Hills regarding any non-Property related settlements.  Neither the Mortgage not the CMA required that Blue Hills, Fineberg or

35

Langelier notify Lender of litigation except in cases of condemnation and other similar and limited circumstances. Further, even if certain language in the Loan Documents required such notification, the mere failure to do so would not constitute fraud.

63.    A promise constitutes an actionable representation only if, at the time the promise was made, an intention to carry out the promise did not exist. *Botti v. Iovino*, 337 Mass. 775 (1958). There is little doubt that the Norfolk Action was not within the contemplation of the parties when the Loan was closed in 1999.

64.    Additionally, proof of a "bare nondisclosure," or the mere failure to speak when there is no particular duty to speak, are insufficient to establish a misrepresentation. *Kannavos v. Annino*, 356 Mass. 42, 46-49 (1969). It is not sufficient for a party to prove a mere nonfeasance or failure to speak or act unless a duty to speak or act is also established. *Wade v. Ford Motor Co.*, 341 Mass. 596, 597-598 (1961). Mere silence does not usually amount to a breach of duty. *Phinney v. Friedman*, 224 Mass. 531 (1916). Absent a contractual obligation to speak – which is not contained in the Loan Documents – no such duty is owed.

65.    No factual or legal bases can prove that the Lender detrimentally relied on Blue Hills' silence regarding the Norfolk Action or the Settlement Proceeds. Indeed, CSFB, did not even come into existence until September 1, 2004, approximately 2½ months before the Property was foreclosed. Thus, it strains credulity for CSFB to claim detrimental reliance.

66.    It is also amply documented that Lender, through its Servicer, Wells Fargo, and Special Servicer, LNR, anxiously awaited an opportunity to default Blue Hills, to scoop approximately $4.1 million of Blue Hills' money in the Reserve Accounts and to either acquire the Property or to quickly dispose of it on foreclosure. Can Lender now credibly claim that their default/foreclosure juggernaut would have been slowed or curtailed had they known of the

36

existence of the Norfolk Action and the Settlement Proceeds?  Given Lender's well documented

intransigence to a Loan restructuring  – or even a meeting – with Blue Hills, that scenario is

highly unlikely.

67.    "Nondisclosure of material information may become actionable as

misrepresentation only if there is a fiduciary relationship or a similar relationship involving trust

and confidence.  Such relationships may arise where there is evidence of dependence upon

another's judgment in business and property matters."  *Shanley v. Rockland Trust Company*,

2000 WL 1476109 at 2 (Mass. App. Ct.) at *3, citing *Nolan & Sartorio,* Tort Law §142 at p. 238

(2d ed. 1989).

68.    "Reliance is an element of actionable fraud." *Nei v. Burley,* 388 Mass. 307, 311

(1983). Moreover, such reliance on the putatively false statement must be reasonable and

justifiable under the circumstances.  *Collins v. Huculak,* 57 Mass. App. Ct. 387, 392 (2003).

Further, detrimental reliance must be properly plead and proven.  *Powell v. Rasmussen*, 355

Mass. 117, 118-119 (1969).

69.    It is axiomatic that misrepresentation must be proved and is not to be presumed.

*E.g., Saphier v. Devonshire St. Fund*, 352 Mass. 683 (1967).

## M.G.L. c. 93A

70.    General Laws chapter 93A, § 2 makes unlawful any "[u]nfair . . . acts or practices

in the conduct of any trade or commerce."  This prohibition is "extended to those engaged in

trade or commerce in business transactions with others similarly engaged" by M.G.L. c. 93A §

11.  *Datacom Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 779 (1986).

71.    A finding of a violation of M.G.L. c. 93A requires at least a minimum threshold

demonstration of "unfair or deceptive acts."  *Spence v. Boston Edison Co.*, 390 Mass. 604, 615

(1983).  Generally, conduct is "unfair" if "without necessarily having been previously considered unlawful [it] offends public policy . . . whether, in other words, it is within at least the penumbra of some common law, statutory or other established concept of unfairness."  *Spence*, 390 Mass. at 615, citing, *Federal Trade Comm. v. Sperry & Hutchinson*, 405 U.S. 233, 244-245 (1972).

72.     Conduct is "deceptive" if it "possesses a tendency to deceive" or if it creates an overall impression which is misleading.  *Leardi v. Brown*, 394 Mass. 151, 156 (1985).  To be "deceptive," an act must be found to be such that "it could reasonably be found to have caused a person to act differently from the way he otherwise would have acted."  *Lowell Gas Co. v. Attorney General*, 377 Mass. 37, 51 (1979).

73.     The standard for unlawful conduct is higher for a business plaintiff pursuant to M.G.L. c. 93A §11 than it is for a consumer plaintiff.  In a case under M.G.L. c. 93A § 11, a purported unfair or deceptive trade practice must be such that "[t]he objectionable conduct . . . attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce."  *Levings v. Forbes & Wallace, Inc.,* 8 Mass. App. 498 (1979); *V.S.H. Realty, Inc. v. Texaco, Inc*., 757 F.2d 411 (D. Ma. 1981).

