UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br><br>    Plaintiff, Defendant-in-Counterclaim,<br><br>v.<br><br>J.P. MORGAN CHASE BANK, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1., and CSFB 1999–C1 ROYALL STREET, LLC,<br><br>    Defendants, Plaintiffs-in-Counterclaim,<br><br>v.<br><br>WILLIAM LANGELIER and GERALD FINEBERG,<br><br>    Defendants-in-Counterclaim. | Civil Action No. 05-CV-10506 (WGY) |

## AFFIDAVIT OF BRUCE E. FALBY, ESQ. IN SUPPORT OF PETITION FOR ATTORNEYS' FEES AND EXPENSES

I, Bruce E. Falby, depose and say as follows:

1.     My name is Bruce E. Falby.  I am a partner at the law firm of DLA Piper US LLP ("DLA Piper," also referred to herein as "Counsel").  I represent defendants and plaintiffs-in-counterclaim J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trustee"), and CSFB 1999-C1 Royall Street, LLC ("CSFB") (together with the Trustee, the "Lender").  I make this affidavit in support of the Petition for Attorneys' Fees and Expenses of Defendants and Plaintiffs-in-Counterclaim J.P. Morgan Chase Bank, as Trustee and

CSFB 1999-C1 Royall Street, LLC, filed herewith. I make the following statements based upon my personal knowledge and upon my review of the records of DLA Piper and of documents produced in this litigation.

### *Firm and Attorney Information*

2.      DLA Piper is a national law firm and is listed in the "AmLaw 100" list of the nation's 100 largest law firms. DLA Piper has offices in various cities, including Boston, New York, Washington, Baltimore, Chicago, Los Angeles, and San Francisco. DLA Piper's Boston office has 52 attorneys.

3.      My partner E. Randolph Tucker was initially responsible for this litigation, assisted primarily by two associates, Bruce Barnett and Traci Feit, and a paralegal, Nili Yavin. Since late 2005, I have been responsible for the litigation, assisted primarily by Mr. Barnett, Ms. Feit, associate Lisa Core, and paralegals Nili Yavin and Susan McNabb. Other partners, associates, and staff have worked on the litigation as necessary to add needed expertise (e.g., real estate and tax advice), meet deadlines (e.g., summary judgment filing deadlines), or accomplish particular tasks (e.g., creation of an indexed computerized database of case documents). The table attached hereto at Tab A identifies all attorneys and legal staff who worked on this litigation.

4.      DLA Piper sets billing rates based upon the particular lawyer's experience level and area of practice. The following is the relevant experience of the attorneys primarily involved in this case and a summary of their work on the case.

5.      E. Randolph Tucker is a 1979 graduate of the University of Virginia Law School and has been a member of the Massachusetts bar and the bar of this Court since 1982. Following graduation from law school, he clerked for the Honorable Joseph S. Lord, Chief Judge of the

BOST1\444515.1

United States District Court for the Eastern District of Pennsylvania, and for the Honorable

Frank M. Coffin, Chief Judge of the United States Court of Appeals for the First Circuit. He

joined Hill & Barlow, a Professional Corporation ("Hill & Barlow") in 1982 and practiced with

Hill & Barlow until January of 2003, when he joined DLA Piper's predecessor firm, Piper

Rudnick LLP. As a member of the Litigation Group at DLA Piper, he has spent most of his

working time on complex commercial litigations. Mr. Tucker is listed in *Best Lawyers in*

*America* and has been named a Massachusetts Super Lawyer.

6.      Mr. Tucker spent 237.8 hours working on this case. Mr. Tucker supervised all

aspects of the case until late 2005, including initial fact investigation and legal research,

preparation of pleadings, including removal papers, a motion to dismiss, and a motion to strike

jury demand, and the initial phase of fact discovery, as further described below. Mr. Tucker

transitioned supervision of the case to me in 2005. Mr. Tucker's billing rate was $510 in 2004,

$545 in 2005, and $590 in 2006. He billed a total of $129,620.50 on this litigation.

7.      I am a 1983 graduate of Georgetown Law School and have been a member of the

Massachusetts bar and of the bar of this Court since 1985. Following graduation from law

school, I clerked for the Honorable R. Lanier Anderson, III, of the United States Court of

Appeals for the Eleventh Circuit. I joined Hill & Barlow in 1984 and practiced continuously

with Hill & Barlow until January 2003, when I joined DLA Piper's predecessor firm, Piper

Rudnick LLP. I am currently the Chair of DLA Piper's Boston Litigation Group and co-chair of

the Litigation Section of the Boston Bar Association. At DLA Piper, I spend most of my

working time on complex commercial litigations. I am listed in *Best Lawyers in America* and

have been named a Massachusetts Super Lawyer.

8.      I spent 971.7 hours working on this case. I initially was involved providing strategic advice to Mr. Tucker and guidance to associates when Mr. Tucker was unavailable. Eventually I became responsible for the litigation. I became involved in the first phase of fact discovery in November and December 2005 and conducted the first mediation session of the case in January 2006 with Judge Kass. Thereafter, I supervised and was intensely involved with the second phase of fact discovery, discovery motion practice, expert discovery, summary judgment motion practice, trial preparation and trial. I conducted most of the fact witness and expert witness depositions, defended key fact and expert witness depositions, retained and worked with expert witnesses, and reviewed, edited or helped draft our numerous summary judgment filings. I was the lead attorney and ultimately responsible for all aspects of trial preparation and trial, and prepared and conducted most of the witness examinations and prepared and gave the opening and closing arguments. I also reviewed and edited all motions, oppositions, and memoranda submitted to the Court. My billing rate was $520 in 2005 and $565 in 2006. I billed a total of $547,413.00 on this litigation.

9.      Bruce S. Barnett is a 2000 graduate of Yale Law School. Following graduation from law school, he clerked for the Honorable Robert N. Chatigny of the United States District Court for the District of Connecticut. He joined Hill & Barlow, PC in 2001, where he practiced until January of 2003. At that time, he joined DLA Piper's predecessor firm, Piper Rudnick LLP. He was admitted to the Massachusetts bar in 2001 and to the bar of this Court in 2002. During his time at the firm he has worked primarily on complex commercial litigations and has devoted much of his time to real estate litigation.

10.      Mr. Barnett, a senior associate in the litigation group, spent 1,488.5 hours working on this case. Mr. Barnett was deeply involved with all aspects of this case, beginning

- 4 -

with the foreclosure sale in 2004. He researched and drafted the Lender's filings relating to the removal of the case to federal court. He traveled to California (the location of master servicer Wells Fargo) to interview numerous fact witnesses and reviewed numerous documents (including all of the servicing records relating to the Loan, from 1999-2004) in order to draft the various Answers filed in this case. He researched and drafted initial disclosures and supervised the document review and production conducted during discovery. He drafted and edited discovery requests and responses. Mr. Barnett prepared for and assisted at the mediation proceedings. He prepared for and defended multiple depositions, took two depositions, and assisted with the preparation for nearly all of the depositions. Mr. Barnett worked with the Lender's expert witnesses and prepared fact witnesses for depositions and (later) for trial. Mr. Barnett also researched and drafted significant portions of the Lender's summary judgment filings, including the memoranda of law and the statements of undisputed facts, and he coordinated the development and compilation of the supporting materials. He assisted with the preparation for the summary judgment hearing and helped draft the pre-trial memorandum. He provided extensive assistance with trial preparation, including preparing direct and cross examinations for his witnesses and supervising and coordinating paralegal support. Mr. Barnett coordinated the compilation and organization of trial exhibits, and second-chaired the trial in this case. Mr. Barnett's billing rate was $285 in 2004, $335 in 2005, and $400 in 2006. Mr. Barnett billed a total of $573,668.00 on this litigation.

11.    Traci S. Feit is a 2004 graduate of Harvard Law School. Upon graduation from law school, she joined DLA Piper's predecessor firm, Piper Rudnick LLP, and has practiced continuously with DLA Piper since that time. She was admitted to the Massachusetts bar in 2004, to the Maryland bar in 2005, and to the bar of this Court in 2005. During her time at the

firm she has worked primarily on complex commercial disputes and has devoted much of her time to real estate litigation.

12.     Ms. Feit, an associate in the litigation group, spent 1,083.6 hours working on this case. Ms. Feit was deeply involved with all aspects of this case, beginning with the initial investigation into the zoning appeal settlement and the resulting settlement payment. She researched, developed, and drafted the Lender's Counterclaim, and participated in researching and drafting virtually all other court filings, including motions for summary judgment, motions to compel discovery, pre-trial motions, the Lender's motions for judgment on partial findings, and the Lender's proposed findings of fact and rulings of law at trial. Ms. Feit participated in document review and production during discovery, and drafted discovery requests and responses. She assisted in deposition preparation and conducted legal research on numerous issues that arose during the course of litigation. She prepared and supervised the service of numerous subpoenas as necessary. Ms. Feit also assisted in preparing for the three mediations held during the course of this litigation. She provided extensive assistance with trial preparation. She provided valuable assistance throughout the trial, including legal research, assistance with witness outlines, and development of an additional basis of recovery on the Lender's counterclaim. In 2004 and 2005, she billed at $235 per hour and in 2006 she billed at $300 per hour. Ms. Feit billed a total of $312,981.00 on this litigation.

13.     Lisa S. Core is a 2003 graduate of Boston College Law School. Following graduation from law school, she clerked for the Honorable Scott L. Kafker and the Honorable Kent B. Smith of the Massachusetts Appeals Court. In 2005, she joined DLA Piper's predecessor firm, Piper Rudnick LLP, and has practiced continuously with DLA Piper since that

time. She was admitted to the Massachusetts bar in 2003 and to the bar of this Court in 2005. During her time at the firm she has worked primarily on complex commercial litigations.

14.    Ms. Core, an associate in the litigation group, spent 96.2 hours working on this case. She provided legal research assistance as needed throughout the litigation, and also assisted with drafting motions and legal memoranda. Ms. Core billed at the rate of $300 per hour for a total of $28,476.50 on this litigation.

### *DLA Piper's Hourly Rates*

15.    As noted above, the current hourly rates charged to clients by DLA Piper for Randolph Tucker, myself, Bruce Barnett, Traci Feit, and Lisa Core are $590, $565, $400, $300 and $300, respectively. These are the rates that we charge and collect from clients in the Boston marketplace. I believe that these rates are reasonable and comparable to those of attorneys at DLA Piper's peer firms that do comparable work, for three reasons.

16.    First, DLA Piper sets our billing rates to be comparable to and competitive with rates charged by other large national firms in Boston. Among other sources of information, DLA Piper has access to a survey of rates of such firms conducted by an outside consultant. I have reviewed the survey and our rates are within the range of the rates reported therein. (DLA Piper agrees not to identify the consultant or to make the survey public so I am unable to provide additional information.)

17.    Second, while preparing this affidavit, I spoke to business litigators at three other large firms in Boston (Ropes & Gray LLP, Choate, Hall & Stewart LLP, and Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.) who confirmed that my billing rate is comparable to those of business litigators at their firms with my level of experience.

18.     Third, a fee petition filed by defendant in Suffolk Superior Court in December 2005 in Brooks Automation v. BlueShift Technologies, Inc., Suffolk Superior Court No. 05-03973-BLS2, reports Goodwin Procter LLP billing rates higher than those we charge and have charged and includes a declaration and letter from a legal consultant confirming that Goodwin Procter's rates are comparable to those charged by other large national firms in Boston. Relevant excerpts of the Goodwin Procter fee petition, including the consultant's letter and declaration, are attached hereto at Tab B. Judge Gants accepted the reasonableness of Goodwin Procter's rates and awarded all but $25,000 of $962,052.75 sought by the defendant, which had defeated plaintiff's claims and recovered $290,300 on a Chapter 93A counterclaim. Judge Gants' memorandum and order on the fee petition is attached at Tab C.

### DLA Piper's Attorneys' Fees and Disbursements

19.     Attached hereto at Tab D are true and correct copies of DLA Piper invoices rendered to our clients for our legal services and disbursements in connection with this litigation. The invoices set forth in detail actual attorneys' fees of $1,764,226.50 and actual disbursements of $109,070.75, for a total of **$1,873,297.25**. These are the amounts our clients are contractually obligated to pay DLA Piper, most of which they have already paid. Attached at Tab E is a summary of the monthly charges for fees and disbursements. Attached at Tab F is a summary of disbursements by category. Attached at Tab G are invoices from our expert witnesses in this case, which we submitted directly to our clients for payment. These invoices total **$183,258.76**. By their fee petition, our clients seek an award in the combined amount of the DLA Piper invoices and expert witness invoices, totaling **$2,056,556.01**.

20.     I have been responsible for preparing DLA Piper's invoices for this litigation since February 2006. Prior to that date, my partner E. Randolph Tucker prepared the invoices.

- 8 -

In preparing the invoices, I wrote off any time charges that I did not believe were reasonably necessary in conducting the litigation, and these charges do not appear on the invoices. For example, at some depositions that I took in this matter, I was accompanied by an associate. Although the associate's assistance was useful, I wrote off the associate's time spent at the deposition because he or she attended primarily for training purposes.

21. The attached invoices contain several redactions. The unredacted invoices are available for the Court's inspection in camera.

      a.    Time and disbursement entries not incurred in connection with this litigation are redacted entirely and they are not included in the amount the Lender seeks to recover by its petition. The monthly totals in the summary at Tab E exclude the redacted items.

      b.    Portions of time entry descriptions protected by the attorney-client privilege or work product doctrine are redacted. For example, particular topics of legal research and particular fact investigation tasks are redacted.

      c.    Information relating to the timing of our clients' payment of invoices is redacted.

22. I have reviewed all of the time entries and disbursements on the attached bills and believe all of the fees and disbursements are reasonable and were necessarily incurred in conducting this litigation.

23. This was a complex commercial litigation, requiring substantial time and effort to prepare and try. To provide a context for the time entries and disbursements, a history of the litigation and description of Counsel's work follows.

### *History of This Litigation*

24. The Lender's predecessor in interest loaned approximately $33 million (the "Loan") to plaintiff Blue Hills Office Park, LLC ("Blue Hills") in 1999, secured by a mortgage

and other loan documents. In November 2004, due to Blue Hills' numerous defaults, the Lender foreclosed on the mortgaged property and was left with a $10,770,847 deficiency (the "Deficiency").

25.    In December 2004, the Lender learned of the settlement (the "Settlement") of a zoning appeal brought by Blue Hills in 2003, as well as the payment (the "Payment") received by Blue Hills in connection with the Settlement (at that time, the Lender did not know the amount of the Payment). At the Lender's request, Counsel began (a) investigating the facts relating to the Settlement and Payment and (b) researching the legal bases for a claim (or claims) against Blue Hills and the guarantors of the Loan (William Langelier and Gerald Fineberg) based on the Settlement and Payment.

### Commencement of Action, Removal, and Initial Filings

26.    In February 2005, as Counsel was preparing the Lender's claim against Blue Hills, Langelier, and Fineberg (collectively, the "Blue Hills Parties"), Blue Hills brought suit in Norfolk Superior Court against CSFB, Credit Suisse First Boston Mortgage Capital, LLC (the "Originator") and Credit Suisse Bank First Boston Mortgage Securities Corp. (the "Depositor"), alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Mass. Gen. Laws c. 93A.

27.    In response, Counsel began investigating the facts alleged by Blue Hills and negotiated an extension of time (to April 14, 2005) to respond to the complaint. The factual investigation required a trip to California to interview numerous employees of the master servicer of the Loan. Also, because Blue Hills' claims were based on alleged conversations and supposed courses of conduct between Blue Hills and representatives of the Lender, Counsel had to thoroughly review all of the servicing records (from 1999 – 2004) relating to the Loan.

28.     Counsel was engaged by the Originator and the Depositor, neither of whom was a proper party to Blue Hills' complaint or to the Lender's claim against the Blue Hills parties. Counsel began investigating the factual and legal bases for removal of Blue Hills' suit to federal court. This was complicated, as it involved determining the citizenship of numerous entities, including Blue Hills, CSFB, the Originator, and the Depositor.

29.     On March 18, 2005, Counsel removed Blue Hills' suit to the United States District Court for the District of Massachusetts. Counsel also negotiated a further extension of time (to April 29, 2005) to file a response to Blue Hills' complaint.

30.     At the same time, Counsel continued researching and preparing its demand for payment of the Deficiency under the Guaranty. Counsel sent the demand letter on April 20, 2005. The Guarantors did not make payment to the Lender, and instead disputed that they were liable under the Guaranty.

31.     During this time, Counsel tried to convince Blue Hills to voluntarily drop the Originator and the Depositor as parties to their complaint. Neither the Originator nor the Depositor had anything to do with the Loan at the time of the conduct complained of by Blue Hills and neither was a proper party to Blue Hills' suit.

32.     Counsel also sought to convince Blue Hills to drop its jury demand, because (a) Blue Hills had agreed in the loan documents to waive its right to a jury trial on its contract claims, and (b) Blue Hills was not entitled to a jury trial on its c. 93A claim.

33.     Counsel prepared a motion and supporting memorandum to dismiss the Amended Complaint as to the Originator for failure to state a claim. Counsel provided a copy of the motion and memorandum to counsel for Blue Hills prior to filing it.

- 11 -

34.     Blue Hills agreed to file an Amended Complaint to which the Originator would not be a party (which Blue Hills did on April 29, 2005), but refused to drop the Depositor as a party. Blue Hills also refused to remove its demand for a jury trial. Counsel negotiated a stipulation with Blue Hills pursuant to which Counsel would not file a response to the original complaint, but would file a response to the Amended Complaint within ten days of its service. Later, Counsel negotiated a further extension of time to respond to June 6, 2005.

35.     Because Blue Hills refused to drop its demand for a jury trial, Counsel researched and drafted a motion to strike Blue Hills' jury demand and memorandum in support thereof, which Counsel filed on June 6, 2005. After Counsel filed this motion, Blue Hills agreed to strike its jury demand. On June 20, 2005, Counsel filed the parties' stipulation to strike the jury demand from Blue Hills' complaint.

36.     During the same time period, Counsel researched and prepared an Answer and Corporate Disclosure Statement on behalf of the Depositor, which Counsel filed on June 6, 2005. The Depositor's Answer explained, as an affirmative defense, that the Depositor had sold its interest in the Loan immediately after purchasing it in November 1999.

37.     Counsel also researched and prepared an Answer, Corporate Disclosure Statement, and Counterclaim on behalf of CSFB, which Counsel filed on June 6, 2005. The Counterclaim set forth the Lender's claims against the Blue Hills Parties relating to the Settlement and Payment.

38.     In response to the Court's scheduling order, Counsel conferred with counsel for the Blue Hills Parties to negotiate a Local Rule 16.1(D) Joint Statement, which was filed on June 29, 2005. When the Court did not approve of the negotiated schedule set forth in the joint statement, Counsel conferred with counsel for the Blue Hills Parties to negotiate an amended

Local Rule 16.1(D) Joint Statement, which was filed on July 27, 2005. As part of the pre-trial schedule, CSFB and the Depositor agreed to the Blue Hills Parties' request for phased discovery, with a non-binding mediation session to follow the initial stage of limited discovery.

*Fact Discovery – Initial Phase*

39.    The initial phase of fact discovery occurred from August to December 2005. Counsel investigated and prepared initial disclosures on behalf of CSFB and the Depositor, as required by Fed. R. Civ. P. 26(a)(1) and Local Rule 26.2. Counsel served the initial disclosures on August 31, 2005.

40.    Counsel also researched and prepared requests for admission, a request for production of documents, and interrogatories, all of which were served on September 15, 2005.

41.    On September 15, 2005, the Blue Hills Parties served (a) interrogatories on behalf of Blue Hills, directed to the Depositor; (b) interrogatories on behalf of Blue Hills, directed to CSFB; (c) a request for production of documents on behalf of Blue Hills, directed to the Depositor; (d) a request for production of documents on behalf of Blue Hills, directed to CSFB; (e) interrogatories on behalf of Gerald Fineberg and William Langelier, directed to CSFB; and (f) a request for production of documents on behalf of Gerald Fineberg and William Langelier, directed to CSFB. Counsel began researching and preparing responses to these discovery requests.

42.    Responding to the Blue Hills Parties' written discovery requests required Counsel to review approximately 32,000 pages of documents, including documents in electronic form, to identify responsive documents and to identify documents containing privileged information. Counsel also had to interview numerous fact witnesses. Counsel ultimately produced approximately 13,000 pages of documents from four different entities on behalf of the Lender.

