UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

———————————————————————

|  |  |
|---|---|
| BLUE HILLS OFFICE PARK LLC, | ) |
|     Plaintiff/Defendant-in-Counterclaim | ) |
|  | ) |
| v. | ) Civil Action No. 05-CV-10506 (WGY) |
|  | ) |
| J.P. MORGAN CHASE BANK, as Trustee for the | ) |
| Registered Holders of Credit Suisse First | ) |
| Boston Mortgage Securities Corp., Commercial | ) |
| Mortgage Pass-Through Certificates, Series | ) |
| 1999-C1, | ) |
|     Defendant | ) |
|  | ) |
| and CSFB 1999 – C1 ROYALL STREET, LLC, | ) |
|     Defendant/Plaintiff-in-Counterclaim | ) |
|  | ) |
| and | ) |
|  | ) |
| WILLIAM LANGELIER and GERALD | ) |
| FINEBERG, | ) |
|     Defendants-in-Counterclaim | ) |

———————————————————————

**SUR-REPLY BRIEF IN SUPPORT OF BLUE HILLS OFFICE PARK LLC,
GERALD FINEBERG AND WILLIAM LANGELIER'S OPPOSITION
TO PETITION FOR ATTORNEYS' FEES AND EXPENSES OF DEFENDANTS
AND PLAINTIFFS-IN-COUNTERCLAIM**

**INTRODUCTION**

Blue Hills Office Park LLC, William Langelier and Gerald Fineberg (collectively, "Blue

Hills") hereby submits this sur-reply in further support of Blue Hills' Opposition to Petition for

Attorneys' Fees and Expenses of Defendants and Plaintiffs-in-Counterclaim J.P. Morgan Chase

Bank, as Trustee and CSFB 1999-C1 Royall Street LLC ("Opposition").

This sur-reply responds only to the issues raised in Defendants' and Plaintiffs-in-

Counterclaim's Reply Brief in Support of Petition for Attorneys' Fees and Expenses ("Reply

Brief"). In their Reply Brief, Defendants J.P. Morgan Chase Bank, as Trustee and CSFB 1999-C1 Royall Street LLC (collectively "Lender") misstate the law governing attorneys' fees, improperly rely upon a fee petition filed by Goodwin Procter, LLP in an unrelated and non-analagous Superior Court action, and attempt to justify unreasonable expenses and block billing by baldly asserting that DLA Piper Rudnick Gray Cary US LLP's ("DLA Piper") clients have not objected to such practices.

<u>**DISCUSSION**</u>

While Lender's ability to recover attorneys' fees is based upon provisions in the pertinent loan documents, Lender is entitled to recover only what is "reasonable." In that regard, this Court has discretion to determine the reasonableness of the fees sought by the Lender despite any contractual provision allowing recovery of attorneys' fees. The Lender's assertion that it is entitled to recover the <u>actual</u> fees billed no matter how unreasonable is meritless.

The Lender cites *U.S. v. Western States Mech. Contractors, Inc.,* 834 F.2d 1533, 1548 (10th Cir. 1987) for the proposition that this Court must enforce the contractual provisions governing attorneys' fees. Reply Brief, Section I, at p. 2. However, the Lender fails to point out that the Court in *Western States* emphasized the trial court's discretion to reduce the amount sought to a reasonable amount:

> When the agreement between the contractor and the subcontractor provides for attorneys' fees, the subcontractor may recover from the contractor and its Miller Act surety consistent with the terms of that agreement. (citations omitted) <u>This does not mean, however, that the trial court should simply award the full amount billed by the prevailing party's attorneys. We reject [the] argument that the contract necessarily requires the recovery of *all* attorneys' fees. Clearly, the trial court has discretion to adjust or even deny a contractual award of fees if such an award would be inequitable or unreasonable.</u> *Id. (emphasis supplied)*

- 2 -

Similarly, as pointed out in Blue Hills' Opposition, the District Court in *MIF Realty, L.P. v. Fineberg*, 989 F. Supp. 400 (D. Mass. 1998) performed an analysis of the reasonableness of the amount of fees sought despite the existence of a contractual basis for recovery of fees. The mere fact that Lender's counsel billed Lender for attorneys' fees does not automatically entitle Lender to recover the entirety of such fees from Blue Hills; the fees must still be reasonable. In *Brown Rudnick Freed and Gesmer et al. v. The Commonwealth of Massachusetts, et al*, 16 Mass. L. Rptr. 815 (2003), the Court determined that attorneys' fees recoverable pursuant to a written contingency fee agreement must be reasonable regardless of whether the parties had agreed that the attorney was entitled to a specific percentage of any amount recovered. "The courts are not powerless to act in disapproving . . . a fee which is plainly unreasonable." *Id.*, quoting *Gagnon v. Shoblom*, 409 Mass. 63, 67 (1991). Further, contrary to Lender's assertions, under Massachusetts law, this Court has discretion to rely upon the lodestar method in determining the reasonableness of attorneys' fees. *Berman v. Linnare*, 434 Mass. 301 (2001).

The Lender attempts to justify its excessive block billing by submitting affidavits purportedly confirming that block billing is the "conventional way that DLA Piper and other firms . . . bill their clients." However, the bills submitted by Lender in support of its fee petition are inconsistent with such practice. According to the Reply Affidavit of Bruce E. Falby, Esq. in Support of Petition for Attorneys' Fees and Expenses ("Falby Affidavit"), "it is (and has always been) my practice to have attorneys record their time by making one entry per matter per day . . . ." Falby Affidavit, ¶2. Contrary to this statement, however, the bills submitted reveal that on many occasions, there are more than one entry per person per day. By way of example, Attorney Feit recorded three separate entries on February 2, 2006 and on June 23, 2006. There are at least 20 instances of multiple billings by the same attorney or paralegal on the same day. This

- 3 -

inconsistency undercuts Lender's attempt to justify significant blocks of time, many of which exceed 8, 9, 10 or even 15 hours during a day.

