UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
───────────────────────────    )
                               )
BLUE HILLS OFFICE PARK LLC      )
                               )
    Plaintiff,                  )
    Defendant-in-Counterclaim,  )
                               )
         v.                     )    CIVIL ACTION
                               )    NO. 05-10506-WGY
J.P. MORGAN CHASE BANK, as      )
Trustee for the Registered      )
Holders of Credit Suisse First  )
Boston Mortgage Securities      )
Corp., Commercial Mortgage      )
Pass-Through Certificates,      )
Series 1999-C1,                 )
                               )
    Defendant,                  )
                               )
and CSFB 1999-C1 Royall         )
Street, LLC,                    )
                               )
    Defendant,                  )
    Plaintiff-in-Counterclaim   )
                               )
and  WILLIAM LANGELIER and      )
GERALD FINEBERG,                )
                               )
    Defendants-in-Counterclaim. )
───────────────────────────    )
```

MEMORANDUM

YOUNG, D.J.                                      March 14, 2007

After a nine-day jury-waived trial, this Court entered its

findings of fact and rulings of law from the bench immediately

following closing arguments.  An appropriate regard for the

requirements of Federal Rule of Civil Procedure 52(a) requires

this more extensive memorandum.  This high stakes, winner-takes-all, quintessentially complex commercial case involves a $33 million dollar nonrecourse loan, multiple sophisticated parties, and an abundance of loan documents.  The plaintiff, Blue Hills Office Park LLC ("Blue Hills"), alleges that the defendants, Credit Suisse First Boston Mortgage Capital LLC ("Credit Suisse"), J.P. Morgan Chase Bank, as Trustee for the Registered Holders of Credit Suisse Bank First Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 1991-C1 ("J.P. Morgan"), and CSFB 1999-C1 Royall Street, LLC ("CSFB") (collectively, the "Lender") breached the loan contract, breached the implied covenant of good faith and fair dealing, and violated Massachusetts General Laws chapter 93A.  Were Blue Hills to succeed on any one of these claims, it would raise the probability that it could deflect the Lender's counterclaims.  The Lender defended against the Blue Hills' barrage by alleging that Blue Hills breached both the loan contract and the implied covenant of good faith and fair dealing.  The Lender then raised the stakes by alleging that Blue Hills and the loan's guarantors, Gerald Fineberg ("Fineberg") and William Langelier ("Langelier") (collectively, the "Guarantors"), made intentional misrepresentations and violated Massachusetts General Laws chapter 93A.  The Lender additionally asserted that the Guarantors breached the guaranty.

## I.    PROCEDURAL BACKGROUND

Blue Hills brought the following claims against J.P. Morgan and CSFB: 1) breach of contract; 2) breach of covenant of good faith and fair dealing; and 3) violations of Massachusetts General Laws chapter 93A.  Second Am. Compl. [Doc. No. 36] at 17-20.  The case came on for a bench trial on September 13, 2006. On the seventh day of trial, at the close of Blue Hills' evidence as to liability, J.P. Morgan and CSFB made an oral motion for a finding in their favor pursuant to Federal Rule of Civil Procedure 52.  Trial Tr. Vol. 7 at 165:21-176:1.  After careful consideration of all the evidence, briefs, and the parties' oral arguments, the Court dismissed all claims brought by Blue Hills. Id. at 176:2-16.  Thereafter, CSFB presented evidence as to liability on all its counterclaim theories.

CSFB alleged that Blue Hills: 1) breached the mortgage contract; 2) breached the case management agreement; and 3) breached the implied covenant of good faith and fair dealing. Answer to Pl.'s Second Am. Compl. and Countercl. [Doc. No. 37] at 20-21.  CSFB also claimed that Blue Hills, Langelier, and Fineberg (collectively, the "Borrowers") made intentional misrepresentations and violated Massachusetts General Laws chapter 93A.  Id. at 21-22.  CSFB further alleged that Langelier and Fineberg breached the guaranty.  Id. at 22.

On the final day of trial, the Court made its findings of fact and rulings of law. Trial Tr. Vol. 9 at 45:3-55:1. The Court denied CSFB's claims of breach of the implied covenant of good faith and fair dealing and intentional misrepresentation. Id. at 45:18-46:22. The Court further found that Blue Hills had breached the mortgage and Langelier and Fineberg had breached the guaranty. Id. at 46:23-51:25. As to the Chapter 93A claim, the Court ruled that CSFB waived the claim and expressed no opinion as to its merits. Id. at 52:4-10. As to interest and attorneys' fees, the Court ruled that the terms of the contract and guaranty governed. Id. at 54:16-55:1.

## II.  FINDINGS OF FACT

In the summer of 1999, Langelier and Fineberg, as trustees of Royall Associates Realty Trust ("Royall Associates"), created Blue Hills as a limited liability company to refinance the mortgage on property located at 150 Royall Street in Canton, Massachusetts ("150 Royall Street"). Joint Pretrial Mem. at 8, 30. Royall Associates is the sole member of Blue Hills. Id. at 29. Langelier has served as president to the Langelier Company, a business that invests in real estate, for 36 years. Trial Tr. Vol. 1 at 27:9-19. Fineberg has approximately 40 years of experience in the real estate business, with substantial experience in acquiring, financing, managing, and selling commercial buildings. Id., Vol. 7 at 101:11-24. Fineberg

4

Management, Inc., a company affiliated with Fineberg, was
retained by Blue Hills to manage the 150 Royall Street property.
Joint Pretrial Mem. at 31.

On or about September 14, 1999, Credit Suisse, a Delaware
limited liability company, loaned Blue Hills, also a Delaware
limited liability company, $33,149,000.00.  Joint Pretrial Mem.
at 29.  The nonrecourse loan[1] was secured by a mortgage on the
real property, 150 Royall Street, and other property, rights and
interests set forth in the mortgage agreement [Trial Ex. 5].  Id.
at 34.  As a precondition to the refinancing, Blue Hills was
formed as a single purpose entity whose sole business was to
acquire and own the 150 Royall Street property.  Id. at 8, 30.
As part of the loan closing, on September 14, 1999, Blue Hills
executed various loan documents including the mortgage agreement,
the mortgage note [Trial Ex. 4], and the cash management
agreement [Trial Ex. 6].  Id. at 30.  That day, Langelier and
Fineberg also executed a guaranty [Trial Ex. 7].  Id. at 30.

Credit Suisse required Blue Hills to deposit substantial
portions of its net cash flow into several sub-accounts
designated for debt service, maintenance, real estate taxes,
insurance, and tenant improvement.  Id. at 2; Cash Management

---

[1] A nonrecourse loan is a "secured loan that allows the
lender to attach only the collateral, not the borrower's personal
assets, if the loan is not repaid."  Black's Law Dictionary 947
(7th ed. 1999).

Agreement at 5-6.  Upon satisfaction of certain conditions precedent, the mortgage agreement permitted Blue Hills to use up to $1,000,000 (in excess of a minimum account balance of $2,750,000) in the reserve accounts for payment of loan principal and interest if the primary tenant vacated the property.  Joint Pretrial Mem. at 2; Mortgage ¶ 6(c)(ix).

On April 20, 2000, all of Credit Suisse's rights, title, interest, and obligations in the loan were assigned to J.P. Morgan, a New York banking corporation.  Joint Pretrial Mem. at 29.  The assignment included a Pooling and Servicing Agreement that made Wells Fargo Commercial Mortgage Servicing ("Wells Fargo") the servicer and LNR Partners, Inc. ("LNR Partners") the special servicer of the loan.  Id. at 31.  Both servicers were agents of J.P. Morgan.  Id.

In April 2003, the owner of 250 Royall Street applied to the Town of Canton Zoning Board of Appeals ("Zoning Board") for a special permit to construct a parking garage.  Id.  The Zoning Board granted the special permit despite Blue Hills' objections. Id.  On or about June 9, 2003, Blue Hills filed an appeal of the Zoning Board's decision in the Massachusetts Superior Court sitting in and for the County of Norfolk, Civ. A. No. 2003-01051 ("Zoning Appeal").  Id. at 32.  On August 5, 2003, without notifying or seeking the consent of the J.P. Morgan, Blue Hills entered into a settlement agreement with the owner of 250 Royall

Street, BlueView Corporate Center LLC, and DST Realty, Inc. ("DST Realty"), an affiliate of Boston Equiserve Limited Partnership ("Equiserve") that intended to purchase 250 Royall Street from BlueView. Joint Pretrial Mem. at 32, 35. Under the terms of the settlement agreement, Blue Hills received $2,000,000 from DST Realty and waived all further rights of appeal from the Zoning Board decision. Id. at 35. On August 8, 2003, the settlement proceeds were wired to a client account at Bernkopf Goodman LLP. Id. at 32. Blue Hills never notified J.P. Morgan of its receipt of the settlement payment or conveyed the payment to J.P. Morgan. Id. at 36.

When the loan was made to Blue Hills, Equiserve occupied approximately 96% of the building on 150 Royall Street. Id. at 30. Equiserve's lease expired on July 31, 2004, though it had an option to extend the lease for an additional five-year term. Id. at 31. In April 2003, Blue Hills became aware of Equiserve's intention to relocate to 250 Royall Street subsequent to the expiration of the lease. Id. On May 14, 2003, Equiserve notified Blue Hills and confirmed its intent not to exercise its option to extend the lease. Id.

As a result, Blue Hills could not obtain from Equiserve all the funds necessary to pay the real estate taxes due on August 2, 2004. Id. at 6. By a letter dated July 16, 2004, Wells Fargo requested that Blue Hills deposit the sum of $158,181.19 to cure

7

the deficiency in its tax funds. Id. at 36-37. On or about August 4, 2004, Blue Hills' chief financial officer, Joseph Donovan ("Donovan"), faxed Wells Fargo a written request seeking disbursements of $412,833.43 from the reserve accounts to pay principal and interest on the loan due for the month of August 2004 and to pay real estate taxes due on August 2, 2004. Id. at 32, 38. As of August 2004, funds deposited in the reserve accounts totaled approximately $4,100,000. Id. at 3. Wells Fargo did not respond to Donovan's letter, but did pay the real estate taxes. Joint Pretrial Mem. at 6. On August 5, 2004, Donovan notified Wells Fargo in writing that Equiserve had vacated the property and no replacement tenant had been found. Id. at 32. Donovan also requested a meeting with Wells Fargo and the special servicer. Id. at 32-33. LNR Partners' asset manager, Job Warshaw ("Warshaw"), notified Blue Hills by fax that the loan servicing had been transferred to LNR Partners. Id. at 33. The same day, Warshaw sent another letter to Blue Hills advising that "we have agreed to discuss the status of your loan. . . ." and affirmed LNR Partners' authority "to meet with Blue Hills to review the status of the [l]oan and any issues arising under [the loan documents]." Id. at 6.