74.     To prevail under M.G.L. c. 93A, a claimant must prove that any unfair or deceptive trade practice was the cause of his loss; namely, that there was a causal connection between the unfair and deceptive trade practice and that the injury was a foreseeable consequence of the unfair or deceptive trade practice.  *E.g., Kohl v. Silver Lake Motors, Inc.*, 369 Mass. 795 (1950); *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841 (1983).

75.     To demonstrate a violation of G.L. c. 93A there must be some conduct alleged that falls "within . . . the penumbra of some common-law, statutory, or other established concept of unfairness . . . is immoral, unethical, oppressive or unscrupulous [and] . . . causes substantial

38

injury to [other businesses]." *Linkage Corporation v. Trustees of Boston University*, 425 Mass. 1, 27 (1997) (quoting *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).

76.    Where commercial entities are involved, conduct will not be unfair or deceptive unless some type of greater "rascality" is shown. *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 477 (1991).

77.    A breach of contract or legal obligation, without more, does not violate G.L. c. 93A. *See, e.g., Whitinsville Plaza, Inc. v. Kotseas*, 378 Mass. 85, 100-101 (1979); *Framingham Auto Sales, Inc. v. Workers Credit Union*, 41 Mass. App. Ct. 416, 418 (1996); *Cahill v. TIG Premier Ins. Co.*, 20 F. Supp. 2d 141 (D. Mass. 1998); *George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129 (D. Mass. 1998); *Davis v. Dawson, Inc.*, 15 F.Supp. 2d 64 (D. Mass. 1998).

78.    G.L. c. 93A, §11 "does not contemplate an overly precise standard of ethical or moral behavior. It is the standard of the commercial marketplace." *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996); *Shepard's Pharmacy Inc. v. Stop & Shop Cos.*, 37 Mass. App. Ct. 516, 520 (1994).

79.    Lender can prove neither deceptive nor unfair conduct. This is particularly true in regard to the heightened standard applicable to commercial disputes. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979) (necessary to "attain a level of rascality . . . [in] the rough and tumble world of commerce.") *Id.*; *Spence v. Boston Edison Co.*, 390 Mass. 604, 616 (1983) (an act that might be unfair, if practiced on a "commercial innocent," may be common practice among businesses).

80.    Multiple damages may not be awarded unless the violation of M.G.L. c. 93A is knowing or willful. A willful or knowing violation occurs when one intentionally or knowingly acts to cause harm. In order to establish a "willful or knowing" violation there must be some

evidence that the defendant had a subsequently culpable state of mind. *Datacomm Interface, Inc. v. Computerworld, Inc.,* 396 Mass. 760 (1986). *Computer Systems Engineering, Inc. v. Quantel Corp.,* 571 F. Supp. 1365 (D. Mass. 1983). " '[K]nowing' refers to a state of mind existing at the time of acting." *Id.* at 1373.

## Damages

81.     It is axiomatic that the goal of damages is to place the injured party in the same position as if the defendant had rightly performed its obligations. *E. Mass. St. Ry. Co. v. Union St. Ry. Co.*, 269 Mass 329, 333 (1929).

82.     Recoverable losses include those that would not have occurred but for the defendant's wrongful acts. *Charlotte Theaters, Inc. v. Gateway Co.,* 191 F. Supp. 834, 844 (D. Mass), vac. on other grounds, 297 F. 2d 483 (1st Cir. 1961).

83.     Recovery for negative tax effects is not contrary to these rules. *E.g., Beggs v. Dougherty Overseas, Inc.,* 287 F.2d 80 (2nd Cir. 1961) (Recovery for loss of a tax benefit for foreign employment by wrongfully discharged employee); *W.H. Walker, et al v. Signal Companies, Inc.;* 84 Cal. App. 3d (CA., 4th Div. 1998) (Recovery of damages for capital gains tax liabilities) *Pruett v. Erickson Air-Crane Co.*, 183 F.R.D. 248 (D. Oregon 1986) (tax liability may constitute an element of damages if it is a natural and proximate result of wrongful act).

## Mitigation of Damages

84.     A party seeking damages must have mitigated its damages.  *See in re Phoenix Restoration Specialists, Inc.*, 14 B.R. 115 (Bankr. D. Mass. 1981).  A party may be required to take affirmative steps to mitigate damages, including efforts to place himself or herself in as good a position as he or she would have enjoyed had the contract been performed.  *In re Phoenix Restoration Specialists, Inc.*, 14 B.R. at 123 (citing *Hall v. Paine*, 224 Mass. 62 (1916)).

40

85.    The mitigation of damages requirement is not, strictly speaking, a "duty" placed on a plaintiff, but rather a recognition that "[t]he law. . . [will do] nothing to compensate [the plaintiff] for the loss that [he or she] helped to cause by not avoiding it." *McKenna v. Comm'r of Mental Health*, 347 Mass. 674, 676 (1964) (quoting Arthur L. Corbin, *Corbin on Contracts* § 1039 (West 1952 & Supp.)).

BLUE HILLS OFFICE PARK LLC, WILLIAM
LANGELIER AND GERALD FINEBERG,
By their attorneys,


/s/ Meredith A. Swisher
Peter B. McGlynn, Esquire (BBO No. 333660)
Meredith A. Swisher, Esquire (BBO No. 646866)
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts 02110
Telephone:      (617) 790-3000
Facsimile:      (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: October 12, 2006

#347120 v2/14500/9985

41