- 13 -

Additionally, when Blue Hills served a subpoena on the law firm of Schulte, Roth (counsel to the Lender at the time the loan was made), Counsel (as current counsel to Lender) had to review the 3,025 pages produced by Schulte, Roth for privilege before they were produced.

43.     On or about November 11, 2005, Blue Hills filed a Second Amended Complaint dismissing the Depositor as a party and substituting the Trustee as the real party in interest. In accordance with an agreement between Blue Hills and the Lender, Counsel reviewed and produced documents of the Depositor that were responsive to the Blue Hills Parties' document requests. Counsel also prepared and served responses on behalf of the Trustee to all of the Blue Hills Parties' discovery requests that were originally directed to the Depositor.

44.     In response to the Second Amended Complaint, Counsel prepared and filed answers and counterclaims on behalf of CSFB and the Trustee.

45.     The Blue Hills Parties produced approximately 6,000 pages of documents, but uniformly refused to respond to any of Lender's discovery requests concerning the Settlement and the Payment, including, *inter alia*, the Lender's requests for the Blue Hills Parties to (a) identify the individuals who had received any portion of the Payment; (b) identify the bank accounts into which any portion of the Payment was deposited; (c) describe conversations relating to the negotiation of the Settlement; and (d) produce documents concerning the Zoning Appeal, Settlement, and Payment. Instead, the Blue Hills Parties invoked a confidentiality provision contained in the Zoning Appeal settlement agreement (the "Settlement Agreement") and stated that the other parties to the Settlement Agreement had refused to consent to the release of information relating to the Settlement. The Blue Hills Parties also objected to the Lender's discovery requests concerning the Payment on the grounds that "information on the receipt,

'disposition' of, and bank accounts related to the settlement amount [are] irrelevant and not likely to lead to the discovery of admissible evidence."

46.     The Blue Hills Parties also failed to adequately respond to many of the Lender's other discovery requests, as set forth more fully in the Lender's Memorandum in Support of [Lender's] Motion to Compel, Docket No. 49.

47.     The Blue Hills Parties' unjustified failure to fully respond to the Lender's discovery requests caused Counsel to expend a great deal of time and effort to obtain responses.

48.     Because the Blue Hills Parties refused to produce information or documents relating to the Settlement and Payment, Counsel sought this information from third parties.  On or around November 20, 2005, Counsel prepared and served subpoenas on National Development, Blue View Corporate Center, LLC, Equiserve, DST Realty of Massachusetts, Inc., and DST Realty, Inc., requesting documents concerning the Settlement and Payment.

49.     Once Counsel served the third party subpoenas, the Blue Hills Parties indicated that they (and the third parties) would produce the requested documents and information if a confidentiality agreement could be reached between the Lender and the Blue Hills Parties. Counsel worked with the Blue Hills Parties to negotiate and draft a confidentiality stipulation.

50.     On December 7, 2005, National Development and the DST entities produced documents in response to the Lender's subpoenas, including the Settlement Agreement and the Purchase and Sale Agreement between DST and Blue View Corporate Center, LLC.

51.     The Blue Hills Parties still failed to produce responsive documents and interrogatory responses relating to the Settlement and Payment.  Following service of a draft motion to compel and repeated requests by Counsel, on November 29, 2005 and December 5,

- 15 -

2005, the Blue Hills Parties produced some additional documents, none of which concerned the disposition of the Payment.

52.    Beginning in late November, 2005, following repeated requests by Counsel, the Blue Hills Parties agreed to provide supplemental answers to three interrogatories, two of which related to the Settlement and Payment. The Blue Hills Parties assured Counsel that they would supplement their interrogatory responses "reasonably in advance of the mediation session" scheduled for January 18, 2006. On January 12, 2006, William Langelier produced his supplemental interrogatory answers; the supplemental answers of Gerald Fineberg and Blue Hills were not produced until January 20, 2006 – two days after the mediation.

53.    Moreover, the supplemental answers failed to remedy the deficiencies present in the Blue Hills Parties' initial responses. The Blue Hills Parties, for example, continued to refuse to disclose information or documents relating to the disposition of the Payment.

54.    On January 18, 2006, a mediation was held between the Lender and the Blue Hills Parties. In anticipation of the mediation, counsel prepared and filed with the mediator a mediation statement on behalf of the Lender. Counsel represented the Lender at the mediation, which lasted a full day. The case did not settle.

*Fact Discovery – Second Phase*

55.    Pursuant to the scheduling order, the parties conducted a second phase of discovery from late January to March 2006. On January 30, 2006, the Blue Hills Parties served interrogatories to CSFB, interrogatories to the Trustee, requests for admissions to CSFB, and requests for admissions to the Trustee. Counsel investigated and prepared responses to these requests, which were served on March 1, 2006.

56.     Counsel also prepared and served a request for production of documents, interrogatories, and requests for admission directed to the Blue Hills Parties, which were served on January 30, 2006.

57.     On or around January 30, 2006, Counsel noticed the depositions of Kenneth Goldberg, Gerald Fineberg, William Langelier, Daniel Frank, Gilbert Stone, Lawrence Needle, Joseph Donovan, and Blue Hills.

58.     On or around February 2, 2006, the Blue Hills Parties noticed the depositions of the Trustee, CSFB, LNR Partners, Inc., Job Warshaw, Randall Rosen, Joseph Polcari, Wells Fargo, Curtis Mellegni, Brent Lloyd, and the Originator.

59.     To prepare for depositions and for further proceedings in the case, Counsel oversaw the creation of an electronic searchable database of all documents produced in this matter. Indexing and creating the database required the efforts of a team of paralegals. Counsel investigated the cost of having an outside litigation support vendor create the database and determined that preparing it internally was equally cost effective and more reliable. The resulting electronic database permitted Counsel to search the approximately 25,000 pages of discovery documents electronically, rather than having to physically review each page. The indexing of these documents also allowed Counsel to quickly find a given document by date and/or title. Counsel used the database extensively, from its creation through the close of the trial.

60.     On February 3, 2006, in a final attempt to obtain complete responses to the Lender's discovery responses without recourse to the Court, Counsel wrote to counsel for the Blue Hills Parties, describing in detail the deficiencies in the Blue Hills Parties' responses and proposing a discovery conference. The discovery conference was held on February 8, 2006. At

- 17 -

the conference, counsel for the Blue Hills Parties stated that (a) complete answers to the interrogatories referenced in the letter (with one exception relating to the disposition of the Payment) would be provided by February 13, 2006, and (b) the Blue Hills Parties believed all responsive documents had already been produced, but they would do another search to make sure and produce any responsive documents not previously produced by February 17, 2006.

61.    However, compete interrogatory answers and document production were not forthcoming. On February 17, 2006, Counsel therefore filed a motion to compel discovery from the Blue Hills Parties and a memorandum in support thereof (Docket Nos. 48, 49). In response, on February 21, 2006, the Blue Hills Parties produced additional documents and, on March 3, 2006, the Blue Hills Parties provided Counsel with a second supplementation to their interrogatory responses. On the same day (March 3), the Blue Hills Parties filed an opposition to the Lender's motion to compel and represented therein that they had fully complied with their discovery obligations. The Court denied the Lender's motion but ordered that the Blue Hills Parties would be precluded from introducing any evidence responsive to the Lender's inquiries beyond March 3, 2006.

62.    On or around February 21, 2006, Blue Hills served a subpoena on Wells Fargo commanding the production of numerous documents.

63.    On or around March 8, 2006, Blue Hills served a deposition subpoena on Joseph Rubino (a former employee of the Originator) commanding that he appear for a deposition in South Carolina.

64.    On or around March 14, 2006, the Blue Hills Parties served a subpoena on DLA Piper, commanding production of numerous documents relating to the Lender's attorneys' fees, costs, and monetary damages. Counsel responded by filing a motion to quash the subpoena and

- 18 -

for protective order, and a memorandum in support thereof. The Court granted this motion on March 22, 2006.

65.    The Court's scheduling order required all non-expert depositions to be completed by March 17, 2006. Due to repeated delays of Mr. Fineberg's deposition, Counsel filed a motion to compel the deposition of Mr. Fineberg, and memorandum in support thereof, on March 23, 2006. A full statement of the events leading up to the motion is set forth in the Lender's memorandum, Docket No. 55.

66.    Ultimately, Counsel took 7 fact witness depositions, and defended 7 fact witness depositions, one of which lasted for two full days. On two days in March (the 10th and the 17th) two depositions occurred in two different locations at once. The depositions of three Wells Fargo witnesses and Mr. Langelier were taken in California, while the deposition of Joseph Rubino took place in South Carolina.

67.    As a result of newly discovered evidence belatedly produced by Messrs. Fineberg and Langelier, Counsel sought to amend the Lender's counterclaim. On March 23, 2006, as required by the confidentiality stipulation requested by the Blue Hills Parties, Counsel filed a motion to impound its forthcoming Motion to Amend and supporting memorandum. Counsel researched and drafted an Amended Counterclaim, Motion for Leave to Amend Counterclaim, and Memorandum in Support of Motion for Leave to Amend Counterclaim, all of which were filed on March 29, 2006.

### *Expert Discovery*

68.    Counsel retained and worked with several experts on issues related to Blue Hills' claims. Counsel retained MAI appraiser Eric Stotz to opine on the value of the Blue Hills Office Park in 2004 and accountants Charles Poutasse and Patrick Riley to opine on the accounting

treatment of the Payment by Blue Hills. With Counsel's input, they prepared expert reports, which were disclosed on March 31, 2006. That same day, Blue Hills disclosed its own expert reports by economist Kenneth Gartrell and tax lawyer David Andelman, who opined on Blue Hills' damages, and Richard Clarke, who offered an expert report on liability issues. Blue Hills' experts ultimately produced a total of five reports. To rebut Mr. Clarke, Counsel then retained and worked with Ronald Greenspan, an expert in the commercial mortgage backed securities industry. Messrs. Greenspan, Stotz, Poutasse, and Riley prepared rebuttal reports, with Counsel's input, which were served on April 14, 2006. The Lender's experts ultimately produced a total of six reports.

69.    Expert depositions followed. Counsel deposed Blue Hills' experts, Clarke, Andelman, and Gartrell, and defended the depositions of the Lender's experts, Greenspan, Stotz, and Riley.

### Summary Judgment

70.    Based on Counsel's review of the evidence produced during fact and expert discovery, Counsel believed that both the Lender's counterclaims and Blue Hills' claims could be resolved in Lender's favor on summary judgment. Although the case was complex and there was an enormous amount of documents, deposition transcripts, and other evidence to review and distill to prepare summary judgment motions and supporting materials, Counsel believed there were no material facts in dispute requiring a bench trial in order to resolve the parties' claims. Therefore, Counsel prepared summary judgment motions, memoranda, and exhibits.

71.    On April 28, 2006, as required by the confidentiality stipulation requested by the Blue Hills Parties, Counsel filed a motion to impound Lender's summary judgment submissions.

BOST1\444515.1

72.    On May 17, 2006, Counsel filed (a) CSFB's Motion for Summary Judgment; (b) CSFB's Memorandum in Support of Motion for Summary Judgment; (c) the Trustee's Motion for Summary Judgment; (d) the Trustee's Memorandum in Support of Motion for Summary Judgment; (e) Lender's Joint Local Rule 56.1 Statement of Undisputed Facts in Support of Their Motions for Summary Judgment; (f) Lender's Appendix of Deposition Transcripts; (g) Lender's Appendix of Deposition Exhibits; and (h) Affidavits of: Joseph A. Polcari, Jr., Edward C. Brown, Curtis J. Mellegni, Stephen Goertzen, Ronald H. Greenspan, Eric S. Stotz, and Bruce S. Barnett. In total, Counsel filed approximately 2,045 pages of materials (including 40 pages of memoranda, a joint 45-page statement of undisputed facts, seven affidavits with a total of 22 exhibits, and a compendium of 87 deposition exhibits) in support of Lender's summary judgment motions.

73.    Counsel also filed a motion to exclude the testimony of Blue Hills' purported damages expert, Kenneth Gartrell. Mr. Gartrell's methods were unreliable and his analysis was fundamentally flawed. Moreover, his testimony as to the value of the Blue Hills Office Park as of the date of the foreclosure was irrelevant; the value of the office park was conclusively set, as a matter of law, by the foreclosure sale price.

74.    The Blue Hills Parties cross-moved for summary judgment on Lender's counterclaim and opposed Lender's summary judgment motions and motion to exclude.

75.    Counsel prepared an opposition to the Blue Hills Parties' cross-motion and statement of undisputed facts. In total, Counsel filed approximately 122 pages of materials (including a 20-page memorandum, a 49-page response to the Blue Hills Parties' statement of facts, an affidavit of counsel with two exhibits, and six additional deposition exhibits) in opposition to the Blue Hills Parties' summary judgment motion.

- 21 -

76.    Counsel also researched, drafted, and filed two 15-page reply memoranda (along with 100 pages of other materials: a joint reply to the Blue Hills Parties' second statement of undisputed facts, two additional affidavits with a total of 14 exhibits, and two additional deposition exhibits) in support of CSFB's and the Trustee's summary judgment motions.

77.    In response to the Lender's summary judgment motions, Mr. Fineberg served purported "clarifications" to his deposition testimony, which contradicted his deposition testimony and appeared designed to manufacture a nonexistent dispute of fact. Therefore, Counsel researched, drafted, and filed a motion to strike the purported "clarifications."

78.    On July 13, 2006, the Court heard arguments on the parties' cross-motions for summary judgment. The Court denied the Blue Hills Parties' motion in a ruling from the bench.

79.    A final pre-trial conference was held on July 18, 2006, requiring preparation of a comprehensive pretrial memorandum.

80.    On August 24, 2006, the Court denied Lender's summary judgment motions and ordered the parties to prepare for trial. Prior to trial, Counsel represented the Lender in a second mediation proceeding, but the case did not settle.

### *Trial Preparation*

81.    Trial preparation was extensive, as Counsel prepared to cross-examine numerous fact and expert witnesses listed on Blue Hills' witness list, and prepared to present the testimony of an equal number of fact and expert witnesses included on the Lender's own witness list. Identifying and organizing potential trial exhibits from among the hundreds of deposition exhibits and the thousands of documents produced in the case was time intensive. Counsel prepared a rebuttal case for Blue Hills' wrongful foreclosure claim in addition to Lender's affirmative case.

82.     Counsel researched, drafted, and filed two motions in limine: (a) a renewed motion to exclude the expert testimony of Kenneth Gartrell; and (b) a motion to exclude evidence of tax losses suffered by persons other than Blue Hills (Blue Hills sought to recover for tax losses allegedly suffered by the beneficiaries of its sole member).

83.     Additionally, when Andrew Cohn's name appeared on the Blue Hills Parties' witness list for the first time less than 48 hours prior to the start of trial, Counsel researched, drafted and filed a motion to exclude Mr. Cohn's testimony.

84.     Counsel worked with counsel for the Blue Hills Parties to identify agreed-upon exhibits, and generated a list of non-agreed exhibits that Counsel intended to introduce at trial. Counsel also prepared exhibit binders for the Court and opposing counsel, and copies of all proposed exhibits for use at trial. Counsel prepared opening arguments, direct examination outlines, cross-examination outlines, chalks, and (later) closing arguments.

*Trial*

85.     Trial commenced on September 13, 2006. At trial, the Court indicated that it would hear argument on the Lender's motion to exclude tax loss evidence on September 14, 2006. In preparation for the hearing, Counsel drafted and filed a supplemental memorandum in support of Lender's motion and prepared for the argument.

86.     The second and third days of the trial were held on September 14 and 15, 2006.

87.     Following the third day of trial, Counsel noticed the deposition of Andrew Cohn and agreed, on behalf of the Lender, to a third day of mediation requested by the Blue Hills Parties in an effort to settle the case. The mediation took place on September 20, 2006 but the case did not settle. Counsel deposed Mr. Cohn on September 26, 2006.

88.     On or around September 21, 2006, Blue Hills served keeper of the records

subpoenas on Wells Fargo and LNR (which are headquartered in California and Florida,

respectively), commanding them to appear at trial and produce 64 documents, all but two of

which were marked as exhibits at various depositions. Counsel thus appeared in the litigation on

behalf of Wells Fargo and LNR for the purpose of moving to quash the subpoenas served upon

them. Counsel prepared and filed the motion to quash on September 28, 2006.

89.     The fourth day of trial was held on September 29, 2006. Counsel moved,

pursuant to Fed. R. Civ. P. 52(c), for judgment on partial findings.

90.     The Court denied Lender's Rule 52(c) motion and the fifth and sixth days of trial

were held on October 3 and 4, 2006.

91.     As part of Counsel's cross-examination of Joseph Polcari, Counsel sought to

introduce Mr. Polcari's handwritten notes. Blue Hills objected. The Court indicated that it

would not admit Mr. Polcari's notes without additional briefing. Counsel therefore prepared a

memorandum in support of admission of the handwritten notes, which was filed on October 9,

2006.

92.     Additionally, during the presentation of plaintiff's evidence, the Court requested

briefing on Blue Hills' claim for breach of the implied covenant of good faith and fair dealing.

Counsel researched and draft a memorandum in support of dismissal of the implied covenant

claim, which Counsel filed on October 10, 2006. On the same day, Counsel also filed a

memorandum in support of Lender's renewed motion for judgment on partial findings pursuant

to Rule 52(c).

93.     Day 7 of the trial was held on October 11, 2006. At the close of Blue Hills'

evidence, Counsel renewed Lender's motion for judgment pursuant to Rule 52(c).

- 24 -

94.    The Court heard argument on the Lender's Rule 52(c) motion on October 11, 2006, granted the motion, and entered judgment on behalf of the Lender as to all counts of Blue Hills' Second Amended Complaint.

95.    On October 12, 2006, prior to the start of Day 8 of the trial, Counsel filed proposed findings of fact and conclusions of law with respect to Lender's counterclaim.

96.    Day 8 of the trial was held on October 12, 2006.

97.    On October 13, 2006, the Court heard closing arguments on the Lender's counterclaim, and found for the Lender on Lender's claims against Blue Hills and the Guarantors.

98.    Attached hereto at Tab H is a true and correct copy of Blue Hills Office Park LLC's [First] Answers to Defendants' First Set of Interrogatories.

99.    Attached hereto at Tab I is a true and correct copy of Gerald Fineberg's [First] Answers to Defendants' First Set of Interrogatories.

100.    Attached hereto at Tab J is a true and correct copy of William Langelier's [First] Answers to Defendants' First Set of Interrogatories.


Signed under the penalties of perjury this 27th day of October, 2006.

_____
Bruce E. Falby, Esq.

BOST1\444515.1

# FALBY AFFIDAVIT

# **TAB A**

## DLA PIPER ATTORNEYS AND LEGAL STAFF APPEARING ON INVOICES

| NAME | TITLE | EDUCATION | HOURS |
|------|-------|-----------|-------|
| E. Randolph Tucker | Litigation Partner | JD 1979 | 237.80 |
| Bruce E. Falby | Litigation Partner | JD 1983 | 971.70 |
| Miriam V. Sheehan | Tax Partner | JD 1980 | 1.50 |
| Stephen M. Nolan | Real Estate Partner | JD 1983 | 3.00 |
| Robert S. Markin | Litigation Partner | JD 1984 | 0.30 |
| Gregory P. Bialecki | Real Estate Partner | JD 1985 | 1.60 |
| Michael D. Vhay | Litigation Partner | JD 1988 | 0.40 |
| William P. Donovan Jr. | Litigation Partner | JD 1991 | 0.40 |
| Diana L. Erbsen | Tax Partner | JD 1992 | 0.75 |
| Geoffrey A. Howell | Real Estate Partner | JD 1996 | 0.40 |
| Joseph A. Hugg | Tax Of Counsel | JD 1973 | 2.30 |
| Barbara J. Nepf | Associate | JD 1997 | 0.20 |
| Bruce S. Barnett | Associate | JD 2000 | 1488.50 |
| Lisa S. Core | Associate | JD 2003 | 96.20 |
| Traci S. Feit | Associate | JD 2004 | 1083.60 |
| Clifford Davidson | Summer Associate | AB 2002, JD 2006 | 14.50 |
| Jessica A. Morin | Summer Associate | BA 2002, JD 2006 | 17.60 |
| Patricia M. Anderson | Litigation Paralegal | BA 1987 | 8.30 |
| Nicole L. Wilson | Litigation Paralegal | BS 1993 | 16.90 |
| Catherine Williams | Litigation Paralegal | Paralegal Certificate 2000 | 4.40 |
| Michele L. Castro | Litigation Paralegal | H.S. Diploma 1993 | 16.00 |
| Susan M. McNabb | Litigation Paralegal | BA 2001 | 217.60 |
| Nili Yavin | Litigation Paralegal | BA 2003 | 438.30 |
| Karlyn E. Gould | Litigation Project Assistant | BA 2005 | 317.95 |
| Bonnie Gardiner | Litigation Project Assistant | H.S. Diploma 1975 | 22.00 |
| Lynne Stewart | Real Estate Paralegal | BA 1995 | 6.50 |
| Abby B. Schmidt | Real Estate Paralegal | BA 2000 | 1.20 |
| Brendan J. Kaisershot | Real Estate Paralegal | BA 2001 | 0.40 |
| Marguerite Hutchinson | Corporate Paralegal | BA 2003 | 20.00 |
| Joel Carreon | Legal Practices Technologies Coordinator | AD 2003 | 19.00 |
| Arnel A. Pagaduan | Legal Practices Technologies Coordinator | AD 2004 | 14.00 |
| Andrea M. Towner | Legal Practices Technologies Coordinator | AA 2004 | 2.50 |
| Julia E. Snyder | Head Librarian | MLS | 9.40 |

Total:    5035.20

# FALBY AFFIDAVIT

# **TAB B**

# EXCERPTED MATERIAL

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
BUSINESS LITIGATION SESSION

---

BROOKS AUTOMATION, INC.,

        Plaintiff,

v.