The Lender also relies upon the bills submitted by Goodwin Procter, LLP in the action *Brooks Automation v. Blueshift Technologies, Inc.*, Suffolk Superior Court, Civil Action No. 05-3973-BLS2 as support for its contention that block billing is an acceptable practice. Lender asserts that time was block billed in that matter and, further, that the "Court took no issue with this practice." Falby Affidavit, ¶4. Lender neglects, however, to disclose that the basis of the award for fees in the *Brooks Automation* case was M.G.L. c. 93A and M.G.L. c. 231 §6F. In its opposition to Goodwin Procter, LLP's application for fees, counsel for Brooks Automation, Inc. ("Brooks") argued that no attorneys' fees should be awarded because the standards for such award under M.G.L. c. 93A and M.G.L. c. 231 §6F were not met. The majority of Brooks' opposition focus <u>solely</u> on the merits of the award of attorneys' fees. While Brooks does raise objections to the reasonableness of the fees, <u>none are based upon impermissible block billing</u>. A copy of Brooks' opposition is attached hereto as Exhibit "A." Thus, it appears that the Massachusetts Superior Court did not take issue with block billing simply because no objection was raised thereto. When the issue of block billing has been raised, Massachusetts courts have found it to be unreasonable. *See, e.g.*, *Ellis v. Varney*, 2005 WL 1009634.

Finally, the Lender's counsel asserts that because its clients are purportedly billed for certain administrative, technical and clerical tasks on a routine basis, Blue Hills is liable for all such overhead expenses. There is no support for this argument and courts have routinely determined that such fees are properly classified as law firm overhead and, accordingly, are not recoverable. *See, e.g. Mogilevsky v. Bally Total Fitness Corporation*, 311 F. Supp. 2d 212 (D. Mass. 2004).

- 4 -

WHEREFORE, Blue Hills respectfully requests that the Court enter an order:

1.     Deducting fees for administrative or clerical tasks in the amount of $37,275.00;

2.     Deducting unreasonable overhead charges from the requested disbursements in the amount of $20,877.45;

3.     Deducting fees charged by summer associates, law librarians and "legal practices technologies coordinators" in the amount of $12,738.50;

4.     Deducting or significantly reducing duplicative and "block billed" time in the amount of $999,223.25; and

5.     Providing such other and further relief as is necessary and just.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(D), Blue Hills, Langelier and Fineberg request a hearing as to the issues raised herein.

BLUE HILLS OFFICE PARK LLC, WILLIAM LANGELIER AND GERALD FINEBERG,
By their attorneys,


/s/ Meredith A. Swisher
Peter B. McGlynn, Esquire (BBO No. 333660)
Meredith A. Swisher, Esquire (BBO No. 646866)
BERNKOPF GOODMAN LLP
125 Summer Street, Suite 1300
Boston, Massachusetts  02110
Telephone:     (617) 790-3000
Facsimile:     (617) 790-3300
pmcglynn@bg-llp.com
mswisher@bg-llp.com

Dated:  December 1, 2006
412396 v1/14500/9985

EXHIBIT A

# COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
Civil Action No. 05-03973-BLS (Judge Gants)

| | |
|---|---|
| BROOKS AUTOMATION, INC., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| BLUESHIFT TECHNOLOGIES, INC., | ) |
| PETER VAN DER MEULEN, | ) |
| | ) |
| Defendants. | ) |

## BROOKS AUTOMATION, INC.'S BRIEF IN OPPOSITION TO DEFENDANTS' APPLICATION AND MOTION FOR ATTORNEYS' FEES AND COSTS

### I.    INTRODUCTION

Brooks Automation, Inc. ("Brooks") submits this brief in opposition to

Defendants' (collectively, "BlueShift" or the "Defendants") application for fees and costs

under G.L. c. 93A and motion for fees and costs under G.L. c. 231 § 6F (the "Application

and Motion"). No fees and, at most, only statutory costs may be awarded on these facts.[1]

BlueShift here seeks an award of costs and fees of almost one million dollars (which, of

course, nearly quintuples the amount of its alleged damages), but fails to submit a single

---

[1]    In the event that this Court is inclined to consider an award of statutory costs to BlueShift under G.L. c. 261 § 1, Brooks hereby demands an opportunity to be heard with respect to those costs. Waldman v. American Honda Motor Co., 413 Mass. 320, 327-28 (1992). BlueShift's submission here is, of course, entirely inadequate to support an award of statutory costs in the amounts claimed. Expert witness fees, for example, grossly exceed the amount permitted under G.L. c. 262 § 29. Moreover, whole categories of claimed costs, such as "Secretarial Overtime," "Travel Expense," "Legal Research" and, for the most part, "Document Production, Duplication and Delivery Costs" are not recoverable as statutory costs. "Court Reporter Service, Deposition Costs" may be recoverable, but only on a showing that each such cost was "reasonably necessary." Mass. R. Civ. P. 54 (d and e); Waldman, 413 Mass. at 327 ("[J]udge erred in awarding the defendant deposition costs without holding a hearing and without making the finding of reasonable necessity required . . . .").

sworn affidavit with respect either to the amount of or the reasonableness of the fees and costs it seeks to recover. See Mass. R. Civ. P. 54 (d) (requiring certificates, affidavits and vouchers pertaining to items of costs party is claiming).