On September 2, 2004, Blue Hills again wrote Wells Fargo requesting a disbursement from the reserve accounts to pay principal and interest for the month of September 2004. Id. at

33.  Joseph Polcari ("Polcari") had replaced Warshaw as asset
manager at LNR Partners on or about September 7, 2004.  Joint
Pretrial Mem. at 33.  In Polcari's September 17, 2004 letter, he
informed Blue Hills that its request for disbursement was denied
due to Blue Hills' default under the mortgage agreement and
mortgage note as of August 2, 2004.  Id. at 33, 38.  LNR Partners
further informed Blue Hills that the mortgage note had been
accelerated and was immediately due and payable.  Id. at 38.  LNR
Partners never requested a meeting or extended the opportunity to
meet with Blue Hills to discuss the loan's status.  Id. at 7.  By
a letter dated October 21, 2004, pursuant to Massachusetts
General Laws chapter 244, sections 14 and 17B, J.P. Morgan
notified Fineberg and Langelier of its intention to foreclose on
the property and of their potential liability under the guaranty
in case of a deficiency in the proceeds of the foreclosure sale.
Id. at 38-39.

On or about November 10, 2004, all of J.P. Morgan's rights,
title, interest, and obligations in the loan were assigned to
CSFB.  Id. at 29.  A foreclosure sale occurred on or about
November 19, 2004.  Id. at 33.  CSFB subsequently sold the
property to One Beacon Insurance Group for $23,000,000 on or
about April 29, 2005.  Id.  By a letter dated April 20, 2005,
counsel for CSFB notified Langelier and Fineberg that CSFB was

9

seeking the full deficiency owed under the loan pursuant the

guaranty.  Id. at 34.  No payment, however, was made.  Id. at 39.

Further factual findings will be set out as necessary to

understand the legal analysis.

**III. APPLYING THE LAW TO THE FACTS**

**A.    Jurisdiction**

This Court has jurisdiction over this action pursuant to 28

U.S.C. § 1332, as the parties are citizens of different states

and the amount in controversy exceeds $75,000.  This Court also

has jurisdiction over CSFB's counterclaim pursuant to 28 U.S.C. §

1367, as the claims arise out of the same transactions and

occurrences asserted in the Second Amended Complaint.

**B.    Blue Hills' Claims**

**1.    Breach of Contract**

This Court construes contract language in its usual and

ordinary sense.[2]  116 Commonwealth Condominium Trust v. Aetna

Cas. & Sur. Co., 433 Mass. 373, 376 (2001).  "The object of the

court is to construe the contract as a whole, in a reasonable and

practical way, consistent with its language, background and

purpose."  USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.

App. Ct. 108, 116 (1989).  Moreover, the Court interprets the

contract as to give it effect as a rational business instrument

─────────────────

[2]  The parties agree that Massachusetts law governs the loan
documents.  Mortgage Note ¶ 17.

10

and in a manner which will carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1995). Thus, the Court "construe[s] the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished." Id. at 190 (quoting Shea v. Bay State Gas Co., 383 Mass. 218, 223 (1981)).

The loan contract here, while complex, is not ambiguous. "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). "However, an ambiguity is not created simply because a controversy exists between the parties, each favoring an interpretation contrary to the other." Id. (quoting Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995)).

Blue Hills contends that the Lender breached the terms bargained for and set out in the contract. While Blue Hills alleged that certain acts of Lender constituted a breach of contract in its second amended complaint, it presented two entirely new arguments during trial. See Trial Tr. Vol. 7 at 148:2-165:21. The Court focuses on the two arguments raised at trial.

Blue Hills' first argument is that, under section 23(1) of the mortgage agreement, the Lender was obliged to afford it a 30-

11

day period to cure its failure to pay the real estate taxes.
Trial Tr. Vol. 7 at 148:21-150:16.  Because Wells Fargo notified
Blue Hills by a letter dated July 16, 2004 that the tax fund sub-
account had inadequate funds to pay the first installment of
taxes for 2004 and requested Blue Hills to pay $158,181.19 within
eleven days, Blue Hills asserts that the Lender breached the
mortgage agreement.  Trial Tr. Vol. 7 at 148-150; July 16, 2004
Letter [Trial Ex. 65].  The Court is not persuaded.

Paragraph 23 of the mortgage agreement is a provision
intended to protect the Lender.  It first defines what happens if
an event of default should occur and then lists what constitutes
an event of default.  As to what happens, paragraph 23 begins by
stating that: "The Debt shall become immediately due and payable
at the option of Mortgagee upon the happening of any one or more
of the following events of default (each an Event of Default)."
Mortgage Agreement ¶ 23.  Then subsections (a) through (p) list
situations that constitute an event of default.  Id.
Specifically, subsection (b) provides that an event of default
occurs "if any of the Taxes or Other Charges are not paid when
the same are due and payable. . . ."  Id. ¶ 23(b).  Subsection
(l) further states that an event of default will occur "if [the]
Mortgagor shall continue to be in default under any term,
covenant, or provision of the Note or any of the other Loan
Documents, beyond applicable cure periods contained in those

12

documents, if any, or, if none, for thirty (30) days after Mortgagor first receives notice of such default." Id. ¶ 23(l).

Blue Hills argues that subsection (l) is a broad notice and cure provision that ought be construed to apply to all that comes before it, thus requiring a 30 day notice and cure period for failure to pay real estate taxes. This contention, however, is incompatible with other contract language and the objectives of the parties. The Court finds persuasive the Lender's position that section 23(l) is a catch-all for other defaults that the Lender had not foreseen or specified in the mortgage agreement. Trial Tr. Vol. 7 at 166:13-167:11. Under the mortgage agreement, a failure to pay taxes under section 23(b) amounted to an immediate default and did not require notice.

Blue Hills' second contention is that the contract was modified as a result of the course of conduct of the parties. Id. at 154:11-15. Paragraph 6(a) of the mortgage agreement originally required Blue Hills to deposit into escrow monthly one-twelfth of the real estate taxes due and one-twelfth of the insurance premium due. Id. at 150:25-153:3; Mortgage Agreement ¶ 6(a). Blue Hills asserts, however, that it was the Lender's obligation to procure the money from Equiserve because over time it was the practice that Equiserve would pay the tax bill on a quarterly basis directly into the clearing account, which would be swept into the Wells Fargo account and used to pay the real

estate tax bill.  Trial Tr. Vol. 7 at 152:7-54:24.  Blue Hills
also argues that the Lender stated in a letter that if Equiserve
was late paying its bills, the Lender would advance the funds and
Blue Hills would pay a $500 late fee.  Id. at 153:4-54:24.  From
this, Blue Hills argues that the manner of making tax payments
was modified to provide for a $500.00 late fee rather than an
event of default.  Id. at 155:10-23.  Thus, Blue Hills concludes,
when the Lender defaulted Blue Hills for failure to pay real
estate taxes due August 2, 2004, the Lender was in breach of the
mortgage agreement.  Id. at 154:5-55:23.

    Blue Hills' second argument fails as well because the only
change in the course of conduct was that the Lender agreed Blue
Hills could pay the taxes later than the loan documents otherwise
required.  It did not become the Lender's obligation to seek
payment from Equiserve.  The July 16, 2004 letter to which Blue
Hills refers was sent from Wells Fargo to Blue Hills, not
Equiserve.  July 16, 2004 Letter.  In that letter, there is no
mention of Equiserve or a modification of contract provisions.
See id.  It merely states that "[f]ailure to remit the shortage
amount within the specified time frame may result in Wells Fargo
Bank advancing corporate funds.  Should this occur, a $500.00 fee
would be assessed to your loan."  Id.

    Donovan, Blue Hill's chief financial officer, testified that
he knew it was Blue Hills' obligation to pay the taxes and that,

14

under its lease agreement with Equiserve, Equiserve was obligated
to Blue Hills for the same.  Trial Tr. Vol. 3 at 42:11-21.
Paragraph 5 of the mortgage agreement states that "[s]ubject to
the provisions of Paragraph 6 hereof and of the Cash Management
Agreement, Mortgagor shall pay all taxes, assessments, water
rates. . . ."  Mortgage Agreement ¶ 5 (emphasis omitted).
According to Donovan's testimony, Equiserve deposited money into
a Blue Hills account called the Lockbox, which would be swept by
Wells Fargo with the funds used to pay the real estate taxes owed
to the Town of Canton.  Trial Tr. Vol. 3 at 42:22-43:1.

Paragraph 6(a) of the mortgage agreement provides that the
"Mortgagor shall pay to Mortgagee on the eleventh day of each
calendar month (a) one-twelfth of the Taxes that Mortgagee
estimates will be payable during the next ensuing (12) months. .
. . "  Mortgage Agreement ¶ 6(a).  Donovan testified that instead
of paying every month, the practice from 1999 through May of 2004
became to deposit sufficient monies in the Lockbox each quarter,
in advance, to allow the taxes to be paid on time.  Trial Tr.
Vol. 3 at 43:17-23.  Even this course of conduct, however, did
not modify the terms set out in paragraph 6 of the mortgage
agreement because paragraph 44, the mortgage agreement's non-
waiver provision, provides in relevant part, as follows:

> The failure of the Mortgagee to insist upon strict
> performance of any term thereof shall not be deemed to be a
> waiver of any term of this Mortgage.  Mortgagor shall not be
> relieved of Mortgagor's obligations hereunder by reason of .