BLUESHIFT TECHNOLOGIES, INC., and
PETER VAN DER MEULEN,

        Defendants.

---

CIV. A. NO. 05-03973-BLS(2)

(Judge Gants)

---

## BLUESHIFT TECHNOLOGIES, INC. AND PETER VAN DER MEULEN'S APPLICATION FOR ATTORNEYS' FEES AND COSTS AND MOTION FOR FEES AND COSTS UNDER G.L. c. 231 § 6F

Pursuant to G.L. c. 93A and c. 231 §6F, Defendants BlueShift Technologies, Inc. ("BlueShift") and Peter van der Meulen (collectively, "Defendants") submit this Application for Attorneys' Fees and Costs ("Application") to be paid by Plaintiff Brooks Automation, Inc. ("Brooks"). As part of its verdict, the jury awarded BlueShift damages totaling $209,300 based on Brooks' tortious interference with BlueShift's relationship with its key customer, Applied Materials, Inc.[1] Based on the jury verdict and a requested finding in BlueShift's favor on its G.L. c. 93A – a claim that is fully supported by the evidence – Defendants also request an award of attorneys' fees and costs. Defendants have incurred actual attorneys' fees in the amount of $873,830.50 and costs in the amount of $124,597.18, and therefore request an award of $998,427.68.[2] An award of attorneys' fees is also justified here pursuant to G.L. c.231, §6F,

---

[1]    BlueShift has asked this Court to award treble damages under G.L. c. 93A based on Brooks' conduct.

[2]    BlueShift brought counterclaims against Brooks for tortious interference and violations of G.L. c. 93A. Given the nature of Brooks' claims and the fact that they stemmed from the same underlying chain of events, the Defendants incurred all fees and costs jointly. BlueShift was therefore responsible for and incurred all costs and fees in this lawsuit, including the costs and fees associated with defending the claims brought against Mr. van der Meulen.

based on Brooks' insubstantial, frivolous, and bad faith claims against Defendants, and Defendants hereby move for fees and costs as provided by that statute.[3]

### Background

Brooks initiated this action on September 16, 2005, alleging defendant Mr. van der Meulen violated a non-compete and non-disclosure agreement with Brooks, that Defendants misappropriated Brooks' proprietary information, and that these acts constituted a violation of c. 93A. BlueShift counterclaimed that Brooks tortiously interfered with BlueShift's advantageous business relations with that same key customer (Applied Materials), and that this interference constituted unfair and deceptive acts or practices in violation of c. 93A of the Massachusetts General Laws. Following a seven-day trial, the jury found for Defendants on all counts, completely rejecting Brooks' allegations of breach. The jury also found for BlueShift on its counterclaims, found that Brooks' lawsuit was totally devoid of merit, found that Brooks had tortiously interfered with BlueShift's relationship with Applied Materials, and awarded damages to BlueShift in the amount of $209,300.

After the jury verdict, the Court asked Defendants to submit an application for attorneys' fees by December 16, 2005. The present Application is submitted in accordance with the Court's request.

### Breakdown of Fees and Costs

Defendants submit the following table of fees and costs incurred during the course of this litigation[4]:

| | |
|---|---|
| Attorneys' Fees: | $873,830.50 |
| Court Reporter Service, Deposition Costs, and Service of Process | $30,084.02 |

---

[3]   BlueShift is seeking a single award of its attorneys' fees and costs. G.L. c. 93A and G.L. c. 231 § 6F provide alternative means for Defendants to recover their attorneys' fees and costs.

[4]   This sum represents attorneys' fees and costs accrued through November 23, 2005 – the date of the jury verdict. Defendants' costs and fees will continue to accrue should Plaintiff prolong this matter further through frivolous post-trial motions or appeals. Defendants reserve their rights to seek further relief in the form of fees and costs associated with continued litigation.

2

| Document Production, Duplication and Delivery Costs: | $65,961.82 |
|---|---|
| Legal Research: | $2,859.22 |
| Secretarial Overtime: | $945.00 |
| Travel expenses: | $1,499.62 |
| Expert Witness Fees[5]: | $23,247.50 |

| **Total Fees and Costs:** | **$998,427.68** |
|---|---|

Defendants respectfully request an award of this amount. Attached to this application as Exhibit A is a complete set of all legal bills rendered to Defendants in conjunction with this litigation through the last day of trial and additional invoices for services (for deposition transcripts and document production) that were paid directly by BlueShift, which supports Defendants' fee and cost application.[6]

Over the course of this litigation, thirteen different Goodwin Procter employees contributed to discovery and trial preparation. The total number of people involved was the result of the expedited nature of the proceedings; however, as reflected in the bills, the bulk of work was accomplished by one partner, four associates, and one paralegal. To aid the court in understanding these bills, Defendants offer the following table identifying the attorneys and legal staff who worked on this litigation:

---

[5]  This sum represents amount paid to Defendants' expert Mitchell Weiss. Attached as Exhibit B is a record of Mr. Weiss' time spent on this litigation. Of this total, $8,856.25 represents Mr. Weiss's preparation for and attendance at two days of deposition. Brooks is required to reimburse this amount pursuant to Rules 26(b)(4)(A)(ii) and 26(b)(4)(C), as reflected in the discovery order entered by the Court. Defendants ask the Court to order Brooks to pay this sum either as part of this request or pursuant to Rule 26.

[6]  On the bills submitted in support of this table, the Court will notice that 20% of the legal fees owed were deferred. Trial counsel agreed to defer 20% of Defendants' fees until Defendants received their second round of financing, thereby sharing with Defendants the risks of the litigation. However, this deferment was not a discount of counsel's total fees. In addition, the Court will notice a rate change occurring October 1, 2005. This rate increase is in conjunction with the changeover in Goodwin Procter's fiscal year. The rates charged after October 1, 2005 are Goodwin Procter's standard fiscal year 2006 rates.

| Name | Title | Education |
|------|-------|-----------|
| Mark Tully | Partner, Co-Chair General Litigation Group, Chair Commercial Litigation Practice, Goodwin \| Procter LLP | J.D. 1987 |
| William Schnoor | Partner, Goodwin \| Procter LLP | J.D. 1983 |
| David Hosp | Partner, Goodwin \| Procter LLP | J.D. 1994 |
| Jim Berriman | Senior Counsel and Executive Manager of Litigation Technology, Goodwin \| Procter LLP | J.D. 1990 |
| David Cappillo | Associate, Goodwin \| Procter LLP | J.D. 1997 |
| Neil Smith | Associate, Goodwin \| Procter LLP | J.D. 2001 |
| Timothy Hirsch | Associate, Goodwin \| Procter LLP | J.D. 2004 |
| Brian LaMacchia | Associate, Goodwin \| Procter LLP | J.D. 2005 |
| Elianna Marziani | Associate, Goodwin \| Procter LLP | J.D. 2005 |
| Francis Kelleher | Trial Practice and Process Attorney, Goodwin \| Procter LLP | J.D. 1995 |
| Lynn Turgeon | Senior Litigation Technology Specialist, Goodwin \| Procter LLP | Certificate 1994 |
| Robin van der Meulen | Paralegal, Goodwin \| Procter LLP | B.A. 2002 |
| Corinne Kyritsopoulos | Case Assistant, Goodwin \| Procter LLP | B.A. 2004 |

## Argument

### I.    The Requested Attorneys' Fees and Costs are Reasonable

The amount of fees and costs requested by plaintiff is reasonable, given the complexity

and scope of this case, the potential harm to Defendants from Plaintiff's unsupported claims, the

expedited nature of this action, the scope of discovery, and the degree of experience and

competence of counsel.  The jury's verdict, which fully exonerated Mr. van der Meulen and

BlueShift, likewise supports Defendants' fee application.

### A.  Brooks Brought a Meritless Lawsuit and Then Attempted at All Times to Needlessly Increase the Scope and Cost of Defending Against Its Claims.

Brooks filed this lawsuit with no articulation of the technology or secrets that Defendants

allegedly misappropriated.  Despite repeated interrogatory requests and promptings from

Defendants, Brooks neglected to identify clearly the technology it alleged Mr. van der Meulen

stole until it was ordered to do so by the Court.  This was done finally on Friday, November 14 –

4

the day before the start of the trial. The reason for Brooks' inability to articulate any alleged

secrets was proven at trial – Brooks had no secrets and therefore no legitimate claims. On

November 14, Brooks finally disclosed five alleged "secrets" that it claimed Defendants used,

disclosed, or misappropriated. Trial was then conducted regarding these five alleged secrets.

Prior to that date, however, Brooks claimed at least sixteen secrets – more than three

times the final claim – all of which Defendants had to prepare for and refute during discovery

and prior to trial. Brooks' baseless and exaggerated claims required Defendants' attorneys and

retained expert to expend countless additional hours researching and preparing defenses

regarding technology Brooks ultimately conceded was not a secret and was never

misappropriated. It is appropriate that the award of attorneys' fees should reflect Brooks'

conduct and failure to set forth valid claims.[7]

In short, this was an extraordinary case in that it threatened the continued existence of

BlueShift despite the utter lack of merit of any of Brooks' claims. Defendants were therefore

required, and fully entitled, to defend themselves as fully and completely as they could.

Defendants retained top-quality trial counsel and incurred substantial legal expert and related

expenses in defending BlueShift's very existence. At the same time, Defendants confronted

tactics by Brooks that can only be viewed as intentionally designed to drive up costs, including

needless motion practice, far reaching (and over-reaching) discovery requests, and deposition

practice that had no merit or ultimate relevance to the case. For example: (1) Brooks deposed all

five BlueShift directors for no apparent reason, then failed to call any of those directors as

witnesses at trial; (2) Brooks deposed Mr. van der Meulen for an unnecessary and repetitive three

---

[7]     Without so much as a request to extend the scope of discovery, Brooks also claimed – briefly and without any
factual basis – that software was an issue in this case. Defendants therefore prepared to defend against this
allegation, which Brooks then abandoned.

days; (3) Brooks extended Mr. Weiss's deposition over two days; and (4) Brooks deposed two third-parties, Mr. Spitzer (an informal advisor to Mr. van der Meulen) and Dr. Abraham (one of Mr. van der Meulen's Babson professors), without any meaningful theory of relevance or intention to use the testimony at trial. In total, depositions for both sides consumed over 20 days of testimony from 17 different witnesses.

Brooks forced Defendants to litigate every aspect of this matter regardless of the existence of a *bona fide* claim or dispute. Brooks deliberately undertook, as a litigation "strategy," to elongate rather than to expedite the resolution of this matter. Brooks made scattershot claims that in the end it did not even attempt to prove at trial. This was all part of Brooks' true purpose in bringing this case which, as the jury found, was to put BlueShift out of business. Brooks should not be able to avoid even one dollar of the expense BlueShift incurred in defending itself.

### B. Defendants' Efforts Resulted in a Total Victory.

The jury found for Defendants on every claim Brooks made against them, granted every element of relief requested by Defendants, and granted the total dollar amount of restitution and damages requested by BlueShift. In short, Defendants prevailed fully. More importantly for these purposes, the jury found that *no aspect* of Brooks' claim was justified – that none of its claims had any factual support or arguable basis in law – and that Defendants' counterclaim was completely justified. The jury found that Brooks had no basis to even file this lawsuit, let alone take it to trial. Defendants request that the Court take this into account in assessing the reasonableness of the requested attorneys' fees and costs.

### C. The Facts and Issues Were Complicated.

Brooks' claims were based on highly complicated technology. The semiconductor industry, and the processing of silicon wafers in particular, is a complicated topic that required additional time to learn in preparation for discovery and trial. In light of Brooks' refusal to identify within a reasonable time the exact technology or combination of technologies it alleged Defendants stole, Defendants were required to expend additional time preparing defenses for "sixteen secrets," although only five such alleged "secrets" survived to trial, and in the end the jury found that none were actually a Brooks secret. Defendants request that the Court take this into account in assessing the reasonableness of the requested attorneys' fees and costs.

### D. Full Discovery, Motion Practice, and Trial Preparation Occurred on an Expedited Basis.

The total attorneys' costs and fees is not excessive given all that was accomplished in the short time period between the filing of the Complaint and the trial. This case involved full discovery and document production, over 20 days of depositions, and pre-trial motions (most of which were brought by Defendants to highlight Plaintiff's lack of valid claims and lack of admissible damages testimony). In short, an equal amount of work was conducted in six weeks as would normally be conducted in litigation lasting at least a full year, but was simply compressed into a shorter time period. Hence, the *total* attorney hours were similar, if not less than, the total hours one would expect to be spent on a normal case involving a similar level of complexity.

### E. The Proposed Award is Reasonable in Light of the Other Factors.

Defendants request that the Court consider the remaining factors identified in *Fontaine v. Ebtec Corp.*, 415 Mass. 309, 324-25 (1993), and *Linthicum v. Archambault*, 379 Mass. 381, 388-389 (1979), *overruled on other grounds by Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 418

7

Mass. 737 (1994). These include: the degree of competence demonstrated by the attorney; the experience, reputation and ability of the attorney; the usual price charged for similar services by other attorneys in the same area; and the amount of awards in similar cases. Defendants note that Brooks had a greater (or equal) number of attorneys working on their case and present at trial. Hopefully the Court recognized the competence of Defendants' counsel and appreciates the extensive efforts required by the demands of this case.

### F. The Submitted Rates are Comparable to Those at Peer Law Firms.

Defendants' attorneys bill at rates comparable to those at peer law firms. While law firms rarely publish their attorneys' billing rates, Goodwin Procter's billing rates are comparable to peer law firms in this market and nationally. In conjunction with this fee request, Goodwin Procter consulted an outside expert, Paula Alvary, who has extensive knowledge regarding law firm billing rates. According to Hoffman Alvary & Company, Goodwin Procter's billing rates are comparable with (and not excessive compared to) the rates of peer law firms given the size of the firm and the experience levels of the attorneys involved. *See* Letter from Paula Alvary, dated December 15, 2005, attached hereto as Ex. C. In short, Goodwin Procter's rates are well within the range of its peers.

### G. The Requested Amount is Necessary to Protect Defendants from Harm Given the Amount of Recovery.

The total amount of restitution and damages awarded by the jury was $209,300. The attorneys' fees and costs sought by the Defendants are $998,427.68. In the absence of a grant of attorneys' fees, Defendants' entire recovery would be depleted and Defendants would still have to pay out-of-pocket for the defense of a lawsuit the jury found to be utterly baseless and brought for improper purposes. Every dollar Defendants must pay in attorneys' fees is a victory for Brooks, which, having no valid claim upon which it could expect recovery, instead sought to

8

destroy Defendants through the costs of litigation. With a successful c. 93A claim, a grant of attorneys' fees is mandatory – the question is only whether the fees requested are reasonable.[8] For the aforementioned reasons, Defendants urges the Court to find that they are, and to award the requested amount in full.

**II.    Attorneys' Fees and Costs are Justified Under the Legal Standards of G.L. c. 93A and c. 231 §6F**

**A. Fees and Costs are Justified Under G.L. c. 93A.**

Defendants have moved for fees under G.L. c. 93A. Section 11 of c. 93A provides that if in any action commenced under c. 93A there has been a violation of §2, the c. 93A petitioner "shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action." This award of attorneys' fees is *mandatory*. M.G.L. 93A §11; *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 780 (1986) ("Having demonstrated a violation of c. 93A, §11, [the prevailing party] is, of course, entitled to reasonable attorneys' fees and costs."). As Defendants showed in their motion for relief pursuant to G.L. c. 93A, the present action meets all the requirements for mandatory attorneys' fees under c. 93A.

Defendants are entitled to an award of their entire attorneys' fees because BlueShift's c. 93A claim is related to all claims and counterclaims brought in this case. Although other claims were brought in this case, it is well-established that, when "a single chain of events" serves as the basis for multiple claims, attorney's fees may be granted for work expended in relation to all such claims, not merely the statutory claim which specifically provides for attorney's fees. *Simon v. Solomon*, 385 Mass. 91, 112 (1982) ("The three verdicts, although rendered separately, represent various elements of damage arising from a single chain of events ... Therefore, we

---

[8]    BlueShift's application for relief pursuant to G.L. c. 93A is pending before the Court.

9

reject [appellant's] argument that the judge should have limited attorneys' fees to the value of services devoted to the count labeled [statutory count].");  *DiMarzo v. American Mutual Insurance Co.*, 389 Mass. 85 (1983) ("We also reject the argument that the judge should have limited attorneys' fees to the services devoted to the c. 93A counts. Since the separate counts represent various elements of damage arising from a single chain of events which were recoverable under c. 93A, the judge did not err") (internal quotation omitted)).  Here, a single chain of events served as the basis for Plaintiff's claims and Defendants' counterclaims. Defendants are therefore entitled to an award of reasonable attorneys' fees for all work expended in the course of the litigation.

### B.  Attorneys' Fees and Costs are Also Justified Under G.L. Chapter 231 §6F.

Although c. 93A mandates the award of attorneys' fees and costs, alternatively, attorneys' fees and costs are also appropriate here under G.L. c. 231 §6 F.  Defendants hereby move for a grant of fees and costs under that statute.  G.L. c. 231, §6 F provides that a party in a civil action shall recover its "reasonable counsel fees and other costs and expenses incurred" if the Court finds that "all or substantially all of the claims…were wholly insubstantial, frivolous, and not advanced in good faith."  An award of attorney's fees and costs under § 6F requires both an evidentiary showing and an explicit judicial finding that the plaintiffs' claims were not advanced in good faith.  *Bartlett v. Greyhound Real Estate Finance Co.*, 41 Mass. App. Ct. 282, 292 (App. Ct. 1996) (reversing finding because trial court did not follow these restrictions).  The absence of good faith of a claimant in litigation may be inferred reasonably from circumstances found by a trial judge.  *Massachusetts Adventura Travel, Inc. v. Mason*, 27 Mass. App. Ct. 293, 299 (App. Ct. 1989).  Where a claim is advanced that is wholly unsupported by the evidence or any reasonable basis, as Brooks' claims were, the subjective belief of the claimant will not

preclude an award under c. 231 § 6F. *Id.* The jury verdict alone satisfies the evidentiary standard

under c. 231 §6F that Brooks' filing of this lawsuit was "wholly insubstantial, frivolous, and not

advanced in good faith."[9] *See DiBenedetto v. Lawless*, 1996 WL 1249882 at *5 (Mass. Super.

1996) (finding that fees were justified under c. 231 §6F where "plaintiffs brought their complaint

against [defendant] for no legitimate purpose and only as a means of harassing the [defendant]").

Defendants request a hearing on this motion.

## Conclusion

For the foregoing reasons, Defendants BlueShift Technologies, Inc. and Peter van der

Meulen respectfully request that Plaintiff Brooks Automation, Inc., be ordered to pay attorneys'

fees in the amount of $873,830.50 and costs in the amount of $124,597.18[10], for a total of

$998,427.68.

---

[9]    *See* Jury Instructions, at 20. The Court's jury instructions made clear that the only way for BlueShift to prevail
on its counterclaim was for the jury to make a finding that Brooks, when it filed the lawsuit, *knew* its claims
were devoid of any reasonable factual support or arguable basis in law and was acting primarily for a purpose
other than that of properly adjudicating its claims. Given that the jury found in favor of BlueShift on its
counterclaim, this finding was made.

[10]    Defendants note that an award of their costs is appropriate under Mass. R. Civ. P. 54(d), which provides that
costs are allowed for the prevailing party.