Tellingly, however, even the two-page "review" submitted in letter form by BlueShift's purported fee expert, Paula Alvary, fails to assert that the fees BlueShift now seeks to recover are "reasonable." See Application and Motion, Exhibit C. In fact, the word "reasonable" never appears in Ms. Alvary's unsworn submission. Id. The reason for this omission is clear: Ms. Alvary's letter (presumably BlueShift's best case with respect to the fee issue) provides that the fees charged by the Goodwin Procter partners on this case exceed those charged by fully half of "similarly experienced partners in other [large national firms in the Boston market],"[2] and that only "about 30% of similarly experienced partners in other [such] firms had rates higher than the Goodwin Procter partners." Id., at p. 2. Similarly, Ms. Alvary indicates that fully one third of the associate rates (by class year) exceed those charged by at least half of other, presumably comparable, firms. Id., at p. 2.[3]

Ms. Alvary's unsworn submission is similarly silent with respect to whether the time charges themselves are reasonable given the tasks described, or whether other "large national firms in the Boston market" would reasonably employ the service of some thirteen different time keepers in the course of this representation. Moreover, Ms. Alvary either did not conduct or has chosen not to report on any review of how the fees of those

---

[2]    Ms. Alvary does not explain why she chose "large national firms in the Boston market" as opposed to, for example, "large Boston firms with other offices" as points of comparison.

[3]    Ms. Alvary's review of associate rates is confusing, at best. She purports to make a review of associate rates for "three class years with rates on this matter," but BlueShift indicates that associates from four, as opposed to three, different class years billed time to this case. Application and Motion, p. 4.

lawyers (both partners and associates) who billed the bulk of the time to this matter compared to the fees charged by lawyers of comparable experience in other firms.

Ultimately, the relief sought in the Application and Motion should be denied for several reasons:

1.    Defendants are not entitled to relief under G.L. c. 93A, and are therefore not entitled to any attorney fees or costs under c. 93A.

2.    Defendants are not entitled to relief under G.L. c. 231 § 6F because substantially all of Brooks' claims were neither "wholly insubstantial" nor "frivolous" nor were they advanced in bad faith.

3.    A substantial portion of the fees sought in the Application and Motion arises out of Defendants' request for accelerated discovery and trial, their unsuccessful pre-trial motions and their obstructionist litigation tactics.

4.    The Application and Motion seeks recovery of unreasonable, unsupported, and excessive fees and expenses.

## II.    ARGUMENT

### A.    Defendants are not entitled to relief under G.L. c. 93A, and are therefore not entitled to any attorney fees or costs under c. 93A.

Obviously, in order to recover reasonable attorney fees and costs under c. 93A, Defendants must first establish that Brooks violated that statute. Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 780 (1986). Defendants' request for attorney fees and costs under c. 93A should be denied for the numerous reasons already set forth in Brooks' opposition and supplement opposition to BlueShift's Application for Relief under G.L. c. 93A (collectively, "Brooks' 93A Opposition").

Moreover, the filing of a lawsuit does not, as BlueShift suggests, give rise to 93A liability. Savers Property & Casualty Ins. Co. v. Admiral Ins. Agency, Inc., 12 Mass. L. Rep. 594, 2000 WL 33223227 (Mass. Super., Oct. 16, 2000) (van Gestel, J.), aff'd on other grounds, 61 Mass. App. Ct. 158 (2004), review denied, 442 Mass. 1105 (2004); see

also First Enterprises, Ltd. v. Cooper, 425 Mass. 344, 347 (1997) (litigation alone

insufficient, showing of "commercial relationship" or interference with "trade or

commerce" required).

In Savers, the defendant asserted a counterclaim under c. 93A based on plaintiff's

alleged "baseless, conjectural, and speculative [claims]" which "knowing[ly] and

intentional[ly] disregard[ed] . . . the truth." Savers, at *1. As here, the defendant's

counterclaim attacked the propriety of the plaintiff's mere filing of a complaint. Id.

Judge van Gestel rejected the counterclaim holding that c. 93A:

> . . . refers to 'marketplace' transactions . . . . The filing of a lawsuit in the
> Superior Court is not 'the use or employment . . . of an unfair method of
> competition or an unfair or deceptive act or practice declared unlawful by
> section two' of G.L. c. 93A. It is not a marketplace transaction, nor is it
> something done 'in the conduct of any trade or commerce.' Thus, for that
> reason alone [defendant's] c. 93A counterclaim – predicated as it is solely
> on the filing by Savers of this lawsuit – cannot survive.

Id., at *3 (internal citations omitted). Although BlueShift may argue that its c. 93A claim

is not predicated solely on Brooks' suit, the sole interference with Applied Materials

alleged by BlueShift was through Brooks' provision of notice of the suit.

**B.    Defendants are not entitled to relief under G.L. c. 231 § 6F because
       substantially all of Brooks' claims were neither "wholly insubstantial"
       nor "frivolous" nor were they advanced in bad faith.**

In order to recover attorney fees and expenses under c. 231 § 6F, this Court must

first conduct a hearing and then make a "separate and distinct finding" that "all or

substantially all" of Brooks' claims were "wholly insubstantial, frivolous, and not

advanced in good faith." G.L. c. 231 § 6F (emphasis added); Bartlett v. Greyhound Real

Estate Finance Co., 41 Mass. App. Ct. 282, 291 (1996). The required finding of this

Court is, as a matter of statutory law, independent of the jury verdict. The statute further

provides that "[n]o finding shall be made that any claim . . . was wholly insubstantial, frivolous and not advanced in good faith solely because a novel or unusual argument or principle of law was advanced in support thereof." G.L. c. 231 § 6F.