15

> . . (c) any agreement or stipulation by Mortgagee extending
> the time of payment or otherwise modifying or supplementing
> the terms of the Note, this Mortgage or any of the other
> Loan Documents.

Mortgage Agreement ¶ 44.  Therefore, contrary to Blue Hills'

argument, while the parties' conduct altered as to the timing of

the payments into the tax account, nothing modified the contract

with respect to who had the obligation to pay the taxes or to

what constituted an event of default (i.e., failure to pay

taxes).  At all times, Blue Hills had the obligation to pay the

taxes and the failure to do so would result in an event of

default.

   After thorough consideration of all evidence presented by

Blue Hills at trial, the Court concluded that the Lender was not

in breach of the mortgage agreement.  The Court consequently

dismissed Blue Hills' breach of contract claim.

### 2.  Breach of the Covenant of Good Faith and Fair Dealing

   "Every contract implies good faith and fair dealing between

the parties to it."  Anthony's Pier Four, Inc. v. HBC Associates,

411 Mass. 451, 471 (1991) (quoting Kerrigan v. Boston, 361 Mass.

24, 33 (1972)).  This implied covenant of good faith and fair

dealing provides "that neither party shall do anything which will

have the effect of destroying or injuring the right of the other

party to receive the fruits of the contract."  Druker v. Roland

16

Wm. Jutras Assocs., 370 Mass 383, 385 (1976) (quoting Uproar Co.
v. National Broad. Co., 81 F.2d 373, 377 (1st Cir. 1936)).

    This Court, however, has noted that "while every breach of
contract has the 'effect of destroying or injuring the rights of
the other party to receive [its] fruit,' not every breach of
contract is a breach of the implied covenant of good faith and
fair dealing." Christensen v. Kingston Sch. Comm., 360 F. Supp.
2d 212, 226 (D. Mass. 2005) (quoting Anthony's Pier Four, 411
Mass. at 471). The latter breach requires "conduct taken in bad
faith either to deprive a party of the fruits of labor already
substantially earned or unfair leveraging of the contract terms
to secure undue economic advantage." Christensen, 360 F. Supp.
2d at 226. "The covenant may not, however, be invoked to create
rights and duties not otherwise provided for in the existing
contractual relationship, as the purpose of the covenant is to
guarantee that the parties remain faithful to the intended and
agreed expectations of the parties in their performance." Uno
Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385
(2004).

    Blue Hills asserts that the Lender breached the covenant of
good faith and fair dealing implied in the agreement when, in bad
faith, it ignored Blue Hills' disbursement request. This
allegedly denied Blue Hills access to the reserve account and
wrongfully placed Blue Hills in default in order to acquire the

real property and building located at 150 Royall Street at a
bargain price.  Mem. on Implied Covenant of Good Faith and Fair
Dealing [Doc. No. 153] at 1-2.  Blue Hills, however, has not
pointed to a single provision in the loan documents that would
entitle it to apply reserve account funds to the payment of real
estate taxes.  Blue Hills has also not produced any evidence that
there was a course of conduct in which the Lender permitted Blue
Hills to pay the property taxes with monies from the reserve
account.  In fact, prior to August 2, 2004, Blue Hills had always
made its property tax, principal, interest, and escrow payments
on time.  Moreover, Blue Hills' request was not timely.  Blue
Hills admits that its request for access to the loan reserves to
pay taxes was at least a day late.  Id. at 10.

In order to have accessed the reserve accounts to pay
principal and interest, Blue Hills was required to meet certain
conditions precedent.  Paragraph 6(c)(ix) of the mortgage
agreement provides in relevant part, the following:

> From time to time (but no more frequently than once in any
> thirty (30) day period), from and after the first time when
> the aggregate amount on deposit in the Leasing Escrow Funds
> equals or exceeds $2,750,000 Mortgagee shall disburse to
> Mortgagor from the Leasing Escrow Funds amounts aggregating
> up to the Interim Reduction Amount (as hereinafter defined),
> for application solely toward payment of principal and
> interest then due and payable on the Note, *upon the
> satisfaction of the following conditions precedent* . . . .

Mortgage Agreement ¶ 6(c)(ix) (emphasis added).  Subsection
6(c)(ix)(b) of the mortgage agreement, one of the many conditions

18

precedent, provides: "no Event of Default hereunder shall have occurred and be continuing as of the date of the request for such disbursement and on the Interim Reduction Date." Id. Therefore, in order to access the reserve account to pay principal and interest, Blue Hills could not be in default.

When Blue Hills made its requests for disbursements on or about August 4, 2004 and September 2, 2004, however, it was already in default. Paragraph 23 of the mortgage agreement provides that "[t]he Debt shall become immediately due and payable at the option of the Mortgagee upon the happening of any one or more of the following events of default (each an "Event of Default")" and under paragraph 23(b) an event of default occurs "if any of the Taxes of Other Charges are not paid when the same are due and payable (unless sums equaling the amount of Taxes and Other Charges then due and payable have been delivered to Mortgagee in accordance with Paragraph 6 hereof)." Id. ¶ 23. Therefore, when Blue Hills failed to pay the real estate taxes due on August 2, 2004, it defaulted. Consequently, Blue Hills failed to meet the preconditions required to access the reserve accounts and was not entitled to access the reserve accounts to pay principal and interest due on the loan. Because Blue Hills did not have the right to receive what it alleges to be the fruit of its contract, the Lender did not destroy or injure this illusory right.

Blue Hills argues broadly, in the alternative, that the Lender attempted to frustrate Blue Hills' legitimate aims and actions by refusing its requests for a meeting and cooperation. Trial Tr. Vol. 7 at 160:12-165:21. Should any express contract provision conflict with this claim, Blue Hills argues that the implied duty of good faith can override the express contractual terms. For support, Blue Hills cites K.M.C. Co., Inc. v. Irving Trust Co., 757 F.2d 752 (6th Cir. 1985), a case involving a grocery store that had a revolving credit agreement with a lender in which the maximum loan amount was $3,500,000. Id. at 754 The lender subsequently denied the grocery store's request for $800,000 and, without operating capital, the grocery store business collapsed. Id. The Court in K.M.C. Co., Inc. held that, based on the evidence presented, although the lender had the right to curtail financing under the agreement, the obligation to act in good faith required a period of notice to the grocery store to provide a reasonable opportunity to seek alternate financing. Id. at 759. The Sixth Circuit reasoned that otherwise the contract would be illusory placing one party entirely at the mercy of the other. See id.

K.M.C. is not on point. Blue Hills did not have a long-term revolving credit agreement with the Lender. Blue Hills borrowed a one-time sum of $33,149,000. Blue Hills was required to make tax, principal, and interest payments and had consistently done

20

so until it failed to make a tax payment on August 2, 2004.  It
was not unreasonable for the Lender to decline to meet or
cooperate with Blue Hills subsequent to its default.  The Court
finds no merit in Blue Hills' argument.  "The covenant of good
faith and fair dealing shall not substitute for its failure to
negotiate those terms."  <u>Uno Rests., Inc.</u>, 441 Mass. at 389.
Moreover, the Lender did not attempt to use its contractual
rights as leverage to obtain some advantage to which the Lender
was not entitled to under the loan documents.

Accordingly, the Court dismissed Blue Hills' claim for
breach of the covenant of good faith and fair dealing.

### 3.    Massachusetts Consumer Protection Act

Finally, Blue Hills contends that the Lender's actions
constitute a breach of Massachusetts General Laws chapter 93A
which prohibits unfair and deceptive business practices.  Second
Am. Compl. ¶¶ 100-03.  Pursuant to section 11 of Chapter 93A, a
business may recover if it suffers "any loss of money or
property, real or personal, as a result of the use or employment
by another person who engages in any trade or commerce of an
unfair method of competition or an unfair or deceptive act or
practice. . . ."  Mass. Gen. Laws. ch. 93A, § 11.  "A practice is
unfair if it is 'within . . . the penumbra of some common-law,
statutory, or other established concept of unfairness; . . . is
immoral, unethical, oppressive, or unscrupulous. . . ."  <u>Linkage</u>

21

Corp. v. Trustees of Boston Univ., 425 Mass. 1, 27 (quoting PMP
Assocs., Inc. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975)).

The Supreme Judicial Court has said that "conduct 'in
disregard of known contractual arrangements' and intended to
secure benefits for the breaching party constitutes an unfair act
or practice for [Chapter] 93A purposes." Anthony's Pier Four,
Inc., 411 Mass. at 474 (quoting Wang Labs., Inc. v. Business
Incentives, Inc., 398 Mass. 854, 857 (1986)).  Blue Hills thus
argues that the Lender acted in an unfair and deceptive manner
when it disregarded known contractual arrangements in order to
harm Blue Hills.  Second Am. Compl. ¶¶ 100-03.  The Court's
previous findings and rulings, however, have left Blue Hills
bereft of support for this argument.  Blue Hills has not
presented persuasive evidence of any contractual arrangements
disregarded or breached by the Lender.  Accordingly, Blue Hills'
Chapter 93A claim was dismissed.

### 1. The Lender's Counterclaims

#### 1. Breach of Contract

Though the loan was generally nonrecourse, the Lender
contends that when Blue Hills acted in violation of certain
provisions of the loan documents, Blue Hills became liable for
the full amount of the loan deficiency, a total of $10,770,000
million subsequent to foreclosure and sale.  CSFB Mem. in Supp.
of Mot. for Summ. J. [Doc. No. 87] at 2.  Specifically, the

Lender argues that when Blue Hills transferred parts of the
Mortgage Property without the prior written consent of the
Lender, it breached the mortgage agreement and became liable for
the deficiency.  Id.