Respectfully submitted,

BLUESHIFT TECHNOLOGIES, INC. &
PETER VAN DER MEULEN,

By their attorneys,


Mark E. Tully (BBO # 550403)
R. David Hosp (BBO # 634091)
Neil T. Smith (BBO # 651157)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109-2881
617.570.1000


Dated: December 16, 2005


## CERTIFICATE OF SERVICE

I, Neil T. Smith, counsel for Defendants BlueShift Technologies, Inc. and Mr. Peter van der Meulen, do hereby certify that the foregoing document has been duly served by delivering a copy of same upon defendant Brooks Automation, Inc. by hand on this 16th day of December, 2005.


Neil T. Smith

LIBA/1651303.2

12

# TAB  A

GOODWIN | PROCTER

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109

T: 617.570.1000
F: 617.523.1231
goodwinprocter.com

Fed. ID #:      04-1378465
Invoice Number:  532384
Client Number:   120298

BlueShift Technologies, Inc.

# REDACTED

November 10, 2005

**FOR PROFESSIONAL SERVICES RENDERED** for the period
through September 30, 2005, in connection with the following:

| Matter | Fees | Disbursements | Total |
|---|---|---|---|
| Brooks Automation, Inc.<br>General | $105,480.50 | $1,499.60 | $106,980.10 |
| **Invoice Total** | | | |
| **Less 20% Deferred** | | | |
| **80% Currently Due** | | | |

120298/155369, 160739
WJS:jr

Mailed To:    Peter van der Meulen
              BlueShift Technologies, Inc.
              3 Riverside Drive
              Andover, MA 01810

**Please return this page with your remittance. Thank you.**
**Payment due within 30 days.**

# GOODWIN | PROCTER

| Matter Summary by Name | Hours | Rate | Total |
|---|---|---|---|
| Schnoor, William | 16.9 | $590.00 | $9,971.00 |
| Tully, Mark | 70.5 | 550.00 | 38,775.00 |
| Cappillo, David | 1.0 | 410.00 | 410.00 |
| Smith, Neil | 75.8 | 365.00 | 27,667.00 |
| La Macchia, Brian | 64.1 | 260.00 | 16,666.00 |
| Marziani, Elianna | 10.8 | 260.00 | 2,808.00 |
| Legal Research Specialist | 3.1 | 250.00 | 775.00 |
| Hirsch, Timothy | 28.5 | 235.00 | 6,697.50 |
| Kelleher, Francis | 6.6 | 210.00 | 1,386.00 |
| Van Der Meulen, Robin | 2.5 | 130.00 | 325.00 |
| **Total** | **279.8** | | **$105,480.50** |

| Matter Disbursement Summary | Total |
|---|---|
| Total Duplicating Charge/Copy | $231.35 |
| Fax | 173.00 |
| Messenger | 136.50 |
| Travel | 189.63 |
| Document Printing | 317.70 |
| Document Scanning | 16.95 |
| Legal Research | 434.47 |
| **Total Disbursements** | **$1,499.60** |

- 8 -

GOODWIN | PROCTER

Goodwin Procter LLP
Counsellors at Law
Exchange Place
Boston, MA 02109

T: 617.570.1000
F: 617.523.1231
goodwinprocter.com

Fed. ID #:        04-1378465
Invoice Number:   538564
Client Number:    120298

BlueShift Technologies, Inc.                    **REDACTED**

November 30, 2005

**FOR PROFESSIONAL SERVICES RENDERED** for the period
through November 23, 2005, in connection with the following:

| Matter | Fees | Disbursements | Total |
|--------|------|---------------|-------|
| Brooks Automation, Inc. | $217,636.00 | $6,446.38 | $224,082.38 |
| Invoice Total | $217,636.00 | $6,446.38 | $224,082.38 |
| Less 20% Deferred | | | $44,816.48 |
| 80% Currently Due | | | $179,265.90 |

120298/160739
WJS:mjm

Mailed To:    Peter van der Meulen
              BlueShift Technologies, Inc.
              3 Riverside Drive
              Andover, MA 01810

**Please return this page with your remittance. Thank you.**
**Payment due within 30 days.**

# GOODWIN | PROCTER

| Date | Name | Hours | Description |
|------|------|-------|-------------|
| 11/22/05 | Van Der Meulen, Robin | 10.0 | Attend trial; assist in preparations for closing arguments. |
| 11/22/05 | La Macchia, Brian | 5.5 | Attend trial and prepare documents for trial. |
| 11/23/05 | Tully, Mark | 10.0 | Trial preparation; trial; closings; jury charge and jury deliberations; follow up telephone conferences and emails regarding trial result; follow up regarding same. |
| 11/23/05 | Berriman, James | 8.4 | Prepare for and attend seventh day of trial, including closing arguments and jury charge; attend to breakdown of presentation system; prepare local copies of animated demonstratives in event jury requests view of same; set up laptop presentation system for same; conferences with Mr. Tully, Mr. Smith, and client regarding preparations for various possible outcomes; attend to preservation of electronic exhibits for possible use in appeal; attend conclusion of trial and jury verdict; conference with Mr. Tully and client regarding post-trial issues. |
| 11/23/05 | Smith, Neil | 8.8 | Prepare for and attend trial; jury verdict; follow up regarding same. |
| 11/23/05 | Hirsch, Timothy | 2.9 | Trial preparation for final day of trial; prepare jury binders; attend trial. |
| 11/23/05 | La Macchia, Brian | 2.8 | Prepare documents for trial and attend trial. |

| Total Hours | | 541.8 | | Total Fees | $217,636.00 |
|-------------|--|-------|--|------------|------------|

| Matter Summary by Name | Hours | Rate | Total |
|------------------------|-------|------|-------|
| Hosp, David | 73.7 | $500.00 | $36,850.00 |
| Tully, Mark | 90.0 | 600.00 | 54,000.00 |
| Berriman, James | 114.0 | 450.00 | 51,300.00 |
| Hirsch, Timothy | 43.6 | 300.00 | 13,080.00 |
| La Macchia, Brian | 38.0 | 260.00 | 9,880.00 |
| Marziani, Elianna | 18.1 | 260.00 | 4,706.00 |
| Smith, Neil | 82.0 | 410.00 | 33,620.00 |
| Turgeon, Lynn | 18.4 | 250.00 | 4,600.00 |
| Van Der Meulen, Robin | 64.0 | 150.00 | 9,600.00 |
| Total | 541.8 | | $217,636.00 |



Seven Wells Avenue
Newton, Massachusetts 02459
Telephone: 617.758.0500
Facsimile: 617.758.0510
www.hoffmanalvary.com

December 15, 2005

Mark E. Tully, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Dear Mr. Tully:

You have requested that I review the billing rates of those lawyers associated with the Brooks Automation v. Blueshift Technologies and Peter van der Meulen litigation matter to help understand the relative position of their rates in the market. I am more than happy to do so, but first thought it made sense to give you some understanding as to my qualifications.

Hoffman Alvary & Company LLC, of which I am a founding principal, is a consulting firm of fifteen professionals dedicated to addressing significant management issues in major law firms across the US. The firm was founded in 1996 by former partners and senior managers of (then) Price Waterhouse. While at Price Waterhouse I was the partner responsible for Law Firm Consulting in the Northeast. I have more than twenty years' experience working with major law firms and an in-depth knowledge of most of the largest 250 law firms in the country. By way of example, we assisted in the combinations of Wilmer, Cutler and Hale and Dorr, Ropes and Gray and Fish & Neave, and Edwards & Angell and Palmer & Dodge. Our work requires that we understand the economics of our clients, including their billing rates. In connection with various of our services I have observed the private rate structures of nearly every major law firm in Boston and approximately 100 other large firms across the US.

The rates you have asked us to review span two pricing periods: those in effect October 1, 2004, through September 30, 2005, and those that went into effect as of October 1, 2005. Goodwin Procter, like nearly all other law firms, undertakes a practice of annual rate increases. Based on my professional experience, it has been common industry practice for law firms to raise their billing rates annually, nearly always timed to coincide with the beginning of the firm's fiscal year. Even during each of the last two recessions, nearly all medium sized and large law firms in the Northeast continued their practice of annual rate increases. Goodwin Procter's rate changes between September 30 and October 1 are consistent with this common practice given that the firm's fiscal year end is September 30. Most other firms' rate changes will take effect January 1, 2006, because most other firms have a December 31 fiscal year end.

Mark E. Tully, Esq.
December 15, 2005
Page 2 of 2

My point of comparison for this review is other large national firms in the Boston market. Based on our observation of billing rates in effect at those firms, your partner rates in effect through September 30 are positioned such that they fall between the middle of the Boston market and the top 30% of the Boston market for partners with like years of experience. In other words, about 50% of similarly experienced partners in other firms had rates lower than the Goodwin Procter partners and about 30% of similarly experienced partners in other firms had rates higher than the Goodwin Procter partners.

For associates where we have observed the rates in effect in 2005 of comparable classes, two of the three class years with rates on this matter were lower than half of all the associates' rates across a population of many firms.

The October 1, 2005, rates for the Goodwin Procter lawyers reflect increases that we would expect to see in other comparable firms upon their change in fiscal year taking effect January 1, 2006, if the industry-wide historical practice of annual rate increases and "step increases" for associates continue. A step increase is the effect of, *e.g.*, a third-year associate taking on a fourth-year associate rate as he or she progresses or "steps up" to become a fourth-year associate. It is typical of nearly all large firms to combine the effect of the step increase and the annual increase in the rate scale for all associate years in generating an increase in an individual associate's new rate.

I hope this information has been helpful characterizing the relative positioning of the Goodwin Procter lawyers' rates in the above matter. Please feel free to contact me at (617) 758-0500 if I can be of any further assistance.

Sincerely,

Paula Alvary

Paula Alvary

cc: Mr. Arthur Greenberg



COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT
BUSINESS LITIGATION
SESSION

---

BROOKS AUTOMATION, INC.,

Plaintiff,

v.

BLUESHIFT TECHNOLOGIES, INC., and
PETER VAN DER MEULEN,

Defendants.

---

CIV. A. NO. 05-03973-BLS(2)

(Judge Gants)

## DECLARATION OF PAULA ALVARY

I, Paula Alvary, depose and state as follows:

1.    I am a founding principal of Hoffman Alvary & Company LLC, a consulting firm of fifteen professionals in which we address significant management issues in major law firms across the United States.

2.    I was asked by counsel for defendants BlueShift Technologies, Inc. and Peter van der Meulen to provide a letter reviewing the billing rates of the lawyers in the above-captioned case. Attached to this Declaration as Exhibit A is a copy of the letter dated December 15, 2005, that I provided.

3.    The information contained in this letter is based on my professional experience in the market among large law firms.

Signed under the pains and penalties of perjury this 7th day of February, 2006.

_____
Paula Alvary



Seven Wells Avenue
Newton, Massachusetts 02459
Telephone: 617.758.0500
Facsimile: 617.758.0510
www.hoffmanavary.com

December 15, 2005

Mark E. Tully, Esq.
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Dear Mr. Tully:

You have requested that I review the billing rates of those lawyers associated with the Brooks Automation v. Blueshift Technologies and Peter van der Meulen litigation matter to help understand the relative position of their rates in the market. I am more than happy to do so, but first thought it made sense to give you some understanding as to my qualifications.

Hoffman Alvary & Company LLC, of which I am a founding principal, is a consulting firm of fifteen professionals dedicated to addressing significant management issues in major law firms across the US. The firm was founded in 1996 by former partners and senior managers of (then) Price Waterhouse. While at Price Waterhouse I was the partner responsible for Law Firm Consulting in the Northeast. I have more than twenty years' experience working with major law firms and an in-depth knowledge of most of the largest 250 law firms in the country. By way of example, we assisted in the combinations of Wilmer, Cutler and Hale and Dorr, Ropes and Gray and Fish & Neave, and Edwards & Angell and Palmer & Dodge. Our work requires that we understand the economics of our clients, including their billing rates. In connection with various of our services I have observed the private rate structures of nearly every major law firm in Boston and approximately 100 other large firms across the US.

The rates you have asked us to review span two pricing periods: those in effect October 1, 2004, through September 30, 2005, and those that went into effect as of October 1, 2005. Goodwin Procter, like nearly all other law firms, undertakes a practice of annual rate increases. Based on my professional experience, it has been common industry practice for law firms to raise their billing rates annually, nearly always timed to coincide with the beginning of the firm's fiscal year. Even during each of the last two recessions, nearly all medium sized and large law firms in the Northeast continued their practice of annual rate increases. Goodwin Procter's rate changes between September 30 and October 1 are consistent with this common practice given that the firm's fiscal year end is September 30. Most other firms' rate changes will take effect January 1, 2006, because most other firms have a December 31 fiscal year end.

Mark E. Tully, Esq.
December 15, 2005
Page 2 of 2

My point of comparison for this review is other large national firms in the Boston market. Based on our observation of billing rates in effect at those firms, your partner rates in effect through September 30 are positioned such that they fall between the middle of the Boston market and the top 30% of the Boston market for partners with like years of experience. In other words, about 50% of similarly experienced partners in other firms had rates lower than the Goodwin Procter partners and about 30% of similarly experienced partners in other firms had rates higher than the Goodwin Procter partners.

For associates where we have observed the rates in effect in 2005 of comparable classes, two of the three class years with rates on this matter were lower than half of all the associates' rates across a population of many firms.

The October 1, 2005, rates for the Goodwin Procter lawyers reflect increases that we would expect to see in other comparable firms upon their change in fiscal year taking effect January 1, 2006, if the industry-wide historical practice of annual rate increases and "step increases" for associates continue. A step increase is the effect of, *e.g.*, a third-year associate taking on a fourth-year associate rate as he or she progresses or "steps up" to become a fourth-year associate. It is typical of nearly all large firms to combine the effect of the step increase and the annual increase in the rate scale for all associate years in generating an increase in an individual associate's new rate.

I hope this information has been helpful characterizing the relative positioning of the Goodwin Procter lawyers' rates in the above matter. Please feel free to contact me at (617) 758-0500 if I can be of any further assistance.

Sincerely,

Paula Alvary

Paula Alvary

cc: Mr. Arthur Greenberg



# FALBY AFFIDAIVT


# <u>TAB C</u>



NOTIFY

# COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, SS.**

**SUPERIOR COURT
CIVIL ACTION
NO. 05-3973-BLS2**

Notice sent
4/06/2006

E. M.  H.
S. N.  S.
B. L.  M.
H. J.  C.
B. R.  B.
   & I.
T. W.  B.
F. H.  F.
   & G.
M. T.
N. T.  S.
R. D.  H.
G. P.

(sc)

## BROOKS AUTOMATION, INC.,
### Plaintiff

### vs.

## BLUESHIFT TECHNOLOGIES, INC. and PETER VAN DER MEULEN,
### Defendants

## <u>MEMORANDUM AND ORDER ON DEFENDANT BLUESHIFT TECHNOLOGIES, INC.'S APPLICATION FOR ASSESSMENT OF ATTORNEY'S FEES AND COSTS</u>

On January 17, 2006, this Court found in favor of the defendant Blueshift Technologies, Inc. ("Blueshift") on its counterclaim under G.L. c. 93A and awarded Blueshift actual damages of $209,300, which it trebled to $627,900, plus reasonable attorney's fees and costs. Findings of Fact, Conclusions of Law and Order on Blueshift Technologies, Inc.'s Application for Relief Under G.L. 93A ("Chapter 93A Decision") at 20-21. Blueshift has now applied for its attorney's fees and costs, seeking an award of $873,830.50 in attorney's fees and $88,222.25 in costs, for a total of $962,052.75. The plaintiff Brooks Automation, Inc. ("Brooks") opposes the application, contending that the amount sought is unreasonably high under the circumstances of this case. After hearing, having considered the fee application and the opposition, and the applicable law, this Court hereby finds that the reasonable attorney's fees and costs that Blueshift incurred in prevailing on its Chapter 93A claim total $848,830.50 in attorney's fees and $88,222.25 in costs, for a total of $937,052.75, and orders that the judgment be amended to provide for the award of these attorney's fees and costs.

Under G.L. c. 93A, § 11, if a Court, as here, finds that the counterclaim defendant has

1

committed unfair and deceptive acts in violation of G.L. c. 93A, § 2, the counterclaim plaintiff "shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action." G.L. c. 93A, § 11. "While the amount of a reasonable attorney's fee is largely discretionary, the judge ... should consider the nature of the case and the issues presented, the time and labor required, the amount of damages involved, the result obtained, the experience, reputation, and ability of the attorney, the usual price charged for similar services by other attorneys in the same area, and the amount of awards in similar cases." Linthicum v. Archambault, 379 Mass. 381,388-389 (1979). See also Heller v. Silverbranch Construction Corp., 376 Mass. 621, 628-629 (1978). "No one factor is determinative, and a factor-by-factor analysis, although helpful, is not required." Berman v. Linnane, 434 Mass. 301, 303 (2001). In making its determination, the Court is not required to review each individual item in the legal bill, but can consider the bill as a whole. Id.

In finding a Chapter 93A violation, this Court essentially found that Brooks' complaint in this action was frivolous, that is, it did not have reasonable factual support under the legal standard adopted by the court, and did not have reasonable factual support under any legal standard that had an arguable basis in law. See Chapter 93A Decision at 13-14. This court also found that Brooks, when it filed suit, acted prematurely, with reckless disregard as to whether there was any reasonable factual support for the allegations in the complaint, because it was concerned about Blueshift's developing relationship with Applied Materials, Inc., a major customer it had worked hard to cultivate, and wanted to disrupt that relationship. Id. This Court concluded:

This Court has carefully considered whether the filing of this action with reckless

2

disregard as to whether there was any reasonable factual support for these allegations, motivated by the desire to interfere with Blueshift's developing contractual relationship with Applied Materials, constitutes an unfair and deceptive act or practice in trade or commerce, in violation of G.L. c. 93A. This Court finds that such reckless disregard, when motivated by the desire to interfere with a competitor's prospective contractual relationship with a coveted customer, is not only sufficient to constitute an unfair and deceptive act or practice in trade or commerce but is also sufficient to constitute a wilful violation of Chapter 93A.

Id. at 17.

This Court is mindful that Blueshift would not have been awarded attorney's fees if it had simply prevailed on its common law counterclaim of tortious interference with contractual relations, and that the award of attorney's fees must be focused on the prosecution of its Chapter 93A counterclaim, from which the entitlement to attorney's fees is derived. See Miller v. Risk Management Foundation of the Harvard Medical Institutions, Inc., 36 Mass. App. Ct. 411, 421 (1994). Yet, where, as here, a single chain of events gives rise to both the common law and the Chapter 93A claim, the Court need not attempt to apportion the legal effort between the two claims. Hanover Insurance Company v. Sutton, 46 Mass. App. Ct. 153, 177 (1999). This Court is also acutely aware that the essence of the Chapter 93A violation here is that Brooks sought to severely, perhaps fatally, injure a budding competitor in its business by recklessly filing a lawsuit that, by its nature, imperiled the continued existence of Blueshift. Pragmatically, justice cannot be served when a Chapter 93A violation is found in these circumstances unless Blueshift is awarded all the reasonable attorney's fees and costs it incurred in having to defend itself from this frivolous lawsuit. Therefore, this Court finds that the appropriate measure of reasonable attorney's fees and costs for this Chapter 93A violation is the entirety of the reasonable attorney's fees and costs that Blueshift incurred in defending itself against the allegations in Brooks'

3

complaint and in prosecuting its counterclaim.

In determining what constitutes an award of <u>reasonable</u> attorney's fees and costs, this Court has considered each of the so-called <u>Linthicum</u> factors set forth above, which I will address separately:

## The Nature of the Case and the Issues Presented

This Court recognizes that the factual issues presented in this case were extremely difficult. The legal issues were not intrinsically difficult, but they were made more difficult to address because of the problems Brooks had in articulating its legal position in a concise and timely fashion. In short, because Brooks could not until the eve of trial articulate precisely what Blueshift and Peter van der Meulen ("van der Meulen") had done that constituted a breach of his restrictive covenant or a theft of trade secrets, Blueshift was faced with essentially a "moving target" of allegations, each of which it had to rebut, both factually and legally..

This Court also recognizes, as it noted earlier, that the future of Blueshift likely depended on the outcome of this litigation. From the point of view of a fledgling corporation like Blueshift, this was a life or death case, and it required a commitment of time from able, experienced attorneys commensurate with the stakes.