Ultimately, c. 231 § 6F is intended to address only insubstantial frivolity that "permeates the proceedings." Jaraki v. Quinlan, 1995 WL 131257 (Mass. Sup. Ct.) (McHugh, J.). Litigation conduct that itself violates G.L. c. 93A has, in fact, been deemed insufficient to support liability under c. 231 § 6F where it has not "permeated 'substantially all'" claims. Datacomm, 396 Mass. at 782.

> The master found that [plaintiff's] verified complaint contained a known misstatement . . . . Clearly a claim founded on this allegation would be insubstantial, frivolous, and certainly in bad faith under G.L.c. 231 § 6F. This is, however, but one relatively minor aspect of [plaintiff's] claims. The statute states that relief may be granted on the court's finding that '<u>all</u> or <u>substantially all</u> of the claim . . . were <u>wholly</u> insubstantial, frivolous and not in good faith'. . . .
>
> Although [this] conduct is clearly reprehensible, it does not appear to have permeated 'substantially all' of [plaintiff's] claims. Neither is it readily apparent that [plaintiff's] claims are 'wholly insubstantial' by virtue of the misrepresentation.

Id. at 782 (emphasis in original).

Here, of course, Brooks has neither violated c. 93A nor engaged in conduct sanctionable under c. 231 § 6F.

1.    **Brooks' claims were not wholly insubstantial, frivolous and advanced in bad faith.**

    a.    **The non-competition claim was not wholly insubstantial, frivolous or advanced in bad faith.**

As set forth in Brooks' 93A Opposition, Brooks alleged that van der Muelen competed "directly or indirectly" with Brooks by engaging in the following activities during the non-compete period: (a) filing a patent application in the same field of

business as Brooks (Trial Exhibit 1); (b) "working on detailed manufacturing drawings for its prototype handling system," Blueshift Business Plan, p. 19 (Trial Exhibit 90); (c) engaging in discussions with Foster-Miller, Inc. related to the development of a prototype wafer handling system, Foster Miller Non-Disclosure Agreement (Trial Exhibit 31); and (d) contracting with CauldronSoft Corporation to develop a proof of concept simulation of BlueShift's robotic system, design software applications, and develop a robot simulator for BlueShift's wafer handling system. CauldronSoft Proposal (Trial Exhibit 38).

Although the jury ultimately rejected Brooks' non-competition claim, there was clearly evidence admitted at trial supporting it and it was therefore far from frivolous. Moreover, one of the primary reasons (perhaps the sole reason) that the jury rejected the claim was this Court's instruction to it with respect to what constitutes competition. Brooks had requested that the Court adopt and instruct based upon the Second Circuit's decision in the De Long Corp. v. Lucas, 278 F.2d 804 (2d Cir. 1960). That case, unlike the Augut case repeatedly referenced by this Court, specifically addressed the effect of a patent application during the non-compete period and held that the defendant breached his non-competition agreement "even though his work was entirely engineering and neither he nor [his new employer] approached customers until [the expiration of his agreement]." Id., at 809.

By its very terms, c. 231 § 6F immunizes "novel or unusual" arguments from being found as "wholly insubstantial, frivolous and not advanced in good faith." Of course, the DeLong rule is not novel or unusual at all. Brooks believed (and still believes) that DeLong was appropriately decided, and that its rule of law is directly

6

applicable on these facts, consistent with Massachusetts' narrow construction of non-competition agreements, necessary to protect the important public interest in fostering technological innovations by companies investing hundreds of thousands of dollars to develop them, and, ultimately, should have been adopted by the Court. This Court rejected Brooks' legal argument. It cannot, however, be said that the non-competition claim (nor has this Court previously suggested that it) was wholly insubstantial, frivolous or not advanced in good faith.

> **b.**    **The misappropriation claim was not wholly insubstantial, frivolous or advanced in bad faith.**

Similarly, given what Brooks perceived to be the virtual identity between Brook's trade secrets and the disclosures in van der Meulen's provisional patent application, this Court cannot conclude that Brooks' misappropriation claim was insubstantial, frivolous or advanced in bad faith.

On November 10, 2003, within months of leaving Brooks, van der Meulen, a Vice President and Patent Committee Member while at Brooks, filed a Provisional Patent Application (the "Provisional") (Trial Exhibit 1) disclosing a linear cluster tool which was virtually identical to that described in the Holtkamp Disclosure owned by Brooks. The identity of components and function can be seen by a comparison of Figure 5 of the Provisional and Figures 2, 3 and 4 of the Holtkamp Disclosure (Trial Exhibit 22):

- In his linear cluster tool, Holtkamp uses a square central chamber with a robot containing a SCARA arm, and connects the central chambers in a linear fashion through the use of an intermediate load lock or "buffer," each of which can be environmentally sealed. Holtkamp states that the series can be repeated as needed to create a "Cluster Avenue." (Holtkamp Disclosure, Trial Exhibit 22, p. 1, ¶ 6 and Figures 2, 3 and 4).

- In the linear cluster tool van der Meulen claimed to have invented, he also uses a square central chamber with a robot containing a SCARA arm, and he

connects the central chambers in a linear fashion through the use of an intermediate load lock or "buffer," each of which can be environmentally sealed. Van der Muelen states that the series "could keep on going." (Provisional, Trial Exhibit 1, Figure 5).

There is certainly a basis for Brooks to believe that its Holtkamp Disclosure and the disclosures by van der Meulen in his Provisional are substantially similar, if not virtually identical.