A recitation of the pertinent facts is appropriate.  In
April 2003, the owner of 250 Royall Street applied to the Zoning
Board for a special permit to construct a parking garage and,
despite Blue Hills' objection, it was granted.  Joint Pretrial
Mem. at 31.  On or about June 9, 2003, Blue Hills filed an appeal
of the Zoning Board's decision.  Id. at 32.  On August 5, 2003,
without notifying the Lender, Blue Hills entered into a
settlement agreement with BlueView, the owner of 250 Royall
Street, and with DST Realty, an affiliate of Equiserve that
intended to purchase 250 Royall Street from BlueView.  Id. at 32,
35.  Under the terms of the settlement agreement, Blue Hills
received $2,000,000 from DST Realty and waived all further rights
of appeal of the Zoning Board decision.  Id. at 32, 35-36.

"[W]here sophisticated parties choose to embody their
agreement in a carefully crafted document, they are entitled to
and should be held to the language they chose." Anderson St.
Assocs. v. City of Boston, 442 Mass. 812, 819 (2004).  "It is no
appropriate part of judicial business to rewrite contacts freely
entered into between sophisticated business entities." Mathewson
Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 856 (1st Cir.

1987) (quoting <u>RCI Northeast Servs. Div.</u> v. <u>Boston Edison Co.</u>, 822 F.2d 199, 205 (1st Cir. 1987)).

Blue Hills does not dispute that a transfer of mortgaged property without prior written consent of the Lender is prohibited under the mortgage and would constitute an event of default and trigger full recourse liability. Paragraph 10(a) of the mortgage agreement, titled "Transfer or Encumbrance of the Mortgaged Property," states in part:

> Mortgagor shall not, without the prior written consent of Mortgagee or as otherwise expressly provided herein or in the other Loan Documents, sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Mortgaged Property or any part thereof, or permit the Mortgaged Property or any part thereof to be sold, conveyed, alienated, mortgaged, encumbered, pledged or otherwise transferred.

Mortgage Agreement ¶ 10(a). Subsection 23(d) states the following to be an event of default: "if Mortgagor transfers or encumbers any portion of the Mortgaged Property without Mortgagee's prior written consent, other than in accordance with Paragraph 10 hereof." <u>Id.</u> ¶ 23(d). Paragraph 13 of the mortgage note states that "the Debt shall be fully recourse to Maker in the event that . . . iv) Maker fails to obtain Payee's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by [paragraph] 10 of the Mortgage. . . ." Mortgage Note ¶ 13 (emphasis omitted).

24

The first determination required is whether any mortgaged property existed in the Zoning Appeal settlement process. Granting Clause Seven of the mortgage agreement states, in relevant part, that the mortgaged property comprises: "[C]auses of action that now or hereafter relate to, are derived from or are used in connection with the Mortgaged Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon. . . ." Mortgage Agreement at 3.

Blue Hills contends that "mortgaged property," in paragraph 10(a) of the mortgage agreement, refers only to real estate and limits the broad, express definitions found in the granting clauses earlier in the mortgage. Trial Tr. Vol. 9 at 28:7-30:25. Blue Hills relies on paragraph 50 of the mortgage agreement when arguing that the phrase "mortgaged property" can have different meanings in context of various sections. Id. at 28:15-24. On the contrary, paragraph 50 states, in part, that "[u]nless the context clearly indicates a contrary intent or unless otherwise specifically provided herein . . . the words 'Mortgaged Property' shall include any portion of the Mortgaged Property and any interest therein. . . ." Mortgage Agreement ¶ 50. It is not specifically provided that the words "mortgaged property" in paragraph 10(a) ought only refer to real estate. The context indicates the opposite.

25

Blue Hills asserts that the Lender's assumption that the language "Mortgaged Property or any interest therein," Mortgage Note ¶ 13, includes assets described in granting clause eight and three is belied by the first two sentences in subsection 10(a)[3] and by subsection 10(b), which goes into greater detail the types of sales, transfers, and conveyances covered. <u>See</u> Trial Tr. Vol. 9 at 28:25-31:23. Blue Hills, however, has not cited to a single case that supports limiting the broad express definition to real property alone.

The Court concludes that the express definition of mortgaged property found in the mortgage agreement's granting clauses hold as to paragraph 10(a). The commercial reason is clear. As drafted, the loan was nonrecourse except under limited circumstances; therefore, the Lender looks entirely to the value of the mortgaged property for security. Merely to protect the real property from transfer would be unreasonable and unpractical. The first two sentences in paragraph 10(a) are intended to maintain the value of the mortgaged property – as

---

[3] "Mortgagor acknowledges that Mortgagee has examined and relied on the creditworthiness and experience of Mortgagor in owning and operating properties such as the Mortgaged property in agreeing to make the Loan, and that Mortgagee will continue to rely on Mortgagor's ownership of the Mortgaged Property as a means of maintaining the value of the Mortgaged Property as security for repayment of the Debt. Mortgagor acknowledges that Mortgagee has a valid interest in maintaining the value of the Mortgaged Property so as to ensure that, should Mortgagor default in the repayment of the Debt, Mortgagee can recover the Debt by a sale of the Mortgaged Property." Mortgage Agreement ¶ 10(a).

defined by the first three pages of the mortgage – as security
for the repayment of the debt, which is crucial in the context of
a nonrecourse loan because the mortgaged property is the only
source of repayment in most default situations.  Mortgage
Agreement ¶ 10(a).  Paragraph 10(b) addressed some indirect
transfers and it, along with all subsections in paragraph 10,
does not purport to be exclusive.  See id.

Thus, the Court finds and rules that the Zoning Appeal was
included in the mortgaged property.  The Zoning Appeal is a cause
of action related to, derived from, and used in connection with
the mortgaged property.  Blue Hills' standing to bring the Zoning
Appeal derived from its ownership of the mortgaged property.[4]
The basis of Blue Hills' Zoning Appeal was that the proposed
parking structure would be "a detriment to" the mortgaged
property because it would be "immediately in the sight line of
[the] Property, will partially block its view and will be
detrimental and offensive to [Blue Hills] and the inhabitants of

---

[4] Under Massachusetts General Laws chapter 40A, section 17,
only a "person aggrieved" may appeal the grant of a special
permit.  Mass. Gen. Laws. ch. 40A § 17.  A "party in interest,"
defined as "the petitioner, abutters, owners of land directly
opposite on any public or private street or way, and [certain]
abutters to the abutters," is presumed to be a "person
aggrieved."  Id. § 11; Marinelli v. Board of Appeals of
Stoughton, 440 Mass. 255, 257 (2003).  Blue Hills based its
standing to bring the Zoning Appeal based on its status as a
"party-in-interest" and stated it had "standing to bring this
action as its property abuts the BlueView Property."  Blue Hills
Zoning Appeal Compl. ¶¶ 42-43 [Trial Ex. 21].

[Blue Hills'] Property." Defs.' and Pls.-in-Countercl.'s Resp. to Rule 56.1 Statement of Undisputed Facts [Doc. No. 108] ("Defs. 56.1 Resp.") ¶ 56; Blue Hills Zoning Appeal Compl. ¶¶ 37-38. Moreover, because Blue Hills was cognizant of Equiserve's intention to vacate its property and purchase the 250 Royall Street property, its appeal of the zoning decision was a strategy to keep its sole tenant and to maintain its cash flow and ability to service the debt. See Defs. 56.1 Resp. ¶ 56; Blue Hills Opp'n to CSFB's Mot. for Summ. J. [Doc. No. 96] at 3-4.

The Court also concludes that the $2,000,000 Blue Hills received as a settlement payment is part of the Mortgage Property pursuant to both Granting Clause Eight and Granting Clause Three. Granting Clause Eight states: "All proceeds, products, offspring, rents and profits from any of the foregoing [which includes the intangibles stated in granting clause seven], including, without limitation, those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing," are also mortgaged property. Mortgage Agreement at 3. Thus, the settlement payment represents "proceeds" of the Zoning Appeal under granting clause eight. See In re Gilley, 236 B.R. 448, 452-53 (Bankr. M.D. Fla. 1999) (proceeds of debtor's settlement for a claim for damage to property constitutes "proceeds of the claim").

28

Granting Clause Three states in pertinent parts, that the following are part of the mortgaged property: "Awards or payments, including interest thereon, that may heretofore and hereafter be made with respect to the Premises and the Improvements . . . for a change of grade, or for any other injury to or decrease in the value of the Premises and Improvements." Mortgage Agreement at 2. The settlement payment was made for an injury to or decrease in value of the mortgaged property. The payment was made in exchange, in part, for Blue Hills' agreement to relinquish its cause of action – the basis of which was damage to the mortgaged property. Settlement Agreement ¶ 8(J) [Trial Ex. 24] ("For so long as this Agreement remains in force and effect, no further action shall be taken in the Appeal by any of the parties. . . ."). With the Zoning Appeal settled, the garage would be built and Equiserve would vacate Blue Hills' property. See Blue Hills Opp'n to CSFB's Mot. for Summ. J. at 4.

The next inquiry is whether Blue Hills transferred mortgaged property in violation of the parties' agreement. Blue Hills never notified the Lender of its receipt of the settlement payment. Joint Pretrial Mem. at 36. Then, on August 8, 2004, the settlement payment was wired to a client's fund account at Bernkopf Goodman LLP. Id. at 32. Gilbert Stone, Blue Hills' in-house accountant whose responsibilities included recording all receipts for Blue Hills, testified that the settlement payment

did not pass through any Blue Hills bank account and was never recorded on any financial statements provided to Lender. Trial Tr. Vol. 8 at 11:9-12:1; December 31, 2003 Financial Statement [Trial Ex. 30]; Defs. 56.1 Resp. § 62. Instead, the settlement proceeds were reflected on Blue Hill's December 31, 2003 compiled financial statements as a reduction in basis of the Property; they were not reported as income. Defs. 56.1 Resp. ¶ 62.

David Andelman, an attorney who provided legal advice to Royall Associates, testified that the transfer was accounted for by Blue Hills as a transfer to Royall Associates, as evidenced by an increase in the "Due from Affiliate" line on Blue Hills' December 31, 2003 balance sheet. Trial Tr. Vol. 8 at 49:7-51:9; see also December 31, 2003 Financial Statement. Blue Hills concedes that it did not seek the Lender's consent prior to transferring the money. Then, pursuant to an agreement between the beneficiaries of Royall Associates entered into on December 31, 2004, the settlement proceeds were transferred again. See December 31, 2004 Agreement [Trial Ex. 26]. This agreement, to which Blue Hills was not a party, split the settlement proceeds between the "Fineberg Beneficiaries" and the "Langelier Beneficiaries." Id. at 2. The Court therefore holds that as of August 8, 2004, Blue Hills was in breach of section 10 of the mortgage agreement and became liable for the full amount of the loan deficiency.