Finally, this Court also recognizes that the trial of this case took place roughly two months after the complaint was filed, at Blueshift's request, based on its argument, ultimately borne out at trial, that the lawsuit was frivolous and needed to be resolved quickly, because Blueshift would have immense difficulty attracting necessary venture capital and new customers if the fate of the company hedged on a pending lawsuit. In essence, Blueshift convinced the Court that, if the trial was scheduled in the usual fashion, Blueshift would lose in its competitive

4

forum even if it prevailed in the legal forum, because there would be nothing or little left of the company by the time it was vindicated at trial. The fast-track which this case was placed on effectively meant that it required an enormous amount of attorney time and effort in a concentrated period.

## The Time and Labor Required

While this Court believes that expediting the trial actually reduced the amount of attorney's fees expended, largely because there are only so many hours that even attorneys can work in that short a period of time, it credits the statements of Blueshift's lead attorney, Mark Tully, that he, associate Neil Smith, and paralegal Robin van der Meulen (no relation to Peter van der Meulen) devoted the vast majority of their time during this two month period to this litigation, and that other attorneys were needed to assist them in various matters and consult with them on numerous legal and factual issues. This Court also credits the affidavit of attorney Tully and attorney Hosp that the time asserted as being devoted to this litigation was actually devoted to this litigation and was reasonably necessary to its success.

## The Amount of Damages Involved

The statutory directive that reasonable attorney's fees be awarded "irrespective of the amount in controversy" means that the prevailing party is entitled to reasonable attorney's fees even if the money award is purely nominal. See <u>Raymer</u> v. <u>Bay State National Bank</u>, 384 Mass. 310, 319-320 (1981) (awarding "modest attorneys' fees" in the amount of $4,500 on money judgment of $1). Yet, the inclusion of the amount of damages involved among the <u>Linthicum</u> factors indicates that what is reasonable may depend, at least in part, on the amount of damages involved and the result obtained. <u>Linthicum</u> v. <u>Archambault</u>, 379 Mass. at 388-389. As Judge

Patti Saris wrote, "While [the phrase, 'irrespective of the amount in controversy'] means the

amount in controversy is not controlling, I have never heard of determining a reasonable fee

without paying some regard to what was involved. The legislature, for example, cannot be

thought to have intended that, simply because a plaintiff has a legitimate, but modest, Chapter

93A claim counsel could proceed as though conducting a multimillion dollar class action."

Morse v. Mutual Federal S. & L. Ass'n of Whitman, 536 F. Supp. 1271, 1283 (D. Mass. 1982).

Here, the amount awarded on the Chapter 93 claim – $209,300, trebled to $627,900 – was

the amount claimed. If one were to look at this amount in isolation, one could properly question

the reasonableness of an application seeking roughly $960,000 in attorney's fees and costs when

the potential damage award, trebled, was roughly one-third less than that. However, as discussed

earlier, this Chapter 93A claim cannot justly be viewed in isolation, since the defense and defeat

of Brooks' claims in its complaint was necessary to the successful prosecution of Blueshift's

Chapter 93A claim, and a victory for Brooks would have been a devastating, perhaps deadly,

blow to Blueshift's corporate future. Since the fate of a corporation, and the livelihood of its

employees, was at risk, this Court finds that the amount of damages involved was immense,

involving many millions of dollars.

## The Result Obtained

The ultimate result obtained by Blueshift in this litigation was a complete victory on

every count in the complaint and counterclaim. Not only did Blueshift defeat Brooks' claims, it

proved them to be frivolous and Brooks to have been reckless in filing them.

## The Experience, Reputation, and Ability of the Attorneys

The performance of Goodwin Procter in this litigation was first-rate in every respect.

6

Attorney Tully did a superb job in trying the case to the jury and in arguing the many motions. The written work submitted was top-notch. Even the audio-visual displays and the manner in which they were presented to the jury were well done. In short, this was an extraordinarily well-litigated case by able attorneys, paralegals, and staff in a highly regarded law firm.

**The Usual Price Charged for Similar Services by Other Attorneys in the Same Area**

This Court credits the affidavit of Paula Alvary, a consultant to law firms whose professional experience gives her access to the billing rates charged by many large national law firms with Boston offices, that the billing rates charged by the Goodwin Procter partners who billed in this litigation for their work on behalf of Blueshift were roughly just above the average for large national firms in the Boston market, and the billing rates for associates were slightly below this average. She found that, during the pertinent time period, about fifty percent of similarly experienced partners in other firms had rates lower than the Goodwin Procter partners and about thirty percent of similarly experienced partners in other firms had rates higher than the Goodwin Procter partners. She also found that two of the three associate class years who billed on this matter at Goodwin Procter were lower than the billing rates for comparable associate class years at other large national firms in the Boston market.

Brooks challenges the comparison used by Alvary, noting that she focused only on large, national law firms. Implicit in this criticism is that Blueshift could have successfully litigated this case with a smaller, local firm. To be sure, there are certainly able, smaller, purely local law firms that could have represented Blueshift in this action, perhaps at a lower price. Yet, it would have been difficult for a small law firm to devote the quantity of resources needed to be devoted in a short time frame to obtain the result that Goodwin Procter was able to produce for Blueshift.

7

Here, as noted earlier, success at trial after a protracted litigation would have yielded, at best, a Pyrrhic victory for Blueshift, since the new corporation may not, by that time, have been financially viable. Moreover, also as noted earlier, for Blueshift, the entire future of the corporation rested on the result, so it was reasonable to seek out the most able, most experienced law firm to represent it in this action. Therefore, this Court does not believe it fair to limit the attorney's fees due to Blueshift to the billing rate charged by smaller local firms, since most such firms would not have been able to produce for Blueshift the same result produced here by Goodwin Procter. Indeed, this Court also observes that it rings hollow for Brooks to complain about Blueshift's retention of a large, national firm to represent it in this action when Brooks, which had much less at stake in terms of its corporate survival, chose to retain its own large, national firm to prosecute this action. Although the Court specifically invited such a submission, Brooks' law firm has not provided an affidavit indicating that its own billing rates were below that charged by Goodwin Procter or that it litigated this case for less than Goodwin Procter.

**The Amount of Awards in Similar Cases**

Brooks has informed this Court of at least two other cases decided by extraordinarily able Superior Court judges in which the amount of attorney's fees sought by the prevailing party in a Chapter 93A action were considerably reduced by the Court. This Court gives little weight to these other cases because this Court knows too little of the circumstances that led those able judges to conclude that the attorney's fees sought were excessive. Certainly, in some cases, the number of attorneys and staff who billed time in this case on behalf of Blueshift – ten attorneys, a senior litigation technology specialist, a paralegal, and a case assistant – would be excessive or inefficient, but this Court does not find that it was here. To be sure, the billing rates charged by

8

all the attorneys and paralegals are large, but they are roughly the median charged among comparable large firms with Boston offices, and therefore reflect approximately the "going-rate" in the large firm attorney market.  To characterize these attorney's fees as "unreasonable" simply because they are expensive would be a moral judgment, not a market judgment.  By analogy, it may seem crazy that a utility infielder in major league baseball earns $1.5 million per year while a Superior Court judge earns $112,000, but that does not mean it would be unreasonable for a baseball team to pay that amount.  Indeed, an arbitrator may justly find that the ballplayer is "entitled" to that amount if his salary is determined by arbitration.  The $600 per hour billed by attorney Tully is certainly a great deal of money, but it is comparable to that billed by other lawyers in Boston of his ability and experience.

## Blueshift's Motion for Summary Judgment

While this Court finds that the amount of attorney's fees and costs sought by Blueshift is generally fair and reasonable, it will reduce the amount sought for the time invested in preparing and filing Blueshift's motion for summary judgment.  Blueshift spent roughly $75,000 in preparing its motion for summary judgment on the eve of trial, when it reasonably should have recognized that the Court, in view of the greatly expedited trial schedule, would not be able in advance of trial to resolve that motion in Blueshift's favor.  While exact calculations are not reasonably possible, this Court estimates that roughly $50,000 of the time and effort invested in preparing that motion would have been invested anyway to address various legal and factual issues that foreseeably were to arise at trial, so this Court does not believe that the entirety of that $75,000 was billed for unreasonably wasted effort.  It will, however, reduce Blueshift's fee award by $25,000 to reflect that portion of this work which probably was unreasonably wasted

9

effort.

## ORDER

For the reasons stated above, after hearing, having considered the fee application and the opposition, and the applicable law, this Court hereby **FINDS** that the reasonable attorney's fees and costs that Blueshift incurred in prevailing on its Chapter 93A claim total $848,830.50 in attorney's fees and $88,222.25 in costs, for a total of $937,052.75, and **ORDERS** that the judgment be amended to provide for the award of these attorney's fees and costs.

_____
Ralph D. Gants
Justice of the Superior Court

DATED: March 30, 2006

10

# FALBY AFFIDAVIT

# **TAB D**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

BLUE HILLS OFFICE PARK LLC,

      Plaintiff, Defendant-in-Counterclaim,

      v.

J.P. MORGAN CHASE BANK, as Trustee for the
Registered Holders of Credit Suisse First Boston
Mortgage Securities Corp., Commercial Mortgage
Pass-Through Certificates, Series 1999-C1, and,
CSFB 1999–C1 ROYALL STREET, LLC,

      Defendants, Plaintiffs-in-Counterclaim,

      v.

WILLIAM LANGELIER and GERALD
FINEBERG,

      Defendants-in-Counterclaim.

Civil Action No.  05-CV-10506 (WGY)

## MANUAL FILING NOTIFICATION

Defendants, Plaintiffs-in-Counterclaim, give notice of the manual filing with the Clerk's

office of **Tab D to the Affidavit of Bruce E. Falby, Esq., which comprises true and correct

copies of DLA Piper invoices,** due to its voluminous size.


Dated:  October 27, 2006

# FALBY AFFIDAVIT

# **TAB E**

## MONTHLY SUMMARY OF DLA PIPER LEGAL FEES AND DISBURSEMENTS FROM DECEMBER 2004 TO OCTOBER 2006

| INVOICE DATE | MONTH IN WHICH SERVICES RENDERED | HOURS | FEES | DISBURSEMENTS | TOTAL |
|---|---|---|---|---|---|
| February 15, 2005 | December, 2004 | 17.20 | $5,500.50 | $91.41 | $5,591.91 |
| March 15, 2005 | January, 2005 | 57.10 | $21,843.50 | $948.56 | $22,792.06 |
| March 31, 2005 | February, 2005 | 63.00 | $26,623.00 | $0.00 | $26,623.00 |
| April 30, 2005 | March, 2005 | 111.40 | $42,717.50 | $1,052.98 | $43,770.48 |
| June 6, 2005 | April, 2005 | 118.10 | $46,251.00 | $1,310.48 | $47,561.48 |
| July 12, 2005 | May, 2005 | 50.30 | $18,187.50 | $423.69 | $18,611.19 |
| August 31, 2005 | June & July, 2005 | 83.70 | $34,519.50 | $1,796.31 | $36,315.81 |
| September 30, 2005 | August, 2005 | 17.80 | $6,849.50 | $20.62 | $6,870.12 |
| October 31, 2005 | September, 2005 | 76.70 | $26,754.50 | $49.65 | $26,804.15 |
| November 30, 2005 | October, 2005 | 144.20 | $43,004.00 | $360.25 | $43,364.25 |
| December 14, 2005 | November, 2005 | 227.80 | $57,942.50 | $5,377.31 | $63,319.81 |
| February 8, 2006 | December, 2005 | 24.70 | $6,402.50 | $1,355.81 | $7,758.31 |
| February 28, 2006 | January, 2006 | 181.65 | $64,023.00 | $2,251.17 | $66,274.17 |
| March 24, 2006 | February, 2006 | 424.40 | $137,843.50 | $2,422.85 | $140,266.35 |
| April 19, 2006 | March, 2006 | 664.55 | $206,351.75 | $9,377.65 | $215,729.40 |
| June 5, 2006 | April, 2006 | 474.60 | $170,881.50 | $23,461.28 | $194,342.78 |
| June 19, 2006 | May, 2006 | 699.60 | $252,643.00 | $26,409.29 | $279,052.29 |
| July 31, 2006 | June, 2006 | 196.85 | $65,060.00 | $4,179.29 | $69,239.29 |
| August 9, 2006 | July, 2006 | 65.25 | $27,996.75 | $5,842.72 | $33,839.47 |
| September 21, 2006 | August, 2006 | 116.50 | $50,778.00 | $494.93 | $51,272.93 |
| October 9, 2006 | September, 2006 | 861.25 | $313,650.25 | $10,130.54 | $323,780.79 |
| October 26, 2006 | October 1, 2006 to October 13, 2006 | 358.55 | $138,403.25 | $11,713.96 | $150,117.21 |
| | | 5035.20 | $1,764,226.50 | $109,070.75 | |

**TOTAL:** $1,873,297.25

# FALBY AFFIDAVIT

## TAB F

## DLA PIPER DISBURSEMENTS BY CATEGORY

| Invoice Date | Lexis/ Westlaw/ Internet Research | Travel/ Airfare/ Hotel/ Car Rental | Delivery Services/ Process Server | Duplicating | Computer Printing | Secretary OT/ Fax/ Postage/ Office Supplies | Court Reporter | Mileage/ Parking/ Meals | Filing Fee | Mediation Fee | Expert Witness Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/15/05 | $91.41 | | | | | | | | | | |
| 3/15/05 | $690.96 | $78.16 | $50.10 | $101.65 | $7.56 | $20.13 | | | | | |
| 3/31/05 | | | | | | | | | $250.00 | | |
| 4/30/05 | $257.30 | | $8.73 | $355.80 | $37.80 | $18.20 | | $125.15 | | | |
| 6/6/05 | $124.87 | $782.32 | $45.41 | $93.60 | $109.80 | $18.04 | | $136.44 | | | |
| 7/12/05 | | | $16.00 | $289.50 | $100.95 | | | $17.24 | | | |
| 8/31/05 | | $1,565.25 | $31.60 | $105.50 | $52.95 | $41.01 | | | | | |
| 9/30/05 | | | $8.32 | | $12.00 | $0.30 | | | | | |
| 10/31/05 | | | | $1.05 | $48.60 | | | | | | |
| 11/30/05 | | $70.00 | $11.50 | $193.65 | $64.35 | $3.96 | | $16.79 | | | |
| 12/14/05 | | | | $5,311.00 | | $16.59 | | $49.72 | | | |
| 2/8/06 | | | $158.38 | $1,114.65 | | $34.78 | | $48.00 | | | |
| 2/28/06 | | $23.00 | | $975.80 | | | | $27.37 | | $1,225.00 | |
| 3/24/06 | | | $6.50 | $2,416.35 | | | | | | | |
| 4/19/06 | $1,192.35 | $775.22 | $352.02 | $5,149.44 | | | | $339.87 | | $568.75 | |
| 6/5/06 | $2,366.88 | $2,236.90 | $1,604.82 | $6,018.33 | | | $5,820.50 | $413.85 | | | $1,000.00 |
| 6/19/06 | $871.35 | $3,280.66 | $1,417.30 | $8,398.16 | | | $12,025.70 | $416.12 | | | $5,000.00 |
| 7/31/06 | $453.07 | $244.70 | $144.72 | $885.45 | | | $1,899.00 | $552.35 | | | |
| 8/9/06 | | $242.20 | $22.50 | $162.15 | | | $5,399.70 | $16.17 | | | |
| 9/21/06 | | $7.00 | | $332.10 | | | | $155.83 | | | |
| 10/9/06 | $2,108.84 | | $8.00 | $6,634.13 | | $9.66 | $5,549.25 | $144.91 | | $1,225.00 | |
| 10/26/06 | $853.42 | $1,695.95 | $635.21 | $1,791.72 | | | | $785.91 | | $402.50 | |
| Totals: | $9,010.45 | $11,001.36 | $4,521.11 | $40,330.03 | $434.01 | $162.67 | $30,694.15 | $3,245.72 | $250.00 | $3,421.25 | $6,000.00 |
| | | | | | | | | | | Grand Total: | $109,070.75 |

# FALBY AFFIDAVIT

## **TAB G**

 F T I

633 West Fifth Street, 16th Floor
Los Angeles, CA 90071-2027

Telephone: 213-689-1200
Facsimile: 213-452-6099
www.fticonsulting.com



May 10, 2006

Bruce E. Falby, Esq.
DLA Piper Rudnick
33 Arch Street, 26th Street
Boston, MA 02110-1447

RE:    LNR – DLA Piper
        FTI Matter # 410660.0034
        Invoice # 7117699

Attached please find FTI's invoice for services performed during the period Inception through May 7, 2006.  The balance due is $99,079.74 consisting of $98,965.00 in fees and $114.74 in expenses.

Please reference invoice number 7117699 when making payment.  Remittance Instructions are:

**Wire Transfers:**
**Bank of America**
**ABA #026009593**
**To credit: FTI Consulting, Inc.**
**Account number: 003939577164**
**RE: Matter No.   007213.0096**

**Checks:**
**FTI Consulting, Inc.**
**P. O. Box 631916**
**Baltimore, MD  21263-1916**

Please do not hesitate contacting me at (213) 452-6006 if you have any questions.

Best regards,

Ronald Greenspan
Senior Managing Director
FTI Consulting
(213) 452-6006



May 10, 2006

Bruce Falby, Esq.
DLA Piper Rudnick
33 Arch Street, 26th Street
Boston, MA 02110-1447

RE:    LNR – DLA Piper
       FTI Matter # 410660.0034
       Invoice # 7117699

Fees and expenses for professional services rendered in connection with the above-named
project during the period Inception through May 7, 2006.

| Professional | Hours | Rate | Amount |
|---|---|---|---|
| Ronald Greenspan | 57.10 | $655 | $ 37,400.50 |
| Michael Linsk | 70.10 | $590 | 41,359.00 |
| Jonathan Barach | 49.50 | $280 | 13,860.00 |
| Sunny Chen | 25.90 | $245 | 6,345.50 |
| Total Hours and Fees | 202.60 | | $ 98,965.00 |

Expenses

|  |  |
|---|---|
| Professional Materials | $     114.74 |

| Total Amount Due | $ 99,074.74 |
|---|---|

---

Please Remit Payment To:

**By Wire Transfer**

Bank of America
ABA # 026009593
In favor of:  FTI Consulting, Inc.
A/C:  003939577164
(Please reference invoice number above.)

**By Check**

FTI Consulting, Inc.
P. O. Box 631916
Baltimore, MD 21263-1916
FED ID#52-1261113



**FTI Consulting**
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071-2071

213.689.1200 telephone
213.689.1220 facsimile
www.fticonsulting.com

July 20, 2006

Bruce Falby, Esq.
DLA Piper Rudnick Gray Cary, LLP
33 Arch Street
Boston, MA 02110

RE:   Blue Hills Office Park LLC (Plaintiff, Defendant-in-Counterclaim) v. J.P. Morgan
      Chase Bank as Trustee for the Registered Holders of Credit Suisse First Boston
      Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series
      1999-C1 (the "Trust") and and CSFB 1999-C1 Royall Street, LLC (Defendants,
      Plaintiffs-in-Counterclaim) v. William Langelier and Gerald Fineberg (Defendants-in-
      Counterclaim).

Dear Bruce:

Enclosed please find our invoice for fees and expenses incurred for professional services
rendered in connection with the above-referenced matter for the period May 8, 2006 through
June 4, 2006.

The balance due FTI for this period is $24,471.07, which consists of $20,305.00 in professional
fees and $4,166.07 in expenses incurred in connection with deposition testimony given by Ron
Greenspan in Boston.  Please reference invoice number **7120097** when payment is remitted.
Remittance instructions are:

Wire Transfers:                          Checks:
Bank of America                          FTI Consulting, Inc.
ABA #026009593                           P. O. Box 631916
To credit: FTI Consulting, Inc.          Baltimore, MD  21263-1916
Account number: 003939577164
RE: Matter No.  410660.0034

Sincerely,

Michael Linsk, Managing Director
FTI Consulting, Inc.