In his Provisional, van der Meulen further states that the object of his claimed invention is to "overcome the inherent constraints of cluster tools while avoiding the problems of linear tools." (Trial Exhibit 1, p. 2). In the Provisional, van der Meulen describes the same three methods for solving the robot limitation that Brooks knew to have been disclosed by Chris Hofmeister during the April 9, 2003 Patent Committee Meeting:

- **The Use of Dual Robot Arms in an Over/Under Configuration**. On page 14 of the Provisional, van der Meulen describes the use of the dual arm architecture to improve throughput: "One arm is mounted from the bottom and the other from the top. . . . The second (top) arm would only be used if necessary for throughput reasons; otherwise the bottom arm would suffice." (Trial Exhibit 1). This Dual Arm Robot configuration is virtually identical to that disclosed in the August 2000 invention disclosure which van der Meulen executed while at Brooks, and which is owned by Brooks. (Trial Exhibit 20). In the Provisional, van der Meulen uses this dual arm robot to solve the robot limitation in precisely the way disclosed by Hofmeister at the April 9, 2003 Patent Committee Meeting. This technology is identified as Brook's Trade Secret No. 3 in the Pre-Trial Brief.

- **The Use of a Wafer Return Lane**. On page 16 of the Provisional, van der Meulen describes the use of an "external return system" in the linear cluster tool, which could either be an "air" return or a "vacuum" return: "The return mechanism is optionally on the top of the linear vacuum chamber. On conventional vacuum handling systems, the return path is often through the entry path . . . [which] makes it necessary for the robot to handle materials going in as materials going out." By "moving the wafers on the top back to the front in an air tunnel . . . the air return frees up the vacuum robots because they do not have to handle materials going out . . ." (Trial Exhibit 1). Hofmeister testified that at the April 2003 Patent Committee Meeting, he

8

disclosed this precise use of the wafer return system to solve the robot limitation present in the Holtkamp Cluster Avenue. This technology is identified as Brook's Trade Secret No. 5 in its Pre-Trial Brief.

- **The Use of the Mid-System Load Lock for Wafer Entry and Exit**. On page 17 of the Provisional, van der Meulen also describes the use of load lock positioned "in the middle of the system" such that a wafer "could enter or exit the system at another point in the system." Van der Meulen further describes "[t]he advantage of a mid-system entry point is that wafers can be inserted in multiple places in the system, allowing for a significantly more flexible process flow" and wafers can be removed "in case of a partial system failure" and that "[i]n each case, the robotic arms described herein can assist in efficiently moving items down the line, without the problems of other linear systems." Hofmeister testified that at the April 2003 Patent Committee Meeting, he disclosed the use of the mid-system load lock to solve the robot limitations of this form of a cluster tool. This technology is described as Brook's Trade Secret No. 2 in its Pre-Trial Brief.

BlueShift suggests that Brooks' "inability to [immediately] articulate" and that Brooks' ultimate narrowing of its trade secret claim somehow casts doubt on its legitimacy. This allegation is specious and purposefully ignores BlueShift's own conduct. First, BlueShift insisted on the greatly accelerated discovery and trial schedule here. Although it complains of disclosures by Brooks allegedly made on the eve of trial, such disclosures occurred literally within a few weeks of bringing suit. Moreover, any suggestion that Brooks should be able to immediately identify its own technology ignores the reality that the full scope of the Defendants' misappropriation of that technology is unlikely to be known or fully understood until after discovery has been completed. Any suggestion that Brooks' trade secrets were somehow neither valuable nor secret is again belied by Defendants' own conduct. One simply does not file a provisional patent application for technology thought to be worthless or believed to already be in the public domain.

9

Ultimately, although the jury rejected the misappropriation claim, it was far from frivolous. In fact, even BlueShift's own expert could not establish that the linear cluster tool that Brooks asserted had been misappropriated was in the public domain at the time of the filing of the Provisional.

2. **This Court's prior rulings establish that Brooks' claims were not wholly insubstantial and frivolous.**

The Defendants failed to convince the Court to dismiss the case under Rule 12(b)(6), failed to convince the Court to grant summary judgment, and, to date, failed to convince this Court to enter a directed verdict in Defendants' favor. As Brooks' has previously reminded this Court, in its Consolidated Order, dated November 10, 2005, the Court concluded, among other things, that there was a genuine dispute of material fact and that the jury could find in Brooks' favor on the non-competition claim:

> . . . summary judgment is denied because there is evidence from van der Muelen's February 14, 2004 email that, viewed in the light most favorable to Brooks, permits the finding that he was in active competition within one year of termination.

Consolidated Order, p. 3.

This finding alone is sufficient to establish that at least one of Brooks' primary claims was substantial enough to go to the jury. Claims that survive summary judgment are not frivolous. See e.g. Campanello v. Anthony & Sylvan Pools Corp., 2004 WL 2049313 (N.D. Tex.) (defendant's request for attorney fees denied even though plaintiff lost at summary judgment; plaintiff's claims were not frivolous, unreasonable or without foundation); Christian v. Mattel, Inc., 286 F.3d 1118, 1126 (9th Cir. 2002) ("a plaintiff who survives a summary judgment motion would necessarily have demonstrated that there are triable, potentially meritorious issues"); Atkinson v. Taylor, 277 F. Supp. 2d

382, 386 (D. Del. 2003) ("the case has survived a summary judgment motion, and therefore, cannot be considered frivolous").

> **3.     Defendants' own conduct establishes that Brooks' claims were not wholly insubstantial and frivolous.**

The complete incongruity of Defendants' assertions in their Application and Motion should not go unnoticed by this Court. Defendants argue that Brooks' claims were frivolous, while also arguing that they were reasonably required to expend nearly a million dollars to defend them. These arguments simply do not and cannot square. Defendants' conduct here simply belies their frivolousness claim.