The Court further concludes the Blue Hills was in breach of the contract when, on August 19, 2004, it sold 1,000 workstations without the Lender's consent to D. Erwin & Associates LLC for $100,000.  The workstations were mortgaged property pursuant to Granting Clause Two, which includes "[a]ll machinery, furniture, furnishings, equipment . . . now or hereafter located upon the Premises and the Improvements, or appurtenant thereto, and usable in connection with the present or future operation, enjoyment and occupancy of the Premises and the Improvements."  Mortgage Agreement at 2.  Dorothy Erwin, the owner of D. Erwin & Associates LLC, testified that the workstations were in very good condition[5] and "totally reusable."  Trial Tr. Vol. 8 at 34:12-22.

### 2. Breach of Guaranty

When determining whether Fineberg and Langelier are personally liable for the full amount of the debt under the guaranty, the plain language of the contract governs.  "A guaranty is a contract 'like all other contracts.'"  Federal Fin. Co. v. Savage, 431 Mass. 814, 817 (2000) (quoting Merchants Nat'l Bank v. Stone, 296 Mass. 243, 250 (1936)).  "When the words of the guaranty 'are clear[,] they alone determine the meaning.'"

---

[5] The meaning of "very good" in the office furniture liquidation industry is that on a scale of one to ten, ten being excellent, Blue Hills' workstations were at eight or nine because they had no dents or tears.  Trial Tr. Vol. 8 at 34:12-24.

Id. (quoting Merrimack Valley Nat'l Bank v. Baird, 372 Mass. 721, 723 (1977)).

The second paragraph of section 1.2 of the guaranty states that the "[g]uarantor shall be liable for the full amount of the Debt in the event [the]. . . (D) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Mortgaged Property or any interest therein if required by Section 10 of the Mortgage." Guaranty § 1.2(ii)(D) (emphasis omitted). The Guarantors, however, assert that the initial paragraph in section 1.2 provides for limited liability in the occurrence of certain events.[6] These events are listed in subparagraphs (a) through (g). Id. at 1-2. The Guarantors contend that, if anything, their acts fell within those subparagraphs, triggering only limited liability, and are not within the bounds of subparagraph (ii)(D). The Court, however, concluded that the Guarantors' act falls within the ambit of the latter.

The Guarantors next argue that the limited liability of the initial paragraph necessarily applies to the second paragraph, including subparagraph (ii)(D), because the acts triggering limited liability, such as misconduct, fraud, intentional

---

[6] It states in relevant part, the following: "[A]ny loss, damage, cost, expense, liability, claim or other obligation incurred by Lender, including attorneys' fees and costs reasonably incurred . . . " Guaranty § 1.2.

physical waste, or removal or disposal of mortgaged property
after default, are more egregious misconduct than what occurred
here.  While the Court agrees that the misconduct described in
subsection (a) through (g) is more severe than the conduct at
issue here, the Court does not accept the Guarantors'
interpretation of the guaranty.

Considering the commercial context, the initial paragraph
must be reasonably construed not to import the limitations on
damages into the second full paragraph, which includes
subparagraph (ii)(D).  The guaranty makes very clear in the
second paragraph of section 1.2 that the "Guarantor shall be
liable for the full amount of the Debt" in certain events
described in subparagraph (A) through (E).  Id.  The occurrences
of the events described, by the express terms of the guaranty,
trigger full liability for the guarantor.

This interpretation of the second paragraph is consistent
with the limited recovery stated in the first paragraph of
section 1.2, including subsections (a) through (g), because the
misconduct described, though more severe, was negotiated in part
by the Lender to create restrictions severe enough adequately to
protect it from the risk of misconduct and in part by the
Guarantors to protect against claims of the nature described.
Subsection (ii)(D) of the second paragraph is intended to protect
the Lender, through the sanction of personal liability, from the

risk of the Guarantors assigning, transferring, or conveying the
mortgaged property.  As mentioned above, as a nonrecourse loan,
the Lender generally could look only to the mortgaged property
for the repayment of the loan.  The second full paragraph,
including subparagraph (ii)(D), provides an incentive for the
Guarantors to repay the loan, maintain the value of the
collateral, and seek the consent of the Lender prior to
interfering with the mortgaged property.

The Court holds that, because Blue Hills failed to obtain
written consent for the settlement proceeds transfer, it violated
subparagraph (ii)(D) of the guaranty.  Accordingly, Fineberg and
Langelier are jointly and severally liable in their individual
capacities under the guaranty for the full amount of the
deficiency once the $2,000,000, which is money owned by Blue
Hills, is subtracted and applied to the deficiency.

The Court further determines that Blue Hills failed to
maintain its status as a single purpose entity in violation of
the guaranty.  Blue Hills cannot use the fact that it was
disregarded for tax purposes to collapse the LLC into its members
for all purposes.  See In re KRSM Props., LLC, 318 B.R. 712, 719
(9th Cir. 2004)("A tax election to have an LLC disregarded as a
taxable entity has no effect on the legal status of ownership of
LLC assets.").  As a precondition to receiving the loan, Blue
Hills was required to be formed as a single purpose entity to

34

serve as the borrower.  The Lender required this provision
because Blue Hills would then possess a separate legal existence,
thereby diminishing the risk that its assets could be claimed by
the creditors of its affiliates.

The second paragraph of section 1.2 unambiguously states
that the "[g]uarantor shall be liable for the full amount of the
Debt in the event that . . . B) Borrower fails to maintain its
status as a single purpose entity, as required by, and in
accordance with, the Mortgage."  Guaranty § 1.2(ii).  Paragraph
12 of the mortgage agreement provides the covenants to which Blue
Hills agreed concerning its single purpose entity status.
Mortgage Agreement ¶ 12.  Specifically, paragraph 12(l) states:
"Mortgagor will not commingle the funds and other assets of
Mortgagor with those of any affiliate or constituent party, and
Guarantor, or any affiliate of any constituent party of
Guarantor, or any other person."  Id. ¶ 12(l).

Blue Hills, however, transferred the $2,000,000 settlement
payment to an account in the name of "Fineberg Royall Associates"
at Bernkopf Goodman LLP - an account which already held funds
owned by Fineberg and Langelier.  Andrew Cohn ("Cohn"),[7]
Langelier's attorney, testified that Fineberg and Langelier had
the ability to release money from the Royall Associates account,
which included the settlement payment, for whatever purpose they

---

[7] Cohn is a senior partner at WilmerHale.

wished.  Trial Tr. Vol 4 at 44:22-45:13.  In addition, pursuant
to the December 31, 2004 agreement, to which Blue Hills was not a
party, the monies were to "continue to be held of behalf of" the
"Fineberg Beneficiaries" and the "Langelier Beneficiaries."
December 31, 2004 Agreement at 2.  Moreover, according to the
testimony of Cohn, the interest accrued on the settlement payment
has been used to pay for Fineberg and Langelier's legal defense
fees in connection with the claims brought against them
personally.  Trial Tr. Vol 4 at 60:5-20, 64:3-65:22.  Cohn
further testified that the $2,000,000 was split in half on
February 1, 2005.  Id. at 52:21-23.  One half was distributed to
WilmerHale, and the other half stayed with Bernkopf Goodman LLP.
Id. at 52:24-53:3.  This commingling of funds violated section
12(l) of the mortgage agreement.  The Borrowers' conduct also
violates paragraph 12(m) of the mortgage agreement, which states:
"Mortgagor has and will maintain its assets in such a manner that
it will not be costly or difficult to segregate, ascertain or
identify its individual assets from those of any affiliate or
constituent party, any Guarantor, or any affiliate of any
constituent party or Guarantor, or any other person."  Mortgage
Agreement ¶ 12(m).

Blue Hills also violated paragraph 12(r) of the mortgage
agreement, which requires it at all times to have an
participating independent director.  Id. ¶ 12(r).  Section 12(r)

36

states, in relevant part: "Mortgagor shall at all times cause there to be at least one duly appointed member of the board of directors (an "Independent Director"). . . ." Id. (emphasis omitted). Although Cohn and Daniel Frank ("Frank")[8] testified that Susan Daly ("Daly") served as the independent director, it is clear that she did not participate in the management of Blue Hills in that capacity. Trial Tr. Vol. 4 at 120:1-121:16; Trial Tr. Vol. 6 at 131:11-133:9. Frank testified that Daly did not participate in the operation or management of Blue Hills, and had once worked at Bernkopf Goodman as a paralegal or secretary. Trial Tr. Vol. 6 at 131:11-133:9. In particular, Cohn and Frank testified that Daly was not involved in the discussions or decisions concerning the $2,000,000 settlement payment. Trial Tr. Vol. 4 at 120:16-25; Trial Tr. Vol. 6 at 132:17-133:6. All this made it clear to the Court that the Borrowers, in violation of section 12(r) of the mortgage agreement, failed to "cause there to be" an independent director. See Mortgage Agreement ¶ 12(r) Consequently, Blue Hills has failed to maintain its status as a single purpose entity and, as a result, has violated section 1.2 of the guaranty.

### 3. Implied Covenant of Good Faith and Fair Dealing

---

[8] Daniel Frank has been the President of Fineberg Management since 2000.

Applying the same analysis as described above with respect
to Blue Hills' claim, the Court concludes that Blue Hills did not
breach the implied covenant of good faith and fair dealing.  The
Lender argues that because Blue Hills deliberately concealed its
receipt of the $2,000,000 settlement payment, which it
transferred to Royall Associates, it prevented the Lender from
seeking immediate redress under the loan documents.  CSFB Mem. in
Supp. of Mot. for Summ. J. at 15-16.  "Harms suffered in a breach
of the implied covenant of good faith and fair dealing generally
involve deceit or 'unfair subterfuge' and usually are 'compounded
by deceptive or unfair behavior that prevented -- or at a minimum
diverted -- the injured parties from seeking immediate redress.'"