Enclosure



**FTI Consulting**
633 West Fifth Street
Suite 1600
Los Angeles, CA 90071-2071

213.689.1200 telephone
213.689.1220 facsimile
www.fticonsulting.com

July 20, 2006  Invoice Number 7120097

For professional services rendered from
May 8, 2006 through June 4, 2006

Blue Hills Office Park LLC (Plaintiff, Defendant-in-Counterclaim) v. J.P. Morgan Chase Bank as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1999-C1 (the "Trust") and and CSFB 1999-C1 Royall Street, LLC (Defendants, Plaintiffs-in-Counterclaim) v. William Langelier and Gerald Fineberg (Defendants-in-Counterclaim).

| PROFESSIONAL FEES | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Name** | **Position** | | **Rate** | | **Hours** | | **Amount** |
| Ronald F. Greenspan | Senior Managing Director | $ | 655 | | 31.0 | $ | 20,305.00 |
| **TOTAL FEES** | | | | | 31.0 | $ | 20,305.00 |

| EXPENSES | | |
|---|---|---|
| **TOTAL EXPENSES** | $ | 4,166.07 |
| **TOTAL NOW DUE AND PAYABLE** | $ | 24,471.07 |





633 West Fifth Street, 16th Floor
Los Angeles, CA 90071-2027

Telephone: 213-689-1200
Facsimile: 213-452-6099
www.fticonsulting.com

October 18, 2006

Bruce E. Falby, Esq.
DLA Piper Rudnick
33 Arch Street, 26th Street
Boston, MA 02110-1447

RE:     LNR – DLA Piper
        FTI Matter # 410660.0034
        Invoice # 7123413

Attached please find FTI's invoice for services performed during the period June 5, 2006 through October 15, 2006. The balance due is $33,019.96 consisting of $28,920.00 in fees and $4,099.96 in expenses.

Please reference the invoice number above when making payment. Remittance instructions are:

**Wire Transfers:**                         **Checks:**
**Bank of America**                         **FTI Consulting, Inc.**
**ABA  #026009593**                         **P. O. Box 631916**
**To credit: FTI Consulting, Inc.**         **Baltimore, MD  21263-1916**
**Account number: 003939577164**
**RE: Matter No.  007213.0096**

Please do not hesitate contacting me at (213) 452-6006 if you have any questions.

Best regards,


/s/ Ronald Greenspan
Senior Managing Director
FTI Consulting
(213) 452-6006



October 18, 2006

Bruce Falby, Esq.
DLA Piper Rudnick
33 Arch Street, 26th Street
Boston, MA 02110-1447

RE:    LNR – DLA Piper
       FTI Matter # 410660.0034
       Invoice # 7123413

Fees and expenses for professional services rendered in connection with the above-named
project during the period June 5, 2006 through October 15, 2006.

| Professional | Hours | Rate | Amount |
|---|---|---|---|
| Ronald Greenspan | 41.00 | $655 | $ 26,855.00 |
| Michael Linsk | 3.50 | $590 | 2,065.00 |
| Total Hours and Fees | 44.50 | | $ 28,920.00 |

Expenses

| | | |
|---|---|---|
| Airfare | | $ 2,296.96 |
| Lodging | | 1,295.43 |
| Meals | | 281.02 |
| Ground Transportation | | 203.00 |
| Sundry | | 17.25 |
| Telecom | | 6.30 |
| Total Expenses | | $ 4,099.96 |

Total Amount Due                                          $ 33,019.96

---

Please Remit Payment To:

**By Wire Transfer**

Bank of America
ABA # 026009593
In favor of:  FTI Consulting, Inc.
A/C:  003939577164
(Please reference invoice number above.)

**By Check**

FTI Consulting, Inc.
P. O. Box 631916
Baltimore, MD 21263-1916
FED ID#52-1261113

# Invoice

SCA

4 Middle St. Suite #212
Newburyport, MA 01950

| Date | Invoice # |
|------|-----------|
| 5/15/2006 | 37 |

**Bill To**

Lennar Partners
c/o DLA Piper Rudnick Gray Cary
Bruce E Falby
33 Arch St, 26th Floor
Boston, MA  02110-1447

| Description | Amount |
|-------------|--------|
| Time and expense progress billing in conjunction with Civil Action No. 05-CV-10506 (WGY) (Blue Hills Office Park LLC vs. J.P. Morgan Chase Bank et al) 3/13/06 - 5/15/06 Eric S. Stotz Report Preparation/Deposition Preparation/General Consulting Time (See attached detail sheet) | 9,125.00 |
| Eric S. Stotz Deposition Time | 1,500.00 |
| Fed Ex and Notary Charges to date | 58.24 |
| Less 50% of retainer received | -500.00 |

| SCA TIN #20-3117338 | **Total** | $10,183.24 |
|---------------------|-----------|-----------|

TIME RECORD

Job: 2006-113 150 Royall Street, Canton, MA Expert Witness - Valuation

| Date | Activities | Hours | Rate | Charges | Cumulative | Notes/Other Charges | Other Charge Cost |
|---|---|---|---|---|---|---|---|
| 3/13/06 | Initial inquiry/discussion | 0.25 | $125.00 | $31.25 | $31.25 | | |
| 3/14/06 | Discuss original appraisal & other issues/write eng. Letter | 0.75 | $125.00 | $93.75 | $125.00 | | |
| 3/15/06 | Rndo eng. Ltr., conv. With BF re: various issues | 0.75 | $125.00 | $93.75 | $218.75 | | |
| 3/20/06 | BF Meeting @ 33 Arch St, drive/tour property & area | 3.50 | $125.00 | $437.50 | $656.25 | | |
| 3/27/06 | Review lease/format pmts./start opinion report | 3.00 | $125.00 | $375.00 | $1,031.25 | | |
| 3/23/06 | Review zoning minutes/ZBA complaint/review lease | 1.00 | $125.00 | $125.00 | $1,156.25 | | |
| 3/28/06 | Start Opinion report write up | 3.00 | $125.00 | $375.00 | $1,531.25 | | |
| 3/28/06 | Reconstruct ARGUS, start 8/03 ARGUS run, continue writing | 7.00 | $125.00 | $875.00 | $2,406.25 | | |
| 3/29/06 | Reconstruct ARGUS, finish 8/03 ARGUS run, continue writing | 9.00 | $125.00 | $1,125.00 | $3,531.25 | | |
| 3/30/06 | Finalize report, create PDF, attach 1004 report | 4.00 | $125.00 | $500.00 | $4,031.25 | | |
| 3/31/06 | Review Gartrell report | 4.00 | $125.00 | $500.00 | $4,218.75 | | |
| 4/3/06 | Review M&G 1999 Report | 1.50 | $125.00 | $187.50 | $4,468.75 | | |
| 4/4/06 | Review of Gartrell report & info, Comps, Inc. Index/analysis, | 2.00 | $125.00 | $250.00 | $4,843.75 | | |
| 4/5/06 | Write Up Gartrell rebuttal, call 250 Royall St seller (DST), call with BF | 3.00 | $125.00 | $375.00 | $5,406.25 | | |
| 4/10/06 | Continue Gartrell rebuttal | 4.50 | $125.00 | $562.50 | $5,906.25 | | |
| 4/12/06 | Finalize Gartrell rebuttal | 4.00 | $125.00 | $500.00 | $6,281.25 | Notary Cost & Fed Ex Charge | $21.89 |
| 4/14/06 | Prepare for deposition | 3.00 | $125.00 | $375.00 | $6,656.25 | | |
| 4/19/06 | Prepare for deposition/write value modification | 3.00 | $125.00 | $375.00 | $8,031.25 | | |
| 4/20/06 | Deposition prep (pre- and lunch break)/ & post- | 11.00 | $125.00 | $1,375.00 | $8,281.25 | | |
| 4/21/06 | Deposition time @ Other Lawyer's Office | 2.00 | $125.00 | $250.00 | $9,781.25 | 9:30 - 12.00 noon, 1 - 4:30 PM | |
| 4/23/06 | Research Appraisal licensing qualifications/re-do Gartrell index/review M&G report | 6.00 | $250.00 | $1,500.00 | $10,156.25 | | |
| 5/8/06 | Review Deposition, get Notarized | 3.00 | $125.00 | $375.00 | $10,593.75 | Notary Cost + Fed Ex Charge | $24.30 |
| 5/15/06 | Receive/edit/sign Affidavit - Fed Ex Shipment | 3.50 | $125.00 | $437.50 | | | $12.05 |
| | | 0.25 | $125.00 | $31.25 | $10,625.00 | Fed Ex Charge | $58.24 |
| | | 79.00 | | $10,625.00 | | | |

Total Deposition/Trial Testimony Time — 6.00 — $250.00 — $1,500.00

Total Review/Expert Report and Expert Rebuttal Report Preparation/Deposition Preparation & Review — 73.00 — $125.00 — $9,125.00

Total Time Charges $10,625.00

Total FedEx Charges $58.24

Total Charges $10,683.24



**Braver** PC
| Accountants & Advisors

DLA Piper Rudnick Gray Cary          Invoice #:    40018
One International Place               Date:   6/22/2006
Boston  MA   02110                   Client ID:    09545

**For Professional Services Rendered:**

For services rendered March through April 31, 2006:

In the matter of Blue Hills Office Park LLC v. J.P. Morgan Chase Bank,
Trustee et al. (Bruce Falby)

| | |
|---|---:|
| Chip Poutasse 28.5 hours @ $230.00 per hour | 6,555.00 |
| Patrick Riley 27.75 hours @ $290.00 per hour | 8,047.50 |
| Bonnie Wassal 8.35 hours @ $210.00 per hour | 1,753.50 |
| Maureen Bonazolli 1.75 hours @ $85.00 per hour | 148.75 |
| | **$16,504.75** |

25 Christina Street
Newton, MA 02461
T 617.969.3300
F 617.969.3311
www.thebravergroup.com



# FALBY AFFIDAVIT

# <u>TAB H</u>

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>     Plaintiff/Defendant-in-<br>     Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>     Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>     Defendant/Plaintiff-in-<br>     Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>     Defendants-in-Counterclaim | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Civil Action No. 05-CV-10506 (WGY) |

## BLUE HILLS OFFICE PARK LLC'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Blue Hills Office Park LLC ("Blue Hills") hereby answers the First Set of Interrogatories

by the Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston

Mortgage Security Corp. ("CS Bank") as follows:

## GENERAL OBJECTIONS

Blue Hills objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure. Blue Hills also objects to each interrogatory to

the extent that each interrogatory is vague, overly broad, unduly burdensome, seeks information

that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence,

seeks information that is not in Smith's possession, custody or control, seeks information that is

already in Defendants' possession, custody or control, seeks information that is subject to the

attorney-client privilege and/or the attorney work-product doctrine, and seeks information that is

otherwise beyond the scope of permissible discovery.

Blue Hills hereby incorporates by reference each and every one of its general objections

into each and every Answer as if fully set forth therein.

Blue Hills reserves its right to supplement its Answers pursuant to Rule 26(e) in the event

that information that may be responsive to these interrogatories becomes available.

## INTERROGATORY NO. 1

Identify each and every person who prepared the responses to these interrogatories and/or
assisted in the preparation of the responses to these interrogatories, and identify the specific
interrogatories with respect to which each such person provided assistance.

## ANSWER NO. 1

Other than counsel, Joseph Donovan, Lawrence Needle, and Daniel Frank assisted in the

preparation of these answers to interrogatories.

## INTERROGATORY NO. 2

Describe each communication that took place during the period from July 1, 1999
through November 30, 2004, and concerned the lease between Blue Hills and Equiserve,
Equiserve leaving the Property, Blue Hills' efforts to re-lease the Property, Blue Hills' requests
for meetings with the mortgagee or Wells Fargo or LNR Partners, Blue Hills' requests for
disbursements from Loan reserve or escrow accounts, payment of property taxes for the
Property, and/or payments to the Tax Fund Sub-account (as that term is used in paragraph 29 of
Blue Hills' First Amended Complaint), including without limitation communications between
you and the mortgagee and/or Wells Fargo and/or LNR Partners, and communications among
any principals, members, managers, employees, agents, or affiliates of Blue Hills, and, in your
answer:

a)    state the nature, date, time and place of each communication;

2

b)    identify the person(s) who made each communication;
c)    identify the person(s) who received each communication; and
d)    identify each and every document which reflects, constitutes, or concerns
      each communication.

## ANSWER NO. 2

Blue Hills objects to this interrogatory to the extent that it is overly broad, unduly

burdensome, vague and ambiguous and seeks information that is subject to attorney-client

privilege. Blue Hills further objects to this interrogatory to the extent its multiple subparts

exceed the limit on interrogatories under the court order governing phased discovery. Without

waiving these objections, Blue Hills states that it and its agents had several conversations with

the Defendants from in or about the fall of 2003 through the date of foreclosure as well as

conversations with third parties. With respect to written communications, pursuant to Fed. R.

Civ. P. 33(c), Blue Hills will make available at a mutually convenient time all non-privileged and

relevant written communications in his possession, custody or control.

## INTERROGATORY NO. 3

State the basis for the allegation, in paragraph 11 of Blue Hills First Amended Complaint,
that "[Originator] and Blue Hills agreed that the various required reserve deposits could be
accessed by Blue Hills in the event that the Equiserve Lease was not renewed."

## ANSWER NO. 3

Paragraph 6(c)(ix) of the Mortgage Agreement requires the Lender to disburse to Blue

Hills funds from Reserve Accounts established with Blue Hills' own funds to pay principal and

interest due on the Note. The disbursement arrangements specifically contemplated release of

funds in the event the Equiserve lease was not renewed or extended. In or about August 1999,

when Blue Hills and the original Lender agreed upon the terms and conditions of the $33.5

million loan to Blue Hills (the "Loan"), the parties were fully aware that the property located at

150 Royall Street, Canton, Massachusetts ("Property") was leased to a single tenant, Equiserve

3

Limited Partnership ("Equiserve"), which lease revenue was the sole recurring source of funds available to service the Loan. The parties were also aware that the Equiserve lease term expired on July 31, 2004, which expiration date is prior to the maturity date of the Loan. As a result, the Lender required Blue Hills to direct a substantial portion of its cash flow from the ownership of the Property into reserve accounts to address the fact that attracting new tenants would likely require significant expenditures to re-tenant the building for a single, a few or multiple tenants. At the time the Equiserve Lease term expired, a total of approximately $4 million was on deposit with the Lender in those Reserve Accounts. It was therefore clearly intended that Blue Hills would have access to deposits in the Reserve Accounts to address the circumstance of the Equiserve Lease not being renewed. The original Term Sheet for the Loan summarizing the intent of the Parties states that "funds will be available to the Borrower for the tenant improvements and leasing commissions necessary to re-let the building." In addition, as the Term Sheet specifically references the renewal of Equiserve's lease (at that time, Bank of Boston), there can be no question that the parties agreed that Blue Hills could access the Reserve Accounts in the event the Equiserve Lease was not renewed. This understanding was confirmed by letter dated August 31, 1999, attached to the First Amended Complaint as Exhibit "B", which states that "the monies held [in reserve] shall additionally be available for monthly debt service payments to the extent the monies from any existing leases in any month are insufficient . . . " The terms of the Mortgage Agreement, including *inter alia* paragraphs 6(b), 6(c)(i), 6(c)(ii), 6(c)(iv), 6(c)(ix), also confirm these understandings.

## INTERROGATORY NO. 4

State the basis for the allegation, in paragraph 16 of Blue Hills' First Amended Complaint, that "[t]he terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note."

**ANSWER NO. 4**

The letter from Blue Hills to Credit Suisse First Boston Mortgage Capital LLC dated

August 31, 1999 confirmed the terms of the financing and was countersigned by Credit Suisse

First Boston Mortgage Capital LLC. The term "loan documents" as defined in the Note

specifically includes all documents "executed and delivered in connection with this Note and the

Loan." The Term Sheet unquestionably falls within this definition.

**INTERROGATORY NO. 5**

If you contend that Blue Hills' mortgage should have permitted Blue Hills access to Loan
reserve or escrow funds to upgrade the Property, make tenant improvements, market the
Property, or for any other purpose, on terms other than those stated within the four corners of the
Mortgage Agreement, state the basis for that contention and, in your answer, identify those other
terms and any documents in which they are stated.

**ANSWER NO. 5**

Blue Hills objects to this interrogatory to the extent that it is vague and ambiguous with

respect to "other than those stated within the four corners of the Mortgage Agreement." Without

waiving that objection, Blue Hills incorporates its answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 6**

State the basis for the allegation in paragraph 34 of Blue Hills' First Amended Complaint
that "[b]eginning in November, 1999 and continuing into 2004, Blue Hills deposited into the
Clearing Account the requisite real estate tax amounts."

**ANSWER NO. 6**

Pursuant to Fed. R. Civ. P. 33(c), Blue Hills will make available at a mutually convenient

time their business records regarding the deposits of real estate tax amounts.

**INTERROGATORY NO. 7**

State the basis for the allegation, in paragraph 38 of Blue Hills' First Amended
Complaint, that "[t]his information [that Equiserve notified Blue Hills that it would not be
exercising its option to renew the Equiserve lease] was communicated to either or both of the
defendants, through their agents, Wells Fargo."

**ANSWER NO. 7**

Equiserve notified Blue Hills of its intent not to exercise its option to extend its lease in

or about May 2003. Shortly thereafter, Blue Hills communicated to Wells Fargo via telephone.

**INTERROGATORY NO. 8**

State the basis for the allegation, in paragraph 40 of Blue Hills' First Amended
Complaint, that Blue Hills' need for "substantial sums of money to upgrade the Property's
infrastructure and to make tenant improvements" was "the very contingency anticipated when
the Term Sheet was executed."

**ANSWER NO. 8**

Blue Hills incorporates its answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 9**

State the basis for the allegation, in paragraph 84 of Blue Hills' First Amended
Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully
defaulted Blue Hills."

**ANSWER NO. 9**

By denying Blue Hills access to the more than $4 million Blue Hills deposited with the

Lender for the purpose of funding debt service and re-tenanting costs upon Equiserve vacating

the Property, the Lender effectively precluded Blue Hills from re-tenanting the Property or

maintaining the Loan. Therefore, by placing Blue Hills' own funds beyond its reach and by its

refusal to even meet with Blue Hills to discuss the procedure for Blue Hills to access those funds,

the Lender procured the very default Lender then asserted entitled it to retain those funds.

Further, by not applying to the physical condition of the Property the multi-million dollar reserve

Blue Hills set aside for capital upgrades, the Lender adversely impacted the value of the Property

as well as the amount the Lender realized from its sale of the Property.

Blue Hills, by letters dated August 2, 2004 and September 2, 2004, requisitioned the Lender for advances from the Reserve Accounts for payment of loan carrying costs, consistent with the terms of the loan documents and the intent of the parties. The Reserves from which Blue Hills requisitioned funds were Reserves established to address the very issue that had arisen – the termination of the Equiserve Lease, the sole source of Borrower's revenue. The Lender's failure to release those funds left Blue Hills with no other source of capital since the Lender's loan documents required Blue Hills to be a single asset entity and expressly prohibited Blue Hills from entering into any other borrowings. Thus, the Lender's refusal to release the funds *caused* the very Event of Default that the Lender asserted was the basis for not releasing the funds from its Reserves.

In addition to the foregoing, the Lender wrongfully defaulted Blue Hills by virtue of the fact that in the September 17, 2004 letter to Blue Hills, the Lender asserted that Blue Hills failed to make certain deposits required by the Loan Documents. However, those deposits were not yet due from Blue Hills. At the time Blue Hills requisitioned for a withdrawal from the Reserves, Blue Hills was not in default under the Loan Documents.

## INTERROGATORY NO. 10

Describe each communication concerning Blueview, the Special Permit, the ZBA Decision, the Zoning Appeal, the Settlement, the Payment, the purchase of Blueview by DST Realty of Massachusetts, Inc. and/or Equiserve's decision to move from the Property to Blueview, including without limitation communications between you and Joseph P. Plunkett, Stephen Cesso, Thomas R. McGee, Thomas R. Tye, or any other person, and among any principals, members, managers, employees, agents, or affiliates of Blue Hills, and in your answer:

      a)     state the nature, date, time and place of each communication;
      b)     identify the person(s) who made each communication;
      c)     identify the person(s) who received each communication; and
      d)     identify each and every document which reflects, constitutes, or concerns each communication.

**ANSWER NO. 10**

Blue Hills objects to this interrogatory to the extent that it is overly broad, unduly burdensome, vague and ambiguous, seeks information that is subject to attorney-client privilege, and seeks information that is publicly available. Blue Hills further objects to this interrogatory to the extent its multiple subparts exceed the limit on interrogatories under the court order governing phased discovery. In addition, Blue Hills objects to this interrogatory to the extent it seeks information related to the settlement of the Zoning Appeal, as the settlement agreement related to the Zoning Appeal contains the following language prohibiting disclosure of the terms of settlement:

> Confidentiality. The terms of this Agreement are confidential, and shall not be disclosed without the parties' written consent to any person or entity other than the parties, their respective counsel and accountants, and any other persons to whom a party may have a legal duty to disclose the information. The parties shall be able to disclose that the Appeal has been settled. In the event that a party is required by subpoena or order, judgment, or decree of a court of competent jurisdiction or similar judicial tribunal to disclose the existence, terms, or contents of this Agreement, it shall, prior to such disclosure, promptly notify each party.