Defendants' bills are replete with entries evidencing tens of thousands of dollars of "research" performed by at least four attorneys regarding claims now alleged to be frivolous.[4] These entries make plain that Defendants thought Brooks' claims were "substantial" enough to warrant thorough research and analysis. This research and analysis apparently prompted Defendants to prepare and file several motions, including a motion to dismiss (largely withdrawn), motions for summary judgment on liability and damages and a motion for directed verdict. Notably, Defendants lost (or abandoned) all but one of these motions.

> **C.     A substantial portion of the fees sought in the Application and Motion arise out of Defendants' request for accelerated discovery and trial, their unsuccessful pre-trial motions and their obstructionist litigation tactics.**

---

[4]     Because Defendants failed to identify how much time was spent on any particular task in each "mixed" time entry, it is impossible for Brooks (or the Court) to determine how much time was spent on the individual tasks for which Defendants seek reimbursement. Although there are many "single" entries that identify a single task performed and the time spent performing it, Defendants should be required to submit revised bills so that the mixed time entries can be analyzed to determine whether the time spent was reasonable. See e.g. Wojtkowski v. Cade, 725 F.2d 127, 130 (1st Cir. 1994) ("Attorneys who anticipate requesting their fees from the court would be well advised to maintain detailed, contemporaneous time records that will enable a later determination of the amount of time spent on particular issues.")

Defendants should not be permitted to recover fees and expenses relating to their various unsuccessful motion practice and their rush to trial in this case. At Defendants' urging, this case proceeded on an extraordinarily accelerated discovery and trial schedule. Discovery and trial preparation occurred at a frenetic pace. Defendants, in fact, concede that the large number of professionals (thirteen) who billed time on this matter "was a result of the expedited nature of the proceedings." Application and Motion, p. 3. Defendants' admission here is an acknowledgement that inefficiencies resulted from the expedited proceedings upon which they insisted.

It is impossible to quantify how much this rush to trial needlessly inflated Defendants' (and, of course, Brooks') fees and costs. It is, however, clear that these additional expenses were a direct result of Defendants' own conduct. Defendants should not be permitted to have it both ways -- they cannot demand a lightning-fast discovery period and trial and then saddle Brooks with the high cost of the inefficiencies resulting from that schedule.

Defendants' motion practice serves as perhaps the prime example here. Although Defendants allege that Brooks engaged in "needless motion practice" they provide no detail with respect to this allegation and later admit that they, rather than Brooks, brought "most of" the pre-trial motions.[5] Application and Motion, pp. 5 and 7. Although they filed a motion to dismiss, they later withdrew the bulk of it from this Court's consideration. In addition, Defendants now seek to saddle Brooks with the costs of

---

[5]          This Court is, of course, aware that Brooks brought a limited number of motions, primarily motions *in limine*. One such motion, later supplemented, addressed Defendants' assertion of attorney-client privilege with respect to a patentability study reasonably believed to have been disclosed to third-parties. Among the depositions that Defendants now seek to fault Brooks for taking were two (the Spitzer and Abraham depositions) directly concerned with the Defendants' assertion of attorney-client privilege with respect to the study.

summary judgment motions that were either denied in their entirety or filed so close to the time of trial that this Court lacked a meaningful opportunity to review them. As this Court commented with respect to one of those motions:

> ". . . it was pragmatically impossible for me to go through the entirety of that record and make that determination in the time I had . . . I did not have any reasonable chance to go through the record . . . and I think I told Mr. Tully that part of the price _you_ pay for getting a trial as quickly as you did was that pragmatically you effectively lost your chance for summary judgment in view of the complexity of the record as to that major point. "

December 15, 2005 Hearing Transcript, p. 25, l. 14-24; p. 26, l. 1-4 (emphasis added).

Perversely, Defendants now seek to pay no price at all for their monumental waste of time and resources. Defendants here had an election to make. If they deemed this case frivolous such that it would likely be resolved at summary judgment, they should have assented to a trial continuance to permit this Court's full consideration of their motions. If they wanted an immediate trial, they merely needed to prepare for it and proceed without engaging in the needless motion practice.

Defendants incurred fees of at least $74,883.50 – a total reflecting just the "single entries" relating to their motion to dismiss and motions for summary judgment. Defendants undoubtedly incurred fees totaling much more than this amount, but because they have failed to present bills that itemize the time spent on particular tasks, it is impossible to determine how much time Defendants' counsel actually spent. As a matter of fundamental fairness, Brooks should not have to pay for Defendants' efforts with respect to these motions, especially where Defendants voluntarily narrowed the issues on their motion to dismiss and filed summary judgment motions too late to be fully considered by this Court. See Eldridge v. Provident Companies, Inc., 18 Mass. L. Rep.

91, 2004 WL 1690382 (Mass. Super., July 6, 2004) (fees relating to preparing and arguing motion for new trial not recoverable as it was "an unsuccessful effort").

Similarly, Brooks should not be required to compensate Defendants for their obstructionist litigation tactics and use of personal invective. Defendants strategy here was clear – having secured a greatly accelerated trial schedule, they then resorted to the "Princeton defense" in an effort to run out the clock. The scheduling of the deposition of their expert, Mitchell Weiss, provides an example of both Defendants' strategy and their resort to unnecessary and inappropriate personal attacks. In their litany of complaints, Defendants tell this Court that "Brooks extended Mr. Weiss's deposition over two days." Defendants fail to inform this Court, however, that the deposition in total lasted for less than eight hours, that it was conducted over two days to accommodate Mr. Weiss's schedule, or that the first day of the deposition, which began in the afternoon, was done in Lowell at Mr. Weiss's office. Nor do the Defendants' inform the Court of their initial insistence on payment for Mr. Weiss's preparation time in advance of the continuation of the deposition, a position that finds no support in Rule 26.[6] Moreover, defense counsel's e-mail exchange with respect to the issue, attached hereto as Exhibit A, is nakedly

---

[6]    In footnote 5 on page 3 of their Application and Motion, Defendants' persist in their inappropriate effort to be compensated for Mr. Weiss's preparation time, as opposed to the time he spent in deposition. This effort does not, however, comport with either Massachusetts rules or practice. Mass. R. Civ. P. 26(b)(4)(C) requires Brooks to pay for the time spent by Mr. Weiss in deposition. Massachusetts practice, however, requires the party who retained the witness to bear any expense incurred for pre-deposition meetings or witness preparation. See Massachusetts Deposition Practice Manual, Compensation of Experts, sec. 13.1.4 (citing to Rhee v. Witco Chem. Corp., 126 F.R.D. 45 (N.D. Ill. 1989)).