Christensen, 360 F. Supp. 2d at 226 (quoting Boston Pilots v.
Motor Vessel Midnight Gambler and E. Coast Excursions, Inc., 357
F.3d 129, 135 (1st Cir. 2004)).  This Court is not persuaded,
however, that Blue Hills' receipt and transfer of the settlement
payment involved an attempt to defraud or mislead the Lenders.
To the contrary, Blue Hills conducted its business and defended
this case under the erroneous impression that the settlement
proceeds were not subject to the agreement as mortgaged property.

The Borrowers were counseled at every step by their
attorneys.  Specifically, certain attorneys from Bernkopf Goodman
LLP advised the Borrowers how to structure the settlement from
the Zoning Appeal.  Further, a senior attorney from WilmerHale

38

counseled Langelier.  Though the Court does not know what advice
was given, the legal consequences of that settlement structure
now result not only in the disgorgement of the $2,000,000
settlement payment but also subjection of the individual
guarantors to joint and several liability for the full
$10,770,847 amount of the deficiency.

While the mortgage agreement, guaranty, and related
financing documents are involved and complex, they yield readily
enough to a careful reading in light of the parties' legitimate
(and mutual) commercial expectations.  Here, wise counsel would
have explained all the risks involved in so transferring the
settlement funds, counseled against it, and pushed for disclosure
to the Lender.  Alternatively, perhaps the lawyers carefully laid
out the risks and advantages of transferring the settlement funds
and left the clients to make the choices.  Another possibility,
of course, is that the attorneys simply told the clients what
they wanted to hear without full evaluation of the risks.  The
Court expresses no opinion as to which of these various
alternatives (or a combination thereof) actually occurred.  It is
appropriate, however, to express regret over the time, money, and
resources that necessarily have been expended to correct this
faulty settlement structure.

Lawyers must remember that, in the very essence, they are
their clients' teachers -- teachers of the law and how the law is

most likely to be applied to the evidence available.  William G.
Young, Reflections of a Trial Judge 40-45 (MCLE 1998).  Indeed,
this is their primary role in our American system of justice, a
system that vests maximum autonomy in the individual.[9]  In
performing that teaching, professional attorneys constantly
demonstrate a profound respect for the law,[10] and test their own
reasoning against how they expect the matter to be evaluated in
the crucible of actual litigation before a neutral fact-finder.
One of the casualties of our general suppression of the processes
of adjudication,[11] is the rigorous analysis of how things will

---

[9] See Maurice Rosenberg, "The Adversary System and Dispute
Processing in Our Society," ABA Conference on Dispute Resolution
(1983); Roy D. Simon & Murray L. Schwartz, Lawyers and the Legal
Profession (Bobbs Merrill 1979); William G. Young, John R.
Pollets & Christopher Poreda, Evidence, 19 Mass. Prac. Series, 8
(1998) ("Adversary presentation also avoids the need for the
court to maintain a large investigatory apparatus and prevents
the litter of bureaucratic evils that official investigatory
bodies inevitably produce.  Giving the parties control of the
scope and content of the dispute also assures that the court will
not go afield into matters the parties would rather not open to
public gaze.").  This observation is tellingly confirmed by the
Honorable Naoko Sonobe, Assistant Judge, Mubashi Family Court,
Japan in Case Management of Civil Litigation at the United States
District Court for the District of Massachusetts and the Trial
Court of Massachusetts, Superior Court, 1194 Hanei Times, Jan.
15, 2006, at 84-90 (original in Japanese).

[10] But see J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim
Health Care, Inc., 365 F. Supp. 2d 119, 149 n.16 (D. Mass. 2005)
(condemning legal practice that was "too slick by half"); Federal
Refinance Co., Inc. v. Klock, 229 F. Supp. 2d 26, 29 n.2 (D.
Mass. 2002), vacated, 352 F.3d 16 (1st Cir. 2003).

[11] Judith Resnick, Whither and Whether Adjudication, 86 B.U.
L. Rev. 101, 123-139 (forthcoming 2007) (discussing the "wilting
of adjudication"); William G. Young, Vanishing Trials, Vanishing

look at trial in the stark lighting of a courtroom before judge
and jury.  See DeLaventura v. Columbia Acorn Trust, 417 F. Supp.
2d 147, 155, 155 n.8 (D. Mass. 2006) (arguing that once the
prospect of prompt trial is removed, litigation abuse tends to
proliferate).  Here, one is left with the indelible impression
that positions were taken and structures arranged with a view to
salvaging something from a general wreck that would inevitably be
"worked out" rather than scrutinized by the full processes of
careful trial and adjudication.

### 4. Intentional Misrepresentation

The Lender further argues that the Borrowers are liable for
fraud because, with the intent to deceive, Blue Hills and its
principals failed to disclose that it was settling the Zoning
Appeal and transferring $2,000,000 in mortgaged property to
Royall Associates.  CSFB Mem. in Supp. of Mot. for Summ. J. at
16.  A party alleging misrepresentation must prove: 1) the
defendant made a misrepresentation of material fact 2) with
knowledge of its falsity 3) intending to induce the plaintiff to
act upon it and 4) that the plaintiff relied on the

---

Juries, Vanishing Constitution, 40 Suffolk U. L. Rev. 67, 76
(2007) ("[F]or decades, business and insurance interests have
disparaged our civil juries while the courts have failed to
defend the single institution upon which their moral authority
ultimately depends."); William G. Young, An Open Letter to United
States District Judges, The Federal Lawyer 30, 33 (July 2003).
("[O]minously, for the first time in our history, business has a
good chance of opting out of the legal system altogether.").

misrepresentation and suffered harm as a result.  Graphic Arts
Finishers, Inc. v. Boston Redevelopment Auth., 357 Mass. 40, 44
(1970).  Here, the Borrowers were, at a minimum, mistaken about
the settlement proceeds and their status as mortgaged property
under the mortgage agreement.  The Court, however, is not
persuaded that the Borrowers were aware of the falsity of their
material omissions or that the Borrowers intended to induce the
Lender to act thereupon.  To the extent that anything was
withheld from disclosure, the disclosure duty was contractual in
nature (as is the remedy).  Here, there was no affirmative
misrepresentation or affirmative attempt to mislead the Lenders.

**2. Prejudgment Interest**

**1. The Contract Rate Applies**

In a diversity action, state law applies to determine
whether and how much prejudgment interest ought be awarded.
Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc., 246 F.3d 64,
69 (1st Cir. 2001).  Massachusetts law differentiates between two
types of interest: interest settled by the terms of a contract
and interest awarded by law.  Boston Children's Heart Found.,
Inc. v. Nadal-Ginard, 73 F.3d 429, 442 (1st Cir. 1996) (citing
Perkins Sch. for the Blind v. Rate Setting Comm'n, 383 Mass. 825,
835 (1981)).  Interest may be awarded by law when no agreement
for interest has been made by the parties.  Perkins, 383 Mass. at
835.  Pursuant to Massachusetts General Laws chapter 231, section

42

6C, the contract rate supersedes the statutory rate of 12%.[12]
Here, the contract between Blue Hills and the Lender provides for
the calculation of an interest rate.  That rate controls, and the
statutory interest rate is not applicable.  Manganaro Drywall,
Inc. v. Penn-Simon Constr. Co., 357 Mass. 653, 658 (1970) ("Since
there is an express written agreement of the parties, it controls
the matter, and the statutory rate of interest is
inapplicable.").

The contract here provides for interest payments at a
default rate.  Paragraph 1(k) of the mortgage note defines
"Default Rate" as "a rate per annum which is equal to the lesser
of (a) the maximum rate permitted by applicable law, or (b) five
percent (5%) above the Applicable Interest Rate.  Mortgage Note ¶
1(k).  Paragraph 1(c) of the mortgage note defines "Applicable
Interest Rate" as "from the date of this Note through but not
including the Anticipated Repayment Date, the Initial Term
Interest Rate. . . ."  Mortgage Note ¶ 1(c)(a).  Paragraph 1(p)
of the Mortgage Note defines "Initial Term Interest Rate" to be
"a rate of Eight and Forty-Nine One-Hundredths percent (8.49%)
per annum."  Id. ¶ 1(p).  Thus, the default rate is 13.49% (8.49%

---

[12] "In all actions based on contractual obligations, upon a
verdict, finding or order for judgment for pecuniary damages,
interest shall be added by the clerk of the court to the amount
of damages, at the contract rate, if established, or at the rate
of twelve per cent per annum from the date of the breach or
demand."  Mass. Gen. Laws ch. 231, § 6C.

43

+ 5.00%).  Blue Hills does not argue that 13.49% exceeds the rate
permitted by law.  Because the Lender and Blue Hills contracted
to the provision regarding interest at arms' length, the contract
default interest rate of 13.49% ought govern.

The Borrowers, however, raise two arguments to avoid the
contract interest rate.  First, the Borrowers argue that
prejudgment interest is not necessary to make the Lender whole
for its loss of use of money.  For support, they cite Criado v.
IBM Corp., 145 F.3d 437 (1st Cir. 1998) and Hogan v. Bangor and
Aroostook R.R. Co., 61 F.3d 1034 (1st Cir. 1995).  In both cases,
the First Circuit held that the district court did not abuse its
discretion when declining to award prejudgment interest because
the large award of damages made the plaintiff whole.  The two
cases, however, involved violations of the Americans with
Disabilities Act and not contract provisions establishing
interest rates.

"The evident thrust of [Massachusetts General Laws chapter
231, section 6C] is to compensate a contract claimant for the
deprivation of amounts due under a contract from the time they
were payable to the time at which judgment is entered."  Liberty
Mut. Ins. Co. v. Greenwich Ins. Co., 417 F.3d 193, 201 (1st Cir.
2005).  Contrary to the Borrowers' assertion, awarding
prejudgment interest will not constitute a windfall because it
directly compensates the Lender for being deprived of its

44

contractual right to possess and use the loan deficiency upon
default.  See id. at 201.