In accordance with this language contained in the settlement agreement, Blue Hills notified the parties to the settlement of the Lender's discovery requests in this action. The parties to the settlement have not consented to the release of the settlement documents due to concerns over the settlement terms becoming publicly available. Therefore, in the absence of a "subpoena or order, judgment or decree of a court . . .," Blue Hills is not authorized to release information or documents related to the settlement of the Zoning Appeal.

**INTERROGATORY NO. 11**

State the amount of the Payment and describe the disposition of the Payment, and in your answer:

a)    identify each and every document which forms any part of the source of your information regarding the amount of the Payment or the disposition of the Payment;

b)    identify each and every person who received any portion of the Payment; and

c)    identify each and every bank account into which any portion of the Payment was deposited.

## ANSWER NO. 11

Blue Hills objects to this interrogatory to the extent that it is overly broad, unduly burdensome, vague and ambiguous, seeks information that is subject to attorney-client privilege, and seeks information on the receipt, "disposition" of, and bank accounts related to the settlement amount that is irrelevant and not likely to lead to the discovery of admissible evidence. Blue Hills further objects to this interrogatory to the extent its multiple subparts exceed the limit on interrogatories under the court order governing phased discovery. In addition, Blue Hills objects to this interrogatory to the extent it seeks information related to the settlement of the Zoning Appeal, as the settlement agreement related to the Zoning Appeal contains the following language prohibiting disclosure of the terms of settlement:

> Confidentiality. The terms of this Agreement are confidential, and shall not be disclosed without the parties' written consent to any person or entity other than the parties, their respective counsel and accountants, and any other persons to whom a party may have a legal duty to disclose the information. The parties shall be able to disclose that the Appeal has been settled. In the event that a party is required by subpoena or order, judgment, or decree of a court of competent jurisdiction or similar judicial tribunal to disclose the existence, terms, or contents of this Agreement, it shall, prior to such disclosure, promptly notify each party.

In accordance with this language contained in the settlement agreement, Blue Hills notified the other parties to the settlement of the Lender's discovery requests in this action. The other parties to the settlement have not consented to the release of the settlement documents due



to concerns over the settlement terms becoming publicly available.  Therefore, in the absence of a "subpoena or order, judgment or decree of a court . . .," Blue Hills is not authorized to release the amount of any payment made in connection with the settlement of the Zoning Appeal or any other information or documents related to the settlement of the Zoning Appeal.

## INTERROGATORY NO. 12

State the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of CSFB 1991 – C1 Royall Street, LLC and at page 11 of the Answer of Defendants-on-Counterclaim Gerald Fineberg and William Blue Hills to Counterclaim of CSFB 1991 – C1 Royall Street, LLC, that "[Lender]'s claims are barred by doctrine of unclean hands."

## ANSWER NO. 12

The Lender and its agents ignored Blue Hills' repeated requests to meet to discuss the expiration of the Equiserve Lease.  After ignoring Blue Hills for several months, the Lender wrongfully declared Blue Hills to be in default under the terms of the Mortgage and refused Blue Hills access to funds to which it was entitled.  As a result, Blue Hills was not able to meet its obligations under the Loan Documents.  Further, Blue Hills incorporates its answers to Interrogatory Nos. 3 and 9.

## INTERROGATORY NO. 13

Stat the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of CSFB 1991 – C1 Royall Street, LLC and at page 12 of the Answer of Defendants-in-Counterclaim Gerald Fineberg and William Blue Hills to Counterclaim of CSFB 1991 – C1 Royall Street, LLC, that "[Lender]'s claims are barred by the doctrines of waiver and estoppel."

## ANSWER NO. 13

Blue Hills incorporates its answers to Interrogatory Nos. 3 and 9.

## INTERROGATORY NO. 14

State the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of CSFB 1991 – C1 Royall Street, LLC and at page 12 of the Answer of Defendants-in-Counterclaim Gerald Fineberg and William Blue Hills to Counterclaim of CSFB 1991 – C1 Royall Street, LLC, that "[Lender]'s claims are barred by the doctrine of laches."

**ANSWER NO. 14**

Blue Hills incorporates its answer to Interrogatory Nos. 3 and 9.

**INTERROGATORY NO. 15**

State the basis for all of your damages claims.

**ANSWER NO. 15**

At present, Blue Hills, Fineberg and Langelier cannot fully quantify their damages until they have had full opportunity to conduct discovery. However, at present it is apparent that they have suffered significant damages as a result of, *inter alia*, Defendants' refusal to release cash reserves and to meet with Blue Hills to discuss the various consents, approvals, and authorizations required by the loan documents to facilitate the marketing of the Property to new tenants. A combination of escrowed funds and additional borrowing/capital, approval for which was to be sought, would have enabled Blue Hills to have pursued re-tenanting of the Property. Together with the offering of ownership interests to attract tenant prospects, the Property could either have been sold or refinanced with payoff or assumption of the loan sufficient to realize recovery of tax costs on disposition plus return of newly loaned and invested capital and a profit in excess of approximately $4,000,000.00. The delineated damages are exclusive of costs, interest, attorneys' fees and other damages which continue to accrue. In addition, Blue Hills seeks treble damages and attorneys' fees pursuant to M.G.L. c. 93A.

Signed under the pains and penalties of perjury this 28 day of October, 2005.

Blue Hills Office Park LLC

By: _Gerald Fineberg_

Gerald Fineberg, President of
Blue Hills Management Corp.,
Manager of Blue Hills Office Park
LLC,  duly authorized

AS TO OBJECTIONS:

BLUE HILLS OFFICE PARK LLC,
By its attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: Nov 11, 2005

#322802 v1/14500/9985

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each other party by mail (by hand) Nov 14 2005

12

# FALBY AFFIDAVIT

## <u>TAB I</u>

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>    Plaintiff/Defendant-in-<br>    Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>    Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>    Defendant/Plaintiff-in-<br>    Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>    Defendants-in-Counterclaim | Civil Action No. 05-CV-10506 (WGY) |

## WILLIAM LANGELIER'S ANSWERS TO DEFENDANTS'
## FIRST SET OF INTERROGATORIES

William Langelier ("Langelier") hereby answers the First Set of Interrogatories by the

Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston

Mortgage Security Corp. ("CS Bank") as follows:

## GENERAL OBJECTIONS

Langelier objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure. Langelier also objects to each interrogatory to the

extent that each interrogatory is vague, overly broad, unduly burdensome, seeks information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, seeks information that is not in Langelier's possession, custody or control, seeks information that is already in Defendants' possession, custody or control, seeks information that is subject to the attorney-client privilege and/or the attorney work-product doctrine, and seeks information that is otherwise beyond the scope of permissible discovery.

Langelier hereby incorporates by reference each and every one of his general objections into each and every Answer as if fully set forth therein.

Langelier reserves his right to supplement his Answers pursuant to Rule 26(e) in the event that information that may be responsive to these interrogatories becomes available.

## INTERROGATORY NO. 1

Identify each and every person who prepared the responses to these interrogatories and/or assisted in the preparation of the responses to these interrogatories, and identify the specific interrogatories with respect to which each such person provided assistance.

## ANSWER NO. 1

Other than counsel, Joseph Donovan, Lawrence Needle, and Daniel Frank assisted in the preparation of these answers to interrogatories.

## INTERROGATORY NO. 2

Describe each communication that took place during the period from July 1, 1999 through November 30, 2004, and concerned the lease between Blue Hills and Equiserve, Equiserve leaving the Property, Blue Hills' efforts to re-lease the Property, Blue Hills' requests for meetings with the mortgagee or Wells Fargo or LNR Partners, Blue Hills' requests for disbursements from Loan reserve or escrow accounts, payment of property taxes for the Property, and/or payments to the Tax Fund Sub-account (as that term is used in paragraph 29 of Blue Hills' First Amended Complaint), including without limitation communications between you and the mortgagee and/or Wells Fargo and/or LNR Partners, and communications among any principals, members, managers, employees, agents, or affiliates of Blue Hills, and, in your answer:

    a)       state the nature, date, time and place of each communication;

b)   identify the person(s) who made each communication;

c)   identify the person(s) who received each communication; and

d)   identify each and every document which reflects, constitutes, or concerns each communication.

## ANSWER NO. 2

Langelier objects to this interrogatory to the extent that it is overly broad, unduly burdensome, vague and ambiguous and seeks information that is subject to attorney-client privilege. Langelier further objects to this interrogatory to the extent its multiple subparts exceed the limit on interrogatories under the court order governing phased discovery. Without waiving these objections, Langelier states that Blue Hills and its agents had several conversations with the Defendants from in or about the fall of 2003 through the date of foreclosure as well as conversations with third parties. With respect to written communications, pursuant to Fed. R. Civ. P. 33(c), Langelier will make available at a mutually convenient time all non-privileged and relevant written communications in his possession, custody or control.

## INTERROGATORY NO. 3

State the basis for the allegation, in paragraph 11 of Blue Hills First Amended Complaint, that "[Originator] and Blue Hills agreed that the various required reserve deposits could be accessed by Blue Hills in the event that the Equiserve Lease was not renewed."

## ANSWER NO. 3

Paragraph 6(c)(ix) of the Mortgage Agreement requires the Lender to disburse to Blue Hills funds from Reserve Accounts established with Blue Hills' own funds to pay principal and interest due on the Note. The disbursement arrangements specifically contemplated release of funds in the event the Equiserve lease was not renewed or extended. In or about August 1999, when Blue Hills and the original Lender agreed upon the terms and conditions of the $33.5 million loan to Blue Hills (the "Loan"), the parties were fully aware that the property located at 150 Royall Street, Canton, Massachusetts ("Property") was leased to a single tenant, Equiserve

3

Limited Partnership ("Equiserve"), which lease revenue was the sole recurring source of funds available to service the Loan. The parties were also aware that the Equiserve lease term expired on July 31, 2004, which expiration date is prior to the maturity date of the Loan. As a result, the Lender required Blue Hills to direct a substantial portion of its cash flow from the ownership of the Property into reserve accounts to address the fact that attracting new tenants would likely require significant expenditures to re-tenant the building for a single, a few or multiple tenants. At the time the Equiserve Lease term expired, a total of approximately $4 million was on deposit with the Lender in those Reserve Accounts. It was therefore clearly intended that Blue Hills would have access to deposits in the Reserve Accounts to address the circumstance of the Equiserve Lease not being renewed. The original Term Sheet for the Loan summarizing the intent of the Parties states that "funds will be available to the Borrower for the tenant improvements and leasing commissions necessary to re-let the building." In addition, as the Term Sheet specifically references the renewal of Equiserve's lease (at that time, Bank of Boston), there can be no question that the parties agreed that Blue Hills could access the Reserve Accounts in the event the Equiserve Lease was not renewed. This understanding was confirmed by letter dated August 31, 1999, attached to the First Amended Complaint as Exhibit "B", which states that "the monies held [in reserve] shall additionally be available for monthly debt service payments to the extent the monies from any existing leases in any month are insufficient . . . " The terms of the Mortgage Agreement, including *inter alia* paragraphs 6(b), 6(c)(i), 6(c)(ii), 6(c)(iv), 6(c)(ix), also confirm these understandings.

## INTERROGATORY NO. 4

State the basis for the allegation, in paragraph 16 of Blue Hills' First Amended Complaint, that "[t]he terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note."

**ANSWER NO. 4**

The letter from Blue Hills to Credit Suisse First Boston Mortgage Capital LLC dated

August 31, 1999 confirmed the terms of the financing and was countersigned by Credit Suisse

First Boston Mortgage Capital LLC.  The term "loan documents" as defined in the Note

specifically includes all documents "executed and delivered in connection with this Note and the

Loan."  The Term Sheet unquestionably falls within this definition.

**INTERROGATORY NO. 5**

If you contend that Blue Hills' mortgage should have permitted Blue Hills access to Loan
reserve or escrow funds to upgrade the Property, make tenant improvements, market the
Property, or for any other purpose, on terms other than those stated within the four corners of the
Mortgage Agreement, state the basis for that contention and, in your answer, identify those other
terms and any documents in which they are stated.

**ANSWER NO. 5**

Langelier objects to this interrogatory to the extent that it is vague and ambiguous with

respect to "other than those stated within the four corners of the Mortgage Agreement."  Without

waiving that objection, Langelier incorporates his answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 6**

State the basis for the allegation in paragraph 34 of Blue Hills' First Amended Complaint
that "[b]eginning in November, 1999 and continuing into 2004, Blue Hills deposited into the
Clearing Account the requisite real estate tax amounts."

**ANSWER NO. 6**

Pursuant to Fed. R. Civ. P. 33(c), Langelier will make available at a mutually convenient

time the business records of Blue Hills regarding the deposits of real estate tax amounts.

**INTERROGATORY NO. 7**

State the basis for the allegation, in paragraph 38 of Blue Hills' First Amended
Complaint, that "[t]his information [that Equiserve notified Blue Hills that it would not be
exercising its option to renew the Equiserve lease] was communicated to either or both of the
defendants, through their agents, Wells Fargo."

## ANSWER NO. 7

Equiserve notified Blue Hills of its intent not to exercise its option to extend its lease in or about May 2003. Shortly thereafter, Blue Hills communicated to Wells Fargo via telephone.

## INTERROGATORY NO. 8

State the basis for the allegation, in paragraph 40 of Blue Hills' First Amended Complaint, that Blue Hills' need for "substantial sums of money to upgrade the Property's infrastructure and to make tenant improvements" was "the very contingency anticipated when the Term Sheet was executed."

## ANSWER NO. 8

Langelier incorporates his answers to Interrogatory Nos. 3 and 4.

## INTERROGATORY NO. 9

State the basis for the allegation, in paragraph 84 of Blue Hills' First Amended Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully defaulted Blue Hills."

## ANSWER NO. 9

By denying Blue Hills access to the more than $4 million Blue Hills deposited with the Lender for the purpose of funding debt service and re-tenanting costs upon Equiserve vacating the Property, the Lender effectively precluded Blue Hills from re-tenanting the Property or maintaining the Loan. Therefore, by placing Blue Hills' own funds beyond its reach and by its refusal to even meet with Blue Hills to discuss the procedure for Blue Hills to access those funds, the Lender procured the very default Lender then asserted entitled it to retain those funds. Further, by not applying to the physical condition of the Property the multi-million dollar reserve Blue Hills set aside for capital upgrades, the Lender adversely impacted the value of the Property as well as the amount the Lender realized from its sale of the Property.

Blue Hills, by letters dated August 2, 2004 and September 2, 2004, requisitioned the Lender for advances from the Reserve Accounts for payment of loan carrying costs, consistent with the terms of the loan documents and the intent of the parties.  The Reserves from which Blue Hills requisitioned funds were Reserves established to address the very issue that had arisen – the termination of the Equiserve Lease, the sole source of Borrower's revenue.  The Lender's failure to release those funds left Blue Hills with no other source of capital since the Lender's loan documents required Blue Hills to be a single asset entity and expressly prohibited Blue Hills from entering into any other borrowings.  Thus, the Lender's refusal to release the funds *caused* the very Event of Default that the Lender asserted was the basis for not releasing the funds from its Reserves.

In addition to the foregoing, the Lender wrongfully defaulted Blue Hills by virtue of the fact that in the September 17, 2004 letter to Blue Hills, the Lender asserted that Blue Hills failed to make certain deposits required by the Loan Documents.  However, those deposits were not yet due from Blue Hills.  At the time Blue Hills requisitioned for a withdrawal from the Reserves, Blue Hills was not in default under the Loan Documents.

## INTERROGATORY NO. 10

Describe each communication concerning Blueview, the Special Permit, the ZBA Decision, the Zoning Appeal, the Settlement, the Payment, the purchase of Blueview by DST Realty of Massachusetts, Inc. and/or Equiserve's decision to move from the Property to Blueview, including without limitation communications between you and Joseph P. Plunkett, Stephen Cesso, Thomas R. McGee, Thomas R. Tye, or any other person, and among any principals, members, managers, employees, agents, or affiliates of Blue Hills, and in your answer:

     a)     state the nature, date, time and place of each communication;
     b)     identify the person(s) who made each communication;
     c)     identify the person(s) who received each communication; and
     d)     identify each and every document which reflects, constitutes, or concerns each communication.

**ANSWER NO. 10**

Langelier objects to this interrogatory to the extent that it is overly broad, unduly

burdensome, vague and ambiguous, seeks information that is subject to attorney-client privilege,

and seeks information that is publicly available. Langelier further objects to this interrogatory to

the extent its multiple subparts exceed the limit on interrogatories under the court order

governing phased discovery. In addition, Langelier objects to this interrogatory to the extent it

seeks information related to the settlement of the Zoning Appeal, as the settlement agreement

related to the Zoning Appeal contains the following language prohibiting disclosure of the terms

of settlement:

> Confidentiality. The terms of this Agreement are confidential, and
> shall not be disclosed without the parties' written consent to any
> person or entity other than the parties, their respective counsel and
> accountants, and any other persons to whom a party may have a
> legal duty to disclose the information. The parties shall be able to
> disclose that the Appeal has been settled. In the event that a party
> is required by subpoena or order, judgment, or decree of a court of
> competent jurisdiction or similar judicial tribunal to disclose the
> existence, terms, or contents of this Agreement, it shall, prior to
> such disclosure, promptly notify each party.

In accordance with this language contained in the settlement agreement, Blue Hills

notified the parties to the settlement of the Lender's discovery requests in this action. The

parties to the settlement have not consented to the release of the settlement documents due to

concerns over the settlement terms becoming publicly available. Therefore, in the absence of a

"subpoena or order, judgment or decree of a court . . .," Langelier is not authorized to release

information or documents related to the settlement of the Zoning Appeal.

**INTERROGATORY NO. 11**

State the amount of the Payment and describe the disposition of the Payment, and in your

answer:

a)    identify each and every document which forms any part of the source of your information regarding the amount of the Payment or the disposition of the Payment;

b)    identify each and every person who received any portion of the Payment; and

c)    identify each and every bank account into which any portion of the Payment was deposited.

## ANSWER NO. 11

Langelier objects to this interrogatory to the extent that it is overly broad, unduly burdensome, vague and ambiguous, seeks information that is subject to attorney-client privilege, and seeks information on the receipt, "disposition" of, and bank accounts related to the settlement amount that is irrelevant and not likely to lead to the discovery of admissible evidence. Langelier further objects to this interrogatory to the extent its multiple subparts exceed the limit on interrogatories under the court order governing phased discovery. In addition, Langelier objects to this interrogatory to the extent it seeks information related to the settlement of the Zoning Appeal, as the settlement agreement related to the Zoning Appeal contains the following language prohibiting disclosure of the terms of settlement:

> Confidentiality. The terms of this Agreement are confidential, and shall not be disclosed without the parties' written consent to any person or entity other than the parties, their respective counsel and accountants, and any other persons to whom a party may have a legal duty to disclose the information. The parties shall be able to disclose that the Appeal has been settled. In the event that a party is required by subpoena or order, judgment, or decree of a court of competent jurisdiction or similar judicial tribunal to disclose the existence, terms, or contents of this Agreement, it shall, prior to such disclosure, promptly notify each party.

In accordance with this language contained in the settlement agreement, Blue Hills notified the other parties to the settlement of the Lender's discovery requests in this action. The other parties to the settlement have not consented to the release of the settlement documents due

9

to concerns over the settlement terms becoming publicly available. Therefore, in the absence of

a "subpoena or order, judgment or decree of a court . . .," Langelier is not authorized to release

the amount of any payment made in connection with the settlement of the Zoning Appeal or any

other information or documents related to the settlement of the Zoning Appeal.

## INTERROGATORY NO. 12

State the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of
CSFB 1991 – C1 Royall Street, LLC and at page 11 of the Answer of Defendants-on-
Counterclaim Gerald Fineberg and William Langelier to Counterclaim of CSFB 1991 – C1
Royall Street, LLC, that "[Lender]'s claims are barred by doctrine of unclean hands."

## ANSWER NO. 12

The Lender and its agents ignored Blue Hills' repeated requests to meet to discuss the

expiration of the Equiserve Lease. After ignoring Blue Hills for several months, the Lender

wrongfully declared Blue Hills to be in default under the terms of the Mortgage and refused Blue

Hills access to funds to which it was entitled. As a result, Blue Hills was not able to meet its

obligations under the Loan Documents. Further, Langelier incorporates his answers to

Interrogatory Nos. 3 and 9.