        In the event that this Court were ultimately to award minimal damages on the c. 93A, it need not award any expert witness fees. Geraci v. Crown Chevrolet, Inc., 15 Mass. App. Ct. 935, 937 (1983):

obstructionist and contains repeated and unwarranted personal attacks. (Mr. Tully: "I can only conclude that you are being intentionally dense . . . .")[7]

### D.     The Application and Motion seeks recovery of unreasonable, unsupported, and excessive fees and expenses.

Defendants must, of course, establish that the fees and expenses sought in the Application and Motion are reasonable.  This Court enjoys great discretion when deciding what constitutes reasonable fees and expenses.  <u>Linthicum v. Archambault</u>, 379 Mass. 381 (1979).  Here, in the event that this Court awards fees and expenses, those fees and expenses should be substantially reduced from the amounts sought in the Application and Motion because those amounts are unreasonable, unsupported and excessive.

### 1.     Defendants have not established the reasonableness of their fees.

As detailed in the Introduction of this Brief, Defendants submission contains no sworn certification by any of their myriad attorneys or by the Defendants' purported expert, Ms. Alvary, that the fees and costs that Defendants seek to recover are reasonable. Defendants' legal argument with respect to the issue largely relies on Ms. Alvary's comparison of Goodwin Procter's <u>rates</u> with those of other firms.  Even that comparison, however, suggests that those rates are, on average, higher (with respect to all partners and some unspecified associates) than more than half of the comparison firms.  Whether Ms. Alvary is picking the appropriate comparison firms is, moreover, far from clear.

According to Ms. Alvary, with respect to two classes of associates (again unspecified) Goodwin Procter's rates were apparently "lower than half of all the

---

[7]     In a similar manner, Defendants complain that Mr. Van der Meulen was deposed for "an unnecessary and repetitive three days," without disclosing to this Court that a two-day deposition was arranged in lieu of Rule 30(b)(6) deposition of BlueShift or that the partial third-day of deposition solely addressed issues upon which Mr. Tully expressed "no problem suspending" on day two.  Van der Meulen Deposition Transcript, Vol. II, p. 434, l. 2.

associates' rates across a population of many firms." The likely meaning of this statement is simply that the rates for some its associates (presumably first and second years) were on par with what are likely to be some of the highest junior associate rates in this country. Ms. Alvary's review, however, contains absolutely no analysis of paralegal rates.

Again, Ms. Alvary provides no analysis of the time actually billed to this matter by the Goodwin Procter attorneys and paralegals, just a comparison of the rates (for some by not all of the timekeepers) with those of other "large national firms in the Boston market."

## 2. Defendants claim vague and unsupported fees and expenses.

### a. The costs are overstated.

Defendants seek $124,597.18 in costs. Defendants have, however, overstated the amount of their costs/disbursements by some $36,374.93. Alternatively, Defendants have failed to submit documentation in support of their claimed costs despite asserting that the Application and Motion contained a "complete set of all legal bills . . . and additional invoices." Application and Motion, p. 3. The costs set forth on the invoices submitted with the Application and Motion are:

| Invoice | Date | Costs |
|---|---|---|
| Goodwin Proctor Invoice No. 532384 | November 10, 2005 | $1,499.60 |
| Goodwin Proctor Invoice No. 532684 | November 10, 2005 | $3,414.15 |
| Goodwin Proctor Invoice No. 535641 | November 14, 2005 | $4,678.53 |
| Goodwin Proctor Invoice No. 536428 | November 17, 2005 | $12,571.19 |
| Goodwin Proctor Invoice No. 538564 | November 30, 2005 | $6,446.38 |
| IKON (copying/bates stamping) | October 17, 2005 | $5,054.51 |
| IKON (copying/bates stamping) | October 26, 2005 | $8,669.85 |
| IKON (copying) | November 23, 2005 | $5,481.50 |
| IKON (copying) | November 29, 2005 | $2,497.53 |
| Farmer Brock (deposition transcripts) | November 4, 2005 | $8,090.00 |
| Farmer Brock (deposition transcripts) | November 7, 2005 | $815.00 |
| Farmer Brock (deposition transcripts) | November 7, 2005 | $896.00 |

| Farmer Brock (deposition transcripts) | November 15, 2005 | $1,884.45 |
|---|---|---|
| Farmer Brock (deposition transcripts) | November 15, 2005 | $937.25 |
| Farmer Brock (deposition transcripts) | November 23, 2005 | $2,048.81 |
| Mitchell Weiss (expert witness)[8] | November 22, 2005 | $23,237.50 |
| | | |
| **Subtotal**[9] | | $88,222.25 |
| **Costs Claimed** | | $124,597.18 |
| **Discrepancy** | | **$36,374.93** |

Moreover, of the total costs actually accounted for, Defendants seek $7,390.55 in "Litigation Support" on their November 17, 2005 invoice. Brooks simply cannot determine the basis for this charge on the materials submitted by BlueShift to this Court.