Second, the Borrowers argue that the Lender must establish
that, because of the breach, it was entitled to access particular
funds on a particular date.  For support, the Borrowers cite
Sterilite Corp. v. Continental Cas. Co., 397 Mass. 837, 842
(1986) (concluding that prejudgment interest under Massachusetts
General Laws Chapter 231, section 6C ought be calculated from the
various dates that Sterilite paid its legal bills and was
deprived of the use of its money).  Sterlite is distinguishable
on the ground that, in that case, the insurance contract did not
provide for interest payments upon default.  This Court found the
Borrowers' argument to be without merit because the Lender was
contractually entitled to access the full amount of the debt when
Blue Hills breached the contract.

## 2. Date of Accrual

Massachusetts General Laws chapter 231, section 6C provides
that prejudgment interest will be added from the date of the
"breach or demand."  Mass. Gen. Laws ch. 231, § 6C.  On August 8,
2003, when Blue Hills transferred the settlement proceeds to
Royall Associates, it engaged in conduct that constituted a
breach of contract and an event of default that triggered the
default rate of 13.49%.

45

The Borrowers, however, contend that prejudgment interest should not accrue prior to April 20, 2005, the date of the demand letter the Lender sent to Blue Hills, because only then did the Lender serve notice of the obligation and amount due. For support, the Borrowers cite <u>Town of Lexington</u> v. <u>Town of Bedford</u>, 378 Mass. 562, 576 (1979), a case in which the Supreme Judicial Court held that for purposes of Massachusetts General Laws chapter 231, section 6C, the date of the letters of notification the City of Lexington sent to the City of Bedford was the proper date of accrual because the letters informed it of the basis and extent of its obligations, as well as the fact that performance was then due. The City of Lexington had paid pension benefits under General Laws of Massachusetts chapter 32, section 58B and sought to have the City of Bedford reimburse 26.28% of the pension payments. <u>Id.</u> at 564-65. The Borrowers fail to note that the case involved neither a private contract nor a breach.[13] The Court is unpersuaded by the Borrowers' argument; they were placed on notice of their obligations by the terms of the contract.

Paragraph 23 of the mortgage agreement states that "[t]he Debt shall become immediately due and payable at the option of

---

[13] The Supreme Judicial Court concluded that section 6C applied to "all actions of contract" and "[t]his language made no distinction between obligations that derive from an agreement and those imposed by statute." <u>Id.</u> at 576.

46

the Mortgagee upon the happening of any one or more of the
following events of default." Mortgage Agreement ¶ 23.  One such
event is "if Mortgagor transfers or encumbers any portion of the
Mortgaged Property without Mortgagee's prior written consent. . .
." Id. ¶ 23(d).  As a result, on August 8, 2003, the debt became
immediately due at the default rate of 13.49%.  The Court
therefore holds that the contract interest rate runs against Blue
Hills from the time of the contract breach, August 8, 2003.  This
squares with the unambiguous language of the contract.

### 3. Award Amount

The Court accepts the Lender's calculations – the Borrowers
have not provided any alternative calculations – and awards
$4,552,365.47 in prejudgment interest as proper under the
contract terms.

The Lender asserts, and the Borrowers do not dispute, that
the amount noted on the payment statement dated November 11,
2004, was no less than $31,979,793.66 from August 8, 2003 through
August 11, 2004.  Def.'s Mem. re: Prejudgment Interest [Doc. No.
178] at 4.  The Lender calculates the default interest due from
August 8, 2003 through August 11, 2004 to be $4,350,024.78.  Id.
This amount is reached by adding one year at the default rate --
$4,314,074.16[14] -- to 3 days of interest at the per diem default

---

[14] For August 8, 2003 through August 8, 2004, $31,979,793.66
x 0.1349 = $4,314,074.16.

47

rate -- \$35,950.62.[15]  From \$4,350,024.78, the Lender subtracts

the \$2,737,710.18[16] Blue Hills paid in interest during that

period at the Initial Term Interest Rate of 8.49% to equal

\$1,612,314.60.  Id. at 4-5.

After the foreclosure sale on or about November 19, 2004,

the outstanding principal sum totaled \$10,770,847.  Id. at 5.

Blue Hills does not dispute that \$10,770,847 is the deficiency

amount.  The Lender then computes the unpaid interest from

November 20, 2004 through November 22, 2006 to be

\$2,917,082.75.[17]  Def.'s Supplemental Mem. re: Prejudgment

Interest [Doc. No. 179], Ex. A at 1.  This is added to

aforestated \$1,612,314.60 to equal a sum of \$4,531,397.35.

On November 22, 2006, the \$1,000,000 held in escrow by

WilmerHale was paid to the Lender.  Id. at 1.  On November 28,

2006, the \$1,000,000 held in escrow by Bernkopf Goodman LLP was

paid over to the Lender.  Id.  Therefore, from November 23, 2006

---

[15] For August 9, 2004 through August 11, 2004,
\$31,979,793.66 x 0.00037472222 x 3 = \$35,950.62.

[16] For August 8, 2003 through August 8, 2004, \$31,979,793.66
x 0.0849 = \$2,715,084.48 and for August 9, 2004 through August
11, 2004, \$31,979,793.66 x 0.00023583333 x 3 = \$22,625.70.
\$2,715,084.48 + \$22,625.70 = \$2,737,710.18.

[17] For November 20, 2004 through November 19, 2006,
\$10,770,847 x 0.1349 x 2 = \$2,905,974.52 and for November 20,
2006 through November 22, 2006, \$10,770,847 x 0.00037472222 x 3 =
\$12,108.23.  \$2,905,974.52 + \$12,108.23 = \$2,918,082.75.

to November 28, 2006, interest equaled $21,968.12.[18]  This amount is added to $4,531,397.35 to reach the total of $4,552,365.47. Id., Ex. A at 2.

The Lender further requests that per diem prejudgment interest of $3,286.63[19] be added for each day between November 29, 2006 to the date of entry of judgment.  Id.  Because prejudgment interest serves as a means to compensate the Lender for the deprivation of amounts due under a contract from the time they were payable to the time judgment is entered, the Lender's request is allowed.  See Liberty Mutual, 417 F.3d at 201.

### 4. Guarantor Liability

When the Guarantors failed to pay the Lender's demand for the full amount of the loan deficiency, they were in breach of the guaranty and became liable for the full amount of the debt. See Guaranty ¶ 1.5.  The Court agrees with the Lender's contention that the deficiency amount is the difference between the debt and the amount it received at the time of the foreclosure sale.  Def.'s Mem. re: Prejudgment Interest at 5-6. Paragraph 1(j) of the mortgage note defines "Debt" as "collectively, the whole of the outstanding principal sum of this Note, together with all interest accrued and unpaid thereon and

---

[18] For November 23, 2006 through November 28, 2006, $9,770,847 x 0.00037472222 x 6 = $21,968.12.

[19] $8,770,847 x 0.00037472222 = $3,286.63.

all other sums due under the Loan Documents." Mortgage Note ¶ 1(j). As a result, when the Guarantors breached the Guaranty on April 20, 2005, the debt included the default rate interest accrued and unpaid through that date, and the default rate has run on the outstanding $10,770,847 principal sum since April 20, 2005. Accordingly, the Court rules that Langelier and Fineberg are individually liable under the guaranty for the full amount of the deficiency jointly and severally once the $2,000,000, which is owed by Blue Hills, is subtracted and applied to that deficiency.

### 3. Attorneys' Fees

In a diversity action, state law governs the awarding of attorneys' fees. Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 475 (1st Cir. 1988). In Massachusetts, counsel fees can be assessed pursuant to "specific affirmative authority," such as a contract or statute. Id. As a general rule, a litigant must bear his own expenses except insofar as 1) a statute permits awards of costs; 2) a valid contract or stipulation provides for costs; or 3) rules concerning damages permit recovery of costs. Broadhurst v. Director of Div. of Employment Sec., 373 Mass. 720, 721-722 (1977). Here, there is an enforceable contract that provides for attorneys' fees and expenses.

Paragraph 25 of the mortgage agreement provides in part:

> Mortgagee is authorized to . . . appear in, defend, or
> bring any action or proceeding *to protect its interest
> in the Mortgaged Property* or to foreclose this Mortgage
> or collect the Debt, and the cost and expense thereof
> (including reasonable attorneys' fees and disbursements
> to the extent permitted by law), with interest at the
> Default Rate (as defined in the Note) for the period
> after notice from Mortgagee that such cost or expense
> was incurred to the date of payment to Mortgagee, shall
> constitute a portion of the Debt.

Mortgage Agreement ¶ 25 (emphasis added).  Paragraph 26(h), the

default provision in the Mortgage, provides in part:

> All costs and expenses of Mortgagee in exercising the
> rights and remedies under this <u>Paragraph 26</u> (including
> reasonable attorneys' fees and disbursements to the
> extent permitted by law), shall be paid by Mortgagor
> immediately upon notice from Mortgagee, with interest
> at the Default Rate for the period after notice from
> Mortgagee and such costs and expenses shall constitute
> a portion of the Debt and shall be secured by this
> Mortgage.

Mortgage Agreement ¶ 26(h).  These provisions apply to the actual

attorneys' fees and expenses the Lender incurred in pursuing its

counterclaim.  Pursuant to paragraphs 25 and 26, the attorneys'

fees and expenses constitute a portion of the debt.[20]  These

provisions also apply to the fees and expenses incurred in

defending against Blue Hills Office's claims because the Lender

---

[20] Paragraph 25 of the mortgage agreement authorizes the
mortgagee to defend "any action or proceeding to protect its
interest in the Mortgaged Property" and provides that the cost
and expense, including attorneys' fees and disbursements will
constitute a portion of the Debt.  Mortgage Agreement ¶ 25.
    More generally, paragraph 1(j) defines Debt as "the whole of
the outstanding principal sum of this Note, together with all
interest accrued and unpaid thereon and all other sums due under
the Loan Documents."  Mortgage Note ¶ 1(j).

was acting to "protect its interest in the Mortgaged Property."
The Borrowers do not dispute this issue.  Accordingly, the Court
holds that the Lender contractually recovers its actual
attorneys' fees.