## INTERROGATORY NO. 13

Stat the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of
CSFB 1991 – C1 Royall Street, LLC and at page 12 of the Answer of Defendants-in-
Counterclaim Gerald Fineberg and William Langelier to Counterclaim of CSFB 1991 – C1
Royall Street, LLC, that "[Lender]'s claims are barred by the doctrines of waiver and estoppel."

## ANSWER NO. 13

Langelier incorporates his answers to Interrogatory Nos. 3 and 9.

## INTERROGATORY NO. 14

State the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of
CSFB 1991 – C1 Royall Street, LLC and at page 12 of the Answer of Defendants-in-
Counterclaim Gerald Fineberg and William Langelier to Counterclaim of CSFB 1991 – C1
Royall Street, LLC, that "[Lender]'s claims are barred by the doctrine of laches."

**ANSWER NO. 14**

Langelier incorporates his answer to Interrogatory Nos. 3 and 9.

**INTERROGATORY NO. 15**

State the basis for all of your damages claims.

**ANSWER NO. 15**

At present, Blue Hills, Fineberg and Langelier cannot fully quantify their damages until they have had full opportunity to conduct discovery. However, at present it is apparent that they have suffered significant damages as a result of, *inter alia*, Defendants' refusal to release cash reserves and to meet with Blue Hills to discuss the various consents, approvals, and authorizations required by the loan documents to facilitate the marketing of the Property to new tenants. A combination of escrowed funds and additional borrowing/capital, approval for which was to be sought, would have enabled Blue Hills to have pursued re-tenanting of the Property. Together with the offering of ownership interests to attract tenant prospects, the Property could either have been sold or refinanced with payoff or assumption of the loan sufficient to realize recovery of tax costs on disposition plus return of newly loaned and invested capital and a profit in excess of approximately $4,000,000.00. The delineated damages are exclusive of costs, interest, attorneys' fees and other damages which continue to accrue. In addition, Blue Hills seeks treble damages and attorneys' fees pursuant to M.G.L. c. 93A.

Signed under the pains and penalties of perjury this _28th_ day of _October_, 2005.

_William Langelier_

AS TO OBJECTIONS:

WILLIAM LANGELIER
By his attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: _Nov 11, 2005_

#322802 v1/14500/9985

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was
served upon (each party appearing pro se and) the attorney of record for
each other party by mail (by hand) _Nov 11, 2005_

12

# FALBY AFFIDAVIT


# <u>TAB J</u>

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BLUE HILLS OFFICE PARK LLC,<br>　　　Plaintiff/Defendant-in-<br>　　　Counterclaim<br><br>v.<br><br>CREDIT SUISSE FIRST BOSTON<br>MORTGAGE SECURITY CORP.,<br>　　　Defendant.<br><br>and<br><br>CSFB 1999 – C1 ROYALL STREET, LLC<br>　　　Defendant/Plaintiff-in-<br>　　　Counterclaim<br><br>and<br><br>WILLIAM LANGELIER and GERALD<br>FINEBERG,<br>　　　Defendants-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 05-CV-10506 (WGY) |

## GERALD FINEBERG'S ANSWERS TO
## DEFENDANTS' FIRST SET OF INTERROGATORIES

Gerald Fineberg ("Fineberg") hereby answers the First Set of Interrogatories by the

Defendants CSFB 1999-C1 Royall Street, LLC ("CSFB") and Credit Suisse First Boston

Mortgage Security Corp. ("CS Bank") as follows:

### GENERAL OBJECTIONS

Fineberg objects to each of Defendants' interrogatories to the extent that each

interrogatory recites or incorporates a "definition" and/or an "instruction" which exceeds the

scope of the Federal Rules of Civil Procedure. Fineberg also objects to each interrogatory to the

extent that each interrogatory is vague, overly broad, unduly burdensome, seeks information that

is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, seeks

information that is not in Fineberg's possession, custody or control, seeks information that is

already in Defendants' possession, custody or control, seeks information that is subject to the

attorney-client privilege and/or the attorney work-product doctrine, and seeks information that is

otherwise beyond the scope of permissible discovery.

Fineberg hereby incorporates by reference each and every one of his general objections

into each and every Answer as if fully set forth therein.

Fineberg reserves the right to supplement his Answers pursuant to Rule 26(e) in the event

that information that may be responsive to these interrogatories becomes available.

## INTERROGATORY NO. 1

Identify each and every person who prepared the responses to these interrogatories and/or
assisted in the preparation of the responses to these interrogatories, and identify the specific
interrogatories with respect to which each such person provided assistance.

## ANSWER NO. 1

Other than counsel, Joseph Donovan, Lawrence Needle, and Daniel Frank assisted in the

preparation of these answers to interrogatories.

## INTERROGATORY NO. 2

Describe each communication that took place during the period from July 1, 1999
through November 30, 2004, and concerned the lease between Blue Hills and Equiserve,
Equiserve leaving the Property, Blue Hills' efforts to re-lease the Property, Blue Hills' requests
for meetings with the mortgagee or Wells Fargo or LNR Partners, Blue Hills' requests for
disbursements from Loan reserve or escrow accounts, payment of property taxes for the
Property, and/or payments to the Tax Fund Sub-account (as that term is used in paragraph 29 of
Blue Hills' First Amended Complaint), including without limitation communications between
you and the mortgagee and/or Wells Fargo and/or LNR Partners, and communications among
any principals, members, managers, employees, agents, or affiliates of Blue Hills, and, in your
answer:

     a)      state the nature, date, time and place of each communication;

2

b)    identify the person(s) who made each communication;
c)    identify the person(s) who received each communication; and
d)    identify each and every document which reflects, constitutes, or concerns
      each communication.

## ANSWER NO. 2

Fineberg objects to this interrogatory to the extent that it is overly broad, unduly

burdensome, vague and ambiguous and seeks information that is subject to attorney-client

privilege.  Fineberg further objects to this interrogatory to the extent its multiple subparts exceed

the limit on interrogatories under the court order governing phased discovery.  Without waiving

these objections, Fineberg states that Blue Hills and its agents had several conversations with the

Defendants from in or about the fall of 2003 through the date of foreclosure as well as

conversations with third parties.  With respect to written communications, pursuant to Fed. R.

Civ. P. 33(c), Fineberg will make available at a mutually convenient time all non-privileged and

relevant written communications in his possession, custody or control.

## INTERROGATORY NO. 3

State the basis for the allegation, in paragraph 11 of Blue Hills First Amended Complaint,
that "[Originator] and Blue Hills agreed that the various required reserve deposits could be
accessed by Blue Hills in the event that the Equiserve Lease was not renewed."

## ANSWER NO. 3

Paragraph 6(c)(ix) of the Mortgage Agreement requires the Lender to disburse to Blue

Hills funds from Reserve Accounts established with Blue Hills' own funds to pay principal and

interest due on the Note.  The disbursement arrangements specifically contemplated release of

funds in the event the Equiserve lease was not renewed or extended.  In or about August 1999,

when Blue Hills and the original Lender agreed upon the terms and conditions of the $33.5

million loan to Blue Hills (the "Loan"), the parties were fully aware that the property located at

150 Royall Street, Canton, Massachusetts ("Property") was leased to a single tenant, Equiserve

3

Limited Partnership ("Equiserve"), which lease revenue was the sole recurring source of funds available to service the Loan. The parties were also aware that the Equiserve lease term expired on July 31, 2004, which expiration date is prior to the maturity date of the Loan. As a result, the Lender required Blue Hills to direct a substantial portion of its cash flow from the ownership of the Property into reserve accounts to address the fact that attracting new tenants would likely require significant expenditures to re-tenant the building for a single, a few or multiple tenants. At the time the Equiserve Lease term expired, a total of approximately $4 million was on deposit with the Lender in those Reserve Accounts. It was therefore clearly intended that Blue Hills would have access to deposits in the Reserve Accounts to address the circumstance of the Equiserve Lease not being renewed. The original Term Sheet for the Loan summarizing the intent of the Parties states that "funds will be available to the Borrower for the tenant improvements and leasing commissions necessary to re-let the building." In addition, as the Term Sheet specifically references the renewal of Equiserve's lease (at that time, Bank of Boston), there can be no question that the parties agreed that Blue Hills could access the Reserve Accounts in the event the Equiserve Lease was not renewed. This understanding was confirmed by letter dated August 31, 1999, attached to the First Amended Complaint as Exhibit "B", which states that "the monies held [in reserve] shall additionally be available for monthly debt service payments to the extent the monies from any existing leases in any month are insufficient . . . " The terms of the Mortgage Agreement, including *inter alia* paragraphs 6(b), 6(c)(i), 6(c)(ii), 6(c)(iv), 6(c)(ix), also confirm these understandings.

## INTERROGATORY NO. 4

State the basis for the allegation, in paragraph 16 of Blue Hills' First Amended Complaint, that "[t]he terms and provisions of the Term Sheet were incorporated by reference into the Mortgage Agreement and Note."

**ANSWER NO. 4**

The letter from Blue Hills to Credit Suisse First Boston Mortgage Capital LLC dated

August 31, 1999 confirmed the terms of the financing and was countersigned by Credit Suisse

First Boston Mortgage Capital LLC.  The term "loan documents" as defined in the Note

specifically includes all documents "executed and delivered in connection with this Note and the

Loan."  The Term Sheet unquestionably falls within this definition.

**INTERROGATORY NO. 5**

If you contend that Blue Hills' mortgage should have permitted Blue Hills access to Loan
reserve or escrow funds to upgrade the Property, make tenant improvements, market the
Property, or for any other purpose, on terms other than those stated within the four corners of the
Mortgage Agreement, state the basis for that contention and, in your answer, identify those other
terms and any documents in which they are stated.

**ANSWER NO. 5**

Fineberg objects to this interrogatory to the extent that it is vague and ambiguous with

respect to "other than those stated within the four corners of the Mortgage Agreement." Without

waiving that objection, Fineberg incorporates his answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 6**

State the basis for the allegation in paragraph 34 of Blue Hills' First Amended Complaint
that "[b]eginning in November, 1999 and continuing into 2004, Blue Hills deposited into the
Clearing Account the requisite real estate tax amounts."

**ANSWER NO. 6**

Pursuant to Fed. R. Civ. P. 33(c), Fineberg will make available at a mutually convenient

time the business records of Blue Hills regarding the deposits of real estate tax amounts.

**INTERROGATORY NO. 7**

State the basis for the allegation, in paragraph 38 of Blue Hills' First Amended
Complaint, that "[t]his information [that Equiserve notified Blue Hills that it would not be
exercising its option to renew the Equiserve lease] was communicated to either or both of the
defendants, through their agents, Wells Fargo."

**ANSWER NO. 7**

Equiserve notified Blue Hills of its intent not to exercise its option to extend its lease in

or about May 2003.  Shortly thereafter, Blue Hills communicated to Wells Fargo via telephone.

**INTERROGATORY NO. 8**

State the basis for the allegation, in paragraph 40 of Blue Hills' First Amended
Complaint, that Blue Hills' need for "substantial sums of money to upgrade the Property's
infrastructure and to make tenant improvements" was "the very contingency anticipated when
the Term Sheet was executed."

**ANSWER NO. 8**

Fineberg incorporates his answers to Interrogatory Nos. 3 and 4.

**INTERROGATORY NO. 9**

State the basis for the allegation, in paragraph 84 of Blue Hills' First Amended
Complaint, that "[t]he defendants, through their agents, Lennar and/or Wells Fargo, wrongfully
defaulted Blue Hills."

**ANSWER NO. 9**

By denying Blue Hills access to the more than $4 million Blue Hills deposited with the

Lender for the purpose of funding debt service and re-tenanting costs upon Equiserve vacating

the Property, the Lender effectively precluded Blue Hills from re-tenanting the Property or

maintaining the Loan.  Therefore, by placing Blue Hills' own funds beyond its reach and by its

refusal to even meet with Blue Hills to discuss the procedure for Blue Hills to access those funds,

the Lender procured the very default Lender then asserted entitled it to retain those funds.

Further, by not applying to the physical condition of the Property the multi-million dollar reserve

Blue Hills set aside for capital upgrades, the Lender adversely impacted the value of the Property

as well as the amount the Lender realized from its sale of the Property.

Blue Hills, by letters dated August 2, 2004 and September 2, 2004, requisitioned the Lender for advances from the Reserve Accounts for payment of loan carrying costs, consistent with the terms of the loan documents and the intent of the parties. The Reserves from which Blue Hills requisitioned funds were Reserves established to address the very issue that had arisen – the termination of the Equiserve Lease, the sole source of Borrower's revenue. The Lender's failure to release those funds left Blue Hills with no other source of capital since the Lender's loan documents required Blue Hills to be a single asset entity and expressly prohibited Blue Hills from entering into any other borrowings. Thus, the Lender's refusal to release the funds *caused* the very Event of Default that the Lender asserted was the basis for not releasing the funds from its Reserves.

In addition to the foregoing, the Lender wrongfully defaulted Blue Hills by virtue of the fact that in the September 17, 2004 letter to Blue Hills, the Lender asserted that Blue Hills failed to make certain deposits required by the Loan Documents. However, those deposits were not yet due from Blue Hills. At the time Blue Hills requisitioned for a withdrawal from the Reserves, Blue Hills was not in default under the Loan Documents.

**INTERROGATORY NO. 10**

Describe each communication concerning Blueview, the Special Permit, the ZBA Decision, the Zoning Appeal, the Settlement, the Payment, the purchase of Blueview by DST Realty of Massachusetts, Inc. and/or Equiserve's decision to move from the Property to Blueview, including without limitation communications between you and Joseph P. Plunkett, Stephen Cesso, Thomas R. McGee, Thomas R. Tye, or any other person, and among any principals, members, managers, employees, agents, or affiliates of Blue Hills, and in your answer:

    a)    state the nature, date, time and place of each communication;
    b)    identify the person(s) who made each communication;
    c)    identify the person(s) who received each communication; and
    d)    identify each and every document which reflects, constitutes, or concerns each communication.

**ANSWER NO. 10**

Fineberg objects to this interrogatory to the extent that it is overly broad, unduly

burdensome, vague and ambiguous, seeks information that is subject to attorney-client privilege,

and seeks information that is publicly available. Fineberg further objects to this interrogatory to

the extent its multiple subparts exceed the limit on interrogatories under the court order

governing phased discovery. In addition, Fineberg objects to this interrogatory to the extent it

seeks information related to the settlement of the Zoning Appeal, as the settlement agreement

related to the Zoning Appeal contains the following language prohibiting disclosure of the terms

of settlement:

> Confidentiality. The terms of this Agreement are confidential, and
> shall not be disclosed without the parties' written consent to any
> person or entity other than the parties, their respective counsel and
> accountants, and any other persons to whom a party may have a
> legal duty to disclose the information. The parties shall be able to
> disclose that the Appeal has been settled. In the event that a party
> is required by subpoena or order, judgment, or decree of a court of
> competent jurisdiction or similar judicial tribunal to disclose the
> existence, terms, or contents of this Agreement, it shall, prior to
> such disclosure, promptly notify each party.

In accordance with this language contained in the settlement agreement, Blue Hills

notified the parties to the settlement of the Lender's discovery requests in this action. The

parties to the settlement have not consented to the release of the settlement documents due to

concerns over the settlement terms becoming publicly available. Therefore, in the absence of a

"subpoena or order, judgment or decree of a court . . .," Fineberg is not authorized to release

information or documents related to the settlement of the Zoning Appeal.

**INTERROGATORY NO. 11**

State the amount of the Payment and describe the disposition of the Payment, and in your answer:

    a)     identify each and every document which forms any part of the source of your information regarding the amount of the Payment or the disposition of the Payment;

    b)     identify each and every person who received any portion of the Payment; and

    c)     identify each and every bank account into which any portion of the Payment was deposited.

**ANSWER NO. 11**

Fineberg objects to this interrogatory to the extent that it is overly broad, unduly burdensome, vague and ambiguous, seeks information that is subject to attorney-client privilege, and seeks information on the receipt, "disposition" of, and bank accounts related to the settlement amount that is irrelevant and not likely to lead to the discovery of admissible evidence. Fineberg further objects to this interrogatory to the extent its multiple subparts exceed the limit on interrogatories under the court order governing phased discovery. In addition, Fineberg objects to this interrogatory to the extent it seeks information related to the settlement of the Zoning Appeal, as the settlement agreement related to the Zoning Appeal contains the following language prohibiting disclosure of the terms of settlement:

> <u>Confidentiality</u>. The terms of this Agreement are confidential, and shall not be disclosed without the parties' written consent to any person or entity other than the parties, their respective counsel and accountants, and any other persons to whom a party may have a legal duty to disclose the information. The parties shall be able to disclose that the Appeal has been settled. In the event that a party is required by subpoena or order, judgment, or decree of a court of competent jurisdiction or similar judicial tribunal to disclose the existence, terms, or contents of this Agreement, it shall, prior to such disclosure, promptly notify each party.

In accordance with this language contained in the settlement agreement, Blue Hills

notified the other parties to the settlement of the Lender's discovery requests in this action. The

other parties to the settlement have not consented to the release of the settlement documents due

to concerns over the settlement terms becoming publicly available. Therefore, in the absence of

a "subpoena or order, judgment or decree of a court . . .," Fineberg is not authorized to release

the amount of any payment made in connection with the settlement of the Zoning Appeal or any

other information or documents related to the settlement of the Zoning Appeal.

**INTERROGATORY NO. 12**

State the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of
CSFB 1991 – C1 Royall Street, LLC and at page 11 of the Answer of Defendants-on-
Counterclaim Gerald Fineberg and William Langelier to Counterclaim of CSFB 1991 – C1
Royall Street, LLC, that "[Lender]'s claims are barred by doctrine of unclean hands."

**ANSWER NO. 12**

The Lender and its agents ignored Blue Hills' repeated requests to meet to discuss the

expiration of the Equiserve Lease. After ignoring Blue Hills for several months, the Lender

wrongfully declared Blue Hills to be in default under the terms of the Mortgage and refused Blue

Hills access to funds to which it was entitled. As a result, Blue Hills was not able to meet its

obligations under the Loan Documents. Further, Fineberg incorporates his answers to

Interrogatory Nos. 3 and 9.

**INTERROGATORY NO. 13**

State the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of
CSFB 1991 – C1 Royall Street, LLC and at page 12 of the Answer of Defendants-in-
Counterclaim Gerald Fineberg and William Langelier to Counterclaim of CSFB 1991 – C1
Royall Street, LLC, that "[Lender]'s claims are barred by the doctrines of waiver and estoppel."

**ANSWER NO. 13**

Fineberg incorporates his answers to Interrogatory Nos. 3 and 9.

**INTERROGATORY NO. 14**

State the basis for the allegation, at page 9 of Blue Hills' Answer to Counterclaim of CSFB 1991 – C1 Royall Street, LLC at page 12 of the Answer of Defendants-in-Counterclaim Gerald Fineberg and William Langelier to Counterclaim of CSFB 1991 – C1 Royall Street, LLC, that "[Lender]'s claims are barred by the doctrine of laches."

**ANSWER NO. 14**

Fineberg incorporates his answer to Interrogatory Nos. 3 and 9.

**INTERROGATORY NO. 15**

State the basis for all of your damages claims.

**ANSWER NO. 15**

At present, Blue Hills, Fineberg and Langelier cannot fully quantify their damages until they have had full opportunity to conduct discovery. However, at present it is apparent that they have suffered significant damages as a result of, *inter alia*, Defendants' refusal to release cash reserves and to meet with Blue Hills to discuss the various consents, approvals, and authorizations required by the loan documents to facilitate the marketing of the Property to new tenants. A combination of escrowed funds and additional borrowing/capital, approval for which was to be sought, would have enabled Blue Hills to have pursued re-tenanting of the Property. Together with the offering of ownership interests to attract tenant prospects, the Property could either have been sold or refinanced with payoff or assumption of the loan sufficient to realize recovery of tax costs on disposition plus return of newly loaned and invested capital and a profit in excess of approximately $4,000,000.00. The delineated damages are exclusive of costs, interest, attorneys' fees and other damages which continue to accrue. In addition, Blue Hills seeks treble damages and attorneys' fees pursuant to M.G.L. c. 93A.

11

Signed under the pains and penalties of perjury this 28 day of October, 2005.

Gerald Fineberg

AS TO OBJECTIONS:

GERALD FINEBERG
By his attorneys,

Peter B. McGlynn, Esq. BBO# 333660
Meredith A. Swisher, Esq. BBO# 646866
BERNKOPF GOODMAN LLP
125 Summer Street, 13th floor
Boston, Massachusetts 02110
(617) 790-3000
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated: October 11, 2005
#323118 v1/14500/9985

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon (each party appearing pro se and) the attorney of record for each other party by mail (by hand) Nov 14 2005

12