**b.    David Hosp's Time Entries.**

Many of David Hosp's time entries are so vague that it is impossible to determine what tasks he performed. Between October 20, 2005 and October 28, 2005, Mr. Hosp spent 50.1 hours ($25,050 in fees) apparently doing something with respect to the summary judgment motions, but it is unclear exactly what. Each of Mr. Hosp's time entries for this period describes his efforts as "attention to summary judgment." In order to assess the reasonableness of the fees and expenses sought, Defendants must, at minimum, present billing entries that allow the Court to meaningfully consider the amount of time spent on any given task. Mr. Hosp's time entries are so vague that it is impossible to determine what tasks were performed in the more than 50 hours he billed to them. Moreover, as a general matter, the number of people (especially partners) involved

---

[8]    Defendants seek $23,247.50 for expert witness fees. However, the invoice submitted in support of those fees reflects a charge of $23,237.50.

[9]    Brooks attempted to discern the basis for Defendants' table of costs on pages 2-3 of the Application and Motion but was unable to do so. Therefore, Brooks simply summed <u>all</u> of the costs identified on Goodwin Procter's invoices, the outside vendor invoices, and Mr. Weiss's invoice.

with Defendants' summary judgment efforts is unreasonable, given that these efforts

proved either meaningless or unsuccessful.

> ### 3. Some of the fees sought are excessive, irrespective of whether the rates charged are reasonable.

> #### a. First-Year Associates' Time.

Defendants were billed $260 per hour for the efforts of two first-year associates

(J.D. 2005), Brian LaMacchia and Elianna Marziani. Mr. La Macchia billed 303.8 hours

to this matter and Ms. Marziani billed 215.3 hours, for fees totaling $134,966. Brooks

questions the efficiency of first-year associates that had likely not even been admitted to

practice at the time they performed much of the work for which the Defendants were

apparently charged, and suggests that it should not be required to pay full cost for

associate time that is routinely written off to training.[10]

> #### b. Jim Berriman's Time.

Between October 3, 2005 and November 23, 2005, Jim Berriman ("Senior

Counsel and Executive Manager of Litigation Technology") billed a total of 114 hours at

$450 per hour, for a total of $51,300. A review of Mr. Berriman's time entries suggests

that he assisted with technical issues relating to discovery, file servers, laptops, computer

files and preparation of demonstrative evidence at trial. It does not appear that Mr.

Berriman performed much, if any, legal analysis or traditional legal work. Brooks should

not be required to pay $450 per hour for the type of work performed by Mr. Berriman. In

fact, many of his time entries reflect work more appropriately performed by a paralegal

or other technical assistant:

---

[10]    In challenging this portion of fees, Brooks does not imply that Mr. LaMacchia's or Ms. Marziani's efforts were not genuine. Rather, first year associates, as a general matter, tend to be somewhat inefficient and their time is often written off or significantly reduced.

- "prepare potential electronic exhibits from Brooks web site for possible use at trial…preparation of electronic materials for use at trial" (November 6, 2005)

- "prepare timelines…review proposed animations…" (November 12, 2005)

- "meet with equipment vendor to supervise setup of equipment…prepare blowups…prepare presentation system for trial" (November 14, 2005)

- "setup of presentation system…" (November 15, 2005)

- "attend to renumbering of electronic exhibits per specifications ordered by court…" (November 16, 2005)

- "conferences with vendor regarding additional blowups for trial…" (November 20, 2005)

- "attend to breakdown of presentation system…set up laptop presentation system…" (November 23, 2005).[11]

Here, much, if not all, of Mr. Berriman's work relates to preparation and presentation of electronic evidence.[12] These fees are excessive. Brooks should not have to pay them.

Finally, in their Application and Motion, Defendants explain that their annual rate increases occurred on October 1, 2005. On the November 14, 2005 bill, Mr. Berriman's rate was $425 for work he performed after October 1, 2005. However, in the November 30, 2005 bill, Mr. Berriman's rate for post-October 1, 2005 work inexplicably increases by $25 to $450. Defendants do not explain the basis for this additional rate increase.

---

[11]     Brooks' reference to these entries is for illustrative purposes only, and does not imply that Mr. Berriman's other time entries are appropriate.

[12]     Under 28 U.S.C. § 1920, fees for a computerized multi-media system that is used to present exhibits to the jury and to aid in the explanation of the case and counsels' arguments are not recoverable as costs. Kohus v. Cosco, Inc., 282 F.3d 1355, 1359-61 (Fed. Cir. 2002) (holding that video exhibit is not exemplification); Arcadian Fertilizer, L.P. v. MPW Indus. Servs., 249 F.3d 1293, 1296-97 (11th Cir. 2001) (refusing to award costs for video exhibits and computer animation).

## III.    CONCLUSION

For the foregoing reasons, Brooks respectfully requests that the Application and Motion be denied in its entirety and Defendants denied any relief under G.L. c. 93A or G.L. c. 231 § 6F.  Unless all such relief is denied, Brooks hereby demands a hearing under <u>Waldman v. American Honda Motor Co.</u>, 413 Mass. 320, 327-28 (1992) and/or G.L. c. 231 § 6F.

**BROOKS AUTOMATION, INC.**
By its Attorneys,

Wayne F. Dennison, BBO No. 558879
**Brown Rudnick Berlack Israels LLP**
One Financial Center
Boston, Massachusetts 02111
Tel.: 617-856-8247
Fax: 617-856-8201

### CERTIFICATE OF SERVICE

I, Wayne F. Dennison, hereby certify that I have this day served a copy of the foregoing document by hand to:

Neil T. Smith
Goodwin Procter LLP
Exchange Place
Boston, MA 02109

Wayne F. Dennison

# 1407291 v1 - denniswf - 014663/0109