### a. Guarantor Liability for Attorneys' Fees

"Under Massachusetts law, even if the language of a guaranty
does not call for payment of reasonable attorney's fees, when a
defendant guaranties payment of a debtor's liabilities, and the
debtor's notes provide for payment of reasonable attorneys' fees,
the guarantor must pay the fees.  F.D.I.C. v. Smith  848 F. Supp.
1053, (D. Mass. 1994) (Tauro, J.) (citing New England Merchs.
Nat'l Bank v. Hoss, 356 Mass. 331, 335-36 (1969)).  In New
England Merchants National Bank v. Hoss, the Supreme Judicial
Court held that, although a guaranty did not expressly provide
for attorneys' fees, the guaranty was so extensive in scope that
it covered the attorneys' fees.  356 Mass. at 335-36.

Here, the mortgage note, the mortgage agreement, and the
guaranty provide for attorneys' fees.  The guaranty, in
particular, specifies that the Guarantors are jointly and
severally liable for the amount of the debt, which encompasses
attorneys' fees and expenses.  The last paragraph of section 1.2
of the guaranty provides:

> (ii) Guarantor shall be liable for the full amount of
> the Debt in the event that . . . (D) Borrower fails
> to obtain Lender's prior written consent to any

52

assignment, transfer, or conveyance of the Mortgaged
Property.

Guaranty § 1.2.  Additionally, section 1.8 of the Guaranty

provides that:

> [I]n the event that Guarantor should breach . . . any
> provisions of this Guaranty, Guarantor shall, immediately
> upon the demand by Lender, pay Lender all costs and expenses
> (including court costs and attorneys' fees) incurred by
> Lender in the enforcement hereof or the preservation of
> Lender's rights hereunder.

Guaranty § 1.8.  The Court notes that the Lender's defense

against Blue Hills' claims was necessary to preserve its rights

under the guaranty because Blue Hills intended to establish that

the Lender had breached the loan agreement and that there was no

merit to the counterclaims.  Moreover, the Borrowers do not

dispute the issue of guarantor liability.  Accordingly, this

Court holds that Fineberg and Langelier are jointly and severally

liable for the attorneys' fees and expenses the Lender incurred

defending against Blue Hills' claims and asserting its

counterclaims.

### b. Reasonableness of Attorneys' Fees

The Borrowers dispute the $2,056,566.01 in attorneys' fees

and expenses sought by the Lender.[21]  The Borrowers contend that

---

[21] "The question of what is fair and reasonable compensation
for legal services rendered is one of fact for a trial judge to
decide."  <u>Mulhern</u> v. <u>Roach</u>, 398 Mass. 18, 23 (1986).

the amount sought by the Lender is excessive and unreasonable and urge the Court to award a lower amount.

In <u>First National Bank of Boston</u> v. <u>Brink</u>, 372 Mass. 257, 263-64 (1977), the Supreme Judicial Court "specifically approved the trial court's application, in determining a fee award pursuant to a contractual provision, of the factors set forth in <u>Cummings</u> v. <u>Nat'l Shawmut Bank</u>, 284 Mass. 563 (1934)." <u>Accusoft Corp.</u> v. <u>Palo</u>, 237 F.3d 31, 61 (1st Cir. 2001). These factors include "the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by controversy, and the results secured." <u>Accusoft Corp.</u>, 237 F.3d at 61 (quoting <u>Cummings</u>, 284 Mass. at 569).

The Lender asserts that the rates charged by the law firm it employed, DLA Piper US LLP ("DLA Piper"), were at the standard hourly rates established and charged to clients by the firm for the services of the lawyers participating in this case.[22] Aff. of Ray Dearchs [Doc. No. 166] ¶ 6. The Borrowers do not dispute

---

[22] The attorneys and rates who have been most involved with the case are as follow: E. Randolph Tucker, Partner since 1979 ($590); Bruce E. Falby, Partner since 1983 ($565.00); Bruce S. Barnett, Associate since 2000 ($400.00); Traci S. Feit, Associate since 2004 ($300.00), and Lisa Core, Associate since 2004 ($300). Aff. of Ray Dearchs ¶ 5.

the ability of the attorneys or the price charged for similar services by other attorneys.  Instead, the Borrowers urge the Court to consider such factors as time "blocked billed"[23] by an attorney and tasks listed in the invoices that could have been conducted more efficiently by junior attorneys.  They argue that $1,070,114.20 is unrecoverable.  <u>See</u> Lender's Opp'n Mem. to Mot. for Attys.' Fees [Doc. No. 172] at 18-19.  For support, Blue Hills and the Guarantors cite cases in which courts awarded attorneys' fees to the prevailing party pursuant to statute.

The Borrowers, however, misconceive the situation.  "Where attorney's fees are provided by contract, a trial court does not possess the same degree of equitable discretion to deny such fees as it has applying a statute providing for a discretionary award."  <u>AccuSoft Corp.</u>, 237 F.3d at 61 (quoting parenthetically <u>Cable Marine, Inc.</u> v. <u>M/V Trust Me II</u>, 632 F.2d 1344, 1345 (5th Cir. 1980)).  This Court is mindful that "when a contractual fee

---

[23] The Borrowers cite <u>Ellis</u> v. <u>Varney</u>, No. 9801397, 2005 WL 1009634, *3-*4 (Mass. Super. Mar. 22, 2005) (Fecteau, J.) for the proposition that block billing in increments of 4 hours or more is commercially unreasonable.  Only one other Massachusetts court case mentions block billing, <u>Roberts</u> v. <u>Department of State Police for the Commonwealth</u>, No. 0101877, 2002 WL 31862711 (Mass. Super. Sept. 26, 2002) (Houston, J.).  Neither case involved a contract providing for attorneys' fees.  In <u>Ellis</u>, the Court awarded attorneys' fees to the prevailing plaintiff who brought a claim against officers and directors of a corporation who engaged in self-dealing.  2005 WL 1009634, at *9.  <u>Roberts</u> involved a settlement situation arising from a claim under the Massachusetts Whistleblower Statute in which the partes agreed to payment of attorneys' fees.  2002 WL 31862711, at *1.

provision is included by the parties, the question of what fees are owed 'is ultimately one of contract interpretation,' and our primary obligation is simply to honor the agreement struck by the parties." Id. (quoting MIF Realty, L.P. v Fineberg, 989 F. Supp. 400, 402 (D. Mass. 1998) (Collings, M.J.)).  Because the Borrowers agreed to contract provisions that require the payment of Lender's attorneys' fees in actions to protect its interest in the mortgaged property, they must do so.  The Lender, however, can contractually recover only the actual attorneys' fees it has paid.

### 1. Actual Attorneys' Fees Paid

On December 17, 2006, the Lender filed its response [Doc. No. 187] to an order to produce documents that demonstrate actual attorneys' fees paid [Doc. No. 186].  After careful review of all documents submitted, the Court has determined that the Lender has paid the $2,056,566.01 in attorneys' fees and expenses it requests.  Attached to Joseph Polcari's[24] Affidavit [Doc. No. 189] are copies of documents, including check and wire transfer payments to DLA Piper and expert witnesses.  The Lender also submitted an affidavit from Susan Scheeler [Doc. No. 188], the accounting department collections manager at DLA Piper.  Attached to Susan Scheeler's Affidavit as Exhibit A are ledger detail

---

[24] Polcari is the asset manager for LNR Partners, the special servicer for a pool of loans securing commercial mortgage-backed securities, including the loan to Blue Hills.

printouts from DLA Piper's database showing the dates and amounts of the payments received from the Lender.  Aside from the Lender's payments to expert witnesses, the check and wire transfer payments made by the Lender correspond to DLA Piper's ledger detail printouts.  According to the documents provided by the Lender and DLA Piper, the Lender has made 20 payments to DLA Piper that total more than the $2,056,566.01 requested by the Lender.  Because the Lender has demonstrated that it has paid the amount requested, the Court holds Fineberg and Langelier contractually jointly and severally liable for the $2,056,566.01 owed to the Lender for attorneys' fees and expenses.

## VI. CONCLUSION

This case having come on for bench trial on September 13, 2006, the Court having considered all evidence and arguments presented by the parties and their counsel, the Court made the following rulings as expressed in its final judgment:

1) Judgment for J.P. Morgan and CSFB ought enter on all claims asserted in the Second Amended Complaint by Blue Hills.

- Blue Hills' breach of contract claim was dismissed with prejudice.

- Blue Hills' breach of covenant of good faith and fair dealing claim was dismissed with prejudice.

- Blue Hills' violation of Massachusetts General Laws chapter 39A claim was dismissed with prejudice.

2) On their Counterclaims, J.P. Morgan and CSFB ought have judgment against Blue Hills, Gerald Fineberg, and William Langelier, jointly and severally, and recover:

- $10,770,847.00;

- Accrued contract interest in the amount of $4,552,365.47 through November 28, 2006;

- Additional accrued contract interest in the amount of $3,286.63 per day for each day after November 28, 2006 until the date of judgment; and

- Attorneys' fees and costs in the amount of $2,056,566.01.

3) CSFB and the Trustee ought recover from Blue Hills, Gerald Fineberg, and William Langelier, jointly and severally, post-judgment interest on the total of the amounts set forth in paragraph two above, to the extent unpaid, at the legally applicable rate.

4) On October 13, 2006, the Court ordered that the $2,000,000 held in escrow at the law firms of Wilmer Cutler Pickering Hale and Dorr LLP and Bernkopf Goodman LLP be paid forthwith to the Trustee and CSFB. Pursuant to that order, those monies have since been paid ($1,000,000 on November 22, 2006 and $1,000,000 on November 28, 2006) in partial satisfaction of the amounts set forth in paragraph 2 above.

5) CSFB's breach of implied covenant of good faith and fair dealing claim and intentional misrepresentation claim were dismissed with prejudice. CSFB's claim of violation of

58

Massachusetts General Laws chapter 93A was deemed waived and the Court expressed no opinion on the matter.

/s/ William G. Young

_____
WILLIAM G. YOUNG
DISTRICT JUDGE